# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

MARCUS CASTER, LAKEISHA
CHESTNUT, BOBBY LEE DUBOSE,
BENJAMIN JONES, RODNEY ALLEN
LOVE, MANASSEH POWELL,
RONALD SMITH, and, WENDELL
THOMAS,

     Plaintiffs,

  v.

JOHN H. MERRILL, in his official
capacity as Alabama Secretary of State,

     Defendant.

Case No. 2:21-cv-751-WKW-JTA

RECEIVED
2021 NOV -4  P 2: 04
DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Marcus Caster, LaKeisha Chestnut, Bobby Lee DuBose, Benjamin

Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, and Wendell Thomas

file this Complaint for Declaratory and Injunctive Relief against Defendant John H.

Merrill in his official capacity as the Alabama Secretary of State, and allege as

follows:

  1.  Plaintiffs bring this voting rights action to challenge HB 1 (2021

Second Special Session), which establishes new congressional districts for Alabama

based on the 2020 Census, on the grounds that it violates Section 2 of the Voting

Rights Act, 52 U.S.C. § 10301, because it strategically cracks and packs Alabama's

Black communities, diluting Black voting strength and confining Black voting

power to one majority-Black district.

2.  Between 2010 and 2020, Alabama's Black population grew 6.5 percent. During the same period, the state's white population fell by 1.7 percent, meaning majority-Black Alabamians drove all of Alabama's population growth over the last decade. And yet the state's newly enacted congressional redistricting plan further entrenches the state's white majority by creating only a single majority-Black district in the state, despite Alabama's Black population being sufficiently numerous and geographically compact to support two majority-Black congressional districts. Indeed, while Black Alabamians now compose more than 27 percent of the state's population and nearly 26 percent of the state's voting age population, they have the opportunity to elect a candidate of their choice in just one out of seven districts.

3.  HB 1 is just the most recent enactment in Alabama's long history of discriminatory voting laws. Black Alabamians have long suffered from voting discrimination and vote dilution and as a result have endured systemic neglect of the issues and needs that deeply affect their community.

4.  The state's newly enacted congressional redistricting plan deepens these issues by creating only a single majority-Black district. HB 1 "cracks" Black voters between the First, Second, and Third Congressional Districts, and "packs" Black voters into the Seventh Congressional District ("CD 7") despite—or perhaps because of—the fact that the Black population in these districts is sufficiently

numerous and geographically compact to form a majority of the voting age population in a second district. Additionally, there is widespread racially polarized voting in Alabama, and when considered against the totality of the circumstances, the enacted plan's failure to create two majority-Black districts dilutes the Black vote in violation of Section 2 of the Voting Rights Act.

5.      Accordingly, Plaintiffs seek an order (1) declaring that HB 1 violates Section 2 of the Voting Rights Act; (2) enjoining Defendant from conducting future elections under HB 1; (3) ordering a congressional redistricting plan that includes two majority-Black congressional districts; and (4) providing any such additional relief as is appropriate.

## JURISDICTION AND VENUE

6.      Plaintiffs bring this action under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

7.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the laws of the United States and involve the assertion of deprivation, under color of state law, of rights under federal law.

8.      This Court has personal jurisdiction over Defendant, who is sued in his official capacity and resides within this state, pursuant to Fed. R. Civ. P. 4(k)(1)(A).

9.      Venue is proper because a substantial part of the events that give rise to Plaintiffs' claims have occurred, and will occur, in this District. 28 U.S.C. § 1391(b).

10.     This Court has authority to grant declaratory and injunctive relief under Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

11.     Plaintiffs are citizens of the United States and are registered to vote in Alabama.

12.     Plaintiff Marcus Caster is a Black Citizen of the United States and of the state of Alabama, a registered voter, and a resident of Washington County in the First Congressional District ("CD 1"). CD 1 is a majority-white district in which Black voters like Mr. Caster do not have an opportunity to elect their preferred candidates. An additional majority-Black district could be drawn incorporating all or some of Washington County, including Mr. Caster's residence.

13.     Plaintiff LaKeisha Chestnut is a Black citizen of the United States and of the state of Alabama, a registered voter, and a resident of Mobile County in CD 1 in the enacted plan. CD 1 is a majority-white district in which Black voters like Ms. Chestnut do not have an opportunity to elect their preferred candidates. An additional majority-Black district could be drawn incorporating all or some of Mobile County, including Ms. Chestnut's residence.

