FILED
2021 Dec-15  PM 08:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

MARCUS CASTER, LAKEISHA CHESTNUT, BOBBY LEE DUBOSE, BENJAMIN JONES, RODNEY ALLEN LOVE, MANASSEH POWELL, RONALD SMITH, and WENDELL THOMAS,

                Plaintiffs,

    v.

JOHN H. MERRILL, in his official capacity as Alabama Secretary of State,

                Defendant.

Case No. 2:21-CV-1536-AMM

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

# TABLE OF CONTENTS

I.     Introduction ..................................................................................1

II.    Background ...................................................................................2

III.   Legal Standard.............................................................................4

IV.    Argument......................................................................................4

    A.  Legal Framework........................................................................4

    B.  Plaintiffs are substantially likely to succeed in showing HB 1 violates Section 2. ...................................................................................5

       i.    *Gingles* Precondition One: An additional, reasonably compact majority-Black district can be drawn....................................5

       ii.   *Gingles* Precondition Two: The relevant minority communities are politically cohesive. ..............................................................7

       iii.  *Gingles* Precondition Three: White voters vote as a bloc usually to defeat the candidates supported by Black voters................................9

       iv.   HB 1 denies Black Alabamians equal access to the process of electing Alabama's congressional delegation....................................11

          a.  HB 1 suffers from significant disproportionality. ......................13

          b.  *Senate Factor One:* Alabama has an ongoing history of official, voting-related discrimination........................................................14

          c.  *Senate Factor Two*: Alabama voters are racially polarized. .......20

          d.  *Senate Factor Three*: Alabama's voting practices enhance the opportunity for discrimination....................................................20

          e.  *Senate Factor Four:* Alabama's history of candidate slating in local elections. ...........................................................................21

          f.  *Senate Factor Five:* Alabama's discrimination has produced severe socioeconomic disparities. ..............................................21

          g.  *Senate Factor Six:* Racial appeals are a prominent feature in Alabama political campaigns. ....................................................25

          h.  *Senate Factor Seven*: Black candidates are underrepresented in public office........................................................................28

          i.  *Senate Factor Eight:* Alabama is not responsive to its Black voters...........................................................................................29

i

        j.   *Senate Factor Nine:* The justification for the new congressional map is tenuous. ...........................................................................32

   C.  Black Alabamians, including Plaintiffs, will suffer irreparable harm absent an injunction. ...............................................................................32

   D.  The balance of equities and the public interest favor relief. ...................33

V.    Conclusion ....................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Legis. Black Caucus v. Alabama*,
231 F. Supp. 3d 1026 (M.D. Ala. 2017)............................................................16

*Ala. State Conf. of NAACP v. Ala.*,
No. 2:16-cv-731-WKW, 2020 WL 583803 (M.D. Ala. Feb. 5,
2020) ................................................................................................8, 10, 20, 21

*Ala. State Conf. of NAACP v. City of Pleasant Grove*,
372 F. Supp. 3d 1333 (N.D. Ala. 2019)........................................................8, 11

*Allen v. City of Evergreen*,
Civ. A. No. 13-107-CG-M, 2014 WL 12607819 (S.D. Ala. Jan. 13,
2014) ................................................................................................................18

*Bartlett v. Strickland*,
556 U.S. 1 (2009)...............................................................................................6

*Bolden v. City of Mobile*,
542 F. Supp. 1050 (S.D. Ala. 1982) ..................................................................16

*Brown v. Bd. of Sch. Comm'rs of Mobile Cnty.*,
542 F. Supp. 1078 (S.D. Ala. 1982) ..................................................................11

*Buskey v. Oliver*,
565 F.Supp. 1473 (M.D. Ala. 1983)..................................................................16

*Campbell v. Bennett*,
212 F. Supp. 2d 1339 (M.D. Ala. 2002)............................................................34

*City of Pleasant Grove v. United States*,
479 U.S. 462 (1987)..........................................................................................16

*Clark v. Calhoun Cnty.*,
88 F.3d 1383 (5th Cir. 1996) ............................................................................12

*Daniels Health Scis. v. Vascular Health Scis.*,
710 F.3d 579 (5th Cir. 2013) ............................................................................33

*Davis v. Chiles*,
   139 F.3d 1414 (11th Cir. 1998) ..........................................................7

*Dillard v. Baldwin Cnty. Bd. Of Educ.*,
   686 F. Supp. 1459 (M.D. Ala. 1988) ...................................................9

*Dillard v. City of Greensboro*,
   946 F. Supp. 946 (M.D. Ala. 1996) .....................................................9

*Dillard v. Crenshaw Cnty.*,
   640 F. Supp. 128 (M.D. Ala. 1986) ...................................................16

*Dillard v. Crenshaw Cnty.*,
   640 F. Supp. 1347 (M.D. Ala. 1986) .................................................14

*Friedenberg v. Sch. Bd. of Palm Beach Cnty.*,
   911 F.3d 1085 (11th Cir. 2018) ...........................................................4

*Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*,
   775 F.3d 1336 (11th Cir. 2015) ...................................................11, 13

*Harris v. Siegelman*,
   695 F. Supp. 517 (M.D. Ala. 1988) ...................................................16

*Hunter v. Underwood*,
   471 U.S. 222 (1985)............................................................................16

*Johnson v. De Grandy*,
   512 U.S. 997 (1994).................................................................5, 13, 14

*Jones v. Jefferson Cnty. Bd. of Educ.*,
   No. 2:19-cv-1821-MHH, 2019 WL 7500528 (N.D. Ala. Dec. 16,
   2019) ......................................................................................9, 10, 18, 19

*Kennedy v. Riley*,
   No. 2:05-cv-1100-MHT, 2007 WL 1461746 (M.D. Ala. May 17,
   2007) ..................................................................................................34

*League of Women Voters of N.C. v. North Carolina*,
   769 F.3d 224 (4th Cir. 2014) ............................................................33

*LULAC v. Perry*,
   548 U.S. 399 (2006).................................................................6, 12, 13

*Nken v. Holder*,
   556 U.S. 418 (2009)................................................................34

*Obama for Am. v. Husted*,
   697 F.3d 423 (6th Cir. 2012) ...............................................33

*Shelby Cnty., Ala. v. Holder*,
   570 U.S. 529 (2013)................................................................17

*Sims v. Baggett*,
   247 F. Supp. 96 (M.D. Ala. 1965) .......................................17

*Thornburg v. Gingles*,
   478 U.S. 30 (1986)..........................................................*passim*

*United States v. Alabama*,
   252 F.Supp. 95 (M.D. Ala. 1966) ........................................16

*United States v. Atkins*,
   323 F.2d 733 (5th Cir. 1963) ...............................................17

*United States v. Logue*,
   344 F.2d 290 (5th Cir. 1965) ...............................................17

*United States v. McGregor*,
   824 F. Supp. 2d 1339 (M.D. Ala. 2011)...........................*passim*

*United States v. Marengo Cnty. Comm'n*,
   731 F.2d 1546 (11th Cir. 1984) ...........................................21

*Veasey v. Abbott*,
   30 F.3d 216 (5th Cir. 2016) ..................................................29

*Williams v. Salerno*,
   792 F.2d 323 (2d Cir. 1986) ................................................33

**Statutes**

52 U.S.C. § 10301(a) ..................................................................4

iv

## I.      Introduction

This case calls for a straightforward application of Section 2 of the Voting Rights Act; no more, no less. Alabama has a Black population sufficiently large and geographically compact to create two majority-Black congressional districts, and absent those two majority-Black districts, the State's judicially-recognized, extreme racially polarized voting prevents Black Alabamians from ever electing a candidate of their choice in more than one district. The combination of a single-majority-Black district map and severe socioeconomic disparities between Black and white Alabamians—a direct result of the State's sordid, persistent, and well documented history of racial discrimination—ensures that Black Alabamians lack equal access to the State's political process. This is precisely the scenario Section 2 was intended to remedy.

