FILED
2021 Dec-15  PM 08:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 4

FILED

2019 Nov-18  AM 11:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ALABAMA
2                     SOUTHERN DIVISION

3
    LAKEISHA CHESTNUT,  an individual;  *
4   MARLENE MARTIN, an individual;      *   2:18-cv-00907-KOB
    BOBBY DUBOSE, an individual;        *   November 5, 2019
5   RODNEY LOVE, an individual; KAREN   *   Birmingham, Alabama
    JONES, an individual; JANICE        *   9:00 a.m.
6   WILLIAMS, an individual; RODERICK   *
    CLARK, an individual; JOHN HARRIS,  *
7   an individual,                      *
            Plaintiffs,                 *
8                                       *
    vs.                                 *
9                                       *
    JOHN H. MERRILL, in his official    *
10  capacity as Alabama Secretary of    *
    State,                              *
11          Defendant.                  *
    ************************************

12

13                 TRANSCRIPT OF BENCH TRIAL
                         VOLUME II
14        BEFORE THE HONORABLE KARON O. BOWDRE
            CHIEF UNITED STATES DISTRICT JUDGE

15

16  FOR THE PLAINTIFFS:
    Abha Khanna, Esq.
17  PERKINS COIE LLP
    1201 Third Avenue
18  Suite 4900
    Seattle, Washington 98101
19  (206) 359-9000

20  Bruce V. Spiva, Esq.
    PERKINS COIE LLP
21  700 13th Street, NW
    Suite 600
22  Washington, DC 20005
    (202) 654-6338

23

24

25
```

```
 1        Richard P. Rouco, Esq.
          QUINN CONNOR WEAVER DAVIES & ROUCO LLP
 2        2 20th Street North
          Suite 930
 3        Birmingham, Alabama 35203
          (205) 870-9989
 4
          Daniel C. Osher, Esq.
 5        PERKINS COIE LLP
          700 13th Street NW
 6        Suite 600
          Washington, DC 20005
 7        (202) 654-6338

 8        Lalitha D. Madduri, Esq.
          PERKINS COIE LLP
 9        700 13th Street NW
          Suite 600
10        Washington, DC 20005
          (202) 654-6322

11

12

          FOR THE DEFENDANT:
13        James W. Davis, Esq.
          Laura E. Howell, Esq.
14        OFFICE OF THE ATTORNEY GENERAL
          501 Washington Avenue
15        P.O. Box 300152
          Montgomery, Alabama 36130-0152
16        (334) 242-7300

17        J. Dorman Walker, Esq.
          BALCH & BINGHAM LLP
18        P.O. Box 78
          Montgomery, Alabama 36101
19        (334) 834-6500

20

          COURTROOM DEPUTY:  Sarah Hollingsworth
21

22        COURT REPORTER:  Christina K. Decker, RMR, CRR

23    Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
      pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
24        and Procedures Vol. VI, Chapter III, D.2.  Transcript
                 produced by computerized stenotype.
25
```

1                           **I N D E X**

2    DR. PEYTON MCCRARY                                        252
     DIRECT EXAMINATION                                       252
3    BY MR. SPIVA
     CROSS-EXAMINATION                                        313
4    BY MS. HOWELL
     REDIRECT EXAMINATION                                     327
5    BY MR. SPIVA

6
     JOHN KNIGHT                                              333
7    DIRECT EXAMINATION                                       334
     BY MS. MADDURI
8    CROSS-EXAMINATION                                        383
     BY MS. HOWELL
9

10   LAKEISHA CHESTNUT                                        416
     DIRECT EXAMINATION                                       417
11   BY MS. KHANNA
     CROSS-EXAMINATION                                        451
12   BY MS. HOWELL
     REDIRECT EXAMINATION                                     457
13   BY MS. KHANNA
     RECROSS-EXAMINATION                                      458
14   BY MS. HOWELL

15
     SHEILA TYSON                                             459
16   DIRECT EXAMINATION                                       459
     BY MR. SPIVA

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**P R O C E E D I N G S**

(In open court.)

THE COURT:  You may be seated.  Plaintiff may call your next witness.

09:05:28  MR. SPIVA:  Thank you, Your Honor.

Your Honor, plaintiffs call Dr. Peyton McCrary.

DR. PEYTON MCCRARY,

having been first duly sworn by the Courtroom Deputy Clerk, was examined and testified as follows:

09:05:54  THE COURTROOM DEPUTY CLERK:  Will you please state your name into the microphone for the record?

THE WITNESS:  My name is Peyton McCrary.

THE COURTROOM DEPUTY CLERK:  Thank you.

DIRECT EXAMINATION

09:06:02  BY MR. SPIVA:

Q    Good morning, Dr. McCrary.

A    Good morning, Mr. Spiva.

Q    One thing -- you're doing fine so far -- but the court reporter asked us to remind all of our witnesses to just speak

09:06:14  into the microphone because it helps her with taking down the transcript.  You know, sometimes when we put things on the screen, it's natural to turn away from it to see what's on the screen, but if you can just keep that in mind.

A    Good advice.

09:06:26  Q    Dr. McCrary, you've been retained as an expert by the

1   plaintiffs in this case; is that right?

2   A    Yes.

3   Q    Let's begin with a little bit of your background.  Can you

4   please describe for us your educational history?

09:06:43  5   A    Well, I received a B.A. and M.A. from the University of

6   Virginia in history, and a Ph.D. from Princeton University in

7   1972 also in the department of history.

8   Q    And what did you do after receiving your doctorate?

9   A    I was already teaching at the University of Minnesota,

09:07:04  10   where I taught from 1969 to '76.  I then taught for two years

11   at Vanderbilt University in Tennessee.  And then from 1978 to

12   1990, I was a professor of history at the University of South

13   Alabama in Mobile.

14   Q    Okay.  And let's turn to Plaintiffs' Exhibit 81.  And in

09:07:29  15   particular -- first of all, is Plaintiffs' Exhibit 81 the first

16   declaration that you submitted in this case, Dr. McCrary?

17   A    Yes.

18   Q    Okay.  If we could turn to the back of that where your

19   curriculum vitae appears, which is just after the report

09:07:46  20   itself.

21   A    Yes, sir.

22   Q    And is this your curriculum vitae?

23   A    Yes, it is.  I prepared it, and it's up to date to the

24   best of my recollection.

09:08:02  25   Q    Okay.

1          THE COURT:  For the record, that's page 39, right?

2          MR. SPIVA:  Thank you, Your Honor.

3    BY MR. SPIVA:

4    Q    And, Dr. McCrary, what did you teach at the universities

09:08:24 5    that you taught at?

6    A    Well, in addition to teaching the standard United States

7    history course, I taught courses in history of the south.  I

8    taught courses in some of those institutions in the American

9    party system.  I taught a course in quantitative methods at the

09:08:42 10   University of South Alabama.  And I taught African-American

11   history one year at Vanderbilt.

12   Q    And what type of quantitative methods did you teach?

13   A    Well, I taught students about the analysis of legislative

14   behavior using roll call voting analysis, the statistical

09:09:07 15   methods used to analyze voting behavior.

16        One of my graduate students did a master's thesis

17   following that course in which she analyzed racially polarized

18   voting in Mobile County, as I recall.

19   Q    And after you finished your teaching at the University of

09:09:29 20   South Alabama, where did you go after that?

21   A    Well, I was employed for 26 years as a social science

22   analyst in the Department of Justice in the Civil Rights

23   Division in the section that enforced the Voting Rights Act.

24   Q    And what was your role while employed at DOJ's Civil

09:09:48 25   Rights Division?

A    One of my principal responsibilities was to help the

attorneys understand the factual evidence in cases, to

determine which disciplines would be the logical place to look

for appropriate expert witnesses, suggesting appropriate expert

witnesses, and giving the attorneys a choice of persons who

could do the analysis needed, working with the lawyers and the

experts to make sure that they understood one another, and

helping the lawyers to assess the evidence of experts -- expert

testimony from opposing parties.

Q    And during that time, did you personally testify as an

expert in Section 2 cases?

A    Not ordinarily.  I did once testify in a case in Alabama

back I think in 1991 because I had -- before being employed by

the Department, I had been an expert witness for the plaintiffs

in that case.

     And as I recall, Judge Dubina accepted the motion from

that attorney that the Department of Justice be asked to

participate on an amicus basis for the purpose of putting on my

testimony.  Otherwise, I did not testify except through written

declarations in certain circumstances in cases during my

employment by the Department.

Q    Did you receive any special recognition relating to your

work at DOJ?

A    Yes.  I think it was in 2011 I received the Maceo Hubbard

Award for sustained commitment to the enforcement of the Voting

1 Rights Act.

2 Q    Have you published literature on the subject of voting

3 rights?

4 A    Yes.  For the last 35 years, almost all of my scholarly

09:11:47 5 writing and publications has been concerned with the history of

6 discriminatory election laws in the south, the enforcement, the

7 adoption and enforcement of the Voting Rights Act, methods used

8 by expert witnesses in addressing issues in voting rights

9 litigation, and the impact of enforcement of the Voting Rights

09:12:10 10 Act on minority representation in Alabama and also in South

11 Carolina.

12 Q    And I take it from your last answer, you have written

13 specifically about voting rights in Alabama?

14 A    Yes, in a variety of those publications.

09:12:22 15 Q    Can you tell us what the publications were?  And if we can

16 go to page 5 of Plaintiff's Exhibit 81, paragraph 8.  And it's

17 actually on pages 4 and 5.  I'm sorry.

18      And if you could actually describe for us what you have

19 written about voting rights in Alabama?

09:12:50 20 A    Well, let me start with a chapter that I coauthored as the

21 senior author in a book published by Princeton University Press

22 in 1994 called *Quiet Revolution of the South:  The Impact of*

23 *the Voting Rights Act*.  I was the senior author of the Alabama

24 chapter in that book.  There were chapters on each of the

09:13:10 25 states covered by Section 5 of the Voting Rights Acts.  I also

1 was the coauthor on the South Carolina chapter.

2     In a recent volume of essays honoring my -- the second

3 reader on my dissertation, Shelton Hackney, just before he

4 passed away of Lou Gehrig's disease, I had an essay that

09:13:32 5 focused on the evidence in *Dillard vs. Crenshaw County, Alabama*

6 in which I was an expert back in the 1980s.

7     I also discussed Alabama evidence in a journal article I

8 published on the subject of racially polarized voting, looking

9 at expert testimony in Alabama cases, analyzing not only the

09:13:57 10 degree to which voting patterns were polarized along racial

11 lines, but also looking at the racial disparities in

12 socioeconomic circumstances cited by an expert in addressing

13 the totality of circumstances test under Section 2 of the

14 Voting Rights Act.

09:14:16 15 Q    Did you also write a book chapter about the evidence

16 presented in city of Mobile?

17 A    Yes. As a matter of fact, I forgot about that. That was

18 my first publication dealing with voting rights matters in a

19 collection published in 1984 called "Minority Vote Dilution."

09:14:35 20 That essay summarized the historical evidence that I had

21 presented as an expert witness in the two Mobile voting rights

22 cases in 1981. And it originated as written testimony to the

23 subcommittee on civil and constitutional rights of the House

24 Judiciary Committee, which was a part of the record before

09:14:55 25 Congress in amending Section 2 of the Voting Rights Act in

1    1982.

2    Q     And you mentioned that you submitted, I guess, written

3    testimony in connection with the 1982 amendments to the Voting

4    Rights Act?

09:15:11  5    A     Yes.

6    Q     And did you also testify live before Congress before those

7    amendments?

8    A     No, I didn't; only submitting written testimony.

9    Q     Okay.  Have you provided any other congressional testimony

09:15:26 10   on voting rights?

11   A     Yes.  Most recently, I gave both written and oral

12   testimony before a subcommittee on -- of the House Judiciary

13   Committee regarding the facts that Congress should know in

14   considering new voting rights litigation.  The staff member who

09:15:50 15   explained what my task was in that instance, he said it was to

16   provide history 101 on the Voting Rights Act.

17              THE COURT:  And when was that, Dr. McCrary?

18              THE WITNESS:  That was in March of this year.

19              THE COURT:  Okay.

09:16:05 20   BY MR. SPIVA:

21   Q     Have you published on aspects of the totality of the

22   circumstances test under Section 2?

23   A     Yes.  In several of my journal articles, in explaining

24   both the case law and explaining how experts have applied

09:16:21 25   quantitative evidence in addressing the totality of

1    circumstances test set out in the Senate's report 1982, I have

2    addressed that.

3    Q    Have you published literature regarding statistical

4    analysis of voting behavior?

09:16:37  5  A    Yes.  The article to which I referred earlier regarding

6    racially polarized voting explains the evolution of the

7    statistical methods used by expert witnesses in voting rights

8    cases in the 1970s and 1980s.  It was published almost 30 years

9    ago.

09:16:54 10  Q    And during your time at DOJ and then after your retirement

11   from DOJ, did you continue to teach?

12   A    Yes.  I'm in my 13th year of co-teaching a course on

13   voting rights law at G. W. Law -- George Washington University

14   Law School in the district where I co-teach the course with a

09:17:18 15  former colleague of mine in the Civil Rights Division of the

16   Department of Justice.

17   Q    I don't know if you mentioned it.  What's that course

18   concerning?

19   A    Voting rights law.

09:17:26 20  Q    Okay.

21   A    However, I am not an attorney.

22   Q    How many times have you testified in court as an expert

23   relating to voting rights?

24   A    I think this is my 18th time in court, 17 or 18.

09:17:45 25  Q    Okay.  And turning to paragraph 6 and 7 of Plaintiffs'

```
 1   Exhibit 81, which is your first declaration, which I think
 2   summarized some of your testimony, can you describe the subject
 3   matter of those cases that you testified in?
 4   A    In most of the cases in Alabama in which I testified, I
 5   was addressing the history of discrimination affecting voting
 6   and the degree to which laws that were being challenged were
 7   adopted with a racially discriminatory purpose.
 8        In one case, Harris vs. Graddick, I was testifying about a
 9   small part of the historical evolution of the laws regarding
10   the appointment of poll officials in Alabama.
11        And in the years since my retirement, I've testified in
12   one case, a case last year tried in Montgomery before Judge
13   Watkins, regarding the method of electing statewide judicial
14   officers in Alabama.
15   Q    Is that the case that is often called the Alabama Judges'
16   Case?
17   A    Yes.
18   Q    And have you also testified concerning the Senate factors
19   in any of those cases?
20   A    Yes.  In that case, as I recall, and also in a Georgia
21   case, which was settled following my deposition in the case.
22   Q    Okay.  Let's see.  Were you qualified by the Court as an
23   expert in each of the cases that you testified in?
24   A    Yes.
25   Q    And let me ask you -- you've confirmed that Plaintiffs'
```

09:18:18 5
09:18:43 10
09:19:07 15
09:19:20 20
09:19:49 25

1  Exhibit 81 is your first declaration.

2       Let's turn briefly to Plaintiffs' Exhibit 82, and ask you

3  if you can confirm that that's the second declaration or

4  rebuttal report that you submitted in this case.

09:20:10  5  A    That's correct.

6  Q    Okay.  Are the opinions and conclusions that you reached

7  in this case contained in those two declarations?

8  A    Yes.

9  Q    And have you changed your opinions or conclusions in any

09:20:25 10  way?

11  A    Only in clarifying an error I made in my deposition

12  answers to a question which I addressed in an errata sheet.

13  Q    Okay.  But in terms of the opinions and conclusions that

14  you reach in the declarations, you haven't changed any of

09:20:48 15  those, I take it?

16  A    No.

17  Q    And can you just briefly describe the materials you

18  reviewed in creating your expert declarations?

19  A    Well, I reviewed the sort of documents that both

09:21:04 20  historians and political scientists address in -- or

21  investigate in describing all of the subject matter that I --

22  with which I'm dealing in this report, and look at the

23  secondary literature that is, say, writing by social scientists

24  and other qualified scholars on the issues that are relevant to

09:21:32 25  the case, look at the government documents that are relevant to

1  the issues in the case, including census data when appropriate.

2      I examined documents that are somewhat unusual in

3  extensive review of expert witness reports and expert witness

4  testimony in voting rights cases.  I look at records submitted

09:22:01  5  under Section 5 review during the period before *Shelby County*

6  *vs. Holder* was decided by the Supreme Court in 2013.  I also

7  look at court decisions which often provide important factual

8  evidence.

9      I also sometimes write about the evolution of the case law

09:22:23  10  and teach that subject matter in court -- in the course I teach

11  at G. W. Law school, but I have never addressed the legal

12  questions in any expert witness testimony that I have given.

13  Q    And I don't know if you mentioned this.  I assume you also

14  reviewed secondary sources written by historians and political

09:22:41  15  scientists, including yourself?

16  A    That's actually where I started.

17  Q    Oh, okay.  Sorry.  I missed that.

18          MR. SPIVA:  Your Honor, at this time, I'd like to

19  offer Dr. McCrary as an expert in the -- as a historian,

09:22:53  20  particularly the history of discrimination affecting voting

21  including in Alabama and in statistical methods in racially

22  polarized voting.

23          THE COURT:  Any objection?

24          MS. HOWELL:  I'm so sorry.

09:23:08  25          THE COURT:  Any objection?

| | |
|---|---|
| 1 | MR. SPIVA:  I just offered him as an expert.  We |
| 2 | already stipulated to his expertise. |
| 3 | MS. HOWELL:  Correct.  I'm sorry.  Could you restate |
| 4 | what you were offering him as an expert in? |
| 09:23:18  5 | MR. SPIVA:  Sure.  Your Honor, we offer Dr. McCrary as |
| 6 | an expert historian, particularly in the history of |
| 7 | discrimination affecting voting including in Alabama, and in |
| 8 | statistical methods particularly concerning racially polarized |
| 9 | voting. |
| 09:23:33 10 | MS. HOWELL:  Your Honor, I had not understood |
| 11 | Dr. McCrary to be testifying as to the statistical methods |
| 12 | underlying racially polarized voting.  I had understood him to |
| 13 | be only an expert on the history of discrimination. |
| 14 | MR. SPIVA:  Only the history of racially polarized |
| 09:23:49 15 | voting.  Anything that he is going to testify about that is in |
| 16 | his report.  And we have stipulated to him being able to |
| 17 | testify about anything that's in his report. |
| 18 | In other words, he's not going to rerun the testimony of |
| 19 | Dr. Palmer.  But he talks about the history of racially |
| 09:24:10 20 | polarized voting in his report. |
| 21 | THE COURT:  Not about statistical methods. |
| 22 | MR. SPIVA:  I mean, he's not going to go through the |
| 23 | things that Dr. Palmer did yesterday.  But in testifying about |
| 24 | the history of racially polarized voting, it may touch on, you |
| 09:24:27 25 | know, the statistical methods that are used to do that.  But |

1    it's not -- it's going to be a very, you know -- it would be

2    ten -- it would be a very minor part of what he might say.

3           THE COURT:  Do either of his reports talk about

4    statistical methods?

09:24:45 5           MR. SPIVA:  They do.  I will amend the request, Your

6    Honor.

7           THE COURT:  Okay.

8           MR. SPIVA:  So instead of saying statistical methods,

9    why don't I say racially polarized voting -- the history of

09:24:57 10   racially polarized voting.

11          MS. HOWELL:  Your Honor, we have no objection to that.

12          THE COURT:  Okay.  All right.  Then I recognize him as

13   an expert in the historical aspects of voting, discrimination

14   in voting, and racially polarized voting.

09:25:47 15          MR. SPIVA:  Thank you, Your Honor.

16   BY MR. SPIVA:

17   Q    So, Dr. McCrary, could you first just please explain what

18   you were asked to analyze for your initial report in this case?

19   A    I was asked to analyze the history of racial

09:26:08 20   discrimination affecting voting in Alabama, including laws

21   adopted by the state over the years and the degree to which

22   there appear to be continuing effects of that history in more

23   recent voting behavior and patterns of representation in the

24   state.

09:26:29 25   Q    Okay.  And did you also look at devices that enhance the

1  opportunity for discrimination in voting?

2  A    That's a part of the history of discrimination that I

3  described in summary.

4  Q    Okay.  I take it you looked at several of the Senate

09:26:58 5  factors in the factual analysis of several of the Senate

6  factors?

7  A    Yes.  It happens that my testimony addresses a number of

8  factors set out in the Senate report in 1982 as criteria for

9  assessing the totality of circumstances evidence in a case.

09:27:17 10  Q    And I know you said you're not a lawyer.  In your

11  experience in testifying in voting rights cases, is it common

12  for social scientists to become familiar with the relevant case

13  law in this area?

14  A    Yes.  In order to be of use to the Court, we need to

09:27:34 15  understand the legal context that the Court has to address the

16  facts in, and so it's helpful to understand the Court

17  decisions.

18  Q    Okay.  And is it common for historians in the area of

19  voting rights to use Court decisions in their scholarly work?

09:27:53 20  A    Yes.

21  Q    And do you often incorporate court decisions in your own

22  scholarly work?

23  A    Yes.

24  Q    And can you please explain what you understand the purpose

09:28:04 25  of the totality of the circumstances analysis under Section 2

1   to be?

2   A    Well, the totality of circumstances test was adopted by

3   Congress in 1982 with the intention of relying on the criteria

4   that the Supreme Court set out in *White versus Regester* in 1973

09:28:28 5   in which the old Fifth Circuit elaborated on in *Zimmer vs.*

6   *McKeithen* I think in 1974, in which the courts had been

7   following as ways of assessing problems of minority vote

8   dilution in the 1970s before the Supreme Court handed down *City*

9   *of Mobile vs. Bolden.*

09:28:50 10   Q    Let's maybe walk through the various Senate factors that

11   your reports address, or particularly your first report.  Let's

12   begin with the first factor the extent of any history of

13   official discrimination in the state or political subdivision

14   that touches the right of the members of the minority group to

09:29:07 15   register to vote or to otherwise participate in the democratic

16   process.

17       What overall conclusion did you reach regarding the first

18   Senate factor?

19   A    That there was an extensive history of racial

09:29:22 20   discrimination affecting voting in Alabama which continues to

21   have effects in current election circumstances in Alabama.

22   Q    And did you also look at the history of discrimination in

23   social and economic life in addition to political life?

24   A    Yes.  I looked at the racial disparities in socioeconomic

09:29:46 25   characteristics, both in the period before the adoption of the

| | |
|---|---|
| 1 | Voting Rights Act and in more recent decades. |
| 2 | Q    And what historical period did you consider in reaching |
| 3 | the conclusion you mentioned a minute ago? |
| 4 | A    My primary focus is the period since the end of the white |
| 09:30:06 5 | primary in the mid-1940s up through more or less the present |
| 6 | period. |
| 7 | Q    But did you also look to some extent at history from |
| 8 | Reconstruction through the period of the white primary? |
| 9 | A    Very briefly in introducing the -- or explaining, I should |
| 09:30:29 10 | say, the changes that began in the mid-1940s. |
| 11 | Q    Okay.  And let me begin by asking you just a couple of |
| 12 | questions about the post-Reconstruction period. |
| 13 | Can you provide, I guess, just a brief history of the |
| 14 | post-Reconstruction period and then discuss the period around |
| 09:30:55 15 | 1901? |
| 16 | A    Well, anyone who's studied Alabama history knows that |
| 17 | African-Americans were enfranchised during the Reconstruction |
| 18 | period, and they continued to be able to vote in elections in |
| 19 | Alabama until really the work of the 1901 constitutional |
| 09:31:14 20 | convention, which is usually referred to by Alabama historians |
| 21 | as the state's disenfranchising convention. |
| 22 | That convention adopted various tests or devices, |
| 23 | including a literacy test to be implemented or enforced, I |
| 24 | should say, by local boards of registrars, a poll tax that |
| 09:31:39 25 | further served to make it difficult for persons who were poor |

1    to vote, and subsequent to the convention the establishment of

2    a white primary that had been in practice in some localities

3    long before the 1901 convention.

4    Q    And did the 1901 convention adopt any other devices such

09:32:04 5    as property qualifications or disqualification of voters who

6    had been convicted of crimes?

7    A    There were property qualifications for voting which would

8    have had an effect of disenfranchising poor whites, as well as

9    poor African-Americans.  And so there was a provision that

09:32:24 10    allowed persons whose ancestors may have fought in the

11    Confederate Army to participate in elections despite not

12    meeting the property qualifications.

13         The Constitution included felon disfranchisement

14    provision, which actually antedated 1901, but was modified in

09:32:48 15    the convention.  And in particular, including a provision of

16    the Constitution known for decades as the petty crimes

17    provision specifying certain misdemeanors that were also

18    disqualifying beyond the felonies.  And those particular

19    methods were cited by one of the delegates to the

09:33:15 20    constitutional convention as crimes typically committed by

21    Negroes, and, therefore, an appropriate way of limiting black

22    participation in the political process.

23    Q    And how did you reach the conclusion that the provisions

24    that were adopted by the 1901 convention were intended to

09:33:36 25    prevent African-Americans from voting?

A     First of all, it's undisputed among all the historians who
have written about the subject, including most prominently
Malcolm McMillan, whose published dissertation was a study of
constitutional development in Alabama, and for many years a
professor of history at Auburn, as I recall.

      But in addition to that, I had occasion to analyze the
debates in the constitutional convention in earlier research,
so I'm familiar with the language of the delegates.  And that
history has been discussed also in numerous judicial decisions,
which means that incidentally I reviewed the language of the
convention over the time I've worked on the history of Alabama.

Q     Am I understanding you correctly that there was -- that
the purpose of these provisions was explicitly stated by the
people who convened the convention?

A     Repeatedly.

Q     I'm sorry?

A     Repeatedly.

Q     Okay.  And let's maybe pull up paragraph 16 of your first
report, Plaintiffs' Exhibit 81, which is on page 10.

      What effect did these provisions that were adopted in the
state's constitution in 1901 have on black voter registration?

A     The impact was to eliminate virtually all black registered
voters from the voter rolls.  The numbers I cite in that
paragraph were 181,000 registered before the 1901 constitution,
and two years later, 3,000 were left on the rolls.

1    Q    Okay.  And what effect, if any, did the provisions have on

2    the partisan landscape of the state of Alabama?

3    A    Well, African-Americans had been voting predominantly

4    Republican during the 19th century.  And the Democratic party

09:35:50 5    was proud to call itself the white supremacy party.  It was

6    overwhelmingly white.  The disenfranchising convention

7    essentially eliminated the Republican party from effective

8    politics in Alabama for decades.

9    Q    And what effect, if any, did the rise of one party rule on

09:36:12 10   the state have on the competitiveness of Alabama elections?

11   A    Well, they were competitive as long as you were white;

12   that is to say African-Americans weren't allowed to participate

13   in the primary by party rules that were sanctioned by state law

14   most of the time.

09:36:27 15   Q    And so you're referring there to the white primaries that

16   you referenced earlier?

17   A    Yes, sir.

18   Q    And what happened to the white primaries ultimately?

19   A    Well, following the outlawing of the white primary in

09:36:44 20   Texas in *Smith vs. Allwright* by the Supreme Court in 1944, each

21   of the southern states that had conducted white primaries

22   ultimately had to concede that African-Americans could

23   participate in democratic primaries even though some adopted

24   measures trying to retain the white primary.

09:37:07 25   Q    And how did the state of Alabama react to that decision?

1  And it might be helpful to pull up paragraph 17 just for

2  reference.

3  A    Well, in 1946, following the outlawing of the Alabama

4  white primary, an amendment to the state constitution was

09:37:26 5  proposed by, as I recall, E.C. Boswell from one of the north

6  Alabama counties, which was popularly known as the Boswell

7  Amendment, which would add to the literacy test adopted in

8  1901, a requirement that individual -- an individual seeking to

9  register be able to read and interpret any provision of the

09:37:51 10  federal constitution.

11     That was ratified by the voters in 1946.  And it was

12  originally proposed by Gessner McCorvey of Mobile, who was a

13  longtime chair of the Alabama State Democratic Executive

14  Committee and whose -- and I happen to have read the records of

09:38:16 15  the Alabama State Democratic Executive Committee for the years

16  of the 1940s, '50s, and early 1960s, so I ran across his

17  comments there.  But they have also been quoted in several

18  historical studies that I cite in my report.

19  Q    What was the effect of the Boswell Amendment?

09:38:38 20  A    Well, it would have had a significant effect on reducing

21  African-American voting registration, except that it was struck

22  down by the federal courts in *Davis vs. Schnell* in 1949, I

23  think.

24  Q    And before it was struck down, though, what effect did it

09:38:54 25  have, in terms of giving registrars discretion?

```
 1   A    Well, it certainly gave registrars maximum discretion.  I
 2   haven't examined the numbers of persons who were turned away
 3   from voter registration.  And I don't recall that other
 4   historians have examined the statistical effects of the
09:39:18  5   quantitative effects, I should say, in that brief period when
 6   it was implemented.
 7        But it gave, as the Court noted in Davis vs. Schnell, it
 8   gave considerable discretion to local registrars, most of whom
 9   were only high school graduates.  Almost none of whom had ever
09:39:37 10  been to law school.  And as the Court noted, there are
11   provisions of the state -- of the U.S. Constitution which are
12   difficult for lawyers to explain.
13   Q    That's for sure.
14        THE COURT:  I think we could get an amen on that.
09:39:59 15  BY MR. SPIVA:
16   Q    And so you mentioned a minute ago that the Boswell
17   Amendment was, I guess -- the Supreme Court struck it down in
18   1949.  How did the state of Alabama react to the Schnell
19   decision striking that down?
09:40:18 20  A    The legislature came up with another constitutional
21   amendment, which was ratified by the voters in 1951, I think,
22   the voter qualification amendment.
23   Q    And what was the purpose of the voter qualification
24   amendment?
09:40:31 25  A    Well, according to a study by the Alabama -- University of
```

 1    Alabama political scientist Donald Strong in the mid-1950s, it
 2    was adopted with a racially discriminatory purpose.
 3         And what it did was to require that the literacy test be
 4    constructed by the Alabama State Supreme Court, which it
09:40:54  5  continued to do until that literacy test was eliminated by the
 6    adoption of the Voting Rights Act in 1965.
 7    Q    And then let me ask you:  In addition to restrictions --
 8    do you have water up there?
 9    A    I do.
09:41:13  10  Q    Okay.  Good.  In addition to restrictions on voter
11    registration, were there other methods of election used
12    pre-1965 that were designed to eliminate the ability of
13    African-Americans to elect their candidates of choice?
14    A    Yes.  In 1951, for example, the legislature adopted an
09:41:37  15  anti-single shot law for municipal elections in the state of
16    Alabama.
17    Q    What's an anti-single shot law?
18    A    Single-shot voting was used throughout the country by
19    minority voters -- and not just African-Americans, but other
09:41:52  20  minority voters and political minorities, as well -- to provide
21    a means of obtaining some representation in local government by
22    voting in an at-large election system for the one candidate
23    they preferred so as to increase the mathematical weight of the
24    votes they cast.
09:42:13  25       And, therefore, an anti-single shot law -- also known as a

1  full slate law -- would eliminate the possibilities of

2  providing token representation, if you will, or some

3  representation for minority voters by requiring that anyone who

4  didn't vote for all the seats up for election at a given moment

09:42:38  5  have their ballot disqualified.

6  Q    Okay.  And if we could just step -- take one step back,

7  because I think the -- we may have missed the kind of the

8  premise or the reason these anti-single shot laws were passed.

9      Can you tell us about the use of at-large elections rather

09:42:59 10  than single-member districts during this period of time?

11  A    Well, at-large elections are -- were a dominant feature of

12  Alabama election law for many years.  Although after the

13  disfranchisement of African-Americans in 1901, a significant

14  number of counties moved back to single-member districts, and

09:43:25 15  after the end of the white primary began moving back to the use

16  of at-large elections.  It's the case that at-large elections

17  make it difficult, if not impossible, for voters who are in a

18  minority in a jurisdiction to elect candidates of their choice

19  where there is racially polarized voting.

09:43:49 20      And that's why in order to understand the way in which an

21  at-large election system operates, analyzing racially polarized

22  voting is necessary.  Where there's no racially polarized

23  voting, at-large elections would not likely have a

24  discriminatory effect.  And the same thing would likely to be

09:44:06 25  true of an anti-single shot law.

