FILED
2021 Dec-15  PM 08:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 5

FILED

2019 Nov-18 AM 11:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

```
1            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ALABAMA
2                   SOUTHERN DIVISION

3
     LAKEISHA CHESTNUT,  an individual;  *
4    MARLENE MARTIN, an individual;      *  2:18-cv-00907-KOB
     BOBBY DUBOSE, an individual;        *  November 6, 2019
5    RODNEY LOVE, an individual; KAREN   *  Birmingham, Alabama
     JONES, an individual; JANICE        *  9:00 a.m.
6    WILLIAMS, an individual; RODERICK   *
     CLARK, an individual; JOHN HARRIS,  *
7    an individual,                      *
             Plaintiffs,                 *
8                                        *
     vs.                                 *
9                                        *
     JOHN H. MERRILL, in his official    *
10   capacity as Alabama Secretary of    *
     State,                              *
11           Defendant.                  *
     ***********************************

12

13            TRANSCRIPT OF BENCH TRIAL
                    VOLUME III
14      BEFORE THE HONORABLE KARON O. BOWDRE
          CHIEF UNITED STATES DISTRICT JUDGE

15

16   FOR THE PLAINTIFFS:
     Abha Khanna, Esq.
17   PERKINS COIE LLP
     1201 Third Avenue
18   Suite 4900
     Seattle, Washington 98101
19   (206) 359-9000

20   Bruce V. Spiva, Esq.
     PERKINS COIE LLP
21   700 13th Street, NW
     Suite 600
22   Washington, DC 20005
     (202) 654-6338

23

24

25
```

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1     Richard P. Rouco, Esq.
      QUINN CONNOR WEAVER DAVIES & ROUCO LLP
2     2 20th Street North
      Suite 930
3     Birmingham, Alabama 35203
      (205) 870-9989

4

      Daniel C. Osher, Esq.
5     PERKINS COIE LLP
      700 13th Street NW
6     Suite 600
      Washington, DC 20005
7     (202) 654-6338

8     Lalitha D. Madduri, Esq.
      PERKINS COIE LLP
9     700 13th Street NW
      Suite 600
10    Washington, DC 20005
      (202) 654-6322

11

12    <u>FOR THE DEFENDANT</u>:
      James W. Davis, Esq.
13    Laura E. Howell, Esq.
      OFFICE OF THE ATTORNEY GENERAL
14    501 Washington Avenue
      P.O. Box 300152
15    Montgomery, Alabama 36130-0152
      (334) 242-7300
16

      J. Dorman Walker, Esq.
17    BALCH & BINGHAM LLP
      P.O. Box 78
18    Montgomery, Alabama 36101
      (334) 834-6500

19

20    <u>COURTROOM DEPUTY</u>:  Sarah Hollingsworth

21

      <u>COURT REPORTER</u>:  Christina K. Decker, RMR, CRR
22

23    Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
      pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
      and Procedures Vol. VI, Chapter III, D.2.  Transcript
24    produced by computerized stenotype.

25

1                           **I N D E X**

2       DIRECT EXAMINATION OF COMMISSIONER TYSON          497
        CONTINUED
3       BY MR. SPIVA
        CROSS-EXAMINATION                                511
4       BY MS. HOWELL
        REDIRECT EXAMINATION                             524
5       BY MS. HOWELL
        RECROSS-EXAMINATION                              526
6       BY MS. HOWELL

7
        HENRY SANDERS                                    527
8       DIRECT EXAMINATION                               527
        BY MS. MADDURI
9       CROSS-EXAMINATION                                570
        BY MR. WALKER
10      REDIRECT EXAMINATION                             601
        BY MS. MADDURI
11      RECROSS-EXAMINATION                              603
        BY MR. WALKER
12

13      GERALD DIAL                                      605
        DIRECT EXAMINATION                               606
14      BY MR. WALKER
        CROSS-EXAMINATION                                644
15      BY MS. MADDURI
        REDIRECT EXAMINATION                             657
16      BY MR. WALKER

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**P R O C E E D I N G S**

1
2          (In open court.)

3              THE COURTROOM DEPUTY CLERK:  I would like to remind

4     you that you are still under the same oath you took yesterday.

09:10:23  5              THE WITNESS:  Okay.

6              MR. SPIVA:  Is it all right to proceed, Your Honor?

7              THE COURT:  Yes, it is.

8          DIRECT EXAMINATION OF COMMISSIONER TYSON CONTINUED

9     BY MR. SPIVA:

09:10:36 10    Q    Good morning, Commissioner Tyson.

11    A    Good morning.

12    Q    I just have a few more questions for you this morning.  I

13    know yesterday you kind of described a number of organizations

14    that you're involved with.  And is there one -- let me ask

09:10:54 15    you -- I think it was the Black Women's Round Table is one of

16    those?

17    A    Yes.  Yes, sir.

18    Q    With that organization, do you ever go to Washington, D.C.

19    to try to visit with Congress people?

09:11:04 20    A    Yes.  We've been going -- this -- 2020 will be our -- I

21    think our ninth year.  We leave March the 4th through the 8th.

22    Q    Uh-huh.

23    A    Next year.

24    Q    And who do you meet with when you go there?

09:11:19 25    A    This organization is nationwide, so it's several states

```
 1  there.  And you actually meet with your Congress and senators.
 2       So we call -- like right now we are sending e-mails for
 3  March the 4th.  And that's the day on the Hill.  We pick
 4  between March the 4th and March the 8th.  We pick one or two of
 5  those days to go out -- to go up on the Hill and talk to your
 6  Congress and our senators.  And so we notify them, you know,
 7  way ahead enough time where they can give us an answer, and we
 8  meet with them.  So out of all the states, Alabama gets the
 9  less meetings.
10  Q    Okay.  So let me ask you:  Who from Alabama goes, in terms
11  of -- what types of people -- younger people, older people, a
12  mix?
13  A    We take high school students, majority of mine are 12th
14  grade, college students, regular citizens from all over the
15  state of Alabama.
16  Q    And about how many people go up?
17  A    From --
18  Q    Just approximately.
19  A    40.
20  Q    Uh-huh.
21  A    We trying to get more next year because it's -- the
22  finances is the reason we take -- we have a limited amount.
23  Q    Sure.  And is it a nonpartisan group?
24  A    It's a nonpartisan group.
25  Q    And in -- how many years did you say you've been doing
```

1   this?

2   A    Next year I think will be the ninth year.

3   Q    When you go there -- when you've gone there in the past,

4   have you attempted to schedule meetings with all of the Alabama

09:13:07 5   congressional delegation and each of Alabama senators?

6   A    Yes, we have.

7   Q    And have you been able to meet with the -- each of the

8   congressional members and each of the senators?

9   A    No.

09:13:22 10   Q    Who have you been able to meet with?

11   A    Congresswoman Sewell and Doug Jones, Senator Doug Jones.

12   Q    And why haven't you met with the other members of the

13   congressional delegation?

14   A    Because they refuse to meet with us.  They don't have

09:13:39 15   time.

16        Senator Shelby, his assistant let us come in the office

17   and meet with us and then gave us a bag of peanuts, but they

18   never give us an answer to the questions.  We have folders to

19   present to them with the outline of questions ahead of time.

09:13:58 20   And then we have a packet when we get there with the same

21   questions to go over with them that we gave them ahead of time.

22   They never really have no answers for us when we get there.

23        And one of the senators -- I think it's the one out of

24   Mobile because you never really -- we never see their face, you

09:14:19 25   know.  So I really couldn't -- I think it was Bradley Byrne.

1    It might have been him -- the one out of Mobile.  They wouldn't

2    even let us in the office.  They made us stand in the hallway

3    and embarrassed us in front of all those states and wouldn't

4    allow us to come in his office.  When we went to the door and

09:14:41 5    we said that we sent an e-mail prior to coming to -- prior to

6    coming to actually meet with the senator and we wanted to

7    know --

8    Q    This is Congressman Byrne?

9    A    Yes.

09:14:55 10   Q    Uh-huh.

11   A    And the senators in the state of Alabama -- I cannot

12   remember which one of them, but I'm almost positive it's the

13   one out of Mobile.

14   Q    Okay.  And you have been saying senators.  Do you mean the

09:15:12 15   House of Representatives delegates, congressional delegates?

16   A    Yes.  Congresswoman Sewell and Doug Jones, the ones that's

17   with Doug Jones, Shelby -- Shelby was -- out of all of those --

18   out of the senators, Doug Jones was the only one that

19   personally met with us.

09:15:25 20   Q    Uh-huh.  Okay.

21   A    Shelby let us come in his office and meet with his

22   assistant.

23   Q    Uh-huh.

24   A    None of the rest of them ever --

09:15:32 25   Q    Uh-huh.

```
 1   A    -- replied or -- they -- when we called they talked to us
 2   on the phone.
 3   Q    Uh-huh.
 4   A    But they never gave us an opening time within the -- that
 5   period that we was going to be down there that we could come
 6   and see them.
 7   Q    Uh-huh.
 8   A    So when we was up there, we just dropped by their office
 9   anyway.
10   Q    Uh-huh.
11   A    And they wouldn't let us in.  They made us stand in the
12   hallway.
13   Q    That was Congressman's Byrne's office?
14   A    I'm almost for sure it was.  I can't be absolutely
15   positive.
16   Q    Uh-huh.
17   A    But I know who met with us and I know who didn't.
18   Q    Okay.
19   A    And that was Shelby and -- we met with his assistant.
20   Q    Okay.
21   A    And Doug Jones has always met with us --
22   Q    Okay.
23   A    -- since he's been there.  And Congresswoman Sewell has
24   been the only one on the Congress side that has -- has met with
25   us.  None of them -- they do the same thing.  They won't even
```

The timestamps in the left margin: 09:15:43 (line 5), 09:15:51 (line 10), 09:16:01 (line 15), 09:16:09 (line 20), 09:16:21 (line 25)

1    let us in they office.

2    Q    Okay.  And so let me ask you:  So it sounds like

3    Congresswoman Sewell and Senator Jones meet with you in person

4    themselves personally?

09:16:36 5    A    Yes.

6    Q    Okay.  And has Congresswoman Sewell done that each time

7    you've gone up to Washington, D.C.?

8    A    Each time we come up there, she's even given us a luncheon

9    and -- to actually go over some of the bills that they're

09:16:50 10    trying to pass.

11    Q    Uh-huh.

12    A    And then she also participates in our press conference

13    that we have --

14    Q    Uh-huh.

09:16:58 15    A    -- on the Hill that's actually covering black women's

16    issues.

17    Q    Uh-huh.

18    A    So it's just not Alabama up there.

19    Q    Uh-huh.

09:17:05 20    A    It's several states up.

21    Q    Uh-huh.

22    A    But after we go to our debriefing, Alabama is the only one

23    that's not able to meet with their Congress people and the

24    senators.

09:17:15 25    Q    Okay.  And then you mentioned Senator Jones also met with

1  you personally.  Has he met with you personally each time

2  you've gone up there since he has been a senator?

3  A    Yes, he has.

4  Q    Okay.  And you mentioned also that -- I think you said you

09:17:29 5  thought it was Congressman Byrne who had had you meet out in

6  the hall.  Did he meet with you personally out in the hall

7  or --

8  A    No.  His assistants.  They wouldn't let us in the door,

9  like in the office way.

09:17:42 10  Q    Uh-huh.

11  A    They told us to step out in the hallway.

12  Q    Okay.  Have you ever through this organization gotten a

13  personal meeting with any of the Congress people when you've

14  gone to Washington other than Congresswoman Sewell or Senator

09:18:01 15  Jones?

16  A    No, I have not.  I've never had a meeting with none -- and

17  I go with several organizations.  And the same two -- that's

18  the same two we always meet with.

19  Q    And you've requested a meeting, though, with each of the

09:18:16 20  Congress people from Alabama each time you've gone?

21  A    Yes.

22  Q    Okay.  Let me ask you:  Have you -- and you mentioned

23  something about a packet that you leave with them.  Is that

24  something that where you're asking for answers to questions

09:18:33 25  after the meeting or after your visit to Washington?

1  A     We send them the questions before.

2  Q     Uh-huh.

3  A     And then we take a packet with us and leave it with them.

4  Q     Okay.

09:18:42  5  A     In case they say they didn't get it.

6  Q     And has Congresswoman Sewell or Senator Jones responded to

7  those questions after you left Washington?

8  A     When we get there, they already have the answers, and they

9  go over the packet with us.

09:18:56  10  Q     Okay.  And do you send you something later in writing, as

11  well?

12  A     They send us something later in writing.  And now they are

13  getting ready to start doing televised meeting with us.

14  Q     Uh-huh.

09:19:08  15  A     Out of my office.

16  Q     Okay.  And have any of the other Congress people that

17  you've requested meetings with, other than Congresswoman Sewell

18  and Senator Jones, ever provided you responses either in person

19  or in writing later to the questions that you posed?

09:19:29  20  A     No.

21  Q     And you've sent -- have you provided the same package to

22  each of the other Congress people as you provide to

23  Congresswoman Sewell and Senator Jones?

24  A     Yes.  We look at their committees that they sit on.  And

09:19:45  25  that's how we target our questions to each one of the

1  representatives.  We have never gotten an answer from anyone

2  but Congresswoman Sewell and Senator Doug Jones.

3  Q    Have you gone to Washington with any other of the

4  organizations that you're involved with?

09:20:04  5  A    Yes, I have.  I went -- I've went to Washington, D.C. with

6  the national action network.  I've went to Washington, D.C.

7  with neighborhood housing services.  I've went there with them

8  also.  I've went with the NAACP, and the same thing.

9  Q    And the ones that you just listed, all of those are

09:20:33 10  nonpartisan organizations?

11  A    All of them are nonpartisan organizations.

12  Q    And have you been able to secure meetings with any of the

13  congressional delegation or senators other than Senator Jones

14  or Congresswoman Sewell in connection with your visits with any

09:20:52 15  of those other organizations?

16  A    No.  We have not.  But the NAACP was a pastor alliance

17  group that actually went up there, and they wouldn't even

18  hardly they went let us in the building really.

19  Q    Uh-huh.

09:21:12 20  A    We was out in the hallway.  And they had security out

21  there.

22  Q    Did Congresswoman Sewell or Senator Jones meet with that

23  group?

24  A    Yes, they did.

09:21:22 25  Q    Okay.  And have they consistently taken meetings with the

|       |                                                                       |
|-------|-----------------------------------------------------------------------|
| 1     | various groups that -- they being Congresswoman Sewell or             |
| 2     | Senator Jones -- have they consistently taken meetings with the       |
| 3     | groups that you have gone to Washington with?                         |
| 4     | A     Yes.                                                            |

09:21:37  5   Q     And have those groups also consistently requested meetings

6     from the other members of Alabama's congressional delegation?

7     A     Yes.

8     Q     And I think you've already said that you have not received

9     those meetings?

09:21:50 10   A     Have not received a meeting.

11    Q     Let me ask you, Commissioner Tyson, have you -- have you

12    ever seen or -- any racial appeals in campaigns in Alabama?

13    A     Yes.

14    Q     What have you seen?

09:22:12 15   A     I know when the -- it was a judge race with -- I think it

16    was Parker and Vance.  I think that's who it was because I go

17    to a breakfast on Sundays with the -- with Vance.  I think

18    that's his name.

19    Q     Uh-huh.

09:22:38 20   A     They had -- had a commercial.  And also when Doug Jones

21    was running, I seen some commercials and several other

22    candidates that was running.

23    Q     What about when President Obama was either in office or

24    running for office, did you see any racial appeals in

09:23:11 25   connection with President Obama?

```
 1  A    Yes.  There were a lot of those with the joker face
 2  stretched out like with the joker face and with the turban hat
 3  on.
 4  Q    This is images of President Obama like that?
 5  A    With the hat on.  His wife looked like a monkey.  They had
 6  her like a monkey and had President Obama like he was in Iraq.
 7  Q    Uh-huh.
 8  A    Like that.
 9  Q    What impact did that have on you personally when you saw
10  those kinds of appeals?
11  A    Racist.  Racist.  And I -- I never really -- I've been
12  dealing with stuff like this all my life.  So why would you --
13  if you were running a judge race, or you running for senator,
14  why are you talking about the President?
15  Q    Uh-huh.  Uh-huh.
16  A    So -- and I just -- that bothered me.
17  Q    Uh-huh.
18  A    A lot.  And when you dealing with young people -- because
19  even my daughter, she was -- she was -- she was in a private
20  school.  So she went to school with a lot of majority of white
21  kids.  And she -- it bothered her --
22  Q    Uh-huh.
23  A    -- you know, when she seen it.  And she said, Now, why
24  would they do that?
25  Q    Uh-huh.
```

```
 1    A    You know.  And I really couldn't -- I told her I said,
 2    Well, you know, it's racism, but, you know, she really
 3    basically didn't understand it.
 4    Q    Uh-huh.
 5    A    And I know exactly what it was.
 6    Q    Uh-huh.
 7    A    And it was to make sure that every person that disliked
 8    people because of their color would come out and vote against
 9    any Democrat that would be in office -- that would even run for
10    office.
11    Q    Did you see some kind of an ad on social media that had
12    Doug Jones as an overseer of a slave camp?
13    A    Yes.  I seen that also.
14    Q    Okay.  And what kind of impact did that -- did that have a
15    similar impact on you?
16    A    Pure racism.  Racism.  Had him with aborting a baby.  Had
17    Doug Jones aborting a baby.
18         It -- just -- I have never in my life -- and you will
19    think since it's the 21st century this wouldn't happen.  But
20    this state that I live in, that I was raised in, and I served
21    the country for this state and for this country is so racist to
22    it really -- to it -- it makes you look outside-eyed at
23    everybody.  So you don't know who to trust because it's so
24    blatant and bold, and they're not trying to hide it.
25    Q    Uh-huh.
```

1  A     It's just everywhere.

2  Q     Uh-huh.

3  A     And it's no one is being punished and nothing is being

4  done about it.

09:26:27  5  Q     Uh-huh.

6  A     It's -- it's like it's a secret people trying to keep

7  hidden, but it's so far out in the public to where you can't

8  hide it.

9      And I -- I know people right now when I was running they

09:26:46 10  didn't -- they said that I was too dark to be a county

11  commissioner, that I would vote for a black girl, but she needs

12  to be light skinned.

13      THE COURT:  Who said things like that to you, that you

14  had to be light skinned?

09:27:08 15      THE WITNESS:  Candidates and people who I asked to

16  vote for me.

17      I went to Princeton Towers, and there was some white

18  senior citizens there, and I was trying to get them to vote for

19  me.  She said, Well, I guess I can vote for you, even though

09:27:21 20  you a nigger.  And I just -- I told her, Well, thank you, and

21  just walked off.

22      THE COURT:  My question was:  Who said that you had to

23  be light skinned?

24      THE WITNESS:  Candidates.

09:27:37 25      THE COURT:  Okay.  Were those white or black

1  candidates?

2      THE WITNESS:  They were white.  They felt like I

3  needed to be a lighter complected.

4      I was trying to raise funding for my election.  They said,

09:27:51 5  Well, we really can't really support you because we don't feel

6  like you stand a chance.  Maybe if you was lighter skinned and

7  an African-American you would stand a chance to run for this

8  seat and win.

9  BY MR. SPIVA:

09:28:10 10 Q    Do you think that there's less racism in Alabama than

11 there was 40 years ago?

12 A    No.  It's just -- they just use that in another way, you

13 know.  It's just being covered up, and it's being displayed in

14 another way.

09:28:32 15     And I see it every day because I'm a person that be out in

16 the community a lot.  I see it every day.  It's not a day that

17 I don't see it.  And a lot of times I ignore it.

18     You know, I see it from the way they charge me with my

19 water and sewer bill, from my light bill.  I see it from the

09:28:58 20 way they take care of the community that I live in.  And they

21 take care of the community on the other side of town that I

22 represent.  I see it in my health care.  I see it in my child's

23 school, my grandbabies.  I see it in her school.

24     So it's there.  It's just in another form.  You know,

09:29:20 25 because they allow us to live in -- in their communities, don't

1   mean that it's not there.

2   Q   Thank you, Commissioner Tyson.  I have no further

3   questions.

4            THE COURT:  Cross?

09:29:37 5            MS. HOWELL:  Yes, Your Honor.

6                         CROSS-EXAMINATION

7   BY MS. HOWELL:

8   Q   Good morning, Commissioner.

9   A   Good morning.

09:30:13 10   Q   You've talked a little bit this morning, but I want to go

11   back to some of the things that you were talking about

12   yesterday afternoon.  You -- we discussed the composition of

13   the district that you represent as a Jefferson County

14   Commissioner?

09:30:30 15   A   Uh-huh.

16   Q   And you said that that includes both some poor black

17   citizens and some wealthier white citizens, correct?

18   A   Right.

19   Q   And you consider yourself a representative for all of your

09:30:41 20   constituents, don't you?

21   A   Absolutely.

22   Q   Okay.  So that's for your white constituents, as well?

23   A   Yes.

24   Q   That you are a representative for them?

09:30:47 25   A   Right.

1    Q    Do you think it's any different for a congressperson?

2    A    They supposed to represent all of us.

3    Q    And that's all of their constituents, right?

4    A    Every last one of them.

09:30:58  5    Q    And that's regardless of their race, correct?

6    A    Yes.  That's what they supposed to do.

7    Q    Okay.  You also talked about problems that there had been

8    with the people that -- I think you were saying specifically

9    the people that you've represented as commissioner and then

09:31:24 10    before that when you were on city council, I believe?

11    A    Yes.

12    Q    Not trusting the system, and so they wouldn't go and vote;

13    is that right?

14    A    Right.

09:31:32 15    Q    So is that happening in -- that is happening in Jefferson

16    County, correct?

17    A    Yes, it is.

18    Q    And that's all happening in Congresswoman Sewell's

19    district?

09:31:42 20    A    It's --

21    Q    I'm not saying it happens only there, but it does happen

22    there, as well?

