FILED

2021 Dec-15  PM 08:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 6

FILED

2019 Oct-21 PM 08:03
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| LAKEISHA CHESTNUT, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 2:18-cv-00907-KOB |
| v. | ) | |
| | ) | |
| JOHN H. MERRILL, in his official | ) | |
| Capacity as Alabama Secretary of State | ) | |
| | ) | |
| Defendant. | ) | |

## JOINT LIST OF AGREED AND DISPUTED PRINCIPAL[1] FACTS

---

[1] While Plaintiffs have set forth below the key facts they intend to prove at trial, they reserve the right to establish further facts in support of their claim through lay witness testimony and cross-examination of Defendant's expert and lay witnesses as trial unfolds. Defendant reserves the same rights. When stipulating to facts as true, the parties do not waive the right to object to evidence as irrelevant or otherwise inadmissible.

# AGREED FACTS

## I.    Plaintiffs

### A.    LaKeisha Chestnut

1.    Plaintiff LaKeisha Chestnut is African American.

2.    Plaintiff LaKeisha Chestnut lives in Mobile, Alabama.

3.    Plaintiff LaKeisha Chestnut moved to and registered to vote in Alabama in May of 2016.

4.    Plaintiff LaKeisha Chestnut currently lives and votes in Congressional District ("CD") 1.

5.    Under each of Plaintiffs' Illustrative Plans, Plaintiff LaKeisha Chestnut would reside in District 2.

### B.    Marlene Martin

6.    Plaintiff Marlene Martin is African American.

7.    Plaintiff Marlene Martin lives in Montgomery, Alabama.

8.    Plaintiff Marlene Martin currently lives and votes in CD 7.

9.    Under each of Plaintiffs' Illustrative Plans, Plaintiff Marlene Martin would reside in District 2.

### C.    Bobby DuBose

10.    Plaintiff Bobby DuBose is African American.

11.    Plaintiff Bobby DuBose lives in Bessemer, Alabama.

12.    Plaintiff Bobby DuBose currently lives and votes in CD 7.

13.     Under each of Plaintiffs' Illustrative Plans, Plaintiff Bobby DuBose would continue to reside in District 7.

**D.    Rodney Love**

14.     Plaintiff Rodney Love is African American.

15.     Plaintiff Rodney Love lives in Birmingham, Alabama.

16.     Plaintiff Rodney Love currently lives and votes in CD 7.

17.     Under each of Plaintiffs' Illustrative Plans, Plaintiff Rodney Love would continue to reside in District 7.

**E.    Janice Williams**

18.     Plaintiff Janice Williams is African American.

19.     Plaintiff Janice Williams lives in Birmingham, Alabama.

20.     Plaintiff Janice Williams currently lives and votes in CD 7.

21.     Under each of Plaintiffs' Illustrative Plans, Plaintiff Janice Williams would continue to reside in District 7.

**F.    Karen Jones**

22.     Plaintiff Karen Jones is African American.

23.     Plaintiff Karen Jones lives in Montgomery, Alabama.

24.     Plaintiff Karen Jones currently lives and votes in CD 7.

25.     Under each of Plaintiffs' Illustrative Plans, Plaintiff Karen Jones would reside in District 2.

### G. Roderick Clark

26. Plaintiff Roderick Clark is African American.

27. Plaintiff Roderick Clark lives in Union Springs, Alabama.

28. Plaintiff Roderick Clark currently lives and votes in CD 2.

29. Under each of Plaintiffs' Illustrative Plans, Plaintiff Roderick Clark would reside in District 2.

### H. John Harris

30. Plaintiff John Harris is African American.

31. Plaintiff John Harris lives in Opelika, Alabama.

32. Plaintiff John Harris currently lives and votes in CD 3.

33. Under each of Plaintiffs' Illustrative Plans, Plaintiff John Harris would continue to reside in District 3.

### I. Minnie Austin

34. Plaintiff Minnie Austin is African American.

35. Plaintiff Minnie Austin lives in Tuskegee, Alabama.

36. Plaintiff Minnie Austin currently lives and votes in CD 3.

37. Under each of Plaintiffs' Illustrative Plans, Plaintiff Minnie Austin would reside in District 2.

### J. Joseph Boykins

38. Plaintiff Joseph Boykins is African American.

39. Plaintiff Joseph Boykins lives in Thomasville, Alabama.

40.     Plaintiff Joseph Boykins currently lives and votes in CD 7.

41.     Under three of Plaintiffs' Illustrative Plans (Revised Plans 1 and 3, and Illustrative Plan 4), Plaintiff Joseph Boykins would reside in District 2, and under one of Plaintiffs' Illustrative Plans (Revised Plan 2), Plaintiff Joseph Boykins would reside in District 7.

## II.     Experts

42.     William Cooper, Dr. Maxwell Palmer, Dr. Peyton McCrary, Dr. Trey Hood, and Dr. Douglas Johnson are all qualified to testify as experts concerning the matters addressed in their reports in this case.

## III.    Demographics of Alabama

43.     The 2010 Census reported Alabama's total population as 4,779,736. According to American Community Survey (ACS) estimates, Alabama's total population was 4,887,871 as of July 1, 2018.

44.     The 2010 Census reported that 67.04% of Alabama's population was White, 26.80% of the population is Any Part Black,[2] 26.20% of the population was Single-Race Black, and 3.88% of the population is Latino (of any race).

---

[2] Any Part ("AP") Black refers to individuals who indicate on the Census form that they are Black, regardless of whether they also choose another race and regardless of any indicated ethnicity, such as Hispanic. Single-Race ("SR") Black refers to individuals who have indicated on the Census form that their only race is Black, regardless of any indicated ethnicity. Single-Race, Non-Hispanic ("SR-NH") Black refers to individuals who have indicated on the Census form that their only race is Black and that they are not Hispanic.

45.     The 2010 Census reported that 69.39% of Alabama's voting age population was White, 25.16% of the voting age population was AP Black, 24.86% of the voting age population was SR Black, and 3.24% of the voting age population was Latino (of any race).

