FILED

2021 Dec-15  PM 08:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 7

FILED

2019 Nov-18 AM 11:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

```
1            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ALABAMA
2                   SOUTHERN DIVISION

3
     LAKEISHA CHESTNUT,  an individual; *
4    MARLENE MARTIN, an individual;     *   2:18-cv-00907-KOB
     BOBBY DUBOSE, an individual;       *   November 4, 2019
5    RODNEY LOVE, an individual; KAREN  *   Birmingham, Alabama
     JONES, an individual; JANICE       *   9:00 a.m.
6    WILLIAMS, an individual; RODERICK  *
     CLARK, an individual; JOHN HARRIS, *
7    an individual,                     *
             Plaintiffs,                *
8                                       *
     vs.                                *
9                                       *
     JOHN H. MERRILL, in his official   *
10   capacity as Alabama Secretary of   *
     State,                             *
11           Defendant.                 *
     ***********************************
12

13              TRANSCRIPT OF BENCH TRIAL
                      VOLUME I
14       BEFORE THE HONORABLE KARON O. BOWDRE
           CHIEF UNITED STATES DISTRICT JUDGE
15

16   FOR THE PLAINTIFFS:
     Abha Khanna, Esq.
17   PERKINS COIE LLP
     1201 Third Avenue
18   Suite 4900
     Seattle, Washington 98101
19   (206) 359-9000

20   Bruce V. Spiva, Esq.
     PERKINS COIE LLP
21   700 13th Street, NW
     Suite 600
22   Washington, DC 20005
     (202) 654-6338

23

24

25
```

```
 1    Richard P. Rouco, Esq.
      QUINN CONNOR WEAVER DAVIES & ROUCO LLP
 2    2 20th Street North
      Suite 930
 3    Birmingham, Alabama 35203
      (205) 870-9989
 4
      Daniel C. Osher, Esq.
 5    PERKINS COIE LLP
      700 13th Street NW
 6    Suite 600
      Washington, DC 20005
 7    (202) 654-6338

 8    Lalitha D. Madduri, Esq.
      PERKINS COIE LLP
 9    700 13th Street NW
      Suite 600
10    Washington, DC 20005
      (202) 654-6322

11

12
      FOR THE DEFENDANT:
13    James W. Davis, Esq.
      Laura E. Howell, Esq.
14    OFFICE OF THE ATTORNEY GENERAL
      501 Washington Avenue
15    P.O. Box 300152
      Montgomery, Alabama 36130-0152
16    (334) 242-7300

17    J. Dorman Walker, Esq.
      BALCH & BINGHAM LLP
18    P.O. Box 78
      Montgomery, Alabama 36101
19    (334) 834-6500

20
      COURTROOM DEPUTY:  Sarah Hollingsworth
21

22    COURT REPORTER:  Christina K. Decker, RMR, CRR

23    Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
      pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
24    and Procedures Vol. VI, Chapter III, D.2.  Transcript
                produced by computerized stenotype.
25
```

I N D E X

WILLIAM COOPER                                           5
DIRECT EXAMINATION                                       5
BY MR. SPIVA
CROSS-EXAMINATION                                      108
BY MR. WALKER
REDIRECT EXAMINATION                                   137
BY MR. SPIVA


MAXWELL PALMER                                         141
DIRECT EXAMINATION                                     142
BY MS. KHANNA
CROSS-EXAMINATION                                      183
BY MR. DAVIS
REDIRECT EXAMINATION                                   203
BY MS. KHANNA
RECROSS-EXAMINATION                                    208
BY MR. DAVIS
FURTHER REDIRECT EXAMINATION                           210
BY MS. KHANNA


KAREN JONES                                            211
DIRECT EXAMINATION                                     212
BY MR. OSHER
CROSS-EXAMINATION                                      238
BY MS. HOWELL
REDIRECT EXAMINATION                                   246
BY MR. OSHER

**P R O C E E D I N G S**

(In open court.)

THE COURT:  You may be seated.

As I stated informally this morning, I think I'm fairly familiar with the issues in the case based upon the excellent briefs that were submitted for pretrial, so we can dispense with any preliminary opening statements.  So plaintiff may call your first witness.

MR. SPIVA:  Thank you, Your Honor.

I wanted to introduce to the Court my colleagues here.  I think you might have met most of them, but beside me is my partner Abha Khanna; my colleague, Lalitha Madduri; Dan Osher also my colleague; and our -- I know you of course know Richard Rouco, our co-counsel.

THE COURT:  Yes.  Yes.

MR. SPIVA:  We call as our first witness, Your Honor, Bill Cooper, William Cooper.

THE COURT:  Okay.

MR. SPIVA:  Your Honor, just FYI, we have put some exhibit books up on your -- up at the podium -- not the podium, forgetting the word, but, yeah.

THE COURT:  Those big ones over there with a few little exhibits?

MR. SPIVA:  A few little.  But I think we're mainly going to be in Volume 1.  And we will also put them up on the

```
 1   screen when we're discussing them.  So if Your Honor is fine
 2   with that...
 3           THE COURT:  I certainly am.  I do like to have my own
 4   copy so that I can highlight them and mark them as -- to make
 5   it easier to go back and find what I may be looking for.
 6           MR. SPIVA:  Sure.  Sure.  I totally understand.  So I
 7   think we'll be mainly in the Volume 1 of the paper copy this
 8   morning.
 9           THE COURT:  Okay.  All right.  Good.
10       All right.
11                        WILLIAM COOPER,
12   having been first duly sworn by the courtroom deputy clerk, was
13   examined and testified as follows:
14           THE COURTROOM DEPUTY CLERK:  Will you please state
15   your name in the microphone for the record?
16           THE WITNESS:  My name is William S. Cooper.
17                     DIRECT EXAMINATION
18   BY MR. SPIVA:
19   Q    Good morning, Mr. Cooper.  I won't ask you to state your
20   full name for the record because you just did that.
21       You have been retained as an expert for the plaintiffs in
22   this case; is that right?
23   A    That is correct.
24   Q    And have you prepared a declaration or declarations in
25   connection with your retention as an expert?
```

Timestamps (left margin): 09:14:56 (line 5), 09:15:11 (line 10), 09:15:27 (line 15), 09:15:38 (line 20), 09:15:53 (line 25)

1    A    I have.

2    Q    Let me turn your attention to Plaintiffs' Exhibit 1.  And

3    if we can pull that up on the screen.  And if you can take a

4    look in your notebook, Mr. Cooper.

09:16:11  5    Is that the first declaration that you prepared in this

6    case?

7    A    Yes.

8    Q    And let me ask you to turn to page 3 --

9        MR. WALKER:  May I interrupt you for a second?  We're

09:16:31 10    not getting -- oh, okay.  I'm sorry.

11        MR. SPIVA:  Technical difficulties.

12        THE COURT:  A little small delay there.  It's normal.

13    BY MR. SPIVA:

14    Q    And, actually, you know what?  I kind of jumped the gun, I

09:16:45 15    think, on the screen anyhow because I want to ask you a couple

16    more general questions before we actually turn to the report.

17        Let's start with a little bit about your background.  What

18    is your profession, Mr. Cooper?

19    A    I provide -- I'm a private consultant.  And I provide

09:17:00 20    technical assistance to various organizations here and there

21    around the country focusing primarily on computer mapping and

22    analysis, socioeconomic data, both spatially and tabular data.

23        So a lot of my work is related to redistricting, but I

24    have also provided assistance to other projects.  For example,

09:17:26 25    every year I work on a nationwide project with the Food

1  Research and Action Center to identify areas with high

2  percentages of children who live in poverty who would qualify

3  for the summer food program or child care food program

4  sponsored by the U.S. Department of Agriculture.  So that's

09:17:44  5  sort of a nationwide project.

6  Q    Okay.  And, Mr. Cooper, just -- I'll just ask you if you

7  can slow down just a little bit because the court reporter is

8  trying to get everything down.  And I know you have a tendency

9  sometimes to start speaking a little bit quickly.  So you're

09:17:58  10  doing fine, but just to remember that.

11       Would you say that you are a Geographic Information

12  Systems consultant, Mr. Cooper?

13  A    Yes, in terms of the application of the GIS software.  I

14  don't design or develop the underlying code.

09:18:16  15  Q    And how long have you been doing that?

16  A    Basically since the mid '80s, late '80s, really, was about

17  the time that the first kinds of GIS software were available to

18  run off a personal computer, which is what I use.

19  Q    And what is the area of expertise that you applied in this

09:18:43  20  case?

21  A    I was specifically asked to determine whether or not it

22  would be possible to draw a congressional redistricting plan in

23  Alabama that would allow for two majority black congressional

24  districts out of seven, while at the same time adhering to what

09:19:05  25  are known as traditional redistricting principles.

|  |  |
|--|--|
| 1 | Q    And in doing that, did you apply your expertise in |
| 2 | redistricting and census data? |
| 3 | A    Yes. |
| 4 | Q    Have you served as an expert witness in cases involving |
| 09:19:20 5 | redistricting before? |
| 6 | A    I have.  I've testified probably in close to 40 cases in |
| 7 | person, and primarily in Section 2 cases.  There have been a |
| 8 | handful of cases that were not strictly Section 2 cases where |
| 9 | I've testified that involved voting districts.  And probably in |
| 09:19:44 10 | another 40 I've submitted declarations, but in those cases for |
| 11 | one reason or another the case did not advance to a |
| 12 | full-fledged trial. |
| 13 | Q    And have you served as an expert in Alabama previously? |
| 14 | A    I have.  I was the plaintiffs' expert in the Alabama |
| 09:20:03 15 | Legislative Black Caucus case that was finally decided in terms |
| 16 | of remedial plans in 2017.  I first began working on that case |
| 17 | I think in the summer of 2012.  I've -- and I testified in that |
| 18 | particular case. |
| 19 |     I also testified here in this very courtroom in 2016 in a |
| 09:20:29 20 | school de-annexation case involving Jefferson County and the |
| 21 | proposed new school system that would have been in Gardendale. |
| 22 | And I was working with the legal defense fund as the |
| 23 | plaintiffs' expert in that case, which was a school |
| 24 | desegregation case going back 50 years actually. |
| 09:20:49 25 | Q    And have you -- did you also testify in the *Alabama State* |

1  *Conference of the NAACP vs. Alabama*, which I think oftentimes

2  is referred to as the "Judges Case"?

3  A    Yes.  I testified in that case in Montgomery, Alabama,

4  exactly one year ago today.  This first part of November was

09:21:07 5  when that trial was held last year.

6  Q    And what did that case involve?  What did your testimony

7  in that case involve?

8  A    Again, I was a GIS expert.  So I prepared a set of

9  illustrative plans for the plaintiffs for the State Supreme

09:21:24 10  Court, a nine-district configuration, and an eight-district

11  configuration, with one at-large chief judge would be elected

12  at large under those illustrative plans.  And then also I

13  prepared several illustrative plans for the state appellate

14  courts divided into five districts, because I think there were

09:21:47 15  only five judges.

16  Q    And forgive me if I missed it, but did you already mention

17  the City of Decatur and/or the Pleasant Grove cases?

18  A    I did not mention them.  I have not testified in those

19  cases, but I have filed declarations.

09:22:03 20       And the Pleasant Grove case has now been resolved.  The

21  consent decree, I think, results in a cumulative voting plan

22  for the city of Pleasant Grove here in Jefferson County.

23  Q    Is that --

24  A    I prepared illustrative plans in that case as part of a

09:22:23 25  short declaration about a year ago.

| | | |
|---|---|---|
| | 1 | Q    And that was a districting case? |
| | 2 | A    Yes.  Section 2. |
| | 3 | Q    And what about the City of Decatur case? |
| | 4 | A    That one is a -- I'm actually working for the defendants |
| 09:22:35 | 5 | in that case.  And I've not testified in court.  It's still an |
| | 6 | ongoing case.  But I have filed a couple of declarations. |
| | 7 | It involves obviously the city of Decatur and Morgan |
| | 8 | County and whether or not the city can proceed to follow |
| | 9 | through on a referendum vote from seven -- well, ten years ago, |
| 09:23:00 | 10 | I think, almost in 2010 which would change, if enacted or |
| | 11 | adopted, the election system in Decatur from a five |
| | 12 | single-member district plan to three single-member districts |
| | 13 | and two at-large positions. |
| | 14 | Q    And you said that you are working on behalf of the |
| 09:23:20 | 15 | defendant in that case? |
| | 16 | A    Yes. |
| | 17 | Q    Have you, other than that case, the City of Decatur case, |
| | 18 | have you ever worked on behalf of or testified on behalf of |
| | 19 | defendants rather than plaintiffs? |
| 09:23:30 | 20 | A    I was briefly engaged as a consultant to the city of |
| | 21 | Calera in 2009 as they were attempting to get preclearance on a |
| | 22 | voting plan.  And I drew some illustrative plans suggesting to |
| | 23 | them that it was not possible to draw a majority black district |
| | 24 | in Calera given the population's changed since the '80s when |
| 09:23:55 | 25 | the initial plan was adopted, I think.  And I suggested they |

1    should consider adopting a plan that would involve cumulative

2    voting as another alternative to a districting system, and

3    that's what they did.

4    Q    Have you served as an expert in any of -- any lawsuits

09:24:12  5    that have resulted in changes to districting plans?

6    A    In Alabama or --

7    Q    Anywhere.

8    A    Yes, I have.  Many over the years.

9    Q    And are those -- maybe I will refer you to Plaintiffs'

09:24:29  10    Exhibit 1, which is your first declaration, paragraphs 5 and 7,

11    which appear on pages 2 and 3 of that report.

12        Does that summarize the cases where you testified that

13    resulted in districting plans being adopted as a result of your

14    testimony?

09:24:53  15    A    Yes, at least going back to 2011.  Section 2 cases only.

16    I have been involved in some other cases.

17    Q    Okay.  And referring you to paragraph 2 of your report,

18    which spans from pages 1 to 2, were those statewide cases in

19    which you've testified?

09:25:26  20    A    Yes.  Over the years, I've been involved in several cases

21    that involved statewide legislative boundaries.

22        In the '90s, I was involved in a case in rural west

23    Tennessee that ultimately led to the creation of a new majority

24    black district in northwest Tennessee outside of the Memphis

09:25:50  25    metro area.  That case was captioned *Rural West Tennessee*

1  *African-American Affairs Council vs. McWhorter.*

2      I also was involved in a state legislative case in Montana

3  called *Old Person vs. Cooney* that spanned a couple of decades.

4  I think I worked on that one from like 1991 until sometime in

09:26:12 5  early 2002.  Ultimately that led to the creation of a couple

6  new Indian majority districts in Montana that encompassed the

7  reservation areas in the state.

8      And the same thing with *Bone Shirt vs. Hazeltine.*  That

9  was a lawsuit filed in the early 2000s in South Dakota, and it

09:26:34 10  created I think two new Indian majority House districts and one

11  new Indian majority Senate district.  And in that case, the

12  Court ordered the plan that I had developed as a remedial plan

13  into place.  It was a court-ordered plan.

14  Q    And, of course, you have already testified about the

09:26:54 15  Alabama Legislative Black Caucus case?

16  A    Right.

17  Q    And then is it accurate to say that you've testified in

18  five cases since 2011 that have resulted in redistricting?  I

19  think that's at paragraph 5.  Does that summarize that -- I

09:27:16 20  don't need you to walk through each one of them, but I just

21  want to make sure I have got that right.

22  A    Yes.  Those are the five Section 2 cases, or at least

23  five cases that were decided on Section 2.

24      The one case that I spent a lot of time on was *Navajo*

09:27:36 25  *Nation v. San Juan County.*  That was both a Section 2 case, but

1    I think there were some constitutional issues.  And ultimately
2    the judge determined that he did not need to rule on Section 2
3    because he had already ruled on the constitutional issues.  And
4    we won the case.  We -- the Navajo Nation -- obviously serving
09:27:51 5    as the Navajo Nation's expert in *Gingles 1*.
6    Q    And I think you have already mentioned the consent decree
7    cases that are set forth in paragraph 6; is that right?
8    A    Yes.
9    Q    Okay.  And if we could pull up Plaintiffs' Exhibit 2,
09:28:12 10   which I believe is Exhibit A to your first report.
11        Mr. Cooper, is your experience detailed more thoroughly in
12   Exhibit A to your expert report?
13   A    Yes.  This just basically reviews all the voting cases
14   I've been in since the late 1980s by state.  And the case
09:28:40 15   caption along with a rough date as to when I was involved in
16   the case.
17   Q    Okay.  Have you testified in any of these cases regarding
18   socioeconomic conditions in the states that you were working
19   in?
09:28:57 20   A    I would have in most of them, because most of these are
21   Section 2 cases.  And almost always as part of my testimony I
22   did provide information about socioeconomic disparities as it
23   relates to the majority white population vis-a-vis the minority
24   group at issue.
09:29:17 25   Q    And what type of data do you review in those cases

1   regarding socioeconomic conditions?

2   A    I think almost always it is Census Bureau produced data in

3   the '90s and '80s.  And even most of the 2000s I relied on

4   information from the census long form, which was a sample of

09:29:45 5   all persons who participated in the decennial census.

6        And in the late 2000s, the Census Bureau shifted to

7   another approach and began to compile information from what is

8   known as the American Community Survey, and which is also

9   sample based, but it is issued on an annual basis to one out of

09:30:08 10   every 42 households.

11        So in this particular Section 2 case, as well as I think

12   almost all of the ones since 2010 I've relied on the American

13   Community Survey data set, because there was no long form

14   option with the 2010 census.  So all socioeconomic data that is

09:30:29 15   highly detailed, anyway, would come from the American Community

16   Survey.

17   Q    Okay.  And I will probably have some more questions for

18   you about that when we get more into the opinions.

19        Have you ever been qualified as an expert in redistricting

09:30:42 20   and demographics in the cases that you have testified in?

21   A    Yes.  In most of the cases, going all the way back to the

22   '80s, I would have been qualified as an expert in redistricting

23   and demographics.  It's possible there may have been some when

24   I was only qualified as an expert in redistricting for one

09:31:01 25   reason or another, particularly the ones that were not Section

```
 1  2 cases where I was not presenting socioeconomic data.
 2        For example, I don't remember with the ALBC case.  I don't
 3  believe I presented any socioeconomic data.  So I may have just
 4  been -- sorry.  So I may have just been qualified as an expert
 5  in redistricting in that case.
 6  Q    Okay.  Have you ever been -- has the Court ever found you
 7  not qualified in either the areas of redistricting or
 8  demographics?
 9  A    Not to my knowledge.
10  Q    And when you serve as an expert in these types of cases,
11  what sorts of analysis do you with regards to redistricting?
12  A    Well, I work with the census data that one would typically
13  use when drawing election plans, and that would be the Census
14  Bureau's P.L. 94-171 file that is released right after the
15  Census Bureau has compiled all of the census data nationwide.
16  So it's the first release out typically in the month of
17  February of the year after the decennial census.
18        So in 2011, the first -- the first few states were
19  released in the month of February, and then most were
20  completely released by the end of March.  And I assume that
21  will be the same in 2021.
22        So that's the primary data set that I use, because when
23  producing election plans particularly for congressional and
24  state legislative redistricting, you have to rely on the 2010
25  census.  So any plan I develop starts with that basic
```

09:31:18   (line 5)
09:31:30   (line 10)
09:32:03   (line 15)
09:32:22   (line 20)
09:32:41   (line 25)

 1 information.

 2     I may have access to other data, like as in this case

 3 where I was also able to rely on the American Community Survey

 4 to get some estimates of the citizen voting age population and

09:33:00 5 the various plans I produced, as well as citizen voting age

 6 population in the 2011 plan, for example, that I break out in

 7 my report.

 8 Q    And we'll get to that in a minute.

 9 A    Yeah.

09:33:12 10 Q    I guess my question really is more broad.  I mean, do you,

 11 in terms of redistricting, are you often called upon to create

 12 illustrative plans in the cases that you have testified in?

 13 A    Oh, yes, almost always.  Any redistrict case I am almost

 14 always called on to develop an alternative plan.

09:33:33 15 Q    And is there -- you've mentioned the census data.  Is

 16 there a type of GIS software that you typically use in those

 17 cases?

 18 A    Yes.  I use Maptitude for redistricting, which is a

 19 well-known software application for redistricting analysis, as

09:33:54 20 well as other forms of socioeconomic analysis.  So that is the

 21 program I use.  I've been using it since the late 1990s for

 22 redistricting purposes.

 23     Prior to that, I used another product from the same

 24 company that was not Windows based.  It was Microsoft-DOS

09:34:15 25 based.  It was an older program.  But it worked quite well.

1  Q    And in terms of -- you already testified that you have

2  done work with census data in terms of looking at disparities

3  between racial groups in other cases; is that right?

4  A    Yes.

09:34:33  5  Q    Okay.

6        MR. SPIVA:  So, Your Honor, at this time, we'd just

7  ask that Mr. Cooper be qualified to testify as an expert in

8  redistricting and demographics.

9        THE COURT:  Is there any objection?

09:34:44 10        MR. WALKER:  No objection, Your Honor.

11        THE COURT:  The Court recognizes Mr. Cooper as

12  qualified as an expert in this case.

13        MR. SPIVA:  Thank you, Your Honor.

14  BY MR. SPIVA:

09:34:52 15  Q    Can you tell the Court, Mr. Cooper, what you were asked to

16  do in this case?

17  A    Well, at the outset, I was specifically asked to determine

18  whether the first *Gingles* precondition could be met while also

19  adhering to traditional redistricting principles.

09:35:13 20        In other words, the issue was whether a second majority

21  black district could be created in Alabama that would be

22  reasonably compact, contiguous, not dilute the minority vote,

23  respect communities of interest, and also keep incumbents in a

24  different district so there were no incumbent conflicts.

09:35:39 25  Q    What was the second thing you were asked to do in this

1  case?

2  A    I was also just asked to review demographic data from

3  recent decades from the decennial census, and as we just

4  reviewed or discussed, analyze the socioeconomic data to

09:35:56 5  determine whether or not the black population and white

6  population have different socioeconomic profiles.

7  Q    Okay.  And you've already I think testified that

8  Plaintiffs' Exhibit 1 is your first declaration in this case.

9       If you could just turn for a minute to Plaintiffs'

09:36:19 10  Exhibit 59, and if you can confirm whether that is the second

11  declaration you prepared and provided in this case?

12  A    Yes.

13  Q    And have you made any changes to either the first or

14  second declaration since you've prepared them?

09:36:40 15  A    Yes.  I corrected some typos.

16       MR. SPIVA:  Okay.  And just for the record, by

17  agreement the correct versions are Plaintiffs' Exhibit 1 and

18  Plaintiffs' Exhibit 59.

19  Q    Are the facts that are contained in these reports true and

09:37:00 20  accurate to the best of your knowledge and belief?

21  A    Yes.

22  Q    And are the conclusions that you reached regarding your

23  two tasks in this case contained in those reports?

24  A    Yes.

09:37:08 25  Q    Have your -- have any of your conclusions changed since

1  submitting those reports?

2  A    No.

3  Q    Let me ask you first just for your high-level conclusions

4  based on the work you have done in the case.  Did you reach any

09:37:28 5  conclusions regarding whether the African-American population

6  in Alabama is sufficiently large and geographically compact to

7  allow for the creation of a second majority-minority

8  congressional district in a seven-district plan?

9  A    Yes.  My conclusion is that the minority population is

09:37:47 10  sufficiently numerous and geographically compact to allow for

11  two single-member majority black districts while adhering to

12  traditional redistricting principles.

13  Q    And did you prepare any illustrative plans demonstrating

14  how two majority black districts could be drawn in a

09:38:07 15  seven-district plan?

16  A    Yes.  I prepared four illustrative plans showing various

17  ways that one could draw two majority-minority districts in

18  Alabama based on the 2010 census.

19  Q    And do those plans comply with traditional redistricting

09:38:21 20  principles?

21  A    In my opinion they do.

22  Q    Okay.  Let me pull up Plaintiffs' Exhibit 1, page 23, and

23  kind of focus your attention on paragraphs 51 through 52 of

24  your first report.  And let me ask you -- pardon me one minute

09:38:54 25  while I get there.

```
 1        Let me ask you:  What were the traditional redistricting
 2   principles that you adhered to as you were drawing these
 3   illustrative plans?
 4   A    Well, as I think I mentioned maybe previously, the primary
 5   principles would be respecting one person one vote.  And it's
 6   my understanding that in Section 2 litigation particularly,
 7   it's now basically a requirement that one must draw plans that
 8   are within plus or minus one person at least for congressional
 9   plans of the ideal population size, which is the ideal
10   population size.  Of course, it's nothing more than dividing a
11   statewide population by seven.  So you have got to be within
12   one person of that figure, which I don't have in front of me
13   right now.
14        And also the plan should be reasonably compact at a
15   reasonable shape.  The districts need to be contiguous.
16        One should take into account various communities of
17   interest around the state.
18   Q    What about -- sorry to interrupt.  But what about
19   political boundaries?  Is that a consideration?
20   A    Yes.  Yes.  That is sort of blended in, with respect for
21   communities of interest, as well as in a sense compactness.
22        So I took into account county boundaries specifically
23   because I in all four plans split -- at least in two of the
24   plans, I split the same number of counties as the 2011 plan.
25   And in two of the plans, I split one fewer, just six counties.
```

1  So I respected the county boundaries, as well as the existing

2  plan.

3  Q    Okay.  And I think I interrupted.  You had said

4  compactness and contiguity, and I think you were getting ready

09:40:51 5  to go on to something else.

6  A    The non dilution of minority vetting strength.  That's the

7  other primary traditional restricting principle.

8  Q    And what about incumbents?  Did you have any consideration

9  for where incumbents lived or where they would be paired?

09:41:07 10  A    Yes.  Originally I did not have information about the home

11  addresses for five of the seven incumbents, and unfortunately

12  in drawing the plan -- because I just knew that Representative

13  Sewell lived somewhere in Jefferson County -- my initial

14  attempts at Illustrative Plans 1, 2, and 3 had to be revised to

09:41:31 15  bring her into District 7.  She was just outside of District 7

16  under Illustrative Plan 1, 2, and 3.

17      So I made minor changes in Jefferson County.  And Those

18  plans are now known as Revised Plan 1, Revised Plan 2, and

19  Revised Plan 3.  And those would be the operative plans in this

09:41:47 20  case, even though in a zoomed-out statewide map you really

21  could not tell the difference between the original Illustrative

22  Plan 1, for example, and Revised Plan 1, because I just shifted

23  three or four precincts in each instance.

24      Illustrative Plan 4 --

09:42:02 25  Q    Sorry to interrupt, but Revised Plans 1, 2, and 3, are

1   those attached to your second declaration?

2   A      Yes.

3   Q      Okay.

4   A      Yes.  And Illustrative Plan 4, which was in my original

09:42:14  5   declaration, fortunately had Representative Sewell already in

6   District 7, so there was no need to revise that plan.

7   Q      Okay.  And then let me ask you:  Were you at some point

8   asked to reach a conclusion regarding whether the

9   African-American population in Alabama is sufficiently large

09:42:36  10   and geographically compact to allow for the creation of a

11   second majority-minority congressional district in a

12   hypothetical six-district plan following the 2020 census?

13   A      Yes.  And I was able to conclude that there's a reasonable

14   likelihood that two out of seven -- two out of six districts in

09:42:59  15   a plan after the 2020 census is released could be majority

16   black citizen voting age population.  Majority.

17   Q      And that hypothetical plan, is that attached to your

18   second declaration?

19   A      Yes.

09:43:15  20   Q      Okay.  And does that plan, the six-district plan comply

21   with the same traditional districting principles as the

22   seven-district illustrative and revised plans?

23   A      I believe so.  It expands the size of the districts both

24   geographically and based on population.  But I think it would

09:43:39  25   comply with traditionally redistributing principles.  But it

1  hasn't been fine-tuned.  I did not spend a lot of time trying

2  to perfect it.  So there obviously could possibly be other

3  configurations, but we will only know in the fullness of time.

4  Q    And shifting to the demographic data you looked at, did

09:43:59 5  you reach any conclusions regarding whether there are

6  disparities between African-Americans and whites in Alabama

7  across indicators of socioeconomic well-being?

8  A    Yes.

9  Q    What were the conclusions?

09:44:11 10  A    There are sharp contrasts across almost all levels of

11  comparison for socioeconomic well-being, whether it be income,

12  education, housing, access to vehicles, that sort of thing.  In

13  almost every instance, whites outpaced blacks.

14  Q    Okay.  Let me pull up Plaintiffs' Exhibit 3, Mr. Cooper,

09:44:39 15  which is Exhibit B to your first declaration.  It's a document

16  that has at the top titled Exhibit B Methodology and Sources.

17  Does this detail the methodology and sources that you used to

18  prepare your report?

19  A    Yes.  It basically just reviews and highlights some of the

09:45:02 20  things I just discussed a few minutes ago about the source of

21  the data that I used to begin working on the illustrative

22  plans.

23     I do make note of the fact that I was also using not just

24  data files like the P.L. 94-171 file from the Census Bureau, I

09:45:18 25  was also using their geographic files that show boundaries for

1    counties and cities and precincts and municipalities, and also

2    information for sub-county designations by the Census Bureau,

3    such as census tracts and census block groups.  And also the

4    most detailed population unit in the census geography is a

09:45:47  5    census block.  So I was using the state census block file, as

6    well.

7    Q    And did you use population and geographic data from the

8    1990 to 2010 decennial censuses?

9    A    I did at a higher geographic level.  I don't think I used

09:46:07 10    2000 block data to do any of my analysis, but I did look at the

11    state and county and maybe even municipal comparisons between

12    1990, 2000, and 2010.  That shows up in my report in the very

13    beginning comparing those three decades.

14    Q    Did you use 2017 and 2018 U.S. Census Bureau population

09:46:33 15    estimates?

16    A    I did use population estimates from the Census Bureau for

17    2017 initially, and then also updated it a bit with 2018

18    estimates.  Those estimates are only available at the state

19    county level by race and only at the state based on voting age

09:46:58 20    by race.  And for cities and towns and other places -- some of

21    them even may not be incorporated -- there is no information

22    about post-2010 population by race.  There's just a total

23    population estimate.

24    Q    You've made reference a couple of times to something

09:47:19 25    called the P.L. 94-171 data file; is that right?

1   A     Right.

2   Q     What is that?

3   A     Well, that is the file that states and localities use to

4   develop new voting plans that would come into compliance with

09:47:37 5   one person one vote specifically based on a new decennial

6   census.  So that's the file I used.  And it has over 200

7   different fields indicating race and ethnicity for all ages and

8   over 18.  And the racial categories are broken out by single

9   race, as well as multi-race categories.  So it's a big file

09:48:08 10  that can be parsed in different ways.

11  Q     So is it correct to say that that's -- when people say,

12  well, the census is going to be released in 2011, or the census

13  is going to released in 2021, is that the file they are

14  talking about?

09:48:22 15  A     That's the first one that is released.  After that, there

16  are some additional releases that would have more information

17  about housing and more detailed age information, breaking out

18  information about, you know, the number of persons between 15

19  and 17, for example, or some other category.  So the later

09:48:44 20  releases are much more detailed, but they would typically not

21  be used for the redistricting work.

22  Q     So that's the file -- the P.L. 94-171 file, that's the

23  file that states use to do their redistricting?

24  A     Exactly, yeah.  Even at this late date.

09:49:00 25        I just finished a plan in Grand County, Utah, and we were

1    using the 2010 data.

2    Q    You referenced earlier the American Community Survey data

3    or ACS data.  Can you explain what that is and at a broad level

4    what use you made of that, in terms of the one year versus the

09:49:21   5    five-year ACS data?

6    A    Well, the one year data is exactly what it says.  It just

7    comes from one sample survey a year.  And that is the sample

8    that is sent out to one out of 42 households nationwide.

9         So because it's just one out of 42, it's acceptable from

09:49:48  10    the standpoint of statistical methodology to use it for large

11    geographies, such as a nation, state, and congressional

12    district.

13        Below that level, when you're looking at legislative

14    districts or cities that have less than 60,000 persons, the

09:50:11  15    margin of error would be too high from just one sample a year.

16    So we use another Census Bureau product called the five-year

17    sample survey.  And the most recent one available right now is

18    the 2013-2017 ACS, which was released in December of 2018.  So

19    there will be a new release out in about six weeks.

09:50:38  20    Q    Okay.  And I think you already testified that you used

21    Maptitude to draw the maps?

22    A    Yes.

23    Q    Okay.  Let me pull up in Plaintiffs' Exhibit 1, Figure 3,

24    which is on page 9 of your first declaration.

09:51:02  25        And, Mr. Cooper, can you describe at a high level the

1 population growth patterns from a racial standpoint in Alabama

2 between 1990 and today?

3 A    Yes.

4       Well, in 1990, you can see that the population of the

09:51:31 5 state was just over 4 million -- 4 million 40,000 roughly.  And

6 of that number, the non-Hispanic white population, which is the

7 second category was nearly three quarters, 73.26 percent.  And

8 the African-American population was 25.26 percent, single-race

9 African-American.  Because in the 1990 census, there was no way

09:51:57 10 to calculate the any-part black category from the P.L. 94-171

11 file.

12      The file released by the Census Bureau in that time period

13 at the time of the 1990 census had fewer categories by race.

14 There was just simply a separate category of others.  Others

09:52:19 15 being a category that would have included people who were

16 multi-race -- black and white or black and American Indian.  So

17 I do not have a figure for the any-part black population in

18 1990.

19      In 2000, the population statewide had grown to 4.47

09:52:39 20 million.  And at that time you can see that the non-Hispanic

21 white population had dropped to about three points to

22 70.29 percent.  And the single-race black population stood at

23 25.99 percent.  But after factoring in persons who were black

24 and one other race -- in other words, any-part black -- it had

09:53:00 25 climbed to 26.29 percent.  So, again, up about a percentage

1　point compared to 1990.

2　　　　Then by 2000, the state's population continued to grow, so

3　it was almost --

4　Q　　You said 2000 or --

09:53:14　5　A　　2010.  Excuse me.  It was 4.78 million.  And the white

6　population had dropped to just 67 percent, down by nearly six

7　percentage points since 1990.  And the black population

8　continued to grow, reaching 26.8 percent any-part in 2010.

9　　　　The key reason that explains why the non-Hispanic white

09:53:44　10　population dropped so significantly versus less of a change in

11　the African-American percentage is that between 1990 and 2010 a

12　large population change occurred in the other minority

13　categories, particularly as it relates to Latinos who comprised

14　just 24,629 of the population in 1990.

09:54:19　15　　　　By 2010, it had gone up by a factor of seven or so to

16　185,602.  So that explains the drop in the percentage of

17　non-Hispanic whites in the state.

18　　　　Latinos may be of any race.  And so some reported white.

19　Others would have reported some other race as a category, or

09:54:45　20　one of the other clear categories, such as American Indian or

21　African-American.

22　Q　　Okay.  And I think this is kind of implicit in what you

23　said before, but I just want to make sure it's clear.  What is

24　the difference between single-race black and any-part black, in

09:55:04　25　terms of these figures?

A     Single-race black is anyone who checked on the census form
that they were black, including persons who would have been
maybe black and Hispanic.

Q     So is that single race or any-part black?

A     That's single race.

Q     Okay.  Thank you.

A     And the any-part black would be any person who was some
part black.  In other words, everyone who is single-race black,
single-race black and Hispanic, as well as all other persons
who checked black and another race, such as black and white, or
even black and white and American Indian -- multi-race
categories.

Q     And which figure do you use any-part black or single-race
black in your analysis when determining whether the
African-American population is sufficiently large and
geographically compact?

A     Nowadays, I tend to use the any-part black definition,
which was accepted and relied upon in the Supreme Court case
involving Georgia legislative districts in 2003 -- *Georgia v.
Ashcroft*.  So that is the definition that I would typically
use.

      I produce information and data about the single-race
category, as well.  That's part of the data set that I have
from the P.L. 94-171 file.  So I'm basically aware of it.  But
in the final analysis, in determining whether a district is

1  majority black, the ultimate decider would be the any-part

2  black definition or possibly the citizen voting age population

3  definition.

4  Q    Okay.

09:56:50  5       THE COURT:  The citizen voting age definition, what do

6  you mean by that?

7       THE WITNESS:  That is obtained through the American

8  Community Survey.  And it's not part of the P.L. 94-171 file.

9       But each year, the Census Bureau releases this special

09:57:08  10  tabulation of the American Community Survey for use by the

11  Department of Justice in voting cases and language cases

12  involving voting.  And so I rely on that data set, which only

13  goes down to the block group level, so it's more than just a

14  census block, but smaller than a census tract, and apply that

09:57:29  15  to the districts to develop an estimate for the citizen voting

16  age population by race in that district.

17       THE COURT:  Okay.  Well, what do you mean by "citizen

18  voting age definition"?  What is that definition?

19       THE WITNESS:  Well, if a district is not over

09:57:45  20  50 percent black citizen voting age population, then it

21  would -- I assume that it would not meet *Gingles 1* as being a

22  majority black district.

