FILED
2021 Dec-21  AM 10:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| MARCUS CASTER, et al., | |
| Plaintiffs, | Case No.: 2:21-cv-1536-AMM |
| v. | |
| JOHN H. MERRILL, in his official capacity as Alabama Secretary of State, | |
| Defendant. | |

**SECOND DECLARATION OF DR. BRIDGETT KING**

Pursuant to 28 U.S.C. § 1746, I, Bridgett King, make the following declaration:

1.      This second declaration responds to assertions made in two reports submitted by the Defendant in this case. Section I addresses Tom Bryan's assertion of how "Black" should be defined for purposes of measuring the Black population of a political subdivision. Section II addresses Dr. M.V. Hood III's assertion that white support of minority Republican candidates suggests racial considerations do not influence their voting behavior, as well as his discussion of a recent Alabama State House race.

2.      In responding to these assertions, I draw on my research and writing as a political/social scientist and my in-depth understanding of voting rights in a historical and contemporary context, along with understanding gained from academic and applied experience.

**I.      Definition of "Black"**

3.      In Mr. Bryan's report, he discusses the need to "define and document the true 'Black' population" of congressional districts.[1] Mr. Bryan notes that in the last two Censuses,

---

[1] Bryan Rep. at 9.

respondents had the option of selecting more than one race.[2] He states: "A 'Black' in Alabama therefore can be Black alone, or perhaps in combination with other races or possibly even also Hispanic.[3] He goes on to assert that "[i]n this matter precise definitions matter," and claims that counting only those Alabamians who identify as Black and no other race ("Black alone," "single race Black," or "SR Black") as Black when analyzing the Black population of a congressional district "has been most defensible from a political science / Gingles 2 voting behavior perspective," as opposed to counting all Alabamians who identify as Black, regardless of whether they also identify with another race ("any part Black" or "AP Black").[4]

4.      Mr. Bryan is not a political scientist, and Mr. Bryan does not offer any explanation, evidence, or citation to support his assertion that counting only those who identify as "Black alone" as Black for purposes of measuring population has been "most defensible" from a "political science" perspective.

5.      Drawing on my own scholarship and those of other political scientists and historians, it is my opinion that Mr. Bryan's assertion has it exactly backwards. From a political science and historical perspective, the more defensible position is that, when determining the Black population of a political subdivision, *all* individuals who identify as Black—whether in combination with other races (and/or Hispanic heritage) or not—should be counted as Black.

6.      The AP Black definition is superior to the Black alone definition from a political science and historical perspective because it better comports with how individuals racially self-identify. Racial self-identification is the result of historical, cultural, and social environments.

7.      From the historical perspective, how individuals racially self-identify must take

---

[2] *Id.*
[3] *Id.*
[4] *Id.* at 10.

account of how society and the State of Alabama has defined the Black race. In Alabama, that understanding must begin with the "one drop rule." For centuries, states in the American South, including Alabama, defined Black by using the one drop rule, also known as the "one black ancestor rule," or in anthropology as "the hypo-descent rule." Stated simply, the rule asserts that a single drop of Black blood makes a person Black. Racially mixed persons were thus considered Black and assigned the status of the subordinate group.[5] As one scholar explains: "Any person who has some 'negro blood' has been or still is regarded as 'colored,' or 'African,' or 'Negro,' or 'Black,' or 'Afro American,' or 'African American.'"[6]

8.      The rule did not apply to people whose heritage was some combination of Caucasian, Hispanic, Asian, or Native. In both the historical and contemporary contextual understanding, the one drop rule applied only to Americans of African descent—in other words it only applies to Black Americans.[7]

9.      The one drop rule became entrenched across the American South in the 1910s and 1920s, but it first appeared in legal codes in the 1800s. The rule evolved out of racist notions of white racial purity.[8] While state statutes often explicitly defined who was considered Black, social customs also played a large role in defining the racial line, which used the one drop rule to suppress political, economic, and social access and mobility. As early as the 1700s, those who were mixed race Black and white ("mulattos," "quadroons," "octoroons," etc.) were subject to the same legal disabilities as Blacks and thus were enslaved. Keeping "mulattos" and other part-Black persons

