FILED
2021 Dec-23  PM 04:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

User:
Plan Name:    **Illustrative Plan 7**
Plan Type:    **Congress**

## Measures of Compactness Report

Sunday, December 19, 2021                                                                                                     7:25 PM

|           | Reock | Polsby-Popper | Area/Convex Hull | Schwartzberg |
|-----------|-------|---------------|------------------|--------------|
| Mean      | 0.41  | 0.21          | 0.71             | 2.08         |
| Min       | 0.20  | 0.13          | 0.58             | 1.53         |
| Max       | 0.56  | 0.39          | 0.82             | 2.52         |
| Std. Dev. | 0.13  | 0.10          | 0.10             | 0.39         |
| Sum       |       |               |                  |              |

| District | Higher Number is Better | | | Lower Number is Better |
|----------|-------|---------------|------------------|--------------|
|          | Reock | Polsby-Popper | Area/Convex Hull | Schwartzberg |
| 1        | 0.20  | 0.13          | 0.58             | 2.43         |
| 2        | 0.39  | 0.19          | 0.72             | 2.00         |
| 3        | 0.32  | 0.17          | 0.68             | 2.19         |
| 4        | 0.54  | 0.32          | 0.82             | 1.61         |
| 5        | 0.47  | 0.39          | 0.82             | 1.53         |
| 6        | 0.56  | 0.14          | 0.77             | 2.29         |
| 7        | 0.37  | 0.13          | 0.59             | 2.52         |

**Caster Plaintiffs' Exhibit 71, Page 1**

## Measures of Compactness Report

Measures of Compactness Summary

| | |
|---|---|
| **Reock** | The measure is always between 0 and 1, with 1 being the most compact. |
| **Polsby-Popper** | The measure is always between 0 and 1, with 1 being the most compact. |
| **Area / Convex Hull** | The measure is always between 0 and 1, with 1 being the most compact. |
| **Schwartzberg** | The measure is usually greater than or equal to 1, with 1 being the most compact. |

**Caster Plaintiffs' Exhibit 71, Page 2**

User:
Plan Name: **AL_2021_Enacted_Congress**
Plan Type: **Congress**

## Measures of Compactness Report

Monday, December 20, 2021                                                                                                          8:39 AM

| | Reock | Polsby-Popper | Area/Convex Hull | Schwartzberg |
|---|---|---|---|---|
| Mean | 0.38 | 0.22 | 0.72 | 1.95 |
| Min | 0.30 | 0.15 | 0.61 | 1.68 |
| Max | 0.50 | 0.32 | 0.80 | 2.28 |
| Std. Dev. | 0.07 | 0.06 | 0.07 | 0.21 |
| Sum | | | | |

| | Higher Number is Better | | | Lower Number is Better |
|---|---|---|---|---|
| District | Reock | Polsby-Popper | Area/Convex Hull | Schwartzberg |
| 1 | 0.40 | 0.20 | 0.71 | 1.98 |
| 2 | 0.50 | 0.26 | 0.76 | 1.78 |
| 3 | 0.36 | 0.25 | 0.77 | 1.79 |
| 4 | 0.36 | 0.19 | 0.61 | 2.09 |
| 5 | 0.30 | 0.32 | 0.80 | 1.68 |
| 6 | 0.31 | 0.15 | 0.68 | 2.28 |
| 7 | 0.43 | 0.19 | 0.68 | 2.04 |

**Caster Plaintiffs' Exhibit 72, Page 1**

## Measures of Compactness Report

Measures of Compactness Summary

| | |
|---|---|
| **Reock** | The measure is always between 0 and 1, with 1 being the most compact. |
| **Polsby-Popper** | The measure is always between 0 and 1, with 1 being the most compact. |
| **Area / Convex Hull** | The measure is always between 0 and 1, with 1 being the most compact. |
| **Schwartzberg** | The measure is usually greater than or equal to 1, with 1 being the most compact. |

**Caster Plaintiffs' Exhibit 72, Page 2**

User:
Plan Name: **AL_BOE_adopted_2021**
Plan Type: **Congress**

# Measures of Compactness Report

Friday, December 17, 2021                                                                                        2:53 PM

|              | Reock | Polsby-Popper | Area/Convex Hull | Schwartzberg |
|--------------|-------|---------------|------------------|--------------|
|              |       |               |                  | 1.93         |
| Mean         | 0.39  | 0.24          | 0.72             |              |
| Min          | 0.24  | 0.18          | 0.66             | 1.51         |
| Max          | 0.52  | 0.38          | 0.85             | 2.21         |
| Std. Dev.    | 0.10  | 0.07          | 0.07             | 0.23         |
| Sum          |       |               |                  |              |

| | Higher Number is Better | | | Lower Number is Better |
|----------|-------|---------------|------------------|--------------|
| **District** | **Reock** | **Polsby-Popper** | **Area/Convex Hull** | **Schwartzberg** |
| 1 | 0.29 | 0.21 | 0.66 | 1.97 |
| 2 | 0.24 | 0.18 | 0.66 | 2.21 |
| 3 | 0.47 | 0.22 | 0.77 | 1.95 |
| 4 | 0.35 | 0.18 | 0.67 | 2.11 |
| 5 | 0.36 | 0.19 | 0.67 | 2.10 |
| 6 | 0.51 | 0.26 | 0.72 | 1.81 |
| 7 | 0.52 | 0.28 | 0.75 | 1.76 |
| 8 | 0.41 | 0.38 | 0.85 | 1.51 |

**Caster Plaintiffs' Exhibit 73, Page 1**

## Measures of Compactness Report

AL_BOE_adopted_2021

Measures of Compactness Summary

| | |
|---|---|
| **Reock** | The measure is always between 0 and 1, with 1 being the most compact. |
| **Polsby-Popper** | The measure is always between 0 and 1, with 1 being the most compact. |
| **Area / Convex Hull** | The measure is always between 0 and 1, with 1 being the most compact. |
| **Schwartzberg** | The measure is usually greater than or equal to 1, with 1 being the most compact. |

**Caster Plaintiffs' Exhibit 73, Page 2**

User:
Plan Name: **AL_Senate_adopted_2021**
Plan Type: **Congress**

## Measures of Compactness Report

Friday, December 17, 2021                                                    2:59 PM

| | Reock | Polsby-Popper | Area/Convex Hull | Schwartzberg |
|---|---|---|---|---|
| Mean | 0.41 | 0.26 | 0.74 | 1.89 |
| Min | 0.19 | 0.12 | 0.54 | 1.33 |
| Max | 0.63 | 0.54 | 0.92 | 2.53 |
| Std. Dev. | 0.12 | 0.10 | 0.10 | 0.33 |
| Sum | | | | |

| | Higher Number is Better | | | Lower Number is Better |
|---|---|---|---|---|
| **District** | **Reock** | **Polsby-Popper** | **Area/Convex Hull** | **Schwartzberg** |
| 1 | 0.21 | 0.29 | 0.78 | 1.82 |
| 2 | 0.63 | 0.37 | 0.82 | 1.58 |
| 3 | 0.62 | 0.54 | 0.92 | 1.33 |
| 4 | 0.26 | 0.33 | 0.84 | 1.60 |
| 5 | 0.57 | 0.38 | 0.84 | 1.50 |
| 6 | 0.43 | 0.44 | 0.83 | 1.49 |
| 7 | 0.26 | 0.14 | 0.59 | 2.49 |
| 8 | 0.53 | 0.35 | 0.87 | 1.53 |
| 9 | 0.48 | 0.21 | 0.67 | 1.98 |
| 10 | 0.44 | 0.28 | 0.74 | 1.70 |
| 11 | 0.32 | 0.12 | 0.56 | 2.53 |
| 12 | 0.19 | 0.16 | 0.62 | 2.30 |
| 13 | 0.30 | 0.27 | 0.71 | 1.82 |
| 14 | 0.48 | 0.29 | 0.82 | 1.67 |
| 15 | 0.53 | 0.16 | 0.71 | 2.20 |
| 16 | 0.50 | 0.20 | 0.74 | 1.98 |

**Maptitude**
For Redistricting

**Caster Plaintiffs' Exhibit 74, Page 1**

## Measures of Compactness Report

AL_Senate_adopted_2021

| District | | Higher Number is Better | | Lower Number is Better |
| --- | --- | --- | --- | --- |
| | Reock | Polsby-Popper | Area/Convex Hull | Schwartzberg |
| 17 | 0.46 | 0.13 | 0.73 | 2.31 |
| 18 | 0.26 | 0.23 | 0.70 | 1.99 |
| 19 | 0.37 | 0.20 | 0.76 | 1.93 |
| 20 | 0.43 | 0.18 | 0.69 | 2.16 |
| 21 | 0.29 | 0.17 | 0.63 | 2.16 |
| 22 | 0.30 | 0.12 | 0.54 | 2.47 |
| 23 | 0.57 | 0.29 | 0.79 | 1.53 |
| 24 | 0.39 | 0.37 | 0.88 | 1.47 |
| 25 | 0.24 | 0.14 | 0.65 | 2.40 |
| 26 | 0.50 | 0.18 | 0.76 | 1.93 |
| 27 | 0.27 | 0.21 | 0.59 | 2.07 |
| 28 | 0.42 | 0.25 | 0.72 | 1.77 |
| 29 | 0.33 | 0.28 | 0.75 | 1.80 |
| 30 | 0.44 | 0.23 | 0.70 | 1.80 |
| 31 | 0.44 | 0.22 | 0.70 | 1.93 |
| 32 | 0.46 | 0.34 | 0.81 | 1.57 |
| 33 | 0.38 | 0.21 | 0.64 | 2.03 |
| 34 | 0.48 | 0.26 | 0.84 | 1.78 |
| 35 | 0.56 | 0.42 | 0.88 | 1.45 |

**Caster Plaintiffs' Exhibit 74, Page 2**

## Measures of Compactness Report

AL_Senate_adopted_2021

Measures of Compactness Summary

| | |
|---|---|
| **Reock** | The measure is always between 0 and 1, with 1 being the most compact. |
| **Polsby-Popper** | The measure is always between 0 and 1, with 1 being the most compact. |
| **Area / Convex Hull** | The measure is always between 0 and 1, with 1 being the most compact. |
| **Schwartzberg** | The measure is usually greater than or equal to 1, with 1 being the most compact. |

**Caster Plaintiffs' Exhibit 74, Page 3**

User:
Plan Name: **AL_House_adopted_2021**
Plan Type: **Congress**

## Measures of Compactness Report

Friday, December 17, 2021                                                                                     3:04 PM

| | Reock | Polsby-Popper | Area/Convex Hull | Schwartzberg |
|---|---|---|---|---|
| Mean | 0.39 | 0.24 | 0.71 | 1.97 |
| Min | 0.11 | 0.07 | 0.45 | 1.27 |
| Max | 0.62 | 0.60 | 0.92 | 3.53 |
| Std. Dev. | 0.11 | 0.10 | 0.11 | 0.42 |
| Sum | | | | |

| | | Higher Number is Better | | Lower Number is Better |
|---|---|---|---|---|
| District | Reock | Polsby-Popper | Area/Convex Hull | Schwartzberg |
| 1 | 0.24 | 0.28 | 0.82 | 1.77 |
| 2 | 0.38 | 0.29 | 0.70 | 1.71 |
| 3 | 0.38 | 0.27 | 0.83 | 1.86 |
| 4 | 0.38 | 0.30 | 0.72 | 1.73 |
| 5 | 0.37 | 0.27 | 0.70 | 1.77 |
| 6 | 0.47 | 0.24 | 0.77 | 2.00 |
| 7 | 0.54 | 0.34 | 0.82 | 1.64 |
| 8 | 0.33 | 0.15 | 0.81 | 2.25 |
| 9 | 0.40 | 0.21 | 0.75 | 1.97 |
| 10 | 0.52 | 0.35 | 0.78 | 1.60 |
| 11 | 0.44 | 0.16 | 0.74 | 2.22 |
| 12 | 0.58 | 0.22 | 0.79 | 1.76 |
| 13 | 0.39 | 0.27 | 0.81 | 1.69 |
| 14 | 0.35 | 0.11 | 0.56 | 2.72 |
| 15 | 0.25 | 0.15 | 0.61 | 2.29 |
| 16 | 0.43 | 0.21 | 0.70 | 1.93 |

**Maptitude**
For Redistricting

**Caster Plaintiffs' Exhibit 75, Page 1**

## Measures of Compactness Report

AL_House_adopted_2021

| District | Higher Number is Better | | | Lower Number is Better |
|---|---|---|---|---|
| | Reock | Polsby-Popper | Area/Convex Hull | Schwartzberg |
| 17 | 0.41 | 0.47 | 0.83 | 1.44 |
| 18 | 0.51 | 0.53 | 0.92 | 1.33 |
| 19 | 0.34 | 0.18 | 0.58 | 2.31 |
| 20 | 0.27 | 0.18 | 0.64 | 2.10 |
| 21 | 0.26 | 0.19 | 0.62 | 2.15 |
| 22 | 0.44 | 0.19 | 0.76 | 1.86 |
| 23 | 0.55 | 0.38 | 0.89 | 1.40 |
| 24 | 0.34 | 0.43 | 0.83 | 1.44 |
| 25 | 0.47 | 0.27 | 0.71 | 1.87 |
| 26 | 0.53 | 0.22 | 0.75 | 1.86 |
| 27 | 0.56 | 0.20 | 0.73 | 1.90 |
| 28 | 0.34 | 0.14 | 0.68 | 2.31 |
| 29 | 0.36 | 0.16 | 0.61 | 2.26 |
| 30 | 0.39 | 0.13 | 0.66 | 2.44 |
| 31 | 0.41 | 0.22 | 0.68 | 1.98 |
| 32 | 0.16 | 0.07 | 0.54 | 3.53 |
| 33 | 0.50 | 0.27 | 0.78 | 1.77 |
| 34 | 0.37 | 0.17 | 0.76 | 2.04 |
| 35 | 0.53 | 0.23 | 0.80 | 1.96 |
| 36 | 0.19 | 0.07 | 0.45 | 3.33 |
| 37 | 0.35 | 0.37 | 0.85 | 1.61 |
| 38 | 0.46 | 0.29 | 0.79 | 1.72 |
| 39 | 0.41 | 0.32 | 0.71 | 1.69 |
| 40 | 0.47 | 0.30 | 0.78 | 1.72 |
| 41 | 0.38 | 0.33 | 0.82 | 1.52 |
| 42 | 0.50 | 0.38 | 0.78 | 1.56 |
| 43 | 0.36 | 0.22 | 0.73 | 1.91 |
| 44 | 0.50 | 0.39 | 0.84 | 1.51 |
| 45 | 0.24 | 0.14 | 0.63 | 2.33 |
| 46 | 0.11 | 0.09 | 0.46 | 3.10 |

**Caster Plaintiffs' Exhibit 75, Page 2**

## Measures of Compactness Report

AL_House_adopted_2021

| | Higher Number is Better | | | Lower Number is Better |
| --- | --- | --- | --- | --- |
| District | Reock | Polsby-Popper | Area/Convex Hull | Schwartzberg |
| 47 | 0.41 | 0.21 | 0.69 | 1.98 |
| 48 | 0.39 | 0.21 | 0.77 | 2.02 |
| 49 | 0.54 | 0.25 | 0.76 | 1.79 |
| 50 | 0.30 | 0.15 | 0.62 | 2.34 |
| 51 | 0.56 | 0.36 | 0.88 | 1.47 |
| 52 | 0.23 | 0.14 | 0.60 | 2.59 |
| 53 | 0.28 | 0.33 | 0.73 | 1.72 |
| 54 | 0.21 | 0.14 | 0.62 | 2.61 |
| 55 | 0.19 | 0.10 | 0.45 | 3.15 |
| 56 | 0.31 | 0.24 | 0.74 | 1.80 |
| 57 | 0.41 | 0.12 | 0.61 | 2.52 |
| 58 | 0.33 | 0.18 | 0.66 | 2.20 |
| 59 | 0.31 | 0.15 | 0.72 | 2.30 |
| 60 | 0.42 | 0.13 | 0.67 | 2.35 |
| 61 | 0.44 | 0.40 | 0.87 | 1.50 |
| 62 | 0.23 | 0.17 | 0.65 | 2.10 |
| 63 | 0.30 | 0.23 | 0.57 | 1.99 |
| 64 | 0.25 | 0.20 | 0.62 | 2.14 |
| 65 | 0.33 | 0.15 | 0.74 | 2.20 |
| 66 | 0.26 | 0.17 | 0.53 | 2.13 |
| 67 | 0.51 | 0.40 | 0.88 | 1.32 |
| 68 | 0.38 | 0.11 | 0.57 | 2.60 |
| 69 | 0.40 | 0.19 | 0.61 | 1.97 |
| 70 | 0.50 | 0.21 | 0.70 | 2.09 |
| 71 | 0.29 | 0.12 | 0.55 | 2.43 |
| 72 | 0.52 | 0.19 | 0.75 | 1.83 |
| 73 | 0.32 | 0.15 | 0.59 | 2.33 |
| 74 | 0.36 | 0.26 | 0.69 | 1.94 |
| 75 | 0.34 | 0.19 | 0.66 | 1.98 |
| 76 | 0.41 | 0.23 | 0.70 | 1.93 |

**Caster Plaintiffs' Exhibit 75, Page 3**

## Measures of Compactness Report

AL_House_adopted_2021

| District | Higher Number is Better | | | Lower Number is Better |
|---|---|---|---|---|
| | Reock | Polsby-Popper | Area/Convex Hull | Schwartzberg |
| 77 | 0.58 | 0.27 | 0.75 | 1.91 |
| 78 | 0.25 | 0.12 | 0.56 | 2.39 |
| 79 | 0.51 | 0.23 | 0.72 | 1.91 |
| 80 | 0.48 | 0.35 | 0.76 | 1.57 |
| 81 | 0.50 | 0.41 | 0.81 | 1.46 |
| 82 | 0.58 | 0.35 | 0.87 | 1.45 |
| 83 | 0.32 | 0.18 | 0.57 | 2.19 |
| 84 | 0.51 | 0.32 | 0.75 | 1.54 |
| 85 | 0.43 | 0.46 | 0.84 | 1.38 |
| 86 | 0.53 | 0.36 | 0.87 | 1.58 |
| 87 | 0.36 | 0.39 | 0.85 | 1.53 |
| 88 | 0.42 | 0.23 | 0.67 | 1.88 |
| 89 | 0.35 | 0.19 | 0.57 | 2.03 |
| 90 | 0.28 | 0.15 | 0.56 | 2.36 |
| 91 | 0.46 | 0.27 | 0.71 | 1.83 |
| 92 | 0.32 | 0.24 | 0.78 | 1.83 |
| 93 | 0.39 | 0.32 | 0.78 | 1.60 |
| 94 | 0.62 | 0.60 | 0.91 | 1.27 |
| 95 | 0.37 | 0.36 | 0.78 | 1.52 |
| 96 | 0.58 | 0.46 | 0.86 | 1.39 |
| 97 | 0.30 | 0.18 | 0.55 | 2.17 |
| 98 | 0.32 | 0.18 | 0.63 | 2.12 |
| 99 | 0.35 | 0.18 | 0.55 | 2.29 |
| 100 | 0.52 | 0.28 | 0.72 | 1.72 |
| 101 | 0.28 | 0.22 | 0.64 | 2.01 |
| 102 | 0.43 | 0.16 | 0.64 | 2.22 |
| 103 | 0.36 | 0.18 | 0.66 | 2.16 |
| 104 | 0.35 | 0.22 | 0.58 | 2.08 |
| 105 | 0.50 | 0.41 | 0.83 | 1.46 |

**Caster Plaintiffs' Exhibit 75, Page 4**

## Measures of Compactness Report

Measures of Compactness Summary

| | |
|---|---|
| **Reock** | The measure is always between 0 and 1, with 1 being the most compact. |
| **Polsby-Popper** | The measure is always between 0 and 1, with 1 being the most compact. |
| **Area / Convex Hull** | The measure is always between 0 and 1, with 1 being the most compact. |
| **Schwartzberg** | The measure is usually greater than or equal to 1, with 1 being the most compact. |

**Caster Plaintiffs' Exhibit 75, Page 5**

Plan Name:   tx_congress
Plan Type:
Date:   12/17/2021
Time:   5:31:03PM
Administrator:

# Measures of Compactness

12/17/202

| DISTRICT | Reock | Polsby-Popper |
|---|---|---|
| 1 | 0.32 | 0.16 |
| 2 | 0.40 | 0.23 |
| 3 | 0.50 | 0.34 |
| 4 | 0.26 | 0.08 |
| 5 | 0.35 | 0.15 |
| 6 | 0.30 | 0.15 |
| 7 | 0.23 | 0.09 |
| 8 | 0.29 | 0.22 |
| 9 | 0.46 | 0.16 |
| 10 | 0.37 | 0.19 |
| 11 | 0.25 | 0.31 |
| 12 | 0.43 | 0.21 |
| 13 | 0.26 | 0.28 |
| 14 | 0.19 | 0.16 |
| 15 | 0.12 | 0.11 |
| 16 | 0.27 | 0.23 |
| 17 | 0.29 | 0.14 |
| 18 | 0.42 | 0.07 |
| 19 | 0.50 | 0.53 |
| 20 | 0.45 | 0.13 |
| 21 | 0.41 | 0.31 |
| 22 | 0.36 | 0.16 |
| 23 | 0.26 | 0.20 |
| 24 | 0.27 | 0.11 |
| 25 | 0.46 | 0.26 |
| 26 | 0.35 | 0.15 |
| 27 | 0.44 | 0.37 |
| 28 | 0.25 | 0.21 |
| 29 | 0.29 | 0.09 |
| 30 | 0.42 | 0.20 |
| 31 | 0.45 | 0.08 |
| 32 | 0.23 | 0.08 |
| 33 | 0.23 | 0.04 |
| 34 | 0.40 | 0.27 |
| 35 | 0.08 | 0.08 |
| 36 | 0.35 | 0.25 |
| 37 | 0.37 | 0.15 |
| 38 | 0.39 | 0.12 |
| Sum | N/A | N/A |
| Min | 0.08 | 0.04 |
| Max | 0.50 | 0.53 |
| Mean | 0.33 | 0.19 |
| Std. Dev. | 0.10 | 0.10 |

