FILED
2021 Dec-23 PM 04:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

MARCUS CASTER, et al.,

Plaintiffs,

v.

JOHN H. MERRILL, in his official capacity as Alabama Secretary of State,

Defendant.

Case No.: 2:21-cv-1536-AMM

**SECOND DECLARATION OF DR. BRIDGETT KING**

Pursuant to 28 U.S.C. § 1746, I, Bridgett King, make the following declaration:

1. This second declaration responds to assertions made in two reports submitted by the Defendant in this case. Section I addresses Tom Bryan's assertion of how "Black" should be defined for purposes of measuring the Black population of a political subdivision. Section II addresses Dr. M.V. Hood III's assertion that white support of minority Republican candidates suggests racial considerations do not influence their voting behavior, as well as his discussion of a recent Alabama State House race.

2. In responding to these assertions, I draw on my research and writing as a political/social scientist and my in-depth understanding of voting rights in a historical and contemporary context, along with understanding gained from academic and applied experience.

## I. Definition of "Black"

3. In Mr. Bryan's report, he discusses the need to "define and document the true 'Black' population" of congressional districts.[1] Mr. Bryan notes that in the last two Censuses,

[1] Bryan Rep. at 9.

respondents had the option of selecting more than one race.[2] He states: "A 'Black' in Alabama therefore can be Black alone, or perhaps in combination with other races or possibly even also Hispanic.[3] He goes on to assert that "[i]n this matter precise definitions matter," and claims that counting only those Alabamians who identify as Black and no other race ("Black alone," "single race Black," or "SR Black") as Black when analyzing the Black population of a congressional district "has been most defensible from a political science / Gingles 2 voting behavior perspective," as opposed to counting all Alabamians who identify as Black, regardless of whether they also identify with another race ("any part Black" or "AP Black").[4]

4. Mr. Bryan is not a political scientist, and Mr. Bryan does not offer any explanation, evidence, or citation to support his assertion that counting only those who identify as "Black alone" as Black for purposes of measuring population has been "most defensible" from a "political science" perspective.

5. Drawing on my own scholarship and those of other political scientists and historians, it is my opinion that Mr. Bryan's assertion has it exactly backwards. From a political science and historical perspective, the more defensible position is that, when determining the Black population of a political subdivision, *all* individuals who identify as Black—whether in combination with other races (and/or Hispanic heritage) or not—should be counted as Black.

6. The AP Black definition is superior to the Black alone definition from a political science and historical perspective because it better comports with how individuals racially self-identify. Racial self-identification is the result of historical, cultural, and social environments.

7. From the historical perspective, how individuals racially self-identify must take

---

[2] *Id.*
[3] *Id.*
[4] *Id.* at 10.

account of how society and the State of Alabama has defined the Black race. In Alabama, that understanding must begin with the "one drop rule." For centuries, states in the American South, including Alabama, defined Black by using the one drop rule, also known as the "one black ancestor rule," or in anthropology as "the hypo-descent rule." Stated simply, the rule asserts that a single drop of Black blood makes a person Black. Racially mixed persons were thus considered Black and assigned the status of the subordinate group.[5] As one scholar explains: "Any person who has some 'negro blood' has been or still is regarded as 'colored,' or 'African,' or 'Negro,' or 'Black,' or 'Afro American,' or 'African American.'"[6]

8. The rule did not apply to people whose heritage was some combination of Caucasian, Hispanic, Asian, or Native. In both the historical and contemporary contextual understanding, the one drop rule applied only to Americans of African descent—in other words it only applies to Black Americans.[7]

9. The one drop rule became entrenched across the American South in the 1910s and 1920s, but it first appeared in legal codes in the 1800s. The rule evolved out of racist notions of white racial purity.[8] While state statutes often explicitly defined who was considered Black, social customs also played a large role in defining the racial line, which used the one drop rule to suppress political, economic, and social access and mobility. As early as the 1700s, those who were mixed race Black and white ("mulattos," "quadroons," "octoroons," etc.) were subject to the same legal disabilities as Blacks and thus were enslaved. Keeping "mulattos" and other part-Black persons

---

[5] Davis, F. J. (1991). Who is Black? One nation's definition. Penn State University Press: University Park, Pennsylvania; Hickman, C. B. (1997). The Devil and the One Drop Rule: Racial Categories, African Americans, and the U.S. Census. *Michigan Law Review*, *95*(5), 1161–1265.
[6] Jordan, W. D. (2014). Historical Origins of the One-Drop Racial Rule in the United States. *Journal of Critical Mixed Race Studies*, 1(1), 98-132.
[7] Davis, *supra* n.5; Jordan, *supra* n.6.
[8] Hickman, *supra* n.5.

enslaved served an economic purpose: the offspring of children with Black mothers and white fathers increased a plantation's inventory.

10. Though the citizenship status of Black Americans changed after the Civil War, Black people with significant white ancestry continued to be considered Black if they also had a Black ancestor.

11. An understanding of Blackness that is inclusive of all Black individuals, both SR Black and AP black, was also adopted by the US Bureau of the Census.

12. By the Fourteenth Census in 1920, when the color line had hardened, the Census Bureau stopped counting "mulattoes" and formally adopted the one drop rule:

> The term "white" as used in the census report refers to persons understood to be pure-blooded whites. A person of mixed blood is classified according to the nonwhite racial strain. . . . [t]hus a person of mixed white . . . and Negro . . . is classified as . . . a Negro . . . regardless of the amount of white blood . . . .[9]

13. This formal adoption of the one drop rule appeared in legislative definitions as well. For example, in 1924, a Virginia Act for "Preservation of Racial Integrity" defined a White person as someone with "no trace whatsoever of any blood other than Caucasian."[10] By 1930, Virginia defined as colored anyone "in whom there is ascertainable any negro blood."[11]

14. As time has progressed, our understanding of who is Black, and who is not, has not deviated; to the contrary, it has been further entrenched in our society. Historian Paul Spickard argues:

> The "one drop" rule is so ingrained in the American psyche that Blacks and Whites do not think twice about it. For example, part-Black people of all hues joined Blacks

[9] Bureau of the Census, U.S. Dept. of Commerce, Fourteenth Census of the United States: 1920, at 10 (1923); Hickman, *supra* n.5.

[10] 1924 VA. Acts ch. 371, § 5.

[11] 1930 VA. Acts ch. 85, § 67.

> in embracing the "Black is Beautiful" slogan advanced in the late 1960s, finally taking pride in their skin color, their hair and other aspects of their black ancestry.[12]

15. For all persons with Black lineage, barriers to full opportunity and participation are formidable, and a person who is fractionally Black cannot escape these obstacles.[13] Asserting one's racial identity is thus a political exercise, a conscious decision to connect to the heritage of that racial identity.[14] It is a choice to connect to the politics and organized interests of that racial identity, but one also accepts the socio-political and anthropological struggles of that group.

16. Individuals who assert their identity as Black, in total or in part, are making a conscious decision to identify with the history and legacy of Black identity in the United States, an identity that includes the trans-Atlantic slave trade, the legacy of Jim Crow, segregation, the relief brought by the 1964 Civil Rights Act and 1965 Voting Right Act, and the contemporary political, economic, and social realities experienced by Black Americans. Excluding such individuals from the definition of Black cannot be supported from a political science perspective.

## II. Republican Voting Patterns

### A. Support for Black Candidates Among White Republican Voters

17. I respond to two assertions made in Dr. Hood's report. First, Dr. Hood asserts that "ideology trumps race in the case of white Republicans and their support for GOP minority candidates," citing specifically an article Dr. Hood published with Seth C. McKee.[15]

---

[12] Spickard, P.R. (1992). The Illogic of American Racial Categories in *Racially mixed people in America*, (in Root, M P.P. Root ed.), p. 12-23. Sage Publishing: Thousand Oaks, California. This observation is cited in Hickman, *supra* n.5.
[13] Davis, *supra* n.5.
[14] Martin, B. L. (1991). From Negro to Black to African American: The Power of Names and Naming. *Political Science Quarterly*, *106*(1), 83–107.
[15] Hood Rep. at 15 (citing Hood, M. V., & Mckee, S. C. (2015). True Colors: White Conservative Support for Minority Republican Candidates. *The Public Opinion Quarterly*, *79*(1), 28–52).

18. In the cited article, while the authors conclude that conservative whites will vote for conservative minority candidates, they provide no explicit discussion of white Republican willingness to vote for Black candidates, the heart of the issue. Nor does the study consider any elections conducted in the state of Alabama.

19. In the analysis, Hood and McKee collapse all the non-white candidates who ran for Congress or Governor in the elections studied—elections in Delaware, Florida, Hawaii, Maryland, Nevada, New Mexico, Ohio, Pennsylvania, South Carolina, Texas, and Vermont into the category of "minority" candidate. This category includes 4 African Americans, 3 Asians, and 4 Hispanics. The level of support among conservative voters for these minority candidates was compared against conservative voters' support for white candidates using the 2006, 2010, and 2012 Cooperative Election Study (formerly known as the Cooperative Congressional Election Study). They provide no discussion of the conditions under which support for a minority candidate will occur.

20. Perhaps more importantly, the mere fact that white Republicans support a minority candidate tells us quite little about whether any of those voters are motivated by racial considerations. As political scientists Hakeem Jefferson and Michael Tesler recently explained, white Republican voters who harbor prejudiced views will still support a Black candidate so long as that candidate takes particular positions on issues relating specifically to race.[16] Specifically, racially prejudiced white voters will support a Black candidate so long as the candidate's positions "don't threaten the racial hierarchy" and give no reason to "worry that the[] candidate[] will

[16] Jefferson, H. & Tesler, M. (2021). Why White Voters With Racist Views Often Still Support Black Republicans, *FiveThirtyEight*, https://fivethirtyeight.com/features/why-racist-white-voters-often-favor-black-republicans/.

represent the interest of Black Americans."[17] In other words, white voters who harbor racial prejudice will support a Black candidate who successfully demonstrates he or she is "not in the business of carrying water for their own racial group."[18] By contrast, they will oppose any Black candidate whom they believe "will fight for 'those people [Black Americans]' and not 'people like us [white Americans].'"[19] Put simply, racially prejudiced white voters "are not hostile to Blackness, per se. They are hostile to a particular manifestation of Blackness – one that reflects a commitment to racial justice and the advancement of [Black Americans'] collective goals."[20]

21. Moreover, Jefferson and Tesler also explain that voting for Black Republicans may be appealing to racially prejudiced whites because "it assuages concerns of being seen as racist by enabling them to say, 'I can't be racist! I voted for the Black candidate!'"[21]

22. The 2016 Republican primary provides a helpful example. During that race, support for candidate Ben Carson, a Black man, was "positively correlated with the belief that Black Americans have too much influence on U.S. politics."[22] Carson also received much more favorable evaluations among Republicans harboring the "overtly prejudiced [view] that 'most African Americans are more violent than most whites'" as compared to white candidate Jeb Bush.[23]

23. When considering partisanship, we know that Democrats and Republicans differ greatly across a wide range of issues. While some of these issues do not pertain to race, many of them do. For example, recent surveys have found the following:

---

17 *Id.*
18 *Id.*
19 *Id.*
20 *Id.*
21 *Id.*
22 *Id.*
23 *Id.*

a. 49 percent of Democrats/Democratic Leaners believe that white people benefit a great deal from advantages in society that Black people do not have, compared to 7 percent of Republicans/Republican Leaners, a 42 percent difference.[24]

b. 67 percent of Democrats/Democrat Leaners believe that when it comes to giving Black people rights the country has not gone far enough, compared to 15 percent of Republicans/Republican Leaners, a 52 difference.[25]

c. 71 percent of Republicans/Republican Leaners believe that a lot of progress has been made when it comes to ensuring equal rights for all Americans regardless of their race/ethnicity, compared to 29 percent of Democrats/Democratic Leaners, a 42 percent difference.[26]

d. 85 percent of Democrats/Democrat Leaners support the Black Lives Matter movement, whereas 78% of Republicans/Republican Leaners say they oppose it.[27]

e. 81 percent of Democrats support removing confederate monuments from public spaces, compared to 17 percent of Republicans, a 62 percent difference.[28]

---

[24] In a Politically Polarized Era, Sharp Divides in Both Partisan Coalitions. *Pew Research Center*. https://www.pewresearch.org/politics/2019/12/17/in-a-politically-polarized-era-sharp-divides-in-both-partisan-coalitions/.

[25] *Id.*

[26] Deep Division in Americans' View of Nation's Racial History – and How to Address It, *Pew Research Center*, https://www.pewresearch.org/politics/2021/08/12/deep-divisions-in-americans-views-of-nations-racial-history-and-how-to-address-it/.

[27] Menasce Horowitz, J. (2021, Sept. 27). Support for Black Lives Matter Declined After George Floyd Protests, but Has Remained Unchanged Since, *Pew Research Center*, https://www.pewresearch.org/fact-tank/2021/09/27/support-for-black-lives-matter-declined-after-george-floyd-protests-but-has-remained-unchanged-since/.

[28] Kelley, A. (2020, July 17). A Majority of Americans Support Removal of Confederate Monuments: Poll. *Washington Post*, https://thehill.com/changing-america/respect/diversity-inclusion/507788-a-majority-of-americans-support-removal-of.

24. These results demonstrate the deep divisions among the two major political parties on issues of race.

**B. The 2021 Alabama House District 73 Election**

25. The second of Dr. Hood's assertions to which I respond is his identification of the election of Kenneth Paschal, a Black Republican, to the Alabama House of Representatives in 2021, as evidence that ideology is more important than race in determining white Republican voting behavior.

26. For the reasons just explained, Mr. Paschal's election tells us very little about whether his supporters harbor racially prejudiced views. And for purposes of political science methodology, when put into context, this single election in one Alabama State House District with less than 4,000 total votes cast provides almost no insight into anything about white voters in Alabama.

27. Additionally, Paschal's election tells us nothing about polarization between Black and white voters.

28. Paschal is the first Black Republican elected to the Alabama Legislature in 140 years, since the end of Reconstruction. This speaks to the significant historical and contemporary challenges that Black Alabamians, including Black Republicans, face when endeavoring to engage in Alabama politics.

29. Moreover, Paschal's win is an outlier in the field of Black Republicans who have recently run for office but lost in the primary election.[29] Below I list Black Republicans who

[29] *See* Cason, M. (2018, Sept. 9). Alabama Republican Chair Terry Lathan Says Party Can Do More to Recruit African-Americans, *AL.com*, https://www.al.com/news/2018/09/alabama_republican_chair_terry.html.

recently ran in contested Republican primary elections.[30] Candidates in bold advanced to the general election.[31]

| Candidate Name | Election Year | Election Type | Office | Votes Received | % of Vote Received |
|---|---|---|---|---|---|
| Pamela Blackmore Jenkins | 2014 | Republican Primary | AL House Seat 46 | 389 | 4.90 |
| Philip Brown | 2014 | Republican Primary | Public Service Commission Position 2 | 43,097 | 12.58 |
| Sam Rowlin | 2014 | Republican Primary | Autauga County Sheriff | 1,610 | 18.74 |
| William McCollum | 2014 | Republican Primary | Fayette County Sheriff | 841 | 34.58 |
| B.J. Major | 2014 | Republican Primary | Cherokee County Board of Education Seat 5 | 466 | 18.64 |
| Tijuanna Adetunji | 2014 | Republican Primary | Montgomery City Council District 2 | 1410 | 13.79 |
| Ron Wilson | 2014 | Republican Primary | House District 85 | 555 | 34.22 |
| Sharica S. Long | 2018 | Republican Primary | Colbert County Circuit Clerk | 1,097 | 19.9 |
| **Phillip** | **2018** | **Republican Primary** | **Jefferson County Executive Committee, Dis 1 Pt. 2** | **797** | **46.2** |

[30] There are other candidates who are listed by the Republican party as qualifying for elections in 2014 and 2018. The results of some of these primary elections, however, are not provided in the official certification on the Alabama Secretary of State website. Although most counties do not have election websites that provide archived results, where possible, I checked county election websites. I also used the website Ballotpedia to verify the returns in primary and general elections for Black Republicans who ran in 2014 and 2018, but I did not use that website as a primary source of information. This list represents the most comprehensive set of information available in light of these data limitations.

[31] I obtained the certified elections results from the Alabama Secretary of State's public website.

| **Brown**[32] | | | | | |
|---|---|---|---|---|---|
| Derrick Williams | 2016 | Republican Primary | District Judge Mobile County P. 4 | 4371 | 12.3 |
| John H. Moore | 2018 | Republican Primary | Morgan County Sheriff | 319 | 1.8 |
| **Lewis Brooks**[33] | **2018** | **Republican Primary** | **Shelby County School Superintendent** | **12626** | **50.7** |
| Randy Turner | 2018 | Republican Primary | Morgan County Commissioner | 4907 | 31.9 |
| Allen Hendrickson | 2018 | Republican Primary | Houston County Commission Seat 2 | 700 | 19.2 |
| Jayla McElrath | 2018 | Republican Primary | Cherokee County Board of Elections Place 4 | 1217 | 25.9 |

30. Finally, if we consider the vote returns from Paschal's performance in both the Republican Primary and Republican Primary runoff as a proxy for white Republican Party support of his candidacy, it is not overwhelming by any means. In the March 30, 2021 House District 73 Special Republican Primary, Paschal received just 27% of votes cast, and the remaining votes went to other candidates. Leigh Hulsey, a white candidate whom Paschal faced in the runoff, received 30.7% of votes cast in the initial primary election.[34] In the April 27 primary runoff election, Husley received 1,414 votes (48.91% of votes cast) and Paschal received 1,477 votes (51.09 % of votes

[32] There is no record of a runoff for this seat in the 2018 returns on the SOS website. 2018 election results are not archived on the Jefferson County Elections website (https://www.jccal.org/Default.asp?ID=1480&pg=Elections+Results). Brown, however, proceeded to the 2018 General Election, and is in bold for this reason.

[33] This election is not in the 2018 returns on the SOS website and the Shelby County Probate Office does not have an election results archive. There was no Democratic Party challenger in the general election. The information about the race is from Dawkins, S. (2018, June 5). Brooks Wins Tightly Contested Race for Superintendent of Shelby County Schools. *Shelby County Reporter*. https://www.shelbycountyreporter.com/2018/06/05/brooks-wins-tightly-contested-race-for-superintendent-of-shelby-county-schools/.

[34] Alabama Secretary of State: https://www.sos.alabama.gov/sites/default/files/election-2021/Certification%20of%20Primary%20Results.pdf).

cast), a difference of just 63 votes.[35] Both the overall number of ballots cast in these elections and the margins between Paschal and Hulsey are small. Using this example to extrapolate any conclusion about white voting behavior in Alabama would be scientifically unsound.

# # #

I declare under penalty of perjury that the foregoing is true and correct. I reserve the right to supplement my report in light of additional facts, testimony, and/or materials that may come to light.

Executed on: December 20, 2021

Bridgett A. King

Bridgett King

[35] Alabama Secretary of State: https://www.sos.alabama.gov/sites/default/files/election-2021/HD73_Republican_Party-Certification_of_Results-Special_Primary_Runoff_Election.pdf.

# Exhibit 1

# REAPPORTIONMENT COMMITTEE REDISTRICTING GUIDELINES

May 5, 2021

## I. POPULATION

The total Alabama state population, and the population of defined subunits thereof, as reported by the 2020 Census, shall be the permissible data base used for the development, evaluation, and analysis of proposed redistricting plans. It is the intention of this provision to exclude from use any census data, for the purpose of determining compliance with the one person, one vote requirement, other than that provided by the United States Census Bureau.

## II. CRITERIA FOR REDISTRICTING

a. Districts shall comply with the United States Constitution, including the requirement that they equalize total population.

b. Congressional districts shall have minimal population deviation.

c. Legislative and state board of education districts shall be drawn to achieve substantial equality of population among the districts and shall not exceed an overall population deviation range of ±5%.

d. A redistricting plan considered by the Reapportionment Committee shall comply with the one person, one vote principle of the Equal Protection Clause of the 14th Amendment of the United States Constitution.

e. The Reapportionment Committee shall not approve a redistricting plan that does not comply with these population requirements.

f. Districts shall be drawn in compliance with the Voting Rights Act of 1965, as amended. A redistricting plan shall have neither the purpose nor the effect of diluting minority voting strength, and shall comply with Section 2 of the Voting Rights Act and the United States Constitution.

g. No district will be drawn in a manner that subordinates race-neutral districting criteria to considerations of race, color, or membership in a language-minority group, except that race, color, or membership in a language-minority group may predominate over race-neutral districting criteria to comply with Section 2 of the Voting Rights Act, provided there is a strong basis in evidence in support of such a race-based choice. A strong basis in evidence exists when there is good reason to believe that race must be used in order to satisfy the Voting Rights Act.

h. Districts will be composed of contiguous and reasonably compact geography.

i. The following requirements of the Alabama Constitution shall be complied with:

(i) Sovereignty resides in the people of Alabama, and all districts should be drawn to reflect the democratic will of all the people concerning how their governments should be restructured.

(ii) Districts shall be drawn on the basis of total population, except that voting age population may be considered, as necessary to comply with Section 2 of the Voting Rights Act or other federal or state law.

(iii) The number of Alabama Senate districts is set by statute at 35 and, under the Alabama Constitution, may not exceed 35.

(iv) The number of Alabama Senate districts shall be not less than one-fourth or more than one-third of the number of House districts.

(v) The number of Alabama House districts is set by statute at 105 and, under the Alabama Constitution, may not exceed 106.

(vi) The number of Alabama House districts shall not be less than 67.

(vii) All districts will be single-member districts.

(viii) Every part of every district shall be contiguous with every other part of the district.

j. The following redistricting policies are embedded in the political values, traditions, customs, and usages of the State of Alabama and shall be observed to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States and of the State of Alabama:

(i) Contests between incumbents will be avoided whenever possible.

(ii) Contiguity by water is allowed, but point-to-point contiguity and long-lasso contiguity is not.

(iii) Districts shall respect communities of interest, neighborhoods, and political subdivisions to the extent practicable and in compliance with paragraphs a through i. A community of interest is defined as an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities. The term communities of interest may, in certain circumstances, include political subdivisions such as counties, voting

precincts, municipalities, tribal lands and reservations, or school districts. The discernment, weighing, and balancing of the varied factors that contribute to communities of interest is an intensely political process best carried out by elected representatives of the people.

(iv) The Legislature shall try to minimize the number of counties in each district.

(v) The Legislature shall try to preserve the cores of existing districts.

(vi) In establishing legislative districts, the Reapportionment Committee shall give due consideration to all the criteria herein. However, priority is to be given to the compelling State interests requiring equality of population among districts and compliance with the Voting Rights Act of 1965, as amended, should the requirements of those criteria conflict with any other criteria.

g. The criteria identified in paragraphs j(i)-(vi) are not listed in order of precedence, and in each instance where they conflict, the Legislature shall at its discretion determine which takes priority.

## III. PLANS PRODUCED BY LEGISLATORS

1. The confidentiality of any Legislator developing plans or portions thereof will be respected. The Reapportionment Office staff will not release any information on any Legislator's work without written permission of the Legislator developing the plan, subject to paragraph two below.

2. A proposed redistricting plan will become public information upon its introduction as a bill in the legislative process, or upon presentation for consideration by the Reapportionment Committee.

3. Access to the Legislative Reapportionment Office Computer System, census population data, and redistricting work maps will be available to all members of the Legislature upon request. Reapportionment Office staff will provide technical assistance to all Legislators who wish to develop proposals.

4. In accordance with Rule 23 of the Joint Rules of the Alabama Legislature "[a]ll amendments or revisions to redistricting plans, following introduction as a bill, shall be drafted by the Reapportionment Office." Amendments or revisions must be part of a whole plan. Partial plans are not allowed.

5. In accordance with Rule 24 of the Joint Rules of the Alabama Legislature, "[d]rafts of all redistricting plans which are for introduction at any session of the Legislature, and which are not prepared by the Reapportionment Office, shall be presented to the Reapportionment Office for review of proper form and for entry into the Legislative Data System at least ten (10) days prior to introduction."

## IV. REAPPORTIONMENT COMMITTEE MEETINGS AND PUBLIC HEARINGS

1. All meetings of the Reapportionment Committee and its sub-committees will be open to the public and all plans presented at committee meetings will be made available to the public.

2. Minutes of all Reapportionment Committee meetings shall be taken and maintained as part of the public record. Copies of all minutes shall be made available to the public.

3. Transcripts of any public hearings shall be made and maintained as part of the public record, and shall be available to the public.

4. All interested persons are encouraged to appear before the Reapportionment Committee and to give their comments and input regarding legislative redistricting. Reasonable opportunity will be given to such persons, consistent with the criteria herein established, to present plans or amendments redistricting plans to the Reapportionment Committee, if desired, unless such plans or amendments fail to meet the minimal criteria herein established.

5. Notice of all Reapportionment Committee meetings will be posted on monitors throughout the Alabama State House, the Reapportionment Committee's website, and on the Secretary of State's website. Individual notice of Reapportionment Committee meetings will be sent by email to any citizen or organization who requests individual notice and provides the necessary information to the Reapportionment Committee staff. Persons or organizations who want to receive this information should contact the Reapportionment Office.

## V. PUBLIC ACCESS

1. The Reapportionment Committee seeks active and informed public participation in all activities of the Committee and the widest range of public information and citizen input into its deliberations. Public access to the Reapportionment Office computer system is available every Friday from 8:30 a.m. to 4:30 p.m. Please contact the Reapportionment Office to schedule an appointment.

2. A redistricting plan may be presented to the Reapportionment Committee by any individual citizen or organization by written presentation at a public meeting or by submission in writing to the Committee. All plans submitted to the Reapportionment Committee will be made part of the public record and made available in the same manner as other public records of the Committee.

3. Any proposed redistricting plan drafted into legislation must be offered by a member of the Legislature for introduction into the legislative process.

4. A redistricting plan developed outside the Legislature or a redistricting plan developed without Reapportionment Office assistance which is to be presented for consideration by the Reapportionment Committee must:

a. Be clearly depicted on maps which follow 2020 Census geographic boundaries;

b. Be accompanied by a statistical sheet listing total population for each district and listing the census geography making up each proposed district;

c. Stand as a complete statewide plan for redistricting.

d. Comply with the guidelines adopted by the Reapportionment Committee.

5. Electronic Submissions

a. Electronic submissions of redistricting plans will be accepted by the Reapportionment Committee.

b. Plans submitted electronically must also be accompanied by the paper materials referenced in this section.

c. See the Appendix for the technical documentation for the electronic submission of redistricting plans.

6. Census Data and Redistricting Materials

a. Census population data and census maps will be made available through the Reapportionment Office at a cost determined by the Permanent Legislative Committee on Reapportionment.

b. Summary population data at the precinct level and a statewide work maps will be made available to the public through the Reapportionment Office at a cost determined by the Permanent Legislative Committee on Reapportionment.

c. All such fees shall be deposited in the state treasury to the credit of the general fund and shall be used to cover the expenses of the Legislature.

## Appendix.

## ELECTRONIC SUBMISSION OF REDISTRICTING PLANS

## REAPPORTIONMENT COMMITTEE - STATE OF ALABAMA

The Legislative Reapportionment Computer System supports the electronic submission of redistricting plans. The electronic submission of these plans must be via email or a flash drive. The software used by the Reapportionment Office is Maptitude.

The electronic file should be in DOJ format (Block, district # or district #, Block). This should be a two column, comma delimited file containing the FIPS code for each block, and the district number. Maptitude has an automated plan import that creates a new plan from the block/district assignment list.

Web services that can be accessed directly with a URL and ArcView Shapefiles can be viewed as overlays. A new plan would have to be built using this overlay as a guide to assign units into a blank Maptitude plan. In order to analyze the plans with our attribute data, edit, and report on, a new plan will have to be built in Maptitude.

In order for plans to be analyzed with our attribute data, to be able to edit, report on, and produce maps in the most efficient, accurate and time saving procedure, electronic submissions are REQUIRED to be in DOJ format.

Example: (DOJ FORMAT BLOCK, DISTRICT #)

SSCCCTTTTTTBBBBDDDD

SS is the 2 digit state FIPS code

CCC is the 3 digit county FIPS code

TTTTTT is the 6 digit census tract code

BBBB is the 4 digit census block code

DDDD is the district number, right adjusted

**Contact Information:**

Legislative Reapportionment Office

Room 317, State House

11 South Union Street

Montgomery, Alabama 36130

(334) 261-0706

For questions relating to reapportionment and redistricting, please contact:

Donna Overton Loftin, Supervisor

Legislative Reapportionment Office

donna.overton@alsenate.gov

Please Note: The above e-mail address is to be used only for the purposes of obtaining information regarding redistricting. Political messages, including those relative to specific legislation or other political matters, cannot be answered or disseminated via this email to members of the Legislature. Members of the Permanent Legislative Committee on Reapportionment may be contacted through information contained on their Member pages of the Official Website of the Alabama Legislature, legislature.state.al.us/aliswww/default.aspx.

# Exhibit 2

FILED
2019 Dec-04 PM 01:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

United States District Court

for the Northern District of Alabama

*Chestnut v. Merrill,*

No. 2:18-cv-907-KOB

March 8, 2018

# Expert Report of Maxwell Palmer, Ph.D.

Maxwell Palmer

2:18-cv-00907-KOB
11/04/2019 Bench Trial
Plaintiff Exhibit No. 79

## Statement of Inquiry

1. I have been asked to evaluate the extent to which voting is racially polarized in southern Alabama, including the 1st, 2nd, 3rd, and 7th Congressional Districts under the redistricting plan enacted by the Alabama State Legislature in 2011.

## Summary of Analysis and Findings

2. I find strong evidence of racially polarized voting in the 1st, 2nd, 3rd, and 7th Congressional Districts (the Focus Area). African American and white voters consistently support different candidates. Across every election I analyzed, the African American-preferred candidate on average won 94% of the African American vote and only 17% of the white vote in the focus area.

3. African American-preferred candidates are largely unable to win elections in the focus region. Across an analysis of 18 statewide elections, the African American-preferred candidate was able to win only two. In analyses of the 2018 elections at the precinct-level, African American-preferred candidates were only able to win elections in the 7th Congressional District.

## Qualifications

4. I am currently an Assistant Professor of Political Science at Boston University. I joined the faculty at Boston University in 2014, after completing my Ph.D. in Political Science at Harvard University. In 2017 I was also appointed a Junior Faculty Fellow at the Hariri Institute for Computing at Boston University. I teach and conduct research on American politics and political methodology.

5. I have published academic work in leading peer-reviewed academic journals, including the *American Political Science Review*, *Journal of Politics*, *Journal of Empirical Legal Studies*, and *Perspectives on Politics*. I have published work on redistricting in the *Ohio State University Law Review* and the *Journal of Politics*. My curriculum vitae is attached to this report. My published research uses a variety of analytical approaches, including statistics, geographic analysis, and simulations.

6. I have served as an expert witness or litigation consultant on numerous cases involving the Voting Rights Act, including redistricting, voter identification, and early voting. I testified as an expert in redistricting and data analysis as it pertains to redistricting before the U.S. District Court for the Eastern District of Virginia in *Bethune Hill v. Virginia* (3:14-cv-00852-REP-AWA-BMK) and before the U.S. District Court for the Southern District of Mississippi in *Thomas v. Bryant* (3:18-CV-441-CWR-FKB). I worked as a data analyst assisting testifying experts in multiple cases concerning congressional and state legislative districting, including: *Perez v. Perry*, in the U.S. District Court for the Western District of Texas (No. 5:11-cv-00360); *LULAC v. Edwards Aquifer Authority* in the U.S. District Court for the Western District of Texas, San Antonio Division (No. 5:12cv620-OLG,); *Harris v. McCrory* in the U. S. District Court

for the Middle District of North Carolina (No. 1:2013cv00949); *Guy v. Miller* in the U.S. District Court for Nevada (No. 11-OC-00042-1B); *In re Senate Joint Resolution of Legislative Apportionment* in the Florida Supreme Court (Nos. 2012-CA-412, 2012-CA-490); and *Romo v. Detzner* in the Circuit Court of the Second Judicial Circuit in Florida (No. 2012 CA 412).

7. I am being compensated at a rate of $350/hour for my work in this case.

## Geographic Area and Elections Analyzed

8. For the purpose of my analysis, I examined elections in the 1st, 2nd, 3rd, and 7th Congressional Districts.

    - The 1st District includes Baldwin, Escambia, Mobile, Monroe, and Washington counties, and parts of Clarke County.
    - The 2nd District includes Autauga, Barbour, Bullock, Butler, Coffee, Conecuh, Covington, Crenshaw, Dale, Elmore, Geneva, Henry, Houston, and Pike counties, and parts of Montgomery County.
    - The 3rd District includes Calhoun, Chambers, Clay, Cleburne, Lee, Macon, Randolph, Russell, St. Clair, Talladega, and Tallapoosa counties, and parts of Cherokee and Montgomery counties.
    - The 7th District includes Choctaw, Dallas, Greene, Hale, Lowndes, Marengo, Perry, Pickens, Sumter, and Wilcox counties, and parts of Clarke, Jefferson, Montgomery, and Tuscaloosa counties.
    - I refer to the combined areas of these four congressional districts, along with the remainder of any county that is partially in these districts and other congressional districts, as the "focus area" for my analysis.[1]

9. Figure 1 maps the focus area. The shaded portions of Figure 1 show the counties and congressional districts included in my analysis, and the solid black line marks the full boundary of each congressional district.

10. To analyze racially polarized voting in the focus area, I examined election results from the 2012, 2014, 2016, and 2018 general elections, and the 2017 special election for U.S. Senate. I included elections for U.S. Congress (endogenous elections), and statewide elections (exogenous).[2]

---

[1] Jefferson County is split between the 6th and 7th districts, Tuscaloosa County is split between the 4th and 7th districts, and Cherokee County is split between the 3rd and 4th districts. The full counties are included in the focus area, but not in analyses of the individual districts alone.

[2] The statewide elections analyzed include elections for U.S President, U.S. Senate, Governor, Lieutenant Governor, Secretary of State, Attorney General, State Auditor, Treasurer, Commissioner of Agriculture and

11. In analyzing racially polarized voting in each election, I used a statistical procedure, ecological inference (EI), that estimates group-level preferences based on aggregate data. While the primary focus of this analysis is on racially polarized voting between African American and white voters, I also added a third group, "other", which includes Hispanics, Asians, Native Americans, and voters who did not identify their race when registering to vote, in the analysis.[3] I excluded third party and write-in candidates, and analyzed votes for the two major-party candidates in each contested election. The results of this analysis are estimates of the percentage of each group (African Americans, whites, and others) that voted for each candidate in each election. The results include both a mean estimate (the most likely vote share), and a 95% confidence interval.[4]

12. I used ecological inference analysis on two different datasets. First, I used county-level election results and data on voter registration by race to analyze racially polarized voting at the county level for the 2012, 2014, 2016, and 2018 general elections, as well as the special election for U.S. Senate in 2017. Second, I used precinct-level data to estimate racially polarized voting at the precinct level for the 2018 general elections. Due to data constraints, I was only able to use precinct-level data for 2018. This analysis offers increased precision in my estimates of racially polarized voting because there is more information about racial voting patterns at the precinct level than at the county level.

## County-Level Analysis

13. To analyze racially polarized voting at the county level, I relied on election results and county-level voter registration data from 2012 to 2018 from the Alabama Secretary of State.[5] The voter registration data includes voter race, based on voters' self-identified race when registering to vote.[6]

---

Industries, Chief Justice of the State Supreme Court, and Associate Justice of the State Supreme Court. I excluded elections for state legislature, as these districts partially overlap with the congressional district boundaries and include different subsets of voters in the area relevant to this case.

[3] Combining the "other" group with whites does not substantively impact the results of the analysis or alter my conclusions.

[4] The 95% confidence interval is a measure of uncertainty in the estimates from the model. For example, the model might estimate that 94% of the members of a group voted for a particular candidate, with a 95% confidence interval of 91-96%. This means that based on the data and the model assumptions, we can be 95% confident that the true level of support is in the range of 91-96%, with 94% being the most likely value. Larger confidence intervals reflect a higher degree of uncertainty in the estimates, while smaller confidence intervals reflect less uncertainty.

[5] https://www.sos.alabama.gov/alabama-votes/voter/election-data

[6] For 2018 only, the Secretary of State's website also included voter turnout by race. While I use voter registration by race in my analysis here to maintain consistency over the different election years, using turnout by race produces substantively similar results and supports the same conclusions.

14. In all of the analyses below, I analyzed racially polarized voting using three demographic groups: African Americans, whites, and other. The "other" group included self-identified Hispanics, Asians, Native Americans, voters of other races, and voters whose race is unknown.[7]

15. For the county-level ecological inference analysis, I examined all of the counties in the focus area as whole, as there are not enough counties in each congressional district to analyze them separately. Consequently, I was only able to analyze the exogenous, statewide elections. For each election, I ran the ecological inference algorithm and then analyze the results.

16. Interpreting the results of the ecological inference models proceeded in two general stages. First, I examined the support for each candidate by each demographic group to determine if members of the group vote cohesively in support of a single candidate. When a significant majority of the group supports a single candidate, I can then identify that candidate as the group's "candidate of choice." If the group's support is roughly evenly divided between the two candidates, then the group does not cohesively support a single candidate and there is not an identifiable candidate of choice. Second, after identifying the candidate of choice for each group (or the lack of such a candidate), I then compared the preferences of African American and white voters. When African American and white voters share the same candidate of choice, or when one or both groups do not have an identifiable candidate of choice, then voting is not polarized. Evidence of racially polarized voting is found when African American and white candidates have different candidates of choice.

17. Figure 2 presents the results of the county-level ecological inference analyses.[8] For each contest examined, the text on the left identifies the candidate of choice for each demographic group.

18. In every election examined in the focus area, both African American and white voters have clearly identifiable candidates of choice, and in all cases African American and white voters cohesively support opposing candidates.

19. The plot to the right in each figure displays the level of support by each group for the African American candidate of choice. The estimated level of support by African American voters is depicted with a black circle, and by white voters with a white circle. The vertical lines to either side of each circle mark the bounds of the 95% confidence intervals, which reflect uncertainty in the estimate.

20. In all cases, African American voters strongly support their candidate of choice, with an average estimated vote share of 94.1%. White voters strongly oppose these candidates, with an average estimated vote share of only 16.7%.

---

[7] In 2018, voters in the "other" group made up 3.3% of registered voters statewide and 3.1% of registered voters in the focus area.

[8] Table 1 presents the numerical estimated displayed in Figure 2.

21. These results demonstrate high levels of racially polarized voting in the focus area.

22. Having identified the African American candidate of choice in each contest, I now turn to their ability to win elections in these districts. Table 2 presents the results of each election in the forty-five counties constituting the focus area. For each election, I calculate the vote share obtained by the African American and white-preferred candidates.

23. Across all 23 statewide contests analyzed, the African American-preferred candidate won only twice. In all other cases, the white-preferred candidate won the majority of the vote.

24. The African American-preferred candidate won the majority of the vote in the focus area in only two contests: the 2012 election for Chief Justice of the Alabama Supreme Court, and the 2017 special election for U.S. Senate. In both cases, the white-preferred candidate was Roy Moore, a former Chief Justice of the Alabama Supreme Court. Moore is a uniquely controversial figure in Alabama politics, having been removed from his position on the Supreme Court in 2003, and later suspended from his position on the Supreme Court in 2016 following his 2012 election. In the 2017 U.S. Senate election, Moore was also accused of sexual assault and misconduct by several women.[9] Moore's unique unpopularity is highlighted by a recent statement of the National Republican Senate Committee on the 2020 Senate race: "'The NRSC's official stance is ABRM: anyone but Roy Moore,' said Kevin McLaughlin, the committee's executive director. 'The only thing Doug Jones and I agree on is that his only prayer for electoral success in 2020 is a rematch with Roy Moore.'"[10]

## Precinct-Level Analysis

25. The previous analysis at the county level provides strong evidence of racial polarization and the inability of African American-preferred candidates to win in most elections due to white bloc voting. I supplement that analysis here with a precinct-level analysis of the 2018 general election. Precinct-level analysis offers two advantages. First, I am able to analyze the endogenous elections for U.S. House in each district. Second, due to the larger number of data points at the precinct level, I am able to measure racially polarized voting in each congressional district separately, as well as in the focus area as a whole.

26. To analyze racially polarized voting at the precinct level, I relied primarily on two data sources:

---

[9] Notwithstanding these potentially distinguishing features of Mr. Moore's candidacy, 70.9% of white voters voted for Moore in 2012 and 66.3% of white voters voted for Moore in 2017. *See* Table 1.

[10] https://www.politico.com/newsletters/playbook-pm/2019/02/28/netanyahu-indicted-pelosi-attempts-to-wrangle-dems-and-says-noko-won-the-summit-401605?tab=most-read

- Precinct-level elections results for the 2018 general election from the Alabama Secretary of State.[11]

- A snapshot of the Alabama voter file following the 2018 general election, provided by the Alabama Secretary of State, dated January 3, 2019. This file lists every individual voter in Alabama as of January 3, their self-identified race, county, voting precinct, and whether they voted in the 2018 general election. This file is used to estimate the percentage of registered voters by race in each precinct for the 2018 election.[12]

27. There are several challenges in combining the voter file snapshot and the precinct election returns into a cohesive dataset for analyzing racially polarized voting. First, I use the voter file to estimate the number of registered voters, by race, in each election precinct. The available voter file is dated two months after the election. This is necessary because, due to how the statewide voter file is administered in Alabama, there is a lag between the date of the election and when counties report voter participation for each voter.[13] The state identified the January 3, 2019 voter file as the snapshot closest to the election with the appropriate voter history data. Such a lag means that voters who died or moved out of state (or otherwise became non-voters) after the election may not be included. Voters who moved and re-registered to vote after the election may now be assigned a different precinct.

28. While this time difference may introduce some small inaccuracies to the count of voters by race in each precinct, these differences are not substantively meaningful. To test for changes in registered voters by race, I compared the percentage of African American and white registered voters in each county, from November 2018 to January 2019, based on registration reports from the Alabama Secretary of State. In every county in the focus area, the demographics of registered voters are essentially the same; the largest change of any racial group in any county was less than 0.25 percentage points.

29. The second challenge in assembling precinct-level data is matching the precincts in the voter file to the precincts in the election returns. For some counties this is a

---

[11] https://www.sos.alabama.gov/alabama-votes/voter/election-data

[12] This file, along with voter snapshot files for the 2012, 2014, and 2016 elections, were provided to me on February 15, 2019. As described below, working with these files and matching the voter registration precincts to the precinct-level election returns is a slow and time-consuming process. Additionally, the file matching precincts in the voter file to precincts in the election returns in some counties, *see supra* n.14, was provided to me on February 19, 2019, and then, too, only for 2018 elections. Consequently, I was only able to assemble data for the 2018 election.

[13] Source: Email from Jim Davis (Alabama Attorney General's Office) to counsel, Feb. 11, 2019: "The voter registration database contains fields for the elections in which a voter has cast a ballot, but that information is not uploaded instantaneously. Local election officials update that information for each election, and it takes several weeks for that to happen. That means that a copy of the database saved the day after the election would not contain the information you requested; we have to go several weeks after the election to be confident that local officials have had enough time to update the voter records."

straightforward task, as the precincts in both data sources use the same names. In other cases names are spelled differently, different abbreviations are used, or precincts are identified using a mix of precinct names and numbers, such that the two data sets must be carefully matched together, one precinct at a time.[14] However, some counties could not be matched because the voter file included only precinct numbers, the election returns included only precinct names, and I did not have a way to match these together.[15] Additionally, there were 20 precincts in the voter file across the other counties that could not be matched because there was not a correspondingly named precinct in the election returns. Finally, I removed an additional 18 precincts from the dataset where the number of voters in the voter file was less than 75% of the number of votes cast for that precinct in the election returns.

30. Overall, I was able to match voter file precincts to election return precincts for more than 90% of the 2018 general election voters from the voter file, and for more than 90% of the ballots cast from the precinct-level election returns. The unmatched areas are demographically similar to those that are matched. 90.4% of Black voters and 90.4% of white voters were matched to their election precinct. Consequently, the unmatched precincts should not bias the results of the ecological inference analysis.

31. Absentee and provisional ballots are recorded at the county level rather than the precinct level. I assigned absentee and provision votes for each candidate to individual precincts based on the precinct's share of the total in-precinct votes cast for that candidate in each county.[16]

32. Figures 3–7 present the results of the precinct-level ecological inference analyses.[17] The first four figures present ecological inference estimates for each congressional district area separately. Figure 7 examines the entire focus area (statewide races only). For each contest examined, the text on the left identifies the candidate of choice for each demographic group.

33. In every election examined, in each congressional district and in the focus area as a whole, both African American and white voters have clearly identifiable candidates of choice, and in all cases African American and white voters cohesively support opposing candidates.

---

[14] Some of the matching was facilitated using a file provided by the defendant that provided precinct names and numbers for some counties.

[15] The following counties could not be matched and are excluded from the precinct-level analysis: Calhoun, Cherokee, Covington, Hale, Henry, Macon, Perry, Russell, Sumter, and Wilcox. Wilcox is excluded because there were a large number of precinct names that did not match between the two files.

[16] Assigning absentee and provisional ballots to precincts has little impact on the ecological inference results; excluding these ballots does not substantively alter my results or conclusions.

[17] Footnote: Tables 3–7 present the numerical estimated displayed in Figures 3–7.

34. The plot to the right in each figure displays the level of support by each group for the African American candidate of choice. The estimated level of support by African American voters is depicted with a black circle, and by white voters with a white circle. The vertical lines to either side of each circle mark the bounds of the 95% confidence intervals, which reflect uncertainty in the estimate.

35. In all cases, African American voters strongly support their candidate of choice, with an average estimated vote share in the focus area of 98.3%. White voters strongly oppose these candidates, with an average estimated vote share in the focus area of only 17.4%.

36. These results demonstrate high levels of racially polarized voting in the focus area and each congressional district individually. The average difference in support for the African American candidate of choice in each district was 78.7 percentage points in CD 1, 85.7 percentage points in CD 2, 81.9 percentage points in CD 3, 77.9 percentage points in CD 7, and 80.9 percentage points in the focus area.

37. Having identified the African American candidate of choice in each contest, I now turn to their ability to win elections in these districts. Table 8 presents the actual results of each election in each of the four congressional districts. For each election, I calculate the vote share obtained by the African American and white-preferred candidates.

38. In the 1st, 2nd, and 3rd Congressional Districts, the African American-preferred candidates lose the elections for U.S. House, as well as all seven statewide contests. In the 7th Congressional District alone, the African-American preferred candidate is able to win each election by large margins.[18]

39. The precinct-level analysis is fully consistent with the results of the county-level analysis. When comparing the racial polarization estimates for the focus area, the two analyses produce similar results and both analyses support the same conclusion: there is a high level of racially polarized voting in the focus area.

[18] The African American candidates of choice won at least 70% of the vote in District 7 in every contest analyzed.



Franklin
Lawrence
Morgan
Marshall
DeKalb
Marion
Winston
Cullman
Cherokee
Etowah
Blount
Lamar
Fayette
Walker
St. Clair
Calhoun
Cleburne
Talladega
Pickens
Shelby
Clay
Randolph
CD 3
Bibb
Coosa
Greene
Chilton
Tallapoosa
Chambers
Hale
Perry
Sumter
Autauga
Elmore
Lee
CD 7
Macon
Dallas
Marengo
Russell
Lowndes
Choctaw
Bullock
Wilcox
Barbour
Pike
Butler
CD 2
Monroe
Henry
Washington
Conecuh
Coffee
Dale
Covington
CD 1
Escambia
Geneva
Houston
Mobile
Baldwin

*Figure 1: Map of Focus Area*

10

Exhibit 79 pg 10 of 30

Caster Plaintiffs' Exhibit 83, Page 11



2012 U.S. President
Black Cand. of Choice: Obama*
White Cand. of Choice: Romney
2012 Supreme Ct., Chief
Black Cand. of Choice: Vance
White Cand. of Choice: Moore
2014 Governor
Black Cand. of Choice: Griffith
White Cand. of Choice: Bentley
2014 Lt. Governor
Black Cand. of Choice: Fields*
White Cand. of Choice: Ivey
2014 Attorney General
Black Cand. of Choice: Hubbard
White Cand. of Choice: Strange
2014 Sec. of State
Black Cand. of Choice: Albert-Kaigler*
White Cand. of Choice: Merrill
2014 State Auditor
Black Cand. of Choice: Joseph*
White Cand. of Choice: Zeigler
2014 Comm. Agriculture
Black Cand. of Choice: Smith
White Cand. of Choice: McMillan
2016 U.S. President
Black Cand. of Choice: Clinton
White Cand. of Choice: Trump
2016 U.S. Senator
Black Cand. of Choice: Crumpton
White Cand. of Choice: Shelby
2017 U.S. Senator
Black Cand. of Choice: Jones
White Cand. of Choice: Moore
2018 Governor
Black Cand. of Choice: Maddox
White Cand. of Choice: Ivey
2018 Lt. Governor
Black Cand. of Choice: Boyd*
White Cand. of Choice: Ainsworth
2018 Attorney General
Black Cand. of Choice: Siegelman
White Cand. of Choice: Marshall
2018 Sec. of State
Black Cand. of Choice: Milam
White Cand. of Choice: Merrill
2018 State Auditor
Black Cand. of Choice: Joseph*
White Cand. of Choice: Zeigler
2018 Supreme Ct., Chief
Black Cand. of Choice: Vance
White Cand. of Choice: Parker
2018 Supreme Ct., Place 4
Black Cand. of Choice: Smalley
White Cand. of Choice: Mitchell
0%
20%
40%
60%
80%
100%
% Voting for Black Candidate of Choice
Black Voters
White Voters

*Figure 2: County-Level Ecological Inference Results*

** indicates African American candidates.*

11

**Exhibit 79 pg 11 of 30**

**Caster Plaintiffs' Exhibit 83, Page 12**



2018 U.S. House
Black Cand. of Choice: Kennedy*
White Cand. of Choice: Byrne
2018 Governor
Black Cand. of Choice: Maddox
White Cand. of Choice: Ivey
2018 Lt. Governor
Black Cand. of Choice: Boyd*
White Cand. of Choice: Ainsworth
2018 Attorney General
Black Cand. of Choice: Siegelman
White Cand. of Choice: Marshall
2018 Sec. of State
Black Cand. of Choice: Milam
White Cand. of Choice: Merrill
2018 State Auditor
Black Cand. of Choice: Joseph*
White Cand. of Choice: Zeigler
2018 Supreme Ct., Chief
Black Cand. of Choice: Vance
White Cand. of Choice: Parker
2018 Supreme Ct., Place 4
Black Cand. of Choice: Smalley
White Cand. of Choice: Mitchell
0%
20%
40%
60%
80%
100%
% Voting for Black Candidate of Choice
Black Voters
White Voters

*Figure 3: 2018 Precinct-Level Ecological Inference Results - CD 1*

** indicates African American candidates.*

12

**Exhibit 79 pg 12 of 30**

**Caster Plaintiffs' Exhibit 83, Page 13**



2018 U.S. House
Black Cand. of Choice: Isner
White Cand. of Choice: Roby
2018 Governor
Black Cand. of Choice: Maddox
White Cand. of Choice: Ivey
2018 Lt. Governor
Black Cand. of Choice: Boyd*
White Cand. of Choice: Ainsworth
2018 Attorney General
Black Cand. of Choice: Siegelman
White Cand. of Choice: Marshall
2018 Sec. of State
Black Cand. of Choice: Milam
White Cand. of Choice: Merrill
2018 State Auditor
Black Cand. of Choice: Joseph*
White Cand. of Choice: Zeigler
2018 Supreme Ct., Chief
Black Cand. of Choice: Vance
White Cand. of Choice: Parker
2018 Supreme Ct., Place 4
Black Cand. of Choice: Smalley
White Cand. of Choice: Mitchell
0%
20%
40%
60%
80%
100%
% Voting for Black Candidate of Choice
Black Voters
White Voters

*Figure 4: 2018 Precinct-Level Ecological Inference Results - CD 2*

** indicates African American candidates.*

13

Exhibit 79 pg 13 of 30

Caster Plaintiffs' Exhibit 83, Page 14



2018 U.S. House
Black Cand. of Choice: Hagan
White Cand. of Choice: Rogers
2018 Governor
Black Cand. of Choice: Maddox
White Cand. of Choice: Ivey
2018 Lt. Governor
Black Cand. of Choice: Boyd*
White Cand. of Choice: Ainsworth
2018 Attorney General
Black Cand. of Choice: Siegelman
White Cand. of Choice: Marshall
2018 Sec. of State
Black Cand. of Choice: Milam
White Cand. of Choice: Merrill
2018 State Auditor
Black Cand. of Choice: Joseph*
White Cand. of Choice: Zeigler
2018 Supreme Ct., Chief
Black Cand. of Choice: Vance
White Cand. of Choice: Parker
2018 Supreme Ct., Place 4
Black Cand. of Choice: Smalley
White Cand. of Choice: Mitchell
0%
20%
40%
60%
80%
100%
% Voting for Black Candidate of Choice
Black Voters
White Voters

*Figure 5: 2018 Precinct-Level Ecological Inference Results - CD 3*

** indicates African American candidates.*

14

**Exhibit 79 pg 14 of 30**

**Caster Plaintiffs' Exhibit 83, Page 15**



2018 Governor
Black Cand. of Choice: Maddox
White Cand. of Choice: Ivey
2018 Lt. Governor
Black Cand. of Choice: Boyd*
White Cand. of Choice: Ainsworth
2018 Attorney General
Black Cand. of Choice: Siegelman
White Cand. of Choice: Marshall
2018 Sec. of State
Black Cand. of Choice: Milam
White Cand. of Choice: Merrill
2018 State Auditor
Black Cand. of Choice: Joseph*
White Cand. of Choice: Zeigler
2018 Supreme Ct., Chief
Black Cand. of Choice: Vance
White Cand. of Choice: Parker
2018 Supreme Ct., Place 4
Black Cand. of Choice: Smalley
White Cand. of Choice: Mitchell
0%
20%
40%
60%
80%
100%
% Voting for Black Candidate of Choice
Black Voters
White Voters

*Figure 6: 2018 Precinct-Level Ecological Inference Results - CD 7*

** indicates African American candidates.*

15

Exhibit 79 pg 15 of 30

Caster Plaintiffs' Exhibit 83, Page 16



2018 Governor
Black Cand. of Choice: Maddox
White Cand. of Choice: Ivey
2018 Lt. Governor
Black Cand. of Choice: Boyd*
White Cand. of Choice: Ainsworth
2018 Attorney General
Black Cand. of Choice: Siegelman
White Cand. of Choice: Marshall
2018 Sec. of State
Black Cand. of Choice: Milam
White Cand. of Choice: Merrill
2018 State Auditor
Black Cand. of Choice: Joseph*
White Cand. of Choice: Zeigler
2018 Supreme Ct., Chief
Black Cand. of Choice: Vance
White Cand. of Choice: Parker
2018 Supreme Ct., Place 4
Black Cand. of Choice: Smalley
White Cand. of Choice: Mitchell
0%
20%
40%
60%
80%
100%
% Voting for Black Candidate of Choice
Black Voters
White Voters

*Figure 7: 2018 Precinct-Level Ecological Inference Results - Focus Area*

** indicates African American candidates.*

16

**Exhibit 79 pg 16 of 30**

**Caster Plaintiffs' Exhibit 83, Page 17**

*Table 1: County-Level Ecological Inference Results*

| Year | Election | Black Cand. of Choice | White Cand. of Choice | % Voting for Black Candidate of Choice: Black | White | Other |
|---|---|---|---|---|---|---|
| 2012 | U.S. President | Obama* | Romney | 96.7 (92.8, 99.0) | 14.7 (12.8, 17.3) | 62.7 (30.6, 91.8) |
| | Supreme Ct., Chief | Vance | Moore | 95.5 (90.8, 98.9) | 29.1 (26.8, 31.9) | 55.6 (25.3, 85.1) |
| 2014 | Governor | Griffith | Bentley | 87.1 (81.6, 93.1) | 16.4 (13.1, 19.4) | 53.4 (20.8, 84.4) |
| | Lt. Governor | Fields* | Ivey | 93.5 (88.3, 97.1) | 10.6 ( 8.2, 13.3) | 55.8 (12.6, 87.1) |
| | Attorney General | Hubbard | Strange | 94.3 (85.5, 98.4) | 19.6 (16.5, 24.8) | 52.8 (19.4, 85.4) |
| | Sec. of State | Albert-Kaigler* | Merrill | 95.6 (91.8, 98.2) | 8.8 ( 7.1, 11.2) | 60.5 (24.6, 86.2) |
| | State Auditor | Joseph* | Zeigler | 94.0 (88.0, 98.1) | 11.8 ( 8.4, 16.0) | 55.1 (22.6, 87.1) |
| | Comm. Agriculture | Smith | McMillan | 94.1 (88.1, 97.3) | 9.1 ( 6.8, 12.8) | 57.9 (21.7, 85.6) |
| 2016 | U.S. President | Clinton | Trump | 94.6 (89.7, 98.3) | 12.2 ( 9.8, 15.2) | 57.1 (25.8, 82.3) |
| | U.S. Senator | Crumpton | Shelby | 88.4 (84.7, 92.2) | 15.2 (12.6, 17.8) | 68.8 (34.9, 90.5) |
| 2017 | U.S. Senator | Jones | Moore | 95.4 (91.1, 98.4) | 33.7 (31.5, 36.4) | 57.4 (25.3, 86.9) |
| 2018 | Governor | Maddox | Ivey | 93.9 (88.5, 97.5) | 17.8 (15.2, 20.5) | 65.1 (28.8, 93.7) |
| | Lt. Governor | Boyd* | Ainsworth | 97.1 (94.7, 98.9) | 13.6 (12.1, 15.5) | 71.1 (35.7, 92.8) |
| | Attorney General | Siegelman | Marshall | 91.7 (84.3, 98.7) | 21.6 (16.2, 26.4) | 63.0 (31.0, 88.2) |
| | Sec. of State | Milam | Merrill | 96.0 (93.2, 98.4) | 14.0 (12.3, 15.9) | 74.4 (44.7, 93.2) |
| | State Auditor | Joseph* | Zeigler | 94.2 (88.7, 98.8) | 16.9 (13.5, 20.3) | 65.3 (34.0, 90.4) |
| | Supreme Ct., Chief | Vance | Parker | 96.3 (92.8, 98.8) | 20.2 (18.5, 22.3) | 67.8 (37.7, 90.2) |
| | Supreme Ct., Place 4 | Smalley | Mitchell | 95.1 (90.5, 98.2) | 15.5 (13.2, 18.3) | 71.4 (43.3, 91.7) |

*Table 2: Actual Election Results*

* indicates African American candidates

| Contest | Black Preferred Cand. | | White Preferred Cand. | |
|---|---|---|---|---|
| | Name | Vote Share | Name | Vote Share |
| 2012 U.S. President | Obama* | 43.9 | Romney | 56.1 |
| 2012 Supreme Ct., Chief | Vance | 52.5 | Moore | 47.5 |
| 2014 Governor | Griffith | 41.8 | Bentley | 58.2 |
| 2014 Lt. Governor | Fields* | 40.9 | Ivey | 59.1 |
| 2014 Attorney General | Hubbard | 46.8 | Strange | 53.2 |
| 2014 Sec. of State | Albert-Kaigler* | 40.5 | Merrill | 59.5 |
| 2014 State Auditor | Joseph* | 41.6 | Zeigler | 58.4 |
| 2014 Comm. Agriculture | Smith | 40.1 | McMillan | 59.9 |
| 2016 U.S. President | Clinton | 41.4 | Trump | 58.6 |
| 2016 U.S. Senator | Crumpton | 41.0 | Shelby | 59.0 |
| 2017 U.S. Senator | Jones | 56.0 | Moore | 44.0 |
| 2018 Governor | Maddox | 45.4 | Ivey | 54.6 |
| 2018 Lt. Governor | Boyd* | 44.0 | Ainsworth | 56.0 |
| 2018 Attorney General | Siegelman | 46.4 | Marshall | 53.6 |
| 2018 Sec. of State | Milam | 44.2 | Merrill | 55.8 |
| 2018 State Auditor | Joseph* | 44.7 | Zeigler | 55.3 |
| 2018 Supreme Ct., Chief | Vance | 47.8 | Parker | 52.2 |
| 2018 Supreme Ct., Place 4 | Smalley | 44.5 | Mitchell | 55.5 |

*Table 3: 2018 Precinct-Level Ecological Inference Results - CD 1*

* indicates African American candidates

| Election | Black Cand. of Choice | White Cand. of Choice | % Voting for Black Candidate of Choice | | |
|---|---|---|---|---|---|
| | | | Black | White | Other |
| U.S. House | Kennedy* | Byrne | 96.5 (94.5, 97.9) | 15.2 (14.4, 16.0) | 70.8 (51.8, 86.6) |
| Governor | Maddox | Ivey | 95.6 (93.5, 97.2) | 18.7 (17.8, 19.7) | 73.2 (50.3, 89.3) |
| Lt. Governor | Boyd* | Ainsworth | 96.6 (94.5, 98.0) | 16.2 (15.4, 17.1) | 71.6 (49.3, 89.4) |
| Attorney General | Siegelman | Marshall | 96.9 (95.1, 98.2) | 19.7 (19.0, 20.5) | 77.3 (59.5, 90.3) |
| Sec. of State | Milam | Merrill | 96.4 (94.5, 97.9) | 16.5 (15.8, 17.4) | 74.8 (53.6, 89.2) |
| State Auditor | Joseph* | Zeigler | 96.6 (94.6, 98.0) | 17.4 (16.6, 18.3) | 73.3 (52.9, 88.3) |
| Supreme Ct., Chief | Vance | Parker | 96.7 (94.7, 98.1) | 22.0 (21.3, 22.9) | 77.1 (59.4, 91.6) |
| Supreme Ct., Place 4 | Smalley | Mitchell | 96.9 (95.0, 98.2) | 16.7 (16.0, 17.6) | 74.8 (53.0, 89.2) |

*Table 4: 2018 Precinct-Level Ecological Inference Results - CD 2*

* indicates African American candidates

| Election | Black Cand. of Choice | White Cand. of Choice | % Voting for Black Candidate of Choice | | |
|---|---|---|---|---|---|
| | | | Black | White | Other |
| U.S. House | Isner | Roby | 97.5 (96.4, 98.4) | 13.8 (13.2, 14.5) | 79.2 (62.9, 90.4) |
| Governor | Maddox | Ivey | 96.9 (95.6, 97.9) | 10.0 (9.3, 10.7) | 80.0 (62.1, 91.8) |
| Lt. Governor | Boyd* | Ainsworth | 97.5 (96.4, 98.3) | 9.8 (9.2, 10.4) | 86.3 (71.0, 94.9) |
| Attorney General | Siegelman | Marshall | 97.6 (96.5, 98.5) | 14.6 (13.9, 15.3) | 78.4 (60.3, 90.0) |
| Sec. of State | Milam | Merrill | 97.5 (96.4, 98.3) | 10.1 (9.6, 10.8) | 83.3 (68.9, 92.7) |
| State Auditor | Joseph* | Zeigler | 97.5 (96.4, 98.3) | 11.5 (10.9, 12.1) | 83.4 (70.6, 92.1) |
| Supreme Ct., Chief | Vance | Parker | 97.4 (96.1, 98.3) | 14.1 (13.5, 14.8) | 81.8 (66.6, 92.2) |
| Supreme Ct., Place 4 | Smalley | Mitchell | 97.6 (96.5, 98.4) | 10.4 (9.9, 11.0) | 86.0 (73.4, 93.8) |

*Table 5: 2018 Precinct-Level Ecological Inference Results - CD 3*

* indicates African American candidates.

| Election | Black Cand. of Choice | White Cand. of Choice | % Voting for Black Candidate of Choice | | |
|---|---|---|---|---|---|
| | | | Black | White | Other |
| U.S. House | Hagan | Rogers | 96.7 (94.7, 98.1) | 14.2 (13.6, 15.0) | 82.5 (64.4, 93.4) |
| Governor | Maddox | Ivey | 96.3 (94.0, 97.9) | 14.9 (14.2, 15.8) | 76.8 (55.3, 91.0) |
| Lt. Governor | Boyd* | Ainsworth | 97.1 (95.0, 98.4) | 13.3 (12.7, 14.0) | 83.2 (65.9, 93.7) |
| Attorney General | Siegelman | Marshall | 96.7 (94.6, 98.2) | 16.0 (15.3, 16.9) | 79.0 (55.9, 92.8) |
| Sec. of State | Milam | Merrill | 97.2 (95.4, 98.5) | 13.9 (13.2, 14.6) | 80.7 (62.1, 93.0) |
| State Auditor | Joseph* | Zeigler | 96.6 (94.7, 98.1) | 14.4 (13.7, 15.2) | 80.1 (60.4, 92.2) |
| Supreme Ct., Chief | Vance | Parker | 96.6 (94.4, 98.1) | 18.3 (17.5, 19.2) | 77.7 (54.9, 92.0) |
| Supreme Ct., Place 4 | Smalley | Mitchell | 97.1 (95.2, 98.4) | 14.1 (13.4, 14.9) | 81.4 (61.3, 93.6) |

*Table 6: 2018 Precinct-Level Ecological Inference Results - CD 7*

* indicates African American candidates.

| Election | Black Cand. of Choice | White Cand. of Choice | % Voting for Black Candidate of Choice | | |
|---|---|---|---|---|---|
| | | | Black | White | Other |
| Governor | Maddox | Ivey | 97.5 (96.8, 98.2) | 22.2 (20.0, 24.5) | 49.5 (31.5, 70.7) |
| Lt. Governor | Boyd* | Ainsworth | 98.7 (98.1, 99.1) | 18.7 (17.0, 20.6) | 70.4 (59.1, 82.0) |
| Attorney General | Siegelman | Marshall | 98.7 (98.1, 99.1) | 22.6 (20.9, 24.6) | 74.7 (64.2, 85.0) |
| Sec. of State | Milam | Merrill | 98.7 (98.1, 99.1) | 18.0 (16.3, 19.8) | 70.8 (58.9, 83.1) |
| State Auditor | Joseph* | Zeigler | 98.6 (98.1, 99.0) | 19.0 (17.4, 20.9) | 69.0 (58.0, 80.0) |
| Supreme Ct., Chief | Vance | Parker | 98.7 (98.2, 99.1) | 23.8 (22.0, 25.8) | 80.1 (69.9, 90.1) |
| Supreme Ct., Place 4 | Smalley | Mitchell | 98.7 (98.2, 99.1) | 20.0 (18.4, 21.8) | 75.9 (66.3, 85.0) |

*Table 7: 2018 Precinct-Level Ecological Inference Results - Focus Area*
* indicates African American candidates.

| Election | Black Cand. of Choice | White Cand. of Choice | % Voting for Black Candidate of Choice | | |
|---|---|---|---|---|---|
| | | | Black | White | Other |
| Governor | Maddox | Ivey | 97.0 (96.4, 97.5) | 18.0 (17.6, 18.4) | 88.3 (80.3, 93.4) |
| Lt. Governor | Boyd* | Ainsworth | 98.4 (98.0, 98.7) | 15.4 (15.0, 15.7) | 87.1 (80.1, 91.9) |
| Attorney General | Siegelman | Marshall | 98.8 (98.4, 99.1) | 18.9 (18.5, 19.2) | 88.0 (81.7, 93.0) |
| Sec. of State | Milam | Merrill | 98.4 (98.1, 98.8) | 15.5 (15.1, 15.8) | 86.9 (80.8, 92.1) |
| State Auditor | Joseph* | Zeigler | 98.3 (97.9, 98.7) | 16.4 (16.1, 16.8) | 87.9 (82.3, 92.4) |
| Supreme Ct., Chief | Vance | Parker | 98.5 (98.1, 98.9) | 21.2 (20.8, 21.6) | 89.5 (84.6, 93.3) |
| Supreme Ct., Place 4 | Smalley | Mitchell | 98.5 (98.1, 98.8) | 16.1 (15.8, 16.5) | 89.4 (84.5, 93.2) |

*Table 8: 2018 Election Results by Congressional District*

| Contest | Black Pref. Cand. | White Pref. Cand. | CD 1 | | CD 2 | | CD 3 | | CD 7 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Black | White | Black | White | Black | White | Black | White |
| U.S. House, Dist. 1 | Kennedy* | Byrne | 36.8 | 63.2 | | | | | | |
| U.S. House, Dist. 2 | Isner | Roby | | | 37.6 | 62.4 | | | | |
| U.S. House, Dist. 3 | Hagan | Rogers | | | | | 35.9 | 64.1 | | |
| Governor | Maddox | Ivey | 39.3 | 60.7 | 34.9 | 65.1 | 36.2 | 63.8 | 71.8 | 28.2 |
| Lt. Governor | Boyd* | Ainsworth | 37.6 | 62.4 | 34.9 | 65.1 | 35.4 | 64.6 | 71.4 | 28.6 |
| Attorney General | Siegelman | Marshall | 40.2 | 59.8 | 38.1 | 61.9 | 37.2 | 62.8 | 72.7 | 27.3 |
| Sec. of State | Milam | Merrill | 37.8 | 62.2 | 35.1 | 64.9 | 35.6 | 64.4 | 71.2 | 28.8 |
| State Auditor | Joseph* | Zeigler | 38.5 | 61.5 | 35.9 | 64.1 | 35.9 | 64.1 | 71.5 | 28.5 |
| Supreme Ct., Chief | Vance | Parker | 41.8 | 58.2 | 37.5 | 62.5 | 38.7 | 61.3 | 73.3 | 26.7 |
| Supreme Ct., Place 4 | Smalley | Mitchell | 38.0 | 62.0 | 35.3 | 64.7 | 35.8 | 64.2 | 71.9 | 28.1 |

This table lists the vote shares received by the Black- and white-preferred candidates in each 2018 election contest by congressional district. The second and third columns identify the preferred candidates of each group, which are the same in each congressional district. The following columns list the vote shares received by the black- and white-preferred candidates in each district. Precincts split between multiple congressional districts are excluded. All of Cherokee County is included in CD 3. * indicates African American candidates.

# Maxwell Palmer

CONTACT

Department of Political Science
Boston University
232 Bay State Road
Boston, MA 02215

*E-mail:* mbpalmer@bu.edu
*Website:* www.maxwellpalmer.com
*Phone:* (617) 358-2654

APPOINTMENTS

**Boston University**, Boston, Massachusetts

Assistant Professor, Department of Political Science, 2014–Present

Junior Faculty Fellow, Hariri Institute for Computing, 2017–Present

EDUCATION

**Harvard University**, Cambridge, Massachusetts

Ph.D., Political Science, May 2014.

A.M., Political Science, May 2012.

**Bowdoin College**, Brunswick, Maine

A.B., Mathematics & Government and Legal Studies, May 2008.

REFEREED PUBLICATIONS

Palmer, Maxwell and Benjamin Schneer. Forthcoming. "Post-Political Careers: How Politicians Capitalize on Public Office." *Journal of Politics.*

Einstein, Katherine Levine, Maxwell Palmer, and David M. Glick. 2019. "Who Participates in Local Government? Evidence from Meeting Minutes." *Perspectives on Politics* 17(1): 28–46.

Einstein, Katherine Levine, David M. Glick, and Maxwell Palmer. 2019. "City Learning: Evidence of Policy Information Diffusion From a Survey of U.S. Mayors." *Political Research Quarterly* 72(1): 243–258.

Einstein, Katherine Levine, David M. Glick, Maxwell Palmer, and Robert Pressel. Forthcoming. "Do Mayors Run for Higher Office? New Evidence on Progressive Ambition." *American Politics Research.*

Ansolabehere, Stephen, Maxwell Palmer and Benjamin Schneer. 2018. "Divided Government and Significant Legislation, A History of Congress from 1789-2010." *Social Science History* 42(1): 81–108.

Edwards, Barry, Michael Crespin, Ryan D. Williamson, and Maxwell Palmer. 2017. "Institutional Control of Redistricting and the Geography of Representation." *Journal of Politics* 79(2): 722–726.

Palmer, Maxwell. 2016. "Does the Chief Justice Make Partisan Appointments to Special Courts and Panels?" *Journal of Empirical Legal Studies* 13(1): 153–177.

Palmer, Maxwell and Benjamin Schneer. 2016. "Capitol Gains: The Returns to Elected Office from Corporate Board Directorships." *Journal of Politics* 78(1): 181–196.

Gerring, John, Maxwell Palmer, Jan Teorell, and Dominic Zarecki. 2015. "Demography and Democracy: A Global, District-level Analysis of Electoral Contestation." *American Political Science Review* 109(3): 574–591.

**Book Manuscript**

*Neighborhood Defenders: Participatory Politics and America's Housing Crisis* (with Katherine Levine Einstein and David M. Glick). Under Contract, Cambridge University Press.

**Other Publications**

Ansolabehere, Stephen and Maxwell Palmer. 2016. "A Two Hundred-Year Statistical History of the Gerrymander." *Ohio State Law Journal* 77(4): 741–762.

Ansolabehere, Stephen, Maxwell Palmer, and Benjamin Schneer. 2016. "What Has Congress Done?" in *Governing in a Polarized Age: Elections, Parties, and Political Representation in America*, eds. Alan Gerber and Eric Schickler. New York, NY: Cambridge University Press.

**Policy Reports**

Einstein, Katherine Levine, David Glick, and Maxwell Palmer. 2018. "2017 Menino Survey of Mayors." Research Report. Boston University Initiative on Cities.

**Working Papers**

"Rainmakers: Former Politicians as Lobbyists" (with Pamela Ban and Benjamin Schneer). Invited to Revise and Resubmit, *Legislative Studies Quarterly.*

"Racial Disparities in Housing Politics: Evidence from Administrative Data" (with Katherine Levine Einstein and David M. Glick). *Under Review.*

"The Gender Pay Gap in Congressional Offices" (with Joshua McCrain).

"Descended from Immigrants and Revolutionists: How Immigrant Experience Shapes Congressional Decision-making on Immigration Votes" (with James Feigenbaum and Benjamin Schneer).

"Reexamining the Gender Gap in Support of War" (with Katherine Krimmel and Douglas Kriner).

"Corporate Political Activity as a Bundle of Goods" (with Daniel Moskowitz and Benjamin Schneer).

**Grants and Awards**

The Rockefeller Foundation, "Menino Survey of Mayors" (Co-principal investigator). 2017. $325,000.

Hariri Institute for Computing, Boston University. Junior Faculty Fellow. 2017.

$10,000.

The Rockefeller Foundation, "2017 Menino Survey of Mayors" (Co-principal investigator). 2017. $100,000.

The Center for Finance, Law, and Policy, Boston University, Research Grant for "From the Capitol to the Boardroom: The Returns to Office from Corporate Board Directorships," 2015.

Senator Charles Sumner Prize, Dept. of Government, Harvard University. 2014.

*Awarded to the best dissertation "from the legal, political, historical, economic, social or ethnic approach, dealing with means or measures tending toward the prevention of war and the establishment of universal peace."*

The Center for American Political Studies, Dissertation Research Fellowship on the Study of the American Republic, 2013–2014.

The Tobin Project, Democracy and Markets Graduate Student Fellowship, 2013–2014.

The Dirksen Congressional Center, Congressional Research Award, 2013.

The Institute for Quantitative Social Science, Conference Travel Grant, 2014.

The Center for American Political Studies, Graduate Seed Grant for "Capitol Gains: The Returns to Elected Office from Corporate Board Directorships," 2014.

The Institute for Quantitative Social Science, Research Grant, 2013.

Bowdoin College: High Honors in Government and Legal Studies; Philo Sherman Bennett Prize for Best Honors Thesis in the Department of Government, 2008.

SELECTED PRESENTATIONS

"The Participatory Politics of Housing," Government Accountability Office Seminar, 2018.

"Descended from Immigrants and Revolutionists: How Immigrant Experience Shapes Immigration Votes in Congress," Congress and History Conference, Princeton University, 2018.

"Identifying Gerrymanders at the Micro- and Macro-Level." Hariri Institute for Computing, Boston University, 2018.

"Descended from Immigrants and Revolutionists: How Immigrant Experience Shapes Immigration Votes in Congress," Annual Meeting of the Southern Political Science Association, New Orleans, LA, 2018.

"How Institutions Enable NIMBYism and Obstruct Development," Boston Area Research Initiative Spring Conference, Northeastern University, 2017.

"Corporate Political Activity as a Bundle of Goods," Annual Meeting of the American Political Science Association, Philadelphia, PA, 2016.

"Congressional Gridlock," American Studies Summer Institute, John F. Kennedy Presidential Library and Museum, 2016.

"Capitol Gains: The Returns to Elected Office from Corporate Board Directorships," Microeconomics Seminar, Department of Economics, Boston University, 2015.

"The Corporate Boardroom's Revolving Door," Annual Meeting of the American Political Science Association, San Francisco, CA, 2015.

"The Corporate Boardroom's Revolving Door," Annual Meeting of the European Political Science Association, Vienna, Austria, 2015.

"A Two Hundred-Year Statistical History of the Gerrymander," Congress and History Conference, Vanderbilt University, 2015.

"A New (Old) Standard for Geographic Gerrymandering," Harvard Ash Center Workshop: How Data is Helping Us Understand Voting Rights After Shelby County, 2015.

"Capitol Gains: The Returns to Elected Office from Corporate Board Directorships," Boston University Center for Finance, Law, and Policy, 2015.

"Does the Chief Justice Make Partisan Appointments to Special Courts and Panels?" Annual Meeting of the American Political Science Association, Washington, DC, 2014.

"Capitol Gains: The Returns to Elected Office from Corporate Board Directorships," Annual Meeting of the Midwest Political Science Association, Chicago, IL, 2014.

"Capitol Gains: The Returns to Elected Office from Corporate Board Directorships," Bowdoin College, 2014.

"Corporate Boards as Legislatures," Annual Meeting of the Southern Political Science Association, New Orleans, LA, 2014.

"Presidential Legacies and Partisan Balance on the Federal Courts," Annual Meeting of the Southern Political Science Association, New Orleans, LA, 2014.

"Time and Political Power: Setting the Calendar in a Busy Legislature," Annual Meeting of the Midwest Political Science Association, Chicago, IL, 2013.

"Using Multiple Elections to Evaluate Districting Maps," Annual Meeting of the Midwest Political Science Association, Chicago, IL, 2012.

Exhibit 79 pg 29 of 30

Caster Plaintiffs' Exhibit 83, Page 30

TEACHING

Boston Univeristy

- *Introduction to American Politics* (Fall 2014, Fall 2015, Fall 2016, Fall 2017)
- *Congress and Its Critics* (Fall 2014, Spring 2015, Spring 2017)
- *Formal Political Theory* (Spring 2015, Spring 2017)
- *Prohibition, Regulation, and Bureaucracy* (Fall 2015)
- *Political Analysis* (Fall 2016, Fall 2017)

Harvard University

- *American Government* (Head Teaching Fellow, Fall 2012 and Fall 2013)
- *The Politics of Congress* (Head Teaching Fellow, Spring 2013).
- *Introduction to Congress* (Teaching Fellow, Spring 2012).

SERVICE

Boston University

- College of Arts and Sciences
  - General Education Curriculum Committee, 2017–2018.
- Department of Political Science
  - Co-organizer, Research in American Politics Workshop, 2016–2018.
  - American Politics Search Committee, 2017.
  - American Politics Search Committee, 2016.
  - Graduate Program Committee, 2014–2015.

Co-organizer, *Boston University Local Political Economy Conference*, August 29, 2018.

Reviewer: *American Journal of Political Science*; *American Political Science Review*; *Journal of Politics*; *Quarterly Journal of Political Science*; *Political Analysis*; *Public Choice*; *Political Science Research and Methods*; *Journal of Law, Economics and Organization*; *Election Law Journal*; *Applied Geography*; Cambridge University Press; Oxford University Press.

Coordinator, Harvard Election Data Archive, 2011–2014.

OTHER EXPERIENCE

**Charles River Associates**, Boston, Massachusetts 2008–2010

*Associate, Energy & Environment Practice*
Economic consulting in the energy sector for electric and gas utilities, private equity, and electric generation owners. Specialized in Financial Modeling, Resource Planning, Regulatory Support, Price Forecasting, and Policy Analysis.

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

LAKEISHA CHESTNUT, an individual; MARLENE MARTIN, an individual; BOBBY DUBOSE, an individual; RODNEY LOVE, an individual; KAREN JONES, an individual; JANICE WILLIAMS, an individual; RODERICK CLARK, an individual; JOHN HARRIS, an individual,
Plaintiffs,

vs.

JOHN H. MERRILL, in his official capacity as Alabama Secretary of State,
Defendant.

2:18-cv-00907-KOB
November 4, 2019
Birmingham, Alabama
9:00 a.m.

***********************************

TRANSCRIPT OF BENCH TRIAL
VOLUME I
BEFORE THE HONORABLE KARON O. BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE

FOR THE PLAINTIFFS:
Abha Khanna, Esq.
PERKINS COIE LLP
1201 Third Avenue
Suite 4900
Seattle, Washington 98101
(206) 359-9000

Bruce V. Spiva, Esq.
PERKINS COIE LLP
700 13th Street, NW
Suite 600
Washington, DC 20005
(202) 654-6338

***CHRISTINA K. DECKER, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 1**

2

Richard P. Rouco, Esq.
QUINN CONNOR WEAVER DAVIES & ROUCO LLP
2 20th Street North
Suite 930
Birmingham, Alabama 35203
(205) 870-9989

Daniel C. Osher, Esq.
PERKINS COIE LLP
700 13th Street NW
Suite 600
Washington, DC 20005
(202) 654-6338

Lalitha D. Madduri, Esq.
PERKINS COIE LLP
700 13th Street NW
Suite 600
Washington, DC 20005
(202) 654-6322

FOR THE DEFENDANT:
James W. Davis, Esq.
Laura E. Howell, Esq.
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
(334) 242-7300

J. Dorman Walker, Esq.
BALCH & BINGHAM LLP
P.O. Box 78
Montgomery, Alabama 36101
(334) 834-6500

COURTROOM DEPUTY: Sarah Hollingsworth

COURT REPORTER: Christina K. Decker, RMR, CRR

Proceedings recorded by OFFICIAL COURT REPORTER, Qualified pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies and Procedures Vol. VI, Chapter III, D.2. Transcript produced by computerized stenotype.

***CHRISTINA K. DECKER, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 2**

3

**I N D E X**

WILLIAM COOPER 5
DIRECT EXAMINATION 5
BY MR. SPIVA
CROSS-EXAMINATION 108
BY MR. WALKER
REDIRECT EXAMINATION 137
BY MR. SPIVA

MAXWELL PALMER 141
DIRECT EXAMINATION 142
BY MS. KHANNA
CROSS-EXAMINATION 183
BY MR. DAVIS
REDIRECT EXAMINATION 203
BY MS. KHANNA
RECROSS-EXAMINATION 208
BY MR. DAVIS
FURTHER REDIRECT EXAMINATION 210
BY MS. KHANNA

KAREN JONES 211
DIRECT EXAMINATION 212
BY MR. OSHER
CROSS-EXAMINATION 238
BY MS. HOWELL
REDIRECT EXAMINATION 246
BY MR. OSHER

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 3**

4

**P R O C E E D I N G S**

(In open court.)

THE COURT: You may be seated.

As I stated informally this morning, I think I'm fairly familiar with the issues in the case based upon the excellent briefs that were submitted for pretrial, so we can dispense with any preliminary opening statements. So plaintiff may call your first witness.

09:13:26

MR. SPIVA: Thank you, Your Honor.

I wanted to introduce to the Court my colleagues here. I think you might have met most of them, but beside me is my partner Abha Khanna; my colleague, Lalitha Madduri; Dan Osher also my colleague; and our -- I know you of course know Richard Rouco, our co-counsel.

09:13:47

THE COURT: Yes. Yes.

09:14:03

MR. SPIVA: We call as our first witness, Your Honor, Bill Cooper, William Cooper.

THE COURT: Okay.

MR. SPIVA: Your Honor, just FYI, we have put some exhibit books up on your -- up at the podium -- not the podium, forgetting the word, but, yeah.

09:14:24

THE COURT: Those big ones over there with a few little exhibits?

MR. SPIVA: A few little. But I think we're mainly going to be in Volume 1. And we will also put them up on the

09:14:38

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 4**

5

screen when we're discussing them. So if Your Honor is fine with that...

THE COURT: I certainly am. I do like to have my own copy so that I can highlight them and mark them as -- to make it easier to go back and find what I may be looking for.

MR. SPIVA: Sure. Sure. I totally understand. So I think we'll be mainly in the Volume 1 of the paper copy this morning.

THE COURT: Okay. All right. Good.

All right.

WILLIAM COOPER,

having been first duly sworn by the courtroom deputy clerk, was examined and testified as follows:

THE COURTROOM DEPUTY CLERK: Will you please state your name in the microphone for the record?

THE WITNESS: My name is William S. Cooper.

DIRECT EXAMINATION

BY MR. SPIVA:

Q Good morning, Mr. Cooper. I won't ask you to state your full name for the record because you just did that.

You have been retained as an expert for the plaintiffs in this case; is that right?

A That is correct.

Q And have you prepared a declaration or declarations in connection with your retention as an expert?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 5**

A I have.

Q Let me turn your attention to Plaintiffs' Exhibit 1. And if we can pull that up on the screen. And if you can take a look in your notebook, Mr. Cooper.

09:16:11 Is that the first declaration that you prepared in this case?

A Yes.

Q And let me ask you to turn to page 3 --

MR. WALKER: May I interrupt you for a second? We're

09:16:31 not getting -- oh, okay. I'm sorry.

MR. SPIVA: Technical difficulties.

THE COURT: A little small delay there. It's normal.

BY MR. SPIVA:

Q And, actually, you know what? I kind of jumped the gun, I

09:16:45 think, on the screen anyhow because I want to ask you a couple more general questions before we actually turn to the report.

Let's start with a little bit about your background. What is your profession, Mr. Cooper?

A I provide -- I'm a private consultant. And I provide

09:17:00 technical assistance to various organizations here and there around the country focusing primarily on computer mapping and analysis, socioeconomic data, both spatially and tabular data.

So a lot of my work is related to redistricting, but I have also provided assistance to other projects. For example,

09:17:26 every year I work on a nationwide project with the Food

7

Research and Action Center to identify areas with high percentages of children who live in poverty who would qualify for the summer food program or child care food program sponsored by the U.S. Department of Agriculture. So that's sort of a nationwide project.

09:17:44

Q Okay. And, Mr. Cooper, just -- I'll just ask you if you can slow down just a little bit because the court reporter is trying to get everything down. And I know you have a tendency sometimes to start speaking a little bit quickly. So you're doing fine, but just to remember that.

09:17:58

Would you say that you are a Geographic Information Systems consultant, Mr. Cooper?

A Yes, in terms of the application of the GIS software. I don't design or develop the underlying code.

09:18:16

Q And how long have you been doing that?

A Basically since the mid '80s, late '80s, really, was about the time that the first kinds of GIS software were available to run off a personal computer, which is what I use.

Q And what is the area of expertise that you applied in this case?

09:18:43

A I was specifically asked to determine whether or not it would be possible to draw a congressional redistricting plan in Alabama that would allow for two majority black congressional districts out of seven, while at the same time adhering to what are known as traditional redistricting principles.

09:19:05

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 7**

8

Q And in doing that, did you apply your expertise in redistricting and census data?
A Yes.
Q Have you served as an expert witness in cases involving redistricting before?
09:19:20 A I have. I've testified probably in close to 40 cases in person, and primarily in Section 2 cases. There have been a handful of cases that were not strictly Section 2 cases where I've testified that involved voting districts. And probably in 09:19:44 another 40 I've submitted declarations, but in those cases for one reason or another the case did not advance to a full-fledged trial.
Q And have you served as an expert in Alabama previously?
A I have. I was the plaintiffs' expert in the Alabama 09:20:03 Legislative Black Caucus case that was finally decided in terms of remedial plans in 2017. I first began working on that case I think in the summer of 2012. I've -- and I testified in that particular case.
I also testified here in this very courtroom in 2016 in a 09:20:29 school de-annexation case involving Jefferson County and the proposed new school system that would have been in Gardendale. And I was working with the legal defense fund as the plaintiffs' expert in that case, which was a school desegregation case going back 50 years actually.
09:20:49 Q And have you -- did you also testify in the *Alabama State*

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 8**

9

*Conference of the NAACP vs. Alabama*, which I think oftentimes is referred to as the "Judges Case"?

A Yes. I testified in that case in Montgomery, Alabama, exactly one year ago today. This first part of November was when that trial was held last year.

Q And what did that case involve? What did your testimony in that case involve?

A Again, I was a GIS expert. So I prepared a set of illustrative plans for the plaintiffs for the State Supreme Court, a nine-district configuration, and an eight-district configuration, with one at-large chief judge would be elected at large under those illustrative plans. And then also I prepared several illustrative plans for the state appellate courts divided into five districts, because I think there were only five judges.

Q And forgive me if I missed it, but did you already mention the City of Decatur and/or the Pleasant Grove cases?

A I did not mention them. I have not testified in those cases, but I have filed declarations.

And the Pleasant Grove case has now been resolved. The consent decree, I think, results in a cumulative voting plan for the city of Pleasant Grove here in Jefferson County.

Q Is that --

A I prepared illustrative plans in that case as part of a short declaration about a year ago.

**_Christina K. Decker, RMR, CRR_**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 9**

10

Q And that was a districting case?
A Yes. Section 2.
Q And what about the City of Decatur case?
A That one is a -- I'm actually working for the defendants in that case. And I've not testified in court. It's still an ongoing case. But I have filed a couple of declarations.

It involves obviously the city of Decatur and Morgan County and whether or not the city can proceed to follow through on a referendum vote from seven -- well, ten years ago, I think, almost in 2010 which would change, if enacted or adopted, the election system in Decatur from a five single-member district plan to three single-member districts and two at-large positions.
Q And you said that you are working on behalf of the defendant in that case?
A Yes.
Q Have you, other than that case, the City of Decatur case, have you ever worked on behalf of or testified on behalf of defendants rather than plaintiffs?
A I was briefly engaged as a consultant to the city of Calera in 2009 as they were attempting to get preclearance on a voting plan. And I drew some illustrative plans suggesting to them that it was not possible to draw a majority black district in Calera given the population's changed since the '80s when the initial plan was adopted, I think. And I suggested they

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 10**

11

should consider adopting a plan that would involve cumulative voting as another alternative to a districting system, and that's what they did.

Q Have you served as an expert in any of -- any lawsuits that have resulted in changes to districting plans?

09:24:12

A In Alabama or --

Q Anywhere.

A Yes, I have. Many over the years.

Q And are those -- maybe I will refer you to Plaintiffs' Exhibit 1, which is your first declaration, paragraphs 5 and 7, which appear on pages 2 and 3 of that report.

09:24:29

Does that summarize the cases where you testified that resulted in districting plans being adopted as a result of your testimony?

A Yes, at least going back to 2011. Section 2 cases only. I have been involved in some other cases.

09:24:53

Q Okay. And referring you to paragraph 2 of your report, which spans from pages 1 to 2, were those statewide cases in which you've testified?

A Yes. Over the years, I've been involved in several cases that involved statewide legislative boundaries.

09:25:26

In the '90s, I was involved in a case in rural west Tennessee that ultimately led to the creation of a new majority black district in northwest Tennessee outside of the Memphis metro area. That case was captioned *Rural West Tennessee*

09:25:50

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 11**

    12

*African-American Affairs Council vs. McWhorter*.

I also was involved in a state legislative case in Montana called *Old Person vs. Cooney* that spanned a couple of decades. I think I worked on that one from like 1991 until sometime in early 2002. Ultimately that led to the creation of a couple new Indian majority districts in Montana that encompassed the reservation areas in the state.

And the same thing with *Bone Shirt vs. Hazeltine*. That was a lawsuit filed in the early 2000s in South Dakota, and it created I think two new Indian majority House districts and one new Indian majority Senate district. And in that case, the Court ordered the plan that I had developed as a remedial plan into place. It was a court-ordered plan.

Q And, of course, you have already testified about the Alabama Legislative Black Caucus case?

A Right.

Q And then is it accurate to say that you've testified in five cases since 2011 that have resulted in redistricting? I think that's at paragraph 5. Does that summarize that -- I don't need you to walk through each one of them, but I just want to make sure I have got that right.

A Yes. Those are the five Section 2 cases, or at least five cases that were decided on Section 2.

The one case that I spent a lot of time on was *Navajo Nation v. San Juan County.* That was both a Section 2 case, but

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 12**

I think there were some constitutional issues. And ultimately the judge determined that he did not need to rule on Section 2 because he had already ruled on the constitutional issues. And we won the case. We -- the Navajo Nation -- obviously serving as the Navajo Nation's expert in *Gingles 1*.

09:27:51

Q And I think you have already mentioned the consent decree cases that are set forth in paragraph 6; is that right?

A Yes.

Q Okay. And if we could pull up Plaintiffs' Exhibit 2, which I believe is Exhibit A to your first report.

09:28:12

Mr. Cooper, is your experience detailed more thoroughly in Exhibit A to your expert report?

A Yes. This just basically reviews all the voting cases I've been in since the late 1980s by state. And the case caption along with a rough date as to when I was involved in the case.

09:28:40

Q Okay. Have you testified in any of these cases regarding socioeconomic conditions in the states that you were working in?

A I would have in most of them, because most of these are Section 2 cases. And almost always as part of my testimony I did provide information about socioeconomic disparities as it relates to the majority white population vis-a-vis the minority group at issue.

09:28:57

Q And what type of data do you review in those cases

09:29:17

14

regarding socioeconomic conditions?

A I think almost always it is Census Bureau produced data in the '90s and '80s. And even most of the 2000s I relied on information from the census long form, which was a sample of all persons who participated in the decennial census.

And in the late 2000s, the Census Bureau shifted to another approach and began to compile information from what is known as the American Community Survey, and which is also sample based, but it is issued on an annual basis to one out of every 42 households.

So in this particular Section 2 case, as well as I think almost all of the ones since 2010 I've relied on the American Community Survey data set, because there was no long form option with the 2010 census. So all socioeconomic data that is highly detailed, anyway, would come from the American Community Survey.

Q Okay. And I will probably have some more questions for you about that when we get more into the opinions.

Have you ever been qualified as an expert in redistricting and demographics in the cases that you have testified in?

A Yes. In most of the cases, going all the way back to the '80s, I would have been qualified as an expert in redistricting and demographics. It's possible there may have been some when I was only qualified as an expert in redistricting for one reason or another, particularly the ones that were not Section

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 14**

15

2 cases where I was not presenting socioeconomic data.

For example, I don't remember with the ALBC case. I don't believe I presented any socioeconomic data. So I may have just been -- sorry. So I may have just been qualified as an expert in redistricting in that case.

Q Okay. Have you ever been -- has the Court ever found you not qualified in either the areas of redistricting or demographics?

A Not to my knowledge.

Q And when you serve as an expert in these types of cases, what sorts of analysis do you with regards to redistricting?

A Well, I work with the census data that one would typically use when drawing election plans, and that would be the Census Bureau's P.L. 94-171 file that is released right after the Census Bureau has compiled all of the census data nationwide. So it's the first release out typically in the month of February of the year after the decennial census.

So in 2011, the first -- the first few states were released in the month of February, and then most were completely released by the end of March. And I assume that will be the same in 2021.

So that's the primary data set that I use, because when producing election plans particularly for congressional and state legislative redistricting, you have to rely on the 2010 census. So any plan I develop starts with that basic

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 15**

16

information.

I may have access to other data, like as in this case where I was also able to rely on the American Community Survey to get some estimates of the citizen voting age population and the various plans I produced, as well as citizen voting age population in the 2011 plan, for example, that I break out in my report.

Q And we'll get to that in a minute.

A Yeah.

Q I guess my question really is more broad. I mean, do you, in terms of redistricting, are you often called upon to create illustrative plans in the cases that you have testified in?

A Oh, yes, almost always. Any redistrict case I am almost always called on to develop an alternative plan.

Q And is there -- you've mentioned the census data. Is there a type of GIS software that you typically use in those cases?

A Yes. I use Maptitude for redistricting, which is a well-known software application for redistricting analysis, as well as other forms of socioeconomic analysis. So that is the program I use. I've been using it since the late 1990s for redistricting purposes.

Prior to that, I used another product from the same company that was not Windows based. It was Microsoft-DOS based. It was an older program. But it worked quite well.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 16**

17

Q And in terms of -- you already testified that you have done work with census data in terms of looking at disparities between racial groups in other cases; is that right?

A Yes.

09:34:33 Q Okay.

MR. SPIVA: So, Your Honor, at this time, we'd just ask that Mr. Cooper be qualified to testify as an expert in redistricting and demographics.

THE COURT: Is there any objection?

09:34:44 MR. WALKER: No objection, Your Honor.

THE COURT: The Court recognizes Mr. Cooper as qualified as an expert in this case.

MR. SPIVA: Thank you, Your Honor.

BY MR. SPIVA:

09:34:52 Q Can you tell the Court, Mr. Cooper, what you were asked to do in this case?

A Well, at the outset, I was specifically asked to determine whether the first *Gingles* precondition could be met while also adhering to traditional redistricting principles.

09:35:13 In other words, the issue was whether a second majority black district could be created in Alabama that would be reasonably compact, contiguous, not dilute the minority vote, respect communities of interest, and also keep incumbents in a different district so there were no incumbent conflicts.

09:35:39 Q What was the second thing you were asked to do in this

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 17**

18

case?

A I was also just asked to review demographic data from recent decades from the decennial census, and as we just reviewed or discussed, analyze the socioeconomic data to determine whether or not the black population and white population have different socioeconomic profiles.

Q Okay. And you've already I think testified that Plaintiffs' Exhibit 1 is your first declaration in this case.

If you could just turn for a minute to Plaintiffs' Exhibit 59, and if you can confirm whether that is the second declaration you prepared and provided in this case?

A Yes.

Q And have you made any changes to either the first or second declaration since you've prepared them?

A Yes. I corrected some typos.

MR. SPIVA: Okay. And just for the record, by agreement the correct versions are Plaintiffs' Exhibit 1 and Plaintiffs' Exhibit 59.

Q Are the facts that are contained in these reports true and accurate to the best of your knowledge and belief?

A Yes.

Q And are the conclusions that you reached regarding your two tasks in this case contained in those reports?

A Yes.

Q Have your -- have any of your conclusions changed since

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 18**

19

submitting those reports?

A No.

Q Let me ask you first just for your high-level conclusions based on the work you have done in the case. Did you reach any conclusions regarding whether the African-American population in Alabama is sufficiently large and geographically compact to allow for the creation of a second majority-minority congressional district in a seven-district plan?

A Yes. My conclusion is that the minority population is sufficiently numerous and geographically compact to allow for two single-member majority black districts while adhering to traditional redistricting principles.

Q And did you prepare any illustrative plans demonstrating how two majority black districts could be drawn in a seven-district plan?

A Yes. I prepared four illustrative plans showing various ways that one could draw two majority-minority districts in Alabama based on the 2010 census.

Q And do those plans comply with traditional redistricting principles?

A In my opinion they do.

Q Okay. Let me pull up Plaintiffs' Exhibit 1, page 23, and kind of focus your attention on paragraphs 51 through 52 of your first report. And let me ask you -- pardon me one minute while I get there.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 19**

          20

Let me ask you: What were the traditional redistricting principles that you adhered to as you were drawing these illustrative plans?

A Well, as I think I mentioned maybe previously, the primary principles would be respecting one person one vote. And it's my understanding that in Section 2 litigation particularly, it's now basically a requirement that one must draw plans that are within plus or minus one person at least for congressional plans of the ideal population size, which is the ideal population size. Of course, it's nothing more than dividing a statewide population by seven. So you have got to be within one person of that figure, which I don't have in front of me right now.

And also the plan should be reasonably compact at a reasonable shape. The districts need to be contiguous.

One should take into account various communities of interest around the state.

Q What about -- sorry to interrupt. But what about political boundaries? Is that a consideration?

A Yes. Yes. That is sort of blended in, with respect for communities of interest, as well as in a sense compactness.

So I took into account county boundaries specifically because I in all four plans split -- at least in two of the plans, I split the same number of counties as the 2011 plan. And in two of the plans, I split one fewer, just six counties.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 20**

21

09:40:51 09:41:07 09:41:31 09:41:47 09:42:02

So I respected the county boundaries, as well as the existing plan.

Q Okay. And I think I interrupted. You had said compactness and contiguity, and I think you were getting ready to go on to something else.

A The non dilution of minority vetting strength. That's the other primary traditional restricting principle.

Q And what about incumbents? Did you have any consideration for where incumbents lived or where they would be paired?

A Yes. Originally I did not have information about the home addresses for five of the seven incumbents, and unfortunately in drawing the plan -- because I just knew that Representative Sewell lived somewhere in Jefferson County -- my initial attempts at Illustrative Plans 1, 2, and 3 had to be revised to bring her into District 7. She was just outside of District 7 under Illustrative Plan 1, 2, and 3.

So I made minor changes in Jefferson County. And Those plans are now known as Revised Plan 1, Revised Plan 2, and Revised Plan 3. And those would be the operative plans in this case, even though in a zoomed-out statewide map you really could not tell the difference between the original Illustrative Plan 1, for example, and Revised Plan 1, because I just shifted three or four precincts in each instance.

Illustrative Plan 4 --

Q Sorry to interrupt, but Revised Plans 1, 2, and 3, are

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 21**

22

those attached to your second declaration?

A Yes.

Q Okay.

A Yes. And Illustrative Plan 4, which was in my original declaration, fortunately had Representative Sewell already in District 7, so there was no need to revise that plan.

09:42:14

Q Okay. And then let me ask you: Were you at some point asked to reach a conclusion regarding whether the African-American population in Alabama is sufficiently large and geographically compact to allow for the creation of a second majority-minority congressional district in a hypothetical six-district plan following the 2020 census?

09:42:36

A Yes. And I was able to conclude that there's a reasonable likelihood that two out of seven -- two out of six districts in a plan after the 2020 census is released could be majority black citizen voting age population. Majority.

09:42:59

Q And that hypothetical plan, is that attached to your second declaration?

A Yes.

Q Okay. And does that plan, the six-district plan comply with the same traditional districting principles as the seven-district illustrative and revised plans?

09:43:15

A I believe so. It expands the size of the districts both geographically and based on population. But I think it would comply with traditionally redistributing principles. But it

09:43:39

**Christina K. Decker, RMR, CRR**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 22**

23

hasn't been fine-tuned. I did not spend a lot of time trying to perfect it. So there obviously could possibly be other configurations, but we will only know in the fullness of time.

Q And shifting to the demographic data you looked at, did you reach any conclusions regarding whether there are disparities between African-Americans and whites in Alabama across indicators of socioeconomic well-being?

A Yes.

Q What were the conclusions?

A There are sharp contrasts across almost all levels of comparison for socioeconomic well-being, whether it be income, education, housing, access to vehicles, that sort of thing. In almost every instance, whites outpaced blacks.

Q Okay. Let me pull up Plaintiffs' Exhibit 3, Mr. Cooper, which is Exhibit B to your first declaration. It's a document that has at the top titled Exhibit B Methodology and Sources. Does this detail the methodology and sources that you used to prepare your report?

A Yes. It basically just reviews and highlights some of the things I just discussed a few minutes ago about the source of the data that I used to begin working on the illustrative plans.

I do make note of the fact that I was also using not just data files like the P.L. 94-171 file from the Census Bureau, I was also using their geographic files that show boundaries for

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 23**

24

counties and cities and precincts and municipalities, and also information for sub-county designations by the Census Bureau, such as census tracts and census block groups. And also the most detailed population unit in the census geography is a census block. So I was using the state census block file, as well.

Q And did you use population and geographic data from the 1990 to 2010 decennial censuses?

A I did at a higher geographic level. I don't think I used 2000 block data to do any of my analysis, but I did look at the state and county and maybe even municipal comparisons between 1990, 2000, and 2010. That shows up in my report in the very beginning comparing those three decades.

Q Did you use 2017 and 2018 U.S. Census Bureau population estimates?

A I did use population estimates from the Census Bureau for 2017 initially, and then also updated it a bit with 2018 estimates. Those estimates are only available at the state county level by race and only at the state based on voting age by race. And for cities and towns and other places -- some of them even may not be incorporated -- there is no information about post-2010 population by race. There's just a total population estimate.

Q You've made reference a couple of times to something called the P.L. 94-171 data file; is that right?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 24**

25

A Right.

Q What is that?

A Well, that is the file that states and localities use to develop new voting plans that would come into compliance with one person one vote specifically based on a new decennial census. So that's the file I used. And it has over 200 different fields indicating race and ethnicity for all ages and over 18. And the racial categories are broken out by single race, as well as multi-race categories. So it's a big file that can be parsed in different ways.

Q So is it correct to say that that's -- when people say, well, the census is going to be released in 2011, or the census is going to be released in 2021, is that the file they are talking about?

A That's the first one that is released. After that, there are some additional releases that would have more information about housing and more detailed age information, breaking out information about, you know, the number of persons between 15 and 17, for example, or some other category. So the later releases are much more detailed, but they would typically not be used for the redistricting work.

Q So that's the file -- the P.L. 94-171 file, that's the file that states use to do their redistricting?

A Exactly, yeah. Even at this late date.

I just finished a plan in Grand County, Utah, and we were

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 25**

           26

using the 2010 data.

Q You referenced earlier the American Community Survey data or ACS data. Can you explain what that is and at a broad level what use you made of that, in terms of the one year versus the five-year ACS data?

09:49:21

A Well, the one year data is exactly what it says. It just comes from one sample survey a year. And that is the sample that is sent out to one out of 42 households nationwide.

So because it's just one out of 42, it's acceptable from

09:49:48

the standpoint of statistical methodology to use it for large geographies, such as a nation, state, and congressional district.

Below that level, when you're looking at legislative districts or cities that have less than 60,000 persons, the

09:50:11

margin of error would be too high from just one sample a year. So we use another Census Bureau product called the five-year sample survey. And the most recent one available right now is the 2013-2017 ACS, which was released in December of 2018. So there will be a new release out in about six weeks.

09:50:38

Q Okay. And I think you already testified that you used Maptitude to draw the maps?

A Yes.

Q Okay. Let me pull up in Plaintiffs' Exhibit 1, Figure 3, which is on page 9 of your first declaration.

09:51:02

And, Mr. Cooper, can you describe at a high level the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 26**

27

population growth patterns from a racial standpoint in Alabama between 1990 and today?

A Yes.

Well, in 1990, you can see that the population of the state was just over 4 million -- 4 million 40,000 roughly. And of that number, the non-Hispanic white population, which is the second category was nearly three quarters, 73.26 percent. And the African-American population was 25.26 percent, single-race African-American. Because in the 1990 census, there was no way to calculate the any-part black category from the P.L. 94-171 file.

The file released by the Census Bureau in that time period at the time of the 1990 census had fewer categories by race. There was just simply a separate category of others. Others being a category that would have included people who were multi-race -- black and white or black and American Indian. So I do not have a figure for the any-part black population in 1990.

In 2000, the population statewide had grown to 4.47 million. And at that time you can see that the non-Hispanic white population had dropped to about three points to 70.29 percent. And the single-race black population stood at 25.99 percent. But after factoring in persons who were black and one other race -- in other words, any-part black -- it had climbed to 26.29 percent. So, again, up about a percentage

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 27**

28

point compared to 1990.

Then by 2000, the state's population continued to grow, so it was almost --

Q You said 2000 or --

A 2010. Excuse me. It was 4.78 million. And the white population had dropped to just 67 percent, down by nearly six percentage points since 1990. And the black population continued to grow, reaching 26.8 percent any-part in 2010.

The key reason that explains why the non-Hispanic white population dropped so significantly versus less of a change in the African-American percentage is that between 1990 and 2010 a large population change occurred in the other minority categories, particularly as it relates to Latinos who comprised just 24,629 of the population in 1990.

By 2010, it had gone up by a factor of seven or so to 185,602. So that explains the drop in the percentage of non-Hispanic whites in the state.

Latinos may be of any race. And so some reported white. Others would have reported some other race as a category, or one of the other clear categories, such as American Indian or African-American.

Q Okay. And I think this is kind of implicit in what you said before, but I just want to make sure it's clear. What is the difference between single-race black and any-part black, in terms of these figures?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 28**

29

A Single-race black is anyone who checked on the census form that they were black, including persons who would have been maybe black and Hispanic.

Q So is that single race or any-part black?

09:55:20 A That's single race.

Q Okay. Thank you.

A And the any-part black would be any person who was some part black. In other words, everyone who is single-race black, single-race black and Hispanic, as well as all other persons 09:55:33 who checked black and another race, such as black and white, or even black and white and American Indian -- multi-race categories.

Q And which figure do you use any-part black or single-race black in your analysis when determining whether the 09:55:54 African-American population is sufficiently large and geographically compact?

A Nowadays, I tend to use the any-part black definition, which was accepted and relied upon in the Supreme Court case involving Georgia legislative districts in 2003 -- *Georgia v.* 09:56:12 *Ashcroft*. So that is the definition that I would typically use.

I produce information and data about the single-race category, as well. That's part of the data set that I have from the P.L. 94-171 file. So I'm basically aware of it. But 09:56:32 in the final analysis, in determining whether a district is

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 29**

30

majority black, the ultimate decider would be the any-part black definition or possibly the citizen voting age population definition.

Q Okay.

09:56:50 THE COURT: The citizen voting age definition, what do you mean by that?

THE WITNESS: That is obtained through the American Community Survey. And it's not part of the P.L. 94-171 file.

But each year, the Census Bureau releases this special 09:57:08 tabulation of the American Community Survey for use by the Department of Justice in voting cases and language cases involving voting. And so I rely on that data set, which only goes down to the block group level, so it's more than just a census block, but smaller than a census tract, and apply that 09:57:29 to the districts to develop an estimate for the citizen voting age population by race in that district.

THE COURT: Okay. Well, what do you mean by "citizen voting age definition"? What is that definition?

THE WITNESS: Well, if a district is not over 09:57:45 50 percent black citizen voting age population, then it would -- I assume that it would not meet *Gingles 1* as being a majority black district.

THE COURT: Thank you.

BY MR. SPIVA:

09:58:01 Q Mr. Cooper, I may -- I think the Judge may be asking just

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 30**

 31

literally what -- what goes into citizen voting age population? I don't know if I understood -- if I got that right, Your Honor, but I think she may be asking a more specific question about that.

09:58:15 A Well, the ACS survey would have a question as to whether or not you are a citizen on it. So if you report that you are non-Hispanic black and also that you are a citizen then -- and you're over 18, then you would be part of the citizen voting age population.

09:58:38 And in Alabama there's not that great of a distinction between all persons who are black and over 18 and all persons who are black and citizens over 18. But in some states, like, say, Florida, or New York, or even Georgia, where there's a much more significant Latino population who is black, there may 09:59:01 be wider differences between the VAP and the citizen voting age population.

Q Let me -- and just for the record, because I don't know if you've said this before -- when you refer to voting age population, either black voting age population, or non-Hispanic 09:59:21 white voting age population, what are you referring to?

A Persons who are 18 and over as of the 2010 census.

Q Okay.

A And that -- I should have pointed out, there is another issue to discuss regarding citizen voting age population, 09:59:34 because each year the Census Bureau comes out with a new data

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 31**

32

set. So I'm using the most recent data set in this case, which would reflect persons who reported that they were citizens on an ACS survey between the years 2013 and 2017. So that would be a mid-decade estimate; whereas the 2010 census data that reflects voting age population is from the year 2010. So it's five years down the road, but still not current. Even though there's a 2017 handle in that five-year survey, the mid-decade would be the midpoint of the survey; in other words, July 2015. So it's still four years behind time at this point.

Q And is that standard in your field to rely on those five-year surveys and to use the midpoint of the five-year survey in doing the types of analysis that you've done?

A It's becoming standard. It's been a long-term standard in Latino voting rights cases in particular in other states. And it's also a metric that I have been reporting in some of the Section 2 cases I've been involved in since 2010.

Q Okay. Let's take a look at your second report, which is Plaintiffs' Exhibit 59, and in particular page 3. And I think we're going to focus in on footnote 1.

Have any courts in Section 2 cases where you have recently served as an expert used the any-part black definition to make that determination of whether a district or districts are sufficiently large and reasonably compact?

A Yes. I've listed them in a footnote.

That definition was reported, and the Court reviewed it in

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 32**

33

*Georgia State Conference of the NAACP v. Fayette County Board of Commissioners*, also in *Missouri State Conference NAACP v. Ferguson Florissant School District*, also in *Terrebonne Parrish NAACP v. Jindal.* That is still at the appellate level. It was decided in favor of the plaintiffs in 2017. But it's still on appeal.

*Navajo Nation v. San Juan County*. In that instance, I reported the any-part definition, and the Court relied on that for county-level stats. The districts that were drawn were over 60 percent single-race Native American in that particular case. So it was not maybe a major focus of the Court at the district level, but it did become an issue in determining whether or not San Juan County was majority Native American. It was just under 50 percent using single race, but over 50 percent using the any-part definition.

And then finally, the partisan gerrymandering case I was involved in, in Ohio, *A. Philip Randolph v. Householder*. That definition also became a bone of contention in that case. And I think the Court accepted that the any-part definition was appropriate to use when trying to determine specifically whether or not African-American voters had been packed into Congressional District 11, which involved Cuyahoga County and Akron County in Ohio.

Q If you could take a look -- and we don't need to pull this up on the screen, but if you can take a look back at Figure 5

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 33**

34

of Plaintiffs' Exhibit 1, your first report, which was on page 12. I guess we could pull it up on the screen. I just want to make sure -- well, I'm sorry. Yeah, let's pull it up on the screen. Figure 5, which is on page 12 of Plaintiffs' Exhibit 1, your first report.

10:04:11

In 2010, what were the black and white voting age population percentages in Alabama?

A Well, the non-Hispanic white voting age population was 69.39 percent, which is a little higher than the all-ages percentage that we just looked at, which was a little bit over 67 percent. And that is because the white population is just an older population. So numbers are boosted when you look at the VAP.

10:04:33

And the single-race black population was 24.86 percent. And the any-part definition was 25.16 percent. And that is a little bit lower than the all ages, because the black population is a younger population. So that explains that difference.

10:04:54

Q And then let's pull up -- if you can look to Figure 6 in your first report, which is on the next page, page 13 of Plaintiffs' Exhibit 1. What were the black and white -- and I'll now refer to voting age population as VAP or V-A-P.

10:05:12

So what were the black and white VAP percentages in 2017 in Alabama?

A The black VAP, according to the most recent Census Bureau

10:05:34

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 34**

35

estimates, was 26.4 percent. And the white VAP was -- non-Hispanic white VAP was 67.8 percent. So it's showing a drop of about a point and a half compared to the 2010 voting age population for non-Hispanic whites, and an increase of about a percentage point in terms of the black voting age population since the 2010 census.

Q And in the 2017 estimates -- first of all, why are they called estimates?

A Well, they're estimates because the Census Bureau produces a report each year based on an analysis of population change at various levels of geography, states, as I mentioned, and counties primarily based on race. And that -- that is done by looking at births and deaths at the county level. And it also includes things like housing starts, in migration, out migration. So it's a sophisticated attempt to arrive at an estimate of what the population is today, or at least in the summer of 2017, as opposed to 2010.

Q And does that come from the ACS data you were talking about?

A No. It's independent of the ACS. It's not really a sample survey. So it's a different approach altogether.

Q Okay. But it's something that is done by and put out by the Census Bureau?

A Yes. I mean, every year the estimates come out. And just about every year all major newspapers will report the change

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 35**

36

since the last year and identify the fastest growing counties, and that sort of thing. I know I've seen that in the Alabama newspapers. Right around March is when the first data set comes out. And then by June you get county-level estimates by race.

10:07:46

Q Okay. And then what are --

THE COURT: Excuse me. Mr. Spiva, could I see you and one person from the defense for just a second, please?

MR. SPIVA: Sure.

(Bench conference:)

THE COURT: I can't figure out why we're going into 2017 stuff when aren't we focusing on what happened in 2011?

MR. SPIVA: Yes. But it's typical in these types of cases to show what the population growth has been. It's also partly in relation to the 2020 argument, you know, that there will be like a six-district plan. So it's partly related to that. But it's the methodology for showing, you know, in part, you know, where the population is now.

THE COURT: But --

MR. WALKER: We don't think it's germane, Your Honor, to the -- I mean, speaking for the defendants, we don't think it's germane to the decision you have to make about whether in 2011 the legislature could have drawn any of the plans proposed by Mr. Cooper.

10:09:02

MR. SPIVA: Yeah. I mean, his maps are drawn with the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 36**

37

2011 data. But it's partly just to show the progression.

Also, they have raised the issue of the fact that the 2021 census may cause Alabama to lose a district. And so he's put forth a six-district plan.

10:09:24 MR. WALKER: I'm unsure about how germane that is since there's no longer going to be an injunctive relief decision before Your Honor, that's whether or not an Alabama Legislature could have drawn one of these proposed plans.

THE COURT: In 2011?

10:09:38 MR. WALKER: Yes, ma'am.

MR. SPIVA: It may also go to the mootness issue, Your Honor, because one of the arguments for mootness is that Alabama is going to lose a seat, and, therefore, any decision Your Honor -- I'm a making the defendant's argument, of course.

10:09:49 It's not my position -- but that any declaratory judgment Your Honor might provide, that it would --

THE COURT: Provide --

MR. SPIVA: Wouldn't be instructive, yeah.

And so part of the reason for providing the hypothetical

10:10:07 plan is to show that it would still -- it would still, A, it would still be possible, but that it would still be instructive.

MR. WALKER: I think -- I think my colleague is stretching, Your Honor. The point of the mootness argument was

10:10:21 that in the cases they relied on Section 5 was still in effect.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 37**

38

Whereas, our point is it's no longer in effect; and, therefore, there's no longer a benchmark we have to refer to. Whether or not we can draw six district plans is really not before Your Honor.

10:10:37 THE COURT: That's what I think, as well.

MR. SPIVA: Okay.

THE COURT: So --

MR. SPIVA: I can kind of move it along, Your Honor.

THE COURT: Yeah, because I don't really see how 2017 data is relevant.

10:10:46

MR. SPIVA: Okay.

THE COURT: All right. Thank you.

MR. SPIVA: Thank you.

MR. WALKER: Thank you, Your Honor.

10:10:51 (End of bench conference.)

BY MR. SPIVA:

Q Let me turn your attention to Figure 4 in your first report, which is on page 11. And let's now discuss the geographic distribution of the African-American population in Alabama.

10:11:52

Is the majority of the African-American population in Alabama contained in certain areas of the state, Mr. Cooper?

A Yes. From this map you can see that the majority black counties, which are shaded pink and a deeper pink, are all in the historical Black Belt of Alabama running east to west

10:12:15

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 38**

39

really from Macon County over to Sumter County. All those counties are majority black.

Montgomery is not. It's an urban county, and it's part of the historical Black Belt, as well.

10:12:43 Q And about how much of Alabama's black population is concentrated in the urban counties of Jefferson, Madison, Montgomery, and Mobile?

A About half of the population is in those three counties. Of course, Madison is in the north. But Montgomery and Mobile 10:13:06 are in areas in the central and south Alabama area and can be drawn into one of two majority black districts.

Q In the rural Black Belt counties excluding --

THE COURT: Wait a minute. I'm not sure I understood that question or that answer.

10:13:27 In looking at your map, I don't see where the majority of the black population is in those counties.

MR. SPIVA: I can pull up the paragraph where it's the actual percentages are reported, Your Honor.

I just wanted to give you a rough sense. But you can -- 10:13:49 and you can see it visually. But the paragraph that follows it I think actually -- well, correct me if I'm wrong, Mr. Cooper, but I believe that the paragraph that follows it reports that.

THE WITNESS: Yes. You would refer to Exhibit D, which has the breakout by county, by race, and ethnicity 10:14:10 according to the 2010 census, if that would help.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 39**

40

MR. SPIVA: Well, actually -- I mean, we could do that, but I think Your Honor is asking -- if I understand your question, Your Honor, you're saying Figure 4 doesn't show you where the half of the black population is in the counties I mentioned, but I think --

THE COURT: Right. Right. Because those are shaded much lighter than the counties in the Black Belt.

MR. SPIVA: Yeah. And they just don't give you the figures. I think the figures are in paragraph 26 of Mr. Cooper's report. I mean, he can confirm obviously, and we can pull that up. Can we actually pull up paragraph 26?

Is it all right if I ask him --

THE COURT: Okay. All right. So there may be a majority of African-Americans in what counties were you talking about? Jefferson? Madison?

MR. SPIVA: Montgomery and Mobile, yes.

THE COURT: Is Madison one of them?

MR. SPIVA: Yes. That was -- if you -- Jefferson, Madison, Montgomery, and Mobile, Your Honor. Those were the urban counties in which --

THE COURT: Right. And certainly that's where the highest population of all citizens in Alabama live. But in looking at the map, which is Figure 4 on page 11 of Exhibit 1, for example, Madison County, according to your shading, looks like it may be 20 percent black.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 40**

41

THE WITNESS: That's true. I mean, I'm looking at aggregate population counts.

THE COURT: Okay.

THE WITNESS: So while 50 percent of the African-American population lives in those urban counties, those urban counties are majority white counties.

THE COURT: Okay.

THE WITNESS: Although I need to check Montgomery. I think it's very close to being a 50/50 county, isn't it?

THE COURT: It's in the 40 percent to 60 percent. But I think it's very close to 50 percent. And Jefferson may also be closer to 50 percent.

THE WITNESS: Yeah. Montgomery is 50.71 percent single-race black and 55 percent any-part black, 55.45 percent any-part black. Jefferson is in the mid 40s.

THE COURT: Okay. All right. But, you know, just looking at this map, that map does not tell me that the majority black population are in those counties.

MR. SPIVA: No. The map alone, Your Honor -- you're absolutely correct, Your Honor. Those are reported both in paragraph 26 and also in, I believe -- which exhibit was it, Mr. Cooper?

THE WITNESS: Exhibit D.

MR. SPIVA: To your first report, which is -- let me get you the Plaintiffs' Exhibit Number, Your Honor. I believe

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 41**

42

that is Plaintiffs' Exhibit 10. And that is Exhibit D to Mr. Cooper's initial report.

So that gives -- well, let me ask -- I guess I shouldn't testify.

10:17:34 THE COURT: No, no, no. It would be better that you don't.

BY MR. SPIVA:

Q But, again, Mr. Cooper, does Exhibit D to your first report, which is Plaintiffs' Exhibit 10, does that show a 10:17:44 county-by-county racial breakdown according to the 2010 census in Alabama?

A Yes.

Q Okay.

A And in paragraph 26, I do note that 12 percent of 10:17:59 statewide black population lives in the historical Black Belt counties. And by 12 percent, I am only counting the rural part of the Black Belt. And I've excluded Montgomery County, which I put in with the urban counties.

THE COURT: But it is part of the Black Belt.

10:18:17 THE WITNESS: It is part of the Black Belt, right. But I'm not double counting. The 12 percent just includes those ten counties that are more rural in nature.

BY MR. SPIVA:

Q And what about the counties -- I think this is also 10:18:33 reported -- well, let me just ask you -- yeah, this is reported

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 42**

43

in paragraph 26.

But what about the counties of Lee and Tuscaloosa? How do they -- what is the percentage of the statewide black population that lives in those counties?

10:18:53 A About seven percent. Those are university counties, so I have broken that out as another category.

Q And taken together, the urban counties, the rural Black Belt counties, and the university -- what you have called the university counties, how much of the statewide black population is contained within those counties?

10:19:15

A About 70 percent.

Q Okay. And which counties do you consider to be part of the Black Belt, Mr. Cooper?

A Well, those would be Sumter going west to east -- east --

10:19:33 THE COURT: Wait a minute. If the university counties have about seven percent of the statewide black population, why are you lumping them in with the urban counties?

THE WITNESS: Well, I'm just --

THE COURT: I don't understand that combination.

10:19:55 THE WITNESS: I'm just simply pointing out where most of the African-American population lives in Alabama, and that would be the two university counties, as well as the urban counties of Jefferson, Madison, Montgomery, and Mobile with the remainder in the historical Black Belt. But noting that the historical Black Belt now really only accounts for 12 percent

10:20:18

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 43**

44

of the statewide black population. So most of the black population by far lives outside of the historical rural Black Belt.

BY MR. SPIVA:

Q That's --

THE COURT: Okay. But 12 percent of them are in the Black Belt, and only 7 percent in Lee and Tuscaloosa, so --

THE WITNESS: Right.

THE COURT: -- I guess I just don't understand why Lee and Tuscaloosa would be lumped in with the urban counties as opposed to the Black Belt being -- but, anyway, that's fine. Move on.

THE WITNESS: Yeah. I'm just trying to show where most of the black -- where most of the black population in the state, in other words, close to three-fourths lives, and it is in that set of counties. But I'm not -- not going beyond that. I'm just identifying those counties.

BY MR. SPIVA:

Q And when you say that that set, you mean the urban counties, the Black Belt counties, the rural Black Belt counties excluding Montgomery and Lee and Tuscaloosa. Is that what you mean?

A That is correct.

Q And --

A And, actually, in the illustrative plans that I have

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 44**

45

developed, the area that I draw from to create this two majority black districts is basically the area that is discussed in paragraph 26 with the exception of Madison County, which, of course, is too far north to be put into a majority black district. And actually Lee County, which does have a fairly significant black population is also not included in the majority black district under the illustrative plans I've drawn.

Q Okay.

10:22:10 MR. SPIVA: Let's -- Your Honor, did that -- have all your questions been answered?

THE COURT: Just need to move on.

MR. SPIVA: Okay. Will do.

BY MR. SPIVA:

10:22:19 Q Let's pull up Plaintiffs' Exhibit 12, please. And this is Exhibit F-1 to your first report, Mr. Cooper. And if we could also pull up Plaintiffs' Exhibit 1, Figure 8, which is on page 15 of your first report on the screen.

Is this the 2001 congressional plan that was in place for congressional elections held between 2002 and 2010?

A Yes.

Q And what was the BVAP of CD 7 in this plan?

A According to the 2010 census, it was 60.11 percent.

Q And in which districts was most of the -- I'm sorry. Yes.

Which districts outside of CD 7 was most of the rest of

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 45**

46

Alabama's African-American population in the 2001 plan according to the 2010 census?

A It was distributed more or less evenly between districts 1, 2, and 3. I believe I have the figures in paragraph 34; 26 percent roughly of the black population in central and south Alabama. It was not part of District 7.

CD 1 was 26.16 percent. CD 2 was 29.63 percent black voting age. And CD 3 was 30.73 percent BVAP.

Q Okay.

A You see 1, 2, and 3. 1 and 2 were basically in central and south Alabama. District 3 started in Montgomery but extended all the way up to Cherokee County and Appalachian, Alabama.

Q Okay. And taken together, and according to the 2010 census, how large was the BVAP populations in those three districts?

A Well, I just said those.

Q What was that?

A Maybe I didn't make that clear.

Q Not individually, but taken together.

A Oh, taken together. Over 600,000; 629,000 total black population, and the BVAP would have been 448,000. But that 629,000 figure indicates that in those three districts alone, just looking at the black population, you had enough to create an entire congressional district -- 92 percent of an entire

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 46**

47

congressional district.

Q So let's pull up or go to your Figure 9 of your initial report on page 16 of Plaintiffs' Exhibit 1.

What does the map in Figure 9 show?

10:25:13 A Well, the map again overlays the black population percentage by county. The black lines show the current 2011 plan District 7. And the red lines show where District 7 was located under the 2001 plan.

So in much of the 2011 plan, the old 2001 lines are 10:25:43 followed. For example, right along the Black Belt, some of those counties were followed exactly. But because the District 7 lost population or did not grow as rapidly as the rest of the state, by 2011 it was underpopulated by -- if you go back to Figure 8 -- by almost 80,000 people.

10:26:08 So District 7, as drawn in the 2001 plan, had to expand and pick up more geography and more population in order to meet one person one vote requirements in the 2010 census and post 2011 redistricting cycle.

Q And where did it pick up that population?

10:26:27 A In this case, District 7 was expanded into Lowndes County and part of Montgomery County, as well as a little bit of -- more of Marengo County was included in District 7. And all of Pickens County was included in 7. Previously Pickens had been split.

10:27:00 Q Okay. And then if we can pull up Plaintiffs' Exhibit 10,

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 47**

48

which is -- that was the Exhibit D to your first report that we were just looking at, Mr. Cooper.

A Yes.

Q And if we could actually leave up Figure 9 on page 16 of Mr. Cooper's first report.

10:27:26

What is the demographic makeup of Lowndes County?

A Lowndes County, according to the 2010 census, is 73.55 percent single-race black and 73.91 percent any-part black.

10:27:57

Q And what is the demographic makeup of Clarke County?

A Clarke is 43.88 percent single-race black and 44.29 percent any-part black.

Q And what is the demographic makeup of Pickens County?

A Pickens is, I believe, actually majority white, is it not? It's -- well, yeah. It's 41.58 percent single-race black and 42.17 any part.

10:28:25

Q Okay. Let's pull up Plaintiffs' Exhibit 17. Is that Exhibit G-4 to your first report, Mr. Cooper?

A Yes.

10:28:49

Q And what is this map?

A This map zooms in on Montgomery County under the 2011 plan. And it shows some of the other counties that are adjacent -- part of Lowndes, part of Bullock, Autauga, and Elmore, Macon.

10:29:08

Q And was Montgomery County or city split in the 2011 plan?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 48**

49

A Yes. It was divided into three congressional districts. Part of Montgomery County went into District 7. Part of it went in District 2 extending through the center of the county north to south, and the other part went into District 3.

10:29:28 Q And had Montgomery County been split in the 2001 plan?

A No. In the 2001 plan, it was entirely in District 3.

Q Was there a small part of Montgomery County in the 2001 plan that was in District 2?

A I'm sorry. I stand corrected. There was a small part

10:29:49 that was in another district.

Q Okay. And how were Montgomery County and -- how was Montgomery County split in the 2011 plan, in terms of race?

A Most of the black population in Montgomery County was placed in District 7. And then the remainder of the black

10:30:19 population would have been subdivided between Districts 2 and 3.

I think most of the areas in District 2 are majority white in that component of Montgomery County, as well as the western part of Montgomery County is predominantly white, as well, and

10:30:35 it went into District 3.

Q Okay. So let's pull up both Figure 10 of Plaintiffs' Exhibit 1 on page 17 of Mr. Cooper's first report. And if we could look at that along side of Figure 11 of the first report, Plaintiffs' Exhibit 1, and paragraph 41 of the first report,

10:31:05 all of those latters all appear on page 18 of his first report.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 49**

50

So this is the -- what we have got up in terms of the map is the current 2011 plan?

A Yes.

Q And about how much of Alabama's African-American population is in CD 7 under this plan?

10:31:34

A About one-third.

Q Okay. And in which districts was the rest of most of Alabama's African-American population?

A Districts 1, 2, and 3.

10:31:48

Q And according to --

MR. SPIVA: Pardon me one second, Your Honor.

BY MR. SPIVA:

Q And do you report in your report in paragraph 41 the BVAP of CD 7 in the 2011 plan?

10:32:26

A Yes. The BVAP CD 7 is 60.91 percent.

Q And what were the BVAPs of each of CDs 1, 2, and 3 in the 2011 plan?

A 26.11 percent for CD 1; 28.26 for CD 2; and 24.34 percent for CD 3. So the BVAP in those three districts actually

10:32:59

dropped compared to the BVAP in CD 1, 2, and 3 under the 2001 plan by a small amount. But it's a little bit smaller than was the case in the earlier plan.

More importantly, this is just a clear example, in my opinion, of what is known as cracking in redistricting

10:33:22

terminology where the black population is just sort of

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 50**

51

distributed into different districts when it's in an area that is sufficiently compact to allow for a stronger district to be created.

Q And what happened, in terms of the -- you gave the number, but in terms of whether it was an increase or decrease in the BVAP in CD 7 as between the 2001 plan and the 2011 plan, what happened with that?

A It went up a little bit from I think 60.11 -- I'm not looking at it -- but it seems like I remember that -- to 60.91 --

Q Okay.

A -- percent.

Q And I think you said that taken together the BVAP in 1, 2, and 3 in the 2011 plan is nearly enough to form an entire congressional district?

A Yes. 84.3 percent.

Q Okay. So let me turn to the illustrative plans that you drew.

And can you describe what you looked at to determine whether the black population in Alabama is sufficiently large and geographically compact to allow for the creation of the second majority-minority district?

A Well, one reference point was the plan that the state legislature adopted for the state board of education.

Q Can you pull up -- while you're talking about that, can we

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 51**

52

pull up Figure 1 on page 5 of Mr. Cooper's first report, Plaintiffs' Exhibit 1?

A So this is the state board of education plan, which creates majority black District 4 that includes part of Jefferson County and a couple of the western Black Belt counties, as well as part of Bibb and Tuscaloosa.

And then there's a majority black district in the south that includes the city of Mobile and most of the rest of the historic Black Belt, including almost all of Montgomery County, except for a little tiny piece in the -- in the north that is part of District 3 along the Elmore County line. So...

Q You're referring to Board of Education District 5?

A Yes. Yes. Both of those districts are majority black voting age. Board of Education District 4 is 51.4 percent BVAP, and District 5 is 57.5 percent.

So from that, it was clear to me that one could draw, in all likelihood, a second majority black district in a seven-district plan that would adhere to the original redistricting principles and would be consistent with what the state legislature did with the state board of education plan, in terms of the counties that would have been included in that district -- in those districts for a seven-congressional district plan.

THE COURT: And when was that plan drawn?

THE WITNESS: In, I believe, May of 2011. I think

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 52**

53

that's when it was adopted. I could be wrong about the month, but I think that's when.

THE COURT: Thank you.

THE WITNESS: Although the previous state board --

10:36:47 THE COURT: No. That was all of my question.

THE WITNESS: Okay. Okay.

BY MR. SPIVA:

Q That is the 2011 plan?

A Yeah.

10:36:52 Q The BOE plan?

A Right.

Q So let's just take a look at Figure 2 on the next page, page 6 of your first report, Plaintiffs' Exhibit 1.

Can you describe what that shows?

10:37:06 A This simply overlays Board of Education Districts 4 and 5 onto a map showing the percent black by county. Similar to the plan -- to the map that I produced showing how District 7 changed between 2001 and 2011, similar kind of overlay. But this is just for this single point in time for the 2011

10:37:32 redistricting plan.

Q In terms of -- you mentioned that District 5 of the BOE plan encompassed part of Mobile County. Does it encompass all of Mobile County?

A No.

10:37:47 Q Can you describe the area of Mobile County that it

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 53**

54

includes?

A It includes most of the city of Mobile, as well as some of the rural precincts extending north into Washington County.

Q And does the 2011 state board of election plan combine part of Mobile County and Montgomery County?

10:38:10

A Yes.

Q Do you know, Mr. Cooper, how long State Board of Election Districts 4 and 5 have been African-American majority districts?

10:38:25

A In the 1990s, there was litigation involving the state board of education plan that I am aware of. I think I have a footnote going to the state board of education plan for 2000 preclearance letter. And in that letter there is a note about what the BVAP was in the two districts in the 1990s, as well as the BVAP.

10:38:57

THE COURT: I think we have an objection.

MR. WALKER: The question that Mr. Cooper is answering I think is beyond the scope of his report.

MR. SPIVA: I think he was referencing a footnote in his --

10:39:11

THE COURT: Well, if he's referencing a footnote, if you will please point out what footnote he's referring to.

BY MR. SPIVA:

Q Mr. Cooper, are you able to point out the footnote that you are referring to?

10:39:22

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 54**

55

A Yes. It's footnote 13 on page 20, referenced in paragraph 45 where I have the percentage statistics for the court-ordered 1996 plan according to the 2000 census. And then the new plan that was adopted I think in 2001 --

10:39:54 THE COURT: Excuse me. I'm not sure that that answers the question that was specifically asked.

BY MR. SPIVA:

Q Yeah. Why don't -- can I withdraw the --

THE COURT: I would ask, Mr. Cooper, if you would

10:40:06 please listen to the question and only answer the specific question that's asked, okay?

THE WITNESS: Okay.

BY MR. SPIVA:

Q Do you know how long, Mr. Cooper, SBOE Districts 4 and 5

10:40:25 have been African-American majority districts?

A Well, I believe that the first time that 4 and 5 were drawn to be both majority black would have been in May of 2011, but I don't know exactly when 4 or 5 might have -- I guess District 4 might have turned African-American at some point in

10:40:55 the 2000s. I don't know.

Q Okay. And if you know, do you know how long SBO Districts 4 and 5 have an African-American opportunity districts?

First of all, if I say opportunity districts, what do you understand me to be asking you?

10:41:11 A A district where an African-American would have an

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 55**

56

opportunity to be elected.

Q But necessarily majority district?

A Not necessarily majority.

Q And do you know how long SBO Districts 4 and 5 have been African-American opportunity districts?

10:41:22

A Since sometime in the 1990s.

Q And is that reflected in paragraph 45 that -- what you just said reflected in paragraph 45 of your first report?

A Yes.

10:41:49

MR. SPIVA: Your Honor, may have just a minute to consult with my colleague on something?

THE COURT: Yes. It's probably a good time to take a break, anyway. I don't want to wear out Ms. Christina's fingers.

10:42:00

MR. SPIVA: Thank you, Your Honor.

THE COURT: We will come back at 11:00 o'clock.

(Recess.)

THE COURT: One thing I should have mentioned when we started this morning -- and I apologize -- I have a sentencing today at 1:00 that I have to take, so we're going to take a little longer -- a little later break for lunch, so you will kind of have an idea of where we're going. I should have told you first. I apologize.

11:00:30

MR. SPIVA: No problem, Your Honor. Sounds like you won't get as much of a break, though.

11:00:42

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 56**

57

THE COURT: Oh, I don't ever get a break, but that's okay.

You may proceed, Mr. Spiva.

MR. SPIVA: Thank you, Your Honor.

11:00:53 BY MR. SPIVA:

Q Mr. Cooper, did you use the 2011 SBOE plan as a point of departure when you were creating your illustrative map?

A Yes. In conjunction with the 2011 plan.

Q In conjunction with the 2011 congressional plan?

11:01:23 A Yes.

Q And what does your review of the SBOE, the 2011 SBOE map tell you about the possibility of making two majority-minority congressional districts in Alabama?

A It suggests to me that it is -- or it suggested to me that 11:01:44 it was highly likely that I could draw two out of seven majority black districts.

Q And let me just draw your attention to paragraph 17 of your initial report, Plaintiffs' Exhibit 1. What about it -- I'm sorry. Did I say -- I meant to say paragraph 17. I don't 11:02:19 know if I said page 17.

THE COURT: Paragraph 17 on page 7.

MR. SPIVA: Thank you, Your Honor.

BY MR. SPIVA:

Q What about it suggested to you the possibility of -- to 11:02:30 potentially having two congressional districts?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 57**

58

A Well, we know that if you could draw two out of seven, as opposed to two out of six districts, the size of the congressional -- I'm sorry -- as opposed to two out of eight districts as in the BOE plan, it's obvious that the population size of the congressional districts has to be larger.

So the districts as drawn in the state board of education plan, Districts 4 and 5, that area would have to expand slightly. And so I was aware that there were other counties that were not in District 4 and 5 with significant black populations. Namely --

MR. SPIVA: Could we put up Figure 2 side by side with that, please?

BY MR. SPIVA:

Q Go ahead. I'm sorry to interrupt.

A Well, mainly, Conecuh, Butler, Barbour, and Russell.

THE COURT: Excuse me. That's Conecuh.

THE WITNESS: I'm sorry. I learned how to say that, and I've been saying Conecuh every time.

MR. SPIVA: I can testify to that, Your Honor. He actually has been saying that.

THE WITNESS: How am I doing on Mobile?

THE COURT: Mobile you're doing okay. We'll wait until you get to some of the other Native American derived counties, so we'll see.

MR. SPIVA: We're just going to stay away from those.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 58**

59

THE WITNESS: Etowah, that's correct, isn't it?

THE COURT: Yeah. You're doing well on that one.

BY MR. SPIVA:

Q So can you explain -- you were mentioning that there were counties outside of the Board of Education District 5 including Conecuh that might be included in a second majority-minority congressional district?

A Right. The four counties -- maybe I didn't list them all due to my mispronunciation of Conecuh.

THE COURT: I'm sorry. That was my problem.

THE WITNESS: No. I'm glad you corrected me.

Well, Conecuh, Butler, Barbour, and Russell all are counties that according to the 2010 census had black populations over 40 percent, and they are not in Districts 4 and 5.

BY MR. SPIVA:

Q Okay.

A So that would be one area where those two districts could be expanded in a fashion that would allow for two out of seven majority black districts, as opposed to two out of eight as in the board of education plans.

Q Can we pull up Figure 12 on page 22 of Mr. Cooper's first report, Plaintiffs' Exhibit 1? And once we get there, Mr. Cooper, if you can explain what the significance of this map?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 59**

60

A Well, this is sort of just jumping ahead in the sense that this particular figure outlines the area of the state that I have included in one or more of the majority black districts.

So you can see that I did include Butler and Conecuh and Barbour. I did not include Russell in any majority black districts.

Q And so I want to just focus this a little bit. When you said you did include, do you mean that in one of the illustrative or revised plans that you prepared, that in each of those plans they fell somewhere within this area?

A Yes.

Q But not that each plan includes the entire area, I take it?

A That's true. In some cases, a county would have been dropped.

Q Uh-huh. And what is the population of the area that's outlined here in Figure 12, and is that reported in paragraph 49 on page 22?

A Yes. There are roughly 1.79 million people living in that area, which would constitute two-and-a-half congressional districts in a seven-district plan according to the 2010 census. So there's more than enough population there to create two majority black districts with over 340,000 people left over.

Q And is there more than enough area -- more than enough

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 60**

61

population there to draw them in different ways?

A Yes. Exactly. That's what I did. And that's why that area is so much larger than two congressional districts because I did different configurations under the illustrative plans.

11:07:15 Q Mr. Cooper, when you assessed whether the African-American population is sufficiently large and geographically compact to constitute a majority voting age population in a given district, is it necessary to consider race to some degree?

A Because this is a *Gingles 1* case, Section 2 case, and you

11:07:39 have to meet the *Gingles 1* precondition, race is in the background, but it does not predominate.

Q Are there other considerations that you take into account as well when you are attempting to draw illustrative plans?

A Well, in this particular instance, I prioritize avoiding

11:07:59 county splits. So right at the outset, I wanted to split no more than seven counties in any plan, which is the same number of counties that the state split in the 2011 plan. And I accomplished that objective. In fact, in two of the illustrative plans, I split just six counties.

11:08:23 Q And what about in terms of precincts are also called voting tabulation districts; is that right?

A Yes.

Q Was there -- was that -- avoiding VTD splits, was that a consideration you -- a consideration in the drawing of your

11:08:56 illustrative plans?

**Christina K. Decker, RMR, CRR**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 61**

62

A Well, that was also a top priority. So my objective was not to split any more precincts than the numbers split in the 2011 plan, and I also achieved that objective.

One plan -- I believe it may be Illustrative Plan 3 or 4 -- splits the same number, 16. All the other split fewer. And so that, too, was prioritized.

And by precinct splits, I'm only calling a split if there is population involved. Because some precincts or VTDs will extend, say, beyond municipal boundary to include a commercial split -- a commercial strip. And if you are going to follow a municipal boundary, in fact, you may end up splitting that precinct, zero population is involved.

So in my tables, I've just broken out the populated splits, which are the most meaningful.

Q And are there instances when a voting tabulation district must be split?

A In a zero deviation plan, which I understand is necessary in a Section 2 lawsuit nowadays, precincts have to be split. It would be just an amazing coincidence if you could combine precincts and magically come up with a zero deviation district.

THE COURT: What do you mean by a zero deviation district or plan?

THE WITNESS: Plus or minus one person.

BY MR. SPIVA:

Q Does that mean --

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 62**

A From the ideal district size.
Q And does that mean that all districts in the plan would have equal population?
A Plus or minus, right.
Q Plus or minus one?
A Yes.
Q So there might be one district that had one more person in it than another district?
A Or even two more.
Q Okay.
A Because one would be plus one and one would be minus one, so, yes.

THE COURT: So you're talking about plus or minus one person, as opposed to plus or minus one percent of population?

THE WITNESS: Yes.

In the state legislative plan, the range was plus or minus one percent, I believe, in the Alabama Legislative Black Caucus case. So you had more population to work with.

But in a case like this, and in most of the congressional plans even drawn by state legislatures following the 2010 census, it was plus or minus one person.

BY MR. SPIVA:
Q When you are forced to split a precinct, what is your approach?

A Basically, when you get to that point, and if it's to zero out the population, you just have to sort of experiment until you get it right. I mean, you move 24 people here, 36 people here, and eventually you can get it down to zero, as opposed to plus or minus five persons.

Q What I am asking, though, is are there certain techniques, in terms of visible features that you try to follow when you have to split a VTD?

A Yes. I would try to follow names, streets, or municipal boundaries, which may not be visible boundaries, or a water body or something so that there, you know, is a clear rationale for the split.

Q In drawing your illustrative plans, did you consider geographical compactness?

A Yes. Both visually, and then I also did compactness tests to compare and contrast an illustrative plan with the 2011 plan, as well as other state plans, state legislative plans, House and Senate, as well as the board of education plan.

Q We'll get there in a minute. I just want to make sure I understand what you considered.

Did you consider contiguity in drawing your illustrative plans?

A Yes. I considered contiguity. And the Maptitude redistricting software actually has a menu check. You just hit the menu button, and it will tell you whether or not the

65

district is contiguous.

Q Are the illustrative plans that you drew contiguous?

A Yes.

Q Did you consider the non-dilution of minority voting strength in drawing the illustrative plans?

11:13:09

A I believe I did.

Q And what does, in the redistricting context, what does non-dilution of minority voting strength mean?

A It means essentially that based on analyses performed by experts other than myself -- because I am not a political scientist -- a determination has been made that a district would perform as an opportunity district; in other words, a black candidate could win, wouldn't ensure a victory, but it would be within the realm of possibility in spite of racially-polarized voting.

11:13:27

11:13:52

Q Let me ask you: Did you consider communities of interest in drawing your plans?

A I did. I was aware of the historical Black Belt and tried to keep that together in one or more of the majority black districts to the extent possible.

11:14:07

I think that counties represent communities of interest, so I wanted to make sure that I did not unnecessarily split counties. And as I've indicated, I matched the state's number of splits in that regard and actually did a little better overall for -- when comparing to all four illustrative plans.

11:14:29

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 65**

66

Q Let me pull up paragraph 19 of Plaintiff' Exhibit 1 on page 7 of your first report. And let me ask you about the quote here. You have in here a quote I believe from the reapportionment committee guidelines for congressional legislative and board of education redistricting.

11:15:04

What is that, and why did you include it?

A Because it's a very concise, clear, general statement about the concept of community of interest. It's a broad concept. And I believe that Mr. Dorman Walker actually authored that paragraph.

11:15:26

Q Well, we won't speculate on that. But mainly I just wanted to know whether this was something you considered in terms of -- and that was intended as a compliment.

A Right.

11:15:41

Q But the main question is did you consider this in drawing your illustrative plans?

A Yes. I consider it to be a very well-written paragraph. And I tried to abide by that paragraph to the best of my ability.

11:15:54

Q And what were the communities of interest that were set forth in the reapportionment committee guidelines?

A Well, I will just repeat them. Areas with recognized similarities of interests, including but not limited to racial, ethnic, geographic, governmental, regional, social, cultural, partisan, or historic interests; county, municipal, or voting

11:16:15

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 66**

67

precinct boundaries, and commonality of communications.

Q Okay. And does this definition comport with your understanding of what communities of interests are?

A Yes. But Mr. Walker has stated it in a much more eloquent fashion than I might have.

11:16:40

Q Okay. And do the illustrative plans that you prepared respect communities of interest?

A I believe so. I understand there would be difference of opinion, but I think that I do meet that standard here.

11:16:54

Q Okay. And do each of the illustrative plans -- and here I'm including Revised Plan 1, Revised Plan 2, Revised Plan 3, and Illustrative Plan 4. Do each of those --

THE COURT: Just a minute, Mr. Spiva. Aren't we only looking at the revised plans? Aren't those the operative ones that we're considering?

11:17:19

MR. SPIVA: That is correct, Your Honor. I just wanted to make sure that was clear.

THE COURT: I'm clear with that, and we can just go on directly to those.

11:17:25

MR. SPIVA: I wont' repeat it. Sometimes I fall into illustrative plan, and I just want to make sure it's clear.

With the exception, Your Honor, that Illustrative Plan 4 is the same.

THE COURT: Was not modified, right?

11:17:35

MR. SPIVA: Yeah. Not modified.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 67**

68

THE COURT: I got it.

MR. SPIVA: Okay.

BY MR. SPIVA:

Q And I think I understand that you did not pair incumbents in those plans, correct?

A Correct.

Q Okay. Was any one of the factors we just discussed the predominant factor in preparing those illustrative plans?

A No.

Q Okay. Did you look predominantly at race in your development of your illustrative plans?

A I was aware of race as a background factor. This is a *Gingles 1* analysis, and this is a Section 2 case, so obviously race is a factor.

But as I've indicated, I was also thinking about other items, like county boundaries, preserving cultural ties, for example, in the Black Belt area. So I was looking at other -- other factors, not race as a predominant factor.

Q Why did you draw four different plans? And I'm again putting aside the original illustrative plans. Why did you draw four plans?

A Well, I just thought it was important to demonstrate that there were various ways to draw two majority black districts that could look quite different, in terms of the counties included in each one of the two majority black districts. It's

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 68**

69

different configurations.

Q Okay. Let's pull up Plaintiffs' Exhibit 61, which is Exhibit A-2 to your second report, your second declaration, or -- and let me ask you to verify once we get there, Mr. Cooper, if that is, in fact -- pardon me one minute -- if Plaintiffs' Exhibit 61 is, in fact, Exhibit A-2 to your second report.

A Yes, it is.

THE COURT: And just for the record, and to be clear, the witness' second report is which exhibit?

MR. SPIVA: Thank you, Your Honor. The witness' second report is Plaintiffs' Exhibit 59.

THE COURT: Thank you. I just want to make sure we got the trail.

MR. SPIVA: Yes. Thank you. It's hard for me to -- I'm trying to trace them through, but sometimes you lose your place.

BY MR. SPIVA:

Q So this Plaintiffs' Exhibit 61, is that the -- well, Revised Plan 1 that you did, Mr. Cooper?

A Yes.

Q And I'm displaying Revised Plan 1 kind of as a visual aid, but I'd like to -- before we dive into the specifics of each one, I'd like to get you to describe the features that the illustrative plans share.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 69**

And let's actually pull up -- sorry. Let's actually pull up paragraph 53. We can keep this maybe to the side -- in your first report, Plaintiffs' Exhibit 1, and it appears on pages 23 and 24 of your first report.

11:21:45 Does this section of your report, Mr. Cooper, describe the common characteristics of each of the illustrative plans that you drew?

A Yes.

Q And this remained true even after you did the revised

11:22:04 versions, right? These remained as common features?

A Right.

Q Okay. Or common characteristics.

And where is the CD 7 roughly located in the illustrative plans?

11:22:20 A Well, CD 7 in the illustrative plans, of course, is always partly in Jefferson County. But then in the various plans that I produced, the other counties varied to a certain extent.

So Tuscaloosa, I believe, is in all of the District 7 plans. But in two of them, Tuscaloosa is divided between

11:22:52 District 7 and District 4 just as it is in the 2011 plan. But in two of the plans, Tuscaloosa County is entirely in District 7.

Q Okay. What about CD 2, the new majority-minority district? Where is that roughly located in the various

11:23:14 illustrative plans that you created?

71

A Okay. Well, one key commonality is that in all of the illustrative plans, District 2 includes part of Mobile County and all of Montgomery County.

And in the existing 2011 plan, part of Montgomery County is in District 7 with the remainder put into white majority districts. And all of Mobile County is in white majority District 1.

Q Okay.

A So that's a key contrast there.

But, again, depending on the illustrative plan, there are various configurations of the counties between those areas shared by both District 2 and 7 depending on the plan.

Q Okay. And we'll dive into each of them in just a minute.

In terms of commonalities, are the black voting age populations of CDs 2 and 7 in each of the illustrative plans that you did greater than 50 percent?

A Yes.

Q Okay. And what is the black-to-white voting age margin for CDs 2 and 7 in the various illustrative plans? In other words, what's the range of margins between black voting age population and white voting age population in each of the illustrative plans that you drew?

A Well, the range for the black voting age population and the non-Hispanic voting age population is roughly 4.7 percentage points to 8 percentage points. So these are strong

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 71**

72

districts.

There's a big differential there between the white population in Districts 2 and 7 under the four illustrative plans. They are not 50/50 districts.

11:25:12 Q And I think you already said this, but is Montgomery County kept whole in each of the illustrative plans that you drew?

A Yes.

Q And did you examine the county in VTD splits in the

11:25:27 illustrative plans as compared to those in the 2011 plan?

A Yes.

Q Let's pull up Plaintiffs' Exhibit 59, which is your second declaration, and in particular, Figure 12 on page 29.

And what does Figure 12 show?

11:26:11 A This just compares in the first column the total number of county splits or split counties in the 2011 plan versus the four illustrative plans.

And as I mentioned earlier, in two I managed to split just six counties, one less than the current 2011 plan that has

11:26:33 seven splits.

The second column shows what I've termed as discrete splits. In other words, if a county is split two ways, then there would be two districts in that county or two unique county district numbers.

11:26:52 So in the 2011 plan, because Montgomery County is split

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 72**

73

three ways, there are 15 unique county district numbers or discrete splits, which is one more than in Revised Plan 2 and Revised Plan 3, and three more than in Revised Plan 1 and Revised Plan 4.

11:27:21 So whether you look at just a number of counties that are split or the actual number of splits within those counties, our plans are superior.

Q And you also have a column for 2010 VTD splits populated. What does that show?

11:27:45 A That just shows the number of VTDs or precincts that are split in the whole plan.

In the 2011 plan, there are 16 populated VTDs that are split. And in the revised plans, Revised Plan 1 splits just 12 populated VTDs; 2 and 3 split 13 and 16 respectively; and 11:28:10 Illustrative Plan 4 splits just 10.

THE COURT: By the populated VTD splits, is that what you were talking about earlier where sometimes it included a commercial district or something or another that had no population?

11:28:23 THE WITNESS: Right.

THE COURT: Okay. Thank you.

BY MR. SPIVA:

Q And I noticed that there are two figures under that column 2010 VTD splits that are in red. Was that because there were 11:28:37 corrections made there?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 73**

74

A Yes. Compared to the original illustrative plans as I was shifting a few precincts around to get Representative Sewell into the majority black District 7.

Q And I think you mentioned a minute ago that generally it's sometimes necessary to split VTDs to reach a zero population deviation. In these plans, when you had to split VTDs, how did you decide where to place the splits?

A I tried to follow named streets, primary roads.

I mean, I guess we will get to this point later on, but in Mobile County, in order to ensure that Mobile and Baldwin counties were connected by land, there are three or four precinct splits that basically just follow I-10 just to the west of the bay. And those splits were unrelated to trying to achieve one person one vote. They were related to trying to make sure that there was land contiguity between Baldwin and Mobile County for District 1.

Q Okay. And let me ask if we can pull up the same exhibit, Plaintiffs' Exhibit 59. It's actually Figure 11 on the previous page, 28 -- page 28.

And does this show the relative compactness scores of the illustrative plans to various other plans?

A Yes.

Q And let me first ask you: I take it that this chart includes the compactness scores of the 2011 plan; is that correct?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 74**

75

A Yes. The first row shows the mean average for all districts for the 2011 plan. And then I break out CD 7 --
Q Okay.
A -- showing the compactness scores under the Reock test and the Polsby-Popper test.
Q Before we get to the particulars of that, I just want to -- it also compares the compactness scores for the board of education plan, the 2017 state Senate plan, the 2017 state House plan, and then your various illustrative plans; is that correct?
A That's correct.
Q And can you explain to the Court what these scores are? What is a Reock score? What is a Polsby-Popper score?
A Well, put simply, since I have a simple mind, the Reock score is simply a ratio of the area of a circle over the area of the district it encompasses. And a higher score means it's more compact and more like a circle.
So a circle has a 1.0 score. And if you draw a really crazy looking district, then you go down to something probably into the single digits.
Q And why a circle? You know, what is it about a circle that is relevant to the measure of compactness?
A It's just one way to look at these -- at whether or not a district is reasonably compact. It's one --
Q Would a circle be the most compact district you could

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 75**

         76

physically create?

A Yes. However, one could look at a square and say that's not bad either, but it would perhaps not score a one. So that's another issue, I suppose. But it's area based.

11:32:42 And then the Polsby-Popper score, which I guess you're getting to -- I will wait for the question, I suppose.

Q Just one more thing, though, because there is no obviously -- it's an obvious question, but there is no such thing as a circular district in the United States that you are aware of, right?

11:32:56

A Not -- not that I am aware of. There are some --

Q I should have known better to ask that question.

A There are some municipalities that are circles. Like, I have seen some in Georgia like that. So, you know, maybe they comprise a single district in a county or something. I can't say.

11:33:12

Q I guess what I am getting at is there are either no or very few districts that could score a perfect one, for instance, on the Reock test?

11:33:26 A Right.

Q Okay. And then what is the Polsby-Popper test?

A It's also based on placing a circle over the district, but it's based on the perimeter of the district.

And, again, one would be a perfect score, but the Polsby-Popper scores are always significantly -- or at least

11:33:43

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 76**

77

always almost significantly lower than Reock.

Q And similar to Reock, the lower the Polsby-Popper score, does that mean the less compact the district is?

A Yes.

11:33:57 Q Okay. And so can you describe how your illustrative plans measure up compared to the compactness in the 2011 plan or the board of education plan?

A They're basically on par. There's a slight difference in the Reock score.

11:34:20 For example, the 2011 plan has a Reock score for all districts of .38, and CD 7 is .38. Revised Plan 1 has District 2 at .35 and District 7 at .38.

And I guess you can see the tables for the rest of the districts are slightly lower, but nothing out of the norm, in 11:34:42 my opinion. I've seen congressional districts in place today in other states that have significantly lower scores than the 2011 plan and the revised plans and the Illustrative Plan 4.

Q Just in terms of kind of -- well, first of all, I think I forgot to ask you: Reock and Polsby-Popper, are those scores 11:35:04 that are commonly used in these types of cases to evaluate the compactness of districts?

A Yes. They seem to be the two primary measures.

Q And is there -- in your experience, is there a significant -- what is the difference, say, between .38 in the 11:35:24 2011 plan and, say, .31 for District 7 in your Revised Plan 2?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 77**

78

A I would consider that insignificant.

Q Are there plans -- you mentioned that there were plans in other states that have significantly lower scores. Can you give, you know, one or two examples of that?

11:35:51 A Louisiana Congressional District 2, which is majority black district running from New Orleans to Baton Rouge, scores .06 on the Polsby-Popper score. I don't recall what the Reock score is.

Q Okay. And how do the illustrative districts compare to 11:36:26 the other Alabama statewide plans on the chart, in terms of compactness?

A Well, the board of education plan is a little more compact overall on the Reock score in District 4 and District 5 score -- .4 and .37; whereas the illustrative plans, other 11:36:49 than District 7, the Revised Plan 1 all score in the lower 30s or mid 20s, with respect to District 2, at least, and District 4 -- Revised Plan 2 and Illustrative Plan 4.

Q And how do the Polsby-Popper scores for your -- for the revised plans and Illustrative Plan 4 compare to the 2011 plan?

11:37:24 A Here, the Polsby-Popper score for Revised Plan 1, both District 2 and District 7 are higher than CD 7, which scores .13. And, in fact, the same holds true for Revised Plan 2. It's higher. District 2 is .14, whereas CD 7 is .13, not much different really, but it did score higher.

11:37:57 And in District 2, in Revised Plan 3 is .18, but District

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 78**

79

7 scores .13. So the same.

And in Illustrative Plan 4, District 2 is .13, the same. District 7 is significantly higher than CD 7.

So on Polsby-Popper measured against CD 7, the illustrative plans are on par or better.

Q Okay. And I noticed that you also have columns next to both the Reock and the Polsby-Popper scores where you say low and high. What are those kind of sub columns referring to?

A That just refers to the lowest score of a district in any given plan.

So you can see that in the 2011, the lowest scoring district was CD 7 under the Polsby-Popper test. And the highest was .28, one of the other districts.

For Reock, the lowest score was .22, which was not CD 7. It was one of the other districts.

Q You don't recall which other district it was?

A No. I actually did prepare an exhibit that has compactness scores for all of the illustrative plans, as well as the 2011 plan. That's not the revised plan. I don't think I ran off an exhibit for the revised plans. But those scores were almost the same anyway.

So I would have to refer back to my declaration as to where that exhibit is.

Q That's fine.

A But it does exist. It shows every district plan by plan

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 79**

80

11:39:43
11:40:09
11:40:30
11:40:52
11:41:14

with Polsby-Popper and Reock scores.

Q We may get to that. I don't have it right handy, so we'll keep going.

So does the chart show that the lowest scoring Reock score for the 2011 congressional plan, the lowest scoring district is lower than the Reock score for Districts 2 and 7 in your various illustrative plans?

A Yes.

Q And in terms of compactness, are there natural geographic features of political bodies, like states, counties, cities, that can affect the compactness of a district?

A Yes. I mean, I think I cited Jefferson County as an example of a place that has very odd-shaped municipality boundaries, which also begins to impact the shape of the voting districts. And so that does make a difference.

You could draw more compact areas in Jefferson County easily but for the fact that you also want to follow the precincts. So it creates some relatively odd shapes for sure in Jefferson County because you're following precincts.

Q So if you split more counties, cities, VTDs, you could draw a more compact district?

A For sure in Jefferson County.

Q Okay. Let's turn to Revised Plan 1. And let's look at Plaintiffs' Exhibit 60, which is Exhibit A-1 to your second report.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 80**

81

And tell me, Mr. Cooper, what is the chart in exhibit -- Plaintiffs' Exhibit 60?

A This just shows a little more detail on the demographics of each of the districts according to the 2010 census for all of the columns except the very last two, which show citizen voting age population for the non-Hispanic black percentage.

Q Can I just interrupt for one second? Because I don't know -- these are population statistics for Revised Plan 1; is that right?

A Right.

Q Okay. Go ahead.

Well, actually, let me ask you a more direct question: What is the BVAP of CD 2 in this plan? In the Revised Plan 1 according to this chart.

A 51.32 percent.

Q And where is that found? What column and row?

A Sort of in the middle.

Q If you can give the label of the column and the --

A Someone just highlighted it.

Q Oh. So it's the column that says percent 18 plus AP black; is that right?

A Right.

Q Is that correct?

A Right.

Q Okay. And that obviously is, of course, percent 18 plus

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 81**

82

all-part black, right?
A Yes.
Q Okay. And what is the BVAP of CD 7 in this plan?
A 50.65.
11:42:53 Q Let's pull up Plaintiffs' Exhibit 67. And what is this, Mr. Cooper?
A This is Revised Plan 2.
Q And how does Revised Plan 2 differ from Revised Plan 1?
A Well, with respect to District 7, Revised Plan 2 would 11:43:37 eliminate the split in Tuscaloosa County. So Tuscaloosa is entirely in District 7, and the district itself extends further south to include Washington and Clarke counties.

District 2 in this configuration also expands in the sense that it picks up one more county in east Alabama -- Barbour 11:44:01 County -- along the Georgia line, which is part of the historic Black Belt. So this really is the only plan that would include Barbour County in a majority black district.

And then the other counties from Mobile to Montgomery there are included in the majority black district is -- would 11:44:24 be a little part of Baldwin, as well as all of Monroe, Conecuh, Butler, Crenshaw, Pike. You know, the rest of the Black Belt counties, plus Montgomery.
Q Okay. Let's take a look at Plaintiffs' Exhibit 66, which is Exhibit B-1 to your second report.

11:44:47 And is that the population and summary report for Revised

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 82**

83

Plan 2?
A Yes.
Q Okay. And what is the BVAP of CD 2 in this plan? In Revised Plan 2?
11:45:00 A 51.37 percent.
Q And what is the BVAP of CD 7 in this plan?
A 51.95 percent.
Q Okay. Let's pull up Plaintiffs' Exhibit 73. Can you describe the configuration of CD 7 in this -- well, first of all, let me ask you: What is Plaintiffs' Exhibit 73?
A This is Revised Plan 3.
Q And can you describe the configuration of CD 7 in this plan?
A Yes. In this plan, as always, Jefferson County is partly in District 7. And in this instance, Tuscaloosa remains split between Districts 6 and 7.
Q I'm sorry to interrupt. When you say remains split, Tuscaloosa is split under the 2011 plan?
A Right.
Q The current plan?
A Right.
Q All right. Go ahead.
A And then it picks up a couple of counties with significant black population; namely, Talladega and Coosa that have roughly 30 to 35 percent black population according to the 2010 census.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 83**

84

So I've included those two counties in District 7. They are not included in any of the other illustrative plans.

And so that results in a District 7 -- well, I don't have the percentage in front of me, but it's majority black --

11:46:49 Q Okay.

A -- and then --

Q What about --

A -- District 2 would extend a little bit further to pick up Choctaw County. It's not always including Choctaw County in

11:47:01 some of the plans.

Q And any other differences or unique features of CD 2 in this Revised Plan 3?

A Well, I do not think that Autauga County is in District 2 in any of the other plans. In this plan, it is shared with

11:47:20 District 3.

Q And let's pull up Plaintiffs' Exhibit 72. And I'll ask you if that is C-1 to your second report, if that's the population summary report for Revised Plan 3?

A Yes.

11:47:38 Q And what is the BVAP of CD 2 in this plan?

A 50.99 percent.

Q And what is the BVAP of CD 7 in this plan?

A 50.34 percent.

Q Okay. And if we can now pull up Plaintiffs' Exhibit 40,

11:48:02 which is Exhibit K-2 to your second report?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 84**

85

A Actually that's first report.

Q Yes. I'm sorry. That's Exhibit K-2 to your first report; is that right?

A Right.

11:48:21 Q And let's now discuss the unique details of Illustrative Plan 4. How does Illustrative Plan 4 differ from the Revised Plans 1, 2, and 3?

A First, in Illustrative Plan 4 as in Illustrative Plan 2, Tuscaloosa is entirely in District 7.

11:48:45 The other primary difference in Illustrative Plan 4 is that Mobile County is divided so that the western-most boundary of District 2 is actually the Mississippi state line and the southern-most is the Gulf. And then the eastern boundary -- for much of the eastern boundary follows Mobile Bay. So that 11:49:13 that allows for a way to drive directly into Mobile County from Baldwin County via I-65.

So the northwest or northeast quadrant of Mobile County now is completely connected to Baldwin via I-65.

Q And in the other plans -- I think you've said this, but I 11:49:49 just want to make sure it's clear in the record -- there's a land route between Baldwin and Mobile County; is that correct?

A Yes. According to the guidelines of the state legislature, water contiguity is acceptable. But I don't know if they really meant Mobile Bay or not. So for that reason, I 11:50:12 decided to split three precincts facing Mobile Bay so that one

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 85**

86

11:50:24
11:51:00
11:51:16
11:51:29
11:52:02

could drive from Baldwin into Mobile and still be in District 1.

Q Okay.

MR. SPIVA: Your Honor, can I have just one second to confer with my colleague?

Thank you.

BY MR. SPIVA:

Q And let's if we can pull up Plaintiffs' Exhibit 39.

And is that -- Mr. Cooper, is that the population summary report for your Illustrative Plan 4? For your reference, this is Exhibit K-1 to your first declaration.

A Yes.

Q And what is the BVAP of CD 2 in this plan?

A 50.33 percent.

Q Is that CD 2 or CD 7?

A That's CD 2.

Q Oh, okay. I'm sorry. My notes were mixed up.

And what is the BVAP of CD 7 of this plan?

A 50.74.

Q I am going to turn, Mr. Cooper, to some of the criticisms of your report in Dr. Johnson's report.

First of all, have you reviewed Dr. Johnson's report?

A Yes.

Q The first issue that Dr. Johnson raises is your use of any-part black in determining whether the illustrative

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 86**

87

districts have BVAPs over 50 percent. Did you see that in his report?

A I did.

Q Okay. I'm not actually directing you to a particular part of his report --

A Right.

Q -- I just -- we've already discussed why you chose to use any-part black figures, so I won't repeat that.

But what measure does Dr. Johnson say you should use?

A Dr. Johnson --

Q I don't know if it will help to look at Plaintiffs' Exhibit 59, which is your second report, paragraph 8.

A Well, Dr. Johnson suggests that I should have used non-Hispanic black VAP as opposed to single-race black VAP, which is what the state legislature used.

Q And if we can take a look at page 5 of your second report, Plaintiffs' Exhibit 59, you report here on citizen voting age population in this table, do you not?

A I do. Of course, that's citizen voting age population under the 2008-2012 American Community Survey, which would be roughly coincident with the 2010 census, because the survey midpoint would have been July of 2010.

Q Okay.

A And so that shows citizen voting age population in the 2011 plan along with the illustrative plans.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 87**

88

And one can see that in all four illustrative plans, Districts 2 and 7 are more than 50 percent non-Hispanic black citizen voting age population based on the 2008-2012 ACS.

And advancing five years to mid decade, the districts are even stronger across the board, the illustrative plans.

Q Let me stop you there, Mr. Cooper, because I think based on a ruling from Your Honor earlier, we probably don't need to go to that data.

But let me -- let's take this down and just ask you the question: Are any of your districts -- are any of the districts in the illustrative plans that you drew over 50 percent BVAP even using the single-race black definition that Dr. Johnson says you should use?

A Yes. Illustrative Plans 1 and 2 would have districts that are over 50 percent non-Hispanic black single race. So, yes.

Q And that's based on the 2010 census numbers?

A Right. Right.

Q Okay.

A That is a more narrow definition than that used by the state legislature.

Q Correct.

THE COURT: Do you have a chart or anything that shows that?

THE WITNESS: I don't think I broke out the non-Hispanic black VAP in a chart.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 88**

89

BY MR. SPIVA:

Q Let me see if I can get that.

A I did not break that out in a chart.

Q Is it elsewhere reported in your second declaration, though?

A Well, the statement I make here is that Dr. Johnson acknowledges that District 2 and District 7 in Illustrative Plans 1 and 2 contain non-Hispanic black voting age population majorities.

Q Where are you referring to?

A Paragraph 8 on page 3 of my declaration.

So I believe that Dr. Johnson has a table or a paragraph that addresses that.

Q Okay.

A But I disagree with Dr. Johnson on the need to use that narrow definition for voting age population.

Q And why is that?

A Because it's not a necessary distinction in a state like Alabama, where Latinos comprise a population that is, in terms of voting age, just in the low single digits. It's just a meaningless term.

Q And just to be clear, using the all-part black definition that you use and that we've seen in the various tables we've looked at, all of the Districts 2 and 7 in each of your illustrative plans are over 50 percent black?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 89**

90

11:57:37

A Yes.

Q And using the narrower definition that Dr. Johnson says that you should use, based on one of his tables, two of your districts in the illustrative plans are also over 50 percent black; is that correct?

A That is correct.

Q And are you able to identify those -- I know this shouldn't be a memory test. So, you know, at a break or something I can get the actual table from his report. But if you know it from memory, if you can --

A I do not recall.

Q Okay. That's fine.

THE COURT: May I ask a question?

MR. SPIVA: Sure.

THE COURT: Mr. Cooper, where did you get the data that went into the any-part black numbers?

THE WITNESS: From the P.L. 94-171 file.

There's not an absolute column showing any-part black. What you do is you add up the various multi-racial categories, and then you have that number. And it is included in the redistricting data sets that are available from the Caliper Corporation that produces Maptitude for redistricting. So at least --

THE COURT: Okay. So you got it from the Census Bureau data?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 90**

91

THE WITNESS: Yes.

THE COURT: Okay. Thank you.

BY MR. SPIVA:

Q And then, Mr. Cooper, Dr. Johnson also criticizes your adherence to what he says are traditional districting principles. And he touches on a number of topics, so let me just ask you about them one by one.

Regarding compactness, Dr. Johnson questions the compactness of the illustrative districts you've drawn. How do you respond to that?

A Well, we'll just have to agree to disagree, because I think visually these plans are acceptable when compared with congressional districts across the land. And the compactness scores provide an objective measure which show that there's nothing unusual about the four illustrative plans as compared to the 2011 plan.

Q And are his criticisms based on compactness scores?

A No. I think he just made the comment without really going deeper into the compactness scores.

Q Did he include compactness scores in his report?

A No.

Q Is there any kind of a break line standard for when a district is -- among redistricting experts for when a district is considered compact or not compact?

A I don't believe so. I don't think any court has ever

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 91**

92

ruled that you have to have a certain Reock score or a certain Polsby-Popper score to be acceptable.

Q Okay.

A There are so many other factors at work like county lines and the shape of states. It does mean that you -- it's very difficult to even conjure up a concept of how that would be done to be applied across any congressional district anywhere in the country.

Q Okay.

12:00:04

12:00:21

MR. SPIVA: Your Honor, I didn't know what time you wanted to break for lunch.

THE COURT: Like I said, I have got a 1:00 o'clock, so closer to 1:00 o'clock if y'all's stomachs aren't growling too much. But if anybody needs a break at any time, all you have to do is let me know.

12:00:34

MR. SPIVA: Okay. Thank you, Your Honor.

BY MR. SPIVA:

Q So let's look at Plaintiffs' Exhibit 63. And that is Exhibit A-4 to your second declaration.

And what is this, Mr. Cooper?

12:00:55

A This is Revised Plan 1 zooming in on the Mobile Bay area. And if you look closely, you can see that crossing I-10 from Baldwin into Mobile you hit a pink area. And from there, you can track down to roughly the area where State Route 163 veers south and continues in District 1.

12:01:27

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 92**

93

So it's contiguous by land. But if I had used water contiguity, at least three of the precincts splits in Mobile County could have been eliminated.

Q And did Dr. Johnson criticize your maps because of a claimed lack of contiguity in Mobile County?

A Did he say it was not -- I'm not sure if he actually stated that or not. Did he?

Q Yes. I mean, he criticizes your maps for lacking contiguity in Mobile County. And what is your response to that?

A Well, he's wrong. He's wrong. Incorrect.

Q And why is that?

A Because, as you can see in all three of these maps Revised Plans 1, 2, and 3, Baldwin County is contiguous by land via I-10 and U.S. 98 into downtown Mobile with plenty of space to the east that is in District 2 and then further District 1. And then further south, you're entirely in District 1.

So it is clearly contiguous.

Q Did you consider using Mobile Bay for contiguity?

A I did. And there is a stipulation in the guidelines of the state redistricting commission, the legislature commission indicating that water contiguity is acceptable.

But what I don't know and still don't to this day really know is did they mean Mobile Bay, or just the Tennessee River, or the Alabama River or something.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 93**

94

So I just wanted to make sure that there could be no argument that I had drawn a district, i.e. District 1, that was not contiguous because it crossed Mobile Bay.

Q Does the 2011 board of education plan join two districts using Mobile Bay for contiguity?

A Yes.

Q And if Mobile Bay could be used for contiguity in your revised and illustrative plans, how could those plans be modified?

A Well, three or four precinct splits along I-10 facing into Mobile Bay would be eliminated. In other words, the number of precinct splits in all -- in Revised Plans 1, 2, and 3 would be cut by about three precincts. Illustrative Plan 4, which has a different configuration that we reviewed earlier --

Q Why don't we actually go to that? Let's pull up Plaintiffs' Exhibit 42, which is I believe is Exhibit K-4 to your first report, and ask you to explain -- I think where you were going, but explain what this is.

A Right. And so in Illustrative Plan 4, as you can see, the connector between I-10 -- I mean, between Baldwin County and Mobile County for District 1, the primary connector would be I-65. And there -- I mean, there's no question it's contiguous. You don't even need to zoom in on downtown Mobile and I-10.

So that solves it. That revolves it. I mean, if there's

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 94**

95

any question about it, here you go.

Q Now, and what's the primary road that connects Mobile and Baldwin in Revised Plan 4?

A Well, it's I-65.

12:05:18 Q Okay. And Dr. Johnson notes that more persons are shifted into different congressional districts under the illustrative plans than under the 2000 plan, as compared to the 2001 plan. Can you explain why that is the case?

A Well, anytime one creates a new majority-minority 12:05:51 district, more often than not a lot of people are going to have to be moved, particularly when the black population has been, in my opinion, cracked between three different districts -- CD 1, CD 2, and CD 3. So to make a new district in that area, you've got to take a lot of people from both CD 1, CD 2, and CD 12:06:13 3 in the present plan -- or in the old 2001 plan -- and put them into a new district. So the fact that the illustrative plans move roughly one-third of the population in a seven-district plan is not at all unusual.

I do, in a footnote, cite a county of Georgia, Emanuel 12:06:37 County, a small rural county that has seven districts, and originally just had one board of education district that was majority black. A lawsuit was filed, and a consent decree was signed in 2016 accepting the plan that I drew that created a new majority black local board of education district. And to 12:06:59 create that district, I had to move 31 percent of the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 95**

96

population in the county into a new plan that had two majority black districts.

Q And just since you referenced it, do you happen to know where that footnote is that you mentioned?

12:07:15 A It's footnote 6 on page 8.

Q Of your second report?

A Yeah.

Q Okay.

A The paragraph 21 references footnote 6.

12:07:22 Q Okay. And that's --

THE COURT: Which is exhibit?

MR. SPIVA: Plaintiffs' Exhibit 59, Your Honor.

THE COURT: Thank you.

BY MR. SPIVA:

12:07:27 Q And we don't need to actually pull it up, but I just wanted the reference to be clear.

And then, in your opinion, would it be unusual to move one-third of the population of a state to create a new majority-minority district?

12:07:47 A Not at all. Not at all. It would be quite common, probably.

Q In developing the illustrative plans, did you consider the 2001 plan or the 2011 plan?

A Well, I was aware of the 2001 plan. So I had lines on my

12:08:08 map showing the configuration of both the 2001 plan and 2011

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 96**

97

plan, as well as the board of education plan. But I mainly was paying attention to the 2011 plan and the board of education plan since they were drawn based on the 2010 census.

Q Now, Dr. Johnson also criticizes your report on the basis that Alabama's likely to lose a district in 2020. And so I'd like to discuss -- shift focus and discuss the possibility of creating a six-district plan with two majority-minority districts.

12:08:38

MR. WALKER: Your Honor, if I may. I thought we were not going into this.

12:08:59

THE COURT: If it's part of your expert's criticism, should we? I don't --

MR. WALKER: My understanding from our conversation earlier was that the 2020 plan is not being considered by the Court, given that the purpose of this hearing is for the Court to determine whether the legislature in 2011 could have drawn any of the illustrative plans proposed by Mr. Cooper, of which the 2020 plan with six districts is not one.

12:09:17

THE COURT: Right.

MR. SPIVA: But in their expert reports, which there is this criticism of the fact that Alabama's likely to lose a seat, and I think in their pretrial brief actually they raise that as one of their defenses. So this was just a response to that.

12:09:33

MR. WALKER: If that's irrelevant, Your Honor, it's

12:09:48

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 97**

98

irrelevant in the report and in our brief.

MR. SPIVA: As long as their defense on that regard is irrelevant, then I'm happy to skip this.

THE COURT: Seems like it's irrelevant to me, because I really believe we need to be focusing on what the legislature could have done in 2011.

MR. SPIVA: And we actually agree for the record, Your Honor. I just want to make sure it is clearly conceded that they are not going to argue that as a defense that we -- it's no longer proper to have a declaration because of the potential loss for a district.

THE COURT: Okay. So when Dr. Johnson testifies, he will not be allowed to criticize any of the reports because of any impact that 2020 may have.

MR. WALKER: Dr. Johnson's criticisms of the 2020 plan, my understanding is that --

THE COURT: I don't think we have a 2020 plan yet, do we?

MR. WALKER: Mr. Cooper has prepared a hypothetical 2020 plan with six districts.

THE COURT: Right. I don't think we need to get there either with Mr. Cooper or with Dr. Johnson.

MR. WALKER: And that is all I was saying. I think both his testimony and his drawing of the plan is irrelevant, as is the criticism of it or any argument about it.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 98**

99

THE COURT: Right. So we're not going to get into it with Dr. Johnson if we don't get it into it with Mr. Cooper today. Right?

MR. WALKER: We are not going to get into that. I mean, we --

THE COURT: Okay.

MR. WALKER: Should that issue somehow become relevant, we stand by what we've said.

THE COURT: Certainly. Certainly.

MR. WALKER: Thank you, Your Honor.

THE COURT: Okay.

MR. SPIVA: Thank you, Your Honor.

BY MR. SPIVA:

Q So, Mr. Cooper, we're going to switch gears and actually talk about the demographic census data that you reviewed regarding socioeconomic disparities between blacks and whites.

And let's take a look at your first report, Plaintiffs' Exhibit 1 at pages 41 to 42. And, Dr. Cooper, you did an analysis of the disparities between African-Americans and whites in Alabama; is that right?

A I did, using the 27 ACS statewide, and also for four of the congressional districts that would be impacted by the illustrative plan districts.

Q And what were your conclusions regarding the socioeconomic disparities between African-Americans and white Alabamians?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 99**

100

A Well, there's a big difference in socioeconomic well-being for African --

THE COURT: Wait a minute. Just a minute. Are you using 2017 information?

12:13:12 THE WITNESS: From the American Community Survey, right.

THE COURT: Okay. So how was that relevant to 2011 situation and what the legislature could have done then?

MR. SPIVA: This is different, Your Honor, because 12:13:26 this goes to the Senate factors. So that really does look to the disparities between blacks and whites, or, in this case, blacks and whites and whether that interacts with, you know, whatever is being -- whatever voting mechanism or districting that is in place to create less opportunity for 12:13:50 African-Americans to participate. And it's a result --

THE COURT: Right. And I understand that that information is relevant. But why are we looking at 2017 information instead of 2011 information to get that data for the Senate factors?

12:14:11 MR. SPIVA: Because it's a results test, Your Honor. And so the Senate factor really looks to what is now. And so that's the more appropriate data, I think, under the case law. I don't have at my fingertips. I could get it for Your Honor.

But you're looking at what is the results of what was -- 12:14:34 what was passed and how that interacts with the socioeconomic

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 100**

101

factors.

THE COURT: So wait a minute. You're saying that these factors in 2017 are a result of the 2011 --

MR. SPIVA: No.

12:14:47 THE COURT: -- drawing of the district?

MR. SPIVA: No. The question is the way the districts were drawn, do they interact with these various Senate factors, some of which are socioeconomic. Some are involving things like racial appeals and the like and polarized voting to deprive African-Americans of the full participation, political participation. It's not a -- it doesn't look at intent. So it doesn't matter what was in the minds of the legislators at the time, what the conditions were at the time.

The question is just does the map that was drawn deprive African-Americans of full political participation as compared to whites? And many of the factors that go into that are these socioeconomic factors.

THE COURT: I understand that. But I don't understand why we're looking at 2017 instead of 2011.

Is there an issue with that, Mr. Walker? Or am I seeing an issue that may not necessarily be there?

MR. WALKER: Your Honor, there's a little cognitive dissonance in it, I suppose. But I believe that on this issue they are entitled to present evidence of current circumstances.

12:16:05 THE COURT: Okay. Thank you.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 101**

102

MR. WALKER: Yes, ma'am.

THE COURT: I don't think there's that much difference from 2011 to 2019, in terms of these disparities. I think they're pretty well recognized in a lot of data from a lot of years and a lot of places.

12:16:22

MR. SPIVA: Yeah. Unfortunately so, Your Honor. And actually documented.

THE COURT: Very unfortunately so, right. You may proceed, then.

12:16:32

MR. SPIVA: Thank you, Your Honor.

BY MR. SPIVA:

Q So was there any measure that you looked at that is set forth in your first report on pages 41 and 42 where African-Americans outpaced whites in these various measures?

12:16:58

A I don't believe so.

Q And let's pull up Plaintiffs' Exhibit 49. And maybe if we can keep those two pages we had up at the same time, if that's possible, which was pages 41 and 42 of the first report.

And this Plaintiffs' Exhibit 49, which runs for several pages, I take it that that is N-1 -- Exhibit N-1 to your first report, Mr. Cooper; is that right?

12:17:49

A Yes. N-1 has bar charts illustrating the disparities. And then the original census document that has the same percentages presented is N-2.

12:18:13

Q Okay. And let's turn -- let's maybe highlight page 22 of

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 102**

103

the first report or blow it up a little bit.

THE COURT: You're not asking much of the poor person who's driving your --

MR. SPIVA: She's a magician, Your Honor.

12:18:32 THE COURT: -- exhibits here. Yeah. I think you've now mentioned maybe four pages that you want up on the same screen, and I'm not sure that's going to be very helpful anyway.

MR. SPIVA: I'm sorry. Did I say page 22? Pardon me.

12:18:47 I'm sorry. Page 22 of N-1, I believe.

THE COURT: Of N-1, which is 49?

MR. SPIVA: Yes, Your Honor.

THE COURT: Okay. For the record, it's going to be much easier if you identify it by the exhibit number that's in

12:19:02 evidence.

MR. SPIVA: Absolutely. I will do that from here on out.

BY MR. SPIVA:

Q And can you tell us what the poverty rate for

12:19:13 African-Americans was -- is in Alabama?

A 27.4 percent.

Q And how does that compare to non-Hispanic whites?

A Non-Hispanic whites poverty rate of 11.6 percent.

Q I think actually -- you know, and Your Honor makes a good

12:19:42 point. I'm not sure we need the non bar charts. But after we

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 103**

104

take them down, Mr. Cooper, let me know if you need to reference them, or you've got it, I think, in your book in front of you, the pages from your report. We can probably just go with the charts.

12:19:58 A Yeah.

Q And what is the child poverty rate for African-Americans in Alabama?

A It's much higher than the overall rate. It's 40.4 percent for African-American children versus 14.3 percent for white children. 12:20:17

Q And what is the African-American -- let's turn to page 14 of this same exhibit of Plaintiffs' Exhibit 49.

And what is African-American median household income, and how does that compare to white median household income?

12:20:41 A It's just a little bit over half of the white median household income. Black median income is $31,398 versus $56,138 for white household income.

Q And looking at page 17 of Plaintiffs' 49, what is the per capita income for black Alabamians, and what is the -- how does that compare to the per capita income for white Alabama? 12:21:08

A Another big gap. The black per capita income in Alabama is $18,229 versus $30,697 for whites.

Q If we can turn to page 5 of Plaintiffs' Exhibit 49. Is this a document which sets forth various measures of educational attainment for the population 25 years and older in 12:21:46

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 104**

                105

Alabama?

A Yes.

Q And of those persons 25 years of age and older, what percentage of African-Americans have not finished high school?

12:21:58 A 16.7 percent.

Q And what is the percentage for whites over 25?

A 11.3.

Q Okay. And what about at the other end of the spectrum? What percentage of African-Americans 25 and over have a bachelor's degree or higher?

12:22:13

A 17.1 percent versus 28.6 percent for whites.

Q Okay. There seems to be an anomaly here. And I wonder if you can explain it, Mr. Cooper.

The set of bars over the high school graduate, GED, or alternative. It seems to show African-Americans -- I mean, would appear that African-Americans -- that higher percentage of African-Americans have a high school degree, or GED, or alternative than non-Hispanic whites. Can you explain how these various graphs work together, why that is?

12:22:35

12:22:56 A Well, the reason is that because there's a big difference between the African-American and white percentages for a bachelor's degree or higher, some of the other categories, specifically high school graduate or some college, would show that as a component, a higher percentage of African-Americans are at that level.

12:23:24

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 105**

106

So in the case of high school graduates -- and that label sort of obscures the African-American percentage which is right around 33 percent -- to just compared to the same component of whites, slightly more have a GED as their highest level of attainment. And again, with some college, but not a full-fledged bachelor's degree, 31.6 percent of African-Americans have some college versus 29.8 percent of whites.

Q Okay. So is it -- I don't know if another way of saying it -- and tell me if this is not correct. But are these kind of like cumulative such that it may be a little bit -- that might explain kind of the anomaly with the two middle bars?

A Right. All these add -- each bar set -- the African-American bars and the white bars would add up to 100 percent.

So the ones to key on are those who lack a high school diploma really. That's a significant one there. And there whites outperform blacks by a considerable margin, 11.3 percent versus 16.7.

And then at the other end of the educational scale, whites have an 11 percentage point advantage over African-Americans 28.6 to 17.1. That's bachelor's degree or higher. So some advanced degrees would be included in that category, of course.

Q Okay. Let's turn to page 11 of Plaintiffs' Exhibit 49. And what is the black unemployment rate as compared to the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 106**

107

white unemployment rate?

A The black unemployment rate in 2017 was 9.1 percent statewide compared to 4.6 percent for whites.

Q And then let's turn to page 13 of Plaintiffs' Exhibit 49. Of those African-Americans who are employed, what portion are in management or professional occupations?

A 24.5 percent of African-Americans are in management or professional occupations compared to 39 percent of whites.

Q Okay. And let's turn to page 21. Do these same disparities exist in housing?

A Yes. Only about half of the black population lives in an owner-occupied dwelling versus three quarters, 76.7 percent of the white population.

Q Okay. And let's turn to page 25 of Plaintiffs' Exhibit 49. For those African-Americans who do own their own homes, what is the median value of those homes?

A $92,200, which is well shy of the $155,600 median value of the white owner-occupied homes.

Q And if we can turn to page 23 of Plaintiffs' Exhibit 49. In terms of vehicle ownership or availability by household, what percentage of African-American households lack access to a vehicle?

A 12 percent.

Q And what about white households? What percentage of white households lack access to a vehicle?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 107**

108

A 3.6 percent.

MR. SPIVA: Your Honor, if I can just confer with my colleagues for a minute, I think I may be done.

THE COURT: All right.

12:27:22 MR. SPIVA: Thank you, Your Honor. I have no further questions of Mr. Cooper.

THE COURT: This may be a good time to take a break. And I hope we will be able to reconvene about 1:30, but it kind of depends upon what the lawyers throw at me that I might not

12:27:37 be expecting.

Okay.

MR. SPIVA: Thank you, Your Honor.

THE COURT: Thank you.

(Recess.)

13:32:37 THE COURT: All right. Is the defense ready to proceed with cross-examination?

MR. WALKER: Yes, ma'am. I'm sorry, Your Honor. I didn't know you had come in.

THE COURT: No problem. You may do so.

13:32:59 CROSS-EXAMINATION

BY MR. WALKER:

Q Good morning -- or afternoon -- excuse me -- good afternoon, Mr. Cooper.

A Good afternoon.

13:33:09 Q You said that the purpose of drawing your four plans was

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 108**

109

to demonstrate the possibility of drawing two majority black congressional districts while at the same time respecting the traditional redistricting criteria. Did I understand correctly?

13:33:31 A Yes.

Q Okay. And I believe you said that you did that by using Maptitude on your program?

A Well, Maptitude is --

Q Was the program?

13:33:47 A -- the redistricting software I used.

Q Okay. And is it fair to say that you were sitting at your computer, and you had a map of Alabama or some part of Alabama up, using the Maptitude program to look at whatever level of geography you were looking at -- census tracts, or census

13:34:08 blocks, or VTDs, or whatever it was?

A Yes.

Q And you would have displayed on your computer as you looked at -- I'm just going to say a census tract. You can correct me if you need to.

13:34:23 As you looked at a census tract, for example, you would have displayed on your computer information telling you how many African-Americans lived in that unit, did you not?

A I would have access to that, but I did not use that information at that level of detail. But if I wanted to know

13:34:46 how many African-Americans were in a particular precinct or

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 109**

110

census block, I could have queried it for that purpose.

MR. DAVIS: Excuse me. Your Honor, I forgot to get the headphones that I use. May I walk up?

THE COURT: Certainly.

13:35:00 MR. DAVIS: Thank you.

THE COURT: Certainly.

MR. DAVIS: I'm so sorry.

BY MR. WALKER:

Q Do you remember when you were deposed, and I asked you 13:35:17 what PL data you had displayed?

A Not specifically, no.

Q Okay. Let's look at Page 45 of your deposition.

And I asked you: Let me ask the question this way: Typically -- and I understand there may have been exceptions 13:35:53 when you wanted to bore down or something like that, but typically, what PL data did you have displayed?

You said population, voting age population, minority population, African-American single race, African-American any part, by total population and voting age population, Latino 13:36:11 population, voting age and total population. So, you know, maybe a dozen categories or so.

Now, I assume that as you were going about looking at districts, you were looking for districts that had whatever your criteria was -- enough African-Americans at that time to 13:36:34 put them into one of your majority black districts; is that

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 110**

111

right?

A Well, I was not looking for districts or blocks on an individual level. What I was trying to do was work at the county and VTD level. And I did have information about the population in the districts as I was drawing them available if I queried.

But oftentimes I would just have a map up there. And knew that I had to add population to District X or District Y. And so I was just adding the data and not even paying attention to exactly what the percentage of African-Americans might have been at each click of a mouse.

Q So your testimony is that you went about building two African-American districts by not looking at the percentage of African-Americans you were putting in those districts?

A Well, no. I looked at it on occasion, but I was not constantly looking at it.

Q Okay. And when you found a district or -- excuse me -- a VTD -- if that's the level you were looking at -- that had enough African-Americans, you would put it into one of your two proposed districts, did you not?

A No.

Q You did not?

A I was not -- I was not querying each VTD as I clicked it in. And I did not have some sort of a numerical guideline that would suggest to me that this precinct has to go into District

**Christina K. Decker, RMR, CRR**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 111**

112

2 and that one cannot.

I was looking at other things like the VTD boundaries and county boundaries and municipal boundaries and the overall shape of the district.

13:38:15 Q Okay. We'll get back to that.

Before you started your work, or as you started, you read the Alabama definition of communities of interest, didn't you?

A Yes, I did.

Q Okay. But you didn't talk to anybody about actual
13:38:39 communities of interest in Districts 1, 2, 3, or 7 before you started drawing, did you?

A My assessment was that I prepared the illustrative plans, and those plans were viewed by the plaintiffs. And --

THE COURT: Just a minute, Mr. Cooper. That was not
13:39:02 the question. If you would, please, listen to the question and answer it as directly as you can, please, sir.

THE WITNESS: Right.

THE COURT: Did you talk to anybody about communities of interest in those districts before you drew them I think was
13:39:16 the question.

BY MR. WALKER:

Q I'm sorry. Did you say no?

A Well, no, not to an individual voter anywhere, no.

Q You did not talk to anybody, did you?

13:39:24 A About this particular case and these particular

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 112**

113

illustrative plans, no. I have had other involvement in Alabama in other cases.

Q Okay. Thank you.

And the need to find enough black persons to put into District 2 and 7 or 2 explains why you split Mobile; is that correct?

A There are a variety of ways to split Mobile. But because more than 100,000 African-Americans live in the city of Mobile, I do believe that Mobile County would have to be split to create the second majority black district.

Q And in every one of your plans, you split Mobile to ensure that 100,000 African-Americans that live in Mobile County were put into District 2; is that correct?

A No.

Q That's not?

A No. I wanted to include the bulk of the African-American population in or around Mobile city, but I was not shooting for a numerical tabulation of that population. So I don't know what the underlying totals are for the numbers of African-Americans living in Mobile in District 2 in my plans right off the top of my head.

Q Well, do you recall testifying that there was 100,000 people -- African-Americans -- in Mobile that you needed to put into District 2?

A Well, I don't think I said I needed to. I just said

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 113**

114

that's the number because I'm sure I didn't include them all.

Q Okay. And when you drew your plans, you didn't know, did you, that Alabama has never split up Mobile in a congressional plan?

13:41:20 A I knew it had not been split in the plans developed in the '90s and 2000s, but I have not seen the plans going back further in time. I have since seen some exhibits that you've presented to the Court for this trial that go back to like the 1950s and before, and I don't think Mobile is split.

13:41:45 Q Is it your understanding that Alabama has at any time split the county of Mobile in traditional -- in congressional redistrictings?

A I don't know that for a fact.

Q And you didn't know that when you started drawing the

13:42:04 plan; isn't that correct?

A Didn't know what?

Q I'll show you page 56 of your deposition and ask you: Do you know whether or not Alabama has traditionally considered Mobile County to be a community of interest that it did not

13:42:21 split when drawing congressional districts?

MR. SPIVA: Sorry to interrupt, Your Honor. I have an objection actually to this. There's no question or answer that he could be --

THE COURT: I would sustain.

13:42:33 BY MR. WALKER:

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 114**

115

Q Let me ask the question again: Did you know when you started drawing the districts that Alabama considered Mobile County a community of interest that it has never split when drawing congressional districts?

13:42:49 A Well, I said I do not know that, and I said I did not know that today. I've seen some congressional maps, historical maps where Mobile was not split. But when you say --

Q You've answered my question.

A Well, okay. Alabama can be defined in many different

13:43:07 ways.

THE COURT: You've answered the question. Thank you.

BY MR. WALKER:

Q And do you know whether or not Alabama has traditionally kept Mobile and Baldwin County together in the same

13:43:32 congressional district since the 1970s?

A I am aware of that. Prior to '70s, sometimes Baldwin County was in a separate district.

Q And what was the difference between before the '70s and after the '70s? Do you know?

13:43:48 A No.

Q Well, isn't it true that before the '70s we had eight congressional districts and after the '70s we had seven?

A I believe at one time you had nine. I don't know when the change was made, though.

13:44:01 Q Okay. Do you know whether or not since 1970 Alabama has

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 115**

116

ever split Auburn County and Mobile County apart in different congressional districts?

A As far as I know, Alabama Legislature has not split that two-county region.

13:44:22 Q Okay. But for you, you split them because you needed to, to create a second majority black district; is that correct?

A I believe that one would have to divide Mobile County in order to create the second majority-minority district or second majority black district.

13:44:50 Q Let me show you what is Revised Plan Number 1, and this is from Exhibit 63. And I just want to say: What community of interest is being kept whole here? You divide the city of Mobile, do you not?

A I believe it is divided.

13:45:22 Q And you divide the County of Mobile, and you divide some other cities, do you not? Do you divide Semmes, for example?

A Not sure right off the top of my head.

Q You don't know?

A I was following precinct boundaries, so possibly.

13:45:37 Q So the answer is you don't know?

A I don't know.

Q And this is Revised Plan Number 2.

THE COURT: What exhibit is that, Mr. Walker?

MR. WALKER: Ma'am?

13:45:57 THE COURT: What exhibit number?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 116**

117

MR. WALKER: I'm sorry. It's Exhibit 69. Plaintiffs' Exhibit 69, Your Honor.

THE COURT: Thank you.

BY MR. WALKER:

13:46:04 Q And District 2 is which color?

A Yellow.

Q The yellow. Okay.

How did you decide where to go as you cut back and forth between District 1 and District 2?

13:46:22 A Almost exclusively on precinct boundaries. Except, as I've indicated, I did split three precincts right off of I-10 and U.S. 98 interchange there to ensure that District 1 in Baldwin County was contiguous with District 1 in Mobile County.

Q Well, isn't it the fact that you put most of the blacks in 13:46:51 Mobile County inside District 2, and most of the whites in Mobile County in District 1?

A Well, it varies from plan to plan, so I'd have to take a look at the data.

Q Well, admitted that the percentages vary on every plan, 13:47:12 but in every plan your intention was to divide Mobile County so that you could put the majority black population into District 2 and the majority white population into District 1; is that correct?

A No. My objective was to unite the African-American 13:47:27 community in south Alabama into a single majority black

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 117**

118

district. So I was not just thinking about Mobile County.

Q Okay. And is it your testimony that the lines that I'm showing you here, the division between District 1 and District 2, does not divide the county of Mobile along race?

13:47:49 A Not -- it depends on the precinct. I mean, there's certainly majority white precincts in District 2.

Q No, no. I'm asking about -- I'm not asking about precincts. Please pay attention to my question, sir.

Within Mobile County, where are the majority of 13:48:08 African-Americans on this map?

A Well, I think --

Q Are they in District 1 or are they in District 2?

A I think it's -- the majority -- I would need to go to the data sheets. But most likely, there are more African-Americans 13:48:21 in District 2 and Mobile County than in District 1. But I'm not --

Q Mr. Cooper, you testified this morning that Mobile was one of the African-American population centers that you needed to put into a majority black district, did you not?

13:48:38 A Well, that's right.

Q Okay. And that's exactly all -- my point simply is that's exactly what you did in each one of your plans?

A But I don't have the numbers in front of me.

Q I didn't ask you the numbers.

13:48:49 A Well, okay. I don't know what you said then. Say it

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 118**

119

again.

Q In each one of your plans in Mobile County, you put more African-Americans in District 2 than you put in District 1; is that correct?

13:49:03 A I think that is correct, yes.

Q You know it's correct, don't you? That was your job.

A No. It was not my job. My job was to draw a majority black district in addition to the existing District 7. And it was not focused solely on Mobile. It was to pay attention to a

13:49:22 community of interest that has historical significance linking African-Americans in Mobile to other parts of south Alabama.

Q What do --

A But I will agree that I probably did. If we went to the data sheet, I could tell you the percentages. And I probably

13:49:38 did put more African-Americans in Mobile County into District 2, but I also left out many thousands, as well, who remain in District 1.

Q And you put the majority of whites in District 1, didn't you?

13:49:54 A Probably.

Q Yeah. You know you did, don't you?

A Well, let me be clear. There's nothing wrong with doing that in a Section 2 lawsuit. That's common.

Q I didn't say you did anything wrong. I just asked you a

13:50:11 question.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 119**

120

A Well, I just want to clarify that.

Q Okay. So are we agreed you put the majority of blacks in District 2 and the majority of whites in District 1 in Mobile County in all four of your plans?

13:50:27 A Again, without looking at the data, I will agree. But I would like to confirm that. But it's in the -- I think you've got some tables that may sort of reflect that even though you're using a different definition of African-American.

Q And what community of interest were you respecting in Mobile County? 13:50:47

A In Mobile County, I was endeavoring to respect your guidelines which say that a community of interest is defined as an area with recognized similarities of interests, including but not limited to racial, ethnic, geographic, governmental, regional, social, cultural, partisan, or historic interest. 13:51:16

Therefore, I think including Mobile County and a predominantly black part of Mobile County in a district that extends into the Alabama Black Belt and on into Montgomery County, which is part of the Black Belt, is appropriate because it's following your guidelines. 13:51:35

Q So in order to draw a majority black district that linked African-American communities separated around the state into one district, you split up Mobile city and Mobile County; is that correct?

13:51:52 A Well, I've already said -- I've already answered that

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 120**

121

question. It is necessary -- if you're going to create a second majority black district in Alabama, you have to include the black population in the city of Mobile or in Mobile County in general because part of the black community in Mobile County actually doesn't live in the city of Mobile. It's outside.

13:52:09

Q I am going to take that as a yes, okay?

A Well, I've said that at the outset.

Q Okay.

A I said that in my deposition.

13:52:19

Q And is preserving the cores of existing districts also a traditional districting criteria?

A I would say no.

Q You would say no?

A I would say no.

13:52:29

Q Okay. Is it your testimony that in order to draw a majority black district you cannot preserve the cores of Districts 1, 2, 3, and 7?

A Districts 1, 2, 3, and 7, as drawn in the 2000 plan and the 2011 plan, in my opinion, cracked African-American voting strength.

13:52:56

Q And let me --

A And for that reason --

THE COURT: Wait, wait, wait, Mr. Cooper. Please, if you would, answer the question that's asked of you.

13:53:05

THE WITNESS: Okay, sorry.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 121**

122

THE COURT: Mr. Spiva will have opportunity to question you again. So if you would just answer the question that's asked, we'll be able to move along much faster.

BY MR. WALKER:

13:53:18 Q Mr. Cooper, is it your testimony that there's no way to preserve the cores of Districts 1, 2, and 3 as they existed at the time the legislature was drawing the districts and also create a second black majority district? You might want to look at the answer you gave in your deposition.

13:53:38 A Well, I would say there's probably not a way to -- in a numerical -- from a numerical perspective, but I would have to -- let me refer to my deposition. Maybe I had a different --

Q Well it's right there in front of you. You said, "That is 13:53:54 true, I believe. And I would also throw in District 3 partly because it goes into Montgomery County," because I had only asked you about 1, 2, and 7.

A Okay. Well, isn't that what I just said?

Q Thank you.

13:54:10 Let's talk about compactness for a second, please, Mr. Cooper.

And you testified about Reock and Polsby-Popper scores as a basis for demonstrating, I think, that the districts you drew are compact in comparison to the districts the state of Alabama 13:54:42 drew. Did I understand your testimony correctly?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 122**

123

A Yes.
Q And in your testimony you compared the state board of education districts and the congressional districts, right?
A There are figures for the Reock scores that include both the 2011 congressional plan, as well as the 2011 board of education plan.
Q I think the answer is just yes, you did?
A Yes, I did.
Q And those are different jurisdictions, aren't they?
A They are different governing bodies, yeah. Alabama --
Q And they have a different number of members, don't they?
A One is eight; the other is seven.
Q And I don't see anywhere in your report where you opined that the demands and expectations of a member of the state board of education are any way congruent or similar to the demands and expectations of a member of Congress. Am I correct on that?
A I'm not a political scientist, so I wouldn't opine on that.
Q And you are not offering an opinion on that?
A No.
Q Okay. Well, let's look at your Plaintiffs' Exhibit 45. And I want to just ask you about District 1.
And under the 2011 plan, the Reock score for District 1 is 42. And your Reock scores in your illustrative plan, in

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 123**

Illustrative Plan 1, District 1 is 21; in illustrative plan 2, District 1 is 21; in Illustrative Plan 3, District 1 is 20; in Illustrative Plan 4, District 1 is 25.

So all of your District 1s are significantly less compact than the existing District 1; is that correct?

A By about 15 percentage -- by about 15 hundredths of a percentage point, right. Of a point, yeah.

Q And if we look at District 2, it's 49 in the 2011 plan; 35 in your Illustrative 1 Plan 1; 27 in your Illustrative Plan 2; 33 in your Illustrative Plan 3; and 24 in your Illustrative Plan 4; is that correct?

A That is correct.

Q Okay. And if we look at 3, it's 36 in Illustrative Plan 11; it's 35 in illustrative plan -- excuse me. It's 36 in the 2011 plan. I'm sorry. It's 35 in Illustrative Plan 1; 46 in Illustrative Plan 2; 26 in Illustrative Plan 3; and 34 in Illustrative Plan 4; is that correct?

A Yes.

Q So the three districts of southern Alabama are all more compact in the 2011 plan than they are in your plans?

A No, that's not true.

Q Okay.

A If we go back, we have to go back to the exhibit and point out one district that is actually more compact in the illustrative plans under the Reock score.

125

Q One, yes.
A And it also has to be gauged on a statewide basis, but...
Q When you calculated your means, you were doing the -- you were averaging all seven districts, weren't you?
13:58:10 A Right.
Q And you made very few changes to the districts of north Alabama relative; is that correct?
A No, that's not correct. I kept District 5 in the extreme north along the Tennessee River almost the same, but District 4 13:58:24 changes as --
Q Are you saying it changed as much as you changed the other districts?
A Probably.
Q All right. Let's look at your Polsby-Popper scores.
13:58:47 THE COURT: Do you know what exhibit that is?
MR. WALKER: That is, Your Honor, still part of Exhibit 45.
BY MR. WALKER:
Q And in the 2011 plan, the Polsby-Popper score is 16 or 13:59:00 .16. In your Illustrative Plan 1, it's .14. In your Illustrative Plan 2, it's .13. In your Illustrative Plan 3, it's .16. And in your Illustrative Plan 4, it's .13.
Now, that indicates that as Polsby-Popper calculates compactness, the 2011 Plan 1 and your Illustrative Plan 3 Plan 13:59:32 1 are equally compact; is that correct?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 125**

126

A That is correct by the Polsby-Popper score.

Q Okay. So I just want to say: Who would think that these two plans are as compact if they were actually driving around, or working, or trying to represent those districts?

13:59:55 A Well, you have a very odd intrusion into Clarke County. So it might be hard to find your way around Clarke County. I don't have an intrusion like that.

But the District 1, as drawn in Revised Plan 3, is based on whole counties from Baldwin to Houston and Henry. There's 14:00:26 nothing unusual about it. It's easy to understand.

Q Well, you seem to think whole counties are important --

THE COURT: Wait, Mr. Walker.

MR. WALKER: I'm sorry.

THE COURT: For purposes of the record, I need to know 14:00:35 what exhibits these two are that you have placed on the screen.

MR. WALKER: I'm sorry. I put on the plaintiffs' map of Revised Plan 3, which is Plaintiffs' Exhibit 73; and the plaintiffs' map of the U.S. House 2011 plan, which is Plaintiffs' Exhibit 15.

14:00:55 THE COURT: Okay. Thank you.

MR. WALKER: Yes, ma'am. Sorry.

BY MR. WALKER:

Q Do you remember testifying in your deposition that the state of Montana probably had a perfect Reock score?

14:01:15 A I may have -- I may have said that sort of in jest I guess

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 126**

127

because it's more of a square instead of a circle. It's not -- it doesn't score quite as high.

Q But it's not a compact in any sense that a person representing that district would recognize, is it? I mean, if you were to drive across the state of Montana, or ride your horse or walk across it, you wouldn't say, my, this is a compact state?

A Well, the Reock score is more than just a score that takes into account population density. It also takes into account the shape of the district.

Q Right. I didn't ask you anything about population density. But I guess my point is that the Reock score is ultimately just a ratio; is that correct?

A Yes.

Q Yeah. And it doesn't tell us anything about how serviceable a district is for the constituents or for the representative, does it?

A I tend to agree with that. I think you need to look at the map itself and make a visual assessment. I look at Revised Plan 3 and see no problems at all.

Q And you have drawn in each one of your maps District 1 that stretches from Mobile County to Houston County. And I understand from the fact that you've included that same basic structure in each one of your maps to mean that you do not believe there's any other way to draw two majority black

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 127**

128

districts without drawing District 1 to stretch from Mobile County to Houston County?

A Well, that's -- that's not exactly the case because I suspect that you could have put Pike and Crenshaw into District 1. I didn't try to do that, but I'm sure you could have. Whether you could have still done that and -- I'm sure you could have kept the counties whole. So I didn't try that option.

This is just an illustrative *Gingles 1* plan, not a remedial plan. And I would certainly think the plaintiffs would be open to reconfiguring Districts 1 and 3.

Q But you didn't present -- your purpose was to show the Judge the possibility of drawing two majority black districts. And in each one of your plans, all of your District 1s go from Mobile to Houston County; is that correct?

A No. That's -- well, yes, that's true. That's true. But I would -- I wish to point out that that may not be necessary.

Q Do you think that when you draw a district it's important to consider how functional that district will be for the representative, for the man or woman who's representing that district, the ability that they have to get around and meet their constituents?

A Yes. That's why I was very careful to follow precinct lines and draw reasonably well-shaped compact districts.

Q And do you think it's important to draw a district where

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 128**

                129

the constituents in the district can reasonably get to their representative?

A To the extent possible, yes. Alabama is a big state.

Q Is it your testimony that the districts that you have drawn for District 1 is a district that could function in any real sense for an Alabama representative?

A Absolutely.

Q How would you get from Mobile to Houston County?

A You would either go via I-59 and then take state routes into the Houston-Dothan area, or you could, say, from Fairhope drive via I-10 and then up through the panhandle of Florida to Dothan. Either trip would take about three hours by car.

Q And you -- what's your basis for saying three hours?

A I checked it on Google Maps.

Q That's funny. When I checked, Google said four.

A You may have checked early this morning. You checked traffic at 9:00 a.m. during rush hour.

Q So --

THE COURT: Not in Escambia County.

THE WITNESS: Well, coming out of Mobile probably. But I will concede there may be differences in the times. I was doing it midday.

BY MR. WALKER:

Q So your testimony is that to get from Mobile you would drive through Florida on Highway 10 to somewhere below Houston

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 129**

130

county and then cut up, I guess, on 231?

A Yes. It's a U.S. highway. I mean, I did it on Google Maps.

Q Yeah.

14:06:02 A It's a little bit -- it's right at three hours.

Q And that's the best way for that representative to get around in that district?

A That's one way. I think it might add 10 minutes or so if you drive up to I-65 and then take another route to Houston. I

14:06:16 don't have all the map -- all the U.S. highways displayed on the map.

But a three-hour trip is not out of the ordinary in Revised Plan 3, nor is it out of the ordinary in existing 2011 plan involving other districts, of course. But certainly other

14:06:35 representatives in the state have to travel --

Q Sir, if you go from Mobile to Dothan and you wanted to --

THE COURT: Wait a minute. Wait a minute. I keep hearing some mumbling over there about letting him answer the question.

14:06:44 If he were answering the question, that would be one thing. But he's not.

So again, Mr. Cooper, this is not a platform for you to just run and say whatever you want to, especially on cross-examination. You need to listen and answer the direct

14:07:06 question that's asked as directly as possible.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 130**

THE WITNESS: Okay. I apologize.

THE COURT: I know it's hard.

THE WITNESS: He's trying to corner me into a yes-or-no answer where there's ambiguity. That's the problem. But I will try.

14:07:15

MR. SPIVA: Your Honor, I just want to be clear. We weren't saying anything about letting him answer. I didn't know if you thought we were saying that. I just wanted to be clear.

14:07:23

THE COURT: Well, I just kept hearing something over there being mumbled.

MR. SPIVA: Sorry. We were probably whispering to each other. We weren't saying that. I didn't want you to think we were being rude.

14:07:30

THE COURT: Okay. And also any objection needs to come from Mr. Spiva, not from someone else.

MR. SPIVA: Of course, Your Honor.

THE COURT: Oh, okay. I'm sorry. It's Christina. All I heard was a female voice, and I thought I saw some lips moving there. I apologize.

14:07:49

But the point is very well taken by Ms. Christina. She cannot get down any testimony when both the attorney and the witness are speaking at the same time. So let's try to avoid that as much as possible.

14:08:07

Okay. All right. We got the rules down now? Only one

132

talk at a time, and answer the question that's asked, okay?

THE WITNESS: I will immediately stop when Mr. Walker says something even if I'm in mid sentence.

THE COURT: Okay. That will be good.

14:08:23 MR. WALKER: Thank you, Your Honor.

BY MR. WALKER:

Q So you would agree with me that if a representative travels to Mobile from Dothan via U.S. Interstate 10, she or he is not going to be meeting with any of her constituents along the way?

14:08:36

A I don't know that for a fact.

Q Well, they would have --

THE COURT: Would a congress person for District 1 have constituents in Florida?

14:08:52 THE WITNESS: They could be meeting halfway. I just --

BY MR. WALKER:

Q So if a representative wanted to travel from Mobile to Dothan, or vice versa, within her or his district, do you know how they could do that on the existing roadway?

14:09:11

A From Mobile to Dothan?

Q Yeah.

A Yes.

Q Could you show the Court?

14:09:19 A Well, I mean, I could show my Google Maps.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 132**

133

Q Okay.

MR. WALKER: Your Honor, may I approach?

THE COURT: You sure may. Is that an official Alabama state map?

14:09:29 MR. WALKER: This is an official Alabama highway map that I retrieved from the Department of Transportation last week.

THE COURT: Okay.

THE WITNESS: Whether I can show it on this map, I

14:09:38 don't know.

BY MR. WALKER:

Q Well, this is the highway road map for the state of Alabama.

A Right.

14:09:47 Q So if you would please take this highlighter and trace the route that your representative would travel from Mobile to Dothan in the district that you designed for that person.

A Well, it's a three-hour trip according to Google Maps, and I did not, you know, save that route. It would, I believe, go

14:10:12 up I-65 probably to --

Q Just trace it out with the highlighter I gave you, please, sir.

A Okay. This may not be the Google Maps route. But I'm nervous, so I'm shaking because I don't like to speak in

14:10:35 public.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 133**

134

So here we are on I-65 up to roughly Evergreen. You get on 84 and go to Andalusia, stay on 84. Go through Enterprise maybe on a state route where you might stay on 84 and go to Elba, and then through Daleville, and right into Dothan hitting State Route 53, or maybe it's U.S. 231 on the north side of Dothan -- Dothan.

I mean, that's just my guess. It's probably not the optimal map as calculated by Google Maps. I see no trouble with that. Congressional representatives all over the country have to travel those distances.

Q We're concerned with Alabama.

And I will show you what I got from Google Maps, which says that it takes 3 hours and 52 minutes.

A And when did you do that? I can't ask him that, right?

Q During the day.

A Yeah. Well, there are two different routes.

So we'll just have to agree to disagree on that.

Q Thank you, sir. Not much more.

Do any of your plans keep the entirety of the historical Black Belt in the same district?

A They do not. Although Illustrative Plan 2 puts all of the Black Belt in one or the other.

Q You testified earlier that there were enough African-Americans in Congressional Districts 1, 2, or 3 to form almost all of a congressional district by total population; is

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 134**

135

that correct?
A Yes.
Q But you also have to consider where that population lives in order to draw a district that complies with historical -- with traditional districting criteria; is that correct?
A Yes.
Q Okay.
MR. WALKER: Your Honor, may I have just one moment?
THE COURT: You may.
BY MR. WALKER:
Q What community of interest, Mr. Cooper, are you observing by connecting rural Mobile County and Houston County?
A It is including a predominantly rural area in Mobile County with a predominantly rural area further east.
Q Any others?
A I think I could say that's probably the -- primary community of interest, although part of Mobile County is suburban. But that would be one key link there is that is a part of Mobile County that is more rural.
MR. WALKER: Your Honor, I move for admission of Defendant's Exhibit 303, which is the map that was marked by Mr. Cooper.
MR. SPIVA: No objection, Your Honor.
THE COURT: It's received.
And just for the record, I want to make sure his route was

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 135**

marked with an orange highlighter; is that correct?

MR. WALKER: Orange highlighter, yes, ma'am.

THE COURT: Okay.

BY MR. WALKER:

14:15:49 Q Your Plans 1 through 4, could the legislature pass those plans in 2020-2021?

A I have no idea.

Q Why not?

A Well, it's a speculative -- it's all speculative. I don't 14:16:09 know. I mean, I don't know what the politics would necessarily be by this time next year.

But certainly if they did pass it, in my opinion it would be considered a plan that was respecting traditional redistricting principles. It may be different than the 2011 14:16:28 plan, but it respects traditional redistricting principles.

Q And you say that without knowing what the census data are for 2020?

A If it's like one of the illustrative plans, it's possible that there would be some need to expand the two majority black 14:16:45 districts to pick up additional population even in a seven-district plan, but I don't know that for a fact.

Q Now, Dr. Cooper, you know that District 7 has lost population over the last decade and is going to need tens of thousands of people added to it, don't you?

14:16:59 A I do not know that.

137

Q You don't?

A No, I don't. Because it also includes in at least two plans Tuscaloosa County, which is a fast-growing county.

Q All right.

14:17:10 MR. WALKER: That's all I have. Thank you, Your Honor.

THE COURT: Any redirect?

MR. SPIVA: Yes, Your Honor. Just a little bit.

REDIRECT EXAMINATION

14:17:17 BY MR. SPIVA:

Q Mr. Cooper, you recall the questioning on cross-ex about not preserving cores of districts. Do you remember that?

A Yes. I remember that vague question.

Q Okay. Let me put up Plaintiffs' Exhibit 84, and

14:17:46 specifically page 4 of Plaintiffs' Exhibit 84.

And this is -- you recognize this, Mr. Cooper, as the state reapportionment committee's guidelines on redistricting?

A Yes.

Q And do you remember we discussed on direct the communities

14:18:30 of interest definition I think you quoted in your report?

A Yes.

Q Does the report -- does the word "core retention" appear anywhere in that guideline from the state reapportionment committee? Preservation of cores? Anything like that?

14:18:47 A No. And --

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 137**

138

THE COURT: You're referring to page 4 of that document; is that correct?

MR. SPIVA: That's right, Your Honor. Page 4 of Exhibit 84. Plaintiffs' Exhibit 84. And maybe we could show the first page of that, too, please, Heather.

14:19:05

THE COURT: You're referring to the criteria that begins on page 2?

MR. SPIVA: Actually it begins there, Your Honor, and it runs through to page 4, where it talks about the integrity of communities of interest.

14:19:29

THE WITNESS: I don't see the word "core," but I may be overlooking something.

BY MR. SPIVA:

Q Okay. And did you review the rest of the -- these guidelines when you were doing your report?

14:19:41

A I think I did at some point. Some of them are obvious, like equal population, avoiding incoming conflicts.

Q And do you recall whether you saw core preservation anywhere in the 2011 Alabama Legislature reapportionment committee guidelines?

14:20:04

A I don't recall seeing that, no.

Q And then you also recall on direct -- I'm sorry -- on cross-examination, you were asked about your use of the board of education plan as a reference point or point of departure. Do you recall that?

14:20:23

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 138**

139

A Yes.

Q And I think the question was something to the extent of the board of education plan is -- you know, represents a totally different constituency or interest than the congressional plan. Do you recall that?

A I do recall that question.

Q And if we can turn to page 2 of this document, Plaintiffs' Exhibit 84, page 2. And if we can kind of cull out Roman Numeral IV.

And would you agree with me, Mr. Cooper, that this says that these are criteria for congressional, legislative, and state board of education districts?

A Yes.

Q And was it your understanding that these redistricting principles that you were attempting to apply applied to all four of those -- rather, say, all three of those types of bodies?

A Yes. Although I don't think the legislature state board of education plans required zero deviation, but --

Q Okay. I'm sure you recall the map exercise and the questions about CD 1 stretching from the west to the east, I take it. Do you recall those questions in drawing the route?

A I recall that, and there's nothing at all unusual about a congressional district extending that distance. You need only to look to Congressional District 5 in Florida.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 139**

140

Q Well, let me also -- let me show you something in Alabama. So can we pull up Plaintiffs' Exhibit 15?

That's the 2011 congressional plan, is it not?

A Yes.

14:22:13 Q And what length of the state does congressional -- existing Congressional District 5 span?

A It goes the entire length of the state along the Tennessee line and cuts across the Tennessee River to pick up Morgan County.

14:22:32 Q So it spans from the east to the west northern border of Alabama?

A Yes.

Q And Congressional District 4, what's its span in the state of Alabama?

14:22:41 A The distances there are longer. It extends east to west, but also more northeast to southwest. I know to go from -- I think it's Sulligent up to Dekalb County is another three-hour trip by car.

Q From where to Dekalb?

14:23:07 A Sulligent, which is in Lamar county not far from the Mississippi line. If you drive from that spot to the central part of Dekalb County, it's a three-hour trip.

Q Okay.

A Essentially the same as driving from Mobile to Dothan,

14:23:24 because I'm in disagreement about the time involved. It's not

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 140**

141

14:23:40 four hours all the time. Put it that way. Maybe during rush hour.

Q And you drive quite frequently, don't you, Mr. Cooper? You drove from your home in Bristol, Virginia to Birmingham, Alabama?

A I did. I drove right through Districts 4, 5, 6, and a little piece of 3 in St. Clair.

MR. SPIVA: All right. I have no further questions. Thank you.

14:23:54 THE COURT: Any recross?

MR. WALKER: No, ma'am, Your Honor. Thank you.

THE COURT: All right. Thank you, Mr. Cooper. You may step down.

14:24:09 We haven't been going very long, but this might be a logical place to take a quick little break. How about 10 minutes? And we will be back at 2:35. How about that? It's 10 minutes. If you will have your witness in the stand, please.

(Recess.)

14:35:47 THE COURT: Plaintiff will call your next witness.

MS. KHANNA: Thank you, Your Honor. Plaintiffs call Dr. Maxwell Palmer to the stand.

MAXWELL PALMER,

14:36:03 having been first duly sworn by the courtroom deputy clerk, was examined and testified as follows:

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 141**

142

THE COURTROOM DEPUTY CLERK: Please state your name into the microphone for the record.

THE WITNESS: Maxwell Palmer.

DIRECT EXAMINATION

14:36:21 BY MS. KHANNA:

Q Good afternoon, Dr. Palmer.

A Good afternoon.

Q You have been retained as an expert by the plaintiffs in this case; is that correct?

14:36:28 A Yes.

Q And you've prepared two reports in the course of this case; is that right?

A Yes.

Q In the notebook in front of you, you'll see two documents

14:36:40 marked Plaintiffs' Exhibit 79 and Plaintiffs' Exhibit 80. Can you please identify those exhibits for the Court?

A The first exhibit is my expert report in this case, and the second exhibit is my rebuttal report in this case.

Q Thank you.

14:36:57 I just want to briefly ask some questions about your background and expertise. Can I direct your attention to page 25 of Plaintiffs' Exhibit 79, which is your first expert report?

What is this document?

14:37:15 A This is my CV.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 142**

143

Q And is this a complete and accurate summary of your educational background and professional experience to date?
A It's complete as of March when I submitted my report.
Q Okay. Has there been any significant changes since March?
14:37:28 A A few new publications.
Q Anything in particular?
A A book on local politics, and a new paper on political careers.
Q Thank you.
14:37:38 Can you briefly summarize your educational background?
A I received a bachelor's degree in math and government and legal studies from Bowdoin college in Maine, and a Ph.D. in political science from Harvard University in 2014.
Q And where are you currently employed?
14:37:53 A I'm currently an assistant professor at Boston University.
Q What classes do you teach at Boston University?
A I mainly teach classes on American politics, including introduction to American politics, and a course on Congress.
I also teach classes on political methodology and 14:38:10 analysis, including a research design class for graduate students, formal and game theory, and a new data science class.
Q And what would you say are your principal areas of research?
A My main areas of research are Congress and redistricting, 14:38:26 political careers, and local and urban politics.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 143**

144

Q Dr. Palmer, have you been accepted as an expert witness in a United States court before?
A Yes.
Q So the cases -- those cases, I believe, are listed in paragraph 6 of your initial report on Plaintiffs' Exhibit 79; is that right?
A Yes.
THE COURT: On which page, please?
MS. KHANNA: That would be page 2 of Plaintiffs' Exhibit 79.
THE COURT: Thank you.
BY MS. KHANNA:
Q And listed here is the case of *Bethune Hill*. What kind of analysis did you perform in *Bethune Hill*?
A I performed a racially polarized voting analyses, as well as an analysis of the degree to which race predominated in the drawing of House of delegates districts.
Q And do you know whether the Court credited your analysis in that case?
A They did. The Court cited it extensively in their opinion.
Q And what kind of analysis did you perform in the *Thomas v. Bryant* case?
A Mainly racially polarized voting analyses.
THE COURT: Mainly racial what?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 144**

145

THE WITNESS: Racially polarized voting.

THE COURT: Okay. You need to slow down just a little bit so the court reporter can get all that down, please, okay?

BY MS. KHANNA:

14:39:43 Q And did the Court credit your analysis in that case?

A Yes.

MS. KHANNA: Your Honor, I would like to now proffer Dr. Palmer as an expert in redistricting and data analysis for the Court.

14:39:56 MR. DAVIS: No objection.

THE COURT: Okay. The Court recognizes Dr. Palmer as an expert.

MS. KHANNA: Thank you, Your Honor.

BY MS. KHANNA:

14:40:06 Q Let's talk specifically about the work you performed in this case. What were you initially asked to do?

A I was asked to evaluate the extent to which voting is racially polarized in the first, second, third, and seventh congressional districts under the map drawn in 2011.

14:40:22 Q And what is racially polarized voting, as you understand it?

A As I understand it, racially polarized voting is when members of different racial or ethnic groups -- when majorities of those groups support different candidates.

14:40:40 For example, if a majority of black voters supports one

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 145**

146

candidate and a majority of white voters supports a different opposing candidate.

Q Is it always the case that each racial group has a preferred candidate?

14:40:53 A Not necessarily. It could be that a group is divided among one or more -- two or more candidates.

Q And does racially polarized voting mean that each racial group votes only for those candidates of the same racial group?

A No. There's no requirement or -- there's no requirement

14:41:14 that members of each group vote for members of their own group.

Q Were you able to draw any conclusions regarding the extent to which voting is racially polarized in the areas that you examined?

A Yes. I found strong evidence of racially polarized voting

14:41:33 in the first, second, third, and seventh districts, as well as the -- those four districts altogether, which I call the focus area in my report.

I find that African-American and white voters consistently support different candidates. On average, the African-American

14:41:50 preferred candidates win about 94 percent of the African-American vote, but only 17 percent of the white vote in the area as a whole.

Q And across the elections that you examined, whose preferred candidates generally prevailed?

14:42:02 A In the focus area as a whole, white preferred candidates

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 146**

147

generally won across 18 statewide elections that I looked at. The African-American preferred candidate only won twice.

Q And how about in congressional elections?

A In the first, second, and third districts, white preferred candidates won in every election I looked at.

In the seventh district, African-American preferred candidates won in every election.

Q Dr. Palmer, what was the geographic area that you examined?

A The geographic area was the first, second, third, and seventh congressional districts, which I referred to as a whole as the focus area. I also include in the focus area a few counties that are split between one of those four districts and one of the other districts.

Q Okay. Can we please call up Plaintiffs' Exhibit 79, Figure 1, which is on page 10.

Dr. Palmer, can you please explain to me what this figure shows?

A This is just a map of the congressional districts as drawn in 2011 highlighting the four districts of my analysis. And then you can also see on this map some of the counties, such as Jefferson County, that I include in the focus area as a whole, because they're partially in one of these four districts.

Q Dr. Palmer, what elections did you examine in the course of your analysis?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 147**

148

A I examined election results from the 2012, 2014, 2016, and 2018 general elections, as well as the 2017 special election for U.S. Senate. This includes both elections for U.S. Congress, which we would call endogenous selections in an analysis like this about congressional districts, and statewide elections are exogenous elections.

Q And what methodology did you use to use to analyze racially polarized voting in the elections and areas that you examined?

14:44:04 A I used a statistical procedure called ecological inference, which is often referred to as EI.

Q And can you explain to us what EI is?

A Ecological inference is a procedure that estimates group-level preferences; that is, what percentage of the voters of each group are voting for each candidate based on aggregate data -- based on the data we're actually able to observe about elections.

Q So what kind of results does an ecological inference analysis yield?

A The ultimate result of an ecological inference analysis is an estimate for each racial group of their level of support for each candidate.

An ecological inference is a procedure I run separately for each election that I look at. So it's not one analysis, but many different ecological inference analyses conducted

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 148**

149

here.

And besides the estimate, which is the mean or average level estimated level of support for each group for each candidate, it also includes a level of uncertainty. In this case, a 95 percent confidence interval. And that tells us how precise the estimate is.

Q And what racial groups did you analyze in the course of your analysis here?

A I primarily focused on African-American and white voters, but I also included a third category of other that includes voters of all other groups.

Q What voters would belong in the "other" category?

A Hispanics, Asians, Native Americans, and the very small percentage of voters who did not identify their race.

Q And how did you determine the racial category into which each voter would belong?

A I relied on data from the Alabama Secretary of State including reports about voter registration and when voters -- my understanding is that when voters registered to vote, they identified their race on form.

Q And do you have any understanding about how they identified their race in their voter registration form?

A They're instructed to check one of a few options, including, black, white, Hispanic, Asian and Native American.

Q So the voter self-identifies their race; is that fair?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 149**

150

A That's right.
Q And approximately how many voters qualified for that other group that you mentioned?
A In the focus area as a whole, it's about 3 percent of registered voters.
Q So what about the other 97 percent of registered voters?
A They're either black or white.
Q And, Dr. Palmer, you explain in your report that you did two types of racially polarized voting analyses, a county-level analysis and a precinct-level analysis. Why did you perform two analyses to examine this question?
A Because of data availability. And so we have a lot more data for more years at the county level and less data at the precinct level. But it's useful to look at things both county level and at the more granular precinct level. We just have more information to work with.
Q Are they able to act as kind of a check on one another?
A Yes. I find essentially the same results in both sets of analyses.
Q So let's first talk about your county-level analysis. What data did you use for that analysis?
A So there's two main types of data used in the analysis.
The first is data on the registered voters, which for the county level analysis comes from reports put out by the Secretary of State at each election that report the number of

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 150**

151

registered voters by race in each county.

And then the second type of data is county-level election results. That is the total number of votes received by each candidate in each election in each county.

14:47:51 Q So for your county-level analysis, you examined only the focus area as a whole and not each individual congressional district; is that right?

A Yes.

Q And why is that?

14:48:02 A There aren't enough counties in the individual congressional districts to do an analysis separately for each one. We need to have enough data, enough different counties, different observations in each analysis to get a good estimate.

Q So can you explain for us how you performed your

14:48:20 county-level analysis? How did it proceed?

A So after I put the data together, I run this algorithm called ecological inference, which produces estimates of support for each group, for each candidate. And then I analyze it in two different steps.

14:48:41 And the first step is I just look at each group alone and I say, is this group cohesively supporting one candidate, or are they split across the two major candidates? And if they were to be supporting one candidate, I can say they have a candidate of choice in that election. But if they're split and

14:48:58 divided between two candidates, I can't come to that

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 151**

conclusion.

And then second, I look at the two groups, mainly blacks and whites together and say, do they have the same candidate of choice or different candidates of choice?

14:49:09 Q So how do you determine from this analysis whether voting in any particular election was racially polarized?

A I consider it racially polarized when each group has a clear candidate of choice and they are opposing candidates.

Q Can we please put up Plaintiffs' Exhibit 79, Figure 2, 14:49:33 which is on page 11?

Can you explain to me what this figure shows?

A This figure reports the county-level ecological inference results. And I'm going to go through it piece by piece because it's a lot of different pieces here.

14:49:54 So on the left-hand side, the text lists each of the different elections that I looked at. And each one is a separate ecological inference run of the model.

Q So can we maybe just focus on the top, the first election so you can walk us through what you looked at for each one?

14:50:10 A Sure. So the top election is the 2012 election for U.S. President.

And what I first find looking at the results is that African-Americans cohesively supported Barack Obama, and white voters cohesively supported Mitt Romney. And so that each 14:50:24 group has a different candidate of choice.

153

And then on the right, the graph shows the percentage of each group voting for the African-American candidate of choice. So in this case, Obama. The black circle corresponds to black voters, and the white circle to white voters.

14:50:40 And so what we see at the far right is that's the estimate for black voters voting for the black candidate of choice, and that's in the high 90s there. And then the vertical lines around that dot are the confidence intervals. So that's our measure of uncertainty from this estimate.

14:50:58 Then the white circle on the left is the percentage of voters -- of white voters voting for the black candidate of choice. So white voters voting for Obama. And that is less than 20 percent. And those vertical lines around the circle are also a confidence interval for that estimate.

14:51:14 Q Can you please explain what the competence intervals are and what they show?

A It's a measure of uncertainty. And so the model produces an estimate that we think is the best -- the best estimate of support for each group and candidate, and that's represented by 14:51:32 the circle. But there is some uncertainty to it.

The model is run through simulations, and each simulation produces a slightly different result. And so those lines show the bounds in which 95 percent of the estimates fall between those two lines.

14:51:44 Q So we can be confident with 95 percent certainty that the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 153**

154

actual vote share falls somewhere between those two lines?

A Given this model, yes.

Q And you mentioned, you know, the category here says "Black candidate of choice." When you say "black candidate of choice," do you mean the candidate who is black?

14:52:05

A No. I mean, the candidate preferred by African-American voters.

Q And if we could zoom out from this one example to the figure as a whole. I see at the bottom there's an asterisk, and the asterisk is included in some elections. Can you explain what the asterisk is?

14:52:18

A Is there a way for me to clear these circles?

Q I'm sure there is.

A So the asterisk here I just used to note which candidates are, in fact, African-American and which ones are not.

14:52:38

Q Okay. Thanks. We can pull that back up.

So what does Figure 2 tell us?

A We see a consistent pattern across all 18 elections ranging from 2012 to 2018. If we look at the far right side, we see high levels of support by black voters for their candidate of choice. They're highly cohesive in their voting behavior across every election.

14:52:56

If we look at the white circles on the left, we see that white candidates always have a candidate of choice, as well, who is opposing the black candidate of choice. They're

14:53:12

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 154**

155

cohesive voting against the black candidate of choice.

Q And is there a place in your report where we would find the numerical values of the point estimates and confidence intervals reflected on Figure 2?

14:53:28 A Yes. This is all in Table 1 on page 17.

Q Can we please pull up Table 1? That's Plaintiffs' Exhibit 79, page 17.

So can you please explain what the information on the table provides?

14:53:46 A So these are the numbers that I used to produce the figure that we just looked at.

And so if we look at that top row again, we see the U.S. presidential election 2012. The next two columns identify the black and white candidate of choice. And then the next set of 14:54:04 columns give us the numbers of the percent of that group voting for the black candidate of choice.

So here we see the numbers used to make the figure. 96.7 percent of black voters supported Obama. That's our best estimate. The confidence interval goes from 92.8 to 99.0.

14:54:25 For white voters, 14.7 percent supported Obama, with a confidence interval of 12.8 to 17.3 percent.

Q And let's take a look at that other category, as well.

What does that other -- what do we learn from that other category, with respect to the election you just mentioned?

14:54:39 A Our best estimate is that 62.7 percent of voters in the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 155**

156

other category supported Obama, but with a very, very large confidence interval from 30.6 to 91.8 percent.

So we learned relatively a little bit about them from this analysis. And that's because they are a very, very small group, and they're scattered across this area as a whole. They're not heavily concentrated in just a few places.

So it's hard to use ecological inference to learn very much about their voting behavior.

Q How do the other category fit into your county-level analysis of racially polarized voting, if at all?

A I'm focused on polarization between black and white voters, who make up 97 percent of the registered voters in this area. Including -- the other group doesn't have to be split out as a third group. Another way of running EI is to include them with the white group. So that would be black voters and everybody else. Doing it that way makes no difference whatsoever to my results or to the estimates.

Q So what is the average estimated vote share of African-Americans for their candidates of choice, as reflected in Table 1?

THE COURT: Table 1, that's what you are talking about here?

BY MS. KHANNA:

Q So I guess what I'm asking --

THE COURT: I got the tables and the figures confused.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 156**

157

BY MS. KHANNA:

Q Table 1 is up on the screen. And I'm asking what is the average estimated vote share of African-Americans for their preferred candidate?

14:56:11 A On average, African-American -- the African-American vote share for their preferred candidate is 94.1 percent. And --

Q And actually just to clarify for the Court, as well, Dr. Palmer, you got that average, I take it, from adding up the number under the word "black," all the numbers there, and then

14:56:29 dividing by the total number of elections; is that right?

A Yes.

Q And I think that's reflected -- that 94.1 percent figure is reflected on page 5, paragraph 20 in your report; is that right?

14:56:40 A Yes.

Q Thank you. I just wanted to make sure to orient everyone.

And what is the average estimated vote share of whites for the African-American preferred candidate based on the elections in Table 1?

14:56:51 A 16.7 percent.

Q Dr. Palmer, based on this table, is it accurate to say that the white vote share for the black preferred candidate was lower when the candidate was African-American than when the candidate was white?

14:57:11 A Yes. The difference is about 6 percent.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 157**

158

Q So what conclusions did you draw based on the estimates depicted in Figure 2 and Table 1?

A This county-level analysis shows a very high level of racially polarized voting in the focus area.

14:57:31 Q Okay. So what further analysis did you do of these 18 elections after you determined that they demonstrated a high level of racially polarized voting?

A I then looked at the ability of African-American preferred candidates to win elections in this focus area.

14:57:49 Q Okay. Let's please turn to Plaintiffs' Exhibit 79, Table 2, which is on page 18.

Dr. Palmer, what does this table show us?

A So this table shows us the same 18 elections that I used for the ecological inference analysis. But I've just shown the 14:58:18 vote share of the black and white preferred candidates in the focus area as a whole for each election.

So this is not the result of running a model. It's just simply adding up all the votes in all the counties in the focus area.

14:58:31 Q And just to be clear, when you mention the vote share in the focus area, these are not the actual vote shares statewide that the candidates received in these elections; is that right?

A That's right. It's just within the counties in the focus area.

14:58:43 Q And so what does Table 2 tell us?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 158**

159

A Table 2 shows us that generally the black preferred candidate is not able to win elections in the focus area. Across these 18 elections, the black preferred candidate only won twice.

14:59:01 Q And what can you tell us about those two elections in which the black preferred candidate was able to win within the focus area?

A The black preferred candidate was able to win in the 2012 Supreme Court Chief Justice contest and the 2017 election for U.S. senator. 14:59:17 In both of those elections, the white preferred candidate was Roy Moore.

Q So the only time that a white preferred candidate lost an election in the focus area to the black preferred candidate, that candidate -- the white preferred candidate was Roy Moore?

14:59:34 A Yes.

Q And just to clarify, are you saying that Roy Moore lost both of these elections in which he ran?

A No. He lost the election for U.S. Senate. But he did win statewide the 2012 Supreme Court election.

14:59:49 Q But among the voters in the focus area, he lost?

A That's right.

Q What, if anything, do you know about Roy Moore?

A My understanding is he's a controversial figure in Alabama politics. He was removed from his position on the Supreme Court in the early 2000s, and I think again later on. 15:00:04 And then

**_Christina K. Decker, RMR, CRR_**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 159**

160

was a very controversial candidate for Senate in 2017.

Q So then did white voters in the focus area reject Roy Moore?

A No. If we turn back to Table 1, we can see that in the Supreme Court election a majority of about 70 percent of white voters still voted for Roy Moore, and only 29 percent voted for the black preferred candidate.

15:00:31

And in the U.S. Senate election, about 66 percent of white voters voted for Roy Moore, and only about 33.7 percent voted for his opponent.

15:00:53

THE COURT: I'm sorry. Where do you see that on Table 1, which is page 17 of Exhibit 79?

THE WITNESS: It's highlighted now on the screen. The vote shares for white voters for the black preferred candidate and then for Moore's -- for Moore's opponent in each of these elections.

15:01:09

THE COURT: Okay. So you have to extrapolate from that those numbers the numbers you just gave me?

THE WITNESS: It's just 100 minus those numbers.

THE COURT: Right.

15:01:22

THE WITNESS: They always have to add up to 100 there.

THE COURT: Right. I understand that. But I didn't see the numbers that you gave on there. So now I've got it.

I appreciate it. Thank you.

BY MS. KHANNA:

15:01:30

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 160**

161

Q Okay, Dr. Palmer, I want to move on from your county-level analysis to your precinct-level analysis.

What do you mean by a precinct-level analysis?

A So in the first analysis, our level of observation is the county. We have -- for every election, we have county-level data on voters and county-level data on election results.

Here we're zooming into the precinct-level instead, going from 45 counties to about 1,100 precincts.

Q So what -- sorry.

A We have data on voters at the precinct level and data on election results at the precinct level.

Q So why did you perform a precinct-level analysis? What additional information does this analysis provide?

A There's two real advantages to it.

First, because we have far more observations than we had before, we can now do analyses at the congressional district level. So instead of just reporting one set of results for the focus area, I can produce results at each congressional district separately.

Second, because we can look at just a congressional district alone, we can also look at elections for U.S. Congress in those districts, which we could not do in the focus area because it spanned all of these districts together.

Q And I think you mentioned that we have far more data points available in the precinct-level analysis. Approximately

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 161**

162

how many data points are we looking at?
A It's about 1,100 precincts across the full focus area.
Q And what data did you rely on for your precinct-level analysis?
15:03:02 A Again, I need two different sets of data -- one on voters and one on elections. And so for elections, I use precinct-level election results for the 2018 elections from the Secretary of State.
And then for voters, it's a little bit harder because we
15:03:19 don't have a simple count of voter -- registered voters by race in each precinct. So instead I relied on a voter file also provided by the Secretary of State to calculate the number of actual voters in each precinct in the 2018 election by race.
Q And what information is included in the voter file
15:03:36 provided by the Secretary of State?
A The voter file has a lot of information. But what I relied on was the voter's self-identified race, their county, their voting precinct, and whether or not they voted in the 2018 election.
15:03:48 Q And did you encounter any difficulties in performing the precinct-level analysis?
A Yes. This was a much more challenging data set to put together.
First, we had to use a voter file from January 3rd, 2019,
15:04:06 instead of a report from election day in order to get the voter

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 162**

163

history into the analysis; that is, in order to have -- in order to know which voters -- which registered voters voted, we needed to have that information reported to -- from the counties to the Secretary of State.

15:04:23 And so the Secretary of State's office recommended that we use a voter file from January for the analysis.

Q And what was any other challenges that you encountered in performing that precinct-level analysis?

A Yes. A second major challenge was after I knew -- after I
15:04:39 calculated the number of voters by race in each precinct, I had to match the precinct-level data on voters to the precinct-level election results.

And this was surprisingly difficult in several counties because the voter file might use numbers to identify each
15:04:55 precinct, but the election returns might use precinct names to identify them instead. And so I had to manually match them up in many cases, and use the files provided by the Secretary of State to do matching in other counties.

Q So were you ultimately able to match all of the precincts?

15:05:09 A No. There were a small number of precincts in a few smaller counties where I was not able to match up the precinct level -- the voter file to the precinct-level election returns.

Q So approximately how many precincts were you able to match? Or I guess for how many voters, if that's an easier
15:05:33 question?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 163**

164

A Yeah. I think that's a better metric.

I was able to match more than 90 percent of the voters who cast a ballot to a voting precinct, and similarly more than 90 percent of the ballots cast to voters in those precincts.

15:05:46 Q And do you have any concerns that the unmatched precincts would change or bias the results of your analysis in any way?

A I don't. If I -- when I looked at the unmatched areas, the areas that I couldn't match up, the distribution of voters by race, it was essentially the same percentage of voters were 15:06:04 matched among whites and blacks.

90.4 of the white voters and 90.4 percent of blacks voters were successfully matched. So I don't think I'm systematically missing voters of either group.

Q Can we put up Plaintiffs' Exhibit 79, Figure 3, which is 15:06:20 on page 12.

Dr. Palmer, can you please explain to me what this figure shows?

A So this figure is ecological inference results for the first congressional district only using the precinct-level 15:06:37 data. And so just like in Figure 1, it's set up the same way.

On the left, I list each of the different elections and identify the candidates of choice for each group. And then on the right, I plot support for the black candidate of choice.

Q And what does Figure 3 tell us?

15:06:54 A Figure 3 shows us a similar pattern as we saw in Figure 1.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 164**

165

We see the African-Americans and white voters each have clear candidates of choice, and they're opposing each other.

Black voters are highly cohesive in their support for their candidate of choice, and white voters are supporting the opposing candidate.

15:07:11

Q And just to clarify, I think you said similar to Figure 1. Do you mean Figure 2?

A I'm sorry. Yes. Figure 2.

Q Figure 1 is the map.

15:07:18

A Yes.

Q So I wanted to make that clear. And where would I find the numerical values for the point estimates and the confidence intervals reflected in Figure 3?

A In Table 3.

15:07:29

Q And could we please turn to Table 3, which is Plaintiffs' Exhibit 79, page 19?

So please explain what information Table 3 provides.

A Table 3 provides the same sort of results as we saw earlier in Table 1. I list each election, then the black and white candidates of choice, and then the percentage of each group voting for the black candidate of choice with the estimate followed by the confidence interval in parenthesis behind -- after it.

15:07:53

Q So what conclusions were you able to draw based on the estimates depicted in Figure 3 and Table 3?

15:08:08

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 165**

166

A There's a high level of racially polarized voting in the first congressional district.

Q So I'm going to try to put up -- if Heather will indulge -- Figures 4, 5, and 6 on the same screen for the sake of efficiency from Plaintiffs' Exhibit 79. We'll see if that's readable.

15:08:27

And if you can tell from this, and you also have it in front of you, as well, each of the figures -- can you please explain to me what we learned from Figures 4, 5, and 6, and what these are?

15:08:46

A So these figures show the results of the precinct-level ecological inference analysis for the second district in Figure 4; the third district in Figure 5; and the seventh district in Figure 6.

15:09:00

And across all three of them, all three districts, we see the same pattern, that afternoon African-Americans and white voters have different candidates of choice, that African-American voters are highly cohesive in support of their candidate of choice, and that white voters are supporting the opposing candidate.

15:09:14

Q And where would we find the numerical estimates for these figures? I believe it's -- there's Tables 4, 5, and 6 that correspond with Figures 4, 5, and 6. Does that sound right?

A That's correct.

15:09:30

Q Can we put those three on the board, as well?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 166**

167

Okay. And can you explain to us what do these tables show?

A These tables show the same thing as the previous table we just looked at. But for the second, third, and seventh congressional districts, they show each election, the black and white candidates of choice, and then the percentage voting for the black candidate of choice for each group with an estimate and a confidence interval.

Q Okay. If we can now call up Table 7 -- actually before that, Figure 7 of Plaintiffs' Exhibit 79 on page 16.

Can you explain to me what this figure is?

A This figure is precinct-level ecological inference results, but for the full focus area.

Q So no one congressional district, but all of them together?

A That's right. So unlike the previous ones where I was able to include elections for the U.S. House, this only has statewide elections.

Q And what does this figure show?

A It shows that same pattern that we've seen before, that African-Americans and white voters have different candidates of choice, that African-American voters are highly cohesive in support of their candidate of choice, and that white voters are strongly supporting the opposing candidate.

Q And it seems here that the confidence intervals, that

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 167**

168

vertical line on either side of the white dot and black dot, are fairly narrow here; is that right?

A Yes.

Q What does that mean?

15:11:02 A That's just reflective of the fact that we have a lot of data here. We have -- this analysis has the most information going into it of all of them, because we have every precinct available instead of just the precincts in any one district.

Q So you can feel very confident that these estimates are

15:11:21 quite precise?

A Yes. Under this model, we get more precision.

THE COURT: Can I ask a question, please?

MS. KHANNA: Sure.

THE COURT: Am I correct that the precinct analysis

15:11:30 was only done of the 2018 statewide elections; is that right?

THE WITNESS: That's right.

THE COURT: Okay. Thank you.

BY MS. KHANNA:

Q Dr. Palmer, can you perhaps explain why you only performed

15:11:42 the 2018 -- why you only performed the precinct analysis on 2018 elections?

A Yes. It was because of data availability.

And so while I could get voter files for earlier elections, that matching up of the voter file precinct to the

15:11:57 election results precinct I was only able to get the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 168**

169

information I needed to do that step for 2018.

Q Thank you.

Can we please turn to Table 7, which is page 23 of Plaintiffs' Exhibit 79? Can you please explain what information this table provides?

A This is just the numbers used in Figure 7. And so precinct-level ecological inference results for the focus area.

Again, I'm listing each election, the black and white candidates of choice, and then the percentage of each group voting for the black candidate of choice.

Q And what is the average estimated vote share of African-Americans for their candidates of choice in the focus area as a whole?

A 98.3 percent.

Q And where are you looking to see that number? Is there somewhere specific in your report?

A Yes. Paragraph 35 on page 9.

Q And what is the average estimated vote share of whites for the African-American candidate of choice in the focus area?

A 17.4 percent.

Q And based on this table, is it accurate to say -- oh, sorry. If we could go back to Table 7. Thank you.

Based on this table, is it accurate to say that the white vote share for the black preferred candidate was lower when the candidate was African-American than when that candidate was

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 169**

170

white?

A On average, yes, by about two percentage points.

Q So what conclusions did you draw based on the analyses in Figure 7 and Table 7?

15:13:35 A There's a high level of racially polarized voting in each of the four districts individually and in the focus area as a whole when you use precinct-level ecological inference.

Q Okay. So the figures and tables that we just looked at analyze the extent to which African-Americans and whites preferred different candidates.

15:13:54 What analysis did you do to determine the extent to which African-American preferred candidates actually win in the focus area?

A Just as I did for the focus area as a whole, I simply

15:14:08 calculated the percentage of the vote that each candidate received in each district. And that's in Table 8.

Q Can we please call up Table 8, which is on page 24 of Plaintiffs' Exhibit 79? Can you please explain what Table 8 shows?

15:14:25 A So first I list each election that I look at, and then the black and white candidates of choice based on the ecological inference analysis. And even though I'm looking at four different districts, because the black and white candidates of choice in the statewide elections were the same, in all four

15:14:43 districts, I only list them once.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 170**

171

And then I list in the next set of columns the vote share for the black preferred candidate and the white preferred candidate in CD 1, and then in CD 2, CD 3, and CD 7.

Q And so it seems that there are three congressional districts at the top in which only one district would have voted in that election -- in each election; is that right?

A That's right. Because those are the U.S. House elections.

So if we look at the very top row, that's U.S. House, the first congressional district. And what we see there is that in CD 1, the black preferred candidate received 36.8 percent of the vote. The white preferred candidate won with 63.2 percent of the vote. We don't have any numbers in the rest of that row because that contest only happened in the first congressional district.

Q And those numbers that you mentioned -- 36.8 and 63.2 -- are the actual vote shares obtained by each candidate; is that right?

A Yes.

Q And I notice here that House District 7, which was one of the districts you analyzed, is not included on this table. Can you explain why?

A That election was not contested by both major parties.

Q So there was no -- there was no contest basically in that election?

A That's right.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 171**

172

Q And what does Table 8 tell us about the extent to which African-American preferred candidates win elections in these congressional districts?
A If we compare the vote shares for the black and white preferred candidates in the first, second, and third districts, we see that the white preferred candidate is winning with large margins, often more than 20 percentage points.
In contrast, in CD 7, we see that the African-American preferred candidate is winning with large margins of about 40 percentage points.
Q Dr. Palmer, after you submitted your initial report in this case, did you receive reports from defendant's experts Drs. Johnson and Hood?
A Yes.
Q And did either expert report address the analyses you performed in your initial report that we just discussed?
A No. Neither Dr. Hood nor Dr. Johnson contested any of my conclusions or my methodology or empirical results.
Q But you did submit a rebuttal report in this case; is that right?
A Yes.
Q And that's Plaintiffs' Exhibit 80?
A Yes.
Q Why did do you that?
A Dr. Hood in his report questioned the functionality of the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 172**

173

new majority-minority districts drawn by Mr. Cooper, and I was asked to analyze a performance of those districts.

Q And what did data did you examine to answer that question?

A It required a variety of data. First, the actual maps drawn by Mr. Cooper in the form of block equivalency files, which are files that list every census block and which district they're assigned to on each map. Then county-level and precinct-level election results and voter turnout data from the 2018 general election. And that's all from the Secretary of State. The voter file that I used in my previous analysis I used again. And then the new data here or precinct boundary shape files for some counties, in order to map out where voters -- to map out voters in counties that were split between two districts under Mr. Cooper's maps.

Q So then what analysis did you perform to analyze whether the districts would be able to perform for the minority preferred candidates?

A The first thing I did was I calculated vote shares for each candidate in the statewide elections in 2018 in each district under each of the four maps.

Q So let's call up Plaintiffs' Exhibit 80, Figure 1.

MR. DAVIS: Your Honor, at this point, I would like to lodge an objection, if I may.

THE COURT: All right.

MR. DAVIS: Dr. Palmer's analysis on whether these

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 173**

174

districts would perform are based solely on the results of the 2018 election. That's not information that would have been available to the Alabama Legislature in 2011. They could not have looked at those results obviously and used that to determine whether or not these districts would, in fact, provide an opportunity to elect.

MS. KHANNA: Your Honor, if I may respond.

THE COURT: Yes.

MS. KHANNA: The legal question here is not what information, data, or intent the map drawers had in 2011. The question is whether race is -- voting is racially polarized in Alabama in these areas. It is not about the intent of the legislature at the time, because it's not a legislative-intent case.

So Dr. Hood, when he raises the question of voter turnout, himself relies on post-2010 data to suggest that there's not -- that there's a functionality problem here, in accordance with that same legal standard that we have all been operating under.

MR. DAVIS: I would respond, Judge, that I don't think this is part of Dr. Palmer's polarized voting analysis. He's assessing whether these districts would, in fact, provide an opportunity to elect.

But if the question is whether the Alabama --

THE COURT: Isn't that beyond the scope of his original report?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 174**

                 175

MS. KHANNA: It is of his original report. It is in response to --

THE COURT: And also beyond the scope of his expertise to some extent, is it not?

15:20:12 MS. KHANNA: I don't believe it's beyond the scope of his expertise. His expertise is in analyzing racial voting patterns in election results.

But it is included in his rebuttal report, specifically in response to Dr. Hood's analysis, which itself is based on 15:20:28 post-2010 data.

THE COURT: Is it based on post-2010 data?

MR. DAVIS: Dr. Hood did not issue -- he did look at post-2011 data.

He didn't issue an opinion that these districts would not 15:20:40 perform. He said the numbers are so close, there are questions, especially when you look at turnout.

But now that it's clear that we are only dealing with the declaratory judgment in this case and that our focus is backwards looking, we don't think that an assessment based on 15:20:56 2018 data would be relevant, because the Alabama Legislature could not have used that.

MS. KHANNA: Your Honor, I would agree that the focus is about whether the current map is a violation, but it is not about whether the legislature knew or should have known that it 15:21:10 was a violation, or intended to violate, or had good

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 175**

176

information, bad information, good faith, or bad faith. None of that is the issue before this Court, whether on declaratory or injunctive relief.

The question of functionality frankly was an issue raised by their expert. We don't believe it is part of our affirmative burden in a Section 2 case. But having been raised by his expert, upon looking at post-2010 data, I think it's appropriate for our expert to respond to say if you think this relevant, I can look at the relevant data.

THE COURT: Okay. But your expert already said that Dr. Hood didn't take issue with any of this expert's report, right?

MS. KHANNA: That's correct. Dr. Hood did not take --

THE COURT: And so his rebuttal was not to defend anything that was part of his original report, right?

MS. KHANNA: That's correct, Your Honor.

He did respond to a concern raised by Dr. Hood for the first time in Dr. Hood's report to demonstrate that that concern was -- an attempt to demonstrate that that concern was not valid. We do not believe that the functionality is a part of the Section 2 affirmative burden on plaintiffs, in any event.

THE COURT: All right. Well, I'm going to overrule the objection, but will keep in mind sort of the extended scope with the involvement of the 2018 stuff on that, so...

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 176**

177

MS. KHANNA: Thank you, Your Honor.

THE COURT: Okay.

BY MS. KHANNA:

Q Dr. Palmer, can you please explain to us what does Figure 1 show -- or is this Figure 1? -- Figure 1 shows?

A So Figure 1 shows the vote shares of the African-American preferred candidates; that is, the candidates identified as African-American preferred candidates in my previous report under each of the four plans in the second and seventh congressional districts.

And so here, the black dot doesn't correspond to white or black voters, but rather to the second congressional district, and the white dot to the seventh district under Mr. Cooper's maps.

And so if we zoom in, for example, on just the top left quadrant, what we see is each of the statewide contested elections in 2018, and then the vote share in the second and seventh districts for the African-American preferred candidate.

And there's a dotted line at 50 percent, and these dots are well to the right of 50 percent. And what that means is that the African-American preferred candidate is winning a significant majority of the overall vote in these districts, in this particular map; and if we zoom back out, in all four maps.

Q And you did say this, but I just want to make extra clear. Here, you have black dots and white dots. We previously looked

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 177**

178

at other figures in which the black dot meant the black preferred candidate -- or the black vote share, and the white dot meant the white vote share. That's not the case here; is that right?

15:24:01 A That's right. Here the black dot means vote share in CD 2, and the white dot, vote share in CD 7.

THE COURT: And that would be total votes black and white?

THE WITNESS: All votes from everybody.

15:24:15 BY MS. KHANNA:

Q Let's call up Table 1 on the same page, please. Please describe what Table 1 shows us.

A These are just the numbers that are plotted in Figure 1. And so they show for each contest what percentage of the vote 15:24:32 the African-American preferred candidate would have received in each district under each map.

And so, for example, in -- under Revised Plan 1 election for Governor, the African-American preferred candidate would have won 59.2 of the vote in CD 2, and 68.8 percent of the vote 15:24:51 in CD 7.

Q And can you tell here what is the lowest vote share that the African-American preferred candidate would have won under District 2 or District 7 in any of these illustrative plans?

A The lowest vote share in any contest under any plan was 15:25:08 58 percent of the vote.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 178**

179

Q And in some cases it's much higher; is that correct?

A In many cases it's much higher.

Q Okay. In his report --

THE COURT: Excuse me. And that is true even though, if I recall correctly, several of the plans drawn by Mr. Cooper had a lower percentage than 58 percent of African-American voters; is that right? Am I remembering that correct?

THE WITNESS: That's right.

THE COURT: Okay. Thank you.

BY MS. KHANNA:

Q Now, in his report, Dr. Hood discussed turnout in Alabama; is that right?

A Yes.

Q And what is your understanding of Dr. Hood's conclusion when it comes to turnout in Alabama?

A My understanding is that Dr. Hood looked at statewide turnout rates by race, and he found a racial turnout gap where African-Americans were turning out at lower rates than white voters statewide.

Q Did you have any reason to dispute that?

A I don't dispute his analysis.

Q Did you perform any additional analysis regarding the actual composition of voters based on Mr. Cooper's illustrative plans?

A Yes. I don't find a statewide estimate of turnout rates

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 179**

180

to be very useful in assessing the functionality of these districts.

And so I took a different approach, which was using the voter file. And so we know where all those voters are located, and we know who actually voted.

15:26:42

I simply calculated the actual number of voters by race, of actual people who actually voted in 2018 in each district under all four maps. And that's in Table 2.

MR. DAVIS: Your Honor, for the record, I would like to lodge the same objection to the assessment of the voter composition.

15:26:58

THE COURT: Objection noted and overruled.

BY MS. KHANNA:

Q Can we please call up Table 2 of Plaintiffs' Exhibit 80? What does Table 2 tell us?

15:27:14

A So Table 2 shows us the percentage of actual voters in 2018 who are black, white, or of some other group in District 2 and District 7 under each of the four maps.

And so what we see is under all four plans in both districts a majority of the actual voters, of the people who actually cast a ballot in this election, were black.

15:27:33

Q So this is not -- like we were looking in Mr. Cooper's plans, we are not looking at the black voting age population here; is that right?

A That's right. We're looking at percentage of voters that

15:27:46

**_Christina K. Decker, RMR, CRR_**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 180**

181

were black, percentage of voters that were white, and percentage of voters that were in some other group.

Q So while Dr. Hood looked at the race of voters who turned out statewide, this analysis looks at the race of voters who voted in -- as drawn in Mr. Cooper's illustrative plan; is that right?

A There's a few different differences to highlight. One is statewide versus looking at the individual districts under each map. And I think that's an important distinction.

The second thing is that what Dr. Hood is looking at is the percentage of among the -- among black registered voters, what percentage turned out to vote? And that's what he means by turnout is what percentage of African-Americans who are registered to vote did vote? And here I'm looking at what percentage of the actual voters belong to each group?

And so we see here in Table 2 that under all four plans in both districts a majority of the actual voters were black.

Q So, Dr. Palmer, based on your functionality analysis, would you have any concerns that any of Mr. Cooper's illustrative plans would fail to provide African-American voters an opportunity to elect in either District 2 or District 7?

A No. African-Americans make up a majority of the actual voters in both districts under all four maps. And their candidates of choice are able to win by significant margins.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 181**

Q Dr. Palmer, you are aware that defendant's experts have questioned whether plaintiffs' illustrative plans should be evaluated based on the AP black metric versus the SR black metric? Are you aware of that?

15:29:29 A Yes.

Q And does that debate affect your analysis in any way?

A No. All of my analyses in both reports use a voter's self-identified race from the voter registration database. I'm not looking at different census classifications of race at all.

15:29:47 THE COURT: And if I'm not mistaken, the information from voter registration deals with single race black, right? Only those who -- I mean, you only have one choice there, whether to identify yourself as black or as something other, right? Am I confused on that?

15:30:07 THE WITNESS: That's my understanding.

THE COURT: Okay. So you used in your analysis the information from voter registration, which would be single-race black or all -- whatever it is.

THE WITNESS: I don't think it's single-race black

15:30:24 because a mixed-race person could choose which box they're checking.

THE COURT: Right. It's how they self-identified.

THE WITNESS: That's right.

THE COURT: But they didn't have an option to

15:30:35 self-identify other than with one checkmark?

183

THE WITNESS: That's my understanding.

THE COURT: All right.

BY MS. KHANNA:

Q Dr. Palmer, I just want to summarize with your overall analysis. What conclusions overall do you arrive at in the course of your work in this case?

A I find high levels of racially polarized voting.

African-American -- white preferred candidates consistently defeat African-American preferred candidates in the focus area in the first, second, and third congressional districts. And under Mr. Cooper's illustrative maps, African-American voters make up the majority of the electorate and are able to elect their candidates of choice.

MS. KHANNA: Thank you. No further questions on direct.

THE COURT: Cross-examination? Mr. Davis?

CROSS-EXAMINATION

BY MR. DAVIS:

Q Good afternoon, Dr. Palmer.

A Good afternoon.

Q Dr. Palmer, were you retained as an expert in the case of *Thomas vs. Bryant* in Mississippi?

A Yes.

Q What was that case about?

A That case was about a single state Senate district in

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 183**

184

Mississippi.

Q What was the nature of the claim against that Senate district?

A Can you refresh my memory?

15:32:16 Q Sure. Would you help if you saw a copy of your report from that case?

A Sure. Thank you.

MR. DAVIS: May I approach?

THE COURT: You may.

15:32:31 BY MR. DAVIS:

Q Let me redirect -- refocus my question, Dr. Palmer.

Do you agree that the case was about Senate District 22 in Mississippi?

A Yes.

15:32:56 Q And that Senate District 22, as drawn, was 50.8 percent black voting age population?

A Yes.

Q Okay. And do you agree that the plaintiffs were claiming that even though African-Americans were more than 50 percent of 15:33:07 the district, they were unable to elect their candidate of choice in that district?

A Yes.

Q And do you agree that as part of that lawsuit the plaintiffs in that case claimed that Section 2 required 15:33:18 Mississippi to redraw the district to increase the percentage

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 184**

185

of black voters in that district?
A That's my understanding.
Q And what analysis did you perform in that case, Dr. Palmer?
15:33:30 A I did a racially polarized voting analysis in that case.
Q Okay. And did you also assess whether if black percentage voting -- excuse me -- if the black voting age population was increased to 62 percent, did you opine that blacks would then be able to elect their candidate of choice?
15:33:47 A Yes.
Q So is it true, Dr. Palmer, that a 50 percent black district or a district that's just over 50 percent African-American voting age population does not necessarily allow the African-American voters to elect their candidate of choice?
15:34:02
A Not necessarily.
Q Okay. Now, in 2011 would you agree that Alabama was governed by Section 5 of the Voting Rights Act?
A I believe so.
15:34:17 Q Okay. Would you agree that because Alabama was governed by Section 5 of the Voting Rights Act that Alabama's congressional districts had to be precleared by the Department of Justice?
A I believe so.
15:34:29 Q Okay. If Alabama had redrawn congressional District 7 and

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 185**

186

lowered the percentage of African-American voters in that district to the point where African-American voters would be unable to elect their candidate of choice, would you agree that Alabama would have had a hard time getting that district precleared?

15:34:52

MS. KHANNA: Objection. Calls for a legal conclusion. Dr. Palmer is not an expert on what would qualify for preclearance by the Department of Justice, what they would have objected to.

15:35:02

THE COURT: I'm aware of that. I will overrule and allow this witness to opine.

THE WITNESS: Can you repeat the question, please?

BY MR. DAVIS:

Q Yes.

15:35:09

Would you agree that if Alabama dropped the voting age population -- the African-American voting age population of congressional District 7 to such a low point that African-Americans would be unable to elect their candidate of choice, that Alabama would have had a difficult time getting that district precleared?

15:35:27

A I don't know.

Q Okay. Would you agree that if African-Americans had been successful in electing their candidate of choice in Congressional District 7, but that if Alabama then dropped the African-American voting age population to such a low percentage

15:35:41

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 186**

187

that they no longer could elect their candidate of choice, that Alabama would in that case have diminished the ability of African-Americans in Congressional District 7 to elect their candidate of choice?

15:35:57 MS. KHANNA: Same objection, Your Honor.

THE COURT: Overruled.

THE WITNESS: I don't know.

BY MR. DAVIS:

Q If they go from can to can't, you don't agree that that's diminishing the opportunity to elect?

15:36:06

A To be clear, you're not specifying a certain number. You're just saying if the district is -- if the black population is reduced to below some point and there's not some other equivalent district drawn with those voters in it.

15:36:22 For example, District 7 could become District 6 and be essentially the same with a different number, and then 6 would be precleared; is that correct?

Q I'm sorry, Dr. Palmer. I'm having a difficult time understanding. Let me try to ask it another way.

15:36:38 Do you not agree that if African-Americans have been successful for years in electing their candidate of choice in a congressional district, but the state then comes in and lowers the African-American population to the point, whatever point where they no longer can do so, in that case, don't you agree that Alabama would have diminished the opportunity of

15:36:58

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 187**

188

African-Americans to elect their candidate of choice?
A I think so.
Q Okay. Now, in 2011 did Alabama -- the state of Alabama have any of the evidence that you assessed to determine whether a district along the lines of what Dr. -- what Mr. Cooper has proposed would, in fact, perform and provide the opportunity to elect?
A Can you be more specific?
Q Sure. The obvious question. Your analysis was based on 2018 elections, right? When you looked at those to determine whether or not African-Americans were a majority of the electorate in the focus area?
A Yes.
Q Alabama did not have the results of the 2018 elections when it was acting in 2012 or 2011?
A Yes.
Q Okay. And you didn't look at any elections before 2011, correct?
A That's right.
Q You conclude in your first report, Dr. Palmer, that voting is polarized in Alabama along racial lines, correct?
A Yes.
Q Does your analysis consider the reasons that any voter votes the way he or she does?
A No.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 188**

189

Q Did you investigate whether a majority of whites in Alabama vote Republican because of some kind of racial bias, as opposed to maybe issues, or beliefs about the issues, or partisan politics?

15:38:34 A No.

Q And the tool you used of ecological inference cannot answer that question, can it?

A No. It's not meant to.

Q So you're not saying that any voter is doing anything

15:38:45 wrong by choosing to support any particular political party?

A No.

THE COURT: While we're on that, may I ask a question that's been burning in my head?

Dr. Palmer, did you consider in any of the demographic

15:39:15 stuff the difference between democratic candidates and Republican candidates and democratic voters and Republican voters, or did you only look at the question of race?

THE WITNESS: I only looked at race.

BY MR. DAVIS:

15:39:34 Q Similarly, Dr. Palmer --

MR. DAVIS: Oh, I'm sorry, Your Honor. Had you concluded?

THE COURT: Yes.

BY MR. DAVIS:

15:39:39 Q When you looked at the different supports the different

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 189**

190

candidates got, did you consider how successful any candidate was in their fund-raising?

A No.

Q Did you assess name recognition?

15:39:50 A No.

Q Did you assess how popular that candidate was in the voting public?

A No.

Q Would you agree that the support that a candidate gets in an election can be related to things like fund-raising and name recognition?

A Sometimes.

Q Sometimes? Would you agree that the strength of the local political party can be a valuable asset to a candidate?

15:40:15 A Potentially.

Q All right. Dr. Palmer, I'd like to understand a little better the ecological inference analysis that you performed. Now, we spoke during your deposition about the concept of bounds, and that's a concept that's part of ecological inference, correct?

A Yes.

Q Now, what I have got up is a hypothetical precinct. There are three on this sheet. And I recognize that you don't perform an ecological inference analysis on one, two, or three precincts?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 190**

191

A That's right.

Q Okay. It would take a lot.

I just want to understand some of the first steps you would perform. So let's say hypothetically there was a precinct that had 1,000 voters. 900 of those voters were minority voters, and 100 were white voters. And then you know from the election returns that candidate A received 850 votes and candidate B received 150 votes.

Where does ecological inference start with this data to determine whether support -- whether either race is cohesive in their support of a particular candidate?

A So I'm not sure if start is a right way of thinking about it. But if you're asking about how bounds are used by ecological inference, that's something I can answer with this table.

Q Okay.

THE COURT: Before you do that, back up and educate me on what you mean by bounds. You both seem to understand that, and I have no idea what it's meant in the context of this ecological analysis that you're doing.

THE WITNESS: I'll do my best to explain it without getting too technical. There are --

THE COURT: Okay. The less technical the better. I appreciate that.

THE WITNESS: So there are a few other methods that

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 191**

192

are also used to analyze racially polarized voting.

But ecological inference, to my understanding, has been accepted as the best one to use because it recognizes a really important constraint in any of our estimates. It recognizes that no candidate can get less than 0 percent of the vote or more than 100. And no group could support a candidate at less than 0 percent or more than 100 percent, which seems really obvious.

Of course, African-Americans can't support their preferred candidate with 110 percent of their vote, but --

THE COURT: Generally, unless there's something funky going on at the ballot box.

THE WITNESS: With proper elections, it would be impossible.

THE COURT: Right.

THE WITNESS: But some of these models, like ecological regression, which is a different method used for RPV, can produce estimates that look like that. That doesn't always mean they are bad. But that's a downside to other models.

And so what ecological inference recognizes is that we can learn information from those limits. That is, we can use these natural limits of, of course, a group can't support a candidate more than 100 percent or less than 0 to start limiting the range of possibilities and get better estimates.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 192**

193

And so I think when we look at this table, that will help clarify it. If I can turn back to the table.

BY MR. DAVIS:

Q Yes, please, Dr. Palmer.

15:43:49 A So here we have a precinct with 900 minority voters, and 100 white voters. 850 votes for candidate A and 150 votes for candidate B.

Let's consider one extreme, where minority voters really like candidate A. It's impossible that more than 850 of them 15:44:10 voted for candidate A because there's only 850 votes for candidate A.

So one extreme is 850 voters voted for -- 850 minority voters voted for candidate A, and 50, then, the remainder, had to have voted for candidate B. And then 0 white voters voted 15:44:30 for candidate A, and 100 white voters voted for candidate B.

That's one extreme that we can learn and that we can sort of narrow down the range of possibilities just by recognizing that these bounds have to exist. These numbers have to add up the right way.

15:44:44 We can also get another bound at the opposite side, which is suppose all 100 white voters love candidate A. Then we can say there's 100 candidate A votes from the white voters, and the rest have to be made up for by the minority voters. So there have to be 750 minority votes for candidate A to get to 15:45:03 850. Then there's 0 votes for candidate B from white voters,

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 193**

194

and 150 votes for candidate B from minority voters.

That's a second bound. And that doesn't -- that's a pretty big range, right? We went from 0 to 100 on these groups. But that actually starts limiting the possibilities.

15:45:22 And as we add more and more precincts, we have different limits, different bounds in each precinct. That provides valuable information to the estimate.

THE COURT: I think this is getting to another big question that's been reverberating in my head since you have 15:45:37 been testifying. And that is, you know, if I remember correctly, not a single time that I have completed a ballot have I marked what my race was before I put it into that little slot so it would go and be counted.

And so my question has been all the while: How do you 15:46:00 know who voted for what candidate or the race of those who voted for which candidate? And I think that's what Mr. Davis is getting to now.

You come up with some kind of formula to make that determination, as opposed to actually knowing how the votes 15:46:19 were cast; is that correct?

THE WITNESS: That's right. We never get to see how the individual voter actually votes. But we can see the places that have a lot of voters of -- we can see how many voters of each group there are in each place, and then how that aggregate 15:46:34 group of voters cast their ballot. And so we can look for

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 194**

195

patterns across that.

For example, places with a very low black population, places with a mixed black and white population, and then places of high black population will have different patterns when racial -- when voting is polarized on which candidates they're supporting. And so we can use ecological inference to produce an estimate. And we call it estimate because there is some uncertainty about it -- it's coming out of a model -- about the levels of support from each group for each candidate.

15:46:49

THE COURT: Okay.

15:47:03

THE WITNESS: And the bounds are part of the information that go into that model along with these general voting patterns.

THE COURT: Well, you could tell, could you not, actually how many -- well, you still won't know the race. But you would be able to tell how many voters voted Republican and how many voters voted Democrat, right?

15:47:16

THE WITNESS: Yes.

THE COURT: Okay. You didn't look at any of those numbers, right?

15:47:30

THE WITNESS: No.

THE COURT: Well, of course, those would be the total numbers, because in each one of these races that you have looked at, it was a Republican versus a Democrat race, correct?

15:47:42

THE WITNESS: Yes.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 195**

196

THE COURT: Okay.

BY MR. DAVIS:

Q So, Dr. Palmer, let's walk through some of these steps. Okay. First, would you agree that if had this hypothetical Precinct 1, that when it comes to minority support for candidate A, at least 750 minority voters voted for candidate A?

A Yes.

Q And it could be as much as 850?

A Yes.

Q Okay. And then 0 -- somewhere between 0 and 100 white voters voted for candidate A?

A Yes.

Q And minority support for candidate B would be at least 50?

A Yes.

Q But no more than 150?

A Yes.

Q And then we're still at between 0 and 100 for white support for candidate B?

A Yes.

Q So looking solely at Precinct 1, you could have on one extreme a situation where 750 minority voters supported candidate, and all 100 white voters supported candidate A?

A If this is our only data point we have available?

Q Yes.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 196**

197

A Then, yes.

Q Okay. So in that event, in Precinct 1, if it was 750 minority voters and 100 white voters all supporting candidate A, voting is not polarized at all?

15:49:25 A I'm sorry. Can you repeat that?

Q Sure. If you have 750 minority voters supporting candidate A and 100 white voters supporting candidate A, voting is not polarized?

A That's right.

15:49:37 Q Okay. On the other extreme, you could have all 850 minority voters supporting candidate A and zero white voters supporting candidate A?

A Yes.

Q And in that case, voting is polarized?

15:49:51 A Yes.

Q So how does ecological inference look at these different precincts and make an analysis of which of these extremes is correct, or if it's somewhere in the middle?

A So that's why we have a model, and why we bring a lot of

15:50:04 data to the model, and why we want as much data as we can.

So that's why, for example, I said I couldn't do ecological inference on the counties in one congressional district alone. There just isn't enough information to look at those and infer with any confidence what the pattern is.

15:50:23 But when you have 1,000 precincts or even just several

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 197**

198

dozen precincts -- when you have the data, and in each place the makeup of the voters is different, the votes cast for each candidate are different, you're going to get different bounds, different limitations, and then you can fit a model that says what pattern best fits the data that we can see.

15:50:42

Q Okay.

A And so that's what ecological inference does, and that's what you can't learn from any one or two or three precincts examples, but can learn from fitting a model to the entire data set.

15:50:55

Q Aren't assumptions part of ecological inference analysis?

A Assumptions are part of all models.

Q Okay. Isn't there a particular assumption -- and I will quote from your deposition here. You say, "The assumptions in ecological inference is that" --

15:51:09

MS. KHANNA: Your honor, objection. I think it's an improper impeachment.

THE COURT: I haven't heard the question.

MS. KHANNA: I believe he's just quoting from the deposition.

15:51:18

THE COURT: I don't think we've gotten there. Let me hear the question.

MR. DAVIS: I was indeed going to quote a line from his deposition. I don't know why that would be improper.

15:51:31

THE COURT: Ask him a question as to what he testified

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 198**

199

about.

BY MR. DAVIS:

Q Sure. This is something you said in your deposition, Dr. Palmer, and I am going to ask if you still agree with this.

15:51:42 You said in your deposition that the assumption in ecological inference is that minority voters across the precincts in the data are going to vote similarly, and that white voters across the precincts will vote similarly.

A Yes.

15:51:56 Q That's a common assumption in an ecological inference, correct?

A Yes.

Q Okay.

THE COURT: Isn't that what you're trying to prove?

15:52:04 So you begin with the assumption that what you want to prove is correct?

THE WITNESS: No. That's not right.

The assumption is that overall on average -- and there will be variation across the place and across the precincts --

15:52:23 that there is some average level of support for each group for each candidate. And what we're trying to find is are there differences in that support?

So it could be -- you can run ecological inference and find that neither group has a candidate of choice. With the

15:52:40 same assumptions going in and saying on average -- you can say

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 199**

in a place you might think on average 50 percent of black voters are voting for candidate A and 50 percent are voting for candidate B.

THE COURT: You may continue, Mr. Davis.

15:52:55 BY MR. DAVIS:

Q Sure. But do you not assume as part of ecological inference that -- let's take two precincts as part of hundreds that you view.

You've got one precinct where average income level is 15:53:08 really low and average education level is really low. And you have another precinct where average income and education is really high.

Does ecological inference assume that the black voters in both of those precincts will vote along similar patterns? And 15:53:24 that the white voters in those two very different precincts will vote along similar patterns simply because of race?

A Ecological inference will not assume that you have the same patterns in the same places, but that there is a pattern on average that you can find.

15:53:39 Q Okay. You said that the assumption is that minority voters across the precincts in the data are going to vote similarly?

A That doesn't mean the same.

Q Okay. What does it mean?

15:53:51 A There's going to be some variation in different places.

201

So in some places, you'll find that the support of black voters for their -- for whatever that -- areas, groups, candidate choice is lower, and some is going to be higher. We are reporting averages here.

15:54:08 So, for example, what I am not saying is that let's say the average I report is 95 percent of black voters are supporting their candidate of choice. I'm not saying it's 95 percent in Precinct 1, and 95 percent in Precinct 2, and 95 percent in Precinct 3, and so on.

15:54:22 I'm saying on average, if you average black support across all these precincts, it will be 95 percent. But some will be higher and some will be lower.

Q So you're not assuming any similarity in -- by voting patterns across precincts when you begin the analysis?

15:54:42 A You're assuming that -- you are assuming that there is a common trend across these groups. But you're not -- you're not assuming what that trend is.

You are not assuming that the groups are polarized, for example, to start. The model -- you are saying there is a

15:54:56 common trend. You are using the model to find what that is. But it could be anywhere from 0 to 100 for either group, and you don't know going in, and you can't assume going in what it will be.

Q Okay. Does ecological inference assume that black voters

15:55:09 will have similar patterns regardless of education and income

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 201**

202

levels?

A It does not take into account education and income levels.

Q Okay. Does it assume that white voters will vote similarly across precincts regardless of education and income levels?

A It doesn't take that into account.

Q Okay. Do you have any basis to assume that voters in Alabama will vote the same along racial patterns regardless of income and education levels?

A I'm sorry. Can you repeat that?

Q Sure. Is there any basis to assume that white voters in different precincts will vote the same even though there are different education and income levels?

A I don't know.

Q Okay. Was there a pattern in the candidate of choice for black voters, in terms of their party affiliation?

A I don't discuss that in my report.

Q Did you notice that at all?

A You can look at the candidates of choice in my report.

Q Okay.

THE COURT: The question was whether you noticed it at all.

THE WITNESS: Yes.

BY MR. DAVIS:

Q What did you notice?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 202**

203

A African-Americans support democratic candidates.

Q Have you ever done a polarized voting analysis where most of the candidates of choice of African-American voters were Republican candidates?

15:56:34 A No.

Q Do you agree that there are more voters in Alabama who tend to support the Republican party than who tend to support the democratic party?

A More voters overall?

15:56:46 Q Yes.

A Yes.

Q Would you agree that Alabama's a conservative state?

A That's my general understanding.

Q Okay. Is anybody calling Alabama a battleground state for 15:56:58 purposes of the upcoming presidential election?

A I don't believe so.

MR. DAVIS: May I have a moment, Your Honor?

THE COURT: Yes, you may.

MR. DAVIS: No further questions at this time.

15:57:36 THE COURT: Any redirect?

MS. KHANNA: Yes, Your Honor. Just a few questions on redirect, Your Honor.

REDIRECT EXAMINATION

BY MS. KHANNA:

15:57:59 Q Dr. Palmer, I believe you were asked on cross the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 203**

204

question: Would you agree that a bare majority-minority district -- just over 50 percent -- does not necessarily allow African-Americans to elect their candidates of choice? Do you recall being asked that question?

15:58:19 A Yes.

Q And you agreed that a bare majority-minority district does not necessarily allow African-Americans to elect their candidates of choice. Do you agree?

A Yes.

15:58:29 Q Would you agree that a bare majority-minority district just over 50 percent BVAP can elect African-Americans to elect their candidate of choice?

A Yes.

Q What would that depend on?

15:58:41 A It would depend on things like turnout, voter participation, and it could also depend on the level of racially polarized voting.

So, for example, if you had a district where turnout was equal among both groups, or both groups are turning out in proportion to their share of the district, you would think that would be a likely district to perform for African-Americans and elect their candidates of choice. You also could have a district where the level of racially polarized voting is lower.

For example, if 20, 30 percent or even lower than that -- let's just say 20 percent of white voters are supporting the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 204**

205

African-American candidate of choice, and 100 percent of African-American voters are -- just to make the math easy -- in a 50/50 district, you would get 50 percent of the vote for the African-American candidate of choice from African-American voters and additional 10 percent of the vote from white voters, and that candidate would win 60/40.

Q I believe you were also asked on cross a hypothetical. If there is a district in which African-Americans can elect their preferred candidates and then it is redrawn into a district in which they can't elect their preferred candidates, that might be diminishment for purposes of retrogression. Do you recall being asked that?

A Yes.

Q And I believe you agreed with that?

A Yes.

Q Is your understanding that CD 7 is currently Alabama's sole majority-minority district?

A Yes.

Q And in your opinion, do any of Mr. Cooper's illustrative District 7 render CD 7 a district in which African-Americans can't elect their candidates of choice?

A No.

Q Can we please pull up Plaintiffs' Exhibit 80, Table 2? I believe it's on page 4. Yes.

I want to focus on District 7, which was the district we

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 205**

206

just talked about. Is it fair to say that under three out of four of Mr. Cooper's revised plans, over 55 percent of the actual voters in District 7 are African-American?

A Yes.

16:01:03 Q You were also asked on cross about whether or not your analysis of racially polarized voting considered certain factors such as the fund-raising of the candidates and the party platforms. Do you recall that?

A Yes.

16:01:24 Q Are these -- are those factors standard -- standard in the methodologies used among experts in evaluating racially polarized voting?

A No. My understanding is those factors are not used.

Q You were also asked about various assumptions that are included in the ecological inference model. 16:01:49 Do you recall that?

A Yes.

Q Are there assumptions in any statistical model?

A Yes.

16:01:56 Q Is it your understanding -- are you saying that the ecological inference method is somehow set up to find racially polarized voting?

A Absolutely not. It's not only possible, but can easily happen where you run the model and don't find any evidence of racially polarized voting. 16:02:14

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 206**

Q Have you ever used ecological inference to find that there is no racially polarized voting?

A Yes. For example, in the *Bethune Hill* trial there, where I was looking at racially polarized voting in House of delegate districts, in some districts there were racial polarized voting, but in other districts, there were not.

16:02:30

And in particular there, I found that white voters tended to be split between the two parties and did not have a clear candidate of choice.

16:02:43

Q And you used -- as you just mentioned, you used the ecological inference method to analyze racially polarized voting in the *Bethune Hill* case?

A Yes. And not just the same method, but the exact same procedure and really the same computer code.

16:02:59

Q And the Court credited your analysis in that case?

A It did.

Q And you used ecological inference in the course of your work in the *Thomas v. Bryant* case?

A Yes.

16:03:07

Q And the Court credited your analysis in that case?

A Yes.

Q Are you aware of any case in which ecological inference has been rejected by a court as a basis for determining racially polarized voting?

16:03:18

A Not to my knowledge.

208

Q As an expert in this field, is ecological inference commonly used by other experts and statisticians to determine racially polarized voting?
A Yes. I have seen it frequently used by other experts.
16:03:32 Q Would you say it's the best available model for assessing racially polarized voting?
A In my opinion, yes.
MS. KHANNA: No further questions, Your Honor.
THE COURT: Any recross?
16:03:47 MR. DAVIS: (Nodded head.)

RECROSS-EXAMINATION

BY MR. DAVIS:
Q So, Dr. Palmer, if I understand your testimony, a district that's barely over 50 percent black voting age population,
16:04:11 maybe that district can perform, maybe it can't?
A That's right.
Q And it depends, you said, on things like voter turnout and the extent of voter polarization?
A Yes.
16:04:24 Q Is there any difference in the levels of voter polarization in Mississippi and Alabama?
A I don't know.
Q Is Alabama -- are African-Americans in Alabama turning out at a higher rate than they are in Mississippi?
16:04:38 A I don't know.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 208**

209

Q Have you ever, in any polarized voting analysis, ever found that there isn't polarized voting when a majority of white voters in that jurisdiction supported Republicans?
A I'm sorry. Can you repeat the question?
16:04:56 Q Sure. Let's say you're performing a racially polarized voting analysis. You determine that there is a candidate of choice of white voters, and that candidate of choice is the Republican candidate.
Have you ever performed a racially polarized voting 16:05:10 analysis in such circumstances where you did not find that voting is racially polarized?
A I don't believe so.
Q You looked again at the 2018 general election results and determined that African-American voters were, in fact, a 16:05:36 majority of the electorate in the districts, correct?
A Yes.
Q Just so -- again -- never mind.
You saw Table 2 before. That is from your supplemental report. Again, that's not information that the Alabama 16:06:01 Legislature had when it drew the districts in 2011?
A That's right.
Q Okay. Are you aware of any evidence that would have been available to the Alabama Legislature that showed them that, in fact, if they had drawn those districts, the districts in 16:06:16 Mr. Cooper's illustrative maps, that they would have given

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 209**

African-American voters an opportunity to elect?

A Can you please repeat the question?

Q Sure. Do you present any evidence that would have been available to the Alabama Legislature in 2011 that would have told them, the Alabama Legislature, that if they draw those districts as Mr. Cooper suggested, that it would provide a fair opportunity for African-American voters to elect their candidate of choice?

A I don't provide that evidence in my report, but they could have had evidence from earlier election years at that time.

Q Do you know of that any such evidence?

A I don't know what evidence they considered.

Q Okay. Are you aware of a state asking that congressional districts be precleared where they say, we've lowered the black voting age population in these districts a lot. We have no idea if they'll work, but don't worry, by 2018 they will?

A I don't know.

MR. DAVIS: Nothing further.

THE COURT: Anything further?

MS. KHANNA: Just one question, Your Honor.

FURTHER REDIRECT EXAMINATION

BY MS. KHANNA:

Q Dr. Palmer, do you have reason to believe or any reason to believe that the Alabama Legislature would have had election data at its disposal when drawing maps?

211

A Yes.

Q The same election data that you had except for different years, correct?

A That's my understanding.

16:07:36 Q And if you were looking at election data for a different year, you could provide the same analysis, the same -- perform the same analysis that you performed here?

A Yes.

MS. KHANNA: Thank you. No further questions.

16:07:49 THE COURT: Anything else?

MR. DAVIS: Nothing else, Your Honor.

THE COURT: Okay. I think this is a good time for a break. We will come back at 4:20.

(Recess.)

16:22:55 THE COURT: Be seated and come to order.

MR. WALKER: Your Honor, we have come up with what we think is probably the schedule that we're going to have. And we can give that to you at the end of the day.

THE COURT: Yeah. That would be good. We'll take it

16:23:37 up then. Let's go on with this next witness, please.

MR. OSHER: The plaintiffs' next witness is Ms. Karen Jones.

THE COURT: Okay.

KAREN JONES,

16:23:45 having been first duly sworn by the courtroom deputy clerk, was

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 211**

212

examined and testified as follows:

THE COURTROOM DEPUTY CLERK: Please state your name for the record.

THE WITNESS: Karen Jones.

16:24:01 DIRECT EXAMINATION

BY MR. OSHER:

Q Hey, Ms. Jones.

A Hey.

THE COURT: And if you would, please, how do you spell

16:24:06 your first name?

THE WITNESS: K-A-R-E-N.

THE COURT: Okay. There are a variety of ways to spell that name. So I just wanted to make sure we had yours correct. Thank you.

16:24:18 BY MR. OSHER:

Q Ms. Jones, are you a plaintiff in this lawsuit?

A Yes.

Q And do you live in Alabama?

A Yes.

16:24:23 Q And what county do you reside in?

A Montgomery County.

Q And do you live in the city of Montgomery?

A Yes.

Q How long have you lived in Alabama?

16:24:32 A I was born and raised in Montgomery, Alabama, went to high

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 212**

213

school and graduated in Montgomery. I moved to Birmingham to attend University of Alabama Birmingham. I became ill and had to move back to Montgomery, Alabama in about '94, '95. And in 1999, I moved to Georgia. And then in 2009, I moved back to Montgomery, Alabama, where I now reside. And I have been ever since.

16:25:01

Q Great. Thank you. And tell us a bit about your educational background.

A I'm a high school graduate of George Washington Carver High School, Montgomery, Alabama. I have my Bachelor's of Science in psychology, and my master's in public administration.

16:25:16

Q Where did you get the master's?

A At the University of Alabama Birmingham.

16:25:29

Q Ms. Jones, do you currently hold any public office?

A Yes, I do.

Q And what is that?

A I am on the state democratic executive committee for District 77.

16:25:41

Q And that's an elected position?

A Yes.

Q Have you run for any other public office?

A Yes.

Q And what were those?

16:25:48

A I ran for Montgomery City Council District 6 in about -- I

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 213**

214

think it was 2011. A former councilman died. And then in 2015, I ran for City Council District 7 in Montgomery municipal election.

Q And during your campaigns for city council, to what extent did you engage with residents of Montgomery to understand their interests and needs?

A I went door to door. I canvassed. I participated in forums. I participated in debates. And just overall in the community meeting people.

Q Do you participate in other civic organizations?

A Yes, I do.

Q And what are those?

A I serve on the board of legal services Alabama. I am -- I help with Save Black Boys, Every Town USA For Gun Safety, Moms Demand Action, Students Demand Action, SOS, Save Ourselves, Movement For Justice and Democracy. I'm the co-county chair for Alabama Poor Peoples Campaign.

Q And you listed a number there. I'm curious about Save Ourselves. What is that organization?

A It is -- and I need to mention one more. ALFRA, Alabama Family Rights Association.

Q Uh-huh.

A But SOS is an organization. It is a nonprofit organization that works on social justice issues.

Q And do you run any nonprofit organizations?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 214**

215

A Yes, I do.

Q And what is that organization?

A It is Whom It Concerns -- W-H-O-M-I-T-C-O-N-C-E-R-N-S -- Incorporated. It's a 501(c)(3). We focus on youth development, community development, and assist nonviolent returning inmates to the community by helping them find resources, and the such.

Q Okay. And in all of this work, can you identify what organizing -- organizing work you do relating to voting?

A I do -- I have voter education, voter registration, workshops, seminars. And I also do workshops on how to restore voting rights for those individuals who may believe they have lost their voting rights who were locked up before and getting out.

So the moral turpitude laws have changed. So some of them have their rights restored due to that law change, and they don't know that their rights have been restored. So I help them with that to find out.

Q Ms. Jones, how do you identify racially?

A I'm an African-American black.

Q Are you currently registered to vote in Alabama?

A Yes.

Q And when was the first time you registered to vote?

A In 1993.

Q And how old were you then?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 215**

216

A I was 18.

Q And when you moved out of the state to move to Georgia, did you move your registration to Georgia?

A Yes, I did.

16:29:20 Q And when you moved back to Alabama, did you re-register in Alabama?

A Yes.

Q And have you been registered since you moved back in 2009?

A Yes. In every election.

16:29:31 Q So do you vote regularly?

A I do.

Q Would you say that voting is important to you?

A It is a sacred event for me personally because I -- I take it as a serious event, sacred event because so many of -- 16:29:50 members of my community, my ancestors have shed blood and died for me to have the right to vote. So I take it seriously. And that's why I vote in every election.

Q And what role do you see your vote playing in Alabama's political system?

16:30:07 A My voice counts. So my vote, you know, I want it to count. So it means something to me to vote for somebody that I think is in the best interest or have the best interest for my community and for the black community and myself.

Q Ms. Jones, what congressional district do you live in?

16:30:29 A District 7.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 216**

217

Q And who currently represents Congressional District 7?
A Congresswoman Terri Sewell.
Q Have you voted for Representative Sewell in congressional elections?
16:30:40 A Yes.
Q And in each of those election in which you have voted for Representative Sewell, has she won her election?
A Yes.
Q Were those elections competitive?
16:30:50 A No.
Q Can you tell me why you believe that?
A Well, it's little to no competition being that she is a front runner, well known. She has name recognition. It's really no competition. She usually wins 3 to 4 to 1 if she has
16:31:11 an opponent, but she's...
Q Ms. Jones, do you feel that your vote matters in Congressional District 7 when voting the congressional elections?
A In all elections, I feel my vote matters. I feel like it
16:31:26 would mean more if I had -- it's like it's diluted to me because with Congresswoman Terri Sewell, she's a shoe-in. So, I mean, it's not to say that I am going to stay home, but I know she's going to win. And most of us know she's going to win, so, you know.
16:31:49 Q Is there something about who lives in District 7 that

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 217**

218

makes you feel this way?

A Who lives in District 7?

Q The population of voters in District 7?

A The black community, yes.

16:32:03 Q And tell me more about that. What is it about the fact that there's a black community in District 7 that makes you feel as if your vote is diluted?

A Well, we're stacked and packed in District 7, whereby out of seven Congress people we just -- I mean, we just -- we just 16:32:23 have her to represent the black issues. And she's flying by herself -- issues that affect the black community, mental health issues, health care, criminal justice, education. It's just her loan self that focuses on issues in the black community.

16:32:44 Q Now, you used the term "stacked and packed." What do you mean by that?

A Well, I feel like the district -- well, I know that her district is majority black. So she's a shoe-in with little to no competition or anybody else to go with because of the name 16:33:06 recognition or whatever. So...

Q All right. In your view, are there more African-Americans that are necessary to elect Terri Sewell in her district?

A Yes.

Q You mentioned that you feel like your vote is diluted in 16:33:27 District 7. Based on your community organizing work, have you

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 218**

219

developed a sense as to whether other black voters in your district feel similarly?

A Yes. Most voters and most who are trying to vote -- and I try to do voter education and voter registration. People like, well, she's going to win anyway, so why do I need to go vote for her? Y'all going to elect her in because, you know, she always gets in.

And I tell them their vote matters. You know, you need to vote anyway because we have a right to vote.

So I think the general consensus is whether or not an individual, black individual votes for her, she's going to get it anyway because the majority black, consistent black voters are going to go to vote for her, anyway.

Q Ms. Jones, what result are you trying to achieve in this lawsuit?

A I would really love another congressional district with hopefully a person of color, black person who will focus on issues in the black community. That will help in my mind the issues that Terri Sewell can't get to. That extra person can focus on those black issues that she couldn't get to. So I think it would be a great help to the black community.

Q Ms. Jones, you mentioned -- well, before I go there, before we go to those specific issues, does the person have to be a black candidate in order to represent the interests and needs of the black community?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 219**

220

A No. But they should have the black interests at heart in that state, yeah.

Q So let's talk about some of those issues. Based on your experience organizing in Montgomery, have you found that the African-American community in the area has particular needs and interests relating to health care?

A Yes.

Q And what are those?

A Affordable health care and Medicaid expansion. I, being a woman who doesn't have children, I had a stroke last year. And had it not been for me going to a charity hospital, waking up at 3:00 in the morning and being in line -- people come from all over to go to Medical Outreach, and they only accept 12. So you have to stay in line.

And I remember one time being Number 13 and having two weeks of heart medication left without any insurance, without Medicaid because I don't have any children. I also have epilepsy.

So they provide medical services that I would not have been able to get as a woman without a child and without Medicaid in Alabama. So I thank God for them.

And since then, I have disability now. But I had to have a stroke and died three times before I got insurance and health care in Alabama.

Q Does the African-American community in Montgomery have

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 220**

particular needs or interests relating to education?

A Yes.

Q What are those?

A Higher education. I've been -- prior to me becoming ill, 16:36:56 I had a job since I was 14 years old. So I got Pell Grant one time, I remember, $300. So I've always had to get student loans. And now student loans are just like burdensome.

So we need someone in there who will fight for Pell Grants for low income people. Even though I had a job at 14, I had to 16:37:22 get a permit to work because I wanted to work. You know, because I wanted to work. I wanted to go to college. I couldn't pay for it. And I really want to go back to college to get my Ph.D., but I'm out of funding.

So I think somebody who would help with education and 16:37:41 post-secondary education is somebody we need.

Q What about lower levels of education -- elementary school, middle school, high schools? Are there particular needs and interests of the African-American community in Montgomery related to those levels of education?

16:37:57 A Yes. I am a lay advocate for children, primarily children with special needs, as well. So I see our special needs children being thrown out to alternative schools and then really getting arrested. Most time they're autistic, ODD, ADHD combined, but severe issues in special needs that usually have 16:38:26 those children instead of individuals who understand them,

222

pushed out into the criminal -- the juvenile system. So it's really the school to prison pipeline at an early age as early as elementary, and I see that.

Q Does the African-American community in Montgomery, based on your work there, have particular needs or interests relating to criminal justice?

A Oh, yes. While working on voter registration and voter education, we have individuals to come in for expungement or to ask about expungement because they owe so much restitution. Sometimes a lot of them owe on restitution, but they can't get a job. They can't get a job because we also have a debtor's prison, debtor's court in Montgomery.

So if they don't have ID or their driver's license, even the temporary agencies, they won't hire them because you must have ID. So I say a hungry man is an angry man. They have to do what they have to do to eat.

I don't condone illegal activities. But they often find themselves in a predicament. And so the criminal is bad.

Q What about the specific relationship between the black community in Montgomery and law enforcement?

A It's bad because of the lack of jobs, accessibility to get the jobs. And if you don't have a driver's license or if you are driving, you're profiled and targeted. And usually if you get stopped, you're going to get not one ticket, usually four.

And we've basically, those of us who are in the community,

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 222**

kind of basically know the first three things that -- a pattern that the police will stop you for -- not fully stopping, not using your signal, proper signal, lane, and improper turn. And so those are the three categories that we've nailed down. And then from there, you're going to at least get three to four more tickets on top of that.

16:40:51

Q And have there been recent instances in Montgomery that has affected the relationship between the African-American community and law enforcement?

16:41:05

A Yes. Three years ago. I think it's been about three years.

My childhood neighbor, Greg Gunn, was walking home unarmed, never got charged for anything. A white officer, new officer, rookie, Aaron Cody Smith, he stopped him. They beat him with an ASP baton, and gave him a one-inch gash in the back of his head, tased him multiple times, shot at him seven times. Five bullets struck -- three in the front, twice in the back. He was just only probably from me to you to his front door of his house. Never was charged for anything. He was just walking home.

16:41:28

16:41:49

So that kind of caused a schism between the community and the police department. Where we had kind of a good relationship under Chief Kevin Murphy, and he was forced to resign after he made a statement about apologizing for the action of Montgomery Police Department during the Civil Rights

16:42:12

     224

era, and John Lewis gave him a ribbon. We had a good, good connection in the community.

But when this -- just atrocious act of assassination of an unarmed black man walking back home happened, it kind of -- everybody's on edge right now because the trial hasn't started, and they moved it to Dale County where he won't have a jury of his peers.

And Ms. Gunn, she just died maybe two months ago. So we kind of in our feelings about it right now.

Q What about employment? Does the African-American community in Montgomery have particular needs and interests related to employment?

A We do.

Q What are those?

A There's little to no jobs. Job availability, again, due to people -- their driver's license. And I wish they would do a work permit -- would allow people if they have tickets paying on them to allow them to drive during certain hours to get to and from work that would at least help them pay on tickets. I raised that to the city council, too, before. Or the bus transportation where it would take you in a car maybe 15 minutes to get somewhere. If you ride the city line, it may take you up to two hours if that driver stops and pick you up at the stop because sometimes I don't know why they keep driving by.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 224**

But it's -- and nobody's really hiring now.

Q And those transportation issues, do they translate to employment issues?

A They do.

16:43:57 Q And why is that?

A Because most of our -- and I used to be on Montgomery transportation coalition. So I kind of know that most of the transportation, they don't go to the industrialized areas, like the Hyundai subsidiaries and plants like that where they can go. They don't go out that far. And for the disabled community, and they don't go to certain communities. So it's a lot going on with our public transit system.

16:44:18

Q Does the African-American community in Montgomery have particular needs and interests related to affordable housing?

16:44:36 A Oh, yes. I tried to assist with others. Most homelessness has increased in Montgomery tremendously where if they're not living under the bridges or whatever, they are using the hotels as apartments because even if parents or a family have jobs, it's not enough to afford the apartments now. So the affordability of it, you making 7, $8, you can't afford a nice apartment.

16:45:05

And then with the public housing, they closed down a lot of them, and then they're remodeling some. But the list is so long. And I couldn't believe it when I moved back to Montgomery. So I said I'm going to apply just to see. Well, I

16:45:25

226

got my approval letter probably year before last, and I had applied in 2009.

Q And, finally, what about access to useful utilities or sewage? Does the African-American community in Montgomery have issues related to that?

A Oh, the electricity bills are just ridiculous. And I try to refer people to 211 and call 211 and ask for utility assistance. If they receive food stamps, they can ask their caseworker for all available assistance. But their utility bills now -- I think Alabama Power went up about maybe, I think maybe 20 percent or so. But most family utility bills range from 500 to $1,100.

We have triple -- triple-digit heat. So most of the houses that some lower income families do get a chance to live in, they have -- not central heat and air, but the air conditioners that you put in the windows, which draws a lot.

Q What about sewage? Are there -- have there been issues relating to the black community and access to working sewage?

A Oh, my God, yes. Water and the flooding and in no man's land. Believe it or not in 2019 the sewage and the flooding in what we call no man's land -- that's out past Madison Park, Ty Rove area (phonetic), Hunter's Station area, community areas, the Vineyard.

Q And are these predominantly black communities?

A Predominantly black and low income areas.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 226**

227

Q So we just ran through a long list of issues that you've told us about. Are you saying that the white residents of Alabama don't have interests in these particular issues or needs relating to these issues?

16:47:35 A They may do. But most times they get their situations taken care of and have resources made readily available from what I notice.

And because I'm with the Poor People's Campaign and other organizations, and as an advocate, I'm not limited to

16:48:00 Montgomery County. I go all over the state to help parents and to help people. So I see. And as compared to Montgomery being the capital city, the capital county, is an embarrassment that we have these issues in 2019.

Q So is it -- it's the level to which the African-American

16:48:24 community is affected by these issues that sets them apart from white residents' interaction with these issues?

A It is.

Q Ms. Jones, do you regularly follow political campaigns in Alabama?

16:48:40 A Yes, I do.

Q And have you observed any instances in which candidates in Alabama have referred to race as a reason to vote for or against a particular candidate?

A They don't do it blatantly. But they do, do it

16:49:03 subliminally through the pronouns. You can hear the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 227**

228

undertones, the racial undertones -- "those people," "they," "them," "us," "we."

Q Does this happen often in Alabama?

A Yes, it does.

16:49:18 Q Let's talk about a few specific instances. Have you personally heard a member of Congress from Alabama make a statement invoking race as a -- as part of candidacy or political campaign?

A Yeah. Mo Brooks.

16:49:35 Q What did you hear Mo Brooks say?

A He had a commercial, and it was something to the effect of that he would shoot immigrants -- be able to shoot immigrants, and that was -- I had to find it on YouTube to make sure I heard what he said. And it was -- that was terrible. I think 16:49:59 most terrible thing for somebody in government to blatantly say.

Q And when specifically did you hear him make the statement?

A Probably about 2017 when he was running -- 2017, 2018.

Q What does that statement regarding shooting undocumented 16:50:23 immigrants, what does that have to do with race?

A It has a lot to do with race, because as a person of color, to me, it implied people of color. And it invoked -- it invoked to me white superiority, white supremacy. It invoked a type of racism and the green light for others who believe in 16:50:56 what he was saying that it was okay. Because if he's in

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 228**

229

government and saying it's okay to do it, it would lead crazies out here to believe it's okay to do it.

Q In the most recent race for Alabama's governor, did you hear any candidate make statements invoking race as a reason to vote for or against someone?

A It -- in the gubernatorial race?

Q Uh-huh.

A I didn't hear anything about, you know, blatantly race. But Governor Kay Ivey did make a statement about preserving the Confederate monuments and statutes. And that hit kind of hard in the black community because what about our history? What about the symbolism that it reflects to black people and people of color, the Native Americans? When you say preserve Confederate statutes and monuments and memorials, you didn't say anything about enhancing black status, memorials, and any symbols that, you know, mean -- matter to the black community or people of color.

Q To you and to the people in your community, based on conversations you have had in your work, what does the preservation of Confederate monuments mean to the black community?

A When I heard that commercial, it -- I felt like she was saying white supremacy forever, you know, white nationalism forever, not anything to embrace unity and diversity. But clearly we're going to recognize these treasonous white

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 229**

230

16:53:05 16:53:34 16:54:01 16:54:20 16:54:47

supremacists and hold them to a higher level, and nothing is to ever change that.

I mean, the bill says that it -- forever basically you cannot do anything, remove or alter any statue or anything that has to do with a Confederate soldier. And when we as a black person have to hear that, that that -- I mean, we want to bring change, you know. It really is bad. And it's terrible.

Q And then what about in the most recent mayoral race in your town? Were there any statements regarding race, invoking race to sway people's votes?

A In the August 27th race, it was good, you know. Everything was fine. But then when it came down to a runoff between a white male, David Woods, versus a black male, Steven Reed, I don't know what happened. But the mudslinging, it was -- it was ugly.

And David Woods had -- it was a survey out, and they called your phone, selected people phones. And they called my mom's phone. And I was there. And asked about 24 questions.

Q Did any of those questions relate to race?

A Yes, they did. Basically, not specifically, he's black, you know, Steven Reed's black, don't vote for him.

But like it just told like where he lived, as if that mattered. That he lived in a certain community, as if black people couldn't afford to live in that community in which he lives.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 230**

That was -- that was -- I mean, most of the questions were very incendiary and invoked some racial overtones, not undertones. It was really ugly.

Q Did David Woods make a part of his platform being tough on crime?

A Yes. And that was very interesting that he wanted to create more police stations and hire more police.

He also has a show. He's over WCOV television station. So his show promotes like cops in Montgomery, like that type of show. But most time whenever they show it, you see black people being arrested. They film it.

And so when he starts saying we're going to be tough on crime, we're going to hire more police, we're going to put more police stations, and to us, it's not finding the root cause of what's going on because we do have white people performing crimes. But it's as if he wants to invoke some type of martial law with all these police, what he wants to create.

And so it's not a good time, being that we still have an open case with a white officer who assassinated an unarmed black man for walking while black, is still being paid by the city of Montgomery. They didn't fire him. And this black man wasn't charged with anything.

So it wasn't the time for him to even bring that up.

Q Do these sort of statements, how do they make you feel as an African-American Alabamian?

232

A I have seven brothers, five older, plenty of nephews and great nephews. And it -- it's frustrating. And it makes me angry that if you want to be over entire city diversity -- but the majority of black, over 60 percent black, and you talking about some issues that are going to drive us apart. It's frustrating because we thought we would -- you know, it's 2019, so...

Q Ms. Jones, are you a member of a political party?

A Yes.

Q And do you prefer -- what party do you prefer?

A Democratic party.

Q And you prefer the democratic party over the Republican party?

A Yes.

Q Tell us why that is.

A For me, the democratic party's platforms and individuals who run as a Democrat, their platforms focus on issues pertaining to what I am in alignment with and what the black community is in alignment with -- health care issues, mental health. When I say health care, I mean affordable health care, criminal justice system, and just climate, you know, ecological issues.

Q Is there something about the relationship between the Republican party and race that makes you prefer the democratic party over the Republican party?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 232**

233

A Yes.

Q What is that?

A Being a Republican for me, seeing somebody who is a Republican right now tells me that they're racist because nothing I've heard a Republican say is in alignment with the platform that will help the interests of the black community.

Q And does that view of the Republican party, is that connected to statements that members of the Republican party have made?

A Yes.

Q Any in particular that we've talked about today?

A Yeah. I was talking about so much statistics.

Q Would you agree that it relates to being -- allowing such statements to be made by members of the Republican party that informs this view?

A Yes.

Q Based on your work relating to voting and voting registration, do black citizens of Montgomery encounter barriers when trying to vote?

A Yes.

Q Tell me about actually registering to vote. What sort of barriers do African-Americans residents in Montgomery encounter when trying to register to vote?

A Some of them are afraid to register to vote because of what they feel like they've -- if they were locked up before,

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 233**

234

even though I tell them they banned the box on the application, they still feel like, man, they're going to reject it. They're going to find out I'm a felon. I have to educate them because the moral turpitude laws have changed, which have decreased most of the moral turpitude laws.

So that's a major factor that I see when I'm out registering doing voter registration drives. That's a major thing.

Q And does the disproportionate incarceration and criminal records of the black community impact their ability to restore their voting rights?

A It does. Most of the individuals are black males primarily. I've had very few black females with former felons. But black males primarily are very disenfranchised. Their restitution when they get out, you know, to pay for restitution. So if they have tickets, say, for instance, they can't get ID. So you can't get ID, you are can't really get a job. Not only that, you can't -- if you can't work, you can't pay the restitution and also with child support. They can't pay child support.

And so it's a number of elements that affects voter registration and people. And primarily with -- when I go out and do these voter registration drives.

Q What about actually casting a vote? Do African-American residents of Montgomery encounter barriers actually casting a

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 234**

235

vote even if they're registered?

A Oh, my God, yes. Their names are what I've been seeing in the last few elections, because Montgomery has had so many elections in the last three years, it's ridiculous, special elections. So a lot of their names are not showing up on the rosters.

17:02:01

When they go there to the precinct, the precincts have changed. So they say that they send notices out, but I know they don't because I'm an avid voter. And I haven't received my voter registration card that they said they sent out to everybody. I had to call the board of registrars and say, hey, I didn't get mine. Everybody else is saying they have theirs. Make sure that I am listed as an active voter, I'm still on the roll because I don't have a middle name. So I want to make sure that Karen no-middle-name Jones is on the roll as active.

17:02:27

17:02:46

And so take a typical person may not know to call the board of registrars. And it's frustrating for them if they've been living behind a church that is a precinct for all these years, and then abruptly something changes that they have to now go about two, three miles over to the library.

17:03:13

Q And does someone with fewer resources, would they be able to handle the situation that you handled as well as you were able to?

A No. They get frustrated. They'll call me and tell me about it and I'm about to just leave, you know. And I said,

17:03:29

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 235**

236

don't go anywhere. Just ask for a provisional ballot, and we will work out everything later. It's really frustrating.

I worked for the first time at a white precinct last year -- no. Yeah. It was last year. And it was so smooth, people just came in, they went to the line and got -- it was so smooth. I hadn't ever experienced a smooth transition like that. And I was like, why is this so smooth over here? It didn't take them a good 10 minutes from the time they came in the building to leave out. Where as with us, you know, the power is not working, your name's not on the list. It's just -- where's your ID. And then you have to educate people if they don't have ID. If two people at the precinct and recognize them, they still can vote.

So it's a lot of disenfranchisement at the black precincts that I was just -- I was in amazement when I was down Vaughn Road, way down Vaughn Road. It was like a whole other experience. I was like, wow, it really can happen, just go in and vote and go home without a problem.

Q Ms. Jones, have you done organizing work in Mobile?

A I helped with the Alabama Poor People's Campaign.

Q And do you interact with people who live in Mobile?

A Some of the organizers when we have our Poor People's Campaign training and meetings, yeah.

Q And based on that work, do you have a sense of whether there's similarities between the cities of Mobile and

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 236**

237

Montgomery?

A Yes. They have a same --

THE COURT: Just a minute, Ms. Jones. I'm not sure if you said that you had actually done work in Mobile or that you know people who have done work in Mobile.

THE WITNESS: I know people who have done work in Mobile.

THE COURT: But you have not actually done work there yourself?

THE WITNESS: I've gone to the rallies and --

THE COURT: In terms of voter registration and things of that nature?

THE WITNESS: No.

BY MR. OSHER:

Q Have you had conversations with people who live in Mobile about the issues that they -- the African-American community faces?

A Yes.

Q In Mobile?

MS. HOWELL: Your Honor, I am going to object to that as hearsay.

THE COURT: If we go further than has she had conversations, yes, it would be hearsay.

BY MR. OSHER:

Q Would you say that you have had many conversations with

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 237**

238

people in Mobile during your organizing work?

A Yes.

Q That was -- thank you. Based on those conversations, have you learned a general sense of the issues that African-Americans are facing in Mobile?

17:06:22

MS. HOWELL: Your Honor, I am going to renew my objection.

THE COURT: Sustained. It doesn't matter how many people have told her something, that's still hearsay, is it not?

17:06:31

MR. OSHER: Your Honor, based on her actual organizing work she's done with the Poor People's Campaign, it's the same organization, she could develop a lay opinion as to what is going on Mobile.

17:06:44

MS. HOWELL: Your Honor, she's already testified that she did not directly work with them.

THE COURT: I sustain the objection.

MR. OSHER: Thank you, Your Honor. No further questions. Thank you.

17:06:59

THE COURT: Cross-examination?

MS. HOWELL: Yes, Your Honor.

CROSS-EXAMINATION

BY MS. HOWELL:

Q Hi, Ms. Jones.

17:07:33

A Hi.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 238**

239

17:07:40
17:07:53
17:08:01
17:08:17
17:08:41

Q Thank you for taking the time to come up today. We appreciate it.
A You're welcome.
Q I wanted to ask you a few follow-up questions about what your counsel was just asking you.
So you talked about having moved back to Montgomery in 2009; is that correct?
A Yes.
Q Okay. So you've lived in Montgomery since the 2011 districts were drawn; is that right?
A Yes.
Q Okay. And you, in fact, attended a hearing about those districts, did you not?
A A public hearing, yes.
Q Okay. And you actually spoke at that hearing, correct?
A Yes.
Q Okay. And you spoke about a couple of things, right? And we talked about those at your deposition, didn't we?
A Yes. But you know I had a stroke. So you have to refresh my memory.
Q All right.
A For specifics.
Q I'm happy to do that.
MS. HOWELL: So and, Your Honor, I have here this -- I had taken an excerpt from Defendant's Exhibit 3, which I

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 239**

240

recognize that plaintiffs' counsel had objected to at least in part. That's the preclearance submission from the 2011 act.

This is just a transcript of the Montgomery hearing. I'm not offering it for -- I believe what the grounds of the objection were for relevance relating to the state of mind of the legislators as they were passing the Act. And my aim here is only to get Ms. Jones' testimony on the record, so --

THE COURT: Okay. Is there any objection to that component?

MR. OSHER: That doesn't involve our objection to the exhibit.

THE COURT: Okay. Ms. Howell, are you wanting to offer this as an exhibit?

MS. HOWELL: Yeah. If -- if I could, Your Honor, that would be -- that would be my preference to offer this as an exhibit.

THE COURT: All right. Do you want brand new number, or do you want to do this like Defendant's Exhibit 3-A, or however?

MR. DAVIS: Do a brand new number.

THE COURT: Okay.

MS. HOWELL: I will defer to my co-counsel.

MR. WALKER: 313.

THE COURT: So Defendant's Exhibit 313? Is there any objection to that being admitted?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 240**

241

MR. OSHER: No objection, Your Honor.

THE COURT: Okay. Thank you.

MS. HOWELL: I do, Your Honor, have copies of the excerpt that I am working with if the deputy -- if the Judge or the witness would care to see it in a place of other than on the Elmo.

THE COURT: I'm fine with it there for now.

MS. HOWELL: Your Honor, may I approach?

THE COURT: You may.

BY MS. HOWELL:

Q Ms. Jones, and if you will flip to -- it's 383. It has the number at the bottom when you start speaking.

Okay. So now that you have your testimony from the hearing that's in front of you, if you want to take a minute to read it, I'm happy to give that to you. But it appears that the only two things that you talked about at the hearing were wanting more notice about it and the need for legislators who were working on the district to pay attention to communities of interest.

Does that seem correct to you?

A No. I talked about the lack of notice given in a timely manner. I talked about fair representation and having a commission for citizens to be in the redistricting process.

As you can see, when I stated that we needed a redistricting -- I saw it better over here -- that we needed a

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 241**

redistricting commission, a citizens redistricting commission. I also talked about legislators allowed to choose their voters instead of voters choosing their legislators by being in the writing of the district's process. And so they can kind of cherry pick who gets their vote.

17:12:24

Q So it would be fair to say, then, that you covered a fair amount of ground in your short speech --

A Yes.

Q -- at the public hearing?

17:12:35

Okay. Do you see anywhere in there that you requested the drawing of a second majority-minority district in Alabama?

A No.

Q Okay. And did you, in fact, request such a district be drawn in 2011?

17:12:48

A No.

Q I'm sorry. Was that no?

A Yes, that was no.

Q Okay. So you waited until 2018 and filing this case to request a second majority-minority district be drawn in Alabama; is that correct?

17:13:18

A Yes.

Q Okay. You also talked about several different things with your counsel. Particularly, I want to draw your attention to certain things that you had said about the local election that recently took place in Montgomery. And the candidates in that

17:13:35

243

election were as you mentioned David Woods, correct? And Steven Reed was the other candidate?

A For the runoff.

Q For the runoff.

17:13:45 A Yes.

Q All right. And can you tell me who won that election?

A The black male, Steven Reed.

Q Okay. And he won actually in a landslide; is that a fair characterization?

17:13:58 A Yes.

Q Okay. You also talked a lot about interests that you thought that you characterized as being interests of the black community, I believe. You talked about affordable health care, correct?

17:14:21 A Yes.

Q Okay. And education needs?

A Yes.

Q And criminal justice?

A Yes.

17:14:27 Q And also employment, right?

A Yes.

Q Okay. Would you not agree that all of those are interests common to any number of voters in Alabama?

A No.

17:14:39 Q Why not?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 243**

244

A Because there's a significant disenfranchisement in the black community in education, in criminal justice, in having health care.

If you look at the statistics, you will see that whereas they tout we just may have 9 percent unemployment in Alabama in the black community, it's probably three to four times as high. So it's kind of when they give statistics they show a general number. They don't actually show what's going on in the black community.

A black person's going to get more time for crack cocaine than a white person will get for powder cocaine, and we know this. So the numbers are kind of skewed, if you would, when we see them on the news in the headlines. And these are facts.

We can look at bonds being given to a black person who commits murder versus a white person who commits murder. The bonds are really ridiculous and racial. And it is what it is.

Q And I do hear what you are saying, Ms. Jones. But white people, too, are concerned about affordable health care, are they not?

A I don't know. I'm black. I don't -- I'm telling you from my point of view.

When we are talking about health care, and I'm standing in line and have to wake up at 3:00 a.m. to try to get heart medication and seizure pills, you know who's in that line? Majority is black people in that line.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 244**

245

Q Let me reframe this for you, Ms. Jones. Do you know of anybody who wants unaffordable health care?
A I haven't asked.
Q You haven't asked. Do you know of anyone who wants unaffordable health care?
17:16:39
A I don't know. I have not asked. You -- that's just like -- do you know anyone who would want -- who would not want a Louis Vuitton bag? It depends on what that person values.

If you can afford health care, it wouldn't matter to you whether you wanted affordable health care because you got money to pay for your doctor bill. I can't pay -- I can't get my heart medications when I didn't have insurance. And when you looking at 13 pills and you on a waiting list, it's a difference for an indigent person who is impoverished person with no options versus someone who has money and it doesn't matter whether they're down to their last medication because they can go get some more. It's a big difference.
17:17:00
17:17:24
Q You also talked about how you feel right now that someone who votes Republican is racist, correct?
17:17:47
A Yes.
Q Does voting for Republican candidates render the voter racist?
A Yes.
Q Haven't you voted for Republican candidates?
17:17:55
A Yes. But I'm black, and I can't be racist by definition.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 245**

246

Q Thank you, Ms. Jones.

A You're welcome.

THE COURT: Any redirect?

MR. OSHER: Just a brief redirect, Your Honor.

17:18:25 REDIRECT EXAMINATION

BY MR. OSHER:

Q Do you still have that document in front of you?

A I do.

Q Do you see it on the screen?

17:18:46 A Yes.

Q This paragraph here that I'm pointing to that starts at dates and times. The last sentence, you're referring to the citizen redistricting commission that you were discussing earlier; is that correct?

17:19:01 A Yes.

Q Can you read for us?

A "The citizens redistricting commission will consider public input in legal and expert advice to meet the Voting Rights Act's requirement."

17:19:15 Q Did you know that you might have a legal right to a second majority-minority district in Alabama in 2011?

A I didn't. When I called about redistricting to the legislative reference office, you will get transferred umpteen number of times.

17:19:37 THE COURT: Okay. I think you answered the question.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 246**

247

Thank you.

THE WITNESS: Oh, okay.

MR. OSHER: Thank you, Your Honor. No further questions.

THE COURT: Anything further?

MS. HOWELL: Nothing further, Your Honor.

THE COURT: Thank you. Thank you, Ms. Jones. You may step down.

And I think this is a good time to recess for the day. I know our court security officers will be glad to know that.

All right. Thank you. I think you said you've got some material for me or something to discuss? We can do that up here, or if you want to take a break and come back to the office, whatever.

(Whereupon, the above proceedings were concluded at 5:20 p.m.)

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 247**

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

11-15-19

Christina K. Decker, RMR, CRR    Date

Federal Official Court Reporter

ACCR#: 255

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

LAKEISHA CHESTNUT, an individual; MARLENE MARTIN, an individual; BOBBY DUBOSE, an individual; RODNEY LOVE, an individual; KAREN JONES, an individual; JANICE WILLIAMS, an individual; RODERICK CLARK, an individual; JOHN HARRIS, an individual,
Plaintiffs,

vs.

JOHN H. MERRILL, in his official capacity as Alabama Secretary of State,
Defendant.

2:18-cv-00907-KOB
November 5, 2019
Birmingham, Alabama
9:00 a.m.

TRANSCRIPT OF BENCH TRIAL
VOLUME II
BEFORE THE HONORABLE KARON O. BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE

FOR THE PLAINTIFFS:
Abha Khanna, Esq.
PERKINS COIE LLP
1201 Third Avenue
Suite 4900
Seattle, Washington 98101
(206) 359-9000

Bruce V. Spiva, Esq.
PERKINS COIE LLP
700 13th Street, NW
Suite 600
Washington, DC 20005
(202) 654-6338

Richard P. Rouco, Esq.
QUINN CONNOR WEAVER DAVIES & ROUCO LLP
2 20th Street North
Suite 930
Birmingham, Alabama 35203
(205) 870-9989

Daniel C. Osher, Esq.
PERKINS COIE LLP
700 13th Street NW
Suite 600
Washington, DC 20005
(202) 654-6338

Lalitha D. Madduri, Esq.
PERKINS COIE LLP
700 13th Street NW
Suite 600
Washington, DC 20005
(202) 654-6322

FOR THE DEFENDANT:
James W. Davis, Esq.
Laura E. Howell, Esq.
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
(334) 242-7300

J. Dorman Walker, Esq.
BALCH & BINGHAM LLP
P.O. Box 78
Montgomery, Alabama 36101
(334) 834-6500

COURTROOM DEPUTY: Sarah Hollingsworth

COURT REPORTER: Christina K. Decker, RMR, CRR

Proceedings recorded by OFFICIAL COURT REPORTER, Qualified pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies and Procedures Vol. VI, Chapter III, D.2. Transcript produced by computerized stenotype.

251

**I N D E X**

| | |
|---|---|
| DR. PEYTON MCCRARY | 252 |
| DIRECT EXAMINATION | 252 |
| BY MR. SPIVA | |
| CROSS-EXAMINATION | 313 |
| BY MS. HOWELL | |
| REDIRECT EXAMINATION | 327 |
| BY MR. SPIVA | |
| | |
| JOHN KNIGHT | 333 |
| DIRECT EXAMINATION | 334 |
| BY MS. MADDURI | |
| CROSS-EXAMINATION | 383 |
| BY MS. HOWELL | |
| | |
| LAKEISHA CHESTNUT | 416 |
| DIRECT EXAMINATION | 417 |
| BY MS. KHANNA | |
| CROSS-EXAMINATION | 451 |
| BY MS. HOWELL | |
| REDIRECT EXAMINATION | 457 |
| BY MS. KHANNA | |
| RECROSS-EXAMINATION | 458 |
| BY MS. HOWELL | |
| | |
| SHEILA TYSON | 459 |
| DIRECT EXAMINATION | 459 |
| BY MR. SPIVA | |

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 3**

252

**P R O C E E D I N G S**

(In open court.)

THE COURT: You may be seated. Plaintiff may call your next witness.

09:05:28 MR. SPIVA: Thank you, Your Honor.

Your Honor, plaintiffs call Dr. Peyton McCrary.

DR. PEYTON MCCRARY,

having been first duly sworn by the Courtroom Deputy Clerk, was examined and testified as follows:

09:05:54 THE COURTROOM DEPUTY CLERK: Will you please state your name into the microphone for the record?

THE WITNESS: My name is Peyton McCrary.

THE COURTROOM DEPUTY CLERK: Thank you.

DIRECT EXAMINATION

09:06:02 BY MR. SPIVA:

Q Good morning, Dr. McCrary.

A Good morning, Mr. Spiva.

Q One thing -- you're doing fine so far -- but the court reporter asked us to remind all of our witnesses to just speak 09:06:14 into the microphone because it helps her with taking down the transcript. You know, sometimes when we put things on the screen, it's natural to turn away from it to see what's on the screen, but if you can just keep that in mind.

A Good advice.

09:06:26 Q Dr. McCrary, you've been retained as an expert by the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 4**

253

plaintiffs in this case; is that right?
A Yes.
Q Let's begin with a little bit of your background. Can you please describe for us your educational history?
09:06:43 A Well, I received a B.A. and M.A. from the University of Virginia in history, and a Ph.D. from Princeton University in 1972 also in the department of history.
Q And what did you do after receiving your doctorate?
A I was already teaching at the University of Minnesota, 09:07:04 where I taught from 1969 to '76. I then taught for two years at Vanderbilt University in Tennessee. And then from 1978 to 1990, I was a professor of history at the University of South Alabama in Mobile.
Q Okay. And let's turn to Plaintiffs' Exhibit 81. And in 09:07:29 particular -- first of all, is Plaintiffs' Exhibit 81 the first declaration that you submitted in this case, Dr. McCrary?
A Yes.
Q Okay. If we could turn to the back of that where your curriculum vitae appears, which is just after the report 09:07:46 itself.
A Yes, sir.
Q And is this your curriculum vitae?
A Yes, it is. I prepared it, and it's up to date to the best of my recollection.
09:08:02 Q Okay.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 5**

254

THE COURT: For the record, that's page 39, right?

MR. SPIVA: Thank you, Your Honor.

BY MR. SPIVA:

Q And, Dr. McCrary, what did you teach at the universities that you taught at?

A Well, in addition to teaching the standard United States history course, I taught courses in history of the south. I taught courses in some of those institutions in the American party system. I taught a course in quantitative methods at the University of South Alabama. And I taught African-American history one year at Vanderbilt.

Q And what type of quantitative methods did you teach?

A Well, I taught students about the analysis of legislative behavior using roll call voting analysis, the statistical methods used to analyze voting behavior.

One of my graduate students did a master's thesis following that course in which she analyzed racially polarized voting in Mobile County, as I recall.

Q And after you finished your teaching at the University of South Alabama, where did you go after that?

A Well, I was employed for 26 years as a social science analyst in the Department of Justice in the Civil Rights Division in the section that enforced the Voting Rights Act.

Q And what was your role while employed at DOJ's Civil Rights Division?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 6**

255

A One of my principal responsibilities was to help the attorneys understand the factual evidence in cases, to determine which disciplines would be the logical place to look for appropriate expert witnesses, suggesting appropriate expert witnesses, and giving the attorneys a choice of persons who could do the analysis needed, working with the lawyers and the experts to make sure that they understood one another, and helping the lawyers to assess the evidence of experts -- expert testimony from opposing parties.

09:10:08

Q And during that time, did you personally testify as an expert in Section 2 cases?

09:10:26

A Not ordinarily. I did once testify in a case in Alabama back I think in 1991 because I had -- before being employed by the Department, I had been an expert witness for the plaintiffs in that case.

09:10:50

And as I recall, Judge Dubina accepted the motion from that attorney that the Department of Justice be asked to participate on an amicus basis for the purpose of putting on my testimony. Otherwise, I did not testify except through written declarations in certain circumstances in cases during my employment by the Department.

09:11:17

Q Did you receive any special recognition relating to your work at DOJ?

A Yes. I think it was in 2011 I received the Maceo Hubbard Award for sustained commitment to the enforcement of the Voting

09:11:31

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 7**

256

Rights Act.

Q Have you published literature on the subject of voting rights?

A Yes. For the last 35 years, almost all of my scholarly writing and publications has been concerned with the history of discriminatory election laws in the south, the enforcement, the adoption and enforcement of the Voting Rights Act, methods used by expert witnesses in addressing issues in voting rights litigation, and the impact of enforcement of the Voting Rights Act on minority representation in Alabama and also in South Carolina.

Q And I take it from your last answer, you have written specifically about voting rights in Alabama?

A Yes, in a variety of those publications.

Q Can you tell us what the publications were? And if we can go to page 5 of Plaintiff's Exhibit 81, paragraph 8. And it's actually on pages 4 and 5. I'm sorry.

And if you could actually describe for us what you have written about voting rights in Alabama?

A Well, let me start with a chapter that I coauthored as the senior author in a book published by Princeton University Press in 1994 called *Quiet Revolution of the South: The Impact of the Voting Rights Act*. I was the senior author of the Alabama chapter in that book. There were chapters on each of the states covered by Section 5 of the Voting Rights Acts. I also

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 8**

was the coauthor on the South Carolina chapter.

In a recent volume of essays honoring my -- the second reader on my dissertation, Shelton Hackney, just before he passed away of Lou Gehrig's disease, I had an essay that focused on the evidence in *Dillard vs. Crenshaw County, Alabama* in which I was an expert back in the 1980s.

I also discussed Alabama evidence in a journal article I published on the subject of racially polarized voting, looking at expert testimony in Alabama cases, analyzing not only the degree to which voting patterns were polarized along racial lines, but also looking at the racial disparities in socioeconomic circumstances cited by an expert in addressing the totality of circumstances test under Section 2 of the Voting Rights Act.

Q Did you also write a book chapter about the evidence presented in city of Mobile?

A Yes. As a matter of fact, I forgot about that. That was my first publication dealing with voting rights matters in a collection published in 1984 called "Minority Vote Dilution." That essay summarized the historical evidence that I had presented as an expert witness in the two Mobile voting rights cases in 1981. And it originated as written testimony to the subcommittee on civil and constitutional rights of the House Judiciary Committee, which was a part of the record before Congress in amending Section 2 of the Voting Rights Act in

258

1982.

Q And you mentioned that you submitted, I guess, written testimony in connection with the 1982 amendments to the Voting Rights Act?

09:15:11 A Yes.

Q And did you also testify live before Congress before those amendments?

A No, I didn't; only submitting written testimony.

Q Okay. Have you provided any other congressional testimony on voting rights?

09:15:26

A Yes. Most recently, I gave both written and oral testimony before a subcommittee on -- of the House Judiciary Committee regarding the facts that Congress should know in considering new voting rights litigation. The staff member who explained what my task was in that instance, he said it was to provide history 101 on the Voting Rights Act.

09:15:50

THE COURT: And when was that, Dr. McCrary?

THE WITNESS: That was in March of this year.

THE COURT: Okay.

09:16:05 BY MR. SPIVA:

Q Have you published on aspects of the totality of the circumstances test under Section 2?

A Yes. In several of my journal articles, in explaining both the case law and explaining how experts have applied quantitative evidence in addressing the totality of

09:16:21

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 10**

259

circumstances test set out in the Senate's report 1982, I have addressed that.

Q Have you published literature regarding statistical analysis of voting behavior?

09:16:37 A Yes. The article to which I referred earlier regarding racially polarized voting explains the evolution of the statistical methods used by expert witnesses in voting rights cases in the 1970s and 1980s. It was published almost 30 years ago.

09:16:54 Q And during your time at DOJ and then after your retirement from DOJ, did you continue to teach?

A Yes. I'm in my 13th year of co-teaching a course on voting rights law at G. W. Law -- George Washington University Law School in the district where I co-teach the course with a 09:17:18 former colleague of mine in the Civil Rights Division of the Department of Justice.

Q I don't know if you mentioned it. What's that course concerning?

A Voting rights law.

09:17:26 Q Okay.

A However, I am not an attorney.

Q How many times have you testified in court as an expert relating to voting rights?

A I think this is my 18th time in court, 17 or 18.

09:17:45 Q Okay. And turning to paragraph 6 and 7 of Plaintiffs'

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 11**

260

Exhibit 81, which is your first declaration, which I think summarized some of your testimony, can you describe the subject matter of those cases that you testified in?

A In most of the cases in Alabama in which I testified, I was addressing the history of discrimination affecting voting and the degree to which laws that were being challenged were adopted with a racially discriminatory purpose.

In one case, *Harris vs. Graddick*, I was testifying about a small part of the historical evolution of the laws regarding the appointment of poll officials in Alabama.

And in the years since my retirement, I've testified in one case, a case last year tried in Montgomery before Judge Watkins, regarding the method of electing statewide judicial officers in Alabama.

Q Is that the case that is often called the Alabama Judges' Case?

A Yes.

Q And have you also testified concerning the Senate factors in any of those cases?

A Yes. In that case, as I recall, and also in a Georgia case, which was settled following my deposition in the case.

Q Okay. Let's see. Were you qualified by the Court as an expert in each of the cases that you testified in?

A Yes.

Q And let me ask you -- you've confirmed that Plaintiffs'

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 12**

261

Exhibit 81 is your first declaration.

Let's turn briefly to Plaintiffs' Exhibit 82, and ask you if you can confirm that that's the second declaration or rebuttal report that you submitted in this case.

A That's correct.

Q Okay. Are the opinions and conclusions that you reached in this case contained in those two declarations?

A Yes.

Q And have you changed your opinions or conclusions in any way?

A Only in clarifying an error I made in my deposition answers to a question which I addressed in an errata sheet.

Q Okay. But in terms of the opinions and conclusions that you reach in the declarations, you haven't changed any of those, I take it?

A No.

Q And can you just briefly describe the materials you reviewed in creating your expert declarations?

A Well, I reviewed the sort of documents that both historians and political scientists address in -- or investigate in describing all of the subject matter that I -- with which I'm dealing in this report, and look at the secondary literature that is, say, writing by social scientists and other qualified scholars on the issues that are relevant to the case, look at the government documents that are relevant to

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 13**

262

the issues in the case, including census data when appropriate.

I examined documents that are somewhat unusual in extensive review of expert witness reports and expert witness testimony in voting rights cases. I look at records submitted under Section 5 review during the period before *Shelby County vs. Holder* was decided by the Supreme Court in 2013. I also look at court decisions which often provide important factual evidence.

I also sometimes write about the evolution of the case law and teach that subject matter in court -- in the course I teach at G. W. Law school, but I have never addressed the legal questions in any expert witness testimony that I have given.

Q And I don't know if you mentioned this. I assume you also reviewed secondary sources written by historians and political scientists, including yourself?

A That's actually where I started.

Q Oh, okay. Sorry. I missed that.

MR. SPIVA: Your Honor, at this time, I'd like to offer Dr. McCrary as an expert in the -- as a historian, particularly the history of discrimination affecting voting including in Alabama and in statistical methods in racially polarized voting.

THE COURT: Any objection?

MS. HOWELL: I'm so sorry.

THE COURT: Any objection?

**Christina K. Decker, RMR, CRR**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 14**

263

MR. SPIVA: I just offered him as an expert. We already stipulated to his expertise.

MS. HOWELL: Correct. I'm sorry. Could you restate what you were offering him as an expert in?

09:23:18 MR. SPIVA: Sure. Your Honor, we offer Dr. McCrary as an expert historian, particularly in the history of discrimination affecting voting including in Alabama, and in statistical methods particularly concerning racially polarized voting.

09:23:33 MS. HOWELL: Your Honor, I had not understood Dr. McCrary to be testifying as to the statistical methods underlying racially polarized voting. I had understood him to be only an expert on the history of discrimination.

MR. SPIVA: Only the history of racially polarized 09:23:49 voting. Anything that he is going to testify about that is in his report. And we have stipulated to him being able to testify about anything that's in his report.

In other words, he's not going to rerun the testimony of Dr. Palmer. But he talks about the history of racially 09:24:10 polarized voting in his report.

THE COURT: Not about statistical methods.

MR. SPIVA: I mean, he's not going to go through the things that Dr. Palmer did yesterday. But in testifying about the history of racially polarized voting, it may touch on, you 09:24:27 know, the statistical methods that are used to do that. But

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 15**

264

it's not -- it's going to be a very, you know -- it would be ten -- it would be a very minor part of what he might say.

THE COURT: Do either of his reports talk about statistical methods?

09:24:45 MR. SPIVA: They do. I will amend the request, Your Honor.

THE COURT: Okay.

MR. SPIVA: So instead of saying statistical methods, why don't I say racially polarized voting -- the history of

09:24:57 racially polarized voting.

MS. HOWELL: Your Honor, we have no objection to that.

THE COURT: Okay. All right. Then I recognize him as an expert in the historical aspects of voting, discrimination in voting, and racially polarized voting.

09:25:47 MR. SPIVA: Thank you, Your Honor.

BY MR. SPIVA:

Q So, Dr. McCrary, could you first just please explain what you were asked to analyze for your initial report in this case?

A I was asked to analyze the history of racial

09:26:08 discrimination affecting voting in Alabama, including laws adopted by the state over the years and the degree to which there appear to be continuing effects of that history in more recent voting behavior and patterns of representation in the state.

09:26:29 Q Okay. And did you also look at devices that enhance the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 16**

opportunity for discrimination in voting?

A That's a part of the history of discrimination that I described in summary.

Q Okay. I take it you looked at several of the Senate factors in the factual analysis of several of the Senate factors?

A Yes. It happens that my testimony addresses a number of factors set out in the Senate report in 1982 as criteria for assessing the totality of circumstances evidence in a case.

Q And I know you said you're not a lawyer. In your experience in testifying in voting rights cases, is it common for social scientists to become familiar with the relevant case law in this area?

A Yes. In order to be of use to the Court, we need to understand the legal context that the Court has to address the facts in, and so it's helpful to understand the Court decisions.

Q Okay. And is it common for historians in the area of voting rights to use Court decisions in their scholarly work?

A Yes.

Q And do you often incorporate court decisions in your own scholarly work?

A Yes.

Q And can you please explain what you understand the purpose of the totality of the circumstances analysis under Section 2

266

to be?

A Well, the totality of circumstances test was adopted by Congress in 1982 with the intention of relying on the criteria that the Supreme Court set out in *White versus Regester* in 1973 in which the old Fifth Circuit elaborated on in *Zimmer vs. McKeithen* I think in 1974, in which the courts had been following as ways of assessing problems of minority vote dilution in the 1970s before the Supreme Court handed down *City of Mobile vs. Bolden*.

Q Let's maybe walk through the various Senate factors that your reports address, or particularly your first report. Let's begin with the first factor the extent of any history of official discrimination in the state or political subdivision that touches the right of the members of the minority group to register to vote or to otherwise participate in the democratic process.

What overall conclusion did you reach regarding the first Senate factor?

A That there was an extensive history of racial discrimination affecting voting in Alabama which continues to have effects in current election circumstances in Alabama.

Q And did you also look at the history of discrimination in social and economic life in addition to political life?

A Yes. I looked at the racial disparities in socioeconomic characteristics, both in the period before the adoption of the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 18**

267

Voting Rights Act and in more recent decades.

Q And what historical period did you consider in reaching the conclusion you mentioned a minute ago?

A My primary focus is the period since the end of the white primary in the mid-1940s up through more or less the present period.

Q But did you also look to some extent at history from Reconstruction through the period of the white primary?

A Very briefly in introducing the -- or explaining, I should say, the changes that began in the mid-1940s.

Q Okay. And let me begin by asking you just a couple of questions about the post-Reconstruction period.

Can you provide, I guess, just a brief history of the post-Reconstruction period and then discuss the period around 1901?

A Well, anyone who's studied Alabama history knows that African-Americans were enfranchised during the Reconstruction period, and they continued to be able to vote in elections in Alabama until really the work of the 1901 constitutional convention, which is usually referred to by Alabama historians as the state's disenfranchising convention.

That convention adopted various tests or devices, including a literacy test to be implemented or enforced, I should say, by local boards of registrars, a poll tax that further served to make it difficult for persons who were poor

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 19**

268

to vote, and subsequent to the convention the establishment of a white primary that had been in practice in some localities long before the 1901 convention.

Q And did the 1901 convention adopt any other devices such as property qualifications or disqualification of voters who had been convicted of crimes?

A There were property qualifications for voting which would have had an effect of disenfranchising poor whites, as well as poor African-Americans. And so there was a provision that allowed persons whose ancestors may have fought in the Confederate Army to participate in elections despite not meeting the property qualifications.

The Constitution included felon disfranchisement provision, which actually antedated 1901, but was modified in the convention. And in particular, including a provision of the Constitution known for decades as the petty crimes provision specifying certain misdemeanors that were also disqualifying beyond the felonies. And those particular methods were cited by one of the delegates to the constitutional convention as crimes typically committed by Negroes, and, therefore, an appropriate way of limiting black participation in the political process.

Q And how did you reach the conclusion that the provisions that were adopted by the 1901 convention were intended to prevent African-Americans from voting?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 20**

269

09:33:55 A First of all, it's undisputed among all the historians who have written about the subject, including most prominently Malcolm McMillan, whose published dissertation was a study of constitutional development in Alabama, and for many years a professor of history at Auburn, as I recall.

But in addition to that, I had occasion to analyze the debates in the constitutional convention in earlier research, so I'm familiar with the language of the delegates. And that history has been discussed also in numerous judicial decisions, 09:34:17 which means that incidentally I reviewed the language of the convention over the time I've worked on the history of Alabama.

Q Am I understanding you correctly that there was -- that the purpose of these provisions was explicitly stated by the people who convened the convention?

09:34:36 A Repeatedly.

Q I'm sorry?

A Repeatedly.

Q Okay. And let's maybe pull up paragraph 16 of your first report, Plaintiffs' Exhibit 81, which is on page 10.

09:34:57 What effect did these provisions that were adopted in the state's constitution in 1901 have on black voter registration?

A The impact was to eliminate virtually all black registered voters from the voter rolls. The numbers I cite in that paragraph were 181,000 registered before the 1901 constitution, 09:35:27 and two years later, 3,000 were left on the rolls.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 21**

270

Q Okay. And what effect, if any, did the provisions have on the partisan landscape of the state of Alabama?

A Well, African-Americans had been voting predominantly Republican during the 19th century. And the Democratic party was proud to call itself the white supremacy party. It was overwhelmingly white. The disenfranchising convention essentially eliminated the Republican party from effective politics in Alabama for decades.

09:35:50

Q And what effect, if any, did the rise of one party rule on the state have on the competitiveness of Alabama elections?

09:36:12

A Well, they were competitive as long as you were white; that is to say African-Americans weren't allowed to participate in the primary by party rules that were sanctioned by state law most of the time.

Q And so you're referring there to the white primaries that you referenced earlier?

09:36:27

A Yes, sir.

Q And what happened to the white primaries ultimately?

A Well, following the outlawing of the white primary in Texas in *Smith vs. Allwright* by the Supreme Court in 1944, each of the southern states that had conducted white primaries ultimately had to concede that African-Americans could participate in democratic primaries even though some adopted measures trying to retain the white primary.

09:36:44

Q And how did the state of Alabama react to that decision?

09:37:07

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 22**

271

And it might be helpful to pull up paragraph 17 just for reference.

A Well, in 1946, following the outlawing of the Alabama white primary, an amendment to the state constitution was proposed by, as I recall, E.C. Boswell from one of the north Alabama counties, which was popularly known as the Boswell Amendment, which would add to the literacy test adopted in 1901, a requirement that individual -- an individual seeking to register be able to read and interpret any provision of the federal constitution.

That was ratified by the voters in 1946. And it was originally proposed by Gessner McCorvey of Mobile, who was a longtime chair of the Alabama State Democratic Executive Committee and whose -- and I happen to have read the records of the Alabama State Democratic Executive Committee for the years of the 1940s, '50s, and early 1960s, so I ran across his comments there. But they have also been quoted in several historical studies that I cite in my report.

Q What was the effect of the Boswell Amendment?

A Well, it would have had a significant effect on reducing African-American voting registration, except that it was struck down by the federal courts in *Davis vs. Schnell* in 1949, I think.

Q And before it was struck down, though, what effect did it have, in terms of giving registrars discretion?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 23**

A Well, it certainly gave registrars maximum discretion. I haven't examined the numbers of persons who were turned away from voter registration. And I don't recall that other historians have examined the statistical effects of the quantitative effects, I should say, in that brief period when it was implemented.

But it gave, as the Court noted in *Davis vs. Schnell,* it gave considerable discretion to local registrars, most of whom were only high school graduates. Almost none of whom had ever been to law school. And as the Court noted, there are provisions of the state -- of the U.S. Constitution which are difficult for lawyers to explain.

Q That's for sure.

THE COURT: I think we could get an amen on that.

BY MR. SPIVA:

Q And so you mentioned a minute ago that the Boswell Amendment was, I guess -- the Supreme Court struck it down in 1949. How did the state of Alabama react to the Schnell decision striking that down?

A The legislature came up with another constitutional amendment, which was ratified by the voters in 1951, I think, the voter qualification amendment.

Q And what was the purpose of the voter qualification amendment?

A Well, according to a study by the Alabama -- University of

Alabama political scientist Donald Strong in the mid-1950s, it was adopted with a racially discriminatory purpose.

And what it did was to require that the literacy test be constructed by the Alabama State Supreme Court, which it continued to do until that literacy test was eliminated by the adoption of the Voting Rights Act in 1965.

Q And then let me ask you: In addition to restrictions -- do you have water up there?

A I do.

Q Okay. Good. In addition to restrictions on voter registration, were there other methods of election used pre-1965 that were designed to eliminate the ability of African-Americans to elect their candidates of choice?

A Yes. In 1951, for example, the legislature adopted an anti-single shot law for municipal elections in the state of Alabama.

Q What's an anti-single shot law?

A Single-shot voting was used throughout the country by minority voters -- and not just African-Americans, but other minority voters and political minorities, as well -- to provide a means of obtaining some representation in local government by voting in an at-large election system for the one candidate they preferred so as to increase the mathematical weight of the votes they cast.

And, therefore, an anti-single shot law -- also known as a

274

full slate law -- would eliminate the possibilities of providing token representation, if you will, or some representation for minority voters by requiring that anyone who didn't vote for all the seats up for election at a given moment have their ballot disqualified.

09:42:38

Q Okay. And if we could just step -- take one step back, because I think the -- we may have missed the kind of the premise or the reason these anti-single shot laws were passed.

Can you tell us about the use of at-large elections rather than single-member districts during this period of time?

09:42:59

A Well, at-large elections are -- were a dominant feature of Alabama election law for many years. Although after the disfranchisement of African-Americans in 1901, a significant number of counties moved back to single-member districts, and after the end of the white primary began moving back to the use of at-large elections. It's the case that at-large elections make it difficult, if not impossible, for voters who are in a minority in a jurisdiction to elect candidates of their choice where there is racially polarized voting.

09:43:25

And that's why in order to understand the way in which an at-large election system operates, analyzing racially polarized voting is necessary. Where there's no racially polarized voting, at-large elections would not likely have a discriminatory effect. And the same thing would likely to be true of an anti-single shot law.

09:43:49

09:44:06

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 26**

275

Q And this is probably an obvious question, but during this period of time that you have been talking about, roughly the '40s through the '65 Act, was the there racially polarized voting in Alabama?

09:44:19 A Yes.

Q And so then can you explain how the anti-single shot law interacts with at-large voting to undermine African-American voting participation?

A Well --

09:44:45 Q And I know you probably partly described that, but you can kind of consider me a slow undergrad guy, so...

A Well, the effect of the anti-single shot laws is most evident in the municipal elections that were the focus of it.

African-Americans had reached significant voting strength 09:45:04 in the city of Tuskegee, Alabama, also to some extent in Mobile and Montgomery and in Birmingham. And it was in that context that the legislature decided, after explicit explanation of the racial effects of an anti-single shot law, to prevent the black vote from increasing or from having a chance to elect 09:45:29 candidates in those elections by member of the legislature.

The effect of these laws was to make it impossible for African-Americans to elect a candidate of their choice in those places where they were reaching a level where that would be possible.

09:45:51 Q And what about the numbered place requirement? What is

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 27**

276

that? And how does that relate to the discussion we've been having?

A Well, numbered place requirements had been used for some elections in Alabama before 1961. But in 1961, the legislature adopted Act Number 221, which set forth a requirement that all at-large elections or multi-member district elections in legislatures require candidates to qualify for a specific place -- Place Number 1, Place Number 2, Place Number 3, and so on.

09:46:31 And the effect of that was to convert all elections in an at-large system into head-to-head contests for a particular place. And it has the effect of eliminating the possibility of single-shot voting; thereby making the 1951 municipal election law prohibiting single-shot voting irrelevant.

Q And with respect to these provisions -- the anti-single shot law, the numbered place requirement -- who typically passed that? Were they passed at the local level? The state level?

A In Alabama in that period, especially and for decades afterwards, almost all jurisdictions lacked the authority to set their own method of election. The Alabama Legislature did so. And when localities wanted to change the method of election, they had to operate through the local legislative delegation from the county in which they were located.

And so there were a few cities that had home rule

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 28**

          277

provisions under the Alabama municipal election code, as I recall. But other than home rule cities, the legislative delegation was typically granted local courtesy by the entire legislature in passing those laws.

09:48:08 Q Can you put up paragraph 24 of Plaintiffs' Exhibit 81, which appears on pages 15 and 16?

And I'll just ask you: What was the purpose of these provisions -- the anti-single shot, the numbered place requirement? What was the purpose of those provisions?

09:48:31 A To limit African-American abilities to elect representatives of their choice.

Q And how did you reach that conclusion?

A I already referred to the racially explicit justification for the anti-single shot law in 1951. The evidence is in some 09:48:49 ways more dramatic, in regard to the 1961 numbered place law. And I cite some of that specific evidence in my report in that paragraph or in successive paragraphs.

Q Okay. What is the language that you're referring to, in terms of the 1961 plan?

09:49:13 A There is one news article in which Bob Ingram of *The Montgomery Advertiser* said explicitly that the new law, Act 221, was -- and I'm quoting -- "aimed at Negroes as much as anything else," end of quote.

Mr. Ingram actually testified as a witness in the 1991 09:49:41 trial where I was an expert and did not recall that. But he

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 29**

278

did write that in 1961.

Q Is that in paragraph 26? Is that quoted in paragraph 26?

A Actually, that's quoted in paragraph 25 of the report.

Q Okay.

09:49:59 A But the most dramatic evidence is cited in paragraph 26 --

Q If we could pull that up, please?

A -- in an indented quote.

Q Paragraph 26, next page?

A This was a speech given by Frank Mizell who was active in 09:50:19 the democratic party leadership before the Alabama State Democratic Executive Committee in January of 1962.

He was explaining to the executive committee why the democratic primaries would have to employ the numbered place requirement adopted by the legislature in 1961. And he 09:50:41 explained its purposes in, shall we say colorful language that it would no longer be considered politically correct.

Q Yeah. It's explicitly racist language; is that right?

A Yes.

Q Okay. And that's seen in the indented paragraph in 09:51:06 paragraph 26 of your first report?

A Yes.

Q Okay. What effect, if any, did Jim Crow laws have on these provisions, or how did they interact with these provisions?

09:51:25 A Well, recall that the state of Alabama, like the state of

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 30**

279

Virginia in which I grew up, was operating under a system of official racial discrimination in all walks of life. And so the social context in which the election process operated was affected by that.

09:51:43 For example, I cite evidence of the racial disparities in educational levels of African-Americans and whites in Alabama cited in --

Q Pull up paragraph 28, which appears on pages 18 and 19.

A -- cited in Donald Strong's study of voter registration in Alabama in 1956. 09:52:02

And that evidence I'm familiar with from a book I assigned in teaching Alabama history Horace Mann Bond's classic study of *Negro Education in Alabama*, which was his desecration at the University of Chicago in 1939, where he first used per pupil expenditure data by race for the funding of the white schools 09:52:24 and the Negro schools in the Jim Crow system, demonstrating that there were quite remarkable racial disparities in the funding for black and white schools at that time. And other studies have shown using similar data that this continued.

09:52:44 And consequently, every time the census measured educational achievement, there was a racial disparity observed even then in the 1950s and '60s between whites and blacks. And since the level of education of voters is considered by political scientists analyzing the degree of political participation from the 1960s forward to be the single most -- 09:53:04

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 31**

280

usually the single most important determinative of voter participation rates, certainly augmented by other social and economic characteristics, such as poverty levels and access to vehicles, educational disparities have a marked impact on the degree to which poor people are able to register and vote -- poor people, whether white or black.

Q What role, if any, did violence play in this history that you have been discussing?

A Well, violence was a significant factor in the late 19th century. And there were instances reported in studies of Alabama, like other states, where there was sometimes physical intimidation of persons seeking to register and vote. But the evidence on that score that I've examined is a lot less dramatic than, say, in Mississippi.

But there were, of course, in -- well, in Birmingham in the 1950s there were the bombing of various black churches not directly related to the political process, but creating an atmosphere of racial intimidation. They were, of course, not carried out by officials, but by members of the Klu Klux Klan, or other similar organizations.

But in that period, of course, Birmingham was sometimes referred to in the press as "Bombingham".

Q Can you tell us what, if anything, you found regarding the state's role in political violence against African-Americans at any point in this history?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 32**

281

09:55:23

A Other than in the late 19th century, I can't recall any violence until the incident at the Edmund Pettus Bridge in Selma in 1965 where state troopers did attack physically Civil Rights marchers with the implicit authorization of Governor George Wallace in what was often referred to in the press as "Bloody Sunday".

Q And you mentioned in that last answer that other than in the late 19th century. What in the late -- just briefly in the late 19th century, what role did the state either sponsored or violence under the color of law play?

09:55:44

A The only things I recall are local officials who were involved as in Mobile, where I remember in the 1870s at one point a piece of field artillery was rolled out into the streets and pointed at the polls in the seventh ward of the heavily black ward of Mobile in the 1870s. But I don't think that had anything to do with state officials.

09:56:05

Q And going back to the "Bloody Sunday" violence that you mentioned a moment ago, did this violence prompt intervention from the federal government?

09:56:24

A Yes.

Q And how so?

A Well, it played a significant role in stimulating voting support in the Congress for the adoption of the Voting Rights Act of 1965.

09:56:38

Q So now I'd like to focus on the period after the Voting

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 33**

282

Rights Act of 1965. What effect did the Voting Rights Act have on black registration in Alabama?

A Well, because it struck down the use of tests or devices, such as the literacy test, and understanding clauses, and the requirement that new registrants have an existing registered voter vouch for them when seeking to register, the Voting Rights Act also provided for the use of federal examiners and federal observers.

09:57:00

And in the early period -- in the early years after the adoption of the Voting Rights Act, some Alabama counties did have federal examiners who were sent in to register voters if there was a determination in the federal government that that was necessary to provide effective voter registration opportunities.

09:57:22

Federal observers were sent in and continued to be sent in right on through the 2006 Reauthorization Act in elections where it was believed by federal authorities that there was a possibility of interference with elections on the part of the people running them against the interest of minority voters.

09:57:43

The federal examiners were rarely used, but the threat of using federal examiners played a role, according to most of the studies of this period, in encouraging local officials to cooperate with the -- with the requirements of the Voting Rights Act.

09:58:09

And in a few instances in Alabama -- I remember writing

09:58:27

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 34**

283

about two or three of them -- the state courts sought to prevent the enforcement of the Voting Rights Act in their jurisdiction. And their decisions were overturned by federal courts.

09:58:45 Q And how did the state respond to the passage of the '65 Voting Rights Act?

A Well, the state was one of many southern states that supplied an amicus brief before the Supreme Court decision in *South Carolina vs. Katzenbach*.

09:59:07 Q And did the state or local jurisdictions in Alabama adopt any dilutive practices after the passage of the '65 Act?

A There were a number of counties as I recall which had not yet adopted at-large elections that did shift back to use of at-large elections.

09:59:26 The Wallace administration also encouraged private efforts of voter mobilization. And that's been studied by political scientists. And they think that plays a role in the fact that while the Voting Rights Act enfranchised African-Americans in Alabama, it also enfranchised a lot of white people who had 09:59:47 been -- who had previously not been voting, in part because not only the Voting Rights Act, but a federal court determination that the Alabama poll tax was unconstitutional.

Q And what role did the Department of Justice, the federal Department of Justice play in this process between 1965 and 10:00:11 1982?

**Christina K. Decker, RMR, CRR**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 35**

284

A Well, first of all, the Department of Justice -- I didn't address this in my report. But the Department of Justice did play a substantial role in drafting the Voting Rights Act.

But what I did discuss in my report is that the Department, in addition to sending federal observers or federal examiners to which I've also already referred, was enforcing the provisions of Section 5 of the Voting Rights Act which required all voting changes --

Q Paragraph 31, please, on Page 20. Sorry to interrupt.

A -- which required all voting changes from many jurisdictions covered under the formula set out in Section 4 to get federal approval of those voting changes either by administrative review by the Department of Justice or by a three-judge court in the District of Columbia.

Thus, the Department of Justice played a substantial role in either preclearing, as they did most of the time, for changes in voting in Alabama, but sometimes objecting when there were changes that appeared to have racially discriminatory -- the possibility of a racially discriminatory effect, or were adopted with a racially discriminatory purpose.

Q And do you discuss in your report how many times the Department of Justice objected to proposed changes to elections procedures in Alabama?

A Yes. I cite numerical data regarding objections in the 1970s, '80s, '90s, and the early 21st century.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 36**

285

Q Okay. And did you also cite data concerning the number of times the federal government sent observers to Alabama?

A I think I did at one period in the 1970s.

Q Is that reflected in paragraph 31 of your report, which is up on the screen?

A Yes.

Q Okay. And did federal courts play a role in identifying discriminatory conduct by Alabama officials during this period?

A Yes.

Q Can you discuss that? I guess particularly with regard to Hale County, Marengo County?

A Well, the Hale County case that I cite in paragraph 32 was a case decided by a District of Columbia court under Section 5 of the Voting Rights Act.

Hale County filed a lawsuit seeking a declaratory judgment by the three-judge court in D.C. as I recall after the Department of Justice had objected to a change from district to at-large elections. And the federal court enforced an objection -- determined de novo to refuse preclearance to the change.

The Marengo County case was a long running case which I've studied a good bit. And it began as an equal protection challenge to the Fourteenth Amendment in the 1970s. And I think the first trial was held when the Equal Protection Clause was the operative legal issue under which the Court was

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 37**

286

reviewing the matter. But it was eventually decided, I think in 1984, where Section 2, as amended in 1982, was the operative legal basis for the Court's decision. And the evidence in that case was very substantial. And it required a change from at-large elections to the use of a fairly drawn single-member district plan.

Q And was there a similar court case in 1982 in the city of Mobile?

A Well, actually, the two Mobile cases -- one challenging the county school board's at-large elections and the city commission elections for the city of Mobile -- was decided in 1982 before the revision of the Voting Rights Act. So it was actually decided under the Equal Protection Clause, under the intent standard before the creation of a Section 2 results test.

Q And what was the result of that case?

A A change to single-member districts under which African-Americans were able to elect representatives of their choice.

Q And was there a finding concerning discriminatory intent in that case?

A Yes.

Q What was that finding?

A That the adoption of at-large elections for the county school board in 1876, and the adoption of at-large elections

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 38**

287

for the city commission in 1911 were adopted with a racially discriminatory purpose and with a racially discriminatory effect.

Q Dr. McCrary, how was the 1982 amendment to Section 2 of the Voting Rights Act relevant to your analysis of official voting-related discrimination in Alabama?

A Well, a part of the amended Section 2 sets out a totality of circumstances case -- or a test under which the very first factor was the history of racial discrimination affecting voting about which you've been asking me.

Q And after the 1982 amendments, what role did the Department of Justice play in limiting voting-related discrimination in Alabama?

And if we could put up paragraph 33, please.

A Well, the Department brought numerous voting rights lawsuits under Section 2 as it had under the Equal Protection Clause focusing on Black Belt counties in Alabama.

But what I discussed in that paragraph is a case involving the city of Pleasant Grove, Alabama, which initiated -- was initiated from a Section 5 lawsuit by the city seeking preclearance of changes involving annexations to which the Department of Justice had objected. Of course, the Department was defending the interests of the United States in that litigation.

That was a case that I have written about extensively,

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 39**

 288

including the legal issues used by the city in its -- and its treatment by the Supreme Court in deciding how to interpret the requirements of Section 5 of the Voting Rights Act.

10:07:33 But as a practical matter, what the Court was doing was refusing to preclear certain annexations because they were a part of a pattern of racially selective annexations by the city in which efforts by surrounding black communities to seek admission into the city boundaries were rejected, whereas white jurisdiction -- white areas were routinely annexed as a part of municipal policies. 10:08:01

And the city's defense was there were no black voters in Pleasant Grove, so there couldn't be anything that would signify retrogression because they had prevented them from coming in. And that was ultimately rejected by the federal courts, including the United States Supreme Court, in the decision I cite there. 10:08:18

Q And how many times did the DOJ object to preclearance submissions between 1982 and 2006 from Alabama?

A I don't remember the precise numbers, but I set them out in the report. 10:08:38

Q Is it set out in paragraph 33 that's on the screen?

A Yes. I identify there seven objections from the state of Alabama as a whole, and 39 from local jurisdictions, and that's for the years between 1982 and 2006.

10:09:08 And I also note that the Department of Justice sent

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 40**

289

federal observers to monitor elections during that period to Alabama jurisdictions 91 times.

Q And can you just explain what -- is the sending of federal observers, is that what you were discussing earlier when you -- I think -- I don't know if you called them observers or inspectors?

A I referred earlier to the use of federal examiners and federal observers beginning in the late 1960s.

And while federal examiners were rarely used after 1980 to my recollection, federal observers continued to be used to observe elections where there were reports that there might be racial problems at the polls.

Q And was that the purpose -- or what under what circumstances were federal observers sent?

A Where there were reports from persons in a particular jurisdiction, or knowledgeable observers, or sometimes actually local officials that were relayed usually by telephone to the Department of Justice staff and sometimes by written letters.

Q Do you talk in your report about the case of *Harris vs. Graddick* in 1984?

A Yes.

Q And what is the -- what did you -- what is the discussion of that case?

And we can take down that paragraph. Thanks.

A Well, *Harris vs. Graddick* which in a later phase of the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 41**

290

case was entitled *Harris vs. Siegelman,* when the Attorney General was a different person -- involved the procedures for appointing poll officials in local jurisdictions, which had resulted in virtually no African-American poll officials.

10:11:13 And the evidence in the case before Judge Myron Thompson documented that there was an intimidation factor in the operation of elections in all-white polling, when all the poll officials were white in a jurisdiction which was both minority black and in majority black jurisdictions, especially for older voters. 10:11:41

Q And what happened in that case?

A Well, as I recall, Judge Thompson issued a preliminary injunction initially in *Harris vs. Graddick* that set up procedures for trying to equalize the appointment of poll officials, you know, governed by state law. 10:12:02

Q And was that an important change in voting in Alabama?

A Yes. Along with many other changes, it increased the opportunity for African-Americans to register and vote.

And the increasing parity between black registration and white registration, or between black turnout and white turnout 10:12:24 that continued right up into the present day, the tendency to merge toward parity, though never quite reaching parity, was we think significantly influenced by the appointment of black poll officials.

10:12:42 Q And what's the importance of having black poll officials

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 42**

291

present at the polls?

A It was intended, I suspect, and certainly had the effect of giving the appearance of welcoming to voters whatever their race.

10:13:04 Q Were there any other decisions during this period -- roughly 1982 to 2006 -- that indicated racial discrimination in voting in Alabama?

A Well, the most important is *Dillard vs. Crenshaw County, Alabama*, a case about which I've written extensively. And that 10:13:24 was a case in which I served as an expert witness at the preliminary injunction phase of the case in 1986.

Q And what was the issue there?

A The issue was the use of at-large elections where the plaintiffs were arguing that there was a state policy of using 10:13:40 at-large elections to dilute minority voting strength whenever African-Americans were in a position of substantial voting strength where they could affect the outcome of elections.

Q And what was the outcome of that?

A The Court enjoined the further use of at-large elections 10:14:01 in the nine county commissions that were initially involved in the litigation as defendants.

The plaintiffs then amended their complaint to add all the municipalities and school boards in the state, where, as I recall, there were at-large elections and no African-Americans 10:14:21 elected to public office.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 43**

292

Eventually, I think about 175 or 176 jurisdictions agreed to go, and signed consent decrees agreeing to go from at-large elections to either fairly drawn single-member district plans, or to cumulative or limited voting plans if they preferred, which allowed very substantial increases in minority representation in local governing bodies.

Q I'm going to turn to redistricting issues -- the history of redistricting issues in Alabama. And let me -- if we can put up paragraph 37, please, of your report, which appears on pages 23 and 24 of Plaintiffs' Exhibit 81.

And just beginning with the 1980s, can you please describe what you found regarding the DOJ's preclearance submissions for districting maps?

A Well, the Department of Justice objected to state legislative redistricting plans at least twice. Initially on the grounds that the plan was retrogressive because it reduced the number of majority-minority districts from the benchmark plan. And in the second instance because it appeared intentionally to fragment or crack minority voting strength in some portion of the Black Belt counties.

Eventually, black plaintiffs filed a lawsuit, and the Court ordered an interim plan for the 1982 elections. And the state agreed to a new redistricting plan in 1983, which was a compromise with the plaintiffs that I suppose resulted in a consent decree.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 44**

293

Q Can we pull up paragraph 38 of Plaintiffs' Exhibit 81, which appears on pages 24 -- just page 24?

In the 1990s redistricting cycle, what objections, if any, did DOJ make to the state's congressional plan?

10:16:48 A Well, the congressional plan was objected to by the Department because an intentionally fragmented black population concentrations in order to dilute minority voting strength. And there was also a separate lawsuit in federal court and a three-judge court ordered the use of an interim redistricting 10:17:14 plan for congressional seats.

And that interim plan, like the state legislative plan to which the Department had objected, had only a single black majority district, but it was the first black majority congressional district in the state and allowed the election of 10:17:33 the first African-American to Congress since the Reconstruction period.

Q And were there any issues -- did DOJ object -- turning from the 1990s, did the DOJ issue any objections to Alabama's redistricting plan after the 2000 census?

10:17:57 A No.

Q And if we could put up paragraph 42, please.

And then looking at this last redistricting period, was there a racial pattern in Alabama's legislators' vote for or against the congressional plan that resulted from the 2011 10:18:23 redistricting?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 45**

294

A Well, when I was reviewing the adoption of the 2011 plan, one of the documents I examined carefully was the preclearance submission from the state of that 2011 plan, because I'd always found the submission documents to have very important information. And one of the things that the preclearance submission letter from the state emphasized was the importance of the fact that the legislature was now controlled by the Republican party.

Now, the Republican party had not been in control of a majority in the legislature throughout most of the period I've been describing. It was under Democratic control.

Beginning in the mid 1960s -- usually we attribute it to the 1964 presidential election -- there was a growing tendency of white voters to leave the Democratic party and go into the Republican party. Political scientists describe the pattern at issue as a secular realignment; that is, a realignment that is more gradual, not a critical realignment, but a gradual realignment of voters. And in this case, the white voters were gradually leaving the Democratic party and going into the Republican party with increasing tendency to switch parties that culminated finally in Republican victories earlier than 2011.

But in 2010 the elections dramatically increased the strength of the Republican party in the Alabama Legislature, leading the state to emphasize the significance of that fact as

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 46**

a background factor in the redistricting plan adopted in 2011.

Q In your opinion, what caused the secular shift that you just described?

A Well, this is not something I've analyzed in my own research, but the studies by political scientists who have written about that process in Alabama, as in other southern states, emphasize the racial concerns that white voters had with the operation of the national Democratic party.

Of course, there were antecedents to that in the Dixiecrat movement in 1948, and objections in the party before 1965. But, you know, this is a -- this is a subject that political scientists have looked at, to answer your question.

Q Okay.

MS. HOWELL: Your Honor, before we go any further, I need to belatedly lodge an objection. That opinion is not expressed anywhere Dr. McCrary's report, nor is anything about the political shift or the partisan shift -- excuse me -- and party affiliations in Alabama addressed anywhere in his report.

MR. SPIVA: Well, it's addressed in -- the party affiliations and the split in the vote is addressed right here.

But this is, I think is just a part of the history. I mean, he's discussing the history of racial issues in Alabama. And it's pretty closely linked, I think, to the rest of his opinion.

THE COURT: Well --

296

MR. SPIVA: I don't intend to go any further with this. That was --

THE COURT: Dr. McCrary said that he had not analyzed it himself, anyway. So I wasn't giving a lot of weight to that.

10:21:58

But the report merely states a fact that the Republican party gained control in 2010. I don't think there's any dispute about that.

So sustained and overruled at the same time. Okay?

10:22:14

MS. HOWELL: Thank you, Your Honor.

THE COURT: You may proceed.

BY MR. SPIVA:

Q Let me turn to Senate Factor 2, Dr. McCrary, the existence of racially --

10:22:29

THE COURT: Well, are we leaving the 2011 submission?

MR. SPIVA: Yes. Yes.

THE COURT: Okay.

MR. SPIVA: Do you have questions?

THE COURT: Well, that plan was precleared, was it not?

10:22:44

THE WITNESS: Yes, ma'am.

THE COURT: Okay. Thank you.

BY MR. SPIVA:

Q Turn just briefly to racially polarized voting, the second Senate factor.

10:22:56

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 48**

297

And you were not asked to examine the extent of present racially polarized voting in Alabama; is that correct?
A That's correct.
Q But did you examine the historical racially polarized voting in Alabama?
A Yes. I cited a good bit of evidence about the history of racially polarized voting in Alabama.
Q Okay. And maybe if we can put up paragraph 53 of your report, which is on pages 32 to 33 of Plaintiffs' Exhibit 81.
First of all, what conclusion did you reach regarding the history of racially polarized voting in Alabama?
A Well, I reached the conclusion that racially polarized voting was a dominant trend in Alabama voting practices from the late 1940s, when blacks began voting in significant numbers in elections that were meaningful, right on up through the last period that I discussed; that is to say, up until recently. And that this was a critical reason why the use of at-large elections effectively diluted minority voting strength in the past. And so that's the general conclusion.
Q Let me turn to Senate Factor 3, the use of mechanisms that enhance the opportunity for discrimination.
And, Dr. McCrary, is it fair to say that you discussed that in your discussion of the history of discrimination, some of the things we've already been talking about this morning?
A Yes.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 49**

298

Q Okay. And that would be things like at-large elections, anti-single shot voting, et cetera?

A Well, at-large elections aren't classified as an enhancing device. The term means to designate provisions that enhance the discriminatory potential of at-large elections, which includes the use of anti-single shot laws, and numbered place laws, and other circumstances in other states. It also includes majority vote requirements.

And, you know, there's evidence that I cited in the history of the use of enhancing devices that we've already covered.

Q And does the state engage in any such practices today?

A No. It's -- I believe it's correct to say it's prohibited by federal court decisions.

Q What about in terms of at-large elections? Does the state continue to have at-large elections for certain offices?

A In some cases, yes. Not in the legislature. But, of course, there are at-large elections for judicial office in the state of Alabama.

Q And you've served as an expert in a case challenging that, I take it?

A Actually in two cases involving judicial elections.

THE COURT: What were the results of those cases?

THE WITNESS: Well, in 1991 the plaintiffs failed to prevail in *SCLC vs. Evans* or Siegelman, whatever the final

**Christina K. Decker, RMR, CRR**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 50**

 299

style of the case was. And the more recent case is still pending before Judge Watkins, I believe.

BY MR. SPIVA:

Q And that's the Alabama, I think, state conference NAACP case?

10:26:46

A Yes. Yes.

Q Regarding Senate Factor 4, exclusion from slating process, that's not something that you looked at, correct?

A That's correct.

10:26:57

Q And then -- and that's because there is no slating process or was no slating process in Alabama?

A That's correct, to my knowledge.

Q And Senate Factor 5, the extent to which members of the minority group bear the effects of discrimination, can you tell us what conclusions you reached regarding this factor?

10:27:21

And if we could pull up paragraphs 54 and 55 of Dr. McCrary's report, that would be good. It's on pages 33 through 34.

A Once again, I am not considering the current evidence of racial disparities in socioeconomic characteristics and how that affects the ability of African-Americans to participate in office. That's something that I -- that another expert has testified about.

10:27:41

I was considering the history of socioeconomic characteristics and their impact on political participation

10:28:01

Christina K. Decker, RMR, CRR
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

Caster Plaintiffs' Exhibit 85, Page 51

300

rates relying primarily on the expert witness reports from a variety of cases, and relying on findings by -- factual findings by federal courts.

I also have examined the census data, when looking at expert witness reports, to confirm that I agreed with an expert's assessment in past cases; not in this case.

Q I mean, do you disagree with any of the plaintiffs' experts' assessment in this case?

A No.

Q Okay.

A But that wasn't my charge.

Q Yeah. And what does the social science literature about socioeconomic status and political participation state?

And maybe if we can pull up paragraph 56 of his report?

A Well, as I said in the report, there's little dispute among political scientists that lower socioeconomic characteristics tend to deter voter participation by everyone, not just along race lines. But because African-Americans are, generally speaking, in most places substantially poorer and less well-educated than whites in those jurisdictions, it naturally has a racial implication, as well.

And the political scientists who have looked at the racial aspects of this -- of this question, agreed readily with that -- that extension.

Q Did you reach any conclusions about whether

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 52**

301

African-Americans participate politically in Alabama at the same rate as non-Hispanic whites?

A Yes. Relying on studies --

Q Paragraph 57, please.

10:30:00 A -- relying on studies by political scientists that I cite in my report, and also relying for the 1970s on reports by the United States Commission on Civil Rights, I concluded that there never has been complete parity in political participation rates in Alabama. Although we have, as I said earlier, moved 10:30:26 in the direction of parity over time as a result of the enforcement of the Voting Rights Act and various federal court orders.

Q And did you review registration and turnout information from more recent elections in Alabama?

10:30:42 A Yes. I looked at the Secretary of State's website in Alabama and found that there continue to be, according to the official records of the state, modest disparities between white and black participation rates in 2018, which I think is the first time racial turnout by race was reported by the Secretary 10:31:03 of State's office.

THE COURT: And by "modest disparities," what do you mean?

THE WITNESS: I'm sorry, Your Honor. I didn't hear your question.

10:31:13 THE COURT: I'm sorry. By "modest disparities," what

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 53**

302

do you mean?

THE WITNESS: That they were not as great as they used to be. You know, I cite, I think, the specific numbers in the report from 2018, and also in the earlier decade from studies published by political scientists.

MR. SPIVA: I'm trying to find the reference, Your Honor.

MS. HOWELL: Your Honor, I believe that's paragraph 60 of his report.

MR. SPIVA: Thank you.

THE COURT: Thank you.

THE WITNESS: Yes.

BY MR. SPIVA:

Q And what do you report in paragraph 60, just for the record?

A That in 2018 -- in the 2018 general election, black turnout remained lower than white turnout; 52.2 percent for blacks, 55.1 percent for whites.

THE COURT: So that's what you mean by "modest"?

THE WITNESS: Yes.

THE COURT: I am not a mathematician, but about a 3-point difference, 3 percentage point difference?

THE WITNESS: In terms -- yes. Yes, that's correct.

BY MR. SPIVA:

Q And with regard to Senate Factor 6, racial appeals, that

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 54**

303

was not something that you were asked to look at in this case; is that right?

A No. That's correct.

Q And with regard to Senate Factor 7, the extent to which the minority group has been elected to public office in the jurisdiction, what conclusion did you reach regarding this factor?

And if we could maybe pull up paragraph 46 of Dr. McCrary's report which is on pages 28 and 29 of Plaintiffs' Exhibit 81.

A Well, in that paragraph, I report data from a 1981 report that was prepared by lawyers in Alabama and became a part of the record before Congress in regard to the amendments of Section 2 -- of the Voting Rights Act in 1982.

And there were virtually no blacks elected to office in Alabama except in black majority jurisdictions, or in a small number of instances in single-member districts, which appear to have been majority-minority districts. But they were only a handful of districts.

Q Can we put up paragraph 48, which is on pages 29 to 30 of Plaintiffs' Exhibit 81, of Dr. McCrary's first declaration?

Dr. McCrary, between Reconstruction and 1992, how many African-American members of Congress were elected from Alabama?

A None.

Q And does that include U.S. senators?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 55**

304

A Yes.

Q And after 1992 how many African-American Congress people have there been in Alabama?

A One.

10:34:25 Q Okay. And do you describe in your report in paragraph 49 the history of election to statewide offices in Alabama?

A Yes.

Q What did you find?

A That no African-Americans were elected to statewide office 10:34:54 in Alabama except in the context of judicial elections where African-Americans were appointed to fill a vacancy in some judicial office and then ran as incumbents for reelection, beginning with Oscar Adams in, I think, 1982, early 1980s, and continuing through the 1990s, when Ralph Cook and John England 10:35:20 were both appointed and elected to judicial office.

But beginning in the year 2000, even incumbent African-American judges running for election have been defeated, so that in the 21st century no black judges have been elected statewide in the state of Alabama.

10:35:41 Q And between 2000 and 2008, were there black candidates who ran for statewide office that lost?

A Yes. I cite several in the report. But all of them lost, whether incumbents or not.

Q Okay. And Alabama has never had an African-American 10:36:18 governor?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 56**

305

A No.

Q And let me ask you about state legislative elections. What conclusion did you reach about African-American representation in the state legislature?

10:36:31 A Well, almost all African-Americans elected to the state legislature in Alabama have been elected under court-ordered single-member district plans.

Beginning with the early 1970s -- 1973 or '4, something like that -- and the study of elections to legislative office 10:36:59 in *Quiet Revolution in the South* includes data on Alabama that substantiates that for the period up through the end of the 1980s. But I know that that continues to be the case.

Q And let me just turn to the one additional relevant factor in the -- articulated in the Senate report, the tenuousness of 10:37:29 the plan.

What is the tenuousness consideration, Dr. McCrary?

A Well, under the Senate factors that were, as I said, taken from the Supreme Court's criteria in *White vs. Regester* back in 1973, one of the factors that a court can consider is whether 10:37:50 the reasons given for the adoption of a particular election method are tenuous. And, of course, the way it's phrased by the Court and by the Congress is somewhat ambiguous, but it is essentially raising the question of assessing the credibility of the reasons asserted for the adoption of the plan.

10:38:15 Q Let me ask if we can put up paragraphs 44 and 45, which

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 57**

306

are on pages 27 and 28 of Dr. McCrary's first declaration, Plaintiffs' Exhibit 81.

And let me ask you: What was your opinion that you reached and reported in your report concerning the connection between the past redistricting plan and -- well, let me strike that. Let me get a better question.

What opinion, if any, did you reach concerning tenuousness and the passage of the 2011 congressional plan?

A Well, when I examined the reasons asserted by the state in its preclearance submission, which included legislative documents such as the guidelines adopted by the reapportionment committee, I concluded that the justification offered for the racial composition of Congressional District 7 were tenuous.

Q And how did you reach that conclusion?

A Well, first, I reviewed what, of course, the state said its reasons for adopting the plan were. And that's set out in the guidelines adopted by the legislature, which are very close parallels to the guidelines established in the 2000, 2001, which was actually what the state cited in its preclearance submission.

And those reasons included an awareness that all of the criteria that the state set out had to be subordinated if there were a conflict between the one person one vote requirement of the Voting Rights Act and compliance with the requirements of the -- I'm sorry -- the one person one vote standard sent down

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 58**

307

in federal courts decisions since 1962 and '64, and also with compliance with Voting Rights Act.

Q Let me ask you: Did the analysis of the electoral results in CD 7, both before and after passage of the plan, weigh into your analysis of tenuousness?

A Yes, they did.

Q And how so?

A Well, in addition to the point I initially stated, the guidelines set out an understanding of the requirements of Section 5 of the Voting Rights Act as to retrogression.

And the standards that it set out to govern the adoption of a congressional redistricting plan were the same as the guidelines for adopting legislative plans.

And as the Court I'm sure is well aware, the Alabama -- the U.S. Supreme Court found that that -- that guideline provision was not a correct interpretation of the retrogression standard under Section 5, and was a part of the evidence the Court considered in reaching a conclusion that the legislative plans were racial gerrymandering.

Q What about the margins by which the representative of CD 7 had been elected both before and after the adoption of the plan, which is reported in paragraph 44 of your report?

A Well, the incumbent in Congressional District 7 had been elected with over 70 percent of the vote, which indicates that the racial -- the African-American composition of the district

**_Christina K. Decker, RMR, CRR_**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 59**

was far higher than necessary to provide a fair opportunity to elect candidates of their choice for minority voters. And in fact, the margins for prior congressional elections in Congressional District 7 going back into the 1990s was also far higher than needed to provide a fair opportunity to elect.

10:42:39

Recall that the standards set out in the Department of Justice's guidelines for the administration of Section 5, as the Court notes in the ALBC case, have always required a functional analysis of the electoral process in order to assess the degree to which the effect of a plan, the expected effect of a plan would be retrogressive.

10:43:04

In other words, the Department of Justice, like the federal courts, and like all the expert witnesses in addressing redistricting questions, considers the level of registration and turnout by minority voters -- I'm sorry -- by the minority population and the majority group in the population. It considers the role of primary elections and general elections in the outcome, because sometimes that can affect the level of functionality. It depends on an assessment of the degree to which there is, despite racially polarized voting, a sufficient degree of white crossover voting to provide an opportunity to elect foreign minority voters if they are in coalition with that white crossover group.

10:43:27

10:43:54

So all of these are a functional analysis that the Department of Justice and federal courts have always followed

10:44:15

309

really since the 1970s in assessing a redistricting -- a particular district in a redistricting plan. And where a district is significantly higher than it needs to be under that functional analysis, political scientists and historians and the courts refer to that as packing.

10:44:37

And, you know, there were periods in the past where a district might be 70 or 80 percent black, and that certainly would constitute packing. But it's not necessary to understand the meaning of the term packing that it be that high. If it is far higher than it needs to be, then the plan is packed. Congressional District 7 was already packed, and it continued to be packed.

10:44:58

In the 2011 plan, the justification offered was tenuous in the sense that the state took the position, and it states this in its preclearance submission that there -- that you could not -- that the jurisdiction could not reduce the minority percentage in the district without violating the retrogression standard of Section 5, and that's just incorrect. And I say that not as a matter of law, but by observing how the Department of Justice has administered the plan over the last few decades during a quarter century, of which I was actually involved in the enforcement of Section 5.

10:45:17

10:45:37

Q Thank you.

THE COURT: We've been going for a while. I kept waiting for a time, but I'm not sure this is a good one, but I

10:45:53

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 61**

think we're going to go on and take a break. We will come back at 11:00 o'clock.

MR. SPIVA: Thank you, Your Honor.

(Recess.)

11:03:31 THE COURT: You may proceed.

MR. SPIVA: Thank you, Your Honor.

BY MR. SPIVA:

Q Dr. McCrary, I think we left off before the break with Your Honor's question about preclearance of the 2011 plan.

11:03:48 Does the fact that the 2011 plan was precleared, i.e., determined not to be retrogressive indicate it also complies with Section 2 of the Voting Rights Act?

A No. Every preclearance letter contains boilerplate language saying that determination under Section 5 doesn't 11:04:08 signify that the voting change is in compliance with Section 2 of the Voting Rights Act, or I think the Fourteenth and Fifteenth Amendments.

Q And are you saying DOJ should not have precleared the plan because of packing?

11:04:25 A No.

Q And why is that?

A Well, the analysis of packing is only a part of what would make a plan objectionable if there is other evidence of discriminatory purpose in the decision-making process. So that 11:04:48 if there were such evidence, the Department could object under

311

the purpose prong of Section 5.

But I have no idea whether the Department considered or found any evidence that would have justified a purpose objection. So as far as I'm aware, the plan, which was challenged in federal court as well as in the Department's administrative process, was assessed under the purpose prong. I didn't work on that case.

Q Let me turn to your rebuttal report, Dr. McCrary, which is Plaintiffs' Exhibit 82 and just ask you a couple of questions about that.

In your rebuttal report or your second declaration, were you responding to defendant's experts' assertions that the definition of black for purposes of the *Gingles* analysis should exclude multiracial and/or ethnically Hispanic African-Americans?

A Yes. I was asked to respond to only that specific point.

Q And can you describe or can you state your response to that assertion?

A Well, what I said in my report was, first of all, that all the expert witness reports that I've examined over the years are consistent with the approach that Mr. Cooper takes in his analysis in his report in this case, and that it's also consistent with the way the term black has been -- or Negro in earlier decades -- has been assessed in Alabama, both in Alabama law, as I understand it, and in practice.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 63**

312

Q All right. And you're referring to the one drop rule?

A Yes, among other things.

Q Okay. What was the one drop rule?

A Well, the idea was that any degree of Negro ancestry makes a person a Negro. And that, of course, was something that could practically be enforced only if there were visible evidence or local knowledge of the race of the person. But that's what the law required.

And in all of the segregated societies of the south, if a person were of Negro parentage, that would -- meant that they would go to a racially segregated school -- school for Negro students.

Q Based on your experience working in voting rights and in the DOJ, what is the proper way to define African-American in this case?

A I'm not sure precisely what you're asking me.

Q In terms of any-part black and single-race black.

A Well, first of all, in most jurisdictions, it doesn't make much difference which definition you use unless you're in a jurisdiction with numerous racial groups and attitudes toward race that are different from southern states such as Alabama.

But the usual procedure is to use any -- any evidence of blackness. Remember we're talking about reported data in most cases here, unless the expert has to rely on census data and states that don't have racial identification of registered

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 64**

313

voters and so on.

So any-part black is the most logical racial variable to use in an exercise such as Mr. Cooper's engaging in. But it wouldn't make any practical difference if he used an alternative definition in most instances, and I suspect in Alabama. If there were evidence to the contrary, I would certainly consider it. But I wouldn't expect to see it.

Q Thank you, Dr. McCrary. I have no further questions.

THE COURT: Cross-examination?

MS. HOWELL: Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. HOWELL:

Q All right. Good morning, Dr. McCrary. I think we're still in morning.

A Good morning, Ms. Howell.

Q I'm going to tell you on the front end I'm going to try and use the Elmo to show you parts of your report on a less tech savvy scale than what plaintiffs' counsel was able to do. But if that doesn't work out, then I do have hard copies that I can give to you and to the Court to facilitate questioning.

So you were brought on as an expert in this case to talk about the history of racial discrimination in Alabama; is that right?

A Among other things, yes.

Q Okay. And you've been qualified as an expert in the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 65**

314

history of voting discrimination in Alabama?

A Yes.

Q Okay. So -- we'll start back. Does Alabama have a white primary today?

11:11:25 A No.

Q Okay. How long has it been since Alabama has had a white primary?

A Since 1945.

Q Does Alabama have a poll tax today?

11:11:34 A No.

Q How long has it been since Alabama had a poll tax?

A Since 1966, I believe.

Q Okay. Does Alabama use a literacy test today?

A No.

11:11:42 Q How long has it been since we had a literacy test in Alabama?

A Since 1965.

Q And you don't know of anyone from the 1901 constitutional convention who is still alive and kicking and legislating in

11:11:57 Alabama today, do you?

A I certainly do not.

Q Okay. Your report addresses an awful lot of history that occurred prior to 1965 and the passage of the Voting Rights Act; is that correct?

11:12:13 A That's correct.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 66**

315

Q Okay. And the bulk of it up until probably paragraph 33, I think, only addresses events that occurred prior to about 1985. Would that be a fair characterization?

A That's probably right, yes.

11:12:30 Q And 1985 was about 30 years ago or so, right?

A 34.

THE COURT: We don't do math around here. We're lawyers.

A Pardon?

11:12:45 THE COURT: We're lawyers. We don't do math.

BY MS. HOWELL:

Q You talked a lot about at-large elections and their use across the state of Alabama, and local jurisdictions in particular, correct?

11:13:12 A Yes.

Q The state of Alabama doesn't use at-large elections to elect its Congressmen or women, does it?

A No, not anymore.

Q And it hasn't since about 1970, right?

11:13:24 A Since it was outlawed by the Congress of the United States in 1967, I think it's required to use single-member districts.

Q I want to talk to you a little bit about a paragraph in your report that plaintiffs' counsel didn't really take up with you, but which you mentioned in one of your opening comments, which is paragraph 36.

11:13:53

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 67**

316

Now, this is really in your narrative of a history in voting registration in Alabama. This is really the only paragraph that deals with something we might call relatively current. Is that a fair characterization?

11:14:31 A If you consider 2011 not current, yes.

Q But occurring at approximately the same time that the congressional districts were passed that are at issue in this case?

A I'm not sure I understand the question, Ms. Howell.

11:14:55 Q Sure.

A If you could pare it down.

Q Let me rephrase that. Current being things that happened at approximately the same time or in the same era even as the time that the congressional districts that are at issue in this

11:15:06 case were passed?

A Well, I did talk about 2018 data in regard to assessing the levels of registration and turnout in Alabama. And I talked about election history going up to shortly before the 2011 redistricting plan. But my report is primarily focused on

11:15:30 the period before the adoption of the plan.

Q Okay. Thank you.

So in this paragraph, in paragraph 36, you talk about the implementation of the voter ID law in Alabama?

A Yes.

11:15:43 Q And your report concluded, and we discussed this in your

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 68**

317

deposition, that the voter ID law disproportionately burdened African-American voters; is that right?

A That's correct.

Q And when we discussed it at your deposition, I showed you the opinion in that case, did I not?

A You did.

Q And then you subsequently went back in your errata and made a correction that you didn't believe that the statement that you made in this paragraph of the report, that the voter ID law disproportionately burdened African-American voters was incorrect?

A That's correct.

Q Okay. So that case was decided by a court in 2017, correct?

A I don't remember the precise day, but I will take your word for it.

Q Okay. I'll just show to you that -- oh.

A Actually it was 2018, according to the --

Q Yes.

A -- document you just put up.

Q I have gotten my years mixed up. We don't do math here. I do recall.

A How do you deal with birthdays?

THE COURT: Forget them.

MS. HOWELL: Or allow your parents to remember them in

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 69**

318

some instances.

THE WITNESS: Sorry for that, Your Honor. I didn't mean to be --

THE COURT: That's okay. I have forgotten many birthdays of mine.

11:17:21

BY MS. HOWELL:

Q Now, can you tell me which court issued a decision in this case?

A This was decided by the district court in the Northern District of Alabama.

11:17:42

Q Okay. Which is the same court that we're currently before, right?

A Yes.

Q And that case is still on appeal, correct?

A I actually don't know that. I will take your word for it.

11:17:49

MS. HOWELL: Your Honor, may I approach the witness with a copy of this opinion?

THE COURT: You may.

MS. HOWELL: And would Your Honor like a copy of the opinion?

11:18:04

THE COURT: Sure. I don't have enough to read in this case.

BY MS. HOWELL:

Q So on the copy that I've given you, and which I'm going to try and negotiate here on the Elmo, as well, there is a page

11:18:25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 70**

319

that is tabbed.

A Yes.

MS. HOWELL: Your Honor, it's page 15 of the opinion.

BY MS. HOWELL:

11:18:59 Q So on the copy that is on the Elmo, you'll see that I have highlighted a portion. And I wondered if you could read that highlighted portion for me.

A This highlighted portion says, "Frankly, the discrepancy in photo ID possession rates among white, black, and Hispanic registered voters in Alabama is minuscule. In other words, it appears that very few registrants of any racial group may presently be affected by the photo ID law."

11:19:18

Q Okay. So when your report said that the voter ID law disproportionately burdened African-American voters, do the Court's words give you any pause about whether it reached the same conclusion?

11:19:48

A Not in those two sentences. But the Court does say there is a statistical disparity in the possession of photo ID requirements. And my recollection is that in another portion of the opinion the Court notes that Secretary of State Merrill conceded that there were numerical disparities in possession of photo ID.

11:20:03

What the Court says here is that the rate is minuscule, in the Court's words, or it's not great enough to worry about; not that there were no racial disparities.

11:20:23

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 71**

Q Okay. Is a racial disparity -- is a disparity in possession rates the same thing in your mind as a disproportionate burden?
A It depends on the circumstances. The Court here reaches 11:20:38 the conclusion that because they could -- as I recall the opinion, because they could get photo ID documents that would satisfy the requirements of the Alabama law, that this is not burdensome. And the Court has legal reasoning that I don't recall that would further buttress that opinion.

11:21:04 The Court reached the conclusion that isn't inconsistent with the fact that I cited that there's a racial disparity in possession, which I interpreted as creating a burden.
Q Okay. Well, your report, in fact, doesn't make any mention of a disparate possession rate, but it does say that it 11:21:25 disproportionately burdened African-American voters?
A Well, that's what I meant by possession rate is evidence of burden.
Q Okay. So I've moved the opinion down a little bit and have further highlighting. And if I could also get you to read 11:21:40 those portions that are highlighted, as well.
A The Court says, "Anyone without a photo ID can obtain one for the sole" --
Q I'm sorry, Dr. McCrary.
A I'm sorry. You asked me about Dr. Siskin's estimate?
11:21:56 Q Yes. And we'll clarify for the record, Dr. Siskin was one

321

of plaintiffs' experts in that case, correct?
A Yes. I'm sorry. I skipped that passage.
Q No. That's quite all right.
A "But in the end, Dr. Siskin's estimate does not matter" -- that is, his estimate that found a racial disparity in the possession rate. "This is because a person who does not have a photo ID today is not prevented from voting if he or she can easily get one. And it is so easy to get a photo ID in Alabama, no one is prevented from voting."
Q Okay. And would you mind continuing with the further highlighted portion?
A "Anyone without a photo ID can obtain one for the sole purpose of voting, free of charge. These IDs can be obtained at Secretary Merrill's office at the state capital building in Montgomery, any board of registrars' office located in each county and open during daily business hours, or to an event where the secretary's mobile ID unit is visiting."
Q Okay. Thank you.
And that takes me to actually the very next sentence in your paragraph 36, where you say "Subsequently, the state closed 31 driver's license offices located in predominantly poor and African-American areas making it disproportionally more difficult for black voters to acquire the identification necessary to vote." Did I read that correctly?
A Yes.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 73**

322

Q But what the opinion actually says, right, is that there are far more opportunities in other places to get the required photo ID under that law; is that correct?
A That's correct.
11:23:35 Q Okay. So that whether those driver's license offices were closed or were, in fact, subsequently reopened as they were, that would not have been the thing that prevented any voter from getting the identification necessary to vote?
A I'm uncertain about the dates of those closures in
11:23:56 relation to the Court's ruling. They were -- were they before the Court's decision in 2018? I mean, I read about them in the newspapers, and I just don't remember the exact period in which it occurred.
Q Certainly. But the Court's point was, in fact, was it
11:24:15 not, that other IDs were available and readily so for no charge whatsoever regardless of what the driver's license offices' availability was?
A Yeah. That's correct. I don't remember that the Court referred to the closing of DMV offices.
11:24:36 Q Okay. Now, you talked some about racially polarized voting in Alabama in your report as part of the historical context for understanding the history of voting discrimination in Alabama, right?
A Yes.
11:25:19 Q Okay. And you are not discussing racially polarized

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 74**

323

voting as a statistical expert in this case, right?

A That's correct.

Q Okay. But based on the testimony that you have given this morning, isn't voting going to be racially polarized in any state where a majority of white voters tend to vote Republican?

11:25:40

A Well, it depends on the racial composition of the voters who identify as Republican. In most states, that would certainly be true.

In the sense that the Republican party has become overwhelmingly a party of white voters and the Democratic party is cohesively supported by a substantial majority of African-Americans, that's a reflection of the racial disparity in party identification.

11:25:58

Q So in a state like Alabama, where the vast majority of black voters vote for Democratic candidates, and the vast majority of whites voters vote for Republican candidates, there will always be racially polarized voting in a state where white voters vote Republican?

11:26:16

A Not always, but usually.

Q Okay. Now, you also talked about the history a little bit of objections to Alabama's prior congressional districts. And I believe that's at paragraph 38 of your report -- or paragraphs 37 and 38.

11:26:30

And, specifically, you talked about the objections that the Department of Justice lodged in 1992 to Alabama's

11:27:08

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 75**

324

congressional district, right?

A One objection, I think.

Q Okay. And Alabama was ordered to/agreed to draw a single majority-minority district in response to that, correct?

11:27:25 A Well, my recollection is that simultaneously there was a lawsuit in federal court and that -- I don't remember the precise connection between the DOJ objection and the Court's order, but I know that the Court ordered an interim redistricting plan to be in effect.

11:27:49 Q Okay. But that redistricting plan had just the single majority black district, correct?

A That's correct.

Q Okay. And that is what your report says, right?

A Yes.

11:27:58 Q Okay. Alabama has never been ordered to draw a second majority-minority district, has it?

A Not to my knowledge.

Q Okay. You also talked some about the tenuousness of rationales given for making a particular election law or 11:28:22 electoral change, I guess. That was in paragraph 45 of your report. Do you recall talking about that?

A Yes. But let me get paragraph 45 to see precisely what you're referring to. Sorry.

Q But your conclusion about the tenuousness of the 11:29:10 rationales given for drawing Alabama's congressional districts

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 76**

325

in 2011 was that nothing but tenuous justifications had been given, and that's what you indicate in the last sentence of that paragraph?

A No, not that nothing was ever asserted, but that the assertions didn't require maintaining the same racial composition or higher composition of blacks in the district.

Q Are you able to distinguish that from passage of the 2011 congressional plan?

A No. I'm referring to the comparison with other criteria that are set out in the guidelines. And because the drawing of the district falls into the category that political scientists would and historians would characterize as packing, and under some circumstances, that is to say, if there was Section 2 voting rights lawsuit, then that issue would have become an issue that wasn't an issue in the Section 5 review, that compliance with Section 2 of the Voting Rights Act would have to take into account the fact that the district was packed.

And all the other criteria was supposed to be subordinated to compliance with the Voting Rights Act, the one person one vote requirement in federal reapportionment law, and the Equal Protection Clause.

Q Okay. But your paragraph ends with the conclusion that the justifications for drawing Congressional District 7 the way that it was drawn appear to have been tenuous, at best; is that correct?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 77**

326

A Yes.
Q And you're not an expert in legislative intent, are you?
A Well, I've testified about discriminatory intent in all manner of cases over the last 40 -- I'm sorry -- 39 years.

11:31:16 So, you know, I am routinely considered an expert on assessing the degree to which the intent underlying the adoption of any law or redistricting plan is racially discriminatory.
Q Do you know who had input into the drawing of

11:31:33 Congressional District 7?
A I didn't make that examination. I only examined the documents submitted for Section 5 review by the state.

THE COURT: So is your answer that you do not know who had input?

11:31:49 THE WITNESS: Well, I know it was the legislature. But beyond that, I don't know anything -- any details about it. I haven't investigated that.

BY MS. HOWELL:
Q Okay. And you don't know the intent of any of the

11:32:00 legislators or other people who had any kind of input into the drawing of that district?
A No. I wasn't asked to assess the intent behind the plan.
Q Do you consider obtaining preclearance from the Department of Justice to be a tenuous justification?

11:32:16 A No. That's one consideration in drawing the plan, as the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 78**

327

guidelines indicate.

Q Okay. And you were, in fact, employed at the Department of Justice when the 2011 congressional plan was precleared, right?

11:32:27 A That's correct.

Q Okay.

MS. HOWELL: Your Honor, could I have a moment?

THE COURT: You sure may.

MS. HOWELL: Dr. McCrary, I think that's all I have for you at the moment. Thank you.

11:33:14

THE COURT: Any redirect?

MR. SPIVA: Yes.

THE WITNESS: Ms. Howell, do you need this document back?

11:33:21 MS. HOWELL: No. You're free to keep it if you'd like.

REDIRECT EXAMINATION

BY MR. SPIVA:

Q Dr. McCrary, I'd like to begin with the discussion of voter ID. You recall the discussion of that on your cross-examination where Ms. Howell had you read certain portions of the Merrill vs -- *Greater Birmingham Ministries vs. Merrill* decision?

11:33:52

A Yes.

11:34:08 Q And when you were deposed, did you have an opportunity to

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 79**

328

review the full opinion?
A No. I foolishly agreed to answer questions based on a cursory examination during the deposition, which didn't give me an opportunity to read the entire opinion. And thus I gave an incorrect answer in the deposition.
11:34:33
Q And did you submit an errata upon reviewing your deposition transcript?
A I did. And I corrected my concession that I had been wrong in the declaration about the numerical disparity in the possession of photo IDs.
11:34:47
Q That's right. Dr. McCrary, as I tell my kids, I have made a mistake before. I thought I was wrong, but I wasn't.
MR. SPIVA: If I can use the Elmo -- and this is going to really test my skills, Your Honor.
11:35:05
BY MR. SPIVA:
Q Dr. McCrary, you recall that Ms. Howell had you read a couple of portions of this opinion?
A Yes.
Q And I want you to -- I'd like to ask you to read a couple of the portions around the portions she asked you to read.
11:35:23
THE COURT: Can you identify which page number that's on, please?
MR. SPIVA: Yes. Yes, Your Honor. This appears on page 15 in the printed Westlaw copy.
11:35:38
BY MR. SPIVA:

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 80**

329

Q And if you could read the highlighted portions of this -- of the opinion that surround the areas that Ms. Howell had you read.
A Okay. It begins with data from the plaintiffs' expert in that case, Dr. Siskin.
"1.37 percent of white registered voters, 2.44 percent of black registered voters, and 2.29 percent of Hispanic registered voters may not currently have an acceptable photo ID."
Q And then further down after the section that Ms. Howell had you read it says -- where it says "nonetheless"?
A "Nonetheless, the numbers show that black and Latino registered voters are almost twice as likely as white voters to lack an acceptable photo ID for voting."
Q Okay. Thank you.
And do you know in terms of when -- you're familiar with Shelby County, the Shelby County decision?
A Yes. I worked on the case.
Q Okay. And that eliminated essentially the preclearance regime under the Voting Rights Act?
A Yes. By finding that the formula for coverage of Section 5 to be unconstitutional, the Court's decision effectively eliminated the preclearance review process.
Q And do you know whether Alabama's photo ID law was passed -- was enacted before or after the Shelby County

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 81**

330

decision was issued?

A My understanding is it was after the elimination of preclearance review.

Q Okay. And so does that mean -- was Alabama's voter ID law subject to preclearance?

11:37:20

A No.

Q Okay. You recall Ms. Howell asked you some questions about the closure of the DMV offices, the 31 DMV offices located in predominantly poor and African-American areas that you reported in paragraph 36 of your report?

11:37:43

A Yes.

Q And are you aware that those offices were opened back up prior to the photo ID opinion pursuant to an agreement between Alabama and the U.S. Department of Transportation?

11:38:07

A That's my recollection, that the closure of the driver's license offices was several years, probably two or three years at least prior to the Court's decision.

Q So that situation had been remedied at the time that the Court issued its decision saying that it would be easy in the Court's findings to obtain a free ID?

11:38:26

A Well, the closure of those offices had been remedied, yes.

Q Correct. And were you aware that the U.S. Department of Transportation had made a finding that the closings disproportionately hurt black residents?

11:38:45

A I recall that from news coverage, but I didn't factor that

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 82**

331

into my declaration.

THE COURT: Do you know how long those offices were closed?

THE WITNESS: I don't recall, Your Honor. My recollection is it was for some months.

THE COURT: A few months as opposed to years?

THE WITNESS: That's my recollection.

BY MR. SPIVA:

Q Dr. McCrary, you were asked some questions about how long it had been since Alabama had a poll tax, since Alabama, you know, had a literacy test, et cetera.

Do you recall Ms. Howell asking those questions?

A I do.

Q And do you believe that the history pre-1965 of voting discrimination in Alabama is irrelevant to the state of race relations in Alabama today?

A No. But in regard to the concessions about which you asked, all of them, as I recall, were found to be in violation of federal law.

Q And do you believe that that history is relevant to the issues of access to voting or electoral participation among African-Americans today?

A Yes. For example, the educational disparities that I testified about on direct are things that have a long-lasting effect. There are African-Americans in Alabama's electorate

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 83**

332

today who were raised in a public school system that was racially discriminatory in its operation, with poor funding for African-American students in segregated schools.

Moreover, parents' level of education affects the level of education achieved by their children. That is to say, children of parents who are of limited educational background are often subject to burdens in acquiring the quality of education in their own life so that the educational disparities, for example, contribute over decades to the socioeconomic characteristics that measure educational achievement, which are the very things that the census report documents down into the present day.

And with regard to other aspects of the way in which the Jim Crow system operated, there are numerous court decisions in which courts have agreed with social scientists that the effects of the Jim Crow era are extended into the continued racially polarized voting in southern states. So that that's why evidence about the history of racially polarized voting is relevant to an assessment of the current levels of racially polarized voting, though they can, and, of course, are directly measured by statistical evidence, and in this case, presented by another expert.

Q And does the history of discrimination in voting by the state of Alabama have any current relevance to political participation by African-Americans today?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 84**

333

A Well, I think I've already answered the question. It does.

Q Okay.

MR. SPIVA: If I can just have one second to confer.

11:42:32 Thank you. I have no further questions.

THE COURT: Any further cross, Ms. Howell?

MS. HOWELL: No, Your Honor.

THE COURT: Okay. Do we want to get started with a new witness, or wait until after lunch to do that? Whatever 11:42:47 y'all want to do.

MR. SPIVA: We have another witness here, Your Honor, so we could start. I don't think we would finish before lunch, but we could get started, if Your Honor wants.

THE COURT: Okay. I'm good with that.

11:43:02 All right. Thank you, Dr. McCrary. You may step down. I should have said that first. I apologize.

And the plaintiff may call your next witness.

MR. SPIVA: Ms. Madduri is going to call the next witness, Your Honor.

11:43:18 THE COURT: Okay. Is that going to be Representative Knight?

MS. MADDURI: Yes. Plaintiffs call Representative John Knight.

THE COURT: I thought I recognized him sitting out 11:43:50 there.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 85**

334

JOHN KNIGHT,

having been first duly sworn by the courtroom deputy clerk, was examined and testified as follows:

THE COURTROOM DEPUTY CLERK: Please state your name for the record.

THE WITNESS: John Knight, Jr.

THE COURTROOM DEPUTY CLERK: Thank you.

DIRECT EXAMINATION

BY MS. MADDURI:

11:44:13 Q Good morning, Representative Knight.

A Good morning.

Q We can get started with some background information. Where do you currently live?

A Montgomery, Alabama.

11:44:24 Q And where were you born?

A Montgomery, Alabama.

Q And where did you grow up?

A Montgomery, Alabama.

Q Have you lived in Alabama all of your life?

11:44:34 A I have.

Q Did you serve in the military at any point?

A I did.

Q How long were you in the military?

A For two years.

11:44:43 Q After you served, did you return to Montgomery?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 86**

A I did.
Q Approximately when was that?
A 1969.
Q And did you attend college?
A I did.
Q Where did you attend college?
A Alabama State University.
Q Where is Alabama State University?
A Montgomery.
THE COURT: Montgomery.
BY MS. MADDURI:
Q And when did you graduate, sir?
A 1974.
Q Is Alabama State University a historically black college?
A It is, yes.
Q And what race do you identify as?
A I'm black.
Q What is your current occupation?
A Retired.
Q And what job did you hold before you retired?
A I retired from Alabama State University after 38 years of employment.
Q And what was the last position you held there?
A Executive vice-president.
Q Did you work anywhere else prior to working at Alabama

336

State University?
A Throughout my life?
Q Maybe after you graduated college.
A Oh, after I graduated college, yeah. I worked at Alabama Public Service Commission. I worked for the United States Post Office.
Q And are you involved with any community organizations?
A I am, yes.
Q What are those?
A I am involved with the Montgomery County Democratic Conference. I'm involved with the Montgomery Improvement Association, the NAACP, YMCA, Leadership Montgomery, Leadership Alabama, and a number of other organizations.
Q Do these organizations work throughout the state of Alabama?
A Some of them do, and some are restricted -- not necessarily restricted, but work basically in Montgomery.
Q Understood. And have you ever held elected office?
A I was on the county commission of Montgomery for 12 years.
Q And approximately when did you start serving on the Montgomery commission?
A Montgomery County Commission, my memory serves -- around 1980. I served 12 years until 1992.
Q Okay. Have you held any other elected office?
A Member of the Alabama Legislature.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 88**

337

Q And approximately when were you elected?
A 1993, and I came out in 2018.
Q What district did you represent when you were in the legislature?
11:47:16 A Montgomery, Alabama, District 77.
Q Is that a majority black district?
A It is.
Q Was it a majority black district when you were elected?
A It was.
11:47:27 Q When you were in the legislature, what committees did you serve on?
A I served on the Ways and Means Committee. I served on public safety. And I served on health. I served on local government, contract review. Those are the committees.
11:47:49 Q Were you a member of any caucus?
A I was a member of the legislative black caucus and the minority caucus, as well as the Democratic caucus.
Q Did you share any of those caucuses?
A I shared the legislative black caucus for eight years.
11:48:05 Q Did you ever serve on the reapportionment committee?
A No, I did not.
Q When you were in the legislature, what were the issues that your constituents were bringing up with you most often?
A Oh, they would bring up education, economic development in
11:48:23 terms of jobs, making certain that jobs would come to

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 89**

338

Montgomery and to Alabama.

They were also bringing up the criminal justice system, health care, the general issues that people are concerned about.

11:48:35 And it depended on who you're talking to. Different people would have different issues.

Q Do you think any of these issues affected the black community differently than they affected the white community?

A I do, yes.

11:48:48 Q In what ways?

A Well, in many ways the criminal justice system mainly because you find more blacks incarcerated than you do whites in the state of Alabama, as well as the problems that we've had in our Alabama criminal justice system.

11:49:02 The education issue relative to being able to get a quality education in the state of Alabama, not having to leave Alabama as you had to do years ago in order to go to graduate schools and things of that nature.

And many other things that would impact the day-to-day 11:49:20 living of the people within the state of Alabama. These are the type things that I find that were of interest.

Q Have you observed a need for affordable housing in Montgomery?

A Yes. I also served -- I forgot and left that off. I 11:49:35 serve on the Montgomery Housing Authority Board. I have been

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 90**

339

there for a number of years. And that has been one of my passions to try to provide affordable housing within the city of Montgomery.

Q And is there an area that the board focuses on in terms of housing?

A Well, right now, we are focusing away from the traditional aspect of public housing moving towards affordable housing. And what I mean by that is trying to have mixed housing communities rather than just public housing projects and trying to have market rate rents, Section 8 vouchers, and all of that combined to build communities and to strengthen communities rather than just having large -- with all poor people stacked together.

So we have gone in that direction just recently under my leadership trying to make certain that we stabilize and sustain low-income areas of the city of Montgomery.

Q In terms of the people who are looking for low-income housing -- and you mentioned public housing, as well -- do you know approximately how many people in Montgomery are currently looking for that?

A Right now on our waiting list, the last time I checked, we had approximately 8,000 people on the waiting list for public housing or subsidized housing in the Montgomery area.

Q Do you know what the demographic makeup of that waiting list is?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 91**

340

A Majority black.

Q In your experience -- you mentioned criminal justice as an issue of interest. In your experience, have you observed any criminal justice disparities between black and white children?

11:51:21 A Well, what I've observed, it seems like black children are incarcerated faster than others. They are charged with -- many people are incarcerated for possession of marijuana and things of that nature. And it seems like within the criminal justice system itself there's a disproportionate number of

11:51:46 African-Americans that happen to be criminalized within the Alabama correctional system.

Q In your time in the legislature, did you work on any issues that were affecting Mobile?

A Mobile? Well, yeah. I chaired the Ways and Means

11:52:05 Committee for 12 years. So in that position, I would have the opportunity to work with legislators and representatives from the Mobile area relative to the things that were of interest to them, things such as the docks in Mobile. I passed a bond issue of raising money for the docks in Mobile, and a number of

11:52:28 other things relative to the funding for the school system in the Mobile area. Just a number of things that would be of interest to the local legislative delegation of the people from Mobile.

Q Did you observe any issues that affected the black

11:52:42 residents of Montgomery and also the black residents of Mobile?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 92**

341

A Well, yes. Yes. That would be -- in many cases, some of the same issues, with the exception of where Mobile is located that affected Mobile or affected people in Montgomery.

When it came to the criminal justice system, people were equally concerned about that. When it comes to education, I found there was an interest in that. When it came to health care, all of these things are things that are common whether you are in Mobile or Montgomery.

Q When you served as a legislator, were you a member of a political party?

A Yes.

Q Which one?

A Democratic party.

Q And are you a member of the Democratic party today?

A I am.

Q Do you have views on whether African-Americans in Alabama tend to support a particular political party?

A The majority of African-Americans support the Democratic party in Alabama.

Q What are your views of the party, in terms of race and racial justice in Alabama?

A My views of the Democratic party?

Q Sure, as concerns the Democratic party.

A I am a member of the Democratic party because I feel comfortable within the Democratic party. I have never felt

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 93**

342

welcome in the Republican party in the state of Alabama.

I feel that the Democratic party represents those core values that I believe in, in terms of making sure that people are treated fairly, making certain that you have good education, making certain that we have fair wages, that we concentrate as well on bringing jobs to Alabama. All of those things are of interest and a priority for the Democratic party.

But the things that helps me most is the broad tint that comprise the Democratic party where all people should feel welcome and want to be a part. Even if you don't totally agree on everything, the ability to work together collectively as a group of people, I find that to be very interesting and the reason that I share most of the views of the Democratic party, not necessarily all views, but most of the views.

Q I think you said you feel comfortable in the Democratic party. Why is that? What did you mean by that?

A Well, because I can interact with other people of my race, as well as other people that would be in my situation, or moderate income situation, things of that nature.

And you have things in common that you can talk about and that you can relate to -- educational issues, economic development issues, health care, criminal justice reform. Those are the type things that I find is very appealing and challenging when it comes to trying to address in this state.

Q And are there race or racial justice issues that draw you

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 94**

343

to the Democratic party?

A Well, I think the Democratic party with its broad tint are as fair as it possibly can be when it comes to racial issues. When it comes to trying to work across racial lines and things of that nature, I think that they do a good job of trying to do that.

Q So we're discussing the Democratic party. I asked you why you think most African-Americans in Alabama -- I'm sorry. I asked you whether you had views about the Democratic party in terms of race and racial justice.

Do you have any views about the Republican party in Alabama in terms of race and racial justice?

A Well, my view is basically -- has been based on my experience with the Republican party here in Alabama, that it seems to be kind of one-sided when it comes to racial justice.

People that run under the Republican banner, just an example, Attorney General, things of that nature, will talk about how tough they're going to be on crime. I think it was one Attorney General that ran that they're going to lock them up and keep them until -- until the eyeballs popped out, or something of that nature, talking about the electric chair.

THE COURT: I think that was Graddick, was it not?

THE WITNESS: I couldn't remember exactly.

THE COURT: Back when we had the Yellow Mama.

THE WITNESS: That's what it was.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 95**

344

THE COURT: Some of us still remember that.

THE WITNESS: I do. I certainly do.

THE COURT: Yeah. Not the high point in Alabama elections, I don't think.

11:57:23 THE WITNESS: No, it's not.

THE COURT: Sorry.

MS. MADDURI: No problem, Your Honor.

THE COURT: Well, during this little break that I've created -- and I apologize -- you were talking about criminal justice reform, and I understand that Cam Ward has been somewhat of a leader in criminal justice reform. And which party is he affiliated with?

THE WITNESS: He is affiliated with the Republican party. He really should be a Democrat.

11:57:57 THE COURT: I won't tell him you said that. But there are some Republicans that are interested in criminal justice reform.

THE WITNESS: Well, I have had the opportunity -- there have been some Republicans interested in criminal justice reform.

And, you know, as I chaired the Ways and Means Committee, you know, I have had opportunity to work with some Republicans. We were able to. But just overall, the party itself has not been that receptive to include some of the blacks that have been in the Republican party. They wished they would be able

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 96**

345

to progress much more within the ranks of the party than they are able to progress.

BY MS. MADDURI:

Q Since Your Honor brought up Charlie Graddick, do you know, Representative Knight, whether Mr. Graddick is currently serving in the criminal justice system in Alabama?

A Yes. Surprising to me, he served as chair of the Pardon and Paroles Board for the state of Alabama at this point. That's an oxymoron, but it's...

Q And you --

THE COURT: Between those times, do you recall what he was doing?

THE WITNESS: I think he was district judge in Mobile, if I'm not mistaken.

THE COURT: Was he a District Attorney there?

THE WITNESS: I may be wrong. It may have been District Attorney. But...

MS. MADDURI: He does have a judge title, so...

THE COURT: But he was elected in Mobile, whatever the position was?

THE WITNESS: Yes, Your Honor.

BY MS. MADDURI:

Q You mentioned some of the statements you remember Mr. Graddick saying. In your opinion, how did those -- how do those statements relate to race?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 97**

346

A Well, I just think it was a code word for race at that particular time during -- it was in the heat of a campaign, if I recall correctly. It was just code words to excite his base and to get people to turn out and vote.
12:00:04 Q When you say his base, who do you mean?
A Which would be his white constituents.
Q Okay. I think we have established you have a lot of experience with Montgomery. So let's talk about Montgomery for a moment.
12:00:24 Are you aware of if Montgomery County is currently majority black?
A It is, yes.
Q And are you familiar with the current configuration of Montgomery in the congressional district map?
12:00:39 A In the congressional district map, I think we have three congressional districts in Montgomery.
Q So Montgomery County is split between three congressional districts?
A That is correct, yes.
12:00:57 Q In your view, does that configuration have any impact on the county of Montgomery?
A Oh, absolutely. I think when you have -- when you pick up just a small portion of a congressional district, it decreases your impact within the district or with your congressperson
12:01:17 that's representing that district.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 98**

347

I think that if you had a greater portion of Montgomery in the congressional district, you would have more impact because a person only represents, say, a few thousand people within that particular county, would take very little interest in the county, or that's been what I have seen in terms of experience. They would -- they would tend to pay more attention to the areas with the largest population.

Q And how does -- if it does, how does that affect the residents of Montgomery?

A Well, I think the residents think that you don't get some of the services that you think you should get or some of the things that you would ordinarily receive from your congressperson representing you, dilute having some time the congressional people that represent your district.

Q Do you think there are any benefits to Montgomery by being split three ways?

A No. Other than saying that you have three congressional representatives.

Q Do you know if Montgomery has always been split that way?

A No. I think that -- the only other time we've been split with two congressional districts.

THE COURT: Doesn't that mean you have got two more people you can pick up the phone and call and say we need help here?

THE WITNESS: It does. But the ones with very little

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 99**

348

population will pay you little attention.

THE COURT: Okay.

BY MS. MADDURI:

Q How do you think that being in a single district would help the county of Montgomery?

A I think -- I think it's extremely important for the county of Montgomery. One thing would be important about it is Montgomery is the capital city of the state. So you need strong representation on a congressional level.

12:03:02

12:03:17

And with the things that are taking place -- in particular, Montgomery now with all the growth and things of that nature, I think that if you didn't have the congressional district split as much as they are, you could get more, in terms of tourism, getting dollars to come into the state relative to the history of Montgomery, and more attention paid on the congressional level to Montgomery than what has been paid in the past. And I think that, you know, if you had a good strong representative representing Montgomery, it would bring dollars to the capital city, and the capital city could be a showplace to this nation.

12:03:35

12:03:57

Q Representative Knight, approximately when were you born? And I won't ask you for an exact year.

A You want an exact year, or you don't want an exact year?

Q It's up to you.

12:04:12

THE COURT: Well, he told us when he finished the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 100**

military.

MS. MADDURI: That's true. But like you said, Judge, we're not so good with the math in here.

THE WITNESS: Okay. I was born June 7th, 1945.

12:04:24 BY MS. MADDURI:

Q And I know you said you grew up in Montgomery. So what was your childhood like?

A Well, I grew up on Hall Street, kind of central Montgomery. I remember my first house, a shotgun house and 12:04:44 outdoor facilities. And I remember when we got indoor facilities probably when I was about five or six years of age.

I remember -- the most dramatic thing that I remember about Hall Street was when the Klan marched down Hall Street. Hall Street was located not far from Dr. Martin Luther King's 12:05:13 house and not far from Dr. Ralph Abernathy. So there was Klan activity during that particular time, and they marched down Hall street. And I can remember my dad making us get under the bed and stuff like that.

Q Do you recall any bombings in your neighborhood when you 12:05:30 were growing up?

A Yes. Ralph Abernathy's house was bombed, and Dr. King's house was bombed, and a service station on the corner of High and Jackson was bombed.

Q What kind of work did your parents do?

12:05:46 A My father was in the military, World War II veteran. My

350

mother was a domestic worker.

Q And what was your -- what was your schooling like?

A Oh, I went to a segregated -- I went to Booker T. Washington High School. Well, I started off in elementary school. I started off at Saint John's Catholic School because my parents wanted me to go with Catholic school, started off with what they considered to be a good education.

I stayed there three years, and asked if I could go to public schools because in the neighborhood that I lived in, in the Catholic schools, we had to wear uniforms and ties. So coming back home was not a good experience coming back home through the neighborhood.

They finally, after the third grade, said I could go to Booker T. Washington. And then went to McDavid Elementary School and finished Booker T. Washington High School, which was a segregated high school in 1963.

Q Other than schooling, did segregation affect other parts of your life growing up?

A It did. I mean, I recall the times when, you know, water fountains were separate, riding on the back of the bus. We lived one block from a park that we couldn't -- couldn't use, couldn't play in.

And, you know, it's just -- it's just southern life the way it was at that particular time. And, you know, as a kid, sometimes you didn't think about those things. But as you grew

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 102**

351

up and as I became of age, that's the reason that I took an active role in the community because I wanted to make a difference and make things change.

Q Was part of that active role in the community in the Civil Rights movement?

12:07:29

A It was. I was not a leader in the Civil Rights movement, but I participated. During the Civil Rights movement, you know, in high school, I would participate in some of the marches and demonstrations.

12:07:44

I have to be very candid under oath. At that time, I didn't know what some of them were all about, but it was just a way to get out of school. So we participated in that.

But I -- after finishing high school, I got more involved working with SCLC and other organizations with the various demonstrations and marches in Montgomery and other areas, as well.

12:08:01

Q And why did you choose to get more involved after high school?

A Well, at that particular time, it was because -- I mean, it was just so much excitement about the opportunity to make a difference, and for things to change and not to accept the status quo of the way things had been, and not have to go through things that your parents had to go through.

12:08:16

You know, my father was a sharecropper. So, you know, those are the type things you want to make certain that you

12:08:34

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 103**

352

make it better for your kids.

Q Are there any particular demonstrations or marches that stick out in your mind today?

A Well, one was when we marched for the state capital. And I don't know what the issue was at that particular time, but I was in that particular march. And we were surrounded by state troopers. We couldn't leave.

And my parents happened to see me on TV, came down to try to get me out of the march, but they wouldn't allow them to do so. That was one time because I was really talked to very harshly about being in the march without them knowing it.

Another time is we marched from Alabama State University to the state capital. And I remember the police officers going into the crowd with horses, and things of that nature.

I remember some marches where we marched, and the Klu Klux Klan was lined up down the streets, with all types of names, and things of that nature.

I mean, there was just all kind of marches during that time.

Q Do you think conditions for African-Americans in Alabama have improved since that time?

A Oh, yes. Things have -- there have been improvements. There's no question about it.

I mean, I realize that a lot of very young people said, well, nothing has changed. But much has changed.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 104**

353

But I have seen things seem to -- I have seen some regression taking place in recent years, and that's very troubling to me. I think we made a lot of progress in the Civil Rights movement, and we opened a lot of doors. But I've seen regression in the last several years that's very discouraging.

Q What are some of the ways or areas in which you've seen regression?

A Well, the one area that concerns me happens to be education, a lack of funding for education, the lack of emphasis on education. The other thing has been, as I said earlier, the criminal justice system itself and the way that people are incarcerated. And the lack of funding for mental health, and those things that really impact families in so many different ways.

And I found that a lot of people in Alabama are being incarcerated. And in many cases, they have no health insurance, but they can't get the treatment that's necessary to sustain them so that they will stay out of the criminal justice system itself. And for us not to pay attention to that is very disturbing.

And at one time, you know, there were opportunities -- I would say opportunities were opening up after the Civil Rights movement and affirmative action plans, and things of that nature. But now you find in many cases opportunities in

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 105**

354

Alabama the doors are shut. That's why we lose so many young people.

If they go to college and get a degree -- just like we tried to encourage all our kids. If you go get an education, you will be able to sustain yourself and your family.

Well, what happens is when they get an education to include advanced degrees, in many cases they have to leave the state of Alabama and go to New York, go to California, or even go oversees somewhere to be gainfully employed to be able to establish themselves and get the careers that are necessary for what they have been trained for.

So I find that very disturbing and discouraging, especially after all the efforts that we put into the Civil Rights movement -- the marches, the demonstrations, the -- I mean, the intimidation of parents being intimidated, afraid that they would lose their jobs because of what they were fighting for, and things of that nature.

So where we are now, it seems like there's been some regression taking place.

Q In terms of the disparities you're speaking of and the opportunities for employment in Alabama, am I right in understanding that you believe that the situation that you just described affects African-Americans differently than it affects white folks?

A Yes. That's what I am talking about -- African-Americans.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 106**

355

You see, in my generation, we encourage our daughters and sons, look, you go get an education and things are going to be okay. With the anticipation that they do that, that they will be welcome and they can stay in Alabama.

12:13:24 But you look at Montgomery, for example. It may be a little differently in Birmingham. You look at Montgomery. You look at the banking industry. You see very few blacks as presidents of a bank or vice-presidents of a bank. You look at the high-level jobs. I am not talking about entry-level jobs. 12:13:39 I'm talking about high-level jobs and opportunities for blacks. In many cases, they're just not there.

Because what happened is you have -- so often progress comes down through the family. So where you have families who have been successful throughout their lives, had money and 12:14:06 economic growth, then their children benefit from that. In the African-American family, you don't have as much of that.

So you have to -- you have first generations of young people trying to get into the workforce, trying to get into high-level positions that they've never been in before. And a 12:14:23 lot of that is missing as from what I have seen within the state of Alabama.

Even though we have gone out -- and I worked very hard to, as a matter of fact, for the Republican governor trying to do economic development and bring industry to the state. We 12:14:38 brought companies like Hyundai, Mercedes, Honda to have

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 107**

manufacturing jobs and things of that nature for people to be gainfully employed. And I think it's extremely important to do that.

Q I think you mentioned that African-Americans, when they leave the state of Alabama for places like New York or California, they have different job opportunities. Can you tell me more about that?

A Well, it's almost like when I was coming up as a kid. For summer jobs, we would leave Alabama. We would go to New York, wait tables and do things of that nature to make enough money to come back home.

But now you can go to college, and you're unable -- with the exception -- I have nothing against this. Unless you to happen to have been a star athlete at one of the major schools -- Alabama, Auburn -- you can come back if you're African-American and get a high-level job. But just the average working Joe out there that go and get a quality education, it's extremely difficult for them to be able to come back within the environment that we have here in this state and be gainfully employed at that level.

Q What do you mean by the environment in the state?

A The way that the structure is set up. The -- and in terms of being able to get the type of jobs that you're qualified for.

Q And so you think that African-Americans who leave Alabama

are able to get the jobs that they're qualified for outside of Alabama?

A Oh, yeah. I mean, I know kids that's gone to University of Alabama engineering program, get an engineering degree, but to get a job they go to Detroit. I know people that have gotten Ph.D. degrees, but to get a job they have to go somewhere else to have the type of position that they feel they're qualified for.

Q In your experience, do white folks also have to leave Alabama to get those same kinds of opportunities?

A I don't think necessarily they have to, but I think some of them do. But I think it's not a matter of choice for African-American kids. I think many of them have to because there are no jobs -- the jobs are just not here and available to them in this state.

Q Do you think those disparities in job opportunities between African-Americans and white folks in Alabama, do you think that leads to income disparities?

A Oh, absolutely.

Q Can you tell me more about that?

A Well, I mean, because you have the low paying job for African-Americans in this state, they don't have the high-level jobs as I was explaining. There's certainly going to be a disparity in terms of income and wealth, and that's what you see in the state.

358

Q These incomes -- sorry. These disparities in education and income, do you believe that those affect voting?

A Oh, it does. I mean, the less education you have, the less likely you are to have faith in the system and want to go vote.

I mean, I run into people each day in the neighborhood that say, Well, why, my vote doesn't count. Why should I go and vote? Those are the type things you run into with less education. And I think that adversely impacts African-Americans in this state.

Q And what about the income disparities? Does that also affect people's voting?

A It does. It does. And it reminds me of when I first got elected to the legislature. I had no idea what I was getting into and what I would encounter.

And the first thing that I encountered was in Alabama a family of four making $3,500 had to start paying Alabama income taxes. I mean, that was unconscionable to think if you have a family of four, you are making $3,500, and you have to start paying Alabama income taxes. But you would have large multimillion dollar corporation that would be paying zero in taxes.

I was able to work -- I tried to get it up to the poverty level. And I was able to work to get it up to $12,500 for a family of four. And that was working with -- even though --

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 110**

359

working with a Republican governor to do that. So it was the black caucus and the Republican governor that worked together do that.

The other thing I have tried to do in this state that is very regressive is we have a sales tax on food and groceries. I have tried to get that removed. That is -- I have not been successful over the length of time that I spent in the Alabama Legislature trying to get that done. But I hope some day that somebody will be able to get it done.

Q So these two taxes you mentioned -- taxing very low incomes and also taxing food, do you think that disproportionately impacts African-Americans in Alabama?

A It does, because we are disproportionately lower incomes than others. When we elevated the tax for the family of four, I think the total amount of it at that time, I think, was $60 million.

Q In terms of when someone has a lower income or a lower paying job, have you observed any practical barriers that get in their way when they go to vote or want to vote?

A I'm sorry. I don't --

Q I can --

A Okay.

Q In terms of when somebody has a lower paying job or, like you said, the manufacturing job like these hourly jobs?

A Okay.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 111**

360

Q Something like that or a lower income one, does that --
A Well, and if I'm not understanding your question correctly -- but I think it depends on the type of job that you have.

12:20:51 There are some people that I work with they can only go vote during their lunch hour. So if you have a large election, they go during the lunch hour, when they go to the polls, they see a long line, well, on their mind, they have got to get back to work or they're going to lose their job. They are not going 12:21:08 to stay in a long line and cast their vote. They are going to go back to their job.

The other thing is there are many people that work two and three jobs. And the polls open at 7:00, close at 7:00. There needs to be a way that the voting is more available more than 12:21:27 just on election day, early voting, and things of that nature, so it will be convenient for people that have jobs such as that to be able to go vote.

And there are still people that feel intimidated if they tell the people that they're working for that they want to take 12:21:47 off to go vote because years ago it was an intimidating factor if you worked in a certain environment to tell people that you were going to go and vote without losing your job, or something of that nature.

So you still have some of those factors that's commonplace 12:22:06 in certain areas of the state and in certain households.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 112**

Q You touched on a few things, so I will take them one by one.

The intimidation you mentioned. Can you tell me a little bit more about that?

12:22:20 A Intimidation at the polls, or you mean intimidation to go vote, or what?

Q Either one. We can start with you said intimidation about potentially I think being discouraged from your employer or something related to your employment?

12:22:36 A I was talking about if a person has a job where they only have an hour off for lunch and they choose to go and vote during that hour, if they -- if it's a long line and confusion at the polls, they're not going to stay there and go vote.

And then you say, Well, will you come back after you get 12:22:55 off? Well, then most of them got to go pick up their kids or something of that nature.

There's all these types of things that come into play when it comes to that. And I think that's the reason that we have not been able to have legislation that will allow people to do 12:23:11 early voting.

Now, we do have absentee voting. But the affidavits and all that have to be signed, that's intimidating to many people because you have to swear that you are going to be out of town or something of that nature to go vote. And people are afraid 12:23:24 that if they do that and something happens and they're not,

362

that they will be arrested, or be charged with voter fraud, or something of that nature.

And that's been -- and in the state of Alabama, there has been a lot of talk about voter fraud in the Black Belt, or absentee voter fraud, things of that nature, which puts up a red flag in the minds of a lot of good people that would love to work in the voting process but are afraid that if they do so, that they're going to be charged with a crime, in terms of absentee voter fraud and things of that nature. And you haven't found much of that.

As a matter of fact, in my experience in working in the community, I worked there for a number of years. You have to beg people almost to go vote. Nobody is running over you to go vote. To say that if it's convenient for people to go vote that you would have all this voter fraud, I mean, it's just another way of intimidating voters and keeping them afraid of the process.

Because, see, within certain communities, there were times when people were just afraid to go to the courthouse. So when you go and you trying to get people to fill out affidavits or things of that nature, nobody wants to spend, or even have the money to hire lawyers to defend them once they're charged with voter fraud, or something of that nature.

Q When you say certain communities, what do you mean?

A In African-American communities. Those are the ones that

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 114**

I've worked in all of my life.

Q And does the intimidation that you're talking about -- intimidation and the fear in African-American communities -- does that actually lead to people not voting?

A Oh, absolutely.

Q Even today?

A Yes. Yes. It's not as -- it's not as pervasive today as it was years ago.

I remember in Montgomery at one time when we had a mayor there that was a very strong mayor, at certain voting places, you would have city police officers stationed out there on motorcycles in front of every polling place. Well, I mean, we challenged that. We challenged. We finally eliminated that.

One other instance during one period during the polling places, they would have a white gentleman with dark glasses standing at the front door. People are thinking those are FBI agents so they wouldn't go in and vote.

These are the type things that I have actually seen. And we've challenged a lot of that. We got it eliminated. But it's still in the minds of many. You still have a lot of things where they are intimidated about going to vote.

Q You mentioned that it can be difficult for people who have jobs where they have just an hour off at lunch or something like that to go vote. In your experience, do African-Americans disproportionately hold those kind of jobs?

364

A Yes. Hold many of those jobs, yes, and still do. That hasn't changed in a number of years.

Q You also mentioned that there are occasions where people are working two to three jobs or something like that --

12:26:41 A Yeah.

Q -- which might also make it difficult to vote on election day. Are those jobs also disproportionately held by African-Americans in your experience?

A Yes. You have more African-Americans having to work two 12:26:52 and three jobs. Don't get me wrong. I don't want to imply that there are not others that do the same thing. But disproportionately, African-Americans are affected.

Q You also discussed intimidation around absentee voting. Can you tell me more about that?

12:27:10 A There's been quite of that here within the state of Alabama where there have been accusations about voter fraud and illegal absentee voting especially in the Black Belt area; not as much in the Montgomery area, but in the Black Belt area of our city, which happens to be where a majority of the blacks 12:27:29 live.

That -- and most of it has not turned out to be actual or factual information. It's just been out there where people are intimidated when it comes to the absentee ballot process.

Q You've mentioned education a number of times since we 12:28:11 began speaking. Are there disparities at the lower education

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 116**

365

level in the K-12 space that you've observed?

A In the K-12?

Q Uh-huh.

A When you say disparities, you mean in funding or?

12:28:26 Q Either in quality of education, or funding for education, or access to education, and just generally in the education realm for that group?

A I can't speak too much on that particular on K-12. I can speak on higher ed.

12:28:44 But in the K-12, in Montgomery, the public school system's composed majority -- I'll say 85 to 90 percent of blacks are in public education. White kids go to private schools. The public education system has been underfunded.

In Montgomery you have the lowest millage rate of any 12:29:12 other schools in the state.

THE COURT: Have the lowest what rate?

THE WITNESS: Millage rate. Property tax.

THE COURT: Okay. Thank you.

THE WITNESS: It's the bare minimum that's required by 12:29:24 state law, and that has been a problem in terms of funding for the educational system there in the state of Alabama.

And the reason that that has prevailed in Montgomery is because most of the white kids are in private schools. So to be able to get the rate increase there in Montgomery, we have 12:29:41 had it on the ballot I think twice.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 117**

366

BY MS. MADDURI:

Q And it's failed?

A It's failed, yes. Uh-huh.

Q Do you have an understanding of how --

12:29:50 THE COURT: Just a minute. Doesn't Montgomery have, I think, the highest rated high school in the state?

THE WITNESS: That's very interesting you ask that question, but that is correct. But that's the magnet program.

THE COURT: Yeah. I grew up in Montgomery.

12:30:06 THE WITNESS: Okay.

THE COURT: So, you know, have a lot of ties there myself. But the magnet school?

THE WITNESS: The magnet school.

My position on that is I feel like every school should be 12:30:16 a magnet school. And when you take the smartest kids out and put them all into one program, then you leave very little incentives for average kids -- I know I was an average student.

So coming up, if I didn't have somebody that made better grades than I did or something to strive for, you know, it 12:30:36 just -- I don't know if I would have had the effort or the energy to --

THE COURT: Yeah. I think we would probably agree a lot on education issues.

But I did note that as a point of pride for a lot of folks 12:30:50 in Montgomery that they do have the best high school in the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 118**

state.

THE WITNESS: Oh, yes. Yes. Uh-huh.

THE COURT: Okay.

THE WITNESS: And it's interesting, because as we attract industry there, I look at the public school system. And you see what takes place in the public school system for some of the kids that's coming from overseas, the Korean students. I mean, there are programs there and they do very well.

And the magnet program, all of the kids in the magnet program do very well. So if we --

THE COURT: We shouldn't leave the rest behind.

THE WITNESS: Right.

THE COURT: I agree with you on that.

BY MS. MADDURI:

Q You said that the public school system in Montgomery is I believe you said 85 to 90 percent black. And then most of the white children or students are in private schools.

Do you have a sense or understanding of how that division occurred, or has it just always been that way?

A Well, when I grew up, I was -- I grew up in the segregated system. When integration came, as I recall -- and I think during that period of time, I was in between college and the military.

When integration came, they would close the black schools,

and the black kids had to go to the white schools. And the one thing that concerned me about that was why couldn't it not be just the reverse? Because I felt like Booker T. Washington was one of the greatest high schools there in the city. Why couldn't you have an equal sharing of transfer of students? But it didn't end up that way.

All of the black kids had to go and the teachers, and transfer. And Booker T. Washington -- I think Carver maintained, but Booker T. Washington did not. And they turned it into what they called a magnet program.

And Booker T. Washington is one of the magnet programs for performing arts.

Q You said that they closed the black schools, and then the black children went to white schools?

A Well, they didn't close -- well, yeah. As we would know the schools.

What I was saying is to me the ideal plan would have been to have -- it was Booker T. Washington or Carver and then -- I just use these as the examples of -- Lee and Lanier.

THE COURT: And Jeff Davis. Let's not forget Jeff Davis.

THE WITNESS: My daughter finished at Jeff Davis. It's hard -- and Jeff Davis.

But so that if you could take and keep Booker T. Washington, just mix the students in that way from, say,

Lanier, and then have students from Carver going to Lee, something of that nature rather than getting rid of the black schools itself. That happened during that particular time.

THE COURT: But Carver High School was maintained.

12:33:48 THE WITNESS: Yeah. Carver has maintained, and it's still there, yes. Uh-huh.

BY MS. MADDURI:

Q So, then, when the these closings were or consolidations happened, did the schools become integrated fully?

12:33:59 A Yeah. Well, they -- yeah. They became integrated, yes.

Q And do they --

A You had busing. You had all of the ingredients that took place as it relates to that.

Q So what happened between then and now where the schools

12:34:17 are now 90 percent black?

A Because you had a proliferation of private schools.

Q And white children went to private schools?

A Yes, over a period of time. That's what has happened.

Q Based on what you have observed, is it your belief that

12:34:33 African-American students and white students are getting equal education in Alabama?

A Not in Montgomery.

Q And what about in the higher education level, in terms of college or graduate school? Are there disparities that you

12:34:54 observed there?

A Yes, I did. And I filed a lawsuit on it. *Knight v. Alabama*. I felt that -- well, what happened years ago in the higher education arena, they created the school systems: one for blacks and one for white -- separate but equal.

12:35:16 You had Auburn University, and you had Alabama. You had Alabama A&M, and you had Alabama State University. Alabama A&M was created as the counterpart basically for Auburn University which would have been the land grant programs in the state; and Alabama State University created for blacks, which would have 12:35:33 been the equivalent of Alabama.

But they were never funded at the same level. They were separate, but they were not equal.

So I filed a lawsuit January 15th, I think it was 1981, alleging that there still existed in the state the remnants of 12:35:53 a dual system of higher education. And that suit went on for a greater portion of my adult life hood.

Q Does the state fund those schools?

A They're partially funded by the state, yes. They're state-supported schools, yes. Not fully. You have tuition, 12:36:13 and you have other things that make up the complete budget for higher ed.

Q What was the outcome of that case?

A I was eventually successful in that. And there were remedies put in place by the Court.

12:36:27 Q And what did the Court find in the case?

371

A That there still remained in Alabama the vestiges of a dual system of higher ed and to order the state to come up with corrective actions.

Q Was there a finding of intentional discrimination on the part of the state?

12:36:44

A I don't -- I can't recall whether there was a finding of intentional. I don't -- I was just so happy to get the funding. I don't know about the details.

Q I understand. That's lot of details for lawyers.

12:37:02

What was the remedy that was ordered?

A The remedy was -- well, initially we were asking for money to make up for the disparities that were taking place. And I really didn't like the remedy initially, but I think the more that I looked at it, I think it was a good remedy.

12:37:24

There were -- Alabama State and A&M were awarded certain what they call high demand programs, a certain amount of money for both schools. But it was also given an opportunity to develop new programs over a period of time that were not competing programs by the other universities.

12:37:45

As a matter of fact, in the Montgomery area, one of the allegations were that in order to keep the schools segregated that you had the branch campus of your major universities located in Montgomery with a population of less than 200,000. You had a branch campus of Auburn University, and you had a branch campus of Troy.

12:38:04

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 123**

 372

12:38:23 12:38:44 12:39:02 12:39:20 12:39:36

So given a choice, white students would go to the branch campus of Troy or the branch campus of Auburn before they would come to an HBCU. So that made it extremely difficult for an HBCU to attract white students especially from the state of Alabama or that particular area there.

So it froze the program for those schools. They couldn't bring on any new programs that would duplicate what was being offered at Alabama State and Alabama A&M. And that gave Alabama State and Alabama A&M an opportunity to have what would be known as high demand programs.

Alabama State was given several doctoral programs or given forensic science, physical therapy, programs such as that. Alabama A&M -- they combined the extension program with Auburn. So now it's called the Alabama Extension Program.

So Alabama A&M participates fully in the extension program with Alabama A&M, and they were given some advanced programs as well. So that's kind of a summary.

Oh, the other thing which was the most controversial part was the Court order that Alabama State and Alabama A&M had to recognize that they were traditionally or historically black. But they were not black universities. So they gave minority scholarships.

So that was controversial because you had whites getting scholarships to the black college campus. And some of the black students were a little upset about that because they

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 124**

373

couldn't get scholarships otherwise.

But it worked out to integrate or to bring whites onto the campus of Alabama State, as well as onto the campus of Alabama A&M.

12:39:50 Q Was there a monetary award in the remedy?

A There was a monetary award. I mean, over a period of time, like I said, initially we really wanted some cash up front, but we got -- I think it was -- I don't remember the exact amount initially.

12:40:11 But over a period of time, it's been millions of dollars that's gone to Alabama State, as well as Alabama A&M not only for physical growth but for the new programs, as well.

Q And was there -- was part of that remedy in order to correct the disparate findings that African-American -- 12:40:30 historically black colleges had in Alabama?

A Well, I don't think it insisted on correctly because it was such a large gap that it's almost impossible -- when you look at what has happened over the period of time since 1874, you know, Alabama State and Alabama A&M with the lack of 12:40:55 funding, but it was to take us from where we were at that particular time, given new programs and the opportunity to take it from there. I think that was basically kind of the way that the order was written.

It didn't give us a large amount of money that would make 12:41:11 up for the disparities of the past, but it gave an opportunity

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 125**

374

to move from that point forward and try to do some things as it relates to equalizing the playing field.

THE COURT: Ms. Madduri, would this be a good time to take a break?

12:41:32 MS. MADDURI: Yes. I apologize. Yes, that would be great.

THE COURT: I don't know what time it is. We'll come back at 1:45.

MS. MADDURI: Thank you.

12:41:45 THE COURT: Thank you.

(Recess.)

THE COURT: Ms. Madduri, are you ready to proceed?

MS. MADDURI: Yes, ma'am.

THE COURT: You may do so.

13:46:55 BY MS. MADDURI:

Q Mr. Knight, do you believe that there is official voting-related discrimination in Alabama today?

A Yes, I do.

Q Are you familiar with the current voter ID law in Alabama?

13:47:16 A Vaguely, yes. Uh-huh.

Q In your opinion, is the voter ID law a form of voter-related discrimination?

A I was against the voter ID law because I think it created such an issue for people having to go and get their ID to be

13:47:33 able to vote.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 126**

375

As a matter of fact, we tried to come up with legislation that would address that issue and make it possible where almost any form of ID you would be able to identify. I come from the train of thought that if you were a resident of Montgomery, you shouldn't have to go through a lot of hassle to be able to register and vote for the candidate of your choice. It should be open, and there shouldn't be any barriers put up.

Now, having said that, I do think there has to be accountability. You do have to have some form. But it doesn't have to be as strict as Alabama has. I would think there could be some better ways to do it.

The special technology the way it is now and the way that you can identify people, there are so many ways now that I think you could make it easier for people to vote and then be able to take advantage of everybody having that opportunity.

Q In terms of the current law that Alabama does have, do you think that disparately impacts African-Americans in Alabama?

A I think so. I think that any time you put barriers like that in place it has an adverse impact on low-income families and people that -- working families, things of that nature rather than professional families. And I think African-Americans make up the majority of that. Not that it will not have an adverse impact on anybody to fill in that category, but African-Americans are more affected by it.

Q Have you observed any issues with DMV offices in the Black

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 127**

376

Belt in the last few years?

A If I recall correctly, it was Governor Bentley at that time. Something came up in the legislative process that he was not satisfied with relative to the black caucus. And I think a way of punishment was closing some of the -- the offices in the Black Belt.

I'm trying to think of what that issue may have been, but I don't recall at this time. But it -- the Governor got very upset with the black caucus on some bill or legislation that he wanted that we were opposed to. And when we looked up, he had closed all of the voting places in some of the Black Belt areas, voter ID places in the Black Belt area.

Q How would the closing of the DMV offices impact African-Americans differently than it might white voters?

A Well, the feedback that I got -- and I'm not in the Black Belt -- but people would have to drive sometimes an hour to get to a location where they would be able to get their ID to be able to vote. And I mean, that's a lot just to go get an ID to be able to go vote.

So, and then there was some problems with the hours. I'm not thoroughly familiar with all of the details because most of the legislators from that particular area handled that issue with the Governor in trying to make the corrections. But it was a tremendous, you know, burden on people in the Black Belt to be able to do that. Somebody from that area will probably

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 128**

377

have more information than I on that.

Q Certainly. Have you --

THE COURT: Do you know how long that was a problem?

THE WITNESS: For some reason, we were very aggressive and adamant about -- to include, we started filibustering in the legislature. So I don't know. It may have been 30 days or so. I'm not certain on the exact time on that.

THE COURT: But it wasn't a period of years?

THE WITNESS: No, ma'am.

THE COURT: Okay.

BY MS. MADDURI:

Q Mr. Knight, have you observed any issues with African-Americans not being on the voter rolls when they go to vote?

A Yeah. That's interesting you would ask that question. I ran for Senate this last election, and I've been a Democrat all my life. And when I got to the polls to vote in the election, I was told that -- it was in the runoff election -- and I was told that I had voted in the Republican primary so I couldn't vote in the Democratic runoff election. And it took me almost half a day to correct that.

Q Have you observed the same thing happening to other African-Americans?

A Yes. I work -- I worked the polling places on election day, and there are all kind of problems many times on election

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 129**

378

day. People going to vote, names not on the list, they be told by people that -- election officials -- that they have to go to the courthouse to correct it.

13:52:32 Some election officials will allow them to vote provisional ballots. Others would not.

There have been instances where polling places are not open on time. But they have allowed -- when they were not open on time and we complained about it, they would extend the hours and keep the polling place open for that length of time that they were closed. 13:52:51

There have been instances where the 30-foot rule, 30-feet rule that you have to stand 30 feet from the poll if you have any campaign material, where in some polling places, they would not allow people to have campaign material at all whether it was 30 feet or anywhere on the property. 13:53:11

So there have been -- I mean, just about in every election you have some problems that you are going to deal with on election day. And now, these are precincts in the African-American community. I focus my attention basically in those African-American communities in the city of Montgomery. 13:53:26

THE COURT: So you don't know if there are similar problems in any of the white precincts?

THE WITNESS: No, ma'am, I don't. Huh-uh.

BY MS. MADDURI:

13:53:41 Q Have you received complaints from African-Americans about

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 130**

379

these issues?

A I have, yes.

Q Have you received any complaints from white voters?

A Not at the same level. Maybe two or three. I know the issue of dealing with my name not being -- where there was a mixup on whether somebody voted Republican or Democrat, I think a few whites had a problem with that, as well.

Q Mr. Knight, do you know how many African-Americans have been elected to statewide office in Alabama?

A I know Justice Adams was elected statewide to the Supreme Court. Justice England, I think -- I know he was appointed. I think he was elected, as well. Justice Cook was appointed, but I don't think he was subsequently elected.

So that would be two that I could think of immediately. I can think of those two that's been elected.

Q And in the Alabama state legislature, are you aware of approximately how many African-Americans are in the house?

A It's 27.

Q Are any of them elected from non-majority black districts?

A All of them are elected from majority black districts. There's one district that I would consider kind of marginal. That's the one that -- the Locy Baker district down in Houston County. It may be -- it may be kind of even. That's the only one that would be considered marginal in my mind. All the rest of them are majority black.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 131**

THE COURT: The one in Houston County, what did you call it?

THE WITNESS: The Locy Baker -- he's the representative that got elected from that district.

13:56:15 THE COURT: Do you know how to spell Locy?

THE WITNESS: L-O-C-Y.

THE COURT: Okay. Thank you.

BY MS. MADDURI:

Q Do you think the fact that no African-Americans have been

13:56:32 elected statewide have an effect on --

A Let me -- there was -- there is a district. James Fields got elected from a district in Cullman, Alabama.

Q And James Fields is African-American?

A He's African-American, yes. He's no longer there. He got

13:56:49 elected one term from a district in Cullman, Alabama. I remember that.

Q Do you remember approximately when that was?

A That was in -- not this past session, but the session of the legislature before that.

13:57:04 THE COURT: And do you know the racial makeup of Cullman?

THE WITNESS: It's white. I don't know --

THE COURT: It's predominantly white, isn't it?

THE WITNESS: Yes. I think so. It is.

13:57:19 BY MS. MADDURI:

381

Q Do you think that the fact that no African-Americans have been elected statewide has an impact on the African-American community in Alabama?

A Well, yes. I think that anytime you can't have representation it's going to have an impact on it. You like to feel like you have people that will have at least not everything that you stand for that you believe in, but at least represent some of the views that you might have and that you -- you have that type of representation on all levels.

Q When you were in the state legislature, were you involved in the passage of any laws in relation to the composition of boards, city boards in Montgomery?

A That was -- I was involved in that around 19 -- around 1993 -- at the time that Montgomery changed from the council form of government to the -- from the mayor-council to the commission form of government -- from the commission to the mayor-council form of government.

I passed a bill in the Alabama Legislature that would add diversity to all of the municipal boards. It was a bill that gave the council the authority to make -- to make recommendations -- to make appointment to municipal boards, where in the past the mayor had made appointments to all municipal boards. So most of them were basically white.

When we passed that bill, that bill gave African-Americans an opportunity to be represented on municipal boards because we

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 133**

382

had a council form of government where you had four blacks and five whites -- nine-member council. So you at least have four African-Americans on all your municipal boards within the city of Montgomery.

13:59:19 Q I'm just about done with you. I promise.

Were you ever the victim of a crime in your home? At your home?

A A crime in my home? Oh. Well, yes, it was a crime. I mean, I had a cross burned in my yard.

14:00:00 Q Can you tell me about that?

A That was in 19 -- it had to be around 1981 or so.

At the time, there was a lot of controversy in the city of Montgomery. I led the protest on the demonstration concerning -- I'm trying to think exactly now what the issue

14:00:20 was at that time. I was working with Montgomery improvement association. It was a controversial dealing with the police department and something that had happened. I think it may have been an African-American that got shot in the back or something of that nature. And we were holding demonstrations.

14:00:38 And one Sunday morning, my neighbors called, and there was a cross in my yard, a big telephone pole and a cross that was -- I mean, it was like daylight.

Q Did you find out who did -- who did it? Who committed the crime?

14:01:00 A The best that I could remember -- at that time, I think

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 134**

383

14:01:25 the Attorney General was Jimmy Evans. And they were able, with the Southern Poverty Law Center, I think they -- they were able to find some people for that, along with some other things that had been planned. Because at one of the demonstrations there had been a plan to blow up a bridge or something that we were going to march over.

14:01:40 So they were able to gather that information. I think they tied all of it together. I don't know all the details about the outcome of it or when it happened. But I do know that something did happen as it relates to them being able to identify some of the people that were involved in it.

Q Do you recall who those people were?

A No, I do not.

Q That's all my questions for you right now.

14:02:00 A Thank you.

THE COURT: Cross-examination?

MS. HOWELL: Briefly, Your Honor.

CROSS-EXAMINATION

BY MS. HOWELL:

14:02:40 Q Hi, Representative Knight. I didn't get to meet you earlier. I'm Laura Howell, and it is nice to meet you in person finally. I've heard a lot about you.

A I hope it has been good.

Q It has been.

14:02:53 And you have covered a lot of ground. So please forgive

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 135**

384

me if I take a little bit longer than maybe I should just asking you a bunch of questions.

So you've talked a lot about -- and it sounds like you're very passionate about improvements for the city of Montgomery; is that a fair statement?

14:03:10

A I would want to think so, yes. Uh-huh.

Q And you talked about sort of your perspective on having Montgomery split between three congressional districts, right?

A Yes.

14:03:25

Q And how you felt like that diluted the influence that someone might have there, right?

A Yes.

Q Okay. You also said that there was probably less interest in looking after the city of Montgomery; is that correct? Did I understand you correctly?

14:03:46

A I don't know exactly what -- the intent on what I'm saying on that is I think that if you have a person that represents 30,000 people opposed to somebody that only represent 3,000, that you would have more impact, in terms of the decision-making process with that individual in terms of their priorities.

14:04:02

Say, for instance, in politics, you establish your priorities. If you got something that you can deliver to 30,000 people, you're going to do that before you deliver to 3,000 people. That's kind of --

14:04:17

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 136**

385

Q I understand. So we have three Congress people that represent some part of the city of Montgomery, correct?
A We do, yes.
Q And one of them is Terri Sewell, correct?
14:04:32 A That's correct.
Q And one of them is Martha Roby?
A Yes.
Q Those are the two bigger ones at issue, I think, in this.
A And Mike Rogers.
14:04:40 Q And Mike Rogers is in District 3, right?
A Yes.
Q Do you know where Martha Roby lives?
A No, I don't. I could guess, but I do not know.
Q So you don't know that she lives in Montgomery?
14:04:54 A Oh, no. She lives in Montgomery. I thought you meant the street address or something.
Q Oh, no, sir. I wouldn't ask you that in open court.
A Oh. She lives in Montgomery. Yes. I'm sorry.
Q Do you think she's doing an effective job representing her portion of the city of Montgomery?
14:05:07
A I think she's a good representative, yes.
Q Do you think that her ability to represent the city of Montgomery depends on her living in Montgomery? Do you think that she represents it -- I'm sorry. That's compound.
14:05:21 Do you think that she represents it well living there?

**_Christina K. Decker, RMR, CRR_**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 137**

386

A I think based -- because she happens to be who she is, and she served on the city council there in Montgomery, I think that's had an added impact in terms of her ability to represent Montgomery.

14:05:39 Q So in wanting -- I presume you would like a congressperson who would represent Montgomery probably better and more fully than someone represents it now?

A Well, I would just want the best representation that we could get for Montgomery. Mainly because it's the capital city, as I said. 14:06:02 And I think with all of the things that's taken place in the capital city with the possibility of tourism and the amount of revenue that could come in, that good representation, you know, in Montgomery will certainly be a plus.

14:06:19 Q Sure. But are you saying that the current representatives are not representing it as well as they could?

A No. I'm not going to say that -- not as well as they could necessarily. I'm just saying if a person only had 3,000 -- if Martha Roby only had 3,000 people from Montgomery 14:06:38 district, and she had 30 or 40,000 from Houston County, then the emphasis would be more on Houston County than Montgomery, and her priorities would be more in Houston County than Montgomery. That's all.

THE COURT: But wait a minute. The Montgomery 14:06:51 representative isn't divided with Houston County, right?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 138**

THE WITNESS: I just used that hypothetical as an example.

THE COURT: Okay. All right. So Mike Rogers represents part of Montgomery, Macon, Russell, Lee, Tallapoosa Chambers, Randolph, Clay -- oh, he has a big one -- St. Clair, Calhoun, Cleburne, and Cherokee roughly for District 3?

THE WITNESS: Right. I assume.

THE COURT: So you're saying that because he only has a small part of Montgomery County, he would be less receptive to issues that affect Montgomery County?

THE WITNESS: Yes. It's just to me -- it's just -- I mean, it's just natural that you have got all those other counties with much larger population, more population and voters, that you have got to take care of those before you take care of a small population there.

BY MS. HOWELL:

Q Okay. So let me ask you this, then: Have you seen any of the illustrative plans drawn by plaintiffs' experts in this case?

A No, I have not.

Q Okay. So then you might not know that certain of those illustrative plans combine portions of Mobile County with Montgomery County in a proposed second majority black district.

Do you think that a potential future congressperson's attentions would be divided between Mobile County or even the

city of Mobile and the city of Montgomery if they were to represent portions of both?

A Now, when it comes to the congressional districts, I have looked at several districts. You have the one that's in the seventh, and I know sometime ago we had another one similar to the board of education district, and there's one dealing with Mobile. I'm not familiar with the details of the Mobile. The only one I'm familiar with partially would be the one that exists at the present time.

14:08:33

14:08:48 I do think that as you draw those that you have communities of interest. Say, for instance, Mobile and Montgomery would have some things in common that a representative could very well represent both -- both of those areas equally and be very successful in doing so.

14:09:09 But when you get down to having three like we have in Montgomery at the present time, I think that you could get very little, in terms of attention from, say, Mike Rogers' district. I know Mike, so -- I mean Representative Rogers. He's a good representative. But I can understand where he would pay more attention to the -- he would pay more attention to Talladega maybe rather than he would Alabama State University, if that --

14:09:28

Q Sure. But I thought -- I understood that part of your point had to do with the proportion of the population that they were representing. And so in the instance where Mobile, the city of Mobile, and the city of Montgomery were in a single

14:09:52

389

district, the city of Mobile is larger than the city of Montgomery, isn't it?

A I don't know what the population is. But it may be a little larger. But I mean, if it's the entire city, I think that would depend on the total number of the population. And to me, that would determine your interests. If you split it half and half or what your interests might be.

But there will be some areas of commonality to Montgomery, as well as Mobile, because both of them are urban areas. And some of the needs and concerns would be for both areas.

Q Sure. But the same could also be said for the current congressional districts, right? So Mobile -- or, excuse me -- Montgomery is an urban area the same way that perhaps Dothan is also a small urban area, right?

A It could be said possibly, yes.

Q And Montgomery is also an urban area that's represented in part by Terri Sewell in the same way that Birmingham is in part represented by her, and that's also an urban area, right?

A Right.

Q And you're not contending today as part of your testimony that the city of Montgomery could only be represented effectively by a black representative, correct?

A Could only be by a black representative?

Q Correct.

A No. I would -- what I am contending is I think blacks

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 141**

should have the opportunity that if they want to elect a black, they should have the opportunity to do so. And if you don't have a majority black district, you limit your opportunity to be able to do that presently in Alabama the way that the voting trends are.

Q But, for example, Representative Roby could, in fact, represent Montgomery just as effectively as Representative Sewell could?

A I don't know if I want to answer that question. Martha -- Representative Roby is a very good representative. Representative Sewell is a very good representative.

Q A very diplomatic answer from a legislator, sir.

You also talked about -- a little bit about party affiliation. And we --

THE COURT: May I ask a question before you leave that completely?

Are you aware, Representative Knight, of circumstances where Representative Sewell and Representative Roby have worked together to accomplish things for their respective districts?

THE WITNESS: Yes, I am. And they work very well together. I'm very familiar with that. They have -- I mean, they have put together a great alliance, in terms of working together. There's no question about that.

THE COURT: And in that sense, sometimes having two people working together to accomplish things can get more done

391

in the House of Representatives than one person trying to get something done.

THE WITNESS: In that particular instance, I would have to agree with you on that.

14:13:00 THE COURT: Thank you.

BY MS. HOWELL:

Q You also talked earlier in your testimony about your political affiliation. And you are -- you associate with the Democratic party, correct?

14:13:16 A I'm a Democrat.

Q And you told us, I believe, that you felt comfortable within the Democratic party in part because of shared characteristics, including race, right? Of other members of the party?

14:13:32 A I think that's correct.

Q Did you feel comfortable in the party when it was not predominantly black members?

A Oh, yes, I was comfortable in the party. I mean, we had within the Democratic party -- now, I'm not going to say that 14:13:56 we agreed on everything or -- but I felt comfortable because, I mean, there were other blacks in the party, and there were whites in the party that in some cases totally disagreed with the views of the black caucus. And we would fight and debate and everything else. But there was a comfort level because all 14:14:19 of us were members of the same party.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 143**

392

Q Right. And you felt comfortable working with them?
A Yes. Yes.
Q And that was regardless of their race, right?
A I have been able to work across not only racial lines, but I've been able to work across political lines, as well.
14:14:32
Q Okay. And, in fact, some of the people that were especially state legislators used to be members of the Democratic party and have since shifted over to the Republican party, correct?
14:14:46
A That is correct.
Q Are you still comfortable working with them even though they are members of the Republican party?
A I feel comfortable working with them. But once they changed to the Republican party, some of their ideas changed dramatically. But they still remain the same individuals.
14:14:59
Q Okay. And you've served in the state legislature for a good long time, right?
A Yes, I think 20 -- 20 years.
Q Yeah. I'm attempting to do more math. We were talking about the difficulties inherent in that earlier today for lawyers. And I believe it's 25 years that you served?
14:15:19
A 25, okay.
Q And the Democrats were, in fact, the majority political party in the state legislature until 2010, weren't they?
14:15:36
A That is correct.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 144**

393

Q And then that shifted in 2010, right?
A Yes.
Q So that the Republican -- I'm sorry. So that the Republicans became the majority political party?
14:15:47 A Yeah. They call it storming the statehouse.
Q And just to follow that a little bit more.
So the Democrats were the minority political party at the time that the current congressional districts were drawn, right?
14:16:04 A The -- we were the minority, yes. We were the minority party, yes.
Q The minority caucus, I guess?
A Caucus.
Q You also told us that you were the chair of the Alabama
14:16:22 Legislative Black Caucus; is that correct?
A That's correct.
Q And that you served for eight years, I think?
A That's correct.
Q Do you recall what years you served as chair of the
14:16:30 caucus?
A The eight -- let's see. '15 -- two consecutive years from '15 back -- from '18 back. I'm sorry.
Q Two consecutive terms?
A Terms, yes.
14:16:51 Q Okay. So from 2010 to 2018, does that sound right?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 145**

394

A 2010 to 2018. That would be correct, yes.

Q Okay. And in that capacity, did you have any role in helping draft or draw up the new congressional districts that were passed in 2011?

14:17:23 A If my memory serves me correctly on that, I think most of the work on the congressional districts were dealt with, with the congressional delegation. We got -- I think we got a recommendation of the plans that came down. I didn't -- I didn't personally work on any congressional plan, no.

14:17:45 Q Okay. So you didn't personally work on putting together even a map or anything like that? Do you know if the black caucus did?

A Well, I'm sure we put together a map because we would have to introduce the maps, yes.

14:18:02 Q Okay. Do you know if any maps were introduced by a member of the black caucus?

A There were -- I don't remember -- I think Representative McClammy introduced at least one or two maps on behalf of the legislative black caucus for the congressional district.

14:18:21 I may be -- Representative McClammy or Representative Laura Hall. I'm not certain on that, but there were some that were introduced or were provided to districts in the state for African-Americans.

Q Do you happen to know when those plans were introduced in

14:18:37 the legislature?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 146**

395

A No, I do not.
Q Okay. So you don't know whether that was before or after the congressional plan had passed the legislature?
A I don't. I don't recall.
14:18:46 Q Okay. Do you recall having any discussions with members of the majority party -- of the Republican party when those plans were being drafted?
A I'm sure I may have. I'm not certain. I know that we -- on the behalf of the caucus, we were trying to convince them that we would like to have two majority black districts.
14:19:06
Q Okay. Did you personally do that? Or did someone else in the caucus do that?
A I probably personally talked to some members on the legislature on that. That would have been on the reapportionment committee. Whoever from the caucus -- and I think it was Representative McClammy or Representative Laura Hall. I'm not certain which one at this point.
14:19:23
Q But they either Representative McClammy or Representative Hall would have spoken to someone?
14:19:37 A Yes. Or someone on the legislative black caucus would have spoken to someone.
Q But you have no personal knowledge of that?
A I don't think so.
Q Okay.
14:19:45 A You're talking about congressional district, not

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 147**

396

legislative district?

Q Correct.

A Okay.

Q Did you work with anyone on the state legislative districts?

A Oh, yes.

Q Okay. Did you spend a significant amount of time on those?

A Yes, ma'am.

Q Okay. And you submitted plans presumably for those, as well?

A We submitted several plans, yes.

Q And then subsequently the legislative black caucus decided to file suit over those state legislative plans, didn't it?

A That is correct.

Q Okay. And do you recall what the claims were in that case?

A They are too complex for me. But, I mean, we went all the way -- those are the plans, I think, if you're talking about the same one. We went all the way to the Supreme Court on that.

Q And that was before a three-judge court in Montgomery went all the way up, came all the way back down, right?

A Yes.

Q And resulted in changes to the state legislative

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 148**

397

districts, correct?

A It did.

Q But that case did not bring any claims against the congressional districts in Alabama, did it?

14:20:54 A That case, to my recollection, was strictly on the legislative districts, not the -- you said the congressional districts?

Q Yes, sir.

A Not that I am aware of. I don't think -- I don't think

14:21:08 that was included in that.

Q So it only concerned the state legislative districts?

A The state legislative districts, yes.

Q Okay. Now --

A I wouldn't mind including the congressional districts in

14:21:22 there.

Q Well, why did you not?

A I don't -- we were only addressing the legislative districts.

Q Okay. You also talked a lot about the different problems

14:21:50 that have faced Montgomery that you've seen while you've been a legislator. You mentioned a lack of emphasis on education, and a lack of funding for mental health, and seeking criminal justice reform. I believe those were three big ones that you mentioned, correct?

14:22:07 A Yes.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 149**

398

Q Would you characterize those as concerns that are specific to Alabama, or do you think that those are nationwide concerns?
A Well, I mean, I can speak for what I -- what I experienced here in Alabama. I don't know on the national level whether they have the same issues and/or concerns or not. I think they have some that are very similar. But I think that when it comes to the correctional department, when it comes to mental health, it's much more pervasive here than other areas from what I've seen.

14:22:20

14:22:36 When you look at the number of people that's incarcerated, you look at the complaints even from corrections, in terms of being unable to handle the caseload when it comes to mental health patients that they have within the corrections facility, there's an ongoing lawsuit on that at the present time.

14:22:55 So I mean, it's just -- I mean, it's -- it's at a boiling point here in Montgomery. And something has to be done from a legislative perspective to address it.
Q But you think that those concerns are particular to Alabama?
14:23:13 A I'm not going to say they're particular to Alabama, but I'm just saying that the concerns are real here in Alabama. I can speak for that being here.

And having been in the legislative process and knowing what it takes to actually try to address those which would be additional funding and the difficulty in terms of trying to get
14:23:29

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 150**

399

the funding to do what's necessary. So I can speak to that. But I can't say on the rest of the country what it might be.

Q You also talked about a lack of opportunities for, in particular, younger people in Alabama, and noted that people are leaving the state to seek other opportunities, especially members of the black community; is that correct?

A Yes. Uh-huh.

Q And you said that you didn't think -- that you were very concerned about leaving -- leaving children in a better position than their parents were in when they were their age; is that fair?

A I think that's fair. I want to make sure that they are in a better position than their parents, yes.

Q And I framed that very badly, and you put it more eloquently than I did.

Do you have kids?

A I do.

Q Do you think that they're in a better position than you were in when you were their age?

A Oh, yes.

Q Okay. You also discussed some problems that at least you have seen a very particular side of in Montgomery and mentioned particularly -- I'm thinking of the millage rate and that being on the ballot twice in Montgomery, to raise the millage for public education; is that right?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 151**

400

A That's correct.

Q And you said it had failed twice. Do you know when that was on the ballot?

A I should -- I can't give you the dates. I remember because -- I can't remember when it was on the ballot, no.

Q Do you know if it was in like the last five years?

A No, not the last five years.

Q Okay. More than a decade ago, maybe? Before 2008?

A Maybe.

Q So --

A I can give you the name of the people --

Q The names of the people that?

A That -- that was supportive of it because it was a good cross-section of people that supported it, but it just didn't pass. I'm sorry.

Q We're all a little looser after lunch. Apparently, it's nap time.

So when you talked about the millage increase being voted down, you also had mentioned at a different point in time in your testimony that the city of Montgomery and Montgomery County are both majority black, are they not?

A They are now, yes.

Q Do you know when that became the case?

A Just recently within the last four years possibly.

Q Okay. All right. You also talked about -- you were asked

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 152**

401

questions about problems with voter rolls and with polling places in Montgomery. Do you remember that?

A Yes.

Q And you talked specifically about, you know, places not being open when they were supposed to be, or being moved around, and other things of that nature, I believe; is that right?

A I did.

Q Well, first, do you recall -- or do you know actually whether polling places are run by local officials or by state officials?

A Well, the polling places are supervised by the Secretary of State's office, as I understand it.

Q Do you know who is in charge of deciding where polling places are?

A The county commission on the local level --

Q Okay.

A -- would be.

Q Do you know if the probate judge plays a role in that?

A I don't think the probate judge decides. I think the county commission decides the location of polling places. I think the probate judge can make recommendations.

Q Okay. But the -- excuse me. The probate judge is in charge of making sure the polling places are staffed and operational --

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 153**

402

A Yes.

Q -- is that fair?

Can you tell me when you encountered these problems at the polling places?

A There have been problems at the polling places ever since I was working the polling places even before I was an elected official. And there are still problems we encounter at the polling places.

Q And so you've even encountered problems at the polling places while they have been under the supervision of the current probate -- well, the probate judge who was recently elected mayor?

A Yes. I have -- I personally have some problems at the polling places there. But I'm saying there have been problems at the polling places.

I worked at polling places every election just about, and there have been various problems from people names not being on the voting list; people that registered to vote, but their name did not appear there, and they thought they were registered voters but somehow the forms had not been turned in; people going to the polling places and saying that their name's not on the list, and they should be able even if their name is not on the list, they should be eligible to vote a provisional ballot, but the polling officials tell them they have to go to the courthouse and register -- couldn't vote in that election.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 154**

403

There's just a number of problems such as that that I have seen take place at the polling places.

Q But those are all by and large either created by or resolved by local election officials, are they not?

A Well, but you have -- I couldn't just pin it down to just local officials, because the way the whole process operates, as I understand it, is the Secretary of State on the state level is responsible for the operations in state elections.

You also have voter registrars that's responsible for voter registration, making sure everybody's on the voter list. And the registrars are appointed by the Governor, the Agricultural Commissioner, and one other person. But it's a three-member panel that appoint all of the registrars.

Say, for instance, Montgomery right now is a majority black county, but we have three white board members on the board of registrars.

Q And the black probate judge, correct?

A And you have a black probate judge that recently got elected.

Q Yes. Steven Reed has now been elected mayor?

A Yes.

Q In a landslide, right?

A It was.

Q But you would agree with me that these elections are meant to be run and operated by and are currently, at least in

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 155**

404

Montgomery County, by both black and white officials alike?
A At the present time, yes.
Q I'm going to loop back really quickly.
We had talked about the Democratic party and your leadership roles in the Democratic party. Would you say that it's true that basically everywhere in the United States black voters tend to vote for Democratic candidates?
A I -- I can't speak for everywhere. I say in Alabama that is basically the case. And when you look at it across the country, it seems that way.
Q Representative Knight, just a couple more questions for you.
We had talked earlier about the legislative black caucus being involved in the redistricting process for congressional districts. Do you remember that?
A Yes.
Q And you said that Representative McClammy had by and large, you thought, been in charge of introducing plans on behalf of the caucus; is that right?
A I said he had introduced some. I mean, a number of people introduce plans. I don't remember everybody. I think I introduced plans myself.
Q For the congressional districts?
A Oh, not the congressional districts. No. I thought you said on reapportionment.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 156**

Q Oh, I'm sorry. I should have been more specific. For the congressional redistricting?

A I don't -- I mean, I think Representative McClammy, I knew he had a plan. Now, whether he introduced it or not, I'm not certain.

14:33:18

Q Okay.

A Or a plan was introduced, if I'm not mistaken.

Q I wanted to show you a couple of maps from one of the defendants exhibits, Exhibit 3, and ask you -- well, just to confirm with you that these are the plans that were introduced by Representative McClammy.

14:33:31

MS. MADDURI: Objection.

MS. HOWELL: He's says that he's in charge of the legislative black caucus, and these were introduced on behalf of the legislative black caucus. Unless you wish to withdraw your statement that Representative McClammy was acting on behalf of the caucus.

14:33:45

MS. MADDURI: He testified that he's not familiar with the maps, or he's not even sure if they were introduced.

THE COURT: Well, I think it would be super human amazing if he could, in fact, remember without seeing anything what may have been introduced in 2010. So I have no problem with Ms. Howell showing him the map and seeing if he remembers it, or, you know, if he does, great. If not, that's another thing.

14:33:57

14:34:19

406

And so which exhibit are you referring to?

MS. HOWELL: This is Defendant's Exhibit 3, Your Honor. And I'm currently looking at -- it will be Exhibit C-10 of the preclearance submission. And it's Chestnut Defense 179. Or actually let me see if I can get 179 and 180 on there at the same time.

THE COURT: So it's part of Defendant's Exhibit 3? Is that what you said?

MS. HOWELL: Yes, ma'am.

THE COURT: What page?

MS. HOWELL: I believe it will be pages 179 and 180 we're looking at.

BY MS. HOWELL:

Q And, Representative Knight, is that on your screen up there, or no?

A No, it's not.

Q It might take a minute to pull up.

A It is now.

Q And can you read the top part of that page what it says?

A It says -- it says, "McClammy 2010 U.S. congressional plan."

Q And then on the next page, which is Chestnut?

THE COURT: Well, just before we leave that, you may be able to recognize Montgomery County a little better than I do. But does that plan still show three districts in part of

**_Christina K. Decker, RMR, CRR_**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 158**

407

Montgomery County?

THE WITNESS: I think it only shows one. Well, maybe --

THE COURT: Seems like the blue from 3.

14:36:25 THE WITNESS: Yeah.

THE COURT: Comes in there, and a little of the pink from 7 still comes in there.

BY MS. HOWELL:

Q So does that map also appear to split Montgomery County three ways?

14:36:51

A This map here? If the blue comes in, yes. And if the pink comes in, it will split it three ways.

If I'm reading it correctly here based on what I --

Q I'm going to refer you --

14:37:15 THE COURT: And, Ms. Howell, I believe that this was one of the exhibits that had not been pre admitted; is that correct?

MS. HOWELL: That is correct, Your Honor. But I believe that the only objection to the exhibit was to the extent that it was offered as evidence of the legislature's intent in passing the plans; unless plaintiffs articulate another objection.

14:37:27

THE COURT: What's the objection to this information that's in Defendant's Exhibit 3, which is the preclearance submission?

14:37:51

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 159**

408

MS. MADDURI: Your Honor, Ms. Howell's correct. Our objection is to the extent that the maps are offered as an intent of legislators at the time.

THE COURT: Overruled.

14:38:06 MS. MADDURI: Or, no -- I'm sorry. I'm trying to say that we agree with her. We're not objecting to the extent that it's not being used for -- the intent of legislators.

THE COURT: Okay. All right. Got it.

MS. HOWELL: My apologies.

14:38:22 BY MS. HOWELL:

Q And, Representative Knight, I'm very sorry for my lack of facility with all the technology. But we will flip to the next page that's in this. And then if you can see right there, it's very small print.

14:38:45 THE COURT: Ms. Howell, when you're away from the microphone, you may need to speak just a little bit louder.

BY MS. HOWELL:

Q So on this next page, it talks about -- or it's a population summary of the plan. Do you see that at the top?

14:39:07 A I do.

Q And I wonder if you can read -- I'm sorry.

A No.

Q I'm struggling. The number that is highlighted in yellow there at the bottom, if you can take a quick look at this chart and tell me how many of the districts in this plan have a

14:39:31

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 160**

409

majority black population?

A It looks like one.

Q Okay.

A Okay.

14:39:59 THE COURT: And just to be clear, this population summary report on page 180 of Defendant's Exhibit 3 deals with which congressional district plan? Can you tell, Representative Knight?

THE WITNESS: It says plan -- it says Plan McClammy

14:40:25 Congressional B. I don't know what that is.

THE COURT: Okay. But this is not a population report for the 2011 congressional redistricting plan that's at issue here, right? Or Ms. Howell?

MS. HOWELL: Correct.

14:40:47 THE COURT: Not that I'm taking testimony from an attorney.

MS. HOWELL: This is all submitted. I apologize for lack of preparedness. But this is all part of the same single exhibit to preclearance submission.

14:41:14 BY MS. HOWELL:

Q So that first plan -- that first plan only appears to have one majority black district in it?

A That particular plan, yes.

THE COURT: And it's District 7, right?

14:41:37 THE WITNESS: Yes. It's District 7.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 161**

410

BY MS. HOWELL:

Q And so that was one plan submitted by Representative McClammy on -- presumably on behalf of the legislative black caucus?

14:41:53 A I can't say it was on behalf of the caucus.

The way the legislative process operates, every legislator has a right to introduce a plan. And there was several -- there may have been several plans that were introduced. I'm just not certain.

14:42:09 Q Do you have any reason to dispute that all of the plans that were submitted would be in the preclearance submission?

A Would be in the preclearance submission?

Q Yes, sir. To the Department of Justice?

A No. I don't know. I don't know.

14:42:29 Q I direct you to the next plan that was submitted by Representative McClammy. Can you see from -- I apologize for being terrible with technology.

THE COURT: You're doing fine.

BY MS. HOWELL:

14:42:57 Q Can you see from this view that's on your screen that this is another of the congressional plans submitted by Representative McClammy?

A I can, yes.

Q So it says, "2010 McClammy Congressional Plan 2M;" is that

14:43:14 right?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 162**

411

A Congressional Plan 2M, yes.

Q And then I switch to -- this is page 194, which is --

THE COURT: If you just give it a minute, it will kind of adjust itself, and then you can adjust it in or out more.

14:43:34 BY MS. HOWELL:

Q And, Representative Knight, can you see up in the corner of that page -- I'm going to mark it on mine, and hopefully that shows up on yours -- and read back for me what that says at the top?

14:43:56 A It says, "McClammy Congress 2M" it looks like.

Q Okay. So that appears to match the description on the page before that it would be a plan submitted by Representative McClammy?

A It appears to be, yes.

14:44:12 Q Okay. And then on the next page over, which I may have to zoom again -- is that clear enough to read?

A I think I can make the numbers out here. Okay. Yes.

Q And can you read for me the part that I'm underlying on the screen?

14:44:53 A "Plan McClammy Congress" -- I can't make out that.

Q Would you have any reason to dispute it if I told you it said, "Plan McClammy Congress 2M?

A 2 what?

Q 2M?

14:45:10 A 2M?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 163**

412

14:45:25

Q You wouldn't have any reason to dispute that?

A I wouldn't have a reason to dispute it or not.

Q You've watched me flip through this book over here, correct? So it probably and presumably goes with the other things that read "McClammy Congress 2M"?

A Okay.

Q And can you see and read on here how many -- take a second and look at the chart, and tell me how many majority black districts are included in this plan?

14:45:41

A I see one, which is 420 -- looks like 425. 425,000 black. And then there's another one that's -- I don't know, is that 3 or 2?

Q I believe that is a 3.

A 3? Okay. That would be 2, then. If that is a 3. I can't make that number out.

14:46:06

THE COURT: That would be District 7 and District 3; is that correct? Can you see that?

THE WITNESS: Yes. I can see the districts.

BY MS. HOWELL:

14:46:17

Q So this plan, in fact, did have two majority black districts as part of it?

A According to what I see here, yes.

Q And then, Representative Knight, can you tell me what this page says at the bottom?

14:47:24

A "Congressional Plan PPB," it looks like --

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 164**

THE COURT: What page is that on, please, Ms. Howell?

MS. HOWELL: That is on page 209, Your Honor.

THE COURT: Thank you.

BY MS. HOWELL:

14:47:34 Q And I will flip from there over to page 210, and then get you, Representative Knight, to confirm that the writing up at the top right there also says "McClammy Congress PPB"?

A It does, yes.

Q And does that appear to be a partial plan to you?

14:47:54 A It's like a partial plan, or the map has been cut off here.

Q Yes. It does look like that.

A It's not the entire state.

Q Right. It does look like the map was cut off, which I

14:48:15 cannot vouch for the copying over at the state legislature. I'm sorry.

A I can't either.

Q Let's see. I've now flipped over to page 211 of this submission.

14:48:34 THE COURT: Representative, let me let you have the book that I have.

THE WITNESS: Yes, ma'am. Thank you.

THE COURT: That may help you read it a little better.

BY MS. HOWELL:

14:48:49 Q And can you see up in the top left-hand corner that this

414

also says "McClammy Congress PPB"?

A Yes. In the left, yes, "Congress PPB."

Q And it looks like, in fact, the map might have just been cut off, doesn't it? Because there are numbers for all seven districts, as opposed to just the three that were shown on the map?

A There's numbers for all seven districts --

Q Okay.

A -- on this report, yes.

Q Yes. And according to this report, how many of the districts does it look like contain a majority black population?

A District 7 is the -- District 7 it looks like on this one.

Q Okay.

A One. One district.

Q Thank you. And do you have any reason to believe that Representative McClammy submitted any other districting plans that we wouldn't know about from this preclearance submission?

A I would have no idea. Like I say, legislators introduce bills every day, so I would -- Mr. McClammy would have to respond to that. I wouldn't know how many plans he would have introduced.

Q But, to your knowledge, the legislative black caucus did not present any other plans for the congressional redistricting cycle in 2011 that contained two majority black districts

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 166**

415

outside of the one that we just reviewed that Representative McClammy put forward?

A To my knowledge, I'm not familiar with one. I'm not going to say that one was not introduced on behalf of the caucus. But I don't recall another one. I know that was a plan that created two districts.

Q And that would be the middle plan that we looked at, correct?

A From the one that I've seen here today, yes.

Q Thank you.

THE COURT: Ms. Howell, were you offering these exhibits at this time?

MS. HOWELL: Yes, Your Honor. We would offer Defense Exhibit 3 just for the purpose of showing those plans and what was offered.

THE COURT: Okay. And should we just excerpt those that you showed him, or are you -- trying to figure out what we are wanting to do with this huge big book. And if you're not offering it for the intent of the legislature, I think there's not an objection to it now?

MS. HOWELL: That is my understanding, Your Honor, that all of it would be admissible as long as it's not to show intent.

THE COURT: Is that correct?

MS. MADDURI: We would withdraw our objection to

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 167**

preclearance.

THE COURT: So Defendant's Exhibit 3 is admitted, then.

MS. HOWELL: Thank you. And thank you, Representative Knight. I apologize for all of the technical difficulties. I know I am a millennial, but I'm really not.

THE COURT: Any redirect?

MS. MADDURI: No, Your Honor.

THE COURT: All right. Thank you, Representative Knight. We appreciate you being here today. And you may step down.

THE WITNESS: Thank you. Thank you.

THE COURT: Do you want a short break before we get to our next witness?

MR. SPIVA: That would be good, Your Honor.

THE COURT: Okay. We'll come back at five after 3:00? 10 after 3:00.

MR. SPIVA: Thank you.

(Recess.)

THE COURT: Plaintiffs may call your next witness.

MS. KHANNA: Thank you, Your Honor. Plaintiffs call Lakeisha Chestnut.

LAKEISHA CHESTNUT,

having been first duly sworn by the courtroom deputy clerk, was examined and testified as follows:

417

THE CLERK: Please state your name for the record in the microphone.

THE WITNESS: My name is Lakeisha Chestnut.

THE COURTROOM DEPUTY CLERK: Thank you.

15:13:54 DIRECT EXAMINATION

BY MS. KHANNA:

Q Good afternoon, Ms. Chestnut.

A Good afternoon.

Q Ms. Chestnut, are you a plaintiff in this case?

15:14:00 A Yes, I am.

Q Do you live in Alabama?

A Yes, I do.

Q What county do you reside in?

A Mobile.

15:14:06 Q And what city do you reside in?

A Mobile.

Q Do you have family in Alabama?

A Yes, I do.

Q Which family?

15:14:12 A My husband, my kids, my mom, aunts, and uncles live in Mobile County. I have family in Marengo, Wilcox County. And I have family right here in Birmingham.

Q And how long have you lived in Alabama?

A I've been in Alabama since I was 17 months old. I moved 15:14:35 away when I was 20 in 1996. I've been off and on in Alabama

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 169**

418

for a while. And then I officially came home in May of 2016.

Q And what is it that you do for a living?

A I am a licensed sales agent and a team technical expert at Results Companies in Mobile, Alabama.

15:14:59 Q And can you tell me a little bit about your educational background?

A So I attended Murphy High School, got my GED in 1995, been to college off and on. And now I'm currently a college student at Academy of Art University in San Francisco, California where I attend online study and screenwriting. 15:15:19

Q Ms. Chestnut, are you registered to vote in Alabama?

A Yes, I am.

Q When did you first register?

A When I was 18.

15:15:30 Q When you moved out of Alabama -- I believe you said 1996?

A Yes.

Q Did you change your voter registration?

A Yes, I did.

Q And when you moved back to Alabama in May of 2016, did you re-register in Alabama? 15:15:41

A Yes, I did.

Q Do you vote regularly?

A Yes, I do.

Q Would you say that voting is important to you?

15:15:50 A It's very important to me.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 170**

419

Q Why?

A Because my vote is my voice. It makes me hold the people that represent me accountable for everything that they do, whether it's a local level, state level, or even federal level.

15:16:02 Q And what congressional district do you live in?

A I'm in Congressional District 1.

Q Who currently represents Congressional District 1 in Alabama?

A Bradley Byrne.

15:16:14 Q Have you supported him in congressional elections?

A No.

Q Have you voted for Bradley Byrne?

A No.

Q As far as you know, have Mr. Byrne's congressional races

15:16:23 been competitive --

A No.

Q -- since you returned to Alabama in 2016?

A No, they have not.

Q And what makes you say that?

15:16:30 A Because in the first time that he ran, he has run unopposed. He has had some -- some opponents, I think, in one primary, and a couple opponents in the general election.

In 2018, there was a young man by the named of Robert Kennedy, Jr., who ran against him, and he lost by 30 points.

15:16:57 Q Ms. Chestnut, you grew up in the city of Mobile; is that

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 171**

right?

A That is correct.

Q And since you moved back to Alabama, you've lived in Mobile; is that right?

15:17:09 A That is correct.

Q Did you go to public school in Mobile?

A Yes, I did.

Q Do you have children who went to public school in Mobile?

A Yes, I did.

15:17:15 Q Based on your experiences in the area, does the African-American community in Mobile have unique needs and interests related to public education?

A Yes, they do.

Q And what would -- what are those?

15:17:27 A So -- excuse me -- our public schools are failing. A lot of the black students that go to predominantly black schools are basically struggling to survive, struggling to get, you know, get their education. They are trying to do the best that they can with what they have.

15:17:58 We have a few of our majority black schools that are currently on the failing list. I don't think there's like a couple of white schools that are on that list from Mobile County.

But they work hard. They try their best. But and some of

15:18:20 them want to go to really good schools. But they -- some end

421

up going to community college and then transferring to a different, you know, transferring to another school. Some just go straight from high school to the workforce.

So it's -- the struggle for having a really great public education is truly real.

Q And you mentioned -- what about white -- white students in Mobile or white families in Mobile? Do they -- don't they have an interest in public education, as well?

A They do. But their needs are different than ours.

White kids don't -- when I was in school -- I will put it to you like this. When I was in high school, I went to Murphy High School. Murphy was, first of all, the first school that was integrated in Mobile County. Second, it was a majority white school when I went there. Now it's a majority black school because all the students that attend Murphy or were in Murphy's district are either going to private schools, like Saint Paul's or Saint -- or UMS-Wright or McGill-Toolen, or they're going to school further out west that have majority white students that attend there. So they're not going to like schools like Williamson or Blount or Vigor. They're going to like Baker or Alma Bryant. Those are the schools that they're attending.

Q And what about higher education? Are there any, in particular, interests within the African-American community in Mobile regarding access to higher education?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 173**

422

A We can't afford it. I am a product of that. I don't have a Pell Grant. I actually had to take the semester off because I couldn't afford my classes this semester. My student loan was only enough to pay for maybe one and a half of my classes. So I have to wait until next semester to see if I have enough in student loans just so I can attend my -- my classes next semester. After that, I don't even know.

I just feel like I'm going to have to give up on my dream of being a screen writer. You have to -- you -- student -- black students have to see if they can get a scholarship just to attend school.

My daughter just graduated a few years ago. My daughter -- she attended -- she wanted to attend Harvard. That was her dream school. But she thought her grades weren't good enough so she could attend Harvard. So she ended up at Bishop State Community College, and then turned around and transferred to Troy and switched her major a couple of times, but now she is a chemical engineering major. And that's because that's the only way she could afford to go to school.

So affordability, having the resources to be able to go to school, not going into debt, you know, to get our degrees? I mean, I'm 43 years old, and I'm still trying to go back to school, and I can't even afford it.

So, yes, so those are one of our immediate concerns with higher education.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 174**

Q Does the African-American community in which you live in Mobile have any unique needs or interests relating to criminal justice?

A Yes.

15:21:49 Q And what are those?

A We're more concerned with a lot of police brutality.

My husband walks everywhere that he wants -- that he needs to go. I can't begin to tell you how many times that my husband has come home and said that he's been pulled over by 15:22:09 the police just because he looked like somebody that committed a crime. Every night when he goes out for his nightly walk, I'm afraid that he may never come home.

The last time he got pulled over by the police, they held him for an hour and a half for a shooting that happened in the 15:22:28 opposite direction that he was going because he went to Wal-Mart to go grab dinner for the night. And when he was coming back, that's when the police stopped him.

So that's a concern. It's a concern for me.

I be at home alone sometimes. What if one of my neighbors 15:22:46 like what happened to the young lady in Fort Worth? What if one of my neighbors got concerned and saw me in the window and shoots me in my own home? You know.

My stepson, 15 -- well, actually 16, just turned 16, I worry about him.

15:23:04 So we worry about those things. We worry about the high

incarceration rates, how a lot of our black young black men are being incarcerated at higher rates than whites. It is an issue.

And I wish that we had more -- somebody who actually represented us that actually addressed those concerns.

15:23:25

Q Has Congressman Byrne taken any actions in Congress related to criminal justice?

A Yes, he did.

Q What did he do?

15:23:36

A He voted against the First Step Act.

Q And what is the First Step Act, as far as you know?

A The First Step Act is a bill that was passed that allowed first-time offenders who get out on parole to get help with education opportunities, job opportunities, housing, whatever they need once they are released from jail.

15:24:00

And so that's a good first step. There needs to be more.

But for him to vote against that, something that is helpful in the way, really kind of made me a little mad, little upset about it.

15:24:23

Q Are there any particular needs or interests among the African-American community in Mobile relating to employment?

A So Mobile is -- as far as jobs are concerned, the major employers in Mobile are Austal, Airbus, and some people might consider the docks. But the two biggest ones is Austal and Airbus.

15:24:53

425

And with Austal, there is an apprenticeship program for Austal. But, one, you need a GE -- you know, you need a high school diploma or GED. You do need a clean record in order to -- in order to be any part of this program.

15:25:15 Another one, of course, Airbus. You got to have a degree, I know, because I looked. Because I was thinking about working for Airbus at one point. But you have to have a degree of some sort to work for Airbus. And also, another, clean record.

And a lot of young men don't have clean records. They 15:25:37 have a felony, and they can't get a job at Austal, or they can't get a job at Airbus.

They work -- there are a lot of young men that have to either start they own business if they can, like my nephew who started his own power washing business. They have to work like 15:25:59 a fast food, like Burger King, or McDonald's, or retail, or restaurants like Olive Garden.

I mean, there really is not a whole lot in the way of good-paying jobs in Mobile unless you're working at a call center or the other two places that I just mentioned.

15:26:22 Q Do you feel like the issues that you had mentioned about African-Americans in the fields of education, criminal justice, affect the abilities of African-Americans to obtain good employment in Mobile?

A Yes.

15:26:33 Q Are there any particular needs or interests relating to

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 177**

426

health care among the African-American community in Mobile?

A This is one of my biggest issues. I am a daughter of a nurse -- actually a granddaughter of a nurse. I have seen the level of care and the access to care go down since my grandmother was alive. And my grandmother passed away in 2001.

It's harder now when you go to the hospital, especially if you have to go to the emergency room, and you have to get, like get seen. If you're really sick, you have to wait. Sometimes you have to wait four, five, even six hours in an emergency room just to get seen. And even once you do get seen, you still have to wait. I have known people that have been in the hospital six hours before they even got in the back.

My daughter has sickle cell. She gets pain episodes probably once every two to three months. She's also pregnant again. And she can't even afford sometimes to go to the hospital. She has to just grin and bear the pain at home because she can't afford it.

So, yeah. Access, limited resources, stuff like that impacts health --

Q Has Congressman Byrne taken any actions in Congress that you are aware of relating to health care?

A He voted to repeal the Affordable Care Act.

Q And do you believe that the African-American community in Mobile benefitted or benefits from the Affordable Care Act?

A I am one of those people that benefitted from the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 178**

427

Affordable Care Act. If it wasn't for the Affordable Care Act, I wouldn't be able to have insurance at all even with my job.

So, yeah. I am one of those people that would definitely -- and I also have a preexisting condition. I have diabetes. And I'm -- and I also had asthma as a kid.

Q Does the African-American community in Mobile have any particular needs or interests related to affordable housing?

A Yes. So the latest news out of Mobile is the Mobile Housing Board in January is closing the Section 8 department. They're firing everybody -- all the staff from Section 8, and they're going to outsource it to a private company.

The waiting list for Section 8 is anywhere from five to seven years long. There have been people that have been on there for a long time.

My mom was homeless when she came home in 2017. My mother is 67 years old. My mother has two bad knees, diabetes, high blood pressure. She also has sleep apnea. My mother had to sleep in her car. My mother had to couch surf.

My mother ended up in a homeless shelter. It wasn't until October of last year she finally got hooked up with a program that put her in an apartment that she could afford.

So we have a homeless population that is insane. We don't have any public housing because they're getting -- doing away with all the public housing. It's just hard to find an affordable place to live in Mobile unless you have got a really

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 179**

great job.

Q Ms. Chestnut, is it your understanding that the city of Mobile is a majority-minority city?

A Yes.

15:30:58 Q And Mobile is currently entirely located within a single congressional district; is that right?

A That is correct.

Q And what congressional district is that?

A Congressional District 1.

15:31:10 Q Do you feel that having the city of Mobile wholly contained within that one congressional district has served Mobile citizens well?

A No.

Q If the city of Mobile were divided between CD 1 and a new 15:31:24 majority-minority district, do you feel the interests of the city of Mobile residents would be better served?

A Yes.

Q And, Ms. Chestnut, I believe you were in the courtroom while Ms. Howell was questioning Representative Knight and 15:31:37 asked whether having two people working together to represent Montgomery can, in fact, benefit the residents of Montgomery. Were you here for that?

A Yes, I was.

Q Do you believe that Mobile could benefit from having 15:31:51 representation by more than one representative?

A Yes.

Q Ms. Chestnut, do you regularly follow political campaigns in Alabama?

A Yes, I do.

15:32:07 Q Have you observed any instances in which a candidate in Alabama has referred to race as a reason to vote for or against a given candidate?

A Yes.

Q Does that happen often in Alabama?

15:32:19 A Quite a few times I've heard a couple of things that kind of made me upset and mad and frustrated.

Q Let's talk about some specifics. Have you personally heard members of Congress from Alabama make any such statements about race recently?

15:32:40 A Mo Brooks.

Q What did you hear Mo Brooks say?

A Something about the war on white people. I'm still trying to figure that one out.

Q And where did you hear Mo Brooks talk about war on white 15:33:03 people?

A He did an interview, radio interview I heard that I almost threw my phone clean across the room when I heard it. But I held my composure because my phone is expensive.

But I'm still trying to figure out what he means by a war 15:33:22 on white people.

Q What did that statement mean to you?
A It means that white people should be afraid of people that don't look like them, people that look like me, people that look like my husband, you know, people that look like my granddaughter. So that's what it means to me.

15:33:39

Fear. It incites fear.
Q Did you personally hear any such statements regarding race made during Alabama's special election for Senate in 2017?
A Yes.
Q From whom?

15:33:53

A Roy Moore.
Q And what did you hear Roy Moore say?
A So in September of 2018, he did a rally in Florence, Alabama. And I'm paraphrasing here. I could be wrong, but I'm kind of paraphrasing here. But that families were together and happy during the time of slavery. So that made me think that so that slavery was good.

15:34:14

Q Is that what you heard when you heard?
A That's kind of -- that's kind of what I, you know, kind of interpreted a little bit.

15:34:37

I wasn't born during that time. I don't even -- none of my -- I think my ancestors were. But I get -- I'm sorry. I just get mad when I hear things like that.
Q Did it affect you when you heard Roy Moore talk about a time of slavery is when families were happier?

15:35:07

431

A Yes. I would think families were happier even during the time of Jim Crow, even during the time of Civil Rights, you know, during the '80s.

Dynamics change, yes. I was raised by a single parent. But that doesn't mean we weren't happy. We were very happy.

Q What does it mean to you when you hear -- when you heard a candidate running for office indicate that families might have been happier during the time of slavery?

A Makes me mad. Makes me -- you know how it makes me feel? That I don't matter. I'm sorry. It makes me feel like I'm a second class citizen in a state that I love.

I love the state. I may go away. I may be away from -- for a very long time, but this is my home. And I love my home. And I want to be treated equally across the board. And I want my voice to be heard. I'm sorry.

Q That's okay. Take your time.

A I'm sorry.

Q No. You're fine. Do you need a break or something?

A No. I'm good. I'm good. I knew it was coming. I just --

Q Ms. Chestnut, did you personally hear any statements regarding race made during the most recent Alabama Supreme Court election?

A Yes, I did.

Q From whom?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 183**

432

A Tom Parker.

Q Do you recall in what forum you saw or heard Tom Parker?

A There were two videos that I saw. One came across my YouTube feed.

15:37:18 And just so anybody don't understand anything about YouTube and feeds, when you are on YouTube and you go to your home -- your home portion of YouTube, it shows you different videos that you may have an interest in or that you watch before you may want to watch another one again.

15:37:36 In this case, because I had been watching a few political ads on my YouTube, this particular video showed up on my feed.

Q Do you recall when -- when this happened?

A This was during the -- this was during the election -- the election proceedings. And the video that I saw was -- the beginning of it was a -- you saw a group of Latinos at a -- I think at a fence, and they were talking about an invasion. And how Tom Parker talked about how he took on the ALCU and the Southern Poverty Law Center, which --

MR. WALKER: This goes to two of the exhibits about which we made an objection.

15:38:30

MS. KHANNA: Sure, Your Honor. I haven't actually sought to admit the exhibit yet, but I will offer to admit them now, and we can discuss the exhibit, if that works for you.

MR. WALKER: No. I'm sorry if --

15:38:45 MS. KHANNA: That's fine. I was going to ask her to

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 184**

pull up the exhibits so we could identify it, and I'm happy to discuss it now if, Your Honor --

THE COURT: All right. Normally we do side bars for that, and even though we don't have a jury, I think we probably should because of a witness presence, as well. So come up here and talk to me about it.

(Bench conference:)

MR. WALKER: Your Honor, we objected to those two exhibits because they weren't disclosed prior to being on the exhibit list. And our position is --

THE COURT: Which ones are they? What numbers are they?

MR. WALKER: I'm sorry --

MS. KHANNA: They're 85 and 86.

MR. WALKER: And our position is that if we had known about them in discovery, we could have done discovery on when they were shown, if they were shown, what formats they were shown in, who had seen them, and that sort of thing. But we don't have any of that information now.

MS. KHANNA: If I may respond.

So I believe that their objection is under Rule 37(c)(1). And that provides that the evidence could be excluded if -- unless it is substantially justified for lack of disclosure or harmless.

And here I think it's both. There was actually no

434

discovery request asking for anything resembling these exhibits. And these exhibits have never actually been in plaintiffs' custody or control. They're on the Internet.

15:40:21 In fact, plaintiffs' counsel didn't even become aware of them until after the close of discovery. And we disclosed them on the pretrial list.

The defendants, Secretary Merrill and his counsel, were present over a year ago at a trial where these videos were played well before our witnesses were deposed. And, in fact, 15:40:36 Ms. Chestnut was -- even if we had disclosed them, you know, by the close of discovery, Ms. Chestnut was deposed well before the close of discovery.

I'm not sure how they would have been prejudiced by not -- they knew of these things existence on the Internet before we 15:40:51 even did.

THE COURT: Okay. But how did they know that they were going to be used in this case?

MS. KHANNA: I think that we've -- we've never actually been asked to identify all things in the public domain 15:41:01 that might be used in this case.

THE COURT: Okay. If this is something, though, that you're relying on in your case in chief, why wasn't it part of disclosures when you found out about it?

MS. KHANNA: Oh, when we found out about it, we did 15:41:14 disclose it. That was just after the close of the -- I think

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 186**

the objection is it was after the close of discovery. We did disclose it on the pretrial list after we found it about.

THE COURT: But disclosing it on the pretrial list doesn't mean you disclosed it as soon as you found out about it.

MS. KHANNA: Well, I can say that we did -- I can assure you we did disclose it very shortly after we had found out about it.

MR. WALKER: I don't question -- I'm just saying that it's unfortunate perhaps for them when they found out about it, but, nonetheless, we did not have the opportunity to do discovery that we would have done to show its context, to show who saw it, and various other things of that nature.

THE COURT: Okay. Well, I'm afraid I remember seeing at least one of these myself.

Off the record.

(Discussion off the record.)

THE COURT: How is it really prejudicial, Dorman? I mean, what would you have done, in terms of where it was shown and -- you know, it was on TV, wasn't it?

MR. WALKER: Well, it was -- I think the testimony was it was on YouTube. I don't know if it's actually -- I don't know. I don't know if it was shown on -- I mean, the -- I guess to the extent that what they ultimately seek to show is the use of race in political appeals. Whether or not it was

436

run on TV is relevant to how broadly that appeal was.

THE COURT: Yeah.

MR. WALKER: Whether it was beneficial advertisement in the Tom Parker campaign.

15:42:58 THE COURT: And I think we're also at that point in our world that you can't believe everything that you see and hear in one of these things.

I saw something the other day that had been completely cut and pasted and was totally, completely false.

15:43:21 MR. WALKER: Let me just say that Ms. Khanna is indicating I went beyond the scope of our objection. And Jim was actually going to argue this. So I didn't mean to -- and I withdraw --

MS. KHANNA: I was actually going to say that I

15:43:33 believe that they stipulated to the authentication of it, that it was, in fact, linked to Tom Parker's campaign. Yeah, we provided that.

THE COURT: Okay. Well, I hate to rule against you when Jim's not here.

15:43:45 MR. WALKER: That's quite all right.

THE COURT: And I had intended several times this morning to ask him about his father-in-law.

(Discussion off the record.)

THE COURT: Okay. All right. Well, I'm going to

15:44:15 overrule your objection. But you can tell Jim that you fought

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 188**

437

it valiantly.

(End of side bar.)

THE COURT: So Plaintiffs' Exhibits 85 and 86 may be admitted.

15:44:40 MS. KHANNA: Thank you, Your Honor.

Heather, can you --

THE COURT: You may publish those, if you'd like.

MS. KHANNA: Can you please pull up Plaintiffs' Exhibit 85?

15:45:04 BY MS. KHANNA:

Q Ms. Chestnut, based on what you see on your screen, can you identify if this is one of the videos that you mentioned popped up on your YouTube feed?

A Yes.

15:45:16 MR. WALKER: I'm sorry. We don't have it. We're good.

MS. KHANNA: Heather, can you please play the video?

(Whereupon, Plaintiffs' Exhibit 85 was played in open court.)

15:46:10 BY MS. KHANNA:

Q Ms. Chestnut, the beginning of this ad mentioned an invasion of -- an invasion -- I believe it is what you had remembered, as well. And I think you saw the pictures of what purported to be a bunch of immigrants coming in to some place.

15:46:28 When you saw that part of the ad, what did it -- what did

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 189**

438

it make you think? How did you feel?

A Angry.

Q Why is that?

A This country was founded by immigrants. My ancestral background is Native American, part of it, anyway. The other part of it is Irish. I found that out.

Q Did you understand that reference to an invasion to be a statement about race?

A Yes. Because the word "invasion" means that you're invading someone -- you're invading somewhere, which means you're coming in, and you're going to take something, as well.

What are people taking? I -- my ancestors didn't invade this country. They were brought over here on ships. They were sent somewhere else on reservations. They didn't invade. We didn't take anything.

So why would you not allow at least a humane way to let people who are running from persecution and violence find a safe harbor here in this country?

Q So in what portion -- in what way did you see this to be a statement about race?

A The word "if they." Who's "they"? Am I "they"? Is my husband "they"? Is my friends who are Hispanic, are they "they"? Who is this "they"?

Q Do you believe "they" to refer to Hispanics?

A Yes.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 190**

439

Q Can we pull up Plaintiffs' Exhibit 86, as well, just the top of it?

And I believe, Ms. Chestnut you testified that you had seen a couple of video ads from Justice Parker's campaign; is that right?

A Yes.

Q And do you recall seeing -- does this video that -- from what you can see on the screen, is this a video you have seen before?

A Yes.

Q Do you recall when?

A It was on my husband's Facebook timeline.

Q And just for the record, what does that mean it was on his Facebook timeline?

A So when he pulls up his Facebook, or I pull up my Facebook, if someone posts something, it usually goes onto like what they call a news feed. So we call it a timeline. But it comes in a news feed.

So you see what your friends posted, you know, or pages that you liked what they posted. And one of his family members posted this.

Q Do you recall when you saw it?

A It was during the election season.

Q Can we please play the video?

(Whereupon, Plaintiffs' Exhibit 86

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 191**

440

was played in open court.)

BY MS. KHANNA:

Q Ms. Chestnut, when you saw this ad, when you saw Justice Parker's reference to having taken on the Southern Poverty Law Center, did you view that to be a statement about race?

A Yes.

Q Why?

A Because Southern Poverty Law Center Is a Civil Rights organization.

I always felt -- there is the reason why I didn't go into law. I always thought that law should be applied equally across the board, no matter if you walk in someone's courtroom whether you're white, black, Asian, pink, purple, it should be equally across the board.

So why would you go up against an organization whose main objective is to make sure that everyone in this country, in this state, have the same rights as everybody else?

Q Is it your understanding that the Southern Poverty Law Center has worked primarily on issues of racial justice?

A Yes.

Q And when you saw the portion of the ad discussing mob rule and depicting Maxine Waters giving a speech, along with the fires burning and the people running, did you view that to be a statement or a sentiment about race?

A Yes.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 192**

Q And why?

A Because they make it seem like black people are mobs. We're just unruly. We just do whatever we want to do. We don't respect nothing. We don't have -- you know, we don't have no morals, no scruples, no nothing. We're out here running willy-nilly.

Q And you can take this down. Thank you, Heather.

Ms. Chestnut, how do these types of statements make you feel as an African-American voter?

A As I said earlier in my testimony, it makes me angry. Makes me frustrated. It makes me feel like I'm a second-class citizen. Makes me think that people don't care.

Q And what effect do these types of statements have on race relations in Mobile?

A It divides us. There is a lot of people who are on -- used to be a lot of time when you can talk to your friends even when you guys don't agree on everything. But you still had respect for one another. You still was there for one another.

Nowadays we're so deeply divided, it's like you can't even be friends on Facebook. And I've lost quite a few friends on Facebook because I've disagreed with them on something. I've said something, you know, your opinion's not a fact. It's just an opinion.

But they want to believe everything they hear about black people in general -- that we're lazy, that we don't do

442

anything, that all we want to do is collect entitlements, and stuff like that. They just don't care.

And so my job is to prove everybody wrong.

Q Do you believe that the ads like the ones we've just seen deepen the racial divides within Mobile?

A Yes.

Q Ms. Chestnut, do you travel to Baldwin County often?

A No. Not like I used to.

Q Why not?

A One, I don't have a car that would help. But Baldwin County frightens me. It scares me a little bit. The stigma that Baldwin County has is that it is a sundown county.

Q What is a sundown county?

A A sundown town. So a sundown county or town is a town or a county that if you as an African-American are in after a certain time, there's a possibility you may not make it out of that area. You may be chased by white supremacists. You may be followed by the police. You may be harassed the whole entire time.

Yeah. You don't -- Baldwin County has always had that stigma.

Q What makes your view of Baldwin County as a sundown town or a place where African-Americans might not feel safe after a given hour?

A So I have a little story to tell everybody. In 1981 there

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 194**

443

was a young black man by the name of Michael Donald. He was 19 years old. He was in a black neighborhood. He had just left the store to buy his sister a pack of cigarettes.

Two Klu Klux Klansmen under the guise of giving them directions to a local black club kidnapped Michael, brought him over to Baldwin County. When he tried to run away, they beat him with a tree limb. They tied him to a tree limb and still continuously beat him with a tree limb.

They brought him back over to Mobile County --

15:56:29 Q Baldwin County?

A No. They brought him to Baldwin County. Then they brought him back to Mobile County. And they hung him as a reminder to every black person in that -- in Mobile, Baldwin, wherever you live -- that you can't escape the Klan.

15:56:49 Q How old were you at the time of this incident?

A I was five years old.

Q And what do you remember about that incident?

A My mother served on that jury that convicted the man that killed Michael Donald.

15:57:03 Q Does this history from Baldwin County continue to impact your view of Baldwin County --

A It does.

Q -- today?

A It does. It impacts not only my view, it impacts a lot of my friends' reviews. It impacts my husband's view.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 195**

444

I was willing to take a chance for our anniversary and go over to Applebee's because it's the only Applebee's in the area is in Baldwin County, and for our anniversary celebrating our one year. And my husband pushed back the whole time. No, I don't want to go. Baby, it's not safe. Baby, I don't want to go. Baby, we don't need to be over there. It -- we don't need to be over there. I had to convince him that we're going to go with friends. We'll be fine.

15:57:38

Well, luckily, our friends backed out. So we ended up at Fridays and had our anniversary dinner.

15:57:58

But, yeah, he -- we don't -- we're -- it's -- the fear is -- the fear is real about Baldwin County.

Q Have you had any personal experiences in Baldwin County that would validate those fears or strengthen them?

15:58:19

A Yes. So when I first got my car in 2004, I had went over to Fairhope beach and Parrish, which is one of my favorite places to go during -- you know, during safe time of the day. I went over there to kind of like clear my head and just relax by the beach. And it was getting late.

15:58:41

So I said, well, I need to go, because I got to get up in the morning and go to work. And as I was leaving Fairhope and leaving going into -- coming almost into Daphne, there was a Fairhope police officer that followed me the entire way until I got to the -- to Daphne city limits.

15:59:05

He didn't pull over, didn't stop me. I wasn't doing

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 196**

445

anything. I was driving the speed limit. I was -- you know, had all the lights on, you know, properly made lane changes if I need to. I was literally scared. I was in the car by myself. I was so glad when I got to Daphne because I knew in the next 10 minutes I would be at I-10 going west, going back to Mobile County.

15:59:24

The last time I was really in Baldwin County, I went to Fairhope for a protest. Yeah. I do that sometimes. Protesting Roy Moore. Almost got ran over by a Roy Moore supporter in front of the police. They didn't even do anything. They just sent him on his merry way.

15:59:47

My friend who happened to go inside to kind of hear what was being said -- the protest was over. I forgot where she had parked her truck. It was raining. I was getting soaked. I was texting her, saying, Come on, I'm getting wet. Can you hurry up? And she was like, I'm on my way out. And while I was standing there, a guy who claims that he was security had nothing on him that said he was security basically called me everything but a child of God. I was all kinds of N-words, N-itches. I was -- I didn't feel safe.

16:00:10

16:00:33

It was luckily one of my friends who was actually leaving -- was actually leaving told me to get in her car, and she was going to drive me off the property until I could meet up with my other friend who had brought me there.

16:00:51

I was a nervous wreck. I cried. I was -- I was -- I was

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 197**

446

ready to go.

Q Ms. Chestnut, have you spent any time in Montgomery?

A I have been to Montgomery quite a few times.

Q And in your view, does the city of Mobile have more in common with Montgomery County or Baldwin County?

A They're more in common with Montgomery County. It's an urban center. They both are urban centers. It's just like Birmingham.

Birmingham is an urban center. They have the same, you know, same concerns, same issues -- education, health care, jobs, affordable housing.

Baldwin County is filled with -- no offense -- old white retirees. There is -- there's -- I mean, there are retirees in Mobile, but Mobile is starting to become a young and, you know, fresh kind of, you know, city now.

It's more -- they're trying to be more things that's geared to a lot of people my age, like in their 40s and millennials. I mean, it's starting to kind of get younger and hipper. So there's not like a whole lot there.

You go to -- if you go to Baldwin County, there's not that big city feel as if you go to Mobile. They got that -- because we have Mardi Gras, you know, different music festivals. We have a cruise that leaves out of Mobile.

So it's got -- it's just got more there between Montgomery County and Mobile County than Baldwin.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 198**

Q Do you feel like there are certain cultural and economic similarities between Mobile and Montgomery?

A Yes, there are. I mean, of course, both of them are -- and no lie -- they're both majority black cities and counties. I know Montgomery just recently became more majority black.

But there's, you know, like I said, same concerns, you know, as far as like the different issues that we all have concerns about. So there's a lot more in common between Mobile and Montgomery.

Q How easy is the -- sorry.

How easy is it to get from the city of Mobile to Montgomery?

A Oh, all you got to do is hit I-65 and go north, and you will be in Montgomery in no time.

Q Are there public transportation options between the two cities?

A There's a Greyhound and a megabus.

Q Ms. Chestnut, are you a member of a political party?

A Yes, I am.

Q What party is that?

A I'm a Democrat.

Q What are your views of the two parties in Alabama when it comes to issues of race and racial justice?

A So I've been a Democrat since I was 16. I always kind of -- when I was growing up, my grandmother made sure I watched

448

both national conventions every four years. She didn't tell me to not watch Democrats. She didn't tell me to watch the Republicans. She made me watch both of them because she knew eventually I was going to have to choose a party when I got older and I was ready to vote.

16:04:11

She always told me to vote along my convictions and what I believe. And my beliefs line up more with the Democratic party than the Republican party.

I feel comfortable as a black woman because they have the core -- my core principles -- racial justice, social justice, equal pay, equal -- equal rights for everybody. I align with those thoughts in the Democratic party.

16:04:30

Do I -- do I agree with everything that the Democratic party does? Not all the time. But I am -- you know, but I do vote my convictions. I vote my -- my concerns. And the Democratic party aligns right along with those.

16:04:59

The Republican party? I have friends who are Republicans. Love them to death. We agree to disagree. But I can't feel comfortable in a party that allows -- well, that's hospitable to hate. I'm not saying everything that's a Republican is a racist. But what I feel is -- and I gave this analogy earlier -- if I'm sitting -- if I have a friend -- you know, if you have got a friend named Joe, and Joe's sitting next to you, and he is saying the most vile and disgusting things that you have heard -- you've heard, and it goes against your core

16:05:27

16:05:50

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 200**

449

principles, your feelings, and if you don't stand there and say, Hey, Joe, why are you saying that? Man, you know that's wrong. You know, stop saying that. You know, and distance yourself from them, then you've said volumes.

16:06:14 But if you're sitting there and you're letting him spew all this hatred, all this vileness out of his mouth, and you don't say anything, of course people are going to group you in the same group. Of course it's going to happen.

So why would I want to associate myself with somebody -- 16:06:34 with a party that allows that to happen? Like I said, I know -- look, like I say, I got friends who are Republicans. We agree to disagree. But they're not racists, and I know that.

Some of them I've been friends with for 25 years or more. 16:06:51 I went to high school with them. But we don't sit there and -- you know, they hadn't never said anything that made me just want to, you know, backhand them, or anything like that.

They -- you know, so I know where their hearts is. I know where they -- you know. But some people, sometimes you don't 16:07:11 know where they heart is because of they're not speaking up and they're not speaking out.

Q Do you feel -- as a black woman, do you feel welcome within the Republican party in Alabama?

A No. I hate to say it. It needs to be -- can I say 16:07:28 something real quick?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 201**

There needs to be more unity in this state. The reality is, is that we're all equal. We're all the same. We're Alabamians first before we're Americans. This is our home state.

16:07:48 I love Alabama. I love it to death. I defend it to death. When I lived up north, I would have people say bad things about Alabama all the time. And you know what? I wouldn't let nobody say anything bad about my home state.

We need to come together. We need to stop all this 16:08:10 division. It is time. And if this is the way for it to happen, I'm all for it.

I'm not saying that I need another congressional district so I can vote for a black candidate. Heck, it could be a white candidate that could do the same thing -- represent the people 16:08:32 of this -- of this district the same way that they represent District 7, that Terri Sewell represent the same district in District 7.

I just want to be able to have a seat at the table. And if I got to make my own table and put my own seat at it, that's 16:08:52 exactly what I'm about to do.

Q Thank you, Ms. Chestnut.

A Thank you.

MS. KHANNA: No further questions on direct.

THE COURT: Any cross-examination?

16:09:04 MS. HOWELL: Yes, Your Honor.

451

CROSS-EXAMINATION

BY MS. HOWELL:

Q Hi, Ms. Chestnut.

A Hello.

16:09:43 Q You covered a lot of ground in your testimony here today, and I just wanted to ask you a few follow-up questions about it.

You moved back to Alabama in 2016, right?

A That is correct.

16:09:56 Q Okay. And you talked about -- well, some things that it sounds like you've seen since then. And I want to ask you particularly about the racial appeals that you talked about hearing in elections.

A Uh-huh.

16:10:10 Q When do you recall having heard Mo Brooks talk about -- make the racial appeals that you were discussing earlier?

A Oh, let's see. I have heard him say it this year. I heard him say it last year.

The most recent was an -- like I said, it was a radio 16:10:27 interview that I heard him, I heard him say that.

Q Do you recall which radio station you heard him on?

A I couldn't tell you. It was -- I can't really -- it's like some northern -- up here in northern Alabama radio station.

16:10:44 Q Okay. But you live in Mobile County, do you not?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 203**

452

A Yes, I do. I do have iHeartRadio.
Q Okay. So you heard it on your phone on the radio streaming on your phone?
A Yes.
16:10:55 Q Okay. Thank you.
You also talked about Roy Moore making racial appeals in the 2017 campaign for a Senate seat for the state, right?
A Uh-huh.
Q And Roy Moore did not win that election, did he?
16:11:11 A No, he didn't.
Q Who won that election?
A Doug Jones.
Q And Doug Jones is a Democrat, is he not?
A Yes, he is.
16:11:18 Q He defeated the Republican candidate, did he not?
A Yes, he did.
Q You also talked about the interests that you have in various sort of issues facing the state -- public education, law enforcement, a couple of more things like that, affordable housing, right?
16:11:46
A Yes.
Q Do you know whether public education is typically dealt with by state or federal government?
A It starts at the federal, goes down to the state, and it trickles down to the school boards.
16:12:02

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 204**

453

Q Okay. And school boards are local bodies, are they not?
A Yes, they are.
Q They're usually state officials, right?
A No. In Mobile County -- in Mobile County, we have -- we elect our school board.
Q Right. But that's as a part of state government, right? As opposed to federal government, right?
A Yes. Part of state government.
Q The same is true as far as law enforcement, right? Those are usually state officers rather than federal?
A Yes.
Q And those issues are typically dealt with on the state level?
A I would think so, yeah.
Q So a congressperson plays a more distant role in those policy decisions?
A But even if they don't -- even if it's a state issue, it's also a federal issue, too. People's rights are being violated. That's the bottom line to this -- to this whole thing.

My husband -- look. My husband has a right to go wherever he wants to go. If he wants to go to the store, he can go to the store. If he has to go pay a bill, he can go pay a bill. Unless he's doing something absolutely wrong, or he's walking in the middle of the street, or walking naked somewhere, he should be able to do that without being accosted by the police.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 205**

                 454

I can't count on this hand -- on these two hands how many times in the three years that me and my husband been together, how many times he been stopped by the police for doing nothing.

We can appeal to the -- I can appeal to the mayor, the city council, the governor, my state legislator, all day long, but something has to start on the federal level and --

Q What are you hoping that your congressperson will do differently to address those issues?

A I would hope that some type of piece of legislation will make sure that if something happens, that police officers are held accountable for their actions. I mean, because apparently it's not happening on the local level, and it's definitely not happening on the state level.

Q Have you taken any actions to see if anything can be done on the local or state level?

A There was a young lady by the name of Shakeisha (phonetic).

THE COURT: I'm sorry. That calls for a yes-or-no answer.

THE WITNESS: Okay. That calls for yes or no? Okay. Repeat that question again.

BY MS. HOWELL:

Q Have you done -- have you taken any actions on the state or local level --

A Yes.

**_Christina K. Decker, RMR, CRR_**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 206**

455

Q -- to press those issues?
A Yes.
Q What are you hoping to accomplish in this lawsuit that would address those issues?
16:14:46 A I want representation. I want a seat at the table.
I'm tired of being disfranchised. I'm tired of every time I go to vote, I don't have nobody that I can vote for. There is no competition. We want a seat at the table.
I am tired of hearing my fellow African-Americans in
16:15:12 Mobile County say the following to me: I don't vote because they vote in who they want in. I don't want to vote. I don't want to vote because why? My voice don't matter.
That's what is time for this to end.
Q And you --
16:15:36 A We have seven -- we have seven congressional districts.
THE COURT: I think you've answered the question. Thank you.
THE WITNESS: I'm sorry. I just --
THE COURT: I know.
16:15:45 BY MS. HOWELL:
Q Do you think that redrawing the congressional districts would motivate for people to vote?
A Yes. Sorry. I don't mean to sound kind of, you know, forceful there, but, yes.
16:15:56 I have kids. I encourage them to vote.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 207**

456

When I talk to young folks about voting, they don't want to vote because they don't have a reason to vote. They don't feel like they voiced -- their voice will be heard.

And like I said, they need -- we want a seat at the table. How can I -- how can I get a seat at the table if my voice is not being heard?

16:16:18

Q You talked toward the end of your direct examination about a need for more unity in the state. Do you believe that redrawing the congressional districts will accomplish that?

16:16:36

A Yes.

Q How?

A Because we will have a voice.

Q Do you think that filing a lawsuit accomplishes more unity in the state?

16:16:47

A If it's to get y'all attention, yes.

Q Who is "y'all"?

A The state of Alabama, my home state.

Q I will ask you one final question. Do you believe that Representative Sewell up in Congressional District 7 represents her district better than Representative Byrne down in your district represents his?

16:17:08

A Yes.

Q Why?

A Because she has -- because she has connections in every part of her district. She has connections in Tuscaloosa. She

16:17:22

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 208**

457

has connections here in Birmingham. She has connections in Selma.

I know Terri. I've actually went to convention with Terri. So I know Terri. I know what her -- she's going -- she's -- I knew she was going to do a good job representing District 7.

Q Do you know if Representative Sewell had any role in drawing her congressional district?

A No, I do not.

Q Okay. Thank you very much, Ms. Chestnut.

A You're welcome.

THE COURT: Any redirect?

MS. KHANNA: Briefly, Your Honor.

THE COURT: All right.

REDIRECT EXAMINATION

BY MS. KHANNA:

Q Just a few quick questions, Ms. Chestnut.

A Uh-huh.

Q Do you believe that your member of Congress has the ability to ask the Department of Justice to investigate situations within a state?

A Yes.

Q Do you believe that your member of Congress has the ability to write a letter to local officials if he or she thinks that the state needs to take action?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 209**

458

A Yes.

Q Do you believe that your representative in Congress has the ability to vote to repeal mandatory minimums?

A Yes.

16:18:28 Q Do you believe that your representative in Congress has the ability to vote for more funding for poor schools?

A Yes.

Q Do you believe that your representative in Congress has the ability to vote to decriminalize the possession of

16:18:44 marijuana?

A Yes.

Q Do you believe that your representative in Congress has the ability to vote for more affordable -- more funding for affordable housing?

16:18:55 A Yes.

Q Section 8 is a federal program; is that correct?

A Yes.

Q You testified about Section 8 housing today?

A Yes. Yes.

16:19:00 Q Thank you, Ms. Chestnut.

THE COURT: Any recross?

MS. HOWELL: Just one question, Your Honor.

THE COURT: Okay.

RECROSS-EXAMINATION

16:19:14 BY MS. HOWELL:

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 210**

459

Q Your counsel just asked you a few questions about your congressperson writing letters to those state and local officials, correct?
A Uh-huh.
16:19:25 Q When those congress people write those letters, who has to take the actions?
A The local -- local people.
Q Thank you.

THE COURT: Anything else?

16:19:36 MS. KHANNA: Oh, sorry. No. Nothing further, Your Honor.

THE COURT: Thank you, Ms. Chestnut. You may step down.

Call your next witness.

16:20:02 MR. SPIVA: Yes, Your Honor. Plaintiffs call commissioner -- County Commissioner Sheila Tyson.

SHEILA TYSON,

having been first duly sworn by the courtroom deputy clerk, was examined and testified as follows:

16:20:42 THE COURTROOM DEPUTY CLERK: Please state your name for the record in the microphone.

THE WITNESS: Sheila Tyson.

DIRECT EXAMINATION

BY MR. SPIVA:

16:20:58 Q Good afternoon, Commissioner Tyson. Where do you live?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 211**

460

A I stay in West End in the City of Birmingham at 1233, 14th Place Southwest, 25211.

Q Okay. Thank you, Commissioner. How long have you lived in Birmingham?

16:21:16 A I have stayed in Birmingham all of my life. I left for about 17 years and came back.

Q In which congressional district do you live in?

A I stay in Congresswoman Sewell's district, and it's 7.

Q Have you -- and you said you had left Birmingham for a 16:21:36 time. What were you doing -- well, where did you go when you left Birmingham?

A I was in the military, and I traveled all over. And I worked -- also worked for the military.

Q And how long did you serve in the military?

16:21:53 A I served four years in active duty.

Q And then how long with the reserve time?

A I actually had several jobs. I worked in the post office. I worked with several other disabled veteran units all over.

Q And that was all with the military?

16:22:13 A No. No. Some with the military and some wasn't. So, no, it was federal government.

Q Okay. And which one branch of the military were you in?

A The Army.

Q And what was your position in the military?

16:22:30 A I was actually a warehouse specialist in a chemical

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 212**

warehouse.

Q And when did you return to Alabama?

A I returned to Alabama in '82. Left, came back, and returned back in '88. Left, came back, returned back in the '90s.

16:22:59

Q Okay. And have you -- have you been then living again in Alabama since the early '90s?

A Yes.

Q And did you attend college, Commissioner Tyson?

16:23:11

A No. I went to the Quartermaster School in the military.

Q And which high school did you attend in Birmingham?

A West End High.

Q When did you graduate?

A '79.

16:23:24

Q And can you describe your upbringing in Birmingham?

A When I grew up in -- my mother and father had seven children. I had both parents. They were married.

I grew up in part of Smithfield. That was my early years.

Q When you say 'early years' -- sorry to interrupt. But in Smithfield about --

16:23:52

A It was from to the third grade we stayed on Ninth Avenue West. And that was right down the street from Graymont Elementary School. And we moved out from over there when I was in the third grade when my father -- my father died when I was like five or six. I can't remember. But I was of age when he

16:24:13

462

died.

Q Tell me about your early schooling experience in Smithfield. Did you go to a segregated school?

A Yes. We went to a segregated school. I went to --- Graymont was the first school I went to. And that was when -- they was first segregated in, I think it was 1963 or '64. I went in '64, maybe '65.

Q To Graymont?

A To Graymont Elementary School, along with my brothers. And my other sister they was at -- it was me, Scooter, Rosalind. And Jerome and Amanda, they was at Parker.

Q Okay.

A And Jerome was at Holy Family.

Q So when you were at Graymont, did you say around the '64 time period -- did you say that that was around the time it was first being desegregated, or --

A It was then -- it was blacks being brought in to Graymont Elementary School. We weren't the first ones brought in there. But we were a big part of the groups that came in.

Q Uh-huh.

A And --

Q Tell me about that experience.

A It was horrible. I was little, and so I really wasn't able to really protect myself and fight. But my brothers were. They were -- they were big teenagers.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 214**

And it was just hell every day. You had to -- when you got to school, they tried to stop you from coming to school. And on your way back, you got rocks throwed at you.

We used to call this coming off of -- we used to call it turnpike because the road kind of twisted. So it was downhill running, you know, every day. They had the smaller kids, they had to grab each one of our hands on each side because we would fall. And we had to run from the school about -- probably about six blocks until we made it home.

16:26:01

Q And because of the treatment that you received at Graymont, did your family make a change, in terms of where you went to school next?

16:26:24

A We didn't -- my family didn't make a change. The system made a change because of the fighting. They started fighting back.

16:26:43

So they moved us to Wilkerson Elementary School. And we had to walk from Ninth Avenue to Wilkerson, which the freeway wasn't there. It was just a bunch of red dirt. So we used to have to cut across.

And I remember it good because I was -- it was a dog -- it was First Baptist Graymont Church. It was a dog in a fence next door. And we used to have to cut across Graymont in order to -- First Baptist Graymont in order to get across the red dirt to the school. If not, it would add like some -- a whole lot of more blocks on to the distance to walk.

16:26:59

16:27:21

And I was so afraid of that dog if -- because I used to have to walk sometime if I -- if my brother -- they had to go to basketball practice, or something like that earlier, we -- I would have to go by myself.

16:27:38 And my mom, she was sick. So she would walk halfway. And when she get to the church, I used to have to walk the rest of the way over the red dirt to get to Wilkerson.

Q Let me ask you: Was Wilkerson an integrated school?

A It was a black school.

16:27:54 Q Okay. So after your experience at Graymont, the system moved you back to a segregated school?

A Yes. It's because -- and it was because of the fights. It was the -- it was the white kids against the black kids. And as long as the white kids was beating us up, nothing was 16:28:15 said, you know. It was -- you know, we reported it, but it was all right.

But then black kids started beating the white kids back up. That's when they moved us.

Q And how long did you go to the Wilkerson -- to Wilkerson?

16:28:29 A I left Wilkerson and went -- in the third grade and went to -- that's when we moved. My mother got insurance money off of my father death. And we built a house in West End.

Q And what was West End like racially, the area that you all moved to when you were in third grade?

16:28:47 A They thought we were the moving company when we first

465

moved in because she actually built a house. So it was like -- and I can't remember -- I was in the third grade, so I had have to go back the years and count.

When we first moved in the house, we were like probably one or two people moving in at the same time that was African-American. It was solid white.

And I remember a lady coming over with a basket. And I was like -- I told you in the third grade. And she said that, Is a lady of the house here? And I called my mom. And she came, and she said, I was just wanted to, you know, meet the family that was moving in.

She said, Well, how you doing? And the stare the lady gave her was like you can't possibly being built a split-level home in this area. And it was a corner lot.

So right then I was just looking because I knew my mother actually was a foot soldier. So I'm looking like, oh, my God. And she gave my mother the basket, and she took the basket. And they didn't shake hands, but she did give her the basket.

Q And just to make sure the record is clear. So the lady who came over to the house, she was expecting to see a white family?

A Yes.

Q And so she was white, the neighbor?

A Yes.

Q Okay. And so what happened after that?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 217**

466

A Gradually the families started moving out, out the community, just one at a time within like -- it wasn't no years or no months. This was like you wake up and a family gone.

It was like -- and my mother kept telling my brothers the -- two neighbors across the street had girls. And the girls was, you know, kept trying to talk to them. And she said, I told you to stay out from over there. You going to end up in jail. And they -- the girls wouldn't stop. And gradually within a couple of weeks, them people, they were gone. I'm talking like dominoes. Just gradually everyone was moving, moving, moving.

And about time I got in the eighth grade, all of the -- all of the whites in that community was gone.

Q And did the neighborhood become a predominantly black neighborhood then?

A It became -- we had one older lady. I cannot think of this lady's name for nothing. There was one older lady stayed. And she stayed across the street on the -- she stayed, like it was about four doors down. And we used to help her, you know, cut her grass. And my mama used to go over there and help her also because she was really up in age. And that was the only lady that stayed over there.

Q Only white lady that stayed?

A That was the only one. And I just think she was, you know, satisfied that, you know, that she just didn't try to

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 218**

         move, I don't believe. I was so young. I really didn't focus, you know, on that.

Q Where did you go to school during this period at the West End neighborhood after Wilkerson? Did you go through high school there?

A Went to Jackson Elementary School, which was right in our back door.

Q Uh-huh.

A So that was like nowhere to walk.

Q Was that school predominantly black or predominantly white when you got there?

A It was -- it was really, really white when we got there in West End. It was really white. And gradually they -- they left.

Q Uh-huh.

A And before I was in the eighth grade, it was all black. Might have been one or two white students left.

Q Uh-huh.

A But I can guarantee you it wasn't many.

Q Uh-huh. And then where did you graduate from high school?

A At West End.

Q Uh-huh.

A I graduated, I think it was -- I'm almost -- because we just had a class reunion. It was 360 graduated in my class. We might have had 25, maybe, whites.

468

Q When you graduated?
A When I graduated.
Q When you first started at -- sorry. I lost the name -- West End?
16:33:19 A Yes. West End.
Q When you first started there, was it -- was it integrated at that point?
A It was well mixed. It was well mixed. It was -- behind the high school, it was a lot of white people stayed behind in
16:33:34 that area. It was a lot of people stayed behind there.
Q When you graduated from high school, Commissioner, is that when you first went into the military?
A I went in the military, yes.
Q Why did you decide to go into the military at that point?
16:33:51 A Well, when I was in high school, I was very good in volleyball. I had an opportunity, actually, to go to college. And both of my parents had died by then. And it was my sister at the age of 21 raised five children. And I wanted to help her.
16:34:18 And I was a community activist all the way from ten years old all the way until I graduated. And I just -- I just felt like I needed go because I wasn't going to stop doing what I was doing. And I had her worried. That's when Bonita Carter had died, got killed by the police. And we were sneaking out
16:34:40 of school, marching in the Civil Rights movement trying to get

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 220**

Richard Arrington in office.

It was just, you know -- it was just a political thing after every -- just protesting, protesting. And I had I -- I just -- I felt like I needed to leave because if I didn't, I was going to end up in some bad trouble because I wasn't going to stop protesting.

Q Uh-huh.

A And my --

Q When you said you needed to leave, you mean you needed to leave Alabama?

A I needed to leave Alabama because we wasn't stopping. We kept protesting.

And my -- I got so -- and I'm so glad social media wasn't back then because I probably would have got more whippings than I did because she didn't want me, you know, taking, sneaking out of school going to protest. And we did it. I did it anyway.

And she wanted me to graduate. And I graduated. And when I graduated, I needed -- I wanted to leave. They wanted -- when I went in the military, they wanted me to wait until 1980 to leave, but I had to leave.

And they, most of the time when they send you off, they send you to the closest base and that's in Georgia. I would have went to Fort -- to training, basic training. But I ended up going to New Jersey because I wanted to leave so soon. So

470

they sent me on December the 5th. So I had to leave then.

Q Uh-huh.

A Because we was still protesting. It was still so many issues in the community. And I was still going to protests.

16:36:16 Q Let me ask you about that, because you said you'd been an activist since the age of ten?

A Yes.

Q What did these protests involve, you know, from then through the time that you were leaving Alabama?

16:36:27 A It was equal rights to vote. My mother did it, and, you know, back then you took your children with you. And out of seven kids, I was the one that decided to be a foot soldier with my mom.

And we used to do voter registration. We used to do 16:36:47 marches to the poll. We was trying to get more people of African-American on the city council in the City of Birmingham. And we had the coalition back then.

I was a member of the coalition back in -- when they used young people to actually lead a lot of the marches. And I was 16:37:12 within that group.

Q What kind of reaction did you get from local or state officials to these marches and protests?

A Well, a lot of them, you know, they didn't like what we were doing. You know, they used to -- I never got bit by a 16:37:33 dog. I never did experience that because all of that was gone

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 222**

471

by then. But we used to get cursed out and spit on, different things.

Not so much about public officials, but it was just the people who we were protesting against the different issues that was going on within the City of Birmingham. It wasn't a community thing. It was actually a city thing. And we were leading the marches that we came together with the coalition and met about.

16:37:50

Q Uh-huh.

16:38:03 A And most of the marches was led by children, young people, because I wasn't a child then. I was a young adult. I was 18. And it was by women.

Q Uh-huh. Uh-huh. Let me turn to the present day for a minute. What is your current occupation?

16:38:24 A I'm a county commissioner for Jefferson County District 2.

Q And can you describe your district, in terms of demographically and racially?

A I have a large portion of African-American, low income. I have a percentage of whites in my district. But majority of them are -- it's not -- I don't believe it's a median income. You're either poor or you're rich, so they in the rich category.

16:38:50

Q But these are some portion of your constituents?

A Yes.

16:39:02 Q And where do they stay?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 223**

472

A Downtown, the south side, Lakeview.

Q Uh-huh.

A In that area.

Q And what -- what's the kind of -- the larger portion of your district?

16:39:15

A It's poor from the southwest Titusville. I have Druid here, Evergreen bottom, Fountain Heights. All of that is behind the civic center. If you look behind the civic center, all of that is nothing but poverty.

16:39:34

You go to Norwood. Norwood is kind of trying to build itself up, but I have only like two streets off of Norwood. Once you stopped right there at Uptown, everything back there is nothing but low income.

Q Uh-huh.

16:39:49

A You skip over downtown, all that's money. Even within the -- the low income apartments that's downtown, those are mixed-use apartments. So you have a lot of upper-scale citizens that stay in those apartments. You have a lot of low income.

16:40:08

Q Uh-huh.

A Now, it's always a small portion -- I think it's maybe like ten percent that live over there.

Q Uh-huh.

A And I have -- there's south town, which is low income.

16:40:21

That's about 525 units there. But all of the south side is

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 224**

473

like an upper-scale income.

And then you go to Titusville, that's low income. All the way -- and you pull all the way back through Ensley, Smithville, West End, Hillman Estates, all of that back there, you go to Lipscomb, is very poor. And it's a lot of poor whites and Latinos there in Lipscomb and Brighton.

You go all the way through to Bessemer, and that's where my district stop at.

Q Okay. And then the area that you described at first that you said was -- you said it was all kind of very deep poverty, what's the racial makeup of that portion of your district?

A It's black.

Q And what are some of the concerns that your -- in the poor areas of your district that your constituents have?

A They are not being represented. And that's one of the main reasons that I ran for this position.

Q Do they have -- in terms of issues, do they have health care concerns?

A Yes. They closed our county hospital. They had been chipping away at the county hospital since 1999. They finally closed the -- they sold the beds back in 2012.

Q Uh-huh.

A And they did a study three years ago. Diseases that was back in the '60s, they are starting to pop back up now because of the county hospital closing. And people now don't have

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 225**

anywhere to go to be treated.

Q And are these individuals who don't have health insurance?

A They do not have health insurance. They are all indigent care patients.

16:42:15 Q How important is the Affordable Care Act to your constituents, Obamacare?

A I don't know how they came up with that name Obamacare. I guess because he the one that talked about it.

But health care is so important. And I don't understand 16:42:36 how we are not taking advantage of this here in the state of Alabama. And it's not -- it's hurting -- it's hurting so many people.

The mortality rate of pregnant women here in the state of Alabama, African-American women, it's the highest in the world. 16:42:59 How can that possibly happen? And we're not the largest state in the United States. How can that -- how could that happen?

Diseases that you find in third-world countries are here in Alabama. They see it in Jefferson County a lot. How is that happening here when we have the -- the best hospital -- 16:43:26 UAB -- in the country?

Q How about affordable housing? Is that a concern of some of your constituents?

A They are chipping away affordable housing. If you look at it -- you're making 7.25. Most of these jobs, if you're making 16:43:47 7.25, and you get 40 hours a week, that's still not enough to

pay. The lowest rent you going to get is at least 750 a month. And that's where I live at. And I stay in a bad area in West End.

Q Uh-huh.

16:44:07 A So you going to pay $750 to live in West End.

That's -- if you're going to get just a halfway decent place, if you paid 325 or anything -- and I have been talking about this for I don't know how many years. If you pay 325 here in Jefferson County, you going to be in a slum shotgun 16:44:32 house not fit for a dog to live in.

So affordable housing is very important. It's needed here in this state. It's critically needed in this state.

Q And, Commissioner Tyson, what about criminal justice issues and criminal justice reform? Is that something of 16:44:54 concern to you and your constituents?

A Of course it is. It's -- I actually -- we just -- we had -- we just got through protesting. Yes. I am a commissioner that protests still.

A young man just served two years in Bessemer jail, city 16:45:13 jail, for a crime that he was on camera where he was at work. He had 100-something people saying he was at work. His time clock said he was at work.

But he sat in the jail two years -- two years -- and a man they just let out serve 59 years in jail for $5.

16:45:36 So criminal justice is very important, and it's needed

476

here.

Q Commissioner Tyson, I wanted to ask you was your district a majority African-American district before you won?

A Yes.

16:45:51 Q And when were you elected?

A Last year. November the 14th, I will have been serving in the county commission seat a year.

Q Okay. And did you run affiliated with a political party?

A Yes.

16:46:05 Q Which party?

A I'm a Democrat.

Q And have you held any elected office other than Jefferson County Commissioner?

A Yes. I was a city council person.

16:46:18 Q And I take it city council here in Birmingham?

A In Birmingham.

Q And how long were you city councilwoman?

A I was appointed in 2013. I think I -- they left that seat open for nine months before they appointed anyone because they 16:46:34 didn't want to appoint me. And I served, I think nine months. And then I turned around, and I ran and won that seat. And I was in five years.

Q And what part of Birmingham did you represent as a city councilwoman?

16:46:48 A District 6. And it's a portion of the area that I have

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 228**

477

now. I still -- I have all of my city council district and my county commission district.

Q And was the city council position a non-partisan position?

A Yes, it is.

16:47:02 Q And have you ever held any other elected offices?

A Yes. I was the neighborhood president. You have to vote for that, and that's over the West End community. Then I was a -- the Citizen Advisory Board president. That's over all 99 neighborhoods in Birmingham. So that's really over the whole city. I was the neighborhood president. 16:47:26

Q Uh-huh. And in these various elected positions, have you met regularly with your constituents or with your potential constituents when you were campaigning for office?

A Yes. We had monthly meetings when I was at the Citizen Advisory Board. We met every month. 16:47:48

Q Uh-huh.

A And as my city council, I met every quarter. And as a county commissioner, we have been meeting every quarter.

Q Okay. And can you describe what the Citizen Advisory Board is? 16:48:09

A Yes.

Q Sorry. You were president of the Citizen Advisory Board?

A Yes.

Q Can you describe what that is?

16:48:17 A The City of Birmingham has 99 neighborhoods and 23

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 229**

communities. And then we have an advisory board which is a hub that convenes over all 99 neighborhoods. And I was the president of that board.

And what we do, we talk to the citizens and find out the issues. And we are the liaison between the mayor and the citizens.

Q Uh-huh. And can you please describe your work in other community organizations that you are involved with?

A I'm a member of the NAACP. I'm a member of the -- I'm the chair of the Veterans of America. I'm a lifetime member of Disabled Veterans. I'm an SELC member. I am the convenor for the Alabama coalition on blacks city participation. I'm a convenor for the Black Women's Round Table. I'm also the second chair for Ignite Alabama, which is a women's group. And I'm also the chair of the board for Black Youth Vote. And I also sit on the board for the Community Advisory Committee, which is the one that -- we have the largest Martin Luther King breakfast in the United States.

Q Can you describe for the Court, Commissioner Tyson, when you sleep? Sorry. I was just --

But so can you tell me a little bit about the work of the Women's -- I may not get the title right -- women's coalition I think you had mentioned? This is an organization that you take to Washington, D.C. on an annual basis or women's round table, I believe?

479

A Yes. I'm the convenor for the state.

And what we do, we go into low income areas --

THE COURT: First of all, could you give me what the correct name of the organization is?

16:50:34 THE WITNESS: It's the -- it's the Alabama Coalition on Black Civic Participation. Up under that umbrella, we have Black Youth Vote and Black Women's Round Table.

And we go into low income communities, and we educate, motivate, and mobilize the communities around voting, and

16:50:58 voting and laws that will improve the quality of life of each and every citizen.

And that's a non-partisan organization.

BY MR. SPIVA:

Q As part of that organization, Commissioner Tyson, have you

16:51:13 done work all around the state of Alabama?

A All around the state of Alabama.

Q Have you done work in Montgomery County?

A Montgomery.

Q How about Mobile?

16:51:21 A Mobile.

Q Can you describe the type of work you do with that organization?

A We go in, and it's the -- it's depending on what issue they're having.

16:51:32 Majority of the -- the reason we're in the neighborhoods

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 231**

480

and in the city is to advocate for voting, and encouraging and registering people to vote.

And when we get there, we also mobilize them on other issues -- environment. Some of them environmental issues, some -- I'd say racial discrimination issues, criminal justice. You name it. We have had to do so many things concerning the citizens. It's no different than NAACP, but we just -- we are on the ground more than that average -- of that group too.

I'm also a member of national action network. I forgot to tell you that.

Q Okay. And so, Commissioner Tyson, you said we're on the ground more. So have you been on the ground doing that type of work in Mobile County?

A Yes.

Q And in Mobile city?

A Yes.

Q Okay. And have you gone block by block and knocked on doors and sat in people's homes?

A Block by block, knocking on doors, all over Mobile.

Q In Montgomery?

A Montgomery, yes. Huntsville. Selma.

Q Uh-huh.

A Camden, Alabama, Perry County.

Q Uh-huh. What observations have you made about -- is this predominantly in the African-American communities in those?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 232**

481

A In the African-American community, we -- we really -- when we go in, we go in and we pull up really the poverty rate in these counties. And we look at the voting numbers.

Q Uh-huh.

16:53:27 A And that's how we can tell the need of where we need to actually go. And, yes, majority of them are African-American counties.

Q Uh-huh. What kinds of concerns have you heard in doing that work -- strike that.

16:53:48 What have you observed, in terms of the concerns of the people in those neighborhoods that you've met with in Mobile County?

A They are concerned about health care. They are concerned about housing, criminal justice, environmental concerns, and 16:54:10 the poverty level, and the condition that they are living in.

Q Would you say, based on your experience, that they -- that the African-American and poor neighborhoods that you have worked in Mobile share many of the same concerns that you have talked about earlier that the African-American community has in 16:54:35 Birmingham and in Montgomery?

A Yes.

Q And do you do voter registration and get out the vote efforts in connection with that work?

A Yes.

16:54:45 Q Can you tell me about that?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 233**

A We go in and it's the -- okay. Just say that when we go -- we went to Pritchard. You have to find a person to partner with in there.

So we -- number one, we go to the largest churches, and actually we connect with them. And it's always some type of group -- NAACP, different groups that's out there advocating for voting. We partner with those groups. And we educate them on the process of voting and on the laws and the laws that has been changed.

And we go out, and we go into the areas where it's low voting at. And we go door to door. We go into the gymnasiums. We go churches, schools, clubs, corner stores, wherever is bodies, wherever is people. And we talk about voting and educate them. And we try to get them to register to vote. And we try to mobilize them and also just build up infrastructure and where they can actually start their own organization and become a part of our group.

Q What kinds of challenges have you experienced or have the people that you have been trying to mobilize experienced in trying to register and actually vote?

A You know, they don't trust the system. They have been purged from the voting list. A lot of them have been purged from the voting list.

They said that every time they go vote, they have to go to another box. They said they no longer vote at that site again.

So they have to go to another site. And the polling places are too far from their residence.

And they're not -- I say, well, what about the provisional ballot? They don't know what a provisional ballot is because no one has ever offered them a provisional ballot.

16:56:44

And they also talked about that their ID have to have their address on it. But if you are transit -- and really the working poor and you don't have a sufficient income to pay because of minimum wage being so low, it's hard to keep somewhere to stay at. So that mean every time you move, you got to get your -- another ID. And if it's not an ID, it's a driver's license. And that costs.

16:57:07

Q Uh-huh.

A Every time that you move in order to match up with your voting, that's on your voting record. And it's just -- they said the process is too hard. And it's set up and it don't make no -- well, our vote is not going to matter, and, you know, and sometime, you know, they push back on us.

16:57:22

Q Have you found that there's a certain level of distrust in the system among the communities that you work -- you've done work in?

16:57:44

A A lot of distrust. Especially when they was purged off the list.

Q I want to ask you more about that, the purging. Have you actually kind of personally encountered that either in your

16:57:55

campaigns, or work here in Birmingham, or elsewhere?

A Yes.

Q This issue of people having been purged off the list?

A Yes. Yes. And we have talked to the Secretary of State about it. Actually, trying to get the list with New South and trying to actually get the list from the secretary of the people that they took off of the list. And they wouldn't give it to us. They said that we have to go to court. And we don't have the money to go to court to sue to get the list.

16:58:08

Q And what -- you mentioned a New South. I don't know if you've described that already.

16:58:34

A No. I left it out. I forgot to tell you.

We just had a meeting Saturday. It's New South Coalition. It's another advocate group that advocate for voting and to change laws.

16:58:54

Q Uh-huh. And you attended a meeting with the Secretary of State at one point and asked them about the purged voter list?

A Yes. It was at the -- Representative Rolanda Hollis had the meeting at the YWCA over in Roebuck. And we asked him about the list. And he said that they were on the list -- purged off the list because they hadn't voted in the last couple of elections.

16:59:12

So I asked him, How did you decide who would get purged off the list? Because it looked like all the African-American people were the ones that I have been talking to were the ones

16:59:32

that was purged off the list. And I said, How many was purged off the list? And he said that he didn't have the number in front of him.

I said, So how can I get it? I wrote his office. They did not give us the list. I -- I talked to him several times, and he would not give me the list. And they said I would have to go to court.

And when I actually finally talked to someone up there, they told me they said, Well, I'll lose my job if I give it to you. But I can tell you it's over 700,000 people that's been purged off the list over the last couple of years.

Q How do you know that?

A Because one of the employees told us that. And they didn't want -- I don't know the person, anyway, because I don't live down there.

Q Was it an employee of the Secretary of State?

A Yes. In the voting office.

Q Let me ask you: Have you either as a candidate or in your capacity as a county commissioner had election day reports from people who say, Hey, I can't vote because I'm not on the list?

A We have -- we have a command center set up during each election where they send attorneys, and they give us the number of the attorneys from the Poverty Law Center to call about election complaints.

And you hear all day long that, I'm not on the list. They

486

changed me from Democrat to Republican. They keep changing my polling places. This is the third place I have went to and it -- this is every election.

Q Uh-huh.

A Every -- every election.

Q You mentioned the Poverty Law Center. Is that the Southern Poverty Law Center?

A The Southern Poverty Law Center. They give us attorneys, a list of attorneys. And also the national coalition on blacks and participation. They give us a list of attorneys that's in our state.

Q Uh-huh.

A That we can call with the problems.

Q Uh-huh.

A That we have in the -- and it's all we can do. And they file -- they can file something, but you won't hear nothing until after the election.

Q Uh-huh.

A And every answer that we have ever received is that they were purged off the list because they didn't vote on the last election, or they notified them, they moved their polling spots, and they were notified. But for some reason, the person never get the notification. And, well, that polling site was closed. Well, did y'all send out anything? No. They put a note on the door.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 238**

          487

So if the people go over there, they would know that their polling site was changed to this place. But everyone said when they went over there wasn't no note on the door.

Q Uh-huh.

17:02:32 A So they just come up with all types of reasons. But we still are left with this person not having a fair opportunity to vote, not even had an opportunity to do a provisional ballot because they don't even give them a provisional ballot.

Q And you have done -- personally done work to try to educate people about their right to vote with the provisional ballot?

A Yes.

Q That's a violation of federal law to deny somebody a provisional ballot?

17:03:02 A They don't tell them that they can do one.

Q Okay. And so, Commissioner Tyson, the majority of these reports that you hear in your work as a commissioner or in the voter -- get out the vote work, do they predominantly come from one race or the other?

17:03:21 A The majority of the people that I deal with is African-Americans and Latino because of the area that I cover. And those are the ones that's being disenfranchised.

Q Have you heard any reports from either any of your colleagues or any -- from anyone else about predominantly white areas having the same kinds of issues?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 239**

488

A No.

Q Let me ask you about the polling place. You mentioned polling place, I think, movement and closing. Is that what you were talking about earlier?

17:03:58 A Yes.

Q Did you actually have a personal experience where your polling place was moved without notification?

A Yes. They actually moved my polling place, and I wasn't notified. And I checked my mail every day. And I know when

17:04:13 I -- when I -- when I'm ever given a polling slip, I put mine on the refrigerator.

Q Uh-huh.

A And I was not notified that they moved my polling place from Harrison Park to Hemphill Elementary School.

17:04:31 Q Let me ask you: You also -- well, let me ask you one more question about that.

And have you -- and have you received or been -- or seen yourself others who have been affected by the same thing in terms of polling place changes without notification?

17:04:48 A Yes. Yes.

Q And then you mentioned voter ID and the challenges of people when their address changes.

Do people in your -- the communities that you represent and that you work in, do they -- do many of them frequently

17:05:08 have to move?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 240**

489

A Yes, they do.

Q And why is that?

A Because of the working poor. They are not able to meet their rent. And they have to end up moving to try to find a cheaper place, you know.

17:05:23

I just had one Carla McGee -- I asked her could I use her name. She had to move from Avondale, which is on the south side. They raised her rent to $750. Now she stay in West End with her daughter until she can find somewhere to stay on her own that's more affordable.

17:05:48

Q How often do you receive calls like that of people who are suffering from housing instability?

A Every day. Like I told you, I'm a county commissioner, but I just, you know, was elected. And this work I have been doing since I was ten.

17:06:06

My mother did it. She ran the commodities for the community.

And we have a -- a list of agencies that we can help people get their utilities paid and find them somewhere to stay. And so most people do call me for different things like that. So I get calls like that every day.

17:06:24

Q And how have you found -- just going back to the voter ID issue. How does this housing issue relate to the challenges people have to vote?

A If you stay -- like Carla stayed in Avondale. Her ID,

17:06:41

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 241**

490

which is her driver's license -- license going to have Avondale address on it. So if she change her address on her voting roster to West End, that means she got to turn around and change it on her driver's license in order to vote in March. So if she find a house or somewhere else to live after March, she going to have to turn around, change her voting box in order to vote in November, and turn around again and change her ID. That means she going to have to go back and pay another 40-something dollars and get another ID in order for her to vote in November. So that's right there is like almost a hundred dollars in order to do that.

Q Do some of your constituents work two and three jobs in order to try to make ends meet?

A The majority of the people I know work two to three jobs. And I -- I do too. So I -- I'm -- I fall right in that category.

Q You worked more than two or three jobs, Commissioner. I think we established that.

A Yes. So I understand it and I get it. That's why in the area I live in, I don't know -- I don't know anyone I know don't work two and three jobs, really, just thinking about it. Just thinking about it. I -- let me see. I really don't unless they are older.

Q Right. Well, let me ask you: So do the people that you know that work two, three jobs, do they have a lot of time to

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 242**

491

go and change their address every time they move?

A No. They don't have a lot of times. We actually do a campaign on different social media outlets. If you need an address change, we try to give them the form they can fill out online in order to change their address.

17:08:54

But with the ID, you can get a free ID, but you can't get a free ID if you already have one.

Q Uh-huh.

A And with the homeless community, you can get free IDs, but you have to actually be homeless and have no income coming in, in order to qualify for that ID. So we have two, three places that do that.

17:09:09

THE COURT: Mr. Spiva, might this be an okay time to break? I don't think we'll be able to get through cross tonight, so I think Ms. Tyson will need to come back tomorrow. Can you do that?

17:09:29

THE WITNESS: I will if I have to.

THE COURT: I mean, it's after 5:00, and I just -- I don't see this winding up in time for us to finish cross.

MR. SPIVA: That's probably right, Your Honor. And sorry. I think I might have mistimed.

17:09:48

THE COURT: That's all right. As my mother always said, things always take longer than they do.

All right. So we will be adjourned until in the morning at 9:00 o'clock.

17:10:04

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 243**

492

MR. SPIVA: Yes, Your Honor. If the Commissioner's schedule doesn't permit her to start at 9:00, can we start with another witness and then come back to her?

THE COURT: Certainly. Certainly.

17:10:17 MR. SPIVA: I haven't actually talked to her about it yet, but I'll find out.

THE COURT: We can be very flexible, if we need to.

(Whereupon, the above proceedings were concluded at 5:10 p.m.)

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 244**

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Christina K Decker

11-15-19

Christina K. Decker, RMR, CRR — Date

Federal Official Court Reporter

ACCR#: 255

494

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

LAKEISHA CHESTNUT, an individual; MARLENE MARTIN, an individual; BOBBY DUBOSE, an individual; RODNEY LOVE, an individual; KAREN JONES, an individual; JANICE WILLIAMS, an individual; RODERICK CLARK, an individual; JOHN HARRIS, an individual,
Plaintiffs,

vs.

JOHN H. MERRILL, in his official capacity as Alabama Secretary of State,
Defendant.

2:18-cv-00907-KOB
November 6, 2019
Birmingham, Alabama
9:00 a.m.

***********************************

TRANSCRIPT OF BENCH TRIAL
VOLUME III
BEFORE THE HONORABLE KARON O. BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE

FOR THE PLAINTIFFS:

Abha Khanna, Esq.
PERKINS COIE LLP
1201 Third Avenue
Suite 4900
Seattle, Washington 98101
(206) 359-9000

Bruce V. Spiva, Esq.
PERKINS COIE LLP
700 13th Street, NW
Suite 600
Washington, DC 20005
(202) 654-6338

***CHRISTINA K. DECKER, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 1**

Richard P. Rouco, Esq.
QUINN CONNOR WEAVER DAVIES & ROUCO LLP
2 20th Street North
Suite 930
Birmingham, Alabama 35203
(205) 870-9989

Daniel C. Osher, Esq.
PERKINS COIE LLP
700 13th Street NW
Suite 600
Washington, DC 20005
(202) 654-6338

Lalitha D. Madduri, Esq.
PERKINS COIE LLP
700 13th Street NW
Suite 600
Washington, DC 20005
(202) 654-6322

FOR THE DEFENDANT:
James W. Davis, Esq.
Laura E. Howell, Esq.
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
(334) 242-7300

J. Dorman Walker, Esq.
BALCH & BINGHAM LLP
P.O. Box 78
Montgomery, Alabama 36101
(334) 834-6500

COURTROOM DEPUTY: Sarah Hollingsworth

COURT REPORTER: Christina K. Decker, RMR, CRR

Proceedings recorded by OFFICIAL COURT REPORTER, Qualified pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies and Procedures Vol. VI, Chapter III, D.2. Transcript produced by computerized stenotype.

496

**I N D E X**

DIRECT EXAMINATION OF COMMISSIONER TYSON CONTINUED 497
BY MR. SPIVA
CROSS-EXAMINATION 511
BY MS. HOWELL
REDIRECT EXAMINATION 524
BY MS. HOWELL
RECROSS-EXAMINATION 526
BY MS. HOWELL

HENRY SANDERS 527
DIRECT EXAMINATION 527
BY MS. MADDURI
CROSS-EXAMINATION 570
BY MR. WALKER
REDIRECT EXAMINATION 601
BY MS. MADDURI
RECROSS-EXAMINATION 603
BY MR. WALKER

GERALD DIAL 605
DIRECT EXAMINATION 606
BY MR. WALKER
CROSS-EXAMINATION 644
BY MS. MADDURI
REDIRECT EXAMINATION 657
BY MR. WALKER

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 3**

497

**P R O C E E D I N G S**

(In open court.)

THE COURTROOM DEPUTY CLERK: I would like to remind you that you are still under the same oath you took yesterday.

09:10:23 THE WITNESS: Okay.

MR. SPIVA: Is it all right to proceed, Your Honor?

THE COURT: Yes, it is.

DIRECT EXAMINATION OF COMMISSIONER TYSON CONTINUED

BY MR. SPIVA:

09:10:36 Q Good morning, Commissioner Tyson.

A Good morning.

Q I just have a few more questions for you this morning. I know yesterday you kind of described a number of organizations that you're involved with. And is there one -- let me ask 09:10:54 you -- I think it was the Black Women's Round Table is one of those?

A Yes. Yes, sir.

Q With that organization, do you ever go to Washington, D.C. to try to visit with Congress people?

09:11:04 A Yes. We've been going -- this -- 2020 will be our -- I think our ninth year. We leave March the 4th through the 8th.

Q Uh-huh.

A Next year.

Q And who do you meet with when you go there?

09:11:19 A This organization is nationwide, so it's several states

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 4**

there. And you actually meet with your Congress and senators.

So we call -- like right now we are sending e-mails for March the 4th. And that's the day on the Hill. We pick between March the 4th and March the 8th. We pick one or two of those days to go out -- to go up on the Hill and talk to your Congress and our senators. And so we notify them, you know, way ahead enough time where they can give us an answer, and we meet with them. So out of all the states, Alabama gets the less meetings.

09:11:47

09:12:12

Q Okay. So let me ask you: Who from Alabama goes, in terms of -- what types of people -- younger people, older people, a mix?

A We take high school students, majority of mine are 12th grade, college students, regular citizens from all over the state of Alabama.

09:12:30

Q And about how many people go up?

A From --

Q Just approximately.

A 40.

09:12:39

Q Uh-huh.

A We trying to get more next year because it's -- the finances is the reason we take -- we have a limited amount.

Q Sure. And is it a nonpartisan group?

A It's a nonpartisan group.

09:12:51

Q And in -- how many years did you say you've been doing

499

this?

A Next year I think will be the ninth year.

Q When you go there -- when you've gone there in the past, have you attempted to schedule meetings with all of the Alabama congressional delegation and each of Alabama senators?

09:13:07

A Yes, we have.

Q And have you been able to meet with the -- each of the congressional members and each of the senators?

A No.

09:13:22

Q Who have you been able to meet with?

A Congresswoman Sewell and Doug Jones, Senator Doug Jones.

Q And why haven't you met with the other members of the congressional delegation?

A Because they refuse to meet with us. They don't have time.

09:13:39

Senator Shelby, his assistant let us come in the office and meet with us and then gave us a bag of peanuts, but they never give us an answer to the questions. We have folders to present to them with the outline of questions ahead of time. And then we have a packet when we get there with the same questions to go over with them that we gave them ahead of time. They never really have no answers for us when we get there.

09:13:58

And one of the senators -- I think it's the one out of Mobile because you never really -- we never see their face, you know. So I really couldn't -- I think it was Bradley Byrne.

09:14:19

**Christina K. Decker, RMR, CRR**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 6**

It might have been him -- the one out of Mobile. They wouldn't even let us in the office. They made us stand in the hallway and embarrassed us in front of all those states and wouldn't allow us to come in his office. When we went to the door and we said that we sent an e-mail prior to coming to -- prior to coming to actually meet with the senator and we wanted to know --

Q This is Congressman Byrne?

A Yes.

Q Uh-huh.

A And the senators in the state of Alabama -- I cannot remember which one of them, but I'm almost positive it's the one out of Mobile.

Q Okay. And you have been saying senators. Do you mean the House of Representatives delegates, congressional delegates?

A Yes. Congresswoman Sewell and Doug Jones, the ones that's with Doug Jones, Shelby -- Shelby was -- out of all of those -- out of the senators, Doug Jones was the only one that personally met with us.

Q Uh-huh. Okay.

A Shelby let us come in his office and meet with his assistant.

Q Uh-huh.

A None of the rest of them ever --

Q Uh-huh.

501

A -- replied or -- they -- when we called they talked to us on the phone.

Q Uh-huh.

A But they never gave us an opening time within the -- that period that we was going to be down there that we could come and see them.

Q Uh-huh.

A So when we was up there, we just dropped by their office anyway.

Q Uh-huh.

A And they wouldn't let us in. They made us stand in the hallway.

Q That was Congressman's Byrne's office?

A I'm almost for sure it was. I can't be absolutely positive.

Q Uh-huh.

A But I know who met with us and I know who didn't.

Q Okay.

A And that was Shelby and -- we met with his assistant.

Q Okay.

A And Doug Jones has always met with us --

Q Okay.

A -- since he's been there. And Congresswoman Sewell has been the only one on the Congress side that has -- has met with us. None of them -- they do the same thing. They won't even

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 8**

502

let us in they office.

Q Okay. And so let me ask you: So it sounds like Congresswoman Sewell and Senator Jones meet with you in person themselves personally?

09:16:36 A Yes.

Q Okay. And has Congresswoman Sewell done that each time you've gone up to Washington, D.C.?

A Each time we come up there, she's even given us a luncheon and -- to actually go over some of the bills that they're trying to pass.

09:16:50

Q Uh-huh.

A And then she also participates in our press conference that we have --

Q Uh-huh.

09:16:58 A -- on the Hill that's actually covering black women's issues.

Q Uh-huh.

A So it's just not Alabama up there.

Q Uh-huh.

09:17:05 A It's several states up.

Q Uh-huh.

A But after we go to our debriefing, Alabama is the only one that's not able to meet with their Congress people and the senators.

09:17:15 Q Okay. And then you mentioned Senator Jones also met with

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 9**

503

you personally. Has he met with you personally each time you've gone up there since he has been a senator?

A Yes, he has.

Q Okay. And you mentioned also that -- I think you said you thought it was Congressman Byrne who had had you meet out in the hall. Did he meet with you personally out in the hall or --

A No. His assistants. They wouldn't let us in the door, like in the office way.

Q Uh-huh.

A They told us to step out in the hallway.

Q Okay. Have you ever through this organization gotten a personal meeting with any of the Congress people when you've gone to Washington other than Congresswoman Sewell or Senator Jones?

A No, I have not. I've never had a meeting with none -- and I go with several organizations. And the same two -- that's the same two we always meet with.

Q And you've requested a meeting, though, with each of the Congress people from Alabama each time you've gone?

A Yes.

Q Okay. Let me ask you: Have you -- and you mentioned something about a packet that you leave with them. Is that something that where you're asking for answers to questions after the meeting or after your visit to Washington?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 10**

504

A We send them the questions before.
Q Uh-huh.
A And then we take a packet with us and leave it with them.
Q Okay.
09:18:42 A In case they say they didn't get it.
Q And has Congresswoman Sewell or Senator Jones responded to those questions after you left Washington?
A When we get there, they already have the answers, and they go over the packet with us.
09:18:56 Q Okay. And do they send you something later in writing, as well?
A They send us something later in writing. And now they are getting ready to start doing televised meeting with us.
Q Uh-huh.
09:19:08 A Out of my office.
Q Okay. And have any of the other Congress people that you've requested meetings with, other than Congresswoman Sewell and Senator Jones, ever provided you responses either in person or in writing later to the questions that you posed?
09:19:29 A No.
Q And you've sent -- have you provided the same package to each of the other Congress people as you provide to Congresswoman Sewell and Senator Jones?
A Yes. We look at their committees that they sit on. And 09:19:45 that's how we target our questions to each one of the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 11**

                505

representatives. We have never gotten an answer from anyone but Congresswoman Sewell and Senator Doug Jones.

Q Have you gone to Washington with any other of the organizations that you're involved with?

09:20:04 A Yes, I have. I went -- I've went to Washington, D.C. with the national action network. I've went to Washington, D.C. with neighborhood housing services. I've went there with them also. I've went with the NAACP, and the same thing.

Q And the ones that you just listed, all of those are

09:20:33 nonpartisan organizations?

A All of them are nonpartisan organizations.

Q And have you been able to secure meetings with any of the congressional delegation or senators other than Senator Jones or Congresswoman Sewell in connection with your visits with any

09:20:52 of those other organizations?

A No. We have not. But the NAACP was a pastor alliance group that actually went up there, and they wouldn't even hardly they went let us in the building really.

Q Uh-huh.

09:21:12 A We was out in the hallway. And they had security out there.

Q Did Congresswoman Sewell or Senator Jones meet with that group?

A Yes, they did.

09:21:22 Q Okay. And have they consistently taken meetings with the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 12**

506

various groups that -- they being Congresswoman Sewell or Senator Jones -- have they consistently taken meetings with the groups that you have gone to Washington with?
A Yes.
09:21:37 Q And have those groups also consistently requested meetings from the other members of Alabama's congressional delegation?
A Yes.
Q And I think you've already said that you have not received those meetings?
09:21:50 A Have not received a meeting.
Q Let me ask you, Commissioner Tyson, have you -- have you ever seen or -- any racial appeals in campaigns in Alabama?
A Yes.
Q What have you seen?
09:22:12 A I know when the -- it was a judge race with -- I think it was Parker and Vance. I think that's who it was because I go to a breakfast on Sundays with the -- with Vance. I think that's his name.
Q Uh-huh.
09:22:38 A They had -- had a commercial. And also when Doug Jones was running, I seen some commercials and several other candidates that was running.
Q What about when President Obama was either in office or running for office, did you see any racial appeals in connection with President Obama?
09:23:11

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 13**

A Yes. There were a lot of those with the joker face stretched out like with the joker face and with the turban hat on.
Q This is images of President Obama like that?
09:23:23 A With the hat on. His wife looked like a monkey. They had her like a monkey and had President Obama like he was in Iraq.
Q Uh-huh.
A Like that.
Q What impact did that have on you personally when you saw those kinds of appeals?
09:23:46
A Racist. Racist. And I -- I never really -- I've been dealing with stuff like this all my life. So why would you -- if you were running a judge race, or you running for senator, why are you talking about the President?
09:24:12 Q Uh-huh. Uh-huh.
A So -- and I just -- that bothered me.
Q Uh-huh.
A A lot. And when you dealing with young people -- because even my daughter, she was -- she was -- she was in a private school. So she went to school with a lot of majority of white
09:24:27
kids. And she -- it bothered her --
Q Uh-huh.
A -- you know, when she seen it. And she said, Now, why would they do that?
09:24:43 Q Uh-huh.

A You know. And I really couldn't -- I told her I said, Well, you know, it's racism, but, you know, she really basically didn't understand it.

Q Uh-huh.

09:24:53 A And I know exactly what it was.

Q Uh-huh.

A And it was to make sure that every person that disliked people because of their color would come out and vote against any Democrat that would be in office -- that would even run for 09:25:14 office.

Q Did you see some kind of an ad on social media that had Doug Jones as an overseer of a slave camp?

A Yes. I seen that also.

Q Okay. And what kind of impact did that -- did that have a 09:25:29 similar impact on you?

A Pure racism. Racism. Had him with aborting a baby. Had Doug Jones aborting a baby.

It -- just -- I have never in my life -- and you will think since it's the 21st century this wouldn't happen. But 09:25:48 this state that I live in, that I was raised in, and I served the country for this state and for this country is so racist to it really -- to it -- it makes you look outside-eyed at everybody. So you don't know who to trust because it's so blatant and bold, and they're not trying to hide it.

09:26:17 Q Uh-huh.

509

A It's just everywhere.

Q Uh-huh.

A And it's no one is being punished and nothing is being done about it.

Q Uh-huh.

A It's -- it's like it's a secret people trying to keep hidden, but it's so far out in the public to where you can't hide it.

And I -- I know people right now when I was running they didn't -- they said that I was too dark to be a county commissioner, that I would vote for a black girl, but she needs to be light skinned.

THE COURT: Who said things like that to you, that you had to be light skinned?

THE WITNESS: Candidates and people who I asked to vote for me.

I went to Princeton Towers, and there was some white senior citizens there, and I was trying to get them to vote for me. She said, Well, I guess I can vote for you, even though you a nigger. And I just -- I told her, Well, thank you, and just walked off.

THE COURT: My question was: Who said that you had to be light skinned?

THE WITNESS: Candidates.

THE COURT: Okay. Were those white or black

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 16**

candidates?

THE WITNESS: They were white. They felt like I needed to be a lighter completed.

I was trying to raise funding for my election. They said, Well, we really can't really support you because we don't feel like you stand a chance. Maybe if you was lighter skinned and an African-American you would stand a chance to run for this seat and win.

BY MR. SPIVA:

Q Do you think that there's less racism in Alabama than there was 40 years ago?

A No. It's just -- they just use that in another way, you know. It's just being covered up, and it's being displayed in another way.

And I see it every day because I'm a person that be out in the community a lot. I see it every day. It's not a day that I don't see it. And a lot of times I ignore it.

You know, I see it from the way they charge me with my water and sewer bill, from my light bill. I see it from the way they take care of the community that I live in. And they take care of the community on the other side of town that I represent. I see it in my health care. I see it in my child's school, my grandbabies. I see it in her school.

So it's there. It's just in another form. You know, because they allow us to live in -- in their communities, don't

mean that it's not there.

Q Thank you, Commissioner Tyson. I have no further questions.

THE COURT: Cross?

09:29:37 MS. HOWELL: Yes, Your Honor.

CROSS-EXAMINATION

BY MS. HOWELL:

Q Good morning, Commissioner.

A Good morning.

09:30:13 Q You've talked a little bit this morning, but I want to go back to some of the things that you were talking about yesterday afternoon. You -- we discussed the composition of the district that you represent as a Jefferson County Commissioner?

09:30:30 A Uh-huh.

Q And you said that that includes both some poor black citizens and some wealthier white citizens, correct?

A Right.

Q And you consider yourself a representative for all of your

09:30:41 constituents, don't you?

A Absolutely.

Q Okay. So that's for your white constituents, as well?

A Yes.

Q That you are a representative for them?

09:30:47 A Right.

512

Q Do you think it's any different for a congressperson?
A They supposed to represent all of us.
Q And that's all of their constituents, right?
A Every last one of them.
09:30:58 Q And that's regardless of their race, correct?
A Yes. That's what they supposed to do.
Q Okay. You also talked about problems that there had been with the people that -- I think you were saying specifically the people that you've represented as commissioner and then
09:31:24 before that when you were on city council, I believe?
A Yes.
Q Not trusting the system, and so they wouldn't go and vote; is that right?
A Right.
09:31:32 Q So is that happening in -- that is happening in Jefferson County, correct?
A Yes, it is.
Q And that's all happening in Congresswoman Sewell's district?
09:31:42 A It's --
Q I'm not saying it happens only there, but it does happen there, as well?
A Yes. It happens all over the state.
Q Okay. You also talked some about polling places being
09:31:54 moved around without any prior notice, and you gave a specific

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 19**

513

example of that that had happened to you, correct?
A Absolutely.
Q And when you figured out that your polling place had been moved, you went and found the correct polling place, right?
09:32:06 A Yes; after I went to three polling places. But I had a car.
Q Okay. But you did eventually find the correct polling place?
A Yes.
09:32:12 Q Okay. And you were able to vote when you got there, right?
A Yes.
Q Okay. And you said that there had been a lack of notice involved in not -- let me strike that.
09:32:25 You said that part of the problem had been you hadn't received any notice that your polling place had been moved, right?
A Right.
Q And you got there, and the doors were closed, and there
09:32:33 was just a sign?
A Yes.
Q Okay.
A No. No. I didn't say that.
Q Oh, I'm sorry.
09:32:40 A When I got there, I gave them my ID. They said that, You

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 20**

514

don't vote at this box. I said, So what box do I vote at? She said, I can't tell you. I don't know which box you vote at.

Q Okay. So the polling place was still open, but it was no longer your polling place?

09:32:54 A It wasn't my polling place. But some more people went to a polling place in their -- there was a note on the door saying that it was moved to More Than Conquerors.

Q Okay. So just going back for a second to just your polling place. Do you know who's in charge of giving the

09:33:13 notice about when a polling place has been moved?

A Yes.

Q Who is that?

A The clerk's office.

Q Okay. And that's the clerk for Jefferson County, correct?

09:33:19 A The clerk for Jefferson County. And if it's a city election, it's the city clerk.

Q Okay. And the clerk for Jefferson County is an elected official, correct?

A Yes.

09:33:31 Q Do you know if they're a Republican or Democrat in Jefferson County?

A It's a Democrat in there now.

Q Okay. You had also mentioned just in passing now that you had been speaking to other people, and they had encountered

09:33:49 similar problems to you?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 21**

A Yes.

Q Was that in your capacity as a county commissioner for Jefferson County?

A No. I've been a community activist since I was ten years old. I have only been a county commissioner for a year. So it did -- it has happened within this year, but I've always did voting. So it has always have happened.

Q Okay. And so when people have told you these stories, have you had any way of verifying whether what they're telling you is true or correct? You've just taken them at your word, haven't you?

A No, huh-uh. I actually take them around to the polls and make sure they vote.

We take -- we pick people up and take them and vote. This is every election. We have an election coming up on November the 19th. We will be there transporting people to the polls.

Q But when people tell you, for example, that they have a problem with their ID?

A Uh-huh.

Q You take them at their word that what their problem -- whatever their problem is, it is actually their problem?

A No.

Q No.

A I give them the 1-800 number for the attorneys that was given to us to help us with voting fraud. I call Judge King.

516

I take them back to the poll and find out what their problem was; why this person cannot vote. And they tell me it's because the address do not match up with the address that's on this voting roster.

09:35:18 Q Okay. And the attorneys tell you that?

A No. We report it to the attorneys from NAACP.

Q Uh-huh.

A We report it to those attorneys, and I ask them can they vote provisional ballot. And then they let them vote

09:35:35 provisional ballot.

But they never tell them that they can vote provisional ballot. They have to ask for a provisional ballot.

Q So I think you have said two things; that, first, you were talking to the attorneys; is that correct?

09:35:48 A We report it to the attorneys.

Q Okay. But then you're going to the polling places?

A I'm going to the polling place. And I don't do it by myself.

Q Okay.

09:35:56 A It's a lot of us out there.

Q Okay.

A It's not just me.

Q But you're talking to the local election officials?

A Yes.

09:36:03 Q Okay. And getting them to give provisional ballots?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 23**

517

A Yes.

Q Have you ever had any problems getting them to give someone a provisional ballot once you've asked for it?

A Yes. They run out.

09:36:15

Q But they have given them to you anytime there have been some available?

A Yes. But they shouldn't run out of provisional ballots.

Q Okay. You also talked some about racial appeals in campaigns. And you actually listed some racial appeals in, I believe, President Obama's possibly re-election campaign?

09:36:37

A Yes.

Q That was a national contest, right? President is a nationwide office?

A Yes. But it was a local election, and that's what I never understood. It was a local election, and the whole -- the whole campaign was talking about Obamacare, and we're going to abolish Obamacare, and we are going to make sure that we get rid of this with Obama, and this with Obama.

09:36:50

And I'm like, what does that have to do with the person that's running? That's not -- we're not voting for President. But everything was targeted toward the President.

09:37:14

Q But you considered that a racial appeal, as opposed to an issue-based appeal?

A Yes. If your face stretched like a joker and you got a turban hat on and you in a tank with a rifle.

09:37:33

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 24**

518

Q Okay. Do you know who made those ads?
A No. I remember one of them -- I know all of them was dealing with either judge elections or Congress -- dealing -- something dealing with Congress, or some type of election like that.
Q Okay.
A That had to go -- that they had to go to and hold a seat in D.C.
Q Okay. But it sounds like you don't remember which specific election it was?
A No. It had to be when he was in office. I do remember that.
Q Okay. So going back for a second, you talked about different problems that people had experienced with the laws and with getting health care, and other things. Do you know if white people have also experienced those same sorts of problems?
A I doubt it. No. I haven't had one to actually tell me that.
Q Okay. But just because they haven't told you that doesn't mean that they've never experienced the problem, right?
A Well, yeah. Yeah.
Q And I apologize. I'm jumping around a little bit.
A That's fine.
Q Going back to those racial appeals you heard about in

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 25**

campaigns. You talked about a particular ad that I believe you have seen on Facebook during Doug Jones' campaign for Senate?

A Uh-huh.

Q You said that you saw it on Facebook. Do you know if that 09:39:32 was made by one of his opponents, or by just a private individual posting something like that?

A It was by one of his opponents.

Q Okay. Do you recall which one?

A It was the -- it was the cowboy with the one -- what's his 09:39:47 name that ride the -- the child molester. What is that man -- I cannot remember his name. The one that ride the horse.

Q Are you referring to Roy Moore?

A Oh, yeah. That's who it is.

Q Okay. And Roy Moore did, in fact, lose that election, 09:40:07 didn't he?

A Yes, he did.

Q Which is how you came to be visiting with Doug Jones as Senator in Washington, D.C.?

A Right.

09:40:15 Q And you -- you talked a lot about going with an organization -- and forgive me if I missed the name of the organization that you go up with every year. Can you remind me again what organization that's with?

A It's the National Coalition on Black City Participation, 09:40:34 and the Black Women's Round Table is the conference that we go

520

to.

Q Okay. And that conference is in Washington, D.C.?

A It's in Washington, D.C. Yeah. Our home office is in Washington, D.C.

09:40:44 Q And you talked about trying to meet with, I believe, Congressperson Byrne, who represents the Mobile area at present?

A Uh-huh.

Q And you said that -- well, you said that they had been

09:40:54 unable to meet with you in the first place, right?

A Right.

Q And that when you arrived, you went and tried to visit his office anyway and were unable to get in; is that right?

A Yes. They made us stand in the hallway.

09:41:05 Q Okay. And when you went to visit Congresswoman Sewell, did she meet with you in her actual office?

A Of course. And fed us lunch, and gave us lunch, and gave us tours.

Q But let me take a step back. Did you meet with her in her

09:41:20 actual office office?

A In her office office.

Q Okay. And it wasn't in some other room in the building?

A We have met with her -- each time we meet with her in her office and we take a picture around her desk with all of the

09:41:34 people that we bring down. And --

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 27**

THE COURT: How many people is that?

THE WITNESS: Sometimes we -- most of the time we bring -- now, last year I took 15. The year -- that was 2018. 2017 we took 40.

09:41:53 So it's depending on how much money we raise. We take different amount of people.

BY MS. HOWELL:

Q Okay. But those offices are fairly small, aren't they?

A Yes. But we all pack up in there. I have a bunch of 09:42:04 pictures because they souvenirs for the students. And how many people actually get a chance to go to D.C. to meet their congressperson?

Q That is a good point. But if you had other people visiting your office, perhaps it would be difficult to fit 09:42:20 everybody into the office; is that fair?

A Yeah. But she know we want a picture of that seal that she has. And that's why she stuff us all in her office to make sure we get -- and she give us a pin, also.

Q That was nice.

09:42:44 Just one last question. You were elected to city council in 2013; is that right?

A I was appointed in 2013.

Q Appointed to city council. But in 2013; is that right?

A Yes.

09:42:58 Q Were you politically active in 2011?

522

A Of course.
Q Sorry. Let me clarify. Were you an elected official in 2011?
A No. I was a neighborhood officer. I guess that would -- I'm still -- yeah. I was elected by the citizens for that, too.
Q Okay. And you've considered yourself an activist since you were ten, right?
A Yes.
Q Did you play any role in the redrawing of the congressional districts back in 2011?
A I tried to, but I actually protested the drawing of the one that was back in 2011.
Q Okay. When did you protest it?
A At the Five Points West library when they was drawing it.
Q Okay.
A And that's when Carole Smitherman was the city council person. That was the drawing of the city council district now. I ain't talking about the Congress district.

THE COURT: Wait a minute. I want to make sure I understand. What did you protest?

THE WITNESS: The drawing of District 6, city council.

THE COURT: The city council?

THE WITNESS: The city council district.

THE COURT: I think Ms. Howell was asking you about

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 29**

523

the congressional district map that we're here talking about this week.

THE WITNESS: Oh, I'm sorry.

BY MS. HOWELL:

09:44:26 Q That's quite all right. My question might not have been clear. So did you participate in redrawing the congressional map in 2011?

A Oh, no, ma'am.

Q That's what I wanted to clarify. You also mentioned that

09:44:40 some very hurtful things were said to you when you were running for county commissioner about your complexion being too dark; is that right?

A Yes.

Q Can you tell me -- who were you trying to raise money from

09:44:52 when you ran for commissioner?

A Well, it definitely my neighborhood -- I stay in a poor neighborhood, and the people that I know are poor people. So I was branching out going to different people that -- the candidate that I was running from, I got their fund-raiser list

09:45:13 because it has to be turned in. And so I was calling some of the people that -- the donors that gave them money, and they are the ones that told me that.

Q Okay. Do you -- do you know what race those people were of that you were calling?

09:45:27 A They were white.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 30**

524

09:45:37 09:46:02 09:46:13 09:46:31 09:46:43

Q How do you know that they were white when you were calling them?
A Just like I would know if you was white if I called you; your voice, your tone of your voice.
Q Okay. Do you know whether the people that you were trying to raise money from were with Democratic organizations or Democratic voters, as opposed to Republican voters?
A I really didn't -- I really don't know whether they were democratic or Republicans, but I requested some funding from them, and I didn't get it, so...
Q You did get it?
A I didn't.
Q Didn't. Okay.

MS. HOWELL: Could I have a moment, Your Honor?

THE COURT: Certainly.

BY MS. HOWELL:

Q Ms. Tyson, I think that's all I have for you. Thank you for coming in this morning.

THE COURT: Any redirect?

MR. SPIVA: Yes, Your Honor. Just briefly.

REDIRECT EXAMINATION

BY MS. HOWELL:

Q Commissioner Tyson, you recall you were asked on cross-examination whether Congress people are supposed to represent all of their constituents, whether they're black or

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 31**

525

white. Do you recall that?
A Yes.
Q And other than Senator Jones, do you think that the Congress -- do you think that the Congress people in Alabama actually represent all -- excuse me. Let me step back.
Other than Representative Sewell and Senator Jones, do you think that the other -- the rest of the congressional delegation in Alabama represents both black and white interests?
A No, they do not.
Q And why do you say that?
A It's no compromise with the Republicans. It's either -- Congresswoman Sewell and Doug Jones, they always talk about compromising and working across the aisle trying to get benefits and bills passed for the citizens in their district.
Republicans, it's either their way or no way, or you are going to get run over.
It's no reason we shouldn't have health care expansion here in this state with illness that's popping up from back in the '60s that they've really thought they had cleared. And if you don't want to pass a law to make sure we can get that, you're definitely not representing everyone.
And if you don't want to increase minimum wage, and you know for a fact that the working poor is not surviving and thriving in the state that you are supposed to love, it's no

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 32**

526

way that you can represent all of the people in your district.

And if you're not putting money in education that you know that we need these young people in order to take care of us when we get old, you're not representing all of us.

09:48:43 They know the condition of this state. They know that the -- the condition of the rural areas in the state of Alabama are like a third-world country. They are very aware of it, and they are not passing any bills or laws or doing anything to make sure that that population is all taken care of.

09:49:07 Q Thank you, Commissioner Tyson. I have no further questions.

MS. HOWELL: Your Honor, just one question.

THE COURT: Okay.

RECROSS-EXAMINATION

09:49:23 BY MS. HOWELL:

Q Ms. Tyson, do you personally feel that a congressman has to support Democratic initiatives to represent everyone in his constituency?

A Yes, I do.

09:49:34 Q Okay.

MS. HOWELL: Thank you very much.

THE COURT: Anything else?

MR. SPIVA: No, Your Honor.

THE COURT: Thank you, Commissioner. You may step

09:49:45 down. Thank you for coming back today.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 33**

527

Plaintiff may call your next witness.

MS. MADDURI: Plaintiffs call Senator Hank Sanders, or Henry Sanders.

HENRY SANDERS,

having been first duly sworn by the courtroom deputy clerk, was examined and testified as follows:

THE COURTROOM DEPUTY CLERK: Please state your name in the microphone for the record.

THE WITNESS: Sure. My name is Henry Sanders, but nobody knows me as Henry Sanders. Everybody knows me as Hank Sanders.

DIRECT EXAMINATION

BY MS. MADDURI:

Q Good morning, Mr. Sanders. I forgot to mention this to you before we started, but if you can try to speak into the microphone just for the court reporter's ease of taking down your testimony today.

A I will do that.

Q Thank you. Senator Sanders, where do you live?

A Selma, Alabama.

Q And how long have you lived there?

A 48 years.

Q Selma has a unique place in Alabama Civil Rights history, doesn't it?

A It does.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 34**

528

Q Can you tell us a little bit about that?

A Well, in the '60s, there were tremendous efforts to try to get the right to vote for African-Americans, and it was happening all over the south. But it came to a head in Selma.

So Selma became a symbol not only in Alabama, and not only in this country, but in other places.

And it had to do with during those struggles in Selma and surrounding areas, Jimmy Lee Jackson got killed -- well, he got shot in Perry County. He died in Selma.

And out of that came the "Bloody Sunday" where people were beaten on the bridge. Out of that came the Selma -- the Montgomery March and other attempted marches called Turnaround Tuesday.

All of those gave Selma a unique place. And so you not only run into Selma being recognized as a symbol here. But in many other countries, I've run into it. So it certainly has a unique place.

Q And what is your current occupation?

A I'm an attorney.

Q What's the name of your firm?

A Chestnut, Sanders & Sanders, LLC.

Q And what type of law do you practice?

A I practice Civil Rights law. I practice governmental law, because we represent a couple of small commissions, a couple of small boards of education, small town.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 35**

529

I've practiced -- the truth is when you're in a small town, you really have a general practice. So I've done some personal injury, some contract. You might say sometime whatever comes through the door.

09:53:36 Q Okay. What type of Civil Rights law have you practiced?

A I have -- I have practiced -- I've done some voting rights. I've done some police brutality. I've done some black farmer issues. I was one of three key council persons in the Black Farmers Litigation. And I was an attorney in the other 09:54:15 one. They were two national nationwide class action dealing with issues where the United States Government had discriminated against black farmers, in terms of loans and programs and other kinds of things.

Q When was that case filed originally approximately?

09:54:39 A The first case was filed in 1997. The second case was filed in 2008.

Q And what was the -- what was the monetary -- was there a monetary award in the case?

A Yes. In the first case, over a billion dollars was 09:55:03 distributed to black farmers across the country.

In the second case, $1.25 billion was distributed.

Q Were any of the farmers in the case from Alabama?

A Yes.

Q And where are you originally from?

09:55:26 A I'm from Baldwin County, Alabama. I'm -- and I rush to

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 36**

530

say that I'm from north Baldwin, which is Tensaw River, those kinds of areas. Most people think of Orange Beach and Gulf Shores. But I'm from north Baldwin, Alabama.

Q When did you first leave Alabama?

A I first left Alabama in 1961.

Q Where did you go?

A I went to New York City.

Q How did New York City compare to Alabama for you?

A It was a world of difference. I -- in New York City, I was no longer afraid that when I left home I may not come back.

In New York City, I still got the lowest jobs on the lowest rung, but they were not as hard, and they didn't -- and pay as little as in Alabama.

In New York City, I must say that people treated people from the south as kind of like immigrants. You were on the low end of the totem pole, but it was still so much better than it was in Alabama.

In New York City, I graduated high school without taking any math course. And I was able to go to William Cullen Bryant High School at night and be able to get math. I was able to go to RCA school in electronics and eventually get a skill.

So it was a world of difference. But the most striking thing, though, is when you can talk to a white person and not have to be afraid that you may say the wrong thing. You may say it the wrong way, or you may look at them in the eyes a

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 37**

09:58:11 09:58:24 09:58:57 09:59:19 09:59:38

wrong way.

So that -- it's hard for people to understand how -- what a weight that is, that if something happened to somebody you love and care about you can defend them or you can defend yourself. So...

Q Did you have any interactions in Alabama with white folks where you didn't feel like you could do that?

A Yes.

Q Can you tell us about those or one of those?

A Well, I was a -- I was a terrible child. I always in fights and struggles and stuff with folks in my family. So when my mother was going to the grocery store, she would often take me. I was the second of 13 children. But she would often take me so I wouldn't get in fights with my sisters and brothers.

And on one occasion, I was sitting outside in the car. I had the door open. I had my feet outside the door. And a white woman came along and -- and I just looked up and looked right back down. It was only seconds. And it might not even have been a good second. And a white man came over to me and said, I saw you looking at that white woman, and I'm going to teach you a lesson. And I said -- I told him, I just looked up and I just looked right back down. And said he was going to teach me a lesson.

So I snatched my feet back in the car and closed the door.

And I was trying to wind up the window, and he was struggling there.

And my mother came out, and my mother was probably what you would call a cursing Christian. She started cursing him and telling him to get away. And he kept insisting that he was going to teach me a lesson. And she told him that she was going to teach him a lesson. And eventually he -- he walked away slowly. So...

So that's one example.

10:00:00

10:00:26

Q What did that --

A My brother.

Q What did that experience mean to you?

A It -- what it did was reenforced the concept that I was not free to even look up and look down; that you always in a -- in danger of being beaten, or being killed, or being oppressed in some other way.

10:00:50

It's just a heavy weight to know that if you have the wrong facial expression, if you have the wrong tone in your voice, that that's enough to have you harmed or even killed, so...

10:01:22

THE COURT: Senator Sanders, approximately when was that?

THE WITNESS: Okay. That was -- would have been in the late 1950s.

10:01:40

BY MS. MADDURI:

533

Q Senator, did you read a lot when you were growing up?
A Yes. I loved to read, but we didn't have -- we didn't have much things to read. So when I would -- on the school bus, I not only read all of my books all the way to the end, but I read books from students in higher levels.

And when you -- when you living in a house that's a three-room house and you got -- and you got 11 people living in a three-room house -- and I don't mean a three-bedroom house. I mean a kitchen, middle room, and front room. And you really don't have things to read. So...

So when opportunity come up to read something, I would read it. In fact, reading stuff was what caused me to be a lawyer.

When I was -- my mother worked for a large landowner in Baldwin County named Thomas Earl, who not only owned thousands -- well, I don't know. He owned at least a thousand acres. But she worked in the house. And she would bring magazines and newspapers and things that were -- after they no longer wanted them. But she didn't bring them home for us to read. She brought them home for us to use as toilet paper. And I read about Thurgood Marshall.

And every Friday the teachers would have us say what we were going to be when we grow up. And they did that on Fridays. So on the weekend we would stay focused.

And so the next Friday, I stood up and said I was going to

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 40**

534

be a lawyer when I grow up. And the whole class started laughing at me. And the boy right next to me before they started laughing, he started snickering under his breath. And the boy next to him started snickering, and it wasn't under his breath. And after a while, the whole class was just laughing. And the teacher tried to get them to stop. And she couldn't get them to stop. She tried to get me to sit down. And I was in too much of a shock.

So the more I cried, the more they laughed. The more they laughed, the more I cried. And finally she came over and put her left arm around me and put her right hand on my stomach and got me to sit down.

When I sat down, I -- I said, If they going to laugh at me, I ain't going to be nothing. And then I thought about it and said, They don't expect me to be nothing anyway. And I decided that if it was the last thing I did, that I was going to be a lawyer if it killed me.

But I also decided I wasn't going to tell nobody because I didn't want to be laughed at. And I didn't -- it took me years to understand why they were laughing at me.

I'm sorry.

Q That's okay, Senator. Thank you for sharing that story with us.

THE COURT: Senator Sanders, just to be clear, your classmates who were laughing at you, were they

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 41**

535

African-American?

THE WITNESS: Yes.

THE COURT: I know it doesn't matter what color your classmates are when they're laughing at you. It's not pleasant.

THE WITNESS: I understand.

But what you -- the first thing I thought about, I said, They laughing at us because we're from this big family which eventually grew to be 13 children, a mother, and a father. And then I said, but, you know, they knew that all along.

And then I thought that they were laughing at us because we were real poor because food would sometimes run out on a Wednesday, and we would just have grits, no butter, no egg nor anything for the rest of the week.

And then I thought that they were laughing because I stuttered. And it took me years to understand that they were laughing because not only could they not visualize me as a lawyer, they couldn't visualize them or anybody in that room as a lawyer. It was beyond their experiences.

It was only my experience because my mother brought home those things, and I read about Thurgood Marshall. So -- but it took years to understand that. Because I hadn't seen a lawyer. Nobody in there hadn't seen a lawyer. And we certainly hadn't seen a black lawyer. And it was hard to conceive of that.

BY MS. MADDURI:

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 42**

536

Q And where did you go on to go to law school?
A Okay. I went to -- I went to Harvard Law School. But before that, I came back south from New York and went to Talladega College.
10:07:37 Q Is Talladega College a historically black college?
A Yes.
Q And do you identify as an African-American?
A Yes.
Q When did you return to Alabama following law school?
10:07:51 A I returned in 1971. When I graduated from law school in 1970, I went to Africa for a year on a fellowship. And so I returned in 1971.
Q And you said, I think, that you have been living in Selma for 48 years?
10:08:13 A Yes.
Q So you moved there around 1971?
A Yes.
Q Are you involved in community work?
A Yes.
10:08:21 Q What groups are you involved with?
A I'm involved with a number of organizations. I'm involved with 21st Century Youth Leadership Movement. We have started McRae Learning Center, which I still support.
THE COURT: You started what kind of learning center?
10:08:44 THE WITNESS: McRae Learning Center. It's a

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 43**

537

preschool.

THE COURT: Okay. Thank you.

THE WITNESS: I've been involved with the Alabama Lawyer's Association. I've been involved with Alabama New South Coalition and Alabama New South Alliance.

I've been involved in SOS, which is Save Ourselves coalition for justice and democracy.

I've been involved in National Voting Rights Museum. I've been involved in the what they call a slavery museum, but the name of it -- ancient Africa and enslavement museum.

I've been involved in a lot more.

BY MS. MADDURI:

Q What type of issues are these organizations focused on?

A Nearly all of them in one way or another involve efforts to include those who are left out and lift those who are down. All of those organizations are a nonpartisan except for the Alabama New South Alliance. All of them are -- they just try to fight on each front to try to include those who left out -- lift those who are down.

Q Are voting rights one of the issues that --

A Yes.

Q -- organizations?

A Yes.

Q Does your work as a lawyer and as a very active community member take you -- result in you traveling around Alabama a

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 44**

538

lot?

A Yes.

Q Are there particular --

A And some -- and my practice of law.

10:10:51 Q Of course. Are there particular parts of the state that you have traveled to the most?

A Well, I guess it would be across the Alabama black belt, particularly the west Alabama black belt.

Q Anywhere else?

10:11:12 A Well, I've traveled to Mobile. I've traveled to Birmingham. I've traveled to Tuscaloosa. I've traveled to Montgomery. I've traveled to Dothan. I've traveled to Auburn.

Before, when I first began the practice of law, much of my practice was dealing with helping black people and poor people 10:11:40 save their land because the land was being taken going and coming. So I -- I traveled all over Alabama from Huntsville to Mobile, from Auburn to Sumter County.

Q A better question might have been: Where have you not traveled in Alabama?

10:12:02 A I think I've been to virtually every county in Alabama.

Q And have you held elected office?

A I have.

Q What office have you held?

A I was a member of the Alabama State Senate.

10:12:18 Q When did you first run for Senate?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 45**

539

A I first ran for Senate in 1982, and I was not elected. But I was elected the year afterward in 1983 but came back. And they declared -- the jurors declared those districts as unconstitutional. So we had an election a year later, and I was elected.

Q When you were elected, was the district -- had the district become a majority black district?

A Yes.

Q Did you run affiliated with a political party?

A I did.

Q Which one was that?

A Democratic party.

Q Do you still consider yourself a Democrat today?

A Yes.

Q When did you first begin to identify with the Democratic party?

A I -- my best guess on that would have been in the 1970s.

Q And why did you start identifying with the Democratic party?

A Well, I -- it seems that that the people who were in the Democratic party, at least some of them, certainly want me to be there.

The Republican party seemed to have been greatly identified with Senator Barry Goldwater who had been against the -- I believe the 1963 Civil Rights Act. So I -- somewhere

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 46**

in there, I began to identify with the Democratic party.

Q You said that it seemed like the Democratic party wanted you. Do you mean you as a black man?

A As a black person, yes.

10:14:22 Q Based on your experience, do you have an opinion on whether African-Americans in Alabama affiliate more with the Democratic party or the Republican party?

A I have an opinion.

Q What is that?

10:14:36 A Nearly all African-Americans affiliate with the Democratic party if they affiliate with a party.

Q Does that general preference among African-Americans for the Democratic party have anything to do with race?

A Yes.

10:14:55 Q Can you tell us more about that?

A Well, when you have been excluded all your life, like I have been much of my life, it becomes important to feel that you are wanted by somebody within the context of that group.

And although the Democratic party certainly back in the 10:15:33 '60s and the part of the '70s had plenty of people who were not exactly welcoming to black people, the Republican party seemed that it was not only not welcome, but it was adverse to the interests of black people.

When I ran in 1982 and '83, that was right after 10:16:11 President -- he wasn't President at the time, but President --

541

I'm having trouble pulling up the name. President Reagan. They kicked off his campaign in Philadelphia, Mississippi. And Philadelphia, Mississippi was burned into not only my memory, but my very being because that's where those three -- three boys, three young men had been killed.

10:16:40

And so there was those kinds of things that helped me to run as a Democrat.

Q Do you think the same things are true today? Do African-Americans in Alabama have a general preference for the Democratic party today because of race?

10:17:05

A Yes.

Q And do you see the same issues with the Republican party today in Alabama?

A Yes. You know, but the way it's expressed is different.

10:17:32

For example, you know that -- the role that the Confederate monuments and all of those kinds of things and played -- which to me have strong racial implications. And it always says to me that I'm not -- I'm not just wanted, but I'm expected to be on the bottom.

10:18:07

So it manifests itself in various kinds of way.

Q You mentioned that when you first joined the party or started to affiliate with it there was still a number of white folks who held, perhaps, racially charged views. When did you observe that start to change?

10:18:46

A I think it -- I observed it starting to change in the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 48**

542

'70s.

In 1965, I participated in the last leg of the Selma to Montgomery March. In 1966, I came -- I was still a student at Talladega, and I came back to Lowndes County to work to try to get African-Americans elected. And the county was like nearly -- nearly 80 percent African-American, 70, 80 percent. I don't remember. But we weren't able to elect a single person.

And the Democratic party at that time was still very much anti-African-American voters. And they -- it was -- the candidates were on NDPA. But starting in the '70s, it became a different kind of situation.

THE COURT: Wait a minute. You said NDPA.

THE WITNESS: Yes. That was National Democratic Party of Alabama.

THE COURT: Okay.

THE WITNESS: It was a -- see, the Democratic party had the white rooster, and it had been excluding African-Americans.

So a political party was started, and it was called NDPA, which is National Democratic Party of Alabama.

BY MS. MADDURI:

Q And so when did the transition happen when white folks left the Democratic party in Alabama approximately?

A Well, it's a funny kind of thing. Because in 1964, that's

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 49**

543

when it began. But it took many years to come to full fruition.

Because when I went in the Senate in 1983, if I remember correctly, there was -- I remember one Republican that might have been three. But I -- so it was a slow process.

And the more active African-Americans became in the Democratic party, the more whites began to go to the Republican party.

So it took a long time. But it was a constant growing movement.

Q What areas did you represent when you were a senator?

A The first time I ran, I represented Dallas -- I mean, the first time I -- the first time I was in Alabama Senate I represented Lowndes, Dallas, Wilcox, Perry, Hale, Greene, Sumter, Choctaw, and Marengo, all or parts of those counties.

Q And would you consider your district part of the Black Belt?

A Yes.

Q What is the Black Belt?

A The Black Belt is an area of Alabama where the soil is very black. And it was very conducive to raising cotton. So that also meant a lot of enslaved people were in those areas.

And even though it's tied to the soil, the designation, most of those counties will be either majority African-American or have high percentage of African-American. So a lot of

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 50**

544

people think that somehow it's the Black Belt because black people are there. And black people are there because the soil was black.

Q And how long did you serve in the Alabama Senate?

10:23:27 A I served 35 years. But after -- after 1992, the district changed substantially.

Q And what committees did you serve on over the years?

A I served on education. I served on the finance and taxation committee. I've served on -- and when the committee 10:24:00 was divided, I became chair of the finance and taxation education committee, which handled the Alabama budget, the budget -- education budget. But I served on judiciary.

I've served on banking and insurance. I've served on -- I can't pull it up now, but the -- the committee that would deal 10:24:28 with utilities, whether that was Alabama Power, Alabama Gas, those kind. The name changed from time to time. And they would put transportation in there.

I've served on the local legislation committee. And I can't pull up the others at this moment.

10:24:49 Q Did you ever serve on the reapportionment committee?

A Not that I recall. I don't think I did.

Q When you first returned to Alabama after attending law school, I think we said it was 1971?

A Yeah.

10:25:11 Q At that time, do you believe that there was official

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 51**

545

discrimination in Alabama against African-Americans related to voting?

A Yes.

Q How about since that time? Has that discrimination gone away?

A No. It's -- it has changed forms. It has diminished in some kinds of ways.

But when I came to Alabama, we agreed to stay just five years. And that was partly because my wife never wanted to -- to go to Selma. But we thought that somehow in five years the Voting Rights Act would be fully implemented, and, therefore, you know, we wouldn't -- we -- the burden wouldn't be so heavy to stay in Alabama because she really wanted to live in Harlem, New York. She had -- as a student, she had gone there in the summer.

But, and here it is 40 -- 48 years later since we went to Selma, we still have to struggle for the right to vote.

I mean, in 2011, I worked hard because we had a referendum. And I -- and they was going to provide some money for help. And I -- so when I got to the polls -- I had been in the Alabama State Senate then for 24 years. I got to the poll, and my name was not on the list.

And so the polling official said, Well, we know you vote here all the time. Let us call the Board of Registrars. They called the Board of Registrars, and I could hear the one end of

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 52**

546

the conversation. And they would not agree for me to vote in a place I had voted all the while.

So then they put me on the phone with one of the voting registrars. They told me -- she told me -- he told me that I -- that I couldn't vote. He said, You haven't been voting. I said, Well, I'm in the Alabama State Senate. I got -- I know I had to vote for myself.

Then he said, Well, you must have moved. And I said, I haven't been moved. I've been in the same house since 1978, '79. And then he said -- he kept coming up with reasons why I wasn't on -- on the voting list.

And finally he told me I needed to go to other voting places to try to see if my name was on the list. He was there in the -- in the Board of Registrars. He could've looked. So I told him I wasn't going to do that.

And then I decided I wasn't -- I wasn't going to go vote as a protest. But then I thought the referendum might lose by one vote, and I would have contributed to that. So I voted in a provisional ballot.

And here I was the highest elected official there in that county, and I knew him, and he knew me because I was working with economic development, and his brother was the head of that. So, of course, that also had something to do with my -- my wife because they had appointed all whites in the Board of Registrars. And she had led protests against that. And

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 53**

547

eventually they took off one white and put one black on in a county that's 70 percent African-American.

And I think that they just -- my assumption was that they wanted to show -- show me if they could do that to me, they could do it to anybody.

Q Have you ever observed other African-Americans finding that they are no longer on the voting rolls when they've gone to vote?

A Yes. When I would -- part of my service was when -- on election day was when there was election problems was to try to deal with them.

So even before election day, when the people would be taken off voting rolls, and many times they didn't know it -- so we would designate people in various counties to -- to look at those lists because our experience had told us that most of the folks who were on there by far would be African-American.

So they would look at the lists. And sometimes I would look at them. But most of the time, I coordinated people looking at them so that they could -- we could try to find ways to get them back on.

Q What -- can you clarify just for the Court what were the lists you were looking at?

A Well, when they would remove people off the list, they would run something -- before an election, they had to print the lists of all the voters in a particular county. So that's

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 54**

548

one of the lists we looked at.

And also, there were -- when -- when -- it was my understanding that when people were removed, they were supposed to let folks know. But we -- that was an ongoing effort across the communities to try to make sure that people were not excluded from voting by being taken off the list, or whatever.

Q So did they also create a list of voters who had been removed?

A Yes.

Q And did you review those lists, as well, or you or the people that you coordinated with?

A Yes. When -- yes. There were times.

Q Did you get a sense when you were reviewing these lists or when you were working with the folks reviewing these lists, could you tell if more African-Americans were being removed from the rolls, or if it was white folks?

A It was nearly always black people in those counties.

Q And approximately when did you observe these issues?

A I have observed those issues over the years.

In the 70s, the '80s, the '90s, 2000, 2010. It's been a constant struggle.

Q Did you raise this particular issue with anyone in the state government, or Secretary of State, or anyone like that?

A No, because I -- I didn't think that they would do anything about it.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 55**

When I was taken off, I went to the local probate judge, and he went over there and dealt with it.

I thought it was real sad that I was an elected official all these years, and I had to go to the local white probate judge to try to get my name straightened out on the voting list.

THE COURT: Did he take care of that for you?

THE WITNESS: Yes, he did.

BY MS. MADDURI:

Q When you -- sorry.

A No. He took care of me -- for me. But I couldn't help but think of all the people who had that problem who couldn't go to him or who couldn't be treated the same way.

I had the status of an elected official. I had the status of a lawyer. I had the status of a person who had worked in the community across lines. And I had to have help.

Q Are you familiar with, in the 1980s, any prosecutions that occurred relating to voter fraud?

A Yes.

Q Can you tell us about those?

A Yes. In the '70s in these majority black counties, we had -- white people voted huge number of absentees. And we would document that many of them were actually deceased. You'd go to the graveyard and be able to do it.

And so we went to -- we sent a delegation to the U.S.

Justice Department to complain. And the Justice Department said, We can't do anything about it. Y'all need to learn to use absentee ballots.

And so we came back. And I looked up the law. And I taught classes in Perry County on how to follow the law and to do absentee voting.

And so in 19 -- the election in 1984 had sprung out about 211 different indictments for what's called voter fraud. And we called it voter persecution cases. So it was something we were extremely concerned about. And I was the only lawyer initially, but then I recruited other lawyers. And we had to fight it on -- felt like we had to fight it on every ground. Because we felt legally you could fight and you could lose and you could still have the community so afraid to vote. We needed to fight it on political ground, as well, and public relation grounds. And it was just a tremendous struggle. And we had to fight on all those fronts.

Q I think you said there were 211 charges filed?

A Yeah.

Q Were those filed primarily against African-Americans or white folks?

A No. All of those were against African-Americans, except there was a white lady in Greene County who worked closely with African-Americans on voter registration, voter mobilization. I think her name was Bobbie Simmons.

551

Q And do you remember who the prosecuting attorneys were?
A Well, I remember the prosecuting attorney in Perry County in the Southern District was Jeff Sessions. And I don't recall who the prosecuting attorney was in Greene County at the time. But it was all a coordinated effort.
Q Were any of those cases tried?
A Yes.
Q And what happened?
A I think one case I think somebody pleaded -- might have pled guilty to a misdemeanor. But all 210 other cases, they were found not guilty.
Q I think you said you had to fight these -- when this happened, you had to fight on another different ground. I think you said legal --
A Different levels.
Q -- legally, politically, et cetera.
What are some of the impacts of cases like this or instances like this where something happens that feels targeted towards the African-American community? What kind of impact does that have on the community?
A It has a powerful impact. Because when you have been prevented from voting for these hundreds of years, or hundreds and some years and then all of a sudden these charges are brought in the federal -- I mean in -- brought by federal officials, which we thought ought to have been, you know,

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 58**

552

helping us to expand the voting right -- fear is such a powerful thing in the black community based upon all of what has happened over the years. So and people -- even after we won, people were afraid to vote.

10:39:41 And so particularly with absentees, but they were afraid in general. And we had to work year after year to try to -- try to overcome that.

Q Does that fear that results from things like this, does that have an impact on whether African-Americans actually go out to vote? 10:39:59

A Yes.

Q Have you seen any instances more recently where this kind of fear has prevented African-Americans from voting?

A Yes. I think it was 2017 a group of us met in Montgomery to -- people who worked to try to mobilize and encourage people to vote. We have all of these theories about why people do not -- not vote. 10:40:29

And so we decided that it wasn't enough for us just to make those assumptions. So we gathered in Montgomery. And we were -- all of us had to bring some people who did not vote so we could listen to them, as well. 10:41:01

And we just assumed that it was because they didn't think it was going to be -- was going to do any good because you would hear that. And we were amazed at the number of people who talked about fear. 10:41:29

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 59**

553

And much of that fear was tied to the criminal justice system in some kind of way. They thought -- well, they said, Well, they probably ain't going to do something to me. But they'll do something to my son, or my daughter, or my children, or my grandchildren.

10:41:50

Fear is still a very powerful factor in the African-American community that suppresses the vote.

Q Do you think those fears are rational?

A Yes. They're rational when you know that they've lynched people in the past for trying to vote. When you know that people off their land for trying to vote. When you know that people have lost their jobs for it. It's absolutely rational in my opinion.

10:42:20

Because people -- this might not make any sense. But every time I drive and I get stopped by a policeman, I don't know whether I will drive away from there.

10:42:48

So fear doesn't have to be rational in the sense that it's going to happen every time. Fear is rational if it can happen any time.

So I -- and I've had -- my wife is an attorney. And they stopped her from voting in Selma. So I had to go down there and start cursing just for her to be able to vote.

10:43:16

So it's real in the black community.

Q Senator Sanders, are you familiar with the law that's passed in the last ten years that's limited how political --

10:44:03

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 60**

limited how political organizations can contribute money to each other?

A Yes.

Q Can you tell us about that?

10:44:14 A It was -- I think it was passed in the -- in December of 2010 right after the election. And it was called PAC-to-PAC transfer. That bill came up in the legislature over the years, and we had always been able to defeat it.

PAC-to-PAC transfer says that if you are a PAC, you can't 10:44:45 transfer money to other PACs except to a particular elected official.

And one of the ways to deal with that was -- before the law came along was if I ran and I did not have a strong opponent and I had extra money, I could transfer it and help 10:45:10 out to different organizations. I could transfer it to other elected officials and stuff. And so when PAC-to-PAC transfer came in, I was one of those who went to Washington, D.C. to try to fight against the preclearance of that.

We didn't succeed. But that meant that organizations that 10:45:44 usually get out to vote in various kinds of ways, it was much harder for them to get funds or resources to be able to do that.

THE COURT: So was this a federal law?

THE WITNESS: No. It was a state law.

10:45:57 THE COURT: Okay. But I thought you said you went to

555

Washington, D.C to fight against it.

THE WITNESS: We asked them to preclear -- not to preclear it.

THE COURT: Okay.

10:46:08 THE WITNESS: We went to the U.S. Justice Department.

THE COURT: Okay.

THE WITNESS: Okay.

BY MS. MADDURI:

Q I think you said that these organizations helped get out 10:46:17 the vote and do other -- other sorts of things like that.

Do African-Americans depend disproportionately on those kinds of organizations?

A Yes.

Q In what ways?

10:46:29 A Well, because of the history of African-Americans not voting, it's not enough to say, well, this candidate is better than the other one, or to look at television, or to listen to a radio. You really have to get out and be able to do that partly to overcome the fear, partly to overcome a range of 10:47:00 things. So it takes resources to do that.

So with the PAC-to-PAC transfer, it just made it very difficult to be able to get resources to do that kind of mobilization.

THE COURT: Let me see if I can clarify. When you 10:47:22 refer to PAC-to-PAC transfers, are you referring to a law that

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 62**

allows PAC-to-PAC transfers or a law that prohibits PAC-to-PAC transfers?

THE WITNESS: A law that prohibits PAC-to-PAC transfers.

10:47:38 THE COURT: You were just referring to it at PAC-to-PAC transfers. So I wanted to make sure that it was clear that it was a law that precluded that.

MS. MADDURI: Thank you, Your Honor.

THE WITNESS: I really appreciate that.

10:47:50 BY MS. MADDURI:

Q Do you remember if there were justifications given for why this law was being passed?

A I'm sure there were, but I -- I don't -- I'm trying to pull up in my mind now exactly what those justifications were.
10:48:14 But I don't -- I don't. I don't -- I can't pull it up. That happens to you when you're 77 years old.

THE COURT: It also happens to you when you're in your 60s.

BY MS. MADDURI:

10:48:31 Q Senator Sanders, are you familiar with how judges are elected to the Alabama Supreme Court and the Alabama Courts of Appeals?

A Yes.

Q How is that?

10:48:43 A They are elected statewide, and they're elected from what

557

they call place. On the ballot, it will be statewide. But you'll be Place 1 or, Place 2, or Place 3, or 4.

Q Is that system also referred to as at-large elections?

A Yes.

10:48:56 Q In your experience, do at-large elections for these positions enhance the opportunity for discrimination?

A Yes.

Q How so?

A Well, Alabama is about 25 percent, 26 percent

10:49:14 African-American. And you have a number of positions in court. If they ran from district, African-Americans would have a very good chance of being represented on those -- on the Alabama Supreme Court, Alabama Court of Criminal Appeals, Alabama Court of Civil Appeals. But since they're elected at large and

10:49:43 elected from place -- if they were elected at large and you could just vote for one, then it wouldn't be so oppressive. But the way it's set up, you don't stand a real chance of winning.

Q Is it important to you that there are African-Americans

10:50:02 elected to those courts?

A Absolutely.

You know, there are times when people don't start out trying to do something that's -- that's racial. But then they don't understand all of the different dynamics, the in and out,

10:50:28 how this particular act is going to have that kind of impact.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 64**

558

It's just not in their experience.

And so if you had one person or two persons on that Alabama Supreme Court, they could help the other court members to see the different kinds of ramification.

10:50:47 But when the way they're elected, you don't get anybody on there to talk about those ramifications, so...

Q So you think it would be important to have that range of perspective from the African-American experience in the justice system?

10:51:04 A Absolutely.

Q Do you know how many African-Americans have been elected to statewide office in Alabama?

A Yes.

Q How many is that?

10:51:13 A Two.

Q Do you remember roughly when the last time an African-American was elected to a statewide office?

A My best guess is like '94 or '96, somewhere -- now, three African-Americans have served statewide and -- that I can

10:51:37 recall. But one was appointed. All of them were appointed before they were elected, which makes a lot of difference, you know. Because people say, well, you know, they -- they all right. They were appointed. They have the stamp of approval, you know, from -- from the higher-ups.

10:51:56 So Oscar Adams was appointed in the late '70s, early '80s.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 65**

559

I can't remember. And then Ralph Cook. I should say Justice Oscar Adams and Justice Ralph Cook was appointed. And then Justice John England was appointed like 2000, or something like that.

But the last ones all went out in, I think, 2002, or something in that time frame.

Q How does the lack of African-Americans elected statewide affect the African-American community?

A It has a profound impact. Because in the political system in Alabama and in this country, a great number of decisions are made all the time. They're made when people act in their elected position. Then they appoint people who do regulations and other kinds of stuff.

So literally, every aspect of our life is affected one way or another by government. And from the air we breathe to the food we eat to the water we drink to birth and death, all of these things. It's impacted there.

And so when -- when anybody's left out, it's a problem. But if you have been historically left out down through for hundreds of years, then it's even more important that you be represented -- that that particular group be represented in government.

Because all of these decisions have that kind of impact.

MS. MADDURI: Your Honor, would this be a good time to take a break?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 66**

THE COURT: It's fine with me if it's good for you. We will come back at 11:10.

MS. MADDURI: Thank you.

(Recess.)

11:11:23 THE COURT: Ms. Madduri, you may proceed.

MS. MADDURI: Thank you, Your Honor.

BY MS. MADDURI:

Q Senator, in your time in the legislature, in the Senate, did you ever introduce any voting rights legislation?

11:11:42 A Yes.

Q Can you tell us about that?

A I introduced legislation that would allow people to register to vote up until -- up until the day of voting. I introduced legislation to -- I may have -- I'm trying to -- I 11:12:20 know I had legislation drawn up. I think I introduced it through -- I have -- to try to make it easier to register. It might have been automatic registration.

I -- over the --

THE COURT: What do you mean by automatic 11:12:42 registration?

THE WITNESS: There are some states that have legislation have -- that when you become 18, you automatically are registered. You don't have to go through the process.

I was trying to pull up -- trying to pull up, but -- to 11:13:11 have it -- to have people make it much easier for folks to

561

vote. And there were others, but I can't pull them up right now. They may pop up in a minute.

BY MS. MADDURI:

Q Okay. And approximately how many times would you say you've introduced legislation related to either automatic registration, or same day, or late registration, I think as you said?

A I don't know how many. Because when you've been around 35 years, you can't pull it up.

Q Any efforts in the last five years that you were in the legislature?

A Yes. I know I -- I know there were two bills. It might have been as late as 2018.

Q And did any of those bills ever pass?

A No. No. I never expected them to pass. I simply introduced them because it was a statement that was important that we address those issues.

But, no, they -- no.

Q When we were going over the committees that you had served on, you mentioned the finance, taxation, and education committee, right?

A Yes.

Q How long did you serve on that committee?

A I was chair of the committee for 16 years. I think the most anybody chaired a single committee. But that committee

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 68**

562

was only in existence from '95 until starting in '95.

So I was -- but the dealing with the budget committee, I think I was on the budget committee before '95. But that particular committee started in '95.

Q Okay. Do you believe that African-Americans in Alabama bear the effects of discrimination in education?

A Yes.

Q In what way?

A When I -- when I became chair of finance and taxation, the first thing I tried to do was change the formula for educating -- for allocating funds to try to make it easier for poor areas, make it easier for rural areas. And there were changes, but it was not enough.

The way Alabama fund education is much of it from the state but some of it from the local level. And so if you're in an area that's got a lot of poverty, a lot of lower income people, then you end up with less money to educate when the problems are, in fact, are greater and need more.

So it's -- I think time after time you see education struggling a lot more in African-American communities. And that's, you know, one of the things that I think that strike me the most is that the farther you down on the status pole, the farther you're down on the education pole, the farther you're down on the economic pole, the less you see where your education is going to make a difference.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 69**

563

When you higher on the status pole, you can see where more education going to help you. You can see where more education going to help you when you higher on the job, or higher on the economic scale, higher on the social scale.

11:18:03 When you down at the bottom, it's hard for students to be able to see that. And, therefore, all of those things come together in a way that you have a vast number of people getting less education. They need more resources, but they're getting less resources.

11:18:25 Q And are those people primarily African-American in Alabama?

A Yes.

Q Or more often than not?

A Yes. Primarily.

11:18:33 Q And how does being lower on the totem pole or the status pole in education and income, how does that impact whether or not African-Americans are able to vote?

A When you have to jump through hoops to be able to vote, then you have to see where it's going to make a difference in

11:19:02 your life if you are able to vote.

And so if you are -- if the polling place is a problem, if you have to have transportation to get there, then you need more encouragement to vote.

But, in fact, you're encouraged less because it's harder

11:19:31 for you to see how this is going to make a difference.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 70**

564

I -- one time there was a lady, she was -- I can't think of her name. But she was traveling over the country trying to encourage young people to vote. And she came to Selma. And so we went out to the 21st Century Youth Leadership camp. And we did a demonstration. We asked her -- we asked the students -- we had some students. And so we asked them name something that voting does not impact. That's what we asked the students.

And then they would start out with things like air. And then we would explain that people put all kind of things in the air, and you have the Environmental Protection Agency trying to stop it. So the very air that you breathe.

And then they'd say food. And we'd talk about the Food and Drug Administration.

And they'd talk about water. And we'd talk about how water, whether it's local or federal, all of that --

So they went on down to talk about religion. And then we will say, point out -- how we ask them can they organize in the schools.

So what we were doing was demonstrating that every single thing is affected by voting. And you don't see that when you're poor. You don't see that when you're low on the education pole -- totem pole. You don't see that when you're low on the education and economics, and all of that.

So the higher you are on those totem poles, the more likely you are able to see where voting would make a

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 71**

565

difference. The lower you are on there, you worried about whether you're going to be able to get food to eat. You're worried about -- whether you're going to be able to get to and from to work, to and from school, all those kinds of things.

11:21:50 And the one of the things that people really don't understand that if you have one of those, that that's a burden. If you have one of them, that's an obstacle. If you have two of them, that's a burden. If you have three of those, then it's prohibitive.

11:22:08 You know, we see them separately. But the impact of them is collective.

Q Would you say that conditions for African-Americans in Alabama today are better than they were in the 1960s or '70s?

A Yes. Things are definitely better than they were in the 11:22:40 1960s and 1970s. Because in the 1960s, there were times when I had to get off the sidewalk if a white person was coming in the opposite direction. So I had to get off and let them go.

And every single thing was segregated. And every single thing was holding us down in ways. So it's definitely better.

11:23:15 In the 1970s, things improved some. But it was in 1972 that I went -- my wife was pregnant, and she didn't know she was pregnant, but she wanted fudge. And she does not like fudge. But all of a sudden she wanted fudge. So --

THE COURT: You should have known something was 11:23:42 getting right with her.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 72**

566

THE WITNESS: I should have when I looked back.

So I took her to this place. It was called Dairy Queen, or Dairy Dream, or something. It was right there in Selma on 80 and Lapsley Street or Summerfield Road.

11:24:01 And I pulled up, and she got out and went to stand in line. And when they stood in line, all of a sudden this white man came up and pushed her down. And he was standing over her.

So I jumped out and ran over there and hit him and he fell down. And I started trying to get her up. And she -- and he 11:24:22 got up, and he stabbed me in the left side. To even today, I have a reduced kidney where I was stabbed.

So I swore out a warrant against him. She wore out a warrant against him. He swore out a warrant against us -- against me. And the judge dismissed all the charges against 11:24:45 him even though he had stabbed me and even though he had knocked her down.

The judge did give a $20 fine against him for pushing her down. And so I -- I was just absolutely shocked. But then he sentenced me to jail.

11:25:06 So when I went to jail, I refused to make bond. I said, you know, this is so unfair. I'm going to just stay here in jail. My wife and I talked, and we agreed she was not going to bond me out or let nobody bond me out.

Then the probate -- I mean, after a few hours, the police 11:25:27 chief came and he said, Somebody's bonded you out. And I said,

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 73**

567

Well, we agreed that we weren't going to be bonded out. So -- he said, But you were bonded out. I said, Well, who bonded me out? He said, I'm not going to tell you. I said, People -- that's public information. He said, Not in this jail.

11:25:48 So then I told him I said, Well, I'm going to just stay right here. And he said, You're not going to stay right here. You're getting out of here.

I got out. I appealed the case. And then when it didn't show up in circuit court, I went over -- eventually went over 11:26:07 to find out what happened to it. All of the records had disappeared. All of the arrest records, all of the court records, everything. And I haven't been able to find them to this day. I keep thinking that that's going to show up at the bar association any time.

11:26:27 So I mean, that was -- that was in 1972. And you had had the Civil Rights Act in 1963. You had the Voting Rights Act in 1965. But it was just so powerful.

Even so, things have gotten better. Whenever I look at it, things got better from the '60s, got better in the '70s, 11:26:56 got better in the '80s.

And in the '90s, I -- things seemed to be slowing down. And eventually, in 2010, whatever things -- my impression was things were going back.

So when you say are they better today than they were? And 11:27:19 when I look at that, they were getting better. Now, there's a

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 74**

568

serious question about whether they're getting worse.

BY MS. MADDURI:

Q I think at the beginning of your testimony you mentioned that you marched part of the Selma to Montgomery, the last leg of it?

A Yeah.

Q What was that like?

A It was -- it was such a powerful experience because we didn't -- well, only 300 people marched all the way.

But we were so far back down the line because it was like 25, 35,000 people there. But you couldn't see -- you could see the outline of Dr. King, but you couldn't see his face. You could hear him because he had those big speakers.

And whenever he got into this rhythm where he would say, How long? And initially, when we would say, How long? He would say, Not long. But then after while when he would say, How long? The crowd responded saying, Not long.

And I left there thinking that it really won't be long before we have the right the -- the full right to vote. And then the Voting Rights Act was passed in August and was signed on August the 6th, 1965, I could never conceive of the idea that 50 years later I would still be struggling and fighting to implement it. I should have known that "how long" was Biblical, not months, not years.

In 1966, when we couldn't elect a single person, I should

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 75**

        569

have known that it took until 1988 -- two incumbents that had 60 and 70 percent -- black people to be able to elect to county commission and board of education -- a majority. I should have known. I didn't know. I just kept thinking that "how long" meant 5 years, then 10 years, then 20 years, then 30 years.

But it was one of the more powerful experience to see all those people -- black and white, old and young, fighting, marching for the right to vote.

Q Why have you chosen to stay so involved and done so much work for the right to vote?

A I think that President Johnson may have put it best whenever he was talking about the right to vote in 1965.

First, the vote is the only thing where everybody starts out even. You get one vote. So everybody starts out equal.

Second, there's the vote is the only thing that can stop -- that can protect every other right. It's not an accident that the right to vote was the last major bill -- the last major Civil Rights legislation to pass.

Even in 1963, when they did public accommodation, when they then did employment discrimination, whatever. But the right to vote came last because it protects every other right.

And the right to vote, the only vote that you can use -- the thing you can use to change things without resorting to violence and other kinds of things. So it's the most powerful right that we have because it protects every other right.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 76**

570

11:31:53
11:32:07
11:32:30
11:32:44
11:32:59

Q Thank you, Senator. That's all my questions for you right now.

THE COURT: Any cross?

MR. WALKER: Yes, ma'am, Your Honor.

THE COURT: Mr. Walker?

CROSS-EXAMINATION

BY MR. WALKER:

Q Good morning, Senator Sanders. Nice to see you.

A It's good to see you again.

Q I'd like to start by asking you some questions about what you've already testified about today, sir.

A Sure.

Q And I think you -- you testified about the *Pigford* case?

A Yes.

Q Was that the former class action case?

A Yes. That was the first one.

Q And who was the defendant, or what was the defendant in that case, if you recall?

A The defendant was the United States Department of Agricultural, USDA.

Q Do you recall the second case, the style of that case?

A Yes. It was discrimination litigation. It was a black farmers discrimination litigation.

Q And the defendant in that case was also the United States Department of Education?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 77**

571

A Yes -- no. United States Department of Agriculture.
Q Sorry. Thank you.
A Yeah.
Q You mentioned some voter fraud prosecutions that occurred in west Alabama, and I believe you associated those with Jeff Sessions?
A Yes.
Q And he brought those as U.S. Attorney for the Southern District of Alabama; is that correct?
A Yes.
Q Do you know whether or not --
A He brought some of them, yeah.
Q And then the U.S. Attorney for the northern district brought some?
A Yes.
Q Okay. Do you know whether or not those U.S. Attorneys were required to get approval from main Justice before they filed those lawsuits?
A No. I do not know. But I think we were -- we were just shocked that we -- that we complained and nothing happened.
Q I understand.
A And they told us to learn to use absentee ballots.
Q You talked with some sense about -- some sense of frustration about bills that you've not been able to get passed in the legislature. And it would be true that every legislator

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 78**

572

has bills that they strongly believe in and can't get passed; is that correct?

A That's correct.

Q And I want to give you an opportunity to be clear about something. Were you saying that all Republican members of the legislature were racists?

A No.

Q Okay.

A But what I am saying is that race is such a powerful factor.

I don't use the term racist because it cuts off conversation. The moment you say somebody's a racist, you don't have any conversation.

But race is a very powerful factor.

Q You talked about some bills that you wished you had been able to pass. And one of them -- let's see if I can find my notes. And I apologize, sir.

One of them was to allow voting registration up to the day of voting?

A Yeah.

Q And the other one I think was to allow automatic voting or require automatic voting when you register for a driver's license?

A Automatic? No.

Q Did I misunderstand?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 79**

573

11:36:05
11:36:18
11:36:23
11:36:38
11:36:53

A I think it was automatic registration.

Q Automatic -- I said voting, and I meant registration. And I apologize.

So to be clear since I've muddled things up, one was to allow people to register to vote up to the day -- up to election day?

A Yeah.

Q And one of them was to allow automatic registration when people went to get a driver's license?

A No. No.

Q Just --

A When they became 18.

Q When they became 18?

A Yeah.

Q Just automatic registration?

A Yeah.

Q Okay. Is there any reason you could not have proposed those bills before 2010 when the Democrats were in power in the legislature?

A No. I don't think there was any reason -- it simply didn't come up at that time.

Q And --

A And --

Q I'm sorry.

A Go ahead.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 80**

574

Q No. Please go ahead, sir.

A Well, see, the thing you have to understand was there was -- even when Democrats were in control, there were tremendous limitations on things that affected African-American. So it was -- it became to a much greater degree. But there were -- I don't want to suggest that race was only an issue with Republicans.

Race became more of an issue because we were not in that structure. But there were many Democrats who had reservations to -- they grew up in the system, as well.

Q And just to be clear, from let's say 1901 until 2010, state government in Alabama was controlled by the Democratic party; is that correct?

A From?

Q 1901 or 1900?

A Yeah. Well --

Q No.

A From 1819 --

Q Until?

A No. No. Yeah. From 1819 except for maybe a brief period.

Q During Reconstruction?

A Reconstruction.

Q Okay. The state was controlled by Democrats until 2010?

A Yes.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 81**

575

Q Thank you.

A Well, I wouldn't say until -- the legislature was controlled by Democrats until 2010. But the governor and a lot of other office some happened before 2010.

11:38:41 Q So before 2010, the legislature was controlled by Democrats. And after 2010, it became controlled by Republicans?

A Yes.

Q Thank you, sir.

11:39:08 Senator Sanders, you testified about reasons why African-Americans may be afraid to vote. And I understand that. And we both understand that our state has a very sorry history as we go back of Civil Rights. And I don't mean to minimize that.

11:39:31 But you said three things: That people were afraid to vote because in the past African-Americans have been lynched for voting, and people have lost their jobs for voting, and people have lost their land for trying to vote.

A Put off the land.

11:39:58 Q Different from --

A The reason I say put off the land -- in 1966, when I went to Lowndes County, every black person who would try to register to vote, they were put off the land. They -- so they had tent city right there on 80 between Selma and Montgomery because all

11:40:20 these people were put off the land. And so they would live in

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 82**

576

tents and stuff, yeah.

Q I understand that. And you and I grew up roughly -- you're a little bit older than me, but we --

A A few years on the front end and on the back end make a lot of difference. In the middle, it's not much.

Q It's been a long time since any of those things happened to a black person who tried to vote, has it not?

A It's been a long time since a person was lynched who was trying to vote. It's been a long time since people were put off the land. And it's been a long time.

But the memory of those in our collective memory is so powerful. And it's handed down from generation to generation. So it's still there in a very powerful way.

Q I understand that. Thank you.

There's been testimony throughout this trial that I would generally summarize as saying that -- and I think you were sitting in the courtroom today when the commissioner who preceded you testified. And it may be fair -- and if you feel like I'm misstating her testimony, let me know, because that's not my intent.

But some of what she said was that it would be good to have another African-American congressperson because the white people in Congress don't represent their black constituents, and that there should -- for that reason, there should be a -- an area drawn with majority a black district that could elect a

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 83**

577

majority black -- I mean, that could elect the African-American candidate of choice who, in most cases, would probably be African-American.

Does that -- I'm not sure she said all of that --

A Neither am I.

But let me address it this way. No white person can fully understand all of the ramifications and manifestations that race impact on things. So even the ones who try very hard can't do it because it affects everything in one way or another. So -- so since that's the case, if you -- and in Alabama if you don't get a majority district, you don't get black people elected.

As far as I can recall on the state level, there was only one black person elected in a majority white district. And that was up in Cullman County. I forget his name. And he only served one term.

So the only way that black people -- since the state is majority white, the only way black people get in office essentially is through district. And that's true in Congress, as well.

And the county -- the state is 25 percent, 26 percent African-American. And there's no doubt in my mind that the county representation will end up being different because they have different experiences that they went through things.

I think Congresswoman Terri Sewell, she was among -- as I

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 84**

578

recall, she may be -- she might not have been among the ones who desegregated schools, but she -- part of her experience would have been that.

So all of that informs how you understand issues and, therefore, how you respond to issues.

When -- if somebody thinks everything is hunky-dory, then they're not going to respond the way you want -- you may want them to respond. So I -- it just makes a big difference.

One of the things that I have noticed when I -- in the Senate -- maybe I said this. But when white people came to see me -- and a lot of white people came for representation -- they always came with a proposal to advance them being in the system. And most of the time when black folks came to see me, they came with ideas of how black people as a group can get within the system.

So that was a completely different thing because white people usually came with a proposal saying specifically, Here's what I want you to do for me or for my group that's a small group. And black people came saying, how do we get in economically? How do we get in educationally? How do we get in all of these other kinds of ways?

So it was just a profound difference. I was willing to see all of them. I was willing to work with all of them. But they came differently.

Q I asked my question perhaps poorly and maybe misdirected

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 85**

579

you in where I meant to go.

Let me ask you the question this way: You talked about fact that we have at-large elections for the Supreme Court and the Court of Civil Appeals.

A Yeah.

Q And I think both of us agree that the state is better served when we have people from all backgrounds on those courts. I don't in any way disagree with you on that.

But did you mean to say that the use of the state -- that the state's reliance on statewide at-large elections is necessarily race based?

And let me ask that question a little bit differently. Doesn't the state have a legitimate argument -- you may not agree with it -- but at least one that reasonable people could think was valid, that if people are elected from districts, they may feel like they're supposed to represent their districts, as opposed to other voters, and that we don't want our judges on the Supreme Court and the Court of Criminal and Civil Appeals to feel like they have a constituency other than all the people of the state as a whole.

And so my question is: Would you at least agree that that is not necessarily a racially motivated point of view, even if it's not one you would agree with?

A It may not be racially motivated. It certainly has powerful racial impact.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 86**

580

And by your argument, then they all are elected by the Republican party. So that means that by your argument, that that he would -- they are likely to serve the interests of the Republican party.

11:48:20 So to me, it makes sense to end up having inclusion where everybody's at the table. Even though you are in a minority, you are still at the table. So you have a chance to try to educate others who are there making a decision.

Q Would you agree with me that the manner in which we fund 11:48:41 schools in Alabama is very complicated, perhaps needlessly very complicated?

A Very complicated, yes.

Q And that since I've been an adult, at least, for the last 30 years, at least, a lot of people, black and white, have been 11:49:01 working very hard with not as much success perhaps as we would hope, but working very hard to change the way that we fund our schools and to create better schools that are better funded?

A I don't know about a lot of people. Some people have worked hard to try to have better funding of education.

11:49:26 Q And that would be black people and white people?

A Yes. Some whites and some black.

Q And do you know whether or not the poverty rate among African-Americans in Alabama has gone up or down since 2000?

A I don't know that for a fact.

11:49:49 Q Do you know whether the lifespan of African-Americans in

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 87**

581

Alabama has gone up or down since 2000?

A I don't know.

Q Do you know whether the per capita income of African-Americans in Alabama has gone up or down in 2000?

11:50:07 A Per capita? I think so. But I don't know for a fact. I haven't looked at these figures.

Q Do you know if the rate of Internet access among African-Americans in Alabama has gone up or down since 2000?

A I'm sure it's gone up. There wasn't hardly any Internet

11:50:28 before 2000 among black people. I'm sure it's gone up.

Q I think maybe you have me there.

What about 2010? Do you know whether or not the rates of Internet access among African-Americans in Alabama has gone up since 2010?

11:50:41 A I don't know for a fact, but I believe it has.

Q And do you know whether health outcomes for African-Americans on average have gone up since 2010?

A I don't know that for a fact, but I hope and pray it has.

Q And I do too.

11:51:00 Let me change subjects just a little bit, Senator Sanders. You mentioned earlier two things, one of which kind of caught my ear because I didn't know the difference.

You mentioned the Alabama New South Coalition, and I'd like to ask you some questions about that. But you actually

11:51:20 also -- I thought I heard -- and the acoustics in this

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 88**

582

courtroom are not good. But I thought I heard you mention the Alabama New South Alliance.

A Alliance, yeah.

Q What's the difference between the New South Coalition and the New South Alliance?

11:51:30

A Well, when Alabama New South was created, it not only did voter registration, voter mobilization, and voter participation, voter education, but it also endorsed candidates.

11:51:48

And after the -- after the PAC-to-PAC transfer of things came in, that that created all kinds of problem. So Alabama New South Coalition ceased to endorse candidates. And candidates are actually endorsed by Alabama New South Alliance.

Q Oh, so you did that because of the PAC-to-PAC problem?

11:52:13

A Yeah.

Q I see. By the way, you mentioned the PAC-to-PAC legislation. And did you say that was in 2010 or 2011?

A I thought it was in 2010. I thought it was passed in December -- the election was in November, and then there was a special session in 2010 in December.

11:52:30

Q I think you're right. And you mentioned that you were part of the delegation of people who went -- excuse me, sir -- to Washington to lobby the Attorney General not to preclear that bill; is that correct?

11:52:47

A Yes.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 89**

583

Q Did y'all meet with the Attorney General at that time?
A I don't -- I don't know whether we met with the Attorney General on that occasion. We met with some people in the Civil Rights Division.
11:53:04 Q And, ultimately, I guess they concluded that the PAC-to-PAC transfer would not have a retrogressive effect on the opportunities for African-Americans to elect the voters of their choice and participate in elections; is that correct?
A No. No. What they decided was somehow this kind of
11:53:25 legislation does not come within the purview of Section 5.
Q So they said was not preclearable, not within their jurisdiction?
A Yes.
Q Who was the Attorney General at that time? Do you recall?
11:53:42 A Yes. As I recall, it was -- because he was there during most of the Obama administration. I can't think of his --
Q Let me tell you that I believe the Attorney General from 2009 to 2015 was Eric Holder?
A It was Eric Holder.
11:53:59 Q Thank you.
A See, that's that 77 years again.
Q I'm right there with you. If I hadn't looked it up on Google while you were talking, I wouldn't have known.
Can you tell us what the Alabama Democratic Conference is?
11:54:13 A Yes. The Alabama Democratic Conference is a caucus within

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 90**

584

the Democratic party.

Q And is it fair to say for a long time -- I don't know if it still is -- but that by and large, that was created and led by a man named Joe Reed?

11:54:31 A Yes -- well, it wasn't created, but it was led by him for many years.

Q Okay. And many people would call Joe Reed the dean of Alabama redistricting. Have you ever referred to him -- heard him referred to in terms like that?

11:54:49 A No, but -- but we give him a lot of credit for his work in redistricting.

Q And do you know whether or not he has played a role since at least 1980 in drawing the state legislative and congressional districts when they were passed by the

11:55:19 legislature?

A I know for a fact that he played a significant role in legislative districts. I'm not sure about exactly what happened. But I think that he may have been involved when the one black district was created in 1991-'92.

11:55:39 Q Are you a member of the ADC?

A No.

Q And you haven't been a member of the ADC since you were one of the cofounders of the New South Coalition; is that correct?

11:55:51 A Yes. I haven't been a member of the ADC since 1980 --

**Christina K. Decker, RMR, CRR**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 91**

585

well, it started a little before -- it was created in '86. But I went out in, I think, in '80 -- '84.

Q And why did you cofound the Alabama Democratic Coalition?

A Okay --

11:56:15 Q Excuse me. Alabama Democratic Conference. Sorry.

A Ask the question --

Q Excuse me. Let me ask my question again. I got all messed up.

Why did you, Senator Sanders, co-found the New South

11:56:27 Coalition?

A There were two major things that led to it. We were in the seventh district, and the ADC elected chairs -- elected the chair of each district.

And we -- some of us got together and elected Judge Branch

11:56:54 from Eutaw. He was probate judge over there as the seventh district chair.

Dr. Reed did not want him as chair. So the election got set aside. And then they called another meeting. He wanted the mayor of Uniontown, and the meeting was in Uniontown. So

11:57:16 they called a second meeting. And when the second meeting was called, we gathered again, and we elected Judge Branch again, and it was set aside again.

And then the meeting was set in Chilton County. And we didn't bother to go. That was -- that was one thing that had a

11:57:36 very profound impact.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 92**

586

The other one was when Jesse Jackson was running in 1984. And so we all went to Mobile to participate. And most folks there were supportive of Jesse Jackson.

And there was a motion put on the floor and second and passed in very -- like seconds. And so people were very upset.

And the last part of that was in 1985, I received word that Dr. Reed was opposed to me in the Senate, although I was already in the Senate.

And so all of those things came together. And we said we wanted to create an organization that was not limited to one race or it was open to whites, as well as blacks. We wanted to create an entity that was not tied to the Democratic party or any other party.

And we -- if I'm going on too long, let me stop.

Q No. I think you've answered my question, sir.

THE COURT: May I ask, is that the same Dr. Reed that seems to be at outs with other members of the Democratic party in Alabama right now?

THE WITNESS: It's the same Dr. Reed that's been in a struggle with some other members of the Democratic party.

THE COURT: Okay.

BY MR. WALKER:

Q Senator Sanders, ever since I've been voting, I have been seeing yellow ballots handed out outside of polling places where I vote. And what would those be?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 93**

587

A That yellow ballot is the ADC ballot. The blue ballot is the Alabama New South Alliance ballot.
Q And --
A Of course, other organizations will sometimes put out a yellow ballot or a blue ballot.
Q Yeah. But the ADC routinely outside of polls hands out ballots that tells people who are interested in the ADC's position how to vote.

And the New South Coalition, of course, does the same thing, and other groups may do the same thing too. I'm not saying there's anything wrong with that.
A Yeah.
Q And is the position that the New South Coalition takes always the same as the position that ADC takes?
A No.
Q Okay. Are they mostly different, or do you know?
A When you say mostly different, you have a number of positions on the ballot. Sometimes you have 30-something -- 30-something positions. And I would -- if I had to answer that, I would say most of the positions are probably the same person --
Q Let me rephrase my question. Do the ADC and the New South Coalition independently come up with who they decide to endorse and support?
A Yes.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 94**

588

Q And sometimes it's not the same person?
A Yes.
Q Okay. And, in fact, I'm not sure if it was the first time, but I think it was the first time that Ms. Sewell ran for District 7, the New South Coalition endorsed, I believe, Earl Hilliard, did it not?
A It --
Q In the primary?
A In the primary, it endorsed Earl Hilliard. In the runoff, it endorsed Congresswoman Sewell. ADC endorsed, I think, Sheila -- from Jefferson County. Sheila...
Q I can't think of her last name right now.
A She was on the county commission at that time.
Q Sheila Smoot?
A Sheila Smoot. Yeah. If I remember correctly. That's been a while.
Q Well, that's what my research showed.
You were in the legislature -- your -- when did you give up your seat, sir?
A I went out in November.
Q Of this November or last November?
A This -- no. I went out in November of 2018.
Q Okay.
A I've been out a year.
Q And you've been succeeded by your daughter -- one of your

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 95**

daughters, rather, at any rate, I believe?
A Yes.
Q And she was elected without opposition?
A No. She was elected. An independent ran against her who was a -- who was a Republican member of the Dallas County Board of Education. But he ran as an independent, so...
Q And did she win by a landslide?
A She won by a very good margin.
Q I'll take that. And congratulations.
A Thank you.
Q But you were in the legislature in 2011 when the legislature took up congressional redistricting, were you not?
A Yes.
Q So I'd like to ask you about that, please, sir.
A Okay.
Q Do you need some water or anything?
A I'm fine.
Q Okay. Did you ever talk with Ms. Sewell about her district?
A In the 2011?
Q Yes, sir. When the new plan came up, did you ever talk to her about her district?
A I didn't have a conversation with her.
Q Do you know whether or not she designed her district herself or with her staff?

590

A No, I do not know.

Q Do you know whether or not she approved that district?

A I do not know. But I -- I know it was very common for people to be consulted about their particular district, but I do not know that.

Q If Senator Dial were to testify that she told him she approved that district, you would not disagree with that, would you?

MS. MADDURI: Objection. Calls for speculation.

THE COURT: Overruled.

THE WITNESS: If Senator Dial said it, I don't know whether I would agree with it, but I could envision that possibility.

BY MR. WALKER:

Q Okay. Did you, at the time the legislature was taking up the 2010 congressional districts, suggest to anybody that there should be two majority black districts?

A I don't know whether I suggested it, but I know there was discussion of that.

Q Was that discussion with any of the chairs of the redistricting committee so far as you know?

A I didn't have any discussion with the chairs of the redistricting commission.

Q Was that discussion among members of the Alabama legislative black caucus?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 97**

591

A I know it was discussions among members of -- yeah, members of the black caucus. Yeah. Yes. Among African-Americans in the legislature.

Q Do you know if they --

12:05:13 A Which it may be different from the black caucus.

Q Uh-huh. Do you think when the legislature is looking at a redistricting plan, one of the considerations is whether or not that's a plan that can be passed? Is that a legitimate consideration?

12:05:32 A Yes.

Q Okay.

A Because I know that there are things that we think would certainly be fair or better, but we also know that they are not likely to pass, so...

12:05:59 Q I understand. Do you recall coming to a hearing that we held when we were doing the legislative -- not congressional redistricting -- in Selma?

A I recall.

Q And I think it was at the Saint James Hotel?

12:06:20 A I recall that.

Q And do you recall that at that time you testified that you believed that a majority black district should have about 62 percent African-American population?

A A majority black legislative district.

12:06:38 Q Yes, sir.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 98**

592

A Yes.

Q Okay. About 62 percent is what you told the committee; is that correct?

A Yes.

12:06:43 Q And was that a decision that you had just made that day, or was it based on your experience over time as a legislator?

A Well, it was a decision that I had arrived to over time because there was a time when I thought it should be higher --

Q Uh-huh.

12:07:08 A -- than been 62. But as time went along, that continued to change. And the percentage continued to go down because there are so many different factors that are involved.

Q That would not be your opinion today, would it?

A 62 percent?

12:07:27 Q Yes, sir.

A No.

Q But it was -- that was your opinion at the time based on your experience as a successful African-American politician?

A Well, I don't know whether it was based on my experience,

12:07:43 but that was my position at that time.

In fact, it was commonly thought back at that time that you needed 65 percent.

Q Uh-huh.

A But that just kept going down because you would see

12:08:00 developments that indicate that you could win with less than

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 99**

593

62 -- less than 65, less than 60 percent.

Q And what were those developments?

A Well, when you are looking at whether somebody can be elected in addition to the number of African-Americans, you are also looking at what kind of organization exists in that. You are also looking at what's the education level of people. You are looking at how many people have criminal records. You're looking at what kind of -- what's the economic kind of situation.

Because in those districts -- and I've run in them enough to know -- that the smaller the district is the more difficult it is to elect an African-American. You would think it would be the other way around.

So because when local people decide they don't want you, they can come together and bring things together. So when you are talking about a bigger district, then it makes a difference.

So all of those factors come there, and they have continued to evolve over the years.

Q When you have a -- and when you have a -- an experienced and successful politician with good name recognition, like Ms. Sewell is in District 7, can you have a lower black population and still think of that as a majority black district than if you have an unknown black candidate?

A Well, I wouldn't -- I wouldn't recommend deciding a

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 100**

594

district based upon the person that's in that office because they're not going to always be there. So I wouldn't recommend that.

You know, I ran for that district once. I ran in 1992. There were 76,000 votes. And I lost by 400, 500 votes. So I'm -- I was familiar with that district from that experience.

Q One last question.

When you --

THE COURT: Well, before we leave that, may I ask one?

MR. WALKER: Yes, ma'am.

THE COURT: Okay. So from that -- I think the records show that in the last election Representative Sewell carried the vote by 70-something percent? I'm asking the attorneys if I'm wrong.

MR. WALKER: I don't have that in front of me, Your Honor.

THE COURT: Seems like I can remember 74, something like that.

Would the fact that she has had such a large majority of the votes in that district -- should that fact affect the way the redistricting commission looks at the percentage of African-American population in that district in deciding to add to or shrink that district, or should other factors come into play?

THE WITNESS: I wouldn't base that at all because the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 101**

595

candidates who have run against her have not been strong candidates.

So if strong candidates was out there, it might be a very different thing. So I -- I would say you have to look at all of those factors and all of those dynamics.

THE COURT: And as much as we all love Representative Sewell -- I do -- she may not run for that district forever, right?

THE WITNESS: That's right. She may run for U.S. Senate.

THE COURT: I didn't say anything. I didn't -- anyway.

But the next candidate may not have it as easy as she has had it, I guess is what I'm trying to get around to.

So...

THE WITNESS: Well --

THE COURT: I mean, in looking at the voting trends in that district, it seems to me -- and these attorneys are going to educate me on it -- that the mere fact that she's been able to carry it with such a strong high percentage doesn't mean that it would necessarily be as easy for the next candidate to run without her presence there to be elected, I guess is what I'm trying to say.

THE WITNESS: Well, she --

THE COURT: When you have a good candidates, it's

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 102**

596

easier to get a more cohesive base for election than if you have one that's not as well known in the district even though that candidate may be a good one, too.

THE WITNESS: Well, if I remember correctly, most of the people who have run against her have been other African-Americans. So I don't think you can tell anything from -- from that.

It may -- there may have been -- I was trying to think if I'd known of any white who ran against her. There may have been one, but I don't know. It depends on who the candidates are. It depends on the resources that they have. It depends on what's the makeup of that district, but all of those other kinds of things.

So I can't -- I can't say -- because I considered running in 2010 when she was elected. But people strongly encouraged me to stay in the Alabama Legislature.

So all of those kinds of things, it doesn't mean that -- I don't think you can tell anything about that because it's so many factors and so many dynamics.

THE COURT: Thank you.

BY MR. WALKER:

Q Senator Sanders, you're a lawyer, too, and you know when a lawyer says I have one more question...

A That's the exact thing that ran through my mind. In all my 48 years of practicing law, I have not known one single

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 103**

597

lawyer who to say that and it was just one more question.

Q Well --

THE COURT: I actually had one.

THE WITNESS: One.

12:15:06 THE COURT: In a case a tried two weeks ago.

THE WITNESS: Oh.

THE COURT: Said one question and only had one.

THE WITNESS: That's was your first time.

THE COURT: I made note of that -- one of the rare times.

12:15:15

BY MR. WALKER:

Q I'm not going to be that lawyer today. I've got more than one now.

You talked about when you have a good candidate. And what makes a good candidate?

12:15:25

A For me, a good candidate is a person who understands what the district is like, who understands all of the dynamics in the committee, who has a personality that connects with people, who can raise a minimum amount of resources.

12:15:58 And I say a minimum amount because when I ran for -- I was always underfunded compared to other committees until the last few years.

But a good candidate has a vision that he or she can share with the people and can tell them how they can plug into that vision.

12:16:26

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 104**

598

Q Does name recognition, is that one of the factors that relates to electoral success?

A That can be a factor. But there have been times when people didn't have name recognition at the beginning, but 12:16:47 various organizations supported them and helped in spite of the fact they didn't have name recognition.

Q Senator Sanders, I now want to put you on the spot a little bit, and I'm sorry to do that.

A I would be disappointed if you didn't.

12:17:04 Q Okay. Well, thank you.

I want to ask you about something that happened in 2010, and I'm going to ask you about the robocall and give you a chance to explain that, please.

A Sure.

12:17:14 Q And here is the text of the robocall that I understand you made in 2010.

A Yes.

Q It was, quote, This is Hank Sanders, Alabama State Senator, and I'm still mad as hell. I say, hell, no. I ain't 12:17:35 going back to the cotton fields of Jim Crow days. I'm going forward with Ron Sparks, Jim Folsom, and others who would do right by all of us. I hope you're mad as hell and will not go back. And you have the power to choose. I will stand until hell freezes over.

12:17:58 Was that the text from the robocall, sir?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 105**

599

A Yes.

Q And I have to say to me and to a lot of people -- and you were questioned by Anderson Cooper about this -- I thought that was a racist appeal. So I want to give you a chance to explain that.

12:18:14

A It was not racist at all. What -- there were a lot of ads saying that we have to take our country back. All of those ads about taking our country back. And I was responding to that by this ad.

12:18:33

And I was saying -- because I viewed them as saying take our country back as talking about going back to segregation, going back to that. And I was saying, Hell, no. We ain't going back. And I didn't consider that racist.

In fact, that was a response to a racist ads and racist statements.

12:18:54

Q Well, did -- I believe that the people who were running against Ron Sparks and Jim Folsom were the person who became Governor Bentley and Kay Ivey. Am I correct on that?

A I think so.

12:19:13

Q Did either Mr. -- or Dr. Bentley -- Bentley or Kay Ivey run any ads that you thought were racist or say, let's take something back, with regard to Civil Rights?

A What -- there were -- I don't know whether they ran an ad specifically. But ads were being run saying, Let's take our country back.

12:19:38

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 106**

Q Okay.

A And the people who were saying that was supporting them. And I was saying, no, we need to fight. We can't go back.

That -- it's like Make America Great Again. And you asked when was America great again? And then they say, well, during slavery or during segregation. So I was responding to that concept.

Q Thank you, Senator Sanders, for letting me ask you questions.

A Thank you.

THE COURT: Any redirect?

Senator, it's getting into the lunch hour. Are you okay to go on a for a little while?

THE WITNESS: Oh, yes. I hope to finish and they'll let me go. I need to be in Greene County for a legal matter.

THE COURT: Okay. We'll see if we can finish and get you out. I just didn't want you to be sitting there starving.

THE WITNESS: No. I'm fine.

THE COURT: Okay.

THE WITNESS: Maybe she will say one more question and mean it.

MS. MADDURI: I'm not going to promise one more question. But it won't be very many questions.

THE WITNESS: Okay.

THE COURT: Just about every time a lawyer says that,

601

you can pretty well be assured they're telling a story, can't you?

THE WITNESS: Yes.

REDIRECT EXAMINATION

BY MS. MADDURI:

Q Senator, Mr. Walker talked to you about the comment you made about 62 percent in a legislative district about ten years ago.

On that occasion, were you speaking about legislative -- sorry -- you were speaking about legislative districts?

A Yes.

Q Were you offering any opinion about the level of black voting age population that was required in a congressional district?

A No.

Q Are you familiar with the fact that state legislative races have a much lower rate of participation than congressional races?

A Yes.

Q Are you familiar with the fact that state legislative races are typically far less well publicized than congressional races?

A Yes.

Q Are you familiar with the fact that state legislative races have much lower levels of fund-raising and spending than

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 108**

602

congressional races?
A Yes.
Q Are you familiar with the fact that far fewer people as a percentage vote in the state legislative races than congressional races?
12:22:07
A Yes.
Q In your opinion, would all of these factors impact the level of black voting age population that would be needed to ensure that African-Americans have an opportunity to elect their candidates of choice?
12:22:20
A Yes.
Q When you gave testimony at that hearing, did you also offer testimony about the fact requesting that African-Americans do not be packed into districts in the legislature -- in legislative districts?
12:22:34
A I don't recall at the moment what I -- whether I did or not. I know that's a concern. But I can't recall whether I testified on that or not.
Q Okay. Have you ever been involved with redistricting for congressional districts?
12:22:53
A Not really. There was a -- when the district was created, the seventh district was created, I remember interacting with some people in discussions and stuff. But I've never been really involved in the creation of congressional district.
12:23:25
Q Isn't it true that Terri Sewell won 72 percent of the vote

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 109**

603

the first time she ran for Congress?

A I don't recall.

Q What do you understand the opportunity to elect to mean?

A Opportunity to elect means that you have a reasonable chance to elect. Reasonable chance doesn't mean that you will be elected. It doesn't mean that the odds are with you. It simply means that you -- that you -- you have an opportunity, you have a chance. You have a reasonable chance. It may be 40. It may be 50. It may be 60. But it means that all of these different factors could come together, and you have a reasonable chance to prevail.

Q Thank you, Senator. That's all for me.

THE COURT: Any recross, Mr. Walker?

MR. WALKER: Yes, ma'am. A short recross.

THE COURT: We gave him an opportunity to think a little bit before.

RECROSS-EXAMINATION

BY MR. WALKER:

Q Senator Sanders, just a few more questions, please, sir.

A I notice you avoid one more question.

Q I did deliberately avoid one more question.

If you had been asked in 2010 what the African-American population of District 7 should be, the minimum African-American population, what would you have told the legislature, given that in 2011 you thought it should be about

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 110**

604

62 percent?

A Well, first, I don't know what I would have told them because I know it's a very different situation with a congressional district than it is with legislative district. So I don't know what I would have told them.

But I would have said -- you know, there are so many different factors, and you have to take them all into consideration. I'm sure I would have said that it needed to be at least 50 percent.

Q Do you know Terri Sewell?

A Yes.

Q Do you believe that she has the best interests of African-Americans at heart?

A I think that she has -- that she's a good representative.

Q Okay. Do you believe --

A For the state of Alabama, whether that's black people, white people.

Q Fair enough.

Do you think that she would agree to a plan if she understood that it packed or cracked African-American populations?

MS. MADDURI: Objection. Calls for speculation.

THE COURT: Overruled.

THE WITNESS: I know -- I know elected officials -- and I know every elected official wants the best district for

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 111**

605

12:26:52 their election. They're not thinking about what's the best district for all black people, or all white people, or all other people. They want the best district for them.

That's -- I've seen it over and over and over again that people want a district that's going to assure their re-election. And that's a reasonable response for their interest. That's not a reasonable response for the interest of the people who have been excluded.

BY MR. WALKER:

12:27:14 Q Thank you very much, Senator Sanders. I appreciate it.

A Thank you.

THE COURT: Anything else, Ms. Madduri?

MS. MADDURI: No, Your Honor.

THE COURT: Okay. Well, I think we can let Senator 12:27:23 Sanders go so he make his other commitment. And we will take lunch and be back at 1:30.

THE WITNESS: Thank you, Judge.

MR. WALKER: Thank you, Your Honor.

(Recess.)

13:34:32 THE COURT: Okay. Where is our next witness?

MR. SPIVA: The plaintiffs have no further witnesses, Your Honor.

THE COURT: Does defense have any witnesses? Let's get your witness up here.

13:34:47 GERALD DIAL,

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 112**

606

having been first duly sworn by the courtroom deputy clerk, was examined and testified as follows:

THE COURTROOM DEPUTY CLERK: Please state your name in the microphone.

13:35:23 THE WITNESS: My name is Gerald Dial.

THE CLERK: Thank you.

THE COURT: We're waiting on you, Mr. Walker.

MR. WALKER: Thank you, Your Honor.

DIRECT EXAMINATION

13:36:26 BY MR. WALKER:

Q Senator Dial, would you state your name for the record?

A My name is Gerald Dial.

Q I'm calling you Senator Dial. Are you still in the Alabama Legislature?

13:36:37 A No. I retired in November of 2018.

Q And were you in the Alabama Legislature?

A Yes. I served in the legislature two terms in the House from '74 to '84. And I was elected to the Senate in '83, served until 2006, was defeated, and then ran again in 2010, 13:36:58 and served until November of 2018.

Q What was your Senate district, please, sir?

A Senate District 13, which was mostly east Alabama.

Q Does that include Lineville and Clay County?

A Yes.

13:37:12 Q And is Lineville where you're from in Clay County?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 113**

607

A Yes.

Q What do you do for a living?

A I'm retired at this time. I retired in 2018.

Q What are you retired from?

A I retired from the legislature, and I was in the real estate development business.

Q And during the time, did you have any elected office other than member of the House or member of the Senate?

A I had other jobs, but not elected job. But I -- that's the only elected job that I had.

Q Okay. Would you tell the Court a little bit about your educational background, please?

A I graduated with a B.S. degree from West Alabama University, and I got my education requirement degree from Jacksonville University.

Q And I believe you coached for a while?

A I -- after graduation, I returned to Lineville, Alabama, where I coached football, basketball, and taught American history and political science.

Q What civic activities were you involved in, in Lineville in Clay County over the course of your life?

A Oh, well, I've been involved in quite a few things. I was elected to the school board once I retired from education. When I got out of education, I was elected to the school board. I was elected to city council. I served two years on the local

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 114**

608

city council after that. And I was elected to the legislature.

I was a member of the Baptist church there for 50 years. And I was also a member of the Clay County exchange club, and the quarterback club, which you have got to be a member of the quarterback club if you live in Clay County.

Q When you were first elected for office, what party were you in?

A I was a Democrat.

Q Okay. Did you at some point become a Republican?

A Yes. In 1983, I ran and was elected as an independent. And then in 2010, I had briefly joined the Republican party and elected as a Republican in 2010.

Q Why did you join the Republican party?

A Well, at that time, in 2010, Governor -- who was later elected Governor Riley. Bob Riley was running for Governor was a Republican. He was from my home county, and so I endorsed him.

I felt like the philosophy and ideas of the Republican party were much more aligned to my beliefs and ideas than the Democratic party. When I went to the legislature, it was only Democrats, but there's always been a two-faction member of the legislature. And there was a conservative pro-business side of the legislature, and there was the -- the more liberal side than the -- basically the teacher union side.

And so the legislature's always -- even though we had one

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 115**

party, there were two divisions in that, and my division was more of a conservative business-oriented side.

And as the Democratic party continued to lean in the other direction, then basically, it was not with my philosophy, so I became a Republican.

13:40:26

Q Did becoming a Republican have anything to do with race or racial concerns?

A None.

Q You've also been active in the military, have you not?

13:40:39

A Yes, sir. I served 36 years in the Alabama National Guard.

Q Okay. And what was your rank when you retired?

A I retired as a brigadier general.

Q Will you tell the Court something about boards and other things like that that you've served on?

13:40:54

A I presently serve on the university -- Troy University board of trustees. I served for eight years chairman of that and rotated off just in November this past year because we have term limits of years years. And I still serve on the board. I'm just not the chairman.

13:41:10

I serve as the chairman of the Southern Union Community College Foundation Board. I serve as the chairman of the International Motor Sports Hall of Fame and Museum board.

Q Is that in Talladega?

13:41:24

A In Talladega at the race track. I passed the legislation

that created that. I have been the chairman ever since. I serve as the chairman of the space board authority board. And I'm probably leaving out a couple. But that's a pretty good full-time job that I have got doing those since I've retired.

13:41:44 Q There's a Rosa Parks Museum in Montgomery. Are you familiar with that?

A Very much so. Troy University owned the property where Rosa Parks boarded the bus in Montgomery. And as we began to look at expanding Troy University, we wanted to build a new 13:42:09 facility on that piece of property. And the board did not want to diminish or do anything to take away the attention of what Rosa Parks had done. So we created the Rosa Parks Museum there.

That's something we're very extremely proud of. And as 13:42:26 Troy University, it's world renowned and one of the largest tourist attractions in Alabama and something we're very proud of.

And Mr. Lamar Higgins, who works on my board, was able to -- he had connection with Ms. Rosa Parks before she passed 13:42:41 away, and she was able to approve us for doing that and using her name. And today it's part of Troy University and one of our flagship operations that we're most proud of at Troy.

Q During your time in the legislature, did Alabama celebrate its Civil Rights history, in terms of creating Civil Rights 13:43:04 trails or funding Civil Rights tours to Alabama?

A I would say yes. And if you'll just look at what's happened in Montgomery and Selma with the -- of course, now it's federally recognized the Selma to Montgomery marches.

And then just recently, our tourism department under Mr. Sentell has been the leader in creating the heritage trail for -- the black heritage trail, which begins in Montgomery and goes all the way out to the midwest. And we were the leaders in that. We've supported other endeavors that have gone on in Montgomery, as well.

13:43:43 Q Let's talk about things you did when you were in the legislature. What committees did you serve on?

A Well, the most recent committee -- and if I went back 40 years, we'd be here until next week.

Q Let's not do that.

13:43:57 A In the last session, I served as a chairman of the local legislation. I served as chairman of the health committee. I served on the education committee. I served on the education and finance committee. And I served on the long-range transportation committee. And I chaired the reapportionment committee.

Q I'm going to get back to the reapportionment committee in just a second. But can you tell the Court about some of the bills that you've sponsored that you're most proud of?

A Well, I've -- in my tenure, I've been fortunate to sponsor a number of bills. And I guess one of the bills that receives

612

very little attention, but that it's important to me because the legislative political office said it saved the taxpayers a billion dollars. I created the five-year tag bill.

Most of us in this room are too old to remember. But you used to have to get a new tag every year and you had to put it on your car, and you had to take the old one off and put it on the barn.

I came up with the idea years ago to do a five-year tag, keep at that tag for five years and just put a decal on it. So the savings on the cost of not having to reproduce that tag which costs about $1.10 of metal each year is -- over the term that I passed that bill, it saved the state over a billion dollars to the taxpayers.

I've been real active in education. I passed the Alabama Ahead Act.

Q Our court reporter wants you to slow down some.

THE COURT: You're getting too excited about those bills.

THE WITNESS: I am. I am, Judge, because I spent a lot of time and effort in that arena.

THE COURT: I understand.

THE WITNESS: And it's something exciting to me. And the Alabama Ahead Act is one that I'm very excited about.

THE COURT: Okay. Are you saying Hat Act?

THE WITNESS: Alabama Ahead Act.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 119**

613

THE COURT: Ahead. Okay.

THE WITNESS: The Ahead Act. That bill is designed to replace all textbooks with digital devices. And we're well on the way to doing that. So I'm very proud of that.

13:46:03 Other bills -- I was instrumental in passing a bill that regulates sports agents. And you say, well, that's not important. Part of that, when our college athletes would leave college and sign with the pros, the sports agents would get most of their money. You're talking about dealing with mostly 13:46:24 minorities who had very little education and very little financial knowledge. They would sign with the agents, and the agents would sign them massive contracts, and the agents would get most of the money.

I passed a bill that limited -- put a cap that they could 13:46:40 not get but 10 percent. That was the first time ever in America, and that bill is has now been adopted with every state. And it saves our athletes that go into the professional sports, whatever, the opportunity to retain most of the money that they earn and not give to it sports agents. I'm very 13:46:58 proud of that. It's not something that is a growing thing on my resume, but it has saved millions and millions of dollars and put it back into the athletes' pocket rather than to the agents' pocket.

Other bills -- I worked diligent on the transportation 13:47:15 bill. And laid the foundation for the bill that we just --

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 120**

614

they just passed this past session, which provides adequate funding to redo our roads and bridges, make them safe.

I was the father of the seat belt bill. I was the person who passed the bill that required you to wear a seat belt. And when you look at statistics, they tell me that bill has saved thousands and thousands of lives this year in Alabama.

I could go on, but I know we've got a time limit.

BY MR. WALKER:

Q That's a good illustration. Now, you just got back from Korea, did you not?

A Yes.

Q What was the purpose of your trip to Korea?

A I started an organization years ago called ACEEP -- Alabama Career Economic and Education Plan. And we partner with people in Korea to bring Korean students to Alabama two weeks and learn about our culture. We, in turn, sent 20 kids to Korea each year and let them learn the Korean culture because Korea is a vital part of Alabama's economy.

ACEEP worked well for many years until the Korean government withdrew their funding. So we kept ACEEP together. And now we're working on a plan to try to recruit qualified math and science teachers from Korea to Alabama.

Today, we have about 52 vacancies with qualified math teachers in Alabama, mostly rural Alabama. We have P.E. teachers teaching math, and that's just not good. So if we can

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 121**

615

work a program --

THE COURT: It would be worse if it was lawyers teaching math.

THE WITNESS: I cut you a little slack, ma'am.

13:49:09 But we hope to recruit -- and we worked out an MOU with the education commissioner that they will help us as we do this to pay the cost for those teachers to come and get acclimated into Alabama. We think this may be a solution.

I wish we could grow our own, but a student today 13:49:30 finishing college with a math degree can make three times more in the private sector than they can in the public sector, and they're just not willing to go into education.

And if you're any what familiar with the recent report on Alabama education, we're at the bottom in math and science. At 13:49:47 the bottom of all 50 states. So we've got to think outside the box. And I don't get paid for this. It's just something I have an interest in.

I went to Korea with a state superintendent, six legislators, and six superintendents to view their colleges, 13:50:05 their schools so that the superintendents who will eventually hire those people will feel comfortable in being able to retain them and bring them to America. And we hope this will be an example for us and other states to follow.

BY MR. WALKER:

13:50:18 Q Thank you. Let's talk about the legislature now, and in

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 122**

616

particular, the reapportionment committee. That's referred to as the joint committee. What does that mean?

A Means you have equal number from the House and the Senate.

Q And how are they appointed?

13:50:31 A The lieutenant governor appoints in the Senate. The lieutenant governor and the speaker pro tem appoints members. And in the House -- the Speaker of the House appoints members.

Q And in years when the legislature is doing redistricting, I believe the committee has more people than in other years; is 13:50:51 that correct?

A That's correct. They have one from each congressional district. In the off years, when you're not doing the redistricting or re -- then you have three members from each House.

13:50:59 Q And do the members of the committee include members of both parties?

A Correct.

Q And that was the case when the committee was looking at congressional redistricting in 2011?

13:51:11 A Correct.

Q Who was the other cochair?

A In 2011, it was Senator McClendon, who was a House member.

Q At that time, he was a Representative McClendon?

A Yeah. Now, he's in the Senate today.

13:51:25 Q And what plans is the reapportionment committee

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 123**

responsible for giving to the legislature?

A We have to do both the legislative, the House, and the Senate, the congressional plans and the state board of education plan.

13:51:42 Q Might be losing that last one, the state board of education plan?

A Well, it may be. That's to be seen.

Q Does the reapportionment committee have a staff?

A Yes.

13:51:55 Q And what does the staff do?

A The staff keeps records. They keep all the -- they collect all the census data. They program it into their computers. They keep all the maps and the directions.

Not only do they work for us in the legislature, but they 13:52:12 also assist cities and counties in doing their redistricting while they're doing theirs in the years that we're not. But they're basically responsible for producing the maps.

Because any piece of legislation dealing with reapportionment has to first go to the reapportionment 13:52:36 committee and be programed into their system so that any amendment, or any changes, or any substitutes would be susceptible to having the correct boundaries and correct numbers in them.

Q So are you saying that the reapportionment committee has 13:52:45 the state's redistricting system?

A Correct.
Q And they operate that?
A Correct.
Q So can any member of the legislature go in and draw a plan?
13:52:52
A They can draw it, but they first have to go to the legislative redistricting reapportionment committee and work with them to make sure that they are within the guidelines, and then it has to be put into their system.
13:53:06
Q I didn't ask my question well. If I'm a member of the legislature, and I think I wanted to draw let's say a congressional plan, do I have the ability or the right to go to the reapportionment office and say, work with me to draw a plan?
13:53:21
A Yes, you do.
Q And will that plan be kept confidential until I say so?
A Yes.
Q Okay. And I can also draw a plan outside of the reapportionment office; is that correct?
13:53:36
A You can draw one, but you can't present it because it's first got to go to the reapportionment committee and be put into their system to ensure that what you have drawn does not lie outside the boundaries of where it should operating.
Q Okay. So there are two ways to have a plan drawn; one is
13:53:55
on the state's redistricting system, and one is on some other

619

system. But then it has to be imported into the state's redistricting system before it can be introduced?

A Correct. If it has errors when it's presented to the redistricting committee, it would have to be corrected before they can put it into the system.

13:54:11

Q And the legislative session of 2011, do you remember the dates of at that session? Let me refresh your memory if I can.

Do you remember if that was March 1 to June 9 to 2011?

A Sounds close to being correct.

13:54:28

Q Okay. Was the legislature passing plans -- reapportionment plans during that 2011 legislative session?

A We were only passing congressional plans.

Q Were you also passing state board of education?

A Yes.

13:54:42

Q Okay. And why weren't you passing legislative plans that year?

A We were not passing legislative plans that year.

Q Right. And my question is: Why were you only passing the first two?

13:54:55

A Oh, okay. I'm sorry.

Q I'm sorry.

A The reason we were passing those was two reasons: One was the election was pending because congressional districts run every two years. So we had to get that plan finished so that those people seeking office in those congressional districts,

13:55:08

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 126**

not only the incumbents, but anyone seeking office would know they were living -- what district they lived in. So it was imperative we get that done within the time frame that we had.

And also we had certain members of the school board who would be running in that same cycle. We have eight school boards, and they are on staggered terms. Some of the -- some of them were running, as well. We had to get those ready, too, so that at the upcoming election they would know the districts and where to qualify and where to run from.

13:55:24

13:55:40

Q So if the members of Congress, that is, members of the House of Representatives were going to be running for their seats again in 2012, when would they start campaigning for those and raising funds for those seats?

A Well, they would start -- they would start in early -- in the early spring -- January, February, March, April time frame -- in the time frame in which we were working.

13:56:01

Q And so was that one of the reasons that you were concerned to make sure that the bill was passed during that legislative session so you wouldn't interfere with congressional elections?

13:56:15

A That was one of the main ones. And had we not gotten it finished in that session, we would not have another session before the election, so we would were faced with the Governor having to call a special session and costing the taxpayers a tremendous amount of money just to address that issue. So the idea was to save the taxpayers money to get them a district

13:56:33

621

drawn where they know their boundaries. And they began campaigning on the time frame that would meet the schedule in which the election would be held.

13:56:49 Q So did the legislature pass new congressional districts in 2011?

A Yes.

Q And those are the districts that we're talking about today, in fact.

13:56:59 Do you know how the districting plan that was ultimately passed by the legislature came to be?

A Yes.

MS. MADDURI: Objection, Your Honor. We object to this entire line of questioning for lack of relevance.

THE COURT: Overruled.

13:57:11 MS. MADDURI: May I explain my objection?

THE COURT: This whole case is about the redistricting in 2011, is it not?

13:57:26 MS. MADDURI: It is, Your Honor. But what actually happened in 2011, the understandings of the intentions or the beliefs or even the information available to the legislators who drew the map are not relevant to the Section 2 results base plan.

THE COURT: Overruled.

BY MR. WALKER:

13:57:42 Q Senator Dial, can you please tell the Court how the plan

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 128**

622

that came to be passed as a 2011 Alabama congressional plan, came into existence?

A The plan that we eventually passed was developed by a gentleman named Randy Hinaman, was retained by the congressional delegation. All the congressional delegation members I understand retained him to begin to work and draw a plan that they would agree upon.

He brought to me a plan and told me that they had agreed upon this plan, the seven sitting congressional members, and this was the plan they wanted to go with. I, in turn, to be assured that there was no dissension among the members of Congress, asked him to get a conference call together for all the congressional members.

That conference call was conducted with me in my office in Montgomery. All the congressional delegates were -- congressional members on that call, I think, except one. I can't be sure. But I'm almost sure that there may have been one that was not.

I went down the line. And each one of those assured me that --

MS. MADDURI: Objection, Your Honor. Hearsay.

THE COURT: Overruled.

THE WITNESS: They assured me on the phone that they were okay and the plan was something that we could pass.

And so with that amount of information and that

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 129**

623

confidence, I introduced the plan, and the plan was eventually passed.

BY MR. WALKER:

Q Did Representative Sewell participate in that conference call?

A Yes.

Q Did you ask her if she supported the plan and supported her district as drawn?

A I asked her. I said, is there any objection to this plan, and she said no.

Q Okay. And I'll ask you to look at the map which -- I mean to look at the screen in front of you, which is showing Plaintiffs' Exhibit 15, which is the 2011 plan. And I will ask you is that the congressional plan that was enacted and passed into law?

A Yes.

Q Thank you.

Do you recall at the start of redistricting process -- there are, of course, population shifts that occurred over the decades since the last census. That's the whole reason for redistricting?

A Yes.

Q Do you recall how many people needed to be moved into Representative Sewell's district in order to comply with the one person one vote equal population requirement?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 130**

624

A Approximately 70,000. I don't know the exact number, but I remember it was somewhere near 70,000.
Q Was that -- I actually think it was 700 -- almost 80,000. Do you recall?
A Okay. I knew it was in the 70s, somewhere in that neighborhood, maybe.
Q Do you recall if that was the largest deviation of all the plans?
A Yes.
Q Okay. Did you rely on Representative Sewell to develop a district that she could be reelected in?
A I was certain that she had reviewed the plan and felt comfortable with it and that she could be reelected in that district.
Q What were you and members of the committee concerned that the legislature had to pass a plan that could get precleared by the Attorney General under Section 5 of the Voting Rights Act?
A Correct.
Q Why was that important?
A Well, if it's not precleared, we've got to go back and do a new plan if it fails to be cleared.
So I had two objectives: One was I had to have a plan I could pass through both houses of the legislature, because this is a bill just like any other bill, and it has to receive them -- it has to be introduced. It has to go to committee,

**_Christina K. Decker, RMR, CRR_**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 131**

625

has to get favorable report in the committee, has to come back to the floor of the legislature, has to pass both houses in the same form. That was my first objective. If I can't pass it there, then I'm not going any further.

14:02:13 And the second was I had to have a plan that we felt comfortable would pass the scrutiny of the Justice Department and get precleared so it could move on with the election.

Q What would have been the consequence if Justice had not precleared that plan?

14:02:27 A I would assume that they would send it back and ask us to draw another plan, and we would go to a special session.

Q And that would -- that would interrupt the schedule for congressional elections, would it not?

A It certainly would have -- it would have changed the 14:02:46 process in which -- of course, it depends on how soon they did and if we can get an another special session and get another bill through.

But it certainly would disrupt the plans that -- where they had already starting money, where they knew where the 14:03:01 district lines were, and they knew what people they would be representing. So it would certainly disrupt the plan for many congressional members standing. And anyone who had intentions of running against one of those people would be certainly -- their intentions would be delayed, as well.

14:03:16 Q And if the legislature had had to pass a new plan, that

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 132**

plan also would have had to be precleared by the Attorney General, correct?
A Correct.
Q And there was no guarantee that a second plan would be precleared, was it?
A Correct.
Q So it was important to get it done right the first time?
A Correct.
Q During that process, when the -- when the proposal from the representatives of their districts was under consideration, did -- and until the bill was passed, did any member of the legislature tell you that they thought it was possible to draw a congressional plan with two majority black districts?
A During the session?
Q Yes, sir.
A No.
Q Do you know Joe Reed?
A Very well.
Q There was some testimony earlier, and I think you may have been in the court when I asked Senator Sanders about Joe Reed. And I asked him if he was considered or at least sometimes referred to as the dean of redistricting in Alabama. Do you recall that?
A Correct. And you were correct. You were on spot.
Q He has been involved in every redistricting effort in a

627

significant way since at least 1980; would that be correct?
A That's correct.
Q Has Joe Reed over the course of his career been an effective advocate for the interests of African-Americans in the legislature?
A Absolutely.
Q Have you ever known him to leave a lot on the table, in terms of his negotiated positions?
A No. Never. And I've negotiated with him many times.
Q Did Joe Reed ever come to you and say, Senator Dial, I think we can draw two majority black districts, and I want that to do?
A No.
Q Did any other African-American leaders come to you and say that?
A No. Not until the session was over when I was advised of a plan that had been drawn after -- after we'd already passed this bill.
Q Was that a plan drawn by Mr. McClammy -- excuse me -- by Representative McClammy?
A It was presented by Representative McClammy. It was presented to the reapportionment office. And the clerk of the committee called me and said, We've just got a new plan in. And so I went down to review the plan. And she said, It's a congressional plan, and it creates a second minority district,

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 134**

628

and that was the intent of it. That was as far as I went because we'd already passed the other plan. It had already been signed by the Governor and gone forward. So that was the extent of that.

14:06:23 The only conversation I had later on with Representative McClammy was in the hall where he said to me, I've introduced a plan. I said, Well, you know it's too late. We've already passed this plan.

Q When he said introduced, did he mean introduced into the

14:06:37 reapportionment office or introduced into the legislature?

A Introduced in the reapportionment office.

Q I will ask you to look, Senator Dial, at what's on your screen now. And I will represent that this is Defendant's Exhibit 3, page 194, and ask you if that is the plan that

14:06:58 Representative McClammy submitted to the reapportionment office with two majority black districts?

A I understand it is. I didn't review it that close at that time in the office. But since that time, I've reviewed it, and this is the McClammy plan.

14:07:15 Q Senator Dial, would you describe District 7 as drawn in the McClammy plan to the Court?

A Well, District 7 extends all the way up into what we call the Tennessee Valley area. It goes all the way over into Madison, Huntsville area. It gets Limestone and up all the way

14:07:43 in and picks up part of Lauderdale, which is totally removed

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 135**

629

from the basic foundation of District 7, which was in Dallas and Jefferson and Tuscaloosa.

Q So District 7 extends all the way from Washington County in south Alabama up to Madison County in north Alabama?

14:08:10 A Correct.

Q Does it keep together communities of interest?

A Definitely not.

Q Does it preserve the cores of existing districts?

A No.

14:08:20 Q Is it compact?

A No.

Q Look at District 2. And would you describe District 2 for the Court, please?

A District 2 is the congressional district I live in. And 14:08:36 it goes from -- it almost extends the whole length of the state. And it takes away community of interest.

It takes away -- it's just a district that's totally disconnected in three or four different areas because there's not even a major highway you can go from one end of that 14:08:56 district to the other without crossing into other districts. It's just not compatible with anything that -- that Congressman Rogers or anybody running that district would be -- be happy at all with.

Q I'm sorry. Go ahead, sir.

14:09:11 A Go ahead.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 136**

630

Q Has there ever been a District 2 that looked anything like that?
A Never; not that I've seen.
Q And I ask you one more time, Senator Dial, to look at District 3 and describe where that begins and where that ends, please.
A It appears that District 3 begins in Calhoun County and goes almost to Mobile meandering through the eastern part of the state through Talladega County and then down part of the Black Belt and on into -- it even gets a part of Clarke County.
So that's totally -- when you talk about communities of interest and governmental identity that associates with each other, that's totally disconnected.
Q Is it compact?
A No.
Q Does it preserve the core of any existing districts?
A No, sir.
Q Let me ask you the same questions about District 2 as presented in this plan.
Does it respect any community of interests that you can identify?
A Which district?
Q District 2.
A Well, there are some. But when you get south of the interstate, you have moved into a totally different area of

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 137**

631

interest political subdivisions or -- as I said in the deposition, you even get -- you divide the state, and you take away that interest, and you take away those areas that have universities that people coalish around that become a very important part of those communities that keep them together. And it divides that up, as well.

Q And would you consider District 2 compact?

A No.

Q If this plan had been introduced into the legislature in a timely manner, could you have passed it?

A No.

Q Now, how can you say that, Senator Dial?

A I can say first is I don't believe any of the members of the sitting congressional delegation would have supported this.

Q Why would that matter?

A That matters in the fact that they mobilize their legislators, their House members, and their senators to be opposed to it and make amendments to it, and, therefore, my opportunity to pass it through and get a majority is greatly diminished.

Q Any other considerations?

A That would be the main one. And I'm not too sure -- of course, I can't answer for Justice, but I'm not too sure you can get this precleared with Justice because my understanding it regresses District 7 in the minority population to a point

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 138**

632

of about 51, 50 percent.

Q Let me ask you about -- oh, I'm sorry.

A Go ahead.

Q Let me ask you about the people up in Madison County. Independent of what any congressperson wants, do you think that, for example, the legislators across north Alabama would have supported this plan?

A No. The -- as you know, geographically the TVA area is always considered the north part of Alabama, and they always have so much of common interest because of the TVA area and that portion of economic development that they are very -- very attuned to what goes on there, and that gets them a congressman, who would be basically from Dallas County who would not be acceptable to them not because it's a minority, but because it's geographically.

They would not accept it if District 2 ran into the Tennessee Valley area because they want a congressman from that area because you have Huntsville and NASA and all the things that's going on up there. And they're very attuned to having someone who is really supportive of that concept of what's being developed in the Huntsville area.

Q And the same question for south Alabama. Independent of what the members of the congressional delegation might want or not want, would the senators and representatives from south Alabama have supported this plan?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 139**

633

A No. They would have been very similar to the people in the north Alabama and the people in east Alabama. I don't see -- I don't see any -- any group of -- there might be some individual legislators with some ideas that they like this plan because it would put them in a district that they might run for Congress from, but I don't see any group of legislators supporting this in any manner.

Q Thank you.

Earlier I put up on the table in front of you a copy of the reapportionment guidelines. Do you see those?

A Yes.

Q And that's part of exhibit -- Defendant's Exhibit 3, pages 260 through 275. And I'd like to ask you, please, sir, to turn to page 267 and let me know when you get there. I've got it up on the screen if you want to look there.

A Okay. I see it.

Q Okay. And this is the paragraph that defines communities of interest. Are you familiar with that?

A Correct. Yes.

Q And it talks about governmental and regional interests?

A Yes.

Q And it talks about boundaries of county municipalities and voting precincts.

Let me ask you this: Has the legislature consistently understood this guideline to include the concept of preserving

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 140**

634

the cores of existing districts?
A Yes. And that's pretty well pointed out in governmental regions.
Q Okay.
14:15:36 A And the core in which you work from. You -- in reapportionment congressional district, you take the core from which you are already existing and work from there rather than try to create new districts and create havoc among the system.
Q You've talked about the importance of being able to pass a
14:15:58 bill. And I think is it fair to say, if you can't pass a bill, you can't do anything? Could you pass a legislative redistricting bill -- excuse me -- a congressional redistricting bill that does not preserve the cores of existing districts?
14:16:16 A No.
Q Is that just a reality of life --
A It is.
Q -- in the legislature?
A It is. And it boils down to those legislators within that
14:16:23 district and those constituents that they are going to have that's going to impact upon how their vote is and why they should or should not vote for it. It's not going to be simply left up to that individual legislator.
But the constituency, the governmental identities within
14:16:42 his district is going to have a big influence on how he or she

Christina K. Decker, RMR, CRR
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

Caster Plaintiffs' Exhibit 86, Page 141

635

votes on any redistricting plan.

Q Look again, if you will, Senator Dial, at Plaintiffs' Exhibit 15, which is the 2011 plan that you have testified was created by the members of the House of Representatives of Congress and passed by the legislature.

14:17:01

And look in particular at District 7, which you've testified was drawn by the consultant hired by the members of Congress, including Representative Sewell and approved by her.

And let me ask you this: What if you had gone back to Representative Sewell and said, Representative Sewell, we don't -- we don't like your district. We've got this alternative map with two minority districts, or with some other alternative map, and we're going to pass that instead. What do you think would have happened?

14:17:26

14:17:43

MS. MADDURI: Objection, Your Honor. Calls for speculation.

MR. WALKER: Your Honor, I'm asking for his --

THE COURT: Overruled.

THE WITNESS: I think that it -- of course, it depends a lot. But if we're going to change her district from what she's agreed to, then she's immediately going to go to the other members of the congressional delegation and say we had an agreement. You're breaking our agreement.

14:17:54

And she would begin to ignite or get her people who are close to her and in her delegation, senators and

14:18:13

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 142**

636

representatives begin to do an alternative plan to either put it back like she had it or get them to try to kill the bill on the floor.

BY MR. WALKER:

14:18:27 Q In other words, is it -- was it your judgment at the time that if you had tried to change her district materially, it would have resulted in a bill that could not be passed?

A Let's be practical. The first thing we knew we had to do was make sure that she was happy with her district. If she's

14:18:43 not happy with her district, then we're going to have difficulty, tremendously difficulty in getting any kind of plan through the legislature.

Q Did you also have some concern that she had friends in Washington that she could call?

14:18:55 A Well, you know, I understand that she was Ms. Obama's roommate in college certainly would have an impact on her, and then the U.S. Attorney General, who was a classmate of hers at Harvard, was certainly someone she could call on.

So, you know, basically as we said, we understood the

14:19:16 practicality that she had to be okay with any plan that we passed.

Q Let me show you -- and I believe I put up before you the four alternative maps proposed by the plaintiffs. Do you see those, sir? And I'll show you right here --

14:19:48 THE COURT: What's the exhibit number, please?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 143**

637

BY MR. WALKER:

Q Plaintiffs' Exhibit 61, which is Revised Plan 1; and Plaintiffs' Exhibit 67, which is Revised Plan 2; Plaintiffs' Exhibit 73, which is Revised Plan 3; and Illustrative Plan 4, which is Plaintiffs' Exhibit 40. Do you see those, sir?

A Yes.

Q Now, all of those have District 1 that extends from Mobile County to Houston County. So I'll just use Plaintiffs' Exhibit 61, Revised Plan 1, as an example.

Do you see that, sir? It's on the screen in front of you?

A Yes.

Q Okay. Now, let me ask you: Is that the plan that was passed by the legislature?

A No.

Q Is that the plan that was agreed upon by the members of Congress?

A No.

Q Does District 1 respect well-established communities of interest in Alabama?

A No.

Q Can you explain your answer, please?

A Mobile and Baldwin County are very closely connected, only separated by the river and the bay flowing between them, and they have a very strong economic ties between those two areas.

When you go over to eastern Alabama, you've got Dale and

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 144**

638

Coffee, and Geneva, and Henry, and Houston, which is part of the Wiregrass area, which has the military base there at Enterprise, and it also is very closely connected in the Wiregrass. They have the Wiregrass Chamber of Commerce. They have the Wiregrass Economic Development Council. And so all of those identities are totally separated.

14:21:34

And, again, you have no major road to get from Baldwin. If you are congressman, you've got to go into Florida to get to your district. Mainly, there's no major thoroughfare through there. You could go I-10 and then get off and go up to Houston, I guess. But you'd have to travel a long way through Florida to get to your district.

14:21:54

So it's just not practical. And there's no economic ties between those two geographical areas.

14:22:08

Q Let me show you Plaintiffs' Exhibit 15 again, which is the plan that was passed, and ask you about District 2 as passed.

Is there a community of interest or communities of interest between the Wiregrass area and the Montgomery area?

And I will start by asking you: Where are the military bases?

14:22:38

A Well, the military bases at Maxwell and Gunter in Montgomery and the military base in Enterprise down in Coffee County. And that's the two major military facilities in our state, and they're very closely related.

14:22:53

If you're going to represent the military -- and that's

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 145**

why that congressman from that district has always been on the military affairs committee, because it has the two major military operations within their congressional districts. And it gives them a bond and a common interest in supporting the military in that district.

14:23:10

Q And do you happen to know -- where is Maxwell Air Force Base?

A It's in Montgomery.

Q And does Maxwell Air Force Base, as we use that term, now include what we used to call Gunter Air Force Base?

14:23:22

A Yes.

Q Two separate locations within the city of Montgomery?

A Yes.

THE COURT: On two different sides of town, too.

14:23:31

THE WITNESS: Correct. Two different sides of town.

BY MR. WALKER:

Q And do you know whether or not people who live and work and are stationed at Maxwell and Gunter live in Montgomery, Autauga, and Elmore counties?

14:23:44

A Many of them live in the Prattville area and the Elmore area and drive into -- and the way you can verify that is be on the interstate at 7:30 in the morning and at 5:30 in the afternoon.

Q I'm on my bike on Bell Street at about 6:00 o'clock in the morning. I can tell you they're all coming in from Elmore

14:24:05

County.

And within the Wiregrass, where is the Army base?

A It's in Coffee at Enterprise.

Q Okay. And are the counties around Coffee and between --

14:24:19 A It's in Dale. I'm sorry. Enterprise is in Dale.

Q Are the counties that surround Dale, do they have defense-related industries located in those counties?

A They do. And between that and Montgomery and Troy, you have -- you have two major military suppliers in those two -- 14:24:40 in that area alone. And a lot of the support for military in that area has grown up around the base.

Q And do the people who -- I'm having a senior moment. I can't think of the name of the base down there.

A Fort Rucker.

14:24:57 Q Fort Rucker. Thank you.

Do the people who live and work at Fort Rucker live in Dale County and the counties that surround that?

A Yes. And Houston and -- Dothan and Houston counties are major larger area of where they go to do most of their trade. 14:25:12 It's the largest Metropolitan area in that area. And that's their center of trade for that area.

Q That's also where they go for their health care unless they go on to --

A Yeah. On base. Yeah.

14:25:29 THE COURT: Are there major roads between -- what were

641

we looking at -- Montgomery and Houston County?

THE WITNESS: Yes, ma'am. 431 is the major highway, and 280 -- I believe 280 is another one. And then the 2 -- it's -- oh, it's the Montgomery to Panama City.

14:25:52 THE COURT: 231?

THE WITNESS: It's 231. Yes, ma'am. I was just on it Saturday.

MR. WALKER: Your Honor, may I approach Senator Dial to give him this?

14:26:04 THE COURT: Yes, you may.

BY MR. WALKER:

Q Senator Dial, I'm going to give you what's marked as Defendant's Exhibit 1, and I will ask you to look at it, please. Take a moment and look at it while I walk back to the 14:26:14 podium.

And I will represent to you that it shows Alabama's congressional districts on -- this is Defendant's Exhibit 1, and it's page 3017. On 3017, are the congressional districts that were passed in 2011; is that correct?

14:26:41 A Correct.

Q And then if you'll look at the next page, 3018, and I'll ask you if you know whether or not those are the congressional districts from 2020?

THE COURT: From what?

14:26:58 BY MR. WALKER:

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 148**

642

Q Excuse me. From 2002?
A 2002.
Q I'm a little dyslexic. 2002.
A Yes.
14:27:05 Q And I will represent to you that the next page, 3019, is the 1992 congressional districts. Do you see that?
A Yes. Yes.
Q And the next page I will represent to you is the 1980 congressional districts. That's page 3019.1?
14:27:27 A Yes.
Q And then let's take it back to 1970, page 3020, the 1970 congressional districts. Do you see that?
A Yes.
Q From looking at these maps, can you form a conclusion as 14:27:43 to whether or not the Alabama Legislature has consistently sought to preserve the cores of existing districts when it reapportioned or redrew the Alabama congressional districts?
A Yes. It's quite obvious that they used the same core and only extended where they had to extend the boundaries because 14:28:00 of gain or loss in population.
Q Do you know Terri Sewell, sir?
A Yes.
Q Do you believe that Terri Sewell would ask the legislature to pass a plan that discriminated against African-Americans?
14:28:16 A No.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 149**

643

Q Do you believe it's appropriate when you're conducting redistricting to rely on the advice of an African-American Congress person as to what she needs based on her experience to win in her district?

14:28:33 A Yes.

Q Did she ever tell you that you should reduce the number of African-Americans in her district?

A No.

MS. MADDURI: Objection. Hearsay, Your Honor.

14:28:47 THE COURT: Overruled.

BY MR. WALKER:

Q Were you aware that in the past the Department of Justice had refused to preclear plans where the percentage of black voters had been lowered?

14:29:03 A Yes.

Q Did you have an understanding at the time the congressional plan was being passed from talking to other African-American politicians of what their belief -- of their belief of what was necessary, in terms of percentage of the black population for them to have an opportunity to be 14:29:30 reelected?

A Well, the only -- as Senator Sanders testified is his testimony to the legislative delegation, as we were drawing legislative districts in his district, when he informed us that 14:29:47 he thought it needed to be at least 65, 62 to 65 percent.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 150**

644

Q Thank you very much, Senator Dial.
A Thank you.
THE COURT: Cross?

CROSS-EXAMINATION

14:30:01 BY MS. MADDURI:
Q Good afternoon, Senator Dial.
A Good afternoon.
Q I don't know if you know that we've met, but I was on the other side of the video conference when we took your
14:30:32 deposition.
A Okay.
Q So I could see you, but I don't think you could see me.
A I could.
Q Senator, Mr. Walker showed you some of the illustrative
14:30:52 plans that plaintiffs have proposed in this case, correct?
A Correct.
Q And I understand that you have certain criticisms of the proposed plans, correct?
A Correct.
14:31:01 Q And one of those criticisms is that it breaks up communities of interest, correct?
A Correct.
Q Is it fair to say that you view the meaning of a community of interest as focused on economic ties?
14:31:15 A Not solely, but that's part of it, yes.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 151**

14:31:31
14:32:15
14:32:50
14:33:00
14:33:26

Q Senator, do you recall having your deposition taken in this case?
A Yes.
Q And you were asked about that issue, I think?
A Yes.
MS. MADDURI: Heather, can you pull up page 49?
BY MS. MADDURI:
Q Senator, I will direct your attention to line 18.
A Yes.
Q You were asked: Is it fair to say that a community of interest is based on economic factors, then? And you said, Very much economic interests, yes.
A Yes. I said very much. I didn't say that was all.
Q And Mr. Walker also asked you about the reapportionment committee's guidelines on redistricting, correct?
A Correct.
Q And you were involved in drafting and adopting those guidelines, correct?
A Correct.
Q And you adopted a set of guidelines in 2011 prior to passing the plan that we're talking about here, correct?
A Correct.
MS. MADDURI: Heather, can you pull up Plaintiffs' Exhibit 84 at page 4? Actually can you stay on the first page for a moment? Sorry.

646

BY MS. MADDURI:

Q Are these those guidelines, Senator, to the best of your knowledge?

A Best of my knowledge, yes.

14:33:33 Q And then we can turn to page 4.

Is it fair to say that the reapportionment committee worked to comply with these guidelines when enacting the 2011 plan?

A Yes.

14:33:53 Q Is it fair to say the reapportionment committee also worked to comply with these guidelines when enacting the state board of education plan?

A Yes.

Q And the guidelines, they outline a number of factors that

14:34:11 should be considered when redistricting, correct?

A Correct.

Q And one of those factors is communities of interest, yes?

A Correct.

Q And I will draw your attention to paragraph -- it looks

14:34:26 like paragraph B on this page towards the top.

A What page?

Q Oh, it's actually on your screen, or would you prefer a hard copy?

A That's okay. I can see it.

14:34:36 Q Are these the -- is this the definition that the committee

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 153**

647

enacted in 2011?

A Correct.

Q And does that definition -- that definition does not include economic interests, correct?

14:34:53 A Well, it would come under recognized similar -- similarities of interests would be economic.

Q But it does not recognize economic interests, correct?

A Well, it -- if you're -- it's not spelled out there, but when you talk about recognizing similarities of interests, certainly would be economics.

14:35:20

Q Would you agree that it's not always possible to protect communities of interest?

A I agree.

Q And Mr. Walker, I think, showed you another set of these same guidelines.

14:35:41

MS. MADDURI: So, Heather, would you mind putting up Defendant's Exhibit 3 at page 267 in addition to this?

BY MS. MADDURI:

Q Senator, I think Mr. Walker talked to you about the page, the page 267 of Defendant's Exhibit 3 that's on the right side of your screen. And I want to draw your attention to letter D at the bottom of that page. So these guidelines were in place prior to the ones you adopted in 2011, correct?

14:36:29

A Correct.

14:36:49 Q And these plans noted that the plan, the redistricting

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 154**

648

plan, whichever one it was would attempt to preserve the cores of existing districts, correct?
A Correct.
Q And the guidelines the committee passed when you were the co-chair in 2011 did not contain that requirement, correct?
14:37:04
A I'm -- I can't answer that.
Q I can draw your -- excuse me. Senator Dial, in 2011, you were co-chairman of the reapportionment committee, correct?
A Correct.
14:38:03
Q And you were responsible for helping to prepare the congressional district map that was adopted, correct?
A Correct.
Q But you were not actually involved in drawing the map, correct?
14:38:12
A Correct.
Q The congressional delegation hired an outside consultant for that, correct?
A Correct.
Q And that consultant his name, I believe, was Randy Hinaman, correct?
14:38:23
A Correct.
Q And Mr. Hinaman was not hired by the reapportionment committee, correct?
A Correct.
14:38:29
Q And Mr. Hinaman did not consult with the reapportionment

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 155**

committee in preparing the 2011 plan, correct?

A Correct.

Q Mr. Hinaman brought you the congressional plan he prepared, correct?

14:38:42 A Correct.

Q And that plan was adopted with minimal changes; is that correct?

A Correct.

Q And Mr. Hinaman was hired by the congressional -- sorry.

14:38:56 I already asked you that.

You also discussed during your testimony a call that you had with the congressional delegation regarding the 2011 plan. That call involved, I think you said six of the seven members of the delegation, correct?

14:39:14 A Correct. I'm not sure if one of the congressmen was on it, Congressman Aderholt. I think he was, but I'm not sure. I think he was on and had to leave. But I just can't be certain on that.

Q Understood. That call was quite brief, correct?

14:39:32 A Relatively brief, yes.

Q And, Senator, you've never had any other communication with Congresswoman Sewell regarding the 2011 plan, correct?

A Correct.

Q Congresswoman Sewell never told you anything about how to

14:39:54 comply with the Voting Rights Act on that call, correct?

650

A Correct.

Q And she never told you that she thought the black voting age population in her district needed to comply with Section 2 of the Voting Rights Act, correct?

14:40:09

A Correct.

Q And she never told you her thoughts on what the Black Voting Age Population would need to be to comply with Section 2, correct?

A Correct.

14:40:25

Q And, Senator Dial, the committee did not do any analysis to determine whether a second black congressional district -- black majority congressional district could have been created in 2011, correct?

A Correct.

14:40:39

Q The committee did not consider whether it was possible to draw that second majority black district in 2011, correct?

A Correct.

Q The committee did not actually consider any plans that proposed a second majority-minority district, correct?

14:40:58

A Correct.

Q And neither you nor anyone else on the committee did any analysis to determine the percentage of black voters that needed to be in CD 7 in order for black voters to be able to elect their candidates of choice, correct?

14:41:12

A Correct.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 157**

651

Q And you did not review the election history of Congressional District 7 prior to adopting the plan, correct?
A Correct.
Q And you're not aware of anyone else on the committee who reviewed the election history of Congressional District 7 prior to adopting that plan, correct?
A Correct.
Q You also testified earlier that there were a number of voters that had to be -- or citizens who had to be added to CD 7 between the -- as a result of the population shifts between 2001 and 2011. Do you remember that?
A Correct. Yes.
Q But you were not actually aware of the racial composition of the voters that were added to CD 7 to meet that gap, correct?
A Correct. We just tried to keep counties contiguous as possible.
Q You would agree that it would have made sense, if necessary, to extend Terri Sewell's district into Mobile, correct?
A Say again.
Q You would agree that it would have made sense to extend Terri Sewell's district into Mobile 7 -- into Mobile in CD 7, correct?
A It would have made sense -- if she had approved the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 158**

652

already plan that we had given, it would not make sense to deviate from what she had already approved and to create opposition to the plan that the seven-member legislative delegation had approved.

14:43:00 So to expand anything above what they had given me would have created opposition to the plan as we saw it. And so it made no sense to do anything other than what they had agreed upon.

Q Senator, you totally support maintaining one 14:43:20 majority-minority congressional district in Alabama, correct?

A Correct.

Q And, Senator, you believe that allowing minorities to have representation that is more than the proportion of the population that they make up would violate the ideas and 14:43:38 philosophy of the state and would violate the state constitution, correct?

MR. WALKER: Objection, Your Honor. The part of Senator Dial's deposition that is being referred to now was when he was being asked questions about the 2020 six-district 14:43:59 plan which the Court has ruled is irrelevant.

MS. MADDURI: May I respond?

THE COURT: All right.

MS. MADDURI: I am not going to ask him any questions about a future district or 2020 district.

14:44:14 MR. WALKER: But that's what these questions were

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 159**

653

about.

MS. MADDURI: I haven't actually -- I'm asking him a question right now, Your Honor.

THE COURT: Right.

14:44:25 MR. WALKER: She wants to ask him about testimony that he gave when he was being asked about the 2020 six-district plan.

THE COURT: Okay. In other words, set the context for your question or allow him to answer a different question than what was asked at the deposition.

14:44:42 Do you understand what I'm saying? In other words, don't be taking his testimony at a deposition out of context with a question you're asking now.

MS. MADDURI: May I confer for a moment?

14:44:59 THE COURT: Yes, you may.

MS. MADDURI: Thank you, Your Honor.

BY MS. MADDURI:

Q So, Senator, I just want to ask you: Do you believe that allowing minorities to have more representation than their

14:46:51 proportion of the population would violate the ideas and philosophies of the state of Alabama?

A Do I believe that having a district with more than a majority members of a minority population would violate the Constitution?

14:47:11 Q No. I asked if you believe that allowing minorities to

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 160**

654

have representation that exceeds their proportion of the population in Alabama would violate the ideas and philosophies of the state?

A Yes.

Q Alabama currently has one majority black district, correct?

A Correct.

Q And that's about 14 percent of the districts. Does that sound right to you? One of seven? I know we're not good at math in here. But I can represent to you that that's about 14 percent.

A Okay.

Q Is that right?

A You want me to get my calculator out? We need math teachers in Alabama.

THE COURT: We sure do.

THE WITNESS: I am sure you're probably correct.

BY MS. MADDURI:

Q I used a calculator. I didn't do it in my head. I'm also very inept in that field.

So right now, would you agree that African-Americans in Alabama have a lower proportion of representation than their share of the population?

A At 14 percent?

Q They currently have 14 percent of the seats in the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 161**

655

delegation. And I can represent to you -- would you -- let me back up.

Would you agree with me that African-Americans right now in the state of Alabama make up about a quarter of the population?

A Correct.

Q So would you agree with me that African-Americans in Alabama have a lower proportion of the representation out of the seats in the congressional delegation than their share of the population?

A Yes.

Q And currently six of the seven congressional districts are majority white, correct?

A Correct.

Q And would you -- do you have any reason to dispute that 67 percent of the state's population right now is white?

A I'm not -- I don't have those statistics, but -- I can't answer that. I don't know.

Q Do you have any reason to disagree with me that that's --

A I have no reason to disagree or agree.

Q And -- I can represent to you that the population right now in Alabama is about 67 percent non-Hispanic white.

A Before this census?

Q Correct. As of 2010 census data, correct.

A Okay.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 162**

656

Q And we're going to keep doing math. Would you agree with me six out of seven is about 86 percent? I can represent to you that it is.

A Okay.

Q So is the fact that there is a greater proportion of majority white districts in the population in Alabama, is that consistent with the ideas and the philosophies of the state in your opinion?

A Say again.

Q Is the fact that there's a greater proportion of majority white districts right now in Alabama than the white population, is that consistent with the ideas and philosophies of the state of Alabama?

A No. I don't -- but -- you're boxing me in. I can't create two districts and reach what you want to. And so neither one of the numbers will work for me.

If we want to get into a numbers game, you're talking about the population. You're talking about what the six congressional districts are, and then what the seventh district are. And then if I'm going to create two, then I'm going to create a disproportionate on the other side.

Q No, sir. I'm not asking you about a situation where there's six districts. I'm asking you about the current map that has seven districts.

THE COURT: He was talking about seven.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 163**

657

BY MS. MADDURI:

Q Yes?

A I'm talking about seven. I'm saying if you are going to make me take one of my six and make a minority, then I'm going to disproportion the other way.

14:51:45

The question -- you're boxing me in if I answer yes or no either way it's -- it's no easy answer to that question.

Q Sure. Would you agree with me that two out of seven is about 28 percent?

14:51:59

A Probably 20, a little over 28, probably, yeah.

Q And I can represent to you that the African-American population right now as of the 2010 census in Alabama is over 26 percent?

A Okay.

14:52:12

Q That's all I have.

THE COURT: Redirect?

MR. WALKER: Just a little bit, Your Honor.

THE COURT: Or do you want to take a break?

MR. WALKER: I think just one or two questions.

14:52:27

THE COURT: Okay. We never say one; but one or two.

MR. WALKER: I didn't say one. I said one or two.

REDIRECT EXAMINATION

BY MR. WALKER:

Q Senator Dial, you were asked whether or not the committee assessed whether or not you could draw two majority

14:52:46

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 164**

658

African-American -- two majority minority -- minority-majority districts. Do you recall that?

A Yes.

Q When you accepted the plan, were you relying on the expertise of Terri Sewell as a successful African-American politician to tell you what she needed for her district?

A Yes.

Q And were you also relying on the experience of Randy Hinaman to tell you what was needed?

A Yes.

Q And did you also rely on what you understood from your conversations from Senator Sanders or other members of the African-American legislative delegation to be necessary for a successful minority-majority district?

A Yes.

Q And let me clear this up. You're not against African-American members of the Congress, are you?

A No.

Q If all seven districts elected African-American congress people, you would be fine with that?

A I certainly would.

MR. WALKER: I have nothing else. Thank you, sir.

THE COURT: Any cross?

MS. MADDURI: No, Your Honor.

THE COURT: Okay. All right. Thank you. Thank you,

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 165**

659

Senator Dial. We appreciate you educating us about this process.

(Discussion off the record.)

MR. WALKER: Your Honor, that's the last witness we have today.

THE COURT: Okay. All right.

(Discussion off the record.)

(Whereupon, the above proceedings were concluded at 2:55 p.m.)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 166**

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

11-13-19

Christina K. Decker, RMR, CRR Date

Federal Official Court Reporter

ACCR#: 255

867

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

LAKEISHA CHESTNUT, an individual; MARLENE MARTIN, an individual; BOBBY DUBOSE, an individual; RODNEY LOVE, an individual; KAREN JONES, an individual; JANICE WILLIAMS, an individual; RODERICK CLARK, an individual; JOHN HARRIS, an individual,
Plaintiffs,

vs.

JOHN H. MERRILL, in his official capacity as Alabama Secretary of State,
Defendant.

2:18-cv-00907-KOB
November 8, 2019
Birmingham, Alabama
9:00 a.m.

**********************************

TRANSCRIPT OF BENCH TRIAL
VOLUME V
BEFORE THE HONORABLE KARON O. BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE

FOR THE PLAINTIFFS:

Abha Khanna, Esq.
PERKINS COIE LLP
1201 Third Avenue
Suite 4900
Seattle, Washington 98101
(206) 359-9000

Bruce V. Spiva, Esq.
PERKINS COIE LLP
700 13th Street, NW
Suite 600
Washington, DC 20005
(202) 654-6338

***CHRISTINA K. DECKER, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 1**

868

Richard P. Rouco, Esq.
QUINN CONNOR WEAVER DAVIES & ROUCO LLP
2 20th Street North
Suite 930
Birmingham, Alabama 35203
(205) 870-9989

Daniel C. Osher, Esq.
PERKINS COIE LLP
700 13th Street NW
Suite 600
Washington, DC 20005
(202) 654-6338

Lalitha D. Madduri, Esq.
PERKINS COIE LLP
700 13th Street NW
Suite 600
Washington, DC 20005
(202) 654-6322

FOR THE DEFENDANT:
James W. Davis, Esq.
Laura E. Howell, Esq.
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
(334) 242-7300

J. Dorman Walker, Esq.
BALCH & BINGHAM LLP
P.O. Box 78
Montgomery, Alabama 36101
(334) 834-6500

COURTROOM DEPUTY: Kecia Lightner

COURT REPORTER: Christina K. Decker, RMR, CRR

Proceedings recorded by OFFICIAL COURT REPORTER, Qualified pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies and Procedures Vol. VI, Chapter III, D.2. Transcript produced by computerized stenotype.

***CHRISTINA K. DECKER, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 2**

869

**I N D E X**

| | |
|---|---|
| M. V. Hood, III | 870 |
| DIRECT EXAMINATION | 870 |
| BY MR. DAVIS | |
| CROSS-EXAMINATION | 895 |
| BY MS. KHANNA | |
| REDIRECT EXAMINATION | 946 |
| BY MR. DAVIS | |
| RECROSS-EXAMINATION | 957 |
| BY MS. KHANNA | |
| FURTHER REDIRECT EXAMINATION | 957 |
| BY MR. DAVIS | |
| | |
| DOUGLAS JOHNSON | 958 |
| DIRECT EXAMINATION | 959 |
| BY MR. WALKER | |
| CROSS-EXAMINATION | 998 |
| BY MS. KHANNA | |
| REDIRECT EXAMINATION | 1039 |
| BY MR. WALKER | |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 3**

870

**P R O C E E D I N G S**

(In open court.)

THE COURT: Will the defendant call your next witness?

MR. DAVIS: Your Honor, the defendant calls Dr. Trey Hood.

M. V. Hood, III,

having been first duly sworn by the Courtroom Deputy Clerk, was examined and testified as follows:

THE COURTROOM DEPUTY CLERK: Please state your name for the record.

THE WITNESS: M. V. Hood, III.

THE CLERK: And spell your first and last name for the record.

THE WITNESS: M, period, V, period, H-O-O-D, I-I-I.

THE COURTROOM DEPUTY CLERK: Thank you.

MR. DAVIS: Ready?

THE COURT: You may proceed.

DIRECT EXAMINATION

BY MR. DAVIS:

Q Good morning, Dr. Hood.
A Good morning.
Q You go by Trey, do you not?
A That's fine.
Q Okay.
A Yes, I do.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 4**

871

Q Dr. Hood, you've been retained by the defendants as an expert in this case, correct?
A Correct.
Q And what is your field?
09:04:27 A I'm a political scientist at the University of Georgia.
Q In front of you, Dr. Hood, you'll see a copy of Defendant's Exhibit 11. And is that a copy of the report that you submitted in this case?
A Yes.
09:04:43 Q And did you attach a copy of your CV to that report?
A Yes.

MR. DAVIS: Your Honor, we submit Dr. Hood as an expert in political science and for the matters discussed in his report.

09:05:03 MS. KHANNA: No objection, Your Honor.

THE COURT: Thank you. Recognized as an expert.

BY MR. DAVIS:
Q Dr. Hood, I'll refer you to page 4 of your report, please.

And as part of your analysis in this case, did you assess 09:05:26 the level of African-American majorities in the districts in plaintiffs' illustrative plans?
A I did.
Q And how did you perform that analysis?
A I had block-level data that had census data attached to it 09:05:44 relating to the racial makeup of each census block. And I

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 5**

872

simply aggregated them into the districts as presented by Mr. Cooper's plans.

Q And what measurement did you use for African-American voting strengths?

09:06:00 A So I used single-race black non-Hispanic as my metric.

Q What measurement do you commonly use in your academic research, Dr. Hood?

A That would be the exact same measure I would use in my academic research.

09:06:14 Q Single-race black?

A Single-race black non-Hispanic.

Q Are you aware of any research, Dr. Hood, in this case or elsewhere which shows that persons who identify as any-part black vote cohesively with persons who identify as single-race

09:06:31 black?

A I'm not. Again, I typically separate individuals in that subset into another category.

Q And, Dr. Hood, I've put on the screen a copy of your Table 1. Would you walk us through and tell us about the results of

09:06:48 your analysis?

A Sure. These -- the first column to the left is simply Mr. Cooper's calculations based on his report for CD 7 and 2 for his hypothetical plans. And you can also see the enacted districts as they stand right there.

09:07:09 Q Okay.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 6**

873

A And then the columns to the right are for CD 2 and 7 for my racial calculations for those districts for each one of the four hypothetical plans Mr. Cooper drew.
Q Okay. And when you performed the analysis using the single-race measurement, were African-Americans a majority of voting age population in Districts 2 and 7 in each of plaintiffs' illustrative plans?
A No.
Q Where were they not?
A Hypothetical 1 and 2. Excuse me. Sorry. Hypothetical 3 and 4 there's at least one of the districts in Mr. Cooper's plan that's not majority black voting age population.
Q Now, Dr. Hood, there was testimony earlier in this case from one of plaintiffs' experts, Dr. McCrary, who referred to the so-called one-drop rule. Are you familiar with that?
A Yes.
Q And what is the one-drop rule?
A Well, I mean, it was -- it was a metric put in place by the state a long time ago for racial discrimination essentially. So if you were any-part black, you were essentially considered to be black.
Q And that rule was -- was that rule discriminatory in origin?
A Yes. Certainly.
Q Would it be appropriate to adopt such a policy for use in

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 7**

874

the social sciences?

A Well, I wouldn't adopt that rule, no.

Q I refer you now, Dr. Hood, to page 5 of your report, which, again, is Defendant's Exhibit 11.

09:09:01 Did you perform a core retention analysis of plaintiffs' illustrative districts?

A I did, yes. For each one of the hypothetical plans.

THE COURT: And by hypothetical plan, is that the same as the plaintiffs' illustrative plan number-wise? I mean, I'm

09:09:26 trying to make sure that I understand that we're comparing apples and apples. And Hypothetical 1 is not what --

MR. DAVIS: I can answer your question, Judge, and I think the answer is yes. But let me ask a question of Dr. Hood to make sure it's appropriately in the record.

09:09:43 THE COURT: Okay.

BY MR. DAVIS:

Q Dr. Hood, when you say hypothetical plans, do you mean the four plans that Bill Cooper has submitted in this case as a way of suggesting how Alabama might draw two majority black

09:09:54 districts?

A Yes.

Q Okay.

THE COURT: And are we talking about the original plans or the revised plans from Mr. Cooper?

09:10:06 BY MR. DAVIS:

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 8**

875

Q Did you assess the plans as submitted in Dr. Cooper's original report, Dr. Hood, or did you assess the plans that he had tweaked in a supplemental report?
A I don't know that I had access to the supplemental report. I believe these are the original.
MR. DAVIS: The revised illustrative plans, Your Honor, had not been prepared at the time of our expert designations.
THE COURT: Okay.
BY MR. DAVIS:
Q Dr. Hood, is it your understanding that when Mr. Cooper revised three of the four illustrative plans that he was making minor adjustments in Jefferson County?
A That's my understanding, yes.
Q And that was to ensure, was it not, that Congresswoman Terri Sewell's residence was, in fact, included in District 7?
A That was my understanding, yes.
Q Would that materially change your analysis in any way?
A I don't believe so, no.
Q Now, tell us what a core retention analysis is, Dr. Hood.
A So a core retention analysis asks the question for a given congressional district or a district of any kind how many of the residents in the new district were carried over from the previous district? So in this case, I'm comparing the illustrative for hypothetical plans Mr. Cooper drew to the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 9**

876

enacted plan that was put in place in 2011.
Q Okay. And are you assessing -- I think you just said this, but I want to be clear. Are you assessing how much geography of District 1 in this plan is included in the geography of District 1 in that plan, or how many of the people?
A This is population based.
Q Population?
A Voting age population to be more specific.
Q And how did you perform this analysis? What data did you use?
A Well, again, I had block-level census data files, and I had the district allocation numbers for each block for the hypothetical or the illustrative plans and the enacted plans.
Q Okay.
A So I just compared each one of the blocks -- of course, I didn't do this manually. But I'm looking to see where Block 1 was in the enacted plan and where it ended up in the hypothetical or the illustrative plan.
Q Okay. So let's look at your Table 2, Dr. Hood. And I see there District 1. And if I go along that row under the heading Hypothetical 1, I see the number 58.42. What does that number 58.42 tell us about District 1 in Hypothetical Plan 1?
A Well, it means specifically that 58.42 percent of the population in Hypothetical District 1 resided in Enacted

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 10**

877

District 1 previously.

Q Okay. So Mr. Cooper's plan includes 58.42 percent of the persons who reside within District 1, or at least who did as of the 2010 census?

09:12:59 A Correct.

Q Okay. And did you draw any conclusions from performing this analysis?

A Well, district core retention levels are fairly high for six of the seven districts. For District 2, though, district 09:13:16 core retention levels for these illustrative plans are fairly low; 28.34 percent in Hypothetical 1; 39.50 percent Hypothetical 2; 29.19 in Hypothetical 3; and 28.46 in Hypothetical 4.

Q Okay. So would it be fair to say, if you look, say, at 09:13:44 District 5, that if the Alabama Legislature switched from its enacted plan to one of Mr. Cooper's plan, it would be preserving almost entirely the core of District 5?

A Virtually, yes.

Q Okay. And it would be preserving a very small amount of 09:14:01 the core of District 2?

A Correct.

Q Okay. So does this suggest to you, Dr. Hood, that in order to enact one of Mr. Cooper's hypothetical or illustrative plans, that that -- that would require losing a lot of the core 09:14:21 of District 2?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 11**

878

A Yes. From this analysis, that would be the conclusion.

Q That would suggest that it would not take merely minor tweaks in the plan in order to draw a second majority black district?

09:14:33 A Fairly large population movements would be required.

Q Now, look at page 6 of your report, Dr. Hood. And you performed, did you not, an analysis of population shifts?

A Yes.

Q How is that different from the core retention analysis?

09:14:51 A Well, in some ways, it's similar. But here I'm looking at racial groups that are being moved in and out of particular districts.

If you were to draw a hypothetical plan, say, 1, as compared to the enacted plan, it's a little more detail here.

09:15:10 Q Okay. And actually, on the next page, on page 7 of your report, I see Table 3. And first off, use this if you want to answer this question, but just tell us how you did the population shift analysis.

A Okay. Well, again, I'm using the same block-level

09:15:28 population data. Again, this has racial data appended to these files. So it's the same set of files I'm using for the analysis.

And here I'm just looking to see, again, racially speaking where people are being moved in and out of these districts in

09:15:49 order to create one of these hypothetical plans.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 12**

879

THE COURT: Okay. So Table 2 just looked at the shift of -- or the maintaining of the core for population in general?

THE WITNESS: Yes. Yes, Your Honor.

THE COURT: And then Table 3 is breaking it down by race?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay.

BY MR. DAVIS:

Q Okay. Did you see any relationship, Dr. Hood, in who Mr. Hood was moving in and out of districts and race?

A Yes. There is definite patterns here. And I did some statistical testing, as well, for these tables. And that's reported in the footnotes.

Q Yeah. You know, I want to try asking that last question again. You understood what I meant and you answered it well, but it was a horrible question.

Was there a pattern, Dr. Hood, in your opinion, between race and the people that Mr. Hood -- that Mr. Cooper was moving in and out of the districts?

A Yes. There's definitely a pattern.

Q Okay. And what is that pattern?

A Well, it varies, but, for instance, if you look at Table 3, so this would be illustrative or Hypothetical Plan 1, as compared to the benchmark plan.

So, again, I just did this for Districts 2 and 7 for each

**Christina K. Decker, RMR, CRR**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 13**

880

one of these plans.

If you look at District 2, if you look at the column that says moved out of district, 20 percent of those residents in the current District 2 that were moved were black residents versus almost 75 percent of those that were moved out of the district who were white residents.

Of those moved into the district, the majority, 53.1 percent, were black versus 42.8 percent who were white.

Again, I applied a very simple and straightforward statistical test to these tables. It's called the chi-square test. It's very old. It's been around a long time. And it asks the questions -- in this case, are race and population movement independent of one another? I can definitively reject that null hypothesis in this case and say that race and population movement are related.

Q Okay.

A Statistically speaking.

Q Now, you said the chi-square test?

A Chi-square.

Q And that's C-H-I like the Greek letter Chi?

A C-H-I dash square.

And it's footnoted in the report.

Q And you did a similar analysis, did you not, for all of the hypothetical plans?

A I did.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 14**

881

Q Yes. And those are presented -- well, did you find a similar pattern or a connection between race and population movements in each of Mr. Cooper's illustrative plans?

A Yes. The overall patterns there, the degree to which it may be present, varies by hypothetical plan.

Q Dr. Hood, on page 11 of your report, you looked, did you not, at turnout rates in Alabama?

A I did.

Q How did you perform that analysis?

A This was a set of data I received from the Alabama Secretary of State's office. So these are voter registration and history files.

So I'm looking at turnout as a percentage of registrants in this case. And I had data for the 2010 through 2018 election cycles.

And, again, in Alabama, it's requested that registrants record their race. And so we're not estimating that. I'm using this from the voter file again -- race of registrant, that is. So we can compare turnout rates by race -- white, black in this case.

Q I'll refer you to Table 7, Dr. Hood, which is on page 11 of your report. And tell us about your conclusions.

A Well, a little bit about the table. Again, these are white and black turnout rates for Alabama. Again, these are statewide turnout rates, I want to emphasize, for the 2010,

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 15**

882

'12, '14, '16, and '18 election cycles. So I have it broken down for each cycle. And then I have a difference measure over there. And then at the bottom I have some different mean figures, the average across all elections cycles, the average for midterm election cycles, and the average for presidential election cycles.

09:20:25

So with the exception of one election cycle, which was 2012, there is a gap between black and white turnout rates in Alabama. Maybe it's best to look at the mean numbers down at the bottom.

09:20:41

Across all elections that I analyze election cycles, the black white turnout rate gap is 4.8. For midterm elections it's 5.6, and for presidential elections it's 3.6.

THE COURT: And that gap goes which way?

09:21:02

THE WITNESS: There's more white turnout than black turnout, Your Honor, with the exception of the 2012 presidential election.

THE COURT: I want to make sure that -- we've had a lot of jokes this week about how lawyers aren't mathematicians or not good at math -- and I want to make sure I'm looking at these numbers correctly.

09:21:17

THE WITNESS: Okay.

THE COURT: The percentage you have for -- for example, we'll just take 2010. The 52.4 percent white, is that the 52.4 percent of the white registered voters turned out to

09:21:34

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 16**

883

vote? Is that what that number reflects?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. I just wanted to make sure that my very non-math mind was following that and understood that.

09:21:50 Thank you.

THE WITNESS: And it is the -- I usually footnote the calculations in the report. So if you have any questions, it's usually footnoted.

THE COURT: All right. Thank you.

09:22:00 THE WITNESS: I think it's footnote 21 in this case.

THE COURT: Okay. Thank you.

BY MR. DAVIS:

Q Dr. Hood, if there is a gap between white turnout and black turnout in a particular election, is that relevant

09:22:17 information when you're assessing whether a district that is close to 50 percent black voting age population will, in fact, result in the election of the candidate of choice of the African-American voters?

A Yes. And certainly in this case in Alabama I think it's

09:22:34 been established probably that there are high levels of racially polarized voting. To the extent to which that's the case, it's very important to look at the racial composition of the district.

Q And to be clear, again, you're not saying this is the gap

09:22:51 in turnout in any particular congressional district?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 17**

A These are statewide turnout numbers.
Q Statewide results?
A Yes.
Q I am going to refer you now to page 14 of your report.

09:23:17 There's a section in your report, Dr. Hood, that's headed Black Voting Patterns. What analysis were you performing here?
A I was asked to analyze black voting patterns in Alabama and in other states, as well. And in order to do that, I chose, of course, Alabama, and I also looked at 20 other states

09:23:41 that had a black population of at least 10 percent or greater. And those states are listed on page 14 under Section 6.
Q Okay. Did the states that you reviewed include southern states?
A All the southern states.

09:23:57 Q Okay.
A Or at least the way I defined the south.
Q And did it include northern states?
A Yes.
Q So there I see under black voting patterns about the third

09:24:07 line under this district you say these states are Arkansas, Connecticut, Delaware, Florida, et cetera. And that's a listing of all the states that you reviewed?
A Yes.
Q And these are states where African-Americans are

09:24:21 10 percent or more of the total population?

885

A Yes.

Q Okay. And what did you find when you looked at these voting patterns?

A Well, I guess a little more background. I looked at two different data sources for this -- the national exit polls that occur on election day typically after general election cycles in the U.S.; and also another data source, the CCES, the Cooperative Congressional Election Study, which is a very common form of -- which is a very common survey that's used in a lot of research in political science.

So I'm not estimating these voting patterns. I'm using these survey data to make these inferences.

And, again, I think I went -- it looks like I went from 2008 to 2018 on this analysis.

Q Let's look at the results when you were reviewing the national exit polls, Dr. Hood. I'll refer you to Table 9 on page 15 of your report.

A So there were three different offices that I was able to analyze using the national exit polls -- President, Governor, and Senate again for 2008 through 2018. And those figures are compiled in Table 9. There are more detailed tables for each year in office by state in the appendix of the report. So this is sort of a summary table here.

What you find consistently are very high levels of black support for Democratic candidates both in these comparison

**Christina K. Decker, RMR, CRR**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 19**

886

states and in Alabama. So Table 10 is the same thing just for Alabama.

Q Okay. So looking at the top table, Table 9, I see in the year 2008 under President, 95.6 percent?

09:26:18 A Correct.

Q What does -- 95.6 percent of what? And what does that mean?

A 95.6 percent of African-Americans in these comparison states voted for the Democratic candidate for president in 09:26:32 2008.

Q Okay. So that's of the 21 states where African-Americans are 10 percent or more of the population, Table 10 singles out Alabama, and Table 9 is averaging up the results from the other 20 states?

09:26:46 A Correct. Right. So Alabama is not part of the average in Table 9, just to be clear.

Q Right. Overall, what's the result for all races, Dr. Hood?

A Across -- again, this is 135 different races in different 09:27:06 states. The black support rate for Democratic candidates from this data set was 91.1 percent.

Q And what did you find for the state of Alabama again when you looked at the national exit polls?

A Again, there are far fewer comparison points just simply 09:27:22 for Alabama. But the support rate in Alabama was 94.3 percent

**_Christina K. Decker, RMR, CRR_**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 20**

887

for Democratic candidates.

Q Now, if you will turn the page, Dr. Hood, I'm going to put Tables 11 and 12 up on the screen.

These are on page 16 of the report, Defendant's Exhibit 11. And are these the results from the CCES data?

A Yes.

Q And what did you find?

A Very similar patterns; very high rates of support for Democratic candidates among African-Americans either in the comparison states or in Alabama.

Q Okay.

A It's 91.5 percent in the comparison states across all these races versus 90.9 percent in Alabama.

Q Okay.

A And in this particular analysis, I was able to include some data from U.S. House races, as well, in addition to President, Senate, and Governor.

Q Is there any significant difference that you saw, Dr. Hood, in African-American support for Democratic candidates in Alabama and African-American support for Democratic candidates in other states?

A It's very similar.

Q And that includes states outside the south?

A Correct.

Q Throughout the country?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 21**

888

A Right. As long as they have an African-American population of 10 percent or greater.

Q Dr. Hood, this actually goes back to some of the population shift analysis, and I forgot to ask this: You mentioned at one point when you're looking at the relationship between race and the people that Mr. Cooper was moving in and out of districts, and you say that the relationship is statistically significant, correct?

A Correct, in that case.

Q What does that mean, statistically significant?

A Well, using the specific Chi-square test that I was talking about, statistically significant in that case means that there's a relationship between population movement and race. Now, that's where it ends with that particular test. I can't make any inferences beyond that.

The null hypothesis in that case would be that there's no relationship between race and population movement, that those factors are independent of one another. But that's not what I found.

Q I'd like to go back now, Dr. Hood, to page 13 of your report.

I've put Table 8 on the screen from page 13 of your report. Can you tell me what you were looking at here?

A So I'm looking at population in Mr. Cooper's study area as he defined it. Again, these are whole counties. I'm not using

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 22**

889

partial counties for this particular analysis. But I'm looking at what's happening with the black voting age population in 2010 as compared to 2017, which is the last year that I had data that was usable for this comparison.

09:30:55 MS. KHANNA: Objection, Your Honor. I believe this goes to the post-2020 considerations that we've already agreed are not relevant in this case.

MR. DAVIS: Your Honor, it is in the section of his report titled Post-2020 Considerations, but we think the fact 09:31:12 that there are shifts in population is relevant to our mootness argument.

We're not suggesting that -- we're only suggesting that the fact -- I think as Dr. Hood would testify if you allow it, that there's loss of population in some areas and gain of 09:31:28 population in others that would show that the illustrative districts could not, in fact, be passed as they are after 2020, meaning in our view it's moot.

THE COURT: Well, that's not the question of the mootness that I've asked to be briefed. There's more of a 09:31:49 legal issue that we discussed yesterday.

I think that we all can acknowledge, or at least I hope we can, that the 2020 census may well be very different from the 2010 census, and that it will be the 2020 census that will determine how districts will be drawn in reapportionment or 09:32:17 redistricting then.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 23**

890

So I didn't let the plaintiffs get into the -- I think 2018 was when I stopped them. So I think I'll stop you with 2017.

MR. DAVIS: I will move on.

THE COURT: Okay. Thank you.

MS. KHANNA: Thank you, Your Honor.

BY MR. DAVIS:

Q Dr. Hood, when you looked at the black support of Democratic candidates, did you find overall that African-Americans supported Democratic candidates over 90 percent in every state you reviewed?

A Well, it wasn't always over 90 percent. That was the average figure.

Q The average overall, of all the elections you reviewed was over 90 percent?

A Yes. Yes.

Q And that's in Alabama and outside Alabama?

A Right. So black support for Democratic candidates is fairly monolithic is the way I would put it, which is not a surprise, given -- I hadn't studied all these states, but certainly I studied the south quite a bit, and these patterns were not a surprise to me. But they are documented here.

Q Now, look at page 17 of your report, Dr. Hood. And Section 7 is titled Racial Comparison. Tell me what you were looking at here.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 24**

09:34:03 09:34:22 09:34:43 09:35:06 09:35:22

A So I'm comparing black and white citizens on a number of sociodemographic characteristics. I think there were nine in all, if I recall correctly. Most of these data are coming from the Census Bureau, some of it from the Centers For Disease Control, some of it from the Bureau of Labor Statistics. So they're all government agencies.

So I'm looking at various disparity rates between black and white citizens in Alabama and again in these 20 comparison states that have a black population of at least 10 percent.

Q Okay. So let's look at Table 13, which is from page 18 of your report, Dr. Hood. And we're not going to do this for each category you reviewed, but using this as an example, tell us what data you used, how you assessed this, and what your findings were.

A Okay. So these are education levels, and these data come from the American Community Survey, which is the census run by the Census Bureau. And this is from 2017, specifically.

So the column to the left I'm looking at the percentage of citizens in each one of these racial categories, blacks and whites, who obtained at least a high school degree or equivalent.

And in the column to the right, I'm looking at least a college education -- a B.S. degree or higher.

Q And what is the column on the far right, for example, that just says difference?

892

A So literally that's just the subtraction between the white column and the black column.

Q Okay.

A So to run through an example, maybe, using Alabama high school or equivalent, 87.7 percent of the white population in Alabama has a high school or equivalency degree versus 81.6 percent of black citizens in Alabama. So the arithmetic there is just 6.1 percent, the literal difference between those two.

Q And what patterns did you find, if any, in the other states that you reviewed?

A Well, the difference measure varies by state. Certainly you can just look down the column and see that.

And the question I'm not really -- I'm not really asking the question is, is the difference measure larger or smaller in Alabama versus these other states, just whether or not a disparity exists between blacks and whites on these various sociodemographic characteristics in these other states and in Alabama, as well. And the answer is, yes.

So in this case, the positive difference measure would mean that there's a disparity between black and white education rates.

Q Okay.

A And you can see there's a positive number all the way down the column.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 26**

893

THE COURT: Positive number meaning what?

THE WITNESS: The disparity rate -- in this particular case, there are more whites who have a high school or equivalency degree than blacks.

09:37:01 BY MR. DAVIS:

Q So if we're going to summarize your Table 13, you found, did you not, that according to the data you reviewed, which includes census and other data, that there is a gap between the number of white citizens in Alabama or white persons in Alabama 09:37:18 who have a high school degree or greater and African-Americans in Alabama who have a high school diploma or equivalent?

A Yes.

Q Okay. And did you --

A There's a similar gap for all these other 20 states.

09:37:28 Q You found --

A It's not the exact same figure, necessarily, but there's a similar gap.

Q Yeah. The amount of the gap may vary, but you found such a gap in each state that you reviewed, did you not?

09:37:43 A Correct.

Q Okay. Now, we're not going to take up court time, Dr. Hood, going in detail of the other categories you looked at. But if you would, flip through your report and just tell the Court what other categories -- what other socioeconomic 09:37:59 categories you reviewed.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 27**

894

A So in addition to education levels, I looked at food stamp provision, median household income, per capita income, poverty rate, home ownership rates, unemployment rates, and infant mortality rates.

09:38:23 Q Dr. Hood, was there any category in any state you reviewed where you did not find a gap?

A No.

Q That's true in Alabama and in all of the states that you reviewed, correct?

09:38:40 A Correct. All these factors.

Q So that would include states that were below the Mason Dixon line and states above the Mason Dixon line?

A Correct.

Q Dr. Hood, you mentioned in your report that in 2011 09:39:03 Alabama was subject to the retrogression standard of Section 5 of the Voting Rights Act, correct?

A Correct.

Q Dr. Hood, if a district is 65 percent African-American voting age population, would you agree that at least in most 09:39:22 cases it is likely that the African-American voters would be able to elect their candidate of choice?

A Yes, I would agree with that.

Q Is that likelihood 100 percent iron-clad guarantee in every election?

09:39:35 A No.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 28**

Q Would you agree that if the voting age population is dropped to 50.1 percent, that the likelihood has been somewhat lessened that African-Americans would be able to elect their candidate of choice?

09:39:53 A In that case, the probability would have been decreased, yes.

MR. DAVIS: Your Honor, may I have a moment?

THE COURT: Yes, you may.

MR. DAVIS: Your Honor, I pass the witness.

09:40:18 THE COURT: Cross-examination?

MS. KHANNA: Yes, Your Honor.

CROSS-EXAMINATION

BY MS. KHANNA:

Q Good morning, Dr. Hood.

09:40:38 A Good morning.

Q It's good to see you again.

A You, too.

Q Dr. Hood, at the top of page 3 of your report, which is marked Defendant's Exhibit 11, you write that, I have been 09:40:55 asked by counsel for the defendant to provide a response to reports by plaintiffs' experts, Mr. William Cooper, and Professor Maxwell Palmer. Did I read that correctly?

A Yes.

Q And you provided no response to the expert report of 09:41:10 Dr. Peyton McCrary regarding the history of voting-related

896

racial discrimination in Alabama; is that correct?

A That's correct.

Q And while you do respond to Mr. Cooper's expert report, at no point do you offer an opinion that plaintiffs are unable to satisfy the first *Gingles* precondition; is that correct?

A Well, I raised questions about that, yes.

Q Do you ever opine on whether or not plaintiffs have satisfied the first *Gingles* precondition?

A Not directly.

Q And you do not dispute Mr. Cooper's conclusion that there are racial disparities across key indicators of socioeconomic well-being in Alabama generally and in the Black Belt region specifically?

A Well, I document those myself. I may have used different variables, but I can't argue with that.

Q Now, you mentioned in the scope of your report that you were asked by counsel to provide a response to Dr. Palmer's initial report, as well; is that right?

A Yes.

Q And Dr. Palmer's initial report concluded that voting is racially polarized in Congressional Districts 1, 2, 3, and 7 individually and combined; is that right?

A Well, I'll take your word for that.

Q Is that your recollection?

A Yes, that's my recollection.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 30**

897

Q And you provide no opinion regarding the existence of racially polarized voting in Alabama, correct?
A Correct.
Q And, in fact, you performed no analysis at all of racially polarized voting in Alabama generally or in any region of Alabama?
A That's correct.
Q Are you familiar with ecological inference, which is the method that Dr. Palmer used to evaluate racially polarized voting?
A Yes.
Q And you have used that method before in other cases in order to analyze racially polarized voting; is that right?
A Yes.
Q And, in fact, in one of your previous reports in a different case you stated that, It is my contention that of the current statistical tools that can be employed to aid in vote dilution analyses, the EI technique provides the most reliable and realistic estimates of voter choice; is that correct? Do you recall that?
A I recall saying something like that, yes.
Q And you stand by that?
A Yes, of course.
Q But you offer no EI analysis here?
A I do not.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 31**

898

Q And at no point in your report do you refute Dr. Palmer's conclusion that African-Americans in the areas he examined are politically cohesive; is that right?
A Correct.
09:43:41 Q And at no point in your report do you refute Dr. Palmer's conclusion that African-American voters and white voters in the areas he examined consistently prefer different candidates?
A Correct. I mean, that's just another way of saying there's racially polarized voting.
09:43:58 Q That's right.
A Right.
Q And at no point in your report do you refute Dr. Palmer's conclusions that the candidates preferred by white voters in the areas he examined usually defeat the candidates preferred
09:44:10 by black voters?
A Right. They don't offer an opinion on that.
Q So also in the background section on page 3 of your report, you provide a review of redistricting in Alabama; is that right?
09:44:31 A A paragraph, yes.
Q And you note in that section that, In 2011 the map drawers in Alabama saw to ensure that the proposed plan would not be rejected under the retrogression standard enunciated in Section 5. Did I read that correctly?
09:44:49 A Yes.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 32**

899

Q And you did not participate in Alabama's redistricting process following the 2010 census, correct?
A That's correct.
Q And it's fair to say that any documents or data that you relied upon in drafting your report is listed in your report in the footnote usually; is that right?
A Certainly, yes.
Q And at no point does your report indicate that you received information from the map drawers of the 2011 plan, correct?
A That's correct.
Q And, in fact, you never conferred with the map drawers of the 2011 plan in preparing your report?
A That is correct.
Q And you reviewed the state's preclearance submission in preparing your report?
A Yes.
Q And isn't it a fact that you can't recall any sort of analysis from the preclearance submission of whether an increase in black voting age population from 58.33 to 60.55 in CD 7 was necessary in order to maintain the ability of minority voters in CD 7 to elect their preferred candidates?
A I believe I said at deposition I could not recall any kind of specific statistical analysis.
Q And you don't recall any today, as well?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 33**

900

A Right. That's not changed. I was just clarifying.

Q Thank you.

And certainly you have performed no analysis to determine whether an increase in the black voting age population in CD 7 was necessary in order to comply with Section 5 and maintain the ability to elect for African-Americans?

A That's correct.

Q So in the next section, in Section 4 of your report, you discuss Mr. Cooper's illustrative plans; is that right?

A Yes.

Q And the first aspect you examined is the racial composition of Mr. Cooper's illustrative districts, correct?

A Correct.

Q And on page 4, you state that it is your understanding that the Alabama reapportionment office defines black as only those individuals who identify as single-race non-Hispanic black?

A That's my understanding, yes.

Q And that understanding is based solely on information you received from counsel for the defendant in this case; is that right?

A As recorded in the report, yes.

Q In what -- oh, in your own report.

A Yes, as recorded in my report, yes.

Q And you received no document from counsel confirming that

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 34**

901

the Alabama reapportionment office, in fact, defined black in that manner; is that right?

A That's correct.

Q Are you aware that Dr. Johnson has referenced a different metric for calculating who should count as African-American in this case?

A I'm aware of that, yes.

Q And you've seen Mr. Cooper's reply report or rebuttal report in this case; is that right?

A Yes.

Q And you're aware that Mr. Cooper has stated his understanding that, in fact, the Alabama Legislature had relied on a single-race black category that includes Hispanics in the 2011 redistricting documents and previous Alabama litigation. Do you recall seeing that?

A Yes. I mean, that's what he states. I guess there's a dispute about who used what at this point. That wasn't the information I received.

Q Fair enough. Yeah. I wasn't asking if you --

A Okay.

Q -- agreed with it. I just wanted to make sure that you recalled that.

You have no specific information other than what your counsel told you -- or rather what defendant's counsel told you that contradicts the statements made by Mr. Cooper; is that

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 35**

902

right?

A Except for that information I received through counsel, no.

Q So -- you said you reviewed Alabama's preclearance submission in drafting your report; is that right?

A Yes.

Q And on page 3 of your report, you cite to page 424 of that preclearance submission when discussing the black voting age population of CD 7; is that right?

A According to footnote 3, yes.

Q All right. Can we please call up Plaintiffs' Exhibit 83, page 424?

So Plaintiffs' Exhibit 83 is the exhibits to Alabama's preclearance submission. And I believe this is the page that you were referring to in -- in footnote 3 of your report; is that right?

A It's been quite a while, but this looks familiar.

Q Okay. Now, you note on page 3 of your report that in the 2011 plan the map drawers increased the BVAP of CD 7 from 58.33 percent to 60.55 percent. Am I reading that correctly from page 3 of your report?

A Yes.

Q And those are the same numbers reflected here on the screen on PX-83 page 424 in the submission drafted by the state of Alabama to the U.S. Department of Justice; is that right?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 36**

903

A Correct.

Q But you used the definition obtained by counsel in calculating the percentages in Table 1 of your report, which is on page 4 of your report; is that right?

09:50:12 A Correct. So as I've said, the definition in Table 1 is single-race non-Hispanic black, which is also the definition I used in social science research.

Q So if we look at your Table 1 on page 4 of your report, based on your calculation, using single-race non-Hispanic

09:50:43 black, you report the black voting age population of District 7 under the 2011 plan as 60.34. Do you see that?

A Yes.

Q And that's a different BVAP number than reported in the state of Alabama's preclearance submission for that same

09:51:02 district under the 2011 plan; is that right?

A Yes. Slightly different. Yes.

Q And, in fact, it's different than the BVAP reported by you in just the previous page of your report, in the background section of your report?

09:51:20 A Right. Which is taken from the preclearance submission.

Q There's about a two-tenths of a percentage point between those two metrics, right?

A Correct.

THE COURT: And where did you get your data for the

09:51:35 BVAP of District 7 in 2011?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 37**

THE WITNESS: Well, those -- that was from calculations I made, Your Honor. I think I was using Mr. Cooper's data files, the block equivalency files.

Now, I may have -- I'm trying to reconstruct what I did. I may have added to those block equivalency files. I may have gone back to the census and merged the demographic data back in, from what I remember.

BY MS. KHANNA:

Q And just to clarify, Dr. Hood, I'm not asking about any of Mr. Cooper's illustrative plans right now. I'm talking solely about the enacted 2011 plan and your calculation of the BVAP in that plan. And if I understand you correctly, your calculation of the BVAP in that plan is lower than the BVAP reported by the state of Alabama; is that right?

A Yes.

Q Does the fact that that number is lower, does it give you reason to believe that Mr. Cooper's statement that the state of Alabama actually used black Hispanics in its count of African-Americans for preclearance purposes, does it give you reason to believe that that statement is true?

A Not on its face. I would have to look into it.

Q But there's some discrepancy there that would require some further investigation; is that right?

A I think that's fair.

Q And you did not perform any analysis to determine why the

905

number reported in the preclearance report is different than the number reported on Table 1 of your report; is that right?

A That's correct.

Q Dr. Hood, I believe you testified on direct that you're not aware of any evidence or studies that would show that African-Americans who are single-race non-Hispanics black vote cohesively with African-Americans who might have other minority affiliations as well; is that right? I apologize if I misstated that. You can correct me.

A I think that's pretty close. I mean, what I am trying to say is that typically -- at least in the social sciences when I'm doing this type of research, you know, we look at people who have identified by one racial category who are non-Hispanic to do the analysis, if that makes sense.

THE COURT: So you rely on self-identification of race by people in -- when you're doing your studies of them?

THE WITNESS: Yes. I mean, certainly any census data is self-identification. We have allowed -- the Census Bureau is allowing the individual to identify with the racial and ethnic categories that they want to.

THE COURT: Okay. And if -- I don't know if this is true or not -- but if the voter registration document only allowed a choice of -- I don't know -- hypothetically, white, black, other, would you be using those who identified as black?

THE WITNESS: Yes. Yes, Your Honor.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 39**

906

THE COURT: Okay.

THE WITNESS: Yes.

BY MS. KHANNA:

Q And if I understand your position correctly, before you would countenance the inclusion of, for example, black Hispanics, someone who is both black and Hispanic at the same time in the metric of black voting age population, you would need to see some kind of evidence of cohesion between blacks and Hispanics; is that right?

A Well, I would just say that if -- again, just to back up for a second. Black is a racial category. Hispanic is an ethnicity. So you can be both black and Hispanic.

Now, in my own research in political science, anyone that identifies themselves as Hispanic, I count as Hispanic, whether they identify as white, black, Asian, American Indian. However they identify racially, I identify them as Hispanic because they have said ethnically they're Hispanic. So I think that -- hopefully that answers that.

I would not categorize someone who said they were a black and Hispanic as black. I would categorize them as Hispanic.

Q I understand.

A And I have done that consistently for more than 20 years I think, so...

Q And I believe you testified both in your report and on direct that before you would ever categorize or consider

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 40**

907

categorizing someone who is both black and Hispanic as African-American, you would need to see some evidence of cohesion between those racial and ethnic groups; is that right?
A Well, I think that's one reason you don't classify -- or I don't classify them as black versus Hispanic. Again, I would keep them in the Hispanic category. Now, you can do an analysis and say, How are Hispanics voting? You know, that's a different question, though.
Q Dr. Hood, you are aware that Dr. Palmer's study of racially polarized voting relied on voting registration data, right?
A Yes.
Q And you provide no basis in your report to refute Dr. Palmer's analysis of the extent to which African-Americans vote cohesively; is that right?
A That's correct.
Q You would agree that unlike the census form, Alabama's voter registration form specifically instructs individuals to choose only one race or ethnicity; is that right?
A That is correct.
Q They're not -- they can't check both black and Hispanic on that form, or they're not instructed to?
A They're not supposed to, I guess is the way to put it.
Q So it's entirely possible that someone who is both black and Hispanic would mark both boxes on the census form, and then

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 41**

908

when following the instructions on Alabama's voter registration form, would choose only black?

A It's possible.

Q And the same goes for someone who self-identifies as both black and white on the census form, that person may well choose just black on their voter registration form following a different set of instructions; is that right?

A It's possible, yes.

Q And you would agree that there's really no way to figure out what percentage of individuals self-identified as bi-racial or black and Hispanic on the census form also self-identified as black on their voter registration form; is that right?

A I think we can agree on that, yes. There's no way to determine that.

Q So as I just mentioned and as we already discussed, you state on page 4 of your report that you're unaware of any research that would indicate that black citizens exhibit cohesive voting patterns with people who are both black and Hispanic, correct?

A Correct.

Q Are you aware of any analysis presented by plaintiffs indicating that Alabama's relatively small Hispanic and multi-race population exhibits cohesive voting patterns with black citizens?

A I am not aware, no.

**_Christina K. Decker, RMR, CRR_**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 42**

909

Q Could we please pull up Dr. Palmer's report, which is Plaintiffs' Exhibit 79 on page 17?

Now, Dr. Hood, you reviewed Dr. Palmer's report before drafting your own report; is that right?

09:59:11 A That is correct.

Q In fact, you were specifically tasked with responding to Dr. Palmer's report; is that right?

A That is correct.

Q Now, this is Table 1 of Dr. Palmer's report reflecting his 09:59:21 county-wide racially polarized voting analysis. And Dr. Palmer explained in his report that the other category on the very far right-hand side includes Hispanics, Asians, native Americans, and people who did not identify race on their voter registration forms. Do you recall that?

09:59:41 A Yes.

Q And that -- he also noted in his report that approximately 3 percent of the population fell into that other category?

A I mean, I believe that's right. It's been quite a while since I looked at it.

09:59:53 Q Okay. Now, you would agree that according to Dr. Palmer's analysis, the point estimates of the other vote share here indicate that a majority of the other category votes in favor of the African-American preferred candidate; is that right?

A Well, the point estimate, yes. If you look at the 10:00:10 credible interval, though, it drops below 50 percent. For

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 43**

instance, U.S. President, the point estimate is 62.7, but the range is 30.6 to 91.8.

Q And you were -- sorry.

A So we're really not sure.

10:00:27 Q And you weren't in the courtroom when Dr. Palmer testified, were you?

A I just got here yesterday.

Q I know. For the record.

And so Dr. Palmer agreed that in the county-level analysis 10:00:41 there was just too few data points, too few numbers to make the confidence interval more narrow.

If we could turn to Table 3 of this same report on page 19. This is Dr. Palmer's precinct-level analysis of Congressional District 1. You see here that according to 10:01:04 Dr. Palmer's analysis over 70 percent of the other category votes in favor of the African-American preferred candidate in CD 1?

A Yes.

Q And all of the confidence intervals exceed 50 percent; is 10:01:19 that right? Except for, looks like one, which is 49.3?

A For lieutenant governor, yes.

Q Could we please turn to Table 4 on the next page?

And here we see even a higher percentage of the other category voting in favor of the African-American preferred 10:01:37 candidate in CD 2; is that right?

911

A Yes.

Q And here the point estimates are well above 60 percent at the very least; is that right?

A Yes.

10:01:49 Q Let's go to Table 5 on the next page.

We see a similar story in Congressional District 3, where the vast majority of people in the other category are voting alongside the African-American group for the African-American preferred candidate. Would you agree with that?

10:02:08 A Yes.

Q And can we please turn to Table 6 on the next page?

Similar story in CD 7. Would you agree? We see --

A Well, except for Governor, it looks like. Otherwise, similar story, yes.

10:02:28 Q Okay. If we turn to Table 7 on the next page.

This table reflects Dr. Palmer's precinct level-analysis of racial voting patterns in the focus area as a whole. You would agree, Dr. Hood, wouldn't you, that according to Dr. Palmer's analysis, over 86 percent of the other category

10:02:48 votes cohesively with African-Americans for the African-American preferred candidate?

A According to that table, yes.

Q And you provide no response to Dr. Palmer's analysis of racial voting patterns in this table or any other pattern; is

10:03:04 that right?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 45**

912

A Correct.

THE COURT: We're still talking about the population that -- or voting age population that's roughly 3 percent, correct?

10:03:15 MS. KHANNA: Yes, Your Honor.

THE COURT: Okay.

BY MS. KHANNA:

Q Dr. Hood, is it your position that anyone who is both black and Hispanic should not be considered African-American?

10:03:35 A Well, they can personally identify however they want to. I'm just talking about the way I conduct social science research.

Again, I take anyone who's identified ethnically as Hispanic and consider them to be Hispanic in my own research.

10:03:54 Q And you take a similar approach to anyone who self-identifies as both black and another race; is that right?

A Yes.

Q If they identify as both black and white, they are neither? What are they, as far as --

10:04:09 A Well, they would be in the other category --

Q Okay.

A -- like Dr. Palmer had.

Q Now --

A I would create another category for those individuals.

10:04:17 Q Okay. So in your own academic literature, you have

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 46**

913

referred to President Barack Obama as this country's first black president, haven't you?

A I'm sure I have at some point.

Q And you would agree that President Obama had a black father and a white mother; is that correct?

A Yes.

Q But according to your definition that you advance in your report in this case, as a statistical matter, President Obama would not qualify as an African-American in your studies; is that right?

A Not according to that definition, no.

Q Dr. Hood, you would agree that at least one of the reasons that African-Americans vote cohesively is because they share a common history of discrimination; is that right?

A Yes, that's part of it.

Q Dr. Hood, you are aware that Mr. Cooper used the AP black category from the census to determine the black voting age population in his illustrative district; is that right?

A Yes.

Q And it's fair to say that you are not aware of what metric courts use in voting rights cases to determine who is considered black when looking at illustrative districts; is that right?

A I guess it could vary potentially.

Q Are you aware one way or the other what metric courts tend

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 47**

914

to use?
A No.
Q And you have no reason to dispute Mr. Cooper's statement that courts in Section 2 cases generally use the AP black metric; is that right?
A Well, I don't necessarily know that that's true or false I guess is what I would say.
Q You have no reason to dispute it one way or the other?
A I don't have any information one way or the other.
Q So, Dr. Hood, you would agree that even using your preferred definition of black to mean single-race non-Hispanic black, Districts 2 and 7 are both over 50 percent black voting age population in Mr. Cooper's illustrative plan 1; is that right?
A That is correct.
Q And even using your definition of black, you would agree that Districts 2 and 7 are both over 50 percent black voting age population in Mr. Cooper's Illustrative Plan 2; is that right?
A That is correct.
Q We'll move on to your discussion of district core retention.
Now, you defined core retention as the percentage of a district's population that is held over from the previous version of that district, correct?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 48**

915

A Correct.

Q And you note in your report that core retention is one of the stated redistricting criteria in the legislature's adopted guidelines governing the redistricting process. Do you see that?

A Yes.

Q And you relied on those guidelines in drafting your report?

A I certainly looked at them, yes.

Q And I believe on page 6, footnote 10 of your report, you cite to the document marked Chestnut Defense 0267 in referring to those guidelines; is that right?

A Yes.

Q And you write there that, This criterion was a stated objective of the 2011 congressional plan; is that correct?

A Yes.

Q Can we please call up Plaintiffs' Exhibit 83, page 267, and you'll see here that the Bates number here is Chestnut Defense 0267.

Is this the page that you're referring to when you were drafting your report?

A Well, that is the page number that's listed there.

Q And there you'll see at the bottom in 7D it says, The plan will attempt to preserve the cores of existing districts. Do you see that?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 49**

A Yes.

Q I also want to call out paragraph 7 at the top. Here it says, The following redistricting policies are embedded in the political values, traditions, customs, and usages of the state of Alabama and shall be observed to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States and of the state of Alabama. Did I read that correctly?

A Yes.

Q And we can delete those out now.

And also included in Section 7 is avoiding contests between incumbents. You see that in 7A?

A Correct. Correct.

Q Right? And we also see another paragraph about communities of interest in 7B, is that right?

A Correct.

Q Could we turn back a few pages to the first page of this -- of this part of the document, to page 260 of Plaintiffs' Exhibit 83?

This is the -- the first page of the guidelines that you were referring to, Dr. Hood. Would you agree with me that based on the first paragraph that these guidelines actually apply to the 2000 redistricting cycle and not the 2010 redistricting cycle?

A That's what it says.

917

Q Were you aware of that at the time you wrote this report?
A No.
Q Can we please pull up Plaintiffs' Exhibit 84?
So, Dr. Hood, have you -- did you review this document in preparing your report?
A I may have. I'm not certain.
Q You don't cite to this document in any of the footnotes in your report; is that right?
A I believe that's correct.
Q And I'll represent to you that these are the reapportionment committee's adopted guidelines for the 2011 cycle.
If we can please turn to page 3 of Plaintiffs' Exhibit 84. There at the bottom we see the same language from Section 7 that we saw in the previous version; is that right?
A Yes.
Q If we could turn to the next page.
Here we see the criterion for avoiding incumbent contests?
A Right.
Q We see a paragraph on communities of interest. Do you see that?
A Yes.
Q And it's actually a different paragraph, a different definition than the previous version.
But nothing in that section mentions core preservation; is

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 51**

918

that correct?
A I don't see it.
Q And if I told you that the word core did not appear once in the guidelines that governed the 2011 redistricting process, would that affect your opinion of whether that criterion, in fact, was a stated objective of the 2011 congressional plan?
A Well, if it wasn't stated, it wasn't stated.
Q Dr. Hood, you would agree that whether based on the guidelines or anything else, the attempt to preserve cores of existing districts may not trump compliance with the Voting Rights Act, correct?
A Well, in footnote 10, I state that essentially.
Q In footnote 10 you say, quote, I am not arguing that this criterion overrides all redistricting criteria, as it certainly does not; is that right?
A Right. That's what I am referring to.
Q Right. And so specifically I'm saying it does not -- you would agree that it does not and cannot trump compliance with Section 2 of the Voting Rights Act, correct?
A That's correct.
Q In determining the district core retention of plaintiffs' illustrative plans, you compare each of those illustrative plans to the enacted 2011 plan; is that right?
A Yes.
Q And you report how each illustrative district fares on

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 52**

919

your measure of core retention?

A Yes.

Q But you did not report how the 2011 plan fares on your measure of core retention relative to the previous districts, correct?

A That's correct.

Q And you performed no analysis of the core retention of the 2011 plan, as compared to the previous 2001 plan?

A That's correct.

Q So you determine on page 5 of your report that plaintiffs' illustrative plans to a large extent do, in fact, preserve the cores of districts under the enacted plan with the exception of one district; is that right?

A Yes.

Q I believe you testified on direct, as well, that district core retention is fairly high for six of the seven districts; is that right?

A Yes.

Q And that includes District 1, correct?

A Yes.

Q The only exception to that -- your conclusion in that regard was District 2, according to your report; is that right?

A Correct.

Q Dr. Hood, you're familiar with the *Gingles* preconditions, are you not?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 53**

920

A Yes.

Q You would agree that the first *Gingles* precondition requires Section 2 plaintiffs to actually draw a new minority-majority district where previously there was not one; is that right?

A Yes.

Q And you understand that plaintiffs here claim that the Alabama congressional plan should contain a second majority-minority district, as opposed to its current configuration, which includes only one such district?

A Correct.

Q And you understand that plaintiffs' illustrative plans propose that District 2 be transformed from a non majority-minority district into a majority-minority district, correct?

A Yes.

Q So by your own calculation in Table 1, CD 2 under the enacted plan had a BVAP of 28.26 percent, correct?

A Yes.

Q And it's fair to say that is decidedly not a majority black district?

A I think my calculation was 27.76.

Q Fair enough. 27.76?

A Yes.

Q Under your metric?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 54**

921

A Right.

Q Still not a majority-minority district, correct?

A Correct.

Q And by your calculation, at least three of plaintiffs' illustrative plans redraw CD 2 to have a BVAP of over 50 percent; is that right?

A Yes.

Q And you have performed no analysis whatsoever to determine whether it would be possible to draw an additional majority-minority district in the congressional plan while retaining a higher percentage of the core of the 2011 version of the district than plaintiffs' illustrative plans do, correct?

A I did not perform that analysis.

Q And you would agree that you can't create a second majority-minority district, as *Gingles 1* requires plaintiffs to do, without shifting a fair bit of population in that district as compared to the 2011 plan, correct?

A There would have to be quite a bit of population shifting, yes.

Q You've been involved in Section 2 cases before?

A Yes.

Q Isn't it true that you can't recall a single case in which a proposed majority-minority district has been rejected because it was considered to inadequately retain the core of the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 55**

922

enacted plan?

A I think that's a fair statement, yes.

Q And you expressed no opinion in your report about whether the African-American population is, in the 2011 plan, cracked among CDs 1, 2, and 3, do you?

A No, I don't.

Q And you express no opinion in your report about whether the African-American population is packed within CD 7 under the 2011 plan, correct?

A Correct.

Q Moving on to your analysis of population shifts.

Now, here you provide an analysis of population shifts in plaintiffs' illustrative plans relative to the 2011 plan, correct?

A Correct.

Q You provide no analysis of population shifts in the 2011 plan relative to the 2001 plan, do you?

A No.

Q So it's fair to say that the reason you performed this particular analysis comparing the illustrative plans to the 2011 plan is because if a remedy map were granted in this case, the Court would be starting from the 2011 enacted plan; is that right?

A I think that's fair. I thought that was the best comparison point.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 56**

923

Q And are you aware, Dr. Hood, that the Court has already decided that it will not be issuing a remedy plan regardless of whether the current plan violates Section 2?
A I am aware of that, yes.
10:17:49 Q So you calculate that in plaintiffs' illustrative plans a majority of the individuals that moved into District 2 are African-American, correct?
A Yes.
Q And a majority of the individuals moved out of District 2
10:18:09 are white?
A Yes. As compared to the enacted plan.
Q And District 2 is plaintiffs' proposed new majority-minority district, correct?
A Correct. When you say -- can I ask a clarification?
10:18:25 Q Oh, absolutely.
A So when you a majority-minority, are we saying majority black? Is that fair?
Q I'm using those terms interchangeably. Thank you for clarifying.
10:18:33 A Okay.
Q But is it your understanding that Mr. Cooper's illustrative plans propose that District 2 be drawn as a majority BVAP district?
A Okay. I'm -- I just wanted to make sure we had the same
10:18:55 terminology.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 57**

924

THE COURT: And she changed the terminology on you --

BY MS. KHANNA:

Q I changed it on you.

THE COURT: -- didn't she?

BY MS. KHANNA:

Q Majority-minority district in this context refers to a majority black district --

A Okay.

Q -- as far as my questions are concerned.

A Okay. That's fine.

Q And maybe you already answered this, but section -- District 2 is, in fact, that proposed majority-minority district as far as plaintiffs' maps are concerned, correct?

A Correct.

Q And, as we've already discussed, Section 2 plaintiffs are required to propose a new majority-minority district under the first *Gingles* precondition, correct?

A Correct.

Q Dr. Hood, you do not know whether it would be possible to draw a second majority-minority district without the racial pattern you observe, correct?

A Well, there are many permutations that might be possible. I was looking at the four permutations provided by the plaintiffs -- by Mr. Cooper specifically.

Q But you do not know, as you testified today or in drafting

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 58**

925

your report, whether it would be possible to draw a second majority-minority district without the racial pattern that you observe; is that right?

A I don't know definitively, because, again, there are many, many possibilities out there.

THE COURT: That wasn't your job, was it?

THE WITNESS: No, Your Honor.

BY MS. KHANNA:

Q You also don't know whether it would be possible to draw a second majority-minority district in a manner in which race and population movements are entirely unrelated; is that right?

A Again, I'll say it hypothetically could be possible.

Q But you didn't perform any such analysis here?

A No.

Q You didn't even attempt such an analysis here, correct?

A Well, I wasn't asked to do that.

Q Okay. I'm going to -- let's hypothetically assume we have a district with 100 voting age individuals.

A Okay.

Q Let's assume that 28 of those voting age individuals are black and 72 of those individuals are white. So far so good?

A Okay. I'm with you.

Q Now, that's time one. That's District 1 time one, right? Let's assume that time two, we have that same district, that district has now been redrawn, and the redrawn version has the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 59**

926

same number of voting age individuals -- still 100 -- except now 51 of those individuals are black and 49 are white.

A Okay.

Q You with me?

10:21:44 A I'm -- so far.

Q Now, let's assume that the process -- how you got from between time one and time two, let's assume the process was perfectly consistent with traditional districting principles. It's a perfect circle of a district, there was no counties split, everything at the end -- everything is as clean as it ever can possibly be in any hypothetical world. But it just so happens at the end of this process, 51 of the voting age individuals are black and 49 are white. Sound good?

A Okay.

10:22:21 Q Is there any mathematical way for this transformation from a 100-person district with 28 black voters to a 100-person district with 51 black voters to occur without having a majority of the voting age population move into the district be black?

10:22:40 MR. DAVIS: Your Honor, before he responds, I would like to object. Thank goodness my expert's a lot smarter than I am. There would be too many numbers for me to follow without there being something up on the board.

If Dr. Hood is comfortable answering, I will sit down and withdraw my objection. But this is an awful lot of numbers to

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 60**

927

try to keep in a person's head.

THE COURT: Can you answer that question?

THE WITNESS: Can you say it one more -- the question -- the question part one more time?

BY MS. KHANNA:

Q So let's assume that the districts are always 100 people?

A I'm with you.

Q You're with me on that?

A Just read the --

THE COURT: I think he may have the numbers.

BY MS. KHANNA:

Q Is there any mathematical way for this district -- for this transformation from a district with 28 black voters to a district with 51 black voters to occur without having a majority of the individuals moved into the district be black?

A Well, I would say in answer that, to some degree, there would have to be blacks citizens shifted into that hypothetical district to create a black majority. And there would have to be white citizens shifted out of that district to, again, create that black majority.

I mean, that's the way I would answer that.

Q There's no mathematical way for it to be otherwise, correct? If you are going to go from a district where 28 out of 100 black voters to a district with 51 out of 100 black voters?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 61**

928

A In terms of whose -- so are we asking -- are we at the point now where we are having to say you would have to shift in more black voters and shift out more white voters?
Q Yes.
10:24:22 A Something like that would have to occur to reach those numbers.
Q Now, you conclude in your report that race and population movement are related in plaintiffs' illustrative plans; is that right?
10:24:37 A Correct.
Q You would agree that in order to draw a majority-minority district in Alabama one is -- one would have to consider race to some extent, correct?
A Correct.
10:24:46 Q And you expressed no opinion as to whether race actually predominated in the drawing of any of the illustrative plans, correct?
A That is correct.
Q Now, in the next section of your report regarding district functionality, you expressed concern about whether plaintiffs' 10:25:11 proposed majority-minority districts will actually provide African-Americans the opportunity to elect their preferred candidates, correct?
A That's fair.
10:25:26 Q And you've heard the term functional analysis before as it

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 62**

929

applies to majority-minority districts?

A Yes.

Q And a functional analysis determines whether a hypothetical district could function as a minority opportunity to elect district if it were put into place; is that right?

A That's the idea behind it, yes.

Q So if a district could, in fact, function as a minority opportunity district, then that means, while there's no guarantee that it's possible, that the minority group in the district that comprises the majority would be able to elect their candidate of choice?

A There's no guarantee. It's a hypothetical.

Q It's an opportunity is what it is, correct?

A Right. But the functional part is a hypothetical.

Q It's a hypothetical -- a functional analysis is, in fact, an actual analysis that experts can perform to help answer this question of what the opportunity to elect would be?

A Well, I'm not saying that the analysis is hypothetical. I'm saying it's based on a hypothetical set of circumstances.

Q Because nobody can look in the future and tell you exactly what will happen in the next election, right?

A Exactly. That's what I am saying.

Q And you did not perform any functional analysis of any of the illustrative districts in Mr. Cooper plan, correct?

A Correct.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 63**

930

Q So what you did do in on page 11 of your report is analyze voter turnout statewide in Alabama; is that right?
A Correct.
Q And you say that you did this to draw some inferences about the functionality of plaintiffs' illustrative districts, correct?
A Correct.
Q So you note that the implication of your statewide look at voter turnout is that a bare voting age majority of a racial group may not be able to actually function as such electorally speaking. Did I read that correctly?
A Yes.
Q You never actually examined turnout in plaintiffs' illustrative districts, do you?
A No.
Q You just look at the state as a whole?
A That's correct.
Q And you look at the percentage of each racial group's registered voters who turned out, correct?
A That is how turnout is measured, yes.
Q You did not look at each racial group's percentage of the voters who turned out as a whole?
A No.
Q So you note on Table 7 that five of the six elections this decade -- for five of those six elections that you analyzed,

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 64**

white registrants turned out in higher proportions than black registrants; is that right?
A Yes.
Q By an average of around 5 percent?
10:28:10 A Yeah. 4.8. Yes.
Q There was one election for which that was not true, correct?
A That is correct.
Q That was the 2012 presidential election?
10:28:19 A Yes.
Q In which black turnout was .9 percentage points higher than white turnout?
A That is correct.
Q So in that instance, not only was the margin between white
10:28:32 and black voting narrowed, it was flipped?
A That's correct.
Q And that was the presidential election between Presidential Obama and Mitt Romney; is that right?
A Correct.
10:28:42 Q You would agree that it's possible that having a viable black candidate on the ballot would, in fact, drive higher black turnout?
A Certainly possible, yes.
Q You would agree there are many factors that can affect
10:28:55 turnout rates in given district in a given election, correct?

932

A There are a multitude of factors that affect turnout.

Q That would include enthusiasm for the election, correct?

A Correct.

Q And it would include the possibility that one's preferred candidate might actually have a chance at winning, correct?

A The perception of that, yes.

Q Now, at the beginning of this section of your report, you note that none of plaintiffs' experts have produced any analysis to determine if these illustrative districts could, indeed, function as black opportunity to elect districts. Do you see that?

A Right.

Q And you are aware that subsequently Dr. Palmer in his reply report did provide such an analysis; is that right?

A Correct.

Q And Dr. Palmer calculated black turnout as a percentage of total turnout in plaintiffs' illustrative Districts 2 and 7; is that right?

A From what I remember, yes.

Q And he also measured the racial breakdown of the actual voters in the 2018 election in plaintiffs' illustrative Districts 2 and 7. Do you recall that?

A Yes.

Q You would agree the issue you raised earlier in your report regarding how to determine who gets counted as black

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 66**

933

does not apply to any of Dr. Palmer's analyses, correct?
A Right. I believe he is using black as defined by those who check the box "black" on the voter registration form.
Q And you don't have any qualms with Dr. Palmer's calculations in his functionality analysis, correct?
A No.
Q You would agree that Dr. Palmer's analysis and his rebuttal report shows that the African-American preferred candidates are winning and would win in both Districts 2 and 7 in all the illustrative plans, correct?
A According to his calculations, yes.
Q And you would agree that, based on what he's reported in his rebuttal report, Dr. Palmer's analysis shows that Districts 2 and 7 in the illustrative plans would function as African-American opportunity districts, correct?
A According to his calculations, yes.
Q Now, on page 14 of your report, you discuss -- you have a section entitled Black Voting Patterns that you also discussed with counsel on direct, correct?
A Correct.
Q And, basically, what you do here is you examine survey data to see the levels at which African-Americans vote for the Democratic party both inside and outside of Alabama?
A That's correct.
Q And you agree, based on your findings here, that

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 67**

934

African-Americans in Alabama vote cohesively, correct?

A Yes.

Q And you provide no analysis of the extent of white crossover voting in any of these jurisdictions, correct?

10:31:38 A That's not what I was asked to do.

Q You would agree --

A But the answer is, yes, I didn't.

Q You would agree that the extent to which white voters vote for or against minority preferred candidates likely varies across all of the jurisdictions that you looked at?

10:31:50

A There's variance, yes.

Q In many cases significance variance?

A Well, I didn't perform that analysis.

Q You didn't look at white crossover voting at all?

10:32:02 A That is correct.

THE COURT: Would this be an okay time for a break, or are you almost finished?

MS. KHANNA: I can finish with this section on black voting patterns and then maybe take a break, if that's all right.

10:32:20

THE COURT: Okay.

MS. KHANNA: Actually, no, I apologize, Your Honor. I think now we can take a break. Thank you.

THE COURT: Okay. We will come back at 10:50.

10:32:29 (Recess.)

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 68**

935

THE COURT: You may continue with cross.

MS. KHANNA: Thank you, Your Honor.

BY MS. KHANNA:

Q Dr. Hood, before the break, we were talking about the section of your report entitled Black Voting Patterns, correct?

A Correct.

Q And you conclude in the section that African-American voters both inside and outside of Alabama have almost monolithic voting patterns; is that correct?

A Yes.

Q You offer no opinion based on this analysis as to why these voting patterns exist, do you?

A No.

Q Dr. Hood, as a political scientist, wouldn't you agree that groups tend to vote for candidates that they perceive to be protective of their interests?

A I think that's certainly a part of it, yes.

Q In fact, there's research that suggests that African-Americans tend to vote for Democratic party candidates because they perceive that party to be aligned with their interests, correct?

A Yes.

Q And white voters similarly tend to vote for candidates they believe to be protective of their interests, correct?

A I think that's part of the calculus.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 69**

936

Q And, in fact, research has shown that there was an association between resentment of minority races and voting for President Trump; is that correct?

A Yes.

10:55:12 I mean, now, if we want to go off into that area, we can. Racial resentment's a pretty complicated construct. What you're saying is correct.

I've also seen people that have high racial resentment scores be more than apt to vote for black conservative

10:55:29 candidates. So it can cut both ways. In fact, my own research says that.

Q Speaking of your own research, on page 2 of your report, you state you are an expert in American politics, specifically in the area of electoral politics, racial politics, election

10:55:48 administration, and southern politics; is that right?

A Yes.

Q And one of the articles listed in your CV, I believe it's on page 51 of Defendant's Exhibit 11, but we don't have to call it up.

10:56:09 It's called "Black mobilization and Republican growth in the south. The more things change, the more they stay the same." Do you recall that article?

A Okay. What page on my vitae is it on, if you can tell me that?

10:56:40 THE COURT: Are you referring to his CV?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 70**

937

MS. KHANNA: Yes, Your Honor. I'm just trying to find the right page.

Q Looks like it's on page 10 -- Roman numeral X at the very top of your CV.

10:57:11 A Okay.

Q Do you recall that article?

A That's a conference paper.

Q It's a conference paper that you wrote?

A Yes.

10:57:16 Q And is it fair to say that in that paper you discuss partisan change in the south after enactment of the Voting Rights Act?

A Well, I would really refer to the book I wrote rather than a conference paper -- on the same topic.

10:57:30 Q But are there any opinions in that conference paper that you don't stand by today?

A I wouldn't say that, but I haven't looked at that conference paper in eons.

Q Okay.

10:57:42 THE COURT: When was that paper presented, for the record?

THE WITNESS: Was it presented at a conference?

THE COURT: When?

THE WITNESS: Oh, when? 2010 is what it says, Your

10:57:52 Honor.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 71**

938

THE COURT: Thank you. And was that kind of an excerpt out of a book you had written?

THE WITNESS: Well, that work grew into a book.

THE COURT: Grew into a book, okay. What is the book?

10:58:05 THE WITNESS: So the book is listed -- it should be on the first page of my vitae. *The Rational Southerner.*

BY MS. KHANNA:

Q Dr. Hood, in the course of both the article and the book, you discuss partisan change in the south after enactment of the Voting Rights Act; is that correct?

10:58:27

A I certainly do.

Q And you specifically discuss the partisan realignment that happened in the south among black and white voters after the Voting Rights Act, correct?

10:58:36 A That is correct.

Q Isn't it correct that once African-Americans were re-enfranchised in the mid-1960s due to the Voting Rights Act, African-American southerners fairly quickly realigned to the Democratic party in the south?

10:58:51 A I think that's almost a quote from me.

Q It is, in fact, a quote.

A Okay. I'm glad I'm not going crazy.

Q No. You're paying attention.

They were an almost uniformly Democratic electorate from the time they were re-enfranchised, correct?

10:59:04

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 72**

939

A From what my research shows, yes.
Q Prior to that realignment, white southerners had overwhelmingly preferred or voted for the Democratic party; is that right?
10:59:15 A In the south, yes. Now, again, there was only one party --
Q And you --
A -- the Democratic party.
Q That's right. Before that time.
10:59:24 A Correct.
Q And you observe in your research that after the Voting Rights Act white southerners subsequently realigned to affiliate with the Republican party; is that right?
A A very slow secular -- when I say the word "secular," I mean slow overtime change. I'm not talking about religion there.
A very slow secular realignment began in the mid-1960s among white southerners, yes.
Q And you also observe in your research that this realignment is primarily a function of racial and political dynamics, is that correct?
A Yes.
Q And that is the story from 1960s through today; is that right?
11:00:01 A I think we went through 2008.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 73**

940

Q So you would agree that prior to the Voting Rights Act of 1965, many African-Americans couldn't participate in elections, period, right?
A In the south, yes.
11:00:15 Q They were disenfranchised?
A That's correct.
Q And you observed in your article that the transformation we just discussed was in part due to the Voting Rights Act, correct?
11:00:23 A Certainly, yes.
Q Specifically, your research states that the increasingly liberal orientation of the National Democratic Party on the issue of Civil Rights affected white southerners, correct?
A Correct.
11:00:37 Q And you also state that, in fact, the VRA was a milestone in the development of the Republican party in the south; is that correct?
A Correct.
Q There was also a transition at the national level at this 11:00:54 time where the Democratic party became more liberal on the issue of civil rights for African-Americans, and the Republican party became more conservative on that same issue during that time; is that correct?
A That's correct.
11:01:09 Q Specifically, the Republican party was increasingly viewed

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 74**

941

as the party of racial conservatism; is that correct?
A Yes.
Q Black mobilization led directly to the transition of whites in the Republican party -- into the Republican party in the south; is that correct?
A That's what our research finds, yes.
Q And your research also finds that Republican party growth also resulted in black mobilization; is that correct?
A In the deep south. It's countercyclical. Not in the rim south.
Q In fact, President Johnson said after the passage of the 1964 Civil Rights Act, that the Democratic party had lost the south for a generation; is that right?
A I believe that's correct. I don't -- I don't know that we quote that in the book.
Q Okay. And you would agree that that has -- seems to have come to fruition?
A Seems to, yes.
THE COURT: Is there any particular part of the Voting Rights Act that seems to have more of an effect than another?
THE WITNESS: Well, I would say we're not really imputing motives necessarily in terms of why someone decides to join one party or the other.
I mean, what the Voting Rights Act did, though, was to re-enfranchise African-Americans in the south. So now there's

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 75**

942

a new political power block, and that's what started this change, if that makes -- that makes sense.

THE COURT: Okay. Thank you.

THE WITNESS: Literally the mobilization of African-Americans into the electorate.

THE COURT: Uh-huh.

THE WITNESS: So...

BY MS. KHANNA:

Q Dr. Hood, the final section of your report is entitled Racial Comparisons. And you testified about that section on direct; is that right?

A Yes.

Q And you note on page 17 of your report, The key question being examined is not whether disparity rates in Alabama are higher or lower than the comparison states, but whether the same pattern of black and white disparities also exists in other states. Did I read that correctly?

A Yes.

Q This key question as you put it, that was a question posed to you by counsel for the defendant, correct?

A The defendant -- counsel for the defendant asked me to analyze this question, yes.

Q You would agree that, based on your understanding of Section 2, that is not the key question under Section 2; is that correct?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 76**

943

A Correct.

THE COURT: Was that the key question of your entire report?

THE WITNESS: No, Your Honor; just this section.

11:03:53 THE COURT: Thank you.

BY MS. KHANNA:

Q In fact, as of the time that you wrote your report, you didn't know what relevance this question had to the Section 2 case; is that right?

11:04:03 A Again, I answered this question because I was asked to answer the question.

Q You did not know the relevance to Section 2 at the time you wrote your report?

A Well, I'm aware of the Senate factors and such. Again, I 11:04:17 was asked to answer this question, and I did.

Q When you were asked about, well, how is this relevant to Section 2 during your deposition, you did not know; is that correct?

A I believe so, yes.

11:04:28 MR. DAVIS: Your Honor, we haven't designated Dr. Hood as an expert on the law or Section 2 requirements.

THE COURT: I understand.

BY MS. KHANNA:

Q Dr. Hood, you mentioned earlier that you have been 11:04:41 involved in Section 2 cases before; is that correct?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 77**

944

A Yes.

Q You've never provided an analysis -- of similar to this racial comparison's analysis in any other expert report you have written in any other Section 2 case; is that right?

11:04:55 A That's correct.

Q You would agree that there is, in fact, a significant racial disparity in the socioeconomic indicators you looked at in Alabama, including education, employment, and health; is that right?

11:05:09 A Yes.

Q You'd also agree that the fact that racial disparities may exist in one state does not mean that the racial disparities present in Alabama do not impact the ability by African-Americans to participate in the electoral process; is 11:05:25 that correct?

A That's correct.

Q Regardless of whether those disparities exist in other states, it does not suggest that the racial disparities in Alabama don't impact the opportunity to elect for 11:05:41 African-Americans; is that correct?

A Correct.

Q Dr. Hood, on page 2 of your report you list all of the cases in which you offered expert testimony during the past four years; is that right?

11:05:57 A Yes.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 78**

Q And one of those cases you list is the *Bethune Hill vs Virginia State Board of Elections* case, correct?
A Correct.
Q And isn't it right that the court rejected your analysis in that case as vague and unsubstantiated?
A I will certainly let the Court's opinion speak for itself.
Q You do recall that, though, correct?
A Something like that.
Q You also list the *Northeast Ohio Coalition vs. Husted*, correct?
A Correct.
Q And isn't it a fact that the Court in that case found your testimony, in large part, irrelevant to the issues before the Court, and also reflected methodological errors that undermined your conclusions? Do you recall that?
A If you're representing that's what the Court said, then yes.
Q You also listed *V.C. vs. Perry*, correct?
A Correct.
Q And in that case, the Court found your testimony also had significant methodological oversights, correct?
A Actually, I don't think it's listed here, but I did testify in that trial.
Q Now, you've testified in other cases other than those listed on page 2; is that right?

946

A Right. This is the last four years.

Q Okay. You testified in a case called *Common Cause vs. Billups*. Do you recall that?

A Yes. Yes.

11:07:14 Q And your testimony was, in fact -- you were excluded from testifying as an expert in that case because the Court deemed your method as not reliable; is that right?

MR. DAVIS: Your Honor, I object. I know it's fine to play gotcha with another witness. But the sides have 11:07:33 stipulated to each other's expertise. He's already in as an expert.

MS. KHANNA: Your Honor, I'm not questioning whether or not he should be excluded under *Daubert*, but I do believe that his history, including the testimony that he says is 11:07:42 relevant to his expertise in this case, does go to the weight and credibility that this Court should afford the expert.

THE COURT: I think I am capable of making that decision.

MS. KHANNA: Thank you, Your Honor.

11:07:55 Thank you, Dr. Hood.

THE WITNESS: Thank you.

MS. KHANNA: No further questions.

THE COURT: Any redirect, Mr. Davis?

MR. DAVIS: Yes, Your Honor.

11:08:02 REDIRECT EXAMINATION

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 80**

947

BY MR. DAVIS:

Q Dr. Hood, when you're retained as an expert, do you just show up and submit a report on any topic you want, or do you wait for guidance from the attorneys who hire you?

11:08:33 A I usually wait to see what they want me to look into.

Q So if a court did find something irrelevant, that's probably -- you're just submitting a report on what you were asked to address, correct?

A Correct.

11:08:44 Q You've been around a lot of redistricting cases, is it fair to say?

A Some, yes.

Q Some. In your experience, do they often involve a lot of districts, and a lot of maps, and a lot of reports, and a lot

11:09:15 of charts?

A I'd say too many.

Q I would, too.

Would it be surprising to you if, in fact, there were sometimes inconsistencies in the way the same party measured

11:09:33 demographics? They might in this chart cite to one category, in this cite to another?

A That can happen, yeah.

Q What I've put on the screen, Dr. Hood, is Table 3 from Dr. Max Palmer's report.

11:09:54 MR. DAVIS: Your Honor, since I brought up this page,

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 81**

948

I don't recall the exhibit number for that.

THE COURT: Uh-oh. We need to have the exhibit number.

MS. KHANNA: Plaintiffs' Exhibit 79.

11:10:05 MR. DAVIS: Plaintiffs' Exhibit 79.

THE COURT: Thank you. Plaintiffs' Exhibit 79. And this is Table 3. Do we know what page it might be on?

MR. DAVIS: It is page 19 of his report, Your Honor.

THE COURT: Okay. Thank you.

11:10:17 BY MR. DAVIS:

Q This is one of the tables that you were asked about, Dr. Hood. You see the reported for different elections, the percentage voting for black candidate of choice, a black, white, and other, correct?

11:10:34 A Correct.

Q Okay. If a person identifies as Native American, which category would they appear on?

A I'm assuming they're going in the other category here.

Q And Hispanic?

11:10:44 A Other.

Q And Asian?

A Other.

Q And someone who doesn't check anything because they don't think it's anybody's business?

11:10:50 A Other.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 82**

949

Q So can you look at this other category and conclude that one of these racial categories votes a particular way?
A Not necessarily.
Q You -- and it's not your fault, Dr. Hood, if the state back in 2011 included the wrong version of the guidelines in their preclearance submission.
Were you aware that Senator -- former Senator Gerald Dial testified in this trial that even though the new guidelines may not include the words preserve core of districts, that, in fact, the language does reflect that philosophy?
A Yes.
Q I want to put this on the screen first. This is Exhibit D-1, Dr. Hood.
THE COURT: Defendant's Exhibit 1, page...
MR. DAVIS: Defendant's Exhibit 1 -- it's a ten-page -- and the version I have does not have the page numbers.
But this particular map is a 2000 --
THE COURT: Can you pull it down so we can see how it's identified at the top? Okay.
MR. DAVIS: It's the 2011 districts.
THE COURT: Okay.
MR. DAVIS: And what I am going to hand --
THE COURT: For the record, that is 3017.
MR. DAVIS: Thank you. And I'm going to hand Dr. Hood, with Your Honor's permission, the similar maps for

**Christina K. Decker, RMR, CRR**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 83**

950

the 2002 districts, the 1992 districts.

THE COURT: Are these all from Exhibit 1?

MR. DAVIS: All from Defendant's Exhibit 1.

MS. KHANNA: And, Your Honor --

11:12:39 THE COURT: And with your permission, I will try to make sure we have the page numbers referenced as he discusses each one.

MR. DAVIS: Thank you.

THE COURT: Okay.

11:12:47 MS. KHANNA: Your Honor, I would just object because it's beyond the scope of his report. At no time did Dr. Hood ever consider this in -- his expert analysis in his report.

THE COURT: You questioned him about whether he did. So I think having raised some question about the completeness 11:13:10 of his report because he didn't, that he should be allowed to at least respond to that.

MS. KHANNA: Yes, Your Honor.

THE COURT: I assume that's --

MR. DAVIS: Your Honor, this is the question I would 11:13:23 like to ask him. He was asked by plaintiffs' counsel if Alabama seemed to have abandoned the traditional district principle of preserving the core of districts since -- if there was some problem with that.

I'd like him to look at a few plans and to see if it 11:13:40 appears, just from the shape of the districts, if in his

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 84**

951

opinion, Alabama has disregarded the traditional districting principle of reserving the core of districts.

THE COURT: Okay.

MR. DAVIS: So I have been helpfully handed a better version that includes page numbers.

THE COURT: Good. Thank you.

MR. DAVIS: Defendant's Exhibit 1, 2011 congressional districts, Chestnut Defense 3017; 2002 congressional districts, 3018; '92 congressional districts, 3019; 1980 districts, 3019.1; and 1970 districts, 3020.

And may I hand these to the witness, Your Honor?

THE COURT: You may.

BY MR. DAVIS:

Q And, Dr. Hood, as you look at these districts going back to the '70s, do you have an opinion as to whether Alabama appears to care about the traditional districting principles of preserving the core of districts?

A Well, again, population has to be equalized across redistricting cycles. That's the chief goal always.

But with that in mind, looking at these districts from 1970 to 2011, they're fairly remarkable in the sense that they have, for the most part, stayed in the same place. Of course, the boundaries are shifting some. But they look remarkably similar.

Q They have to shift some, do they not?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 85**

952

A Certainly. I mean, you have to equalize population.
Q So does the pattern seem the hold, even going from the 2000 cycle to the 2010 cycle?
A Well, yes. There's a lot of geographic congruity between those two.
Q Thank you.
Now, you did not replicate or test Dr. Palmer's polarized voting analysis, did you?
A Correct.
Q You weren't asked to?
A Correct.
Q And when Dr. Palmer says that African-American voting appears -- that African-Americans appear to vote cohesively in Alabama, your own research suggests the same, does it not?
A Correct.
Q You were asked if a history of -- a shared history of discrimination is a factor that may lead to African-American vote cohesiveness, correct?
A Correct.
Q Aren't there a lot of issues that lead to a voter supporting a particular political party?
A There can be quite a few, yes.
Q Now, your research that showed ties to the Voting Rights Act, does that tell us why any voter today supports the Democratic or the Republican party?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 86**

11:17:38 11:17:54 11:18:09 11:18:32 11:18:47

A Not necessarily.
Q Okay.
A Again, that goes back 50 years now.
Q Right. Some of us -- some voters weren't alive at the time or weren't voting at the time the Voting Rights Act was passed, were they?
A Some voters literally weren't alive either.
Q Have you seen research that suggests that religion and matters of faith may drive political choices in some circumstances?
A Yes. I mean, there was another realignment among white southerners in the late '70s, early '80s, along religious lines. So that's another component. Economic issues, as well. Foreign policy.
So there are a lot of things that can figure into the calculus of which party to support or not support.
Q And you were asked if groups -- if African-Americans vote as a group or who is perceived to be in their interests. Actually, groups don't vote, do they? Individuals vote.
A Right.
Q And as a social scientist, can you say that any individual or collection of individuals are voting the way they do today because of the passage of the Voting Rights Act?
A I think that would be a difficult causal inference to draw.

954

Q And you said that your research didn't address motives at all?

A We do not look at motives, no, just what happens.

Q Are you familiar with the language that's often used dividing states into red states, blue states, and purple states?

A Yes.

Q What do they mean?

A Well, typically what they're talking -- I can't remember what election cycle this grew out of. But some media group adopted this. So a red state would be a Republican state, a blue state a Democratic state, and a purple state sort of a swing state, a battleground state.

Q What's Alabama?

A I would say it's red.

Q A lot of --

A Maybe here I would say crimson.

THE COURT: You're right. He is so right. Thank you.

I have wondered why all along Alabama wasn't designated as a crimson state instead of a red one, but I guess there are some folks that like the blue and orange that might argue with that.

Sorry. I haven't said much today. I had to perk up a little bit here.

BY MR. DAVIS:

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 88**

11:20:08
11:20:28
11:20:46
11:21:15
11:21:46

Q Would you agree that a lot of voters in Alabama, like other southern states, are fairly conservative in their political philosophy?
A Certainly white voters are, yes.
Q And would you agree that a voter's views on issues, a variety of issues and not just those related to race, can lead a person to support a particular political party?
A Certainly. In the current party alignment, of course, the Republican party is the home for conservatives, and the Democratic party is the home for liberal adherence, so...
Q And, of course, you're not casting judgment on anyone's choice of which party to support, are you?
A No.
Q Would you agree that the major political parties are more polarized today than they were in previous decades?
A Well, from political science research, yes, certainly so.
Q Is that only on issues related to race?
A No. It's all issues essentially.
Q Have you seen any evidence in this case from the charts the way Alabama reported districts, that Alabama uses the any-part black category routinely?
A I haven't seen evidence of that, no.
Q Would you agree, Dr. Hood -- well, let's take a hypothetical district. And I'm not going to cite numbers because I can't keep up in my head.

956

11:22:06

But let's say Alabama drew a congressional district, and it turned out to be close to 50 percent African-American. And then it could, by switching one county for another, result in a district that was over 50 percent African-American. In that event, Alabama might be able to switch from a one majority-minority district plan to a two majority-minority district plan without major shifts in population. Would you agree with that?

A Probably so under that hypothetical scenario.

11:22:22

Q Okay. Did your analysis show that, at least in this case, going from one majority black district to two would require some pretty major restructuring in the southern half of the state?

A Yes.

11:22:39

Q It would require putting entirely different areas of the state together that haven't traditionally been put in the districts?

A Right. The districts geographically would like quite a bit different, especially in the southern part of the state.

11:23:08

MR. DAVIS: May I have a moment, Judge?

THE COURT: Certainly.

MR. DAVIS: That's all, Your Honor.

Thank you, Dr. Hood.

THE WITNESS: Thank you.

11:23:18

THE COURT: Any recross?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 90**

957

MS. KHANNA: One moment, Your Honor. Briefly, Your Honor.

RECROSS-EXAMINATION

BY MS. KHANNA:

Q Dr. Hood, I believe you testified on redirect that a lot of issues -- there are a lot of issues that lead to a voter supporting a political party; is that correct?

A There could be more than one, yes.

Q Based on your research, can you say that race is not one of them?

A No, certainly not.

Q And, in fact, in the book that you discussed when we talked earlier, you state, We argue that a complete understanding of southern party politics requires a full appreciation for the role that race has played and continues to play in the region; is that correct?

A Yes.

MS. KHANNA: Thank you, Dr. Hood.

THE WITNESS: Thank you.

FURTHER REDIRECT EXAMINATION

BY MR. DAVIS:

Q And in that statement, were you assessing what it took to understand southern history over time, or how to address the reason a particular voter votes the way they do today?

A That was a historical analysis.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 91**

958

MR. DAVIS: Thank you.

THE COURT: Anything else?

MS. KHANNA: No, Your Honor. Thank you.

THE COURT: All right. Thank you.

11:24:46 Thank you, Dr. Hood. You may step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: Do you want to start on your next witness now, or do you want to break for lunch early and then come back and start? I'm at y'all's mercy today.

11:25:02 MR. WALKER: I'd be just as happy to break so that he can be presented in one go, if that suits Your Honor.

THE COURT: That suits me fine. So we'll come back at 12:30.

(Recess.)

12:33:36 THE COURT: You may be seated and you may call your next witness.

MR. WALKER: Your Honor, I am going to use with this witness some larger pictures that are more clear of what he has in his report, and I would like to give you a copy of it.

12:34:01 THE COURT: Okay. Thank you.

DOUGLAS JOHNSON,

having been first duly sworn by the courtroom deputy clerk, was examined and testified as follows:

THE COURTROOM DEPUTY CLERK: Please state your name

12:34:13 for the record.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 92**

959

THE WITNESS: Douglas Mark Johnson.

THE COURTROOM DEPUTY CLERK: And spell your first and last names for the record.

THE WITNESS: D-O-U-G-L-A-S; and J-O-H-N-S-O-N.

12:34:40 DIRECT EXAMINATION

BY MR. WALKER:

Q Good afternoon. It's Dr. Douglas Johnson, is it not?

A Yes.

Q Okay. And I've got -- I placed in front of you a copy of 12:34:50 Defendant's Exhibit 13, which is a copy of your report. Would you look at that, please?

A Yes.

Q Okay. And please turn to paragraphs 2 through 9, and I'll ask you: Are those the -- your qualifications to testify as a 12:35:10 political scientist and your experience as a political scientist?

A Yes.

Q Okay.

MR. WALKER: Your Honor, the parties have stipulated 12:35:19 that the experts in this case are qualified to testify to the matters in their reports, and so I tender Dr. Johnson.

MS. KHANNA: No objection.

THE COURT: He's received as an expert.

BY MR. WALKER:

12:35:32 Q Look at paragraph 11, please, and tell the Court what you

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 93**

were asked to do in this report, please.

A I was asked to review Mr. Cooper's work and to show my opinions of them; in particular, looking at whether the illustrative maps follow traditional redistricting principles or whether race predominated in the drawing of those maps.

Q You used the term "traditional redistricting principles," and I, by habit, may sometimes lapse into the term I use, which is "traditional redistricting criteria."

But can we understand that we're referring to the same thing by those two terms?

A Yes.

Q Okay. Thank you.

Dr. Johnson, there's been a lot of testimony throughout this trial about whether it's appropriate to use -- which measure of the black population is appropriate to use when drawing single-member districts such as Mr. Cooper has done. And one is single-race black, and the other is any-part black.

And would you explain to the Court, please, the differences between those and which one is appropriate to use when you're drawing single-member districts such as Dr. Cooper has done? And you may wish to refer to paragraphs 11 and 12 of your report for that purpose.

THE COURT: And just for clarification, the report has two paragraph 11s, I believe.

MR. WALKER: It does have two paragraph 11s. And this

961

would be the paragraph 11 -- thank you, Your Honor -- after Roman Numeral III, Opinions and Analysis.

THE WITNESS: So the challenge is that the census allows people to choose multiple categories. It started with introduction of the Hispanic ethnicity question, and then a separate race question.

And then starting with the 2000 census, the Census Bureau now allows people to mark in the decennial census as many ethnic and racial categories as they want.

BY MR. WALKER:

Q For example?

A For example, they can mark Hispanic, black, African-American, Asian American, white, as many of those as they self-identify as being a part of.

Q How many of them are there?

A Well, when the -- all the different combinations come together, the Census Bureau reports a data for each individual combination. And there are 255 possible racial categories that the census tabulates.

And, of course, 255 or so is, you know, far too many to be useful in any kind of analysis. If you're breaking out, you know, voting cohesion studies, or anything like that, 255 fields would be useless.

Q Yeah.

A So what people debate, what economics debate is whether to

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 95**

962

look -- what grouping of those to put together.

If you go with the any-part black, it counts as black, as Mr. Cooper tends to focus on, although he uses different measures, as well, in his report. But if anyone marks any black or African-American category, regardless of what else they put, do you count them? Or do you only count what we call the single-race black where they only mark black, and we just focus on those.

So when the Census Bureau decided to -- was directed by Congress to allow people to choose multiple categories, the Department of Justice got together with the Office of Management and Budget and put out guidelines for the purpose of redistricting. And, technically, it's mainly focused on the jurisdictions that were preclearance jurisdictions back then, but, of course, it became guidelines for everyone because everyone's covered by Section 2.

They put out guidelines saying how to group these different groups. And they said the primary way to look at them is -- it's controversial. It was fought over, but their guidance was if someone marks Hispanic, you count them as Hispanic. It doesn't matter what else they mark. They go down as Hispanic. And for the primary groupings, you would ignore anything else they would mark.

If someone marks white in one of the other categories other than Hispanic, then they are counted as that other

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 96**

963

category -- African-American, Asian American, whatever it is. And the white is ignored.

12:40:17 If they mark African-American and Asian American, or any other combination of non-white non-Hispanic groups, then they go into a multi-race category.

So once you follow those different guidelines, you end up with the groupings listed on page 5 that -- so we're taking those -- the giant pool of categories and narrowed it down to eight essentially useful categories.

12:40:37 They also gave guidance saying kind of secondarily that they will -- you know, where they find it relevant, they will also look at single-race or any-part black, and they kept the door open to that. But this is their primary data, which was also reflected when Department of Justice went to the Census 12:40:59 Bureau and said, We need citizen voting age population data broken down by a census block group.

So the Census Bureau releases the citizens voting age data by a tract, which are units that roughly have about 4,000 people in them. So they're not very small. There are big 12:41:18 neighborhoods.

And the Department of Justice -- oh, and when people like me ask the bureau to give us more detailed data, the bureau said, no, it's not statistically reliable at smaller geographies. We can't put out that data.

12:41:31 When people like me asked, they said, no. When the

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 97**

964

Department of Justice asks, they do it. And so they did put it out at the block group level.

And in that case, they only followed the primary method. You can't get single-race black data that includes Hispanics in the citizen voting age special tabulations from the Department of Justice. It only has non-Hispanic black and non-Hispanic black and African-American combined.

12:41:41

Q For the CVAP?

A For the CVAP, yes.

12:42:02

So it's both the primary focus and their guidance, and the only data available in the Department of Justice's citizen voting age population.

And I went to -- and I spoke at multiple conferences of the National Conference of State Legislatures where DOJ would be there, and the Census Bureau would be there. And we would have these debates in 2010 and going into early 2011. And the DOJ was very clear about their primary guidance.

12:42:17

THE COURT: Okay. So just to make sure I am clear on the DOJ's primary guidance. It is what?

12:42:34

THE WITNESS: It is --

BY MR. WALKER:

Q Dr. Johnson, look at the eight categories.

A Right.

Q And please let the Court which one is the correct category.

12:42:42

**Christina K. Decker, RMR, CRR**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 98**

965

A Yeah. So in -- for the focus here where we're looking at black or African-American in these districts, the DOJ guidance would be non-Hispanic black, plus non-Hispanic black and white. So very close to single-race black non-Hispanic with a -- the people who marked black and white also included in there.

12:43:02

THE COURT: Okay. So --

THE WITNESS: So single race is the closest.

THE COURT: So you're looking at these eight categories that are in paragraph -- second paragraph 11, and it's on page 5 of your report; is that right?

12:43:18

THE WITNESS: Correct.

THE COURT: Okay. And so the category to use in determining the African-American/black population is non-Hispanic black plus non-Hispanic black and white?

12:43:40

THE WITNESS: Correct. Yeah.

In the Maptitude data that Mr. Cooper and I both use, or the software that we use for mapping, the company actually processes the census data for all their clients, and they actually call this category DOJ black.

12:43:56

THE COURT: DOJ black. Okay.

What is CVAP? I missed that.

THE WITNESS: It's citizen voting age population.

THE COURT: Okay. All right. I got that.

THE WITNESS: Yeah.

12:44:06

THE COURT: I'm sorry.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 99**

966

THE WITNESS: It's not as prominent in this case as it generally is. I suspect given the growth of the Latino population in the next round of redistricting, it will be much more prominent.

12:44:17 BY MR. WALKER:

Q That's prominent in California where you do a lot of work, I suppose?

A Yes. Anywhere that has large non-citizen populations, that tends to be more of the focus.

12:44:26 Q Dr. Johnson, looking at the list of the eight categories in the second paragraph 11 on page 5, which category did Mr. Cooper use to populate his districts?

A The numbers he reports are not in this list. He used the all-part or -- I'm sorry -- any-part black. So if someone 12:44:47 marked black and anything else, he counted them when he compiled his data for the illustrative maps.

And he talks about his view, that's the historic way and could very well be true. I haven't looked back.

But as his data points out, 20 years ago in 1990, even in 12:45:04 2000, the number of Hispanics and Asian Americans in the state was really small. So that difference between any-part black and the single-race black was probably minuscule.

Now, of course, as Mr. Cooper himself puts out in the data, the Latino population has grown very fast. The Asian 12:45:27 population has grown. And now we see it in the two reports.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 100**

967

The margins on these illustrative districts are so narrow that those few people who mark African-American and Asian American, or African-American and white, they make the difference by whether or not you cross that 50 percent threshold.

Q Well, let me ask you about that. And I will represent to you that I am showing you a chart --

MR. WALKER: Your Honor, this is a chart from Document 102, page 8. It happens to be --

THE COURT: Plaintiffs' or defendant's?

MR. WALKER: It's the plaintiffs' pretrial brief. The reason I'm using it is I came with my own charts, but Mr. Cooper had made some adjustments that didn't get carried over to my charts. So there were minor adjustments, and we didn't contest them. But there is a correct chart. So I'm using it for that purpose.

THE COURT: Wait. This is from plaintiffs' brief?

MR. WALKER: Yes, ma'am.

THE COURT: Okay.

MR. WALKER: I'm just using the chart.

THE COURT: For the record, do we know the CMECF document number?

MR. WALKER: 102.

THE COURT: Okay. All right. Thank you. Just wanted to make sure we've got it straight.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 101**

968

And whose chart is that? And where did it come from?

MR WALKER: They've cited it to some of their exhibits there just below the chart, Your Honor.

THE COURT: Okay.

12:47:01 MR. WALKER: And we don't contest these numbers.

THE COURT: All right.

MR. WALKER: Except that we do, but for different reasons.

THE COURT: Okay.

12:47:20 BY MR. WALKER:

Q Dr. Johnson, if you'd look at the chart, and tell me if Mr. Cooper had used what you said Maptitude refers to as DOJ black, would all of Mr. Cooper's plans have two majority black districts? And you may want to look at your paragraph 14 of

12:47:44 your report.

A No, they would not.

Q What would happen?

A Revised Plans 3 and 4 drop below -- it's weird to see your hand up here next to me.

12:48:02 Q Oh, I'm sorry. Go ahead.

A So the Revised Plans 3 and 4 would no longer have a second majority black district.

Q So explain that with regard to each plan, please.

A So I have the numbers here. So in paragraph 14, I talk

12:48:18 about -- that's on page 6 of my report -- the voting age

Christina K. Decker, RMR, CRR
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

Caster Plaintiffs' Exhibit 87, Page 102

969

population in District 7 of Illustrative Plan 3.

So we're here on the chart he's reporting 50.34 percent. It drops down to 49.9. And the voting age population District 2 in Illustrative Plan 4 is only 49.8.

12:48:42 So even though they're really small numbers of people marking multiple categories in these areas, the margins on how he's drawing these districts are so razor thin that it trips them below the 50 percent threshold.

MR. ROUCO: I thought it said 49.8.

12:49:13 THE WITNESS: Correct.

MR. ROUCO: Not 49.08.

MR. WALKER: Oh. 49.8. I'm sorry.

THE COURT: It's that math again.

BY MR. WALKER:

12:49:20 Q And the other one was 49?

A .9.

Q .9. I wrote them down both wrong. My bad.

Let's take the numbers that Mr. Cooper used at face value, okay? And assume that those are -- were the correct numbers to use. 12:49:48 Would you still have any problems with the districts that he drew, in terms of demonstrating the possibility of complying with the *Gingles 1*'s requirement?

A Yes. The Census Bureau loves the fact that census data often gets treated as perfect and cited as being perfect. But, 12:50:08 you know, when we all step back and think about it, we know

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 103**

970

it's not, you know.

There's no margin of error in the decennial census because of the way math works. You can't calculate a statistical margin of error. But we've all heard about, you know, every census has an undercount. Let's discuss every census it that has an over count of different groups.

And so even at the point the census is taken, there's error in it. And when the data comes out eight months later, you know, people have moved. That area has grown.

So we know that there's changes. And we know that things change over time. So whenever I see just, you know, 50.1 or bare, bare majority numbers, it always makes me nervous that --

Q And by bare majority numbers, are you referring to the numbers that are displayed -- that Mr. Cooper put into his Districts 2 and 7 in Plans 1 through 4?

A Exactly. They're an example. And I see this fairly often as people talk about -- in my work in redistricting.

But like him claiming 50.3, that's an awful big reliance on the data being perfect with almost no margin for error.

Q And is it your testimony that the margins that Mr. Cooper has given to his Districts 2 and 7 in Plans 1 through 4 are well within the probable error of the census?

A Certainly.

Q Yeah.

A You know, there's no doubt, you know, and especially

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 104**

971

nine years later. But when we're looking at the time of adoption, we want to be sure that the district's going to meet the threshold and perform, both when it's adopted and in the elections that are going to take place over that decade.

12:51:54 And so having a .3 margin is razor thin. And it's kind of a coin toss whether that city is actually majority African-American or not.

Q In your work with redistricting, would you be comfortable representing to a court districts with margins such as these as evidence of compliance with the *Gingles* 1 requirement? 12:52:14

A No. It would be -- maybe it's not 50/50. Maybe it's 52/48 percent that it is or isn't in compliance. But those are very narrow margins for a court to rely on.

Q If a district is drawn with a 60 percent -- let's say about 60 percent BVAP, would that guarantee black success every time? 12:52:37

A No. There's -- nothing guarantees success every time in any election.

Q Does that give you a reasonable opportunity that a minority will be able to elect a candidate of their choice as a district -- as that district changes over the decade? 12:52:53

A It gives a much more solid belief that it is going to stay majority African-American, or meet that threshold throughout the decade, and certainly at the time of adoption.

12:53:18 Q Let's move from population numbers to compactness. And

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 105**

972

I'll show you a map or actually a figure. This is from Defendant's Exhibit 13 on page 7, and it's four views of District 1; that is, it's each one of the District 1s drawn by Mr. Cooper.

12:53:46 And, first of all, what are the ways in which compactness can be measured?

A There are lots of measurements out there of compactness. I think there's now eight of them built into the redistricting software that we use.

12:54:03 A couple of years ago, actually, the U.S. Mathematics Association had a whole panel at their annual conference on new mathematical ways to measure compactness and redistricting.

And all of the math formulas have strengths and weaknesses. And really what they're all trying to do is 12:54:26 numerically measure what we can all see in the maps.

The famous phrase in redistricting literature, as someone wrote, The best compactness test remains the interocular test, which is just a professor saying, I'll know it when I see it. And each one has its own focus, and each one has its own flaws.

12:54:46 What really we're trying to measure, and what all of them are trying to measure is are we bypassing one group of people to get to another group of people? Are we wrapping around one area and not putting them in because we don't like them in our district for some reason in order to get to another group of 12:55:02 people that we prefer to have in our district? And that really

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 106**

 973

is the heart of what people really mean when they say gerrymandering.

Q So the more you bypass one group of people to get to another group of people, the less compact the district becomes?

12:55:17 A Exactly.

Q Okay. And would that be a description of the original Shaw District?

A Yes, exactly.

Q Could you describe, if you could, the shape of the original Shaw District?

12:55:28

THE COURT: First, what is the Shaw District?

BY MR. WALKER:

Q Sorry. Sorry. Would you explain to the Court what the original Shaw District was?

12:55:36 A Sure. So there were a string of U.S. Supreme Court cases about the -- really defined racial gerrymandering in a going too far approach; decide the voting rights where we didn't go far enough in cases.

And so the Shaw cases came out in North Carolina where one of the plaintiffs I think are -- one of the parties was named Shaw. And this is where Justice O'Connor wrote that appearances matter.

12:55:57

And the Shaw District was a freeway. It was literally the four lanes or eight lanes of the freeway. And then at different off ramps, the district would stretch out and grab

12:56:14

**Christina K. Decker, RMR, CRR**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 107**

974

African-American pockets of population. And then it would go back to the freeway up to the next town and stretch off. And so they --

Q And that went on for quite some distance, did it not?

A Yeah, it did. It was going through kind of rural North Carolina and picking up different towns along the way until it got to the necessary population and percentages.

And what the Court said was -- that's where the rule that race can't be the predominant factor came from. Is looking at appearances -- this looks really weird. Is it a sign that something's wrong? Do we need to investigate this and see was race a predominant factor, or does something else explain this?

I actually was part of drawing one of the ugliest districts ever drawn which was Arizona's first district in 2001 that literally used the Colorado River through the Grand Canyon to connect two parts of the district. It was ugly. We made a lot of posters after that where people said gerrymandering. But the reality was -- and that was ugly and that totally met Justice O'Connor's rule of if this looks ugly, we need to investigate.

Well, what it was, was the Hopi Nation was completely surrounded by the Navajo Nation. And we had hours and hours and thousands of pages of testimony from both groups saying they didn't get along. And the Hopi wanted to be in a different district so that they could get federal funding. So

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 108**

975

that neck had a purpose that was very community of interest driven.

So lack of compactness isn't a conviction. It's a trigger for a deeper investigation to see is there some other factor, traditional criteria or traditional principle that would justify this district.

Q And I want to ask you whether or not you see a lack of compactness in these maps. But I realize I forgot to ask you something when we were talking about numbers and percentages and the risk presented by relatively low percentages of African-Americans in a district that purports to be a *Gingles* 1 district. And can you give a recent example from Mississippi of that?

A Yes. This was just actually in the news this morning is that Mississippi had a state senate district that was drawn to be 51 percent African-American in 2011, and it consistently elected a white Republican.

Q So it was drawn to be a majority African-American district, and it consistently elected the Republican candidate?

A Exactly.

Q And in Mississippi, do African-Americans identify typically with the Republican party?

A No. Their voting patterns are very similar to what has been set up in the record in this case.

Q So there's a very high degree of congruence between race

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 109**

976

and party identification in Mississippi as in Alabama?

A That's my understanding.

Q And African-Americans in Mississippi --

Ms. KHANNA: Objection, Your Honor. This is beyond the scope of his report. I don't remember him testifying about Mississippi at all.

BY MR. WALKER:

Q I will withdraw those questions and ask if you just want to tell us about the example of the risk of a low margin as illustrated in Mississippi?

A Sure.

MS. KHANNA: Objection, Your Honor. Again, that example is not provided anywhere in his report.

THE COURT: I believe that's because it was something in the news today; is that correct?

THE WITNESS: Right. I had not followed the case closely until the election was just held. But it was a lawsuit that overturned the 51 percent seat as not sufficient and imposed a remedy district that's 57 percent. And then just today the news came out that the African-American won that seat by 4 percent, so moving it from 51 -- when the lawsuit moved it from 51 to 57, that gave a 4 percent --

THE COURT: Do you remember the name of that lawsuit?

THE WITNESS: I'm horrible with lawsuit names. I'm sorry.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 110**

977

THE COURT: I can relate.

THE WITNESS: It's the Mississippi State Senate.

THE COURT: Okay.

THE WITNESS: Case.

13:00:09 THE COURT: Thank you. *Thomas V. Bryant*?

MR. WALKER: I believe that's it, Your Honor.

THE COURT: Let the record reflect that Alex Davis came forward with that name. I've hired smart law clerks.

BY MR. WALKER:

13:00:33 Q So you have before you this page that has all four districts together on it. And then behind those, you have expanded views of each district. And what I would like for you to do, please, Dr. Johnson, is look at each one of these, and I'll show you -- this is illustration 1, the Illustrative Plan 13:00:55 1, the District 1 from that, and that that's Defendant's Exhibit 13 on page 25, and ask you if you see any problems with this district, in terms of compactness and your definition of compactness?

A Yes. So as you look at this map, the pink is District 1. 13:01:12 The white area is the other districts. And over in Mobile on the left-hand side, the white is Mr. Cooper's new proposed district coming into Mobile County.

And the kind of brownish lines on there are the county borders, obviously. You have Henry and Houston. And where you 13:01:30 don't see a thick black line, the district border is following

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 111**

978

the county border.

And so we come across the south, and when you get into Mobile County, you can see the thick black line appear with all the zigs and zags and jigs and jogs as the district crosses using the I-10 bridge as it's contiguity, and then comes down in essentially the smallest geographic edge he could along --

Q Am I pointing to the right place? The slender neck?

A Yes. Yes -- along the bay side of the city of Mobile. Because he's avoiding picking up the Mobile voters in District 1. He's keeping all those voters in the heart of Mobile out.

Q What voters?

A The voters in the heart of Mobile who are mostly African-American.

Q Okay.

A He's keeping them -- he's going around them and keeping them out of the district to then get around and pick up the south and west parts of the city of Mobile and the areas -- the outlying areas to the west and south of the city, which are, again, largely white voters he's putting into District 1.

Q Does it appear to you that he has gone around one group of people to get to another group of people in drawing this district?

A Exactly. He's going around one group to get to another. And the only apparent justification that he can give for that is race.

**_Christina K. Decker, RMR, CRR_**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 112**

979

Q Let me show you an expansion of Illustrative Plan 2 and ask you: Does this also illustrate that Mr. Cooper went around one group of people to get to another group of people?
A Yes. In Illustrative Map 2 that we're looking at now, he's actually cutting through both Baldwin and Mobile counties. He's picking up -- or he's picking up almost all of Baldwin County except for some far north areas that are actually relatively heavily African-American, and then, again, coming down and using the Interstate 10 bridge and a very, very narrow connector along the bay on the east side of the city to go around those African-Americans in Mobile in another very jagged zigs and zags approach that has no, you know, basis or reason other -- given other than the race of the residents in those areas in order to get around Mobile and again pick up the southwest city residents and the rural residents who are largely white in District 1.
Q He could have put all of Mobile County into District 2, could he not have?
A I presume.
Q What would be the consequence of that?
A District 2 would not have been majority African-American.
Q Let me show you Illustrative Plan 3 and ask for your opinion of District 1 in that plan. Does it also illustrate that he went around one group of people to get to another group of people?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 113**

980

A Exactly. Again, it's the kind of hooking around the city using the I-10 freeway bridge across. And then at the bay front edge of the city -- again, he's getting as little territory of the city as possible on the bay front, and then wrapping around picking up the south and west parts of the city which are more white after going around that more African-American parts of the area.

Q And, finally, Illustrative Plan 4, again, your testimony, please?

A I give him points for creativity on this one. In this case, he's using more of a fishhook. Instead of coming across and going around the population with District 1, in this case, it's his remedy district coming around and fishhook around District 1 aiming at the same population of heavily African-Americans in the Mobile area.

But in this case, he's connecting them -- instead of coming down along the county line, he's coming down along the state line. In those areas, they look whiter out in the rural areas, but that's just one VTDY. He's just picking the minimum number of VTDs with as few people as he can to get around to the populated area in the city.

Q So just to be clear on this map, which is from the Defendant's Exhibit 13, page 26, within mobile County, the white area is District 2, and that's actually the area where the relatively high concentration of African-American

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 114**

981

population?

A Yes. The area along the state line is isn't heavily African-American, but he's just getting as few people as he can to hook around and get in to where the population is that that fishhook contains, which is almost entirely in the African-American neighborhoods of Mobile.

MR. WALKER: And, Your Honor, just because I wasn't as scrupulous about this -- the maps, the expanded maps that I have shown were from Defendant's Exhibit 13, pages 25 and 26.

THE COURT: Got it. Thank you.

BY MR. WALKER:

Q Not to beat a dead horse, Dr. Johnson, but let's do the same thing with exhibit -- with the proposed District 2s.

And I'm showing you Defendant's Exhibit 13, page 8, which are the four views of Defendant's Exhibit 2. And I'll ask you to look at each one of these and say whether or not you think it's compact.

And let me stop there. Your testimony was that in all four of the versions of District 1 that we just looked at, Mr. Cooper went around one group of people to get to another group of people; is that correct?

A Yes.

Q And does it follow that you have an opinion as to whether those districts are compact?

A Exactly, yeah. By definition, they would not be compact.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 115**

Q And, now, if you would give us your testimony as to Illustrative District 1 version of District 2, please.

A Yeah. So these are the mere image or the puzzle pieces that fit into the districts we were just looking at. And they highlight how the map again is coming down into Mobile County.

In the case of Illustrative Map 1, it's getting the north end of the county and then coming down into that heavily African-American area mostly in Mobile and the surrounding cities and picking up the African-American neighborhoods; not picking up the whole city, just the African-American parts of those cities and putting them into District 2.

And my -- my analysis has all been fairly heavily focused on highlighting what's going on in Mobile. But you can see in this map in Illustrative 1, he's also got these jigs and jogs going through Marengo County. So, again, he hasn't given any explanation or justification other than the --

MS. KHANNA: Objection, Your Honor. Outside the scope of his report. There is no analysis on Marengo county.

MR. WALKER: I don't recall if -- if Ms. Khanna says there's no analysis on Marengo County, I will go with that.

THE COURT: All right.

MR. WALKER: I'll withdraw that part of his testimony.

BY MR. WALKER:

Q Look, if you would, please, at Exhibit -- Defendant's Exhibit 13, page 31, which shows Illustrative Map 2, please.

983

And does that also, within Mobile County and Baldwin County, illustrate a lack of compactness in the drawing of that district?

A Yes. Exactly. It's stretching through the north kind of African-American -- heavily African-American part of Baldwin County, and then the largely unpopulated Delta area in order to use a narrow, narrow neck to get down into the African-American neighborhoods in the Mobile area, in the city of Mobile area that are being added in while bypassing all those populations that they went -- you know, that they narrowly squeezed through.

Q And the same with Illustrative Map -- I mean Illustrative Map 3, District 2.

A Yes. This is, again, highlighting the area that District 2's picking up and forcing District 1 to wrap around as he draws his districts, and just barely gets to that -- by his own numbers, 50 percent, and by my numbers doesn't quite get to that 50 percent number.

Q Okay. And, finally, Illustrative Map 4, District 2, a hook or whatever it is?

A Rights. Again, this really -- the blue really shows the fishhook through Mobile County. And it really highlights the tip of the fishhook is that very densely, heavily populated part of the city that is the goal that he's trying to get into District 2 in all four of these maps just using various

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 117**

984

different creative necks and arms to squeeze in there while bypassing the more white population that he doesn't want to put in there.

Q And so do you have an opinion of whether District 2 in all four versions of the districting plan presented by Mr. Cooper, does District 2 meet your definition of compactness?

A No, it does not.

Q Okay.

MR. WALKER: And, Your Honor, those maps were from Defendant's Exhibit 13, page 8 -- excuse me -- and then Defendant's Exhibit 13, pages 31 and 32.

THE COURT: Thank you.

BY MR. WALKER:

Q Mr. Johnson, go through the stack that I have got -- we're going to skip over some of that. I think we have made our point.

And go to this map (indicating), which is Defendant's Exhibit 13, page 35.

A Okay.

Q And I'll ask you to explain this map to the Court, please.

A So this is zoomed in on Illustrative Map 2. And this is that neck that comes down to the north part of Baldwin County and down into Mobile County, the neck of District 2.

The colors that are shown here are highlighting the African-American percentage. And I'm using the all-part

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 118**

985

African-American because those are numbers Mr. Cooper said he was looking at or using when he drew his maps.

And so the red census blocks are where African-Americans are 75 percent or more of the voting age population. By that, all parts count -- or any parts count. The yellow are 65 to 75 percent of the population is African-American. And the green is 50 percent to 65 percent.

So the greens, yellows, and reds are where the African-Americans are the majority. And then the blues --

Q Let me stop you there and ask you a question.

A Oh. Sure.

Q Does this tell you the percentage of ethnicity in a given census block? Is that what it tells you?

A Exactly.

Q Okay. But it doesn't tell you the number of people who live in an area?

A Correct.

Q Okay. So this area of west Mobile that I'm looking at, as we read this map, what it tells us is that's primarily a white area, but it doesn't tell us anything about the level of population in that area?

A Exactly. The only population numbers you can tell are -- the areas that are colored in as white, we know those are zero population.

Q Okay.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 119**

986

A But other than that, we don't know whether it's one person or a thousand people in a given census block.

Q So looking at this map from Defendant's Exhibit 13, page 35, what, in summary, does it show?

13:13:42 A It shows how, in Illustrative Map 2, District 2 is coming through, and you can see the mostly red and yellow and green areas in the north part of Baldwin County, coming through that neck, and then using mostly unpopulated territory to come down south to get into where the -- the dense concentration of red, 13:14:06 yellow, and green census blocks are in the city.

Q And where you have the word Mobile, does that mean the city of Mobile -- the densely populated city of Mobile is in that area?

A Yes. That's that geographic center of the city.

13:14:19 Q Let me show you a map that's from Defendant's Exhibit 13, page 36, and ask you to explain this to the Court, please.

A So this is the same color scheme and same demographics being shown. In this case though, it's Illustrative Map 4. This is the fishhook map.

13:14:40 So you can see District 2 coming along through -- granted the white areas -- the purple meaning less than 25 percent black or African-American. But, again, as we were just discussing, they're very sparsely populated out along the state line hooking down along the south edge and then up into Mobile 13:15:01 to capture that same pocket of green, yellow, and red census

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 120**

987

blocks.

Q One more. This is from Defendant's Exhibit 13, page 34. If you'll explain this one, and then we'll move on.

A Yes. So this is that same map we just looked at. This is the tip of the fishhook coming up into Mobile.

So the black line is the district border. And, again, you can see the colored-in census blocks. And it really shows how closely aligned the district borders are to those majority black or African-American census blocks.

Q Thank you. Excuse me, Dr. Johnson. Next I want to show you this map from Defendant's Exhibit 13, page 14, and ask you what it shows?

A So this is showing an overlay of the 2011 adopted map with the 2001 benchmark or predecessor map.

So the colors -- the pink, blue, green, yellow, and brown -- are the districts as adopted in 2011. And the thick black lines are the 2001 district lines.

So this is showing how kind of at a glance you can see how closely aligned the two districts were -- or I'm sorry -- the two maps were.

Q So when the legislature adopted the 2011 congressional map, does it appear that the legislature was conscious of and sought to preserve the cores of existing districts?

A Certainly.

Q Why would the legislature want to do that? What's the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 121**

988

value, in terms of democracy and the functioning of democracy, in preserving the cores of existing districts?

A It gets to actually what other districts have talked about already, which is most, if -- certainly a lot, if not most, of the issues that members of Congress and other elected officials deal with are long-term problems; you know, trying to expand the bridge, trying to deal with education issues in a district, trying to bring economic development to an area, trying to build a new freeway.

All of these major issues that members of Congress deal with all the time, these are long-term issues. And so by preserving the core of the districts, you keep the relationships that are working on those issues. The member of Congress knows the local officials. They know the, you know, civil servants who are working on these projects. And they have their own expertise on that issue.

You have had other witnesses talking about their detailed knowledge of the economic engines of each of their districts and what needs to be done to improve the economic needs in each district.

So when we say preserving the cores of a district, or, you know, when the U.S. Supreme Court cites that as a traditional criteria, it's a very -- you know, I'm a demographer -- it's a very generic vanilla demographer's term.

But what they're talking about is maintaining all that

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 122**

989

history and all that work that's going on in those relationships that exist so that they can continue to work going forward.

Q I believe you were in the courtroom -- you may have been in the courtroom yesterday when Representative Byrne testified about the importance of getting a bridge across the Mobile Bay. Is that something that he could handle in a two-year term?

MS. KHANNA: Objection, Your Honor. Beyond the scope of his report.

THE COURT: Sustained.

BY MR. WALKER:

Q Look, if you will, at Defendant's Exhibit 13, page 15, and tell the Court what this map is, please.

A So the black lines on here are, again, the same as in the previous map. They are the 2001 map lines that were in place before the 2011 redistricting.

But the color shadings in this case have been replaced now with the Illustrative Map 3 drawn by Mr. Cooper. So now you can see the difference between those thick black lines, and the colors underneath show much more extensive changes that have been drawn into this map compared to the previous map.

Q Does it appear that this -- at least in Illustrative Map 3 that Mr. Cooper showed regard for the cores of existing districts?

A Definitely not.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 123**

990

Q Okay. And do you know whether the Supreme Court has stated that the cores of existing districts is a conditional redistricting principle or criteria?
A Multiple times. The best known was in *Karcher v. Daggett* -- K-A-R-C-H-E-R, V --
Q Which, as I recall, was a congressional redistricting case?
A Yes, I believe so. And then that's been cited in subsequent cases, as well.
Q I am now showing you Defendant's Exhibit 13, page 20. What does this map show, please, Dr. Johnson?
A So, this is Mr. Cooper's map showing the area that he put together into the District 2 and District 7 in his illustrative maps.

So the thick black line that you see kind of weaving through the central and south part of the state, that's the outer border of the combination of those two districts combined over all of his maps. And the color shading that I'm pretty sure has been discussed before, this is the African-American percentage of the county as a whole for each of the counties in the state.

And then highlighted in the bottom left with the purple arrow is this weird pocket that he includes. And that's the arrow I added. The pocket is in his map. It's the kind of south and west edge of Mobile and the areas outside it which

**_Christina K. Decker, RMR, CRR_**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 124**

991

are heavily white that he went around in every one of his maps. So when he overlays all four, that pocket is left out.

Q In every one of his maps, that pocket is left out?

A Exactly.

13:21:51 Q Would that affect the population count for the districts to which that pocket would have been assigned?

A Yes. That small area has -- I spelled it out in my report, I think 94,000 people in it. And when you put it into the rest of the outlined area, it's so much more heavily white that it actually drops the African-American percentage of the area as a whole by about 2 percent.

13:22:12

Q Thank you.

I'd like to show you -- ask you to look at, please, Dr. Johnson, paragraphs 28 and 29 of your report. And I will show you Figure 10 from your report, which is Defendant's Exhibit 13, page 16. Again, Figure 10. And ask you to explain this to the Court, please.

13:22:34

A So this is looking at the percentage of the population that was moved into new districts between the -- compared to the 2001 map. So this is numerically showing what we were just looking at in the overlay maps.

13:23:01

And you can see the adopted 2011 map at the far left, where it says 10.4 percent, the short bar, shows the state really made minimal changes. You know, the 70-something thousand people had to be added into District 7 because it was

13:23:24

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 125**

992

short of what the population needed according to the 2010 census.

Q Did you say 70,000?

A I think it was 70,000 -- yes. Oh, here in paragraph 31 is the specific number. It's 79,467.

Q About 500 less than 80,000?

A Yes, exactly. So some people had to move. That district was short. Other districts were over. So that's why we restrict is people have to move.

So the adopted map kind of was minimal changes you might describe it, and only 10 percent of the state's population moved.

Then the other bars you can see how much more population moved. 25 to 31 percent of the state's population were changed from their old district to the new district, which means new relationships, getting to know new representatives, having to educate the new representative on the issue of their areas, and, to some degree, start over in whatever projects each community had going with their old representative, and hopefully convincing the new representative to be just as interested in the project as the old representative was. You use that buy-in that you had before.

Q Well, if the state, when it drew the maps in 2011 only needed to move 10.4 percent of the population, and in the process of that had to repopulate Representative Sewell's

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 126**

993

district, which was almost 800,000 -- I mean, excuse me -- 80,000 people short of ideal population, why did Mr. Cooper need to move in his Illustrative Plan 1, 30 percent of the state's population; and in Illustrative Plan 2, 25.3 percent of the state's population; and in Illustrative Plan 3, 28.8 percent of the state's population; and in Illustrative Plan 4, 30.9 percent of the state's population?

A Well, this is the core of the whole of my report where I kind of walk through all these other criteria of looking for an explanation. Was he trying to make the map more compact? Was he trying to respect cities and other communities of interest better than the adopted map? Was he trying to retain the core? Was he trying to follow any of the traditional redistricting principles in drawing the lines a different way and in moving all these additional people?

And, you know, you can't check any of those boxes. None of those traditional criteria explain it. The only thing that explains it is race.

Q So Mr. Cooper seemed to indicate in his testimony that it was important to try to keep counties whole. Did he keep Mobile County whole in any of his plans?

A No.

Q Did he respect communities of interest in Mobile County in his plans?

A No.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 127**

994

Q Did he respect communities of interest between Mobile and Baldwin County in his plan?

MS. KHANNA: Objection, Your Honor. There's no testimony about the communities of interest in his report.

13:26:40 MR. WALKER: That's not correct. There is.

BY MR. WALKER:

Q Dr. Johnson, if you can find the report I'm looking for, feel free to speak up.

A Yeah. So on page 22, paragraph 44, where I summarize it, 13:27:43 I list -- page 22, paragraph 44, it's subpoint B, as in boy, I list out the traditional redistricting principles I look at, and I find that Mr. Cooper does not justify the changes based on any of them, including respecting communities of interest such as counties, cities, and VTDs.

13:28:02 THE COURT: Which subparagraph of paragraph 44 is that?

THE WITNESS: B, as in boy.

THE COURT: Thank you. You may proceed.

MR. WALKER: I beg your pardon?

13:28:32 THE COURT: You may proceed.

MR. WALKER: Thank you, Your Honor.

BY MR. WALKER:

Q So you looked at -- we've talked about communities of interest. We've talked about compactness. We've talked about 13:28:45 contiguity.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 128**

Is his plan any more or less contiguous than -- do all the districts in his plan link up or connect to each other?

A Technically, yes. They all are geographic contiguous. Is that the extreme definition? As I mentioned, in three of these maps he's only using the I-10 bridge for contiguity, but...

Q Maybe threadbare, but it's contiguous?

A Yes.

Q Does he have significantly less or even less in all of his plans splits of cities, counties, and VTDs than the state did in its 2010 plan?

A I didn't find any disagreements with his counts where he talks about he had the same number -- or I think in some of the maps he said he had one or fewer splits. The one or fewer split claims are a little extreme because what he's counting is up in Jackson County.

MS. KHANNA: Objection, Your Honor. Not in his report.

BY MR. WALKER:

Q Dr. Johnson, do you talk about VTD splits in the reports? I think it's in the same paragraphs that we just looked at that says respecting communities of interest such as counties, districts, and VTDs?

MS. KHANNA: Your Honor, Dr. Johnson is providing a lot of color on -- well, he did -- on new criticisms of Mr. Cooper's plans that are just not included in his report.

996

It's very difficult to rebut something that you are learning for the first time at trial.

MR. WALKER: Dr. Johnson was deposed, and they were free to ask any question they wanted about any part of this exhibit.

MS. KHANNA: Based on his report.

THE COURT: Did you ask him what VTDs did you mean?

MS. KHANNA: No. We did not ask him whether or not he had additional criticisms other than what's in his report. And if he did, I think that would still be beyond the scope of his report.

THE COURT: Did you ask what VTDs he was referring to on page 22?

MS. KHANNA: We certainly discussed VTD at his deposition.

THE COURT: Did he discuss Jackson County?

MS. KHANNA: Not that I recall.

MR. WALKER: I don't actually recall whether he did. We will withdraw the comment about Jackson County if that helps us move forward, Your Honor.

THE COURT: Okay.

BY MR. WALKER:

Q Let me just bring this to a close.

Does respect for communities of interest explain the difference in the districts that Mr. Cooper drew and the

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 130**

997

state's 2011 districts?

A No.

Q Does compactness explain that difference?

A No.

13:31:28 Q Does contiguity explain that difference?

A No.

Q Does minimizing splits explain that difference?

A No.

Q Does protecting incumbents explain that difference?

13:31:41 A No.

Q Or preserving the cores of existing districts?

A No.

Q So what are we left with?

A The only explanation is that race is the predominant factor in Mr. Cooper's maps.

13:31:51

Q Thank you much, Dr. Johnson.

MR. WALKER: Your Honor, I pass the witness.

THE COURT: If we could -- I need to take a short break. I have got a phone call I need to return.

13:32:05 We'll come back at -- let's just go on and say 1:45.

MS. KHANNA: Yes, Your Honor.

MR. WALKER: Thank you, Your Honor.

(Recess.)

THE COURT: You may proceed.

13:47:40 MS. KHANNA: Thank you, Your Honor.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 131**

998

CROSS-EXAMINATION

BY MS. KHANNA:

Q Good afternoon, Dr. Johnson.

A Good afternoon.

13:47:44 Q Your task in this case was to review the expert report and illustrative maps submitted by Mr. Cooper and to share your opinions of them; is that correct?

A Along with looking at the data, yes.

Q And you provide no response to Dr. Palmer's initial report 13:48:02 on racially polarized voting in Alabama?

A Correct.

Q And you have no reason to dispute Dr. Palmer's conclusions on functionality in his rebuttal report, correct?

A I don't think I even read them.

13:48:15 Q And you did not dispute any part of Mr. Cooper's analysis of socioeconomic disparities between blacks and whites in Alabama?

A Correct.

Q And you have no reason to dispute any of the conclusions 13:48:28 in Dr. McCrary's report relating to the history of discrimination in voting?

A Correct.

Q On page 4 of your report, you discuss what you believe to be the proper metric of African-American; is that right?

13:48:47 A Proper in that it's the Department of Justice guidelines,

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 132**

999

yes.

Q And your preferred metric, as reflected in your report, is made without reference to any understanding you had about what Alabama actually uses when it tabulates black voting age population, correct?

A Right. I was not relying on what the state had done.

Q And is it fair to say that your metric, metric that you advance is different than the metric that Dr. Hood advances?

A Slightly different, yes.

Q Is it your opinion that Dr. Hood's position -- sorry. Is it your position that Dr. Hood is using the wrong metric?

A Well, depends on his purposes. If he's trying to evaluate the *Gingles* majority test, then, yeah, it would be the wrong metric. It may be the right metric for his purposes.

Q But you do not argue that Dr. -- that Mr. Cooper is, in fact, using the wrong metric to calculate BVAP, do you?

A I'm sorry?

Q How about this: Is it your position that Mr. Cooper is using the wrong metric according to the DOJ guidelines for assessing black voting age population?

A Yes; that he's using the wrong measure. And when you use the right measure, the two lesser maps don't meet the 50 percent threshold.

Q So in your report, don't you say in paragraph -- on page 5, footnote 3 that both the DOJ guidance and the OMB guidance

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 133**

1000

provide the option to follow Mr. Cooper's approach?
A I don't know about -- I wouldn't describe it as an option. It's a secondary analysis that DOJ reserves the right to do if they find it's justified in using that instead of the original approach. And, again, as I mentioned, when you get into citizen voting age cases, you can't do the secondary method because that data is not available.
Q And the cases in which you're talking about that often get into the issues of citizen voting age population, those are cases that are often involving large Latino populations; is that correct?
A Some of them are not so large, but, yes, they tend to involve Latino or Asian American communities.
Q And oftentimes where the minority group at issue is either exclusively or includes the Latino population; is that correct?
A It also comes into play in Asian-America jurisdictions, but in addition to Latinos areas.
Q The vast majority of your work has been in California and the American southwest; is that correct?
A Yes.
Q Where there are significant Latino populations and Asian populations; is that correct?
A Certainly Latino in just about all of them, and Asian in many of them.
Q Certainly relative to southern Alabama, larger populations

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 134**

1001

of those minority groups?

A Certainly larger in Latino -- you have some pockets of fairly large Asian American population here. But, yes, not -- Alabama doesn't have percentages that California does, for example.

Q Fair enough. So you refer to the DOJ guidelines in your report; is that correct?

A Yes.

Q Can we please pull up Plaintiffs' Exhibit 125?

So Plaintiffs' Exhibit 125 is the DOJ's guidance concerning redistricting under Section 5 of the Voting Rights Act; is that correct?

A Yes.

Q And it's dated in February of 2011, right?

A Yes.

Q And this is the document that you cite in your report discussing how to allocate African-American population?

A Yes. There are earlier versions, and there's an OMB guidance too, but they're all essentially the same.

Q Well, this is the version that would have governed the redistricting process in 2011, correct?

A Yes; along with Department of Justice speeches.

Q So does this version refer to Department of Justice speeches?

A No.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 135**

1002

Q It's the written document actually published by the Department of Justice, correct?

A Yes. When I refer to speeches, the head of the Section 5 unit comes to the National Conference of the State Legislature redistricting seminars, and we talk about these guidelines and how they would be interpreted and implemented.

Q So you have heard some speeches from DOJ officials before, right?

A Yes, many times.

Q So you would agree that the standard for determining racial categories in the Section 5 context is the standard to be applied in the Section 2 case, as well; is that right?

A In my experience, they tend to be the same standard. There may be some legal intricacies that are more lawyerly than my work, but, yes, generally, they would correspond.

Q If we could turn to page 4 of this document. I won't ask you to read the very fine print on this whole thing. Although I think it's -- there we go.

But you do see the heading called The Use of the 2010 Census Data --

A Yes.

Q -- in the middle of the page?

And you would agree that that is where the DOJ guidance discusses the various racial categories on the census, correct?

A In this register, yes.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 136**

1003

Q And at no point in this DOJ guidance does the DOJ list the eight categories of race data that your report lists, correct?
A I don't remember if it would be here or in the OMB guidance.
13:54:49 Q Okay. But it's not listed here. We will take a look at that in a second.
A Okay.
Q Is that fair?
A I -- it's not listed on the page you're showing. I don't
13:54:57 know if it's on another page or not.
Q Can I -- can we show the next page, as well?
You agree it's not listed in the section called, The Use of 2010 Census Data?
A Well, actually in the third column, it does -- it doesn't
13:55:23 list them. It describes them.
Q In your interpretation, you believe that those eight categories come from the text of this document?
A Well, no. Here it's describing them. It's summarizing the OMB guidance.
13:55:38 Q Okay. If we can go back to the page 4 of the document. So you did mention that the DOJ guidelines refer to a separate document issued by the OMB, correct?
A Yes.
Q And that's a lot of acronyms. The OMB, for the record, is
13:56:01 what office?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 137**

A Office of Management and Budget.

Q Okay. And in this document toward the -- in the third column toward the bottom, you'll see that DOJ specifically cites to footnote 1 of the *Georgia v. Ashcroft* opinion; is that correct?

13:56:18

A Yes.

Q And they do that in the discussion of how to allocate multi-race responses, correct?

A They're talking about their secondary approach would be allocating those numbers off.

13:56:48

Q They're -- you said secondary approach. But I'm just looking at the beginning of the paragraph. The department will then move to the second step in its application of the census data.

13:57:00

Are you referring to that second step as a secondary approach?

A Yes.

Q Okay. Are you familiar with the *Georgia v. Ashcroft* opinion?

13:57:11

A I'm aware of it. I couldn't quote it to you.

Q Luckily, I can.

In fact, Mr. Cooper actually cites to that exact same footnote in *Georgia v. Ashcroft* in his rebuttal report -- or actually in his initial report, correct?

13:57:29

A I don't recall off top of my head.

1005

Q Do you want me to show you? Do you believe me?
A It's up to you. Yes.
Q We'll just pull up Plaintiffs' Exhibit 1, please, at page 5.

13:57:48 And here this is Dr. Cooper's initial -- sorry -- Mr. Cooper's -- I just promoted him -- Mr. Cooper's initial report. And you see in his footnote on page 5, he says, It is my understanding that following the U.S. Supreme Court decision in *Georgia v. Ashcroft* that the any-part definition is the 13:58:05 appropriate census classification to use in most Section 2 cases? Correct?
A That's what it says.
Q Okay. And --

THE COURT: Is that based on a footnote in that 13:58:17 *Ashcroft* case -- *Georgia v. Ashcroft* case?

MS. KHANNA: Yes. And I'm happy to pull up the footnote, if that's easier.

THE COURT: No. But if it's a footnote, that's not a holding or a determination in the case, is it?

13:58:42 MS. KHANNA: That may well be, Your Honor. But I believe that the questions that I am posing of Dr. Johnson are what his understandings of the guidelines are. And the guidelines do specifically cite to a footnote in the *Georgia v. Ashcroft* opinion.

13:58:55 BY MS. KHANNA:

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 139**

1006

Q In fact, if we can go back to the guidelines, Plaintiffs' Exhibit 125, page 4.

And we already saw that the *Georgia v. Ashcroft* opinion is specifically cited here, footnote 1.

13:59:13 MS. KHANNA: And actually, Heather, can you pull up the *Georgia v. Ashcroft* opinion?

THE COURT: Are we going to look at the holding of the case, or are we going to look at a footnote?

MS. KHANNA: We're going to look at the actual footnote to which the DOJ guidelines cite. 13:59:30

And if we can scroll down -- I apologize. I don't have the pdf number -- to footnote 1. Here we go.

BY MS. KHANNA:

Q Footnote 1 here you'll see, Dr. Johnson, the Court notes that Georgia and the United States in this case had different figures depending on, quote, whether the total number of blacks included those people who self-identify as both black and a member of another minority group such as Hispanic. 13:59:55

Do you see that?

14:00:12 A Yes.

Q Okay. And I'll just direct your attention to the kind of second half of that footnote where it says, moreover.

Moreover, the United States does not count all persons who identify themselves as black. It counts those who say they are black and those who say that they are both back and white. But 14:00:32

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 140**

1007

it does not count those who say they are both black and a member of another minority group. Using the United States' numbers may have more relevance if the case involves a comparison of different minority groups.

14:00:51 And then it cites to some cases there.

Here, however, the case involves an examination of only one minority group's effective exercise of the electoral franchise. In such circumstances, we believe it is proper to look at all individuals who identify themselves as black.

14:01:09 Did I read that correctly?

A I believe so.

Q And that's the footnote cited by DOJ; is that correct?

A Yes.

Q You also mentioned the OMB guidance, as well. If we could

14:01:25 pull up Plaintiffs' Exhibit 126.

And this is the OMB bulletin that you cite in your report, is it not?

A Yes.

Q And if we could please turn to page 3 of this document.

14:01:45 Here at the top we see a section entitled, Guidance on Aggregation and Allocation of Multiple Race Responses For Use in Civil Rights Monitoring and Enforcement. Correct?

A Yes.

Q Okay. And at the bottom we see a section entitled,

14:02:00 Allocation Guidance. It's Roman Numeral II.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 141**

A Yes.

Q And there it is says that, Federal agencies will use the following rules to allocate multiple race respondents for use in Civil Rights monitoring and enforcement. Do you see that paragraph?

A Yes.

Q And it lists several bullet points underneath that. That third bullet point there says, Responses that include two or more minority races are allocated as follows: If the enforcement action is in response to a complaint, allocate to the race that the complainant alleges the discrimination is based on.

Do you see that?

A Yes.

Q So you would agree that according to the OMB guidance that you cite in your report, if the minority group upon which the complaint is based is African-American, then individuals who identify themselves as black and one or more other minority races should be assigned to the African-American category, correct?

THE COURT: Excuse me. Is this an enforcement action in response to a complaint?

MS. KHANNA: Is this present case an enforcement action? No, it is a -- but it is the guidance that Dr. Johnson has said is relevant in deciding what the appropriate metric is

in this case.

THE COURT: I'm confused. Is this the guidance that you were relying on?

THE WITNESS: No. Since this is not the methodology that we use in developing databases for redistricting.

THE COURT: All right.

THE WITNESS: And it's not -- it's not the methodology that the Department of Justice asked the Census Bureau to follow when it asked the Census Bureau to calculate the citizens voting age population.

BY MS. KHANNA:

Q I'm going to turn your attention to your report, Defendant's Exhibit 13, page 5, footnote 3.

I believe the Court just asked you if that OMB guidance was the guidance you were relying on. Do you not cite that exact OMB document in your footnote 3 on your report?

A Yes.

Q So it is, in fact, the guidance that your report is relying upon, correct?

A Not the sentence you're reading there about the enforcement action.

Q Can you -- and you would agree that the DOJ guidelines that you also cite in your report refer to that same OMB document, correct?

THE COURT: I don't think he's disputing the document.

1010

I think he's disputing that one sentence that you pointed out to him that appears to apply to an enforcement action.

BY MS. KHANNA:

Q Can we go back to Plaintiffs' 126? Let's start from the first page. So this is a four-page document, and this is the document that you cite in your report, and it's the document that DOJ relies upon, as far as you're concerned in its guidelines, correct?

A That's my understanding.

Q Can you take -- and take your time. Take a look at the four-page document and tell me what it is that you cite it for.

A Well, I refer to it because it's referred to in the DOJ guidance. And I would note right in that DOJ guidance is their initial method is not the method you're reading here from the OMB process.

So their initial method in the DOJ guidance that I'm reading is not what's listed in that enforcement action paragraph. It's to allocate them as I have described.

Q So when you cite the OMB guidance, this document in your report, you're actually not citing it for any particular proposition stated in the OMB guidance?

A It's -- as you saw in the DOJ guidance, it's all rolled together, so they tend to get cited together. And that's where the data -- the data we compile comes from is that guidance from DOJ, which focuses on what DOJ says is their initial

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 144**

1011

method of reviewing these cases.

And, yes, this is in as a second method as an option. And it really highlights -- you know, this goes to the key point I'm bringing up of Mr. Cooper's plans -- that the debate over whether we include or not include African-Americans who also marked Asian, who also marked Hispanic, who also marked Native American which way that debate goes decides whether his maps work -- if they meet the threshold because his margins are so narrow. And that --

14:06:34

14:06:54 Q I appreciate your testimony. That's not exactly what I asked. I'm really just trying to find out what you are relying on for what you determined to be the proper metric of BVAP. That's about three or four pages of report. And so I just want to completely understand. You are relying on the DOJ guidelines that we've already looked at, correct?

14:07:10

A Yes.

Q And those guidelines cite *Georgia v. Ashcroft*, footnote 1?

A In their secondary approach.

Q And what you're referring to as the secondary approach is, in fact, DOJ's second step of its approach, correct?

14:07:34

A Sure.

Q You could see how maybe those are different things, a first step and a second step?

A I am not a lawyer, so I'll let you -- I will let the lawyers debate that.

14:07:48

**_Christina K. Decker, RMR, CRR_**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 145**

         1012

Q Dr. Johnson, you would agree that Mr. Cooper's approach is not wrong under the DOJ guidance read as a whole, correct?

A I would say it fails under one approach and barely passes under the other approach.

14:08:34 Q Because you are reviewing the DOJ guidance as two separate approaches rather than an initial step and a second step, correct?

A I'm not sure I see the difference there.

Q You would agree that Mr. Cooper's approach is not wrong

14:08:52 under the U.S. Supreme Court's guidance in *Georgia v. Ashcroft,* footnote 1?

A From what we've just looked at, it seems to follow that. I have -- I don't know -- I'm not enough of an expert to know how much of the Voting Rights Act reauthorization -- I know it

14:09:14 reversed some of the *Georgia v. Ashcroft* precedents, but I don't know if it reversed that part or not.

Q On page 5 of your report, in paragraph 5, you state that, Of the Alabama residents who marked black, African-American on their 2010 census form, 11,026 or 1.2 percent of them also

14:09:35 marked some either other category. Mr. Cooper counts them all in his BVAP figures, but his report provides no analysis or even anecdotes that these 11,026 people vote cohesively with those who meet the traditional Department of Justice definition of African-American for redistricting purposes.

14:09:55 Did I read that correctly?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 146**

1013

A Yes.

Q And that 11,026 number that you cull out, that includes people who are both black and white, correct?

A Yes.

14:10:08

Q But according to you, those people should, in fact, be counted as African-American in this Section 2 analysis, correct?

A Yes.

Q Regardless of whether blacks and whites vote cohesively with one another?

14:10:23

A Under the DOJ guidance, correct.

Q And, in fact, we know from racial voting patterns in the area that blacks and whites don't vote cohesively with one another?

14:10:35

A People who are black and people who are white. We don't have any data on people who self-identified both.

Q But regardless, is it your opinion that we should be including both people black and white in that figure?

A I follow DOJ's guidance on that.

14:10:53

Q I want to make sure, because you talk about an 11,026 that I think you're suggesting Mr. Cooper should have not included, but that number includes people that you think should be included in the determination of BVAP, correct?

A I didn't break them out, so I don't know the number in there, but some fraction of 11,000.

14:11:13

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 147**

And, again, we're back to the margins on these districts are so narrow that 11,000 people swings them over or under the *Gingles* threshold -- G-I-N-G-L-E-S.

Q Well, I won't cross-examine you on whether it's pronounced *Gingles* or *Jingles*.

THE COURT: I won't either.

BY MS. KHANNA:

Q Is it fair to say that neither the DOJ guidance that we looked at -- Plaintiffs' Exhibit 125 -- or the OMB guidance ever mentions the word cohesive or cohesion in its discussion about how to allocate the races?

A You're right. They don't mention it directly. But obviously it would be part of their review if they're looking to see if a cohesive voting block is experiencing polarized voting. They would want to know if -- by definition they would need to know if it's cohesive.

Q You state in your report that, Even if the those multi-race, multi-ethnic voters really do vote cohesively with African-American voters, a 1 percent error in the census numbers would mean that Illustrative Maps 3 and 4 have zero majority African-American districts. An illustrative map would have only one. In pursuit of a stated goal to create two districts where African-Americans could elect their preferred candidates, the illustrative maps could end up with zero such districts.

1015

Did I read that correctly?

A Which paragraph are you reading?

Q I am looking at -- did I not refer you to a number?

A No.

14:13:31 Q Paragraph 15, I think, starting on page 6. And I believe I started reading on --

A Correct.

Q -- the third to the last line.

So isn't it a fact that there is no statistical margin of

14:13:51 error for the census?

A The margin of error can't be statistically measured. There is an error.

Q It cannot be calculated?

A Correct.

14:14:02 Q And you have not provided any estimate that the statistical - or any calculation -- or reason to believe that the statistical margin or error for the census is 1 percent, or .1 percent, or 3 percent, correct?

A I have not cited the studies because they're --

14:14:22 Q Because the number can't be calculated?

A Yeah. There are estimates out there. The Census Bureau itself puts out estimates of what it thinks the undercount is of different groups and what the over count is of other groups. But they're all specific to those studies.

14:14:38 There's no statistical number. And this is the key to

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 149**

1016

statistics is we have statistically measurable error, and then we have systematic error. And so we know there's systematic error. We just don't know how big.

Q And you have chosen 1 percent not based on any particular study or reason to believe that that would be the right calculation in a world where you could calculate it?

A It's an often cited sample number when you're talking about the overall error in the census. Lots of people throw out 1 percent as a general rule, because we know it's pretty good. It better be. We use it for every opinion poll and every other study in the country. But we also know that there's some error.

We know that -- for example, for African-Americans and Latinos, most undercount estimates are around 2 or 3 percent. College students are actually over counted.

So 1 percent is a fairly reasonable guess. But, again, we're looking at systematic here. We can't confirm it.

Q And you don't have any citation for that, correct?

A No. I didn't put any in my report.

Q Dr. Johnson, you are not aware of any instance in which any type of error in the decennial census was determined to have an effect on whether a district could be considered a majority-minority district, are you?

A I'm not aware of any federal case where the remedy district -- or the illustrative district was so close that it

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 150**

1017

would have mattered.

Q It would not surprise you to learn that there are, in fact, a number of majority black districts across the country that are less than 52 percent BVAP, would it?

14:16:17 A I mean, there are three in California less than 33 percent BVAP.

Q There's three majority-minority districts in California that are less than 33 percent BVAP?

A There are three voting rights driven districts in Los

14:16:32 Angeles that are less than 33 percent that are -- that consistently elect African-Americans.

Q Thank you.

So you would agree that there probably are majority black districts that are less than 52 percent minority voting age

14:16:46 population, correct?

A I know the three from California off the top of my head.

Q Which are far less than 52 percent, correct?

A Yes. And also don't meet the *Gingles* threshold.

Q But as you just testified, they do provide opportunities

14:17:06 to elect for minority voters, correct?

A Yes. One of them recently failed, but historically they have.

Q Dr. Johnson, you are familiar with the *Gingles 1* standard as articulated by the U.S. Supreme Court?

14:17:21 A Yes.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 151**

1018

Q You applied it in your analysis in this case and others?
A And in my work almost daily.
Q So you're familiar with the *Bartlett v. Strickland* case defining the numerical threshold for that standard?
14:17:41 A Yes.
Q Can we please pull up *Bartlett v. Strickland*? If we could turn to page 8 of the document?
You'll see the highlighted portion on your screen. Provides the majority my -- actually why don't you read it
14:18:04 because I'm tired of reading?
A The majority-minority rule relies on an objective, numerical test: Do minorities make up more than 50 percent of the voting age population in the relevant geographic area? That rule provides straightforward guidance to courts and to
14:18:21 those officials charged with drawing district lines to comply with Section 2.
Q Dr. Johnson, this does not say that the objective numerical test is 50 percent minus an estimate or guess at the level of error in the census, does it?
14:18:37 A No. It says what I read.
Q And it doesn't say that the objective numerical test is 50 percent plus whatever specific percentage in that area would provide a functional opportunity based on analysis of turnout and voter registration in the area? Does it?
14:18:55 A No. It says what I read.

**_Christina K. Decker, RMR, CRR_**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 152**

1019

Q Because you would agree with me that it would hardly provide straightforward guidance to courts and officials charged with drawing district lines if different people were to provide guesses at a supposed error that you just testified can't be calculated, correct?

A No. I wouldn't agree with everything wrapped into that statement.

Q So I asked whether or not the *Bartlett v. Strickland* test incorporates in this language an error rate in the census, and you, I believe, testified it does not?

A No. I said that it did not -- that written in here was not the line that you had read.

Q Fair enough. Written in the language that I read -- written in the highlighted language. It says nothing about a census error, correct?

A It talks about more than 50 percent, a number that has to be measurable, and the Court would have to be confident of that number.

An error -- you know, it's not the total population rule, you know. It's not this artificial one person thing.

It's pretty clear to me that that language says the 50 percent number needs to be a reliable number. We can't be 50/50 it is. We can't be -- you know, we can't be 52/48 that it is 50 percent. It doesn't apply to me that we should guess or be that close. When we know there's error in the data, we

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 153**

want to be safe.

Q So your understanding is that this language implies that we should guess at the census error rate which cannot be calculated?

14:20:38 A No.

Q And that that would be straightforward guidance?

MR. WALKER: Your Honor, if I may. This is a matter that we will be glad to brief to the Court.

THE COURT: Sustained.

14:20:46 MR. WALKER: It's not appropriate to continue to ask this witness about that.

THE COURT: It's a legal matter. I think it's appropriate for the Court, not for the witness.

MS. KHANNA: Understood, Your Honor.

14:20:57 BY MS. KHANNA:

Q To be clear, Dr. Johnson, you performed no analysis whatsoever of the effectiveness of the illustrative districts in Mr. Cooper's plans, correct?

A Correct.

14:21:12 Q You had performed no analysis about the extent to which they would actually provide an opportunity to elect minority preferred candidates?

A Correct.

Q And you are not asserting any opinion on the effectiveness

14:21:25 of those districts, are you?

1021

A Correct. I've seen lots of districts like this drawn and seen what they've done, but I did not write that up in my report.

Q You certainly provide no analysis to that effect, correct?

14:21:40 A Correct.

Q So, Dr. Johnson, I believe you testified on direct that Plaintiffs' illustrative plans fail to comply with the traditional districting criterion of compactness, correct?

A Yes.

14:21:57 Q And that's based on your visual review of the districts?

A And just about any measure of that southern district, in particular.

Q So you would agree, wouldn't you, that under *Gingles 1* plaintiffs must establish that the minority community is 14:22:19 sufficiently numerous and geographically compact to comprise a majority of the voting age population in a new congressional district, correct?

A Yes.

Q And you would agree that the compactness aspect of the 14:22:30 first *Gingles* precondition refers to the compactness of the minority population, not the compactness of any given district, correct?

A No. I disagree with that.

Q So your understanding of the *Gingles 1* standard is that it 14:23:12 looks at -- it does not look at the compactness of the minority

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 155**

1022

population, but looks at the compactness of a minority district?

A The remedy district -- or the illustrative district -- sorry -- the illustrative district would need to be geographically compact to meet the language of the *Gingles*.

Q I guess we'll save that legal dispute for another day.

You looked at the Reock scores of the illustrative plans on page 10 of your report; is that right?

A Yes.

Q And in your opinion, there are no thresholds in the Reock score that would classify a district as objectively compact or objectively non-compact; is that correct?

A Not built into the test itself. The jurisdictions often set a floor.

Q But you don't actually have a threshold that you apply, correct?

A Well, it would vary based on the jurisdiction. The scores are heavily driven by the shape of the jurisdiction. So you couldn't set -- it would be impossible to set an effective universal Reock score. It has to be done jurisdiction by jurisdiction.

Q I believe you testified on direct about an instance in which the Hopi and the Navajo didn't get along, and, therefore, it made sense they would be drawn into different districts. Did I understand that correctly?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 156**

1023

A Yes. That was -- the request given their history was to be drawn in different districts.

Q Given their history?

A Yes.

14:24:59 Q And so if two groups -- your opinion was that in those two Native American nations didn't get along it made sense to draw them in different districts; is that correct?

MR. WALKER: Object, Your Honor.

THE COURT: Sustained.

14:25:10 BY MS. KHANNA:

Q Dr. Johnson, you would agree that when you're drawing a plan to add a new majority-minority district, that plan will often look different from the prior plan because of that change?

14:25:28 A Are you citing something I said up here or something I wrote?

Q I'm asking you a question.

A I'm sorry. What was the question?

Q You would agree that when you are drawing a plan to add a 14:25:45 new majority-minority district, that plan will often look different from the prior plan because of that change?

A The degree of difference will vary depending on the situation, but obviously it will be a different plan, so something would be different.

14:26:01 Q You would be putting a new district into an area where it

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 157**

1024

wasn't before, so, yes, it would look different from the prior plan, correct?

A Not necessarily.

Q Do you recall having your deposition taken in this case?

14:26:25 A Yes.

Q If we could call up Dr. Johnson's deposition page 120.

You see at the bottom on line 18 you were asked: When you draw a plan and add a new majority-minority district, does that plan or that district often look different from the prior plan because you're adding a majority-minority district?

14:26:42

If you could turn to the next page. Your answer was: Yes. You're putting a new district into an area where it wasn't before, so yes.

Is that what you testified to?

14:26:53 A Yes. What I was referring to now is that you don't necessarily need to put a new district. It can sometimes be a small adjustment to an existing district.

Q Understood. If the plan adds a majority-minority district that wasn't there before, core retention in that district will be less; is that correct?

14:27:15

A Usually. Depends on how it's drawn.

Q And you would agree that if we were to look at some of the plans that you have drawn over the course of your career, it is likely we would find that in those plans that have added a new majority-minority seat that wasn't there before, the core

14:27:31

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 158**

retention of the surrounding districts will have decreased, correct?

A I am sure there is examples of that. I mean, it all goes back to whether you're having to erase a part of the map and draw something all new or just slightly adjust one of the existing districts, or if you're adding a whole new district to the state, like Arizona when they -- when you add a whole another congressional district.

Q I believe you testified on direct to a legal case --

THE COURT: Just a minute. Would that also be the same if you're losing a district, as opposed to adding a district?

THE WITNESS: You would get very funny core retention numbers because one of the old districts would now go to zero because it doesn't exist anymore.

So there you would have to carefully review what you're -- what my numbers would say about core retention. And you have to exclude that one piece and only look at the other seven, I guess, or whatever the remaining number are.

BY MS. KHANNA:

Q And, Dr. Johnson, I believe you testified with counsel on direct about a case called *Karcher v. Daggett*. That's a case you brought up; is that right?

A Yes.

Q That's a 1983 one person one vote case. Is that what you

1026

recall?

A I remember. I cite it for the core constituency. I don't remember the details of it versus another case.

Q Well, in that case, the Court cites core retention of the government interest that might justify population deviations. Does that sound familiar?

A Yes. That's how the Supreme Court defines all traditional criteria is things beyond the federal laws, obviously, which I intend to separate federal laws are not traditional criteria. They kind of top everything.

And then the traditional criteria are essentially things the courts have approved as appropriate justifications for deviation.

Q You would agree that a congressional plan cannot have any population deviation outside of one person deviation; is that correct?

A There are exceptions to that, but they're pretty rare.

Q All right. Dr. Johnson, you present the opinion that race predominated in Mr. Cooper's illustrative plans; is that right?

A Yes. In the absence of any other explanation, that's the only remaining explanation left standing.

Q So you base your determination on Mr. Cooper's explanations about what he did and did not consider; is that right?

A I'm not aware of any other available information to base

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 160**

1027

it on.

Q You weren't in the courtroom on Monday when Mr. Cooper testified about what he considered and didn't consider in drawing illustrative plans, were you?

14:30:18 A No.

Q And you agree that Mr. Cooper says in his report that race was not his predominant consideration?

A Of course he does.

Q And he testified in open court under oath to that same effect, or I can represent to you that he testified since you weren't here to hear him.

14:30:32

A Okay.

Q Would you be surprised to learn that no Court has ever rejected Mr. Cooper's Section 2 illustrative plans on the basis of race predominating?

14:30:45

MR. WALKER: Objection, Your Honor. She is asking the witness to vouch for Mr. Cooper, which is simply not appropriate.

MS. KHANNA: Your Honor, I believe this witness' testimony is based entirely on whether or not Mr. Cooper's explanations are what he deems to be credible. And I think that Mr. Cooper's explanation --

14:30:52

THE COURT: I think the question of credibility is left for the Court. I observed and heard Mr. Cooper's testimony. He did not.

14:31:09

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 161**

1028

BY MS. KHANNA:

Q I want to turn to the maps that your counsel showed you. And I am going to have to use the Elmo. I'm not sure if I can.

THE COURT: It's not so terribly hard.

14:31:27 MS. KHANNA: I just didn't know if I had the power.

THE COURT: You've got the power.

MS. KHANNA: I've got the power.

Thank you, Your Honor.

BY MS. KHANNA:

14:31:34 Q So this is from Defendant's Exhibit 13, page 35. This is the blowup map that your counsel talked with you about; is that right?

A Yes.

Q I appreciate my assistant's help.

14:31:54 MR. SPIVA: I told her I'd be her Vanna White.

THE COURT: All right, good.

BY MS. KHANNA:

Q And this is a portion -- a blown-up portion of Illustrative Plan 2; is that correct?

14:32:04 A Yes.

Q And I believe you testified on direct that this, what you call a foot, reflects a racial predominance; is that correct?

A Yes.

Q You would agree that there are pockets of high density

14:32:27 African-American or rather high BVAP populations right outside

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 162**

this district, say in Citronelle, or at the very bottom of this district, that green square right there (indicating)?

A Actually, once you get outside of the core area, the numbers of people per census block get very low. And the other piece is that this map is showing census block by census block.

14:32:50

And to his credit, Mr. Cooper was at least staying in the VTD level of geography. So one of the problems of these maps is you can't see how many people are in each block. So I don't know and I have significant doubt that the red and yellow pockets that are a little ways outside the district have any significant number of people in them or that they're in a VTD, they would be majority African-American.

14:33:09

Q And you would agree that Dr. Cooper -- sorry -- Mr. Cooper did follow VTD lines in drawing this map, correct?

A As he discussed, he had to split the VTDs along the bay front as he squeaked along the edge there. But otherwise, yes.

14:33:24

Q In fact, you mentioned that there might not be too much population out here in the rural area like over here (indicating); is that correct?

A I'm sorry. I didn't see where you're pointing. You're pointing on the Elmo.

14:33:41

Q In the Citronelle area. You said there might not be too much population there?

A Well, Citronelle has people. It's a city. But the question is how many people are in that one census block that

14:33:55

1030

pops up as red in that field of purple.

Q You don't know, correct?

A I don't know. But the odds are its not much, or he probably would have grabbed it.

14:34:09 Q That's probably true for some of these predominantly white areas that are in the relatively rural part; is that correct?

A Yeah. I already discussed the white areas along the state border are very sparsely populated.

Now, that's not true in Mobile where we're in the city and

14:34:24 actually incorporated areas that are fairly densely populated.

Q You would agree that in this portion of District 2 Mr. Cooper does include large pockets of white areas as well; is that correct?

A There are some that he could not get around.

14:34:42 THE COURT: And just to be clear for the record. When we're talking about white areas, what are we referring to when looking at this map?

BY MS. KHANNA:

Q Well, I can clarify the way I was using the term, and

14:34:59 maybe you can clarify if you were using a similar definition?

THE COURT: Well, this is his map, so I would like to hear from Dr. Johnson as to what the white portions of the map represent.

THE WITNESS: Sure. So I understand the confusion

14:35:14 definitely.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 164**

1031

The areas shown on the map in the color white are unpopulated areas that have no people in them. I believe what we are discussing is the areas where the demographic of the block is white unless it's shown as purple or dark blue.

14:35:27 THE COURT: Okay. And how would we know the difference between a white color on the map that's unpopulated and an area where white people populate the map?

THE WITNESS: So where the white people live are shown as purple and blue. And then the area that's colored white is -- it's mainly Delta, but it's -- no one lives there at all.

14:35:55

THE COURT: Thank you.

BY MS. KHANNA:

Q I'm glad to learn that we're both using the same definition of white.

14:36:08 THE COURT: I just wanted to make sure that the record reflects that.

MS. KHANNA: Yes. I appreciate that, Your Honor. And I realize that there could be some confusion.

BY MS. KHANNA:

14:36:15 Q You would agree that -- this is Illustrative Plan 2; is that correct?

A Yes.

Q You would agree that if we were looking at, say, Illustrative Plan 1, that plan would include something along these lines, some things -- a line that is more west than the

14:36:27

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 165**

District 2 line in Illustrative Plan 2?

A Yes. If you go back to the -- the zoomed-in blue maps you can see Exhibit 13, page 31. Oh, I was going to the next one. It's the blue map showing -- yeah.

14:37:03 Q Actually, I'm going to look at Defendant's Exhibit 13, page 7, and I believe what we were just discussing was Illustrative Plan 1 and how it actually extends more west into those predominantly white areas. Would you agree with that?

A Yes. Instead of coming south to get the rest of the population, it doesn't come as far south, it goes west. 14:37:29

Q And in so doing, it has more predominantly white areas in that portion of that extension, correct, into Mobile County?

A On the very fringe. I don't know if it's more white than the southern tip of Illustrative 2. I presume in each case -- 14:37:53 the end of the district tends to be where you're just get getting to the final population count and doing as well as you can.

So I presume in the four maps, since the numbers came out fairly similar, the demographics are fairly similar, regardless 14:38:05 of whether you took the southern tip of Illustrative 2 or the western edge of Illustrative 1.

Q You don't know if this part has more white population than this part, is that what you are saying?

A Correct. Again, we're in the density of the population at 14:38:20 issue.

Q But you don't actually provide a racial schematic analysis of Illustrative Plan 1 at all; is that right?
A No, I didn't. No.
Q And you would agree -- sorry. You would agree that
14:38:40 looking at your Defendant's Exhibit 13, page 7, those four maps, Illustrative Plan 2 shows perhaps the narrowest and longest extension into Mobile County; is that correct?
A It's a hotly contested debate between Illustrative 2 and then the fishhook in Illustrative 4.
14:39:02 Q Both of which you present analyses of in your report, correct?
A Yes.
Q And you provide no analysis -- racial schematic analysis of Illustrative Plan 1 or Illustrative Plan 2; is that correct?
14:39:13 A You mean Illustrative 1 or 3?
Q Exactly. Thank you for correcting the record. You provide no racial schematic analysis of Illustrative Plan 1 or Illustrative Plan 3; is that correct?
A Correct. As you've done, it's easy enough to flip between
14:39:30 the amount of maps that I did do and just compare where the lines go.
Q Dr. Johnson, you would agree that all of Mr. Cooper's plans comply with the equal population principle?
A Yes.
14:39:51 Q And you would agree that Mr. Cooper's plans keep the same

1034

number of counties whole as the 2011 plan, and in some cases preserve more whole counties than in the 2011 plan, correct?

A No. I think the county splits that he claims to reduce is he takes one -- Jackson County from having two splits to just one split in it. So I don't think he's reducing the number of counties split.

THE COURT: That's if we look at his maps as a whole, as opposed to just Districts 1 and 2?

THE WITNESS: Correct. Yeah. Districts 1 and 2 are definitely splitting more counties -- at least District 1 is splitting more counties in his map than it does in the adopted.

BY MS. KHANNA:

Q Maybe I can make this clearer and quicker.

Do you have any reason -- you have no reason to dispute Mr. Cooper's analysis on the number of county and VTD splits for each of his illustrative plans; is that correct? As reported in his report; is that correct?

A One of them's fairly ticky-tack. I didn't go into detail about it, but -- the numbers are close enough that clearly the number of county splits doesn't just -- improving -- improving the number of county splits doesn't justify the massive changes he's making because he didn't -- even by his own numbers, he didn't make that big of an improvement.

But whether it's one or zero, I didn't go into, even though that Jackson County thing is a bit of an overriding

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 168**

1035

legislative decision just to have a fun number to put in his report.

Q I am going to repeat my question.

THE COURT: I think that's something that the Court can count, even if it is counting numbers.

14:41:36

BY MS. KHANNA:

Q You provided no such analysis of that split in either your report or your deposition when discussing the number of county splits; is that correct?

14:41:51

A Right. It didn't go to the point of my report which is does -- is that a traditional criteria that would justify how he drew these lines, and explain how it's a basis other than race. And it does not.

Q You would agree that Mr. Cooper's illustrative plans are contiguous, correct?

14:42:07

A As we discussed, just barely. But, yes, they do meet the technical definition of contiguous.

Q And you would agree his illustrative plans do not pair any incumbents as based on the revised plans; is that correct?

14:42:22

A Yes, as revised.

Q And you do not dispute Mr. Cooper's claim that he follows VTD lines; is that correct?

A I agree with his description that generally he does. There are a couple of exceptions. But I agree with how he describes it.

14:42:38

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 169**

Q As he reports?
A Yes.
Q Dr. Johnson, on page 3 of your report, you list other cases in which you've testified as an expert; is that correct?
14:42:53 A Yes.
Q On one case that does not appear on that list is one that just happened this summer called *Common Cause v. Lewis* in which you testified?

MR. WALKER: Your Honor, I'm sorry. I didn't mean to 14:43:04 interrupt my colleague. But I do want to make an objection when it's appropriate.

THE COURT: Do you know what she's going to ask, or should we let her ask her question and then you can object?

MR. WALKER: I'm pretty sure what I know what she's 14:43:20 going to ask. She is going to ask about some cases that he has participated in.

And I would make the same objection that my colleague Mr. Davis made when earlier she asked about cases that Dr. Hood had participated in. The point being that the parties have 14:43:37 stipulated to the expertise of these expert witnesses.

MS. KHANNA: Your Honor, I believe on direct Mr. Walker specifically asked about previous cases that Dr. Johnson has testified in, whether he would or would not point out various flaws or would present various arguments in a 14:43:59 Section 2 case. And I believe he's certainly opened the door

to question Dr. Johnson on opinions he's had in other cases on these similar topics.

MR. WALKER: Your Honor, I believe that I -- I may recall incorrectly. But my recollection is that I very generally said, Do these paragraphs indicate cases in which you have testified? And he said, yes. And I think we moved on.

MS. KHANNA: Well --

THE COURT: I don't remember any significant conversation about prior testimony.

MS. KHANNA: I believe he asked Dr. Johnson whether or not he would present an analysis in a certain way to a Court in a Section 2 case, whether he would have provided those numbers.

THE COURT: Well, if there's a case that occurred after his report, I think we could easily update his report with a reference to a more recent case. Is that what you're trying to do?

MS. KHANNA: Yes, Your Honor.

THE COURT: Okay. Do you want to ask him if he's testified more recently than his report which was submitted -- I don't know if it's got a date on it or not.

MR. WALKER: Your Honor, if I may get a point of clarification.

THE COURT: Okay. His report was dated May 6th, 2019. So are you asking him about something subsequent to the report?

MS. KHANNA: Yes, Your Honor.

MR. WALKER: If she wants a stipulation that he participated in a case, we would agree to that.

If she wants to talk about that in a way that attacks his expertise, we would say that the parties have agreed to the expertise of the experts. And that and consistent with the ruling Your Honor made earlier today about with Dr. Hood under the same circumstance, that that line of inquiry should be foreclosed.

THE COURT: Okay. Well, I'd like to know if he testified in another case more recently. So I'd like to have an answer to that question, if I may. Is that what you're asking him?

MS. KHANNA: That would be the first question I was going to ask, Your Honor, yes.

BY MS. KHANNA:

Q Dr. Johnson, is it -- you did testify this summer in a case in North Carolina called *Common Cause v. Lewis*; is that correct?

A Yes.

Q Do you recall how the Court -- whether the Court rejected your testimony in that case?

A I recall.

Q You recall that it did?

A No, it did not.

Q Do you recall whether the Court stated that you testified

1039

as a live witness in four cases previously, and the courts in all four cases have rejected your analysis?

MR. WALKER: Objection, Your Honor.

MS. KHANNA: Your Honor, he just said the Court did not reject his analysis, and I'm correcting him or attempting to impeach him.

MR. WALKER: She's attempting to impeach his expertise, but the parties have stipulated to the expertise.

MS. KHANNA: Your Honor, I would just like to renew the argument about the weight and credibility of the expert's testimony. We are not trying to exclude his testimony, but we believe this is relevant to the weight and credibility of his testimony, particularly since it's a case not included in his report.

THE COURT: That was why I wanted to know the name of it. Thank you. That's all I need.

MS. KHANNA: Thank you, Your Honor.

Thank you, Dr. Johnson.

THE COURT: Redirect, Mr. Walker?

MR. WALKER: A very little bit, Your Honor. More than one question, but a very little bit.

REDIRECT EXAMINATION

BY MR. WALKER:

Q Dr. Johnson, you were asked about the primary method that DOJ uses and then a secondary method that it uses.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 173**

1040

Does DOJ ever skip the primary method and go to the second method?
A No.
Q It always uses the primary method? That's why it's called the primary method?
A Yeah, or the initial method, yes.
Q Okay. Now, would you agree with me that for the Voting Rights Act to work for all of this to matter, when an election is held enough African-Americans have got to show up at the polls for African-Americans to have a reasonable opportunity to elect their candidate of choice?
A Yes.
Q And do Dr. Cooper's plans, his proposed District 1s, embedded in those is the assumption that persons who identify as part black and part something else, that those people vote together with people who identify as DOJ black?
A Right. My entire understanding is the reason to bring a challenge is to get a remedy.
Q Yeah. And if that assumption fails, if people who do not identify or who -- people who identify as part black and part something else do not vote cohesively with DOJ black, then I believe it's your testimony that in at least two of the districts, there's no majority black district; is that correct?
A Correct.
Q Okay. You were asked some questions about compactness.

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 174**

1041

And the *Gingles 1* requirement is to demonstrate that the African-American population is significant -- is sufficiently populous and geographically compact to be able to draw a district; is that correct?

14:50:15 A Exactly.

Q So if the African-American population of Alabama were spread across the state, that population would not be sufficiently compact to be able to draw a district. Would that be correct?

14:50:31 A I think that's exactly the point both the *Gingles* and, I think it was LULAC in Texas. That was the whole point of that case.

Q So the point is, I think, that you've got to have a population that's in an area of reasonable compactness so that

14:50:51 you can draw a district around it; is that correct?

A Exactly. I suppose --

Q Well, just -- yeah. Is that correct?

A Yes.

Q Okay. But in addition, traditional districting criteria

14:51:03 require that districts be compact, do they not?

A It is certainly one of the traditional goals of redistricting.

Q So the minority population has to be compact enough that you can fit it inside one district, and that district itself

14:51:18 has to meet the traditional districting criteria of compactness

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 175**

1042

without race predominating; is that correct? Is that your understanding?

A Yes. I suppose once you got there you could have a non-compact arm for some other reason as long as that wasn't what was getting --

Q As long as race is not predominant?

A Yeah.

Q As long as you were not bypassing one group of people to get to another group of people?

A Exactly.

Q And that's what Dr. Cooper did; is that correct?

A Yes.

Q That's all I have. Thank you.

THE COURT: Any recross?

MS. KHANNA: Nothing further, Your Honor.

THE COURT: All right. Thank you. Dr. Johnson, you may step down.

Anything else from defense?

MR. WALKER: Your Honor, I get to say defense rests.

THE COURT: Mr. Davis had jumped up, as well. I'm surprised Ms. Howell didn't also jump up to say --

MR. DAVIS: I was too.

THE COURT: They all rest.

Anything else from the plaintiff?

MR. SPIVA: Your Honor, we just want to submit two

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 176**

proposed exhibits as rebuttal, but we don't have a witness.

We've shown -- you have an objection or -- oh, I should tell you what they are.

It's simply the House resolution regarding President Trump's tweets and the vote roll call.

THE COURT: Okay.

MR. SPIVA: It's concerning the testimony yesterday from Congress Byrne.

I'm sorry. I didn't know you were waiting for me.

MR. DAVIS: I wasn't sure you were finished.

MR. SPIVA: I was done. I just wanted to tell you what they were, yeah.

THE COURT: Do they have numbers?

MR. SPIVA: Well, I was going to -- the discussion we were having is should I write it on there, or would the Court prefer that we first, you know, do them electronically.

They would be PX-130, which we're proposing as the resolution itself, Your Honor, and then the roll call vote from the -- which -- I guess is from the congressional record is -- I mean, the vote from the congressional record would be PX-131.

THE COURT: Okay. Mr. Davis, have you seen those?

MR. DAVIS: We have seen them.

THE COURT: Do you have any objections to them?

MR. DAVIS: We do. We don't understand the relevance of this. If the relevance is how a particular congressman

voted, only one testified that day, and they could have asked him about it then. I think they did, and that provided sufficient testimony.

THE COURT: Well, I think he testified about it yesterday, and wasn't -- the resolution wasn't shown to him, and so Congressman Byrne refused to commit, not having the resolution to see. I think that was his testimony that, you know --

MR. SPIVA: Yes, Your Honor.

THE COURT: -- there are a lot of resolutions, and they often cover a lot of things. And until he could read it, he wasn't going to commit to how he voted on it.

MR. SPIVA: Right. He couldn't remember how he voted, I think was his testimony.

THE COURT: Well, I think he also had questions about the resolution itself. But the record will be clear on that when we get it.

So I understand that's why it's being offered.

MR. DAVIS: Offered just to show how he voted, but, well --

THE COURT: Or to show what the resolution was and how he voted on it, and I guess in essence to impeach his recollection of the resolution.

MR. DAVIS: Without him here, I don't see the relevance of any Trump tweet. We do object on grounds of

1045

relevancy, Your Honor.

THE COURT: I will overrule. I understand it's being offered as impeachment, and it's a little unusual. I don't know that I would allow it in a jury trial without the opportunity of the person to rebut it.

But I think Congressman Byrne's testimony is what it was, and this record is what it is.

So, I mean --

MR. SPIVA: Thank you, Your Honor.

THE COURT: So I will allow those two exhibits in.

MR. SPIVA: Should I hand up a copy at this point? I've got copies of it. That's why -- I don't know how many copies the Court requires.

THE COURT: We'll need one official and I guess one for me.

MR. SPIVA: Okay.

THE COURT: Assuming that defense already has one.

MR. SPIVA: If you don't mind my scribbles on it, I'll just put the exhibit number on both of them.

THE COURT: I'm not the keeper of the exhibits. Ms. Kecia is.

MR. SPIVA: Ms. Kecia, do you mind my scribbles?

THE COURTROOM DEPUTY CLERK: I don't. As long as I can make the numbers out.

MR. SPIVA: Yeah. There are two sets of them. 130,

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 179**

131. 130, 131. Thank you.

MR. DAVIS: Mr. Spiva, what were those exhibit numbers, please?

MR. SPIVA: Oh, yes. I labeled the resolution itself as PX-130, and the roll call vote is PX-131.

14:56:47

I won't note that Ms. Howell is one step ahead of you, you know, but...

MR. DAVIS: That is not unusual.

THE COURT: Okay. Anything else from the plaintiff, then? Is that the extent of your rebuttal?

14:57:06

MR. SPIVA: That is the extent of our rebuttal.

THE COURT: Okay. Great.

MR. SPIVA: We -- if Your Honor wants closings, we did prepare one, but if -- you know, it's up to you.

THE COURT: Defense wants to close?

14:57:21

MR. WALKER: Your Honor, we're happy to if you want to. But we would defer to have the opportunity --

THE COURT: Ms. Howell wants to.

MR. WALKER: Ma'am?

THE COURT: Ms. Howell wants to.

14:57:31

MR. WALKER: We would prefer to have the opportunity to look at the record and give you our arguments in a brief.

THE COURT: Well, I think we talked about yesterday allowing y'all to do that on certain points, and I kind of outlined those.

14:57:45

If there are other things that y'all want to emphasize -- how much time, Mr. Spiva?

MR. SPIVA: About 25 minutes, Your Honor. For our side it would be given by my much more eloquent and concise partner actually, so -- and --

THE COURT: I don't know that I want to sit for 25 minutes. I mean, I think y'all have done a really good job presenting your case, both sides, from the very beginning. You gave me very good pretrial briefs.

And I really think it may be more effective to have written summations, particularly after you have the benefit of the transcript, if you want those. And as we discussed yesterday, if after reading those and digesting everything that I have heard this week, and studying it a bit more and -- oh, I can't wait to get into this over the holiday break, which looks like that will be when it will be.

If I have additional questions, we can reconvene for oral argument, which, when I have them, is more oral questioning-and-answer session. I think that would be more helpful and effective to me.

MR. SPIVA: That makes sense, Your Honor. And I was joking about the eloquence. I mean, she is more eloquent than I am. But it's focused on the legal issues. So I just wanted to make sure that was clear.

THE COURT: Oh, yeah. I understand. She can make

1048

that argument at the bar tonight, or on the way home, or whatever.

But I think at this point, the other plan would be just a lot more helpful and effective for me. Okay?

14:59:53 MR. SPIVA: All right. Thank you.

THE COURT: Case closed. We talked about it last night -- yeah.

MR. SPIVA: The exhibits?

THE COURT: Yeah. I want those. What did we decide? A week?

15:00:10 MR. SPIVA: Yeah --

THE COURTROOM DEPUTY CLERK: That was two weeks.

THE COURT: Okay. All right.

MR. DAVIS: Is it one week or two?

15:00:21 THE COURT: That's what we were discussing.

We can do this off the record.

(Discussion off the record.)

(Whereupon, the above proceedings were concluded at 3:10 p.m.)

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 182**

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Christina K. Decker 11-15-19

Christina K. Decker, RMR, CRR Date

Federal Official Court Reporter

ACCR#: 255

Randy Hinaman
December 09, 2021

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

EVAN MILLIGAN, et al.,    )

                               )          CIVIL CASE NO.

      Plaintiffs,     )   2:21-CV-01530-AMM

VS.                   )   VIDEO DEPOSITION OF:

JOHN MERRILL, et al.,    )    RANDY HINAMAN

                               )

      Defendants.     )

S T I P U L A T I O N S

IT IS STIPULATED AND AGREED, by and
between the parties through their respective
counsel, that the deposition of:

RANDY HINAMAN,

may be taken before LeAnn Maroney, Notary Public,
State at Large, at the law offices of Balch &
Bingham, 105 Tallapoosa Street, Montgomery,
Alabama, 36104, on December 9, 2021, commencing at
9:13 a.m.

U.S. Legal Support | www.uslegalsupport.com

Caster Plaintiffs' Exhibit 88, Page 1

IT IS FURTHER STIPULATED AND AGREED that the signature to and reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

***

A P P E A R A N C E S

FOR THE MILLIGAN PLAINTIFFS:

MICHAEL L. TURRILL
Attorney at Law
Hogan Lovells US LLP
1999 Avenue of the Stars, Ste. 1400
Los Angeles, California 90067
michael.turrill@hoganlovells.com

BLAYNE R. THOMPSON
Attorney at Law
Hogan Lovells US LLP
609 Main Street, Ste. 4200
Houston, Texas 77002
blayne.thompson@hoganlovells.com

DEUEL ROSS (Via Zoom)
Attorney at Law
NAACP Legal Defense & Educational Fund
700 14th Street N.W., Ste. 600
Washington, DC 20005
dross@naacpldf.org

DAVIN M. ROSBOROUGH (Via Zoom)
JULIE A. EBENSTEIN
Attorneys at Law
American Civil Liberties Union Foundation
125 Broad Street
New York, New York 10004
drosborough@aclu.org

LaTISHA GOTELL FAULKS (Via Zoom)
Attorney at Law
American Civil Liberties Union of Alabama
P.O. Box 6179
Montgomery, Alabama 36106
tgfaulks@aclualabama.org

FOR THE SINGLETON PLAINTIFFS: (Via Zoom)

JAMES URIAH BLACKSHER
Attorney at Law
825 Linwood Road
Birmingham, Alabama 35222
jublacksher@gmail.com

MYRON C. PENN
Attorney at Law
Penn & Seaborn
1971 Berry Chase Place
Montgomery, Alabama 36117
myronpenn28@hotmail.com

ELI J. HARE
Attorney at Law
Dicello Levitt Gutzler
420 20th Street North, Ste. 2525
Birmingham, Alabama 35203
Ehare@dicellolevitt.com

HENRY C. QUILLEN (Via Zoom)
Attorney at Law
Whatley Kallas, LLP
159 Middle Street, Ste. 2C
Portsmouth, New Hampshire 03801
hquillen@whatleykallas.com

FOR THE CASTER PLAINTIFFS: (Via Zoom)
LALI MADDURI
Attorney at Law
Elias Law Group
10 G Street NE, Ste. 600
Washington, DC 20002
lmadduri@elias.law

FOR DEFENDANT JOHN H. MERRILL:
JIM DAVIS
Assistant Attorney General
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130
jim.davis@alabamaag.gov

FOR THE DEFENDANTS JIM McCLENDON & CHRIS PRINGLE:
DORMAN WALKER
Attorney at Law
Balch & Bingham
105 Tallapoosa Street, Ste. 200
Montgomery, Alabama 36104
dwalker@balch.com

ALSO PRESENT:
Paige Ali, Videographer
Elizabeth Baggett

I N D E X

MR. THOMPSON: 11-197
MR. BLACKSHER: 197-229

E X H I B I T L I S T

| | PAGE |
|---|---|
| Plaintiff's Exhibit 1 - (Depo notice) | 14 |
| Plaintiff's Exhibit 2 - (Subpoena) | 14 |
| Plaintiff's Exhibit 3 - (CV) | 21 |
| Plaintiff's Exhibit 4 - (Declaration) | 25 |
| Plaintiff's Exhibit 5 - (2021 Alabama Congressional Plan, RC 000553) | 92 |
| Plaintiff's Exhibit 6 - (2011 Congressional Districts) | 93 |
| Plaintiff's Exhibit 7 - (5-5-21 Reapportionment Committee Redistricting Guidelines) | 135 |

| | |
|---|---|
| Plaintiff's Exhibit 8 - (District 1-7 maps, RC 000556-562) | 160 |
| Plaintiff's Exhibit 9 - (List of 2021 congressional plans) | 179 |
| Plaintiff's Exhibit 10 - (State of AL v. US Department of Commerce Introduction) | 201 |
| Plaintiff's Exhibit 11 - (9-1-21 public hearing transcript excerpt) | 203 |
| Plaintiff's Exhibit 12 - (Whole County Plan) | 208 |
| Plaintiff's Exhibit 13 - (Tuscaloosa and Montgomery Whole) | 213 |
| Plaintiff's Exhibit 14 - (Data table) | 213 |

I, LeAnn Maroney, a Court Reporter of Birmingham, Alabama, and a Notary Public for the State of Alabama at Large, acting as commissioner, certify that on this date, pursuant to the Federal Rules of Civil Procedure and the foregoing stipulation of counsel, there came before me on December 9, 2021, RANDY HINAMAN, witness in the above cause, for oral examination, whereupon the following proceedings were had:

* * * * *

THE VIDEOGRAPHER: This marks the beginning of the deposition of Randy Hinaman in the matter of Evan Milligan, et al, versus John H. Merrill, et al., Civil Case Number 2:21-CV-01530-AMM filed in the United States District Court for the Northern District of Alabama. The date is December 9, 2021. The time is 9:13 a.m

All attorneys present, will you please state your names and whom you represent.

MR. HARE: Eli Hare on behalf of the Singleton plaintiffs.

MR. DAVIS: Jim Davis for Secretary Merrill.

MR. WALKER: Dorman Walker for the Committee Chairs, Senator Jim McClendon and

Representative Chris Pringle.
MR. PENN: Myron Penn for the Singleton plaintiffs.
MR. TURRILL: Mike Turrill for the Milligan plaintiffs.
MR. THOMPSON: And Blain Thompson for the Milligan plaintiffs.
MR. BLACKSHER: And Jim Blacksher for the Singleton plaintiffs. I'll be asking questions virtually.
MS. MADDURI: Lali Madduri for the Caster plaintiffs.
MR. QUILLEN: Henry Quillen for the Singleton plaintiffs.
MR. ROSS: Deuel Ross for the Milligan plaintiffs.
MR. ROSBOROUGH: Davin Rosborough for the Milligan plaintiffs.
MS. EBENSTEIN: Good morning. Julie Ebenstein for the Milligan plaintiffs.
MS. FAULKS: Good morning. Tish Faulks for the Milligan plaintiffs.
MS. BAGGETT: Good morning. It's Elizabeth Baggett for the Milligan plaintiffs. I'm a law clerk, not an attorney.

THE VIDEOGRAPHER: Court Reporter, will you please swear in the witness.
RANDY HINAMAN,
having been duly sworn, was examined and testified as follows:
THE REPORTER: Usual stipulations?
MR. WALKER: The ones that we've just discussed.
MR. THOMPSON: Yes.
Mr. Walker, did you want to say something before we begin?
MR. WALKER: Yes. I'd like to put on the record that the committee chair, Senator Jim McClendon, and Representative Chris Pringle have asserted their legislative privilege and immunity in this case. Of course, the Court has not yet ruled on that. Thank you.
EXAMINATION BY MR. THOMPSON:
Q. Good morning, sir.
A. Good morning.
Q. Please state your name for the record.
A. Randy Hinaman.
Q. Mr. Hinaman, you understand that you're testifying under oath right now?
A. I do.

Q. Is there anything that might prevent you from understanding my questions or answering truthfully today?
A. No.
Q. Are you being represented by a lawyer today?
A. Dorman Walker with the reapportionment committee.
Q. Are you paying Mr. Walker to be your lawyer today?
A. I am not.
Q. Do you assume that plaintiffs or the State of Alabama is paying Mr. Walker to be your lawyer today?
A. I do.
Q. Have you ever been deposed before?
A. I have.
Q. How many times?
A. Once. Once is all I remember, not counting trial.
Q. And was that in the ALBC versus the State of Alabama lawsuit?
A. Yes, sir.
Q. All right. So I'll go over a few of the key rules.

I think that last deposition was about eight years ago. Is that correct?
A. Yes, sir.
Q. Okay. So I'll be asking questions today. And then after I'm done, there will be several other people asking questions, as well.
If you don't understand a question, just let me know. Is that okay?
A. Yes, sir.
Q. If you answer a question, I will assume that you understood it. Is that fair?
A. Yes.
Q. Also, as you can see, we have a court reporter here who is doing an amazing job typing everything that we say as we go. But it's very important, because she's typing it, that we both speak one at a time. So I'll do my best to wait until you're done answering questions. And if you can do the same, that will help her out a lot. Is that all right?
A. Yes.
Q. And then we'll take a break about every hour. If you need a break before then, just let us know, and we can do that as long as there's not a question pending. Fair?

A. Very well.

(Plaintiff's Exhibits 1&2 were marked for identification.)

Q. I'm handing you what's been marked as Exhibit 1 and Exhibit 2.

MR. THOMPSON: I've got copies for everyone else to the extent you would like one.

Q. This is a copy of the deposition notice and subpoena.

MR. WALKER: Which one is which?

MR. THOMPSON: Exhibit 1 is the notice.

MR. WALKER: Okay.

MR. THOMPSON: And Exhibit 2 is the subpoena.

MR. WALKER: Thanks.

Q. Have you seen a copy of these documents before today?

A. I have.

Q. Both of them?

A. Yes, sir.

Q. Who provided them to you?

A. Dorman Walker.

Q. And when was that?

A. The end of last week. Friday maybe.

Q. All right. You can set those aside.

Without disclosing the content of any discussions that you had with your attorneys, what did you do to prepare for your deposition today?

A. I met with Dorman Walker and Jim Davis and others and did some -- just reviewed numbers and talked about the process we followed.

Q. When did you meet with them?

A. Monday and Tuesday, Monday morning and -- Monday afternoon really and Tuesday morning of this week.

Q. About how long would you say you met with them?

A. I guess about four -- four or five hours on Monday. We also had lunch in there. And three hours on Tuesday.

Q. Did you meet with anyone who was not an attorney?

A. No, I don't believe so.

Q. Did you review any documents in preparation for today?

A. I just reviewed some of the census numbers and the guidelines, the committee guidelines. That would be about it.

Q. Did you review any of the complaints in this lawsuit?

A. No, I didn't.

Q. Did you review any maps?

A. Yeah. I looked -- I looked at the current -- the map that was passed. And I also looked briefly at some of the other maps that were offered to the legislature.

Q. Which other maps did you look at?

A. The Singleton --

MR. BLACKSHER: Randy needs to speak up a little bit, please.

THE WITNESS: Sure.

A. The Singleton maps, the Coleman map, and the Hatcher map, I believe.

Q. Had you reviewed those maps, any of those maps, before preparing for your deposition?

MR. WALKER: Objection to form.

Q. You mentioned that you reviewed several of those maps in preparation for your deposition, correct?

A. Correct.

Q. Before then, had you reviewed any of those maps?

A. I looked at them when they were offered

on the floor of either -- whatever body they were offered in.

Q. Other than in preparation for your deposition last Monday and Tuesday, have you discussed this lawsuit with anyone?

A. No.

Q. Did you do anything else to prepare for your deposition today?

A. I did not.

Q. Are you being compensated by anyone for being here today?

A. I assume I am. I haven't -- I haven't billed anybody yet. But I'm planning to.

Q. And who do you plan to bill for today?

A. The attorney general's office.

Q. How much do you plan to bill the attorney general's office for your time today?

A. $400 an hour.

Q. Is that pursuant to some agreement that you have with the attorney general's office?

A. Well, we really haven't even discussed it, honestly. I guess I'll send them the bill, and we'll see if they pay it.

Q. Fair enough.

Similarly, do you expect to be

compensated in any way to testify at trial?
A. I would assume the same arrangement.
Q. By the attorney general's office, as well?
A. Yes.
Q. All right. Taking a step back and just talking about your background a little bit, can you please state your date of birth?
A. 5-5-57.
Q. What's your address?
A. 33267 River Road, Orange Beach, Alabama, 36561.
Q. Is that your full-time address now here in Alabama?
A. Yes, sir.
Q. You previously lived in Virginia; is that correct?
A. That's correct.
Q. When did you make that move?
A. I bought this property about five years ago. But I really technically moved probably about three years ago.
Q. Do you have a telephone number?
A. Just my cell phone.
Q. What's that number?

A. (703)598-8383.
Q. Do you have an email account?
A. I do.
Q. What is that?
A. Sharh1@comcast.net.
Q. Do you have any other email addresses?
A. I do not.
Q. Have you ever been involved in any other lawsuits?
A. No. I mean, not as a witness or -- no.
Q. What's the highest level of education you've completed?
A. I attended Cornell University.
Q. Was that for undergraduate?
A. Yes.
Q. Did you graduate?
A. I did not.
Q. What did you study at Cornell?
A. Political science. Really they called it government.
MR. WALKER: Called it what?
THE WITNESS: Government. Anywhere else on earth, it would be political science.
Q. And if you don't mind me asking, you said you did not graduate. Is there a reason why?

A. Yeah. In the middle of that, I was offered a position with the Reagan campaign, which was sort of my dream job to work for his presidential race. So I left to take on that responsibility for the national field director for the Reagan Youth Campaign.
Q. How far along had you gotten in your studies when you left?
A. Two years.
Q. Do you have any other -- excuse me. Do you have any educational certificates or anything like that?
A. No.
Q. Do you have any certain specializations in anything?
A. No.
Q. Mr. Hinaman, what do you do for a living?
A. I do political consulting and lobbying.
Q. Where do you work?
A. I work for my own company out of my residence in Orange Beach.
Q. What's the name of that company?
A. R. Hinaman, LLC.
Q. And what is your -- do you have a formal

title within R. Hinaman, LLC?
A. I guess I would be the president of R. Hinaman, LLC.
Q. Are there other employees of that company?
A. There are not.
Q. If you can, explain to me briefly what you do as a political consultant and lobbyist.
A. Sure. On the political consulting front, I usually do -- I consult political campaigns, usually on the federal level, mostly congress, put together the campaign team for various candidates to get elected to those offices.
On the lobbying side, which I'm doing less and less and less of, I did lobbying on the federal level for various companies and organizations.

(Plaintiff's Exhibit 3 was marked for identification.)

Q. I think I can short-circuit our discussion about your background a little bit here. This is Exhibit 3.
MR. THOMPSON: I can get you a copy, as

well, Mr. Walker.
Q. And I'll state for the record that this is a copy of your resume that was shown to you in a prior deposition that you gave on June 25, 2013. I believe this was PX3 in that deposition.
Do you recognize this document?
A. I do.
Q. Does this appear to be a true and correct copy of your resume as of June 25, 2013?
A. It does.
Q. Is this resume up to date?
A. It is not.
Q. What has changed?
A. Well, technically, the name of my company changed because I moved from Virginia to Alabama. Obviously, my address has changed, again because of moving. Obviously, I've had some additional clients since 2013.
Q. Who have your additional clients been?
A. I was afraid you would ask me that.
Congressman Ben Cline, I did his campaign to replace Bob Goodlatte who retired in 2018. Let's see. The American Dental Association is on there.
That's the major one. I can't say there

wasn't another campaign in there.
Q. On here, it says that your company name is Hinaman & Company, Inc. Did that change at some point?
A. Yeah, when I moved. That was an LLC in Virginia. And when I moved to Alabama, I formed a new LLC.
Q. And when was that?
A. Again, approximately about three years ago.
Q. Does a more current version of your resume exist anywhere?
A. Yeah, I'm sure it does.
Q. Is that something that you could produce in this case if you were asked to?
A. Yes.
Q. What experience do you have working with redistricting?
A. Obviously, I drew three of the four maps for Alabama ten years ago, 2011, 2012. I drew the congressional maps and the two legislative maps. I also worked for the republican congressmen in Virginia to draw their map in 2012.
And before that, I worked with Congressman Callahan, who was my -- I was his chief

of staff at one point and then his consultant in Alabama, and helped draw a map in 1992 which was then put into practice by a federal court.
Q. Anything beyond that?
A. No. I mean, I assisted the majority leader of the Virginia senate in some of his efforts on redistricting ten years ago. Actually, it was more like 20 years ago. But I wasn't really the lead on it. I was just assisting his office.
Q. Outside of Alabama and Virginia, have you ever worked in redistricting for any other states?
A. I have not.
Q. How did you get involved in drawing maps originally?
A. Well, my first effort, I guess, was way back in 1992 when the legislature failed to draw a map for congress in Alabama. I was working for Congressman Callahan. And with him and some of the other members of the delegation, we decided that we needed to file a lawsuit to remedy that situation. And so I helped produce a map that was filed with that lawsuit. That was my first endeavor.
Q. Had you ever drawn a map before then?
A. I had not.

Q. So how did they come about saying, "Randy, we want you to draw this map"?
A. I guess we drew straws and I lost.
Q. Fair enough.

(Plaintiff's Exhibit 4 was marked for identification.)

Q. I'm going to hand you another exhibit here. This is being marked as Plaintiff's Exhibit 4. This is also from the ALBC versus Alabama lawsuit. This is a declaration that was signed by you.
And you can see at the top there, there's a date that says this was filed on June 17, 2013, in the Alabama Legislative Black Caucus for the State of Alabama lawsuit. Do you see that?
A. I do.
Q. Do you recognize this document?
A. Not particularly.
Q. If you can, flip to Page 7. Do you see there's a signature?
A. Yes.
Q. And your name?
A. Yes.

Q. Does that appear to be your signature?
A. Yes, sir.
Q. Does this appear to be a true and correct copy of your declaration?
A. Again, it doesn't ring a bill. But I have no reason to believe it isn't.
Q. Take a look at paragraph two. It states, "I have substantial experience in drafting redistricting plans in Alabama, including drawing the congressional plan adopted by the three-judge federal district court in Mobile in 1992 and work on the 2011 congressional plan." Excuse me. "And work on the 2001 congressional plan. In 2011, I developed the redistricting plan for the Alabama congressional delegation. In that work, I worked within the guidelines for redistricting adopted by the reapportionment committee."
Do you see that?
A. I do.
Q. Is that an accurate description of your experience in drafting redistricting plans in Alabama?
A. It is. I mean, I don't know what that -- the sentence on 2001, I did not draft the 2001 plans. But I did work with the leaders in the

legislature who did draft those plans. I didn't want it to imply that I drew those maps. I don't know that it does imply that.
Q. Okay. Well, let's go to the first part there where you said that you -- your experience did include drawing the congressional plan adopted in 1992. Does that mean that you did draw that map?
A. I did, yes.
Q. Is that the map that was used for the Alabama congressional elections in the '90s?
A. Yes, sir.
Q. Did that map serve as the starting point, then, for the congressional map that was drafted for 2001?
A. I didn't draw that map.
Q. You said you worked on drawing that map. What does that mean?
A. The legislature at that time was controlled by the democrats, and I was representing some republican Congressman in just interacting with them. But they -- they drew the map. I was just trying to give our point of view to it.
Q. Are you familiar at all with how that map was drawn in 2001?
A. Vaguely, but not -- not the specifics of

it.
Q. What's your understanding?
A. Well, it was essentially a continuation of the 1992 map, just updated for the most part for population shift.
Q. And you said you were working with the republican legislators?
A. I was working with Congressman Callahan at that point.
Q. Did you have any role whatsoever in drawing that map in 2001?
A. I had no official role other than I was working with the leaders -- the democratic leaders who were working on that map. I would occasionally, you know, talk to them about the changes that were made, and for especially Congressman Callahan's district. But I didn't -- I didn't have control of the process, if that makes any sense.
Q. Do you know who did draw the map?
A. Senator Enfinger, I believe.
Q. Did he --
A. Well, that's who the -- he was the -- I don't know who he hired. That's who I interfaced with. Let's put it that way.
Q. Understood. That was going to be my

next question.
You said you spoke to several members of the legislature. Do you remember who you spoke to?
A. In 2001?
Q. Yes.
A. My primary -- my primary interface on that map was Senator Enfinger.
Q. When you spoke with Senator Enfinger, did you provide any sort of input or recommendations about how the map should be drawn?
A. Only as to how -- he had a draft, I believe, and was talking about the changes he wanted to make in various districts. And my primary focus was the first district because I was working for Congressman Callahan.
So he had come with some suggestions, and we just talked about those. They were not -- I don't think I had any tremendously substantive changes to recommend. So I think it was pretty much what he had drawn, we were comfortable with.
Q. Did you provide any other sort of feedback in drawing the 2001 congressional map beyond what you just mentioned with District 1?
A. I did not.
Q. Do you know if it was a goal in the 2001

congressional map to make sure that District 7 remained a majority black district?
A. I do not.
Q. Do you know if it was considered in 2001 to draw two majority black districts?
A. I do not, no.
Q. Let's go back to the 1992 congressional map. Because you said you did draw that one, correct?
A. Yes, sir.
Q. The 1992 congressional map created the first majority black congressional district in Alabama history; is that correct?
A. I believe so, yes.
Q. And you said you drafted that map?
A. I did.
Q. So you drafted District 7 as it stood in 1992?
A. Yes, sir.
Q. Who asked you to draw that map?
A. I was working for Congressman Callahan and some of the other members of the Alabama delegation.
Q. Did you work with Senator Larry Dixon in drafting the map?

A. Probably, yes.
I will point out that this was 30 years ago. So if you ask me a specific question, it's probably going to be hard for me to answer.
Q. Understood.
Do you remember any other legislators that you worked with directly in drafting the 1992 map?
A. I do not. As you know, the legislature did not ultimately pass a map. So we went -- it was a court action that imposed this map.
Q. Were you asked to create a majority black district in drawing the 1992 map?
A. I guess -- I guess I was, yeah.
Q. Who asked you to do that?
A. I think the -- well, Congressman Callahan and the delegation probably in concert with the NRCC.
Q. Do you know why you were asked to do that?
A. At the time, I believe they thought that was the proper thing to do under the Voting Rights Act.
Q. Did you receive any instructions from the court?

A. No, sir.
Q. Did you draw District 7 with the intent to make it a majority black district?
A. I did.
Q. How did you make sure that District 7 would have a majority black voting age population?
A. I just included areas of high concentration of African American voters.
Q. How did you do that?
A. By assigning counties and precincts that fit that definition.
Q. Did you have a particular percentage of black voters that you were shooting for?
A. I did not.
Q. How did you go about choosing District 7 to be the district that has the majority black voting age population?
A. I don't -- I mean, I think it was a function of geography, I mean, where areas with concentration of black voters were.
Q. And how did you gather that information?
A. Census data.
Q. What specifically?
A. Just the census data from the -- related to population and race.

Q. So when you were drawing it, you were able to pull up and see black voters, white voters in different areas?
A. Yes.
MR. WALKER: Objection to form.
Q. How did you see that information when you were drawing the map in 1992?
A. I'm not sure I understand your question.
Q. Did you use a software to draw the map in 1992?
A. As I remember -- again, it was 30 years ago -- I believe I used the computers at the Alabama reapportionment office to draw the map. So I don't know what their software was, to be honest with you.
Q. What specific racial data did you have in front of you when you were drawing that map?
A. I would have total pop, total African -- total black, and voting age data.
Q. Was that broken down by county, precinct, neighborhood, block?
A. County, precinct, block, yes. Yes, sir.
Q. And I realize it was 30 years ago. How did you go about drawing District 7 in 1992?
A. Again, it was 30 years ago. I don't remember the machinations that went into drawing the

map.
Q. Did you have in your mind a certain black voting age population that you were shooting for?
A. No.
Q. So you just drew general lines and you found that it came to a certain percentage of black voting age population, and you thought that was good?
A. Obviously, I was -- I had in my mind that we wanted it to be majority black district. But in terms of above 50 percent, I didn't have a specific number in mind.
Q. Did you take into account any other characteristics of the black voting age population that you were looking at when you drew that map in 1992?
A. Such as?
Q. For instance, did you look at any socioeconomic factors?
A. I did not.
Q. Did you look at attitudes?
A. I did not.
Q. Interests?
A. (Witness shakes head).

Q. Type of employment?
A. I did not.
Q. Income?
A. I did not.
Q. Educational level?
A. No.
Q. Voter turnout?
A. No.
Q. Election results to assess party affiliation amongst the black voting age population?
A. No, I don't believe so.
Q. When you drew District 7 in 1992, did you determine that to be a community of interest?
A. Yeah. Well, I think it included most of the black belt. I would say they had a community of interest along -- yeah. So yes.
Q. And what was the basis for that determination?
A. Well, geography and like demographics.
Q. And race?
A. And race.
Q. Was race the main factor you considered in drawing District 7?
A. It was a major factor.
Q. Was there a more predominant factor than

race?
A. Other than geography and deviation. Those would be the top -- obviously, things had to be contiguous.
Q. If District 7 did not have a majority black population, would it have passed?
A. Passed what?
Q. Would it have been approved?
A. You're asking me to question what three federal judges would approve?
Q. You were asked to draw a map that had a majority black district, correct?
A. Yes.
Q. If you had turned in a map that did not have a majority black district, would you have done what you were asked to do?
A. You mean turned into Congressman Callahan?
Q. Correct.
A. No. I think our goal was to draw a majority black district.
Q. Why did you draw only one majority black district?
A. That was our -- that was our goal, to draw a district.

Q. Your goal was to draw only one district?
A. Well, I'm not sure at that -- I don't remember the numbers exactly. I'm not sure -- I'm not sure whether it would have been possible to draw two or not. I don't know that it would have.
Q. Did you consider drawing two majority black districts?
A. I did not.
Q. Did anyone suggest to you to draw that?
A. They did not.
Q. Did you review or comment on any other maps that contained two majority black districts at the time?
A. I don't --
MR. WALKER: Objection to form.
A. I don't remember seeing any majority two district maps.
Q. Did you consider race in drawing any of the other districts in 1992?
A. I did not. I mean, other than -- I did not, no.
Q. Skipping ahead to the 2011 congressional map. You also drew that map, correct?
A. Yes. But may I go back just one?
Q. Sure.

A. Obviously, we drew this map -- I drew this map, and it was submitted in a lawsuit. I had no idea what would happen to it from there. So it's not like I -- you know, I didn't know whether the judges would change it or what would happen.

Q. That's a good point. Did the judges change it after you submitted it?

A. I don't -- no, I don't believe they did. Sorry. Go ahead.

Q. So you stated that you also drew the 2011 congressional map, correct?

A. Yes, sir.

Q. That one is a little bit more recent, ten years ago. Do you recall the general method that you used in drawing that map?

A. Yeah. I mean, essentially it was updating the 2001 map based on demographic changes that had happened over the last ten years and working with the -- all of the -- I was hired by all of the members to update the map and submit a -- submit a map to the legislature for approval.

Q. So correct me if I'm wrong. But generally when you're drawing these maps, it's more of a redrawing than a drawing from scratch. Is that fair to say?

A. That is fair to say.

Q. So the general process is that you will use the existing map from the prior census data and update it with the new census data, correct?

A. That's correct. And obviously, whether it's a congressional map or any other maps, you have officeholders who have an interest in, for the most part, keeping the voters that they've had for the last ten years. So, most of them would not go into a redistricting process looking for wholesale change.

Q. So the 2021 map, for instance, can be traced back to the 2011 map, the 2001 map, and the 1992 map in that order, correct?

A. Yeah. Preserving cores of existing districts was a guideline for the 2021 map.

Q. For instance, the 2001 map used the 1992 map as a starting point, true?

A. I didn't draw that map.

Q. Do you have any other understanding of how that map was drawn?

A. I mean, if you look at it, it looks like it was continuing that map, yes. But I didn't -- the democratic legislature drew that map.

Q. Is it a fair assumption to say that they probably used the 1992 map in drawing the 2001 map?

A. That's an -- a fair assumption, I guess.

Q. And the 2011 map then that you drew used the 2001 map as its starting point?

A. Yes, sir.

Q. And then the 2021 map that you drew used the 2011 map as its starting point?

A. Yes, sir.

Q. In drawing the 2011 congressional map, did you speak to members of congress?

A. I spoke to all of them, yes, sir.

Q. All seven of the incumbents?

A. Yes.

Q. And what did you speak to them about?

A. We're talking about 2011?

Q. Correct.

A. I spoke to them about the over and under nature of their districts, whether they needed to gain population or lose population. And based on that, where they would like to gain or where they would like to -- where they would be -- you know, like to lose.

And I tried to work with adjacent districts to make sure that if person X wanted to give up this county, that the other person would be amenable to taking it. So I tried to negotiate a map that everybody was happy with.

Q. Did you consult the state's redistricting criteria in drawing that map?

A. I did.

Q. Did you review election returns in drawing that map?

A. They were part of it, yes.

Q. What data did you have on that?

A. I don't remember if all their races were in there. But I had the latest last three or four state-wide races that were available.

Q. And how did you use that information?

A. I didn't use it all that much. It was a common -- you know, a common question from a member might be, you know, what did the governor get in my district? And if we make this change -- or what did whomever ran for president in the race before that, whoever that was.

But I didn't use it so much in drawing the map. It was more of confirming to them that their district was going to perform similarly to how the previous district had performed electorally.

Q. Did that data give you information on party affiliation?

A. I don't believe so. I think it was just election returns.
Q. Was that aggregate election returns? Or was that by individual counties or precincts? Does that make sense?
A. Yeah. It was precinct-based. But then it was aggregate for counties and then for the districts.
Q. You can look at all of that?
A. Yes.
Q. Understood.
Did you look at any racial polarization data in drawing the 2011 map?
A. I did not.
Q. Did you look at any other voter behavior data?
A. I did not.
Q. Was it a goal in drafting the 2011 congressional map to make sure that District 7 remained a majority black district?
(Zoom interruption.)
A. What is that?
Q. It sounds like we might have a singer.
MR. TURRILL: Someone is off on mute on the line there.

Q. I think we're good now.
A. Can you ask -- I'm sorry. Can you ask that again?
Q. No problem.
Was it a goal in drafting the 2011 congressional map to make sure that District 7 remained a majority black district?
A. Yeah. Obviously, Congresswoman Sewell was one of my -- one of my clients for that map. And she wanted to maintain her majority black district, yes.
Q. When you say that she was one of your clients, what do you mean?
A. She was one of the members of congress who paid me to draw the map.
Q. Did you have a contract with those members of congress?
A. Verbally.
Q. You didn't have a written contract?
A. No.
Q. What was the verbal contract?
A. That they would all put in $10,000 to draw -- each to draw -- pay me to draw this map.
Q. That each individual congressman or woman would put in $10,000?

A. Their campaigns, yes.
Q. Was that the extent of the verbal agreement?
A. It was.
Q. Was it a goal in drafting that 2011 congressional map to make sure that District 7 kept a 60 percent black voting age population?
A. No.
Q. Was there any sort of specific black voting age population percentage that you were shooting for?
A. No.
Q. Were you successful in making sure that District 7 remained a majority black district?
A. We were.
Q. How did you make sure of that?
A. By whatever -- you know, whatever -- and I don't even remember the various counties ten years ago. If you handed me a map, I could probably tell you.
But by what we added county and precinct-wise to make sure it did not dramatically alter the makeup of the district.
Q. Explain that to me a little bit further. So what changes were you making in 2011?

A. Again, I don't even know how much -- I'm going to hazard a guess that District 7 was underpopulated in 2011. I don't remember the exact numbers. It was ten years ago.
But I'm going to guess that it was underpopulated. And so then the discussion with Congresswoman Sewell would be, you know, where -- what areas would we add to your district to get your district to ideal population.
And, obviously, in looking at those areas, we, you know, wanted to make sure that we preserved the majority black district.
Q. I know some of this was discussed in your deposition eight years ago. So I'll try not to tread the same water too much.
But explain to me just a little bit about the process when you were drawing the 2011 congressional map. So did you start with District 7?
A. I probably did start with District 7. I don't really remember, to be honest with you. I mean, I -- you know, I was meeting -- I met with the entire delegation to start. And then we went from there.
But preserving Congresswoman Sewell's

majority black district was a priority for the delegation.

Q. And that was the priority for you, as well?

A. Yes.

Q. Do you remember generally what sort of changes you made to District 7 in 2011?

A. I really don't. I mean, I apologize. But I did so many maps and plans in the last ten years that I don't.

Q. What other maps and plans have you done in the last ten years?

A. Well, we just did four in the last couple of months.

Q. Anything else?

A. Those are the ones that are mostly stuck in my brain.

Q. Are there any others?

A. No.

MR. WALKER: What was the question again?

MR. THOMPSON: He said there were so many maps that he had drawn in the last ten years. And I asked him which ones, and he said just the four that he just did.

A. Well, "drawn" is -- we could find the exact number. But I think in this last legislative session, there were something like 41 various maps and plans that were submitted to the legislature. So while I certainly didn't draw most of those, I did look at them.

So to ask me to go back ten years, it's hard to -- when you have some 41 pieces of 41 maps in your head, it's hard to expand back ten years.

Q. So you reviewed all 41 maps that were submitted?

A. I didn't review them all, but I looked at most of them.

Q. What's the difference between looking at them and reviewing them?

A. Well, reviewing them would take more time. Looking at them would be, okay, this is a -- this is a house map or a senate map or whatever. I just looked at the cover sheet and maybe the overall numbers, but didn't review -- didn't -- some of them were never offered, obviously. So if they weren't offered, I didn't look at them more seriously than that.

Q. Did you review all of the maps that were offered?

A. I looked at --

MR. WALKER: And you're talking about --

Q. We're talking about 2021 now. Did you review all the maps that were offered in the legislature in 2021?

A. Yes, I tried to. Some of -- some of that may have been a very short review because some of those maps were literally submitted 24 hours before they were offered either on the floor or at committee. So it's not like it was a long review.

Q. One more question going back to the 2011 congressional map. Did you consider race -- excuse me. A couple more questions, to be fair.

Did you consider race in drawing any of the other districts other than District 7 in 2011?

MR. WALKER: Congressional.

Q. The congressional map in 2011.

A. Not specifically. I mean, I'm not sure I know what "consider" means. But, obviously, all that information was available on each district. But --

Q. Did you review the racial data for each district when you were drawing the 2011 congressional map?

A. As a matter of course, yeah. I mean,

it's all there.

Q. Explain that.

A. Well, when you finish -- when you draw a map, obviously, you've got seven districts. And you're going to have -- if you look at the, you know, top data for each district, it's going to have race and voting age, black, so forth and so on for each district. It's not like it just only comes up on the majority black district. It would come up on all of them, obviously.

Q. Did you review that data for each district?

A. I looked at it.

Q. What did that data tell you?

A. Nothing specifically.

Q. Did you do anything with that data?

A. I did not.

Q. Did you consider drawing two majority black districts when you drew the 2011 congressional map?

A. I really did not.

Q. Why not?

A. Well, primarily because the people who were paying me to draw these maps preferred the districts similar to how they were.

Q. Did the people that were paying you to draw the map prefer not to have a second majority black district?
A. I don't know about that. But they preferred to have their districts as close to what they had under that map going forward.
Q. Did you discuss with anyone the possibility of creating a second majority black district?
A. I don't believe so.
Q. Were you aware of requests in the legislature in 2011 to create a second majority black district?
A. Again, I don't have a -- I don't have a complete recollection of ten years ago what maps were offered or not offered on the -- I don't want to guess on what was offered and what wasn't offered.
Q. Do you know if it would have been possible to create a second majority black district in 2011?
MR. DAVIS: Object to the form.
MR. WALKER: Objection. Go ahead.
A. I did not do it. So I -- I don't have an opinion on whether it was possible.

Q. To be clear for the timeline, I'm moving ahead now to 2021 for the most recent maps that were drawn.
A. Yes, sir.
Q. And I'm going to refer now to the 2021 congressional map. When I refer to that, I mean the one that was enacted. It was also referred to, I believe, as HB-1 and then ultimately Act 2021-555. Is that fair?
A. Yes, sir.
Q. And I'll refer to that either as the 2021 map or the 2021 congressional map. Is that okay?
A. Yes, sir.
Q. When were you first approached about drawing the 2021 congressional map?
A. That probably would have been the end -- sometime in September or October of 2020.
Q. Of 2020 or 2021?
A. 2020. About a year out, I would say.
Q. Who approached you?
A. Senator McClendon and Representative Pringle on behalf of the republican leadership.
Q. What were you asked to do?
A. They asked me if I would be interested

in drawing all four maps that they -- the congressional, as well as the other maps that needed to be drawn in this session.
Q. And those four would be the congressional, the house and senate for the state legislature, and the board of education?
A. Yes, sir.
Q. Did you agree to draw all four?
A. I did.
Q. When were you officially retained?
A. Around that time, I would think. Like maybe October of 2020.
Q. And who officially retained you?
A. Well, I was working for the two chairs of the -- the house chair, Representative Pringle, and the senate chair, Senator McClendon.
Q. Did you sign a contract?
A. I did.
Q. When did you sign that contract?
A. Again, I don't have that in front of me. But September or October of 2020, I would imagine.
Q. Is the contract with you individually, or is it with your company?
A. It was with R. Hinaman, yes.
Q. And who is the other party that you

contracted with?
A. Citizens for Fair -- Citizens for Fair Representation. Or maybe Alabamians for Fair Representation.
Q. Do you recall which one it is?
A. Not off the top of my head.
Q. Who is Citizens for Fair Representation or Alabamians or Fair Representation? Whichever the name is, who is that group?
A. It's a 501(c)(4) which also paid me to do the map drawing that I did in 2011.
Q. And what's your understanding of why you were contracted by this particular group?
A. Meaning?
Q. As opposed to the State of Alabama, the legislature, anyone else. Why this 501(c)(4) organization?
A. The leadership had set up that (c)(4) for the purpose of drawing districts in 2020 -- 2011 and then continued it for 2021.
Q. So this 501(c)(4) organization was created for the purpose of drawing the redistricting in the state of Alabama?
A. In 2011, that's my understanding, yes.
Q. Do you know if that organization does

anything else?
A. I do not.
Q. The contract that you signed around September, October of 2020, did you draft that contract?
A. I did.
Q. What does the contract call for you to do?
A. It calls for me to work with the two chairs and the leadership of the house and the senate to draw four maps, congressional, state senate, state house, and state board of education. And to the extent practical and possible, meet with the officeholders for those four maps to get their interest in changes and so forth.
Q. In that last part, you said "to meet with the officeholders"?
A. Yes.
Q. Is that basically the incumbents for each of the various districts on each of those maps?
A. Correct.
Q. Do you have a copy of that contract?
A. Not with me. But yes, I do.
Q. Is that something that you could produce if you were requested in this case?

A. Yes.
Q. What were the terms of your compensation in that contract?
A. Four payments spaced out over various months, four payments of $50,000 spaced out over the length of the contract.
I believe when we actually signed the contract back in September or October, we were hoping or planning to do a special session in July. So we didn't at that time know that COVID was going to delay the census numbers and so forth and so on.
So when I started the process at the end of 2020, the theory was we would, you know, probably have a special session in June or July sometime to pass these maps.
Q. You said you started the process around the end of 2020. What do you --
A. Well, when I signed the contract.
Q. You also said that there was -- the contract called for four payments of $50,000. Is that four separate payments of 50,000 each, for a total of --
A. Yes, sir.
Q. -- 200,000?
A. Yes, sir.

Q. Have you been fully paid at this point?
A. I have.
Q. Was any part of your compensation contingent on anything?
A. No. However, the -- just to be clear on the payment, because the time frame of the project changed -- I mean, when we initially signed the contract, the theory was, again, we would have the census data in March and we would pass a plan in July. Obviously, that didn't happen.
So my timeline for when I was supposed to get those four payments I modified so that they didn't have to pay me before I had actually even had census data. So we changed the timeline. But yes.
Q. Were you able to do any work on the maps before you got the census data?
A. Yeah. We -- especially the state-wide ones such as congress and state board of education. We had to -- we had the estimates, county estimates, from the census bureau. I guess it would have been the 2019 numbers.
So it was possible to look at them and say, okay, this district is likely to be under, this district is likely to be over, which on the congressional level allowed me to start meeting with

members before we had the official census data which we didn't get until the end of August.
Q. So you didn't get the official census data until the end of August. But you had unofficial estimates from the census before then?
A. Correct.
Q. And when did you receive those unofficial results?
A. I don't -- I don't know when the 2019 numbers were updated. But I'm going to say around the end of -- somewhere around the end of 2020. But I don't know that exactly.
Q. Did you begin working on the congressional map before you received the official census data?
A. Yes, sir.
Q. When did you begin working on that map?
A. In earnest probably in May of 2021.
Q. What do you mean "in earnest"?
A. Well, meeting with members and talking substantively about potential changes.
Q. Before we get into the specifics of that, just on your compensation real quick, were you paid or retained by anyone else?
A. No. I mean, I assume you mean relative

to redistricting.
Q. Certainly. You've received other payments --
A. Yes.
Q. -- for other --
A. Consulting.
Q. Correct.
So you stated that you began drawing the 2021 map in earnest in May of 2021. Did you do anything else in preparation for drawing the maps before that date?
A. No. I mean, I had conversations with members of the congressional delegation. And as you may -- may know, there was considerable concerns/discussion about whether Alabama would have seven members of congress or six.
And until we really knew the answer to that -- which I think we were told by the census bureau in April, sometime in April what the answer to that question was -- there really wasn't much -- I didn't -- my position with the congressmen was it would not make sense to work on a map until we knew how many districts we were going to have.
Because, obviously, working on a six-person map where somebody would be paired with

somebody was not going to be a lot of fun. And there was no need to do that if we didn't ever have to.
Q. Certainly. So the census bureau informed --
A. All the states, I think, in April of how many -- how many members of congress they would have. And then that allowed me to set up meetings and work off of the estimates of 2019 to talk about whether your district was over or under and so forth.
Q. And you began those meetings around May of --
A. I went to DC with the goal to meet with everybody in May, yes, sir.
Q. So you said you went to DC. So I assume that you're referring to meetings with the congressional members.
A. Yes.
Q. Did you meet with any other -- for instance, did you meet with anybody in the Alabama state legislature in the spring of 2021?
A. Well, I met with the two co-chairs to talk about my plan to how to -- you know, how to move forward on the congressional, that we would

wait until we knew how many districts the state would have. And then I would go to Washington and meet with the members and start formulating a plan from there to hopefully reach some consensus on a map.
Q. Before you received word from the census bureau that there were going to be seven districts in Alabama again, did you do anything else in furtherance of drawing the 2021 congressional map?
A. I did not.
Q. When did you actually begin redrawing the 2021 congressional map?
A. After my May round of meetings in Washington.
Q. You say after then. Would that have been in May? Or June, July?
A. I think the end of May, beginning -- again, this was all based on estimates. We did not have the real census data. So I just -- I probably roughed out a map sometime in May or June based off of the estimates, knowing full well they were not going to be completely accurate.
Q. From the time that you started drawing the 2021 congressional map until it was completed, about how much time did you spend in terms of hours

on drawing that map?
A. I have no idea. I guess I would make a bad lawyer.
Q. Well, I don't want you to guess.
When was the map completed for the 2021 congressional?
A. Complete. When was I done with what I was doing with it?
Q. Correct.
A. Probably the Friday before the week we went into session. So whatever that -- October 23rd or -- I'm making up that date. Whatever the Friday before we went into session was.
Q. And you're referring to the special session that was called in the fall of 2021?
A. Correct.
Q. Going back to how much time it took you in terms of hours. Would you say that you spent more than 100 hours drawing the congressional map in 2021?
A. Well, if you're including meetings and discussions about it, yeah, probably.
Q. Would you say you spent more than 150 hours?
A. I don't know. I just -- I don't really

have a -- I didn't think of it in terms of hours. My contract didn't -- my contract was just you were going to draw these four maps. And whether it took 123 hours or 217 was irrelevant to what I was doing.

Q. Right. I'm just trying to get an idea about how long it took you. I know there were months involved.

But how much time you were actually spending on this in that time frame, would you say it took you more than 200 hours?

A. I have no way of even guessing that. I really -- I apologize, but I don't.

Q. Were you doing other things work-wise between May 2021 and -- when was the special session? Was it in October?

A. October of 2021, yes.

Q. Between May 2021 and October 2021, were you doing anything else work-wise other than drawing these four maps?

A. Not very much because it was an off-year, obviously. I had clients that I did things for, obviously, in 2020, working up to the November 2020 election. But -- and I still had an ongoing relationship with some of -- a couple of my clients. But there wasn't a lot of work that needed

to be done in the off-year.

Q. Were you working full 40-hour weeks during that entire time?

A. By and large, yes.

Q. Did you take any trips or personal vacation time during that time period?

A. Well, it was during COVID. So I didn't travel a whole lot. But it was a crazy time, as you all remember.

Q. Did you take any time off?

A. Sure.

Q. About how long did you take off?

A. I don't know. A couple of weeks.

Q. And in that -- you had mentioned that you weren't able to begin redrawing the congressional map before you received the census estimates in April of 2021. Does that apply to all --

A. Before I received how many districts we had in April of 2021.

Q. Correct. Does that --

A. I think we had the census estimates before that. I'm saying we just didn't know how many districts there were.

Q. Fair enough. Thank you for the

clarification.

Does that apply to all four of the maps that you were drawing?

A. No. That's obviously the -- the only one that the census determined how many members there would be would be -- was congress.

Q. Because you said you had unofficial census data on, I guess, population prior to that?

A. By county, yes.

Q. And did you use that unofficial data for the other maps?

A. I used it -- I used it to start working with the state school board members.

It was less effective at the senate and house levels, virtually useless at the house level because it was mostly county data at the beginning. And so most house districts are not made up of full counties, obviously. So it was less valuable in those maps and more valuable in the statewide maps.

Q. When did you begin drawing the state house and senate maps in 2021?

A. I did not start on a house map until we actually had all of our census data at the end of August. I had roughed out a few of the rural senate districts based on some of the estimates. But it

wasn't particularly effective.

So I would -- I would really say I didn't seriously start drawing those maps until August of 2021.

Q. And what about the board of education map?

A. The board of education I was doing simultaneously to congress because that was obviously a statewide map. And the county numbers were more usable in that type of map than they were in a 105-member state house map.

Q. So you began drawing the board of education map around --

A. The same times as congress.

Q. Which was around May of 2021?

A. Correct. I think I started meeting with those members in May, as well.

Q. We've been going about an hour. Do you want to take a break?

A. Sure.

THE VIDEOGRAPHER: We're off the record. The time is 10:17 a.m.

(Recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is now 10:35 a.m.

Q. Mr. Hinaman, when we left off, we were talking about the preparation that you did starting to get into the beginnings of drawing the 2021 map.
Prior to May 2021, did you anything in furtherance of drawing the 2021 congressional map?
A. Other than reviewing the 2019 census estimates by county, no.
Q. And what did you do when you were reviewing the --
A. I was trying to get a feel for what districts would be underpopulated and what districts would be overpopulated based on those estimates.
And while the estimates in the end didn't turn out to be obviously particularly close to the actual numbers, in order -- they were -- they were close in that they did predict the three districts that would be under and the four districts that would be over.
So it was helpful to pay attention to that when I started to do my round of meetings with the members of congress.
Q. Did you do anything else prior to May 2021 in furtherance of drawing the 2021 congressional map?
A. No. I mean, obviously, I -- at some

point in that time frame, the reapportionment committee met and passed their guidelines. Obviously, I reviewed those and how they would impact the drawing of the maps. But that was -- that was about the May time frame, as well. It may have been early May rather than later May.
Q. You met with members of congress in DC in May of 2021, correct?
A. Yes.
Q. Was that the first thing that you did after the census data came out in 2021?
A. Well, the data --
Q. Let me take a step back there.
You said that prior to May 2021, the only thing that you had done was review some of the unofficial census data to get a feel for underpopulation, overpopulation?
A. Yes.
Q. Then the census bureau announced around April 2021 that there will be seven congressional districts again in Alabama?
A. Correct.
Q. Was the next step that you did flying to DC to meet with the congressional members?
A. Yes. And that was, again, after

guidelines had been passed in early May.
The only other thing in there, obviously I had talked -- before we knew seven to six, I had talked to, obviously, all of the offices, the congressional offices, about what my -- what our proposed timeline was going to be based on the fact that the census data was delayed, and that hopefully we would be able to set up a round of meetings in May and then we would get our data in August or whatever, and then we would fine tune it from there.
Q. So those were more of administrative coordination discussions?
A. Yes, sir.
Q. You flew to DC, you said, in May of 2021 to meet with the congressional members. Did you meet with each -- all seven congressional members?
A. I met with five in person, one by Zoom. And one of the members declined to meet because they were more interested in running for a different office, I guess.
Q. Which member was that that declined to meet?
A. Mo Brooks. I met with his chief of staff, but I did not meet with Congressman Brooks directly.

Q. You met with each of the other congressional members?
A. Five in person and one by Zoom.
Q. Who was the one you met with by Zoom?
A. Congresswoman Sewell. She was back in Alabama on a personal matter. So I met with her by Zoom.
Q. Did you meet personally with Congressman Sewell by Zoom?
A. Yes.
Q. And when was that?
A. During the May trip. Is that what you're asking me?
Q. Correct. Because you went to DC to meet with some of them.
A. Yes. And she was not in DC because of a personal matter. So we did a Zoom call.
Q. You were in DC when you had the Zoom call?
A. And she was in Birmingham, I believe.
Q. Was it just one call that you had with Congressman Sewell?
A. During that trip, just one call.
Q. Have you had other meetings with Congressman Sewell?

A. I've had other Zoom meetings with her. Microsoft Teams, technically. But yes, Zoom meetings.

Q. Have you had any in-person meetings with Congressman Sewell?

A. No, I don't think I did this time. I mean, as -- in-person meetings were rather difficult. It was actually May when I went to -- the house office buildings were actually closed and didn't allow visitors. So meeting anybody in person was a bit challenging during that time.

I would have met with her in person on that trip had she been in town. But she was not. But the other members that I met with were all off-campus, so to speak, because we couldn't go to -- I couldn't go to their offices.

Q. As far as Congressman Brooks goes, you said you met with somebody from his staff?

A. I met with his chief of staff, yes.

Q. And what did you discuss with these representatives when you met with them in May of 2021?

A. I discussed the over and under nature of their district. And if their district was underpopulated based on the estimates, I said, you

know, "Where would you envision picking up population?" If you were over populated, "What areas of your district would you envision potentially losing?"

Q. Did you discuss anything other than population changes with them?

A. Population changes and potential timelines and when we might get the real census data.

Q. Anything else that you discussed with them?

A. That was about it.

Q. What did you do next after meeting with the representatives in May of 2021?

A. I took -- took back that information and looked at it in terms of a map, and then waited for the real census data to come to see where we really were.

Q. You said you took back that information. What sort of information did you get from these meetings?

A. When somebody said if I need to lose 10,000, I would like to lose them in county X or place Y or whatever.

Q. And so you said you took that

information. And then what did you do with it?

A. Tried to rough it out in an estimated map, but again knowing that it was going to change because the estimates were not going to be completely accurate.

And, again, I didn't want to -- if there was a conflict somewhere between some -- two members wanted county X, I didn't really want to litigate that until we had real numbers because it may become irrelevant when it turns out that their district was 10,000 off of what the estimate said.

So I tried not to get into any negotiations at that point.

Q. Were there some disputes in the recommendations and requests that you received?

A. Minorly, yeah.

Q. Were there specific counties that more than one representative wanted?

A. Yeah. I mean, for example, the 1st District was going to be over. The 1st District was going to be overpopulated, and it was going to have to lose some. And the 1st District congressman wanted to probably lose some to the 2nd in Monroe, but the 2nd District congressman wanted to gain some from the 1st in Escambia, just things like that.

They were not major.

But, again, it really wasn't worth the point of negotiating it fully until we knew the real numbers. Because as it turned out, it only ended up being 739 people, and it wasn't particularly important which county it was in the scheme of 717,000 voters or citizens in a district.

Q. You said you then took that information from those meetings with the representatives and roughed out a map. What does that mean?

A. It means I took the -- we had the estimates on Maptitude at the state reapportionment office. And I just roughed without -- I mean, I didn't get anywhere close to zero deviation because there was no point in it.

I just generally roughed out based on what we had discussed in DC, knowing that it was all going to change when we got the real numbers. But just explored some of the potential.

Q. And to be clear, for somebody that doesn't draw maps, what does "roughed out" mean?

A. Meaning assigned various counties to districts just in an effort to get things closer to the ideal population.

Q. Kind of playing with the numbers, just

kind of seeing what works as a preliminary standpoint, I guess?
A. Yes. And just to be clear, that was all on total population. Because I certainly didn't have the ability or trust the internals of any of those -- I mean, I wouldn't have trusted like BVAP or anything else to the extent it wouldn't have made any sense to look at it at that point.
Q. Did you have any data on the black voting age population at that --
A. I don't know what the estimates had. But I didn't even look at it because I knew it wasn't going to be significant to what we were doing.
Q. Did you do anything else before you received the official census data in August of 2021?
A. No.
Q. Did you review any other materials in that time frame before August 2021?
A. Obviously, I reviewed the guidelines and had discussions with the two chairs of how we will proceed once we get the data in terms of all the maps.
Q. What were those discussions like?
A. Just mostly timing and how we would --

how we would go forward. And hopefully we could get some consensus on the state school board members and some consensus with the congressional members.
And, obviously, the house map I couldn't do anything with until we got the real numbers. The senate map I could do next to nothing with. I mean, I could look at a few of the more rural districts because they were whole counties. But once you got into major metropolitan areas, I couldn't come up with too many suggestions for that then.
Q. Other than Pringle and McClendon, did you meet with any other members of the Alabama legislature?
A. I don't believe so at that time.
Q. And "that time" being before August 2021, correct?
A. Correct.
Q. Did you review any election returns in that time frame?
A. I did not.
Q. Did you review any voter registration info in that time frame?
A. I did not.
Q. Did you review any voter primary participation data in that time frame?

A. No, sir.
Q. And then in August 2021, you received the official census data, correct?
A. Correct.
Q. What did you do once you received that data?
A. Well, the State received it.
Q. And then ultimately it was passed on to you, correct?
A. Well, it was -- I used the state computer. So their -- that data was then given to Maptitude. This is my understanding. I did not do any of this.
That data was given to Maptitude, and Maptitude turned it into their workable -- put it into their program and sent it back to the State. And the State loaded it into their computers, which all took another week. And then I was able to manipulate it on -- use it on a computer at that point.
Q. So walk me through that. So Maptitude is a software on a computer, correct?
A. Yes.
Q. A map-drawing software?
A. Correct.

Q. Is it the same software that you had used previously in drawing maps?
A. I used it in 2011, yes, sir.
Q. Did you ever use it before then?
THE WITNESS: I used it in 2011. The State used ESRI.
A. Excuse me?
Q. Did you use it before 2011?
A. I don't think so.
Q. And you were clarifying with Mr. Walker that you used in 2011 --
A. Yeah. In 2011, I had a computer, and I had Maptitude on it. The State used -- the State of Alabama used a different software, I think, called ESRI.
THE REPORTER: Called what?
A. ESRI.
Q. Can you spell that?
A. I don't know.
MR. WALKER: E-S-R-I, all capital letters.
Q. And what is ESRI?
A. It's just a -- it's similar to Maptitude software for using the census data.
Q. So in 2011, you drew the map using your

own computer and your own software?
A. Correct.
Q. Was that then imported into ESRI for the State?
A. Yes, sir.
Q. The file types can be imported from one to the other?
A. Yes, sir.
Q. Then in 2021, you did not use your own computer and software, correct?
A. That's correct.
Q. You used the State's computers and software?
A. Entirely.
Q. Where was that physically?
A. In the reapportionment office at the state house, Room 317.
Q. So any time that you wanted to actually work on redrawing the map, you had to --
A. Physically be there.
Q. How often --
A. Sorry. I didn't mean to finish your sentences.
Q. That's fine. And we're doing a pretty decent job. But let's try to remember to let each

other finish so that the court reporter can type everything down.
How often -- starting in August 2021, how often would you go to the -- what did you say it was? The reapportionment office?
A. Reapportionment office.
Q. How often would you go to the reapportionment office after August 2021?
A. Once the -- once the material was loaded into the computer, which was probably the last week of August maybe, I was there once or twice a week for the next week or so. And then after that, I was there four or five days a week until we were through the special session. I basically lived in Montgomery. For all intents and purposes, I lived in Montgomery for a couple of months.
Q. From, say, the beginning of September through the end of October?
A. Yeah. Certainly Labor Day until the end of October.
Q. Would you work on weekends, as well?
A. Rarely. I mean, once we got very close to the session, yes. But not -- not normally.
Q. Of the four maps you were -- you were working on all four maps in that time frame, right,

starting in August 2021 through October 2021?
A. Yes.
Q. And all four maps, you were doing the same process using the State's computers and using Maptitude, correct?
A. Correct.
Q. Were there any of those maps that took a significantly larger portion of your time to draw?
A. Well, obviously, including meetings with members. 105 house members are significantly more meetings than, you know, seven for congress and eight for school board.
So, obviously, the house map probably took a lot longer just in terms of meeting with 105 different -- I didn't meet with everybody. But the vast majority of 105 people -- and sometimes more than once -- took a lot longer than meeting with seven congressmen, for example.
Q. In addition to meeting, I assume that drawing 105 districts probably takes a lot more of your time to do than just drawing seven. Is that fair?
A. That's fair.
Q. If you had to put very rough percentages on the amount of time you spent on the congressional

map versus the other ones, about how much of your time would you say you spent?
A. Now you're -- now you're making me a lawyer again. And I'm not good at this.
I really -- I don't really know how to do that. I mean, you would be correct that the majority -- I mean, I put more time into the house map than I put into the state school board and the congressional. But I really don't have a way to quantify that.
Q. Did you put more time into the senate map, as well?
A. Yeah. Obviously, it's 35 members versus seven or eight. It just takes longer to do the meetings and follow-ups and so forth.
Q. And the state school board --
A. Is eight members.
Q. Eight members. Did that take you about the same amount of time to draw as the --
A. Yeah.
Q. Sorry. Let me make sure that I can finish.
Did drawing the state school board map take you about the same amount of time as it did for drawing the congressional map, given that they have

about the same number of districts?
A. Yes.
Q. Going back to the software, this Maptitude software, you said that it took about a week for the census information to be uploaded; is that correct?
A. Yeah, that's what I said.
Q. What does that mean?
A. Again, this was not part of my responsibility. But the State got the data, as I understood it, and gave it to Maptitude. Maptitude translated it into their software and sent it back to the State to be loaded on the State computer.
But, again, this is all my secondhand knowledge of what was going on. I was not doing this.
Q. From your perspective, once you arrived around the end of August looking at Maptitude and the software, you were able to see what information has been uploaded, correct?
A. Well, once it's -- yeah. Once it's uploaded, yes.
Q. What sort of information is -- was available to you on the Maptitude software regarding the districts?

A. Once it's all loaded in, I have, you know, total population and voting age population and race down to the block level.
Q. Is there any other information that's available to you in Maptitude?
A. I don't believe so.
Q. Did you, yourself, upload any additional information into Maptitude?
A. I did not.
Q. Did you review any other data in preparing the maps?
A. I did not.
Q. Did you meet with anyone between August 2021 and the time that you submitted the maps before the special session in furtherance of drawing the 2021 congressional map?
A. Well, I met with virtually all of the officeholders.
Q. You met with each of the seven congressional representatives again?
A. Oh, yeah. I had Zoom calls with -- with them. And then -- are you talking just congressional now, or all of it?
Q. Focusing on the 2021 congressional map.
A. Yes.

Q. Who did you meet with to discuss the drawing of the map between August 2021 and when you submitted the map in the week before the special session?
A. Once we had the real data, I went back and had Zoom calls with all of the members of congress or their -- or their chief of staff to talk about what the differences were from the estimates versus the actual census data and to reiterate, you know, what we discussed in May, what was still operable and what maybe needed to be slightly revised based on what our thoughts were.
Then after those round of Zoom calls, I went back and drew a proposed map. Which I then did another round of calls, Zoom calls with, to look at the final -- semifinal, final version, I guess.
Q. In those meetings, did you discuss anything with the representatives other than changes that needed to be made for population deviation?
A. No.
Q. How many meetings would you say you had with each of the representatives in that time frame?
A. It varied. For example, Mo Brooks would be zero because he again was not interested to participate. Others took, you know, three, four,

five phone calls. Some were one or two.
In the final end, Representative Palmer decided not to do the final call. So I didn't have a final call with him. But everybody else, I had at least two, if not more.
Q. Were all of the meetings with the representatives from August 2021 through the special session by Zoom?
A. Yes.
Q. When you had those meetings, would you share your screen to be able to show what the map looks like?
A. Exactly, yes.
Q. Did you discuss with each of the representatives the map as a whole or just their specific districts?
A. Their specific districts and an adjacent district if there was some change there.
Q. You stated for the 2011 congressional map that you were actually hired by the seven congressional representatives, correct?
A. Correct.
Q. That was not the case for 2021, correct?
A. That's correct.
Q. Why not?

A. That was not my -- the leadership decided that they would, you know, hire me through the 501(c)(4), which -- which is how they hired me for legislative. I did the legislative maps in 2021, and I guess they preferred that model over the other one. I don't know. That was their choice, not mine.

Q. Did you receive any other instructions or requests from the congressional representatives other than changes to make to account for population deviation?

A. No.

Q. Did you meet with any members of the Alabama state legislature to discuss the 2021 congressional maps?

A. Just -- just the two co-chairs, two chairs.

Q. And that's --

A. Senator McClendon and Representative Pringle.

Q. What did you discuss with Senator McClendon and Representative Pringle?

A. I would just update them on our progress and discussions with various members. And to the extent that there were conflicts like the one I

described between the 1st and the 2nd, I just updated on that in case they were to receive a call from somebody, they would know what was happening.

Q. In these meetings with Senator McClendon and Representative Pringle, were you pretty much just providing information to them?

A. Yeah, pretty much.

Q. Did you receive any feedback or particular requests from them about how to draw the map?

A. No.

Q. Beyond anything that you were told from the congressional -- U.S. congressional representatives, were you given any instructions or requests about how to draw the 2021 congressional map from anyone?

A. No.

Q. And how many times did you meet with Representative Pringle and Senator McClendon in preparation for drawing the 2021 congressional maps?

A. I don't -- I mean, this was during the course in time when they were also in town doing meetings with their colleagues. So maybe I updated them every other week. It was rather -- I mean, it wasn't a formally structured we meet every Tuesday

at 10:00 o'clock. It was just when they were both there or singularly there, I would just give them a quick update.

Q. Were these updates by phone or email or in person?

A. Usually in person.

Q. Were there ever communications by email with them?

A. No.

Q. Did you attend any of the public hearings in preparation for the 2021 congressional maps?

A. I didn't. They were happening simultaneously with me being in Montgomery. And I would occasionally walk in the room while they were happening to talk to somebody else or whatever. But I didn't officially attend them.

Q. There were a few that you walked into the room while they were going, you said?

A. Well, they were being done in an adjacent room, and I occasionally walked in. And I would also occasionally -- either the co-chairs or Dorman Walker or somebody would come back and update me as to something somebody said if they thought it was significant to my drawing.

Q. Do you recall what any of those sort of comments would have been?

A. Yeah. For example -- and this was already in process, so it wasn't a tremendous shock. But there were comments, for example, in the Montgomery meeting that they didn't want to be split into three districts as they were in 2001, that they would prefer Montgomery not -- probably they preferred it not to be split at all. But if it were going to be split, to certainly not three ways and have it be two, which was a feature of a map I was already working on. But things like that.

Q. Do you remember any other specific feedback that you received from the public hearings?

A. Just areas like the Shoals area wanted to be kept as intact as possible. And people in Madison and Morgan wanted to be -- they thought there was obviously a lot of community of interest between those areas in north Alabama. People in Baldwin and Mobile wanted to be kept together. There was a lot of community of interest between those counties. Things like that.

Q. When you refer to "the Shoals area," you're referring to Muscle Shoals?

A. Yes.

Q. Any other specific feedback that you recall receiving from the public hearings?

A. Not on congressional. There was a lot of feedback on state maps that we also talked about.

Q. And did you ever personally sit in on any of these hearings or hear anything that was being said personally?

A. I did for ten-minute snippets occasionally when I was waiting to talk to somebody in that room.

Q. Did you gather anything from the time that you spent in the hearing personally?

A. Nothing other than observations that I relayed to you a minute ago.

Q. You mentioned that Montgomery County, the public hearings provided feedback that they didn't want to be split. Do you remember why that was?

A. I think -- I think both in Montgomery County and most any county when you have split counties or split precincts, there's confusion as to who somebody's -- who their representative may be.

And it was a -- it was obviously a guideline of the committees on all these maps to try to split less precincts and less counties.

Q. Do you know when Montgomery County was originally split?

A. Originally split?

Q. Correct.

A. No. I mean -- no, I don't.

Q. The first map you drew was in 1992. Was Montgomery County already split prior to that?

A. I have no idea. I'm sorry. I don't even remember the map I drew, whether it was split, to be honest with you.

Q. Did any of the information that you received from the public hearings impact the way you drew the 2021 congressional map?

A. No, other than things like I said, not splitting Montgomery three ways, putting as much of the Shoals area together, keeping Mobile and Baldwin together, keeping Madison and Morgan together.

Q. Was that something that you specifically made changes to your map to accommodate?

A. No. Most of those features were already happening. It just -- I kept it in mind. For example, when -- we eventually had to split Lauderdale County between 5 and 4. And when we were doing that, I was trying to keep Florence and Muscle Shoals together as much as possible when we were

doing that split. So yes, it was in my mind when we were, for example, doing that split.

Q. Other than the accommodations for the Lauderdale, Muscle Shoals area, did any of the public feedback that you received from the public hearings tangibly impact a change that you made on the map?

A. Not so much a change. But it did -- it did confirm that our theory of putting -- not splitting Montgomery three ways was a worthy goal. And I worked to get Congressmen Rogers to agree to come out of Montgomery County because he was partially in Montgomery County.

Q. Since we're talking about it, this may help a bit.

(Plaintiff's Exhibit 5 was marked for identification.)

Q. I'm handing you Exhibit 5. I don't want this to be a memory test for you. So this is a copy of the 2021 --

A. I've had enough -- I've had enough of those already.

Q. This is a copy of the 2021 congressional

map. Do you recognize this?

A. I do.

Q. Does this appear to be a true and correct of the 2021 congressional map?

A. It does.

Q. We were talking about Montgomery County here not wanting to be split.

A. Three ways, yes.

(Plaintiff's Exhibit 6 was marked for identification.)

Q. I'm also going to hand you what's being marked as Plaintiff's Exhibit 6 for your reference. This is a copy of the 2011 congressional map.

So looking at Montgomery County, it looks like in -- well, first off, Plaintiff's Exhibit 6, does that appear to be a true and correct copy of the 2011 congressional map, to your knowledge?

A. It does.

Q. We were -- and you used this 2011 congressional map as the starting point in drafting the 2021 congressional map, correct?

A. I used the cores of the existing

districts as a starting point, yes.
Q. Is that different from using this map as the starting point?
A. I don't know. I don't think so.
Q. When you began drawing the 2021 congressional map, you didn't start from scratch, right?
A. No. Correct.
Q. You started using the 2011 congressional map?
A. Correct.
Q. Looking at Montgomery County, so that was split into three districts in 2011; is that right?
A. That's correct.
Q. Do you know why that was split into three districts at the time?
A. Not specifically, other than, obviously, it had been -- Congressman Mike Rogers in the 3rd District had had an office in Montgomery, that part of Montgomery County, and had represented it for a while and probably didn't -- didn't want to lose that base of support and financial support and so forth.
Q. In the 2011 congressional map, District

7 reaches into a portion in the middle of Montgomery County. Do you know why it does that?
A. To gain population for that district.
Q. Was District 7 reaching into a portion of Montgomery County in the prior 2001 congressional map?
A. I don't know.
Q. Do you remember if Montgomery County -- do you remember if District 7 reached into a portion of Montgomery County in the 1992 congressional map that you drew?
A. I do not remember, no. I'm sure somebody has a map and could tell me. But I don't know.
Q. So it looks like from the 2011 congressional map to the 2021 congressional map, you were able to take District 3 out of Montgomery so that it's not split three ways anymore and is only split two ways; is that correct?
A. That's correct.
Q. Is there a reason why it still needed to be split into two different districts?
A. Yeah. I mean, obviously, the 7th District was underpopulated. So if you took it all the way out of Montgomery, then you would have to

add a number of different counties to make up that population.
Q. Well, it looks like District 7 also includes only a portion of Tuscaloosa County and Jefferson County, correct?
A. That's correct.
Q. So could you not have taken more of either Tuscaloosa County or Jefferson County and then been able to leave Montgomery County as being solely in one district?
A. Well, yeah, it would have been possible certainly in Jefferson. I don't know about Tuscaloosa. I don't think actually -- I think there are many more people in the 7th District portion of Montgomery than there are in the 4th District portion of Tuscaloosa. But yes, certainly in Jefferson that would have been possible.
But as you know, they -- these all have to fit back together at the end. So what might have been a perfect map for somebody in Montgomery may not have created a perfect situation for whatever member represented Jefferson or wherever.
Q. Did you consider moving -- did you consider making Montgomery County solely District 2?
A. I did not.

Q. Why not?
A. Because, again, I didn't think it -- while that may look like geographically not a very large area, it has a considerable number of voters in it. And it would have been hard to take that out of 7 and make up the population somewhere else.
About the only place, as you pointed out, to do that might have been Jefferson. But, again, we have two representatives in Jefferson County right now. And it would have been hard to eliminate one from that process.
Q. Is there anything in particular about this specific portion of Montgomery County that's in District 7 that makes it a community of interest or something that ties it into District 7 versus District 2?
A. Not necessarily. I mean, obviously, geographically it's next to -- it's adjacent to Lowndes County.
Q. Did you look at racial data in including that portion of Montgomery County in District 7?
A. I didn't. When we started doing -- I didn't initially. When we started filling in this -- all these discussions we've had up until now have all been based on total pop. I didn't look at race

at all on the computer when we were adding folks to these districts or subtracting folks from these districts.

So at this point, I've basically just been looking at total pop and where do you get the total pop to get the districts back to ideal population. So at that point, there was no discussion of race. It was all a discussion of total pop.

Q. You say "at this point." Where are we talking in the timeline?
A. Up until -- up until we finished the map.
Q. Finishing the map being the week before the special session?
A. Correct.
Q. So is it your testimony that you did not look at race at all in 2021 before submitting the maps to the special session?
A. No, I did not look at it up until the week before we submitted the maps, when at that point we did turn on race and look at the racial breakdowns in the various maps.
Q. Why did you look at the racial breakdown that week before the special session?

A. Well, to -- obviously, we wanted to see what the, you know, outcomes of our changes were.
Q. What do you mean?
A. We wanted to see what -- the changes we had made to get the population balanced among all these districts, if it changed any of the, you know, racial makeup of the districts.
Q. Why did you want to know that?
A. Well, one of our guidelines is to comply with the Voting Rights Act.
Q. And you say "we wanted." Who is "we"?
A. The two co-chairs, myself, and legal counsel.
Q. "Legal counsel" being Mr. Dorman --
A. Yes.
Q. -- Walker?
A. Yes.
Q. And prior to that week before the special session, it's your testimony that you did not look at any of the racial data at all for any of the districts in drawing the 2021 congressional map?
A. That's correct.
Q. What data did you look at?
A. Just -- just total pop and geography.

Q. Anything else?
A. That's it.
Q. Other than modifying the existing district lines to account for population changes, did you make any other changes from the 2011 congressional map?
A. I'm not sure I follow that.
Q. You made changes to the 2011 congressional map for the 2021 map based on changes in population, correct?
A. Correct.
Q. Did you make any changes based on any other factors?
A. Are we talking -- we're talking the 2021 map?
Q. Correct. So in drawing the 2021 map, you made certain changes from the prior map based on changes in population, correct?
A. Correct.
Q. Did you make any changes based on any other factors?
A. No. I didn't make any changes. Obviously, where members lived was a consideration. I certainly would be mindful -- when I was moving a precinct in Jefferson County, for example, I

couldn't move Congresswoman Sewell out of her district, for example. But I didn't make any changes based on that.
Q. Other than population data and race data starting the week before the map was submitted, did you review any other data about the constituents or the districts when drawing the 2021 map?
A. I did not.
Q. If any changes were made to the 2021 map, would you have been the one to physically make those changes on the computer?
A. Yes.
Q. Was there anyone else who physically sat on the computer and made any changes for the 2021 map?
A. I don't believe so. I mean, Donna Loftin, who heads the reapportionment office, certainly was capable of doing that. But I don't believe she ever -- she's not really authorized to change a map, I guess, without me asking her to.
Q. Do you know if she made any changes?
A. I don't believe she did, no.
Q. Did anyone else assist you in drawing the map?
A. Nobody assisted me in drawing the map.

Q. When did you have a -- when did you first have an initial draft map completed?
A. Using the real data? I mean, not an estimate.
Q. Did you have an initial draft made from the estimates?
A. I had a -- I roughed -- again, it wasn't -- it wasn't something that would have -- it wasn't to zero deviation. It was just roughed-out counties.
So yes, when I came back from my May meetings, I roughed out a map using the estimates on Maptitude just to get a feel for what areas needed to be added and subtracted from various districts.
But, again, it was -- it was not -- it was not to deviation and it was knowing that the estimates were going to be off by thousands, if not tens of thousands, which they turned out to be.
Q. When was that draft completed?
A. The end of May.
Q. Did you save a copy of that draft?
A. No.
Q. After that, when was the next draft using official data completed?
A. After my round of calls in September.

So probably mid -- mid to late September would have been the next draft. And then I did a round of calls to go over those maps and make any last changes before the last week.
Q. A round of calls being the calls that you discussed with the U.S. congress representatives?
A. Yes.
Q. Did you make any further changes to the draft based on any feedback you received from those calls?
A. Very minorly. Congresswoman Sewell, I had split a precinct in Montgomery County that she did not want split. So I put it back together and split in a different -- an adjacent precinct. But very, very minorly.
Q. What precinct was that?
A. It was the Acadome precinct. I had split the university into two different districts, and she, I think wanted it all in her district. So I put that back together.
Q. Do you know why she wanted that all in her district?
A. I don't. I mean, other than that was one of her principles in this redistricting process.

She felt strongly about picking up facilities and universities and things rather than just random citizens.
Q. And what precinct did you take out from District 7 in exchange?
A. Well, it was a split at an adjacent precinct. Whitfield, I think, was the name of it.
Q. How do you choose that precinct?
A. It just was adjacent to it.
Q. That was the only factor?
A. That was the only factor.
Q. So you had the draft completed, you said, mid September?
A. Yeah. And just to give a more complete answer, I also had to do a -- change the split a little bit in Lauderdale based on conversations with Congressman Adderholt. I had conversations with Representative -- Congressman Moore's representative, Bill Harris, about he would have preferred a change in Monroe rather than the way I did it in Escambia.
So they were each -- not every district. But a number of districts had these little minor things that we talked through at that point.
Q. Beyond any minor changes -- and I assume

this is more kind of a precinct-by-precinct type change that you're referring to there, correct?
A. Yes, sir.
Q. Beyond that, were there any changes that you made based on those calls that you would consider to be significant changes?
A. No.
Q. So once you had the draft completed in mid September and then had the calls with the various representatives to go over that, then you made whatever minor changes you could based on that feedback.
When did you have the next draft completed?
A. Going into the last -- the next to last week of October. And in some of these -- as you well know, with congressional schedules, it's not like I had seven congressmen lined up to talk to me at 9:00 o'clock on a Monday morning. This took over a course of weeks. I would, you know, schedule, and move and change for voting schedules and all the wonderful things that go on with dealing with congressmen.
Q. And in that same time frame, you were also drawing three other maps?

A. Correct.
Q. And meeting with all of the representatives and senators and all of that?
A. Yes, sir.
Q. Was there any other drafts that you had other than the first one that you made using the unofficial data in the summer of 2021, the next draft that you made using the official data in mid September 2021, and then the draft that you had based on the congressional representatives' feedback that was completed the week before the special session in October of 2021? Were there any other drafts that you made of the 2021 congressional map?
A. No.
Q. Between those last two drafts that we discussed, between September 2021 and the special session, did you meet with anyone else to discuss the redrawing of the 2021 map, congressional map, other than the seven representatives and Senator McClendon and Representative Pringle?
A. And legal counsel.
Q. Anyone else?
A. No.
Q. At that time, did you consider Mr. Walker to be your attorney?

A. I considered him to be the reapportionment committee's attorney.
Q. Did you consider him to represent you personally?
A. I don't know how to answer that. I didn't -- I didn't feel I needed representation at that point personally.
Q. Did you have any sort of retention agreement with Mr. Walker or his office?
A. No.
Q. Once you had the draft completed of the 2021 congressional map the week before the special session, who did you provide it to?
A. Well, obviously, all of the members saw their districts. But they didn't really see the rest of the map. The members of congress saw their district, but they didn't really -- and adjacent districts. But they didn't really see the rest of the map.
I think at that last week, I went through that map with Representative Pringle and Senator McClendon and Dorman Walker. Obviously, Donna Loftin, who runs the office, was in the background during most of this.
Q. What sort of feedback did you receive

when you met with Senator McClendon and Representative Pringle about the draft map?
MR. WALKER: I'm going to object to attorney-client privilege to the extent that I was present in the room and we were having an attorney-client communication. If you had any communications with them that I was not present, you may answer the question.
A. There were -- they just looked at the map. There was nothing substantive in terms of a response.
Q. And are you going to refuse to answer any questions that I were to ask you that would involve any discussions that you had where Mr. Walker was present?
MR. WALKER: I would instruct him not to answer those questions if other conditions indicating it was an attorney-client privilege were present.
Let me -- let me clarify that for you. If I believed we had a conversation that was an attorney-client privilege, I would -- I would instruct him not to answer the question. I don't think that all the conversations I had with him were covered by the privilege.

MR. THOMPSON: When you say you don't think that all of the conversations you had with him, do you mean nonsubstantive conversations like lunch and dinner?
MR. WALKER: Certainly that would be included. What I'm saying is there -- I can think of times when he and I were speaking, although I may not know exactly what we were talking about, when there were other people in the room who were not within the privilege. And we may have been talking about the map. I just don't know.
But there were certain times when I reviewed with him specifically the map. And I would contend that that's covered by the attorney-client privilege.
MR. THOMPSON: Understood. And you would instruct him not to answer on those.
MR. WALKER: Yeah.
Q. And would you follow that instruction?
A. Yes.
Q. So walk me through the timeline, then, once you provided the draft to Senator McClendon and Representative Pringle. What happened with the map at that point?
A. I mean, once it was finalized and they

made no changes to it, it was submitted to be drawn up into a bill and prepared to be presented at the -- be sent out to the members of the reapportionment committee the following Monday and then voted on in committee on Tuesday.

Q. Were there any changes made to the map by the reapportionment committee?

A. No.

Q. Were there any changes made to the map after it was submitted to the legislature?

A. No.

Q. So the version of the map that you completed the week before the special session is identical to the version of the map that was ultimately enacted that we've marked as Exhibit 5, Plaintiff's Exhibit 5, correct?

A. Correct.

Q. Did you save any drafts of the 2021 congressional map?

A. No, sir. The way Maptitude works is it just -- every time you make a change, it saves -- it saves the map at that point. So previous iterations don't -- don't really exist.

Q. Did you print out any copies of any drafts?

A. No.

Q. Do you have any notes that you took or used while drafting the 2021 congressional map?

A. No. I mean, I'm sure I had a scrap of paper somewhere that said Congressman Moore would rather split Escambia and Congressman Carl would rather split Monroe. But they were -- all these things were so -- there were not very many of them. There weren't too may. I didn't need notes to remember that.

Q. Do you have any of those notes saved?

A. No.

Q. If you needed to modify the maps now, do you have any estimate of about how long that would take you to do?

A. Modify in what way?

Q. For instance, are you familiar with what this lawsuit is about?

A. Well, it's three different lawsuits, if I understand it correctly.

Q. What is your understanding of the three different lawsuits?

A. I think two of the -- well, two of the lawsuits I think would have preferred two majority black districts. And the Singleton lawsuit would

have preferred sort of a whole county map with two -- I would call them influence districts.

THE REPORTER: What districts?

A. Influence districts

Q. Would that be the same as -- I've heard "opportunity district." Would "influence district" and "opportunity district" be about the same?

A. Yes, sir.

Q. And what's your understanding of what an influence district or opportunity district is?

A. It would be a district that would be less than a majority of BVAP, but still have a substantial population of minorities that could potentially impact the election of a candidate of their choice.

Q. And when we say "minorities" here specifically, are we referring to the black voting age population?

A. Primarily here in Alabama, you would be referring to the black voting age population.

Q. So if in this case the court were to find that the maps do not comply with the Voting Rights Act or the 14th Amendment and they needed to be modified, do you expect that you would be the one that would be asked to make those modifications?

A. I don't have a crystal ball. I can't predict the future.

Q. Is that something that's covered in your contract?

A. It is not.

Q. If you were asked to modify the map to make changes to comply with the Voting Rights Act or the 14th Amendment, in that situation, do you have any estimate about how long it would take you to do that?

A. No. I mean, asked by whom?

Q. The Alabama state legislature, the courts, Mr. Walker, any of us.

A. No. I mean, I -- conceptually, I guess that would depend on what the court deemed changes were.

Q. Is that something that you think you could complete within a month?

A. I would hope so. I don't know.

Q. Is it something you think you could complete within a week?

A. You're asking me a hypothetical about something that hasn't happened, and I don't have a clue what the changes would be.

Q. When you met with Congressman Sewell,

did you receive any specific instructions from her about how to draw District 7?

A. No, not specifically. Again, it was more of -- our initial meetings were more of here is what the estimates show, here is -- you're obviously -- the district is going to be underpopulated. Let's talk about areas where you may -- may pick up population to get closer to the ideal.

As I said earlier, she was interested in facilities and universities and some companies and military, like Maxwell, and so forth. So she was interested in things above and beyond just picking up additional voters or citizens. So we talked about that briefly.

And then we just went through the most likely areas where she could pick up additional population. And the most likely in my mind, again, to present to her as options were counties that were split.

For example, Clarke County was -- under this map, the 2011 map, was split between 7 and 1. We know 1 is going to be over. We knew -- at the beginning, we didn't know how much. But we knew 1 would be over, and we knew 7 would be under.

So a logical thing, in my mind anyway, would be let's put Clarke County back together. And whatever population that is, let's put that into 7.

And also we talked about some of the changes that would happen that would cascade to her from north Alabama. As we knew, District 5 would be over. The only place District 5 can go to is to District 4 because it's the only district adjacent to it. And that would then put District 4 over. And one of the options was for her to pick up some more of District 4 in Tuscaloosa. So we talked about that.

And then we talked about potential changes in Jefferson, another area where she could pick up additional population.

Q. You mentioned that she wanted universities in her district. What were the names of the universities she wanted?

A. She wanted to make sure that whatever changes we made in Tuscaloosa, we kept the University of Alabama in her district. She was interested in picking up Maxwell Air Force Base in Montgomery, if that was a possibility.

As I discussed earlier, I had split a precinct that had a university in Montgomery. And

she wanted that in her district not split. So we talked about things like that.

Q. Do you remember the name of that university in Montgomery?

A. Yeah, I do. I'm blanking on it at the moment. Alabama -- is it State?

MR. WALKER: Alabama State, ASU.

A. ASU. ASU. Sorry.

Q. Other than those things that you just discussed, did you receive any other instructions or feedback from Congressman Sewell about how to draw District 7?

A. No, not at that time. We did -- in the next round of those talks after we had real numbers, we did talk about some of the changes in Jefferson.

In this -- in the 2011 map, some of the precincts of Homewood -- I think there were three or four Homewood precincts. Some were in her district, and some were in 6. She thought that maybe it might make sense for all of them to be in one district. She would be happy if they were hers, which I did.

So we talked about a few things like that in the next round of discussions.

Q. Did you discuss anything else with her about how to draw her map?

A. No.

Q. Did you discuss race at all with Congressman Sewell?

A. No.

Q. Did she give you any instructions or requests about a certain black voting age population percentage that she wanted in District 7?

A. She did not, other than I think there was -- we both assumed, and I think she would confirm, that she wanted a majority -- a majority black district for her district.

And she also, I should add -- there was one other thing. When we initially asked every member for their home addresses so we made sure we had them inside their own districts, she actually sent in two addresses, knowing that only one of them was her official home address.

One of them was also her home -- her mother's home or whatever in Dallas County. And she wanted -- would prefer that both of those addresses be inside her district. So that was one request she made.

Q. Was that an accommodation you had to change the map to --

A. No. They were -- it was already

happening. They both were -- they both under this map were in her district, and they both under this map were in her district.
Q. Going back to your prior statement, you said that you didn't discuss race with Congressman Sewell; is that correct?
A. Not at that point.
Q. Did you at some point?
A. In the last week, she did ask what was the BVAP of my -- her district.
Q. And what did you tell her?
A. I told her it was 54.22.
Q. And what did she say?
A. She didn't -- I mean, she was comfortable with that, I guess. She didn't comment further. She didn't ask me to make any changes, I guess, if that's what you're asking me.
Q. You said before then that you both assumed that she wanted a majority black population. What are you basing that off of?
A. I don't even know if it's an assumption. I think she -- I think she did say that, that she would prefer to continue to have a majority black district.
Q. You think she said that, or you know she

said that?
A. I think she -- yeah, I think -- I think she said that.
Q. But you don't know for certain?
A. I'm pretty confident she said that, yes.
Q. Are you certain that she said that?
A. I'm pretty confident she said that.
Q. Just to be clear, pretty confident, but not 100 percent certain, fair?
A. Sure.
Q. Did she say anything about any sort of percentage of black voting age population that she wanted in District 7?
A. No.
Q. Did you discuss race with any of the other representatives?
A. I did not.
Q. So Congressman Sewell was the only Congressman you discussed race with?
A. Well, she's the only one who asked at the end of the process what her black -- black voting age population was.
Q. Other than the U.S. congressional representatives and Senator McClendon and Representative Pringle, did you speak with any other

Alabama legislators or their staff about the 2021 congressional maps?
A. No. Maybe -- maybe right before we went to the floor, I think I probably had a conversation with the pro tem and speaker just briefly to say that the members of congress were reasonably in agreement on this map. But it was just sort of a pro forma discussion, not about the details of the map.
Q. Did you speak with anyone else?
A. No.
Q. Did you correspond with anyone by email regarding the redistricting process?
A. No.
Q. Did you make any recommendations to the committee, the reapportionment committee, about how the map should be drawn beyond just providing them a copy of the map?
A. No.
Q. Did the reapportionment committee make any requests or recommendations to you about how the map should be drawn or changed?
A. None other than the guidelines they passed.
Q. Did you receive any requests or

instructions about how to draw the 2021 congressional map from anyone else that we haven't discussed yet?
A. No.
Q. Did you receive any feedback from anyone else that we haven't discussed yet about the way that the 2021 congressional map was drawn?
A. No. I'm assuming you're including chiefs of staff as a subset of a congressman.
Q. Certainly. No one other than the congressmen or their chiefs of staff or anyone else that we've discussed?
A. Right.
MR. THOMPSON: Dorman, I think we've been going a little over an hour. We're approaching that lunch time. We could go a little bit longer, or we could go ahead and break now. What do you prefer?
MR. WALKER: I'm happy with whatever y'all want to do.
MR. THOMPSON: Are you hungry, sir?
THE WITNESS: Not overly. But I'm happy to --
MR. WALKER: I usually go to lunch at 11:30. So I'm happy to take a lunch break.

MR. THOMPSON: Let's -- let's take a lunch break, then.

MR. WALKER: All right.

THE VIDEOGRAPHER: We're off the record. The time is 11:42 a.m.

(Lunch break was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 12:57 p.m.

Q. Mr. Hinaman, before we broke for lunch, we had discussed some of the conversations that you had with the seven U.S. congressmen. Do you recall that?

A. Yes.

Q. And we went into some specifics about your discussions with Congressman Sewell. Or Congresswoman Sewell. Excuse me. I would like to discuss some of the specifics with the other representatives. So I just kind of want to go down the line.

So starting with Representative Carl in District 1, can you tell me what specifics you recall from your discussions with him?

A. Yes. But just to be clear, are we -- you just want -- over the whole time frame, just capsulize it? Or are you talking about a specific

time frame?

Q. At any point in the discussions you had with them in drawing the 2021 congressional map.

A. Okay. So essentially from May to October?

Q. Correct.

A. Okay. Yeah. So we talked about Clarke County which was split, of course, between 7 and District 1. And we talked that the 1st District would likely be over or was over after we got the real numbers, and that one of the solutions to that would be putting Clarke County back together and be putting it in 7.

And then whatever else the overage was, which turned out to be 739 people, that we would take those out of either -- initially we said Monroe or Escambia. And as it turned out, we fine tuned it to Escambia. And that's where we made that change.

And those are basically the discussions with the 1st District congressman.

Q. Did he have any objections to putting all of Clarke County in District 7?

A. He did not.

Q. All right. Tell me what specifics you recall from your discussions with Congressman Moore

in District 2.

A. Well, we talked again about making Montgomery County only split between 7 and 2 and getting the 3rd District out of Montgomery County, which was good because 2 was under anyway. So they needed to pick up some people.

Initially I said, well, depending on what the numbers are, we might need to split off a little bit of Elmore to balance out 3 if we're not splitting Montgomery. But as it turned out, we didn't have to do that. We did -- we did make some changes to 3 in Coosa and Chilton, but we made no further changes in the 2nd.

We talked a little bit about the Escambia and Monroe thing. Again, he would have preferred not to have picked up another county. But unfortunately, that was not in the cards by 739 people. So he needed to -- he did end up picking up Escambia.

And we talked about just geographically making the 7th District a little more compact in Montgomery from where the 2011 lines were versus to what they are now in the 2021 plan.

And at the end of it -- I mean, we had some discussions about Maxwell going into the 7th,

which surprisingly he wasn't too excited about initially, but at the end was comfortable with I think primarily because there was some talk of another BRAC, base closing commission.

And Congressman Moore probably thought it would be helpful to have Terri representing part -- that part of Maxwell that she would have, and he represents another part of Maxwell, the annex, in his district. So two congresspeople fighting that was maybe better than one.

Q. Where is Maxwell?

A. Maxwell is in the northern little part of Montgomery County here that was -- in 2011 was in the 2nd, but is now in the 7th.

Q. With Congressman Sewell, especially in the area you were just discussing there, it had gotten as granular was this college or whatnot. Did you have discussions to that detail with either of the two representatives in District 1 or 2?

A. No, other than the Maxwell, Maxwell annex thing we just talked about with Congressman Moore. He wanted to make sure he still had one of them. And he has the annex one, which is further west in Montgomery, but not the actual base itself.

Q. Do you know why he wanted that in his

district?

A. Again, so they had two voices on base closing issues rather than one.

Q. Do you recall anything else specifically from your discussions with Congressman Moore?

A. No.

Q. How about Congressman Rogers in District 3?

A. Well, we talked briefly. There was a little piece of Cherokee County that was split off in the last redistricting, which was really somewhat needless. So we talked about putting that back together.

We talked about again him getting out of Montgomery County so that it would only be split two ways instead of three. And then we talked about what that might mean in terms of where he would pick up.

Coosa had been in the 3rd in some earlier maps, meaning 2001 or sometime back in the past. So he was fine picking up Coosa County from 6. And then for population -- obviously, population reasons, he needed a little more than that. So we took, I think, like 12,000 people from Chilton and put it into 3 to get his population to where it

needed to be.

Q. Anything else you recall?

A. No.

Q. What about Congressman Adderholt in District 4?

A. Yeah, I talked to him numerous times. Part of it is, obviously, he was going to pick up a lot of folks from the 5th district. And there was initial discussion on which end of the 5th, should we take them from Jackson County or should we take them from Lauderdale, and how was the best way to do that.

And we had a couple of different discussions about that, and finally decided that putting the Shoals -- Muscle Shoals area back together as much as possible in Lauderdale was the preferable way to do that. And that's what we talked about.

And then, obviously, that required him to lose some of Tuscaloosa, a few precincts in Tuscaloosa, to make up for -- to get the population to equal out.

And also he had a little chunk of Blount County, as well, from 6. And we talked about making Blount whole again and not splitting it between two

congressional districts.

Q. Did you have any discussions with him about which specific areas of Tuscaloosa to include or not include?

A. A little bit. I mean, we talked about the precincts, the next most likely geographical precincts to add into 7. We talked about them. It was sort of obvious geographically where he had to go next. So there wasn't much discussion about it.

Q. How did you choose the precincts you chose other than geography?

A. Well, that's -- population and geography were the only two ways to choose them.

Q. Do you recall anything else, specifics about your conversations with Congressman Adderholt?

A. No. And then at the end -- as I said, I had splint a precinct in Lauderdale to get to zero deviation in District 5, and he referred a different precinct split. So I changed it to the one he preferred. So that was -- that was one of the final changes at the end that we made.

Q. Moving on to Congressman Brooks in District 5. What do you recall from those conversations?

A. Well, there weren't any because

Congressman Brooks decided not to meet -- this is my presumption -- because he was running for the senate and had less interest in how this was going to come out.

I did meet the first time with his chief of staff just to talk about keeping Morgan and Madison together. But that was -- that was about it.

Q. What was the discussion there about keeping Morgan and Madison together?

A. The community of interest. And a number of people that, obviously, live in northern Morgan work in Huntsville, in Madison County, and so forth, and thought it was a good combination to keep them whole and together.

Q. Other than that first meeting -- and I guess that would have been back in May --

A. May.

Q. -- of 2021 with the chief of staff for Congressman Brooks, did you meet with anybody else on behalf of Congressman Brooks or his office?

A. No. I called his chief of staff back once we had, you know, roughed out a -- gotten the math from the real data. And he -- he didn't call me back. I called him a couple of times. And I

assumed that meant he was less interested in how this was going to go.
Q. And then finally, what about Congressman Palmer in District 6? What do you recall about those conversations?
A. Well, I talked to him about again putting Blount back together and giving that all to him. I talked to him -- in the meantime, he had -- he had initially, I thought, lived in Jefferson County. And then he had moved to Shelby.
So I talked a little bit about making sure I had the right home address for him. Because I initially thought he still lived in Jefferson, but he didn't. So we did have the right address in Shelby. So that was fine.
I talked about he may loose Coosa to the 3rd and a little part of Chilton. He was comfortable with that. And I talked to him about some of the changes in Jefferson in the 7th District where geographically I was trying to make the 7th District's footprint in Jefferson more compact by adding western Jefferson and shortening the district on the top. And I wanted him to be aware of that.
But as I said earlier, we had initial meetings and even a follow-up call. But when the

final map was done, meaning that last week of October, he -- he allowed as how he didn't really want to -- his chief of staff told me that the congressman did not really want to talk about it, that he was convinced we were going to go to court, and he didn't really see a need to discuss it.
Q. Who was that that told you that?
A. Congressman Palmer's chief of staff.
Q. And when was that discussion?
A. That was in mid October.
Q. And why did he say that he was convinced that this was going to go to court?
A. I don't know. He was -- the chief of staff said that -- the chief of staff said that he had been told, I think, by the NRCC that this map was going to go to court, and that Congressman Palmer had decided to not discuss it further.
Q. Did you ask him why he thought it was going to court?
A. No. I accepted his answer.
Q. Did you have any idea about why this would go to court based on that discussion?
A. No.
Q. And you didn't care to ask?
A. It was his opinion. I didn't think it

was relevant to what I was doing.
Q. Jefferson County, the way it's split in the 2021 congressional map, is not exactly a straight line. How did you decide which areas of Jefferson County would move from District 6 to District 7?
A. I was looking geographically to widen the face of the protrusion into Jefferson -- if you want to call it that, into Jefferson County. I was looking to not split precincts. Those are all, except for one that's split for deviation -- well, two, technically. One Congressman Sewell -- Congresswoman Sewell lives in and another one.
But I was trying not to split precincts. I was picking whole precincts. And I was trying to make the district more compact, meaning widen it as it goes into Jefferson County and eliminate some of the longer, further-away ones at the northern part of the county.
Q. So how does that process work when you're choosing which precincts to pick up? Are you just kind of choosing at random geographically as you move up and seeing what works? Or are there other factors at play that you're considering?
A. No, that's exactly it, seeing what works

numerically and making something, in my mind, look more compact geographically.
Q. Are there any other factors or data that you're considering when you're choosing which precincts to include?
A. No. I mean, other than -- we had that discussion about Homewood where she allowed that -- we had split a couple of Homewood precincts, some on one side of her line in 7 and some on the other side in 6, and thought it might be good to group them all together.
Q. You mentioned that there were two precincts that were split for deviation purposes, one of which Congressman Sewell lives in you said. What were those two precincts?
A. The names?
Q. Do you recall?
A. I do not.
Q. This isn't a memory test. I just --
A. I do not.
Q. Okay.
A. And the reason it's not one -- I was trying to make the split just solely in one precinct. But unfortunately the census blocks didn't cooperate very much. And when I got to where

I got to geographically in the one -- the precinct she lived in, I was hoping I could pick up the right number of populations.

But unfortunately I hit a situation where there was like a 550 block next to it, and that was too many. So that was not going to work. So I had to split another precinct to get to zero deviation.

Q. Do you recall anything else specifically from your discussions with Congressman Palmer or his chief of staff in furtherance of drawing the 2021 congressional map?

A. No.

Q. And I think we discussed this earlier. But in any of those discussions with any of those congressmen, Congressmen Carl, Moore, Rogers, Adderholt, Brooks, Palmer, did race ever come up in your discussions with any of them or their staff?

A. No.

I mean, I'll amend that slightly. I do think in the final when I went through with everybody, I think maybe Congressman Moore's district director, Bill Harris, who I was talking to, may have asked, "Can you tell me what the BVAP of the 2nd District is now?" I think I probably

gave him that number.

Q. And when was that?

A. In the last -- that last week when we turned race on.

Q. You gave him the --

A. He asked --

Q. -- black voting age population?

A. Yeah. He asked what the BVAP for that district was, and I gave him that number.

Q. Was there any further discussion about it?

A. No.

(Plaintiff's Exhibit 7 was marked for identification.)

Q. I'm handing you what's been marked as Plaintiff's Exhibit 7. This is a copy of the reapportionment committee redistricting guidelines that was produced in this lawsuit. The Bates number at the bottom is RC 043723, and it's dated May 5th 2021.

Do you see that?

A. I do.

Q. Do you recognize this document?

A. I do.

Q. What is this document?

A. These are the guidelines that were approved by the reapportionment committee for drawing the four maps.

Q. Were you provided a copy of these redistricting guidelines before you drafted the 2021 congressional map?

A. I was.

Q. Who provided it to you?

A. The two co-chairs, probably with Dorman Walker, as well. I'm not sure who handed it to me.

Q. And when was that?

A. It would have been around the time it was passed, May 5th.

Q. What --

A. Which very importantly happens to be my birthday.

Q. That is an important note. Thank you for letting me know. Happy belated birthday.

A. Thank you.

Q. What were you told when you were provided these guidelines?

A. I was told these were the guidelines for drawing the four maps that you've been contracted to

draw, and to follow them to the best of my abilities.

Q. Anything else that you recall?

A. No.

Q. And did you, in fact, follow these guidelines in drawing the 2021 congressional map?

A. I did.

Q. Let's take a look at the criteria that's listed here. So starting on Page 1, you see Line 10 there. It says Section II, Criteria for Redistricting.

A. Yes, sir.

Q. I want to talk through these with you. So Sections II a and b both state that the congressional district should equalize total population and have minimal population deviation.

Do you see that?

A. I do.

Q. What does minimal population deviation mean to you?

A. I took that to mean for the congressional districts, that that was -- they should be zero for six of the districts and plus one for the remaining district because the population was not divisible by seven. So six were to zero

deviation, and one should be plus one.
Q. Which district did you choose to be the plus one deviation?
A. I knew you would ask me that. I don't -- I would have to look. I think it was the 6th maybe. I would have to look at a map. I don't have numbers. I'm sorry.
Q. Was it District 7?
A. No, I don't think so. I think it was 2 or 6, but I can't remember which.
Q. And what did you do to make sure that your map complied with that zero deviation for six of the districts and plus or minus one for the other?
A. I moved -- I split seven precincts down to the census block level to get to zero deviation for six of the districts and plus one for the seventh one.
Q. Did anyone tell you that zero percent deviation was required or that there was a certain cutoff that you had to reach to satisfy this criteria?
MR. WALKER: Objection to form. You can answer.
A. I was told that it was literally zero

deviation, meaning zero -- not percent, but zero people except for the one that had to be plus one.
Q. Is that plus one person?
A. Yes.
Q. Understood.
A. Sorry. Plus one person.
Q. And who told you --
A. Dorman Walker, legal counsel.
Q. Section II c looks like it's about legislative and board of education districts. So I don't think that would apply to the congressional map. Is that correct?
A. Correct.
Q. Section II d says that the plan must comply with the one person, one vote principle of the Equal Protection Clause of the 14th Amendment of the United States Constitution.
Do you understand what the one person, one vote principle is?
A. I think I do.
Q. What's your understanding?
A. Again, that's so no -- so people have equal representation, the representatives in those, in the congressional case, should be representing the same number of people.

Q. So that goes back to the population deviation?
A. Correct.
Q. And where does that understanding come from?
A. Where does my understanding come from? I'm sure if I had any questions about it, I asked legal counsel.
Q. So other than what you just discussed doing for Sections II a and b in adjusting for the population, did you do anything else to make sure that your plan complies with the one person, one vote principle?
A. No.
Q. Section II e looks like it just states that a plan that does not comply with the population requirements above will not be approved.
Is there anything additional you needed to consider here for this section e beyond what we've already discussed?
A. I don't believe so.
Q. Section II f states, "Districts shall be drawn in compliance with the Voting Rights Act of 1965 as amended. A redistricting plan shall have neither the purpose nor the effect of diluting

minority voting strength, and shall comply with Section 2 of the Voting Rights Act and the United States Constitution."
Are you familiar with the Voting Rights Act of 1965?
A. I'm not a lawyer, but I'm familiar with it.
Q. What is your understanding?
A. Well, that the -- a plan should not have the intent or purpose of discriminating against any minority population.
Q. Where does that understanding come from?
A. Just conversations with legal counsel and others during the process.
Q. Are you familiar with Section 2 of the Voting Rights Act?
A. Again, I'm not a lawyer. But vaguely.
Q. Have you ever read Section 2 of the Voting Rights Act?
A. I'm not sure I have.
Q. What is your understanding of what Section 2 requires?
A. Where there -- I guess my understanding of it, a layman's understanding of it, would be where there's a sufficient and compact enough

population of -- minority population to create a district, a congressional district in this case, that a district should be drawn if it's compact and sort of meets the Gingles, I guess, requirements, compact, contiguous population.

Q. Where there would be a majority black district?

A. Right, and would have the opportunity to elect a candidate of their choice.

Q. And does that understanding come from the same sources, conversations with counsel?

A. Yes, sir.

Q. What did you do to make sure that your plan complies with Section 2 of the Voting Rights Act?

A. Again, once it was done and we turned on race, we talked about it. No one asked me to make any other changes. And I talked to legal counsel and, I guess, concluded that it satisfies Section 2 of the Voting Rights Act.

Q. Anything else?

A. No.

Q. Did you personally make a determination that your plan does not have the purpose or effect of diluting minority voting strength?

A. I'm -- I'm not a lawyer, so I don't know that I can make that -- I don't know that it's my job to make that distinction. But I don't believe it discriminated against anyone.

Q. Did you do anything to make that determination yourself?

A. Other than talk to legal counsel, no.

Q. Other than potentially legal counsel, did you have discussions with anyone else about whether your plan complied with Section II of the Voting Rights Act?

A. No.

Q. In making the determination, whether that's through conversation with legal counsel or not, about whether your plan complies with this policy, did that require you to review the racial makeup of the districts?

A. Well, yeah. I mean, race -- at that point, we had turned race on. So the BVAPs and numbers were available.

Q. And you say they were available. So then you had to review them, as well, to make sure that everything was in compliance with this policy?

A. Well, we -- the numbers were then revealed or available, and we discussed the various

numbers related to the map.

Q. Did you have anyone other than Mr. Walker or someone with his firm analyze your map at any point to confirm that it complies with Section 2 of the Voting Rights Act?

A. I did not.

Q. Do you know if anyone reviewed the map to determine whether it complies with Section 2 of the Voting Rights Act, other than potentially Mr. Walker and his firm?

A. I do not, no.

Q. And other than what we've discussed already, did you do anything else to make sure that your plan complies with Section 2 of the Voting Rights Act?

A. I did not.

Q. Moving on to the next criteria, Section II g. This one is a little longer.

It states, "No district will be drawn in a manner that subordinates race-neutral districting criteria to considerations of race, color, or membership in a language-minority group, except that race, color, or membership in a language-minority group may predominate over race-neutral districting criteria to comply with Section 2 of the Voting

Rights Act, provided there is a strong basis in evidence in support of such a race-based choice. A strong basis in evidence exists when there is good reason to believe that race must be used in order to satisfy the Voting Rights Act."

Do you see that?

A. I do.

Q. What is your understanding of what that section requires?

A. My understanding of what that section requires is that's why -- when we made all of our changes to the districts by adding or subtracting population, that's why race was not on. We did it based on total population. And then at the end of the process, we did turn race on to look at various districts.

And because we were doing a number of these maps at the same time, there were a couple of instances in the other maps where we did look at race to add to a district. But that did not come into play in congressional.

Q. What, if anything, did you do to make sure that specific congressional districts complied with this policy?

A. I made sure that when I added -- I used

traditional redistricting principles of total pop and geography considerations to add and subtract to these districts, and that that was not based on race.

Q. Flip the page to Page 2. The next section is Section 2 h, and it states that districts must be composed of contiguous and reasonably compact geography.

What is your understanding of what this section requires?

A. Yeah, obviously contiguous counties and/or precincts had to be adjacent, to be hooked together, to form a district. You couldn't have part of Madison County tied to Mobile or something crazy like that.

And to the extent possible, I was trying to, when changing things inside a county as Jefferson, I was trying to make -- or Montgomery, for that matter, tried to make districts more geographically compact so they were not as spread out.

Q. Beyond what you just mentioned with Montgomery -- sorry. Was that Jefferson County?

A. And Montgomery, too.

Q. And Montgomery County. Beyond that,

what did you do to make sure that your plan complies with this policy?

A. That's about it.

Q. Moving on to the next section, Section II i. It lists several requirements of the Alabama Constitution. I'm not going to read all of them here.

Did you consider these factors in drawing your map?

A. I did.

Q. It appears, just by looking at them, that most of them do not apply to the congressional map. Rather, they talk about Alabama senate and Alabama house. Is that right?

A. Correct.

Q. How did you consider these factors here under Section II i in drawing the congressional map?

A. Well, I don't know how far down this list -- I don't know how far down this list you're counting.

Q. It looks likes II i. It's from Line 3 down to Line 20 on Page 2 of Exhibit 7.

A. As you say, most of them don't really apply. They are all -- all districts will be single-member districts, they're contiguous. That's

already basically been covered in other things we've discussed.

Q. Anything else that you had to take into account to comply with this policy?

A. I don't think so.

Q. Section II j starting at Line 21 there. Section II j lists six redistricting policies. Do you see that?

A. Uh-huh.

Q. Sorry. Can you answer verbally?

A. Yes. Sorry.

Q. That's fine.

Did you consider these redistricting policies when drawing your map?

A. I did.

Q. How?

A. Well, I wanted to make sure that no -- to the extent possible that no incumbents were put together, which they were not, in the congressional map. While continuity by water was allowed, I was trying to not use that. Which I don't think we did.

I don't know how far down your --

Q. I can walk through them with you. That might make more sense.

First off, did anyone explain to you

what these policies mean?

A. No. I'm sure if I had a question, I would have asked legal counsel. But I don't remember asking.

Q. Similarly, did anyone explain to you how to apply these policies in drawing the map?

A. No.

Q. What is your understanding of the priority amongst these various policies?

A. I think the only two that are paramount to the rest of them would be one person, one vote and the Voting Rights Act.

The rest of them are somewhat -- can occasionally be in conflict. And it depends on the various situations where one might trump the other or vice versa.

You may have two incumbents that live very close to one another. Maybe they need to be split apart. That may make the districts not quite as compact as you would like. But one of those -- you know, you couldn't put the two incumbents together. So sometimes they are in conflict, and you have to resolve that.

Q. Other than the two you just mentioned, one person, one vote and the Voting Rights Act, did

you place any greater importance on one of these policies over the other?
A. No.
Q. Let's walk through these. So the first policy under Section J starting on Line 25 there states, "Contests between incumbents will be avoided whenever possible."
What's your understanding of what this requires?
A. That when -- certainly when possible, I would not put incumbents in the same district.
Q. What did you do to make sure that you complied with that?
A. Retrieved -- made sure that we retrieved all of the home addresses and looked to where they were and made sure two of them were not in the same district.
Q. You might have answered this earlier. But did you have to make any modifications to your map to comply with this?
A. Not the congressional map.
Q. This factor applies equally to both parties, correct?
A. Certainly, yes.
Q. So you applied it equally to all

incumbents, both the republicans and to the democrat, correct?
A. Correct.
Q. The second policy there, Section II j(ii) starting on Line 26, states -- I don't know why I'm having trouble pronouncing the word. "Contiguity by water is allowed, but point-to-point contiguity and long-lasso contiguity is not."
What is your understanding of what that policy requires?
A. I'm not sure I even know what long-lasso contiguity is, to be honest with you.
But point-to-point, occasionally you can have a precinct or a census block that connects to the next one just by one point in space. And that's not -- under their guidelines, not allowable in terms of connecting them together.
Again, on the congressional map, it didn't come into play very much because I tried not to split -- I only split seven precincts and tried not to have situations where census blocks were -- weren't any -- weren't close to any of those options there.
Q. Did you have to do anything else to make sure your plan complied with this policy?

A. No.
Q. Did you have to make any modifications to your map to comply with this policy?
A. I did not.
Q. The third one -- the third policy, which is Section II j(iii,) states, "Districts shall respect communities of interest, neighborhoods, and political subdivisions to the extent practicable and in compliance with paragraphs a through i."
What is your understanding of what this policy requires?
A. It requires -- like I said earlier, in areas; for example, Mobile and Baldwin which wanted to stay together or Madison and Morgan that had specific communities of interest, it was to keep areas together that have similar -- and, obviously, there are lots of different communities of interest. So I tried to keep areas, to the extent possible, together.
Obviously, this comes into conflict with county lines, precinct lines, other things. So it's not always -- and everybody has -- a number of people have different views of what communities of interest are. So it's certainly not always possible to keep all of them together.

Q. What is your definition of a community of interest?
A. My definition of community of interest, it can be geographic, it can be economic, where people work, it can be racial, it could be geography, it could be people on the bay, for example, for Mobile and Baldwin counties. A host of -- a host of communities of interest.
Q. What do you consider to be communities of interest in Alabama?
A. All those things I just listed.
Q. Is there any sort of particular communities of interest that are well established or a list of any of these? Or is this just something that is subjectively known but doesn't really exist in writing anywhere?
A. I don't know of a definitive list of all the communities of interest in Alabama.
Q. Are there any specific communities of interest that come to mind for you right now?
A. No, other than the ones I listed. I mean, precincts can be -- counties are, I guess, communities of interest sometimes. I mean, it's -- there are a whole host of things.
Q. It sounds like communities of interest

can be somewhat fluid. Is that fair to say?
A. It is fair to say.
Q. One area, say, where we're sitting right now in Montgomery, could be part of three, four, five, six different communities of interest depending on what factors you're looking at?
A. Yeah, whether they're economic or racial or social or everybody roots for the same football team, I suppose.
Q. Do they?
A. No.
Q. I see. I see. That would be a community of interest perhaps.
Are you familiar with the black belt? You mentioned that earlier.
A. I am.
Q. What is the black belt?
A. It's a group of mostly rural counties that have a -- for the most part have a majority black population.
Q. Do you know what counties are in the black belt?
A. I'm not sure I can list every one. But yeah, in general, I do.
Q. What counties would you say are in the

black belt?
A. I would say Sumpter, Greene, Choctaw, Marengo, Hale, Perry, Dallas, Wilcox, Lowndes, I guess Macon and Bullock. Some would say Montgomery.
Q. Do you consider the black belt to be a community of interest?
A. I do.
Q. So in drawing your map, what did you do to make sure that your plan complies with this policy, that it respected communities of interest?
A. Again, I mean, because there are so many different communities of interest, they're not -- I mean, no plan is going to respect all of them. So there are trade-offs.
There are also -- you know, the entire black belt I imagine if you made into a congressional district would accomplish -- would hit up against other one person, one vote issues and other issues in here, as well. So they are sometimes in conflict. So you can't -- you can't satisfy all communities of interest.
Q. Did you have to make any specific modifications to your map to make sure that you were respecting communities of interest?
A. No. Although, again, I tried to keep,

for example, the Muscle Shoals area together in the -- in the 4th District when we split Lauderdale. Not that it was at issue, but the people in Mobile and Baldwin very much wanted to be together because they share the bay. But that didn't require a change. It just is a . . .
Q. Other than the modification for the Muscle Shoals community, are there any other specific modifications that you felt like you made in drawing the 2021 map?
A. No, not specifically.
Q. Does your map split any communities of interest?
A. Oh, I'm sure it does. I mean, all maps split some communities of interest.
Q. And part of that is because of what we just discussed, that communities of interest can mean lots of different things?
A. To different people, I'm sure.
Q. Looking at the bottom of Section II j(iii,) that third policy, it gives a definition. It says, "The term communities of interest" -- excuse me.
It says, "A community of interest is defined as an area with recognized similarities of

interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities. The term communities of interest may in certain circumstances include political subdivisions such as counties, voting precincts, municipalities, tribal lands and reservations, or school districts."
Did you review any ethnic, racial, tribal, or other similar data to identify communities of interest?
A. I did not.
Q. Moving to the next policy, the fourth policy, Section II j(iv.) It states, "The legislature shall try to minimize the number of counties in each district."
I think that's pretty self-explanatory. But what is your understanding of what that policy requires?
A. Yeah, that's sort of a compactness thing. I was trying to keep the fewest number of counties necessary to -- and it's not always -- there are other -- the next one down says "preserving cores of existing districts."
I mean, some of these things come into conflict. But to where possible, I tried to deal in

whole counties, keeping counties whole, and the minimum number to reach the ideal population.

Q. Did you have to make any specific modifications to your map to comply with that policy?

A. No. Although it does come into effect when people were talking about adding -- where you split a -- for example, the Escambia County split, you know, where does that go.

I was trying to keep districts so that not all of the splits were in the same district and the number of counties in a particular district didn't grow a lot. Because for a congressional office, that takes on local governments and more work. So I tried to be mindful of that when looking at it.

Q. Other than trying to be mindful of that, did you have to make any specific changes?

A. No.

Q. You referenced it just now. The next policy, the fifth policy, Section II j(v) states, "The legislature shall try to preserve the cores of existing districts."

What is your understanding of what that policy requires?

A. That's basically the cores of the -- of existing districts or the counties that make up the majority of those districts, to keep them together in the same district.

Obviously, incumbents have a preference to not have to add folks they haven't represented when they can continue to keep the folks they have been representing.

Q. What, in your mind, is the core of an existing district?

A. The core of an existing district is basically -- I view it as geography. It's the county -- the key counties that make up the current district, current as in 2001.

Q. Where --

A. Or 2011 I mean.

Q. Where does that understanding come from?

A. I don't know. That understanding comes from what the cores of a district are.

Q. Your understanding of what a core of a district is comes from --

A. I mean, that's what the definition of those words are to me anyway.

Q. Did you have some sort of metric to use when determining what the core of an existing

district is?

A. I did not.

Q. Does maintaining the core of districts require considerations of racial data?

A. I don't think it does, no.

(Plaintiff's Exhibit 8 was marked for identification.)

Q. I'm handing you what's been marked as Plaintiff's Exhibit 8. This is a document that was produced in this lawsuit. The Bates number in the corner is RC 00056. It's a seven-page document. Each page has one of the seven congressional districts from the 2021 congressional map.

Do you see that?

A. I do.

Q. Have you seen this document before?

A. I have not.

Q. And you can take a look through it if you don't believe me. But these are the seven -- these are maps of each of the seven congressional districts in the 2021 map that you drew; is that correct?

A. Yes, sir.

Q. Looking at page one here, District 1, show me on here where the core of District 1 is.

A. Well, the core of District 1 to me would be Mobile and Baldwin counties.

Q. Flipping over to -- and why do you consider those two --

A. Well, that's --

Q. -- to be the core?

A. Those are the two predominant counties. They have the vast majority of the population in the district.

Q. Flipping the page to District 2. What do you consider to be the core of District 2?

A. The core of District 2 is a little more complicated than that, I guess. You have the Wire -- you have Dothan, which is Houston County, you have the Wiregrass region, you have Montgomery, and then you have Autauga and Elmore on top -- of top of them.

Q. And why do you consider those counties to be the core of this district?

A. Again, that's where the majority of the population is. And they've been for the most part consistently inside the 2nd District for a considerable period of time.

Q. Moving the page to District 3, the same question. What do you consider to be the core of District 3?
A. The core of District 3 would be Calhoun and St. Clair. And then obviously more down, Lee and Russell, which are very fast-growing counties, especially Lee County. That would be the core of the district to me.
Q. And why do you say that?
A. Again, it's the vast majority of the population. It's also -- those areas have been pretty much continuously in the 3rd District.
Q. Turning the page to District 4, same question. What do you consider to be the core of District 4?
A. The core of District 4 would be sort of the Winston, Walker, Cullman area, and then northern Tuscaloosa which was only added ten years ago but certainly plays a key role in the district now. And then sort of Marshall, Etowah, again large population, have been in the district a considerable amount of time.
Q. Is your answer for why those are the core based on population again?
A. Population, yeah.

Q. Flipping the page to District 5, same question. What's the core there?
A. The core would be Madison and Morgan and Limestone, which is now rapidly growing, as well. Again, population, and they've been in that district for a considerable period of time.
Q. Any other reasons?
A. No.
Q. Turning the page to District 6, same question.
A. District 6, obviously Shelby and then Jefferson because of population would be, in my mind, the core of that district.
Q. Any other reasons?
A. No. It's population primarily.
Q. Finally flipping the page to District 7. What would you consider to be the core of District 7?
A. I would say the core of District 7 is the black belt counties that we talked about earlier from Choctaw through to Lowndes, and then also the portions of Tuscaloosa and Jefferson.
Q. What are the reasons for considering those to be the core?
A. Again, population and that they've been

in that district for a long period of time.
Q. And going through each of these counties that you consider to be the core of each district, is that a determination that you made? Or is that something that you were told by someone else?
A. That's a determination I made.
Q. Have you discussed what you consider to be the core of each of these districts with anyone else?
A. I may have discussed it with legal counsel. But I don't have a specific recollection of the discussion.
Q. Has anyone ever told you before what the core of each district is?
A. No.
Q. Looking back at the policy that we were referencing here about preserving the cores of each of the districts, what did you do to make sure that your plan preserved the core of each of these districts?
A. I kept the areas we referenced by district inside that district.
Q. Did you have to make any specific modifications to comply with this?
A. No.

Q. Where did this policy rank in comparison to the other policies?
A. It was equal to all except one person, one vote and the Voting Rights Act.
Q. We're almost through the criteria here. The last policy, Section II j(vi) states, "In establishing legislative districts, the reapportionment committee shall give due consideration to all the criteria herein. However, priority is to be given to the compelling state interests requiring equality of population among districts and compliance with the Voting Rights Act of 1965, as amended, should the requirements of those criteria conflict with any other criteria."
That sounds to be pretty much what you just said to me, correct?
A. Correct.
Q. To your knowledge, was there any conflict between the five policies we just discussed and the requirements regarding equality of population?
A. No. I mean, obviously, there can be conflicts between one person, one vote and communities of interest and one person, one vote and how many counties are in a district. But not on

that level, I guess. You would have to ask me that one again.
Q. And did you run into any of those conflicts? Did you have to make any modifications based on any sort of conflict like that in drawing the map?
A. Well, I mean, I didn't run into them. But, I mean, I kept those in mind when we were doing our initial additions or subtractions to the plan.
Q. Same question. To your knowledge, was there any conflict between those five policies we just discussed and the requirements under the Voting Rights Act of 1965?
A. No. As I stated, when I added population to the 7th district, for example, I was not looking at race. So there was no conflict with any of it to the Voting Rights Act.
THE REPORTER: There was no conflict what?
A. With any of those to the Voting Rights Act.
Q. I don't think it's another policy. But looking down here at the bottom, g, the last section under the criteria. Section g states that the six policies we just discussed in paragraphs j(i)

through (vi) are not listed in order of precedence, and in each instance where they conflict, the legislature shall at its discrimination determine which takes priority.
Were you given any instruction on which policy should take priority over the others?
A. No, other than section 6 that says clearly one person, one vote and the Voting Rights Act. But other than that, no.
Q. Is there anything else in Exhibit 8, which is the reapportionment committee redistricting guidelines, that you considered other than the criteria we just discussed in Section II?
A. No.
Q. In looking back at these criteria in Exhibit 8, Section II, were these the main factors that you considered when drawing the 2021 congressional map?
A. They were.
Q. Did you consider any other factors when drawing the 2021 congressional map?
A. I did not.
Q. Are you aware of any racial polarization analysis that was done on any of the districts on the 2021 congressional map?

A. I'm not.
Q. What is your understanding of what a racial polarization analysis entails?
A. I think it -- I've never done one, and I'm not an expert. But my understanding -- a layman's understanding of it, it is an analysis of performance of how a district would perform in terms of electing a candidate of choice for a minority candidate.
Q. Do you know why a racial polarization analysis was not conducted?
A. I do -- that was -- I do not.
Q. Did you ever suggest one?
A. I did not.
Q. Why not?
A. It wasn't under my purview.
Q. What do you mean?
A. It wasn't part of my -- I was asked to draw four maps and submit them to the legislature.
Q. Did anyone ever talk to you about a racial polarization analysis?
A. Counsel. We talked -- we've talked about --
MR. WALKER: Objection to form.
Q. Without going into any discussion that

you had with Mr. Walker, did anyone else ever talk to you about any racial polarization analysis being done for the 2021 congressional map?
A. No.
MR. THOMPSON: For the record, Counsel, I have a copy here of the joint stipulated facts that were agreed to by counsel and filed this past Friday. I only have one copy.
MR. WALKER: Do you want me to get a copy made, copies made?
MR. THOMPSON: We can. I just have a question about one of these. So if it works, I can just read it into the record and show the witness.
MR. WALKER: That's fine.
Q. Paragraph 62 of -- for your knowledge, sir, this is a document titled Joint Stipulated Facts for Preliminary Injunction Proceedings. And this was a document of stipulated facts that the parties in the three lawsuits here have agreed to. Does that make sense?
A. Yes.
MR. DAVIS: Actually, there are differences. What one set of counsel agreed to with us may not be exactly what another set of counsel agreed to with us. So you might want to clarify for

the record in which case those stipulations are.
MR. THOMPSON: This is the Milligan plaintiffs versus Merrill stipulations.
Q. All right. Paragraph 62 in this -- and I'll read it to you, and then I can show it to you.
It states, "In recent litigation, Secretary Merrill stated that CD 7," which is Congressional District 7, "appears to be racially gerrymandered, with a finger sticking up from the black belt for the sole purpose of grabbing the black population of Jefferson County. Defendant does not believe that the law would permit Alabama to draw that district today if the finger into Jefferson County was for the predominant purpose of drawing African American voters into the district." And that's from Secretary of State Merrill's pretrial brief in Chestnut v. Merrill.
And I'll show that to you. Just let me know when you've had a chance to look at it.
A. Okay.
Q. Do you agree with Secretary Merrill that District 7 appears to be racially gerrymandered?
MR. DAVIS: Object to the form.
MR. WALKER: Object to the form.
MR. DAVIS: Which District 7? What

year?
MR. THOMPSON: I believe this was in reference to the 2011 --
MR. WALKER: Right.
MR. THOMPSON: -- congressional map. Correct?
MR. DAVIS: I just want to make sure it's clear if, in fact, you're asking him about the 2011 district, that y'all are on the same page.
MR. THOMPSON: Thank you.
Q. So do you agree with Secretary Merrill that District 7 in the 2011 Alabama congressional map appears to be racially gerrymandered?
A. Well, again, I'm not a lawyer nor an expert. But I think it's clear there is a racial component to the finger that goes into Jefferson County.
Q. And why do you say that?
A. Well, I think because of shape and size and what have you. And, again, I haven't done -- I haven't looked at it specifically. But I imagine, obviously, the majority of the folks inside that finger, for lack of a better word, are probably African American and the majority of folks on the outside probably aren't.

Q. And you drew the original District 7 back in 1992, we discussed, right?
A. Correct.
Q. So you drew that original, for lack of better terms, finger that extends into District 6?
A. Yeah. And I'm not sure it looked exactly like that. But yes, I did.
Q. And why did you draw that long finger extension into District 6?
A. Well, it partially probably had to do with where the incumbent lived at that point. But also to create a majority black district.
Q. Moving ahead to the 2021 congressional map. Were you asked to do anything to District 7 so that it does not appear to be racially gerrymandered?
A. I wasn't asked to do anything. But when I was looking at adding population to District 7, I was hoping -- my goal was to make it more compact and geographically comprehensible in terms of, for example, Jefferson County. So that's why I was adding west Jefferson County and gaining population there.
Q. Did you do anything specifically in drawing the 2021 congressional map to modify it so

that District 7 does not appear to be racially gerrymandered?
A. I don't know how to answer that other than I tried to make it more geographically compact in shape.
Q. Other than that, did you make --
A. And not -- and not split precincts. Which I think a number of precincts were split in this version.
Q. Other than trying to make it geographically compact and not splitting precincts, did you make any other changes for that purpose?
A. No.
MR. WALKER: Just so the record is clear, the witness' reference to "this version" was to the 2011 version.
A. When I said they were split. Is that what you're talking -- yeah.
MR. THOMPSON: Thank you.
Q. And I'm referring to when you were drawing the 2021 map now. So thank you for the clarification.
Did you specifically make any changes in drawing the 2021 map to ensure that District 7 does not appear to be racially gerrymandered?

A. No, other than -- other than making the district more compact and more geographically contiguous.
Q. Anything else?
A. And not split precincts.
Q. Anything beyond that?
A. No.
Q. Do you know if District 7 would still be majority black without that finger sticking up into Jefferson County?
A. I do not.
Q. Have you looked at that?
A. No. But, of course, it's not really a finger anymore. It was basically the southwestern part of the county.
Q. In drawing the 2021 congressional map, were you asked to consider anything about race when drawing District 7?
A. No.
Q. Did you consider anything about race when drawing District 7?
A. No.
Q. And you say "No." That was before the week before you submitted this to the special session, correct?

A. Correct. But even once we turned race on, nobody asked me to make any changes to District 7 or any other district.
Q. And did you make any changes to District 7 at that point?
A. No.
Q. Did you look at the racial makeup of certain neighborhoods that week before the special session?
A. I did not.
Q. Did you take into account any of the other characteristics of the black voting age population when drawing District 7?
A. Help me with that one.
Q. Similar to what I asked before. Did you take into account different socioeconomic factors within the black voting age population?
A. No, sir, I did not.
Q. Attitudes?
A. No, sir.
Q. Interests?
A. No.
Q. Type of employment?
A. No.
Q. Income?

A. No.
Q. Educational level?
A. No.
Q. Favorite football team?
A. No.
Q. Voter turnout?
A. No, sir.
Q. Election results to assess party affiliation?
A. No.
Q. Were you asked to consider anything about race when drawing any of the other districts?
A. I was not.
Q. Did you consider anything about race when drawing Districts 1 through 6?
A. I did not.
Q. Did you consider whether it would be possible to create a second black majority district when drawing the 2021 congressional map?
A. I did.
Q. When did you make that -- when did you consider that?
MR. WALKER: I'm going to asset the attorney-client privilege.
THE REPORTER: I'm sorry?

MR. WALKER: I'm asserting the attorney-client privilege in response to that question.
MR. THOMPSON: To the question of when?
MR. WALKER: He can answer when.
Q. When did you consider whether making a -- excuse me. Let me ask the question again.
When did you consider whether it would be possible to create a second majority black district?
A. After we got the final census results. So early September.
Q. Did anyone ask you to consider that?
MR. WALKER: Objection.
MR. THOMPSON: Was that an instruction not to answer, or just an objection?
MR. WALKER: I think he can tell you that I asked him to consider that.
Q. I'll go ahead and let you --
A. Dorman Walker asked me to take -- to look at it, yes.
Q. Did you attempt to draw such a plan?
MR. WALKER: Objection. I instruct the witness not to answer. It's privileged.
Q. Beyond your discussion with Mr. Walker,

did you discuss with anyone else the possibility of creating a second majority black district?
A. I did not.
Q. Do you agree that it would be possible to create a second majority black district in Alabama?
MR. DAVIS: Object to the form.
MR. WALKER: Same objection.
THE WITNESS: Does that mean I'm not supposed to answer?
MR. WALKER: It's an objection to the form of the question.
A. I think it would be possible. It's a question of whether -- how many counties and precincts you feel comfortable splitting to do so and how -- what the shape and size and scope of it would be.
Q. Would it be possible to create a second majority black district and still comply with the reapportionment committee redistricting guidelines?
A. I would not think so.
Q. Why not?
A. Well, I can't say every -- some of the plans that were submitted that did that either paired incumbents or disallowed cores of districts

or made an inordinate number of splits or had 20 counties in a congressional district or some other thing that was not positive in our guidelines.
Q. You said some of the other plans that were submitted. I know we referenced this way back earlier there morning --
A. Yes.
Q. -- that there were, you said, approximately 41 plans that were offered at some point in the special --
A. Not congressional. All the -- all the whole. That was all. That was legislative, that was everything.
Q. Understood. This may help.

(Plaintiff's Exhibit 9 was marked for identification.)

Q. I'm marking Plaintiff's Exhibit 9. This is another document that was produced in this lawsuit. It's Bates number RC 000007. And I will represent to you that the file name for this document is Congressional Plans Introduced in 2021 Special Session.
Have you seen this document before?

A. I don't think I have.
Q. Does this appear to be a list of the congressional plans that were introduced in the 2021 special session?
A. It does.
Q. Did you review any of these maps?
A. I looked at most all of them, yes.
Q. Earlier today you made a distinction between looking at and reviewing.
A. Well, because a couple of these plans I know were put into the system very, very late in the process. So my quote, unquote review of them may have been ten minutes.
Q. Which plans were those?
A. Well, Senator Coleman's plan. Senator Hatcher's plan, I think, came in very late. A couple of these others which are full plans, obviously, but they were more amendments. Like Waggoner and Barfoot were done on the last day. So I looked at them, but I didn't have very long to look at them.
Q. Did you have an opportunity to review the Holmes congressional plan?
A. Yeah. Again, that was basically a change for Congressman Moore when we were discussing

the whole Escambia versus Monroe thing. So it was -- it was not really a whole -- it was a whole plan. But the changes were very specific to Congressman Moore. So yes, I'm familiar with it.
Q. Did you have an opportunity to review the Faulkner congressional plan two?
A. I did. Those were changes that were primarily in Jefferson County. Again, the vast majority of the plan was the same this as the Pringle plan. So I was familiar with those changes.
Q. You may or may not know the answer to this. There's only one Faulkner plan listed here, but it's numbered two. Do you know if there was a Faulkner plan one?
A. I don't know. I don't know.
Q. It seems to be like the school prank where you number the pigs one, two, and four.
A. One would guess there would be a one. But I don't -- I don't know that.
MR. WALKER: I think that's the best extraneous comment in a deposition I've ever heard.
Q. Understood.
Then did you review the Singleton congressional plans? And there's three of those here.

A. The first one, the whole county plan, I did because that was a plan that was submitted to public hearings along the way and had been in the office for quite a while. So yes, I did. I did have more time to look at that one, yes.
Q. And that's plan one, the --
A. Plan one, yeah, SB-10. Yes, sir.
Q. I'm sorry. Go ahead.
A. Yes, plan one, SB-10.
Q. And are you aware that that one was submitted by the League of Women Voters?
A. Yes, sir.
Q. And there is also two other plans, plan two and plan three. Did you have an opportunity to review those?
A. Much more quickly. I mean, they were offshoots of the initial plan that just changed deviation for the most part.
Q. I want to walk through those, the Holmes plan, the Faulkner plan, and the Singleton plan.
Starting with the Holmes plan, why did you review that one?
A. I reviewed that because that was put in essentially for Congressman Moore because he did not want to pick up another county. And instead of

splitting Escambia between 1 and 2, he wanted to split Monroe between 1 and 7 so that District 7 would pick up an additional county and he would not, and then make the corresponding change in Montgomery to offset the 739 people that were needed to get 1 to zero deviation. To my knowledge, those were the only changes.
Q. You had had conversations with Congressman Moore when you were creating your map, correct?
A. Correct.
Q. Were these changes in the Moore -- excuse me.
Were these changes in the Holmes plan changes that you did not want to or did not for some reason make in the 2021 map that you drew?
A. That's correct.
Q. And why did you not make those changes?
A. Because I didn't think it was fair to put the majority of split counties into the 7th District.
Q. Why not?
A. I just didn't think any one district should have to have four split counties when other districts only had one.

Q. Was that the only reason you didn't make those changes?
A. Primarily. I didn't think it was a good -- first of all, it's 739 people. It's not really -- you couldn't make a case that Congressman Moore was going to lose re-election over gaining 739 republicans in Escambia County.
So I was not concerned about what it did to his district. I was concerned about the fairness issue of putting all of the splits in one congressional district.
Q. Were there any other reasons why you didn't incorporate those changes in the Holmes plan into your map?
A. That was -- that was the primary reason.
Q. Were you asked by anybody to review the Holmes congressional plan?
A. Well, when it was offered on the floor -- I'm not sure where it was offered. The house floor maybe. This doesn't say on here.
But whatever chair where that was being offered asked me to, I'm sure, tell him what I knew about the Holmes plan.
Q. What did you tell him?
MR. WALKER: You can tell him.

THE WITNESS: I thought you didn't want me to --
MR. WALKER: You can tell him.
A. I told him that I didn't -- I didn't think that was a good change to our map because, again, it put all of -- not all. But put another split into the 7th District. Which I didn't think it was equitable to put most of the splits in one congressional district.
Q. Did you tell him anything else?
A. That's basically it.
Q. Did you provide any evaluations or recommendations regarding that map?
A. Other than voting it down, no. I suggested they not vote for it.
Q. Moving to the Faulkner congressional plan two.
A. Yes.
Q. Why did you review that map?
A. That was the change where I had put Homewood back together that made a few people in Jefferson County, I guess, unhappy.
So representative Faulkner, who is from Jefferson County, had a map that took the three Homewood precincts out of District 7 and put them

into District 6, and took four precincts in the Center Point area, which is the northern end of District 7, and put those back into District 7. So I reviewed those changes.

Q. Similar to before, were you asked by anybody to review that plan?

A. I was. And whatever -- again, I think these were offered in the house. So I think it probably would have been Representative Pringle that asked me for a quick analysis of what the plan changes were.

Q. And what did you tell him?

A. I told him that it moved the Homewood area into District 6, and it took those four precincts at the northern end of district -- who were in District 7 and added them back into District 7.

And I allowed as how I didn't think that was really a good thing to do because it eliminated some of my geographical compactness of what I was trying to do when we were adding in western Jefferson and not extending the quote, unquote finger further north into Jefferson County.

Q. To your knowledge, did any of the changes from your plan to the Faulkner plan have to

do with any racial factors?

A. I don't know -- I mean, I don't know about the motivations of who drew the Faulkner plan.

Q. Are you aware of any racial considerations that were taken in account in drawing the Faulkner plan?

A. I'm not.

MR. WALKER: Objection to form. You may answer.

Q. What about the Singleton plan? Why did you review that plan?

A. Well, that was one that -- the initial Singleton plan was one that was offered at a number of public -- virtually every public hearing, I believe. It had been in existence for quite a while.

So I looked at it for what it -- you know, for what it was doing. And I had a little more time to look at it, actually, than some of these other ones that came in at the last minute.

Q. Do you know what feedback there was from the public hearings on the Singleton plan?

A. Not specifically. I really don't.

Q. Did you ever hear of any public feedback on the Singleton plan?

A. Not that comes to mind, no.

Q. Were you asked by anybody to review the Singleton plan?

A. Again, I was when it was offered in the house or senate -- I guess it was offered on the senate floor maybe first. Whichever chair of wherever it was offered, I was asked to comment on it.

Q. And what did you tell that chairperson?

A. Well, the initial Singleton plan was not a zero deviation plan. So it really didn't meet our guidelines. I also think it paired a couple of incumbents, if I'm remembering the plan correctly, in the 3rd District. I think it put in -- put maybe Shelby County in the 3rd. So it would have paired Gary Palmer and Mike Rogers. And it wasn't to zero deviation. Also, it didn't have a majority black district in it.

Q. Was that an issue to you, that there's not a majority black district?

A. Yeah. Well, it -- it was an observation that it did not have a majority black district.

Q. Does that matter for any particular reason to you?

A. Well, it matters -- again, I'm not a

lawyer. But I suppose there would be some question to how well it comported with Section 2 of the Voting Rights Act. But, again, that wasn't my major concern with it.

Q. There were two subsequent Singleton plans, plan two and three.

A. Yeah.

Q. Both of which you stated -- and it describes here in Exhibit 9 as having adjustments for population deviation.

Were there any other changes in Singleton plan two and three other than changes to deviation, to your knowledge?

A. Not to my knowledge. And, again, I looked at -- I didn't look at these plans extensively. But to my knowledge, it was just a change in deviation.

Q. Were those other observations that you made to Singleton plan one regarding incumbents being paired up against each other, a lack of a black majority district, any other observations you made, were any of those addressed with Singleton plan two or three?

A. Not that I'm aware of.

Q. Were you asked by anybody to review

Singleton plan two and three?
A. Again, in whatever body they were offered in, the chair would have asked me about them, yes.
Q. Do you recall what recommendations or observations you provided?
A. Basically the same ones. The narrow deviation, again while a more narrow deviation, was not to zero deviation. And I think it still paired the incumbents. And as I remember, the BVAPs on the districts were very similar between -- among the three. So I don't think it changed any of those things.
Q. You also mentioned that you looked at briefly the Coleman plan, Hatcher plan, Waggoner plan, and Barfoot --
A. Yeah.
Q. -- plan.
A. Yes, sir.
Q. Did you make any observations from your looking at or review of those?
A. No. Well, the Barfoot plan was sort of just the senate version of the Holmes plan making the change for Representative Moore.
The Wagner plan was basically Faulkner

and Barfoot put together or Barfoot and Holmes put together. It also made the Moore change, but made the Faulkner change in Jefferson County. So they were just sort of different versions or compilations of those two things.
Q. I'm going to stop you right there because I think there's -- it looks like there's two Waggoner plans here. Which one are you referring to, three or one?
A. Three was the combination. One -- one was essentially the Faulkner version of the plan, only in a -- drawn up by a senator or offered by a senator.
Q. And I interrupted you there. I think the only other plan we haven't discussed yet is the Hatcher plan.
A. Right. And, again, that came in, if I remember correctly, the night before it was offered on the floor. So I really looked at it for literally ten minutes before whoever -- wherever it was offered. I guess on the senate side. So I didn't do a very deep analysis of the Hatcher plan.
Q. For each of these plans that you said you just looked at briefly, the Coleman plan, the Waggoner plans, the Barfoot plan, and the Hatcher

plan, is it a similar response as you had to the other ones, that you were asked to look at those by whoever was presenting them on the floor?
A. Whoever was managing the time, the time on the floor.
Q. And as to each of those, do you recall what your feedback was?
A. Yeah. I mean, obviously, the Waggoner plan was the same as the Faulkner plan. So I didn't think it was a good change. And the Barfoot plan was essentially the same as the Holmes plan. So I didn't think that was a good change. And the Waggoner three was just a compilation of the two of them added together, which didn't do anything to move the bar.
Q. What about the Coleman plan?
A. The Coleman plan, again, I didn't look -- didn't have a chance to look at very much. I believe it paired two incumbents in 1, in District 1, Carl and Moore. And it certainly didn't respect the cores of districts because I think it had District -- District 7 went from Mobile to Tuscaloosa maybe.
Anyway, again, I didn't spend a lot of time on either of those, looking at either of those

plans.
Q. What about the Hatcher plan?
A. The Hatcher plan I think was obviously a two black district plan.
THE REPORTER: Two?
A. Two black district plan. I do think it -- I think it paired incumbents, but maybe I'm wrong. Again, geographically it was not very compact. I think it went from Mobile to Russell essentially on one of the black districts.
So I didn't think it -- I didn't think it followed our guidelines very well in terms of compactness.
Q. Other than compactness --
A. And splits. I think it also had like 13 county splits, where the Pringle plan had six. I think it split a lot more precincts.
Q. Other than compactness and splitting precincts, was there any other reason that you felt that the Hatcher plan did not comply with the guidelines?
A. Those were the main issues.
Q. Were there any other issues?
A. I don't think so.
Q. And with the Singleton plan, were there

any reasons why you felt that the Singleton plan did not comply with the redistricting guidelines?
A. Yeah. Well, the initial Singleton plan was not to zero deviation. It did pair incumbents again in the 6th -- in the 3rd District, it had two incumbents together, Moore and -- not Moore. Palmer and Mike Rogers.
Q. Any other reasons?
A. And, again, it didn't have a majority black district.
Q. Speaking of that, when you drew your map -- which on this table, I would assume that's the Pringle congressional plan. Correct?
A. Yes, sir.
Q. When you drew the 2021 congressional map -- remind me. Did you start with drawing District 7?
A. No. Actually, I started -- I started with District 5 because I knew it had to spill into 4. And I had to do that before I could do much else there.
Q. What order did you go in for drawing the districts after that?
A. I basically moved down -- moved down the state. I did 5 to 4. And then the changes that 4

-- putting Cherokee back together in 3, putting Blount back together in 6, corresponding changes in Tuscaloosa in 7. I basically worked down the map from there.
Q. And you stated that you did not look at the racial data in drawing the 2021 map until the week before the special session, correct?
A. Correct.
Q. When you did review the racial data, if it had shown that District 7 was below 50 percent black voting age population, what would you have done?
A. I would have talked to legal counsel about what steps to take at that point.
Q. Do you believe that you would have needed to make modifications to make the black voting age population percentage higher than 50 percent?
MR. WALKER: Object to the form, calls for speculation.
Q. You can answer.
A. I'm sorry. Say that again.
MR. THOMPSON: Can I have the question read back?
(Record read.)

A. I think if it had come back under 50 percent, in consultation with legal counsel, I assume we would have, under the guidelines, looked for a basis and evidence to see if one existed to add African Americans to the district.
Q. Did you draw any other maps other than -- let me take a step back.
Did you draw any other congressional maps other than the HB-1 Pringle congressional plan that was ultimately enacted?
A. This cycle -- I don't know what time frame we're talking about.
Q. I'll try again. Sorry.
In drawing the 2021 congressional maps, through that process you drew the map that was ultimately enacted, correct?
A. Yes, sir.
Q. Did you draw any other maps in that cycle --
MR. WALKER: I'm going to --
Q. -- for the congressional plan?
MR. WALKER: -- object to the extent that -- and you may not be intending to. You're asking him whether he tried to draw a two majority black district --

Q. I'm just asking if you drew any other maps at all.
MR. WALKER: And my instruction to you is if you did anything at the instruction of me alone, then that would not be part of your answer.
A. Other than that, no.
Q. I've gone a little over an hour there, but I wanted to finish up. I think I'm done with my questions for now. So I think we'll take a break and then allow some other folks to ask you some questions. Is that fair?
A. That's fair.
THE VIDEOGRAPHER: We are off the record. The time is 2:28 p.m.
(Recess was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is now 2:47 p.m.
MR. THOMPSON: At this time, I'm going to pass the questions to Mr. Blacksher.
EXAMINATION BY MR. BLACKSHER:
Q. Good afternoon, Mr. Hinaman.
A. Good afternoon.
Q. So it was Dorman Walker who told you you were required to achieve zero population deviation; is that right?

MR. WALKER: Object to the form.
Q. You know, I'm having -- I've had trouble hearing you throughout. So I'm going to have to ask you to speak up a little louder.
What was your last response?
MR. WALKER: Are you talking to me, Jim?
MR. BLACKSHER: The witness didn't respond? That was you?
MR. WALKER: That was I who said "Object to the form." He doesn't make objections.
MR. BLACKSHER: Oh, you said objection?
MR. WALKER: Yes.
Q. Okay. I'm going back to what you said in your examination, your direct examination, I guess we call it, where you said you were advised that you needed to use zero deviation in your plan. Is that right?
A. That's correct. Under two criteria for redistricting, B, "Congressional districts shall have minimal population deviation."
I was told by counsel that that was zero for six districts and plus one for one district.
Q. And when you say "by counsel," you mean -- well, I didn't ask you. Were you advised by lawyers other than Dorman Walker?

A. No.
Q. So it was Dorman who told you that minimal deviation means zero deviation?
A. That's correct.
Q. Okay. So you also drew the plan in 1992. And did you read the opinion of the court in West v. Hunt, the 1992 opinion that adopted your plan?
A. I'm sure I did in 1992 or '93. But I sure don't remember it today.
Q. You don't recall -- well, let me ask you this: Did counsel tell you or remind you that in that decision, the three-judge court said that because it was a court-approved plan, a court-ordered plan, it felt constrained to have perfect or zero deviation. But that if the legislature had drawn the plan itself, it would have had greater leeway with respect to deviation?
MR. WALKER: Objection.
Q. Do you recall reading that?
MR. WALKER: Jim, you've asked that question several ways. And one -- it could be interpreted in one way to be whether or not I gave him advice on that. If that's what you're asking, I object to that.

Q. Okay. So if you read the West v. Hunt opinion -- let me ask this question -- do you recall the court saying that it felt compelled, because it was a court-ordered plan, to use zero deviation?
A. I do not. As I said, I probably read it 30 years ago. I certainly don't remember what it said today.
Q. Were you advised to use zero deviation by anybody -- any lawyers in Washington, say, connected with the republican party, the RNC or -- what was that other organization that you used letters for? NRRC or something?
A. No. In terms of the -- are you talking about the 2021 plan?
Q. The 2021 plan, yes.
A. No, I did not speak to anybody at the NRCC or the RNC or anybody in Washington other than members of congress and their staffs.
Q. Okay. NRCC, what does that stand for?
A. National Republican Congressional Committee.
Q. Okay. But they didn't give you any instructions or any advice about zero deviation?
A. No, sir.
Q. What about the members of congress in

the Alabama delegation? Did they give you any instructions to use zero deviation?
A. No, sir.
MR. BLACKSHER: Eli, did I print out a copy of the passage from State of Alabama versus U.S. Department of Commerce that you can show him?
MR. HARE: Let me see here.
MR. BLACKSHER: It's got a highlighted section in it.
MR. HARE: Yes.
MR. BLACKSHER: Okay. Can you mark that as -- what did you say, PX 10?
MR. HARE: Right. It's PX 10.

(Plaintiff's Exhibit 10 was marked for identification.)

MR. BLACKSHER: And show that to Mr. Hinaman
Q. That, Randy, is the document that was filed by the State of Alabama, as you can see, in Montgomery's federal court against the census bureau and styled 21-211.
And would you please read the highlighted part in Paragraph 116 of the State's

complaint?
A. The part --
Q. Read it into the record.
A. I must admit highlighting in it in blue makes it rather hard to read. But nevertheless.

"Even at the higher census geography of Alabama's congressional districts, the November 2020 demonstration data indicated that the differential privacy algorithm skewed the data enough to create population deviation on a level that courts have found in other contexts to violate the supreme court's equal population jurisprudence."
Q. Thank you.

And under that language is a table that shows what the State thought were errors caused by differential privacy in the demonstration. And they were congressional districts.

Did counsel tell you that the State of Alabama thought that the zero deviation requirement was using flawed data, in their opinion?

MR. WALKER: Objection to form. And I instruct the witness not to answer.
Q. Okay. Are you going to follow counsel's advice not to answer my question, Mr. Hinaman?
A. I am.

Q. So aside from what counsel told you, were you aware that the State of Alabama took the position in federal court that the -- that the 2020 census, because of differential privacy, would not be reliable enough to use for zero -- for separating people at that level?
A. I was not.

MR. BLACKSHER: Eli, if you can find that passage from the public hearing at Northeast Alabama Community College.

MR. HARE: I've got it right here.

MR. BLACKSHER: And mark that as Exhibit 11, please.

(Plaintiff's Exhibit 11 was marked for identification.)

MR. BLACKSHER: And show that to Randy, to Mr. Hinaman.
Q. As you can see, this is a transcript of the reapportionment committee's hearing on September 1 at Northeast Alabama Community College. And I've printed out Page 12 and highlighted it.

Would you read the highlighted statement of one Toni McGriff who lives in Dutton? Would you

read into that into the record, please?

MR. WALKER: You haven't highlighted the whole statement. You've highlighted Lines 5 through 16. Is that what you want him to read?

MR. BLACKSHER: Yes, the highlighted lines, please.
A. "Most of Jackson County, particularly all of Jackson County -- practically all of Jackson County is in Congressional District 5. But there is a tiny little sliver of southern Jackson County that's in 4. And I understand about trying to get everything equalized in terms of population. But the very few people who live there very frequently think they're in District 5 and do not know who to vote for. And I would ask that you consider that when you are redistricting so that you don't have that tiny little sliver out of that county. It is in a section called Macedonia. Senator Livingston would know where I'm talking about, I'm sure."
Q. Thank you.

So did anyone on the reapportionment committee, the chairs or counsel, show you or tell you about that testimony?

MR. WALKER: Objection as to what he may have been told my counsel. Otherwise, he may answer

the question.
A. I was not familiar with that testimony. But I did, of course, put Jackson County back together.
Q. You sure did. And who paid the price for that? Lauderdale County?
A. Well, you're comparing 17 people to 43,000 or something. I'm not sure that's a fair comparison. But yes.
Q. Was it 17 people in Jackson County?
A. I'm making up that number. You're comparing a few people to many tens of thousands. But nevertheless.
Q. In most of the cases on the 2021 plan, the enacted plan, for example, down in Escambia County where you had to put the eastern slice of Escambia into 2?
A. Yeah, 739 people.
Q. 739 people. Do you think that they're going to share the sentiment of Mr. Toni McGriff in Jackson County?
A. They may very well.
Q. And what I'm saying, what I'm trying to point out, can't we agree that most of these tiny splits to achieve zero population result in people

being basically separated from their home county and put in a district where they really don't have much influence at all over the member of congress, right?
A. In the Escambia County case, I would agree with that. Although looking at the map, there aren't many examples of that. Because most of the other splits in the enacted map are much larger segments of folks.
Q. Okay. Now, you said that you began working on the congressional plan in May at some point; is that correct, when you found out that Alabama would have seven seats in congress apportioned to it?
A. Yes, once we found out seven. And also the guidelines were passed on May 5th. I started work thereafter.
Q. And you were using estimated census data to sort of rough out what that plan might look like; is that correct?
A. That's correct.
Q. And those estimated census data were only available for whole counties, right?
A. I believe that's the case, yes.
Q. So you were having to work with whole counties. And when the final census data came out,

you simply had to adjust with the correct 2020 legacy data; is that correct?
A. That's correct. Although while the estimates captured the flavor of the changes that happened over the last ten years, meaning four districts were over and three districts were under and the estimates properly identified those districts, they didn't really capture the magnitude of it.
Because I think the estimates had the 7th District being 30,000 and some odd number under when it ended up being 54, and it had the 5th District being something like 23,000 over when it was really 43.
So while it captured the over/under nature of the districts, it didn't -- it didn't do a particularly good job of capturing the ultimate numbers.
Q. Did you attempt drawing a whole county plan at that point in May of 2021?
A. No. I just -- no.
Q. Why not?
A. Well, I don't even consider it a plan. I mean, I was just lumping together -- and I do think I was able to split. I just don't think the

answers were very accurate on what Maptitude had for estimates.
So I didn't -- I didn't -- I lumped some counties together and I split some larger counties based on precincts, knowing that those numbers were not going to be very accurate, and then waited until we got the real numbers.
Q. Okay. And when you got the real numbers, did you attempt to draw a whole county plan?
A. I did not.
Q. And why did you not attempt to do that?
A. No one asked me to do that. And, again, my understanding of our guidelines would be that that would not have followed the proper deviation.
Q. Take a look at our whole county --
MR. BLACKSHER: Can you mark a copy -- I don't think it's been passed around yet -- just so we can be talking from something, the same thing?
MR. HARE: This will be Plaintiff's Exhibit 12.

(Plaintiff's Exhibit 12 was marked for identification.)

Q. So think along with me, Mr. Hinaman, about how you might have attempted to reproduce your starting point of the plan, which was the 2011 plan, right?
A. Yes, sir.
Q. And if you were going to attempt to take the 2011 plan and create whole districts and you start with Congressional District 7, then you would try to make Jefferson, Tuscaloosa, and Montgomery whole. And that's what this plan does, doesn't it?
A. It does.
Q. You would have attempted to keep as much of the black belt together as you could. And that's what this plan does, doesn't it?
MR. WALKER: Objection. I'm not sure, Jim, the way you're phrasing your questions, what you're asking him. You seem to be telling him what he would have been doing and then -- I'm just confused.
MR. BLACKSHER: I'm asking leading questions, Counsel. Is that all right?
MR. WALKER: Well, you're allowed to ask leading questions. I just didn't understand what you were doing. So go ahead, if that's what you want to do.

MR. BLACKSHER: Can you read the question back, please, Court Reporter? I'm sorry.

(Record read.)

MR. WALKER: Objection to form.

A. It does, I guess. Hale and Perry I think would be considered part of the black belt, and that's in a different district. But by and large, you're correct, yes.

Q. Switching gears for a minute. When you met with Congresswoman Sewell, do I understand you to say that she -- your testimony was that Congresswoman Sewell wanted to keep her district the way it is, adjusted for the population deviation known; is that correct?

A. I would phrase it this way: I met with Congresswoman Sewell and told her her district was 54,000 under. And I gave her some options of where it made, in my opinion anyway, sense to gain folks to make up that 54,000 difference. And then we worked through that on the map. That's how I would phrase it.

Q. Did Congresswoman Sewell tell you she was opposed to attempting to draw two districts in which blacks could elect candidates of their choice?

A. She did not. She didn't offer an

opinion, to my knowledge, on that issue.

Q. Say again.

A. She didn't offer an opinion on that, to my knowledge.

Q. And you didn't ask her about it?

A. I did not.

Q. Were you aware of all of the nongovernmental organizations and grass roots organizations in Alabama who have been urging the legislature to draw two districts from which blacks can elect candidates of their choice?

A. I'm not sure that I was that aware of it in our initial meetings in May. Obviously, once public hearings were held and your whole county plan came out and so forth and so on, I was obviously more aware of it at that point.

Q. Okay. So what you're saying is that you simply sat down with Ms. Sewell and made suggestions on how to increase -- get 53,000 and some odd additional population in District 7, correct?

A. That's correct, and keeping her existing -- the core of her existing district together.

Q. And didn't I hear you say you suggested that one option might be to making Tuscaloosa County and Montgomery County whole; that is, swapping the

population in Montgomery -- in Tuscaloosa County, north Tuscaloosa County, with a population that extends into Montgomery County?

A. I didn't offer that.

Q. What did -- you said something in your earlier examination about considering that option.

A. If I did, I didn't mean to. I did not consider that option.

Q. You did not consider that option?

A. No, I did not.

Q. Why not?

A. Because I started with her existing cores of districts and I looked at what she needed to gain, and I suggested areas that she may wish to gain in. And we worked through the map and made those changes.

Q. Well, I mean, was the -- is the little -- the extension of District 7 that goes into Montgomery County part of the core of that district, in your opinion?

A. It may be now. It probably wasn't at the -- obviously, I don't think it existed at the beginning. It's a lot of people. I mean, I don't know the exact number. We can obviously look it up. But it's --

Q. Well, I can tell you that based on the data that Dorman Walker and the reapportionment committee provided to us, the population of District 7 in Montgomery County is 62,519.

A. Okay.

Q. And the population of the portion of Tuscaloosa County that's in District 4, the northern part of Tuscaloosa County, is 42,770. So there's about a 20,000 difference between those two split counties making them whole in District 7.

MR. BLACKSHER: So I'm going to ask Eli, if he would, to mark up those two documents that show -- that are labeled Plan Tuscaloosa and Montgomery Whole and show it to Mr. Hinaman.

MR. HARE: I'm going to mark them as -- the map as Plaintiff's 13, and then the chart or the data sheet as Plaintiff's 14, Jim.

(Plaintiff's Exhibits 13&14 were marked for identification.)

Q. I'll tell you, Mr. Hinaman, that I did this with Dave's Redistricting app. Are you familiar with Dave's Redistricting app?

A. I've heard of it. I've never used it.

Q. Okay. And I did exactly what I just suggested. I made -- took Montgomery County completely out of District 7, and I put all of Tuscaloosa County into District 7. And that 20,000 difference I got out of Jefferson County.

Otherwise, it looks pretty close to the map that you ended up drawing and that was enacted. But, of course, would you -- would agree that it otherwise (inaudible) the one that you drew?

A. Yeah. Obviously, there's a split in Blount and a split in Etowah that I don't have. But yeah.

Q. Well, this is a good point. When you talk about making changes in District 7 like I just did with Dave's, you end up requiring changes in several of the surrounding districts.

I mean, for example, because District 6 lost population to District 7, I elected to get some population out of Blount. And that ended up splitting Blount.

A. Right.

Q. And because Montgomery County went into District 2, I ended up having to do a little split of Elmore County, right?

A. Yes, sir.

Q. And on up the line, if you will. But, of course, I didn't have to interfere with the split you made in Lauderdale County. And these are -- and this is not zero deviation.

If you look to the left in that table, you will see that there are as many as 471 people in District 2 who are going to have to be -- I'm sorry. District 3 who are going to have to be taken out, right?

A. Yeah. I'll take -- I can't find that number on this sheet. But I'll take your word for it.

Q. Well, it's on the map.

A. Oh, I'm sorry. Yeah, I see it. Thank you. I was looking on the corresponding number sheet. Sorry.

Q. The point I want to make here is isn't it true when you're drawing maps and you get to 471 people who have to be moved in order to get to zero deviation, you go down to the block level, right?

A. Most times, yeah. Precincts aren't going to have an exact number or that small a number.

Q. And I'll represent to you that I

didn't -- this is drawn with precincts. So you're going to have to split some precincts, right?

A. Yes, sir.

Q. But that usually can be done after you have achieved the goal you set out to in broader terms in your districting scheme, right?

A. Sure.

Q. There are a lot of ways that you can split precincts or counties in order to achieve this -- this sacred zero deviation objective. And yet you didn't consider this option at all when you were going over the plan with Congresswoman Sewell; is that correct?

A. That's correct.

Q. She did not -- she did not have an option to consider this arrangement, right?

MR. WALKER: Objection to form.

A. Obviously, she could have said how about if I get all of Tuscaloosa County and come out of Montgomery? Which she said neither.

Q. Well, I wonder if the reason she said neither is because it turns out that doing that reduces the BVAP, the black voting age population, to 49.79 percent?

MR. WALKER: For CD 7?

THE REPORTER: For what?

MR. WALKER: CD 7.

Q. Do you see that in the statistical table?

A. Yes, sir, I do.

Q. So would that have been a problem for Terri Sewell based on what she was telling you were her objectives?

A. I don't know specifically. I don't think she considered this map. So I can't -- I don't really know how to answer your question.

Q. Okay. Did you and Congresswoman Sewell discuss the whole county plan, the League of Women Voters' whole county plan?

A. We did not. I don't think it -- in our initial meetings, I don't think it existed. Or at least I was not aware of it. I don't think she was. So we really did not.

Q. It didn't exist in May, but it did exist before you finalized the plan that became HB-1, right?

A. Correct.

Q. And September 1, 2021, was the first public hearing of the reapportionment committee. And the League of Women Voters was the first

witness at the first hearing offering that plan; isn't that correct?
A. I wasn't at that hearing. But I'll take your word for it.
Q. So you're telling us that the whole county plan offered by the League of Women Voters was never discussed at all when you were communicating with Congresswoman Sewell?
A. I don't believe it -- maybe it was discussed at the very end about what other plans are out there. We may have had a minor discussion about -- frankly, I think at that point in time yours would have been the only other publicly acknowledged congressional plan. So she may have mentioned it. But we didn't have a very healthy discussion about it. Let's put it that way.
Q. What do you mean not healthy?
A. Very long, very detailed. She was asking what other plans have you heard about. And I think at that point, yours was the only one that was public at that point in time.
Q. Did she tell you she would object to that plan?
A. We didn't have that detailed a discussion about it.

Q. So we don't know -- we don't know whether Congresswoman Sewell would be happy with the whole county plan or not; is that correct?
A. I do not know, no. You may know.
Q. Sir?
A. I don't know. I mean, you may have talked to her about it. I don't have any knowledge of it directly.
Q. I understand.
Can you take another look at the whole county plan map, please?
A. Yes, sir.
Q. And compare it -- and compare it with the map of the 55 -- 555 plan, HB-1, the enacted plan.
A. Yes, sir. Exhibit 5.
Q. If the court wanted to -- was drawing a remedial plan in this case, just for the sake of argument, it had reached the point where it was going to draw its own plan, and it wanted to change the whole county plan to look more like the plan that the legislature enacted, that would simply be a matter of changing the array between Districts 5 and 4, correct?
A. No. I mean -- well, first of all,

Terri Sewell doesn't even live in District 7 under your whole county plan. She lives in District 6.
Q. I'm sorry. I'm not being clear, and my question was not understood by you.
I'm just asking if the court wanted to change the array -- if it was drawing a court-ordered plan and it wanted to make the whole county plan 5 and 4 look more like the whole -- like the 5 and 4 districts in the enacted plan, it would simply be a matter of balancing out the populations between 4 and 5, correct, splitting some counties as needed?
A. Yeah. Obviously, 4 has changes in Tuscaloosa and St. Clair that are different than the enacted plan.
Q. Every -- every change has a ripple effect, right?
A. Yes, sir.
Q. All right. But there would be no problem in putting Lauderdale, Colbert, and Franklin in CD 4 and moving Morgan County back up into CD 5 if the court wanted to do that and made the splits necessary to bring it into population equality; isn't that correct?
A. Yeah. These hypothetical the court

wants to change things are hard for me. But yes, I guess that's correct.
Q. I'm looking at the map of the plan you drew in 1992 that was adopted by the three-judge court in West versus Hunt. Did that map ever get shown to you today, or not?
A. It has not been shown to me today.
MR. BLACKSHER: Okay. I'm looking at it in the amended complaint. I don't know if anyone has a copy there that they can show Mr. Hinaman or not.
But do you recall, Mr. Hinaman, that the plan you drew in 1992 included all of the same counties that are in the plan you drew in 2021?
A. I'm not sure I -- I'm not sure I know what that -- I'm not sure I know what you mean by that.
Q. The plan that you drew in 1992 had Clarke split, it had Pickens split, Tuscaloosa and Jefferson split, and Montgomery County split.
Now, your plan in 2021 leaves Pickens whole, correct?
A. Correct, and Clarke whole.
Q. And Clarke whole. But Tuscaloosa, Jefferson, and Montgomery are still split?

A. Yes, sir.
Q. So your 2021 plan, the plan you drew and that was enacted by the legislature in 2021, preserves the core of the 1992 plan that you drew; is that correct?
A. It's -- it's correct. But you've missed a few steps along the way, obviously. Because as we discussed earlier in the deposition testimony, it more preserves the cores of the 2011 districts, which I guess by chain preserve some of the 2001 districts, which the legislature preserved some of the 1992 districts, if that made any sense.
In other words, I did not use the 1992 map as the starting point for my 2021 map.
Q. No. You used the 2011 plan, correct?
A. Correct.
Q. And isn't it true that the 2002 plan and the 2011 plan preserved the cores -- the core of the 1992 plan?
A. For the most part.
Q. Can we sum up your testimony about how you went about drawing the 2021 enacted plan by saying that you drew the plan so that it satisfied what each incumbent member of the Alabama congressional delegation wanted? That was your

primary guideline, right?
A. Well, that was a part of it. My primary guidelines were the guidelines given to me by the reapportionment committee, and then based off of the subsequent population shifts over the last ten years to repopulate or take away from, depending on the over/under of each district, population, and geography to reach the required guidelines of zero deviation and preserving the cores of districts.
And, of course, where possible -- and we've had a couple of minor cases where it wasn't, as we discussed with Representative Moore and so forth. But preserving what the incumbents would have -- would like to accomplish, as well.
Q. But your testimony is that nobody else but the members of the Alabama congressional delegation had any input into the decisions you made about how to draw that plan; isn't that correct?
A. That's pretty much correct, yes, sir.
Q. No member of the Alabama legislature's reapportionment committee, including its chairs, had any input into that plan; isn't that correct?
A. They had all the input they wanted

into the plan. But they chose to allow the members of congress to talk about what areas they wanted to gain and lose underneath the guidelines that they had already passed.
Q. And, in fact, in 19 -- let's see. Excuse me.
In 2011, that's what the legislature did, as well. They simply deferred to what the congressional delegation wanted in redrawing that plan, right?
A. No, that's not -- that was the goal I had. But that's not what happened. When we got -- as you may remember, when we got to the senate floor, there were some members of the senate who may have wanted to run in one district or another who moved some things around.
My map -- my initial map in 2011 didn't even have the 4th District in Tuscaloosa. It had the 6th District in Tuscaloosa.
So there were numerous changes made on the senate floor and probably subsequently the house floor from the map that the members and I worked on, members of congress and I worked on.
Q. But that didn't happen in 2021?
A. It did not happen in 2021. The map

that came out of -- the map that I gave to the chairs that was offered at the reapportionment committee was not amended through the process. So it was identical to what was passed into law and signed by the governor.
Q. Okay. So let me just go over -- I think I'm about finished here. I want to make sure I understand what your testimony is.
You considered no other plans that did not have a zero deviation; is that correct? You never considered drawing a plan that did not have a zero deviation?
A. That's correct. My understanding and -- my understanding of the guidelines required us to be at zero deviation.
Q. And you understood, didn't you, that Jefferson County was now at a population level that was smaller than an ideal congressional district and, therefore, no longer needed to be split? You were aware of that, weren't you?
A. I'm aware of it. I'm not sure I focused on it. But what you say is true.
Q. It wasn't -- it wasn't a priority for you to try to make Jefferson County whole? That's what you're saying?

A. That's correct.

And, frankly, when I started the meetings, I didn't even -- at the time I started the meetings -- subsequently I realized it. But at the time I started the meetings, I actually thought that both Representative -- Congresswoman Sewell and Congressman Palmer both lived in Jefferson County. As I turned out, he had -- Representative Palmer had moved over the last few years into Shelby.

But at the time, I would have thought that that wasn't possible under our guidelines. Because when I started the process, I thought they both lived in Jefferson County.

Q. But, in fact, you found out that Congressman Gary Palmer lives about three blocks south of the Jefferson County line in Shelby County, and Congresswoman Sewell lives about a mile away from where Palmer lives. But she's on the Jefferson side of the line in Lake Cyrus, right?

A. That's correct, yeah.

Q. But I also understood you to say that Congresswoman Sewell considered making her residence, for purpose of redistricting, Dallas County. Am I correct?

A. I'm not sure I would phrase it that way.

When asked what residence -- when asked for her residence address so it could be put in the computer so that we would make sure she was inside her district, she gave us both her address where she votes at, which is obviously Jefferson County, and her ancestral home. I don't know the right way to phrase it. Where she grew up in Dallas County.

Q. She grew up in Selma, right?

A. Yes. Yes, sir.

Q. Okay. And you're aware, aren't you, that there is no residency requirement for members of congress, aren't you?

A. I am aware. I'm also aware it's exceedingly difficult to get elected when you're outside of your district. It makes a rather good TV spot.

Q. So even though congress -- Congressman Palmer still lives in the city of Birmingham, he's in that part that extends into Shelby County, he would not feel comfortable representing the Birmingham area again; is that right?

A. I don't know that. He may feel

perfectly comfortable. But I've -- I've seen in other races where, you know, the fact that somebody doesn't reside in their district is not a positive when you get around to campaigning.

Q. Okay. I think I'm about done here. I need one more look at my notes.

That's it. Thank you very much, Mr. Hinaman.

A. Thank you.

MS. MADDURI: This is Lali Madduri for the Caster plaintiffs. We don't have any questions.

MR. THOMPSON: I think that's all the questions that I have at this time, too. So on behalf of all the plaintiffs, I'll pass the witness at this time.

MR. WALKER: Let us have a few minutes.

THE VIDEOGRAPHER: We're off the record. The time is 3:34 p.m.

(Recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 3:39 p.m.

MR. WALKER: We have nothing to ask Mr. Hinaman. So I guess we're done. Thank you

very much, everyone.

THE VIDEOGRAPHER: This ends the deposition of Randy Hinaman. The time is now 3:40 p.m.

(DEPOSITION ENDED AT 3:40 P.M.)

STATE OF ALABAMA )
JEFFERSON COUNTY )

I hereby certify that the above proceedings were taken down by me and transcribed by me using computer-aided transcription and that the above is a true and correct transcript of said proceedings taken down by me and transcribed by me.

I further certify that I am neither of kin nor of counsel to any of the parties nor in anywise financially interested in the result of this case.

I further certify that I am duly licensed by the Alabama Board of Court Reporting as a Certified Court Reporter as evidenced by the ACCR number following my name found below.

So certified on December 9, 2021.

______________________
LeAnn Maroney, Commissioner
ACCR# 134, Expires 9/30/25
505 North 20th Street, Suite 1250
Birmingham, AL 35203

**Exhibits**

**EX 0001 Randy Hinaman 120921**
7:13 14:7,13
**EX 0002 Randy Hinaman 120921**
7:15 14:7,15
**EX 0003 Randy Hinaman 120921**
7:17 21:19, 24
**EX 0004 Randy Hinaman 120921**
7:19 25:6, 10,11
**EX 0005 Randy Hinaman 120921**
7:21 92:17, 20 110:15,16 219:16
**EX 0006 Randy Hinaman 120921**
7:23 93:10, 14,18
**EX 0007 Randy Hinaman 120921**
7:25 135:14, 18 147:22
**EX 0008 Randy Hinaman 120921**
8:3 160:7,11 167:10,16
**EX 0009 Randy Hinaman 120921**
8:5 179:16, 19 189:9
**EX 0010 Randy Hinaman 120921**
8:7 201:15
**EX 0011 Randy Hinaman 120921**
8:10 203:12, 13,15
**EX 0012 Randy Hinaman 120921**
8:12 208:21, 23
**EX 0013 Randy Hinaman 120921**
8:14
**EX 0014 Randy Hinaman 120921**
8:16

**$**

**$10,000**
43:22,25
**$400**
17:18
**$50,000**
55:5,20

**(**

**(c)(4)**
53:18

**0**

**000007**
179:21
**00056**
160:13
**043723**
135:21

**1**

**1**
14:7,13 29:23 114:22,23,24 122:21 123:9 125:19 137:9 161:1,2,3 176:15 183:1,2,5 192:19,20 203:22 217:23
**1&2**
14:3
**10**
137:9 201:12,13,15
**10,000**
71:23 72:11
**100**
61:19 119:9
**105**
80:10,14,16, 20
**105-member**
65:11
**10:00**
88:1
**10:17**
65:22
**10:35**
65:25
**11**
203:13,15
**116**
201:25
**11:30**
121:25
**11:42**
122:5
**12**
203:23 208:21,23
**12,000**
126:24
**123**
62:4
**12:57**
122:8
**13**
193:15 213:16
**13&14**
213:19
**14**
213:17
**14th**
112:23 113:8 139:16
**150**
61:23
**16**
204:4
**17**
25:15 205:7, 10
**19**
224:5
**1965**
140:24 141:5 165:13 166:13
**1992**
24:2,17 26:11 27:7 28:4 30:7, 11,18 31:7, 13 33:7,10, 23 34:17 35:12 37:19 39:14,17 40:1 91:6 95:10 172:2 199:6,7,9 221:4,13,18 222:4,12,13, 19
**1st**
72:19,20,22, 25 87:1

123:9,20

## 2

**2**
14:7,15 96:24 97:16 124:1,3,5 125:19 138:9 141:2,15,18, 22 142:14,19 144:5,8,14, 25 146:5,6 147:22 161:12,13,14 183:1 189:2 205:17 214:24 215:8
**20**
24:8 147:22 179:1
**20,000**
213:9 214:4
**200**
62:10
**200,000**
55:24
**2001**
26:13,24 27:14,24 28:11 29:4, 22,25 30:4 38:17 39:13, 17 40:1,4 89:7 95:5 126:20 159:14 222:11
**2002**
222:17
**2011**
23:20 26:12, 13 37:22 38:11 39:13 40:3,7,9,15 42:13,18 43:5 44:5,25 45:3,17 46:7 48:11,15,17, 23 49:19 50:12,21 53:11,19,24 77:3,5,8,11, 12,25 85:19 93:15,19,22 94:9,13,25 95:15 100:5, 8 114:22 116:16 124:22 125:13 159:16 171:3,9,12 173:16 209:3,7 222:9,15,18 224:7,17
**2012**
23:20,23
**2013**
22:4,9,18 25:16
**2018**
22:23
**2019**
56:21 57:9 59:9 66:6
**2020**
51:18,19,20 52:12,21 53:19 54:4 55:13,17 57:11 62:22, 23 202:7 203:3 207:1
**2021**
9:7,17 39:12,16 40:6 48:3,5 51:2,5,12, 16,19 53:20 57:18 58:9 59:22 60:9, 12,24 61:5, 15,20 62:14, 16,17 63:17, 20 64:21 65:4,15 66:3,4,5,23 67:8,11,14, 20 68:14 70:22 71:14 74:16,19 75:16 76:2 78:9 79:3,8 80:1 83:14, 16,24 84:2 85:7,23 86:5,14 87:15,20 88:11 91:13 92:22,25 93:4,24 94:5 95:16 98:18 99:21 100:9, 14,16 101:7, 9,14 106:7, 9,12,13,16, 18 107:12 110:18 111:3 120:1 121:1, 7 123:3 124:23 129:19 132:3 134:11 135:22 136:7 137:6 156:10 160:15,23 167:17,21,25 169:3 172:13,25 173:21,24 174:16 176:19 179:23 180:3 183:16 194:15 195:6 196:14 200:14,15 205:14 207:20 217:23 221:14,21 222:2,3,14, 22 224:24,25
**2021-555**
51:8
**21**
148:6
**21-211**
201:23
**217**
62:4
**23,000**
207:13
**23rd**
61:11
**24**
48:8
**25**
22:4,9 150:5
**26**
151:5
**2:21-CV-01530-AMM**
9:14
**2:28**
197:14
**2:47**
197:17
**2nd**
72:23,24 87:1 124:13 125:14 134:25 161:24

## 3

**3**
21:19,24 95:17 124:9, 12 126:8,25 147:21 162:1,3,4 195:1 215:9
**30**
31:2 33:11, 22,24 200:6
**30,000**
207:11

**317**
78:17
**33267**
18:11
**35**
81:13
**36561**
18:12
**3:34**
228:20
**3:39**
228:23
**3:40**
229:4,6
**3rd**
94:19 124:4 126:19 130:17 162:12 188:14,15 194:5

**4**

**4**
25:6,11 91:23 115:8, 9,11 127:5 162:13,15,16 194:20,25 204:11 213:7 219:24 220:8,9,11, 13,21
**40-hour**
63:2
**41**
47:3,8,10 179:9
**42,770**
213:8
**43**
207:14
**43,000**
205:8
**471**
215:7,19
**49.79**
216:24
**4th**
96:15 156:2 224:18

**5**

**5**
91:23 92:17, 20 110:15,16 115:6,7 128:18,23 163:1 194:19,25 204:3,9,14 219:16,23 220:8,9,11, 22
**5-5-57**
18:9
**50**
34:12 195:10,17 196:1
**50,000**
55:21
**501(c)(4)**
53:10,16,21 86:3
**53,000**
211:19
**54**
207:12
**54,000**
210:17,19
**54.22**
118:12
**55**
219:14
**550**
134:5
**555**
219:14
**5th**
127:8,9 135:21 136:15 206:15 207:12

**6**

**6**
93:10,14,18 116:19 126:22 127:24 130:4 132:5 133:10 138:10 163:9,11 167:7 172:5, 9 176:15 186:1,14 195:2 214:19 220:2
**60**
44:7
**62**
169:15 170:4
**62,519**
213:4
**6th**
138:5 194:5 224:19

**7**

**7**
25:21 30:1, 17 32:2,5,15 33:23 35:12, 23 36:5 42:19 43:6 44:6,14 45:2,19,20 46:7 48:15 95:1,4,9 96:3 97:6, 14,15,21 104:5 114:2, 22,25 115:3 116:12 117:7 119:13 123:8,13,22 124:3 128:7 132:6 133:9 135:14,18 138:8 147:22 163:16,18,19 170:7,8,22, 25 171:12 172:1,14,18 173:1,24 174:8,18,21 175:3,5,13 183:2 185:25 186:3,16,17 192:22 194:17 195:3,10 209:8 211:20 212:18 213:4,10 214:3,4,15, 19 216:25 217:2 220:1
**703 598-8383**
19:1
**717,000**
73:7
**739**
73:5 123:15 124:17 183:5 184:4,6 205:18,19
**7th**
95:23 96:14 124:21,25 125:14 130:19,20 166:15 183:20 185:7 207:11

**8**

**8**
160:7,11 167:10,16

**9**

**9** 9:7,17 179:16,19 189:9
**90s** 27:10
**93** 199:9
**9:00** 105:19
**9:13** 9:17

**A**

**a.m** 9:17
**a.m.** 65:22,25 122:5
**abilities** 137:2
**ability** 74:5
**able** 33:2 56:15 63:15 68:8 76:18 82:19 85:11 95:17 96:9 207:25
**above** 9:8 34:12 114:13 140:17
**Acadome** 103:18
**accepted** 131:20
**accommodate** 91:19
**accommodation** 117:23
**accommodations** 92:3
**accomplish** 155:17 223:15
**account** 19:2 34:14 86:10 100:4 148:4 175:11,16 187:5
**accurate** 26:20 60:22 72:5 208:1,6
**achieve** 197:24 205:25 216:9
**achieved** 216:5
**acknowledged** 218:14
**Act** 31:23 51:8 99:10 112:23 113:7 140:23 141:2,5,16, 19 142:15,20 143:11 144:5,9,15 145:1,5 149:12,25 165:4,12 166:13,17,21 167:9 189:3
**acting** 9:3
**action** 31:11
**actual** 66:15 84:9 125:24
**add** 45:8 96:1 117:12 128:7 145:20 146:2 159:6 196:5
**added** 44:21 102:14 145:25 162:18 166:14 186:16 192:14
**Adderholt** 104:17 127:4 128:15 134:17
**adding** 98:1 130:22 145:12 158:7 172:18,22 186:21
**addition** 80:19
**additional** 22:18,19 83:7 114:14, 17 115:15 140:18 183:3 211:20
**additions** 166:9
**address** 18:10,13 22:16 117:17 130:12,14 227:4,6
**addressed** 189:22
**addresses** 19:6 117:14, 16,20 150:15
**adjacent** 40:23 85:17 88:21 97:18 103:15 104:6,9 107:17 115:8 146:12
**adjust** 207:1
**adjusted** 210:13
**adjusting** 140:10
**adjustments** 189:9
**administrative** 68:11
**admit** 202:4
**adopted** 26:10,16 27:6 199:7 221:4
**advice** 199:24 200:23 202:24
**advised** 198:15,24 200:8
**affiliation** 35:10 41:25 176:9
**afraid** 22:20
**African** 32:8 33:17 170:15 171:24 196:5
**afternoon** 15:11 197:21,22
**age** 32:6,17 33:18 34:3, 8,15 35:10 44:7,10 49:7 74:10 83:2 112:18,20 117:6 119:12,22 135:7 175:12,17 195:11,17 216:23
**aggregate** 42:3,7

**ago**
13:2 18:21, 22 23:10,20 24:7,8 31:3 33:12,22,24 38:14 44:19 45:4,14 50:15 90:14 162:18 200:6

**agree**
52:8 92:11 170:21 171:11 178:4 205:24 206:5 214:8

**agreed**
169:7,19,23, 25

**agreement**
17:19 44:3 107:9 120:7

**ahead**
37:22 38:9 50:23 51:2 121:17 172:13 177:19 182:8 209:24

**Air**
115:22

**Alabama**
9:2,3,16 12:13,22 18:11,14 22:16 23:6, 20 24:2,10, 18 25:11,16, 17 26:9,14, 22 27:10 30:13,22 33:12 53:15, 23 58:15 59:21 60:8 67:21 69:6 75:12 77:14 86:14 89:19 112:19 113:12 115:6,21 116:6,7 120:1 147:5, 13,14 153:10,18 170:12 171:12 178:6 201:1,5,21 202:19 203:2,10,22 206:12 211:9 222:24 223:17,22

**Alabama's**
202:7

**Alabamians**
53:3,8

**ALBC**
12:21 25:11

**algorithm**
202:9

**allow**
70:10 197:10 224:1

**allowable**
151:16

**allowed**
56:25 59:8 131:2 133:7 148:20 151:7 186:18 209:22

**alter**
44:23

**amazing**
13:14

**amenable**
41:1

**amend**
134:20

**amended**
140:24 165:13 221:9 225:3

**Amendment**
112:23 113:8 139:16

**amendments**
180:18

**American**
22:23 32:8 170:15 171:24

**Americans**
196:5

**amount**
80:25 81:19, 24 162:22

**analysis**
167:24 168:3,6,11, 21 169:2 186:10 191:22

**analyze**
144:3

**ancestral**
227:8

**and/or**
146:12

**annex**
125:8,21,23

**announced**
67:19

**answer**
13:10 31:4 58:17,19 104:15 107:5 108:8,12,17, 23 109:17 131:20 138:24 148:10 162:23 173:3 177:5,16,24 178:10 181:11 187:9 195:21 197:5 202:22,24 204:25 217:11

**answered**
150:18

**answering**
12:2 13:18

**answers**
208:1

**anybody**
17:13 59:21 70:10 129:20 184:16 186:6 188:2 189:25 200:9,16,17

**anymore**
95:18 174:14

**anyone**
15:18 17:5, 10 37:9 50:7 53:16 57:24 83:13 87:16 101:13,23 106:17,22 120:10,12 121:2,5,11 138:19 143:4,9 144:2,7 148:25 149:5 164:8,13 168:20 169:1 177:13 178:1 204:21 221:10

**apart**
149:19

**apologize**
46:8 62:12

**app**
213:23,24

**appears**
147:11 170:8,22 171:13

**applied**
150:25

**applies**
150:22

**apply**
63:17 64:2 139:11

147:12,24 149:6
**apportioned** 206:13
**approached** 51:15,21
**approaching** 121:15
**approval** 38:21
**approve** 36:10
**approved** 36:8 136:4 140:17
**approximately** 23:9 179:9
**April** 58:19 59:6 63:17,20 67:20
**area** 89:15,23 91:16 92:4 97:4 115:14 125:16 127:15 154:3 156:1,25 162:17 186:2,14 227:24
**areas** 32:7,19 33:3 45:8,11 71:3 75:9 89:15, 19 102:13 114:7,17 128:3 132:4 152:13,16,18 162:11 164:21 212:14 224:2
**argument** 219:19
**around** 52:11 54:3 55:16 57:10, 11 59:12 65:13,15 67:19 82:18 136:14 208:18 224:16 228:4
**arrangement** 18:2 216:16
**array** 219:23 220:6
**arrived** 82:17
**asked** 23:15 30:20 31:12,15,19 36:11,16 46:24 51:24, 25 112:25 113:6,11 117:13 119:20 134:24 135:6,8 140:7 142:17 149:3 168:18 172:14,17 174:17 175:2,15 176:11 177:18,20 184:16,22 186:5,10 188:2,7 189:25 190:3 192:2 199:21 208:13 227:3,4
**asking** 10:9 13:4,6 19:24 36:9 69:13 101:20 113:22 118:17 149:4 171:8 196:24 197:1 199:24 209:17,20 218:19 220:5
**asserted** 11:15
**asserting** 177:1
**assess** 35:9 176:8
**asset** 176:23
**assigned** 73:22
**assigning** 32:10
**assist** 101:23
**assisted** 24:5 101:25
**assisting** 24:9
**Association** 22:23
**assume** 12:12 13:10 17:12 18:2 57:25 59:16 80:19 104:25 194:12 196:3
**assumed** 117:9 118:19 130:1
**assuming** 121:8
**assumption** 39:25 40:2 118:21
**ASU** 116:7,8
**attempt** 177:22 207:19 208:9,12 209:6
**attempted** 209:2,12
**attempting** 210:23
**attend** 88:10,17
**attended** 19:13
**attention** 66:19
**attitudes** 34:22 175:19
**attorney** 10:25 15:19 17:15,17,20 18:3 106:25 107:2
**attorney-client** 108:4,6,18, 22 109:14 176:24 177:2
**attorneys** 9:18 15:4
**August** 57:2,4 64:24 65:4 68:9 74:16,19 75:15 76:2 79:3,8,11 80:1 82:18 83:13 84:2 85:7
**Autauga** 161:18
**authorized** 101:19
**available** 41:12 48:20 82:24 83:5 143:20,21,25 206:22
**avoided** 150:6
**aware** 50:11 130:23 167:23 182:10 187:4 189:24 203:2 211:7,12,16 217:17 225:20,21 227:13,16

B

**back**
18:6 24:17 30:7 37:24 39:13 47:7,9 48:11 55:8 61:17 65:24 67:13 69:5 71:15,19 76:16 82:3, 12 84:5,14 88:23 96:19 98:6 102:11 103:14,21 115:2 118:4 122:7 123:12 126:12,20 127:15 129:17,22,25 130:7 140:1 164:16 167:15 172:2 179:5 185:21 186:3,16 195:1,2,24 196:1,7 197:16 198:13 205:3 210:2 220:21 228:22

**background**
18:7 21:23 107:24

**bad**
61:3

**Baggett**
10:23,24

**balance**
124:9

**balanced**
99:5

**balancing**
220:10

**Baldwin**
89:20 91:16 152:13 153:7 156:4 161:4

**ball**
113:1

**bar**
192:15

**Barfoot**
180:19 190:16,22 191:1,25 192:10

**base**
94:23 115:22 125:4,24 126:2

**based**
38:17 40:19 60:18,20 64:25 66:12 68:6 70:25 73:16 84:12 97:25 100:9, 12,17,20 101:3 103:10 104:16 105:5,11 106:10 131:22 145:14 146:3 162:24 166:5 208:5 213:1 217:7 223:4

**basically**
54:19 79:14 98:4 123:19 148:1 159:1, 12 174:14 180:24 185:11 190:7,25 194:24 195:3 206:1

**basing**
118:20

**basis**
35:17 145:1, 3 196:4

**Bates**
135:20 160:12 179:21

**bay**
153:6 156:5

**Beach**
18:11 20:22

**began**
58:8 59:12 65:12 94:5 206:9

**begin**
11:11 57:13, 17 60:11 63:15 64:20

**beginning**
9:12 60:17 64:16 79:17 114:24 212:23

**beginnings**
66:3

**behalf**
9:20 51:23 129:21 228:15

**behavior**
42:15

**belated**
136:20

**believe**
15:20 16:15 22:5 26:6 28:20 29:12 30:14 31:21 33:12 35:11 38:8 42:1 50:10 51:8 55:7 69:20 75:14 83:6 101:16,19,22 140:21 143:3 145:4 160:21 170:12 171:2 187:15 192:19 195:15 206:23 218:9

**believed**
108:21

**below**
195:10

**belt**
35:15 154:14,17,22 155:1,5,16 163:20 170:10 209:13 210:6

**Ben**
22:21

**best**
13:17 127:11 137:1 181:20

**better**
125:10 171:23 172:5

**bill**
17:14,16,22 26:5 104:19 110:2 134:23

**billed**
17:13

**Birmingham**
9:2 69:20 227:21,24

**birth**
18:8

**birthday**
136:18,20

**bit**
16:12 18:7 21:23 38:13 44:24 45:16 70:11 92:15 104:16 121:16 124:9,14 128:5 130:11

**black**
25:16 30:2, 5,12 31:13 32:3,6,13, 16,20 33:2, 18 34:3,7,

11,15 35:10, 15 36:6,12, 15,21,22 37:7,12 42:20 43:7, 10 44:7,9,14 45:12 46:1 49:7,9,19 50:3,8,13,20 74:9 111:25 112:17,20 117:6,11 118:19,23 119:12,21 135:7 142:6 154:14,17, 20,22 155:1, 5,16 163:20 170:10,11 172:12 174:9 175:12,17 176:18 177:9 178:2,5,19 188:17,20,22 189:21 193:4,6,10 194:10 195:11,16 196:25 209:13 210:6 216:23

**blacks** 210:24 211:10

**Blacksher** 10:8 16:11 197:19,20 198:7,11 201:4,8,11, 18 203:8,12, 18 204:5 208:17 209:20 210:1 213:11 221:8

**Blain** 10:6

**blanking** 116:5

**block** 33:20,21 83:3 134:5 138:16 151:14 215:21

**blocks** 133:24 151:21 226:16

**Blount** 127:23,25 130:7 195:2 214:12,20,21

**blue** 202:4

**board** 52:6 54:12 56:18 64:13 65:5,7,12 75:2 80:12 81:8,16,23 139:10

**Bob** 22:22

**body** 17:1 190:2

**bottom** 135:21 156:20 166:23

**bought** 18:20

**BRAC** 125:4

**brain** 46:17

**break** 13:22,23 65:19 121:17,25 122:2,6 197:9

**breakdown** 98:24

**breakdowns** 98:23

**brief** 170:17

**briefly** 16:7 21:7 114:15 120:5 126:9 190:15 191:24

**bring** 220:23

**broader** 216:5

**broke** 122:9

**broken** 33:19

**Brooks** 68:23,24 70:17 84:23 128:22 129:1,20,21 134:17

**buildings** 70:9

**Bullock** 155:4

**bureau** 56:20 58:19 59:4 60:7 67:19 201:22

**BVAP** 74:6 112:12 118:10 134:24 135:8 216:23

**BVAPS** 143:19 190:10

**C**

**Calhoun** 162:4

**call** 54:7 69:17, 19,21,23 85:3,4 87:2 112:2 129:24 130:25 132:9 198:15

**Callahan** 23:25 24:19 28:8 29:15 30:21 31:17 36:18

**Callahan's** 28:16

**called** 19:19,21 55:20 61:15 77:14,16 129:22,25 204:18

**calls** 54:9 83:21 84:6,13,15 85:1 102:25 103:3,5,11 105:5,9 195:19

**campaign** 20:2,6 21:12 22:22 23:1

**campaigning** 228:4

**campaigns** 21:11 44:1

**candidate** 112:14 142:9 168:8,9

**candidates** 21:13 210:24 211:11

**capable** 101:18

**capital** 77:20

**capsulize** 122:25

**capture** 207:8

**captured** 207:4,15

**capturing** 207:17

**cards**
124:17
**care**
131:24
**Carl**
111:6 122:20 134:16 192:20
**cascade**
115:5
**case**
9:14 11:16 23:15 54:25 85:23 87:2 112:21 139:24 142:2 170:1 184:5 206:4,23 219:18
**cases**
205:14 223:12
**Caster**
10:12 228:11
**Caucus**
25:16
**caused**
202:15
**CD**
170:7 216:25 217:2 220:21,22
**cell**
18:24
**census**
15:23 32:22, 24 39:3,4 55:11 56:9, 14,16,20 57:1,3,5,15 58:18 59:4 60:6,19 63:16,22 64:5,8,23 66:6 67:11, 16,19 68:7 71:8,17 74:16 76:3 77:24 82:5 84:9 133:24 138:16 151:14,21 177:11 201:22 202:6 203:4 206:17,21,25
**Center**
186:2
**certain**
20:14 34:2,7 100:17 109:12 117:6 119:4,6,9 138:20 157:4 175:8
**certainly**
47:5 58:2 59:4 74:4 79:19 89:10 96:12,16 100:24 101:18 109:5 121:10 150:10,24 152:24 162:19 192:20 200:6
**certificates**
20:11
**certify**
9:4
**chain**
222:10
**chair**
11:13 52:15, 16 184:21 188:6 190:3
**chairperson**
188:9
**chairs**
9:25 52:14 54:10 74:21 86:17 204:22 223:23 225:2
**challenging**
70:11
**chance**
170:19 192:18
**change**
23:3 38:5,7 39:11 41:17 72:3 73:18 85:18 92:6,8 101:20 104:15,20 105:2,21 110:21 117:24 123:18 156:6 180:25 183:4 185:5,20 189:17 190:24 191:2,3 192:10,12 219:20 220:6,16 221:1
**changed**
22:13,15,16 56:7,14 99:6 120:22 128:19 182:17 190:12
**changes**
28:15 29:12, 19 38:17 44:25 46:7 54:15 57:21 71:6,7 84:18 86:10 91:19 99:2,4 100:4,5,8,9, 12,17,18,20, 22 101:3,9, 11,14,21 103:4,9 104:25 105:4,6,11 110:1,6,9 113:7,15,24 115:5,14,20 116:15 118:16 124:12,13 128:21 130:19 142:18 145:12 158:18 173:12,23 175:2,4 181:3,7,10 183:7,12,14, 15,18 184:2, 13 186:4,11, 25 189:11,12 194:25 195:2 207:4 212:16 214:15,16 220:13 224:20
**changing**
146:17 219:23
**characteristics**
34:15 175:12
**chart**
213:16
**Cherokee**
126:10 195:1
**Chestnut**
170:17
**chief**
23:25 68:23 70:19 84:7 129:5,19,22 131:3,8,13, 14 134:11
**chiefs**
121:9,11
**Chilton**
124:12 126:24 130:17
**Choctaw**
155:2 163:21

**choice**
86:6 112:15 142:9 145:2 168:8 210:24 211:11
**choose**
104:8 128:10,13 138:2
**choosing**
32:15 132:21,22 133:4
**chose**
128:11 224:1
**Chris**
10:1 11:14
**chunk**
127:23
**circumstances**
157:4
**citizens**
53:2,7 73:7 104:3 114:14
**city**
227:21
**Civil**
9:5,14
**Clair**
162:5 220:14
**clarification**
64:1 173:22
**clarify**
108:20 169:25
**clarifying**
77:10
**Clarke**
114:21 115:2 123:7,12,22 221:19,23,24
**Clause**
139:16
**clear**
51:1 56:5 73:20 74:3 119:8 122:23 171:8,15 173:15 220:3
**clearly**
167:8
**clerk**
10:25
**clients**
22:18,19 43:9,13 62:21,25
**Cline**
22:21
**close**
50:5 66:14, 16 73:14 79:22 149:18 151:22 214:6
**closed**
70:9
**closer**
73:23 114:8
**closing**
125:4 126:3
**clue**
113:24
**co-chairs**
59:23 86:16 88:22 99:12 136:11
**Colbert**
220:20
**Coleman**
16:14 190:15 191:24 192:16,17
**Coleman's**
180:15
**colleagues**
87:23
**college**
125:17 203:10,22
**color**
144:21,23
**combination**
129:14 191:10
**come**
25:1 29:16 49:9 71:17 75:9 88:23 92:12 129:3 134:17 140:4,6 141:12 142:10 145:20 151:19 153:20 157:24 158:6 159:17 196:1 216:19
**comes**
49:8 152:20 159:18,21 188:1
**comfortable**
29:20 118:15 125:2 130:18 178:15 227:23 228:1
**comment**
37:11 118:15 181:21 188:7
**comments**
89:2,5
**Commerce**
201:6
**commission**
125:4
**commissioner**
9:3
**committee**
9:25 11:13 12:8 15:24 26:17 48:10 67:2 110:4, 5,7 120:16, 20 135:19 136:4 165:8 167:11 178:20 200:21 204:22 213:3 217:24 223:4,23 225:3
**committee's**
107:2 203:21
**committees**
90:24
**common**
41:15
**communicating**
218:8
**communication**
108:6
**communications**
88:7 108:7
**communities**
152:7,15,17, 23 153:8,9, 13,18,19,23, 25 154:5 155:10,12, 21,24 156:12,15, 17,22 157:3, 10 165:24
**community**
35:13,15 89:18,21 97:14 129:11 153:1,3 154:13 155:6 156:8,24 203:10,22
**compact**
124:21 130:21 132:16 133:2 141:25 142:3,5 146:8,20 149:20 172:19 173:4,11 174:2 193:9
**compactness**
157:19 186:20 193:13,14,18

**companies** 21:16 114:11
**company** 20:21,23 21:5 22:15 23:2,3 52:23
**compare** 219:13
**comparing** 205:7,12
**comparison** 165:1 205:9
**compelled** 200:3
**compelling** 165:10
**compensated** 17:10 18:1
**compensation** 55:2 56:3 57:23
**compilation** 192:13
**compilations** 191:4
**complaint** 202:1 221:9
**complaints** 16:1
**complete** 50:15 61:7 104:14 113:18,21
**completed** 19:12 60:24 61:5 102:2, 19,24 104:12 105:8,14 106:11 107:11 110:13
**completely** 60:22 72:5 214:3
**compliance** 140:23 143:23 152:9 165:12
**complicated** 161:15
**complied** 138:12 143:10 145:23 150:13 151:25
**complies** 140:12 142:14 143:15 144:4,8,14 147:1 155:9
**comply** 99:9 112:22 113:7 139:15 140:16 141:1 144:25 148:4 150:20 152:3 158:4 164:24 178:19 193:20 194:2
**component** 171:16
**comported** 189:2
**composed** 146:7
**comprehensible** 172:20
**computer** 76:11,19,22 77:12 78:1, 10 79:10 82:13 98:1 101:11,14 227:5
**computers** 33:12 76:17 78:12 80:4
**concentration** 32:8,20
**conceptually** 113:14
**concern** 189:4
**concerned** 184:8,9
**concerns/ discussion** 58:15
**concert** 31:17
**concluded** 142:19
**conditions** 108:17
**conducted** 168:11
**confident** 119:5,7,8
**confirm** 92:9 117:10 144:4
**confirming** 41:21
**conflict** 72:7 149:14, 22 152:20 155:20 157:25 165:14,19 166:5,11,16, 18 167:2
**conflicts** 86:25 165:23 166:4
**confused** 209:19
**confusion** 90:21
**congress** 21:12 24:18 40:10 43:14, 17 56:18 58:16 59:7 64:6 65:8,14 66:21 67:7 80:11 84:7 103:6 107:16 120:6 200:18,25 206:3,12 224:2,23 227:15,20
**congressional** 23:21 26:10, 12,13,15 27:6,10,13 29:22 30:1, 7,11,12 37:22 38:11 39:6 40:9 42:19 43:6 44:6 45:18 48:12,16,17, 24 49:19 51:6,12,16 52:2,5 54:11 56:25 57:14 58:13 59:18, 25 60:9,12, 24 61:6,19 63:16 66:5, 24 67:20,24 68:5,15,16 69:2 75:3 80:25 81:9, 25 83:16,20, 23,24 85:19, 21 86:9,15 87:13,15,20 88:11 90:3 91:13 92:25 93:4,15,19, 23,24 94:6, 9,25 95:5, 10,16 99:21 100:6,9 105:17 106:10,13,18 107:12 110:19 111:3 119:23 120:2 121:2,7 123:3 128:1 132:3 134:12 136:8 137:6, 15,22 139:11,24

142:2 145:21,23 147:12,17 148:19 150:21 151:18 155:17 158:13 160:14,15,22 167:18,21,25 169:3 170:8 171:5,12 172:13,25 174:16 176:19 179:2,11,23 180:3,23 181:6,24 184:11,17 185:9,16 194:13,15 196:8,9,14, 21 198:19 200:20 202:7,17 204:9 206:10 209:8 218:14 222:25 223:17 224:9 225:18

**congressman** 22:21 23:25 24:19 27:20 28:8,16 29:15 30:21 31:16 36:17 43:24 68:24 69:8,22,25 70:5,17 72:22,24 94:19 104:17,18 111:5,6 113:25 116:11 117:3 118:5 119:18,19 121:9 122:15 123:20,25 125:5,15,21 126:5,7 127:4 128:15,22 129:1,20,21 130:3 131:4, 8,16 132:12 133:14 134:10,22 180:25 181:4 182:24 183:9 184:5 226:7, 16 227:20

**congressmen** 23:22 58:21 80:18 92:11 105:18,23 121:11 122:11 134:16

**congresspeople** 125:9

**Congresswoman** 43:8 45:7,25 69:5 101:1 103:12 122:16 132:13 210:10,12, 16,22 216:12 217:12 218:8 219:2 226:6, 18,23

**connected** 200:10

**connecting** 151:17

**connects** 151:14

**consensus** 60:4 75:2,3

**consider** 37:6,18 48:12,14,19 49:18 96:23, 24 105:6 106:24 107:3 140:19 147:8,16 148:13 153:9 155:5 161:6, 13,20 162:2, 14 163:17 164:3,7 167:20 174:17,20 176:11,14, 17,22 177:6, 8,13,18 204:15 207:23 212:8,9 216:11,16

**considerable** 58:14 97:4 161:25 162:21 163:6

**consideration** 100:23 165:9

**considerations** 144:21 146:2 160:4 187:5

**considered** 30:4 35:22 107:1 167:12,17 210:6 217:10 225:9,11 226:23

**considering** 132:24 133:4 163:23 212:6

**consistently** 161:24

**constituents** 101:6

**Constitution** 139:17 141:3 147:6

**constrained** 199:15

**consult** 21:10 41:3

**consultant** 21:8 24:1

**consultation** 196:2

**consulting** 20:19 21:9 58:6

**contained** 37:12

**contend** 109:14

**content** 15:3

**Contests** 150:6

**contexts** 202:11

**contiguity** 151:7,8,12

**contiguous** 36:4 142:5 146:7,11 147:25 174:3

**contingent** 56:4

**continuation** 28:3

**continue** 118:23 159:7

**continued** 53:20

**continuing** 39:23

**continuity** 148:20

**continuously** 162:12

**contract** 43:16,19,21 52:17,19,22 54:3,5,7,22 55:3,6,8,18, 20 56:8 62:2 113:4

**contracted** 53:1,13 136:25

**control** 28:17
**controlled** 27:19
**conversation** 108:21 120:4 143:14
**conversations** 58:12 104:16,17 108:24 109:2,3 122:10 128:15,24 130:5 141:13 142:11 183:8
**convinced** 131:5,11
**cooperate** 133:25
**coordination** 68:12
**Coosa** 124:12 126:19,21 130:16
**copies** 14:8 110:24 169:10
**copy** 14:10,18 21:25 22:3,9 26:4 54:22 92:21,25 93:15,19 102:21 120:18 135:18 136:6 169:6,8,10 201:5 208:17 221:10
**core** 159:9,11,20, 25 160:3 161:2,3,8, 13,14,21 162:2,4,7, 14,16,24 163:2,3,13, 17,19,24 164:3,8,14, 19 211:22 212:19 222:4,18
**cores** 39:15 93:25 157:23 158:22 159:1,19 164:17 178:25 192:21 212:13 222:9,18 223:10
**Cornell** 19:13,18
**corner** 160:13
**correct** 13:2 16:21, 22 18:17,18 22:9 26:4 30:9,13 36:12,19 37:23 38:11, 22 39:4,5,14 40:16 54:21 57:6 58:7 61:9,16 63:21 65:16 67:8,22 69:14 75:16, 17 76:3,4,9, 22,25 78:2, 10,11 80:5,6 81:6 82:6,20 85:21,22,23, 24 91:4 93:4,18,24 94:8,11,15 95:19,20 96:5,6 98:16 99:23 100:10,11, 16,18,19 105:2 106:1 110:16,17 118:6 123:6 139:12,13 140:3 147:15 150:23 151:2,3 160:24 165:16,17 171:6 172:3 174:25 175:1 183:10,11,17 194:13 195:7,8 196:16 198:18 199:4 206:11,19,20 207:1,2,3 210:8,14 211:20,21 216:13,14 217:22 218:2 219:3,24 220:11,24 221:2,22,23 222:5,6,15, 16 223:20, 21,24 225:10,13 226:1,21,25
**correctly** 111:20 188:13 191:18
**correspond** 120:12
**corresponding** 183:4 195:2 215:16
**counsel** 9:6 99:13,14 106:21 139:8 140:8 141:13 142:11,18 143:7,8,14 149:3 164:11 168:22 169:5,7,23, 24 195:13 196:2 198:21,23 199:12 202:18 203:1 204:22,25 209:21
**counsel's** 202:23
**counties** 32:10 42:4,7 44:18 64:18 72:17 73:22 75:8 89:22 90:21,25 96:1 102:10 114:19 146:11 153:7,22 154:18,21,25 157:5,15,21 158:1,12 159:2,13 161:4,9,20 162:6 163:20 164:2 165:25 178:14 179:2 183:20,24 206:22,25 208:4 213:10 216:9 220:12 221:14
**counting** 12:20 147:20
**county** 33:19,21 40:25 44:21 56:19 64:9, 16 65:9 66:7 71:23 72:8 73:6 90:15, 20 91:1,7,23 92:12,13 93:6,16 94:12,21 95:2,5,8,10 96:4,5,8,9, 24 97:10,13,

19,21 100:25 103:13 112:1 114:21 115:2 117:19 123:8,12,22 124:3,4,16 125:13 126:10,15,21 127:10,24 129:13 130:10 132:2,5,9, 17,19 146:14,17, 23,25 152:21 158:8 159:13 161:16 162:7 170:11,14 171:17 172:21,22 174:10,15 181:8 182:1, 25 183:3 184:7 185:22,24 186:23 188:15 191:3 193:16 204:7,8,9, 10,17 205:3, 6,10,16,21 206:1,4 207:19 208:9,16 211:14,24,25 212:1,2,3,19 213:4,7,8 214:2,4,5, 23,25 215:4 216:19 217:13,14 218:6 219:3, 11,21 220:2, 8,21 221:20 225:17,24 226:8,14,17, 18,25 227:8, 10,22

**couple** 46:14 48:13 62:24 63:13 79:16 127:13 129:25 133:8 145:18 180:10,17 188:12 223:12

**course** 11:16 48:25 87:22 105:20 123:8 174:13 205:3 214:8 215:3 223:11

**court** 9:1,15 11:1, 16 13:13 24:3 26:11 31:11,25 79:1 112:21 113:15 131:5,12,16, 19,22 199:6, 13 200:3 201:22 203:3 210:2 219:17 220:5,22,25 221:5

**court's** 202:12

**court-approved** 199:14

**court-ordered** 199:15 200:4 220:7

**courts** 113:13 202:10

**cover** 47:19

**covered** 108:25 109:14 113:3 148:1

**COVID** 55:10 63:7

**crazy** 63:8 146:15

**create** 31:12 50:12, 20 142:1 172:12 176:18 177:9 178:5,18 202:9 209:7

**created** 30:11 53:22 96:21

**creating** 50:8 178:2 183:9

**criteria** 41:4 137:8, 10 138:22 144:17,21,25 165:5,9,14 166:24 167:13,15 198:18

**crystal** 113:1

**Cullman** 162:17

**current** 16:6 23:11 159:13,14

**cutoff** 138:21

**cycle** 196:11,19

**Cyrus** 226:20

**D**

**Dallas** 117:19 155:3 226:24 227:10

**data** 32:22,24 33:15,18 39:3,4 41:9, 24 42:13,16 48:22 49:6, 11,14,16 56:9,14,16 57:1,4,15 60:19 64:8, 10,16,23 67:11,12,16 68:7,9 71:9, 17 74:9,16, 22 75:25 76:3,6,11,14 77:24 82:10 83:10 84:5,9 97:20 99:20, 24 101:4,6 102:3,24 106:7,8 129:24 133:3 157:9 160:4 195:6,9 202:8,9,20 206:17,21,25 207:2 213:2, 17

**date** 9:4,16 18:8 22:11 25:15 58:11 61:12

**dated** 135:21

**Dave's** 213:23,24 214:16

**Davin** 10:17

**Davis** 9:22 15:6 50:22 169:22 170:23,25 171:7 178:7

**day** 79:19 180:19

**days** 79:13

**DC** 59:14,16 67:7,24

68:14 69:14, 16,18 73:17
**deal** 157:25
**dealing** 105:22
**December** 9:7,16
**decent** 78:25
**decide** 132:4
**decided** 24:20 85:3 86:2 127:14 129:1 131:17
**decision** 199:13
**decisions** 223:18
**declaration** 25:12 26:4
**declined** 68:18,21
**deemed** 113:15
**deep** 191:22
**Defendant** 170:11
**deferred** 224:8
**defined** 156:25
**definition** 32:11 153:1, 3 156:21 159:22
**definitive** 153:17
**delay** 55:11
**delayed** 68:7
**delegation** 24:20 26:15 30:23 31:17 45:23 46:2 58:13 201:1 222:25 223:18 224:9
**democrat** 151:2
**democratic** 28:13 39:24
**democrats** 27:19
**demographic** 38:17
**demographics** 35:19
**demonstration** 202:8,16
**Dental** 22:23
**Department** 201:6
**depend** 113:15
**depending** 124:7 154:6 223:7
**depends** 149:14
**deposed** 12:16
**deposition** 9:12 13:1 14:10 15:5 16:17,20 17:4,8 22:4, 5 45:14 181:21 222:8 229:3,6
**described** 87:1
**describes** 189:9
**description** 26:20
**detail** 125:18
**detailed** 218:18,24
**details** 120:8
**determination** 35:18 142:23 143:6,13 164:4,6
**determine** 35:13 144:8 167:3
**determined** 64:5
**determining** 159:25
**Deuel** 10:15
**developed** 26:14
**deviation** 36:2 73:14 84:19 86:11 102:9,16 128:18 132:11 133:13 134:8 137:16,19 138:1,3,12, 16,20 139:1 140:2 182:18 183:6 188:11,17 189:10,13,17 190:8,9 194:4 197:24 198:16,20 199:3,16,18 200:4,8,23 201:2 202:10,19 208:15 210:13 215:5,21 216:10 223:9 225:10,12,15
**difference** 47:14 210:19 213:9 214:5
**differences** 84:8 169:23
**different** 33:3 68:19 77:14 80:15 94:2 95:22 96:1 103:15, 19 111:19,22 127:13 128:18 152:17,23 154:5 155:12 156:18,19 175:16 191:4 210:7 220:14
**differential** 202:8,16 203:4
**difficult** 70:8 227:17
**diluting** 140:25 142:25
**dinner** 109:4
**direct** 198:14
**directly** 31:7 68:25 219:8
**director** 20:5 134:23
**disallowed** 178:25
**disclosing** 15:3
**discriminated** 143:4
**discriminating** 141:10
**discrimination** 167:3
**discuss** 50:7 70:20 71:5 84:1,17 85:14 86:14, 21 106:17

116:24 117:2 118:5 119:15 122:17 131:6,17 178:1 217:13
**discussed**
11:8 17:5,21 45:13 70:23 71:10 73:17 84:10 103:6 106:16 115:24 116:10 119:19 121:3,6,12 122:10 134:14 140:9,20 143:25 144:12 148:2 156:17 164:7,10 165:19 166:12,25 167:13 172:2 191:15 218:7,10 222:8 223:13
**discussing**
125:16 180:25
**discussion**
21:23 45:6 98:8 120:8 127:9 128:9 129:9 131:9, 22 133:7 135:10 164:12 168:25 177:25 218:11,16,25
**discussions**
15:4 61:22 68:12 74:21, 24 86:24 97:24 108:14 116:23 122:15,22 123:2,19,25 124:25 125:18 126:5 127:14 128:2 134:10,15,18 143:9
**disputes**
72:14
**distinction**
143:3 180:8
**district**
9:15,16 26:11 28:17 29:14,23 30:1,2,12,17 31:13 32:2, 3,5,15,16 33:23 34:11 35:12,23 36:5,12,15, 21,23,25 37:1,17 41:17,22,23 42:19,20 43:6,7,11 44:6,14,23 45:2,8,9,12, 18,20 46:1,7 48:15,20,23 49:6,8,9,12 50:3,9,13,20 56:23,24 59:10 70:24 71:3 72:10, 20,22,24 73:7 85:18 94:20,25 95:3,4,9,17, 24 96:3,10, 14,15,24 97:14,15,16, 21 100:4 101:2 103:20,23 104:5,22 107:17 112:6,7,10, 11 114:2,6 115:6,7,8,9, 11,17,21 116:1,12,18, 20 117:7,11, 21 118:2,3, 10,24 119:13 122:21 123:9,20,22 124:1,4,21 125:9,19 126:1,7 127:5,8 128:18,23 130:4,19,22 132:5,6,16 134:23,25 135:9 137:15,24 138:2,8 142:2,3,7 144:19 145:20 146:13 150:11,17 155:17 156:2 157:15 158:11,12 159:4,10,11, 14,19,21 160:1 161:1, 2,3,11,12, 13,14,21,24 162:1,3,4,8, 12,13,15,16, 19,21 163:1, 5,9,11,13, 16,17,19 164:1,3,14, 22 165:25 166:15 168:7 170:8,13,15, 22,25 171:9, 12 172:1,5, 9,12,14,18 173:1,24 174:2,8,18, 21 175:2,3, 4,13 176:18 177:10 178:2,5,19 179:2 183:2, 21,23 184:9, 11 185:7,9, 25 186:1,3, 14,15,16 188:14,18, 20,22 189:21 192:19,22 193:4,6 194:5,10,17, 19 195:10 196:5,25 198:22 204:9,14 206:2 207:11,13 209:8 210:7, 12,16 211:20,22 212:18,20 213:4,7,10 214:3,4,15, 18,19,24 215:8,9 220:1,2 223:7 224:15,18,19 225:18 227:6,18 228:3
**District's**
130:21
**districting**
144:20,24 216:6
**districts**
29:13 30:5 37:7,12,19 39:16 40:18, 24 42:8 48:15 49:4, 19,25 50:5 53:19 54:20 58:23 60:1,7 63:19,24 64:17,25

66:11,17 67:21 73:23 75:7 80:20 82:1,25 85:16,17 89:7 94:1, 13,17 95:22 98:2,3,6 99:6,7,21 101:7 102:14 103:19 104:23 107:15,18 111:25 112:2,3,4 117:15 128:1 137:22,23 138:13,17 139:10 140:22 143:17 145:12,16,23 146:3,6,19 147:24,25 149:19 152:6 157:7,23 158:10,23 159:2,3 160:3,15,23 164:8,18,20 165:7,12 167:24 176:12,15 178:25 183:25 190:11 192:21 193:10 194:23 198:19,22 202:7,17 207:6,8,16 209:7 210:23 211:10 212:13 214:17 219:23 220:9 222:10,11,12 223:10

**divisible** 137:25

**Dixon** 30:24

**document** 22:6 25:19 135:25 136:2 160:11,13,18 169:16,18 179:20,23,25 201:20

**documents** 14:18 15:21 213:12

**doing** 13:14 21:14 61:8 62:4, 13,18 65:7 74:14 78:24 80:3 82:15 87:22 91:24 92:1,2 97:22 101:18 132:1 140:10 145:17 166:8 187:18 209:18,24 216:22

**Donna** 101:16 107:23

**Dorman** 9:24 12:7 14:24 15:6 88:23 99:14 107:22 121:14 136:11 139:8 177:20 197:23 198:25 199:2 213:2

**Dothan** 161:16

**draft** 26:24 27:1 29:11 54:4 102:2,5,19, 21,23 103:2, 10 104:12 105:8,13 106:8,9 107:11 108:2 109:22

**drafted** 27:14 30:15, 17 136:7

**drafting** 26:8,21 30:25 31:7 42:18 43:5 44:5 93:23 111:3

**drafts** 106:5,13,15 110:18,25

**dramatically** 44:22

**draw** 23:23 24:2, 17 25:2 27:7,15 28:19 30:5, 8,20 32:2 33:9,13 36:11,20,22, 25 37:1,4,9 39:19 43:15, 23 47:5 49:3,24 50:2 52:8 54:11 62:3 73:21 80:8 81:19 87:9,15 114:2 116:11,25 121:1 137:1 168:19 170:13 172:8 177:22 196:6,8,18, 24 208:9 210:23 211:10 219:20 223:19

**drawing** 24:14 26:9 27:6,16 28:11 29:22 31:13 33:1, 7,16,23,25 35:23 37:6, 18 38:15,23, 24 40:1,9 41:4,7,20 42:13 45:17 48:14,23 49:18 51:16 52:1 53:11, 19,22 58:8, 10 60:9,23 61:1,19 62:18 64:3, 20 65:3,12 66:3,5,23 67:4 77:2 80:20,21 81:23,25 83:15 84:2 87:20 88:25 94:5 99:21 100:16 101:7,23,25 105:25 123:3 134:11 136:5,25 137:6 147:9, 17 148:14 149:6 155:8 156:10 166:5 167:17,21 170:15 172:25 173:21,24 174:16,18,21 175:13 176:12,15,19 187:5 194:16,22 195:6 196:14 207:19 214:7 215:19 219:17 220:6 222:22

225:11
**drawn**
24:24 27:24 29:10,20 39:21 46:23 47:1 51:3 52:3 110:1 120:17,22 121:7 140:23 142:3 144:19 191:12 199:17 216:1
**dream**
20:3
**drew**
23:19,20 25:3 27:2,21 34:6,16 35:12 37:23 38:1,10 39:24 40:3,6 49:19 77:25 84:14 91:6, 9,13 95:11 160:23 172:1,4 183:16 187:3 194:11,15 196:15 197:1 199:5 214:10 221:4,13,14, 18 222:2,4, 23
**due**
165:8
**duly**
11:4
**Dutton**
203:25

**E**

**E-S-R-I**
77:20
**earlier**
114:10 115:24 126:20 130:24 134:14 150:18 152:12 154:15 163:20 179:6 180:8 212:6 222:8
**early**
67:6 68:1 177:12
**earnest**
57:18,19 58:9
**earth**
19:23
**eastern**
205:16
**Ebenstein**
10:19,20
**economic**
153:4 154:7 157:2
**education**
19:11 52:6 54:12 56:18 65:5,7,13 139:10
**educational**
20:11 35:5 176:2
**effect**
140:25 142:24 158:6 220:17
**effective**
64:14 65:1
**effort**
24:16 73:23
**efforts**
24:6
**eight**
13:2 45:14 80:12 81:14, 17,18
**either**
17:1 48:9 51:11 88:22 96:8 123:16 125:18 178:24 192:25
**elect**
142:9 210:24 211:11
**elected**
21:13 214:19 227:17
**electing**
168:8
**election**
35:9 41:6 42:2,3 62:23 75:18 112:14 176:8
**elections**
27:10
**electorally**
41:23
**Eli**
9:20 201:4 203:8 213:12
**eliminate**
97:11 132:17
**eliminated**
186:19
**Elizabeth**
10:24
**Elmore**
124:9 161:18 214:25
**email**
19:2,6 88:4, 7 120:12
**employees**
21:4
**employment**
35:1 175:23
**enacted**
51:7 110:15 196:10,16 205:15 206:7 214:8 219:14,22 220:9,15 222:3,22
**end**
15:1 51:17 55:12,17 57:2,4,11 60:17 64:23 66:13 79:18, 19 82:18 85:2 96:19 102:20 119:21 124:18,24 125:2 127:9 128:16,21 145:14 186:2,15 214:16 218:10
**endeavor**
24:23
**ended**
73:4 207:12 214:7,20,24 229:6
**ends**
229:2
**Enfinger**
28:20 29:7,8
**ensure**
173:24
**entails**
168:3
**entire**
45:23 63:3 155:15
**Entirely**
78:14
**envision**
71:1,3
**equal**
127:22 139:16,23 165:3 202:12

**equality** 165:11,20 220:24
**equalize** 137:15
**equalized** 204:12
**equally** 150:22,25
**equitable** 185:8
**errors** 202:15
**Escambia** 72:25 104:21 111:6 123:17,18 124:15,19 158:8 181:1 183:1 184:7 205:15,17 206:4
**ESRI** 77:6,15,17, 22 78:3
**essentially** 28:3 38:16 123:4 182:24 191:11 192:11 193:10
**established** 153:13
**establishing** 165:7
**estimate** 72:11 102:4 111:14 113:9
**estimated** 72:2 206:17, 21
**estimates** 56:19 57:5 59:9 60:18, 21 63:17,22 64:25 66:7, 12,13 70:25 72:4 73:12 74:11 84:8 102:6,12,17 114:5 207:4, 7,10 208:2
**et al** 9:13,14
**ethnic** 157:1,8
**Etowah** 162:20 214:12
**evaluations** 185:12
**Evan** 9:13
**eventually** 91:22
**everybody** 41:2 59:15 80:15 85:4 134:22 152:22 154:8
**everyone** 14:9 229:1
**evidence** 145:2,3 196:4
**exact** 45:3 47:2 212:24 215:23
**exactly** 37:3 57:12 85:13 109:8 132:3,25 169:24 172:7 214:1
**examination** 9:8 11:18 197:20 198:14 212:6
**examined** 11:4
**examples** 206:6
**exceedingly** 227:17
**exchange** 104:5
**excited** 125:1
**excuse** 20:10 26:12 48:12 77:7 122:16 156:23 177:7 183:13 224:6
**exhibit** 14:7,13,15 21:19,24 25:6,9,10 92:17,20 93:10,14,18 110:15,16 135:14,18 147:22 160:7,11 167:10,16 179:16,19 189:9 201:15 203:12,15 208:21,23 219:16
**Exhibits** 14:3 213:19
**exist** 23:12 110:23 153:15 217:19,20
**existed** 196:4 212:22 217:16
**existence** 187:15
**existing** 39:3,15 93:25 100:3 157:23 158:23 159:2,10,11, 25 211:21,22 212:12
**exists** 145:3
**expand** 47:9
**expect** 17:25 112:24
**experience** 23:17 26:8, 21 27:5
**expert** 168:5 171:15
**explain** 21:7 44:24 45:16 49:2 148:25 149:5
**explored** 73:19
**extending** 186:22
**extends** 172:5 212:3 227:22
**extension** 172:9 212:18
**extensively** 189:16
**extent** 14:9 44:2 54:13 74:7 86:25 108:4 146:16 148:18 152:8,18 196:22
**extraneous** 181:21

F

**face** 132:8
**facilities** 104:1 114:11
**fact** 68:6 137:5 171:8 224:5 226:15 228:2

**factor**
35:22,24,25 104:10,11 150:22
**factors**
34:20 100:13,21 132:24 133:3 147:8,16 154:6 167:16,20 175:16 187:1
**facts**
169:6,17,18
**failed**
24:17
**fair**
13:11,25 17:24 25:4 38:25 39:1, 25 40:2 48:13 51:9 53:2,3,7,8 63:25 80:22, 23 119:9 154:1,2 183:19 197:11,12 205:8
**fairness**
184:9
**fall**
61:15
**familiar**
27:23 111:17 141:4,6,15 154:14 181:4,10 205:2 213:24
**far**
20:7 70:17 147:18,19 148:22
**fast-growing**
162:6
**Faulkner**
181:6,12,14 182:20
185:16,23 186:25 187:3,6 190:25 191:3,11 192:9
**Faulks**
10:21
**Favorite**
176:4
**feature**
89:11
**features**
91:20
**federal**
9:4 21:11,16 24:3 26:11 36:10 201:22 203:3
**feedback**
29:22 87:8 89:14 90:1, 4,16 92:5 103:10 105:12 106:10 107:25 116:11 121:5 187:21,24 192:7
**feel**
66:10 67:16 102:13 107:6 178:15 227:23,25
**felt**
104:1 156:9 193:19 194:1 199:15 200:3
**fewest**
157:20
**field**
20:5
**fifth**
158:21
**fighting**
125:9
**file**
24:21 78:6 179:22
**filed**
9:15 24:22 25:15 169:7 201:21
**filling**
97:23
**final**
84:16 85:2, 3,4 128:20 131:1 134:21 177:11 206:25
**finalized**
109:25 217:20
**finally**
127:14 130:3 163:16
**financial**
94:23
**find**
47:1 112:22 203:8 215:11
**fine**
68:10 78:24 123:17 126:21 130:15 148:12 169:14
**finger**
170:9,13 171:16,23 172:5,8 174:9,14 186:23
**finish**
49:3 78:22 79:1 81:22 197:8
**finished**
98:12 225:7
**Finishing**
98:14
**firm**
144:3,10
**first**
24:16,23 27:4 29:14 30:12 51:15 67:10 91:6 93:17 102:2 106:6 129:5, 16 148:25 150:4 182:1 184:4 188:6 217:23,25 218:1 219:25
**fit**
32:11 96:19
**five**
15:15 18:20 68:17 69:3 79:13 85:1 154:5 165:19 166:11
**flavor**
207:4
**flawed**
202:20
**flew**
68:14
**flip**
25:21 146:5
**flipping**
161:5,12 163:1,16
**floor**
17:1 48:9 120:4 184:19,20 188:6 191:19 192:3,5 224:14,21,22
**Florence**
91:24
**fluid**
154:1
**flying**
67:23

**focus** 29:13
**focused** 225:22
**Focusing** 83:24
**folks** 98:1,2 127:8 159:6,7 171:22,24 197:10 206:8 210:18
**follow** 100:7 109:19 137:1,5 202:23
**follow-up** 130:25
**follow-ups** 81:15
**followed** 15:8 193:12 208:15
**following** 9:9 110:4
**follows** 11:5
**football** 154:8 176:4
**footprint** 130:21
**Force** 115:22
**foregoing** 9:5
**form** 16:18 33:5 37:15 50:22 138:23 146:13 168:24 170:23,24 178:7,12 187:8 195:19 198:1,10 202:21 210:4 216:17
**forma** 120:8
**formal** 20:25
**formally** 87:25
**formed** 23:6
**formulating** 60:3
**forth** 49:7 54:15 55:11 59:11 81:15 94:24 114:12 129:13 211:15 223:14
**forward** 50:6 59:25 75:1
**found** 34:7 202:11 206:11,14 226:15
**four** 15:15 23:19 41:11 46:13, 25 52:1,4,8 54:11,14 55:4,5,20,21 56:12 62:3, 19 64:2 66:17 79:13, 24,25 80:3 84:25 116:18 136:5,25 154:4 168:19 181:17 183:24 186:1,14 207:5
**fourth** 157:12
**frame** 56:6 62:9 67:1,5 74:19 75:19,22,25 79:25 84:22 105:24 122:24 123:1 196:12
**Franklin** 220:21
**frankly** 218:12 226:2
**frequently** 204:13
**Friday** 15:1 61:10, 12 169:8
**front** 21:10 33:16 52:20
**full** 60:21 63:2 64:17 180:17
**full-time** 18:13
**fully** 56:1 73:3
**fun** 59:1
**function** 32:19
**further-away** 132:18
**furtherance** 60:9 66:5,23 83:15 134:11
**future** 113:2

**G**

**gain** 40:19,20 72:24 95:3 210:18 212:14,15 224:3
**gaining** 172:22 184:6
**Gary** 188:16 226:16
**gather** 32:21 90:11
**gave** 22:4 82:11 135:1,5,9 199:23 210:17 225:1 227:6
**gears** 210:9
**general** 34:6 38:14 39:2 154:24
**general's** 17:15,17,20 18:3
**generally** 38:23 46:6 73:16
**geographic** 153:4 157:2
**geographical** 128:6 186:20
**geographically** 97:3,18 124:20 128:8 130:20 132:7,22 133:2 134:1 146:20 172:20 173:4,11 174:2 193:8
**geography** 32:19 35:19 36:2 99:25 128:11,12 146:2,8 153:6 159:12 202:6 223:8
**gerrymandered** 170:9,22 171:13 172:16 173:2,25

**get all**
216:19
**getting**
124:4 126:14
**Gingles**
142:4
**give**
27:22 40:25 41:24 88:2 104:14 117:5 165:8 200:22 201:1
**given**
76:11,14 81:25 87:14 165:10 167:5 223:3
**giving**
130:7
**goal**
29:25 36:20, 24 37:1 42:18 43:5 44:5 59:14 92:10 172:19 216:5 224:11
**goes**
70:17 132:17 140:1 171:16 212:18
**going**
25:9 28:25 31:4 41:22 45:2,5 48:11 49:5,6 50:6 51:5 55:10 57:10 58:23 59:1 60:7,22 61:17 62:3 65:18 68:6 72:3,4,20,21 73:18 74:13 82:3,15 88:19 89:10 93:13 102:17 105:15 108:3,12 114:6,23 118:4 121:15 124:25 127:7 129:3 130:2 131:5,12,16, 19 134:6 147:6 155:13 164:2 168:25 176:23 184:6 191:6 196:20 197:18 198:3,13 202:23 205:20 208:6 209:6 213:11,15 215:8,9,23 216:2,12 219:20
**good**
10:19,21,23 11:19,20 34:9 38:6 43:1 81:4 124:5 129:14 133:10 145:3 184:3 185:5 186:19 192:10,12 197:21,22 207:17 214:14 227:18
**Goodlatte**
22:22
**government**
19:20,22
**governments**
158:14
**governor**
41:16 225:5
**grabbing**
170:10
**graduate**
19:16,25
**granular**
125:17
**grass**
211:8
**greater**
150:1 199:18
**Greene**
155:2
**grew**
227:9,11
**group**
53:9,13 133:10 144:22,24 154:18
**grow**
158:13
**growing**
163:4
**guess**
15:15 17:22 21:2 24:16 25:3 31:14 40:2 45:2,5 50:17 56:20 61:2,4 64:8 68:20 74:2 84:16 86:5 101:20 113:14 118:15,17 129:17 141:23 142:4,19 153:22 155:4 161:15 166:1 181:18 185:22 188:5 191:21 198:15 210:5 221:2 222:10 228:25
**guessing**
62:11
**guideline**
39:16 90:24 223:1
**guidelines**
15:24,25 26:16 67:2 68:1 74:20 99:9 120:23 135:19 136:3,7,23, 24 137:6 151:16 167:12 178:20 179:3 188:12 193:12,21 194:2 196:3 206:15 208:14 223:3,9 224:3 225:14 226:12

**H**

**Hale**
155:3 210:5
**hand**
25:9 93:13
**handed**
44:19 136:12
**handing**
14:6 92:20 135:17 160:10
**happen**
38:3,5 56:10 115:5 224:24,25
**happened**
38:18 109:23 113:23 207:5 224:12
**happening**
87:3 88:13, 16 91:21 118:1
**happy**
41:2 116:21 121:19,22,25 136:20 219:2
**hard**
31:4 47:8,9 97:5,10 202:5 221:1

**Hare**
9:20 201:7, 10,13 203:11 208:20 213:15
**Harris**
104:19 134:23
**Hatcher**
16:15 190:15 191:16,22,25 193:2,3,20
**Hatcher's**
180:16
**hazard**
45:2
**HB-1**
51:8 196:9 217:21 219:14
**head**
34:25 47:9 53:6
**heads**
101:17
**healthy**
218:15,17
**hear**
90:6 187:24 211:23
**heard**
112:5 181:21 213:25 218:19
**hearing**
90:12 187:14 198:3 203:9, 21 217:24 218:1,3
**hearings**
88:11 89:14 90:2,6,16 91:12 92:6 182:3 187:22 211:14
**held**
211:14
**help**
13:19 92:15 175:14 179:14
**helped**
24:2,22
**helpful**
66:19 125:6
**Henry**
10:13
**high**
32:7
**higher**
195:17 202:6
**highest**
19:11
**highlighted**
201:8,25 203:23,24 204:2,3,5
**highlighting**
202:4
**Hinaman**
9:7,12 11:3, 22,23 20:17, 24 21:1,3 23:3 52:24 66:1 122:9 197:21 201:19 202:24 203:19 209:1 213:14,22 221:11,12 228:8,25 229:3
**hire**
86:2
**hired**
28:23 38:19 85:20 86:3
**historical**
157:3
**history**
30:13
**hit**
134:4 155:17
**Holmes**
180:23 182:19,21 183:14 184:13,17,23 190:23 191:1 192:11
**home**
117:14,17, 18,19 130:12 150:15 206:1 227:8
**Homewood**
116:17,18 133:7,8 185:21,25 186:13
**honest**
33:14 45:21 91:10 151:12
**honestly**
17:22
**hooked**
146:12
**hope**
113:19
**hoping**
55:9 134:2 172:19
**host**
153:7,8,24
**hour**
13:23 17:18 65:18 121:15 197:7
**hours**
15:15,17 48:8 60:25 61:18,19,24 62:1,4,10
**house**
47:18 52:5, 15 54:10,12 64:15,17,21, 22 65:11 70:9 75:4 78:17 80:10, 13 81:7 147:14 184:20 186:8 188:5 224:22
**Houston**
161:16
**hungry**
121:21
**Hunt**
199:7 200:1 221:5
**Huntsville**
129:13
**hypothetical**
113:22 220:25

**I**

**idea**
38:3 61:2 62:5 91:8 131:21
**ideal**
45:9 73:24 98:6 114:9 158:2 225:18
**identical**
110:14 225:4
**identification**
14:4 21:20 25:7 92:18 93:11 135:15 160:8 179:17 201:16 203:16 208:24 213:20
**identified**
207:7
**identify**
157:9
**identities**
157:3
**II**
137:10,14

139:9,14 140:10,15,22 143:10 144:18 147:5,17,21 148:6,7 151:4 152:6 156:20 157:13 158:21 165:6 167:13,16
**imagine** 52:21 155:16 171:21
**immunity** 11:15
**impact** 67:4 91:12 92:6 112:14
**imply** 27:2,3
**importance** 150:1
**important** 13:16 73:6 136:19
**importantly** 136:17
**imported** 78:3,6
**imposed** 31:11
**in-person** 70:4,7
**inaudible** 214:9
**include** 27:6 128:3,4 133:5 157:4
**included** 32:7 35:14 109:6 221:13
**includes** 96:4
**including** 26:9 61:21 80:9 97:20 121:8 157:1 223:23
**Income** 35:3 175:25
**incorporate** 184:13
**increase** 211:19
**incumbent** 172:11 222:24
**incumbents** 40:12 54:19 148:18 149:17,21 150:6,11 151:1 159:5 178:25 188:13 189:19 190:10 192:19 193:7 194:4,6 223:14
**indicated** 202:8
**indicating** 108:18
**individual** 42:4 43:24
**individually** 52:22
**influence** 112:2,4,6,10 206:3
**info** 75:22
**information** 32:21 33:6 41:13,24 48:20 71:15, 19,20 72:1 73:8 82:5, 19,23 83:4,8 87:6 91:11
**informed** 59:5
**initial** 102:2,5 114:4 127:9 130:24 166:9 182:17 187:12 188:10 194:3 211:13 217:16 224:17
**initially** 56:7 97:23 117:13 123:16 124:7 125:2 130:9, 13
**Injunction** 169:17
**inordinate** 179:1
**input** 29:9 223:18, 24,25
**inside** 117:15,21 146:17 161:24 164:22 171:22 227:6
**instance** 34:19 39:12, 17 59:21 111:17 167:2
**instances** 145:19
**instruct** 108:16,23 109:17 177:23 202:22
**instruction** 109:19 167:5 177:15 197:3,4
**instructions** 31:24 86:8 87:14 114:1 116:10 117:5 121:1 200:23 201:2
**intact** 89:16
**intending** 196:23
**intent** 32:2 141:10
**intents** 79:15
**interacting** 27:20
**interest** 35:13,16 39:7 54:15 89:18,21 97:14 129:3, 11 152:7,15, 17,24 153:2, 3,8,10,13, 18,20,23,25 154:5,13 155:6,10,12, 21,24 156:13,15, 17,22,24 157:4,10 165:24
**interested** 51:25 68:19 84:24 114:10,13 115:22 130:1
**interests** 34:24 157:1 165:11 175:21
**interface** 29:6
**interfaced** 28:23
**interfere** 215:3
**internals** 74:5
**interpreted** 199:23

**interrupted** 191:14
**interruption** 42:21
**introduced** 179:23 180:3
**involve** 108:14
**involved** 19:8 24:14 62:7
**irrelevant** 62:4 72:10
**issue** 156:3 184:10 188:19 211:1
**issues** 126:3 155:18,19 193:22,23
**iterations** 110:22

**J**

**j(i)** 166:25
**j(ii)** 151:5
**j(iii,)** 152:6 156:21
**j(iv.)** 157:13
**j(v)** 158:21
**j(vi)** 165:6
**Jackson** 127:10 204:7,8,10 205:3,10,21
**Jefferson** 96:5,8,12, 17,22 97:8,9 100:25 115:14 116:15 130:9,13,19, 21,22 132:2, 5,8,9,17 146:18,23 163:12,22 170:11,14 171:16 172:21,22 174:10 181:8 185:22,24 186:22,23 191:3 209:9 214:5 221:20,25 225:17,24 226:7,14,17, 20 227:7
**Jim** 9:22,25 10:8 11:13 15:6 198:6 199:21 209:16 213:17
**job** 13:14 20:3 78:25 143:3 207:17
**John** 9:13
**joint** 169:6,16
**judges** 36:10 38:5,6
**Julie** 10:19
**July** 55:9,14 56:10 60:16
**June** 22:4,9 25:15 55:14 60:16, 20
**jurisprudence** 202:12

**K**

**keep** 91:24 129:14 152:15,18,25 155:25 157:20 158:10 159:3,7 209:12 210:12
**keeping** 39:8 91:16, 17 129:6,10 158:1 211:21
**kept** 44:6 89:16, 20 91:21 115:20 164:21 166:8
**key** 12:25 159:13 162:19
**kind** 73:25 74:1 105:1 122:18 132:22
**knew** 58:17,22 60:1 68:3 73:3 74:12 114:23,24,25 115:6 138:4 184:22 194:19
**know** 13:8,24 26:23 27:3 28:15,19,23 29:25 30:4 31:9,19 33:14 37:5 38:4 40:21 41:15,16 44:17 45:1, 7,11,13,22 48:19 49:6 50:4,19 53:25 55:10, 13 57:9,12 58:14 59:24 61:25 62:6 63:13,23 71:1 74:11 77:19 80:11 81:5 83:2 84:10,25 86:2,6 87:3 91:1 94:4,16 95:2,7,14 96:12,18 99:2,6,8 101:21 103:22 105:17,20 107:5 109:8, 11 113:19 114:23,24 118:21,25 119:4 125:25 129:23 131:13 136:20 143:1,2 144:7 147:18,19 148:22 149:21 151:5,11 153:17 154:21 155:15 158:9 159:18 168:10 170:19 173:3 174:8 179:5 180:11 181:11,13, 15,19 187:2, 18,21 196:11 198:2 204:14,19 212:24 217:9,11 219:1,4,6 221:9,15,16

227:8,25 228:2
**knowing** 60:21 72:3 73:17 102:16 117:16 208:5
**knowledge** 82:15 93:20 165:18 166:10 169:15 183:6 186:24 189:13,14,16 211:1,4 219:7
**known** 153:15 210:14

**L**

**labeled** 213:13
**Labor** 79:19
**lack** 171:23 172:4 189:20
**Lake** 226:20
**Lali** 10:11 228:10
**lands** 157:6
**language** 202:14
**language-minority** 144:22,23
**large** 9:3 63:4 97:4 162:20 210:8
**larger** 80:8 206:7 208:4
**Larry** 30:24
**late** 103:1 180:11,16
**latest** 41:11
**Lauderdale** 91:23 92:4 104:16 127:11,16 128:17 156:2 205:6 215:4 220:20
**law** 10:25 170:12 225:4
**lawsuit** 12:22 16:2 17:5 24:21, 23 25:12,17 38:2 111:18, 25 135:20 160:12 179:21
**lawsuits** 19:9 111:19, 22,24 169:19
**lawyer** 12:5,10,14 61:3 81:4 141:6,17 143:1 171:14 189:1
**lawyers** 198:25 200:9
**layman's** 141:24 168:6
**lead** 24:9
**leader** 24:6
**leaders** 26:25 28:13
**leadership** 51:23 53:18 54:10 86:1
**leading** 209:20,23
**League** 182:11 217:13,25 218:6
**Leann** 9:1
**leave** 96:9
**leaves** 221:21
**Lee** 162:5,7
**leeway** 199:18
**left** 20:4,8 66:1 215:6
**legacy** 207:2
**legal** 99:12,14 106:21 139:8 140:8 141:13 142:18 143:7,8,14 149:3 164:10 195:13 196:2
**legislative** 11:15 23:21 25:16 47:2 86:4 139:10 165:7 179:12
**legislators** 28:7 31:6 120:1
**legislature** 16:8 24:17 27:1,18 29:3 31:9 38:21 39:24 47:4 48:5 50:12 52:6 53:16 59:22 75:13 86:14 110:10 113:12 157:14 158:22 167:3 168:19 199:17 211:10 219:22 222:3,11 224:7
**legislature's** 223:22
**length** 55:6
**letters** 77:21 200:12
**letting** 136:20
**level** 19:11 21:11, 16 35:5 56:25 64:15 83:3 138:16 166:1 176:2 202:10 203:6 215:21 225:17
**levels** 64:15
**likes** 147:21
**Limestone** 163:4
**limited** 157:1
**line** 42:25 122:19 132:4 133:9 137:9 147:21,22 148:6 150:5 151:5 215:2 226:17,20
**lined** 105:18
**lines** 34:6 100:4 124:22 152:21

204:3,6
**list**
147:19 153:14,17 154:23 180:2
**listed**
137:9 153:11,21 167:1 181:12
**lists**
147:5 148:7
**literally**
48:8 138:25 191:20
**litigate**
72:8
**litigation**
170:6
**little**
16:12 18:7 21:23 38:13 44:24 45:16 104:16,23 121:15,16 124:9,14,21 125:12 126:10,23 127:23 128:5 130:11,17 144:18 161:14 187:18 197:7 198:4 204:10,17 212:17 214:24
**live**
129:12 149:17 204:13 220:1
**lived**
18:16 79:14, 15 100:23 130:9,13 134:2 172:11 226:7,14
**lives**
132:13 133:14 203:25 220:2 226:16,18,19 227:21
**living**
20:18
**Livingston**
204:18
**LLC**
20:24 21:1,3 23:5,7
**loaded**
76:17 79:9 82:13 83:1
**lobbying**
20:19 21:14, 15
**lobbyist**
21:8
**local**
158:14
**Loftin**
101:17 107:23
**logical**
115:1
**long**
13:24 15:13 48:10 62:6 63:12 111:14 113:9 164:1 172:8 180:20 218:18
**long-lasso**
151:8,11
**longer**
80:14,17 81:14 121:16 132:18 144:18 225:19
**look**
16:9 26:7 34:19,22 39:22 42:9, 12,15 47:6, 22 49:5 56:22 74:8, 12 75:7 84:15 97:3, 20,25 98:18, 20,22,24 99:20,24 133:1 137:8 138:5,6 145:15,19 160:20 170:19 175:7 177:21 180:21 182:5 187:19 189:15 192:2,17,18 195:5 206:18 208:16 212:24 215:6 219:10,21 220:8 228:6
**looked**
16:5,7,25 47:12,19 48:1 49:13 71:16 108:9 150:15 171:21 172:6 174:12 180:7,20 187:17 189:15 190:14 191:19,24 196:3 212:13
**looking**
34:16 39:10 45:10 47:14, 17 82:18 93:16 94:12 98:5 132:7, 10 147:11 154:6 156:20 158:15 161:1 164:16 166:16,23 167:15 172:18 180:9 190:21 192:25 206:5 215:16 221:3,8
**looks**
39:22 85:12 93:17 95:15 96:3 139:9 140:15 147:21 191:7 214:6
**loose**
130:16
**lose**
40:19,22 71:22,23 72:22,23 94:22 127:20 184:6 224:3
**losing**
71:4
**lost**
25:3 214:19
**lot**
13:19 59:1 62:25 63:8 80:14,17,20 89:18,21 90:3 127:8 158:13 192:24 193:17 212:23 216:8
**lots**
152:17 156:18
**louder**
198:4
**Lowndes**
97:19 155:3 163:21
**lumped**
208:3
**lumping**
207:24
**lunch**
15:16 109:4

121:16,24,25 122:2,6,9

M

**Macedonia** 204:18
**machinations** 33:25
**Macon** 155:4
**Madduri** 10:11 228:10
**made** 28:16 46:7 64:17 74:7 84:19 91:19 92:6 99:5 100:8,17 101:9,14,21 102:5 105:5, 11 106:6,8, 13 110:1,6,9 115:20 117:14,22 123:18 124:12 128:21 145:11,25 150:14,16 155:16 156:9 164:4,6 169:10 179:1 180:8 185:21 189:19,22 191:2 210:18 211:18 212:15 214:2 215:4 220:22 222:12 223:19 224:20
**Madison** 89:17 91:17 129:7,10,13 146:14 152:14 163:3
**magnitude** 207:8
**main** 35:22 167:16 193:22
**maintain** 43:10
**maintaining** 160:3
**major** 22:25 35:24 73:1 75:9 189:3
**majority** 24:5 30:2,5, 12 31:12 32:3,6,16 34:11 36:5, 12,15,21,22 37:6,12,16 42:20 43:7, 10 44:14 45:12 46:1 49:9,18 50:2,8,12,20 80:16 81:7 111:24 112:12 117:10 118:19,23 142:6 154:19 159:3 161:10,22 162:10 171:22,24 172:12 174:9 176:18 177:9 178:2,5,19 181:9 183:20 188:17,20,22 189:21 194:9 196:24
**make** 18:19 29:13 30:1 32:3,5 40:24 41:17 42:5,19 43:6 44:6,16,22 45:11 58:22 61:2 81:21 86:10 96:1 97:6 100:5, 12,20,22 101:2,10 103:3,9 110:21 112:25 113:7 115:19 116:20 118:16 120:15,20 124:11 125:22 127:21 130:20 132:16 133:23 138:11 140:11 142:13,17,23 143:2,3,5,22 144:13 145:22 146:18,19 147:1 148:17,24 149:19 150:12,19 151:24 152:2 155:9,22,23 158:3,18 159:2,13 164:18,23 166:4 169:20 171:7 172:19 173:4,6,10, 12,23 175:2, 4 176:21 183:4,16,18 184:1,5 190:20 195:16 198:10 209:9 210:19 215:18 220:7 225:7,24 227:5
**makes** 28:18 97:14 202:5 227:18
**makeup** 44:23 99:7 143:17 175:7
**making** 44:13,25 61:12 81:3 96:24 124:2, 21 127:24 130:11 133:1 143:13 174:1 177:6 190:23 205:11 211:24 213:10 214:15 226:23
**managing** 192:4
**manipulate** 76:19
**manner** 144:20
**map** 16:6,14,15 23:23 24:2, 18,22,24 25:2 27:7,9, 12,13,15,16, 21,24 28:4, 11,14,19 29:7,10,22 30:1,8,11, 15,20,25 31:8,10,11, 13 33:7,9, 13,16 34:1, 16 36:11,14 37:23 38:1, 2,11,15,17, 20,21 39:3, 6,12,13,14, 16,17,18,19, 21,23,24 40:1,3,4,6, 7,9 41:2,4,

7,21 42:13, 19 43:6,9, 15,23 44:6, 19 45:18 47:18 48:12, 17,24 49:4, 20 50:2,6 51:6,12,16 53:11 57:14, 17 58:9,22, 25 60:5,9, 12,20,24 61:1,5,19 63:16 64:22 65:6,9,10, 11,13 66:3, 5,24 71:16 72:3 73:10 75:4,6 77:25 78:19 80:13 81:1,8,12, 23,25 83:16, 24 84:2,3,14 85:11,15,20 87:10,16 89:11 91:6, 9,13,19 92:7 93:1,4,15, 19,23,24 94:2,6,10,25 95:6,10,13, 16 96:20 98:13,14 99:22 100:6, 9,15,16,17 101:5,7,10, 15,20,24,25 102:2,12 106:13,18 107:12,16, 19,21 108:2, 10 109:11, 13,23 110:6, 9,12,14,19, 22 111:3 112:1 113:6 114:22 116:16,25 117:24 118:2,3 120:7,9,17, 18,22 121:2, 7 123:3 131:1,15 132:3 134:12 136:8 137:6 138:6,12 139:12 144:1,3,7 147:9,13,17 148:14,20 149:6 150:20,21 151:18 152:3 155:8,23 156:10,12 158:4 160:15,23 166:6 167:18,21,25 169:3 171:5, 13 172:14,25 173:21,24 174:16 176:19 183:9,16 184:14 185:5,13,19, 24 194:12,16 195:3,6 196:15 206:5,7 210:20 212:15 213:16 214:7 215:14 217:10 219:11,14 221:3,5 222:14 224:17,22,25 225:1

**map-drawing** 76:24

**maps** 16:4,7,9,14, 16,17,20,24 23:19,21 24:14 27:2 37:12,17 38:23 39:6 46:9,11,23 47:3,8,10,24 48:4,8 49:24 50:15 51:2 52:1,2 54:11,14,20 55:15 56:15 58:10 62:3, 19 64:2,11, 19,21 65:3 67:4 73:21 74:23 77:2 79:24,25 80:3,7 83:11,14 86:4,15 87:20 88:12 90:4,24 98:19,21,23 103:3 105:25 111:13 112:22 120:2 126:20 136:5,25 145:18,19 156:14 160:22 168:19 180:6 196:6,9,14, 18 197:2 215:19

**Maptitude** 73:12 76:12, 14,15,21 77:13,23 80:5 82:4, 11,18,24 83:5,8 102:13 110:20 208:1

**March** 56:9

**Marengo** 155:3

**mark** 201:11 203:12 208:17 213:12,15

**marked** 14:4,6 21:20 25:7,10 92:18 93:11, 14 110:15 135:15,17 160:8,10 179:17 201:16 203:16 208:24 213:20

**marking** 179:19

**marks** 9:11

**Maroney** 9:1

**Marshall** 162:20

**material** 79:9

**materials** 74:18

**math** 129:24

**matter** 9:13 48:25 69:6,17 146:19 188:23 219:23 220:10

**matters** 188:25

**Maxwell** 114:12 115:22 124:25 125:7,8,11, 12,20

**Mcclendon** 9:25 11:14 51:22 52:16 75:11 86:19, 22 87:4,19 106:20 107:22 108:1 109:22 119:24
**Mcgriff** 203:25 205:20
**mean** 19:10 24:5 26:23 27:7, 17 32:18,19 36:17 37:20 38:16 39:22 43:13 45:22 46:8 48:18, 25 51:6 56:7 57:19,25 58:12 66:25 70:7 72:19 73:10,13,21 74:6 75:6 78:22 79:22 81:6,7 82:8 87:21,24 91:5 95:23 97:17 99:3 101:16 102:3 103:24 109:3,25 111:4 113:11,14 118:14 124:24 126:17 128:5 133:6 134:20 137:20,21 143:18 149:1 153:22,23 155:11,13 156:14,18 157:24 159:16,22 165:22 166:7,8 168:17 178:9 182:16 187:2 192:8 198:23 207:24 212:7,17,23 214:18 218:17 219:6,25 221:16
**meaning** 53:14 73:22 126:20 131:1 132:16 139:1 207:5
**means** 48:19 73:11 199:3
**meant** 130:1
**meantime** 130:8
**meet** 15:9,18 54:13,16 59:14,20,21 60:3 67:24 68:15,16,18, 22,24 69:8, 14 75:12 80:15 83:13 84:1 86:13 87:18,25 106:17 129:1,5,20 188:11
**meeting** 45:22 56:25 57:20 65:16 70:10 71:13 80:14,17,19 89:6 106:2 129:16
**meetings** 59:8,12,17 60:13 61:21 66:20 68:8 69:24 70:1, 3,4,7 71:21 73:9 80:9,11 81:15 84:17, 21 85:6,10 87:4,23 102:12 114:4 130:25 211:13 217:16 226:3,4,5
**meets** 142:4
**member** 41:15 68:21 96:22 117:14 206:3 222:24 223:22
**members** 24:20 29:2 30:22 38:20 40:10 43:14, 17 57:1,20 58:13,16 59:7,18 60:3 64:5,13 65:17 66:21 67:7,24 68:15,16,18 69:2 70:14 72:7 75:2,3, 12 80:10 81:13,17,18 84:6 86:13, 24 100:23 107:14,16 110:3 120:6 200:18,25 223:17 224:1,14,22, 23 227:14
**membership** 144:22,23
**memory** 92:21 133:19
**mentioned** 16:19 29:23 63:14 90:15 115:16 133:12 146:22 149:24 154:15 190:14 218:15
**Merrill** 9:14,23 170:3,7,17, 21 171:11
**Merrill's** 170:16
**met** 15:6,13 45:22 59:23 67:2,7 68:17,23 69:1,4,6 70:12,14,18, 19,21 83:17, 19 108:1 113:25 210:10,15
**method** 38:14
**metric** 159:24
**metropolitan** 75:9
**Microsoft** 70:2
**mid** 103:1 104:13 105:9 106:8 131:10
**middle** 20:1 95:1
**Mike** 10:4 94:19 188:16 194:7
**mile** 226:18
**military** 114:12
**Milligan** 9:13 10:5,7, 15,18,20,22,

24 170:2
**mind**
19:24 34:2, 10,13 91:21 92:1 114:18 115:1 133:1 153:20 159:9 163:13 166:8 188:1
**mindful**
100:24 158:15,17
**mine**
86:7
**minimal**
137:16,19 198:20 199:3
**minimize**
157:14
**minimum**
158:2
**minor**
104:23,25 105:11 218:11 223:12
**minorities**
112:13,16
**minority**
141:1,11 142:1,25 168:8
**minorly**
72:16 103:12,16
**minus**
138:13
**minute**
90:14 187:20 210:9
**minutes**
180:13 191:20 228:18
**missed**
222:7
**Mo**
68:23 84:23
**Mobile**
26:11 89:20 91:16 146:14 152:13 153:7 156:3 161:4 192:22 193:9
**model**
86:5
**modification**
156:7
**modifications**
112:25 150:19 152:2 155:23 156:9 158:4 164:24 166:4 195:16
**modified**
56:12 112:24
**modify**
111:13,16 113:6 172:25
**modifying**
100:3
**moment**
116:6
**Monday**
15:10,11,16 17:4 105:19 110:4
**Monroe**
72:23 104:20 111:7 123:16 124:15 181:1 183:2
**Montgomery**
79:15,16 88:14 89:6,8 90:15,19 91:1,7,15 92:10,12,13 93:6,16 94:12,20,21 95:1,5,8,10, 17,25 96:9, 15,20,24 97:13,21 103:13 115:23,25 116:4 124:3, 4,10,22 125:13,24 126:15 146:18,23, 24,25 154:4 155:4 161:17 183:4 209:9 211:25 212:1,3,19 213:4,14 214:2,23 216:20 221:20,25
**Montgomery's**
201:22
**month**
113:18
**months**
46:14 55:5 62:7 79:16
**Moore**
111:5 123:25 125:5,22 126:5 134:16 180:25 181:4 182:24 183:9,12 184:5 190:24 191:2 192:20 194:6 223:13
**Moore's**
104:18 134:22
**Morgan**
89:17 91:17 129:6,10,12 152:14 163:3 220:21
**morning**
10:19,21,23 11:19,20 15:10,11 105:19 179:6
**mother's**
117:19
**motivations**
187:3
**move**
18:19 59:25 101:1 105:21 132:5,23 192:15
**moved**
18:21 22:15 23:5,6 130:10 138:15 186:13 194:24 215:20 224:16 226:9
**moving**
22:17 51:1 96:23 100:24 128:22 144:17 147:4 157:12 162:1 172:13 185:16 220:21
**municipalities**
157:6
**Muscle**
89:24 91:24 92:4 127:15 156:1,8
**mute**
42:24
**Myron**
10:2

**N**

**name**
11:21 20:23 22:14 23:2 25:24 53:9 104:7 116:3 179:22

Randy Hinaman
December 09, 2021

**names** 9:19 115:17 133:16
**narrow** 190:7,8
**national** 20:5 200:20
**nature** 40:18 70:23 207:16
**necessarily** 97:17
**necessary** 157:21 220:23
**need** 13:23 59:2 71:22 111:9 124:8 131:6 149:18 228:6
**needed** 24:21 40:18 52:2 62:25 84:11,19 95:21 102:13 107:6 111:13 112:23 124:6,18 126:23 127:1 140:18 183:5 195:16 198:16 212:13 220:12 225:19
**needless** 126:12
**needs** 16:11
**negotiate** 41:1
**negotiating** 73:3
**negotiations** 72:13
**neighborhood** 33:20
**neighborhoods** 152:7 175:8
**never** 47:21 168:4 213:25 218:7 225:11
**night** 191:18
**nongovernmental** 211:8
**nonsubstantive** 109:3
**north** 89:19 115:6 186:23 212:2
**Northeast** 203:9,22
**northern** 9:16 125:12 129:12 132:18 162:17 186:2,15 213:8
**Notary** 9:2
**note** 136:19
**notes** 111:2,9,11 228:6
**notice** 14:10,13
**November** 62:23 202:7
**NRCC** 31:18 131:15 200:17,19
**NRRC** 200:12
**number** 9:14 18:23,25 34:13 47:2 82:1 96:1 97:4 104:23 129:11 134:3 135:1,9,20 139:25 145:17 152:22 157:14,20 158:2,12 160:12 173:8 179:1,21 181:17 187:13 205:11 207:11 212:24 215:12,16,23,24
**numbered** 181:13
**numbers** 15:7,24 37:3 45:4 47:20 55:11 56:21 57:10 65:9 66:15 72:9 73:4,18,25 75:5 116:14 123:11 124:8 138:7 143:20,24 144:1 207:18 208:5,7,9
**numerically** 133:1
**numerous** 127:6 224:20

**O**

**oath** 11:24
**object** 50:22 108:3 170:23,24 178:7 195:19 196:22 198:1,9 199:25 218:22
**objection** 16:18 33:5 37:15 50:23 138:23 168:24 177:14,16,23 178:8,11 187:8 198:11 199:19 202:21 204:24 209:15 210:4 216:17
**objections** 123:21 198:10
**objective** 216:10
**objectives** 217:8
**observation** 188:21
**observations** 90:13 189:18,21 190:6,20
**obvious** 128:8
**obviously** 22:16,17 23:19 34:10 36:3 38:1 39:5 43:8 45:10 47:21 48:19 49:4,10 56:10 58:24 62:21,22 64:4,18 65:9 66:14,25 67:3 68:2,4 74:20 75:4 80:9,13 81:13 89:18 90:23 94:18 95:23 97:17 99:1 100:23 107:14,22

114:6 126:22 127:7,19 129:12 146:11 152:16,20 159:5 162:5 163:11 165:22 171:22 180:18 192:8 193:3 211:13,15 212:22,24 214:11 216:18 220:13 222:7 227:7

**occasionally**
28:14 88:15, 21,22 90:9 149:14 151:13

**October**
51:18 52:12, 21 54:4 55:8 61:11 62:15, 16,17 79:18, 20 80:1 105:16 106:12 123:5 131:2,10

**odd**
207:11 211:19

**off-campus**
70:15

**off-year**
62:21 63:1

**offer**
210:25 211:3 212:4

**offered**
16:8,25 17:2 20:2 47:21, 22,25 48:4,9 50:16,17,18 179:9 184:18,19,22 186:8 187:13 188:4,5,7 190:3 191:12,18,21 218:6 225:2

**offering**
218:1

**office**
17:15,17,20 18:3 24:9 33:13 68:20 70:9 73:13 78:16 79:5, 6,8 94:20 101:17 107:9,23 129:21 158:14 182:4

**officeholders**
39:7 54:14, 17 83:18

**offices**
21:13 68:4,5 70:16

**official**
28:12 57:1, 3,14 74:16 76:3 102:24 106:8 117:17

**officially**
52:10,13 88:17

**offset**
183:5

**offshoots**
182:17

**okay**
13:4,8 14:14 27:4 47:17 51:13 56:23 123:4,7 133:21 170:20 198:13 199:5 200:1,19,22 201:11 202:23 206:9 208:8 211:17 213:5 214:1 217:12 221:8 225:6 227:13 228:5

**once**
12:19 74:22 75:8 76:5 79:9,11,22 80:17 82:17, 21 83:1 84:5 105:8 107:11 109:22,25 129:23 142:16 175:1 206:14 211:13

**one**
13:17 14:9, 12 22:25 24:1 30:8 36:22 37:1, 24 38:13 43:9,12,14 48:11 51:7 53:5 64:5 68:17,18 69:3,4,21,23 72:18 78:6 85:1 86:6,25 96:10 97:11 99:9 101:10 103:25 106:6 112:24 115:10 116:20 117:13,16, 18,21 119:20 121:10 123:11 125:10,22,23 126:3 128:19,20 132:11,12,13 133:9,14,22, 23 134:1 137:23 138:1,3,13, 17,18 139:2, 3,6,15,18,19 140:12 142:17 144:18 149:11,15, 18,20,25 150:1 151:15 152:5 154:3, 23 155:18 157:22 160:14 161:1 165:3,4,23, 24 166:2 167:8 168:4, 13 169:8,12, 23 175:14 181:12,14, 17,18 182:1, 5,6,7,9,10, 22 183:23,25 184:10 185:8 187:12,13 189:19 191:8,9,10 193:10 196:4 198:22 199:22,23 203:25 208:13 211:24 214:9 218:20 224:15 228:6

**ones**
11:7 46:16, 24 56:18 81:1 132:18 153:21 187:20 190:7 192:2

**ongoing**
62:24

**operable**
84:11

**opinion**
50:25 131:25 199:6,7 200:2 202:20 210:18

211:1,3 212:20
**opportunity** 112:6,7,10 142:8 180:22 181:5 182:14
**opposed** 53:15 210:23
**option** 211:24 212:6,8,9 216:11,16
**options** 114:19 115:10 151:22 210:17
**oral** 9:8
**Orange** 18:11 20:22
**order** 39:14 66:15 145:4 167:1 194:22 215:20 216:9
**organization** 53:17,21,25 200:11
**organizations** 21:17 211:8, 9
**original** 172:1,4
**originally** 24:15 91:2,3
**outcomes** 99:2
**outside** 24:10 171:25 227:18
**over/under** 207:15 223:7
**overage** 123:14
**overly** 121:22
**overpopulated** 66:12 72:21
**overpopulation** 67:17

**P**

**p.m.** 122:8 197:14,17 228:20,23 229:4,6
**page** 25:21 137:9 146:5 147:22 160:14 161:1,12 162:1,13 163:1,9,16 171:9 203:23
**paid** 43:15 53:10 56:1 57:24 205:5
**pair** 194:4
**paired** 58:25 178:25 188:12,15 189:20 190:9 192:19 193:7
**Palmer** 85:2 130:4 131:17 134:10,17 188:16 194:6 226:7,9,16, 19 227:21
**Palmer's** 131:8
**paper** 111:5
**paragraph** 26:7 169:15 170:4 201:25
**paragraphs** 152:9 166:25
**paramount** 149:10
**part** 27:4 28:4 39:8 41:8 54:16 56:3 82:9 94:20 125:6,7,8,12 127:7 130:17 132:18 146:14 154:4,19 156:16 161:23 168:18 174:15 182:18 197:5 201:25 202:2 210:6 212:19 213:8 222:20 223:2 227:22
**partially** 92:13 172:10
**participate** 84:25
**participation** 75:25
**particular** 32:12 53:13 87:9 97:12 153:12 158:12 188:23
**parties** 150:23 169:19
**party** 35:9 41:25 52:25 176:8 200:10
**pass** 31:10 55:15 56:9 197:19 228:15
**passage** 201:5 203:9
**passed** 16:6 36:6,7 67:2 68:1 76:8 120:24 136:15 206:15 208:18 224:4 225:4
**past** 126:21 169:7
**pay** 17:23 43:23 56:13 66:19
**paying** 12:9,13 49:24 50:1
**payment** 56:6
**payments** 55:4,5,20,21 56:12 58:3
**pending** 13:25
**Penn** 10:2
**people** 13:6 49:23 50:1 73:5 80:16 89:16, 19 96:14 109:9 123:15 124:6,18 126:24 129:12 139:2,22,25 152:23 153:5,6 156:3,19 158:7 183:5 184:4 185:21 203:6 204:13 205:7,10,12, 18,19,25 212:23 215:7,20
**percent** 34:12 44:7 119:9 138:19

139:1 195:10,18 196:2 216:24
**percentage** 32:12 34:7 44:10 117:7 119:12 195:17
**percentages** 80:24
**perfect** 96:20,21 199:16
**perfectly** 228:1
**perform** 41:22 168:7
**performance** 168:7
**performed** 41:23
**period** 63:6 161:25 163:6 164:1
**permit** 170:12
**Perry** 155:3 210:5
**person** 40:24,25 68:17 69:3 70:10,12 88:5,6 139:3,6,15, 18 140:12 149:11,25 155:18 165:3,23,24 167:8
**personal** 63:5 69:6,17
**personally** 69:8 90:5,7, 12 107:4,7 142:23
**perspective** 82:17
**phone** 18:24 85:1 88:4
**phrase** 210:15,21 227:1,9
**phrasing** 209:16
**physically** 78:15,20 101:10,13
**pick** 114:8,17 115:10,15 124:6 126:17 127:7 132:21 134:2 182:25 183:3
**picked** 124:16
**Pickens** 221:19,21
**picking** 71:1 104:1 114:13 115:22 124:18 126:21 132:15
**piece** 126:10
**pieces** 47:8
**pigs** 181:17
**place** 71:24 97:7 115:7 150:1
**plaintiff's** 14:3 21:19 25:6,10 92:17 93:10, 14,17 110:16 135:14,18 160:7,11 179:16,19 201:15
203:15 208:20,23 213:16,17,19
**plaintiffs** 9:21 10:3,5, 7,9,12,14, 16,18,20,22, 24 12:12 170:3 228:11,15
**plan** 17:14,16 26:10,12,13, 14 27:6 56:9 59:24 60:3 124:23 139:14 140:12,16,24 141:9 142:14,24 143:10,15 144:14 147:1 151:25 155:9,13 164:19 166:9 177:22 180:15,16,23 181:3,6,9, 10,12,14 182:1,2,6,7, 9,13,14,17, 20,21 183:14 184:13,17,23 185:17 186:6,10,25 187:3,6,10, 11,13,22,25 188:3,10,11, 13 189:6,12, 19,23 190:1, 15,16,18,22, 23,25 191:11,15, 16,22,24,25 192:1,9,10, 11,16,17 193:2,3,4,6, 16,20,25
194:1,3,13 196:9,21 198:16 199:5,8,14, 15,17 200:4, 14,15 205:14,15 206:10,18 207:20,23 208:10 209:3,7,10, 14 211:14 213:13 216:12 217:13,14,20 218:1,6,14, 23 219:3,11, 14,15,18,20, 21 220:2,7, 8,9,15 221:3,13,14, 18,21 222:2, 4,15,17,18, 19,22,23 223:19,24 224:1,10 225:11
**planning** 17:13 55:9
**plans** 26:9,21,25 27:1 46:9,11 47:4 178:24 179:4,9,23 180:3,10,14, 17 181:24 182:13 189:6,15 191:8,23,25 193:1 218:10,19 225:9
**play** 132:24 145:21 151:19
**playing** 73:25

**plays**
162:19

**please**
9:18 11:2,21 16:12 18:8 201:24 203:13 204:1,6 210:2 219:11

**point**
23:4 24:1 27:13,22 28:9 31:2 38:6 39:18 40:4,7 56:1 67:1 72:13 73:3,15 74:8 76:20 93:23 94:1,3 98:4, 7,10,22 104:24 107:7 109:24 110:22 118:7,8 123:2 143:19 144:4 151:15 172:11 175:5 179:10 186:2 195:14 205:24 206:11 207:20 209:3 211:16 214:14 215:18 218:12,20,21 219:19 222:14

**point-to-point**
151:7,13

**pointed**
97:7

**polarization**
42:12 167:23 168:3,10,21 169:2

**policies**
148:7,14 149:1,6,9 150:2 165:2, 19 166:11,25

**policy**
143:16,23 145:24 147:2 148:4 150:5 151:4,10,25 152:3,5,11 155:10 156:21 157:12,13,17 158:5,21,25 164:16 165:1,6 166:22 167:6

**political**
19:19,23 20:19 21:8, 9,10 152:8 157:5

**pop**
33:17 97:25 98:5,6,9 99:25 146:1

**populated**
71:2

**population**
28:5 32:6, 17,25 34:3, 8,15 35:10 36:6 40:19 44:7,10 45:9 64:8 71:2,6, 7 73:24 74:4,10 83:2 84:19 86:10 95:3 96:2 97:6 98:7 99:5 100:4, 10,18 101:4 112:13,18,20 114:8,18 115:3,15 117:6 118:19 119:12,22 126:22,25 127:21 128:12 135:7 137:16,19,24 140:1,11,16 141:11 142:1,5 145:13,14 154:20 158:2 161:10,23 162:11,21, 24,25 163:5, 12,15,25 165:11,21 166:15 170:11 172:18,22 175:13,17 189:10 195:11,17 197:24 198:20 202:10,12 204:12 205:25 210:13 211:20 212:1,2 213:3,6 214:19,20 216:23 220:23 223:5,8 225:17

**populations**
134:3 220:11

**portion**
80:8 95:1,4, 9 96:4,14,16 97:13,21 213:6

**portions**
163:22

**position**
20:2 58:21 203:3

**positive**
179:3 228:3

**possibility**
50:8 115:23 178:1

**possible**
37:4 50:20, 25 54:13 56:22 89:16 91:25 96:11, 17 127:16 146:16 148:18 150:7,10 152:18,24 157:25 176:18 177:9 178:4,13,18 223:11 226:12

**potential**
57:21 71:7 73:19 115:13

**potentially**
71:4 112:14 143:8 144:9

**practicable**
152:8

**practical**
54:13

**practically**
204:8

**practice**
24:3

**prank**
181:16

**precedence**
167:1

**precinct**
33:20,21 100:25 103:13,15, 17,18 104:4, 7,8 115:25 128:17,19 133:24 134:1,7 151:14 152:21

**precinct-based** 42:6
**precinct-by-precinct** 105:1
**precinct-wise** 44:22
**precincts** 32:10 42:4 90:21,25 116:17,18 127:20 128:6,7,10 132:10,14,15,21 133:5,8,13,15 138:15 146:12 151:20 153:22 157:6 173:7,8,11 174:5 178:15 185:25 186:1,15 193:17,19 208:5 215:22 216:1,2,9
**predict** 66:16 113:2
**predominant** 35:25 161:9 170:14
**predominate** 144:24
**prefer** 50:2 89:8 117:20 118:23 121:18
**preferable** 127:17
**preference** 159:5
**preferred** 49:24 50:5 86:5 89:9 104:20 111:24 112:1 124:16 128:20
**preliminary** 74:1 169:17
**preparation** 15:22 16:20 17:3 58:10 66:2 87:20 88:11
**prepare** 15:5 17:7
**prepared** 110:2
**preparing** 16:17 83:11
**present** 9:18 108:5,7,15,19 114:19
**presented** 110:2
**presenting** 192:3
**preserve** 158:22 222:10
**preserved** 45:12 164:19 222:11,18
**preserves** 222:4,9
**preserving** 39:15 45:25 157:23 164:17 223:9,14
**president** 21:2 41:18
**presidential** 20:4
**presumption** 129:2
**pretrial** 170:17
**pretty** 29:19 78:24 87:5,7 119:5,7,8 157:16 162:12 165:15 214:6 223:21
**prevent** 12:1
**previous** 41:23 110:22
**previously** 18:16 77:2
**price** 205:5
**primarily** 49:23 112:19 125:3 163:15 181:8 184:3
**primary** 29:6,13 75:24 184:15 223:1,3
**principle** 139:15,19 140:13
**principles** 103:25 146:1
**Pringle** 10:1 11:14 51:23 52:15 75:11 86:20,22 87:5,19 106:20 107:21 108:2 109:23 119:25 181:10 186:9 193:16 194:13 196:9
**print** 110:24 201:4
**printed** 203:23
**prior** 22:4 39:3 64:8 66:4,22 67:14 91:7 95:5 99:18 100:17 118:4
**priority** 46:1,3 149:9 165:10 167:4,6 225:23
**privacy** 202:9,16 203:4
**privilege** 11:15 108:4,18,22,25 109:10,15 176:24 177:2
**privileged** 177:24
**pro** 120:5,8
**probably** 18:21 31:1,4,17 40:1 44:19 45:20 51:17 55:13 57:18 60:19 61:10,22 72:23 79:10 80:13,20 89:8 94:22 103:1 120:4 125:5 134:25 136:11 171:23,25 172:10 186:9 200:5 212:21 224:21
**problem** 43:4 217:6 220:20
**Procedure** 9:5
**proceed** 74:22
**proceedings** 9:9 169:17
**process** 15:8 28:18

39:2,10 45:17 55:12, 16 80:4 89:4 97:11 103:25 119:21 120:13 132:20 141:14 145:15 180:12 196:15 225:3 226:13
**produce** 23:14 24:22 54:24
**produced** 135:20 160:12 179:20
**program** 76:16
**progress** 86:23
**project** 56:6
**pronouncing** 151:6
**proper** 31:22 208:15
**properly** 207:7
**property** 18:20
**proposed** 68:6 84:14
**Protection** 139:16
**protrusion** 132:8
**provide** 29:9,21 107:13 185:12
**provided** 14:23 90:16 109:22 136:6,10,23 145:1 190:6 213:3
**providing** 87:6 120:17
**public** 9:2 88:10 89:14 90:2, 16 91:12 92:5 182:3 187:14,22,24 203:9 211:14 217:24 218:21
**publicly** 218:13
**pull** 33:2
**purpose** 53:19,22 140:25 141:10 142:24 170:10,14 173:12 226:24
**purposes** 79:15 133:13
**pursuant** 9:4 17:19
**purview** 168:16
**put** 11:12 21:12 24:3 28:24 43:22,25 76:15 80:24 81:7,8,11 103:14,21 115:2,3,9 126:25 148:18 149:21 150:11 180:11 182:23 183:20 185:6,8,20, 25 186:3 188:14 191:1 205:3,16 206:2 214:3 218:16 227:4
**putting** 91:15 92:9 123:12,13,21 126:12 127:15 130:7 184:10 195:1 220:20
**PX** 201:12,13
**PX3** 22:5

**Q**

**quantify** 81:10
**question** 13:7,10,25 29:1 31:3 33:8 36:9 41:15 46:20 48:11 58:20 108:8,23 149:2 162:2, 14 163:2,10 166:10 169:12 177:3,4,7 178:12,14 189:1 195:23 199:22 200:2 202:24 205:1 210:2 217:11 220:4
**questions** 10:9 12:2 13:4,6,18 48:13 108:13,17 140:7 197:9, 11,19 209:16,21,23 228:12,14
**quick** 57:23 88:3 186:10
**quickly** 182:16
**Quillen** 10:13
**quite** 149:19 182:4 187:15
**quote** 180:12 186:22

**R**

**race** 20:4 32:25 35:20,21,22 36:1 37:18 41:18 48:12, 14 49:7 83:3 97:25 98:8, 18,22 101:4 117:2 118:5 119:15,19 134:17 135:4 142:17 143:18,19 144:21,23 145:4,13,15, 20 146:4 166:16 174:17,20 175:1 176:12,14
**race-based** 145:2
**race-neutral** 144:20,24
**races** 41:10,12 228:2
**racial** 33:15 42:12 48:22 97:20 98:22,24

99:7,20 143:16 153:5 154:7 157:2, 8 160:4 167:23 168:3,10,21 169:2 171:15 175:7 187:1, 4 195:6,9

**racially**
170:8,22 171:13 172:15 173:1,25

**ran**
41:18

**random**
104:2 132:22

**Randy**
9:7,12 11:3, 22 16:11 25:2 201:20 203:18 229:3

**rank**
165:1

**rapidly**
163:4

**Rarely**
79:22

**RC**
135:21 160:13 179:21

**re-election**
184:6

**reach**
60:4 138:21 158:2 223:8

**reached**
95:9 219:19

**reaches**
95:1

**reaching**
95:4

**read**
141:18 147:6 169:13 170:5 195:24,25 199:6 200:1, 5 201:24 202:3,5 203:24 204:1,4 210:1,3

**reading**
199:20

**Reagan**
20:2,6

**real**
57:23 60:19 71:8,17 72:9 73:3,18 75:5 84:5 102:3 116:14 123:11 129:24 208:7,8

**realize**
33:22

**realized**
226:4

**reapportionment**
12:7 26:17 33:13 67:1 73:12 78:16 79:5,6,8 101:17 107:2 110:3,7 120:16,20 135:19 136:4 165:8 167:11 178:20 203:21 204:21 213:2 217:24 223:4,23 225:2

**reason**
19:25 26:6 95:21 133:22 145:4 183:16 184:1,15 188:24 193:19 216:21

**reasons**
126:23 163:7,14,23 184:12 194:1,8

**recall**
38:14 53:5 89:1 90:2 122:11,22 123:25 126:4 127:2 128:14,23 130:4 133:17 134:9 137:3 190:5 192:6 199:11,20 200:2 221:12

**receive**
31:24 57:7 86:8 87:2,8 107:25 114:1 116:10 120:25 121:5

**received**
57:14 58:2 60:6 63:16, 19 72:15 74:16 76:2, 5,7 89:14 91:12 92:5 103:10

**receiving**
90:2

**recent**
38:13 51:2 170:6

**recess**
65:23 197:15 228:21

**recognize**
22:6 25:19 93:1 135:25

**recognized**
156:25

**recollection**
50:15 164:11

**recommend**
29:19

**recommendations**
29:9 72:15 120:15,21 185:13 190:5

**record**
11:13,21 22:2 65:21, 25 122:4,8 169:5,13 170:1 173:14 195:25 197:14,17 202:3 204:1 210:3 228:20,23

**redistricting**
23:18 24:7, 11 26:9,14, 16,21 39:10 41:4 53:22 58:1 103:25 120:13 126:11 135:19 136:7 137:11 140:24 146:1 148:7,13 167:11 178:20 194:2 198:19 204:16 213:23,24 226:24

**redrawing**
38:24 60:11 63:15 78:19 106:18 224:9

**reduces**
216:23

**refer**
51:5,6,11 89:23

**reference**
93:14 171:3 173:15

**referenced**
158:20 164:21 179:5
**referencing**
164:17
**referred**
51:7 128:18
**referring**
59:17 61:14 89:24 105:2 112:17,20 173:20 191:8
**refuse**
108:12
**regarding**
82:24 120:13 165:20 185:13 189:19
**region**
161:17
**registration**
75:21
**reiterate**
84:9
**related**
32:24 144:1
**relationship**
62:24
**relative**
57:25
**relayed**
90:14
**relevant**
132:1
**reliable**
203:5
**remained**
30:2 42:20 43:7 44:14
**remaining**
137:24
**remedial**
219:18
**remedy**
24:21
**remember**
12:19 29:3 31:6 33:11, 25 37:3,16 41:10 44:18 45:3,21 46:6 63:9 78:25 89:13 90:17 91:9 95:8,9, 12 111:10 116:3 138:10 149:4 190:10 191:18 199:10 200:6 224:13
**remembering**
188:13
**remind**
194:16 199:12
**replace**
22:22
**repopulate**
223:6
**reporter**
9:1 11:1,6 13:14 77:16 79:1 112:3 166:18 176:25 193:5 210:2 217:1
**represent**
9:19 107:3 179:22 215:25
**representation**
53:3,4,7,8 107:6 139:23
**representative**
10:1 11:14 51:22 52:15 72:18 85:2 86:19,22 87:5,19 90:22 104:18,19 106:20 107:21 108:2 109:23 119:25 122:20 185:23 186:9 190:24 223:13 226:6,8
**representatives**
70:21 71:14 73:9 83:20 84:18,22 85:7,15,21 86:9 87:14 97:9 103:7 105:10 106:3,19 119:16,24 122:18 125:19 139:23
**representatives'**
106:10
**represented**
12:5 94:21 96:22 159:6
**representing**
27:19 125:6 139:24 159:8 227:23
**represents**
125:8
**reproduce**
209:2
**republican**
23:22 27:20 28:7 51:23 200:10,20
**republicans**
151:1 184:7
**request**
117:21
**requested**
54:25
**requests**
50:11 72:15 86:9 87:9,15 117:6 120:21,25
**require**
143:16 156:5 160:4
**required**
127:19 138:20 197:24 223:8 225:14
**requirement**
202:19 227:14
**requirements**
140:17 142:4 147:5 165:13,20 166:12
**requires**
141:22 145:9,11 146:10 150:9 151:10 152:11,12 157:18 158:25
**requiring**
165:11 214:16
**reservations**
157:7
**reside**
228:3
**residence**
20:22 226:24 227:3,4
**residency**
227:14
**resolve**
149:23
**respect**
152:7 155:13 192:20 199:18

**respected** 155:10
**respecting** 155:24
**respond** 198:8
**response** 108:11 177:2 192:1 198:5
**responsibility** 20:5 82:10
**rest** 107:16,18 149:11,13
**result** 205:25
**results** 35:9 57:8 176:8 177:11
**resume** 22:3,9,11 23:12
**retained** 52:10,13 57:24
**retention** 107:8
**retired** 22:22
**retrieved** 150:14
**returns** 41:6 42:2,3 75:18
**revealed** 143:25
**review** 15:21 16:1,4 37:11 41:6 47:12,20,24 48:4,7,10,22 49:11 67:15 74:18 75:18, 21,24 83:10 101:6 143:16,22 157:8 180:6, 12,22 181:5, 23 182:15,22 184:16 185:19 186:6 187:11 188:2 189:25 190:21 195:9
**reviewed** 15:7,23 16:16,19,23 47:10 67:3 74:20 109:13 144:7 182:23 186:4
**reviewing** 47:15,16 66:6,9 180:9
**revised** 84:12
**right** 11:24 12:24 13:20 15:2 18:6 62:5 79:25 94:7, 14 97:10 120:3 121:13 122:3 123:24 130:12,14 134:2 142:8 147:14 153:20 154:3 170:4 171:4 172:2 191:6, 17 197:25 198:17 201:13 203:11 206:3,22 209:4,21 214:22,25 215:10,21 216:2,6,16 217:21 220:17,19 223:1 224:10 226:20 227:9,11,24
**Rights** 31:22 99:10 112:23 113:7 140:23 141:2,4,16, 19 142:14,20 143:11 144:5,9,15 145:1,5 149:12,25 165:4,12 166:13,17,20 167:8 189:3
**ring** 26:5
**ripple** 220:16
**River** 18:11
**RNC** 200:10,17
**Road** 18:11
**Rogers** 92:11 94:19 126:7 134:16 188:16 194:7
**role** 28:10,12 162:19
**room** 78:17 88:15, 19,21 90:10 108:5 109:9
**roots** 154:8 211:8
**Rosborough** 10:17
**Ross** 10:15
**rough** 72:2 80:24 206:18
**roughed** 60:20 64:24 73:10,13,16, 21 102:7,12 129:23
**roughed-out** 102:9
**round** 60:13 66:20 68:8 84:13, 15 102:25 103:2,5 116:14,23
**ruled** 11:16
**rules** 9:5 12:25
**run** 166:3,7 224:15
**running** 68:19 129:2
**runs** 107:23
**rural** 64:24 75:7 154:18
**Russell** 162:6 193:9

**S**

**sacred** 216:10
**sake** 219:18
**sat** 101:13 211:18
**satisfied** 222:23
**satisfies** 142:19
**satisfy** 138:21 145:5 155:21
**save** 102:21 110:18
**saved** 111:11

**saves** 110:21,22
**saying** 25:1 63:23 109:6 200:3 205:23 211:17 222:23 225:25
**says** 23:2 25:15 137:10 139:14 156:22,24 157:22 167:7
**SB-10** 182:7,9
**schedule** 105:20
**schedules** 105:17,21
**scheme** 73:6 216:6
**school** 64:13 75:2 80:12 81:8, 16,23 157:7 181:16
**science** 19:19,23
**scope** 178:16
**scrap** 111:4
**scratch** 38:24 94:6
**screen** 85:11
**seats** 206:12
**second** 50:2,8,12,20 151:4 176:18 177:9 178:2, 5,18
**secondhand** 82:14
**Secretary** 9:22 170:7, 16,21 171:11
**section** 137:10 139:9,14 140:15,19,22 141:2,15,18, 22 142:14,19 143:10 144:5,8,14, 17,25 145:9, 10 146:6,10 147:4,17 148:6,7 150:5 151:4 152:6 156:20 157:13 158:21 165:6 166:23,24 167:7,13,16 189:2 201:9 204:18
**Sections** 137:14 140:10
**see** 13:13 17:23 22:23 25:14, 17,21 26:18 33:2,6 71:17 82:19 99:1,4 107:15,18 131:6 135:23 137:9,17 145:6 148:8 154:12 160:16 196:4 201:7,21 203:20 215:7,15 217:3 224:5
**seeing** 37:16 74:1 132:23,25
**segments** 206:8
**self-explanatory** 157:16
**Selma** 227:11
**semifinal** 84:16
**senate** 24:6 47:18 52:5,16 54:11,12 64:14,21,24 75:6 81:11 129:2 147:13 188:5,6 190:23 191:21 224:13,14,21
**senator** 9:25 11:13 28:20 29:7,8 30:24 51:22 52:16 86:19, 21 87:4,19 106:19 107:22 108:1 109:22 119:24 180:15 191:12,13 204:18
**senators** 106:3
**send** 17:22
**sense** 28:18 42:5 58:22 74:8 116:20 148:24 169:20 210:18 222:12
**sentence** 26:24
**sentences** 78:23
**sentiment** 205:20
**separate** 55:21
**separated** 206:1
**separating** 203:5
**September** 51:18 52:21 54:4 55:8 79:17 102:25 103:1 104:13 105:9 106:9, 16 177:12 203:21 217:23
**seriously** 47:22 65:3
**serve** 27:12
**session** 47:3 52:3 55:9,14 61:11,13,15 62:15 79:14, 23 83:15 84:4 85:8 98:15,19,25 99:19 106:12,17 107:13 110:13 174:25 175:9 179:24 180:4 195:7
**set** 15:2 53:18 59:8 68:8 169:23,24 216:5
**seven** 40:12 49:4 58:16 60:7 67:20 68:3, 16 80:11,18, 21 81:14 83:19 85:20

105:18 106:19 122:11 137:25 138:15 151:20 160:14,21,22 206:12,14
**seven-page** 160:13
**seventh** 138:18
**several** 13:6 16:19 29:2 147:5 199:22 214:17
**Sewell** 43:8 45:7 69:5,9,22,25 70:5 101:1 103:12 113:25 116:11 117:3 118:6 119:18 122:15,16 125:15 132:12,13 133:14 210:10,12, 16,22 211:18 216:12 217:7,13 218:8 219:2 220:1 226:6, 18,23
**Sewell's** 45:25
**shakes** 34:25
**shape** 171:19 173:5 178:16
**share** 85:11 156:5 205:20
**Sharh1@ comcast.net.** 19:5
**sheet** 47:19 213:17 215:12,17
**Shelby** 130:10,15 163:11 188:15 226:10,17 227:22
**shift** 28:5
**shifts** 223:5
**Shoals** 89:15,23,24 91:16,25 92:4 127:15 156:1,8
**shock** 89:4
**shooting** 32:13 34:3 44:11
**short** 48:7
**short-circuit** 21:22
**shortening** 130:22
**show** 85:11 114:5 161:2 169:13 170:5,18 201:6,18 203:18 204:22 213:13,14 221:10
**shown** 22:3 195:10 221:6,7
**shows** 202:15
**side** 21:14 133:9 191:21 226:20
**sign** 52:17,19
**signature** 25:22 26:1
**signed** 25:12 54:3 55:7,18 56:7 225:5
**significant** 74:13 88:25 105:6
**significantly** 80:8,10
**similar** 49:25 77:23 152:16 157:9 175:15 186:5 190:11 192:1
**similarities** 156:25
**similarly** 17:25 41:22 149:5
**simply** 207:1 211:18 219:22 220:10 224:8
**simultaneousl y** 65:8 88:14
**singer** 42:23
**single-member** 147:25
**Singleton** 9:21 10:2,9, 14 16:10,14 111:25 181:23 182:20 187:10,13, 22,25 188:3, 10 189:5,12, 19,22 190:1 193:25 194:1,3
**singularly** 88:2
**sir** 11:19 12:23 13:3,9 14:22 18:15 26:2 27:11 30:10, 19 32:1 33:21 38:12 40:5,8,11 51:4,10,14 52:7 55:23, 25 57:16 59:15 68:13 76:1 77:3 78:5,8 105:3 106:4 110:20 112:8 121:21 137:12 142:12 160:25 169:16 175:18,20 176:7 182:7, 12 190:19 194:14 196:17 200:24 201:3 209:5 215:1 216:3 217:5 219:5,12,16 220:18 222:1 223:21 227:12
**sit** 90:5
**sitting** 154:3
**situation** 24:21 96:21 113:8 134:4
**situations** 149:15 151:21

**six-person** 58:25
**size** 171:19 178:16
**skewed** 202:9
**Skipping** 37:22
**slice** 205:16
**slightly** 84:11 134:20
**sliver** 204:10,17
**small** 215:23
**smaller** 225:18
**snippets** 90:8
**social** 154:8 157:2
**socioeconomic** 34:20 175:16
**software** 33:9,14 76:22,24 77:1,14,24 78:1,10,13 82:3,4,12, 19,24
**sole** 170:10
**solely** 96:10,24 133:23
**solutions** 123:11
**somebody's** 90:22
**sort** 20:3 29:9,21 44:9 46:6 71:20 82:23 89:1 107:8, 25 112:1 119:11 120:7 128:8 142:4 153:12 157:19 159:24 162:16,20 166:5 190:22 191:4 206:18
**sounds** 42:23 153:25 165:15
**sources** 142:11
**south** 226:17
**southern** 204:10
**southwestern** 174:14
**space** 151:15
**spaced** 55:4,5
**speak** 13:17 16:11 40:10,14 70:15 119:25 120:10 198:4 200:16
**speaker** 120:5
**speaking** 109:7 194:11
**special** 55:9,14 61:14 62:14 79:14 83:15 84:3 85:7 98:15,19,25 99:19 106:11,16 107:12 110:13 174:24 175:8 179:10,24 180:4 195:7
**specializations** 20:14
**specific** 31:3 33:15 34:13 44:9 72:17 85:16, 17 89:13 90:1 97:13 114:1 122:25 128:3 145:23 152:15 153:19 155:22 156:9 158:3,18 164:11,23 181:3
**specifically** 32:23 48:18 49:15 91:18 94:18 109:13 112:17 114:3 126:4 134:9 156:11 171:21 172:24 173:23 187:23 217:9
**specifics** 27:25 57:22 122:14,17,21 123:24 128:14
**speculation** 195:20
**spell** 77:18
**spend** 60:25 192:24
**spending** 62:9
**spent** 61:18,23 80:25 81:2 90:12
**spill** 194:19
**splint** 128:17
**split** 89:6,9,10 90:17,20,21, 25 91:2,3,7, 9,22 92:1,2 93:7 94:13, 16 95:18,19, 22 103:13, 14,15,19 104:6,15 111:6,7 114:20,22 115:24 116:1 123:8 124:3, 8 126:10,15 128:19 132:2,10,11, 14 133:8,13, 23 134:7 138:15 149:19 151:20 156:2,12,15 158:8 173:7, 8,17 174:5 183:2,20,24 185:7 193:17 207:25 208:4 213:10 214:11,12,25 215:4 216:2, 9 221:19,20, 25 225:19
**splits** 158:11 179:1 184:10 185:8 193:15,16 205:25 206:7 220:23
**splitting** 91:15 92:10 124:10 127:25 173:11 178:15 183:1 193:18

214:21 220:11
**spoke** 29:2,3,8 40:11,17
**spot** 227:19
**spread** 146:20
**spring** 59:22
**St** 162:5 220:14
**staff** 24:1 68:24 70:18,19 84:7 120:1 121:9,11 129:6,19,22 131:3,8,14 134:11,18
**staffs** 200:18
**stand** 200:19
**standpoint** 74:2
**start** 45:18,20,23 56:25 60:3 64:12,22 65:3 94:6 194:16 209:8
**started** 55:12,16 60:23 65:16 66:20 94:9 97:22,23 194:18 206:15 212:12 226:2,3,5,13
**starting** 27:12 39:18 40:4,7 66:2 79:3 80:1 93:23 94:1,3
101:5 122:20 137:9 148:6 150:5 151:5 182:21 209:3 222:14
**state** 9:3,19 11:21 12:13,22 18:8 22:2 25:17 52:5 53:15,23 54:11,12 56:18 59:22 60:1 64:13, 20 65:11 73:12 75:2 76:7,10,16, 17 77:6,13 78:4,17 81:8,16,23 82:10,13 86:14 90:4 113:12 116:6,7 137:14 165:10 170:16 194:25 201:5,21 202:15,18 203:2
**state's** 41:3 78:12 80:4 201:25
**state-wide** 41:12 56:17
**stated** 38:10 58:8 85:19 166:14 170:7 189:8 195:5
**statement** 118:4 203:24 204:3
**states** 9:15 24:12 26:8 59:6 139:17
140:15,22 141:3 144:19 146:6 150:6 151:5 152:6 157:13 158:21 165:6 166:24 170:6
**statewide** 64:19 65:9
**statistical** 217:3
**stay** 152:14
**step** 18:6 67:13, 23 196:7
**steps** 195:14 222:7
**sticking** 170:9 174:9
**stipulated** 169:6,16,18
**stipulation** 9:6
**stipulations** 11:6 170:1,3
**stood** 30:17
**stop** 191:6
**straight** 132:4
**straws** 25:3
**strength** 141:1 142:25
**strong** 145:1,3
**strongly** 104:1
**structured** 87:25
**stuck** 46:16
**studies** 20:8
**study** 19:18
**styled** 201:23
**subdivisions** 152:8 157:5
**subjectively** 153:15
**submit** 38:20,21 168:19
**submitted** 38:2,7 47:4, 11 48:8 83:14 84:3 98:21 101:5 110:1,10 174:24 178:24 179:5 182:2,11
**submitting** 98:18
**subordinates** 144:20
**subpoena** 14:11,16
**subsequent** 189:5 223:5
**subsequently** 224:21 226:4
**subset** 121:9
**substantial** 26:8 112:13
**substantive** 29:18 108:10
**substantively** 57:21
**subtract** 146:2
**subtracted** 102:14
**subtracting** 98:2 145:12
**subtractions** 166:9

**successful** 44:13
**sufficient** 141:25
**suggest** 37:9 168:13
**suggested** 185:15 211:23 212:14 214:2
**suggestions** 29:16 75:10 211:18
**sum** 222:21
**summer** 106:7
**Sumpter** 155:2
**support** 94:23 145:2
**suppose** 154:9 189:1
**supposed** 56:11 178:10
**supreme** 202:11
**sure** 16:13 21:9 23:13 30:1 32:5 33:8 37:2,3,4,25 40:24 42:19 43:6 44:6, 13,16,22 45:11 48:18 63:11 65:20 81:21 95:12 100:7 111:4 115:19 117:14 119:10 125:22 130:12 136:12 138:11 140:7,11 141:20 142:13 143:22 144:13 145:23,25 147:1 148:17 149:2 150:12,14,16 151:11,25 154:23 155:9,23 156:14,19 164:18 171:7 172:6 184:19,22 199:9,10 204:19 205:5,8 209:15 211:12 216:7 221:15,16 225:7,21 227:1,5
**surprisingly** 125:1
**surrounding** 214:17
**swapping** 211:25
**swear** 11:2
**Switching** 210:9
**sworn** 11:4
**system** 180:11

**T**

**table** 194:12 202:14 215:6 217:4
**take** 13:22 20:4 26:7 34:14 47:16 63:5, 10,12 65:19 67:13 81:18, 24 95:17 97:5 104:4 111:15 113:9 121:25 122:1 123:16 127:10 137:8 148:3 160:20 167:6 175:11,16 177:20 195:14 196:7 197:9 208:16 209:6 215:11,12 218:4 219:10 223:6
**taken** 65:23 96:7 122:6 187:5 197:15 215:10 228:21
**takes** 80:20 81:14 158:14 167:4
**taking** 18:6 41:1
**talk** 28:15 59:9, 24 84:7 88:16 90:9 105:18 114:7 116:15 125:3 129:6 131:4 137:13 143:7 147:13 168:20 169:1 214:15 224:2
**talked** 15:8 29:17 68:3,4 90:4 104:24 114:14 115:4,11,13 116:2,22 123:7,9 124:2,14,20 125:21 126:9,12,14, 16 127:6,18, 24 128:5,7 130:6,8,11, 16,18 142:17,18 163:20 168:22 195:13 219:7
**talking** 18:7 29:12 40:15 48:2,3 57:20 66:2 83:22 92:14 93:6 98:11 100:14 109:8,10 122:25 134:23 158:7 173:18 196:12 198:6 200:13 204:19 208:19
**talks** 116:14
**tangibly** 92:6
**team** 21:12 154:9 176:4
**Teams** 70:2
**technically** 18:21 22:14 70:2 132:12
**telephone** 18:23
**tell** 44:19 49:14 95:13 118:11 122:21 123:24 134:24 138:19

177:17 184:22,24,25 185:3,10 186:12 188:9 199:12 202:18 204:22 210:22 213:1,22 218:22

**telling**
209:17 217:7 218:5

**tem**
120:5

**ten**
23:20 24:7 38:14,18 39:9 44:18 45:4 46:9, 12,23 47:7,9 50:15 162:18 180:13 191:20 207:5 223:6

**ten-minute**
90:8

**tens**
102:18 205:12

**term**
156:22 157:3

**terms**
34:12 55:2 60:25 61:18 62:1 71:16 74:22 80:14 108:10 126:17 151:17 168:7 172:5,20 193:12 200:13 204:12 216:6

**Terri**
125:6 217:7 220:1

**test**
92:21 133:19

**testified**
11:4

**testify**
18:1

**testifying**
11:24

**testimony**
98:17 99:19 204:23 205:2 210:11 222:9,21 223:16 225:8

**thank**
11:17 63:25 136:19,21 171:10 173:19,21 202:13 204:20 215:15 228:7,9,25

**Thanks**
14:17

**theory**
55:13 56:8 92:9

**thing**
31:22 67:10, 15 68:2 115:1 117:13 124:15 125:21 157:20 179:3 181:1 186:19 208:19

**things**
36:3 62:13, 22 72:25 73:23 89:12, 22 91:14 104:2,24 105:22 111:8 114:13 116:2,9,22 146:17 148:1 152:21

153:11,24 156:18 157:24 190:13 191:5 221:1 224:16

**think**
13:1 21:22 29:18,19 31:16 32:18 35:14 36:20 42:1 43:1 47:2 52:11 58:18 59:6 60:17 62:1 63:22 65:16 70:6 77:9,14 90:19 94:4 96:13 97:2 103:20 104:7 107:20 108:24 109:2,6 111:23,24 113:17,20 116:17 117:8,9 118:22,25 119:2 120:4 121:14 125:3 126:24 131:15,25 134:14,21, 22,25 138:5, 9 139:11,20 148:5,21 149:10 157:16 160:5 166:22 168:4 171:15,19 173:8 177:17 178:13,21 180:1,16 181:20 183:19,23 184:3 185:5, 7 186:7,8,18 188:12,14 190:9,12 191:7,14

192:10,12,21 193:3,6,7,9, 11,15,17,24 196:1 197:8, 9 204:14 205:19 207:10,25 208:18 209:1 210:6 212:22 217:10,15, 16,17 218:12,20 225:7 228:5, 13

**third**
152:5 156:21

**Thompson**
10:6 11:9,18 14:8,13,15 21:25 46:22 109:1,16 121:14,21 122:1 169:5, 11 170:2 171:2,5,10 173:19 177:4,15 195:23 197:18 228:13

**thought**
31:21 34:8 88:24 89:17 116:19 125:5 129:14 130:9,13 131:18 133:10 185:1 202:15,19 226:5,11,13

**thoughts**
84:12

**thousands**
102:17,18 205:12

**three**
15:16 18:22 23:9,19 36:9

41:11 66:16 84:25 89:7, 10 91:15 92:10 93:8 94:13,17 95:18 105:25 111:19,21 116:17 126:16 154:4 169:19 181:24 182:14 185:24 189:6,12,23 190:1,12 191:9,10 192:13 207:6 226:16

**three-judge**
26:10 199:13 221:4

**tied**
146:14

**ties**
97:15

**time**
9:17 13:17 17:17 27:18 31:21 37:13 47:17 52:11 55:10 56:6 60:23,25 61:17 62:8,9 63:3,6,8,10 65:22,25 67:1,5 70:6, 11 74:19 75:14,15,19, 22,25 78:18 79:25 80:8, 21,25 81:2, 7,11,19,24 83:14 84:22 87:22 90:11 94:17 105:24 106:24 110:21 116:13 121:16 122:5,8,24 123:1 129:5 136:14 145:18 161:25 162:22 163:6 164:1 182:5 187:19 192:4,25 196:11 197:14,17,18 218:12,21 226:3,5,11 228:14,16, 20,23 229:3

**timeline**
51:1 56:11, 14 68:6 98:11 109:21

**timelines**
71:8

**times**
12:18 65:14 87:18 109:7, 12 127:6 129:25 215:22

**timing**
74:25

**tiny**
204:10,17 205:24

**Tish**
10:21

**title**
21:1

**titled**
169:16

**today**
12:3,6,10,14 13:5 14:19 15:5,22 17:8,11,14, 17 170:13 180:8 199:10 200:7 221:6, 7

**told**
58:18 87:12 118:12 131:3,7,15 136:22,24 138:25 139:7 164:5,13 185:4 186:13 197:23 198:21 199:2 203:1 204:25 210:16

**Toni**
203:25 205:20

**top**
25:14 36:3 49:6 53:6 130:23 161:18

**total**
33:17,18 55:22 74:4 83:2 97:25 98:5,6,9 99:25 137:15 145:14 146:1

**town**
70:13 87:22

**traced**
39:13

**trade-offs**
155:14

**traditional**
146:1

**transcript**
203:20

**translated**
82:12

**travel**
63:8

**tread**
45:15

**tremendous**
89:4

**tremendously**
29:18

**trial**
12:20 18:1

**tribal**
157:2,6,9

**trip**
69:12,23 70:13

**trips**
63:5

**trouble**
151:6 198:2

**true**
22:8 26:3 39:18 93:3, 18 215:19 222:17 225:22

**trump**
149:15

**trust**
74:5

**trusted**
74:6

**truthfully**
12:3

**try**
45:14 78:25 90:24 157:14 158:22 196:13 209:9 225:24

**trying**
27:22 62:5 66:10 91:24 130:20 132:14,15 133:23 146:16,18 148:21 157:20 158:10,17 173:10 186:21 204:11 205:23

**Tuesday**
15:10,11,17

17:4 87:25 110:5
**tune** 68:10
**tuned** 123:17
**turn** 66:14 98:22 145:15
**turned** 36:14,17 73:4 76:15 102:18 123:15,17 124:10 135:4 142:16 143:19 175:1 226:8
**Turning** 162:13 163:9
**turnout** 35:7 176:6
**turns** 72:10 216:22
**Turrill** 10:4 42:24
**Tuscaloosa** 96:4,8,13,16 115:11,20 127:20,21 128:3 162:18 163:22 192:23 195:3 209:9 211:24 212:1,2 213:7,8,13 214:4 216:19 220:14 221:19,24 224:18,19
**TV** 227:19
**twice** 79:11
**two** 20:9 23:21 26:7 30:5 37:5,6,12,16 49:18 52:14 54:9 59:23 72:7 74:21 85:1,5 86:16 89:11 95:19,22 97:9 99:12 103:19 106:15 111:23,24 112:2 117:16 125:9,19 126:2,15 127:25 128:13 132:12 133:12,15 136:11 149:10,17,21,24 150:16 161:6,9 181:6,13,17 182:13,14 185:17 189:5,6,12,23 190:1 191:5,7 192:13,19 193:4,5,6 194:5 196:24 198:18 210:23 211:10 213:9,12
**type** 35:1 65:10 79:1 105:1 175:23
**types** 78:6
**typing** 13:14,16

**U**

**U.S.** 87:13 103:6 119:23 122:11 201:6
**Uh-huh** 148:9
**ultimate** 207:17
**ultimately** 31:10 51:8 76:8 110:15 196:10,16
**undergraduate** 19:14
**underneath** 224:3
**underpopulated** 45:3,6 66:11 70:25 95:24 114:7
**underpopulation** 67:17
**understand** 11:23 13:7 33:8 111:20 139:18 204:11 209:23 210:10 219:9 225:8
**understanding** 12:2 28:2 39:20 53:12,24 76:12 111:21 112:9 139:21 140:4,6 141:8,12,21,23,24 142:10 145:8,10 146:9 149:8 150:8 151:9 152:10 157:17 158:24 159:17,18,20 168:2,5,6 208:14 225:13,14
**understood** 13:11 28:25 31:5 42:11 82:11 109:16 139:5 179:14 181:22 220:4 225:16 226:22
**unhappy** 185:22
**United** 9:15 139:17 141:2
**universities** 104:2 114:11 115:17,18
**university** 19:13 103:19 115:21,25 116:4
**unofficial** 57:5,8 64:7,10 67:16 106:7
**unquote** 180:12 186:22
**update** 38:20 39:4 86:23 88:3,23
**updated** 28:4 57:10 87:2,23
**updates** 88:4
**updating** 38:17
**upload** 83:7
**uploaded** 82:5,20,22
**urging** 211:9
**usable** 65:10

**useless** 64:15
**Usual** 11:6

**V**

**vacation** 63:6
**vaguely** 27:25 141:17
**valuable** 64:18,19
**varied** 84:23
**various** 21:12,16 29:13 44:18 47:3 54:20 55:4 73:22 86:24 98:23 102:14 105:10 143:25 145:15 149:9,15
**vast** 80:16 161:10 162:10 181:8
**verbal** 43:21 44:2
**verbally** 43:18 148:10
**versa** 149:16
**version** 23:11 84:16 110:12,14 173:9,15,16 190:23 191:11
**versions** 191:4
**versus** 9:13 12:21 25:11 81:1, 13 84:9 97:15 124:22 170:3 181:1 201:5 221:5
**vi** 167:1
**vice** 149:16
**VIDEOGRAPHER** 9:11 11:1 65:21,24 122:4,7 197:13,16 228:19,22 229:2
**view** 27:22 159:12
**views** 152:23
**violate** 202:11
**Virginia** 18:16 22:15 23:6,23 24:6,10
**virtually** 10:10 64:15 83:17 187:14
**visitors** 70:10
**voices** 126:2
**vote** 139:15,19 140:13 149:11,25 155:18 165:4,23,24 167:8 185:15 204:15
**voted** 110:4
**voter** 35:7 42:15 75:21,24 176:6
**voters** 32:8,13,20 33:2 39:8 73:7 97:4 114:14 170:15 182:11 217:25 218:7
**Voters'** 217:14
**votes** 227:7
**voting** 31:22 32:6, 17 33:18 34:3,8,15 35:10 44:7, 10 49:7 74:10 83:2 99:10 105:21 112:17,20,22 113:7 117:6 119:12,22 135:7 140:23 141:1,2,4, 16,19 142:14,20,25 143:11 144:5,9,14, 25 145:5 149:12,25 157:5 165:4, 12 166:12, 17,20 167:8 175:12,17 185:14 189:3 195:11,17 216:23

**W**

**Waggoner** 180:19 190:15 191:8,25 192:8,13
**Wagner** 190:25
**wait** 13:17 60:1
**waited** 71:16 208:6
**waiting** 90:9
**walk** 76:21 88:15 109:21 148:23 150:4 182:19
**walked** 88:18,21
**Walker** 9:24 11:7, 10,12 12:7, 9,13 14:12, 14,17,24 15:6 16:18 19:21 22:1 33:5 37:15 46:20 48:2, 16 50:23 77:10,20 88:23 99:16 106:25 107:9,22 108:3,15,16 109:5,18 113:13 116:7 121:19,24 122:3 136:12 138:23 139:8 144:3,10 162:17 168:24 169:1,9,14 170:24 171:4 173:14 176:23 177:1,5,14, 17,20,23,25 178:8,11 181:20 184:25 185:3 187:8 195:19 196:20,22 197:3,23 198:1,6,9, 12,25

199:19,21 202:21 204:2,24 209:15,22 210:4 213:2 216:17,25 217:2 228:17,24

**want**
11:10 25:2 27:2 50:16 61:4 65:19 72:6,8 89:6 90:17 92:20 94:22 99:8 103:14 121:20 122:18,24 131:3,4 132:9 137:13 169:9,25 171:7 182:19,25 183:15 185:1 204:4 209:25 215:18 225:7

**wanted**
29:12 34:11 40:24 43:10 45:11 72:8, 18,23,24 78:18 89:15, 17,20 99:1, 4,11 103:20, 22 115:16, 18,19 116:1 117:7,10,20 118:19 119:13 125:22,25 130:23 148:17 152:13 156:4 183:1 197:8 210:12 219:17,20 220:5,7,22 222:25 223:25 224:2,9,15

**wanting**
93:7

**Washington**
60:2,14 200:9,17

**water**
45:15 148:20 151:7

**way**
18:1 24:16 28:24 62:11 81:9 91:12 95:25 104:20 110:20 111:16 121:6 127:11,17 132:2 179:5 182:3 199:23 209:16 210:13,15 218:16 222:7 227:2,9

**ways**
89:10 91:15 92:10 93:8 95:18,19 126:16 128:13 199:22 216:8

**week**
15:1,12 61:10 76:18 79:10,11,12, 13 82:5 84:3 87:24 98:14, 21,25 99:18 101:5 103:4 105:16 106:11 107:12,20 110:13 113:21 118:9 131:1 135:3 174:24 175:8 195:7

**weekends**
79:21

**weeks**
63:2,13 105:20

**went**
31:10 33:25 45:23 59:14, 16 61:11,13 69:14 70:8 84:5,14 107:20 114:16 120:3 122:14 134:21 192:22 193:9 214:23 222:22

**west**
125:24 172:22 199:7 200:1 221:5

**western**
130:22 186:21

**whatnot**
125:17

**whatsoever**
28:10

**Whichever**
53:8 188:6

**white**
33:2

**Whitfield**
104:7

**wholesale**
39:10

**whomever**
41:18

**widen**
132:7,16

**Wilcox**
155:3

**Winston**
162:17

**Wire**
161:15

**Wiregrass**
161:17

**witness**
9:7 11:2 16:13 19:10, 22 34:25 77:5 121:22 169:13 177:24 178:9 185:1 198:7 202:22 218:1 228:15

**witness'**
173:15

**woman**
43:25

**Women**
182:11 217:14,25 218:6

**wonder**
216:21

**wonderful**
105:22

**word**
60:6 151:6 171:23 215:12 218:4

**words**
159:23 222:13

**work**
20:3,20,21 26:11,12,15, 25 30:24 40:23 54:9 56:15 58:22 59:9 62:25 78:19 79:21 129:13 132:20 134:6 153:5 158:15 206:16,24

**work-wise**
62:13,18

**workable**
76:15

**worked**
23:22,24 24:11 26:15 27:16 31:7 92:11 195:3 210:20 212:15 224:23
**working**
23:17 24:18 28:6,8,13,14 29:14 30:21 38:19 52:14 57:13,17 58:24 62:22 63:2 64:12 79:25 89:12 206:10
**works**
74:1 110:20 132:23,25 169:12
**worth**
73:2
**worthy**
92:10
**writing**
153:16
**written**
43:19
**wrong**
38:22 193:8

**Y**

**y'all**
121:20 171:9
**yeah**
16:5 20:1 23:5,13 31:14 35:14, 16 38:16 39:15 42:6 43:8 48:25 56:17 61:22 72:16,19 77:12 79:19 81:13,20 82:7,21 83:21 87:7 89:3 95:23 96:11 104:14 109:18 116:5 119:2 123:7 127:6 135:8 143:18 146:11 154:7,24 157:19 162:25 172:6 173:18 180:24 182:7 188:21 189:7 190:17 192:8 194:3 205:18 214:11,13 215:11,15,22 220:13,25 226:21
**year**
51:20 171:1
**years**
13:2 18:20, 22 20:9 23:9,20 24:7,8 31:2 33:11,22,24 38:14,18 39:9 44:18 45:4,14 46:10,12,23 47:7,9 50:15 162:18 200:6 207:5 223:6 226:9
**Youth**
20:6

**Z**

**zero**
73:14 84:24 102:9 128:17 134:7 137:23,25 138:12,16, 19,25 139:1 183:6 188:11,16 190:9 194:4 197:24 198:16,21 199:3,16 200:4,8,23 201:2 202:19 203:5 205:25 215:5,20 216:10 223:9 225:10,12,15
**zoom**
42:21 68:17 69:3,4,7,9, 17,19 70:1,2 83:21 84:6, 13,15 85:8

**In The Matter Of:**

**Evan Milligan,et al v. John H.Merrill, et al.**

---

Chris Pringle

*December 17, 2021*

---

US Legal

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

EVAN MILLIGAN, et al., )
) CIVIL CASE NO.
Plaintiffs, ) 2:2021-CV-01530-AMM
VS. ) VIDEO DEPOSITION OF:
JOHN MERRILL, et al., ) CHRIS PRINGLE
)
Defendants. )

S T I P U L A T I O N S

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the deposition of:

CHRIS PRINGLE,

may be taken before LeAnn Maroney, Notary Public, State at Large, at the law offices of Balch & Bingham, 105 Tallapoosa Street, Montgomery, Alabama, 36104, on December 17, 2021, commencing at 9:14 a.m.

Page 1

IT IS FURTHER STIPULATED AND AGREED that the signature to and reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

***

Page 2

A P P E A R A N C E S

FOR THE MILLIGAN PLAINTIFFS:

MICHAEL L. TURRILL
Attorney at Law
Hogan Lovells US LLP
1999 Avenue of the Stars, Ste. 1400
Los Angeles, California 90067
michael.turrill@hoganlovells.com

KATHRYN SADASIVAN
Attorney at Law
NAACP Legal Defense & Educational Fund
40 Rector Street, FL 5
New York, New York 10006
ksadasivan@naacpldf.org

DEUEL ROSS (Via Zoom)
Attorney at Law
NAACP Legal Defense & Educational Fund
700 14th Street N.W., Ste. 600
Washington, DC 20005
dross@naacpldf.org

Page 3

JULIE A. EBENSTEIN
DAVIN M. ROSBOROUGH
Attorneys at Law
American Civil Liberties Union Foundation
125 Broad Street
New York, New York 10004
drosborough@aclu.org

KAITLIN WELBORN
LaTISHA GOTELL FAULKS
Attorneys at Law
American Civil Liberties Union of Alabama
P.O. Box 6179
Montgomery, Alabama 36106
kwelborn@aclualabama.org

FOR THE SINGLETON PLAINTIFFS: (Via Zoom)

JAMES URIAH BLACKSHER
Attorney at Law
825 Linwood Road
Birmingham, Alabama 35222
jublacksher@gmail.com

Page 4

FOR THE CASTER PLAINTIFFS: (Via Zoom)

DAN OSHER
Attorney at Law
Elias Law Group
10 G Street NE, Ste. 600
Washington, DC 20002
dosher@elias.law

FOR DEFENDANT JOHN H. MERRILL:

JIM DAVIS
Assistant Attorney General
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130
jim.davis@alabamaag.gov

FOR THE DEFENDANTS JIM McCLENDON & CHRIS PRINGLE:

DORMAN WALKER
Attorney at Law
Balch & Bingham
105 Tallapoosa Street, Ste. 200
Montgomery, Alabama 36104
dwalker@balch.com

Page 5

ALSO PRESENT:

Paige Ali, Videographer
Elizabeth Baggett

I N D E X

MS. WELBORN: 9-120
MR. OSHER: 120-125
MR. BLACKSHER: 125-140
MR. DAVIS: 140-141

E X H I B I T L I S T

| | PAGE |
|---|---|
| Plaintiff's Exhibit 1 - (Depo notice) | 12 |
| Plaintiff's Exhibit 2 - (Reapportionment Guidelines) | 52 |
| Plaintiff's Exhibit 3 - (Proposed guidelines handout) | 55 |
| Plaintiff's Exhibit 4 - (Transcript of 10-26-21) | 104 |
| Plaintiff's Exhibit 5 - (Transcript of 11-1-21) | 116 |
| Plaintiff's Exhibit 6 - (2021 Congressional map) | 119 |

Page 6

I, LeAnn Maroney, a Court Reporter of Birmingham, Alabama, and a Notary Public for the State of Alabama at Large, acting as commissioner, certify that on this date, pursuant to the Federal Rules of Civil Procedure and the foregoing stipulation of counsel, there came before me on December 17, 2021, CHRIS PRINGLE, witness in the above cause, for oral examination, whereupon the following proceedings were had:

* * * * *

THE VIDEOGRAPHER: This marks the beginning of the deposition of Chris Pringle in the matter of Evan Milligan, et al., versus John H. Merrill, et al., Civil Case Number 2:21-CV-01530-AMM filed in the United States District Court for the Northern District of Alabama. The date is December 17, 2021. The time is 9:14 a.m.

All attorneys present, will you please state your names and whom you represent.

MS. WELBORN: Kaitlin Welborn from the ACLU of Alabama representing the plaintiffs.

MS. FAULKS: LaTisha Gotell Faulks, ACLU of Alabama, representing the plaintiffs.

MR. WALKER: Dorman Walker, Balch & Bingham, representing the intervenor defendants,

Page 7

Senator Jim McClendon and Representative Chris Pringle.

MR. DAVIS: Jim Davis, Alabama Attorney General's office, representing Secretary of State John Merrill.

THE VIDEOGRAPHER: All attorneys on Zoom.

MS. SADASIVAN: This is Kathryn Sadasivan from LDF for the Milligan plaintiffs.

MR. ROSS: Deuel Ross for the Milligan plaintiffs.

MR. TURRILL: Michael Turrill for the Milligan plaintiffs.

MR. OSHER: Hi. This is Dan Osher from Elias Law Group representing the Caster plaintiffs. Good to see you all.

MR. WALKER: Good to see you, Dan.

MR. ROSBOROUGH: Good morning. I'm Davin Rosborough for the Milligan plaintiffs.

MS. EBENSTEIN: Julie Ebenstein for the Milligan plaintiffs.

MR. BLACKSHER: Jim Blacksher for the Singleton plaintiffs.

MS. BAGGETT: Elizabeth Baggett. I'm a law clerk with the ACLU, not an attorney, for the

Page 8

Milligan plaintiffs.
THE VIDEOGRAPHER: Court reporter, will you please swear in the witness.
CHRIS PRINGLE,
having been duly sworn, was examined and testified as follows:
THE REPORTER: Usual stipulations?
MS. WELBORN: Yes.
MR. WALKER: Yeah. Kaitlin, that means -- okay.
MS. WELBORN: Yes, I understand.
EXAMINATION BY MS. WELBORN:
Q. Representative Pringle, my name is Kaitlin Welborn from the ACLU of Alabama. I represent the Milligan plaintiffs.
Could you please state your full name for the record?
**A. Christopher Paul Pringle.**
Q. And do you understand that you're testifying under oath right now?
**A. I do.**
Q. Is there anything that might prevent you from understanding my questions or answering truthfully today?
**A. No.**

Q. Are you represented by a lawyer today?
**A. Yes.**
Q. And who is that lawyer?
**A. Dorman Walker.**
Q. And is he the same lawyer who represents plaintiffs -- or defendants in this lawsuit?
**A. Yes.**
Q. And --
MR. WALKER: I'm not sure what the question is.
**A. The defendants are --**
MS. WELBORN: That's okay.
Q. The intervenors. He represents the intervenors --
**A. Yes.**
Q. -- is that correct? Okay.
And are you paying Mr. Walker to be your lawyer today?
**A. No.**
Q. And do you assume that the State of Alabama is paying Mr. Walker to be your lawyer?
**A. Yes.**
Q. Have you ever been deposed before?
**A. One time.**
Q. And when was that?

**A. 2003.**
Q. And what was the case?
**A. Mr. Blacksher, redistricting.**
Q. Okay. And what was it -- it was about redistricting. Do you know what the result of that case was?
**A. No.**
Q. So I'll just go over some key rules of the road as a refresher. I'll ask the questions. And if you don't understand a question, let me know, just like you did just now. And if you answer a question, I will assume that you understood that question. Is that fair?
**A. Yes.**
Q. The court reporter is here, and she's typing everything you and I say and everybody else says. And she'll type everything said by anyone in the room or on Zoom.
It's really important that only one person speaks at a time. So if you could just allow me to finish my questions and sentences, and I'll do my best to allow you to finish your answers before jumping on to the next question. Okay?
I'd like to introduce my first exhibit, which is the deposition notice.

MR. WALKER: Are you -- are you numbering these sequentially from the last --
MS. WELBORN: We'll start over. So this will be Plaintiff's Exhibit Number 1.

(Plaintiff's Exhibit 1 was marked for identification.)

Q. So have you seen this document before?
**A. Yes, ma'am.**
Q. And without disclosing the content of any discussions with your attorney, what did you do to prepare for your deposition today?
**A. We met yesterday to discuss the deposition.**
Q. With Mr. Walker?
**A. Yes.**
Q. With anybody else?
**A. Mr. Davis and Senator McClendon.**
Q. Okay. And for how long did you meet?
**A. An hour an 45 minutes, two hours maybe. It wasn't long.**
Q. Okay. And other than Senator McClendon, did you meet with anyone who's not an attorney?
**A. No.**

MS. WELBORN: I'm sorry. I don't know if you're an attorney or not.
MR. McCLENDON: No.
MS. WELBORN: I'm from DC. I just assume everybody is an attorney.
MR. WALKER: He's an eye doctor, if you have any issues there. But he's not an attorney.
MS. WELBORN: Well, clearly, I do.
Q. Okay. And did you review any documents for today?
**A. No.**
Q. Okay. You didn't review the complaint for this case?
**A. No.**
Q. And have you discussed this case with anyone other than your attorney, Mr. Davis, and Senator McClendon?
**A. No.**
Q. And have you discussed your deposition with anyone?
**A. I told people I was being deposed. But that was the extent of it.**
Q. Okay. And who first told you that this lawsuit had been filed?
**A. Was this the one that was filed before**

Page 13

**we even introduced a bill?**
Q. No.
**A. Okay. So I have no recollection.**
Q. And who first told you that your deposition had been requested?
**A. My attorney.**
Q. And when was that? Do you remember?
**A. Shortly after y'all noticed it.**
Q. Okay. Which was --
**A. Just a couple of days ago.**
Q. Just a few days ago.
Are you being compensated by anyone to be here today?
**A. I'm getting my usual legislative per diem for travel, which all state employees are entitled to.**
Q. Right. And do you expect to be compensated in any way if you testify at trial?
**A. I will receive the same compensation for travel that all state employees are entitled to.**
Q. Okay. Do you have an email account?
**A. Yes.**
Q. And what is that email account?
**A. My private personal is chrispringle@southerntimberlands.com. My state**

Page 14

**government, I couldn't even tell you.**
Q. And that's your legislative --
**A. Yes.**
Q. -- email address?
Do you have any other email accounts?
**A. No.**
Q. Do you have an email account for any PAC, for example?
**A. No.**
Q. So everything goes to either your legislative account or your personal account?
**A. Yes.**
Q. Okay. Do you have any personal social media accounts?
**A. I have a Facebook page.**
Q. So Twitter, anything like that, for personal use?
**A. Not for me, no.**
Q. Okay.
**A. I mean, there -- there are Twitter accounts for me, but I didn't use them. I didn't -- they had my name on them, but I never used them.**
Q. Okay. And on your personal Facebook account, it's just your name on the account; is that correct?

Page 15

**A. Yes.**
Q. Okay. And have you been involved in any lawsuits other than the redistricting one with Mr. Blacksher?
**A. No.**
Q. Okay. What's the highest level of education that you've completed?
**A. A graduate of the University of Alabama.**
Q. And when was that?
**A. August 11th 1984.**
Q. And what degree did you obtain?
**A. I got a degree in communications with a minor in political science.**
Q. Okay. Do you have any certificates or any specialties, any certifications in anything?
**A. I'm a licensed realtor. I'm a licensed homebuilder. I'm a licensed general contractor. And until I let it expire, I was a certified control burn specialist.**
THE REPORTER: Control what?
**A. Control burn. You know when you see the woods on fire? Guys like me are burning it on purpose.**
Q. Okay. Well, if I need to fix anything in my apartment, it sounds like you're the person to

Page 16

come to.
A. **I don't fight fires.**
Q. Well, no fires. I hope there's not a fire in my apartment.
So what do you do for a living other than burn things?
A. **I actually quit doing that. I am a real estate agent with Southern Timberlands. We specialize in timberland sales and acquisitions. And I am a licensed homebuilder and a licensed general contractor. I build houses, hunting camps, and I do commercial remodeling work.**
Q. Who so is your employer? I'm sorry.
A. **Southern Timberlands.**
Q. Okay. And so all of those, the realtor and being a contractor, et cetera, that's all for that company, correct?
A. **No.**
Q. No?
A. **My real estate license is held at Southern Timberlands, a division of Cooper & Company, Incorporated.**
Q. Okay.
A. **My contracting license are held under Chris Pringle, Incorporated.**

Page 17

Q. Okay. Any other employers?
A. **Alabama House of Representatives.**
Q. Right. And at Southern Timberlands, what's your title?
A. **Realtor, agent.**
Q. Right. Okay. And how long have you worked there?
A. **27 plus years.**
Q. Okay. And how long have you been a contractor?
A. **Since about 2007.**
Q. And what's your current role in the legislature?
A. **I'm a state representative from House District 101 in Mobile.**
Q. I'm sorry. Could you repeat that?
A. **State representative from House District 101.**
Q. Okay. And what portion of the state is that?
A. **Mobile.**
Q. Okay. And how long have you been in office?
A. **I was elected in 1994. I served two terms. I left in 2002. I was re-elected in '14.**

Page 18

**So seven years now. I mean seven years my second term.**
Q. Okay.
A. **So about 15 years.**
Q. And currently are you on any committees?
A. **Yes.**
Q. Which ones?
A. **I chair the committee on state government. I am cochairman of the house -- cochairman of the reapportionment committee. I serve on constitution, campaigns, and elections; internal affairs; the oversight committee of public examiners; contract review. I believe that's all.**
Q. Okay. And during your first stint in the legislature -- so that's your first two terms. I'll just refer to it as your first stint. Is that okay?
A. **That's fine.**
Q. Or is there a different term that you --
A. **That works.**
Q. -- prefer?
Okay. And what district did you represent at that time?
A. **101.**
Q. Okay. So the same district?

Page 19

A. **Yes.**
Q. And were you on any committees then?
A. **Yes.**
Q. Do you remember which ones?
A. **I know I served on reapportionment. I served on boards and commissions, I served on health, I served on constitution, campaigns, and elections, I served on contract review. And that's all I can remember right now.**
Q. Okay. Did you chair any of those committees?
A. **No.**
Q. Okay. I'm sorry.
A. **We were in the superminority at that time.**
Q. Right. Well, were you the ranking member in any of the committees?
A. **No.**
Q. And why did you leave office?
A. **I decided not to run and sought higher office and was defeated.**
Q. And other than serving in the house of representatives, have you served in any other public office?
A. **No.**

Page 20

Q. Okay. And you mentioned that you were on the reapportionment committee during your first --
A. **Yes.**
Q. -- stint in the legislature. So you were involved in the redistricting process, correct?
A. **Yes.**
Q. And what role did you have in the redistricting process?
A. **I was the ranking minority party member in the house, not the senate.**
Q. Okay. For the republicans, the minority party, correct?
A. **Yes.**
Q. And why did you become involved in redistricting?
A. **Congressman Sonny Callahan, who I had previously worked for in Washington, wanted me to serve on the committee because they were trying to draw him out of his district. He believed they were trying to draw him out of his district. Let me --**
Q. I see. Any other reason?
A. **No, ma'am. I like serving.**
Q. And so that redistricting process ended in 2001; is that correct?

Page 21

A. **January of 2002.**
Q. Of 2002. Okay.
A. **In the special session.**
Q. Okay. So the special session was in January of 2002?
A. **Yes, ma'am.**
Q. Okay. And what was the result of that redistricting?
A. **The democratic leadership drew the plans and passed them.**
Q. And how did you become a cochair -- I'm sorry. What is your role in the 2021 redistricting process?
A. **I'm the house cochairman.**
Q. Okay. And is that a nonpartisan role?
A. **I was elected by the members of the -- the house members of the committee.**
Q. Okay. And why did you decide to seek that role?
A. **The house member that chaired it prior to me was leaving, and we needed somebody with experience to step up and be the house chairman.**
Q. And other than currently and the 2002 redistricting cycle, have you been involved in any other redistricting process?

Page 22

A. **No.**
Q. So the 2002 congressional map, can you be a little more specific about what your involvement was in helping to draw that map?
A. **Virtually none.**
Q. Okay.
A. **Those maps were drawn off -- what we call off campus. They were not drawn in the state house.**
Q. Can you explain more about what that means?
A. **They were drawn by somebody off -- they were not drawn in the reapportionment office in the state house.**
Q. Okay. So they were drawn by somebody other than someone in the legislature?
A. **Yes.**
Q. Do you know who that was?
A. **No.**
Q. Did you work with anyone to change the map at all?
A. **Yes.**
Q. Who was that?
A. **Randy Hinaman.**
Q. Okay. And what did you do with him?

Page 23

A. **We were in contact with Congressman Callahan. And he was in contact with the other members of the congressional delegation who had actually -- this is my memory, now.**
Q. Sure.
A. **The members of congress hired Mr. Hinaman to represent them on drawing -- redrawing the congressional maps in 2002.**
Q. And so ultimately do you know who drew the 2002 map?
A. **I do not know who the democrats retained, no, ma'am.**
Q. Okay. But it was the democratic party of Alabama?
A. **They had somebody, yes. I don't know who.**
Q. Do you know the general method that was used to draw the map?
A. **I would -- I'm assuming that the guidelines we adopted in 2002 were used by them to draw the 2002 plan.**
Q. Do you know the software that was used to draw the maps?
A. **No, ma'am.**
Q. Do you know the data that was used to

Page 24

Evan Milligan,et al v. John H.Merrill, et al. Chris Pringle 12/17/2021

draw the maps?
A. **No, ma'am.**
Q. So the 1992 congressional map created the first majority black congressional district in Alabama history. That's District 7. Do you know if that map served as the starting point for the 2002 congressional map?
A. **You are -- that is the Reed Buskey plan, correct?**
Q. To be honest, I don't know. I don't know the answer to that question.
A. **I'm pretty sure that's what we refer to as the Reed Buskey plan.**
Q. Okay.
A. **That was -- that was the first time that a map was drawn where a majority minority congressional district was created.**
Q. And so --
A. **And I know that the guidelines in 2002 said we shall use the core of existing districts and not -- use the core of existing districts.**
Q. Okay. So is it fair to say that Reed -- well, who drew the 1992 map? You don't know?
A. **I just know it's referred as the Reed Buskey plan because Representative Buskey and I**

Page 25

**served together, and he's a personal friend of mine.**
Q. Okay. So you said that it was in the legislative guidelines to maintain the cores of prior districts?
A. **If I remember the 2002 guidelines correctly, that's been a longstanding tradition of the Alabama legislature.**
Q. Okay. Do you know if it was -- and we're talking still about the 2002 redistricting process -- if it was a primary goal of the legislature to keep the racial demographics of each district the same?
A. **I couldn't answer that. I don't know.**
Q. Okay. So you wouldn't know if it was a primary goal to keep about a 60 percent black population in District 7?
A. **I don't remember. I have no -- no recollection of that.**
Q. Do you know if the legislature took into account any other characteristics other than keeping the core of each district the same?
A. **In 2002?**
Q. Yes.
A. **No, ma'am.**
Q. Okay.

Page 26

A. **Now, we're talking just the congressional plan, correct?**
Q. Yes. That's right. And that's throughout this -- throughout the deposition we're referring to the congressional plans. If we refer to any other plans, I'll make sure to be more specific.
MR. OSHER: I'm sorry to interrupt. Would it be possible to move the microphone a little closer to the witness?
(Discussion held off the record.)
Q. Okay. So for the 2001 congressional map, do you know the -- did you know the racial makeup of districts other than District 7?
A. **No.**
Q. Did you know the racial makeup of District 7?
A. **No. I mean, after the maps were passed, yes, we knew it.**
Q. Okay.
A. **But going into it --**
Q. Do you recall what they were?
A. **No.**
Q. And do you know if the legislature considered race in drawing any districts other than

Page 27

District 7?
A. **In 2001?**
Q. That's right.
A. **Those maps were drawn off campus. That's the reason that ten-day rule comes into -- into play. If you draw a map outside of the legislature reapportionment office, you have to submit it ten days before it can be introduced into the legislature so it can be put into the computer and analyzed.**
**And those maps were drawn exactly ten days out at the last minute before the special session in 2020 -- in 2002.**
Q. And when did that rule come into play?
A. **It was there in 2002. Now, when it came into the guidelines, I don't know.**
Q. Okay. Do you know if in -- during the 2001-2002 process if any legislators advocated for two majority black districts?
A. **Not to my recollection.**
Q. And if the 2000 -- well, did you vote for the 2002 congressional map? Did you vote to approve it?
A. **Yes.**
Q. And if --

Page 28

Page: 7 (25 - 28)

Caster Plaintiffs' Exhibit 89, Page 8

Evan Milligan,et al v. John H.Merrill, et al.
Chris Pringle
12/17/2021

A. **To the best of my recollection, I did. It protected Congressman Sonny Callahan and his district, so I'm assuming I voted for it.**
Q. Okay. And all of this is to the best of your --
A. **Yes.**
Q. -- recollection.
A. **Yes.**
Q. If the 2002 map had contained two majority black districts, would you have voted for it?
A. **I can't answer that.**
Q. Why not?
A. **Because I didn't look at how they would have drawn it.**
Q. Okay.
A. **It was never presented to me. So I can't tell you how I would vote on something I've never seen.**
Q. Do you think that the legislature as a whole would have approved a congressional map like that?
A. **I'm not going to speak to that.**
Q. Did you play a role in the 2011 congressional redistricting process?

Page 29

A. **No.**
Q. Okay. And do you happen to know, even though you weren't there, if the 2001 congressional map or 2002 congressional map was considered as the starting point for the 2011 congressional map?
A. **No.**
Q. So you are the cochair of the reapportionment committee for this year's congressional redistricting process. What does it mean to be the cochair of the reapportionment committee?
A. **I work with members of the Alabama house on drawing their districts, their legislative districts.**
Q. And for congress, as well?
A. **No.**
Q. So who works on the congressional map?
A. **Mr. Hinaman worked with members of congress to help -- for them to draw the maps.**
Q. Okay.
A. **To have input from the members of congress on their districts, what they wanted.**
Q. So what is the role of the reapportionment committee with respect to congressional maps or the congressional map?

Page 30

A. **We adopted the guidelines. If you read the guidelines, they lay out what we expect the committee and the plans to look like, to respect communities of interest, not to pit incumbents against each other. There's a whole list of things that we put into the guidelines that we wanted to see in our plans.**
**And Mr. Hinaman was given those guidelines and instructed to draw those plans in a race-neutral manner following the guidelines and work with members of congress in how they wanted their districts drawn.**
Q. And as a member of the reapportionment committee, do you have any input on how the congressional maps are drawn?
A. **We voted on the guidelines.**
Q. Okay. You voted on --
A. **We gave -- we gave Mr. Hinaman the guidelines and told him to follow those guidelines and to draw those -- those maps in a race-neutral manner.**
Q. Okay. Any other way that the members of the reapportionment committee are involved in drawing the congressional map?
A. **Once they were finished, we looked at them in committee.**

Page 31

Q. Okay. And anything else?
A. **Not that I can remember right now.**
Q. Okay. And what are your responsibilities as the cochair of the reapportionment committee?
A. **We -- we set -- we oversaw the public hearings, the 28 public hearings we had dealing with congressional, state board of education, state senate, and state house maps and districts.**
**And I worked with members of the Alabama house to work on their districts and what they wanted and how we could address communities of interest.**
**But on congressional, I allowed Mr. Hinaman to meet with members of congress and take the information we gathered in the public hearings that was available to him and the guidelines.**
Q. Any other responsibilities?
A. **Not that I can think of right now.**
Q. And so what was the starting point for drawing the 2021 congressional map?
A. **I would say the guidelines. And part of our guidelines are preserve the core of the existing**

Page 32

Page: 8 (29 - 32)

Caster Plaintiffs' Exhibit 89, Page 9

Evan Milligan,et al v. John H.Merrill, et al. Chris Pringle 12/17/2021

**districts and not pit incumbents against each other.**
Q. And so is it fair to say that the 2011 congressional map served as the starting point for the 2021 congressional map?
**A. I would assume it would. But I wasn't there when Mr. Hinaman started drawing them.**
Q. Did you instruct him to use the 2011 map as a starting point?
**A. I mean, the guidelines say preserve the core of the existing districts. So I would assume that if the committee told him to start with the core of the existing districts, he would start with the core of the existing districts.**
Q. Which is the 2011 congressional map, correct?
**A. Yes, ma'am.**
Q. And just really quickly going back to the 2001, 2002 redistricting process. You mentioned that it was a priority to protect Senator Callahan's district, correct?
**A. For Sonny Callahan, yes, and me.**
Q. And for you?
**A. Yes.**
Q. Right. Did you have any other priorities for the 2002 congressional map?

Page 33

**A. No. Just protect the congressman --**
Q. Okay.
**A. -- who I worked for at one time.**
Q. Right. So you were -- you worked for him before you were in the --
**A. Yes.**
Q. -- Alabama legislature. So when you were in the Alabama legislature, you wanted to protect his seat, correct?
**A. Yes.**
Q. Okay. So that was really your motivation?
**A. Yes.**
Q. Anything else?
**A. I was trying to see if we could draw legislative districts. But that's not the point today.**
Q. I'm sorry?
**A. State legislative districts, also.**
Q. Right.
**A. But that was a different story.**
Q. Okay. Thank you.
So now back to today's redistricting process. When did you first start planning for the 2021 redistricting process?

Page 34

**A. Probably 2019. You know, we were working on trying to come up with some type of schedule. But with the census being delayed and getting the numbers so late, we were working on a schedule of public hearings and working on the guidelines.**
Q. Do you remember when in 2019 you started?
**A. No, ma'am.**
Q. So what was your first step?
**A. We had a -- the first step was actually getting me reelected house chairman after the 2018 election. Because I was -- I assumed -- I came on the committee in 2000 and, I want to tell you, 17 when Mr. Davis stepped down. And then after the election, I had to be reelected by my colleagues to serve as the house -- the house cochairman.**
**Then we began the process of updating the guidelines to conform with what we considered to be the law dealing with reapportionment and redistricting to make sure our guidelines complied with the law.**
**Then we had extensive conversations, Mr. Davis and Mr. Dorman and Senator McClendon and I, in the reapportionment office about public**

Page 35

**hearings and how we were going to address public hearings, which all changed because of COVID-19.**
**We began the process of laying out those -- talking about those meetings and where we were going to have them and how we were going to publicize them and conduct them.**
Q. Okay. So do you recall when you first started thinking about updating the reapportionment guidelines?
**A. 2019, 2000. I can't remember the exact date. But that was one of the first things we addressed, making sure our guidelines were updated based on the current reapportionment law and court cases.**
Q. Is it required to update the guidelines every redistricting cycle?
**A. Well, the law changes. So yes, you have to update your guidelines. I mean, the courts are constantly telling us -- handing down their rulings. And we have to update based on those rulings.**
Q. But it's not required by Alabama law or by any legislative rule to update the guidelines every -- you know, every cycle?
**A. I can't imagine not updating the guidelines going into this process if you know the**

Page 36

Page: 9 (33 - 36)

Caster Plaintiffs' Exhibit 89, Page 10

**law has changed. You have to.**

Q. If you could just give a broad overview or a timeline of the 2021 redistricting process for me.

A. **We were supposed to receive our initial numbers at the end of January. Then they -- then we were going to get our finals in April.**

Q. I'm sorry?

A. **We were supposed to get our initial -- if I remember this correctly, we were supposed to get our initial census numbers in, I think, January. Yeah, January. And then we would get our final numbers in April.**

**That all got bumped to -- we didn't get any numbers until the middle of the August. And we were trying to work out a schedule of public hearings from the spring and the summer. But we couldn't -- we couldn't engage in those public hearings because we had no numbers.**

**And when we finally got our numbers in the middle of August, we immediately -- we laid out a series of public hearings, sent a notice to all the members of the committee. I think it was 22 public hearings we had -- we proposed.**

**Representative Hall sent us a letter**

**requesting six additional public hearings in various parts of the state. We accepted her request and added the six additional public hearings Ms. Hall asked for, then published a list to everybody in the media and advertised that those are the public hearings we would be holding all over the state. As soon as we could get it to, we got it to.**

**And as soon as those meetings were over, we took that information and began drawing districts. Because the secretary of state had given us a deadline of the 1st of November to have our plans passed in order for all the work behind the scenes that has to be done to get ready for the next election to occur.**

Q. So you started drawing the maps after the public hearings; is that correct?

A. **Yes, ma'am.**

Q. Okay. And when you said "we," who do you mean?

A. **Well, Randy Hinaman. And we began meeting with the individual house members about their -- their individual districts.**

Q. Okay. But for the congressional map, you mean primarily Mr. Hinaman?

A. **Yes.**

Q. And then what happened after that point?

A. **We worked right up to the last possible minute drawing those -- meeting with members, trying to adjust the districts to make sure the members were happy with them.**

**But I'm talking about the state legislature.**

Q. Right. Right.

A. **The congressional, Mr. Hinaman met with the members of congress, and he worked on that. He -- I didn't. I was busy working on the state house.**

Q. Okay. For the congressional districts, what happened for you in between the public hearings and the reapportionment committee meeting at the end of October?

A. **Mr. Hinaman met with the members of congress. I did not.**

Q. Did you do anything else during that time with respect to the congressional map?

A. **No, ma'am. The closest I came, I walked in the room and he was on a team call with a member of congress. I picked up my paper and walked out of the room. I wasn't there but just a minute.**

Q. Okay.

A. **I didn't participate in any of those**

**meetings.**

Q. And what happened -- I'm just trying to get like a timeline of events rather than the specifics.

So after the reapportionment committee met on, I think, October 26th of 2020, what happened after that point?

A. **We adopted the plans. And we were in special session dealing with the prisons. So we went -- we went straight into special session dealing with the prison system.**

**I was not there that week. I was only there one day. I had a prior contractual obligation to finish a construction project that I had to stay on. So I came one day that week, and that was it.**

Q. Okay. And regarding redistricting, what was the first thing that happened for redistricting after the reapportionment committee on October 26th?

A. **I don't understand the question.**

Q. Well, what happened next? How -- eventually the maps were passed and signed by the governor, including the congressional map. So they made it out of the reapportionment committee. Then what happened?

A. **They made it out of the committee. They**

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

**became public. And when we went into the special session for redistricting, they were introduced in bill form.**

Q. Okay. And can you explain in sort of a Schoolhouse Rock way how that bill became a law?

A. **It was brought up -- it was introduced into the house. It passed. It was assigned to the state government committee where it passed. It was given a second reading on the floor. It was put on the calendar. It was brought up on the floor, and it was passed by the members of the Alabama house of representatives.**

Q. And then what happened?

A. **It was sent to the senate --**

Q. Okay.

A. **-- where it went to committee, went to the floor, and passed, was signed by the governor.**

Q. So I just wanted to make sure that I had the full -- the full process.

A. **All nine steps occurred.**

Q. Okay. Well, I'm glad that I paid attention to Schoolhouse Rock, then.

I'm sorry to keep jumping back and forth, but I'm just going to go back to the 2001, 2002 process really quickly.

Page 41

Which district did Representative Callahan represent?

A. **The 1st congressional district.**

Q. And what area of the state is that?

A. **At that time, it was Mobile, Washington, Clarke, Monroe, Escambia, and Baldwin County.**

Q. Okay.

A. **I believe it lost Wilcox County in -- I believe the Buskey Reed plan took Wilcox County out of the 1st congressional district, I believe.**

Q. Okay. And do you remember the racial makeup of Representative Callahan's district?

A. **No, ma'am.**

Q. Do you have any sense at all?

A. **No, ma'am.**

Q. 10 percent black, 90 percent black?

A. **No, ma'am.**

Q. None at all?

A. **No.**

Q. Let's say that Representative Callahan's district had -- previously had 40 percent black population. If, in the redistricting cycle, his district had an increase of black voters in the district to 50 percent, would that be something that you would have supported?

Page 42

A. **I can't answer that. That's speculation. I don't know.**

Q. Okay. When you said that you were protecting Representative Callahan's seat, what does that mean?

A. **There was a plan produced that used the Mobile ship channel to come up. They turned and used the Dog River channel. And they hit Congressman Callahan's property line, and they came down his property line to the road and went up the road to the other side and back down his property line and back out into the Dog River ship channel and back out into the Mobile ship channel. They carved just his house into the 1st congressional district and sent it all the way to Dothan.**

Q. So what was your -- what was your response to that?

A. **It's quicker to drive to Huntsville, Alabama, from Mobile than it is to drive to Dothan. Think about that. It's quicker for us to get in a car and drive to Huntsville, Alabama, than it is to drive to Dothan or Henry County. The congressman was adamant that we would not do that to him.**

Q. So what was the ideal outcome of the -- of that situation?

Page 43

A. **We kept the core of the existing 1st Congressional District intact. We kept Washington, Clarke, Mobile, Monroe, Escambia, and Baldwin County.**

Q. Okay. And what about Representative Callahan's house?

A. **All of Mobile County was in the district.**

Q. Okay.

A. **All of Mobile, all of Baldwin, all of Washington, all of Monroe, all of Escambia. And I believe that was the first time Clarke County was split to achieve zero deviation.**

Q. So your aim was -- is it fair to say that your aim was to keep Senator Callahan's residence within his district?

A. **Yes, ma'am.**

Q. Okay. Is that what you mean by protecting his district?

A. **Well, I mean, to draw just the lot his house is on out of the district using a ship channel or a boat channel, we didn't consider that to be reasonable.**

Q. So what would be reasonable?

A. **Well, I mean, they didn't have the**

Page 44

Page: 11 (41 - 44)

Caster Plaintiffs' Exhibit 89, Page 12

**Gingles test then. But we didn't consider that to be compact, concise, or a community of interest to send one lot in Mobile County and share it with Dothan in Houston and Henry County.**
Q. Do you mean -- were there any other ways that you wanted to protect Representative Callahan's seat?
A. **Well, of course. He was elected by the people in that district, and they -- he wanted to continue to represent those people. That's why he won reelection so overwhelmingly every time he ran.**
Q. Is it fair to say that you wanted to make sure that Representative Callahan remained in the 1st District so that he could win reelection?
A. **I wanted to make sure he continued to represent the people that had elected him, yes. And they continued to reelect him overwhelmingly for years.**
Q. So you mentioned that one of the first steps of the 2021 redistricting cycle were updating the reapportionment committee redistricting guidelines; is that correct?
A. **(Witness nods head).**
Q. When did that happen?
A. **I'm going to yield to the attorneys.**

**But I remember sitting at a table with Mr. Davis, Representative McClendon, and Mr. Walker, and we began the process of working on those guidelines to update.**
MR. OSHER: We can't hear you.
A. **I remember sitting at a table in the reapportionment office with Mr. Davis, Senator McClendon, Mr. Walker, and myself, and we began reviewing the guidelines from the past redistricting. And the discussion to update them based on new -- the current law and court rulings.**
**I think the Gingles test came into play first. Because I don't think Gingles was in effect in 2011. But I'm not an attorney.**
MR. WALKER: I'm going to instruct you, given that Mr. Davis and I were there, not to discuss what we discussed at that meeting because it was an attorney-client meeting.
THE WITNESS: Okay.
Q. When did that meeting occur?
A. **2019 or '20.**
Q. Do you have any sense of what time of the year?
A. **No, ma'am, I don't remember.**
Q. And did you bring any materials to that

meeting?
A. **No, ma'am.**
Q. And was anybody in -- was anybody else in attendance other than Mr. Walker, Mr. Davis, and Senator McClendon?
A. **Not to my recollection, no.**
MS. SADASIVAN: The audio has stopped again.
MS. WELBORN: Can you hear me, Kathryn?
MS. SADASIVAN: I can hear you now. But the audio keeps coming in and out.
Q. Did you -- was that your only meeting to talk about revising the reapportionment committee redistricting guidelines?
A. **No.**
Q. How many other meetings did you have, if you recall?
A. **I don't recall.**
Q. Do you have a sense of how many meetings you had?
A. **I would hate to put a number on it. But it was several.**
Q. Five, let's say?
A. **It was several meetings.**
Q. Okay. But less than ten?

A. **I would -- I would say that, yes.**
Q. Okay. And who was at those meetings?
A. **I remember Mr. Davis, Senator McClendon, Mr. Walker, and myself.**
Q. Anybody else?
A. **I'm going to say maybe a member of the reapportionment staff was there.**
Q. From the reapportionment office?
A. **Yes.**
Q. And do you know who that was?
A. **To err on the safe side, I would say Ms. Overton.**
Q. And what's her role?
A. **She is the director of the reapportionment staff.**
Q. And do you remember when that meeting occurred?
A. **No, ma'am.**
Q. And what was the goal of these meetings?
A. **To write committee guidelines that we thought would conform with the existing reapportionment law.**
Q. So on May 5th 2001 there was a meeting of the reapportionment committee; is that right?
A. **I believe you.**

Q. Okay. Well, when were there meetings of the reapportionment committee since 2019?
**A. I -- I couldn't answer that. I just don't remember.**
Q. Do you remember any --
MR. ROSBOROUGH: I'm sorry. Everyone's audio has completely dropped out again.
MS. FAULKS: We should take a break.
MS. SADASIVAN: I think we should break possibly to resolve the audio issues quickly because we keep going in and out.
THE VIDEOGRAPHER: We are off the record. The time is 10:03 a.m.
(Recess was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 10:22 a.m.
THE WITNESS: Can they hear me now? Is this better?
MS. SADASIVAN: Right. Thank you so much.
Q. So before the break, we were talking about the reapportionment committee. How many times has the reapportionment committee met in 2021, if you can recall?
**A. I don't remember. 20 --**

Page 49

Q. This year.
**A. I don't remember the exact number.**
Q. A handful?
**A. Yes.**
Q. Okay. Is there a regular schedule for the reapportionment committee to have meetings?
**A. No reapportionment committee I've ever served on had a regular schedule.**
Q. So how --
**A. I mean, like my state government committee meets every Wednesday at 3:00 o'clock.**
Q. Right.
**A. Reapportionment doesn't do that.**
Q. So how do you decide when you have to have a meeting?
**A. When we have something to discuss.**
Q. Okay.
MS. WELBORN: So if there -- so we know that there was a reapportionment committee meeting on May 5th and one on October 26th. Mr. Walker, if there were any other committee meetings for the reapportionment committee, we would request any records or recordings of those.
MR. WALKER: Let me represent to you that I'm not aware of any other reapportionment

Page 50

committee meetings in 2021 except for the May 5th and the October 26th meetings.
MS. WELBORN: Okay. Thank you. I just wanted to double-check.
Q. So for the May 5th meeting, do you -- did you do anything to prepare for the meeting that you recall?
**A. Nothing out of the -- that's -- that's the day we voted on the guidelines.**
Q. That's correct.
**A. Yes. I mean, I read the proposed guidelines and went over them with the attorney.**
Q. Okay. Did you do anything else to prepare?
**A. No, ma'am.**
Q. And other than the meetings with the attorneys and Senator McClendon to talk about the revised guidelines, did you talk to anyone else about the May 5th meeting ahead of time?
**A. I may have talked to the committee members in the house, but I don't recall any specific conversations.**
Q. So at the May 5th meeting, what happened?
**A. The guidelines were sent to the members**

Page 51

**prior to the meeting for their review and input. And at the meeting, we talked about the guidelines. And if I remember correctly, the attorney explained them to the members of the committee, and we passed them. We adopted them.**
Q. And do you remember when the proposed guidelines were sent to members of the committee?
**A. No, ma'am. I know it was prior to the meeting.**
Q. And did you take any notes at the meeting?
**A. No, ma'am.**

(Plaintiff's Exhibit 2 was marked for identification.)

Q. So I would like to introduce as Plaintiff's Exhibit 2 the reapportionment committee redistricting guidelines from May 5th of 2021. There's a copy.
And did you have any role in drafting this document?
**A. It was reviewed with me by Mr. Walker, and we discussed it.**
Q. Okay. Did you have any other role in

Page 52

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

drafting the document?
A. **No, ma'am.**
Q. Who drafted the document?
A. **I would say Mr. Walker. Now, who he was in conjunction with, I do not know.**
Q. And is that normal to have an attorney draft the guidelines, would you say?
A. **Attorneys draft about everything we do. I'm not an attorney. I make no bones about it.**
Q. So the members of the reapportionment committee did not draft this document; is that correct?
A. **They were -- they reviewed it and the attorneys explained it to them.**
Q. Okay. Did anyone on the reapportionment committee make any changes to the document at that -- at the May 5th meeting?
A. **Not that I remember.**
Q. Do you know if they made any changes after the meeting? I guess they couldn't have if you voted on them.
A. **Right.**
Q. Sorry. I answered my own question for you.
So what are these guidelines?

Page 53

A. **That's the parameters that we used in order to draw districts we thought complied with the Voting Rights Act and the 14th amendment to the Constitution and the court rulings that the courts had handed down in redistricting.**
Q. And so what is your understanding -- when you say "comply" with the Voting Rights Act or the constitution and court rulings, what do you mean by that?
A. **I mean, it deals with drawing districts on a race neutral -- race neutral. We didn't look at race while we were drawing the districts. And it complies with not putting incumbents together and respecting single-member districts and eliminating contests between incumbents. Everything is spelled out here. That was just a few of the highlights.**
Q. And other than compliance with federal laws, are there any other reasons why you have the guidelines?
A. **Just a road map for everybody to follow when we're drawing lines. It's agreed to by the committee and the members of the committee and what we prioritize as what we need to do.**
Q. And do you recall what updates there were to the law that needed to be put into the

Page 54

guidelines?
A. **I don't recall any specifics. But there were a -- there were a handful of changes to update. But I don't remember the exact specifics.**
Q. And who provided you with those specifics?
A. **Our attorney.**
Q. Mr. Walker?
A. **Yes.**
Q. And do you know -- do you know why those specifics were chosen?
A. **It was my understanding that the courts had handed down additional rulings since the last reapportionment guidelines were adopted. And we updated them to reflect those changes in the law.**
Q. And do you know how those specifics were chosen?
A. **Changes in the law in courtrooms.**

(Plaintiff's Exhibit 3 was marked for identification.)

Q. Let me introduce Plaintiff's Exhibit 3. This is the proposed guidelines handout.
Do you recognize this document?

Page 55

A. **It looks like the one I saw earlier, yes, ma'am, back in May.**
Q. And when you say you saw it earlier, could you explain?
A. **Back during the discussion of the guidelines.**
Q. And who provided this document to you?
A. **Mr. Walker.**
Q. And do you know when he provided it to you?
A. **Prior to -- I believe every member of the committee saw these -- the existing, the proposed changes, and the enrolled changes prior to the meeting for their review.**
Q. And did you see it before -- as a cochair, did you see it before any of the other members of the reapportionment committee?
A. **Yes, ma'am.**
Q. Did you have any role in drafting this document?
A. **No, ma'am, other than it was reviewed with me prior to that.**
Q. Okay. But you did discuss revisions to the guidelines prior to this document --
A. **Yes, ma'am.**

Page 56

Page: 14 (53 - 56)

Caster Plaintiffs' Exhibit 89, Page 15

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

Q. -- being drafted?
A. **Yes, ma'am.**
Q. Do you know if any of your discussions went into the creation of this document?
A. **I couldn't answer that question.**
Q. Okay. Do you know if any of the updates that you wanted to make to the guidelines made it into this document?
A. **I know I was in favor of the 5 percent deviation.**
Q. And that's for the state --
A. **Yes.**
Q. -- legislative maps, correct?
Anything else?
A. **Not that I recall.**
Q. Okay. Do you know what the process was for drafting this document?
A. **Our attorney met with us and we went over the old guidelines, some proposed changes, and what we thought we needed to update to comply with the law.**
Q. And did you suggest any changes?
A. **The 5 percent.**
Q. Anything else?
A. **Not that I recall.**

Page 57

Q. And just to make sure, other than Mr. Walker, Mr. Davis, and Senator McClendon, and perhaps one member of the reapportionment committee, did you speak to anyone else about revising the guidelines prior to the May 5th meeting?
A. **I can't recall.**
Q. Were the -- so on this document there are the 2010 guidelines. Would you say that it's fair -- is it fair to say that those were the basis for the 2021 guidelines?
A. **I would say that, yes.**
Q. Why did you choose to rely on the 2010 guidelines rather than starting from scratch?
A. **Because the 2010 were based off the 2002 guidelines, I would assume. I wasn't there.**
Q. Right.
A. **But I would just assume that they used the 2002 as the basis for the 2010, and we used them for the 2020.**
Q. Is there a reason why you would want to rely on the past documents?
A. **Because we had passed plans that were approved by the justice department under Section 5. In 2002, remember our plan -- our congressional plan was precleared by the United States Department of**

Page 58

**Justice under Section 5.**
Q. Okay.
A. **And they were -- they were drawn fairly closely alined with the committee guidelines at that time.**
Q. And so you believe that the 2010 guidelines, then, were based on the 2002 guidelines for that reason?
A. **What I remember from 2002, when they brought the 2010, I saw similarities that I remembered from both of them to the -- to the 2020 guidelines, yes.**
Q. Okay. So one of the reasons that the 2021 guidelines are based on the 2010 guidelines is because you believe that they would be -- they would have complied with Section 5 of the Voting Rights Act had that -- if that were still in effect?
A. **They would comply with Section 1 of the Voting Rights Act. I mean Section 2. I'm sorry. Section 2 of the Voting Rights Act. But they were precleared under Section 5.**
Q. Right.
A. **And I also thought they would comply with the 14th Amendment, one man, one vote.**
Q. Okay. Is there any other reason why you

Page 59

based the 2021 guidelines off of the 2010 guidelines other than that you think that it would -- that they would have complied with federal law?
A. **Well, when I read the 2010, they were very similar to what I remember the 2002 guidelines. I remember specifically the ten-day rule was there in 2002.**
Q. Is it a principle that the committee follows to generally use what has come before, use materials that have come before?
A. **Yes.**
Q. Out of ease of use or out of tradition or because the -- you know, because you believe that they comply with the law? What -- what is the reason for reusing?
A. **I would say all three of those.**
Q. Is anything more important, any of those more important than the other?
A. **Complying with the law.**
Q. That's pretty important, huh?
A. **Yeah.**
Q. I think we all can agree on that.
And do you know how the 2010 guidelines were created --
A. **No.**

Page 60

Page: 15 (57 - 60)

Caster Plaintiffs' Exhibit 89, Page 16

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

Q. -- other than being based off of the 2002?
**A. No, ma'am.**
Q. Who would know how the 2010 guidelines were created?
**A. I would say Mr. Walker.**
Q. Okay. Anybody else?
**A. I wasn't there.**
Q. Okay.
**A. I take that back. I said Senator McClendon was there in 2010. I wasn't.**
Q. Let's see. If you could flip to Pages 7 and 8. Let's start with 7. And as you'll see, that third box is entirely striked out in the middle with the proposed changes.
**A. Uh-huh.**
Q. That's the section on communities of interest. If you'd like to read through those boxes on Pages 7 and 8, it might be helpful.
**A. Okay.**
Q. So it looks to me like this subsection was entirely rewritten. Do you know why?
**A. I can't answer with certainty. But I believe it goes back -- and I'm just supposing -- to the Gingles test.**

Page 61

Q. And what's your understanding of the Gingles test?
**A. Compactness, contiguity, and communities of interest, I would assume. I don't know.**
Q. Can you think of any other reason why the section on communities of interest would be entirety rewritten?
**A. Other than a court ruling that gave a better definition, I don't know.**
Q. Did you have any role in this particular change?
**A. No, ma'am.**
Q. Do you know who made this particular change on the document?
**A. You would have to talk to the attorney.**
Q. Talk to Mr. Walker?
**A. Mr. Walker.**
Q. In this section, if you compare the 2010 guidelines to the enrolled guidelines, the 2021 guidelines eliminate partisan interest from the definition of communities of interest.
So in 2010, partisan interests were part of the definition of community of interest. But in 2021, they're not. Do you know why that is?
**A. No, ma'am.**

Page 62

Q. Who would know why?
**A. I would suggest you talk to my attorney.**
Q. Okay.
**A. When you get into legal definitions --**
Q. I understand that lawyers are pretty fond of legal definitions.
So in the May 5th meeting, you mentioned that Mr. Walker discussed these proposed changes. Do you know if there were any other changes made at that meeting other than the ones proposed by Mr. Walker?
MR. WALKER: I think the way that question is asked, I need to assert the attorney-client privilege.
Q. I guess what I'm saying is did any -- are there any differences between these proposed changes that were presented in the meeting and the final version in Exhibit 2, the final guidelines? Did anybody suggest any other changes?
**A. Not that I recall.**
Q. So the version that is here of these proposed changes, they were accepted in whole and no other changes were made?
**A. No changes were made after the committee adopted them.**

Page 63

Q. Well, I guess I'm talking about at the -- at the committee meeting.
**A. I don't -- I don't remember.**
Q. Okay. And did you talk to anyone about the May 5th meeting after it happened?
**A. I'm sure I did. But I don't recall.**
Q. Do you recall what you would have talked about?
**A. The general guidelines that we adopted, the guidelines that would control the committee's -- the way we drew plans. But they were public record at that point.**
Q. So what happened next in the redistricting process?
**A. Then we began trying to work on public hearings and how we were going to handle public hearings with COVID-19.**
Q. Okay.
**A. So we had -- we had to come up with a way to handle the public hearings and where we were going to hold them and how we were going to hold them.**
Q. So why did you hold public meetings?
**A. It's part of the guidelines, and it's tradition. They've been held -- I've heard they did**

Page 64

Page: 16 (61 - 64)

Caster Plaintiffs' Exhibit 89, Page 17

**them in 2010. I know we did them in 2002.**
Q. And what's the purpose of the public meetings?
A. **To take input from the community at large, the people that live in the communities and what they like or dislike about the existing plan and what they would like to see changed.**
Q. Was there a draft -- when you say "existing plan," what do you -- what do you mean by that?
A. **The plan that we were currently operating under.**
Q. So you mean the 2011 map?
A. **Yes.**
Q. So the purpose of the public meetings is for people to express what they like or do not like about the current setup?
A. **Yes.**
Q. Is there any other reason why public meetings are held?
A. **Well, we go to the public and show them the existing plans and where the population has shifted and how they would like to see the lines drawn.**
Q. So you mentioned that there were public

Page 65

meetings that were also held in 2001 when you were part of that redistricting process. Do you think that people's -- do you recall if people's -- their concerns are different now than they were then?
A. **Explain what you mean by that question.**
Q. Well, I guess I'm not talking about the nitty-gritty little, you know, this block here, this block there, but general opinions about how maps should be drawn or what a community of interest is or anything like that.
Do people -- do you think that people felt the same way at public meetings back in 2001 as they did in the meetings this year?
A. **I would say, generally speaking, they held the same views.**
Q. And what sorts of views are those?
A. **I mean, some communities wanted to -- I'm having -- I would have to separate congressional from --**
Q. Right.
A. **-- legislative.**
**Some people wanted to see maps drawn differently. There was numerous people there to present the map for the League of Women Voters and discuss it. They asked us to look at that map. And**

Page 66

**there were people that liked their members of congress and wanted the maps to stay the way they were.**
Q. Was there a draft of the congressional map prepared before the public meetings occurred?
A. **No, ma'am.**
Q. And when did the public meetings occur? Not every single one, but in general.
A. **As soon as we had numbers from the census bureau and we could tell the people whether their congressional district was overpopulated or underpopulated and how many people they had to gain or lose based on the new -- we didn't know what the number was going to be to get to zero deviation on the congressional map until we had the census numbers.**
**So we couldn't go out and talk to people about how they wanted to see their congressional district change in order to comply with one man, one vote.**
Q. Why is it -- why was it necessary to have the census numbers if you don't have a map yet? I guess I'm curious why the -- why the census numbers are necessary to hold the public hearings.
A. **We had a map.**

Page 67

Q. The 2010?
A. **The existing map.**
Q. Okay.
A. **And then after we got the numbers, we knew which congressional district was over and which congressional districts were underpopulated and the amount of people we needed in each congressional district in order to comply with one man, one vote.**
Q. Okay.
A. **The same thing we did in 2001. We presented the existing map to the people in all the public hearings. And after the public hearings, then and only then was a map produced. And we had a lot more time in '01.**
Q. Right.
Did the public have access to the numbers of people that would need to move between districts, about the overpopulation and underpopulation numbers? Did they have access to that?
A. **That was gone over in every public hearing.**
Q. Okay. Why was it necessary to have those numbers before holding the public hearings?
A. **So we could -- we knew how many people**

Page 68

**went into a district and how many people were in the current district.**
Q. Well, I guess people have concerns about -- well, did people have concerns about districts other than, you know, the pure numbers? Did they have opinions about how maps should be drawn period regardless of the census numbers? Do you understand what I'm saying?
**A. If you are referring to the League of Women Voters who sent somebody to virtually every --**
Q. I'm talking in general.
**A. There were people there every -- every meeting that had their talking points that basically read them that all said the same thing. They wanted to adopt another plan that created two majority minority districts.**
Q. Well, I assume that there were people at the meetings who didn't share that view.
**A. Yeah.**
Q. Do you think -- I guess wouldn't it be possible to have that opinion before the census numbers were even out?
**A. Well, they did have the opinion before the numbers were out.**
Q. Okay. I guess I'm just not really

Page 69

understanding why the -- why you had to wait to hold the public hearings until the census numbers were out.
**A. Accuracy.**
Q. Okay. So you had mentioned that at the public meetings, public hearings, some people liked their members of congress and wanted to keep them. What did you mean by that?
**A. They were happy with the representation they were receiving from their elected representatives.**
Q. So what does that mean for those representatives' districts? Would they want to keep them the same or --
**A. Our guidelines say we try to protect the core of the existing districts, yes.**
Q. Well, I guess if you're happy with your representative, that doesn't mean that -- you could still live in the district and have the rest of the district change and still keep your representative if like, you know, they're on the margins. The rest of the district could change. If you live in the center of the district, you're still going to keep your representative, right?
**A. I couldn't answer that question.**

Page 70

Q. Well, there are people -- so the map changed between 2010 and today, right?
**A. Yes.**
Q. And there are members who have kept their -- there are citizens who have kept their representatives even though the lines of the districts have changed, right?
**A. Correct.**
Q. So you could keep your representative even though the line of the district changes, correct?
**A. Correct.**
Q. So when people are saying "I'm happy with my representative," are they just saying that they don't want the district to change at all? Or what -- what do you think that they're saying?
**A. I would hate to interpret what they would mean by that. They said they were happy with their representative.**
Q. Okay. And how many of the public hearings did you participate in?
**A. All 28.**
Q. Did you go in person --
**A. Yes.**
Q. -- to all 28?

Page 71

**A. Yes. I want to say I -- I don't remember missing any of them, no.**
Q. Okay. And how were the public meetings held?
**A. Virtually, just like this meeting. We were -- we were in COVID and we had to get as many locations as we could to get as much input as we could in a very compressed time period. So we did it remotely.**
Q. And in person?
**A. Yes. We had one in the state house.**
Q. But 27 out of 28 were only held virtually; is that right?
**A. Just like this meeting, yes, ma'am.**
Q. Okay. And what was your role in the public meetings?
**A. I was to go over the -- to listen to the house, when they talked about the state house districts. And I listened to all the house, congressional, senate, state school board, yes.**
Q. And were you just there to listen? Or did you do anything else?
**A. I listened.**
Q. And did you answer any questions from the public?

Page 72

A. I believe I answered one.
Q. And what was that question?
A. I don't remember.
Q. Was it about the congressional map?
A. I don't remember.
Q. And was Mr. Walker present at these public meetings?
A. He was our moderator. Yes, ma'am.
Q. Okay. And what does that mean?
A. He conducted the meeting.
Q. Okay. And is it fair to say that Mr. Walker primarily addressed or answered audience questions during the hearings?
A. There was a time when people could either ask a question or submit a question electronically.
Q. Okay.
A. And he would address those questions.
Q. And he addressed most of -- I'm sorry. Of the questions that were answered, Mr. Walker was the one who answered most of them?
A. Yes, ma'am.
Q. Okay. And did audience members ever direct questions to you specifically?
A. I can't remember.

Page 73

Q. And do you know if they directed questions to Senator McClendon specifically?
A. I don't remember.
Q. Did you prepare for any of the public meetings?
A. We had the maps in front of us and the demographic shifts in front of us. And we would -- I would read those as we went through the meetings.
Q. And by "the maps," you mean the 2011 --
A. Yes.
Q. -- maps? Because you didn't have draft maps of the 2021 --
A. No.
Q. -- at that time. Okay.
And what demographic figures are you talking about?
A. The over and underpopulations, whether they had too many or too few people in them to stay within -- of course, I'm kind of talking legislative here and not congressional. Because congressional, we went to zero deviation. But we looked at the congressional districts to see which ones were overpopulated and which ones were underpopulated.
Q. Okay.
A. And how many people would have to change

Page 74

in order to get to zero deviation.
Q. And who created that document?
A. I'm not sure.
Q. Do you know -- sorry.
Did you take any notes during any of the public meetings?
A. Any notes I took, I turned over in my evidence. They were handwritten on those -- those documents.
Q. But you did take some --
A. Very few.
Q. -- notes? Okay.
Did you take any notes after any of the public meetings?
A. No, ma'am.
Q. And did you talk to anyone about the -- what happened in the public hearings?
A. I'm sure I did. But I don't recall specifics.
Q. Did you talk to Mr. Hinaman about what happened in the public meetings?
A. Yes, ma'am.
Q. And what did you tell him?
A. Most of the conversations at the public hearings were dealing with state legislative races,

Page 75

if I remember correctly.
Q. But occasionally people talked about congress, right?
A. Yes. But we had not seen -- I had not seen the numbers on any plans until after they were submitted to reapportionment.
So until I saw the -- you know, that ten-day rule kicked in and these plans that had been drawn off campus were submitted to the reapportionment office. Then and only then could we look at the demographics, the population changes, and the deviations in those districts.
Q. Well, you had the demographic shift numbers to get to zero deviation during the public meetings, right?
A. I had the number that we needed to get to, correct.
Q. So you did talk to Mr. Hinaman about what was brought up at the public hearings about congress, correct?
A. We talked -- I would assume we discussed it, yes.
Q. And do you recall any specifics of what you talked about?
A. Just the difference -- we were trying to

Page 76

**get to zero deviation.**
Q. Did you relay any specific concerns that someone had at a public meeting about the congressional map to Mr. Hinaman?
**A. I was concerned about the deviations in any other proposed plans.**
Q. Well, the public, though, I'm talking about, what they brought up at the public hearings. Did you relay any of those specifics to Mr. Hinaman?
**A. I don't remember.**
Q. Do you recall discussing any of those kinds of specifics that the public had about congress to anyone else?
**A. I'm sure we did. I mean, it was the same talking points at every public hearing on the congressional plan.**
Q. I mean, that suggests that there was really only one view about the congressional map coming up at the public hearings.
**A. Well, it was the plan produced by the League of Women Voters. Every -- if I remember correctly, almost every single public hearing we had, somebody stood up with their talking points and read them to us and entered them into the record.**
Q. But not everybody who attended the

public hearings would have known about the League of Women Voters' map, right?
**A. Somebody was there at virtually every meeting that I remember to talk about it.**
Q. Did anyone discuss anything about the congressional map that wasn't related to the League of Women Voters' map that you recall?
**A. I don't recall.**
Q. Do you know how many of the 28 meetings were held on weekdays during working hours, 9:00 to 5:00?
**A. Like this one here, all but one of them.**
Q. Okay. And most people are working on weekdays during working hours from 9:00 to 5:00, right?
That's a yes?
**A. That's -- I know a lot of people that work different hours.**
Q. But most people work on weekdays from the hours of around 9:00 to 5:00, would you say?
**A. I would say it's very common, yes.**
Q. Okay. Do you think that that had an impact on who could attend the public meetings?
**A. I don't know.**
Q. I mean, if I'm at work, I tend to not be

doing other things that aren't work related during the work hours. Do you think that that would have had an impact at all on --
**A. Well, the schedule of the public hearings was public. It was released. The links were public. You might not have been able to make one specific meeting, but you could have logged into any of the other 28 at any given time on any given day that we held them and listened and interjected into the congressional plan.**
Q. Well --
**A. I mean, you had 28 opportunities to log on over a three-week period that you could have come in and watched. It's not like you had to drive to a location like in the old days when you had to drive somewhere during the daytime to come hear us. You were able to listen at any time.**
Q. But even so, if you work at McDonald's from 9:00 to 5:00 and you're at the cash register, how are you going to attend one of those meetings?
**A. There are 28 different meetings at all different times of the day.**
Q. Well, not -- they're all between 9:00 and 5:00 except for one.
**A. Then you could have logged in that night**

**and watched.**
Q. For that one meeting?
**A. Exactly. And you could have spoken your mind or emailed in your questions or your concerns at that time.**
Q. Okay. But you and others from the reapportionment committee set the times of those meetings, correct?
**A. Yes, ma'am.**
Q. Primarily you and Senator McClendon; is that right?
**A. In conjunction with the other members. Like I said, we produced a list of 22. And Ms. Hall asked us to add six meetings in communities she thought did not have enough representation or enough opportunities. So we added those additional six meetings and included them in our press releases so anybody could log in.**
Q. Did you consider holding more meetings in the evening other than just the one?
**A. I couldn't answer that question.**
Q. Before the public hearings happened, Senator McClendon told the press that the new maps wouldn't cause, quote, any surprises for the candidates or for the voters. I'll just represent

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

to you that that happened.
Q. Do you know what the basis was for that statement?
**A. You'll have to ask Senator McClendon.**
Q. Do you agree with that statement, that even before the public hearings would have happened, that there wouldn't be surprises for candidates or for the voters?
**A. I think every time you change the lines, you surprise people.**
Q. But on the whole, would you say that that statement was true?
**A. Well, when your guidelines are to keep the core of the existing districts intact as much as practicable, it shouldn't be too earth shattering, some of the changes around the edges.**
Q. And do you know if any work had been conducted on drafting the congressional map prior to the public hearings?
**A. No, ma'am.**
Q. Do you know if any decisions on the lines for the congressional maps had been made before holding the public hearings?
**A. No, ma'am.**
Q. Are you familiar with the black belt

Page 81

counties in Alabama, that term?
**A. I sell timberland. I work all through the black belt.**
Q. Okay.
**A. I've spent more time in the black belt than . . .**
Q. And what's your understanding of the black belt?
**A. It's a region in the middle of the state of Alabama that got its name because of the rich soils.**
Q. And what counties are in it?
**A. It's like 28 counties, I think, something like that. I spend most of my time in Wilcox, Marengo, Lowndes, Perry, Hale, those areas.**
Q. And if you could just describe what portion of the state are we talking about.
**A. Central Alabama.**
Q. Do you recall if anyone discussed the black belt at any of the public hearings?
MR. WALKER: What was --
MS. WELBORN: If anyone at the public meetings discussed the black belt.
**A. It's a term that's often used in Alabama. But I don't remember specifically.**

Page 82

Q. Would you agree that the black belt is a community of interest?
**A. It's a very broad area that stretches from one side of the state to the other. I believe it has some communities of interest in it, yes.**
Q. But as a whole, is the black belt a community of interest?
**A. I couldn't answer that.**
Q. Why not?
**A. Because while I work in Wilcox and Marengo and Perry, I don't go to Macon or the counties on the other side. So I don't really know much about them.**
Q. But that's true for other communities of interest in other parts of the state, right?
**A. Explain that one to me.**
Q. I guess if the legislature -- if the reapportionment committee is tasked with approving a congressional map that keeps, you know, communities of interest together, you don't personally know about every community of interest in the same way that you do know about those particular counties, right?
**A. I mean, you know, I'm from Mobile. And we run up and -- it's the river system. So many of**

Page 83

**the families in Mobile come from northern counties because of the way the river system is. We have very little to nothing in common with the people in the Wiregrass. It's not -- it's almost a totally different state over there.**
**So I don't know -- if you're asking me do the people in Wilcox County have something in common with the people in Macon County, I can't answer that. But I know the people in Wilcox County. We go up and down the rivers.**
Q. Right. I guess what I'm saying is you still approve a map even though you don't have personal experience with every single community of interest, right?
**A. The state legislature approved the map, yes, ma'am.**
Q. Well, you voted for it, right?
**A. Yes.**
Q. So just going back to the black belt. Even though you don't necessarily have personal experience with every single county, can you still form an opinion about in general whether that is a community of interest?
**A. I know it's a very rural part of the state of Alabama.**

Page 84

Page: 21 (81 - 84)

Caster Plaintiffs' Exhibit 89, Page 22

Q. Does that make it a community of interest?
A. **I don't know what your definition of a community of interest is.**
Q. Well, the reapportionment committee has a definition of community of interest, right?
A. **Yes.**
Q. So looking at that definition, would you consider the black belt to be a community of interest?
A. **Our definition of community of interest is in certain circumstances to include political subdivisions such as counties, voting precincts, municipalities, tribal lands, reservations, or school districts. Those counties -- the counties are a community of interest.**
Q. Well, it also includes ethnic, racial, economic, tribal, social, geographic, and historical identities.
A. **Yes.**
Q. Under any of those aspects, does the black belt constitute a community of interest?
A. **I know it's -- it is predominantly African American.**
Q. And the black belt is a historical term,

Page 85

right?
A. **Based on the soil, yes, ma'am.**
Q. Okay. And that term goes back quite a long time?
A. **It was developed because of the rich soil in that area.**
Q. So yes or no, under these guidelines, does the black belt constitute a community of interest?
A. **I couldn't answer that question. I just couldn't answer that.**
Q. I don't understand why not.
A. **Because I'm not sure they are politically cohesive and compact and contiguous enough to constitute one.**
Q. What, if anything, did you learn or take away from the public hearings?
A. **What do you mean by that?**
Q. Well, did you learn anything from what you heard at the public hearings?
A. **I walked away thinking most people in the state of Alabama were happy with their representation the way it was in congress.**
Q. And do you recall any specifics about -- about that?

Page 86

A. **The general public -- I mean, every committee meeting had somebody standing up and reading the talking points on the League of Women Voters' plan. So if you read the record, it's all in there. They all talked about that specific plan on their talking points.**
Q. But the --
A. **I don't remember the general public being dissatisfied with the members of congress.**
Q. Meaning other people at the -- at the public meetings --
A. **Yes.**
Q. -- were not --
A. **I don't remember them being dissatisfied, no, ma'am.**
Q. Okay. So how -- but you still took away the idea that the general public was happy with their current representation?
A. **Yes, ma'am.**
Q. Okay. And what did you do with that information?
A. **I mean, it's all part of the permanent record. I remembered it because I listened to all of it.**
Q. Right.

Page 87

A. **We put it in the record. It's all there.**
Q. After -- after the meetings, what did you do with that information?
A. **It was put into the official record of the committee.**
Q. I guess I'm -- did any of what you learned at the public hearings influence how the congressional map was drawn?
A. **I can't answer that. I don't -- I wasn't a member -- that map was drawn by Mr. Hinaman and in conjunction with the members of congress.**
Q. But you did discuss what you learned about the public meetings with Mr. Hinaman with respect to the congressional meetings at some point?
A. **That somebody had come to every meeting and read the League of Women Voters' talking points, yes.**
Q. But did you express to Mr. Hinaman your sentiment that the general public was happy with their representation?
A. **I don't remember.**
Q. Do you remember telling him, about the congressional map, anything other than about the -- from the public hearings other than the League of

Page 88

Women Voters' talking points?
A. **Not that I can recall.**
Q. And how much weight did you give to those -- the sentiment that the general public was happy with their representation in terms of its importance in drawing the map?
A. **We listened to the people. I was anxious to see what the League of Women Voters' map turned out to be.**
Q. Did you -- did you consider it to be more important when the congressional map was being drawn that the general public was satisfied with their representation compared to what was said about the League of Women Voters' map?
A. **You know, when every meeting somebody stands up and reads the same talking points and you could tell they've been prompted just to go say that to get it into the record, I put more weight on the people who came out of a true sense of wanting to express their opinion, not the opinion that was written down on a piece of paper form them by an attorney. What I assume was an attorney. I'm sorry.**
Q. So you gave less weight to those League of Women Voter talking points than you did the

Page 89

people who were discussing on their own that they were happy with their representation?
A. **Somebody that was put in the room to put statements into the record is not, in my opinion, the same as somebody who comes on their own free will and their own fruition to express their personal opinion about their representation.**
Q. So did you give any instructions to Mr. Hinaman to change anything about the congressional map because of the public hearings?
A. **Not that I recall.**
Q. Did you give instructions to anyone else about changing the map because of the public hearings?
A. **Not that I recall.**
Q. At the public hearings, do you recall anyone discussing the need to have two majority black districts for congress?
A. **Two majority black congressional districts, yes, ma'am.**
Q. Yes. Who mentioned that?
A. **I don't recall specifically.**
Q. Was it mentioned often, would you say?
A. **I don't remember.**
Q. Was it something that only came up once

Page 90

or twice?
A. **I don't remember the number of times. But it came up a few.**
Q. A few. But not at every meeting?
A. **I don't remember it coming up at every meeting, no.**
Q. What was your response to the suggestion that there should be two majority black congressional districts?
A. **If somebody could show me a plan that met the guidelines, I would be interested in looking at it.**
Q. And what do you mean by "interested in looking at it"?
A. **I mean I would give it due consideration if it met the guidelines.**
Q. If you have competing maps that all meet the guidelines, how do you choose one over the other?
A. **I would go with the one that's most in line with the guidelines.**
Q. How do you determine what is most in line with the guidelines?
A. **The number of county splits, the deviations.**

Page 91

Q. Okay. Is something -- is one of those factors more important than the other?
A. **Deviations.**
Q. That's the most important factor, in your opinion?
A. **Yes, ma'am.**
Q. And how important are the county splits?
A. **Well, we tried to split as the few counties as possible in order to achieve the zero deviation.**
Q. Just quickly going back to talking about this sentiment that people were happy with their representation. How did you know or how did you determine who was there with their talking points and who was there, you know, coming of their own volition?
A. **If they're reading a piece of paper and it's the same talking points you've heard, I would assume they were sent there to read it. If they're talking extemporaneously and they don't line up with the talking points you've heard before, I would assume they were talking of their own fruition.**
Q. Did you ask anyone at any of the public meetings if they were part of a particular group?
A. **They were instructed by Mr. Dorman to**

Page 92

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

**state their name and who they represented.**
Q. And did you ask any of them if they were sent there by somebody else?
**A. No. They -- when they were called to speak, they were to state their name and who they represented.**
Q. Okay. And did you -- did you consider -- if someone came there, you know, with a prepared set of talking points, did you consider their opinion to be less -- less important to drawing the map than someone who came there to speak extemporaneously, like you said?
**A. I believe I answered that question already, didn't I?**
Q. Do you know if a map with two majority minority districts was proposed at any point?
**A. During the legislative process when we were in session, yes, ma'am.**
Q. Do you know if any were proposed before the special session?
**A. We have a rule that any plan drawn off campus, outside the reapportionment office, has to be turned over ten days before it can be introduced as a bill.**
**So after they were turned over, at**

Page 93

**whatever point they were turned over and they were put through our computers and we could get the information on them, the deviations and the county splits, we looked at them then.**
Q. So if someone submitted an outside plan, let's say, 30 days before the special session, so more than ten days, when would you have had access to that plan?
**A. I don't remember seeing the demographics of any plan that was introduced earlier than that.**
Q. I'm sorry. Could you --
**A. I don't remember seeing a plan that was submitted before then.**
Q. Before the ten days?
**A. Ten days, yes, ma'am.**
Q. Okay. And once a plan is submitted by outside groups, what happens?
**A. It's put through the computer and turned into what we call bill form. And then you have to find a member of the legislature that's willing to introduce it.**
Q. Okay. But you mentioned deviation and demographic data. Does the computer program also give you that information?
**A. Yes.**

Page 94

Q. What --
**A. Until it -- until it reaches that bill form and we can analyze it based on the population and the deviations, I don't consider it a plan.**
Q. Okay. What all information could you look at from any plan at that point?
**A. At that point?**
Q. Uh-huh.
**A. After it's introduced from the outside source?**
Q. Yes.
**A. Then we look at the population, we look at the deviations, we look at the county splits, and we look at the BVAP, we look at the racial makeup of the district.**
Q. And when you say "BVAP," just for the record, what do you mean?
**A. Black voting age population.**
Q. And is that all black or any part black? Do you know?
**A. No, I couldn't answer that. I've seen both columns, but I don't know.**
Q. So just to clarify, you did not see a map for two majority minority or majority black congressional districts prior to the ten-day mark?

Page 95

**A. I did not see a plan that had the deviations in the populations until then. There's a difference between just color coding a map and letting me see an actual plan.**
Q. Okay. What's the difference?
**A. Well, you can -- you can draw anything you want to on a map. But until you actually have the census numbers and the demographic numbers in it, I don't consider it a plan.**
Q. And why not?
**A. Because until I know the population in that district -- the whole basis of redistricting is the 14th Amendment to the Constitution, equal protection, that my vote for a member of congress counts the same as another person in the state of Alabama's vote. That's the reason why we go through this process. It's one man, one vote. And until I look at a plan and the numbers associated with that plan, I don't consider it a full plan.**
Q. So I just want to make sure that I'm getting this right. I'm not trying to ask you over and over and over again.
Is it right that you did not look at what you considered to be a plan, so an analyzed, you know, map with all that demographic information

Page 96

Page: 24 (93 - 96)

Caster Plaintiffs' Exhibit 89, Page 25

and deviation information, until after that ten-day mark?
A. **Until after it was analyzed and I could get the numbers, yes.**
Q. Okay.
A. **Then we looked at it to see what the deviation was, the overall deviation of the plan, and how many splits there were in counties and what counties were split.**
Q. Okay. And at that point, were there any maps that were -- had two majority black districts?
A. **I don't remember seeing two majority black districts. I remember seeing one -- two of what they call opportunity districts, what they were calling -- the districts were not 50 percent minority.**
Q. Could you define your understanding of an opportunity district?
A. **That's what they were calling them. They called them opportunity districts, and they were both under 50 percent minority.**
THE REPORTER: Under 50 percent what?
A. **Minority population.**
Q. And who is "they"?
A. **The people who introduced them, the**

Page 97

**League of Women Voters and -- I can't remember who introduced the bill in the house.**
Q. Okay. And -- sorry. One second.
If a district has under a 50 percent minority population, what is the importance of that number, I guess? Why was that number important?
A. **Under Section 2 of the Voting Rights Act, we can't do anything to diminish the ability or protect a class of minority citizens from electing or defeating a candidate of their choice.**
Q. So if a district has under 50 percent voting age population -- sorry. Under 50 percent minority population, does that automatically diminish their ability to choose a candidate of their choice under Section 2?
A. **You're asking an attorney question.**
Q. Well, I mean, ultimately it's your responsibility to --
A. **It would -- it would -- I would give great caution in order to draw a district that was less than 50 percent, yes.**
Q. Under 50 percent minority population?
A. **Yes. I would be very cautious.**
Q. Okay. And by "very cautious," does that mean you are -- what does that mean?

Page 98

A. **I'm afraid we would run afoul of Section 2 of the Voting Rights Act.**
Q. Okay.
MR. DAVIS: Can I ask how we're doing on time? This was -- I know we had a break, a long break, for audio. This was a two-hour deposition that was noticed. We've got three PI motions we need to get back to work on. This seems to be really dragging.
MS. WELBORN: Well, I mean, we have up to 7 hours under the Rules of Federal Procedure.
MR. DAVIS: You're going to take 14?
MS. WELBORN: I would hope -- I would really like to not do that. But it certainly is our right to do that. I can't really tell you at this point exactly how much longer. But I'm happy to take a break right now to help confer --
MR. DAVIS: I'm hearing a lot of repetition and a lot of arguing with the witness. If you're going to do this discovery before the preliminary injunction hearing, it needs to get pretty focused and be a little sensitive and courteous towards everything that we've got to do on the defense side to get ready to respond to your motions.

Page 99

MS. WELBORN: I understand what you're saying.
MR. ROSBOROUGH: Counsel, I thought we were going to refrain from speaking objections.
MR. DAVIS: What did he say?
THE REPORTER: Refrain from speaking objections.
MS. WELBORN: Let's take a break. Let's go off the record. And we'll come back and talk after that.
THE VIDEOGRAPHER: We are off the record. The time is 11:26 a.m.
(Recess was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 12:06 p.m.
Q. So I'd like to talk about the October 26th reapportionment committee meeting. Do you remember if you did anything to prepare for that meeting?
A. **Yes. We sent the proposed maps to all the members for their review prior to the meeting.**
Q. And by "we," who do you mean?
A. **The staff at the reapportionment committee.**
Q. Okay. And do you remember how far in

Page 100

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

advance you sent them out?
A. **As fast as we could. Remember this whole process was very condensed, very condensed.**
Q. I think it was the day before the meeting. Is that right?
A. **Yes, ma'am, which is standard operating procedure. We get bills usually about a day before.**
Q. Okay.
A. **Usually. Not all the time.**
Q. And did you talk to anyone about this meeting beforehand?
A. **I approached the members of my -- the house members of the committee to make sure they read their information and make sure they came to the meeting.**
Q. And other than the maps themselves, did you provide any materials to the members of the committee?
A. **Whatever the committee sent with the notice.**
Q. With the -- I'm sorry. What do you mean by the notes?
A. **They were sent an email notifying them of the meeting. Whatever was contained in that notification of the meeting.**

Page 101

Q. And do you know who sent that email?
A. **Somebody on the reapportionment staff.**
Q. Okay. So a considerable portion of that meeting was about racial polarization analysis, which I'll also refer to as RPV. Does that --
A. **RP what?**
Q. RPV. Have you heard that term before?
A. **I've heard of racial population analysis.**
Q. I'll try to refer to it as racial polarization analysis. But that's also a lot of words.
A. **You can use the acronym.**
Q. So what's your understanding of racial polarization analysis?
A. **My understanding is that is done particularly for the courts to determine whether we either on purpose -- intentionally or unintentionally violated Section 2 of the Voting Rights Act and denied a group of protected class of minority citizens from electing or defeating a candidate of their choice based on the analysis of the historical vote.**
Q. And do you know how it's done?
A. **No, ma'am.**

Page 102

Q. Who decides whether a racial polarization analysis should be done for a particular district?
A. **Not me.**
Q. Do you know who does decide?
A. **I would -- I would assume it would be our attorney.**
Q. Why that assumption?
A. **Because he's an attorney and he understands Section 2.**
Q. But the actual analysis itself is math, right?
A. **I would assume. But I've never -- never done it.**
Q. Okay. Would anyone other than your attorneys make the decision to have a racial polarization analysis done for a particular district?
A. **Not that I'm aware of. I'm sure if I asked for one, I could get it.**
Q. Okay. Can anyone ask for it?
A. **I don't know the answer to that question.**
Q. Well, could a member of the reapportionment committee ask for it and have it be

Page 103

performed?
A. **I'm sure if a member of the reapportionment committee wanted one, they could approach the legal counsel of the committee and request one.**
Q. How do you decide which district a racial polarization analysis should be done for?
A. **I didn't make that decision.**
Q. So you don't play any role in deciding district X should have a racial polarization analysis done?
A. **I did not, no.**
Q. Okay. Do you know if there are any written guidelines for how someone should decide whether a racial polarization analysis should be done?
A. **I don't recall ever seeing any.**
Q. Do you know if there are any informal guidelines?
A. **I don't recall ever seeing any.**
Q. Or hearing of any?
A. **No.**

(Plaintiff's Exhibit 4 was marked for identification.)

Page 104

Page: 26 (101 - 104)

Caster Plaintiffs' Exhibit 89, Page 27

Evan Milligan,et al v. John H.Merrill, et al.
Chris Pringle
12/17/2021

Q. I'd like to introduce Exhibit 4. This is a transcript of the reapportionment committee meeting from October 26th.
MS. WELBORN: And we will provide electronic copies.
MR. WALKER: I understand. My only caveat is while I don't have any reason to believe that these are inaccurate, we haven't had a chance to check it.
MS. WELBORN: Of course.
Q. I'll get to that in a second.
But do you know when a racial polarization analysis is conducted? At what point in the process, I mean.
**A. I was under the assumption that after we passed the bills, that a racial polarization analysis would be done for the lawsuits.**
Q. Okay. So after they are already enacted, right?
**A. Well, given the timeline.**
Q. Okay.
**A. We didn't have time to.**
Q. If you could turn to Page 20. I'm sorry. It's Page 18. And at the very bottom,

Page 105

Senator McClendon says, "Can I ask something? The question you're asking, the answer is our attorney, mine and your attorney, set that data off for districts that it looked like there might possibly be a racial issue."
And this is referring to a racial polarization analysis. That is, that racial polarization is done -- analysis is done for districts where it looked like there might possibly be a racial issue.
Is that your understanding of when racial polarization -- that that is why a racial polarization analysis is done, is because there might possibly be a racial issue?
**A. I read that as our attorney was going to make that determination.**
Q. And is it your understanding that looking like there might possibly be a racial issue is the criteria for determining whether a racial polarization analysis should be conducted for a particular district?
**A. Again, I was leaving that to the attorney to determine, what we would have to prepare for court cases.**
Q. So talking about might possibly be a

Page 106

racial issue, do you have an understanding of what that means?
**A. You would have to ask Mr. -- Senator McClendon.**
Q. Okay. Did you encounter any possible racial -- racial issues over the course of the redistricting process?
MR. WALKER: Objection to form. I'm just not sure what you mean.
Q. When did you take race into account in the redistricting process?
**A. Mr. Hinaman was directed by the committee to follow the guidelines and to draw those plans race neutral, without looking at race until after he had developed a plan. That's my understanding. The plan was developed, and race was not looked at until after it was drawn.**
Q. And then how was -- it was looked at after the plan was drawn?
**A. After the plan was drawn, yes, ma'am, in conjunction with the members of congress.**
Q. And do you know how it was looked at?
**A. No. He met with members of congress to go over it.**
Q. And do you know what data was looked at?

Page 107

**A. No, ma'am.**
MR. WALKER: Did you say date?
MS. WELBORN: Data.
Q. And do you know anything that would have changed because race was taken into account in the congressional map?
**A. No, ma'am.**
Q. And when you said the committee gave instructions to Mr. Hinaman, who are you referring to specifically?
**A. I would say Chairman McClendon and I told Mr. Hinaman to follow the guidelines in drawing these maps.**
Q. And in doing so, that means taking a race-neutral approach to drawing the first map; is that right?
**A. Yes, ma'am. The congressional map, yes, ma'am.**
Q. Did you give any other instructions to Mr. Hinaman?
**A. Follow the guidelines.**
Q. But that's it?
**A. That's the reason why we adopted the guidelines.**
Q. And how did you communicate with

Page 108

Page: 27 (105 - 108)

Caster Plaintiffs' Exhibit 89, Page 28

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

Mr. Hinaman?
**A. I would see him in the reapportionment office, and on the telephone.**
Q. Okay. Did you ever email with him?
**A. No, ma'am. I'm not a big email person.**
Q. I suppose that means you didn't text him either.
**A. Nothing of substance.**
Q. Okay.
**A. And I'll be glad to show you the texts.**
Q. So are you aware of any racial polarization analysis that was done for any district in the 2001 -- or 2021 congressional map prior to this meeting on October 26th?
**A. No, ma'am.**
Q. So not for District 7?
**A. No, ma'am.**
Q. Had a racial polarization analysis been done for some state legislative districts?
**A. No, ma'am.**
Q. Was any racial polarization analysis conducted for any of the maps at any point before October 26th?
**A. No, ma'am.**
Q. So a racial polarization analysis

Page 109

couldn't be taken into account for drawing the initial map?
**A. We drew them race blind.**
Q. Do you know when the first time a racial polarization analysis was conducted for any district for the congressional map?
**A. My understanding, they were sent off sometime after the bills at the end of the special session.**
Q. Do you know who requested that?
**A. I believe Mr. Walker.**
Q. And do you know why that request was made?
**A. Because we already had a lawsuit filed. We had a lawsuit filed against us before we ever filed a bill.**
Q. Who -- do you know who did the racial polarization analysis?
**A. No, ma'am.**
Q. Do you know if a consultant was hired to do it?
**A. There was somebody hired. I do not know who.**
Q. So just to be clear, nothing changed as a part of the maps after the racial polarization

Page 110

analysis was done because the maps had already passed, right?
**A. Yes.**
Q. Sorry. I'm not trying to trick you.
**A. No. I had to think about it. Yes, we -- we passed the maps.**
Q. Okay. Did you ever suggest having a racial polarization analysis done before the maps were passed?
**A. I didn't consider it an option. We were under such a tight timeline. We knew we would have to do it because of the lawsuit that had already been filed before we ever filed a bill, and we knew it would be done. We just didn't have time to . . .**
Q. To get it done?
**A. To get it done.**
Q. Do you know how long it takes to perform a racial polarization analysis?
**A. No, ma'am.**
Q. Do you know if anyone suggested doing a racial polarization analysis prior to the bill's passing?
**A. It came up in the committee meeting. And we assured them that we were going to perform them, the ones that our attorneys deemed necessary,**

Page 111

**and we would get that to them when we had the information.**
Q. Do you know if a racial polarization analysis had been done for congressional maps in previous redistricting cycles?
**A. I have no knowledge.**
Q. You don't remember from the 2001, 2002 cycle if that happened?
**A. Remember we were under Section 5 preclearance at the time. And once they called and said we had been precleared -- I had never heard the term before that.**
Q. Okay. So do you know when the racial polarization analysis for the congressional map was finished?
**A. I have not seen it.**
Q. You have not seen it?
**A. I have not seen it.**
Q. Okay. Have you asked to look at it?
**A. No, ma'am.**
Q. Have you talked to anyone about it?
**A. You.**
Q. So why don't you do the racial polarization analysis for all districts just as a matter of course? And I'm not talking -- I

Page 112

Page: 28 (109 - 112)

Caster Plaintiffs' Exhibit 89, Page 29

understand there's a time crunch here. But in general, why isn't it done for all of the districts just because?

**A. I don't see a need for some of the districts. They're not being challenged in court, are they?**

Q. Well, Districts 1, 2, and 3 are also being challenged.

**A. Okay.**

Q. And when you say you don't see a need, why is that?

**A. If you're not challenging them in court, I mean, I don't see the need to do an analysis on them.**

Q. Okay. But four of seven districts are being challenged in this lawsuit.

**A. Okay.**

Q. If you turn to Page 19, Senator McClendon and Representative England have a back-and-forth here about a number, 54 percent of black voting age population for District 7. So 54 percent BVAP.

And Representative England is asking that a racial polarization analysis be done. And Senator McClendon says that he was told by

Mr. Walker that a racial polarization analysis for District 7 is unnecessary because District 7 has a BVAP of around 54 percent.

Why would it be unnecessary to conduct a racial polarization analysis if a district has a BVAP of around 54 percent?

**A. I think you need to ask Senator McClendon that. I didn't say that.**

Q. But do you have an opinion on that?

**A. No, ma'am.**

Q. Do you think that having a BVAP of around 54 percent for a particular district is important?

**A. I -- it's my understanding that's -- that's the plan that Congresswoman Sewell agreed to.**

Q. And what do you mean by that?

**A. Mr. Hinaman worked with the members of congress, and they signed off on the map that he had drawn and said they agreed to it and would accept it. I was not privy to that conversation, though. That's secondhand. I was just told that.**

Q. Who told you that?

**A. I don't remember.**

Q. So do you have any opinion on whether District 7 should have a BVAP of around 54 percent?

**A. No, ma'am, I have no opinion.**

Q. Do you know what the relationship is between having a BVAP of 54 percent and the decision to do a racial polarization analysis?

**A. No, ma'am.**

Q. Do you know at what percent of BVAP a district would have that you would need to do a racial polarization analysis?

**A. No, ma'am.**

Q. So would you agree with the statement that if a black district has a BVAP of under 54 percent, that requires a racial polarization analysis?

**A. I can't agree or disagree with that statement. I think it depends on the district. But I don't know.**

Q. What would -- what do you mean by "depends on the district"?

**A. I've seen majority minority districts elect nonminorities.**

Q. I would like to introduce another exhibit. This is the transcript of the floor debate, Plaintiff's Exhibit 5, on November 1st.

**A. All right.**

(Plaintiff's Exhibit 5 was marked for identification.)

Q. And if you'll flip to Page 20.

MR. WALKER: And, Kaitlin, I'll just put on the record that we also have not had a chance to check this. I don't have any reason to believe it's inaccurate. But I just note that for the record.

MS. WELBORN: Yes. We will stipulate to that for all of the transcripts.

MR. WALKER: Okay.

Q. So you're having a back-and-forth here with Representative England who again is asking why a racial polarization analysis was not done on District 7.

And at the very bottom of the page, you said, "We thought it was necessary, but they cut it off, I think, at 51 percent. Anything under 51 percent they did it on. Anyone over that, they didn't do it."

Do you know what you mean -- what you meant by that statement?

**A. I don't remember. I really -- I think that what I was talking about at that point was trying to get something done rapidly, as fast as**

**possible. And we didn't have time to do 140 legislative districts, eight school board digits, and seven congressional districts given the time frame we had.**
Q. And the 51 percent is BVAP. I'll tell you that that.
Okay. And when you said, "We thought it was necessary," do you know who you were referring to?
A. **I would assume it was Mr. Walker and Mr. Hinaman and myself.**
Q. Okay. And when you said they --
A. **Because on that floor -- at this time, I'm sure you have my talking points.**
Q. Yes.
A. **I was going -- I was using my talking points. And remember this was rapid fire, as fast as -- and I was -- this was late into the session.**
**And Mr. England is a very skilled attorney and chairman of the democratic party. So he is quite, quite gifted in the way he can ask questions and get people that are not attorneys to answer them.**
Q. And so when you said that they cut it off at 51 percent, do you know who the "they" is?

A. **I would assume I was referring to Mr. Walker and Mr. Hinaman.**
Q. And how was that 51 percent number chosen?
A. **I'm sure I was just reading the talking point.**
Q. And who prepared those talking points?
A. **Mr. Walker and, I believe, Mr. Hinaman.**
Q. And did you discuss those talking points with either Mr. Walker or Mr. Hinaman?
A. **They were getting them to me as fast as they could. This was rapid fire.**
Q. What is your understanding of how you can tell whether minorities can elect their candidate of choice?
A. **In the congressional maps?**
Q. Yes.
A. **I don't really understand that question. Would you repeat it, please?**
Q. How can you tell whether minorities can elect their candidate of choice in a particular district?
A. **In a particular congressional district?**
Q. Well, any district. But in this case, yes, we're talking about a congressional district.

A. **That's a question I really can't -- I don't think there's a magic number that exists to guarantee the election or defeat of a minority candidate.**
Q. Is there some range?
A. **Again, I was told that Congresswoman Sewell was comfortable with the plan that had been presented and was in support of that plan. And the other members of congress were in support of it.**
Q. I would like to introduce Plaintiff's Exhibit 6, which is the final 2021 map for congress.

(Plaintiff's Exhibit 6 was marked for identification.)

Q. And District 7 is the one in brown. Would you agree that District 7 appears to be racially jerrymandered?
A. **I think just District 7 is in large part the same district that was drawn under the Reed Buskey, just adjusted for population increases.**
Q. And how would you describe the shape of District 7?
A. **Again, we try and maintain the core of existing districts. And this district was created**

**in 1992 by the Reed Buskey plan.**
MS. WELBORN: I would like to take just a short break. We might be finished. I just want to double-check.
MR. WALKER: Would you like for us to leave the room?
MS. WELBORN: Let's go off the record.
THE VIDEOGRAPHER: We are off the record. The time is 12:33 p.m.
(Recess was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 12:40 p.m.
MS. WELBORN: The Milligan plaintiffs are finished asking questions. I'm not sure if the Singleton or Caster plaintiffs have any questions for you. But after that, we can break for lunch and you'll be done.
MR. WALKER: Yay.
MS. WELBORN: Yay.
MS. FAULKS: Do the Caster plaintiffs have any questions?
MR. OSHER: Can you hear me?
(Discussion held off the record.)
EXAMINATION BY MR. OSHER:
Q. I only have a few questions. So this

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

should be -- this should be very quick. Representative, thank you for your time. My name is Daniel Osher. I am an attorney for the plaintiffs in the Caster litigation.

You might have said this before. And I apologize if you did, Representative. How long have you served in the Alabama legislature?

A. **I was first elected in 1994. I served two terms. I left in 2002. And I was reelected in 2014 and '18.**

Q. Okay. So that's roughly how many years?

A. **12. How many years total? I'll be 16 years in the legislature with a 12-year gap.**

Q. Great. Thank you.

And have you been a member of the republican party that whole time?

A. **I've been an elected republican official. But I've never been an official member of the Alabama Republican Party.**

Q. I understand. Have you always considered yourself a republican?

A. **Yes, sir.**

Q. Based on your 16 years serving in the legislature, in your view, do the views of members of the democratic party in Alabama differ from the

Page 121

members of the republican party in Alabama when it comes to removing confederate monuments from public spaces?

A. **I mean, you're asking me to suppose what other people are thinking. But I would say yes.**

Q. And based -- based on your 16 years in the legislature, do the views of members of the democratic party in Alabama differ from the members of the republican party in Alabama when it comes to affirmative action?

MR. WALKER: Objection to form. Dan, I'm not sure that we have a clear understanding of what affirmative action is these days.

MR. OSHER: I didn't catch that, Dorman. Can you say that again?

MR. WALKER: Yeah. I'm not sure that I would have a clear understanding of what affirmative action is these days.

MR. OSHER: Sure.

Q. Representative, in your 16 years of service in the legislature, have you had an opportunity to view what the general views of each of the major parties in the state are?

A. **On which issue?**

Q. On various issues.

Page 122

A. **I'm assuming that I've had numerous conversations with both republicans and democrats, yes.**

Q. And do you have a general sense of how one party views a major issue in Alabama as opposed to another party?

A. **I'm sure we differ on specific issues, yes.**

Q. Okay. So based on your 16 years serving in the legislature, do the views of members of the democratic party in Alabama generally differ from the members of the republican party in Alabama generally when it comes to affirmative action?

A. **Again, your definition of affirmative action I don't know.**

Q. Policies implementing a preference for individuals while considering their race.

A. **I think given my history of being in the Alabama legislature when the democrats were in supermajority, it's a pretty wide spectrum across political lines.**

Q. So you're saying that the two major parties in Alabama do not have the -- have the same view when it comes to affirmative action?

A. **I couldn't answer that. I've run across**

Page 123

**varying opinions in different members.**

Q. Okay. Based on your 16 years in the legislature, do the views of members of the democratic party in Alabama generally differ from members of the republican party in Alabama generally when it comes to criminal justice reform?

A. **I think -- I think there's a divide, yes. But I know some -- some conservatives that are in favor of criminal justice reform themselves.**

Q. And just to clarify, you're saying that there is a difference between the general views of the democratic party -- members of the democratic party and members of the republican party when it comes to criminal justice reform?

A. **There could be, yes.**

Q. Is it -- in your view, is there a divide between the members of the party or not?

A. **I think some members hold different opinions, yes.**

Q. And the same question. Based on your experience in serving in the legislature, do the views of the members of the democratic party generally in Alabama differ from the members of the republican party generally in Alabama when it comes to the view of whether there's a significant amount

Page 124

Page: 31 (121 - 124)

Caster Plaintiffs' Exhibit 89, Page 32

of discrimination against black individuals in the state?
A. **Yes.**
MR. OSHER: Okay. That's all I have. Thank you very much for your time, Representative.
MR. WALKER: Thank you. Thank you, Daniel.
MS. FAULKS: Singleton plaintiffs, do you have any questions?
MR. BLACKSHER: Did I get called?
MR. WALKER: You did. You did, Jim.
MR. BLACKSHER: Well, thank you.
EXAMINATION BY MR. BLACKSHER:
Q. Representative Pringle, I hope you make it back to Mobile before the night is over.
A. **Thank you. So do I.**
Q. I wouldn't want to stay in Montgomery overnight if I could get back to Mobile on a Friday night.
A. **See, we have a lot in common, Mr. Blacksher.**
Q. Yeah.
A. **I'm not --**
Q. I just have a --
MR. WALKER: Go ahead.

Page 125

Q. I just have -- I have very few questions.
Representative Pringle, you said that -- and I haven't been in on your whole discussion. I confess I had to jump off on some other calls while it was all going on. So I apologize if I go over something that you've already spoken about.
But I did hear you say with a smile on your face that there was a lawsuit filed even before you passed a plan. And that would be referring to the Singleton case, right?
A. **I refer to it as the League of Women Voters. But yes, sir.**
Q. The League of Women Voters. It was the lawsuit that was advocating the League of Women Voters whole county plan?
A. **Yes, sir.**
Q. Okay. And who informed you that that suit had been filed? It was Mr. Walker, wasn't it?
A. **Yes, sir.**
Q. And did you get a chance to read the complaint?
A. **No, sir.**
Q. And did Mr. Walker tell you what the lawsuit was about?

Page 126

A. **You were asking for a plan that had all whole counties that created two opportunity districts.**
Q. Did he tell you that the lawsuit contended that the plan that was enacted in 2011 was racially jerrymandered?
MR. WALKER: I'm going to -- I'm going to assert privilege. You might be able to ask that question a different way, Jim. But I think the way you've asked it, it calls -- or could call for an attorney-client communication.
Q. Okay. I lost you. All I see is a telephone screen now. Oh, there you are up in the corner.
Let me ask it this way, Representative Pringle. Were you aware and are you aware now that the Singleton complaint alleged, when it was filed September 27th, that the plan enacted in 2011 was unconstitutional because it was racially jerrymandered?
A. **Not specifically.**
Q. Okay. Were you aware that the state attorney general's office had said in a lawsuit in Birmingham in 2019 that the 2011 plan was racially jerrymandered?

Page 127

MR. DAVIS: Object to the form.
MR. WALKER: Jim, did you hear that objection to form from Jim Davis?
MR. BLACKSHER: Yes.
MR. DAVIS: That's not what it said.
Q. Are you aware that that is what the complaint that Singleton filed alleged, that the state attorney general had conceded in federal court in 2019 that the 2011 plan was racially jerrymandered? Were you aware of that?
MR. DAVIS: Object to the form.
MR. WALKER: Object to form.
Q. You -- you can answer.
MR. WALKER: I'm sorry. You can answer, if you can.
A. **No.**
Q. You weren't aware of that.
Were you aware -- did anyone tell you that the lawsuit contended that when drawing a new congressional plan with 2020 census data, that the legislature had a constitutional obligation to remedy a racial jerrymandering?
A. **No.**
Q. Okay. And as chair of the reapportionment committee, you can testify that

Page 128

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

there was no effort made by the reapportionment committee to remedy any racial jerrymandering in the 2011 claim; isn't that correct?

**A. I testified that Mr. Hinaman was directed to draw those seven congressional districts based on the guidelines of the committee.**

Q. Yeah. And no one informed you, and you -- excuse me.

The committee never attempted to remedy a racial jerrymandering; is that correct?

**A. I did not know there was a --**

Q. Racial jerrymandering?

**A. Yes.**

Q. Okay. Now, my understanding from your testimony is that Mr. Walker advised you as chair of the reapportionment committee that the congressional redistricting plan had to have zero deviation; is that correct?

**A. Yes.**

Q. So did anyone else give you that advice, zero deviation?

**A. Mr. Hinaman.**

Q. So Mr. Hinaman advised you that the plan had to be zero deviation?

**A. Well, Mr. Blacksher, was not the 2011**

Page 129

**and the 2002 plans all zero deviations, and the 1992 plan?**

Q. Well, what I asked -- the question was did Mr. Hinaman advise you that it needed to be zero deviation.

**A. Again, Mr. Hinaman has been part of this for years. And I think every plan has been drawn to zero deviation.**

Q. Okay. Does that mean that he did advise you to keep it at zero deviation?

**A. Yes. Because all the other plans had been drawn to zero deviation.**

Q. Okay. That's fine.

And did anyone besides Mr. Walker and Mr. Hinaman advise the committee that the plan had to keep a zero deviation?

**A. Not to my knowledge.**

Q. Did the -- did you as chair or did anyone on the committee seek the advice of the Alabama attorney general's office on whether it needed to have zero deviation?

**A. I did not.**

Q. Are you aware of anyone on the committee who did?

**A. No, sir.**

Page 130

Q. Are you aware of any -- anyone -- did Mr. Walker, by the way, advise you that he had consulted other lawyers to reach this opinion?

MR. WALKER: Jim, I'm going to object on the grounds of privilege to that. You can ask it some other way.

Q. I'm just trying to get everything you knew or did not know about the requirement of zero deviation.

And what I've heard you say, Representative Pringle, is that you were aware, since you've been involved in one way or the other with redistricting, that it had been going on for several decades, right?

**A. Zero deviation in congressional races?**

Q. Yes.

**A. Yes.**

Q. Okay. And when it came to drawing the 2020 plan, you were advised that that needed to continue, zero deviation needed to continue. And that advice came from Mr. Walker and Mr. Hinaman; is that correct?

MR. WALKER: Objection to form to the extent it calls for an attorney-client communication.

Page 131

Q. But you can answer, I think.

MR. BLACKSHER: Counsel, can he answer?

Q. Okay. Let me ask another question.

Did Mr. Walker also advise you that in order to comply with the Voting Rights Act, the congressional redistricting plan had to have a majority black district? Is that correct?

MR. WALKER: Objection, attorney-client privilege.

Q. Well, that's in the talking points, isn't it? Isn't that -- isn't the requirement of a majority black district one of the things that's in the talking points that you've exchanged with us that you -- that you read from on the floor of the legislature?

**A. I don't have any direct recollection of that at this time.**

Q. So did anyone advise you, as chair of the reapportionment committee, that in order to comply with the Voting Rights Act, the plan had to have one majority black district, at least one majority black district?

MR. WALKER: Object to the question to the extent it calls for an attorney-client communication. Otherwise, you can answer.

Page 132

Page: 33 (129 - 132)

Caster Plaintiffs' Exhibit 89, Page 34

Evan Milligan,et al v. John H.Merrill, et al.
Chris Pringle
12/17/2021

A. **We instructed Mr. Hinaman, quoting the guidelines, to protect the core of the existing districts to the extent possible and to draw it to zero deviation.**
Q. Okay. Representative Pringle, there's absolutely no mention of majority black in the guidelines.
So the question is: In complying -- the guidelines say that you had to comply with the Voting Rights Act, right?
A. **Yes, sir.**
Q. Okay. But it doesn't say majority black, right?
A. **The guidelines, I don't recall them saying that.**
Q. Right. So the question is: Were you advised that to comply with the Voting Rights Act, there had to be a majority black district?
MR. WALKER: Objection that I've made before to the extent it calls for attorney-client communication. Otherwise, he can answer.
A. **Again, those plans are drawn in a race-neutral manner based on the guidelines to preserve the core of the existing congressional districts.**

Page 133

Q. Yes, sir. I've heard that testimony.
My question, though, is were you advised that the Voting Rights Act required there to be a majority black district?
MR. WALKER: Same objection.
A. **The Voting Rights Act requires that we in no way intentionally nor unintentionally diminish the ability of a protected class of minority citizens from electing or defeating a candidate of their choosing.**
Q. And did that mean a majority black district?
A. **It means we had -- we drew a district that would allow -- that maintained the core of an existing minority district. But we did it in a race-neutral way.**
Q. Your understanding of the requirement of maintaining the cores and drawing a race-neutral plan meant that you needed to end up with a majority black district. Am I hearing you correctly?
A. **We -- we made every opportunity to protect the incumbents who were seeking reelection.**
Q. That's not the question I asked you about the incumbent.
I asked if you were advised and did you

Page 134

understand that you needed to have a majority black district.
A. **I understood that we needed to draw districts to help protect the incumbent, yes.**
Q. And to you, that meant a majority black district, protecting the incumbent. Is that your answer?
A. **Well, I acquiesced to Mr. Hinaman who met with the members of the congress and talked to them about their districts and what they wanted and how they wanted them drawn. And he presented a plan to me that he said the members of congress agreed to that were seeking reelection, that they had agreed to.**
Q. Okay. Let's talk for just a second about the League of Women Voters' whole county plan.
According to the talking points, you were advised that that plan would be unconstitutional because its deviation was too large; isn't that correct?
A. **That was in my -- the analysis I received, yes.**
Q. And that information came from whoever wrote the talking points?
A. **Yes. That would be Mr. Hinaman and**

Page 135

**Mr. Walker.**
Q. Okay. And the talking points also advised, didn't they, that the League of Women Voters' plan would violate the Voting Rights Act because it did not have a majority black district; isn't that correct?
A. **It could potentially violate Section 2 by diminishing the ability of a protected class of citizens from electing or defeating a candidate of their choosing, yes.**
Q. I'm just asking if the talking points said -- you know, I don't have them in front of me. You've probably been looking at them all morning.
A. **Actually, I haven't.**
Q. The talking points actually said, didn't it -- the talking points actually said that the League of Women Voters' whole county plan would violate the Voting Rights Act because it did not have a majority black district.
Now, did you -- did anyone else give you that advice other than what was in the talking points?
MR. DAVIS: Object to the form.
MR. WALKER: Object to the form.
THE WITNESS: Can I answer?

Page 136

Page: 34 (133 - 136)

Caster Plaintiffs' Exhibit 89, Page 35

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

MR. WALKER: You can answer to the extent that you do not discuss any communication you may have received from an attorney, in particular one from the AG's office.
A. **I was reading the talking points that you have before you.**
Q. Actually, I don't have them before me. I'm sorry.
But in any event, let me -- let me wrap this up this way. Was the -- was the committee ever presented in writing a statement that the League of Women Voters' whole county plan violated the Voting Rights Act?
A. **If my memory serves me correctly, we did not yet have the official League of Women Voters' plan in the computer at the time of the committee meeting. I think it was introduced later.**
Q. Okay. You're going to have to listen to the question again.
MR. BLACKSHER: Could I ask the court reporter to read the question back, please?
(Record read.)
A. **Was the committee ever presented --**
MR. WALKER: Was the committee ever presented in writing.

Page 137

A. **I have no recollection of that.**
Q. Okay. Thank you.
And was the committee ever presented in writing a statement that the League of Women Voters -- I'm sorry. Let me strike that. Let me start over.
Was the committee ever presented in writing a statement that the congressional plan had to have zero deviation?
A. **I don't understand the question.**
Q. Did the committee have in writing a statement that the congressional plan had to have zero deviation?
A. **The guidelines called for it, which has been done for -- as you know, for years and years. For decades, we've always drawn down to zero deviation in congressional.**
Q. Okay. So the guidelines say that the congressional plan must have minimal deviation.
A. **Which we interpret to be -- which we interpret to be zero deviation just like it was, you know, in 2011, 2002, 1992.**
Q. Okay. That's good.
So in other words, when you saw, as chair of the committee, that the guidelines said

Page 138

"minimal deviation," you interpreted that on your own as meaning zero deviation; is that correct?
A. **Based on my knowledge and history of reapportionment, congressional reapportionment, and the fact that we have drawn zero deviation districts, yes, sir.**
Q. Okay. So that would -- and you reached that conclusion independently of anybody's advice, right?
A. **Well, Mr. Walker and Mr. Hinaman and I all concurred that minimum deviation means zero. And based on my readings, I would concur with that, what I read.**
Q. Thank you, Representative Pringle. Those are the only questions that I have.
A. **Mr. Blacksher, it's always a pleasure.**
Q. I hope to see you again soon.
A. **I'm sure you will.**
MR. WALKER: I think that can be arranged.
MS. FAULKS: Dorman, with that, I think that we are done. For lunch, how long do we want to break?
MR. WALKER: Wait. Can we have 30 seconds to confer?

Page 139

THE VIDEOGRAPHER: We're off the record. The time is 1:05 p.m.
(Recess was taken.)
THE VIDEOGRAPHER: We're back on the record. The time is 1:08 p.m.
EXAMINATION BY MR. DAVIS:
Q. Representative Pringle, this is Jim Davis. I represent Secretary Merrill in this lawsuit. I have just a couple of follow-up questions.
Did you instruct Mr. Hinaman to -- when he drew a congressional plan, that it had to include a majority black district?
A. **No.**
Q. Did you instruct him to include districts with any particular demographics?
A. **No.**
Q. Are you aware of any member on the reapportionment committee who gave him such instructions?
A. **No.**
Q. Did you decide in advance that there had to be a majority black district in Alabama's congressional plan?
A. **No.**

Page 140

Page: 35 (137 - 140)

Caster Plaintiffs' Exhibit 89, Page 36

MR. DAVIS: Thank you. No other questions.

THE VIDEOGRAPHER: This ends the deposition of Chris Pringle. The time is now 1:09 p.m.

(DEPOSITION ENDED AT 1:09 P.M.)

STATE OF ALABAMA )
JEFFERSON COUNTY )

I hereby certify that the above proceedings were taken down by me and transcribed by me using computer-aided transcription and that the above is a true and correct transcript of said proceedings taken down by me and transcribed by me.

I further certify that I am neither of kin nor of counsel to any of the parties nor in anywise financially interested in the result of this case.

I further certify that I am duly licensed by the Alabama Board of Court Reporting as a Certified Court Reporter as evidenced by the ACCR number following my name found below.

So certified on December 17, 2021.

______________________________
LeAnn Maroney, Commissioner
ACCR# 134, Expires 9/30/25
505 North 20th Street, Suite 1250
Birmingham, AL 35203

WORD INDEX

< 0 >
**01** 68:14

< 1 >
**1** 6:14 12:4, 6 59:18 113:7
**1:05** 140:2
**1:08** 140:5
**1:09** 141:5, 7
**10** 5:5 42:16
**10:03** 49:13
**10:22** 49:16
**10004** 4:6
**10006** 3:15
**101** 18:15, 18 19:24
**10-26-21** 6:21
**104** 6:20
**105** 1:23 5:21
**11:26** 100:12
**11-1-21** 6:23
**116** 6:22
**119** 6:24
**11th** 16:10
**12** 6:14 121:12
**12:06** 100:15
**12:33** 120:9
**12:40** 120:12
**120-125** 6:8
**125** 4:5
**1250** 142:23
**125-140** 6:9
**12-year** 121:13
**134** 142:23
**14** 18:25 99:12
**140** 117:1
**1400** 3:7
**140-141** 6:10
**14th** 3:21 54:3 59:24 96:13
**15** 19:4
**16** 121:12, 23 122:6, 20 123:9 124:2
**17** 1:24 7:7, 17 35:14 142:17
**18** 105:25 121:10
**19** 113:18
**1984** 16:10
**1992** 25:3, 23 120:1 130:1 138:22
**1994** 18:24 121:8
**1999** 3:7
**1st** 38:11 42:3, 10 43:14 44:1 45:14 115:23

< 2 >
**2** 6:16 52:14, 18 59:19, 20 63:18 98:7, 15 99:2 102:19 103:10 113:7 136:7
**2:2021-CV-01530-AMM** 1:8
**2:21-CV-01530-AMM** 7:14
**20** 46:21 49:25 105:24 116:4
**200** 5:21
**2000** 28:21 35:14 36:10
**20002** 5:6
**20005** 3:22
**2001** 21:25 27:12 28:2 30:3 33:18 41:24 48:23 66:1, 12 68:10 109:13 112:7
**2001-2002** 28:18
**2002** 18:25 22:1, 2, 5, 23 23:2 24:8, 10, 20, 21 25:6, 19 26:5, 9, 22 28:13, 15, 22 29:9 30:4 33:18, 25 41:25 58:14, 18, 24 59:7, 9 60:5, 7 61:2 65:1 112:7 121:9 130:1 138:22
**2003** 11:1
**2007** 18:11
**2010** 58:8, 12, 14, 18 59:6, 10, 14 60:1, 4, 23 61:4, 11 62:18, 22 65:1 68:1 71:2
**2011** 29:24 30:5 33:2, 7, 14 46:14 65:13 74:9 127:5, 18, 24 128:9 129:3, 25 138:22
**2014** 121:10
**2018** 35:12
**2019** 35:1, 7 36:10 46:21 49:2 127:24 128:9
**2020** 28:13 40:6 58:19 59:11 128:20 131:19
**2021** 1:24 6:25 7:7, 17 22:12 32:23 33:4 34:25 37:3 45:20 49:23 51:1 52:19 58:10 59:14 60:1 62:19, 24 74:12 109:13 119:11 142:17
**20th** 142:23
**22** 37:23 80:13
**26th** 40:6, 18 50:20 51:2 100:17 105:4 109:14, 23
**27** 18:8 72:12
**27th** 127:18
**28** 32:8 71:22, 25 72:12 78:9 79:8, 12, 21 82:13

< 3 >
**3** 6:18 55:20, 23 113:7
**3:00** 50:11
**30** 94:6 139:24
**35203** 142:24
**35222** 4:21
**36104** 1:24 5:22
**36106** 4:14
**36130** 5:14

< 4 >
**4** 6:20 104:24 105:2
**40** 3:14 42:21
**45** 12:21

< 5 >
**5** 3:14 6:22 57:9, 23 58:23 59:1, 16, 21 112:9 115:23 116:1
**5:00** 78:11, 14, 20 79:19, 24
**50** 42:24 97:15, 21, 22 98:4, 11, 12, 21, 22
**501** 5:13
**505** 142:23
**51** 116:18 117:5, 25 118:3
**52** 6:16
**54** 113:20, 21 114:3, 6, 12, 25 115:3, 11
**55** 6:18
**5th** 48:23 50:20 51:1, 5, 19, 23 52:19 53:17 58:5 63:7 64:5

< 6 >
**6** 6:24 119:11, 13
**60** 26:15
**600** 3:21 5:5
**6179** 4:13

< 7 >

**7** 25:*5* 26:*16* 27:*14*, *17* 28:*1* 61:*12*, *13*, *19* 99:*11* 109:*16* 113:*21* 114:*2*, *25* 116:*15* 119:*16*, *17*, *19*, *23*
**700** 3:*21*

**< 8 >**
**8** 61:*13*, *19*
**825** 4:*20*

**< 9 >**
**9/30/25** 142:*23*
**9:00** 78:*10*, *14*, *20* 79:*19*, *23*
**9:14** 1:*24* 7:*17*
**90** 42:*16*
**90067** 3:*8*
**9-120** 6:*7*

**< A >**
**a.m** 1:*24* 7:*17* 49:*13*, *16* 100:*12*
**ability** 98:*8*, *14* 134:*8* 136:*8*
**able** 79:*6*, *17* 127:*8*
**absolutely** 133:*6*
**accept** 114:*19*
**accepted** 38:*2* 63:*22*
**access** 68:*16*, *19* 94:*7*
**According** 135:*17*
**account** 14:*21*, *23* 15:*7*, *11*, *24* 26:*20* 107:*10* 108:*5* 110:*1*
**accounts** 15:*5*, *14*, *21*
**ACCR** 142:*15*, *23*
**Accuracy** 70:*4*
**achieve** 44:*13* 92:*9*
**ACLU** 7:*21*, *22* 8:*25* 9:*14*
**acquiesced** 135:*8*
**acquisitions** 17:*9*
**acronym** 102:*13*
**Act** 54:*3*, *7* 59:*17*, *19*, *20* 98:*8* 99:*2* 102:*20* 132:*5*, *20* 133:*10*, *17* 134:*3*, *6* 136:*4*, *18* 137:*13*
**acting** 7:*3*
**action** 122:*10*, *13*, *18* 123:*13*, *15*, *24*
**actual** 96:*4* 103:*11*
**adamant** 43:*23*
**add** 80:*14*
**added** 38:*3* 80:*16*
**additional** 38:*1*, *3* 55:*13* 80:*16*
**address** 15:*4* 32:*13* 36:*1* 73:*18*
**addressed** 36:*12* 73:*12*, *19*
**adjust** 39:*4*
**adjusted** 119:*21*
**adopt** 69:*15*
**adopted** 24:*20* 31:*1* 40:*8* 52:*5* 55:*14* 63:*25* 64:*9* 108:*23*
**advance** 101:*1* 140:*22*
**advertised** 38:*5*
**advice** 129:*20* 130:*19* 131:*21* 136:*21* 139:*8*
**advise** 130:*4*, *9*, *15* 131:*2* 132:*4*, *18*
**advised** 129:*15*, *23* 131:*19* 133:*17* 134:*2*, *25* 135:*18* 136:*3*
**advocated** 28:*18*
**advocating** 126:*15*
**affairs** 19:*12*
**affirmative** 122:*10*, *13*, *17* 123:*13*, *14*, *24*
**afoul** 99:*1*
**afraid** 99:*1*
**African** 85:*24*
**age** 95:*18* 98:*12* 113:*21*
**agent** 17:*8* 18:*5*
**ago** 14:*10*, *11*
**agree** 60:*22* 81:*5* 83:*1* 115:*10*, *14* 119:*17*
**AGREED** 1:*17* 2:*1*, *8* 54:*21* 114:*15*, *19* 135:*12*, *13*
**AG's** 137:*4*
**ahead** 51:*19* 125:*25*
**aim** 44:*14*, *15*
**al** 1:*6*, *10* 7:*13*, *14* 142:*24*
**ALABAMA** 1:*2*, *23* 4:*12*, *14*, *21* 5:*14*, *22* 7:*2*, *3*, *16*, *21*, *23* 8:*3* 9:*14* 10:*21* 16:*8* 18:*2* 24:*14* 25:*5* 26:*7* 30:*12* 32:*11* 34:*7*, *8* 36:*21* 41:*11* 43:*19*, *21* 82:*1*, *10*, *18*, *25* 84:*25* 86:*22* 121:*7*, *19*, *25* 122:*1*, *8*, *9* 123:*5*, *11*, *12*, *19*, *23* 124:*4*, *5*, *23*, *24* 130:*20* 142:*1*, *14*
**Alabama's** 96:*16* 140:*23*
**Ali** 6:*2*
**alined** 59:*4*
**alleged** 127:*17* 128:*7*
**allow** 11:*20*, *22* 134:*14*
**allowed** 32:*15*
**amendment** 54:*3* 59:*24* 96:*13*
**American** 4:*4*, *12* 85:*24*
**amount** 68:*7* 124:*25*
**analysis** 102:*4*, *9*, *11*, *15*, *22* 103:*2*, *11*, *17* 104:*7*, *11*, *15* 105:*14*, *18* 106:*7*, *8*, *13*, *20* 109:*12*, *18*, *21*, *25* 110:*5*, *18* 111:*1*, *8*, *18*, *21* 112:*4*, *14*, *24* 113:*13*, *24* 114:*1*, *5* 115:*4*, *8*, *13* 116:*14* 135:*21*
**analyze** 95:*3*
**analyzed** 28:*10* 96:*24* 97:*3*
**Angeles** 3:*8*
**answer** 11:*11* 25:*11* 26:*13* 29:*12* 43:*1* 49:*3* 57:*5* 61:*23* 70:*25* 72:*24* 80:*21* 83:*8* 84:*9* 86:*10*, *11* 88:*10* 95:*21* 103:*22* 106:*2* 117:*23* 123:*25* 128:*13*, *14* 132:*1*, *2*, *25* 133:*21* 135:*7* 136:*25* 137:*1*
**answered** 53:*23* 73:*1*, *12*, *20*, *21* 93:*13*
**answering** 9:*23*
**answers** 11:*22*
**anxious** 89:*8*
**anybody** 12:*18* 47:*3* 48:*5* 61:*7* 63:*19*

80:18
**anybody's** 139:8
**anywise** 142:11
**apartment** 16:25 17:4
**apologize** 121:6 126:6
**appears** 119:17
**approach** 104:4 108:15
**approached** 101:12
**approve** 28:23 84:12
**approved** 29:21 58:23 84:15
**approving** 83:18
**April** 37:7, 13
**area** 42:4 83:3 86:6
**areas** 82:15
**arguing** 99:19
**arranged** 139:20
**asked** 38:4 63:13 66:25 80:14 103:20 112:19 127:10 130:3 134:23, 25
**asking** 84:6 98:16 106:2 113:23 116:13 120:14 122:4 127:1 136:11
**aspects** 85:21
**assert** 63:13 127:8
**assign** 2:12
**assigned** 41:7
**Assistant** 5:11
**associated** 96:18
**assume** 10:20 11:12 13:5 33:5, 10 58:15, 17 62:4 69:17 76:21 89:22 92:19, 22 103:6, 13 117:10 118:1
**assumed** 35:13
**assuming** 24:19 29:3 123:1
**assumption** 103:8 105:16
**assured** 111:24
**attempted** 129:9
**attend** 78:23 79:20
**attendance** 47:4
**attended** 77:25
**attention** 41:22
**Attorney** 3:5, 12, 19 4:19 5:3, 11, 12, 19 8:3, 25 12:12, 24 13:2, 5, 7, 16 14:6 46:14 51:12 52:3 53:6, 9 55:7 57:18 62:15 63:2 89:22 98:16 103:7, 9 106:2, 3, 15, 23 117:20 121:3 127:23 128:8 130:20 137:3
**attorney-client** 46:18 63:14 127:11 131:24 132:8, 24 133:20
**Attorneys** 4:3, 11 7:18 8:6 45:25 51:17 53:8, 14 103:16 111:25 117:22
**audience** 73:12, 23
**audio** 47:7, 11 49:7, 10 99:6
**August** 16:10 37:15, 21
**automatically** 98:13
**available** 32:18
**Avenue** 3:7 5:13
**aware** 50:25 103:19 109:11 127:16, 22 128:6, 10, 17, 18 130:23
131:1, 11 140:18

**< B >**
**back** 33:17 34:23 41:23, 24 43:11, 12, 13 49:15 56:2, 5 61:10, 24 66:12 84:19 86:3 92:11 99:8 100:9, 14 120:11 125:15, 18 137:21 140:4
**back-and-forth** 113:20 116:12
**Baggett** 6:3 8:24
**Balch** 1:22 5:20 7:24
**Baldwin** 42:6 44:3, 10
**based** 36:13, 20 46:11 58:14 59:7, 14 60:1 61:1 67:13 86:2 95:3 102:22 121:23 122:6 123:9 124:2, 20 129:6 133:23 139:3, 12
**basically** 69:13
**basis** 58:9, 18 81:2 96:12
**began** 35:18 36:3 38:9, 20 46:3, 8 64:15
**beginning** 7:12
**believe** 19:13 42:8, 9, 10 44:12 48:25 56:11 59:6, 15 60:13 61:24 73:1 83:4 93:13 105:8 110:11 116:7 118:8
**believed** 21:20
**belt** 81:25 82:3, 5, 8, 20, 23 83:1, 6 84:19 85:9, 22, 25 86:8
**best** 11:22 29:1, 4
**better** 49:18 62:9
**big** 109:5
**bill** 14:1 41:3, 5 93:24 94:19 95:2 98:2 110:16 111:13
**bills** 101:7 105:17 110:8
**bill's** 111:21
**Bingham** 1:23 5:20 7:25
**Birmingham** 4:21 7:2 127:24 142:24
**black** 25:4 26:15 28:19 29:10 42:16, 21, 23 81:25 82:3, 5, 8, 20, 23 83:1, 6 84:19 85:9, 22, 25 86:8 90:18, 19 91:8 95:18, 19, 24 97:11, 13 113:21 115:11 125:1 132:7, 12, 21, 22 133:6, 13, 18 134:4, 11, 20 135:1, 5 136:5, 19 140:13, 23
**BLACKSHER** 4:18 6:9 8:22 11:3 16:4 125:10, 12, 13, 21 128:4 129:25 132:2 137:20 139:16
**blind** 110:3
**block** 66:7, 8
**board** 32:9 72:20 117:2 142:14

**boards** 20:6
**boat** 44:22
**bones** 53:9
**bottom** 105:25 116:16
**Box** 4:13 61:14
**boxes** 61:18
**break** 49:8, 9, 21 99:5, 6, 17 100:8 120:3, 16 139:23
**bring** 46:25
**Broad** 4:5 37:2 83:3
**brought** 41:6, 10 59:10 76:19 77:8
**brown** 119:16
**build** 17:11
**bumped** 37:14
**bureau** 67:10
**burn** 16:19, 21 17:6
**burning** 16:22
**Buskey** 25:8, 13, 25 42:9 119:21 120:1
**busy** 39:11
**BVAP** 95:14, 16 113:22 114:3, 6, 11, 25 115:3, 6, 11 117:5

**< C >**
**calendar** 41:10
**California** 3:8
**call** 23:8 39:21 94:19 97:14 127:10
**Callahan** 21:17 24:2 29:2 33:21 42:2 45:13
**Callahan's** 33:19 42:12, 20 43:4, 9 44:6, 15 45:6
**called** 93:4 97:20 112:10 125:10 138:14
**calling** 97:15, 19
**calls** 126:5 127:10 131:24 132:24 133:20
**campaigns** 19:11 20:7
**camps** 17:11
**campus** 23:8 28:4 76:9 93:22
**candidate** 98:10, 14 102:22 118:15, 21 119:4 134:9 136:9
**candidates** 80:25 81:7
**car** 43:21
**carved** 43:14
**CASE** 1:7 7:14 11:2, 6 13:13, 15 118:24 126:11 142:12
**cases** 36:14 106:24
**cash** 79:19
**CASTER** 5:1 8:15 120:15, 20 121:4
**catch** 122:14
**cause** 7:8 80:24
**caution** 98:20
**cautious** 98:23, 24
**caveat** 105:8
**census** 35:3 37:11 67:10, 15, 22, 23 69:7, 21 70:2 96:8 128:20
**center** 70:23
**Central** 82:18
**certain** 85:12
**certainly** 99:14
**certainty** 61:23
**certificates** 16:14
**certifications** 16:15
**certified** 16:18 142:15, 17
**certify** 7:4 142:4, 9, 13
**cetera** 17:16
**chair** 19:8 20:10 128:24 129:15 130:18 132:18 138:25
**chaired** 22:20
**chairman** 22:22 35:12 108:11 117:20
**challenged** 113:5, 8, 16
**challenging** 113:12
**chance** 105:9 116:6 126:21
**change** 23:20 62:11, 14 67:19 70:20, 22 71:15 74:25 81:9 90:9
**changed** 36:2 37:1 65:7 71:2, 7 108:5 110:24
**changes** 36:17 53:16, 19 55:3, 15, 18 56:13 57:19, 22 61:15 63:8, 9, 17, 19, 22, 23, 24 71:10 76:11 81:16
**changing** 90:13
**channel** 43:7, 8, 12, 13 44:21, 22
**characteristics** 26:20
**check** 105:10 116:7
**choice** 98:10, 15 102:22 118:15, 21
**choose** 58:12 91:18 98:14
**choosing** 134:10 136:10
**chosen** 55:11, 17 118:4
**CHRIS** 1:10, 20 5:17 7:7, 12 8:1 9:4 17:25 141:4
**chrispringle@southerntimberlands.com** 14:25
**Christopher** 9:18
**circumstances** 85:12
**citizens** 71:5 98:9 102:21 134:9 136:9
**CIVIL** 1:7 4:4, 12 7:5, 14
**claim** 129:3
**clarify** 95:23 124:10
**Clarke** 42:6 44:3, 12
**class** 98:9 102:20 134:8 136:8
**clear** 110:24 122:12, 17
**clearly** 13:8
**clerk** 8:25
**closely** 59:4
**closer** 27:10
**closest** 39:20
**cochair** 22:11 30:7, 10 32:5 56:16
**cochairman** 19:9, 10 22:14 35:17
**coding** 96:3
**cohesive** 86:14
**colleagues** 35:16
**color** 96:3
**columns** 95:22
**come** 17:1 28:14 35:2 43:7 60:9, 10 64:19 79:13, 16 84:1 88:16 100:9
**comes** 28:5 90:5 122:2, 9 123:13, 24 124:6, 14, 24

**comfortable** 119:7
**coming** 47:11 77:19 91:5 92:15
**commencing** 1:24
**commercial** 17:12
**commissioner** 7:3 142:22
**commissions** 20:6
**committee** 19:8, 10, 12 21:2, 19 22:17 30:8, 11, 24 31:3, 14, 23 32:1, 6 33:11 35:14 37:23 39:14 40:5, 18, 23, 25 41:8, 16 45:21 47:13 48:20, 24 49:2, 22, 23 50:6, 7, 11, 19, 21, 22 51:1, 20 52:4, 7, 18 53:11, 16 54:22 56:12, 17 58:3 59:4 60:8 63:24 64:2 80:7 83:18 85:5 87:2 88:6 100:17, 24 101:13, 18, 19 103:25 104:3, 4 105:3 107:13 108:8 111:23 128:25 129:2, 6, 9, 16 130:15, 19, 24 132:19 137:10, 16, 23, 24 138:3, 7, 11, 25 140:19
**committees** 19:5 20:2, 11, 17
**committee's** 64:10
**common** 78:21 84:3, 8 125:20
**communicate** 108:25
**communication** 127:11 131:25 132:25 133:21 137:2
**communications** 16:12
**communities** 31:4 32:13 61:17 62:3, 6, 21 65:5 66:17 80:14 83:5, 14, 19
**community** 45:2 62:23 65:4 66:9 83:2, 7, 21 84:13, 23 85:1, 4, 6, 9, 11, 16, 22 86:8
**compact** 45:2 86:14
**Compactness** 62:3
**company** 17:17, 22
**compare** 62:18
**compared** 89:13
**compensated** 14:12, 18
**compensation** 14:19
**competing** 91:17
**complaint** 13:12 126:22 127:17 128:7
**completed** 16:7
**completely** 49:7
**compliance** 2:4 54:17
**complied** 35:21 54:2 59:16 60:3
**complies** 54:13
**comply** 54:7 57:20 59:18, 23 60:14 67:19 68:8 132:5, 20 133:9, 17
**Complying** 60:19 133:8
**compressed** 72:8
**computer** 28:9 94:18, 23 137:16
**computer-aided** 142:6
**computers** 94:2
**conceded** 128:8
**concerned** 77:5
**concerns** 66:4 69:3, 4 77:2 80:4
**concise** 45:2
**conclusion** 139:8
**concur** 139:12
**concurred** 139:11
**condensed** 101:3
**conduct** 36:6 114:4
**conducted** 73:10 81:18 105:14 106:20 109:22 110:5
**confederate** 122:2
**confer** 99:17 139:25
**confess** 126:5
**conform** 35:19 48:21
**congress** 24:6 30:15, 19, 22 31:11 32:16 39:10, 17, 22 67:2 70:7 76:3, 20 77:13 86:23 87:9 88:12 90:18 96:14 107:21, 23 114:18 119:9, 11 135:9, 12
**Congressional** 6:25 23:2 24:3, 8 25:3, 4, 7, 17 27:2, 5, 12 28:22 29:21, 25 30:3, 4, 5, 9, 17, 25 31:15, 24 32:9, 15, 23 33:3, 4, 14, 25 38:23 39:9, 12, 19 40:22 42:3, 10 43:14 44:2 58:24 66:18 67:4, 11, 15, 18 68:5, 6, 7 72:20 73:4 74:20, 22 77:4, 16, 18 78:6 79:10 81:18, 22 83:19 88:9, 15, 24 89:11 90:10, 19 91:9 95:25 108:6, 17 109:13 110:6 112:4, 14 117:3 118:16, 23, 25 128:20 129:5, 16 131:15 132:6 133:24 138:8, 12, 17, 19 139:4 140:12, 24
**Congressman** 21:17 24:1 29:2 34:1 43:9, 22
**Congresswoman** 114:15 119:6
**conjunction** 53:5 80:12 88:12 107:21
**conservatives** 124:8
**consider** 44:22 45:1 80:19 85:9 89:10 93:7, 9 95:4 96:9, 19 111:10
**considerable** 102:3
**consideration** 91:15
**considered** 27:25 30:4 35:19 96:24 121:21
**considering** 123:17
**constantly** 36:19
**constitute** 85:22 86:8, 15
**constitution** 19:11 20:7 54:4, 8 96:13

**constitutional** 128:21
**construction** 40:14
**consultant** 110:20
**consulted** 131:3
**contact** 24:1, 2
**contained** 29:9 101:24
**contended** 127:5 128:19
**content** 12:11
**contests** 54:15
**contiguity** 62:3
**contiguous** 86:14
**continue** 45:10 131:20
**continued** 45:15, 17
**contract** 19:13 20:8
**contracting** 17:24
**contractor** 16:17 17:11, 16 18:10
**contractual** 40:13
**control** 16:18, 20, 21 64:10
**conversation** 114:20
**conversations** 35:23 51:22 75:24 123:2
**Cooper** 17:21
**copies** 105:6
**copy** 52:20
**core** 25:20, 21 26:21 32:25 33:10, 12, 13 44:1 70:16 81:14 119:24 133:2, 24 134:14
**cores** 26:3 134:18
**corner** 127:14
**correct** 10:16 15:25 17:17 21:6, 13, 25 25:9 27:2 33:15, 20 34:9 38:16 45:22 51:10 53:12 57:13 71:8, 11, 12 76:17, 20 80:8 129:3, 10, 18 131:22 132:7 135:20 136:6 139:2 142:7
**correctly** 26:6 37:10 52:3 76:1 77:22 134:20 137:14
**counsel** 1:18 2:10, 11 7:6 100:3 104:4 132:2 142:10
**counties** 82:1, 12, 13 83:12, 22 84:1 85:13, 15 92:9 97:8, 9 127:2
**counts** 96:15
**County** 42:6, 8, 9 43:22 44:4, 7, 12 45:3, 4 84:7, 8, 10, 21 91:24 92:7 94:3 95:13 126:16 135:16 136:17 137:12 142:2
**couple** 14:10 140:9
**course** 45:8 74:19 105:11 107:6 112:25
**COURT** 1:1 2:5 7:1, 15 9:2 11:15 36:13 46:11 54:4, 8 62:8 106:24 113:5, 12 128:8 137:20 142:14, 15
**courteous** 99:23
**courtrooms** 55:18
**courts** 36:18 54:4 55:12 102:17
**COVID** 72:6
**COVID-19** 36:2 64:17
**created** 25:3, 17 60:24 61:5 69:15 75:2 119:25 127:2
**creation** 57:4
**criminal** 124:6, 9, 14
**criteria** 106:19
**crunch** 113:1
**curious** 67:23
**current** 18:12 36:13 46:11 65:17 69:2 87:18
**currently** 19:5 22:23 65:11
**cut** 116:17 117:24
**cycle** 22:24 36:16, 23 42:22 45:20 112:8
**cycles** 112:5

**< D >**
**DAN** 5:2 8:14, 17 122:11
**Daniel** 121:3 125:7
**data** 24:25 94:23 106:3 107:25 108:3 128:20
**date** 7:4, 16 36:11 108:2
**DAVIN** 4:2 8:19
**DAVIS** 5:10 6:10 8:3 12:19 13:16 35:15, 24 46:1, 7, 16 47:4 48:3 58:2 99:4, 12, 18 100:5 128:1, 3, 5, 11 136:23 140:6, 8 141:1
**day** 40:13, 15 51:9 79:9, 22 101:4, 7
**days** 14:10, 11 28:8, 12 79:15 93:23 94:6, 7, 14, 15 122:13, 18
**daytime** 79:16
**DC** 3:22 5:6 13:4
**deadline** 38:11
**dealing** 32:8 35:20 40:9, 11 75:25
**deals** 54:10
**debate** 115:23
**decades** 131:14 138:16
**December** 1:24 7:7, 16 142:17
**decide** 22:18 50:14 103:5 104:6, 14 140:22
**decided** 20:20
**decides** 103:1
**deciding** 104:9
**decision** 103:16 104:8 115:3
**decisions** 81:21
**deemed** 111:25
**defeat** 119:3
**defeated** 20:21
**defeating** 98:10 102:21 134:9 136:9
**DEFENDANT** 5:9
**Defendants** 1:12 5:17 7:25 10:6, 11
**Defense** 3:13, 20 99:24
**define** 97:17
**definition** 62:9, 21, 23 85:3, 6, 8, 11 123:14
**definitions** 63:4, 6
**degree** 16:11, 12
**delayed** 35:3
**delegation** 24:3

**democratic** 22:9 24:13 117:20 121:25 122:8 123:11 124:4, 12, 22
**democrats** 24:11 123:2, 19
**demographic** 74:7, 15 76:13 94:23 96:8, 25
**demographics** 26:11 76:11 94:9 140:16
**denied** 102:20
**department** 58:23, 25
**depends** 115:15, 18
**Depo** 6:15
**deposed** 10:23 13:21
**DEPOSITION** 1:9, 19 2:2, 3, 13 7:12 11:25 12:13, 15 13:19 14:5 27:4 99:6 141:4, 7
**depositions** 2:6
**describe** 82:16 119:22
**determination** 106:16
**determine** 91:22 92:14 102:17 106:23
**determining** 106:19
**DEUEL** 3:18 8:10
**developed** 86:5 107:15, 16
**deviation** 44:13 57:10 67:14 74:21 75:1 76:14 77:1 92:10 94:22 97:1, 7 129:17, 21, 24 130:5, 8, 10, 12, 16, 21 131:9, 15, 20 133:4 135:19 138:9, 13, 17, 19, 21 139:1, 2, 5, 11
**deviations** 76:12 77:5 91:25 92:3 94:3 95:4, 13 96:2 130:1
**diem** 14:15
**differ** 121:25 122:8 123:7, 11 124:4, 23
**difference** 76:25 96:3, 5 124:11
**differences** 63:16
**different** 19:19 34:21 66:4 78:18 79:21, 22 84:5 124:1, 18 127:9
**differently** 66:23
**digits** 117:2
**diminish** 98:8, 14 134:7
**diminishing** 136:8
**direct** 73:24 132:16
**directed** 74:1 107:12 129:5
**director** 48:14
**disagree** 115:14
**disclosing** 12:11
**discovery** 99:20
**discrimination** 125:1
**discuss** 12:14 46:17 50:16 56:23 66:25 78:5 88:13 118:9 137:2
**discussed** 13:15, 19 46:17 52:24 63:8 76:21 82:19, 23
**discussing** 77:11 90:1, 17
**Discussion** 27:11 46:10 56:5 120:23 126:4
**discussions** 12:12 57:3
**dislike** 65:6
**dissatisfied** 87:9, 15
**DISTRICT** 1:1, 2 7:15, 16 18:15, 17 19:22, 25 21:20, 21 25:4, 5, 17 26:12, 16, 21 27:14, 17 28:1 29:3 33:20 42:1, 3, 10, 12, 21, 23, 24 43:15 44:2, 8, 16, 19, 21 45:9, 14 67:11, 19 68:5, 8 69:1, 2 70:19, 20, 22, 23 71:10, 15 95:15 96:12 97:18 98:4, 11, 20 103:3, 18 104:6, 10 106:21 109:12, 16 110:5 113:21 114:2, 5, 12, 25 115:7, 11, 15, 18 116:15 118:22, 23, 24, 25 119:16, 17, 19, 20, 23, 25 132:7, 12, 21, 22 133:18 134:4, 12, 13, 15, 20 135:2, 6 136:5, 19 140:13, 23
**districts** 25:20, 21 26:4 27:14, 25 28:19 29:10 30:13, 14, 22 31:12 32:10, 12 33:1, 10, 12, 13 34:16, 19 38:10, 22 39:4, 12 54:2, 10, 12, 14 68:6, 18 69:4, 16 70:13, 16 71:7 72:19 74:22 76:12 81:14 85:15 90:18, 20 91:9 93:16 95:25 97:11, 13, 14, 15, 20 106:4, 9 109:19 112:24 113:2, 5, 7, 15 115:19 117:2, 3 119:25 127:3 129:5 133:3, 25 135:4, 10 139:6 140:16
**divide** 124:7, 16
**division** 17:21
**doctor** 13:6
**document** 12:9 52:22 53:1, 3, 11, 16 55:25 56:7, 20, 24 57:4, 8, 17 58:7 62:14 75:2
**documents** 13:9 58:21 75:9
**Dog** 43:8, 12
**doing** 17:7 79:1 99:4 108:14 111:20
**DORMAN** 5:18 7:24 10:4 35:24 92:25 122:14 139:21
**dosher@elias.law** 5:7
**Dothan** 43:15, 19, 22 45:4
**double-check** 51:4 120:4
**draft** 53:7, 8, 11 65:8 67:4 74:11
**drafted** 53:3 57:1
**drafting** 52:21 53:1 56:19 57:17 81:18
**dragging** 99:9

**draw** 21:20, 21 23:4 24:18, 21, 23 25:1 28:6 30:19 31:9, 20 34:15 44:20 54:2 96:6 98:20 107:13 129:5 133:3 135:3
**drawing** 24:7 27:25 30:13 31:24 32:23 33:6 38:9, 15 39:3 54:10, 12, 21 89:6 93:10 108:12, 15 110:1 128:19 131:18 134:18
**drawn** 23:7, 8, 12, 13, 15 25:16 28:4, 11 29:15 31:12, 15 59:3 65:24 66:9, 22 69:6 76:9 88:9, 11 89:12 93:21 107:17, 19, 20 114:19 119:20 130:7, 12 133:22 135:11 138:16 139:5
**drew** 22:9 24:9 25:23 64:11 110:3 134:13 140:12
**drive** 43:18, 19, 21, 22 79:14, 15
**dropped** 49:7
**drosborough@aclu.org** 4:7
**dross@naacpldf.org** 3:23
**due** 91:15
**duly** 9:5 142:13
**dwalker@balch.com** 5:23

**< E >**
**earlier** 56:1, 3 94:10
**earth** 81:15
**ease** 60:12
**EBENSTEIN** 4:1 8:20
**economic** 85:18
**edges** 81:16
**education** 16:7 32:9
**Educational** 3:13, 20
**effect** 2:4 46:13 59:17
**effort** 129:1
**eight** 117:2
**either** 15:10 73:15 102:18 109:7 118:10
**elect** 115:20 118:14, 21
**elected** 18:24 22:16 45:8, 16 70:10 121:8, 17
**electing** 98:9 102:21 134:9 136:9
**election** 35:13, 16 38:14 119:3
**elections** 19:11 20:8
**electronic** 105:6
**electronically** 73:16
**Elias** 5:4 8:15
**eliminate** 62:20
**eliminating** 54:14
**Elizabeth** 6:3 8:24
**email** 14:21, 23 15:4, 5, 7 101:23 102:1 109:4, 5
**emailed** 80:4
**employees** 14:15, 20
**employer** 17:13
**employers** 18:1
**enacted** 105:20 127:5, 18
**encounter** 107:5
**ended** 21:24 141:7
**ends** 141:3
**engage** 37:18
**England** 113:19, 23 116:13 117:19
**enrolled** 56:13 62:19
**entered** 77:24
**entirely** 61:14, 22
**entirety** 62:7
**entitled** 14:16, 20
**equal** 96:13
**err** 48:11
**Escambia** 42:6 44:3, 11
**estate** 17:8, 20
**et** 1:6, 10 7:13, 14 17:16
**ethnic** 85:17
**EVAN** 1:6 7:13
**evening** 80:20
**event** 137:9
**events** 40:3
**eventually** 40:21
**everybody** 11:16 13:5 38:4 54:20 77:25
**Everyone's** 49:6
**evidence** 2:14 75:8
**evidenced** 142:15
**exact** 36:10 50:2 55:4
**exactly** 28:11 80:3 99:16
**examination** 7:8 9:12 120:24 125:13 140:6
**examined** 9:5
**examiners** 19:13
**example** 15:8
**exchanged** 132:13
**excuse** 129:8
**Exhibit** 6:14, 16, 18, 20, 22, 24 11:24 12:4, 6 52:14, 18 55:20, 23 63:18 104:24 105:2 115:22, 23 116:1 119:11, 13
**existing** 25:20, 21 32:25 33:10, 12, 13 44:1 48:21 56:12 65:6, 9, 22 68:2, 11 70:16 81:14 119:25 133:2, 24 134:15
**exists** 119:2
**expect** 14:17 31:2
**experience** 22:22 84:13, 21 124:21
**expire** 16:18
**Expires** 142:23
**explain** 23:10 41:4 56:4 66:5 83:16
**explained** 52:3 53:14
**express** 65:16 88:19 89:20 90:6
**extemporaneously** 92:20 93:12
**extensive** 35:23
**extent** 13:22 131:24 132:24 133:3, 20 137:2
**eye** 13:6

**< F >**
**face** 126:9
**Facebook** 15:15, 23
**fact** 139:5
**factor** 92:4
**factors** 92:2
**fair** 11:13 25:22 33:2 44:14 45:12 58:9 73:11
**fairly** 59:3
**familiar** 81:25
**families** 84:1
**far** 100:25

**fast** 101:2 116:25 117:17 118:11
**FAULKS** 4:10 7:22 49:8 120:20 125:8 139:21
**favor** 57:9 124:9
**Federal** 7:4 54:17 60:3 99:11 128:8
**felt** 66:12
**fight** 17:2
**figures** 74:15
**filed** 7:15 13:24, 25 110:14, 15, 16 111:13 126:9, 19 127:17 128:7
**final** 37:12 63:18 119:11
**finally** 37:20
**finals** 37:7
**financially** 142:11
**find** 94:20
**fine** 19:18 130:13
**finish** 11:21, 22 40:14
**finished** 31:25 112:15 120:3, 14
**fire** 16:22 17:4 117:17 118:12
**fires** 17:2, 3
**first** 11:24 13:23 14:4 19:14, 15, 16 21:3 25:4, 15 34:24 35:10, 11 36:7, 11 40:17 44:12 45:19 46:13 108:15 110:4 121:8
**Five** 47:23
**fix** 16:24
**FL** 3:14
**flip** 61:12 116:4
**floor** 41:9, 10, 17 115:22 117:13 132:14
**focused** 99:22
**follow** 31:19 54:20 107:13 108:12, 21
**following** 7:9 31:10 142:16
**follows** 9:6 60:9
**follow-up** 140:9
**fond** 63:6
**force** 2:4
**foregoing** 7:5
**form** 2:10 41:3 84:22 89:21 94:19 95:3 107:8 122:11 128:1, 3, 11, 12 131:23 136:23, 24
**forth** 41:24
**found** 142:16
**Foundation** 4:4
**four** 113:15
**frame** 117:4
**free** 90:5
**Friday** 125:18
**friend** 26:1
**front** 74:6, 7 136:12
**fruition** 90:6 92:22
**full** 2:4 9:16 41:19 96:19
**Fund** 3:13, 20
**FURTHER** 2:1, 8 142:9, 13

**< G >**
**gain** 67:12
**gap** 121:13
**gathered** 32:17
**General** 5:11, 12 16:17 17:11 24:17 64:9 66:8 67:8 69:11 84:22 87:1, 8, 17 88:20 89:4, 12 113:2 122:22 123:4 124:11 128:8
**generally** 60:9 66:14 123:11, 13 124:4, 5, 23, 24
**General's** 8:4 127:23 130:20
**geographic** 85:18
**getting** 14:14 35:4, 12 96:21 118:11
**gifted** 117:21
**Gingles** 45:1 46:12, 13 61:25 62:2
**give** 37:2 89:3 90:8, 12 91:15 94:24 98:19 108:19 129:20 136:20
**given** 31:8 38:10 41:9 46:16 79:8 105:21 117:3 123:18
**glad** 41:21 109:10
**go** 11:8 41:24 65:21 67:17 71:23 72:17 83:11 84:10 89:17 91:20 96:16 100:9 107:24 120:7 125:25 126:6
**goal** 26:10, 15 48:19
**goes** 15:10 61:24 86:3
**going** 27:21 29:23 33:17 36:1, 5, 25 37:7 41:24 45:25 46:15 48:6 49:11 64:16, 21 67:14 70:23 79:20 84:19 92:11 99:12, 20 100:4 106:15 111:24 117:16 126:6 127:7 131:4, 13 137:18
**Good** 8:16, 17, 18 138:23
**GOTELL** 4:10 7:22
**government** 15:1 19:9 41:8 50:10
**governor** 40:22 41:17
**graduate** 16:8
**great** 98:20 121:14
**grounds** 2:12 131:5
**Group** 5:4 8:15 92:24 102:20
**groups** 94:17
**guarantee** 119:3
**guess** 53:20 63:15 64:1 66:6 67:23 69:3, 20, 25 70:17 83:17 84:11 88:7 98:6
**Guidelines** 6:17, 19 24:20 25:19 26:3, 5 28:16 31:1, 2, 6, 9, 10, 16, 19 32:19, 24, 25 33:9 35:6, 19, 21 36:9, 12, 15, 18, 22, 25 45:22 46:3, 9 47:14 48:20 51:9, 12, 18, 25 52:2, 7, 19 53:7, 25 54:19 55:1, 14, 24 56:6, 24 57:7, 19 58:5, 8, 10, 13, 15 59:4, 7, 12, 14 60:1, 5, 23 61:4 62:19,

20 63:18 64:9, 10, 24 70:15 81:13 86:7 91:11, 16, 18, 21, 23 104:14, 19 107:13 108:12, 21, 24 129:6 133:2, 7, 9, 14, 23 138:14, 18, 25
**Guys** 16:22

**< H >**
**Hale** 82:15
**Hall** 37:25 38:3 80:13
**handed** 54:5 55:13
**handful** 50:3 55:3
**handing** 36:19
**handle** 64:16, 20
**handout** 6:19 55:24
**handwritten** 75:8
**happen** 30:2 45:24
**happened** 39:1, 13 40:2, 6, 17, 20, 24 41:13 51:24 64:5, 13 75:17, 21 80:22 81:1, 6 112:8
**happens** 94:17
**happy** 39:5 70:9, 17 71:13, 18 86:22 87:17 88:20 89:5 90:2 92:12 99:16
**hate** 47:21 71:17
**head** 45:23
**health** 20:7
**hear** 46:5 47:9, 10 49:17 79:16 120:22 126:8 128:2
**heard** 64:25 86:20 92:18, 21 102:7, 8 112:11 131:10 134:1
**hearing** 68:22 77:15, 22 99:18, 21 104:21 134:20
**hearings** 32:8, 18 35:5 36:1, 2 37:17, 19, 22, 24 38:1, 3, 6, 16 39:13 64:16, 17, 20 67:24 68:12, 24 70:2, 6 71:21 73:13 75:17, 25 76:19 77:8, 19 78:1 79:5 80:22 81:6, 19, 23 82:20 86:17, 20 88:8, 25 90:10, 14, 16
**held** 17:20, 24 27:11 64:25 65:20 66:1, 15 72:4, 12 78:10 79:9 120:23
**help** 30:19 99:17 135:4
**helpful** 61:19
**helping** 23:4
**Henry** 43:22 45:4
**Hi** 8:14
**higher** 20:20
**highest** 16:6
**highlights** 54:16
**Hinaman** 23:24 24:7 30:18 31:8, 18 32:16 33:6 38:20, 24 39:9, 16 75:20 76:18 77:4, 9 88:11, 14, 19 90:9 107:12 108:9, 12, 20 109:1 114:17 117:11 118:2, 8, 10 129:4, 22, 23 130:4, 6, 15 131:21 133:1 135:8, 25 139:10 140:11
**hired** 24:6 110:20, 22
**historical** 85:18, 25 102:23
**history** 25:5 123:18 139:3
**hit** 43:8
**Hogan** 3:6
**hold** 64:21, 23 67:24 70:1 124:18
**holding** 38:6 68:24 80:19 81:23
**homebuilder** 16:17 17:10
**honest** 25:10
**hope** 17:3 99:13 125:14 139:17
**hour** 12:21
**hours** 12:21 78:10, 14, 18, 20 79:2 99:11
**House** 18:2, 14, 17 19:9 20:22 21:11 22:14, 17, 20, 22 23:9, 14 30:12 32:10, 12 35:12, 17 38:21 39:11 41:7, 11 43:14 44:6, 21 51:21 72:11, 18, 19 98:2 101:13
**houses** 17:11
**Houston** 45:4
**huh** 60:20
**hunting** 17:11
**Huntsville** 43:18, 21

**< I >**
**idea** 87:17
**ideal** 43:24
**identification** 12:7 52:15 55:21 104:25 116:2 119:14
**identities** 85:19
**imagine** 36:24
**immediately** 37:21
**impact** 78:23 79:3
**implementing** 123:16
**importance** 89:6 98:5
**important** 11:19 60:17, 18, 20 89:11 92:2, 4, 7 93:10 98:6 114:13
**inaccurate** 105:9 116:8
**include** 85:12 140:12, 15
**included** 80:17
**includes** 85:17
**including** 40:22
**Incorporated** 17:22, 25
**increase** 42:23
**increases** 119:21
**incumbent** 134:24 135:4, 6
**incumbents** 31:4 33:1 54:13, 15 134:22
**independently** 139:8
**individual** 38:21, 22
**individuals** 123:17 125:1
**influence** 88:8
**informal** 104:18
**information** 32:17 38:9 87:21 88:4 94:3, 24 95:5 96:25 97:1 101:14 112:2 135:23
**informed** 126:18 129:7
**initial** 37:5, 9,

11 110:2
**injunction** 99:21
**input** 30:21 31:14 52:1 65:4 72:7
**instruct** 33:7 46:15 140:11, 15
**instructed** 31:9 92:25 133:1
**instructions** 90:8, 12 108:9, 19 140:20
**intact** 44:2 81:14
**intentionally** 102:18 134:7
**interest** 31:4 32:14 45:2 61:18 62:4, 6, 20, 21, 23 66:9 83:2, 5, 7, 15, 20, 21 84:14, 23 85:2, 4, 6, 10, 11, 16, 22 86:9
**interested** 91:11, 13 142:11
**interests** 62:22
**interjected** 79:9
**internal** 19:12
**interpret** 71:17 138:20, 21
**interpreted** 139:1
**interrupt** 27:8
**intervenor** 7:25
**intervenors** 10:13, 14
**introduce** 11:24 52:17 55:23 94:21 105:2 115:21 119:10
**introduced** 14:1 28:8 41:2, 6 93:23 94:10 95:9 97:25 98:2 137:17
**involved** 16:2 21:6, 15 22:24 31:23 131:12
**involvement** 23:4
**issue** 106:5, 10, 14, 18 107:1 122:24 123:5
**issues** 13:7 49:10 107:6 122:25 123:7
**its** 82:10 89:5 135:19

**< J >**
**JAMES** 4:18
**January** 22:1, 5 37:6, 11, 12
**JEFFERSON** 142:2
**jerrymandered** 119:18 127:6, 20, 25 128:10
**jerrymandering** 128:22 129:2, 10, 12
**JIM** 5:10, 17 8:1, 3, 22 125:11 127:9 128:2, 3 131:4 140:7
**jim.davis@alabamaag.gov** 5:15
**JOHN** 1:10 5:9 7:13 8:5
**jublacksher@gmail.com** 4:22
**JULIE** 4:1 8:20
**jump** 126:5
**jumping** 11:23 41:23
**justice** 58:23 59:1 124:6, 9, 14

**< K >**
**KAITLIN** 4:9 7:20 9:9, 14 116:5
**KATHRYN** 3:11 8:8 47:9
**keep** 26:11, 15 41:23 44:15 49:11 70:7, 13, 20, 23 71:9 81:13 130:10, 16
**keeping** 26:20
**keeps** 47:11 83:19
**kept** 44:1, 2 71:4, 5
**key** 11:8
**kicked** 76:8
**kin** 142:10
**kind** 74:19
**kinds** 77:12
**knew** 27:19 68:5, 25 111:11, 13 131:8
**know** 11:5, 10 13:1 16:21 20:5 23:18 24:9, 11, 15, 17, 22, 25 25:5, 10, 11, 19, 23, 24 26:8, 13, 14, 19 27:13, 16, 24 28:16, 17 30:2 35:1 36:23, 25 43:2 48:10 50:18 52:8 53:5, 19 55:10, 16 56:9 57:3, 6, 9, 16 60:13, 23 61:4, 22 62:4, 9, 13, 24 63:1, 9 65:1 66:7 67:13 69:5 70:21 74:1 75:4 76:7 78:9, 17, 24 81:2, 17, 21 83:12, 19, 20, 22, 24 84:6, 9, 24 85:3, 23 89:15 92:13, 15 93:8, 15, 19 95:20, 22 96:11, 25 99:5 102:1, 24 103:5, 22 104:13, 18 105:13 107:22, 25 108:4 110:4, 10, 12, 17, 20, 22 111:17, 20 112:3, 13 115:2, 6, 16 116:21 117:8, 25 123:15 124:8 129:11 131:8 136:12 138:15, 22
**knowledge** 112:6 130:17 139:3
**known** 78:1
**ksadasivan@naacpldf.org** 3:16
**kwelborn@aclualabama.org** 4:15

**< L >**
**laid** 37:21
**lands** 85:14
**Large** 1:22 7:3 65:5 119:19 135:20
**late** 35:4 117:18
**LaTISHA** 4:10 7:22
**law** 1:22 3:5, 12, 19 4:3, 11, 19 5:3, 4, 19 8:15, 25 35:20, 22 36:13, 17, 21 37:1 41:5 46:11 48:22 54:25 55:15, 18 57:21 60:3, 14, 19
**laws** 2:5 54:18
**lawsuit** 10:6 13:24 110:14, 15 111:12 113:16 126:9, 15, 25 127:4, 23 128:19 140:9
**lawsuits** 16:3 105:18
**lawyer** 10:1, 3, 5, 18, 21
**lawyers** 63:5 131:3

**lay** 31:2
**laying** 36:3
**LDF** 8:9
**leadership** 22:9
**leading** 2:11
**League** 66:24 69:9 77:21 78:1, 6 87:3 88:17, 25 89:8, 14, 24 98:1 126:12, 14, 15 135:16 136:3, 17 137:11, 15 138:4
**LeAnn** 1:21 7:1 142:22
**learn** 86:16, 19
**learned** 88:8, 13
**leave** 20:19 120:6
**leaving** 22:21 106:22
**left** 18:25 121:9
**Legal** 3:13, 20 63:4, 6 104:4
**legislative** 14:14 15:2, 11 26:3 30:13 34:16, 19 36:22 57:13 66:21 74:19 75:25 93:17 109:19 117:2
**legislators** 28:18
**legislature** 18:13 19:15 21:5 23:16 26:7, 11, 19 27:24 28:7, 9 29:20 34:7, 8 39:7 83:17 84:15 94:20 121:7, 13, 24 122:7, 21 123:10, 19 124:3, 21 128:21 132:15
**letter** 37:25
**letting** 96:4
**level** 16:6
**Liberties** 4:4, 12
**license** 17:20, 24
**licensed** 16:16, 17 17:10 142:14
**liked** 67:1 70:6
**line** 43:9, 10, 12 71:10 91:21, 23 92:20
**lines** 54:21 65:23 71:6 81:9, 22 123:21
**links** 79:5
**Linwood** 4:20
**list** 31:5 38:4 80:13
**listen** 72:17, 21 79:17 137:18
**listened** 72:19, 23 79:9 87:23 89:7
**litigation** 121:4
**little** 23:3 27:9 66:7 84:3 99:22
**live** 65:5 70:19, 22
**living** 17:5
**LLP** 3:6
**location** 79:15
**locations** 72:7
**log** 79:12 80:18
**logged** 79:7, 25
**long** 12:20, 22 18:6, 9, 22 86:4 99:5 111:17 121:6 139:22
**longer** 99:16
**longstanding** 26:6
**look** 29:14 31:3 54:11 66:25 76:11 95:6, 12, 13, 14 96:18, 23 112:19
**looked** 31:25 74:21 94:4 97:6 106:4, 9 107:17, 18, 22, 25
**looking** 85:8 91:11, 14 106:18 107:14 136:13
**looks** 56:1 61:21
**Los** 3:8
**lose** 67:13
**lost** 42:8 127:12
**lot** 44:20 45:3 68:14 78:17 99:18, 19 102:11 125:20
**Lovells** 3:6
**Lowndes** 82:15
**lunch** 120:16 139:22

**< M >**
**ma'am** 12:10 21:23 22:6 24:12, 24 25:2 26:24 33:16 35:9 38:17 39:20 42:13, 15, 17 44:17 46:24 47:2 48:18 51:15 52:8, 12 53:2 56:2, 18, 21, 25 57:2 61:3 62:12, 25 67:6 72:14 73:8, 22 75:15, 22 80:9 81:20, 24 84:16 86:2 87:15, 19 90:20 92:6 93:18 94:15 101:6 102:25 107:20 108:1, 7, 17, 18 109:5, 15, 17, 20, 24 110:19 111:19 112:20 114:10 115:1, 5, 9
**Macon** 83:11 84:8
**magic** 119:2
**maintain** 26:3 119:24
**maintained** 134:14
**maintaining** 134:18
**major** 122:23 123:5, 22
**majority** 25:4, 16 28:19 29:10 69:15 90:17, 19 91:8 93:15 95:24 97:11, 12 115:19 132:7, 12, 21, 22 133:6, 12, 18 134:4, 11, 19 135:1, 5 136:5, 19 140:13, 23
**makeup** 27:14, 16 42:12 95:14
**making** 36:12
**man** 59:24 67:19 68:8 96:17
**manner** 31:10, 21 133:23
**map** 6:25 23:2, 4, 21 24:10, 18 25:3, 6, 7, 16, 23 27:13 28:6, 22 29:9, 21 30:4, 5, 17, 25 31:24 32:23 33:3, 4, 7, 14, 25 38:23 39:19 40:22 54:20 65:13 66:24, 25 67:5, 15, 22, 25 68:2, 11, 13 71:1 73:4 77:4, 18 78:2, 6, 7 81:18 83:19 84:12, 15 88:9, 11, 24 89:6, 8,

11, 14 90:10, 13 93:11, 15 95:24 96:3, 7, 25 108:6, 15, 17 109:13 110:2, 6 112:14 114:18 119:11
**maps** 23:7 24:8, 23 25:1 27:18 28:4, 11 30:19, 25 31:15, 20 32:10 38:15 40:21 57:13 66:8, 22 67:2 69:6 74:6, 9, 11, 12 80:23 81:22 91:17 97:11 100:20 101:16 108:13 109:22 110:25 111:1, 6, 8 112:4 118:16
**Marengo** 82:15 83:11
**margins** 70:21
**mark** 95:25 97:2
**marked** 12:7 52:15 55:21 104:25 116:2 119:14
**marks** 7:11
**Maroney** 1:21 7:1 142:22
**materials** 46:25 60:10 101:17
**math** 103:11
**matter** 7:13 112:25
**McCLENDON** 5:17 8:1 12:19, 23 13:3, 17 35:24 46:2, 8 47:5 48:3 51:17 58:2 61:11 74:2 80:10, 23 81:4 106:1 107:4 108:11 113:19, 25 114:8
**McDonald's** 79:18
**mean** 15:20 19:1 27:18 30:10 33:9 36:18 38:19, 24 43:5 44:18, 20, 25 45:5 50:10 51:11 54:8, 10 59:19 65:9, 13 66:5, 17 70:8, 12, 18 71:18 73:9 74:9 77:14, 17 78:25 79:12 83:24 86:18 87:1, 22 91:13, 15 95:17 98:17, 25 99:10 100:22 101:21 105:15 107:9 113:13 114:16 115:17 116:21 122:4 130:9 134:11
**Meaning** 87:10 139:2
**means** 9:9 23:11 107:2 108:14 109:6 134:13 139:11
**meant** 116:22 134:19 135:5
**media** 15:14 38:5
**meet** 12:20, 24 32:16 91:17
**meeting** 38:21 39:3, 14 46:17, 18, 20 47:1, 12 48:16, 23 50:15, 19 51:5, 6, 19, 23 52:1, 2, 9, 11 53:17, 20 56:14 58:5 63:7, 10, 17 64:2, 5 69:13 72:5, 14 73:10 77:3 78:4 79:7 80:2 87:2 88:16 89:15 91:4, 6 100:17, 19, 21 101:5, 11, 15, 24, 25 102:4 105:4 109:14 111:23 137:17
**meetings** 36:4 38:8 40:1 47:16, 19, 24 48:2, 19 49:1 50:6, 21 51:1, 2, 16 64:23 65:3, 15, 20 66:1, 12, 13 67:5, 7 69:18 70:6 72:3, 16 73:7 74:5, 8 75:6, 14, 21 76:15 78:9, 23 79:20, 21 80:8, 14, 17, 19 82:23 87:11 88:3, 14, 15 92:24
**meets** 50:11
**member** 20:17 21:10 22:20 31:13 39:21 48:6 56:11 58:3 88:11 94:20 96:14 103:24 104:2 121:15, 18 140:18
**members** 22:16, 17 24:3, 6 30:12, 18, 21 31:11, 22 32:11, 16 37:23 38:21 39:3, 4, 10, 16 41:11 51:21, 25 52:4, 7 53:10 54:22 56:17 67:1 70:7 71:4 73:23 80:12 87:9 88:12 100:21 101:12, 13, 17 107:21, 23 114:17 119:9 121:24 122:1, 7, 8 123:10, 12 124:1, 3, 5, 12, 13, 17, 18, 22, 23 135:9, 12
**memory** 24:4 137:14
**mention** 133:6
**mentioned** 21:1 33:18 45:19 63:7 65:25 70:5 90:21, 23 94:22
**MERRILL** 1:10 5:9 7:14 8:5 140:8
**met** 12:14 39:9, 16 40:6 49:23 57:18 91:11, 16 107:23 135:9
**method** 24:17
**MICHAEL** 3:4 8:12
**michael.turrill@hoganlovells.com** 3:9
**microphone** 27:9
**middle** 37:15, 21 61:14 82:9
**MILLIGAN** 1:6 3:3 7:13 8:9, 10, 13, 19, 21 9:1, 15 120:13
**mind** 80:4
**mine** 26:1 106:3
**minimal** 138:19 139:1
**minimum** 139:11
**minor** 16:13
**minorities** 118:14, 20
**minority** 21:10, 12 25:16 69:16 93:16 95:24 97:16, 21, 23 98:5, 9, 13, 22 102:21 115:19 119:3 134:8, 15
**minute** 28:12

39:3, 23
**minutes** 12:21
**missing** 72:2
**Mobile** 18:15, 21 42:5 43:7, 13, 19 44:3, 7, 10 45:3 83:24 84:1 125:15, 18
**moderator** 73:8
**Monroe** 42:6 44:3, 11
**Montgomery** 1:23 4:14 5:14, 22 125:17
**monuments** 122:2
**morning** 8:18 136:13
**motions** 99:7, 25
**motivation** 34:12
**move** 27:9 68:17
**municipalities** 85:14

**< N >**
**N.W** 3:21
**NAACP** 3:13, 20
**name** 9:13, 16 15:22, 24 82:10 93:1, 5 121:2 142:16
**names** 7:19
**NE** 5:5
**necessarily** 84:20
**necessary** 2:9 67:21, 24 68:23 111:25 116:17 117:8
**need** 16:24 54:23 63:13 68:17 90:17 99:8 113:4, 10, 13 114:7 115:7
**needed** 22:21 54:25 57:20 68:7 76:16 130:4, 21 131:19, 20 134:19 135:1, 3
**needs** 99:21
**neither** 142:9
**neutral** 54:11 107:14
**never** 15:22 29:17, 19 103:13 112:11 121:18 129:9
**New** 3:15 4:6 46:11 67:13 80:23 128:19
**night** 79:25 125:15, 19
**nine** 41:20
**nitty-gritty** 66:7
**nods** 45:23
**nonminorities** 115:20
**nonpartisan** 22:15
**normal** 53:6
**North** 142:23
**NORTHERN** 1:2 7:16 84:1
**Notary** 1:21 7:2
**note** 116:8
**notes** 52:10 75:5, 7, 12, 13 101:22
**notice** 6:15 11:25 37:22 101:20
**noticed** 14:8 99:7
**notification** 101:25
**notifying** 101:23
**November** 38:11 115:23
**Number** 7:14 12:4 47:21 50:2 67:14 76:16 91:2, 24 98:6 113:20 118:3 119:2 142:16
**numbering** 12:2
**numbers** 35:4 37:6, 11, 13, 15, 19, 20 67:9, 16, 22, 24 68:4, 17, 19, 24 69:5, 7, 22, 24 70:2 76:5, 14 96:8, 18 97:4
**numerous** 66:23 123:1

**< O >**
**oath** 9:20
**Object** 128:1, 11, 12 131:4 132:23 136:23, 24
**Objection** 107:8 122:11 128:3 131:23 132:8 133:19 134:5
**objections** 2:9, 12 100:4, 7
**obligation** 40:13 128:21
**obtain** 16:11
**occasionally** 76:2
**occur** 38:14 46:20 67:7
**occurred** 41:20 48:17 67:5
**o'clock** 50:11
**October** 39:15 40:6, 18 50:20 51:2 100:16 105:4 109:14, 23
**offered** 2:14
**Office** 5:12 8:4 18:23 20:19, 21, 24 23:13 28:7 35:25 46:7 48:8 76:10 93:22 109:3 127:23 130:20 137:4
**offices** 1:22
**official** 88:5 121:18 137:15
**Oh** 127:13
**okay** 9:10 10:12, 16 11:4, 23 12:20, 23 13:9, 12, 23 14:3, 9, 21 15:13, 19, 23 16:2, 6, 14, 24 17:15, 23 18:1, 6, 9, 19, 22 19:3, 14, 17, 22, 25 20:10, 13 21:1, 12 22:2, 4, 7, 15, 18 23:6, 15, 25 24:13 25:14, 22 26:2, 8, 14, 25 27:12, 20 28:17 29:4, 16 30:2, 20 31:17, 22 32:2, 4 34:2, 11, 22 36:7 38:18, 23 39:12, 24 40:16 41:4, 15, 21 42:7, 11 43:3 44:5, 9, 18 46:19 47:25 48:2 49:1 50:5, 17 51:3, 13 52:25 53:15 56:23 57:6, 16 59:2, 13, 25 61:7, 9, 20 63:3 64:4, 18 68:3, 9, 23 69:25 70:5 71:20 72:3, 15 73:9, 11, 17, 23 74:14, 24 75:12 78:13, 22 80:6 82:4 86:3 87:16, 20 92:1 93:7 94:16, 22 95:5 96:5 97:5, 10 98:3, 24 99:3 100:25 101:8 102:3 103:15, 21 104:13 105:19, 22 107:5 109:4, 9 111:7 112:13, 19 113:9, 15, 17 116:11 117:7, 12 121:11 123:9 124:2 125:4

126:18 127:12, 22 128:24 129:14 130:9, 13 131:18 132:3 133:5, 12 135:15 136:2 137:18 138:2, 18, 23 139:7
**old** 57:19 79:15
**Once** 31:25 90:25 94:16 112:10
**ones** 19:7 20:4 63:10 74:22, 23 111:25
**operating** 65:12 101:6
**opinion** 69:21, 23 84:22 89:20 90:4, 7 92:5 93:10 114:9, 24 115:1 131:3
**opinions** 66:8 69:6 124:1, 19
**opportunities** 79:12 80:16
**opportunity** 97:14, 18, 20 122:22 127:2 134:21
**opposed** 123:5
**option** 111:10
**oral** 7:8
**order** 38:12 54:2 67:19 68:8 75:1 92:9 98:20 132:5, 19
**OSHER** 5:2 6:8 8:14 27:8 46:5 120:22, 24 121:3 122:14, 19 125:4
**outcome** 43:24
**outside** 28:6 93:22 94:5, 17
95:9
**overall** 97:7
**overnight** 125:18
**overpopulated** 67:11 74:23
**overpopulation** 68:18
**oversaw** 32:7
**oversight** 19:12
**Overton** 48:12
**overview** 37:2
**overwhelmingly** 45:11, 17

**< P >**
**p.m** 100:15 120:9, 12 140:2, 5 141:5, 7
**P.O** 4:13
**PAC** 15:8
**PAGE** 6:13 15:15 105:24, 25 113:18 116:4, 16
**Pages** 61:12, 19
**paid** 41:21
**Paige** 6:2
**paper** 39:22 89:21 92:17
**parameters** 54:1
**part** 32:24 62:22 64:24 66:2 84:24 87:22 92:24 95:19 110:25 119:19 130:6
**participate** 39:25 71:21
**particular** 62:10, 13 83:22 92:24 103:3, 17 106:21 114:12 118:21, 23 137:3 140:16
**particularly** 102:17
**parties** 1:18 2:11 122:23 123:23 142:10
**partisan** 62:20, 22
**parts** 38:2 83:15
**party** 21:10, 13 24:13 117:20 121:16, 19, 25 122:1, 8, 9 123:5, 6, 11, 12 124:4, 5, 12, 13, 17, 22, 24
**passed** 22:10 27:18 38:12 40:21 41:7, 8, 11, 17 52:4 58:22 105:17 111:2, 6, 9 126:10
**passing** 111:22
**Paul** 9:18
**paying** 10:17, 21
**people** 13:21 45:9, 10, 16 65:5, 16 66:11, 22, 23 67:1, 10, 12, 17 68:7, 11, 17, 25 69:1, 3, 4, 12, 17 70:6 71:1, 13 73:14 74:18, 25 76:2 78:13, 17, 19 81:10 84:3, 7, 8, 9 86:21 87:10 89:7, 19 90:1 92:12 97:25 117:22 122:5
**people's** 66:3
**percent** 26:15 42:16, 21, 24 57:9, 23 97:15, 21, 22 98:4, 11, 12, 21, 22 113:20, 22 114:3, 6, 12, 25 115:3, 6, 12 116:18, 19 117:5, 25 118:3
**perform** 111:17, 24
**performed** 104:1
**period** 69:6 72:8 79:13
**permanent** 87:22
**Perry** 82:15 83:11
**person** 11:20 16:25 71:23 72:10 96:15 109:5
**personal** 14:24 15:11, 13, 17, 23 26:1 84:13, 20 90:7
**personally** 83:20
**PI** 99:7
**picked** 39:22
**piece** 89:21 92:17
**pit** 31:4 33:1
**Plaintiffs** 1:8 3:3 4:17 5:1 7:21, 23 8:9, 11, 13, 15, 19, 21, 23 9:1, 15 10:6 120:13, 15, 20 121:3 125:8
**Plaintiff's** 6:14, 16, 18, 20, 22, 24 12:4, 6 52:14, 18 55:20, 23 104:24 115:23 116:1 119:10, 13
**plan** 24:21 25:8, 13, 25 27:2 42:9 43:6 58:24 65:6, 9, 11 69:15 77:16, 20 79:10 87:4, 5 91:10 93:21 94:5, 8, 10, 12, 16 95:4, 6 96:1, 4, 9, 18, 19, 24 97:7 107:15, 16, 19, 20 114:15 119:7, 8 120:1 126:10, 16 127:1, 5, 18, 24

128:9, 20
129:17, 23
130:2, 7, 15
131:19 132:6, 20 134:19
135:11, 16, 18
136:4, 17
137:12, 16
138:8, 12, 19
140:12, 24
**planning** 34:24
**plans** 22:9
27:5, 6 31:3, 7, 9 38:12
40:8 58:22
64:11 65:22
76:5, 8 77:6
107:14 130:1, 11 133:22
**play** 28:6, 14
29:24 46:12
104:9
**please** 7:18
9:3, 16 118:19
137:21
**pleasure** 139:16
**plus** 18:8
**point** 25:6
30:5 32:22
33:3, 8 34:16
39:1 40:7
64:12 88:15
93:16 94:1
95:6, 7 97:10
99:16 105:14
109:22 116:24
118:6
**points** 69:13
77:15, 23 87:3, 6 88:17 89:1, 16, 25 92:14, 18, 21 93:9
117:14, 17
118:7, 9
132:10, 13
135:17, 24
136:2, 11, 15, 16, 22 137:5
**polarization**
102:4, 11, 15
103:2, 17
104:7, 10, 15
105:14, 17
106:7, 8, 12, 13, 20 109:12, 18, 21, 25 110:5, 18, 25 111:8, 18, 21 112:3, 14, 24 113:24
114:1, 5 115:4, 8, 12 116:14
**Policies** 123:16
**political** 16:13
85:12 123:21
**politically**
86:14
**population**
26:16 42:22
65:22 76:11
95:3, 12, 18
96:11 97:23
98:5, 12, 13, 22
102:8 113:21
119:21
**populations** 96:2
**portion** 18:19
82:17 102:3
**possible** 27:9
39:2 69:21
92:9 107:5
117:1 133:3
**possibly** 49:10
106:4, 9, 14, 18, 25
**potentially**
136:7
**practicable**
81:15
**precincts** 85:13
**preclearance**
112:10
**precleared**
58:25 59:21
112:11
**predominantly**
85:23
**prefer** 19:21
**preference**
123:16
**preliminary**
99:21
**prepare** 12:13
51:6, 14 74:4
100:18 106:23
**prepared** 67:5
93:8 118:7
**PRESENT** 6:1
7:18 66:24
73:6
**presented** 29:17
63:17 68:11
119:8 135:11
137:11, 23, 25
138:3, 7
**preserve** 32:25
33:9 133:24
**press** 80:17, 23
**pretty** 25:12
60:20 63:5
99:22 123:20
**prevent** 9:22
**previous** 112:5
**previously**
21:18 42:21
**primarily** 38:24
73:12 80:10
**primary** 26:10, 15
**principle** 60:8
**PRINGLE** 1:10, 20 5:17 7:7, 12 8:2 9:4, 13, 18 17:25
125:14 126:3
127:16 131:11
133:5 139:14
140:7 141:4
**prior** 2:14
22:20 26:4
40:13 52:1, 8
56:11, 13, 22, 24 58:5 81:18
95:25 100:21
109:13 111:21
**priorities** 33:25
**prioritize** 54:23
**priority** 33:19
**prison** 40:11
**prisons** 40:9
**private** 14:24
**privilege** 63:14
127:8 131:5
132:9
**privy** 114:20
**Probably** 35:1
136:13
**Procedure** 7:5
99:11 101:7
**proceedings** 7:9
142:5, 8
**process** 21:6, 9, 24 22:13, 25
26:10 28:18
29:25 30:9
33:18 34:24, 25 35:18 36:3, 25 37:3 41:19, 25 46:3 57:16
64:14 66:2
93:17 96:17
101:3 105:15
107:7, 11
**produced** 43:6
68:13 77:20
80:13
**program** 94:23
**project** 40:14
**prompted** 89:17
**property** 43:9, 10, 11
**Proposed** 6:19
37:24 51:11
52:6 55:24
56:13 57:19
61:15 63:8, 10, 16, 22 77:6
93:16, 19
100:20
**protect** 33:19
34:1, 9 45:6
70:15 98:9
133:2 134:22
135:4
**protected** 29:2
102:20 134:8
136:8
**protecting** 43:4
44:19 135:6
**protection** 96:14
**provide** 101:17
105:5
**provided** 55:5
56:7, 9
**Public** 1:21
7:2 19:12
20:23 32:7, 8, 17 35:5, 25
36:1 37:16, 18,

22, 24 38:1, 3, 5, 16 39:13 41:1 64:11, 15, 16, 20, 23 65:2, 15, 19, 21, 25 66:12 67:5, 7, 24 68:12, 16, 21, 24 70:2, 6 71:20 72:3, 16, 25 73:7 74:4 75:6, 14, 17, 21, 24 76:14, 19 77:3, 7, 8, 12, 15, 19, 22 78:1, 23 79:4, 5, 6 80:22 81:6, 19, 23 82:20, 22 86:17, 20 87:1, 8, 11, 17 88:8, 14, 20, 25 89:4, 12 90:10, 13, 16 92:23 122:2
**publicize** 36:6
**published** 38:4
**pure** 69:5
**purpose** 16:23 65:2, 15 102:18
**pursuant** 7:4
**put** 28:9 31:6 41:9 47:21 54:25 88:1, 5 89:18 90:3 94:2, 18 116:5
**putting** 54:13

**< Q >**
**question** 10:10 11:10, 12, 13, 23 25:11 40:19 53:23 57:5 63:13 66:5 70:25 73:2, 15 80:21 86:10 93:13 98:16 103:23 106:2 118:18 119:1 124:20 127:9 130:3 132:3, 23 133:8, 16 134:2, 23 137:19, 21 138:10
**questions** 2:10, 11 9:23 11:9, 21 72:24 73:13, 18, 20, 24 74:2 80:4 117:22 120:14, 15, 21, 25 125:9 126:2 139:15 140:10 141:2
**quick** 121:1
**quicker** 43:18, 20
**quickly** 33:17 41:25 49:10 92:11
**quit** 17:7
**quite** 86:3 117:21
**quote** 80:24
**quoting** 133:1

**< R >**
**race** 27:25 54:11, 12 107:10, 14, 16 108:5 110:3 123:17
**race-neutral** 31:10, 20 108:15 133:23 134:16, 18
**races** 75:25 131:15
**racial** 26:11 27:13, 16 42:11 85:17 95:14 102:4, 8, 10, 14 103:1, 16 104:7, 10, 15 105:13, 17 106:5, 6, 7, 10, 12, 14, 18, 19 107:1, 6 109:11, 18, 21, 25 110:4, 17, 25 111:8, 18, 21 112:3, 13, 23 113:24 114:1, 5 115:4, 8, 12 116:14 128:22 129:2, 10, 12
**racially** 119:18 127:6, 19, 24 128:9
**ran** 45:11
**Randy** 23:24 38:20
**range** 119:5
**ranking** 20:16 21:10
**rapid** 117:17 118:12
**rapidly** 116:25
**reach** 131:3
**reached** 139:7
**reaches** 95:2
**read** 31:1 51:11 60:4 61:18 69:14 74:8 77:24 87:4 88:17 92:19 101:14 106:15 126:21 132:14 137:21, 22 139:13
**reading** 2:2 41:9 87:3 92:17 118:5 137:5
**readings** 139:12
**reads** 89:16
**ready** 38:13 99:24
**real** 17:7, 20
**really** 11:19 33:17 34:11 41:25 69:25 77:18 83:12 99:9, 14, 15 116:23 118:18 119:1
**realtor** 16:16 17:15 18:5
**Reapportionment** 6:17 19:10 20:5 21:2 23:13 28:7 30:8, 10, 24 31:13, 23 32:6 35:20, 25 36:8, 13 39:14 40:5, 18, 23 45:21 46:7 47:13 48:7, 8, 15, 22, 24 49:2, 22, 23 50:6, 7, 13, 19, 22, 25 52:18 53:10, 15 55:14 56:17 58:3 76:6, 10 80:7 83:18 85:5 93:22 100:17, 23 102:2 103:25 104:3 105:3 109:2 128:25 129:1, 16 132:19 139:4 140:19
**reason** 21:22 28:5 58:20 59:8, 25 60:15 62:5 65:19 96:16 105:8 108:23 116:7
**reasonable** 44:23, 24
**reasons** 54:18 59:13
**recall** 27:22 36:7 47:17, 18 49:24 51:7, 21 54:24 55:2 57:15, 25 58:6 63:20 64:6, 7 66:3 75:18 76:23 77:11 78:7, 8 82:19 86:24 89:2 90:11, 15, 16, 22 104:17, 20 133:14
**receive** 14:19 37:5
**received** 135:22 137:3
**receiving** 70:10
**Recess** 49:14 100:13 120:10 140:3
**recognize** 55:25

**recollection** 14:3 26:18 28:20 29:1, 7 47:6 132:16 138:1
**record** 9:17 27:11 49:13, 16 64:11 77:24 87:4, 23 88:1, 5 89:18 90:4 95:17 100:9, 12, 15 116:6, 8 120:7, 9, 12, 23 137:22 140:1, 5
**recordings** 50:23
**records** 50:23
**Rector** 3:14
**redistricting** 11:3, 5 16:3 21:6, 9, 16, 24 22:8, 12, 24, 25 26:9 29:25 30:9 33:18 34:23, 25 35:21 36:16 37:3 40:16, 17 41:2 42:22 45:20, 21 46:10 47:14 52:19 54:5 64:14 66:2 96:12 107:7, 11 112:5 129:17 131:13 132:6
**redrawing** 24:8
**Reed** 25:8, 13, 22, 24 42:9 119:20 120:1
**reelect** 45:17
**reelected** 35:12, 16 121:9
**re-elected** 18:25
**reelection** 45:11, 14 134:22 135:13
**refer** 19:16 25:12 27:5 102:5, 10 126:12
**referred** 25:24
**referring** 27:5 69:9 106:6 108:9 117:8 118:1 126:10
**reflect** 55:15
**reform** 124:6, 9, 14
**refrain** 100:4, 6
**refresher** 11:9
**regarding** 40:16
**regardless** 69:7
**region** 82:9
**register** 79:19
**regular** 50:5, 8
**related** 78:6 79:1
**relating** 2:5
**relationship** 115:2
**relay** 77:2, 9
**released** 79:5
**releases** 80:17
**rely** 58:12, 21
**remained** 45:13
**remedy** 128:22 129:2, 9
**remember** 14:7 20:4, 9 26:5, 17 32:3 35:7 36:10 37:10 42:11 46:1, 6, 24 48:3, 16 49:4, 5, 25 50:2 52:3, 6 53:18 55:4 58:24 59:9 60:5, 6 64:3 72:2 73:3, 5, 25 74:3 76:1 77:10, 21 78:4 82:25 87:8, 14 88:22, 23 90:24 91:2, 5 94:9, 12 97:12, 13 98:1 100:18, 25 101:2 112:7, 9 114:23 116:23 117:17
**remembered** 59:11 87:23
**remodeling** 17:12
**remotely** 72:9
**removing** 122:2
**repeat** 18:16 118:19
**repetition** 99:19
**Reporter** 7:1 9:2, 7 11:15 16:20 97:22 100:6 137:21 142:15
**Reporting** 142:14
**represent** 7:19 9:15 19:23 24:7 42:2 45:10, 16 50:24 80:25 140:8
**representation** 70:9 80:15 86:23 87:18 88:21 89:5, 13 90:2, 7 92:13
**Representative** 8:1 9:13 18:14, 17 25:25 37:25 42:1, 12, 20 43:4 44:5 45:6, 13 46:2 70:18, 20, 24 71:9, 14, 19 113:19, 23 116:13 121:2, 6 122:20 125:5, 14 126:3 127:15 131:11 133:5 139:14 140:7
**Representatives** 18:2 20:23 41:12 70:11, 13 71:6
**represented** 10:1 93:1, 6
**representing** 7:21, 23, 25 8:4, 15
**represents** 10:5, 13
**republican** 121:16, 17, 19, 21 122:1, 9 123:12 124:5, 13, 24
**republicans** 21:12 123:2
**request** 38:2 50:22 104:5 110:12
**requested** 14:5 110:10
**requesting** 38:1
**required** 36:15, 21 134:3
**requirement** 131:8 132:11 134:17
**requires** 115:12 134:6
**reservations** 85:14
**residence** 44:16
**resolve** 49:10
**respect** 30:24 31:3 39:19 88:15
**respecting** 54:14
**respective** 1:18
**respond** 99:24
**response** 43:17 91:7
**responsibilities** 32:5, 20
**responsibility** 98:18
**rest** 70:19, 21
**result** 11:5 22:7 142:11
**retained** 24:12
**reusing** 60:15
**review** 13:9, 12 19:13 20:8 52:1 56:14 100:21
**reviewed** 52:23 53:13 56:21
**reviewing** 46:9
**revised** 51:18
**revising** 47:13 58:4
**revisions** 56:23
**rewritten** 61:22 62:7

**rich** 82:10 86:5
**right** 9:20 14:17 18:3, 6 20:9, 16 27:3 28:3 32:3, 21 33:24 34:4, 20 39:2, 8 48:24 49:19 50:12 53:22 58:16 59:22 66:20 68:15 70:24 71:2, 7 72:13 76:3, 15 78:2, 15 80:11 83:15, 23 84:11, 14, 17 85:6 86:1 87:25 96:21, 23 99:15, 17 101:5 103:12 105:20 108:16 111:2 115:24 126:11 131:14 133:10, 13, 16 139:9
**Rights** 54:3, 7 59:16, 19, 20 98:7 99:2 102:20 132:5, 20 133:10, 17 134:3, 6 136:4, 18 137:13
**River** 43:8, 12 83:25 84:2
**rivers** 84:10
**Road** 4:20 11:9 43:10, 11 54:20
**Rock** 41:5, 22
**role** 18:12 21:8 22:12, 15, 19 29:24 30:23 48:13 52:21, 25 56:19 62:10 72:15 104:9
**room** 11:18 39:21, 23 90:3 120:6
**ROSBOROUGH** 4:2 8:18, 19 49:6 100:3
**ROSS** 3:18 8:10
**roughly** 121:11
**RP** 102:6
**RPV** 102:5, 7
**rule** 28:5, 14 36:22 60:6 76:8 93:21
**rules** 2:5 7:5 11:8 99:11
**ruling** 62:8
**rulings** 36:19, 20 46:11 54:4, 8 55:13
**run** 20:20 83:25 99:1 123:25
**rural** 84:24

**< S >**
**SADASIVAN** 3:11 8:8, 9 47:7, 10 49:9, 19
**safe** 48:11
**sales** 17:9
**satisfied** 89:12
**saw** 56:1, 3, 12 59:10 76:7 138:24
**saying** 63:15 69:8 71:13, 14, 16 84:11 100:2 123:22 124:10 133:15
**says** 11:17 106:1 113:25
**scenes** 38:13
**schedule** 35:3, 5 37:16 50:5, 8 79:4
**school** 72:20 85:15 117:2
**Schoolhouse** 41:5, 22
**science** 16:13
**scratch** 58:13
**screen** 127:13
**seat** 34:9 43:4 45:7
**second** 19:1 41:9 98:3 105:12 135:15
**secondhand** 114:21
**seconds** 139:25
**Secretary** 8:4 38:10 140:8
**Section** 58:23 59:1, 16, 18, 19, 20, 21 61:17 62:6, 18 98:7, 15 99:1 102:19 103:10 112:9 136:7
**see** 8:16, 17 16:21 21:22 31:7 34:15 56:15, 16 61:12, 13 65:7, 23 66:22 67:18 74:22 89:8 95:23 96:1, 4 97:6 109:2 113:4, 10, 13 125:20 127:12 139:17
**seeing** 94:9, 12 97:12, 13 104:17, 20
**seek** 22:18 130:19
**seeking** 134:22 135:13
**seen** 12:9 29:19 76:4, 5 95:21 112:16, 17, 18 115:19
**sell** 82:2
**senate** 21:11 32:10 41:14 72:20
**Senator** 8:1 12:19, 23 13:17 33:19 35:24 44:15 46:7 47:5 48:3 51:17 58:2 61:10 74:2 80:10, 23 81:4 106:1 107:3 113:18, 25 114:7
**send** 45:3
**sense** 42:14 46:22 47:19 89:19 123:4
**sensitive** 99:22
**sent** 37:22, 25 41:14 43:15 51:25 52:7 69:10 92:19 93:3 100:20 101:1, 19, 23 102:1 110:7
**sentences** 11:21
**sentiment** 88:20 89:4 92:12
**separate** 66:18
**September** 127:18
**sequentially** 12:2
**series** 37:22
**serve** 19:11 21:19 35:17
**served** 18:24 20:5, 6, 7, 8, 23 25:6 26:1 33:3 50:8 121:7, 8
**serves** 137:14
**service** 122:21
**serving** 20:22 21:23 121:23 123:9 124:21
**session** 22:3, 4 28:13 40:9, 10 41:2 93:18, 20 94:6 110:9 117:18
**set** 32:7 80:7 93:9 106:3
**setup** 65:17
**seven** 19:1 113:15 117:3 129:5
**Sewell** 114:15 119:7
**shape** 119:22
**share** 45:3 69:18
**shattering** 81:15

**she'll** 11:17
**shift** 76:13
**shifted** 65:23
**shifts** 74:7
**ship** 43:7, 12, 13 44:21
**short** 120:3
**Shortly** 14:8
**show** 65:21 91:10 109:10
**side** 43:11 48:11 83:4, 12 99:24
**signature** 2:2
**signed** 40:21 41:17 114:18
**significant** 124:25
**similar** 60:5
**similarities** 59:10
**single** 67:8 77:22 84:13, 21
**single-member** 54:14
**SINGLETON** 4:17 8:23 120:15 125:8 126:11 127:17 128:7
**sir** 121:22 126:13, 17, 20, 23 130:25 133:11 134:1 139:6
**sitting** 46:1, 6
**situation** 43:25
**six** 38:1, 3 80:14, 16
**skilled** 117:19
**smile** 126:8
**social** 15:13 85:18
**software** 24:22
**soil** 86:2, 6
**soils** 82:11
**somebody** 22:21 23:12, 15 24:15 69:10 77:23 78:3 87:2 88:16 89:15 90:3, 5 91:10 93:3 102:2 110:22
**Sonny** 21:17 29:2 33:21
**soon** 38:7, 8 67:9 139:17
**sorry** 13:1 17:13 18:16 20:13 22:12 27:8 34:18 37:8 41:23 49:6 53:23 59:19 73:19 75:4 89:23 94:11 98:3, 12 101:21 105:25 111:4 128:14 137:8 138:5
**sort** 41:4
**sorts** 66:16
**sought** 20:20
**sounds** 16:25
**source** 95:10
**Southern** 17:8, 14, 21 18:3
**spaces** 122:3
**speak** 29:23 58:4 93:5, 11
**speaking** 66:14 100:4, 6
**speaks** 11:20
**special** 22:3, 4 28:12 40:9, 10 41:1 93:20 94:6 110:8
**specialist** 16:19
**specialize** 17:9
**specialties** 16:15
**specific** 23:3 27:7 51:22 77:2 79:7 87:5 123:7
**specifically** 60:6 73:24 74:2 82:25 90:22 108:10 127:21
**specifics** 40:4 55:2, 4, 6, 11, 16 75:19 76:23 77:9, 12 86:24
**spectrum** 123:20
**speculation** 43:2
**spelled** 54:15
**spend** 82:14
**spent** 82:5
**split** 44:13 92:8 97:9
**splits** 91:24 92:7 94:4 95:13 97:8
**spoken** 80:3 126:7
**spring** 37:17
**staff** 48:7, 15 100:23 102:2
**standard** 101:6
**standing** 87:2
**stands** 89:16
**Stars** 3:7
**start** 12:3 33:11, 12 34:24 61:13 138:5
**started** 33:6 35:8 36:8 38:15
**starting** 25:6 30:5 32:22 33:3, 8 58:13
**State** 1:22 7:3, 19 8:4 9:16 10:20 14:15, 20, 25 18:14, 17, 19 19:8 23:8, 14 32:9, 10 34:19 38:2, 6, 10 39:6, 11 41:8 42:4 50:10 57:11 72:11, 18, 20 75:25 82:9, 17 83:4, 15 84:5, 15, 25 86:22 93:1, 5 96:15 109:19 122:23 125:2 127:22 128:8 142:1
**statement** 81:3, 5, 12 115:10, 15 116:22 137:11 138:4, 8, 12
**statements** 90:4
**STATES** 1:1 7:15 58:25
**stay** 40:14 67:2 74:18 125:17
**Ste** 3:7, 21 5:5, 21
**step** 22:22 35:10, 11
**stepped** 35:15
**steps** 41:20 45:20
**stint** 19:14, 16 21:5
**stipulate** 116:9
**STIPULATED** 1:17 2:1, 8
**stipulation** 7:6
**stipulations** 9:7
**stood** 77:23
**stopped** 47:7
**story** 34:21
**straight** 40:10
**Street** 1:23 3:14, 21 4:5 5:5, 21 142:23
**stretches** 83:3
**strike** 138:5
**striked** 61:14
**subdivisions** 85:13
**submit** 28:8 73:15
**submitted** 76:6, 9 94:5, 13, 16
**subsection** 61:21
**substance** 109:8
**suggest** 57:22 63:2, 19 111:7
**suggested** 111:20
**suggestion** 91:7
**suggests** 77:17
**suit** 126:19
**Suite** 142:23
**summer** 37:17
**supermajority** 123:20

**superminority** 20:14
**support** 119:8, 9
**supported** 42:25
**suppose** 109:6 122:4
**supposed** 37:5, 9, 10
**supposing** 61:24
**sure** 10:9 24:5 25:12 27:6 35:21 36:12 39:4 41:18 45:13, 15 58:1 64:6 75:3, 18 77:14 86:13 96:20 101:13, 14 103:19 104:2 107:9 117:14 118:5 120:14 122:12, 16, 19 123:7 139:18
**surprise** 81:10
**surprises** 80:24 81:7
**swear** 9:3
**sworn** 9:5
**system** 40:11 83:25 84:2

**< T >**
**table** 46:1, 6
**take** 32:17 49:8 52:10 61:10 65:4 75:5, 10, 13 86:16 99:12, 17 100:8 107:10 120:2
**taken** 1:21 49:14 100:13 108:5 110:1 120:10 140:3 142:5, 8
**takes** 111:17
**talk** 47:13 51:17, 18 62:15, 16 63:2 64:4 67:17 75:16, 20 76:18 78:4 100:9, 16 101:10 135:15
**talked** 51:20 52:2 64:7 72:18 76:2, 21, 24 87:5 112:21 135:9
**talking** 26:9 27:1 36:4 39:6 49:21 64:1 66:6 69:11, 13 74:16, 19 77:7, 15, 23 82:17 87:3, 6 88:17 89:1, 16, 25 92:11, 14, 18, 20, 21, 22 93:9 106:25 112:25 116:24 117:14, 16 118:5, 7, 9, 25 132:10, 13 135:17, 24 136:2, 11, 15, 16, 21 137:5
**Tallapoosa** 1:23 5:21
**tasked** 83:18
**team** 39:21
**telephone** 109:3 127:13
**tell** 15:1 29:18 35:14 67:10 75:23 89:17 99:15 117:5 118:14, 20 126:24 127:4 128:18
**telling** 36:19 88:23
**ten** 28:8, 11 47:25 93:23 94:7, 14, 15
**tend** 78:25
**ten-day** 28:5 60:6 76:8 95:25 97:1
**term** 19:2, 19 82:1, 24 85:25 86:3 102:7 112:12
**terms** 18:25 19:15 89:5 121:9
**test** 45:1 46:12 61:25 62:2
**testified** 9:5 129:4
**testify** 14:18 128:25
**testifying** 9:20
**testimony** 129:15 134:1
**text** 109:6
**texts** 109:10
**Thank** 34:22 49:19 51:3 121:2, 14 125:5, 6, 12, 16 138:2 139:14 141:1
**thereto** 2:14
**thing** 40:17 68:10 69:14
**things** 17:6 31:5 36:11 79:1 132:12
**think** 29:20 32:21 37:11, 23 40:6 43:20 46:12, 13 49:9 60:2, 22 62:5 63:12 66:2, 11 69:20 71:16 78:22 79:2 81:9 82:13 101:4 111:5 114:7, 11 115:15 116:18, 23 119:2, 19 123:18 124:7, 18 127:9 130:7 132:1 137:17 139:19, 21
**thinking** 36:8 86:21 122:5
**third** 61:14
**thought** 48:21 54:2 57:20 59:23 80:15 100:3 116:17 117:7
**three** 60:16 99:7
**three-week** 79:13
**tight** 111:11
**timberland** 17:9 82:2
**Timberlands** 17:8, 14, 21 18:3
**time** 2:12, 13 7:17 10:24 11:20 19:23 20:15 25:15 34:3 39:19 42:5 44:12 45:11 46:22 49:13, 16 51:19 59:5 68:14 72:8 73:14 74:14 79:8, 17 80:5 81:9 82:5, 14 86:4 99:5 100:12, 15 101:9 105:23 110:4 111:14 112:10 113:1 117:1, 3, 13 120:9, 12 121:2, 16 125:5 132:17 137:16 140:2, 5 141:4
**timeline** 37:3 40:3 105:21 111:11
**times** 49:22 79:22 80:7 91:2
**title** 18:4
**today** 9:24 10:1, 18 12:13 13:10 14:13 34:17 71:2
**today's** 34:23
**told** 13:21, 23 14:4 31:19 33:11 80:23 108:12 113:25

114:21, 22
119:6
**total** 121:12
**totally** 84:4
**tradition** 26:6
60:12 64:25
**transcribed**
142:5, 8
**Transcript** 6:21, 23 105:3
115:22 142:7
**transcription**
142:6
**transcripts**
116:10
**travel** 14:15, 20
**trial** 2:13
14:18
**tribal** 85:14, 18
**trick** 111:4
**tried** 92:8
**true** 81:12
83:14 89:19
142:7
**truthfully** 9:24
**try** 70:15
102:10 119:24
**trying** 21:19, 21 34:15 35:2
37:16 39:3
40:2 64:15
76:25 96:21
111:4 116:25
131:7
**turn** 105:24
113:18
**turned** 43:7
75:7 89:9
93:23, 25 94:1, 18
**TURRILL** 3:4
8:12
**twice** 91:1
**Twitter** 15:16, 20
**two** 12:21
18:24 19:15
28:19 29:9
69:15 90:17, 19 91:8 93:15
95:24 97:11, 12, 13 121:9
123:22 127:2
**two-hour** 99:6
**type** 11:17
35:2
**typing** 11:16

**< U >**
**Uh-huh** 61:16
95:8
**ultimately** 24:9
98:17
**unconstitutional**
127:19 135:19
**underpopulated**
67:12 68:6
74:23
**underpopulation**
68:19
**underpopulations**
74:17
**understand** 9:11, 19 11:10
40:19 63:5
69:7 86:12
100:1 105:7
113:1 118:18
121:20 135:1
138:10
**understanding**
9:23 54:6
55:12 62:1
70:1 82:7
97:17 102:14, 16 106:11, 17
107:1, 16
110:7 114:14
118:13 122:12, 17 129:14
134:17
**understands**
103:10
**understood**
11:12 135:3
**unintentionally**
102:19 134:7
**Union** 4:4, 12
**UNITED** 1:1
7:15 58:25
**University** 16:8
**unnecessary**
114:2, 4
**update** 36:15, 18, 20, 22 46:4, 10 55:3 57:20
**updated** 36:12
55:15
**updates** 54:24
57:6
**updating** 35:18
36:8, 24 45:20
**URIAH** 4:18
**use** 15:17, 21
25:20, 21 33:7
60:9, 12 102:13
**Usual** 9:7
14:14
**usually** 101:7, 9

**< V >**
**various** 38:1
122:25
**varying** 124:1
**version** 63:18, 21
**versus** 7:13
**VIDEO** 1:9
**Videographer**
6:2 7:11 8:6
9:2 49:12, 15
100:11, 14
120:8, 11
140:1, 4 141:3
**view** 69:18
77:18 121:24
122:22 123:24
124:16, 25
**views** 66:15, 16
121:24 122:7, 22 123:5, 10
124:3, 11, 22
**violate** 136:4, 7, 18
**violated** 102:19
137:12
**Virtually** 23:5
69:10 72:5, 13
78:3
**volition** 92:16
**vote** 28:21, 22
29:18 59:24
67:20 68:8
96:14, 16, 17
102:23
**voted** 29:3, 10
31:16, 17 51:9
53:21 84:17
**Voter** 89:25
**voters** 42:23
66:24 69:10
77:21 78:2, 7
80:25 81:8
87:4 88:17
89:1, 8, 14
98:1 126:13, 14, 16 135:16
136:4, 17
137:12, 15
138:4
**Voting** 54:3, 7
59:16, 19, 20
85:13 95:18
98:7, 12 99:2
102:19 113:21
132:5, 20
133:10, 17
134:3, 6 136:4, 18 137:12
**VS** 1:9

**< W >**
**wait** 70:1
139:24
**waived** 2:3
**walked** 39:20, 22 86:21
**WALKER** 5:18
7:24 8:17
9:9 10:4, 9, 17, 21 12:1, 16
13:6 46:2, 8, 15 47:4 48:4
50:20, 24
52:23 53:4
55:8 56:8
58:2 61:6
62:16, 17 63:8, 11, 12 73:6, 12, 20 82:21
105:7 107:8
108:2 110:11
114:1 116:5, 11 117:10
118:2, 8, 10
120:5, 18
122:11, 16

125:6, 11, 25
126:19, 24
127:7 128:2, 12, 14 129:15
130:14 131:2, 4, 21, 23 132:4, 8, 23 133:19
134:5 136:1, 24 137:1, 24
139:10, 19, 24
**want** 35:14
58:20 70:13
71:15 72:1
96:7, 20 120:3
125:17 139:22
**wanted** 21:18
30:22 31:6, 11
32:13 34:8
41:18 45:6, 9, 12, 15 51:4
57:7 66:17, 22
67:2, 18 69:14
70:7 104:3
135:10, 11
**wanting** 89:19
**Washington** 3:22
5:6, 13 21:18
42:5 44:2, 11
**watched** 79:14
80:1
**way** 14:18
31:22 41:5
43:15 63:12
64:11, 20
66:12 67:2
83:21 84:2
86:23 117:21
127:9, 15
131:2, 6, 12
134:7, 16
137:10
**ways** 45:5
**Wednesday** 50:11
**week** 40:12, 15
**weekdays** 78:10, 14, 19
**weight** 89:3, 18, 24
**WELBORN** 4:9
6:7 7:20 9:8, 11, 12, 14
10:12 12:3
13:1, 4, 8
47:9 50:18
51:3 82:22
99:10, 13
100:1, 8 105:5, 11 108:3
116:9 120:2, 7, 13, 19
**Well** 13:8
16:24 17:3
20:16 25:23
28:21 30:15
36:17 38:20
40:20 41:21
44:20, 25 45:8
49:1 60:4
64:1 65:21
66:6 69:3, 4, 17, 23 70:17
71:1 76:13
77:7, 20 79:4, 11, 23 81:13
84:17 85:5, 17
86:19 92:8
96:6 98:17
99:10 103:24
105:21 113:7
118:24 125:12
129:25 130:3
132:10 135:8
139:10
**went** 40:10
41:1, 16 43:10
51:12 57:4, 18
69:1 74:8, 21
**we're** 26:9
27:1, 4 54:21
99:4 118:25
140:1, 4
**We've** 99:7, 23
138:16
**wide** 123:20
**Wilcox** 42:8, 9
82:15 83:10
84:7, 9
**willing** 94:20
**win** 45:14
**Wiregrass** 84:4
**witness** 2:3
7:7 9:3
27:10 45:23
46:19 49:17
99:19 136:25
**Women** 66:24
69:10 77:21
78:2, 7 87:3
88:17 89:1, 8, 14, 25 98:1
126:12, 14, 15
135:16 136:3, 17 137:12, 15
138:4
**won** 45:11
**woods** 16:22
**words** 102:12
138:24
**work** 17:12
23:20 30:12
31:11 32:12
37:16 38:12
64:15 78:18, 19, 25 79:1, 2, 18 81:17 82:2
83:10 99:8
**worked** 18:7
21:18 30:18
32:11 34:3, 4
39:2, 10 114:17
**working** 35:2, 4, 5 39:11 46:3
78:10, 13, 14
**works** 19:20
30:17
**wrap** 137:9
**write** 48:20
**writing** 137:11, 25 138:4, 8, 11
**written** 89:21
104:14
**wrote** 135:24

**< Y >**
**y'all** 14:8
**Yay** 120:18, 19
**Yeah** 9:9
37:12 60:21
69:19 122:16
125:22 129:7
**year** 46:23
50:1 66:13
**years** 18:8
19:1, 4 45:18
121:11, 12, 13, 23 122:6, 20
123:9 124:2
130:7 138:15
**year's** 30:8
**yesterday** 12:14
**yield** 45:25
**York** 3:15 4:6

**< Z >**
**zero** 44:13
67:14 74:21
75:1 76:14
77:1 92:9
129:17, 21, 24
130:1, 4, 8, 10, 12, 16, 21
131:8, 15, 20
133:4 138:9, 13, 16, 21
139:2, 5, 11
**Zoom** 3:18
4:17 5:1 8:7
11:18

**In The Matter Of:**

**Evan Milligan,et al v. John H.Merrill, et al.**

---

Jim McClendon

*December 17, 2021*

---

US Legal

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

EVAN MILLIGAN, et al., )
) CIVIL CASE NO.
Plaintiffs, ) 2:2021-CV-01530-AMM
VS. ) VIDEO DEPOSITION OF:
JOHN MERRILL, et al., ) JAMES McCLENDON
)
Defendants. )

S T I P U L A T I O N S

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the deposition of:

JAMES McCLENDON,

may be taken before LeAnn Maroney, Notary Public, State at Large, at the law offices of Balch & Bingham, 105 Tallapoosa Street, Montgomery, Alabama, 36104, on December 17, 2021, commencing at 1:57 p.m.

Page 1

IT IS FURTHER STIPULATED AND AGREED that the signature to and reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

***

Page 2

A P P E A R A N C E S

FOR THE MILLIGAN PLAINTIFFS:

MICHAEL L. TURRILL
Attorney at Law
Hogan Lovells US LLP
1999 Avenue of the Stars, Ste. 1400
Los Angeles, California 90067
michael.turrill@hoganlovells.com

KATHRYN SADASIVAN
Attorney at Law
NAACP Legal Defense & Educational Fund
40 Rector Street, FL 5
New York, New York 10006
ksadasivan@naacpldf.org

DEUEL ROSS (Via Zoom)
Attorney at Law
NAACP Legal Defense & Educational Fund
700 14th Street N.W., Ste. 600
Washington, DC 20005
dross@naacpldf.org

Page 3

JULIE A. EBENSTEIN
Attorney at Law
American Civil Liberties Union Foundation
125 Broad Street
New York, New York 10004
jebenstein@aclu.org

KAITLIN WELBORN
Attorney at Law
American Civil Liberties Union of Alabama
P.O. Box 6179
Montgomery, Alabama 36106
kwelborn@aclualabama.org

FOR THE CASTER PLAINTIFFS: (Via Zoom)
DAN OSHER
Attorney at Law
Elias Law Group
10 G Street NE, Ste. 600
Washington, DC 20002
dosher@elias.law

Page 4

**Evan Milligan,et al v. John H.Merrill, et al.** **Jim McClendon 12/17/2021**

FOR DEFENDANT JOHN H. MERRILL:
JIM DAVIS
Assistant Attorney General
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130
jim.davis@alabamaag.gov

FOR THE DEFENDANTS JAMES McCLENDON & JAMES McCLENDON:
DORMAN WALKER
Attorney at Law
Balch & Bingham
105 Tallapoosa Street, Ste. 200
Montgomery, Alabama 36104
dwalker@balch.com

ALSO PRESENT:
Paige Ali, Videographer

Page 5

I N D E X

MS. SADASIVAN: 9-103
MR. OSHER: 104-111
MR. DAVIS: 111-114

E X H I B I T L I S T

| | PAGE |
|---|---|
| Plaintiff's Exhibit 1 - (Talk points) | 35 |
| Plaintiff's Exhibit 2 - (2011 reapportionment guidelines) | 36 |
| Plaintiff's Exhibit 3 - (Montgomeryadvertiser.com) | 47 |
| Plaintiff's Exhibit 4 - (Public hearing schedule) | 61 |
| Plaintiff's Exhibit 5 - (2021 reapportionment guidelines) | 64 |
| Plaintiff's Exhibit 6 - (Transcript of October 26, 2021) | 76 |
| Plaintiff's Exhibit 7 - (Transcript of November 3, 2021) | 94 |
| Plaintiff's Exhibit 8 - (Hall request for additional meetings) | 100 |

Page 6

I, LeAnn Maroney, a Court Reporter of Birmingham, Alabama, and a Notary Public for the State of Alabama at Large, acting as commissioner, certify that on this date, pursuant to the Federal Rules of Civil Procedure and the foregoing stipulation of counsel, there came before me on December 17, 2021, JAMES McCLENDON, witness in the above cause, for oral examination, whereupon the following proceedings were had:

* * * * *

THE VIDEOGRAPHER: This marks the beginning of the deposition of Jim McClendon in the matter of Evan Milligan, et al., versus John H. Merrill, et al., Civil Case Number 2:21-CV-01530-AMM filed in the United States District Court for the Northern District of Alabama. The date is December 17, 2021. The time is 1:57 p.m.

All attorneys present, will you please state your names and whom you represent.

MR. DAVIS: Jim Davis, Alabama Attorney General's Office, for Secretary of State John Merrill.

MR. WALKER: Dorman Walker, Balch & Bingham, for Senator Jim McClendon.

MS. SADASIVAN: This is Kathryn

Page 7

Sadasivan for plaintiffs Evan Milligan, Shalela Dowdy, Letetia Jackson, Greater Birmingham Ministries, and the NAACP of Alabama.

I'm still having trouble hearing you all, though. The audio is going out. Are you able to move the place where -- anything towards the witness, a phone, audio of some sort?

(Discussion held off the record.)

THE VIDEOGRAPHER: Okay. The attorneys that are on Zoom, if you'll do your introductions.

MR. TURRILL: Michael Turrill of Hogan Lovells on behalf of the Milligan plaintiffs.

MR. ROSS: Deuel Ross for the Milligan plaintiffs.

MR. OSHER: Dan Osher for the Caster plaintiffs.

MS. EBENSTEIN: Julie Ebenstein for the Milligan plaintiffs.

THE VIDEOGRAPHER: Do you want to swear him in?

JAMES McCLENDON,

having been duly sworn, was examined and testified as follows:

THE REPORTER: Usual stipulations?

MR. WALKER: Meaning that the only

Page 8

Page: 2 (5 - 8)

Caster Plaintiffs' Exhibit 90, Page 3

objections that need to be made are to the form of the question. Yes, Katherine?
MS. SADASIVAN: Yes.
THE VIDEOGRAPHER: We are off the record. The time is 1:59 p.m.
(Recess was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 2:04 p.m.
EXAMINATION BY MS. SADASIVAN:
Q. Good afternoon, Mr. McClendon. My name is Kathryn Sadasivan and I work for the NAACP Legal Defense & Educational Fund. I represent the plaintiffs in this case, Milligan versus Merrill. Thank you for making yourself available for today's deposition.
Do you understand that you're here today because you've been served with a notice of deposition and you are a defendant in Milligan versus Merrill in your official capacity as cochair of the Alabama permanent legislative committee on reapportionment?
**A. I do.**
Q. Before going any further, can you please state and spell your name for the record?
**A. James H. McClendon, M-c-C-L-E-N-D-O-N.**

Q. And your first name, as well, please.
**A. J-A-M-E-S.**
Q. Have you ever been deposed before?
**A. Yes.**
Q. When?
**A. Roughly ten years ago during redistricting last time.**
Q. And what was your role in the litigation?
**A. I was house chairman of redistricting at that time.**
Q. Were you a defendant?
**A. Yes.**
Q. Were you -- have you been involved in any other cases?
**A. Any? No.**
Q. You are sworn and under oath. Do you understand that for purposes of my questioning, you must testify truthfully and as completely as possible as though we were before a judge in a courtroom?
**A. Yes.**
Q. Is there any reason you cannot give truthful and complete testimony today?
**A. No.**

Q. Are you taking any medication that might affect your ability to understand the questions that I ask or provide answers to those questions?
**A. No.**
Q. Do you have any condition that would affect your ability to understand the questions that I ask and provide answers to the questions?
**A. No.**
Q. Do you understand that today's deposition is being conducted via web videoconference?
**A. Yes.**
Q. Do you understand that a court reporter is transcribing this deposition, meaning that they are writing down everything that you, your counsel, and I say today?
**A. Yes.**
Q. It's important that all of your answers are verbal. This will allow the court reporter to record our statements. The court reporter won't be able to record gestures or nodding. Do you understand?
**A. I do.**
Q. Likewise, it's important that we don't speak over one another. I will wait until you

finish your answer, and I ask that you please wait until I finish my question before answering. Do you understand?
**A. I do.**
Q. If you don't understand a question that I ask, please just let me know, and I'll rephrase it. If at any point you recall additional information that is responsive to a question that I asked you earlier, please let me know, and I will allow you to clarify the record. Do you understand?
**A. I do.**
Q. Please do not guess or assume when answering. Be sure to state only that which you know to be true based on your personal knowledge. Will you do that?
**A. Yes.**
Q. You may hear your attorney, Mr. Walker, object to a question from time to time. His objections are being made for the record, and you are still required to answer my question unless you are instructed by your attorney not to answer. Do you understand?
**A. I'm not sure about that. Maybe say it again. Let me hear you say that one more time.**
Q. You may hear your attorney object to a

Evan Milligan,et al v. John H.Merrill, et al. Jim McClendon 12/17/2021

question from time to time throughout this deposition. Those objections are made largely for the record. And you understand you are still required to respond to my question unless you are instructed by your attorney not to?
A. **Okay.**
Q. Do you understand that?
A. **I've got it.**
Q. Is that a yes?
A. **Yes.**
Q. Thank you.
Since we're conducting this deposition remotely and we're not together in the same room, I ask that you please keep your cell phone off unless we are on a break. Can you do that?
A. **I understand.**
Q. Please don't refer to any documents or other materials during our conversation today. Will you do that?
A. **Did you say don't refer to any materials or documents today? Is that what you said?**
Q. Do you have any documents with you?
A. **I do not.**
MR. WALKER: Oh, did you mean don't look at any documents?

Page 13

Q. Do you have any -- if you don't have any documents with you, please don't look at any documents other than those that I will give you. Do you understand that?
A. **I do.**
Q. Thank you. Sorry for all the preparatory language.
Finally, if you need a break at any time, please just let me know. If there's a question pending, I just ask that you answer that question before going on a break. Do you understand?
A. **I do.**
Q. Thank you.
I'm going to ask you some background questions to get to know you a little bit better.
What is your date of birth?
A. **1-10-43.**
Q. That's January 10, 1943?
A. **Correct.**
Q. What's your address?
A. **361 Jones Road, Springville, Alabama.**
Q. And your telephone number?
A. **(205)999-8096.**
Q. Is that a mobile phone number?

Page 14

A. **Correct. Yes, it is.**
MR. WALKER: Kathryn, can I ask that this personal information be redacted with anything you file with the court?
Q. Do you have any other phone numbers?
A. **Well, I do have a phone in my office in the Alabama state house, but I'm not sure what the number is.**
Q. Do you have an email account?
A. **I do. I have two.**
Q. And what are they?
A. **My personal email is jimmcc@windstream.net. My senate email is jim.mcclendon@alsenate.gov.**
Q. Do you have any personal social media accounts?
A. **Facebook, yes.**
Q. You just have a Facebook account?
A. **Correct.**
Q. No Twitter?
A. **No Twitter.**
Q. And where were you born?
A. **Mobile, Alabama.**
Q. And where did you go to high school?
A. **Springville, Alabama.**

Page 15

Q. Where did you go to college?
A. **My undergraduate degree is from Birmingham Southern College in Birmingham, and my doctorate is from the University of Houston, Houston, Texas.**
Q. And what is your doctorate in?
A. **Optometry.**
Q. And what courses did you take at Birmingham Southern?
A. **Just pretty much premed-type courses.**
Q. And have you studied anywhere else?
A. **No, other than continuing education courses required to maintain my optometry license.**
Q. So you are an optometrist?
A. **Correct. Yes, I am.**
Q. Have you -- are you married?
A. **I am.**
Q. How long have you been married?
A. **26 years.**
Q. Congratulations.
Do you have kids?
A. **I do.**
Q. How many?
A. **One child.**
Q. One child. And how old are they?

Page 16

Page: 4 (13 - 16)

Caster Plaintiffs' Exhibit 90, Page 5

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

A. She is 50.
Q. And what does she do for a living?
A. A school teacher.
Q. In Alabama?
A. Yes.
Q. Where?
A. In the Jefferson County system.
Q. And where do you work?
A. I'm a -- I'm retired from optometry.
Q. So you are not employed currently?
A. As an optometrist, no, I am not.
Q. Are you employed anywhere currently?
A. Only as an Alabama senator.
Q. So you're working as an Alabama senator?
A. Well, I am a senator, and we do work from time to time.
Q. Are you paid?
A. Yes.
Q. Do you know why you're here today?
A. Yes.
Q. Why?
A. A lawsuit concerning redistricting that we just completed in the Alabama legislature.
Q. Did you read the complaint in the case in which you're sitting for a deposition today?

Page 17

A. I didn't quite understand. Did you say will you read or did you read?
Q. Did you read.
A. I have not read it, no.
Q. Do you know what the case is about?
A. Yes. This case has to deal with the congressional districts.
Q. Are you represented by counsel today?
A. I am.
Q. Who is your counsel?
A. Dorman Walker.
Q. And how did you prepare for this deposition today?
A. I came in yesterday and we met for a couple of hours and we sort of talked about how this works and what to expect. But that was the only preparation.
Q. And who is "we"?
A. Jim Davis was here and Chris -- Representative Pringle was here and I was here. So it was four of us present.
Q. So you -- the only preparation you did for this deposition was to meet with Chris Pringle, Jim Davis, and Mr. Walker yesterday for a few hours?
A. That is correct.

Page 18

Q. Did you review any documents?
A. Yes.
Q. Which documents?
A. There were two. Actually, I can't say I reviewed them. I looked at the cover. One of them had to do with the notes -- the bullet points we used on the floor, in my case on the floor of the senate.
And the other one -- I can't even remember what the other one was. But I gave them back to my attorney. I didn't take them home and read them or study them.
Q. So I am going to try to drop in the chat a document that I'll ask the court reporter to mark as Exhibit 1. And I can show it on my screen, as well.
Is this the document that you reviewed in advance of your deposition today? Let me share my screen.
Senator McClendon, is this the document that you were referring to?
A. I really can't read that. I see talking points -- okay. Scroll it up and let me see it. Well, that looks similar. I don't know if that's exactly the same document. But that's sort of the

Page 19

format that was used.
Q. I'll represent that this was produced in this litigation and that I have given it to the court reporter and hopefully you also have a copy.
And what was this document?
A. What you and I were just discussing was talking points that I was provided by our attorney when the issue of the congressional map came before the senate as a body.
Q. And who gave you this document?
A. Pardon?
Q. Who gave that document to you?
A. One of the staff members of the redistricting -- not committee, but the redistricting department there in the state house.
Q. What is the difference between the redistricting committee and the redistricting department?
A. Well, the redistricting office is staffed by state employees. And the redistricting committee is composed of elected senators and representatives.
Q. So you were given this document when?
A. Well, prior to it going on the floor for debate, and not much sooner than that.

Page 20

Page: 5 (17 - 20)

Caster Plaintiffs' Exhibit 90, Page 6

Q. Prior to what going on the floor for debate?
A. **The congressional bill.**
Q. And do you remember when that was?
MR. WALKER: Hang on. Kathryn, when you say "this document," are you talking about Talking Points for Likely Issues No. 1? Or are you talking about the collection of talking points?
Q. Well, does that change your answer?
A. **Well, I don't think it does. I got that prior to the bill going on the floor for debate. In fact, I may have gotten it prior to the committee -- the standing committee meeting. That would -- that would make sense.**
Q. And what standing committee meeting are you talking about?
A. **The bills that -- the redistricting committee is considered an interim committee. And the bills that come out of interim committees must go to a standing committee before they can go to rules in order to get on the floor.**
**So there was a standing committee -- which happened to be general fund -- that was handling not only a general fund bill but all the redistricting bills, as well. So that would have**

**been the standing committee that this bill went to after it came to the senate from the house.**
Q. You said you reviewed the talking points that we discussed. And what else before this deposition?
A. **What did I review? Well, no. The talking points was the -- that was the purpose of having the talking points, is I had a summary of the main points that needed to be shared with the standing committee members so they would be able to vote however they wanted to.**
Q. I'm sorry. I meant -- just going back, what documents other than this talking points did you look at to prepare for this deposition today?
A. **Well, I looked at a number of documents during the process of the bill going through the redistricting committee. But there wasn't anything in particular that I did to review that prior to the meeting of the standing committee. They were all summarized. So --**
Q. For this deposition, though, you mentioned that you met yesterday with Mr. Davis, Mr. Walker, and Mr. Pringle and that you looked at several documents.
A. **Yes.**

Q. Besides the talking points, what other documents did you look at?
A. **It may have been a summary of this lawsuit. But I'm not -- Kathryn, I'm really not -- I really don't remember what it was. I didn't pay much attention to it.**
Q. You say "a summary of this lawsuit." Would you mind giving me a summary of this lawsuit?
A. **I can't do it. Sorry. I wish I could.**
Q. You testified earlier that you were a party to a lawsuit in the last redistricting cycle; is that correct?
A. **Correct.**
Q. Was that a redistricting case?
A. **Yes.**
Q. And you were deposed?
A. **Yes.**
Q. Did you testify at trial?
A. **I'm sorry. I didn't understand you.**
Q. Sorry. Did you testify at trial?
A. **Yes.**
Q. And what was that case about?
A. **That case, I believe, was -- legislative was the target, not congressional. The issue was --**
Q. And when you say --

A. **I'm sorry.**
Q. I'm sorry.
A. **It's my turn?**
**My point is that case was not congressional. That had do with house and senate districts.**
Q. And when you say "the target," you mean what?
A. **That the object, the goal of the case was to challenge the way house and senate districts were drawn.**
Q. And do you remember under what law those were challenged?
A. **No.**
Q. So let's talk about your career in public service. When were you first elected to public office?
A. **2001.**
Q. And what were you elected -- where were you elected?
A. **What or where? Which one do you want? I was elected --**
Q. What district (inaudible.)
A. **Alabama house of representatives, House District 50.**

Q. And did you run as a -- with the support of a political party?
**A. Well, there was a primary with republican -- I don't think the republican party endorsed any of the republican candidates.**
Q. You ran as a republican?
**A. Yes, I did.**
Q. Why did you run as a republican?
**A. Why did I run as a republican? Is that what you said?**
Q. Yes, sir.
**A. Because I am a republican.**
Q. What does it mean to be a republican?
**A. I would say the first word that comes to mind would be "conservative." And that would be socially conservative and fiscally conservative.**
Q. And when you say "socially conservative," what do you mean?
**A. It has to do with policies that we make that are conservative in nature.**
Q. And what is a policy that is conservative in nature?
**A. I would say one of the things that conservatives believe in is law and order.**
Q. Okay. So how long did you serve in

Page 25

house district 50?
**A. I served three four-year terms. I went into office -- well, I went into office in 2021. So three four-year terms.**
Q. And are you currently a member of the house of representatives?
**A. No. I'm a member of the Alabama senate.**
Q. And when were you first elected to the Alabama senate?
**A. It must have been '14. Yeah, 2014.**
Q. Prior to --
**A. Your turn.**
Q. I'm so sorry. I said don't cut each other off, and I'm cutting you off. I'm sorry.
**A. I answered your -- 2014, which is the answer to the question.**
Q. Thank you. Sorry again.
What legislative committees have you served on during your very long tenure in the Alabama legislature?
**A. Well, in the senate, I'm currently on the health committee, I am on the general fund committee, I am on the education trust fund committee, and I am on education policy. And I chair the health committee.**

Page 26

Q. Those are all of the committees that you have ever served on?
**A. No. No. In the house, I served on several different committees over three terms. And, of course, I served on redistricting, as well, ten years ago and became -- and was house chair of redistricting.**
Q. And when you say "redistricting," you mean the permanent -- the Alabama legislative committee on reapportionment?
**A. That's exactly what I mean.**
Q. Okay. So if I say redistricting for the reapportionment committee or if you say those things, you mean the permanent committee on reapportionment?
Is that a yes?
**A. You know, there's a little difference in there. During the interim years when there's not redistricting activity going on, there is a permanent redistricting committee composed of three members of the house and three of the senate.**
**And then as we approach the redistricting time period where the activity goes up, then -- then it converts over to 11 and 11 for the actual process.**

Page 27

Q. That makes sense. So it's the same committee, just getting bigger or larger or smaller based on the time period?
**A. Correct.**
Q. What was your role in Alabama's 2011 redistricting process?
**A. I was house chairman.**
Q. And what are the responsibilities of the house chairman for redistricting?
**A. Well, part of -- essentially part of a leadership team that makes preparations for the actual process, meets with the attorney and can meet with the person that draws the maps, and begins discussions and review, for example, of our guidelines to see if they need to be updated or changed, and also help time the scheduling of the actual meeting of the full redistricting committee.**
Q. Do you have any other responsibilities?
**A. No. I think that pretty well summarizes it. I'm sure there's some other things that we do that are not big items. But I think that summarizes the things worth discussing.**
Q. And when you said you meet with the attorney and you -- as the cochair, you meet with the attorney and you meet with the person who draws

Page 28

the map, what do you -- what do you do during those meetings? Or what is your role during those meetings?

MR. WALKER: I'll instruct you not to discuss anything that I may have told you or you may have told me during those meetings.

A. **Yes, ma'am. Do you mind me correcting you on a phrase?**

**Actually, if you look at the law, there is a house chair and a senate chair. They are not cochairs, although that seems to be a well-kept secret. But now you know.**

**So now --**

Q. The secret is out.

So as the house chair of the redistricting committee, what do you mean -- what was your responsibility with respect to your meetings with the attorney and the meetings with the person who draws the map?

MR. WALKER: Same instruction.

THE WITNESS: Okay. Well, stop me if I go astray here.

MR. WALKER: Okay.

A. **Of course, probably the single most important role of the attorney is to help the**

Page 29

**elected members of this committee know what the law is and what -- and keep us up to date on recent court cases so we can do our best to be in compliance with what the law says and what the courts have subsequently interpreted.**

Q. So as the house chair of the reapportionment committee, what were -- what was your role in those meetings?

A. **Well, I guess my role was to be there and to make sure that we stay -- are we -- I guess we're talking generically here. We're not talking about 2011 or 2021. Are we just talking about being a chair, a redistricting chair? Is that what the discussion is? Or are we talking about a certain time period?**

Q. So when I asked you what your responsibilities were as house chair of the reapportionment committee, you said, among other things, you meet with the attorney, you meet with the person who draws the map, meeting with the reapportionment committee. And I'm just asking what you meant by that as your role.

What was your role in those meetings with the attorney and with the drawer?

A. **To discuss the -- one of the issues, of**

Page 30

**course, is the time schedule on when we can carry out the duties and when we need to carry out the duties. And then another thing has to do with making sure that we stay in compliance with the courts and the law and recent court cases.**

Q. Who selected the attorney?

MR. WALKER: At what time are you talking about?

MS. SADASIVAN: In 2011.

A. **I do not know the answer to that.**

Q. Did you have any involvement in the selection of the attorney --

A. **No.**

Q. -- for the reapportionment committee?

A. **No.**

Q. Did you have any role in the selection of the demographer as the house chair of the reapportionment committee?

A. **No.**

Q. Do you know who made the decision?

A. **I do not.**

Q. How were you selected to serve as the house chair of the reapportionment committee?

A. **By the speaker of the house. Actually --**

Page 31

Q. Who was that?

A. **-- I was -- he selected me to be on the committee. And then the house members on that committee elected the house chair.**

Q. I see. So you were elected by the other house members of the reapportionment committee to serve as the house chair?

A. **Correct.**

Q. And who was the senate chair of the reapportionment committee in 2011?

A. **Gerald Dial.**

THE REPORTER: Gerald who?

A. **D-I-A-L.**

Q. And was the starting point -- what was the starting point for drawing the congressional maps in 2011?

A. **The starting point would be the existing lines.**

Q. What existing lines?

A. **The congressional lines that were current at that time.**

Q. And how did you go about deciding how to update those lines based on the census data in 2011?

A. **Actually, I didn't make those decisions.**

Q. Who did?

Page 32

A. **The map drawer met with and talked to the members of the congressional delegation. And, of course, once we had the data, the population numbers, then they knew if a district needed to have an increase or a decrease in population.**
Q. Did the legislature conduct public hearings in the redistricting process?
A. **Yes.**
Q. Following the (inaudible.)
A. **What was the last thing you said? Following?**
Q. The 2010 census.
A. **Yeah, the -- correct, we did have public hearings.**
Q. How many?
A. **22.**
Q. And when did those hearings occur?
A. **I just -- I do not remember. I don't remember those dates.**
Q. How many meetings did the reapportionment committee hold in 2011?
A. **I can't tell you exactly. I don't know the exact number. I don't -- I don't remember the exact number.**
Q. Was it more than one?

A. **Yes.**
Q. Was it more than two meetings?
A. **I'm sorry? What was the last word you said? It came out fuzzy.**
Q. Was it more that two meetings?
A. **I'm just guessing. And I can't answer that question because I don't remember.**
Q. What was the role of the reapportionment committee in the map drawing process in 2011?
A. **Are we talking congressional maps?**
Q. Yes.
A. **The role of the reapportionment committee was to take the map that was submitted, that was put together by the -- with the approval of the congressional delegation, and to approve or disapprove that map and submit it for introduction to the legislature.**
Q. And how did the committee go about approving or disapproving of the map drawn?
A. **A roll call vote.**
Q. Were members given any guidance on how to vote?
A. **I don't quite understand that -- that question, were they given guidance.**
Q. Any information on how to vote or how to

look at a map?
A. **Well, the map and the data was put before them at the committee meeting.**
Q. I'm dropping into the chat and I will ask the court reporter to mark as McClendon Exhibit 2 --
MR. WALKER: Kathryn, what was Exhibit 1? I'm sorry. Was that the talking points?
MS. SADASIVAN: Yes, sir.
MR. WALKER: Okay. Let me -- let me -- I'm your secretary in this. So let me take care of it.
MS. SADASIVAN: Oh, thank you so much, Dorman. I'm sorry about that. I appreciate it.
MR. WALKER: We're a full-service law firm.
MS. WELBORN: I'm happy to play the role.
MR. WALKER: Well, I've got them spread out over here.

(Plaintiff's Exhibit 1 was marked for identification.)

Q. Senator McClendon, do you have the

document that I've asked the court reporter to mark as McClendon Exhibit 2 in front of you?
MR. WALKER: I'm sorry. Which one is it? Tell me.
A. **Exhibit what?**
MR. WALKER: No. Don't say anything. Exhibit 2, just tell me what it is.
Q. Do you recognize the document in front of you?
MS. WELBORN: What is the document, Kathryn? Which one is it?
MS. SADASIVAN: I just dropped it into the chat. It is the 2011 legislative reapportionment committee guidelines.
MR. DAVIS: The chat is not going to work because the system is pretty far away from us all. Nobody can get to the chat easily.
MS. SADASIVAN: Okay. Would it help if I pull it up so you can see it?
MR. WALKER: The May 2011 guidelines?
MS. SADASIVAN: This is the document we're looking at.

(Plaintiff's Exhibit 2 was marked for identification.)

Q. Do you recognize this document, Senator McClendon?
**A. Yes. It looks -- it looks familiar.**
Q. How do you recognize this document?
**A. The first part of what you said was cut off. Say it again.**
Q. How do you recognize this document?
**A. How do I recognize it? I mainly recognize it by the fact that it's reapportionment committee guidelines. And I recall going through that process and the adoption of those guidelines.**
Q. Do you know who drafted the document?
**A. Did I draft the document?**
Q. Do you know who drafted the 2011 reapportionment --
**A. Do I know who drafted it. I think I have a good idea. But I can't say that I'm a hundred percent certain who drafted the document. So the answer to the question would be no.**
Q. Who do you think drafted it?
**A. I imagine it was our attorney at the time. But I'm just not sure about that.**
Q. Can you read please on Page 1 under May 2011 the paragraph beginning with "Pursuant"?

Page 37

**A. I see that.**
Q. Could you read it, please?
**A. To myself or to you?**
Q. Out loud. Thank you.
**A. "Pursuant to the constitution of the United States and the Constitution of the State of Alabama, the Alabama state legislature is required to review 2010 federal decennial census data provided by the U.S. Bureau of the Census to determine if it is necessary redistrict Alabama's congressional, legislative, and state board of education districts because of population changes since the 2000 census.**
**Accordingly, the following guidelines for congressional, legislative, and state board of education redistricting have been established by the legislature's permanent joint legislative committee on reapportionment, (hereinafter referred to as the 'reapportionment committee.')**
**There you go.**
Q. Thank you.
In the paragraph that you just read where you said that the guidelines were established by the committee, what does that mean?
**A. Okay. Let me find it.**

Page 38

Q. It's in the sentence beginning with "Accordingly."
**A. Yeah, I see it.**
**Well, that means the committee, the reapportionment committee, adopted the guidelines, had a vote and said that's our guidelines.**
Q. Will you please go to page two and read under numeral III Voting Rights Act, and read the two paragraphs below it?
**A. "Districts shall be drawn in accordance with the laws of the United States and the State of Alabama, including compliance with protections against the unwarranted retrogression or dilution of racial or ethnic minority voting strength. Nothing in these guidelines shall be construed to require or permit any districting policy or action that is contrary to the U.S. Constitution or the Voting Rights Act."**
**Number 2, "Redistricting plans are subject to the preclearance process established in Section 5 of the Voting Rights Act."**
Q. I'm sorry. I'll just have you read Page 4, Paragraph 2 and 3 under Plans Produced by Legislators. 2, 3, and 4. I apologize.
**A. 2, 3, and 4 under Roman numeral V. Is**

Page 39

**that what you're asking for? It must be. That's the only 2, 3, and 4 on the page.**
**"A proposed redistricting plan will be public information upon its introduction as a bill in the legislative process, or upon presentation for consideration by the reapportionment committee."**
**"Access to the legislative reapportionment office computer system, census population data, and redistricting work maps will be available to all members of the legislature upon request. Reapportionment office staff will provide technical assistance to all legislators who wish to develop proposals."**
**Number 4, "In accordance with Rule 23 of the joint rules of the Alabama legislature (2011) all amendments or revisions to the redistricting plans, following introduction as a bill, shall be drafted by the reapportionment office."**
Q. I'm going to ask you to quickly scan the lest of the guidelines and then let me know if you followed those guidelines in 2011.
MR. WALKER: Objection to form. You may answer the question.
**A. Yes, ma'am, it's my belief that we followed the guidelines.**

Page 40

Q. And how did you go about following the guidelines in the map-drawing process?
**A. Well, you just read the guidelines and try to stay -- and try to do what it says.**
Q. What action did you take to make sure that the guidelines were followed?
**A. What action did I take to make sure they were followed. I consulted with the attorney and with the person drawing the map to make sure that they were following the rules that we had before us.**
Q. And how did you do that?
**A. I just looked them in the eye.**
Q. You looked them in the eye and what?
**A. And said, "Are we staying within the guidelines?" I'm not even sure I said that. We did -- we did talk about the importance of the guidelines. And it was understood everybody would use that as exactly what they're called, guidelines.**
Q. And so when you said you talked about the guidelines and that they were important, were you explaining the guidelines to the demographer?
**A. I was not explaining them, no. We would talk about them from time to time. But it was just so well known that we followed the guidelines. That's what we did. That's our job.**

Page 41

Q. Do you know if anyone else talked to the person -- the attorney or to the map drawer about the guidelines?
**A. Do I know? No, I do not.**
Q. How many congressional redistricting plans were considered by the reapportionment committee in 2011?
**A. I don't recall.**
Q. How did the reapportionment committee decide on which Alabama congressional map to introduce?
**A. We took the map that the members of the congressional delegation had -- proved to be satisfied with.**
Q. That was the starting point in the 2001 map?
**A. Yes.**
Q. Was the goal in drafting to make sure the congressional districts remained roughly the same as in 2001?
**A. One of the goals is that we keep the core of the districts recognizable, or we attempt to do that.**
Q. Was it a primary goal to keep the same racial demographics for each district?

Page 42

**A. To keep the what demographics?**
Q. The racial demographics.
**A. Racial demographics. In 2011, you know, I don't know the answer to that.**
Q. Was it a primary goal to keep District 7 the same black population as in 2001?
**A. I do not know the answer to that question.**
Q. Did you consider race in drawing any of the districts in 2011?
**A. No.**
Q. Why was there only one district with a majority black voting age population in 2011?
THE REPORTER: I'm sorry. Could you say that question over?
Q. Why was there only one district with a majority black voting age population in 2011?
**A. Well, I -- I don't need to speculate. I will say I do not know why.**
Q. What is Section 5 of the Voting Rights Act?
**A. Section 5 has to do with racial injustice or racial problems when it comes to elections. And it provides some solutions to that. Or remedy, I should say.**

Page 43

Q. What is a racial problem?
**A. What is a racial problem? Are you asking for an example or something? I don't quite -- I don't understand your question, what is a racial problem.**
Q. I'm asking you what you meant by your statement. Do you want your court reporter to read your answer about what Section 5 is back?
**A. To make sure that every -- every group, subgroup, race had a fair opportunity to express themselves at the polls.**
Q. And why did Section 5 apply to Alabama?
THE REPORTER: I'm sorry. What?
Q. Why did Section 5 apply to Alabama?
**A. You know, I could -- I could guess at that. But I don't want to do that. So I'll say I don't know.**
Q. You don't know why Section 5 applied to Alabama?
**A. Like I said, I could guess at it. But I don't want to do that. So I don't know.**
Q. And I'm just asking you don't know why Section 5 applied to Alabama?
**A. Correct.**
Q. The guidelines mention preclearance

Page 44

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

under Section 5 of the VRA. What involvement did you have in obtaining justice department preclearance of a proposed congressional plan in 2011?

**A. None.**

Q. Did you have any role in proposing judicial preclearance of the 2021 map?

**A. Did I have any -- I'm really having a time understanding you. Did I have any -- okay. Say that -- say that again, please, ma'am.**

Q. Did you have any role in proposing judicial preclearance in the redistricting process in 2011?

**A. No.**

Q. Did you introduce any proposed redistricting plans for the Alabama congressional delegation in 2011?

**A. I do not recall if the bill started in the house or in the senate. I don't know. So I can't answer the question.**

Q. Did you introduce any redistricting bills in the 2011 legislative session?

**A. Any redistricting bill. So we've gone outside of congressional.**

**Yes, I'm sure I introduced the house**

Page 45

**bill in the house. I don't remember who did the BOE bill, who started it. I don't remember who started the congressional bill.**

Q. Did you consider a plan permitting two majority minority districts in 2011?

**A. Not to my knowledge.**

Q. Why?

**A. It wasn't brought before us.**

Q. It wasn't brought before who?

**A. That is correct.**

Q. Who? You said, "It wasn't brought before us." It wasn't brought before who?

**A. The redistricting committee.**

Q. Did you have the opportunity to consider a map with two majority minority districts in the legislature?

**A. No, I don't think so.**

Q. You did not?

**A. I don't remember that at all, if we did.**

Q. I'm going to -- I'm dropping it in the chat, as well, in case it's helpful. I know it's probably not.

I am going to show you what I ask the court reporter to mark as McClendon Exhibit 3. And let me just share my screen quickly. It is exhibit,

Page 46

and then the number after it is SOS 001929. And this is what the document looks like.

MR. WALKER: Can you describe it, please?

THE WITNESS: Look up here.

MR. WALKER: Oh, that. Okay. We've got it.

(Plaintiff's Exhibit 3 was marked for identification.)

Q. Do you recognize this document, Senator McClendon?

**A. No.**

Q. I will represent to you that this is a news article produced by the secretary of state, a defendant in this case. In it, Brian Lyman is discussing a plan put forward by Mr. Buskey which would have created two majority minority districts.

And in this article, you were quoted as saying -- on Page 2, the second paragraph on Page 2, as saying, The Buskey plan would lead to "retrogression," or a retreat from minority population benchmarks set by the department of justice. Under the Voting Rights Act, the DOJ must

Page 47

approve the state's redistricting plan before it can be implemented. If the redistricting plan retreats from the justice department benchmarks, such as reducing minority population in a previously-approved congressional district, the state must show that it had no discriminatory purpose in the move and did not reduce minority voters' effective exercise of the electoral franchise.

Does that sound familiar to you?

MR. WALKER: Are you asking him if he said that, or what?

Q. I'm just asking if that helps refresh your memory.

**A. Well, it provides a memory. I don't -- I don't remember this.**

Q. So you don't know why you believed that the map introduced by Representative Buskey would have led to retrogression?

**A. So what did he introduce? No. I'm really lost on trying to decipher this.**

Q. So is that -- did you say the quote that I just read to you?

**A. I don't recall saying it. I don't recall the article.**

Page 48

Page: 12 (45 - 48)

Caster Plaintiffs' Exhibit 90, Page 13

Q. How about I give you a few minutes to look through the article, and then I'll ask you some questions again.
MR. WALKER: Kathryn, we've been going for about an hour, and I need to step out for a second. Would you mind if we took a five-minute break?
MS. SADASIVAN: If you don't mind, we'll just finish this question after Senator McClendon has a chance to look at it. And then after that, we can take a break.
MR. WALKER: Certainly. No problem.
MS. SADASIVAN: Thank you so much, Dorman.
**A. I'm ready when you are.**
Q. Do you have any reason to believe that quote is inaccurate?
**A. Now, what did you --**
MR. WALKER: Which quote?
**A. Yeah. My question is what quote are you talking about?**
Q. On Page 2 of the exhibit I just shared with you beginning with Rep Jim McClendon, R-Springville, who carried the plan in the house. There are two paragraphs where Senator McClendon is

Page 49

quoted. And I'm asking if you have any reason to believe that that quote is inaccurate.
**A. Well, there are no -- the only quotation marks are around the word "retrogression" and around the words "effective exercise of the electoral franchise." There's no -- I don't see where I was attributed a quote in those paragraphs.**
Q. Do you have any reason to believe that that paragraph discussing -- beginning with "Rep Jim McClendon" and continuing on until "This plan, as far as the justice department and Voting Rights Act goes, it's a failure," do you have any reason to believe that that is inaccurate?
**A. Well, the only part that has quotes is the one you just read. And I do not recall making that statement.**
Q. So you don't think that that was an accurate reflection of what you thought at the time?
MR. WALKER: Objection to form. You may answer it.
**A. I just -- I don't recall making the statement.**
Q. And you don't recall having the opportunity to see two majority minority districts in a congressional plan?

Page 50

**A. I do not.**
MR. DAVIS: Are we breaking now?
MS. SADASIVAN: No. I'm sorry. I asked a question.
MR. DAVIS: And he answered it.
Q. You don't recall seeing two majority minority districts in the Alabama congressional plan in 2011?
**A. I do not recall it.**
Q. Okay. Thank you so much.
MR. SADASIVAN: We can take a break now.
MR. WALKER: Thank you.
THE VIDEOGRAPHER: We are off the record. The time is 3:09 p.m.
(Recess was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 3:22 p.m.
Q. Senator McClendon, I just want to clarify really quickly Exhibit 3. You stated that you don't remember being interviewed for that article, right?
**A. I do not.**
Q. And you don't remember saying anything about retrogression?
**A. Yes. The answer is the same as it was**

Page 51

**before. I do not remember.**
Q. If there was a plan in 2011 that complied with all the districting principles and the guidelines and created two majority minority districts, would you have voted for it?
**A. Okay. Say that again. We're having a hard time.**
THE REPORTER: I think if you would slow down just a little bit, that would help.
MS. SADASIVAN: If I come in a little bit, is this better?
MR. WALKER: No. Slow down.
Q. If there was a plan that complied with the redistricting guidelines and created two majority minority districts in 2011, would you have voted for it?
**A. Thank you. I -- I understood you very well.**
**I would certainly have considered it and would -- but part of that is looking at what else is available. So I would have put it on the list for consideration, yes.**
Q. Let's move to the 2021 redistricting process.
**A. Good.**

Page 52

Q. What was your role in the reapportionment committee in 2021?
**A. Senate chair.**
Q. And what were your responsibilities as senate chair?
**A. Pretty much the same as it was as house chair, to confer with the attorney and the map drawer, to help try to set the schedule of events as they were going to unfold.**
Q. And when you say "confer with the attorney and map drawer, I'm not asking for attorney-client information. But generally as senate chair, what responsibilities did conferring with the attorney and map drawer entail?
**A. Well, for quite some time, we were trying to decide when we could actually get started on the process. And we spent a little bit of time wondering when we were going to get the data. We spent a lot of time wondering when we were going to get the data. And we shared some speculation about when it would show up. So we did the timing of the -- and sequence of events is one of the things initially that we talked about.**
Q. And so conferring with the attorney and the map drawer, you were trying to reach decisions

Page 53

about the timeline?
**A. Correct.**
Q. Anything else?
**A. That's the main -- at that point, that was the main thing, when can we get started.**
Q. At what point?
**A. Was that a question?**
Q. Yes. You said "at that point." And I'm just asking at what point was that the main --
**A. That was prior to receiving the data from the census bureau.**
Q. And did your responsibilities to confer with the attorney and the map drawer change after you received census data?
**A. I'm not sure I understand your question. Do it again and let me listen carefully.**
Q. You just shared that your responsibilities before the census numbers came out with respect to the attorney and the map drawer as senate chair of the reapportionment committee was to determine a timeline.
And I'm asking if your responsibilities as senate chair of the reapportionment committee with respect to conferring with the attorney and map drawer changed once you received census data.

Page 54

**A. Well, no. It was just part of a continuum of setting the schedule and seeing when things would work out, how things -- in what order things needed to unfold in order to get the job done in a timely manner.**
Q. And other than you and the map drawer and the attorney, who else was involved in that decision-making?
**A. Representative Pringle.**
Q. Anybody else?
**A. No.**
Q. So you, the attorney, Representative Pringle, and the map drawer determined when you would begin the public hearings or the reapportionment committee meetings?
**A. Well, the staff, the reapportionment staff, had some input into it. Although the public hearings, we gave -- we gave a time frame to the community -- the community college system. The chancellor loaned us one of his personnel to help us coordinate those public hearings. And so he's the one that actually set up the dates, locations, and times for the public hearings.**
**I think we told him we wanted to get this done the first couple of weeks in September.**

Page 55

**And then one of the representatives asked for additional meetings, so it spilled over into the third week into September.**
Q. So just going back to your role as senate chair of the reapportionment committee and your responsibilities to confer with the attorney and the map drawer, what were -- the public hearings -- strike that.
Going back to your role as senate chair of the reapportionment committee and your responsibilities to confer with the attorney and map drawer, what other timelines did you discuss?
**A. We also needed to be able to give some idea as to when we would actually be prepared for a legislative session, for the governor to call a special session to consider redistricting.**
Q. And how did you arrive at that information of when that should be?
**A. There was -- we just sort of projected forward saying we need -- we'll need X amount of time for the public hearings and then we'll need X amount of time to meet with the legislators and the congressional delegation and the board of education.**
**And then we basically set a timeline and said we can -- and then at this point we'll be ready**

Page 56

**A. to ask the governor to call a special session.**

Q. And were other members of the reapportionment committee besides House Chair Pringle involved in that decision?

**A. No.**

Q. When did you start planning for the 2021 redistricting process?

**A. We probably started thinking about it a year and a half ahead of time or more, two years maybe ahead of time.**

Q. And what were the first steps that you took to prepare for the redistricting process?

**A. The first thing that I personally tried to figure out was what the timeline was going to be. And, of course, that proved to be futile because of the delay in receiving the data and another delay and another delay.**

Q. When was your first meeting on redistricting in 2021?

**A. You know, I don't know the date.**

Q. Do you know who it was with?

**A. Are you talking about the redistricting committee? Or who are -- what kind of meeting are you talking about?**

Q. I'm talking about a meeting between you,

Senator McClendon, and any other person about redistricting in 2021.

**A. Okay. I don't know the answer to that question.**

Q. What role did you play in setting the schedule of the public hearings on redistricting?

**A. I talked to the chancellor of the two-year system and asked him to designate someone to work with our staff. And then they worked it out from there and came back with a schedule and a plan.**

Q. Did you review the locations of the public hearings?

**A. Yes, I looked at what they put together. And we were just about ready to announce it when Representative Hall requested that we add some more, which we did.**

Q. When were you preparing to announce the dates and locations of the public hearings?

**A. You know, I don't know why I would remember this, but I think June 30th was our target date to do that. And then I believe it was the day before we got a letter, an email maybe -- I didn't get it. The staff received communications from one of the members of our redistricting committee requesting that there be another half dozen added on**

**to it.**

**So we sort of had to work on that before we actually announced it. And I don't know the final date that we came out with it.**

Q. And that's Representative Laura Hall?

**A. Yes.**

Q. And there was no deadline to decide on public hearings?

**A. Well, there was a deadline. June 30th.**

Q. Who set the deadline?

**A. But on June -- I think it was June 29th, we received communication from her. So we sort of scrapped the deadline in order to the comply with her request.**

Q. Is there a time to determine public hearings set by law in Alabama?

**A. Ask that again, now.**

Q. Is there any law governing public redistricting hearings in Alabama?

**A. Not to my knowledge.**

Q. Was there any committee deadline or a committee -- rather a committee rule setting a deadline to determine public hearings?

**A. Not to my knowledge.**

Q. Who developed the deadline on

determining the time, location, and manner of public hearings?

**A. I think the staff, in conjunction with a representative from the community system, said we feel like we can get it done by this date, and actually communicated with members of the redistricting committee for suggestions and asked that they have those suggestions in by June 30.**

Q. When did you discuss public hearings with the reapportionment committee?

**A. When did who?**

Q. When did you discuss -- you or other members of the legislative delegation of the reapportionment committee discuss the public hearings?

**A. I don't know the answer.**

Q. What venues did you consider in Montgomery for public hearings?

**A. Well, we held one at the -- the public one was at the state house.**

Q. Were there any others?

**A. I don't know the answer to that. I don't have that schedule in front of me. I would be surprised if we had more than one, but I don't know for sure.**

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

MS. SADASIVAN: I am going to drop into the chat -- again, I know you all can't see it. So I will share my screen.
But I would ask the court reporter to mark it as McClendon Exhibit 4. It is a document that says 2021 Legislative Reapportionment Public Hearings Final.
Do you have that before you, Senator McClendon?
MR. WALKER: Give me just a second.

(Plaintiff's Exhibit 4 was marked for identification.)

MR. WALKER: Is this it? Is that what she's showing?
THE WITNESS: That looks like it. It's hard to tell. It does look similar to it.
MS. WELBORN: That's it.
**A. Does yours start off with Drake State in the upper left?**
Q. Yes, sir.
**A. Okay. Then we probably have -- I probably have that document before me, yes.**
Q. And can you look through that document

Page 61

and just see if you had any other public hearings in Montgomery?
**A. Well, I don't see any.**
Q. Did you consider any historically black colleges or universities when you were scheduling the public hearings?
**A. Well, I wasn't doing the considering. It was the staff in the two-year college.**
**The original idea started with having these meetings at our two-year colleges because they are spread all over the state. And so that's why we got a liaison from them to help schedule these things.**
**So whether they -- I think I saw one with Troy on here. And if I recall -- yeah, here is one at Trojan Center Ballroom. And that's because there was not a community college close by or something like that.**
**So by and large, we focused on our community college system to host us, to host these meetings. So --**
Q. How many meetings did --
**A. I'm sorry. Go ahead. Your turn.**
Q. I was just asking how many meetings did the reapportionment committee hold in 2021?

Page 62

**A. 22.**
MR. WALKER: No. Meetings.
**A. Oh, meetings. I can think of two meetings that we had. I don't know if there was a third or not.**
Q. What were the dates of those meetings?
**A. I'm thinking the first one was during the legislative session, probably the very -- toward the very end of the regular session, which would have put it in May. We did it because we had -- you know, everybody was in town.**
**And then the next meeting that I am thinking about was held just prior to the special session that was called for consideration of the bills, the redistricting bills.**
MS. SADASIVAN: So I am going to drop in the chat an exhibit that I'll ask the court reporter to mark as McClendon Exhibit 4. I'm going to pull it up on my screen and share my screen with you so you can see it.
MR. WALKER: I think this is five.
MS. SADASIVAN: I'm sorry. Five. Thank you.
Q. Can you see my screen?
**A. Reapportionment Committee Redistricting**

Page 63

**Guidelines, May 5th. Okay.**

(Plaintiff's Exhibit 5 was marked for identification.)

Q. Have you seen this document before, Senator McClendon?
**A. Give me a second to look at it. Yes. It looks -- it looks familiar.**
Q. Where have you seen this document before?
**A. Where? At the state house.**
Q. How do you recognize it?
**A. I'm just looking at -- well, I look at the title, I look at the date, I look at the plus or minus 5 percent, and some of the other topics. And those all appear to be the guidelines that we -- that the redistricting or reapportionment committee adopted prior to the map-making process.**
Q. And did you endeavor to comply with these policies in the 2021 redistricting --
**A. Did I --**
Q. -- process?
**A. Did I try to comply with these policies? Is that your question?**

Page 64

Page: 16 (61 - 64)

Caster Plaintiffs' Exhibit 90, Page 17

Evan Milligan,et al v. John H.Merrill, et al.
Jim McClendon
12/17/2021

Q. Did you comply with these -- yes. Did you comply with these policies in the 2021 redistricting process as senate chair of the reapportionment committee?
**A. I did.**
Q. Section II f states, "Districts shall be drawn in compliance with the Voting Rights Act of 1965, as amended. A redistricting plan shall have neither the purpose nor the effect of diluting minority voting strength, and shall comply with Section 2 of the Voting Rights Act and the United States Constitution."
How did you go about complying with Section 2 of the Voting Rights Act?
MR. WALKER: Are you -- may I ask, Kathryn, are you talking about for the congressional plan?
MS. SADASIVAN: I'm asking -- he said Senator McClendon tried to comply with these guidelines as senate chair of the redistricting committee. I'm asking how in general did Senator McClendon, as senate chair of the reapportionment committee, go about ensuring compliance with this particular policy.
**A. Well, subsequent to us adopting these**

Page 65

**guidelines, then I was dependent on the attorney, Dorman Walker, and the map drawer during the process, once they started actually putting lines down on paper, to stay inside those guidelines.**
Q. So your role was overseeing the map-drawing process to ensure that it complied with the guidelines?
**A. One of my goals was to be in compliance with the Voting Rights Act of 1965. That was one of my jobs. And, of course --**
Q. It was your job to ensure compliance with the Voting Rights Act of 1965?
**A. Yes.**
Q. And how did you go about doing that?
**A. Well, I counted on these experts that were working for me and working for the committee to follow those guidelines and be familiar with the court cases and with the law and with the rulings.**
Q. And what is required to determine if a map complies with Section 2 of the Voting Rights Act?
**A. Say that again. Once again -- something about the audio. It could be me. But go ahead and try it again.**
Q. It's probably me. I'm also a

Page 66

southerner, so I talk quickly, and I'm probably using too many adjectives.
I was asking you what is required to determine whether a map complies with the Voting Rights Act.
**A. Well, it's -- I would say it's a legal opinion first to be familiar with the Voting Rights Act and subsequent cases, and then to be able to compare what we have produced, what's in front of us, with the knowledge of the requirement of the Constitution and the Voting Rights Act.**
Q. And when did you compare what was produced by your demographer with the requirements of the Voting Rights Act?
**A. I think probably every time we talked, this was part of it. It came up in the conversation as we went through the map-drawing process. And both the attorney and the map drawer would be quick to say that could -- that particular line moved over there could be a problem, and we need to look at it.**
Q. And when you say "could be a problem," you mean could be a problem under the Voting Rights Act?
**A. Yes.**
Q. And what was your understanding of what

Page 67

was required to comply with the Voting Rights Act?
**A. Well, as far as what's in the Voting Rights Act, I couldn't quote it. But that's why I have an attorney.**
Q. How many times did you have a conversation where the map drawer said if you move this line, you could have a problem under the Voting Rights Act?
**A. I can say I heard that several times.**
Q. And who did you hear that from?
**A. I heard it both from the attorney and the map drawer, not necessarily at the same time.**
Q. You were --
**A. Pardon?**
Q. You were advised several times by your attorney and by the map drawer that the way that a particular line was drawn could violate the Voting Rights Act?
**A. Or the way a line was proposed to go. That was their job.**
Q. And did that occur with respect to the congressional map?
**A. Not to my knowledge. Because I was not involved in drawing the congressional map.**
Q. Who was involved in drawing the

Page 68

Page: 17 (65 - 68)

Caster Plaintiffs' Exhibit 90, Page 18

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

congressional map?

A. **The map drawer met with the congressional delegation or their representative sometimes in person, sometimes virtually like this, and really worked this out with the members of the congressional delegation.**

Q. Were the members of the congressional delegation responsible for ensuring that map complied with the Voting Rights Act?

A. **That's a good question. I don't know the answer to that question.**

Q. Were you responsible for ensuring that the congressional map complied with the Voting Rights Act?

A. **Yes. I would say that was one of my responsibilities.**

Q. In the conversations that you had regarding potential violations of the Voting Rights Act, did you or anyone else discuss racial polarization analysis?

A. **No. No.**

Q. Do you know what the basis for -- in these conversations when you heard there might be a potential Voting Rights Act violation, do you know what that was based upon?

Page 69

A. **Well, I think at different times there were different issues.**

Q. Such as?

A. **On the congressional side, I cannot -- as far as the congressional districts go, I can't give you a single example because I simply wasn't involved in that process.**

Q. When did you adopt the guidelines that we're talking about right now?

A. **Maybe May the 5th of 2021. That's the date on the document. And that was one of the purposes of -- objectives of that particular meeting of the committee, was to have the guidelines in place before we got the data and before we started working with the elected officials.**

Q. So the third policy in Section II j (iii) in McClendon Exhibit 5 that we're talking about now, the May 5, 2021, redistricting criteria, says, "Districts shall respect communities of interest, neighborhoods, and political subdivisions to the extent practicable and in compliance with paragraphs a through 1."

What is your understanding of what that policy requires?

A. **Well, when possible, it's good to keep**

Page 70

**communities of interest, communities that have a particularly common political interest, keep them together, keep them in the same whatever it is, house direct, congressional district, BOE district, if possible.**

Q. You said "common political interests." Is that your definition of community of interest?

A. **There's a -- there's a definition right here in whatever this is on Line 30. Line 30 through 32 is a definition of communities of interest.**

Q. So you just mentioned a common political interest, and I was wondering if that was part of your definition of communities of interest.

A. **Oh, that's just one -- that's just one part of it, one part -- one way you could have a community of interest. There's a lot of different ways you can have a community of interest.**

Q. What do you consider to be communities of interest in Alabama?

A. **There are -- there's not a community of interest in Alabama. There are many communities of interest.**

Q. Such as?

A. **Well, a city. A city is a community of**

Page 71

**interest.**

Q. Is Montgomery a community of interest?

A. **Yes. Montgomery is a city.**

Q. What are some other communities of interest?

A. **You can have parts of a city that are a community of interest. There are -- a county is a community of interest.**

Q. What is the black belt in Alabama?

A. **It's a geographic area pretty much across the middle of the state from east to west. And it has to do with the rich soil that's found in that area.**

Q. Do you know what counties are in the black belt?

A. **I couldn't name -- I could name a few counties. But I cannot -- I cannot name the counties in the black belt.**

Q. Is there anything other than the soil that might define the black belt?

A. **I don't know what you're fishing for.**

Q. I can ask the question again.

What are other characteristics that you know of of the black belt?

A. **That's a better question.**

Page 72

Page: 18 (69 - 72)

Caster Plaintiffs' Exhibit 90, Page 19

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

**Well, I think there's a perception that there's a lower socioeconomic income level across the black belt. There's probably -- there may be -- that would probably be the main thing.**
Q. Do you consider the black belt a community of interest?
**A. No, not necessarily, because it's multiple counties, multiple communities.**
Q. Going back to your testimony earlier about maintaining the core of districts. Does maintaining the core of the existing congressional districts require consideration of racial data?
**A. Say that again and slow down again. I'm not listening very fast today.**
Q. I'm sorry. I'm speaking quickly. And I like that term, "listening fast."
So what I asked was you testified earlier that you were maintaining -- or attempting to maintain the core of exhibiting districts in the congressional map. And I'm asking whether that requires the consideration of racial data.
**A. Well, we don't -- no. We don't -- we don't use racial data except after the fact.**
Q. After what fact do you use racial data?
**A. After the lines are drawn.**

Page 73

Q. And how do you see that racial data when you decide to look at it?
**A. The software will produce that.**
Q. What software?
**A. The software used to draw the maps.**
Q. Do you know what that software is?
**A. Give me a multiple choice, and I'll give it to you. Not right off the bat, no. You know, it's like I know it when I see it. But, you know, I never used it. But it's a new system for us. We recently adopted it.**
Q. When was the second meeting of the reapportionment committee in 2021?
**A. If, in fact, there were just the two meetings, it would have been immediately -- let me see. It would have been on the Tuesday prior to the special session convening on a Thursday. So whatever those dates are.**
Q. Do you have reason to believe that there was another meeting of the reapportionment committee other than the two we're discussing now?
**A. No, I don't. But I wouldn't be surprised. But I just don't believe there was.**
Q. I unfortunately don't have the exhibits (inaudible) the meetings, so we'll just move on.

Page 74

So you said you met the Tuesday before the Alabama special legislative session began on redistricting?
**A. Correct.**
Q. And that was the second meeting in your memory of the reapportionment committee?
**A. That is -- I believe that is correct, yes.**
Q. Were there other meetings of the reapportionment committee outside of those two to draw the map that we're discussing today?
**A. No, not of the -- not of the committee. Not a regular committee meeting, no.**
Q. What about a subset of the committee?
**A. What about what?**
MS. WELBORN: A subset.
Q. Were there other meetings of a subset of the committee?
**A. No.**
Q. What was the agenda for your October 26th meeting, reapportionment committee meeting?
**A. To select -- so is that the date, October 26th? That was meeting number two?**
**A goal for that committee was to select the bills, the maps, that would be introduced to the**

Page 75

**legislature on Thursday.**
Q. And how many congressional maps did the members of the reapportionment committee vote on?
**A. I think just the one. But I can't -- I can't swear to that.**
Q. So when you say "select the map," you mean to vote on the one map?
**A. I can't remember if a substitute congressional map was offered or not.**
Q. I am going to drop into chat, and I will share my screen, as well. I will represent to you that this is a certified transcript of the October 26, 2021, meeting of the reapportionment committee.

(Plaintiff's Exhibit 6 was marked for identification.)

Q. Do you see this?
**A. I do.**
MS. SADASIVAN: I'm going to ask Mr. Walker if you would be so kind to mark this as Exhibit 6.
MR. WALKER: I have done so. It is marked.
MS. SADASIVAN: Thank you, sir.

Page 76

Page: 19 (73 - 76)

Caster Plaintiffs' Exhibit 90, Page 20

Q. I'll let you quickly scan -- it's quite a long document. I'll let you just scan through it. And if you wouldn't mind just letting me know if this looks familiar to you.
**A. Well, I've glanced through it. It looks familiar. But it's really --**
Q. Okay. Again, I'll represent to you that it's a transcript of the October 26, 2021, meeting of the reapportionment committee, as you likely remember. And as you can see from the transcript, a considerable portion of the meeting was about racial polarization analysis.
What is your understanding of racial polarization in voting?
**A. In this case, this -- this is an additional evaluation or test of the data to any place it's suspicious that there could be racial discrimination. It's an extra test tacked on to what we normally do to see if, in fact, we are in or out of compliance with the Voting Rights Act and our own guidelines and the court cases.**
Q. And what would give rise to suspicious racial discrimination that would require a racial polarization analysis?
**A. What would -- what would make you think**

**that that's an issue? Is that what you're asking, that racial discrimination is an issue?**
**I guess, you know, the first thing I would say is if we had an incumbent minority person and there was such a change in the composition of the voters in that district, that that -- that district may no longer have -- have less of a chance of having a minority representative. That would be -- I think that would be a red flag.**
Q. So a suspicious racial issue would be if a minority representative were no longer able to win an election in their district?
**A. Or threatened if they -- yeah. Roughly what you said. I don't exactly agree word for word. But yeah, that's the idea.**
Q. What is your understanding of why RPV -- and when I say RPV, I mean racially polarized voting. What is your understanding of why RPV was discussed in the October 26th meeting?
**A. Wait a minute. I missed one word I didn't understand. Why is it what in the meeting?**
MS. WELBORN: Discussed.
**A. "Discussed," is that the word you used?**
Q. Yes, sir.
**A. Oh, okay. Well, it was brought up by**

**one of the committee members.**
Q. Who?
**A. It might have been Representative England. I think that's who it was. I'm not a hundred percent sure. I think he had a good bit to say about it.**
Q. And why did -- what was your understanding of why Representative England was concerned about racially polarized voting?
**A. I didn't have an understanding of why he was concerned. He just let it be known that he was concerned.**
Q. Did anyone else express concerns about racially polarized voting?
**A. I don't remember.**
Q. What was the conversation?
**A. I don't know. If we've got the transcript, we can take a look at it.**
**I think there was someone that may have even suggested we should have evaluated all 140 races for this. I don't remember who that was.**
Q. So if you wouldn't mind turning to Page 17 of McClendon Exhibit 5.
MS. WELBORN: I think it's Exhibit 6.
Q. Exhibit 6. I apologize.

**A. I'm on Page 17. Yep, Smitherman.**
Q. All right. So you'll see that Representative Laura Hall asked you about a racially polarized voting study done.
Can you read where it says Senator McClendon beginning with "Because"?
**A. "Because of the black age voting population in Congressional District 7, there was not one needed because it was over 54 percent black voting age population."**
Q. And then will you also read what Representative Hall said in response?
**A. "So you're saying that we don't have a black -- we don't have a polarization, racially polarization study?"**
Q. And then please read your response.
**A. "None. Because the voting age" -- well, I suspect that's a transcript error. "What is it? I got it right here."**
**"Because the voting age is 54." Don't you think that's the VAP, 54, instead of the voting age?**
Q. And then -- I'm sorry. Can you please just read it as it is on the transcript, what Representative Hall said after that beginning with

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

"And"?

A. **"And you use District 7 as the basis for not having such a study done?"**

Q. And then please read your response.

A. **The black vote -- "The black VAP of the district is sufficient to where you don't need a study done."**

Q. Who makes the decision to undertake an RPV analysis?

A. **The attorney.**

Q. If you asked the attorney to undertake an RPV analysis, what would happen?

A. **We would discuss whether, in his opinion, the issue was actually there or not and needed to be decided and further information gathered on the outside. I mean, his job is not just to jump.**

Q. If you asked Mr. Walker to conduct an RPV analysis, would one be conducted?

A. **First, I don't think -- I would not ask Mr. Walker to do something. I would ask Mr. Walker, "What is your opinion? Do we need to do this or not?" That's how it works.**

Q. I understand. And if you asked him to undertake a racial polarization analysis, would one

Page 81

be undertaken?

A. **You know, that's a hypothetical. And I'm not going to do a hypothetical.**

Q. Do you have the power, as senate chair of the reapportionment committee, to ensure that the individuals, the attorney, and the map drawer, for example, comply with the Voting Rights Act?

A. **Well, yes. That's their responsibility.**

Q. And if you decided that you needed a racially polarized voting study done, could you insist that they undertake one?

A. **Well, once again, you're doing something hypothetical. I depend on Mr. Walker for his legal opinion and his experience. He's got many more years of experience than I do.**

**And what I most likely do with him is say, "Dorman, what do you think about this? Do we need to do this or not? Does it make any sense?"**

Q. Senator McClendon, I understand that you're very personable and you rely on the opinions of your attorneys.

What I'm asking you is if you have the power to insist, as senate chair of the reapportionment committee, that a racially polarized voting study be undertaken?

Page 82

A. **You know, I don't know the answer to that question.**

Q. You don't know whether or not you could undertake --

A. **I don't know. The only way I would know is if I had exercised that and see how it worked out. But I've never exercised it, never thought about exercising it. So I don't know the answer to that.**

Q. You didn't think about asking for an RPV analysis when Representative England and Representative Hall asked for one to be undertaken?

A. **It's like -- it's highly probable that we discussed doing that afterwards, after the meeting. I may have discussed it with Mr. Walker. And if he had thought it was of value and worthwhile to do and would give us additional information that we needed, it would have been ordered. And if he had felt like it was an exercise in futility and a waste of time and money, he would have made that expression, as well.**

Q. And did you ask Mr. Walker to undertake an RPV analysis after the October 26th meeting?

A. **We may have talked about it. But I don't remember exactly doing that.**

Page 83

Q. How much did Alabama's population change between 2011 and 2021?

A. **I believe it increased about 5 percent. I think it went from 4.88 to a little over 5 million, 5,020,000 or something like that.**

Q. In this redistricting cycle, was District 7 over or underpopulated?

A. **I think it was under. Yes, I'm sure it was under.**

Q. I'm going to go back to McClendon Exhibit 6. If you wouldn't mind please turning to Page 19.

And if you could look at the second paragraph on the page after Representative England said, "It would appear that District 7 would look like that would need to be done," referring to an RPV analysis.

He goes on, "So it appears to me that if we're doing this in the logical way, that District 7 just -- as it appears on a map, would produce a certain percentage."

And he asks, "And what is the relationship between the 54 percent that you're citing and the actual results or potential results of a racial polarization study? What is the

Page 84

Page: 21 (81 - 84)

Caster Plaintiffs' Exhibit 90, Page 22

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

relationship between the two?"

A. Let me --

Would you read your response?

A. I'm sorry. I thought you were done. Go ahead.

Q. Would you please read your response?

A. Let me read this sentence you just read. So I would like to request that the study be done on District 7. And what is the relationship between the 54 percent that you're citing and a racial polarization study? What is the relationship?

My response is, "I got no clue."

Q. Does this seem like an accurate representation of your conversation in the meeting, the October 26 reapportionment committee meeting?

A. I think it's fairly accurate. I've certainly found some errors in here. But it's probably close enough.

Q. And do you still have no clue what the relationship between the 54 percent number that you cited earlier as not a threshold by which you would consider an RPV analysis and the actual or potential results of a racial polarization analysis?

A. Okay. Give me -- break that up. That was a couple of questions. Give me the first one.

Page 85

Q. It's just one question, but it's long.

I'm asking you if you still have no clue with respect to the question that Representative England asked you and that you just read?

A. Here -- here's the issue. Representative England apparently was targeting that number of 54 percent of BVAP as if it were some sort of threshold of do or die.

And even the courts, to my knowledge, have never come up with a number that says you've got to have this percent or you can't go below this percent. It's never happened.

So when somebody picks out a number of 54 percents and says that's good or bad, well, Congresswoman Sewell was happy with it. And she's probably got a whole lot more information on her electability in her own district than I have.

Q. So I'm just going to point you back to Page 17 of the transcript of your October 26th meeting of the reapportionment committee where before Representative England brought that up, you had said, "Because of the black voting age population in Congressional District 7, there was not one needed," referring to an RPV analysis, because it was over 54 percent BVAP.

Page 86

What did you mean by that?

A. What I meant by that was it didn't look like it was -- that a minority congresswoman was at risk. If she wanted to be elected again -- and apparently she does -- there was nothing to suggest it was close enough to think there was a threat to her reelection.

Q. And how is that related to the black voting age population in District 7 at 54 percent?

A. Well, most of the voters are a minority.

Q. And so you were assuming that black voters would vote for a black representative?

A. That's pretty -- a pretty safe bet here in Alabama.

Q. And where did the 54 percent number come from?

A. Those -- those numbers are generated by the software when the district is drawn. But they are generated after the district is drawn.

Q. Did you talk to Representative Sewell about the black voting age population in her district?

A. No, I did not.

Q. Did you talk to Representative Sewell about the congressional map?

Page 87

A. No, I did not.

Q. How do you know that Representative Sewell was okay with the district, as you suggested, based on the BVAP?

A. I was told that by the map drawer who interviewed Representative Sewell I think once in person and once virtually. Or it may have been a staff person. But they were okay with the district.

Q. So you wanted to ensure that the BVAP in districts with a minority candidate representing them was not too low?

A. Correct.

Q. Did you take any steps to ensure that the BVAP in any district was not too high?

A. Not to my knowledge.

Q. Who drew the maps for you in 2021?

A. Randy Hinaman.

Q. What is Randy Hinaman's role in the redistricting process?

A. He's the map drawer.

Q. When did you first meet with Mr. Hinaman about the redistricting cycle in 2021?

A. In the spring of 2021, I guess. I don't -- I don't remember an exact date.

Q. Who did you meet with Mr. Hinaman with?

Page 88

Page: 22 (85 - 88)

Caster Plaintiffs' Exhibit 90, Page 23

A. **I don't remember who was there.**
Q. What was discussed?
A. **Pardon me? What was what?**
Q. What did -- what did you all discuss?
A. **I would just guess. And I would say we probably discussed when are we going to see the data so we can go to work.**
Q. Did you provide any instructions to Mr. Hinaman in the spring of 2021?
A. **No.**
Q. Why not?
A. **He was -- he was more experienced than me.**
Q. Did you provide Mr. Hinaman with any materials throughout any of the process of him drawing the 2021 Alabama maps?
A. **No.**
Q. Why?
A. **There was no need to.**
Q. Why was there no need to?
A. **Well, he was the map drawer. He knew his job.**
Q. Where was his job description?
A. **Where was his job description?**
Q. Defined.

A. **You know, he -- I don't know the answer to that.**
MS. SADASIVAN: Would you mind if we take a five-minute break?
THE VIDEOGRAPHER: We are off the record. The time is 4:26 p.m.
(Recess was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 4:37 p.m.
Q. Senator McClendon, thank you again for sitting for the deposition and for your time.
Following up on McClendon Exhibit 6 where we were discussing the quote where you said that because of the black voting age population in Congressional District 7, there was not one needed with respect to an RPV analysis because the district was over 54 percent BVAP. That was the October 26th meeting of the reapportionment committee.
Did Mr. Walker tell you that a racial polarization analysis was unnecessary because District 7 had a BVAP of 54 percent?
MR. WALKER: Object on the basis of attorney-client privilege.
Q. Were you told that a racial polarization analysis was unnecessary because District 7 had a

BVAP of around 54 percent?
A. **I was told that in any of the districts that were drawn that needed this additional analysis, it had been requested.**
Q. Can you repeat your answer, please?
A. **I was told that any of the districts that needed additional analysis, that that analysis had been requested.**
Q. And were you told which districts required analysis?
A. **No.**
Q. Did you know any criteria for which districts required an analysis?
A. **I did not know the criteria.**
Q. When did you determine that your plan didn't violate the Voting Rights Act?
A. **Well, sometime -- sometime prior to submitting it to the redistricting committee for consideration. That was like part of the process, to make sure we were in compliance before introducing it for consideration for the other committee members.**
Q. And when did you submit the congressional redistricting bill for consideration by the reapportionment committee?

A. **The date -- the date we met that Tuesday prior to the special session convening on Thursday.**
Q. So you determined before the October 26th meeting that your map, the congressional redistricting map you introduced, didn't violate the VRA?
A. **I felt confident that was the case, yes.**
Q. Do you know if an RPV analysis was conducted for Congressional District 1?
A. **Do I know if it was conducted? Is that your question?**
**No, I don't know if it was conducted.**
Q. Who would know?
A. **The attorney.**
Q. And who is that?
A. **His name is Dorman Walker.**
Q. When did the special legislative session on redistricting begin in Alabama in 2021?
A. **The Thursday of that week following the redistricting committee meeting. And I don't remember what the date was.**
Q. Did you do anything to prepare for the special session?
A. **Well, yes.**
Q. What did you do to prepare for the

special session?
**A. I tried to get the -- first, we handled -- the senate handled the senate and the BOE map first. And so I wanted my information in place in my hand that I would present to the standing committee and ultimately to the senate floor. So my preparation was to have my bullet points convenient before those meetings.**
Q. Did you review any maps of two majority black districts in 2021?
**A. No.**
Q. Did you have the opportunity to vote on any two majority black congressional district plans in 2021?
MR. WALKER: Did you say have the opportunity to vote?
MS. SADASIVAN: Yes.
MR. WALKER: Okay.
**A. There may -- I don't -- and I'm not certain. But I think one was introduced on the senate floor. But I'm not sure.**
Q. You think that a bill creating two majority minority districts was introduced on the senate floor?
MR. WALKER: May.

Page 93

**A. May have been introduced on the senate floor. Introduced on the senate floor.**
Q. So I am dropping into the chat and I'll ask Mr. Walker to mark as Exhibit 7 or McClendon Exhibit 7 a document that is the transcript of the senate floor debate in Alabama on November 3, 2021.
Do you recognize the document? It's on my screen so you can see it.
MR. WALKER: Oh, okay. This is 7?
MS. WELBORN: Yes.
MS. SADASIVAN: Yes, sir.

(Plaintiff's Exhibit 7 was marked for identification.)

Q. And I have the exhibit pulled up, as well. Take a minute to look at it, Senator McClendon, please.
**A. What did you say?**
Q. Will you just take a minute to look at the transcript, and at the end confirm yes or no whether it generally appears accurate of the senate floor debate in 2021 on the various redistricting bills in the special legislative session.
**A. Where does this start dealing with the**

Page 94

**congressional plan?**
Q. Let me just scroll down.
I guess my question was initially -- and I'm seeing on Page 27 there's the beginning of a discussion between Senator McClendon and Senator Singleton.
But I had first asked, Senator McClendon, if you could look through the transcript and see if it generally appears accurate of the senate floor debate on November 3, 2021, in the Alabama senate. I will represent to you that it's the transcript from the video that we received.
**A. And I'll accept that, that it is a transcript of the senate floor.**
Q. And in this transcript, you vote against a map introduced by Senator Singleton and Senator Hatcher. Can you --
**A. What page is that on?**
Q. I believe the motion is -- the substitute was offered by Senator Hatcher on Page 39.
**A. Okay.**
Q. And Senator McClendon moved it for an up or down vote on Page 40, and then votes against it on Page 41. Do you see that?

Page 95

**A. Okay. Yeah, I do. I do.**
Q. Can you tell me why you voted against Senator Hatcher's two majority minority district plan?
**A. You know, if I recall correctly, his map pitted -- put two incumbent congressional members in the same district.**
**Did you hear me?**
Q. I can. I asked you why you voted against Senator Hatcher's plan.
**A. And my response was that, among other things, the most blatant thing and easiest to notice was that he had put two incumbents in the same district.**
Q. You agree that the black voting age population of the state of Alabama is approximately 27 percent of the state?
**A. Approximately.**
Q. Did that factor in to how you voted on Senator Hatcher's map?
**A. It had nothing to do with it.**
Q. Did you have the opportunity to vote on Senator Singleton's proposed map?
**A. I did.**
Q. And how did you vote?

Page 96

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

A. **A nay.**
Q. And why did you vote nay?
A. **I think the blatant problem with his map was that no minority candidate had a majority district. He had --**
Q. And when you say a minority candidate had a majority district, what do you mean?
A. **I think he drew two districts they called opportunity districts. But no minority candidate had a majority of the voters in either of those districts.**
Q. With respect to Senator Hatcher's map, you said you voted against it because two incumbents were paired?
A. **I think that is -- I think that's correct.**
Q. And what is -- in terms of your understanding of the law, what is a more important criteria for a map proposed by the Alabama legislature? Compliance with federal law and the Voting Rights Act or ensuring incumbents are not paired?
A. **You're asking me to say what's most important among those three or what takes precedent? Is that what your question is?**

Page 97

Q. Yes, sir.
A. **Well, you always have to assume that federal law supersedes state law. But in this case, it was -- it didn't matter. It was just -- it was an -- it was an inappropriate situation.**
**Actually, what happens when you pit two incumbents, suddenly the redistricting committee is picking winners and losers. And that should be up to the voters.**
Q. The reapportionment committee -- just to go back a little bit to the public hearings that you held on redistricting. How many were there?
A. **Still 28.**
Q. And how many occurred between the hours of 9:00 and 5:00?
A. **Well, I don't know. I would have to -- I would have to go back. I think most -- most of them did, yeah.**
Q. If I say the McClendon exhibit, I'm afraid I will get it wrong. But it has the schedule of the public hearings.
A. **That would be Number 4.**
Q. Thank you, sir.
A. **Okay. What is your question, now?**
Q. I asked how many of the 28 public

Page 98

hearings occurred between the hours of 9:00 a.m. and 5:00 p.m.
A. **Most all of them did. I guess there's one exception to that. And that would have been the meeting at the state house in Montgomery.**
Q. How many public hearings were held at the same time as another public hearing?
A. **Zero.**
Q. In other words, how many public hearings overlapped with another one of the public hearings?
A. **Zero.**
Q. No public hearings occurred at the same time as another public hearing?
A. **Correct.**
Q. And when did you finalize the times of the public hearings?
A. **It would have been sometime in July, early July. Actually, it was done twice. The first time, it was targeted to be completed by June 30th. And then we added six more, and that just tacked them on the end. So it was in the early part of July.**
Q. So you added six more why?
A. **Representative Hall requested it.**
Q. How did she request additional hearings?

Page 99

A. **Email.**
Q. Sir, I am going to drop in the chat and I will share my screen and ask Mr. Walker if he could please mark this as, I believe, McClendon Exhibit 7.
MR. WALKER: Eight.
MS. SADASIVAN: Eight. Gosh. Why am I always one off? It's Friday.
Q. So I'm showing you what I've asked Mr. Walker to mark as McClendon Exhibit 8. I'm scrolling down to the bottom where it says RC 045704.
MS. WELBORN: Kathryn, can you scroll all the way up? We don't know what the document is.
MS. SADASIVAN: So the document says RC 045697. This was produced by Mr. Walker yesterday.
MS. WELBORN: What does it look like on the first page so we can figure out which one it is?
MS. SADASIVAN: It looks like this.
MR. WALKER: Okay.

(Plaintiff's Exhibit 8 was marked for identification.)

A. **Is this -- okay. Exhibit 8.**

Page 100

Page: 25 (97 - 100)

Caster Plaintiffs' Exhibit 90, Page 26

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

MR. WALKER: She's turned it back a page or two.

Q. So if you look on Page 12 of the exhibit that Mr. Walker handed you, it's marked at the bottom with Bates number RC 045712.

**A. 712. Okay. I've got 712. What page?**

Q. 045712. It's page 12 of that PDF.

**A. 712. I've got Page 1.**

Q. Do you recognize on Page -- I guess the page that we just landed on, did you recognize the document that you're looking at, Mr. McClendon?

**A. Yes. Well, I have it in front of me. Let me look at it.**

**Yes, I've seen this before.**

Q. Where have you seen it before?

**A. I probably -- I probably received a copy of it, of the email.**

Q. What is this that you're looking at?

**A. This is Representative Hall, I guess. Yes. This is when she made a request for additional meetings. And she sent that to the staff office and they forward a copy to me.**

Q. So in her email that we're looking at right now, Representative Hall says, "During the May 5th committee meeting, members agreed to hearing

Page 101

locations that would not require constituents to travel more than one county. However, the proposed location map will require interested parties to travel significant distances to participate."

Going down, it says, "While it may not be feasible for all committee members to attend every public hearing, the proposed schedule requires members to 'pick and choose' hearings and will not have the full benefit of the public hearing testimony and discussion of any alternative maps introduced."

On the second page -- on the following page, which is Bates number RC 045713, Representative Hall says, "In addition, the timing of each hearing is unsatisfactory. Hearings held during working days cannot be viewed objectively as providing the opportunity for public input."

How did you respond to Representative Hall's concerns about the timing of the public hearings?

**A. I think I called my attorney and basically said, "How do you want to handle this? What do you think we need to do?" And --**

MR. WALKER: Do not discuss what I said to you.

Page 102

**A. But I cannot discuss what he said to me.**

Q. You stated earlier that the time and manner of the public hearings is not governing by Alabama law, correct?

**A. Not to my knowledge.**

Q. So when Representative Hall asked for other times for the public hearings, was there any legal constraints to the times that you could select for the public hearings?

**A. Not to my knowledge.**

Q. Why did you not change the times of the public hearings based on this email?

**A. That was being -- we used our staff and we used our liaison from the community college system to contact the local community colleges and locations and to see what would work out for everybody involved. And that's how it came about.**

MS. SADASIVAN: I think that's all the questions I have. The Singleton and the Caster plaintiffs may have questions.

MR. OSHER: I have a few questions. Jim, if you want to go first for Singleton, you're more than welcome to. He might not be on.

Okay. Senator, give me one moment, sir.

Page 103

EXAMINATION BY MR. OSHER:

Q. Senator McClendon, can you hear me?

**A. I can hear you very well.**

Q. Oh, well that's a surprise. That never happens. Thank you for your time today. I just have a few questions.

I believe -- am I correct that you were in the room when Representative Pringle was taking his deposition?

**A. You are correct.**

Q. Or I should say was having his deposition taken.

And so I assume that you heard the questions that I asked him. Is that correct?

**A. That is correct.**

Q. I'm just going to ask you the same questions.

How long have you been serving in the Alabama legislature?

**A. 19 years.**

Q. 19 years. And have you been a member of the republican party that whole time?

**A. Well, I've always run as a republican. And I believe I've been a dues-paying member of the county republican group that whole time.**

Page 104

Page: 26 (101 - 104)

Caster Plaintiffs' Exhibit 90, Page 27

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

Q. And have you -- have you always been a member of the republican party?
**A. Well, "always been" goes back a long way. I think I've been a member of the republican party as long as I've been a candidate or an elected official.**
Q. And how long does that date back until in the -- in the past?
**A. 2001.**
Q. Okay. Based your 19 years serving in the legislature, in your view, do the views of the members of the democratic party in Alabama generally differ from the members of the republican party in Alabama when it comes to the issue of removing confederate monuments from public spaces?
**A. You know, I think if you make that broad and say generally, I think I can agree with that statement. There -- there are definitely exceptions. But I think with the "general" in there, I can say I generally agree with your statement.**
Q. So the answer to my question was yes?
**A. Yes.**
MR. WALKER: Objection to form. He answered that he can generally agree.

Page 105

Q. My question was do the members of the democratic party, generally do their views generally -- I should start over.
Do the views of the members of the democratic party generally differ from the views of the members of the republican party in Alabama generally when it comes to removal of confederate monuments in public spaces?
**A. I think I can agree with that.**
Q. You think you can agree? Can you give me a yes or no answer on that question?
MR. DAVIS: Objection, asked and answered.
THE WITNESS: So objection, what does that mean for me?
MR. WALKER: That means you don't answer.
Q. Well, it doesn't mean you don't answer. I believe that's a form objection.
MR. WALKER: Excuse me. Forgive me. You're right. Sorry, Dan.
MR. OSHER: That's okay.
Q. Senator, if you wouldn't mind answering the question.
**A. Yes.**

Page 106

Q. Thank you. I appreciate it. A few more.
Based on your 19 years in the Alabama legislature, do the views of the members of the democratic party in Alabama generally differ from the members of the republican party in Alabama when it comes to the issue of affirmative action?
**A. And we'll get back to the discussion you had earlier on affirmative action. I'm not even exactly sure of a definition of affirmative action. I remember hearing that term some years ago. But it hasn't been around in a while. So I'm real hesitant about answering that question.**
**One other thing I would like to point out. You're talking about members of the democratic party, members of the republican party, right? That's who you're asking me about.**
**Well, I don't attend any of the democratic party meetings. Now, I know a lot of democrats that are in the legislature. So I'm more likely to have a feeling for a democratic rather than a member of the democratic party. Do you understand what I'm saying?**
Q. So let me ask you this: In your 19 years serving in the -- in the Alabama legislature,

Page 107

have you worked with your democratic party -- your democratic party colleagues on issues related to pending legislation?
**A. Yes.**
Q. And have you worked with republican members of the Alabama legislature on pending legislation and other issues?
**A. Yes.**
Q. And in that time, have you gained a general view of what the democratic party in Alabama supports and what the republican party in Alabama supports?
**A. Yes.**
Q. Okay. So you -- in terms of affirmative action, let's define affirmative action as giving preference to individual -- considering individual race when making certain decisions about admission to programs or access to benefits.
Using that definition, based on your experience in the legislature, do the views of the democratic party in Alabama generally differ from the members -- the views of the members of the republican party in Alabama?
**A. I really don't have an opinion on that. And the reason is the issue simply has not come up,**

Page 108

Page: 27 (105 - 108)

Caster Plaintiffs' Exhibit 90, Page 28

Evan Milligan,et al v. John H.Merrill, et al. Jim McClendon 12/17/2021

**it's not in front of me, and I have no experience with members of the democrats or the republicans on that issue. So I can't speak for something that hasn't happened.**
Q. Sure.
Based of your experience in the Alabama legislature, do the views of members of the democratic party in Alabama generally differ from the members of the republican party in Alabama when it comes to criminal justice reform?
**A. Okay. And your question is they have disparate or different views? Republicans have different views from democrats on criminal justice reform? That's your question, correct?**
Q. As a general matter, correct.
**A. As a general matter, I agree with that statement.**
Q. And based on your experience in the legislature, do the views of the members of the democratic party in Alabama differ from the views of the members of the republican party in Alabama when it comes to whether there is a significant amount of discrimination against black residents of the state today?
**A. Once again, I need to take a party**

Page 109

**business out. I see the party as these two organizations. These people I know claim to be democrats. Some of them claim to be republicans. Whether they belong to -- are active in a party or not, I have no idea.**
**Now let's go back to the heart of your question, and I'll try to answer it. With that in mind, ask me your -- ask me your question. What is the topic here?**
Q. The fourth topic that I'm asking if the members -- if the views of the members of the democratic party generally differ from the views of the members of the republican party generally.
Based on your experience working in the legislature with members of both parties, do their views generally differ when it comes to the issue of whether there is a significant amount of discrimination against black residents of Alabama today?
**A. Yes.**
MR. OSHER: Thank you very much. That's all I have for you. Thank you for your time, Senator.
**A. You're very welcome.**
MR. WALKER: Are we done?

Page 110

MR. DAVIS: Any questions from the Singleton plaintiffs?
I've got just a couple.
EXAMINATION BY MR. DAVIS:
Q. Hello, Senator.
**A. Hello.**
Q. Jim Davis representing Secretary Merrill.
Senator, how many members are there of the Alabama senate?
**A. 35.**
Q. And do they all have a vote on legislation?
**A. Yes, they do.**
Q. Does that include redistricting litigation?
**A. That is correct.**
Q. Excuse me. I said "litigation." I meant legislation.
**A. Legislation.**
Q. Do all senators' votes count the same?
**A. Yes.**
Q. Do you know why any other member of the Alabama senate voted for or against a redistricting plan?

Page 111

**A. No. That's an individual decision.**
Q. And how many members are there of the Alabama house of representatives?
**A. 105.**
Q. And they all have votes on legislation?
**A. They certainly do.**
Q. Including redistricting legislation?
**A. Correct.**
Q. And their votes all count the same as one anothers?
**A. That's correct.**
Q. Do you know why any member of the Alabama house of representatives voted for or against any plan, any redistricting plan?
**A. No. That's an individual decision.**
Q. Did you instruct Randy Hinaman to be sure to include a majority black district in an Alabama congressional plan draft?
**A. I did not.**
Q. Did you decide ahead of time that Alabama's plan must include a majority black district?
**A. I did not.**
Q. Was your understanding that those districts, when drafted, would be done so without

Page 112

Page: 28 (109 - 112)

Caster Plaintiffs' Exhibit 90, Page 29

consideration of race?

**A. That is correct.**

Q. To the best of your knowledge, was that, in fact, how it was done?

**A. That is exactly how it was done.**

MR. DAVIS: Thank you, Senator.

**A. You're welcome.**

MR. WALKER: Do we have anything further?

MS. SADASIVAN: Nothing from the Milligan plaintiffs. Thank you, Senator, for your time and sitting for the deposition. I appreciate it.

MR. OSHER: Nothing from the Caster plaintiffs. Thank you all.

MR. WALKER: Kathryn, I need to get to you, in addition to my privilege log, the final statement of -- you know, the sheet where I state the request for production and then I state underneath the documents. Can I get that to you on Monday? You've got all the documents. I just need to give you the sheet that says which ones refer to which of your requests.

THE REPORTER: Are we on the record?

MS. WELBORN: Can we go off the record

Page 113

now?

MR. WALKER: Yeah, sure.

THE VIDEOGRAPHER: This ends the deposition of Jim McClendon. The time is now 5:12 p.m.

(DEPOSITION ENDED AT 5:12 P.M.)

Page 114

STATE OF ALABAMA )
JEFFERSON COUNTY )

I hereby certify that the above proceedings were taken down by me and transcribed by me using computer-aided transcription and that the above is a true and correct transcript of said proceedings taken down by me and transcribed by me.

I further certify that I am neither of kin nor of counsel to any of the parties nor in anywise financially interested in the result of this case.

I further certify that I am duly licensed by the Alabama Board of Court Reporting as a Certified Court Reporter as evidenced by the ACCR number following my name found below.

So certified on December 17, 2021.

__________________________
LeAnn Maroney, Commissioner
ACCR# 134, Expires 9/30/25
505 North 20th Street, Suite 1250
Birmingham, AL 35203

Page 115

WORD INDEX

< 0 >
**001929** 47:1
**045697** 100:16
**045704** 100:12
**045712** 101:5, 7
**045713** 102:13

< 1 >
**1** 6:9 19:15 21:7 35:8, 22 37:24 70:22 92:9 101:8
**1:57** 1:24 7:17
**1:59** 9:5
**10** 4:19 14:19
**100** 6:23
**10004** 4:5
**10006** 3:15
**104-111** 6:3
**105** 1:23 5:14 112:4
**11** 27:24
**1-10-43** 14:18
**111-114** 6:4
**12** 101:3, 7
**125** 4:4
**1250** 115:23
**134** 115:23
**14** 26:10
**140** 79:20
**1400** 3:7
**14th** 3:21
**17** 1:24 7:7, 17 79:23 80:1 86:19 115:17
**19** 84:12 104:20, 21 105:10 107:3, 24
**1943** 14:19
**1965** 65:8 66:9, 12
**1999** 3:7

< 2 >
**2** 6:11 35:6 36:2, 7, 24 39:19, 23, 24, 25 40:2 47:21 49:22 65:11, 14 66:20
**2:04** 9:8
**2:2021-CV-01530-AMM** 1:8
**2:21-CV-01530-AMM** 7:14
**200** 5:14
**2000** 38:13
**20002** 4:20
**20005** 3:22
**2001** 24:18 42:15, 20 43:6 105:9
**2010** 33:12 38:8
**2011** 6:12 28:5 30:12 31:9 32:10, 16, 23 33:21 34:9 36:13, 20 37:15, 25 40:15, 21 42:7 43:3, 10, 13, 17 45:4, 13, 17, 22 46:5 51:8 52:2, 15 84:2
**2014** 26:10, 15
**2021** 1:24 6:18, 20, 22 7:7, 17 26:3 30:12 45:7 52:23 53:2 57:6, 19 58:2 61:6 62:25 64:21 65:2 70:10, 18 74:13 76:13 77:8 84:2 88:16, 22, 23 89:9, 16 92:18 93:10, 14 94:6, 23 95:10 115:17
**205)999-8096** 14:24
**20th** 115:23
**22** 33:16 63:1
**23** 40:14
**26** 6:20 16:19 76:13 77:8 85:15
**26th** 75:21, 23 78:19 83:23 86:19 90:17 92:4
**27** 95:4 96:17
**28** 98:13, 25
**29th** 59:11

< 3 >
**3** 6:13, 22 39:23, 24, 25 40:2 46:24 47:9 51:19 94:6 95:10
**3:09** 51:14
**3:22** 51:17
**30** 60:8 71:9
**30th** 58:20 59:9 99:19
**32** 71:10
**35** 6:9 111:11
**35203** 115:24
**36** 6:11
**361** 14:22
**36104** 1:24 5:15
**36106** 4:12
**36130** 5:6
**39** 95:21

< 4 >
**4** 6:15 39:23, 24, 25 40:2, 14 61:5, 12 63:18 98:22
**4.88** 84:4
**4:26** 90:6
**4:37** 90:9
**40** 3:14 95:24
**41** 95:25
**47** 6:13

< 5 >
**5** 3:14 6:17 39:21 43:20, 22 44:8, 12, 14, 18, 23 45:1 64:3, 16 70:17, 18 79:23 84:3, 4
**5,020,000** 84:5
**5:00** 98:15 99:2
**5:12** 114:5, 7
**50** 17:1 24:25 26:1
**501** 5:5
**505** 115:23
**54** 80:9, 20, 21 84:23 85:10, 20 86:7, 14, 25 87:9, 15 90:17, 21 91:1
**5th** 64:1 70:10 101:25

< 6 >
**6** 6:19 76:15, 22 79:24, 25 84:11 90:12
**600** 3:21 4:19
**61** 6:15
**6179** 4:11
**64** 6:17

< 7 >
**7** 6:21 43:5 80:8 81:2 84:7, 15, 19 85:9 86:23 87:9 90:15, 21, 25 94:4, 5, 9, 13 100:5
**700** 3:21
**712** 101:6, 8
**76** 6:19

< 8 >
**8** 6:23 100:10, 22, 25

< 9 >
**9/30/25** 115:23
**9:00** 98:15 99:1
**90067** 3:8
**9-103** 6:2
**94** 6:21

< A >
**a.m** 99:1
**ability** 11:2, 6

**able** 8:5 11:21 22:10 56:13 67:8 78:11
**accept** 95:13
**Access** 40:7 108:18
**accordance** 39:10 40:14
**account** 15:9, 18
**accounts** 15:16
**ACCR** 115:15, 23
**accurate** 50:18 85:13, 16 94:22 95:9
**Act** 39:8, 18, 21 43:21 47:25 50:11 65:7, 11, 14 66:9, 12, 21 67:5, 8, 11, 14, 23 68:1, 3, 8, 18 69:9, 14, 19, 24 77:20 82:7 91:16 97:21
**acting** 7:3
**action** 39:16 41:5, 7 107:7, 9, 10 108:15
**active** 110:4
**activity** 27:19, 23
**actual** 27:25 28:12, 17 84:24 85:22
**add** 58:15
**added** 58:25 99:20, 23
**addition** 102:14 113:17
**additional** 6:24 12:7 56:2 77:16 83:17 91:3, 7 99:25 101:20
**address** 14:21
**adjectives** 67:2
**admission** 108:17
**adopt** 70:8
**adopted** 39:5 64:19 74:11
**adopting** 65:25
**adoption** 37:12
**advance** 19:18
**advised** 68:15
**affect** 11:2, 6
**affirmative** 107:7, 9, 10 108:14, 15
**afraid** 98:20
**afternoon** 9:10
**age** 43:13, 17 80:7, 10, 17, 20, 22 86:22 87:9, 21 90:14 96:15
**agenda** 75:20
**ago** 10:6 27:6 107:11
**agree** 78:14 96:15 105:17, 20, 25 106:9, 10 109:16
**AGREED** 1:17 2:1, 8 101:25
**ahead** 57:9, 10 62:23 66:23 85:5 112:20
**al** 1:6, 10 7:13, 14 115:24
**ALABAMA** 1:2, 23 4:10, 12 5:6, 15 7:2, 3, 16, 20 8:3 9:20 14:22 15:7, 23, 25 17:4, 13, 14, 23 24:24 26:7, 9, 20 27:9 38:7 39:12 40:15 42:10 44:12, 14, 19, 23 45:16 51:7 59:16, 19 71:20, 22 72:9 75:2 87:14 89:16 92:18 94:6 95:11 96:16 97:19 103:4 104:19 105:12, 14 106:6 107:3, 5, 6, 25 108:6, 10, 11, 21, 23 109:6, 8, 9, 20, 21 110:18 111:10, 24 112:3, 13, 18 115:1, 14
**Alabama's** 28:5 38:10 84:1 112:21
**Ali** 5:20
**allow** 11:19 12:10
**alternative** 102:10
**amended** 65:8
**amendments** 40:16
**American** 4:3, 10
**amount** 56:20, 22 109:22 110:17
**analysis** 69:20 77:12, 24 81:9, 12, 19, 25 83:11, 23 84:17 85:22, 23 86:24 90:16, 20, 25 91:4, 7, 10, 13 92:8
**Angeles** 3:8
**announce** 58:14, 17
**announced** 59:3
**anothers** 112:10
**answer** 12:1, 20, 21 14:10 21:9 26:16 31:10 34:6 37:20 40:23 43:4, 7 44:8 45:20 50:20 51:25 58:3 60:16, 22 69:11 83:1, 8 90:1 91:5 105:22 106:11, 17, 18 110:7
**answered** 26:15 51:5 105:25 106:13
**answering** 12:2, 13 106:23 107:13
**answers** 11:3, 7, 18
**Anybody** 55:10
**anywise** 115:11
**apologize** 39:24 79:25
**apparently** 86:6 87:5
**appear** 64:17 84:15
**appears** 84:18, 20 94:22 95:9
**applied** 44:18, 23
**apply** 44:12, 14
**appreciate** 35:14 107:1 113:12
**approach** 27:22
**approval** 34:14
**approve** 34:15 48:1
**approving** 34:19
**approximately** 96:16, 18
**area** 72:10, 13
**arrive** 56:17
**article** 47:16, 20 48:25 49:2 51:21
**asked** 12:9 30:16 36:1 51:3 56:1 58:8 60:7 73:17 80:3 81:11, 18, 24 83:12 86:4 95:7 96:9 98:25 100:9 103:6 104:14 106:12
**asking** 30:21 40:1 44:3, 6, 22 48:11, 13 50:1 53:11 54:9, 22 62:24 65:18, 21 67:3 73:20 78:1 82:22 83:10 86:2 97:23 107:17 110:10
**asks** 84:22

**assign** 2:12
**assistance** 40:12
**Assistant** 5:3
**assume** 12:12 98:2 104:13
**assuming** 87:11
**astray** 29:22
**attempt** 42:22
**attempting** 73:18
**attend** 102:6 107:18
**attention** 23:6
**Attorney** 3:5, 12, 19 4:2, 9, 17 5:3, 4, 12 7:20 12:17, 21, 25 13:5 19:11 20:7 28:12, 24, 25 29:18, 25 30:19, 24 31:6, 12 37:22 41:8 42:2 53:7, 11, 14, 24 54:13, 19, 24 55:7, 12 56:6, 11 66:1 67:18 68:4, 11, 16 81:10, 11 82:6 92:14 102:21
**attorney-client** 53:12 90:23
**attorneys** 7:18 8:9 82:21
**attributed** 50:7
**audio** 8:5, 7 66:23
**available** 9:14 40:10 52:21
**Avenue** 3:7 5:5

**< B >**
**back** 9:7 19:11 22:12 44:8 51:16 56:4, 9 58:10 73:9 84:10 86:18 90:8 98:11, 17 101:1 105:3, 7 107:8 110:6
**background** 14:15
**bad** 86:14
**Balch** 1:22 5:13 7:23
**Ballroom** 62:16
**based** 12:14 28:3 32:23 69:25 88:4 103:12 105:10 107:3 108:19 109:6, 18 110:14
**basically** 56:24 102:22
**basis** 69:22 81:2 90:22
**bat** 74:8
**Bates** 101:5 102:13
**began** 75:2
**beginning** 7:12 37:25 39:1 49:23 50:9 80:6, 25 95:4
**begins** 28:13
**behalf** 8:12
**belief** 40:24
**believe** 23:23 25:24 49:16 50:2, 8, 13 58:21 74:19, 23 75:7 84:3 95:19 100:4 104:7, 24 106:19
**believed** 48:17
**belong** 110:4
**belt** 72:9, 15, 18, 20, 24 73:3, 5
**benchmarks** 47:24 48:3
**benefit** 102:9
**benefits** 108:18
**best** 30:3 113:3
**bet** 87:13
**better** 14:16 52:11 72:25
**big** 28:21
**bigger** 28:2
**bill** 21:3, 11, 24 22:1, 16 40:4, 17 45:18, 23 46:1, 2, 3 91:24 93:22
**bills** 21:17, 19, 25 45:22 63:15 75:25 94:24
**Bingham** 1:23 5:13 7:24
**Birmingham** 7:2 8:2 16:3, 9 115:24
**birth** 14:17
**bit** 14:16 52:9, 11 53:17 79:5 98:11
**black** 43:6, 13, 17 62:4 72:9, 15, 18, 20, 24 73:3, 5 80:7, 9, 14 81:5 86:22 87:8, 11, 12, 21 90:14 93:10, 13 96:15 109:23 110:18 112:17, 21
**blatant** 96:12 97:3
**board** 38:11, 15 56:23 115:14
**body** 20:9
**BOE** 46:1 71:4 93:3
**born** 15:22
**bottom** 100:11 101:5
**Box** 4:11
**break** 13:15 14:8, 11 49:7, 11 51:11 85:24 90:4
**breaking** 51:2
**Brian** 47:17
**Broad** 4:4 105:16
**brought** 46:8, 9, 11, 12 78:25 86:21
**bullet** 19:6 93:7
**Bureau** 38:9 54:11
**business** 110:1
**Buskey** 47:18, 22 48:18
**BVAP** 86:7, 25 88:4, 9, 14 90:17, 21 91:1

**< C >**
**California** 3:8
**call** 34:20 56:15 57:1
**called** 41:18 63:14 97:9 102:21
**candidate** 88:10 97:4, 6, 10 105:5
**candidates** 25:5
**capacity** 9:19
**care** 35:11
**career** 24:15
**carefully** 54:16
**carried** 49:24
**carry** 31:1, 2
**CASE** 1:7 7:14 9:13 17:24 18:5, 6 19:7 23:14, 22, 23 24:4, 9 46:21 47:17 77:15 92:7 98:3 115:12
**cases** 10:15 30:3 31:5 66:18 67:8 77:21
**CASTER** 4:15 8:15 103:19 113:14
**cause** 7:8
**cell** 13:14
**census** 32:23 33:12 38:8, 9, 13 40:8 54:11, 14, 18, 25
**Center** 62:16
**certain** 30:14 37:19 84:21 93:20 108:17

**Certainly** 49:12 52:19 85:17 112:6
**certified** 76:12 115:15, 17
**certify** 7:4 115:4, 9, 13
**chair** 26:25 27:6 29:10, 15 30:6, 13, 17 31:17, 23 32:4, 7, 9 53:3, 5, 7, 13 54:20, 23 56:5, 9 57:3 65:3, 20, 22 82:4, 23
**chairman** 10:10 28:7, 9
**challenge** 24:10
**challenged** 24:13
**chance** 49:10 78:7
**chancellor** 55:20 58:7
**change** 21:9 54:13 78:5 84:1 103:11
**changed** 28:16 54:25
**changes** 38:12
**characteristics** 72:23
**chat** 19:13 35:4 36:13, 15, 17 46:21 61:2 63:17 76:10 94:3 100:2
**child** 16:24, 25
**choice** 74:7
**choose** 102:8
**Chris** 18:19, 23
**cited** 85:21
**citing** 84:24 85:10
**city** 71:25 72:3, 6
**CIVIL** 1:7 4:3, 10 7:5, 14
**claim** 110:2, 3
**clarify** 12:10 51:19
**close** 62:17 85:18 87:6
**clue** 85:12, 19 86:2
**cochair** 9:19 28:24
**cochairs** 29:11
**colleagues** 108:2
**collection** 21:8
**college** 16:1, 3 55:19 62:8, 17, 20 103:14
**colleges** 62:5, 10 103:15
**come** 21:19 52:10 86:10 87:15 108:25
**comes** 25:14 43:23 105:14 106:7 107:7 109:10, 22 110:16
**commencing** 1:24
**commissioner** 7:3 115:22
**committee** 9:20 20:14, 17, 21 21:12, 13, 15, 18, 20, 22 22:1, 10, 17, 19 26:22, 23, 24, 25 27:10, 13, 14, 20 28:2, 17 29:16 30:1, 7, 18, 21 31:14, 18, 23 32:3, 4, 6, 10 33:21 34:9, 13, 18 35:3 36:14 37:11 38:17, 19, 24 39:4, 5 40:6 42:7, 9 46:13 53:2 54:20, 23 55:15 56:5, 10 57:3, 23 58:24 59:21, 22 60:7, 10, 14 62:25 63:25 64:18 65:4, 21, 23 66:16 70:13 74:13, 20 75:6, 10, 12, 13, 14, 18, 21, 24 76:3, 13 77:9 79:1 82:5, 24 85:15 86:20 90:18 91:18, 22, 25 92:20 93:6 98:7, 10 101:25 102:6
**committees** 21:19 26:18 27:1, 4
**common** 71:2, 6, 12
**communicated** 60:6
**communication** 59:12
**communications** 58:23
**communities** 70:19 71:1, 10, 14, 19, 22 72:4 73:8
**community** 55:19 60:4 62:17, 20 71:7, 17, 18, 21, 25 72:2, 7, 8 73:6 103:14, 15
**compare** 67:9, 12
**complaint** 17:24
**complete** 10:24
**completed** 17:23 99:19
**completely** 10:19
**compliance** 2:4 30:4 31:4 39:12 65:7, 23 66:8, 11 70:21 77:20 91:20 97:20
**complied** 52:3, 13 66:6 69:9, 13
**complies** 66:20 67:4
**comply** 59:13 64:20, 24 65:1, 2, 10, 19 68:1 82:7
**complying** 65:13
**composed** 20:21 27:20
**composition** 78:5
**computer** 40:8
**computer-aided** 115:6
**concerned** 79:9, 11, 12
**concerning** 17:22
**concerns** 79:13 102:19
**condition** 11:5
**conduct** 33:6 81:18
**conducted** 11:10 81:19 92:9, 10, 12
**conducting** 13:12
**confederate** 105:15 106:7
**confer** 53:7, 10 54:12 56:6, 11
**conferring** 53:13, 24 54:24
**confident** 92:7
**confirm** 94:21
**Congratulations** 16:20
**congressional** 18:7 20:8 21:3 23:24 24:5 32:15, 20 33:2 34:10, 15 38:11, 15 42:5, 10, 13, 19 45:3, 16, 24 46:3 48:5 50:25 51:7 56:23 65:16 68:22, 24 69:1, 3, 6, 7, 13 70:4, 5 71:4 73:11, 20 76:2, 9 80:8 86:23 87:25 90:15 91:24 92:4, 9 93:13 95:1 96:6 112:18
**Congresswoman** 86:15 87:3
**conjunction** 60:3

**conservative** 25:15, 16, 18, 20, 22
**conservatives** 25:24
**consider** 43:9 46:4, 14 56:16 60:17 62:4 71:19 73:5 85:22
**considerable** 77:11
**consideration** 40:6 52:22 63:14 73:12, 21 91:19, 21, 24 113:1
**considered** 21:18 42:6 52:19
**considering** 62:7 108:16
**constituents** 102:1
**constitution** 38:5, 6 39:17 65:12 67:11
**constraints** 103:8
**construed** 39:15
**consulted** 41:8
**contact** 103:15
**continuing** 16:12 50:10
**continuum** 55:2
**contrary** 39:17
**convenient** 93:7
**convening** 74:17 92:2
**conversation** 13:18 67:16 68:6 79:16 85:14
**conversations** 69:17, 23
**converts** 27:24
**coordinate** 55:21
**copy** 20:4 101:16, 22
**core** 42:22 73:10, 11, 19
**Correct** 14:20 15:1, 19 16:15 18:25 23:12, 13 28:4 32:8 33:13 44:24 46:10 54:2 75:4, 7 88:12 97:16 99:14 103:4 104:7, 10, 14, 15 109:14, 15 111:17 112:8, 11 113:2 115:7
**correcting** 29:7
**correctly** 96:5
**counsel** 1:18 2:10, 11 7:6 11:15 18:8, 10 115:10
**count** 111:21 112:9
**counted** 66:15
**counties** 72:14, 17, 18 73:8
**County** 17:7 72:7 102:2 104:25 115:2
**couple** 18:15 55:25 85:25 111:3
**course** 27:5 29:24 31:1 33:3 57:15 66:10
**courses** 16:8, 10, 13
**COURT** 1:1 2:5 7:1, 15 11:13, 19, 20 15:4 19:14 20:4 30:3 31:5 35:5 36:1 44:7 46:24 61:4 63:17 66:18 77:21 115:14, 15
**courtroom** 10:21
**courts** 30:5 31:5 86:9
**cover** 19:5
**created** 47:19
52:4, 14
**creating** 93:22
**criminal** 109:10, 13
**criteria** 70:18 91:12, 14 97:19
**current** 32:21
**currently** 17:10, 12 26:5, 21
**cut** 26:13 37:6
**cutting** 26:14
**cycle** 23:11 84:6 88:22

**< D >**
**DAN** 4:16 8:15 106:21
**data** 32:23 33:3 35:2 38:8 40:9 53:18, 20 54:10, 14, 25 57:16 70:14 73:12, 21, 23, 24 74:1 77:16 89:6
**date** 7:4, 16 14:17 30:2 57:20 58:21 59:4 60:5 64:15 70:11 75:22 88:24 92:1, 21 105:7
**dates** 33:19 55:22 58:18 63:6 74:18
**DAVIS** 5:2 6:4 7:20 18:19, 24 22:22 36:15 51:2, 5 106:12 111:1, 4, 7 113:6
**day** 58:21
**days** 102:16
**DC** 3:22 4:20
**deadline** 59:7, 9, 10, 13, 21, 23, 25
**deal** 18:6
**dealing** 94:25
**debate** 20:25 21:2, 11 94:6, 23 95:10
**December** 1:24 7:7, 16 115:17
**decennial** 38:8
**decide** 42:10 53:16 59:7 74:2 112:20
**decided** 81:15 82:9
**deciding** 32:22
**decipher** 48:21
**decision** 31:20 57:4 81:8 112:1, 15
**decision-making** 55:8
**decisions** 32:24 53:25 108:17
**decrease** 33:5
**DEFENDANT** 5:1 9:18 10:12 47:17
**Defendants** 1:12 5:9
**Defense** 3:13, 20 9:12
**define** 72:20 108:15
**Defined** 89:25
**definitely** 105:18
**definition** 71:7, 8, 10, 14 107:10 108:19
**degree** 16:2
**delay** 57:16, 17
**delegation** 33:2 34:15 42:13 45:17 56:23 60:13 69:3, 6, 8
**democratic** 105:12 106:2, 5 107:5, 15, 19, 21, 22 108:1, 2, 10, 21 109:8, 20 110:12
**democrats** 107:20 109:2, 13 110:3

**demographer** 31:17 41:21 67:13
**demographics** 42:25 43:1, 2, 3
**department** 20:15, 18 45:2 47:24 48:3 50:11
**depend** 82:13
**dependent** 66:1
**deposed** 10:3 23:16
**DEPOSITION** 1:9, 19 2:2, 3, 13 7:12 9:15, 18 11:10, 14 13:2, 12 17:25 18:13, 23 19:18 22:5, 14, 21 90:11 104:9, 12 113:12 114:4, 7
**depositions** 2:6
**describe** 47:3
**description** 89:23, 24
**designate** 58:8
**determine** 38:10 54:21 59:15, 23 66:19 67:4 91:15
**determined** 55:13 92:3
**determining** 60:1
**DEUEL** 3:18 8:13
**develop** 40:13
**developed** 59:25
**Dial** 32:11
**D-I-A-L** 32:13
**die** 86:8
**differ** 105:13 106:5 107:5 108:21 109:8, 20 110:12, 16
**difference** 20:16 27:17
**different** 27:4 70:1, 2 71:17 109:12, 13
**diluting** 65:9
**dilution** 39:13
**direct** 71:4
**disapprove** 34:16
**disapproving** 34:19
**discrimination** 77:18, 23 78:2 109:23 110:18
**discriminatory** 48:6
**discuss** 29:5 30:25 56:12 60:9, 12, 14 69:19 81:13 89:4 102:24 103:1
**discussed** 22:4 78:19, 22, 23 83:14, 15 89:2, 6
**discussing** 20:6 28:22 47:18 50:9 74:21 75:11 90:13
**Discussion** 8:8 30:14 95:5 102:10 107:8
**discussions** 28:14
**disparate** 109:12
**distances** 102:4
**DISTRICT** 1:1, 2 7:15, 16 24:23, 25 26:1 33:4 42:25 43:5, 12, 16 48:5 71:4 78:6, 7, 12 80:8 81:2, 6 84:7, 15, 19 85:9 86:17, 23 87:9, 18, 19, 22 88:3, 8, 14 90:15, 16, 21, 25 92:9 93:13 96:3, 7, 14 97:5, 7 112:17, 22
**districting** 39:16 52:3
**districts** 18:7 24:6, 10 38:12 39:10 42:19, 22 43:10 46:5, 15 47:19 50:24 51:7 52:5, 15 65:6 70:5, 19 73:10, 12, 19 88:10 91:2, 6, 9, 13 93:10, 23 97:8, 9, 11 112:25
**doctorate** 16:4, 6
**document** 19:14, 17, 20, 25 20:5, 10, 12, 23 21:6 36:1, 8, 10, 21 37:2, 5, 8, 13, 14, 19 47:2, 12 61:5, 24, 25 64:6, 10 70:11 77:2 94:5, 7 100:14, 15 101:11
**documents** 13:17, 21, 22, 25 14:2, 3 19:1, 3 22:13, 15, 24 23:2 113:20, 21
**doing** 62:7 66:14 82:12 83:14, 25 84:19
**DOJ** 47:25
**DORMAN** 5:11 7:23 18:11 35:14 49:14 66:2 82:17 92:16
**dosher@elias.law** 4:21
**Dowdy** 8:2
**dozen** 58:25
**draft** 37:14 112:18
**drafted** 37:13, 15, 17, 19, 21 40:18 112:25
**drafting** 42:18
**Drake** 61:20
**draw** 74:5 75:11
**drawer** 30:24 33:1 42:2 53:8, 11, 14, 25 54:13, 19, 25 55:6, 13 56:7, 12 66:2 67:18 68:6, 12, 16 69:2 82:6 88:5, 20 89:21
**drawing** 32:15 34:9 41:9 43:9 68:24, 25 89:16
**drawn** 24:11 34:19 39:10 65:7 68:17 73:25 87:18, 19 91:3
**draws** 28:13, 25 29:19 30:20
**drew** 88:16 97:8
**drop** 19:13 61:1 63:16 76:10 100:2
**dropped** 36:12
**dropping** 35:4 46:20 94:3
**dross@naacpldf.org** 3:23
**dues-paying** 104:24
**duly** 8:22 115:13
**duties** 31:2, 3
**dwalker@balch.com** 5:16

**< E >**
**earlier** 12:9 23:10 73:9, 18 85:21 103:2 107:9
**early** 99:18, 21
**easiest** 96:12
**easily** 36:17
**east** 72:11
**EBENSTEIN** 4:1 8:17

**education** 16:*12* 26:*23*, *24* 38:*12*, *16* 56:*23*
**Educational** 3:*13*, *20* 9:*12*
**effect** 2:*4* 65:*9*
**effective** 48:*8* 50:*5*
**Eight** 100:*6*, *7*
**either** 97:*10*
**electability** 86:*17*
**elected** 20:*21* 24:*16*, *19*, *20*, *22* 26:*8* 30:*1* 32:*4*, *5* 70:*15* 87:*4* 105:*5*
**election** 78:*12*
**elections** 43:*24*
**electoral** 48:*8* 50:*5*
**Elias** 4:*18*
**email** 15:*9*, *12*, *13* 58:*22* 100:*1* 101:*17*, *23* 103:*12*
**employed** 17:*10*, *12*
**employees** 20:*20*
**endeavor** 64:*20*
**ENDED** 114:*7*
**endorsed** 25:*5*
**ends** 114:*3*
**England** 79:*4*, *8* 83:*11* 84:*14* 86:*4*, *6*, *21*
**ensure** 66:*6*, *11* 82:*5* 88:*9*, *13*
**ensuring** 65:*23* 69:*8*, *12* 97:*21*
**entail** 53:*14*
**error** 80:*18*
**errors** 85:*17*
**essentially** 28:*10*
**established** 38:*16*, *23* 39:*20*
**et** 1:*6*, *10* 7:*13*, *14*
**ethnic** 39:*14*
**evaluated** 79:*20*
**evaluation** 77:*16*
**EVAN** 1:*6* 7:*13* 8:*1*
**events** 53:*8*, *22*
**everybody** 41:*17* 63:*11* 103:*17*
**evidence** 2:*14*
**evidenced** 115:*15*
**exact** 33:*23*, *24* 88:*24*
**exactly** 19:*25* 27:*11* 33:*22* 41:*18* 78:*14* 83:*25* 107:*10* 113:*5*
**examination** 7:*8* 9:*9* 104:*1* 111:*4*
**examined** 8:*22*
**example** 28:*14* 44:*3* 70:*6* 82:*7*
**exception** 99:*4*
**exceptions** 105:*19*
**Excuse** 106:*20* 111:*18*
**exercise** 48:*8* 50:*5* 83:*19*
**exercised** 83:*6*, *7*
**exercising** 83:*8*
**Exhibit** 6:*9*, *11*, *13*, *15*, *17*, *19*, *21*, *23* 19:*15* 35:*5*, *7*, *22* 36:*2*, *5*, *7*, *24* 46:*24*, *25* 47:*9* 49:*22* 51:*19* 61:*5*, *12* 63:*17*, *18* 64:*3* 70:*17* 76:*15*, *22* 79:*23*, *24*, *25* 84:*11* 90:*12* 94:*4*, *5*, *13*, *16* 98:*19* 100:*5*, *10*, *22*, *25* 101:*3*
**exhibiting** 73:*19*
**exhibits** 74:*24*
**existing** 32:*17*, *19* 73:*11*
**expect** 18:*16*
**experience** 82:*14*, *15* 108:*20* 109:*1*, *6*, *18* 110:*14*
**experienced** 89:*12*
**experts** 66:*15*
**Expires** 115:*23*
**explaining** 41:*21*, *22*
**express** 44:*10* 79:*13*
**expression** 83:*21*
**extent** 70:*21*
**extra** 77:*18*
**eye** 41:*12*, *13*

**< F >**
**Facebook** 15:*17*, *18*
**fact** 21:*12* 37:*10* 73:*23*, *24* 74:*14* 77:*19* 113:*4*
**factor** 96:*19*
**failure** 50:*12*
**fair** 44:*10*
**fairly** 85:*16*
**familiar** 37:*4* 48:*10* 64:*9* 66:*17* 67:*7* 77:*4*, *6*
**far** 36:*16* 50:*11* 68:*2* 70:*5*
**fast** 73:*14*, *16*
**feasible** 102:*6*
**Federal** 7:*4* 38:*8* 97:*20* 98:*3*
**feel** 60:*5*
**feeling** 107:*21*
**felt** 83:*19* 92:*7*
**figure** 57:*14* 100:*18*
**file** 15:*4*
**filed** 7:*15*
**final** 59:*4* 61:*7* 113:*17*
**finalize** 99:*15*
**Finally** 14:*8*
**financially** 115:*11*
**find** 38:*25*
**finish** 12:*1*, *2* 49:*9*
**firm** 35:*16*
**first** 10:*1* 24:*16* 25:*14* 26:*8* 37:*6* 55:*25* 57:*11*, *13*, *18* 63:*7* 67:*7* 78:*3* 81:*20* 85:*25* 88:*21* 93:*2*, *4* 95:*7* 99:*18* 100:*18* 103:*22*
**fiscally** 25:*16*
**fishing** 72:*21*
**five** 63:*21*, *22*
**five-minute** 49:*6* 90:*4*
**FL** 3:*14*
**flag** 78:*9*
**floor** 19:*7* 20:*24* 21:*1*, *11*, *21* 93:*6*, *21*, *24* 94:*2*, *6*, *23* 95:*10*, *14*
**focused** 62:*19*
**follow** 66:*17*
**followed** 40:*21*, *25* 41:*6*, *8*, *24*
**following** 7:*9* 33:*9*, *11* 38:*14* 40:*17* 41:*1*, *10* 90:*12* 92:*19* 102:*12* 115:*16*
**follows** 8:*23*
**force** 2:*4*
**foregoing** 7:*5*
**Forgive** 106:*20*
**form** 2:*10* 9:*1* 40:*22* 50:*19* 105:*24* 106:*19*
**format** 20:*1*
**forward** 47:*18* 56:*20* 101:*22*
**found** 72:*12*

85:17 115:16
**Foundation** 4:3
**four** 18:21
**fourth** 110:10
**four-year** 26:2, 4
**frame** 55:18
**franchise** 48:9 50:6
**Friday** 100:8
**front** 36:2, 8 60:23 67:9 101:12 109:1
**full** 2:4 28:17 102:9
**full-service** 35:15
**Fund** 3:13, 20 9:12 21:23, 24 26:22, 23
**FURTHER** 2:1, 8 9:23 81:15 113:9 115:9, 13
**futile** 57:15
**futility** 83:19
**fuzzy** 34:4

**< G >**
**gained** 108:9
**gathered** 81:16
**General** 5:3, 4 21:23, 24 26:22 65:21 105:19 108:10 109:15, 16
**generally** 53:12 94:22 95:9 105:12, 17, 20, 25 106:2, 5, 7 107:5 108:21 109:8 110:12, 13, 16
**General's** 7:21
**generated** 87:17, 19
**generically** 30:11
**geographic** 72:10
**Gerald** 32:11, 12
**gestures** 11:21
**getting** 28:2
**give** 10:23 14:3 49:1 56:13 61:10 64:8 70:6 74:7 77:22 83:17 85:24, 25 103:24 106:10 113:22
**given** 20:3, 23 34:21, 24
**giving** 23:8 108:15
**glanced** 77:5
**go** 15:24 16:1 21:20 29:22 32:22 34:18 38:20 39:7 41:1 62:23 65:13, 23 66:14, 23 68:19 70:5 84:10 85:4 86:11 89:7 98:11, 17 103:22 110:6 113:25
**goal** 24:9 42:18, 24 43:5 75:24
**goals** 42:21 66:8
**goes** 27:23 50:12 84:18 105:3
**going** 8:5 9:23 14:11, 15 19:13 20:24 21:1, 11 22:12, 16 27:19 36:15 37:11 40:19 46:20, 23 49:4 53:9, 18, 19 56:4, 9 57:14 61:1 63:16, 18 73:9 76:10, 20 82:3 84:10 86:18 89:6 100:2 102:5 104:16
**Good** 9:10 37:18 52:25
69:10 70:25 79:5 86:14
**Gosh** 100:7
**gotten** 21:12
**governing** 59:18 103:3
**governor** 56:15 57:1
**Greater** 8:2
**grounds** 2:12
**Group** 4:18 44:9 104:25
**guess** 12:12 30:9, 10 44:15, 20 78:3 88:23 89:5 95:3 99:3 101:9, 19
**guessing** 34:6
**guidance** 34:21, 24
**guidelines** 6:12, 18 28:15 36:14, 20 37:11, 12 38:14, 23 39:5, 6, 15 40:20, 21, 25 41:2, 3, 6, 15, 17, 18, 20, 21, 24 42:3 44:25 52:4, 14 64:1, 17 65:20 66:1, 4, 7, 17 70:8, 13 77:21

**< H >**
**half** 57:9 58:25
**Hall** 6:24 58:15 59:5 80:3, 12, 25 83:12 99:24 101:19, 24 102:14 103:6
**Hall's** 102:19
**hand** 93:5
**handed** 101:4
**handle** 102:22
**handled** 93:2, 3
**handling** 21:24
**Hang** 21:5
**happen** 81:12
**happened** 21:23 86:12 109:4
**happens** 98:6 104:5
**happy** 35:17 86:15
**hard** 52:7 61:18
**Hatcher** 95:17, 20
**Hatcher's** 96:3, 10, 20 97:12
**health** 26:22, 25
**hear** 12:17, 24, 25 68:10 96:8 104:2, 3
**heard** 68:9, 11 69:23 104:13
**hearing** 6:16 8:4 99:7, 13 101:25 102:7, 9, 15 107:11
**hearings** 33:7, 14, 17 55:14, 18, 21, 23 56:7, 21 58:6, 12, 18 59:8, 16, 19, 23 60:2, 9, 15, 18 61:7 62:1, 6 98:11, 21 99:1, 6, 9, 10, 12, 16, 25 102:8, 15, 20 103:3, 7, 9, 12
**heart** 110:6
**held** 8:8 60:19 63:13 98:12 99:6 102:15
**Hello** 111:5, 6
**help** 28:16 29:25 36:18 52:9 53:8 55:20 62:12
**helpful** 46:21
**helps** 48:13
**hereinafter** 38:18
**hesitant** 107:12
**high** 15:24 88:14
**highly** 83:13

**Hinaman** 88:17, 21, 25 89:9, 14 112:16
**Hinaman's** 88:18
**historically** 62:4
**Hogan** 3:6 8:11
**hold** 33:21 62:25
**home** 19:11
**hopefully** 20:4
**host** 62:20
**hour** 49:5
**hours** 18:15, 24 98:14 99:1
**house** 10:10 15:7 20:15 22:2 24:5, 10, 24 26:1, 6 27:3, 6, 21 28:7, 9 29:10, 15 30:6, 17 31:17, 23, 24 32:3, 4, 6, 7 45:19, 25 46:1 49:24 53:6 57:3 60:20 64:12 71:4 99:5 112:3, 13
**Houston** 16:4, 5
**hundred** 37:19 79:5
**hypothetical** 82:2, 3, 13

**< I >**
**idea** 37:18 56:14 62:9 78:15 110:5
**identification** 35:23 36:25 47:10 61:13 64:4 76:16 94:14 100:23
**II** 65:6 70:16
**III** 39:8 70:17
**imagine** 37:22
**immediately** 74:15
**implemented** 48:2
**importance** 41:16
**important** 11:18, 24 29:25 41:20 97:18, 24
**inaccurate** 49:17 50:2, 13
**inappropriate** 98:5
**inaudible** 24:23 33:9 74:25
**include** 111:15 112:17, 21
**including** 39:12 112:7
**income** 73:2
**increase** 33:5
**increased** 84:3
**incumbent** 78:4 96:6
**incumbents** 96:13 97:13, 21 98:7
**individual** 108:16 112:1, 15
**individuals** 82:6
**information** 12:8 15:3 34:25 40:4 53:12 56:18 81:15 83:17 86:16 93:4
**initially** 53:23 95:3
**injustice** 43:23
**input** 55:17 102:17
**inside** 66:4
**insist** 82:11, 23
**instruct** 29:4 112:16
**instructed** 12:21 13:5
**instruction** 29:20
**instructions** 89:8
**interest** 70:20 71:1, 2, 7, 11, 13, 14, 17, 18, 20, 22, 23 72:1, 2, 5, 7, 8 73:6
**interested** 102:3 115:11
**interests** 71:6
**interim** 21:18, 19 27:18
**interpreted** 30:5
**interviewed** 51:20 88:6
**introduce** 42:11 45:15, 21 48:20
**introduced** 45:25 48:18 75:25 92:5 93:20, 23 94:1, 2 95:16 102:11
**introducing** 91:21
**introduction** 34:16 40:4, 17
**introductions** 8:10
**involved** 10:14 55:7 57:4 68:24, 25 70:7 103:17
**involvement** 31:11 45:1
**issue** 20:8 23:24 78:1, 2, 10 81:14 86:5 105:14 107:7 108:25 109:3 110:16
**Issues** 21:7 30:25 70:2 108:2, 7
**items** 28:21
**its** 40:4

**< J >**
**Jackson** 8:2
**JAMES** 1:10, 20 5:9 7:7 8:21 9:25
**J-A-M-E-S** 10:2
**January** 14:19
**jebenstein@aclu.org** 4:6
**Jefferson** 17:7 115:2
**JIM** 5:2 7:12, 20, 24 18:19, 24 49:23 50:9 103:22 111:7 114:4
**jim.davis@alabamaag.gov** 5:7
**jim.mcclendon@alsenate.gov** 15:14
**jimmcc@windstream.net** 15:13
**job** 41:25 55:4 66:11 68:20 81:16 89:22, 23, 24
**jobs** 66:10
**JOHN** 1:10 5:1 7:13, 21
**joint** 38:17 40:15
**Jones** 14:22
**judge** 10:20
**judicial** 45:7, 12
**JULIE** 4:1 8:17
**July** 99:17, 18, 22
**jump** 81:17
**June** 58:20 59:9, 11 60:8 99:19
**justice** 45:2 47:25 48:3 50:11 109:10, 13

**< K >**
**KAITLIN** 4:8
**Katherine** 9:2
**KATHRYN** 3:11 7:25 9:11 15:2 21:5 23:4 35:7 36:11 49:4 65:16 100:13 113:16
**keep** 13:14 30:2 42:21, 24 43:1, 5 70:25 71:2, 3
**kids** 16:21
**kin** 115:10
**kind** 57:23 76:21

**knew** 33:4 89:21
**know** 12:6, 9, 14 14:9, 16 17:19 18:5 19:24 27:17 29:12 30:1 31:10, 20 33:22 37:13, 15, 17 40:20 42:1, 4 43:3, 4, 7, 19 44:15, 17, 18, 21, 22 45:19 46:21 48:17 57:20, 21 58:3, 19 59:3 60:16, 22, 24 61:2 63:4, 11 69:10, 22, 24 72:14, 21, 24 74:6, 8, 9 77:3 78:3 79:17 82:2 83:1, 3, 5, 8 88:2 90:1 91:12, 14 92:8, 10, 12, 13 96:5 98:16 100:14 105:16 107:19 110:2 111:23 112:12 113:18
**knowledge** 12:14 46:6 59:20, 24 67:10 68:23 86:9 88:15 103:5, 10 113:3
**known** 41:24 79:11
**ksadasivan@naacpldf.org** 3:16
**kwelborn@aclualabama.org** 4:13

< L >
**landed** 101:10
**language** 14:7
**Large** 1:22 7:3 62:19
**largely** 13:2
**larger** 28:2
**Laura** 59:5 80:3
**law** 1:22 3:5, 12, 19 4:2, 9, 17, 18 5:12 24:12 25:24 29:9 30:1, 4 31:5 35:15 59:16, 18 66:18 97:18, 20 98:3 103:4
**laws** 2:5 39:11
**lawsuit** 17:22 23:4, 7, 8, 11
**lead** 47:22
**leadership** 28:11
**leading** 2:11
**LeAnn** 1:21 7:1 115:22
**led** 48:19
**left** 61:21
**Legal** 3:13, 20 9:11 67:6 82:13 103:8
**legislation** 108:3, 7 111:13, 19, 20 112:5, 7
**legislative** 9:20 23:23 26:18 27:9 36:13 38:11, 15, 17 40:5, 7 45:22 56:15 60:13 61:6 63:8 75:2 92:17 94:24
**Legislators** 39:24 40:12 56:22
**legislature** 17:23 26:20 33:6 34:17 38:7 40:10, 15 46:16 76:1 97:20 104:19 105:11 107:4, 20, 25 108:6, 20 109:7, 19 110:15
**legislature's** 38:17
**lest** 40:20
**Letetia** 8:2
**letter** 58:22
**letting** 77:3
**level** 73:2
**liaison** 62:12 103:14
**Liberties** 4:3, 10
**license** 16:13
**licensed** 115:14
**Likewise** 11:24
**line** 67:19 68:7, 17, 19 71:9
**lines** 32:18, 19, 20, 23 66:3 73:25
**list** 52:21
**listen** 54:16
**listening** 73:14, 16
**litigation** 10:9 20:3 111:16, 18
**little** 14:16 27:17 52:9, 10 53:17 84:4 98:11
**living** 17:2
**LLP** 3:6
**loaned** 55:20
**local** 103:15
**location** 60:1 102:3
**locations** 55:22 58:11, 18 102:1 103:16
**log** 113:17
**logical** 84:19
**long** 16:18 25:25 26:19 77:2 86:1 104:18 105:3, 5, 7
**longer** 78:7, 11
**look** 13:24 14:2 22:14 23:2 29:9 35:1 47:5 49:2, 10 61:18, 25 64:8, 14, 15 67:20 74:2 79:18 84:13, 15 87:2 94:17, 20 95:8 100:17 101:3, 13
**looked** 19:5 22:15, 23 41:12, 13 58:13
**looking** 36:22 52:20 64:14 101:11, 18, 23
**looks** 19:24 37:4 47:2 61:17 64:9 77:4, 5 100:19
**Los** 3:8
**losers** 98:8
**lost** 48:21
**lot** 53:19 71:17 86:16 107:19
**loud** 38:4
**Lovells** 3:6 8:12
**low** 88:11
**lower** 73:2
**Lyman** 47:17

< M >
**ma'am** 29:7 40:24 45:10
**main** 22:9 54:4, 5, 9 73:4
**maintain** 16:13 73:19
**maintaining** 73:10, 11, 18
**majority** 43:13, 17 46:5, 15 47:19 50:24 51:6 52:4, 15 93:9, 13, 23 96:3 97:4, 7, 10 112:17, 21
**making** 9:14 31:4 50:15, 21 108:17
**manner** 55:5 60:1 103:3
**map** 20:8 29:1, 19 30:20 33:1 34:9, 13, 16, 19 35:1, 2 41:9

42:2, 10, 12, 16 45:7 46:15 48:18 53:7, 11, 14, 25 54:13, 19, 24 55:6, 13 56:7, 11 66:2, 20 67:4, 18 68:6, 12, 16, 22, 24 69:1, 2, 8, 13 73:20 75:11 76:6, 7, 9 82:6 84:20 87:25 88:5, 20 89:21 92:4, 5 93:3 95:16 96:5, 20, 23 97:3, 12, 19 102:3
**map-drawing** 41:2 66:6 67:17
**map-making** 64:19
**maps** 28:13 32:16 34:10 40:9 74:5 75:25 76:2 88:16 89:16 93:9 102:10
**mark** 19:14 35:5 36:1 46:24 61:5 63:18 76:21 94:4 100:4, 10
**marked** 35:23 36:25 47:10 61:13 64:4 76:16, 24 94:14 100:23 101:4
**marks** 7:11 50:4
**Maroney** 1:21 7:1 115:22
**married** 16:16, 18
**materials** 13:18, 20 89:15
**matter** 7:13 98:4 109:15, 16
**McCLENDON** 1:10, 20 5:9, 10 7:7, 12, 24 8:21 9:10, 25 19:20 35:5, 25 36:2 37:3 46:24 47:13 49:9, 23, 25 50:10 51:18 58:1 61:5, 9 63:18 64:7 65:19, 22 70:17 79:23 80:6 82:19 84:10 90:10, 12 94:4, 18 95:5, 8, 23 98:19 100:4, 10 101:11 104:2 114:4
**M-c-C-L-E-N-D-O-N** 9:25
**mean** 13:24 24:7 25:13, 18 27:9, 11, 14 29:16 38:24 67:22 76:7 78:17 81:16 87:1 97:7 106:15, 18
**Meaning** 8:25 11:14
**means** 39:4 106:16
**meant** 22:12 30:22 44:6 87:2 111:19
**media** 15:15
**medication** 11:1
**meet** 18:23 28:12, 23, 24, 25 30:19 56:22 88:21, 25
**meeting** 21:13, 15 22:19 28:17 30:20 35:3 57:18, 23, 25 63:12 70:12 74:12, 20 75:5, 13, 21, 23 76:13 77:8, 11 78:19, 21 83:15, 23 85:14, 15 86:20 90:18 92:4, 20 99:5 101:25
**meetings** 6:24 29:2, 3, 6, 18 30:8, 23 33:20 34:2, 5 55:15 56:2 62:10, 21, 22, 24 63:2, 3, 4, 6 74:15, 25 75:9, 17 93:8 101:21 107:19
**meets** 28:12
**member** 26:5, 7 104:21, 24 105:2, 4 107:22 111:23 112:12
**members** 20:13 22:10 27:21 30:1 32:3, 6 33:2 34:21 40:10 42:12 57:2 58:24 60:6, 13 69:5, 7 76:3 79:1 91:22 96:6 101:25 102:6, 8 105:12, 13 106:1, 4, 6 107:4, 6, 15, 16 108:6, 22 109:2, 7, 9, 19, 21 110:11, 13, 15 111:9 112:2
**memory** 48:14, 15 75:6
**mention** 44:25
**mentioned** 22:22 71:12
**MERRILL** 1:10 5:1 7:14, 22 9:13, 19 111:8
**met** 18:14 22:22 33:1 69:2 75:1 92:1
**MICHAEL** 3:4 8:11
**michael.turrill@hoganlovells.com** 3:9
**middle** 72:11
**MILLIGAN** 1:6 3:3 7:13 8:1, 12, 13, 18 9:13, 18 113:11
**million** 84:5
**mind** 23:8 25:15 29:7 49:6, 8 77:3 79:22 84:11 90:3 106:23 110:8
**Ministries** 8:3
**minority** 39:14 46:5, 15 47:19, 23 48:4, 7 50:24 51:7 52:4, 15 65:10 78:4, 8, 11 87:3, 10 88:10 93:23 96:3 97:4, 6, 9
**minus** 64:16
**minute** 78:20 94:17, 20
**minutes** 49:1
**missed** 78:20
**mobile** 14:25 15:23
**moment** 103:24
**Monday** 113:21
**money** 83:20
**Montgomery** 1:23 4:12 5:6, 15 60:18 62:2 72:2, 3 99:5
**Montgomeryadvertiser.com** 6:14
**monuments** 105:15 106:8
**motion** 95:19
**move** 8:6 48:7 52:23 68:6 74:25
**moved** 67:19 95:23
**multiple** 73:8 74:7

**< N >**
**N.W** 3:21
**NAACP** 3:13, 20 8:3 9:11

**name** 9:10, 24 10:1 72:16, 17 92:16 115:16
**names** 7:19
**nature** 25:20, 22
**nay** 97:1, 2
**NE** 4:19
**necessarily** 68:12 73:7
**necessary** 2:9 38:10
**need** 9:1 14:8 28:15 31:2 43:18 49:5 56:20, 21 67:20 81:6, 22 82:18 84:16 89:19, 20 102:23 109:25 113:16, 21
**needed** 22:9 33:4 55:4 56:13 80:9 81:15 82:9 83:18 86:24 90:15 91:3, 7
**neighborhoods** 70:20
**neither** 65:9 115:9
**never** 74:10 83:7 86:10, 12 104:4
**New** 3:15 4:5 74:10
**news** 47:16
**nodding** 11:21
**normally** 77:19
**North** 115:23
**NORTHERN** 1:2 7:16
**Notary** 1:21 7:2
**notes** 19:6
**notice** 9:17 96:12
**November** 6:22 94:6 95:10
**Number** 7:14 14:23, 25 15:8 22:15 33:23, 24 39:19 40:14 47:1 75:23 85:20 86:7, 10, 13 87:15 98:22 101:5 102:13 115:16
**numbers** 15:5 33:4 54:18 87:17
**numeral** 39:8, 25

**< O >**
**oath** 10:17
**object** 12:18, 25 24:9 90:22
**Objection** 40:22 50:19 105:24 106:12, 14, 19
**objections** 2:9, 12 9:1 12:19 13:2
**objectively** 102:16
**objectives** 70:12
**obtaining** 45:2
**occur** 33:17 68:21
**occurred** 98:14 99:1, 12
**October** 6:20 75:20, 23 76:12 77:8 78:19 83:23 85:15 86:19 90:17 92:3
**offered** 2:14 76:9 95:20
**Office** 5:4 7:21 15:6 20:19 24:17 26:3 40:8, 11, 18 101:21
**offices** 1:22
**official** 9:19 105:6
**officials** 70:15
**Oh** 13:24 35:13 47:6 63:3 71:15 78:25 94:9 104:4
**Okay** 8:9 13:6 19:23 25:25 27:12 29:21, 23 35:10 36:18 38:25 45:9 47:6 51:10 52:6 58:3 61:23 64:1 77:7 78:25 85:24 88:3, 8 93:18 94:9 95:22 96:1 98:24 100:20, 25 101:6 103:24 105:10 106:22 108:14 109:11
**old** 16:25
**once** 33:3 54:25 66:3, 22 82:12 88:6, 7 109:25
**ones** 113:22
**opinion** 67:7 81:14, 22 82:14 108:24
**opinions** 82:20
**opportunity** 44:10 46:14 50:24 93:12, 16 96:22 97:9 102:17
**optometrist** 16:14 17:11
**Optometry** 16:7, 13 17:9
**oral** 7:8
**order** 21:21 25:24 55:3, 4 59:13
**ordered** 83:18
**organizations** 110:2
**original** 62:9
**OSHER** 4:16 6:3 8:15 103:21 104:1 106:22 110:21 113:14
**outside** 45:24 75:10 81:16
**overlapped** 99:10
**overseeing** 66:5

**< P >**
**p.m** 1:24 7:17 9:5, 8 51:14, 17 90:6, 9 99:2 114:5, 7
**P.O** 4:11
**PAGE** 6:8 37:24 39:7, 22 40:2 47:21 49:22 79:22 80:1 84:12, 14 86:19 95:4, 18, 20, 24, 25 100:18 101:1, 3, 6, 7, 8, 9, 10 102:12, 13
**paid** 17:17
**Paige** 5:20
**paired** 97:14, 22
**paper** 66:4
**paragraph** 37:25 38:22 39:23 47:21 50:9 84:14
**paragraphs** 39:9 49:25 50:7 70:22
**Pardon** 20:11 68:14 89:3
**part** 28:10 37:6 50:14 52:20 55:1 67:16 71:13, 16 91:19 99:21
**participate** 102:4
**particular** 22:18 65:24 67:19 68:17 70:12
**particularly** 71:2
**parties** 1:18 2:11 102:3 110:15 115:10
**parts** 72:6
**party** 23:11 25:2, 4 104:22 105:2, 5, 12, 13

106:2, 5, 6
107:5, 6, 16, 19, 22 108:1, 2, 10, 11, 21, 23
109:8, 9, 20, 21, 25 110:1, 4, 12, 13
**pay** 23:5
**PDF** 101:7
**pending** 14:10 108:3, 6
**people** 110:2
**percent** 37:19 64:16 79:5 80:9 84:3, 23 85:10, 20 86:7, 11, 12, 25 87:9, 15 90:17, 21 91:1 96:17
**percentage** 84:21
**percents** 86:14
**perception** 73:1
**period** 27:23 28:3 30:15
**permanent** 9:20 27:9, 14, 20 38:17
**permit** 39:16
**permitting** 46:4
**person** 28:13, 25 29:19 30:20 41:9 42:2 58:1 69:4 78:4 88:7, 8
**personable** 82:20
**personal** 12:14 15:3, 12, 15
**personally** 57:13
**personnel** 55:20
**phone** 8:7 13:14 14:25 15:5, 6
**phrase** 29:8
**pick** 102:8
**picking** 98:8
**picks** 86:13
**pit** 98:6
**pitted** 96:6
**place** 8:6 70:14 77:17 93:4
**Plaintiffs** 1:8 3:3 4:15 8:1, 12, 14, 16, 18 9:13 103:20 111:2 113:11, 15
**Plaintiff's** 6:9, 11, 13, 15, 17, 19, 21, 23 35:22 36:24 47:9 61:12 64:3 76:15 94:13 100:22
**plan** 40:3 45:3 46:4 47:18, 22 48:1, 2 49:24 50:10, 25 51:7 52:2, 13 58:10 65:8, 17 91:15 95:1 96:4, 10 111:25 112:14, 18, 21
**planning** 57:6
**plans** 39:19, 23 40:17 42:6 45:16 93:13
**play** 35:17 58:5
**please** 7:18 9:23 10:1 12:1, 6, 9, 12 13:14, 17 14:2, 9 37:24 38:2 39:7 45:10 47:4 80:16, 23 81:4 84:11 85:6 91:5 94:18 100:4
**plus** 64:15
**point** 12:7 24:4 32:14, 15, 17 42:15 54:4, 6, 8, 9 56:25 86:18 107:14
**points** 6:10 19:6, 23 20:7 21:7, 8 22:3, 7, 8, 9, 13 23:1 35:8 93:7
**polarization** 69:20 77:12, 14, 24 80:14, 15 81:25 84:25 85:11, 23 90:20, 24
**polarized** 78:17 79:9, 14 80:4 82:10, 24
**policies** 25:19 64:21, 24 65:2
**policy** 25:21 26:24 39:16 65:24 70:16, 24
**political** 25:2 70:20 71:2, 6, 12
**polls** 44:11
**population** 33:3, 5 38:12 40:9 43:6, 13, 17 47:24 48:4 80:8, 10 84:1 86:23 87:9, 21 90:14 96:16
**portion** 77:11
**possible** 10:20 70:25 71:5
**potential** 69:18, 24 84:24 85:22
**power** 82:4, 23
**practicable** 70:21
**precedent** 97:24
**preclearance** 39:20 44:25 45:3, 7, 12
**preference** 108:16
**premed-type** 16:10
**preparation** 18:17, 22 93:7
**preparations** 28:11
**preparatory** 14:7
**prepare** 18:12 22:14 57:12 92:22, 25
**prepared** 56:14
**preparing** 58:17
**PRESENT** 5:19 7:18 18:21 93:5
**presentation** 40:5
**pretty** 16:10 28:19 36:16 53:6 72:10 87:13
**previously-approved** 48:5
**primary** 25:3 42:24 43:5
**principles** 52:3
**Pringle** 18:20, 23 22:23 55:9, 13 57:4 104:8
**prior** 2:14 20:24 21:1, 11, 12 22:18 26:11 54:10 63:13 64:19 74:16 91:17 92:2
**privilege** 90:23 113:17
**probable** 83:13
**probably** 29:24 46:22 57:8 61:23, 24 63:8 66:25 67:1, 15 73:3, 4 85:18 86:16 89:6 101:16
**problem** 44:1, 2, 5 49:12 67:20, 21, 22 68:7 97:3
**problems** 43:23
**Procedure** 7:5
**proceedings** 7:9 115:5, 8
**process** 22:16 27:25 28:6, 12 33:7 34:9 37:12 39:20 40:5 41:2 45:12 52:24 53:17 57:7, 12 64:19, 23 65:3 66:3, 6 67:17

70:7 88:19 89:15 91:19
**produce** 74:3 84:20
**produced** 20:2 39:23 47:16 67:9, 13 100:16
**production** 113:19
**programs** 108:18
**projected** 56:19
**proposals** 40:13
**proposed** 40:3 45:3, 15 68:19 96:23 97:19 102:2, 7
**proposing** 45:6, 11
**protections** 39:12
**proved** 42:13 57:15
**provide** 11:3, 7 40:11 89:8, 14
**provided** 20:7 38:9
**provides** 43:24 48:15
**providing** 102:17
**Public** 1:21 6:16 7:2 24:16, 17 33:6, 13 40:4 55:14, 17, 21, 23 56:7, 21 58:6, 12, 18 59:8, 15, 18, 23 60:1, 9, 14, 18, 19 61:6 62:1, 6 98:11, 21, 25 99:6, 7, 9, 10, 12, 13, 16 102:7, 9, 17, 19 103:3, 7, 9, 12 105:15 106:8
**pull** 36:19 63:18
**pulled** 94:16
**purpose** 22:7 48:7 65:9
**purposes** 10:18 70:12
**pursuant** 7:4 37:25 38:5
**put** 34:14 35:2 47:18 52:21 58:13 63:10 96:6, 13
**putting** 66:3

**< Q >**
**question** 9:2 12:2, 5, 8, 18, 20 13:1, 4 14:10, 11 26:16 34:7, 24 37:20 40:23 43:8, 15 44:4 45:20 49:9, 20 51:4 54:7, 15 58:4 64:25 69:10, 11 72:22, 25 83:2 86:1, 3 92:11 95:3 97:25 98:24 105:22 106:1, 11, 24 107:13 109:11, 14 110:7, 8
**questioning** 10:18
**questions** 2:10, 11 11:2, 3, 6, 7 14:16 49:3 85:25 103:19, 20, 21 104:6, 14, 17 111:1
**quick** 67:18
**quickly** 40:19 46:25 51:19 67:1 73:15 77:1
**quite** 18:1 34:23 44:3 53:15 77:1
**quotation** 50:3
**quote** 48:22 49:17, 19, 20 50:2, 7 68:3 90:13
**quoted** 47:20 50:1
**quotes** 50:14

**< R >**
**race** 43:9 44:10 108:17 113:1
**races** 79:21
**racial** 39:14 42:25 43:2, 3, 22, 23 44:1, 2, 5 69:19 73:12, 21, 23, 24 74:1 77:11, 13, 17, 23 78:2, 10 81:25 84:25 85:10, 23 90:19, 24
**racially** 78:17 79:9, 14 80:3, 14 82:10, 24
**ran** 25:6
**Randy** 88:17, 18 112:16
**RC** 100:11, 15 101:5 102:13
**reach** 53:25
**read** 17:24 18:2, 3, 4 19:12, 22 37:24 38:2, 22 39:7, 8, 22 41:3 44:7 48:23 50:15 80:5, 11, 16, 24 81:4 85:3, 6, 7 86:4
**reading** 2:2
**ready** 49:15 56:25 58:14
**real** 107:12
**really** 19:22 23:4, 5 45:8 48:21 51:19 69:5 77:6 108:24
**reapportionment** 6:12, 18 9:21 27:10, 13, 15 30:7, 18, 21 31:14, 18, 23 32:6, 10 33:21 34:8, 12 36:14 37:10, 16 38:18, 19 39:5 40:6, 8, 11, 18 42:6, 9 53:2 54:20, 23 55:15, 16 56:5, 10 57:3 60:10, 14 61:6 62:25 63:25 64:18 65:4, 22 74:13, 20 75:6, 10, 21 76:3, 13 77:9 82:5, 24 85:15 86:20 90:18 91:25 98:10
**reason** 10:23 49:16 50:1, 8, 12 74:19 108:25
**recall** 12:7 37:11 42:8 45:18 48:24, 25 50:15, 21, 23 51:6, 9 62:15 96:5
**received** 54:14, 25 58:23 59:12 95:12 101:16
**receiving** 54:10 57:16
**Recess** 9:6 51:15 90:7
**recognizable** 42:22
**recognize** 36:8 37:2, 5, 8, 9, 10 47:12 64:13 94:7 101:9, 10
**record** 8:8 9:5, 8, 24 11:20, 21 12:10, 19 13:3 51:14, 17 90:6, 9 113:24, 25
**Rector** 3:14
**red** 78:9
**redacted** 15:3
**redistrict** 38:10
**redistricting** 10:7, 10 17:22 20:14, 15, 17,

19, 20 21:17, 25 22:17 23:11, 14 27:5, 7, 8, 12, 19, 20, 23 28:6, 9, 17 29:16 30:13 33:7 38:16 39:19 40:3, 9, 16 42:5 45:12, 16, 21, 23 46:13 48:1, 2 52:14, 23 56:16 57:7, 12, 19, 22 58:2, 6, 24 59:19 60:7 63:15, 25 64:18, 21 65:3, 8, 20 70:18 75:3 84:6 88:19, 22 91:18, 24 92:5, 18, 20 94:23 98:7, 12 111:15, 24 112:7, 14
**reduce** 48:7
**reducing** 48:4
**reelection** 87:7
**refer** 13:17, 20 113:22
**referred** 38:18
**referring** 19:21 84:16 86:24
**reflection** 50:18
**reform** 109:10, 14
**refresh** 48:13
**regarding** 69:18
**regular** 63:9 75:13
**related** 87:8 108:2
**relating** 2:5
**relationship** 84:23 85:1, 9, 11, 20
**rely** 82:20
**remained** 42:19
**remedy** 43:25
**remember** 19:10 21:4 23:5 24:12 33:18, 19, 23 34:7 46:1, 2, 19 48:16 51:20, 23 52:1 58:20 76:8 77:10 79:15, 21 83:25 88:24 89:1 92:21 107:11
**remotely** 13:13
**removal** 106:7
**removing** 105:14
**Rep** 49:23 50:9
**repeat** 91:5
**rephrase** 12:6
**Reporter** 7:1 8:24 11:13, 19, 20 19:14 20:4 32:12 35:5 36:1 43:14 44:7, 13 46:24 52:8 61:4 63:17 113:24 115:15
**Reporting** 115:14
**represent** 7:19 9:12 20:2 47:15 76:11 77:7 95:11
**representation** 85:14
**Representative** 18:20 48:18 55:9, 12 58:15 59:5 60:4 69:3 78:8, 11 79:3, 8 80:3, 12, 25 83:11, 12 84:14 86:3, 6, 21 87:12, 20, 24 88:2, 6 99:24 101:19, 24 102:14, 18 103:6 104:8
**representatives** 20:22 24:24 26:6 56:1 112:3, 13
**represented** 18:8
**representing** 88:10 111:7
**republican** 25:4, 5, 6, 8, 9, 12, 13 104:22, 23, 25 105:2, 4, 13 106:6 107:6, 16 108:5, 11, 23 109:9, 21 110:13
**republicans** 109:2, 12 110:3
**request** 6:24 40:11 59:14 85:8 99:25 101:20 113:19
**requested** 58:15 91:4, 8 99:24
**requesting** 58:25
**requests** 113:23
**require** 39:15 73:12 77:23 102:1, 3
**required** 12:20 13:4 16:13 38:7 66:19 67:3 68:1 91:10, 13
**requirement** 67:10
**requirements** 67:13
**requires** 70:24 73:21 102:7
**residents** 109:23 110:18
**respect** 29:17 54:19, 24 68:21 70:19 86:3 90:16 97:12
**respective** 1:18
**respond** 13:4 102:18
**response** 80:12, 16 81:4 85:3, 6, 12 96:11
**responsibilities** 28:8, 18 30:17 53:4, 13 54:12, 18, 22 56:6, 11 69:16
**responsibility** 29:17 82:8
**responsible** 69:8, 12
**responsive** 12:8
**result** 115:11
**results** 84:24 85:23
**retired** 17:9
**retreat** 47:23
**retreats** 48:2
**retrogression** 39:13 47:23 48:19 50:4 51:24
**review** 19:1 22:6, 18 28:14 38:8 58:11 93:9
**reviewed** 19:5, 17 22:3
**revisions** 40:16
**rich** 72:12
**right** 51:21 70:9 71:8 74:8 80:2, 19 101:24 106:21 107:16
**Rights** 39:8, 18, 21 43:20 47:25 50:11 65:7, 11, 14 66:9, 12, 20 67:5, 7, 11, 14, 22 68:1, 3, 8, 18 69:9, 14, 18, 24 77:20 82:7 91:16 97:21
**rise** 77:22
**risk** 87:4
**Road** 14:22
**role** 10:8 28:5 29:2, 25 30:8, 9, 22, 23 31:16 34:8, 12 35:18 45:6, 11 53:1 56:4, 9 58:5 66:5 88:18
**roll** 34:20
**Roman** 39:25
**room** 13:13 104:8
**ROSS** 3:18 8:13

**Roughly** 10:6 42:19 78:13
**RPV** 78:16, 17, 18 81:9, 12, 19 83:10, 23 84:17 85:22 86:24 90:16 92:8
**R-Springville** 49:24
**Rule** 40:14 59:22
**rules** 2:5 7:5 21:21 40:15 41:10
**rulings** 66:18
**run** 25:1, 8, 9 104:23

**< S >**
**SADASIVAN** 3:11 6:2 7:25 8:1 9:3, 9, 11 31:9 35:9, 13 36:12, 18, 21 49:8, 13 51:3, 11 52:10 61:1 63:16, 22 65:18 76:20, 25 90:3 93:17 94:11 100:7, 15, 19 103:18 113:10
**safe** 87:13
**satisfied** 42:14
**saw** 62:14
**saying** 47:21, 22 48:24 51:23 56:20 80:13 107:23
**says** 30:4 41:4 61:6 70:19 80:5 86:10, 14 100:11, 15 101:24 102:5, 14 113:22
**scan** 40:19 77:1, 2
**schedule** 6:16 31:1 53:8 55:2 58:6, 10 60:23 62:12 98:20 102:7
**scheduling** 28:16 62:5
**school** 15:24 17:3
**scrapped** 59:13
**screen** 19:15, 19 46:25 61:3 63:19, 24 76:11 94:8 100:3
**Scroll** 19:23 95:2 100:13
**scrolling** 100:11
**second** 47:21 49:6 61:10 64:8 74:12 75:5 84:13 102:12
**secret** 29:12, 14
**Secretary** 7:21 35:11 47:16 111:7
**Section** 39:21 43:20, 22 44:8, 12, 14, 18, 23 45:1 65:6, 11, 14 66:20 70:16
**see** 19:22, 23 28:15 32:5 36:19 38:1 39:3 50:6, 24 61:2 62:1, 3 63:20, 24 74:1, 9, 16 76:18 77:10, 19 80:2 83:6 89:6 94:8 95:9, 25 103:16 110:1
**seeing** 51:6 55:2 95:4
**seen** 64:6, 10 101:14, 15
**select** 75:22, 24 76:6 103:8
**selected** 31:6, 22 32:2
**selection** 31:12, 16
**senate** 15:13 19:8 20:9 22:2 24:5, 10 26:7, 9, 21 27:21 29:10 32:9 45:19 53:3, 5, 13 54:20, 23 56:5, 9 65:3, 20, 22 82:4, 23 93:3, 6, 21, 24 94:1, 2, 6, 22 95:10, 11, 14 111:10, 24
**Senator** 7:24 17:13, 14, 15 19:20 35:25 37:2 47:12 49:9, 25 51:18 58:1 61:8 64:7 65:19, 21 80:5 82:19 90:10 94:17 95:5, 7, 16, 20, 23 96:3, 10, 20, 23 97:12 103:24 104:2 106:23 110:23 111:5, 9 113:6, 11
**senators** 20:21 111:21
**sense** 21:14 28:1 82:18
**sent** 101:21
**sentence** 39:1 85:7
**September** 55:25 56:3
**sequence** 53:22
**serve** 25:25 31:22 32:7
**served** 9:17 26:2, 19 27:2, 3, 5
**service** 24:16
**serving** 104:18 105:10 107:25
**session** 45:22 56:15, 16 57:1 63:8, 9, 14 74:17 75:2 92:2, 17, 23 93:1 94:24
**set** 47:24 53:8 55:22 56:24 59:10, 16
**setting** 55:2 58:5 59:22
**Sewell** 86:15 87:20, 24 88:3, 6
**Shalela** 8:1
**share** 19:18 46:25 61:3 63:19 76:11 100:3
**shared** 22:9 49:22 53:20 54:17
**sheet** 113:18, 22
**show** 19:15 46:23 48:6 53:21
**showing** 61:16 100:9
**side** 70:4
**signature** 2:2
**significant** 102:4 109:22 110:17
**similar** 19:24 61:18
**simply** 70:6 108:25
**single** 29:24 70:6
**Singleton** 95:6, 16 103:19, 22 111:2
**Singleton's** 96:23
**sir** 25:11 35:9 61:22 76:25 78:24 94:11 98:1, 23 100:2 103:24
**sitting** 17:25 90:11 113:12
**situation** 98:5
**six** 99:20, 23
**slow** 52:8, 12 73:13
**smaller** 28:2
**Smitherman** 80:1
**social** 15:15

**socially** 25:16, 17
**socioeconomic** 73:2
**software** 74:3, 4, 5, 6 87:18
**soil** 72:12, 19
**solutions** 43:24
**somebody** 86:13
**sooner** 20:25
**Sorry** 14:6 22:12 23:9, 19, 20 24:1, 2 26:13, 14, 17 34:3 35:8, 14 36:3 39:22 43:14 44:13 51:3 62:23 63:22 73:15 80:23 85:4 106:21
**sort** 8:7 18:15 19:25 56:19 59:2, 12 86:7
**SOS** 47:1
**sound** 48:10
**Southern** 16:3, 9
**southerner** 67:1
**spaces** 105:15 106:8
**speak** 11:25 109:3
**speaker** 31:24
**speaking** 73:15
**special** 56:16 57:1 63:13 74:17 75:2 92:2, 17, 23 93:1 94:24
**speculate** 43:18
**speculation** 53:20
**spell** 9:24
**spent** 53:17, 19
**spilled** 56:2
**spread** 35:19 62:11
**spring** 88:23 89:9
**Springville** 14:22 15:25
**staff** 20:13 40:11 55:16, 17 58:9, 23 60:3 62:8 88:8 101:21 103:13
**staffed** 20:20
**standing** 21:13, 15, 20, 22 22:1, 10, 19 93:5
**Stars** 3:7
**start** 57:6 61:20 94:25 106:3
**started** 45:18 46:2 53:16 54:5 57:8 62:9 66:3 70:14
**starting** 32:14, 15, 17 42:15
**State** 1:22 7:3, 19, 21 9:24 12:13 15:7 20:15, 20 38:6, 7, 11, 15 39:11 47:16 48:6 60:20 61:20 62:11 64:12 72:11 96:16, 17 98:3 99:5 109:23 113:18, 19 115:1
**stated** 51:19 103:2
**statement** 44:7 50:16, 22 105:18, 21 109:17 113:18
**statements** 11:20
**STATES** 1:1 7:15 38:6 39:11 65:6, 12
**state's** 48:1
**stay** 30:10 31:4 41:4 66:4
**staying** 41:14
**Ste** 3:7, 21 4:19 5:14
**step** 49:5
**steps** 57:11 88:13
**STIPULATED** 1:17 2:1, 8
**stipulation** 7:6
**stipulations** 8:24
**stop** 29:21
**Street** 1:23 3:14, 21 4:4, 19 5:14 115:23
**strength** 39:14 65:10
**strike** 56:8
**studied** 16:11
**study** 19:12 80:4, 15 81:3, 7 82:10, 25 84:25 85:8, 11
**subdivisions** 70:20
**subgroup** 44:10
**subject** 39:20
**submit** 34:16 91:23
**submitted** 34:13
**submitting** 91:18
**subsequent** 65:25 67:8
**subsequently** 30:5
**subset** 75:14, 16, 17
**substitute** 76:8 95:20
**suddenly** 98:7
**sufficient** 81:6
**suggest** 87:5
**suggested** 79:20 88:3
**suggestions** 60:7, 8
**Suite** 115:23
**summarized** 22:20
**summarizes** 28:19, 21
**summary** 22:8 23:3, 7, 8
**supersedes** 98:3
**support** 25:1
**supports** 108:11, 12
**sure** 12:13, 23 15:7 28:20 30:10 31:4 37:23 41:5, 7, 9, 15 42:18 44:9 45:25 54:15 60:25 79:5 84:8 91:20 93:21 107:10 109:5 112:17 114:2
**surprise** 104:4
**surprised** 60:24 74:23
**suspect** 80:18
**suspicious** 77:17, 22 78:10
**swear** 8:19 76:5
**sworn** 8:22 10:17
**system** 17:7 36:16 40:8 55:19 58:8 60:4 62:20 74:10 103:15

**< T >**
**tacked** 77:18 99:20
**take** 16:8 19:11 34:13 35:11 41:5, 7 49:11 51:11 79:18 88:13 90:4 94:17, 20 109:25
**taken** 1:21 9:6 51:15 90:7 104:12 115:5, 8
**takes** 97:24
**Talk** 6:10 24:15 41:16, 23 67:1 87:20, 24
**talked** 18:15 33:1 41:19 42:1 53:23 58:7 67:15 83:24

**talking** 19:22 20:7 21:6, 7, 8, 16 22:3, 7, 8, 13 23:1 30:11, 12, 14 31:8 34:10 35:8 49:21 57:22, 24, 25 65:16 70:9, 17 107:15
**Tallapoosa** 1:23 5:14
**target** 23:24 24:7 58:20
**targeted** 99:19
**targeting** 86:6
**teacher** 17:3
**team** 28:11
**technical** 40:12
**telephone** 14:23
**tell** 33:22 36:4, 7 61:18 90:19 96:2
**ten** 10:6 27:5
**tenure** 26:19
**term** 73:16 107:11
**terms** 26:2, 4 27:4 97:17 108:14
**test** 77:16, 18
**testified** 8:22 23:10 73:17
**testify** 10:19 23:18, 20
**testimony** 10:24 73:9 102:10
**Texas** 16:5
**Thank** 9:14 13:11 14:6, 14 26:17 35:13 38:4, 21 49:13 51:10, 12 52:17 63:22 76:25 90:10 98:23 104:5 107:1 110:21, 22 113:6, 11, 15
**thereto** 2:14
**thing** 31:3 33:10 54:5 57:13 73:4 78:3 96:12 107:14
**things** 25:23 27:14 28:20, 22 30:19 53:22 55:3, 4 62:13 96:12
**think** 21:10 25:4 28:19, 21 37:17, 21 46:17 50:17 52:8 55:24 58:20 59:11 60:3 62:14 63:3, 21 67:15 70:1 73:1 76:4 77:25 78:9 79:4, 5, 19, 24 80:21 81:20 82:17 83:10 84:4, 8 85:16 87:6 88:6 93:20, 22 97:3, 8, 15 98:17 102:21, 23 103:18 105:4, 16, 17, 19 106:9, 10
**thinking** 57:8 63:7, 13
**third** 56:3 63:5 70:16
**thought** 50:18 83:7, 16 85:4
**threat** 87:6
**threatened** 78:13
**three** 26:2, 4 27:4, 20, 21 97:24
**threshold** 85:21 86:8
**Thursday** 74:17 76:1 92:2, 19
**time** 2:12, 13 7:17 9:5, 8 10:7, 11 12:18, 24 13:1 14:9 17:16 27:23 28:3, 16 30:15 31:1, 7 32:21 37:23 41:23 45:9 50:18 51:14, 17 52:7 53:15, 17, 19 55:18 56:21, 22 57:9, 10 59:15 60:1 67:15 68:12 83:20 90:6, 9, 11 99:7, 13, 19 103:2 104:5, 22, 25 108:9 110:22 112:20 113:12 114:4
**timeline** 54:1, 21 56:24 57:14
**timelines** 56:12
**timely** 55:5
**times** 55:23 68:5, 9, 15 70:1 99:15 103:7, 8, 11
**timing** 53:21 102:14, 19
**title** 64:15
**today** 9:16 10:24 11:16 13:18, 21 17:19, 25 18:8, 13 19:18 22:14 73:14 75:11 104:5 109:24 110:19
**today's** 9:14 11:9
**told** 29:5, 6 55:24 88:5 90:24 91:2, 6, 9
**topic** 110:9, 10
**topics** 64:16
**town** 63:11
**transcribed** 115:5, 8
**transcribing** 11:14
**Transcript** 6:20, 22 76:12 77:8, 10 79:18 80:18, 24 86:19 94:5, 21 95:8, 12, 14, 15 115:7
**transcription** 115:6
**travel** 102:2, 4
**trial** 2:13 23:18, 20
**tried** 57:13 65:19 93:2
**Trojan** 62:16
**trouble** 8:4
**Troy** 62:15
**true** 12:14 115:7
**trust** 26:23
**truthful** 10:24
**truthfully** 10:19
**try** 19:13 41:4 53:8 64:24 66:24 110:7
**trying** 48:21 53:16, 25
**Tuesday** 74:16 75:1 92:1
**turn** 24:3 26:12 62:23
**turned** 101:1
**turning** 79:22 84:11
**TURRILL** 3:4 8:11
**twice** 99:18
**Twitter** 15:20, 21
**two** 15:10 19:4 34:2, 5 39:7, 9 46:4, 15 47:19 49:25 50:24 51:6 52:4, 14 57:9 63:3 74:14, 21 75:10, 23 85:1 93:9, 13, 22 96:3, 6, 13 97:8, 13 98:6 101:2 110:1
**two-year** 58:8 62:8, 10

**< U >**
**U.S** 38:9 39:17
**ultimately** 93:6

**undergraduate** 16:2
**underneath** 113:20
**underpopulated** 84:7
**understand** 9:16 10:18 11:2, 6, 9, 13, 22 12:3, 5, 10, 22 13:3, 7, 16 14:4, 12 18:1 23:19 34:23 44:4 54:15 78:21 81:24 82:19 107:23
**understanding** 45:9 67:25 70:23 77:13 78:16, 18 79:8, 10 97:18 112:24
**understood** 41:17 52:17
**undertake** 81:8, 11, 25 82:11 83:4, 22
**undertaken** 82:1, 25 83:12
**unfold** 53:9 55:4
**unfortunately** 74:24
**Union** 4:3, 10
**UNITED** 1:1 7:15 38:6 39:11 65:11
**universities** 62:5
**University** 16:4
**unnecessary** 90:20, 25
**unsatisfactory** 102:15
**unwarranted** 39:13
**update** 32:23
**updated** 28:15
**upper** 61:21
**use** 41:18 73:23, 24 81:2
**Usual** 8:24

**< V >**
**value** 83:16
**VAP** 80:21 81:5
**various** 94:23
**venues** 60:17
**verbal** 11:19
**versus** 7:13 9:13, 19
**VIDEO** 1:9 95:12
**videoconference** 11:11
**Videographer** 5:20 7:11 8:9, 19 9:4, 7 51:13, 16 90:5, 8 114:3
**view** 105:11 108:10
**viewed** 102:16
**views** 105:11 106:2, 4, 5 107:4 108:20, 22 109:7, 12, 13, 19, 20 110:11, 12, 16
**violate** 68:17 91:16 92:5
**violation** 69:24
**violations** 69:18
**virtually** 69:4 88:7
**vote** 22:11 34:20, 22, 25 39:6 76:3, 7 81:5 87:12 93:12, 16 95:15, 24 96:22, 25 97:2 111:12
**voted** 52:5, 16 96:2, 9, 19 97:13 111:24 112:13
**voters** 48:8 78:6 87:10, 12 97:10 98:9
**votes** 95:24 111:21 112:5, 9
**Voting** 39:8, 14, 17, 21 43:13, 17, 20 47:25 50:11 65:7, 10, 11, 14 66:9, 12, 20 67:4, 7, 11, 14, 22 68:1, 2, 7, 17 69:9, 13, 18, 24 77:14, 20 78:18 79:9, 14 80:4, 7, 10, 17, 20, 21 82:7, 10, 25 86:22 87:9, 21 90:14 91:16 96:15 97:21
**VRA** 45:1 92:6
**VS** 1:9

**< W >**
**wait** 11:25 12:1 78:20
**waived** 2:3
**WALKER** 5:11 7:23 8:25 12:17 13:24 15:2 18:11, 24 21:5 22:23 29:4, 20, 23 31:7 35:7, 10, 15, 19 36:3, 6, 20 40:22 47:3, 6 48:11 49:4, 12, 19 50:19 51:12 52:12 61:10, 15 63:2, 21 65:15 66:2 76:21, 23 81:18, 21 82:13 83:15, 22 90:19, 22 92:16 93:15, 18, 25 94:4, 9 100:3, 6, 10, 16, 20 101:1, 4 102:24 105:24 106:16, 20 110:25 113:8, 16 114:2
**want** 8:19 24:21 44:7, 16, 21 51:18 102:22 103:22
**wanted** 22:11 55:24 87:4 88:9 93:4
**Washington** 3:22 4:20 5:5
**waste** 83:20
**way** 24:10 68:16, 19 71:16 83:5 84:19 100:14 105:4
**ways** 71:18
**web** 11:10
**week** 56:3 92:19
**weeks** 55:25
**WELBORN** 4:8 35:17 36:10 61:19 75:16 78:22 79:24 94:10 100:13, 17 113:25
**welcome** 103:23 110:24 113:7
**well** 10:1 15:6 17:15 19:16, 24 20:19, 24 21:9, 10, 25 22:6, 15 25:3 26:3, 21 27:5 28:10, 19 29:21 30:9 35:2, 19 39:4 41:3, 24 43:18 46:21 48:15 50:3, 14 52:18 53:15 55:1, 16 59:9 60:19 62:3, 7 64:14 65:25 66:15 67:6 68:2 70:1, 25 71:25 73:1, 22 76:11 77:5 78:25 80:17 82:8, 12 83:21 86:14 87:10 89:21 91:17 92:24 94:17 98:2, 16 101:12 104:3,

4, 23 105:3 106:18 107:18
**well-kept** 29:11
**went** 22:1 26:2, 3 67:17 84:4
**we're** 13:12, 13 30:11 35:15 36:22 52:6 70:9, 17 74:21 75:11 84:19 101:23
**west** 72:11
**we've** 45:23 47:6 49:4 79:17
**win** 78:11
**winners** 98:8
**wish** 23:9 40:12
**witness** 2:3 7:7 8:7 29:21 47:5 61:17 106:14
**wondering** 53:18, 19 71:13
**word** 25:14 34:3 50:4 78:14, 20, 23
**words** 50:5 99:9
**work** 9:11 17:8, 15 36:16 40:9 55:3 58:9 59:2 89:7 103:16
**worked** 58:9 69:5 83:6 108:1, 5
**working** 17:14 66:16 70:15 102:16 110:14
**works** 18:16 81:23
**worth** 28:22
**worthwhile** 83:16
**writing** 11:15
**wrong** 98:20

**< Y >**
**Yeah** 26:10 33:13 39:3 49:20 62:15 78:13, 15 96:1 98:18 114:2
**year** 57:9
**years** 10:6 16:19 27:6, 18 57:9 82:15 104:20, 21 105:10 107:3, 11, 25
**Yep** 80:1
**yesterday** 18:14, 24 22:22 100:16
**York** 3:15 4:5

**< Z >**
**Zero** 99:8, 11
**Zoom** 3:18 4:15 8:10