14.     Plaintiff Bobby DuBose is a Black citizen of the United States and of the state of Alabama, a registered voter, and a resident of Jefferson County in CD 7 in the enacted plan, in which Black voters like Mr. DuBose are packed, preventing the creation of an additional majority-Black district as required by the Voting Rights Act.

15.     Plaintiff Benjamin Jones is a Black Citizen of the United States and of the state of Alabama, a registered voter, and a resident of Montgomery County in the Second Congressional District ("CD 2"). CD 2 is a majority-white district in which Black voters like Mr. Jones do not have an opportunity to elect their preferred candidates. An additional majority-Black district could be drawn incorporating all or some of Montgomery County, including Mr. Jones's residence.

16.     Plaintiff Rodney Love is a Black citizen of the United States and of the state of Alabama, a registered voter, and a resident of Jefferson County in CD 7 in the enacted plan, in which Black voters like Mr. Love are packed, preventing the creation of an additional majority-Black district as required by the Voting Rights Act.

17.     Plaintiff Manasseh Powell is a Black citizen of the United States and of the state of Alabama, a registered voter, and a resident of Montgomery County in CD 2. CD 2 is a majority-white district in which Black voters like Mr. Powell do not have an opportunity to elect their preferred candidates. An additional majority-

Black district could be drawn incorporating all or some of Montgomery County, including Mr. Powell's residence.

18.     Plaintiff Ronald Smith is a Black citizen of the United States and of the state of Alabama, a registered voter, and a resident of Bullock County in CD 2. CD 2 is a majority-white district in which Black voters like Mr. Smith do not have an opportunity to elect their preferred candidates. An additional majority-Black district could be drawn incorporating all or some of Bullock County, including Mr. Smith's residence.

19.     Plaintiff Wendell Thomas is a Black citizen of the United States and of the state of Alabama, a registered voter, and a resident of Montgomery County in CD 2 in the enacted plan. CD 2 is a majority-white district in which Black voters like Mr. Thomas do not have an opportunity to elect their preferred candidates. An additional majority-Black district could be drawn incorporating all or some of Montgomery County, including Mr. Thomas's residence.

20.     Defendant John H. Merrill is sued in his official capacity as the Secretary of State of Alabama. The Secretary of State is Alabama's chief election officer. Ala. Code § 17-1-3(a). In that capacity, he is responsible for providing uniform guidance for election activities and implementing the state's election laws and regulations, including HB 1. *Id.*

## LEGAL BACKGROUND

21.       Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits

any "standard, practice, or procedure" that "results in a denial or abridgement of the

right of any citizen of the United States to vote on account of race or color[.]" Thus,

in addition to prohibiting practices that deny outright the exercise of the right to vote,

Section 2 prohibits vote dilution. A violation of Section 2 is established if it is shown

that "the political processes leading to nomination or election" in the jurisdiction

"are not equally open to participation by [majority-Black voters] in that its members

have less opportunity than other members of the electorate to participate in the

political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

22.       The dilution of voting strength "may be caused by the dispersal of

[members of a racial or ethnic group] into districts in which they constitute an

ineffective minority of voters or from the concentration of [members of that group]

into districts where they constitute an excessive majority." *Thornburg v. Gingles*,

478 U.S. 30, 46 n.11 (1986).

23.       In *Thornburg v. Gingles*, the United States Supreme Court

identified three necessary preconditions (the "*Gingles* preconditions") for a claim of

vote dilution under Section 2 of the Voting Rights Act: (1) the minority group must

be "sufficiently large and geographically compact to constitute a majority in a single-

member district"; (2) the minority group must be "politically cohesive"; and (3) the

majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50-51.

24.     Once all three preconditions are established, the statute directs courts to consider whether, under the totality of the circumstances, members of a racial group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b). The Senate Report on the 1982 amendments to the Voting Rights Act identifies several non-exclusive factors that courts should consider when determining if, under the totality of the circumstances in a jurisdiction, the operation of the electoral device being challenged results in a violation of Section 2.

25.     These Senate factors include: (1) the history of official voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority-vote requirements, and prohibitions against bullet-voting; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate

effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; and (7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

26.     The Senate Report itself and the cases interpreting it have made clear that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. No. 97-417, at 29 (1982)); *see also id.* at 1566 ("The statute explicitly calls for a 'totality-of-the circumstances' approach and the Senate Report indicates that no particular factor is an indispensable element of a dilution claim.").

## FACTUAL ALLEGATIONS

### A. Alabama's 2021 Redistricting Process

27.     The enacted plan is the product of a muddled and harried process, which left legislators little time to meaningfully consider alternative proposals and necessary redistricting criteria.