Nevertheless, Alabama has again chosen to deny its Black voters equal voting rights by enacting HB 1, the State's new congressional reapportionment plan. Rather than create two majority-Black districts as Section 2 requires, the map cracks and packs Black voters, ensuring their influence is confined to a single district. HB 1 thus dilutes Alabama's Black vote in violation of Section 2. Without this Court's intervention prior to the 2022 elections, Alabama will subject its Black citizens, including Plaintiffs, to an unlawful congressional district plan, causing an irreparable violation of their fundamental right to vote.

Because all relevant factors counsel in favor of relief, Plaintiffs respectfully request that the Court preliminarily enjoin Alabama's implementation of HB 1 and ensure that the congressional district plan used in the 2022 elections and beyond contains two majority-Black districts.

## II.   Background

HB 1 was the result of a closed-door, disorganized, and rushed process that did not allow legislators to prepare, propose, or diligently consider the enacted map or any alternative proposals. Despite numerous legislators raising concerns about the lack of a second majority-Black district and HB 1's failure to fairly enable Black Alabamians to have equal access to the political process, the map was enacted just ten days after legislators were first given the full map. J. Stipulation of Facts ("Stip. Facts"), ECF No. 44, at 10 ¶ 62, 13 ¶¶ 82-84. The State did not conduct a functional or racial polarization analysis of HB 1. *Id.* at 10 ¶ 69, 14 ¶89. As a result, Alabama adopted its current plan without the support of any Black Senators and only one Black Representative. *Id.* at 12-13 ¶¶ 77, 80.

Only one of the seven districts in the enacted plan is majority-Black (CD-7), even though about two out of every seven Alabamians are Black. Indeed, over the last decade, Alabama's Black population grew by 6.53%, while the white population declined by 1.03%. *See* Expert Rep. of William S. Cooper ("Cooper"), ECF No. 48, at 6, fig. 1. The enacted plan subverts fair representation of Black Alabamians by

2

packing several Plaintiffs and other Black voters into CD-7, and cracking others among other districts. *See* Exs. 8-15. CD-1, CD-2, and CD-3 all have Black voting-age populations between 25% and 31% and include historically Black communities. Cooper at 12, fig. 5. CD-1 includes two counties with significant Black voting-age populations: among those 18 and older, Mobile County is 34.55% Black and Monroe County is 41.42% Black. Cooper Rep. Ex. C, ECF No. 48-3, at 2. Montgomery County, with a Black voting-age population of 56.33%, is split between CD-2 and CD-7. *Id.* CD-3 includes Macon County, which has a Black voting-age population of 80.71%. *Id.* As a result, Black voters in CDs 1, 2, and 3 have *no* opportunity to elect their candidates of choice to the U.S. House of Representatives.

Even more striking is how HB 1 cracks Alabama's Black population in the historic Black Belt. Located in the south-central region of Alabama, the Black Belt was originally named for its rich black soil, but over time came to be associated with the slave labor that tilled the soil. Stip. Facts at 5 ¶ 33. Under HB 1, the Black Belt counties are divvied among four different districts: CD-1, CD-2, CD-3, and CD-7, *see* Cooper at 11 fig. 4; Stip. Facts at 5 ¶ 34, only one of which provides them an opportunity to elect their preferred candidate.

Alabama had the opportunity to draw a second majority-Black congressional district that resembles the configuration of districts in the State Board of Election plan. Cooper at 17 ¶ 37, 20 ¶ 41, 21-22 ¶ 48; Stip. Facts at 15 ¶¶ 96, 98, 100. In fact,

during legislative proceedings, Senator Hatcher introduced a congressional plan that contained two majority-Black districts. Stip. Facts at 13-14 ¶ 86. Instead, by packing and cracking the Black population, HB 1 dilutes the voting strength of Plaintiffs and other Black Alabamians in violation of Section 2.

## III.   Legal Standard

"A preliminary injunction may be entered when a plaintiff establishes four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest." *Friedenberg v. Sch. Bd. of Palm Beach Cnty.*, 911 F.3d 1085, 1090 (11th Cir. 2018) (quoting *Palmer v. Braun,* 287 F.3d 1325, 1329 (11th Cir. 2002)) (internal quotations omitted).

## IV.   Argument

### A.   Legal Framework

Section 2 of the Voting Rights Act (VRA) prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). A district map violates Section 2 if it "dilute[s] the voting strength of politically cohesive minority group members, whether by fragmenting the minority voters among several districts where a bloc-voting majority can routinely outvote them, or by packing them into one or a small number of districts to minimize their influence

4

in the districts next door." *Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994).

"Section 2 prohibits either sort of line-drawing where its result, interact[ing] with social and historical conditions, impairs the ability of a protected class to elect its candidate of choice on an equal basis with other voters." *Id.* (citations omitted).

To prevail, a Section 2 plaintiff must show (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group "is politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986). Once that threshold showing is made, courts must consider "the totality of the circumstances"—including, but not limited to, nine factors identified in the Senate Report accompanying the 1982 amendments to the VRA—to determine whether, as a result of the districts, "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of the minority group. *Id.* at 43-44 (quoting 52 U.S.C. § 10301(b)).

**B.      Plaintiffs are substantially likely to succeed in showing HB 1 violates Section 2.**

**i.      *Gingles* Precondition One: An additional, reasonably compact majority-Black district can be drawn.**

The first *Gingles* factor is readily satisfied here because one can "creat[e] more than the existing number of reasonably compact districts with a sufficiently

large minority population to elect candidates of its choice." *LULAC v. Perry*, 548 U.S. 399, 430 (2006) (quoting *De Grandy*, 512 U.S. at 1008). The numerosity aspect of this precondition involves a "straightforward," "objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?" *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009).