```
 1  Q    And this is probably an obvious question, but during this
 2  period of time that you have been talking about, roughly the
 3  '40s through the '65 Act, was the there racially polarized
 4  voting in Alabama?
 5  A    Yes.
 6  Q    And so then can you explain how the anti-single shot law
 7  interacts with at-large voting to undermine African-American
 8  voting participation?
 9  A    Well --
10  Q    And I know you probably partly described that, but you can
11  kind of consider me a slow undergrad guy, so...
12  A    Well, the effect of the anti-single shot laws is most
13  evident in the municipal elections that were the focus of it.
14       African-Americans had reached significant voting strength
15  in the city of Tuskegee, Alabama, also to some extent in Mobile
16  and Montgomery and in Birmingham.  And it was in that context
17  that the legislature decided, after explicit explanation of the
18  racial effects of an anti-single shot law, to prevent the black
19  vote from increasing or from having a chance to elect
20  candidates in those elections by member of the legislature.
21       The effect of these laws was to make it impossible for
22  African-Americans to elect a candidate of their choice in those
23  places where they were reaching a level where that would be
24  possible.
25  Q    And what about the numbered place requirement?  What is
```

1 that? And how does that relate to the discussion we've been

2 having?

3 A    Well, numbered place requirements had been used for some

4 elections in Alabama before 1961.  But in 1961, the legislature

09:46:09 5 adopted Act Number 221, which set forth a requirement that all

6 at-large elections or multi-member district elections in

7 legislatures require candidates to qualify for a specific

8 place -- Place Number 1, Place Number 2, Place Number 3, and so

9 on.

09:46:31 10    And the effect of that was to convert all elections in an

11 at-large system into head-to-head contests for a particular

12 place.  And it has the effect of eliminating the possibility of

13 single-shot voting; thereby making the 1951 municipal election

14 law prohibiting single-shot voting irrelevant.

09:46:56 15 Q    And with respect to these provisions -- the anti-single

16 shot law, the numbered place requirement -- who typically

17 passed that?  Were they passed at the local level?  The state

18 level?

19 A    In Alabama in that period, especially and for decades

09:47:18 20 afterwards, almost all jurisdictions lacked the authority to

21 set their own method of election.  The Alabama Legislature did

22 so.  And when localities wanted to change the method of

23 election, they had to operate through the local legislative

24 delegation from the county in which they were located.

09:47:44 25    And so there were a few cities that had home rule

1    provisions under the Alabama municipal election code, as I

2    recall.  But other than home rule cities, the legislative

3    delegation was typically granted local courtesy by the entire

4    legislature in passing those laws.

09:48:08 5    Q    Can you put up paragraph 24 of Plaintiffs' Exhibit 81,

6    which appears on pages 15 and 16?

7        And I'll just ask you:  What was the purpose of these

8    provisions -- the anti-single shot, the numbered place

9    requirement?  What was the purpose of those provisions?

09:48:31 10   A    To limit African-American abilities to elect

11   representatives of their choice.

12   Q    And how did you reach that conclusion?

13   A    I already referred to the racially explicit justification

14   for the anti-single shot law in 1951.  The evidence is in some

09:48:49 15   ways more dramatic, in regard to the 1961 numbered place law.

16   And I cite some of that specific evidence in my report in that

17   paragraph or in successive paragraphs.

18   Q    Okay.  What is the language that you're referring to, in

19   terms of the 1961 plan?

09:49:13 20   A    There is one news article in which Bob Ingram of *The*

21   *Montgomery Advertiser* said explicitly that the new law, Act

22   221, was -- and I'm quoting -- "aimed at Negroes as much as

23   anything else," end of quote.

24       Mr. Ingram actually testified as a witness in the 1991

09:49:41 25   trial where I was an expert and did not recall that.  But he

1  did write that in 1961.

2  Q    Is that in paragraph 26?  Is that quoted in paragraph 26?

3  A    Actually, that's quoted in paragraph 25 of the report.

4  Q    Okay.

09:49:59 5  A    But the most dramatic evidence is cited in paragraph 26 --

6  Q    If we could pull that up, please?

7  A    -- in an indented quote.

8  Q    Paragraph 26, next page?

9  A    This was a speech given by Frank Mizell who was active in

09:50:19 10  the democratic party leadership before the Alabama State

11  Democratic Executive Committee in January of 1962.

12      He was explaining to the executive committee why the

13  democratic primaries would have to employ the numbered place

14  requirement adopted by the legislature in 1961.  And he

09:50:41 15  explained its purposes in, shall we say colorful language that

16  it would no longer be considered politically correct.

17  Q    Yeah.  It's explicitly racist language; is that right?

18  A    Yes.

19  Q    Okay.  And that's seen in the indented paragraph in

09:51:06 20  paragraph 26 of your first report?

21  A    Yes.

22  Q    Okay.  What effect, if any, did Jim Crow laws have on

23  these provisions, or how did they interact with these

24  provisions?

09:51:25 25  A    Well, recall that the state of Alabama, like the state of

1    Virginia in which I grew up, was operating under a system of

2    official racial discrimination in all walks of life.  And so

3    the social context in which the election process operated was

4    affected by that.

09:51:43 5        For example, I cite evidence of the racial disparities in

6    educational levels of African-Americans and whites in Alabama

7    cited in --

8    Q    Pull up paragraph 28, which appears on pages 18 and 19.

9    A    -- cited in Donald Strong's study of voter registration in

09:52:02 10   Alabama in 1956.

11        And that evidence I'm familiar with from a book I assigned

12   in teaching Alabama history Horace Mann Bond's classic study of

13   *Negro Education in Alabama*, which was his desecration at the

14   University of Chicago in 1939, where he first used per pupil

09:52:24 15  expenditure data by race for the funding of the white schools

16   and the Negro schools in the Jim Crow system, demonstrating

17   that there were quite remarkable racial disparities in the

18   funding for black and white schools at that time.  And other

19   studies have shown using similar data that this continued.

09:52:44 20       And consequently, every time the census measured

21   educational achievement, there was a racial disparity observed

22   even then in the 1950s and '60s between whites and blacks.  And

23   since the level of education of voters is considered by

24   political scientists analyzing the degree of political

09:53:04 25  participation from the 1960s forward to be the single most --

1 usually the single most important determinative of voter

2 participation rates, certainly augmented by other social and

3 economic characteristics, such as poverty levels and access to

4 vehicles, educational disparities have a marked impact on the

09:53:30 5 degree to which poor people are able to register and vote --

6 poor people, whether white or black.

7 Q    What role, if any, did violence play in this history that

8 you have been discussing?

9 A    Well, violence was a significant factor in the late 19th

09:53:48 10 century.  And there were instances reported in studies of

11 Alabama, like other states, where there was sometimes physical

12 intimidation of persons seeking to register and vote.  But the

13 evidence on that score that I've examined is a lot less

14 dramatic than, say, in Mississippi.

09:54:09 15     But there were, of course, in -- well, in Birmingham in

16 the 1950s there were the bombing of various black churches not

17 directly related to the political process, but creating an

18 atmosphere of racial intimidation.  They were, of course, not

19 carried out by officials, but by members of the Klu Klux Klan,

09:54:35 20 or other similar organizations.

21     But in that period, of course, Birmingham was sometimes

22 referred to in the press as "Bombingham".

23 Q    Can you tell us what, if anything, you found regarding the

24 state's role in political violence against African-Americans at

09:54:53 25 any point in this history?

1  A    Other than in the late 19th century, I can't recall any

2  violence until the incident at the Edmund Pettus Bridge in

3  Selma in 1965 where state troopers did attack physically Civil

4  Rights marchers with the implicit authorization of Governor

09:55:23  5  George Wallace in what was often referred to in the press as

6  "Bloody Sunday".

7  Q    And you mentioned in that last answer that other than in

8  the late 19th century.  What in the late -- just briefly in the

9  late 19th century, what role did the state either sponsored or

09:55:44 10  violence under the color of law play?

11  A    The only things I recall are local officials who were

12  involved as in Mobile, where I remember in the 1870s at one

13  point a piece of field artillery was rolled out into the

14  streets and pointed at the polls in the seventh ward of the

09:56:05 15  heavily black ward of Mobile in the 1870s.  But I don't think

16  that had anything to do with state officials.

17  Q    And going back to the "Bloody Sunday" violence that you

18  mentioned a moment ago, did this violence prompt intervention

19  from the federal government?

09:56:24 20  A    Yes.

21  Q    And how so?

22  A    Well, it played a significant role in stimulating voting

23  support in the Congress for the adoption of the Voting Rights

24  Act of 1965.

09:56:38 25  Q    So now I'd like to focus on the period after the Voting

1   Rights Act of 1965.  What effect did the Voting Rights Act have

2   on black registration in Alabama?

3   A    Well, because it struck down the use of tests or devices,

4   such as the literacy test, and understanding clauses, and the

09:57:00  5   requirement that new registrants have an existing registered

6   voter vouch for them when seeking to register, the Voting

7   Rights Act also provided for the use of federal examiners and

8   federal observers.

9        And in the early period -- in the early years after the

09:57:22 10   adoption of the Voting Rights Act, some Alabama counties did

11   have federal examiners who were sent in to register voters if

12   there was a determination in the federal government that that

13   was necessary to provide effective voter registration

14   opportunities.

09:57:43 15        Federal observers were sent in and continued to be sent in

16   right on through the 2006 Reauthorization Act in elections

17   where it was believed by federal authorities that there was a

18   possibility of interference with elections on the part of the

19   people running them against the interest of minority voters.

09:58:09 20        The federal examiners were rarely used, but the threat of

21   using federal examiners played a role, according to most of the

22   studies of this period, in encouraging local officials to

23   cooperate with the -- with the requirements of the Voting

24   Rights Act.

09:58:27 25        And in a few instances in Alabama -- I remember writing

about two or three of them -- the state courts sought to

prevent the enforcement of the Voting Rights Act in their

jurisdiction.  And their decisions were overturned by federal

courts.

09:58:45  Q    And how did the state respond to the passage of the '65

Voting Rights Act?

A    Well, the state was one of many southern states that

supplied an amicus brief before the Supreme Court decision in

*South Carolina vs. Katzenbach.*

09:59:07  Q    And did the state or local jurisdictions in Alabama adopt

any dilutive practices after the passage of the '65 Act?

A    There were a number of counties as I recall which had not

yet adopted at-large elections that did shift back to use of

at-large elections.

09:59:26      The Wallace administration also encouraged private efforts

of voter mobilization.  And that's been studied by political

scientists.  And they think that plays a role in the fact that

while the Voting Rights Act enfranchised African-Americans in

Alabama, it also enfranchised a lot of white people who had

09:59:47  been -- who had previously not been voting, in part because not

only the Voting Rights Act, but a federal court determination

that the Alabama poll tax was unconstitutional.

Q    And what role did the Department of Justice, the federal

Department of Justice play in this process between 1965 and

10:00:11  1982?

A    Well, first of all, the Department of Justice -- I didn't
address this in my report.  But the Department of Justice did
play a substantial role in drafting the Voting Rights Act.

But what I did discuss in my report is that the
Department, in addition to sending federal observers or federal
examiners to which I've also already referred, was enforcing
the provisions of Section 5 of the Voting Rights Act which
required all voting changes --

Q    Paragraph 31, please, on Page 20.  Sorry to interrupt.

A    -- which required all voting changes from many
jurisdictions covered under the formula set out in Section 4 to
get federal approval of those voting changes either by
administrative review by the Department of Justice or by a
three-judge court in the District of Columbia.

Thus, the Department of Justice played a substantial role
in either preclearing, as they did most of the time, for
changes in voting in Alabama, but sometimes objecting when
there were changes that appeared to have racially
discriminatory -- the possibility of a racially discriminatory
effect, or were adopted with a racially discriminatory purpose.

Q    And do you discuss in your report how many times the
Department of Justice objected to proposed changes to elections
procedures in Alabama?

A    Yes.  I cite numerical data regarding objections in the
1970s, '80s, '90s, and the early 21st century.

```
 1   Q    Okay.  And did you also cite data concerning the number of
 2   times the federal government sent observers to Alabama?
 3   A    I think I did at one period in the 1970s.
 4   Q    Is that reflected in paragraph 31 of your report, which is
 5   up on the screen?
 6   A    Yes.
 7   Q    Okay.  And did federal courts play a role in identifying
 8   discriminatory conduct by Alabama officials during this period?
 9   A    Yes.
10   Q    Can you discuss that?  I guess particularly with regard to
11   Hale County, Marengo County?
12   A    Well, the Hale County case that I cite in paragraph 32 was
13   a case decided by a District of Columbia court under Section 5
14   of the Voting Rights Act.
15        Hale County filed a lawsuit seeking a declaratory judgment
16   by the three-judge court in D.C. as I recall after the
17   Department of Justice had objected to a change from district to
18   at-large elections.  And the federal court enforced an
19   objection -- determined de novo to refuse preclearance to the
20   change.
21        The Marengo County case was a long running case which I've
22   studied a good bit.  And it began as an equal protection
23   challenge to the Fourteenth Amendment in the 1970s.  And I
24   think the first trial was held when the Equal Protection Clause
25   was the operative legal issue under which the Court was
```

Timestamps:
- 10:02:09 (line 5)
- 10:02:30 (line 10)
- 10:03:05 (line 15)
- 10:03:31 (line 20)
- 10:03:52 (line 25)

1    reviewing the matter.  But it was eventually decided, I think

2    in 1984, where Section 2, as amended in 1982, was the operative

3    legal basis for the Court's decision.  And the evidence in that

4    case was very substantial.  And it required a change from

10:04:14  5    at-large elections to the use of a fairly drawn single-member

6    district plan.

7    Q    And was there a similar court case in 1982 in the city of

8    Mobile?

9    A    Well, actually, the two Mobile cases -- one challenging

10:04:30 10    the county school board's at-large elections and the city

11    commission elections for the city of Mobile -- was decided in

12    1982 before the revision of the Voting Rights Act.  So it was

13    actually decided under the Equal Protection Clause, under the

14    intent standard before the creation of a Section 2 results

10:04:50 15    test.

16    Q    And what was the result of that case?

17    A    A change to single-member districts under which

18    African-Americans were able to elect representatives of their

19    choice.

10:04:59 20    Q    And was there a finding concerning discriminatory intent

21    in that case?

22    A    Yes.

23    Q    What was that finding?

24    A    That the adoption of at-large elections for the county

10:05:10 25    school board in 1876, and the adoption of at-large elections

1   for the city commission in 1911 were adopted with a racially

2   discriminatory purpose and with a racially discriminatory

3   effect.

4   Q    Dr. McCrary, how was the 1982 amendment to Section 2 of

10:05:38   5   the Voting Rights Act relevant to your analysis of official

6   voting-related discrimination in Alabama?

7   A    Well, a part of the amended Section 2 sets out a totality

8   of circumstances case -- or a test under which the very first

9   factor was the history of racial discrimination affecting

10:06:02  10   voting about which you've been asking me.

11   Q    And after the 1982 amendments, what role did the

12   Department of Justice play in limiting voting-related

13   discrimination in Alabama?

14       And if we could put up paragraph 33, please.

10:06:18  15   A    Well, the Department brought numerous voting rights

16   lawsuits under Section 2 as it had under the Equal Protection

17   Clause focusing on Black Belt counties in Alabama.

18       But what I discussed in that paragraph is a case involving

19   the city of Pleasant Grove, Alabama, which initiated -- was

10:06:49  20   initiated from a Section 5 lawsuit by the city seeking

21   preclearance of changes involving annexations to which the

22   Department of Justice had objected.  Of course, the Department

23   was defending the interests of the United States in that

24   litigation.

10:07:08  25       That was a case that I have written about extensively,

1   including the legal issues used by the city in its -- and its

2   treatment by the Supreme Court in deciding how to interpret the

3   requirements of Section 5 of the Voting Rights Act.

4        But as a practical matter, what the Court was doing was

10:07:33 5   refusing to preclear certain annexations because they were a

6   part of a pattern of racially selective annexations by the city

7   in which efforts by surrounding black communities to seek

8   admission into the city boundaries were rejected, whereas white

9   jurisdiction -- white areas were routinely annexed as a part of

10:08:01 10   municipal policies.

11        And the city's defense was there were no black voters in

12   Pleasant Grove, so there couldn't be anything that would

13   signify retrogression because they had prevented them from

14   coming in.  And that was ultimately rejected by the federal

10:08:18 15   courts, including the United States Supreme Court, in the

16   decision I cite there.

17   Q   And how many times did the DOJ object to preclearance

18   submissions between 1982 and 2006 from Alabama?

19   A   I don't remember the precise numbers, but I set them out

10:08:38 20   in the report.

21   Q   Is it set out in paragraph 33 that's on the screen?

22   A   Yes.  I identify there seven objections from the state of

23   Alabama as a whole, and 39 from local jurisdictions, and that's

24   for the years between 1982 and 2006.

10:09:08 25        And I also note that the Department of Justice sent

 1    federal observers to monitor elections during that period to

 2    Alabama jurisdictions 91 times.

 3    Q    And can you just explain what -- is the sending of federal

 4    observers, is that what you were discussing earlier when you --

10:09:28  5    I think -- I don't know if you called them observers or

 6    inspectors?

 7    A    I referred earlier to the use of federal examiners and

 8    federal observers beginning in the late 1960s.

 9         And while federal examiners were rarely used after 1980 to

10:09:44 10   my recollection, federal observers continued to be used to

11    observe elections where there were reports that there might be

12    racial problems at the polls.

13    Q    And was that the purpose -- or what under what

14    circumstances were federal observers sent?

10:10:06 15   A    Where there were reports from persons in a particular

16    jurisdiction, or knowledgeable observers, or sometimes actually

17    local officials that were relayed usually by telephone to the

18    Department of Justice staff and sometimes by written letters.

19    Q    Do you talk in your report about the case of *Harris vs.*

10:10:37 20   *Graddick* in 1984?

21    A    Yes.

22    Q    And what is the -- what did you -- what is the discussion

23    of that case?

24         And we can take down that paragraph.  Thanks.

10:10:45 25   A    Well, *Harris vs. Graddick* which in a later phase of the

case was entitled *Harris vs. Siegelman,* when the Attorney

General was a different person -- involved the procedures for

appointing poll officials in local jurisdictions, which had

resulted in virtually no African-American poll officials.

And the evidence in the case before Judge Myron Thompson

documented that there was an intimidation factor in the

operation of elections in all-white polling, when all the poll

officials were white in a jurisdiction which was both minority

black and in majority black jurisdictions, especially for older

voters.

Q    And what happened in that case?

A    Well, as I recall, Judge Thompson issued a preliminary

injunction initially in *Harris vs. Graddick* that set up

procedures for trying to equalize the appointment of poll

officials, you know, governed by state law.

Q    And was that an important change in voting in Alabama?

A    Yes.  Along with many other changes, it increased the

opportunity for African-Americans to register and vote.

And the increasing parity between black registration and

white registration, or between black turnout and white turnout

that continued right up into the present day, the tendency to

merge toward parity, though never quite reaching parity, was we

think significantly influenced by the appointment of black poll

officials.

Q    And what's the importance of having black poll officials

1  present at the polls?

2  A    It was intended, I suspect, and certainly had the effect

3  of giving the appearance of welcoming to voters whatever their

4  race.

10:13:04  5  Q    Were there any other decisions during this period --

6  roughly 1982 to 2006 -- that indicated racial discrimination in

7  voting in Alabama?

8  A    Well, the most important is *Dillard vs. Crenshaw County,*

9  *Alabama*, a case about which I've written extensively.  And that

10:13:24 10  was a case in which I served as an expert witness at the

11  preliminary injunction phase of the case in 1986.

12  Q    And what was the issue there?

13  A    The issue was the use of at-large elections where the

14  plaintiffs were arguing that there was a state policy of using

10:13:40 15  at-large elections to dilute minority voting strength whenever

16  African-Americans were in a position of substantial voting

17  strength where they could affect the outcome of elections.

18  Q    And what was the outcome of that?

19  A    The Court enjoined the further use of at-large elections

10:14:01 20  in the nine county commissions that were initially involved in

21  the litigation as defendants.

22       The plaintiffs then amended their complaint to add all the

23  municipalities and school boards in the state, where, as I

24  recall, there were at-large elections and no African-Americans

10:14:21 25  elected to public office.

1    Eventually, I think about 175 or 176 jurisdictions agreed

2    to go, and signed consent decrees agreeing to go from at-large

3    elections to either fairly drawn single-member district plans,

4    or to cumulative or limited voting plans if they preferred,

10:14:43 5    which allowed very substantial increases in minority

6    representation in local governing bodies.

7    Q    I'm going to turn to redistricting issues -- the history

8    of redistricting issues in Alabama.  And let me -- if we can

9    put up paragraph 37, please, of your report, which appears on

10:15:06 10    pages 23 and 24 of Plaintiffs' Exhibit 81.

11    And just beginning with the 1980s, can you please describe

12    what you found regarding the DOJ's preclearance submissions for

13    districting maps?

14    A    Well, the Department of Justice objected to state

10:15:31 15    legislative redistricting plans at least twice.  Initially on

16    the grounds that the plan was retrogressive because it reduced

17    the number of majority-minority districts from the benchmark

18    plan.  And in the second instance because it appeared

19    intentionally to fragment or crack minority voting strength in

10:15:58 20    some portion of the Black Belt counties.

21    Eventually, black plaintiffs filed a lawsuit, and the

22    Court ordered an interim plan for the 1982 elections.  And the

23    state agreed to a new redistricting plan in 1983, which was a

24    compromise with the plaintiffs that I suppose resulted in a

10:16:24 25    consent decree.

```
 1   Q    Can we pull up paragraph 38 of Plaintiffs' Exhibit 81,
 2   which appears on pages 24 -- just page 24?
 3        In the 1990s redistricting cycle, what objections, if any,
 4   did DOJ make to the state's congressional plan?
10:16:48 5   A    Well, the congressional plan was objected to by the
 6   Department because an intentionally fragmented black population
 7   concentrations in order to dilute minority voting strength.
 8   And there was also a separate lawsuit in federal court and a
 9   three-judge court ordered the use of an interim redistricting
10:17:14 10   plan for congressional seats.
11        And that interim plan, like the state legislative plan to
12   which the Department had objected, had only a single black
13   majority district, but it was the first black majority
14   congressional district in the state and allowed the election of
10:17:33 15   the first African-American to Congress since the Reconstruction
16   period.
17   Q    And were there any issues -- did DOJ object -- turning
18   from the 1990s, did the DOJ issue any objections to Alabama's
19   redistricting plan after the 2000 census?
10:17:57 20   A    No.
21   Q    And if we could put up paragraph 42, please.
22        And then looking at this last redistricting period, was
23   there a racial pattern in Alabama's legislators' vote for or
24   against the congressional plan that resulted from the 2011
10:18:23 25   redistricting?
```

A     Well, when I was reviewing the adoption of the 2011 plan, one of the documents I examined carefully was the preclearance submission from the state of that 2011 plan, because I'd always found the submission documents to have very important information.  And one of the things that the preclearance submission letter from the state emphasized was the importance of the fact that the legislature was now controlled by the Republican party.

Now, the Republican party had not been in control of a majority in the legislature throughout most of the period I've been describing.  It was under Democratic control.

Beginning in the mid 1960s -- usually we attribute it to the 1964 presidential election -- there was a growing tendency of white voters to leave the Democratic party and go into the Republican party.  Political scientists describe the pattern at issue as a secular realignment; that is, a realignment that is more gradual, not a critical realignment, but a gradual realignment of voters.  And in this case, the white voters were gradually leaving the Democratic party and going into the Republican party with increasing tendency to switch parties that culminated finally in Republican victories earlier than 2011.

But in 2010 the elections dramatically increased the strength of the Republican party in the Alabama Legislature, leading the state to emphasize the significance of that fact as

1  a background factor in the redistricting plan adopted in 2011.

2  Q    In your opinion, what caused the secular shift that you

3  just described?

4  A    Well, this is not something I've analyzed in my own

10:20:30 5  research, but the studies by political scientists who have

6  written about that process in Alabama, as in other southern

7  states, emphasize the racial concerns that white voters had

8  with the operation of the national Democratic party.

9       Of course, there were antecedents to that in the Dixiecrat

10:20:50 10  movement in 1948, and objections in the party before 1965.

11  But, you know, this is a -- this is a subject that political

12  scientists have looked at, to answer your question.

13  Q    Okay.

14       MS. HOWELL:  Your Honor, before we go any further, I

10:21:09 15  need to belatedly lodge an objection.  That opinion is not

16  expressed anywhere Dr. McCrary's report, nor is anything about

17  the political shift or the partisan shift -- excuse me -- and

18  party affiliations in Alabama addressed anywhere in his report.

19       MR. SPIVA:  Well, it's addressed in -- the party

10:21:25 20  affiliations and the split in the vote is addressed right here.

21       But this is, I think is just a part of the history.  I

22  mean, he's discussing the history of racial issues in Alabama.

23  And it's pretty closely linked, I think, to the rest of his

24  opinion.

10:21:45 25       THE COURT:  Well --

1    MR. SPIVA:  I don't intend to go any further with

2  this.  That was --

3    THE COURT:  Dr. McCrary said that he had not analyzed

4  it himself, anyway.  So I wasn't giving a lot of weight to

5  that.

6    But the report merely states a fact that the Republican

7  party gained control in 2010.  I don't think there's any

8  dispute about that.

9    So sustained and overruled at the same time.  Okay?

10    MS. HOWELL:  Thank you, Your Honor.

11    THE COURT:  You may proceed.

12  BY MR. SPIVA:

13  Q    Let me turn to Senate Factor 2, Dr. McCrary, the existence

14  of racially --

15    THE COURT:  Well, are we leaving the 2011 submission?

16    MR. SPIVA:  Yes.  Yes.

17    THE COURT:  Okay.

18    MR. SPIVA:  Do you have questions?

19    THE COURT:  Well, that plan was precleared, was it

20  not?

21    THE WITNESS:  Yes, ma'am.

22    THE COURT:  Okay.  Thank you.

23  BY MR. SPIVA:

24  Q    Turn just briefly to racially polarized voting, the second

25  Senate factor.

|   |   |
|---|---|
| 1 | And you were not asked to examine the extent of present |
| 2 | racially polarized voting in Alabama; is that correct? |
| 3 | A    That's correct. |
| 4 | Q    But did you examine the historical racially polarized |
| 10:23:12 5 | voting in Alabama? |
| 6 | A    Yes.  I cited a good bit of evidence about the history of |
| 7 | racially polarized voting in Alabama. |
| 8 | Q    Okay.  And maybe if we can put up paragraph 53 of your |
| 9 | report, which is on pages 32 to 33 of Plaintiffs' Exhibit 81. |
| 10:23:43 10 | First of all, what conclusion did you reach regarding the |
| 11 | history of racially polarized voting in Alabama? |
| 12 | A    Well, I reached the conclusion that racially polarized |
| 13 | voting was a dominant trend in Alabama voting practices from |
| 14 | the late 1940s, when blacks began voting in significant numbers |
| 10:24:02 15 | in elections that were meaningful, right on up through the last |
| 16 | period that I discussed; that is to say, up until recently. |
| 17 | And that this was a critical reason why the use of at-large |
| 18 | elections effectively diluted minority voting strength in the |
| 19 | past.  And so that's the general conclusion. |
| 10:24:25 20 | Q    Let me turn to Senate Factor 3, the use of mechanisms that |
| 21 | enhance the opportunity for discrimination. |
| 22 | And, Dr. McCrary, is it fair to say that you discussed |
| 23 | that in your discussion of the history of discrimination, some |
| 24 | of the things we've already been talking about this morning? |
| 10:24:49 25 | A    Yes. |

1  Q    Okay.  And that would be things like at-large elections,

2  anti-single shot voting, et cetera?

3  A    Well, at-large elections aren't classified as an enhancing

4  device.  The term means to designate provisions that enhance

10:25:06  5  the discriminatory potential of at-large elections, which

6  includes the use of anti-single shot laws, and numbered place

7  laws, and other circumstances in other states.  It also

8  includes majority vote requirements.

9       And, you know, there's evidence that I cited in the

10:25:27  10  history of the use of enhancing devices that we've already

11  covered.

12  Q    And does the state engage in any such practices today?

13  A    No.  It's -- I believe it's correct to say it's prohibited

14  by federal court decisions.

10:25:44  15  Q    What about in terms of at-large elections?  Does the state

16  continue to have at-large elections for certain offices?

17  A    In some cases, yes.  Not in the legislature.  But, of

18  course, there are at-large elections for judicial office in the

19  state of Alabama.

10:26:07  20  Q    And you've served as an expert in a case challenging that,

21  I take it?

22  A    Actually in two cases involving judicial elections.

23            THE COURT:  What were the results of those cases?

24            THE WITNESS:  Well, in 1991 the plaintiffs failed to

10:26:26  25  prevail in *SCLC vs. Evans* or Siegelman, whatever the final

1  style of the case was.  And the more recent case is still
2  pending before Judge Watkins, I believe.
3  BY MR. SPIVA:
4  Q    And that's the Alabama, I think, state conference NAACP
10:26:46  5  case?
6  A    Yes.  Yes.
7  Q    Regarding Senate Factor 4, exclusion from slating process,
8  that's not something that you looked at, correct?
9  A    That's correct.
10:26:57 10  Q    And then -- and that's because there is no slating process
11  or was no slating process in Alabama?
12  A    That's correct, to my knowledge.
13  Q    And Senate Factor 5, the extent to which members of the
14  minority group bear the effects of discrimination, can you tell
10:27:21 15  us what conclusions you reached regarding this factor?
16      And if we could pull up paragraphs 54 and 55 of
17  Dr. McCrary's report, that would be good.  It's on pages 33
18  through 34.
19  A    Once again, I am not considering the current evidence of
10:27:41 20  racial disparities in socioeconomic characteristics and how
21  that affects the ability of African-Americans to participate in
22  office.  That's something that I -- that another expert has
23  testified about.
24      I was considering the history of socioeconomic
10:28:01 25  characteristics and their impact on political participation

1   rates relying primarily on the expert witness reports from a

2   variety of cases, and relying on findings by -- factual

3   findings by federal courts.

4        I also have examined the census data, when looking at

10:28:27  5   expert witness reports, to confirm that I agreed with an

6   expert's assessment in past cases; not in this case.

7   Q    I mean, do you disagree with any of the plaintiffs'

8   experts' assessment in this case?

9   A    No.

10:28:42 10   Q    Okay.

11   A    But that wasn't my charge.

12   Q    Yeah.  And what does the social science literature about

13   socioeconomic status and political participation state?

14        And maybe if we can pull up paragraph 56 of his report?

10:29:04 15   A    Well, as I said in the report, there's little dispute

16   among political scientists that lower socioeconomic

17   characteristics tend to deter voter participation by everyone,

18   not just along race lines.  But because African-Americans are,

19   generally speaking, in most places substantially poorer and

10:29:29 20   less well-educated than whites in those jurisdictions, it

21   naturally has a racial implication, as well.

22        And the political scientists who have looked at the racial

23   aspects of this -- of this question, agreed readily with

24   that -- that extension.

10:29:47 25   Q    Did you reach any conclusions about whether

|     |                                                                    |
| --- | ------------------------------------------------------------------ |
| 1   | African-Americans participate politically in Alabama at the        |
| 2   | same rate as non-Hispanic whites?                                   |
| 3   | A    Yes.  Relying on studies --                                    |
| 4   | Q    Paragraph 57, please.                                          |

10:30:00  5    A    -- relying on studies by political scientists that I cite
6    in my report, and also relying for the 1970s on reports by the
7    United States Commission on Civil Rights, I concluded that
8    there never has been complete parity in political participation
9    rates in Alabama.  Although we have, as I said earlier, moved
10:30:26 10    in the direction of parity over time as a result of the
11    enforcement of the Voting Rights Act and various federal court
12    orders.
13    Q    And did you review registration and turnout information
14    from more recent elections in Alabama?
10:30:42 15    A    Yes.  I looked at the Secretary of State's website in
16    Alabama and found that there continue to be, according to the
17    official records of the state, modest disparities between white
18    and black participation rates in 2018, which I think is the
19    first time racial turnout by race was reported by the Secretary
10:31:03 20    of State's office.
21              THE COURT:  And by "modest disparities," what do you
22    mean?
23              THE WITNESS:  I'm sorry, Your Honor.  I didn't hear
24    your question.
10:31:13 25              THE COURT:  I'm sorry.  By "modest disparities," what

1  do you mean?

2  THE WITNESS:  That they were not as great as they used

3  to be.  You know, I cite, I think, the specific numbers in the

4  report from 2018, and also in the earlier decade from studies

10:31:30 5  published by political scientists.

6  MR. SPIVA:  I'm trying to find the reference, Your

7  Honor.

8  MS. HOWELL:  Your Honor, I believe that's paragraph 60

9  of his report.

10:31:40 10  MR. SPIVA:  Thank you.

11  THE COURT:  Thank you.

12  THE WITNESS:  Yes.

13  BY MR. SPIVA:

14  Q   And what do you report in paragraph 60, just for the

10:31:49 15  record?

16  A   That in 2018 -- in the 2018 general election, black

17  turnout remained lower than white turnout; 52.2 percent for

18  blacks, 55.1 percent for whites.

19  THE COURT:  So that's what you mean by "modest"?

10:32:05 20  THE WITNESS:  Yes.

21  THE COURT:  I am not a mathematician, but about a

22  3-point difference, 3 percentage point difference?

23  THE WITNESS:  In terms -- yes.  Yes, that's correct.

24  BY MR. SPIVA:

10:32:15 25  Q   And with regard to Senate Factor 6, racial appeals, that

```
 1   was not something that you were asked to look at in this case;
 2   is that right?
 3   A    No.  That's correct.
 4   Q    And with regard to Senate Factor 7, the extent to which
10:32:30 5   the minority group has been elected to public office in the
 6   jurisdiction, what conclusion did you reach regarding this
 7   factor?
 8        And if we could maybe pull up paragraph 46 of
 9   Dr. McCrary's report which is on pages 28 and 29 of Plaintiffs'
10:32:57 10   Exhibit 81.
11   A    Well, in that paragraph, I report data from a 1981 report
12   that was prepared by lawyers in Alabama and became a part of
13   the record before Congress in regard to the amendments of
14   Section 2 -- of the Voting Rights Act in 1982.
10:33:17 15        And there were virtually no blacks elected to office in
16   Alabama except in black majority jurisdictions, or in a small
17   number of instances in single-member districts, which appear to
18   have been majority-minority districts.  But they were only a
19   handful of districts.
10:33:37 20   Q    Can we put up paragraph 48, which is on pages 29 to 30 of
21   Plaintiffs' Exhibit 81, of Dr. McCrary's first declaration?
22        Dr. McCrary, between Reconstruction and 1992, how many
23   African-American members of Congress were elected from Alabama?
24   A    None.
10:34:04 25   Q    And does that include U.S. senators?
```

1  A    Yes.

2  Q    And after 1992 how many African-American Congress people

3  have there been in Alabama?

4  A    One.

10:34:25 5  Q    Okay.  And do you describe in your report in paragraph 49

6  the history of election to statewide offices in Alabama?

7  A    Yes.

8  Q    What did you find?

9  A    That no African-Americans were elected to statewide office

10:34:54 10  in Alabama except in the context of judicial elections where

11  African-Americans were appointed to fill a vacancy in some

12  judicial office and then ran as incumbents for reelection,

13  beginning with Oscar Adams in, I think, 1982, early 1980s, and

14  continuing through the 1990s, when Ralph Cook and John England

10:35:20 15  were both appointed and elected to judicial office.

16      But beginning in the year 2000, even incumbent

17  African-American judges running for election have been

18  defeated, so that in the 21st century no black judges have been

19  elected statewide in the state of Alabama.

10:35:41 20  Q    And between 2000 and 2008, were there black candidates who

21  ran for statewide office that lost?

22  A    Yes.  I cite several in the report.  But all of them lost,

23  whether incumbents or not.

24  Q    Okay.  And Alabama has never had an African-American

10:36:18 25  governor?

1    A    No.

2    Q    And let me ask you about state legislative elections.

3    What conclusion did you reach about African-American

4    representation in the state legislature?

10:36:31  5    A    Well, almost all African-Americans elected to the state

6    legislature in Alabama have been elected under court-ordered

7    single-member district plans.

8         Beginning with the early 1970s -- 1973 or '4, something

9    like that -- and the study of elections to legislative office

10:36:59 10   in *Quiet Revolution in the South* includes data on Alabama that

11   substantiates that for the period up through the end of the

12   1980s.  But I know that that continues to be the case.

13   Q    And let me just turn to the one additional relevant factor

14   in the -- articulated in the Senate report, the tenuousness of

10:37:29 15   the plan.

16        What is the tenuousness consideration, Dr. McCrary?

17   A    Well, under the Senate factors that were, as I said, taken

18   from the Supreme Court's criteria in *White vs. Regester* back in

19   1973, one of the factors that a court can consider is whether

10:37:50 20   the reasons given for the adoption of a particular election

21   method are tenuous.  And, of course, the way it's phrased by

22   the Court and by the Congress is somewhat ambiguous, but it is

23   essentially raising the question of assessing the credibility

24   of the reasons asserted for the adoption of the plan.

10:38:15 25   Q    Let me ask if we can put up paragraphs 44 and 45, which

10:38:41

1　are on pages 27 and 28 of Dr. McCrary's first declaration,

2　Plaintiffs' Exhibit 81.

3　　　And let me ask you:  What was your opinion that you

4　reached and reported in your report concerning the connection

5　between the past redistricting plan and -- well, let me strike

6　that.  Let me get a better question.

7　　　What opinion, if any, did you reach concerning tenuousness

8　and the passage of the 2011 congressional plan?

9　A　Well, when I examined the reasons asserted by the state in

10　its preclearance submission, which included legislative

11　documents such as the guidelines adopted by the reapportionment

12　committee, I concluded that the justification offered for the

13　racial composition of Congressional District 7 were tenuous.

14　Q　And how did you reach that conclusion?

15　A　Well, first, I reviewed what, of course, the state said

16　its reasons for adopting the plan were.  And that's set out in

17　the guidelines adopted by the legislature, which are very close

18　parallels to the guidelines established in the 2000, 2001,

19　which was actually what the state cited in its preclearance

20　submission.

21　　　And those reasons included an awareness that all of the

22　criteria that the state set out had to be subordinated if there

23　were a conflict between the one person one vote requirement of

24　the Voting Rights Act and compliance with the requirements of

25　the -- I'm sorry -- the one person one vote standard sent down

```
 1    in federal courts decisions since 1962 and '64, and also with
 2    compliance with Voting Rights Act.
 3    Q    Let me ask you:  Did the analysis of the electoral results
 4    in CD 7, both before and after passage of the plan, weigh into
10:40:51 5    your analysis of tenuousness?
 6    A    Yes, they did.
 7    Q    And how so?
 8    A    Well, in addition to the point I initially stated, the
 9    guidelines set out an understanding of the requirements of
10:41:06 10   Section 5 of the Voting Rights Act as to retrogression.
11        And the standards that it set out to govern the adoption
12    of a congressional redistricting plan were the same as the
13    guidelines for adopting legislative plans.
14        And as the Court I'm sure is well aware, the Alabama --
10:41:28 15   the U.S. Supreme Court found that that -- that guideline
16    provision was not a correct interpretation of the retrogression
17    standard under Section 5, and was a part of the evidence the
18    Court considered in reaching a conclusion that the legislative
19    plans were racial gerrymandering.
10:41:54 20   Q    What about the margins by which the representative of CD 7
21    had been elected both before and after the adoption of the
22    plan, which is reported in paragraph 44 of your report?
23    A    Well, the incumbent in Congressional District 7 had been
24    elected with over 70 percent of the vote, which indicates that
10:42:15 25   the racial -- the African-American composition of the district
```

1  was far higher than necessary to provide a fair opportunity to

2  elect candidates of their choice for minority voters.  And in

3  fact, the margins for prior congressional elections in

4  Congressional District 7 going back into the 1990s was also far

10:42:39  5  higher than needed to provide a fair opportunity to elect.

6  Recall that the standards set out in the Department of

7  Justice's guidelines for the administration of Section 5, as

8  the Court notes in the ALBC case, have always required a

9  functional analysis of the electoral process in order to assess

10:43:04  10  the degree to which the effect of a plan, the expected effect

11  of a plan would be retrogressive.

12  In other words, the Department of Justice, like the

13  federal courts, and like all the expert witnesses in addressing

14  redistricting questions, considers the level of registration

10:43:27  15  and turnout by minority voters -- I'm sorry -- by the minority

16  population and the majority group in the population.  It

17  considers the role of primary elections and general elections

18  in the outcome, because sometimes that can affect the level of

19  functionality.  It depends on an assessment of the degree to

10:43:54  20  which there is, despite racially polarized voting, a sufficient

21  degree of white crossover voting to provide an opportunity to

22  elect foreign minority voters if they are in coalition with

23  that white crossover group.

24  So all of these are a functional analysis that the

10:44:15  25  Department of Justice and federal courts have always followed

```
 1   really since the 1970s in assessing a redistricting -- a

 2   particular district in a redistricting plan.  And where a

 3   district is significantly higher than it needs to be under that

 4   functional analysis, political scientists and historians and

 5   the courts refer to that as packing.

 6       And, you know, there were periods in the past where a

 7   district might be 70 or 80 percent black, and that certainly

 8   would constitute packing.  But it's not necessary to understand

 9   the meaning of the term packing that it be that high.  If it is

10   far higher than it needs to be, then the plan is packed.