23    A    Yes.  It happens all over the state.

24    Q    Okay.  You also talked some about polling places being

09:31:54 25    moved around without any prior notice, and you gave a specific

```
 1  example of that that had happened to you, correct?
 2  A     Absolutely.
 3  Q     And when you figured out that your polling place had been
 4  moved, you went and found the correct polling place, right?
 5  A     Yes; after I went to three polling places.  But I had a
 6  car.
 7  Q     Okay.  But you did eventually find the correct polling
 8  place?
 9  A     Yes.
10  Q     Okay.  And you were able to vote when you got there,
11  right?
12  A     Yes.
13  Q     Okay.  And you said that there had been a lack of notice
14  involved in not -- let me strike that.
15         You said that part of the problem had been you hadn't
16  received any notice that your polling place had been moved,
17  right?
18  A     Right.
19  Q     And you got there, and the doors were closed, and there
20  was just a sign?
21  A     Yes.
22  Q     Okay.
23  A     No.  No.  I didn't say that.
24  Q     Oh, I'm sorry.
25  A     When I got there, I gave them my ID.  They said that, You
```

Timestamps: 09:32:06 (line 5), 09:32:12 (line 10), 09:32:25 (line 15), 09:32:33 (line 20), 09:32:40 (line 25)

```
 1  don't vote at this box.  I said, So what box do I vote at?  She
 2  said, I can't tell you.  I don't know which box you vote at.
 3  Q    Okay.  So the polling place was still open, but it was no
 4  longer your polling place?
 5  A    It wasn't my polling place.  But some more people went to
 6  a polling place in their -- there was a note on the door saying
 7  that it was moved to More Than Conquerors.
 8  Q    Okay.  So just going back for a second to just your
 9  polling place.  Do you know who's in charge of giving the
10  notice about when a polling place has been moved?
11  A    Yes.
12  Q    Who is that?
13  A    The clerk's office.
14  Q    Okay.  And that's the clerk for Jefferson County, correct?
15  A    The clerk for Jefferson County.  And if it's a city
16  election, it's the city clerk.
17  Q    Okay.  And the clerk for Jefferson County is an elected
18  official, correct?
19  A    Yes.
20  Q    Do you know if they're a Republican or Democrat in
21  Jefferson County?
22  A    It's a Democrat in there now.
23  Q    Okay.  You had also mentioned just in passing now that you
24  had been speaking to other people, and they had encountered
25  similar problems to you?
```

```
 1   A     Yes.
 2   Q     Was that in your capacity as a county commissioner for
 3   Jefferson County?
 4   A     No.  I've been a community activist since I was ten years
 5   old.  I have only been a county commissioner for a year.  So it
 6   did -- it has happened within this year, but I've always did
 7   voting.  So it has always have happened.
 8   Q     Okay.  And so when people have told you these stories,
 9   have you had any way of verifying whether what they're telling
10   you is true or correct?  You've just taken them at your word,
11   haven't you?
12   A     No, huh-uh.  I actually take them around to the polls and
13   make sure they vote.
14         We take -- we pick people up and take them and vote.  This
15   is every election.  We have an election coming up on November
16   the 19th.  We will be there transporting people to the polls.
17   Q     But when people tell you, for example, that they have a
18   problem with their ID?
19   A     Uh-huh.
20   Q     You take them at their word that what their problem --
21   whatever their problem is, it is actually their problem?
22   A     No.
23   Q     No.
24   A     I give them the 1-800 number for the attorneys that was
25   given to us to help us with voting fraud.  I call Judge King.
```

```
 1  I take them back to the poll and find out what their problem
 2  was; why this person cannot vote.  And they tell me it's
 3  because the address do not match up with the address that's on
 4  this voting roster.
09:35:18  5  Q    Okay.  And the attorneys tell you that?
 6  A    No.  We report it to the attorneys from NAACP.
 7  Q    Uh-huh.
 8  A    We report it to those attorneys, and I ask them can they
 9  vote provisional ballot.  And then they let them vote
09:35:35 10  provisional ballot.
11         But they never tell them that they can vote provisional
12  ballot.  They have to ask for a provisional ballot.
13  Q    So I think you have said two things; that, first, you were
14  talking to the attorneys; is that correct?
09:35:48 15  A    We report it to the attorneys.
16  Q    Okay.  But then you're going to the polling places?
17  A    I'm going to the polling place.  And I don't do it by
18  myself.
19  Q    Okay.
09:35:56 20  A    It's a lot of us out there.
21  Q    Okay.
22  A    It's not just me.
23  Q    But you're talking to the local election officials?
24  A    Yes.
09:36:03 25  Q    Okay.  And getting them to give provisional ballots?
```

```
 1  A    Yes.
 2  Q    Have you ever had any problems getting them to give
 3  someone a provisional ballot once you've asked for it?
 4  A    Yes.  They run out.
09:36:15 5  Q    But they have given them to you anytime there have been
 6  some available?
 7  A    Yes.  But they shouldn't run out of provisional ballots.
 8  Q    Okay.  You also talked some about racial appeals in
 9  campaigns.  And you actually listed some racial appeals in, I
09:36:37 10  believe, President Obama's possibly re-election campaign?
11  A    Yes.
12  Q    That was a national contest, right?  President is a
13  nationwide office?
14  A    Yes.  But it was a local election, and that's what I never
09:36:50 15  understood.  It was a local election, and the whole -- the
16  whole campaign was talking about Obamacare, and we're going to
17  abolish Obamacare, and we are going to make sure that we get
18  rid of this with Obama, and this with Obama.
19         And I'm like, what does that have to do with the person
09:37:14 20  that's running?  That's not -- we're not voting for President.
21  But everything was targeted toward the President.
22  Q    But you considered that a racial appeal, as opposed to an
23  issue-based appeal?
24  A    Yes.  If your face stretched like a joker and you got a
09:37:33 25  turban hat on and you in a tank with a rifle.
```

1   Q    Okay.  Do you know who made those ads?

2   A    No.  I remember one of them -- I know all of them was

3   dealing with either judge elections or Congress -- dealing --

4   something dealing with Congress, or some type of election like

09:38:03  5   that.

6   Q    Okay.

7   A    That had to go -- that they had to go to and hold a seat

8   in D.C.

9   Q    Okay.  But it sounds like you don't remember which

09:38:12 10   specific election it was?

11   A    No.  It had to be when he was in office.  I do remember

12   that.

13   Q    Okay.  So going back for a second, you talked about

14   different problems that people had experienced with the laws

09:38:37 15   and with getting health care, and other things.  Do you know if

16   white people have also experienced those same sorts of

17   problems?

18   A    I doubt it.  No.  I haven't had one to actually tell me

19   that.

09:38:51 20   Q    Okay.  But just because they haven't told you that doesn't

21   mean that they've never experienced the problem, right?

22   A    Well, yeah.  Yeah.

23   Q    And I apologize.  I'm jumping around a little bit.

24   A    That's fine.

09:39:17 25   Q    Going back to those racial appeals you heard about in

```
 1   campaigns.  You talked about a particular ad that I believe you

 2   have seen on Facebook during Doug Jones' campaign for Senate?

 3   A    Uh-huh.

 4   Q    You said that you saw it on Facebook.  Do you know if that

 5   was made by one of his opponents, or by just a private

 6   individual posting something like that?

 7   A    It was by one of his opponents.

 8   Q    Okay.  Do you recall which one?

 9   A    It was the -- it was the cowboy with the one -- what's his

10   name that ride the -- the child molester.  What is that man --

11   I cannot remember his name.  The one that ride the horse.

12   Q    Are you referring to Roy Moore?

13   A    Oh, yeah.  That's who it is.

14   Q    Okay.  And Roy Moore did, in fact, lose that election,

15   didn't he?

16   A    Yes, he did.

17   Q    Which is how you came to be visiting with Doug Jones as

18   Senator in Washington, D.C.?

19   A    Right.

20   Q    And you -- you talked a lot about going with an

21   organization -- and forgive me if I missed the name of the

22   organization that you go up with every year.  Can you remind me

23   again what organization that's with?

24   A    It's the National Coalition on Black City Participation,

25   and the Black Women's Round Table is the conference that we go
```

The time stamps in left margin:
09:39:32 (line 5)
09:39:47 (line 10)
09:40:07 (line 15)
09:40:15 (line 20)
09:40:34 (line 25)

1    to.

2    Q    Okay.  And that conference is in Washington, D.C.?

3    A    It's in Washington, D.C.  Yeah.  Our home office is in

4    Washington, D.C.

09:40:44  5    Q    And you talked about trying to meet with, I believe,

6    Congressperson Byrne, who represents the Mobile area at

7    present?

8    A    Uh-huh.

9    Q    And you said that -- well, you said that they had been

09:40:54 10    unable to meet with you in the first place, right?

11    A    Right.

12    Q    And that when you arrived, you went and tried to visit his

13    office anyway and were unable to get in; is that right?

14    A    Yes.  They made us stand in the hallway.

09:41:05 15    Q    Okay.  And when you went to visit Congresswoman Sewell,

16    did she meet with you in her actual office?

17    A    Of course.  And fed us lunch, and gave us lunch, and gave

18    us tours.

19    Q    But let me take a step back.  Did you meet with her in her

09:41:20 20    actual office office?

21    A    In her office office.

22    Q    Okay.  And it wasn't in some other room in the building?

23    A    We have met with her -- each time we meet with her in her

24    office and we take a picture around her desk with all of the

09:41:34 25    people that we bring down.  And --

1    THE COURT:  How many people is that?

2    THE WITNESS:  Sometimes we -- most of the time we

3  bring -- now, last year I took 15.  The year -- that was 2018.

4  2017 we took 40.

09:41:53  5    So it's depending on how much money we raise.  We take

6  different amount of people.

7  BY MS. HOWELL:

8  Q    Okay.  But those offices are fairly small, aren't they?

9  A    Yes.  But we all pack up in there.  I have a bunch of

09:42:04 10  pictures because they souvenirs for the students.  And how many

11  people actually get a chance to go to D.C. to meet their

12  congressperson?

13  Q    That is a good point.  But if you had other people

14  visiting your office, perhaps it would be difficult to fit

09:42:20 15  everybody into the office; is that fair?

16  A    Yeah.  But she know we want a picture of that seal that

17  she has.  And that's why she stuff us all in her office to make

18  sure we get -- and she give us a pin, also.

19  Q    That was nice.

09:42:44 20    Just one last question.  You were elected to city council

21  in 2013; is that right?

22  A    I was appointed in 2013.

23  Q    Appointed to city council.  But in 2013; is that right?

24  A    Yes.

09:42:58 25  Q    Were you politically active in 2011?

1    A    Of course.

2    Q    Sorry.  Let me clarify.  Were you an elected official in

3    2011?

4    A    No.  I was a neighborhood officer.  I guess that would --

09:43:11  5    I'm still -- yeah.  I was elected by the citizens for that,

6    too.

7    Q    Okay.  And you've considered yourself an activist since

8    you were ten, right?

9    A    Yes.

09:43:19 10    Q    Did you play any role in the redrawing of the

11    congressional districts back in 2011?

12    A    I tried to, but I actually protested the drawing of the

13    one that was back in 2011.

14    Q    Okay.  When did you protest it?

09:43:38 15    A    At the Five Points West library when they was drawing it.

16    Q    Okay.

17    A    And that's when Carole Smitherman was the city council

18    person.  That was the drawing of the city council district now.

19    I ain't talking about the Congress district.

09:44:08 20         THE COURT:  Wait a minute.  I want to make sure I

21    understand.  What did you protest?

22         THE WITNESS:  The drawing of District 6, city council.

23         THE COURT:  The city council?

24         THE WITNESS:  The city council district.

09:44:18 25         THE COURT:  I think Ms. Howell was asking you about

```
 1   the congressional district map that we're here talking about
 2   this week.
 3              THE WITNESS:  Oh, I'm sorry.
 4   BY MS. HOWELL:
 5   Q    That's quite all right.  My question might not have been
 6   clear.  So did you participate in redrawing the congressional
 7   map in 2011?
 8   A    Oh, no, ma'am.
 9   Q    That's what I wanted to clarify.  You also mentioned that
10   some very hurtful things were said to you when you were running
11   for county commissioner about your complexion being too dark;
12   is that right?
13   A    Yes.
14   Q    Can you tell me -- who were you trying to raise money from
15   when you ran for commissioner?
16   A    Well, it definitely my neighborhood -- I stay in a poor
17   neighborhood, and the people that I know are poor people.  So I
18   was branching out going to different people that -- the
19   candidate that I was running from, I got their fund-raiser list
20   because it has to be turned in.  And so I was calling some of
21   the people that -- the donors that gave them money, and they
22   are the ones that told me that.
23   Q    Okay.  Do you -- do you know what race those people were
24   of that you were calling?
25   A    They were white.
```

1    Q    How do you know that they were white when you were calling

2    them?

3    A    Just like I would know if you was white if I called you;

4    your voice, your tone of your voice.

09:45:37  5    Q    Okay.  Do you know whether the people that you were trying

6    to raise money from were with Democratic organizations or

7    Democratic voters, as opposed to Republican voters?

8    A    I really didn't -- I really don't know whether they were

9    democratic or Republicans, but I requested some funding from

09:46:02 10    them, and I didn't get it, so...

11    Q    You did get it?

12    A    I didn't.

13    Q    Didn't.  Okay.

14         MS. HOWELL:  Could I have a moment, Your Honor?

09:46:13 15         THE COURT:  Certainly.

16    BY MS. HOWELL:

17    Q    Ms. Tyson, I think that's all I have for you.  Thank you

18    for coming in this morning.

19         THE COURT:  Any redirect?

09:46:31 20         MR. SPIVA:  Yes, Your Honor.  Just briefly.

21                        REDIRECT EXAMINATION

22    BY MS. HOWELL:

23    Q    Commissioner Tyson, you recall you were asked on

24    cross-examination whether Congress people are supposed to

09:46:43 25    represent all of their constituents, whether they're black or

```
 1  white.  Do you recall that?
 2  A     Yes.
 3  Q     And other than Senator Jones, do you think that the
 4  Congress -- do you think that the Congress people in Alabama
 5  actually represent all -- excuse me.  Let me step back.
 6        Other than Representative Sewell and Senator Jones, do you
 7  think that the other -- the rest of the congressional
 8  delegation in Alabama represents both black and white
 9  interests?
10  A     No, they do not.
11  Q     And why do you say that?
12  A     It's no compromise with the Republicans.  It's either --
13  Congresswoman Sewell and Doug Jones, they always talk about
14  compromising and working across the aisle trying to get
15  benefits and bills passed for the citizens in their district.
16        Republicans, it's either their way or no way, or you are
17  going to get run over.
18        It's no reason we shouldn't have health care expansion
19  here in this state with illness that's popping up from back in
20  the '60s that they've really thought they had cleared.  And if
21  you don't want to pass a law to make sure we can get that,
22  you're definitely not representing everyone.
23        And if you don't want to increase minimum wage, and you
24  know for a fact that the working poor is not surviving and
25  thriving in the state that you are supposed to love, it's no
```

09:47:04
09:47:22
09:47:43
09:48:02
09:48:25

1  way that you can represent all of the people in your district.

2      And if you're not putting money in education that you know

3  that we need these young people in order to take care of us

4  when we get old, you're not representing all of us.

09:48:43 5      They know the condition of this state.  They know that

6  the -- the condition of the rural areas in the state of Alabama

7  are like a third-world country.  They are very aware of it, and

8  they are not passing any bills or laws or doing anything to

9  make sure that that population is all taken care of.

09:49:07 10  Q    Thank you, Commissioner Tyson.  I have no further

11  questions.

12          MS. HOWELL:  Your Honor, just one question.

13          THE COURT:  Okay.

14                  RECROSS-EXAMINATION

09:49:23 15  BY MS. HOWELL:

16  Q    Ms. Tyson, do you personally feel that a congressman has

17  to support Democratic initiatives to represent everyone in his

18  constituency?

19  A    Yes, I do.

09:49:34 20  Q    Okay.

21          MS. HOWELL:  Thank you very much.

22          THE COURT:  Anything else?

23          MR. SPIVA:  No, Your Honor.

24          THE COURT:  Thank you, Commissioner.  You may step

09:49:45 25  down.  Thank you for coming back today.

|  |  |
|---|---|
| 1 | Plaintiff may call your next witness. |
| 2 | MS. MADDURI:  Plaintiffs call Senator Hank Sanders, or |
| 3 | Henry Sanders. |
| 4 | HENRY SANDERS, |
09:50:12 5 | having been first duly sworn by the courtroom deputy clerk, was |
| 6 | examined and testified as follows: |
| 7 | THE COURTROOM DEPUTY CLERK:  Please state your name in |
| 8 | the microphone for the record. |
| 9 | THE WITNESS:  Sure.  My name is Henry Sanders, but |
09:50:40 10 | nobody knows me as Henry Sanders.  Everybody knows me as Hank |
| 11 | Sanders. |
| 12 | DIRECT EXAMINATION |
| 13 | BY MS. MADDURI: |
| 14 | Q    Good morning, Mr. Sanders.  I forgot to mention this to |
09:50:50 15 | you before we started, but if you can try to speak into the |
| 16 | microphone just for the court reporter's ease of taking down |
| 17 | your testimony today. |
| 18 | A    I will do that. |
| 19 | Q    Thank you.  Senator Sanders, where do you live? |
09:51:03 20 | A    Selma, Alabama. |
| 21 | Q    And how long have you lived there? |
| 22 | A    48 years. |
| 23 | Q    Selma has a unique place in Alabama Civil Rights history, |
| 24 | doesn't it? |
09:51:18 25 | A    It does. |

1  Q    Can you tell us a little bit about that?

2  A    Well, in the '60s, there were tremendous efforts to try to

3  get the right to vote for African-Americans, and it was

4  happening all over the south.  But it came to a head in Selma.

09:51:39  5    So Selma became a symbol not only in Alabama, and not only

6  in this country, but in other places.

7    And it had to do with during those struggles in Selma and

8  surrounding areas, Jimmy Lee Jackson got killed -- well, he got

9  shot in Perry County.  He died in Selma.

09:52:06  10    And out of that came the "Bloody Sunday" where people were

11  beaten on the bridge.  Out of that came the Selma -- the

12  Montgomery March and other attempted marches called Turnaround

13  Tuesday.

14    All of those gave Selma a unique place.  And so you not

09:52:34  15  only run into Selma being recognized as a symbol here.  But in

16  many other countries, I've run into it.  So it certainly has a

17  unique place.

18  Q    And what is your current occupation?

19  A    I'm an attorney.

09:52:51  20  Q    What's the name of your firm?

21  A    Chestnut, Sanders & Sanders, LLC.

22  Q    And what type of law do you practice?

23  A    I practice Civil Rights law.  I practice governmental law,

24  because we represent a couple of small commissions, a couple of

09:53:11  25  small boards of education, small town.

```
 1        I've practiced -- the truth is when you're in a small
 2   town, you really have a general practice.  So I've done some
 3   personal injury, some contract.  You might say sometime
 4   whatever comes through the door.
09:53:36  5   Q    Okay.  What type of Civil Rights law have you practiced?
 6   A    I have -- I have practiced -- I've done some voting
 7   rights.  I've done some police brutality.  I've done some black
 8   farmer issues.  I was one of three key council persons in the
 9   Black Farmers Litigation.  And I was an attorney in the other
09:54:15 10   one.  They were two national nationwide class action dealing
11   with issues where the United States Government had
12   discriminated against black farmers, in terms of loans and
13   programs and other kinds of things.
14   Q    When was that case filed originally approximately?
09:54:39 15   A    The first case was filed in 1997.  The second case was
16   filed in 2008.
17   Q    And what was the -- what was the monetary -- was there a
18   monetary award in the case?
19   A    Yes.  In the first case, over a billion dollars was
09:55:03 20   distributed to black farmers across the country.
21        In the second case, $1.25 billion was distributed.
22   Q    Were any of the farmers in the case from Alabama?
23   A    Yes.
24   Q    And where are you originally from?
09:55:26 25   A    I'm from Baldwin County, Alabama.  I'm -- and I rush to
```

<span style="float:left">1</span> say that I'm from north Baldwin, which is Tensaw River, those

<span style="float:left">2</span> kinds of areas.  Most people think of Orange Beach and Gulf

<span style="float:left">3</span> Shores.  But I'm from north Baldwin, Alabama.

<span style="float:left">4</span> Q     When did you first leave Alabama?

09:55:49 5   A     I first left Alabama in 1961.

<span style="float:left">6</span> Q     Where did you go?

<span style="float:left">7</span> A     I went to New York City.

<span style="float:left">8</span> Q     How did New York City compare to Alabama for you?

<span style="float:left">9</span> A     It was a world of difference.  I -- in New York City, I

09:56:17 10  was no longer afraid that when I left home I may not come back.

<span style="float:left">11</span> In New York City, I still got the lowest jobs on the

<span style="float:left">12</span> lowest rung, but they were not as hard, and they didn't -- and

<span style="float:left">13</span> pay as little as in Alabama.

<span style="float:left">14</span> In New York City, I must say that people treated people

09:56:52 15  from the south as kind of like immigrants.  You were on the low

<span style="float:left">16</span> end of the totem pole, but it was still so much better than it

<span style="float:left">17</span> was in Alabama.

<span style="float:left">18</span> In New York City, I graduated high school without taking

<span style="float:left">19</span> any math course.  And I was able to go to William Cullen Bryant

09:57:17 20  High School at night and be able to get math.  I was able to go

<span style="float:left">21</span> to RCA school in electronics and eventually get a skill.

<span style="float:left">22</span> So it was a world of difference.  But the most striking

<span style="float:left">23</span> thing, though, is when you can talk to a white person and not

<span style="float:left">24</span> have to be afraid that you may say the wrong thing.  You may

09:57:47 25  say it the wrong way, or you may look at them in the eyes a

1  wrong way.

2      So that -- it's hard for people to understand how -- what

3  a weight that is, that if something happened to somebody you

4  love and care about you can defend them or you can defend

09:58:11  5  yourself.  So...

6  Q    Did you have any interactions in Alabama with white folks

7  where you didn't feel like you could do that?

8  A    Yes.

9  Q    Can you tell us about those or one of those?

09:58:24 10  A    Well, I was a -- I was a terrible child.  I always in

11  fights and struggles and stuff with folks in my family.  So

12  when my mother was going to the grocery store, she would often

13  take me.  I was the second of 13 children.  But she would often

14  take me so I wouldn't get in fights with my sisters and

09:58:57 15  brothers.

16      And on one occasion, I was sitting outside in the car.  I

17  had the door open.  I had my feet outside the door.  And a

18  white woman came along and -- and I just looked up and looked

19  right back down.  It was only seconds.  And it might not even

09:59:19 20  have been a good second.  And a white man came over to me and

21  said, I saw you looking at that white woman, and I'm going to

22  teach you a lesson.  And I said -- I told him, I just looked up

23  and I just looked right back down.  And said he was going to

24  teach me a lesson.

09:59:38 25      So I snatched my feet back in the car and closed the door.

```
 1   And I was trying to wind up the window, and he was struggling
 2   there.
 3        And my mother came out, and my mother was probably what
 4   you would call a cursing Christian.  She started cursing him
10:00:00  5   and telling him to get away.  And he kept insisting that he was
 6   going to teach me a lesson.  And she told him that she was
 7   going to teach him a lesson.  And eventually he -- he walked
 8   away slowly.  So...
 9        So that's one example.
10:00:26 10  Q    What did that --
11   A    My brother.
12   Q    What did that experience mean to you?
13   A    It -- what it did was reenforced the concept that I was
14   not free to even look up and look down; that you always in a --
10:00:50 15  in danger of being beaten, or being killed, or being oppressed
16   in some other way.
17        It's just a heavy weight to know that if you have the
18   wrong facial expression, if you have the wrong tone in your
19   voice, that that's enough to have you harmed or even killed,
10:01:22 20  so...
21             THE COURT:  Senator Sanders, approximately when was
22   that?
23             THE WITNESS:  Okay.  That was -- would have been in
24   the late 1950s.
10:01:40 25  BY MS. MADDURI:
```

1   Q      Senator, did you read a lot when you were growing up?

2   A      Yes.  I loved to read, but we didn't have -- we didn't

3   have much things to read.  So when I would -- on the school

4   bus, I not only read all of my books all the way to the end,

10:02:00  5   but I read books from students in higher levels.

6          And when you -- when you living in a house that's a

7   three-room house and you got -- and you got 11 people living in

8   a three-room house -- and I don't mean a three-bedroom house.

9   I mean a kitchen, middle room, and front room.  And you really

10:02:32 10   don't have things to read.  So...

11          So when opportunity come up to read something, I would

12   read it.  In fact, reading stuff was what caused me to be a

13   lawyer.

14          When I was -- my mother worked for a large landowner in

10:03:00 15   Baldwin County named Thomas Earl, who not only owned

16   thousands -- well, I don't know.  He owned at least a thousand

17   acres.  But she worked in the house.  And she would bring

18   magazines and newspapers and things that were -- after they no

19   longer wanted them.  But she didn't bring them home for us to

10:03:24 20   read.  She brought them home for us to use as toilet paper.

21   And I read about Thurgood Marshall.

22          And every Friday the teachers would have us say what we

23   were going to be when we grow up.  And they did that on

24   Fridays.  So on the weekend we would stay focused.

10:03:43 25          And so the next Friday, I stood up and said I was going to

1  be a lawyer when I grow up.  And the whole class started

2  laughing at me.  And the boy right next to me before they

3  started laughing, he started snickering under his breath.  And

4  the boy next to him started snickering, and it wasn't under his

10:04:12  5  breath.  And after a while, the whole class was just laughing.

6  And the teacher tried to get them to stop.  And she couldn't

7  get them to stop.  She tried to get me to sit down.  And I was

8  in too much of a shock.

9        So the more I cried, the more they laughed.  The more they

10:04:32  10  laughed, the more I cried.  And finally she came over and put

11  her left arm around me and put her right hand on my stomach and

12  got me to sit down.

13        When I sat down, I -- I said, If they going to laugh at

14  me, I ain't going to be nothing.  And then I thought about it

10:04:53  15  and said, They don't expect me to be nothing anyway.  And I

16  decided that if it was the last thing I did, that I was going

17  to be a lawyer if it killed me.

18        But I also decided I wasn't going to tell nobody because I

19  didn't want to be laughed at.  And I didn't -- it took me years

10:05:14  20  to understand why they were laughing at me.

21        I'm sorry.

22  Q    That's okay, Senator.  Thank you for sharing that story

23  with us.

24            THE COURT:  Senator Sanders, just to be clear, your

10:05:45  25  classmates who were laughing at you, were they

1  African-American?

2       THE WITNESS:  Yes.

3       THE COURT:  I know it doesn't matter what color your

4  classmates are when they're laughing at you.  It's not

10:06:01  5  pleasant.