46.     Between 1990 and 2010, African Americans (AP Black) represented 35% of Alabama's total population growth according to Census figures. Those identifying as SR Black represented 31% of the State's total population growth.

47.     Between 2010 and 2017, the AP Black population in Alabama grew by 5.2% according to Census estimates, accounting for 71.1% of Alabama's total population growth and 60.19% of the State's voting-age population growth during that time period. The SR Black population in Alabama during this period grew by 4.5% according to Census estimates, accounting for 59.89% of Alabama's total population growth and 56.81% of the State's voting-age population growth.

48.     During that same period, the non-Hispanic White proportion of Alabama's population fell by 0.2% according to Census estimates.

49.     As of 2017, 26.4% of Alabama's voting-age population is AP Black and 26.0% of Alabama's voting-age population is SR Black, according to Census estimates.

50.     The "Black Belt" in Alabama is a collection of counties in the "south-central region of the state named for its black soil. Many black Alabamans reside

there due to the region's history of agriculture and slavery." *Alabama Legislative Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1036 (M.D. Ala. 2017).

51.     Alabama's population shifts between every census.

## IV.     Alabama's District Maps

### A.     Pre-2011 Congressional District Plans

52.     Since 1973, Alabama has had seven congressional seats.

53.     Since the 1970 districting cycle when Alabama was first allocated 7 seats in Congress, Alabama's First Congressional District (CD 1) has included the entireties of both Mobile and Baldwin Counties.

54.     In early 1992, Alabama consented in litigation to create its first majority-African-American congressional district, CD 7. *Wesch v. Hunt*, 785 F. Supp. 1491 (S.D. Ala. 1992).

55.     In the November 1992 general election, CD 7 elected Alabama's first African-American member of Congress since Reconstruction, Earl Hilliard.

56.     Following the 2000 Census, Alabama enacted a new seven-district congressional plan (the "2001 Plan") in which CD 7 remained the only majority-minority district.

57.     Under the 2001 Plan, Montgomery County was split between CDs 2 and 3.

58.     In the general congressional elections of 2002, 2004, 2006, and 2008,

Artur Davis was the candidate of choice of African Americans in CD 7.

59.     In each of the general congressional elections of 2002, 2004, 2006, and 2008, Representative Davis won election with no less than 74.9% of the vote.

60.     In 2010, CD 7 under the 2001 Plan had a black voting-age population ("BVAP") of 60.11% under the 2001 Plan.

61.     In the November 2010 general congressional election, Terri Sewell was the candidate of choice of African Americans in CD 7.

62.     In the November 2010 general congressional election, Representative Sewell won election in CD 7 with 72% of the vote, beating her opponent by 45 points.

63.     In 2010, CD 1 under the 2001 Plan had a BVAP of 26.16%; CD 2 had a BVAP of 29.63%; and CD 3 had a BVAP of 30.73%.

64.     In 2010, CDs 1, 2, and 3 under the 2001 Plan contained a combined AP Black population of 629,911, which was 92.3% of the ideal total population for a single congressional district, calculated by dividing the total population by the number of congressional districts. In 2010, CDs 1, 2, and 3 under the 2001 Plan contained a combined SR Black population of 615,896, which was 90.1% of the ideal total population for a single congressional district.

**B.     2011 Congressional District Plan (the "2011 Plan")**

65.     In 2011, Alabama enacted a seven-district congressional plan with one

majority-minority district, CD 7.

66. In 2011, Alabama was a covered jurisdiction under Section 5 of the Voting Rights Act, and Alabama's congressional plans therefore had to be precleared by the U.S. Department of Justice.

67. Alabama's First Congressional District is a compact district that has included the entireties of both Mobile and Baldwin Counties since Alabama was first allocated seven congressional districts after the 1970 census.

68. Alabama's Second Congressional District (CD 2) has included parts of Montgomery County and parts of the Wiregrass region of southeast Alabama since the 1970s.

69. The 2011 Plan increased the BVAP of CD 7 to 60.91% AP Black and 60.55% SR Black, according to 2010 Census data.

70. According to the 2010 Census data, CD 1 under the 2011 Plan has a BVAP of 25.8%; CD 2 has a BVAP of 27.9%; and CD 3 has a BVAP of 24.04%.

71. According to 2010 Census data, CDs 1, 2, and 3 under the 2011 Plan contained a combined AP Black population of 575,923, which is 84.3% of the total population of an ideal congressional district. Those districts contained a combined SR Black population of 561,978, which is 82.3% of the total population of an ideal congressional district.

72. While the 2001 Plan split Montgomery County among two districts—

CDs 2 and 3—the 2011 Plan now splits Montgomery County between three congressional districts: CDs 2, 3, and 7.

73.    In the 2012 general congressional election—the first held under the 2011 Plan—Representative Sewell won 75% of the vote in a contested race, beating her opponent by 51 points.

74.    In each election since 2012, Representative Sewell has run unopposed in the general election.

75.    The Reock compactness score of CD 7 under the 2011 Plan is .38.[3]

76.    The Polsby-Popper compactness score of CD 7 under the 2011 Plan is .13, which is the lowest score among all districts under the 2011 Plan.[4]

## C.    State Board of Education ("SBOE") Plan

77.    In 2011, Alabama adopted an eight-district SBOE Plan (the "2011 SBOE Plan") with two majority-minority districts, Districts 4 and 5.

78.    According to 2010 Census data, District 4 is 51.4% AP BVAP, and District 5 is 57.5% AP BVAP.

---

[3] A Reock compactness score is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible. For each district the Reock test computes the ratio of the area of the minimum enclosing circle for the district. The measure is always between 0 and 1, with 1 being the most compact.

[4] A Polsby-Popper compactness score is the product of a test that computes the ratio of the district area to the area of a circle with the same perimeter. The measure is always between 0 and 1, with 1 being the most compact.