23       THE COURT:  Thank you.

24  BY MR. SPIVA:

09:58:01  25  Q    Mr. Cooper, I may -- I think the Judge may be asking just

1  literally what -- what goes into citizen voting age population?

2  I don't know if I understood -- if I got that right, Your

3  Honor, but I think she may be asking a more specific question

4  about that.

09:58:15  5  A    Well, the ACS survey would have a question as to whether

6  or not you are a citizen on it.  So if you report that you are

7  non-Hispanic black and also that you are a citizen then -- and

8  you're over 18, then you would be part of the citizen voting

9  age population.

09:58:38 10        And in Alabama there's not that great of a distinction

11  between all persons who are black and over 18 and all persons

12  who are black and citizens over 18.  But in some states, like,

13  say, Florida, or New York, or even Georgia, where there's a

14  much more significant Latino population who is black, there may

09:59:01 15  be wider differences between the VAP and the citizen voting age

16  population.

17  Q    Let me -- and just for the record, because I don't know if

18  you've said this before -- when you refer to voting age

19  population, either black voting age population, or non-Hispanic

09:59:21 20  white voting age population, what are you referring to?

21  A    Persons who are 18 and over as of the 2010 census.

22  Q    Okay.

23  A    And that -- I should have pointed out, there is another

24  issue to discuss regarding citizen voting age population,

09:59:34 25  because each year the Census Bureau comes out with a new data

1    set.  So I'm using the most recent data set in this case, which

2    would reflect persons who reported that they were citizens on

3    an ACS survey between the years 2013 and 2017.  So that would

4    be a mid-decade estimate; whereas the 2010 census data that

09:59:58  5    reflects voting age population is from the year 2010.  So it's

6    five years down the road, but still not current.  Even though

7    there's a 2017 handle in that five-year survey, the mid-decade

8    would be the midpoint of the survey; in other words, July 2015.

9    So it's still four years behind time at this point.

10:00:21 10    Q    And is that standard in your field to rely on those

11    five-year surveys and to use the midpoint of the five-year

12    survey in doing the types of analysis that you've done?

13    A    It's becoming standard.  It's been a long-term standard in

14    Latino voting rights cases in particular in other states.  And

10:00:46 15    it's also a metric that I have been reporting in some of the

16    Section 2 cases I've been involved in since 2010.

17    Q    Okay.  Let's take a look at your second report, which is

18    Plaintiffs' Exhibit 59, and in particular page 3.  And I think

19    we're going to focus in on footnote 1.

10:01:13 20    Have any courts in Section 2 cases where you have recently

21    served as an expert used the any-part black definition to make

22    that determination of whether a district or districts are

23    sufficiently large and reasonably compact?

24    A    Yes.  I've listed them in a footnote.

10:01:39 25    That definition was reported, and the Court reviewed it in

*Georgia State Conference of the NAACP v. Fayette County Board of Commissioners*, also in *Missouri State Conference NAACP v. Ferguson Florissant School District*, also in *Terrebonne Parrish NAACP v. Jindal.* That is still at the appellate level. It was decided in favor of the plaintiffs in 2017. But it's still on appeal.

*Navajo Nation v. San Juan County*. In that instance, I reported the any-part definition, and the Court relied on that for county-level stats. The districts that were drawn were over 60 percent single-race Native American in that particular case. So it was not maybe a major focus of the Court at the district level, but it did become an issue in determining whether or not San Juan County was majority Native American. It was just under 50 percent using single race, but over 50 percent using the any-part definition.

And then finally, the partisan gerrymandering case I was involved in, in Ohio, *A. Philip Randolph v. Householder*. That definition also became a bone of contention in that case. And I think the Court accepted that the any-part definition was appropriate to use when trying to determine specifically whether or not African-American voters had been packed into Congressional District 11, which involved Cuyahoga County and Akron County in Ohio.

Q    If you could take a look -- and we don't need to pull this up on the screen, but if you can take a look back at Figure 5

1    of Plaintiffs' Exhibit 1, your first report, which was on page

2    12.  I guess we could pull it up on the screen.  I just want to

3    make sure -- well, I'm sorry.  Yeah, let's pull it up on the

4    screen.  Figure 5, which is on page 12 of Plaintiffs' Exhibit

5    1, your first report.

6        In 2010, what were the black and white voting age

7    population percentages in Alabama?

8    A    Well, the non-Hispanic white voting age population was

9    69.39 percent, which is a little higher than the all-ages

10   percentage that we just looked at, which was a little bit over

11   67 percent.  And that is because the white population is just

12   an older population.  So numbers are boosted when you look at

13   the VAP.

14       And the single-race black population was 24.86 percent.

15   And the any-part definition was 25.16 percent.  And that is a

16   little bit lower than the all ages, because the black

17   population is a younger population.  So that explains that

18   difference.

19   Q    And then let's pull up -- if you can look to Figure 6 in

20   your first report, which is on the next page, page 13 of

21   Plaintiffs' Exhibit 1.  What were the black and white -- and

22   I'll now refer to voting age population as VAP or V-A-P.

23       So what were the black and white VAP percentages in 2017

24   in Alabama?

25   A    The black VAP, according to the most recent Census Bureau

estimates, was 26.4 percent.  And the white VAP was --

non-Hispanic white VAP was 67.8 percent.  So it's showing a

drop of about a point and a half compared to the 2010 voting

age population for non-Hispanic whites, and an increase of

10:06:03  about a percentage point in terms of the black voting age

population since the 2010 census.

Q    And in the 2017 estimates -- first of all, why are they

called estimates?

A    Well, they're estimates because the Census Bureau produces

10:06:24  a report each year based on an analysis of population change at

various levels of geography, states, as I mentioned, and

counties primarily based on race.  And that -- that is done by

looking at births and deaths at the county level.  And it also

includes things like housing starts, in migration, out

10:06:56  migration.  So it's a sophisticated attempt to arrive at an

estimate of what the population is today, or at least in the

summer of 2017, as opposed to 2010.

Q    And does that come from the ACS data you were talking

about?

10:07:10  A    No.  It's independent of the ACS.  It's not really a

sample survey.  So it's a different approach altogether.

Q    Okay.  But it's something that is done by and put out by

the Census Bureau?

A    Yes.  I mean, every year the estimates come out.  And just

10:07:25  about every year all major newspapers will report the change

1  since the last year and identify the fastest growing counties,

2  and that sort of thing.  I know I've seen that in the Alabama

3  newspapers.  Right around March is when the first data set

4  comes out.  And then by June you get county-level estimates by

10:07:46  5  race.

6  Q    Okay.  And then what are --

7         THE COURT:  Excuse me.  Mr. Spiva, could I see you and

8  one person from the defense for just a second, please?

9         MR. SPIVA:  Sure.

10        (Bench conference:)

11        THE COURT:  I can't figure out why we're going into

12  2017 stuff when aren't we focusing on what happened in 2011?

13        MR. SPIVA:  Yes.  But it's typical in these types of

14  cases to show what the population growth has been.  It's also

15  partly in relation to the 2020 argument, you know, that there

16  will be like a six-district plan.  So it's partly related to

17  that.  But it's the methodology for showing, you know, in part,

18  you know, where the population is now.

19        THE COURT:  But --

20        MR. WALKER:  We don't think it's germane, Your Honor,

21  to the -- I mean, speaking for the defendants, we don't think

22  it's germane to the decision you have to make about whether in

23  2011 the legislature could have drawn any of the plans proposed

24  by Mr. Cooper.

10:09:02  25        MR. SPIVA:  Yeah.  I mean, his maps are drawn with the

1  2011 data.  But it's partly just to show the progression.

2      Also, they have raised the issue of the fact that the 2021

3  census may cause Alabama to lose a district.  And so he's put

4  forth a six-district plan.

10:09:24  5      MR. WALKER:  I'm unsure about how germane that is

6  since there's no longer going to be an injunctive relief

7  decision before Your Honor, that's whether or not an Alabama

8  Legislature could have drawn one of these proposed plans.

9      THE COURT:  In 2011?

10:09:38  10      MR. WALKER:  Yes, ma'am.

11      MR. SPIVA:  It may also go to the mootness issue, Your

12  Honor, because one of the arguments for mootness is that

13  Alabama is going to lose a seat, and, therefore, any decision

14  Your Honor -- I'm a making the defendant's argument, of course.

10:09:49  15  It's not my position -- but that any declaratory judgment Your

16  Honor might provide, that it would --

17      THE COURT:  Provide --

18      MR. SPIVA:  Wouldn't be instructive, yeah.

19      And so part of the reason for providing the hypothetical

10:10:07  20  plan is to show that it would still -- it would still, A, it

21  would still be possible, but that it would still be

22  instructive.

23      MR. WALKER:  I think -- I think my colleague is

24  stretching, Your Honor.  The point of the mootness argument was

10:10:21  25  that in the cases they relied on Section 5 was still in effect.

1    Whereas, our point is it's no longer in effect; and, therefore,

2    there's no longer a benchmark we have to refer to.  Whether or

3    not we can draw six district plans is really not before Your

4    Honor.

10:10:37  5              THE COURT:  That's what I think, as well.

6              MR. SPIVA:  Okay.

7              THE COURT:  So --

8              MR. SPIVA:  I can kind of move it along, Your Honor.

9              THE COURT:  Yeah, because I don't really see how 2017

10:10:46 10   data is relevant.

11             MR. SPIVA:  Okay.

12             THE COURT:  All right.  Thank you.

13             MR. SPIVA:  Thank you.

14             MR. WALKER:  Thank you, Your Honor.

10:10:51 15             (End of bench conference.)

16   BY MR. SPIVA:

17   Q    Let me turn your attention to Figure 4 in your first

18   report, which is on page 11.  And let's now discuss the

19   geographic distribution of the African-American population in

10:11:52 20   Alabama.

21        Is the majority of the African-American population in

22   Alabama contained in certain areas of the state, Mr. Cooper?

23   A    Yes.  From this map you can see that the majority black

24   counties, which are shaded pink and a deeper pink, are all in

10:12:15 25   the historical Black Belt of Alabama running east to west

1    really from Macon County over to Sumter County.  All those

2    counties are majority black.

3        Montgomery is not.  It's an urban county, and it's part of

4    the historical Black Belt, as well.

10:12:43  5  Q    And about how much of Alabama's black population is

6    concentrated in the urban counties of Jefferson, Madison,

7    Montgomery, and Mobile?

8    A    About half of the population is in those three counties.

9    Of course, Madison is in the north.  But Montgomery and Mobile

10:13:06 10  are in areas in the central and south Alabama area and can be

11   drawn into one of two majority black districts.

12   Q    In the rural Black Belt counties excluding --

13            THE COURT:  Wait a minute.  I'm not sure I understood

14   that question or that answer.

10:13:27 15      In looking at your map, I don't see where the majority of

16   the black population is in those counties.

17            MR. SPIVA:  I can pull up the paragraph where it's the

18   actual percentages are reported, Your Honor.

19       I just wanted to give you a rough sense.  But you can --

10:13:49 20  and you can see it visually.  But the paragraph that follows it

21   I think actually -- well, correct me if I'm wrong, Mr. Cooper,

22   but I believe that the paragraph that follows it reports that.

23            THE WITNESS:  Yes.  You would refer to Exhibit D,

24   which has the breakout by county, by race, and ethnicity

10:14:10 25  according to the 2010 census, if that would help.

1          MR. SPIVA:  Well, actually -- I mean, we could do

2     that, but I think Your Honor is asking -- if I understand your

3     question, Your Honor, you're saying Figure 4 doesn't show you

4     where the half of the black population is in the counties I

10:14:27  5     mentioned, but I think --

6          THE COURT:  Right.  Right.  Because those are shaded

7     much lighter than the counties in the Black Belt.

8          MR. SPIVA:  Yeah.  And they just don't give you the

9     figures.  I think the figures are in paragraph 26 of

10:14:43 10     Mr. Cooper's report.  I mean, he can confirm obviously, and we

11     can pull that up.  Can we actually pull up paragraph 26?

12          Is it all right if I ask him --

13          THE COURT:  Okay.  All right.  So there may be a

14     majority of African-Americans in what counties were you talking

10:15:02 15     about?  Jefferson?  Madison?

16          MR. SPIVA:  Montgomery and Mobile, yes.

17          THE COURT:  Is Madison one of them?

18          MR. SPIVA:  Yes.  That was -- if you -- Jefferson,

19     Madison, Montgomery, and Mobile, Your Honor.  Those were the

10:15:17 20     urban counties in which --

21          THE COURT:  Right.  And certainly that's where the

22     highest population of all citizens in Alabama live.  But in

23     looking at the map, which is Figure 4 on page 11 of Exhibit 1,

24     for example, Madison County, according to your shading, looks

10:15:45 25     like it may be 20 percent black.

```
 1              THE WITNESS:  That's true.  I mean, I'm looking at
 2  aggregate population counts.
 3              THE COURT:  Okay.
 4              THE WITNESS:  So while 50 percent of the
10:15:54 5  African-American population lives in those urban counties,
 6  those urban counties are majority white counties.
 7              THE COURT:  Okay.
 8              THE WITNESS:  Although I need to check Montgomery.  I
 9  think it's very close to being a 50/50 county, isn't it?
10:16:12 10              THE COURT:  It's in the 40 percent to 60 percent.  But
11  I think it's very close to 50 percent.  And Jefferson may also
12  be closer to 50 percent.
13              THE WITNESS:  Yeah.  Montgomery is 50.71 percent
14  single-race black and 55 percent any-part black, 55.45 percent
10:16:34 15  any-part black.  Jefferson is in the mid 40s.
16              THE COURT:  Okay.  All right.  But, you know, just
17  looking at this map, that map does not tell me that the
18  majority black population are in those counties.
19              MR. SPIVA:  No.  The map alone, Your Honor -- you're
10:16:54 20  absolutely correct, Your Honor.  Those are reported both in
21  paragraph 26 and also in, I believe -- which exhibit was it,
22  Mr. Cooper?
23              THE WITNESS:  Exhibit D.
24              MR. SPIVA:  To your first report, which is -- let me
10:17:10 25  get you the Plaintiffs' Exhibit Number, Your Honor.  I believe
```

```
 1    that is Plaintiffs' Exhibit 10.  And that is Exhibit D to
 2    Mr. Cooper's initial report.
 3         So that gives -- well, let me ask -- I guess I shouldn't
 4    testify.
 5                 THE COURT:  No, no, no.  It would be better that you
 6    don't.
 7    BY MR. SPIVA:
 8    Q    But, again, Mr. Cooper, does Exhibit D to your first
 9    report, which is Plaintiffs' Exhibit 10, does that show a
10    county-by-county racial breakdown according to the 2010 census
11    in Alabama?
12    A    Yes.
13    Q    Okay.
14    A    And in paragraph 26, I do note that 12 percent of
15    statewide black population lives in the historical Black Belt
16    counties.  And by 12 percent, I am only counting the rural part
17    of the Black Belt.  And I've excluded Montgomery County, which
18    I put in with the urban counties.
19                 THE COURT:  But it is part of the Black Belt.
20                 THE WITNESS:  It is part of the Black Belt, right.
21    But I'm not double counting.  The 12 percent just includes
22    those ten counties that are more rural in nature.
23    BY MR. SPIVA:
24    Q    And what about the counties -- I think this is also
25    reported -- well, let me just ask you -- yeah, this is reported
```

10:17:34
10:17:44
10:17:59
10:18:17
10:18:33

1    in paragraph 26.

2           But what about the counties of Lee and Tuscaloosa?  How do

3    they -- what is the percentage of the statewide black

4    population that lives in those counties?

10:18:53 5   A    About seven percent.  Those are university counties, so I

6    have broken that out as another category.

7    Q    And taken together, the urban counties, the rural Black

8    Belt counties, and the university -- what you have called the

9    university counties, how much of the statewide black population

10:19:15 10  is contained within those counties?

11   A    About 70 percent.

12   Q    Okay.  And which counties do you consider to be part of

13   the Black Belt, Mr. Cooper?

14   A    Well, those would be Sumter going west to east -- east --

10:19:33 15          THE COURT:  Wait a minute.  If the university counties

16   have about seven percent of the statewide black population, why

17   are you lumping them in with the urban counties?

18           THE WITNESS:  Well, I'm just --

19           THE COURT:  I don't understand that combination.

10:19:55 20          THE WITNESS:  I'm just simply pointing out where most

21   of the African-American population lives in Alabama, and that

22   would be the two university counties, as well as the urban

23   counties of Jefferson, Madison, Montgomery, and Mobile with the

24   remainder in the historical Black Belt.  But noting that the

10:20:18 25  historical Black Belt now really only accounts for 12 percent

Case 2:18-cv-00535-AMN   Document 56-7   Filed 11/15/21   Page 45 of 249

1  of the statewide black population.  So most of the black

2  population by far lives outside of the historical rural Black

3  Belt.

4  BY MR. SPIVA:

10:20:32  5  Q    That's --

6         THE COURT:  Okay.  But 12 percent of them are in the

7  Black Belt, and only 7 percent in Lee and Tuscaloosa, so --

8         THE WITNESS:  Right.

9         THE COURT:  -- I guess I just don't understand why Lee

10:20:44  10  and Tuscaloosa would be lumped in with the urban counties as

11  opposed to the Black Belt being -- but, anyway, that's fine.

12  Move on.

13         THE WITNESS:  Yeah.  I'm just trying to show where

14  most of the black -- where most of the black population in the

10:21:03  15  state, in other words, close to three-fourths lives, and it is

16  in that set of counties.  But I'm not -- not going beyond that.

17  I'm just identifying those counties.

18  BY MR. SPIVA:

19  Q    And when you say that that set, you mean the urban

10:21:23  20  counties, the Black Belt counties, the rural Black Belt

21  counties excluding Montgomery and Lee and Tuscaloosa.  Is that

22  what you mean?

23  A    That is correct.

24  Q    And --

10:21:35  25  A    And, actually, in the illustrative plans that I have

developed, the area that I draw from to create this two

majority black districts is basically the area that is

discussed in paragraph 26 with the exception of Madison County,

which, of course, is too far north to be put into a majority

10:21:55 black district.  And actually Lee County, which does have a

fairly significant black population is also not included in the

majority black district under the illustrative plans I've

drawn.

Q    Okay.

10:22:10     MR. SPIVA:  Let's -- Your Honor, did that -- have all

your questions been answered?

THE COURT:  Just need to move on.

MR. SPIVA:  Okay.  Will do.

BY MR. SPIVA:

10:22:19 Q    Let's pull up Plaintiffs' Exhibit 12, please.  And this is

Exhibit F-1 to your first report, Mr. Cooper.  And if we could

also pull up Plaintiffs' Exhibit 1, Figure 8, which is on page

15 of your first report on the screen.

Is this the 2001 congressional plan that was in place for

10:22:52 congressional elections held between 2002 and 2010?

A    Yes.

Q    And what was the BVAP of CD 7 in this plan?

A    According to the 2010 census, it was 60.11 percent.

Q    And in which districts was most of the -- I'm sorry.  Yes.

10:23:16     Which districts outside of CD 7 was most of the rest of

1  Alabama's African-American population in the 2001 plan

2  according to the 2010 census?

3  A    It was distributed more or less evenly between districts

4  1, 2, and 3.  I believe I have the figures in paragraph 34;

10:23:40 5  26 percent roughly of the black population in central and south

6  Alabama.  It was not part of District 7.

7      CD 1 was 26.16 percent.  CD 2 was 29.63 percent black

8  voting age.  And CD 3 was 30.73 percent BVAP.

9  Q    Okay.

10:23:59 10 A    You see 1, 2, and 3.  1 and 2 were basically in central

11 and south Alabama.  District 3 started in Montgomery but

12 extended all the way up to Cherokee County and Appalachian,

13 Alabama.

14 Q    Okay.  And taken together, and according to the 2010

10:24:16 15 census, how large was the BVAP populations in those three

16 districts?

17 A    Well, I just said those.

18 Q    What was that?

19 A    Maybe I didn't make that clear.

10:24:28 20 Q    Not individually, but taken together.

21 A    Oh, taken together.  Over 600,000; 629,000 total black

22 population, and the BVAP would have been 448,000.  But that

23 629,000 figure indicates that in those three districts alone,

24 just looking at the black population, you had enough to create

10:24:50 25 an entire congressional district -- 92 percent of an entire

1  congressional district.

2  Q    So let's pull up or go to your Figure 9 of your initial

3  report on page 16 of Plaintiffs' Exhibit 1.

4       What does the map in Figure 9 show?

10:25:13 5  A    Well, the map again overlays the black population

6  percentage by county.  The black lines show the current 2011

7  plan District 7.  And the red lines show where District 7 was

8  located under the 2001 plan.

9       So in much of the 2011 plan, the old 2001 lines are

10:25:43 10  followed.  For example, right along the Black Belt, some of

11  those counties were followed exactly.  But because the District

12  7 lost population or did not grow as rapidly as the rest of the

13  state, by 2011 it was underpopulated by -- if you go back to

14  Figure 8 -- by almost 80,000 people.

10:26:08 15       So District 7, as drawn in the 2001 plan, had to expand

16  and pick up more geography and more population in order to meet

17  one person one vote requirements in the 2010 census and post

18  2011 redistricting cycle.

19  Q    And where did it pick up that population?

10:26:27 20  A    In this case, District 7 was expanded into Lowndes County

21  and part of Montgomery County, as well as a little bit of --

22  more of Marengo County was included in District 7.  And all of

23  Pickens County was included in 7.  Previously Pickens had been

24  split.

10:27:00 25  Q    Okay.  And then if we can pull up Plaintiffs' Exhibit 10,

1  which is -- that was the Exhibit D to your first report that we

2  were just looking at, Mr. Cooper.

3  A    Yes.

4  Q    And if we could actually leave up Figure 9 on page 16 of

10:27:26 5  Mr. Cooper's first report.

6       What is the demographic makeup of Lowndes County?

7  A    Lowndes County, according to the 2010 census, is

8  73.55 percent single-race black and 73.91 percent any-part

9  black.

10:27:57 10  Q    And what is the demographic makeup of Clarke County?

11  A    Clarke is 43.88 percent single-race black and

12  44.29 percent any-part black.

13  Q    And what is the demographic makeup of Pickens County?

14  A    Pickens is, I believe, actually majority white, is it not?

10:28:25 15  It's -- well, yeah.  It's 41.58 percent single-race black and

16  42.17 any part.

17  Q    Okay.  Let's pull up Plaintiffs' Exhibit 17.  Is that

18  Exhibit G-4 to your first report, Mr. Cooper?

19  A    Yes.

10:28:49 20  Q    And what is this map?

21  A    This map zooms in on Montgomery County under the 2011

22  plan.  And it shows some of the other counties that are

23  adjacent -- part of Lowndes, part of Bullock, Autauga, and

24  Elmore, Macon.

10:29:08 25  Q    And was Montgomery County or city split in the 2011 plan?

1  A    Yes.  It was divided into three congressional districts.

2  Part of Montgomery County went into District 7.  Part of it

3  went in District 2 extending through the center of the county

4  north to south, and the other part went into District 3.

10:29:28  5  Q    And had Montgomery County been split in the 2001 plan?

6  A    No.  In the 2001 plan, it was entirely in District 3.

7  Q    Was there a small part of Montgomery County in the 2001

8  plan that was in District 2?

9  A    I'm sorry.  I stand corrected.  There was a small part

10:29:49 10  that was in another district.

11  Q    Okay.  And how were Montgomery County and -- how was

12  Montgomery County split in the 2011 plan, in terms of race?

13  A    Most of the black population in Montgomery County was

14  placed in District 7.  And then the remainder of the black

10:30:19 15  population would have been subdivided between Districts 2 and

16  3.

17      I think most of the areas in District 2 are majority white

18  in that component of Montgomery County, as well as the western

19  part of Montgomery County is predominantly white, as well, and

10:30:35 20  it went into District 3.

21  Q    Okay.  So let's pull up both Figure 10 of Plaintiffs'

22  Exhibit 1 on page 17 of Mr. Cooper's first report.  And if we

23  could look at that along side of Figure 11 of the first report,

24  Plaintiffs' Exhibit 1, and paragraph 41 of the first report,

10:31:05 25  all of those latters all appear on page 18 of his first report.

       1        So this is the -- what we have got up in terms of the map

       2   is the current 2011 plan?

       3   A    Yes.

       4   Q    And about how much of Alabama's African-American

10:31:34  5   population is in CD 7 under this plan?

       6   A    About one-third.

       7   Q    Okay.  And in which districts was the rest of most of

       8   Alabama's African-American population?

       9   A    Districts 1, 2, and 3.

10:31:48 10   Q    And according to --

      11        MR. SPIVA:  Pardon me one second, Your Honor.

      12   BY MR. SPIVA:

      13   Q    And do you report in your report in paragraph 41 the BVAP

      14   of CD 7 in the 2011 plan?

10:32:26 15   A    Yes.  The BVAP CD 7 is 60.91 percent.

      16   Q    And what were the BVAPs of each of CDs 1, 2, and 3 in the

      17   2011 plan?

      18   A    26.11 percent for CD 1; 28.26 for CD 2; and 24.34 percent

      19   for CD 3.  So the BVAP in those three districts actually

10:32:59 20   dropped compared to the BVAP in CD 1, 2, and 3 under the 2001

      21   plan by a small amount.  But it's a little bit smaller than was

      22   the case in the earlier plan.

      23        More importantly, this is just a clear example, in my

      24   opinion, of what is known as cracking in redistricting

10:33:22 25   terminology where the black population is just sort of

```
        1   distributed into different districts when it's in an area that
        2   is sufficiently compact to allow for a stronger district to be
        3   created.
        4   Q    And what happened, in terms of the -- you gave the number,
10:33:42 5   but in terms of whether it was an increase or decrease in the
        6   BVAP in CD 7 as between the 2001 plan and the 2011 plan, what
        7   happened with that?
        8   A    It went up a little bit from I think 60.11 -- I'm not
        9   looking at it -- but it seems like I remember that -- to
10:34:00 10  60.91 --
       11   Q    Okay.
       12   A    -- percent.
       13   Q    And I think you said that taken together the BVAP in 1, 2,
       14   and 3 in the 2011 plan is nearly enough to form an entire
10:34:12 15  congressional district?
       16   A    Yes.  84.3 percent.
       17   Q    Okay.  So let me turn to the illustrative plans that you
       18   drew.
       19        And can you describe what you looked at to determine
10:34:32 20  whether the black population in Alabama is sufficiently large
       21   and geographically compact to allow for the creation of the
       22   second majority-minority district?
       23   A    Well, one reference point was the plan that the state
       24   legislature adopted for the state board of education.
10:34:52 25  Q    Can you pull up -- while you're talking about that, can we
```

1    pull up Figure 1 on page 5 of Mr. Cooper's first report,

2    Plaintiffs' Exhibit 1?

3    A    So this is the state board of education plan, which

4    creates majority black District 4 that includes part of

10:35:13 5    Jefferson County and a couple of the western Black Belt

6    counties, as well as part of Bibb and Tuscaloosa.

7         And then there's a majority black district in the south

8    that includes the city of Mobile and most of the rest of the

9    historic Black Belt, including almost all of Montgomery County,

10:35:35 10   except for a little tiny piece in the -- in the north that is

11   part of District 3 along the Elmore County line.  So...

12   Q    You're referring to Board of Education District 5?

13   A    Yes.  Yes.  Both of those districts are majority black

14   voting age.  Board of Education District 4 is 51.4 percent

10:35:58 15   BVAP, and District 5 is 57.5 percent.

16        So from that, it was clear to me that one could draw, in

17   all likelihood, a second majority black district in a

18   seven-district plan that would adhere to the original

19   redistricting principles and would be consistent with what the

10:36:22 20   state legislature did with the state board of education plan,

21   in terms of the counties that would have been included in that

22   district -- in those districts for a seven-congressional

23   district plan.

24           THE COURT:  And when was that plan drawn?

10:36:34 25           THE WITNESS:  In, I believe, May of 2011.  I think

1    that's when it was adopted.  I could be wrong about the month,

2    but I think that's when.

3              THE COURT:  Thank you.

4              THE WITNESS:  Although the previous state board --

5    10:36:47    THE COURT:  No.  That was all of my question.

6              THE WITNESS:  Okay.  Okay.

7    BY MR. SPIVA:

8    Q    That is the 2011 plan?

9    A    Yeah.

10   10:36:52 Q    The BOE plan?

11   A    Right.

12   Q    So let's just take a look at Figure 2 on the next page,

13   page 6 of your first report, Plaintiffs' Exhibit 1.

14        Can you describe what that shows?

15   10:37:06 A    This simply overlays Board of Education Districts 4 and 5

16   onto a map showing the percent black by county.  Similar to the

17   plan -- to the map that I produced showing how District 7

18   changed between 2001 and 2011, similar kind of overlay.  But

19   this is just for this single point in time for the 2011

20   10:37:32 redistricting plan.

21   Q    In terms of -- you mentioned that District 5 of the BOE

22   plan encompassed part of Mobile County.  Does it encompass all

23   of Mobile County?

24   A    No.

25   10:37:47 Q    Can you describe the area of Mobile County that it

```
 1  includes?

 2  A    It includes most of the city of Mobile, as well as some of

 3  the rural precincts extending north into Washington County.

 4  Q    And does the 2011 state board of election plan combine

10:38:10  5  part of Mobile County and Montgomery County?

 6  A    Yes.

 7  Q    Do you know, Mr. Cooper, how long State Board of Election

 8  Districts 4 and 5 have been African-American majority

 9  districts?

10:38:25 10  A    In the 1990s, there was litigation involving the state

11  board of education plan that I am aware of.  I think I have a

12  footnote going to the state board of education plan for 2000

13  preclearance letter.  And in that letter there is a note about

14  what the BVAP was in the two districts in the 1990s, as well as

10:38:57 15  the BVAP.

16            THE COURT:  I think we have an objection.

17            MR. WALKER:  The question that Mr. Cooper is answering

18  I think is beyond the scope of his report.

19            MR. SPIVA:  I think he was referencing a footnote in

10:39:11 20  his --

21            THE COURT:  Well, if he's referencing a footnote, if

22  you will please point out what footnote he's referring to.

23  BY MR. SPIVA:

24  Q    Mr. Cooper, are you able to point out the footnote that

10:39:22 25  you are referring to?
```

 1  A    Yes.  It's footnote 13 on page 20, referenced in paragraph
 2  45 where I have the percentage statistics for the court-ordered
 3  1996 plan according to the 2000 census.  And then the new plan
 4  that was adopted I think in 2001 --

10:39:54  5          THE COURT:  Excuse me.  I'm not sure that that answers
 6  the question that was specifically asked.
 7  BY MR. SPIVA:
 8  Q    Yeah.  Why don't -- can I withdraw the --
 9          THE COURT:  I would ask, Mr. Cooper, if you would
10:40:06 10 please listen to the question and only answer the specific
11  question that's asked, okay?
12          THE WITNESS:  Okay.
13  BY MR. SPIVA:
14  Q    Do you know how long, Mr. Cooper, SBOE Districts 4 and 5
10:40:25 15 have been African-American majority districts?
16  A    Well, I believe that the first time that 4 and 5 were
17  drawn to be both majority black would have been in May of 2011,
18  but I don't know exactly when 4 or 5 might have -- I guess
19  District 4 might have turned African-American at some point in
10:40:55 20 the 2000s.  I don't know.
21  Q    Okay.  And if you know, do you know how long SBO Districts
22  4 and 5 have an African-American opportunity districts?
23          First of all, if I say opportunity districts, what do you
24  understand me to be asking you?
10:41:11 25 A    A district where an African-American would have an

```
 1  opportunity to be elected.
 2  Q    But necessarily majority district?
 3  A    Not necessarily majority.
 4  Q    And do you know how long SBO Districts 4 and 5 have been
 5  African-American opportunity districts?
 6  A    Since sometime in the 1990s.
 7  Q    And is that reflected in paragraph 45 that -- what you
 8  just said reflected in paragraph 45 of your first report?
 9  A    Yes.
10         MR. SPIVA:  Your Honor, may have just a minute to
11  consult with my colleague on something?
12         THE COURT:  Yes.  It's probably a good time to take a
13  break, anyway.  I don't want to wear out Ms. Christina's
14  fingers.
15         MR. SPIVA:  Thank you, Your Honor.
16         THE COURT:  We will come back at 11:00 o'clock.
17         (Recess.)
18         THE COURT:  One thing I should have mentioned when we
19  started this morning -- and I apologize -- I have a sentencing
20  today at 1:00 that I have to take, so we're going to take a
21  little longer -- a little later break for lunch, so you will
22  kind of have an idea of where we're going.  I should have told
23  you first.  I apologize.
24         MR. SPIVA:  No problem, Your Honor.  Sounds like you
25  won't get as much of a break, though.
```

10:41:22
10:41:49
10:42:00
11:00:30
11:00:42

```
          1          THE COURT:  Oh, I don't ever get a break, but that's
          2    okay.
          3          You may proceed, Mr. Spiva.
          4          MR. SPIVA:  Thank you, Your Honor.
11:00:53  5    BY MR. SPIVA:
          6    Q    Mr. Cooper, did you use the 2011 SBOE plan as a point of
          7    departure when you were creating your illustrative map?
          8    A    Yes.  In conjunction with the 2011 plan.
          9    Q    In conjunction with the 2011 congressional plan?
11:01:23 10    A    Yes.
         11    Q    And what does your review of the SBOE, the 2011 SBOE map
         12    tell you about the possibility of making two majority-minority
         13    congressional districts in Alabama?
         14    A    It suggests to me that it is -- or it suggested to me that
11:01:44 15    it was highly likely that I could draw two out of seven
         16    majority black districts.
         17    Q    And let me just draw your attention to paragraph 17 of
         18    your initial report, Plaintiffs' Exhibit 1.  What about it --
         19    I'm sorry.  Did I say -- I meant to say paragraph 17.  I don't
11:02:19 20    know if I said page 17.
         21          THE COURT:  Paragraph 17 on page 7.
         22          MR. SPIVA:  Thank you, Your Honor.
         23    BY MR. SPIVA:
         24    Q    What about it suggested to you the possibility of -- to
11:02:30 25    potentially having two congressional districts?
```

```
 1  A    Well, we know that if you could draw two out of seven, as
 2  opposed to two out of six districts, the size of the
 3  congressional -- I'm sorry -- as opposed to two out of eight
 4  districts as in the BOE plan, it's obvious that the population
 5  size of the congressional districts has to be larger.
 6       So the districts as drawn in the state board of education
 7  plan, Districts 4 and 5, that area would have to expand
 8  slightly.  And so I was aware that there were other counties
 9  that were not in District 4 and 5 with significant black
10  populations.  Namely --
11            MR. SPIVA:  Could we put up Figure 2 side by side with
12  that, please?
13  BY MR. SPIVA:
14  Q    Go ahead.  I'm sorry to interrupt.
15  A    Well, mainly, Conecuh, Butler, Barbour, and Russell.
16            THE COURT:  Excuse me.  That's Conecuh.
17            THE WITNESS:  I'm sorry.  I learned how to say that,
18  and I've been saying Conecuh every time.
19            MR. SPIVA:  I can testify to that, Your Honor.  He
20  actually has been saying that.
21            THE WITNESS:  How am I doing on Mobile?
22            THE COURT:  Mobile you're doing okay.  We'll wait
23  until you get to some of the other Native American derived
24  counties, so we'll see.
25            MR. SPIVA:  We're just going to stay away from those.
```

Timestamps: 11:02:53 (line 5), 11:03:14 (line 10), 11:03:25 (line 15), 11:03:38 (line 20), 11:03:51 (line 25)

```
 1              THE WITNESS:  Etowah, that's correct, isn't it?
 2              THE COURT:  Yeah.  You're doing well on that one.
 3   BY MR. SPIVA:
 4   Q    So can you explain -- you were mentioning that there were
 5   counties outside of the Board of Education District 5 including
 6   Conecuh that might be included in a second majority-minority
 7   congressional district?
 8   A    Right.  The four counties -- maybe I didn't list them all
 9   due to my mispronunciation of Conecuh.
10              THE COURT:  I'm sorry.  That was my problem.
11              THE WITNESS:  No.  I'm glad you corrected me.
12         Well, Conecuh, Butler, Barbour, and Russell all are
13   counties that according to the 2010 census had black
14   populations over 40 percent, and they are not in Districts 4
15   and 5.
16   BY MR. SPIVA:
17   Q    Okay.
18   A    So that would be one area where those two districts could
19   be expanded in a fashion that would allow for two out of seven
20   majority black districts, as opposed to two out of eight as in
21   the board of education plans.
22   Q    Can we pull up Figure 12 on page 22 of Mr. Cooper's first
23   report, Plaintiffs' Exhibit 1?  And once we get there,
24   Mr. Cooper, if you can explain what the significance of this
25   map?
```

The timestamps in the left margin are:
11:04:03 (line 5), 11:04:20 (line 10), 11:04:35 (line 15), 11:04:45 (line 20), 11:05:11 (line 25).

```
 1  A    Well, this is sort of just jumping ahead in the sense that
 2  this particular figure outlines the area of the state that I
 3  have included in one or more of the majority black districts.
 4       So you can see that I did include Butler and Conecuh and
11:05:42  5  Barbour.  I did not include Russell in any majority black
 6  districts.
 7  Q    And so I want to just focus this a little bit.  When you
 8  said you did include, do you mean that in one of the
 9  illustrative or revised plans that you prepared, that in each
11:06:00 10  of those plans they fell somewhere within this area?
11  A    Yes.
12  Q    But not that each plan includes the entire area, I take
13  it?
14  A    That's true.  In some cases, a county would have been
11:06:13 15  dropped.
16  Q    Uh-huh.  And what is the population of the area that's
17  outlined here in Figure 12, and is that reported in paragraph
18  49 on page 22?
19  A    Yes.  There are roughly 1.79 million people living in that
11:06:36 20  area, which would constitute two-and-a-half congressional
21  districts in a seven-district plan according to the 2010
22  census.  So there's more than enough population there to create
23  two majority black districts with over 340,000 people left
24  over.
11:06:56 25  Q    And is there more than enough area -- more than enough
```

population there to draw them in different ways?