---

[5] Davis, F. J. (1991). Who is Black? One nation's definition. Penn State University Press: University Park, Pennsylvania; Hickman, C. B. (1997). The Devil and the One Drop Rule: Racial Categories, African Americans, and the U.S. Census. *Michigan Law Review*, *95*(5), 1161–1265.
[6] Jordan, W. D. (2014). Historical Origins of the One-Drop Racial Rule in the United States. *Journal of Critical Mixed Race Studies*, 1(1), 98-132.
[7] Davis*, supra* n.5; Jordan*, supra* n.6.
[8] Hickman, *supra* n.5.

enslaved served an economic purpose: the offspring of children with Black mothers and white fathers increased a plantation's inventory.

10.    Though the citizenship status of Black Americans changed after the Civil War, Black people with significant white ancestry continued to be considered Black if they also had a Black ancestor.

11.    An understanding of Blackness that is inclusive of all Black individuals, both SR Black and AP black, was also adopted by the US Bureau of the Census.

12.    By the Fourteenth Census in 1920, when the color line had hardened, the Census Bureau stopped counting "mulattoes" and formally adopted the one drop rule:

> The term "white" as used in the census report refers to persons understood to be pure-blooded whites. A person of mixed blood is classified according to the nonwhite racial strain. . . . [t]hus a person of mixed white . . . and Negro . . . is classified as . . . a Negro . . . regardless of the amount of white blood . . . .[9]

13.    This formal adoption of the one drop rule appeared in legislative definitions as well. For example, in 1924, a Virginia Act for "Preservation of Racial Integrity" defined a White person as someone with "no trace whatsoever of any blood other than Caucasian."[10] By 1930, Virginia defined as colored anyone "in whom there is ascertainable any negro blood."[11]

14.    As time has progressed, our understanding of who is Black, and who is not, has not deviated; to the contrary, it has been further entrenched in our society.  Historian Paul Spickard argues:

> The "one drop" rule is so ingrained in the American psyche that Blacks and Whites do not think twice about it. For example, part-Black people of all hues joined Blacks

---

[9] Bureau of the Census, U.S. Dept. of Commerce, Fourteenth Census of the United States: 1920, at 10 (1923); Hickman, *supra* n.5.

[10] 1924 VA. Acts ch. 371, § 5.

[11] 1930 VA. Acts ch. 85, § 67.

in embracing the "Black is Beautiful" slogan advanced in the late 1960s, finally taking pride in their skin color, their hair and other aspects of their black ancestry.[12]

15.     For all persons with Black lineage, barriers to full opportunity and participation are formidable, and a person who is fractionally Black cannot escape these obstacles.[13] Asserting one's racial identity is thus a political exercise, a conscious decision to connect to the heritage of that racial identity.[14]  It is a choice to connect to the politics and organized interests of that racial identity, but one also accepts the socio-political and anthropological struggles of that group.

16.     Individuals who assert their identity as Black, in total or in part, are making a conscious decision to identify with the history and legacy of Black identity in the United States, an identity that includes the trans-Atlantic slave trade, the legacy of Jim Crow, segregation, the relief brought by the 1964 Civil Rights Act and 1965 Voting Right Act, and the contemporary political, economic, and social realities experienced by Black Americans. Excluding such individuals from the definition of Black cannot be supported from a political science perspective.

## II.     Republican Voting Patterns

### A.  Support for Black Candidates Among White Republican Voters

17.     I respond to two assertions made in Dr. Hood's report. First, Dr. Hood asserts that "ideology trumps race in the case of white Republicans and their support for GOP minority candidates," citing specifically an article Dr. Hood published with Seth C. McKee.[15]

---

[12] Spickard, P.R.  (1992). The Illogic of American Racial Categories in *Racially mixed people in America*, (in Root, M P.P. Root ed.), p. 12-23. Sage Publishing: Thousand Oaks, California. This observation is cited in Hickman, *supra* n.5.