Plan Name:   tx_senate
Plan Type:
Date:   12/17/2021
Time:   4:28:41PM
Administrator:

# Measures of Compactness
12/17/202

| DISTRICT | Reock | Polsby-Popper |
|---|---|---|
| 1 | 0.48 | 0.30 |
| 2 | 0.46 | 0.19 |
| 3 | 0.37 | 0.18 |
| 4 | 0.21 | 0.12 |
| 5 | 0.33 | 0.12 |
| 6 | 0.33 | 0.07 |
| 7 | 0.38 | 0.14 |
| 8 | 0.36 | 0.36 |
| 9 | 0.43 | 0.21 |
| 10 | 0.32 | 0.15 |
| 11 | 0.40 | 0.14 |
| 12 | 0.34 | 0.22 |
| 13 | 0.22 | 0.12 |
| 14 | 0.41 | 0.30 |
| 15 | 0.31 | 0.07 |
| 16 | 0.29 | 0.09 |
| 17 | 0.53 | 0.13 |
| 18 | 0.32 | 0.11 |
| 19 | 0.26 | 0.10 |
| 20 | 0.22 | 0.11 |
| 21 | 0.26 | 0.18 |
| 22 | 0.37 | 0.23 |
| 23 | 0.42 | 0.19 |
| 24 | 0.28 | 0.15 |
| 25 | 0.52 | 0.25 |
| 26 | 0.39 | 0.15 |
| 27 | 0.25 | 0.13 |
| 28 | 0.35 | 0.18 |
| 29 | 0.35 | 0.25 |
| 30 | 0.39 | 0.14 |
| 31 | 0.30 | 0.17 |
| Sum | N/A | N/A |
| Min | 0.21 | 0.07 |
| Max | 0.53 | 0.36 |
| Mean | 0.35 | 0.17 |
| Std. Dev. | 0.08 | 0.07 |

Caster Plaintiffs' Exhibit 77, Page 1

Plan Name:	tx_house
Plan Type:
Date:	12/20/2021
Time:	1:02:37PM
Administrator:

# Measures of Compactness
12/20/202

| DISTRICT | Reock | Polsby-Popper |
|---|---|---|
| 1 | 0.35 | 0.19 |
| 2 | 0.44 | 0.22 |
| 3 | 0.28 | 0.16 |
| 4 | 0.42 | 0.31 |
| 5 | 0.45 | 0.27 |
| 6 | 0.32 | 0.33 |
| 7 | 0.48 | 0.53 |
| 8 | 0.31 | 0.18 |
| 9 | 0.48 | 0.17 |
| 10 | 0.58 | 0.61 |
| 11 | 0.24 | 0.13 |
| 12 | 0.48 | 0.14 |
| 13 | 0.35 | 0.18 |
| 14 | 0.43 | 0.13 |
| 15 | 0.28 | 0.28 |
| 16 | 0.36 | 0.32 |
| 17 | 0.38 | 0.30 |
| 18 | 0.46 | 0.27 |
| 19 | 0.42 | 0.30 |
| 20 | 0.46 | 0.25 |
| 21 | 0.21 | 0.09 |
| 22 | 0.36 | 0.14 |
| 23 | 0.37 | 0.32 |
| 24 | 0.38 | 0.19 |
| 25 | 0.43 | 0.20 |
| 26 | 0.32 | 0.22 |
| 27 | 0.47 | 0.53 |
| 28 | 0.44 | 0.17 |
| 29 | 0.34 | 0.30 |
| 30 | 0.41 | 0.28 |
| 31 | 0.34 | 0.20 |
| 32 | 0.26 | 0.25 |
| 33 | 0.27 | 0.31 |
| 34 | 0.50 | 0.27 |
| 35 | 0.26 | 0.08 |
| 36 | 0.38 | 0.19 |
| 37 | 0.48 | 0.31 |
| 38 | 0.35 | 0.27 |
| 39 | 0.50 | 0.27 |
| 40 | 0.38 | 0.20 |
| 41 | 0.40 | 0.24 |
| 42 | 0.36 | 0.27 |
| 43 | 0.30 | 0.13 |
| 44 | 0.45 | 0.37 |
| 45 | 0.40 | 0.34 |
| 46 | 0.50 | 0.26 |
| 47 | 0.31 | 0.18 |

Plan Name: tx_house
Plan Type:

Administrator:
User:

| DISTRICT | Roeck | |
|---|---|---|
| 48 | 0.21 | 0.14 |
| 49 | 0.18 | 0.19 |
| 50 | 0.48 | 0.39 |
| 51 | 0.54 | 0.35 |
| 52 | 0.41 | 0.32 |
| 53 | 0.30 | 0.21 |
| 54 | 0.45 | 0.19 |
| 55 | 0.34 | 0.25 |
| 56 | 0.48 | 0.26 |
| 57 | 0.26 | 0.19 |
| 58 | 0.38 | 0.48 |
| 59 | 0.38 | 0.35 |
| 60 | 0.39 | 0.58 |
| 61 | 0.32 | 0.20 |
| 62 | 0.21 | 0.13 |
| 63 | 0.17 | 0.26 |
| 64 | 0.52 | 0.44 |
| 65 | 0.18 | 0.16 |
| 66 | 0.23 | 0.17 |
| 67 | 0.37 | 0.22 |
| 68 | 0.24 | 0.15 |
| 69 | 0.41 | 0.32 |
| 70 | 0.30 | 0.12 |
| 71 | 0.51 | 0.51 |
| 72 | 0.48 | 0.49 |
| 73 | 0.42 | 0.31 |
| 74 | 0.19 | 0.14 |
| 75 | 0.42 | 0.50 |
| 76 | 0.35 | 0.29 |
| 77 | 0.21 | 0.22 |
| 78 | 0.67 | 0.49 |
| 79 | 0.25 | 0.31 |
| 80 | 0.37 | 0.22 |
| 81 | 0.40 | 0.33 |
| 82 | 0.37 | 0.55 |
| 83 | 0.47 | 0.34 |
| 84 | 0.41 | 0.26 |
| 85 | 0.47 | 0.22 |
| 86 | 0.38 | 0.40 |
| 87 | 0.41 | 0.51 |
| 88 | 0.22 | 0.26 |
| 89 | 0.46 | 0.31 |
| 90 | 0.27 | 0.07 |
| 91 | 0.48 | 0.44 |
| 92 | 0.27 | 0.10 |
| 93 | 0.41 | 0.31 |
| 94 | 0.33 | 0.08 |
| 95 | 0.29 | 0.09 |
| 96 | 0.35 | 0.18 |
| 97 | 0.48 | 0.26 |
| 98 | 0.55 | 0.45 |
| 99 | 0.39 | 0.25 |
| 100 | 0.30 | 0.12 |
| 101 | 0.30 | 0.32 |
| 102 | 0.43 | 0.27 |
| 103 | 0.30 | 0.14 |
| 104 | 0.35 | 0.29 |

Plan Name: tx_house
Plan Type:                    Administrator    User:

| DISTRICT | Roeck | |
|---|---|---|
| 105 | 0.41 | 0.43 |
| 106 | 0.39 | 0.32 |
| 107 | 0.21 | 0.17 |
| 108 | 0.37 | 0.11 |
| 109 | 0.26 | 0.19 |
| 110 | 0.36 | 0.17 |
| 111 | 0.46 | 0.28 |
| 112 | 0.18 | 0.11 |
| 113 | 0.18 | 0.11 |
| 114 | 0.36 | 0.11 |
| 115 | 0.40 | 0.15 |
| 116 | 0.24 | 0.26 |
| 117 | 0.25 | 0.22 |
| 118 | 0.32 | 0.15 |
| 119 | 0.27 | 0.11 |
| 120 | 0.57 | 0.31 |
| 121 | 0.32 | 0.17 |
| 122 | 0.45 | 0.30 |
| 123 | 0.28 | 0.17 |
| 124 | 0.43 | 0.29 |
| 125 | 0.27 | 0.23 |
| 126 | 0.29 | 0.21 |
| 127 | 0.35 | 0.25 |
| 128 | 0.26 | 0.12 |
| 129 | 0.46 | 0.15 |
| 130 | 0.29 | 0.26 |
| 131 | 0.13 | 0.13 |
| 132 | 0.31 | 0.31 |
| 133 | 0.26 | 0.35 |
| 134 | 0.41 | 0.32 |
| 135 | 0.28 | 0.22 |
| 136 | 0.40 | 0.35 |
| 137 | 0.40 | 0.28 |
| 138 | 0.35 | 0.16 |
| 139 | 0.22 | 0.13 |
| 140 | 0.44 | 0.39 |
| 141 | 0.32 | 0.20 |
| 142 | 0.31 | 0.16 |
| 143 | 0.20 | 0.14 |
| 144 | 0.32 | 0.20 |
| 145 | 0.17 | 0.12 |
| 146 | 0.28 | 0.15 |
| 147 | 0.19 | 0.20 |
| 148 | 0.22 | 0.09 |
| 149 | 0.32 | 0.24 |
| 150 | 0.33 | 0.22 |
| Sum | N/A | N/A |
| Min | 0.13 | 0.07 |
| Max | 0.67 | 0.61 |
| Mean | 0.36 | 0.25 |
| Std. Dev. | 0.10 | 0.11 |

# EXPERT REPORT OF MAXWELL PALMER, PH.D.

I, Dr. Maxwell Palmer, declare as follows:

1. My name is Maxwell Palmer. I am currently an Associate Professor of Political Science at Boston University. I joined the faculty at Boston University in 2014, after completing my Ph.D. in Political Science at Harvard University. I was promoted to Associate Professor, with tenure, in 2021. I teach and conduct research on American politics and political methodology.

2. I have published academic work in leading peer-reviewed academic journals, including the *American Political Science Review*, *Journal of Politics*, *Perspectives on Politics*, *British Journal of Political Science*, *Journal of Empirical Legal Studies*, and *Political Science Research and Methods*. My book, *Neighborhood Defenders: Participatory Politics and America's Housing Crisis* was published by Cambridge University Press in 2019. I have also published academic work in the *Ohio State University Law Review*. My published research uses a variety of analytical approaches, including statistics, geographic analysis, and simulations, and data sources including academic surveys, precinct-level election results, voter registration and vote history files, and census data. My curriculum vitae is attached to this report.

3. I have served as an expert witness or litigation consultant on numerous cases involving voting restrictions. I testified at trial or by deposition in *Bethune Hill v. Virginia* before the U.S. District Court for the Eastern District of Virginia (No. 3:14-cv-00852-REP-AWA-BMK); *Thomas v. Bryant* before the U.S. District Court for the Southern District of Mississippi (No. 3:18-CV-00441-CWR-FKB); *Chestnut v. Merrill* before the U.S. District Court for the Northern District of Alabama (No. 2:18-cv-00907-KOB); *Dwight v. Raffensperger* before the U.S. District Court for the Northern District of Georgia (No. 1:18-cv-2869-RWS); *Brandt v. Hughes* before the U.S. District Court for the Southern District of Texas (No. 5:20-cv-35); and *Texas Alliance for Retired Americans v. Hughs* before the U.S. District Court for the Southern District of Texas (No. 5:20-cv-128). I also served as the independent racially polarized voting analyst for the Virginia Redistricting Commission in 2021. I worked as a data analyst assisting testifying experts in *Perez v. Perry* before the U.S. District Court for the Western District of Texas (No. 5:11-cv-00360-OLG); in *LULAC v. Edwards Aquifer Authority* before the U.S. District Court for the Western District of Texas (No. 5:12-cv-00620-OLG); in *Harris v. McCrory* before the U. S. District Court for the Middle District of North Carolina (No. 1:13-cv-00949-WO-JEP); in *Guy v. Miller* before the U.S. District Court for the District of Nevada (No. 11-OC-00042-1B); in *In re Senate Joint Resolution of Legislative Apportionment* before the Florida Supreme Court (Nos. 2012-CA-412, 2012-CA-490); and in *Romo v. Detzner* before the Circuit Court of the Second Judicial

1

Circuit in Florida (No. 2012 CA 412).

4. I am being compensated at a rate of $350/hour for my work in this case. No part of my compensation is dependent upon the conclusions that I reach or the opinions that I offer.

5. I was retained by the plaintiffs in this litigation to offer an expert opinion on the extent to which voting is racially polarized in parts of Alabama. I was also asked to evaluate the performance of the majority-minority districts in the plaintiffs' illustrative maps.

6. I find strong evidence of racially polarized voting across the focus area, which is comprised of the 1st, 2nd, 3rd, 6th, and 7th Congressional Districts under the 2021 redistricting map. Black and White voters consistently support different candidates. I also find strong evidence of racially polarized voting in each of the five individual congressional districts.

7. Black-preferred candidates are largely unable to win elections in the focus area. Across an analysis of 12 statewide elections, the Black-preferred candidate was able to win in the focus area only once. When taken on a district-by-district basis, the Black-preferred candidate was defeated in every one of the 12 elections analyzed in the 1st, 2nd, 3rd, and 6th Congressional Districts. The Black-preferred candidate won a majority of the vote in District 7 in all 12 elections.

8. Under all six of the illustrative maps, I find that Black-preferred candidates are able to win elections in both majority-minority districts.

# Data Sources and Elections Analyzed

9. For the purpose of my analysis, I examined elections in the 1st, 2nd, 3rd, 6th, and 7th Congressional Districts, under the plan adopted by the state legislature in 2021. Collectively, I refer to this area as the "focus area." Figure 1 maps the focus area.

10. To analyze racially polarized voting, I examined election results from the 2012, 2014, 2016, 2018, and 2020 general elections, and the 2017 special election for U.S. Senate. I included statewide elections for U.S President, U.S. Senate, Governor, Lieutenant Governor, Secretary of State, Attorney General, State Auditor, Treasurer, Commissioner of Agriculture and Industries, Chief Justice of the State Supreme Court, and Associate Justice of the State Supreme Court. I excluded all offices that were only contested by one of the major parties.

11. I analyzed racially polarized voting using two different data sources:

- Precinct-level election results and data on Citizen Voting Age Population (CVAP) by race for the 2016, 2018, and 2020 general elections and the 2017 special election for U.S. Senate. The precinct level data was assembled by the Voting and Election Science Team, an academic group that provides precinct-level data for U.S. Elections, based on data from the Secretary of State. This data was then updated to use 2020 Voting Tabulation

2



Figure 1: Map of the Focus Area

Districts (VTDs), and distributed on the Redistricting Data Hub.[1] I merged this with Citizen Voting Age Population data from the U.S. Census' American Community Survey (ACS).[2] I used CVAP data at the census block group level, and allocated populations to 2020 VTDs. When census blocks or VTDs were split, I weighted the population data using 2010 census block populations.[3]

• Precinct-level election results and data on actual voter turnout by race for the 2020

[1] https://redistrictingdatahub.org/dataset/2016-al-election-data-projected-to-2020-vtds/; https://redistrictingdatahub.org/dataset/2018-al-election-data-projected-to-2020-vtds/; https://redistrictingdatahub.org/dataset/2020-al-election-data-projected-to-2020-vtds/. For 2017, I used 2017 election results and shape files provided by VEST at https://doi.org/10.7910/DVN/VNJAB1 and updated the results to use 2020 VTDs.

[2] https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.html

[3] I used the ACS 2014-2018 5-year averages for the 2016 election, and ACS 2015-2019 5-year averages for the 2017, 2018, and 2020 elections.

3

general elections. The precinct level data was assembled by the Voting and Election Science Team and updated to use 2020 Voting Tabulation Districts (VTDs), and distributed on the Redistricting Data Hub.[4] Actual turnout by race was calculated by the Redistricting Data Hub using a commercial voter file provided by the data vendor L2.[5] This data provides a close estimate of the actual number of voters who cast a ballot in each VTD in the 2020 general election.[6]

- County-level election results and data on voter registration by race for the 2012 and 2014 general elections. This data was downloaded from the website of the Alabama Secretary of State.[7] I use this data to estimate racially polarized voting at the county level for the focus area in 2012 and 2014, where precinct-level data is not available.

## Racially Polarized Voting Analysis

13. In analyzing racially polarized voting in each election, I used a statistical procedure, ecological inference (EI), that estimates group-level preferences based on aggregate data. I analyzed the results for three racial demographic groups: Non-Hispanic Black, non-Hispanic White, and Other, based on the voters' self-identified race in the voter registration database or American Community Survey Citizen Voting Age Population ("CVAP") data. I excluded third party and write-in candidates, and analyzed votes for the two major-party candidates in each election. The results of this analysis are estimates of the percentage of each group that voted for the candidate from each party in each election. The results include both a mean estimate (the most likely vote share), and a 95% confidence interval.[8]

14. Interpreting the results of the ecological inference models proceeds in two general stages. First, I examined the support for each candidate by each demographic group to determine if members of the group vote cohesively in support of a single candidate in each election. When a significant majority of the group supports a single candidate, I can then identify that candidate as the group's candidate of choice. If the group's support is roughly evenly divided between the two candidates, then the group does not cohesively support a single candidate and does not have a clear preference. Second,

[4] https://redistrictingdatahub.org/dataset/2020-al-election-data-projected-to-2020-vtds/

[5] https://redistrictingdatahub.org/dataset/2020-alabama-elections-turnout-by-race-ethnicity-aggregated-to-2020-census-vtds/

[6] The estimates provided in this data source are inexact because the voter file used for the calculation is dated August 22, 2021. It is missing any voters removed from the voter file between election day and this date, and may also locate voters who changed addresses since the election in the wrong precinct. I validated this data by comparing county totals by race to actual turnout by race data from the Secretary of State.

[7] https://www.sos.alabama.gov/alabama-votes/voter/election-data

[8] The 95% confidence interval is a measure of uncertainty in the estimates from the model. For example, the model might estimate that 94% of the members of a group voted for a particular candidate, with a 95% confidence interval of 91-96%. This means that based on the data and the model assumptions, 95% of the simulated estimates for this group fall in the range of 91-96%, with 94% being the average value. Larger confidence intervals reflect a higher degree of uncertainty in the estimates, while smaller confidence intervals reflect less uncertainty. For the analyses using Citizen Voting Age Population data and voter registration data, I estimated models that allow for different voter turnout levels by race.

after identifying the preferred candidate for each group (or the lack of such a candidate), I then compared the preferences of White voters to the preferences of Black voters. Evidence of racially polarized voting is found when Black voters and White voters support different candidates.

15. Figure 2 presents the estimates of support for the Black-Preferred candidate for Black and White voters for all 12 electoral contests from 2016 to 2020 using precinct-level election data and Citizen Voting Age Population data. Here, I present only the estimates and confidence intervals, and exclude individual election labels. Full results for each election are presented in Figure 3 and Table 2. In each panel, the solid dots correspond to an estimate in a particular election, and the gray vertical lines behind each dot are the 95% confidence intervals for the estimate.[9]



Figure 2: Racially Polarized Voting Estimates by Race — Focus Area

16. Examining Figure 2, the estimates for support for Black-Preferred candidates by Black voters are all significantly above 50%. Black voters are extremely cohesive, with a clear candidate of choice in all 12 elections. On average, Black voters supported their candidates of choice with 92.3% of the vote.

17. In contrast to the Black voters, Figure 2 shows that White voters are highly cohesive in voting in opposition to the Black candidate of choice in every election. On average, White voters supported Black-preferred candidates with 15.4% of the vote, and in no election did this estimate exceed 26%.

[9]In some cases the lines for the confidence intervals are not visible behind the dots because they are relatively small.

5



Figure 3: Racially Polarized Voting Estimates by Election — Focus Area

18. Figure 3 presents the same results as Figure 2, separated by each electoral contest. The estimated levels of support for the Black-Preferred candidate in each election for each group are represented by the colored points, and the horizontal lines indicate the range of the 95% confidence intervals. In every election, Black voters have a clear candidate of choice, and White voters are strongly opposed to this candidate.

19. Table 9 presents the ecological inference results for the precinct-level data with actual voter turnout by race for 2020. These results support the findings discussed above. Black voters are highly cohesive and have a clear candidate of choice in each election, and White voters cohesively oppose the Black candidates of choice.

20. While the precinct data is limited to 2016 to 2020, county-level election results provide similar evidence of racially polarized voting in 2012 and 2014. Figure 4 and Table 3 present county-level ecological inference results for these elections, using county-level voter registration by race to estimate the voting population. The results are consistent across these seven elections; Black voters have a clear candidate of choice in each election, and White voters strongly opposed the Black-preferred candidates.

Caster Plaintiffs' Exhibit 79, Page 6



Figure 4: Racially Polarized Voting Estimates by Election Using County-Level Data — Focus Area

21. There is also strong evidence of racially polarized voting in each of the five congressional districts that comprise the focus area. Figure 5 plots the results, and Tables 4–8 present the full results, using precinct-level election results and Citizen Voting Age Population Data.[10] Black voters are extremely cohesive, with a clear candidate of choice in all 12 elections in each district. On average, Black voters supported their candidates of choice with 92.7% of the vote in CD 1, 88.8% in CD 2, 90.0% in CD 3, 92.2% in CD 6, and 94.4% in CD 7.[11]

22. In contrast to the Black voters, Figure 5 shows that White voters are highly cohesive in voting in opposition to the Black candidate of choice in every election in each district. On average, White voters supported Black-preferred candidates with 16.2% of the vote in CD 1, 9.2% in CD 2, 11.9% in CD 3, 22.8% in CD 6, and 25.0% in CD 7.