28.     On October 26, 2021, two days before the Legislature took up redistricting in a special session, the Alabama Legislative Committee on Reapportionment held a hearing to approve plan proposals to be presented to the full Legislature. Committee members, however, were not sent the proposed plans until the night before the hearing, forcing them to vote and debate maps they had almost

no time to consider.

29.     It quickly became apparent that no committee member understood why the maps were drawn the way they were. The chair of the committee explained that the proposed maps were drawn not by, or in coordination with, committee members but rather were the product of committee staff and the committee's attorney. It was also revealed that the proposed maps were not subjected to functional or racial polarization analyses, tests critical to determining whether a plan complies with Section 2 of the Voting Rights Act.

30.     Many committee members found these substantive and procedural flaws fatal to the committee's work and implored the chair to postpone approval of the maps until members could meaningfully consider the proposals and to allow time to determine whether the maps complied with the Constitution and the Voting Rights Act. Members were emphatic that to do otherwise would make a mockery of the committee's work and leave them unable to intelligently explain the advantages or disadvantages of the ultimately approved proposals to the full legislature.

31.     These objections were overruled or voted down along party lines by the Republican-led committee. In the end, each proposal, including the congressional plan that formed the basis of the enacted map, were approved only by Republican committee members who had fewer than 24 hours to consider the proposals for which they voted.

32.     The Legislature's special session was no less perfunctory. The Legislature began formally considering map proposals on October 28, 2021. By November 1, 2021, the congressional map had passed the House. And by, November 3, 2021, it was approved by the senate. Throughout the session, Democratic legislators criticized the law's passage as irreparably flawed, leaving legislators little time to consider the map and in the dark as to the data and process that led to the map's drawing. Moreover, many legislators lamented the enacted map's failure to create a second majority-Black district and emphasized the state's continued practice of stymying Black representation within the state.

33.     Governor Kay Ivey signed HB 1 into law on November 4, 2021.

**B. The 2021 Congressional Redistricting Plan**

34.     The enacted congressional plan contains only a single majority-Black district—CD 7—despite Black Alabamians composing over 27 percent of the state's population. CD 7 is heavily Black and includes nearly 30% of Alabama's Black population.[1]

35.     Enacted CD 7 includes Jefferson, Tuscaloosa, Pickens, Greene, Sumter, Hale, Perry, Dallas, Montgomery, Lowndes, Wilcox, Marengo, Choctaw,

---

[1] For purposes of this Complaint, "Black" represents any person who selected "Black or African Am." on the Census form, regardless of whether they also selected another race, and regardless of whether they indicated they were of "Hispanic, Latino, or Spanish origin."

and Clarke Counties.

36.     HB 1 "cracks" Black voters in surrounding districts CDs 1, 2, and 3 and "packs" Black voters into CD 7, preventing the emergence of a second congressional district in which Black voters would have an opportunity to elect their candidates of choice.

37.     This is all despite the state's rising Black population. Between 2010 and 2020, Alabama's population increased from 4,779,736 to 5,024,279, a 5.1 percent increase. Thirty-four percent of that population increase is attributable to Black residents.

38.     By combining cracked Black populations in CDs 1, 2, and 3 and unpacking CD 7, the Alabama mapdrawers could have drawn two majority-Black districts, as required by Section 2 of the Voting Rights Act.

39.     Each of the three districts among which the Black population is significantly cracked—CDs 1, 2, and 3—includes at least one significant Black population center in an otherwise overwhelmingly white district. For example, CD 3 contains Macon County, which is home to the historically Black college Tuskegee University and has a Black population of 80.4 percent. Similarly, CD 1 includes Mobile County, which has a Black population of 36.2 percent, and Monroe County, which has a Black population of 41.0 percent. Montgomery County, which has a Black population of 59.3 percent is split between CDs 2 and 7. The Black population

in the eastern portion of Alabama is split in two by the border between CDs 2 and 3.

40.     HB 1's cracking of the state's Black population is exemplified by the splitting of the state's historical Black Belt. Located in the south-central region of Alabama, the Black Belt was originally named for its rich black soil, but over time came to be associated with the slave labor that soil attracted. Today the Black Belt region refers to the state's counties with the largest Black populations. As Booker T. Washington explained in 1901, the Black Belt was "the part of the South where the slaves were most profitable, and consequently they were taken there in the largest numbers."

41.     According to the Center for Business and Economic Research at the University of Alabama, the "traditional counties" of the Alabama Black Belt include Sumter, Choctaw, Greene, Hale, Marengo, Perry, Dallas, Wilcox, Lowndes, Butler, Crenshaw, Montgomery, Macon, Bullock, Pike, Barbour, and Russell Counties. The counties that surround the Black Belt, such as Washington, Mobile, Clarke, Escambia, and Monroe Counties, are also known for their large Black populations.