Expert demographer William Cooper offers six illustrative congressional plans that unequivocally satisfy the first *Gingles* precondition, demonstrating that the Black community in southern and central Alabama is sufficiently large and geographically compact to comprise more than 50% of the voting-age population of two reasonably compact congressional districts. *See* Cooper at 20-35 ¶¶ 42-81. Compared to the enacted plan and congressional plans nationwide, Mr. Cooper's plans score in the same range of average compactness. *Id.* at 34 ¶ 82, 37 ¶ 84. Mr. Cooper's illustrative maps also adhere to other traditional redistricting principles, including population equality, contiguity, maintaining political and geographical boundaries, protection of incumbents, and maintaining communities of interest, *id.* at 21 ¶¶ 45-47; *see Davis v. Chiles*,  139 F.3d 1414, 1425 (11th Cir. 1998) (finding a plaintiff satisfies *Gingles* 1's compactness requirement when she proposes a majority-minority district that is "consistent with traditional districting principles."), all of which were enumerated in the Legislature's redistricting guidelines prior to enacting HB 1, *see* Ex. 1.

Dr. Maxwell Palmer confirms that Black voters would be able to elect their preferred candidates in Mr. Cooper's illustrative majority-Black districts. In each illustrative map, the Black-preferred candidate won all 12 elections between 2016 and 2020 in both majority-Black districts, with an average of at least 57% of the vote in CD 2 and an average of at least 65% of the vote in CD 7. Expert Rep. of Dr. Maxwell Palmer ("Palmer"), ECF No. 49, at 9 ¶ 27.

### ii. *Gingles* Precondition Two: The relevant minority communities are politically cohesive.

The second *Gingles* precondition is also satisfied here because Black voters in Alabama are politically cohesive. *Gingles*, 478 U.S. at 49. "Bloc voting by blacks tends to prove that the black community is politically cohesive, that is, it shows that blacks prefer certain candidates whom they could elect in a single-member, black majority district." *Id.* at 69.

Dr. Palmer analyzed racially polarized voting in a "Focus Area" comprising the congressional districts from which Mr. Cooper's illustrative majority-Black districts are drawn. Palmer at 2 ¶ 9. To perform these analyses, Dr. Palmer used official election data from 2012 to 2020 and a widely accepted methodology called ecological inference analysis. *See Ala. State Conf. of NAACP v. Ala.*, No. 2:16-cv-731-WKW, 2020 WL 583803, at *29, n.27 (M.D. Ala. Feb. 5, 2020) (recognizing ecological inference as the "gold standard" for racially polarized voting analysis (quoting *Wright v. Sumter Cnty. Bd. of Elections,* 301 F. Supp. 3d 1297, 1305 (M.D.

Ga. 2018))). His analysis shows that Black Alabamians have remained "extremely cohesive" over nearly a decade of elections. Palmer at 5 ¶ 16. In all elections analyzed between 2016 and 2020, Black Alabamians voted as a bloc for the same candidate by an average of 92.3%. *Id*. The same holds true for the elections Dr. Palmer analyzed for 2012 and 2014, *id.* at 6 ¶ 19, as well as across 2018 congressional elections in CDs 1, 2, and 3, Ex. 2 at 19-21. These results more than satisfy the legal threshold of cohesive voting. *See Gingles*, 478 U.S. at 56 ("A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim.").

Dr. Palmer's analyses accord with the findings of a long line of federal courts that have concluded that Black voters in various parts of Alabama vote cohesively. *See Ala. State Conf. of NAACP*, 2020 WL 583803, at *35; *Ala. State Conf. of NAACP v. City of Pleasant Grove*, 372 F. Supp. 3d 1333, 1340 (N.D. Ala. 2019) ("Plaintiffs have also sufficiently alleged that Pleasant Grove's Black voters are 'politically cohesive' and that Pleasant Grove's 'white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate.'" (quoting *Gingles,* 478 U.S. at 51)); *Jones v. Jefferson Cnty. Bd. of Educ.*, No. 2:19-cv-1821-MHH, 2019 WL 7500528, at *2 (N.D. Ala. Dec. 16, 2019) (accepting parties' stipulation that "Black voters are politically cohesive"); *Dillard v. City of Greensboro*, 946 F. Supp.

946, 952-53 (M.D. Ala. 1996) (noting City of Greensboro conceded that its Black population is "politically cohesive"); *Dillard v. Baldwin Cnty. Bd. Of Educ.*, 686 F. Supp. 1459, 1465 (M.D. Ala. 1988). Dr. Palmer's results confirm that cohesion among Black voters in Alabama remains beyond dispute.

### iii.      *Gingles* Precondition Three: White voters vote as a bloc usually to defeat the candidates supported by Black voters.

Finally, in the area where Mr. Cooper proposes a new majority-Black district, "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51. In the same elections discussed above, Dr. Palmer found high levels of white bloc voting for candidates running against the candidates whom Black voters cohesively supported.

Between 2016 and 2020, Alabama's white majority opposed Black voters' candidates of choice by an average of 84.6%. Palmer at 5 ¶ 17. White voters' opposition to Black voters' candidates of choice was comparable in 2012 and 2014. *Id.* at 7, fig. 4. The same is true for congressional races in CDs 1, 2, and 3, in 2018. Ex. 2 at 19-21. The effect of this bloc voting is unmistakable: in the relevant area, Black-preferred candidates prevailed only twice across the 20 elections analyzed. Palmer at 7-8 ¶¶ 24-25 & fig. 5.[1] And considering election results on a district-by-district basis reveals that Black-preferred candidates prevail only in CD-7, where

---

[1] In the only two elections where Black-preferred candidates prevailed, the white candidate of choice was Roy Moore. *Id.* at 8-9 ¶ 25.

Black voters comprise a majority of voters. Even in the single election between 2016 and 2020 where the Black voters' candidate of choice won, he captured a majority of votes only in CD-7 but lost each of the other congressional districts in the Focus Area. *Id*. at 7-8 ¶¶ 24-25 & fig. 5. Likewise, all the Black-preferred candidates lost to white-preferred candidates in 2018 congressional elections in CDs 1, 2, and 3. Ex. 2 at 9 ¶ 38; Stip. Facts at 6 ¶ 43. Thus, Black voters' candidates of choice are consistently defeated by white bloc voting, except for when Black voters make up a majority of eligible voters. *See Gingles*, 478 U.S. at 68 ("Bloc voting by a white majority tends to prove that blacks will generally be unable to elect representatives of their choice.").

Courts evaluating racially polarized voting within Alabama have consistently reached the same conclusions. *See, e.g.*, *Ala. State Conf. of NAACP*, 2020 WL 583803, at *36 ("Plaintiffs have proven that . . . white bloc voting usually defeated the black-preferred candidate."); *Jefferson Cnty. Bd. of Educ.*, 2019 WL 7500528, at *2 (accepting undisputed fact that "White people vote sufficiently as a bloc to enable them to defeat Black voters' preferred candidates"); *City of Pleasant Grove*, 372 F. Supp. 3d at 1339 ("Plaintiffs have . . . sufficiently alleged that . . . [the] 'white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate.'" (quoting *Gingles*, 478 U.S. at 51)); *Brown v. Bd. of Sch. Comm'rs of Mobile Cnty.*, 542 F. Supp. 1078, 1094 (S.D. Ala. 1982), *aff'd*, 706 F.2d 1103 (11th

10

Cir. 1983), *aff'd* 464 U.S. 1005 (1983) ("Racial bloc voting by whites is attributable in part to past discrimination, and the past history of segregation and discrimination affects the choices of voters at the polls.").