11   Congressional District 7 was already packed, and it continued

12   to be packed.

13       In the 2011 plan, the justification offered was tenuous in

14   the sense that the state took the position, and it states this

15   in its preclearance submission that there -- that you could

16   not -- that the jurisdiction could not reduce the minority

17   percentage in the district without violating the retrogression

18   standard of Section 5, and that's just incorrect.  And I say

19   that not as a matter of law, but by observing how the

20   Department of Justice has administered the plan over the last

21   few decades during a quarter century, of which I was actually

22   involved in the enforcement of Section 5.

23   Q   Thank you.

24       THE COURT:  We've been going for a while.  I kept

25   waiting for a time, but I'm not sure this is a good one, but I
```

10:44:37
10:44:58
10:45:17
10:45:37
10:45:53

1    think we're going to go on and take a break.  We will come back

2    at 11:00 o'clock.

3             MR. SPIVA:  Thank you, Your Honor.

4             (Recess.)

11:03:31  5             THE COURT:  You may proceed.

6             MR. SPIVA:  Thank you, Your Honor.

7    BY MR. SPIVA:

8    Q    Dr. McCrary, I think we left off before the break with

9    Your Honor's question about preclearance of the 2011 plan.

11:03:48 10        Does the fact that the 2011 plan was precleared, i.e.,

11   determined not to be retrogressive indicate it also complies

12   with Section 2 of the Voting Rights Act?

13   A    No.  Every preclearance letter contains boilerplate

14   language saying that determination under Section 5 doesn't

11:04:08 15   signify that the voting change is in compliance with Section 2

16   of the Voting Rights Act, or I think the Fourteenth and

17   Fifteenth Amendments.

18   Q    And are you saying DOJ should not have precleared the plan

19   because of packing?

11:04:25 20   A    No.

21   Q    And why is that?

22   A    Well, the analysis of packing is only a part of what would

23   make a plan objectionable if there is other evidence of

24   discriminatory purpose in the decision-making process.  So that

11:04:48 25   if there were such evidence, the Department could object under

1    the purpose prong of Section 5.

2        But I have no idea whether the Department considered or

3    found any evidence that would have justified a purpose

4    objection.  So as far as I'm aware, the plan, which was

11:05:10 5    challenged in federal court as well as in the Department's

6    administrative process, was assessed under the purpose prong.

7    I didn't work on that case.

8    Q    Let me turn to your rebuttal report, Dr. McCrary, which is

9    Plaintiffs' Exhibit 82 and just ask you a couple of questions

11:05:31 10    about that.

11        In your rebuttal report or your second declaration, were

12    you responding to defendant's experts' assertions that the

13    definition of black for purposes of the *Gingles* analysis should

14    exclude multiracial and/or ethnically Hispanic

11:05:54 15    African-Americans?

16    A    Yes.  I was asked to respond to only that specific point.

17    Q    And can you describe or can you state your response to

18    that assertion?

19    A    Well, what I said in my report was, first of all, that all

11:06:10 20    the expert witness reports that I've examined over the years

21    are consistent with the approach that Mr. Cooper takes in his

22    analysis in his report in this case, and that it's also

23    consistent with the way the term black has been -- or Negro in

24    earlier decades -- has been assessed in Alabama, both in

11:06:34 25    Alabama law, as I understand it, and in practice.

```
 1   Q    All right.  And you're referring to the one drop rule?

 2   A    Yes, among other things.

 3   Q    Okay.  What was the one drop rule?

 4   A    Well, the idea was that any degree of Negro ancestry makes

 5   a person a Negro.  And that, of course, was something that

 6   could practically be enforced only if there were visible

 7   evidence or local knowledge of the race of the person.  But

 8   that's what the law required.

 9        And in all of the segregated societies of the south, if a

10   person were of Negro parentage, that would -- meant that they

11   would go to a racially segregated school -- school for Negro

12   students.

13   Q    Based on your experience working in voting rights and in

14   the DOJ, what is the proper way to define African-American in

15   this case?

16   A    I'm not sure precisely what you're asking me.

17   Q    In terms of any-part black and single-race black.

18   A    Well, first of all, in most jurisdictions, it doesn't make

19   much difference which definition you use unless you're in a

20   jurisdiction with numerous racial groups and attitudes toward

21   race that are different from southern states such as Alabama.

22        But the usual procedure is to use any -- any evidence of

23   blackness.  Remember we're talking about reported data in most

24   cases here, unless the expert has to rely on census data and

25   states that don't have racial identification of registered
```

11:06:55 (line 5)
11:07:17 (line 10)
11:07:37 (line 15)
11:07:57 (line 20)
11:08:25 (line 25)

1    voters and so on.

2         So any-part black is the most logical racial variable to

3    use in an exercise such as Mr. Cooper's engaging in.  But it

4    wouldn't make any practical difference if he used an

11:08:49  5   alternative definition in most instances, and I suspect in

6    Alabama.  If there were evidence to the contrary, I would

7    certainly consider it.  But I wouldn't expect to see it.

8    Q    Thank you, Dr. McCrary.  I have no further questions.

9              THE COURT:  Cross-examination?

11:09:05 10            MS. HOWELL:  Thank you, Your Honor.

11                      CROSS-EXAMINATION

12   BY MS. HOWELL:

13   Q    All right.  Good morning, Dr. McCrary.  I think we're

14   still in morning.

11:10:15 15  A    Good morning, Ms. Howell.

16   Q    I'm going to tell you on the front end I'm going to try

17   and use the Elmo to show you parts of your report on a less

18   tech savvy scale than what plaintiffs' counsel was able to do.

19   But if that doesn't work out, then I do have hard copies that I

11:10:33 20  can give to you and to the Court to facilitate questioning.

21        So you were brought on as an expert in this case to talk

22   about the history of racial discrimination in Alabama; is that

23   right?

24   A    Among other things, yes.

11:11:00 25  Q    Okay.  And you've been qualified as an expert in the

1    history of voting discrimination in Alabama?

2    A    Yes.

3    Q    Okay.  So -- we'll start back.  Does Alabama have a white

4    primary today?

11:11:25 5    A    No.

6    Q    Okay.  How long has it been since Alabama has had a white

7    primary?

8    A    Since 1945.

9    Q    Does Alabama have a poll tax today?

11:11:34 10    A    No.

11    Q    How long has it been since Alabama had a poll tax?

12    A    Since 1966, I believe.

13    Q    Okay.  Does Alabama use a literacy test today?

14    A    No.

11:11:42 15    Q    How long has it been since we had a literacy test in

16    Alabama?

17    A    Since 1965.

18    Q    And you don't know of anyone from the 1901 constitutional

19    convention who is still alive and kicking and legislating in

11:11:57 20    Alabama today, do you?

21    A    I certainly do not.

22    Q    Okay.  Your report addresses an awful lot of history that

23    occurred prior to 1965 and the passage of the Voting Rights

24    Act; is that correct?

11:12:13 25    A    That's correct.

| | | |
|---|---|---|
| | 1 | Q    Okay.  And the bulk of it up until probably paragraph 33, |
| | 2 | I think, only addresses events that occurred prior to about |
| | 3 | 1985.  Would that be a fair characterization? |
| | 4 | A    That's probably right, yes. |
| 11:12:30 | 5 | Q    And 1985 was about 30 years ago or so, right? |
| | 6 | A    34. |
| | 7 | THE COURT:  We don't do math around here.  We're |
| | 8 | lawyers. |
| | 9 | A    Pardon? |
| 11:12:45 | 10 | THE COURT:  We're lawyers.  We don't do math. |
| | 11 | BY MS. HOWELL: |
| | 12 | Q    You talked a lot about at-large elections and their use |
| | 13 | across the state of Alabama, and local jurisdictions in |
| | 14 | particular, correct? |
| 11:13:12 | 15 | A    Yes. |
| | 16 | Q    The state of Alabama doesn't use at-large elections to |
| | 17 | elect its Congressmen or women, does it? |
| | 18 | A    No, not anymore. |
| | 19 | Q    And it hasn't since about 1970, right? |
| 11:13:24 | 20 | A    Since it was outlawed by the Congress of the United States |
| | 21 | in 1967, I think it's required to use single-member districts. |
| | 22 | Q    I want to talk to you a little bit about a paragraph in |
| | 23 | your report that plaintiffs' counsel didn't really take up with |
| | 24 | you, but which you mentioned in one of your opening comments, |
| 11:13:53 | 25 | which is paragraph 36. |

```
 1         Now, this is really in your narrative of a history in
 2  voting registration in Alabama.  This is really the only
 3  paragraph that deals with something we might call relatively
 4  current.  Is that a fair characterization?
11:14:31  5  A    If you consider 2011 not current, yes.
 6  Q    But occurring at approximately the same time that the
 7  congressional districts were passed that are at issue in this
 8  case?
 9  A    I'm not sure I understand the question, Ms. Howell.
11:14:55 10  Q    Sure.
11  A    If you could pare it down.
12  Q    Let me rephrase that.  Current being things that happened
13  at approximately the same time or in the same era even as the
14  time that the congressional districts that are at issue in this
11:15:06 15  case were passed?
16  A    Well, I did talk about 2018 data in regard to assessing
17  the levels of registration and turnout in Alabama.  And I
18  talked about election history going up to shortly before the
19  2011 redistricting plan.  But my report is primarily focused on
11:15:30 20  the period before the adoption of the plan.
21  Q    Okay.  Thank you.
22         So in this paragraph, in paragraph 36, you talk about the
23  implementation of the voter ID law in Alabama?
24  A    Yes.
11:15:43 25  Q    And your report concluded, and we discussed this in your
```

|  | 1 | deposition, that the voter ID law disproportionately burdened |
|---|---|---|
|  | 2 | African-American voters; is that right? |
|  | 3 | A    That's correct. |
|  | 4 | Q    And when we discussed it at your deposition, I showed you |
| 11:15:58 | 5 | the opinion in that case, did I not? |
|  | 6 | A    You did. |
|  | 7 | Q    And then you subsequently went back in your errata and |
|  | 8 | made a correction that you didn't believe that the statement |
|  | 9 | that you made in this paragraph of the report, that the voter |
| 11:16:11 | 10 | ID law disproportionately burdened African-American voters was |
|  | 11 | incorrect? |
|  | 12 | A    That's correct. |
|  | 13 | Q    Okay.  So that case was decided by a court in 2017, |
|  | 14 | correct? |
| 11:16:41 | 15 | A    I don't remember the precise day, but I will take your |
|  | 16 | word for it. |
|  | 17 | Q    Okay.  I'll just show to you that -- oh. |
|  | 18 | A    Actually it was 2018, according to the -- |
|  | 19 | Q    Yes. |
| 11:16:56 | 20 | A    -- document you just put up. |
|  | 21 | Q    I have gotten my years mixed up.  We don't do math here. |
|  | 22 | I do recall. |
|  | 23 | A    How do you deal with birthdays? |
|  | 24 | THE COURT:  Forget them. |
| 11:17:09 | 25 | MS. HOWELL:  Or allow your parents to remember them in |

```
 1   some instances.
 2            THE WITNESS:  Sorry for that, Your Honor.  I didn't
 3   mean to be --
 4            THE COURT:  That's okay.  I have forgotten many
 5   birthdays of mine.
 6   BY MS. HOWELL:
 7   Q    Now, can you tell me which court issued a decision in this
 8   case?
 9   A    This was decided by the district court in the Northern
10   District of Alabama.
11   Q    Okay.  Which is the same court that we're currently
12   before, right?
13   A    Yes.
14   Q    And that case is still on appeal, correct?
15   A    I actually don't know that.  I will take your word for it.
16            MS. HOWELL:  Your Honor, may I approach the witness
17   with a copy of this opinion?
18            THE COURT:  You may.
19            MS. HOWELL:  And would Your Honor like a copy of the
20   opinion?
21            THE COURT:  Sure.  I don't have enough to read in this
22   case.
23   BY MS. HOWELL:
24   Q    So on the copy that I've given you, and which I'm going to
25   try and negotiate here on the Elmo, as well, there is a page
```

1    that is tabbed.

2    A    Yes.

3        MS. HOWELL:  Your Honor, it's page 15 of the opinion.

4    BY MS. HOWELL:

11:18:59 5    Q    So on the copy that is on the Elmo, you'll see that I have

6    highlighted a portion.  And I wondered if you could read that

7    highlighted portion for me.

8    A    This highlighted portion says, "Frankly, the discrepancy

9    in photo ID possession rates among white, black, and Hispanic

11:19:18 10   registered voters in Alabama is minuscule.  In other words, it

11   appears that very few registrants of any racial group may

12   presently be affected by the photo ID law."

13   Q    Okay.  So when your report said that the voter ID law

14   disproportionately burdened African-American voters, do the

11:19:48 15   Court's words give you any pause about whether it reached the

16   same conclusion?

17   A    Not in those two sentences.  But the Court does say there

18   is a statistical disparity in the possession of photo ID

19   requirements.  And my recollection is that in another portion

11:20:03 20   of the opinion the Court notes that Secretary of State Merrill

21   conceded that there were numerical disparities in possession of

22   photo ID.

23        What the Court says here is that the rate is minuscule, in

24   the Court's words, or it's not great enough to worry about; not

11:20:23 25   that there were no racial disparities.

1    Q    Okay.  Is a racial disparity -- is a disparity in

2    possession rates the same thing in your mind as a

3    disproportionate burden?

4    A    It depends on the circumstances.  The Court here reaches

11:20:38 5    the conclusion that because they could -- as I recall the

6    opinion, because they could get photo ID documents that would

7    satisfy the requirements of the Alabama law, that this is not

8    burdensome.  And the Court has legal reasoning that I don't

9    recall that would further buttress that opinion.

11:21:04 10        The Court reached the conclusion that isn't inconsistent

11    with the fact that I cited that there's a racial disparity in

12    possession, which I interpreted as creating a burden.

13    Q    Okay.  Well, your report, in fact, doesn't make any

14    mention of a disparate possession rate, but it does say that it

11:21:25 15    disproportionately burdened African-American voters?

16    A    Well, that's what I meant by possession rate is evidence

17    of burden.

18    Q    Okay.  So I've moved the opinion down a little bit and

19    have further highlighting.  And if I could also get you to read

11:21:40 20    those portions that are highlighted, as well.

21    A    The Court says, "Anyone without a photo ID can obtain one

22    for the sole" --

23    Q    I'm sorry, Dr. McCrary.

24    A    I'm sorry.  You asked me about Dr. Siskin's estimate?

11:21:56 25    Q    Yes.  And we'll clarify for the record, Dr. Siskin was one

1    of plaintiffs' experts in that case, correct?

2    A    Yes.  I'm sorry.  I skipped that passage.

3    Q    No.  That's quite all right.

4    A    "But in the end, Dr. Siskin's estimate does not

11:22:08  5    matter" -- that is, his estimate that found a racial disparity

6    in the possession rate.  "This is because a person who does not

7    have a photo ID today is not prevented from voting if he or she

8    can easily get one.  And it is so easy to get a photo ID in

9    Alabama, no one is prevented from voting."

11:22:28 10    Q    Okay.  And would you mind continuing with the further

11    highlighted portion?

12    A    "Anyone without a photo ID can obtain one for the sole

13    purpose of voting, free of charge.  These IDs can be obtained

14    at Secretary Merrill's office at the state capital building in

11:22:43 15    Montgomery, any board of registrars' office located in each

16    county and open during daily business hours, or to an event

17    where the secretary's mobile ID unit is visiting."

18    Q    Okay.  Thank you.

19         And that takes me to actually the very next sentence in

11:23:01 20    your paragraph 36, where you say "Subsequently, the state

21    closed 31 driver's license offices located in predominantly

22    poor and African-American areas making it disproportionally

23    more difficult for black voters to acquire the identification

24    necessary to vote."  Did I read that correctly?

11:23:24 25    A    Yes.

1  Q    But what the opinion actually says, right, is that there

2  are far more opportunities in other places to get the required

3  photo ID under that law; is that correct?

4  A    That's correct.

11:23:35  5  Q    Okay.  So that whether those driver's license offices were

6  closed or were, in fact, subsequently reopened as they were,

7  that would not have been the thing that prevented any voter

8  from getting the identification necessary to vote?

9  A    I'm uncertain about the dates of those closures in

11:23:56  10  relation to the Court's ruling.  They were -- were they before

11  the Court's decision in 2018?  I mean, I read about them in the

12  newspapers, and I just don't remember the exact period in which

13  it occurred.

14  Q    Certainly.  But the Court's point was, in fact, was it

11:24:15  15  not, that other IDs were available and readily so for no charge

16  whatsoever regardless of what the driver's license offices'

17  availability was?

18  A    Yeah.  That's correct.  I don't remember that the Court

19  referred to the closing of DMV offices.

11:24:36  20  Q    Okay.  Now, you talked some about racially polarized

21  voting in Alabama in your report as part of the historical

22  context for understanding the history of voting discrimination

23  in Alabama, right?

24  A    Yes.

11:25:19  25  Q    Okay.  And you are not discussing racially polarized

1  voting as a statistical expert in this case, right?

2  A    That's correct.

3  Q    Okay.  But based on the testimony that you have given this

4  morning, isn't voting going to be racially polarized in any

11:25:40 5  state where a majority of white voters tend to vote Republican?

6  A    Well, it depends on the racial composition of the voters

7  who identify as Republican.  In most states, that would

8  certainly be true.

9         In the sense that the Republican party has become

11:25:58 10  overwhelmingly a party of white voters and the Democratic party

11  is cohesively supported by a substantial majority of

12  African-Americans, that's a reflection of the racial disparity

13  in party identification.

14  Q    So in a state like Alabama, where the vast majority of

11:26:16 15  black voters vote for Democratic candidates, and the vast

16  majority of whites voters vote for Republican candidates, there

17  will always be racially polarized voting in a state where white

18  voters vote Republican?

19  A    Not always, but usually.

11:26:30 20  Q    Okay.  Now, you also talked about the history a little bit

21  of objections to Alabama's prior congressional districts.  And

22  I believe that's at paragraph 38 of your report -- or

23  paragraphs 37 and 38.

24         And, specifically, you talked about the objections that

11:27:08 25  the Department of Justice lodged in 1992 to Alabama's

```
 1  congressional district, right?

 2  A     One objection, I think.

 3  Q     Okay.  And Alabama was ordered to/agreed to draw a single

 4  majority-minority district in response to that, correct?

11:27:25  5  A     Well, my recollection is that simultaneously there was a

 6  lawsuit in federal court and that -- I don't remember the

 7  precise connection between the DOJ objection and the Court's

 8  order, but I know that the Court ordered an interim

 9  redistricting plan to be in effect.

11:27:49 10  Q     Okay.  But that redistricting plan had just the single

11  majority black district, correct?

12  A     That's correct.

13  Q     Okay.  And that is what your report says, right?

14  A     Yes.

11:27:58 15  Q     Okay.  Alabama has never been ordered to draw a second

16  majority-minority district, has it?

17  A     Not to my knowledge.

18  Q     Okay.  You also talked some about the tenuousness of

19  rationales given for making a particular election law or

11:28:22 20  electoral change, I guess.  That was in paragraph 45 of your

21  report.  Do you recall talking about that?

22  A     Yes.  But let me get paragraph 45 to see precisely what

23  you're referring to.  Sorry.

24  Q     But your conclusion about the tenuousness of the

11:29:10 25  rationales given for drawing Alabama's congressional districts
```

1   in 2011 was that nothing but tenuous justifications had been

2   given, and that's what you indicate in the last sentence of

3   that paragraph?

4   A    No, not that nothing was ever asserted, but that the

11:29:28  5   assertions didn't require maintaining the same racial

6   composition or higher composition of blacks in the district.

7   Q    Are you able to distinguish that from passage of the 2011

8   congressional plan?

9   A    No.  I'm referring to the comparison with other criteria

11:29:54 10   that are set out in the guidelines.  And because the drawing of

11   the district falls into the category that political scientists

12   would and historians would characterize as packing, and under

13   some circumstances, that is to say, if there was Section 2

14   voting rights lawsuit, then that issue would have become an

11:30:21 15   issue that wasn't an issue in the Section 5 review, that

16   compliance with Section 2 of the Voting Rights Act would have

17   to take into account the fact that the district was packed.

18        And all the other criteria was supposed to be subordinated

19   to compliance with the Voting Rights Act, the one person one

11:30:42 20   vote requirement in federal reapportionment law, and the Equal

21   Protection Clause.

22   Q    Okay.  But your paragraph ends with the conclusion that

23   the justifications for drawing Congressional District 7 the way

24   that it was drawn appear to have been tenuous, at best; is that

11:31:04 25   correct?

```
 1   A     Yes.

 2   Q     And you're not an expert in legislative intent, are you?

 3   A     Well, I've testified about discriminatory intent in all

 4   manner of cases over the last 40 -- I'm sorry -- 39 years.

 5         So, you know, I am routinely considered an expert on

 6   assessing the degree to which the intent underlying the

 7   adoption of any law or redistricting plan is racially

 8   discriminatory.

 9   Q     Do you know who had input into the drawing of

10   Congressional District 7?

11   A     I didn't make that examination.  I only examined the

12   documents submitted for Section 5 review by the state.

13         THE COURT:  So is your answer that you do not know who

14   had input?

15         THE WITNESS:  Well, I know it was the legislature.

16   But beyond that, I don't know anything -- any details about it.

17   I haven't investigated that.

18   BY MS. HOWELL:

19   Q     Okay.  And you don't know the intent of any of the

20   legislators or other people who had any kind of input into the

21   drawing of that district?

22   A     No.  I wasn't asked to assess the intent behind the plan.

23   Q     Do you consider obtaining preclearance from the Department

24   of Justice to be a tenuous justification?

25   A     No.  That's one consideration in drawing the plan, as the
```

(timestamps in left margin: 11:31:16 at line 5, 11:31:33 at line 10, 11:31:49 at line 15, 11:32:00 at line 20, 11:32:16 at line 25)

1   guidelines indicate.

2   Q    Okay.  And you were, in fact, employed at the Department

3   of Justice when the 2011 congressional plan was precleared,

4   right?

11:32:27  5   A    That's correct.

6   Q    Okay.

7        MS. HOWELL:  Your Honor, could I have a moment?

8        THE COURT:  You sure may.

9        MS. HOWELL:  Dr. McCrary, I think that's all I have

11:33:14 10   for you at the moment.  Thank you.

11       THE COURT:  Any redirect?

12       MR. SPIVA:  Yes.

13       THE WITNESS:  Ms. Howell, do you need this document

14   back?

11:33:21 15       MS. HOWELL:  No.  You're free to keep it if you'd

16   like.

17                    REDIRECT EXAMINATION

18   BY MR. SPIVA:

19   Q    Dr. McCrary, I'd like to begin with the discussion of

11:33:52 20   voter ID.  You recall the discussion of that on your

21   cross-examination where Ms. Howell had you read certain

22   portions of the Merrill vs -- *Greater Birmingham Ministries vs.*

23   *Merrill* decision?

24   A    Yes.

11:34:08 25   Q    And when you were deposed, did you have an opportunity to

1    review the full opinion?

2    A     No.  I foolishly agreed to answer questions based on a

3    cursory examination during the deposition, which didn't give me

4    an opportunity to read the entire opinion.  And thus I gave an

11:34:33 5    incorrect answer in the deposition.

6    Q     And did you submit an errata upon reviewing your

7    deposition transcript?

8    A     I did.  And I corrected my concession that I had been

9    wrong in the declaration about the numerical disparity in the

11:34:47 10   possession of photo IDs.

11   Q     That's right.  Dr. McCrary, as I tell my kids, I have made

12   a mistake before.  I thought I was wrong, but I wasn't.

13         MR. SPIVA:  If I can use the Elmo -- and this is going

14   to really test my skills, Your Honor.

11:35:05 15   BY MR. SPIVA:

16   Q     Dr. McCrary, you recall that Ms. Howell had you read a

17   couple of portions of this opinion?

18   A     Yes.

19   Q     And I want you to -- I'd like to ask you to read a couple

11:35:23 20   of the portions around the portions she asked you to read.

21         THE COURT:  Can you identify which page number that's

22   on, please?

23         MR. SPIVA:  Yes.  Yes, Your Honor.  This appears on

24   page 15 in the printed Westlaw copy.

11:35:38 25   BY MR. SPIVA:

1  Q    And if you could read the highlighted portions of this --

2  of the opinion that surround the areas that Ms. Howell had you

3  read.

4  A    Okay.  It begins with data from the plaintiffs' expert in

11:35:52  5  that case, Dr. Siskin.

6        "1.37 percent of white registered voters, 2.44 percent of

7  black registered voters, and 2.29 percent of Hispanic

8  registered voters may not currently have an acceptable photo

9  ID."

11:36:10  10  Q    And then further down after the section that Ms. Howell

11  had you read it says -- where it says "nonetheless"?

12  A    "Nonetheless, the numbers show that black and Latino

13  registered voters are almost twice as likely as white voters to

14  lack an acceptable photo ID for voting."

11:36:25  15  Q    Okay.  Thank you.

16        And do you know in terms of when -- you're familiar with

17  Shelby County, the Shelby County decision?

18  A    Yes.  I worked on the case.

19  Q    Okay.  And that eliminated essentially the preclearance

11:36:44  20  regime under the Voting Rights Act?

21  A    Yes.  By finding that the formula for coverage of Section

22  5 to be unconstitutional, the Court's decision effectively

23  eliminated the preclearance review process.

24  Q    And do you know whether Alabama's photo ID law was

11:37:03  25  passed -- was enacted before or after the Shelby County

1   decision was issued?

2   A    My understanding is it was after the elimination of

3   preclearance review.

4   Q    Okay.  And so does that mean -- was Alabama's voter ID law

11:37:20  5   subject to preclearance?

6   A    No.

7   Q    Okay.  You recall Ms. Howell asked you some questions

8   about the closure of the DMV offices, the 31 DMV offices

9   located in predominantly poor and African-American areas that

11:37:43 10   you reported in paragraph 36 of your report?

11   A    Yes.

12   Q    And are you aware that those offices were opened back up

13   prior to the photo ID opinion pursuant to an agreement between

14   Alabama and the U.S. Department of Transportation?

11:38:07 15   A    That's my recollection, that the closure of the driver's

16   license offices was several years, probably two or three years

17   at least prior to the Court's decision.

18   Q    So that situation had been remedied at the time that the

19   Court issued its decision saying that it would be easy in the

11:38:26 20   Court's findings to obtain a free ID?

21   A    Well, the closure of those offices had been remedied, yes.

22   Q    Correct.  And were you aware that the U.S. Department of

23   Transportation had made a finding that the closings

24   disproportionately hurt black residents?

11:38:45 25   A    I recall that from news coverage, but I didn't factor that

       1  into my declaration.
       2            THE COURT:  Do you know how long those offices were
       3  closed?
       4            THE WITNESS:  I don't recall, Your Honor.  My
11:39:00  5  recollection is it was for some months.
       6            THE COURT:  A few months as opposed to years?
       7            THE WITNESS:  That's my recollection.
       8  BY MR. SPIVA:
       9  Q    Dr. McCrary, you were asked some questions about how long
11:39:16 10  it had been since Alabama had a poll tax, since Alabama, you
      11  know, had a literacy test, et cetera.
      12       Do you recall Ms. Howell asking those questions?
      13  A    I do.
      14  Q    And do you believe that the history pre-1965 of voting
11:39:40 15  discrimination in Alabama is irrelevant to the state of race
      16  relations in Alabama today?
      17  A    No.  But in regard to the concessions about which you
      18  asked, all of them, as I recall, were found to be in violation
      19  of federal law.
11:40:00 20  Q    And do you believe that that history is relevant to the
      21  issues of access to voting or electoral participation among
      22  African-Americans today?
      23  A    Yes.  For example, the educational disparities that I
      24  testified about on direct are things that have a long-lasting
11:40:17 25  effect.  There are African-Americans in Alabama's electorate

today who were raised in a public school system that was

racially discriminatory in its operation, with poor funding for

African-American students in segregated schools.

Moreover, parents' level of education affects the level of

education achieved by their children.  That is to say, children

of parents who are of limited educational background are often

subject to burdens in acquiring the quality of education in

their own life so that the educational disparities, for

example, contribute over decades to the socioeconomic

characteristics that measure educational achievement, which are

the very things that the census report documents down into the

present day.

And with regard to other aspects of the way in which the

Jim Crow system operated, there are numerous court decisions in

which courts have agreed with social scientists that the

effects of the Jim Crow era are extended into the continued

racially polarized voting in southern states.  So that that's

why evidence about the history of racially polarized voting is

relevant to an assessment of the current levels of racially

polarized voting, though they can, and, of course, are directly

measured by statistical evidence, and in this case, presented

by another expert.

Q    And does the history of discrimination in voting by the

state of Alabama have any current relevance to political

participation by African-Americans today?

```
 1  A    Well, I think I've already answered the question.  It
 2  does.
 3  Q    Okay.
 4          MR. SPIVA:  If I can just have one second to confer.
 5          Thank you.  I have no further questions.
 6          THE COURT:  Any further cross, Ms. Howell?
 7          MS. HOWELL:  No, Your Honor.
 8          THE COURT:  Okay.  Do we want to get started with a
 9  new witness, or wait until after lunch to do that?  Whatever
10  y'all want to do.
11          MR. SPIVA:  We have another witness here, Your Honor,
12  so we could start.  I don't think we would finish before lunch,
13  but we could get started, if Your Honor wants.
14          THE COURT:  Okay.  I'm good with that.
15      All right.  Thank you, Dr. McCrary.  You may step down.  I
16  should have said that first.  I apologize.
17      And the plaintiff may call your next witness.
18          MR. SPIVA:  Ms. Madduri is going to call the next
19  witness, Your Honor.
20          THE COURT:  Okay.  Is that going to be Representative
21  Knight?
22          MS. MADDURI:  Yes.  Plaintiffs call Representative
23  John Knight.
24          THE COURT:  I thought I recognized him sitting out
25  there.
```

11:42:32  (line 5)
11:42:47  (line 10)
11:43:02  (line 15)
11:43:18  (line 20)
11:43:50  (line 25)

|     |                                                                          |
| --- | ------------------------------------------------------------------------ |
| 1   | JOHN KNIGHT,                                                              |
| 2   | having been first duly sworn by the courtroom deputy clerk, was          |
| 3   | examined and testified as follows:                                       |
| 4   | THE COURTROOM DEPUTY CLERK:  Please state your name                       |
| 5   | for the record.                                                          |
| 6   | THE WITNESS:  John Knight, Jr.                                            |
| 7   | THE COURTROOM DEPUTY CLERK:  Thank you.                                   |
| 8   | DIRECT EXAMINATION                                                        |
| 9   | BY MS. MADDURI:                                                           |
| 10  | Q    Good morning, Representative Knight.                                 |
| 11  | A    Good morning.                                                        |
| 12  | Q    We can get started with some background information.                 |
| 13  | Where do you currently live?                                             |
| 14  | A    Montgomery, Alabama.                                                 |
| 15  | Q    And where were you born?                                            |
| 16  | A    Montgomery, Alabama.                                                 |
| 17  | Q    And where did you grow up?                                          |
| 18  | A    Montgomery, Alabama.                                                 |
| 19  | Q    Have you lived in Alabama all of your life?                          |
| 20  | A    I have.                                                              |
| 21  | Q    Did you serve in the military at any point?                          |
| 22  | A    I did.                                                               |
| 23  | Q    How long were you in the military?                                   |
| 24  | A    For two years.                                                       |
| 25  | Q    After you served, did you return to Montgomery?                      |

11:43:53 (line 5)
11:44:13 (line 10)
11:44:24 (line 15)
11:44:34 (line 20)
11:44:43 (line 25)

```
 1   A    I did.

 2   Q    Approximately when was that?

 3   A    1969.

 4   Q    And did you attend college?

 5   A    I did.

 6   Q    Where did you attend college?

 7   A    Alabama State University.

 8   Q    Where is Alabama State University?

 9   A    Montgomery.

10        THE COURT:  Montgomery.

11   BY MS. MADDURI:

12   Q    And when did you graduate, sir?

13   A    1974.

14   Q    Is Alabama State University a historically black college?

15   A    It is, yes.

16   Q    And what race do you identify as?

17   A    I'm black.

18   Q    What is your current occupation?

19   A    Retired.

20   Q    And what job did you hold before you retired?

21   A    I retired from Alabama State University after 38 years of

22   employment.

23   Q    And what was the last position you held there?

24   A    Executive vice-president.

25   Q    Did you work anywhere else prior to working at Alabama
```

Timestamps in left margin: 11:44:58 (line 5), 11:45:08 (line 10), 11:45:18 (line 15), 11:45:28 (line 20), 11:45:41 (line 25)

State University?

A     Throughout my life?

Q     Maybe after you graduated college.

A     Oh, after I graduated college, yeah.  I worked at Alabama
11:45:56  Public Service Commission.  I worked for the United States Post
Office.

Q     And are you involved with any community organizations?

A     I am, yes.

Q     What are those?

11:46:07 A     I am involved with the Montgomery County Democratic
Conference.  I'm involved with the Montgomery Improvement
Association, the NAACP, YMCA, Leadership Montgomery, Leadership
Alabama, and a number of other organizations.

Q     Do these organizations work throughout the state of
11:46:33 Alabama?

A     Some of them do, and some are restricted -- not
necessarily restricted, but work basically in Montgomery.

Q     Understood.  And have you ever held elected office?

A     I was on the county commission of Montgomery for 12 years.
11:46:47 Q     And approximately when did you start serving on the
Montgomery commission?

A     Montgomery County Commission, my memory serves -- around
1980.  I served 12 years until 1992.

Q     Okay.  Have you held any other elected office?
11:47:02 A     Member of the Alabama Legislature.

```
 1  Q    And approximately when were you elected?
 2  A    1993, and I came out in 2018.
 3  Q    What district did you represent when you were in the
 4  legislature?
 5  A    Montgomery, Alabama, District 77.
 6  Q    Is that a majority black district?
 7  A    It is.
 8  Q    Was it a majority black district when you were elected?
 9  A    It was.
10  Q    When you were in the legislature, what committees did you
11  serve on?
12  A    I served on the Ways and Means Committee.  I served on
13  public safety.  And I served on health.  I served on local
14  government, contract review.  Those are the committees.
15  Q    Were you a member of any caucus?
16  A    I was a member of the legislative black caucus and the
17  minority caucus, as well as the Democratic caucus.
18  Q    Did you share any of those caucuses?
19  A    I shared the legislative black caucus for eight years.
20  Q    Did you ever serve on the reapportionment committee?
21  A    No, I did not.
22  Q    When you were in the legislature, what were the issues
23  that your constituents were bringing up with you most often?
24  A    Oh, they would bring up education, economic development in
25  terms of jobs, making certain that jobs would come to
```

11:47:16 (line 5)
11:47:27 (line 10)
11:47:49 (line 15)
11:48:05 (line 20)
11:48:23 (line 25)

1   Montgomery and to Alabama.

2        They were also bringing up the criminal justice system,

3   health care, the general issues that people are concerned

4   about.

11:48:35  5        And it depended on who you're talking to.  Different

6   people would have different issues.

7   Q    Do you think any of these issues affected the black

8   community differently than they affected the white community?

9   A    I do, yes.

11:48:48 10  Q    In what ways?

11  A    Well, in many ways the criminal justice system mainly

12  because you find more blacks incarcerated than you do whites in

13  the state of Alabama, as well as the problems that we've had in

14  our Alabama criminal justice system.

11:49:02 15       The education issue relative to being able to get a

16  quality education in the state of Alabama, not having to leave

17  Alabama as you had to do years ago in order to go to graduate

18  schools and things of that nature.

19       And many other things that would impact the day-to-day

11:49:20 20  living of the people within the state of Alabama.  These are

21  the type things that I find that were of interest.

22  Q    Have you observed a need for affordable housing in

23  Montgomery?

24  A    Yes.  I also served -- I forgot and left that off.  I

11:49:35 25  serve on the Montgomery Housing Authority Board.  I have been

1    there for a number of years.  And that has been one of my

2    passions to try to provide affordable housing within the city

3    of Montgomery.

4    Q    And is there an area that the board focuses on in terms of

11:49:51  5    housing?

6    A    Well, right now, we are focusing away from the traditional

7    aspect of public housing moving towards affordable housing.

8    And what I mean by that is trying to have mixed housing

9    communities rather than just public housing projects and trying

11:50:08 10    to have market rate rents, Section 8 vouchers, and all of that

11    combined to build communities and to strengthen communities

12    rather than just having large -- with all poor people stacked

13    together.

14        So we have gone in that direction just recently under my

11:50:24 15    leadership trying to make certain that we stabilize and sustain

16    low-income areas of the city of Montgomery.

17    Q    In terms of the people who are looking for low-income

18    housing -- and you mentioned public housing, as well -- do you

19    know approximately how many people in Montgomery are currently

11:50:45 20    looking for that?

21    A    Right now on our waiting list, the last time I checked, we

22    had approximately 8,000 people on the waiting list for public

23    housing or subsidized housing in the Montgomery area.

24    Q    Do you know what the demographic makeup of that waiting

11:51:02 25    list is?

1    A      Majority black.

2    Q      In your experience -- you mentioned criminal justice as an

3    issue of interest.  In your experience, have you observed any

4    criminal justice disparities between black and white children?

11:51:21  5    A      Well, what I've observed, it seems like black children are

6    incarcerated faster than others.  They are charged with -- many

7    people are incarcerated for possession of marijuana and things

8    of that nature.  And it seems like within the criminal justice

9    system itself there's a disproportionate number of

11:51:46 10    African-Americans that happen to be criminalized within the

11    Alabama correctional system.

12    Q      In your time in the legislature, did you work on any

13    issues that were affecting Mobile?

14    A      Mobile?  Well, yeah.  I chaired the Ways and Means

11:52:05 15    Committee for 12 years.  So in that position, I would have the

16    opportunity to work with legislators and representatives from

17    the Mobile area relative to the things that were of interest to

18    them, things such as the docks in Mobile.  I passed a bond

19    issue of raising money for the docks in Mobile, and a number of

11:52:28 20    other things relative to the funding for the school system in

21    the Mobile area.  Just a number of things that would be of

22    interest to the local legislative delegation of the people from

23    Mobile.

24    Q      Did you observe any issues that affected the black

11:52:42 25    residents of Montgomery and also the black residents of Mobile?