6       THE WITNESS:  I understand.

7    But what you -- the first thing I thought about, I said,

8  They laughing at us because we're from this big family which

9  eventually grew to be 13 children, a mother, and a father.  And

10:06:14 10  then I said, but, you know, they knew that all along.

11    And then I thought that they were laughing at us because

12  we were real poor because food would sometimes run out on a

13  Wednesday, and we would just have grits, no butter, no egg nor

14  anything for the rest of the week.

10:06:34 15    And then I thought that they were laughing because I

16  stuttered.  And it took me years to understand that they were

17  laughing because not only could they not visualize me as a

18  lawyer, they couldn't visualize them or anybody in that room as

19  a lawyer.  It was beyond their experiences.

10:06:57 20    It was only my experience because my mother brought home

21  those things, and I read about Thurgood Marshall.  So -- but it

22  took years to understand that.  Because I hadn't seen a lawyer.

23  Nobody in there hadn't seen a lawyer.  And we certainly hadn't

24  seen a black lawyer.  And it was hard to conceive of that.

10:07:23 25  BY MS. MADDURI:

```
 1    Q    And where did you go on to go to law school?
 2    A    Okay.  I went to -- I went to Harvard Law School.  But
 3    before that, I came back south from New York and went to
 4    Talladega College.
```
10:07:37
```
 5    Q    Is Talladega College a historically black college?
 6    A    Yes.
 7    Q    And do you identify as an African-American?
 8    A    Yes.
 9    Q    When did you return to Alabama following law school?
```
10:07:51
```
10    A    I returned in 1971.  When I graduated from law school in
11    1970, I went to Africa for a year on a fellowship.  And so I
12    returned in 1971.
13    Q    And you said, I think, that you have been living in Selma
14    for 48 years?
```
10:08:13
```
15    A    Yes.
16    Q    So you moved there around 1971?
17    A    Yes.
18    Q    Are you involved in community work?
19    A    Yes.
```
10:08:21
```
20    Q    What groups are you involved with?
21    A    I'm involved with a number of organizations.  I'm involved
22    with 21st Century Youth Leadership Movement.  We have started
23    McRae Learning Center, which I still support.
24         THE COURT:  You started what kind of learning center?
```
10:08:44
```
25         THE WITNESS:  McRae Learning Center.  It's a
```

```
 1  preschool.

 2            THE COURT:  Okay.  Thank you.

 3            THE WITNESS:  I've been involved with the Alabama

 4  Lawyer's Association.  I've been involved with Alabama New

 5  South Coalition and Alabama New South Alliance.

 6       I've been involved in SOS, which is Save Ourselves

 7  coalition for justice and democracy.

 8       I've been involved in National Voting Rights Museum.  I've

 9  been involved in the what they call a slavery museum, but the

10  name of it -- ancient Africa and enslavement museum.

11       I've been involved in a lot more.

12  BY MS. MADDURI:

13  Q    What type of issues are these organizations focused on?

14  A    Nearly all of them in one way or another involve efforts

15  to include those who are left out and lift those who are down.

16  All of those organizations are a nonpartisan except for the

17  Alabama New South Alliance.  All of them are -- they just try

18  to fight on each front to try to include those who left out --

19  lift those who are down.

20  Q    Are voting rights one of the issues that --

21  A    Yes.

22  Q    -- organizations?

23  A    Yes.

24  Q    Does your work as a lawyer and as a very active community

25  member take you -- result in you traveling around Alabama a
```

Timestamps: 10:09:03 (5), 10:09:38 (10), 10:10:01 (15), 10:10:30 (20), 10:10:41 (25)

1    lot?

2    A    Yes.

3    Q    Are there particular --

4    A    And some -- and my practice of law.

10:10:51 5    Q    Of course.  Are there particular parts of the state that

6    you have traveled to the most?

7    A    Well, I guess it would be across the Alabama black belt,

8    particularly the west Alabama black belt.

9    Q    Anywhere else?

10:11:12 10    A    Well, I've traveled to Mobile.  I've traveled to

11    Birmingham.  I've traveled to Tuscaloosa.  I've traveled to

12    Montgomery.  I've traveled to Dothan.  I've traveled to Auburn.

13        Before, when I first began the practice of law, much of my

14    practice was dealing with helping black people and poor people

10:11:40 15    save their land because the land was being taken going and

16    coming.  So I -- I traveled all over Alabama from Huntsville to

17    Mobile, from Auburn to Sumter County.

18    Q    A better question might have been:  Where have you not

19    traveled in Alabama?

10:12:02 20    A    I think I've been to virtually every county in Alabama.

21    Q    And have you held elected office?

22    A    I have.

23    Q    What office have you held?

24    A    I was a member of the Alabama State Senate.

10:12:18 25    Q    When did you first run for Senate?

1    A    I first ran for Senate in 1982, and I was not elected.

2    But I was elected the year afterward in 1983 but came back.

3    And they declared -- the jurors declared those districts as

4    unconstitutional.  So we had an election a year later, and I

10:12:43 5    was elected.

6    Q    When you were elected, was the district -- had the

7    district become a majority black district?

8    A    Yes.

9    Q    Did you run affiliated with a political party?

10:12:59 10    A    I did.

11    Q    Which one was that?

12    A    Democratic party.

13    Q    Do you still consider yourself a Democrat today?

14    A    Yes.

10:13:08 15    Q    When did you first begin to identify with the Democratic

16    party?

17    A    I -- my best guess on that would have been in the 1970s.

18    Q    And why did you start identifying with the Democratic

19    party?

10:13:29 20    A    Well, I -- it seems that that the people who were in the

21    Democratic party, at least some of them, certainly want me to

22    be there.

23        The Republican party seemed to have been greatly

24    identified with Senator Barry Goldwater who had been against

10:14:03 25    the -- I believe the 1963 Civil Rights Act.  So I -- somewhere

```
 1  in there, I began to identify with the Democratic party.

 2  Q    You said that it seemed like the Democratic party wanted

 3  you.  Do you mean you as a black man?

 4  A    As a black person, yes.

 5  Q    Based on your experience, do you have an opinion on

 6  whether African-Americans in Alabama affiliate more with the

 7  Democratic party or the Republican party?

 8  A    I have an opinion.

 9  Q    What is that?

10  A    Nearly all African-Americans affiliate with the Democratic

11  party if they affiliate with a party.

12  Q    Does that general preference among African-Americans for

13  the Democratic party have anything to do with race?

14  A    Yes.

15  Q    Can you tell us more about that?

16  A    Well, when you have been excluded all your life, like I

17  have been much of my life, it becomes important to feel that

18  you are wanted by somebody within the context of that group.

19       And although the Democratic party certainly back in the

20  '60s and the part of the '70s had plenty of people who were not

21  exactly welcoming to black people, the Republican party seemed

22  that it was not only not welcome, but it was adverse to the

23  interests of black people.

24       When I ran in 1982 and '83, that was right after

25  President -- he wasn't President at the time, but President --
```

10:14:22 (line 5)
10:14:36 (line 10)
10:14:55 (line 15)
10:15:33 (line 20)
10:16:11 (line 25)

1   I'm having trouble pulling up the name.  President Reagan.

2   They kicked off his campaign in Philadelphia, Mississippi.  And

3   Philadelphia, Mississippi was burned into not only my memory,

4   but my very being because that's where those three -- three

10:16:40  5   boys, three young men had been killed.

6        And so there was those kinds of things that helped me to

7   run as a Democrat.

8   Q    Do you think the same things are true today?  Do

9   African-Americans in Alabama have a general preference for the

10:17:05 10   Democratic party today because of race?

11   A    Yes.

12   Q    And do you see the same issues with the Republican party

13   today in Alabama?

14   A    Yes.  You know, but the way it's expressed is different.

10:17:32 15        For example, you know that -- the role that the

16   Confederate monuments and all of those kinds of things and

17   played -- which to me have strong racial implications.  And it

18   always says to me that I'm not -- I'm not just wanted, but I'm

19   expected to be on the bottom.

10:18:07 20        So it manifests itself in various kinds of way.

21   Q    You mentioned that when you first joined the party or

22   started to affiliate with it there was still a number of white

23   folks who held, perhaps, racially charged views.  When did you

24   observe that start to change?

10:18:46 25   A    I think it -- I observed it starting to change in the

1    '70s.

2         In 1965, I participated in the last leg of the Selma to

3    Montgomery March.  In 1966, I came -- I was still a student at

4    Talladega, and I came back to Lowndes County to work to try to

10:19:18  5    get African-Americans elected.  And the county was like

6    nearly -- nearly 80 percent African-American, 70, 80 percent.

7    I don't remember.  But we weren't able to elect a single

8    person.

9         And the Democratic party at that time was still very much

10:19:40 10    anti-African-American voters.  And they -- it was -- the

11    candidates were on NDPA.  But starting in the '70s, it became a

12    different kind of situation.

13              THE COURT:  Wait a minute.  You said NDPA.

14              THE WITNESS:  Yes.  That was National Democratic Party

10:20:02 15    of Alabama.

16              THE COURT:  Okay.

17              THE WITNESS:  It was a -- see, the Democratic party

18    had the white rooster, and it had been excluding

19    African-Americans.

10:20:17 20         So a political party was started, and it was called NDPA,

21    which is National Democratic Party of Alabama.

22    BY MS. MADDURI:

23    Q    And so when did the transition happen when white folks

24    left the Democratic party in Alabama approximately?

10:20:45 25    A    Well, it's a funny kind of thing.  Because in 1964, that's

```
 1   when it began.  But it took many years to come to full
 2   fruition.
 3        Because when I went in the Senate in 1983, if I remember
 4   correctly, there was -- I remember one Republican that might
 5   have been three.  But I -- so it was a slow process.
 6        And the more active African-Americans became in the
 7   Democratic party, the more whites began to go to the Republican
 8   party.
 9        So it took a long time.  But it was a constant growing
10   movement.
11   Q    What areas did you represent when you were a senator?
12   A    The first time I ran, I represented Dallas -- I mean, the
13   first time I -- the first time I was in Alabama Senate I
14   represented Lowndes, Dallas, Wilcox, Perry, Hale, Greene,
15   Sumter, Choctaw, and Marengo, all or parts of those counties.
16   Q    And would you consider your district part of the Black
17   Belt?
18   A    Yes.
19   Q    What is the Black Belt?
20   A    The Black Belt is an area of Alabama where the soil is
21   very black.  And it was very conducive to raising cotton.  So
22   that also meant a lot of enslaved people were in those areas.
23        And even though it's tied to the soil, the designation,
24   most of those counties will be either majority African-American
25   or have high percentage of African-American.  So a lot of
```

10:21:19   5
10:21:49  10
10:22:24  15
10:22:37  20
10:23:09  25

1    people think that somehow it's the Black Belt because black

2    people are there.  And black people are there because the soil

3    was black.

4    Q    And how long did you serve in the Alabama Senate?

10:23:27 5    A    I served 35 years.  But after -- after 1992, the district

6    changed substantially.

7    Q    And what committees did you serve on over the years?

8    A    I served on education.  I served on the finance and

9    taxation committee.  I've served on -- and when the committee

10:24:00 10   was divided, I became chair of the finance and taxation

11   education committee, which handled the Alabama budget, the

12   budget -- education budget.  But I served on judiciary.

13        I've served on banking and insurance.  I've served on -- I

14   can't pull it up now, but the -- the committee that would deal

10:24:28 15   with utilities, whether that was Alabama Power, Alabama Gas,

16   those kind.  The name changed from time to time.  And they

17   would put transportation in there.

18        I've served on the local legislation committee.  And I

19   can't pull up the others at this moment.

10:24:49 20   Q    Did you ever serve on the reapportionment committee?

21   A    Not that I recall.  I don't think I did.

22   Q    When you first returned to Alabama after attending law

23   school, I think we said it was 1971?

24   A    Yeah.

10:25:11 25   Q    At that time, do you believe that there was official

```
 1  discrimination in Alabama against African-Americans related to
 2  voting?
 3  A    Yes.
 4  Q    How about since that time?  Has that discrimination gone
 5  away?
 6  A    No.  It's -- it has changed forms.  It has diminished in
 7  some kinds of ways.
 8       But when I came to Alabama, we agreed to stay just
 9  five years.  And that was partly because my wife never wanted
10  to -- to go to Selma.  But we thought that somehow in
11  five years the Voting Rights Act would be fully implemented,
12  and, therefore, you know, we wouldn't -- we -- the burden
13  wouldn't be so heavy to stay in Alabama because she really
14  wanted to live in Harlem, New York.  She had -- as a student,
15  she had gone there in the summer.
16       But, and here it is 40 -- 48 years later since we went to
17  Selma, we still have to struggle for the right to vote.
18       I mean, in 2011, I worked hard because we had a
19  referendum.  And I -- and they was going to provide some money
20  for help.  And I -- so when I got to the polls -- I had been in
21  the Alabama State Senate then for 24 years.  I got to the poll,
22  and my name was not on the list.
23       And so the polling official said, Well, we know you vote
24  here all the time.  Let us call the Board of Registrars.  They
25  called the Board of Registrars, and I could hear the one end of
```

1    the conversation.  And they would not agree for me to vote in a

2    place I had voted all the while.

3         So then they put me on the phone with one of the voting

4    registrars.  They told me -- she told me -- he told me that

10:27:36 5    I -- that I couldn't vote.  He said, You haven't been voting.

6    I said, Well, I'm in the Alabama State Senate.  I got -- I know

7    I had to vote for myself.

8         Then he said, Well, you must have moved.  And I said, I

9    haven't been moved.  I've been in the same house since 1978,

10:27:54 10    '79.  And then he said -- he kept coming up with reasons why I

11    wasn't on -- on the voting list.

12         And finally he told me I needed to go to other voting

13    places to try to see if my name was on the list.  He was there

14    in the -- in the Board of Registrars.  He could've looked.  So

10:28:24 15    I told him I wasn't going to do that.

16         And then I decided I wasn't -- I wasn't going to go vote

17    as a protest.  But then I thought the referendum might lose by

18    one vote, and I would have contributed to that.  So I voted in

19    a provisional ballot.

10:28:47 20         And here I was the highest elected official there in that

21    county, and I knew him, and he knew me because I was working

22    with economic development, and his brother was the head of

23    that.  So, of course, that also had something to do with my --

24    my wife because they had appointed all whites in the Board of

10:29:19 25    Registrars.  And she had led protests against that.  And

```
 1  eventually they took off one white and put one black on in a
 2  county that's 70 percent African-American.
 3       And I think that they just -- my assumption was that they
 4  wanted to show -- show me if they could do that to me, they
 5  could do it to anybody.
 6  Q    Have you ever observed other African-Americans finding
 7  that they are no longer on the voting rolls when they've gone
 8  to vote?
 9  A    Yes.  When I would -- part of my service was when -- on
10  election day was when there was election problems was to try to
11  deal with them.
12       So even before election day, when the people would be
13  taken off voting rolls, and many times they didn't know it --
14  so we would designate people in various counties to -- to look
15  at those lists because our experience had told us that most of
16  the folks who were on there by far would be African-American.
17       So they would look at the lists.  And sometimes I would
18  look at them.  But most of the time, I coordinated people
19  looking at them so that they could -- we could try to find ways
20  to get them back on.
21  Q    What -- can you clarify just for the Court what were the
22  lists you were looking at?
23  A    Well, when they would remove people off the list, they
24  would run something -- before an election, they had to print
25  the lists of all the voters in a particular county.  So that's
```

Timestamps in left margin: 10:29:49 (line 5), 10:30:15 (line 10), 10:30:42 (line 15), 10:31:04 (line 20), 10:31:26 (line 25)

1  one of the lists we looked at.

2       And also, there were -- when -- when -- it was my

3  understanding that when people were removed, they were supposed

4  to let folks know.  But we -- that was an ongoing effort across

10:31:54 5  the communities to try to make sure that people were not

6  excluded from voting by being taken off the list, or whatever.

7  Q    So did they also create a list of voters who had been

8  removed?

9  A    Yes.

10:32:14 10  Q    And did you review those lists, as well, or you or the

11  people that you coordinated with?

12  A    Yes.  When -- yes.  There were times.

13  Q    Did you get a sense when you were reviewing these lists or

14  when you were working with the folks reviewing these lists,

10:32:35 15  could you tell if more African-Americans were being removed

16  from the rolls, or if it was white folks?

17  A    It was nearly always black people in those counties.

18  Q    And approximately when did you observe these issues?

19  A    I have observed those issues over the years.

10:33:00 20       In the 70s, the '80s, the '90s, 2000, 2010.  It's been a

21  constant struggle.

22  Q    Did you raise this particular issue with anyone in the

23  state government, or Secretary of State, or anyone like that?

24  A    No, because I -- I didn't think that they would do

10:33:21 25  anything about it.

        When I was taken off, I went to the local probate judge,
and he went over there and dealt with it.

        I thought it was real sad that I was an elected official
all these years, and I had to go to the local white probate
judge to try to get my name straightened out on the voting
list.

                THE COURT:  Did he take care of that for you?

                THE WITNESS:  Yes, he did.

BY MS. MADDURI:

Q    When you -- sorry.

A    No.  He took care of me -- for me.  But I couldn't help
but think of all the people who had that problem who couldn't
go to him or who couldn't be treated the same way.

        I had the status of an elected official.  I had the status
of a lawyer.  I had the status of a person who had worked in
the community across lines.  And I had to have help.

Q    Are you familiar with, in the 1980s, any prosecutions that
occurred relating to voter fraud?

A    Yes.

Q    Can you tell us about those?

A    Yes.  In the '70s in these majority black counties, we
had -- white people voted huge number of absentees.  And we
would document that many of them were actually deceased.  You'd
go to the graveyard and be able to do it.

        And so we went to -- we sent a delegation to the U.S.

1    Justice Department to complain.  And the Justice Department

2    said, We can't do anything about it.  Y'all need to learn to

3    use absentee ballots.

4         And so we came back.  And I looked up the law.  And I

10:35:47  5    taught classes in Perry County on how to follow the law and to

6    do absentee voting.

7         And so in 19 -- the election in 1984 had sprung out about

8    211 different indictments for what's called voter fraud.  And

9    we called it voter persecution cases.  So it was something we

10:36:26 10    were extremely concerned about.  And I was the only lawyer

11    initially, but then I recruited other lawyers.  And we had to

12    fight it on -- felt like we had to fight it on every ground.

13    Because we felt legally you could fight and you could lose and

14    you could still have the community so afraid to vote.  We

10:36:47 15    needed to fight it on political ground, as well, and public

16    relation grounds.  And it was just a tremendous struggle.  And

17    we had to fight on all those fronts.

18    Q    I think you said there were 211 charges filed?

19    A    Yeah.

10:37:04 20    Q    Were those filed primarily against African-Americans or

21    white folks?

22    A    No.  All of those were against African-Americans, except

23    there was a white lady in Greene County who worked closely with

24    African-Americans on voter registration, voter mobilization.  I

10:37:23 25    think her name was Bobbie Simmons.

```
 1   Q     And do you remember who the prosecuting attorneys were?
 2   A     Well, I remember the prosecuting attorney in Perry County
 3   in the Southern District was Jeff Sessions.  And I don't recall
 4   who the prosecuting attorney was in Greene County at the time.
 5   But it was all a coordinated effort.
 6   Q     Were any of those cases tried?
 7   A     Yes.
 8   Q     And what happened?
 9   A     I think one case I think somebody pleaded -- might have
10   pled guilty to a misdemeanor.  But all 210 other cases, they
11   were found not guilty.
12   Q     I think you said you had to fight these -- when this
13   happened, you had to fight on another different ground.  I
14   think you said legal --
15   A     Different levels.
16   Q     -- legally, politically, et cetera.
17         What are some of the impacts of cases like this or
18   instances like this where something happens that feels targeted
19   towards the African-American community?  What kind of impact
20   does that have on the community?
21   A     It has a powerful impact.  Because when you have been
22   prevented from voting for these hundreds of years, or hundreds
23   and some years and then all of a sudden these charges are
24   brought in the federal -- I mean in -- brought by federal
25   officials, which we thought ought to have been, you know,
```

helping us to expand the voting right -- fear is such a
powerful thing in the black community based upon all of what
has happened over the years.  So and people -- even after we
won, people were afraid to vote.

10:39:41    And so particularly with absentees, but they were afraid
in general.  And we had to work year after year to try to --
try to overcome that.

Q    Does that fear that results from things like this, does
that have an impact on whether African-Americans actually go
10:39:59 out to vote?

A    Yes.

Q    Have you seen any instances more recently where this kind
of fear has prevented African-Americans from voting?

A    Yes.  I think it was 2017 a group of us met in Montgomery
10:40:29 to -- people who worked to try to mobilize and encourage people
to vote.  We have all of these theories about why people do
not -- not vote.

    And so we decided that it wasn't enough for us just to
make those assumptions.  So we gathered in Montgomery.  And we
10:41:01 were -- all of us had to bring some people who did not vote so
we could listen to them, as well.

    And we just assumed that it was because they didn't think
it was going to be -- was going to do any good because you
would hear that.  And we were amazed at the number of people
10:41:29 who talked about fear.

```
 1        And much of that fear was tied to the criminal justice
 2   system in some kind of way.  They thought -- well, they said,
 3   Well, they probably ain't going to do something to me.  But
 4   they'll do something to my son, or my daughter, or my children,
 5   or my grandchildren.
 6        Fear is still a very powerful factor in the
 7   African-American community that suppresses the vote.
 8   Q    Do you think those fears are rational?
 9   A    Yes.  They're rational when you know that they've lynched
10   people in the past for trying to vote.  When you know that
11   people off their land for trying to vote.  When you know that
12   people have lost their jobs for it.  It's absolutely rational
13   in my opinion.
14        Because people -- this might not make any sense.  But
15   every time I drive and I get stopped by a policeman, I don't
16   know whether I will drive away from there.
17        So fear doesn't have to be rational in the sense that it's
18   going to happen every time.  Fear is rational if it can happen
19   any time.
20        So I -- and I've had -- my wife is an attorney.  And they
21   stopped her from voting in Selma.  So I had to go down there
22   and start cursing just for her to be able to vote.
23        So it's real in the black community.
24   Q    Senator Sanders, are you familiar with the law that's
25   passed in the last ten years that's limited how political --
```

```
 1   limited how political organizations can contribute money to
 2   each other?
 3   A     Yes.
 4   Q     Can you tell us about that?
 5   A     It was -- I think it was passed in the -- in December of
 6   2010 right after the election.  And it was called PAC-to-PAC
 7   transfer.  That bill came up in the legislature over the years,
 8   and we had always been able to defeat it.
 9         PAC-to-PAC transfer says that if you are a PAC, you can't
10   transfer money to other PACs except to a particular elected
11   official.
12         And one of the ways to deal with that was -- before the
13   law came along was if I ran and I did not have a strong
14   opponent and I had extra money, I could transfer it and help
15   out to different organizations.  I could transfer it to other
16   elected officials and stuff.  And so when PAC-to-PAC transfer
17   came in, I was one of those who went to Washington, D.C. to try
18   to fight against the preclearance of that.
19         We didn't succeed.  But that meant that organizations that
20   usually get out to vote in various kinds of ways, it was much
21   harder for them to get funds or resources to be able to do
22   that.
23               THE COURT:  So was this a federal law?
24               THE WITNESS:  No.  It was a state law.
25               THE COURT:  Okay.  But I thought you said you went to
```

10:44:14  (line 5)
10:44:45  (line 10)
10:45:10  (line 15)
10:45:44  (line 20)
10:45:57  (line 25)

1  Washington, D.C to fight against it.

2          THE WITNESS:  We asked them to preclear -- not to

3  preclear it.

4          THE COURT:  Okay.

10:46:08  5          THE WITNESS:  We went to the U.S. Justice Department.

6          THE COURT:  Okay.

7          THE WITNESS:  Okay.

8  BY MS. MADDURI:

9  Q    I think you said that these organizations helped get out

10:46:17 10  the vote and do other -- other sorts of things like that.

11          Do African-Americans depend disproportionately on those

12  kinds of organizations?

13  A    Yes.

14  Q    In what ways?

10:46:29 15  A    Well, because of the history of African-Americans not

16  voting, it's not enough to say, well, this candidate is better

17  than the other one, or to look at television, or to listen to a

18  radio.  You really have to get out and be able to do that

19  partly to overcome the fear, partly to overcome a range of

10:47:00 20  things.  So it takes resources to do that.