79.    In each election since 2011, the candidate of choice of African Americans has been elected to represent Districts 4 and 5 of the SBOE.

80.    District 5 of the SBOE Plan connects the City of Mobile to the Black Belt Counties.

## V.    *Gingles* Preconditions

### A.    Precondition One: Whether the Minority Group Is Sufficiently Large and Geographically Compact to Constitute a Majority-Minority District

81.    Prior to receiving the home address information for all of Alabama's congressional incumbents, Mr. Cooper drew four illustrative plans: Illustrative Plan 1, Illustrative Plan 2, Illustrative Plan 3, and Illustrative Plan 4.

82.    After receiving additional home address information for Alabama's congressional incumbents, and to ensure that no incumbents were drawn out of their present districts, Mr. Cooper replaced Illustrative Plans 1 through 3 with Revised Plan 1, Revised Plan 2, and Revised Plan 3, respectively.[5]

83.    In drawing the Illustrative Plans, Mr. Cooper used the 2011 Plan as his starting point and used the 2011 SBOE Plan as a guide for where in the State a second majority-African-American congressional district could be drawn.

#### 1.    Numerousness

84.    According to 2010 Census data, in each of the Illustrative Plans, more

---

[5] Unless otherwise specified, "the Illustrative Plans" in this document refers to the operative illustrative plans: Revised Plans 1, 2, and 3, and Illustrative Plan 4.

than 50% of the voting-age population in Districts 2 and 7 is AP Black.

85.     According to the 2010 Census data, in Revised Plan 1 and Revised Plan 2, more than 50% of the voting-age population in Districts 2 and 7 is SR Black.

86.     According to the 2010 Census data, in Revised Plan 1 and Revised Plan 2, more than 50% of the voting-age population in Districts 2 and 7 is SR-NH Black.

### 2.    Geographic Compactness of the Minority Group

87.     Each of the Illustrative Plans complies with the one-person, one-vote principle using 2010 Census data, with an overall population deviation from the ideal district size of plus or minus one.

88.     None of the Illustrative Plans pairs congressional incumbents against one another.

89.     Each of the Illustrative Plans splits the same number of, or fewer, counties than the 2011 Plan.

90.     Each of the Illustrative Plans has fewer discrete county splits—i.e., unique district/county combinations—than the 2011 Plan.

91.     Three of the Illustrative Plans (Revised Plans 1 and 2, and Illustrative Plan 4) split fewer of the State's 2010 VTDs than the 2011 Plan, and the remaining Illustrative Plan (Revised Plan 3) splits the same number of the State's 2010 VTDs as the 2011 Plan.

92.     Unlike the 2011 Plan, which splits Montgomery County among three

congressional districts, each of the Illustrative Plans place Montgomery County entirely into one district, District 2.

93.     Except for a shift of 200 residents in Jackson County—whom the 2011 Plan splits away from CD 5 in a non-contiguous manner—District 5 in the Illustrative Plans is identical to CD 5 in the 2011 Plan.

94.     The Reock scores of District 2 in each Illustrative Plan are .35, .27, .33, and .24, respectively.

95.     The Reock scores of the District 7 in each Illustrative Plan are .38, .31, .31, and .35, respectively.

96.     The Polsby-Popper scores of District 2 in each Illustrative Plan are .18, .14, .18, and .13, respectively.

97.     The Polsby-Popper scores of District 7 in each Illustrative Plan are .19, .19, .13, and .26, respectively.

98.     In 2011, Alabama defined communities of interest as "an area with recognized similarities of interests, including but not limited to racial, ethnic, geographic, governmental, regional, social, cultural, partisan, or historic interests; county, municipal, or voting precinct boundaries; and commonality of communications."

**B.     Precondition Two: Whether the Minority Group Is Politically Cohesive**

99.      Dr. Palmer employed a statistical method called Ecological Inference

("EI") to derive estimates of the percentage of African American and white voters in Alabama's 1st, 2nd, 3rd, and 7th Congressional Districts ("Focus Area") that voted for each candidate in elections for U.S. Congress and statewide elections for U.S. President, U.S. Senate, Governor, Lieutenant Governor, Secretary of State, Attorney General, State Auditor, Treasurer, Commissioner of Agriculture and Industries, Chief Justice of the State Supreme Court, and Associate Justice of the State Supreme Court from 2012-2018.

100.  Dr. Palmer conducted two analyses, one at the county level for the 2012, 2014, 2016, 2018 general elections and the 2017 special election for U.S. Senate, and one at the precinct level for the 2018 general elections.

101.  In every election Dr. Palmer examined, in each Congressional District and the Focus Area as a whole, African-American voters had clearly identifiable candidates of choice.

102.  In Dr. Palmer's county level analysis, on average, African-American voters supported their candidates of choice with an estimated vote share of 94.1%.

103.  In Dr. Palmer's precinct level analysis, on average, African-American voters supported their candidates of choice with an estimated vote share of 98.3%.

104.  African Americans in the Focus Area vote cohesively for their candidates of choice.

**C.  Precondition Three: Whether the White Majority Votes Sufficiently as a Bloc to Enable It Usually to Defeat the Minority's Preferred Candidate**

105.   In every election Dr. Palmer examined, in each Congressional District and the Focus Area as a whole, white voters had clearly identifiable candidates of choice.

106.   In every election Dr. Palmer examined, in each Congressional District and the Focus Area as a whole, African-American and white voters cohesively supported opposing candidates.

107.   In Dr. Palmer's county level analysis, on average, white voters opposed African-American voters' candidates of choice with an estimated vote share for those candidates of 16.7%.

108.   In Dr. Palmer's precinct level analysis, on average, white voters opposed African-American voters' candidates of choice with an estimated vote share for those candidates of 17.4%.

109.   Based on Dr. Palmer's precinct level analysis, the average difference of support for African-American-preferred candidates between African-American and white voters in the Focus Area was 80.9 percentage points.