A    Yes.  Exactly.  That's what I did.  And that's why that area is so much larger than two congressional districts because I did different configurations under the illustrative plans.

11:07:15  Q    Mr. Cooper, when you assessed whether the African-American population is sufficiently large and geographically compact to constitute a majority voting age population in a given district, is it necessary to consider race to some degree?

A    Because this is a *Gingles 1* case, Section 2 case, and you

11:07:39  have to meet the *Gingles 1* precondition, race is in the background, but it does not predominate.

Q    Are there other considerations that you take into account as well when you are attempting to draw illustrative plans?

A    Well, in this particular instance, I prioritize avoiding

11:07:59  county splits.  So right at the outset, I wanted to split no more than seven counties in any plan, which is the same number of counties that the state split in the 2011 plan.  And I accomplished that objective.  In fact, in two of the illustrative plans, I split just six counties.

11:08:23  Q    And what about in terms of precincts are also called voting tabulation districts; is that right?

A    Yes.

Q    Was there -- was that -- avoiding VTD splits, was that a consideration you -- a consideration in the drawing of your

11:08:56  illustrative plans?

```
 1   A    Well, that was also a top priority.  So my objective was
 2   not to split any more precincts than the numbers split in the
 3   2011 plan, and I also achieved that objective.
 4        One plan -- I believe it may be Illustrative Plan 3 or
 5   4 -- splits the same number, 16.  All the other split fewer.
 6   And so that, too, was prioritized.
 7        And by precinct splits, I'm only calling a split if there
 8   is population involved.  Because some precincts or VTDs will
 9   extend, say, beyond municipal boundary to include a commercial
10   split -- a commercial strip.  And if you are going to follow a
11   municipal boundary, in fact, you may end up splitting that
12   precinct, zero population is involved.
13        So in my tables, I've just broken out the populated
14   splits, which are the most meaningful.
15   Q    And are there instances when a voting tabulation district
16   must be split?
17   A    In a zero deviation plan, which I understand is necessary
18   in a Section 2 lawsuit nowadays, precincts have to be split.
19   It would be just an amazing coincidence if you could combine
20   precincts and magically come up with a zero deviation district.
21             THE COURT:  What do you mean by a zero deviation
22   district or plan?
23             THE WITNESS:  Plus or minus one person.
24   BY MR. SPIVA:
25   Q    Does that mean --
```

11:09:12 (line 5)
11:09:36 (line 10)
11:09:55 (line 15)
11:10:19 (line 20)
11:10:33 (line 25)

```
 1  A     From the ideal district size.

 2  Q     And does that mean that all districts in the plan would

 3  have equal population?

 4  A     Plus or minus, right.

 5  Q     Plus or minus one?

 6  A     Yes.

 7  Q     So there might be one district that had one more person in

 8  it than another district?

 9  A     Or even two more.

10  Q     Okay.

11  A     Because one would be plus one and one would be minus one,

12  so, yes.

13              THE COURT:  So you're talking about plus or minus

14  one person, as opposed to plus or minus one percent of

15  population?

16              THE WITNESS:  Yes.

17         In the state legislative plan, the range was plus or minus

18  one percent, I believe, in the Alabama Legislative Black Caucus

19  case.  So you had more population to work with.

20         But in a case like this, and in most of the congressional

21  plans even drawn by state legislatures following the 2010

22  census, it was plus or minus one person.

23  BY MR. SPIVA:

24  Q     When you are forced to split a precinct, what is your

25  approach?
```

```
 1  A     Basically, when you get to that point, and if it's to zero
 2  out the population, you just have to sort of experiment until
 3  you get it right.  I mean, you move 24 people here, 36 people
 4  here, and eventually you can get it down to zero, as opposed to
 5  plus or minus five persons.
 6  Q     What I am asking, though, is are there certain techniques,
 7  in terms of visible features that you try to follow when you
 8  have to split a VTD?
 9  A     Yes.  I would try to follow names, streets, or municipal
10  boundaries, which may not be visible boundaries, or a water
11  body or something so that there, you know, is a clear rationale
12  for the split.
13  Q     In drawing your illustrative plans, did you consider
14  geographical compactness?
15  A     Yes.  Both visually, and then I also did compactness tests
16  to compare and contrast an illustrative plan with the 2011
17  plan, as well as other state plans, state legislative plans,
18  House and Senate, as well as the board of education plan.
19  Q     We'll get there in a minute.  I just want to make sure I
20  understand what you considered.
21        Did you consider contiguity in drawing your illustrative
22  plans?
23  A     Yes.  I considered contiguity.  And the Maptitude
24  redistricting software actually has a menu check.  You just hit
25  the menu button, and it will tell you whether or not the
```

11:11:54  (line 5)
11:12:07  (line 10)
11:12:22  (line 15)
11:12:44  (line 20)
11:12:56  (line 25)

```
 1    district is contiguous.
 2    Q     Are the illustrative plans that you drew contiguous?
 3    A     Yes.
 4    Q     Did you consider the non-dilution of minority voting
 5    strength in drawing the illustrative plans?
 6    A     I believe I did.
 7    Q     And what does, in the redistricting context, what does
 8    non-dilution of minority voting strength mean?
 9    A     It means essentially that based on analyses performed by
10    experts other than myself -- because I am not a political
11    scientist -- a determination has been made that a district
12    would perform as an opportunity district; in other words, a
13    black candidate could win, wouldn't ensure a victory, but it
14    would be within the realm of possibility in spite of
15    racially-polarized voting.
16    Q     Let me ask you:  Did you consider communities of interest
17    in drawing your plans?
18    A     I did.  I was aware of the historical Black Belt and tried
19    to keep that together in one or more of the majority black
20    districts to the extent possible.
21          I think that counties represent communities of interest,
22    so I wanted to make sure that I did not unnecessarily split
23    counties.  And as I've indicated, I matched the state's number
24    of splits in that regard and actually did a little better
25    overall for -- when comparing to all four illustrative plans.
```

```
 1    Q    Let me pull up paragraph 19 of Plaintiff' Exhibit 1 on
 2    page 7 of your first report.  And let me ask you about the
 3    quote here.  You have in here a quote I believe from the
 4    reapportionment committee guidelines for congressional
11:15:04  5    legislative and board of education redistricting.
 6         What is that, and why did you include it?
 7    A    Because it's a very concise, clear, general statement
 8    about the concept of community of interest.  It's a broad
 9    concept.  And I believe that Mr. Dorman Walker actually
11:15:26 10    authored that paragraph.
11    Q    Well, we won't speculate on that.  But mainly I just
12    wanted to know whether this was something you considered in
13    terms of -- and that was intended as a compliment.
14    A    Right.
11:15:41 15    Q    But the main question is did you consider this in drawing
16    your illustrative plans?
17    A    Yes.  I consider it to be a very well-written paragraph.
18    And I tried to abide by that paragraph to the best of my
19    ability.
11:15:54 20    Q    And what were the communities of interest that were set
21    forth in the reapportionment committee guidelines?
22    A    Well, I will just repeat them.  Areas with recognized
23    similarities of interests, including but not limited to racial,
24    ethnic, geographic, governmental, regional, social, cultural,
11:16:15 25    partisan, or historic interests; county, municipal, or voting
```

1  precinct boundaries, and commonality of communications.

2  Q    Okay.  And does this definition comport with your

3  understanding of what communities of interests are?

4  A    Yes.  But Mr. Walker has stated it in a much more eloquent

11:16:40 5  fashion than I might have.

6  Q    Okay.  And do the illustrative plans that you prepared

7  respect communities of interest?

8  A    I believe so.  I understand there would be difference of

9  opinion, but I think that I do meet that standard here.

11:16:54 10  Q    Okay.  And do each of the illustrative plans -- and here

11  I'm including Revised Plan 1, Revised Plan 2, Revised Plan 3,

12  and Illustrative Plan 4.  Do each of those --

13          THE COURT:  Just a minute, Mr. Spiva.  Aren't we only

14  looking at the revised plans?  Aren't those the operative ones

11:17:19 15  that we're considering?

16          MR. SPIVA:  That is correct, Your Honor.  I just

17  wanted to make sure that was clear.

18          THE COURT:  I'm clear with that, and we can just go on

19  directly to those.

11:17:25 20          MR. SPIVA:  I wont' repeat it.  Sometimes I fall into

21  illustrative plan, and I just want to make sure it's clear.

22       With the exception, Your Honor, that Illustrative Plan 4

23  is the same.

24          THE COURT:  Was not modified, right?

11:17:35 25          MR. SPIVA:  Yeah.  Not modified.

|     |                                                               |
|-----|---------------------------------------------------------------|
| 1   | THE COURT:  I got it.                                          |
| 2   | MR. SPIVA:  Okay.                                              |
| 3   | BY MR. SPIVA:                                                  |

4    Q    And I think I understand that you did not pair incumbents

11:17:41  5    in those plans, correct?

6    A    Correct.

7    Q    Okay.  Was any one of the factors we just discussed the

8    predominant factor in preparing those illustrative plans?

9    A    No.

11:17:59 10    Q    Okay.  Did you look predominantly at race in your

11    development of your illustrative plans?

12    A    I was aware of race as a background factor.  This is a

13    *Gingles 1* analysis, and this is a Section 2 case, so obviously

14    race is a factor.

11:18:21 15    But as I've indicated, I was also thinking about other

16    items, like county boundaries, preserving cultural ties, for

17    example, in the Black Belt area.  So I was looking at other --

18    other factors, not race as a predominant factor.

19    Q    Why did you draw four different plans?  And I'm again

11:18:44 20    putting aside the original illustrative plans.  Why did you

21    draw four plans?

22    A    Well, I just thought it was important to demonstrate that

23    there were various ways to draw two majority black districts

24    that could look quite different, in terms of the counties

11:19:00 25    included in each one of the two majority black districts.  It's

1   different configurations.

2   Q    Okay.  Let's pull up Plaintiffs' Exhibit 61, which is

3   Exhibit A-2 to your second report, your second declaration,

4   or -- and let me ask you to verify once we get there,

11:19:27 5   Mr. Cooper, if that is, in fact -- pardon me one minute -- if

6   Plaintiffs' Exhibit 61 is, in fact, Exhibit A-2 to your second

7   report.

8   A    Yes, it is.

9           THE COURT:  And just for the record, and to be clear,

11:19:58 10  the witness' second report is which exhibit?

11          MR. SPIVA:  Thank you, Your Honor.  The witness'

12  second report is Plaintiffs' Exhibit 59.

13          THE COURT:  Thank you.  I just want to make sure we

14  got the trail.

11:20:08 15          MR. SPIVA:  Yes.  Thank you.  It's hard for me to --

16  I'm trying to trace them through, but sometimes you lose your

17  place.

18  BY MR. SPIVA:

19  Q    So this Plaintiffs' Exhibit 61, is that the -- well,

11:20:26 20  Revised Plan 1 that you did, Mr. Cooper?

21  A    Yes.

22  Q    And I'm displaying Revised Plan 1 kind of as a visual aid,

23  but I'd like to -- before we dive into the specifics of each

24  one, I'd like to get you to describe the features that the

11:20:48 25  illustrative plans share.

1    And let's actually pull up -- sorry.  Let's actually pull

2  up paragraph 53.  We can keep this maybe to the side -- in your

3  first report, Plaintiffs' Exhibit 1, and it appears on pages 23

4  and 24 of your first report.

11:21:45 5    Does this section of your report, Mr. Cooper, describe the

6  common characteristics of each of the illustrative plans that

7  you drew?

8  A    Yes.

9  Q    And this remained true even after you did the revised

11:22:04 10 versions, right?  These remained as common features?

11 A    Right.

12 Q    Okay.  Or common characteristics.

13    And where is the CD 7 roughly located in the illustrative

14 plans?

11:22:20 15 A    Well, CD 7 in the illustrative plans, of course, is always

16 partly in Jefferson County.  But then in the various plans that

17 I produced, the other counties varied to a certain extent.

18    So Tuscaloosa, I believe, is in all of the District 7

19 plans.  But in two of them, Tuscaloosa is divided between

11:22:52 20 District 7 and District 4 just as it is in the 2011 plan.  But

21 in two of the plans, Tuscaloosa County is entirely in District

22 7.

23 Q    Okay.  What about CD 2, the new majority-minority

24 district?  Where is that roughly located in the various

11:23:14 25 illustrative plans that you created?

```
 1  A    Okay.  Well, one key commonality is that in all of the
 2  illustrative plans, District 2 includes part of Mobile County
 3  and all of Montgomery County.
 4       And in the existing 2011 plan, part of Montgomery County
 5  is in District 7 with the remainder put into white majority
 6  districts.  And all of Mobile County is in white majority
 7  District 1.
 8  Q    Okay.
 9  A    So that's a key contrast there.
10       But, again, depending on the illustrative plan, there are
11  various configurations of the counties between those areas
12  shared by both District 2 and 7 depending on the plan.
13  Q    Okay.  And we'll dive into each of them in just a minute.
14       In terms of commonalities, are the black voting age
15  populations of CDs 2 and 7 in each of the illustrative plans
16  that you did greater than 50 percent?
17  A    Yes.
18  Q    Okay.  And what is the black-to-white voting age margin
19  for CDs 2 and 7 in the various illustrative plans?  In other
20  words, what's the range of margins between black voting age
21  population and white voting age population in each of the
22  illustrative plans that you drew?
23  A    Well, the range for the black voting age population and
24  the non-Hispanic voting age population is roughly 4.7
25  percentage points to 8 percentage points.  So these are strong
```

Timestamps: 11:23:38 (line 5), 11:23:50 (line 10), 11:24:10 (line 15), 11:24:37 (line 20), 11:24:56 (line 25)

1   districts.

2       There's a big differential there between the white

3   population in Districts 2 and 7 under the four illustrative

4   plans.  They are not 50/50 districts.

11:25:12  5  Q   And I think you already said this, but is Montgomery

6   County kept whole in each of the illustrative plans that you

7   drew?

8   A   Yes.

9   Q   And did you examine the county in VTD splits in the

11:25:27 10  illustrative plans as compared to those in the 2011 plan?

11  A   Yes.

12  Q   Let's pull up Plaintiffs' Exhibit 59, which is your second

13  declaration, and in particular, Figure 12 on page 29.

14      And what does Figure 12 show?

11:26:11 15  A   This just compares in the first column the total number of

16  county splits or split counties in the 2011 plan versus the

17  four illustrative plans.

18      And as I mentioned earlier, in two I managed to split just

19  six counties, one less than the current 2011 plan that has

11:26:33 20  seven splits.

21      The second column shows what I've termed as discrete

22  splits.  In other words, if a county is split two ways, then

23  there would be two districts in that county or two unique

24  county district numbers.

11:26:52 25      So in the 2011 plan, because Montgomery County is split

three ways, there are 15 unique county district numbers or

discrete splits, which is one more than in Revised Plan 2 and

Revised Plan 3, and three more than in Revised Plan 1 and

Revised Plan 4.

11:27:21     So whether you look at just a number of counties that are

split or the actual number of splits within those counties, our

plans are superior.

Q    And you also have a column for 2010 VTD splits populated.

What does that show?

11:27:45 A    That just shows the number of VTDs or precincts that are

split in the whole plan.

In the 2011 plan, there are 16 populated VTDs that are

split.  And in the revised plans, Revised Plan 1 splits just 12

populated VTDs; 2 and 3 split 13 and 16 respectively; and

11:28:10 Illustrative Plan 4 splits just 10.

THE COURT:  By the populated VTD splits, is that what

you were talking about earlier where sometimes it included a

commercial district or something or another that had no

population?

11:28:23     THE WITNESS:  Right.

THE COURT:  Okay.  Thank you.

BY MR. SPIVA:

Q    And I noticed that there are two figures under that column

2010 VTD splits that are in red.  Was that because there were

11:28:37 corrections made there?

1  A    Yes.  Compared to the original illustrative plans as I was

2  shifting a few precincts around to get Representative Sewell

3  into the majority black District 7.

4  Q    And I think you mentioned a minute ago that generally it's

11:29:00  5  sometimes necessary to split VTDs to reach a zero population

6  deviation.  In these plans, when you had to split VTDs, how did

7  you decide where to place the splits?

8  A    I tried to follow named streets, primary roads.

9       I mean, I guess we will get to this point later on, but in

11:29:23 10  Mobile County, in order to ensure that Mobile and Baldwin

11  counties were connected by land, there are three or four

12  precinct splits that basically just follow I-10 just to the

13  west of the bay.  And those splits were unrelated to trying to

14  achieve one person one vote.  They were related to trying to

11:29:47 15  make sure that there was land contiguity between Baldwin and

16  Mobile County for District 1.

17  Q    Okay.  And let me ask if we can pull up the same exhibit,

18  Plaintiffs' Exhibit 59.  It's actually Figure 11 on the

19  previous page, 28 -- page 28.

11:30:19 20       And does this show the relative compactness scores of the

21  illustrative plans to various other plans?

22  A    Yes.

23  Q    And let me first ask you:  I take it that this chart

24  includes the compactness scores of the 2011 plan; is that

11:30:45 25  correct?

|  | |
|---|---|
| 1 | A    Yes.  The first row shows the mean average for all |
| 2 | districts for the 2011 plan.  And then I break out CD 7 -- |
| 3 | Q    Okay. |
| 4 | A    -- showing the compactness scores under the Reock test and |
| 11:31:00  5 | the Polsby-Popper test. |

A    Yes.  The first row shows the mean average for all
districts for the 2011 plan.  And then I break out CD 7 --
Q    Okay.
A    -- showing the compactness scores under the Reock test and
the Polsby-Popper test.
Q    Before we get to the particulars of that, I just want
to -- it also compares the compactness scores for the board of
education plan, the 2017 state Senate plan, the 2017 state
House plan, and then your various illustrative plans; is that
correct?
A    That's correct.
Q    And can you explain to the Court what these scores are?
What is a Reock score?  What is a Polsby-Popper score?
A    Well, put simply, since I have a simple mind, the Reock
score is simply a ratio of the area of a circle over the area
of the district it encompasses.  And a higher score means it's
more compact and more like a circle.
     So a circle has a 1.0 score.  And if you draw a really
crazy looking district, then you go down to something probably
into the single digits.
Q    And why a circle?  You know, what is it about a circle
that is relevant to the measure of compactness?
A    It's just one way to look at these -- at whether or not a
district is reasonably compact.  It's one --
Q    Would a circle be the most compact district you could

1   physically create?

2   A    Yes.  However, one could look at a square and say that's

3   not bad either, but it would perhaps not score a one.  So

4   that's another issue, I suppose.  But it's area based.

11:32:42  5      And then the Polsby-Popper score, which I guess you're

6   getting to -- I will wait for the question, I suppose.

7   Q    Just one more thing, though, because there is no

8   obviously -- it's an obvious question, but there is no such

9   thing as a circular district in the United States that you are

11:32:56 10  aware of, right?

11  A    Not -- not that I am aware of.  There are some --

12  Q    I should have known better to ask that question.

13  A    There are some municipalities that are circles.  Like, I

14  have seen some in Georgia like that.  So, you know, maybe they

11:33:12 15  comprise a single district in a county or something.  I can't

16  say.

17  Q    I guess what I am getting at is there are either no or

18  very few districts that could score a perfect one, for

19  instance, on the Reock test?

11:33:26 20  A    Right.

21  Q    Okay.  And then what is the Polsby-Popper test?

22  A    It's also based on placing a circle over the district, but

23  it's based on the perimeter of the district.

24       And, again, one would be a perfect score, but the

11:33:43 25  Polsby-Popper scores are always significantly -- or at least

1   always almost significantly lower than Reock.

2   Q    And similar to Reock, the lower the Polsby-Popper score,

3   does that mean the less compact the district is?

4   A    Yes.

11:33:57 5   Q    Okay.  And so can you describe how your illustrative plans

6   measure up compared to the compactness in the 2011 plan or the

7   board of education plan?

8   A    They're basically on par.  There's a slight difference in

9   the Reock score.

11:34:20 10   For example, the 2011 plan has a Reock score for all

11   districts of .38, and CD 7 is .38.  Revised Plan 1 has District

12   2 at .35 and District 7 at .38.

13   And I guess you can see the tables for the rest of the

14   districts are slightly lower, but nothing out of the norm, in

11:34:42 15   my opinion.  I've seen congressional districts in place today

16   in other states that have significantly lower scores than the

17   2011 plan and the revised plans and the Illustrative Plan 4.

18   Q    Just in terms of kind of -- well, first of all, I think I

19   forgot to ask you:  Reock and Polsby-Popper, are those scores

11:35:04 20   that are commonly used in these types of cases to evaluate the

21   compactness of districts?

22   A    Yes.  They seem to be the two primary measures.

23   Q    And is there -- in your experience, is there a

24   significant -- what is the difference, say, between .38 in the

11:35:24 25   2011 plan and, say, .31 for District 7 in your Revised Plan 2?

1    A    I would consider that insignificant.

2    Q    Are there plans -- you mentioned that there were plans in

3    other states that have significantly lower scores.  Can you

4    give, you know, one or two examples of that?

11:35:51  5    A    Louisiana Congressional District 2, which is majority

6    black district running from New Orleans to Baton Rouge, scores

7    .06 on the Polsby-Popper score.  I don't recall what the Reock

8    score is.

9    Q    Okay.  And how do the illustrative districts compare to

11:36:26  10   the other Alabama statewide plans on the chart, in terms of

11   compactness?

12   A    Well, the board of education plan is a little more compact

13   overall on the Reock score in District 4 and District

14   5 score -- .4 and .37; whereas the illustrative plans, other

11:36:49  15   than District 7, the Revised Plan 1 all score in the lower 30s

16   or mid 20s, with respect to District 2, at least, and District

17   4 -- Revised Plan 2 and Illustrative Plan 4.

18   Q    And how do the Polsby-Popper scores for your -- for the

19   revised plans and Illustrative Plan 4 compare to the 2011 plan?

11:37:24  20   A    Here, the Polsby-Popper score for Revised Plan 1, both

21   District 2 and District 7 are higher than CD 7, which scores

22   .13.  And, in fact, the same holds true for Revised Plan 2.

23   It's higher.  District 2 is .14, whereas CD 7 is .13, not much

24   different really, but it did score higher.

11:37:57  25        And in District 2, in Revised Plan 3 is .18, but District

1    7 scores .13.  So the same.

2         And in Illustrative Plan 4, District 2 is .13, the same.

3    District 7 is significantly higher than CD 7.

4         So on Polsby-Popper measured against CD 7, the

11:38:14   5    illustrative plans are on par or better.

6    Q    Okay.  And I noticed that you also have columns next to

7    both the Reock and the Polsby-Popper scores where you say low

8    and high.  What are those kind of sub columns referring to?

9    A    That just refers to the lowest score of a district in any

11:38:32  10    given plan.

11         So you can see that in the 2011, the lowest scoring

12    district was CD 7 under the Polsby-Popper test.  And the

13    highest was .28, one of the other districts.

14         For Reock, the lowest score was .22, which was not CD 7.

11:38:51  15    It was one of the other districts.

16    Q    You don't recall which other district it was?

17    A    No.  I actually did prepare an exhibit that has

18    compactness scores for all of the illustrative plans, as well

19    as the 2011 plan.  That's not the revised plan.  I don't think

11:39:10  20    I ran off an exhibit for the revised plans.  But those scores

21    were almost the same anyway.

22         So I would have to refer back to my declaration as to

23    where that exhibit is.

24    Q    That's fine.

11:39:20  25    A    But it does exist.  It shows every district plan by plan

1  with Polsby-Popper and Reock scores.

2  Q    We may get to that.  I don't have it right handy, so we'll

3  keep going.

4      So does the chart show that the lowest scoring Reock score

11:39:43  5  for the 2011 congressional plan, the lowest scoring district is

6  lower than the Reock score for Districts 2 and 7 in your

7  various illustrative plans?

8  A    Yes.

9  Q    And in terms of compactness, are there natural geographic

11:40:09  10  features of political bodies, like states, counties, cities,

11  that can affect the compactness of a district?

12  A    Yes.  I mean, I think I cited Jefferson County as an

13  example of a place that has very odd-shaped municipality

14  boundaries, which also begins to impact the shape of the voting

11:40:30  15  districts.  And so that does make a difference.

16      You could draw more compact areas in Jefferson County

17  easily but for the fact that you also want to follow the

18  precincts.  So it creates some relatively odd shapes for sure

19  in Jefferson County because you're following precincts.

11:40:52  20  Q    So if you split more counties, cities, VTDs, you could

21  draw a more compact district?

22  A    For sure in Jefferson County.

23  Q    Okay.  Let's turn to Revised Plan 1.  And let's look at

24  Plaintiffs' Exhibit 60, which is Exhibit A-1 to your second

11:41:14  25  report.

|  |  |
|---|---|
| 1 | And tell me, Mr. Cooper, what is the chart in exhibit -- |
| 2 | Plaintiffs' Exhibit 60? |
| 3 | A    This just shows a little more detail on the demographics |
| 4 | of each of the districts according to the 2010 census for all |
| 11:41:45 5 | of the columns except the very last two, which show citizen |
| 6 | voting age population for the non-Hispanic black percentage. |
| 7 | Q    Can I just interrupt for one second?  Because I don't |
| 8 | know -- these are population statistics for Revised Plan 1; is |
| 9 | that right? |
| 11:42:01 10 | A    Right. |
| 11 | Q    Okay.  Go ahead. |
| 12 | Well, actually, let me ask you a more direct question: |
| 13 | What is the BVAP of CD 2 in this plan?  In the Revised Plan 1 |
| 14 | according to this chart. |
| 11:42:14 15 | A    51.32 percent. |
| 16 | Q    And where is that found?  What column and row? |
| 17 | A    Sort of in the middle. |
| 18 | Q    If you can give the label of the column and the -- |
| 19 | A    Someone just highlighted it. |
| 11:42:29 20 | Q    Oh.  So it's the column that says percent 18 plus AP |
| 21 | black; is that right? |
| 22 | A    Right. |
| 23 | Q    Is that correct? |
| 24 | A    Right. |
| 11:42:38 25 | Q    Okay.  And that obviously is, of course, percent 18 plus |

```
 1  all-part black, right?
 2  A    Yes.
 3  Q    Okay.  And what is the BVAP of CD 7 in this plan?
 4  A    50.65.
11:42:53  5  Q    Let's pull up Plaintiffs' Exhibit 67.  And what is this,
 6  Mr. Cooper?
 7  A    This is Revised Plan 2.
 8  Q    And how does Revised Plan 2 differ from Revised Plan 1?
 9  A    Well, with respect to District 7, Revised Plan 2 would
11:43:37 10  eliminate the split in Tuscaloosa County.  So Tuscaloosa is
11  entirely in District 7, and the district itself extends further
12  south to include Washington and Clarke counties.
13      District 2 in this configuration also expands in the sense
14  that it picks up one more county in east Alabama -- Barbour
11:44:01 15  County -- along the Georgia line, which is part of the historic
16  Black Belt.  So this really is the only plan that would include
17  Barbour County in a majority black district.
18      And then the other counties from Mobile to Montgomery
19  there are included in the majority black district is -- would
11:44:24 20  be a little part of Baldwin, as well as all of Monroe, Conecuh,
21  Butler, Crenshaw, Pike.  You know, the rest of the Black Belt
22  counties, plus Montgomery.
23  Q    Okay.  Let's take a look at Plaintiffs' Exhibit 66, which
24  is Exhibit B-1 to your second report.
11:44:47 25      And is that the population and summary report for Revised
```

```
 1   Plan 2?

 2   A    Yes.

 3   Q    Okay.  And what is the BVAP of CD 2 in this plan?  In

 4   Revised Plan 2?

 5   A    51.37 percent.

 6   Q    And what is the BVAP of CD 7 in this plan?

 7   A    51.95 percent.

 8   Q    Okay.  Let's pull up Plaintiffs' Exhibit 73.  Can you

 9   describe the configuration of CD 7 in this -- well, first of

10   all, let me ask you:  What is Plaintiffs' Exhibit 73?

11   A    This is Revised Plan 3.

12   Q    And can you describe the configuration of CD 7 in this

13   plan?

14   A    Yes.  In this plan, as always, Jefferson County is partly

15   in District 7.  And in this instance, Tuscaloosa remains split

16   between Districts 6 and 7.

17   Q    I'm sorry to interrupt.  When you say remains split,

18   Tuscaloosa is split under the 2011 plan?

19   A    Right.

20   Q    The current plan?

21   A    Right.

22   Q    All right.  Go ahead.

23   A    And then it picks up a couple of counties with significant

24   black population; namely, Talladega and Coosa that have roughly

25   30 to 35 percent black population according to the 2010 census.
```

| | |
|---|---|
| 1 | So I've included those two counties in District 7.  They are |
| 2 | not included in any of the other illustrative plans. |
| 3 | And so that results in a District 7 -- well, I don't have |
| 4 | the percentage in front of me, but it's majority black -- |
| 11:46:49 5 | Q     Okay. |
| 6 | A     -- and then -- |
| 7 | Q     What about -- |
| 8 | A     -- District 2 would extend a little bit further to pick up |
| 9 | Choctaw County.  It's not always including Choctaw County in |
| 11:47:01 10 | some of the plans. |
| 11 | Q     And any other differences or unique features of CD 2 in |
| 12 | this Revised Plan 3? |
| 13 | A     Well, I do not think that Autauga County is in District 2 |
| 14 | in any of the other plans.  In this plan, it is shared with |
| 11:47:20 15 | District 3. |
| 16 | Q     And let's pull up Plaintiffs' Exhibit 72.  And I'll ask |
| 17 | you if that is C-1 to your second report, if that's the |
| 18 | population summary report for Revised Plan 3? |
| 19 | A     Yes. |
| 11:47:38 20 | Q     And what is the BVAP of CD 2 in this plan? |
| 21 | A     50.99 percent. |
| 22 | Q     And what is the BVAP of CD 7 in this plan? |
| 23 | A     50.34 percent. |
| 24 | Q     Okay.  And if we can now pull up Plaintiffs' Exhibit 40, |
| 11:48:02 25 | which is Exhibit K-2 to your second report? |

1  A    Actually that's first report.

2  Q    Yes.  I'm sorry.  That's Exhibit K-2 to your first report;

3  is that right?

4  A    Right.

11:48:21  5  Q    And let's now discuss the unique details of Illustrative

6  Plan 4.  How does Illustrative Plan 4 differ from the Revised

7  Plans 1, 2, and 3?

8  A    First, in Illustrative Plan 4 as in Illustrative Plan 2,

9  Tuscaloosa is entirely in District 7.

11:48:45  10      The other primary difference in Illustrative Plan 4 is

11  that Mobile County is divided so that the western-most boundary

12  of District 2 is actually the Mississippi state line and the

13  southern-most is the Gulf.  And then the eastern boundary --

14  for much of the eastern boundary follows Mobile Bay.  So that

11:49:13  15  that allows for a way to drive directly into Mobile County from

16  Baldwin County via I-65.

17      So the northwest or northeast quadrant of Mobile County

18  now is completely connected to Baldwin via I-65.

19  Q    And in the other plans -- I think you've said this, but I

11:49:49  20  just want to make sure it's clear in the record -- there's a

21  land route between Baldwin and Mobile County; is that correct?

22  A    Yes.  According to the guidelines of the state

23  legislature, water contiguity is acceptable.  But I don't know

24  if they really meant Mobile Bay or not.  So for that reason, I

11:50:12  25  decided to split three precincts facing Mobile Bay so that one

1   could drive from Baldwin into Mobile and still be in District

2   1.

3   Q    Okay.

4        MR. SPIVA:  Your Honor, can I have just one second to

11:50:24 5   confer with my colleague?

6        Thank you.

7   BY MR. SPIVA:

8   Q    And let's if we can pull up Plaintiffs' Exhibit 39.

9        And is that -- Mr. Cooper, is that the population summary

11:51:00 10  report for your Illustrative Plan 4?  For your reference, this

11  is Exhibit K-1 to your first declaration.

12  A    Yes.

13  Q    And what is the BVAP of CD 2 in this plan?

14  A    50.33 percent.

11:51:16 15  Q    Is that CD 2 or CD 7?

16  A    That's CD 2.

17  Q    Oh, okay.  I'm sorry.  My notes were mixed up.

18        And what is the BVAP of CD 7 of this plan?

19  A    50.74.

11:51:29 20  Q    I am going to turn, Mr. Cooper, to some of the criticisms

21  of your report in Dr. Johnson's report.

22        First of all, have you reviewed Dr. Johnson's report?

23  A    Yes.

24  Q    The first issue that Dr. Johnson raises is your use of

11:52:02 25  any-part black in determining whether the illustrative

```
 1   districts have BVAPs over 50 percent.  Did you see that in his
 2   report?
 3   A    I did.
 4   Q    Okay.  I'm not actually directing you to a particular part
 5   of his report --
 6   A    Right.
 7   Q    -- I just -- we've already discussed why you chose to use
 8   any-part black figures, so I won't repeat that.
 9        But what measure does Dr. Johnson say you should use?
10   A    Dr. Johnson --
11   Q    I don't know if it will help to look at Plaintiffs'
12   Exhibit 59, which is your second report, paragraph 8.
13   A    Well, Dr. Johnson suggests that I should have used
14   non-Hispanic black VAP as opposed to single-race black VAP,
15   which is what the state legislature used.
16   Q    And if we can take a look at page 5 of your second report,
17   Plaintiffs' Exhibit 59, you report here on citizen voting age
18   population in this table, do you not?
19   A    I do.  Of course, that's citizen voting age population
20   under the 2008-2012 American Community Survey, which would be
21   roughly coincident with the 2010 census, because the survey
22   midpoint would have been July of 2010.
23   Q    Okay.
24   A    And so that shows citizen voting age population in the
25   2011 plan along with the illustrative plans.
```

Timestamps in left margin: 11:52:15 (line 5), 11:52:30 (line 10), 11:52:51 (line 15), 11:53:50 (line 20), 11:54:07 (line 25)

1    And one can see that in all four illustrative plans,

2 Districts 2 and 7 are more than 50 percent non-Hispanic black

3 citizen voting age population based on the 2008-2012 ACS.

4    And advancing five years to mid decade, the districts are

11:54:33 5 even stronger across the board, the illustrative plans.

6 Q    Let me stop you there, Mr. Cooper, because I think based

7 on a ruling from Your Honor earlier, we probably don't need to

8 go to that data.

9    But let me -- let's take this down and just ask you the

11:54:54 10 question:  Are any of your districts -- are any of the

11 districts in the illustrative plans that you drew over

12 50 percent BVAP even using the single-race black definition

13 that Dr. Johnson says you should use?

14 A    Yes.  Illustrative Plans 1 and 2 would have districts that

11:55:19 15 are over 50 percent non-Hispanic black single race.  So, yes.

16 Q    And that's based on the 2010 census numbers?

17 A    Right.  Right.

18 Q    Okay.

19 A    That is a more narrow definition than that used by the

11:55:37 20 state legislature.

21 Q    Correct.

22    THE COURT:  Do you have a chart or anything that shows

23 that?

24    THE WITNESS:  I don't think I broke out the

11:55:42 25 non-Hispanic black VAP in a chart.

BY MR. SPIVA:

1  Q    Let me see if I can get that.

3  A    I did not break that out in a chart.

4  Q    Is it elsewhere reported in your second declaration,

11:56:08 5  though?

6  A    Well, the statement I make here is that Dr. Johnson

7  acknowledges that District 2 and District 7 in Illustrative

8  Plans 1 and 2 contain non-Hispanic black voting age population

9  majorities.

11:56:23 10  Q    Where are you referring to?

11  A    Paragraph 8 on page 3 of my declaration.

12      So I believe that Dr. Johnson has a table or a paragraph

13  that addresses that.

14  Q    Okay.

11:56:34 15  A    But I disagree with Dr. Johnson on the need to use that

16  narrow definition for voting age population.

17  Q    And why is that?

18  A    Because it's not a necessary distinction in a state like

19  Alabama, where Latinos comprise a population that is, in terms

11:56:51 20  of voting age, just in the low single digits.  It's just a

21  meaningless term.