[13] Davis, *supra* n.5.

[14] Martin, B. L. (1991). From Negro to Black to African American: The Power of Names and Naming. *Political Science Quarterly*, *106*(1), 83–107.

[15] Hood Rep. at 15 (citing Hood, M. V., & Mckee, S. C. (2015). True Colors: White Conservative Support for Minority Republican Candidates. *The Public Opinion Quarterly*, *79*(1), 28–52).

18.     In the cited article, while the authors conclude that conservative whites will vote for conservative minority candidates, they provide no explicit discussion of white Republican willingness to vote for Black candidates, the heart of the issue. Nor does the study consider any elections conducted in the state of Alabama.

19.     In the analysis, Hood and McKee collapse all the non-white candidates who ran for Congress or Governor in the elections studied—elections in Delaware, Florida, Hawaii, Maryland, Nevada, New Mexico, Ohio, Pennsylvania, South Carolina, Texas, and Vermont into the category of "minority" candidate. This category includes 4 African Americans, 3 Asians, and 4 Hispanics. The level of support among conservative voters for these minority candidates was compared against conservative voters' support for white candidates using the 2006, 2010, and 2012 Cooperative Election Study (formerly known as the Cooperative Congressional Election Study). They provide no discussion of the conditions under which support for a minority candidate will occur.

20.     Perhaps more importantly, the mere fact that white Republicans support a minority candidate tells us quite little about whether any of those voters are motivated by racial considerations. As political scientists Hakeem Jefferson and Michael Tesler recently explained, white Republican voters who harbor prejudiced views will still support a Black candidate so long as that candidate takes particular positions on issues relating specifically to race.[16] Specifically, racially prejudiced white voters will support a Black candidate so long as the candidate's positions "don't threaten the racial hierarchy" and give no reason to "worry that the[] candidate[] will

---

[16] Jefferson, H. & Tesler, M. (2021). Why White Voters With Racist Views Often Still Support Black Republicans, *FiveThirtyEight*, https://fivethirtyeight.com/features/why-racist-white-voters-often-favor-black-republicans/.

represent the interest of Black Americans."[17] In other words, white voters who harbor racial prejudice will support a Black candidate who successfully demonstrates he or she is "not in the business of carrying water for their own racial group."[18] By contrast, they will oppose any Black candidate whom they believe "will fight for 'those people [Black Americans]' and not 'people like us [white Americans].'"[19] Put simply, racially prejudiced white voters "are not hostile to Blackness, per se. They are hostile to a particular manifestation of Blackness – one that reflects a commitment to racial justice and the advancement of [Black Americans'] collective goals."[20]

21.     Moreover, Jefferson and Tesler also explain that voting for Black Republicans may be appealing to racially prejudiced whites because "it assuages concerns of being seen as racist by enabling them to say, 'I can't be racist! I voted for the Black candidate!'"[21]

22.     The 2016 Republican primary provides a helpful example. During that race, support for candidate Ben Carson, a Black man, was "positively correlated with the belief that Black Americans have too much influence on U.S. politics."[22] Carson also received much more favorable evaluations among Republicans harboring the "overtly prejudiced [view] that 'most African Americans are more violent than most whites'" as compared to white candidate Jeb Bush.[23]

23.     When considering partisanship, we know that Democrats and Republicans differ greatly across a wide range of issues. While some of these issues do not pertain to race, many of them do. For example, recent surveys have found the following:

---

[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*

a.   49 percent of Democrats/Democratic Leaders believe that white people benefit a great deal from advantages in society that Black people do not have, compared to 7 percent of Republicans/Republican Leaders, a 42 percent difference.[24]

b.   67 percent of Democrats/Democrat Leaders believe that when it comes to giving Black people rights the country has not gone far enough, compared to 15 percent of Republicans/Republican Leaders, a 52 difference.[25]

c.   71 percent of Republicans/Republican Leaders believe that a lot of progress has been made when it comes to ensuring equal rights for all Americans regardless of their race/ethnicity, compared to 29 percent of Democrats/Democratic Leaders, a 42 percent difference.[26]

d.   85 percent of Democrats/Democrat Leaders support the Black Lives Matter movement, whereas 78% of Republicans/Republican Leaders say they oppose it.[27]

e.   81 percent of Democrats support removing confederate monuments from public spaces, compared to 17 percent of Republicans, a 62 percent difference.[28]

---

[24] In a Politically Polarized Era, Sharp Divides in Both Partisan Coalitions. *Pew Research Center*. https://www.pewresearch.org/politics/2019/12/17/in-a-politically-polarized-era-sharp-divides-in-both-partisan-coalitions/.
[25] *Id.*
[26] Deep Division in Americans' View of Nation's Racial History – and How to Address It, *Pew Research Center*, https://www.pewresearch.org/politics/2021/08/12/deep-divisions-in-americans-views-of-nations-racial-history-and-how-to-address-it/.
[27] Menasce Horowitz, J. (2021, Sept. 27). Support for Black Lives Matter Declined After George Floyd Protests, but Has Remained Unchanged Since, *Pew Research Center*, https://www.pewresearch.org/fact-tank/2021/09/27/support-for-black-lives-matter-declined-after-george-floyd-protests-but-has-remained-unchanged-since/.
[28] Kelley, A. (2020, July 17). A Majority of Americans Support Removal of Confederate Monuments: Poll. *Washington Post*, https://thehill.com/changing-america/respect/diversity-inclusion/507788-a-majority-of-americans-support-removal-of.

24.     These results demonstrate the deep divisions among the two major political parties on issues of race.

**B.     The 2021 Alabama House District 73 Election**

25.     The second of Dr. Hood's assertions to which I respond is his identification of the election of Kenneth Paschal, a Black Republican, to the Alabama House of Representatives in 2021, as evidence that ideology is more important than race in determining white Republican voting behavior.

26.     For the reasons just explained, Mr. Paschal's election tells us very little about whether his supporters harbor racially prejudiced views. And for purposes of political science methodology, when put into context, this single election in one Alabama State House District with less than 4,000 total votes cast provides almost no insight into anything about white voters in Alabama.

27.     Additionally, Paschal's election tells us nothing about polarization between Black and white voters.

28.     Paschal is the first Black Republican elected to the Alabama Legislature in 140 years, since the end of Reconstruction. This speaks to the significant historical and contemporary challenges that Black Alabamians, including Black Republicans, face when endeavoring to engage in Alabama politics.

29.     Moreover, Paschal's win is an outlier in the field of Black Republicans who have recently run for office but lost in the primary election.[29] Below I list Black Republicans who

---

[29] *See* Cason, M. (2018, Sept. 9). Alabama Republican Chair Terry Lathan Says Party Can Do More to Recruit African-Americans, *AL.com*,
https://www.al.com/news/2018/09/alabama_republican_chair_terry.html.

recently ran in contested Republican primary elections.[30] Candidates in bold advanced to the general election.[31]

| Candidate Name | Election Year | Election Type | Office | Votes Received | % of Vote Received |
|---|---|---|---|---|---|
| Pamela Blackmore Jenkins | 2014 | Republican Primary | AL House Seat 46 | 389 | 4.90 |
| Philip Brown | 2014 | Republican Primary | Public Service Commission Position 2 | 43,097 | 12.58 |
| Sam Rowlin | 2014 | Republican Primary | Autauga County Sheriff | 1,610 | 18.74 |
| William McCollum | 2014 | Republican Primary | Fayette County Sheriff | 841 | 34.58 |
| B.J. Major | 2014 | Republican Primary | Cherokee County Board of Education Seat 5 | 466 | 18.64 |
| Tijuanna Adetunji | 2014 | Republican Primary | Montgomery City Council District 2 | 1410 | 13.79 |
| Ron Wilson | 2014 | Republican Primary | House District 85 | 555 | 34.22 |
| Sharica S. Long | 2018 | Republican Primary | Colbert County Circuit Clerk | 1,097 | 19.9 |
| **Phillip** | **2018** | **Republican Primary** | **Jefferson County Executive Committee, Dis 1 Pt. 2** | **797** | **46.2** |