# Performance of Black-Preferred Candidates in the Focus Area

23. Having identified the Black candidate of choice in each election, I now turn to their ability to win elections in these districts. Table 1 presents the results of each election in the focus area and each congressional district for the 2016 to 2020 elections. For each election, I present the vote share obtained by the Black-preferred candidate.

24. Across the 12 statewide contests analyzed, the Black-preferred candidate won only once in the focus area. In all other cases, the White-preferred candidate won the

[10] Table 9 presents the ecological inference results for the precinct-level data with actual voter turnout by race for 2020.

[11] I restrict this analysis to the 2016-2020 elections because the necessary precinct-level data is not available for 2012 and 2014.

7

Caster Plaintiffs' Exhibit 79, Page 7

majority of the vote. In the 1st, 2nd, 3rd, and 6th Congressional Districts, the White-preferred candidate defeated the Black-preferred candidate in all 12 elections. In the 7th Congressional District, the Black-preferred candidate won all 12 elections.[12]

25. The Black-preferred candidate won the majority of the vote in the focus area in only one contest, the 2017 special election for U.S. Senate. In this election the White-preferred candidate was Roy Moore, a former Chief Justice of the Alabama Supreme Court.[13] Moore is a uniquely controversial figure in Alabama politics, having been removed from his position on the Supreme Court in 2003, and later suspended from his position on the Supreme Court in 2016 following his 2012 election. In the 2017 U.S. Senate election, Moore was also accused of sexual assault and misconduct by several women.[14] Moore's unique unpopularity is highlighted by a statement of the National Republican Senate Committee on the 2020 Senate race: "The NRSC's official stance is ABRM: anyone but Roy Moore," said Kevin McLaughlin, the committee's executive director. 'The only thing Doug Jones and I agree on is that his only prayer for electoral success in



Figure 5: Racially Polarized Voting Estimates by Race — Congressional Districts

---

[12] I restrict this analysis to the 2016-2020 elections where I have precinct-level data in order to analyze performance in each Congressional District. However, the results are similar when I include the 2012 and 2014 elections at the county-level for the focus area. Black-preferred candidates win only one of the eight statewide elections analyzed in 2012 and 2014.

[13] When the 2012 and 2014 elections are included for the focus area, the Black-preferred candidate wins one additional election, the 2012 election for Chief Justice of the Supreme Court. In this election, the White-preferred candidate was Roy Moore as well.

[14] Notwithstanding these potentially distinguishing features of Mr. Moore's candidacy, more than 74% of White voters voted for Moore in 2012 and 2017. See Table 2.

Caster Plaintiffs' Exhibit 79, Page 8

2020 is a rematch with Roy Moore.'"[15] However, the Black-preferred candidate, Doug Jones, won this election in the focus area only because of his large margin of victory in the 7th Congressional District; Moore won the majority of the vote in the other four congressional districts in the focus area.

## Performance of the Majority-Minority Districts in the Illustrative Maps

26. I also analyzed the performance of Black-preferred candidates for the versions of CD 2 and CD 7 in the plaintiffs' six illustrative maps by calculating the percentage of the vote won by the Black-preferred candidates across the twelve statewide races from 2016 through 2020 analyzed above.

27. Figure 6 presents the results of this analysis. In the two majority-minority districts in each illustrative map, CD 2 and CD 7, the Black-preferred candidate won all twelve statewide elections, with an average of at least 57% of the vote in all maps for CD 2, and an average of at least 65% of the vote for CD 7. Figure 7 plots the vote shares in each election of the Black-preferred candidates for districts 2 and 7 for each illustrative map. In Districts 1, 3, and 6 the White-preferred candidate defeated the Black-preferred candidate in all 12 elections. Tables 10-15 provide the full results in all districts for each map.

I declare under penalty of perjury that the foregoing is true and correct.

I reserve the right to continue to supplement my reports in light of additional facts, testimony and/or materials that may come to light.

Executed on: December 10, 2021

*[signature]*

[15] https://www.politico.com/newsletters/playbook-pm/2019/02/28/netanyahu-indicted-pelosi-attempts-to-wrangle-dems-and-says-noko-won-the-summit-401605

9



Figure 6: Vote Shares of Black-Preferred Candidates Under the Illustrative Maps

Caster Plaintiffs' Exhibit 79, Page 10



Figure 7: Vote Shares of Black-Preferred Candidates Under the Illustrative Maps, Districts 2 and 7

11

Table 1: Election Results in the Focus Area — Vote Share of Black-Preferred Candidates

| | | Focus Area | CD 1 | CD 2 | CD 3 | CD 6 | CD 7 |
|---|---|---|---|---|---|---|---|
| 2016 | U.S. President | 39.5% | 35.0% | 33.3% | 32.1% | 29.7% | 65.7% |
| | U.S. Senator | 39.3% | 34.6% | 33.7% | 33.0% | 29.7% | 64.1% |
| 2017 | U.S. Senator | 54.3% | 49.1% | 45.7% | 47.0% | 48.6% | 76.2% |
| 2018 | Governor | 43.8% | 39.4% | 35.8% | 35.4% | 37.9% | 68.0% |
| | Lt. Governor | 42.3% | 37.7% | 35.7% | 34.6% | 34.3% | 67.1% |
| | Attorney General | 44.6% | 40.3% | 38.8% | 36.4% | 36.7% | 68.6% |
| | Sec. of State | 42.4% | 37.9% | 35.8% | 34.8% | 34.5% | 67.0% |
| | State Auditor | 42.9% | 38.6% | 36.8% | 35.1% | 35.0% | 67.4% |
| | Supreme Ct., Chief | 46.2% | 41.9% | 38.5% | 37.8% | 40.8% | 69.6% |
| | Supreme Ct., Place 4 | 42.7% | 38.1% | 36.1% | 35.1% | 34.7% | 67.7% |
| 2020 | U.S. President | 40.9% | 35.7% | 35.2% | 32.8% | 34.6% | 66.2% |
| | U.S. Senator | 43.4% | 39.1% | 37.8% | 35.2% | 37.2% | 67.8% |

Table 2: Ecological Inference Results — Estimated Vote Share of Black-Preferred Candidates — Precinct-Level Election Data with Citizen Voting Age Population — Focus Area

| | | Black | White | Other |
|---|---|---|---|---|
| 2016 | U.S. President | 90.8% (89.5, 92.1) | 10.3% (9.5, 11.4) | 68.8% (63.9, 74.0) |
| | U.S. Senator | 91.0% (89.8, 92.2) | 10.9% (10.0, 11.7) | 70.7% (64.8, 77.0) |
| 2017 | U.S. Senator | 94.2% (93.2, 95.1) | 25.3% (24.0, 26.7) | 79.9% (70.3, 86.8) |
| 2018 | Governor | 92.4% (91.2, 93.6) | 16.2% (15.0, 17.7) | 78.1% (69.1, 84.3) |
| | Lt. Governor* | 92.9% (91.8, 94.0) | 13.0% (11.8, 14.1) | 79.9% (73.2, 85.2) |
| | Attorney General | 93.3% (92.2, 94.3) | 15.7% (14.6, 16.8) | 83.6% (78.2, 88.1) |
| | Sec. of State | 93.0% (91.7, 94.1) | 13.4% (12.4, 14.5) | 81.3% (74.6, 87.2) |
| | State Auditor* | 93.2% (91.8, 94.2) | 14.0% (13.0, 15.1) | 81.5% (74.6, 86.3) |
| | Supreme Ct., Chief | 93.7% (92.5, 94.7) | 18.4% (17.2, 19.5) | 82.0% (75.4, 87.9) |
| | Supreme Ct., Place 4 | 93.1% (91.9, 94.1) | 13.8% (12.9, 14.7) | 80.9% (73.6, 87.6) |
| 2020 | U.S. President | 89.3% (87.7, 90.5) | 15.4% (14.5, 16.4) | 66.1% (60.9, 72.2) |
| | U.S. Senator | 90.2% (88.6, 91.9) | 18.4% (17.4, 19.5) | 71.9% (66.7, 76.6) |

* Indicates that the Black candidate of choice was Black.

12

Table 3: Ecological Inference Results — Estimated Vote Share of Black-Preferred Candidates — County-Level Election Data with Voter Registration by Race — Focus Area

| | | Black | White | Other |
|---|---|---|---|---|
| 2012 | U.S. President* | 93.6% (88.1, 97.8) | 12.2% (8.8, 16.0) | 52.6% (16.7, 84.5) |
| | Supreme Ct., Chief | 93.8% (89.4, 98.1) | 26.6% (22.3, 34.1) | 56.1% (19.2, 86.4) |
| 2014 | Governor | 91.6% (84.6, 97.4) | 9.4% (4.7, 12.8) | 50.9% (20.6, 82.3) |
| | Lt. Governor* | 91.2% (85.7, 96.1) | 9.4% (3.9, 14.4) | 51.9% (16.0, 82.9) |
| | Attorney General | 92.4% (84.9, 97.1) | 20.5% (13.3, 28.0) | 62.7% (28.1, 93.0) |
| | Sec. of State* | 89.9% (81.9, 96.8) | 7.1% (3.6, 11.8) | 55.4% (22.6, 85.4) |
| | State Auditor* | 90.2% (81.6, 96.7) | 12.4% (7.4, 17.3) | 54.5% (22.5, 84.1) |
| | Comm. Agriculture | 90.1% (83.4, 96.5) | 9.1% (5.0, 15.1) | 54.2% (23.3, 82.2) |

* Indicates that the Black candidate of choice was Black.

Table 4: Ecological Inference Results — Estimated Vote Share of Black-Preferred Candidates — Precinct-Level Election Data with Citizen Voting Age Population — CD 1

| | | Black | White | Other |
|---|---|---|---|---|
| 2016 | U.S. President | 93.0% (90.3, 95.2) | 9.9% (8.1, 12.1) | 66.8% (50.3, 79.8) |
| | U.S. Senator | 92.1% (89.3, 94.7) | 11.1% (9.3, 13.1) | 63.3% (37.1, 80.6) |
| 2017 | U.S. Senator | 93.9% (91.3, 96.0) | 26.9% (24.1, 29.8) | 63.1% (41.4, 80.7) |
| 2018 | Governor | 92.9% (90.2, 95.0) | 17.5% (15.3, 19.8) | 65.0% (41.1, 83.0) |
| | Lt. Governor* | 92.8% (89.8, 95.4) | 14.1% (11.4, 16.5) | 69.3% (50.7, 83.8) |
| | Attorney General | 93.9% (91.3, 96.1) | 17.3% (14.8, 19.9) | 73.3% (45.8, 86.4) |
| | Sec. of State | 93.0% (90.4, 95.2) | 14.7% (12.6, 17.5) | 71.0% (50.3, 86.9) |
| | State Auditor* | 93.2% (90.1, 95.6) | 15.5% (13.1, 17.8) | 72.4% (51.1, 85.4) |
| | Supreme Ct., Chief | 93.5% (90.7, 95.7) | 19.8% (17.5, 21.8) | 73.9% (57.9, 86.1) |
| | Supreme Ct., Place 4 | 93.3% (90.5, 95.7) | 14.8% (12.2, 17.2) | 70.7% (49.3, 84.6) |
| 2020 | U.S. President | 90.0% (86.4, 93.4) | 14.4% (12.3, 16.7) | 55.4% (42.0, 71.0) |
| | U.S. Senator | 90.2% (87.1, 93.0) | 18.8% (16.0, 21.7) | 64.6% (46.7, 78.7) |

* Indicates that the Black candidate of choice was Black.

13

Caster Plaintiffs' Exhibit 79, Page 13

Table 5: Ecological Inference Results — Estimated Vote Share of Black-Preferred Candidates — Precinct-Level Election Data with Citizen Voting Age Population — CD 2

| | | Black | White | Other |
|---|---|---|---|---|
| 2016 | U.S. President | 86.2% (81.3, 90.1) | 6.8% (5.5, 8.6) | 60.9% (42.5, 75.8) |
| | U.S. Senator | 87.4% (83.3, 90.7) | 7.6% (5.7, 9.9) | 70.3% (48.7, 84.3) |
| 2017 | U.S. Senator | 91.3% (88.5, 93.8) | 14.8% (10.9, 17.6) | 70.9% (50.5, 86.1) |
| 2018 | Governor | 88.8% (84.5, 92.4) | 8.6% (6.4, 10.7) | 64.8% (37.9, 82.4) |
| | Lt. Governor* | 88.6% (85.2, 91.6) | 7.9% (6.2, 10.3) | 71.3% (50.5, 85.5) |
| | Attorney General | 90.8% (87.0, 93.6) | 10.5% (8.5, 12.6) | 66.1% (48.4, 80.2) |
| | Sec. of State | 88.4% (84.6, 91.7) | 8.4% (6.7, 10.6) | 68.8% (47.1, 84.1) |
| | State Auditor* | 89.5% (86.1, 92.5) | 8.8% (6.5, 10.9) | 68.9% (45.7, 85.4) |
| | Supreme Ct., Chief | 91.2% (87.7, 93.8) | 10.2% (7.9, 12.7) | 72.3% (54.0, 86.7) |
| | Supreme Ct., Place 4 | 90.1% (86.8, 92.7) | 7.6% (5.9, 9.7) | 73.7% (55.7, 87.4) |
| 2020 | U.S. President | 87.1% (82.6, 90.3) | 8.9% (6.9, 10.9) | 60.0% (46.3, 76.2) |
| | U.S. Senator | 86.3% (82.5, 90.1) | 10.8% (8.6, 13.3) | 71.0% (50.8, 83.4) |

* Indicates that the Black candidate of choice was Black.

Table 6: Ecological Inference Results — Estimated Vote Share of Black-Preferred Candidates — Precinct-Level Election Data with Citizen Voting Age Population — CD 3

| | | Black | White | Other |
|---|---|---|---|---|
| 2016 | U.S. President | 88.7% (84.6, 92.7) | 7.8% (6.1, 9.9) | 77.4% (63.1, 91.0) |
| | U.S. Senator | 88.5% (83.6, 92.5) | 10.5% (8.6, 13.0) | 71.8% (54.9, 84.1) |
| 2017 | U.S. Senator | 93.4% (90.3, 95.7) | 21.3% (18.6, 24.0) | 82.4% (70.0, 91.1) |
| 2018 | Governor | 89.7% (84.6, 93.5) | 12.0% (10.1, 14.3) | 72.6% (58.1, 84.9) |
| | Lt. Governor* | 90.6% (86.8, 93.8) | 10.2% (8.1, 12.6) | 76.7% (60.9, 88.5) |
| | Attorney General | 90.4% (86.5, 93.8) | 12.8% (10.2, 15.4) | 76.0% (59.8, 88.5) |
| | Sec. of State | 90.9% (86.9, 94.1) | 10.8% (8.7, 13.4) | 72.6% (47.8, 87.8) |
| | State Auditor* | 90.4% (86.2, 94.0) | 10.6% (8.5, 13.1) | 76.3% (63.3, 86.1) |
| | Supreme Ct., Chief | 90.9% (85.9, 94.5) | 13.9% (11.4, 16.6) | 79.7% (62.7, 91.1) |
| | Supreme Ct., Place 4 | 91.2% (86.8, 94.6) | 10.8% (8.4, 13.0) | 73.5% (56.1, 85.9) |
| 2020 | U.S. President | 86.8% (82.0, 90.7) | 9.7% (7.4, 11.8) | 67.7% (56.3, 79.8) |
| | U.S. Senator | 88.2% (83.8, 92.0) | 12.0% (9.6, 14.4) | 73.5% (59.1, 86.0) |

* Indicates that the Black candidate of choice was Black.

Caster Plaintiffs' Exhibit 79, Page 14

Table 7: Ecological Inference Results — Estimated Vote Share of Black-Preferred Candidates — Precinct-Level Election Data with Citizen Voting Age Population — CD 6

| | | Black | White | Other |
|---|---|---|---|---|
| 2016 | U.S. President | 91.9% (87.4, 94.9) | 14.5% (12.5, 16.4) | 48.4% (34.5, 68.6) |
| | U.S. Senator | 89.1% (84.6, 93.2) | 14.6% (12.9, 16.6) | 57.8% (45.6, 69.7) |
| 2017 | U.S. Senator | 93.3% (89.6, 96.2) | 36.7% (34.7, 38.8) | 46.9% (25.3, 72.6) |
| 2018 | Governor | 94.1% (90.9, 96.4) | 25.0% (22.8, 27.2) | 48.9% (27.6, 76.4) |
| | Lt. Governor* | 95.0% (92.3, 97.1) | 19.6% (17.9, 21.5) | 52.6% (29.2, 80.3) |
| | Attorney General | 94.9% (91.8, 97.0) | 22.3% (20.5, 24.3) | 61.8% (39.5, 81.8) |
| | Sec. of State | 95.0% (92.2, 97.0) | 19.9% (17.9, 22.0) | 53.6% (24.5, 77.9) |
| | State Auditor* | 94.9% (92.0, 96.9) | 20.4% (18.2, 22.5) | 53.3% (26.6, 81.7) |
| | Supreme Ct., Chief | 95.0% (91.3, 97.1) | 28.5% (26.5, 30.4) | 52.9% (26.9, 80.4) |
| | Supreme Ct., Place 4 | 95.7% (93.3, 97.5) | 19.7% (17.4, 21.8) | 57.3% (34.1, 79.0) |
| 2020 | U.S. President | 83.5% (77.7, 88.4) | 24.6% (23.1, 26.3) | 35.2% (20.2, 59.0) |
| | U.S. Senator | 83.6% (74.9, 89.0) | 27.8% (25.1, 30.1) | 38.5% (23.6, 54.8) |

* Indicates that the Black candidate of choice was Black.

Table 8: Ecological Inference Results — Estimated Vote Share of Black-Preferred Candidates — Precinct-Level Election Data with Citizen Voting Age Population — CD 7

| | | Black | White | Other |
|---|---|---|---|---|
| 2016 | U.S. President | 93.3% (91.2, 94.9) | 21.2% (17.9, 24.5) | 82.1% (71.9, 89.3) |
| | U.S. Senator | 92.9% (91.0, 94.5) | 19.2% (16.5, 22.3) | 80.4% (69.7, 90.1) |
| 2017 | U.S. Senator | 95.8% (94.6, 96.9) | 32.2% (28.2, 37.0) | 88.1% (79.4, 93.9) |
| 2018 | Governor | 94.7% (92.9, 96.0) | 24.8% (20.9, 29.8) | 83.0% (72.6, 91.4) |
| | Lt. Governor* | 94.8% (93.2, 96.1) | 22.1% (18.7, 25.9) | 84.0% (67.6, 92.0) |
| | Attorney General | 95.0% (93.4, 96.4) | 25.9% (21.8, 31.3) | 87.5% (80.1, 93.4) |
| | Sec. of State | 95.0% (93.3, 96.2) | 22.0% (18.6, 25.4) | 88.5% (80.7, 93.9) |
| | State Auditor* | 95.2% (93.9, 96.3) | 22.4% (18.9, 26.2) | 85.5% (73.2, 92.9) |
| | Supreme Ct., Chief | 95.2% (93.8, 96.5) | 26.1% (22.8, 29.2) | 89.3% (81.5, 94.1) |
| | Supreme Ct., Place 4 | 95.2% (93.5, 96.5) | 22.0% (18.9, 25.9) | 89.3% (82.1, 94.6) |
| 2020 | U.S. President | 92.4% (90.4, 94.0) | 28.7% (25.2, 32.6) | 77.3% (69.1, 86.1) |
| | U.S. Senator | 92.8% (90.8, 94.7) | 33.0% (28.6, 37.8) | 84.4% (74.2, 92.6) |

* Indicates that the Black candidate of choice was Black.