42.     In HB 1, the Black Belt and its surrounding counties are split among four congressional districts—CDs, 1, 2, 3, and 7.

43.     Rather than crack and pack Black voters in these districts, a second majority-Black district could have been drawn in CD 2 in any number of

configurations. As just one example, CD 2 could be drawn to include all of Montgomery County and to encompass Black Belt counties in the western part of the state, ceding the state's southernmost counties to CD 1. This configuration would have resulted in two majority-Black districts, CDs 2 and 7, while adhering to each of the state's redistricting criteria.

44. Indeed, the Legislature could have reached this result by any number of variations on a similar configuration, suggesting that rather than embrace a natural second majority-Black district, the Legislature worked to avoid one.

## C. Racial Polarization in Alabama

45. Voting in Alabama is racially polarized. Black voters in Alabama are politically cohesive and overwhelmingly support Democratic candidates. The white majority in Alabama is also politically cohesive, overwhelmingly supports Republican candidates, and historically votes as a bloc to defeat Black voters' candidates of choice.

46. The last time voters in CD 1 elected a Black candidate to represent them in Congress, for example, was during Reconstruction. Indeed, while about a quarter of the voting age population in CD 1 is Black, white Republicans have been continuously elected to represent CD 1 since 1965.

47. In 2020, exit polling showed that 89 percent of Black voters in Alabama supported President Biden in the presidential election while 77 percent of

white Alabamians voted for former President Trump.

48.     Federal courts have consistently found that voting in Alabama is
and remains severely racially polarized. In *Buskey v. Oliver*, for example, the U.S.
District Court for the Middle District of Alabama concluded that the City of
Montgomery, which is the county seat of Montgomery County in the Black Belt, is
"a city still polarized by race, with only white council members being elected from
predominantly white council districts and with only black council members being
elected from predominantly black council districts." 565 F. Supp. 1473, 1482 (M.D.
Ala. 1983).

49.     In *United States v. Dallas County Commission*, 739 F.2d 1529,
1536 (11th Cir. 1984), the Eleventh Circuit found that racially polarized voting
existed in Dallas County elections for the period from 1966 through 1978. On
remand, the U.S. District Court for the Southern District of Alabama determined that
voting patterns in Dallas County remained polarized along racial lines between 1978
and 1986. *United States v. Dallas Cty. Comm'n*, 636 F. Supp. 704, 710 (S.D. Ala.
1986).

50.     And in 2011, the Middle District of Alabama recognized "[i]n an
era when the degree of racially polarized voting in the South is increasing, not
decreasing, Alabama remains vulnerable to politicians setting an agenda that
exploits racial differences." *United States v. McGregor*, 824 F. Supp. 2d 1339, 1347

(M.D. Ala. 2011) (internal quotation marks omitted); *see also Dillard v. Baldwin Cnty. Comm'n*, 222 F. Supp. 2d 1283, 1290 (M.D. Ala. 2002) ("[B]lack citizens of Baldwin County still suffer from . . . racially polarized voting and from historically depressed conditions, economically and socially.") *aff'd*, 376 F.3d 1260 (11th Cir. 2004).

51.     The cause of the state's racial polarization can be found in its long history of racial discrimination: "Racial bloc voting by whites is attributable in part to past discrimination, and the past history of segregation and discrimination affects the choices of voters at the polls." *Brown v. Bd. of Sch. Comm'rs of Mobile Cnty.*, 542 F. Supp. 1078, 1094 (S.D. Ala. 1982), *aff'd*, 706 F.2d 1103 (11th Cir. 1983), *aff'd* 464 U.S. 1005 (1983).

### D. Alabama's History of Racial Discrimination

52.     In a region infamous for its racial discrimination, Alabama stands out. After nearly a century of formal disenfranchisement, Reconstruction granted Black Alabamians the right to vote. Almost immediately afterward, however, Alabama embarked on what would become a centuries-long program to ensure Black citizens could never exercise that right. At first manifesting in literacy tests and poll taxes, Alabama's effort to discriminate against Black voters morphed over time into white primaries, and eventually into the vote dilution reflected in the map at issue in this litigation.

53.    Consider first Alabama's 1901 constitutional convention. The state ratified voter restrictions such as literacy tests, employment and property requirements, and a cumulative poll tax, which formed a legal blockade against the Black vote.