### iv. HB 1 denies Black Alabamians equal access to the process of electing Alabama's congressional delegation.

Considering the "totality of the circumstances," HB 1 deprives Black Alabamians of an equal opportunity to elect their preferred congressional representatives. *Gingles*, 478 U.S. at 47. "[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* [preconditions] but still have failed to establish a violation of § 2 under the totality of the circumstances." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015).

The factors outlined in the Senate Judiciary Committee Report accompanying the 1982 VRA amendments guide this final analysis. These "Senate Factors" are "typically relevant to a § 2 claim." *LULAC*, 548 U.S. at 426.[2] They are not exclusive,

---

[2] The Senate Factors are as follows:

(1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

(2) the extent to which voting in the elections of the state or political subdivision is racially polarized;

(3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

and "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Gingles*, 478 U.S. at 45. Yet, the Supreme Court has instructed that "the most important" factors are the "extent to which minority group members have been elected to public office in the jurisdiction" and the "extent to which voting in the elections of the state or political subdivision is racially polarized." *Id.* at 51 n.15; *see also Clark v. Calhoun Cnty.*, 88 F.3d 1383, 1397 (5th Cir. 1996); *Ga. State Conf. of NAACP*, 775 F.3d at 1347 n.9. It has also instructed that, beyond the Senate Factors, courts should consider the relative "proportionality" between the minority group's population and the number of districts in which they can elect candidates of their choice. *LULAC*, 548 U.S. at 438.

---

(4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

(5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

(6) whether political campaigns have been characterized by overt or subtle racial appeals;

(7) the extent to which members of the minority group have been elected to public office in the jurisdiction;

(8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

(9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles*, 478 U.S. at 36–37.

12

Ultimately, each of the relevant Senate Factors—and HB 1's significant disproportionality—confirms that allowing Alabama's congressional elections to take place under HB 1 would deny Black voters equal electoral opportunities.

### a. HB 1 suffers from significant disproportionality.

The enacted plan's flagrant lack of proportionality strongly supports Plaintiffs' claims here. *See LULAC*, 548 U.S. at 438 (proportionality "provides some evidence of whether the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by a minority group (internal quotations omitted)); *De Grandy*, 512 U.S. at 1021 (proportionality "is obviously an indication that minority voters have an equal opportunity, in spite of racial polarization, to participate in the political process and to elect representatives of their choice" (internal quotations omitted)). Black Alabamians make up 27% of Alabama's total population, and nearly 26% of Alabama's citizen voting age population. Cooper at 6, fig. 1; *id.* at 9, fig. 3. Yet under the enacted plan, Black Alabamians will be able to elect their candidates of choice in just 14% of Alabama's congressional districts. In contrast, white Alabamians make up about 63% of Alabama's total population, and less than 66% of Alabama's citizen voting age population, *id.*, yet the enacted plan ensures that white Alabamians can elect their candidates of choice in 86% of Alabama's congressional districts. There is no justification for this extraordinary disparate treatment.

The creation of two majority-Black districts would come much closer to proportionality for Alabama voters. Under any of Mr. Cooper's illustrative maps, Black Alabamians would be able to elect their preferred candidates in 28.5% of congressional (less than three percentage points higher than the Black citizen voting-age population) and white Alabamians would be able to elect their preferred candidates in the remaining 71.5% of districts (more than six percentage points higher than the white citizen voting-age population).

> **b.** *Senate Factor One:* **Alabama has an ongoing history of official, voting-related discrimination.**

"Alabama has a lengthy and infamous history of racial discrimination in voting." *United States v. McGregor*, 824 F. Supp. 2d 1339, 1346 (M.D. Ala. 2011). From "1901 to the present, the State of Alabama has consistently devoted its official resources to maintaining white supremacy and a segregated society." *Dillard v. Crenshaw Cnty.*, 640 F. Supp. 1347, 1360 (M.D. Ala. 1986) (quoting *United States v. Alabama*, 252 F.Supp. 95, 101 (M.D. Ala. 1966)). While these discriminatory actions have evolved over the years, they continue to this day. Indeed, just ten years ago, a federal judge wrote in a published opinion that "it is still clear that [racist] sentiments remain regrettably entrenched in the high echelons of [Alabama] state government." *McGregor*, 824 F. Supp. 2d at 1347. As a result of this centuries-long effort to disenfranchise Black Alabamians, that community still lacks equal access to the State's political process today.

Alabama's history of discrimination began in the wake of the Civil War. In 1901, Alabama created a new constitution chock full of measures explicitly intended to prevent Black people from voting. *See* Expert Rep. of Dr. Bridgett King ("King"), ECF No. 50 at 6-8 ¶¶ 17-23; Stip. Facts at 17 ¶¶ 111-113. Indeed, the express goal of the constitutional convention was to establish "white supremacy in the State." King at 6 ¶ 20. The 1901 framers achieved their goal. In 1900, approximately 181,000 Black male Alabamians were registered to vote. By 1903, there were less than 3,000, and by 1906 only two percent of voting-age Black Alabamians were registered to vote. *Id.* at 8 ¶ 24.

After federal courts invalidated some of these practices, Alabama and its local jurisdictions turned to more subtle electoral devices meant to prevent Black voters from electing their preferred candidates, such as at-large elections, outlawing "single-shot" voting and using numbered-place elections, and drawing municipal lines to exclude entire Black communities. *Id.* at 13-14 ¶¶ 35-39. The State also enabled capricious registrars and poll workers to block Black citizens from registering to vote through the administration of tests and questionnaires and requiring voters to wait in excessively long lines. *Id.* at 9-13 ¶¶ 26-33. These efforts continued to devastate the state's Black vote. *See id.* at 12 ¶ 31.

Passage of the VRA did not, and has not, stopped Alabama from continuing to try to reduce and dilute the Black vote. Since the VRA's passage, the U.S.

Department of Justice has been forced to send election observers to Alabama nearly 200 different times. Stip. Facts at 18 ¶¶ 117-118. Between 1965 and 2013, more than 100 voting changes proposed by the State or its local jurisdictions were blocked or altered under Section 5 of the VRA. *Id.*; Ex. 3 at 29 ¶ 149.