```
 1  A      Well, yes.  Yes.  That would be -- in many cases, some of
 2  the same issues, with the exception of where Mobile is located
 3  that affected Mobile or affected people in Montgomery.
 4          When it came to the criminal justice system, people were
 5  equally concerned about that.  When it comes to education, I
 6  found there was an interest in that.  When it came to health
 7  care, all of these things are things that are common whether
 8  you are in Mobile or Montgomery.
 9  Q      When you served as a legislator, were you a member of a
10  political party?
11  A      Yes.
12  Q      Which one?
13  A      Democratic party.
14  Q      And are you a member of the Democratic party today?
15  A      I am.
16  Q      Do you have views on whether African-Americans in Alabama
17  tend to support a particular political party?
18  A      The majority of African-Americans support the Democratic
19  party in Alabama.
20  Q      What are your views of the party, in terms of race and
21  racial justice in Alabama?
22  A      My views of the Democratic party?
23  Q      Sure, as concerns the Democratic party.
24  A      I am a member of the Democratic party because I feel
25  comfortable within the Democratic party.  I have never felt
```

Timestamps:
11:53:03 (line 5)
11:53:18 (line 10)
11:53:26 (line 15)
11:53:46 (line 20)
11:54:03 (line 25)

1  welcome in the Republican party in the state of Alabama.

2      I feel that the Democratic party represents those core

3  values that I believe in, in terms of making sure that people

4  are treated fairly, making certain that you have good

11:54:19 5  education, making certain that we have fair wages, that we

6  concentrate as well on bringing jobs to Alabama.  All of those

7  things are of interest and a priority for the Democratic party.

8      But the things that helps me most is the broad tint that

9  comprise the Democratic party where all people should feel

11:54:40 10  welcome and want to be a part.  Even if you don't totally agree

11  on everything, the ability to work together collectively as a

12  group of people, I find that to be very interesting and the

13  reason that I share most of the views of the Democratic party,

14  not necessarily all views, but most of the views.

11:54:58 15  Q    I think you said you feel comfortable in the Democratic

16  party.  Why is that?  What did you mean by that?

17  A    Well, because I can interact with other people of my race,

18  as well as other people that would be in my situation, or

19  moderate income situation, things of that nature.

11:55:16 20      And you have things in common that you can talk about and

21  that you can relate to -- educational issues, economic

22  development issues, health care, criminal justice reform.

23  Those are the type things that I find is very appealing and

24  challenging when it comes to trying to address in this state.

11:55:35 25  Q    And are there race or racial justice issues that draw you

1    to the Democratic party?

2    A    Well, I think the Democratic party with its broad tint are

3    as fair as it possibly can be when it comes to racial issues.

4    When it comes to trying to work across racial lines and things

11:55:58  5    of that nature, I think that they do a good job of trying to do

6    that.

7    Q    So we're discussing the Democratic party.  I asked you why

8    you think most African-Americans in Alabama -- I'm sorry.  I

9    asked you whether you had views about the Democratic party in

11:56:23 10    terms of race and racial justice.

11       Do you have any views about the Republican party in

12    Alabama in terms of race and racial justice?

13    A    Well, my view is basically -- has been based on my

14    experience with the Republican party here in Alabama, that it

11:56:38 15    seems to be kind of one-sided when it comes to racial justice.

16       People that run under the Republican banner, just an

17    example, Attorney General, things of that nature, will talk

18    about how tough they're going to be on crime.  I think it was

19    one Attorney General that ran that they're going to lock them

11:56:57 20    up and keep them until -- until the eyeballs popped out, or

21    something of that nature, talking about the electric chair.

22          THE COURT:  I think that was Graddick, was it not?

23          THE WITNESS:  I couldn't remember exactly.

24          THE COURT:  Back when we had the Yellow Mama.

11:57:14 25          THE WITNESS:  That's what it was.

```
 1              THE COURT:  Some of us still remember that.
 2              THE WITNESS:  I do.  I certainly do.
 3              THE COURT:  Yeah.  Not the high point in Alabama
 4    elections, I don't think.
 5              THE WITNESS:  No, it's not.
 6              THE COURT:  Sorry.
 7              MS. MADDURI:  No problem, Your Honor.
 8              THE COURT:  Well, during this little break that I've
 9    created -- and I apologize -- you were talking about criminal
10    justice reform, and I understand that Cam Ward has been
11    somewhat of a leader in criminal justice reform.  And which
12    party is he affiliated with?
13              THE WITNESS:  He is affiliated with the Republican
14    party.  He really should be a Democrat.
15              THE COURT:  I won't tell him you said that.  But there
16    are some Republicans that are interested in criminal justice
17    reform.
18              THE WITNESS:  Well, I have had the opportunity --
19    there have been some Republicans interested in criminal justice
20    reform.
21          And, you know, as I chaired the Ways and Means Committee,
22    you know, I have had opportunity to work with some Republicans.
23    We were able to.  But just overall, the party itself has not
24    been that receptive to include some of the blacks that have
25    been in the Republican party.  They wished they would be able
```

1    to progress much more within the ranks of the party than they
2    are able to progress.
3    BY MS. MADDURI:
4    Q    Since Your Honor brought up Charlie Graddick, do you know,
11:58:43 5    Representative Knight, whether Mr. Graddick is currently
6    serving in the criminal justice system in Alabama?
7    A    Yes.  Surprising to me, he served as chair of the Pardon
8    and Paroles Board for the state of Alabama at this point.
9    That's an oxymoron, but it's...
11:59:05 10    Q    And you --
11              THE COURT:  Between those times, do you recall what he
12    was doing?
13              THE WITNESS:  I think he was district judge in Mobile,
14    if I'm not mistaken.
11:59:21 15              THE COURT:  Was he a District Attorney there?
16              THE WITNESS:  I may be wrong.  It may have been
17    District Attorney.  But...
18              MS. MADDURI:  He does have a judge title, so...
19              THE COURT:  But he was elected in Mobile, whatever the
11:59:34 20    position was?
21              THE WITNESS:  Yes, Your Honor.
22    BY MS. MADDURI:
23    Q    You mentioned some of the statements you remember
24    Mr. Graddick saying.  In your opinion, how did those -- how do
11:59:47 25    those statements relate to race?

```
 1  A    Well, I just think it was a code word for race at that
 2  particular time during -- it was in the heat of a campaign, if
 3  I recall correctly.  It was just code words to excite his base
 4  and to get people to turn out and vote.
```
12:00:04
```
 5  Q    When you say his base, who do you mean?
 6  A    Which would be his white constituents.
 7  Q    Okay.  I think we have established you have a lot of
 8  experience with Montgomery.  So let's talk about Montgomery for
 9  a moment.
```
12:00:24
```
10       Are you aware of if Montgomery County is currently
11  majority black?
12  A    It is, yes.
13  Q    And are you familiar with the current configuration of
14  Montgomery in the congressional district map?
```
12:00:39
```
15  A    In the congressional district map, I think we have three
16  congressional districts in Montgomery.
17  Q    So Montgomery County is split between three congressional
18  districts?
19  A    That is correct, yes.
```
12:00:57
```
20  Q    In your view, does that configuration have any impact on
21  the county of Montgomery?
22  A    Oh, absolutely.  I think when you have -- when you pick up
23  just a small portion of a congressional district, it decreases
24  your impact within the district or with your congressperson
```
12:01:17
```
25  that's representing that district.
```

 1      I think that if you had a greater portion of Montgomery in
 2  the congressional district, you would have more impact because
 3  a person only represents, say, a few thousand people within
 4  that particular county, would take very little interest in the
12:01:33 5  county, or that's been what I have seen in terms of experience.
 6  They would -- they would tend to pay more attention to the
 7  areas with the largest population.
 8  Q    And how does -- if it does, how does that affect the
 9  residents of Montgomery?
12:01:48 10  A    Well, I think the residents think that you don't get some
11  of the services that you think you should get or some of the
12  things that you would ordinarily receive from your
13  congressperson representing you, dilute having some time the
14  congressional people that represent your district.
12:02:05 15  Q    Do you think there are any benefits to Montgomery by being
16  split three ways?
17  A    No.  Other than saying that you have three congressional
18  representatives.
19  Q    Do you know if Montgomery has always been split that way?
12:02:24 20  A    No.  I think that -- the only other time we've been split
21  with two congressional districts.
22          THE COURT:  Doesn't that mean you have got two more
23  people you can pick up the phone and call and say we need help
24  here?
12:02:42 25          THE WITNESS:  It does.  But the ones with very little

```
 1  population will pay you little attention.
 2          THE COURT:  Okay.
 3  BY MS. MADDURI:
 4  Q    How do you think that being in a single district would
 5  help the county of Montgomery?
 6  A    I think -- I think it's extremely important for the county
 7  of Montgomery.  One thing would be important about it is
 8  Montgomery is the capital city of the state.  So you need
 9  strong representation on a congressional level.
10          And with the things that are taking place -- in
11  particular, Montgomery now with all the growth and things of
12  that nature, I think that if you didn't have the congressional
13  district split as much as they are, you could get more, in
14  terms of tourism, getting dollars to come into the state
15  relative to the history of Montgomery, and more attention paid
16  on the congressional level to Montgomery than what has been
17  paid in the past.  And I think that, you know, if you had a
18  good strong representative representing Montgomery, it would
19  bring dollars to the capital city, and the capital city could
20  be a showplace to this nation.
21  Q    Representative Knight, approximately when were you born?
22  And I won't ask you for an exact year.
23  A    You want an exact year, or you don't want an exact year?
24  Q    It's up to you.
25          THE COURT:  Well, he told us when he finished the
```

12:03:02  (line 5)
12:03:17  (line 10)
12:03:35  (line 15)
12:03:57  (line 20)
12:04:12  (line 25)

```
 1   military.
 2            MS. MADDURI:  That's true.  But like you said, Judge,
 3   we're not so good with the math in here.
 4            THE WITNESS:  Okay.  I was born June 7th, 1945.
 5   BY MS. MADDURI:
 6   Q    And I know you said you grew up in Montgomery.  So what
 7   was your childhood like?
 8   A    Well, I grew up on Hall Street, kind of central
 9   Montgomery.  I remember my first house, a shotgun house and
10   outdoor facilities.  And I remember when we got indoor
11   facilities probably when I was about five or six years of age.
12            I remember -- the most dramatic thing that I remember
13   about Hall Street was when the Klan marched down Hall Street.
14   Hall Street was located not far from Dr. Martin Luther King's
15   house and not far from Dr. Ralph Abernathy.  So there was Klan
16   activity during that particular time, and they marched down
17   Hall street.  And I can remember my dad making us get under the
18   bed and stuff like that.
19   Q    Do you recall any bombings in your neighborhood when you
20   were growing up?
21   A    Yes.  Ralph Abernathy's house was bombed, and Dr. King's
22   house was bombed, and a service station on the corner of High
23   and Jackson was bombed.
24   Q    What kind of work did your parents do?
25   A    My father was in the military, World War II veteran.  My
```

12:04:24
12:04:44
12:05:13
12:05:30
12:05:46

          1   mother was a domestic worker.
          2   Q    And what was your -- what was your schooling like?
          3   A    Oh, I went to a segregated -- I went to Booker T.
          4   Washington High School.  Well, I started off in elementary
12:06:05  5   school.  I started off at Saint John's Catholic School because
          6   my parents wanted me to go with Catholic school, started off
          7   with what they considered to be a good education.
          8        I stayed there three years, and asked if I could go to
          9   public schools because in the neighborhood that I lived in, in
12:06:20 10   the Catholic schools, we had to wear uniforms and ties.  So
         11   coming back home was not a good experience coming back home
         12   through the neighborhood.
         13        They finally, after the third grade, said I could go to
         14   Booker T. Washington.  And then went to McDavid Elementary
12:06:34 15   School and finished Booker T. Washington High School, which was
         16   a segregated high school in 1963.
         17   Q    Other than schooling, did segregation affect other parts
         18   of your life growing up?
         19   A    It did.  I mean, I recall the times when, you know, water
12:06:49 20   fountains were separate, riding on the back of the bus.  We
         21   lived one block from a park that we couldn't -- couldn't use,
         22   couldn't play in.
         23        And, you know, it's just -- it's just southern life the
         24   way it was at that particular time.  And, you know, as a kid,
12:07:08 25   sometimes you didn't think about those things.  But as you grew

```
 1  up and as I became of age, that's the reason that I took an
 2  active role in the community because I wanted to make a
 3  difference and make things change.
 4  Q    Was part of that active role in the community in the Civil
 5  Rights movement?
 6  A    It was.  I was not a leader in the Civil Rights movement,
 7  but I participated.  During the Civil Rights movement, you
 8  know, in high school, I would participate in some of the
 9  marches and demonstrations.
10       I have to be very candid under oath.  At that time, I
11  didn't know what some of them were all about, but it was just a
12  way to get out of school.  So we participated in that.
13       But I -- after finishing high school, I got more involved
14  working with SCLC and other organizations with the various
15  demonstrations and marches in Montgomery and other areas, as
16  well.
17  Q    And why did you choose to get more involved after high
18  school?
19  A    Well, at that particular time, it was because -- I mean,
20  it was just so much excitement about the opportunity to make a
21  difference, and for things to change and not to accept the
22  status quo of the way things had been, and not have to go
23  through things that your parents had to go through.
24       You know, my father was a sharecropper.  So, you know,
25  those are the type things you want to make certain that you
```

12:07:29 (line 5)
12:07:44 (line 10)
12:08:01 (line 15)
12:08:16 (line 20)
12:08:34 (line 25)

1    make it better for your kids.

2    Q    Are there any particular demonstrations or marches that

3    stick out in your mind today?

4    A    Well, one was when we marched for the state capital.  And

12:08:59  5    I don't know what the issue was at that particular time, but I

6    was in that particular march.  And we were surrounded by state

7    troopers.  We couldn't leave.

8         And my parents happened to see me on TV, came down to try

9    to get me out of the march, but they wouldn't allow them to do

12:09:17 10    so.  That was one time because I was really talked to very

11    harshly about being in the march without them knowing it.

12         Another time is we marched from Alabama State University

13    to the state capital.  And I remember the police officers going

14    into the crowd with horses, and things of that nature.

12:09:39 15         I remember some marches where we marched, and the Klu Klux

16    Klan was lined up down the streets, with all types of names,

17    and things of that nature.

18         I mean, there was just all kind of marches during that

19    time.

12:09:54 20    Q    Do you think conditions for African-Americans in Alabama

21    have improved since that time?

22    A    Oh, yes.  Things have -- there have been improvements.

23    There's no question about it.

24         I mean, I realize that a lot of very young people said,

12:10:15 25    well, nothing has changed.  But much has changed.

1       But I have seen things seem to -- I have seen some

2  regression taking place in recent years, and that's very

3  troubling to me.  I think we made a lot of progress in the

4  Civil Rights movement, and we opened a lot of doors.  But I've

12:10:33  5  seen regression in the last several years that's very

6  discouraging.

7  Q     What are some of the ways or areas in which you've seen

8  regression?

9  A     Well, the one area that concerns me happens to be

12:10:46 10  education, a lack of funding for education, the lack of

11  emphasis on education.  The other thing has been, as I said

12  earlier, the criminal justice system itself and the way that

13  people are incarcerated.  And the lack of funding for mental

14  health, and those things that really impact families in so many

12:11:08 15  different ways.

16      And I found that a lot of people in Alabama are being

17  incarcerated.  And in many cases, they have no health

18  insurance, but they can't get the treatment that's necessary to

19  sustain them so that they will stay out of the criminal justice

12:11:24 20  system itself.  And for us not to pay attention to that is very

21  disturbing.

22      And at one time, you know, there were opportunities -- I

23  would say opportunities were opening up after the Civil Rights

24  movement and affirmative action plans, and things of that

12:11:44 25  nature.  But now you find in many cases opportunities in

1  Alabama the doors are shut.  That's why we lose so many young

2  people.

3      If they go to college and get a degree -- just like we

4  tried to encourage all our kids.  If you go get an education,

12:11:59  5  you will be able to sustain yourself and your family.

6      Well, what happens is when they get an education to

7  include advanced degrees, in many cases they have to leave the

8  state of Alabama and go to New York, go to California, or even

9  go oversees somewhere to be gainfully employed to be able to

12:12:14 10  establish themselves and get the careers that are necessary for

11  what they have been trained for.

12      So I find that very disturbing and discouraging,

13  especially after all the efforts that we put into the Civil

14  Rights movement -- the marches, the demonstrations, the -- I

12:12:29 15  mean, the intimidation of parents being intimidated, afraid

16  that they would lose their jobs because of what they were

17  fighting for, and things of that nature.

18      So where we are now, it seems like there's been some

19  regression taking place.

12:12:48 20  Q    In terms of the disparities you're speaking of and the

21  opportunities for employment in Alabama, am I right in

22  understanding that you believe that the situation that you just

23  described affects African-Americans differently than it affects

24  white folks?

12:13:09 25  A    Yes.  That's what I am talking about -- African-Americans.

1  You see, in my generation, we encourage our daughters and sons,

2  look, you go get an education and things are going to be okay.

3  With the anticipation that they do that, that they will be

4  welcome and they can stay in Alabama.

12:13:24  5       But you look at Montgomery, for example.  It may be a

6  little differently in Birmingham.  You look at Montgomery.  You

7  look at the banking industry.  You see very few blacks as

8  presidents of a bank or vice-presidents of a bank.  You look at

9  the high-level jobs.  I am not talking about entry-level jobs.

12:13:39 10 I'm talking about high-level jobs and opportunities for blacks.

11 In many cases, they're just not there.

12       Because what happened is you have -- so often progress

13 comes down through the family.  So where you have families who

14 have been successful throughout their lives, had money and

12:14:06 15 economic growth, then their children benefit from that.  In the

16 African-American family, you don't have as much of that.

17       So you have to -- you have first generations of young

18 people trying to get into the workforce, trying to get into

19 high-level positions that they've never been in before.  And a

12:14:23 20 lot of that is missing as from what I have seen within the

21 state of Alabama.

22       Even though we have gone out -- and I worked very hard to,

23 as a matter of fact, for the Republican governor trying to do

24 economic development and bring industry to the state.  We

12:14:38 25 brought companies like Hyundai, Mercedes, Honda to have

| | |
|---|---|
| 1 | manufacturing jobs and things of that nature for people to be |
| 2 | gainfully employed.  And I think it's extremely important to do |
| 3 | that. |
| 4 | Q    I think you mentioned that African-Americans, when they |
| 12:14:56 5 | leave the state of Alabama for places like New York or |
| 6 | California, they have different job opportunities.  Can you |
| 7 | tell me more about that? |
| 8 | A    Well, it's almost like when I was coming up as a kid.  For |
| 9 | summer jobs, we would leave Alabama.  We would go to New York, |
| 12:15:10 10 | wait tables and do things of that nature to make enough money |
| 11 | to come back home. |
| 12 | But now you can go to college, and you're unable -- with |
| 13 | the exception -- I have nothing against this.  Unless you to |
| 14 | happen to have been a star athlete at one of the major |
| 12:15:28 15 | schools -- Alabama, Auburn -- you can come back if you're |
| 16 | African-American and get a high-level job.  But just the |
| 17 | average working Joe out there that go and get a quality |
| 18 | education, it's extremely difficult for them to be able to come |
| 19 | back within the environment that we have here in this state and |
| 12:15:42 20 | be gainfully employed at that level. |
| 21 | Q    What do you mean by the environment in the state? |
| 22 | A    The way that the structure is set up.  The -- and in terms |
| 23 | of being able to get the type of jobs that you're qualified |
| 24 | for. |
| 12:16:00 25 | Q    And so you think that African-Americans who leave Alabama |

```
 1   are able to get the jobs that they're qualified for outside of
 2   Alabama?
 3   A    Oh, yeah.  I mean, I know kids that's gone to University
 4   of Alabama engineering program, get an engineering degree, but
 5   to get a job they go to Detroit.  I know people that have
 6   gotten Ph.D. degrees, but to get a job they have to go
 7   somewhere else to have the type of position that they feel
 8   they're qualified for.
 9   Q    In your experience, do white folks also have to leave
10   Alabama to get those same kinds of opportunities?
11   A    I don't think necessarily they have to, but I think some
12   of them do.  But I think it's not a matter of choice for
13   African-American kids.  I think many of them have to because
14   there are no jobs -- the jobs are just not here and available
15   to them in this state.
16   Q    Do you think those disparities in job opportunities
17   between African-Americans and white folks in Alabama, do you
18   think that leads to income disparities?
19   A    Oh, absolutely.
20   Q    Can you tell me more about that?
21   A    Well, I mean, because you have the low paying job for
22   African-Americans in this state, they don't have the high-level
23   jobs as I was explaining.  There's certainly going to be a
24   disparity in terms of income and wealth, and that's what you
25   see in the state.
```

12:16:20  (line 5)
12:16:41  (line 10)
12:16:59  (line 15)
12:17:19  (line 20)
12:17:34  (line 25)

```
 1   Q    These incomes -- sorry.  These disparities in education
 2   and income, do you believe that those affect voting?
 3   A    Oh, it does.  I mean, the less education you have, the
 4   less likely you are to have faith in the system and want to go
 5   vote.
 6        I mean, I run into people each day in the neighborhood
 7   that say, Well, why, my vote doesn't count.  Why should I go
 8   and vote?  Those are the type things you run into with less
 9   education.  And I think that adversely impacts
10   African-Americans in this state.
11   Q    And what about the income disparities?  Does that also
12   affect people's voting?
13   A    It does.  It does.  And it reminds me of when I first got
14   elected to the legislature.  I had no idea what I was getting
15   into and what I would encounter.
16        And the first thing that I encountered was in Alabama a
17   family of four making $3,500 had to start paying Alabama income
18   taxes.  I mean, that was unconscionable to think if you have a
19   family of four, you are making $3,500, and you have to start
20   paying Alabama income taxes.  But you would have large
21   multimillion dollar corporation that would be paying zero in
22   taxes.
23        I was able to work -- I tried to get it up to the poverty
24   level.  And I was able to work to get it up to $12,500 for a
25   family of four.  And that was working with -- even though --
```

12:17:59
12:18:13
12:18:32
12:18:48
12:19:07

1    working with a Republican governor to do that.  So it was the

2    black caucus and the Republican governor that worked together

3    do that.

4        The other thing I have tried to do in this state that is

12:19:26 5    very regressive is we have a sales tax on food and groceries.

6    I have tried to get that removed.  That is -- I have not been

7    successful over the length of time that I spent in the Alabama

8    Legislature trying to get that done.  But I hope some day that

9    somebody will be able to get it done.

12:19:40 10    Q    So these two taxes you mentioned -- taxing very low

11    incomes and also taxing food, do you think that

12    disproportionately impacts African-Americans in Alabama?

13    A    It does, because we are disproportionately lower incomes

14    than others.  When we elevated the tax for the family of four,

12:20:03 15    I think the total amount of it at that time, I think, was

16    $60 million.

17    Q    In terms of when someone has a lower income or a lower

18    paying job, have you observed any practical barriers that get

19    in their way when they go to vote or want to vote?

12:20:24 20    A    I'm sorry.  I don't --

21    Q    I can --

22    A    Okay.

23    Q    In terms of when somebody has a lower paying job or, like

24    you said, the manufacturing job like these hourly jobs?

12:20:40 25    A    Okay.

1  Q    Something like that or a lower income one, does that --
2  A    Well, and if I'm not understanding your question
3  correctly -- but I think it depends on the type of job that you
4  have.

12:20:51 5  There are some people that I work with they can only go
6  vote during their lunch hour.  So if you have a large election,
7  they go during the lunch hour, when they go to the polls, they
8  see a long line, well, on their mind, they have got to get back
9  to work or they're going to lose their job.  They are not going
12:21:08 10  to stay in a long line and cast their vote.  They are going to
11  go back to their job.

12  The other thing is there are many people that work two and
13  three jobs.  And the polls open at 7:00, close at 7:00.  There
14  needs to be a way that the voting is more available more than
12:21:27 15  just on election day, early voting, and things of that nature,
16  so it will be convenient for people that have jobs such as that
17  to be able to go vote.

18  And there are still people that feel intimidated if they
19  tell the people that they're working for that they want to take
12:21:47 20  off to go vote because years ago it was an intimidating factor
21  if you worked in a certain environment to tell people that you
22  were going to go and vote without losing your job, or something
23  of that nature.

24  So you still have some of those factors that's commonplace
12:22:06 25  in certain areas of the state and in certain households.

1  Q    You touched on a few things, so I will take them one by

2  one.

3       The intimidation you mentioned.  Can you tell me a little

4  bit more about that?

12:22:20  5  A    Intimidation at the polls, or you mean intimidation to go

6  vote, or what?

7  Q    Either one.  We can start with you said intimidation about

8  potentially I think being discouraged from your employer or

9  something related to your employment?

12:22:36  10  A    I was talking about if a person has a job where they only

11  have an hour off for lunch and they choose to go and vote

12  during that hour, if they -- if it's a long line and confusion

13  at the polls, they're not going to stay there and go vote.

14       And then you say, Well, will you come back after you get

12:22:55  15  off?  Well, then most of them got to go pick up their kids or

16  something of that nature.

17       There's all these types of things that come into play when

18  it comes to that.  And I think that's the reason that we have

19  not been able to have legislation that will allow people to do

12:23:11  20  early voting.

21       Now, we do have absentee voting.  But the affidavits and

22  all that have to be signed, that's intimidating to many people

23  because you have to swear that you are going to be out of town

24  or something of that nature to go vote.  And people are afraid

12:23:24  25  that if they do that and something happens and they're not,

1  that they will be arrested, or be charged with voter fraud, or

2  something of that nature.

3      And that's been -- and in the state of Alabama, there has

4  been a lot of talk about voter fraud in the Black Belt, or

12:23:41  5  absentee voter fraud, things of that nature, which puts up a

6  red flag in the minds of a lot of good people that would love

7  to work in the voting process but are afraid that if they do

8  so, that they're going to be charged with a crime, in terms of

9  absentee voter fraud and things of that nature.  And you

12:24:01 10  haven't found much of that.

11      As a matter of fact, in my experience in working in the

12  community, I worked there for a number of years.  You have to

13  beg people almost to go vote.  Nobody is running over you to go

14  vote.  To say that if it's convenient for people to go vote

12:24:16 15  that you would have all this voter fraud, I mean, it's just

16  another way of intimidating voters and keeping them afraid of

17  the process.

18      Because, see, within certain communities, there were times

19  when people were just afraid to go to the courthouse.  So when

12:24:31 20  you go and you trying to get people to fill out affidavits or

21  things of that nature, nobody wants to spend, or even have the

22  money to hire lawyers to defend them once they're charged with

23  voter fraud, or something of that nature.

24  Q   When you say certain communities, what do you mean?

12:24:46 25  A   In African-American communities.  Those are the ones that

I've worked in all of my life.

Q    And does the intimidation that you're talking about --
intimidation and the fear in African-American communities --
does that actually lead to people not voting?

12:25:02 A    Oh, absolutely.

Q    Even today?

A    Yes.  Yes.  It's not as -- it's not as pervasive today as
it was years ago.

I remember in Montgomery at one time when we had a mayor
12:25:15 there that was a very strong mayor, at certain voting places,
you would have city police officers stationed out there on
motorcycles in front of every polling place.  Well, I mean, we
challenged that.  We challenged.  We finally eliminated that.

One other instance during one period during the polling
12:25:36 places, they would have a white gentleman with dark glasses
standing at the front door.  People are thinking those are FBI
agents so they wouldn't go in and vote.

These are the type things that I have actually seen.  And
we've challenged a lot of that.  We got it eliminated.  But
12:25:52 it's still in the minds of many.  You still have a lot of
things where they are intimidated about going to vote.

Q    You mentioned that it can be difficult for people who have
jobs where they have just an hour off at lunch or something
like that to go vote.  In your experience, do African-Americans
12:26:27 disproportionately hold those kind of jobs?

```
 1  A    Yes.  Hold many of those jobs, yes, and still do.  That
 2  hasn't changed in a number of years.
 3  Q    You also mentioned that there are occasions where people
 4  are working two to three jobs or something like that --
 5  A    Yeah.
 6  Q    -- which might also make it difficult to vote on election
 7  day.  Are those jobs also disproportionately held by
 8  African-Americans in your experience?
 9  A    Yes.  You have more African-Americans having to work two
10  and three jobs.  Don't get me wrong.  I don't want to imply
11  that there are not others that do the same thing.  But
12  disproportionately, African-Americans are affected.
13  Q    You also discussed intimidation around absentee voting.
14  Can you tell me more about that?
15  A    There's been quite of that here within the state of
16  Alabama where there have been accusations about voter fraud and
17  illegal absentee voting especially in the Black Belt area; not
18  as much in the Montgomery area, but in the Black Belt area of
19  our city, which happens to be where a majority of the blacks
20  live.
21       That -- and most of it has not turned out to be actual or
22  factual information.  It's just been out there where people are
23  intimidated when it comes to the absentee ballot process.
24  Q    You've mentioned education a number of times since we
25  began speaking.  Are there disparities at the lower education
```

The timestamps in the left margin:
12:26:41 (line 5)
12:26:52 (line 10)
12:27:10 (line 15)
12:27:29 (line 20)
12:28:11 (line 25)

```
 1  level in the K-12 space that you've observed?
 2  A    In the K-12?
 3  Q    Uh-huh.
 4  A    When you say disparities, you mean in funding or?
 5  Q    Either in quality of education, or funding for education,
 6  or access to education, and just generally in the education
 7  realm for that group?
 8  A    I can't speak too much on that particular on K-12.  I can
 9  speak on higher ed.
10       But in the K-12, in Montgomery, the public school system's
11  composed majority -- I'll say 85 to 90 percent of blacks are in
12  public education.  White kids go to private schools.  The
13  public education system has been underfunded.
14       In Montgomery you have the lowest millage rate of any
15  other schools in the state.
16            THE COURT:  Have the lowest what rate?
17            THE WITNESS:  Millage rate.  Property tax.
18            THE COURT:  Okay.  Thank you.
19            THE WITNESS:  It's the bare minimum that's required by
20  state law, and that has been a problem in terms of funding for
21  the educational system there in the state of Alabama.
22       And the reason that that has prevailed in Montgomery is
23  because most of the white kids are in private schools.  So to
24  be able to get the rate increase there in Montgomery, we have
25  had it on the ballot I think twice.
```

BY MS. MADDURI:

1

2   Q    And it's failed?

3   A    It's failed, yes.  Uh-huh.

4   Q    Do you have an understanding of how --

12:29:50  5         THE COURT:  Just a minute.  Doesn't Montgomery have, I

6  think, the highest rated high school in the state?

7         THE WITNESS:  That's very interesting you ask that

8  question, but that is correct.  But that's the magnet program.

9         THE COURT:  Yeah.  I grew up in Montgomery.

12:30:06 10         THE WITNESS:  Okay.

11         THE COURT:  So, you know, have a lot of ties there

12  myself.  But the magnet school?

13         THE WITNESS:  The magnet school.

14    My position on that is I feel like every school should be

12:30:16 15  a magnet school.  And when you take the smartest kids out and

16  put them all into one program, then you leave very little

17  incentives for average kids -- I know I was an average student.

18    So coming up, if I didn't have somebody that made better

19  grades than I did or something to strive for, you know, it

12:30:36 20  just -- I don't know if I would have had the effort or the

21  energy to --

22         THE COURT:  Yeah.  I think we would probably agree a

23  lot on education issues.

24    But I did note that as a point of pride for a lot of folks

12:30:50 25  in Montgomery that they do have the best high school in the

     1    state.

     2              THE WITNESS:  Oh, yes.  Yes.  Uh-huh.

     3              THE COURT:  Okay.

     4              THE WITNESS:  And it's interesting, because as we

12:31:04  5    attract industry there, I look at the public school system.

     6    And you see what takes place in the public school system for

     7    some of the kids that's coming from overseas, the Korean

     8    students.  I mean, there are programs there and they do very

     9    well.

12:31:17 10       And the magnet program, all of the kids in the magnet

    11    program do very well.  So if we --

    12              THE COURT:  We shouldn't leave the rest behind.

    13              THE WITNESS:  Right.

    14              THE COURT:  I agree with you on that.

12:31:33 15    BY MS. MADDURI:

    16    Q    You said that the public school system in Montgomery is I

    17    believe you said 85 to 90 percent black.  And then most of the

    18    white children or students are in private schools.

    19         Do you have a sense or understanding of how that division

12:31:49 20    occurred, or has it just always been that way?

    21    A    Well, when I grew up, I was -- I grew up in the segregated

    22    system.  When integration came, as I recall -- and I think

    23    during that period of time, I was in between college and the

    24    military.

12:32:08 25       When integration came, they would close the black schools,

                  1   and the black kids had to go to the white schools.  And the one

                  2   thing that concerned me about that was why couldn't it not be

                  3   just the reverse?  Because I felt like Booker T. Washington was

                  4   one of the greatest high schools there in the city.  Why

        12:32:24  5   couldn't you have an equal sharing of transfer of students?

                  6   But it didn't end up that way.

                  7       All of the black kids had to go and the teachers, and

                  8   transfer.  And Booker T. Washington -- I think Carver

                  9   maintained, but Booker T. Washington did not.  And they turned

        12:32:42 10   it into what they called a magnet program.

                 11       And Booker T. Washington is one of the magnet programs for

                 12   performing arts.

                 13   Q    You said that they closed the black schools, and then the

                 14   black children went to white schools?

        12:32:55 15   A    Well, they didn't close -- well, yeah.  As we would know

                 16   the schools.

                 17       What I was saying is to me the ideal plan would have been

                 18   to have -- it was Booker T. Washington or Carver and then -- I

                 19   just use these as the examples of -- Lee and Lanier.

        12:33:13 20           THE COURT:  And Jeff Davis.  Let's not forget Jeff

                 21   Davis.

                 22           THE WITNESS:  My daughter finished at Jeff Davis.

                 23   It's hard -- and Jeff Davis.

                 24       But so that if you could take and keep Booker T.

        12:33:28 25   Washington, just mix the students in that way from, say,

1  Lanier, and then have students from Carver going to Lee,

2  something of that nature rather than getting rid of the black

3  schools itself.  That happened during that particular time.

4          THE COURT:  But Carver High School was maintained.

12:33:48  5          THE WITNESS:  Yeah.  Carver has maintained, and it's

6  still there, yes.  Uh-huh.

7  BY MS. MADDURI:

8  Q    So, then, when the these closings were or consolidations

9  happened, did the schools become integrated fully?

12:33:59  10  A    Yeah.  Well, they -- yeah.  They became integrated, yes.

11  Q    And do they --

12  A    You had busing.  You had all of the ingredients that took

13  place as it relates to that.

14  Q    So what happened between then and now where the schools

12:34:17  15  are now 90 percent black?

16  A    Because you had a proliferation of private schools.

17  Q    And white children went to private schools?

18  A    Yes, over a period of time.  That's what has happened.

19  Q    Based on what you have observed, is it your belief that

12:34:33  20  African-American students and white students are getting equal

21  education in Alabama?

22  A    Not in Montgomery.

23  Q    And what about in the higher education level, in terms of

24  college or graduate school?  Are there disparities that you

12:34:54  25  observed there?