21          So with the PAC-to-PAC transfer, it just made it very

22  difficult to be able to get resources to do that kind of

23  mobilization.

24          THE COURT:  Let me see if I can clarify.  When you

10:47:22 25  refer to PAC-to-PAC transfers, are you referring to a law that

1  allows PAC-to-PAC transfers or a law that prohibits PAC-to-PAC

2  transfers?

3          THE WITNESS:  A law that prohibits PAC-to-PAC

4  transfers.

10:47:38  5          THE COURT:  You were just referring to it at

6  PAC-to-PAC transfers.  So I wanted to make sure that it was

7  clear that it was a law that precluded that.

8          MS. MADDURI:  Thank you, Your Honor.

9          THE WITNESS:  I really appreciate that.

10:47:50  10  BY MS. MADDURI:

11  Q    Do you remember if there were justifications given for why

12  this law was being passed?

13  A    I'm sure there were, but I -- I don't -- I'm trying to

14  pull up in my mind now exactly what those justifications were.

10:48:14  15  But I don't -- I don't.  I don't -- I can't pull it up.  That

16  happens to you when you're 77 years old.

17          THE COURT:  It also happens to you when you're in your

18  60s.

19  BY MS. MADDURI:

10:48:31  20  Q    Senator Sanders, are you familiar with how judges are

21  elected to the Alabama Supreme Court and the Alabama Courts of

22  Appeals?

23  A    Yes.

24  Q    How is that?

10:48:43  25  A    They are elected statewide, and they're elected from what

```
 1   they call place.  On the ballot, it will be statewide.  But
 2   you'll be Place 1 or, Place 2, or Place 3, or 4.
 3   Q    Is that system also referred to as at-large elections?
 4   A    Yes.
 5   Q    In your experience, do at-large elections for these
 6   positions enhance the opportunity for discrimination?
 7   A    Yes.
 8   Q    How so?
 9   A    Well, Alabama is about 25 percent, 26 percent
10   African-American.  And you have a number of positions in court.
11   If they ran from district, African-Americans would have a very
12   good chance of being represented on those -- on the Alabama
13   Supreme Court, Alabama Court of Criminal Appeals, Alabama Court
14   of Civil Appeals.  But since they're elected at large and
15   elected from place -- if they were elected at large and you
16   could just vote for one, then it wouldn't be so oppressive.
17   But the way it's set up, you don't stand a real chance of
18   winning.
19   Q    Is it important to you that there are African-Americans
20   elected to those courts?
21   A    Absolutely.
22        You know, there are times when people don't start out
23   trying to do something that's -- that's racial.  But then they
24   don't understand all of the different dynamics, the in and out,
25   how this particular act is going to have that kind of impact.
```

```
 1   It's just not in their experience.
 2       And so if you had one person or two persons on that
 3   Alabama Supreme Court, they could help the other court members
 4   to see the different kinds of ramification.
```
10:50:47
```
 5       But when the way they're elected, you don't get anybody on
 6   there to talk about those ramifications, so...
 7   Q    So you think it would be important to have that range of
 8   perspective from the African-American experience in the justice
 9   system?
```
10:51:04
```
10   A    Absolutely.
11   Q    Do you know how many African-Americans have been elected
12   to statewide office in Alabama?
13   A    Yes.
14   Q    How many is that?
```
10:51:13
```
15   A    Two.
16   Q    Do you remember roughly when the last time an
17   African-American was elected to a statewide office?
18   A    My best guess is like '94 or '96, somewhere -- now, three
19   African-Americans have served statewide and -- that I can
```
10:51:37
```
20   recall.  But one was appointed.  All of them were appointed
21   before they were elected, which makes a lot of difference, you
22   know.  Because people say, well, you know, they -- they all
23   right.  They were appointed.  They have the stamp of approval,
24   you know, from -- from the higher-ups.
```
10:51:56
```
25       So Oscar Adams was appointed in the late '70s, early '80s.
```

```
 1   I can't remember.  And then Ralph Cook.  I should say Justice
 2   Oscar Adams and Justice Ralph Cook was appointed.  And then
 3   Justice John England was appointed like 2000, or something like
 4   that.
10:52:24  5       But the last ones all went out in, I think, 2002, or
 6   something in that time frame.
 7   Q    How does the lack of African-Americans elected statewide
 8   affect the African-American community?
 9   A    It has a profound impact.  Because in the political system
10:52:56 10  in Alabama and in this country, a great number of decisions are
11   made all the time.  They're made when people act in their
12   elected position.  Then they appoint people who do regulations
13   and other kinds of stuff.
14       So literally, every aspect of our life is affected one way
10:53:27 15  or another by government.  And from the air we breathe to the
16   food we eat to the water we drink to birth and death, all of
17   these things.  It's impacted there.
18       And so when -- when anybody's left out, it's a problem.
19   But if you have been historically left out down through for
10:53:58 20  hundreds of years, then it's even more important that you be
21   represented -- that that particular group be represented in
22   government.
23       Because all of these decisions have that kind of impact.
24           MS. MADDURI:  Your Honor, would this be a good time to
10:54:27 25  take a break?
```

```
 1              THE COURT:  It's fine with me if it's good for you.
 2         We will come back at 11:10.
 3              MS. MADDURI:  Thank you.
 4              (Recess.)
 5              THE COURT:  Ms. Madduri, you may proceed.
 6              MS. MADDURI:  Thank you, Your Honor.
 7    BY MS. MADDURI:
 8    Q    Senator, in your time in the legislature, in the Senate,
 9    did you ever introduce any voting rights legislation?
10    A    Yes.
11    Q    Can you tell us about that?
12    A    I introduced legislation that would allow people to
13    register to vote up until -- up until the day of voting.  I
14    introduced legislation to -- I may have -- I'm trying to -- I
15    know I had legislation drawn up.  I think I introduced it
16    through -- I have -- to try to make it easier to register.  It
17    might have been automatic registration.
18         I -- over the --
19              THE COURT:  What do you mean by automatic
20    registration?
21              THE WITNESS:  There are some states that have
22    legislation have -- that when you become 18, you automatically
23    are registered.  You don't have to go through the process.
24         I was trying to pull up -- trying to pull up, but -- to
25    have it -- to have people make it much easier for folks to
```

11:11:23  (line 5)
11:11:42  (line 10)
11:12:20  (line 15)
11:12:42  (line 20)
11:13:11  (line 25)

 1  vote.  And there were others, but I can't pull them up right
 2  now.  They may pop up in a minute.
 3  BY MS. MADDURI:
 4  Q    Okay.  And approximately how many times would you say
 11:13:33 5  you've introduced legislation related to either automatic
 6  registration, or same day, or late registration, I think as you
 7  said?
 8  A    I don't know how many.  Because when you've been around
 9  35 years, you can't pull it up.
 11:13:54 10  Q    Any efforts in the last five years that you were in the
 11  legislature?
 12  A    Yes.  I know I -- I know there were two bills.  It might
 13  have been as late as 2018.
 14  Q    And did any of those bills ever pass?
 11:14:15 15  A    No.  No.  I never expected them to pass.  I simply
 16  introduced them because it was a statement that was important
 17  that we address those issues.
 18       But, no, they -- no.
 19  Q    When we were going over the committees that you had served
 11:14:49 20  on, you mentioned the finance, taxation, and education
 21  committee, right?
 22  A    Yes.
 23  Q    How long did you serve on that committee?
 24  A    I was chair of the committee for 16 years.  I think the
 11:15:02 25  most anybody chaired a single committee.  But that committee

 1  was only in existence from '95 until starting in '95.

 2       So I was -- but the dealing with the budget committee, I

 3  think I was on the budget committee before '95.  But that

 4  particular committee started in '95.

11:15:34  5  Q    Okay.  Do you believe that African-Americans in Alabama

 6  bear the effects of discrimination in education?

 7  A    Yes.

 8  Q    In what way?

 9  A    When I -- when I became chair of finance and taxation, the

11:15:53 10  first thing I tried to do was change the formula for

11  educating -- for allocating funds to try to make it easier for

12  poor areas, make it easier for rural areas.  And there were

13  changes, but it was not enough.

14       The way Alabama fund education is much of it from the

11:16:24 15  state but some of it from the local level.  And so if you're in

16  an area that's got a lot of poverty, a lot of lower income

17  people, then you end up with less money to educate when the

18  problems are, in fact, are greater and need more.

19       So it's -- I think time after time you see education

11:17:01 20  struggling a lot more in African-American communities.  And

21  that's, you know, one of the things that I think that strike me

22  the most is that the farther you down on the status pole, the

23  farther you're down on the education pole, the farther you're

24  down on the economic pole, the less you see where your

11:17:44 25  education is going to make a difference.

1     When you higher on the status pole, you can see where more

2  education going to help you. You can see where more education

3  going to help you when you higher on the job, or higher on the

4  economic scale, higher on the social scale.

11:18:03  5     When you down at the bottom, it's hard for students to be

6  able to see that. And, therefore, all of those things come

7  together in a way that you have a vast number of people getting

8  less education. They need more resources, but they're getting

9  less resources.

11:18:25 10  Q   And are those people primarily African-American in

11  Alabama?

12  A   Yes.

13  Q   Or more often than not?

14  A   Yes. Primarily.

11:18:33 15  Q   And how does being lower on the totem pole or the status

16  pole in education and income, how does that impact whether or

17  not African-Americans are able to vote?

18  A   When you have to jump through hoops to be able to vote,

19  then you have to see where it's going to make a difference in

11:19:02 20  your life if you are able to vote.

21     And so if you are -- if the polling place is a problem, if

22  you have to have transportation to get there, then you need

23  more encouragement to vote.

24     But, in fact, you're encouraged less because it's harder

11:19:31 25  for you to see how this is going to make a difference.

```
 1        I -- one time there was a lady, she was -- I can't think
 2   of her name.  But she was traveling over the country trying to
 3   encourage young people to vote.  And she came to Selma.  And so
 4   we went out to the 21st Century Youth Leadership camp.  And we
11:20:02 5   did a demonstration.  We asked her -- we asked the students --
 6   we had some students.  And so we asked them name something that
 7   voting does not impact.  That's what we asked the students.
 8        And then they would start out with things like air.  And
 9   then we would explain that people put all kind of things in the
11:20:24 10   air, and you have the Environmental Protection Agency trying to
11   stop it.  So the very air that you breathe.
12        And then they'd say food.  And we'd talk about the Food
13   and Drug Administration.
14        And they'd talk about water.  And we'd talk about how
11:20:42 15   water, whether it's local or federal, all of that --
16        So they went on down to talk about religion.  And then we
17   will say, point out -- how we ask them can they organize in the
18   schools.
19        So what we were doing was demonstrating that every single
11:21:01 20   thing is affected by voting.  And you don't see that when
21   you're poor.  You don't see that when you're low on the
22   education pole -- totem pole.  You don't see that when you're
23   low on the education and economics, and all of that.
24        So the higher you are on those totem poles, the more
11:21:27 25   likely you are able to see where voting would make a
```

difference.  The lower you are on there, you worried about

whether you're going to be able to get food to eat.  You're

worried about -- whether you're going to be able to get to and

from to work, to and from school, all those kinds of things.

11:21:50      And the one of the things that people really don't

understand that if you have one of those, that that's a burden.

If you have one of them, that's an obstacle.  If you have two

of them, that's a burden.  If you have three of those, then

it's prohibitive.

11:22:08      You know, we see them separately.  But the impact of them

is collective.

Q    Would you say that conditions for African-Americans in

Alabama today are better than they were in the 1960s or '70s?

A    Yes.  Things are definitely better than they were in the

11:22:40  1960s and 1970s.  Because in the 1960s, there were times when I

had to get off the sidewalk if a white person was coming in the

opposite direction.  So I had to get off and let them go.

      And every single thing was segregated.  And every single

thing was holding us down in ways.  So it's definitely better.

11:23:15      In the 1970s, things improved some.  But it was in 1972

that I went -- my wife was pregnant, and she didn't know she

was pregnant, but she wanted fudge.  And she does not like

fudge.  But all of a sudden she wanted fudge.  So --

            THE COURT:  You should have known something was

11:23:42  getting right with her.

          1          THE WITNESS:  I should have when I looked back.

          2      So I took her to this place.  It was called Dairy Queen,

          3  or Dairy Dream, or something.  It was right there in Selma on

          4  80 and Lapsley Street or Summerfield Road.

11:24:01  5      And I pulled up, and she got out and went to stand in

          6  line.  And when they stood in line, all of a sudden this white

          7  man came up and pushed her down.  And he was standing over her.

          8      So I jumped out and ran over there and hit him and he fell

          9  down.  And I started trying to get her up.  And she -- and he

11:24:22 10  got up, and he stabbed me in the left side.  To even today, I

         11  have a reduced kidney where I was stabbed.

         12      So I swore out a warrant against him.  She wore out a

         13  warrant against him.  He swore out a warrant against us --

         14  against me.  And the judge dismissed all the charges against

11:24:45 15  him even though he had stabbed me and even though he had

         16  knocked her down.

         17      The judge did give a $20 fine against him for pushing her

         18  down.  And so I -- I was just absolutely shocked.  But then he

         19  sentenced me to jail.

11:25:06 20      So when I went to jail, I refused to make bond.  I said,

         21  you know, this is so unfair.  I'm going to just stay here in

         22  jail.  My wife and I talked, and we agreed she was not going to

         23  bond me out or let nobody bond me out.

         24      Then the probate -- I mean, after a few hours, the police

11:25:27 25  chief came and he said, Somebody's bonded you out.  And I said,

Well, we agreed that we weren't going to be bonded out.  So --
he said, But you were bonded out.  I said, Well, who bonded me
out?  He said, I'm not going to tell you.  I said, People --
that's public information.  He said, Not in this jail.

11:25:48    So then I told him I said, Well, I'm going to just stay
right here.  And he said, You're not going to stay right here.
You're getting out of here.

I got out.  I appealed the case.  And then when it didn't
show up in circuit court, I went over -- eventually went over
11:26:07  to find out what happened to it.  All of the records had
disappeared.  All of the arrest records, all of the court
records, everything.  And I haven't been able to find them to
this day.  I keep thinking that that's going to show up at the
bar association any time.

11:26:27    So I mean, that was -- that was in 1972.  And you had had
the Civil Rights Act in 1963.  You had the Voting Rights Act in
1965.  But it was just so powerful.

Even so, things have gotten better.  Whenever I look at
it, things got better from the '60s, got better in the '70s,
11:26:56  got better in the '80s.

And in the '90s, I -- things seemed to be slowing down.
And eventually, in 2010, whatever things -- my impression was
things were going back.

So when you say are they better today than they were?  And
11:27:19  when I look at that, they were getting better.  Now, there's a

1   serious question about whether they're getting worse.

2   BY MS. MADDURI:

3   Q    I think at the beginning of your testimony you mentioned

4   that you marched part of the Selma to Montgomery, the last leg

11:27:42  5   of it?

6   A    Yeah.

7   Q    What was that like?

8   A    It was -- it was such a powerful experience because we

9   didn't -- well, only 300 people marched all the way.

11:27:58 10       But we were so far back down the line because it was like

11   25, 35,000 people there.  But you couldn't see -- you could see

12   the outline of Dr. King, but you couldn't see his face.  You

13   could hear him because he had those big speakers.

14       And whenever he got into this rhythm where he would say,

11:28:20 15   How long?  And initially, when we would say, How long?  He

16   would say, Not long.  But then after while when he would say,

17   How long?  The crowd responded saying, Not long.

18       And I left there thinking that it really won't be long

19   before we have the right the -- the full right to vote.  And

11:28:46 20   then the Voting Rights Act was passed in August and was signed

21   on August the 6th, 1965, I could never conceive of the idea

22   that 50 years later I would still be struggling and fighting to

23   implement it.  I should have known that "how long" was

24   Biblical, not months, not years.

11:29:16 25       In 1966, when we couldn't elect a single person, I should

1  have known that it took until 1988 -- two incumbents that had
2  60 and 70 percent -- black people to be able to elect to county
3  commission and board of education -- a majority.  I should have
4  known.  I didn't know.  I just kept thinking that "how long"
11:29:43  5  meant 5 years, then 10 years, then 20 years, then 30 years.

6      But it was one of the more powerful experience to see all
7  those people -- black and white, old and young, fighting,
8  marching for the right to vote.

9  Q    Why have you chosen to stay so involved and done so much
11:30:11 10  work for the right to vote?

11  A    I think that President Johnson may have put it best
12  whenever he was talking about the right to vote in 1965.

13      First, the vote is the only thing where everybody starts
14  out even.  You get one vote.  So everybody starts out equal.

11:30:43 15      Second, there's the vote is the only thing that can
16  stop -- that can protect every other right.  It's not an
17  accident that the right to vote was the last major bill -- the
18  last major Civil Rights legislation to pass.

19      Even in 1963, when they did public accommodation, when
11:31:11 20  they then did employment discrimination, whatever.  But the
21  right to vote came last because it protects every other right.

22      And the right to vote, the only vote that you can use --
23  the thing you can use to change things without resorting to
24  violence and other kinds of things.  So it's the most powerful
11:31:39 25  right that we have because it protects every other right.

```
 1   Q    Thank you, Senator.  That's all my questions for you right
 2   now.
 3              THE COURT:  Any cross?
 4              MR. WALKER:  Yes, ma'am, Your Honor.
11:31:53 5     THE COURT:  Mr. Walker?
 6                        CROSS-EXAMINATION
 7   BY MR. WALKER:
 8   Q    Good morning, Senator Sanders.  Nice to see you.
 9   A    It's good to see you again.
11:32:07 10  Q    I'd like to start by asking you some questions about what
11   you've already testified about today, sir.
12   A    Sure.
13   Q    And I think you -- you testified about the Pigford case?
14   A    Yes.
11:32:30 15  Q    Was that the former class action case?
16   A    Yes.  That was the first one.
17   Q    And who was the defendant, or what was the defendant in
18   that case, if you recall?
19   A    The defendant was the United States Department of
11:32:44 20  Agricultural, USDA.
21   Q    Do you recall the second case, the style of that case?
22   A    Yes.  It was discrimination litigation.  It was a black
23   farmers discrimination litigation.
24   Q    And the defendant in that case was also the United States
11:32:59 25  Department of Education?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1   A      Yes -- no.  United States Department of Agriculture.
 2   Q      Sorry.  Thank you.
 3   A      Yeah.
 4   Q      You mentioned some voter fraud prosecutions that occurred
 5   in west Alabama, and I believe you associated those with Jeff
 6   Sessions?
 7   A      Yes.
 8   Q      And he brought those as U.S. Attorney for the Southern
 9   District of Alabama; is that correct?
10   A      Yes.
11   Q      Do you know whether or not --
12   A      He brought some of them, yeah.
13   Q      And then the U.S. Attorney for the northern district
14   brought some?
15   A      Yes.
16   Q      Okay.  Do you know whether or not those U.S. Attorneys
17   were required to get approval from main Justice before they
18   filed those lawsuits?
19   A      No.  I do not know.  But I think we were -- we were just
20   shocked that we -- that we complained and nothing happened.
21   Q      I understand.
22   A      And they told us to learn to use absentee ballots.
23   Q      You talked with some sense about -- some sense of
24   frustration about bills that you've not been able to get passed
25   in the legislature.  And it would be true that every legislator
```

(timestamps in left margin: 11:33:22 at line 5, 11:33:33 at line 10, 11:33:41 at line 15, 11:33:56 at line 20, 11:34:27 at line 25)

1  has bills that they strongly believe in and can't get passed;

2  is that correct?

3  A    That's correct.

4  Q    And I want to give you an opportunity to be clear about

11:34:45 5  something.  Were you saying that all Republican members of the

6  legislature were racists?

7  A    No.

8  Q    Okay.

9  A    But what I am saying is that race is such a powerful

11:34:59 10  factor.

11       I don't use the term racist because it cuts off

12  conversation.  The moment you say somebody's a racist, you

13  don't have any conversation.

14       But race is a very powerful factor.

11:35:11 15  Q    You talked about some bills that you wished you had been

16  able to pass.  And one of them -- let's see if I can find my

17  notes.  And I apologize, sir.

18       One of them was to allow voting registration up to the day

19  of voting?

11:35:43 20  A    Yeah.

21  Q    And the other one I think was to allow automatic voting or

22  require automatic voting when you register for a driver's

23  license?

24  A    Automatic?  No.

11:35:52 25  Q    Did I misunderstand?

```
 1   A     I think it was automatic registration.
 2   Q     Automatic -- I said voting, and I meant registration.  And
 3   I apologize.
 4         So to be clear since I've muddled things up, one was to
 5   allow people to register to vote up to the day -- up to
 6   election day?
 7   A     Yeah.
 8   Q     And one of them was to allow automatic registration when
 9   people went to get a driver's license?
10   A     No.  No.
11   Q     Just --
12   A     When they became 18.
13   Q     When they became 18?
14   A     Yeah.
15   Q     Just automatic registration?
16   A     Yeah.
17   Q     Okay.  Is there any reason you could not have proposed
18   those bills before 2010 when the Democrats were in power in the
19   legislature?
20   A     No.  I don't think there was any reason -- it simply
21   didn't come up at that time.
22   Q     And --
23   A     And --
24   Q     I'm sorry.
25   A     Go ahead.
```

1    Q    No.  Please go ahead, sir.

2    A    Well, see, the thing you have to understand was there

3    was -- even when Democrats were in control, there were

4    tremendous limitations on things that affected

11:37:15  5    African-American.  So it was -- it became to a much greater

6    degree.  But there were -- I don't want to suggest that race

7    was only an issue with Republicans.

8         Race became more of an issue because we were not in that

9    structure.  But there were many Democrats who had reservations

11:37:42 10    to -- they grew up in the system, as well.

11    Q    And just to be clear, from let's say 1901 until 2010,

12    state government in Alabama was controlled by the Democratic

13    party; is that correct?

14    A    From?

11:38:02 15    Q    1901 or 1900?

16    A    Yeah.  Well --

17    Q    No.

18    A    From 1819 --

19    Q    Until?

11:38:11 20    A    No.  No.  Yeah.  From 1819 except for maybe a brief

21    period.

22    Q    During Reconstruction?

23    A    Reconstruction.

24    Q    Okay.  The state was controlled by Democrats until 2010?

11:38:25 25    A    Yes.

1   Q    Thank you.

2   A    Well, I wouldn't say until -- the legislature was

3   controlled by Democrats until 2010.  But the governor and a lot

4   of other office some happened before 2010.

11:38:41 5   Q    So before 2010, the legislature was controlled by

6   Democrats.  And after 2010, it became controlled by

7   Republicans?

8   A    Yes.

9   Q    Thank you, sir.

11:39:08 10       Senator Sanders, you testified about reasons why

11   African-Americans may be afraid to vote.  And I understand

12   that.  And we both understand that our state has a very sorry

13   history as we go back of Civil Rights.  And I don't mean to

14   minimize that.

11:39:31 15       But you said three things:  That people were afraid to

16   vote because in the past African-Americans have been lynched

17   for voting, and people have lost their jobs for voting, and

18   people have lost their land for trying to vote.