110.   Based on Dr. Palmer's precinct level analysis, the average difference of support for African-American-preferred candidates between African-American and white voters in CD 1 was 78.7 percentage points.

111. Based on Dr. Palmer's precinct level analysis, the average difference of support for African-American-preferred candidates between African-American and white voters in CD 2 was 85.7 percentage points.

112. Based on Dr. Palmer's precinct level analysis, the average difference of support for African-American-preferred candidates between African-American and white voters in CD 3 was 81.9 percentage points.

113. Based on Dr. Palmer's precinct level analysis, the average difference of support for African-American-preferred candidates between African-American and white voters in CD 7 was 77.9 percentage points.

114. Across all statewide contests analyzed, the white-preferred candidate defeated the African-American-preferred candidate in 16 of 18 races.

## VI. Totality of the Circumstances

115. After Reconstruction, Alabama lawmakers held a constitutional convention in 1901 with the purpose of enacting a political structure that would maintain white supremacy and prevent African-American participation.

116. The 1901 Convention adopted election structures meant to disenfranchise African Americans, including a literacy test, employment requirements, property qualifications, a cumulative poll tax, and disenfranchisement of those convicted of minor crimes.

117. The 1901 Convention created exemptions from their discriminatory

devices that sought to limit those devices' disenfranchisement of white voters.

118.   The devices in the Alabama's Constitution decreased the number of registered African-American voters from 181,000 in 1900 to 3,000 in 1903.

119.   Because Democrats dominated Alabama's politics in the 20th century, Alabama's official exclusion of African Americans from primary elections foreclosed them from participating in the political process.

120.   After the United States Supreme Court invalidated white-only primaries in 1944, Alabama passed the "Boswell Amendment" to its Constitution in 1946, adding an "understanding requirement" meant to give registrars broad discretion to deny African Americans the ability to register to vote.

121.   After a federal court invalidated the Boswell Amendment in 1949, Alabama replaced its understanding requirement with a literacy test, again with the purpose of preventing African Americans from registering to vote.

122.   After the Supreme Court outlawed the white primary in 1944, many Alabama counties shifted to at-large elections, the intent of which was to prevent African Americans from electing their candidates of choice.

123.   In 1951, Alabama enacted a law prohibiting single-shot voting in municipal elections, the intent of which was to prevent African Americans from electing their candidates of choice.

124.   In 1957, Alabama transformed the boundaries of the city of Tuskegee

into a twenty-eight-sided figure designed to fence out African Americans from the city limits and ensure that only white residents could elect city officials. *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

125. In the mid-1960s, Dallas County Sheriff Jim Clark oversaw violent attacks by police officers on individuals advocating for African Americans' right to vote.

126. Between 1965 and 1982, the Justice Department ("DOJ") objected 58 times to proposed changes to election practices or procedures in Alabama and sent observers to the State 107 times. Ten of the objections were to preclearance submissions by the State, and 48 were to preclearance submissions by local jurisdictions.

127. Between 1965 and 1982, subdivisions in Alabama continued to use at-large elections.

128. In *Hale County, Alabama v. United States*, 496 F. Supp. 1206 (D.D.C. 1980), the court found that Hale County had implemented at-large elections for the purpose of discriminating against African Americans.

129. Between 1982 and 2006, DOJ objected to preclearance submissions from Alabama 46 times—seven from the State and 39 from local jurisdictions—and sent federal observers to the State 91 times.

130. In 1982, DOJ objected to Alabama's legislative redistricting plans

because the plans reduced the number of majority-minority districts and fragmented minority voting strength in a portion of the Black Belt.

131.   In *Harris v. Graddick*, 593 F. Supp. 128, 133 (M.D. Ala. 1984), the court found that state and local officials in Alabama had in the past "intentionally created an atmosphere of fear and intimidation to keep black persons from voting" and that "[t]he present reality in Alabama is that many black citizens, particularly the elderly and uneducated, still bear the scars of this past, and are still afraid to engage in the simple act of registering to vote and voting."

132.   In *Dillard v. Crenshaw County*, 640 F. Supp. 1347, 1356 (M.D. Ala. 1986), the court found that five Alabama counties' continued use of at-large elections was "still having their intended racist impact."

133.   The last Department of Justice objection to a preclearance submission from the State of Alabama occurred in 1994. The last Department of Justice objection to a preclearance submission from a local Alabama jurisdiction was in 2008.

134.   In *Alabama Legislative Black Caucus v. Alabama*, 231 F. Supp. 3d 1026 (M.D. Ala. 2017), the court found that race predominated the Alabama Legislature's drawing of 14 legislative districts after the 2010 Census, and that 12 of those districts violated the Equal Protection Clause because they failed to satisfy strict scrutiny.

135.   After the decision in *Shelby County, Alabama v. Holder* was issued, 570 U.S. 529 (2013), Defendant Merrill began enforcing Alabama's voter-ID law.

136.   Today, Alabama holds statewide at-large elections for seats on its Supreme Court, Court of Criminal Appeals, and Court of Civil Appeals.

137.   Today, Alabama has a majority-vote requirement in all primary elections.

138.   There is no slating process involved in Alabama's congressional elections.

139.   African Americans in Alabama experience poverty at more than twice the rate of non-Hispanic Whites.

140.   The child poverty rate of African Americans in Alabama is 40.4%, and the rate for non-Hispanic White children is 14.3%.

141.   The median household income of African Americans in Alabama is 55.9% that of non-Hispanic Whites.

142.   Per capita income in Alabama among African Americans is $18,229; among non-Hispanic Whites it is $30,697.

143.   While 27.6% of African-American households in Alabama rely on food stamps, 8.6% of non-Hispanic White households do the same.

144.   16.7% of African Americans in Alabama 25 years of age and older have not finished high school, compared to 11.3% of non-Hispanic Whites of the same

age.

145.    17.1% of African Americans in Alabama 25 years of age and older have a bachelor's degree, compared to 28.6% of non-Hispanic Whites of the same age.