22  Q    And just to be clear, using the all-part black definition

23  that you use and that we've seen in the various tables we've

24  looked at, all of the Districts 2 and 7 in each of your

11:57:16 25  illustrative plans are over 50 percent black?

```
 1   A     Yes.
 2   Q     And using the narrower definition that Dr. Johnson says
 3   that you should use, based on one of his tables, two of your
 4   districts in the illustrative plans are also over 50 percent
 5   black; is that correct?
 6   A     That is correct.
 7   Q     And are you able to identify those -- I know this
 8   shouldn't be a memory test.  So, you know, at a break or
 9   something I can get the actual table from his report.  But if
10   you know it from memory, if you can --
11   A     I do not recall.
12   Q     Okay.  That's fine.
13             THE COURT:  May I ask a question?
14             MR. SPIVA:  Sure.
15             THE COURT:  Mr. Cooper, where did you get the data
16   that went into the any-part black numbers?
17             THE WITNESS:  From the P.L. 94-171 file.
18        There's not an absolute column showing any-part black.
19   What you do is you add up the various multi-racial categories,
20   and then you have that number.  And it is included in the
21   redistricting data sets that are available from the Caliper
22   Corporation that produces Maptitude for redistricting.  So at
23   least --
24             THE COURT:  Okay.  So you got it from the Census
25   Bureau data?
```

```
 1              THE WITNESS:  Yes.
 2              THE COURT:  Okay.  Thank you.
 3   BY MR. SPIVA:
 4   Q    And then, Mr. Cooper, Dr. Johnson also criticizes your
 5   adherence to what he says are traditional districting
 6   principles.  And he touches on a number of topics, so let me
 7   just ask you about them one by one.
 8        Regarding compactness, Dr. Johnson questions the
 9   compactness of the illustrative districts you've drawn.  How do
10   you respond to that?
11   A    Well, we'll just have to agree to disagree, because I
12   think visually these plans are acceptable when compared with
13   congressional districts across the land.  And the compactness
14   scores provide an objective measure which show that there's
15   nothing unusual about the four illustrative plans as compared
16   to the 2011 plan.
17   Q    And are his criticisms based on compactness scores?
18   A    No.  I think he just made the comment without really going
19   deeper into the compactness scores.
20   Q    Did he include compactness scores in his report?
21   A    No.
22   Q    Is there any kind of a break line standard for when a
23   district is -- among redistricting experts for when a district
24   is considered compact or not compact?
25   A    I don't believe so.  I don't think any court has ever
```

11:58:48
11:59:03
11:59:17
11:59:34
11:59:50

 1  ruled that you have to have a certain Reock score or a certain

 2  Polsby-Popper score to be acceptable.

 3  Q    Okay.

 4  A    There are so many other factors at work like county lines

12:00:04  5  and the shape of states.  It does mean that you -- it's very

 6  difficult to even conjure up a concept of how that would be

 7  done to be applied across any congressional district anywhere

 8  in the country.

 9  Q    Okay.

12:00:21 10       MR. SPIVA:  Your Honor, I didn't know what time you

11  wanted to break for lunch.

12       THE COURT:  Like I said, I have got a 1:00 o'clock, so

13  closer to 1:00 o'clock if y'all's stomachs aren't growling too

14  much.  But if anybody needs a break at any time, all you have

12:00:34 15  to do is let me know.

16       MR. SPIVA:  Okay.  Thank you, Your Honor.

17  BY MR. SPIVA:

18  Q    So let's look at Plaintiffs' Exhibit 63.  And that is

19  Exhibit A-4 to your second declaration.

12:00:55 20       And what is this, Mr. Cooper?

21  A    This is Revised Plan 1 zooming in on the Mobile Bay area.

22  And if you look closely, you can see that crossing I-10 from

23  Baldwin into Mobile you hit a pink area.  And from there, you

24  can track down to roughly the area where State Route 163 veers

12:01:27 25  south and continues in District 1.

1       So it's contiguous by land.  But if I had used water

2    contiguity, at least three of the precincts splits in Mobile

3    County could have been eliminated.

4    Q    And did Dr. Johnson criticize your maps because of a

12:01:51 5    claimed lack of contiguity in Mobile County?

6    A    Did he say it was not -- I'm not sure if he actually

7    stated that or not.  Did he?

8    Q    Yes.  I mean, he criticizes your maps for lacking

9    contiguity in Mobile County.  And what is your response to

12:02:10 10    that?

11    A    Well, he's wrong.  He's wrong.  Incorrect.

12    Q    And why is that?

13    A    Because, as you can see in all three of these maps Revised

14    Plans 1, 2, and 3, Baldwin County is contiguous by land via

12:02:29 15    I-10 and U.S. 98 into downtown Mobile with plenty of space to

16    the east that is in District 2 and then further District 1.

17    And then further south, you're entirely in District 1.

18        So it is clearly contiguous.

19    Q    Did you consider using Mobile Bay for contiguity?

12:02:48 20    A    I did.  And there is a stipulation in the guidelines of

21    the state redistricting commission, the legislature commission

22    indicating that water contiguity is acceptable.

23        But what I don't know and still don't to this day really

24    know is did they mean Mobile Bay, or just the Tennessee River,

12:03:09 25    or the Alabama River or something.

1    So I just wanted to make sure that there could be no

2    argument that I had drawn a district, i.e. District 1, that was

3    not contiguous because it crossed Mobile Bay.

4    Q    Does the 2011 board of education plan join two districts

12:03:29  5    using Mobile Bay for contiguity?

6    A    Yes.

7    Q    And if Mobile Bay could be used for contiguity in your

8    revised and illustrative plans, how could those plans be

9    modified?

12:03:51 10    A    Well, three or four precinct splits along I-10 facing into

11    Mobile Bay would be eliminated.  In other words, the number of

12    precinct splits in all -- in Revised Plans 1, 2, and 3 would be

13    cut by about three precincts.  Illustrative Plan 4, which has a

14    different configuration that we reviewed earlier --

12:04:15 15    Q    Why don't we actually go to that?  Let's pull up

16    Plaintiffs' Exhibit 42, which is I believe is Exhibit K-4 to

17    your first report, and ask you to explain -- I think where you

18    were going, but explain what this is.

19    A    Right.  And so in Illustrative Plan 4, as you can see, the

12:04:38 20    connector between I-10 -- I mean, between Baldwin County and

21    Mobile County for District 1, the primary connector would be

22    I-65.  And there -- I mean, there's no question it's

23    contiguous.  You don't even need to zoom in on downtown Mobile

24    and I-10.

12:04:54 25    So that solves it.  That revolves it.  I mean, if there's

1   any question about it, here you go.

2   Q     Now, and what's the primary road that connects Mobile and

3   Baldwin in Revised Plan 4?

4   A     Well, it's I-65.

12:05:18  5   Q     Okay.  And Dr. Johnson notes that more persons are shifted

6   into different congressional districts under the illustrative

7   plans than under the 2000 plan, as compared to the 2001 plan.

8   Can you explain why that is the case?

9   A     Well, anytime one creates a new majority-minority

12:05:51 10   district, more often than not a lot of people are going to have

11   to be moved, particularly when the black population has been,

12   in my opinion, cracked between three different districts -- CD

13   1, CD 2, and CD 3.  So to make a new district in that area,

14   you've got to take a lot of people from both CD 1, CD 2, and CD

12:06:13 15   3 in the present plan -- or in the old 2001 plan -- and put

16   them into a new district.  So the fact that the illustrative

17   plans move roughly one-third of the population in a

18   seven-district plan is not at all unusual.

19        I do, in a footnote, cite a county of Georgia, Emanuel

12:06:37 20   County, a small rural county that has seven districts, and

21   originally just had one board of education district that was

22   majority black.  A lawsuit was filed, and a consent decree was

23   signed in 2016 accepting the plan that I drew that created a

24   new majority black local board of education district.  And to

12:06:59 25   create that district, I had to move 31 percent of the

1  population in the county into a new plan that had two majority

2  black districts.

3  Q    And just since you referenced it, do you happen to know

4  where that footnote is that you mentioned?

12:07:15 5  A    It's footnote 6 on page 8.

6  Q    Of your second report?

7  A    Yeah.

8  Q    Okay.

9  A    The paragraph 21 references footnote 6.

12:07:22 10  Q    Okay.  And that's --

11            THE COURT:  Which is exhibit?

12            MR. SPIVA:  Plaintiffs' Exhibit 59, Your Honor.

13            THE COURT:  Thank you.

14  BY MR. SPIVA:

12:07:27 15  Q    And we don't need to actually pull it up, but I just

16  wanted the reference to be clear.

17        And then, in your opinion, would it be unusual to move

18  one-third of the population of a state to create a new

19  majority-minority district?

12:07:47 20  A    Not at all.  Not at all.  It would be quite common,

21  probably.

22  Q    In developing the illustrative plans, did you consider the

23  2001 plan or the 2011 plan?

24  A    Well, I was aware of the 2001 plan.  So I had lines on my

12:08:08 25  map showing the configuration of both the 2001 plan and 2011

plan, as well as the board of education plan.  But I mainly was

paying attention to the 2011 plan and the board of education

plan since they were drawn based on the 2010 census.

Q    Now, Dr. Johnson also criticizes your report on the basis

12:08:38  that Alabama's likely to lose a district in 2020.  And so I'd

like to discuss -- shift focus and discuss the possibility of

creating a six-district plan with two majority-minority

districts.

         MR. WALKER:  Your Honor, if I may.  I thought we were

12:08:59  not going into this.

         THE COURT:  If it's part of your expert's criticism,

should we?  I don't --

         MR. WALKER:  My understanding from our conversation

earlier was that the 2020 plan is not being considered by the

12:09:17  Court, given that the purpose of this hearing is for the Court

to determine whether the legislature in 2011 could have drawn

any of the illustrative plans proposed by Mr. Cooper, of which

the 2020 plan with six districts is not one.

         THE COURT:  Right.

12:09:33  MR. SPIVA:  But in their expert reports, which there

is this criticism of the fact that Alabama's likely to lose a

seat, and I think in their pretrial brief actually they raise

that as one of their defenses.  So this was just a response to

that.

12:09:48  MR. WALKER:  If that's irrelevant, Your Honor, it's

 1  irrelevant in the report and in our brief.

 2          MR. SPIVA:  As long as their defense on that regard is

 3  irrelevant, then I'm happy to skip this.

 4          THE COURT:  Seems like it's irrelevant to me, because

 5  I really believe we need to be focusing on what the legislature

 6  could have done in 2011.

 7          MR. SPIVA:  And we actually agree for the record, Your

 8  Honor.  I just want to make sure it is clearly conceded that

 9  they are not going to argue that as a defense that we -- it's

10  no longer proper to have a declaration because of the potential

11  loss for a district.

12          THE COURT:  Okay.  So when Dr. Johnson testifies, he

13  will not be allowed to criticize any of the reports because of

14  any impact that 2020 may have.

15          MR. WALKER:  Dr. Johnson's criticisms of the 2020

16  plan, my understanding is that --

17          THE COURT:  I don't think we have a 2020 plan yet, do

18  we?

19          MR. WALKER:  Mr. Cooper has prepared a hypothetical

20  2020 plan with six districts.

21          THE COURT:  Right.  I don't think we need to get there

22  either with Mr. Cooper or with Dr. Johnson.

23          MR. WALKER:  And that is all I was saying.  I think

24  both his testimony and his drawing of the plan is irrelevant,

25  as is the criticism of it or any argument about it.

```
 1              THE COURT:  Right.  So we're not going to get into it
 2       with Dr. Johnson if we don't get it into it with Mr. Cooper
 3       today.  Right?
 4              MR. WALKER:  We are not going to get into that.  I
12:11:24 5       mean, we --
 6              THE COURT:  Okay.
 7              MR. WALKER:  Should that issue somehow become
 8       relevant, we stand by what we've said.
 9              THE COURT:  Certainly.  Certainly.
12:11:31 10              MR. WALKER:  Thank you, Your Honor.
11              THE COURT:  Okay.
12              MR. SPIVA:  Thank you, Your Honor.
13       BY MR. SPIVA:
14       Q    So, Mr. Cooper, we're going to switch gears and actually
12:11:47 15       talk about the demographic census data that you reviewed
16       regarding socioeconomic disparities between blacks and whites.
17              And let's take a look at your first report, Plaintiffs'
18       Exhibit 1 at pages 41 to 42.  And, Dr. Cooper, you did an
19       analysis of the disparities between African-Americans and
12:12:39 20       whites in Alabama; is that right?
21       A    I did, using the 27 ACS statewide, and also for four of
22       the congressional districts that would be impacted by the
23       illustrative plan districts.
24       Q    And what were your conclusions regarding the socioeconomic
12:12:58 25       disparities between African-Americans and white Alabamians?
```

1  A    Well, there's a big difference in socioeconomic well-being

2  for African --

3         THE COURT:  Wait a minute.  Just a minute.  Are you

4  using 2017 information?

12:13:12 5         THE WITNESS:  From the American Community Survey,

6  right.

7         THE COURT:  Okay.  So how was that relevant to 2011

8  situation and what the legislature could have done then?

9         MR. SPIVA:  This is different, Your Honor, because

12:13:26 10  this goes to the Senate factors.  So that really does look to

11  the disparities between blacks and whites, or, in this case,

12  blacks and whites and whether that interacts with, you know,

13  whatever is being -- whatever voting mechanism or districting

14  that is in place to create less opportunity for

12:13:50 15  African-Americans to participate.  And it's a result --

16         THE COURT:  Right.  And I understand that that

17  information is relevant.  But why are we looking at 2017

18  information instead of 2011 information to get that data for

19  the Senate factors?

12:14:11 20         MR. SPIVA:  Because it's a results test, Your Honor.

21  And so the Senate factor really looks to what is now.  And so

22  that's the more appropriate data, I think, under the case law.

23  I don't have at my fingertips.  I could get it for Your Honor.

24         But you're looking at what is the results of what was --

12:14:34 25  what was passed and how that interacts with the socioeconomic

factors.

        THE COURT:  So wait a minute.  You're saying that
these factors in 2017 are a result of the 2011 --

        MR. SPIVA:  No.

12:14:47    THE COURT:  -- drawing of the district?

        MR. SPIVA:  No.  The question is the way the districts
were drawn, do they interact with these various Senate factors,
some of which are socioeconomic.  Some are involving things
like racial appeals and the like and polarized voting to
12:15:07 deprive African-Americans of the full participation, political
participation.  It's not a -- it doesn't look at intent.  So it
doesn't matter what was in the minds of the legislators at the
time, what the conditions were at the time.

        The question is just does the map that was drawn deprive
12:15:27 African-Americans of full political participation as compared
to whites?  And many of the factors that go into that are these
socioeconomic factors.

        THE COURT:  I understand that.  But I don't understand
why we're looking at 2017 instead of 2011.

12:15:45     Is there an issue with that, Mr. Walker?  Or am I seeing
an issue that may not necessarily be there?

        MR. WALKER:  Your Honor, there's a little cognitive
dissonance in it, I suppose.  But I believe that on this issue
they are entitled to present evidence of current circumstances.

12:16:05     THE COURT:  Okay.  Thank you.

```
 1              MR. WALKER:  Yes, ma'am.

 2              THE COURT:  I don't think there's that much difference

 3    from 2011 to 2019, in terms of these disparities.  I think

 4    they're pretty well recognized in a lot of data from a lot of

 5    years and a lot of places.

 6              MR. SPIVA:  Yeah.  Unfortunately so, Your Honor.  And

 7    actually documented.

 8              THE COURT:  Very unfortunately so, right.  You may

 9    proceed, then.

10              MR. SPIVA:  Thank you, Your Honor.

11    BY MR. SPIVA:

12    Q    So was there any measure that you looked at that is set

13    forth in your first report on pages 41 and 42 where

14    African-Americans outpaced whites in these various measures?

15    A    I don't believe so.

16    Q    And let's pull up Plaintiffs' Exhibit 49.  And maybe if we

17    can keep those two pages we had up at the same time, if that's

18    possible, which was pages 41 and 42 of the first report.

19         And this Plaintiffs' Exhibit 49, which runs for several

20    pages, I take it that that is N-1 -- Exhibit N-1 to your first

21    report, Mr. Cooper; is that right?

22    A    Yes.  N-1 has bar charts illustrating the disparities.

23    And then the original census document that has the same

24    percentages presented is N-2.

25    Q    Okay.  And let's turn -- let's maybe highlight page 22 of
```

Timestamps in left margin: 12:16:22 (line 5), 12:16:32 (line 10), 12:16:58 (line 15), 12:17:49 (line 20), 12:18:13 (line 25)

1   the first report or blow it up a little bit.

2          THE COURT:  You're not asking much of the poor person

3   who's driving your --

4          MR. SPIVA:  She's a magician, Your Honor.

12:18:32 5      THE COURT:  -- exhibits here.  Yeah.  I think you've

6   now mentioned maybe four pages that you want up on the same

7   screen, and I'm not sure that's going to be very helpful

8   anyway.

9          MR. SPIVA:  I'm sorry.  Did I say page 22?  Pardon me.

12:18:47 10  I'm sorry.  Page 22 of N-1, I believe.

11         THE COURT:  Of N-1, which is 49?

12         MR. SPIVA:  Yes, Your Honor.

13         THE COURT:  Okay.  For the record, it's going to be

14  much easier if you identify it by the exhibit number that's in

12:19:02 15  evidence.

16         MR. SPIVA:  Absolutely.  I will do that from here on

17  out.

18  BY MR. SPIVA:

19  Q    And can you tell us what the poverty rate for

12:19:13 20  African-Americans was -- is in Alabama?

21  A    27.4 percent.

22  Q    And how does that compare to non-Hispanic whites?

23  A    Non-Hispanic whites poverty rate of 11.6 percent.

24  Q    I think actually -- you know, and Your Honor makes a good

12:19:42 25  point.  I'm not sure we need the non bar charts.  But after we

```
 1  take them down, Mr. Cooper, let me know if you need to

 2  reference them, or you've got it, I think, in your book in

 3  front of you, the pages from your report.  We can probably just

 4  go with the charts.

12:19:58  5  A    Yeah.

 6  Q    And what is the child poverty rate for African-Americans

 7  in Alabama?

 8  A    It's much higher than the overall rate.  It's 40.4 percent

 9  for African-American children versus 14.3 percent for white

12:20:17 10  children.

11  Q    And what is the African-American -- let's turn to page 14

12  of this same exhibit of Plaintiffs' Exhibit 49.

13        And what is African-American median household income, and

14  how does that compare to white median household income?

12:20:41 15  A    It's just a little bit over half of the white median

16  household income.  Black median income is $31,398 versus

17  $56,138 for white household income.

18  Q    And looking at page 17 of Plaintiffs' 49, what is the per

19  capita income for black Alabamians, and what is the -- how does

12:21:08 20  that compare to the per capita income for white Alabama?

21  A    Another big gap.  The black per capita income in Alabama

22  is $18,229 versus $30,697 for whites.

23  Q    If we can turn to page 5 of Plaintiffs' Exhibit 49.  Is

24  this a document which sets forth various measures of

12:21:46 25  educational attainment for the population 25 years and older in
```

1    Alabama?

2    A    Yes.

3    Q    And of those persons 25 years of age and older, what

4    percentage of African-Americans have not finished high school?

12:21:58    5    A    16.7 percent.

6    Q    And what is the percentage for whites over 25?

7    A    11.3.

8    Q    Okay.  And what about at the other end of the spectrum?

9    What percentage of African-Americans 25 and over have a

12:22:13   10    bachelor's degree or higher?

11    A    17.1 percent versus 28.6 percent for whites.

12    Q    Okay.  There seems to be an anomaly here.  And I wonder if

13    you can explain it, Mr. Cooper.

14        The set of bars over the high school graduate, GED, or

12:22:35   15    alternative.  It seems to show African-Americans -- I mean,

16    would appear that African-Americans -- that higher percentage

17    of African-Americans have a high school degree, or GED, or

18    alternative than non-Hispanic whites.  Can you explain how

19    these various graphs work together, why that is?

12:22:56   20    A    Well, the reason is that because there's a big difference

21    between the African-American and white percentages for a

22    bachelor's degree or higher, some of the other categories,

23    specifically high school graduate or some college, would show

24    that as a component, a higher percentage of African-Americans

12:23:24   25    are at that level.

1    So in the case of high school graduates -- and that label

2    sort of obscures the African-American percentage which is right

3    around 33 percent -- to just compared to the same component of

4    whites, slightly more have a GED as their highest level of

12:23:47 5    attainment.  And again, with some college, but not a

6    full-fledged bachelor's degree, 31.6 percent of

7    African-Americans have some college versus 29.8 percent of

8    whites.

9    Q    Okay.  So is it -- I don't know if another way of saying

12:24:07 10   it -- and tell me if this is not correct.  But are these kind

11   of like cumulative such that it may be a little bit -- that

12   might explain kind of the anomaly with the two middle bars?

13   A    Right.  All these add -- each bar set -- the

14   African-American bars and the white bars would add up to 100

12:24:28 15   percent.

16       So the ones to key on are those who lack a high school

17   diploma really.  That's a significant one there.  And there

18   whites outperform blacks by a considerable margin, 11.3 percent

19   versus 16.7.

12:24:42 20       And then at the other end of the educational scale, whites

21   have an 11 percentage point advantage over African-Americans

22   28.6 to 17.1.  That's bachelor's degree or higher.  So some

23   advanced degrees would be included in that category, of course.

24   Q    Okay.  Let's turn to page 11 of Plaintiffs' Exhibit 49.

12:25:06 25   And what is the black unemployment rate as compared to the

1    white unemployment rate?

2    A    The black unemployment rate in 2017 was 9.1 percent

3    statewide compared to 4.6 percent for whites.

4    Q    And then let's turn to page 13 of Plaintiffs' Exhibit 49.

12:25:30   5    Of those African-Americans who are employed, what portion are

6    in management or professional occupations?

7    A    24.5 percent of African-Americans are in management or

8    professional occupations compared to 39 percent of whites.

9    Q    Okay.  And let's turn to page 21.  Do these same

12:25:54  10    disparities exist in housing?

11    A    Yes.  Only about half of the black population lives in an

12    owner-occupied dwelling versus three quarters, 76.7 percent of

13    the white population.

14    Q    Okay.  And let's turn to page 25 of Plaintiffs' Exhibit

12:26:17  15    49.  For those African-Americans who do own their own homes,

16    what is the median value of those homes?

17    A    $92,200, which is well shy of the $155,600 median value of

18    the white owner-occupied homes.

19    Q    And if we can turn to page 23 of Plaintiffs' Exhibit 49.

12:26:45  20    In terms of vehicle ownership or availability by household,

21    what percentage of African-American households lack access to a

22    vehicle?

23    A    12 percent.

24    Q    And what about white households?  What percentage of white

12:27:03  25    households lack access to a vehicle?

```
 1  A    3.6 percent.

 2          MR. SPIVA:  Your Honor, if I can just confer with my

 3  colleagues for a minute, I think I may be done.

 4          THE COURT:  All right.

 5          MR. SPIVA:  Thank you, Your Honor.  I have no further

 6  questions of Mr. Cooper.

 7          THE COURT:  This may be a good time to take a break.

 8  And I hope we will be able to reconvene about 1:30, but it kind

 9  of depends upon what the lawyers throw at me that I might not

10  be expecting.

11      Okay.

12          MR. SPIVA:  Thank you, Your Honor.

13          THE COURT:  Thank you.

14          (Recess.)

15          THE COURT:  All right.  Is the defense ready to

16  proceed with cross-examination?

17          MR. WALKER:  Yes, ma'am.  I'm sorry, Your Honor.  I

18  didn't know you had come in.

19          THE COURT:  No problem.  You may do so.

20                       CROSS-EXAMINATION

21  BY MR. WALKER:

22  Q    Good morning -- or afternoon -- excuse me -- good

23  afternoon, Mr. Cooper.

24  A    Good afternoon.

25  Q    You said that the purpose of drawing your four plans was
```

Timestamps: 12:27:22 (line 5), 12:27:37 (line 10), 13:32:37 (line 15), 13:32:59 (line 20), 13:33:09 (line 25)

1    to demonstrate the possibility of drawing two majority black

2    congressional districts while at the same time respecting the

3    traditional redistricting criteria.  Did I understand

4    correctly?

13:33:31  5    A    Yes.

6    Q    Okay.  And I believe you said that you did that by using

7    Maptitude on your program?

8    A    Well, Maptitude is --

9    Q    Was the program?

13:33:47 10    A    -- the redistricting software I used.

11    Q    Okay.  And is it fair to say that you were sitting at your

12    computer, and you had a map of Alabama or some part of Alabama

13    up, using the Maptitude program to look at whatever level of

14    geography you were looking at -- census tracts, or census

13:34:08 15    blocks, or VTDs, or whatever it was?

16    A    Yes.

17    Q    And you would have displayed on your computer as you

18    looked at -- I'm just going to say a census tract.  You can

19    correct me if you need to.

13:34:23 20        As you looked at a census tract, for example, you would

21    have displayed on your computer information telling you how

22    many African-Americans lived in that unit, did you not?

23    A    I would have access to that, but I did not use that

24    information at that level of detail.  But if I wanted to know

13:34:46 25    how many African-Americans were in a particular precinct or

census block, I could have queried it for that purpose.

       MR. DAVIS:  Excuse me.  Your Honor, I forgot to get the headphones that I use.  May I walk up?

       THE COURT:  Certainly.

13:35:00        MR. DAVIS:  Thank you.

       THE COURT:  Certainly.

       MR. DAVIS:  I'm so sorry.

BY MR. WALKER:

Q   Do you remember when you were deposed, and I asked you 13:35:17 what PL data you had displayed?

A   Not specifically, no.

Q   Okay.  Let's look at Page 45 of your deposition.

       And I asked you:  Let me ask the question this way: Typically -- and I understand there may have been exceptions 13:35:53 when you wanted to bore down or something like that, but typically, what PL data did you have displayed?

       You said population, voting age population, minority population, African-American single race, African-American any part, by total population and voting age population, Latino 13:36:11 population, voting age and total population.  So, you know, maybe a dozen categories or so.

       Now, I assume that as you were going about looking at districts, you were looking for districts that had whatever your criteria was -- enough African-Americans at that time to 13:36:34 put them into one of your majority black districts; is that

1  right?

2  A   Well, I was not looking for districts or blocks on an

3  individual level.  What I was trying to do was work at the

4  county and VTD level.  And I did have information about the

13:36:50 5  population in the districts as I was drawing them available if

6  I queried.

7      But oftentimes I would just have a map up there.  And knew

8  that I had to add population to District X or District Y.  And

9  so I was just adding the data and not even paying attention to

13:37:10 10  exactly what the percentage of African-Americans might have

11  been at each click of a mouse.

12  Q   So your testimony is that you went about building two

13  African-American districts by not looking at the percentage of

14  African-Americans you were putting in those districts?

13:37:26 15  A   Well, no.  I looked at it on occasion, but I was not

16  constantly looking at it.

17  Q   Okay.  And when you found a district or -- excuse me -- a

18  VTD -- if that's the level you were looking at -- that had

19  enough African-Americans, you would put it into one of your two

13:37:42 20  proposed districts, did you not?

21  A   No.

22  Q   You did not?

23  A   I was not -- I was not querying each VTD as I clicked it

24  in.  And I did not have some sort of a numerical guideline that

13:37:59 25  would suggest to me that this precinct has to go into District

1  2 and that one cannot.

2      I was looking at other things like the VTD boundaries and

3  county boundaries and municipal boundaries and the overall

4  shape of the district.

13:38:15 5  Q    Okay.  We'll get back to that.

6      Before you started your work, or as you started, you read

7  the Alabama definition of communities of interest, didn't you?

8  A    Yes, I did.

9  Q    Okay.  But you didn't talk to anybody about actual

13:38:39 10  communities of interest in Districts 1, 2, 3, or 7 before you

11  started drawing, did you?

12  A    My assessment was that I prepared the illustrative plans,

13  and those plans were viewed by the plaintiffs.  And --

14          THE COURT:  Just a minute, Mr. Cooper.  That was not

13:39:02 15  the question.  If you would, please, listen to the question and

16  answer it as directly as you can, please, sir.

17          THE WITNESS:  Right.

18          THE COURT:  Did you talk to anybody about communities

19  of interest in those districts before you drew them I think was

13:39:16 20  the question.

21  BY MR. WALKER:

22  Q    I'm sorry.  Did you say no?

23  A    Well, no, not to an individual voter anywhere, no.

24  Q    You did not talk to anybody, did you?

13:39:24 25  A    About this particular case and these particular

illustrative plans, no.  I have had other involvement in

Alabama in other cases.

Q     Okay.  Thank you.

       And the need to find enough black persons to put into

13:39:43  District 2 and 7 or 2 explains why you split Mobile; is that

correct?

A      There are a variety of ways to split Mobile.  But because

more than 100,000 African-Americans live in the city of Mobile,

I do believe that Mobile County would have to be split to

13:40:04 create the second majority black district.

Q      And in every one of your plans, you split Mobile to ensure

that 100,000 African-Americans that live in Mobile County were

put into District 2; is that correct?

A      No.

13:40:17 Q      That's not?

A      No.  I wanted to include the bulk of the African-American

population in or around Mobile city, but I was not shooting for

a numerical tabulation of that population.  So I don't know

what the underlying totals are for the numbers of

13:40:41 African-Americans living in Mobile in District 2 in my plans

right off the top of my head.

Q      Well, do you recall testifying that there was 100,000

people -- African-Americans -- in Mobile that you needed to put

into District 2?

13:40:55 A      Well, I don't think I said I needed to.  I just said

1 that's the number because I'm sure I didn't include them all.

2 Q    Okay.  And when you drew your plans, you didn't know, did

3 you, that Alabama has never split up Mobile in a congressional

4 plan?

13:41:20 5 A    I knew it had not been split in the plans developed in the

6 '90s and 2000s, but I have not seen the plans going back

7 further in time.  I have since seen some exhibits that you've

8 presented to the Court for this trial that go back to like the

9 1950s and before, and I don't think Mobile is split.

13:41:45 10 Q    Is it your understanding that Alabama has at any time

11 split the county of Mobile in traditional -- in congressional

12 redistrictings?

13 A    I don't know that for a fact.

14 Q    And you didn't know that when you started drawing the

13:42:04 15 plan; isn't that correct?

16 A    Didn't know what?

17 Q    I'll show you page 56 of your deposition and ask you:  Do

18 you know whether or not Alabama has traditionally considered

19 Mobile County to be a community of interest that it did not

13:42:21 20 split when drawing congressional districts?

21       MR. SPIVA:  Sorry to interrupt, Your Honor.  I have an

22 objection actually to this.  There's no question or answer that

23 he could be --

24       THE COURT:  I would sustain.

13:42:33 25 BY MR. WALKER:

1    Q    Let me ask the question again:  Did you know when you

2    started drawing the districts that Alabama considered Mobile

3    County a community of interest that it has never split when

4    drawing congressional districts?

13:42:49 5    A    Well, I said I do not know that, and I said I did not know

6    that today.  I've seen some congressional maps, historical maps

7    where Mobile was not split.  But when you say --

8    Q    You've answered my question.

9    A    Well, okay.  Alabama can be defined in many different

13:43:07 10    ways.

11            THE COURT:  You've answered the question.  Thank you.

12    BY MR. WALKER:

13    Q    And do you know whether or not Alabama has traditionally

14    kept Mobile and Baldwin County together in the same

13:43:32 15    congressional district since the 1970s?

16    A    I am aware of that.  Prior to '70s, sometimes Baldwin

17    County was in a separate district.

18    Q    And what was the difference between before the '70s and

19    after the '70s?  Do you know?

13:43:48 20    A    No.

21    Q    Well, isn't it true that before the '70s we had eight

22    congressional districts and after the '70s we had seven?

23    A    I believe at one time you had nine.  I don't know when the

24    change was made, though.

13:44:01 25    Q    Okay.  Do you know whether or not since 1970 Alabama has

```
 1  ever split Auburn County and Mobile County apart in different

 2  congressional districts?

 3  A    As far as I know, Alabama Legislature has not split that

 4  two-county region.

13:44:22 5  Q    Okay.  But for you, you split them because you needed to,

 6  to create a second majority black district; is that correct?

 7  A    I believe that one would have to divide Mobile County in

 8  order to create the second majority-minority district or second

 9  majority black district.

13:44:50 10  Q    Let me show you what is Revised Plan Number 1, and this is

11  from Exhibit 63.  And I just want to say:  What community of

12  interest is being kept whole here?  You divide the city of

13  Mobile, do you not?

14  A    I believe it is divided.

13:45:22 15  Q    And you divide the County of Mobile, and you divide some

16  other cities, do you not?  Do you divide Semmes, for example?

17  A    Not sure right off the top of my head.

18  Q    You don't know?

19  A    I was following precinct boundaries, so possibly.

13:45:37 20  Q    So the answer is you don't know?

21  A    I don't know.

22  Q    And this is Revised Plan Number 2.

23            THE COURT:  What exhibit is that, Mr. Walker?

24            MR. WALKER:  Ma'am?

13:45:57 25            THE COURT:  What exhibit number?
```

            MR. WALKER:  I'm sorry.  It's Exhibit 69.  Plaintiffs'

Exhibit 69, Your Honor.

            THE COURT:  Thank you.

BY MR. WALKER:

Q     And District 2 is which color?

A     Yellow.

Q     The yellow.  Okay.

      How did you decide where to go as you cut back and forth

between District 1 and District 2?

A     Almost exclusively on precinct boundaries.  Except, as

I've indicated, I did split three precincts right off of I-10

and U.S. 98 interchange there to ensure that District 1 in

Baldwin County was contiguous with District 1 in Mobile County.

Q     Well, isn't it the fact that you put most of the blacks in

Mobile County inside District 2, and most of the whites in

Mobile County in District 1?

A     Well, it varies from plan to plan, so I'd have to take a

look at the data.

Q     Well, admitted that the percentages vary on every plan,

but in every plan your intention was to divide Mobile County so

that you could put the majority black population into District

2 and the majority white population into District 1; is that

correct?

A     No.  My objective was to unite the African-American

community in south Alabama into a single majority black

district.  So I was not just thinking about Mobile County.

Q    Okay.  And is it your testimony that the lines that I'm

showing you here, the division between District 1 and District

2, does not divide the county of Mobile along race?

13:47:49  A    Not -- it depends on the precinct.  I mean, there's

certainly majority white precincts in District 2.

Q    No, no.  I'm asking about -- I'm not asking about

precincts.  Please pay attention to my question, sir.

Within Mobile County, where are the majority of

13:48:08  African-Americans on this map?

A    Well, I think --

Q    Are they in District 1 or are they in District 2?

A    I think it's -- the majority -- I would need to go to the

data sheets.  But most likely, there are more African-Americans

13:48:21  in District 2 and Mobile County than in District 1.  But I'm

not --

Q    Mr. Cooper, you testified this morning that Mobile was one

of the African-American population centers that you needed to

put into a majority black district, did you not?

13:48:38  A    Well, that's right.

Q    Okay.  And that's exactly all -- my point simply is that's

exactly what you did in each one of your plans?

A    But I don't have the numbers in front of me.

Q    I didn't ask you the numbers.

13:48:49  A    Well, okay.  I don't know what you said then.  Say it

1  again.

2  Q    In each one of your plans in Mobile County, you put more

3  African-Americans in District 2 than you put in District 1; is

4  that correct?

13:49:03  5  A    I think that is correct, yes.

6  Q    You know it's correct, don't you?  That was your job.

7  A    No.  It was not my job.  My job was to draw a majority

8  black district in addition to the existing District 7.  And it

9  was not focused solely on Mobile.  It was to pay attention to a

13:49:22 10  community of interest that has historical significance linking

11  African-Americans in Mobile to other parts of south Alabama.

12  Q    What do --

13  A    But I will agree that I probably did.  If we went to the

14  data sheet, I could tell you the percentages.  And I probably

13:49:38 15  did put more African-Americans in Mobile County into District

16  2, but I also left out many thousands, as well, who remain in

17  District 1.

18  Q    And you put the majority of whites in District 1, didn't

19  you?

13:49:54 20  A    Probably.

21  Q    Yeah.  You know you did, don't you?

22  A    Well, let me be clear.  There's nothing wrong with doing

23  that in a Section 2 lawsuit.  That's common.

24  Q    I didn't say you did anything wrong.  I just asked you a

13:50:11 25  question.

1  A    Well, I just want to clarify that.

2  Q    Okay.  So are we agreed you put the majority of blacks in

3  District 2 and the majority of whites in District 1 in Mobile

4  County in all four of your plans?

13:50:27  5  A    Again, without looking at the data, I will agree.  But I

6  would like to confirm that.  But it's in the -- I think you've

7  got some tables that may sort of reflect that even though

8  you're using a different definition of African-American.

9  Q    And what community of interest were you respecting in

13:50:47 10  Mobile County?

11  A    In Mobile County, I was endeavoring to respect your

12  guidelines which say that a community of interest is defined as

13  an area with recognized similarities of interests, including

14  but not limited to racial, ethnic, geographic, governmental,

13:51:16 15  regional, social, cultural, partisan, or historic interest.