---

[30] There are other candidates who are listed by the Republican party as qualifying for elections in 2014 and 2018. The results of some of these primary elections, however, are not provided in the official certification on the Alabama Secretary of State website. Although most counties do not have election websites that provide archived results, where possible, I checked county election websites. I also used the website Ballotpedia to verify the returns in primary and general elections for Black Republicans who ran in 2014 and 2018, but I did not use that website as a primary source of information. This list represents the most comprehensive set of information available in light of these data limitations.

[31] I obtained the certified elections results from the Alabama Secretary of State's public website.

| **Brown[32]** | | | | | |
|---|---|---|---|---|---|
| Derrick Williams | 2016 | Republican Primary | District Judge Mobile County P. 4 | 4371 | 12.3 |
| John H. Moore | 2018 | Republican Primary | Morgan County Sheriff | 319 | 1.8 |
| **Lewis Brooks[33]** | **2018** | **Republican Primary** | **Shelby County School Superintendent** | **12626** | **50.7** |
| Randy Turner | 2018 | Republican Primary | Morgan County Commissioner | 4907 | 31.9 |
| Allen Hendrickson | 2018 | Republican Primary | Houston County Commission Seat 2 | 700 | 19.2 |
| Jayla McElrath | 2018 | Republican Primary | Cherokee County Board of Elections Place 4 | 1217 | 25.9 |

30.     Finally, if we consider the vote returns from Paschal's performance in both the Republican Primary and Republican Primary runoff as a proxy for white Republican Party support of his candidacy, it is not overwhelming by any means. In the March 30, 2021 House District 73 Special Republican Primary, Paschal received just 27% of votes cast, and the remaining votes went to other candidates. Leigh Hulsey, a white candidate whom Paschal faced in the runoff, received 30.7% of votes cast in the initial primary election.[34] In the April 27 primary runoff election, Husley received 1,414 votes (48.91% of votes cast) and Paschal received 1,477 votes (51.09 % of votes

---

[32] There is no record of a runoff for this seat in the 2018 returns on the SOS website. 2018 election results are not archived on the Jefferson County Elections website (https://www.jccal.org/Default.asp?ID=1480&pg=Elections+Results). Brown, however, proceeded to the 2018 General Election, and is in bold for this reason.

[33] This election is not in the 2018 returns on the SOS website and the Shelby County Probate Office does not have an election results archive. There was no Democratic Party challenger in the general election. The information about the race is from Dawkins, S. (2018, June 5). Brooks Wins Tightly Contested Race for Superintendent of Shelby County Schools. *Shelby County Reporter*. https://www.shelbycountyreporter.com/2018/06/05/brooks-wins-tightly-contested-race-for-superintendent-of-shelby-county-schools/.

[34] Alabama Secretary of State: https://www.sos.alabama.gov/sites/default/files/election-2021/Certification%20of%20Primary%20Results.pdf).

cast), a difference of just 63 votes.[35] Both the overall number of ballots cast in these elections and the margins between Paschal and Hulsey are small. Using this example to extrapolate any conclusion about white voting behavior in Alabama would be scientifically unsound.

# # #

I declare under penalty of perjury that the foregoing is true and correct. I reserve the right to supplement my report in light of additional facts, testimony, and/or materials that may come to light.

Executed on: December 20, 2021

Bridgett King

---

[35] Alabama Secretary of State: https://www.sos.alabama.gov/sites/default/files/election-2021/HD73_Republican_Party-Certification_of_Results-Special_Primary_Runoff_Election.pdf.