15

Table 9: Ecological Inference Results — Estimated Vote Share of Black-Preferred Candidates — Precinct-Level Election Data with Voter Turnout by Race — 2020 Elections

| | | Black | White | Other |
|---|---|---|---|---|
| Focus Area | U.S. President | 97.3% (96.8, 97.6) | 9.1% (8.7, 9.5) | 82.0% (78.6, 84.9) |
| | U.S. Senator | 97.6% (97.2, 98.0) | 12.1% (11.8, 12.5) | 88.9% (85.6, 91.6) |
| CD 1 | U.S. President | 96.5% (95.2, 97.6) | 8.6% (7.5, 9.8) | 75.9% (66.3, 83.1) |
| | U.S. Senator | 97.0% (95.5, 98.1) | 12.7% (11.7, 14.0) | 82.1% (72.7, 89.7) |
| CD 2 | U.S. President | 96.9% (95.7, 97.8) | 5.6% (4.7, 6.8) | 68.6% (58.2, 77.2) |
| | U.S. Senator | 97.1% (96.0, 98.0) | 6.9% (6.4, 7.6) | 92.8% (88.3, 96.0) |
| CD 3 | U.S. President | 96.7% (95.3, 97.8) | 7.4% (6.8, 8.2) | 83.1% (75.9, 88.7) |
| | U.S. Senator | 97.0% (95.5, 98.1) | 10.7% (9.9, 11.7) | 83.9% (74.8, 91.1) |
| CD 6 | U.S. President | 97.0% (95.5, 98.1) | 11.8% (11.2, 12.6) | 91.6% (86.0, 95.3) |
| | U.S. Senator | 96.8% (94.8, 98.1) | 15.2% (14.6, 16.0) | 93.0% (88.4, 96.2) |
| CD 7 | U.S. President | 97.5% (97.0, 98.0) | 16.6% (15.0, 19.3) | 66.4% (39.8, 80.6) |
| | U.S. Senator | 98.0% (97.4, 98.4) | 19.7% (18.4, 21.2) | 71.5% (58.3, 82.4) |

Table 10: Vote Share of Black-Preferred Candidates — Illustrative Map 1

| | | CD 1 | CD 2 | CD 3 | CD 4 | CD 5 | CD 6 | CD 7 |
|---|---|---|---|---|---|---|---|---|
| 2016 | U.S. President | 23.4% | 55.1% | 29.8% | 16.1% | 33.9% | 24.7% | 65.0% |
| | U.S. Senator | 24.1% | 54.0% | 30.7% | 19.0% | 34.4% | 25.0% | 63.4% |
| 2017 | U.S. Senator | 37.1% | 65.5% | 45.2% | 27.8% | 51.4% | 43.1% | 76.8% |
| 2018 | Attorney General | 29.1% | 58.5% | 35.1% | 21.6% | 41.2% | 31.2% | 69.1% |
| | State Auditor | 27.3% | 56.9% | 33.6% | 19.7% | 39.8% | 29.4% | 67.8% |
| | Governor | 27.8% | 55.7% | 33.7% | 21.9% | 40.1% | 32.5% | 69.0% |
| | Lt. Governor | 26.5% | 56.1% | 32.5% | 18.7% | 38.5% | 28.7% | 67.6% |
| | Supreme Ct., Place 4 | 26.9% | 56.6% | 33.2% | 20.1% | 39.8% | 29.1% | 68.1% |
| | Supreme Ct., Chief | 29.7% | 59.2% | 36.4% | 22.6% | 41.9% | 35.3% | 70.4% |
| | Sec. of State | 26.7% | 56.2% | 32.8% | 19.0% | 39.1% | 29.0% | 67.4% |
| 2020 | U.S. President | 25.4% | 55.4% | 31.3% | 16.5% | 37.2% | 28.6% | 66.9% |
| | U.S. Senator | 28.9% | 57.6% | 33.9% | 19.6% | 40.5% | 31.2% | 68.5% |

16

Table 11: Vote Share of Black-Preferred Candidates — Illustrative Map 2

| | | CD 1 | CD 2 | CD 3 | CD 4 | CD 5 | CD 6 | CD 7 |
|---|---|---|---|---|---|---|---|---|
| 2016 | U.S. President | 22.8% | 55.5% | 29.8% | 16.1% | 33.9% | 24.9% | 65.7% |
| | U.S. Senator | 23.5% | 54.5% | 30.7% | 19.0% | 34.4% | 25.2% | 64.0% |
| 2017 | U.S. Senator | 36.7% | 65.8% | 45.3% | 27.8% | 51.4% | 43.3% | 77.1% |
| 2018 | Attorney General | 28.7% | 58.9% | 35.1% | 21.6% | 41.2% | 31.5% | 69.5% |
| | State Auditor | 27.0% | 57.2% | 33.6% | 19.7% | 39.8% | 29.6% | 68.3% |
| | Governor | 27.5% | 56.0% | 33.7% | 21.9% | 40.1% | 32.7% | 69.4% |
| | Lt. Governor | 26.1% | 56.5% | 32.5% | 18.7% | 38.5% | 29.0% | 68.1% |
| | Supreme Ct., Place 4 | 26.5% | 57.0% | 33.2% | 20.1% | 39.8% | 29.4% | 68.6% |
| | Supreme Ct., Chief | 29.4% | 59.4% | 36.4% | 22.6% | 41.9% | 35.6% | 70.8% |
| | Sec. of State | 26.4% | 56.6% | 32.8% | 19.0% | 39.1% | 29.3% | 67.8% |
| 2020 | U.S. President | 24.9% | 55.9% | 31.3% | 16.5% | 37.2% | 29.0% | 67.4% |
| | U.S. Senator | 28.6% | 58.0% | 33.8% | 19.6% | 40.5% | 31.6% | 69.0% |

Table 12: Vote Share of Black-Preferred Candidates — Illustrative Map 3

| | | CD 1 | CD 2 | CD 3 | CD 4 | CD 5 | CD 6 | CD 7 |
|---|---|---|---|---|---|---|---|---|
| 2016 | U.S. President | 23.5% | 56.4% | 31.9% | 17.7% | 33.9% | 21.0% | 62.8% |
| | U.S. Senator | 24.2% | 55.0% | 32.4% | 20.4% | 34.4% | 22.1% | 61.2% |
| 2017 | U.S. Senator | 37.0% | 66.7% | 46.0% | 31.3% | 51.4% | 37.9% | 75.4% |
| 2018 | Attorney General | 29.1% | 59.8% | 36.5% | 23.4% | 41.2% | 27.6% | 66.9% |
| | State Auditor | 27.3% | 58.2% | 35.0% | 21.6% | 39.8% | 25.6% | 65.6% |
| | Governor | 27.7% | 57.2% | 34.7% | 23.9% | 40.1% | 28.5% | 67.1% |
| | Lt. Governor | 26.5% | 57.3% | 34.2% | 20.5% | 38.5% | 24.9% | 65.3% |
| | Supreme Ct., Place 4 | 26.8% | 57.8% | 34.7% | 21.8% | 39.8% | 25.6% | 65.8% |
| | Supreme Ct., Chief | 29.5% | 60.6% | 37.4% | 24.6% | 41.9% | 31.1% | 68.7% |
| | Sec. of State | 26.7% | 57.4% | 34.4% | 20.8% | 39.1% | 25.1% | 65.2% |
| 2020 | U.S. President | 25.4% | 56.7% | 33.2% | 18.1% | 37.2% | 24.5% | 65.0% |
| | U.S. Senator | 29.0% | 58.8% | 35.6% | 21.2% | 40.5% | 27.2% | 66.8% |

17

Caster Plaintiffs' Exhibit 79, Page 17

Table 13: Vote Share of Black-Preferred Candidates — Illustrative Map 4

| | | CD 1 | CD 2 | CD 3 | CD 4 | CD 5 | CD 6 | CD 7 |
|---|---|---|---|---|---|---|---|---|
| 2016 | U.S. President | 23.5% | 55.9% | 32.1% | 16.6% | 33.9% | 24.3% | 61.2% |
| | U.S. Senator | 24.2% | 54.6% | 32.7% | 19.7% | 34.4% | 24.5% | 60.0% |
| 2017 | U.S. Senator | 37.0% | 66.1% | 47.0% | 28.6% | 51.4% | 43.4% | 73.6% |
| 2018 | Attorney General | 29.1% | 59.4% | 36.6% | 22.2% | 41.2% | 31.4% | 65.4% |
| | State Auditor | 27.3% | 57.7% | 35.2% | 20.3% | 39.8% | 29.5% | 64.1% |
| | Governor | 27.7% | 56.5% | 35.3% | 22.1% | 40.1% | 32.6% | 65.7% |
| | Lt. Governor | 26.5% | 56.8% | 34.6% | 19.2% | 38.5% | 28.7% | 63.9% |
| | Supreme Ct., Place 4 | 26.8% | 57.3% | 35.1% | 20.6% | 39.8% | 29.1% | 64.6% |
| | Supreme Ct., Chief | 29.5% | 60.1% | 37.9% | 23.3% | 41.9% | 35.6% | 66.6% |
| | Sec. of State | 26.7% | 56.9% | 34.8% | 19.6% | 39.1% | 29.0% | 63.6% |
| 2020 | U.S. President | 25.4% | 56.2% | 33.2% | 16.9% | 37.2% | 28.8% | 62.7% |
| | U.S. Senator | 29.0% | 58.4% | 35.7% | 20.0% | 40.5% | 31.6% | 64.4% |

Table 14: Vote Share of Black-Preferred Candidates — Illustrative Map 5

| | | CD 1 | CD 2 | CD 3 | CD 4 | CD 5 | CD 6 | CD 7 |
|---|---|---|---|---|---|---|---|---|
| 2016 | U.S. President | 25.0% | 55.1% | 31.0% | 15.9% | 33.9% | 24.4% | 63.5% |
| | U.S. Senator | 25.5% | 54.0% | 31.6% | 18.8% | 34.4% | 25.0% | 61.9% |
| 2017 | U.S. Senator | 39.4% | 65.1% | 45.2% | 27.6% | 51.4% | 42.9% | 76.0% |
| 2018 | Attorney General | 30.8% | 58.5% | 35.6% | 21.4% | 41.2% | 31.1% | 67.8% |
| | State Auditor | 29.0% | 56.8% | 34.1% | 19.5% | 39.8% | 29.1% | 66.5% |
| | Governor | 29.7% | 55.5% | 34.0% | 21.7% | 40.1% | 32.1% | 68.0% |
| | Lt. Governor | 28.0% | 56.1% | 33.3% | 18.5% | 38.5% | 28.3% | 66.3% |
| | Supreme Ct., Place 4 | 28.4% | 56.6% | 33.8% | 19.9% | 39.8% | 28.9% | 66.9% |
| | Supreme Ct., Chief | 31.8% | 58.9% | 36.5% | 22.4% | 41.9% | 35.0% | 69.4% |
| | Sec. of State | 28.3% | 56.2% | 33.6% | 18.8% | 39.1% | 28.7% | 66.1% |
| 2020 | U.S. President | 26.9% | 55.4% | 32.2% | 16.3% | 37.2% | 28.0% | 65.8% |
| | U.S. Senator | 30.5% | 57.5% | 34.7% | 19.4% | 40.5% | 30.8% | 67.5% |

Caster Plaintiffs' Exhibit 79, Page 18

Table 15: Vote Share of Black-Preferred Candidates — Illustrative Map 6

| | | CD 1 | CD 2 | CD 3 | CD 4 | CD 5 | CD 6 | CD 7 |
|---|---|---|---|---|---|---|---|---|
| 2016 | U.S. President | 22.2% | 57.3% | 31.1% | 15.7% | 33.9% | 23.9% | 63.5% |
| | U.S. Senator | 23.0% | 55.9% | 31.7% | 18.4% | 34.4% | 24.6% | 62.1% |
| 2017 | U.S. Senator | 35.4% | 67.6% | 45.3% | 27.8% | 51.4% | 42.4% | 75.7% |
| 2018 | Attorney General | 27.9% | 60.7% | 35.7% | 21.3% | 41.2% | 30.6% | 67.7% |
| | State Auditor | 26.0% | 59.2% | 34.3% | 19.4% | 39.8% | 28.7% | 66.4% |
| | Governor | 26.4% | 58.3% | 34.1% | 21.9% | 40.1% | 31.7% | 67.5% |
| | Lt. Governor | 25.2% | 58.3% | 33.5% | 18.4% | 38.5% | 27.9% | 66.2% |
| | Supreme Ct., Place 4 | 25.6% | 58.8% | 34.0% | 19.8% | 39.8% | 28.4% | 66.7% |
| | Supreme Ct., Chief | 28.2% | 61.7% | 36.7% | 22.5% | 41.9% | 34.5% | 69.2% |
| | Sec. of State | 25.5% | 58.4% | 33.7% | 18.7% | 39.1% | 28.3% | 66.0% |
| 2020 | U.S. President | 24.2% | 57.6% | 32.4% | 16.2% | 37.2% | 27.5% | 65.8% |
| | U.S. Senator | 27.7% | 59.7% | 34.8% | 19.3% | 40.5% | 30.3% | 67.4% |

19

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| MARCUS CASTER, et al., | |
| Plaintiffs, | |
| v. | Case No.: 2:21-cv-1536-AMM |
| JOHN H. MERRILL, in his official capacity as Alabama Secretary of State, | |
| Defendant. | |

**DECLARATION OF DR. BRIDGETT KING**

Pursuant to 28 U.S.C. § 1746, I, Bridgett King, make the following declaration:

1. My name is Bridget King, and I reside in Opelika, Alabama. I have been asked by attorneys for the plaintiffs in this litigation to examine the history of race discrimination in voting in Alabama, and the impact that racial discrimination has on the ability of Black voters in Alabama to participate equally in the political process and elect candidates of their choice. The analysis that follows is based on my expertise as a political and social scientist.

2. I have employed the standard methodology used in my field of expertise in this declaration.[1] My hourly rate of compensation in this case is $300.00.

**Qualifications**

3. I am faculty in the department of Political Science at Auburn University. I have been on the faculty since the 2014/2015 academic year and currently hold the rank of Associate Professor

---

[1] In performing this type of analysis, political and social scientists examine sources such as relevant scholarly studies, newspaper articles on historical events, reports of state or federal governments, and relevant court decisions. We also use secondary data and data sets collected by governments and other reputable research entities to understand political behavior. We use appropriate quantitative methodological approaches to analyze such data, adhering to standard conventions of statistical significance.

1

with tenure. I additionally serve as the Director of the Master of Public Administration Program.

As a member of the Auburn University faculty, I teach undergraduate courses in state policy and governance and graduate courses in policy analysis, public administration and service, and diversity in public administration.

4.     I earned my Bachelor's degree in Psychology from Hampton University in 2003; a Master's Degree in Justice Studies from Kent State University in 2006 and Doctor of Philosophy (Ph.D.) in Political Science in 2012 from Kent State University.

5.     My doctoral dissertation entitled, "The Effect of State Policy On The Individual Vote Decisions Of African Americans In Presidential And Midterm Elections, 1996 To 2008" evaluates the effect of seven state voting policies (registration closing date, photo identification requirements, statewide computer registration database, in person early voting, Election Day registration, no excuse absentee voting, and felony disenfranchisement) on Black turnout in Presidential and midterm elections from 1996 to 2008. I used individual-level data from the US Census Bureau Current Population Survey ("CPS") that was merged with detailed state level voting policy, demographic, social and economic indicators. Using a series of multilevel models, I analyzed the effect of policy variations on the Black population.

6.     Following the completion of my doctorate, I was a voting rights researcher at the Brennan Center for Justice at New York University School of Law. In my role as a voting rights researcher, I was responsible for original research—including empirical research, interviews of public officials and private individuals, collection and analysis of public data, news searches and the supervision of research. Working with other voter rights advocates I developed and coordinated a 2012 Presidential election voter survey that was administered in six states. I also

2

conducted a county level analysis of the quality of voter registration databases across the United States and a preliminary analysis of Election Day voter challenges.

7.     My current research focuses on election administration, public policy, citizen voting experiences, and race and ethnicity. Overarching themes in my writings include the administrative structure of felony disenfranchisement policies and their effect on participation and representation, citizen confidence in electoral outcomes, and the consequences of administrative discretion on voter experiences and democratic representation. I also work on interdisciplinary projects that apply systems and architectural engineering approaches to the field of election administration to address challenges associated with administrative decision-making and voter experiences.

8.     I have received external support for my research in election administration from the National Science Foundation, Rockefeller Family Fund, Democracy Fund, and others. I also hold positions in several election administration and research focused projects and initiatives. I am currently on the Electoral Integrity Project International Academic Advisory Board, a track leader with the Election and Voting Information Center (EVIC), and a research partner with the University of Rhode Island Voter Operations and Election Systems (URIVOTES).

9.     I am also regularly asked to speak on domestic and international academic and practitioner panels on issues related to election administration and participate in domestic and international election observation efforts.

10.    In addition to teaching at Auburn University, I am an instructor in the National Association of Election Officials (Election Center) Certified Elections/Registration Administrator ("CERA") Program. In the CERA Program I teach courses that have a substantive focus on communication, voter participation, state constitutions and court cases from early

3

America to 1965, the history of elections from 1781 to the present, and federal interventions in elections and voter registration from the 1960s to the present.

11.    I have published 10 journal articles, edited 4 books, and authored 8 book chapters and 3 applied reports. Much of this scholarship focuses on the administration of elections.

12.    My research has appeared in the *Election Law Journal*, *Journal of Black Studies*, *Social Science Quarterly*, *Government Information Quarterly*, *Policy Studies*, and the *Journal of Information Technology and Politics*. I have contributed to and edited multiple book manuscripts, including, *Voting Rights in America: Primary Documents in Context, The Future of Election Administration, The Future of Election Administration: Cases and Conversations*, and *Why Don't Americans Vote? Causes and Consequences*.

**Brief Summary of Conclusions**

13.    This report reviews Alabama's well-documented, pervasive, and sordid history of racial discrimination in the context of voting and political participation. The combination of the continuing effects of this discrimination (as reflected in racial disparities in social and economic indicators such as rates of unemployment, poverty, education, and healthcare), the persistence of severe and ongoing racially polarized voting, and the state's racialized politics significantly and adversely impact the ability of Black Alabamians to participate equally in the state's political process. The district map challenged in this lawsuit should be viewed in this context.

**SENATE FACTORS**

14.    This report examines the factors established by the U.S. Senate Judiciary Committee in 1982 to guide courts in assessing the totality of circumstances relevant to a Section 2 claim that a challenged law impedes the ability of a minority group to participate equally in the political

4

process. [2]

15.     The Senate Factors are:

- Factor 1: The extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, vote, or otherwise to participate in the democratic process;

- Factor 2: The extent to which voting in the elections of the state or political subdivision is racially polarized; [3]

- Factor 3: The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

- Factor 4: If there is a candidate slating process, whether the members of the minority group have been denied access to that process; [4]

- Factor 5: The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

- Factor 6: Whether political campaigns have been characterized by overt or subtle racial appeals; and

- Factor 7: The extent to which members of the minority group have been elected to public office in the jurisdiction.

The Judiciary Committee also noted that the court could consider additional factors such as:

- Factor 8: Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

- Factor 9: Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous. [5]

---

[2] *See Thornburg v. Gingles*, 478 U.S. 30, 45 (1986); United States Department of the Justice, *Section 2 of the Voting Rights Act*, (Sept. 14, 2018), https://www.justice.gov/crt/section-2-voting-rights-act.

[3] My report does not analyze the extent to which voting in Alabama is racially polarized, as I understand another expert retained by Plaintiffs will provide such analysis.

[4] My report does not address this factor as recent Alabama elections have not utilized slating processes.

[5] S. Rep. No. 97-417, at 28-29 (1982).

Caster Plaintiffs' Exhibit 80, Page 5

**Senate Factor 1: History of official discrimination in Alabama affecting Black Alabamians'
political participation.**

16.    Limiting Black Americans' ability to fully participate in civic life by enacting

discriminatory measures has been an integral part of Alabama politics and culture.

**A.    Foundational Discrimination Against Black Alabamians**

17.    Following the Civil War, during the Reconstruction Era, the state actively passed policies

with the explicit goal of limiting the ability of newly enfranchised Black Americans to exercise

their newfound political rights secured by the 13th, 14th, and 15th Amendments.

18.    After the passage of the 13th Amendment by the United States Congress in January 1865,

Alabama amended its constitution in September 1865. Article I, Sections 5 and 8 of Alabama's

newly amended constitution explicitly stated that only white males could be senators or

representatives, and Article VIII, Section 1 stated that only white males were qualified to vote.

19.    After the passage of the 14th Amendment, Alabama again amended its constitution. The

1868 constitution, or "Second Reconstruction Constitution," which was required for Alabama to

be admitted back to the union, removed its race qualification for senators and representatives and

the race qualifications for voting.[6]

20.    Soon thereafter, however, Democratic party leaders began a program of racial

discrimination and voter suppression. When white leaders in Alabama gathered for the state's

1901 Constitutional Convention, they stated on the record that their express goal was to establish

"white supremacy in the State."[7] The state's now infamous voting restrictions were thus born.

_____

[6] Martin, D. (1993). The birth of Jim Crow in Alabama 1865-1896. *National Black Law Journal,
13*(1), 184-197; Bridges, E. C. (2016). *Alabama: The Making of an American State.* Tuscaloosa:
University of Alabama Press. 2016.
[7] Alabama Constitutional Convention (1901). *Journal of the proceedings of the Constitutional
convention of the state of Alabama: held in the city of Montgomery, commencing May 21st,
1901.* Montgomery: The Brown printing company.

The 1901 Constitution codified literacy tests and mandated the payment of a $1.50 cumulative poll tax, both of which were intended to keep Black Alabamians from the polls. As one supporter of these measures stated, Alabama "want[ed] that poll tax to stack up so high that he will never be able to vote again."[8] The state's poll tax survived until 1966.[9]

21.      Voters were also required to demonstrate the ability to read and write a section of the U.S. Constitution, a requirement that gave broad discretion to election officials to apply the test more strictly against Black applicants.[10] Black applicants were often rejected for "formal, technical, and inconsequential" errors. As an example, Black voters had their registration forms rejected because they did not sign an oath, despite often not being told that they had to sign an oath. By contrast, white applicants were often provided assistance in passing the test.[11]

22.      The 1901 constitution also imposed employment and property requirements on voters, again intended to exclude Black Alabamians from the electorate. Applicants were required to demonstrate one year of employment and the possession of 40 acres of land or property valued at $300.00 or more. To ensure white voters weren't accidentally disenfranchised by these provisions, Section 180 of the 1901 constitution included a grandfather clause allowing the registration of any qualifying adult male who was a veteran of a nineteenth century American

---

[8] *United States* v. *State of Alabama*, 252 F. Supp. 95, 99 (M.D. Ala. 1966).

[9] *Id.*

[10] Cianci Salvatore, S., Foley N., Iverson, P. & Lawson, S. F. (2009). Civil rights in America: Racial voting rights. *National Park Service.* https://www.nps.gov/subjects/tellingallamericansstories/upload/CivilRights_VotingRights.pdf; H. B. E, & K., Jr., J.J. (1965). Federal Protection of Negro Voting Rights. *Virginia Law Review,* 51(6), 1095.

[11] H. B. E, & K., Jr., J.J. (1965). Federal Protection of Negro Voting Rights. *Virginia Law Review, 51*(6), 1094.

Caster Plaintiffs' Exhibit 80, Page 7

war or a descendant of a veteran, even if they were unable to meet the other voter qualifications required by the state constitution, an exception very few Black Alabamians could meet.