54.    The state's intentions were obvious. The President of the constitutional convention, John B. Knox, explained that the purpose of the convention was "to establish white supremacy in this State," asserting that within

> the white man [is] an inherited capacity for government, which is wholly wanting in the Negro. Before the art of reading and writing was known, the ancestors of the Anglo-Saxon had established an orderly system of government . . . the Negro on the other hand, is descended from a race lowest in intelligence and moral perceptions of the races of men.

55.    Delegates to the convention both understood and desired that these laws would restrict the Black vote. It was the judgment of one delegate that "th[e] poll tax qualification is the most important provision" in the proposed constitution because "in the Black Belt and . . . in many counties in the state, there is a large percentage of those young Negroes who are coming of age that will be able to read and write, [and] therefore will be qualified under the provisions of this article" to vote. "The only safety valve," he continued, "that is contained in this article, after 1903 for a large proportion of the Negroes in this State is this Poll tax of $1.50." *United States v. Alabama*, 252 F. Supp. 95, 99 (M.D. Ala. 1966). Alabama "want[ed] that poll tax to pile up so high that [Black voters] will never be able to vote again."

*Id.* The State's poll tax would exist until 1966, when a federal court finally struck it down. *Id.*

56.     At the same time that Alabama actively worked to disenfranchise Black voters, it strove to protect the enfranchisement of white voters. For example, to avoid unintentionally suppressing white voters, the 1901 constitution provided "grandfather clauses" that exempted voters from the constitution's voter suppression provisions if they could show, for example, a vague level of "understanding" of the U.S. Constitution or that they were veterans or descendants of veterans, requirements very few Black Alabamians at the time could meet.

57.     The effect of the 1901 constitution on the Black vote was staggering. In 1900 there were approximately 181,000 registered Black male voters in Alabama. By 1903, there were 3,000.

58.     For Alabama, even 3,000 Black voters were still too many. The state's voter suppression laws brought about one-party rule in Alabama, shifting the importance of the general election to the primary. Realizing that excluding Black voters from primary contests would effectively eliminate the chance for Black voters to influence the outcome of any election, Alabama legislators seized the opportunity by inventing the all-white primary system. Alabama expressly excluded Black voters from participating in primary elections, cutting off Black Alabamians from any hope of political power.

59.     Alabama fiercely defended its right to disenfranchise its Black citizens in the face of federal interference. Fearing that the United States Senate would pass a law eliminating the state's poll tax, the Alabama Legislature in 1942 congratulated its U.S. Senators on "their magnificent fight against the measure now pending in Congress which is calculated to destroy our Poll Tax Law." *Id.* at 102.

60.     Legal upsets, however, only emboldened Alabama. After the Supreme Court found the use of white-only primaries unconstitutional in *Smith v. Allwright*, 321 U.S. 649 (1944), Alabama ratified a new constitutional amendment that would require new voting registrants to "understand and explain," and read and write, an article of the U.S. Constitution. Like its predecessors, this voting measure was motivated by racial discrimination. One drafter of the amendment explained that the "understanding" clause would give "discretion to the Board of Registrars and enable them to prevent from registering those elements in our community which have not yet fitted themselves for self-government."

61.     A court ultimately concluded that the "understanding" clause was unlawful, but Alabama quickly replaced it with a questionnaire that took advantage of the state's racial disparity in education to bar Black voters from the polls. One academic explained that even an "honestly designed educational test" would "bar the ballot to the great mass of uneducated Negroes."

62.     The state's effort to disenfranchise Black voters extended to its

electoral devices. For example, Alabama embraced at-large elections whenever it perceived a threat of meaningful Black voter participation to dilute the Black vote. Alabama also passed a bill eliminating "single-shot" voting, which had previously enabled "a minority group to win some at-large seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of candidates." *City of Rome v. United States*, 446 U.S. 156, 184 n.19 (1980), *abrogated by Shelby Cnty. v. Holder*, 570 U.S. 529 (2013).

63.    Further, in a primitive form of gerrymandering that would portend the more sophisticated line drawing to come, the city of Tuskegee redrew its city limits in 1957 to oust Black residents and eliminate their ability to influence city council elections. This flagrantly discriminatory gerrymander would be declared unconstitutional by the Supreme Court three years later in *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

64.    This period in the state's centuries-long effort to disenfranchise Black voters culminated in 1965 on "Bloody Sunday." On March 7, 1965, non-violent activists began a march from Selma to Montgomery to protest Alabama's voter suppression laws and practices. As the marchers crossed the Edmund Pettus Bridge, Dallas County Sheriff Jim Clark directed state troopers to attack the unarmed activists with billy clubs and tear gas. The country and world watched in horror.