Overall, Alabama's discriminatory practices have drawn dozens of successful lawsuits. *See, e.g., Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026 (M.D. Ala. 2017) (racial gerrymandering); *City of Pleasant Grove v. United States*, 479 U.S. 462 (1987) (selective annexations); *Dillard v. Crenshaw Cnty.*, 640 F. Supp. 128 (M.D. Ala. 1986) (at-large county elections); *Hunter v. Underwood*, 471 U.S. 222 (1985) (felon disenfranchisement); *Harris v. Siegelman*, 695 F. Supp. 517 (M.D. Ala. 1988) (appointment of disproportionately few Black poll officials); *Buskey v. Oliver*, 565 F.Supp. 1473 (M.D. Ala. 1983) (discriminatory districting plan); *Bolden v. City of Mobile*, 542 F. Supp. 1050 (S.D. Ala. 1982) (at-large city voting); *United States v. Alabama*, 252 F. Supp. 95 (M.D. Ala. 1966) (discriminatory administration of the poll tax); *United States v. Logue*, 344 F.2d 290 (5th Cir. 1965) (racial discrimination in voter registration); *Sims v. Baggett*, 247 F. Supp. 96 (M.D. Ala. 1965) (racial gerrymandering); *United States v. Atkins*, 323 F.2d 733 (5th Cir. 1963) (racial discrimination in voter registration).

Such practices have marred the last decade of Alabama politics. In 2010, for example, Alabama State Senators conspired to depress turnout among Black

residents—whom they called "Aborigines"—by keeping a referendum issue popular with Black voters off an upcoming ballot. *McGregor*, 824 F. Supp. 2d at 1345. These officials expressed concern that if the issue made it on the ballot, "[e]very black, every illiterate" would be "bused on HUD financed buses" to vote. *Id.* A federal judge wrote that these actions and statements "represent compelling evidence that political exclusion through racism *remains a real and enduring problem in this State.*" *Id.* at 1347 (emphasis added).

In 2013, the U.S. Supreme Court released Alabama from the VRA's preclearance requirement. *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529 (2013). Shortly thereafter, Alabama began enforcing a strict voter ID law that it had enacted in 2011. Stip. Facts at 20 ¶ 126. Four years later, Governor Bentley announced the closure of 31 Motor Vehicle Division offices—which provide identification—as a form of retaliation against the Black legislative caucus. King at 17-18 ¶ 49; Ex. 4 at 376:2-19 (Rep. Knight). An investigation by the U.S. Department of Transportation concluded that these closures would have an adverse impact on Black populations, forcing the State to reverse course. King at 17-18 ¶ 49.

In 2014—less than six months after *Shelby County*—the City of Evergreen consented to being "bailed-in" for preclearance under Section 3(c) of the VRA due to its registrars and election officials unconstitutionally discriminating against Black voters. *Allen v. City of Evergreen*, Civ. A. No. 13-107-CG-M, 2014 WL 12607819

(S.D. Ala. Jan. 13, 2014). And in 2019, a court in this district "bailed-in" the Jefferson County Board of Education and the Probate Judge due to Fourteenth Amendment and VRA violations. *Jones v. Jefferson Cnty. Bd. of Elections*, 2019 WL 7500528, at \*4-5.

Alabama's discrimination has also extended to its redistricting efforts. For the last 50 years, the State's redistricting maps have been plagued by vote dilution and racial discrimination. In the 1960s, a federal court found that the Alabama Legislature had packed Black voters into state House districts "for the sole purpose of preventing the election of Negroes to [State] House membership." King at 22 ¶ 60 (quoting *Sims,* 247 F. Supp. at 108-09). The next decade, a court rejected the State's proposed map because of its discriminatory effect on Black voters. *Id.* at 22 ¶ 61. In the 1980s and 1990s, the DOJ objected to plans submitted by the State because the plans diluted Black voting strength. *Id.* at 22-23 ¶¶ 62-63; Stip. Facts at 19 ¶ 119 (regarding 1980 cycle). And just four years ago, a federal court invalidated 12 of Alabama's legislative districts as racial gerrymanders. King at 23 ¶ 64.

Discriminatory laws aside, Black Alabamians have continuously faced violence and intimidation meant to solidify their political and societal subjugation. King at 19-21 ¶¶ 54-58. Examples of such violence abound. In 1963, the Sixteenth Street Baptist Church, a key civil rights meeting place, was bombed, killing four young Black girls and injuring many others; two years later, Dallas County Sheriff

Jim Clark's troopers brutalized peaceful civil rights marchers on the Edmund Pettus Bridge. *Id.* at 20-21 ¶¶ 55. In 1981, KKK members brutally murdered 19-year-old Michael Donald and left him hanging from a tree in Mobile, a horrific incident that continues to haunt the Black community, including Plaintiff LaKeisha Chestnut. *See* Ex. 4 at 442:22-443:25. Black Alabamians also have faced the terror of cross burnings, a practice that continues to this day: in 2020, a burning cross was placed on a bridge in predominantly-Black Macon County, an incident deemed a hate crime by the FBI. King at 21 ¶¶ 57-58.

In addition to outright violence, Alabama has intimidated Black voters from participating in elections by threatening them with criminal sanctions. As former chair of the Alabama House Black Caucus John Knight and longtime former State Senator Hank Sanders recently testified, specious accusations of voter fraud against Black Alabamians—particularly in the Black Belt—have fostered an environment of intimidation in which Black residents are too afraid to vote, and especially to vote absentee, leading many to not vote at all. Ex. 4 at 361:21-363:21, 364:13-23 (Rep. Knight); Ex. 5 at 549:17-553:23 (Sen. Sanders).

In sum, "[t]he intersection of political strategy and purposeful racial prejudice" has remained a feature of Alabama's politics for centuries. *McGregor*, 824 F. Supp. 2d at 1346. As discussed further below, that combination has wrought

devastating consequences upon the State's Black community. This factor weighs heavily in favor of Plaintiffs' Section 2 claim.

### c. *Senate Factor Two*: Alabama voters are racially polarized.

As discussed above, voting in Alabama is indisputably racially polarized and Black voters are unable to elect their preferred candidates outside of majority-Black districts due to white bloc voting. *Supra* Sections IV.B.ii, IV.B.iii. Federal courts have repeatedly found that Alabama's voters are racially polarized such that Black preferred candidates usually lose elections, including as recently as last year. *See, e.g.*, *Ala. State Conf. of NAACP*, 2020 WL 583803, at \*35-37.

### d. *Senate Factor Three*: Alabama's voting practices enhance the opportunity for discrimination.

As discussed with respect to Senate Factor One, Alabama has employed a variety of voting practices designed to discriminate against Black voters. King at 27-30 ¶¶ 80-87. The State, for example, has used at-large elections, anti-single shot voting laws, majority-vote requirements, and numbered-place requirements, all of which allowed the state to discriminate against its Black voters. *Id.* at 13-14 ¶¶ 35-38; *id.* at 28-30 ¶¶ 84-87. Even today, Alabama runs statewide at-large elections for judicial posts on its Supreme Court, Court of Criminal Appeal, and Court of Civil Appeals. And the state continues to impose a majority-vote requirement in its primary elections. This factor therefore strongly counsels in favor of a Section 2

violation.

> **e.** ***Senate Factor Four:*** **Alabama's history of candidate slating in local elections.**

Because Alabama's congressional elections do not use a slating process, this factor has no relevance to Plaintiffs' claim.