```
 1  A    Yes, I did.  And I filed a lawsuit on it.  Knight v.
 2  Alabama.  I felt that -- well, what happened years ago in the
 3  higher education arena, they created the school systems:  one
 4  for blacks and one for white -- separate but equal.
```
12:35:16
```
 5       You had Auburn University, and you had Alabama.  You had
 6  Alabama A&M, and you had Alabama State University.  Alabama A&M
 7  was created as the counterpart basically for Auburn University
 8  which would have been the land grant programs in the state; and
 9  Alabama State University created for blacks, which would have
```
12:35:33
```
10  been the equivalent of Alabama.
11       But they were never funded at the same level.  They were
12  separate, but they were not equal.
13       So I filed a lawsuit January 15th, I think it was 1981,
14  alleging that there still existed in the state the remnants of
```
12:35:53
```
15  a dual system of higher education.  And that suit went on for a
16  greater portion of my adult life hood.
17  Q    Does the state fund those schools?
18  A    They're partially funded by the state, yes.  They're
19  state-supported schools, yes.  Not fully.  You have tuition,
```
12:36:13
```
20  and you have other things that make up the complete budget for
21  higher ed.
22  Q    What was the outcome of that case?
23  A    I was eventually successful in that.  And there were
24  remedies put in place by the Court.
```
12:36:27
```
25  Q    And what did the Court find in the case?
```

1   A    That there still remained in Alabama the vestiges of a

2   dual system of higher ed and to order the state to come up with

3   corrective actions.

4   Q    Was there a finding of intentional discrimination on the

12:36:44   5   part of the state?

6   A    I don't -- I can't recall whether there was a finding of

7   intentional.  I don't -- I was just so happy to get the

8   funding.  I don't know about the details.

9   Q    I understand.  That's lot of details for lawyers.

12:37:02  10        What was the remedy that was ordered?

11  A    The remedy was -- well, initially we were asking for money

12  to make up for the disparities that were taking place.  And I

13  really didn't like the remedy initially, but I think the more

14  that I looked at it, I think it was a good remedy.

12:37:24  15        There were -- Alabama State and A&M were awarded certain

16  what they call high demand programs, a certain amount of money

17  for both schools.  But it was also given an opportunity to

18  develop new programs over a period of time that were not

19  competing programs by the other universities.

12:37:45  20        As a matter of fact, in the Montgomery area, one of the

21  allegations were that in order to keep the schools segregated

22  that you had the branch campus of your major universities

23  located in Montgomery with a population of less than 200,000.

24  You had a branch campus of Auburn University, and you had a

12:38:04  25  branch campus of Troy.

Case 2:13-cv-00307-AKK Document 564 Filed 11/15/21 Page 125 of 246

1     So given a choice, white students would go to the branch

2  campus of Troy or the branch campus of Auburn before they would

3  come to an HBCU.  So that made it extremely difficult for an

4  HBCU to attract white students especially from the state of

12:38:23  5  Alabama or that particular area there.

6     So it froze the program for those schools.  They couldn't

7  bring on any new programs that would duplicate what was being

8  offered at Alabama State and Alabama A&M.  And that gave

9  Alabama State and Alabama A&M an opportunity to have what would

12:38:44 10  be known as high demand programs.

11     Alabama State was given several doctoral programs or given

12  forensic science, physical therapy, programs such as that.

13  Alabama A&M -- they combined the extension program with Auburn.

14  So now it's called the Alabama Extension Program.

12:39:02 15     So Alabama A&M participates fully in the extension program

16  with Alabama A&M, and they were given some advanced programs as

17  well.  So that's kind of a summary.

18     Oh, the other thing which was the most controversial part

19  was the Court order that Alabama State and Alabama A&M had to

12:39:20 20  recognize that they were traditionally or historically black.

21  But they were not black universities.  So they gave minority

22  scholarships.

23     So that was controversial because you had whites getting

24  scholarships to the black college campus.  And some of the

12:39:36 25  black students were a little upset about that because they

```
 1    couldn't get scholarships otherwise.
 2         But it worked out to integrate or to bring whites onto the
 3    campus of Alabama State, as well as onto the campus of Alabama
 4    A&M.
```
12:39:50 5    Q    Was there a monetary award in the remedy?
```
 6    A    There was a monetary award.  I mean, over a period of
 7    time, like I said, initially we really wanted some cash up
 8    front, but we got -- I think it was -- I don't remember the
 9    exact amount initially.
```
12:40:11 10        But over a period of time, it's been millions of dollars
```
11    that's gone to Alabama State, as well as Alabama A&M not only
12    for physical growth but for the new programs, as well.
13    Q    And was there -- was part of that remedy in order to
14    correct the disparate findings that African-American --
```
12:40:30 15   historically black colleges had in Alabama?
```
16    A     Well, I don't think it insisted on correctly because it
17    was such a large gap that it's almost impossible -- when you
18    look at what has happened over the period of time since 1874,
19    you know, Alabama State and Alabama A&M with the lack of
```
12:40:55 20   funding, but it was to take us from where we were at that
```
21    particular time, given new programs and the opportunity to take
22    it from there.  I think that was basically kind of the way that
23    the order was written.
24         It didn't give us a large amount of money that would make
```
12:41:11 25   up for the disparities of the past, but it gave an opportunity

```
 1  to move from that point forward and try to do some things as it
 2  relates to equalizing the playing field.
 3           THE COURT:  Ms. Madduri, would this be a good time to
 4  take a break?
 5           MS. MADDURI:  Yes.  I apologize.  Yes, that would be
 6  great.
 7           THE COURT:  I don't know what time it is.  We'll come
 8  back at 1:45.
 9           MS. MADDURI:  Thank you.
10           THE COURT:  Thank you.
11           (Recess.)
12           THE COURT:  Ms. Madduri, are you ready to proceed?
13           MS. MADDURI:  Yes, ma'am.
14           THE COURT:  You may do so.
15  BY MS. MADDURI:
16  Q    Mr. Knight, do you believe that there is official
17  voting-related discrimination in Alabama today?
18  A    Yes, I do.
19  Q    Are you familiar with the current voter ID law in Alabama?
20  A    Vaguely, yes.  Uh-huh.
21  Q    In your opinion, is the voter ID law a form of
22  voter-related discrimination?
23  A    I was against the voter ID law because I think it created
24  such an issue for people having to go and get their ID to be
25  able to vote.
```

Timestamps in left margin: 12:41:32 (line 5), 12:41:45 (line 10), 13:46:55 (line 15), 13:47:16 (line 20), 13:47:33 (line 25)

13:47:48 

1    As a matter of fact, we tried to come up with legislation

2    that would address that issue and make it possible where almost

3    any form of ID you would be able to identify.  I come from the

4    train of thought that if you were a resident of Montgomery, you

5    shouldn't have to go through a lot of hassle to be able to

6    register and vote for the candidate of your choice.  It should

7    be open, and there shouldn't be any barriers put up.

8        Now, having said that, I do think there has to be

9    accountability.  You do have to have some form.  But it doesn't

10   have to be as strict as Alabama has.  I would think there could

11   be some better ways to do it.

12       The special technology the way it is now and the way that

13   you can identify people, there are so many ways now that I

14   think you could make it easier for people to vote and then be

15   able to take advantage of everybody having that opportunity.

16   Q    In terms of the current law that Alabama does have, do you

17   think that disparately impacts African-Americans in Alabama?

18   A    I think so.  I think that any time you put barriers like

19   that in place it has an adverse impact on low-income families

20   and people that -- working families, things of that nature

21   rather than professional families.  And I think

22   African-Americans make up the majority of that.  Not that it

23   will not have an adverse impact on anybody to fill in that

24   category, but African-Americans are more affected by it.

25   Q    Have you observed any issues with DMV offices in the Black

1    Belt in the last few years?

2    A    If I recall correctly, it was Governor Bentley at that

3    time.  Something came up in the legislative process that he was

4    not satisfied with relative to the black caucus.  And I think a

13:49:22 5    way of punishment was closing some of the -- the offices in the

6    Black Belt.

7         I'm trying to think of what that issue may have been, but

8    I don't recall at this time.  But it -- the Governor got very

9    upset with the black caucus on some bill or legislation that he

13:49:43 10   wanted that we were opposed to.  And when we looked up, he had

11   closed all of the voting places in some of the Black Belt

12   areas, voter ID places in the Black Belt area.

13   Q    How would the closing of the DMV offices impact

14   African-Americans differently than it might white voters?

13:50:05 15   A    Well, the feedback that I got -- and I'm not in the Black

16   Belt -- but people would have to drive sometimes an hour to get

17   to a location where they would be able to get their ID to be

18   able to vote.  And I mean, that's a lot just to go get an ID to

19   be able to go vote.

13:50:27 20        So, and then there was some problems with the hours.  I'm

21   not thoroughly familiar with all of the details because most of

22   the legislators from that particular area handled that issue

23   with the Governor in trying to make the corrections.  But it

24   was a tremendous, you know, burden on people in the Black Belt

13:50:48 25   to be able to do that.  Somebody from that area will probably

```
 1  have more information than I on that.
 2  Q    Certainly.  Have you --
 3            THE COURT:  Do you know how long that was a problem?
 4            THE WITNESS:  For some reason, we were very aggressive
13:51:05  5  and adamant about -- to include, we started filibustering in
 6  the legislature.  So I don't know.  It may have been 30 days or
 7  so.  I'm not certain on the exact time on that.
 8            THE COURT:  But it wasn't a period of years?
 9            THE WITNESS:  No, ma'am.
13:51:21 10            THE COURT:  Okay.
11  BY MS. MADDURI:
12  Q    Mr. Knight, have you observed any issues with
13  African-Americans not being on the voter rolls when they go to
14  vote?
13:51:31 15  A    Yeah.  That's interesting you would ask that question.  I
16  ran for Senate this last election, and I've been a Democrat all
17  my life.  And when I got to the polls to vote in the election,
18  I was told that -- it was in the runoff election -- and I was
19  told that I had voted in the Republican primary so I couldn't
13:51:55 20  vote in the Democratic runoff election.  And it took me almost
21  half a day to correct that.
22  Q    Have you observed the same thing happening to other
23  African-Americans?
24  A    Yes.  I work -- I worked the polling places on election
13:52:15 25  day, and there are all kind of problems many times on election
```

```
 1  day.  People going to vote, names not on the list, they be told
 2  by people that -- election officials -- that they have to go to
 3  the courthouse to correct it.
 4      Some election officials will allow them to vote
13:52:32 5  provisional ballots.  Others would not.
 6      There have been instances where polling places are not
 7  open on time.  But they have allowed -- when they were not open
 8  on time and we complained about it, they would extend the hours
 9  and keep the polling place open for that length of time that
13:52:51 10  they were closed.
11      There have been instances where the 30-foot rule, 30-feet
12  rule that you have to stand 30 feet from the poll if you have
13  any campaign material, where in some polling places, they would
14  not allow people to have campaign material at all whether it
13:53:11 15  was 30 feet or anywhere on the property.
16      So there have been -- I mean, just about in every election
17  you have some problems that you are going to deal with on
18  election day.  And now, these are precincts in the
19  African-American community.  I focus my attention basically in
13:53:26 20  those African-American communities in the city of Montgomery.
21          THE COURT:  So you don't know if there are similar
22  problems in any of the white precincts?
23          THE WITNESS:  No, ma'am, I don't.  Huh-uh.
24  BY MS. MADDURI:
13:53:41 25  Q   Have you received complaints from African-Americans about
```

1   these issues?

2   A     I have, yes.

3   Q     Have you received any complaints from white voters?

4   A     Not at the same level.  Maybe two or three.  I know the

13:53:59 5   issue of dealing with my name not being -- where there was a

6   mixup on whether somebody voted Republican or Democrat, I think

7   a few whites had a problem with that, as well.

8   Q     Mr. Knight, do you know how many African-Americans have

9   been elected to statewide office in Alabama?

13:54:33 10   A     I know Justice Adams was elected statewide to the Supreme

11   Court.  Justice England, I think -- I know he was appointed.  I

12   think he was elected, as well.  Justice Cook was appointed, but

13   I don't think he was subsequently elected.

14         So that would be two that I could think of immediately.  I

13:55:08 15   can think of those two that's been elected.

16   Q     And in the Alabama state legislature, are you aware of

17   approximately how many African-Americans are in the house?

18   A     It's 27.

19   Q     Are any of them elected from non-majority black districts?

13:55:30 20   A     All of them are elected from majority black districts.

21   There's one district that I would consider kind of marginal.

22   That's the one that -- the Locy Baker district down in Houston

23   County.  It may be -- it may be kind of even.  That's the only

24   one that would be considered marginal in my mind.  All the rest

13:56:02 25   of them are majority black.

|   |   |
|---|---|
| 1 | THE COURT:  The one in Houston County, what did you |
| 2 | call it? |
| 3 | THE WITNESS:  The Locy Baker -- he's the |
| 4 | representative that got elected from that district. |
| 13:56:15 5 | THE COURT:  Do you know how to spell Locy? |
| 6 | THE WITNESS:  L-O-C-Y. |
| 7 | THE COURT:  Okay.  Thank you. |
| 8 | BY MS. MADDURI: |
| 9 | Q    Do you think the fact that no African-Americans have been |
| 13:56:32 10 | elected statewide have an effect on -- |
| 11 | A    Let me -- there was -- there is a district.  James Fields |
| 12 | got elected from a district in Cullman, Alabama. |
| 13 | Q    And James Fields is African-American? |
| 14 | A    He's African-American, yes.  He's no longer there.  He got |
| 13:56:49 15 | elected one term from a district in Cullman, Alabama.  I |
| 16 | remember that. |
| 17 | Q    Do you remember approximately when that was? |
| 18 | A    That was in -- not this past session, but the session of |
| 19 | the legislature before that. |
| 13:57:04 20 | THE COURT:  And do you know the racial makeup of |
| 21 | Cullman? |
| 22 | THE WITNESS:  It's white.  I don't know -- |
| 23 | THE COURT:  It's predominantly white, isn't it? |
| 24 | THE WITNESS:  Yes.  I think so.  It is. |
| 13:57:19 25 | BY MS. MADDURI: |

1    Q    Do you think that the fact that no African-Americans have

2    been elected statewide has an impact on the African-American

3    community in Alabama?

4    A    Well, yes.  I think that anytime you can't have

13:57:35 5    representation it's going to have an impact on it.  You like to

6    feel like you have people that will have at least not

7    everything that you stand for that you believe in, but at least

8    represent some of the views that you might have and that you --

9    you have that type of representation on all levels.

13:57:54 10   Q    When you were in the state legislature, were you involved

11   in the passage of any laws in relation to the composition of

12   boards, city boards in Montgomery?

13   A    That was -- I was involved in that around 19 -- around

14   1993 -- at the time that Montgomery changed from the council

13:58:24 15   form of government to the -- from the mayor-council to the

16   commission form of government -- from the commission to the

17   mayor-council form of government.

18        I passed a bill in the Alabama Legislature that would add

19   diversity to all of the municipal boards.  It was a bill that

13:58:44 20   gave the council the authority to make -- to make

21   recommendations -- to make appointment to municipal boards,

22   where in the past the mayor had made appointments to all

23   municipal boards.  So most of them were basically white.

24        When we passed that bill, that bill gave African-Americans

13:59:02 25   an opportunity to be represented on municipal boards because we

```
 1  had a council form of government where you had four blacks and
 2  five whites -- nine-member council.  So you at least have four
 3  African-Americans on all your municipal boards within the city
 4  of Montgomery.
```
13:59:19
```
 5  Q    I'm just about done with you.  I promise.
 6       Were you ever the victim of a crime in your home?  At your
 7  home?
 8  A    A crime in my home?  Oh.  Well, yes, it was a crime.  I
 9  mean, I had a cross burned in my yard.
```
14:00:00
```
10  Q    Can you tell me about that?
11  A    That was in 19 -- it had to be around 1981 or so.
12       At the time, there was a lot of controversy in the city of
13  Montgomery.  I led the protest on the demonstration
14  concerning -- I'm trying to think exactly now what the issue
```
14:00:20
```
15  was at that time.  I was working with Montgomery improvement
16  association.  It was a controversial dealing with the police
17  department and something that had happened.  I think it may
18  have been an African-American that got shot in the back or
19  something of that nature.  And we were holding demonstrations.
```
14:00:38
```
20       And one Sunday morning, my neighbors called, and there was
21  a cross in my yard, a big telephone pole and a cross that
22  was -- I mean, it was like daylight.
23  Q    Did you find out who did -- who did it?  Who committed the
24  crime?
```
14:01:00
```
25  A    The best that I could remember -- at that time, I think
```

1  the Attorney General was Jimmy Evans.  And they were able, with

2  the Southern Poverty Law Center, I think they -- they were able

3  to find some people for that, along with some other things that

4  had been planned.  Because at one of the demonstrations there

14:01:25  5  had been a plan to blow up a bridge or something that we were

6  going to march over.

7      So they were able to gather that information.  I think

8  they tied all of it together.  I don't know all the details

9  about the outcome of it or when it happened.  But I do know

14:01:40  10  that something did happen as it relates to them being able to

11  identify some of the people that were involved in it.

12  Q    Do you recall who those people were?

13  A    No, I do not.

14  Q    That's all my questions for you right now.

14:02:00  15  A    Thank you.

16          THE COURT:  Cross-examination?

17          MS. HOWELL:  Briefly, Your Honor.

18                  CROSS-EXAMINATION

19  BY MS. HOWELL:

14:02:40  20  Q    Hi, Representative Knight.  I didn't get to meet you

21  earlier.  I'm Laura Howell, and it is nice to meet you in

22  person finally.  I've heard a lot about you.

23  A    I hope it has been good.

24  Q    It has been.

14:02:53  25      And you have covered a lot of ground.  So please forgive

1    me if I take a little bit longer than maybe I should just

2    asking you a bunch of questions.

3         So you've talked a lot about -- and it sounds like you're

4    very passionate about improvements for the city of Montgomery;

14:03:10  5    is that a fair statement?

6    A    I would want to think so, yes.  Uh-huh.

7    Q    And you talked about sort of your perspective on having

8    Montgomery split between three congressional districts, right?

9    A    Yes.

14:03:25 10    Q    And how you felt like that diluted the influence that

11    someone might have there, right?

12    A    Yes.

13    Q    Okay.  You also said that there was probably less interest

14    in looking after the city of Montgomery; is that correct?  Did

14:03:46 15    I understand you correctly?

16    A    I don't know exactly what -- the intent on what I'm saying

17    on that is I think that if you have a person that represents

18    30,000 people opposed to somebody that only represent 3,000,

19    that you would have more impact, in terms of the

14:04:02 20    decision-making process with that individual in terms of their

21    priorities.

22         Say, for instance, in politics, you establish your

23    priorities.  If you got something that you can deliver to

24    30,000 people, you're going to do that before you deliver to

14:04:17 25    3,000 people.  That's kind of --

```
 1   Q    I understand.  So we have three Congress people that
 2   represent some part of the city of Montgomery, correct?
 3   A    We do, yes.
 4   Q    And one of them is Terri Sewell, correct?
 5   A    That's correct.
 6   Q    And one of them is Martha Roby?
 7   A    Yes.
 8   Q    Those are the two bigger ones at issue, I think, in this.
 9   A    And Mike Rogers.
10   Q    And Mike Rogers is in District 3, right?
11   A    Yes.
12   Q    Do you know where Martha Roby lives?
13   A    No, I don't.  I could guess, but I do not know.
14   Q    So you don't know that she lives in Montgomery?
15   A    Oh, no.  She lives in Montgomery.  I thought you meant the
16   street address or something.
17   Q    Oh, no, sir.  I wouldn't ask you that in open court.
18   A    Oh.  She lives in Montgomery.  Yes.  I'm sorry.
19   Q    Do you think she's doing an effective job representing her
20   portion of the city of Montgomery?
21   A    I think she's a good representative, yes.
22   Q    Do you think that her ability to represent the city of
23   Montgomery depends on her living in Montgomery?  Do you think
24   that she represents it -- I'm sorry.  That's compound.
25        Do you think that she represents it well living there?
```

```
 1  A    I think based -- because she happens to be who she is, and
 2  she served on the city council there in Montgomery, I think
 3  that's had an added impact in terms of her ability to represent
 4  Montgomery.
```
14:05:39
```
 5  Q    So in wanting -- I presume you would like a congressperson
 6  who would represent Montgomery probably better and more fully
 7  than someone represents it now?
 8  A    Well, I would just want the best representation that we
 9  could get for Montgomery.  Mainly because it's the capital
```
14:06:02
```
10  city, as I said.  And I think with all of the things that's
11  taken place in the capital city with the possibility of tourism
12  and the amount of revenue that could come in, that good
13  representation, you know, in Montgomery will certainly be a
14  plus.
```
14:06:19
```
15  Q    Sure.  But are you saying that the current representatives
16  are not representing it as well as they could?
17  A    No.  I'm not going to say that -- not as well as they
18  could necessarily.  I'm just saying if a person only had
19  3,000 -- if Martha Roby only had 3,000 people from Montgomery
```
14:06:38
```
20  district, and she had 30 or 40,000 from Houston County, then
21  the emphasis would be more on Houston County than Montgomery,
22  and her priorities would be more in Houston County than
23  Montgomery.  That's all.
24          THE COURT:  But wait a minute.  The Montgomery
```
14:06:51
```
25  representative isn't divided with Houston County, right?
```

 1        THE WITNESS:  I just used that hypothetical as an

 2  example.

 3        THE COURT:  Okay.  All right.  So Mike Rogers

 4  represents part of Montgomery, Macon, Russell, Lee, Tallapoosa

14:07:11  5  Chambers, Randolph, Clay -- oh, he has a big one -- St. Clair,

 6  Calhoun, Cleburne, and Cherokee roughly for District 3?

 7        THE WITNESS:  Right.  I assume.

 8        THE COURT:  So you're saying that because he only has

 9  a small part of Montgomery County, he would be less receptive

14:07:31  10  to issues that affect Montgomery County?

11        THE WITNESS:  Yes.  It's just to me -- it's just -- I

12  mean, it's just natural that you have got all those other

13  counties with much larger population, more population and

14  voters, that you have got to take care of those before you take

14:07:47  15  care of a small population there.

16  BY MS. HOWELL:

17  Q    Okay.  So let me ask you this, then:  Have you seen any of

18  the illustrative plans drawn by plaintiffs' experts in this

19  case?

14:07:58  20  A    No, I have not.

21  Q    Okay.  So then you might not know that certain of those

22  illustrative plans combine portions of Mobile County with

23  Montgomery County in a proposed second majority black district.

24        Do you think that a potential future congressperson's

14:08:17  25  attentions would be divided between Mobile County or even the

city of Mobile and the city of Montgomery if they were to

represent portions of both?

A     Now, when it comes to the congressional districts, I have

looked at several districts.  You have the one that's in the

seventh, and I know sometime ago we had another one similar to

the board of education district, and there's one dealing with

Mobile.  I'm not familiar with the details of the Mobile.  The

only one I'm familiar with partially would be the one that

exists at the present time.

     I do think that as you draw those that you have

communities of interest.  Say, for instance, Mobile and

Montgomery would have some things in common that a

representative could very well represent both -- both of those

areas equally and be very successful in doing so.

     But when you get down to having three like we have in

Montgomery at the present time, I think that you could get very

little, in terms of attention from, say, Mike Rogers' district.

I know Mike, so -- I mean Representative Rogers.  He's a good

representative.  But I can understand where he would pay more

attention to the -- he would pay more attention to Talladega

maybe rather than he would Alabama State University, if that --

Q     Sure.  But I thought -- I understood that part of your

point had to do with the proportion of the population that they

were representing.  And so in the instance where Mobile, the

city of Mobile, and the city of Montgomery were in a single

1  district, the city of Mobile is larger than the city of

2  Montgomery, isn't it?

3  A    I don't know what the population is.  But it may be a

4  little larger.  But I mean, if it's the entire city, I think

14:10:10  5  that would depend on the total number of the population.  And

6  to me, that would determine your interests.  If you split it

7  half and half or what your interests might be.

8       But there will be some areas of commonality to Montgomery,

9  as well as Mobile, because both of them are urban areas.  And

14:10:26  10  some of the needs and concerns would be for both areas.

11  Q    Sure.  But the same could also be said for the current

12  congressional districts, right?  So Mobile -- or, excuse me --

13  Montgomery is an urban area the same way that perhaps Dothan is

14  also a small urban area, right?

14:10:41  15  A    It could be said possibly, yes.

16  Q    And Montgomery is also an urban area that's represented in

17  part by Terri Sewell in the same way that Birmingham is in part

18  represented by her, and that's also an urban area, right?

19  A    Right.

14:10:55  20  Q    And you're not contending today as part of your testimony

21  that the city of Montgomery could only be represented

22  effectively by a black representative, correct?

23  A    Could only be by a black representative?

24  Q    Correct.

14:11:14  25  A    No.  I would -- what I am contending is I think blacks

          1  should have the opportunity that if they want to elect a black,

          2  they should have the opportunity to do so.  And if you don't

          3  have a majority black district, you limit your opportunity to

          4  be able to do that presently in Alabama the way that the voting

14:11:31  5  trends are.

          6  Q    But, for example, Representative Roby could, in fact,

          7  represent Montgomery just as effectively as Representative

          8  Sewell could?

          9  A    I don't know if I want to answer that question.  Martha --

14:11:48 10  Representative Roby is a very good representative.

         11  Representative Sewell is a very good representative.

         12  Q    A very diplomatic answer from a legislator, sir.

         13       You also talked about -- a little bit about party

         14  affiliation.  And we --

14:12:05 15       THE COURT:  May I ask a question before you leave that

         16  completely?

         17       Are you aware, Representative Knight, of circumstances

         18  where Representative Sewell and Representative Roby have worked

         19  together to accomplish things for their respective districts?

14:12:26 20       THE WITNESS:  Yes, I am.  And they work very well

         21  together.  I'm very familiar with that.  They have -- I mean,

         22  they have put together a great alliance, in terms of working

         23  together.  There's no question about that.

         24       THE COURT:  And in that sense, sometimes having two

14:12:46 25  people working together to accomplish things can get more done

```
 1  in the House of Representatives than one person trying to get
 2  something done.
 3          THE WITNESS:  In that particular instance, I would
 4  have to agree with you on that.
 5          THE COURT:  Thank you.
 6  BY MS. HOWELL:
 7  Q    You also talked earlier in your testimony about your
 8  political affiliation.  And you are -- you associate with the
 9  Democratic party, correct?
10  A    I'm a Democrat.
11  Q    And you told us, I believe, that you felt comfortable
12  within the Democratic party in part because of shared
13  characteristics, including race, right?  Of other members of
14  the party?
15  A    I think that's correct.
16  Q    Did you feel comfortable in the party when it was not
17  predominantly black members?
18  A    Oh, yes, I was comfortable in the party.  I mean, we had
19  within the Democratic party -- now, I'm not going to say that
20  we agreed on everything or -- but I felt comfortable because, I
21  mean, there were other blacks in the party, and there were
22  whites in the party that in some cases totally disagreed with
23  the views of the black caucus.  And we would fight and debate
24  and everything else.  But there was a comfort level because all
25  of us were members of the same party.
```

```
 1  Q    Right.  And you felt comfortable working with them?
 2  A    Yes.  Yes.
 3  Q    And that was regardless of their race, right?
 4  A    I have been able to work across not only racial lines, but
 5  I've been able to work across political lines, as well.
 6  Q    Okay.  And, in fact, some of the people that were
 7  especially state legislators used to be members of the
 8  Democratic party and have since shifted over to the Republican
 9  party, correct?
10  A    That is correct.
11  Q    Are you still comfortable working with them even though
12  they are members of the Republican party?
13  A    I feel comfortable working with them.  But once they
14  changed to the Republican party, some of their ideas changed
15  dramatically.  But they still remain the same individuals.
16  Q    Okay.  And you've served in the state legislature for a
17  good long time, right?
18  A    Yes, I think 20 -- 20 years.
19  Q    Yeah.  I'm attempting to do more math.  We were talking
20  about the difficulties inherent in that earlier today for
21  lawyers.  And I believe it's 25 years that you served?
22  A    25, okay.
23  Q    And the Democrats were, in fact, the majority political
24  party in the state legislature until 2010, weren't they?
25  A    That is correct.
```

1    Q    And then that shifted in 2010, right?

2    A    Yes.

3    Q    So that the Republican -- I'm sorry.  So that the

4    Republicans became the majority political party?

14:15:47  5    A    Yeah.  They call it storming the statehouse.

6    Q    And just to follow that a little bit more.

7         So the Democrats were the minority political party at the

8    time that the current congressional districts were drawn,

9    right?

14:16:04 10   A    The -- we were the minority, yes.  We were the minority

11   party, yes.

12   Q    The minority caucus, I guess?

13   A    Caucus.

14   Q    You also told us that you were the chair of the Alabama

14:16:22 15   Legislative Black Caucus; is that correct?

16   A    That's correct.

17   Q    And that you served for eight years, I think?

18   A    That's correct.

19   Q    Do you recall what years you served as chair of the

14:16:30 20   caucus?

21   A    The eight -- let's see.  '15 -- two consecutive years from

22   '15 back -- from '18 back.  I'm sorry.

23   Q    Two consecutive terms?

24   A    Terms, yes.

14:16:51 25   Q    Okay.  So from 2010 to 2018, does that sound right?

1  A    2010 to 2018.  That would be correct, yes.

2  Q    Okay.  And in that capacity, did you have any role in

3  helping draft or draw up the new congressional districts that

4  were passed in 2011?

14:17:23  5  A    If my memory serves me correctly on that, I think most of

6  the work on the congressional districts were dealt with, with

7  the congressional delegation.  We got -- I think we got a

8  recommendation of the plans that came down.  I didn't -- I

9  didn't personally work on any congressional plan, no.

14:17:45  10  Q    Okay.  So you didn't personally work on putting together

11  even a map or anything like that?  Do you know if the black

12  caucus did?

13  A    Well, I'm sure we put together a map because we would have

14  to introduce the maps, yes.

14:18:02  15  Q    Okay.  Do you know if any maps were introduced by a member

16  of the black caucus?

17  A    There were -- I don't remember -- I think Representative

18  McClammy introduced at least one or two maps on behalf of the

19  legislative black caucus for the congressional district.

14:18:21  20     I may be -- Representative McClammy or Representative

21  Laura Hall.  I'm not certain on that, but there were some that

22  were introduced or were provided to districts in the state for

23  African-Americans.

24  Q    Do you happen to know when those plans were introduced in

14:18:37  25  the legislature?

1　A　　No, I do not.

2　Q　　Okay.  So you don't know whether that was before or after

3　the congressional plan had passed the legislature?

4　A　　I don't.  I don't recall.

14:18:46　5　Q　　Okay.  Do you recall having any discussions with members

6　of the majority party -- of the Republican party when those

7　plans were being drafted?

8　A　　I'm sure I may have.  I'm not certain.  I know that we --

9　on the behalf of the caucus, we were trying to convince them

14:19:06　10　that we would like to have two majority black districts.

11　Q　　Okay.  Did you personally do that?  Or did someone else in

12　the caucus do that?

13　A　　I probably personally talked to some members on the

14　legislature on that.  That would have been on the

14:19:23　15　reapportionment committee.  Whoever from the caucus -- and I

16　think it was Representative McClammy or Representative Laura

17　Hall.  I'm not certain which one at this point.

18　Q　　But they either Representative McClammy or Representative

19　Hall would have spoken to someone?

14:19:37　20　A　　Yes.  Or someone on the legislative black caucus would

21　have spoken to someone.

22　Q　　But you have no personal knowledge of that?

23　A　　I don't think so.

24　Q　　Okay.

14:19:45　25　A　　You're talking about congressional district, not

1   legislative district?

2   Q    Correct.

3   A    Okay.

4   Q    Did you work with anyone on the state legislative

14:19:55 5   districts?

6   A    Oh, yes.

7   Q    Okay.  Did you spend a significant amount of time on

8   those?

9   A    Yes, ma'am.

14:20:01 10   Q    Okay.  And you submitted plans presumably for those, as

11   well?

12   A    We submitted several plans, yes.

13   Q    And then subsequently the legislative black caucus decided

14   to file suit over those state legislative plans, didn't it?

14:20:22 15   A    That is correct.

16   Q    Okay.  And do you recall what the claims were in that

17   case?

18   A    They are too complex for me.  But, I mean, we went all the

19   way -- those are the plans, I think, if you're talking about

14:20:35 20   the same one.  We went all the way to the Supreme Court on

21   that.

22   Q    And that was before a three-judge court in Montgomery went

23   all the way up, came all the way back down, right?

24   A    Yes.

14:20:44 25   Q    And resulted in changes to the state legislative

```
         1  districts, correct?
         2  A    It did.
         3  Q    But that case did not bring any claims against the
         4  congressional districts in Alabama, did it?
14:20:54 5  A    That case, to my recollection, was strictly on the
         6  legislative districts, not the -- you said the congressional
         7  districts?
         8  Q    Yes, sir.
         9  A    Not that I am aware of.  I don't think -- I don't think
14:21:08 10 that was included in that.
        11  Q    So it only concerned the state legislative districts?
        12  A    The state legislative districts, yes.
        13  Q    Okay.  Now --
        14  A    I wouldn't mind including the congressional districts in
14:21:22 15 there.
        16  Q    Well, why did you not?
        17  A    I don't -- we were only addressing the legislative
        18  districts.
        19  Q    Okay.  You also talked a lot about the different problems
14:21:50 20 that have faced Montgomery that you've seen while you've been a
        21  legislator.  You mentioned a lack of emphasis on education, and
        22  a lack of funding for mental health, and seeking criminal
        23  justice reform.  I believe those were three big ones that you
        24  mentioned, correct?
14:22:07 25 A    Yes.
```

```
 1  Q    Would you characterize those as concerns that are specific
 2  to Alabama, or do you think that those are nationwide concerns?
 3  A    Well, I mean, I can speak for what I -- what I experienced
 4  here in Alabama.  I don't know on the national level whether
 5  they have the same issues and/or concerns or not.  I think they
 6  have some that are very similar.  But I think that when it
 7  comes to the correctional department, when it comes to mental
 8  health, it's much more pervasive here than other areas from
 9  what I've seen.
10       When you look at the number of people that's incarcerated,
11  you look at the complaints even from corrections, in terms of
12  being unable to handle the caseload when it comes to mental
13  health patients that they have within the corrections facility,
14  there's an ongoing lawsuit on that at the present time.
15       So I mean, it's just -- I mean, it's -- it's at a boiling
16  point here in Montgomery.  And something has to be done from a
17  legislative perspective to address it.
18  Q    But you think that those concerns are particular to
19  Alabama?
20  A    I'm not going to say they're particular to Alabama, but
21  I'm just saying that the concerns are real here in Alabama.  I
22  can speak for that being here.
23       And having been in the legislative process and knowing
24  what it takes to actually try to address those which would be
25  additional funding and the difficulty in terms of trying to get
```

14:22:20 (line 5)
14:22:36 (line 10)
14:22:55 (line 15)
14:23:13 (line 20)
14:23:29 (line 25)

```
      1  the funding to do what's necessary.  So I can speak to that.
      2  But I can't say on the rest of the country what it might be.
      3  Q    You also talked about a lack of opportunities for, in
      4  particular, younger people in Alabama, and noted that people
14:23:55 5  are leaving the state to seek other opportunities, especially
      6  members of the black community; is that correct?
      7  A    Yes.  Uh-huh.
      8  Q    And you said that you didn't think -- that you were very
      9  concerned about leaving -- leaving children in a better
14:24:13 10 position than their parents were in when they were their age;
     11  is that fair?
     12  A    I think that's fair.  I want to make sure that they are in
     13  a better position than their parents, yes.
     14  Q    And I framed that very badly, and you put it more
14:24:28 15 eloquently than I did.
     16       Do you have kids?
     17  A    I do.
     18  Q    Do you think that they're in a better position than you
     19  were in when you were their age?
14:24:36 20 A    Oh, yes.
     21  Q    Okay.  You also discussed some problems that at least you
     22  have seen a very particular side of in Montgomery and mentioned
     23  particularly -- I'm thinking of the millage rate and that being
     24  on the ballot twice in Montgomery, to raise the millage for
14:25:05 25 public education; is that right?
```

1    A    That's correct.

2    Q    And you said it had failed twice.  Do you know when that

3    was on the ballot?

4    A    I should -- I can't give you the dates.  I remember

14:25:17  5    because -- I can't remember when it was on the ballot, no.

6    Q    Do you know if it was in like the last five years?

7    A    No, not the last five years.

8    Q    Okay.  More than a decade ago, maybe?  Before 2008?

9    A    Maybe.

14:25:31 10    Q    So --

11    A    I can give you the name of the people --

12    Q    The names of the people that?

13    A    That -- that was supportive of it because it was a good

14    cross-section of people that supported it, but it just didn't

14:25:51 15    pass.  I'm sorry.

16    Q    We're all a little looser after lunch.  Apparently, it's

17    nap time.

18         So when you talked about the millage increase being voted

19    down, you also had mentioned at a different point in time in

14:26:04 20    your testimony that the city of Montgomery and Montgomery

21    County are both majority black, are they not?

22    A    They are now, yes.

23    Q    Do you know when that became the case?

24    A    Just recently within the last four years possibly.

14:26:18 25    Q    Okay.  All right.  You also talked about -- you were asked