19   A    Put off the land.

11:39:58 20   Q    Different from --

21   A    The reason I say put off the land -- in 1966, when I went

22   to Lowndes County, every black person who would try to register

23   to vote, they were put off the land.  They -- so they had tent

24   city right there on 80 between Selma and Montgomery because all

11:40:20 25   these people were put off the land.  And so they would live in

```
 1  tents and stuff, yeah.
 2  Q    I understand that.  And you and I grew up roughly --
 3  you're a little bit older than me, but we --
 4  A    A few years on the front end and on the back end make a
 5  lot of difference.  In the middle, it's not much.
 6  Q    It's been a long time since any of those things happened
 7  to a black person who tried to vote, has it not?
 8  A    It's been a long time since a person was lynched who was
 9  trying to vote.  It's been a long time since people were put
10  off the land.  And it's been a long time.
11       But the memory of those in our collective memory is so
12  powerful.  And it's handed down from generation to generation.
13  So it's still there in a very powerful way.
14  Q    I understand that.  Thank you.
15       There's been testimony throughout this trial that I would
16  generally summarize as saying that -- and I think you were
17  sitting in the courtroom today when the commissioner who
18  preceded you testified.  And it may be fair -- and if you feel
19  like I'm misstating her testimony, let me know, because that's
20  not my intent.
21       But some of what she said was that it would be good to
22  have another African-American congressperson because the white
23  people in Congress don't represent their black constituents,
24  and that there should -- for that reason, there should be a --
25  an area drawn with majority a black district that could elect a
```

```
 1    majority black -- I mean, that could elect the African-American
 2    candidate of choice who, in most cases, would probably be
 3    African-American.
 4         Does that -- I'm not sure she said all of that --
 5    A    Neither am I.
 6         But let me address it this way.  No white person can fully
 7    understand all of the ramifications and manifestations that
 8    race impact on things.  So even the ones who try very hard
 9    can't do it because it affects everything in one way or
10    another.  So -- so since that's the case, if you -- and in
11    Alabama if you don't get a majority district, you don't get
12    black people elected.
13         As far as I can recall on the state level, there was only
14    one black person elected in a majority white district.  And
15    that was up in Cullman County.  I forget his name.  And he only
16    served one term.
17         So the only way that black people -- since the state is
18    majority white, the only way black people get in office
19    essentially is through district.  And that's true in Congress,
20    as well.
21         And the county -- the state is 25 percent, 26 percent
22    African-American.  And there's no doubt in my mind that the
23    county representation will end up being different because they
24    have different experiences that they went through things.
25         I think Congresswoman Terri Sewell, she was among -- as I
```

11:42:42  (line 5)
11:43:19  (line 10)
11:43:49  (line 15)
11:44:08  (line 20)
11:44:32  (line 25)

1  recall, she may be -- she might not have been among the ones
2  who desegregated schools, but she -- part of her experience
3  would have been that.
4       So all of that informs how you understand issues and,
11:44:53 5  therefore, how you respond to issues.
6       When -- if somebody thinks everything is hunky-dory, then
7  they're not going to respond the way you want -- you may want
8  them to respond.  So I -- it just makes a big difference.
9       One of the things that I have noticed when I -- in the
11:45:19 10  Senate -- maybe I said this.  But when white people came to see
11  me -- and a lot of white people came for representation -- they
12  always came with a proposal to advance them being in the
13  system.  And most of the time when black folks came to see me,
14  they came with ideas of how black people as a group can get
11:45:52 15  within the system.
16       So that was a completely different thing because white
17  people usually came with a proposal saying specifically, Here's
18  what I want you to do for me or for my group that's a small
19  group.  And black people came saying, how do we get in
11:46:11 20  economically?  How do we get in educationally?  How do we get
21  in all of these other kinds of ways?
22       So it was just a profound difference.  I was willing to
23  see all of them.  I was willing to work with all of them.  But
24  they came differently.
11:46:24 25  Q    I asked my question perhaps poorly and maybe misdirected

1  you in where I meant to go.

2      Let me ask you the question this way:  You talked about

3  fact that we have at-large elections for the Supreme Court and

4  the Court of Civil Appeals.

11:46:41 5  A      Yeah.

6  Q    And I think both of us agree that the state is better

7  served when we have people from all backgrounds on those

8  courts.  I don't in any way disagree with you on that.

9      But did you mean to say that the use of the state -- that

11:46:57 10  the state's reliance on statewide at-large elections is

11  necessarily race based?

12      And let me ask that question a little bit differently.

13  Doesn't the state have a legitimate argument -- you may not

14  agree with it -- but at least one that reasonable people could

11:47:16 15  think was valid, that if people are elected from districts,

16  they may feel like they're supposed to represent their

17  districts, as opposed to other voters, and that we don't want

18  our judges on the Supreme Court and the Court of Criminal and

19  Civil Appeals to feel like they have a constituency other than

11:47:39 20  all the people of the state as a whole.

21      And so my question is:  Would you at least agree that that

22  is not necessarily a racially motivated point of view, even if

23  it's not one you would agree with?

24  A      It may not be racially motivated.  It certainly has

11:47:58 25  powerful racial impact.

1      And by your argument, then they all are elected by the

2  Republican party.  So that means that by your argument, that

3  that he would -- they are likely to serve the interests of the

4  Republican party.

11:48:20 5      So to me, it makes sense to end up having inclusion where

6  everybody's at the table.  Even though you are in a minority,

7  you are still at the table.  So you have a chance to try to

8  educate others who are there making a decision.

9  Q    Would you agree with me that the manner in which we fund

11:48:41 10  schools in Alabama is very complicated, perhaps needlessly very

11  complicated?

12  A    Very complicated, yes.

13  Q    And that since I've been an adult, at least, for the last

14  30 years, at least, a lot of people, black and white, have been

11:49:01 15  working very hard with not as much success perhaps as we would

16  hope, but working very hard to change the way that we fund our

17  schools and to create better schools that are better funded?

18  A    I don't know about a lot of people.  Some people have

19  worked hard to try to have better funding of education.

11:49:26 20  Q    And that would be black people and white people?

21  A    Yes.  Some whites and some black.

22  Q    And do you know whether or not the poverty rate among

23  African-Americans in Alabama has gone up or down since 2000?

24  A    I don't know that for a fact.

11:49:49 25  Q    Do you know whether the lifespan of African-Americans in

1  Alabama has gone up or down since 2000?

2  A    I don't know.

3  Q    Do you know whether the per capita income of

4  African-Americans in Alabama has gone up or down in 2000?

11:50:07  5  A    Per capita?  I think so.  But I don't know for a fact.  I

6  haven't looked at these figures.

7  Q    Do you know if the rate of Internet access among

8  African-Americans in Alabama has gone up or down since 2000?

9  A    I'm sure it's gone up.  There wasn't hardly any Internet

11:50:28  10  before 2000 among black people.  I'm sure it's gone up.

11  Q    I think maybe you have me there.

12      What about 2010?  Do you know whether or not the rates of

13  Internet access among African-Americans in Alabama has gone up

14  since 2010?

11:50:41  15  A    I don't know for a fact, but I believe it has.

16  Q    And do you know whether health outcomes for

17  African-Americans on average have gone up since 2010?

18  A    I don't know that for a fact, but I hope and pray it has.

19  Q    And I do too.

11:51:00  20      Let me change subjects just a little bit, Senator Sanders.

21  You mentioned earlier two things, one of which kind of caught

22  my ear because I didn't know the difference.

23      You mentioned the Alabama New South Coalition, and I'd

24  like to ask you some questions about that.  But you actually

11:51:20  25  also -- I thought I heard -- and the acoustics in this

1  courtroom are not good.  But I thought I heard you mention the
2  Alabama New South Alliance.
3  A    Alliance, yeah.
4  Q    What's the difference between the New South Coalition and
11:51:30  5  the New South Alliance?
6  A    Well, when Alabama New South was created, it not only did
7  voter registration, voter mobilization, and voter
8  participation, voter education, but it also endorsed
9  candidates.
11:51:48 10      And after the -- after the PAC-to-PAC transfer of things
11  came in, that that created all kinds of problem.  So Alabama
12  New South Coalition ceased to endorse candidates.  And
13  candidates are actually endorsed by Alabama New South Alliance.
14  Q    Oh, so you did that because of the PAC-to-PAC problem?
11:52:13 15  A    Yeah.
16  Q    I see.  By the way, you mentioned the PAC-to-PAC
17  legislation.  And did you say that was in 2010 or 2011?
18  A    I thought it was in 2010.  I thought it was passed in
19  December -- the election was in November, and then there was a
11:52:30 20  special session in 2010 in December.
21  Q    I think you're right.  And you mentioned that you were
22  part of the delegation of people who went -- excuse me, sir --
23  to Washington to lobby the Attorney General not to preclear
24  that bill; is that correct?
11:52:47 25  A    Yes.

```
 1  Q     Did y'all meet with the Attorney General at that time?
 2  A     I don't -- I don't know whether we met with the Attorney
 3  General on that occasion.  We met with some people in the Civil
 4  Rights Division.
 5  Q     And, ultimately, I guess they concluded that the
 6  PAC-to-PAC transfer would not have a retrogressive effect on
 7  the opportunities for African-Americans to elect the voters of
 8  their choice and participate in elections; is that correct?
 9  A     No.  No.  What they decided was somehow this kind of
10  legislation does not come within the purview of Section 5.
11  Q     So they said was not preclearable, not within their
12  jurisdiction?
13  A     Yes.
14  Q     Who was the Attorney General at that time?  Do you recall?
15  A     Yes.  As I recall, it was -- because he was there during
16  most of the Obama administration.  I can't think of his --
17  Q     Let me tell you that I believe the Attorney General from
18  2009 to 2015 was Eric Holder?
19  A     It was Eric Holder.
20  Q     Thank you.
21  A     See, that's that 77 years again.
22  Q     I'm right there with you.  If I hadn't looked it up on
23  Google while you were talking, I wouldn't have known.
24        Can you tell us what the Alabama Democratic Conference is?
25  A     Yes.  The Alabama Democratic Conference is a caucus within
```

Time stamps: 11:53:04 (line 5), 11:53:25 (line 10), 11:53:42 (line 15), 11:53:59 (line 20), 11:54:13 (line 25)

1   the Democratic party.

2   Q    And is it fair to say for a long time -- I don't know if

3   it still is -- but that by and large, that was created and led

4   by a man named Joe Reed?

11:54:31  5   A    Yes -- well, it wasn't created, but it was led by him for

6   many years.

7   Q    Okay.  And many people would call Joe Reed the dean of

8   Alabama redistricting.  Have you ever referred to him -- heard

9   him referred to in terms like that?

11:54:49 10  A    No, but -- but we give him a lot of credit for his work in

11  redistricting.

12  Q    And do you know whether or not he has played a role since

13  at least 1980 in drawing the state legislative and

14  congressional districts when they were passed by the

11:55:19 15  legislature?

16  A    I know for a fact that he played a significant role in

17  legislative districts.  I'm not sure about exactly what

18  happened.  But I think that he may have been involved when the

19  one black district was created in 1991-'92.

11:55:39 20  Q    Are you a member of the ADC?

21  A    No.

22  Q    And you haven't been a member of the ADC since you were

23  one of the cofounders of the New South Coalition; is that

24  correct?

11:55:51 25  A    Yes.  I haven't been a member of the ADC since 1980 --

```
 1  well, it started a little before -- it was created in '86.  But
 2  I went out in, I think, in '80 -- '84.
 3  Q     And why did you cofound the Alabama Democratic Coalition?
 4  A     Okay --
 5  Q     Excuse me.  Alabama Democratic Conference.  Sorry.
 6  A     Ask the question --
 7  Q     Excuse me.  Let me ask my question again.  I got all
 8  messed up.
 9        Why did you, Senator Sanders, co-found the New South
10  Coalition?
11  A     There were two major things that led to it.  We were in
12  the seventh district, and the ADC elected chairs -- elected the
13  chair of each district.
14        And we -- some of us got together and elected Judge Branch
15  from Eutaw.  He was probate judge over there as the seventh
16  district chair.
17        Dr. Reed did not want him as chair.  So the election got
18  set aside.  And then they called another meeting.  He wanted
19  the mayor of Uniontown, and the meeting was in Uniontown.  So
20  they called a second meeting.  And when the second meeting was
21  called, we gathered again, and we elected Judge Branch again,
22  and it was set aside again.
23        And then the meeting was set in Chilton County.  And we
24  didn't bother to go.  That was -- that was one thing that had a
25  very profound impact.
```

1       The other one was when Jesse Jackson was running in 1984.

2  And so we all went to Mobile to participate.  And most folks

3  there were supportive of Jesse Jackson.

4       And there was a motion put on the floor and second and

11:58:12 5  passed in very -- like seconds.  And so people were very upset.

6       And the last part of that was in 1985, I received word

7  that Dr. Reed was opposed to me in the Senate, although I was

8  already in the Senate.

9       And so all of those things came together.  And we said we

11:58:56 10  wanted to create an organization that was not limited to one

11  race or it was open to whites, as well as blacks.  We wanted to

12  create an entity that was not tied to the Democratic party or

13  any other party.

14       And we -- if I'm going on too long, let me stop.

11:59:17 15  Q    No.  I think you've answered my question, sir.

16            THE COURT:  May I ask, is that the same Dr. Reed that

17  seems to be at outs with other members of the Democratic party

18  in Alabama right now?

19            THE WITNESS:  It's the same Dr. Reed that's been in a

11:59:33 20  struggle with some other members of the Democratic party.

21            THE COURT:  Okay.

22  BY MR. WALKER:

23  Q    Senator Sanders, ever since I've been voting, I have been

24  seeing yellow ballots handed out outside of polling places

11:59:47 25  where I vote.  And what would those be?

A     That yellow ballot is the ADC ballot.  The blue ballot is
the Alabama New South Alliance ballot.

Q     And --

A     Of course, other organizations will sometimes put out a
yellow ballot or a blue ballot.

Q     Yeah.  But the ADC routinely outside of polls hands out
ballots that tells people who are interested in the ADC's
position how to vote.

      And the New South Coalition, of course, does the same
thing, and other groups may do the same thing too.  I'm not
saying there's anything wrong with that.

A     Yeah.

Q     And is the position that the New South Coalition takes
always the same as the position that ADC takes?

A     No.

Q     Okay.  Are they mostly different, or do you know?

A     When you say mostly different, you have a number of
positions on the ballot.  Sometimes you have 30-something --
30-something positions.  And I would -- if I had to answer
that, I would say most of the positions are probably the same
person --

Q     Let me rephrase my question.  Do the ADC and the New South
Coalition independently come up with who they decide to endorse
and support?

A     Yes.

1    Q    And sometimes it's not the same person?

2    A    Yes.

3    Q    Okay.  And, in fact, I'm not sure if it was the first

4    time, but I think it was the first time that Ms. Sewell ran for

12:01:26  5    District 7, the New South Coalition endorsed, I believe, Earl

6    Hilliard, did it not?

7    A    It --

8    Q    In the primary?

9    A    In the primary, it endorsed Earl Hilliard.  In the runoff,

12:01:44 10    it endorsed Congresswoman Sewell.  ADC endorsed, I think,

11    Sheila -- from Jefferson County.  Sheila...

12    Q    I can't think of her last name right now.

13    A    She was on the county commission at that time.

14    Q    Sheila Smoot?

12:02:00 15    A    Sheila Smoot.  Yeah.  If I remember correctly.  That's

16    been a while.

17    Q    Well, that's what my research showed.

18         You were in the legislature -- your -- when did you give

19    up your seat, sir?

12:02:15 20    A    I went out in November.

21    Q    Of this November or last November?

22    A    This -- no.  I went out in November of 2018.

23    Q    Okay.

24    A    I've been out a year.

12:02:25 25    Q    And you've been succeeded by your daughter -- one of your

```
 1  daughters, rather, at any rate, I believe?
 2  A    Yes.
 3  Q    And she was elected without opposition?
 4  A    No.  She was elected.  An independent ran against her who
 5  was a -- who was a Republican member of the Dallas County Board
 6  of Education.  But he ran as an independent, so...
 7  Q    And did she win by a landslide?
 8  A    She won by a very good margin.
 9  Q    I'll take that.  And congratulations.
10  A    Thank you.
11  Q    But you were in the legislature in 2011 when the
12  legislature took up congressional redistricting, were you not?
13  A    Yes.
14  Q    So I'd like to ask you about that, please, sir.
15  A    Okay.
16  Q    Do you need some water or anything?
17  A    I'm fine.
18  Q    Okay.  Did you ever talk with Ms. Sewell about her
19  district?
20  A    In the 2011?
21  Q    Yes, sir.  When the new plan came up, did you ever talk to
22  her about her district?
23  A    I didn't have a conversation with her.
24  Q    Do you know whether or not she designed her district
25  herself or with her staff?
```

12:02:43 (line 5)
12:03:06 (line 10)
12:03:15 (line 15)
12:03:24 (line 20)
12:03:37 (line 25)

1    A    No, I do not know.

2    Q    Do you know whether or not she approved that district?

3    A    I do not know.  But I -- I know it was very common for

4    people to be consulted about their particular district, but I

12:03:53 5    do not know that.

6    Q    If Senator Dial were to testify that she told him she

7    approved that district, you would not disagree with that, would

8    you?

9            MS. MADDURI:  Objection.  Calls for speculation.

12:04:05 10           THE COURT:  Overruled.

11           THE WITNESS:  If Senator Dial said it, I don't know

12   whether I would agree with it, but I could envision that

13   possibility.

14   BY MR. WALKER:

12:04:17 15   Q    Okay.  Did you, at the time the legislature was taking up

16   the 2010 congressional districts, suggest to anybody that there

17   should be two majority black districts?

18   A    I don't know whether I suggested it, but I know there was

19   discussion of that.

12:04:39 20   Q    Was that discussion with any of the chairs of the

21   redistricting committee so far as you know?

22   A    I didn't have any discussion with the chairs of the

23   redistricting commission.

24   Q    Was that discussion among members of the Alabama

12:04:55 25   legislative black caucus?

```
 1   A      I know it was discussions among members of -- yeah,
 2   members of the black caucus.  Yeah.  Yes.  Among
 3   African-Americans in the legislature.
 4   Q      Do you know if they --
 5   A      Which it may be different from the black caucus.
 6   Q      Uh-huh.  Do you think when the legislature is looking at a
 7   redistricting plan, one of the considerations is whether or not
 8   that's a plan that can be passed?  Is that a legitimate
 9   consideration?
10   A      Yes.
11   Q      Okay.
12   A      Because I know that there are things that we think would
13   certainly be fair or better, but we also know that they are not
14   likely to pass, so...
15   Q      I understand.  Do you recall coming to a hearing that we
16   held when we were doing the legislative -- not congressional
17   redistricting -- in Selma?
18   A      I recall.
19   Q      And I think it was at the Saint James Hotel?
20   A      I recall that.
21   Q      And do you recall that at that time you testified that you
22   believed that a majority black district should have about
23   62 percent African-American population?
24   A      A majority black legislative district.
25   Q      Yes, sir.
```

12:05:13  5
12:05:32 10
12:05:59 15
12:06:20 20
12:06:38 25

```
 1   A     Yes.
 2   Q     Okay.  About 62 percent is what you told the committee; is
 3   that correct?
 4   A     Yes.
12:06:43 5   Q     And was that a decision that you had just made that day,
 6   or was it based on your experience over time as a legislator?
 7   A     Well, it was a decision that I had arrived to over time
 8   because there was a time when I thought it should be higher --
 9   Q     Uh-huh.
12:07:08 10  A     -- than been 62.  But as time went along, that continued
11   to change.  And the percentage continued to go down because
12   there are so many different factors that are involved.
13   Q     That would not be your opinion today, would it?
14   A     62 percent?
12:07:27 15  Q     Yes, sir.
16   A     No.
17   Q     But it was -- that was your opinion at the time based on
18   your experience as a successful African-American politician?
19   A     Well, I don't know whether it was based on my experience,
12:07:43 20  but that was my position at that time.
21         In fact, it was commonly thought back at that time that
22   you needed 65 percent.
23   Q     Uh-huh.
24   A     But that just kept going down because you would see
12:08:00 25  developments that indicate that you could win with less than
```

1   62 -- less than 65, less than 60 percent.

2   Q    And what were those developments?

3   A    Well, when you are looking at whether somebody can be

4   elected in addition to the number of African-Americans, you are

12:08:16  5   also looking at what kind of organization exists in that.  You

6   are also looking at what's the education level of people.  You

7   are looking at how many people have criminal records.  You're

8   looking at what kind of -- what's the economic kind of

9   situation.

12:08:41  10   Because in those districts -- and I've run in them enough

11   to know -- that the smaller the district is the more difficult

12   it is to elect an African-American.  You would think it would

13   be the other way around.

14   So because when local people decide they don't want you,

12:09:01  15   they can come together and bring things together.  So when you

16   are talking about a bigger district, then it makes a

17   difference.

18   So all of those factors come there, and they have

19   continued to evolve over the years.

12:09:18  20   Q    When you have a -- and when you have a -- an experienced

21   and successful politician with good name recognition, like

22   Ms. Sewell is in District 7, can you have a lower black

23   population and still think of that as a majority black district

24   than if you have an unknown black candidate?

12:09:45  25   A    Well, I wouldn't -- I wouldn't recommend deciding a

```
 1   district based upon the person that's in that office because
 2   they're not going to always be there.  So I wouldn't recommend
 3   that.
 4        You know, I ran for that district once.  I ran in 1992.
 5   There were 76,000 votes.  And I lost by 400, 500 votes.  So
 6   I'm -- I was familiar with that district from that experience.
 7   Q    One last question.
 8        When you --
 9        THE COURT:  Well, before we leave that, may I ask one?
10        MR. WALKER:  Yes, ma'am.
11        THE COURT:  Okay.  So from that -- I think the records
12   show that in the last election Representative Sewell carried
13   the vote by 70-something percent?  I'm asking the attorneys if
14   I'm wrong.
15        MR. WALKER:  I don't have that in front of me, Your
16   Honor.
17        THE COURT:  Seems like I can remember 74, something
18   like that.
19        Would the fact that she has had such a large majority of
20   the votes in that district -- should that fact affect the way
21   the redistricting commission looks at the percentage of
22   African-American population in that district in deciding to add
23   to or shrink that district, or should other factors come into
24   play?
25        THE WITNESS:  I wouldn't base that at all because the
```

```
        1   candidates who have run against her have not been strong
        2   candidates.
        3        So if strong candidates was out there, it might be a very
        4   different thing.  So I -- I would say you have to look at all
12:11:57 5   of those factors and all of those dynamics.
        6            THE COURT:  And as much as we all love Representative
        7   Sewell -- I do -- she may not run for that district forever,
        8   right?
        9            THE WITNESS:  That's right.  She may run for U.S.
12:12:15 10  Senate.
       11            THE COURT:  I didn't say anything.  I didn't --
       12   anyway.
       13        But the next candidate may not have it as easy as she has
       14   had it, I guess is what I'm trying to get around to.
12:12:32 15       So...
       16            THE WITNESS:  Well --
       17            THE COURT:  I mean, in looking at the voting trends in
       18   that district, it seems to me -- and these attorneys are going
       19   to educate me on it -- that the mere fact that she's been able
12:12:49 20  to carry it with such a strong high percentage doesn't mean
       21   that it would necessarily be as easy for the next candidate to
       22   run without her presence there to be elected, I guess is what
       23   I'm trying to say.
       24            THE WITNESS:  Well, she --
12:13:09 25            THE COURT:  When you have a good candidates, it's
```

```
 1   easier to get a more cohesive base for election than if you
 2   have one that's not as well known in the district even though
 3   that candidate may be a good one, too.
 4          THE WITNESS:  Well, if I remember correctly, most of
12:13:25  5   the people who have run against her have been other
 6   African-Americans.  So I don't think you can tell anything
 7   from -- from that.
 8       It may -- there may have been -- I was trying to think if
 9   I'd known of any white who ran against her.  There may have
12:13:48 10   been one, but I don't know.  It depends on who the candidates
11   are.  It depends on the resources that they have.  It depends
12   on what's the makeup of that district, but all of those other
13   kinds of things.
14       So I can't -- I can't say -- because I considered running
12:14:14 15   in 2010 when she was elected.  But people strongly encouraged
16   me to stay in the Alabama Legislature.
17       So all of those kinds of things, it doesn't mean that -- I
18   don't think you can tell anything about that because it's so
19   many factors and so many dynamics.
12:14:38 20          THE COURT:  Thank you.
21   BY MR. WALKER:
22   Q   Senator Sanders, you're a lawyer, too, and you know when a
23   lawyer says I have one more question...
24   A   That's the exact thing that ran through my mind.  In all
12:14:55 25   my 48 years of practicing law, I have not known one single
```

 1    lawyer who to say that and it was just one more question.

 2    Q    Well --

 3             THE COURT:  I actually had one.

 4             THE WITNESS:  One.

 5             THE COURT:  In a case a tried two weeks ago.

 6             THE WITNESS:  Oh.

 7             THE COURT:  Said one question and only had one.

 8             THE WITNESS:  That's was your first time.

 9             THE COURT:  I made note of that -- one of the rare

10    times.

11    BY MR. WALKER:

12    Q    I'm not going to be that lawyer today.  I've got more than

13    one now.

14         You talked about when you have a good candidate.  And what

15    makes a good candidate?

16    A    For me, a good candidate is a person who understands what

17    the district is like, who understands all of the dynamics in

18    the committee, who has a personality that connects with people,

19    who can raise a minimum amount of resources.

20         And I say a minimum amount because when I ran for -- I was

21    always underfunded compared to other committees until the last

22    few years.