146.    The unemployment rate among African Americans in Alabama is 9.1%; for non-Hispanic Whites, it is 4.6%.

147.    24.5% of employed African Americans are in management positions, compared to 39.9% of employed non-Hispanic Whites.

148.    49.2% of African-American householders in Alabama are homeowners, compared to 76.7% of non-Hispanic White householders.

149.    12% of African-American households lack access to a vehicle, compared to 3.6% of non-Hispanic White households.

150.    The median home value for African-American homeowners in Alabama is $92,200; for non-Hispanic Whites homeowners, it is $155,600.

151.    A higher percentage of African Americans in Alabama between the ages of 18 and 64 lack health insurance compared to non-Hispanic Whites.

152.    Individuals with lower household incomes are significantly less likely to vote.

153.    The single best indicator of whether an individual will vote is her level of education.

154.    In the 2010, 2012, 2014, 2016, and 2018 general elections in Alabama,

the turn-out rate among African-American voters statewide was, on average, 4.8% lower than the turn out rate among non-Hispanic White voters.

155.   Disparities between African American and white Alabamians on various socio-economic indicators are also present in 20 States where African Americans are at least 10% of the population, all with various levels of severity.

156.   Alabama has never had more than one African-American congressional representative, and no African American has been elected to the U.S. House of Representatives outside of CD 7.

157.   No African American has ever been elected to the U.S. Senate from Alabama.

158.   There are currently no African-American statewide officials in Alabama.

159.   Only two African Americans have been elected to statewide office in Alabama, and both ran as incumbents after first being appointed.

160.   The overwhelming majority of African-American representatives in the Alabama Legislature come from majority-minority districts.

## VII.   Facts Relevant to Defendant's Defenses

161.   Alabama's voter registration form allows residents to select one racial or ethnic group, meaning that if an individual chooses "Black," that individual cannot choose an additional race or also choose Hispanic.

162.   Dr. Hood did not examine the racial composition of voters in Districts 2 or 7 as drawn in the Illustrative Plans.

163.   Dr. Hood did not apply any data to the Illustrative Plans for purposes of testing the functionality of Districts 2 and 7 as majority-minority districts.

164.   Dr. Hood agrees that Dr. Palmer's analysis showed that in the 2018 general election, African Americans constituted a majority of voters in Districts 2 and 7.

165.   Dr. Hood reviewed exit polls and surveys relating to the general elections for U.S. President, U.S. Senate, and Governor in 2008, 2010, 2012, 2014, 2016, and 2018. He found that these polls and surveys show that in Alabama and 20 other states where African Americans constitute 10% or more of the population, African-American voters supported Democratic candidates in these elections by margins greater than 80%.

166.   U.S. Senator Doug Jones is currently the only Democratic statewide elected official in Alabama.

167.   When Congresswoman Terri Sewell has been on the ballot as a candidate for Congress, she has been Plaintiff Marlene Martin's candidate of choice.

168.   250.   When Congresswoman Terri Sewell has been on the ballot as a candidate for Congress, she has been Plaintiff Bobby Dubose's candidate of choice.

169.   When Congresswoman Terri Sewell has been on the ballot as a

candidate for Congress, she has been Plaintiff Rodney Love's candidate of choice.

170.   When Congresswoman Terri Sewell has been on the ballot as a candidate for Congress, she has been Plaintiff Joseph Boykins's candidate of choice.

# DISPUTED FACTS

## I.     Facts Plaintiffs Will Seek to Prove

### A.     *Gingles* Preconditions

#### 1.     Precondition One: Whether the Minority Group is Sufficiently Large and Geographically Compact to Constitute a Majority-Minority District

1.     Plaintiffs' expert William Cooper has drawn illustrative plans demonstrating that the African-American community in Alabama is sufficiently large and geographically compact to constitute a majority of the voting-age population in two of Alabama's congressional districts.

#### a.     Numerousness

2.     African Americans constitute a majority of the voting-age population in Districts 2 and 7 in each of the Illustrative Plans.

3.     According to the 2008–2012 and 2013–2017 American Community Survey ("ACS") data, under each Illustrative Plan, the citizen voting-age populations ("CVAPs") of Districts 2 and 7 are more than 50% SR-NH Black.

4.     Since 2010, the SR-NH African-American CVAP in Districts 2 and 7 of the Illustrative Plans has increased, while the non-Hispanic White CVAP has decreased.

#### b.     Geographic Compactness of the Minority Group

5.     The Illustrative Plans comply with traditional redistricting principles.

6.     All districts in each Illustrative Plan are contiguous.

7.      District 2 in each of the Illustrative Plans has a configuration that is similar to District 5 of the 2011 SBOE Plan, which also connects the City of Mobile to the Black Belt counties.

8.      District 1 in the Illustrative Plans connect a part of Mobile County with Baldwin County in a manner similar to District 1 of the 2011 SBOE Plan.

9.      The Illustrative Plans are within the norm of objective measures of compactness for statewide redistricting plans in Alabama.

10.      The 2011 Plan splits seven counties and contains 15 discrete splits (unique district/county combinations).

11.      The 2011 Plan splits 16 of the State's 2010 voter tabulation districts ("VTDs").

12.      African Americans in the City of Mobile and the Black Belt Counties, including the City of Montgomery, share racial, ethnic, geographic, governmental, regional, social, cultural, partisan, and historic interests.

### 2.      Precondition Two: Whether the Minority Group is Politically Cohesive

13.      Defendant's experts, Dr. Hood and Dr. Johnson, do not dispute Dr. Palmer's conclusions, methodology, or empirical results.

14.      A significant number of African Americans voted for the same candidates in every election examined.

### 3. Precondition Three: Whether the White Majority Votes Sufficiently as a Bloc to Enable It Usually to Defeat the Minority's Preferred Candidate

15.     There is a high level of racially polarized voting in the Focus Area.

16.     Dr. Hood and Dr. Johnson do not dispute that there is a high degree of racially polarized voting in all of the elections analyzed in the Focus Area.