16      Therefore, I think including Mobile County and a

17  predominantly black part of Mobile County in a district that

18  extends into the Alabama Black Belt and on into Montgomery

19  County, which is part of the Black Belt, is appropriate because

13:51:35 20  it's following your guidelines.

21  Q    So in order to draw a majority black district that linked

22  African-American communities separated around the state into

23  one district, you split up Mobile city and Mobile County; is

24  that correct?

13:51:52 25  A    Well, I've already said -- I've already answered that

```
 1  question.  It is necessary -- if you're going to create a
 2  second majority black district in Alabama, you have to include
 3  the black population in the city of Mobile or in Mobile County
 4  in general because part of the black community in Mobile County
```
13:52:09 5  actually doesn't live in the city of Mobile.  It's outside.
```
 6  Q    I am going to take that as a yes, okay?
 7  A    Well, I've said that at the outset.
 8  Q    Okay.
 9  A    I said that in my deposition.
```
13:52:19 10  Q    And is preserving the cores of existing districts also a
```
11  traditional districting criteria?
12  A    I would say no.
13  Q    You would say no?
14  A    I would say no.
```
13:52:29 15  Q    Okay.  Is it your testimony that in order to draw a
```
16  majority black district you cannot preserve the cores of
17  Districts 1, 2, 3, and 7?
18  A    Districts 1, 2, 3, and 7, as drawn in the 2000 plan and
19  the 2011 plan, in my opinion, cracked African-American voting
```
13:52:56 20  strength.
```
21  Q    And let me --
22  A    And for that reason --
23       THE COURT:  Wait, wait, wait, Mr. Cooper.  Please, if
24  you would, answer the question that's asked of you.
```
13:53:05 25       THE WITNESS:  Okay, sorry.

1          THE COURT:  Mr. Spiva will have opportunity to
2    question you again.  So if you would just answer the question
3    that's asked, we'll be able to move along much faster.
4    BY MR. WALKER:
13:53:18 5    Q    Mr. Cooper, is it your testimony that there's no way to
6    preserve the cores of Districts 1, 2, and 3 as they existed at
7    the time the legislature was drawing the districts and also
8    create a second black majority district?  You might want to
9    look at the answer you gave in your deposition.
13:53:38 10   A    Well, I would say there's probably not a way to -- in a
11   numerical -- from a numerical perspective, but I would have
12   to -- let me refer to my deposition.  Maybe I had a
13   different --
14   Q    Well it's right there in front of you.  You said, "That is
13:53:54 15   true, I believe.  And I would also throw in District 3 partly
16   because it goes into Montgomery County," because I had only
17   asked you about 1, 2, and 7.
18   A    Okay.  Well, isn't that what I just said?
19   Q    Thank you.
13:54:10 20        Let's talk about compactness for a second, please,
21   Mr. Cooper.
22        And you testified about Reock and Polsby-Popper scores as
23   a basis for demonstrating, I think, that the districts you drew
24   are compact in comparison to the districts the state of Alabama
13:54:42 25   drew.  Did I understand your testimony correctly?

1  A    Yes.

2  Q    And in your testimony you compared the state board of

3  education districts and the congressional districts, right?

4  A    There are figures for the Reock scores that include both

13:54:59  5  the 2011 congressional plan, as well as the 2011 board of

6  education plan.

7  Q    I think the answer is just yes, you did?

8  A    Yes, I did.

9  Q    And those are different jurisdictions, aren't they?

13:55:09 10  A    They are different governing bodies, yeah.  Alabama --

11  Q    And they have a different number of members, don't they?

12  A    One is eight; the other is seven.

13  Q    And I don't see anywhere in your report where you opined

14  that the demands and expectations of a member of the state

13:55:28 15  board of education are any way congruent or similar to the

16  demands and expectations of a member of Congress.  Am I correct

17  on that?

18  A    I'm not a political scientist, so I wouldn't opine on

19  that.

13:55:40 20  Q    And you are not offering an opinion on that?

21  A    No.

22  Q    Okay.  Well, let's look at your Plaintiffs' Exhibit 45.

23  And I want to just ask you about District 1.

24        And under the 2011 plan, the Reock score for District 1 is

13:56:07 25  42.  And your Reock scores in your illustrative plan, in

1  Illustrative Plan 1, District 1 is 21; in illustrative plan 2,

2  District 1 is 21; in Illustrative Plan 3, District 1 is 20; in

3  Illustrative Plan 4, District 1 is 25.

4      So all of your District 1s are significantly less compact

13:56:29 5  than the existing District 1; is that correct?

6  A    By about 15 percentage -- by about 15 hundredths of a

7  percentage point, right.  Of a point, yeah.

8  Q    And if we look at District 2, it's 49 in the 2011 plan; 35

9  in your Illustrative 1 Plan 1; 27 in your Illustrative Plan 2;

13:56:54 10  33 in your Illustrative Plan 3; and 24 in your Illustrative

11  Plan 4; is that correct?

12  A    That is correct.

13  Q    Okay.  And if we look at 3, it's 36 in Illustrative Plan

14  11; it's 35 in illustrative plan -- excuse me.  It's 36 in the

13:57:15 15  2011 plan.  I'm sorry.  It's 35 in Illustrative Plan 1; 46 in

16  Illustrative Plan 2; 26 in Illustrative Plan 3; and 34 in

17  Illustrative Plan 4; is that correct?

18  A    Yes.

19  Q    So the three districts of southern Alabama are all more

13:57:39 20  compact in the 2011 plan than they are in your plans?

21  A    No, that's not true.

22  Q    Okay.

23  A    If we go back, we have to go back to the exhibit and point

24  out one district that is actually more compact in the

13:57:53 25  illustrative plans under the Reock score.

| | |
|---|---|
| 1 | Q     One, yes. |
| 2 | A     And it also has to be gauged on a statewide basis, but... |
| 3 | Q     When you calculated your means, you were doing the -- you |
| 4 | were averaging all seven districts, weren't you? |
| 13:58:10  5 | A     Right. |
| 6 | Q     And you made very few changes to the districts of north |
| 7 | Alabama relative; is that correct? |
| 8 | A     No, that's not correct.  I kept District 5 in the extreme |
| 9 | north along the Tennessee River almost the same, but District 4 |
| 13:58:24 10 | changes as -- |
| 11 | Q     Are you saying it changed as much as you changed the other |
| 12 | districts? |
| 13 | A     Probably. |
| 14 | Q     All right.  Let's look at your Polsby-Popper scores. |
| 13:58:47 15 | THE COURT:  Do you know what exhibit that is? |
| 16 | MR. WALKER:  That is, Your Honor, still part of |
| 17 | Exhibit 45. |
| 18 | BY MR. WALKER: |
| 19 | Q     And in the 2011 plan, the Polsby-Popper score is 16 or |
| 13:59:00 20 | .16.  In your Illustrative Plan 1, it's .14.  In your |
| 21 | Illustrative Plan 2, it's .13.  In your Illustrative Plan 3, |
| 22 | it's .16.  And in your Illustrative Plan 4, it's .13. |
| 23 | Now, that indicates that as Polsby-Popper calculates |
| 24 | compactness, the 2011 Plan 1 and your Illustrative Plan 3 Plan |
| 13:59:32 25 | 1 are equally compact; is that correct? |

1    A     That is correct by the Polsby-Popper score.

2    Q     Okay.  So I just want to say:  Who would think that these

3    two plans are as compact if they were actually driving around,

4    or working, or trying to represent those districts?

13:59:55 5    A     Well, you have a very odd intrusion into Clarke County.

6    So it might be hard to find your way around Clarke County.  I

7    don't have an intrusion like that.

8        But the District 1, as drawn in Revised Plan 3, is based

9    on whole counties from Baldwin to Houston and Henry.  There's

14:00:26 10    nothing unusual about it.  It's easy to understand.

11    Q     Well, you seem to think whole counties are important --

12         THE COURT:  Wait, Mr. Walker.

13         MR. WALKER:  I'm sorry.

14         THE COURT:  For purposes of the record, I need to know

14:00:35 15    what exhibits these two are that you have placed on the screen.

16         MR. WALKER:  I'm sorry.  I put on the plaintiffs' map

17    of Revised Plan 3, which is Plaintiffs' Exhibit 73; and the

18    plaintiffs' map of the U.S. House 2011 plan, which is

19    Plaintiffs' Exhibit 15.

14:00:55 20         THE COURT:  Okay.  Thank you.

21         MR. WALKER:  Yes, ma'am.  Sorry.

22    BY MR. WALKER:

23    Q     Do you remember testifying in your deposition that the

24    state of Montana probably had a perfect Reock score?

14:01:15 25    A     I may have -- I may have said that sort of in jest I guess

because it's more of a square instead of a circle.  It's not --
it doesn't score quite as high.

Q    But it's not a compact in any sense that a person
representing that district would recognize, is it?  I mean, if
14:01:32 5  you were to drive across the state of Montana, or ride your
horse or walk across it, you wouldn't say, my, this is a
compact state?

A    Well, the Reock score is more than just a score that takes
into account population density.  It also takes into account
14:01:48 10  the shape of the district.

Q    Right.  I didn't ask you anything about population
density.  But I guess my point is that the Reock score is
ultimately just a ratio; is that correct?

A    Yes.

14:01:58 15  Q    Yeah.  And it doesn't tell us anything about how
serviceable a district is for the constituents or for the
representative, does it?

A    I tend to agree with that.  I think you need to look at
the map itself and make a visual assessment.  I look at Revised
14:02:15 20  Plan 3 and see no problems at all.

Q    And you have drawn in each one of your maps District 1
that stretches from Mobile County to Houston County.  And I
understand from the fact that you've included that same basic
structure in each one of your maps to mean that you do not
14:02:33 25  believe there's any other way to draw two majority black

 1  districts without drawing District 1 to stretch from Mobile
 2  County to Houston County?
 3  A    Well, that's -- that's not exactly the case because I
 4  suspect that you could have put Pike and Crenshaw into District
14:02:58  5  1.  I didn't try to do that, but I'm sure you could have.
 6  Whether you could have still done that and -- I'm sure you
 7  could have kept the counties whole.  So I didn't try that
 8  option.
 9      This is just an illustrative *Gingles 1* plan, not a
14:03:12 10  remedial plan.  And I would certainly think the plaintiffs
11  would be open to reconfiguring Districts 1 and 3.
12  Q    But you didn't present -- your purpose was to show the
13  Judge the possibility of drawing two majority black districts.
14  And in each one of your plans, all of your District 1s go from
14:03:27 15  Mobile to Houston County; is that correct?
16  A    No.  That's -- well, yes, that's true.  That's true.  But
17  I would -- I wish to point out that that may not be necessary.
18  Q    Do you think that when you draw a district it's important
19  to consider how functional that district will be for the
14:03:55 20  representative, for the man or woman who's representing that
21  district, the ability that they have to get around and meet
22  their constituents?
23  A    Yes.  That's why I was very careful to follow precinct
24  lines and draw reasonably well-shaped compact districts.
14:04:13 25  Q    And do you think it's important to draw a district where

```
 1  the constituents in the district can reasonably get to their
 2  representative?
 3  A      To the extent possible, yes.  Alabama is a big state.
 4  Q      Is it your testimony that the districts that you have
 5  drawn for District 1 is a district that could function in any
 6  real sense for an Alabama representative?
 7  A      Absolutely.
 8  Q      How would you get from Mobile to Houston County?
 9  A      You would either go via I-59 and then take state routes
10  into the Houston-Dothan area, or you could, say, from Fairhope
11  drive via I-10 and then up through the panhandle of Florida to
12  Dothan.  Either trip would take about three hours by car.
13  Q      And you -- what's your basis for saying three hours?
14  A      I checked it on Google Maps.
15  Q      That's funny.  When I checked, Google said four.
16  A      You may have checked early this morning.  You checked
17  traffic at 9:00 a.m. during rush hour.
18  Q      So --
19              THE COURT:  Not in Escambia County.
20              THE WITNESS:  Well, coming out of Mobile probably.
21  But I will concede there may be differences in the times.  I
22  was doing it midday.
23  BY MR. WALKER:
24  Q      So your testimony is that to get from Mobile you would
25  drive through Florida on Highway 10 to somewhere below Houston
```

Time stamps in left margin: 14:04:37 (line 5), 14:05:01 (line 10), 14:05:21 (line 15), 14:05:33 (line 20), 14:05:47 (line 25)

```
 1  county and then cut up, I guess, on 231?
 2  A    Yes.  It's a U.S. highway.  I mean, I did it on Google
 3  Maps.
 4  Q    Yeah.
 5  A    It's a little bit -- it's right at three hours.
 6  Q    And that's the best way for that representative to get
 7  around in that district?
 8  A    That's one way.  I think it might add 10 minutes or so if
 9  you drive up to I-65 and then take another route to Houston.  I
10  don't have all the map -- all the U.S. highways displayed on
11  the map.
12       But a three-hour trip is not out of the ordinary in
13  Revised Plan 3, nor is it out of the ordinary in existing 2011
14  plan involving other districts, of course.  But certainly other
15  representatives in the state have to travel --
16  Q    Sir, if you go from Mobile to Dothan and you wanted to --
17            THE COURT:  Wait a minute.  Wait a minute.  I keep
18  hearing some mumbling over there about letting him answer the
19  question.
20       If he were answering the question, that would be one
21  thing.  But he's not.
22       So again, Mr. Cooper, this is not a platform for you to
23  just run and say whatever you want to, especially on
24  cross-examination.  You need to listen and answer the direct
25  question that's asked as directly as possible.
```

```
 1              THE WITNESS:  Okay.  I apologize.

 2              THE COURT:  I know it's hard.

 3              THE WITNESS:  He's trying to corner me into a

 4    yes-or-no answer where there's ambiguity.  That's the problem.

 5    But I will try.

 6              MR. SPIVA:  Your Honor, I just want to be clear.  We

 7    weren't saying anything about letting him answer.  I didn't

 8    know if you thought we were saying that.  I just wanted to be

 9    clear.

10              THE COURT:  Well, I just kept hearing something over

11    there being mumbled.

12              MR. SPIVA:  Sorry.  We were probably whispering to

13    each other.  We weren't saying that.  I didn't want you to

14    think we were being rude.

15              THE COURT:  Okay.  And also any objection needs to

16    come from Mr. Spiva, not from someone else.

17              MR. SPIVA:  Of course, Your Honor.

18              THE COURT:  Oh, okay.  I'm sorry.  It's Christina.

19    All I heard was a female voice, and I thought I saw some lips

20    moving there.  I apologize.

21         But the point is very well taken by Ms. Christina.  She

22    cannot get down any testimony when both the attorney and the

23    witness are speaking at the same time.  So let's try to avoid

24    that as much as possible.

25         Okay.  All right.  We got the rules down now?  Only one
```

1   talk at a time, and answer the question that's asked, okay?

2          THE WITNESS:  I will immediately stop when Mr. Walker

3   says something even if I'm in mid sentence.

4          THE COURT:  Okay.  That will be good.

14:08:23 5          MR. WALKER:  Thank you, Your Honor.

6   BY MR. WALKER:

7   Q    So you would agree with me that if a representative

8   travels to Mobile from Dothan via U.S. Interstate 10, she or he

9   is not going to be meeting with any of her constituents along

14:08:36 10   the way?

11   A    I don't know that for a fact.

12   Q    Well, they would have --

13          THE COURT:  Would a congress person for District 1

14   have constituents in Florida?

14:08:52 15          THE WITNESS:  They could be meeting halfway.  I

16   just --

17   BY MR. WALKER:

18   Q    So if a representative wanted to travel from Mobile to

19   Dothan, or vice versa, within her or his district, do you know

14:09:11 20   how they could do that on the existing roadway?

21   A    From Mobile to Dothan?

22   Q    Yeah.

23   A    Yes.

24   Q    Could you show the Court?

14:09:19 25   A    Well, I mean, I could show my Google Maps.

```
 1  Q     Okay.
 2            MR. WALKER:  Your Honor, may I approach?
 3            THE COURT:  You sure may.  Is that an official Alabama
 4  state map?
 5            MR. WALKER:  This is an official Alabama highway map
 6  that I retrieved from the Department of Transportation last
 7  week.
 8            THE COURT:  Okay.
 9            THE WITNESS:  Whether I can show it on this map, I
10  don't know.
11  BY MR. WALKER:
12  Q     Well, this is the highway road map for the state of
13  Alabama.
14  A     Right.
15  Q     So if you would please take this highlighter and trace the
16  route that your representative would travel from Mobile to
17  Dothan in the district that you designed for that person.
18  A     Well, it's a three-hour trip according to Google Maps, and
19  I did not, you know, save that route.  It would, I believe, go
20  up I-65 probably to --
21  Q     Just trace it out with the highlighter I gave you, please,
22  sir.
23  A     Okay.  This may not be the Google Maps route.  But I'm
24  nervous, so I'm shaking because I don't like to speak in
25  public.
```

Timestamps: 14:09:29 (line 5), 14:09:38 (line 10), 14:09:47 (line 15), 14:10:12 (line 20), 14:10:35 (line 25)

1       So here we are on I-65 up to roughly Evergreen.  You get

2   on 84 and go to Andalusia, stay on 84.  Go through Enterprise

3   maybe on a state route where you might stay on 84 and go to

4   Elba, and then through Daleville, and right into Dothan hitting

14:11:05  5   State Route 53, or maybe it's U.S. 231 on the north side of

6   Dothan -- Dothan.

7       I mean, that's just my guess.  It's probably not the

8   optimal map as calculated by Google Maps.  I see no trouble

9   with that.  Congressional representatives all over the country

14:11:23 10   have to travel those distances.

11  Q    We're concerned with Alabama.

12       And I will show you what I got from Google Maps, which

13  says that it takes 3 hours and 52 minutes.

14  A    And when did you do that?  I can't ask him that, right?

14:11:38 15  Q    During the day.

16  A    Yeah.  Well, there are two different routes.

17       So we'll just have to agree to disagree on that.

18  Q    Thank you, sir.  Not much more.

19       Do any of your plans keep the entirety of the historical

14:12:34 20  Black Belt in the same district?

21  A    They do not.  Although Illustrative Plan 2 puts all of the

22  Black Belt in one or the other.

23  Q    You testified earlier that there were enough

24  African-Americans in Congressional Districts 1, 2, or 3 to form

14:13:03 25  almost all of a congressional district by total population; is

```
 1  that correct?

 2  A    Yes.

 3  Q    But you also have to consider where that population lives

 4  in order to draw a district that complies with historical --

 5  with traditional districting criteria; is that correct?

 6  A    Yes.

 7  Q    Okay.

 8            MR. WALKER:  Your Honor, may I have just one moment?

 9            THE COURT:  You may.

10  BY MR. WALKER:

11  Q    What community of interest, Mr. Cooper, are you observing

12  by connecting rural Mobile County and Houston County?

13  A    It is including a predominantly rural area in Mobile

14  County with a predominantly rural area further east.

15  Q    Any others?

16  A    I think I could say that's probably the -- primary

17  community of interest, although part of Mobile County is

18  suburban.  But that would be one key link there is that is a

19  part of Mobile County that is more rural.

20            MR. WALKER:  Your Honor, I move for admission of

21  Defendant's Exhibit 303, which is the map that was marked by

22  Mr. Cooper.

23            MR. SPIVA:  No objection, Your Honor.

24            THE COURT:  It's received.

25        And just for the record, I want to make sure his route was
```

Timestamps in left margin: 14:13:17 (line 5), 14:14:00 (line 10), 14:14:25 (line 15), 14:15:09 (line 20), 14:15:29 (line 25)

```
 1  marked with an orange highlighter; is that correct?
 2          MR. WALKER:  Orange highlighter, yes, ma'am.
 3          THE COURT:  Okay.
 4  BY MR. WALKER:
 5  Q    Your Plans 1 through 4, could the legislature pass those
 6  plans in 2020-2021?
 7  A    I have no idea.
 8  Q    Why not?
 9  A    Well, it's a speculative -- it's all speculative.  I don't
10  know.  I mean, I don't know what the politics would necessarily
11  be by this time next year.
12          But certainly if they did pass it, in my opinion it would
13  be considered a plan that was respecting traditional
14  redistricting principles.  It may be different than the 2011
15  plan, but it respects traditional redistricting principles.
16  Q    And you say that without knowing what the census data are
17  for 2020?
18  A    If it's like one of the illustrative plans, it's possible
19  that there would be some need to expand the two majority black
20  districts to pick up additional population even in a
21  seven-district plan, but I don't know that for a fact.
22  Q    Now, Dr. Cooper, you know that District 7 has lost
23  population over the last decade and is going to need tens of
24  thousands of people added to it, don't you?
25  A    I do not know that.
```

14:15:49 (line 5)
14:16:09 (line 10)
14:16:28 (line 15)
14:16:45 (line 20)
14:16:59 (line 25)

1    Q     You don't?

2    A     No, I don't.  Because it also includes in at least two

3    plans Tuscaloosa County, which is a fast-growing county.

4    Q     All right.

14:17:10  5              MR. WALKER:  That's all I have.  Thank you, Your

6    Honor.

7              THE COURT:  Any redirect?

8              MR. SPIVA:  Yes, Your Honor.  Just a little bit.

9                        REDIRECT EXAMINATION

14:17:17 10   BY MR. SPIVA:

11   Q     Mr. Cooper, you recall the questioning on cross-ex about

12   not preserving cores of districts.  Do you remember that?

13   A     Yes.  I remember that vague question.

14   Q     Okay.  Let me put up Plaintiffs' Exhibit 84, and

14:17:46 15   specifically page 4 of Plaintiffs' Exhibit 84.

16         And this is -- you recognize this, Mr. Cooper, as the

17   state reapportionment committee's guidelines on redistricting?

18   A     Yes.

19   Q     And do you remember we discussed on direct the communities

14:18:30 20   of interest definition I think you quoted in your report?

21   A     Yes.

22   Q     Does the report -- does the word "core retention" appear

23   anywhere in that guideline from the state reapportionment

24   committee?  Preservation of cores?  Anything like that?

14:18:47 25   A     No.  And --

  1          THE COURT:  You're referring to page 4 of that
  2     document; is that correct?
  3          MR. SPIVA:  That's right, Your Honor.  Page 4 of
  4     Exhibit 84.  Plaintiffs' Exhibit 84.  And maybe we could show
14:19:05  5  the first page of that, too, please, Heather.
  6          THE COURT:  You're referring to the criteria that
  7     begins on page 2?
  8          MR. SPIVA:  Actually it begins there, Your Honor, and
  9     it runs through to page 4, where it talks about the integrity
14:19:29 10  of communities of interest.
 11          THE WITNESS:  I don't see the word "core," but I may
 12     be overlooking something.
 13     BY MR. SPIVA:
 14     Q    Okay.  And did you review the rest of the -- these
14:19:41 15  guidelines when you were doing your report?
 16     A    I think I did at some point.  Some of them are obvious,
 17     like equal population, avoiding incoming conflicts.
 18     Q    And do you recall whether you saw core preservation
 19     anywhere in the 2011 Alabama Legislature reapportionment
14:20:04 20  committee guidelines?
 21     A    I don't recall seeing that, no.
 22     Q    And then you also recall on direct -- I'm sorry -- on
 23     cross-examination, you were asked about your use of the board
 24     of education plan as a reference point or point of departure.
14:20:23 25  Do you recall that?

1    A    Yes.

2    Q    And I think the question was something to the extent of

3    the board of education plan is -- you know, represents a

4    totally different constituency or interest than the

14:20:34  5    congressional plan.  Do you recall that?

6    A    I do recall that question.

7    Q    And if we can turn to page 2 of this document, Plaintiffs'

8    Exhibit 84, page 2.  And if we can kind of cull out Roman

9    Numeral IV.

14:20:55  10    And would you agree with me, Mr. Cooper, that this says

11    that these are criteria for congressional, legislative, and

12    state board of education districts?

13    A    Yes.

14    Q    And was it your understanding that these redistricting

14:21:11  15    principles that you were attempting to apply applied to all

16    four of those -- rather, say, all three of those types of

17    bodies?

18    A    Yes.  Although I don't think the legislature state board

19    of education plans required zero deviation, but --

14:21:32  20    Q    Okay.  I'm sure you recall the map exercise and the

21    questions about CD 1 stretching from the west to the east, I

22    take it.  Do you recall those questions in drawing the route?

23    A    I recall that, and there's nothing at all unusual about a

24    congressional district extending that distance.  You need only

14:21:56  25    to look to Congressional District 5 in Florida.

```
 1   Q    Well, let me also -- let me show you something in Alabama.
 2   So can we pull up Plaintiffs' Exhibit 15?
 3        That's the 2011 congressional plan, is it not?
 4   A    Yes.
 5   Q    And what length of the state does congressional --
 6   existing Congressional District 5 span?
 7   A    It goes the entire length of the state along the Tennessee
 8   line and cuts across the Tennessee River to pick up Morgan
 9   County.
10   Q    So it spans from the east to the west northern border of
11   Alabama?
12   A    Yes.
13   Q    And Congressional District 4, what's its span in the state
14   of Alabama?
15   A    The distances there are longer.  It extends east to west,
16   but also more northeast to southwest.  I know to go from -- I
17   think it's Sulligent up to Dekalb County is another three-hour
18   trip by car.
19   Q    From where to Dekalb?
20   A    Sulligent, which is in Lamar county not far from the
21   Mississippi line.  If you drive from that spot to the central
22   part of Dekalb County, it's a three-hour trip.
23   Q    Okay.
24   A    Essentially the same as driving from Mobile to Dothan,
25   because I'm in disagreement about the time involved.  It's not
```

```
 1  four hours all the time.  Put it that way.  Maybe during rush
 2  hour.
 3  Q    And you drive quite frequently, don't you, Mr. Cooper?
 4  You drove from your home in Bristol, Virginia to Birmingham,
 5  Alabama?
 6  A    I did.  I drove right through Districts 4, 5, 6, and a
 7  little piece of 3 in St. Clair.
 8            MR. SPIVA:  All right.  I have no further questions.
 9  Thank you.
10            THE COURT:  Any recross?
11            MR. WALKER:  No, ma'am, Your Honor.  Thank you.
12            THE COURT:  All right.  Thank you, Mr. Cooper.  You
13  may step down.
14       We haven't been going very long, but this might be a
15  logical place to take a quick little break.  How about
16  10 minutes?  And we will be back at 2:35.  How about that?
17  It's 10 minutes.  If you will have your witness in the stand,
18  please.
19            (Recess.)
20            THE COURT:  Plaintiff will call your next witness.
21            MS. KHANNA:  Thank you, Your Honor.  Plaintiffs call
22  Dr. Maxwell Palmer to the stand.
23                      MAXWELL PALMER,
24  having been first duly sworn by the courtroom deputy clerk, was
25  examined and testified as follows:
```

14:23:40   5
14:23:54  10
14:24:09  15
14:35:47  20
14:36:03  25

1          THE COURTROOM DEPUTY CLERK:  Please state your name

2     into the microphone for the record.

3          THE WITNESS:  Maxwell Palmer.

4                         DIRECT EXAMINATION

14:36:21 5     BY MS. KHANNA:

6     Q     Good afternoon, Dr. Palmer.

7     A     Good afternoon.

8     Q     You have been retained as an expert by the plaintiffs in

9     this case; is that correct?

14:36:28 10     A     Yes.

11     Q     And you've prepared two reports in the course of this

12     case; is that right?

13     A     Yes.

14     Q     In the notebook in front of you, you'll see two documents

14:36:40 15     marked Plaintiffs' Exhibit 79 and Plaintiffs' Exhibit 80.  Can

16     you please identify those exhibits for the Court?

17     A     The first exhibit is my expert report in this case, and

18     the second exhibit is my rebuttal report in this case.

19     Q     Thank you.

14:36:57 20          I just want to briefly ask some questions about your

21     background and expertise.  Can I direct your attention to page

22     25 of Plaintiffs' Exhibit 79, which is your first expert

23     report?

24          What is this document?

14:37:15 25     A     This is my CV.

Q    And is this a complete and accurate summary of your

educational background and professional experience to date?

A    It's complete as of March when I submitted my report.

Q    Okay.  Has there been any significant changes since March?

14:37:28 A    A few new publications.

Q    Anything in particular?

A    A book on local politics, and a new paper on political

careers.

Q    Thank you.

14:37:38    Can you briefly summarize your educational background?

A    I received a bachelor's degree in math and government and

legal studies from Bowdoin college in Maine, and a Ph.D. in

political science from Harvard University in 2014.

Q    And where are you currently employed?

14:37:53 A    I'm currently an assistant professor at Boston University.

Q    What classes do you teach at Boston University?

A    I mainly teach classes on American politics, including

introduction to American politics, and a course on Congress.

    I also teach classes on political methodology and

14:38:10 analysis, including a research design class for graduate

students, formal and game theory, and a new data science class.

Q    And what would you say are your principal areas of

research?

A    My main areas of research are Congress and redistricting,

14:38:26 political careers, and local and urban politics.

          1    Q    Dr. Palmer, have you been accepted as an expert witness in

          2    a United States court before?

          3    A    Yes.

          4    Q    So the cases -- those cases, I believe, are listed in

14:38:41  5    paragraph 6 of your initial report on Plaintiffs' Exhibit 79;

          6    is that right?

          7    A    Yes.

          8              THE COURT:  On which page, please?

          9              MS. KHANNA:  That would be page 2 of Plaintiffs'

14:38:56 10    Exhibit 79.

         11              THE COURT:  Thank you.

         12    BY MS. KHANNA:

         13    Q    And listed here is the case of *Bethune Hill*.  What kind of

         14    analysis did you perform in *Bethune Hill*?

14:39:06 15    A    I performed a racially polarized voting analyses, as well

         16    as an analysis of the degree to which race predominated in the

         17    drawing of House of delegates districts.

         18    Q    And do you know whether the Court credited your analysis

         19    in that case?

14:39:19 20    A    They did.  The Court cited it extensively in their

         21    opinion.

         22    Q    And what kind of analysis did you perform in the *Thomas v.*

         23    *Bryant* case?

         24    A    Mainly racially polarized voting analyses.

14:39:32 25              THE COURT:  Mainly racial what?

1              THE WITNESS:  Racially polarized voting.

2              THE COURT:  Okay.  You need to slow down just a little

3    bit so the court reporter can get all that down, please, okay?

4    BY MS. KHANNA:

14:39:43  5    Q    And did the Court credit your analysis in that case?

6    A    Yes.

7              MS. KHANNA:  Your Honor, I would like to now proffer

8    Dr. Palmer as an expert in redistricting and data analysis for

9    the Court.

14:39:56 10              MR. DAVIS:  No objection.

11              THE COURT:  Okay.  The Court recognizes Dr. Palmer as

12    an expert.

13              MS. KHANNA:  Thank you, Your Honor.

14    BY MS. KHANNA:

14:40:06 15    Q    Let's talk specifically about the work you performed in

16    this case.  What were you initially asked to do?

17    A    I was asked to evaluate the extent to which voting is

18    racially polarized in the first, second, third, and seventh

19    congressional districts under the map drawn in 2011.

14:40:22 20    Q    And what is racially polarized voting, as you understand

21    it?

22    A    As I understand it, racially polarized voting is when

23    members of different racial or ethnic groups -- when majorities

24    of those groups support different candidates.

14:40:40 25              For example, if a majority of black voters supports one

candidate and a majority of white voters supports a different

opposing candidate.

Q    Is it always the case that each racial group has a

preferred candidate?

14:40:53 A    Not necessarily.  It could be that a group is divided

among one or more -- two or more candidates.

Q    And does racially polarized voting mean that each racial

group votes only for those candidates of the same racial group?

A    No.  There's no requirement or -- there's no requirement

14:41:14 that members of each group vote for members of their own group.

Q    Were you able to draw any conclusions regarding the extent

to which voting is racially polarized in the areas that you

examined?

A    Yes.  I found strong evidence of racially polarized voting

14:41:33 in the first, second, third, and seventh districts, as well as

the -- those four districts altogether, which I call the focus

area in my report.

I find that African-American and white voters consistently

support different candidates.  On average, the African-American

14:41:50 preferred candidates win about 94 percent of the

African-American vote, but only 17 percent of the white vote in

the area as a whole.

Q    And across the elections that you examined, whose

preferred candidates generally prevailed?

14:42:02 A    In the focus area as a whole, white preferred candidates

1  generally won across 18 statewide elections that I looked at.

2  The African-American preferred candidate only won twice.

3  Q    And how about in congressional elections?

4  A    In the first, second, and third districts, white preferred

14:42:21  5  candidates won in every election I looked at.

6       In the seventh district, African-American preferred

7  candidates won in every election.

8  Q    Dr. Palmer, what was the geographic area that you

9  examined?

14:42:34 10  A    The geographic area was the first, second, third, and

11  seventh congressional districts, which I referred to as a whole

12  as the focus area.  I also include in the focus area a few

13  counties that are split between one of those four districts and

14  one of the other districts.

14:42:51 15  Q    Okay.  Can we please call up Plaintiffs' Exhibit 79,

16  Figure 1, which is on page 10.

17       Dr. Palmer, can you please explain to me what this figure

18  shows?

19  A    This is just a map of the congressional districts as drawn

14:43:08 20  in 2011 highlighting the four districts of my analysis.  And

21  then you can also see on this map some of the counties, such as

22  Jefferson County, that I include in the focus area as a whole,

23  because they're partially in one of these four districts.

24  Q    Dr. Palmer, what elections did you examine in the course

14:43:29 25  of your analysis?

A    I examined election results from the 2012, 2014, 2016, and
2018 general elections, as well as the 2017 special election
for U.S. Senate.  This includes both elections for U.S.
Congress, which we would call endogenous selections in an
14:43:51 analysis like this about congressional districts, and statewide
elections are exogenous elections.
Q    And what methodology did you use to use to analyze
racially polarized voting in the elections and areas that you
examined?
14:44:04 A    I used a statistical procedure called ecological
inference, which is often referred to as EI.
Q    And can you explain to us what EI is?
A    Ecological inference is a procedure that estimates
group-level preferences; that is, what percentage of the voters
14:44:22 of each group are voting for each candidate based on aggregate
data -- based on the data we're actually able to observe about
elections.
Q    So what kind of results does an ecological inference
analysis yield?
14:44:36 A    The ultimate result of an ecological inference analysis is
an estimate for each racial group of their level of support for
each candidate.

     An ecological inference is a procedure I run separately
for each election that I look at.  So it's not one analysis,
14:44:55 but many different ecological inference analyses conducted

1  here.

2      And besides the estimate, which is the mean or average

3  level estimated level of support for each group for each

4  candidate, it also includes a level of uncertainty.  In this

14:45:09  5  case, a 95 percent confidence interval.  And that tells us how

6  precise the estimate is.

7  Q    And what racial groups did you analyze in the course of

8  your analysis here?

9  A    I primarily focused on African-American and white voters,

14:45:23  10  but I also included a third category of other that includes

11  voters of all other groups.

12  Q    What voters would belong in the "other" category?

13  A    Hispanics, Asians, Native Americans, and the very small

14  percentage of voters who did not identify their race.

14:45:40  15  Q    And how did you determine the racial category into which

16  each voter would belong?

17  A    I relied on data from the Alabama Secretary of State

18  including reports about voter registration and when voters --

19  my understanding is that when voters registered to vote, they

14:45:56  20  identified their race on form.

21  Q    And do you have any understanding about how they

22  identified their race in their voter registration form?

23  A    They're instructed to check one of a few options,

24  including, black, white, Hispanic, Asian and Native American.

14:46:11  25  Q    So the voter self-identifies their race; is that fair?

1    A    That's right.

2    Q    And approximately how many voters qualified for that other

3    group that you mentioned?

4    A    In the focus area as a whole, it's about 3 percent of

14:46:27 5    registered voters.

6    Q    So what about the other 97 percent of registered voters?

7    A    They're either black or white.

8    Q    And, Dr. Palmer, you explain in your report that you did

9    two types of racially polarized voting analyses, a county-level

14:46:43 10   analysis and a precinct-level analysis.  Why did you perform

11   two analyses to examine this question?

12   A    Because of data availability.  And so we have a lot more

13   data for more years at the county level and less data at the

14   precinct level.  But it's useful to look at things both county

14:47:04 15   level and at the more granular precinct level.  We just have

16   more information to work with.

17   Q    Are they able to act as kind of a check on one another?

18   A    Yes.  I find essentially the same results in both sets of

19   analyses.

14:47:16 20   Q    So let's first talk about your county-level analysis.

21   What data did you use for that analysis?

22   A    So there's two main types of data used in the analysis.

23        The first is data on the registered voters, which for the

24   county level analysis comes from reports put out by the

14:47:34 25   Secretary of State at each election that report the number of

1   registered voters by race in each county.

2        And then the second type of data is county-level election

3   results.  That is the total number of votes received by each

4   candidate in each election in each county.

14:47:51  5  Q    So for your county-level analysis, you examined only the

6   focus area as a whole and not each individual congressional

7   district; is that right?