23.     The constitution also disqualified voters if they committed minor crimes such as vagrancy and larceny, or vague crimes of moral failing and mental deficiency. This broad, and often standardless, definition of disqualifying crimes provided white officials an additional and highly effective tool to disenfranchise Black voters. Specifically, Article VIII, Section 182 states,

> The following persons shall be disqualified both from registering and from voting, namely: All idiots and insane persons; those who shall by reason of conviction of crime be disqualified from voting at the time of the ratification of this Constitution; those who shall be convicted of treason, murder, arson, embezzlement, malfeasance in office, larceny, receiving stolen property, obtaining property or money under false pretenses, perjury, subornation of perjury, robbery, assault with intent to rob, burglary, forgery, bribery, assault and battery on the wife, bigamy, living in adultery, sodomy, incest, rape, miscegenation, crime against nature, or any crime punishable by imprisonment in the penitentiary, or of any infamous crime or crime involving moral turpitude; also, any person who shall be convicted as a vagrant or tramp, or of selling or offering to sell his vote or the vote of another, or of making or offering to make false return in any election by the people or in any primary election to procure the nomination or election of any person to any office, or of suborning any witness or registrar to secure the registration of any person as an elector.[12]

24.     The adoption of the literacy test and poll tax requirements all but eliminated the Black voting population in Alabama. In 1900, there were 180,000 registered Black voters in Alabama. By 1903 there were fewer than 3,000.[13] In 1906, five years after the adoption of the 1901 Constitution, only two percent of the Black voting age population remained on the voter registration rolls in Alabama.[14]

---

[12] The Constitution of Alabama, (1901), *available at* https://constituti.files.wordpress.com/2013/02/alabama.pdf.
[13] McCrary, P., Gray, J.A., Still, E., Perry, H.L (1994). Alabama. In quiet revolution in the South (Grofman, B. & Davidson, C., Eds), Princeton University Press: Princeton, New Jersey, p. 38-66.
[14] Salvatore, *supra*, n.10.

8

25.     The state's program of disenfranchisement was not limited to voting laws. The state also actively worked to reduce the ability of Black Americans to participate in elections and public life. For example, the state adopted the secret ballot, which replaced the use of voice voting and party printed ballots for elections. The secret ballots also served as a de facto literacy test because they prohibited voters from receiving assistance to read and cast the ballot. The Sayre Act (1893) empowered the Alabama Governor to appoint election officials and make changes to the election system, a process that is widely understood to have been designed to prevent the election of Black county commissioners.[15] The Democrats in the State Legislature also gerrymandered Black voters into single districts, eliminated elected positions and replaced them with appointments, and stuffed ballot boxes to ensure political victories.[16]

26.     Further still, in 1902 the Democratic Party adopted the all-white primary for statewide elections. After the white primary was ruled unconstitutional in *Smith v. Allwright*, 321 U.S. 649 (1944), the state adopted the Boswell Amendment (1946), which required that an applicant for voter registration not only be able to read and write a section of the US Constitution, but also "understand and explain" it.[17] In 1949, the Southern District of Alabama in *Davis v. Schnell*, concluded that the "understand and explain" text violated the 14th and 15th amendments. 81 F.Supp. 872, 878-80 (S.D. Ala. 1949), *aff'd*, 336 U.S. 933 (1949). In that ruling, the court explained that the "Boswell Amendment was purposely used to counteract the Supreme Court's

[15] Blacksher J., Still E., Greenbaum, J.M., Quinton, N. Brown, C., & Dumas, R. (2008) Voting rights in Alabama: 1982-2006. *Southern California Review of Law and Social Justice, 17*, 249-281.
https://gould.usc.edu/students/journals/rlsj/issues/assets/docs/issue_17/04_Alabama_Macro.pdf.
[16] Warren, S. (2011). Alabama Constitution of 1901. Encyclopedia of Alabama.
http://encyclopediaofalabama.org/article/h-3030.
[17] H. B. E. *supra*, n.11.

invalidation of the white primary and that both its object and the manner of its administration violated the 14th Amendment."[18]

27. And yet the state pressed on with new policies that prevented Black Alabamians from participating in the political process. In 1951 a new constitutional amendment required that voter registration applicants be able to read and write any article of the federal constitution, be of good character, and embrace the duties and obligations of citizenship under the federal and state constitutions. "In order to aid the local board of registrars in determining whether an applicant satisfied these requirements, the applicant was required to answer in writing and without assistance a questionnaire, or application form, prescribed by the Alabama Supreme Court."[19] From January 1952 to February 1964, the state used a four-page application and form.[20] In January 1964 the Alabama Supreme Court modified the form and questionnaire and included questions testing the applicant's knowledge of government, including the names of government officials, four excerpts from the federal constitution, and a space in which the applicant was to write from dictation several words from the federal constitution. Again, these changes were intended to prevent Black Alabamians from voting.[21]

28. The voter registration application also allowed local registrars to demand an affirmation under oath by a supporting witness, who must also be a registered voter, who could attest to knowing the applicant and possessing personal knowledge of the applicant's residence and length of residence in the county and state.[22] This affirmation was not required by law and its application was at the sole discretion of the registrars. While some counties did not require a

_____

[18] H. B. E., & K., Jr., *supra* n. 11 at 1092.
[19] *Id.*
[20] *Id.* at 1123.
[21] *Id.* at 1093.
[22] *Id.* at 1097.

10

supporting witness, in other counties the witness affirmation requirement was applied only to Black voters. [23]

29.   In some counties, the Board of Registrars adopted a "white voucher rule" which required voter registration applicants to have a white person vouch for their qualifications, which was meant to prevent Blacks from registering. Where this was in effect, white voter registration applicants were often provided a voucher by the registrars. [24]

30.   Other counties developed novel measures to slow down the process of voter registration among Black citizens. In some counties Black Alabamians were made to wait in excessively long voter registration lines, were instructed to register at a specific time, were not informed when the voter registration office would be open, were not permitted to apply for registration after a prior rejection, and had their ballots rejected without notice of rejection or reason for their rejection. The lack of notice of rejection or reason for rejection failed to provide Black applicants with sufficient time or information to effectively appeal their rejection during the 30-day appeal window. In some counties, the registrars would simply close the office. [25] Elsewhere, registrars would simply not allow Blacks to register. [26] For example, in Bullock County, the Board of Registrars refused applications from Black Alabamians from 1946 until 1955.

31.   Even in communities where Black Alabamians had enhanced opportunities for education and employment, elected officials' efforts to reduce and eliminate Black political participation

---

[23] "A federal district court in *United States v. Hines* found that in Sumpter County while the requirement has been strictly applied to Nego applicants, its use has been a mere formality for whites, who have been given assistance in finding the necessary witness.'" *Id.* at 1097 (citing *United States v. Hines*, 9 Race Rel. L. Rep. 1332 (N. D. Ala. 1964) (Sumter County)).
[24] *Id.* at 1099.
[25] *Id.*
[26] *Id.* at 1091.

11

was effective. In Tuskegee (Macon County) home of Tuskegee University,[27] where after World

War II Blacks held a majority of the white-collar jobs and there was an educated Black middle

class, unequal application of the literacy test created an environment where Black college

graduates were no more likely to pass the literacy test than those who possessed slightly more

than a grade school education. The Board of Registrars would also require Black but not white

voters to provide the name of three registered voters who could vouch for them. Because there

were so few Blacks on the voter rolls, the number of registered Black Alabamians remained low.

By 1958, Blacks were 84 percent of Macon County's population, but white voters outnumbered

Black voters by two and a half times.[28]

32.     In a 1956 study, a political scientist at the University of Alabama concluded that this

registration process "was designed to be discriminatory" and consequently served to bar Black

Alabamians from voting.[29] The scientist concluded that even an "honestly designed educational

test" would "bar the ballot to the great mass of uneducated Negroes."[30]

33.     *United States v. Penton*, 212 F.Supp. 193 (1962), highlighted the devastating effect of not

only the literacy test but also its application. The case centered on the Montgomery County

Board of Registrars and their use of their discretion when reviewing the Alabama voter

application form, which included a literacy test. In that specific case, the Court found that:

- Approximately 8,868 applications were filed by white persons, 4,522 by
  Black persons.
- Under 4 percent of the white applicants were rejected, over 75 percent of the
  Black applicants were rejected.

---

[27] Founded in 1881 by Booker T. Washington, the Tuskegee Institute remained an "institute" until 1985 when it obtained "university" status.
[28] Salvatore, *et al.*, *supra* n.10.
[29] Strong, D. S (1956). *Registration of voters in Alabama*. University of Alabama: University of Alabama Bureau of Public Administration: Tuscaloosa, AL.
[30] *Id.* at 120.

12

- 710 of the rejected Black applicants had 12 grades of formal education or more, six of whom had master's degrees, 152 had four years of college training, and 222 had some college education.

- Question 5 was filled out completely by the Board of Registrars for white persons but not for Black persons. On other specific questions, whites were assisted and Black persons were required to fill them out without assistance.

- In general, the application form used as a "tricky" examination for Black persons and purely to obtain substantive information from white persons; almost all Black applicants were rejected for a single error while almost 1,070 of the accepted white applications contained technical errors.[31]

34.    As the federal government slowly began to adopt remedies for voting rights violations in the south, and civil rights activists worked to demonstrate the need to dismantle disenfranchisement more directly, Black Alabamians remained largely excluded from voting; in 1965, only 23 percent of Blacks in the state could vote.[32]

35.    After the all-white primary was struck down in 1944, many counties in Alabama responded by adopting at-large elections, with the intent of preventing majority-minority communities from electing candidates of their choice. The state sought to achieve the same end in 1951 when it prohibited single-shot voting in municipal elections.

36.    In 1951, a restriction on single shot voting or a full slate law was applied to all Alabama counties.[33] Prior to that provision, the at-large voting systems in some counties made it possible for Black Alabamians to elect a member of the city council if multiple seats were being filled in the same election: if they were politically cohesive, Black voters could secure the election of a Black candidate by casting only votes for that candidate and otherwise failing to cast the full number of votes suggested. The 1951 provision made single shot voting impossible by disqualifying ballots that did not make selections equal to the full slate of seats.[34] A proponent of

---

[31] *See Penton*, 212 F. Supp. at 196–98.
[32] Salvatore, *et al.*, *supra* n.10.
[33] McCrary, *supra*, n.13.
[34] *Id.*

13

the law justified its need by stating, "there are some who fear that the colored voters might be

well able to elect one of their own race to the city council by single shot voting."[35]

37.     The single shot provision was replaced by numbered places in 1961. Numbered-place

laws, also used in at-large elections with multiple candidates, designate each position by a

separate number, require that each candidate qualify and run for a specific number, and allow

each voter to only vote for one candidate in each number.[36] "Such laws are also potential means

for perfecting majority control; the same jurisdiction-wide majority can control each and every

seat when candidates must compete directly for specific seats."[37] Steadily, Alabama jurisdictions

adopted a voting system requiring at-large elections, numbered places, and a majority vote,

making it virtually impossible for Blacks to elect candidates of their choice without substantial

crossover voting by whites.[38]

38.     By enacting these various measures, the State sought to prevent its Black population from

organizing their votes around one candidate.

39.     So desperate were counties in Alabama to eliminate the Black vote that in 1957, Alabama

redrew the boundaries of the city of Tuskegee to exclude Black residents to ensure that city

elections could be controlled by white residents, an act the U.S. Supreme Court held was

intentionally discriminatory. *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

_____

[35] *Id.* at 46.
[36] Derfner, A. (1973). *Racial discrimination and the right to vote*, Vanderbilt L. R. 26(3), 523-
584, https://scholarship.law.vanderbilt.edu/vlr/vol26/iss3/9/.
[37] Pildes, R. H. & Donoghue, K. A. (1995). Cumulative voting in the United States. *University of
Chicago Legal Forum,1995(1)*, 241-313,
http://chicagounbound.uchicago.edu/uclf/vol1995/iss1/10
[38] McCrary, *supra*, n.13 at 47.

14

**B.**      **Modern Discrimination Against Black Alabamians**

40.      Following the passage of the Voting Rights Act ("VRA") in 1965, the state relied on

other administrative mechanisms to limit the political power of Black Alabamians, many of

which were invalidated by federal courts. In *Sims v. Baggett*, 247 F.Supp. 96 (M.D. Ala. 1965),

the court invalidated a reapportionment plan that combined majority white and majority Black

counties; stating the clear purpose was to discriminate against Black voters.[39] In *Sims v. Amos*,

336 F.Supp. 924 (M.D. Ala. 1972), the court ruled that the use of multi-member districts tends to

discriminate against Black people.[40]

41.      In *Dillard v. Crenshaw Cty.*, 640 F.Supp. 128 (M.D. Ala. 1986), the court found that

counties' use of at-large elections were the result of intentional discrimination. This litigation

was subsequently expanded to include nearly 200 defendants, most of whom settled and agreed

to eliminate their at-large systems.

42.      Other court cases point to the use of administrative rules and procedures to limit the

ability of Black Alabamians to fully participate in elections and other democratic processes. *See,

e.g., Buskey v. Oliver*, 574 F.Supp. 41 (1983) (finding that city districting plan adopted for

racially discriminatory purpose); *Bolden v. City of Mobile*, 542 F.Supp. 1050 (S.D. Ala.

1982), (at-large voting for city commissioners adopted with racially discriminatory

purpose); *Sims v. Baggett*, 247 F.Supp. 96 (M.D. Ala. 1965) (finding that state house districts

were drawn to discriminate against Black voters).

43.      Due to the history described above, Alabama and its local jurisdictions became subject to

the VRA's preclearance process, which required them to obtain preclearance before

[39] Derfner, *supra*, n.36.
[40] *Id.*

15

implementing any new policies affecting voting and registration. The preclearance requirement limited Alabama's ability to legislatively or administratively adopt rules that adversely affected the political power of Black Alabamians.

44.     All told, between 1965 and 2013, at least 100 voting changes proposed by Alabama state, county, or city officials were either blocked or altered under the VRA.[41] These objections included a wide range of potential changes and included districting and redistricting plans, the annexation and de-annexation of geographic areas, changes from single member districts to at-large elections, increasing the size of representative bodies, voter purges, and voter re-identification. In just one example of these incidents, after Hale County had been sent federal observers under the VRA, the county changed its electoral system from district to at-large elections. A federal district court concluded that "the change to at-large voting . . . had the purpose and . . . the effect of abridging the right to vote on the basis of race." *Hale Cty. Ala. v. United States*, 496 F.Supp. 1206, 1207 (D.D.C. 1980).

45.     The U.S. Supreme Court's 2013 decision in *Shelby County v. Holder* invalidated Section 4(b) of the VRA, which provided the formula determining which jurisdictions were subject to preclearance. After *Shelby County* removed Alabama from covered status, the state rapidly made changes to voting and registration policies and procedures.

46.     One of the first changes Alabama made to its voting laws was to institute one of the most rigorous voter identification requirements in the nation.[42] This law was originally adopted in

_____
[41] Blacksher, *supra* n.15.
[42] Alabama Advisory Committee to the U.S. Commission on Civil Rights (2020). *Barriers to voting in Alabama.* https://www.usccr.gov/files/2020/2020-07-02-Barriers-to-Voting-in-Alabama.pdf.

16

2011. At the time, Alabama was subject to preclearance under the VRA. Alabama never even submitted the law for federal review.[43]

47.    Shortly after the *Shelby County* decision was issued, Alabama began enforcing its voter identification law. The law requires all voters to present one of 11 approved forms of identification or be positively identified by two election officials. If the voter does not have the approved identification and cannot be positively identified by two election officials, the voter may cast a provisional ballot. For the provisional ballot to be counted, the voter must present a proper form of photo identification to the Board of Registrars by 5:00 p.m. the Friday following Election Day.[44]

48.    Despite the various types of identification accepted, during testimony before the Alabama Advisory Committee to U.S. Commission on Civil Rights, Secretary of State John Merrill explained that "the most common forms of voter identification are state issued identification cards – such as a driver's license, a nondriver identification, or an Alabama Photo Voter ID card."[45] The driver's license and nondriver identification cards can be acquired from the Motor Vehicles Division offices. The Alabama Photo Voter ID Card can be obtained from the Office of the Secretary of State, the 67 County Board of Registrar Offices, or the Secretary of State's mobile identification unit.[46]

49.    However, in 2015, in response to a budget dispute, then-Governor Robert Bentley closed 31 Motor Vehicle Division offices in Alabama. In 2016, the U.S. Department of Transportation

[43] Dunphy, P. (2018). *When it comes to voter suppression, don't forget about Alabama*. Brennan Center for Justice.

[44] *See* Ala. Code § 17-9-30 *et seq.*; *id.* § 17-9-30(e); *id.* § 17-9-30(d); *id.* § 17-10-1.

[45] Alabama Advisory Committee, *supra* n.42.

[46] Alabama Secretary of State (n.d.). *Application for free Alabama photo voter identification card*, https://www.sos.alabama.gov/sites/default/files/voter-pdfs/candidate-resources/ApplicationForFreeALPhotoVoterIdCard.pdf.

17

investigated the closures and concluded that they adversely affected counties with majority Black and rural populations. Statistics from the Alabama Law Enforcement Agency and census data for the state show that 8 of the 11 counties in Alabama that have a majority or near majority black population, *i.e.*, approximately 72.7 percent suffered closure of MVD offices in their counties, compared to 23 of the 56 majority white counties in the state, about 41.1 percent.

50.    In response to the Department of Transportation's findings, the state re-opened offices in some of the affected counties with limited hours. Two such counties were Wilcox and Bullock. Both are poor, predominantly Black, rural counties. For one year, the Alabama Advisory Committee unsuccessfully tried to ascertain the days and hours of operation for the Motor Vehicles Division Office in Wilcox County. "When the chair of the Committee called the number that was listed for the office, no one answered the phone regardless of when she called. There was no recorded message to offer hours of operation. A call made by the Chair of the Committee to the Wilcox County clerk's office produced a suggestion that she travel to another county to obtain a driver's license."[47] Similar challenges were reported by those trying to determine the hours of operation for the Bullock County Motor Vehicles Division Office. This situation was reminiscent of counties' historical failure to provide Black residents with voting information, as discussed above.

51.    One of the many observations made by the Alabama Advisory Committee was that Bullock County had no website and the information about Motor Vehicle Offices that was posted on the Alabama Law Enforcement Agency website was either incorrect or the hours posted were not consistently kept. The Committee concluded that either possibility creates a hurdle for a voter seeking an identification from the offices in question.

_____

[47] Alabama Advisory Committee, *supra* n.42.

18

52.    The lack of accessible online information in the state is not limited to Motor Vehicle

Offices. After conducting an extensive online review of Alabama counties, researchers found that 47 of

67 counties have county websites. Of those counties, 43 had websites specifically for voting and

elections.[48]

53.    A study analyzing the post-*Shelby County* closure of polling locations found that there

were at least 66 fewer polling locations in Alabama than there were prior. The analysis also

found that the reduction was the result of decisions made in 12 counties. Although the study

included a relatively small sample of 18 Alabama counties and did not identify any definitive

racial pattern, the authors noted concern over such a small number of counties eliminating that

many polling locations.[49] For example, Daphne County, Alabama eliminated 3 of 5 polling

locations; two of the three closed polling locations are where a majority of Daphne's Black

population voted.[50]

C.    **Political Violence and Intimidation Against Black Alabamians**

54.    In addition to navigating a complex system of administrative policies and procedures and

cultural rules that have limited, and continue to limit, the ability of Black Alabamians to

participate in the political process, they have also been intimidated against participating in social,

political, and economic life by physical force and violence. Indeed, "[v]iolence was central to

suppressing the Black vote in the South."[51] After Reconstruction, Democrats used violence as a

---

[48] King, B.A., & Youngblood, N.E. (2016). E-government in Alabama: An analysis of county voting and election website content, usability, accessibility, and mobile readiness. *Government Information Quarterly, 33*, 715-726.
[49] The Leadership Conference Education Fund (2016). *The great poll closure*.
[50] Sharp, J. (2016, August 4). Alabama city battles questions over closing precincts near black voters, https://www.al.com/news/mobile/2016/08/alabama_city_battles_questions.html.
[51] Epperly, B., Wilco, C., Strickler, R., & White, P. (2020). Rule by violence, rule by law: Lynching, Jim Crow, and the continuing evolution of voter suppression in the U.S. *Perspectives on Policies 18*(3), 756-769.


tactic to defeat Republicans. In 1874, "two Sumter County Republican leaders, one black and one white were killed on Election Day and a mob murdered seven Black Americans and wounded nearly 70 others."[52]

55. Although there are various interpretations about the use of lynching to intimidate potential Black voters, many understand lynching to be a tool central to the suppression of Black voting rights.[53] "Since 1874 there have been more than 400 documented lynchings or attempted lynchings of Black men, women and children in Alabama."[54] "Nearly 200 Reconstruction-era victims of Alabama racial violence, including those lynched, assaulted, raped, or killed throughout the state [have been identified]. Perpetrators and supporters of this violence were never prosecuted. Some went on to hold elected office, including Governor George Houston, for whom Houston County is named, and Governor Braxton Bragg Comer."[55] Examples of this violence include:

- In Mobile County in 1865, white mobs killed an estimated 138 Black people over several months.
- In Eutaw, Alabama in November 1870, white mobs attack a political meeting of Black residents and white allies, killing four Black people.
- In November 1874 in Eufaula, Alabama, armed white men attack Black voters at the polls on election day and killed at least six Black people.
- On September 15, 1963, the Sixteenth Street Baptist Church, a key civil rights meeting place, was bombed. Four Black girls were killed and more than 20 were injured inside the church. The bomb was planted by members of the Ku Klux Klan.
- On March 7, 1965, state and local police attacked hundreds of civil rights activists beginning a march from Selma to Montgomery. The activists were protesting the denial of voting rights for Black Americans and the murder of Jimmie Lee Jackson, a civil rights activist who had been shot by police during a peaceful protest. The protestors were attacked with billy clubs, whips, and gas masks,

---

[52] Salvatore, *supra* n.10 at 10.
[53] Wells, I. B. (1900). Lynch law in America. *The Arena* (23), 15-24.
[54] Alabama Memory Project. (n.d.), *Lynching in Alabama,* https://alabamamemory.as.ua.edu/.
[55] Equal Justice Initiative. (n.d.). *Reconstruction In America racial violence after the civil war, 1865-1876.* https://eji.org/wp-content/uploads/2020/07/reconstruction-in-america-report.pdf.

while crossing the Edmund Pettus Bridge in Selma; a day that would come to be known as "Bloody Sunday." [56]

56.    Black Alabamians have also been subject to intimidation at the polls. In *Harris v. Graddick*, 593 F.Supp. 128, 133 (M.D. Ala. 1984), the court found that state and local officials had "intentionally created an atmosphere of fear and intimidation to keep black persons from voting" and that "[t]he present reality in Alabama is that many black citizens, particularly the elderly and uneducated, still bear the scars of this past, and are still afraid to engage in the simple act of registering to vote and voting."