65.    Bloody Sunday and the public outcry it produced motivated

Congress to pass the landmark Voting Rights Act in August 1965. Because of the state's history of adopting and enforcing unconstitutional devices designed to disenfranchise Black voters, Alabama was deemed a "covered" state under the Voting Rights Act, requiring Alabama to submit changes to its electoral practices or procedures to the U.S. Department of Justice or to a Federal District Court for approval.

66.     The Voting Rights Act was not the cure-all the country had hoped for: Alabama has remained incorrigibly committed to voter suppression.

67.     From the Act's passage in 1965 to 1982, when the Voting Rights Act was reauthorized, the Department of Justice was forced to send election observers to Alabama a staggering 107 times to prevent Alabama from restricting Black voters from accessing the polls. Between 1982 and 2006, the Department sent observers to the state another 91 times. In 1992, for example, the Department sent officials to Greensboro, Alabama after white election officials—incensed by the election of the first Black officials to local office—sought to prevent Black voters from entering polling places. All told, between 1965 and 2013 the Department blocked at least 100 of Alabama's proposed voting changes under the Voting Rights Act's preclearance process. *See* U.S. Dep't of Justice, Civil Rights Division, Voting Section, Voting Determination Letters for Alabama, http://www.justice.gov/crt/records/vot/obj_letters/state_letters.php?state=al (last

updated May 18, 2020) (listing all objections imposed against Alabama under Section 5 of the Voting Rights Act)

68.     Over the nearly six decades since the Voting Rights Act was passed, Alabama has been sued dozens of times over its racially discriminatory voting practices. *See, e.g.*, *People First of Ala. v. Merrill*, 467 F. Supp. 3d 1179 (N.D. Ala. 2020) (witness requirement for absentee ballots); *Greater Birmingham Ministries v. Alabama*, 161 F. Supp. 3d 1104 (N.D. Ala. 2016) (photo identification law); *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254 (2015) (racial gerrymandering); *S. Christian Leadership Conf. of Ala. v. Sessions*, 56 F.3d 1281 (11th Cir. 1995) (at-large system for electing trial judges); *City of Pleasant Grove v. United States*, 479 U.S. 462 (1987) (selective annexations); *Hunter v. Underwood*, 471 U.S. 222 (1985) (felon disenfranchisement); *Harris v. Graddick* (*Harris I*), 593 F. Supp. 128 (M.D. Ala. 1984) (appointment of disproportionately few Black poll officials); *United States v. Alabama*, 252 F. Supp. 95 (M.D. Ala. 1966) (discriminatory administration of the poll tax); *United States v. Logue*, 344 F.2d 290 (5th Cir. 1965) (racial discrimination in voter registration); *Sims v. Baggett*, 247 F. Supp. 96 (M.D. Ala. 1965) (racial gerrymandering); *United States v. Atkins*, 323 F.2d 733 (5th Cir. 1963) (racial discrimination in voter registration).

69.     The Supreme Court's invalidation of Section 4 of the Voting Rights Act in *Shelby County v. Holder*, 570 U.S. 529 (2013), left the state unchecked to

continue its legacy of racially discriminatory practices. The day after *Shelby County* was decided, Alabama announced that it would pursue a strict voter ID law. Alabama then proceeded to close 31 offices providing driver's license services to make it more difficult for voters to obtain the necessary photo ID to satisfy the state's new law. An investigation by the Federal Department of Transportation concluded that "African Americans residing in the Black Belt region of Alabama were disproportionately underserved by [the state's] driver licensing services, causing a disparate and adverse impact on the basis of race."

70.      What is briefly described here as Alabama's history of voter discrimination cannot possibly capture the state's centuries-long efforts to maintain white supremacy within its borders. Nevertheless, several federal courts, including the U.S. Supreme Court, have acknowledged the state's history in official opinions which provide additional context. *See, e.g.*, *McGregor*, 824 F. Supp. 2d at 1346 ("The intersection of political strategy and purposeful racial prejudice is nothing new. Alabama has a lengthy and infamous history of racial discrimination in voting."); *Hunter*, 471 U.S. at 229 ("[T]he Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks . . . . The delegates to the all-white convention were not secretive about their purpose."); *Dillard v. Crenshaw Cnty.*, 640 F. Supp. 1347, 1360 (M.D. Ala. 1986) ("As the late Judge Richard T. Rives stated, 'from the

Constitutional Convention of 1901 to the present, the State of Alabama has consistently devoted its official resources to maintaining white supremacy and a segregated society.'") (quoting *United States v. Alabama*, 252 F. Supp. at 101).