> **f.** ***Senate Factor Five:*** **Alabama's discrimination has produced severe socioeconomic disparities.**

There can be no question that the wellbeing of Alabama's Black community continues to suffer as a result of the State's history of discrimination. Black Alabamians lag behind their white counterparts on nearly every socioeconomic indicator. Cooper at 37-39 ¶¶ 85-86. These disparities depress Black voter participation: as the State stipulated in litigation two years ago, Black turnout in general elections between 2010 and 2018 was on average nearly 5% lower than white turnout. *See* Ex. 6, at 21-22 ¶ 154. And while "the burden is not on the plaintiffs to prove" these disparities are "causing reduced political participation," *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1569 (11th Cir. 1984), that is surely the case, *see* King at 32-33 ¶¶ 94-97 (impact of education on political participation); *id.* at 36-37 ¶¶ 107-08 (income); *id.* at 44-45 ¶¶ 126-27 (health insurance); *id.* at 39-40 ¶¶ 112-13 (disproportionate disqualification due to Alabama's felon disenfranchisement law). Specifically, socioeconomic disparities depress Black political participation in Alabama both by reducing "faith in the system" and making

it harder to register and vote. Ex. 4 at 358:1-360:25, 363:22-364:12, 375:18-24 (Rep. Knight); *id.* at 456:1-6 (Chestnut); *id.* at 481:22-483:23, 487:16-491:12 (Commissioner Tyson). And at a certain point, the cumulative effect of the socioeconomic difficulties Black voters disproportionately face makes the process of voting "prohibitive." Ex. 5 at 564:24-565:11 (Sen. Sanders).

First, education. Black Alabamians have significantly lower average educational achievement than their white counterparts. 14.9% of Black Alabamians have not finished high school, compared to just 10.9% of white Alabamians. Cooper at 38 ¶ 86. Meanwhile, only 19.4% of Black Alabamians have a bachelor's degree or higher, compared to 28.8% of white Alabamians. *Id.*

This is a tragic yet predictable outcome of Alabama's history. The State long suppressed Black education out of fear that an educated Black citizenry would enable them to engage in a "future race war." King at 30 ¶ 89. The 1901 framers ensured "there was neither the will nor the money to provide" educational services to the public because they thought it would "disproportionately favor" Black children. *Id.* at 31 ¶ 89. These decisions reverberate today. Alabama ranks 39th in per-pupil spending, and that minimal spending goes disproportionately to white students. *Id.* at 31-32 ¶ 92.

While in school, Black students in Alabama today are "markedly" more likely to face more severe disciplinary action than their white peers. *See id.* at 33 ¶ 98. As

a result, Black students are more likely to drop out of school. *Id.* at 34 ¶ 98. A study of 32 school districts in the State also indicates that Black students are more likely to receive criminal referrals for their already-disproportionate school discipline. *Id.* at 34 ¶ 100.

Similar disparities exist with respect to economic outcomes. The poverty rate among Black Alabamians is more than double that of white Alabamians, and the child poverty rate is nearly triple. *Id.* at 36 ¶ 105. Black median household income is just 59.9% of white income. Cooper at 38 ¶ 86. And the portion of Black households that rely on food stamps is more than triple that of white households. *Id.* The Black unemployment rate in Alabama is more than double the white unemployment rate, and of those who are employed, white Alabamians are more than 1.5 times more likely to be in management or professional occupations. *Id.* White Alabamians are 1.5 times more likely to own a house than their Black counterparts, and their homes are more than 1.5 times more valuable. *Id.* at 38-39 ¶ 86. And Black Alabamians are nearly three times more likely to lack access to a vehicle. *Id.* at 38 ¶ 86.

Financial reality for Black Alabamians also leads to poorer health outcomes. Nearly 20% of Black citizens lack health insurance, compared to only 12.9% of white Alabamians. King at 43 ¶ 123. Because Black Alabamians tend to live in poorer communities, they have less access to health care services and higher

instances of chronic disease. *Id.* at 43-44 ¶ 123. The infant mortality rate among Black Alabamians is more than twice the rate among white Alabamians. *Id.* at 44 ¶ 123.

Discrimination in criminal justice further impedes Black access to the political process. The combination of Alabama's felon disenfranchisement law—initially created for the explicit purpose of disenfranchising Black voters—and wildly disparate incarceration rates means that Black Alabamians are far more likely to be disenfranchised due to a criminal conviction than their white counterparts. King at 37-40 ¶¶ 109-13. At the time of the 2020 election, over 15% of Black Alabamians were disenfranchised due to a felony conviction, compared to just 8.94% of all voting-age residents of the State. *Id.* at 39 ¶ 113.

The combined effect of these disparities imposes a daily toll on Black Alabamians and gives them political interests and needs that differ from white Alabamians in terms of both quality and quantity. As Black residents and leaders recently testified, Black residents have needs relating to education, employment, criminal justice, affordable housing, and health care that are distinct from those of the white community, and which would be better served if they were able to elect an additional candidate of choice to Congress. *See* Ex. 4 at 337:7-340:11, 353:22-357:25, 364:24-365:15, 369:8-22 (Rep. Knight); *id.* at 420:10-429:1 (Chestnut); *id.*

at 473:13-476:1 (Jefferson County Commissioner Sheila Tyson); Ex. 7 at 220:3-227-7 (Karen Jones); Ex. 5 at 562:5-563:14 (Sen. Sanders); *id.* at 525:6-526:9 (Tyson).

**g.**     ***Senate Factor Six:*** **Racial appeals are a prominent feature in Alabama political campaigns.**

Alabama politicians have consistently utilized racial appeals to influence voter behavior. In Alabama, "The intersection of political strategy and purposeful racial prejudice is nothing new." *McGregor*, 824 F. Supp. 2d at 1346. From George Wallace's infamous proclamation of "segregation now, segregation tomorrow, segregation forever" to the present, overt and covert appeals to race in Alabama political campaigns persist. These appeals harden the racial divide among the State's electorate, pitting voters against each other based on issues closely tied to race.

The "Southern Strategy" during the mid-20th Century relied explicitly on race to appeal to the anxieties of white voters. King at 46 ¶ 130. This evolved into the modern "Long Southern Strategy," which uses subtle imagery and coded language that fits the social and political moment but nonetheless targets the same racial anxieties on which the original Southern Strategy capitalized. *Id.* at 47 ¶ 133. Examples of this strategy in recent campaigns abound. In 2010, gubernatorial candidate Tim James declared: "This is Alabama; we speak English. If you want to live here, learn it," a clear effort to capitalize on anti-immigrant sentiment. *Id.* at 47 ¶ 134.