```
 1  questions about problems with voter rolls and with polling
 2  places in Montgomery.  Do you remember that?
 3  A    Yes.
 4  Q    And you talked specifically about, you know, places not
 5  being open when they were supposed to be, or being moved
 6  around, and other things of that nature, I believe; is that
 7  right?
 8  A    I did.
 9  Q    Well, first, do you recall -- or do you know actually
10  whether polling places are run by local officials or by state
11  officials?
12  A    Well, the polling places are supervised by the Secretary
13  of State's office, as I understand it.
14  Q    Do you know who is in charge of deciding where polling
15  places are?
16  A    The county commission on the local level --
17  Q    Okay.
18  A    -- would be.
19  Q    Do you know if the probate judge plays a role in that?
20  A    I don't think the probate judge decides.  I think the
21  county commission decides the location of polling places.  I
22  think the probate judge can make recommendations.
23  Q    Okay.  But the -- excuse me.  The probate judge is in
24  charge of making sure the polling places are staffed and
25  operational --
```

1    A       Yes.

2    Q       -- is that fair?

3            Can you tell me when you encountered these problems at the

4    polling places?

14:27:41 5    A    There have been problems at the polling places ever since

6    I was working the polling places even before I was an elected

7    official.  And there are still problems we encounter at the

8    polling places.

9    Q    And so you've even encountered problems at the polling

14:27:58 10   places while they have been under the supervision of the

11   current probate -- well, the probate judge who was recently

12   elected mayor?

13   A    Yes.  I have -- I personally have some problems at the

14   polling places there.  But I'm saying there have been problems

14:28:13 15   at the polling places.

16           I worked at polling places every election just about, and

17   there have been various problems from people names not being on

18   the voting list; people that registered to vote, but their name

19   did not appear there, and they thought they were registered

14:28:28 20   voters but somehow the forms had not been turned in; people

21   going to the polling places and saying that their name's not on

22   the list, and they should be able even if their name is not on

23   the list, they should be eligible to vote a provisional ballot,

24   but the polling officials tell them they have to go to the

14:28:49 25   courthouse and register -- couldn't vote in that election.

1    There's just a number of problems such as that that I have

2    seen take place at the polling places.

3    Q    But those are all by and large either created by or

4    resolved by local election officials, are they not?

14:29:05 5    A    Well, but you have -- I couldn't just pin it down to just

6    local officials, because the way the whole process operates, as

7    I understand it, is the Secretary of State on the state level

8    is responsible for the operations in state elections.

9        You also have voter registrars that's responsible for

14:29:30 10   voter registration, making sure everybody's on the voter list.

11   And the registrars are appointed by the Governor, the

12   Agricultural Commissioner, and one other person.  But it's a

13   three-member panel that appoint all of the registrars.

14       Say, for instance, Montgomery right now is a majority

14:29:50 15   black county, but we have three white board members on the

16   board of registrars.

17   Q    And the black probate judge, correct?

18   A    And you have a black probate judge that recently got

19   elected.

14:30:03 20   Q    Yes.  Steven Reed has now been elected mayor?

21   A    Yes.

22   Q    In a landslide, right?

23   A    It was.

24   Q    But you would agree with me that these elections are meant

14:30:15 25   to be run and operated by and are currently, at least in

1  Montgomery County, by both black and white officials alike?

2  A    At the present time, yes.

3  Q    I'm going to loop back really quickly.

4      We had talked about the Democratic party and your

14:30:48 5  leadership roles in the Democratic party.  Would you say that

6  it's true that basically everywhere in the United States black

7  voters tend to vote for Democratic candidates?

8  A    I -- I can't speak for everywhere.  I say in Alabama that

9  is basically the case.  And when you look at it across the

14:31:09 10  country, it seems that way.

11  Q    Representative Knight, just a couple more questions for

12  you.

13      We had talked earlier about the legislative black caucus

14  being involved in the redistricting process for congressional

14:32:41 15  districts.  Do you remember that?

16  A    Yes.

17  Q    And you said that Representative McClammy had by and

18  large, you thought, been in charge of introducing plans on

19  behalf of the caucus; is that right?

14:32:52 20  A    I said he had introduced some.  I mean, a number of people

21  introduce plans.  I don't remember everybody.  I think I

22  introduced plans myself.

23  Q    For the congressional districts?

24  A    Oh, not the congressional districts.  No.  I thought you

14:33:05 25  said on reapportionment.

1  Q    Oh, I'm sorry.  I should have been more specific.  For the

2  congressional redistricting?

3  A    I don't -- I mean, I think Representative McClammy, I knew

4  he had a plan.  Now, whether he introduced it or not, I'm not

14:33:18 5  certain.

6  Q    Okay.

7  A    Or a plan was introduced, if I'm not mistaken.

8  Q    I wanted to show you a couple of maps from one of the

9  defendants exhibits, Exhibit 3, and ask you -- well, just to

14:33:31 10  confirm with you that these are the plans that were introduced

11  by Representative McClammy.

12        MS. MADDURI:  Objection.

13        MS. HOWELL:  He's says that he's in charge of the

14  legislative black caucus, and these were introduced on behalf

14:33:45 15  of the legislative black caucus.  Unless you wish to withdraw

16  your statement that Representative McClammy was acting on

17  behalf of the caucus.

18        MS. MADDURI:  He testified that he's not familiar with

19  the maps, or he's not even sure if they were introduced.

14:33:57 20        THE COURT:  Well, I think it would be super human

21  amazing if he could, in fact, remember without seeing anything

22  what may have been introduced in 2010.  So I have no problem

23  with Ms. Howell showing him the map and seeing if he remembers

24  it, or, you know, if he does, great.  If not, that's another

14:34:19 25  thing.

```
 1          And so which exhibit are you referring to?
 2               MS. HOWELL:  This is Defendant's Exhibit 3, Your
 3     Honor.  And I'm currently looking at -- it will be Exhibit C-10
 4     of the preclearance submission.  And it's Chestnut Defense 179.
 5     Or actually let me see if I can get 179 and 180 on there at the
 6     same time.
 7               THE COURT:  So it's part of Defendant's Exhibit 3?  Is
 8     that what you said?
 9               MS. HOWELL:  Yes, ma'am.
10               THE COURT:  What page?
11               MS. HOWELL:  I believe it will be pages 179 and 180
12     we're looking at.
13     BY MS. HOWELL:
14     Q    And, Representative Knight, is that on your screen up
15     there, or no?
16     A    No, it's not.
17     Q    It might take a minute to pull up.
18     A    It is now.
19     Q    And can you read the top part of that page what it says?
20     A    It says -- it says, "McClammy 2010 U.S. congressional
21     plan."
22     Q    And then on the next page, which is Chestnut?
23               THE COURT:  Well, just before we leave that, you may
24     be able to recognize Montgomery County a little better than I
25     do.  But does that plan still show three districts in part of
```

1    Montgomery County?

2         THE WITNESS:  I think it only shows one.  Well,

3    maybe --

4         THE COURT:  Seems like the blue from 3.

14:36:25  5         THE WITNESS:  Yeah.

6         THE COURT:  Comes in there, and a little of the pink

7    from 7 still comes in there.

8    BY MS. HOWELL:

9    Q    So does that map also appear to split Montgomery County

14:36:51 10  three ways?

11   A    This map here?  If the blue comes in, yes.  And if the

12   pink comes in, it will split it three ways.

13        If I'm reading it correctly here based on what I --

14   Q    I'm going to refer you --

14:37:15 15        THE COURT:  And, Ms. Howell, I believe that this was

16   one of the exhibits that had not been pre admitted; is that

17   correct?

18        MS. HOWELL:  That is correct, Your Honor.  But I

19   believe that the only objection to the exhibit was to the

14:37:27 20  extent that it was offered as evidence of the legislature's

21   intent in passing the plans; unless plaintiffs articulate

22   another objection.

23        THE COURT:  What's the objection to this information

24   that's in Defendant's Exhibit 3, which is the preclearance

14:37:51 25  submission?

1          MS. MADDURI:  Your Honor, Ms. Howell's correct.  Our

2     objection is to the extent that the maps are offered as an

3     intent of legislators at the time.

4          THE COURT:  Overruled.

14:38:06  5          MS. MADDURI:  Or, no -- I'm sorry.  I'm trying to say

6     that we agree with her.  We're not objecting to the extent that

7     it's not being used for -- the intent of legislators.

8          THE COURT:  Okay.  All right.  Got it.

9          MS. HOWELL:  My apologies.

14:38:22 10   BY MS. HOWELL:

11    Q    And, Representative Knight, I'm very sorry for my lack of

12    facility with all the technology.  But we will flip to the next

13    page that's in this.  And then if you can see right there, it's

14    very small print.

14:38:45 15          THE COURT:  Ms. Howell, when you're away from the

16    microphone, you may need to speak just a little bit louder.

17    BY MS. HOWELL:

18    Q    So on this next page, it talks about -- or it's a

19    population summary of the plan.  Do you see that at the top?

14:39:07 20   A    I do.

21    Q    And I wonder if you can read -- I'm sorry.

22    A    No.

23    Q    I'm struggling.  The number that is highlighted in yellow

24    there at the bottom, if you can take a quick look at this chart

14:39:31 25   and tell me how many of the districts in this plan have a

1    majority black population?

2    A    It looks like one.

3    Q    Okay.

4    A    Okay.

14:39:59 5          THE COURT:  And just to be clear, this population

6    summary report on page 180 of Defendant's Exhibit 3 deals with

7    which congressional district plan?  Can you tell,

8    Representative Knight?

9          THE WITNESS:  It says plan -- it says Plan McClammy

14:40:25 10   Congressional B.  I don't know what that is.

11         THE COURT:  Okay.  But this is not a population report

12   for the 2011 congressional redistricting plan that's at issue

13   here, right?  Or Ms. Howell?

14         MS. HOWELL:  Correct.

14:40:47 15        THE COURT:  Not that I'm taking testimony from an

16   attorney.

17         MS. HOWELL:  This is all submitted.  I apologize for

18   lack of preparedness.  But this is all part of the same single

19   exhibit to preclearance submission.

14:41:14 20   BY MS. HOWELL:

21   Q    So that first plan -- that first plan only appears to have

22   one majority black district in it?

23   A    That particular plan, yes.

24         THE COURT:  And it's District 7, right?

14:41:37 25        THE WITNESS:  Yes.  It's District 7.

BY MS. HOWELL:

Q    And so that was one plan submitted by Representative McClammy on -- presumably on behalf of the legislative black caucus?

14:41:53  A    I can't say it was on behalf of the caucus.

The way the legislative process operates, every legislator has a right to introduce a plan.  And there was several -- there may have been several plans that were introduced.  I'm just not certain.

14:42:09  Q    Do you have any reason to dispute that all of the plans that were submitted would be in the preclearance submission?

Q    Would be in the preclearance submission?

Q    Yes, sir.  To the Department of Justice?

A    No.  I don't know.  I don't know.

14:42:29  Q    I direct you to the next plan that was submitted by Representative McClammy.  Can you see from -- I apologize for being terrible with technology.

THE COURT:  You're doing fine.

BY MS. HOWELL:

14:42:57  Q    Can you see from this view that's on your screen that this is another of the congressional plans submitted by Representative McClammy?

A    I can, yes.

Q    So it says, "2010 McClammy Congressional Plan 2M;" is that
14:43:14  right?

```
 1   A      Congressional Plan 2M, yes.

 2   Q      And then I switch to -- this is page 194, which is --

 3          THE COURT:  If you just give it a minute, it will kind

 4   of adjust itself, and then you can adjust it in or out more.

 5   BY MS. HOWELL:

 6   Q      And, Representative Knight, can you see up in the corner

 7   of that page -- I'm going to mark it on mine, and hopefully

 8   that shows up on yours -- and read back for me what that says

 9   at the top?

10   A      It says, "McClammy Congress 2M" it looks like.

11   Q      Okay.  So that appears to match the description on the

12   page before that it would be a plan submitted by Representative

13   McClammy?

14   A      It appears to be, yes.

15   Q      Okay.  And then on the next page over, which I may have to

16   zoom again -- is that clear enough to read?

17   A      I think I can make the numbers out here.  Okay.  Yes.

18   Q      And can you read for me the part that I'm underlying on

19   the screen?

20   A      "Plan McClammy Congress" -- I can't make out that.

21   Q      Would you have any reason to dispute it if I told you it

22   said, "Plan McClammy Congress 2M?

23   A      2 what?

24   Q      2M?

25   A      2M?
```

14:43:34  (line 5)
14:43:56  (line 10)
14:44:12  (line 15)
14:44:53  (line 20)
14:45:10  (line 25)

```
 1   Q    You wouldn't have any reason to dispute that?

 2   A    I wouldn't have a reason to dispute it or not.

 3   Q    You've watched me flip through this book over here,

 4   correct?  So it probably and presumably goes with the other

 5   things that read "McClammy Congress 2M"?

 6   A    Okay.

 7   Q    And can you see and read on here how many -- take a second

 8   and look at the chart, and tell me how many majority black

 9   districts are included in this plan?

10   A    I see one, which is 420 -- looks like 425.  425,000 black.

11   And then there's another one that's -- I don't know, is that 3

12   or 2?

13   Q    I believe that is a 3.

14   A    3?  Okay.  That would be 2, then.  If that is a 3.  I

15   can't make that number out.

16            THE COURT:  That would be District 7 and District 3;

17   is that correct?  Can you see that?

18            THE WITNESS:  Yes.  I can see the districts.

19   BY MS. HOWELL:

20   Q    So this plan, in fact, did have two majority black

21   districts as part of it?

22   A    According to what I see here, yes.

23   Q    And then, Representative Knight, can you tell me what this

24   page says at the bottom?

25   A    "Congressional Plan PPB," it looks like --
```

The timestamps in the left margin: 14:45:25 (line 5), 14:45:41 (line 10), 14:46:06 (line 15), 14:46:17 (line 20), 14:47:24 (line 25).

```
 1              THE COURT:  What page is that on, please, Ms. Howell?
 2              MS. HOWELL:  That is on page 209, Your Honor.
 3              THE COURT:  Thank you.
 4    BY MS. HOWELL:
 5    Q    And I will flip from there over to page 210, and then get
 6    you, Representative Knight, to confirm that the writing up at
 7    the top right there also says "McClammy Congress PPB"?
 8    A    It does, yes.
 9    Q    And does that appear to be a partial plan to you?
10    A    It's like a partial plan, or the map has been cut off
11    here.
12    Q    Yes.  It does look like that.
13    A    It's not the entire state.
14    Q    Right.  It does look like the map was cut off, which I
15    cannot vouch for the copying over at the state legislature.
16    I'm sorry.
17    A    I can't either.
18    Q    Let's see.  I've now flipped over to page 211 of this
19    submission.
20              THE COURT:  Representative, let me let you have the
21    book that I have.
22              THE WITNESS:  Yes, ma'am.  Thank you.
23              THE COURT:  That may help you read it a little better.
24    BY MS. HOWELL:
25    Q    And can you see up in the top left-hand corner that this
```

1 also says "McClammy Congress PPB"?

2 A    Yes.  In the left, yes, "Congress PPB."

3 Q    And it looks like, in fact, the map might have just been

4 cut off, doesn't it?  Because there are numbers for all seven

14:49:07 5 districts, as opposed to just the three that were shown on the

6 map?

7 A    There's numbers for all seven districts --

8 Q    Okay.

9 A    -- on this report, yes.

14:49:15 10 Q    Yes.  And according to this report, how many of the

11 districts does it look like contain a majority black

12 population?

13 A    District 7 is the -- District 7 it looks like on this one.

14 Q    Okay.

14:49:36 15 A    One.  One district.

16 Q    Thank you.  And do you have any reason to believe that

17 Representative McClammy submitted any other districting plans

18 that we wouldn't know about from this preclearance submission?

19 A    I would have no idea.  Like I say, legislators introduce

14:49:59 20 bills every day, so I would -- Mr. McClammy would have to

21 respond to that.  I wouldn't know how many plans he would have

22 introduced.

23 Q    But, to your knowledge, the legislative black caucus did

24 not present any other plans for the congressional redistricting

14:50:14 25 cycle in 2011 that contained two majority black districts

1   outside of the one that we just reviewed that Representative

2   McClammy put forward?

3   A   To my knowledge, I'm not familiar with one.  I'm not going

4   to say that one was not introduced on behalf of the caucus.

14:50:32 5   But I don't recall another one.  I know that was a plan that

6   created two districts.

7   Q   And that would be the middle plan that we looked at,

8   correct?

9   A   From the one that I've seen here today, yes.

14:50:42 10   Q   Thank you.

11         THE COURT:  Ms. Howell, were you offering these

12   exhibits at this time?

13         MS. HOWELL:  Yes, Your Honor.  We would offer Defense

14   Exhibit 3 just for the purpose of showing those plans and what

14:51:07 15   was offered.

16         THE COURT:  Okay.  And should we just excerpt those

17   that you showed him, or are you -- trying to figure out what we

18   are wanting to do with this huge big book.  And if you're not

19   offering it for the intent of the legislature, I think there's

14:51:31 20   not an objection to it now?

21         MS. HOWELL:  That is my understanding, Your Honor,

22   that all of it would be admissible as long as it's not to show

23   intent.

24         THE COURT:  Is that correct?

14:51:44 25         MS. MADDURI:  We would withdraw our objection to

```
 1  preclearance.

 2          THE COURT:  So Defendant's Exhibit 3 is admitted,

 3  then.

 4          MS. HOWELL:  Thank you.  And thank you, Representative

 5  Knight.  I apologize for all of the technical difficulties.  I

 6  know I am a millennial, but I'm really not.

 7          THE COURT:  Any redirect?

 8          MS. MADDURI:  No, Your Honor.

 9          THE COURT:  All right.  Thank you, Representative

10  Knight.  We appreciate you being here today.  And you may step

11  down.

12          THE WITNESS:  Thank you.  Thank you.

13          THE COURT:  Do you want a short break before we get to

14  our next witness?

15          MR. SPIVA:  That would be good, Your Honor.

16          THE COURT:  Okay.  We'll come back at five after 3:00?

17  10 after 3:00.

18          MR. SPIVA:  Thank you.

19          (Recess.)

20          THE COURT:  Plaintiffs may call your next witness.

21          MS. KHANNA:  Thank you, Your Honor.  Plaintiffs call

22  Lakeisha Chestnut.

23                          LAKEISHA CHESTNUT,

24  having been first duly sworn by the courtroom deputy clerk, was

25  examined and testified as follows:
```

Timestamps (left margin): 14:51:54 (line 5), 14:52:12 (line 10), 14:52:23 (line 15), 15:13:29 (line 20), 15:13:35 (line 25)

```
          1          THE CLERK:  Please state your name for the record in

          2   the microphone.

          3          THE WITNESS:  My name is Lakeisha Chestnut.

          4          THE COURTROOM DEPUTY CLERK:  Thank you.

15:13:54  5                        DIRECT EXAMINATION

          6   BY MS. KHANNA:

          7   Q    Good afternoon, Ms. Chestnut.

          8   A    Good afternoon.

          9   Q    Ms. Chestnut, are you a plaintiff in this case?

15:14:00 10   A    Yes, I am.

         11   Q    Do you live in Alabama?

         12   A    Yes, I do.

         13   Q    What county do you reside in?

         14   A    Mobile.

15:14:06 15   Q    And what city do you reside in?

         16   A    Mobile.

         17   Q    Do you have family in Alabama?

         18   A    Yes, I do.

         19   Q    Which family?

15:14:12 20   A    My husband, my kids, my mom, aunts, and uncles live in

         21   Mobile County.  I have family in Marengo, Wilcox County.  And I

         22   have family right here in Birmingham.

         23   Q    And how long have you lived in Alabama?

         24   A    I've been in Alabama since I was 17 months old.  I moved

15:14:35 25   away when I was 20 in 1996.  I've been off and on in Alabama
```

```
 1  for a while.  And then I officially came home in May of 2016.
 2  Q    And what is it that you do for a living?
 3  A    I am a licensed sales agent and a team technical expert at
 4  Results Companies in Mobile, Alabama.
 5  Q    And can you tell me a little bit about your educational
 6  background?
 7  A    So I attended Murphy High School, got my GED in 1995, been
 8  to college off and on.  And now I'm currently a college student
 9  at Academy of Art University in San Francisco, California where
10  I attend online study and screenwriting.
11  Q    Ms. Chestnut, are you registered to vote in Alabama?
12  A    Yes, I am.
13  Q    When did you first register?
14  A    When I was 18.
15  Q    When you moved out of Alabama -- I believe you said 1996?
16  A    Yes.
17  Q    Did you change your voter registration?
18  A    Yes, I did.
19  Q    And when you moved back to Alabama in May of 2016, did you
20  re-register in Alabama?
21  A    Yes, I did.
22  Q    Do you vote regularly?
23  A    Yes, I do.
24  Q    Would you say that voting is important to you?
25  A    It's very important to me.
```

```
          1    Q     Why?

          2    A     Because my vote is my voice.  It makes me hold the people

          3    that represent me accountable for everything that they do,

          4    whether it's a local level, state level, or even federal level.

15:16:02  5    Q     And what congressional district do you live in?

          6    A     I'm in Congressional District 1.

          7    Q     Who currently represents Congressional District 1 in

          8    Alabama?

          9    A     Bradley Byrne.

15:16:14 10    Q     Have you supported him in congressional elections?

         11    A     No.

         12    Q     Have you voted for Bradley Byrne?

         13    A     No.

         14    Q     As far as you know, have Mr. Byrne's congressional races

15:16:23 15    been competitive --

         16    A     No.

         17    Q     -- since you returned to Alabama in 2016?

         18    A     No, they have not.

         19    Q     And what makes you say that?

15:16:30 20    A     Because in the first time that he ran, he has run

         21    unopposed.  He has had some -- some opponents, I think, in one

         22    primary, and a couple opponents in the general election.

         23          In 2018, there was a young man by the named of Robert

         24    Kennedy, Jr., who ran against him, and he lost by 30 points.

15:16:57 25    Q     Ms. Chestnut, you grew up in the city of Mobile; is that
```

1  right?

2  A    That is correct.

3  Q    And since you moved back to Alabama, you've lived in

4  Mobile; is that right?

15:17:09 5  A    That is correct.

6  Q    Did you go to public school in Mobile?

7  A    Yes, I did.

8  Q    Do you have children who went to public school in Mobile?

9  A    Yes, I did.

15:17:15 10  Q    Based on your experiences in the area, does the

11  African-American community in Mobile have unique needs and

12  interests related to public education?

13  A    Yes, they do.

14  Q    And what would -- what are those?

15:17:27 15  A    So -- excuse me -- our public schools are failing.  A lot

16  of the black students that go to predominantly black schools

17  are basically struggling to survive, struggling to get, you

18  know, get their education.  They are trying to do the best that

19  they can with what they have.

15:17:58 20      We have a few of our majority black schools that are

21  currently on the failing list.  I don't think there's like a

22  couple of white schools that are on that list from Mobile

23  County.

24      But they work hard.  They try their best.  But and some of

15:18:20 25  them want to go to really good schools.  But they -- some end

1 up going to community college and then transferring to a

2 different, you know, transferring to another school.  Some just

3 go straight from high school to the workforce.

4     So it's -- the struggle for having a really great public

15:18:47 5 education is truly real.

6 Q    And you mentioned -- what about white -- white students in

7 Mobile or white families in Mobile?  Do they -- don't they have

8 an interest in public education, as well?

9 A    They do.  But their needs are different than ours.

15:19:02 10    White kids don't -- when I was in school -- I will put it

11 to you like this.  When I was in high school, I went to Murphy

12 High School.  Murphy was, first of all, the first school that

13 was integrated in Mobile County.  Second, it was a majority

14 white school when I went there.  Now it's a majority black

15:19:19 15 school because all the students that attend Murphy or were in

16 Murphy's district are either going to private schools, like

17 Saint Paul's or Saint -- or UMS-Wright or McGill-Toolen, or

18 they're going to school further out west that have majority

19 white students that attend there.  So they're not going to like

15:19:43 20 schools like Williamson or Blount or Vigor.  They're going to

21 like Baker or Alma Bryant.  Those are the schools that they're

22 attending.

23 Q    And what about higher education?  Are there any, in

24 particular, interests within the African-American community in

15:20:00 25 Mobile regarding access to higher education?

A    We can't afford it.  I am a product of that.  I don't have

a Pell Grant.  I actually had to take the semester off because

I couldn't afford my classes this semester.  My student loan

was only enough to pay for maybe one and a half of my classes.

15:20:20 So I have to wait until next semester to see if I have enough

in student loans just so I can attend my -- my classes next

semester.  After that, I don't even know.

I just feel like I'm going to have to give up on my dream

of being a screen writer.  You have to -- you -- student --

15:20:42 black students have to see if they can get a scholarship just

to attend school.

My daughter just graduated a few years ago.  My

daughter -- she attended -- she wanted to attend Harvard.  That

was her dream school.  But she thought her grades weren't good

15:21:02 enough so she could attend Harvard.  So she ended up at Bishop

State Community College, and then turned around and transferred

to Troy and switched her major a couple of times, but now she

is a chemical engineering major.  And that's because that's the

only way she could afford to go to school.

15:21:21 So affordability, having the resources to be able to go to

school, not going into debt, you know, to get our degrees?  I

mean, I'm 43 years old, and I'm still trying to go back to

school, and I can't even afford it.

So, yes, so those are one of our immediate concerns with

15:21:38 higher education.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1    Q    Does the African-American community in which you live in

2    Mobile have any unique needs or interests relating to criminal

3    justice?

4    A    Yes.

15:21:49  5    Q    And what are those?

6    A    We're more concerned with a lot of police brutality.

7         My husband walks everywhere that he wants -- that he needs

8    to go.  I can't begin to tell you how many times that my

9    husband has come home and said that he's been pulled over by

15:22:09 10    the police just because he looked like somebody that committed

11    a crime.  Every night when he goes out for his nightly walk,

12    I'm afraid that he may never come home.

13         The last time he got pulled over by the police, they held

14    him for an hour and a half for a shooting that happened in the

15:22:28 15    opposite direction that he was going because he went to

16    Wal-Mart to go grab dinner for the night.  And when he was

17    coming back, that's when the police stopped him.

18         So that's a concern.  It's a concern for me.

19         I be at home alone sometimes.  What if one of my neighbors

15:22:46 20    like what happened to the young lady in Fort Worth?  What if

21    one of my neighbors got concerned and saw me in the window and

22    shoots me in my own home?  You know.

23         My stepson, 15 -- well, actually 16, just turned 16, I

24    worry about him.

15:23:04 25         So we worry about those things.  We worry about the high

```
 1   incarceration rates, how a lot of our black young black men are

 2   being incarcerated at higher rates than whites.  It is an

 3   issue.

 4       And I wish that we had more -- somebody who actually

 5   represented us that actually addressed those concerns.

 6   Q   Has Congressman Byrne taken any actions in Congress

 7   related to criminal justice?

 8   A   Yes, he did.

 9   Q   What did he do?

10   A   He voted against the First Step Act.

11   Q   And what is the First Step Act, as far as you know?

12   A   The First Step Act is a bill that was passed that allowed

13   first-time offenders who get out on parole to get help with

14   education opportunities, job opportunities, housing, whatever

15   they need once they are released from jail.

16       And so that's a good first step.  There needs to be more.

17       But for him to vote against that, something that is

18   helpful in the way, really kind of made me a little mad, little

19   upset about it.

20   Q   Are there any particular needs or interests among the

21   African-American community in Mobile relating to employment?

22   A   So Mobile is -- as far as jobs are concerned, the major

23   employers in Mobile are Austal, Airbus, and some people might

24   consider the docks.  But the two biggest ones is Austal and

25   Airbus.
```

15:23:25 (line 5)
15:23:36 (line 10)
15:24:00 (line 15)
15:24:23 (line 20)
15:24:53 (line 25)

1     And with Austal, there is an apprenticeship program for

2    Austal.  But, one, you need a GE -- you know, you need a high

3    school diploma or GED.  You do need a clean record in order

4    to -- in order to be any part of this program.

15:25:15 5    Another one, of course, Airbus.  You got to have a degree,

6    I know, because I looked.  Because I was thinking about working

7    for Airbus at one point.  But you have to have a degree of some

8    sort to work for Airbus.  And also, another, clean record.

9    And a lot of young men don't have clean records.  They

15:25:37 10    have a felony, and they can't get a job at Austal, or they

11    can't get a job at Airbus.

12    They work -- there are a lot of young men that have to

13    either start they own business if they can, like my nephew who

14    started his own power washing business.  They have to work like

15:25:59 15    a fast food, like Burger King, or McDonald's, or retail, or

16    restaurants like Olive Garden.

17    I mean, there really is not a whole lot in the way of

18    good-paying jobs in Mobile unless you're working at a call

19    center or the other two places that I just mentioned.

15:26:22 20    Q    Do you feel like the issues that you had mentioned about

21    African-Americans in the fields of education, criminal justice,

22    affect the abilities of African-Americans to obtain good

23    employment in Mobile?

24    A    Yes.

15:26:33 25    Q    Are there any particular needs or interests relating to

```
 1  health care among the African-American community in Mobile?
 2  A    This is one of my biggest issues.  I am a daughter of a
 3  nurse -- actually a granddaughter of a nurse.  I have seen the
 4  level of care and the access to care go down since my
 5  grandmother was alive.  And my grandmother passed away in 2001.
 6       It's harder now when you go to the hospital, especially if
 7  you have to go to the emergency room, and you have to get, like
 8  get seen.  If you're really sick, you have to wait.  Sometimes
 9  you have to wait four, five, even six hours in an emergency
10  room just to get seen.  And even once you do get seen, you
11  still have to wait.  I have known people that have been in the
12  hospital six hours before they even got in the back.
13       My daughter has sickle cell.  She gets pain episodes
14  probably once every two to three months.  She's also pregnant
15  again.  And she can't even afford sometimes to go to the
16  hospital.  She has to just grin and bear the pain at home
17  because she can't afford it.
18       So, yeah.  Access, limited resources, stuff like that
19  impacts health --
20  Q    Has Congressman Byrne taken any actions in Congress that
21  you are aware of relating to health care?
22  A    He voted to repeal the Affordable Care Act.
23  Q    And do you believe that the African-American community in
24  Mobile benefitted or benefits from the Affordable Care Act?
25  A    I am one of those people that benefitted from the
```

15:26:59 (line 5)
15:27:22 (line 10)
15:27:53 (line 15)
15:28:16 (line 20)
15:28:32 (line 25)

1    Affordable Care Act.  If it wasn't for the Affordable Care Act,
2    I wouldn't be able to have insurance at all even with my job.
3        So, yeah.  I am one of those people that would
4    definitely -- and I also have a preexisting condition.  I have
15:28:51 5  diabetes.  And I'm -- and I also had asthma as a kid.
6    Q    Does the African-American community in Mobile have any
7    particular needs or interests related to affordable housing?
8    A    Yes.  So the latest news out of Mobile is the Mobile
9    Housing Board in January is closing the Section 8 department.
15:29:20 10  They're firing everybody -- all the staff from Section 8, and
11   they're going to outsource it to a private company.
12       The waiting list for Section 8 is anywhere from five to
13   seven years long.  There have been people that have been on
14   there for a long time.
15:29:43 15  My mom was homeless when she came home in 2017.  My mother
16   is 67 years old.  My mother has two bad knees, diabetes, high
17   blood pressure.  She also has sleep apnea.  My mother had to
18   sleep in her car.  My mother had to couch surf.
19       My mother ended up in a homeless shelter.  It wasn't until
15:30:14 20  October of last year she finally got hooked up with a program
21   that put her in an apartment that she could afford.
22       So we have a homeless population that is insane.  We don't
23   have any public housing because they're getting -- doing away
24   with all the public housing.  It's just hard to find an
15:30:42 25  affordable place to live in Mobile unless you have got a really

```
 1  great job.
 2  Q    Ms. Chestnut, is it your understanding that the city of
 3  Mobile is a majority-minority city?
 4  A    Yes.
15:30:58  5  Q    And Mobile is currently entirely located within a single
 6  congressional district; is that right?
 7  A    That is correct.
 8  Q    And what congressional district is that?
 9  A    Congressional District 1.
15:31:10 10  Q    Do you feel that having the city of Mobile wholly
11  contained within that one congressional district has served
12  Mobile citizens well?
13  A    No.
14  Q    If the city of Mobile were divided between CD 1 and a new
15:31:24 15  majority-minority district, do you feel the interests of the
16  city of Mobile residents would be better served?
17  A    Yes.
18  Q    And, Ms. Chestnut, I believe you were in the courtroom
19  while Ms. Howell was questioning Representative Knight and
15:31:37 20  asked whether having two people working together to represent
21  Montgomery can, in fact, benefit the residents of Montgomery.
22  Were you here for that?
23  A    Yes, I was.
24  Q    Do you believe that Mobile could benefit from having
15:31:51 25  representation by more than one representative?
```

```
 1   A     Yes.

 2   Q     Ms. Chestnut, do you regularly follow political campaigns

 3   in Alabama?

 4   A     Yes, I do.

 5   Q     Have you observed any instances in which a candidate in

 6   Alabama has referred to race as a reason to vote for or against

 7   a given candidate?

 8   A     Yes.

 9   Q     Does that happen often in Alabama?

10   A     Quite a few times I've heard a couple of things that kind

11   of made me upset and mad and frustrated.

12   Q     Let's talk about some specifics.  Have you personally

13   heard members of Congress from Alabama make any such statements

14   about race recently?

15   A     Mo Brooks.

16   Q     What did you hear Mo Brooks say?

17   A     Something about the war on white people.  I'm still trying

18   to figure that one out.

19   Q     And where did you hear Mo Brooks talk about war on white

20   people?

21   A     He did an interview, radio interview I heard that I almost

22   threw my phone clean across the room when I heard it.  But I

23   held my composure because my phone is expensive.