23         But a good candidate has a vision that he or she can share

24    with the people and can tell them how they can plug into that

25    vision.

| | |
|---|---|
| 1 | Q    Does name recognition, is that one of the factors that |
| 2 | relates to electoral success? |
| 3 | A    That can be a factor.  But there have been times when |
| 4 | people didn't have name recognition at the beginning, but |
| 12:16:47 5 | various organizations supported them and helped in spite of the |
| 6 | fact they didn't have name recognition. |
| 7 | Q    Senator Sanders, I now want to put you on the spot a |
| 8 | little bit, and I'm sorry to do that. |
| 9 | A    I would be disappointed if you didn't. |
| 12:17:04 10 | Q    Okay.  Well, thank you. |
| 11 | I want to ask you about something that happened in 2010, |
| 12 | and I'm going to ask you about the robocall and give you a |
| 13 | chance to explain that, please. |
| 14 | A    Sure. |
| 12:17:14 15 | Q    And here is the text of the robocall that I understand you |
| 16 | made in 2010. |
| 17 | A    Yes. |
| 18 | Q    It was, quote, This is Hank Sanders, Alabama State |
| 19 | Senator, and I'm still mad as hell.  I say, hell, no.  I ain't |
| 12:17:35 20 | going back to the cotton fields of Jim Crow days.  I'm going |
| 21 | forward with Ron Sparks, Jim Folsom, and others who would do |
| 22 | right by all of us.  I hope you're mad as hell and will not go |
| 23 | back.  And you have the power to choose.  I will stand until |
| 24 | hell freezes over. |
| 12:17:58 25 | Was that the text from the robocall, sir? |

```
 1   A    Yes.
 2   Q    And I have to say to me and to a lot of people -- and you
 3   were questioned by Anderson Cooper about this -- I thought that
 4   was a racist appeal.  So I want to give you a chance to explain
 5   that.
 6   A    It was not racist at all.  What -- there were a lot of ads
 7   saying that we have to take our country back.  All of those ads
 8   about taking our country back.  And I was responding to that by
 9   this ad.
10        And I was saying -- because I viewed them as saying take
11   our country back as talking about going back to segregation,
12   going back to that.  And I was saying, Hell, no.  We ain't
13   going back.  And I didn't consider that racist.
14        In fact, that was a response to a racist ads and racist
15   statements.
16   Q    Well, did -- I believe that the people who were running
17   against Ron Sparks and Jim Folsom were the person who became
18   Governor Bentley and Kay Ivey.  Am I correct on that?
19   A    I think so.
20   Q    Did either Mr. -- or Dr. Bentley -- Bentley or Kay Ivey
21   run any ads that you thought were racist or say, let's take
22   something back, with regard to Civil Rights?
23   A    What -- there were -- I don't know whether they ran an ad
24   specifically.  But ads were being run saying, Let's take our
25   country back.
```

1   Q      Okay.

2   A      And the people who were saying that was supporting them.

3   And I was saying, no, we need to fight.  We can't go back.

4         That -- it's like Make America Great Again.  And you asked

12:19:53 5   when was America great again?  And then they say, well, during

6   slavery or during segregation.  So I was responding to that

7   concept.

8   Q      Thank you, Senator Sanders, for letting me ask you

9   questions.

12:20:09 10   A      Thank you.

11            THE COURT:  Any redirect?

12            Senator, it's getting into the lunch hour.  Are you

13   okay to go on a for a little while?

14            THE WITNESS:  Oh, yes.  I hope to finish and they'll

12:20:23 15   let me go.  I need to be in Greene County for a legal matter.

16            THE COURT:  Okay.  We'll see if we can finish and get

17   you out.  I just didn't want you to be sitting there starving.

18            THE WITNESS:  No.  I'm fine.

19            THE COURT:  Okay.

12:20:38 20            THE WITNESS:  Maybe she will say one more question and

21   mean it.

22            MS. MADDURI:  I'm not going to promise one more

23   question.  But it won't be very many questions.

24            THE WITNESS:  Okay.

12:20:49 25            THE COURT:  Just about every time a lawyer says that,

```
 1    you can pretty well be assured they're telling a story, can't
 2    you?
 3             THE WITNESS:  Yes.
 4                      REDIRECT EXAMINATION
 5    BY MS. MADDURI:
 6    Q    Senator, Mr. Walker talked to you about the comment you
 7    made about 62 percent in a legislative district about ten years
 8    ago.
 9             On that occasion, were you speaking about legislative --
10    sorry -- you were speaking about legislative districts?
11    A    Yes.
12    Q    Were you offering any opinion about the level of black
13    voting age population that was required in a congressional
14    district?
15    A    No.
16    Q    Are you familiar with the fact that state legislative
17    races have a much lower rate of participation than
18    congressional races?
19    A    Yes.
20    Q    Are you familiar with the fact that state legislative
21    races are typically far less well publicized than congressional
22    races?
23    A    Yes.
24    Q    Are you familiar with the fact that state legislative
25    races have much lower levels of fund-raising and spending than
```

12:21:00 (line 5)
12:21:10 (line 10)
12:21:20 (line 15)
12:21:32 (line 20)
12:21:50 (line 25)

1  congressional races?

2  A    Yes.

3  Q    Are you familiar with the fact that far fewer people as a

4  percentage vote in the state legislative races than

12:22:07  5  congressional races?

6  A    Yes.

7  Q    In your opinion, would all of these factors impact the

8  level of black voting age population that would be needed to

9  ensure that African-Americans have an opportunity to elect

12:22:20 10  their candidates of choice?

11  A    Yes.

12  Q    When you gave testimony at that hearing, did you also

13  offer testimony about the fact requesting that

14  African-Americans do not be packed into districts in the

12:22:34 15  legislature -- in legislative districts?

16  A    I don't recall at the moment what I -- whether I did or

17  not.  I know that's a concern.  But I can't recall whether I

18  testified on that or not.

19  Q    Okay.  Have you ever been involved with redistricting for

12:22:53 20  congressional districts?

21  A    Not really.  There was a -- when the district was created,

22  the seventh district was created, I remember interacting with

23  some people in discussions and stuff.  But I've never been

24  really involved in the creation of congressional district.

12:23:25 25  Q    Isn't it true that Terri Sewell won 72 percent of the vote

```
 1  the first time she ran for Congress?
 2  A    I don't recall.
 3  Q    What do you understand the opportunity to elect to mean?
 4  A    Opportunity to elect means that you have a reasonable
 5  chance to elect.  Reasonable chance doesn't mean that you will
 6  be elected.  It doesn't mean that the odds are with you.  It
 7  simply means that you -- that you -- you have an opportunity,
 8  you have a chance.  You have a reasonable chance.  It may be
 9  40.  It may be 50.  It may be 60.  But it means that all of
10  these different factors could come together, and you have a
11  reasonable chance to prevail.
12  Q    Thank you, Senator.  That's all for me.
13            THE COURT:  Any recross, Mr. Walker?
14            MR. WALKER:  Yes, ma'am.  A short recross.
15            THE COURT:  We gave him an opportunity to think a
16  little bit before.
17                     RECROSS-EXAMINATION
18  BY MR. WALKER:
19  Q    Senator Sanders, just a few more questions, please, sir.
20  A    I notice you avoid one more question.
21  Q    I did deliberately avoid one more question.
22       If you had been asked in 2010 what the African-American
23  population of District 7 should be, the minimum
24  African-American population, what would you have told the
25  legislature, given that in 2011 you thought it should be about
```

1  62 percent?

2  A    Well, first, I don't know what I would have told them

3  because I know it's a very different situation with a

4  congressional district than it is with legislative district.

12:25:28  5  So I don't know what I would have told them.

6      But I would have said -- you know, there are so many

7  different factors, and you have to take them all into

8  consideration.  I'm sure I would have said that it needed to be

9  at least 50 percent.

12:25:39 10  Q    Do you know Terri Sewell?

11  A    Yes.

12  Q    Do you believe that she has the best interests of

13  African-Americans at heart?

14  A    I think that she has -- that she's a good representative.

12:25:55 15  Q    Okay.  Do you believe --

16  A    For the state of Alabama, whether that's black people,

17  white people.

18  Q    Fair enough.

19      Do you think that she would agree to a plan if she

12:26:11 20  understood that it packed or cracked African-American

21  populations?

22          MS. MADDURI:  Objection.  Calls for speculation.

23          THE COURT:  Overruled.

24          THE WITNESS:  I know -- I know elected officials --

12:26:27 25  and I know every elected official wants the best district for

| | |
|---|---|
| 1 | their election.  They're not thinking about what's the best |
| 2 | district for all black people, or all white people, or all |
| 3 | other people.  They want the best district for them. |
| 4 | That's -- I've seen it over and over and over again that |
| 12:26:52 5 | people want a district that's going to assure their |
| 6 | re-election.  And that's a reasonable response for their |
| 7 | interest.  That's not a reasonable response for the interest of |
| 8 | the people who have been excluded. |
| 9 | BY MR. WALKER: |
| 12:27:14 10 | Q    Thank you very much, Senator Sanders.  I appreciate it. |
| 11 | A    Thank you. |
| 12 | THE COURT:  Anything else, Ms. Madduri? |
| 13 | MS. MADDURI:  No, Your Honor. |
| 14 | THE COURT:  Okay.  Well, I think we can let Senator |
| 12:27:23 15 | Sanders go so he make his other commitment.  And we will take |
| 16 | lunch and be back at 1:30. |
| 17 | THE WITNESS:  Thank you, Judge. |
| 18 | MR. WALKER:  Thank you, Your Honor. |
| 19 | (Recess.) |
| 13:34:32 20 | THE COURT:  Okay.  Where is our next witness? |
| 21 | MR. SPIVA:  The plaintiffs have no further witnesses, |
| 22 | Your Honor. |
| 23 | THE COURT:  Does defense have any witnesses?  Let's |
| 24 | get your witness up here. |
| 13:34:47 25 | GERALD DIAL, |

```
 1   having been first duly sworn by the courtroom deputy clerk, was

 2   examined and testified as follows:

 3            THE COURTROOM DEPUTY CLERK:  Please state your name in

 4   the microphone.

 5            THE WITNESS:  My name is Gerald Dial.

 6            THE CLERK:  Thank you.

 7            THE COURT:  We're waiting on you, Mr. Walker.

 8            MR. WALKER:  Thank you, Your Honor.

 9                       DIRECT EXAMINATION

10   BY MR. WALKER:

11   Q     Senator Dial, would you state your name for the record?

12   A     My name is Gerald Dial.

13   Q     I'm calling you Senator Dial.  Are you still in the

14   Alabama Legislature?

15   A     No.  I retired in November of 2018.

16   Q     And were you in the Alabama Legislature?

17   A     Yes.  I served in the legislature two terms in the House

18   from '74 to '84.  And I was elected to the Senate in '83,

19   served until 2006, was defeated, and then ran again in 2010,

20   and served until November of 2018.

21   Q     What was your Senate district, please, sir?

22   A     Senate District 13, which was mostly east Alabama.

23   Q     Does that include Lineville and Clay County?

24   A     Yes.

25   Q     And is Lineville where you're from in Clay County?
```

13:35:23 (line 5)
13:36:26 (line 10)
13:36:37 (line 15)
13:36:58 (line 20)
13:37:12 (line 25)

```
 1  A     Yes.
 2  Q     What do you do for a living?
 3  A     I'm retired at this time.  I retired in 2018.
 4  Q     What are you retired from?
```
13:37:25  5  A     I retired from the legislature, and I was in the real
```
 6  estate development business.
 7  Q     And during the time, did you have any elected office other
 8  than member of the House or member of the Senate?
 9  A     I had other jobs, but not elected job.  But I -- that's
```
13:37:45 10  the only elected job that I had.
```
11  Q     Okay.  Would you tell the Court a little bit about your
12  educational background, please?
13  A     I graduated with a B.S. degree from West Alabama
14  University, and I got my education requirement degree from
```
13:38:01 15  Jacksonville University.
```
16  Q     And I believe you coached for a while?
17  A     I -- after graduation, I returned to Lineville, Alabama,
18  where I coached football, basketball, and taught American
19  history and political science.
```
13:38:16 20  Q     What civic activities were you involved in, in Lineville
```
21  in Clay County over the course of your life?
22  A     Oh, well, I've been involved in quite a few things.  I was
23  elected to the school board once I retired from education.
24  When I got out of education, I was elected to the school board.
```
13:38:36 25  I was elected to city council.  I served two years on the local

```
 1  city council after that.  And I was elected to the legislature.
 2       I was a member of the Baptist church there for 50 years.
 3  And I was also a member of the Clay County exchange club, and
 4  the quarterback club, which you have got to be a member of the
```
13:38:53  5  quarterback club if you live in Clay County.
```
 6  Q    When you were first elected for office, what party were
 7  you in?
 8  A    I was a Democrat.
 9  Q    Okay.  Did you at some point become a Republican?
```
13:39:07 10  A    Yes.  In 1983, I ran and was elected as an independent.
```
11  And then in 2010, I had briefly joined the Republican party and
12  elected as a Republican in 2010.
13  Q    Why did you join the Republican party?
14  A    Well, at that time, in 2010, Governor -- who was later
```
13:39:32 15  elected Governor Riley.  Bob Riley was running for Governor was
```
16  a Republican.  He was from my home county, and so I endorsed
17  him.
18       I felt like the philosophy and ideas of the Republican
19  party were much more aligned to my beliefs and ideas than the
```
13:39:49 20  Democratic party.  When I went to the legislature, it was only
```
21  Democrats, but there's always been a two-faction member of the
22  legislature.  And there was a conservative pro-business side of
23  the legislature, and there was the -- the more liberal side
24  than the -- basically the teacher union side.
```
13:40:07 25       And so the legislature's always -- even though we had one

1  party, there were two divisions in that, and my division was

2  more of a conservative business-oriented side.

3       And as the Democratic party continued to lean in the other

4  direction, then basically, it was not with my philosophy, so I

13:40:26 5  became a Republican.

6  Q    Did becoming a Republican have anything to do with race or

7  racial concerns?

8  A    None.

9  Q    You've also been active in the military, have you not?

13:40:39 10  A    Yes, sir.  I served 36 years in the Alabama National

11  Guard.

12  Q    Okay.  And what was your rank when you retired?

13  A    I retired as a brigadier general.

14  Q    Will you tell the Court something about boards and other

13:40:54 15  things like that that you've served on?

16  A    I presently serve on the university -- Troy University

17  board of trustees.  I served for eight years chairman of that

18  and rotated off just in November this past year because we have

19  term limits of years years.  And I still serve on the board.

13:41:10 20  I'm just not the chairman.

21       I serve as the chairman of the Southern Union Community

22  College Foundation Board.  I serve as the chairman of the

23  International Motor Sports Hall of Fame and Museum board.

24  Q    Is that in Talladega?

13:41:24 25  A    In Talladega at the race track.  I passed the legislation

| | |
|---|---|
| 1 | that created that.  I have been the chairman ever since.  I |
| 2 | serve as the chairman of the space board authority board.  And |
| 3 | I'm probably leaving out a couple.  But that's a pretty good |
| 4 | full-time job that I have got doing those since I've retired. |
| 13:41:44 5 | Q    There's a Rosa Parks Museum in Montgomery.  Are you |
| 6 | familiar with that? |
| 7 | A    Very much so.  Troy University owned the property where |
| 8 | Rosa Parks boarded the bus in Montgomery.  And as we began to |
| 9 | look at expanding Troy University, we wanted to build a new |
| 13:42:09 10 | facility on that piece of property.  And the board did not want |
| 11 | to diminish or do anything to take away the attention of what |
| 12 | Rosa Parks had done.  So we created the Rosa Parks Museum |
| 13 | there. |
| 14 | That's something we're very extremely proud of.  And as |
| 13:42:26 15 | Troy University, it's world renowned and one of the largest |
| 16 | tourist attractions in Alabama and something we're very proud |
| 17 | of. |
| 18 | And Mr. Lamar Higgins, who works on my board, was able |
| 19 | to -- he had connection with Ms. Rosa Parks before she passed |
| 13:42:41 20 | away, and she was able to approve us for doing that and using |
| 21 | her name.  And today it's part of Troy University and one of |
| 22 | our flagship operations that we're most proud of at Troy. |
| 23 | Q    During your time in the legislature, did Alabama celebrate |
| 24 | its Civil Rights history, in terms of creating Civil Rights |
| 13:43:04 25 | trails or funding Civil Rights tours to Alabama? |

```
 1  A    I would say yes.  And if you'll just look at what's
 2  happened in Montgomery and Selma with the -- of course, now
 3  it's federally recognized the Selma to Montgomery marches.
 4        And then just recently, our tourism department under Mr.
 5  Sentell has been the leader in creating the heritage trail
 6  for -- the black heritage trail, which begins in Montgomery and
 7  goes all the way out to the midwest.  And we were the leaders
 8  in that.  We've supported other endeavors that have gone on in
 9  Montgomery, as well.
10  Q    Let's talk about things you did when you were in the
11  legislature.  What committees did you serve on?
12  A    Well, the most recent committee -- and if I went back
13  40 years, we'd be here until next week.
14  Q    Let's not do that.
15  A    In the last session, I served as a chairman of the local
16  legislation.  I served as chairman of the health committee.  I
17  served on the education committee.  I served on the education
18  and finance committee.  And I served on the long-range
19  transportation committee.  And I chaired the reapportionment
20  committee.
21  Q    I'm going to get back to the reapportionment committee in
22  just a second.  But can you tell the Court about some of the
23  bills that you've sponsored that you're most proud of?
24  A    Well, I've -- in my tenure, I've been fortunate to sponsor
25  a number of bills.  And I guess one of the bills that receives
```

13:43:24   5
13:43:43  10
13:43:57  15
13:44:17  20
13:44:32  25

1    very little attention, but that it's important to me because

2    the legislative political office said it saved the taxpayers a

3    billion dollars.  I created the five-year tag bill.

4         Most of us in this room are too old to remember.  But you

13:44:51 5    used to have to get a new tag every year and you had to put it

6    on your car, and you had to take the old one off and put it on

7    the barn.

8         I came up with the idea years ago to do a five-year tag,

9    keep at that tag for five years and just put a decal on it.  So

13:45:03 10    the savings on the cost of not having to reproduce that tag

11    which costs about $1.10 of metal each year is -- over the term

12    that I passed that bill, it saved the state over a billion

13    dollars to the taxpayers.

14         I've been real active in education.  I passed the Alabama

13:45:25 15    Ahead Act.

16    Q    Our court reporter wants you to slow down some.

17              THE COURT:  You're getting too excited about those

18    bills.

19              THE WITNESS:  I am.  I am, Judge, because I spent a

13:45:34 20    lot of time and effort in that arena.

21              THE COURT:  I understand.

22              THE WITNESS:  And it's something exciting to me.  And

23    the Alabama Ahead Act is one that I'm very excited about.

24              THE COURT:  Okay.  Are you saying Hat Act?

13:45:46 25              THE WITNESS:  Alabama Ahead Act.

1          THE COURT:  Ahead.  Okay.

2          THE WITNESS:  The Ahead Act.  That bill is designed to

3   replace all textbooks with digital devices.  And we're well on

4   the way to doing that.  So I'm very proud of that.

13:46:03  5      Other bills -- I was instrumental in passing a bill that

6   regulates sports agents.  And you say, well, that's not

7   important.  Part of that, when our college athletes would leave

8   college and sign with the pros, the sports agents would get

9   most of their money.  You're talking about dealing with mostly

13:46:24 10   minorities who had very little education and very little

11   financial knowledge.  They would sign with the agents, and the

12   agents would sign them massive contracts, and the agents would

13   get most of the money.

14      I passed a bill that limited -- put a cap that they could

13:46:40 15   not get but 10 percent.  That was the first time ever in

16   America, and that bill is has now been adopted with every

17   state.  And it saves our athletes that go into the professional

18   sports, whatever, the opportunity to retain most of the money

19   that they earn and not give to it sports agents.  I'm very

13:46:58 20   proud of that.  It's not something that is a growing thing on

21   my resume, but it has saved millions and millions of dollars

22   and put it back into the athletes' pocket rather than to the

23   agents' pocket.

24      Other bills -- I worked diligent on the transportation

13:47:15 25   bill.  And laid the foundation for the bill that we just --

```
 1  they just passed this past session, which provides adequate
 2  funding to redo our roads and bridges, make them safe.
 3      I was the father of the seat belt bill.  I was the person
 4  who passed the bill that required you to wear a seat belt.  And
13:47:35  5  when you look at statistics, they tell me that bill has saved
 6  thousands and thousands of lives this year in Alabama.
 7      I could go on, but I know we've got a time limit.
 8  BY MR. WALKER:
 9  Q    That's a good illustration.  Now, you just got back from
13:47:51 10  Korea, did you not?
11  A    Yes.
12  Q    What was the purpose of your trip to Korea?
13  A    I started an organization years ago called ACEEP --
14  Alabama Career Economic and Education Plan.  And we partner
13:48:05 15  with people in Korea to bring Korean students to Alabama
16  two weeks and learn about our culture.  We, in turn, sent 20
17  kids to Korea each year and let them learn the Korean culture
18  because Korea is a vital part of Alabama's economy.
19      ACEEP worked well for many years until the Korean
13:48:32 20  government withdrew their funding.  So we kept ACEEP together.
21  And now we're working on a plan to try to recruit qualified
22  math and science teachers from Korea to Alabama.
23      Today, we have about 52 vacancies with qualified math
24  teachers in Alabama, mostly rural Alabama.  We have P.E.
13:48:55 25  teachers teaching math, and that's just not good.  So if we can
```

<pre>
 1   work a program --
 2            THE COURT:  It would be worse if it was lawyers
 3   teaching math.
 4            THE WITNESS:  I cut you a little slack, ma'am.
13:49:09  5        But we hope to recruit -- and we worked out an MOU with
 6   the education commissioner that they will help us as we do this
 7   to pay the cost for those teachers to come and get acclimated
 8   into Alabama.  We think this may be a solution.
 9        I wish we could grow our own, but a student today
13:49:30 10  finishing college with a math degree can make three times more
11   in the private sector than they can in the public sector, and
12   they're just not willing to go into education.
13        And if you're any what familiar with the recent report on
14   Alabama education, we're at the bottom in math and science.  At
13:49:47 15  the bottom of all 50 states.  So we've got to think outside the
16   box.  And I don't get paid for this.  It's just something I
17   have an interest in.
18        I went to Korea with a state superintendent, six
19   legislators, and six superintendents to view their colleges,
13:50:05 20  their schools so that the superintendents who will eventually
21   hire those people will feel comfortable in being able to retain
22   them and bring them to America.  And we hope this will be an
23   example for us and other states to follow.
24   BY MR. WALKER:
13:50:18 25  Q    Thank you.  Let's talk about the legislature now, and in
</pre>

particular, the reapportionment committee.  That's referred to

as the joint committee.  What does that mean?

A    Means you have equal number from the House and the Senate.

Q    And how are they appointed?

13:50:31 A    The lieutenant governor appoints in the Senate.  The

lieutenant governor and the speaker pro tem appoints members.

And in the House -- the Speaker of the House appoints members.

Q    And in years when the legislature is doing redistricting,

I believe the committee has more people than in other years; is

13:50:51 that correct?

A    That's correct.  They have one from each congressional

district.  In the off years, when you're not doing the

redistricting or re -- then you have three members from each

House.

13:50:59 Q    And do the members of the committee include members of

both parties?

A    Correct.

Q    And that was the case when the committee was looking at

congressional redistricting in 2011?

13:51:11 A    Correct.

Q    Who was the other cochair?

A    In 2011, it was Senator McClendon, who was a House member.

Q    At that time, he was a Representative McClendon?

A    Yeah.  Now, he's in the Senate today.

13:51:25 Q    And what plans is the reapportionment committee

1  responsible for giving to the legislature?

2  A    We have to do both the legislative, the House, and the

3  Senate, the congressional plans and the state board of

4  education plan.

13:51:42 5  Q    Might be losing that last one, the state board of

6  education plan?

7  A    Well, it may be.  That's to be seen.

8  Q    Does the reapportionment committee have a staff?

9  A    Yes.

13:51:55 10  Q    And what does the staff do?

11  A    The staff keeps records.  They keep all the -- they

12  collect all the census data.  They program it into their

13  computers.  They keep all the maps and the directions.