17.     Dr. Palmer's analysis shows that between 2012 and 2018, across all elections examined, the white majority voted as a bloc usually to defeat African-American-preferred candidates outside of CD 7.

18.     Dr. Hood and Dr. Johnson do not dispute Dr. Palmer's conclusion that the white majority votes as a bloc to usually defeat the African American-preferred candidates outside of CD 7.

19.     In the two statewide contests in which the African-American-preferred candidate won in the Focus Area, the white-preferred candidate was Roy Moore.

20.     In all congressional and statewide elections examined in CDs 1, 2, and 3, the white-preferred candidates defeated the African-American-preferred candidates.

21.     The only congressional district in which African-American-preferred candidates won congressional or statewide races was CD 7, currently the State's only majority-minority congressional district.

### B. Totality of the Circumstances

1. **Senate Factor One: Alabama's History of Official Discrimination**

22. Alabama has a long history of official discrimination that has touched the right of African Americans to participate in the political process.

23. Defendant has not identified any expert who will offer testimony to rebut Dr. McCrary's opinions or testimony.

24. Alabama's official voting-related discrimination has impeded, and continues to impede, African Americans' ability to participate in the political process today.

25. Through much of the 20th century, the State of Alabama did little to prevent brutal violence by white Alabamians against African Americans meant to prevent them from participating in the political process.

26. In 1961, Alabama enacted a numbered-place requirement for all at-large elections in the state, the intent of which was to prevent African Americans from electing their candidates of choice.

27. Despite the Voting Rights Act's protections, Alabama has continued to engage in discriminatory actions that have harmed African Americans' ability to participate in the political process.

28. Many of DOJ's objections between 1965 and 1982 were prompted by continued use of at-large elections intended to dilute African-American voting strength.

29.    In 1992, DOJ objected to Alabama's new congressional redistricting plan because of concerns "that an underlying principle of the Congressional redistricting was a predisposition on the part of the state political leadership to limit black voting potential to a single district," and that beyond that proposed majority-minority district, "the remainder of the state's concentrated black population . . . is fragmented under the submitted plan among a number of districts none of which has a black population of as much as 30 percent."

30.    In 2010, two Alabama state senators were recorded referring to African Americans as "Aborigines" and "Indians" during conversations in which they strategized to limit African-American turnout in an upcoming election by keeping a referendum issue off the ballot. *United States v. McGregor*, 824 F. Supp. 2d 1339, 1345 (M.D. Ala. 2011).

31.    In January 2014, a federal court "bailed-in" the City of Evergreen in Conecuh County for preclearance under Section 3(c) of the Voting Rights Act. *Allen v. City of Evergreen, Ala.*, No. 13-cv-107-CG-M, 2014 WL 12607819 (S.D. Ala. Jan. 13, 2014).

32.    After the United States Supreme Court invalidated the preclearance coverage formula set forth in Section 4 of the Voting Rights Act in *Shelby County, Ala. v. Holder*, 570 U.S. 529 (2013), Alabama engaged in discriminatory actions harming the voting strength of African Americans.

33. The voter-ID law that Defendant Merrill began enforcing after *Shelby County* was decided burdened African-American voters in a disproportionate manner.

34. After *Shelby County*, Alabama closed 31 driver's license offices located in predominantly African-American communities, which made it more difficult for African Americans to acquire the identification necessary to vote under Alabama's voter-ID law.

### 2. Senate Factor Two: Racially Polarized Voting

35. Plaintiffs incorporate by reference all facts in Sections I.A.2 and I.A.3.

### 3. Senate Factor Three: Use of Voting Practices or Procedures that Enhance the Opportunity for Discrimination

36. Alabama has utilized at-large systems, anti-single shot rules, numbered-placed requirements, and majority-vote requirements, all of which have diluted African-American voting strength throughout the State.

### 4. Senate Factor Four: Exclusion from Slating Process

37. There are no disputed facts relevant to this factor.

### 5. Senate Factor Five: Effects of Discrimination

38. Alabama's systemic racial discrimination has had lasting effects on the African-American community.

39. The disparities in everyday life between African Americans and non-Hispanic White residents of Alabama are the product of segregation, Jim Crow laws, and other intentionally discriminatory treatment of African Americans.

40. To this day, Alabama's Constitution still includes a provision mandating racially segregated schools, and since 2004 Alabama voters have twice rejected referenda seeking to remove that language.

41. Individuals with lower household incomes or lower educational achievement face greater burdens in participating in the political process than individuals with higher levels of income and education.

### 6. Senate Factor Six: Racial Appeals in Campaigns

42. Racial appeals are a common feature of Alabama's elections.

43. In 2011, Alabama Congressman Mo Brooks told residents at a town hall meeting that he would "do anything short of shooting" undocumented immigrants in order to remove them from the United States.

44. In 2014, Congressman Brooks stated on a national television show that the Democratic Party, led by President Barack Obama, was engaged in a "war on whites." Congressman Brooks repeated this assertion in 2017 on a local Alabama radio show.

45. During a campaign rally for then-candidate Donald Trump in Birmingham, a Black Lives Matter protestor was punched and kicked by a group of

men who yelled "go home nigger," after which Trump stated that the protestor "should have been roughed up."

46.     During the campaign for the 2017 special election for Alabama's U.S. Senate seat, candidate Roy Moore stated during a revival in Jackson: "They started [to] create new rights in 1965 [the year the Voting Rights Act was passed], and today we've got a problem."

47.     Candidate Moore also stated that America "was great at the time when families were united—even though we had slavery."

48.     In the most recent statewide elections, Alabama Supreme Court Justice Tom Parker ran ads warning that a "leftist mob [was] tr[ying] to destroy our society" under a video of African-American Congresswoman Maxine Waters speaking to a crowd.

49.     In the same election, Justice Parker ran an ad warning of "an invasion" of the country by immigrants with videos of dark-skinned migrants, and stating that Parker stood up for what "we" believe, and stood for "us."