8   A    Yes.

9   Q    And why is that?

14:48:02  10  A    There aren't enough counties in the individual

11   congressional districts to do an analysis separately for each

12   one.  We need to have enough data, enough different counties,

13   different observations in each analysis to get a good estimate.

14   Q    So can you explain for us how you performed your

14:48:20  15  county-level analysis?  How did it proceed?

16   A    So after I put the data together, I run this algorithm

17   called ecological inference, which produces estimates of

18   support for each group, for each candidate.  And then I analyze

19   it in two different steps.

14:48:41  20        And the first step is I just look at each group alone and

21   I say, is this group cohesively supporting one candidate, or

22   are they split across the two major candidates?  And if they

23   were to be supporting one candidate, I can say they have a

24   candidate of choice in that election.  But if they're split and

14:48:58  25  divided between two candidates, I can't come to that

1    conclusion.

2         And then second, I look at the two groups, mainly blacks

3    and whites together and say, do they have the same candidate of

4    choice or different candidates of choice?

14:49:09  5  Q    So how do you determine from this analysis whether voting

6    in any particular election was racially polarized?

7    A    I consider it racially polarized when each group has a

8    clear candidate of choice and they are opposing candidates.

9    Q    Can we please put up Plaintiffs' Exhibit 79, Figure 2,

14:49:33 10  which is on page 11?

11        Can you explain to me what this figure shows?

12   A    This figure reports the county-level ecological inference

13   results.  And I'm going to go through it piece by piece because

14   it's a lot of different pieces here.

14:49:54 15       So on the left-hand side, the text lists each of the

16   different elections that I looked at.  And each one is a

17   separate ecological inference run of the model.

18   Q    So can we maybe just focus on the top, the first election

19   so you can walk us through what you looked at for each one?

14:50:10 20  A    Sure.  So the top election is the 2012 election for U.S.

21   President.

22        And what I first find looking at the results is that

23   African-Americans cohesively supported Barack Obama, and white

24   voters cohesively supported Mitt Romney.  And so that each

14:50:24 25  group has a different candidate of choice.

          1          And then on the right, the graph shows the percentage of
          2     each group voting for the African-American candidate of choice.
          3     So in this case, Obama.  The black circle corresponds to black
          4     voters, and the white circle to white voters.
14:50:40  5          And so what we see at the far right is that's the estimate
          6     for black voters voting for the black candidate of choice, and
          7     that's in the high 90s there.  And then the vertical lines
          8     around that dot are the confidence intervals.  So that's our
          9     measure of uncertainty from this estimate.
14:50:58 10          Then the white circle on the left is the percentage of
         11     voters -- of white voters voting for the black candidate of
         12     choice.  So white voters voting for Obama.  And that is less
         13     than 20 percent.  And those vertical lines around the circle
         14     are also a confidence interval for that estimate.
14:51:14 15     Q    Can you please explain what the competence intervals are
         16     and what they show?
         17     A    It's a measure of uncertainty.  And so the model produces
         18     an estimate that we think is the best -- the best estimate of
         19     support for each group and candidate, and that's represented by
14:51:32 20     the circle.  But there is some uncertainty to it.
         21          The model is run through simulations, and each simulation
         22     produces a slightly different result.  And so those lines show
         23     the bounds in which 95 percent of the estimates fall between
         24     those two lines.
14:51:44 25     Q    So we can be confident with 95 percent certainty that the

 1  actual vote share falls somewhere between those two lines?

 2  A    Given this model, yes.

 3  Q    And you mentioned, you know, the category here says "Black

 4  candidate of choice."  When you say "black candidate of

14:52:05  5  choice," do you mean the candidate who is black?

 6  A    No.  I mean, the candidate preferred by African-American

 7  voters.

 8  Q    And if we could zoom out from this one example to the

 9  figure as a whole.  I see at the bottom there's an asterisk,

14:52:18 10  and the asterisk is included in some elections.  Can you

11  explain what the asterisk is?

12  A    Is there a way for me to clear these circles?

13  Q    I'm sure there is.

14  A    So the asterisk here I just used to note which candidates

14:52:38 15  are, in fact, African-American and which ones are not.

16  Q    Okay.  Thanks.  We can pull that back up.

17       So what does Figure 2 tell us?

18  A    We see a consistent pattern across all 18 elections

19  ranging from 2012 to 2018.  If we look at the far right side,

14:52:56 20  we see high levels of support by black voters for their

21  candidate of choice.  They're highly cohesive in their voting

22  behavior across every election.

23       If we look at the white circles on the left, we see that

24  white candidates always have a candidate of choice, as well,

14:53:12 25  who is opposing the black candidate of choice.  They're

1    cohesive voting against the black candidate of choice.

2    Q    And is there a place in your report where we would find

3    the numerical values of the point estimates and confidence

4    intervals reflected on Figure 2?

14:53:28 5    A    Yes.  This is all in Table 1 on page 17.

6    Q    Can we please pull up Table 1?  That's Plaintiffs' Exhibit

7    79, page 17.

8         So can you please explain what the information on the

9    table provides?

14:53:46 10   A    So these are the numbers that I used to produce the figure

11   that we just looked at.

12        And so if we look at that top row again, we see the U.S.

13   presidential election 2012.  The next two columns identify the

14   black and white candidate of choice.  And then the next set of

14:54:04 15   columns give us the numbers of the percent of that group voting

16   for the black candidate of choice.

17        So here we see the numbers used to make the figure.

18   96.7 percent of black voters supported Obama.  That's our best

19   estimate.  The confidence interval goes from 92.8 to 99.0.

14:54:25 20        For white voters, 14.7 percent supported Obama, with a

21   confidence interval of 12.8 to 17.3 percent.

22   Q    And let's take a look at that other category, as well.

23        What does that other -- what do we learn from that other

24   category, with respect to the election you just mentioned?

14:54:39 25   A    Our best estimate is that 62.7 percent of voters in the

other category supported Obama, but with a very, very large

confidence interval from 30.6 to 91.8 percent.

So we learned relatively a little bit about them from this

analysis.  And that's because they are a very, very small

group, and they're scattered across this area as a whole.

They're not heavily concentrated in just a few places.

So it's hard to use ecological inference to learn very

much about their voting behavior.

Q    How do the other category fit into your county-level

analysis of racially polarized voting, if at all?

A    I'm focused on polarization between black and white

voters, who make up 97 percent of the registered voters in this

area.  Including -- the other group doesn't have to be split

out as a third group.  Another way of running EI is to include

them with the white group.  So that would be black voters and

everybody else.  Doing it that way makes no difference

whatsoever to my results or to the estimates.

Q    So what is the average estimated vote share of

African-Americans for their candidates of choice, as reflected

in Table 1?

          THE COURT:  Table 1, that's what you are talking about

here?

BY MS. KHANNA:

Q    So I guess what I'm asking --

          THE COURT:  I got the tables and the figures confused.

BY MS. KHANNA:

Q     Table 1 is up on the screen.  And I'm asking what is the average estimated vote share of African-Americans for their preferred candidate?

14:56:11  A     On average, African-American -- the African-American vote share for their preferred candidate is 94.1 percent.  And --

Q     And actually just to clarify for the Court, as well, Dr. Palmer, you got that average, I take it, from adding up the number under the word "black," all the numbers there, and then
14:56:29  dividing by the total number of elections; is that right?

A     Yes.

Q     And I think that's reflected -- that 94.1 percent figure is reflected on page 5, paragraph 20 in your report; is that right?

14:56:40  A     Yes.

Q     Thank you.  I just wanted to make sure to orient everyone.

       And what is the average estimated vote share of whites for the African-American preferred candidate based on the elections in Table 1?

14:56:51  A     16.7 percent.

Q     Dr. Palmer, based on this table, is it accurate to say that the white vote share for the black preferred candidate was lower when the candidate was African-American than when the candidate was white?

14:57:11  A     Yes.  The difference is about 6 percent.

1  Q    So what conclusions did you draw based on the estimates

2  depicted in Figure 2 and Table 1?

3  A    This county-level analysis shows a very high level of

4  racially polarized voting in the focus area.

14:57:31  5  Q    Okay.  So what further analysis did you do of these 18

6  elections after you determined that they demonstrated a high

7  level of racially polarized voting?

8  A    I then looked at the ability of African-American preferred

9  candidates to win elections in this focus area.

14:57:49 10  Q    Okay.  Let's please turn to Plaintiffs' Exhibit 79, Table

11  2, which is on page 18.

12       Dr. Palmer, what does this table show us?

13  A    So this table shows us the same 18 elections that I used

14  for the ecological inference analysis.  But I've just shown the

14:58:18 15  vote share of the black and white preferred candidates in the

16  focus area as a whole for each election.

17       So this is not the result of running a model.  It's just

18  simply adding up all the votes in all the counties in the focus

19  area.

14:58:31 20  Q    And just to be clear, when you mention the vote share in

21  the focus area, these are not the actual vote shares statewide

22  that the candidates received in these elections; is that right?

23  A    That's right.  It's just within the counties in the focus

24  area.

14:58:43 25  Q    And so what does Table 2 tell us?

```
 1  A    Table 2 shows us that generally the black preferred
 2  candidate is not able to win elections in the focus area.
 3  Across these 18 elections, the black preferred candidate only
 4  won twice.
 5  Q    And what can you tell us about those two elections in
 6  which the black preferred candidate was able to win within the
 7  focus area?
 8  A    The black preferred candidate was able to win in the 2012
 9  Supreme Court Chief Justice contest and the 2017 election for
10  U.S. senator.  In both of those elections, the white preferred
11  candidate was Roy Moore.
12  Q    So the only time that a white preferred candidate lost an
13  election in the focus area to the black preferred candidate,
14  that candidate -- the white preferred candidate was Roy Moore?
15  A    Yes.
16  Q    And just to clarify, are you saying that Roy Moore lost
17  both of these elections in which he ran?
18  A    No.  He lost the election for U.S. Senate.  But he did win
19  statewide the 2012 Supreme Court election.
20  Q    But among the voters in the focus area, he lost?
21  A    That's right.
22  Q    What, if anything, do you know about Roy Moore?
23  A    My understanding is he's a controversial figure in Alabama
24  politics.  He was removed from his position on the Supreme
25  Court in the early 2000s, and I think again later on.  And then
```

14:59:01 (line 5)
14:59:17 (line 10)
14:59:34 (line 15)
14:59:49 (line 20)
15:00:04 (line 25)

was a very controversial candidate for Senate in 2017.

Q    So then did white voters in the focus area reject Roy Moore?

A    No.  If we turn back to Table 1, we can see that in the Supreme Court election a majority of about 70 percent of white voters still voted for Roy Moore, and only 29 percent voted for the black preferred candidate.

        And in the U.S. Senate election, about 66 percent of white voters voted for Roy Moore, and only about 33.7 percent voted for his opponent.

        THE COURT:  I'm sorry.  Where do you see that on Table 1, which is page 17 of Exhibit 79?

        THE WITNESS:  It's highlighted now on the screen.  The vote shares for white voters for the black preferred candidate and then for Moore's -- for Moore's opponent in each of these elections.

        THE COURT:  Okay.  So you have to extrapolate from that those numbers the numbers you just gave me?

        THE WITNESS:  It's just 100 minus those numbers.

        THE COURT:  Right.

        THE WITNESS:  They always have to add up to 100 there.

        THE COURT:  Right.  I understand that.  But I didn't see the numbers that you gave on there.  So now I've got it.

        I appreciate it.  Thank you.

BY MS. KHANNA:

1  Q    Okay, Dr. Palmer, I want to move on from your county-level

2  analysis to your precinct-level analysis.

3       What do you mean by a precinct-level analysis?

4  A    So in the first analysis, our level of observation is the

15:01:44  5  county.  We have -- for every election, we have county-level

6  data on voters and county-level data on election results.

7       Here we're zooming into the precinct-level instead, going

8  from 45 counties to about 1,100 precincts.

9  Q    So what -- sorry.

15:02:01 10  A    We have data on voters at the precinct level and data on

11  election results at the precinct level.

12  Q    So why did you perform a precinct-level analysis?  What

13  additional information does this analysis provide?

14  A    There's two real advantages to it.

15:02:18 15       First, because we have far more observations than we had

16  before, we can now do analyses at the congressional district

17  level.  So instead of just reporting one set of results for the

18  focus area, I can produce results at each congressional

19  district separately.

15:02:33 20       Second, because we can look at just a congressional

21  district alone, we can also look at elections for U.S. Congress

22  in those districts, which we could not do in the focus area

23  because it spanned all of these districts together.

24  Q    And I think you mentioned that we have far more data

15:02:47 25  points available in the precinct-level analysis.  Approximately

how many data points are we looking at?

A    It's about 1,100 precincts across the full focus area.

Q    And what data did you rely on for your precinct-level analysis?

A    Again, I need two different sets of data -- one on voters and one on elections.  And so for elections, I use precinct-level election results for the 2018 elections from the Secretary of State.

And then for voters, it's a little bit harder because we don't have a simple count of voter -- registered voters by race in each precinct.  So instead I relied on a voter file also provided by the Secretary of State to calculate the number of actual voters in each precinct in the 2018 election by race.

Q    And what information is included in the voter file provided by the Secretary of State?

A    The voter file has a lot of information.  But what I relied on was the voter's self-identified race, their county, their voting precinct, and whether or not they voted in the 2018 election.

Q    And did you encounter any difficulties in performing the precinct-level analysis?

A    Yes.  This was a much more challenging data set to put together.

First, we had to use a voter file from January 3rd, 2019, instead of a report from election day in order to get the voter

history into the analysis; that is, in order to have -- in

order to know which voters -- which registered voters voted, we

needed to have that information reported to -- from the

counties to the Secretary of State.

15:04:23    And so the Secretary of State's office recommended that we

use a voter file from January for the analysis.

Q    And what was any other challenges that you encountered in

performing that precinct-level analysis?

A    Yes.  A second major challenge was after I knew -- after I

15:04:39 calculated the number of voters by race in each precinct, I had

to match the precinct-level data on voters to the

precinct-level election results.

    And this was surprisingly difficult in several counties

because the voter file might use numbers to identify each

15:04:55 precinct, but the election returns might use precinct names to

identify them instead.  And so I had to manually match them up

in many cases, and use the files provided by the Secretary of

State to do matching in other counties.

Q    So were you ultimately able to match all of the precincts?

15:05:09 A    No.  There were a small number of precincts in a few

smaller counties where I was not able to match up the precinct

level -- the voter file to the precinct-level election returns.

Q    So approximately how many precincts were you able to

match?  Or I guess for how many voters, if that's an easier

15:05:33 question?

1  A    Yeah.  I think that's a better metric.

2       I was able to match more than 90 percent of the voters who

3  cast a ballot to a voting precinct, and similarly more than

4  90 percent of the ballots cast to voters in those precincts.

15:05:46  5  Q    And do you have any concerns that the unmatched precincts

6  would change or bias the results of your analysis in any way?

7  A    I don't.  If I -- when I looked at the unmatched areas,

8  the areas that I couldn't match up, the distribution of voters

9  by race, it was essentially the same percentage of voters were

15:06:04 10  matched among whites and blacks.

11       90.4 of the white voters and 90.4 percent of blacks voters

12  were successfully matched.  So I don't think I'm systematically

13  missing voters of either group.

14  Q    Can we put up Plaintiffs' Exhibit 79, Figure 3, which is

15:06:20 15  on page 12.

16       Dr. Palmer, can you please explain to me what this figure

17  shows?

18  A    So this figure is ecological inference results for the

19  first congressional district only using the precinct-level

15:06:37 20  data.  And so just like in Figure 1, it's set up the same way.

21       On the left, I list each of the different elections and

22  identify the candidates of choice for each group.  And then on

23  the right, I plot support for the black candidate of choice.

24  Q    And what does Figure 3 tell us?

15:06:54 25  A    Figure 3 shows us a similar pattern as we saw in Figure 1.

| | |
|---|---|
| 1 | We see the African-Americans and white voters each have clear |
| 2 | candidates of choice, and they're opposing each other. |
| 3 | Black voters are highly cohesive in their support for |
| 4 | their candidate of choice, and white voters are supporting the |
| 15:07:11  5 | opposing candidate. |
| 6 | Q    And just to clarify, I think you said similar to Figure 1. |
| 7 | Do you mean Figure 2? |
| 8 | A    I'm sorry.  Yes.  Figure 2. |
| 9 | Q    Figure 1 is the map. |
| 15:07:18 10 | A    Yes. |
| 11 | Q    So I wanted to make that clear.  And where would I find |
| 12 | the numerical values for the point estimates and the confidence |
| 13 | intervals reflected in Figure 3? |
| 14 | A    In Table 3. |
| 15:07:29 15 | Q    And could we please turn to Table 3, which is Plaintiffs' |
| 16 | Exhibit 79, page 19? |
| 17 | So please explain what information Table 3 provides. |
| 18 | A    Table 3 provides the same sort of results as we saw |
| 19 | earlier in Table 1.  I list each election, then the black and |
| 15:07:53 20 | white candidates of choice, and then the percentage of each |
| 21 | group voting for the black candidate of choice with the |
| 22 | estimate followed by the confidence interval in parenthesis |
| 23 | behind -- after it. |
| 24 | Q    So what conclusions were you able to draw based on the |
| 15:08:08 25 | estimates depicted in Figure 3 and Table 3? |

1  A    There's a high level of racially polarized voting in the

2  first congressional district.

3  Q    So I'm going to try to put up -- if Heather will

4  indulge -- Figures 4, 5, and 6 on the same screen for the sake

15:08:27  5  of efficiency from Plaintiffs' Exhibit 79.  We'll see if that's

6  readable.

7        And if you can tell from this, and you also have it in

8  front of you, as well, each of the figures -- can you please

9  explain to me what we learned from Figures 4, 5, and 6, and

15:08:46 10  what these are?

11  A    So these figures show the results of the precinct-level

12  ecological inference analysis for the second district in Figure

13  4; the third district in Figure 5; and the seventh district in

14  Figure 6.

15:09:00 15        And across all three of them, all three districts, we see

16  the same pattern, that afternoon African-Americans and white

17  voters have different candidates of choice, that

18  African-American voters are highly cohesive in support of their

19  candidate of choice, and that white voters are supporting the

15:09:14 20  opposing candidate.

21  Q    And where would we find the numerical estimates for these

22  figures?  I believe it's -- there's Tables 4, 5, and 6 that

23  correspond with Figures 4, 5, and 6.  Does that sound right?

24  A    That's correct.

15:09:30 25  Q    Can we put those three on the board, as well?

1      Okay.  And can you explain to us what do these tables

2 show?

3 A   These tables show the same thing as the previous table we

4 just looked at.  But for the second, third, and seventh

15:09:49 5 congressional districts, they show each election, the black and

6 white candidates of choice, and then the percentage voting for

7 the black candidate of choice for each group with an estimate

8 and a confidence interval.

9 Q   Okay.  If we can now call up Table 7 -- actually before

15:10:05 10 that, Figure 7 of Plaintiffs' Exhibit 79 on page 16.

11      Can you explain to me what this figure is?

12 A   This figure is precinct-level ecological inference

13 results, but for the full focus area.

14 Q   So no one congressional district, but all of them

15:10:27 15 together?

16 A   That's right.  So unlike the previous ones where I was

17 able to include elections for the U.S. House, this only has

18 statewide elections.

19 Q   And what does this figure show?

15:10:37 20 A   It shows that same pattern that we've seen before, that

21 African-Americans and white voters have different candidates of

22 choice, that African-American voters are highly cohesive in

23 support of their candidate of choice, and that white voters are

24 strongly supporting the opposing candidate.

15:10:52 25 Q   And it seems here that the confidence intervals, that

1  vertical line on either side of the white dot and black dot,

2  are fairly narrow here; is that right?

3  A    Yes.

4  Q    What does that mean?

15:11:02  5  A    That's just reflective of the fact that we have a lot of

6  data here.  We have -- this analysis has the most information

7  going into it of all of them, because we have every precinct

8  available instead of just the precincts in any one district.

9  Q    So you can feel very confident that these estimates are

15:11:21  10  quite precise?

11  A    Yes.  Under this model, we get more precision.

12          THE COURT:  Can I ask a question, please?

13          MS. KHANNA:  Sure.

14          THE COURT:  Am I correct that the precinct analysis

15:11:30  15  was only done of the 2018 statewide elections; is that right?

16          THE WITNESS:  That's right.

17          THE COURT:  Okay.  Thank you.

18  BY MS. KHANNA:

19  Q    Dr. Palmer, can you perhaps explain why you only performed

15:11:42  20  the 2018 -- why you only performed the precinct analysis on

21  2018 elections?

22  A    Yes.  It was because of data availability.

23          And so while I could get voter files for earlier

24  elections, that matching up of the voter file precinct to the

15:11:57  25  election results precinct I was only able to get the

information I needed to do that step for 2018.

Q     Thank you.

Can we please turn to Table 7, which is page 23 of Plaintiffs' Exhibit 79?  Can you please explain what information this table provides?

A     This is just the numbers used in Figure 7.  And so precinct-level ecological inference results for the focus area.

Again, I'm listing each election, the black and white candidates of choice, and then the percentage of each group voting for the black candidate of choice.

Q     And what is the average estimated vote share of African-Americans for their candidates of choice in the focus area as a whole?

A     98.3 percent.

Q     And where are you looking to see that number?  Is there somewhere specific in your report?

A     Yes.  Paragraph 35 on page 9.

Q     And what is the average estimated vote share of whites for the African-American candidate of choice in the focus area?

A     17.4 percent.

Q     And based on this table, is it accurate to say -- oh, sorry.  If we could go back to Table 7.  Thank you.

Based on this table, is it accurate to say that the white vote share for the black preferred candidate was lower when the candidate was African-American than when that candidate was

1  white?

2  A    On average, yes, by about two percentage points.

3  Q    So what conclusions did you draw based on the analyses in

4  Figure 7 and Table 7?

15:13:35 5  A    There's a high level of racially polarized voting in each

6  of the four districts individually and in the focus area as a

7  whole when you use precinct-level ecological inference.

8  Q    Okay.  So the figures and tables that we just looked at

9  analyze the extent to which African-Americans and whites

15:13:54 10  preferred different candidates.

11      What analysis did you do to determine the extent to which

12  African-American preferred candidates actually win in the focus

13  area?

14  A    Just as I did for the focus area as a whole, I simply

15:14:08 15  calculated the percentage of the vote that each candidate

16  received in each district.  And that's in Table 8.

17  Q    Can we please call up Table 8, which is on page 24 of

18  Plaintiffs' Exhibit 79?  Can you please explain what Table 8

19  shows?

15:14:25 20  A    So first I list each election that I look at, and then the

21  black and white candidates of choice based on the ecological

22  inference analysis.  And even though I'm looking at four

23  different districts, because the black and white candidates of

24  choice in the statewide elections were the same, in all four

15:14:43 25  districts, I only list them once.

1      And then I list in the next set of columns the vote share

2  for the black preferred candidate and the white preferred

3  candidate in CD 1, and then in CD 2, CD 3, and CD 7.

4  Q    And so it seems that there are three congressional

15:15:02  5  districts at the top in which only one district would have

6  voted in that election -- in each election; is that right?

7  A    That's right.  Because those are the U.S. House elections.

8       So if we look at the very top row, that's U.S. House, the

9  first congressional district.  And what we see there is that in

15:15:18 10  CD 1, the black preferred candidate received 36.8 percent of

11  the vote.  The white preferred candidate won with 63.2 percent

12  of the vote.  We don't have any numbers in the rest of that row

13  because that contest only happened in the first congressional

14  district.

15:15:32 15  Q    And those numbers that you mentioned -- 36.8 and 63.2 --

16  are the actual vote shares obtained by each candidate; is that

17  right?

18  A    Yes.

19  Q    And I notice here that House District 7, which was one of

15:15:45 20  the districts you analyzed, is not included on this table.  Can

21  you explain why?

22  A    That election was not contested by both major parties.

23  Q    So there was no -- there was no contest basically in that

24  election?

15:15:59 25  A    That's right.

1   Q    And what does Table 8 tell us about the extent to which

2   African-American preferred candidates win elections in these

3   congressional districts?

4   A    If we compare the vote shares for the black and white

15:16:15  5   preferred candidates in the first, second, and third districts,

6   we see that the white preferred candidate is winning with large

7   margins, often more than 20 percentage points.

8        In contrast, in CD 7, we see that the African-American

9   preferred candidate is winning with large margins of about 40

15:16:32 10   percentage points.

11   Q    Dr. Palmer, after you submitted your initial report in

12   this case, did you receive reports from defendant's experts

13   Drs. Johnson and Hood?

14   A    Yes.

15:16:46 15   Q    And did either expert report address the analyses you

16   performed in your initial report that we just discussed?

17   A    No.  Neither Dr. Hood nor Dr. Johnson contested any of my

18   conclusions or my methodology or empirical results.

19   Q    But you did submit a rebuttal report in this case; is that

15:17:05 20   right?

21   A    Yes.

22   Q    And that's Plaintiffs' Exhibit 80?

23   A    Yes.

24   Q    Why did do you that?

15:17:09 25   A    Dr. Hood in his report questioned the functionality of the

new majority-minority districts drawn by Mr. Cooper, and I was

asked to analyze a performance of those districts.

Q    And what did data did you examine to answer that question?

A    It required a variety of data.  First, the actual maps

15:17:33 drawn by Mr. Cooper in the form of block equivalency files,

which are files that list every census block and which district

they're assigned to on each map.  Then county-level and

precinct-level election results and voter turnout data from the

2018 general election.  And that's all from the Secretary of

15:17:51 State.  The voter file that I used in my previous analysis I

used again.  And then the new data here or precinct boundary

shape files for some counties, in order to map out where

voters -- to map out voters in counties that were split between

two districts under Mr. Cooper's maps.

15:18:13 Q    So then what analysis did you perform to analyze whether

the districts would be able to perform for the minority

preferred candidates?

A    The first thing I did was I calculated vote shares for

each candidate in the statewide elections in 2018 in each

15:18:29 district under each of the four maps.

Q    So let's call up Plaintiffs' Exhibit 80, Figure 1.

        MR. DAVIS:  Your Honor, at this point, I would like to

lodge an objection, if I may.

        THE COURT:  All right.

15:18:46         MR. DAVIS:  Dr. Palmer's analysis on whether these

districts would perform are based solely on the results of the
2018 election.  That's not information that would have been
available to the Alabama Legislature in 2011.  They could not
have looked at those results obviously and used that to
determine whether or not these districts would, in fact,
provide an opportunity to elect.

          MS. KHANNA:  Your Honor, if I may respond.

          THE COURT:  Yes.

          MS. KHANNA:  The legal question here is not what
information, data, or intent the map drawers had in 2011.  The
question is whether race is -- voting is racially polarized in
Alabama in these areas.  It is not about the intent of the
legislature at the time, because it's not a legislative-intent
case.

     So Dr. Hood, when he raises the question of voter turnout,
himself relies on post-2010 data to suggest that there's not --
that there's a functionality problem here, in accordance with
that same legal standard that we have all been operating under.

          MR. DAVIS:  I would respond, Judge, that I don't think
this is part of Dr. Palmer's polarized voting analysis.  He's
assessing whether these districts would, in fact, provide an
opportunity to elect.

     But if the question is whether the Alabama --

          THE COURT:  Isn't that beyond the scope of his
original report?

|   | |
|---|---|
| 1 | MS. KHANNA:  It is of his original report.  It is in |
| 2 | response to -- |
| 3 | THE COURT:  And also beyond the scope of his expertise |
| 4 | to some extent, is it not? |
| 15:20:12 5 | MS. KHANNA:  I don't believe it's beyond the scope of |
| 6 | his expertise.  His expertise is in analyzing racial voting |
| 7 | patterns in election results. |
| 8 | But it is included in his rebuttal report, specifically in |
| 9 | response to Dr. Hood's analysis, which itself is based on |
| 15:20:28 10 | post-2010 data. |
| 11 | THE COURT:  Is it based on post-2010 data? |
| 12 | MR. DAVIS:  Dr. Hood did not issue -- he did look at |
| 13 | post-2011 data. |
| 14 | He didn't issue an opinion that these districts would not |
| 15:20:40 15 | perform.  He said the numbers are so close, there are |
| 16 | questions, especially when you look at turnout. |
| 17 | But now that it's clear that we are only dealing with the |
| 18 | declaratory judgment in this case and that our focus is |
| 19 | backwards looking, we don't think that an assessment based on |
| 15:20:56 20 | 2018 data would be relevant, because the Alabama Legislature |
| 21 | could not have used that. |
| 22 | MS. KHANNA:  Your Honor, I would agree that the focus |
| 23 | is about whether the current map is a violation, but it is not |
| 24 | about whether the legislature knew or should have known that it |
| 15:21:10 25 | was a violation, or intended to violate, or had good |

```
 1    information, bad information, good faith, or bad faith.  None
 2    of that is the issue before this Court, whether on declaratory
 3    or injunctive relief.
 4         The question of functionality frankly was an issue raised
 5    by their expert.  We don't believe it is part of our
 6    affirmative burden in a Section 2 case.  But having been raised
 7    by his expert, upon looking at post-2010 data, I think it's
 8    appropriate for our expert to respond to say if you think this
 9    relevant, I can look at the relevant data.
10         THE COURT:  Okay.  But your expert already said that
11    Dr. Hood didn't take issue with any of this expert's report,
12    right?
13         MS. KHANNA:  That's correct.  Dr. Hood did not take --
14         THE COURT:  And so his rebuttal was not to defend
15    anything that was part of his original report, right?
16         MS. KHANNA:  That's correct, Your Honor.
17         He did respond to a concern raised by Dr. Hood for the
18    first time in Dr. Hood's report to demonstrate that that
19    concern was -- an attempt to demonstrate that that concern was
20    not valid.  We do not believe that the functionality is a part
21    of the Section 2 affirmative burden on plaintiffs, in any
22    event.
23         THE COURT:  All right.  Well, I'm going to overrule
24    the objection, but will keep in mind sort of the extended scope
25    with the involvement of the 2018 stuff on that, so...
```

1          MS. KHANNA:  Thank you, Your Honor.

2          THE COURT:  Okay.

3    BY MS. KHANNA:

4    Q    Dr. Palmer, can you please explain to us what does Figure

15:22:42 5    1 show -- or is this Figure 1? -- Figure 1 shows?

6    A    So Figure 1 shows the vote shares of the African-American

7    preferred candidates; that is, the candidates identified as

8    African-American preferred candidates in my previous report

9    under each of the four plans in the second and seventh

15:23:00 10   congressional districts.

11         And so here, the black dot doesn't correspond to white or

12   black voters, but rather to the second congressional district,

13   and the white dot to the seventh district under Mr. Cooper's

14   maps.

15:23:12 15        And so if we zoom in, for example, on just the top left

16   quadrant, what we see is each of the statewide contested

17   elections in 2018, and then the vote share in the second and

18   seventh districts for the African-American preferred candidate.

19         And there's a dotted line at 50 percent, and these dots

15:23:31 20   are well to the right of 50 percent.  And what that means is

21   that the African-American preferred candidate is winning a

22   significant majority of the overall vote in these districts, in

23   this particular map; and if we zoom back out, in all four maps.

24   Q    And you did say this, but I just want to make extra clear.

15:23:48 25   Here, you have black dots and white dots.  We previously looked

at other figures in which the black dot meant the black

preferred candidate -- or the black vote share, and the white

dot meant the white vote share.  That's not the case here; is

that right?

15:24:01 A    That's right.  Here the black dot means vote share in CD

2, and the white dot, vote share in CD 7.

THE COURT:  And that would be total votes black and

white?

THE WITNESS:  All votes from everybody.

15:24:15 BY MS. KHANNA:

Q    Let's call up Table 1 on the same page, please.  Please

describe what Table 1 shows us.

A    These are just the numbers that are plotted in Figure 1.

And so they show for each contest what percentage of the vote

15:24:32 the African-American preferred candidate would have received in

each district under each map.

And so, for example, in -- under Revised Plan 1 election

for Governor, the African-American preferred candidate would

have won 59.2 of the vote in CD 2, and 68.8 percent of the vote

15:24:51 in CD 7.

Q    And can you tell here what is the lowest vote share that

the African-American preferred candidate would have won under

District 2 or District 7 in any of these illustrative plans?

A    The lowest vote share in any contest under any plan was

15:25:08 58 percent of the vote.

```
 1  Q    And in some cases it's much higher; is that correct?

 2  A    In many cases it's much higher.

 3  Q    Okay.  In his report --

 4         THE COURT:  Excuse me.  And that is true even though,

 5  if I recall correctly, several of the plans drawn by Mr. Cooper

 6  had a lower percentage than 58 percent of African-American

 7  voters; is that right?  Am I remembering that correct?

 8         THE WITNESS:  That's right.

 9         THE COURT:  Okay.  Thank you.

10  BY MS. KHANNA:

11  Q    Now, in his report, Dr. Hood discussed turnout in Alabama;

12  is that right?

13  A    Yes.

14  Q    And what is your understanding of Dr. Hood's conclusion

15  when it comes to turnout in Alabama?

16  A    My understanding is that Dr. Hood looked at statewide

17  turnout rates by race, and he found a racial turnout gap where

18  African-Americans were turning out at lower rates than white

19  voters statewide.

20  Q    Did you have any reason to dispute that?

21  A    I don't dispute his analysis.

22  Q    Did you perform any additional analysis regarding the

23  actual composition of voters based on Mr. Cooper's illustrative

24  plans?

25  A    Yes.  I don't find a statewide estimate of turnout rates
```

1  to be very useful in assessing the functionality of these

2  districts.

3      And so I took a different approach, which was using the

4  voter file.  And so we know where all those voters are located,

15:26:42 5  and we know who actually voted.

6      I simply calculated the actual number of voters by race,

7  of actual people who actually voted in 2018 in each district

8  under all four maps.  And that's in Table 2.

9          MR. DAVIS:  Your Honor, for the record, I would like

15:26:58 10  to lodge the same objection to the assessment of the voter

11  composition.

12          THE COURT:  Objection noted and overruled.

13  BY MS. KHANNA:

14  Q    Can we please call up Table 2 of Plaintiffs' Exhibit 80?

15:27:14 15  What does Table 2 tell us?

16  A    So Table 2 shows us the percentage of actual voters in

17  2018 who are black, white, or of some other group in District 2

18  and District 7 under each of the four maps.

19      And so what we see is under all four plans in both

15:27:33 20  districts a majority of the actual voters, of the people who

21  actually cast a ballot in this election, were black.

22  Q    So this is not -- like we were looking in Mr. Cooper's

23  plans, we are not looking at the black voting age population

24  here; is that right?

15:27:46 25  A    That's right.  We're looking at percentage of voters that

1  were black, percentage of voters that were white, and

2  percentage of voters that were in some other group.

3  Q    So while Dr. Hood looked at the race of voters who turned

4  out statewide, this analysis looks at the race of voters who

15:28:05 5  voted in -- as drawn in Mr. Cooper's illustrative plan; is that

6  right?

7  A    There's a few different differences to highlight.  One is

8  statewide versus looking at the individual districts under each

9  map.  And I think that's an important distinction.

15:28:19 10      The second thing is that what Dr. Hood is looking at is

11  the percentage of among the -- among black registered voters,

12  what percentage turned out to vote?  And that's what he means

13  by turnout is what percentage of African-Americans who are

14  registered to vote did vote?  And here I'm looking at what

15:28:38 15  percentage of the actual voters belong to each group?

16      And so we see here in Table 2 that under all four plans in

17  both districts a majority of the actual voters were black.

18  Q    So, Dr. Palmer, based on your functionality analysis,

19  would you have any concerns that any of Mr. Cooper's

15:28:55 20  illustrative plans would fail to provide African-American

21  voters an opportunity to elect in either District 2 or District

22  7?

23  A    No.  African-Americans make up a majority of the actual

24  voters in both districts under all four maps.  And their

15:29:10 25  candidates of choice are able to win by significant margins.

```
 1   Q    Dr. Palmer, you are aware that defendant's experts have
 2   questioned whether plaintiffs' illustrative plans should be
 3   evaluated based on the AP black metric versus the SR black
 4   metric?  Are you aware of that?
 5   A    Yes.
 6   Q    And does that debate affect your analysis in any way?
 7   A    No.  All of my analyses in both reports use a voter's
 8   self-identified race from the voter registration database.  I'm
 9   not looking at different census classifications of race at all.
10        THE COURT:  And if I'm not mistaken, the information
11   from voter registration deals with single race black, right?
12   Only those who -- I mean, you only have one choice there,
13   whether to identify yourself as black or as something other,
14   right?  Am I confused on that?
15        THE WITNESS:  That's my understanding.
16        THE COURT:  Okay.  So you used in your analysis the
17   information from voter registration, which would be single-race
18   black or all -- whatever it is.
19        THE WITNESS:  I don't think it's single-race black
20   because a mixed-race person could choose which box they're
21   checking.
22        THE COURT:  Right.  It's how they self-identified.
23        THE WITNESS:  That's right.
24        THE COURT:  But they didn't have an option to
25   self-identify other than with one checkmark?
```

15:29:29
15:29:47
15:30:07
15:30:24
15:30:35

```
 1              THE WITNESS:  That's my understanding.
 2              THE COURT:  All right.
 3    BY MS. KHANNA:
 4    Q    Dr. Palmer, I just want to summarize with your overall
 5    analysis.  What conclusions overall do you arrive at in the
 6    course of your work in this case?
 7    A    I find high levels of racially polarized voting.
 8         African-American -- white preferred candidates
 9    consistently defeat African-American preferred candidates in
10    the focus area in the first, second, and third congressional
11    districts.  And under Mr. Cooper's illustrative maps,
12    African-American voters make up the majority of the electorate
13    and are able to elect their candidates of choice.
14              MS. KHANNA:  Thank you.  No further questions on
15    direct.
16              THE COURT:  Cross-examination?  Mr. Davis?
17                        CROSS-EXAMINATION
18    BY MR. DAVIS:
19    Q    Good afternoon, Dr. Palmer.
20    A    Good afternoon.
21    Q    Dr. Palmer, were you retained as an expert in the case of
22    Thomas vs. Bryant in Mississippi?
23    A    Yes.
24    Q    What was that case about?
25    A    That case was about a single state Senate district in
```

1   Mississippi.

2   Q    What was the nature of the claim against that Senate

3   district?