57.    Cross burnings, which have "historically been used by the Ku Klux Klan and other racist organizations to rally supporters and terrorize black people in the South and elsewhere," also continue to be a tool used to intimidate Blacks in the South. [57]

58.    In June 2020 a burning cross was placed on a bridge that crosses Interstate 85 in Macon County, Alabama. [58] Macon County is the home of Tuskegee University, a Historically Black University. Macon County has a resident population that is 80 percent Black. [59] The cross burning was ruled a hate crime by the Federal Bureau of Investigation. [60]

**D.    Redistricting-Related Discrimination Against Black Alabamians**

59.    Focusing explicitly on the drawing of electoral boundaries, there is an extensive history in Alabama of racial discrimination.

---

[56] *Id.*

[57] Associated Press, (2020). *Burning cross found atop interstate overpass in Alabama.* https://abcnews.go.com/US/wireStory/deputies-investigate-cross-burning-bridge-alabama-71085645.

[58] *Id.*

[59] US Census QuickFacts, Alabama Population, *available at* https://www.census.gov/quickfacts/fact/table/maconcountyalabama,AL/PST045219.

[60] WSFA News (2020, June 6). FBI: Macon County cross burning incident a hate crime. https://www.wsfa.com/2020/06/05/suspects-sought-after-burning-cross-left-macon-county/.

21

Caster Plaintiffs' Exhibit 80, Page 21

60.      Prior to 1960, the Legislature failed to reapportion for 50 years. As a result, Alabama's entire legislative apportionment scheme was struck down for violating the principle of one person, one vote. *Reynolds v. Sims*, 377 U.S. 533, 568 (1964). On remand, a court found that, in devising remedial maps to correct the malapportionment, the "Legislature intentionally aggregated predominantly Negro counties with predominantly white counties for the sole purpose of preventing the election of Negroes to [State] House membership." *Sims v. Baggett*, 247 F.Supp. 96, 108-109 (M.D. Ala. 1965).

61.      Following *Reynolds* and the 1970 Census, the Legislature again failed to redistrict, forcing a three-judge federal court to draw new district lines. *Sims v. Amos*, 336 F.Supp. 924, 940 (M.D. Ala. 1972). In doing so, the court rejected the Alabama Secretary of State's proposed map because of its racially "discriminatory effect" on Black voters. *Id.* at 936.

62.      During the 1980 reapportionment process, the U.S. Department of Justice objected to maps drawn by the Legislature for the State House and Senate because of their discriminatory effect on Black voters in Jefferson County and the Black Belt. The State House plan reduced the number of majority-minority districts within the state. After the state redrew the map, the DOJ objected again, this time because the plan appeared to intentionally "crack" minority voters in the state's Black Belt counties.[61] A court rejected Alabama's proposed interim remedial state maps in part because Alabama's maps "had the effect of reducing the number of 'safe' black districts" in and near Jefferson County. *Burton v. Hobbie*, 543 F.Supp. 235, 238 (M.D. Ala. 1982).

---

[61] Letter from William Bradford Reynolds, Assistant Attorney Gen., Civil Rights Div., Dep't of Justice, to Charles A. Graddick, Attorney Gen., State of Ala. (Aug. 2, 1982) as cited in Blacksher et al. (2008), 272.

Caster Plaintiffs' Exhibit 80, Page 22

63.     Following the 1990 Census, the U.S. Department of Justice again objected to Alabama's new proposed congressional plan, which included just one majority-Black district and "fragmented" the rest of the Black population in the state to dilute the Black vote. In its objection letter, the DOJ noted a concern of the Black community that "an underlying principle of the Congressional redistricting was a predisposition on the part of the state political leadership to limit black voting potential to a single district."[62]

64.     In 2017, a federal court found that race predominated in the drawing of 14 state legislative districts, and that 12 of them were unconstitutional due to their inability to satisfy the strict scrutiny standard under the Equal Protection Clause. *Alabama Legislative Black Caucus v. Alabama*, 231 F.Supp.3d 1026 (M.D. Ala. 2017).

## Senate Factor 2: The extent to which voting in the elections of the state or political subdivision is racially polarized.

65.     As noted above, this report does not analyze the level of racially polarized occurring in Alabama; that analysis will be performed by a different expert retained by Plaintiffs. Below, however, I discuss how racial attitudes and racialized politics drive the historical and ongoing polarization among Black and white Alabamians.

66.     Over many decades during the Twentieth Century and into the Twenty-First Century, an important political realignment occurred that still frames politics across the United States today. A primary cause of this realignment was a shift in the stances taken by the two major American political parties on issues relating to race.

67.     Following the Emancipation Proclamation and through the Reconstruction Era, many Black Americans aligned with and supported the Republican Party. At the time, the Republican

---

[62] U.S. Dep't of Justice Ltr. to Ala. Att'y General Evans, Mar. 27, 1992, https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1880.pdf.

Caster Plaintiffs' Exhibit 80, Page 23

Party—the party of Abraham Lincoln—was viewed as being supportive of Black American social, economic, and political interests.

68.     During the Great Depression, however, the Democratic Party's New Deal offered significant assistance to Black Americans. Although President Roosevelt did not have a civil rights agenda and Black Americans experienced discrimination when trying to access New Deal Programs, Black Americans were able to participate in programs alongside whites.[63] While Black Americans were often formally excluded from the Democratic Party at the time, their participation in New Deal programs permitted them to participate politically. As an example, Black and white farmers voted each year to determine the level of cotton production.

69.     The partial relief provided by the New Deal sparked a partisan realignment among Black voters that still drives voting patterns today. In the 1936 election, for example, the majority of Black voters in the north left the Republican Party and supported the Democratic Party.[64]

70.     While the New Deal opened the door to this realignment, it was the parties' evolving stances on racial issues that served as the ultimate catalyst. Indeed, scholarship attributes party realignment to race as being the primary factor that "permanently rearranged the American Party system."[65]

71.     This partisan realignment gained its most significant momentum during the "Civil Rights Era" of the mid-Twentieth Century, most notably when President Lyndon Johnson signed the Civil Rights Act of 1964 and Voting Rights Act of 1965 into law. This era "polarized and

[63] Salvatore, et al., supra n.10.
[64] Weiss, N. J. (1983.) Farewell to the party of Lincoln: Black politics in the age of F.D.R. Princeton University Press: Princeton, New Jersey.
[65] Carmines EG, Stimson JA. 1989. Issue evolution: Race and the transformation of American politics. Princeton University Press: Princeton, NJ, xiii.

24

solidified the parties' stands on issues affecting African Americans, black support for the

Democratic Party at all levels of government grew further."[66]

72.    The Democratic Party's advocacy for racial equality and justice not only attracted the

support of Black Americans; it also repelled white voters to the Republican Party. "As the

national Democratic party moved away from its century-long commitment to avoid challenging

the Jim Crow system, the civil rights legislation proposed by Northern Democrats immediately

attracted massive resistance from Southern Democrats in Congress, and support for the

Democratic party began to erode among Southern whites."[67]

73.    To hasten the shift of white voters to its side, the Republican Party actively adopted

reactionary racial politics. Political Science scholarship substantiates that since the 1960s, the

Republican Party has consistently and successfully recruited white voters by adopting racially

and culturally conservative positions.[68] Valentino and Sears also find that racial conservatism

has become more tightly linked to both Republican presidential voting and Republican party

identification in the South.[69]

[66] Hutchings, V. and Nicholas V. A. (2004). The centrality of race in American politics. *Annual Review of Political Science* 7(1), 383–408, 386.
[67] Valentino, N. A. & Sears, D. O. (2005). Old times there are not forgotten: Race and partisan realignment in the contemporary South. *American Journal of Political Science*, 49(3), 672–688, 673.
[68] Boyd, James. 1970. "Nixon's Southern Strategy: 'It's All in the Charts.'" *The New York Times*, http://www.nytimes.com/packages/html/books/phillips-southern.pdf; Edsall, Thomas B., and Mary D. Edsall. 1991. Chain Reaction: The Impact of Race, Rights, and Taxes on American Politcs. New York: Norton; Mendelberg, Tali. 2001. The Race Card: Campaign Strategy, Implicit Messages, and the Norm of Equality. Princeton, NJ: Princeton University Press; Hutchings, Vincent L., and Nicholas A. Valentino. 2004. "The Centrality of Race in American Politics." *Annual Review of Political Science* 7:383–408.
[69] Valentino, Nicholas A., and David O. Sears. 2005. "Old Times There Are Not Forgotten: Race and Partisan Realignment in the Contemporary South." *American Journal of Political Science* 49(3): 672-688, 685.

74.    The realignment discussed above has resulted in a political system where Black Americans currently overwhelmingly identify with the Democratic Party. A 2020 analysis found that more than 60% of Black Americans identify as Democrats.[70] By contrast, white voters, especially across the South, overwhelmingly identify with the Republican Party.[71]

75.    This historical party realignment, caused by racial politics and coupled with the continued prevalence of racial issues and the dominance of race as a political issue in the south, indicates that racial attitudes continue to structure partisan divisions in Alabama today.

76.    Aside from the significant effect that issues relating to race have had on partisanship, race can be a deciding factor in candidate preference more generally. First, literature suggests that both black and white voters prefer to vote for candidates of their own race when a contest includes a black and white candidate.[72] Second, there is no clear relationship between the ideology of black voters and their candidate preferences. For example, while 90% of Black voters supported Barack Obama in 2008, only 47% of Blacks identify as liberal while 45% identify as conservative.[73]

77.    Exit polls from the 2008 election demonstrate this point. They indicate that in the general election, Barack Obama, a Black man, won votes from 98% of Black Alabamians regardless of

---

[70] Cox, D. (2021, April 2). For black voters, friends and family may be a critical link to the Democratic Party. *Survey of American Family Life.* https://www.americansurveycenter.org/for-black-voters-friends-and-family-may-be-a-critical-link-to-the-democratic-party/.

[71] Pew Research Center. (2014). Racial and ethnic composition of adults in the south by political party. https://www.pewforum.org/religious-landscape-study/compare/racial-and-ethnic-composition/by/party-affiliation/among/region/south/.; Pew Research Center. (n.d.). Party affiliation among adults in Alabama. https://www.pewforum.org/religious-landscape-study/state/alabama/party-affiliation/.

[72] Hutchings and Valentino, *supra* n.66.

[73] Hutchings, V., Jefferson, H., & Brown, K. (2014). Why do black Americans overwhelmingly vote Democrat? *University of Michigan Institute for Social Research Center for Political Studies.* https://cpsblog.isr.umich.edu/?p=948&p=948.

26

Caster Plaintiffs' Exhibit 80, Page 26

party, and John McCain, a white man, received votes from 88% of white Alabamians regardless

of party. Obama won only 47% of white Democrats in Alabama, whereas McCain won 51% of

white Democrats, 82% of white independents, and 98% of white Republicans.[74]

78.   This pattern appears within party primaries as well. During the 2008 Democratic Party

Primary, Hillary Clinton, a white woman, ran in a tight two-person race against Barack Obama.

Exit polls indicate that among those who voted in the Democratic primary in Alabama, 84% of

Black voters supported Obama, whereas 72% of white voters supported Clinton.[75]

79.   The same pattern appeared in Alabama's 2008 U.S. Senate election. Exit polls indicate

that 90% of Black voters regardless of party supported Vivian Figures, a Black candidate, while

89% of white voters voted for Jeff Sessions, a white candidate, regardless of party. 58% of white

Democrats, 88% of white Independents, and 96% of white Republicans voted for Sessions,

whereas Figures won the support of 84% of non-white voters, regardless of party.[76]

**Senate Factor 3: Voting practices and procedures that may enhance the opportunity for discrimination against Black Alabamians.**

80.   Alabama has a long history of employing voting procedures that increase the opportunity

for discrimination.

81.   In 1875, the state legislature passed a voter fraud measure that made multiple voting a felony.

Democrats in the state legislature argued that Blacks, but not whites, were often guilty of voting

"early and often" and that it was an established fact that a white man cannot easily vote more

---

[74] CNN Exit Polls: 2008 Presidential General Election, *available at* https://www.cnn.com/ELECTION/2008/results/polls/#val=ALP00p1.
[75] ABC News 2008 Democratic Primary Exit Poll Results, *available at* https://abcnews.go.com/images/PollingUnit/08DemPrimaryKeyGroups.pdf.
[76] CNN Exit Polls: 2008 Alabama U.S. Senate General Election, *available at* https://www.cnn.com/ELECTION/2008/results/polls/#AL501p1.

27

than once at one election because whites "do not all look alike."[77] In 1876, the Alabama Legislature eliminated elections in eight Black Belt counties and authorized the Governor to appoint county commissioners.

82.     As discussed, in 1957, the Alabama Legislature redrew the city boundaries of Tuskegee from a square shape to a 28-sided figure. The purpose of the new figure was to carve out or exclude the Black residents of Tuskegee, who threatened to increase their political participation after passage of the 1957 Civil Right Act and increasing Black registration.

83.     The changing or creation of new jurisdiction boundaries in Tuskegee represents one of many instances in which geographic boundaries have been used to dilute the voting power or exclude Black Alabamians from public spaces. As another example, in 1980, the City of Valley was incorporated in Chambers County. According to the U.S. Department of Justice, "the incorporation was especially motivated by the desire to create a separate city school system. That incorporation defined an irregularly shaped city which included six schools intended for the Valley School System, but which excluded significant areas of Black population concentration."[78]

84.     The shift from ward elections to at-large elections in counties represents another attempt on the part of whites in Alabama to limit the political power of Black Alabamians. When Barbour County changed from single-member districts to at large districts, Senator James S. Clark was quoted as saying that a reason for the change was to "lessen the impact" of a "block vote," a term often used at the time in reference to the Black vote.[79] Following this, the Barbour County Democratic Party Executive Committee changed from ward-based to at-large districts for

_____

[77] Montgomery Advertiser and Mail (March 3, 1875).
[78] Blacksher, *supra* n.15 at 5.
[79] McCrary, *supra*, n.13 at 39

Caster Plaintiffs' Exhibit 80, Page 28

the party primary, despite the ruling in *Smith v. Paris* that the at-large districts violated the Fifteenth Amendment. During the trial, the party acknowledged that the at-large elections had a discriminatory impact.[80] In the *Dillard* litigation over at-large elections in Alabama, the court explained: "From the late 1800s through the present, the state has consistently erected barriers to keep Black persons from full and equal participation in the social, economic, and political life of the state." 640 F.Supp. 1347, 1360 (M.D. Ala. 1986). Because of this the court expanded the suit to include 17 county commissions, 28 county school boards, and 144 municipalities which were using racially motivated at-large voting rules.[81] After the initial *Dillard* decision many of the local jurisdictions who were defendants in the class action suit changed from at-large to single member districts, some jurisdictions refused to enter consent decrees, and others required extended trial proceedings and court ruling before the all-white governing bodies would agree to a consent decree.[82]

85.     Although the *Dillard* decisions may have resulted in increased opportunities for representation for Black Americans in local governments, highly racialized voting patterns persisted.

> An expert analysis of the 2004 general election for the seven members of the Chilton County, Alabama Commission, who, pursuant to a 1987 consent decree, are elected at-large using cumulative voting rules, provides dramatic evidence of how white voters in Alabama remain unwilling to vote for Black candidates. Commissioner Bobby Agee, who is Black, has served continuously on the commission since 1988 and has earned the respect of his fellow commissioners. But even the power of incumbency and familiarity has earned him no support from the white electorate.[83]

According to testimony,

---

[80] *Id.*
[81] Blacksher, *supra* n.15 at 9.
[82] *Id.* at 15.
[83] *Id.* at 277.

29

Mr. Agee, a longtime incumbent on the county commission, is the overwhelming choice of the African American voters. His support among African American voters in the county ranges, across the analyses, from an estimated 5.2 votes per voter to 5.6. He is the first choice of African American voters to represent them on the commission in every analysis. In contrast, his support among the non-African American voters is minimal.[84]

86.     Until 2021, municipalities in Alabama continued to use at-large elections with numbered posts. In recent years, federal courts have struck down or altered these voting systems. *See, e.g.*, *Jones*, 2019 WL 7500528, at *4; *Ala. State Conf. of the NAACP v. City of Pleasant Grove*, No. 2:18-cv-02056, 2019 WL 5172371, at *1 (N.D. Ala. Oct. 11, 2019).

87.     In addition to at-large elections, the single shot provision applied in 1951 and the numbered place laws adopted in 1961, both discussed above, made it nearly impossible for Black voters to elect a Black candidate of their choice without substantial crossover voting by whites.[85]

**Senate Factor 5: Effects of Alabama's history of discrimination on Black Alabamians today.**

88.     There are many areas in Alabama where Black Americans disproportionately bear the negative effects of discrimination. These include education, economics, housing, criminal justice, and health. Disparities across these areas hinder Black Alabamians' ability to participate effectively in the political process.

A.     **Education**

89.     Current racial educational discrepancies in Alabama are the result of the state's historical, intentional discrimination against Black Alabamians. During the 1901 constitutional convention, some convention delegates intentionally "sought to deny [education] rights because they envisioned a future race war, in which education would better equip Blacks to wage." This, coupled with the knowledge that Blacks within Alabama "had the most to gain from public

---

[84] *Id.*
[85] McCrary, *supra* n.13 at 47.

Caster Plaintiffs' Exhibit 80, Page 30

services [such as] . . . public schools," the drafters of the 1901 Constitution set out to ensure that

"there was neither the will nor the money to provide such services" as they would

"disproportionately favor" Blacks.

90.     As such, the 1901 Constitution included a cap placed on the taxes that could be collected

to fund state services such as public education.[86] The property tax cap, coupled with the fact that

individual local governments do not have the authority to increase their tax rates, has resulted in

a system where poorer, less affluent local governments perpetually have less to spend per pupil.

91.     In *Weissinger v. Boswell*, 330 F.Supp. 615 (M.D. Ala. 1971), the court found that the

assessment ratios were being applied unequally across county lines, in violation of the Equal

Protection Clause of the Fourteenth Amendment. In response the state adopted the Lid Bill

which caps property tax rates. However, the cities of Mountain Brook, Vestavia Hills,

Homewood, and Huntsville—all of which are predominantly white—are all exempt from the

limits of the Lid Bill.[87] These school districts are also incidentally among the top-ranked school

districts in student performance.[88]

92.     A report by the Public Affairs Research Council of Alabama ("PARCA") finds that

Alabama ranks 39th among the 50 states when it comes to per-pupil spending on K-12 education.

Further, according to data from the Alabama Department of Education, there is a wide disparity

between spending in Alabama school systems, ranging from over $12,000 per student in

---

[86] Harvey, I. (n.d.). Public school finance programs of the Unites States and Canada:1998-99:
*Alabama. National Center for Educational Statistics.*
https://nces.ed.gov/edfin/pdf/StFinance/Alabama.pdf.
[87] Mountain Brook is 97% white, Vestavia Hills is 88% white, Homewood is 78% white, and
Huntsville is 61% white. *See* US Census QuickFacts, Alabama Population, *available at*
https://www.census.gov/quickfacts/fact/table/vestaviahillscityalabama,mountainbrookcityalabam
a,huntsvillecityalabama,US/PST045219.
[88] Guyse, Z.L. (2013) Note: Alabama's original sin: Property taxes, racism, and constitutional
reform in Alabama, *Alabama Law Review*, 65, 519-538.

31

Mountain Brook to $7,615 per pupil in Autauga County. [89] Differences in local property values

enable wealthier districts to spend more on education and potentially create unequal

opportunities to learn. [90]

93.     As discussed in greater detail below, Black Alabamians are more likely to live in poverty

than their white counterparts. Thus, Black children in Alabama are more likely to live in poverty

than their white peers and are more likely to find themselves in school systems with significantly

inadequate funding. [91]

94.     Throughout the discipline of political science and public administration it is understood

that interaction with public institutions can produce "spillover" effects that can influence the

likelihood of an individual participating politically. There is considerable scholarship that

suggests that interactions with the education system and educational attainment affect political

participation.