### E. Alabama's History of Unlawful Redistricting

71.     Alabama's practice of voter suppression has extended to its modern redistricting efforts. During the 1980 redistricting cycle, the Department of Justice rejected Alabama's proposed legislative redistricting plan because it reduced the number of majority-Black districts within the state. And it objected again to Alabama's revised map because it intentionally "cracked" Black voters in Black Belt counties.

72.     The Department also intervened in Alabama's 1992 redistricting plan for appearing once again to "crack" majority-Black voting populations to dilute Black voting power.

73.     During the 2010 redistricting cycle, Alabama packed the state's existing majority-Black legislative districts with many more Black voters. Of the 15,785 individuals added to Senate District 26, for example, only 36 were white. *Ala. Legis. Black Caucus*, 575 U.S. at 260.

74.     The state's "packing" of Black Alabamians in House and Senate districts drew a lawsuit from the Alabama Legislative Black Caucus and the Alabama Democratic Conference, who argued that Alabama's state legislative

redistricting plans were racial gerrymanders that diluted the Black vote. After being reversed by the U.S. Supreme Court, the United States District Court for the Middle District of Alabama agreed with the plaintiffs, concluding that several state House and Senate districts were unconstitutionally drawn on the basis of race. *Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026 (M.D. Ala. 2017).

### F. Ongoing Effects of Alabama's History of Discrimination

75.     Black Alabamians lag behind their white counterparts on nearly every measure, including in areas such as education, employment, income, and access to health care. For example, according to the most recent five-year American Community Survey, between 2015 and 2019, 27 percent of Black Alabamians were living below the poverty line, more than twice the number of impoverished white Alabamians during the same period. And according to one report, white Alabamians lead their Black counterparts in bachelor's degrees by double-digits. Indeed, education outcomes for Black Alabamians are particularly dire. As of 2014, 43 school districts in Alabama were under some form of federal oversight as a result of continued segregation, despite the Supreme Court's *Brown v. Board of Education* decision 60 years ago.

76.     Black Alabamians also lag behind economically. Black incomes are substantially lower than those paid to their white counterparts, and Black Alabamians are unemployed within the state at much higher rates, too. Similar

disparities exist in the areas of housing, home ownership, and access to a vehicle.

77.     Low-income voters face a number of hurdles to voter participation including working multiple jobs, working during polling place hours, lack of access to childcare, lack of access to transportation, and higher rates of illness and disability. All of these hurdles make it more difficult for poor and low-income voters to participate effectively in the political process.

**G. History of Racial Appeals in Political Campaigns**

78.     Political campaigns in Alabama have long relied on explicit and implicit racial appeals to stir voters.

79.     At the height of Jim Crow, Governor George Wallace famously ran on a platform of "segregation now, segregation tomorrow, segregation forever." Sadly, such sentiments were not confined to that era.

80.     In 2010, some Alabama state senators were recorded strategizing about suppressing Black voter turnout by keeping an issue important to Black Alabamians—whether to legalize electronic bingo—off the ballot. In these conversations, then-state Senator Scott Beason, then-state Representative Benjamin Lewis (now an appointed county judge), and other influential members of the Alabama legislature are heard targeting Black voters for "mockery and racist abuse." *McGregor*, 824 F. Supp. 2d at 1346. They referred to Blacks as "Aborigines" and "Indians" and predicted that if the ballot measure appeared on the ballot "every black

in this state will be bused to the polls . . . [e]very black, every illiterate would be bused on HUD financed buses." *Id.* at 1345 (citation and internal quotation marks omitted). A federal district court found that the state senators' efforts to depress Black voter turnout constituted an intentionally discriminatory "scheme" to "maintain and strengthen white control of the political system," and that "political exclusion through racism remains a real and enduring problem in this State." *Id.* at 1347.

81.     Still more, at a November 2015 rally for then-candidate Donald Trump in Birmingham, a peaceful Black Lives Matter protester was punched and kicked by a group of men yelling, "Go home nigger," after the protester interrupted Trump's speech by shouting "Black Lives Matter!" The next day, referring to the beaten Black Lives Matter protester, then-candidate Trump stated, "Maybe he should have been roughed up, because it was absolutely disgusting what he was doing."

82.     More recently, Roy Moore, who ran for U.S. Senate in 2017, stated at a revival in Jackson, Alabama, "They started [to] create new rights in 1965, and today we've got a problem," an apparent reference to the Voting Rights Act. When asked to speak about the last time America was great, Moore stated, "I think it was great at the time when families were united—even though we had slavery—they cared for one another . . . . Our families were strong, our country had a direction."