In 2014, Alabama Representative Mo Brooks repeatedly asserted that Democrats were "waging a war on whites." *Id.* at 48 ¶ 136. In November 2015, a peaceful protester at a Trump campaign rally was brutally assaulted by a group of men yelling "go home n*****" and who referred to him as a "monkey."[3] In 2017, senatorial candidate Roy Moore complained how the federal government "started [to] create new rights in 1965, and today we've got a problem," an unmistakable reference to civil rights legislation, and also claimed that the last time America was great was "at the time when families were united—even though we had slavery."[4] In 2018, Governor Kay Ivey made the preservation of confederate monuments, an issue that deeply divides white and Black Alabamians, a "centerpiece of her gubernatorial campaign." King at 48 ¶ 138. Also in 2018, Alabama Supreme Court candidate Tom Parker ran an ad highlighting his opposition to the Southern Poverty Law Center, a racial justice organization, and referring to "leftist mobs" while showing video of Congresswoman Maxine Waters of California, who is Black and

---

[3] Carol Robinson, *Black Protestor Attacked at Donald Trump Rally Called 'Monkey' and Other Racial Slurs, He Says*, AL.com (Nov. 21, 2015), https://www.al.com/news/birmingham/2015/11/black_protester_attacked_at_do.html.

[4] *Roy Moore: 'New Rights' in 1965, and Today We've Got a Problem*, MSNBC (Nov. 14, 2017), https://www.msnbc.com/the-last-word/watch/roy-moore-new-rights-in-1965-and-today-we-ve-got-a-problem-1096186947952; *LA Times Releases Audio of Roy Moore's Offhand Comment on Slavery*, ABC News, https://www.youtube.com/watch?v=fqLqWpFb3_4.

had no involvement in Parker's race.[5] He also ran an ad warning of an "invasion" of immigrants from Mexico.[6]

The 2020 election was no different. As is common in Alabama, white candidates evoked images of immigrants taking over the country. King at 49 ¶¶ 139-40. State Representative Will Dismukes spoke in front of the confederate flag at an annual celebration in Selma honoring the 199th birthday of Nathan Bedford Forrest, a brutal slave-holder and former Confederate general who became the first Grand Wizard of the Ku Klux Klan.[7] Congressman Bradley Byrne ran an ad showing Congresswomen Ilhan Omar, Alexandria Ocasio-Cortez, Ayanna Pressley, and Rashida Talib, and former NFL quarterback Colin Kaepernick—all people of color—burning in a fire juxtaposed against references to the 9/11 terrorist attacks. *Id.* at 49 ¶ 139.

Plaintiff LaKeisha Chestnut recently testified that these racial appeals make her "feel like [] a second class citizen in a state that I love" by playing on racial stereotypes and suggesting "white people should be afraid" of "people that look like me, people that look like my husband, . . . my granddaughter." Ex. 4 at 429:16-430:6,

---

[5] Justice Tom Parker, *Parker for CJ Radio*, YouTube (Oct. 20, 2018), https://www.youtube.com/watch?v=LmfTLM5UlBk.

[6] Justice Tom Parker, *TP Invasion 30*, YouTube (Nov. 5, 2018), https://www.youtube.com/watch?v=qUcbS9zLUGE&t=3s.

[7] *Alabama Lawmaker Who Honored Klan Leader Says He's Surprised by Criticism*, WSFA (July 27, 2020), https://www.wsfa.com/2020/07/27/alabama-lawmaker-who-honored-klan-leader-says-hes-surprised-by-criticism/.

431:6-15. These racial appeals "deepen the racial divides" within her hometown of Mobile and beyond. *Id.* at 442:4-6; *see also* Ex. 5 at 508:7-10 (Commissioner Tyson).

**h.     *Senate Factor Seven*: Black candidates are underrepresented in public office.**

As a consequence of Alabama's past history of voter suppression and racial discrimination, Black Alabamians have for more than a century struggled to be elected to public office. Only after the VRA's passage and federal government intervention did Alabama begin to have limited Black representation. Until Earl Frederick Hilliard's election to Congress in 1992—following the creation of a majority-Black district in CD-7—Alabama had not elected a Black person to Congress since the 19th Century. Ex. 3 at 10 ¶ 44. Since then, Alabama has never had more than one Black congressional representative, and no Black candidate has been elected to the U.S. House of Representatives outside of CD-7. Stip. Facts at 19 ¶ 121. Only two Black candidates have been elected to statewide office in Alabama, both of whom ran as incumbents after first being appointed, and both of whom were ultimately defeated by white candidates. *Id.* at 19 ¶¶ 122-123. There are currently no Black statewide officeholders, and no Black person has won statewide office in Alabama in a quarter century. *Id.* at 19 ¶ 122. And although Alabama's Legislature has several Black members, only one is not elected from a majority-Black district. Stip. Facts at 17 ¶ 110; Ex. 3 at 34 ¶ 169. Due to the racially polarized voting in

Alabama, these Black members would be highly unlikely to retain their seats if their districts were not majority-Black.

Alabama failed even to approach proportional representation despite Black Alabamians now comprising nearly 26% of Alabama's voting-age population, Cooper at 8 ¶ 18. This stark discrepancy in representation "contextualizes the degree to which vestiges of discrimination continue to reduce minority participation in the political process," *Veasey v. Abbott*, 830 F.3d 216, 261 (5th Cir. 2016), and has a "profound impact" on the lives of Black Alabamians, Ex. 5 at 559:7-559:23 (Sen. Sanders).

### i. *Senate Factor Eight:* **Alabama is not responsive to its Black voters.**

Alabama has long neglected the needs of its Black residents. This is most clearly demonstrated by its failure to remedy the persistent and dramatic socioeconomic disparities between Black and white Alabamians discussed above. On numerous issues the State has refused to take action that would have demonstrably bettered the lives and political power of its Black community.

The State's failure to expand Medicaid under the Affordable Care Act is one such instance. Expanding Medicaid would disproportionately help uninsured Black Alabamians, who are more likely to report not seeing a doctor due to cost, skip annual checkups, and not have a general practitioner. King at 52-53 ¶ 152-54, 54-55 ¶ 156. It would also particularly benefit Black children. *See id.* at 54 ¶ 156. The

State's refusal to expand Medicaid leaves minority residents disproportionately uninsured, a particularly disastrous result during a pandemic. *Id.* at 55 ¶ 157.

The State's response to the COVID pandemic has exemplified and exacerbated its historical neglect of its Black residents. From the outset, Black Alabamians suffered disproportionate consequences from the pandemic. Black people—who represent 27% of the state population—comprised 37% of Alabama's early COVID cases and a staggering 54% of COVID deaths in April 2020.[8] Despite encountering data collection hurdles, researchers have confirmed the persistence of these disparities as recently as March 2021.[9] The primary causes of these disparities are the socioeconomic disparities discussed above, which are themselves a result of Alabama's history of discrimination: because Black Alabamians are more likely to live in poverty, lack access to health care, have pre-existing conditions, lack access to private transportation, and the like, they are more susceptible to COVID infection and adverse health outcomes as a result.[10]

---

[8] Nick Patterson, *Coronavirus Rates in Alabama Hit Black the Hardest — and Experts Are Not Surprised*, BirminghamWatch (Apr. 20, 2020), https://birminghamwatch.org/coronavirus-rates-alabama-hit-blacks-hardest-experts-not-surprised/.

[9] *See* COVID Tracking Project, *Alabama: All Race & Ethnicity Data*, https://covidtracking.com/data/state/alabama/race-ethnicity.