24         But I'm still trying to figure out what he means by a war

25   on white people.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1   Q     What did that statement mean to you?
 2   A     It means that white people should be afraid of people that
 3   don't look like them, people that look like me, people that
 4   look like my husband, you know, people that look like my
 5   granddaughter.  So that's what it means to me.
 6         Fear.  It incites fear.
 7   Q     Did you personally hear any such statements regarding race
 8   made during Alabama's special election for Senate in 2017?
 9   A     Yes.
10   Q     From whom?
11   A     Roy Moore.
12   Q     And what did you hear Roy Moore say?
13   A     So in September of 2018, he did a rally in Florence,
14   Alabama.  And I'm paraphrasing here.  I could be wrong, but I'm
15   kind of paraphrasing here.  But that families were together and
16   happy during the time of slavery.  So that made me think that
17   so that slavery was good.
18   Q     Is that what you heard when you heard?
19   A     That's kind of -- that's kind of what I, you know, kind of
20   interpreted a little bit.
21         I wasn't born during that time.  I don't even -- none of
22   my -- I think my ancestors were.  But I get -- I'm sorry.  I
23   just get mad when I hear things like that.
24   Q     Did it affect you when you heard Roy Moore talk about a
25   time of slavery is when families were happier?
```

15:33:39
15:33:53
15:34:14
15:34:37
15:35:07

```
 1  A    Yes.  I would think families were happier even during the
 2  time of Jim Crow, even during the time of Civil Rights, you
 3  know, during the '80s.
 4       Dynamics change, yes.  I was raised by a single parent.
 5  But that doesn't mean we weren't happy.  We were very happy.
 6  Q    What does it mean to you when you hear -- when you heard a
 7  candidate running for office indicate that families might have
 8  been happier during the time of slavery?
 9  A    Makes me mad.  Makes me -- you know how it makes me feel?
10  That I don't matter.  I'm sorry.  It makes me feel like I'm a
11  second class citizen in a state that I love.
12       I love the state.  I may go away.  I may be away from --
13  for a very long time, but this is my home.  And I love my home.
14  And I want to be treated equally across the board.  And I want
15  my voice to be heard.  I'm sorry.
16  Q    That's okay.  Take your time.
17  A    I'm sorry.
18  Q    No.  You're fine.  Do you need a break or something?
19  A    No.  I'm good.  I'm good.  I knew it was coming.  I
20  just --
21  Q    Ms. Chestnut, did you personally hear any statements
22  regarding race made during the most recent Alabama Supreme
23  Court election?
24  A    Yes, I did.
25  Q    From whom?
```

15:35:29 (line 5)
15:35:53 (line 10)
15:36:24 (line 15)
15:36:53 (line 20)
15:37:04 (line 25)

1  A     Tom Parker.

2  Q     Do you recall in what forum you saw or heard Tom Parker?

3  A     There were two videos that I saw.  One came across my

4  YouTube feed.

15:37:18 5      And just so anybody don't understand anything about

6  YouTube and feeds, when you are on YouTube and you go to your

7  home -- your home portion of YouTube, it shows you different

8  videos that you may have an interest in or that you watch

9  before you may want to watch another one again.

15:37:36 10     In this case, because I had been watching a few political

11  ads on my YouTube, this particular video showed up on my feed.

12  Q     Do you recall when -- when this happened?

13  A     This was during the -- this was during the election -- the

14  election proceedings.  And the video that I saw was -- the

15:38:01 15  beginning of it was a -- you saw a group of Latinos at a -- I

16  think at a fence, and they were talking about an invasion.  And

17  how Tom Parker talked about how he took on the ALCU and the

18  Southern Poverty Law Center, which --

19          MR. WALKER:  This goes to two of the exhibits about

15:38:30 20  which we made an objection.

21          MS. KHANNA:  Sure, Your Honor.  I haven't actually

22  sought to admit the exhibit yet, but I will offer to admit them

23  now, and we can discuss the exhibit, if that works for you.

24          MR. WALKER:  No.  I'm sorry if --

15:38:45 25          MS. KHANNA:  That's fine.  I was going to ask her to

```
 1   pull up the exhibits so we could identify it, and I'm happy to
 2   discuss it now if, Your Honor --
 3            THE COURT:  All right.  Normally we do side bars for
 4   that, and even though we don't have a jury, I think we probably
 5   should because of a witness presence, as well.  So come up here
 6   and talk to me about it.
 7        (Bench conference:)
 8            MR. WALKER:  Your Honor, we objected to those two
 9   exhibits because they weren't disclosed prior to being on the
10   exhibit list.  And our position is --
11            THE COURT:  Which ones are they?  What numbers are
12   they?
13            MR. WALKER:  I'm sorry --
14            MS. KHANNA:  They're 85 and 86.
15            MR. WALKER:  And our position is that if we had known
16   about them in discovery, we could have done discovery on when
17   they were shown, if they were shown, what formats they were
18   shown in, who had seen them, and that sort of thing.  But we
19   don't have any of that information now.
20            MS. KHANNA:  If I may respond.
21        So I believe that their objection is under Rule 37(c)(1).
22   And that provides that the evidence could be excluded if --
23   unless it is substantially justified for lack of disclosure or
24   harmless.
25        And here I think it's both.  There was actually no
```

discovery request asking for anything resembling these
exhibits.  And these exhibits have never actually been in
plaintiffs' custody or control.  They're on the Internet.

In fact, plaintiffs' counsel didn't even become aware of
them until after the close of discovery.  And we disclosed them
on the pretrial list.

The defendants, Secretary Merrill and his counsel, were
present over a year ago at a trial where these videos were
played well before our witnesses were deposed.  And, in fact,
Ms. Chestnut was -- even if we had disclosed them, you know, by
the close of discovery, Ms. Chestnut was deposed well before
the close of discovery.

I'm not sure how they would have been prejudiced by not --
they knew of these things existence on the Internet before we
even did.

THE COURT:  Okay.  But how did they know that they
were going to be used in this case?

MS. KHANNA:  I think that we've -- we've never
actually been asked to identify all things in the public domain
that might be used in this case.

THE COURT:  Okay.  If this is something, though, that
you're relying on in your case in chief, why wasn't it part of
disclosures when you found out about it?

MS. KHANNA:  Oh, when we found out about it, we did
disclose it.  That was just after the close of the -- I think

```
 1   the objection is it was after the close of discovery.  We did
 2   disclose it on the pretrial list after we found it about.
 3            THE COURT:  But disclosing it on the pretrial list
 4   doesn't mean you disclosed it as soon as you found out about
 5   it.
 6            MS. KHANNA:  Well, I can say that we did -- I can
 7   assure you we did disclose it very shortly after we had found
 8   out about it.
 9            MR. WALKER:  I don't question -- I'm just saying that
10   it's unfortunate perhaps for them when they found out about it,
11   but, nonetheless, we did not have the opportunity to do
12   discovery that we would have done to show its context, to show
13   who saw it, and various other things of that nature.
14            THE COURT:  Okay.  Well, I'm afraid I remember seeing
15   at least one of these myself.
16         Off the record.
17              (Discussion off the record.)
18            THE COURT:  How is it really prejudicial, Dorman?  I
19   mean, what would you have done, in terms of where it was shown
20   and -- you know, it was on TV, wasn't it?
21            MR. WALKER:  Well, it was -- I think the testimony was
22   it was on YouTube.  I don't know if it's actually -- I don't
23   know.  I don't know if it was shown on -- I mean, the -- I
24   guess to the extent that what they ultimately seek to show is
25   the use of race in political appeals.  Whether or not it was
```

```
 1  run on TV is relevant to how broadly that appeal was.
 2              THE COURT:  Yeah.
 3              MR. WALKER:  Whether it was beneficial advertisement
 4  in the Tom Parker campaign.
15:42:58  5   THE COURT:  And I think we're also at that point in
 6  our world that you can't believe everything that you see and
 7  hear in one of these things.
 8      I saw something the other day that had been completely cut
 9  and pasted and was totally, completely false.
15:43:21 10   MR. WALKER:  Let me just say that Ms. Khanna is
11  indicating I went beyond the scope of our objection.  And Jim
12  was actually going to argue this.  So I didn't mean to -- and I
13  withdraw --
14              MS. KHANNA:  I was actually going to say that I
15:43:33 15  believe that they stipulated to the authentication of it, that
16  it was, in fact, linked to Tom Parker's campaign.  Yeah, we
17  provided that.
18              THE COURT:  Okay.  Well, I hate to rule against you
19  when Jim's not here.
15:43:45 20   MR. WALKER:  That's quite all right.
21              THE COURT:  And I had intended several times this
22  morning to ask him about his father-in-law.
23              (Discussion off the record.)
24              THE COURT:  Okay.  All right.  Well, I'm going to
15:44:15 25  overrule your objection.  But you can tell Jim that you fought
```

```
 1   it valiantly.
 2              (End of side bar.)
 3              THE COURT:  So Plaintiffs' Exhibits 85 and 86 may be
 4   admitted.
 5              MS. KHANNA:  Thank you, Your Honor.
 6         Heather, can you --
 7              THE COURT:  You may publish those, if you'd like.
 8              MS. KHANNA:  Can you please pull up Plaintiffs'
 9   Exhibit 85?
10   BY MS. KHANNA:
11   Q    Ms. Chestnut, based on what you see on your screen, can
12   you identify if this is one of the videos that you mentioned
13   popped up on your YouTube feed?
14   A    Yes.
15              MR. WALKER:  I'm sorry.  We don't have it.  We're
16   good.
17              MS. KHANNA:  Heather, can you please play the video?
18              (Whereupon, Plaintiffs' Exhibit 85 was played in open
19       court.)
20   BY MS. KHANNA:
21   Q    Ms. Chestnut, the beginning of this ad mentioned an
22   invasion of -- an invasion -- I believe it is what you had
23   remembered, as well.  And I think you saw the pictures of what
24   purported to be a bunch of immigrants coming in to some place.
25         When you saw that part of the ad, what did it -- what did
```

15:44:40 (line 5)
15:45:04 (line 10)
15:45:16 (line 15)
15:46:10 (line 20)
15:46:28 (line 25)

1    it make you think?  How did you feel?

2    A    Angry.

3    Q    Why is that?

4    A    This country was founded by immigrants.  My ancestral

15:47:02 5    background is Native American, part of it, anyway.  The other

6    part of it is Irish.  I found that out.

7    Q    Did you understand that reference to an invasion to be a

8    statement about race?

9    A    Yes.  Because the word "invasion" means that you're

15:47:34 10   invading someone -- you're invading somewhere, which means

11   you're coming in, and you're going to take something, as well.

12       What are people taking?  I -- my ancestors didn't invade

13   this country.  They were brought over here on ships.  They were

14   sent somewhere else on reservations.  They didn't invade.  We

15:48:01 15   didn't take anything.

16       So why would you not allow at least a humane way to let

17   people who are running from persecution and violence find a

18   safe harbor here in this country?

19   Q    So in what portion -- in what way did you see this to be a

15:48:28 20   statement about race?

21   A    The word "if they."  Who's "they"?  Am I "they"?  Is my

22   husband "they"?  Is my friends who are Hispanic, are they

23   "they"?  Who is this "they"?

24   Q    Do you believe "they" to refer to Hispanics?

15:48:49 25   A    Yes.

```
 1   Q    Can we pull up Plaintiffs' Exhibit 86, as well, just the
 2   top of it?
 3        And I believe, Ms. Chestnut you testified that you had
 4   seen a couple of video ads from Justice Parker's campaign; is
 5   that right?
 6   A    Yes.
 7   Q    And do you recall seeing -- does this video that -- from
 8   what you can see on the screen, is this a video you have seen
 9   before?
10   A    Yes.
11   Q    Do you recall when?
12   A    It was on my husband's Facebook timeline.
13   Q    And just for the record, what does that mean it was on his
14   Facebook timeline?
15   A    So when he pulls up his Facebook, or I pull up my
16   Facebook, if someone posts something, it usually goes onto like
17   what they call a news feed.  So we call it a timeline.  But it
18   comes in a news feed.
19        So you see what your friends posted, you know, or pages
20   that you liked what they posted.  And one of his family members
21   posted this.
22   Q    Do you recall when you saw it?
23   A    It was during the election season.
24   Q    Can we please play the video?
25             (Whereupon, Plaintiffs' Exhibit 86
```

       1              was played in open court.)

       2   BY MS. KHANNA:

       3   Q    Ms. Chestnut, when you saw this ad, when you saw Justice

       4   Parker's reference to having taken on the Southern Poverty Law

15:51:01  5   Center, did you view that to be a statement about race?

       6   A    Yes.

       7   Q    Why?

       8   A    Because Southern Poverty Law Center Is a Civil Rights

       9   organization.

15:51:10 10        I always felt -- there is the reason why I didn't go into

      11   law.  I always thought that law should be applied equally

      12   across the board, no matter if you walk in someone's courtroom

      13   whether you're white, black, Asian, pink, purple, it should be

      14   equally across the board.

15:51:30 15        So why would you go up against an organization whose main

      16   objective is to make sure that everyone in this country, in

      17   this state, have the same rights as everybody else?

      18   Q    Is it your understanding that the Southern Poverty Law

      19   Center has worked primarily on issues of racial justice?

15:51:55 20   A    Yes.

      21   Q    And when you saw the portion of the ad discussing mob rule

      22   and depicting Maxine Waters giving a speech, along with the

      23   fires burning and the people running, did you view that to be a

      24   statement or a sentiment about race?

15:52:15 25   A    Yes.

```
 1   Q    And why?

 2   A    Because they make it seem like black people are mobs.

 3   We're just unruly.  We just do whatever we want to do.  We

 4   don't respect nothing.  We don't have -- you know, we don't

 5   have no morals, no scruples, no nothing.  We're out here

 6   running willy-nilly.

 7   Q    And you can take this down.  Thank you, Heather.

 8        Ms. Chestnut, how do these types of statements make you

 9   feel as an African-American voter?

10   A    As I said earlier in my testimony, it makes me angry.

11   Makes me frustrated.  It makes me feel like I'm a second-class

12   citizen.  Makes me think that people don't care.

13   Q    And what effect do these types of statements have on race

14   relations in Mobile?

15   A    It divides us.  There is a lot of people who are on --

16   used to be a lot of time when you can talk to your friends even

17   when you guys don't agree on everything.  But you still had

18   respect for one another.  You still was there for one another.

19        Nowadays we're so deeply divided, it's like you can't even

20   be friends on Facebook.  And I've lost quite a few friends on

21   Facebook because I've disagreed with them on something.  I've

22   said something, you know, your opinion's not a fact.  It's just

23   an opinion.

24        But they want to believe everything they hear about black

25   people in general -- that we're lazy, that we don't do
```

15:52:33
15:52:47
15:53:12
15:53:35
15:53:57

```
 1    anything, that all we want to do is collect entitlements, and
 2    stuff like that.  They just don't care.
 3         And so my job is to prove everybody wrong.
 4    Q    Do you believe that the ads like the ones we've just seen
 5    deepen the racial divides within Mobile?
 6    A    Yes.
 7    Q    Ms. Chestnut, do you travel to Baldwin County often?
 8    A    No.  Not like I used to.
 9    Q    Why not?
10    A    One, I don't have a car that would help.  But Baldwin
11    County frightens me.  It scares me a little bit.  The stigma
12    that Baldwin County has is that it is a sundown county.
13    Q    What is a sundown county?
14    A    A sundown town.  So a sundown county or town is a town or
15    a county that if you as an African-American are in after a
16    certain time, there's a possibility you may not make it out of
17    that area.  You may be chased by white supremacists.  You may
18    be followed by the police.  You may be harassed the whole
19    entire time.
20         Yeah.  You don't -- Baldwin County has always had that
21    stigma.
22    Q    What makes your view of Baldwin County as a sundown town
23    or a place where African-Americans might not feel safe after a
24    given hour?
25    A    So I have a little story to tell everybody.  In 1981 there
```

Timestamps: 15:54:20 (line 5), 15:54:31 (line 10), 15:54:58 (line 15), 15:55:26 (line 20), 15:55:39 (line 25)

1  was a young black man by the name of Michael Donald.  He was

2  19 years old.  He was in a black neighborhood.  He had just

3  left the store to buy his sister a pack of cigarettes.

4  　　　Two Klu Klux Klansmen under the guise of giving them

15:56:04  5  directions to a local black club kidnapped Michael, brought him

6  over to Baldwin County.  When he tried to run away, they beat

7  him with a tree limb.  They tied him to a tree limb and still

8  continuously beat him with a tree limb.

9  　　　They brought him back over to Mobile County --

15:56:29 10  Q    Baldwin County?

11  A    No.  They brought him to Baldwin County.  Then they

12  brought him back to Mobile County.  And they hung him as a

13  reminder to every black person in that -- in Mobile, Baldwin,

14  wherever you live -- that you can't escape the Klan.

15:56:49 15  Q    How old were you at the time of this incident?

16  A    I was five years old.

17  Q    And what do you remember about that incident?

18  A    My mother served on that jury that convicted the man that

19  killed Michael Donald.

15:57:03 20  Q    Does this history from Baldwin County continue to impact

21  your view of Baldwin County --

22  A    It does.

23  Q    -- today?

24  A    It does.  It impacts not only my view, it impacts a lot of

15:57:14 25  my friends' reviews.  It impacts my husband's view.

```
 1              I was willing to take a chance for our anniversary and go
 2       over to Applebee's because it's the only Applebee's in the area
 3       is in Baldwin County, and for our anniversary celebrating our
 4       one year.  And my husband pushed back the whole time.  No, I
15:57:38 5     don't want to go.  Baby, it's not safe.  Baby, I don't want to
 6       go.  Baby, we don't need to be over there.  It -- we don't need
 7       to be over there.  I had to convince him that we're going to go
 8       with friends.  We'll be fine.
 9              Well, luckily, our friends backed out.  So we ended up at
15:57:58 10    Fridays and had our anniversary dinner.
11              But, yeah, he -- we don't -- we're -- it's -- the fear
12       is -- the fear is real about Baldwin County.
13       Q      Have you had any personal experiences in Baldwin County
14       that would validate those fears or strengthen them?
15:58:19 15    A      Yes.  So when I first got my car in 2004, I had went over
16       to Fairhope beach and Parrish, which is one of my favorite
17       places to go during -- you know, during safe time of the day.
18       I went over there to kind of like clear my head and just relax
19       by the beach.  And it was getting late.
15:58:41 20            So I said, well, I need to go, because I got to get up in
21       the morning and go to work.  And as I was leaving Fairhope and
22       leaving going into -- coming almost into Daphne, there was a
23       Fairhope police officer that followed me the entire way until I
24       got to the -- to Daphne city limits.
15:59:05 25            He didn't pull over, didn't stop me.  I wasn't doing
```

anything.  I was driving the speed limit.  I was -- you know,
had all the lights on, you know, properly made lane changes if
I need to.  I was literally scared.  I was in the car by
myself.  I was so glad when I got to Daphne because I knew in
15:59:24 the next 10 minutes I would be at I-10 going west, going back
to Mobile County.

The last time I was really in Baldwin County, I went to
Fairhope for a protest.  Yeah.  I do that sometimes.
Protesting Roy Moore.  Almost got ran over by a Roy Moore
15:59:47 supporter in front of the police.  They didn't even do
anything.  They just sent him on his merry way.

My friend who happened to go inside to kind of hear what
was being said -- the protest was over.  I forgot where she had
parked her truck.  It was raining.  I was getting soaked.  I
16:00:10 was texting her, saying, Come on, I'm getting wet.  Can you
hurry up?  And she was like, I'm on my way out.  And while I
was standing there, a guy who claims that he was security had
nothing on him that said he was security basically called me
everything but a child of God.  I was all kinds of N-words,
16:00:33 N-itches.  I was -- I didn't feel safe.

It was luckily one of my friends who was actually
leaving -- was actually leaving told me to get in her car, and
she was going to drive me off the property until I could meet
up with my other friend who had brought me there.
16:00:51 I was a nervous wreck.  I cried.  I was -- I was -- I was

16:01:07
1    ready to go.

2    Q    Ms. Chestnut, have you spent any time in Montgomery?

3    A    I have been to Montgomery quite a few times.

4    Q    And in your view, does the city of Mobile have more in

5    common with Montgomery County or Baldwin County?

6    A    They're more in common with Montgomery County.  It's an

7    urban center.  They both are urban centers.  It's just like

8    Birmingham.

9         Birmingham is an urban center.  They have the same, you

10   know, same concerns, same issues -- education, health care,

11   jobs, affordable housing.

12        Baldwin County is filled with -- no offense -- old white

13   retirees.  There is -- there's -- I mean, there are retirees in

14   Mobile, but Mobile is starting to become a young and, you know,

15   fresh kind of, you know, city now.

16        It's more -- they're trying to be more things that's

17   geared to a lot of people my age, like in their 40s and

18   millennials.  I mean, it's starting to kind of get younger and

19   hipper.  So there's not like a whole lot there.

20        You go to -- if you go to Baldwin County, there's not that

21   big city feel as if you go to Mobile.  They got that -- because

22   we have Mardi Gras, you know, different music festivals.  We

23   have a cruise that leaves out of Mobile.

24        So it's got -- it's just got more there between Montgomery

25   County and Mobile County than Baldwin.

```
 1   Q     Do you feel like there are certain cultural and economic
 2   similarities between Mobile and Montgomery?
 3   A     Yes, there are.  I mean, of course, both of them are --
 4   and no lie -- they're both majority black cities and counties.
 5   I know Montgomery just recently became more majority black.
 6         But there's, you know, like I said, same concerns, you
 7   know, as far as like the different issues that we all have
 8   concerns about.  So there's a lot more in common between Mobile
 9   and Montgomery.
10   Q     How easy is the -- sorry.
11         How easy is it to get from the city of Mobile to
12   Montgomery?
13   A     Oh, all you got to do is hit I-65 and go north, and you
14   will be in Montgomery in no time.
15   Q     Are there public transportation options between the two
16   cities?
17   A     There's a Greyhound and a megabus.
18   Q     Ms. Chestnut, are you a member of a political party?
19   A     Yes, I am.
20   Q     What party is that?
21   A     I'm a Democrat.
22   Q     What are your views of the two parties in Alabama when it
23   comes to issues of race and racial justice?
24   A     So I've been a Democrat since I was 16.  I always kind
25   of -- when I was growing up, my grandmother made sure I watched
```

The timestamps in the left margin are: 16:02:49 (line 5), 16:03:05 (line 10), 16:03:18 (line 15), 16:03:30 (line 20), 16:03:50 (line 25).

both national conventions every four years.  She didn't tell me
to not watch Democrats.  She didn't tell me to watch the
Republicans.  She made me watch both of them because she knew
eventually I was going to have to choose a party when I got
older and I was ready to vote.

She always told me to vote along my convictions and what I
believe.  And my beliefs line up more with the Democratic party
than the Republican party.

I feel comfortable as a black woman because they have the
core -- my core principles -- racial justice, social justice,
equal pay, equal -- equal rights for everybody.  I align with
those thoughts in the Democratic party.

Do I -- do I agree with everything that the Democratic
party does?  Not all the time.  But I am -- you know, but I do
vote my convictions.  I vote my -- my concerns.  And the
Democratic party aligns right along with those.

The Republican party?  I have friends who are Republicans.
Love them to death.  We agree to disagree.  But I can't feel
comfortable in a party that allows -- well, that's hospitable
to hate.  I'm not saying everything that's a Republican is a
racist.  But what I feel is -- and I gave this analogy
earlier -- if I'm sitting -- if I have a friend -- you know, if
you have got a friend named Joe, and Joe's sitting next to you,
and he is saying the most vile and disgusting things that you
have heard -- you've heard, and it goes against your core

1  principles, your feelings, and if you don't stand there and

2  say, Hey, Joe, why are you saying that?  Man, you know that's

3  wrong.  You know, stop saying that.  You know, and distance

4  yourself from them, then you've said volumes.

16:06:14  5       But if you're sitting there and you're letting him spew

6  all this hatred, all this vileness out of his mouth, and you

7  don't say anything, of course people are going to group you in

8  the same group.  Of course it's going to happen.

9       So why would I want to associate myself with somebody --

16:06:34 10  with a party that allows that to happen?  Like I said, I

11  know -- look, like I say, I got friends who are Republicans.

12  We agree to disagree.  But they're not racists, and I know

13  that.

14       Some of them I've been friends with for 25 years or more.

16:06:51 15  I went to high school with them.  But we don't sit there and --

16  you know, they hadn't never said anything that made me just

17  want to, you know, backhand them, or anything like that.

18       They -- you know, so I know where their hearts is.  I know

19  where they -- you know.  But some people, sometimes you don't

16:07:11 20  know where they heart is because of they're not speaking up and

21  they're not speaking out.

22  Q    Do you feel -- as a black woman, do you feel welcome

23  within the Republican party in Alabama?

24  A    No.  I hate to say it.  It needs to be -- can I say

16:07:28 25  something real quick?

1    There needs to be more unity in this state.  The reality

2    is, is that we're all equal.  We're all the same.  We're

3    Alabamians first before we're Americans.  This is our home

4    state.

16:07:48  5    I love Alabama.  I love it to death.  I defend it to

6    death.  When I lived up north, I would have people say bad

7    things about Alabama all the time.  And you know what?  I

8    wouldn't let nobody say anything bad about my home state.

9    We need to come together.  We need to stop all this

16:08:10 10   division.  It is time.  And if this is the way for it to

11   happen, I'm all for it.

12   I'm not saying that I need another congressional district

13   so I can vote for a black candidate.  Heck, it could be a white

14   candidate that could do the same thing -- represent the people

16:08:32 15   of this -- of this district the same way that they represent

16   District 7, that Terri Sewell represent the same district in

17   District 7.

18   I just want to be able to have a seat at the table.  And

19   if I got to make my own table and put my own seat at it, that's

16:08:52 20   exactly what I'm about to do.

21   Q    Thank you, Ms. Chestnut.

22   A    Thank you.

23         MS. KHANNA:  No further questions on direct.

24         THE COURT:  Any cross-examination?

16:09:04 25        MS. HOWELL:  Yes, Your Honor.

```
 1                       CROSS-EXAMINATION
 2  BY MS. HOWELL:
 3  Q     Hi, Ms. Chestnut.
 4  A     Hello.
 5  Q     You covered a lot of ground in your testimony here today,
 6  and I just wanted to ask you a few follow-up questions about
 7  it.
 8        You moved back to Alabama in 2016, right?
 9  A     That is correct.
10  Q     Okay.  And you talked about -- well, some things that it
11  sounds like you've seen since then.  And I want to ask you
12  particularly about the racial appeals that you talked about
13  hearing in elections.
14  A     Uh-huh.
15  Q     When do you recall having heard Mo Brooks talk about --
16  make the racial appeals that you were discussing earlier?
17  A     Oh, let's see.  I have heard him say it this year.  I
18  heard him say it last year.
19        The most recent was an -- like I said, it was a radio
20  interview that I heard him, I heard him say that.
21  Q     Do you recall which radio station you heard him on?
22  A     I couldn't tell you.  It was -- I can't really -- it's
23  like some northern -- up here in northern Alabama radio
24  station.
25  Q     Okay.  But you live in Mobile County, do you not?
```

The time stamps in the left margin: 16:09:43 (line 5), 16:09:56 (line 10), 16:10:10 (line 15), 16:10:27 (line 20), 16:10:44 (line 25).

```
          1   A     Yes, I do.  I do have iHeartRadio.

          2   Q     Okay.  So you heard it on your phone on the radio

          3   streaming on your phone?

          4   A     Yes.

16:10:55  5   Q     Okay.  Thank you.

          6         You also talked about Roy Moore making racial appeals in

          7   the 2017 campaign for a Senate seat for the state, right?

          8   A     Uh-huh.

          9   Q     And Roy Moore did not win that election, did he?

16:11:11 10   A     No, he didn't.

         11   Q     Who won that election?

         12   A     Doug Jones.

         13   Q     And Doug Jones is a Democrat, is he not?

         14   A     Yes, he is.

16:11:18 15   Q     He defeated the Republican candidate, did he not?

         16   A     Yes, he did.

         17   Q     You also talked about the interests that you have in

         18   various sort of issues facing the state -- public education,

         19   law enforcement, a couple of more things like that, affordable

16:11:46 20   housing, right?

         21   A     Yes.

         22   Q     Do you know whether public education is typically dealt

         23   with by state or federal government?

         24   A     It starts at the federal, goes down to the state, and it

16:12:02 25   trickles down to the school boards.
```

| | | |
|---|---|---|
| | 1 | Q    Okay.  And school boards are local bodies, are they not? |
| | 2 | A    Yes, they are. |
| | 3 | Q    They're usually state officials, right? |
| | 4 | A    No.  In Mobile County -- in Mobile County, we have -- we |
| 16:12:15 | 5 | elect our school board. |
| | 6 | Q    Right.  But that's as a part of state government, right? |
| | 7 | As opposed to federal government, right? |
| | 8 | A    Yes.  Part of state government. |
| | 9 | Q    The same is true as far as law enforcement, right?  Those |
| 16:12:30 | 10 | are usually state officers rather than federal? |
| | 11 | A    Yes. |
| | 12 | Q    And those issues are typically dealt with on the state |
| | 13 | level? |
| | 14 | A    I would think so, yeah. |
| 16:12:40 | 15 | Q    So a congressperson plays a more distant role in those |
| | 16 | policy decisions? |
| | 17 | A    But even if they don't -- even if it's a state issue, it's |
| | 18 | also a federal issue, too.  People's rights are being violated. |
| | 19 | That's the bottom line to this -- to this whole thing. |
| 16:13:04 | 20 | My husband -- look.  My husband has a right to go wherever |
| | 21 | he wants to go.  If he wants to go to the store, he can go to |
| | 22 | the store.  If he has to go pay a bill, he can go pay a bill. |
| | 23 | Unless he's doing something absolutely wrong, or he's walking |
| | 24 | in the middle of the street, or walking naked somewhere, he |
| 16:13:22 | 25 | should be able to do that without being accosted by the police. |

```
 1       I can't count on this hand -- on these two hands how many
 2  times in the three years that me and my husband been together,
 3  how many times he been stopped by the police for doing nothing.
 4       We can appeal to the -- I can appeal to the mayor, the
 5  city council, the governor, my state legislator, all day long,
 6  but something has to start on the federal level and --
 7  Q    What are you hoping that your congressperson will do
 8  differently to address those issues?
 9  A    I would hope that some type of piece of legislation will
10  make sure that if something happens, that police officers are
11  held accountable for their actions.  I mean, because apparently
12  it's not happening on the local level, and it's definitely not
13  happening on the state level.
14  Q    Have you taken any actions to see if anything can be done
15  on the local or state level?
16  A    There was a young lady by the name of Shakeisha
17  (phonetic).
18       THE COURT:  I'm sorry.  That calls for a yes-or-no
19  answer.
20       THE WITNESS:  Okay.  That calls for yes or no?  Okay.
21  Repeat that question again.
22  BY MS. HOWELL:
23  Q    Have you done -- have you taken any actions on the state
24  or local level --
25  A    Yes.
```

```
 1   Q     -- to press those issues?

 2   A     Yes.

 3   Q     What are you hoping to accomplish in this lawsuit that

 4   would address those issues?

 5   A     I want representation.  I want a seat at the table.

 6         I'm tired of being disfranchised.  I'm tired of every time

 7   I go to vote, I don't have nobody that I can vote for.  There

 8   is no competition.  We want a seat at the table.

 9         I am tired of hearing my fellow African-Americans in

10   Mobile County say the following to me:  I don't vote because

11   they vote in who they want in.  I don't want to vote.  I don't

12   want to vote because why?  My voice don't matter.

13         That's what is time for this to end.

14   Q     And you --

15   A     We have seven -- we have seven congressional districts.

16             THE COURT:  I think you've answered the question.

17   Thank you.

18             THE WITNESS:  I'm sorry.  I just --

19             THE COURT:  I know.

20   BY MS. HOWELL:

21   Q     Do you think that redrawing the congressional districts

22   would motivate for people to vote?

23   A     Yes.  Sorry.  I don't mean to sound kind of, you know,

24   forceful there, but, yes.

25         I have kids.  I encourage them to vote.
```

```
 1        When I talk to young folks about voting, they don't want
 2   to vote because they don't have a reason to vote.  They don't
 3   feel like they voiced -- their voice will be heard.
 4        And like I said, they need -- we want a seat at the table.
 5   How can I -- how can I get a seat at the table if my voice is
 6   not being heard?
 7   Q    You talked toward the end of your direct examination about
 8   a need for more unity in the state.  Do you believe that
 9   redrawing the congressional districts will accomplish that?
10   A    Yes.
11   Q    How?
12   A    Because we will have a voice.
13   Q    Do you think that filing a lawsuit accomplishes more unity
14   in the state?
15   A    If it's to get y'all attention, yes.
16   Q    Who is "y'all"?
17   A    The state of Alabama, my home state.
18   Q    I will ask you one final question.  Do you believe that
19   Representative Sewell up in Congressional District 7 represents
20   her district better than Representative Byrne down in your
21   district represents his?
22   A    Yes.
23   Q    Why?
24   A    Because she has -- because she has connections in every
25   part of her district.  She has connections in Tuscaloosa.  She
```

16:16:18  5
16:16:36 10
16:16:47 15
16:17:08 20
16:17:22 25

         1   has connections here in Birmingham.  She has connections in
         2   Selma.
         3       I know Terri.  I've actually went to convention with
         4   Terri.  So I know Terri.  I know what her -- she's going --
16:17:38 5   she's -- I knew she was going to do a good job representing
         6   District 7.
         7   Q    Do you know if Representative Sewell had any role in
         8   drawing her congressional district?
         9   A    No, I do not.
16:17:50 10  Q    Okay.  Thank you very much, Ms. Chestnut.
        11   A    You're welcome.
        12            THE COURT:  Any redirect?
        13            MS. KHANNA:  Briefly, Your Honor.
        14            THE COURT:  All right.
16:17:58 15                    REDIRECT EXAMINATION
        16   BY MS. KHANNA:
        17   Q    Just a few quick questions, Ms. Chestnut.
        18   A    Uh-huh.
        19   Q    Do you believe that your member of Congress has the
16:18:08 20  ability to ask the Department of Justice to investigate
        21   situations within a state?
        22   A    Yes.
        23   Q    Do you believe that your member of Congress has the
        24   ability to write a letter to local officials if he or she
16:18:19 25  thinks that the state needs to take action?

```
 1  A     Yes.
 2  Q     Do you believe that your representative in Congress has
 3  the ability to vote to repeal mandatory minimums?
 4  A     Yes.
 5  Q     Do you believe that your representative in Congress has
 6  the ability to vote for more funding for poor schools?
 7  A     Yes.
 8  Q     Do you believe that your representative in Congress has
 9  the ability to vote to decriminalize the possession of
10  marijuana?
11  A     Yes.
12  Q     Do you believe that your representative in Congress has
13  the ability to vote for more affordable -- more funding for
14  affordable housing?
15  A     Yes.
16  Q     Section 8 is a federal program; is that correct?
17  A     Yes.
18  Q     You testified about Section 8 housing today?
19  A     Yes.  Yes.
20  Q     Thank you, Ms. Chestnut.
21            THE COURT:  Any recross?
22            MS. HOWELL:  Just one question, Your Honor.
23            THE COURT:  Okay.
24                     RECROSS-EXAMINATION
25  BY MS. HOWELL:
```

16:18:28 (line 5)
16:18:44 (line 10)
16:18:55 (line 15)
16:19:00 (line 20)
16:19:14 (line 25)

1  Q   Your counsel just asked you a few questions about your

2  congressperson writing letters to those state and local

3  officials, correct?

4  A   Uh-huh.

16:19:25  5  Q   When those congress people write those letters, who has to

6  take the actions?

7  A   The local -- local people.

8  Q   Thank you.

9         THE COURT:  Anything else?

16:19:36 10         MS. KHANNA:  Oh, sorry.  No.  Nothing further, Your

11  Honor.

12         THE COURT:  Thank you, Ms. Chestnut.  You may step

13  down.

14    Call your next witness.

16:20:02 15         MR. SPIVA:  Yes, Your Honor.  Plaintiffs call

16  commissioner -- County Commissioner Sheila Tyson.

17                 SHEILA TYSON,

18  having been first duly sworn by the courtroom deputy clerk, was

19  examined and testified as follows:

16:20:42 20         THE COURTROOM DEPUTY CLERK:  Please state your name

21  for the record in the microphone.

22         THE WITNESS:  Sheila Tyson.

23              DIRECT EXAMINATION

24  BY MR. SPIVA:

16:20:58 25  Q   Good afternoon, Commissioner Tyson.  Where do you live?