14      Not only do they work for us in the legislature, but they

13:52:12 15  also assist cities and counties in doing their redistricting

16  while they're doing theirs in the years that we're not.  But

17  they're basically responsible for producing the maps.

18      Because any piece of legislation dealing with

19  reapportionment has to first go to the reapportionment

13:52:36 20  committee and be programed into their system so that any

21  amendment, or any changes, or any substitutes would be

22  susceptible to having the correct boundaries and correct

23  numbers in them.

24  Q    So are you saying that the reapportionment committee has

13:52:45 25  the state's redistricting system?

1    A    Correct.

2    Q    And they operate that?

3    A    Correct.

4    Q    So can any member of the legislature go in and draw a

13:52:52  5  plan?

6    A    They can draw it, but they first have to go to the

7    legislative redistricting reapportionment committee and work

8    with them to make sure that they are within the guidelines, and

9    then it has to be put into their system.

13:53:06 10  Q    I didn't ask my question well.  If I'm a member of the

11   legislature, and I think I wanted to draw let's say a

12   congressional plan, do I have the ability or the right to go to

13   the reapportionment office and say, work with me to draw a

14   plan?

13:53:21 15  A    Yes, you do.

16   Q    And will that plan be kept confidential until I say so?

17   A    Yes.

18   Q    Okay.  And I can also draw a plan outside of the

19   reapportionment office; is that correct?

13:53:36 20  A    You can draw one, but you can't present it because it's

21   first got to go to the reapportionment committee and be put

22   into their system to ensure that what you have drawn does not

23   lie outside the boundaries of where it should operating.

24   Q    Okay.  So there are two ways to have a plan drawn; one is

13:53:55 25  on the state's redistricting system, and one is on some other

```
 1   system.  But then it has to be imported into the state's
 2   redistricting system before it can be introduced?
 3   A    Correct.  If it has errors when it's presented to the
 4   redistricting committee, it would have to be corrected before
 5   they can put it into the system.
 6   Q    And the legislative session of 2011, do you remember the
 7   dates of at that session?  Let me refresh your memory if I can.
 8        Do you remember if that was March 1 to June 9 to 2011?
 9   A    Sounds close to being correct.
10   Q    Okay.  Was the legislature passing plans --
11   reapportionment plans during that 2011 legislative session?
12   A    We were only passing congressional plans.
13   Q    Were you also passing state board of education?
14   A    Yes.
15   Q    Okay.  And why weren't you passing legislative plans that
16   year?
17   A    We were not passing legislative plans that year.
18   Q    Right.  And my question is:  Why were you only passing the
19   first two?
20   A    Oh, okay.  I'm sorry.
21   Q    I'm sorry.
22   A    The reason we were passing those was two reasons:  One was
23   the election was pending because congressional districts run
24   every two years.  So we had to get that plan finished so that
25   those people seeking office in those congressional districts,
```

The time stamps in the left margin read: 13:54:11 (line 5), 13:54:28 (line 10), 13:54:42 (line 15), 13:54:55 (line 20), 13:55:08 (line 25).

         1    not only the incumbents, but anyone seeking office would know

         2    they were living -- what district they lived in.  So it was

         3    imperative we get that done within the time frame that we had.

         4         And also we had certain members of the school board who

13:55:24 5    would be running in that same cycle.  We have eight school

         6    boards, and they are on staggered terms.  Some of the -- some

         7    of them were running, as well.  We had to get those ready, too,

         8    so that at the upcoming election they would know the districts

         9    and where to qualify and where to run from.

13:55:40 10   Q    So if the members of Congress, that is, members of the

        11    House of Representatives were going to be running for their

        12    seats again in 2012, when would they start campaigning for

        13    those and raising funds for those seats?

        14    A    Well, they would start -- they would start in early -- in

13:56:01 15   the early spring -- January, February, March, April time

        16    frame -- in the time frame in which we were working.

        17    Q    And so was that one of the reasons that you were concerned

        18    to make sure that the bill was passed during that legislative

        19    session so you wouldn't interfere with congressional elections?

13:56:15 20   A    That was one of the main ones.  And had we not gotten it

        21    finished in that session, we would not have another session

        22    before the election, so we would were faced with the Governor

        23    having to call a special session and costing the taxpayers a

        24    tremendous amount of money just to address that issue.  So the

13:56:33 25   idea was to save the taxpayers money to get them a district

1  drawn where they know their boundaries.  And they began

2  campaigning on the time frame that would meet the schedule in

3  which the election would be held.

4  Q    So did the legislature pass new congressional districts in

13:56:49 5  2011?

6  A    Yes.

7  Q    And those are the districts that we're talking about

8  today, in fact.

9       Do you know how the districting plan that was ultimately

13:56:59 10  passed by the legislature came to be?

11  A    Yes.

12            MS. MADDURI:  Objection, Your Honor.  We object to

13  this entire line of questioning for lack of relevance.

14            THE COURT:  Overruled.

13:57:11 15            MS. MADDURI:  May I explain my objection?

16            THE COURT:  This whole case is about the redistricting

17  in 2011, is it not?

18            MS. MADDURI:  It is, Your Honor.  But what actually

19  happened in 2011, the understandings of the intentions or the

13:57:26 20  beliefs or even the information available to the legislators

21  who drew the map are not relevant to the Section 2 results base

22  plan.

23            THE COURT:  Overruled.

24  BY MR. WALKER:

13:57:42 25  Q    Senator Dial, can you please tell the Court how the plan

1  that came to be passed as a 2011 Alabama congressional plan,

2  came into existence?

3  A    The plan that we eventually passed was developed by a

4  gentleman named Randy Hinaman, was retained by the

13:58:02  5  congressional delegation.  All the congressional delegation

6  members I understand retained him to begin to work and draw a

7  plan that they would agree upon.

8      He brought to me a plan and told me that they had agreed

9  upon this plan, the seven sitting congressional members, and

13:58:19 10  this was the plan they wanted to go with.  I, in turn, to be

11  assured that there was no dissension among the members of

12  Congress, asked him to get a conference call together for all

13  the congressional members.

14      That conference call was conducted with me in my office in

13:58:37 15  Montgomery.  All the congressional delegates were --

16  congressional members on that call, I think, except one.  I

17  can't be sure.  But I'm almost sure that there may have been

18  one that was not.

19      I went down the line.  And each one of those assured me

13:58:57 20  that --

21          MS. MADDURI:  Objection, Your Honor.  Hearsay.

22          THE COURT:  Overruled.

23          THE WITNESS:  They assured me on the phone that they

24  were okay and the plan was something that we could pass.

13:59:12 25      And so with that amount of information and that

1    confidence, I introduced the plan, and the plan was eventually

2    passed.

3    BY MR. WALKER:

4    Q    Did Representative Sewell participate in that conference

13:59:24  5    call?

6    A    Yes.

7    Q    Did you ask her if she supported the plan and supported

8    her district as drawn?

9    A    I asked her.  I said, is there any objection to this plan,

13:59:32 10    and she said no.

11    Q    Okay.  And I'll ask you to look at the map which -- I mean

12    to look at the screen in front of you, which is showing

13    Plaintiffs' Exhibit 15, which is the 2011 plan.  And I will ask

14    you is that the congressional plan that was enacted and passed

13:59:55 15    into law?

16    A    Yes.

17    Q    Thank you.

18         Do you recall at the start of redistricting process --

19    there are, of course, population shifts that occurred over the

14:00:13 20    decades since the last census.  That's the whole reason for

21    redistricting?

22    A    Yes.

23    Q    Do you recall how many people needed to be moved into

24    Representative Sewell's district in order to comply with the

14:00:28 25    one person one vote equal population requirement?

```
 1   A     Approximately 70,000.  I don't know the exact number, but
 2   I remember it was somewhere near 70,000.
 3   Q     Was that -- I actually think it was 700 -- almost 80,000.
 4   Do you recall?
```
14:00:45
```
 5   A     Okay.  I knew it was in the 70s, somewhere in that
 6   neighborhood, maybe.
 7   Q     Do you recall if that was the largest deviation of all the
 8   plans?
 9   A     Yes.
```
14:00:55
```
10   Q     Okay.  Did you rely on Representative Sewell to develop a
11   district that she could be reelected in?
12   A     I was certain that she had reviewed the plan and felt
13   comfortable with it and that she could be reelected in that
14   district.
```
14:01:22
```
15   Q     What were you and members of the committee concerned that
16   the legislature had to pass a plan that could get precleared by
17   the Attorney General under Section 5 of the Voting Rights Act?
18   A     Correct.
19   Q     Why was that important?
```
14:01:39
```
20   A     Well, if it's not precleared, we've got to go back and do
21   a new plan if it fails to be cleared.
22         So I had two objectives:  One was I had to have a plan I
23   could pass through both houses of the legislature, because this
24   is a bill just like any other bill, and it has to receive
```
14:01:58
```
25   them -- it has to be introduced.  It has to go to committee,
```

1 has to get favorable report in the committee, has to come back

2 to the floor of the legislature, has to pass both houses in the

3 same form.  That was my first objective.  If I can't pass it

4 there, then I'm not going any further.

14:02:13 5      And the second was I had to have a plan that we felt

6 comfortable would pass the scrutiny of the Justice Department

7 and get precleared so it could move on with the election.

8 Q    What would have been the consequence if Justice had not

9 precleared that plan?

14:02:27 10 A    I would assume that they would send it back and ask us to

11 draw another plan, and we would go to a special session.

12 Q    And that would -- that would interrupt the schedule for

13 congressional elections, would it not?

14 A    It certainly would have -- it would have changed the

14:02:46 15 process in which -- of course, it depends on how soon they did

16 and if we can get an another special session and get another

17 bill through.

18      But it certainly would disrupt the plans that -- where

19 they had already starting money, where they knew where the

14:03:01 20 district lines were, and they knew what people they would be

21 representing.  So it would certainly disrupt the plan for many

22 congressional members standing.  And anyone who had intentions

23 of running against one of those people would be certainly --

24 their intentions would be delayed, as well.

14:03:16 25 Q    And if the legislature had had to pass a new plan, that

```
 1  plan also would have had to be precleared by the Attorney

 2  General, correct?

 3  A    Correct.

 4  Q    And there was no guarantee that a second plan would be

 5  precleared, was it?

 6  A    Correct.

 7  Q    So it was important to get it done right the first time?

 8  A    Correct.

 9  Q    During that process, when the -- when the proposal from

10  the representatives of their districts was under consideration,

11  did -- and until the bill was passed, did any member of the

12  legislature tell you that they thought it was possible to draw

13  a congressional plan with two majority black districts?

14  A    During the session?

15  Q    Yes, sir.

16  A    No.

17  Q    Do you know Joe Reed?

18  A    Very well.

19  Q    There was some testimony earlier, and I think you may have

20  been in the court when I asked Senator Sanders about Joe Reed.

21  And I asked him if he was considered or at least sometimes

22  referred to as the dean of redistricting in Alabama.  Do you

23  recall that?

24  A    Correct.  And you were correct.  You were on spot.

25  Q    He has been involved in every redistricting effort in a
```

The timestamps in the left margin:
14:03:29 (line 5), 14:04:02 (line 10), 14:04:23 (line 15), 14:04:32 (line 20), 14:04:46 (line 25)

1  significant way since at least 1980; would that be correct?

2  A    That's correct.

3  Q    Has Joe Reed over the course of his career been an

4  effective advocate for the interests of African-Americans in

14:05:05 5  the legislature?

6  A    Absolutely.

7  Q    Have you ever known him to leave a lot on the table, in

8  terms of his negotiated positions?

9  A    No.  Never.  And I've negotiated with him many times.

14:05:17 10  Q    Did Joe Reed ever come to you and say, Senator Dial, I

11  think we can draw two majority black districts, and I want that

12  to do?

13  A    No.

14  Q    Did any other African-American leaders come to you and say

14:05:32 15  that?

16  A    No.  Not until the session was over when I was advised of

17  a plan that had been drawn after -- after we'd already passed

18  this bill.

19  Q    Was that a plan drawn by Mr. McClammy -- excuse me -- by

14:05:53 20  Representative McClammy?

21  A    It was presented by Representative McClammy.  It was

22  presented to the reapportionment office.  And the clerk of the

23  committee called me and said, We've just got a new plan in.

24  And so I went down to review the plan.  And she said, It's a

14:06:07 25  congressional plan, and it creates a second minority district,

1  and that was the intent of it.  That was as far as I went

2  because we'd already passed the other plan.  It had already

3  been signed by the Governor and gone forward.  So that was the

4  extent of that.

14:06:23  5      The only conversation I had later on with Representative

6  McClammy was in the hall where he said to me, I've introduced a

7  plan.  I said, Well, you know it's too late.  We've already

8  passed this plan.

9  Q    When he said introduced, did he mean introduced into the

14:06:37 10  reapportionment office or introduced into the legislature?

11  A    Introduced in the reapportionment office.

12  Q    I will ask you to look, Senator Dial, at what's on your

13  screen now.  And I will represent that this is Defendant's

14  Exhibit 3, page 194, and ask you if that is the plan that

14:06:58 15  Representative McClammy submitted to the reapportionment office

16  with two majority black districts?

17  A    I understand it is.  I didn't review it that close at that

18  time in the office.  But since that time, I've reviewed it, and

19  this is the McClammy plan.

14:07:15 20  Q    Senator Dial, would you describe District 7 as drawn in

21  the McClammy plan to the Court?

22  A    Well, District 7 extends all the way up into what we call

23  the Tennessee Valley area.  It goes all the way over into

24  Madison, Huntsville area.  It gets Limestone and up all the way

14:07:43 25  in and picks up part of Lauderdale, which is totally removed

```
 1  from the basic foundation of District 7, which was in Dallas
 2  and Jefferson and Tuscaloosa.
 3  Q    So District 7 extends all the way from Washington County
 4  in south Alabama up to Madison County in north Alabama?
 5  A    Correct.
 6  Q    Does it keep together communities of interest?
 7  A    Definitely not.
 8  Q    Does it preserve the cores of existing districts?
 9  A    No.
10  Q    Is it compact?
11  A    No.
12  Q    Look at District 2.  And would you describe District 2 for
13  the Court, please?
14  A    District 2 is the congressional district I live in.  And
15  it goes from -- it almost extends the whole length of the
16  state.  And it takes away community of interest.
17       It takes away -- it's just a district that's totally
18  disconnected in three or four different areas because there's
19  not even a major highway you can go from one end of that
20  district to the other without crossing into other districts.
21  It's just not compatible with anything that -- that Congressman
22  Rogers or anybody running that district would be -- be happy at
23  all with.
24  Q    I'm sorry.  Go ahead, sir.
25  A    Go ahead.
```

14:08:10   5
14:08:20  10
14:08:36  15
14:08:56  20
14:09:11  25

```
 1   Q     Has there ever been a District 2 that looked anything like
 2   that?
 3   A     Never; not that I've seen.
 4   Q     And I ask you one more time, Senator Dial, to look at
 5   District 3 and describe where that begins and where that ends,
 6   please.
 7   A     It appears that District 3 begins in Calhoun County and
 8   goes almost to Mobile meandering through the eastern part of
 9   the state through Talladega County and then down part of the
10   Black Belt and on into -- it even gets a part of Clarke County.
11         So that's totally -- when you talk about communities of
12   interest and governmental identity that associates with each
13   other, that's totally disconnected.
14   Q     Is it compact?
15   A     No.
16   Q     Does it preserve the core of any existing districts?
17   A     No, sir.
18   Q     Let me ask you the same questions about District 2 as
19   presented in this plan.
20         Does it respect any community of interests that you can
21   identify?
22   A     Which district?
23   Q     District 2.
24   A     Well, there are some.  But when you get south of the
25   interstate, you have moved into a totally different area of
```

14:09:23  (line 5)
14:09:45  (line 10)
14:10:06  (line 15)
14:10:16  (line 20)
14:10:29  (line 25)

```
 1  interest political subdivisions or -- as I said in the
 2  deposition, you even get -- you divide the state, and you take
 3  away that interest, and you take away those areas that have
 4  universities that people coalish around that become a very
 5  important part of those communities that keep them together.
 6  And it divides that up, as well.
 7  Q    And would you consider District 2 compact?
 8  A    No.
 9  Q    If this plan had been introduced into the legislature in a
10  timely manner, could you have passed it?
11  A    No.
12  Q    Now, how can you say that, Senator Dial?
13  A    I can say first is I don't believe any of the members of
14  the sitting congressional delegation would have supported this.
15  Q    Why would that matter?
16  A    That matters in the fact that they mobilize their
17  legislators, their House members, and their senators to be
18  opposed to it and make amendments to it, and, therefore, my
19  opportunity to pass it through and get a majority is greatly
20  diminished.
21  Q    Any other considerations?
22  A    That would be the main one.  And I'm not too sure -- of
23  course, I can't answer for Justice, but I'm not too sure you
24  can get this precleared with Justice because my understanding
25  it regresses District 7 in the minority population to a point
```

Timestamps:
14:10:53 (line 5)
14:11:14 (line 10)
14:11:28 (line 15)
14:11:44 (line 20)
14:12:02 (line 25)

1    of about 51, 50 percent.

2    Q    Let me ask you about -- oh, I'm sorry.

3    A    Go ahead.

4    Q    Let me ask you about the people up in Madison County.

14:12:18  5    Independent of what any congressperson wants, do you think

6    that, for example, the legislators across north Alabama would

7    have supported this plan?

8    A    No.  The -- as you know, geographically the TVA area is

9    always considered the north part of Alabama, and they always

14:12:36 10   have so much of common interest because of the TVA area and

11   that portion of economic development that they are very -- very

12   attuned to what goes on there, and that gets them a

13   congressman, who would be basically from Dallas County who

14   would not be acceptable to them not because it's a minority,

14:12:56 15   but because it's geographically.

16         They would not accept it if District 2 ran into the

17   Tennessee Valley area because they want a congressman from that

18   area because you have Huntsville and NASA and all the things

19   that's going on up there.  And they're very attuned to having

14:13:13 20   someone who is really supportive of that concept of what's

21   being developed in the Huntsville area.

22   Q    And the same question for south Alabama.  Independent of

23   what the members of the congressional delegation might want or

24   not want, would the senators and representatives from south

14:13:33 25   Alabama have supported this plan?

```
 1   A    No.  They would have been very similar to the people in
 2   the north Alabama and the people in east Alabama.  I don't
 3   see -- I don't see any -- any group of -- there might be some
 4   individual legislators with some ideas that they like this plan
14:13:53  5   because it would put them in a district that they might run for
 6   Congress from, but I don't see any group of legislators
 7   supporting this in any manner.
 8   Q    Thank you.
 9        Earlier I put up on the table in front of you a copy of
14:14:25 10   the reapportionment guidelines.  Do you see those?
11   A    Yes.
12   Q    And that's part of exhibit -- Defendant's Exhibit 3, pages
13   260 through 275.  And I'd like to ask you, please, sir, to turn
14   to page 267 and let me know when you get there.  I've got it up
14:14:54 15   on the screen if you want to look there.
16   A    Okay.  I see it.
17   Q    Okay.  And this is the paragraph that defines communities
18   of interest.  Are you familiar with that?
19   A    Correct.  Yes.
14:15:04 20   Q    And it talks about governmental and regional interests?
21   A    Yes.
22   Q    And it talks about boundaries of county municipalities and
23   voting precincts.
24        Let me ask you this:  Has the legislature consistently
14:15:24 25   understood this guideline to include the concept of preserving
```

1  the cores of existing districts?

2  A    Yes.  And that's pretty well pointed out in governmental

3  regions.

4  Q    Okay.

14:15:36  5  A    And the core in which you work from.  You -- in

6  reapportionment congressional district, you take the core from

7  which you are already existing and work from there rather than

8  try to create new districts and create havoc among the system.

9  Q    You've talked about the importance of being able to pass a

14:15:58  10  bill.  And I think is it fair to say, if you can't pass a bill,

11  you can't do anything?  Could you pass a legislative

12  redistricting bill -- excuse me -- a congressional

13  redistricting bill that does not preserve the cores of existing

14  districts?

14:16:16  15  A    No.

16  Q    Is that just a reality of life --

17  A    It is.

18  Q    -- in the legislature?

19  A    It is.  And it boils down to those legislators within that

14:16:23  20  district and those constituents that they are going to have

21  that's going to impact upon how their vote is and why they

22  should or should not vote for it.  It's not going to be simply

23  left up to that individual legislator.

24      But the constituency, the governmental identities within

14:16:42  25  his district is going to have a big influence on how he or she

1  votes on any redistricting plan.

2  Q    Look again, if you will, Senator Dial, at Plaintiffs'

3  Exhibit 15, which is the 2011 plan that you have testified was

4  created by the members of the House of Representatives of

14:17:01 5  Congress and passed by the legislature.

6       And look in particular at District 7, which you've

7  testified was drawn by the consultant hired by the members of

8  Congress, including Representative Sewell and approved by her.

9       And let me ask you this:  What if you had gone back to

14:17:26 10  Representative Sewell and said, Representative Sewell, we

11  don't -- we don't like your district.  We've got this

12  alternative map with two minority districts, or with some other

13  alternative map, and we're going to pass that instead.  What do

14  you think would have happened?

14:17:43 15       MS. MADDURI:  Objection, Your Honor.  Calls for

16  speculation.

17       MR. WALKER:  Your Honor, I'm asking for his --

18       THE COURT:  Overruled.

19       THE WITNESS:  I think that it -- of course, it depends

14:17:54 20  a lot.  But if we're going to change her district from what

21  she's agreed to, then she's immediately going to go to the

22  other members of the congressional delegation and say we had an

23  agreement.  You're breaking our agreement.

24       And she would begin to ignite or get her people who are

14:18:13 25  close to her and in her delegation, senators and

1 representatives begin to do an alternative plan to either put

2 it back like she had it or get them to try to kill the bill on

3 the floor.

4 BY MR. WALKER:

14:18:27 5 Q In other words, is it -- was it your judgment at the time

6 that if you had tried to change her district materially, it

7 would have resulted in a bill that could not be passed?

8 A Let's be practical.  The first thing we knew we had to do

9 was make sure that she was happy with her district.  If she's

14:18:43 10 not happy with her district, then we're going to have

11 difficulty, tremendously difficulty in getting any kind of plan

12 through the legislature.

13 Q Did you also have some concern that she had friends in

14 Washington that she could call?

14:18:55 15 A Well, you know, I understand that she was Ms. Obama's

16 roommate in college certainly would have an impact on her, and

17 then the U.S. Attorney General, who was a classmate of hers at

18 Harvard, was certainly someone she could call on.

19 So, you know, basically as we said, we understood the

14:19:16 20 practicality that she had to be okay with any plan that we

21 passed.

22 Q Let me show you -- and I believe I put up before you the

23 four alternative maps proposed by the plaintiffs.  Do you see

24 those, sir?  And I'll show you right here --

14:19:48 25 THE COURT:  What's the exhibit number, please?

BY MR. WALKER:

Q    Plaintiffs' Exhibit 61, which is Revised Plan 1; and

Plaintiffs' Exhibit 67, which is Revised Plan 2; Plaintiffs'

Exhibit 73, which is Revised Plan 3; and Illustrative Plan 4,

14:20:11  which is Plaintiffs' Exhibit 40.  Do you see those, sir?

A    Yes.

Q    Now, all of those have District 1 that extends from Mobile

County to Houston County.  So I'll just use Plaintiffs'

Exhibit 61, Revised Plan 1, as an example.

14:20:31      Do you see that, sir?  It's on the screen in front of you?

A    Yes.

Q    Okay.  Now, let me ask you:  Is that the plan that was

passed by the legislature?

A    No.

14:20:44  Q    Is that the plan that was agreed upon by the members of

Congress?

A    No.

Q    Does District 1 respect well-established communities of

interest in Alabama?

14:20:57  A    No.

Q    Can you explain your answer, please?

A    Mobile and Baldwin County are very closely connected, only

separated by the river and the bay flowing between them, and

they have a very strong economic ties between those two areas.

14:21:16      When you go over to eastern Alabama, you've got Dale and

1  Coffee, and Geneva, and Henry, and Houston, which is part of

2  the Wiregrass area, which has the military base there at

3  Enterprise, and it also is very closely connected in the

4  Wiregrass.  They have the Wiregrass Chamber of Commerce.  They

14:21:34 5  have the Wiregrass Economic Development Council.  And so all of

6  those identities are totally separated.