## C.     Facts Relevant to Defendant's Defenses

50.     Race was not the predominant factor in the drawing of the Illustrative Plans.

51.     In Districts 2 and 7 of each Illustrative Plan, African Americans would be able to elect their candidates of choice.

52.     Dr. Palmer found that, in seven contested statewide elections in Alabama in 2018, each candidate of choice of African Americans won both Districts 2 and 7 as drawn in the Illustrative Plans with at least 58% of the vote, and that a majority of actual voters in both Districts 2 and 7 as drawn in the Illustrative Plans had indicated on their voter-registration form that they were Black.

53.     Mr. Cooper has offered an illustrative plan demonstrating that in light of population shifts in recent years it will be possible after the 2020 Census to draw, consistent with traditional districting principles, a six-district congressional plan with two majority-African-American districts.

## II.     Facts Defendant Will Seek to Prove

54.     Alabama's seven congressional districts have been stable for fifty years. While there have been necessary shifts to equalize population after each census, the Alabama Legislature has consistently valued preserving the core of the districts.

55.      Alabama's First Congressional District contains a strong community of interest and its people are bound together socially, culturally, and economically. Some of the primary interests of a First District Representative include the deep-

water port in Mobile, the Naval shipbuilding yard, seafood production, and tourism.

56.     Settled earlier than most of the State, Mobile has a unique history and culture, an example of which is the annual celebration of Mardi Gras which began in Mobile and is now celebrated throughout most of the First District.

57.     As tourism has developed and the population of Baldwin County has increased, and as more industry has come to Mobile (such as the State Docks and Airbus), the economies of Baldwin and Mobile Counties have become more connected.

58.     Mobile County has avoided some of the racial tensions that other parts of the State experienced. Mobile elected an African-American mayor when it was a majority-white city. The neighboring city of Prichard likewise elected an African-American mayor while majority white, and then elected a white mayor after becoming majority black.

59.     The population of Mobile County has become more integrated residentially in recent years.

60.     The Second District is a strong community of interest bound together socially, culturally, and economically. Some of the primary interest of a Second District Representative include agriculture, particularly peanut farming, and the Army Aviation Center at Fort Rucker near the city of Enterprise.

61.     Plaintiffs' proposed plans split communities of interest and draw congressional districts that combine diverse interests.

62.     The revised First and Second Congressional Districts proposed by Plaintiffs are not compact and would be difficult to represent. It would be difficult for a Representative to travel throughout Plaintiffs' proposed districts, and for him or her to find funds to maintain a sufficient number of branch offices to serve constituents. Moreover, because they would split communities of interest and combine unrelated parts of the State, Plaintiffs' districts would force Representatives to address so wide a variety of interests that their influence on behalf of any one interest would be diluted.

63.     The jobs of a Congressperson and a State School Board member are very different, and just because a map is workable for one body does not mean it is workable for the other.

64.     Congresswoman Terri Sewell, who represents Alabama's Seventh Congressional District (CD 7), has a close relationship with former Attorney General Eric Holder, as well as President Barack Obama and First Lady Michelle Obama. During the 2011 redistricting cycle, Representative Sewell worked to ensure that Alabama's congressional districts were precleared.

65.     In the 2011 reapportionment cycle, no member of the Alabama Legislature, including any member of the Alabama Legislative Black Caucus, introduced a viable plan that contained two majority-minority districts.

66.     In 2011, State Legislators believed that even if it were possible to draw two majority-minority congressional districts, doing so would lower the population of African-American voters in the districts in a way that would jeopardize preclearance.

67.     The National Democratic Party has moved to the left ideologically and has alienated many conservative Alabama voters.

68.     African-American voters throughout the country overwhelmingly support the Democratic Party.

69.     Alabama is expected to lose a congressional seat following the 2020 census.

70.     Inner-city Birmingham and the Black Belt counties consistently lose population relative to other areas of the State.

71.     The areas of Montgomery County that are most heavily populated by African Americans consistently lose population. Many African Americans have moved to areas east of Montgomery that are more heavily white.

72.     The Alabama Legislature considers the Single-Race (SR) Black category when assessing the racial demographics of districts, not the Any Part (AP) Black category used by Plaintiffs' expert Bill Cooper.

73.     There is no evidence that persons who identify as AP Black on the United States Census vote cohesively with persons who check SR Black.

74.     Plaintiffs' Illustrative Plans split counties and precincts along racial lines. These splits, and the choices of which counties to include in which districts, show that race predominated in drawing the plans.

75.     Plaintiff Rodney Love desires that there be a second majority-minority district in another part of the State, even if it requires sorting voters by race, so that Representative Sewell would have "more help in Congress."

76.     Plaintiff Bobby DuBose desires that there be a second-majority minority district in another part of the State.

77.     There is no evidence that Alabama could draw a majority-minority congressional district that includes Plaintiff John Harris's residence.

78.     Plaintiffs' Illustrative Plan 1 splits Mobile County between District 1 (a majority-white district) and District 2 (a majority-black district). Plaintiffs put 43.25% of the total population of Mobile County, but only 17.30% of Mobile County's African American population, into District 1. Plaintiffs put 56.75% of the total population of Mobile county, and 82.70% of the African American

population, into District 2. The part of Mobile county that is in District 1 is 80.07% white and 13.85% African American. The part of Mobile County that is in District 2 is 45.07% white and 50.46% African American.

79.     Plaintiffs' Illustrative Plan 1 splits Jefferson County between District 6 (a majority-white district) and District 7 (a majority black district). Plaintiffs put approximately 62.85% of the total population of Jefferson County, and approximately 91.72% of the African American population of Jefferson County, into District 7. The part of Jefferson County that is in District 6 is approximately 84.96% white and 9.36% African American. The part of Jefferson County that is in District 7 is approximately 34.15% white and 61.28% African American.