4   A    Can you refresh my memory?

15:32:16 5   Q    Sure.  Would you help if you saw a copy of your report

6   from that case?

7   A    Sure.  Thank you.

8          MR. DAVIS:  May I approach?

9          THE COURT:  You may.

15:32:31 10   BY MR. DAVIS:

11   Q    Let me redirect -- refocus my question, Dr. Palmer.

12       Do you agree that the case was about Senate District 22 in

13   Mississippi?

14   A    Yes.

15:32:56 15   Q    And that Senate District 22, as drawn, was 50.8 percent

16   black voting age population?

17   A    Yes.

18   Q    Okay.  And do you agree that the plaintiffs were claiming

19   that even though African-Americans were more than 50 percent of

15:33:07 20   the district, they were unable to elect their candidate of

21   choice in that district?

22   A    Yes.

23   Q    And do you agree that as part of that lawsuit the

24   plaintiffs in that case claimed that Section 2 required

15:33:18 25   Mississippi to redraw the district to increase the percentage

1 of black voters in that district?

2 A    That's my understanding.

3 Q    And what analysis did you perform in that case,

4 Dr. Palmer?

15:33:30 5 A    I did a racially polarized voting analysis in that case.

6 Q    Okay.  And did you also assess whether if black percentage

7 voting -- excuse me -- if the black voting age population was

8 increased to 62 percent, did you opine that blacks would then

9 be able to elect their candidate of choice?

15:33:47 10 A    Yes.

11 Q    So is it true, Dr. Palmer, that a 50 percent black

12 district or a district that's just over 50 percent

13 African-American voting age population does not necessarily

14 allow the African-American voters to elect their candidate of

15:34:02 15 choice?

16 A    Not necessarily.

17 Q    Okay.  Now, in 2011 would you agree that Alabama was

18 governed by Section 5 of the Voting Rights Act?

19 A    I believe so.

15:34:17 20 Q    Okay.  Would you agree that because Alabama was governed

21 by Section 5 of the Voting Rights Act that Alabama's

22 congressional districts had to be precleared by the Department

23 of Justice?

24 A    I believe so.

15:34:29 25 Q    Okay.  If Alabama had redrawn congressional District 7 and

1  lowered the percentage of African-American voters in that

2  district to the point where African-American voters would be

3  unable to elect their candidate of choice, would you agree that

4  Alabama would have had a hard time getting that district

15:34:52 5  precleared?

6          MS. KHANNA:  Objection.  Calls for a legal conclusion.

7      Dr. Palmer is not an expert on what would qualify for

8  preclearance by the Department of Justice, what they would have

9  objected to.

15:35:02 10         THE COURT:  I'm aware of that.  I will overrule and

11  allow this witness to opine.

12         THE WITNESS:  Can you repeat the question, please?

13  BY MR. DAVIS:

14  Q    Yes.

15:35:09 15     Would you agree that if Alabama dropped the voting age

16  population -- the African-American voting age population of

17  congressional District 7 to such a low point that

18  African-Americans would be unable to elect their candidate of

19  choice, that Alabama would have had a difficult time getting

15:35:27 20  that district precleared?

21  A    I don't know.

22  Q    Okay.  Would you agree that if African-Americans had been

23  successful in electing their candidate of choice in

24  Congressional District 7, but that if Alabama then dropped the

15:35:41 25  African-American voting age population to such a low percentage

that they no longer could elect their candidate of choice, that

Alabama would in that case have diminished the ability of

African-Americans in Congressional District 7 to elect their

candidate of choice?

15:35:57           MS. KHANNA:  Same objection, Your Honor.

         THE COURT:  Overruled.

         THE WITNESS:  I don't know.

BY MR. DAVIS:

Q    If they go from can to can't, you don't agree that that's

15:36:06  diminishing the opportunity to elect?

A    To be clear, you're not specifying a certain number.

You're just saying if the district is -- if the black

population is reduced to below some point and there's not some

other equivalent district drawn with those voters in it.

15:36:22      For example, District 7 could become District 6 and be

essentially the same with a different number, and then 6 would

be precleared; is that correct?

Q    I'm sorry, Dr. Palmer.  I'm having a difficult time

understanding.  Let me try to ask it another way.

15:36:38      Do you not agree that if African-Americans have been

successful for years in electing their candidate of choice in a

congressional district, but the state then comes in and lowers

the African-American population to the point, whatever point

where they no longer can do so, in that case, don't you agree

15:36:58  that Alabama would have diminished the opportunity of

```
 1  African-Americans to elect their candidate of choice?
 2  A    I think so.
 3  Q    Okay.  Now, in 2011 did Alabama -- the state of Alabama
 4  have any of the evidence that you assessed to determine whether
15:37:17 5  a district along the lines of what Dr. -- what Mr. Cooper has
 6  proposed would, in fact, perform and provide the opportunity to
 7  elect?
 8  A    Can you be more specific?
 9  Q    Sure.  The obvious question.  Your analysis was based on
15:37:33 10 2018 elections, right?  When you looked at those to determine
11  whether or not African-Americans were a majority of the
12  electorate in the focus area?
13  A    Yes.
14  Q    Alabama did not have the results of the 2018 elections
15:37:45 15 when it was acting in 2012 or 2011?
16  A    Yes.
17  Q    Okay.  And you didn't look at any elections before 2011,
18  correct?
19  A    That's right.
15:37:54 20 Q    You conclude in your first report, Dr. Palmer, that voting
21  is polarized in Alabama along racial lines, correct?
22  A    Yes.
23  Q    Does your analysis consider the reasons that any voter
24  votes the way he or she does?
15:38:20 25 A    No.
```

```
 1   Q    Did you investigate whether a majority of whites in
 2   Alabama vote Republican because of some kind of racial bias, as
 3   opposed to maybe issues, or beliefs about the issues, or
 4   partisan politics?
 5   A    No.
 6   Q    And the tool you used of ecological inference cannot
 7   answer that question, can it?
 8   A    No.  It's not meant to.
 9   Q    So you're not saying that any voter is doing anything
10   wrong by choosing to support any particular political party?
11   A    No.
12        THE COURT:  While we're on that, may I ask a question
13   that's been burning in my head?
14        Dr. Palmer, did you consider in any of the demographic
15   stuff the difference between democratic candidates and
16   Republican candidates and democratic voters and Republican
17   voters, or did you only look at the question of race?
18        THE WITNESS:  I only looked at race.
19   BY MR. DAVIS:
20   Q    Similarly, Dr. Palmer --
21        MR. DAVIS:  Oh, I'm sorry, Your Honor.  Had you
22   concluded?
23        THE COURT:  Yes.
24   BY MR. DAVIS:
25   Q    When you looked at the different supports the different
```

15:38:34 (line 5)
15:38:45 (line 10)
15:39:15 (line 15)
15:39:34 (line 20)
15:39:39 (line 25)

1    candidates got, did you consider how successful any candidate

2    was in their fund-raising?

3    A    No.

4    Q    Did you assess name recognition?

15:39:50  5    A    No.

6    Q    Did you assess how popular that candidate was in the

7    voting public?

8    A    No.

9    Q    Would you agree that the support that a candidate gets in

15:40:00  10   an election can be related to things like fund-raising and name

11   recognition?

12   A    Sometimes.

13   Q    Sometimes?  Would you agree that the strength of the local

14   political party can be a valuable asset to a candidate?

15:40:15  15   A    Potentially.

16   Q    All right.  Dr. Palmer, I'd like to understand a little

17   better the ecological inference analysis that you performed.

18   Now, we spoke during your deposition about the concept of

19   bounds, and that's a concept that's part of ecological

15:40:55  20   inference, correct?

21   A    Yes.

22   Q    Now, what I have got up is a hypothetical precinct.  There

23   are three on this sheet.  And I recognize that you don't

24   perform an ecological inference analysis on one, two, or three

15:41:05  25   precincts?

```
 1  A     That's right.

 2  Q     Okay.  It would take a lot.

 3        I just want to understand some of the first steps you

 4  would perform.  So let's say hypothetically there was a

 5  precinct that had 1,000 voters.  900 of those voters were

 6  minority voters, and 100 were white voters.  And then you know

 7  from the election returns that candidate A received 850 votes

 8  and candidate B received 150 votes.

 9        Where does ecological inference start with this data to

10  determine whether support -- whether either race is cohesive in

11  their support of a particular candidate?

12  A     So I'm not sure if start is a right way of thinking about

13  it.  But if you're asking about how bounds are used by

14  ecological inference, that's something I can answer with this

15  table.

16  Q     Okay.

17        THE COURT:  Before you do that, back up and educate me

18  on what you mean by bounds.  You both seem to understand that,

19  and I have no idea what it's meant in the context of this

20  ecological analysis that you're doing.

21        THE WITNESS:  I'll do my best to explain it without

22  getting too technical.  There are --

23        THE COURT:  Okay.  The less technical the better.  I

24  appreciate that.

25        THE WITNESS:  So there are a few other methods that
```

1    are also used to analyze racially polarized voting.

2         But ecological inference, to my understanding, has been

3    accepted as the best one to use because it recognizes a really

4    important constraint in any of our estimates.  It recognizes

5    that no candidate can get less than 0 percent of the vote or

6    more than 100.  And no group could support a candidate at less

7    than 0 percent or more than 100 percent, which seems really

8    obvious.

9         Of course, African-Americans can't support their preferred

10   candidate with 110 percent of their vote, but --

11              THE COURT:  Generally, unless there's something funky

12   going on at the ballot box.

13              THE WITNESS:  With proper elections, it would be

14   impossible.

15              THE COURT:  Right.

16              THE WITNESS:  But some of these models, like

17   ecological regression, which is a different method used for

18   RPV, can produce estimates that look like that.  That doesn't

19   always mean they are bad.  But that's a downside to other

20   models.

21        And so what ecological inference recognizes is that we can

22   learn information from those limits.  That is, we can use these

23   natural limits of, of course, a group can't support a candidate

24   more than 100 percent or less than 0 to start limiting the

25   range of possibilities and get better estimates.

1    And so I think when we look at this table, that will help

2    clarify it.  If I can turn back to the table.

3    BY MR. DAVIS:

4    Q    Yes, please, Dr. Palmer.

15:43:49 5    A    So here we have a precinct with 900 minority voters, and

6    100 white voters.  850 votes for candidate A and 150 votes for

7    candidate B.

8         Let's consider one extreme, where minority voters really

9    like candidate A.  It's impossible that more than 850 of them

15:44:10 10    voted for candidate A because there's only 850 votes for

11    candidate A.

12         So one extreme is 850 voters voted for -- 850 minority

13    voters voted for candidate A, and 50, then, the remainder, had

14    to have voted for candidate B.  And then 0 white voters voted

15:44:30 15    for candidate A, and 100 white voters voted for candidate B.

16         That's one extreme that we can learn and that we can sort

17    of narrow down the range of possibilities just by recognizing

18    that these bounds have to exist.  These numbers have to add up

19    the right way.

15:44:44 20         We can also get another bound at the opposite side, which

21    is suppose all 100 white voters love candidate A.  Then we can

22    say there's 100 candidate A votes from the white voters, and

23    the rest have to be made up for by the minority voters.  So

24    there have to be 750 minority votes for candidate A to get to

15:45:03 25    850.  Then there's 0 votes for candidate B from white voters,

1    and 150 votes for candidate B from minority voters.

2         That's a second bound.  And that doesn't -- that's a

3    pretty big range, right?  We went from 0 to 100 on these

4    groups.  But that actually starts limiting the possibilities.

15:45:22  5         And as we add more and more precincts, we have different

6    limits, different bounds in each precinct.  That provides

7    valuable information to the estimate.

8         THE COURT:  I think this is getting to another big

9    question that's been reverberating in my head since you have

15:45:37 10  been testifying.  And that is, you know, if I remember

11   correctly, not a single time that I have completed a ballot

12   have I marked what my race was before I put it into that little

13   slot so it would go and be counted.

14        And so my question has been all the while:  How do you

15:46:00 15  know who voted for what candidate or the race of those who

16   voted for which candidate?  And I think that's what Mr. Davis

17   is getting to now.

18        You come up with some kind of formula to make that

19   determination, as opposed to actually knowing how the votes

15:46:19 20  were cast; is that correct?

21        THE WITNESS:  That's right.  We never get to see how

22   the individual voter actually votes.  But we can see the places

23   that have a lot of voters of -- we can see how many voters of

24   each group there are in each place, and then how that aggregate

15:46:34 25  group of voters cast their ballot.  And so we can look for

patterns across that.

For example, places with a very low black population, places with a mixed black and white population, and then places of high black population will have different patterns when

15:46:49 racial -- when voting is polarized on which candidates they're supporting.  And so we can use ecological inference to produce an estimate.  And we call it estimate because there is some uncertainty about it -- it's coming out of a model -- about the levels of support from each group for each candidate.

15:47:03 THE COURT:  Okay.

THE WITNESS:  And the bounds are part of the information that go into that model along with these general voting patterns.

THE COURT:  Well, you could tell, could you not,

15:47:16 actually how many -- well, you still won't know the race.  But you would be able to tell how many voters voted Republican and how many voters voted Democrat, right?

THE WITNESS:  Yes.

THE COURT:  Okay.  You didn't look at any of those

15:47:30 numbers, right?

THE WITNESS:  No.

THE COURT:  Well, of course, those would be the total numbers, because in each one of these races that you have looked at, it was a Republican versus a Democrat race, correct?

15:47:42 THE WITNESS:  Yes.

```
 1              THE COURT:  Okay.
 2   BY MR. DAVIS:
 3   Q     So, Dr. Palmer, let's walk through some of these steps.
 4         Okay.  First, would you agree that if had this
15:47:52  5   hypothetical Precinct 1, that when it comes to minority support
 6   for candidate A, at least 750 minority voters voted for
 7   candidate A?
 8   A     Yes.
 9   Q     And it could be as much as 850?
15:48:05 10   A     Yes.
11   Q     Okay.  And then 0 -- somewhere between 0 and 100 white
12   voters voted for candidate A?
13   A     Yes.
14   Q     And minority support for candidate B would be at least 50?
15:48:31 15   A     Yes.
16   Q     But no more than 150?
17   A     Yes.
18   Q     And then we're still at between 0 and 100 for white
19   support for candidate B?
15:48:45 20   A     Yes.
21   Q     So looking solely at Precinct 1, you could have on one
22   extreme a situation where 750 minority voters supported
23   candidate, and all 100 white voters supported candidate A?
24   A     If this is our only data point we have available?
15:49:12 25   Q     Yes.
```

```
 1   A     Then, yes.
 2   Q     Okay.  So in that event, in Precinct 1, if it was 750
 3   minority voters and 100 white voters all supporting candidate
 4   A, voting is not polarized at all?
15:49:25  5   A     I'm sorry.  Can you repeat that?
 6   Q     Sure.  If you have 750 minority voters supporting
 7   candidate A and 100 white voters supporting candidate A, voting
 8   is not polarized?
 9   A     That's right.
15:49:37 10   Q     Okay.  On the other extreme, you could have all 850
11   minority voters supporting candidate A and zero white voters
12   supporting candidate A?
13   A     Yes.
14   Q     And in that case, voting is polarized?
15:49:51 15   A     Yes.
16   Q     So how does ecological inference look at these different
17   precincts and make an analysis of which of these extremes is
18   correct, or if it's somewhere in the middle?
19   A     So that's why we have a model, and why we bring a lot of
15:50:04 20   data to the model, and why we want as much data as we can.
21         So that's why, for example, I said I couldn't do
22   ecological inference on the counties in one congressional
23   district alone.  There just isn't enough information to look at
24   those and infer with any confidence what the pattern is.
15:50:23 25         But when you have 1,000 precincts or even just several
```

```
       1  dozen precincts -- when you have the data, and in each place
       2  the makeup of the voters is different, the votes cast for each
       3  candidate are different, you're going to get different bounds,
       4  different limitations, and then you can fit a model that says
15:50:42  5  what pattern best fits the data that we can see.
       6  Q    Okay.
       7  A    And so that's what ecological inference does, and that's
       8  what you can't learn from any one or two or three precincts
       9  examples, but can learn from fitting a model to the entire data
15:50:55 10  set.
      11  Q    Aren't assumptions part of ecological inference analysis?
      12  A    Assumptions are part of all models.
      13  Q    Okay.  Isn't there a particular assumption -- and I will
      14  quote from your deposition here.  You say, "The assumptions in
15:51:09 15  ecological inference is that" --
      16            MS. KHANNA:  Your honor, objection.  I think it's an
      17  improper impeachment.
      18            THE COURT:  I haven't heard the question.
      19            MS. KHANNA:  I believe he's just quoting from the
15:51:18 20  deposition.
      21            THE COURT:  I don't think we've gotten there.  Let me
      22  hear the question.
      23            MR. DAVIS:  I was indeed going to quote a line from
      24  his deposition.  I don't know why that would be improper.
15:51:31 25            THE COURT:  Ask him a question as to what he testified
```

```
 1  about.
 2  BY MR. DAVIS:
 3  Q    Sure.  This is something you said in your deposition,
 4  Dr. Palmer, and I am going to ask if you still agree with this.
15:51:42  5       You said in your deposition that the assumption in
 6  ecological inference is that minority voters across the
 7  precincts in the data are going to vote similarly, and that
 8  white voters across the precincts will vote similarly.
 9  A    Yes.
15:51:56 10  Q    That's a common assumption in an ecological inference,
11  correct?
12  A    Yes.
13  Q    Okay.
14       THE COURT:  Isn't that what you're trying to prove?
15:52:04 15  So you begin with the assumption that what you want to prove is
16  correct?
17       THE WITNESS:  No.  That's not right.
18       The assumption is that overall on average -- and there
19  will be variation across the place and across the precincts --
15:52:23 20  that there is some average level of support for each group for
21  each candidate.  And what we're trying to find is are there
22  differences in that support?
23       So it could be -- you can run ecological inference and
24  find that neither group has a candidate of choice.  With the
15:52:40 25  same assumptions going in and saying on average -- you can say
```

1  in a place you might think on average 50 percent of black

2  voters are voting for candidate A and 50 percent are voting for

3  candidate B.

4        THE COURT:  You may continue, Mr. Davis.

15:52:55  5  BY MR. DAVIS:

6  Q    Sure.  But do you not assume as part of ecological

7  inference that -- let's take two precincts as part of hundreds

8  that you view.

9        You've got one precinct where average income level is

15:53:08 10 really low and average education level is really low.  And you

11 have another precinct where average income and education is

12 really high.

13       Does ecological inference assume that the black voters in

14 both of those precincts will vote along similar patterns?  And

15:53:24 15 that the white voters in those two very different precincts

16 will vote along similar patterns simply because of race?

17 A    Ecological inference will not assume that you have the

18 same patterns in the same places, but that there is a pattern

19 on average that you can find.

15:53:39 20 Q    Okay.  You said that the assumption is that minority

21 voters across the precincts in the data are going to vote

22 similarly?

23 A    That doesn't mean the same.

24 Q    Okay.  What does it mean?

15:53:51 25 A    There's going to be some variation in different places.

So in some places, you'll find that the support of black voters
for their -- for whatever that -- areas, groups, candidate
choice is lower, and some is going to be higher.  We are
reporting averages here.

15:54:08    So, for example, what I am not saying is that let's say
the average I report is 95 percent of black voters are
supporting their candidate of choice.  I'm not saying it's
95 percent in Precinct 1, and 95 percent in Precinct 2, and
95 percent in Precinct 3, and so on.

15:54:22    I'm saying on average, if you average black support across
all these precincts, it will be 95 percent.  But some will be
higher and some will be lower.

Q    So you're not assuming any similarity in -- by voting
patterns across precincts when you begin the analysis?

15:54:42 A    You're assuming that -- you are assuming that there is a
common trend across these groups.  But you're not -- you're not
assuming what that trend is.

You are not assuming that the groups are polarized, for
example, to start.  The model -- you are saying there is a
15:54:56 common trend.  You are using the model to find what that is.
But it could be anywhere from 0 to 100 for either group, and
you don't know going in, and you can't assume going in what it
will be.

Q    Okay.  Does ecological inference assume that black voters
15:55:09 will have similar patterns regardless of education and income

```
 1  levels?
 2  A    It does not take into account education and income levels.
 3  Q    Okay.  Does it assume that white voters will vote
 4  similarly across precincts regardless of education and income
 5  levels?
 6  A    It doesn't take that into account.
 7  Q    Okay.  Do you have any basis to assume that voters in
 8  Alabama will vote the same along racial patterns regardless of
 9  income and education levels?
10  A    I'm sorry.  Can you repeat that?
11  Q    Sure.  Is there any basis to assume that white voters in
12  different precincts will vote the same even though there are
13  different education and income levels?
14  A    I don't know.
15  Q    Okay.  Was there a pattern in the candidate of choice for
16  black voters, in terms of their party affiliation?
17  A    I don't discuss that in my report.
18  Q    Did you notice that at all?
19  A    You can look at the candidates of choice in my report.
20  Q    Okay.
21          THE COURT:  The question was whether you noticed it at
22  all.
23          THE WITNESS:  Yes.
24  BY MR. DAVIS:
25  Q    What did you notice?
```

```
 1   A    African-Americans support democratic candidates.
 2   Q    Have you ever done a polarized voting analysis where most
 3   of the candidates of choice of African-American voters were
 4   Republican candidates?
 5   A    No.
 6   Q    Do you agree that there are more voters in Alabama who
 7   tend to support the Republican party than who tend to support
 8   the democratic party?
 9   A    More voters overall?
10   Q    Yes.
11   A    Yes.
12   Q    Would you agree that Alabama's a conservative state?
13   A    That's my general understanding.
14   Q    Okay.  Is anybody calling Alabama a battleground state for
15   purposes of the upcoming presidential election?
16   A    I don't believe so.
17            MR. DAVIS:  May I have a moment, Your Honor?
18            THE COURT:  Yes, you may.
19            MR. DAVIS:  No further questions at this time.
20            THE COURT:  Any redirect?
21            MS. KHANNA:  Yes, Your Honor.  Just a few questions on
22   redirect, Your Honor.
23                      REDIRECT EXAMINATION
24   BY MS. KHANNA:
25   Q    Dr. Palmer, I believe you were asked on cross the
```

question:  Would you agree that a bare majority-minority

district -- just over 50 percent -- does not necessarily allow

African-Americans to elect their candidates of choice?  Do you

recall being asked that question?

15:58:19  A     Yes.

Q     And you agreed that a bare majority-minority district does

not necessarily allow African-Americans to elect their

candidates of choice.  Do you agree?

A     Yes.

15:58:29  Q     Would you agree that a bare majority-minority district

just over 50 percent BVAP can elect African-Americans to elect

their candidate of choice?

A     Yes.

Q     What would that depend on?

15:58:41  A     It would depend on things like turnout, voter

participation, and it could also depend on the level of

racially polarized voting.

So, for example, if you had a district where turnout was

equal among both groups, or both groups are turning out in

15:58:58  proportion to their share of the district, you would think that

would be a likely district to perform for African-Americans and

elect their candidates of choice.  You also could have a

district where the level of racially polarized voting is lower.

For example, if 20, 30 percent or even lower than that --

15:59:15  let's just say 20 percent of white voters are supporting the

|  | |
|---|---|
| 1 | African-American candidate of choice, and 100 percent of |
| 2 | African-American voters are -- just to make the math easy -- in |
| 3 | a 50/50 district, you would get 50 percent of the vote for the |
| 4 | African-American candidate of choice from African-American |
| 15:59:31 5 | voters and additional 10 percent of the vote from white voters, |
| 6 | and that candidate would win 60/40. |
| 7 | Q    I believe you were also asked on cross a hypothetical.  If |
| 8 | there is a district in which African-Americans can elect their |
| 9 | preferred candidates and then it is redrawn into a district in |
| 15:59:52 10 | which they can't elect their preferred candidates, that might |
| 11 | be diminishment for purposes of retrogression.  Do you recall |
| 12 | being asked that? |
| 13 | A    Yes. |
| 14 | Q    And I believe you agreed with that? |
| 16:00:01 15 | A    Yes. |
| 16 | Q    Is your understanding that CD 7 is currently Alabama's |
| 17 | sole majority-minority district? |
| 18 | A    Yes. |
| 19 | Q    And in your opinion, do any of Mr. Cooper's illustrative |
| 16:00:14 20 | District 7 render CD 7 a district in which African-Americans |
| 21 | can't elect their candidates of choice? |
| 22 | A    No. |
| 23 | Q    Can we please pull up Plaintiffs' Exhibit 80, Table 2?  I |
| 24 | believe it's on page 4.  Yes. |
| 16:00:42 25 | I want to focus on District 7, which was the district we |

1    just talked about.  Is it fair to say that under three out of

2    four of Mr. Cooper's revised plans, over 55 percent of the

3    actual voters in District 7 are African-American?

4    A    Yes.

16:01:03  5    Q    You were also asked on cross about whether or not your

6    analysis of racially polarized voting considered certain

7    factors such as the fund-raising of the candidates and the

8    party platforms.  Do you recall that?

9    A    Yes.

16:01:24 10    Q    Are these -- are those factors standard -- standard in the

11   methodologies used among experts in evaluating racially

12   polarized voting?

13   A    No.  My understanding is those factors are not used.

14   Q    You were also asked about various assumptions that are

16:01:49 15   included in the ecological inference model.  Do you recall

16   that?

17   A    Yes.

18   Q    Are there assumptions in any statistical model?

19   A    Yes.

16:01:56 20   Q    Is it your understanding -- are you saying that the

21   ecological inference method is somehow set up to find racially

22   polarized voting?

23   A    Absolutely not.  It's not only possible, but can easily

24   happen where you run the model and don't find any evidence of

16:02:14 25   racially polarized voting.

1   Q     Have you ever used ecological inference to find that there

2   is no racially polarized voting?

3   A     Yes.  For example, in the *Bethune Hill* trial there, where

4   I was looking at racially polarized voting in House of delegate

16:02:30 5   districts, in some districts there were racial polarized

6   voting, but in other districts, there were not.

7         And in particular there, I found that white voters tended

8   to be split between the two parties and did not have a clear

9   candidate of choice.

16:02:43 10   Q     And you used -- as you just mentioned, you used the

11   ecological inference method to analyze racially polarized

12   voting in the *Bethune Hill* case?

13   A     Yes.  And not just the same method, but the exact same

14   procedure and really the same computer code.

16:02:59 15   Q     And the Court credited your analysis in that case?

16   A     It did.

17   Q     And you used ecological inference in the course of your

18   work in the *Thomas v. Bryant* case?

19   A     Yes.

16:03:07 20   Q     And the Court credited your analysis in that case?

21   A     Yes.

22   Q     Are you aware of any case in which ecological inference

23   has been rejected by a court as a basis for determining

24   racially polarized voting?

16:03:18 25   A     Not to my knowledge.

```
 1   Q    As an expert in this field, is ecological inference

 2   commonly used by other experts and statisticians to determine

 3   racially polarized voting?

 4   A    Yes.  I have seen it frequently used by other experts.

 5   Q    Would you say it's the best available model for assessing

 6   racially polarized voting?

 7   A    In my opinion, yes.

 8        MS. KHANNA:  No further questions, Your Honor.

 9        THE COURT:  Any recross?

10        MR. DAVIS:  (Nodded head.)

11                    RECROSS-EXAMINATION

12   BY MR. DAVIS:

13   Q    So, Dr. Palmer, if I understand your testimony, a district

14   that's barely over 50 percent black voting age population,

15   maybe that district can perform, maybe it can't?

16   A    That's right.

17   Q    And it depends, you said, on things like voter turnout and

18   the extent of voter polarization?

19   A    Yes.

20   Q    Is there any difference in the levels of voter

21   polarization in Mississippi and Alabama?

22   A    I don't know.

23   Q    Is Alabama -- are African-Americans in Alabama turning out

24   at a higher rate than they are in Mississippi?

25   A    I don't know.
```

16:03:32 (line 5)
16:03:47 (line 10)
16:04:11 (line 15)
16:04:24 (line 20)
16:04:38 (line 25)

```
 1   Q    Have you ever, in any polarized voting analysis, ever
 2   found that there isn't polarized voting when a majority of
 3   white voters in that jurisdiction supported Republicans?
 4   A    I'm sorry.  Can you repeat the question?
 5   Q    Sure.  Let's say you're performing a racially polarized
 6   voting analysis.  You determine that there is a candidate of
 7   choice of white voters, and that candidate of choice is the
 8   Republican candidate.
 9        Have you ever performed a racially polarized voting
10   analysis in such circumstances where you did not find that
11   voting is racially polarized?
12   A    I don't believe so.
13   Q    You looked again at the 2018 general election results and
14   determined that African-American voters were, in fact, a
15   majority of the electorate in the districts, correct?
16   A    Yes.
17   Q    Just so -- again -- never mind.
18        You saw Table 2 before.  That is from your supplemental
19   report.  Again, that's not information that the Alabama
20   Legislature had when it drew the districts in 2011?
21   A    That's right.
22   Q    Okay.  Are you aware of any evidence that would have been
23   available to the Alabama Legislature that showed them that, in
24   fact, if they had drawn those districts, the districts in
25   Mr. Cooper's illustrative maps, that they would have given
```

16:04:56  (line 5)
16:05:10  (line 10)
16:05:36  (line 15)
16:06:01  (line 20)
16:06:16  (line 25)

1    African-American voters an opportunity to elect?

2    A    Can you please repeat the question?

3    Q    Sure.  Do you present any evidence that would have been

4    available to the Alabama Legislature in 2011 that would have

16:06:32  5    told them, the Alabama Legislature, that if they draw those

6    districts as Mr. Cooper suggested, that it would provide a fair

7    opportunity for African-American voters to elect their

8    candidate of choice?

9    A    I don't provide that evidence in my report, but they could

16:06:46  10   have had evidence from earlier election years at that time.

11   Q    Do you know of that any such evidence?

12   A    I don't know what evidence they considered.

13   Q    Okay.  Are you aware of a state asking that congressional

14   districts be precleared where they say, we've lowered the black

16:07:03  15   voting age population in these districts a lot.  We have no

16   idea if they'll work, but don't worry, by 2018 they will?

17   A    I don't know.

18              MR. DAVIS:  Nothing further.

19              THE COURT:  Anything further?

16:07:16  20             MS. KHANNA:  Just one question, Your Honor.

21                      FURTHER REDIRECT EXAMINATION

22   BY MS. KHANNA:

23   Q    Dr. Palmer, do you have reason to believe or any reason to

24   believe that the Alabama Legislature would have had election

16:07:28  25   data at its disposal when drawing maps?

1    A       Yes.

2    Q       The same election data that you had except for different

3    years, correct?

4    A       That's my understanding.

16:07:36  5    Q       And if you were looking at election data for a different

6    year, you could provide the same analysis, the same -- perform

7    the same analysis that you performed here?

8    A       Yes.

9            MS. KHANNA:  Thank you.  No further questions.

16:07:49  10           THE COURT:  Anything else?

11           MR. DAVIS:  Nothing else, Your Honor.

12           THE COURT:  Okay.  I think this is a good time for a

13   break.  We will come back at 4:20.

14           (Recess.)

16:22:55  15           THE COURT:  Be seated and come to order.

16           MR. WALKER:  Your Honor, we have come up with what we

17   think is probably the schedule that we're going to have.  And

18   we can give that to you at the end of the day.

19           THE COURT:  Yeah.  That would be good.  We'll take it

16:23:37  20   up then.  Let's go on with this next witness, please.

21           MR. OSHER:  The plaintiffs' next witness is Ms. Karen

22   Jones.

23           THE COURT:  Okay.

24                    KAREN JONES,

16:23:45  25   having been first duly sworn by the courtroom deputy clerk, was

```
 1   examined and testified as follows:
 2          THE COURTROOM DEPUTY CLERK:  Please state your name
 3   for the record.
 4          THE WITNESS:  Karen Jones.
 5                      DIRECT EXAMINATION
 6   BY MR. OSHER:
 7   Q    Hey, Ms. Jones.
 8   A    Hey.
 9          THE COURT:  And if you would, please, how do you spell
10   your first name?
11          THE WITNESS:  K-A-R-E-N.
12          THE COURT:  Okay.  There are a variety of ways to
13   spell that name.  So I just wanted to make sure we had yours
14   correct.  Thank you.
15   BY MR. OSHER:
16   Q    Ms. Jones, are you a plaintiff in this lawsuit?
17   A    Yes.
18   Q    And do you live in Alabama?
19   A    Yes.
20   Q    And what county do you reside in?
21   A    Montgomery County.
22   Q    And do you live in the city of Montgomery?
23   A    Yes.
24   Q    How long have you lived in Alabama?
25   A    I was born and raised in Montgomery, Alabama, went to high
```

school and graduated in Montgomery.  I moved to Birmingham to

attend University of Alabama Birmingham.  I became ill and had

to move back to Montgomery, Alabama in about '94, '95.  And in

1999, I moved to Georgia.  And then in 2009, I moved back to

16:25:01  Montgomery, Alabama, where I now reside.  And I have been ever

since.

Q    Great.  Thank you.  And tell us a bit about your

educational background.

A    I'm a high school graduate of George Washington Carver

16:25:16  High School, Montgomery, Alabama.  I have my Bachelor's of

Science in psychology, and my master's in public

administration.

Q    Where did you get the master's?

A    At the University of Alabama Birmingham.

16:25:29  Q    Ms. Jones, do you currently hold any public office?

A    Yes, I do.

Q    And what is that?

A    I am on the state democratic executive committee for

District 77.

16:25:41  Q    And that's an elected position?

A    Yes.

Q    Have you run for any other public office?

A    Yes.

Q    And what were those?

16:25:48  A    I ran for Montgomery City Council District 6 in about -- I

think it was 2011.  A former councilman died.  And then in

2015, I ran for City Council District 7 in Montgomery municipal

election.

Q    And during your campaigns for city council, to what extent

did you engage with residents of Montgomery to understand their

interests and needs?

A    I went door to door.  I canvassed.  I participated in

forums.  I participated in debates.  And just overall in the

community meeting people.

Q    Do you participate in other civic organizations?

A    Yes, I do.

Q    And what are those?

A    I serve on the board of legal services Alabama.  I am -- I

help with Save Black Boys, Every Town USA For Gun Safety, Moms

Demand Action, Students Demand Action, SOS, Save Ourselves,

Movement For Justice and Democracy.  I'm the co-county chair

for Alabama Poor Peoples Campaign.

Q    And you listed a number there.  I'm curious about Save

Ourselves.  What is that organization?

A    It is -- and I need to mention one more.  ALFRA, Alabama

Family Rights Association.

Q    Uh-huh.

A    But SOS is an organization.  It is a nonprofit

organization that works on social justice issues.

Q    And do you run any nonprofit organizations?

1    A    Yes, I do.

2    Q    And what is that organization?

3    A    It is Whom It Concerns -- W-H-O-M-I-T-C-O-N-C-E-R-N-S --

4    Incorporated.  It's a 501(c)(3).  We focus on youth

16:27:51 5    development, community development, and assist nonviolent

6    returning inmates to the community by helping them find

7    resources, and the such.

8    Q    Okay.  And in all of this work, can you identify what

9    organizing -- organizing work you do relating to voting?

16:28:10 10   A    I do -- I have voter education, voter registration,

11   workshops, seminars.  And I also do workshops on how to restore

12   voting rights for those individuals who may believe they have

13   lost their voting rights who were locked up before and getting

14   out.

16:28:39 15       So the moral turpitude laws have changed.  So some of them

16   have their rights restored due to that law change, and they

17   don't know that their rights have been restored.  So I help

18   them with that to find out.

19   Q    Ms. Jones, how do you identify racially?

16:28:58 20   A    I'm an African-American black.