95.     The transcendent power of education has been studied extensively; Black people who are

more educated are more likely to participate in politics. [92] Considerable subsequent scholarship

supports these initial findings. [93]

[89] The city of Mountain Brook is 97% white and 1% Black, while Autauga County, Alabama is
76% white and 20% Black.
[90] Public Affairs Research Council of Alabama (2018). Alabama priorities K-12 education brief.
https://parcalabama.org/wp-content/uploads/2018/10/Alabama-Priorities-K-12-Education-
Brief.pdf?utm_source=K-
12+Education+Ranks+%231+Among+Alabama+Voter+Priorities&utm_campaign=PARCA+20
18&utm_medium=email.
[91] Alabama Possible. (2020). Barriers to Prosperity: Data Sheet 2020: Poverty Rate in Alabama.
https://alabamapossible.org/wp-content/uploads/2020/05/AP_PovertyFactSheet_2020_Web.pdf.
[92] R.E. Wolfinger, S.J. Rosenstone (1980) *Who Votes?* Yale University Press: New Haven, CT;
Abney, F. G. (1974). Factors related to Negro voter turnout in Mississippi. *The Journal of
Politics, 36*(4), 1057-1063.
[93] Miller, W. E. (1992). The Puzzle Transformed: Explaining Declining Turnout. Political
Behavior, 14(1), 1-43; Rosenstone, S.J. & Hansen, J.M. (1993) Mobilization, participation, and

Caster Plaintiffs' Exhibit 80, Page 32

96.     According to political scientist Dr. Barry C. Burden, the connection between education and political participation can be divided into three categories. "First, education provides people with the skills to make sense of the political world. Second, it makes it easier to navigate voter registration requirements and other impediments to voting. Third, classroom instruction and social networks in which higher educated people are situated socialize a sense of civic duty and expose them to elite recruitment efforts."[94]

97.     Scholar Meghan Condon also suggests that the verbal skills that individuals acquire in school affect political participation in adulthood.[95] Namely, when young people learn to use their voices, they are more likely to speak up as participatory adults.[96]

98.     There are other racial disparities in the education system, such as the degree of discipline exacted upon Black students compared to their white peers and exposure to educational enhancements. A recent report by the PARCA found that in schools across Alabama, Black students are more likely to receive harsher disciplinary measures than white students for similar offenses. Further, PARCA finds that while Black students comprise 33 percent of students in Alabama's public schools, they account for 60 percent of all reported disciplinary incidents. "The proportion of Black students receiving out-of-school suspensions is markedly higher than for white students, who are more likely to receive the less severe in-school suspensions."[97] Black

[94] Burden, B.C. (2009). The dynamic effects of education on voter turnout. *Electoral Studies, 28*(4), 540–549, 542, *available at* https://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.706.641&rep=rep1&type=pdf.

[95] Condon, M. (2015)  Voice lessons: Rethinking the relationship between education and political participation. *Political Behavior, 37*(4), 819–843, 837.

[96] *Id.* at 819.

[97] Dailey, D. (2020, July 1). School discipline and race in Alabama. *Public Affairs Research Council of Alabama.* http://parcalabama.org/school-discipline-and-race-in-alabama/.

democracy in America. New York: Macmillan; Verba, S., Lehman Schlozman, K. & Brady, H. (1995). Voice and equality. Civic voluntarism in American politics. Cambridge, MA: Harvard University Press.

33

students in Alabama are also more likely to receive an out of school suspension than white students for the same infraction.[98] Being suspended or expelled increases the odds of dropping out of high school.[99]

99.     Black children are also more likely than their white peers to be referred to law enforcement in 32 Alabama school districts, a referral that can trigger a series of events that can lead to a criminal record with lifelong consequences.[100]

100.    A similar project found that in addition to disparities in punishment, Black students nationally are 3.7 times as likely to be suspended as white students.[101] There are also racial disparities between Black and white students and their ability to access educational enhancement opportunities while in school. White students are 1.7 times more likely to be enrolled in advanced placement (AP) courses than their Black peers.[102] Black students are also less likely to be involved in gifted and talented programs when compared to their white peers.[103] The study also finds that Black students who have been suspended or expelled are more likely to engage in criminal behavior than white students.[104] This study concludes that, for Black students, the effect

---

[98] *Id.*

[99] Pesta, R. (2018). Labeling and the differential impact of school discipline on negative life outcomes: Assessing ethno-racial variation in the school-to prison pipeline. *Crime & Delinquency, 64*(11), 1489–1512.

[100] Alabama Appleseed Center for Law and Justice. (n.d.) *Racial justice: It's past time to reckon with racial justice in Alabama.* https://www.alabamaappleseed.org/racial-justice/#toggle-id-1.

[101] Groeger, L.V., Waldman, A. Eads, D. (2018, October 16). Miseducation: Is there racial inequality at your school? *Propublica.* https://projects.propublica.org/miseducation/.

[102] *Id.*

[103] *Id.*

[104] *Id.* at 1499-1501.

34

Caster Plaintiffs' Exhibit 80, Page 34

of being labeled "a troublemaker" in adolescence may have a strong influence on outcomes in adulthood.[105]

101.    Another scholar finds that the stigma associated with the label "felon" was stronger for Blacks than whites.[106] Black job applicants with a criminal record were the least likely to receive a call back for an interview when compared to white job applicants with a criminal record.

102.    Education has also been identified as a determinant of health. Thus, when Black students are disproportionately removed from the classroom because of suspension and expulsion, existing health disparities are exacerbated.[107]

**B.      Economic Disparities**

103.    In addition to disparities in educational experiences between Black and white Alabamians, there are also economic disparities between racial groups in the state. In terms of employment, the unemployment rate for African American workers (4.6 percent) is twice that of White workers (2.5 percent).[108] Black Alabamians are almost twice as likely to be unemployed when compared to their white counterparts. This disparity in unemployment persists across all education levels.[109] As an example, the unemployment rate for Black residents with a Bachelors degree or higher is 5 percent, compared to 3 percent for comparable white residents. The

[105] More recent scholarship has identified a similar pattern. *See* Hermez, P., Brent, J. J., & Mowen, T. J. (2020). Exploring the school-to-prison pipeline: How school suspensions influence incarceration during young adulthood. *Youth violence and juvenile justice, 18*(3), 235–255.
[106] Pager, D. (2003). The mark of a criminal record. *American Journal of Sociology,208*(5), 937–975.
[107] González, T., Etow, W., & De La Vega, C. (2019). Health equity, school discipline reform, and restorative justice. *Journal of Law, Medicine & Ethics, 4*(S2), 47–50.
[108] Moore, K. (2021). State unemployment by race and ethnicity. *Economic Policy Institute*. https://www.epi.org/indicators/state-unemployment-race-ethnicity/.
[109] Crowder, J.A., Bastien, A., Treuhaft, S., Scoggins, J. and Stephens, P. (2018). Advancing employment equity in Alabama. Alabama Asset Building Coalition. https://nationalequityatlas.org/sites/default/files/Employment_Equity-Alabama_04_03_18.pdf.

35

unemployment rate for Blacks with less than a high school diploma is 24%, compared to 15% for

comparable whites. Similar disparities exist between Blacks and whites with a high school

diploma, some college, and an Associate's degree.

104.    In terms of earning power, according to the National Women's Law Center, Black

women in Alabama typically make $0.59 for every dollar earned by their white male

counterparts.[110]

105.    Black Alabamians also experience poverty at more than twice the rate of whites. Indeed,

the child poverty rate for Black Alabamians is 34.1%, while the same rate for white children is

13.2%.[111] As such a quarter of Black households in Alabama rely on food stamps, compared to

only 8.2% of white households.[112]

106.    The median household income of Black Alabamians is $35,900, nearly half the white

median household income of $59,966.[113]

107.    Economic disparities, similar to disparities in education, can affect the likelihood of an

individual exercising their right to vote. Political science scholarship has demonstrated that

---

[110] Temple, B., & Tucker, J., National Women's Law Center, *Equal Pay for Black Women*, July 2017, *available at* https://nwlc.org/wp-content/uploads/2017/07/Equal-Pay-for-Black-Women.pdf.

[111] U.S. Census Bureau, American Community Survey, 2019 American Community Survey 1-Year Estimates, Table S0201.

[112] *Id.*

[113] *Id.*

36

voting is strongly correlated with income.[114] This is particularly true in the United States.[115]

Galbraith and Hale find that individuals who live in states with high levels of income inequality

are less likely to vote.[116]

108.    Similar findings are reported by Macdonald, who finds that income inequality can

demobilize voters but that the relationship is not consistent across elections.[117] The effect of

income inequality in lower participation is more evident in midterm election years when

compared to presidential election years.

C.    **Criminal Justice and Felony Disenfranchisement**

109.    Felony disenfranchisement is "the practice of removing the right to vote upon conviction

for a felony level offense."[118] These laws "can be viewed as part of a larger movement to

maintain control over access to the ballot following the gradual establishment of white male

suffrage."[119] Only four states had disenfranchisement laws prior to 1840, but between 1840 and

[114] Verba, S., Lehman Schlozman, K., & Brady, H. (1995) *Voice and equality. Civic voluntarism in American politics.* Cambridge, MA: Harvard University Press; Verba, S., Nie, N.H., & Jae-on, K. (1978). *Political participation and political equality. A seven-nation comparison.* University of Chicago Press: Chicago, IL; Verba, S., Lehman Schlozman, K., Brady, H., & and Norman, N. N. (1993). 'Citizen activity: Who participates? What do they say? *American Political Science Review,* 87(2), 303–18; Verba, S., & Nie, N. (1972). *Participation in America: Political democracy and social equality.* Harper & Row, Publishers, Inc. New York, New York.

[115] Albert, J., and Kohler, U. (2010). 'The Inequality of Electoral Participation in Europe and America and the Politically Integrative Functions of the Welfare State, (in J. Alber and N. Gilbert, eds.), *United in Diversity? Comparing Social Models in Europe and America.* Oxford: Oxford University Press, 62–90.

[116] Galbraith, J. K., & Hale, J. T. (2008). State Income Inequality and Presidential Election Turnout and Outcomes. *Social Science Quarterly,* 89(4), 887–901.

[117] Macdonald, D. (2021) When does inequality demobilize? New evidence from the American states, Electoral Studies, 70, 1-8.

[118] Manza, J. and Uggen, C. (2008). *Locked out: Felon disenfranchisement and American democracy.* New York, NY: Oxford University Press.

[119] Uggen, C., Manza, J., & Behrens, A. (2003). Felony voting and the disenfranchisement of African Americans. *Souls,* 5(3), 48-57, 49.

37

the beginning of the Civil War, fourteen states adopted such laws.[120] In the years that followed

the Civil War, 11 more states passed such laws for the first time or broadened an existing law.

The adoption or expansion of felony disenfranchisement laws across the southern states occurred

alongside literacy tests and poll taxes. The expansion of disenfranchisement laws included

serious crimes like treason, but also minor crimes like vagrancy, petty larceny, miscegenation,

bigamy and the receiving of stolen goods. These were crimes of which Black Americans were

more likely to be accused, charged, and convicted.[121] Using the criminal code to target Blacks

has remained consistent: "for the same criminal behavior, poor and/or non-white people are more

likely to be arrested; if arrested, they are more likely to be convicted; if convicted, they are more

likely be sentenced to prison; if sentenced to prison, they are more likely to be given longer

terms, than well off and/or white people."[122] Trends in arrest, prosecution, and sentencing also

result in African Americans being disproportionately affected by felony disenfranchisement

laws.

110.    Alabama originally adopted disenfranchisement for those convicted of "vague acts of

moral turpitude" alongside the other voting restrictions in the 1901 Constitution discussed above.

During that convention, one proponent estimated that "the crime of wife-beating alone would

disqualify sixty percent of Negroes."[123]

---

[120] *Id.*

[121] Ewald, A. C. (2002). "Civil death": The ideological paradox of criminal disenfranchisement
law in the United States. *Wisconsin Law Review*, 5, 1045-1138, 1088–1089; Keyssar, A. 2009.
*The right to vote: The contested history of democracy in America.* New York: Basic Books, 131,
356-364; Brooks, G. (2005). Felon disenfranchisement: Law, history, policy, and politics, 32
Fordham Urban Law Journal, 32, 101-148.

[122] Reiman, Jeffrey (1995). *The Rich get Richer and the Poor get Prison* (Fourth ed.), Boston,
Massachusetts: Allyn & Bacon. 135.

[123] McMillan, M.C. (1955). *Constitutional development in Alabama, 1798-1901. A study in
politics, the Negro, and sectionalism.* By Malcolm Cook McMillan. University of North Carolina
Press: Chapel Hill, NC.

Caster Plaintiffs' Exhibit 80, Page 38

111.    Historically, felony disenfranchisement has been an effective means of reducing the voting power of Black voters because of racially disparate incarceration rates. [124] In a review of state disenfranchisement laws from 1850-2002, scholars find that states with larger proportions of non-whites in prisons are more likely to pass restrictive felony disenfranchisement laws. [125] To this point, two percent of Alabama's prison population was nonwhite in 1850 compared to 74 percent in 1870.

112.    Because Alabama has significantly disparate incarceration rates, the law has a largely disproportionate impact on Black voters. According to the September 2021 Alabama Department of Corrections Statistical Report, Black Alabamians make up more than half (53.3%) of the prison population in the state; even though Black Americans are a little more than a quarter (26.8%) of the state population. White Alabamians, in spite being 69% of the population, are only 45.9 % of the prison population. [126] The incarceration rate in Alabama is 1,132 Black residents in prison per 100,000 Black residents in the state and 421 white residents in prison per 100,000 white residents in the state. [127]

113.    These disparities make Alabama an outlier among other states. At the time of the 2020 presidential election, 5.2 million or 2.27 percent of voting age individuals in the United States were unable to vote due to felony conviction. In Alabama, 15.55 percent of Black Americans are disenfranchised due to felony convictions, compared to just 8.94 percent of all voting-age

---

[124] Uggen, et. al, *supra*, n.119 at 51.

[125] *Id.*

[126] Alabama Dep't of Corrections (Sept. 2021) *Alabama Dep't of corrections monthly statistical report, available at* http://www.doc.state.al.us/docs/MonthlyRpts/September%202021.pdf.

[127] Nellis, A. (2021). The color of justice: Racial and ethnic disparity in state prisons. *The Sentencing Project,* https://www.sentencingproject.org/wp-content/uploads/2016/06/The-Color-of-Justice-Racial-and-Ethnic-Disparity-in-State-Prisons.pdf.

Alabamians.[128]   The law disenfranchises more than one in seven Black Alabamians, twice the national average.[129]

114.    Contemporary felony disenfranchisement laws in the United States can be divided into five categories: no disenfranchisement; disenfranchisement in prison; disenfranchisement in prison and parole, disenfranchisement in prison, parole, and probation, disenfranchisement in prison, parole, probation, and post-sentence for some or all offenses. Alabama falls into the latter category of disenfranchisement while under supervision and post-sentence for some crimes.

115.    Prior to 2017, Alabama had no prescribed list of crimes that constituted "moral turpitude" and therefore were disenfranchising. The result of this was a system where county registrars would use their discretion on a case-by-case basis and make decisions about which crimes were moral turpitude and covered by section 182 of the 1901 Constitution. Although section 182 was struck down in *Hunter v. Underwood*, 471 U.S. 222 (1985), Amendment 579 was added to the Alabama Constitution in 1996. Unlike Section 182, Amendment 579 did not list the felonies an individual could be disenfranchised for but barred "any person convicted of a crime of moral turpitude." This resulted in a system where a crime could be moral turpitude in one county and not moral turpitude in the another. This law was inconsistently applied and disproportionately disenfranchised African Americans.[130]

[128] Uggen, C. Larson, R., Shannon, S., & Pulido-Nava, A. (2020). Locked out 2020: Estimates of people denied voting rights due to felony conviction. *The Sentencing Project*. https://www.sentencingproject.org/publications/locked-out-2020-estimates-of-people-denied-voting-rights-due-to-a-felony-conviction/.

[129] *Id.* at 4.

[130] Harvard Law Review. (2018) Thompson v. Alabama: District court finds no irreparable injury from the State's lack of notice to people with felony convictions. https://harvardlawreview.org/2018/05/thompson-v-alabama/.

40

Caster Plaintiffs' Exhibit 80, Page 40

116.    In 2017 the Alabama State legislature passed the Moral Turpitude Act, which clarified the 47 felonies considered to be crimes of moral turpitude.[131] A 2016 study that compared a list of all Alabamians whose voter registration had been cancelled or rejected because of a felony conviction to the Alabama Criminal Records Database found that between 29,000 and 36,000 individuals who had been removed from voter rolls or denied registration were in fact eligible to vote under the Moral Turpitude Act because they had not been convicted of disqualifying offenses.[132]

117.    Despite passage of the 2017 law clarifying which crimes are disenfranchising, there has been no effort on the part of the state to inform the thousands of Alabamians who, prior to 2017 may have been told that they were ineligible due to their felony conviction(s), but for whom the Moral Turpitude Act clarified that they are indeed eligible to vote.[133]

118.    Although the state has a process to acquire a Certificate of Eligibility to Register to Vote ("CERV") which restores the voting rights for those with felony convictions, research suggests that the completion of the CERV for the restoration of voting rights is rare. In Alabama there have been approximately 3,493 voting rights restorations from 2016 to 2020.[134] In addition to the loss of the right to vote, Alabama also denies those with felony convictions the ability to participate politically by holding office, even among those who have had their voting rights restored.[135]

---

[131] Alabama Code §17-3-30.1.
[132] Alabama Advisory Committee, *supra* n.42.
[133] Harvard Law Review, *supra* n.130.
[134] *Id.*
[135] Alabama Code §36-2-1; Sylacauga News, (2021). *Breaking news: Attorney General's office confirms that convicted felons may not hold office.* https://www.sylacauganews.com/local/breaking-news-attorney-generals-office-confirms-that-convicted-felons-may-not-hold-public-office.

41

119.    Who is drawn or welcomed into political life along with a citizen's goals, beliefs, and identity can all be affected by the policies and institutions that govern them. Felony disenfranchisement policies, especially those that disenfranchise citizens post-sentence for some or all felonies, limit or eliminate the ability of returning citizens to experience the full rights of citizenship, relegating them to a second-tier or second-class citizenship in which they have limited social, political, and economic access.[136] The decision to not actively inform individuals that they may be eligible to vote with the passage of the 2017 Moral Turpitude Law, or even educate potentially affected communities, exacerbates pre-existing inequalities in political power that disproportionately affect Black Alabamians.

120.    The Census Bureau counts incarcerated people as residents of the towns where they are confined. Although some states adjust the Census counts to place incarcerated individuals in their home districts for redistricting, Alabama is one of the many states that does not. This practice of counting incarcerated individuals where they are incarcerated as opposed to their last known home address is known as "prison gerrymandering." Once convicted and sentenced to prison, individuals are, on average, incarcerated more than 100 miles away from their homes. Only about 36 percent of incarcerated persons reside in prisons less than 100 miles from their previous address.[137] Thus, the process of prison gerrymandering moves political power from one region of the state to another.

---

[136] Mettler, S., & Soss, J. (2004). The consequences of public policy for democratic citizenship: Bridging policy studies and mass politics. *Perspectives on Politics*, 2(1), 55-73; Shklar, J. (1991). *American citizenship: The quest for inclusion*. Harvard University Press, Cambridge MA: Weaver, V., & Lerman A. (2010). Political Consequences of the Carceral State. American Political Science Review, 104(4), 817-833.
[137] Bureau of Justice Statistics. (2004). *Survey of inmates in state correctional facilities*. http://www.bjs.gov/index.cfm?ty=dcdetail&iid=275.

121.    Although some Alabama counties adjust the Census counts, many do not.[138] Given this, there are several counties in Alabama with large prison populations relative to the actual population. In these counties there are districts whose populations are inflated with non-resident inmates.[139] As an example, "in Bibb County the prison population from Bibb Correctional Facility was included as part of a commission district population. As a result, 21% of the 5th district is incarcerated. In terms of voting power, every 79 residents in District 5 have as much political power as 100 residents in other non-prison districts. Other counties, including Talladega County and Coosa County, use the prison population to pad their districts, as well."[140]

122.    In the 2010 Census, more than 34,000 Alabama residents were counted in the wrong place because the Census Bureau treats prisons as if they are residential homes.[141]

**D.      Health Insurance and Health Outcome Disparities**

123.    Black Alabamians also experience inequity in access to healthcare and health outcomes. 19 percent of African Americans are uninsured compared to 12.9 percent of their white counterparts.[142] Further, because African Americans tend to live in poorer communities in Alabama, they have less access to healthcare services, and have higher instances of chronic

---

[138] Escambia County, for example, removes the incarcerated population before county commissioner lines are drawn. Marcous, L. (2010, August 9). Alabama county commissioners may be in for an unpleasant surprise in 2011. *Prison Policy Initiative.* https://www.prisonersofthecensus.org/news/2010/08/09/alabama/.
[139] Prison Policy Initiative (2010a). Fixing prison-based gerrymandering after the 2010 census: Alabama. https://www.prisonersofthecensus.org/50states/AL.html.
[140] *Id. supra* n.127; *id. supra* n.126.
[141] *Id.* at n.126.
[142] Alabama Public Health (n.d.). Uninsured population. https://www.alabamapublichealth.gov/healthrankings/assets/atc_uninsured_population_2012.pdf.

43

disease.[143] The infant mortality rate is more than two times higher among African American

infants (13.4%) than Caucasian (6.5%).[144]

124.    Black women in Alabama have significantly higher rates of breast cancer incidence than

white women in Alabama. This is unique because in the whole United States, white women have

significantly higher breast cancer incidence rates than Black women. White males in Alabama

have approximately the same incidence and mortality rates for prostate cancer as the average

American white male, while Black males in Alabama have both higher incidence and mortality

rates than their United States comparison group.[145]

125.    In Alabama, Black residents are significantly more likely to have and die from diabetes

and stroke than white residents.[146]

126.    Quality of health and access to healthcare can also influence voting and reduce electoral

participation. For example, poor health reduces the likelihood that low-income citizens will vote

while high-income citizens continue to turnout to vote regardless of their underlying health

conditions.[147]

---

[143] Alabama Public Health (2021). Vulnerable populations.
https://www.alabamapublichealth.gov/covid19/populations.html.
[144] Alabama Public Health (2021). Infant mortality.
https://www.alabamapublichealth.gov/healthrankings/assets/ppo_infant_mortality_2011_2013.p
df.
[145] Alabama Public Health. (2019). Diabetes.
https://www.alabamapublichealth.gov/healthrankings/diabetes.html.
[146] Alabama Public Health. (2019). Cancer.
https://www.alabamapublichealth.gov/healthrankings/cancer.html; Alabama Public Health
(2019), Cardiovascular disease.
https://www.alabamapublichealth.gov/healthrankings/cardiovascular.html.
[147] Gregory Lyon, G. (2021). The Conditional Effects of Health on Voter Turnout. Journal of
Health Politics, Policy and Law, 46(3): 409–433; Pacheco, J., & Fletcher, J.
(2015). Incorporating health into studies of political behavior: evidence for turnout and
partisanship." Political Research Quarterly 68(1), 104–116; Mattila, M., Söderlund, P., Wass, H.
Rapeli, L. (2013). Healthy voting: The effect of self-reported health on turnout in 30 countries,
Electoral Studies, 32(4), 886-891.