### H. Extent to Which Black Alabamians Have Been Elected to Public Office

83.     As a consequence of Alabama's past history of voter suppression and racial discrimination, Black Alabamians have struggled to be elected to public office in the state.

84.     From Reconstruction until 1992, Alabama failed to elect a single Black representative to Congress. Although today 27.2 percent of Alabama's population is Black, not one statewide elected office is currently held by a Black Alabamian. And Alabama has never had a Black governor or U.S. senator.

85.     It took the creation of the state's first majority-Black district through litigation—CD 7—before a Black Alabamian could win election to federal office. The citizens of CD 7 have elected a Black representative in every election since 1992, and today CD 7 is represented by Congresswoman Terri Sewell, who first won the seat in 2010.

86.     But Black voters in Alabama have been limited to a single Black member of Congress for thirty years. And because of the state's racially polarized voting, it is unlikely to elect another Black candidate to Congress absent the creation of a second majority-Black district.

87.     Black Alabamians have fared no better in statewide elections. Not a single statewide office in the state is held by a Black official—indeed, a Black official has not held a statewide office in the past 21 years. And no Black Alabamian

has held a non-judicial statewide office. Even the only two Black candidates ever to have won a statewide judicial election have done so only after first being appointed by the Governor.

88.     Finally, although the state's Legislature has several Black members, the lion's share of these legislators won their seats only after court-ordered redistricting plans created new majority-Black districts. Without majority-Black districts, Black candidates are highly unlikely to retain these seats, let alone win new ones, due to the white majority's voting as a bloc to prevent Black voters from electing candidates of their choice.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of Section 2 of the Voting Rights Act
### Vote Dilution

89.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the count below as though fully set forth herein.

90.     Section 2 of the Voting Rights Act prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that results in the denial or abridgement of the right of any U.S. citizen to vote on account of race, color, or membership in a language majority-Black group. 52 U.S.C. § 10301(a).

91.     The district boundaries created by HB 1 combine to "crack" and "pack" Black Alabamians, resulting in the dilution of their electoral strength in violation of Section 2 of the Voting Rights Act.

92.     Black Alabamians are sufficiently numerous and geographically compact to constitute a majority of eligible voters in two congressional districts.

93.     Black voters in CDs 1, 2, 3, and 7 are politically cohesive, and elections in the state reveal a clear pattern of racially polarized voting that allows blocs of white voters usually to defeat Black-preferred candidates.

94.     The totality of the circumstances establishes that the enacted congressional plan has the effect of denying Black voters an equal opportunity to participate in the political process and to elect candidates of their choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. §10301.

95.     In enforcing the district boundaries in HB 1, Defendant has acted and, absent relief from this Court, will act to deny Plaintiffs' rights guaranteed to them by Section 2 of the Voting Rights Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Declare that HB 1 violates Section 2 of the Voting Rights Act;

B. Enjoin Defendant, as well as his agents and successors in office, from enforcing or giving any effect to the boundaries of the congressional

districts as drawn in HB 1, including an injunction barring Defendant from conducting any further congressional elections under the current map;

C.  Hold hearings, consider briefing and evidence, and otherwise take actions necessary to order the adoption of a valid congressional plan that includes a second majority-Black congressional district in Alabama;

D.  Grant such other or further relief the Court deems appropriate, including but not limited to an award of Plaintiffs' attorneys' fees and reasonable costs.

Dated: November 4, 2021

Respectfully submitted,

By /s/ *Richard P Rouco*

Richard P. Rouco
(AL Bar. No. 6182-R76R)
**Quinn, Connor, Weaver, Davies**
**& Rouco LLP**
Two North Twentieth
2-20th Street North, Suite 930
Birmingham, AL 35203
Phone: (205) 870-9989
Fax: (205) 803-4143
Email: rrouco@qcwdr.com

Aria C. Branch*
Lalitha D. Madduri*
Joseph N. Posimato*
Olivia N. Sedwick*
**Elias Law Group LLP**
10 G St. NE, Suite 600
Washington, D.C. 20002
Phone: (202) 968-4518
ABranch@elias.law
LMadduri@elias.law
JPosimato@elias.law
OSedwick@elias.law

Abha Khanna*
**Elias Law Group LLP**
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
Phone: (206) 656-0177
AKhanna@elias.law

*Attorneys for Plaintiffs*
*\*Motion for Pro Hac Vice Forthcoming*