[10] *See* Safiya Charles, *Alabama Data Shows Majority of Coronavirus Deaths are African American*, Montgomery Advertiser (Apr. 9, 2020), https://www.montgomeryadvertiser.com/story/news/2020/04/09/why-alabama-data-shows-more-black-people-dying-coronavirus-majority-covid-19-deaths-black/2954304001/

In responding to the pandemic, the State failed its Black residents. By May 2020, there were only 16 testing sites in the 18 Black Belt counties, with seven of those counties lacking even a single site.[11] When vaccines were rolled out, white communities received them before Black communities.[12]

Alabama's insistence on maintaining its notoriously stringent felon disenfranchisement policies also exemplifies its refusal to take action that would benefit its Black community. As explained above, the law has an inordinate effect on Black Alabamians, who are disproportionately convicted of disenfranchising crimes. The State has refused to adopt policies that would ease the criminal justice system's disproportionate impact on Black residents, such as a 2018 bill that would have explicitly banned traffic stops based on racial profiling.[13]

Finally, the State's refusal to create a second majority-Black congressional district—which, as discussed above, is clearly possible—is another instance of unresponsiveness. During the 2021 redistricting process, several leaders advocated

---

[11] *Id.*

[12] *See* Ari Shapiro & Farah Eltohamy, *Alabama Official on Vaccine Rollout: 'How Can This Disparity Exist in This Country?'*, NPR (Mar. 11, 2021), https://www.npr.org/sections/coronavirus-live-updates/2021/03/10/975692487/alabama-official-on-vaccine-rollout-how-can-this-disparity-exist-in-this-country; Sean McMinn et al., *Across the South, COVID-19 Vaccine Sites Missing from Black and Hispanic Neighborhoods*, NPR (Feb. 5, 2021), https://www.npr.org/2021/02/05/962946721/across-the-south-covid-19-vaccine-sites-missing-from-black-and-hispanic-neighbor.

[13] Brian Lyman, *Racial Profiling Bill Dies on Final Day of Alabama Legislative Session*, Montgomery Advertiser (Mar. 29, 2018), https://www.montgomeryadvertiser.com/story/news/2018/03/29/racial-profiling-bill-dies-final-day-alabama-legislative-session/469963002/.

for a second majority-Black district (or at the very least an additional opportunity district), just as others did in each redistricting cycle since 1990. *See* Stip. Facts at 13 ¶¶ 82-85. Nonetheless, the Legislature refused to take this step that would have improved government responsiveness to the Black community's needs.

      **j.**    *Senate Factor Nine:* **The justification for the new congressional map is tenuous.**

Finally, no legitimate governmental interest justifies the systematic denial of Black Alabama voters' ability to elect candidates of their choice. HB 1 was met with resounding opposition from Black voters and legislators across the State, resulting in this suit and others. Stip. Facts at 13 ¶¶ 82-84. The map-drawers and advocates of HB 1 did not and cannot justify HB 1's configuration or lack of a second majority-Black district. Indeed, the Legislature failed to even conduct a racial polarization analysis prior to enacting HB 1. *Id.* at 14 ¶ 89. This unjustified map cannot stand, particularly when drawing districts to account for the numerosity and compactness of Alabama's Black communities is required under the VRA.

**C.**    **Black Alabamians, including Plaintiffs, will suffer irreparable harm absent an injunction.**

A preliminary injunction is needed because, without one, Plaintiffs are "likely to suffer irreparable harm." *Daniels Health Scis. v. Vascular Health Scis.*, 710 F.3d 579, 585 (5th Cir. 2013). The candidate filing period for the 2022 congressional election will close on January 28, 2022. Primary elections will then take place on

May 24, 2022. If these events are allowed to occur under the congressional districts meted out in HB 1, Black Alabamians' voting rights will be unlawfully diluted—a violation of their fundamental rights for which there can be no adequate remedy. "Courts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *see also, e.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (similar); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) ("The registration applicants in this case would certainly suffer irreparable harm if their right to vote were impinged upon."). "[O]nce the election occurs, there can be no do-over and no redress" for voters whose rights were violated. *League of Women Voters of N.C.*, 769 F.3d at 247.

### D.   The balance of equities and the public interest favor relief.

The balance of the equities and the public interest strongly favor injunctive relief.[14] Absent injunctive relief, HB 1 will serve as yet another successful dilution of the Black vote in Alabama. The public interest therefore strongly favors enjoining the law—to do otherwise would subject Plaintiffs, and all those similarly situated, to irreparable harm in the form of vote dilution. *See Kennedy v. Riley*, No. 2:05-cv-1100-MHT, 2007 WL 1461746, at *2 (M.D. Ala. May 17, 2007) (concluding that

---

[14] These two "factors merge when the Government is the opposing party," as it is here. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

vindicating rights protected under the VRA is in the public service because the Act "is intended to protect the right to vote and because that right is a fundamental political right in that it is preservative of all rights") (quotation marks and citation omitted); *Campbell v. Bennett*, 212 F. Supp. 2d 1339, 1348 (M.D. Ala. 2002) (explaining claims at issue "touch upon the public's . . . right to vote, and the preservation of such rights through injunctive relief is not contrary to the public interest").

Alabama recently said as much in federal court earlier this year, where it argued that when "[v]oters face a substantial risk that their votes will be diluted," injunctive relief is appropriate. Ex. 16 at 57. And as the State also argued: "To be sure, [injunctive] relief will cause Defendant[] to change course. But that Defendant[] will be forced to stop violating the law is hardly reason to avoid issuing an injunction." *Id.*

## V.   Conclusion

For the foregoing reasons, Plaintiffs request that the Court issue a preliminary injunction enjoining implementation of HB 1 and ensuring the creation of two majority-Black congressional districts.

Dated: December 15, 2021

Richard P. Rouco
(AL Bar. No. 6182-R76R)
**Quinn, Connor, Weaver, Davies
& Rouco LLP**
Two North Twentieth
2-20th Street North, Suite 930
Birmingham, AL 35203
Phone: (205) 870-9989
Fax: (205) 803-4143
Email: rrouco@qcwdr.com

Respectfully submitted,

By: /s/ *Lalitha D. Madduri*

Lalitha D. Madduri*
Daniel C. Osher*
Joseph N. Posimato*
Olivia N. Sedwick*
**Elias Law Group LLP**
10 G St. NE, Suite 600
Washington, D.C. 20002
Phone: (202) 968-4518
Email: LMadduri@elias.law
Email: DOsher@elias.law
Email: JPosimato@elias.law
Email: OSedwick@elias.law

Abha Khanna*
**Elias Law Group LLP**
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
Phone: (206) 656-0177
Email: AKhanna@elias.law

*Attorneys for Plaintiffs*
*\*Admitted Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 15, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I certify that a copy of the foregoing has been served by ordinary U.S. Mail upon all parties for whom counsel has not yet entered an appearance electronically: None.

/s/ *Lalitha D. Madduri*
Lalitha D. Madduri
Counsel for Plaintiffs