```
 1  A    I stay in West End in the City of Birmingham at 1233, 14th
 2  Place Southwest, 25211.
 3  Q    Okay.  Thank you, Commissioner.  How long have you lived
 4  in Birmingham?
```
16:21:16
```
 5  A    I have stayed in Birmingham all of my life.  I left for
 6  about 17 years and came back.
 7  Q    In which congressional district do you live in?
 8  A    I stay in Congresswoman Sewell's district, and it's 7.
 9  Q    Have you -- and you said you had left Birmingham for a
```
16:21:36
```
10  time.  What were you doing -- well, where did you go when you
11  left Birmingham?
12  A    I was in the military, and I traveled all over.  And I
13  worked -- also worked for the military.
14  Q    And how long did you serve in the military?
```
16:21:53
```
15  A    I served four years in active duty.
16  Q    And then how long with the reserve time?
17  A    I actually had several jobs.  I worked in the post office.
18  I worked with several other disabled veteran units all over.
19  Q    And that was all with the military?
```
16:22:13
```
20  A    No.  No.  Some with the military and some wasn't.  So, no,
21  it was federal government.
22  Q    Okay.  And which one branch of the military were you in?
23  A    The Army.
24  Q    And what was your position in the military?
```
16:22:30
```
25  A    I was actually a warehouse specialist in a chemical
```

1  warehouse.

2  Q    And when did you return to Alabama?

3  A    I returned to Alabama in '82.  Left, came back, and

4  returned back in '88.  Left, came back, returned back in the

16:22:59 5  '90s.

6  Q    Okay.  And have you -- have you been then living again in

7  Alabama since the early '90s?

8  A    Yes.

9  Q    And did you attend college, Commissioner Tyson?

16:23:11 10  A    No.  I went to the Quartermaster School in the military.

11  Q    And which high school did you attend in Birmingham?

12  A    West End High.

13  Q    When did you graduate?

14  A    '79.

16:23:24 15  Q    And can you describe your upbringing in Birmingham?

16  A    When I grew up in -- my mother and father had seven

17  children.  I had both parents.  They were married.

18       I grew up in part of Smithfield.  That was my early years.

19  Q    When you say 'early years' -- sorry to interrupt.  But in

16:23:52 20  Smithfield about --

21  A    It was from to the third grade we stayed on Ninth Avenue

22  West.  And that was right down the street from Graymont

23  Elementary School.  And we moved out from over there when I was

24  in the third grade when my father -- my father died when I was

16:24:13 25  like five or six.  I can't remember.  But I was of age when he

1    died.

2    Q    Tell me about your early schooling experience in

3    Smithfield.  Did you go to a segregated school?

4    A    Yes.  We went to a segregated school.  I went to ---

16:24:29  5    Graymont was the first school I went to.  And that was when --

6    they was first segregated in, I think it was 1963 or '64.  I

7    went in '64, maybe '65.

8    Q    To Graymont?

9    A    To Graymont Elementary School, along with my brothers.

16:24:48  10   And my other sister they was at -- it was me, Scooter,

11   Rosalind.  And Jerome and Amanda, they was at Parker.

12   Q    Okay.

13   A    And Jerome was at Holy Family.

14   Q    So when you were at Graymont, did you say around the '64

16:25:09  15   time period -- did you say that that was around the time it was

16   first being desegregated, or --

17   A    It was then -- it was blacks being brought in to Graymont

18   Elementary School.  We weren't the first ones brought in there.

19   But we were a big part of the groups that came in.

16:25:25  20   Q    Uh-huh.

21   A    And --

22   Q    Tell me about that experience.

23   A    It was horrible.  I was little, and so I really wasn't

24   able to really protect myself and fight.  But my brothers were.

16:25:38  25   They were -- they were big teenagers.

1   And it was just hell every day.  You had to -- when you
2   got to school, they tried to stop you from coming to school.
3   And on your way back, you got rocks throwed at you.
4       We used to call this coming off of -- we used to call it
16:26:01 5   turnpike because the road kind of twisted.  So it was downhill
6   running, you know, every day.  They had the smaller kids, they
7   had to grab each one of our hands on each side because we would
8   fall.  And we had to run from the school about -- probably
9   about six blocks until we made it home.
16:26:24 10   Q    And because of the treatment that you received at
11   Graymont, did your family make a change, in terms of where you
12   went to school next?
13   A    We didn't -- my family didn't make a change.  The system
14   made a change because of the fighting.  They started fighting
16:26:43 15   back.
16       So they moved us to Wilkerson Elementary School.  And we
17   had to walk from Ninth Avenue to Wilkerson, which the freeway
18   wasn't there.  It was just a bunch of red dirt.  So we used to
19   have to cut across.
16:26:59 20       And I remember it good because I was -- it was a dog -- it
21   was First Baptist Graymont Church.  It was a dog in a fence
22   next door.  And we used to have to cut across Graymont in order
23   to -- First Baptist Graymont in order to get across the red
24   dirt to the school.  If not, it would add like some -- a whole
16:27:21 25   lot of more blocks on to the distance to walk.

              1    And I was so afraid of that dog if -- because I used to
              2    have to walk sometime if I -- if my brother -- they had to go
              3    to basketball practice, or something like that earlier, we -- I
              4    would have to go by myself.
    16:27:38  5         And my mom, she was sick.  So she would walk halfway.  And
              6    when she get to the church, I used to have to walk the rest of
              7    the way over the red dirt to get to Wilkerson.
              8    Q    Let me ask you:  Was Wilkerson an integrated school?
              9    A    It was a black school.
    16:27:54 10    Q    Okay.  So after your experience at Graymont, the system
             11    moved you back to a segregated school?
             12    A    Yes.  It's because -- and it was because of the fights.
             13    It was the -- it was the white kids against the black kids.
             14    And as long as the white kids was beating us up, nothing was
    16:28:15 15    said, you know.  It was -- you know, we reported it, but it was
             16    all right.
             17         But then black kids started beating the white kids back
             18    up.  That's when they moved us.
             19    Q    And how long did you go to the Wilkerson -- to Wilkerson?
    16:28:29 20    A    I left Wilkerson and went -- in the third grade and went
             21    to -- that's when we moved.  My mother got insurance money off
             22    of my father death.  And we built a house in West End.
             23    Q    And what was West End like racially, the area that you all
             24    moved to when you were in third grade?
    16:28:47 25    A    They thought we were the moving company when we first

```
 1  moved in because she actually built a house.  So it was like --
 2  and I can't remember -- I was in the third grade, so I had have
 3  to go back the years and count.
 4       When we first moved in the house, we were like probably
16:29:04  5  one or two people moving in at the same time that was
 6  African-American.  It was solid white.
 7       And I remember a lady coming over with a basket.  And I
 8  was like -- I told you in the third grade.  And she said that,
 9  Is a lady of the house here?  And I called my mom.  And she
16:29:27 10  came, and she said, I was just wanted to, you know, meet the
11  family that was moving in.
12       She said, Well, how you doing?  And the stare the lady
13  gave her was like you can't possibly being built a split-level
14  home in this area.  And it was a corner lot.
16:29:44 15       So right then I was just looking because I knew my mother
16  actually was a foot soldier.  So I'm looking like, oh, my God.
17  And she gave my mother the basket, and she took the basket.
18  And they didn't shake hands, but she did give her the basket.
19  Q    And just to make sure the record is clear.  So the lady
16:30:06 20  who came over to the house, she was expecting to see a white
21  family?
22  A    Yes.
23  Q    And so she was white, the neighbor?
24  A    Yes.
16:30:12 25  Q    Okay.  And so what happened after that?
```

```
 1   A    Gradually the families started moving out, out the
 2   community, just one at a time within like -- it wasn't no years
 3   or no months.  This was like you wake up and a family gone.
 4        It was like -- and my mother kept telling my brothers
 5   the -- two neighbors across the street had girls.  And the
 6   girls was, you know, kept trying to talk to them.  And she
 7   said, I told you to stay out from over there.  You going to end
 8   up in jail.  And they -- the girls wouldn't stop.  And
 9   gradually within a couple of weeks, them people, they were
10   gone.  I'm talking like dominoes.  Just gradually everyone was
11   moving, moving, moving.
12        And about time I got in the eighth grade, all of the --
13   all of the whites in that community was gone.
14   Q    And did the neighborhood become a predominantly black
15   neighborhood then?
16   A    It became -- we had one older lady.  I cannot think of
17   this lady's name for nothing.  There was one older lady stayed.
18   And she stayed across the street on the -- she stayed, like it
19   was about four doors down.  And we used to help her, you know,
20   cut her grass.  And my mama used to go over there and help her
21   also because she was really up in age.  And that was the only
22   lady that stayed over there.
23   Q    Only white lady that stayed?
24   A    That was the only one.  And I just think she was, you
25   know, satisfied that, you know, that she just didn't try to
```

16:30:39
16:30:59
16:31:20
16:31:41
16:31:58

```
 1  move, I don't believe.  I was so young.  I really didn't focus,
 2  you know, on that.
 3  Q    Where did you go to school during this period at the West
 4  End neighborhood after Wilkerson?  Did you go through high
 5  school there?
 6  A    Went to Jackson Elementary School, which was right in our
 7  back door.
 8  Q    Uh-huh.
 9  A    So that was like nowhere to walk.
10  Q    Was that school predominantly black or predominantly white
11  when you got there?
12  A    It was -- it was really, really white when we got there in
13  West End.  It was really white.  And gradually they -- they
14  left.
15  Q    Uh-huh.
16  A    And before I was in the eighth grade, it was all black.
17  Might have been one or two white students left.
18  Q    Uh-huh.
19  A    But I can guarantee you it wasn't many.
20  Q    Uh-huh.  And then where did you graduate from high school?
21  A    At West End.
22  Q    Uh-huh.
23  A    I graduated, I think it was -- I'm almost -- because we
24  just had a class reunion.  It was 360 graduated in my class.
25  We might have had 25, maybe, whites.
```

```
 1   Q    When you graduated?

 2   A    When I graduated.

 3   Q    When you first started at -- sorry.  I lost the name --

 4   West End?

 5   A    Yes.  West End.

 6   Q    When you first started there, was it -- was it integrated

 7   at that point?

 8   A    It was well mixed.  It was well mixed.  It was -- behind

 9   the high school, it was a lot of white people stayed behind in

10   that area.  It was a lot of people stayed behind there.

11   Q    When you graduated from high school, Commissioner, is that

12   when you first went into the military?

13   A    I went in the military, yes.

14   Q    Why did you decide to go into the military at that point?

15   A    Well, when I was in high school, I was very good in

16   volleyball.  I had an opportunity, actually, to go to college.

17   And both of my parents had died by then.  And it was my sister

18   at the age of 21 raised five children.  And I wanted to help

19   her.

20        And I was a community activist all the way from ten years

21   old all the way until I graduated.  And I just -- I just felt

22   like I needed go because I wasn't going to stop doing what I

23   was doing.  And I had her worried.  That's when Bonita Carter

24   had died, got killed by the police.  And we were sneaking out

25   of school, marching in the Civil Rights movement trying to get
```

16:33:19  (line 5)
16:33:34  (line 10)
16:33:51  (line 15)
16:34:18  (line 20)
16:34:40  (line 25)

1   Richard Arrington in office.

2        It was just, you know -- it was just a political thing

3   after every -- just protesting, protesting.  And I had I -- I

4   just -- I felt like I needed to leave because if I didn't, I

16:34:59  5   was going to end up in some bad trouble because I wasn't going

6   to stop protesting.

7   Q    Uh-huh.

8   A    And my --

9   Q    When you said you needed to leave, you mean you needed to

16:35:08 10   leave Alabama?

11   A    I needed to leave Alabama because we wasn't stopping.  We

12   kept protesting.

13        And my -- I got so -- and I'm so glad social media wasn't

14   back then because I probably would have got more whippings than

16:35:22 15   I did because she didn't want me, you know, taking, sneaking

16   out of school going to protest.  And we did it.  I did it

17   anyway.

18        And she wanted me to graduate.  And I graduated.  And when

19   I graduated, I needed -- I wanted to leave.  They wanted --

16:35:40 20   when I went in the military, they wanted me to wait until 1980

21   to leave, but I had to leave.

22        And they, most of the time when they send you off, they

23   send you to the closest base and that's in Georgia.  I would

24   have went to Fort -- to training, basic training.  But I ended

16:36:00 25   up going to New Jersey because I wanted to leave so soon.  So

1  they sent me on December the 5th.  So I had to leave then.

2  Q    Uh-huh.

3  A    Because we was still protesting.  It was still so many

4  issues in the community.  And I was still going to protests.

16:36:16 5  Q    Let me ask you about that, because you said you'd been an

6  activist since the age of ten?

7  A    Yes.

8  Q    What did these protests involve, you know, from then

9  through the time that you were leaving Alabama?

16:36:27 10  A    It was equal rights to vote.  My mother did it, and, you

11  know, back then you took your children with you.  And out of

12  seven kids, I was the one that decided to be a foot soldier

13  with my mom.

14      And we used to do voter registration.  We used to do

16:36:47 15  marches to the poll.  We was trying to get more people of

16  African-American on the city council in the City of Birmingham.

17  And we had the coalition back then.

18      I was a member of the coalition back in -- when they used

19  young people to actually lead a lot of the marches.  And I was

16:37:12 20  within that group.

21  Q    What kind of reaction did you get from local or state

22  officials to these marches and protests?

23  A    Well, a lot of them, you know, they didn't like what we

24  were doing.  You know, they used to -- I never got bit by a

16:37:33 25  dog.  I never did experience that because all of that was gone

```
 1   by then.  But we used to get cursed out and spit on, different
 2   things.
 3        Not so much about public officials, but it was just the
 4   people who we were protesting against the different issues that
16:37:50 5   was going on within the City of Birmingham.  It wasn't a
 6   community thing.  It was actually a city thing.  And we were
 7   leading the marches that we came together with the coalition
 8   and met about.
 9   Q    Uh-huh.
16:38:03 10  A    And most of the marches was led by children, young people,
11   because I wasn't a child then.  I was a young adult.  I was 18.
12   And it was by women.
13   Q    Uh-huh.  Uh-huh.  Let me turn to the present day for a
14   minute.  What is your current occupation?
16:38:24 15  A    I'm a county commissioner for Jefferson County District 2.
16   Q    And can you describe your district, in terms of
17   demographically and racially?
18   A    I have a large portion of African-American, low income.  I
19   have a percentage of whites in my district.  But majority of
16:38:50 20  them are -- it's not -- I don't believe it's a median income.
21   You're either poor or you're rich, so they in the rich
22   category.
23   Q    But these are some portion of your constituents?
24   A    Yes.
16:39:02 25  Q    And where do they stay?
```

1   A      Downtown, the south side, Lakeview.

2   Q      Uh-huh.

3   A      In that area.

4   Q      And what -- what's the kind of -- the larger portion of

16:39:15  5  your district?

6   A      It's poor from the southwest Titusville.  I have Druid

7   here, Evergreen bottom, Fountain Heights.  All of that is

8   behind the civic center.  If you look behind the civic center,

9   all of that is nothing but poverty.

16:39:34 10     You go to Norwood.  Norwood is kind of trying to build

11  itself up, but I have only like two streets off of Norwood.

12  Once you stopped right there at Uptown, everything back there

13  is nothing but low income.

14  Q      Uh-huh.

16:39:49 15 A      You skip over downtown, all that's money.  Even within

16  the -- the low income apartments that's downtown, those are

17  mixed-use apartments.  So you have a lot of upper-scale

18  citizens that stay in those apartments.  You have a lot of low

19  income.

16:40:08 20 Q      Uh-huh.

21  A      Now, it's always a small portion -- I think it's maybe

22  like ten percent that live over there.

23  Q      Uh-huh.

24  A      And I have -- there's south town, which is low income.

16:40:21 25 That's about 525 units there.  But all of the south side is

1  like an upper-scale income.

2       And then you go to Titusville, that's low income.  All the

3  way -- and you pull all the way back through Ensley,

4  Smithville, West End, Hillman Estates, all of that back there,

16:40:47 5  you go to Lipscomb, is very poor.  And it's a lot of poor

6  whites and Latinos there in Lipscomb and Brighton.

7       You go all the way through to Bessemer, and that's where

8  my district stop at.

9  Q    Okay.  And then the area that you described at first that

16:41:02 10  you said was -- you said it was all kind of very deep poverty,

11  what's the racial makeup of that portion of your district?

12  A    It's black.

13  Q    And what are some of the concerns that your -- in the poor

14  areas of your district that your constituents have?

16:41:20 15  A    They are not being represented.  And that's one of the

16  main reasons that I ran for this position.

17  Q    Do they have -- in terms of issues, do they have health

18  care concerns?

19  A    Yes.  They closed our county hospital.  They had been

16:41:38 20  chipping away at the county hospital since 1999.  They finally

21  closed the -- they sold the beds back in 2012.

22  Q    Uh-huh.

23  A    And they did a study three years ago.  Diseases that was

24  back in the '60s, they are starting to pop back up now because

16:41:58 25  of the county hospital closing.  And people now don't have

1    anywhere to go to be treated.

2    Q    And are these individuals who don't have health insurance?

3    A    They do not have health insurance.  They are all indigent

4    care patients.

16:42:15  5    Q    How important is the Affordable Care Act to your

6    constituents, Obamacare?

7    A    I don't know how they came up with that name Obamacare.  I

8    guess because he the one that talked about it.

9         But health care is so important.  And I don't understand

16:42:36 10   how we are not taking advantage of this here in the state of

11   Alabama.  And it's not -- it's hurting -- it's hurting so many

12   people.

13        The mortality rate of pregnant women here in the state of

14   Alabama, African-American women, it's the highest in the world.

16:42:59 15   How can that possibly happen?  And we're not the largest state

16   in the United States.  How can that -- how could that happen?

17        Diseases that you find in third-world countries are here

18   in Alabama.  They see it in Jefferson County a lot.  How is

19   that happening here when we have the -- the best hospital --

16:43:26 20   UAB -- in the country?

21   Q    How about affordable housing?  Is that a concern of some

22   of your constituents?

23   A    They are chipping away affordable housing.  If you look at

24   it -- you're making 7.25.  Most of these jobs, if you're making

16:43:47 25   7.25, and you get 40 hours a week, that's still not enough to

1  pay.  The lowest rent you going to get is at least 750 a month.

2  And that's where I live at.  And I stay in a bad area in West

3  End.

4  Q    Uh-huh.

16:44:07  5  A    So you going to pay $750 to live in West End.

6      That's -- if you're going to get just a halfway decent

7  place, if you paid 325 or anything -- and I have been talking

8  about this for I don't know how many years.  If you pay 325

9  here in Jefferson County, you going to be in a slum shotgun

16:44:32 10  house not fit for a dog to live in.

11      So affordable housing is very important.  It's needed here

12  in this state.  It's critically needed in this state.

13  Q    And, Commissioner Tyson, what about criminal justice

14  issues and criminal justice reform?  Is that something of

16:44:54 15  concern to you and your constituents?

16  A    Of course it is.  It's -- I actually -- we just -- we

17  had -- we just got through protesting.  Yes.  I am a

18  commissioner that protests still.

19      A young man just served two years in Bessemer jail, city

16:45:13 20  jail, for a crime that he was on camera where he was at work.

21  He had 100-something people saying he was at work.  His time

22  clock said he was at work.

23      But he sat in the jail two years -- two years -- and a man

24  they just let out serve 59 years in jail for $5.

16:45:36 25      So criminal justice is very important, and it's needed

```
 1  here.
 2  Q    Commissioner Tyson, I wanted to ask you was your district
 3  a majority African-American district before you won?
 4  A    Yes.
 5  Q    And when were you elected?
 6  A    Last year.  November the 14th, I will have been serving in
 7  the county commission seat a year.
 8  Q    Okay.  And did you run affiliated with a political party?
 9  A    Yes.
10  Q    Which party?
11  A    I'm a Democrat.
12  Q    And have you held any elected office other than Jefferson
13  County Commissioner?
14  A    Yes.  I was a city council person.
15  Q    And I take it city council here in Birmingham?
16  A    In Birmingham.
17  Q    And how long were you city councilwoman?
18  A    I was appointed in 2013.  I think I -- they left that seat
19  open for nine months before they appointed anyone because they
20  didn't want to appoint me.  And I served, I think nine months.
21  And then I turned around, and I ran and won that seat.  And I
22  was in five years.
23  Q    And what part of Birmingham did you represent as a city
24  councilwoman?
25  A    District 6.  And it's a portion of the area that I have
```

16:45:51 (line 5)
16:46:05 (line 10)
16:46:18 (line 15)
16:46:34 (line 20)
16:46:48 (line 25)

```
 1  now.  I still -- I have all of my city council district and my
 2  county commission district.
 3  Q    And was the city council position a non-partisan position?
 4  A    Yes, it is.
16:47:02  5  Q    And have you ever held any other elected offices?
 6  A    Yes.  I was the neighborhood president.  You have to vote
 7  for that, and that's over the West End community.  Then I was
 8  a -- the Citizen Advisory Board president.  That's over all 99
 9  neighborhoods in Birmingham.  So that's really over the whole
16:47:26 10  city.  I was the neighborhood president.
11  Q    Uh-huh.  And in these various elected positions, have you
12  met regularly with your constituents or with your potential
13  constituents when you were campaigning for office?
14  A    Yes.  We had monthly meetings when I was at the Citizen
16:47:48 15  Advisory Board.  We met every month.
16  Q    Uh-huh.
17  A    And as my city council, I met every quarter.  And as a
18  county commissioner, we have been meeting every quarter.
19  Q    Okay.  And can you describe what the Citizen Advisory
16:48:09 20  Board is?
21  A    Yes.
22  Q    Sorry.  You were president of the Citizen Advisory Board?
23  A    Yes.
24  Q    Can you describe what that is?
16:48:17 25  A    The City of Birmingham has 99 neighborhoods and 23
```

1    communities.  And then we have an advisory board which is a hub

2    that convenes over all 99 neighborhoods.  And I was the

3    president of that board.

4         And what we do, we talk to the citizens and find out the

16:48:39 5    issues.  And we are the liaison between the mayor and the

6    citizens.

7    Q    Uh-huh.  And can you please describe your work in other

8    community organizations that you are involved with?

9    A    I'm a member of the NAACP.  I'm a member of the -- I'm the

16:49:03 10   chair of the Veterans of America.  I'm a lifetime member of

11   Disabled Veterans.  I'm an SELC member.  I am the convenor for

12   the Alabama coalition on blacks city participation.  I'm a

13   convenor for the Black Women's Round Table.  I'm also the

14   second chair for Ignite Alabama, which is a women's group.  And

16:49:30 15   I'm also the chair of the board for Black Youth Vote.  And I

16   also sit on the board for the Community Advisory Committee,

17   which is the one that -- we have the largest Martin Luther King

18   breakfast in the United States.

19   Q    Can you describe for the Court, Commissioner Tyson, when

16:49:57 20   you sleep?  Sorry.  I was just --

21        But so can you tell me a little bit about the work of the

22   Women's -- I may not get the title right -- women's coalition I

23   think you had mentioned?  This is an organization that you take

24   to Washington, D.C. on an annual basis or women's round table,

16:50:19 25   I believe?

```
 1   A     Yes.  I'm the convenor for the state.

 2         And what we do, we go into low income areas --

 3         THE COURT:  First of all, could you give me what the

 4   correct name of the organization is?

 5         THE WITNESS:  It's the -- it's the Alabama Coalition

 6   on Black Civic Participation.  Up under that umbrella, we have

 7   Black Youth Vote and Black Women's Round Table.

 8         And we go into low income communities, and we educate,

 9   motivate, and mobilize the communities around voting, and

10   voting and laws that will improve the quality of life of each

11   and every citizen.

12         And that's a non-partisan organization.

13   BY MR. SPIVA:

14   Q     As part of that organization, Commissioner Tyson, have you

15   done work all around the state of Alabama?

16   A     All around the state of Alabama.

17   Q     Have you done work in Montgomery County?

18   A     Montgomery.

19   Q     How about Mobile?

20   A     Mobile.

21   Q     Can you describe the type of work you do with that

22   organization?

23   A     We go in, and it's the -- it's depending on what issue

24   they're having.

25         Majority of the -- the reason we're in the neighborhoods
```

16:50:34 (line 5)
16:50:58 (line 10)
16:51:13 (line 15)
16:51:21 (line 20)
16:51:32 (line 25)

1    and in the city is to advocate for voting, and encouraging and

2    registering people to vote.

3         And when we get there, we also mobilize them on other

4    issues -- environment.  Some of them environmental issues,

16:51:54 5    some -- I'd say racial discrimination issues, criminal justice.

6    You name it.  We have had to do so many things concerning the

7    citizens.  It's no different than NAACP, but we just -- we are

8    on the ground more than that average -- of that group too.

9         I'm also a member of national action network.  I forgot to

16:52:27 10   tell you that.

11   Q    Okay.  And so, Commissioner Tyson, you said we're on the

12   ground more.  So have you been on the ground doing that type of

13   work in Mobile County?

14   A    Yes.

16:52:36 15   Q    And in Mobile city?

16   A    Yes.

17   Q    Okay.  And have you gone block by block and knocked on

18   doors and sat in people's homes?

19   A    Block by block, knocking on doors, all over Mobile.

16:52:53 20   Q    In Montgomery?

21   A    Montgomery, yes.  Huntsville.  Selma.

22   Q    Uh-huh.

23   A    Camden, Alabama, Perry County.

24   Q    Uh-huh.  What observations have you made about -- is this

16:53:09 25   predominantly in the African-American communities in those?

1   A    In the African-American community, we -- we really -- when

2   we go in, we go in and we pull up really the poverty rate in

3   these counties.  And we look at the voting numbers.

4   Q    Uh-huh.

16:53:27   5   A    And that's how we can tell the need of where we need to

6   actually go.  And, yes, majority of them are African-American

7   counties.

8   Q    Uh-huh.  What kinds of concerns have you heard in doing

9   that work -- strike that.

16:53:48  10        What have you observed, in terms of the concerns of the

11   people in those neighborhoods that you've met with in Mobile

12   County?

13   A    They are concerned about health care.  They are concerned

14   about housing, criminal justice, environmental concerns, and

16:54:10  15   the poverty level, and the condition that they are living in.

16   Q    Would you say, based on your experience, that they -- that

17   the African-American and poor neighborhoods that you have

18   worked in Mobile share many of the same concerns that you have

19   talked about earlier that the African-American community has in

16:54:35  20   Birmingham and in Montgomery?

21   A    Yes.

22   Q    And do you do voter registration and get out the vote

23   efforts in connection with that work?

24   A    Yes.

16:54:45  25   Q    Can you tell me about that?

```
 1  A    We go in and it's the -- okay.  Just say that when we
 2  go -- we went to Pritchard.  You have to find a person to
 3  partner with in there.
 4       So we -- number one, we go to the largest churches, and
 5  actually we connect with them.  And it's always some type of
 6  group -- NAACP, different groups that's out there advocating
 7  for voting.  We partner with those groups.  And we educate them
 8  on the process of voting and on the laws and the laws that has
 9  been changed.
10       And we go out, and we go into the areas where it's low
11  voting at.  And we go door to door.  We go into the gymnasiums.
12  We go churches, schools, clubs, corner stores, wherever is
13  bodies, wherever is people.  And we talk about voting and
14  educate them.  And we try to get them to register to vote.  And
15  we try to mobilize them and also just build up infrastructure
16  and where they can actually start their own organization and
17  become a part of our group.
18  Q    What kinds of challenges have you experienced or have the
19  people that you have been trying to mobilize experienced in
20  trying to register and actually vote?
21  A    You know, they don't trust the system.  They have been
22  purged from the voting list.  A lot of them have been purged
23  from the voting list.
24       They said that every time they go vote, they have to go to
25  another box.  They said they no longer vote at that site again.
```

16:55:02 (line 5)
16:55:23 (line 10)
16:55:50 (line 15)
16:56:07 (line 20)
16:56:23 (line 25)

1    So they have to go to another site.  And the polling places are

2    too far from their residence.

3        And they're not -- I say, well, what about the provisional

4    ballot?  They don't know what a provisional ballot is because

16:56:44 5    no one has ever offered them a provisional ballot.

6        And they also talked about that their ID have to have

7    their address on it.  But if you are transit -- and really the

8    working poor and you don't have a sufficient income to pay

9    because of minimum wage being so low, it's hard to keep

16:57:07 10   somewhere to stay at.  So that mean every time you move, you

11   got to get your -- another ID.  And if it's not an ID, it's a

12   driver's license.  And that costs.

13   Q    Uh-huh.

14   A    Every time that you move in order to match up with your

16:57:22 15   voting, that's on your voting record.  And it's just -- they

16   said the process is too hard.  And it's set up and it don't

17   make no -- well, our vote is not going to matter, and, you

18   know, and sometime, you know, they push back on us.

19   Q    Have you found that there's a certain level of distrust in

16:57:44 20   the system among the communities that you work -- you've done

21   work in?

22   A    A lot of distrust.  Especially when they was purged off

23   the list.

24   Q    I want to ask you more about that, the purging.  Have you

16:57:55 25   actually kind of personally encountered that either in your

```
 1  campaigns, or work here in Birmingham, or elsewhere?
 2  A    Yes.
 3  Q    This issue of people having been purged off the list?
 4  A    Yes.  Yes.  And we have talked to the Secretary of State
 5  about it.  Actually, trying to get the list with New South and
 6  trying to actually get the list from the secretary of the
 7  people that they took off of the list.  And they wouldn't give
 8  it to us.  They said that we have to go to court.  And we don't
 9  have the money to go to court to sue to get the list.
10  Q    And what -- you mentioned a New South.  I don't know if
11  you've described that already.
12  A    No.  I left it out.  I forgot to tell you.
13       We just had a meeting Saturday.  It's New South Coalition.
14  It's another advocate group that advocate for voting and to
15  change laws.
16  Q    Uh-huh.  And you attended a meeting with the Secretary of
17  State at one point and asked them about the purged voter list?
18  A    Yes.  It was at the -- Representative Rolanda Hollis had
19  the meeting at the YWCA over in Roebuck.  And we asked him
20  about the list.  And he said that they were on the list --
21  purged off the list because they hadn't voted in the last
22  couple of elections.
23       So I asked him, How did you decide who would get purged
24  off the list?  Because it looked like all the African-American
25  people were the ones that I have been talking to were the ones
```

16:58:08
16:58:34
16:58:54
16:59:12
16:59:32

```
 1   that was purged off the list.  And I said, How many was purged
 2   off the list?  And he said that he didn't have the number in
 3   front of him.
 4        I said, So how can I get it?  I wrote his office.  They
16:59:45 5  did not give us the list.  I -- I talked to him several times,
 6   and he would not give me the list.  And they said I would have
 7   to go to court.
 8        And when I actually finally talked to someone up there,
 9   they told me they said, Well, I'll lose my job if I give it to
17:00:05 10 you.  But I can tell you it's over 700,000 people that's been
11   purged off the list over the last couple of years.
12   Q    How do you know that?
13   A    Because one of the employees told us that.  And they
14   didn't want -- I don't know the person, anyway, because I don't
17:00:22 15 live down there.
16   Q    Was it an employee of the Secretary of State?
17   A    Yes.  In the voting office.
18   Q    Let me ask you:  Have you either as a candidate or in your
19   capacity as a county commissioner had election day reports from
17:00:39 20 people who say, Hey, I can't vote because I'm not on the list?
21   A    We have -- we have a command center set up during each
22   election where they send attorneys, and they give us the number
23   of the attorneys from the Poverty Law Center to call about
24   election complaints.
17:01:00 25      And you hear all day long that, I'm not on the list.  They
```

         1   changed me from Democrat to Republican.  They keep changing my
         2   polling places.  This is the third place I have went to and
         3   it -- this is every election.
         4   Q      Uh-huh.
17:01:20 5   A      Every -- every election.
         6   Q      You mentioned the Poverty Law Center.  Is that the
         7   Southern Poverty Law Center?
         8   A      The Southern Poverty Law Center.  They give us attorneys,
         9   a list of attorneys.  And also the national coalition on blacks
17:01:33 10  and participation.  They give us a list of attorneys that's in
        11   our state.
        12   Q      Uh-huh.
        13   A      That we can call with the problems.
        14   Q      Uh-huh.
17:01:40 15  A      That we have in the -- and it's all we can do.  And they
        16   file -- they can file something, but you won't hear nothing
        17   until after the election.
        18   Q      Uh-huh.
        19   A      And every answer that we have ever received is that they
17:01:54 20  were purged off the list because they didn't vote on the last
        21   election, or they notified them, they moved their polling
        22   spots, and they were notified.  But for some reason, the person
        23   never get the notification.  And, well, that polling site was
        24   closed.  Well, did y'all send out anything?  No.  They put a
17:02:19 25  note on the door.

1          So if the people go over there, they would know that their

2     polling site was changed to this place.  But everyone said when

3     they went over there wasn't no note on the door.

4     Q     Uh-huh.

17:02:32  5     A     So they just come up with all types of reasons.  But we

6     still are left with this person not having a fair opportunity

7     to vote, not even had an opportunity to do a provisional ballot

8     because they don't even give them a provisional ballot.

9     Q     And you have done -- personally done work to try to

17:02:51 10     educate people about their right to vote with the provisional

11    ballot?

12    A     Yes.

13    Q     That's a violation of federal law to deny somebody a

14    provisional ballot?

17:03:02 15    A     They don't tell them that they can do one.

16    Q     Okay.  And so, Commissioner Tyson, the majority of these

17    reports that you hear in your work as a commissioner or in the

18    voter -- get out the vote work, do they predominantly come from

19    one race or the other?

17:03:21 20    A     The majority of the people that I deal with is

21    African-Americans and Latino because of the area that I cover.

22    And those are the ones that's being disenfranchised.

23    Q     Have you heard any reports from either any of your

24    colleagues or any -- from anyone else about predominantly white

17:03:47 25    areas having the same kinds of issues?

```
 1   A     No.
 2   Q     Let me ask you about the polling place.  You mentioned
 3   polling place, I think, movement and closing.  Is that what you
 4   were talking about earlier?
 5   A     Yes.
 6   Q     Did you actually have a personal experience where your
 7   polling place was moved without notification?
 8   A     Yes.  They actually moved my polling place, and I wasn't
 9   notified.  And I checked my mail every day.  And I know when
10   I -- when I -- when I'm ever given a polling slip, I put mine
11   on the refrigerator.
12   Q     Uh-huh.
13   A     And I was not notified that they moved my polling place
14   from Harrison Park to Hemphill Elementary School.
15   Q     Let me ask you:  You also -- well, let me ask you one more
16   question about that.
17         And have you -- and have you received or been -- or seen
18   yourself others who have been affected by the same thing in
19   terms of polling place changes without notification?
20   A     Yes.  Yes.
21   Q     And then you mentioned voter ID and the challenges of
22   people when their address changes.
23         Do people in your -- the communities that you represent
24   and that you work in, do they -- do many of them frequently
25   have to move?
```

 1   A    Yes, they do.

 2   Q    And why is that?

 3   A    Because of the working poor.  They are not able to meet

 4   their rent.  And they have to end up moving to try to find a

17:05:23  5   cheaper place, you know.

 6        I just had one Carla McGee -- I asked her could I use her

 7   name.  She had to move from Avondale, which is on the south

 8   side.  They raised her rent to $750.  Now she stay in West End

 9   with her daughter until she can find somewhere to stay on her

17:05:48 10   own that's more affordable.

11   Q    How often do you receive calls like that of people who are

12   suffering from housing instability?

13   A    Every day.  Like I told you, I'm a county commissioner,

14   but I just, you know, was elected.  And this work I have been

17:06:06 15   doing since I was ten.

16        My mother did it.  She ran the commodities for the

17   community.

18        And we have a -- a list of agencies that we can help

19   people get their utilities paid and find them somewhere to

17:06:24 20   stay.  And so most people do call me for different things like

21   that.  So I get calls like that every day.

22   Q    And how have you found -- just going back to the voter ID

23   issue.  How does this housing issue relate to the challenges

24   people have to vote?

17:06:41 25   A    If you stay -- like Carla stayed in Avondale.  Her ID,

```
 1    which is her driver's license -- license going to have Avondale
 2    address on it.  So if she change her address on her voting
 3    roster to West End, that means she got to turn around and
 4    change it on her driver's license in order to vote in March.
 5    So if she find a house or somewhere else to live after March,
 6    she going to have to turn around, change her voting box in
 7    order to vote in November, and turn around again and change her
 8    ID.  That means she going to have to go back and pay another
 9    40-something dollars and get another ID in order for her to
10    vote in November.  So that's right there is like almost a
11    hundred dollars in order to do that.
12    Q    Do some of your constituents work two and three jobs in
13    order to try to make ends meet?
14    A    The majority of the people I know work two to three jobs.
15    And I -- I do too.  So I -- I'm -- I fall right in that
16    category.
17    Q    You worked more than two or three jobs, Commissioner.  I
18    think we established that.
19    A    Yes.  So I understand it and I get it.  That's why in the
20    area I live in, I don't know -- I don't know anyone I know
21    don't work two and three jobs, really, just thinking about it.
22    Just thinking about it.  I -- let me see.  I really don't
23    unless they are older.
24    Q    Right.  Well, let me ask you:  So do the people that you
25    know that work two, three jobs, do they have a lot of time to
```

17:07:10 (line 5)
17:07:34 (line 10)
17:07:53 (line 15)
17:08:13 (line 20)
17:08:31 (line 25)

1  go and change their address every time they move?

2  A    No.  They don't have a lot of times.  We actually do a

3  campaign on different social media outlets.  If you need an

4  address change, we try to give them the form they can fill out

17:08:54 5  online in order to change their address.

6       But with the ID, you can get a free ID, but you can't get

7  a free ID if you already have one.

8  Q    Uh-huh.

9  A    And with the homeless community, you can get free IDs, but

17:09:09 10  you have to actually be homeless and have no income coming in,

11  in order to qualify for that ID.  So we have two, three places

12  that do that.

13            THE COURT:  Mr. Spiva, might this be an okay time to

14  break?  I don't think we'll be able to get through cross

17:09:29 15  tonight, so I think Ms. Tyson will need to come back tomorrow.

16  Can you do that?

17            THE WITNESS:  I will if I have to.

18            THE COURT:  I mean, it's after 5:00, and I just -- I

19  don't see this winding up in time for us to finish cross.

17:09:48 20            MR. SPIVA:  That's probably right, Your Honor.  And

21  sorry.  I think I might have mistimed.

22            THE COURT:  That's all right.  As my mother always

23  said, things always take longer than they do.

24       All right.  So we will be adjourned until in the morning

17:10:04 25  at 9:00 o'clock.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1          MR. SPIVA:  Yes, Your Honor.  If the Commissioner's

2     schedule doesn't permit her to start at 9:00, can we start with

3     another witness and then come back to her?

4          THE COURT:  Certainly.  Certainly.

17:10:17  5          MR. SPIVA:  I haven't actually talked to her about it

6     yet, but I'll find out.

7          THE COURT:  We can be very flexible, if we need to.

8          (Whereupon, the above proceedings were concluded at

9          5:10 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>CERTIFICATE</u>

2

3

4      I certify that the foregoing is a correct

5 transcript from the record of proceedings in the

6 above-entitled matter.

7

8

9

10

11                                                   <u>11-15-19</u>

12 Christina K. Decker, RMR, CRR                Date

13 Federal Official Court Reporter

14 ACCR#:   255

15

16

17

18

19

20

21

22

23

24

25