7       And, again, you have no major road to get from Baldwin.

8  If you are congressman, you've got to go into Florida to get to

9  your district.  Mainly, there's no major thoroughfare through

14:21:54 10  there.  You could go I-10 and then get off and go up to

11  Houston, I guess.  But you'd have to travel a long way through

12  Florida to get to your district.

13       So it's just not practical.  And there's no economic ties

14  between those two geographical areas.

14:22:08 15  Q    Let me show you Plaintiffs' Exhibit 15 again, which is the

16  plan that was passed, and ask you about District 2 as passed.

17       Is there a community of interest or communities of

18  interest between the Wiregrass area and the Montgomery area?

19       And I will start by asking you:  Where are the military

14:22:38 20  bases?

21  A    Well, the military bases at Maxwell and Gunter in

22  Montgomery and the military base in Enterprise down in Coffee

23  County.  And that's the two major military facilities in our

24  state, and they're very closely related.

14:22:53 25       If you're going to represent the military -- and that's

```
 1  why that congressman from that district has always been on the
 2  military affairs committee, because it has the two major
 3  military operations within their congressional districts.  And
 4  it gives them a bond and a common interest in supporting the
```
14:23:10 `5  military in that district.`
```
 6  Q    And do you happen to know -- where is Maxwell Air Force
 7  Base?
 8  A    It's in Montgomery.
 9  Q    And does Maxwell Air Force Base, as we use that term, now
```
14:23:22 `10 include what we used to call Gunter Air Force Base?`
```
11  A    Yes.
12  Q    Two separate locations within the city of Montgomery?
13  A    Yes.
14         THE COURT:  On two different sides of town, too.
```
14:23:31 `15         THE WITNESS:  Correct.  Two different sides of town.`
```
16  BY MR. WALKER:
17  Q    And do you know whether or not people who live and work
18  and are stationed at Maxwell and Gunter live in Montgomery,
19  Autauga, and Elmore counties?
```
14:23:44 `20 A    Many of them live in the Prattville area and the Elmore`
```
21  area and drive into -- and the way you can verify that is be on
22  the interstate at 7:30 in the morning and at 5:30 in the
23  afternoon.
24  Q    I'm on my bike on Bell Street at about 6:00 o'clock in the
```
14:24:05 `25 morning.  I can tell you they're all coming in from Elmore`

```
 1  County.
 2        And within the Wiregrass, where is the Army base?
 3  A    It's in Coffee at Enterprise.
 4  Q    Okay.  And are the counties around Coffee and between --
```
14:24:19  5  A    It's in Dale.  I'm sorry.  Enterprise is in Dale.
```
 6  Q    Are the counties that surround Dale, do they have
 7  defense-related industries located in those counties?
 8  A    They do.  And between that and Montgomery and Troy, you
 9  have -- you have two major military suppliers in those two --
```
14:24:40 10  in that area alone.  And a lot of the support for military in
```
11  that area has grown up around the base.
12  Q    And do the people who -- I'm having a senior moment.  I
13  can't think of the name of the base down there.
14  A    Fort Rucker.
```
14:24:57 15  Q    Fort Rucker.  Thank you.
```
16        Do the people who live and work at Fort Rucker live in
17  Dale County and the counties that surround that?
18  A    Yes.  And Houston and -- Dothan and Houston counties are
19  major larger area of where they go to do most of their trade.
```
14:25:12 20  It's the largest Metropolitan area in that area.  And that's
```
21  their center of trade for that area.
22  Q    That's also where they go for their health care unless
23  they go on to --
24  A    Yeah.  On base.  Yeah.
```
14:25:29 25        THE COURT:  Are there major roads between -- what were

1  we looking at -- Montgomery and Houston County?

2          THE WITNESS:  Yes, ma'am.  431 is the major highway,

3  and 280 -- I believe 280 is another one.  And then the 2 --

4  it's -- oh, it's the Montgomery to Panama City.

14:25:52 5          THE COURT:  231?

6          THE WITNESS:  It's 231.  Yes, ma'am.  I was just on it

7  Saturday.

8          MR. WALKER:  Your Honor, may I approach Senator Dial

9  to give him this?

14:26:04 10          THE COURT:  Yes, you may.

11  BY MR. WALKER:

12  Q    Senator Dial, I'm going to give you what's marked as

13  Defendant's Exhibit 1, and I will ask you to look at it,

14  please.  Take a moment and look at it while I walk back to the

14:26:14 15  podium.

16      And I will represent to you that it shows Alabama's

17  congressional districts on -- this is Defendant's Exhibit 1,

18  and it's page 3017.  On 3017, are the congressional districts

19  that were passed in 2011; is that correct?

14:26:41 20  A    Correct.

21  Q    And then if you'll look at the next page, 3018, and I'll

22  ask you if you know whether or not those are the congressional

23  districts from 2020?

24          THE COURT:  From what?

14:26:58 25  BY MR. WALKER:

```
 1   Q    Excuse me.  From 2002?

 2   A    2002.

 3   Q    I'm a little dyslexic.  2002.

 4   A    Yes.

 5   Q    And I will represent to you that the next page, 3019, is

 6   the 1992 congressional districts.  Do you see that?

 7   A    Yes.  Yes.

 8   Q    And the next page I will represent to you is the 1980

 9   congressional districts.  That's page 3019.1?

10   A    Yes.

11   Q    And then let's take it back to 1970, page 3020, the 1970

12   congressional districts.  Do you see that?

13   A    Yes.

14   Q    From looking at these maps, can you form a conclusion as

15   to whether or not the Alabama Legislature has consistently

16   sought to preserve the cores of existing districts when it

17   reapportioned or redrew the Alabama congressional districts?

18   A    Yes.  It's quite obvious that they used the same core and

19   only extended where they had to extend the boundaries because

20   of gain or loss in population.

21   Q    Do you know Terri Sewell, sir?

22   A    Yes.

23   Q    Do you believe that Terri Sewell would ask the legislature

24   to pass a plan that discriminated against African-Americans?

25   A    No.
```

14:27:05 (line 5)
14:27:27 (line 10)
14:27:43 (line 15)
14:28:00 (line 20)
14:28:16 (line 25)

```
 1   Q    Do you believe it's appropriate when you're conducting
 2   redistricting to rely on the advice of an African-American
 3   Congress person as to what she needs based on her experience to
 4   win in her district?
 5   A    Yes.
 6   Q    Did she ever tell you that you should reduce the number of
 7   African-Americans in her district?
 8   A    No.
 9            MS. MADDURI:  Objection.  Hearsay, Your Honor.
10            THE COURT:  Overruled.
11   BY MR. WALKER:
12   Q    Were you aware that in the past the Department of Justice
13   had refused to preclear plans where the percentage of black
14   voters had been lowered?
15   A    Yes.
16   Q    Did you have an understanding at the time the
17   congressional plan was being passed from talking to other
18   African-American politicians of what their belief -- of their
19   belief of what was necessary, in terms of percentage of the
20   black population for them to have an opportunity to be
21   reelected?
22   A    Well, the only -- as Senator Sanders testified is his
23   testimony to the legislative delegation, as we were drawing
24   legislative districts in his district, when he informed us that
25   he thought it needed to be at least 65, 62 to 65 percent.
```

14:28:33 (line 5)
14:28:47 (line 10)
14:29:03 (line 15)
14:29:30 (line 20)
14:29:47 (line 25)

```
 1   Q    Thank you very much, Senator Dial.

 2   A    Thank you.

 3        THE COURT:   Cross?

 4                     CROSS-EXAMINATION

 5   BY MS. MADDURI:

 6   Q    Good afternoon, Senator Dial.

 7   A    Good afternoon.

 8   Q    I don't know if you know that we've met, but I was on the

 9   other side of the video conference when we took your

10   deposition.

11   A    Okay.

12   Q    So I could see you, but I don't think you could see me.

13   A    I could.

14   Q    Senator, Mr. Walker showed you some of the illustrative

15   plans that plaintiffs have proposed in this case, correct?

16   A    Correct.

17   Q    And I understand that you have certain criticisms of the

18   proposed plans, correct?

19   A    Correct.

20   Q    And one of those criticisms is that it breaks up

21   communities of interest, correct?

22   A    Correct.

23   Q    Is it fair to say that you view the meaning of a community

24   of interest as focused on economic ties?

25   A    Not solely, but that's part of it, yes.
```

1   Q    Senator, do you recall having your deposition taken in

2   this case?

3   A    Yes.

4   Q    And you were asked about that issue, I think?

14:31:31  5   A    Yes.

6        MS. MADDURI:  Heather, can you pull up page 49?

7   BY MS. MADDURI:

8   Q    Senator, I will direct your attention to line 18.

9   A    Yes.

14:32:15  10   Q    You were asked:  Is it fair to say that a community of

11   interest is based on economic factors, then?  And you said,

12   Very much economic interests, yes.

13   A    Yes.  I said very much.  I didn't say that was all.

14   Q    And Mr. Walker also asked you about the reapportionment

14:32:50  15   committee's guidelines on redistricting, correct?

16   A    Correct.

17   Q    And you were involved in drafting and adopting those

18   guidelines, correct?

19   A    Correct.

14:33:00  20   Q    And you adopted a set of guidelines in 2011 prior to

21   passing the plan that we're talking about here, correct?

22   A    Correct.

23        MS. MADDURI:  Heather, can you pull up Plaintiffs'

24   Exhibit 84 at page 4?  Actually can you stay on the first page

14:33:26  25   for a moment?  Sorry.

BY MS. MADDURI:

1  Q    Are these those guidelines, Senator, to the best of your

2  knowledge?

3  A    Best of my knowledge, yes.

4  Q    And then we can turn to page 4.

14:33:33  5

6       Is it fair to say that the reapportionment committee

7  worked to comply with these guidelines when enacting the 2011

8  plan?

9  A    Yes.

14:33:53 10  Q    Is it fair to say the reapportionment committee also

11  worked to comply with these guidelines when enacting the state

12  board of education plan?

13  A    Yes.

14  Q    And the guidelines, they outline a number of factors that

14:34:11 15  should be considered when redistricting, correct?

16  A    Correct.

17  Q    And one of those factors is communities of interest, yes?

18  A    Correct.

19  Q    And I will draw your attention to paragraph -- it looks

14:34:26 20  like paragraph B on this page towards the top.

21  A    What page?

22  Q    Oh, it's actually on your screen, or would you prefer a

23  hard copy?

24  A    That's okay.  I can see it.

14:34:36 25  Q    Are these the -- is this the definition that the committee

```
 1  enacted in 2011?

 2  A    Correct.

 3  Q    And does that definition -- that definition does not

 4  include economic interests, correct?

14:34:53  5  A    Well, it would come under recognized similar --

 6  similarities of interests would be economic.

 7  Q    But it does not recognize economic interests, correct?

 8  A    Well, it -- if you're -- it's not spelled out there, but

 9  when you talk about recognizing similarities of interests,

14:35:20 10  certainly would be economics.

11  Q    Would you agree that it's not always possible to protect

12  communities of interest?

13  A    I agree.

14  Q    And Mr. Walker, I think, showed you another set of these

14:35:41 15  same guidelines.

16          MS. MADDURI:  So, Heather, would you mind putting up

17  Defendant's Exhibit 3 at page 267 in addition to this?

18  BY MS. MADDURI:

19  Q    Senator, I think Mr. Walker talked to you about the page,

14:36:29 20  the page 267 of Defendant's Exhibit 3 that's on the right side

21  of your screen.  And I want to draw your attention to letter D

22  at the bottom of that page.  So these guidelines were in place

23  prior to the ones you adopted in 2011, correct?

24  A    Correct.

14:36:49 25  Q    And these plans noted that the plan, the redistricting
```

```
 1  plan, whichever one it was would attempt to preserve the cores
 2  of existing districts, correct?
 3  A    Correct.
 4  Q    And the guidelines the committee passed when you were the
 5  co-chair in 2011 did not contain that requirement, correct?
 6  A    I'm -- I can't answer that.
 7  Q    I can draw your -- excuse me.  Senator Dial, in 2011, you
 8  were co-chairman of the reapportionment committee, correct?
 9  A    Correct.
10  Q    And you were responsible for helping to prepare the
11  congressional district map that was adopted, correct?
12  A    Correct.
13  Q    But you were not actually involved in drawing the map,
14  correct?
15  A    Correct.
16  Q    The congressional delegation hired an outside consultant
17  for that, correct?
18  A    Correct.
19  Q    And that consultant his name, I believe, was Randy
20  Hinaman, correct?
21  A    Correct.
22  Q    And Mr. Hinaman was not hired by the reapportionment
23  committee, correct?
24  A    Correct.
25  Q    And Mr. Hinaman did not consult with the reapportionment
```

```
 1   committee in preparing the 2011 plan, correct?
 2   A    Correct.
 3   Q    Mr. Hinaman brought you the congressional plan he
 4   prepared, correct?
14:38:42  5   A    Correct.
 6   Q    And that plan was adopted with minimal changes; is that
 7   correct?
 8   A    Correct.
 9   Q    And Mr. Hinaman was hired by the congressional -- sorry.
14:38:56 10   I already asked you that.
11        You also discussed during your testimony a call that you
12   had with the congressional delegation regarding the 2011 plan.
13   That call involved, I think you said six of the seven members
14   of the delegation, correct?
14:39:14 15   A    Correct.  I'm not sure if one of the congressmen was on
16   it, Congressman Aderholt.  I think he was, but I'm not sure.  I
17   think he was on and had to leave.  But I just can't be certain
18   on that.
19   Q    Understood.  That call was quite brief, correct?
14:39:32 20   A    Relatively brief, yes.
21   Q    And, Senator, you've never had any other communication
22   with Congresswoman Sewell regarding the 2011 plan, correct?
23   A    Correct.
24   Q    Congresswoman Sewell never told you anything about how to
14:39:54 25   comply with the Voting Rights Act on that call, correct?
```

```
 1   A    Correct.

 2   Q    And she never told you that she thought the black voting

 3   age population in her district needed to comply with Section 2

 4   of the Voting Rights Act, correct?

14:40:09  5   A    Correct.

 6   Q    And she never told you her thoughts on what the Black

 7   Voting Age Population would need to be to comply with Section

 8   2, correct?

 9   A    Correct.

14:40:25 10   Q    And, Senator Dial, the committee did not do any analysis

11   to determine whether a second black congressional district --

12   black majority congressional district could have been created

13   in 2011, correct?

14   A    Correct.

14:40:39 15   Q    The committee did not consider whether it was possible to

16   draw that second majority black district in 2011, correct?

17   A    Correct.

18   Q    The committee did not actually consider any plans that

19   proposed a second majority-minority district, correct?

14:40:58 20   A    Correct.

21   Q    And neither you nor anyone else on the committee did any

22   analysis to determine the percentage of black voters that

23   needed to be in CD 7 in order for black voters to be able to

24   elect their candidates of choice, correct?

14:41:12 25   A    Correct.
```

1    Q    And you did not review the election history of

2    Congressional District 7 prior to adopting the plan, correct?

3    A    Correct.

4    Q    And you're not aware of anyone else on the committee who

14:41:28 5    reviewed the election history of Congressional District 7 prior

6    to adopting that plan, correct?

7    A    Correct.

8    Q    You also testified earlier that there were a number of

9    voters that had to be -- or citizens who had to be added to CD

14:41:43 10    7 between the -- as a result of the population shifts between

11    2001 and 2011.  Do you remember that?

12    A    Correct.  Yes.

13    Q    But you were not actually aware of the racial composition

14    of the voters that were added to CD 7 to meet that gap,

14:42:02 15    correct?

16    A    Correct.  We just tried to keep counties contiguous as

17    possible.

18    Q    You would agree that it would have made sense, if

19    necessary, to extend Terri Sewell's district into Mobile,

14:42:28 20    correct?

21    A    Say again.

22    Q    You would agree that it would have made sense to extend

23    Terri Sewell's district into Mobile 7 -- into Mobile in CD 7,

24    correct?

14:42:38 25    A    It would have made sense -- if she had approved the

                 1   already plan that we had given, it would not make sense to

                 2   deviate from what she had already approved and to create

                 3   opposition to the plan that the seven-member legislative

                 4   delegation had approved.

14:43:00         5        So to expand anything above what they had given me would

                 6   have created opposition to the plan as we saw it.  And so it

                 7   made no sense to do anything other than what they had agreed

                 8   upon.

                 9   Q    Senator, you totally support maintaining one

14:43:20        10   majority-minority congressional district in Alabama, correct?

                11   A    Correct.

                12   Q    And, Senator, you believe that allowing minorities to have

                13   representation that is more than the proportion of the

                14   population that they make up would violate the ideas and

14:43:38        15   philosophy of the state and would violate the state

                16   constitution, correct?

                17            MR. WALKER:  Objection, Your Honor.  The part of

                18   Senator Dial's deposition that is being referred to now was

                19   when he was being asked questions about the 2020 six-district

14:43:59        20   plan which the Court has ruled is irrelevant.

                21            MS. MADDURI:  May I respond?

                22            THE COURT:  All right.

                23            MS. MADDURI:  I am not going to ask him any questions

                24   about a future district or 2020 district.

14:44:14        25            MR. WALKER:  But that's what these questions were

1    about.

2              MS. MADDURI:  I haven't actually -- I'm asking him a

3    question right now, Your Honor.

4              THE COURT:  Right.

14:44:25  5    MR. WALKER:  She wants to ask him about testimony that

6    he gave when he was being asked about the 2020 six-district

7    plan.

8              THE COURT:  Okay.  In other words, set the context for

9    your question or allow him to answer a different question than

14:44:42 10   what was asked at the deposition.

11         Do you understand what I'm saying?  In other words, don't

12   be taking his testimony at a deposition out of context with a

13   question you're asking now.

14             MS. MADDURI:  May I confer for a moment?

14:44:59 15            THE COURT:  Yes, you may.

16             MS. MADDURI:  Thank you, Your Honor.

17   BY MS. MADDURI:

18   Q    So, Senator, I just want to ask you:  Do you believe that

19   allowing minorities to have more representation than their

14:46:51 20   proportion of the population would violate the ideas and

21   philosophies of the state of Alabama?

22   A    Do I believe that having a district with more than a

23   majority members of a minority population would violate the

24   Constitution?

14:47:11 25   Q    No.  I asked if you believe that allowing minorities to

```
 1   have representation that exceeds their proportion of the
 2   population in Alabama would violate the ideas and philosophies
 3   of the state?
 4   A    Yes.
 5   Q    Alabama currently has one majority black district,
 6   correct?
 7   A    Correct.
 8   Q    And that's about 14 percent of the districts.  Does that
 9   sound right to you?  One of seven?  I know we're not good at
10   math in here.  But I can represent to you that that's about
11   14 percent.
12   A    Okay.
13   Q    Is that right?
14   A    You want me to get my calculator out?  We need math
15   teachers in Alabama.
16            THE COURT:  We sure do.
17            THE WITNESS:  I am sure you're probably correct.
18   BY MS. MADDURI:
19   Q    I used a calculator.  I didn't do it in my head.  I'm also
20   very inept in that field.
21        So right now, would you agree that African-Americans in
22   Alabama have a lower proportion of representation than their
23   share of the population?
24   A    At 14 percent?
25   Q    They currently have 14 percent of the seats in the
```

```
 1   delegation.  And I can represent to you -- would you -- let me
 2   back up.
 3        Would you agree with me that African-Americans right now
 4   in the state of Alabama make up about a quarter of the
 5   population?
 6   A    Correct.
 7   Q    So would you agree with me that African-Americans in
 8   Alabama have a lower proportion of the representation out of
 9   the seats in the congressional delegation than their share of
10   the population?
11   A    Yes.
12   Q    And currently six of the seven congressional districts are
13   majority white, correct?
14   A    Correct.
15   Q    And would you -- do you have any reason to dispute that
16   67 percent of the state's population right now is white?
17   A    I'm not -- I don't have those statistics, but -- I can't
18   answer that.  I don't know.
19   Q    Do you have any reason to disagree with me that that's --
20   A    I have no reason to disagree or agree.
21   Q    And -- I can represent to you that the population right
22   now in Alabama is about 67 percent non-Hispanic white.
23   A    Before this census?
24   Q    Correct.  As of 2010 census data, correct.
25   A    Okay.
```

Timestamps:
14:48:54 (line 5)
14:49:07 (line 10)
14:49:28 (line 15)
14:49:51 (line 20)
14:50:12 (line 25)

1  Q     And we're going to keep doing math.  Would you agree with

2  me six out of seven is about 86 percent?  I can represent to

3  you that it is.

4  A     Okay.

14:50:27 5  Q     So is the fact that there is a greater proportion of

6  majority white districts in the population in Alabama, is that

7  consistent with the ideas and the philosophies of the state in

8  your opinion?

9  A     Say again.

14:50:41 10  Q     Is the fact that there's a greater proportion of majority

11  white districts right now in Alabama than the white population,

12  is that consistent with the ideas and philosophies of the state

13  of Alabama?

14  A     No.  I don't -- but -- you're boxing me in.  I can't

14:51:00 15  create two districts and reach what you want to.  And so

16  neither one of the numbers will work for me.

17      If we want to get into a numbers game, you're talking

18  about the population.  You're talking about what the six

19  congressional districts are, and then what the seventh district

14:51:24 20  are.  And then if I'm going to create two, then I'm going to

21  create a disproportionate on the other side.

22  Q     No, sir.  I'm not asking you about a situation where

23  there's six districts.  I'm asking you about the current map

24  that has seven districts.

14:51:37 25      THE COURT:  He was talking about seven.

BY MS. MADDURI:

Q    Yes?

A    I'm talking about seven.  I'm saying if you are going to

make me take one of my six and make a minority, then I'm going

14:51:45  to disproportion the other way.

The question -- you're boxing me in if I answer yes or no

either way it's -- it's no easy answer to that question.

Q    Sure.  Would you agree with me that two out of seven is

about 28 percent?

14:51:59  A    Probably 20, a little over 28, probably, yeah.

Q    And I can represent to you that the African-American

population right now as of the 2010 census in Alabama is over

26 percent?

A    Okay.

14:52:12  Q    That's all I have.

THE COURT:  Redirect?

MR. WALKER:  Just a little bit, Your Honor.

THE COURT:  Or do you want to take a break?

MR. WALKER:  I think just one or two questions.

14:52:27  THE COURT:  Okay.  We never say one; but one or two.

MR. WALKER:  I didn't say one.  I said one or two.

REDIRECT EXAMINATION

BY MR. WALKER:

Q    Senator Dial, you were asked whether or not the committee

14:52:46  assessed whether or not you could draw two majority

```
 1  African-American -- two majority minority -- minority-majority
 2  districts.  Do you recall that?
 3  A    Yes.
 4  Q    When you accepted the plan, were you relying on the
 5  expertise of Terri Sewell as a successful African-American
 6  politician to tell you what she needed for her district?
 7  A    Yes.
 8  Q    And were you also relying on the experience of Randy
 9  Hinaman to tell you what was needed?
10  A    Yes.
11  Q    And did you also rely on what you understood from your
12  conversations from Senator Sanders or other members of the
13  African-American legislative delegation to be necessary for a
14  successful minority-majority district?
15  A    Yes.
16  Q    And let me clear this up.  You're not against
17  African-American members of the Congress, are you?
18  A    No.
19  Q    If all seven districts elected African-American congress
20  people, you would be fine with that?
21  A    I certainly would.
22            MR. WALKER:  I have nothing else.  Thank you, sir.
23            THE COURT:  Any cross?
24            MS. MADDURI:  No, Your Honor.
25            THE COURT:  Okay.  All right.  Thank you.  Thank you,
```

14:53:05 (line 5)
14:53:22 (line 10)
14:53:43 (line 15)
14:53:56 (line 20)
14:54:08 (line 25)

```
        1    Senator Dial.  We appreciate you educating us about this
        2    process.
        3              (Discussion off the record.)
        4         MR. WALKER:  Your Honor, that's the last witness we
14:54:42 5    have today.
        6         THE COURT:  Okay.  All right.
        7              (Discussion off the record.)
        8      (Whereupon, the above proceedings were concluded at 2:55
        9    p.m.)
       10
       11
       12
       13
       14
       15
       16
       17
       18
       19
       20
       21
       22
       23
       24
       25
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

CERTIFICATE


    I certify that the foregoing is a correct
transcript from the record of proceedings in the
above-entitled matter.




Christina K. Decker                              11-13-19

Christina K. Decker, RMR, CRR                    Date

Federal Official Court Reporter

ACCR#:  255