80.     Plaintiffs' Illustrative Plan 1 splits Tuscaloosa County between District 4 (a majority white district) and District 7 (a majority black district). Plaintiffs put 82.99% of the total population of Tuscaloosa County, and 97.06% of the African American population of Tuscaloosa County, into District 7. The part of Tuscaloosa County that is in District 4 is 91.09% white and 5.12% African American. The part of Tuscaloosa County that is in District 7 is 61.19% white and 34.61% African American.

81.     Plaintiffs' Illustrative Plan 2 splits Mobile County between District 1 (a majority white district) and District 2 (a majority black district). Plaintiffs put 43.61% of the total population of Mobile County, but only 16.12% of Mobile

County's African American population, into District 1. Plaintiffs put 56.39% of the total population of Mobile County, and 83.88% of the African American population, into District 2. The part of Mobile County that is in District 1 is 81.15% white and 12.80% African American. The part of Mobile County that is in District 2 is 44.01% white and 51.50% African American.

82.    Plaintiffs' Illustrative Plan 2 splits Baldwin County between District 1 (a majority white district) and District 2 (a majority black district). The part of Baldwin County that is in District 1 is 86.01% white and 9.04% African American. The part of Baldwin County that is in District 2 is 44.92% white and 51.29% African American.

83.    Plaintiffs' Illustrative Plan 2 splits Jefferson County between District 6 (a majority white district) and District 7 (a majority black district). Plaintiffs put approximately 50.02% of the total population of Jefferson County, and approximately 84.47% of the African American population of Jefferson County, into District 7. The part of Jefferson County that is in District 6 is approximately 81.49% white and 13.05% African American. The part of Jefferson County that is in District 7 is approximately 24.60% white and 70.91% African American.

84.    Plaintiffs' Illustrative Plan 3 splits Mobile County between District 1 (a majority white district) and District 2 (a majority black district). Plaintiffs put 43.25% of the total population of Mobile County, but only 18.87% of Mobile

County's African American population, into District 1. Plaintiffs put 56.75% of the total population of Mobile County, and 81.13% of the African American population, into District 2. The part of Mobile County that is in District 1 is 78.75% white and 15.11% African American. The part of Mobile County that is in District 2 is 46.07% white and 49.50% African American.

85. Plaintiffs' Illustrative Plan 3 splits Jefferson County between District 6 (a majority white district) and District 7 (a majority black district). Plaintiffs put approximately 46.35% of the total population of Jefferson County, and approximately 80.03% of the African American population of Jefferson County, into District 7. The part of Jefferson County that is in District 6 is approximately 78.91% white and 15.63% African American. The part of Jefferson County that is in District 7 is approximately 23.07% white and 72.51% African American.

86. Plaintiffs' Illustrative Plan 4 splits Mobile County between District 1 (a majority white district) and District 2 (a majority black district). Plaintiffs put 38.58% of the total population of Mobile County, but only 16.59% of Mobile County's African American population, into District 1. Plaintiffs put 61.42% of the total population of Mobile County, and 83.41% of its African American population, into District 2. The part of Mobile County that is in District 1 is 78.99% white and 14.89% African American. The part of Mobile County that is in District 2 is 48.40% white and 47.02% African American.

87.     Plaintiffs' Illustrative Plan 4 splits Jefferson County between District 6 (a majority white district) and District 7 (a majority black district). Plaintiffs put 54.89% of the total population of Jefferson County, and 87.41% of the African American population of Jefferson County, into District 7. The part of Jefferson County that is in District 6 is 82.79% white and 11.72% African American. The part of Jefferson County that is in District 7 is 28.57% white and 66.87% African American.

Dated: October 21, 2019

Respectfully Submitted,

By */s/ James W. Davis*
James W. Davis (ASB-4063-I58J)
*Deputy Attorney General*
Winfield J. Sinclair (ASB-1750-S81W)
Misty S. Fairbanks Messick
(ASB-1813-T71F)
Laura E. Howell (ASB-0551-A41H)
Brad A. Chynoweth (ASB-0030-S63K)
*Assistant Attorneys General*


Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8440
jimdavis@ago.state.al.us
wsinclair@ago.state.al.us
mmessick@ago.state.al.us
lhowell@ago.state.al.us
bchynoweth@ago.state.al.us

Dorman Walker (ASB-9154-R81J)
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (334) 269-3115
dwalker@balch.com

*Counsel for the Defendant*

Respectfully submitted,

By */s/ Bruce V. Spiva*
Marc Erik Elias (*admitted pro hac vice*)
Bruce V. Spiva (*admitted pro hac vice*)
Uzoma N. Nkwonta (*admitted pro hac vice*)
Aria C. Branch (*admitted pro hac vice*)
Lalitha D. Madduri (*admitted pro hac vice*)
Daniel C. Osher (*admitted pro hac vice*)
**Perkins Coie, LLP**
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 654-6338
Fax: (202) 654-9106
Email: MElias@perkinscoie.com
Email: BSpiva@perkinscoie.com
Email: UNkwonta@perkinscoie.com
Email: ABranch@perkinscoie.com
Email: LMadduri@perkinscoie.com
Email: DOsher@perkinscoie.com

Abha Khanna (*admitted pro hac vice*)
**Perkins Coie, LLP**
1201 Third Avenue, Ste. 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000
Email: AKhanna@perkinscoie.com

By: *Richard P. Rouco* (AL Bar. No. 6182-R76R)
**Quinn, Connor, Weaver, Davies & Rouco LLP**
Two North Twentieth
2-20th Street North, Suite 930
Birmingham, AL 35203
Phone: (205) 870-9989
Fax: (205) 803-4143

Email: rrouco@qcwdr.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 21, 2019, I filed a copy of the foregoing

Parties' Joint List of Agreed and Disputed Principal Facts with the Clerk of the

Court using the CM/ECF system, which will send notification of such filing to all

counsel of record.

<div style="margin-left:40%">

*/s/ Bruce V. Spiva*
Bruce V. Spiva
**Perkins Coie LLP**
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 654-6338
Fax: (202) 654-9106
Email: BSpiva@perkinscoie.com

</div>