21   Q    Are you currently registered to vote in Alabama?

22   A    Yes.

23   Q    And when was the first time you registered to vote?

24   A    In 1993.

16:29:11 25   Q    And how old were you then?

```
 1   A     I was 18.

 2   Q     And when you moved out of the state to move to Georgia,

 3   did you move your registration to Georgia?

 4   A     Yes, I did.

16:29:20  5   Q     And when you moved back to Alabama, did you re-register in

 6   Alabama?

 7   A     Yes.

 8   Q     And have you been registered since you moved back in 2009?

 9   A     Yes.  In every election.

16:29:31 10   Q     So do you vote regularly?

11   A     I do.

12   Q     Would you say that voting is important to you?

13   A     It is a sacred event for me personally because I -- I take

14   it as a serious event, sacred event because so many of --

16:29:50 15   members of my community, my ancestors have shed blood and died

16   for me to have the right to vote.  So I take it seriously.  And

17   that's why I vote in every election.

18   Q     And what role do you see your vote playing in Alabama's

19   political system?

16:30:07 20   A     My voice counts.  So my vote, you know, I want it to

21   count.  So it means something to me to vote for somebody that I

22   think is in the best interest or have the best interest for my

23   community and for the black community and myself.

24   Q     Ms. Jones, what congressional district do you live in?

16:30:29 25   A     District 7.
```

1  Q    And who currently represents Congressional District 7?

2  A    Congresswoman Terri Sewell.

3  Q    Have you voted for Representative Sewell in congressional

4  elections?

16:30:40 5  A    Yes.

6  Q    And in each of those election in which you have voted for

7  Representative Sewell, has she won her election?

8  A    Yes.

9  Q    Were those elections competitive?

16:30:50 10  A    No.

11  Q    Can you tell me why you believe that?

12  A    Well, it's little to no competition being that she is a

13  front runner, well known.  She has name recognition.  It's

14  really no competition.  She usually wins 3 to 4 to 1 if she has

16:31:11 15  an opponent, but she's...

16  Q    Ms. Jones, do you feel that your vote matters in

17  Congressional District 7 when voting the congressional

18  elections?

19  A    In all elections, I feel my vote matters.  I feel like it

16:31:26 20  would mean more if I had -- it's like it's diluted to me

21  because with Congresswoman Terri Sewell, she's a shoe-in.  So,

22  I mean, it's not to say that I am going to stay home, but I

23  know she's going to win.  And most of us know she's going to

24  win, so, you know.

16:31:49 25  Q    Is there something about who lives in District 7 that

makes you feel this way?

A     Who lives in District 7?

Q     The population of voters in District 7?

A     The black community, yes.

16:32:03  Q     And tell me more about that.  What is it about the fact
that there's a black community in District 7 that makes you
feel as if your vote is diluted?

A     Well, we're stacked and packed in District 7, whereby out
of seven Congress people we just -- I mean, we just -- we just
16:32:23  have her to represent the black issues.  And she's flying by
herself -- issues that affect the black community, mental
health issues, health care, criminal justice, education.  It's
just her loan self that focuses on issues in the black
community.

16:32:44  Q     Now, you used the term "stacked and packed."  What do you
mean by that?

A     Well, I feel like the district -- well, I know that her
district is majority black.  So she's a shoe-in with little to
no competition or anybody else to go with because of the name
16:33:06  recognition or whatever.  So...

Q     All right.  In your view, are there more African-Americans
that are necessary to elect Terri Sewell in her district?

A     Yes.

Q     You mentioned that you feel like your vote is diluted in
16:33:27  District 7.  Based on your community organizing work, have you

1    developed a sense as to whether other black voters in your

2    district feel similarly?

3    A    Yes.  Most voters and most who are trying to vote -- and I

4    try to do voter education and voter registration.  People like,

16:33:49  5    well, she's going to win anyway, so why do I need to go vote

6    for her?  Y'all going to elect her in because, you know, she

7    always gets in.

8         And I tell them their vote matters.  You know, you need to

9    vote anyway because we have a right to vote.

16:34:04 10        So I think the general consensus is whether or not an

11    individual, black individual votes for her, she's going to get

12    it anyway because the majority black, consistent black voters

13    are going to go to vote for her, anyway.

14    Q    Ms. Jones, what result are you trying to achieve in this

16:34:24 15    lawsuit?

16    A    I would really love another congressional district with

17    hopefully a person of color, black person who will focus on

18    issues in the black community.  That will help in my mind the

19    issues that Terri Sewell can't get to.  That extra person can

16:34:48 20    focus on those black issues that she couldn't get to.  So I

21    think it would be a great help to the black community.

22    Q    Ms. Jones, you mentioned -- well, before I go there,

23    before we go to those specific issues, does the person have to

24    be a black candidate in order to represent the interests and

16:35:15 25    needs of the black community?

1  A     No.  But they should have the black interests at heart in
2  that state, yeah.
3  Q     So let's talk about some of those issues.  Based on your
4  experience organizing in Montgomery, have you found that the
5  African-American community in the area has particular needs and
6  interests relating to health care?
7  A     Yes.
8  Q     And what are those?
9  A     Affordable health care and Medicaid expansion.  I, being a
10  woman who doesn't have children, I had a stroke last year.  And
11  had it not been for me going to a charity hospital, waking up
12  at 3:00 in the morning and being in line -- people come from
13  all over to go to Medical Outreach, and they only accept 12.
14  So you have to stay in line.
15      And I remember one time being Number 13 and having
16  two weeks of heart medication left without any insurance,
17  without Medicaid because I don't have any children.  I also
18  have epilepsy.
19      So they provide medical services that I would not have
20  been able to get as a woman without a child and without
21  Medicaid in Alabama.  So I thank God for them.
22      And since then, I have disability now.  But I had to have
23  a stroke and died three times before I got insurance and health
24  care in Alabama.
25  Q     Does the African-American community in Montgomery have

1   particular needs or interests relating to education?

2   A    Yes.

3   Q    What are those?

4   A    Higher education.  I've been -- prior to me becoming ill,

16:36:56 5   I had a job since I was 14 years old.  So I got Pell Grant one

6   time, I remember, $300.  So I've always had to get student

7   loans.  And now student loans are just like burdensome.

8        So we need someone in there who will fight for Pell Grants

9   for low income people.  Even though I had a job at 14, I had to

16:37:22 10  get a permit to work because I wanted to work.  You know,

11  because I wanted to work.  I wanted to go to college.  I

12  couldn't pay for it.  And I really want to go back to college

13  to get my Ph.D., but I'm out of funding.

14       So I think somebody who would help with education and

16:37:41 15  post-secondary education is somebody we need.

16  Q    What about lower levels of education -- elementary school,

17  middle school, high schools?  Are there particular needs and

18  interests of the African-American community in Montgomery

19  related to those levels of education?

16:37:57 20  A    Yes.  I am a lay advocate for children, primarily children

21  with special needs, as well.  So I see our special needs

22  children being thrown out to alternative schools and then

23  really getting arrested.  Most time they're autistic, ODD, ADHD

24  combined, but severe issues in special needs that usually have

16:38:26 25  those children instead of individuals who understand them,

 1   pushed out into the criminal -- the juvenile system.  So it's

 2   really the school to prison pipeline at an early age as early

 3   as elementary, and I see that.

 4   Q    Does the African-American community in Montgomery, based

 5   on your work there, have particular needs or interests relating

 6   to criminal justice?

 7   A    Oh, yes.  While working on voter registration and voter

 8   education, we have individuals to come in for expungement or to

 9   ask about expungement because they owe so much restitution.

10   Sometimes a lot of them owe on restitution, but they can't get

11   a job.  They can't get a job because we also have a debtor's

12   prison, debtor's court in Montgomery.

13        So if they don't have ID or their driver's license, even

14   the temporary agencies, they won't hire them because you must

15   have ID.  So I say a hungry man is an angry man.  They have to

16   do what they have to do to eat.

17        I don't condone illegal activities.  But they often find

18   themselves in a predicament.  And so the criminal is bad.

19   Q    What about the specific relationship between the black

20   community in Montgomery and law enforcement?

21   A    It's bad because of the lack of jobs, accessibility to get

22   the jobs.  And if you don't have a driver's license or if you

23   are driving, you're profiled and targeted.  And usually if you

24   get stopped, you're going to get not one ticket, usually four.

25        And we've basically, those of us who are in the community,

1  kind of basically know the first three things that -- a pattern

2  that the police will stop you for -- not fully stopping, not

3  using your signal, proper signal, lane, and improper turn.  And

4  so those are the three categories that we've nailed down.  And

16:40:51 5  then from there, you're going to at least get three to four

6  more tickets on top of that.

7  Q    And have there been recent instances in Montgomery that

8  has affected the relationship between the African-American

9  community and law enforcement?

16:41:05 10 A    Yes.  Three years ago.  I think it's been about

11  three years.

12      My childhood neighbor, Greg Gunn, was walking home

13  unarmed, never got charged for anything.  A white officer, new

14  officer, rookie, Aaron Cody Smith, he stopped him.  They beat

16:41:28 15  him with an ASP baton, and gave him a one-inch gash in the back

16  of his head, tased him multiple times, shot at him seven times.

17  Five bullets struck -- three in the front, twice in the back.

18  He was just only probably from me to you to his front door of

19  his house.  Never was charged for anything.  He was just

16:41:49 20  walking home.

21      So that kind of caused a schism between the community and

22  the police department.  Where we had kind of a good

23  relationship under Chief Kevin Murphy, and he was forced to

24  resign after he made a statement about apologizing for the

16:42:12 25  action of Montgomery Police Department during the Civil Rights

1  era, and John Lewis gave him a ribbon.  We had a good, good

2  connection in the community.

3      But when this -- just atrocious act of assassination of an

4  unarmed black man walking back home happened, it kind of --

16:42:34  5  everybody's on edge right now because the trial hasn't started,

6  and they moved it to Dale County where he won't have a jury of

7  his peers.

8      And Ms. Gunn, she just died maybe two months ago.  So we

9  kind of in our feelings about it right now.

16:42:49 10  Q    What about employment?  Does the African-American

11  community in Montgomery have particular needs and interests

12  related to employment?

13  A    We do.

14  Q    What are those?

16:42:58 15  A    There's little to no jobs.  Job availability, again, due

16  to people -- their driver's license.  And I wish they would do

17  a work permit -- would allow people if they have tickets paying

18  on them to allow them to drive during certain hours to get to

19  and from work that would at least help them pay on tickets.  I

16:43:26 20  raised that to the city council, too, before.  Or the bus

21  transportation where it would take you in a car maybe

22  15 minutes to get somewhere.  If you ride the city line, it may

23  take you up to two hours if that driver stops and pick you up

24  at the stop because sometimes I don't know why they keep

16:43:47 25  driving by.

<pre>
 1          But it's -- and nobody's really hiring now.
 2     Q     And those transportation issues, do they translate to
 3     employment issues?
 4     A     They do.
16:43:57 5     Q     And why is that?
 6     A     Because most of our -- and I used to be on Montgomery
 7     transportation coalition.  So I kind of know that most of the
 8     transportation, they don't go to the industrialized areas, like
 9     the Hyundai subsidiaries and plants like that where they can
16:44:18 10     go.  They don't go out that far.  And for the disabled
11     community, and they don't go to certain communities.  So it's a
12     lot going on with our public transit system.
13     Q     Does the African-American community in Montgomery have
14     particular needs and interests related to affordable housing?
16:44:36 15     A     Oh, yes.  I tried to assist with others.  Most
16     homelessness has increased in Montgomery tremendously where if
17     they're not living under the bridges or whatever, they are
18     using the hotels as apartments because even if parents or a
19     family have jobs, it's not enough to afford the apartments now.
16:45:05 20     So the affordability of it, you making 7, $8, you can't afford
21     a nice apartment.
22          And then with the public housing, they closed down a lot
23     of them, and then they're remodeling some.  But the list is so
24     long.  And I couldn't believe it when I moved back to
16:45:25 25     Montgomery.  So I said I'm going to apply just to see.  Well, I
</pre>

```
 1  got my approval letter probably year before last, and I had
 2  applied in 2009.
 3  Q    And, finally, what about access to useful utilities or
 4  sewage?  Does the African-American community in Montgomery have
 5  issues related to that?
 6  A    Oh, the electricity bills are just ridiculous.  And I try
 7  to refer people to 211 and call 211 and ask for utility
 8  assistance.  If they receive food stamps, they can ask their
 9  caseworker for all available assistance.  But their utility
10  bills now -- I think Alabama Power went up about maybe, I think
11  maybe 20 percent or so.  But most family utility bills range
12  from 500 to $1,100.
13       We have triple -- triple-digit heat.  So most of the
14  houses that some lower income families do get a chance to live
15  in, they have -- not central heat and air, but the air
16  conditioners that you put in the windows, which draws a lot.
17  Q    What about sewage?  Are there -- have there been issues
18  relating to the black community and access to working sewage?
19  A    Oh, my God, yes.  Water and the flooding and in no man's
20  land.  Believe it or not in 2019 the sewage and the flooding in
21  what we call no man's land -- that's out past Madison Park, Ty
22  Rove area (phonetic), Hunter's Station area, community areas,
23  the Vineyard.
24  Q    And are these predominantly black communities?
25  A    Predominantly black and low income areas.
```

The times in left margin: 16:45:45 (line 5), 16:46:10 (line 10), 16:46:35 (line 15), 16:46:58 (line 20), 16:47:19 (line 25)

```
 1   Q    So we just ran through a long list of issues that you've
 2   told us about.  Are you saying that the white residents of
 3   Alabama don't have interests in these particular issues or
 4   needs relating to these issues?
 5   A    They may do.  But most times they get their situations
 6   taken care of and have resources made readily available from
 7   what I notice.
 8        And because I'm with the Poor People's Campaign and other
 9   organizations, and as an advocate, I'm not limited to
10   Montgomery County.  I go all over the state to help parents and
11   to help people.  So I see.  And as compared to Montgomery being
12   the capital city, the capital county, is an embarrassment that
13   we have these issues in 2019.
14   Q    So is it -- it's the level to which the African-American
15   community is affected by these issues that sets them apart from
16   white residents' interaction with these issues?
17   A    It is.
18   Q    Ms. Jones, do you regularly follow political campaigns in
19   Alabama?
20   A    Yes, I do.
21   Q    And have you observed any instances in which candidates in
22   Alabama have referred to race as a reason to vote for or
23   against a particular candidate?
24   A    They don't do it blatantly.  But they do, do it
25   subliminally through the pronouns.  You can hear the
```

1    undertones, the racial undertones -- "those people," "they,"

2    "them," "us," "we."

3    Q    Does this happen often in Alabama?

4    A    Yes, it does.

16:49:18    5    Q    Let's talk about a few specific instances.  Have you

6    personally heard a member of Congress from Alabama make a

7    statement invoking race as a -- as part of candidacy or

8    political campaign?

9    A    Yeah.  Mo Brooks.

16:49:35    10    Q    What did you hear Mo Brooks say?

11    A    He had a commercial, and it was something to the effect of

12    that he would shoot immigrants -- be able to shoot immigrants,

13    and that was -- I had to find it on YouTube to make sure I

14    heard what he said.  And it was -- that was terrible.  I think

16:49:59    15    most terrible thing for somebody in government to blatantly

16    say.

17    Q    And when specifically did you hear him make the statement?

18    A    Probably about 2017 when he was running -- 2017, 2018.

19    Q    What does that statement regarding shooting undocumented

16:50:23    20    immigrants, what does that have to do with race?

21    A    It has a lot to do with race, because as a person of

22    color, to me, it implied people of color.  And it invoked -- it

23    invoked to me white superiority, white supremacy.  It invoked a

24    type of racism and the green light for others who believe in

16:50:56    25    what he was saying that it was okay.  Because if he's in

1  government and saying it's okay to do it, it would lead crazies

2  out here to believe it's okay to do it.

3  Q    In the most recent race for Alabama's governor, did you

4  hear any candidate make statements invoking race as a reason to

16:51:16  5  vote for or against someone?

6  A    It -- in the gubernatorial race?

7  Q    Uh-huh.

8  A    I didn't hear anything about, you know, blatantly race.

9  But Governor Kay Ivey did make a statement about preserving the

16:51:37  10  Confederate monuments and statutes.  And that hit kind of hard

11  in the black community because what about our history?  What

12  about the symbolism that it reflects to black people and people

13  of color, the Native Americans?  When you say preserve

14  Confederate statutes and monuments and memorials, you didn't

16:51:59  15  say anything about enhancing black status, memorials, and any

16  symbols that, you know, mean -- matter to the black community

17  or people of color.

18  Q    To you and to the people in your community, based on

19  conversations you have had in your work, what does the

16:52:20  20  preservation of Confederate monuments mean to the black

21  community?

22  A    When I heard that commercial, it -- I felt like she was

23  saying white supremacy forever, you know, white nationalism

24  forever, not anything to embrace unity and diversity.  But

16:52:42  25  clearly we're going to recognize these treasonous white

1  supremacists and hold them to a higher level, and nothing is to

2  ever change that.

3      I mean, the bill says that it -- forever basically you

4  cannot do anything, remove or alter any statue or anything that

16:53:05  5  has to do with a Confederate soldier.  And when we as a black

6  person have to hear that, that that -- I mean, we want to bring

7  change, you know.  It really is bad.  And it's terrible.

8  Q    And then what about in the most recent mayoral race in

9  your town?  Were there any statements regarding race, invoking

16:53:34 10  race to sway people's votes?

11  A    In the August 27th race, it was good, you know.

12  Everything was fine.  But then when it came down to a runoff

13  between a white male, David Woods, versus a black male, Steven

14  Reed, I don't know what happened.  But the mudslinging, it was

16:54:01 15  -- it was ugly.

16      And David Woods had -- it was a survey out, and they

17  called your phone, selected people phones.  And they called my

18  mom's phone.  And I was there.  And asked about 24 questions.

19  Q    Did any of those questions relate to race?

16:54:20 20  A    Yes, they did.  Basically, not specifically, he's black,

21  you know, Steven Reed's black, don't vote for him.

22      But like it just told like where he lived, as if that

23  mattered.  That he lived in a certain community, as if black

24  people couldn't afford to live in that community in which he

16:54:47 25  lives.

1       That was -- that was -- I mean, most of the questions were
2   very incendiary and invoked some racial overtones, not
3   undertones.  It was really ugly.
4   Q   Did David Woods make a part of his platform being tough on
16:55:10 5  crime?
6   A   Yes.  And that was very interesting that he wanted to
7   create more police stations and hire more police.

8       He also has a show.  He's over WCOV television station.
9   So his show promotes like cops in Montgomery, like that type of
16:55:33 10 show.  But most time whenever they show it, you see black
11  people being arrested.  They film it.

12      And so when he starts saying we're going to be tough on
13  crime, we're going to hire more police, we're going to put more
14  police stations, and to us, it's not finding the root cause of
16:55:59 15 what's going on because we do have white people performing
16  crimes.  But it's as if he wants to invoke some type of martial
17  law with all these police, what he wants to create.

18      And so it's not a good time, being that we still have an
19  open case with a white officer who assassinated an unarmed
16:56:22 20 black man for walking while black, is still being paid by the
21  city of Montgomery.  They didn't fire him.  And this black man
22  wasn't charged with anything.

23      So it wasn't the time for him to even bring that up.
24  Q   Do these sort of statements, how do they make you feel as
16:56:42 25 an African-American Alabamian?

```
 1  A    I have seven brothers, five older, plenty of nephews and
 2  great nephews.  And it -- it's frustrating.  And it makes me
 3  angry that if you want to be over entire city diversity -- but
 4  the majority of black, over 60 percent black, and you talking
 5  about some issues that are going to drive us apart.  It's
 6  frustrating because we thought we would -- you know, it's 2019,
 7  so...
 8  Q    Ms. Jones, are you a member of a political party?
 9  A    Yes.
10  Q    And do you prefer -- what party do you prefer?
11  A    Democratic party.
12  Q    And you prefer the democratic party over the Republican
13  party?
14  A    Yes.
15  Q    Tell us why that is.
16  A    For me, the democratic party's platforms and individuals
17  who run as a Democrat, their platforms focus on issues
18  pertaining to what I am in alignment with and what the black
19  community is in alignment with -- health care issues, mental
20  health.  When I say health care, I mean affordable health care,
21  criminal justice system, and just climate, you know, ecological
22  issues.
23  Q    Is there something about the relationship between the
24  Republican party and race that makes you prefer the democratic
25  party over the Republican party?
```

1   A    Yes.

2   Q    What is that?

3   A    Being a Republican for me, seeing somebody who is a

4   Republican right now tells me that they're racist because

16:58:35  5   nothing I've heard a Republican say is in alignment with the

6   platform that will help the interests of the black community.

7   Q    And does that view of the Republican party, is that

8   connected to statements that members of the Republican party

9   have made?

16:58:58 10   A    Yes.

11   Q    Any in particular that we've talked about today?

12   A    Yeah.  I was talking about so much statistics.

13   Q    Would you agree that it relates to being -- allowing such

14   statements to be made by members of the Republican party that

16:59:22 15   informs this view?

16   A    Yes.

17   Q    Based on your work relating to voting and voting

18   registration, do black citizens of Montgomery encounter

19   barriers when trying to vote?

16:59:36 20   A    Yes.

21   Q    Tell me about actually registering to vote.  What sort of

22   barriers do African-Americans residents in Montgomery encounter

23   when trying to register to vote?

24   A    Some of them are afraid to register to vote because of

16:59:50 25   what they feel like they've -- if they were locked up before,

1    even though I tell them they banned the box on the application,

2    they still feel like, man, they're going to reject it.  They're

3    going to find out I'm a felon.  I have to educate them because

4    the moral turpitude laws have changed, which have decreased

17:00:12 5    most of the moral turpitude laws.

6        So that's a major factor that I see when I'm out

7    registering doing voter registration drives.  That's a major

8    thing.

9    Q    And does the disproportionate incarceration and criminal

17:00:33 10   records of the black community impact their ability to restore

11   their voting rights?

12   A    It does.  Most of the individuals are black males

13   primarily.  I've had very few black females with former felons.

14   But black males primarily are very disenfranchised.  Their

17:00:58 15   restitution when they get out, you know, to pay for

16   restitution.  So if they have tickets, say, for instance, they

17   can't get ID.  So you can't get ID, you are can't really get a

18   job.  Not only that, you can't -- if you can't work, you can't

19   pay the restitution and also with child support.  They can't

17:01:23 20   pay child support.

21       And so it's a number of elements that affects voter

22   registration and people.  And primarily with -- when I go out

23   and do these voter registration drives.

24   Q    What about actually casting a vote?  Do African-American

17:01:40 25   residents of Montgomery encounter barriers actually casting a

vote even if they're registered?

A    Oh, my God, yes.  Their names are what I've been seeing in the last few elections, because Montgomery has had so many elections in the last three years, it's ridiculous, special elections.  So a lot of their names are not showing up on the rosters.

When they go there to the precinct, the precincts have changed.  So they say that they send notices out, but I know they don't because I'm an avid voter.  And I haven't received my voter registration card that they said they sent out to everybody.  I had to call the board of registrars and say, hey, I didn't get mine.  Everybody else is saying they have theirs.  Make sure that I am listed as an active voter, I'm still on the roll because I don't have a middle name.  So I want to make sure that Karen no-middle-name Jones is on the roll as active.

And so take a typical person may not know to call the board of registrars.  And it's frustrating for them if they've been living behind a church that is a precinct for all these years, and then abruptly something changes that they have to now go about two, three miles over to the library.

Q    And does someone with fewer resources, would they be able to handle the situation that you handled as well as you were able to?

A    No.  They get frustrated.  They'll call me and tell me about it and I'm about to just leave, you know.  And I said,

don't go anywhere.  Just ask for a provisional ballot, and we
will work out everything later.  It's really frustrating.

    I worked for the first time at a white precinct last
year -- no.  Yeah.  It was last year.  And it was so smooth,
people just came in, they went to the line and got -- it was so
smooth.  I hadn't ever experienced a smooth transition like
that.  And I was like, why is this so smooth over here?  It
didn't take them a good 10 minutes from the time they came in
the building to leave out.  Where as with us, you know, the
power is not working, your name's not on the list.  It's
just -- where's your ID.  And then you have to educate people
if they don't have ID.  If two people at the precinct and
recognize them, they still can vote.

    So it's a lot of disenfranchisement at the black precincts
that I was just -- I was in amazement when I was down Vaughn
Road, way down Vaughn Road.  It was like a whole other
experience.  I was like, wow, it really can happen, just go in
and vote and go home without a problem.

Q    Ms. Jones, have you done organizing work in Mobile?

A    I helped with the Alabama Poor People's Campaign.

Q    And do you interact with people who live in Mobile?

A    Some of the organizers when we have our Poor People's
Campaign training and meetings, yeah.

Q    And based on that work, do you have a sense of whether
there's similarities between the cities of Mobile and

Montgomery?

A     Yes.  They have a same --

THE COURT:  Just a minute, Ms. Jones.  I'm not sure if you said that you had actually done work in Mobile or that you know people who have done work in Mobile.

THE WITNESS:  I know people who have done work in Mobile.

THE COURT:  But you have not actually done work there yourself?

THE WITNESS:  I've gone to the rallies and --

THE COURT:  In terms of voter registration and things of that nature?

THE WITNESS:  No.

BY MR. OSHER:

Q     Have you had conversations with people who live in Mobile about the issues that they -- the African-American community faces?

A     Yes.

Q     In Mobile?

MS. HOWELL:  Your Honor, I am going to object to that as hearsay.

THE COURT:  If we go further than has she had conversations, yes, it would be hearsay.

BY MR. OSHER:

Q     Would you say that you have had many conversations with

```
 1  people in Mobile during your organizing work?
 2  A    Yes.
 3  Q    That was -- thank you.  Based on those conversations, have
 4  you learned a general sense of the issues that
17:06:22  5  African-Americans are facing in Mobile?
 6       MS. HOWELL:  Your Honor, I am going to renew my
 7  objection.
 8       THE COURT:  Sustained.  It doesn't matter how many
 9  people have told her something, that's still hearsay, is it
17:06:31 10  not?
11       MR. OSHER:  Your Honor, based on her actual organizing
12  work she's done with the Poor People's Campaign, it's the same
13  organization, she could develop a lay opinion as to what is
14  going on Mobile.
17:06:44 15       MS. HOWELL:  Your Honor, she's already testified that
16  she did not directly work with them.
17       THE COURT:  I sustain the objection.
18       MR. OSHER:  Thank you, Your Honor.  No further
19  questions.  Thank you.
17:06:59 20       THE COURT:  Cross-examination?
21       MS. HOWELL:  Yes, Your Honor.
22                      CROSS-EXAMINATION
23  BY MS. HOWELL:
24  Q    Hi, Ms. Jones.
17:07:33 25  A    Hi.
```

1  Q    Thank you for taking the time to come up today.  We

2  appreciate it.

3  A    You're welcome.

4  Q    I wanted to ask you a few follow-up questions about what

17:07:40  5  your counsel was just asking you.

6       So you talked about having moved back to Montgomery in

7  2009; is that correct?

8  A    Yes.

9  Q    Okay.  So you've lived in Montgomery since the 2011

17:07:53 10  districts were drawn; is that right?

11 A    Yes.

12 Q    Okay.  And you, in fact, attended a hearing about those

13 districts, did you not?

14 A    A public hearing, yes.

17:08:01 15 Q    Okay.  And you actually spoke at that hearing, correct?

16 A    Yes.

17 Q    Okay.  And you spoke about a couple of things, right?  And

18 we talked about those at your deposition, didn't we?

19 A    Yes.  But you know I had a stroke.  So you have to refresh

17:08:17 20 my memory.

21 Q    All right.

22 A    For specifics.

23 Q    I'm happy to do that.

24      MS. HOWELL:  So and, Your Honor, I have here this -- I

17:08:41 25 had taken an excerpt from Defendant's Exhibit 3, which I

Case 2:18-cv-00907-KOB   Document 50-7   Filed 11/15/21   Page 241 of 249

```
 1    recognize that plaintiffs' counsel had objected to at least in

 2    part.  That's the preclearance submission from the 2011 act.

 3         This is just a transcript of the Montgomery hearing.  I'm

 4    not offering it for -- I believe what the grounds of the

 5    objection were for relevance relating to the state of mind of

 6    the legislators as they were passing the Act.  And my aim here

 7    is only to get Ms. Jones' testimony on the record, so --

 8              THE COURT:  Okay.  Is there any objection to that

 9    component?

10              MR. OSHER:  That doesn't involve our objection to the

11    exhibit.

12              THE COURT:  Okay.  Ms. Howell, are you wanting to

13    offer this as an exhibit?

14              MS. HOWELL:  Yeah.  If -- if I could, Your Honor, that

15    would be -- that would be my preference to offer this as an

16    exhibit.

17              THE COURT:  All right.  Do you want brand new number,

18    or do you want to do this like Defendant's Exhibit 3-A, or

19    however?

20              MR. DAVIS:  Do a brand new number.

21              THE COURT:  Okay.

22              MS. HOWELL:  I will defer to my co-counsel.

23              MR. WALKER:  313.

24              THE COURT:  So Defendant's Exhibit 313?  Is there any

25    objection to that being admitted?
```

Timestamps in left margin:
17:09:00 (line 5)
17:09:15 (line 10)
17:09:45 (line 15)
17:10:00 (line 20)
17:10:12 (line 25)

<pre>
 1              MR. OSHER:  No objection, Your Honor.

 2              THE COURT:  Okay.  Thank you.

 3              MS. HOWELL:  I do, Your Honor, have copies of the

 4    excerpt that I am working with if the deputy -- if the Judge or

17:10:22  5    the witness would care to see it in a place of other than on

 6    the Elmo.

 7              THE COURT:  I'm fine with it there for now.

 8              MS. HOWELL:  Your Honor, may I approach?

 9              THE COURT:  You may.

17:10:44 10    BY MS. HOWELL:

11    Q    Ms. Jones, and if you will flip to -- it's 383.  It has

12    the number at the bottom when you start speaking.

13         Okay.  So now that you have your testimony from the

14    hearing that's in front of you, if you want to take a minute to

17:11:13 15    read it, I'm happy to give that to you.  But it appears that

16    the only two things that you talked about at the hearing were

17    wanting more notice about it and the need for legislators who

18    were working on the district to pay attention to communities of

19    interest.

17:11:28 20         Does that seem correct to you?

21    A    No.  I talked about the lack of notice given in a timely

22    manner.  I talked about fair representation and having a

23    commission for citizens to be in the redistricting process.

24         As you can see, when I stated that we needed a

17:11:57 25    redistricting -- I saw it better over here -- that we needed a
</pre>

redistricting commission, a citizens redistricting commission.

I also talked about legislators allowed to choose their voters

instead of voters choosing their legislators by being in the

writing of the district's process.  And so they can kind of

17:12:24   cherry pick who gets their vote.

Q    So it would be fair to say, then, that you covered a fair

amount of ground in your short speech --

A    Yes.

Q    -- at the public hearing?

17:12:35   Okay.  Do you see anywhere in there that you requested the

drawing of a second majority-minority district in Alabama?

A    No.

Q    Okay.  And did you, in fact, request such a district be

drawn in 2011?

17:12:48   A    No.

Q    I'm sorry.  Was that no?

A    Yes, that was no.

Q    Okay.  So you waited until 2018 and filing this case to

request a second majority-minority district be drawn in

17:13:18   Alabama; is that correct?

A    Yes.

Q    Okay.  You also talked about several different things with

your counsel.  Particularly, I want to draw your attention to

certain things that you had said about the local election that

17:13:35   recently took place in Montgomery.  And the candidates in that

1    election were as you mentioned David Woods, correct?  And

2    Steven Reed was the other candidate?

3    A    For the runoff.

4    Q    For the runoff.

17:13:45 5    A    Yes.

6    Q    All right.  And can you tell me who won that election?

7    A    The black male, Steven Reed.

8    Q    Okay.  And he won actually in a landslide; is that a fair

9    characterization?

17:13:58 10    A    Yes.

11    Q    Okay.  You also talked a lot about interests that you

12    thought that you characterized as being interests of the black

13    community, I believe.  You talked about affordable health care,

14    correct?

17:14:21 15    A    Yes.

16    Q    Okay.  And education needs?

17    A    Yes.

18    Q    And criminal justice?

19    A    Yes.

17:14:27 20    Q    And also employment, right?

21    A    Yes.

22    Q    Okay.  Would you not agree that all of those are interests

23    common to any number of voters in Alabama?

24    A    No.

17:14:39 25    Q    Why not?

1   A     Because there's a significant disenfranchisement in the

2   black community in education, in criminal justice, in having

3   health care.

4         If you look at the statistics, you will see that whereas

17:14:54 5  they tout we just may have 9 percent unemployment in Alabama in

6   the black community, it's probably three to four times as high.

7   So it's kind of when they give statistics they show a general

8   number.  They don't actually show what's going on in the black

9   community.

17:15:17 10        A black person's going to get more time for crack cocaine

11  than a white person will get for powder cocaine, and we know

12  this.  So the numbers are kind of skewed, if you would, when we

13  see them on the news in the headlines.  And these are facts.

14        We can look at bonds being given to a black person who

17:15:42 15  commits murder versus a white person who commits murder.  The

16  bonds are really ridiculous and racial.  And it is what it is.

17  Q     And I do hear what you are saying, Ms. Jones.  But white

18  people, too, are concerned about affordable health care, are

19  they not?

17:16:04 20  A     I don't know.  I'm black.  I don't -- I'm telling you from

21  my point of view.

22        When we are talking about health care, and I'm standing in

23  line and have to wake up at 3:00 a.m. to try to get heart

24  medication and seizure pills, you know who's in that line?

17:16:26 25  Majority is black people in that line.

```
 1   Q    Let me reframe this for you, Ms. Jones.  Do you know of
 2   anybody who wants unaffordable health care?
 3   A    I haven't asked.
 4   Q    You haven't asked.  Do you know of anyone who wants
 5   unaffordable health care?
 6   A    I don't know.  I have not asked.  You -- that's just
 7   like -- do you know anyone who would want -- who would not want
 8   a Louis Vuitton bag?  It depends on what that person values.
 9        If you can afford health care, it wouldn't matter to you
10   whether you wanted affordable health care because you got money
11   to pay for your doctor bill.  I can't pay -- I can't get my
12   heart medications when I didn't have insurance.  And when you
13   looking at 13 pills and you on a waiting list, it's a
14   difference for an indigent person who is impoverished person
15   with no options versus someone who has money and it doesn't
16   matter whether they're down to their last medication because
17   they can go get some more.  It's a big difference.
18   Q    You also talked about how you feel right now that someone
19   who votes Republican is racist, correct?
20   A    Yes.
21   Q    Does voting for Republican candidates render the voter
22   racist?
23   A    Yes.
24   Q    Haven't you voted for Republican candidates?
25   A    Yes.  But I'm black, and I can't be racist by definition.
```

17:16:39  (line 5)
17:17:00  (line 10)
17:17:24  (line 15)
17:17:47  (line 20)
17:17:55  (line 25)

```
     1   Q      Thank you, Ms. Jones.

     2   A      You're welcome.

     3              THE COURT:  Any redirect?

     4              MR. OSHER:  Just a brief redirect, Your Honor.

17:18:25  5                     REDIRECT EXAMINATION

     6   BY MR. OSHER:

     7   Q      Do you still have that document in front of you?

     8   A      I do.

     9   Q      Do you see it on the screen?

17:18:46 10   A      Yes.

    11   Q      This paragraph here that I'm pointing to that starts at

    12   dates and times.  The last sentence, you're referring to the

    13   citizen redistricting commission that you were discussing

    14   earlier; is that correct?

17:19:01 15   A      Yes.

    16   Q      Can you read for us?

    17   A      "The citizens redistricting commission will consider

    18   public input in legal and expert advice to meet the Voting

    19   Rights Act's requirement."

17:19:15 20   Q      Did you know that you might have a legal right to a second

    21   majority-minority district in Alabama in 2011?

    22   A      I didn't.  When I called about redistricting to the

    23   legislative reference office, you will get transferred umpteen

    24   number of times.

17:19:37 25              THE COURT:  Okay.  I think you answered the question.
```

          1   Thank you.

          2           THE WITNESS:  Oh, okay.

          3           MR. OSHER:  Thank you, Your Honor.  No further

          4   questions.

17:19:42  5           THE COURT:  Anything further?

          6           MS. HOWELL:  Nothing further, Your Honor.

          7           THE COURT:  Thank you.  Thank you, Ms. Jones.  You may

          8   step down.

          9       And I think this is a good time to recess for the day.  I

17:19:54 10   know our court security officers will be glad to know that.

         11       All right.  Thank you.  I think you said you've got some

         12   material for me or something to discuss?  We can do that up

         13   here, or if you want to take a break and come back to the

         14   office, whatever.

17:20:22 15           (Whereupon, the above proceedings were concluded at

         16       5:20 p.m.)

         17

         18

         19

         20

         21

         22

         23

         24

         25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

248

CERTIFICATE

    I certify that the foregoing is a correct
transcript from the record of proceedings in the
above-entitled matter.

*Christina K. Decker*                    11-15-19

Christina K. Decker, RMR, CRR                    Date

Federal Official Court Reporter

ACCR#:  255