127. Evaluating the effect of Medicaid expansion on voter turnout for low-income citizens, Haselswerdt finds that the increases in Medicaid enrollment that occur as a consequence of Medicaid expansion are related to higher voter turnout in those states. Haselswerdt suggests that these increases, in part, are a result of increases in participation among new Medicaid enrollees. Specifically, Haselswerdt evaluates the relationship between Medicaid expansion in the states and voter turnout in 2012 and 2014 United State House of Representatives races. Haselswerdt finds that relative to the 2012 election, voter turnout in 2014 increased in those states that implemented Medicaid expansion through the ACA.[148] This finding is particularly noteworthy because increases in Medicaid enrollment are generally associated with decreased voter turnout.[149]

Alabama is one of the 12 states that has not expanded Medicaid.

### Senate Factor 6: Overt and subtle racial appeals in Alabama campaigns.

128. Overt and subtle racist appeals have been used throughout the state's history to persuade or dissuade Alabama voters from voting for certain candidates for political office and ballot measures. Similar language has been used by elected officials to persuade or dissuade their peers in supporting or opposing legislation.

129. At the 1901 Alabama Constitutional Convention, the Democratic Party was explicit in stating that the goal of the convention was to establish white supremacy in the state.

During the convention, convention president John B. Knox's opening address, stated

In my judgment, the people of Alabama have been called upon to face no more important situation than now confronts us, unless it be when they, in 1861, stirred by the momentous issues of impending conflict between the North and the South,

[148] Haselswerdt J. (2017). Expanding Medicaid, expanding the electorate: The Affordable Care Act's short-term impact on political participation. *Journal of Health Politics, Policy and Law, 42(4):667–695.*

[149] Michener JD. (2017). People, places, power: Medicaid concentration and local political participation. *Journal of Health, Politics, Policy and Law, 42(5):865–900.*

Caster Plaintiffs' Exhibit 80, Page 45

were forced to decide whether they would remain in or withdraw from the Union. Then, as now, the negro was the prominent factor in the issue.[150]

He then goes on to say, "And what is it that we want to do? Why, it is, within the limits imposed by the Federal Constitution, to establish white supremacy in this State."[151]

130.    In the Twentieth Century, Alabama was a primary target of the Southern Strategy. Initially adopted by Barry Goldwater, the Southern Strategy "dictated a posture of benign neglect toward the aspirations of Black America."[152] During the Civil Rights Movement, the Southern Strategy relied on appeals to racism against African Americans, to gain the support of white voters in the south, particularly those that had traditionally supported the Democratic Party. The Southern Strategy appealed to the racial grievances of white Southerners to gain their political support in electoral contests. The Southern Strategy was also used by Democrats in the south to separate their political ideals from Democrats in the North.[153]

131.    Governor George Wallace, a Southern Democrat and staunch segregationist who was elected during the Civil Rights Era, during his inauguration speech for Governor in January 1963 stated,

> Today I have stood, where once Jefferson Davis stood, and took an oath to my people. It is very appropriate then that from this Cradle of the Confederacy, this very Heart of the Great Anglo-Saxon Southland, that today we sound the drum for freedom as have our generations of forebears before us done, time and time again through history.  Let us rise to the call of freedom- loving blood that is in us and send our answer to the tyranny that clanks its chains upon the South. In the name

[150] Alabama Constitutional Convention (1901). *Journal of the proceedings of the Constitutional convention of the state of Alabama: held in the city of Montgomery; commencing May 21st, 1901.* Montgomery: The Brown printing company.
[151] *Id.*
[152] Maxwell, Angie. (2019, July 26). What we get wrong about the southern strategy. *The Washington Post*, https://www.washingtonpost.com/outlook/2019/07/26/what-we-get-wrong-about-southern-strategy/; Tindall, G. B. (1971). Southern Strategy: A Historical Perspective. *The North Carolina Historical Review*, 48(2), 126–141.
[153] Maxwell, Angie. (2019, March 28) *The long southern strategy: How chasing white voters the south changed American politics* [Video], University of Arkansas Prior Center for Oral and Visual History; Maxwell, *supra* n.152.

46

of the greatest people that have ever trod this earth, I draw the line in the dust and toss the gauntlet before the feet of tyranny . . . and I say . . . segregation today . . . segregation tomorrow . . . segregation forever.

132.   Martin Luther King described Wallace as, "perhaps the most dangerous racist in America today." In a 1965 interview King also stated, "I am not sure that he believes all the poison that he preaches, but he is artful enough to convince others that he does."[154] Whether he believed the rhetoric or not, for Wallace, the strategy was successful not only in Alabama but also across the county when he ran for president in 1968 as an independent as he was able to demonstrate that there were millions of angry whites who were willing to vote for a "vulgar racist whose policy proposals were scarcely more than slogans."[155]

133.   Although it has evolved, the use of racist rhetoric and imagery has remained a tool that is used by political candidates in Alabama to this day. The use of more subtle imagery and coded language in contemporary political campaigns is what Maxwell might refer to as a part of "the Long Southern Strategy," a strategy that modifies racial language and imagery in a way that fits the political and social moment.[156]

134.   In 2010, gubernatorial candidate Tim James released a campaign ad in which he asserted, "This is Alabama; we speak English. If you want to live here, learn it."[157]

[154] Wallace, George Corely, Jr. (n.d.) Stanford Martin Luther King, Jr. Research and Education Institute. https://kinginstitute.stanford.edu/encyclopedia/wallace-george-corley-jr.

[155] Mayer, J.D. (2001) Nixon rides the backlash to victory: Racial politics in the 1968 presidential campaign. *The Historian, 64*(2), 351-366.

[156] Barber, B. (2021, January 22). Political scientist Angie Maxwell on countering the 'long southern strategy.' *Facing South*. https://www.facingsouth.org/2021/01/political-scientist-angie-maxwell-countering-long-southern-strategy.

[157] Huffington Post. (2010, June 28). *'We speak English' ad" Watch controversial Alabama governor's race advertisement.* https://www.huffpost.com/entry/we-speak-english-ad-watch_n_555928.

135.   Also in 2010, a group of Alabama state senators were recorded discussing strategies to suppress Black voter turnout and referred to Black Alabamians as "Aborigines" and "Indians." The senators also stated that if a ballot measure to legalize electronic bingo was included on the ballot "every Black in this state will be bused to the polls . . . [e]very Black, every illiterate will be bused on HUD financed buses."[158]

136.   In 2014, Alabama Representative Mo Brooks repeatedly asserted that Democrats were "waging a war on whites."[159]

137.   In 2017, at a campaign rally in Midland City, Kayla Moore, wife of Senate candidate Roy Moore, touted her husband's appointment of the first Black marshal at the Alabama Supreme Court as proof that he supported the rights of African Americans: "Fake news would also have you think that my husband doesn't support the Black community. Yet my husband appointed the very first Black marshal to the Alabama Supreme Court, Mr. Willie James. When he first took office as the chief justice many years ago, he brought with him three people from Etowah County. Two were Black, and one of them is here tonight." Although the statement is not racist, it is meant to appeal to Black voters by demonstrating that Moore has association with a few Black individuals.[160]

138.   In 2018, Kay Ivey made the preservation of confederate monuments a centerpiece of her gubernatorial campaign,[161] to which Black leaders in the community loudly protested.[162]

_____

[158] *United States v. McGregor*, 824 F.Supp.2d 1339, 1345 (M.D. Ala. 2011).
[159] McCalmont, Lucy, *Brooks : Dems wage 'war on whites'*, Politico (Aug. 4, 2014), *available at* https://www.politico.com/story/2014/08/mo-brooks-war-on-whites-109703.
[160] Campaign Legal Center (n.d.), Race in our politics: A catalog of campaign materials. https://campaignlegal.org/race-our-politics-catalog-campaign-materials.
[161] Moench, Mallory (2018, April 17). *Gov. Ivey campaign ad praises Confederate monument law*, Associated Press News, (April 17, 2018). https://apnews.com/article/6758488e013b4650813840e105b61ae4.
[162] Andone, Dakin. (2018, April 21) *NAACP slams Alabama governor's campaign ad about law protecting Confederate monuments*, CNN. https://www.cnn.com/2018/04/21/us/alabama-confederate-monuments-kay-ivey-campaign/index.html.

48

139.    In 2020, "Bradley Byrne who was running in Alabama for US Senate drew national attention when he aired a Television ad that featured the faces of prominent minorities burning in a fire. The faces include those of Rep. Ilhan Omar, then NFL quarterback Colin Kaepernick, then the complete Squad: Reps. Omar, Alexandria Ocasio-Cortez, Ayanna Pressley and Rashida Talib."[163]

140.    Also in 2020, Jeff Sessions, then a Republican party primary candidate for the U.S. Senate, ran an ad warning that "socialism, open borders, free healthcare for illegal immigrants, that is the Democrats' plan for America."[164] "During the same election, State Rep. Arnold Mooney, released an ad warning that "our southern border is on fire. Illegal aliens swarm, opioids flow, Americans die," over images of heavily tattooed MS-13 gang members. The ad cuts to Mooney, who says he wants to "cut legal immigration. That's right, I said legal immigration. We can either put America first or we can keep emptying out Central America."[165]

**Senate Factor 7: Underrepresentation of Black Alabamians in electoral office.**

141.    During Reconstruction and prior to the adoption of the 1901 constitution, Black Alabamians experienced some representation in the State Legislature. In 1868, there was one Black man elected to the Alabama senate and 30 in the Alabama House of Representatives.

---

[163] Whitmore, K. (2020, January 9). Byrne, baby, Byrne: Alabama candidate's racist ad stokes and old fire. *Alabama.com*. https://www.al.com/news/2020/01/byrne-baby-byrne-alabama-candidate-for-senates-racist-ad-stokes-an-old-fire.html; Moon, J. (2020, March 2). Opinion: Are Alabama voters really as hateful and shallow and scared as the GOP senate field things? *Alabama Political Reporter*. https://www.al.com/news/2020/01/byrne-baby-byrne-alabama-candidate-for-senates-racist-ad-stokes-an-old-fire.html; Pitofsky, M. (2020, January 7). GOP rep releases campaign ad ripping Kapernick, 'the squad.' *The Hill*. https://thehill.com/blogs/blog-briefing-room/news/477092-gop-rep-releases-campaign-ad-ripping-kaepernick-the-squad.
[164] Sessions, J. (2020, January 16). Won't back down [Video]. YouTube. https://www.youtube.com/watch?v=BbVlHfhXAvc&t=30s.
[165] Mooney, A. (2019, October 18). Border on fire [Video]. YouTube. https://www.youtube.com/watch?v=r-x6HIcb0zE&t=6s.

Caster Plaintiffs' Exhibit 80, Page 49

While the number of Black members of the Alabama House of Representatives remained stable until 1876, there were increases in the Alabama Senate. In 1874, there were six Black members in the Alabama Senate.

142.    These electoral and representative victories, however, were short-lived. By 1876, there were no Black members of the Alabama Senate and the number of Black members of the Alabama House of Representatives decreased to ten in 1876, and then to two in 1878.[166]

143.    In addition to the disenfranchising effect of the policies enacted after Reconstruction discussed at length above, the decline and lack of Black representation in the Alabama Legislature during this period can also be understood by considering that no redistricting was conducted in the state between the adoption of the 1901 constitution until the 1960s. While the disenfranchising 1901 Alabama Constitution called for the Legislature to redistrict after every decennial census, this mandate was ignored. As a result, the original 1901 House and Senate boundaries were still in place even after publication of the 1960 Census.

144.    It was not until 1970 when, following federal intervention, two Black candidates were finally elected to the Alabama Legislature, the first since Reconstruction. In the first election following the 1980 Census, seventeen Blacks were elected to the House and three to the Senate.[167] The election of Black Americans to seats in the Alabama Legislature during this time was the direct result of the creation of majority-minority districts. In both chambers, the change to single member districts created new opportunities for Black Alabamians to elect Black candidates. Following the passage of the VRA in 1965, the Alabama Senate grew from zero

---

[166] Alabama Archives. (1997). African American legislators in reconstruction Alabama. https://archives.alabama.gov/afro/African American%20Legislators%20in%20Reconstruction%20Alabama1867.pdf.
[167] Blacksher, *supra* n.15.

Black state senators to five by 1985. While the House of Representatives had no Black members in 1965, by 1985 it had 19. [168] These Black candidates were elected by majority-minority districts; none came from predominantly white districts. [169]

145.   Due to white bloc voting against Black candidates, only two Black candidates have been elected to statewide office in the entire history of Alabama (Oscar Adams and Ralph Cook), both to the Alabama Supreme Court after an initial gubernatorial appointment. [170] No Black person has been elected to statewide office in Alabama since 1996.

146.   No current statewide official in Alabama is Black. There are currently 27 Black members of the Alabama House of Representatives and seven Black members of the Alabama Senate. But for one Black representative, all of these Black legislators are elected in majority-Black districts.

147.   Since Reconstruction, just three Black candidates have been elected to the U.S. House of Representatives from Alabama, all of which were elected by the state's sole majority-Black district.

148.   No Black candidate has ever been elected Governor, Lieutenant Governor, U.S. Senator, Secretary of State, or State Auditor in Alabama. [171]

149.   Even though Black people comprise approximately 27% of Alabama's population, only one of seven or approximately 14 percent of Alabama's congressional representatives is Black.

---

[168] Grofman, B., & Handley, L. (1991). The impact of the Voting Rights Act on black representation in southern state legislatures. *Legislative Studies Quarterly, 16*(1), 111–128. https://doi.org/10.2307/439970.

[169] *Id.*

[170] Blacksher, *supra* n.15.

[171] Associated Press (2016, Sept. 3). *There are 10 states where only white candidates have won statewide office,* (The Guardian). The https://www.theguardian.com/us-news/2016/sep/03/missouri-10-states-only-white-candidates-get-elected.

51

This number of majority-Black congressional districts has remained constant since 1992, the first time in the Twentieth Century that a Black candidate was elected to Congress.

**Senate Factor 8: Lack of responsiveness of Alabama officials to the particularized needs of Black Alabamians.**

150.     There are various areas where Alabama has had the opportunity, but failed, to act in a way that would have substantially benefitted the lives of Black Alabamians. Two examples are (1) the expansion of Medicaid and (2) felony disenfranchisement. Alabama's action (and inaction) in these two areas exacerbate the existing disparities between Black and white Alabamians and hinder Black Alabamians' political participation.

**A.     Expansion of Medicaid**

151.     The Affordable Care Act gives Alabama, like all other states, the opportunity to expand access to Medicaid by providing Medicaid to individuals whose income is 138 percent of the federal poverty rate.[172] 38 states and the District of Columbia have opted to expand Medicaid. Alabama is one of the 12 states have opted to not expand Medicaid.[173]

152.     A 2013 analysis that focused on the expansion of Medicaid found that there were more than 300,000 low-income, uninsured adults in Alabama who would benefit from Medicaid expansion. Thirty-six percent of this population—more than 108,000 people—are Black. The analysis found that uninsured, low-income, Black Alabamians were more likely to report not

_____

[172] Healthcare.gov (n.d.) Medicaid expansion and what it means for you. https://www.healthcare.gov/medicaid-chip/medicaid-expansion-and-you/.
[173] Kaiser Family Foundation. (2021). Status of Medicaid expansion decision: Interactive map. https://www.kff.org/medicaid/issue-brief/status-of-state-medicaid-expansion-decisions-interactive-map/.

52

seeing a doctor because of cost; more likely to report not having a regular doctor; and more likely to report missing an annual, routine check-up than their insured counterparts.[174]

153.    Representative Terri Sewell, who is Black and represents the only majority-Black district in the state, has been an advocate for Medicaid expansion in Alabama since the passage of the Affordable Care Act. In 2013 she urged then-Governor Robert Bentley to expand Medicaid.[175] Most recently, in 2020, she urged Governor Kay Ivey to expand Medicaid in Alabama.

According to Sewell, "Not only would expansion provide affordable health care to more than 340,000 Alabamians, it would also serve as an economic boon, adding about $1.7 billion a year to our economy. All Alabamians stand to benefit from Medicaid expansion and, especially, the most vulnerable in our communities."[176] Yet, Alabama has continued to refuse to expand converge.

154.    A more recent analysis using data from the American Community Survey suggests that 137,000 uninsured low-income individuals ages 19-64 would benefit from Medicaid expansion in Alabama. Of these individuals, 53,000 or 38 percent are Black.[177]

155.    Most recently, Representative Sewell, joined by 40 other Democrats in Congress introduced the Cover Outstanding Vulnerable Expansion-Eligible Residents Now ("COVER

---

[174] Stoll, K., & Zhang, S. (2015). Expanding Medicaid in Alabama: Unlocking the Door to Health Insurance for African Americans. *Families USA*. https://familiesusa.org/wp-content/uploads/2019/09/MCD_Morehouse-COC-HE-report_AL_Black_final_web.pdf
[175] Chandler, K. (2019, March 7). U.S. Rep. Terri Sewell says Obamacare is 'not just about website'; urges Alabama to expand Medicaid. *Alabama.com*. https://www.al.com/wire/2013/11/s_rep_terri_sewell_says_obamac.html.
[176] Press Release. (2020, April 3). Rep. Terri Sewell calls on Governor Ivey to expand Medicaid in light of COVID-19 pandemic. *Congresswoman Terri Sewell*.
[177] Lukens, G. & Sharer, B. (2021). Closing Medicaid coverage gap would help diverse group and narrow racial disparities. *Center on Budget and Policy Priorities*. https://www.cbpp.org/research/health/closing-medicaid-coverage-gap-would-help-diverse-group-and-narrow-racial.

53

Now") Act. This legislation would authorize the Centers for Medicare and Medicaid Services to

work directly with counties, cities, and other political subdivisions to expand Medicaid coverage.

In addressing the need for COVER as it relates to health disparities in Alabama, she stated:

"Because of the State of Alabama's refusal to expand Medicaid, more than 200,000 low-income

Alabamians who would otherwise qualify for health insurance coverage are being forced to go

without care, putting their health and their lives at risk. If the State of Alabama won't expand

access to health care for our underserved communities, local governments should have the power

to do it themselves. That's why I'm proud to join my colleagues in introducing the COVER Now

Act which would help thousands of Alabamians see a doctor, obtain medications, and afford life-

saving care."[178]

156.     According to the Center on Budget and Policy Priorities, there have been many benefits

in states that expanded Medicaid. Expansion states have seen the following benefits:

The gap in uninsured rates between white and Black adults shrank by 51 percent in expansion

states (versus 33 percent in non-expansion states), while the gap between white and Hispanic

adults shrank by 45 percent in expansion states (27 percent in non-expansion states). Medicaid

expansion also helped narrow racial disparities in those not seeking care due to cost.

- Low-income children, who in Alabama are disproportionately Black, are more likely to receive annual checkups when their parents are enrolled in Medicaid.
- Medicaid expansion has made it easier for people to afford needed health care. Beyond improvements to health, studies find that access to healthcare reduces medical debt, problems paying bills, and evictions.
- Additionally, Medicaid makes it easier to look for work and easier to work once they have a job. Health coverage helps low-income adults address health problems such as diabetes or depression, which are a common reason why some people lose their job or cannot find one.

---

[178] Sewell Press Release, *supra* n.176.

- States that expanded Medicaid were better positioned to respond to the COVID-19 public health emergency and prevent the resulting economic downturn from worsening access to care, financial security, health outcomes, and health disparities.[179]

157.    The decision to not expand Medicaid has worsened health disparities by race and ethnicity, leaving more Black and Hispanic people and American Indians and Alaska Natives uninsured during a pandemic in which they have seen especially high rates of infections and deaths.

158.    According to the COVID Tracking Project, as of March 2021 Black Alabamians were more likely to both contract and die from COVID. Among Alabamians the rate of COVID infection was 6,373 cases per 100,000 people for African Americans compared to 4,829 per 100,000 for whites. The rate of COVID death was 171 per 100,000 for African Americans compared to 142 per 100,000 people for whites.[180]

## B.    Felony Disenfranchisement

159.    As discussed in greater length above, Alabama's felony disenfranchisement law has a significantly adverse effect on Black Alabamians, who are much more likely than their white counterparts to have been convicted with a disqualifying offense. More than one in seven Black Alabamians is disenfranchised due to this law, twice the national average.[181]

---

[179] Center on Budget and Policy Priorities. (2020). The far-reaching benefits of the Affordable Care Act's Medicaid expansion. https://www.cbpp.org/research/health/chart-book-the-far-reaching-benefits-of-the-affordable-care-acts-medicaid-expansion.
[180] Lukens, G. & Sharer, B. (2021). Closing Medicaid coverage gap would help diverse group and narrow racial disparities. *Center on Budget and Policy Priorities*. https://www.cbpp.org/research/health/closing-medicaid-coverage-gap-would-help-diverse-group-and-narrow-racial.
[181] *Id.* at n.115.

55

160.    As also discussed above, Alabama failed to inform thousands of Alabamians whom prior

to 2017 may have been told that they were ineligible due to a felony, but whom the Moral

Turpitude Act may have rendered eligible to vote.

161.    By disproportionately preventing Black Alabamians from voting, the state's felony

disenfranchisement law and its implementation limit Black political participation and impede

Black residents' ability to achieve political outcomes that would improve their lives.

# # #

I declare under penalty of perjury that the foregoing is true and correct. I reserve the right to

supplement my report in light of additional facts, testimony, and/or materials that may come to

light.

Executed on: December 10, 2021

Bridgett King

56