FILED

2021 Dec-23  PM 04:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

MARCUS CASTER, et al.,

       Plaintiffs,

       v.

JOHN H. MERRILL, in his official capacity
as Alabama Secretary of State,

       Defendant.

Case No.: 2:21-cv-1536-AMM

<u>**SECOND DECLARATION OF DR. BRIDGETT KING**</u>

Pursuant to 28 U.S.C. § 1746, I, Bridgett King, make the following declaration:

1.     This second declaration responds to assertions made in two reports submitted by the Defendant in this case. Section I addresses Tom Bryan's assertion of how "Black" should be defined for purposes of measuring the Black population of a political subdivision. Section II addresses Dr. M.V. Hood III's assertion that white support of minority Republican candidates suggests racial considerations do not influence their voting behavior, as well as his discussion of a recent Alabama State House race.

2.     In responding to these assertions, I draw on my research and writing as a political/social scientist and my in-depth understanding of voting rights in a historical and contemporary context, along with understanding gained from academic and applied experience.

**I.**    <u>**Definition of "Black"**</u>

3.     In Mr. Bryan's report, he discusses the need to "define and document the true 'Black' population" of congressional districts.[1] Mr. Bryan notes that in the last two Censuses,

---

[1] Bryan Rep. at 9.

**Caster Plaintiffs' Exhibit 81, Page 1**

respondents had the option of selecting more than one race.[2] He states: "A 'Black' in Alabama therefore can be Black alone, or perhaps in combination with other races or possibly even also Hispanic.[3] He goes on to assert that "[i]n this matter precise definitions matter," and claims that counting only those Alabamians who identify as Black and no other race ("Black alone," "single race Black," or "SR Black") as Black when analyzing the Black population of a congressional district "has been most defensible from a political science / Gingles 2 voting behavior perspective," as opposed to counting all Alabamians who identify as Black, regardless of whether they also identify with another race ("any part Black" or "AP Black").[4]

4.      Mr. Bryan is not a political scientist, and Mr. Bryan does not offer any explanation, evidence, or citation to support his assertion that counting only those who identify as "Black alone" as Black for purposes of measuring population has been "most defensible" from a "political science" perspective.

5.      Drawing on my own scholarship and those of other political scientists and historians, it is my opinion that Mr. Bryan's assertion has it exactly backwards. From a political science and historical perspective, the more defensible position is that, when determining the Black population of a political subdivision, *all* individuals who identify as Black—whether in combination with other races (and/or Hispanic heritage) or not—should be counted as Black.

6.      The AP Black definition is superior to the Black alone definition from a political science and historical perspective because it better comports with how individuals racially self-identify. Racial self-identification is the result of historical, cultural, and social environments.

7.      From the historical perspective, how individuals racially self-identify must take

---

[2] *Id.*
[3] *Id.*
[4] *Id.* at 10.

**Caster Plaintiffs' Exhibit 81, Page 2**

account of how society and the State of Alabama has defined the Black race. In Alabama, that understanding must begin with the "one drop rule." For centuries, states in the American South, including Alabama, defined Black by using the one drop rule, also known as the "one black ancestor rule," or in anthropology as "the hypo-descent rule." Stated simply, the rule asserts that a single drop of Black blood makes a person Black. Racially mixed persons were thus considered Black and assigned the status of the subordinate group.[5] As one scholar explains: "Any person who has some 'negro blood' has been or still is regarded as 'colored,' or 'African,' or 'Negro,' or 'Black,' or 'Afro American,' or 'African American.'"[6]

8.     The rule did not apply to people whose heritage was some combination of Caucasian, Hispanic, Asian, or Native. In both the historical and contemporary contextual understanding, the one drop rule applied only to Americans of African descent—in other words it only applies to Black Americans.[7]

9.     The one drop rule became entrenched across the American South in the 1910s and 1920s, but it first appeared in legal codes in the 1800s. The rule evolved out of racist notions of white racial purity.[8] While state statutes often explicitly defined who was considered Black, social customs also played a large role in defining the racial line, which used the one drop rule to suppress political, economic, and social access and mobility. As early as the 1700s, those who were mixed race Black and white ("mulattos," "quadroons," "octoroons," etc.) were subject to the same legal disabilities as Blacks and thus were enslaved. Keeping "mulattos" and other part-Black persons

---

[5] Davis, F. J. (1991). Who is Black? One nation's definition. Penn State University Press: University Park, Pennsylvania; Hickman, C. B. (1997). The Devil and the One Drop Rule: Racial Categories, African Americans, and the U.S. Census. *Michigan Law Review*, *95*(5), 1161–1265.
[6] Jordan, W. D. (2014). Historical Origins of the One-Drop Racial Rule in the United States. *Journal of Critical Mixed Race Studies*, 1(1), 98-132.
[7] Davis, *supra* n.5; Jordan, *supra* n.6.
[8] Hickman, *supra* n.5.

- 3 -

Caster Plaintiffs' Exhibit 81, Page 3

enslaved served an economic purpose: the offspring of children with Black mothers and white fathers increased a plantation's inventory.

10.　　Though the citizenship status of Black Americans changed after the Civil War, Black people with significant white ancestry continued to be considered Black if they also had a Black ancestor.

11.　　An understanding of Blackness that is inclusive of all Black individuals, both SR Black and AP black, was also adopted by the US Bureau of the Census.

12.　　By the Fourteenth Census in 1920, when the color line had hardened, the Census Bureau stopped counting "mulattoes" and formally adopted the one drop rule:

> The term "white" as used in the census report refers to persons understood to be pure-blooded whites. A person of mixed blood is classified according to the nonwhite racial strain. . . . [t]hus a person of mixed white . . . and Negro . . . is classified as . . . a Negro . . . regardless of the amount of white blood . . . .[9]

13.　　This formal adoption of the one drop rule appeared in legislative definitions as well. For example, in 1924, a Virginia Act for "Preservation of Racial Integrity" defined a White person as someone with "no trace whatsoever of any blood other than Caucasian."[10] By 1930, Virginia defined as colored anyone "in whom there is ascertainable any negro blood."[11]

14.　　As time has progressed, our understanding of who is Black, and who is not, has not deviated; to the contrary, it has been further entrenched in our society.  Historian Paul Spickard argues:

> The "one drop" rule is so ingrained in the American psyche that Blacks and Whites do not think twice about it. For example, part-Black people of all hues joined Blacks

---

[9] Bureau of the Census, U.S. Dept. of Commerce, Fourteenth Census of the United States: 1920, at 10 (1923); Hickman, *supra* n.5.

[10] 1924 VA. Acts ch. 371, § 5.

[11] 1930 VA. Acts ch. 85, § 67.

**Caster Plaintiffs' Exhibit 81, Page 4**

in embracing the "Black is Beautiful" slogan advanced in the late 1960s, finally taking pride in their skin color, their hair and other aspects of their black ancestry.[12]

15.     For all persons with Black lineage, barriers to full opportunity and participation are formidable, and a person who is fractionally Black cannot escape these obstacles.[13] Asserting one's racial identity is thus a political exercise, a conscious decision to connect to the heritage of that racial identity.[14]   It is a choice to connect to the politics and organized interests of that racial identity, but one also accepts the socio-political and anthropological struggles of that group.

16.     Individuals who assert their identity as Black, in total or in part, are making a conscious decision to identify with the history and legacy of Black identity in the United States, an identity that includes the trans-Atlantic slave trade, the legacy of Jim Crow, segregation, the relief brought by the 1964 Civil Rights Act and 1965 Voting Right Act, and the contemporary political, economic, and social realities experienced by Black Americans. Excluding such individuals from the definition of Black cannot be supported from a political science perspective.

## II.   Republican Voting Patterns

### A.  Support for Black Candidates Among White Republican Voters

17.     I respond to two assertions made in Dr. Hood's report. First, Dr. Hood asserts that "ideology trumps race in the case of white Republicans and their support for GOP minority candidates," citing specifically an article Dr. Hood published with Seth C. McKee.[15]

---

[12] Spickard, P.R.  (1992). The Illogic of American Racial Categories in *Racially mixed people in America*, (in Root, M P.P. Root ed.), p. 12-23. Sage Publishing: Thousand Oaks, California. This observation is cited in Hickman, *supra* n.5.

[13] Davis, *supra* n.5.

[14] Martin, B. L. (1991). From Negro to Black to African American: The Power of Names and Naming. *Political Science Quarterly*, *106*(1), 83–107.

[15] Hood Rep. at 15 (citing Hood, M. V., & Mckee, S. C. (2015). True Colors: White Conservative Support for Minority Republican Candidates. *The Public Opinion Quarterly*, *79*(1), 28–52).

- 5 -

**Caster Plaintiffs' Exhibit 81, Page 5**

18.     In the cited article, while the authors conclude that conservative whites will vote for conservative minority candidates, they provide no explicit discussion of white Republican willingness to vote for Black candidates, the heart of the issue. Nor does the study consider any elections conducted in the state of Alabama.

19.     In the analysis, Hood and McKee collapse all the non-white candidates who ran for Congress or Governor in the elections studied—elections in Delaware, Florida, Hawaii, Maryland, Nevada, New Mexico, Ohio, Pennsylvania, South Carolina, Texas, and Vermont into the category of "minority" candidate. This category includes 4 African Americans, 3 Asians, and 4 Hispanics. The level of support among conservative voters for these minority candidates was compared against conservative voters' support for white candidates using the 2006, 2010, and 2012 Cooperative Election Study (formerly known as the Cooperative Congressional Election Study). They provide no discussion of the conditions under which support for a minority candidate will occur.

20.     Perhaps more importantly, the mere fact that white Republicans support a minority candidate tells us quite little about whether any of those voters are motivated by racial considerations. As political scientists Hakeem Jefferson and Michael Tesler recently explained, white Republican voters who harbor prejudiced views will still support a Black candidate so long as that candidate takes particular positions on issues relating specifically to race.[16] Specifically, racially prejudiced white voters will support a Black candidate so long as the candidate's positions "don't threaten the racial hierarchy" and give no reason to "worry that the[] candidate[] will

---

[16] Jefferson, H. & Tesler, M. (2021). Why White Voters With Racist Views Often Still Support Black Republicans, *FiveThirtyEight*, https://fivethirtyeight.com/features/why-racist-white-voters-often-favor-black-republicans/.

Caster Plaintiffs' Exhibit 81, Page 6

represent the interest of Black Americans."[17] In other words, white voters who harbor racial prejudice will support a Black candidate who successfully demonstrates he or she is "not in the business of carrying water for their own racial group."[18] By contrast, they will oppose any Black candidate whom they believe "will fight for 'those people [Black Americans]' and not 'people like us [white Americans].'"[19] Put simply, racially prejudiced white voters "are not hostile to Blackness, per se. They are hostile to a particular manifestation of Blackness – one that reflects a commitment to racial justice and the advancement of [Black Americans'] collective goals."[20]

21.     Moreover, Jefferson and Tesler also explain that voting for Black Republicans may be appealing to racially prejudiced whites because "it assuages concerns of being seen as racist by enabling them to say, 'I can't be racist! I voted for the Black candidate!'"[21]

22.     The 2016 Republican primary provides a helpful example. During that race, support for candidate Ben Carson, a Black man, was "positively correlated with the belief that Black Americans have too much influence on U.S. politics."[22] Carson also received much more favorable evaluations among Republicans harboring the "overtly prejudiced [view] that 'most African Americans are more violent than most whites'" as compared to white candidate Jeb Bush.[23]

23.     When considering partisanship, we know that Democrats and Republicans differ greatly across a wide range of issues. While some of these issues do not pertain to race, many of them do. For example, recent surveys have found the following:

---

[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*

**Caster Plaintiffs' Exhibit 81, Page 7**

a. 49 percent of Democrats/Democratic Leaners believe that white people benefit a great deal from advantages in society that Black people do not have, compared to 7 percent of Republicans/Republican Leaners, a 42 percent difference.[24]

b. 67 percent of Democrats/Democrat Leaners believe that when it comes to giving Black people rights the country has not gone far enough, compared to 15 percent of Republicans/Republican Leaners, a 52 difference.[25]

c. 71 percent of Republicans/Republican Leaners believe that a lot of progress has been made when it comes to ensuring equal rights for all Americans regardless of their race/ethnicity, compared to 29 percent of Democrats/Democratic Leaners, a 42 percent difference.[26]

d. 85 percent of Democrats/Democrat Leaners support the Black Lives Matter movement, whereas 78% of Republicans/Republican Leaners say they oppose it.[27]

e. 81 percent of Democrats support removing confederate monuments from public spaces, compared to 17 percent of Republicans, a 62 percent difference.[28]

---

[24] In a Politically Polarized Era, Sharp Divides in Both Partisan Coalitions. *Pew Research Center*. https://www.pewresearch.org/politics/2019/12/17/in-a-politically-polarized-era-sharp-divides-in-both-partisan-coalitions/.
[25] *Id.*
[26] Deep Division in Americans' View of Nation's Racial History – and How to Address It, *Pew Research Center*, https://www.pewresearch.org/politics/2021/08/12/deep-divisions-in-americans-views-of-nations-racial-history-and-how-to-address-it/.
[27] Menasce Horowitz, J. (2021, Sept. 27). Support for Black Lives Matter Declined After George Floyd Protests, but Has Remained Unchanged Since, *Pew Research Center*, https://www.pewresearch.org/fact-tank/2021/09/27/support-for-black-lives-matter-declined-after-george-floyd-protests-but-has-remained-unchanged-since/.
[28] Kelley, A. (2020, July 17). A Majority of Americans Support Removal of Confederate Monuments: Poll. *Washington Post*, https://thehill.com/changing-america/respect/diversity-inclusion/507788-a-majority-of-americans-support-removal-of.

Caster Plaintiffs' Exhibit 81, Page 8

24.     These results demonstrate the deep divisions among the two major political parties on issues of race.

**B.      The 2021 Alabama House District 73 Election**

25.     The second of Dr. Hood's assertions to which I respond is his identification of the election of Kenneth Paschal, a Black Republican, to the Alabama House of Representatives in 2021, as evidence that ideology is more important than race in determining white Republican voting behavior.

26.     For the reasons just explained, Mr. Paschal's election tells us very little about whether his supporters harbor racially prejudiced views. And for purposes of political science methodology, when put into context, this single election in one Alabama State House District with less than 4,000 total votes cast provides almost no insight into anything about white voters in Alabama.

27.     Additionally, Paschal's election tells us nothing about polarization between Black and white voters.

28.     Paschal is the first Black Republican elected to the Alabama Legislature in 140 years, since the end of Reconstruction. This speaks to the significant historical and contemporary challenges that Black Alabamians, including Black Republicans, face when endeavoring to engage in Alabama politics.

29.     Moreover, Paschal's win is an outlier in the field of Black Republicans who have recently run for office but lost in the primary election.[29] Below I list Black Republicans who

---

[29] *See* Cason, M. (2018, Sept. 9). Alabama Republican Chair Terry Lathan Says Party Can Do More to Recruit African-Americans, *AL.com*,
https://www.al.com/news/2018/09/alabama_republican_chair_terry.html.

**Caster Plaintiffs' Exhibit 81, Page 9**

recently ran in contested Republican primary elections.[30] Candidates in bold advanced to the general election.[31]

| Candidate Name | Election Year | Election Type | Office | Votes Received | % of Vote Received |
|---|---|---|---|---|---|
| Pamela Blackmore Jenkins | 2014 | Republican Primary | AL House Seat 46 | 389 | 4.90 |
| Philip Brown | 2014 | Republican Primary | Public Service Commission Position 2 | 43,097 | 12.58 |
| Sam Rowlin | 2014 | Republican Primary | Autauga County Sheriff | 1,610 | 18.74 |
| William McCollum | 2014 | Republican Primary | Fayette County Sheriff | 841 | 34.58 |
| B.J. Major | 2014 | Republican Primary | Cherokee County Board of Education Seat 5 | 466 | 18.64 |
| Tijuanna Adetunji | 2014 | Republican Primary | Montgomery City Council District 2 | 1410 | 13.79 |
| Ron Wilson | 2014 | Republican Primary | House District 85 | 555 | 34.22 |
| Sharica S. Long | 2018 | Republican Primary | Colbert County Circuit Clerk | 1,097 | 19.9 |
| **Phillip** | **2018** | **Republican Primary** | **Jefferson County Executive Committee, Dis 1 Pt. 2** | **797** | **46.2** |

[30] There are other candidates who are listed by the Republican party as qualifying for elections in 2014 and 2018. The results of some of these primary elections, however, are not provided in the official certification on the Alabama Secretary of State website. Although most counties do not have election websites that provide archived results, where possible, I checked county election websites. I also used the website Ballotpedia to verify the returns in primary and general elections for Black Republicans who ran in 2014 and 2018, but I did not use that website as a primary source of information. This list represents the most comprehensive set of information available in light of these data limitations.

[31] I obtained the certified elections results from the Alabama Secretary of State's public website.

**Caster Plaintiffs' Exhibit 81, Page 10**

| **Brown**[32] | | | | | |
|---|---|---|---|---|---|
| Derrick Williams | 2016 | Republican Primary | District Judge Mobile County P. 4 | 4371 | 12.3 |
| John H. Moore | 2018 | Republican Primary | Morgan County Sheriff | 319 | 1.8 |
| **Lewis Brooks**[33] | **2018** | **Republican Primary** | **Shelby County School Superintendent** | **12626** | **50.7** |
| Randy Turner | 2018 | Republican Primary | Morgan County Commissioner | 4907 | 31.9 |
| Allen Hendrickson | 2018 | Republican Primary | Houston County Commission Seat 2 | 700 | 19.2 |
| Jayla McElrath | 2018 | Republican Primary | Cherokee County Board of Elections Place 4 | 1217 | 25.9 |

30.    Finally, if we consider the vote returns from Paschal's performance in both the Republican Primary and Republican Primary runoff as a proxy for white Republican Party support of his candidacy, it is not overwhelming by any means. In the March 30, 2021 House District 73 Special Republican Primary, Paschal received just 27% of votes cast, and the remaining votes went to other candidates. Leigh Hulsey, a white candidate whom Paschal faced in the runoff, received 30.7% of votes cast in the initial primary election.[34] In the April 27 primary runoff election, Husley received 1,414 votes (48.91% of votes cast) and Paschal received 1,477 votes (51.09 % of votes

---

[32] There is no record of a runoff for this seat in the 2018 returns on the SOS website. 2018 election results are not archived on the Jefferson County Elections website (https://www.jccal.org/Default.asp?ID=1480&pg=Elections+Results). Brown, however, proceeded to the 2018 General Election, and is in bold for this reason.

[33] This election is not in the 2018 returns on the SOS website and the Shelby County Probate Office does not have an election results archive. There was no Democratic Party challenger in the general election. The information about the race is from Dawkins, S. (2018, June 5). Brooks Wins Tightly Contested Race for Superintendent of Shelby County Schools. *Shelby County Reporter*. https://www.shelbycountyreporter.com/2018/06/05/brooks-wins-tightly-contested-race-for-superintendent-of-shelby-county-schools/.

[34] Alabama Secretary of State: https://www.sos.alabama.gov/sites/default/files/election-2021/Certification%20of%20Primary%20Results.pdf).

**Caster Plaintiffs' Exhibit 81, Page 11**

cast), a difference of just 63 votes.[35] Both the overall number of ballots cast in these elections and the margins between Paschal and Hulsey are small. Using this example to extrapolate any conclusion about white voting behavior in Alabama would be scientifically unsound.

# # #

I declare under penalty of perjury that the foregoing is true and correct. I reserve the right to supplement my report in light of additional facts, testimony, and/or materials that may come to light.

Executed on: December 20, 2021

Bridgett King

---

[35] Alabama Secretary of State: https://www.sos.alabama.gov/sites/default/files/election-2021/HD73_Republican_Party-Certification_of_Results-Special_Primary_Runoff_Election.pdf.

Caster Plaintiffs' Exhibit 81, Page 12

# Exhibit 1

Caster Plaintiffs' Exhibit 82, Page 1

# REAPPORTIONMENT COMMITTEE REDISTRICTING GUIDELINES

May 5, 2021

## I. POPULATION

The total Alabama state population, and the population of defined subunits thereof, as reported by the 2020 Census, shall be the permissible data base used for the development, evaluation, and analysis of proposed redistricting plans. It is the intention of this provision to exclude from use any census data, for the purpose of determining compliance with the one person, one vote requirement, other than that provided by the United States Census Bureau.

## II. CRITERIA FOR REDISTRICTING

a.     Districts shall comply with the United States Constitution, including the requirement that they equalize total population.

b.     Congressional districts shall have minimal population deviation.

c.     Legislative and state board of education districts shall be drawn to achieve substantial equality of population among the districts and shall not exceed an overall population deviation range of ±5%.

d.     A redistricting plan considered by the Reapportionment Committee shall comply with the one person, one vote principle of the Equal Protection Clause of the 14th Amendment of the United States Constitution.

e.     The Reapportionment Committee shall not approve a redistricting plan that does not comply with these population requirements.

f.     Districts shall be drawn in compliance with the Voting Rights Act of 1965, as amended. A redistricting plan shall have neither the purpose nor the effect of diluting minority voting strength, and shall comply with Section 2 of the Voting Rights Act and the United States Constitution.

g.     No district will be drawn in a manner that subordinates race-neutral districting criteria to considerations of race, color, or membership in a language-minority group, except that race, color, or membership in a language-minority group may predominate over race-neutral districting criteria to comply with Section 2 of the Voting Rights Act, provided there is a strong basis in evidence in support of such a race-based choice. A strong basis in evidence exists when there is good reason to believe that race must be used in order to satisfy the Voting Rights Act.

10213405.2

**Caster Plaintiffs' Exhibit 82, Page 2**

h.   Districts will be composed of contiguous and reasonably compact geography.

i.   The following requirements of the Alabama Constitution shall be complied with:

(i)   Sovereignty resides in the people of Alabama, and all districts should be drawn to reflect the democratic will of all the people concerning how their governments should be restructured.

(ii)   Districts shall be drawn on the basis of total population, except that voting age population may be considered, as necessary to comply with Section 2 of the Voting Rights Act or other federal or state law.

(iii)   The number of Alabama Senate districts is set by statute at 35 and, under the Alabama Constitution, may not exceed 35.

(iv)   The number of Alabama Senate districts shall be not less than one-fourth or more than one-third of the number of House districts.

(v)   The number of Alabama House districts is set by statute at 105 and, under the Alabama Constitution, may not exceed 106.

(vi)   The number of Alabama House districts shall not be less than 67.

(vii)   All districts will be single-member districts.

(viii)  Every part of every district shall be contiguous with every other part of the district.

j.   The following redistricting policies are embedded in the political values, traditions, customs, and usages of the State of Alabama and shall be observed to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States and of the State of Alabama:

(i)    Contests between incumbents will be avoided whenever possible.

(ii)   Contiguity by water is allowed, but point-to-point contiguity and long-lasso contiguity is not.

(iii)   Districts shall respect communities of interest, neighborhoods, and political subdivisions to the extent practicable and in compliance with paragraphs a through i. A community of interest is defined as an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities. The term communities of interest may, in certain circumstances, include political subdivisions such as counties, voting

2

10213405.2

**Caster Plaintiffs' Exhibit 82, Page 3**

precincts, municipalities, tribal lands and reservations, or school districts. The discernment, weighing, and balancing of the varied factors that contribute to communities of interest is an intensely political process best carried out by elected representatives of the people.

(iv)    The Legislature shall try to minimize the number of counties in each district.

(v)    The Legislature shall try to preserve the cores of existing districts.

(vi)   In establishing legislative districts, the Reapportionment Committee shall give due consideration to all the criteria herein. However, priority is to be given to the compelling State interests requiring equality of population among districts and compliance with the Voting Rights Act of 1965, as amended, should the requirements of those criteria conflict with any other criteria.

g.    The criteria identified in paragraphs j(i)-(vi) are not listed in order of precedence, and in each instance where they conflict, the Legislature shall at its discretion determine which takes priority.

## III. PLANS PRODUCED BY LEGISLATORS

1.    The confidentiality of any Legislator developing plans or portions thereof will be respected. The Reapportionment Office staff will not release any information on any Legislator's work without written permission of the Legislator developing the plan, subject to paragraph two below.

2.    A proposed redistricting plan will become public information upon its introduction as a bill in the legislative process, or upon presentation for consideration by the Reapportionment Committee.

3.    Access to the Legislative Reapportionment Office Computer System, census population data, and redistricting work maps will be available to all members of the Legislature upon request. Reapportionment Office staff will provide technical assistance to all Legislators who wish to develop proposals.

4.    In accordance with Rule 23 of the Joint Rules of the Alabama Legislature "[a]ll amendments or revisions to redistricting plans, following introduction as a bill, shall be drafted by the Reapportionment Office." Amendments or revisions must be part of a whole plan. Partial plans are not allowed.

5.    In accordance with Rule 24 of the Joint Rules of the Alabama Legislature, "[d]rafts of all redistricting plans which are for introduction at any session of the Legislature, and which are not prepared by the Reapportionment Office, shall be presented to the Reapportionment Office for review of proper form and for entry into the Legislative Data System at least ten (10) days prior to introduction."

3

Caster Plaintiffs' Exhibit 82, Page 4

## IV. REAPPORTIONMENT COMMITTEE MEETINGS AND PUBLIC HEARINGS

1. All meetings of the Reapportionment Committee and its sub-committees will be open to the public and all plans presented at committee meetings will be made available to the public.

2. Minutes of all Reapportionment Committee meetings shall be taken and maintained as part of the public record. Copies of all minutes shall be made available to the public.

3. Transcripts of any public hearings shall be made and maintained as part of the public record, and shall be available to the public.

4. All interested persons are encouraged to appear before the Reapportionment Committee and to give their comments and input regarding legislative redistricting. Reasonable opportunity will be given to such persons, consistent with the criteria herein established, to present plans or amendments redistricting plans to the Reapportionment Committee, if desired, unless such plans or amendments fail to meet the minimal criteria herein established.

5. Notice of all Reapportionment Committee meetings will be posted on monitors throughout the Alabama State House, the Reapportionment Committee's website, and on the Secretary of State's website. Individual notice of Reapportionment Committee meetings will be sent by email to any citizen or organization who requests individual notice and provides the necessary information to the Reapportionment Committee staff. Persons or organizations who want to receive this information should contact the Reapportionment Office.

## V. PUBLIC ACCESS

1. The Reapportionment Committee seeks active and informed public participation in all activities of the Committee and the widest range of public information and citizen input into its deliberations. Public access to the Reapportionment Office computer system is available every Friday from 8:30 a.m. to 4:30 p.m. Please contact the Reapportionment Office to schedule an appointment.

2. A redistricting plan may be presented to the Reapportionment Committee by any individual citizen or organization by written presentation at a public meeting or by submission in writing to the Committee. All plans submitted to the Reapportionment Committee will be made part of the public record and made available in the same manner as other public records of the Committee.

4

**Caster Plaintiffs' Exhibit 82, Page 5**

3.      Any proposed redistricting plan drafted into legislation must be offered by a member of the Legislature for introduction into the legislative process.

4.      A redistricting plan developed outside the Legislature or a redistricting plan developed without Reapportionment Office assistance which is to be presented for consideration by the Reapportionment Committee must:

a.      Be clearly depicted on maps which follow 2020 Census geographic boundaries;

b.      Be accompanied by a statistical sheet listing total population for each district and listing the census geography making up each proposed district;

c.      Stand as a complete statewide plan for redistricting.

d.      Comply with the guidelines adopted by the Reapportionment Committee.

5.      Electronic Submissions

a.      Electronic submissions of redistricting plans will be accepted by the Reapportionment Committee.

b.      Plans submitted electronically must also be accompanied by the paper materials referenced in this section.

c.      See the Appendix for the technical documentation for the electronic submission of redistricting plans.

6.      Census Data and Redistricting Materials

a.      Census population data and census maps will be made available through the Reapportionment Office at a cost determined by the Permanent Legislative Committee on Reapportionment.

b.      Summary population data at the precinct level and a statewide work maps will be made available to the public through the Reapportionment Office at a cost determined by the Permanent Legislative Committee on Reapportionment.

c.      All such fees shall be deposited in the state treasury to the credit of the general fund and shall be used to cover the expenses of the Legislature.

## Appendix.

## ELECTRONIC SUBMISSION OF REDISTRICTING PLANS

## REAPPORTIONMENT COMMITTEE - STATE OF ALABAMA

5

10213405.2

**Caster Plaintiffs' Exhibit 82, Page 6**

1

2     The Legislative Reapportionment Computer System supports the electronic
3 submission of redistricting plans. The electronic submission of these plans must
4 be via email or a flash drive. The software used by the Reapportionment Office is
5 Maptitude.

6     The electronic file should be in DOJ format (Block, district # or district #,
7 Block). This should be a two column, comma delimited file containing the FIPS
8 code for each block, and the district number. Maptitude has an automated plan
9 import that creates a new plan from the block/district assignment list.

10     Web services that can be accessed directly with a URL and ArcView
11 Shapefiles can be viewed as overlays. A new plan would have to be built using this
12 overlay as a guide to assign units into a blank Maptitude plan. In order to analyze
13 the plans with our attribute data, edit, and report on, a new plan will have to be
14 built in Maptitude.

15     In order for plans to be analyzed with our attribute data, to be able to edit,
16 report on, and produce maps in the most efficient, accurate and time saving
17 procedure, electronic submissions are REQUIRED to be in DOJ format.

18 Example: (DOJ FORMAT BLOCK, DISTRICT #)

19 SSCCCTTTTTTBBBBDDDD

20 SS     is the 2 digit state FIPS code

21 CCC     is the 3 digit county FIPS code

22 TTTTTT     is the 6 digit census tract code

23 BBBB     is the 4 digit census block code

24 DDDD     is the district number, right adjusted

25 **Contact Information:**

26 Legislative Reapportionment Office

27 Room 317, State House

28 11 South Union Street

29 Montgomery, Alabama 36130

30 (334) 261-0706

6

10213405.2

**Caster Plaintiffs' Exhibit 82, Page 7**

1   For questions relating to reapportionment and redistricting, please contact:

2   Donna Overton Loftin, Supervisor

3   Legislative Reapportionment Office

4   donna.overton@alsenate.gov

5   Please Note: The above e-mail address is to be used only for the purposes of
6   obtaining information regarding redistricting. Political messages, including those
7   relative to specific legislation or other political matters, cannot be answered or
8   disseminated via this email to members of the Legislature. Members of the
9   Permanent Legislative Committee on Reapportionment may be contacted through
10  information contained on their Member pages of the Official Website of the
11  Alabama Legislature, legislature.state.al.us/aliswww/default.aspx.

7

Caster Plaintiffs' Exhibit 82, Page 8

Exhibit 2

FILED

2019 Dec-04  PM 01:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

United States District Court

for the Northern District of Alabama


*Chestnut v. Merrill,*

No. 2:18-cv-907-KOB


March 8, 2018

Expert Report of Maxwell Palmer, Ph.D.




Maxwell Palmer

2:18-cv-00907-KOB
11/04/2019 Bench Trial
Plaintiff Exhibit No. 79

1

Exhibit 79 pg 1 of 30

Caster Plaintiffs' Exhibit 83, Page 2

## Statement of Inquiry

1. I have been asked to evaluate the extent to which voting is racially polarized in southern Alabama, including the 1st, 2nd, 3rd, and 7th Congressional Districts under the redistricting plan enacted by the Alabama State Legislature in 2011.

## Summary of Analysis and Findings

2. I find strong evidence of racially polarized voting in the 1st, 2nd, 3rd, and 7th Congressional Districts (the Focus Area). African American and white voters consistently support different candidates. Across every election I analyzed, the African American-preferred candidate on average won 94% of the African American vote and only 17% of the white vote in the focus area.

3. African American-preferred candidates are largely unable to win elections in the focus region. Across an analysis of 18 statewide elections, the African American-preferred candidate was able to win only two. In analyses of the 2018 elections at the precinct-level, African American-preferred candidates were only able to win elections in the 7th Congressional District.

## Qualifications

4. I am currently an Assistant Professor of Political Science at Boston University. I joined the faculty at Boston University in 2014, after completing my Ph.D. in Political Science at Harvard University. In 2017 I was also appointed a Junior Faculty Fellow at the Hariri Institute for Computing at Boston University. I teach and conduct research on American politics and political methodology.

5. I have published academic work in leading peer-reviewed academic journals, including the *American Political Science Review*, *Journal of Politics*, *Journal of Empirical Legal Studies*, and *Perspectives on Politics*. I have published work on redistricting in the *Ohio State University Law Review* and the *Journal of Politics*. My curriculum vitae is attached to this report. My published research uses a variety of analytical approaches, including statistics, geographic analysis, and simulations.

6. I have served as an expert witness or litigation consultant on numerous cases involving the Voting Rights Act, including redistricting, voter identification, and early voting. I testified as an expert in redistricting and data analysis as it pertains to redistricting before the U.S. District Court for the Eastern District of Virginia in *Bethune Hill v. Virginia* (3:14-cv-00852-REP-AWA-BMK) and before the U.S. District Court for the Southern District of Mississippi in *Thomas v. Bryant* (3:18-CV-441-CWR-FKB). I worked as a data analyst assisting testifying experts in multiple cases concerning congressional and state legislative districting, including: *Perez v. Perry*, in the U.S. District Court for the Western District of Texas (No. 5:11-cv-00360); *LULAC v. Edwards Aquifer Authority* in the U.S. District Court for the Western District of Texas, San Antonio Division (No. 5:12cv620-OLG,); *Harris v. McCrory* in the U. S. District Court

2

**Exhibit 79 pg 2 of 30**

**Caster Plaintiffs' Exhibit 83, Page 3**

for the Middle District of North Carolina (No. 1:2013cv00949); *Guy v. Miller* in the U.S. District Court for Nevada (No. 11-OC-00042-1B); *In re Senate Joint Resolution of Legislative Apportionment* in the Florida Supreme Court (Nos. 2012-CA-412, 2012-CA-490); and *Romo v. Detzner* in the Circuit Court of the Second Judicial Circuit in Florida (No. 2012 CA 412).

7.   I am being compensated at a rate of $350/hour for my work in this case.

## Geographic Area and Elections Analyzed

8.   For the purpose of my analysis, I examined elections in the 1st, 2nd, 3rd, and 7th Congressional Districts.

- The 1st District includes Baldwin, Escambia, Mobile, Monroe, and Washington counties, and parts of Clarke County.

- The 2nd District includes Autauga, Barbour, Bullock, Butler, Coffee, Conecuh, Covington, Crenshaw, Dale, Elmore, Geneva, Henry, Houston, and Pike counties, and parts of Montgomery County.

- The 3rd District includes Calhoun, Chambers, Clay, Cleburne, Lee, Macon, Randolph, Russell, St. Clair, Talladega, and Tallapoosa counties, and parts of Cherokee and Montgomery counties.

- The 7th District includes Choctaw, Dallas, Greene, Hale, Lowndes, Marengo, Perry, Pickens, Sumter, and Wilcox counties, and parts of Clarke, Jefferson, Montgomery, and Tuscaloosa counties.

- I refer to the combined areas of these four congressional districts, along with the remainder of any county that is partially in these districts and other congressional districts, as the "focus area" for my analysis.[1]

9.   Figure 1 maps the focus area. The shaded portions of Figure 1 show the counties and congressional districts included in my analysis, and the solid black line marks the full boundary of each congressional district.

10.   To analyze racially polarized voting in the focus area, I examined election results from the 2012, 2014, 2016, and 2018 general elections, and the 2017 special election for U.S. Senate. I included elections for U.S. Congress (endogenous elections), and statewide elections (exogenous).[2]

---

[1] Jefferson County is split between the 6th and 7th districts, Tuscaloosa County is split between the 4th and 7th districts, and Cherokee County is split between the 3rd and 4th districts. The full counties are included in the focus area, but not in analyses of the individual districts alone.

[2] The statewide elections analyzed include elections for U.S President, U.S. Senate, Governor, Lieutenant Governor, Secretary of State, Attorney General, State Auditor, Treasurer, Commissioner of Agriculture and

3

**Exhibit 79 pg 3 of 30**

**Caster Plaintiffs' Exhibit 83, Page 4**

11.  In analyzing racially polarized voting in each election, I used a statistical procedure, ecological inference (EI), that estimates group-level preferences based on aggregate data. While the primary focus of this analysis is on racially polarized voting between African American and white voters, I also added a third group, "other", which includes Hispanics, Asians, Native Americans, and voters who did not identify their race when registering to vote, in the analysis.[3] I excluded third party and write-in candidates, and analyzed votes for the two major-party candidates in each contested election. The results of this analysis are estimates of the percentage of each group (African Americans, whites, and others) that voted for each candidate in each election. The results include both a mean estimate (the most likely vote share), and a 95% confidence interval.[4]

12.  I used ecological inference analysis on two different datasets. First, I used county-level election results and data on voter registration by race to analyze racially polarized voting at the county level for the 2012, 2014, 2016, and 2018 general elections, as well as the special election for U.S. Senate in 2017. Second, I used precinct-level data to estimate racially polarized voting at the precinct level for the 2018 general elections. Due to data constraints, I was only able to use precinct-level data for 2018. This analysis offers increased precision in my estimates of racially polarized voting because there is more information about racial voting patterns at the precinct level than at the county level.

## County-Level Analysis

13.  To analyze racially polarized voting at the county level, I relied on election results and county-level voter registration data from 2012 to 2018 from the Alabama Secretary of State.[5] The voter registration data includes voter race, based on voters' self-identified race when registering to vote.[6]

---

Industries, Chief Justice of the State Supreme Court, and Associate Justice of the State Supreme Court. I excluded elections for state legislature, as these districts partially overlap with the congressional district boundaries and include different subsets of voters in the area relevant to this case.

[3] Combining the "other" group with whites does not substantively impact the results of the analysis or alter my conclusions.

[4] The 95% confidence interval is a measure of uncertainty in the estimates from the model. For example, the model might estimate that 94% of the members of a group voted for a particular candidate, with a 95% confidence interval of 91-96%. This means that based on the data and the model assumptions, we can be 95% confident that the true level of support is in the range of 91-96%, with 94% being the most likely value. Larger confidence intervals reflect a higher degree of uncertainty in the estimates, while smaller confidence intervals reflect less uncertainty.

[5] https://www.sos.alabama.gov/alabama-votes/voter/election-data

[6] For 2018 only, the Secretary of State's website also included voter turnout by race. While I use voter registration by race in my analysis here to maintain consistency over the different election years, using turnout by race produces substantively similar results and supports the same conclusions.

4

Exhibit 79 pg 4 of 30

Caster Plaintiffs' Exhibit 83, Page 5

14. In all of the analyses below, I analyzed racially polarized voting using three demographic groups: African Americans, whites, and other. The "other" group included self-identified Hispanics, Asians, Native Americans, voters of other races, and voters whose race is unknown.[7]

15. For the county-level ecological inference analysis, I examined all of the counties in the focus area as whole, as there are not enough counties in each congressional district to analyze them separately. Consequently, I was only able to analyze the exogenous, statewide elections. For each election, I ran the ecological inference algorithm and then analyze the results.

16. Interpreting the results of the ecological inference models proceeded in two general stages. First, I examined the support for each candidate by each demographic group to determine if members of the group vote cohesively in support of a single candidate. When a significant majority of the group supports a single candidate, I can then identify that candidate as the group's "candidate of choice." If the group's support is roughly evenly divided between the two candidates, then the group does not cohesively support a single candidate and there is not an identifiable candidate of choice. Second, after identifying the candidate of choice for each group (or the lack of such a candidate), I then compared the preferences of African American and white voters. When African American and white voters share the same candidate of choice, or when one or both groups do not have an identifiable candidate of choice, then voting is not polarized. Evidence of racially polarized voting is found when African American and white candidates have different candidates of choice.

17. Figure 2 presents the results of the county-level ecological inference analyses.[8] For each contest examined, the text on the left identifies the candidate of choice for each demographic group.

18. In every election examined in the focus area, both African American and white voters have clearly identifiable candidates of choice, and in all cases African American and white voters cohesively support opposing candidates.

19. The plot to the right in each figure displays the level of support by each group for the African American candidate of choice. The estimated level of support by African American voters is depicted with a black circle, and by white voters with a white circle. The vertical lines to either side of each circle mark the bounds of the 95% confidence intervals, which reflect uncertainty in the estimate.

20. In all cases, African American voters strongly support their candidate of choice, with an average estimated vote share of 94.1%. White voters strongly oppose these candidates, with an average estimated vote share of only 16.7%.

---

[7] In 2018, voters in the "other" group made up 3.3% of registered voters statewide and 3.1% of registered voters in the focus area.

[8] Table 1 presents the numerical estimated displayed in Figure 2.

**Exhibit 79 pg 5 of 30**

**Caster Plaintiffs' Exhibit 83, Page 6**

21. These results demonstrate high levels of racially polarized voting in the focus area.

22. Having identified the African American candidate of choice in each contest, I now turn to their ability to win elections in these districts. Table 2 presents the results of each election in the forty-five counties constituting the focus area. For each election, I calculate the vote share obtained by the African American and white-preferred candidates.

23. Across all 23 statewide contests analyzed, the African American-preferred candidate won only twice. In all other cases, the white-preferred candidate won the majority of the vote.

24. The African American-preferred candidate won the majority of the vote in the focus area in only two contests: the 2012 election for Chief Justice of the Alabama Supreme Court, and the 2017 special election for U.S. Senate. In both cases, the white-preferred candidate was Roy Moore, a former Chief Justice of the Alabama Supreme Court. Moore is a uniquely controversial figure in Alabama politics, having been removed from his position on the Supreme Court in 2003, and later suspended from his position on the Supreme Court in 2016 following his 2012 election. In the 2017 U.S. Senate election, Moore was also accused of sexual assault and misconduct by several women.[9] Moore's unique unpopularity is highlighted by a recent statement of the National Republican Senate Committee on the 2020 Senate race: "'The NRSC's official stance is ABRM: anyone but Roy Moore,' said Kevin McLaughlin, the committee's executive director. 'The only thing Doug Jones and I agree on is that his only prayer for electoral success in 2020 is a rematch with Roy Moore.'"[10]

## Precinct-Level Analysis

25. The previous analysis at the county level provides strong evidence of racial polarization and the inability of African American-preferred candidates to win in most elections due to white bloc voting. I supplement that analysis here with a precinct-level analysis of the 2018 general election. Precinct-level analysis offers two advantages. First, I am able to analyze the endogenous elections for U.S. House in each district. Second, due to the larger number of data points at the precinct level, I am able to measure racially polarized voting in each congressional district separately, as well as in the focus area as a whole.

26. To analyze racially polarized voting at the precinct level, I relied primarily on two data sources:

---

[9] Notwithstanding these potentially distinguishing features of Mr. Moore's candidacy, 70.9% of white voters voted for Moore in 2012 and 66.3% of white voters voted for Moore in 2017. *See* Table 1.

[10] https://www.politico.com/newsletters/playbook-pm/2019/02/28/netanyahu-indicted-pelosi-attempts-to-wrangle-dems-and-says-noko-won-the-summit-401605?tab=most-read

**Exhibit 79 pg 6 of 30**

Caster Plaintiffs' Exhibit 83, Page 7

– Precinct-level elections results for the 2018 general election from the Alabama Secretary of State.[11]

– A snapshot of the Alabama voter file following the 2018 general election, provided by the Alabama Secretary of State, dated January 3, 2019. This file lists every individual voter in Alabama as of January 3, their self-identified race, county, voting precinct, and whether they voted in the 2018 general election. This file is used to estimate the percentage of registered voters by race in each precinct for the 2018 election.[12]

27. There are several challenges in combining the voter file snapshot and the precinct election returns into a cohesive dataset for analyzing racially polarized voting. First, I use the voter file to estimate the number of registered voters, by race, in each election precinct. The available voter file is dated two months after the election. This is necessary because, due to how the statewide voter file is administered in Alabama, there is a lag between the date of the election and when counties report voter participation for each voter.[13] The state identified the January 3, 2019 voter file as the snapshot closest to the election with the appropriate voter history data. Such a lag means that voters who died or moved out of state (or otherwise became non-voters) after the election may not be included. Voters who moved and re-registered to vote after the election may now be assigned a different precinct.

28. While this time difference may introduce some small inaccuracies to the count of voters by race in each precinct, these differences are not substantively meaningful. To test for changes in registered voters by race, I compared the percentage of African American and white registered voters in each county, from November 2018 to January 2019, based on registration reports from the Alabama Secretary of State. In every county in the focus area, the demographics of registered voters are essentially the same; the largest change of any racial group in any county was less than 0.25 percentage points.

29. The second challenge in assembling precinct-level data is matching the precincts in the voter file to the precincts in the election returns. For some counties this is a

---

[11] https://www.sos.alabama.gov/alabama-votes/voter/election-data

[12] This file, along with voter snapshot files for the 2012, 2014, and 2016 elections, were provided to me on February 15, 2019. As described below, working with these files and matching the voter registration precincts to the precinct-level election returns is a slow and time-consuming process. Additionally, the file matching precincts in the voter file to precincts in the election returns in some counties, *see supra* n.14, was provided to me on February 19, 2019, and then, too, only for 2018 elections. Consequently, I was only able to assemble data for the 2018 election.

[13] Source: Email from Jim Davis (Alabama Attorney General's Office) to counsel, Feb. 11, 2019: "The voter registration database contains fields for the elections in which a voter has cast a ballot, but that information is not uploaded instantaneously. Local election officials update that information for each election, and it takes several weeks for that to happen. That means that a copy of the database saved the day after the election would not contain the information you requested; we have to go several weeks after the election to be confident that local officials have had enough time to update the voter records."

**Exhibit 79 pg 7 of 30**

Caster Plaintiffs' Exhibit 83, Page 8

straightforward task, as the precincts in both data sources use the same names. In other cases names are spelled differently, different abbreviations are used, or precincts are identified using a mix of precinct names and numbers, such that the two data sets must be carefully matched together, one precinct at a time.[14] However, some counties could not be matched because the voter file included only precinct numbers, the election returns included only precinct names, and I did not have a way to match these together.[15] Additionally, there were 20 precincts in the voter file across the other counties that could not be matched because there was not a correspondingly named precinct in the election returns. Finally, I removed an additional 18 precincts from the dataset where the number of voters in the voter file was less than 75% of the number of votes cast for that precinct in the election returns.

30. Overall, I was able to match voter file precincts to election return precincts for more than 90% of the 2018 general election voters from the voter file, and for more than 90% of the ballots cast from the precinct-level election returns. The unmatched areas are demographically similar to those that are matched. 90.4% of Black voters and 90.4% of white voters were matched to their election precinct. Consequently, the unmatched precincts should not bias the results of the ecological inference analysis.

31. Absentee and provisional ballots are recorded at the county level rather than the precinct level. I assigned absentee and provision votes for each candidate to individual precincts based on the precinct's share of the total in-precinct votes cast for that candidate in each county.[16]

32. Figures 3–7 present the results of the precinct-level ecological inference analyses.[17] The first four figures present ecological inference estimates for each congressional district area separately. Figure 7 examines the entire focus area (statewide races only). For each contest examined, the text on the left identifies the candidate of choice for each demographic group.

33. In every election examined, in each congressional district and in the focus area as a whole, both African American and white voters have clearly identifiable candidates of choice, and in all cases African American and white voters cohesively support opposing candidates.

---

[14] Some of the matching was facilitated using a file provided by the defendant that provided precinct names and numbers for some counties.

[15] The following counties could not be matched and are excluded from the precinct-level analysis: Calhoun, Cherokee, Covington, Hale, Henry, Macon, Perry, Russell, Sumter, and Wilcox. Wilcox is excluded because there were a large number of precinct names that did not match between the two files.

[16] Assigning absentee and provisional ballots to precincts has little impact on the ecological inference results; excluding these ballots does not substantively alter my results or conclusions.

[17] Footnote: Tables 3–7 present the numerical estimated displayed in Figures 3–7.

8

Exhibit 79 pg 8 of 30

Caster Plaintiffs' Exhibit 83, Page 9

34. The plot to the right in each figure displays the level of support by each group for the African American candidate of choice. The estimated level of support by African American voters is depicted with a black circle, and by white voters with a white circle. The vertical lines to either side of each circle mark the bounds of the 95% confidence intervals, which reflect uncertainty in the estimate.

35. In all cases, African American voters strongly support their candidate of choice, with an average estimated vote share in the focus area of 98.3%. White voters strongly oppose these candidates, with an average estimated vote share in the focus area of only 17.4%.

36. These results demonstrate high levels of racially polarized voting in the focus area and each congressional district individually. The average difference in support for the African American candidate of choice in each district was 78.7 percentage points in CD 1, 85.7 percentage points in CD 2, 81.9 percentage points in CD 3, 77.9 percentage points in CD 7, and 80.9 percentage points in the focus area.

37. Having identified the African American candidate of choice in each contest, I now turn to their ability to win elections in these districts. Table 8 presents the actual results of each election in each of the four congressional districts. For each election, I calculate the vote share obtained by the African American and white-preferred candidates.

38. In the 1st, 2nd, and 3rd Congressional Districts, the African American-preferred candidates lose the elections for U.S. House, as well as all seven statewide contests. In the 7th Congressional District alone, the African-American preferred candidate is able to win each election by large margins.[18]

39. The precinct-level analysis is fully consistent with the results of the county-level analysis. When comparing the racial polarization estimates for the focus area, the two analyses produce similar results and both analyses support the same conclusion: there is a high level of racially polarized voting in the focus area.

---

[18] The African American candidates of choice won at least 70% of the vote in District 7 in every contest analyzed.

**Exhibit 79 pg 9 of 30**

**Caster Plaintiffs' Exhibit 83, Page 10**



*Figure 1: Map of Focus Area*

**Exhibit 79 pg 10 of 30**

**Caster Plaintiffs' Exhibit 83, Page 11**



*Figure 2: County-Level Ecological Inference Results*

* indicates African American candidates.

11

**Exhibit 79 pg 11 of 30**

**Caster Plaintiffs' Exhibit 83, Page 12**



*Figure 3: 2018 Precinct-Level Ecological Inference Results - CD 1*

*\* indicates African American candidates.*

**Exhibit 79 pg 12 of 30**

**Caster Plaintiffs' Exhibit 83, Page 13**



*Figure 4: 2018 Precinct-Level Ecological Inference Results - CD 2*

*\* indicates African American candidates.*

13

**Exhibit 79 pg 13 of 30**

**Caster Plaintiffs' Exhibit 83, Page 14**



*Figure 5: 2018 Precinct-Level Ecological Inference Results - CD 3*

*\* indicates African American candidates.*

**Exhibit 79 pg 14 of 30**

**Caster Plaintiffs' Exhibit 83, Page 15**



*Figure 6: 2018 Precinct-Level Ecological Inference Results - CD 7*

*\* indicates African American candidates.*

**Exhibit 79 pg 15 of 30**

**Caster Plaintiffs' Exhibit 83, Page 16**



*Figure 7: 2018 Precinct-Level Ecological Inference Results - Focus Area*

*\* indicates African American candidates.*

16

**Exhibit 79 pg 16 of 30**

**Caster Plaintiffs' Exhibit 83, Page 17**

*Table 1: County-Level Ecological Inference Results*

| Year | Election | Black Cand. of Choice | White Cand. of Choice | % Voting for Black Candidate of Choice | | |
|---|---|---|---|---|---|---|
| | | | | Black | White | Other |
| 2012 | U.S. President | Obama* | Romney | 96.7 (92.8, 99.0) | 14.7 (12.8, 17.3) | 62.7 (30.6, 91.8) |
| | Supreme Ct., Chief | Vance | Moore | 95.5 (90.8, 98.9) | 29.1 (26.8, 31.9) | 55.6 (25.3, 85.1) |
| 2014 | Governor | Griffith | Bentley | 87.1 (81.6, 93.1) | 16.4 (13.1, 19.4) | 53.4 (20.8, 84.4) |
| | Lt. Governor | Fields* | Ivey | 93.5 (88.3, 97.1) | 10.6 (8.2, 13.3) | 55.8 (12.6, 87.1) |
| | Attorney General | Hubbard | Strange | 94.3 (85.5, 98.4) | 19.6 (16.5, 24.8) | 52.8 (19.4, 85.4) |
| | Sec. of State | Albert-Kaigler* | Merrill | 95.6 (91.8, 98.2) | 8.8 (7.1, 11.2) | 60.5 (24.6, 86.2) |
| | State Auditor | Joseph* | Zeigler | 94.0 (88.0, 98.1) | 11.8 (8.4, 16.0) | 55.1 (22.6, 87.1) |
| | Comm. Agriculture | Smith | McMillan | 94.1 (88.1, 97.3) | 9.1 (6.8, 12.8) | 57.9 (21.7, 85.6) |
| 2016 | U.S. President | Clinton | Trump | 94.6 (89.7, 98.3) | 12.2 (9.8, 15.2) | 57.1 (25.8, 82.3) |
| | U.S. Senator | Crumpton | Shelby | 88.4 (84.7, 92.2) | 15.2 (12.6, 17.8) | 68.8 (34.9, 90.5) |
| 2017 | U.S. Senator | Jones | Moore | 95.4 (91.1, 98.4) | 33.7 (31.5, 36.4) | 57.4 (25.3, 86.9) |
| 2018 | Governor | Maddox | Ivey | 93.9 (88.5, 97.5) | 17.8 (15.2, 20.5) | 65.1 (28.8, 93.7) |
| | Lt. Governor | Boyd* | Ainsworth | 97.1 (94.7, 98.9) | 13.6 (12.1, 15.5) | 71.1 (35.7, 92.8) |
| | Attorney General | Siegelman | Marshall | 91.7 (84.3, 98.7) | 21.6 (16.2, 26.4) | 63.0 (31.0, 88.2) |
| | Sec. of State | Milam | Merrill | 96.0 (93.2, 98.4) | 14.0 (12.3, 15.9) | 74.4 (44.7, 93.2) |
| | State Auditor | Joseph* | Zeigler | 94.2 (88.7, 98.8) | 16.9 (13.5, 20.3) | 65.3 (34.0, 90.4) |
| | Supreme Ct., Chief | Vance | Parker | 96.3 (92.8, 98.8) | 20.2 (18.5, 22.3) | 67.8 (37.7, 90.2) |
| | Supreme Ct., Place 4 | Smalley | Mitchell | 95.1 (90.5, 98.2) | 15.5 (13.2, 18.3) | 71.4 (43.3, 91.7) |

Exhibit 79 pg 17 of 30

Caster Plaintiffs' Exhibit 83, Page 18

*Table 2: Actual Election Results*
\* indicates African American candidates

| Contest | Black Preferred Cand. Name | Vote Share | White Preferred Cand. Name | Vote Share |
|---|---|---|---|---|
| 2012 U.S. President | Obama* | 43.9 | Romney | 56.1 |
| 2012 Supreme Ct., Chief | Vance | 52.5 | Moore | 47.5 |
| 2014 Governor | Griffith | 41.8 | Bentley | 58.2 |
| 2014 Lt. Governor | Fields* | 40.9 | Ivey | 59.1 |
| 2014 Attorney General | Hubbard | 46.8 | Strange | 53.2 |
| 2014 Sec. of State | Albert-Kaigler* | 40.5 | Merrill | 59.5 |
| 2014 State Auditor | Joseph* | 41.6 | Zeigler | 58.4 |
| 2014 Comm. Agriculture | Smith | 40.1 | McMillan | 59.9 |
| 2016 U.S. President | Clinton | 41.4 | Trump | 58.6 |
| 2016 U.S. Senator | Crumpton | 41.0 | Shelby | 59.0 |
| 2017 U.S. Senator | Jones | 56.0 | Moore | 44.0 |
| 2018 Governor | Maddox | 45.4 | Ivey | 54.6 |
| 2018 Lt. Governor | Boyd* | 44.0 | Ainsworth | 56.0 |
| 2018 Attorney General | Siegelman | 46.4 | Marshall | 53.6 |
| 2018 Sec. of State | Milam | 44.2 | Merrill | 55.8 |
| 2018 State Auditor | Joseph* | 44.7 | Zeigler | 55.3 |
| 2018 Supreme Ct., Chief | Vance | 47.8 | Parker | 52.2 |
| 2018 Supreme Ct., Place 4 | Smalley | 44.5 | Mitchell | 55.5 |

**Table 3: 2018 Precinct-Level Ecological Inference Results - CD 1**
\* indicates African American candidates

| Election | Black Cand. of Choice | White Cand. of Choice | % Voting for Black Candidate of Choice | | |
| --- | --- | --- | --- | --- | --- |
| | | | Black | White | Other |
| U.S. House | Kennedy* | Byrne | 96.5 (94.5, 97.9) | 15.2 (14.4, 16.0) | 70.8 (51.8, 86.6) |
| Governor | Maddox | Ivey | 95.6 (93.5, 97.2) | 18.7 (17.8, 19.7) | 73.2 (50.3, 89.3) |
| Lt. Governor | Boyd* | Ainsworth | 96.6 (94.5, 98.0) | 16.2 (15.4, 17.1) | 71.6 (49.3, 89.4) |
| Attorney General | Siegelman | Marshall | 96.9 (95.1, 98.2) | 19.7 (19.0, 20.5) | 77.3 (59.5, 90.3) |
| Sec. of State | Milam | Merrill | 96.4 (94.5, 97.9) | 16.5 (15.8, 17.4) | 74.8 (53.6, 89.2) |
| State Auditor | Joseph* | Zeigler | 96.6 (94.6, 98.0) | 17.4 (16.6, 18.3) | 73.3 (52.9, 88.3) |
| Supreme Ct., Chief | Vance | Parker | 96.7 (94.7, 98.1) | 22.0 (21.3, 22.9) | 77.1 (59.4, 91.6) |
| Supreme Ct., Place 4 | Smalley | Mitchell | 96.9 (95.0, 98.2) | 16.7 (16.0, 17.6) | 74.8 (53.0, 89.2) |

**Exhibit 79 pg 19 of 30**

**Caster Plaintiffs' Exhibit 83, Page 20**

20

Exhibit 79 pg 20 of 30

*Table 4: 2018 Precinct-Level Ecological Inference Results - CD 2*
* indicates African American candidates

| Election | Black Cand. of Choice | White Cand. of Choice | % Voting for Black Candidate of Choice | | |
|---|---|---|---|---|---|
| | | | Black | White | Other |
| U.S. House | Isner | Roby | 97.5 (96.4, 98.4) | 13.8 (13.2, 14.5) | 79.2 (62.9, 90.4) |
| Governor | Maddox | Ivey | 96.9 (95.6, 97.9) | 10.0 (9.3, 10.7) | 80.0 (62.1, 91.8) |
| Lt. Governor | Boyd* | Ainsworth | 97.5 (96.4, 98.3) | 9.8 (9.2, 10.4) | 86.3 (71.0, 94.9) |
| Attorney General | Siegelman | Marshall | 97.6 (96.5, 98.5) | 14.6 (13.9, 15.3) | 78.4 (60.3, 90.0) |
| Sec. of State | Milam | Merrill | 97.5 (96.4, 98.3) | 10.1 (9.6, 10.8) | 83.3 (68.9, 92.7) |
| State Auditor | Joseph* | Zeigler | 97.5 (96.4, 98.3) | 11.5 (10.9, 12.1) | 83.4 (70.6, 92.1) |
| Supreme Ct., Chief | Vance | Parker | 97.4 (96.1, 98.3) | 14.1 (13.5, 14.8) | 81.8 (66.6, 92.2) |
| Supreme Ct., Place 4 | Smalley | Mitchell | 97.6 (96.5, 98.4) | 10.4 (9.9, 11.0) | 86.0 (73.4, 93.8) |

21

*Table 5: 2018 Precinct-Level Ecological Inference Results - CD 3*
\* indicates African American candidates.

| Election | Black Cand. of Choice | White Cand. of Choice | % Voting for Black Candidate of Choice | | |
|---|---|---|---|---|---|
| | | | Black | White | Other |
| U.S. House | Hagan | Rogers | 96.7 (94.7, 98.1) | 14.2 (13.6, 15.0) | 82.5 (64.4, 93.4) |
| Governor | Maddox | Ivey | 96.3 (94.0, 97.9) | 14.9 (14.2, 15.8) | 76.8 (55.3, 91.0) |
| Lt. Governor | Boyd* | Ainsworth | 97.1 (95.0, 98.4) | 13.3 (12.7, 14.0) | 83.2 (65.9, 93.7) |
| Attorney General | Siegelman | Marshall | 96.7 (94.6, 98.2) | 16.0 (15.3, 16.9) | 79.0 (55.9, 92.8) |
| Sec. of State | Milam | Merrill | 97.2 (95.4, 98.5) | 13.9 (13.2, 14.6) | 80.7 (62.1, 93.0) |
| State Auditor | Joseph* | Zeigler | 96.6 (94.7, 98.1) | 14.4 (13.7, 15.2) | 80.1 (60.4, 92.2) |
| Supreme Ct., Chief | Vance | Parker | 96.6 (94.4, 98.1) | 18.3 (17.5, 19.2) | 77.7 (54.9, 92.0) |
| Supreme Ct., Place 4 | Smalley | Mitchell | 97.1 (95.2, 98.4) | 14.1 (13.4, 14.9) | 81.4 (61.3, 93.6) |

**Exhibit 79 pg 21 of 30**

**Caster Plaintiffs' Exhibit 83, Page 22**

Exhibit 79 pg 22 of 30

Table 6: 2018 Precinct-Level Ecological Inference Results - CD 7

\* indicates African American candidates.

| Election | Black Cand. of Choice | White Cand. of Choice | % Voting for Black Candidate of Choice | | |
|---|---|---|---|---|---|
| | | | Black | White | Other |
| Governor | Maddox | Ivey | 97.5 (96.8, 98.2) | 22.2 (20.0, 24.5) | 49.5 (31.5, 70.7) |
| Lt. Governor | Boyd* | Ainsworth | 98.7 (98.1, 99.1) | 18.7 (17.0, 20.6) | 70.4 (59.1, 82.0) |
| Attorney General | Siegelman | Marshall | 98.7 (98.1, 99.1) | 22.6 (20.9, 24.6) | 74.7 (64.2, 85.0) |
| Sec. of State | Milam | Merrill | 98.7 (98.1, 99.1) | 18.0 (16.3, 19.8) | 70.8 (58.9, 83.1) |
| State Auditor | Joseph* | Zeigler | 98.6 (98.1, 99.0) | 19.0 (17.4, 20.9) | 69.0 (58.0, 80.0) |
| Supreme Ct., Chief | Vance | Parker | 98.7 (98.2, 99.1) | 23.8 (22.0, 25.8) | 80.1 (69.9, 90.1) |
| Supreme Ct., Place 4 | Smalley | Mitchell | 98.7 (98.2, 99.1) | 20.0 (18.4, 21.8) | 75.9 (66.3, 85.0) |

Caster Plaintiffs' Exhibit 83, Page 23

23

*Table 7: 2018 Precinct-Level Ecological Inference Results - Focus Area*
\* indicates African American candidates.

| Election | Black Cand. of Choice | White Cand. of Choice | % Voting for Black Candidate of Choice | | |
|---|---|---|---|---|---|
| | | | Black | White | Other |
| Governor | Maddox | Ivey | 97.0 (96.4, 97.5) | 18.0 (17.6, 18.4) | 88.3 (80.3, 93.4) |
| Lt. Governor | Boyd* | Ainsworth | 98.4 (98.0, 98.7) | 15.4 (15.0, 15.7) | 87.1 (80.1, 91.9) |
| Attorney General | Siegelman | Marshall | 98.8 (98.4, 99.1) | 18.9 (18.5, 19.2) | 88.0 (81.7, 93.0) |
| Sec. of State | Milam | Merrill | 98.4 (98.1, 98.8) | 15.5 (15.1, 15.8) | 86.9 (80.8, 92.1) |
| State Auditor | Joseph* | Zeigler | 98.3 (97.9, 98.7) | 16.4 (16.1, 16.8) | 87.9 (82.3, 92.4) |
| Supreme Ct., Chief | Vance | Parker | 98.5 (98.1, 98.9) | 21.2 (20.8, 21.6) | 89.5 (84.6, 93.3) |
| Supreme Ct., Place 4 | Smalley | Mitchell | 98.5 (98.1, 98.8) | 16.1 (15.8, 16.5) | 89.4 (84.5, 93.2) |

**Exhibit 79 pg 23 of 30**

**Caster Plaintiffs' Exhibit 83, Page 24**

Table 8: 2018 Election Results by Congressional District

| Contest | Black Pref. Cand. | White Pref. Cand. | CD 1 | | CD 2 | | CD 3 | | CD 7 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Black | White | Black | White | Black | White | Black | White |
| U.S. House, Dist. 1 | Kennedy* | Byrne | 36.8 | 63.2 | | | | | | |
| U.S. House, Dist. 2 | Isner | Roby | | | 37.6 | 62.4 | | | | |
| U.S. House, Dist. 3 | Hagan | Rogers | | | | | 35.9 | 64.1 | | |
| Governor | Maddox | Ivey | 39.3 | 60.7 | 34.9 | 65.1 | 36.2 | 63.8 | 71.8 | 28.2 |
| Lt. Governor | Boyd* | Ainsworth | 37.6 | 62.4 | 34.9 | 65.1 | 35.4 | 64.6 | 71.4 | 28.6 |
| Attorney General | Siegelman | Marshall | 40.2 | 59.8 | 38.1 | 61.9 | 37.2 | 62.8 | 72.7 | 27.3 |
| Sec. of State | Milam | Merrill | 37.8 | 62.2 | 35.1 | 64.9 | 35.6 | 64.4 | 71.2 | 28.8 |
| State Auditor | Joseph* | Zeigler | 38.5 | 61.5 | 35.9 | 64.1 | 35.9 | 64.1 | 71.5 | 28.5 |
| Supreme Ct., Chief | Vance | Parker | 41.8 | 58.2 | 37.5 | 62.5 | 38.7 | 61.3 | 73.3 | 26.7 |
| Supreme Ct., Place 4 | Smalley | Mitchell | 38.0 | 62.0 | 35.3 | 64.7 | 35.8 | 64.2 | 71.9 | 28.1 |

This table lists the vote shares received by the Black- and white-preferred candidates in each 2018 election contest by congressional district. The second and third columns identify the preferred candidates of each group, which are the same in each congressional district. The following columns list the vote shares received by the black- and white-preferred candidates in each district. Precincts split between multiple congressional districts are excluded. All of Cherokee County is included in CD 3. * indicates African American candidates.

24

Exhibit 79 pg 24 of 30

# Maxwell Palmer

| | |
|---|---|
| CONTACT | Department of Political Science   *E-mail:* mbpalmer@bu.edu |

CONTACT

Department of Political Science
Boston University
232 Bay State Road
Boston, MA 02215

*E-mail:* mbpalmer@bu.edu
*Website:* www.maxwellpalmer.com
*Phone:* (617) 358-2654

APPOINTMENTS

**Boston University**, Boston, Massachusetts

Assistant Professor, Department of Political Science, 2014–Present

Junior Faculty Fellow, Hariri Institute for Computing, 2017–Present

EDUCATION

**Harvard University**, Cambridge, Massachusetts

Ph.D., Political Science, May 2014.

A.M., Political Science, May 2012.

**Bowdoin College**, Brunswick, Maine

A.B., Mathematics & Government and Legal Studies, May 2008.

REFEREED PUBLICATIONS

Palmer, Maxwell and Benjamin Schneer. Forthcoming. "Post-Political Careers: How Politicians Capitalize on Public Office." *Journal of Politics.*

Einstein, Katherine Levine, Maxwell Palmer, and David M. Glick. 2019. "Who Participates in Local Government? Evidence from Meeting Minutes." *Perspectives on Politics* 17(1): 28–46.

Einstein, Katherine Levine, David M. Glick, and Maxwell Palmer. 2019. "City Learning: Evidence of Policy Information Diffusion From a Survey of U.S. Mayors." *Political Research Quarterly* 72(1): 243–258.

Einstein, Katherine Levine, David M. Glick, Maxwell Palmer, and Robert Pressel. Forthcoming. "Do Mayors Run for Higher Office? New Evidence on Progressive Ambition." *American Politics Research.*

Ansolabehere, Stephen, Maxwell Palmer and Benjamin Schneer. 2018. "Divided Government and Significant Legislation, A History of Congress from 1789-2010." *Social Science History* 42(1): 81–108.

Edwards, Barry, Michael Crespin, Ryan D. Williamson, and Maxwell Palmer. 2017. "Institutional Control of Redistricting and the Geography of Representation." *Journal of Politics* 79(2): 722–726.

Palmer, Maxwell. 2016. "Does the Chief Justice Make Partisan Appointments to Special Courts and Panels?" *Journal of Empirical Legal Studies* 13(1): 153–177.

**Exhibit 79 pg 25 of 30**

**Caster Plaintiffs' Exhibit 83, Page 26**

Palmer, Maxwell and Benjamin Schneer. 2016. "Capitol Gains: The Returns to Elected Office from Corporate Board Directorships." *Journal of Politics* 78(1): 181–196.

Gerring, John, Maxwell Palmer, Jan Teorell, and Dominic Zarecki. 2015. "Demography and Democracy: A Global, District-level Analysis of Electoral Contestation." *American Political Science Review* 109(3): 574–591.

|  |  |
|---|---|
| BOOK MANUSCRIPT | *Neighborhood Defenders: Participatory Politics and America's Housing Crisis* (with Katherine Levine Einstein and David M. Glick). Under Contract, Cambridge University Press. |
| OTHER PUBLICATIONS | Ansolabehere, Stephen and Maxwell Palmer. 2016. "A Two Hundred-Year Statistical History of the Gerrymander." *Ohio State Law Journal* 77(4): 741–762. |
|  | Ansolabehere, Stephen, Maxwell Palmer, and Benjamin Schneer. 2016. "What Has Congress Done?" in *Governing in a Polarized Age: Elections, Parties, and Political Representation in America*, eds. Alan Gerber and Eric Schickler. New York, NY: Cambridge University Press. |
| POLICY REPORTS | Einstein, Katherine Levine, David Glick, and Maxwell Palmer. 2018. "2017 Menino Survey of Mayors." Research Report. Boston University Initiative on Cities. |
| WORKING PAPERS | "Rainmakers: Former Politicians as Lobbyists" (with Pamela Ban and Benjamin Schneer). Invited to Revise and Resubmit, *Legislative Studies Quarterly*. |
|  | "Racial Disparities in Housing Politics: Evidence from Administrative Data" (with Katherine Levine Einstein and David M. Glick). *Under Review*. |
|  | "The Gender Pay Gap in Congressional Offices" (with Joshua McCrain). |
|  | "Descended from Immigrants and Revolutionists: How Immigrant Experience Shapes Congressional Decision-making on Immigration Votes" (with James Feigenbaum and Benjamin Schneer). |
|  | "Reexamining the Gender Gap in Support of War" (with Katherine Krimmel and Douglas Kriner). |
|  | "Corporate Political Activity as a Bundle of Goods" (with Daniel Moskowitz and Benjamin Schneer). |
| GRANTS AND AWARDS | The Rockefeller Foundation, "Menino Survey of Mayors" (Co-principal investigator). 2017. $325,000. |
|  | Hariri Institute for Computing, Boston University. Junior Faculty Fellow. 2017. |

**Exhibit 79 pg 26 of 30**

**Caster Plaintiffs' Exhibit 83, Page 27**

$10,000.

The Rockefeller Foundation, "2017 Menino Survey of Mayors" (Co-principal investigator). 2017. $100,000.

The Center for Finance, Law, and Policy, Boston University, Research Grant for "From the Capitol to the Boardroom: The Returns to Office from Corporate Board Directorships," 2015.

Senator Charles Sumner Prize, Dept. of Government, Harvard University. 2014.
*Awarded to the best dissertation "from the legal, political, historical, economic, social or ethnic approach, dealing with means or measures tending toward the prevention of war and the establishment of universal peace."*

The Center for American Political Studies, Dissertation Research Fellowship on the Study of the American Republic, 2013–2014.

The Tobin Project, Democracy and Markets Graduate Student Fellowship, 2013–2014.

The Dirksen Congressional Center, Congressional Research Award, 2013.

The Institute for Quantitative Social Science, Conference Travel Grant, 2014.

The Center for American Political Studies, Graduate Seed Grant for "Capitol Gains: The Returns to Elected Office from Corporate Board Directorships," 2014.

The Institute for Quantitative Social Science, Research Grant, 2013.

Bowdoin College: High Honors in Government and Legal Studies; Philo Sherman Bennett Prize for Best Honors Thesis in the Department of Government, 2008.

SELECTED PRESENTATIONS

"The Participatory Politics of Housing," Government Accountability Office Seminar, 2018.

"Descended from Immigrants and Revolutionists: How Immigrant Experience Shapes Immigration Votes in Congress," Congress and History Conference, Princeton University, 2018.

"Identifying Gerrymanders at the Micro- and Macro-Level." Hariri Institute for Computing, Boston University, 2018.

"Descended from Immigrants and Revolutionists: How Immigrant Experience Shapes Immigration Votes in Congress," Annual Meeting of the Southern Political Science Association, New Orleans, LA, 2018.

**Exhibit 79 pg 27 of 30**

**Caster Plaintiffs' Exhibit 83, Page 28**

"How Institutions Enable NIMBYism and Obstruct Development," Boston Area Research Initiative Spring Conference, Northeastern University, 2017.

"Corporate Political Activity as a Bundle of Goods," Annual Meeting of the American Political Science Association, Philadelphia, PA, 2016.

"Congressional Gridlock," American Studies Summer Institute, John F. Kennedy Presidential Library and Museum, 2016.

"Capitol Gains: The Returns to Elected Office from Corporate Board Directorships," Microeconomics Seminar, Department of Economics, Boston University, 2015.

"The Corporate Boardroom's Revolving Door," Annual Meeting of the American Political Science Association, San Francisco, CA, 2015.

"The Corporate Boardroom's Revolving Door," Annual Meeting of the European Political Science Association, Vienna, Austria, 2015.

"A Two Hundred-Year Statistical History of the Gerrymander," Congress and History Conference, Vanderbilt University, 2015.

"A New (Old) Standard for Geographic Gerrymandering," Harvard Ash Center Workshop: How Data is Helping Us Understand Voting Rights After Shelby County, 2015.

"Capitol Gains: The Returns to Elected Office from Corporate Board Directorships," Boston University Center for Finance, Law, and Policy, 2015.

"Does the Chief Justice Make Partisan Appointments to Special Courts and Panels?" Annual Meeting of the American Political Science Association, Washington, DC, 2014.

"Capitol Gains: The Returns to Elected Office from Corporate Board Directorships," Annual Meeting of the Midwest Political Science Association, Chicago, IL, 2014.

"Capitol Gains: The Returns to Elected Office from Corporate Board Directorships," Bowdoin College, 2014.

"Corporate Boards as Legislatures," Annual Meeting of the Southern Political Science Association, New Orleans, LA, 2014.

"Presidential Legacies and Partisan Balance on the Federal Courts," Annual Meeting of the Southern Political Science Association, New Orleans, LA, 2014.

"Time and Political Power: Setting the Calendar in a Busy Legislature," Annual Meeting of the Midwest Political Science Association, Chicago, IL, 2013.

**Exhibit 79 pg 28 of 30**

**Caster Plaintiffs' Exhibit 83, Page 29**

"Using Multiple Elections to Evaluate Districting Maps," Annual Meeting of the Midwest Political Science Association, Chicago, IL, 2012.

**Exhibit 79 pg 29 of 30**

**Caster Plaintiffs' Exhibit 83, Page 30**

TEACHING     Boston Univeristy
  – *Introduction to American Politics* (Fall 2014, Fall 2015, Fall 2016, Fall 2017)
  – *Congress and Its Critics* (Fall 2014, Spring 2015, Spring 2017)
  – *Formal Political Theory* (Spring 2015, Spring 2017)
  – *Prohibition, Regulation, and Bureaucracy* (Fall 2015)
  – *Political Analysis* (Fall 2016, Fall 2017)

  Harvard University
  – *American Government* (Head Teaching Fellow, Fall 2012 and Fall 2013)
  – *The Politics of Congress* (Head Teaching Fellow, Spring 2013).
  – *Introduction to Congress* (Teaching Fellow, Spring 2012).

SERVICE      Boston University
  – College of Arts and Sciences

    – General Education Curriculum Committee, 2017–2018.

  – Department of Political Science

    – Co-organizer, Research in American Politics Workshop, 2016–2018.
    – American Politics Search Committee, 2017.
    – American Politics Search Committee, 2016.
    – Graduate Program Committee, 2014–2015.

  Co-organizer, *Boston University Local Political Economy Conference*, August 29, 2018.

  Reviewer: *American Journal of Political Science*; *American Political Science Review*; *Journal of Politics*; *Quarterly Journal of Political Science*; *Political Analysis*; *Public Choice*; *Political Science Research and Methods*; *Journal of Law, Economics and Organization*; *Election Law Journal*; *Applied Geography*; Cambridge University Press; Oxford University Press.

  Coordinator, Harvard Election Data Archive, 2011–2014.

OTHER        **Charles River Associates**, Boston, Massachusetts             2008–2010
EXPERIENCE
             *Associate, Energy & Environment Practice*
             Economic consulting in the energy sector for electric and gas utilities, private equity, and electric generation owners. Specialized in Financial Modeling, Resource Planning, Regulatory Support, Price Forecasting, and Policy Analysis.

**Exhibit 79 pg 30 of 30**

**Caster Plaintiffs' Exhibit 83, Page 31**

```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ALABAMA
 2                          SOUTHERN DIVISION

 3

 4   LAKEISHA CHESTNUT,  an individual; *
     MARLENE MARTIN, an individual;     *  2:18-cv-00907-KOB
 5   BOBBY DUBOSE, an individual;       *  November 4, 2019
     RODNEY LOVE, an individual; KAREN  *  Birmingham, Alabama
 6   JONES, an individual; JANICE       *  9:00 a.m.
     WILLIAMS, an individual; RODERICK  *
 7   CLARK, an individual; JOHN HARRIS, *
     an individual,                     *
 8           Plaintiffs,                *
                                        *
 9   vs.                                *
                                        *
10   JOHN H. MERRILL, in his official   *
     capacity as Alabama Secretary of   *
11   State,                             *
             Defendant.                 *
12   *********************************

13               TRANSCRIPT OF BENCH TRIAL
                        VOLUME I
14          BEFORE THE HONORABLE KARON O. BOWDRE
              CHIEF UNITED STATES DISTRICT JUDGE
15

16   FOR THE PLAINTIFFS:
     Abha Khanna, Esq.
17   PERKINS COIE LLP
     1201 Third Avenue
18   Suite 4900
     Seattle, Washington 98101
19   (206) 359-9000

20   Bruce V. Spiva, Esq.
     PERKINS COIE LLP
21   700 13th Street, NW
     Suite 600
22   Washington, DC 20005
     (202) 654-6338

23

24

25
```

**Caster Plaintiffs' Exhibit 84, Page 1**

```
 1          Richard P. Rouco, Esq.
            QUINN CONNOR WEAVER DAVIES & ROUCO LLP
 2          2 20th Street North
            Suite 930
 3          Birmingham, Alabama 35203
            (205) 870-9989
 4
            Daniel C. Osher, Esq.
 5          PERKINS COIE LLP
            700 13th Street NW
 6          Suite 600
            Washington, DC 20005
 7          (202) 654-6338
 8          Lalitha D. Madduri, Esq.
            PERKINS COIE LLP
 9          700 13th Street NW
            Suite 600
10          Washington, DC 20005
            (202) 654-6322
11

12          FOR THE DEFENDANT:
13          James W. Davis, Esq.
            Laura E. Howell, Esq.
14          OFFICE OF THE ATTORNEY GENERAL
            501 Washington Avenue
15          P.O. Box 300152
            Montgomery, Alabama 36130-0152
16          (334) 242-7300
17          J. Dorman Walker, Esq.
            BALCH & BINGHAM LLP
18          P.O. Box 78
            Montgomery, Alabama 36101
19          (334) 834-6500

20
            COURTROOM DEPUTY:  Sarah Hollingsworth
21

22          COURT REPORTER:  Christina K. Decker, RMR, CRR

23      Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
        pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
24       and Procedures Vol. VI, Chapter III, D.2.  Transcript
                produced by computerized stenotype.
25
```

**Caster Plaintiffs' Exhibit 84, Page 2**

1                                    **I N D E X**

2        WILLIAM COOPER                              5
         DIRECT EXAMINATION                          5
3        BY MR. SPIVA
         CROSS-EXAMINATION                         108
4        BY MR. WALKER
         REDIRECT EXAMINATION                      137
5        BY MR. SPIVA

6
         MAXWELL PALMER                            141
7        DIRECT EXAMINATION                        142
         BY MS. KHANNA
8        CROSS-EXAMINATION                         183
         BY MR. DAVIS
9        REDIRECT EXAMINATION                      203
         BY MS. KHANNA
10       RECROSS-EXAMINATION                       208
         BY MR. DAVIS
11       FURTHER REDIRECT EXAMINATION              210
         BY MS. KHANNA
12

13       KAREN JONES                               211
         DIRECT EXAMINATION                        212
14       BY MR. OSHER
         CROSS-EXAMINATION                         238
15       BY MS. HOWELL
         REDIRECT EXAMINATION                      246
16       BY MR. OSHER

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

Caster Plaintiffs' Exhibit 84, Page 3

<u>**P R O C E E D I N G S**</u>

1
2          (In open court.)

3          THE COURT:  You may be seated.

4      As I stated informally this morning, I think I'm fairly

09:13:26 5 familiar with the issues in the case based upon the excellent

6 briefs that were submitted for pretrial, so we can dispense

7 with any preliminary opening statements.  So plaintiff may call

8 your first witness.

9          MR. SPIVA:  Thank you, Your Honor.

09:13:47 10      I wanted to introduce to the Court my colleagues here.  I

11 think you might have met most of them, but beside me is my

12 partner Abha Khanna; my colleague, Lalitha Madduri; Dan Osher

13 also my colleague; and our -- I know you of course know Richard

14 Rouco, our co-counsel.

09:14:03 15          THE COURT:  Yes.  Yes.

16          MR. SPIVA:  We call as our first witness, Your Honor,

17 Bill Cooper, William Cooper.

18          THE COURT:  Okay.

19          MR. SPIVA:  Your Honor, just FYI, we have put some

09:14:24 20 exhibit books up on your -- up at the podium -- not the podium,

21 forgetting the word, but, yeah.

22          THE COURT:  Those big ones over there with a few

23 little exhibits?

24          MR. SPIVA:  A few little.  But I think we're mainly

09:14:38 25 going to be in Volume 1.  And we will also put them up on the

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 4**

```
 1   screen when we're discussing them.  So if Your Honor is fine
 2   with that...
 3           THE COURT:  I certainly am.  I do like to have my own
 4   copy so that I can highlight them and mark them as -- to make
 5   it easier to go back and find what I may be looking for.
 6           MR. SPIVA:  Sure.  Sure.  I totally understand.  So I
 7   think we'll be mainly in the Volume 1 of the paper copy this
 8   morning.
 9           THE COURT:  Okay.  All right.  Good.
10       All right.
11                        WILLIAM COOPER,
12   having been first duly sworn by the courtroom deputy clerk, was
13   examined and testified as follows:
14           THE COURTROOM DEPUTY CLERK:  Will you please state
15   your name in the microphone for the record?
16           THE WITNESS:  My name is William S. Cooper.
17                        DIRECT EXAMINATION
18   BY MR. SPIVA:
19   Q    Good morning, Mr. Cooper.  I won't ask you to state your
20   full name for the record because you just did that.
21       You have been retained as an expert for the plaintiffs in
22   this case; is that right?
23   A    That is correct.
24   Q    And have you prepared a declaration or declarations in
25   connection with your retention as an expert?
```

09:14:56 (line 5)
09:15:11 (line 10)
09:15:27 (line 15)
09:15:38 (line 20)
09:15:53 (line 25)

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 5**

6

```
 1  A    I have.
 2  Q    Let me turn your attention to Plaintiffs' Exhibit 1.  And
 3  if we can pull that up on the screen.  And if you can take a
 4  look in your notebook, Mr. Cooper.
09:16:11 5       Is that the first declaration that you prepared in this
 6  case?
 7  A    Yes.
 8  Q    And let me ask you to turn to page 3 --
 9            MR. WALKER:  May I interrupt you for a second?  We're
09:16:31 10  not getting -- oh, okay.  I'm sorry.
11            MR. SPIVA:  Technical difficulties.
12            THE COURT:  A little small delay there.  It's normal.
13  BY MR. SPIVA:
14  Q    And, actually, you know what?  I kind of jumped the gun, I
09:16:45 15  think, on the screen anyhow because I want to ask you a couple
16  more general questions before we actually turn to the report.
17       Let's start with a little bit about your background.  What
18  is your profession, Mr. Cooper?
19  A    I provide -- I'm a private consultant.  And I provide
09:17:00 20  technical assistance to various organizations here and there
21  around the country focusing primarily on computer mapping and
22  analysis, socioeconomic data, both spatially and tabular data.
23       So a lot of my work is related to redistricting, but I
24  have also provided assistance to other projects.  For example,
09:17:26 25  every year I work on a nationwide project with the Food
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 6**

1  Research and Action Center to identify areas with high

2  percentages of children who live in poverty who would qualify

3  for the summer food program or child care food program

4  sponsored by the U.S. Department of Agriculture.  So that's

09:17:44 5  sort of a nationwide project.

6  Q    Okay.  And, Mr. Cooper, just -- I'll just ask you if you

7  can slow down just a little bit because the court reporter is

8  trying to get everything down.  And I know you have a tendency

9  sometimes to start speaking a little bit quickly.  So you're

09:17:58 10  doing fine, but just to remember that.

11       Would you say that you are a Geographic Information

12  Systems consultant, Mr. Cooper?

13  A    Yes, in terms of the application of the GIS software.  I

14  don't design or develop the underlying code.

09:18:16 15  Q    And how long have you been doing that?

16  A    Basically since the mid '80s, late '80s, really, was about

17  the time that the first kinds of GIS software were available to

18  run off a personal computer, which is what I use.

19  Q    And what is the area of expertise that you applied in this

09:18:43 20  case?

21  A    I was specifically asked to determine whether or not it

22  would be possible to draw a congressional redistricting plan in

23  Alabama that would allow for two majority black congressional

24  districts out of seven, while at the same time adhering to what

09:19:05 25  are known as traditional redistricting principles.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 7**

1  Q   And in doing that, did you apply your expertise in

2  redistricting and census data?

3  A   Yes.

4  Q   Have you served as an expert witness in cases involving

09:19:20  5  redistricting before?

6  A   I have.  I've testified probably in close to 40 cases in

7  person, and primarily in Section 2 cases.  There have been a

8  handful of cases that were not strictly Section 2 cases where

9  I've testified that involved voting districts.  And probably in

09:19:44 10  another 40 I've submitted declarations, but in those cases for

11  one reason or another the case did not advance to a

12  full-fledged trial.

13  Q   And have you served as an expert in Alabama previously?

14  A   I have.  I was the plaintiffs' expert in the Alabama

09:20:03 15  Legislative Black Caucus case that was finally decided in terms

16  of remedial plans in 2017.  I first began working on that case

17  I think in the summer of 2012.  I've -- and I testified in that

18  particular case.

19      I also testified here in this very courtroom in 2016 in a

09:20:29 20  school de-annexation case involving Jefferson County and the

21  proposed new school system that would have been in Gardendale.

22  And I was working with the legal defense fund as the

23  plaintiffs' expert in that case, which was a school

24  desegregation case going back 50 years actually.

09:20:49 25  Q   And have you -- did you also testify in the *Alabama State*

**Caster Plaintiffs' Exhibit 84, Page 8**

```
         1  Conference of the NAACP vs. Alabama, which I think oftentimes
         2  is referred to as the "Judges Case"?
         3  A    Yes.  I testified in that case in Montgomery, Alabama,
         4  exactly one year ago today.  This first part of November was
09:21:07 5  when that trial was held last year.
         6  Q    And what did that case involve?  What did your testimony
         7  in that case involve?
         8  A    Again, I was a GIS expert.  So I prepared a set of
         9  illustrative plans for the plaintiffs for the State Supreme
09:21:24 10 Court, a nine-district configuration, and an eight-district
        11  configuration, with one at-large chief judge would be elected
        12  at large under those illustrative plans.  And then also I
        13  prepared several illustrative plans for the state appellate
        14  courts divided into five districts, because I think there were
09:21:47 15 only five judges.
        16  Q    And forgive me if I missed it, but did you already mention
        17  the City of Decatur and/or the Pleasant Grove cases?
        18  A    I did not mention them.  I have not testified in those
        19  cases, but I have filed declarations.
09:22:03 20      And the Pleasant Grove case has now been resolved.  The
        21  consent decree, I think, results in a cumulative voting plan
        22  for the city of Pleasant Grove here in Jefferson County.
        23  Q    Is that --
        24  A    I prepared illustrative plans in that case as part of a
09:22:23 25 short declaration about a year ago.
```

**Christina K. Decker, RMR, CRR**
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 9**

1    Q    And that was a districting case?

2    A    Yes.  Section 2.

3    Q    And what about the City of Decatur case?

4    A    That one is a -- I'm actually working for the defendants

09:22:35 5   in that case.  And I've not testified in court.  It's still an

6    ongoing case.  But I have filed a couple of declarations.

7         It involves obviously the city of Decatur and Morgan

8    County and whether or not the city can proceed to follow

9    through on a referendum vote from seven -- well, ten years ago,

09:23:00 10  I think, almost in 2010 which would change, if enacted or

11   adopted, the election system in Decatur from a five

12   single-member district plan to three single-member districts

13   and two at-large positions.

14   Q    And you said that you are working on behalf of the

09:23:20 15  defendant in that case?

16   A    Yes.

17   Q    Have you, other than that case, the City of Decatur case,

18   have you ever worked on behalf of or testified on behalf of

19   defendants rather than plaintiffs?

09:23:30 20  A    I was briefly engaged as a consultant to the city of

21   Calera in 2009 as they were attempting to get preclearance on a

22   voting plan.  And I drew some illustrative plans suggesting to

23   them that it was not possible to draw a majority black district

24   in Calera given the population's changed since the '80s when

09:23:55 25  the initial plan was adopted, I think.  And I suggested they

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 10**

1    should consider adopting a plan that would involve cumulative

2    voting as another alternative to a districting system, and

3    that's what they did.

4    Q     Have you served as an expert in any of -- any lawsuits

09:24:12 5   that have resulted in changes to districting plans?

6    A     In Alabama or --

7    Q     Anywhere.

8    A     Yes, I have.  Many over the years.

9    Q     And are those -- maybe I will refer you to Plaintiffs'

09:24:29 10  Exhibit 1, which is your first declaration, paragraphs 5 and 7,

11   which appear on pages 2 and 3 of that report.

12         Does that summarize the cases where you testified that

13   resulted in districting plans being adopted as a result of your

14   testimony?

09:24:53 15  A     Yes, at least going back to 2011.  Section 2 cases only.

16   I have been involved in some other cases.

17   Q     Okay.  And referring you to paragraph 2 of your report,

18   which spans from pages 1 to 2, were those statewide cases in

19   which you've testified?

09:25:26 20  A     Yes.  Over the years, I've been involved in several cases

21   that involved statewide legislative boundaries.

22         In the '90s, I was involved in a case in rural west

23   Tennessee that ultimately led to the creation of a new majority

24   black district in northwest Tennessee outside of the Memphis

09:25:50 25  metro area.  That case was captioned *Rural West Tennessee*

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 11**

1    *African-American Affairs Council vs. McWhorter.*

2        I also was involved in a state legislative case in Montana

3    called *Old Person vs. Cooney* that spanned a couple of decades.

4    I think I worked on that one from like 1991 until sometime in

09:26:12 5    early 2002.  Ultimately that led to the creation of a couple

6    new Indian majority districts in Montana that encompassed the

7    reservation areas in the state.

8        And the same thing with *Bone Shirt vs. Hazeltine.*  That

9    was a lawsuit filed in the early 2000s in South Dakota, and it

09:26:34 10    created I think two new Indian majority House districts and one

11    new Indian majority Senate district.  And in that case, the

12    Court ordered the plan that I had developed as a remedial plan

13    into place.  It was a court-ordered plan.

14    Q    And, of course, you have already testified about the

09:26:54 15    Alabama Legislative Black Caucus case?

16    A    Right.

17    Q    And then is it accurate to say that you've testified in

18    five cases since 2011 that have resulted in redistricting?  I

19    think that's at paragraph 5.  Does that summarize that -- I

09:27:16 20    don't need you to walk through each one of them, but I just

21    want to make sure I have got that right.

22    A    Yes.  Those are the five Section 2 cases, or at least

23    five cases that were decided on Section 2.

24        The one case that I spent a lot of time on was *Navajo*

09:27:36 25    *Nation v. San Juan County.*  That was both a Section 2 case, but

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 12**

1    I think there were some constitutional issues.  And ultimately

2    the judge determined that he did not need to rule on Section 2

3    because he had already ruled on the constitutional issues.  And

4    we won the case.  We -- the Navajo Nation -- obviously serving

09:27:51 5    as the Navajo Nation's expert in *Gingles 1.*

6    Q    And I think you have already mentioned the consent decree

7    cases that are set forth in paragraph 6; is that right?

8    A    Yes.

9    Q    Okay.  And if we could pull up Plaintiffs' Exhibit 2,

09:28:12 10   which I believe is Exhibit A to your first report.

11       Mr. Cooper, is your experience detailed more thoroughly in

12   Exhibit A to your expert report?

13   A    Yes.  This just basically reviews all the voting cases

14   I've been in since the late 1980s by state.  And the case

09:28:40 15   caption along with a rough date as to when I was involved in

16   the case.

17   Q    Okay.  Have you testified in any of these cases regarding

18   socioeconomic conditions in the states that you were working

19   in?

09:28:57 20   A    I would have in most of them, because most of these are

21   Section 2 cases.  And almost always as part of my testimony I

22   did provide information about socioeconomic disparities as it

23   relates to the majority white population vis-a-vis the minority

24   group at issue.

09:29:17 25   Q    And what type of data do you review in those cases

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 13**

1    regarding socioeconomic conditions?

2    A    I think almost always it is Census Bureau produced data in

3    the '90s and '80s.  And even most of the 2000s I relied on

4    information from the census long form, which was a sample of

09:29:45   5    all persons who participated in the decennial census.

6         And in the late 2000s, the Census Bureau shifted to

7    another approach and began to compile information from what is

8    known as the American Community Survey, and which is also

9    sample based, but it is issued on an annual basis to one out of

09:30:08  10    every 42 households.

11         So in this particular Section 2 case, as well as I think

12    almost all of the ones since 2010 I've relied on the American

13    Community Survey data set, because there was no long form

14    option with the 2010 census.  So all socioeconomic data that is

09:30:29  15    highly detailed, anyway, would come from the American Community

16    Survey.

17    Q    Okay.  And I will probably have some more questions for

18    you about that when we get more into the opinions.

19         Have you ever been qualified as an expert in redistricting

09:30:42  20    and demographics in the cases that you have testified in?

21    A    Yes.  In most of the cases, going all the way back to the

22    '80s, I would have been qualified as an expert in redistricting

23    and demographics.  It's possible there may have been some when

24    I was only qualified as an expert in redistricting for one

09:31:01  25    reason or another, particularly the ones that were not Section

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 14**

```
 1    2 cases where I was not presenting socioeconomic data.

 2         For example, I don't remember with the ALBC case.  I don't

 3    believe I presented any socioeconomic data.  So I may have just

 4    been -- sorry.  So I may have just been qualified as an expert

 5    in redistricting in that case.

 6    Q    Okay.  Have you ever been -- has the Court ever found you

 7    not qualified in either the areas of redistricting or

 8    demographics?

 9    A    Not to my knowledge.

10    Q    And when you serve as an expert in these types of cases,

11    what sorts of analysis do you with regards to redistricting?

12    A    Well, I work with the census data that one would typically

13    use when drawing election plans, and that would be the Census

14    Bureau's P.L. 94-171 file that is released right after the

15    Census Bureau has compiled all of the census data nationwide.

16    So it's the first release out typically in the month of

17    February of the year after the decennial census.

18         So in 2011, the first -- the first few states were

19    released in the month of February, and then most were

20    completely released by the end of March.  And I assume that

21    will be the same in 2021.

22         So that's the primary data set that I use, because when

23    producing election plans particularly for congressional and

24    state legislative redistricting, you have to rely on the 2010

25    census.  So any plan I develop starts with that basic
```

09:31:18 (line 5)
09:31:30 (line 10)
09:32:03 (line 15)
09:32:22 (line 20)
09:32:41 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 15**

1   information.

2       I may have access to other data, like as in this case

3   where I was also able to rely on the American Community Survey

4   to get some estimates of the citizen voting age population and

09:33:00 5  the various plans I produced, as well as citizen voting age

6   population in the 2011 plan, for example, that I break out in

7   my report.

8   Q    And we'll get to that in a minute.

9   A    Yeah.

09:33:12 10 Q    I guess my question really is more broad.  I mean, do you,

11  in terms of redistricting, are you often called upon to create

12  illustrative plans in the cases that you have testified in?

13  A    Oh, yes, almost always.  Any redistrict case I am almost

14  always called on to develop an alternative plan.

09:33:33 15 Q    And is there -- you've mentioned the census data.  Is

16  there a type of GIS software that you typically use in those

17  cases?

18  A    Yes.  I use Maptitude for redistricting, which is a

19  well-known software application for redistricting analysis, as

09:33:54 20 well as other forms of socioeconomic analysis.  So that is the

21  program I use.  I've been using it since the late 1990s for

22  redistricting purposes.

23      Prior to that, I used another product from the same

24  company that was not Windows based.  It was Microsoft-DOS

09:34:15 25 based.  It was an older program.  But it worked quite well.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 16**

1  Q    And in terms of -- you already testified that you have

2  done work with census data in terms of looking at disparities

3  between racial groups in other cases; is that right?

4  A    Yes.

09:34:33 5  Q    Okay.

6        MR. SPIVA:  So, Your Honor, at this time, we'd just

7  ask that Mr. Cooper be qualified to testify as an expert in

8  redistricting and demographics.

9        THE COURT:  Is there any objection?

09:34:44 10       MR. WALKER:  No objection, Your Honor.

11       THE COURT:  The Court recognizes Mr. Cooper as

12  qualified as an expert in this case.

13       MR. SPIVA:  Thank you, Your Honor.

14  BY MR. SPIVA:

09:34:52 15  Q    Can you tell the Court, Mr. Cooper, what you were asked to

16  do in this case?

17  A    Well, at the outset, I was specifically asked to determine

18  whether the first *Gingles* precondition could be met while also

19  adhering to traditional redistricting principles.

09:35:13 20       In other words, the issue was whether a second majority

21  black district could be created in Alabama that would be

22  reasonably compact, contiguous, not dilute the minority vote,

23  respect communities of interest, and also keep incumbents in a

24  different district so there were no incumbent conflicts.

09:35:39 25  Q    What was the second thing you were asked to do in this

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 17**

```
      1  case?
      2  A    I was also just asked to review demographic data from
      3  recent decades from the decennial census, and as we just
      4  reviewed or discussed, analyze the socioeconomic data to
09:35:56 5  determine whether or not the black population and white
      6  population have different socioeconomic profiles.
      7  Q    Okay.  And you've already I think testified that
      8  Plaintiffs' Exhibit 1 is your first declaration in this case.
      9       If you could just turn for a minute to Plaintiffs'
09:36:19 10  Exhibit 59, and if you can confirm whether that is the second
     11  declaration you prepared and provided in this case?
     12  A    Yes.
     13  Q    And have you made any changes to either the first or
     14  second declaration since you've prepared them?
09:36:40 15  A    Yes.  I corrected some typos.
     16           MR. SPIVA:  Okay.  And just for the record, by
     17  agreement the correct versions are Plaintiffs' Exhibit 1 and
     18  Plaintiffs' Exhibit 59.
     19  Q    Are the facts that are contained in these reports true and
09:37:00 20  accurate to the best of your knowledge and belief?
     21  A    Yes.
     22  Q    And are the conclusions that you reached regarding your
     23  two tasks in this case contained in those reports?
     24  A    Yes.
09:37:08 25  Q    Have your -- have any of your conclusions changed since
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 18**

1  submitting those reports?

2  A   No.

3  Q   Let me ask you first just for your high-level conclusions

4  based on the work you have done in the case.  Did you reach any

09:37:28 5  conclusions regarding whether the African-American population

6  in Alabama is sufficiently large and geographically compact to

7  allow for the creation of a second majority-minority

8  congressional district in a seven-district plan?

9  A   Yes.  My conclusion is that the minority population is

09:37:47 10  sufficiently numerous and geographically compact to allow for

11  two single-member majority black districts while adhering to

12  traditional redistricting principles.

13  Q   And did you prepare any illustrative plans demonstrating

14  how two majority black districts could be drawn in a

09:38:07 15  seven-district plan?

16  A   Yes.  I prepared four illustrative plans showing various

17  ways that one could draw two majority-minority districts in

18  Alabama based on the 2010 census.

19  Q   And do those plans comply with traditional redistricting

09:38:21 20  principles?

21  A   In my opinion they do.

22  Q   Okay.  Let me pull up Plaintiffs' Exhibit 1, page 23, and

23  kind of focus your attention on paragraphs 51 through 52 of

24  your first report.  And let me ask you -- pardon me one minute

09:38:54 25  while I get there.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 19**

1       Let me ask you:  What were the traditional redistricting

2  principles that you adhered to as you were drawing these

3  illustrative plans?

4  A    Well, as I think I mentioned maybe previously, the primary

09:39:21 5  principles would be respecting one person one vote.  And it's

6  my understanding that in Section 2 litigation particularly,

7  it's now basically a requirement that one must draw plans that

8  are within plus or minus one person at least for congressional

9  plans of the ideal population size, which is the ideal

09:39:44 10  population size.  Of course, it's nothing more than dividing a

11  statewide population by seven.  So you have got to be within

12  one person of that figure, which I don't have in front of me

13  right now.

14       And also the plan should be reasonably compact at a

09:39:58 15  reasonable shape.  The districts need to be contiguous.

16       One should take into account various communities of

17  interest around the state.

18  Q    What about -- sorry to interrupt.  But what about

19  political boundaries?  Is that a consideration?

09:40:12 20  A    Yes.  Yes.  That is sort of blended in, with respect for

21  communities of interest, as well as in a sense compactness.

22       So I took into account county boundaries specifically

23  because I in all four plans split -- at least in two of the

24  plans, I split the same number of counties as the 2011 plan.

09:40:37 25  And in two of the plans, I split one fewer, just six counties.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 20**

1   So I respected the county boundaries, as well as the existing

2   plan.

3   Q    Okay.  And I think I interrupted.  You had said

4   compactness and contiguity, and I think you were getting ready

09:40:51 5   to go on to something else.

6   A    The non dilution of minority vetting strength.  That's the

7   other primary traditional restricting principle.

8   Q    And what about incumbents?  Did you have any consideration

9   for where incumbents lived or where they would be paired?

09:41:07 10  A    Yes.  Originally I did not have information about the home

11  addresses for five of the seven incumbents, and unfortunately

12  in drawing the plan -- because I just knew that Representative

13  Sewell lived somewhere in Jefferson County -- my initial

14  attempts at Illustrative Plans 1, 2, and 3 had to be revised to

09:41:31 15  bring her into District 7.  She was just outside of District 7

16  under Illustrative Plan 1, 2, and 3.

17      So I made minor changes in Jefferson County.  And Those

18  plans are now known as Revised Plan 1, Revised Plan 2, and

19  Revised Plan 3.  And those would be the operative plans in this

09:41:47 20  case, even though in a zoomed-out statewide map you really

21  could not tell the difference between the original Illustrative

22  Plan 1, for example, and Revised Plan 1, because I just shifted

23  three or four precincts in each instance.

24      Illustrative Plan 4 --

09:42:02 25  Q    Sorry to interrupt, but Revised Plans 1, 2, and 3, are

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 21**

1  those attached to your second declaration?

2  A    Yes.

3  Q    Okay.

4  A    Yes.  And Illustrative Plan 4, which was in my original

09:42:14  5  declaration, fortunately had Representative Sewell already in

6  District 7, so there was no need to revise that plan.

7  Q    Okay.  And then let me ask you:  Were you at some point

8  asked to reach a conclusion regarding whether the

9  African-American population in Alabama is sufficiently large

09:42:36 10  and geographically compact to allow for the creation of a

11  second majority-minority congressional district in a

12  hypothetical six-district plan following the 2020 census?

13  A    Yes.  And I was able to conclude that there's a reasonable

14  likelihood that two out of seven -- two out of six districts in

09:42:59 15  a plan after the 2020 census is released could be majority

16  black citizen voting age population.  Majority.

17  Q    And that hypothetical plan, is that attached to your

18  second declaration?

19  A    Yes.

09:43:15 20  Q    Okay.  And does that plan, the six-district plan comply

21  with the same traditional districting principles as the

22  seven-district illustrative and revised plans?

23  A    I believe so.  It expands the size of the districts both

24  geographically and based on population.  But I think it would

09:43:39 25  comply with traditionally redistributing principles.  But it

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 22**

| | |
|---|---|
| 1 | hasn't been fine-tuned.  I did not spend a lot of time trying |
| 2 | to perfect it.  So there obviously could possibly be other |
| 3 | configurations, but we will only know in the fullness of time. |
| 4 | Q    And shifting to the demographic data you looked at, did |
| 09:43:59 5 | you reach any conclusions regarding whether there are |
| 6 | disparities between African-Americans and whites in Alabama |
| 7 | across indicators of socioeconomic well-being? |
| 8 | A    Yes. |
| 9 | Q    What were the conclusions? |
| 09:44:11 10 | A    There are sharp contrasts across almost all levels of |
| 11 | comparison for socioeconomic well-being, whether it be income, |
| 12 | education, housing, access to vehicles, that sort of thing.  In |
| 13 | almost every instance, whites outpaced blacks. |
| 14 | Q    Okay.  Let me pull up Plaintiffs' Exhibit 3, Mr. Cooper, |
| 09:44:39 15 | which is Exhibit B to your first declaration.  It's a document |
| 16 | that has at the top titled Exhibit B Methodology and Sources. |
| 17 | Does this detail the methodology and sources that you used to |
| 18 | prepare your report? |
| 19 | A    Yes.  It basically just reviews and highlights some of the |
| 09:45:02 20 | things I just discussed a few minutes ago about the source of |
| 21 | the data that I used to begin working on the illustrative |
| 22 | plans. |
| 23 | I do make note of the fact that I was also using not just |
| 24 | data files like the P.L. 94-171 file from the Census Bureau, I |
| 09:45:18 25 | was also using their geographic files that show boundaries for |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 23**

counties and cities and precincts and municipalities, and also

information for sub-county designations by the Census Bureau,

such as census tracts and census block groups.  And also the

most detailed population unit in the census geography is a

09:45:47  census block.  So I was using the state census block file, as

well.

Q    And did you use population and geographic data from the

1990 to 2010 decennial censuses?

A    I did at a higher geographic level.  I don't think I used

09:46:07  2000 block data to do any of my analysis, but I did look at the

state and county and maybe even municipal comparisons between

1990, 2000, and 2010.  That shows up in my report in the very

beginning comparing those three decades.

Q    Did you use 2017 and 2018 U.S. Census Bureau population

09:46:33  estimates?

A    I did use population estimates from the Census Bureau for

2017 initially, and then also updated it a bit with 2018

estimates.  Those estimates are only available at the state

county level by race and only at the state based on voting age

09:46:58  by race.  And for cities and towns and other places -- some of

them even may not be incorporated -- there is no information

about post-2010 population by race.  There's just a total

population estimate.

Q    You've made reference a couple of times to something

09:47:19  called the P.L. 94-171 data file; is that right?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 24**

                1   A     Right.

                2   Q     What is that?

                3   A     Well, that is the file that states and localities use to

                4   develop new voting plans that would come into compliance with

09:47:37    5   one person one vote specifically based on a new decennial

                6   census.  So that's the file I used.  And it has over 200

                7   different fields indicating race and ethnicity for all ages and

                8   over 18.  And the racial categories are broken out by single

                9   race, as well as multi-race categories.  So it's a big file

09:48:08   10   that can be parsed in different ways.

               11   Q     So is it correct to say that that's -- when people say,

               12   well, the census is going to be released in 2011, or the census

               13   is going to be released in 2021, is that the file they are

               14   talking about?

09:48:22   15   A     That's the first one that is released.  After that, there

               16   are some additional releases that would have more information

               17   about housing and more detailed age information, breaking out

               18   information about, you know, the number of persons between 15

               19   and 17, for example, or some other category.  So the later

09:48:44   20   releases are much more detailed, but they would typically not

               21   be used for the redistricting work.

               22   Q     So that's the file -- the P.L. 94-171 file, that's the

               23   file that states use to do their redistricting?

               24   A     Exactly, yeah.  Even at this late date.

09:49:00   25         I just finished a plan in Grand County, Utah, and we were

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 25**

 1  using the 2010 data.

 2  Q    You referenced earlier the American Community Survey data

 3  or ACS data.  Can you explain what that is and at a broad level

 4  what use you made of that, in terms of the one year versus the

09:49:21  5  five-year ACS data?

 6  A    Well, the one year data is exactly what it says.  It just

 7  comes from one sample survey a year.  And that is the sample

 8  that is sent out to one out of 42 households nationwide.

 9      So because it's just one out of 42, it's acceptable from

09:49:48 10  the standpoint of statistical methodology to use it for large

 11  geographies, such as a nation, state, and congressional

 12  district.

 13      Below that level, when you're looking at legislative

 14  districts or cities that have less than 60,000 persons, the

09:50:11 15  margin of error would be too high from just one sample a year.

 16  So we use another Census Bureau product called the five-year

 17  sample survey.  And the most recent one available right now is

 18  the 2013-2017 ACS, which was released in December of 2018.  So

 19  there will be a new release out in about six weeks.

09:50:38 20  Q    Okay.  And I think you already testified that you used

 21  Maptitude to draw the maps?

 22  A    Yes.

 23  Q    Okay.  Let me pull up in Plaintiffs' Exhibit 1, Figure 3,

 24  which is on page 9 of your first declaration.

09:51:02 25      And, Mr. Cooper, can you describe at a high level the

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 26**

 1  population growth patterns from a racial standpoint in Alabama

 2  between 1990 and today?

 3  A     Yes.

 4        Well, in 1990, you can see that the population of the

 5  state was just over 4 million -- 4 million 40,000 roughly.  And

 6  of that number, the non-Hispanic white population, which is the

 7  second category was nearly three quarters, 73.26 percent.  And

 8  the African-American population was 25.26 percent, single-race

 9  African-American.  Because in the 1990 census, there was no way

10  to calculate the any-part black category from the P.L. 94-171

11  file.

12        The file released by the Census Bureau in that time period

13  at the time of the 1990 census had fewer categories by race.

14  There was just simply a separate category of others.  Others

15  being a category that would have included people who were

16  multi-race -- black and white or black and American Indian.  So

17  I do not have a figure for the any-part black population in

18  1990.

19        In 2000, the population statewide had grown to 4.47

20  million.  And at that time you can see that the non-Hispanic

21  white population had dropped to about three points to

22  70.29 percent.  And the single-race black population stood at

23  25.99 percent.  But after factoring in persons who were black

24  and one other race -- in other words, any-part black -- it had

25  climbed to 26.29 percent.  So, again, up about a percentage

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 27**

1    point compared to 1990.

2         Then by 2000, the state's population continued to grow, so

3    it was almost --

4    Q    You said 2000 or --

09:53:14  5    A    2010.  Excuse me.  It was 4.78 million.  And the white

6    population had dropped to just 67 percent, down by nearly six

7    percentage points since 1990.  And the black population

8    continued to grow, reaching 26.8 percent any-part in 2010.

9         The key reason that explains why the non-Hispanic white

09:53:44 10   population dropped so significantly versus less of a change in

11   the African-American percentage is that between 1990 and 2010 a

12   large population change occurred in the other minority

13   categories, particularly as it relates to Latinos who comprised

14   just 24,629 of the population in 1990.

09:54:19 15        By 2010, it had gone up by a factor of seven or so to

16   185,602.  So that explains the drop in the percentage of

17   non-Hispanic whites in the state.

18        Latinos may be of any race.  And so some reported white.

19   Others would have reported some other race as a category, or

09:54:45 20   one of the other clear categories, such as American Indian or

21   African-American.

22   Q    Okay.  And I think this is kind of implicit in what you

23   said before, but I just want to make sure it's clear.  What is

24   the difference between single-race black and any-part black, in

09:55:04 25   terms of these figures?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 28**

1  A    Single-race black is anyone who checked on the census form

2  that they were black, including persons who would have been

3  maybe black and Hispanic.

4  Q    So is that single race or any-part black?

09:55:20  5  A    That's single race.

6  Q    Okay.  Thank you.

7  A    And the any-part black would be any person who was some

8  part black.  In other words, everyone who is single-race black,

9  single-race black and Hispanic, as well as all other persons

09:55:33 10  who checked black and another race, such as black and white, or

11  even black and white and American Indian -- multi-race

12  categories.

13  Q    And which figure do you use any-part black or single-race

14  black in your analysis when determining whether the

09:55:54 15  African-American population is sufficiently large and

16  geographically compact?

17  A    Nowadays, I tend to use the any-part black definition,

18  which was accepted and relied upon in the Supreme Court case

19  involving Georgia legislative districts in 2003 -- *Georgia v.*

09:56:12 20  *Ashcroft*.  So that is the definition that I would typically

21  use.

22      I produce information and data about the single-race

23  category, as well.  That's part of the data set that I have

24  from the P.L. 94-171 file.  So I'm basically aware of it.  But

09:56:32 25  in the final analysis, in determining whether a district is

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 29**

```
 1  majority black, the ultimate decider would be the any-part
 2  black definition or possibly the citizen voting age population
 3  definition.
 4  Q    Okay.
 5              THE COURT:  The citizen voting age definition, what do
 6  you mean by that?
 7              THE WITNESS:  That is obtained through the American
 8  Community Survey.  And it's not part of the P.L. 94-171 file.
 9        But each year, the Census Bureau releases this special
10  tabulation of the American Community Survey for use by the
11  Department of Justice in voting cases and language cases
12  involving voting.  And so I rely on that data set, which only
13  goes down to the block group level, so it's more than just a
14  census block, but smaller than a census tract, and apply that
15  to the districts to develop an estimate for the citizen voting
16  age population by race in that district.
17              THE COURT:  Okay.  Well, what do you mean by "citizen
18  voting age definition"?  What is that definition?
19              THE WITNESS:  Well, if a district is not over
20  50 percent black citizen voting age population, then it
21  would -- I assume that it would not meet Gingles 1 as being a
22  majority black district.
23              THE COURT:  Thank you.
24  BY MR. SPIVA:
25  Q    Mr. Cooper, I may -- I think the Judge may be asking just
```

Timestamps (left margin):
09:56:50 — line 5
09:57:08 — line 10
09:57:29 — line 15
09:57:45 — line 20
09:58:01 — line 25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 30**

1    literally what -- what goes into citizen voting age population?

2    I don't know if I understood -- if I got that right, Your

3    Honor, but I think she may be asking a more specific question

4    about that.

09:58:15  5    A    Well, the ACS survey would have a question as to whether

6    or not you are a citizen on it.  So if you report that you are

7    non-Hispanic black and also that you are a citizen then -- and

8    you're over 18, then you would be part of the citizen voting

9    age population.

09:58:38 10        And in Alabama there's not that great of a distinction

11   between all persons who are black and over 18 and all persons

12   who are black and citizens over 18.  But in some states, like,

13   say, Florida, or New York, or even Georgia, where there's a

14   much more significant Latino population who is black, there may

09:59:01 15   be wider differences between the VAP and the citizen voting age

16   population.

17   Q    Let me -- and just for the record, because I don't know if

18   you've said this before -- when you refer to voting age

19   population, either black voting age population, or non-Hispanic

09:59:21 20   white voting age population, what are you referring to?

21   A    Persons who are 18 and over as of the 2010 census.

22   Q    Okay.

23   A    And that -- I should have pointed out, there is another

24   issue to discuss regarding citizen voting age population,

09:59:34 25   because each year the Census Bureau comes out with a new data

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 31**

set.  So I'm using the most recent data set in this case, which
would reflect persons who reported that they were citizens on
an ACS survey between the years 2013 and 2017.  So that would
be a mid-decade estimate; whereas the 2010 census data that
09:59:58 reflects voting age population is from the year 2010.  So it's
five years down the road, but still not current.  Even though
there's a 2017 handle in that five-year survey, the mid-decade
would be the midpoint of the survey; in other words, July 2015.
So it's still four years behind time at this point.

10:00:21 Q    And is that standard in your field to rely on those
five-year surveys and to use the midpoint of the five-year
survey in doing the types of analysis that you've done?

A    It's becoming standard.  It's been a long-term standard in
Latino voting rights cases in particular in other states.  And
10:00:46 it's also a metric that I have been reporting in some of the
Section 2 cases I've been involved in since 2010.

Q    Okay.  Let's take a look at your second report, which is
Plaintiffs' Exhibit 59, and in particular page 3.  And I think
we're going to focus in on footnote 1.

10:01:13      Have any courts in Section 2 cases where you have recently
served as an expert used the any-part black definition to make
that determination of whether a district or districts are
sufficiently large and reasonably compact?

A    Yes.  I've listed them in a footnote.

10:01:39      That definition was reported, and the Court reviewed it in

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 32**

  1    *Georgia State Conference of the NAACP v. Fayette County Board*

  2    *of Commissioners*, also in *Missouri State Conference NAACP v.*

  3    *Ferguson Florissant School District*, also in *Terrebonne Parrish*

  4    *NAACP v. Jindal.*  That is still at the appellate level.  It was

10:02:04  5    decided in favor of the plaintiffs in 2017.  But it's still on

  6    appeal.

  7        *Navajo Nation v. San Juan County.*  In that instance, I

  8    reported the any-part definition, and the Court relied on that

  9    for county-level stats.  The districts that were drawn were

10:02:29 10    over 60 percent single-race Native American in that particular

  11    case.  So it was not maybe a major focus of the Court at the

  12    district level, but it did become an issue in determining

  13    whether or not San Juan County was majority Native American.

  14    It was just under 50 percent using single race, but over

10:02:53 15    50 percent using the any-part definition.

  16        And then finally, the partisan gerrymandering case I was

  17    involved in, in Ohio, *A. Philip Randolph v. Householder*.  That

  18    definition also became a bone of contention in that case.  And

  19    I think the Court accepted that the any-part definition was

10:03:15 20    appropriate to use when trying to determine specifically

  21    whether or not African-American voters had been packed into

  22    Congressional District 11, which involved Cuyahoga County and

  23    Akron County in Ohio.

  24    Q    If you could take a look -- and we don't need to pull this

10:03:45 25    up on the screen, but if you can take a look back at Figure 5

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 33**

1   of Plaintiffs' Exhibit 1, your first report, which was on page

2   12.  I guess we could pull it up on the screen.  I just want to

3   make sure -- well, I'm sorry.  Yeah, let's pull it up on the

4   screen.  Figure 5, which is on page 12 of Plaintiffs' Exhibit

10:04:11  5   1, your first report.

6        In 2010, what were the black and white voting age

7   population percentages in Alabama?

8   A    Well, the non-Hispanic white voting age population was

9   69.39 percent, which is a little higher than the all-ages

10:04:33 10   percentage that we just looked at, which was a little bit over

11   67 percent.  And that is because the white population is just

12   an older population.  So numbers are boosted when you look at

13   the VAP.

14        And the single-race black population was 24.86 percent.

10:04:54 15   And the any-part definition was 25.16 percent.  And that is a

16   little bit lower than the all ages, because the black

17   population is a younger population.  So that explains that

18   difference.

19   Q    And then let's pull up -- if you can look to Figure 6 in

10:05:12 20   your first report, which is on the next page, page 13 of

21   Plaintiffs' Exhibit 1.  What were the black and white -- and

22   I'll now refer to voting age population as VAP or V-A-P.

23        So what were the black and white VAP percentages in 2017

24   in Alabama?

10:05:34 25   A    The black VAP, according to the most recent Census Bureau

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 34**

estimates, was 26.4 percent.  And the white VAP was --

non-Hispanic white VAP was 67.8 percent.  So it's showing a

drop of about a point and a half compared to the 2010 voting

age population for non-Hispanic whites, and an increase of

10:06:03 about a percentage point in terms of the black voting age

population since the 2010 census.

Q    And in the 2017 estimates -- first of all, why are they

called estimates?

A    Well, they're estimates because the Census Bureau produces

10:06:24 a report each year based on an analysis of population change at

various levels of geography, states, as I mentioned, and

counties primarily based on race.  And that -- that is done by

looking at births and deaths at the county level.  And it also

includes things like housing starts, in migration, out

10:06:56 migration.  So it's a sophisticated attempt to arrive at an

estimate of what the population is today, or at least in the

summer of 2017, as opposed to 2010.

Q    And does that come from the ACS data you were talking

about?

10:07:10 A    No.  It's independent of the ACS.  It's not really a

sample survey.  So it's a different approach altogether.

Q    Okay.  But it's something that is done by and put out by

the Census Bureau?

A    Yes.  I mean, every year the estimates come out.  And just

10:07:25 about every year all major newspapers will report the change

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 35**

```
        1   since the last year and identify the fastest growing counties,
        2   and that sort of thing.  I know I've seen that in the Alabama
        3   newspapers.  Right around March is when the first data set
        4   comes out.  And then by June you get county-level estimates by
10:07:46 5   race.
        6   Q    Okay.  And then what are --
        7            THE COURT:  Excuse me.  Mr. Spiva, could I see you and
        8   one person from the defense for just a second, please?
        9            MR. SPIVA:  Sure.
       10            (Bench conference:)
       11            THE COURT:  I can't figure out why we're going into
       12   2017 stuff when aren't we focusing on what happened in 2011?
       13            MR. SPIVA:  Yes.  But it's typical in these types of
       14   cases to show what the population growth has been.  It's also
       15   partly in relation to the 2020 argument, you know, that there
       16   will be like a six-district plan.  So it's partly related to
       17   that.  But it's the methodology for showing, you know, in part,
       18   you know, where the population is now.
       19            THE COURT:  But --
       20            MR. WALKER:  We don't think it's germane, Your Honor,
       21   to the -- I mean, speaking for the defendants, we don't think
       22   it's germane to the decision you have to make about whether in
       23   2011 the legislature could have drawn any of the plans proposed
       24   by Mr. Cooper.
10:09:02 25            MR. SPIVA:  Yeah.  I mean, his maps are drawn with the
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 36**

```
 1  2011 data.  But it's partly just to show the progression.
 2      Also, they have raised the issue of the fact that the 2021
 3  census may cause Alabama to lose a district.  And so he's put
 4  forth a six-district plan.
10:09:24  5      MR. WALKER:  I'm unsure about how germane that is
 6  since there's no longer going to be an injunctive relief
 7  decision before Your Honor, that's whether or not an Alabama
 8  Legislature could have drawn one of these proposed plans.
 9          THE COURT:  In 2011?
10:09:38 10      MR. WALKER:  Yes, ma'am.
11          MR. SPIVA:  It may also go to the mootness issue, Your
12  Honor, because one of the arguments for mootness is that
13  Alabama is going to lose a seat, and, therefore, any decision
14  Your Honor -- I'm a making the defendant's argument, of course.
10:09:49 15  It's not my position -- but that any declaratory judgment Your
16  Honor might provide, that it would --
17          THE COURT:  Provide --
18          MR. SPIVA:  Wouldn't be instructive, yeah.
19      And so part of the reason for providing the hypothetical
10:10:07 20  plan is to show that it would still -- it would still, A, it
21  would still be possible, but that it would still be
22  instructive.
23          MR. WALKER:  I think -- I think my colleague is
24  stretching, Your Honor.  The point of the mootness argument was
10:10:21 25  that in the cases they relied on Section 5 was still in effect.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1  Whereas, our point is it's no longer in effect; and, therefore,
 2  there's no longer a benchmark we have to refer to.  Whether or
 3  not we can draw six district plans is really not before Your
 4  Honor.
 5            THE COURT:  That's what I think, as well.
 6            MR. SPIVA:  Okay.
 7            THE COURT:  So --
 8            MR. SPIVA:  I can kind of move it along, Your Honor.
 9            THE COURT:  Yeah, because I don't really see how 2017
10  data is relevant.
11            MR. SPIVA:  Okay.
12            THE COURT:  All right.  Thank you.
13            MR. SPIVA:  Thank you.
14            MR. WALKER:  Thank you, Your Honor.
15            (End of bench conference.)
16  BY MR. SPIVA:
17  Q    Let me turn your attention to Figure 4 in your first
18  report, which is on page 11.  And let's now discuss the
19  geographic distribution of the African-American population in
20  Alabama.
21       Is the majority of the African-American population in
22  Alabama contained in certain areas of the state, Mr. Cooper?
23  A    Yes.  From this map you can see that the majority black
24  counties, which are shaded pink and a deeper pink, are all in
25  the historical Black Belt of Alabama running east to west
```

10:10:37 (line 5)
10:10:46 (line 10)
10:10:51 (line 15)
10:11:52 (line 20)
10:12:15 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 38**

1  really from Macon County over to Sumter County.  All those

2  counties are majority black.

3      Montgomery is not.  It's an urban county, and it's part of

4  the historical Black Belt, as well.

10:12:43  5  Q   And about how much of Alabama's black population is

6  concentrated in the urban counties of Jefferson, Madison,

7  Montgomery, and Mobile?

8  A   About half of the population is in those three counties.

9  Of course, Madison is in the north.  But Montgomery and Mobile

10:13:06  10  are in areas in the central and south Alabama area and can be

11  drawn into one of two majority black districts.

12  Q   In the rural Black Belt counties excluding --

13      THE COURT:  Wait a minute.  I'm not sure I understood

14  that question or that answer.

10:13:27  15      In looking at your map, I don't see where the majority of

16  the black population is in those counties.

17      MR. SPIVA:  I can pull up the paragraph where it's the

18  actual percentages are reported, Your Honor.

19      I just wanted to give you a rough sense.  But you can --

10:13:49  20  and you can see it visually.  But the paragraph that follows it

21  I think actually -- well, correct me if I'm wrong, Mr. Cooper,

22  but I believe that the paragraph that follows it reports that.

23      THE WITNESS:  Yes.  You would refer to Exhibit D,

24  which has the breakout by county, by race, and ethnicity

10:14:10  25  according to the 2010 census, if that would help.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 39**

```
 1            MR. SPIVA:  Well, actually -- I mean, we could do
 2   that, but I think Your Honor is asking -- if I understand your
 3   question, Your Honor, you're saying Figure 4 doesn't show you
 4   where the half of the black population is in the counties I
 5   mentioned, but I think --
 6            THE COURT:  Right.  Right.  Because those are shaded
 7   much lighter than the counties in the Black Belt.
 8            MR. SPIVA:  Yeah.  And they just don't give you the
 9   figures.  I think the figures are in paragraph 26 of
10   Mr. Cooper's report.  I mean, he can confirm obviously, and we
11   can pull that up.  Can we actually pull up paragraph 26?
12       Is it all right if I ask him --
13            THE COURT:  Okay.  All right.  So there may be a
14   majority of African-Americans in what counties were you talking
15   about?  Jefferson?  Madison?
16            MR. SPIVA:  Montgomery and Mobile, yes.
17            THE COURT:  Is Madison one of them?
18            MR. SPIVA:  Yes.  That was -- if you -- Jefferson,
19   Madison, Montgomery, and Mobile, Your Honor.  Those were the
20   urban counties in which --
21            THE COURT:  Right.  And certainly that's where the
22   highest population of all citizens in Alabama live.  But in
23   looking at the map, which is Figure 4 on page 11 of Exhibit 1,
24   for example, Madison County, according to your shading, looks
25   like it may be 20 percent black.
```

Timestamps in left margin:
10:14:27 (line 5)
10:14:43 (line 10)
10:15:02 (line 15)
10:15:17 (line 20)
10:15:45 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 40**

```
 1              THE WITNESS:  That's true.  I mean, I'm looking at
 2    aggregate population counts.
 3              THE COURT:  Okay.
 4              THE WITNESS:  So while 50 percent of the
10:15:54  5    African-American population lives in those urban counties,
 6    those urban counties are majority white counties.
 7              THE COURT:  Okay.
 8              THE WITNESS:  Although I need to check Montgomery.  I
 9    think it's very close to being a 50/50 county, isn't it?
10:16:12 10              THE COURT:  It's in the 40 percent to 60 percent.  But
11    I think it's very close to 50 percent.  And Jefferson may also
12    be closer to 50 percent.
13              THE WITNESS:  Yeah.  Montgomery is 50.71 percent
14    single-race black and 55 percent any-part black, 55.45 percent
10:16:34 15    any-part black.  Jefferson is in the mid 40s.
16              THE COURT:  Okay.  All right.  But, you know, just
17    looking at this map, that map does not tell me that the
18    majority black population are in those counties.
19              MR. SPIVA:  No.  The map alone, Your Honor -- you're
10:16:54 20    absolutely correct, Your Honor.  Those are reported both in
21    paragraph 26 and also in, I believe -- which exhibit was it,
22    Mr. Cooper?
23              THE WITNESS:  Exhibit D.
24              MR. SPIVA:  To your first report, which is -- let me
10:17:10 25    get you the Plaintiffs' Exhibit Number, Your Honor.  I believe
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 41**

42

1    that is Plaintiffs' Exhibit 10.  And that is Exhibit D to

2    Mr. Cooper's initial report.

3         So that gives -- well, let me ask -- I guess I shouldn't

4    testify.

10:17:34  5         THE COURT:  No, no, no.  It would be better that you

6    don't.

7    BY MR. SPIVA:

8    Q    But, again, Mr. Cooper, does Exhibit D to your first

9    report, which is Plaintiffs' Exhibit 10, does that show a

10:17:44 10  county-by-county racial breakdown according to the 2010 census

11   in Alabama?

12   A    Yes.

13   Q    Okay.

14   A    And in paragraph 26, I do note that 12 percent of

10:17:59 15  statewide black population lives in the historical Black Belt

16   counties.  And by 12 percent, I am only counting the rural part

17   of the Black Belt.  And I've excluded Montgomery County, which

18   I put in with the urban counties.

19         THE COURT:  But it is part of the Black Belt.

10:18:17 20         THE WITNESS:  It is part of the Black Belt, right.

21   But I'm not double counting.  The 12 percent just includes

22   those ten counties that are more rural in nature.

23   BY MR. SPIVA:

24   Q    And what about the counties -- I think this is also

10:18:33 25  reported -- well, let me just ask you -- yeah, this is reported

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 42**

```
 1  in paragraph 26.
 2       But what about the counties of Lee and Tuscaloosa?  How do
 3  they -- what is the percentage of the statewide black
 4  population that lives in those counties?
 5  A    About seven percent.  Those are university counties, so I
 6  have broken that out as another category.
 7  Q    And taken together, the urban counties, the rural Black
 8  Belt counties, and the university -- what you have called the
 9  university counties, how much of the statewide black population
10  is contained within those counties?
11  A    About 70 percent.
12  Q    Okay.  And which counties do you consider to be part of
13  the Black Belt, Mr. Cooper?
14  A    Well, those would be Sumter going west to east -- east --
15       THE COURT:  Wait a minute.  If the university counties
16  have about seven percent of the statewide black population, why
17  are you lumping them in with the urban counties?
18       THE WITNESS:  Well, I'm just --
19       THE COURT:  I don't understand that combination.
20       THE WITNESS:  I'm just simply pointing out where most
21  of the African-American population lives in Alabama, and that
22  would be the two university counties, as well as the urban
23  counties of Jefferson, Madison, Montgomery, and Mobile with the
24  remainder in the historical Black Belt.  But noting that the
25  historical Black Belt now really only accounts for 12 percent
```

Line timestamps: 10:18:53 (5), 10:19:15 (10), 10:19:33 (15), 10:19:55 (20), 10:20:18 (25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 43**

<table>
<tr><td>1</td><td>of the statewide black population.  So most of the black</td></tr>
</table>

```
        1    of the statewide black population.  So most of the black
        2    population by far lives outside of the historical rural Black
        3    Belt.
        4    BY MR. SPIVA:
10:20:32 5   Q    That's --
        6         THE COURT:  Okay.  But 12 percent of them are in the
        7    Black Belt, and only 7 percent in Lee and Tuscaloosa, so --
        8         THE WITNESS:  Right.
        9         THE COURT:  -- I guess I just don't understand why Lee
10:20:44 10  and Tuscaloosa would be lumped in with the urban counties as
        11   opposed to the Black Belt being -- but, anyway, that's fine.
        12   Move on.
        13        THE WITNESS:  Yeah.  I'm just trying to show where
        14   most of the black -- where most of the black population in the
10:21:03 15  state, in other words, close to three-fourths lives, and it is
        16   in that set of counties.  But I'm not -- not going beyond that.
        17   I'm just identifying those counties.
        18   BY MR. SPIVA:
        19   Q    And when you say that that set, you mean the urban
10:21:23 20  counties, the Black Belt counties, the rural Black Belt
        21   counties excluding Montgomery and Lee and Tuscaloosa.  Is that
        22   what you mean?
        23   A    That is correct.
        24   Q    And --
10:21:35 25  A    And, actually, in the illustrative plans that I have
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 44**

1  developed, the area that I draw from to create this two

2  majority black districts is basically the area that is

3  discussed in paragraph 26 with the exception of Madison County,

4  which, of course, is too far north to be put into a majority

10:21:55  5  black district.  And actually Lee County, which does have a

6  fairly significant black population is also not included in the

7  majority black district under the illustrative plans I've

8  drawn.

9  Q    Okay.

10:22:10  10        MR. SPIVA:  Let's -- Your Honor, did that -- have all

11  your questions been answered?

12             THE COURT:  Just need to move on.

13             MR. SPIVA:  Okay.  Will do.

14  BY MR. SPIVA:

10:22:19  15  Q    Let's pull up Plaintiffs' Exhibit 12, please.  And this is

16  Exhibit F-1 to your first report, Mr. Cooper.  And if we could

17  also pull up Plaintiffs' Exhibit 1, Figure 8, which is on page

18  15 of your first report on the screen.

19        Is this the 2001 congressional plan that was in place for

10:22:52  20  congressional elections held between 2002 and 2010?

21  A    Yes.

22  Q    And what was the BVAP of CD 7 in this plan?

23  A    According to the 2010 census, it was 60.11 percent.

24  Q    And in which districts was most of the -- I'm sorry.  Yes.

10:23:16  25        Which districts outside of CD 7 was most of the rest of

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 45**

1    Alabama's African-American population in the 2001 plan

2    according to the 2010 census?

3    A    It was distributed more or less evenly between districts

4    1, 2, and 3.  I believe I have the figures in paragraph 34;

10:23:40 5    26 percent roughly of the black population in central and south

6    Alabama.  It was not part of District 7.

7        CD 1 was 26.16 percent.  CD 2 was 29.63 percent black

8    voting age.  And CD 3 was 30.73 percent BVAP.

9    Q    Okay.

10:23:59 10    A    You see 1, 2, and 3.  1 and 2 were basically in central

11    and south Alabama.  District 3 started in Montgomery but

12    extended all the way up to Cherokee County and Appalachian,

13    Alabama.

14    Q    Okay.  And taken together, and according to the 2010

10:24:16 15    census, how large was the BVAP populations in those three

16    districts?

17    A    Well, I just said those.

18    Q    What was that?

19    A    Maybe I didn't make that clear.

10:24:28 20    Q    Not individually, but taken together.

21    A    Oh, taken together.  Over 600,000; 629,000 total black

22    population, and the BVAP would have been 448,000.  But that

23    629,000 figure indicates that in those three districts alone,

24    just looking at the black population, you had enough to create

10:24:50 25    an entire congressional district -- 92 percent of an entire

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 46**

1   congressional district.

2   Q    So let's pull up or go to your Figure 9 of your initial

3   report on page 16 of Plaintiffs' Exhibit 1.

4        What does the map in Figure 9 show?

10:25:13  5   A    Well, the map again overlays the black population

6   percentage by county.  The black lines show the current 2011

7   plan District 7.  And the red lines show where District 7 was

8   located under the 2001 plan.

9        So in much of the 2011 plan, the old 2001 lines are

10:25:43 10  followed.  For example, right along the Black Belt, some of

11  those counties were followed exactly.  But because the District

12  7 lost population or did not grow as rapidly as the rest of the

13  state, by 2011 it was underpopulated by -- if you go back to

14  Figure 8 -- by almost 80,000 people.

10:26:08 15       So District 7, as drawn in the 2001 plan, had to expand

16  and pick up more geography and more population in order to meet

17  one person one vote requirements in the 2010 census and post

18  2011 redistricting cycle.

19  Q    And where did it pick up that population?

10:26:27 20  A    In this case, District 7 was expanded into Lowndes County

21  and part of Montgomery County, as well as a little bit of --

22  more of Marengo County was included in District 7.  And all of

23  Pickens County was included in 7.  Previously Pickens had been

24  split.

10:27:00 25  Q    Okay.  And then if we can pull up Plaintiffs' Exhibit 10,

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 47**

48

```
 1  which is -- that was the Exhibit D to your first report that we

 2  were just looking at, Mr. Cooper.

 3  A    Yes.

 4  Q    And if we could actually leave up Figure 9 on page 16 of

10:27:26 5  Mr. Cooper's first report.

 6       What is the demographic makeup of Lowndes County?

 7  A    Lowndes County, according to the 2010 census, is

 8  73.55 percent single-race black and 73.91 percent any-part

 9  black.

10:27:57 10  Q    And what is the demographic makeup of Clarke County?

11  A    Clarke is 43.88 percent single-race black and

12  44.29 percent any-part black.

13  Q    And what is the demographic makeup of Pickens County?

14  A    Pickens is, I believe, actually majority white, is it not?

10:28:25 15  It's -- well, yeah.  It's 41.58 percent single-race black and

16  42.17 any part.

17  Q    Okay.  Let's pull up Plaintiffs' Exhibit 17.  Is that

18  Exhibit G-4 to your first report, Mr. Cooper?

19  A    Yes.

10:28:49 20  Q    And what is this map?

21  A    This map zooms in on Montgomery County under the 2011

22  plan.  And it shows some of the other counties that are

23  adjacent -- part of Lowndes, part of Bullock, Autauga, and

24  Elmore, Macon.

10:29:08 25  Q    And was Montgomery County or city split in the 2011 plan?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 48**

```
 1  A    Yes.  It was divided into three congressional districts.
 2  Part of Montgomery County went into District 7.  Part of it
 3  went in District 2 extending through the center of the county
 4  north to south, and the other part went into District 3.
```
10:29:28 `5  Q    And had Montgomery County been split in the 2001 plan?`
```
 6  A    No.  In the 2001 plan, it was entirely in District 3.
 7  Q    Was there a small part of Montgomery County in the 2001
 8  plan that was in District 2?
 9  A    I'm sorry.  I stand corrected.  There was a small part
```
10:29:49 `10  that was in another district.`
```
11  Q    Okay.  And how were Montgomery County and -- how was
12  Montgomery County split in the 2011 plan, in terms of race?
13  A    Most of the black population in Montgomery County was
14  placed in District 7.  And then the remainder of the black
```
10:30:19 `15  population would have been subdivided between Districts 2 and`
```
16  3.
17       I think most of the areas in District 2 are majority white
18  in that component of Montgomery County, as well as the western
19  part of Montgomery County is predominantly white, as well, and
```
10:30:35 `20  it went into District 3.`
```
21  Q    Okay.  So let's pull up both Figure 10 of Plaintiffs'
22  Exhibit 1 on page 17 of Mr. Cooper's first report.  And if we
23  could look at that along side of Figure 11 of the first report,
24  Plaintiffs' Exhibit 1, and paragraph 41 of the first report,
```
10:31:05 `25  all of those latters all appear on page 18 of his first report.`

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 49**

```
 1        So this is the -- what we have got up in terms of the map
 2   is the current 2011 plan?
 3   A    Yes.
 4   Q    And about how much of Alabama's African-American
 5   population is in CD 7 under this plan?
 6   A    About one-third.
 7   Q    Okay.  And in which districts was the rest of most of
 8   Alabama's African-American population?
 9   A    Districts 1, 2, and 3.
10   Q    And according to --
11             MR. SPIVA:  Pardon me one second, Your Honor.
12   BY MR. SPIVA:
13   Q    And do you report in your report in paragraph 41 the BVAP
14   of CD 7 in the 2011 plan?
15   A    Yes.  The BVAP CD 7 is 60.91 percent.
16   Q    And what were the BVAPs of each of CDs 1, 2, and 3 in the
17   2011 plan?
18   A    26.11 percent for CD 1; 28.26 for CD 2; and 24.34 percent
19   for CD 3.  So the BVAP in those three districts actually
20   dropped compared to the BVAP in CD 1, 2, and 3 under the 2001
21   plan by a small amount.  But it's a little bit smaller than was
22   the case in the earlier plan.
23        More importantly, this is just a clear example, in my
24   opinion, of what is known as cracking in redistricting
25   terminology where the black population is just sort of
```

10:31:34 (line 5)
10:31:48 (line 10)
10:32:26 (line 15)
10:32:59 (line 20)
10:33:22 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 50**

```
 1  distributed into different districts when it's in an area that
 2  is sufficiently compact to allow for a stronger district to be
 3  created.
 4  Q    And what happened, in terms of the -- you gave the number,
 5  but in terms of whether it was an increase or decrease in the
 6  BVAP in CD 7 as between the 2001 plan and the 2011 plan, what
 7  happened with that?
 8  A    It went up a little bit from I think 60.11 -- I'm not
 9  looking at it -- but it seems like I remember that -- to
10  60.91 --
11  Q    Okay.
12  A    -- percent.
13  Q    And I think you said that taken together the BVAP in 1, 2,
14  and 3 in the 2011 plan is nearly enough to form an entire
15  congressional district?
16  A    Yes.  84.3 percent.
17  Q    Okay.  So let me turn to the illustrative plans that you
18  drew.
19       And can you describe what you looked at to determine
20  whether the black population in Alabama is sufficiently large
21  and geographically compact to allow for the creation of the
22  second majority-minority district?
23  A    Well, one reference point was the plan that the state
24  legislature adopted for the state board of education.
25  Q    Can you pull up -- while you're talking about that, can we
```

10:33:42  (line 5)
10:34:00  (line 10)
10:34:12  (line 15)
10:34:32  (line 20)
10:34:52  (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 51**

1   pull up Figure 1 on page 5 of Mr. Cooper's first report,

2   Plaintiffs' Exhibit 1?

3   A     So this is the state board of education plan, which

4   creates majority black District 4 that includes part of

10:35:13 5   Jefferson County and a couple of the western Black Belt

6   counties, as well as part of Bibb and Tuscaloosa.

7         And then there's a majority black district in the south

8   that includes the city of Mobile and most of the rest of the

9   historic Black Belt, including almost all of Montgomery County,

10:35:35 10   except for a little tiny piece in the -- in the north that is

11   part of District 3 along the Elmore County line.  So...

12   Q     You're referring to Board of Education District 5?

13   A     Yes.  Yes.  Both of those districts are majority black

14   voting age.  Board of Education District 4 is 51.4 percent

10:35:58 15   BVAP, and District 5 is 57.5 percent.

16         So from that, it was clear to me that one could draw, in

17   all likelihood, a second majority black district in a

18   seven-district plan that would adhere to the original

19   redistricting principles and would be consistent with what the

10:36:22 20   state legislature did with the state board of education plan,

21   in terms of the counties that would have been included in that

22   district -- in those districts for a seven-congressional

23   district plan.

24             THE COURT:  And when was that plan drawn?

10:36:34 25             THE WITNESS:  In, I believe, May of 2011.  I think

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 52**

```
 1   that's when it was adopted.  I could be wrong about the month,
 2   but I think that's when.
 3                THE COURT:  Thank you.
 4                THE WITNESS:  Although the previous state board --
10:36:47  5                THE COURT:  No.  That was all of my question.
 6                THE WITNESS:  Okay.  Okay.
 7   BY MR. SPIVA:
 8   Q    That is the 2011 plan?
 9   A    Yeah.
10:36:52 10   Q    The BOE plan?
11   A    Right.
12   Q    So let's just take a look at Figure 2 on the next page,
13   page 6 of your first report, Plaintiffs' Exhibit 1.
14        Can you describe what that shows?
10:37:06 15   A    This simply overlays Board of Education Districts 4 and 5
16   onto a map showing the percent black by county.  Similar to the
17   plan -- to the map that I produced showing how District 7
18   changed between 2001 and 2011, similar kind of overlay.  But
19   this is just for this single point in time for the 2011
10:37:32 20   redistricting plan.
21   Q    In terms of -- you mentioned that District 5 of the BOE
22   plan encompassed part of Mobile County.  Does it encompass all
23   of Mobile County?
24   A    No.
10:37:47 25   Q    Can you describe the area of Mobile County that it
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 53**

54

```
       1   includes?
       2   A    It includes most of the city of Mobile, as well as some of
       3   the rural precincts extending north into Washington County.
       4   Q    And does the 2011 state board of election plan combine
10:38:10 5  part of Mobile County and Montgomery County?
       6   A    Yes.
       7   Q    Do you know, Mr. Cooper, how long State Board of Election
       8   Districts 4 and 5 have been African-American majority
       9   districts?
10:38:25 10 A    In the 1990s, there was litigation involving the state
      11   board of education plan that I am aware of.  I think I have a
      12   footnote going to the state board of education plan for 2000
      13   preclearance letter.  And in that letter there is a note about
      14   what the BVAP was in the two districts in the 1990s, as well as
10:38:57 15 the BVAP.
      16            THE COURT:  I think we have an objection.
      17            MR. WALKER:  The question that Mr. Cooper is answering
      18   I think is beyond the scope of his report.
      19            MR. SPIVA:  I think he was referencing a footnote in
10:39:11 20 his --
      21            THE COURT:  Well, if he's referencing a footnote, if
      22   you will please point out what footnote he's referring to.
      23   BY MR. SPIVA:
      24   Q    Mr. Cooper, are you able to point out the footnote that
10:39:22 25 you are referring to?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 54**

```
          1   A    Yes.  It's footnote 13 on page 20, referenced in paragraph
          2   45 where I have the percentage statistics for the court-ordered
          3   1996 plan according to the 2000 census.  And then the new plan
          4   that was adopted I think in 2001 --
10:39:54  5           THE COURT:  Excuse me.  I'm not sure that that answers
          6   the question that was specifically asked.
          7   BY MR. SPIVA:
          8   Q    Yeah.  Why don't -- can I withdraw the --
          9           THE COURT:  I would ask, Mr. Cooper, if you would
10:40:06 10   please listen to the question and only answer the specific
         11   question that's asked, okay?
         12           THE WITNESS:  Okay.
         13   BY MR. SPIVA:
         14   Q    Do you know how long, Mr. Cooper, SBOE Districts 4 and 5
10:40:25 15   have been African-American majority districts?
         16   A    Well, I believe that the first time that 4 and 5 were
         17   drawn to be both majority black would have been in May of 2011,
         18   but I don't know exactly when 4 or 5 might have -- I guess
         19   District 4 might have turned African-American at some point in
10:40:55 20   the 2000s.  I don't know.
         21   Q    Okay.  And if you know, do you know how long SBO Districts
         22   4 and 5 have an African-American opportunity districts?
         23         First of all, if I say opportunity districts, what do you
         24   understand me to be asking you?
10:41:11 25   A    A district where an African-American would have an
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 55**

56

```
    1  opportunity to be elected.
    2  Q    But necessarily majority district?
    3  A    Not necessarily majority.
    4  Q    And do you know how long SBO Districts 4 and 5 have been
10:41:22  5  African-American opportunity districts?
    6  A    Since sometime in the 1990s.
    7  Q    And is that reflected in paragraph 45 that -- what you
    8  just said reflected in paragraph 45 of your first report?
    9  A    Yes.
10:41:49 10       MR. SPIVA:  Your Honor, may have just a minute to
   11  consult with my colleague on something?
   12       THE COURT:  Yes.  It's probably a good time to take a
   13  break, anyway.  I don't want to wear out Ms. Christina's
   14  fingers.
10:42:00 15       MR. SPIVA:  Thank you, Your Honor.
   16       THE COURT:  We will come back at 11:00 o'clock.
   17       (Recess.)
   18       THE COURT:  One thing I should have mentioned when we
   19  started this morning -- and I apologize -- I have a sentencing
11:00:30 20  today at 1:00 that I have to take, so we're going to take a
   21  little longer -- a little later break for lunch, so you will
   22  kind of have an idea of where we're going.  I should have told
   23  you first.  I apologize.
   24       MR. SPIVA:  No problem, Your Honor.  Sounds like you
11:00:42 25  won't get as much of a break, though.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 56**

```
          1            THE COURT:  Oh, I don't ever get a break, but that's

          2    okay.

          3        You may proceed, Mr. Spiva.

          4            MR. SPIVA:  Thank you, Your Honor.

11:00:53  5    BY MR. SPIVA:

          6    Q    Mr. Cooper, did you use the 2011 SBOE plan as a point of

          7    departure when you were creating your illustrative map?

          8    A    Yes.  In conjunction with the 2011 plan.

          9    Q    In conjunction with the 2011 congressional plan?

11:01:23 10    A    Yes.

         11    Q    And what does your review of the SBOE, the 2011 SBOE map

         12    tell you about the possibility of making two majority-minority

         13    congressional districts in Alabama?

         14    A    It suggests to me that it is -- or it suggested to me that

11:01:44 15    it was highly likely that I could draw two out of seven

         16    majority black districts.

         17    Q    And let me just draw your attention to paragraph 17 of

         18    your initial report, Plaintiffs' Exhibit 1.  What about it --

         19    I'm sorry.  Did I say -- I meant to say paragraph 17.  I don't

11:02:19 20    know if I said page 17.

         21            THE COURT:  Paragraph 17 on page 7.

         22            MR. SPIVA:  Thank you, Your Honor.

         23    BY MR. SPIVA:

         24    Q    What about it suggested to you the possibility of -- to

11:02:30 25    potentially having two congressional districts?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 57**

```
         1   A     Well, we know that if you could draw two out of seven, as

         2   opposed to two out of six districts, the size of the

         3   congressional -- I'm sorry -- as opposed to two out of eight

         4   districts as in the BOE plan, it's obvious that the population

11:02:53 5   size of the congressional districts has to be larger.

         6        So the districts as drawn in the state board of education

         7   plan, Districts 4 and 5, that area would have to expand

         8   slightly.  And so I was aware that there were other counties

         9   that were not in District 4 and 5 with significant black

11:03:14 10  populations.  Namely --

        11             MR. SPIVA:  Could we put up Figure 2 side by side with

        12   that, please?

        13   BY MR. SPIVA:

        14   Q     Go ahead.  I'm sorry to interrupt.

11:03:25 15  A     Well, mainly, Conecuh, Butler, Barbour, and Russell.

        16             THE COURT:  Excuse me.  That's Conecuh.

        17             THE WITNESS:  I'm sorry.  I learned how to say that,

        18   and I've been saying Conecuh every time.

        19             MR. SPIVA:  I can testify to that, Your Honor.  He

11:03:38 20  actually has been saying that.

        21             THE WITNESS:  How am I doing on Mobile?

        22             THE COURT:  Mobile you're doing okay.  We'll wait

        23   until you get to some of the other Native American derived

        24   counties, so we'll see.

11:03:51 25            MR. SPIVA:  We're just going to stay away from those.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 58**

           1            THE WITNESS:  Etowah, that's correct, isn't it?

           2            THE COURT:  Yeah.  You're doing well on that one.

           3   BY MR. SPIVA:

           4   Q    So can you explain -- you were mentioning that there were

11:04:03   5   counties outside of the Board of Education District 5 including

           6   Conecuh that might be included in a second majority-minority

           7   congressional district?

           8   A    Right.  The four counties -- maybe I didn't list them all

           9   due to my mispronunciation of Conecuh.

11:04:20  10            THE COURT:  I'm sorry.  That was my problem.

          11            THE WITNESS:  No.  I'm glad you corrected me.

          12       Well, Conecuh, Butler, Barbour, and Russell all are

          13   counties that according to the 2010 census had black

          14   populations over 40 percent, and they are not in Districts 4

11:04:35  15   and 5.

          16   BY MR. SPIVA:

          17   Q    Okay.

          18   A    So that would be one area where those two districts could

          19   be expanded in a fashion that would allow for two out of seven

11:04:45  20   majority black districts, as opposed to two out of eight as in

          21   the board of education plans.

          22   Q    Can we pull up Figure 12 on page 22 of Mr. Cooper's first

          23   report, Plaintiffs' Exhibit 1?  And once we get there,

          24   Mr. Cooper, if you can explain what the significance of this

11:05:11  25   map?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 59**

60

```
         1   A    Well, this is sort of just jumping ahead in the sense that
         2   this particular figure outlines the area of the state that I
         3   have included in one or more of the majority black districts.
         4        So you can see that I did include Butler and Conecuh and
11:05:42 5   Barbour.  I did not include Russell in any majority black
         6   districts.
         7   Q    And so I want to just focus this a little bit.  When you
         8   said you did include, do you mean that in one of the
         9   illustrative or revised plans that you prepared, that in each
11:06:00 10  of those plans they fell somewhere within this area?
        11   A    Yes.
        12   Q    But not that each plan includes the entire area, I take
        13   it?
        14   A    That's true.  In some cases, a county would have been
11:06:13 15  dropped.
        16   Q    Uh-huh.  And what is the population of the area that's
        17   outlined here in Figure 12, and is that reported in paragraph
        18   49 on page 22?
        19   A    Yes.  There are roughly 1.79 million people living in that
11:06:36 20  area, which would constitute two-and-a-half congressional
        21   districts in a seven-district plan according to the 2010
        22   census.  So there's more than enough population there to create
        23   two majority black districts with over 340,000 people left
        24   over.
11:06:56 25  Q    And is there more than enough area -- more than enough
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 60**

population there to draw them in different ways?

A    Yes.  Exactly.  That's what I did.  And that's why that area is so much larger than two congressional districts because I did different configurations under the illustrative plans.

11:07:15  Q    Mr. Cooper, when you assessed whether the African-American population is sufficiently large and geographically compact to constitute a majority voting age population in a given district, is it necessary to consider race to some degree?

A    Because this is a *Gingles 1* case, Section 2 case, and you

11:07:39  have to meet the *Gingles 1* precondition, race is in the background, but it does not predominate.

Q    Are there other considerations that you take into account as well when you are attempting to draw illustrative plans?

A    Well, in this particular instance, I prioritize avoiding

11:07:59  county splits.  So right at the outset, I wanted to split no more than seven counties in any plan, which is the same number of counties that the state split in the 2011 plan.  And I accomplished that objective.  In fact, in two of the illustrative plans, I split just six counties.

11:08:23  Q    And what about in terms of precincts are also called voting tabulation districts; is that right?

A    Yes.

Q    Was there -- was that -- avoiding VTD splits, was that a consideration you -- a consideration in the drawing of your

11:08:56  illustrative plans?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 61**

```
 1   A    Well, that was also a top priority.  So my objective was

 2   not to split any more precincts than the numbers split in the

 3   2011 plan, and I also achieved that objective.

 4        One plan -- I believe it may be Illustrative Plan 3 or

11:09:12  5   4 -- splits the same number, 16.  All the other split fewer.

 6   And so that, too, was prioritized.

 7        And by precinct splits, I'm only calling a split if there

 8   is population involved.  Because some precincts or VTDs will

 9   extend, say, beyond municipal boundary to include a commercial

11:09:36 10   split -- a commercial strip.  And if you are going to follow a

11   municipal boundary, in fact, you may end up splitting that

12   precinct, zero population is involved.

13        So in my tables, I've just broken out the populated

14   splits, which are the most meaningful.

11:09:55 15   Q    And are there instances when a voting tabulation district

16   must be split?

17   A    In a zero deviation plan, which I understand is necessary

18   in a Section 2 lawsuit nowadays, precincts have to be split.

19   It would be just an amazing coincidence if you could combine

11:10:19 20   precincts and magically come up with a zero deviation district.

21             THE COURT:  What do you mean by a zero deviation

22   district or plan?

23             THE WITNESS:  Plus or minus one person.

24   BY MR. SPIVA:

11:10:33 25   Q    Does that mean --
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 62**

```
      1   A     From the ideal district size.

      2   Q     And does that mean that all districts in the plan would

      3   have equal population?

      4   A     Plus or minus, right.

11:10:44 5   Q     Plus or minus one?

      6   A     Yes.

      7   Q     So there might be one district that had one more person in

      8   it than another district?

      9   A     Or even two more.

11:10:51 10  Q     Okay.

     11   A     Because one would be plus one and one would be minus one,

     12   so, yes.

     13         THE COURT:  So you're talking about plus or minus

     14   one person, as opposed to plus or minus one percent of

11:11:03 15  population?

     16         THE WITNESS:  Yes.

     17        In the state legislative plan, the range was plus or minus

     18   one percent, I believe, in the Alabama Legislative Black Caucus

     19   case.  So you had more population to work with.

11:11:17 20       But in a case like this, and in most of the congressional

     21   plans even drawn by state legislatures following the 2010

     22   census, it was plus or minus one person.

     23   BY MR. SPIVA:

     24   Q     When you are forced to split a precinct, what is your

11:11:33 25  approach?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 63**

64

```
         1   A    Basically, when you get to that point, and if it's to zero
         2   out the population, you just have to sort of experiment until
         3   you get it right.  I mean, you move 24 people here, 36 people
         4   here, and eventually you can get it down to zero, as opposed to
11:11:54 5   plus or minus five persons.
         6   Q    What I am asking, though, is are there certain techniques,
         7   in terms of visible features that you try to follow when you
         8   have to split a VTD?
         9   A    Yes.  I would try to follow names, streets, or municipal
11:12:07 10  boundaries, which may not be visible boundaries, or a water
        11   body or something so that there, you know, is a clear rationale
        12   for the split.
        13   Q    In drawing your illustrative plans, did you consider
        14   geographical compactness?
11:12:22 15  A    Yes.  Both visually, and then I also did compactness tests
        16   to compare and contrast an illustrative plan with the 2011
        17   plan, as well as other state plans, state legislative plans,
        18   House and Senate, as well as the board of education plan.
        19   Q    We'll get there in a minute.  I just want to make sure I
11:12:44 20  understand what you considered.
        21       Did you consider contiguity in drawing your illustrative
        22   plans?
        23   A    Yes.  I considered contiguity.  And the Maptitude
        24   redistricting software actually has a menu check.  You just hit
11:12:56 25  the menu button, and it will tell you whether or not the
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 64**

```
 1  district is contiguous.
 2  Q    Are the illustrative plans that you drew contiguous?
 3  A    Yes.
 4  Q    Did you consider the non-dilution of minority voting
 5  strength in drawing the illustrative plans?
 6  A    I believe I did.
 7  Q    And what does, in the redistricting context, what does
 8  non-dilution of minority voting strength mean?
 9  A    It means essentially that based on analyses performed by
10  experts other than myself -- because I am not a political
11  scientist -- a determination has been made that a district
12  would perform as an opportunity district; in other words, a
13  black candidate could win, wouldn't ensure a victory, but it
14  would be within the realm of possibility in spite of
15  racially-polarized voting.
16  Q    Let me ask you:  Did you consider communities of interest
17  in drawing your plans?
18  A    I did.  I was aware of the historical Black Belt and tried
19  to keep that together in one or more of the majority black
20  districts to the extent possible.
21       I think that counties represent communities of interest,
22  so I wanted to make sure that I did not unnecessarily split
23  counties.  And as I've indicated, I matched the state's number
24  of splits in that regard and actually did a little better
25  overall for -- when comparing to all four illustrative plans.
```

11:13:09  5
11:13:27 10
11:13:52 15
11:14:07 20
11:14:29 25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 65**

```
         1   Q    Let me pull up paragraph 19 of Plaintiff' Exhibit 1 on

         2   page 7 of your first report.  And let me ask you about the

         3   quote here.  You have in here a quote I believe from the

         4   reapportionment committee guidelines for congressional

11:15:04 5   legislative and board of education redistricting.

         6        What is that, and why did you include it?

         7   A    Because it's a very concise, clear, general statement

         8   about the concept of community of interest.  It's a broad

         9   concept.  And I believe that Mr. Dorman Walker actually

11:15:26 10  authored that paragraph.

        11   Q    Well, we won't speculate on that.  But mainly I just

        12   wanted to know whether this was something you considered in

        13   terms of -- and that was intended as a compliment.

        14   A    Right.

11:15:41 15  Q    But the main question is did you consider this in drawing

        16   your illustrative plans?

        17   A    Yes.  I consider it to be a very well-written paragraph.

        18   And I tried to abide by that paragraph to the best of my

        19   ability.

11:15:54 20  Q    And what were the communities of interest that were set

        21   forth in the reapportionment committee guidelines?

        22   A    Well, I will just repeat them.  Areas with recognized

        23   similarities of interests, including but not limited to racial,

        24   ethnic, geographic, governmental, regional, social, cultural,

11:16:15 25  partisan, or historic interests; county, municipal, or voting
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 66**

```
  1  precinct boundaries, and commonality of communications.
  2  Q    Okay.  And does this definition comport with your
  3  understanding of what communities of interests are?
  4  A    Yes.  But Mr. Walker has stated it in a much more eloquent
  5  fashion than I might have.
  6  Q    Okay.  And do the illustrative plans that you prepared
  7  respect communities of interest?
  8  A    I believe so.  I understand there would be difference of
  9  opinion, but I think that I do meet that standard here.
 10  Q    Okay.  And do each of the illustrative plans -- and here
 11  I'm including Revised Plan 1, Revised Plan 2, Revised Plan 3,
 12  and Illustrative Plan 4.  Do each of those --
 13           THE COURT:  Just a minute, Mr. Spiva.  Aren't we only
 14  looking at the revised plans?  Aren't those the operative ones
 15  that we're considering?
 16           MR. SPIVA:  That is correct, Your Honor.  I just
 17  wanted to make sure that was clear.
 18           THE COURT:  I'm clear with that, and we can just go on
 19  directly to those.
 20           MR. SPIVA:  I wont' repeat it.  Sometimes I fall into
 21  illustrative plan, and I just want to make sure it's clear.
 22        With the exception, Your Honor, that Illustrative Plan 4
 23  is the same.
 24           THE COURT:  Was not modified, right?
 25           MR. SPIVA:  Yeah.  Not modified.
```

Time stamps: 11:16:40 (line 5), 11:16:54 (line 10), 11:17:19 (line 15), 11:17:25 (line 20), 11:17:35 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 67**

```
 1              THE COURT:  I got it.
 2              MR. SPIVA:  Okay.
 3    BY MR. SPIVA:
 4    Q    And I think I understand that you did not pair incumbents
 5    in those plans, correct?
 6    A    Correct.
 7    Q    Okay.  Was any one of the factors we just discussed the
 8    predominant factor in preparing those illustrative plans?
 9    A    No.
10    Q    Okay.  Did you look predominantly at race in your
11    development of your illustrative plans?
12    A    I was aware of race as a background factor.  This is a
13    Gingles 1 analysis, and this is a Section 2 case, so obviously
14    race is a factor.
15         But as I've indicated, I was also thinking about other
16    items, like county boundaries, preserving cultural ties, for
17    example, in the Black Belt area.  So I was looking at other --
18    other factors, not race as a predominant factor.
19    Q    Why did you draw four different plans?  And I'm again
20    putting aside the original illustrative plans.  Why did you
21    draw four plans?
22    A    Well, I just thought it was important to demonstrate that
23    there were various ways to draw two majority black districts
24    that could look quite different, in terms of the counties
25    included in each one of the two majority black districts.  It's
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 68**

1   different configurations.

2   Q    Okay.  Let's pull up Plaintiffs' Exhibit 61, which is

3   Exhibit A-2 to your second report, your second declaration,

4   or -- and let me ask you to verify once we get there,

11:19:27  5   Mr. Cooper, if that is, in fact -- pardon me one minute -- if

6   Plaintiffs' Exhibit 61 is, in fact, Exhibit A-2 to your second

7   report.

8   A    Yes, it is.

9        THE COURT:  And just for the record, and to be clear,

11:19:58  10   the witness' second report is which exhibit?

11        MR. SPIVA:  Thank you, Your Honor.  The witness'

12   second report is Plaintiffs' Exhibit 59.

13        THE COURT:  Thank you.  I just want to make sure we

14   got the trail.

11:20:08  15        MR. SPIVA:  Yes.  Thank you.  It's hard for me to --

16   I'm trying to trace them through, but sometimes you lose your

17   place.

18   BY MR. SPIVA:

19   Q    So this Plaintiffs' Exhibit 61, is that the -- well,

11:20:26  20   Revised Plan 1 that you did, Mr. Cooper?

21   A    Yes.

22   Q    And I'm displaying Revised Plan 1 kind of as a visual aid,

23   but I'd like to -- before we dive into the specifics of each

24   one, I'd like to get you to describe the features that the

11:20:48  25   illustrative plans share.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 69**

70

```
  1        And let's actually pull up -- sorry.  Let's actually pull
  2   up paragraph 53.  We can keep this maybe to the side -- in your
  3   first report, Plaintiffs' Exhibit 1, and it appears on pages 23
  4   and 24 of your first report.
11:21:45  5        Does this section of your report, Mr. Cooper, describe the
  6   common characteristics of each of the illustrative plans that
  7   you drew?
  8   A    Yes.
  9   Q    And this remained true even after you did the revised
11:22:04 10   versions, right?  These remained as common features?
 11   A    Right.
 12   Q    Okay.  Or common characteristics.
 13        And where is the CD 7 roughly located in the illustrative
 14   plans?
11:22:20 15   A    Well, CD 7 in the illustrative plans, of course, is always
 16   partly in Jefferson County.  But then in the various plans that
 17   I produced, the other counties varied to a certain extent.
 18        So Tuscaloosa, I believe, is in all of the District 7
 19   plans.  But in two of them, Tuscaloosa is divided between
11:22:52 20   District 7 and District 4 just as it is in the 2011 plan.  But
 21   in two of the plans, Tuscaloosa County is entirely in District
 22   7.
 23   Q    Okay.  What about CD 2, the new majority-minority
 24   district?  Where is that roughly located in the various
11:23:14 25   illustrative plans that you created?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 70**

1   A     Okay.  Well, one key commonality is that in all of the

2   illustrative plans, District 2 includes part of Mobile County

3   and all of Montgomery County.

4        And in the existing 2011 plan, part of Montgomery County

11:23:38 5   is in District 7 with the remainder put into white majority

6   districts.  And all of Mobile County is in white majority

7   District 1.

8   Q     Okay.

9   A     So that's a key contrast there.

11:23:50 10       But, again, depending on the illustrative plan, there are

11   various configurations of the counties between those areas

12   shared by both District 2 and 7 depending on the plan.

13  Q     Okay.  And we'll dive into each of them in just a minute.

14        In terms of commonalities, are the black voting age

11:24:10 15  populations of CDs 2 and 7 in each of the illustrative plans

16  that you did greater than 50 percent?

17  A     Yes.

18  Q     Okay.  And what is the black-to-white voting age margin

19  for CDs 2 and 7 in the various illustrative plans?  In other

11:24:37 20  words, what's the range of margins between black voting age

21  population and white voting age population in each of the

22  illustrative plans that you drew?

23  A     Well, the range for the black voting age population and

24  the non-Hispanic voting age population is roughly 4.7

11:24:56 25  percentage points to 8 percentage points.  So these are strong

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 71**

1  districts.

2       There's a big differential there between the white

3  population in Districts 2 and 7 under the four illustrative

4  plans.  They are not 50/50 districts.

11:25:12  5  Q   And I think you already said this, but is Montgomery

6  County kept whole in each of the illustrative plans that you

7  drew?

8  A   Yes.

9  Q   And did you examine the county in VTD splits in the

11:25:27 10  illustrative plans as compared to those in the 2011 plan?

11  A   Yes.

12  Q   Let's pull up Plaintiffs' Exhibit 59, which is your second

13  declaration, and in particular, Figure 12 on page 29.

14       And what does Figure 12 show?

11:26:11 15  A   This just compares in the first column the total number of

16  county splits or split counties in the 2011 plan versus the

17  four illustrative plans.

18       And as I mentioned earlier, in two I managed to split just

19  six counties, one less than the current 2011 plan that has

11:26:33 20  seven splits.

21       The second column shows what I've termed as discrete

22  splits.  In other words, if a county is split two ways, then

23  there would be two districts in that county or two unique

24  county district numbers.

11:26:52 25       So in the 2011 plan, because Montgomery County is split

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 72**

| | |
|---|---|
| 1 | three ways, there are 15 unique county district numbers or |
| 2 | discrete splits, which is one more than in Revised Plan 2 and |
| 3 | Revised Plan 3, and three more than in Revised Plan 1 and |
| 4 | Revised Plan 4. |
| 11:27:21 5 | So whether you look at just a number of counties that are |
| 6 | split or the actual number of splits within those counties, our |
| 7 | plans are superior. |
| 8 | Q   And you also have a column for 2010 VTD splits populated. |
| 9 | What does that show? |
| 11:27:45 10 | A   That just shows the number of VTDs or precincts that are |
| 11 | split in the whole plan. |
| 12 | In the 2011 plan, there are 16 populated VTDs that are |
| 13 | split.  And in the revised plans, Revised Plan 1 splits just 12 |
| 14 | populated VTDs; 2 and 3 split 13 and 16 respectively; and |
| 11:28:10 15 | Illustrative Plan 4 splits just 10. |
| 16 | THE COURT:  By the populated VTD splits, is that what |
| 17 | you were talking about earlier where sometimes it included a |
| 18 | commercial district or something or another that had no |
| 19 | population? |
| 11:28:23 20 | THE WITNESS:  Right. |
| 21 | THE COURT:  Okay.  Thank you. |
| 22 | BY MR. SPIVA: |
| 23 | Q   And I noticed that there are two figures under that column |
| 24 | 2010 VTD splits that are in red.  Was that because there were |
| 11:28:37 25 | corrections made there? |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 73**

A     Yes.  Compared to the original illustrative plans as I was

shifting a few precincts around to get Representative Sewell

into the majority black District 7.

Q     And I think you mentioned a minute ago that generally it's

11:29:00  sometimes necessary to split VTDs to reach a zero population

deviation.  In these plans, when you had to split VTDs, how did

you decide where to place the splits?

A     I tried to follow named streets, primary roads.

I mean, I guess we will get to this point later on, but in

11:29:23  Mobile County, in order to ensure that Mobile and Baldwin

counties were connected by land, there are three or four

precinct splits that basically just follow I-10 just to the

west of the bay.  And those splits were unrelated to trying to

achieve one person one vote.  They were related to trying to

11:29:47  make sure that there was land contiguity between Baldwin and

Mobile County for District 1.

Q     Okay.  And let me ask if we can pull up the same exhibit,

Plaintiffs' Exhibit 59.  It's actually Figure 11 on the

previous page, 28 -- page 28.

11:30:19  And does this show the relative compactness scores of the

illustrative plans to various other plans?

A     Yes.

Q     And let me first ask you:  I take it that this chart

includes the compactness scores of the 2011 plan; is that

11:30:45  correct?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 74**

1   A     Yes.   The first row shows the mean average for all

2   districts for the 2011 plan.   And then I break out CD 7 --

3   Q     Okay.

4   A     -- showing the compactness scores under the Reock test and

11:31:00  5   the Polsby-Popper test.

6   Q     Before we get to the particulars of that, I just want

7   to -- it also compares the compactness scores for the board of

8   education plan, the 2017 state Senate plan, the 2017 state

9   House plan, and then your various illustrative plans; is that

11:31:17 10  correct?

11  A     That's correct.

12  Q     And can you explain to the Court what these scores are?

13  What is a Reock score?   What is a Polsby-Popper score?

14  A     Well, put simply, since I have a simple mind, the Reock

11:31:34 15  score is simply a ratio of the area of a circle over the area

16  of the district it encompasses.   And a higher score means it's

17  more compact and more like a circle.

18       So a circle has a 1.0 score.   And if you draw a really

19  crazy looking district, then you go down to something probably

11:32:01 20  into the single digits.

21  Q     And why a circle?   You know, what is it about a circle

22  that is relevant to the measure of compactness?

23  A     It's just one way to look at these -- at whether or not a

24  district is reasonably compact.   It's one --

11:32:24 25  Q     Would a circle be the most compact district you could

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 75**

1  physically create?

2  A    Yes.  However, one could look at a square and say that's

3  not bad either, but it would perhaps not score a one.  So

4  that's another issue, I suppose.  But it's area based.

11:32:42 5       And then the Polsby-Popper score, which I guess you're

6  getting to -- I will wait for the question, I suppose.

7  Q    Just one more thing, though, because there is no

8  obviously -- it's an obvious question, but there is no such

9  thing as a circular district in the United States that you are

11:32:56 10 aware of, right?

11  A    Not -- not that I am aware of.  There are some --

12  Q    I should have known better to ask that question.

13  A    There are some municipalities that are circles.  Like, I

14  have seen some in Georgia like that.  So, you know, maybe they

11:33:12 15 comprise a single district in a county or something.  I can't

16  say.

17  Q    I guess what I am getting at is there are either no or

18  very few districts that could score a perfect one, for

19  instance, on the Reock test?

11:33:26 20 A    Right.

21  Q    Okay.  And then what is the Polsby-Popper test?

22  A    It's also based on placing a circle over the district, but

23  it's based on the perimeter of the district.

24       And, again, one would be a perfect score, but the

11:33:43 25 Polsby-Popper scores are always significantly -- or at least

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 76**

1 always almost significantly lower than Reock.

2 Q    And similar to Reock, the lower the Polsby-Popper score,

3 does that mean the less compact the district is?

4 A    Yes.

11:33:57 5 Q    Okay.  And so can you describe how your illustrative plans

6 measure up compared to the compactness in the 2011 plan or the

7 board of education plan?

8 A    They're basically on par.  There's a slight difference in

9 the Reock score.

11:34:20 10    For example, the 2011 plan has a Reock score for all

11 districts of .38, and CD 7 is .38.  Revised Plan 1 has District

12 2 at .35 and District 7 at .38.

13    And I guess you can see the tables for the rest of the

14 districts are slightly lower, but nothing out of the norm, in

11:34:42 15 my opinion.  I've seen congressional districts in place today

16 in other states that have significantly lower scores than the

17 2011 plan and the revised plans and the Illustrative Plan 4.

18 Q    Just in terms of kind of -- well, first of all, I think I

19 forgot to ask you:  Reock and Polsby-Popper, are those scores

11:35:04 20 that are commonly used in these types of cases to evaluate the

21 compactness of districts?

22 A    Yes.  They seem to be the two primary measures.

23 Q    And is there -- in your experience, is there a

24 significant -- what is the difference, say, between .38 in the

11:35:24 25 2011 plan and, say, .31 for District 7 in your Revised Plan 2?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 77**

```
 1  A    I would consider that insignificant.
 2  Q    Are there plans -- you mentioned that there were plans in
 3  other states that have significantly lower scores.  Can you
 4  give, you know, one or two examples of that?
 5  A    Louisiana Congressional District 2, which is majority
 6  black district running from New Orleans to Baton Rouge, scores
 7  .06 on the Polsby-Popper score.  I don't recall what the Reock
 8  score is.
 9  Q    Okay.  And how do the illustrative districts compare to
10  the other Alabama statewide plans on the chart, in terms of
11  compactness?
12  A    Well, the board of education plan is a little more compact
13  overall on the Reock score in District 4 and District
14  5 score -- .4 and .37; whereas the illustrative plans, other
15  than District 7, the Revised Plan 1 all score in the lower 30s
16  or mid 20s, with respect to District 2, at least, and District
17  4 -- Revised Plan 2 and Illustrative Plan 4.
18  Q    And how do the Polsby-Popper scores for your -- for the
19  revised plans and Illustrative Plan 4 compare to the 2011 plan?
20  A    Here, the Polsby-Popper score for Revised Plan 1, both
21  District 2 and District 7 are higher than CD 7, which scores
22  .13.  And, in fact, the same holds true for Revised Plan 2.
23  It's higher.  District 2 is .14, whereas CD 7 is .13, not much
24  different really, but it did score higher.
25       And in District 2, in Revised Plan 3 is .18, but District
```

11:35:51 (line 5)
11:36:26 (line 10)
11:36:49 (line 15)
11:37:24 (line 20)
11:37:57 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 78**

1  7 scores .13.  So the same.

2       And in Illustrative Plan 4, District 2 is .13, the same.

3  District 7 is significantly higher than CD 7.

4       So on Polsby-Popper measured against CD 7, the

11:38:14  5  illustrative plans are on par or better.

6  Q    Okay.  And I noticed that you also have columns next to

7  both the Reock and the Polsby-Popper scores where you say low

8  and high.  What are those kind of sub columns referring to?

9  A    That just refers to the lowest score of a district in any

11:38:32 10  given plan.

11       So you can see that in the 2011, the lowest scoring

12  district was CD 7 under the Polsby-Popper test.  And the

13  highest was .28, one of the other districts.

14       For Reock, the lowest score was .22, which was not CD 7.

11:38:51 15  It was one of the other districts.

16  Q    You don't recall which other district it was?

17  A    No.  I actually did prepare an exhibit that has

18  compactness scores for all of the illustrative plans, as well

19  as the 2011 plan.  That's not the revised plan.  I don't think

11:39:10 20  I ran off an exhibit for the revised plans.  But those scores

21  were almost the same anyway.

22       So I would have to refer back to my declaration as to

23  where that exhibit is.

24  Q    That's fine.

11:39:20 25  A    But it does exist.  It shows every district plan by plan

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 79**

```
 1  with Polsby-Popper and Reock scores.
 2  Q    We may get to that.  I don't have it right handy, so we'll
 3  keep going.
 4       So does the chart show that the lowest scoring Reock score
 5  for the 2011 congressional plan, the lowest scoring district is
 6  lower than the Reock score for Districts 2 and 7 in your
 7  various illustrative plans?
 8  A    Yes.
 9  Q    And in terms of compactness, are there natural geographic
10  features of political bodies, like states, counties, cities,
11  that can affect the compactness of a district?
12  A    Yes.  I mean, I think I cited Jefferson County as an
13  example of a place that has very odd-shaped municipality
14  boundaries, which also begins to impact the shape of the voting
15  districts.  And so that does make a difference.
16       You could draw more compact areas in Jefferson County
17  easily but for the fact that you also want to follow the
18  precincts.  So it creates some relatively odd shapes for sure
19  in Jefferson County because you're following precincts.
20  Q    So if you split more counties, cities, VTDs, you could
21  draw a more compact district?
22  A    For sure in Jefferson County.
23  Q    Okay.  Let's turn to Revised Plan 1.  And let's look at
24  Plaintiffs' Exhibit 60, which is Exhibit A-1 to your second
25  report.
```

11:39:43  5
11:40:09 10
11:40:30 15
11:40:52 20
11:41:14 25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 80**

1    And tell me, Mr. Cooper, what is the chart in exhibit --

2  Plaintiffs' Exhibit 60?

3  A    This just shows a little more detail on the demographics

4  of each of the districts according to the 2010 census for all

11:41:45  5  of the columns except the very last two, which show citizen

6  voting age population for the non-Hispanic black percentage.

7  Q    Can I just interrupt for one second?  Because I don't

8  know -- these are population statistics for Revised Plan 1; is

9  that right?

11:42:01  10  A    Right.

11  Q    Okay.  Go ahead.

12    Well, actually, let me ask you a more direct question:

13  What is the BVAP of CD 2 in this plan?  In the Revised Plan 1

14  according to this chart.

11:42:14  15  A    51.32 percent.

16  Q    And where is that found?  What column and row?

17  A    Sort of in the middle.

18  Q    If you can give the label of the column and the --

19  A    Someone just highlighted it.

11:42:29  20  Q    Oh.  So it's the column that says percent 18 plus AP

21  black; is that right?

22  A    Right.

23  Q    Is that correct?

24  A    Right.

11:42:38  25  Q    Okay.  And that obviously is, of course, percent 18 plus

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 81**

          1  all-part black, right?

          2  A    Yes.

          3  Q    Okay.  And what is the BVAP of CD 7 in this plan?

          4  A    50.65.

11:42:53  5  Q    Let's pull up Plaintiffs' Exhibit 67.  And what is this,

          6  Mr. Cooper?

          7  A    This is Revised Plan 2.

          8  Q    And how does Revised Plan 2 differ from Revised Plan 1?

          9  A    Well, with respect to District 7, Revised Plan 2 would

11:43:37 10  eliminate the split in Tuscaloosa County.  So Tuscaloosa is

         11  entirely in District 7, and the district itself extends further

         12  south to include Washington and Clarke counties.

         13      District 2 in this configuration also expands in the sense

         14  that it picks up one more county in east Alabama -- Barbour

11:44:01 15  County -- along the Georgia line, which is part of the historic

         16  Black Belt.  So this really is the only plan that would include

         17  Barbour County in a majority black district.

         18      And then the other counties from Mobile to Montgomery

         19  there are included in the majority black district is -- would

11:44:24 20  be a little part of Baldwin, as well as all of Monroe, Conecuh,

         21  Butler, Crenshaw, Pike.  You know, the rest of the Black Belt

         22  counties, plus Montgomery.

         23  Q    Okay.  Let's take a look at Plaintiffs' Exhibit 66, which

         24  is Exhibit B-1 to your second report.

11:44:47 25      And is that the population and summary report for Revised

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 82**

```
 1  Plan 2?

 2  A    Yes.

 3  Q    Okay.  And what is the BVAP of CD 2 in this plan?  In

 4  Revised Plan 2?

 5  A    51.37 percent.

 6  Q    And what is the BVAP of CD 7 in this plan?

 7  A    51.95 percent.

 8  Q    Okay.  Let's pull up Plaintiffs' Exhibit 73.  Can you

 9  describe the configuration of CD 7 in this -- well, first of

10  all, let me ask you:  What is Plaintiffs' Exhibit 73?

11  A    This is Revised Plan 3.

12  Q    And can you describe the configuration of CD 7 in this

13  plan?

14  A    Yes.  In this plan, as always, Jefferson County is partly

15  in District 7.  And in this instance, Tuscaloosa remains split

16  between Districts 6 and 7.

17  Q    I'm sorry to interrupt.  When you say remains split,

18  Tuscaloosa is split under the 2011 plan?

19  A    Right.

20  Q    The current plan?

21  A    Right.

22  Q    All right.  Go ahead.

23  A    And then it picks up a couple of counties with significant

24  black population; namely, Talladega and Coosa that have roughly

25  30 to 35 percent black population according to the 2010 census.
```

Time stamps in margin: 11:45:00 (line 5), 11:45:42 (line 10), 11:46:02 (line 15), 11:46:16 (line 20), 11:46:29 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 83**

84

```
       1  So I've included those two counties in District 7.  They are
       2  not included in any of the other illustrative plans.
       3       And so that results in a District 7 -- well, I don't have
       4  the percentage in front of me, but it's majority black --
11:46:49 5  Q    Okay.
       6  A    -- and then --
       7  Q    What about --
       8  A    -- District 2 would extend a little bit further to pick up
       9  Choctaw County.  It's not always including Choctaw County in
11:47:01 10 some of the plans.
      11  Q    And any other differences or unique features of CD 2 in
      12  this Revised Plan 3?
      13  A    Well, I do not think that Autauga County is in District 2
      14  in any of the other plans.  In this plan, it is shared with
11:47:20 15 District 3.
      16  Q    And let's pull up Plaintiffs' Exhibit 72.  And I'll ask
      17  you if that is C-1 to your second report, if that's the
      18  population summary report for Revised Plan 3?
      19  A    Yes.
11:47:38 20 Q    And what is the BVAP of CD 2 in this plan?
      21  A    50.99 percent.
      22  Q    And what is the BVAP of CD 7 in this plan?
      23  A    50.34 percent.
      24  Q    Okay.  And if we can now pull up Plaintiffs' Exhibit 40,
11:48:02 25 which is Exhibit K-2 to your second report?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 84**

85

| | |
|---|---|
| 1 | A    Actually that's first report. |
| 2 | Q    Yes.  I'm sorry.  That's Exhibit K-2 to your first report; |
| 3 | is that right? |
| 4 | A    Right. |
| 11:48:21 5 | Q    And let's now discuss the unique details of Illustrative |
| 6 | Plan 4.  How does Illustrative Plan 4 differ from the Revised |
| 7 | Plans 1, 2, and 3? |
| 8 | A    First, in Illustrative Plan 4 as in Illustrative Plan 2, |
| 9 | Tuscaloosa is entirely in District 7. |
| 11:48:45 10 | The other primary difference in Illustrative Plan 4 is |
| 11 | that Mobile County is divided so that the western-most boundary |
| 12 | of District 2 is actually the Mississippi state line and the |
| 13 | southern-most is the Gulf.  And then the eastern boundary -- |
| 14 | for much of the eastern boundary follows Mobile Bay.  So that |
| 11:49:13 15 | that allows for a way to drive directly into Mobile County from |
| 16 | Baldwin County via I-65. |
| 17 | So the northwest or northeast quadrant of Mobile County |
| 18 | now is completely connected to Baldwin via I-65. |
| 19 | Q    And in the other plans -- I think you've said this, but I |
| 11:49:49 20 | just want to make sure it's clear in the record -- there's a |
| 21 | land route between Baldwin and Mobile County; is that correct? |
| 22 | A    Yes.  According to the guidelines of the state |
| 23 | legislature, water contiguity is acceptable.  But I don't know |
| 24 | if they really meant Mobile Bay or not.  So for that reason, I |
| 11:50:12 25 | decided to split three precincts facing Mobile Bay so that one |

**Caster Plaintiffs' Exhibit 84, Page 85**

86

```
         1   could drive from Baldwin into Mobile and still be in District
         2   1.
         3   Q    Okay.
         4        MR. SPIVA:  Your Honor, can I have just one second to
11:50:24 5   confer with my colleague?
         6        Thank you.
         7   BY MR. SPIVA:
         8   Q    And let's if we can pull up Plaintiffs' Exhibit 39.
         9        And is that -- Mr. Cooper, is that the population summary
11:51:00 10  report for your Illustrative Plan 4?  For your reference, this
        11   is Exhibit K-1 to your first declaration.
        12   A    Yes.
        13   Q    And what is the BVAP of CD 2 in this plan?
        14   A    50.33 percent.
11:51:16 15  Q    Is that CD 2 or CD 7?
        16   A    That's CD 2.
        17   Q    Oh, okay.  I'm sorry.  My notes were mixed up.
        18        And what is the BVAP of CD 7 of this plan?
        19   A    50.74.
11:51:29 20  Q    I am going to turn, Mr. Cooper, to some of the criticisms
        21   of your report in Dr. Johnson's report.
        22        First of all, have you reviewed Dr. Johnson's report?
        23   A    Yes.
        24   Q    The first issue that Dr. Johnson raises is your use of
11:52:02 25  any-part black in determining whether the illustrative
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 86**

```
 1  districts have BVAPs over 50 percent.  Did you see that in his
 2  report?
 3  A    I did.
 4  Q    Okay.  I'm not actually directing you to a particular part
 5  of his report --
 6  A    Right.
 7  Q    -- I just -- we've already discussed why you chose to use
 8  any-part black figures, so I won't repeat that.
 9       But what measure does Dr. Johnson say you should use?
10  A    Dr. Johnson --
11  Q    I don't know if it will help to look at Plaintiffs'
12  Exhibit 59, which is your second report, paragraph 8.
13  A    Well, Dr. Johnson suggests that I should have used
14  non-Hispanic black VAP as opposed to single-race black VAP,
15  which is what the state legislature used.
16  Q    And if we can take a look at page 5 of your second report,
17  Plaintiffs' Exhibit 59, you report here on citizen voting age
18  population in this table, do you not?
19  A    I do.  Of course, that's citizen voting age population
20  under the 2008-2012 American Community Survey, which would be
21  roughly coincident with the 2010 census, because the survey
22  midpoint would have been July of 2010.
23  Q    Okay.
24  A    And so that shows citizen voting age population in the
25  2011 plan along with the illustrative plans.
```

Line timestamps: 11:52:15 (5), 11:52:30 (10), 11:52:51 (15), 11:53:50 (20), 11:54:07 (25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 87**

```
 1        And one can see that in all four illustrative plans,
 2   Districts 2 and 7 are more than 50 percent non-Hispanic black
 3   citizen voting age population based on the 2008-2012 ACS.
 4        And advancing five years to mid decade, the districts are
 5   even stronger across the board, the illustrative plans.
 6   Q    Let me stop you there, Mr. Cooper, because I think based
 7   on a ruling from Your Honor earlier, we probably don't need to
 8   go to that data.
 9        But let me -- let's take this down and just ask you the
10   question:  Are any of your districts -- are any of the
11   districts in the illustrative plans that you drew over
12   50 percent BVAP even using the single-race black definition
13   that Dr. Johnson says you should use?
14   A    Yes.  Illustrative Plans 1 and 2 would have districts that
15   are over 50 percent non-Hispanic black single race.  So, yes.
16   Q    And that's based on the 2010 census numbers?
17   A    Right.  Right.
18   Q    Okay.
19   A    That is a more narrow definition than that used by the
20   state legislature.
21   Q    Correct.
22        THE COURT:  Do you have a chart or anything that shows
23   that?
24        THE WITNESS:  I don't think I broke out the
25   non-Hispanic black VAP in a chart.
```

11:54:33  (line 5)
11:54:54  (line 10)
11:55:19  (line 15)
11:55:37  (line 20)
11:55:42  (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 88**

BY MR. SPIVA:

Q    Let me see if I can get that.

A    I did not break that out in a chart.

Q    Is it elsewhere reported in your second declaration,
though?

A    Well, the statement I make here is that Dr. Johnson
acknowledges that District 2 and District 7 in Illustrative
Plans 1 and 2 contain non-Hispanic black voting age population
majorities.

Q    Where are you referring to?

A    Paragraph 8 on page 3 of my declaration.

     So I believe that Dr. Johnson has a table or a paragraph
that addresses that.

Q    Okay.

A    But I disagree with Dr. Johnson on the need to use that
narrow definition for voting age population.

Q    And why is that?

A    Because it's not a necessary distinction in a state like
Alabama, where Latinos comprise a population that is, in terms
of voting age, just in the low single digits.  It's just a
meaningless term.

Q    And just to be clear, using the all-part black definition
that you use and that we've seen in the various tables we've
looked at, all of the Districts 2 and 7 in each of your
illustrative plans are over 50 percent black?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

| | |
|---|---|
| 1 | A    Yes. |
| 2 | Q    And using the narrower definition that Dr. Johnson says |
| 3 | that you should use, based on one of his tables, two of your |
| 4 | districts in the illustrative plans are also over 50 percent |
| 11:57:37 5 | black; is that correct? |
| 6 | A    That is correct. |
| 7 | Q    And are you able to identify those -- I know this |
| 8 | shouldn't be a memory test.  So, you know, at a break or |
| 9 | something I can get the actual table from his report.  But if |
| 11:57:48 10 | you know it from memory, if you can -- |
| 11 | A    I do not recall. |
| 12 | Q    Okay.  That's fine. |
| 13 | THE COURT:  May I ask a question? |
| 14 | MR. SPIVA:  Sure. |
| 11:57:57 15 | THE COURT:  Mr. Cooper, where did you get the data |
| 16 | that went into the any-part black numbers? |
| 17 | THE WITNESS:  From the P.L. 94-171 file. |
| 18 | There's not an absolute column showing any-part black. |
| 19 | What you do is you add up the various multi-racial categories, |
| 11:58:19 20 | and then you have that number.  And it is included in the |
| 21 | redistricting data sets that are available from the Caliper |
| 22 | Corporation that produces Maptitude for redistricting.  So at |
| 23 | least -- |
| 24 | THE COURT:  Okay.  So you got it from the Census |
| 11:58:35 25 | Bureau data? |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 90**

                    1          THE WITNESS:  Yes.

                    2          THE COURT:  Okay.  Thank you.

                    3   BY MR. SPIVA:

                    4   Q    And then, Mr. Cooper, Dr. Johnson also criticizes your

11:58:48   5   adherence to what he says are traditional districting

                    6   principles.  And he touches on a number of topics, so let me

                    7   just ask you about them one by one.

                    8          Regarding compactness, Dr. Johnson questions the

                    9   compactness of the illustrative districts you've drawn.  How do

11:59:03  10   you respond to that?

                   11   A    Well, we'll just have to agree to disagree, because I

                   12   think visually these plans are acceptable when compared with

                   13   congressional districts across the land.  And the compactness

                   14   scores provide an objective measure which show that there's

11:59:17  15   nothing unusual about the four illustrative plans as compared

                   16   to the 2011 plan.

                   17   Q    And are his criticisms based on compactness scores?

                   18   A    No.  I think he just made the comment without really going

                   19   deeper into the compactness scores.

11:59:34  20   Q    Did he include compactness scores in his report?

                   21   A    No.

                   22   Q    Is there any kind of a break line standard for when a

                   23   district is -- among redistricting experts for when a district

                   24   is considered compact or not compact?

11:59:50  25   A    I don't believe so.  I don't think any court has ever

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 91**

92

1   ruled that you have to have a certain Reock score or a certain

2   Polsby-Popper score to be acceptable.

3   Q    Okay.

4   A    There are so many other factors at work like county lines

12:00:04 5   and the shape of states.  It does mean that you -- it's very

6   difficult to even conjure up a concept of how that would be

7   done to be applied across any congressional district anywhere

8   in the country.

9   Q    Okay.

12:00:21 10        MR. SPIVA:  Your Honor, I didn't know what time you

11   wanted to break for lunch.

12        THE COURT:  Like I said, I have got a 1:00 o'clock, so

13   closer to 1:00 o'clock if y'all's stomachs aren't growling too

14   much.  But if anybody needs a break at any time, all you have

12:00:34 15   to do is let me know.

16        MR. SPIVA:  Okay.  Thank you, Your Honor.

17   BY MR. SPIVA:

18   Q    So let's look at Plaintiffs' Exhibit 63.  And that is

19   Exhibit A-4 to your second declaration.

12:00:55 20        And what is this, Mr. Cooper?

21   A    This is Revised Plan 1 zooming in on the Mobile Bay area.

22   And if you look closely, you can see that crossing I-10 from

23   Baldwin into Mobile you hit a pink area.  And from there, you

24   can track down to roughly the area where State Route 163 veers

12:01:27 25   south and continues in District 1.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1          So it's contiguous by land.  But if I had used water

2    contiguity, at least three of the precincts splits in Mobile

3    County could have been eliminated.

4    Q    And did Dr. Johnson criticize your maps because of a

12:01:51  5    claimed lack of contiguity in Mobile County?

6    A    Did he say it was not -- I'm not sure if he actually

7    stated that or not.  Did he?

8    Q    Yes.  I mean, he criticizes your maps for lacking

9    contiguity in Mobile County.  And what is your response to

12:02:10  10   that?

11   A    Well, he's wrong.  He's wrong.  Incorrect.

12   Q    And why is that?

13   A    Because, as you can see in all three of these maps Revised

14   Plans 1, 2, and 3, Baldwin County is contiguous by land via

12:02:29  15   I-10 and U.S. 98 into downtown Mobile with plenty of space to

16   the east that is in District 2 and then further District 1.

17   And then further south, you're entirely in District 1.

18          So it is clearly contiguous.

19   Q    Did you consider using Mobile Bay for contiguity?

12:02:48  20   A    I did.  And there is a stipulation in the guidelines of

21   the state redistricting commission, the legislature commission

22   indicating that water contiguity is acceptable.

23          But what I don't know and still don't to this day really

24   know is did they mean Mobile Bay, or just the Tennessee River,

12:03:09  25   or the Alabama River or something.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 93**

1      So I just wanted to make sure that there could be no

2  argument that I had drawn a district, i.e. District 1, that was

3  not contiguous because it crossed Mobile Bay.

4  Q    Does the 2011 board of education plan join two districts

12:03:29  5  using Mobile Bay for contiguity?

6  A    Yes.

7  Q    And if Mobile Bay could be used for contiguity in your

8  revised and illustrative plans, how could those plans be

9  modified?

12:03:51 10  A    Well, three or four precinct splits along I-10 facing into

11  Mobile Bay would be eliminated.  In other words, the number of

12  precinct splits in all -- in Revised Plans 1, 2, and 3 would be

13  cut by about three precincts.  Illustrative Plan 4, which has a

14  different configuration that we reviewed earlier --

12:04:15 15  Q    Why don't we actually go to that?  Let's pull up

16  Plaintiffs' Exhibit 42, which is I believe is Exhibit K-4 to

17  your first report, and ask you to explain -- I think where you

18  were going, but explain what this is.

19  A    Right.  And so in Illustrative Plan 4, as you can see, the

12:04:38 20  connector between I-10 -- I mean, between Baldwin County and

21  Mobile County for District 1, the primary connector would be

22  I-65.  And there -- I mean, there's no question it's

23  contiguous.  You don't even need to zoom in on downtown Mobile

24  and I-10.

12:04:54 25      So that solves it.  That revolves it.  I mean, if there's

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 94**

1  any question about it, here you go.

2  Q    Now, and what's the primary road that connects Mobile and

3  Baldwin in Revised Plan 4?

4  A    Well, it's I-65.

12:05:18  5  Q    Okay.  And Dr. Johnson notes that more persons are shifted

6  into different congressional districts under the illustrative

7  plans than under the 2000 plan, as compared to the 2001 plan.

8  Can you explain why that is the case?

9  A    Well, anytime one creates a new majority-minority

12:05:51  10  district, more often than not a lot of people are going to have

11  to be moved, particularly when the black population has been,

12  in my opinion, cracked between three different districts -- CD

13  1, CD 2, and CD 3.  So to make a new district in that area,

14  you've got to take a lot of people from both CD 1, CD 2, and CD

12:06:13  15  3 in the present plan -- or in the old 2001 plan -- and put

16  them into a new district.  So the fact that the illustrative

17  plans move roughly one-third of the population in a

18  seven-district plan is not at all unusual.

19      I do, in a footnote, cite a county of Georgia, Emanuel

12:06:37  20  County, a small rural county that has seven districts, and

21  originally just had one board of education district that was

22  majority black.  A lawsuit was filed, and a consent decree was

23  signed in 2016 accepting the plan that I drew that created a

24  new majority black local board of education district.  And to

12:06:59  25  create that district, I had to move 31 percent of the

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 95**

```
  1  population in the county into a new plan that had two majority
  2  black districts.
  3  Q    And just since you referenced it, do you happen to know
  4  where that footnote is that you mentioned?
12:07:15 5  A    It's footnote 6 on page 8.
  6  Q    Of your second report?
  7  A    Yeah.
  8  Q    Okay.
  9  A    The paragraph 21 references footnote 6.
12:07:22 10  Q    Okay.  And that's --
 11           THE COURT:  Which is exhibit?
 12           MR. SPIVA:  Plaintiffs' Exhibit 59, Your Honor.
 13           THE COURT:  Thank you.
 14  BY MR. SPIVA:
12:07:27 15  Q    And we don't need to actually pull it up, but I just
 16  wanted the reference to be clear.
 17       And then, in your opinion, would it be unusual to move
 18  one-third of the population of a state to create a new
 19  majority-minority district?
12:07:47 20  A    Not at all.  Not at all.  It would be quite common,
 21  probably.
 22  Q    In developing the illustrative plans, did you consider the
 23  2001 plan or the 2011 plan?
 24  A    Well, I was aware of the 2001 plan.  So I had lines on my
12:08:08 25  map showing the configuration of both the 2001 plan and 2011
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 96**

plan, as well as the board of education plan.  But I mainly was

paying attention to the 2011 plan and the board of education

plan since they were drawn based on the 2010 census.

Q    Now, Dr. Johnson also criticizes your report on the basis

12:08:38  that Alabama's likely to lose a district in 2020.  And so I'd

like to discuss -- shift focus and discuss the possibility of

creating a six-district plan with two majority-minority

districts.

         MR. WALKER:  Your Honor, if I may.  I thought we were

12:08:59  not going into this.

         THE COURT:  If it's part of your expert's criticism,

should we?  I don't --

         MR. WALKER:  My understanding from our conversation

earlier was that the 2020 plan is not being considered by the

12:09:17  Court, given that the purpose of this hearing is for the Court

to determine whether the legislature in 2011 could have drawn

any of the illustrative plans proposed by Mr. Cooper, of which

the 2020 plan with six districts is not one.

         THE COURT:  Right.

12:09:33  MR. SPIVA:  But in their expert reports, which there

is this criticism of the fact that Alabama's likely to lose a

seat, and I think in their pretrial brief actually they raise

that as one of their defenses.  So this was just a response to

that.

12:09:48  MR. WALKER:  If that's irrelevant, Your Honor, it's

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 97**

```
 1   irrelevant in the report and in our brief.
 2           MR. SPIVA:  As long as their defense on that regard is
 3   irrelevant, then I'm happy to skip this.
 4           THE COURT:  Seems like it's irrelevant to me, because
 5   I really believe we need to be focusing on what the legislature
 6   could have done in 2011.
 7           MR. SPIVA:  And we actually agree for the record, Your
 8   Honor.  I just want to make sure it is clearly conceded that
 9   they are not going to argue that as a defense that we -- it's
10   no longer proper to have a declaration because of the potential
11   loss for a district.
12           THE COURT:  Okay.  So when Dr. Johnson testifies, he
13   will not be allowed to criticize any of the reports because of
14   any impact that 2020 may have.
15           MR. WALKER:  Dr. Johnson's criticisms of the 2020
16   plan, my understanding is that --
17           THE COURT:  I don't think we have a 2020 plan yet, do
18   we?
19           MR. WALKER:  Mr. Cooper has prepared a hypothetical
20   2020 plan with six districts.
21           THE COURT:  Right.  I don't think we need to get there
22   either with Mr. Cooper or with Dr. Johnson.
23           MR. WALKER:  And that is all I was saying.  I think
24   both his testimony and his drawing of the plan is irrelevant,
25   as is the criticism of it or any argument about it.
```

Timestamps: 12:10:00 (line 5), 12:10:17 (line 10), 12:10:37 (line 15), 12:10:55 (line 20), 12:11:12 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 98**

|              |    |                                                          |
|--------------|----|----------------------------------------------------------|
|              | 1  | THE COURT:  Right.  So we're not going to get into it     |
|              | 2  | with Dr. Johnson if we don't get it into it with Mr. Cooper |
|              | 3  | today.  Right?                                            |
|              | 4  | MR. WALKER:  We are not going to get into that.  I        |
| 12:11:24     | 5  | mean, we --                                               |
|              | 6  | THE COURT:  Okay.                                         |
|              | 7  | MR. WALKER:  Should that issue somehow become             |
|              | 8  | relevant, we stand by what we've said.                    |
|              | 9  | THE COURT:  Certainly.  Certainly.                        |
| 12:11:31     | 10 | MR. WALKER:  Thank you, Your Honor.                       |
|              | 11 | THE COURT:  Okay.                                         |
|              | 12 | MR. SPIVA:  Thank you, Your Honor.                        |
|              | 13 | BY MR. SPIVA:                                             |
|              | 14 | Q    So, Mr. Cooper, we're going to switch gears and actually |
| 12:11:47     | 15 | talk about the demographic census data that you reviewed  |
|              | 16 | regarding socioeconomic disparities between blacks and whites. |
|              | 17 | And let's take a look at your first report, Plaintiffs'   |
|              | 18 | Exhibit 1 at pages 41 to 42.  And, Dr. Cooper, you did an |
|              | 19 | analysis of the disparities between African-Americans and |
| 12:12:39     | 20 | whites in Alabama; is that right?                         |
|              | 21 | A    I did, using the 27 ACS statewide, and also for four of |
|              | 22 | the congressional districts that would be impacted by the |
|              | 23 | illustrative plan districts.                              |
|              | 24 | Q    And what were your conclusions regarding the socioeconomic |
| 12:12:58     | 25 | disparities between African-Americans and white Alabamians? |

**Caster Plaintiffs' Exhibit 84, Page 99**

A     Well, there's a big difference in socioeconomic well-being

for African --

          THE COURT:  Wait a minute.  Just a minute.  Are you

using 2017 information?

          THE WITNESS:  From the American Community Survey,

right.

          THE COURT:  Okay.  So how was that relevant to 2011

situation and what the legislature could have done then?

          MR. SPIVA:  This is different, Your Honor, because

this goes to the Senate factors.  So that really does look to

the disparities between blacks and whites, or, in this case,

blacks and whites and whether that interacts with, you know,

whatever is being -- whatever voting mechanism or districting

that is in place to create less opportunity for

African-Americans to participate.  And it's a result --

          THE COURT:  Right.  And I understand that that

information is relevant.  But why are we looking at 2017

information instead of 2011 information to get that data for

the Senate factors?

          MR. SPIVA:  Because it's a results test, Your Honor.

And so the Senate factor really looks to what is now.  And so

that's the more appropriate data, I think, under the case law.

I don't have at my fingertips.  I could get it for Your Honor.

     But you're looking at what is the results of what was --

what was passed and how that interacts with the socioeconomic

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 100**

        1  factors.

        2          THE COURT:  So wait a minute.  You're saying that

        3  these factors in 2017 are a result of the 2011 --

        4          MR. SPIVA:  No.

12:14:47 5          THE COURT:  -- drawing of the district?

        6          MR. SPIVA:  No.  The question is the way the districts

        7  were drawn, do they interact with these various Senate factors,

        8  some of which are socioeconomic.  Some are involving things

        9  like racial appeals and the like and polarized voting to

12:15:07 10 deprive African-Americans of the full participation, political

       11  participation.  It's not a -- it doesn't look at intent.  So it

       12  doesn't matter what was in the minds of the legislators at the

       13  time, what the conditions were at the time.

       14      The question is just does the map that was drawn deprive

12:15:27 15 African-Americans of full political participation as compared

       16  to whites?  And many of the factors that go into that are these

       17  socioeconomic factors.

       18          THE COURT:  I understand that.  But I don't understand

       19  why we're looking at 2017 instead of 2011.

12:15:45 20     Is there an issue with that, Mr. Walker?  Or am I seeing

       21  an issue that may not necessarily be there?

       22          MR. WALKER:  Your Honor, there's a little cognitive

       23  dissonance in it, I suppose.  But I believe that on this issue

       24  they are entitled to present evidence of current circumstances.

12:16:05 25         THE COURT:  Okay.  Thank you.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 101**

1          MR. WALKER:  Yes, ma'am.

2          THE COURT:  I don't think there's that much difference

3    from 2011 to 2019, in terms of these disparities.  I think

4    they're pretty well recognized in a lot of data from a lot of

12:16:22 5    years and a lot of places.

6          MR. SPIVA:  Yeah.  Unfortunately so, Your Honor.  And

7    actually documented.

8          THE COURT:  Very unfortunately so, right.  You may

9    proceed, then.

12:16:32 10          MR. SPIVA:  Thank you, Your Honor.

11   BY MR. SPIVA:

12   Q    So was there any measure that you looked at that is set

13   forth in your first report on pages 41 and 42 where

14   African-Americans outpaced whites in these various measures?

12:16:58 15   A    I don't believe so.

16   Q    And let's pull up Plaintiffs' Exhibit 49.  And maybe if we

17   can keep those two pages we had up at the same time, if that's

18   possible, which was pages 41 and 42 of the first report.

19        And this Plaintiffs' Exhibit 49, which runs for several

12:17:49 20   pages, I take it that that is N-1 -- Exhibit N-1 to your first

21   report, Mr. Cooper; is that right?

22   A    Yes.  N-1 has bar charts illustrating the disparities.

23   And then the original census document that has the same

24   percentages presented is N-2.

12:18:13 25   Q    Okay.  And let's turn -- let's maybe highlight page 22 of

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 102**

1   the first report or blow it up a little bit.

2          THE COURT:  You're not asking much of the poor person

3   who's driving your --

4          MR. SPIVA:  She's a magician, Your Honor.

12:18:32  5          THE COURT:  -- exhibits here.  Yeah.  I think you've

6   now mentioned maybe four pages that you want up on the same

7   screen, and I'm not sure that's going to be very helpful

8   anyway.

9          MR. SPIVA:  I'm sorry.  Did I say page 22?  Pardon me.

12:18:47 10  I'm sorry.  Page 22 of N-1, I believe.

11          THE COURT:  Of N-1, which is 49?

12          MR. SPIVA:  Yes, Your Honor.

13          THE COURT:  Okay.  For the record, it's going to be

14   much easier if you identify it by the exhibit number that's in

12:19:02 15  evidence.

16          MR. SPIVA:  Absolutely.  I will do that from here on

17   out.

18   BY MR. SPIVA:

19   Q    And can you tell us what the poverty rate for

12:19:13 20  African-Americans was -- is in Alabama?

21   A    27.4 percent.

22   Q    And how does that compare to non-Hispanic whites?

23   A    Non-Hispanic whites poverty rate of 11.6 percent.

24   Q    I think actually -- you know, and Your Honor makes a good

12:19:42 25  point.  I'm not sure we need the non bar charts.  But after we

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 103**

1  take them down, Mr. Cooper, let me know if you need to

2  reference them, or you've got it, I think, in your book in

3  front of you, the pages from your report.  We can probably just

4  go with the charts.

12:19:58  5  A    Yeah.

6  Q    And what is the child poverty rate for African-Americans

7  in Alabama?

8  A    It's much higher than the overall rate.  It's 40.4 percent

9  for African-American children versus 14.3 percent for white

12:20:17 10  children.

11  Q    And what is the African-American -- let's turn to page 14

12  of this same exhibit of Plaintiffs' Exhibit 49.

13       And what is African-American median household income, and

14  how does that compare to white median household income?

12:20:41 15  A    It's just a little bit over half of the white median

16  household income.  Black median income is $31,398 versus

17  $56,138 for white household income.

18  Q    And looking at page 17 of Plaintiffs' 49, what is the per

19  capita income for black Alabamians, and what is the -- how does

12:21:08 20  that compare to the per capita income for white Alabama?

21  A    Another big gap.  The black per capita income in Alabama

22  is $18,229 versus $30,697 for whites.

23  Q    If we can turn to page 5 of Plaintiffs' Exhibit 49.  Is

24  this a document which sets forth various measures of

12:21:46 25  educational attainment for the population 25 years and older in

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 104**

1   Alabama?

2   A    Yes.

3   Q    And of those persons 25 years of age and older, what

4   percentage of African-Americans have not finished high school?

12:21:58  5   A    16.7 percent.

6   Q    And what is the percentage for whites over 25?

7   A    11.3.

8   Q    Okay.  And what about at the other end of the spectrum?

9   What percentage of African-Americans 25 and over have a

12:22:13 10   bachelor's degree or higher?

11   A    17.1 percent versus 28.6 percent for whites.

12   Q    Okay.  There seems to be an anomaly here.  And I wonder if

13   you can explain it, Mr. Cooper.

14        The set of bars over the high school graduate, GED, or

12:22:35 15   alternative.  It seems to show African-Americans -- I mean,

16   would appear that African-Americans -- that higher percentage

17   of African-Americans have a high school degree, or GED, or

18   alternative than non-Hispanic whites.  Can you explain how

19   these various graphs work together, why that is?

12:22:56 20   A    Well, the reason is that because there's a big difference

21   between the African-American and white percentages for a

22   bachelor's degree or higher, some of the other categories,

23   specifically high school graduate or some college, would show

24   that as a component, a higher percentage of African-Americans

12:23:24 25   are at that level.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 105**

```
 1          So in the case of high school graduates -- and that label
 2     sort of obscures the African-American percentage which is right
 3     around 33 percent -- to just compared to the same component of
 4     whites, slightly more have a GED as their highest level of
12:23:47 5     attainment.  And again, with some college, but not a
 6     full-fledged bachelor's degree, 31.6 percent of
 7     African-Americans have some college versus 29.8 percent of
 8     whites.
 9     Q    Okay.  So is it -- I don't know if another way of saying
12:24:07 10    it -- and tell me if this is not correct.  But are these kind
11     of like cumulative such that it may be a little bit -- that
12     might explain kind of the anomaly with the two middle bars?
13     A    Right.  All these add -- each bar set -- the
14     African-American bars and the white bars would add up to 100
12:24:28 15    percent.
16          So the ones to key on are those who lack a high school
17     diploma really.  That's a significant one there.  And there
18     whites outperform blacks by a considerable margin, 11.3 percent
19     versus 16.7.
12:24:42 20          And then at the other end of the educational scale, whites
21     have an 11 percentage point advantage over African-Americans
22     28.6 to 17.1.  That's bachelor's degree or higher.  So some
23     advanced degrees would be included in that category, of course.
24     Q    Okay.  Let's turn to page 11 of Plaintiffs' Exhibit 49.
12:25:06 25    And what is the black unemployment rate as compared to the
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 106**

1  white unemployment rate?

2  A    The black unemployment rate in 2017 was 9.1 percent

3  statewide compared to 4.6 percent for whites.

4  Q    And then let's turn to page 13 of Plaintiffs' Exhibit 49.

12:25:30 5  Of those African-Americans who are employed, what portion are

6  in management or professional occupations?

7  A    24.5 percent of African-Americans are in management or

8  professional occupations compared to 39 percent of whites.

9  Q    Okay.  And let's turn to page 21.  Do these same

12:25:54 10  disparities exist in housing?

11  A    Yes.  Only about half of the black population lives in an

12  owner-occupied dwelling versus three quarters, 76.7 percent of

13  the white population.

14  Q    Okay.  And let's turn to page 25 of Plaintiffs' Exhibit

12:26:17 15  49.  For those African-Americans who do own their own homes,

16  what is the median value of those homes?

17  A    $92,200, which is well shy of the $155,600 median value of

18  the white owner-occupied homes.

19  Q    And if we can turn to page 23 of Plaintiffs' Exhibit 49.

12:26:45 20  In terms of vehicle ownership or availability by household,

21  what percentage of African-American households lack access to a

22  vehicle?

23  A    12 percent.

24  Q    And what about white households?  What percentage of white

12:27:03 25  households lack access to a vehicle?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 107**

```
          1   A    3.6 percent.

          2        MR. SPIVA:  Your Honor, if I can just confer with my

          3   colleagues for a minute, I think I may be done.

          4        THE COURT:  All right.

12:27:22  5        MR. SPIVA:  Thank you, Your Honor.  I have no further

          6   questions of Mr. Cooper.

          7        THE COURT:  This may be a good time to take a break.

          8   And I hope we will be able to reconvene about 1:30, but it kind

          9   of depends upon what the lawyers throw at me that I might not

12:27:37 10   be expecting.

         11      Okay.

         12        MR. SPIVA:  Thank you, Your Honor.

         13        THE COURT:  Thank you.

         14        (Recess.)

13:32:37 15        THE COURT:  All right.  Is the defense ready to

         16   proceed with cross-examination?

         17        MR. WALKER:  Yes, ma'am.  I'm sorry, Your Honor.  I

         18   didn't know you had come in.

         19        THE COURT:  No problem.  You may do so.

13:32:59 20                      CROSS-EXAMINATION

         21   BY MR. WALKER:

         22   Q    Good morning -- or afternoon -- excuse me -- good

         23   afternoon, Mr. Cooper.

         24   A    Good afternoon.

13:33:09 25   Q    You said that the purpose of drawing your four plans was
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 108**

1   to demonstrate the possibility of drawing two majority black

2   congressional districts while at the same time respecting the

3   traditional redistricting criteria.  Did I understand

4   correctly?

13:33:31   5   A    Yes.

6   Q    Okay.  And I believe you said that you did that by using

7   Maptitude on your program?

8   A    Well, Maptitude is --

9   Q    Was the program?

13:33:47  10   A    -- the redistricting software I used.

11   Q    Okay.  And is it fair to say that you were sitting at your

12   computer, and you had a map of Alabama or some part of Alabama

13   up, using the Maptitude program to look at whatever level of

14   geography you were looking at -- census tracts, or census

13:34:08  15   blocks, or VTDs, or whatever it was?

16   A    Yes.

17   Q    And you would have displayed on your computer as you

18   looked at -- I'm just going to say a census tract.  You can

19   correct me if you need to.

13:34:23  20        As you looked at a census tract, for example, you would

21   have displayed on your computer information telling you how

22   many African-Americans lived in that unit, did you not?

23   A    I would have access to that, but I did not use that

24   information at that level of detail.  But if I wanted to know

13:34:46  25   how many African-Americans were in a particular precinct or

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 109**

```
       1   census block, I could have queried it for that purpose.
       2          MR. DAVIS:  Excuse me.  Your Honor, I forgot to get
       3   the headphones that I use.  May I walk up?
       4          THE COURT:  Certainly.
13:35:00 5          MR. DAVIS:  Thank you.
       6          THE COURT:  Certainly.
       7          MR. DAVIS:  I'm so sorry.
       8   BY MR. WALKER:
       9   Q    Do you remember when you were deposed, and I asked you
13:35:17 10  what PL data you had displayed?
      11   A    Not specifically, no.
      12   Q    Okay.  Let's look at Page 45 of your deposition.
      13        And I asked you:  Let me ask the question this way:
      14   Typically -- and I understand there may have been exceptions
13:35:53 15  when you wanted to bore down or something like that, but
      16   typically, what PL data did you have displayed?
      17        You said population, voting age population, minority
      18   population, African-American single race, African-American any
      19   part, by total population and voting age population, Latino
13:36:11 20  population, voting age and total population.  So, you know,
      21   maybe a dozen categories or so.
      22        Now, I assume that as you were going about looking at
      23   districts, you were looking for districts that had whatever
      24   your criteria was -- enough African-Americans at that time to
13:36:34 25  put them into one of your majority black districts; is that
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 110**

1   right?

2   A    Well, I was not looking for districts or blocks on an

3   individual level.  What I was trying to do was work at the

4   county and VTD level.  And I did have information about the

13:36:50 5   population in the districts as I was drawing them available if

6   I queried.

7        But oftentimes I would just have a map up there.  And knew

8   that I had to add population to District X or District Y.  And

9   so I was just adding the data and not even paying attention to

13:37:10 10   exactly what the percentage of African-Americans might have

11   been at each click of a mouse.

12   Q    So your testimony is that you went about building two

13   African-American districts by not looking at the percentage of

14   African-Americans you were putting in those districts?

13:37:26 15   A    Well, no.  I looked at it on occasion, but I was not

16   constantly looking at it.

17   Q    Okay.  And when you found a district or -- excuse me -- a

18   VTD -- if that's the level you were looking at -- that had

19   enough African-Americans, you would put it into one of your two

13:37:42 20   proposed districts, did you not?

21   A    No.

22   Q    You did not?

23   A    I was not -- I was not querying each VTD as I clicked it

24   in.  And I did not have some sort of a numerical guideline that

13:37:59 25   would suggest to me that this precinct has to go into District

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 111**

```
 1  2 and that one cannot.

 2      I was looking at other things like the VTD boundaries and

 3  county boundaries and municipal boundaries and the overall

 4  shape of the district.

13:38:15  5  Q    Okay.  We'll get back to that.

 6      Before you started your work, or as you started, you read

 7  the Alabama definition of communities of interest, didn't you?

 8  A    Yes, I did.

 9  Q    Okay.  But you didn't talk to anybody about actual

13:38:39 10  communities of interest in Districts 1, 2, 3, or 7 before you

11  started drawing, did you?

12  A    My assessment was that I prepared the illustrative plans,

13  and those plans were viewed by the plaintiffs.  And --

14          THE COURT:  Just a minute, Mr. Cooper.  That was not

13:39:02 15  the question.  If you would, please, listen to the question and

16  answer it as directly as you can, please, sir.

17          THE WITNESS:  Right.

18          THE COURT:  Did you talk to anybody about communities

19  of interest in those districts before you drew them I think was

13:39:16 20  the question.

21  BY MR. WALKER:

22  Q    I'm sorry.  Did you say no?

23  A    Well, no, not to an individual voter anywhere, no.

24  Q    You did not talk to anybody, did you?

13:39:24 25  A    About this particular case and these particular
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 112**

1   illustrative plans, no.  I have had other involvement in

2   Alabama in other cases.

3   Q    Okay.  Thank you.

4        And the need to find enough black persons to put into

13:39:43 5   District 2 and 7 or 2 explains why you split Mobile; is that

6   correct?

7   A    There are a variety of ways to split Mobile.  But because

8   more than 100,000 African-Americans live in the city of Mobile,

9   I do believe that Mobile County would have to be split to

13:40:04 10  create the second majority black district.

11  Q    And in every one of your plans, you split Mobile to ensure

12  that 100,000 African-Americans that live in Mobile County were

13  put into District 2; is that correct?

14  A    No.

13:40:17 15  Q    That's not?

16  A    No.  I wanted to include the bulk of the African-American

17  population in or around Mobile city, but I was not shooting for

18  a numerical tabulation of that population.  So I don't know

19  what the underlying totals are for the numbers of

13:40:41 20  African-Americans living in Mobile in District 2 in my plans

21  right off the top of my head.

22  Q    Well, do you recall testifying that there was 100,000

23  people -- African-Americans -- in Mobile that you needed to put

24  into District 2?

13:40:55 25  A    Well, I don't think I said I needed to.  I just said

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 113**

```
 1   that's the number because I'm sure I didn't include them all.
 2   Q    Okay.  And when you drew your plans, you didn't know, did
 3   you, that Alabama has never split up Mobile in a congressional
 4   plan?
13:41:20  5   A    I knew it had not been split in the plans developed in the
 6   '90s and 2000s, but I have not seen the plans going back
 7   further in time.  I have since seen some exhibits that you've
 8   presented to the Court for this trial that go back to like the
 9   1950s and before, and I don't think Mobile is split.
13:41:45 10   Q    Is it your understanding that Alabama has at any time
11   split the county of Mobile in traditional -- in congressional
12   redistrictings?
13   A    I don't know that for a fact.
14   Q    And you didn't know that when you started drawing the
13:42:04 15   plan; isn't that correct?
16   A    Didn't know what?
17   Q    I'll show you page 56 of your deposition and ask you:  Do
18   you know whether or not Alabama has traditionally considered
19   Mobile County to be a community of interest that it did not
13:42:21 20   split when drawing congressional districts?
21           MR. SPIVA:  Sorry to interrupt, Your Honor.  I have an
22   objection actually to this.  There's no question or answer that
23   he could be --
24           THE COURT:  I would sustain.
13:42:33 25   BY MR. WALKER:
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 114**

```
           1  Q    Let me ask the question again:  Did you know when you

           2  started drawing the districts that Alabama considered Mobile

           3  County a community of interest that it has never split when

           4  drawing congressional districts?

13:42:49   5  A    Well, I said I do not know that, and I said I did not know

           6  that today.  I've seen some congressional maps, historical maps

           7  where Mobile was not split.  But when you say --

           8  Q    You've answered my question.

           9  A    Well, okay.  Alabama can be defined in many different

13:43:07  10  ways.

          11       THE COURT:  You've answered the question.  Thank you.

          12  BY MR. WALKER:

          13  Q    And do you know whether or not Alabama has traditionally

          14  kept Mobile and Baldwin County together in the same

13:43:32  15  congressional district since the 1970s?

          16  A    I am aware of that.  Prior to '70s, sometimes Baldwin

          17  County was in a separate district.

          18  Q    And what was the difference between before the '70s and

          19  after the '70s?  Do you know?

13:43:48  20  A    No.

          21  Q    Well, isn't it true that before the '70s we had eight

          22  congressional districts and after the '70s we had seven?

          23  A    I believe at one time you had nine.  I don't know when the

          24  change was made, though.

13:44:01  25  Q    Okay.  Do you know whether or not since 1970 Alabama has
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 115**

116

1    ever split Auburn County and Mobile County apart in different

2    congressional districts?

3    A    As far as I know, Alabama Legislature has not split that

4    two-county region.

13:44:22 5    Q    Okay.  But for you, you split them because you needed to,

6    to create a second majority black district; is that correct?

7    A    I believe that one would have to divide Mobile County in

8    order to create the second majority-minority district or second

9    majority black district.

13:44:50 10    Q    Let me show you what is Revised Plan Number 1, and this is

11    from Exhibit 63.  And I just want to say:  What community of

12    interest is being kept whole here?  You divide the city of

13    Mobile, do you not?

14    A    I believe it is divided.

13:45:22 15    Q    And you divide the County of Mobile, and you divide some

16    other cities, do you not?  Do you divide Semmes, for example?

17    A    Not sure right off the top of my head.

18    Q    You don't know?

19    A    I was following precinct boundaries, so possibly.

13:45:37 20    Q    So the answer is you don't know?

21    A    I don't know.

22    Q    And this is Revised Plan Number 2.

23              THE COURT:  What exhibit is that, Mr. Walker?

24              MR. WALKER:  Ma'am?

13:45:57 25              THE COURT:  What exhibit number?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

|      |    |                                                                    |
|------|----|--------------------------------------------------------------------|
|          | 1  | MR. WALKER:  I'm sorry.  It's Exhibit 69.  Plaintiffs' |
|          | 2  | Exhibit 69, Your Honor. |
|          | 3  | THE COURT:  Thank you. |
|          | 4  | BY MR. WALKER: |
| 13:46:04 | 5  | Q    And District 2 is which color? |
|          | 6  | A    Yellow. |
|          | 7  | Q    The yellow.  Okay. |
|          | 8  | How did you decide where to go as you cut back and forth |
|          | 9  | between District 1 and District 2? |
| 13:46:22 | 10 | A    Almost exclusively on precinct boundaries.  Except, as |
|          | 11 | I've indicated, I did split three precincts right off of I-10 |
|          | 12 | and U.S. 98 interchange there to ensure that District 1 in |
|          | 13 | Baldwin County was contiguous with District 1 in Mobile County. |
|          | 14 | Q    Well, isn't it the fact that you put most of the blacks in |
| 13:46:51 | 15 | Mobile County inside District 2, and most of the whites in |
|          | 16 | Mobile County in District 1? |
|          | 17 | A    Well, it varies from plan to plan, so I'd have to take a |
|          | 18 | look at the data. |
|          | 19 | Q    Well, admitted that the percentages vary on every plan, |
| 13:47:12 | 20 | but in every plan your intention was to divide Mobile County so |
|          | 21 | that you could put the majority black population into District |
|          | 22 | 2 and the majority white population into District 1; is that |
|          | 23 | correct? |
|          | 24 | A    No.  My objective was to unite the African-American |
| 13:47:27 | 25 | community in south Alabama into a single majority black |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 117**

```
 1  district.  So I was not just thinking about Mobile County.
 2  Q    Okay.  And is it your testimony that the lines that I'm
 3  showing you here, the division between District 1 and District
 4  2, does not divide the county of Mobile along race?
```
13:47:49
```
 5  A    Not -- it depends on the precinct.  I mean, there's
 6  certainly majority white precincts in District 2.
 7  Q    No, no.  I'm asking about -- I'm not asking about
 8  precincts.  Please pay attention to my question, sir.
 9       Within Mobile County, where are the majority of
```
13:48:08
```
10  African-Americans on this map?
11  A    Well, I think --
12  Q    Are they in District 1 or are they in District 2?
13  A    I think it's -- the majority -- I would need to go to the
14  data sheets.  But most likely, there are more African-Americans
```
13:48:21
```
15  in District 2 and Mobile County than in District 1.  But I'm
16  not --
17  Q    Mr. Cooper, you testified this morning that Mobile was one
18  of the African-American population centers that you needed to
19  put into a majority black district, did you not?
```
13:48:38
```
20  A    Well, that's right.
21  Q    Okay.  And that's exactly all -- my point simply is that's
22  exactly what you did in each one of your plans?
23  A    But I don't have the numbers in front of me.
24  Q    I didn't ask you the numbers.
```
13:48:49
```
25  A    Well, okay.  I don't know what you said then.  Say it
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 118**

 1  again.

 2  Q    In each one of your plans in Mobile County, you put more

 3  African-Americans in District 2 than you put in District 1; is

 4  that correct?

13:49:03  5  A    I think that is correct, yes.

 6  Q    You know it's correct, don't you?  That was your job.

 7  A    No.  It was not my job.  My job was to draw a majority

 8  black district in addition to the existing District 7.  And it

 9  was not focused solely on Mobile.  It was to pay attention to a

13:49:22 10  community of interest that has historical significance linking

11  African-Americans in Mobile to other parts of south Alabama.

12  Q    What do --

13  A    But I will agree that I probably did.  If we went to the

14  data sheet, I could tell you the percentages.  And I probably

13:49:38 15  did put more African-Americans in Mobile County into District

16  2, but I also left out many thousands, as well, who remain in

17  District 1.

18  Q    And you put the majority of whites in District 1, didn't

19  you?

13:49:54 20  A    Probably.

21  Q    Yeah.  You know you did, don't you?

22  A    Well, let me be clear.  There's nothing wrong with doing

23  that in a Section 2 lawsuit.  That's common.

24  Q    I didn't say you did anything wrong.  I just asked you a

13:50:11 25  question.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 119**

    1   A    Well, I just want to clarify that.

    2   Q    Okay.  So are we agreed you put the majority of blacks in

    3   District 2 and the majority of whites in District 1 in Mobile

    4   County in all four of your plans?

13:50:27  5   A    Again, without looking at the data, I will agree.  But I

    6   would like to confirm that.  But it's in the -- I think you've

    7   got some tables that may sort of reflect that even though

    8   you're using a different definition of African-American.

    9   Q    And what community of interest were you respecting in

13:50:47 10   Mobile County?

   11   A    In Mobile County, I was endeavoring to respect your

   12   guidelines which say that a community of interest is defined as

   13   an area with recognized similarities of interests, including

   14   but not limited to racial, ethnic, geographic, governmental,

13:51:16 15   regional, social, cultural, partisan, or historic interest.

   16        Therefore, I think including Mobile County and a

   17   predominantly black part of Mobile County in a district that

   18   extends into the Alabama Black Belt and on into Montgomery

   19   County, which is part of the Black Belt, is appropriate because

13:51:35 20   it's following your guidelines.

   21   Q    So in order to draw a majority black district that linked

   22   African-American communities separated around the state into

   23   one district, you split up Mobile city and Mobile County; is

   24   that correct?

13:51:52 25   A    Well, I've already said -- I've already answered that

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 120**

```
          1   question.  It is necessary -- if you're going to create a
          2   second majority black district in Alabama, you have to include
          3   the black population in the city of Mobile or in Mobile County
          4   in general because part of the black community in Mobile County
13:52:09  5   actually doesn't live in the city of Mobile.  It's outside.
          6   Q    I am going to take that as a yes, okay?
          7   A    Well, I've said that at the outset.
          8   Q    Okay.
          9   A    I said that in my deposition.
13:52:19 10   Q    And is preserving the cores of existing districts also a
         11   traditional districting criteria?
         12   A    I would say no.
         13   Q    You would say no?
         14   A    I would say no.
13:52:29 15   Q    Okay.  Is it your testimony that in order to draw a
         16   majority black district you cannot preserve the cores of
         17   Districts 1, 2, 3, and 7?
         18   A    Districts 1, 2, 3, and 7, as drawn in the 2000 plan and
         19   the 2011 plan, in my opinion, cracked African-American voting
13:52:56 20   strength.
         21   Q    And let me --
         22   A    And for that reason --
         23        THE COURT:  Wait, wait, wait, Mr. Cooper.  Please, if
         24   you would, answer the question that's asked of you.
13:53:05 25        THE WITNESS:  Okay, sorry.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 121**

```
 1            THE COURT:  Mr. Spiva will have opportunity to
 2    question you again.  So if you would just answer the question
 3    that's asked, we'll be able to move along much faster.
 4    BY MR. WALKER:
 5    Q    Mr. Cooper, is it your testimony that there's no way to
 6    preserve the cores of Districts 1, 2, and 3 as they existed at
 7    the time the legislature was drawing the districts and also
 8    create a second black majority district?  You might want to
 9    look at the answer you gave in your deposition.
10    A    Well, I would say there's probably not a way to -- in a
11    numerical -- from a numerical perspective, but I would have
12    to -- let me refer to my deposition.  Maybe I had a
13    different --
14    Q    Well it's right there in front of you.  You said, "That is
15    true, I believe.  And I would also throw in District 3 partly
16    because it goes into Montgomery County," because I had only
17    asked you about 1, 2, and 7.
18    A    Okay.  Well, isn't that what I just said?
19    Q    Thank you.
20         Let's talk about compactness for a second, please,
21    Mr. Cooper.
22         And you testified about Reock and Polsby-Popper scores as
23    a basis for demonstrating, I think, that the districts you drew
24    are compact in comparison to the districts the state of Alabama
25    drew.  Did I understand your testimony correctly?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 122**

1    A    Yes.

2    Q    And in your testimony you compared the state board of

3    education districts and the congressional districts, right?

4    A    There are figures for the Reock scores that include both

13:54:59 5    the 2011 congressional plan, as well as the 2011 board of

6    education plan.

7    Q    I think the answer is just yes, you did?

8    A    Yes, I did.

9    Q    And those are different jurisdictions, aren't they?

13:55:09 10    A    They are different governing bodies, yeah.  Alabama --

11    Q    And they have a different number of members, don't they?

12    A    One is eight; the other is seven.

13    Q    And I don't see anywhere in your report where you opined

14    that the demands and expectations of a member of the state

13:55:28 15    board of education are any way congruent or similar to the

16    demands and expectations of a member of Congress.  Am I correct

17    on that?

18    A    I'm not a political scientist, so I wouldn't opine on

19    that.

13:55:40 20    Q    And you are not offering an opinion on that?

21    A    No.

22    Q    Okay.  Well, let's look at your Plaintiffs' Exhibit 45.

23    And I want to just ask you about District 1.

24         And under the 2011 plan, the Reock score for District 1 is

13:56:07 25    42.  And your Reock scores in your illustrative plan, in

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 123**

```
 1   Illustrative Plan 1, District 1 is 21; in illustrative plan 2,
 2   District 1 is 21; in Illustrative Plan 3, District 1 is 20; in
 3   Illustrative Plan 4, District 1 is 25.
 4        So all of your District 1s are significantly less compact
 5   than the existing District 1; is that correct?
 6   A   By about 15 percentage -- by about 15 hundredths of a
 7   percentage point, right.  Of a point, yeah.
 8   Q   And if we look at District 2, it's 49 in the 2011 plan; 35
 9   in your Illustrative 1 Plan 1; 27 in your Illustrative Plan 2;
10   33 in your Illustrative Plan 3; and 24 in your Illustrative
11   Plan 4; is that correct?
12   A   That is correct.
13   Q   Okay.  And if we look at 3, it's 36 in Illustrative Plan
14   11; it's 35 in illustrative plan -- excuse me.  It's 36 in the
15   2011 plan.  I'm sorry.  It's 35 in Illustrative Plan 1; 46 in
16   Illustrative Plan 2; 26 in Illustrative Plan 3; and 34 in
17   Illustrative Plan 4; is that correct?
18   A   Yes.
19   Q   So the three districts of southern Alabama are all more
20   compact in the 2011 plan than they are in your plans?
21   A   No, that's not true.
22   Q   Okay.
23   A   If we go back, we have to go back to the exhibit and point
24   out one district that is actually more compact in the
25   illustrative plans under the Reock score.
```

Timestamps (left margin): 13:56:29 (line 5), 13:56:54 (line 10), 13:57:15 (line 15), 13:57:39 (line 20), 13:57:53 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 124**

|       |   |                                                          |
|-------|---|----------------------------------------------------------|
| 1     | Q | One, yes.                                                |
| 2     | A | And it also has to be gauged on a statewide basis, but... |
| 3     | Q | When you calculated your means, you were doing the -- you |
| 4     |   | were averaging all seven districts, weren't you?         |

13:58:10  5  A    Right.

6  Q    And you made very few changes to the districts of north

7  Alabama relative; is that correct?

8  A    No, that's not correct.  I kept District 5 in the extreme

9  north along the Tennessee River almost the same, but District 4

13:58:24 10  changes as --

11  Q    Are you saying it changed as much as you changed the other

12  districts?

13  A    Probably.

14  Q    All right.  Let's look at your Polsby-Popper scores.

13:58:47 15         THE COURT:  Do you know what exhibit that is?

16         MR. WALKER:  That is, Your Honor, still part of

17  Exhibit 45.

18  BY MR. WALKER:

19  Q    And in the 2011 plan, the Polsby-Popper score is 16 or

13:59:00 20  .16.  In your Illustrative Plan 1, it's .14.  In your

21  Illustrative Plan 2, it's .13.  In your Illustrative Plan 3,

22  it's .16.  And in your Illustrative Plan 4, it's .13.

23         Now, that indicates that as Polsby-Popper calculates

24  compactness, the 2011 Plan 1 and your Illustrative Plan 3 Plan

13:59:32 25  1 are equally compact; is that correct?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 125**

126

```
          1  A    That is correct by the Polsby-Popper score.
          2  Q    Okay.  So I just want to say:  Who would think that these
          3  two plans are as compact if they were actually driving around,
          4  or working, or trying to represent those districts?
13:59:55  5  A    Well, you have a very odd intrusion into Clarke County.
          6  So it might be hard to find your way around Clarke County.  I
          7  don't have an intrusion like that.
          8       But the District 1, as drawn in Revised Plan 3, is based
          9  on whole counties from Baldwin to Houston and Henry.  There's
14:00:26 10  nothing unusual about it.  It's easy to understand.
         11  Q    Well, you seem to think whole counties are important --
         12            THE COURT:  Wait, Mr. Walker.
         13            MR. WALKER:  I'm sorry.
         14            THE COURT:  For purposes of the record, I need to know
14:00:35 15  what exhibits these two are that you have placed on the screen.
         16            MR. WALKER:  I'm sorry.  I put on the plaintiffs' map
         17  of Revised Plan 3, which is Plaintiffs' Exhibit 73; and the
         18  plaintiffs' map of the U.S. House 2011 plan, which is
         19  Plaintiffs' Exhibit 15.
14:00:55 20            THE COURT:  Okay.  Thank you.
         21            MR. WALKER:  Yes, ma'am.  Sorry.
         22  BY MR. WALKER:
         23  Q    Do you remember testifying in your deposition that the
         24  state of Montana probably had a perfect Reock score?
14:01:15 25  A    I may have -- I may have said that sort of in jest I guess
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 126**

1  because it's more of a square instead of a circle.  It's not --

2  it doesn't score quite as high.

3  Q    But it's not a compact in any sense that a person

4  representing that district would recognize, is it?  I mean, if

14:01:32 5  you were to drive across the state of Montana, or ride your

6  horse or walk across it, you wouldn't say, my, this is a

7  compact state?

8  A    Well, the Reock score is more than just a score that takes

9  into account population density.  It also takes into account

14:01:48 10  the shape of the district.

11  Q    Right.  I didn't ask you anything about population

12  density.  But I guess my point is that the Reock score is

13  ultimately just a ratio; is that correct?

14  A    Yes.

14:01:58 15  Q    Yeah.  And it doesn't tell us anything about how

16  serviceable a district is for the constituents or for the

17  representative, does it?

18  A    I tend to agree with that.  I think you need to look at

19  the map itself and make a visual assessment.  I look at Revised

14:02:15 20  Plan 3 and see no problems at all.

21  Q    And you have drawn in each one of your maps District 1

22  that stretches from Mobile County to Houston County.  And I

23  understand from the fact that you've included that same basic

24  structure in each one of your maps to mean that you do not

14:02:33 25  believe there's any other way to draw two majority black

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 127**

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | districts without drawing District 1 to stretch from Mobile   |
|       | 2  | County to Houston County?                                     |
|       | 3  | A    Well, that's -- that's not exactly the case because I    |
|       | 4  | suspect that you could have put Pike and Crenshaw into District |
| 14:02:58 | 5 | 1.  I didn't try to do that, but I'm sure you could have.   |
|       | 6  | Whether you could have still done that and -- I'm sure you    |
|       | 7  | could have kept the counties whole.  So I didn't try that     |
|       | 8  | option.                                                       |
|       | 9  | This is just an illustrative *Gingles 1* plan, not a         |
| 14:03:12 | 10 | remedial plan.  And I would certainly think the plaintiffs   |
|       | 11 | would be open to reconfiguring Districts 1 and 3.            |
|       | 12 | Q    But you didn't present -- your purpose was to show the  |
|       | 13 | Judge the possibility of drawing two majority black districts. |
|       | 14 | And in each one of your plans, all of your District 1s go from |
| 14:03:27 | 15 | Mobile to Houston County; is that correct?                   |
|       | 16 | A    No.  That's -- well, yes, that's true.  That's true.  But |
|       | 17 | I would -- I wish to point out that that may not be necessary. |
|       | 18 | Q    Do you think that when you draw a district it's important |
|       | 19 | to consider how functional that district will be for the     |
| 14:03:55 | 20 | representative, for the man or woman who's representing that |
|       | 21 | district, the ability that they have to get around and meet  |
|       | 22 | their constituents?                                          |
|       | 23 | A    Yes.  That's why I was very careful to follow precinct  |
|       | 24 | lines and draw reasonably well-shaped compact districts.     |
| 14:04:13 | 25 | Q    And do you think it's important to draw a district where |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 128**

1    the constituents in the district can reasonably get to their

2    representative?

3    A    To the extent possible, yes.  Alabama is a big state.

4    Q    Is it your testimony that the districts that you have

14:04:37  5    drawn for District 1 is a district that could function in any

6    real sense for an Alabama representative?

7    A    Absolutely.

8    Q    How would you get from Mobile to Houston County?

9    A    You would either go via I-59 and then take state routes

14:05:01  10   into the Houston-Dothan area, or you could, say, from Fairhope

11   drive via I-10 and then up through the panhandle of Florida to

12   Dothan.  Either trip would take about three hours by car.

13   Q    And you -- what's your basis for saying three hours?

14   A    I checked it on Google Maps.

14:05:21  15   Q    That's funny.  When I checked, Google said four.

16   A    You may have checked early this morning.  You checked

17   traffic at 9:00 a.m. during rush hour.

18   Q    So --

19        THE COURT:  Not in Escambia County.

14:05:33  20        THE WITNESS:  Well, coming out of Mobile probably.

21   But I will concede there may be differences in the times.  I

22   was doing it midday.

23   BY MR. WALKER:

24   Q    So your testimony is that to get from Mobile you would

14:05:47  25   drive through Florida on Highway 10 to somewhere below Houston

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 129**

1    county and then cut up, I guess, on 231?

2    A    Yes.  It's a U.S. highway.  I mean, I did it on Google

3    Maps.

4    Q    Yeah.

14:06:02  5    A    It's a little bit -- it's right at three hours.

6    Q    And that's the best way for that representative to get

7    around in that district?

8    A    That's one way.  I think it might add 10 minutes or so if

9    you drive up to I-65 and then take another route to Houston.  I

14:06:16 10    don't have all the map -- all the U.S. highways displayed on

11    the map.

12         But a three-hour trip is not out of the ordinary in

13    Revised Plan 3, nor is it out of the ordinary in existing 2011

14    plan involving other districts, of course.  But certainly other

14:06:35 15    representatives in the state have to travel --

16    Q    Sir, if you go from Mobile to Dothan and you wanted to --

17         THE COURT:  Wait a minute.  Wait a minute.  I keep

18    hearing some mumbling over there about letting him answer the

19    question.

14:06:44 20         If he were answering the question, that would be one

21    thing.  But he's not.

22         So again, Mr. Cooper, this is not a platform for you to

23    just run and say whatever you want to, especially on

24    cross-examination.  You need to listen and answer the direct

14:07:06 25    question that's asked as directly as possible.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

131

```
 1              THE WITNESS:  Okay.  I apologize.

 2              THE COURT:  I know it's hard.

 3              THE WITNESS:  He's trying to corner me into a

 4    yes-or-no answer where there's ambiguity.  That's the problem.

 5    But I will try.

 6              MR. SPIVA:  Your Honor, I just want to be clear.  We

 7    weren't saying anything about letting him answer.  I didn't

 8    know if you thought we were saying that.  I just wanted to be

 9    clear.

10              THE COURT:  Well, I just kept hearing something over

11    there being mumbled.

12              MR. SPIVA:  Sorry.  We were probably whispering to

13    each other.  We weren't saying that.  I didn't want you to

14    think we were being rude.

15              THE COURT:  Okay.  And also any objection needs to

16    come from Mr. Spiva, not from someone else.

17              MR. SPIVA:  Of course, Your Honor.

18              THE COURT:  Oh, okay.  I'm sorry.  It's Christina.

19    All I heard was a female voice, and I thought I saw some lips

20    moving there.  I apologize.

21          But the point is very well taken by Ms. Christina.  She

22    cannot get down any testimony when both the attorney and the

23    witness are speaking at the same time.  So let's try to avoid

24    that as much as possible.

25          Okay.  All right.  We got the rules down now?  Only one
```

14:07:15 (line 5)
14:07:23 (line 10)
14:07:30 (line 15)
14:07:49 (line 20)
14:08:07 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 131**

```
 1   talk at a time, and answer the question that's asked, okay?

 2          THE WITNESS:  I will immediately stop when Mr. Walker

 3   says something even if I'm in mid sentence.

 4          THE COURT:  Okay.  That will be good.

 5          MR. WALKER:  Thank you, Your Honor.

 6   BY MR. WALKER:

 7   Q    So you would agree with me that if a representative

 8   travels to Mobile from Dothan via U.S. Interstate 10, she or he

 9   is not going to be meeting with any of her constituents along

10   the way?

11   A    I don't know that for a fact.

12   Q    Well, they would have --

13          THE COURT:  Would a congress person for District 1

14   have constituents in Florida?

15          THE WITNESS:  They could be meeting halfway.  I

16   just --

17   BY MR. WALKER:

18   Q    So if a representative wanted to travel from Mobile to

19   Dothan, or vice versa, within her or his district, do you know

20   how they could do that on the existing roadway?

21   A    From Mobile to Dothan?

22   Q    Yeah.

23   A    Yes.

24   Q    Could you show the Court?

25   A    Well, I mean, I could show my Google Maps.
```

14:08:23 (line 5)
14:08:36 (line 10)
14:08:52 (line 15)
14:09:11 (line 20)
14:09:19 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 132**

| | |
|---|---|
| 1 | Q    Okay. |
| 2 | MR. WALKER:  Your Honor, may I approach? |
| 3 | THE COURT:  You sure may.  Is that an official Alabama |
| 4 | state map? |
| 14:09:29 5 | MR. WALKER:  This is an official Alabama highway map |
| 6 | that I retrieved from the Department of Transportation last |
| 7 | week. |
| 8 | THE COURT:  Okay. |
| 9 | THE WITNESS:  Whether I can show it on this map, I |
| 14:09:38 10 | don't know. |
| 11 | BY MR. WALKER: |
| 12 | Q    Well, this is the highway road map for the state of |
| 13 | Alabama. |
| 14 | A    Right. |
| 14:09:47 15 | Q    So if you would please take this highlighter and trace the |
| 16 | route that your representative would travel from Mobile to |
| 17 | Dothan in the district that you designed for that person. |
| 18 | A    Well, it's a three-hour trip according to Google Maps, and |
| 19 | I did not, you know, save that route.  It would, I believe, go |
| 14:10:12 20 | up I-65 probably to -- |
| 21 | Q    Just trace it out with the highlighter I gave you, please, |
| 22 | sir. |
| 23 | A    Okay.  This may not be the Google Maps route.  But I'm |
| 24 | nervous, so I'm shaking because I don't like to speak in |
| 14:10:35 25 | public. |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 133**

134

```
 1          So here we are on I-65 up to roughly Evergreen.  You get

 2     on 84 and go to Andalusia, stay on 84.  Go through Enterprise

 3     maybe on a state route where you might stay on 84 and go to

 4     Elba, and then through Daleville, and right into Dothan hitting

14:11:05  5   State Route 53, or maybe it's U.S. 231 on the north side of

 6     Dothan -- Dothan.

 7          I mean, that's just my guess.  It's probably not the

 8     optimal map as calculated by Google Maps.  I see no trouble

 9     with that.  Congressional representatives all over the country

14:11:23 10   have to travel those distances.

11     Q    We're concerned with Alabama.

12          And I will show you what I got from Google Maps, which

13     says that it takes 3 hours and 52 minutes.

14     A    And when did you do that?  I can't ask him that, right?

14:11:38 15   Q    During the day.

16     A    Yeah.  Well, there are two different routes.

17          So we'll just have to agree to disagree on that.

18     Q    Thank you, sir.  Not much more.

19          Do any of your plans keep the entirety of the historical

14:12:34 20   Black Belt in the same district?

21     A    They do not.  Although Illustrative Plan 2 puts all of the

22     Black Belt in one or the other.

23     Q    You testified earlier that there were enough

24     African-Americans in Congressional Districts 1, 2, or 3 to form

14:13:03 25   almost all of a congressional district by total population; is
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 134**

         1   that correct?

         2   A     Yes.

         3   Q     But you also have to consider where that population lives

         4   in order to draw a district that complies with historical --

14:13:17  5   with traditional districting criteria; is that correct?

         6   A     Yes.

         7   Q     Okay.

         8         MR. WALKER:  Your Honor, may I have just one moment?

         9         THE COURT:  You may.

14:14:00 10   BY MR. WALKER:

        11   Q     What community of interest, Mr. Cooper, are you observing

        12   by connecting rural Mobile County and Houston County?

        13   A     It is including a predominantly rural area in Mobile

        14   County with a predominantly rural area further east.

14:14:25 15   Q     Any others?

        16   A     I think I could say that's probably the -- primary

        17   community of interest, although part of Mobile County is

        18   suburban.  But that would be one key link there is that is a

        19   part of Mobile County that is more rural.

14:15:09 20         MR. WALKER:  Your Honor, I move for admission of

        21   Defendant's Exhibit 303, which is the map that was marked by

        22   Mr. Cooper.

        23         MR. SPIVA:  No objection, Your Honor.

        24         THE COURT:  It's received.

14:15:29 25         And just for the record, I want to make sure his route was

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 135**

| | |
|---|---|
| 1 | marked with an orange highlighter; is that correct? |
| 2 | MR. WALKER:  Orange highlighter, yes, ma'am. |
| 3 | THE COURT:  Okay. |
| 4 | BY MR. WALKER: |
| 14:15:49 5 | Q    Your Plans 1 through 4, could the legislature pass those |
| 6 | plans in 2020-2021? |
| 7 | A    I have no idea. |
| 8 | Q    Why not? |
| 9 | A    Well, it's a speculative -- it's all speculative.  I don't |
| 14:16:09 10 | know.  I mean, I don't know what the politics would necessarily |
| 11 | be by this time next year. |
| 12 | But certainly if they did pass it, in my opinion it would |
| 13 | be considered a plan that was respecting traditional |
| 14 | redistricting principles.  It may be different than the 2011 |
| 14:16:28 15 | plan, but it respects traditional redistricting principles. |
| 16 | Q    And you say that without knowing what the census data are |
| 17 | for 2020? |
| 18 | A    If it's like one of the illustrative plans, it's possible |
| 19 | that there would be some need to expand the two majority black |
| 14:16:45 20 | districts to pick up additional population even in a |
| 21 | seven-district plan, but I don't know that for a fact. |
| 22 | Q    Now, Dr. Cooper, you know that District 7 has lost |
| 23 | population over the last decade and is going to need tens of |
| 24 | thousands of people added to it, don't you? |
| 14:16:59 25 | A    I do not know that. |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 136**

1    Q     You don't?

2    A     No, I don't.  Because it also includes in at least two

3    plans Tuscaloosa County, which is a fast-growing county.

4    Q     All right.

14:17:10  5          MR. WALKER:  That's all I have.  Thank you, Your

6    Honor.

7              THE COURT:  Any redirect?

8              MR. SPIVA:  Yes, Your Honor.  Just a little bit.

9                        REDIRECT EXAMINATION

14:17:17 10   BY MR. SPIVA:

11   Q     Mr. Cooper, you recall the questioning on cross-ex about

12   not preserving cores of districts.  Do you remember that?

13   A     Yes.  I remember that vague question.

14   Q     Okay.  Let me put up Plaintiffs' Exhibit 84, and

14:17:46 15   specifically page 4 of Plaintiffs' Exhibit 84.

16         And this is -- you recognize this, Mr. Cooper, as the

17   state reapportionment committee's guidelines on redistricting?

18   A     Yes.

19   Q     And do you remember we discussed on direct the communities

14:18:30 20   of interest definition I think you quoted in your report?

21   A     Yes.

22   Q     Does the report -- does the word "core retention" appear

23   anywhere in that guideline from the state reapportionment

24   committee?  Preservation of cores?  Anything like that?

14:18:47 25   A     No.  And --

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 137**

```
 1            THE COURT:  You're referring to page 4 of that
 2    document; is that correct?
 3            MR. SPIVA:  That's right, Your Honor.  Page 4 of
 4    Exhibit 84.  Plaintiffs' Exhibit 84.  And maybe we could show
14:19:05 5    the first page of that, too, please, Heather.
 6            THE COURT:  You're referring to the criteria that
 7    begins on page 2?
 8            MR. SPIVA:  Actually it begins there, Your Honor, and
 9    it runs through to page 4, where it talks about the integrity
14:19:29 10   of communities of interest.
11            THE WITNESS:  I don't see the word "core," but I may
12    be overlooking something.
13    BY MR. SPIVA:
14    Q    Okay.  And did you review the rest of the -- these
14:19:41 15   guidelines when you were doing your report?
16    A    I think I did at some point.  Some of them are obvious,
17    like equal population, avoiding incoming conflicts.
18    Q    And do you recall whether you saw core preservation
19    anywhere in the 2011 Alabama Legislature reapportionment
14:20:04 20   committee guidelines?
21    A    I don't recall seeing that, no.
22    Q    And then you also recall on direct -- I'm sorry -- on
23    cross-examination, you were asked about your use of the board
24    of education plan as a reference point or point of departure.
14:20:23 25   Do you recall that?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 138**

```
     1  A     Yes.
     2  Q     And I think the question was something to the extent of
     3  the board of education plan is -- you know, represents a
     4  totally different constituency or interest than the
14:20:34  5  congressional plan.  Do you recall that?
     6  A     I do recall that question.
     7  Q     And if we can turn to page 2 of this document, Plaintiffs'
     8  Exhibit 84, page 2.  And if we can kind of cull out Roman
     9  Numeral IV.
14:20:55  10      And would you agree with me, Mr. Cooper, that this says
    11  that these are criteria for congressional, legislative, and
    12  state board of education districts?
    13  A     Yes.
    14  Q     And was it your understanding that these redistricting
14:21:11  15  principles that you were attempting to apply applied to all
    16  four of those -- rather, say, all three of those types of
    17  bodies?
    18  A     Yes.  Although I don't think the legislature state board
    19  of education plans required zero deviation, but --
14:21:32  20  Q     Okay.  I'm sure you recall the map exercise and the
    21  questions about CD 1 stretching from the west to the east, I
    22  take it.  Do you recall those questions in drawing the route?
    23  A     I recall that, and there's nothing at all unusual about a
    24  congressional district extending that distance.  You need only
14:21:56  25  to look to Congressional District 5 in Florida.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 139**

140

|   |   |
|---|---|
| 1 | Q    Well, let me also -- let me show you something in Alabama. |
| 2 | So can we pull up Plaintiffs' Exhibit 15? |
| 3 | That's the 2011 congressional plan, is it not? |
| 4 | A    Yes. |
| 14:22:13  5 | Q    And what length of the state does congressional -- |
| 6 | existing Congressional District 5 span? |
| 7 | A    It goes the entire length of the state along the Tennessee |
| 8 | line and cuts across the Tennessee River to pick up Morgan |
| 9 | County. |
| 14:22:32 10 | Q    So it spans from the east to the west northern border of |
| 11 | Alabama? |
| 12 | A    Yes. |
| 13 | Q    And Congressional District 4, what's its span in the state |
| 14 | of Alabama? |
| 14:22:41 15 | A    The distances there are longer.  It extends east to west, |
| 16 | but also more northeast to southwest.  I know to go from -- I |
| 17 | think it's Sulligent up to Dekalb County is another three-hour |
| 18 | trip by car. |
| 19 | Q    From where to Dekalb? |
| 14:23:07 20 | A    Sulligent, which is in Lamar county not far from the |
| 21 | Mississippi line.  If you drive from that spot to the central |
| 22 | part of Dekalb County, it's a three-hour trip. |
| 23 | Q    Okay. |
| 24 | A    Essentially the same as driving from Mobile to Dothan, |
| 14:23:24 25 | because I'm in disagreement about the time involved.  It's not |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 140**

```
 1  four hours all the time.  Put it that way.  Maybe during rush

 2  hour.

 3  Q    And you drive quite frequently, don't you, Mr. Cooper?

 4  You drove from your home in Bristol, Virginia to Birmingham,

 5  Alabama?

 6  A    I did.  I drove right through Districts 4, 5, 6, and a

 7  little piece of 3 in St. Clair.

 8         MR. SPIVA:  All right.  I have no further questions.

 9  Thank you.

10         THE COURT:  Any recross?

11         MR. WALKER:  No, ma'am, Your Honor.  Thank you.

12         THE COURT:  All right.  Thank you, Mr. Cooper.  You

13  may step down.

14     We haven't been going very long, but this might be a

15  logical place to take a quick little break.  How about

16  10 minutes?  And we will be back at 2:35.  How about that?

17  It's 10 minutes.  If you will have your witness in the stand,

18  please.

19         (Recess.)

20         THE COURT:  Plaintiff will call your next witness.

21         MS. KHANNA:  Thank you, Your Honor.  Plaintiffs call

22  Dr. Maxwell Palmer to the stand.

23                    MAXWELL PALMER,

24  having been first duly sworn by the courtroom deputy clerk, was

25  examined and testified as follows:
```

Timestamps in left margin: 14:23:40 (line 5), 14:23:54 (line 10), 14:24:09 (line 15), 14:35:47 (line 20), 14:36:03 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 141**

|   | |
|---|---|
| 1 | THE COURTROOM DEPUTY CLERK:  Please state your name |
| 2 | into the microphone for the record. |
| 3 | THE WITNESS:  Maxwell Palmer. |
| 4 | DIRECT EXAMINATION |
| 14:36:21 5 | BY MS. KHANNA: |
| 6 | Q    Good afternoon, Dr. Palmer. |
| 7 | A    Good afternoon. |
| 8 | Q    You have been retained as an expert by the plaintiffs in |
| 9 | this case; is that correct? |
| 14:36:28 10 | A    Yes. |
| 11 | Q    And you've prepared two reports in the course of this |
| 12 | case; is that right? |
| 13 | A    Yes. |
| 14 | Q    In the notebook in front of you, you'll see two documents |
| 14:36:40 15 | marked Plaintiffs' Exhibit 79 and Plaintiffs' Exhibit 80.  Can |
| 16 | you please identify those exhibits for the Court? |
| 17 | A    The first exhibit is my expert report in this case, and |
| 18 | the second exhibit is my rebuttal report in this case. |
| 19 | Q    Thank you. |
| 14:36:57 20 | I just want to briefly ask some questions about your |
| 21 | background and expertise.  Can I direct your attention to page |
| 22 | 25 of Plaintiffs' Exhibit 79, which is your first expert |
| 23 | report? |
| 24 | What is this document? |
| 14:37:15 25 | A    This is my CV. |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0080/ChristinaDecker.rmr.crr@aol.com

| | |
|---|---|
| 1 | Q    And is this a complete and accurate summary of your |
| 2 | educational background and professional experience to date? |
| 3 | A    It's complete as of March when I submitted my report. |
| 4 | Q    Okay.  Has there been any significant changes since March? |
| 14:37:28 5 | A    A few new publications. |
| 6 | Q    Anything in particular? |
| 7 | A    A book on local politics, and a new paper on political |
| 8 | careers. |
| 9 | Q    Thank you. |
| 14:37:38 10 | Can you briefly summarize your educational background? |
| 11 | A    I received a bachelor's degree in math and government and |
| 12 | legal studies from Bowdoin college in Maine, and a Ph.D. in |
| 13 | political science from Harvard University in 2014. |
| 14 | Q    And where are you currently employed? |
| 14:37:53 15 | A    I'm currently an assistant professor at Boston University. |
| 16 | Q    What classes do you teach at Boston University? |
| 17 | A    I mainly teach classes on American politics, including |
| 18 | introduction to American politics, and a course on Congress. |
| 19 | I also teach classes on political methodology and |
| 14:38:10 20 | analysis, including a research design class for graduate |
| 21 | students, formal and game theory, and a new data science class. |
| 22 | Q    And what would you say are your principal areas of |
| 23 | research? |
| 24 | A    My main areas of research are Congress and redistricting, |
| 14:38:26 25 | political careers, and local and urban politics. |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 143**

1    Q    Dr. Palmer, have you been accepted as an expert witness in

2    a United States court before?

3    A    Yes.

4    Q    So the cases -- those cases, I believe, are listed in

14:38:41  5    paragraph 6 of your initial report on Plaintiffs' Exhibit 79;

6    is that right?

7    A    Yes.

8              THE COURT:  On which page, please?

9              MS. KHANNA:  That would be page 2 of Plaintiffs'

14:38:56 10    Exhibit 79.

11             THE COURT:  Thank you.

12    BY MS. KHANNA:

13    Q    And listed here is the case of *Bethune Hill*.  What kind of

14    analysis did you perform in *Bethune Hill*?

14:39:06 15    A    I performed a racially polarized voting analyses, as well

16    as an analysis of the degree to which race predominated in the

17    drawing of House of delegates districts.

18    Q    And do you know whether the Court credited your analysis

19    in that case?

14:39:19 20    A    They did.  The Court cited it extensively in their

21    opinion.

22    Q    And what kind of analysis did you perform in the *Thomas v.*

23    *Bryant* case?

24    A    Mainly racially polarized voting analyses.

14:39:32 25             THE COURT:  Mainly racial what?

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 144**

```
 1          THE WITNESS:  Racially polarized voting.
 2          THE COURT:  Okay.  You need to slow down just a little
 3   bit so the court reporter can get all that down, please, okay?
 4   BY MS. KHANNA:
 5   Q    And did the Court credit your analysis in that case?
 6   A    Yes.
 7          MS. KHANNA:  Your Honor, I would like to now proffer
 8   Dr. Palmer as an expert in redistricting and data analysis for
 9   the Court.
10          MR. DAVIS:  No objection.
11          THE COURT:  Okay.  The Court recognizes Dr. Palmer as
12   an expert.
13          MS. KHANNA:  Thank you, Your Honor.
14   BY MS. KHANNA:
15   Q    Let's talk specifically about the work you performed in
16   this case.  What were you initially asked to do?
17   A    I was asked to evaluate the extent to which voting is
18   racially polarized in the first, second, third, and seventh
19   congressional districts under the map drawn in 2011.
20   Q    And what is racially polarized voting, as you understand
21   it?
22   A    As I understand it, racially polarized voting is when
23   members of different racial or ethnic groups -- when majorities
24   of those groups support different candidates.
25          For example, if a majority of black voters supports one
```

14:39:43 (line 5)
14:39:56 (line 10)
14:40:06 (line 15)
14:40:22 (line 20)
14:40:40 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1   candidate and a majority of white voters supports a different

2   opposing candidate.

3   Q    Is it always the case that each racial group has a

4   preferred candidate?

14:40:53 5   A    Not necessarily.  It could be that a group is divided

6   among one or more -- two or more candidates.

7   Q    And does racially polarized voting mean that each racial

8   group votes only for those candidates of the same racial group?

9   A    No.  There's no requirement or -- there's no requirement

14:41:14 10   that members of each group vote for members of their own group.

11   Q    Were you able to draw any conclusions regarding the extent

12   to which voting is racially polarized in the areas that you

13   examined?

14   A    Yes.  I found strong evidence of racially polarized voting

14:41:33 15   in the first, second, third, and seventh districts, as well as

16   the -- those four districts altogether, which I call the focus

17   area in my report.

18        I find that African-American and white voters consistently

19   support different candidates.  On average, the African-American

14:41:50 20   preferred candidates win about 94 percent of the

21   African-American vote, but only 17 percent of the white vote in

22   the area as a whole.

23   Q    And across the elections that you examined, whose

24   preferred candidates generally prevailed?

14:42:02 25   A    In the focus area as a whole, white preferred candidates

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 146**

1  generally won across 18 statewide elections that I looked at.

2  The African-American preferred candidate only won twice.

3  Q    And how about in congressional elections?

4  A    In the first, second, and third districts, white preferred

14:42:21  5  candidates won in every election I looked at.

6      In the seventh district, African-American preferred

7  candidates won in every election.

8  Q    Dr. Palmer, what was the geographic area that you

9  examined?

14:42:34  10  A    The geographic area was the first, second, third, and

11  seventh congressional districts, which I referred to as a whole

12  as the focus area.  I also include in the focus area a few

13  counties that are split between one of those four districts and

14  one of the other districts.

14:42:51  15  Q    Okay.  Can we please call up Plaintiffs' Exhibit 79,

16  Figure 1, which is on page 10.

17      Dr. Palmer, can you please explain to me what this figure

18  shows?

19  A    This is just a map of the congressional districts as drawn

14:43:08  20  in 2011 highlighting the four districts of my analysis.  And

21  then you can also see on this map some of the counties, such as

22  Jefferson County, that I include in the focus area as a whole,

23  because they're partially in one of these four districts.

24  Q    Dr. Palmer, what elections did you examine in the course

14:43:29  25  of your analysis?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 147**

14:43:51

14:44:04

14:44:22

14:44:36

14:44:55

A     I examined election results from the 2012, 2014, 2016, and
2018 general elections, as well as the 2017 special election
for U.S. Senate.  This includes both elections for U.S.
Congress, which we would call endogenous selections in an
analysis like this about congressional districts, and statewide
elections are exogenous elections.

Q     And what methodology did you use to use to analyze
racially polarized voting in the elections and areas that you
examined?

A     I used a statistical procedure called ecological
inference, which is often referred to as EI.

Q     And can you explain to us what EI is?

A     Ecological inference is a procedure that estimates
group-level preferences; that is, what percentage of the voters
of each group are voting for each candidate based on aggregate
data -- based on the data we're actually able to observe about
elections.

Q     So what kind of results does an ecological inference
analysis yield?

A     The ultimate result of an ecological inference analysis is
an estimate for each racial group of their level of support for
each candidate.

       An ecological inference is a procedure I run separately
for each election that I look at.  So it's not one analysis,
but many different ecological inference analyses conducted

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 148**

1  here.

2       And besides the estimate, which is the mean or average

3  level estimated level of support for each group for each

4  candidate, it also includes a level of uncertainty.  In this

14:45:09 5  case, a 95 percent confidence interval.  And that tells us how

6  precise the estimate is.

7  Q    And what racial groups did you analyze in the course of

8  your analysis here?

9  A    I primarily focused on African-American and white voters,

14:45:23 10  but I also included a third category of other that includes

11  voters of all other groups.

12  Q    What voters would belong in the "other" category?

13  A    Hispanics, Asians, Native Americans, and the very small

14  percentage of voters who did not identify their race.

14:45:40 15  Q    And how did you determine the racial category into which

16  each voter would belong?

17  A    I relied on data from the Alabama Secretary of State

18  including reports about voter registration and when voters --

19  my understanding is that when voters registered to vote, they

14:45:56 20  identified their race on form.

21  Q    And do you have any understanding about how they

22  identified their race in their voter registration form?

23  A    They're instructed to check one of a few options,

24  including, black, white, Hispanic, Asian and Native American.

14:46:11 25  Q    So the voter self-identifies their race; is that fair?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 149**

```
         1   A     That's right.

         2   Q     And approximately how many voters qualified for that other

         3   group that you mentioned?

         4   A     In the focus area as a whole, it's about 3 percent of

14:46:27 5   registered voters.

         6   Q     So what about the other 97 percent of registered voters?

         7   A     They're either black or white.

         8   Q     And, Dr. Palmer, you explain in your report that you did

         9   two types of racially polarized voting analyses, a county-level

14:46:43 10  analysis and a precinct-level analysis.  Why did you perform

        11   two analyses to examine this question?

        12   A     Because of data availability.  And so we have a lot more

        13   data for more years at the county level and less data at the

        14   precinct level.  But it's useful to look at things both county

14:47:04 15  level and at the more granular precinct level.  We just have

        16   more information to work with.

        17   Q     Are they able to act as kind of a check on one another?

        18   A     Yes.  I find essentially the same results in both sets of

        19   analyses.

14:47:16 20  Q     So let's first talk about your county-level analysis.

        21   What data did you use for that analysis?

        22   A     So there's two main types of data used in the analysis.

        23         The first is data on the registered voters, which for the

        24   county level analysis comes from reports put out by the

14:47:34 25  Secretary of State at each election that report the number of
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 150**

1  registered voters by race in each county.

2      And then the second type of data is county-level election

3  results.  That is the total number of votes received by each

4  candidate in each election in each county.

14:47:51  5  Q    So for your county-level analysis, you examined only the

6  focus area as a whole and not each individual congressional

7  district; is that right?

8  A    Yes.

9  Q    And why is that?

14:48:02  10  A    There aren't enough counties in the individual

11  congressional districts to do an analysis separately for each

12  one.  We need to have enough data, enough different counties,

13  different observations in each analysis to get a good estimate.

14  Q    So can you explain for us how you performed your

14:48:20  15  county-level analysis?  How did it proceed?

16  A    So after I put the data together, I run this algorithm

17  called ecological inference, which produces estimates of

18  support for each group, for each candidate.  And then I analyze

19  it in two different steps.

14:48:41  20      And the first step is I just look at each group alone and

21  I say, is this group cohesively supporting one candidate, or

22  are they split across the two major candidates?  And if they

23  were to be supporting one candidate, I can say they have a

24  candidate of choice in that election.  But if they're split and

14:48:58  25  divided between two candidates, I can't come to that

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 151**

```
 1   conclusion.

 2        And then second, I look at the two groups, mainly blacks

 3   and whites together and say, do they have the same candidate of

 4   choice or different candidates of choice?

14:49:09 5   Q    So how do you determine from this analysis whether voting

 6   in any particular election was racially polarized?

 7   A    I consider it racially polarized when each group has a

 8   clear candidate of choice and they are opposing candidates.

 9   Q    Can we please put up Plaintiffs' Exhibit 79, Figure 2,

14:49:33 10  which is on page 11?

11        Can you explain to me what this figure shows?

12   A    This figure reports the county-level ecological inference

13   results.  And I'm going to go through it piece by piece because

14   it's a lot of different pieces here.

14:49:54 15       So on the left-hand side, the text lists each of the

16   different elections that I looked at.  And each one is a

17   separate ecological inference run of the model.

18   Q    So can we maybe just focus on the top, the first election

19   so you can walk us through what you looked at for each one?

14:50:10 20  A    Sure.  So the top election is the 2012 election for U.S.

21   President.

22        And what I first find looking at the results is that

23   African-Americans cohesively supported Barack Obama, and white

24   voters cohesively supported Mitt Romney.  And so that each

14:50:24 25  group has a different candidate of choice.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 152**

1    And then on the right, the graph shows the percentage of

2  each group voting for the African-American candidate of choice.

3  So in this case, Obama.  The black circle corresponds to black

4  voters, and the white circle to white voters.

14:50:40  5    And so what we see at the far right is that's the estimate

6  for black voters voting for the black candidate of choice, and

7  that's in the high 90s there.  And then the vertical lines

8  around that dot are the confidence intervals.  So that's our

9  measure of uncertainty from this estimate.

14:50:58 10    Then the white circle on the left is the percentage of

11  voters -- of white voters voting for the black candidate of

12  choice.  So white voters voting for Obama.  And that is less

13  than 20 percent.  And those vertical lines around the circle

14  are also a confidence interval for that estimate.

14:51:14 15  Q   Can you please explain what the competence intervals are

16  and what they show?

17  A   It's a measure of uncertainty.  And so the model produces

18  an estimate that we think is the best -- the best estimate of

19  support for each group and candidate, and that's represented by

14:51:32 20  the circle.  But there is some uncertainty to it.

21    The model is run through simulations, and each simulation

22  produces a slightly different result.  And so those lines show

23  the bounds in which 95 percent of the estimates fall between

24  those two lines.

14:51:44 25  Q   So we can be confident with 95 percent certainty that the

**Caster Plaintiffs' Exhibit 84, Page 153**

1    actual vote share falls somewhere between those two lines?

2    A    Given this model, yes.

3    Q    And you mentioned, you know, the category here says "Black

4    candidate of choice."  When you say "black candidate of

14:52:05  5    choice," do you mean the candidate who is black?

6    A    No.  I mean, the candidate preferred by African-American

7    voters.

8    Q    And if we could zoom out from this one example to the

9    figure as a whole.  I see at the bottom there's an asterisk,

14:52:18 10    and the asterisk is included in some elections.  Can you

11    explain what the asterisk is?

12    A    Is there a way for me to clear these circles?

13    Q    I'm sure there is.

14    A    So the asterisk here I just used to note which candidates

14:52:38 15    are, in fact, African-American and which ones are not.

16    Q    Okay.  Thanks.  We can pull that back up.

17         So what does Figure 2 tell us?

18    A    We see a consistent pattern across all 18 elections

19    ranging from 2012 to 2018.  If we look at the far right side,

14:52:56 20    we see high levels of support by black voters for their

21    candidate of choice.  They're highly cohesive in their voting

22    behavior across every election.

23         If we look at the white circles on the left, we see that

24    white candidates always have a candidate of choice, as well,

14:53:12 25    who is opposing the black candidate of choice.  They're

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 154**

```
 1  cohesive voting against the black candidate of choice.
 2  Q    And is there a place in your report where we would find
 3  the numerical values of the point estimates and confidence
 4  intervals reflected on Figure 2?
```

14:53:28  5  A    Yes.  This is all in Table 1 on page 17.

```
 6  Q    Can we please pull up Table 1?  That's Plaintiffs' Exhibit
 7  79, page 17.
 8       So can you please explain what the information on the
 9  table provides?
```

14:53:46 10  A    So these are the numbers that I used to produce the figure

```
11  that we just looked at.
12       And so if we look at that top row again, we see the U.S.
13  presidential election 2012.  The next two columns identify the
14  black and white candidate of choice.  And then the next set of
```

14:54:04 15  columns give us the numbers of the percent of that group voting

```
16  for the black candidate of choice.
17       So here we see the numbers used to make the figure.
18  96.7 percent of black voters supported Obama.  That's our best
19  estimate.  The confidence interval goes from 92.8 to 99.0.
```

14:54:25 20       For white voters, 14.7 percent supported Obama, with a

```
21  confidence interval of 12.8 to 17.3 percent.
22  Q    And let's take a look at that other category, as well.
23       What does that other -- what do we learn from that other
24  category, with respect to the election you just mentioned?
```

14:54:39 25  A    Our best estimate is that 62.7 percent of voters in the

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 155**

1  other category supported Obama, but with a very, very large

2  confidence interval from 30.6 to 91.8 percent.

3       So we learned relatively a little bit about them from this

4  analysis.  And that's because they are a very, very small

14:54:56 5  group, and they're scattered across this area as a whole.

6  They're not heavily concentrated in just a few places.

7       So it's hard to use ecological inference to learn very

8  much about their voting behavior.

9  Q    How do the other category fit into your county-level

14:55:09 10  analysis of racially polarized voting, if at all?

11  A    I'm focused on polarization between black and white

12  voters, who make up 97 percent of the registered voters in this

13  area.  Including -- the other group doesn't have to be split

14  out as a third group.  Another way of running EI is to include

14:55:30 15  them with the white group.  So that would be black voters and

16  everybody else.  Doing it that way makes no difference

17  whatsoever to my results or to the estimates.

18  Q    So what is the average estimated vote share of

19  African-Americans for their candidates of choice, as reflected

14:55:44 20  in Table 1?

21           THE COURT:  Table 1, that's what you are talking about

22  here?

23  BY MS. KHANNA:

24  Q    So I guess what I'm asking --

14:56:01 25           THE COURT:  I got the tables and the figures confused.

**Caster Plaintiffs' Exhibit 84, Page 156**

BY MS. KHANNA:

Q    Table 1 is up on the screen.  And I'm asking what is the average estimated vote share of African-Americans for their preferred candidate?

14:56:11  A    On average, African-American -- the African-American vote share for their preferred candidate is 94.1 percent.  And --

Q    And actually just to clarify for the Court, as well, Dr. Palmer, you got that average, I take it, from adding up the number under the word "black," all the numbers there, and then 14:56:29 dividing by the total number of elections; is that right?

A    Yes.

Q    And I think that's reflected -- that 94.1 percent figure is reflected on page 5, paragraph 20 in your report; is that right?

14:56:40  A    Yes.

Q    Thank you.  I just wanted to make sure to orient everyone.

And what is the average estimated vote share of whites for the African-American preferred candidate based on the elections in Table 1?

14:56:51  A    16.7 percent.

Q    Dr. Palmer, based on this table, is it accurate to say that the white vote share for the black preferred candidate was lower when the candidate was African-American than when the candidate was white?

14:57:11  A    Yes.  The difference is about 6 percent.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 157**

```
         1   Q    So what conclusions did you draw based on the estimates
         2   depicted in Figure 2 and Table 1?
         3   A    This county-level analysis shows a very high level of
         4   racially polarized voting in the focus area.
14:57:31 5   Q    Okay.  So what further analysis did you do of these 18
         6   elections after you determined that they demonstrated a high
         7   level of racially polarized voting?
         8   A    I then looked at the ability of African-American preferred
         9   candidates to win elections in this focus area.
14:57:49 10  Q    Okay.  Let's please turn to Plaintiffs' Exhibit 79, Table
         11  2, which is on page 18.
         12       Dr. Palmer, what does this table show us?
         13  A    So this table shows us the same 18 elections that I used
         14  for the ecological inference analysis.  But I've just shown the
14:58:18 15  vote share of the black and white preferred candidates in the
         16  focus area as a whole for each election.
         17       So this is not the result of running a model.  It's just
         18  simply adding up all the votes in all the counties in the focus
         19  area.
14:58:31 20  Q    And just to be clear, when you mention the vote share in
         21  the focus area, these are not the actual vote shares statewide
         22  that the candidates received in these elections; is that right?
         23  A    That's right.  It's just within the counties in the focus
         24  area.
14:58:43 25  Q    And so what does Table 2 tell us?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

A    Table 2 shows us that generally the black preferred
candidate is not able to win elections in the focus area.
Across these 18 elections, the black preferred candidate only
won twice.

14:59:01 Q    And what can you tell us about those two elections in
which the black preferred candidate was able to win within the
focus area?

A    The black preferred candidate was able to win in the 2012
Supreme Court Chief Justice contest and the 2017 election for
14:59:17 U.S. senator.  In both of those elections, the white preferred
candidate was Roy Moore.

Q    So the only time that a white preferred candidate lost an
election in the focus area to the black preferred candidate,
that candidate -- the white preferred candidate was Roy Moore?

14:59:34 A    Yes.

Q    And just to clarify, are you saying that Roy Moore lost
both of these elections in which he ran?

A    No.  He lost the election for U.S. Senate.  But he did win
statewide the 2012 Supreme Court election.

14:59:49 Q    But among the voters in the focus area, he lost?

A    That's right.

Q    What, if anything, do you know about Roy Moore?

A    My understanding is he's a controversial figure in Alabama
politics.  He was removed from his position on the Supreme
15:00:04 Court in the early 2000s, and I think again later on.  And then

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 159**

1  was a very controversial candidate for Senate in 2017.

2  Q    So then did white voters in the focus area reject Roy

3  Moore?

4  A    No.  If we turn back to Table 1, we can see that in the

15:00:31 5  Supreme Court election a majority of about 70 percent of white

6  voters still voted for Roy Moore, and only 29 percent voted for

7  the black preferred candidate.

8       And in the U.S. Senate election, about 66 percent of white

9  voters voted for Roy Moore, and only about 33.7 percent voted

15:00:53 10  for his opponent.

11            THE COURT:  I'm sorry.  Where do you see that on Table

12  1, which is page 17 of Exhibit 79?

13            THE WITNESS:  It's highlighted now on the screen.  The

14  vote shares for white voters for the black preferred

15:01:09 15  candidate and then for Moore's -- for Moore's opponent in each

16  of these elections.

17            THE COURT:  Okay.  So you have to extrapolate from

18  that those numbers the numbers you just gave me?

19            THE WITNESS:  It's just 100 minus those numbers.

15:01:22 20            THE COURT:  Right.

21            THE WITNESS:  They always have to add up to 100 there.

22            THE COURT:  Right.  I understand that.  But I didn't

23  see the numbers that you gave on there.  So now I've got it.

24       I appreciate it.  Thank you.

15:01:30 25  BY MS. KHANNA:

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 160**

1   Q    Okay, Dr. Palmer, I want to move on from your county-level

2   analysis to your precinct-level analysis.

3        What do you mean by a precinct-level analysis?

4   A    So in the first analysis, our level of observation is the

15:01:44  5   county.  We have -- for every election, we have county-level

6   data on voters and county-level data on election results.

7        Here we're zooming into the precinct-level instead, going

8   from 45 counties to about 1,100 precincts.

9   Q    So what -- sorry.

15:02:01 10   A    We have data on voters at the precinct level and data on

11   election results at the precinct level.

12   Q    So why did you perform a precinct-level analysis?  What

13   additional information does this analysis provide?

14   A    There's two real advantages to it.

15:02:18 15        First, because we have far more observations than we had

16   before, we can now do analyses at the congressional district

17   level.  So instead of just reporting one set of results for the

18   focus area, I can produce results at each congressional

19   district separately.

15:02:33 20        Second, because we can look at just a congressional

21   district alone, we can also look at elections for U.S. Congress

22   in those districts, which we could not do in the focus area

23   because it spanned all of these districts together.

24   Q    And I think you mentioned that we have far more data

15:02:47 25   points available in the precinct-level analysis.  Approximately

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 161**

1   how many data points are we looking at?

2   A    It's about 1,100 precincts across the full focus area.

3   Q    And what data did you rely on for your precinct-level

4   analysis?

15:03:02 5   A    Again, I need two different sets of data -- one on voters

6   and one on elections.  And so for elections, I use

7   precinct-level election results for the 2018 elections from the

8   Secretary of State.

9        And then for voters, it's a little bit harder because we

15:03:19 10   don't have a simple count of voter -- registered voters by race

11   in each precinct.  So instead I relied on a voter file also

12   provided by the Secretary of State to calculate the number of

13   actual voters in each precinct in the 2018 election by race.

14   Q    And what information is included in the voter file

15:03:36 15   provided by the Secretary of State?

16   A    The voter file has a lot of information.  But what I

17   relied on was the voter's self-identified race, their county,

18   their voting precinct, and whether or not they voted in the

19   2018 election.

15:03:48 20   Q    And did you encounter any difficulties in performing the

21   precinct-level analysis?

22   A    Yes.  This was a much more challenging data set to put

23   together.

24        First, we had to use a voter file from January 3rd, 2019,

15:04:06 25   instead of a report from election day in order to get the voter

```
  1  history into the analysis; that is, in order to have -- in
  2  order to know which voters -- which registered voters voted, we
  3  needed to have that information reported to -- from the
  4  counties to the Secretary of State.
15:04:23 5      And so the Secretary of State's office recommended that we
  6  use a voter file from January for the analysis.
  7  Q    And what was any other challenges that you encountered in
  8  performing that precinct-level analysis?
  9  A    Yes.  A second major challenge was after I knew -- after I
15:04:39 10 calculated the number of voters by race in each precinct, I had
 11  to match the precinct-level data on voters to the
 12  precinct-level election results.
 13      And this was surprisingly difficult in several counties
 14  because the voter file might use numbers to identify each
15:04:55 15 precinct, but the election returns might use precinct names to
 16  identify them instead.  And so I had to manually match them up
 17  in many cases, and use the files provided by the Secretary of
 18  State to do matching in other counties.
 19  Q    So were you ultimately able to match all of the precincts?
15:05:09 20 A    No.  There were a small number of precincts in a few
 21  smaller counties where I was not able to match up the precinct
 22  level -- the voter file to the precinct-level election returns.
 23  Q    So approximately how many precincts were you able to
 24  match?  Or I guess for how many voters, if that's an easier
15:05:33 25 question?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 163**

A      Yeah.  I think that's a better metric.

       I was able to match more than 90 percent of the voters who cast a ballot to a voting precinct, and similarly more than 90 percent of the ballots cast to voters in those precincts.

15:05:46  Q    And do you have any concerns that the unmatched precincts would change or bias the results of your analysis in any way?

A     I don't.  If I -- when I looked at the unmatched areas, the areas that I couldn't match up, the distribution of voters by race, it was essentially the same percentage of voters were matched among whites and blacks.

15:06:04

       90.4 of the white voters and 90.4 percent of blacks voters were successfully matched.  So I don't think I'm systematically missing voters of either group.

Q     Can we put up Plaintiffs' Exhibit 79, Figure 3, which is on page 12.

15:06:20

       Dr. Palmer, can you please explain to me what this figure shows?

A     So this figure is ecological inference results for the first congressional district only using the precinct-level data.  And so just like in Figure 1, it's set up the same way.

15:06:37

       On the left, I list each of the different elections and identify the candidates of choice for each group.  And then on the right, I plot support for the black candidate of choice.

Q     And what does Figure 3 tell us?

15:06:54  A    Figure 3 shows us a similar pattern as we saw in Figure 1.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 164**

1   We see the African-Americans and white voters each have clear

2   candidates of choice, and they're opposing each other.

3        Black voters are highly cohesive in their support for

4   their candidate of choice, and white voters are supporting the

15:07:11 5   opposing candidate.

6   Q    And just to clarify, I think you said similar to Figure 1.

7   Do you mean Figure 2?

8   A    I'm sorry.  Yes.  Figure 2.

9   Q    Figure 1 is the map.

15:07:18 10   A    Yes.

11   Q    So I wanted to make that clear.  And where would I find

12   the numerical values for the point estimates and the confidence

13   intervals reflected in Figure 3?

14   A    In Table 3.

15:07:29 15   Q    And could we please turn to Table 3, which is Plaintiffs'

16   Exhibit 79, page 19?

17        So please explain what information Table 3 provides.

18   A    Table 3 provides the same sort of results as we saw

19   earlier in Table 1.  I list each election, then the black and

15:07:53 20   white candidates of choice, and then the percentage of each

21   group voting for the black candidate of choice with the

22   estimate followed by the confidence interval in parenthesis

23   behind -- after it.

24   Q    So what conclusions were you able to draw based on the

15:08:08 25   estimates depicted in Figure 3 and Table 3?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 165**

1  A    There's a high level of racially polarized voting in the

2  first congressional district.

3  Q    So I'm going to try to put up -- if Heather will

4  indulge -- Figures 4, 5, and 6 on the same screen for the sake

15:08:27  5  of efficiency from Plaintiffs' Exhibit 79.  We'll see if that's

6  readable.

7        And if you can tell from this, and you also have it in

8  front of you, as well, each of the figures -- can you please

9  explain to me what we learned from Figures 4, 5, and 6, and

15:08:46  10  what these are?

11  A    So these figures show the results of the precinct-level

12  ecological inference analysis for the second district in Figure

13  4; the third district in Figure 5; and the seventh district in

14  Figure 6.

15:09:00  15        And across all three of them, all three districts, we see

16  the same pattern, that afternoon African-Americans and white

17  voters have different candidates of choice, that

18  African-American voters are highly cohesive in support of their

19  candidate of choice, and that white voters are supporting the

15:09:14  20  opposing candidate.

21  Q    And where would we find the numerical estimates for these

22  figures?  I believe it's -- there's Tables 4, 5, and 6 that

23  correspond with Figures 4, 5, and 6.  Does that sound right?

24  A    That's correct.

15:09:30  25  Q    Can we put those three on the board, as well?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 166**

1       Okay.  And can you explain to us what do these tables

2   show?

3   A    These tables show the same thing as the previous table we

4   just looked at.  But for the second, third, and seventh

15:09:49  5   congressional districts, they show each election, the black and

6   white candidates of choice, and then the percentage voting for

7   the black candidate of choice for each group with an estimate

8   and a confidence interval.

9   Q    Okay.  If we can now call up Table 7 -- actually before

15:10:05 10   that, Figure 7 of Plaintiffs' Exhibit 79 on page 16.

11       Can you explain to me what this figure is?

12   A    This figure is precinct-level ecological inference

13   results, but for the full focus area.

14   Q    So no one congressional district, but all of them

15:10:27 15   together?

16   A    That's right.  So unlike the previous ones where I was

17   able to include elections for the U.S. House, this only has

18   statewide elections.

19   Q    And what does this figure show?

15:10:37 20   A    It shows that same pattern that we've seen before, that

21   African-Americans and white voters have different candidates of

22   choice, that African-American voters are highly cohesive in

23   support of their candidate of choice, and that white voters are

24   strongly supporting the opposing candidate.

15:10:52 25   Q    And it seems here that the confidence intervals, that

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 167**

```
 1  vertical line on either side of the white dot and black dot,
 2  are fairly narrow here; is that right?
 3  A    Yes.
 4  Q    What does that mean?
 5  A    That's just reflective of the fact that we have a lot of
 6  data here.  We have -- this analysis has the most information
 7  going into it of all of them, because we have every precinct
 8  available instead of just the precincts in any one district.
 9  Q    So you can feel very confident that these estimates are
10  quite precise?
11  A    Yes.  Under this model, we get more precision.
12            THE COURT:  Can I ask a question, please?
13            MS. KHANNA:  Sure.
14            THE COURT:  Am I correct that the precinct analysis
15  was only done of the 2018 statewide elections; is that right?
16            THE WITNESS:  That's right.
17            THE COURT:  Okay.  Thank you.
18  BY MS. KHANNA:
19  Q    Dr. Palmer, can you perhaps explain why you only performed
20  the 2018 -- why you only performed the precinct analysis on
21  2018 elections?
22  A    Yes.  It was because of data availability.
23        And so while I could get voter files for earlier
24  elections, that matching up of the voter file precinct to the
25  election results precinct I was only able to get the
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 168**

            1   information I needed to do that step for 2018.

            2   Q     Thank you.

            3         Can we please turn to Table 7, which is page 23 of

            4   Plaintiffs' Exhibit 79?  Can you please explain what

15:12:15    5   information this table provides?

            6   A     This is just the numbers used in Figure 7.  And so

            7   precinct-level ecological inference results for the focus area.

            8         Again, I'm listing each election, the black and white

            9   candidates of choice, and then the percentage of each group

15:12:32   10   voting for the black candidate of choice.

           11   Q     And what is the average estimated vote share of

           12   African-Americans for their candidates of choice in the focus

           13   area as a whole?

           14   A     98.3 percent.

15:12:42   15   Q     And where are you looking to see that number?  Is there

           16   somewhere specific in your report?

           17   A     Yes.  Paragraph 35 on page 9.

           18   Q     And what is the average estimated vote share of whites for

           19   the African-American candidate of choice in the focus area?

15:13:01   20   A     17.4 percent.

           21   Q     And based on this table, is it accurate to say -- oh,

           22   sorry.  If we could go back to Table 7.  Thank you.

           23         Based on this table, is it accurate to say that the white

           24   vote share for the black preferred candidate was lower when the

15:13:20   25   candidate was African-American than when that candidate was

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 169**

1    white?

2    A    On average, yes, by about two percentage points.

3    Q    So what conclusions did you draw based on the analyses in

4    Figure 7 and Table 7?

15:13:35  5    A    There's a high level of racially polarized voting in each

6    of the four districts individually and in the focus area as a

7    whole when you use precinct-level ecological inference.

8    Q    Okay.  So the figures and tables that we just looked at

9    analyze the extent to which African-Americans and whites

15:13:54 10    preferred different candidates.

11    What analysis did you do to determine the extent to which

12    African-American preferred candidates actually win in the focus

13    area?

14    A    Just as I did for the focus area as a whole, I simply

15:14:08 15    calculated the percentage of the vote that each candidate

16    received in each district.  And that's in Table 8.

17    Q    Can we please call up Table 8, which is on page 24 of

18    Plaintiffs' Exhibit 79?  Can you please explain what Table 8

19    shows?

15:14:25 20    A    So first I list each election that I look at, and then the

21    black and white candidates of choice based on the ecological

22    inference analysis.  And even though I'm looking at four

23    different districts, because the black and white candidates of

24    choice in the statewide elections were the same, in all four

15:14:43 25    districts, I only list them once.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 170**

1    And then I list in the next set of columns the vote share

2    for the black preferred candidate and the white preferred

3    candidate in CD 1, and then in CD 2, CD 3, and CD 7.

4  Q    And so it seems that there are three congressional

15:15:02 5  districts at the top in which only one district would have

6    voted in that election -- in each election; is that right?

7  A    That's right.  Because those are the U.S. House elections.

8    So if we look at the very top row, that's U.S. House, the

9    first congressional district.  And what we see there is that in

15:15:18 10  CD 1, the black preferred candidate received 36.8 percent of

11    the vote.  The white preferred candidate won with 63.2 percent

12    of the vote.  We don't have any numbers in the rest of that row

13    because that contest only happened in the first congressional

14    district.

15:15:32 15  Q    And those numbers that you mentioned -- 36.8 and 63.2 --

16    are the actual vote shares obtained by each candidate; is that

17    right?

18  A    Yes.

19  Q    And I notice here that House District 7, which was one of

15:15:45 20  the districts you analyzed, is not included on this table.  Can

21    you explain why?

22  A    That election was not contested by both major parties.

23  Q    So there was no -- there was no contest basically in that

24    election?

15:15:59 25  A    That's right.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 171**

1  Q     And what does Table 8 tell us about the extent to which
2  African-American preferred candidates win elections in these
3  congressional districts?
4  A     If we compare the vote shares for the black and white
15:16:15  5  preferred candidates in the first, second, and third districts,
6  we see that the white preferred candidate is winning with large
7  margins, often more than 20 percentage points.
8       In contrast, in CD 7, we see that the African-American
9  preferred candidate is winning with large margins of about 40
15:16:32 10  percentage points.
11  Q     Dr. Palmer, after you submitted your initial report in
12  this case, did you receive reports from defendant's experts
13  Drs. Johnson and Hood?
14  A     Yes.
15:16:46 15  Q     And did either expert report address the analyses you
16  performed in your initial report that we just discussed?
17  A     No.  Neither Dr. Hood nor Dr. Johnson contested any of my
18  conclusions or my methodology or empirical results.
19  Q     But you did submit a rebuttal report in this case; is that
15:17:05 20  right?
21  A     Yes.
22  Q     And that's Plaintiffs' Exhibit 80?
23  A     Yes.
24  Q     Why did do you that?
15:17:09 25  A     Dr. Hood in his report questioned the functionality of the

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 172**

1    new majority-minority districts drawn by Mr. Cooper, and I was

2    asked to analyze a performance of those districts.

3    Q    And what did data did you examine to answer that question?

4    A    It required a variety of data.  First, the actual maps

15:17:33 5    drawn by Mr. Cooper in the form of block equivalency files,

6    which are files that list every census block and which district

7    they're assigned to on each map.  Then county-level and

8    precinct-level election results and voter turnout data from the

9    2018 general election.  And that's all from the Secretary of

15:17:51 10   State.  The voter file that I used in my previous analysis I

11   used again.  And then the new data here or precinct boundary

12   shape files for some counties, in order to map out where

13   voters -- to map out voters in counties that were split between

14   two districts under Mr. Cooper's maps.

15:18:13 15   Q    So then what analysis did you perform to analyze whether

16   the districts would be able to perform for the minority

17   preferred candidates?

18   A    The first thing I did was I calculated vote shares for

19   each candidate in the statewide elections in 2018 in each

15:18:29 20   district under each of the four maps.

21   Q    So let's call up Plaintiffs' Exhibit 80, Figure 1.

22        MR. DAVIS:  Your Honor, at this point, I would like to

23   lodge an objection, if I may.

24        THE COURT:  All right.

15:18:46 25        MR. DAVIS:  Dr. Palmer's analysis on whether these

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 173**

174

 1  districts would perform are based solely on the results of the

 2  2018 election.  That's not information that would have been

 3  available to the Alabama Legislature in 2011.  They could not

 4  have looked at those results obviously and used that to

15:18:59  5  determine whether or not these districts would, in fact,

 6  provide an opportunity to elect.

 7            MS. KHANNA:  Your Honor, if I may respond.

 8            THE COURT:  Yes.

 9            MS. KHANNA:  The legal question here is not what

15:19:08 10  information, data, or intent the map drawers had in 2011.  The

11  question is whether race is -- voting is racially polarized in

12  Alabama in these areas.  It is not about the intent of the

13  legislature at the time, because it's not a legislative-intent

14  case.

15:19:26 15       So Dr. Hood, when he raises the question of voter turnout,

16  himself relies on post-2010 data to suggest that there's not --

17  that there's a functionality problem here, in accordance with

18  that same legal standard that we have all been operating under.

19            MR. DAVIS:  I would respond, Judge, that I don't think

15:19:46 20  this is part of Dr. Palmer's polarized voting analysis.  He's

21  assessing whether these districts would, in fact, provide an

22  opportunity to elect.

23       But if the question is whether the Alabama --

24            THE COURT:  Isn't that beyond the scope of his

15:19:59 25  original report?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 174**

```
 1          MS. KHANNA:  It is of his original report.  It is in
 2   response to --
 3          THE COURT:  And also beyond the scope of his expertise
 4   to some extent, is it not?
15:20:12 5      MS. KHANNA:  I don't believe it's beyond the scope of
 6   his expertise.  His expertise is in analyzing racial voting
 7   patterns in election results.
 8      But it is included in his rebuttal report, specifically in
 9   response to Dr. Hood's analysis, which itself is based on
15:20:28 10  post-2010 data.
 11         THE COURT:  Is it based on post-2010 data?
 12         MR. DAVIS:  Dr. Hood did not issue -- he did look at
 13  post-2011 data.
 14     He didn't issue an opinion that these districts would not
15:20:40 15  perform.  He said the numbers are so close, there are
 16  questions, especially when you look at turnout.
 17     But now that it's clear that we are only dealing with the
 18  declaratory judgment in this case and that our focus is
 19  backwards looking, we don't think that an assessment based on
15:20:56 20  2018 data would be relevant, because the Alabama Legislature
 21  could not have used that.
 22         MS. KHANNA:  Your Honor, I would agree that the focus
 23  is about whether the current map is a violation, but it is not
 24  about whether the legislature knew or should have known that it
15:21:10 25  was a violation, or intended to violate, or had good
```

```
 1  information, bad information, good faith, or bad faith.  None
 2  of that is the issue before this Court, whether on declaratory
 3  or injunctive relief.
 4       The question of functionality frankly was an issue raised
 5  by their expert.  We don't believe it is part of our
 6  affirmative burden in a Section 2 case.  But having been raised
 7  by his expert, upon looking at post-2010 data, I think it's
 8  appropriate for our expert to respond to say if you think this
 9  relevant, I can look at the relevant data.
10       THE COURT:  Okay.  But your expert already said that
11  Dr. Hood didn't take issue with any of this expert's report,
12  right?
13            MS. KHANNA:  That's correct.  Dr. Hood did not take --
14            THE COURT:  And so his rebuttal was not to defend
15  anything that was part of his original report, right?
16            MS. KHANNA:  That's correct, Your Honor.
17       He did respond to a concern raised by Dr. Hood for the
18  first time in Dr. Hood's report to demonstrate that that
19  concern was -- an attempt to demonstrate that that concern was
20  not valid.  We do not believe that the functionality is a part
21  of the Section 2 affirmative burden on plaintiffs, in any
22  event.
23            THE COURT:  All right.  Well, I'm going to overrule
24  the objection, but will keep in mind sort of the extended scope
25  with the involvement of the 2018 stuff on that, so...
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 176**

| | |
|---|---|
| 1 | MS. KHANNA:  Thank you, Your Honor. |
| 2 | THE COURT:  Okay. |
| 3 | BY MS. KHANNA: |
| 4 | Q    Dr. Palmer, can you please explain to us what does Figure |
| 15:22:42 5 | 1 show -- or is this Figure 1? -- Figure 1 shows? |
| 6 | A    So Figure 1 shows the vote shares of the African-American |
| 7 | preferred candidates; that is, the candidates identified as |
| 8 | African-American preferred candidates in my previous report |
| 9 | under each of the four plans in the second and seventh |
| 15:23:00 10 | congressional districts. |
| 11 | And so here, the black dot doesn't correspond to white or |
| 12 | black voters, but rather to the second congressional district, |
| 13 | and the white dot to the seventh district under Mr. Cooper's |
| 14 | maps. |
| 15:23:12 15 | And so if we zoom in, for example, on just the top left |
| 16 | quadrant, what we see is each of the statewide contested |
| 17 | elections in 2018, and then the vote share in the second and |
| 18 | seventh districts for the African-American preferred candidate. |
| 19 | And there's a dotted line at 50 percent, and these dots |
| 15:23:31 20 | are well to the right of 50 percent.  And what that means is |
| 21 | that the African-American preferred candidate is winning a |
| 22 | significant majority of the overall vote in these districts, in |
| 23 | this particular map; and if we zoom back out, in all four maps. |
| 24 | Q    And you did say this, but I just want to make extra clear. |
| 15:23:48 25 | Here, you have black dots and white dots.  We previously looked |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 177**

1   at other figures in which the black dot meant the black

2   preferred candidate -- or the black vote share, and the white

3   dot meant the white vote share.  That's not the case here; is

4   that right?

15:24:01 5   A   That's right.  Here the black dot means vote share in CD

6   2, and the white dot, vote share in CD 7.

7         THE COURT:  And that would be total votes black and

8   white?

9         THE WITNESS:  All votes from everybody.

15:24:15 10   BY MS. KHANNA:

11   Q   Let's call up Table 1 on the same page, please.  Please

12   describe what Table 1 shows us.

13   A   These are just the numbers that are plotted in Figure 1.

14   And so they show for each contest what percentage of the vote

15:24:32 15   the African-American preferred candidate would have received in

16   each district under each map.

17        And so, for example, in -- under Revised Plan 1 election

18   for Governor, the African-American preferred candidate would

19   have won 59.2 of the vote in CD 2, and 68.8 percent of the vote

15:24:51 20   in CD 7.

21   Q   And can you tell here what is the lowest vote share that

22   the African-American preferred candidate would have won under

23   District 2 or District 7 in any of these illustrative plans?

24   A   The lowest vote share in any contest under any plan was

15:25:08 25   58 percent of the vote.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 178**

```
 1   Q     And in some cases it's much higher; is that correct?

 2   A     In many cases it's much higher.

 3   Q     Okay.  In his report --

 4              THE COURT:  Excuse me.  And that is true even though,

 5   if I recall correctly, several of the plans drawn by Mr. Cooper

 6   had a lower percentage than 58 percent of African-American

 7   voters; is that right?  Am I remembering that correct?

 8              THE WITNESS:  That's right.

 9              THE COURT:  Okay.  Thank you.

10   BY MS. KHANNA:

11   Q     Now, in his report, Dr. Hood discussed turnout in Alabama;

12   is that right?

13   A     Yes.

14   Q     And what is your understanding of Dr. Hood's conclusion

15   when it comes to turnout in Alabama?

16   A     My understanding is that Dr. Hood looked at statewide

17   turnout rates by race, and he found a racial turnout gap where

18   African-Americans were turning out at lower rates than white

19   voters statewide.

20   Q     Did you have any reason to dispute that?

21   A     I don't dispute his analysis.

22   Q     Did you perform any additional analysis regarding the

23   actual composition of voters based on Mr. Cooper's illustrative

24   plans?

25   A     Yes.  I don't find a statewide estimate of turnout rates
```

The timestamps in the left margin are: 15:25:21 (line 5), 15:25:44 (line 10), 15:25:55 (line 15), 15:26:12 (line 20), 15:26:25 (line 25).

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 179**

```
 1   to be very useful in assessing the functionality of these
 2   districts.
 3        And so I took a different approach, which was using the
 4   voter file.  And so we know where all those voters are located,
 5   and we know who actually voted.
 6        I simply calculated the actual number of voters by race,
 7   of actual people who actually voted in 2018 in each district
 8   under all four maps.  And that's in Table 2.
 9             MR. DAVIS:  Your Honor, for the record, I would like
10   to lodge the same objection to the assessment of the voter
11   composition.
12             THE COURT:  Objection noted and overruled.
13   BY MS. KHANNA:
14   Q    Can we please call up Table 2 of Plaintiffs' Exhibit 80?
15   What does Table 2 tell us?
16   A    So Table 2 shows us the percentage of actual voters in
17   2018 who are black, white, or of some other group in District 2
18   and District 7 under each of the four maps.
19        And so what we see is under all four plans in both
20   districts a majority of the actual voters, of the people who
21   actually cast a ballot in this election, were black.
22   Q    So this is not -- like we were looking in Mr. Cooper's
23   plans, we are not looking at the black voting age population
24   here; is that right?
25   A    That's right.  We're looking at percentage of voters that
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 180**

1    were black, percentage of voters that were white, and

2    percentage of voters that were in some other group.

3    Q    So while Dr. Hood looked at the race of voters who turned

4    out statewide, this analysis looks at the race of voters who

15:28:05  5    voted in -- as drawn in Mr. Cooper's illustrative plan; is that

6    right?

7    A    There's a few different differences to highlight.  One is

8    statewide versus looking at the individual districts under each

9    map.  And I think that's an important distinction.

15:28:19 10    The second thing is that what Dr. Hood is looking at is

11    the percentage of among the -- among black registered voters,

12    what percentage turned out to vote?  And that's what he means

13    by turnout is what percentage of African-Americans who are

14    registered to vote did vote?  And here I'm looking at what

15:28:38 15    percentage of the actual voters belong to each group?

16    And so we see here in Table 2 that under all four plans in

17    both districts a majority of the actual voters were black.

18    Q    So, Dr. Palmer, based on your functionality analysis,

19    would you have any concerns that any of Mr. Cooper's

15:28:55 20    illustrative plans would fail to provide African-American

21    voters an opportunity to elect in either District 2 or District

22    7?

23    A    No.  African-Americans make up a majority of the actual

24    voters in both districts under all four maps.  And their

15:29:10 25    candidates of choice are able to win by significant margins.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 181**

Q    Dr. Palmer, you are aware that defendant's experts have
questioned whether plaintiffs' illustrative plans should be
evaluated based on the AP black metric versus the SR black
metric?  Are you aware of that?

15:29:29 5    A    Yes.

Q    And does that debate affect your analysis in any way?

A    No.  All of my analyses in both reports use a voter's
self-identified race from the voter registration database.  I'm
not looking at different census classifications of race at all.

15:29:47 10    THE COURT:  And if I'm not mistaken, the information
from voter registration deals with single race black, right?
Only those who -- I mean, you only have one choice there,
whether to identify yourself as black or as something other,
right?  Am I confused on that?

15:30:07 15    THE WITNESS:  That's my understanding.

16    THE COURT:  Okay.  So you used in your analysis the
information from voter registration, which would be single-race
black or all -- whatever it is.

19    THE WITNESS:  I don't think it's single-race black
15:30:24 20    because a mixed-race person could choose which box they're
checking.

22    THE COURT:  Right.  It's how they self-identified.

23    THE WITNESS:  That's right.

24    THE COURT:  But they didn't have an option to
15:30:35 25    self-identify other than with one checkmark?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 182**

```
 1              THE WITNESS:  That's my understanding.
 2              THE COURT:  All right.
 3      BY MS. KHANNA:
 4      Q    Dr. Palmer, I just want to summarize with your overall
15:30:47 5      analysis.  What conclusions overall do you arrive at in the
 6      course of your work in this case?
 7      A    I find high levels of racially polarized voting.
 8           African-American -- white preferred candidates
 9      consistently defeat African-American preferred candidates in
15:31:04 10     the focus area in the first, second, and third congressional
11      districts.  And under Mr. Cooper's illustrative maps,
12      African-American voters make up the majority of the electorate
13      and are able to elect their candidates of choice.
14              MS. KHANNA:  Thank you.  No further questions on
15:31:19 15     direct.
16              THE COURT:  Cross-examination?  Mr. Davis?
17                        CROSS-EXAMINATION
18      BY MR. DAVIS:
19      Q    Good afternoon, Dr. Palmer.
15:31:50 20     A    Good afternoon.
21      Q    Dr. Palmer, were you retained as an expert in the case of
22      Thomas vs. Bryant in Mississippi?
23      A    Yes.
24      Q    What was that case about?
15:31:58 25     A    That case was about a single state Senate district in
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 183**

184

1    Mississippi.

2    Q    What was the nature of the claim against that Senate

3    district?

4    A    Can you refresh my memory?

15:32:16 5    Q    Sure.  Would you help if you saw a copy of your report

6    from that case?

7    A    Sure.  Thank you.

8         MR. DAVIS:  May I approach?

9         THE COURT:  You may.

15:32:31 10   BY MR. DAVIS:

11   Q    Let me redirect -- refocus my question, Dr. Palmer.

12        Do you agree that the case was about Senate District 22 in

13   Mississippi?

14   A    Yes.

15:32:56 15   Q    And that Senate District 22, as drawn, was 50.8 percent

16   black voting age population?

17   A    Yes.

18   Q    Okay.  And do you agree that the plaintiffs were claiming

19   that even though African-Americans were more than 50 percent of

15:33:07 20   the district, they were unable to elect their candidate of

21   choice in that district?

22   A    Yes.

23   Q    And do you agree that as part of that lawsuit the

24   plaintiffs in that case claimed that Section 2 required

15:33:18 25   Mississippi to redraw the district to increase the percentage

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 184**

1  of black voters in that district?

2  A    That's my understanding.

3  Q    And what analysis did you perform in that case,

4  Dr. Palmer?

15:33:30 5  A    I did a racially polarized voting analysis in that case.

6  Q    Okay.  And did you also assess whether if black percentage

7  voting -- excuse me -- if the black voting age population was

8  increased to 62 percent, did you opine that blacks would then

9  be able to elect their candidate of choice?

15:33:47 10  A    Yes.

11  Q    So is it true, Dr. Palmer, that a 50 percent black

12  district or a district that's just over 50 percent

13  African-American voting age population does not necessarily

14  allow the African-American voters to elect their candidate of

15:34:02 15  choice?

16  A    Not necessarily.

17  Q    Okay.  Now, in 2011 would you agree that Alabama was

18  governed by Section 5 of the Voting Rights Act?

19  A    I believe so.

15:34:17 20  Q    Okay.  Would you agree that because Alabama was governed

21  by Section 5 of the Voting Rights Act that Alabama's

22  congressional districts had to be precleared by the Department

23  of Justice?

24  A    I believe so.

15:34:29 25  Q    Okay.  If Alabama had redrawn congressional District 7 and

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 185**

        1   lowered the percentage of African-American voters in that
        2   district to the point where African-American voters would be
        3   unable to elect their candidate of choice, would you agree that
        4   Alabama would have had a hard time getting that district
15:34:52 5   precleared?
        6          MS. KHANNA:  Objection.  Calls for a legal conclusion.
        7      Dr. Palmer is not an expert on what would qualify for
        8   preclearance by the Department of Justice, what they would have
        9   objected to.
15:35:02 10         THE COURT:  I'm aware of that.  I will overrule and
       11   allow this witness to opine.
       12         THE WITNESS:  Can you repeat the question, please?
       13   BY MR. DAVIS:
       14   Q    Yes.
15:35:09 15      Would you agree that if Alabama dropped the voting age
       16   population -- the African-American voting age population of
       17   congressional District 7 to such a low point that
       18   African-Americans would be unable to elect their candidate of
       19   choice, that Alabama would have had a difficult time getting
15:35:27 20   that district precleared?
       21   A    I don't know.
       22   Q    Okay.  Would you agree that if African-Americans had been
       23   successful in electing their candidate of choice in
       24   Congressional District 7, but that if Alabama then dropped the
15:35:41 25   African-American voting age population to such a low percentage

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 186**

```
  1  that they no longer could elect their candidate of choice, that
  2  Alabama would in that case have diminished the ability of
  3  African-Americans in Congressional District 7 to elect their
  4  candidate of choice?
15:35:57  5          MS. KHANNA:  Same objection, Your Honor.
  6          THE COURT:  Overruled.
  7          THE WITNESS:  I don't know.
  8  BY MR. DAVIS:
  9  Q    If they go from can to can't, you don't agree that that's
15:36:06 10 diminishing the opportunity to elect?
 11  A    To be clear, you're not specifying a certain number.
 12  You're just saying if the district is -- if the black
 13  population is reduced to below some point and there's not some
 14  other equivalent district drawn with those voters in it.
15:36:22 15        For example, District 7 could become District 6 and be
 16  essentially the same with a different number, and then 6 would
 17  be precleared; is that correct?
 18  Q    I'm sorry, Dr. Palmer.  I'm having a difficult time
 19  understanding.  Let me try to ask it another way.
15:36:38 20        Do you not agree that if African-Americans have been
 21  successful for years in electing their candidate of choice in a
 22  congressional district, but the state then comes in and lowers
 23  the African-American population to the point, whatever point
 24  where they no longer can do so, in that case, don't you agree
15:36:58 25 that Alabama would have diminished the opportunity of
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 187**

188

1  African-Americans to elect their candidate of choice?

2  A    I think so.

3  Q    Okay.  Now, in 2011 did Alabama -- the state of Alabama

4  have any of the evidence that you assessed to determine whether

15:37:17 5  a district along the lines of what Dr. -- what Mr. Cooper has

6  proposed would, in fact, perform and provide the opportunity to

7  elect?

8  A    Can you be more specific?

9  Q    Sure.  The obvious question.  Your analysis was based on

15:37:33 10  2018 elections, right?  When you looked at those to determine

11  whether or not African-Americans were a majority of the

12  electorate in the focus area?

13  A    Yes.

14  Q    Alabama did not have the results of the 2018 elections

15:37:45 15  when it was acting in 2012 or 2011?

16  A    Yes.

17  Q    Okay.  And you didn't look at any elections before 2011,

18  correct?

19  A    That's right.

15:37:54 20  Q    You conclude in your first report, Dr. Palmer, that voting

21  is polarized in Alabama along racial lines, correct?

22  A    Yes.

23  Q    Does your analysis consider the reasons that any voter

24  votes the way he or she does?

15:38:20 25  A    No.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 188**

189

|  |  |
|---|---|
| 1 | Q    Did you investigate whether a majority of whites in |
| 2 | Alabama vote Republican because of some kind of racial bias, as |
| 3 | opposed to maybe issues, or beliefs about the issues, or |
| 4 | partisan politics? |
| 15:38:34  5 | A    No. |
| 6 | Q    And the tool you used of ecological inference cannot |
| 7 | answer that question, can it? |
| 8 | A    No.  It's not meant to. |
| 9 | Q    So you're not saying that any voter is doing anything |
| 15:38:45 10 | wrong by choosing to support any particular political party? |
| 11 | A    No. |
| 12 | THE COURT:  While we're on that, may I ask a question |
| 13 | that's been burning in my head? |
| 14 | Dr. Palmer, did you consider in any of the demographic |
| 15:39:15 15 | stuff the difference between democratic candidates and |
| 16 | Republican candidates and democratic voters and Republican |
| 17 | voters, or did you only look at the question of race? |
| 18 | THE WITNESS:  I only looked at race. |
| 19 | BY MR. DAVIS: |
| 15:39:34 20 | Q    Similarly, Dr. Palmer -- |
| 21 | MR. DAVIS:  Oh, I'm sorry, Your Honor.  Had you |
| 22 | concluded? |
| 23 | THE COURT:  Yes. |
| 24 | BY MR. DAVIS: |
| 15:39:39 25 | Q    When you looked at the different supports the different |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 189**

190

1    candidates got, did you consider how successful any candidate

2    was in their fund-raising?

3    A    No.

4    Q    Did you assess name recognition?

15:39:50  5    A    No.

6    Q    Did you assess how popular that candidate was in the

7    voting public?

8    A    No.

9    Q    Would you agree that the support that a candidate gets in

15:40:00 10    an election can be related to things like fund-raising and name

11    recognition?

12    A    Sometimes.

13    Q    Sometimes?  Would you agree that the strength of the local

14    political party can be a valuable asset to a candidate?

15:40:15 15    A    Potentially.

16    Q    All right.  Dr. Palmer, I'd like to understand a little

17    better the ecological inference analysis that you performed.

18    Now, we spoke during your deposition about the concept of

19    bounds, and that's a concept that's part of ecological

15:40:55 20    inference, correct?

21    A    Yes.

22    Q    Now, what I have got up is a hypothetical precinct.  There

23    are three on this sheet.  And I recognize that you don't

24    perform an ecological inference analysis on one, two, or three

15:41:05 25    precincts?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 190**

```
 1   A     That's right.

 2   Q     Okay.  It would take a lot.

 3         I just want to understand some of the first steps you

 4   would perform.  So let's say hypothetically there was a

 5   precinct that had 1,000 voters.  900 of those voters were

 6   minority voters, and 100 were white voters.  And then you know

 7   from the election returns that candidate A received 850 votes

 8   and candidate B received 150 votes.

 9         Where does ecological inference start with this data to

10   determine whether support -- whether either race is cohesive in

11   their support of a particular candidate?

12   A     So I'm not sure if start is a right way of thinking about

13   it.  But if you're asking about how bounds are used by

14   ecological inference, that's something I can answer with this

15   table.

16   Q     Okay.

17             THE COURT:  Before you do that, back up and educate me

18   on what you mean by bounds.  You both seem to understand that,

19   and I have no idea what it's meant in the context of this

20   ecological analysis that you're doing.

21             THE WITNESS:  I'll do my best to explain it without

22   getting too technical.  There are --

23             THE COURT:  Okay.  The less technical the better.  I

24   appreciate that.

25             THE WITNESS:  So there are a few other methods that
```

15:41:14
15:41:35
15:41:58
15:42:14
15:42:23

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 191**

```
       1  are also used to analyze racially polarized voting.

       2      But ecological inference, to my understanding, has been

       3  accepted as the best one to use because it recognizes a really

       4  important constraint in any of our estimates.  It recognizes

15:42:40 5  that no candidate can get less than 0 percent of the vote or

       6  more than 100.  And no group could support a candidate at less

       7  than 0 percent or more than 100 percent, which seems really

       8  obvious.

       9      Of course, African-Americans can't support their preferred

15:42:57 10 candidate with 110 percent of their vote, but --

      11          THE COURT:  Generally, unless there's something funky

      12  going on at the ballot box.

      13          THE WITNESS:  With proper elections, it would be

      14  impossible.

15:43:07 15         THE COURT:  Right.

      16          THE WITNESS:  But some of these models, like

      17  ecological regression, which is a different method used for

      18  RPV, can produce estimates that look like that.  That doesn't

      19  always mean they are bad.  But that's a downside to other

15:43:21 20 models.

      21      And so what ecological inference recognizes is that we can

      22  learn information from those limits.  That is, we can use these

      23  natural limits of, of course, a group can't support a candidate

      24  more than 100 percent or less than 0 to start limiting the

15:43:37 25 range of possibilities and get better estimates.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 192**

1        And so I think when we look at this table, that will help

2    clarify it.  If I can turn back to the table.

3    BY MR. DAVIS:

4    Q    Yes, please, Dr. Palmer.

15:43:49 5    A    So here we have a precinct with 900 minority voters, and

6    100 white voters.  850 votes for candidate A and 150 votes for

7    candidate B.

8        Let's consider one extreme, where minority voters really

9    like candidate A.  It's impossible that more than 850 of them

15:44:10 10    voted for candidate A because there's only 850 votes for

11    candidate A.

12        So one extreme is 850 voters voted for -- 850 minority

13    voters voted for candidate A, and 50, then, the remainder, had

14    to have voted for candidate B.  And then 0 white voters voted

15:44:30 15    for candidate A, and 100 white voters voted for candidate B.

16        That's one extreme that we can learn and that we can sort

17    of narrow down the range of possibilities just by recognizing

18    that these bounds have to exist.  These numbers have to add up

19    the right way.

15:44:44 20        We can also get another bound at the opposite side, which

21    is suppose all 100 white voters love candidate A.  Then we can

22    say there's 100 candidate A votes from the white voters, and

23    the rest have to be made up for by the minority voters.  So

24    there have to be 750 minority votes for candidate A to get to

15:45:03 25    850.  Then there's 0 votes for candidate B from white voters,

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 193**

1   and 150 votes for candidate B from minority voters.

2       That's a second bound.  And that doesn't -- that's a

3   pretty big range, right?  We went from 0 to 100 on these

4   groups.  But that actually starts limiting the possibilities.

15:45:22 5       And as we add more and more precincts, we have different

6   limits, different bounds in each precinct.  That provides

7   valuable information to the estimate.

8           THE COURT:  I think this is getting to another big

9   question that's been reverberating in my head since you have

15:45:37 10  been testifying.  And that is, you know, if I remember

11  correctly, not a single time that I have completed a ballot

12  have I marked what my race was before I put it into that little

13  slot so it would go and be counted.

14      And so my question has been all the while:  How do you

15:46:00 15  know who voted for what candidate or the race of those who

16  voted for which candidate?  And I think that's what Mr. Davis

17  is getting to now.

18      You come up with some kind of formula to make that

19  determination, as opposed to actually knowing how the votes

15:46:19 20  were cast; is that correct?

21          THE WITNESS:  That's right.  We never get to see how

22  the individual voter actually votes.  But we can see the places

23  that have a lot of voters of -- we can see how many voters of

24  each group there are in each place, and then how that aggregate

15:46:34 25  group of voters cast their ballot.  And so we can look for

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 194**

1   patterns across that.

2        For example, places with a very low black population,

3   places with a mixed black and white population, and then places

4   of high black population will have different patterns when

15:46:49 5   racial -- when voting is polarized on which candidates they're

6   supporting.  And so we can use ecological inference to produce

7   an estimate.  And we call it estimate because there is some

8   uncertainty about it -- it's coming out of a model -- about the

9   levels of support from each group for each candidate.

15:47:03 10        THE COURT:  Okay.

11        THE WITNESS:  And the bounds are part of the

12   information that go into that model along with these general

13   voting patterns.

14        THE COURT:  Well, you could tell, could you not,

15:47:16 15   actually how many -- well, you still won't know the race.  But

16   you would be able to tell how many voters voted Republican and

17   how many voters voted Democrat, right?

18        THE WITNESS:  Yes.

19        THE COURT:  Okay.  You didn't look at any of those

15:47:30 20   numbers, right?

21        THE WITNESS:  No.

22        THE COURT:  Well, of course, those would be the total

23   numbers, because in each one of these races that you have

24   looked at, it was a Republican versus a Democrat race, correct?

15:47:42 25        THE WITNESS:  Yes.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 195**

```
          1         THE COURT:  Okay.
          2    BY MR. DAVIS:
          3    Q    So, Dr. Palmer, let's walk through some of these steps.
          4         Okay.  First, would you agree that if had this
15:47:52  5    hypothetical Precinct 1, that when it comes to minority support
          6    for candidate A, at least 750 minority voters voted for
          7    candidate A?
          8    A    Yes.
          9    Q    And it could be as much as 850?
15:48:05 10    A    Yes.
         11    Q    Okay.  And then 0 -- somewhere between 0 and 100 white
         12    voters voted for candidate A?
         13    A    Yes.
         14    Q    And minority support for candidate B would be at least 50?
15:48:31 15    A    Yes.
         16    Q    But no more than 150?
         17    A    Yes.
         18    Q    And then we're still at between 0 and 100 for white
         19    support for candidate B?
15:48:45 20    A    Yes.
         21    Q    So looking solely at Precinct 1, you could have on one
         22    extreme a situation where 750 minority voters supported
         23    candidate, and all 100 white voters supported candidate A?
         24    A    If this is our only data point we have available?
15:49:12 25    Q    Yes.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 196**

1    A    Then, yes.

2    Q    Okay.  So in that event, in Precinct 1, if it was 750

3    minority voters and 100 white voters all supporting candidate

4    A, voting is not polarized at all?

15:49:25  5    A    I'm sorry.  Can you repeat that?

6    Q    Sure.  If you have 750 minority voters supporting

7    candidate A and 100 white voters supporting candidate A, voting

8    is not polarized?

9    A    That's right.

15:49:37 10    Q    Okay.  On the other extreme, you could have all 850

11    minority voters supporting candidate A and zero white voters

12    supporting candidate A?

13    A    Yes.

14    Q    And in that case, voting is polarized?

15:49:51 15    A    Yes.

16    Q    So how does ecological inference look at these different

17    precincts and make an analysis of which of these extremes is

18    correct, or if it's somewhere in the middle?

19    A    So that's why we have a model, and why we bring a lot of

15:50:04 20    data to the model, and why we want as much data as we can.

21        So that's why, for example, I said I couldn't do

22    ecological inference on the counties in one congressional

23    district alone.  There just isn't enough information to look at

24    those and infer with any confidence what the pattern is.

15:50:23 25        But when you have 1,000 precincts or even just several

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 197**

```
 1    dozen precincts -- when you have the data, and in each place
 2    the makeup of the voters is different, the votes cast for each
 3    candidate are different, you're going to get different bounds,
 4    different limitations, and then you can fit a model that says
 5    what pattern best fits the data that we can see.
 6    Q    Okay.
 7    A    And so that's what ecological inference does, and that's
 8    what you can't learn from any one or two or three precincts
 9    examples, but can learn from fitting a model to the entire data
10    set.
11    Q    Aren't assumptions part of ecological inference analysis?
12    A    Assumptions are part of all models.
13    Q    Okay.  Isn't there a particular assumption -- and I will
14    quote from your deposition here.  You say, "The assumptions in
15    ecological inference is that" --
16         MS. KHANNA:  Your honor, objection.  I think it's an
17    improper impeachment.
18         THE COURT:  I haven't heard the question.
19         MS. KHANNA:  I believe he's just quoting from the
20    deposition.
21         THE COURT:  I don't think we've gotten there.  Let me
22    hear the question.
23         MR. DAVIS:  I was indeed going to quote a line from
24    his deposition.  I don't know why that would be improper.
25         THE COURT:  Ask him a question as to what he testified
```

*15:50:42* (line 5)
*15:50:55* (line 10)
*15:51:09* (line 15)
*15:51:18* (line 20)
*15:51:31* (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 198**

1    about.

2    BY MR. DAVIS:

3    Q    Sure.  This is something you said in your deposition,

4    Dr. Palmer, and I am going to ask if you still agree with this.

15:51:42 5        You said in your deposition that the assumption in

6    ecological inference is that minority voters across the

7    precincts in the data are going to vote similarly, and that

8    white voters across the precincts will vote similarly.

9    A    Yes.

15:51:56 10  Q    That's a common assumption in an ecological inference,

11   correct?

12   A    Yes.

13   Q    Okay.

14            THE COURT:  Isn't that what you're trying to prove?

15:52:04 15  So you begin with the assumption that what you want to prove is

16   correct?

17            THE WITNESS:  No.  That's not right.

18        The assumption is that overall on average -- and there

19   will be variation across the place and across the precincts --

15:52:23 20  that there is some average level of support for each group for

21   each candidate.  And what we're trying to find is are there

22   differences in that support?

23        So it could be -- you can run ecological inference and

24   find that neither group has a candidate of choice.  With the

15:52:40 25  same assumptions going in and saying on average -- you can say

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 199**

           1    in a place you might think on average 50 percent of black

           2    voters are voting for candidate A and 50 percent are voting for

           3    candidate B.

           4              THE COURT:  You may continue, Mr. Davis.

15:52:55   5    BY MR. DAVIS:

           6    Q    Sure.  But do you not assume as part of ecological

           7    inference that -- let's take two precincts as part of hundreds

           8    that you view.

           9         You've got one precinct where average income level is

15:53:08  10    really low and average education level is really low.  And you

          11    have another precinct where average income and education is

          12    really high.

          13         Does ecological inference assume that the black voters in

          14    both of those precincts will vote along similar patterns?  And

15:53:24  15    that the white voters in those two very different precincts

          16    will vote along similar patterns simply because of race?

          17    A    Ecological inference will not assume that you have the

          18    same patterns in the same places, but that there is a pattern

          19    on average that you can find.

15:53:39  20    Q    Okay.  You said that the assumption is that minority

          21    voters across the precincts in the data are going to vote

          22    similarly?

          23    A    That doesn't mean the same.

          24    Q    Okay.  What does it mean?

15:53:51  25    A    There's going to be some variation in different places.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 200**

1    So in some places, you'll find that the support of black voters

2    for their -- for whatever that -- areas, groups, candidate

3    choice is lower, and some is going to be higher.  We are

4    reporting averages here.

15:54:08   5        So, for example, what I am not saying is that let's say

6    the average I report is 95 percent of black voters are

7    supporting their candidate of choice.  I'm not saying it's

8    95 percent in Precinct 1, and 95 percent in Precinct 2, and

9    95 percent in Precinct 3, and so on.

15:54:22  10        I'm saying on average, if you average black support across

11    all these precincts, it will be 95 percent.  But some will be

12    higher and some will be lower.

13    Q    So you're not assuming any similarity in -- by voting

14    patterns across precincts when you begin the analysis?

15:54:42  15   A    You're assuming that -- you are assuming that there is a

16    common trend across these groups.  But you're not -- you're not

17    assuming what that trend is.

18        You are not assuming that the groups are polarized, for

19    example, to start.  The model -- you are saying there is a

15:54:56  20   common trend.  You are using the model to find what that is.

21    But it could be anywhere from 0 to 100 for either group, and

22    you don't know going in, and you can't assume going in what it

23    will be.

24    Q    Okay.  Does ecological inference assume that black voters

15:55:09  25   will have similar patterns regardless of education and income

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 201**

```
           1  levels?
           2  A    It does not take into account education and income levels.
           3  Q    Okay.  Does it assume that white voters will vote
           4  similarly across precincts regardless of education and income
15:55:25   5  levels?
           6  A    It doesn't take that into account.
           7  Q    Okay.  Do you have any basis to assume that voters in
           8  Alabama will vote the same along racial patterns regardless of
           9  income and education levels?
15:55:39  10  A    I'm sorry.  Can you repeat that?
          11  Q    Sure.  Is there any basis to assume that white voters in
          12  different precincts will vote the same even though there are
          13  different education and income levels?
          14  A    I don't know.
15:55:51  15  Q    Okay.  Was there a pattern in the candidate of choice for
          16  black voters, in terms of their party affiliation?
          17  A    I don't discuss that in my report.
          18  Q    Did you notice that at all?
          19  A    You can look at the candidates of choice in my report.
15:56:12  20  Q    Okay.
          21       THE COURT:  The question was whether you noticed it at
          22  all.
          23       THE WITNESS:  Yes.
          24  BY MR. DAVIS:
15:56:21  25  Q    What did you notice?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 202**

```
 1   A     African-Americans support democratic candidates.
 2   Q     Have you ever done a polarized voting analysis where most
 3   of the candidates of choice of African-American voters were
 4   Republican candidates?
 5   A     No.
 6   Q     Do you agree that there are more voters in Alabama who
 7   tend to support the Republican party than who tend to support
 8   the democratic party?
 9   A     More voters overall?
10   Q     Yes.
11   A     Yes.
12   Q     Would you agree that Alabama's a conservative state?
13   A     That's my general understanding.
14   Q     Okay.  Is anybody calling Alabama a battleground state for
15   purposes of the upcoming presidential election?
16   A     I don't believe so.
17            MR. DAVIS:  May I have a moment, Your Honor?
18            THE COURT:  Yes, you may.
19            MR. DAVIS:  No further questions at this time.
20            THE COURT:  Any redirect?
21            MS. KHANNA:  Yes, Your Honor.  Just a few questions on
22   redirect, Your Honor.
23                       REDIRECT EXAMINATION
24   BY MS. KHANNA:
25   Q     Dr. Palmer, I believe you were asked on cross the
```

15:56:34 (line 5)
15:56:46 (line 10)
15:56:58 (line 15)
15:57:36 (line 20)
15:57:59 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0080/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 203**

1  question:  Would you agree that a bare majority-minority

2  district -- just over 50 percent -- does not necessarily allow

3  African-Americans to elect their candidates of choice?  Do you

4  recall being asked that question?

15:58:19  5  A    Yes.

6  Q    And you agreed that a bare majority-minority district does

7  not necessarily allow African-Americans to elect their

8  candidates of choice.  Do you agree?

9  A    Yes.

15:58:29  10  Q    Would you agree that a bare majority-minority district

11  just over 50 percent BVAP can elect African-Americans to elect

12  their candidate of choice?

13  A    Yes.

14  Q    What would that depend on?

15:58:41  15  A    It would depend on things like turnout, voter

16  participation, and it could also depend on the level of

17  racially polarized voting.

18        So, for example, if you had a district where turnout was

19  equal among both groups, or both groups are turning out in

15:58:58  20  proportion to their share of the district, you would think that

21  would be a likely district to perform for African-Americans and

22  elect their candidates of choice.  You also could have a

23  district where the level of racially polarized voting is lower.

24        For example, if 20, 30 percent or even lower than that --

15:59:15  25  let's just say 20 percent of white voters are supporting the

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 204**

1   African-American candidate of choice, and 100 percent of

2   African-American voters are -- just to make the math easy -- in

3   a 50/50 district, you would get 50 percent of the vote for the

4   African-American candidate of choice from African-American

15:59:31   5   voters and additional 10 percent of the vote from white voters,

6   and that candidate would win 60/40.

7   Q    I believe you were also asked on cross a hypothetical.  If

8   there is a district in which African-Americans can elect their

9   preferred candidates and then it is redrawn into a district in

15:59:52 10   which they can't elect their preferred candidates, that might

11   be diminishment for purposes of retrogression.  Do you recall

12   being asked that?

13   A    Yes.

14   Q    And I believe you agreed with that?

16:00:01 15   A    Yes.

16   Q    Is your understanding that CD 7 is currently Alabama's

17   sole majority-minority district?

18   A    Yes.

19   Q    And in your opinion, do any of Mr. Cooper's illustrative

16:00:14 20   District 7 render CD 7 a district in which African-Americans

21   can't elect their candidates of choice?

22   A    No.

23   Q    Can we please pull up Plaintiffs' Exhibit 80, Table 2?  I

24   believe it's on page 4.  Yes.

16:00:42 25       I want to focus on District 7, which was the district we

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

just talked about.  Is it fair to say that under three out of

four of Mr. Cooper's revised plans, over 55 percent of the

actual voters in District 7 are African-American?

A    Yes.

16:01:03  Q    You were also asked on cross about whether or not your

analysis of racially polarized voting considered certain

factors such as the fund-raising of the candidates and the

party platforms.  Do you recall that?

A    Yes.

16:01:24  Q    Are these -- are those factors standard -- standard in the

methodologies used among experts in evaluating racially

polarized voting?

A    No.  My understanding is those factors are not used.

Q    You were also asked about various assumptions that are

16:01:49  included in the ecological inference model.  Do you recall

that?

A    Yes.

Q    Are there assumptions in any statistical model?

A    Yes.

16:01:56  Q    Is it your understanding -- are you saying that the

ecological inference method is somehow set up to find racially

polarized voting?

A    Absolutely not.  It's not only possible, but can easily

happen where you run the model and don't find any evidence of

16:02:14  racially polarized voting.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 206**

1    Q    Have you ever used ecological inference to find that there

2    is no racially polarized voting?

3    A    Yes.  For example, in the *Bethune Hill* trial there, where

4    I was looking at racially polarized voting in House of delegate

16:02:30  5    districts, in some districts there were racial polarized

6    voting, but in other districts, there were not.

7         And in particular there, I found that white voters tended

8    to be split between the two parties and did not have a clear

9    candidate of choice.

16:02:43 10    Q    And you used -- as you just mentioned, you used the

11    ecological inference method to analyze racially polarized

12    voting in the *Bethune Hill* case?

13    A    Yes.  And not just the same method, but the exact same

14    procedure and really the same computer code.

16:02:59 15    Q    And the Court credited your analysis in that case?

16    A    It did.

17    Q    And you used ecological inference in the course of your

18    work in the *Thomas v. Bryant* case?

19    A    Yes.

16:03:07 20    Q    And the Court credited your analysis in that case?

21    A    Yes.

22    Q    Are you aware of any case in which ecological inference

23    has been rejected by a court as a basis for determining

24    racially polarized voting?

16:03:18 25    A    Not to my knowledge.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

208

1    Q    As an expert in this field, is ecological inference

2    commonly used by other experts and statisticians to determine

3    racially polarized voting?

4    A    Yes.  I have seen it frequently used by other experts.

16:03:32 5    Q    Would you say it's the best available model for assessing

6    racially polarized voting?

7    A    In my opinion, yes.

8            MS. KHANNA:  No further questions, Your Honor.

9            THE COURT:  Any recross?

16:03:47 10           MR. DAVIS:  (Nodded head.)

11                    RECROSS-EXAMINATION

12    BY MR. DAVIS:

13    Q    So, Dr. Palmer, if I understand your testimony, a district

14    that's barely over 50 percent black voting age population,

16:04:11 15    maybe that district can perform, maybe it can't?

16    A    That's right.

17    Q    And it depends, you said, on things like voter turnout and

18    the extent of voter polarization?

19    A    Yes.

16:04:24 20    Q    Is there any difference in the levels of voter

21    polarization in Mississippi and Alabama?

22    A    I don't know.

23    Q    Is Alabama -- are African-Americans in Alabama turning out

24    at a higher rate than they are in Mississippi?

16:04:38 25    A    I don't know.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 208**

```
 1  Q    Have you ever, in any polarized voting analysis, ever
 2  found that there isn't polarized voting when a majority of
 3  white voters in that jurisdiction supported Republicans?
 4  A    I'm sorry.  Can you repeat the question?
```
16:04:56 `5  Q    Sure.  Let's say you're performing a racially polarized`
```
 6  voting analysis.  You determine that there is a candidate of
 7  choice of white voters, and that candidate of choice is the
 8  Republican candidate.
 9       Have you ever performed a racially polarized voting
```
16:05:10 `10 analysis in such circumstances where you did not find that`
```
11  voting is racially polarized?
12  A    I don't believe so.
13  Q    You looked again at the 2018 general election results and
14  determined that African-American voters were, in fact, a
```
16:05:36 `15 majority of the electorate in the districts, correct?`
```
16  A    Yes.
17  Q    Just so -- again -- never mind.
18       You saw Table 2 before.  That is from your supplemental
19  report.  Again, that's not information that the Alabama
```
16:06:01 `20 Legislature had when it drew the districts in 2011?`
```
21  A    That's right.
22  Q    Okay.  Are you aware of any evidence that would have been
23  available to the Alabama Legislature that showed them that, in
24  fact, if they had drawn those districts, the districts in
```
16:06:16 `25 Mr. Cooper's illustrative maps, that they would have given`

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 209**

1    African-American voters an opportunity to elect?

2    A    Can you please repeat the question?

3    Q    Sure.  Do you present any evidence that would have been

4    available to the Alabama Legislature in 2011 that would have

16:06:32 5    told them, the Alabama Legislature, that if they draw those

6    districts as Mr. Cooper suggested, that it would provide a fair

7    opportunity for African-American voters to elect their

8    candidate of choice?

9    A    I don't provide that evidence in my report, but they could

16:06:46 10   have had evidence from earlier election years at that time.

11   Q    Do you know of that any such evidence?

12   A    I don't know what evidence they considered.

13   Q    Okay.  Are you aware of a state asking that congressional

14   districts be precleared where they say, we've lowered the black

16:07:03 15   voting age population in these districts a lot.  We have no

16   idea if they'll work, but don't worry, by 2018 they will?

17   A    I don't know.

18            MR. DAVIS:  Nothing further.

19            THE COURT:  Anything further?

16:07:16 20            MS. KHANNA:  Just one question, Your Honor.

21                  FURTHER REDIRECT EXAMINATION

22   BY MS. KHANNA:

23   Q    Dr. Palmer, do you have reason to believe or any reason to

24   believe that the Alabama Legislature would have had election

16:07:28 25   data at its disposal when drawing maps?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 210**

```
 1  A    Yes.
 2  Q    The same election data that you had except for different
 3  years, correct?
 4  A    That's my understanding.
 5  Q    And if you were looking at election data for a different
 6  year, you could provide the same analysis, the same -- perform
 7  the same analysis that you performed here?
 8  A    Yes.
 9            MS. KHANNA:  Thank you.  No further questions.
10            THE COURT:  Anything else?
11            MR. DAVIS:  Nothing else, Your Honor.
12            THE COURT:  Okay.  I think this is a good time for a
13  break.  We will come back at 4:20.
14            (Recess.)
15            THE COURT:  Be seated and come to order.
16            MR. WALKER:  Your Honor, we have come up with what we
17  think is probably the schedule that we're going to have.  And
18  we can give that to you at the end of the day.
19            THE COURT:  Yeah.  That would be good.  We'll take it
20  up then.  Let's go on with this next witness, please.
21            MR. OSHER:  The plaintiffs' next witness is Ms. Karen
22  Jones.
23            THE COURT:  Okay.
24                      KAREN JONES,
25  having been first duly sworn by the courtroom deputy clerk, was
```

Timestamps in left margin:
16:07:36 (line 5)
16:07:49 (line 10)
16:22:55 (line 15)
16:23:37 (line 20)
16:23:45 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 211**

```
 1   examined and testified as follows:
 2           THE COURTROOM DEPUTY CLERK:  Please state your name
 3   for the record.
 4           THE WITNESS:  Karen Jones.
 5                      DIRECT EXAMINATION
 6   BY MR. OSHER:
 7   Q    Hey, Ms. Jones.
 8   A    Hey.
 9           THE COURT:  And if you would, please, how do you spell
10   your first name?
11           THE WITNESS:  K-A-R-E-N.
12           THE COURT:  Okay.  There are a variety of ways to
13   spell that name.  So I just wanted to make sure we had yours
14   correct.  Thank you.
15   BY MR. OSHER:
16   Q    Ms. Jones, are you a plaintiff in this lawsuit?
17   A    Yes.
18   Q    And do you live in Alabama?
19   A    Yes.
20   Q    And what county do you reside in?
21   A    Montgomery County.
22   Q    And do you live in the city of Montgomery?
23   A    Yes.
24   Q    How long have you lived in Alabama?
25   A    I was born and raised in Montgomery, Alabama, went to high
```

Timestamps: 16:24:01 (line 5), 16:24:06 (line 10), 16:24:18 (line 15), 16:24:23 (line 20), 16:24:32 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 212**

1    school and graduated in Montgomery.  I moved to Birmingham to

2    attend University of Alabama Birmingham.  I became ill and had

3    to move back to Montgomery, Alabama in about '94, '95.  And in

4    1999, I moved to Georgia.  And then in 2009, I moved back to

16:25:01  5    Montgomery, Alabama, where I now reside.  And I have been ever

6    since.

7    Q    Great.  Thank you.  And tell us a bit about your

8    educational background.

9    A    I'm a high school graduate of George Washington Carver

16:25:16 10    High School, Montgomery, Alabama.  I have my Bachelor's of

11    Science in psychology, and my master's in public

12    administration.

13    Q    Where did you get the master's?

14    A    At the University of Alabama Birmingham.

16:25:29 15    Q    Ms. Jones, do you currently hold any public office?

16    A    Yes, I do.

17    Q    And what is that?

18    A    I am on the state democratic executive committee for

19    District 77.

16:25:41 20    Q    And that's an elected position?

21    A    Yes.

22    Q    Have you run for any other public office?

23    A    Yes.

24    Q    And what were those?

16:25:48 25    A    I ran for Montgomery City Council District 6 in about -- I

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 213**

1   think it was 2011.  A former councilman died.  And then in

2   2015, I ran for City Council District 7 in Montgomery municipal

3   election.

4   Q    And during your campaigns for city council, to what extent

16:26:12 5   did you engage with residents of Montgomery to understand their

6   interests and needs?

7   A    I went door to door.  I canvassed.  I participated in

8   forums.  I participated in debates.  And just overall in the

9   community meeting people.

16:26:28 10   Q    Do you participate in other civic organizations?

11   A    Yes, I do.

12   Q    And what are those?

13   A    I serve on the board of legal services Alabama.  I am -- I

14   help with Save Black Boys, Every Town USA For Gun Safety, Moms

16:26:49 15   Demand Action, Students Demand Action, SOS, Save Ourselves,

16   Movement For Justice and Democracy.  I'm the co-county chair

17   for Alabama Poor Peoples Campaign.

18   Q    And you listed a number there.  I'm curious about Save

19   Ourselves.  What is that organization?

16:27:10 20   A    It is -- and I need to mention one more.  ALFRA, Alabama

21   Family Rights Association.

22   Q    Uh-huh.

23   A    But SOS is an organization.  It is a nonprofit

24   organization that works on social justice issues.

16:27:28 25   Q    And do you run any nonprofit organizations?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 214**

```
 1  A    Yes, I do.

 2  Q    And what is that organization?

 3  A    It is Whom It Concerns -- W-H-O-M-I-T-C-O-N-C-E-R-N-S --

 4  Incorporated.  It's a 501(c)(3).  We focus on youth

 5  development, community development, and assist nonviolent

 6  returning inmates to the community by helping them find

 7  resources, and the such.

 8  Q    Okay.  And in all of this work, can you identify what

 9  organizing -- organizing work you do relating to voting?

10  A    I do -- I have voter education, voter registration,

11  workshops, seminars.  And I also do workshops on how to restore

12  voting rights for those individuals who may believe they have

13  lost their voting rights who were locked up before and getting

14  out.

15      So the moral turpitude laws have changed.  So some of them

16  have their rights restored due to that law change, and they

17  don't know that their rights have been restored.  So I help

18  them with that to find out.

19  Q    Ms. Jones, how do you identify racially?

20  A    I'm an African-American black.

21  Q    Are you currently registered to vote in Alabama?

22  A    Yes.

23  Q    And when was the first time you registered to vote?

24  A    In 1993.

25  Q    And how old were you then?
```

The timestamps in the left margin are: 16:27:51 (line 5), 16:28:10 (line 10), 16:28:39 (line 15), 16:28:58 (line 20), 16:29:11 (line 25).

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 215**

|         |     |                                                                    |
|---------|-----|--------------------------------------------------------------------|
|         | 1   | A    I was 18.                                                      |
|         | 2   | Q    And when you moved out of the state to move to Georgia,        |
|         | 3   | did you move your registration to Georgia?                         |
|         | 4   | A    Yes, I did.                                                    |
| 16:29:20 | 5  | Q    And when you moved back to Alabama, did you re-register in     |
|         | 6   | Alabama?                                                            |
|         | 7   | A    Yes.                                                           |
|         | 8   | Q    And have you been registered since you moved back in 2009?     |
|         | 9   | A    Yes.  In every election.                                       |
| 16:29:31 | 10 | Q    So do you vote regularly?                                      |
|         | 11  | A    I do.                                                          |
|         | 12  | Q    Would you say that voting is important to you?                 |
|         | 13  | A    It is a sacred event for me personally because I -- I take     |
|         | 14  | it as a serious event, sacred event because so many of --           |
| 16:29:50 | 15 | members of my community, my ancestors have shed blood and died     |
|         | 16  | for me to have the right to vote.  So I take it seriously.  And     |
|         | 17  | that's why I vote in every election.                                |
|         | 18  | Q    And what role do you see your vote playing in Alabama's        |
|         | 19  | political system?                                                   |
| 16:30:07 | 20 | A    My voice counts.  So my vote, you know, I want it to           |
|         | 21  | count.  So it means something to me to vote for somebody that I     |
|         | 22  | think is in the best interest or have the best interest for my     |
|         | 23  | community and for the black community and myself.                  |
|         | 24  | Q    Ms. Jones, what congressional district do you live in?         |
| 16:30:29 | 25 | A    District 7.                                                    |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 216**

1  Q     And who currently represents Congressional District 7?

2  A     Congresswoman Terri Sewell.

3  Q     Have you voted for Representative Sewell in congressional

4  elections?

16:30:40  5  A     Yes.

6  Q     And in each of those election in which you have voted for

7  Representative Sewell, has she won her election?

8  A     Yes.

9  Q     Were those elections competitive?

16:30:50 10  A     No.

11  Q     Can you tell me why you believe that?

12  A     Well, it's little to no competition being that she is a

13  front runner, well known.  She has name recognition.  It's

14  really no competition.  She usually wins 3 to 4 to 1 if she has

16:31:11 15  an opponent, but she's...

16  Q     Ms. Jones, do you feel that your vote matters in

17  Congressional District 7 when voting the congressional

18  elections?

19  A     In all elections, I feel my vote matters.  I feel like it

16:31:26 20  would mean more if I had -- it's like it's diluted to me

21  because with Congresswoman Terri Sewell, she's a shoe-in.  So,

22  I mean, it's not to say that I am going to stay home, but I

23  know she's going to win.  And most of us know she's going to

24  win, so, you know.

16:31:49 25  Q     Is there something about who lives in District 7 that

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 217**

```
 1  makes you feel this way?
 2  A     Who lives in District 7?
 3  Q     The population of voters in District 7?
 4  A     The black community, yes.
16:32:03  5  Q     And tell me more about that.  What is it about the fact
 6  that there's a black community in District 7 that makes you
 7  feel as if your vote is diluted?
 8  A     Well, we're stacked and packed in District 7, whereby out
 9  of seven Congress people we just -- I mean, we just -- we just
16:32:23 10  have her to represent the black issues.  And she's flying by
11  herself -- issues that affect the black community, mental
12  health issues, health care, criminal justice, education.  It's
13  just her loan self that focuses on issues in the black
14  community.
16:32:44 15  Q     Now, you used the term "stacked and packed."  What do you
16  mean by that?
17  A     Well, I feel like the district -- well, I know that her
18  district is majority black.  So she's a shoe-in with little to
19  no competition or anybody else to go with because of the name
16:33:06 20  recognition or whatever.  So...
21  Q     All right.  In your view, are there more African-Americans
22  that are necessary to elect Terri Sewell in her district?
23  A     Yes.
24  Q     You mentioned that you feel like your vote is diluted in
16:33:27 25  District 7.  Based on your community organizing work, have you
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 218**

```
     1  developed a sense as to whether other black voters in your
     2  district feel similarly?
     3  A    Yes.  Most voters and most who are trying to vote -- and I
     4  try to do voter education and voter registration.  People like,
16:33:49 5  well, she's going to win anyway, so why do I need to go vote
     6  for her?  Y'all going to elect her in because, you know, she
     7  always gets in.
     8       And I tell them their vote matters.  You know, you need to
     9  vote anyway because we have a right to vote.
16:34:04 10       So I think the general consensus is whether or not an
    11  individual, black individual votes for her, she's going to get
    12  it anyway because the majority black, consistent black voters
    13  are going to go to vote for her, anyway.
    14  Q    Ms. Jones, what result are you trying to achieve in this
16:34:24 15  lawsuit?
    16  A    I would really love another congressional district with
    17  hopefully a person of color, black person who will focus on
    18  issues in the black community.  That will help in my mind the
    19  issues that Terri Sewell can't get to.  That extra person can
16:34:48 20  focus on those black issues that she couldn't get to.  So I
    21  think it would be a great help to the black community.
    22  Q    Ms. Jones, you mentioned -- well, before I go there,
    23  before we go to those specific issues, does the person have to
    24  be a black candidate in order to represent the interests and
16:35:15 25  needs of the black community?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 219**

220

```
      1  A     No.  But they should have the black interests at heart in
      2  that state, yeah.
      3  Q     So let's talk about some of those issues.  Based on your
      4  experience organizing in Montgomery, have you found that the
16:35:29 5  African-American community in the area has particular needs and
      6  interests relating to health care?
      7  A     Yes.
      8  Q     And what are those?
      9  A     Affordable health care and Medicaid expansion.  I, being a
16:35:44 10  woman who doesn't have children, I had a stroke last year.  And
     11  had it not been for me going to a charity hospital, waking up
     12  at 3:00 in the morning and being in line -- people come from
     13  all over to go to Medical Outreach, and they only accept 12.
     14  So you have to stay in line.
16:36:06 15       And I remember one time being Number 13 and having
     16  two weeks of heart medication left without any insurance,
     17  without Medicaid because I don't have any children.  I also
     18  have epilepsy.
     19       So they provide medical services that I would not have
16:36:21 20  been able to get as a woman without a child and without
     21  Medicaid in Alabama.  So I thank God for them.
     22       And since then, I have disability now.  But I had to have
     23  a stroke and died three times before I got insurance and health
     24  care in Alabama.
16:36:42 25  Q     Does the African-American community in Montgomery have
```

**Caster Plaintiffs' Exhibit 84, Page 220**

1   particular needs or interests relating to education?

2   A    Yes.

3   Q    What are those?

4   A    Higher education.  I've been -- prior to me becoming ill,

16:36:56  5   I had a job since I was 14 years old.  So I got Pell Grant one

6   time, I remember, $300.  So I've always had to get student

7   loans.  And now student loans are just like burdensome.

8        So we need someone in there who will fight for Pell Grants

9   for low income people.  Even though I had a job at 14, I had to

16:37:22 10   get a permit to work because I wanted to work.  You know,

11   because I wanted to work.  I wanted to go to college.  I

12   couldn't pay for it.  And I really want to go back to college

13   to get my Ph.D., but I'm out of funding.

14        So I think somebody who would help with education and

16:37:41 15   post-secondary education is somebody we need.

16   Q    What about lower levels of education -- elementary school,

17   middle school, high schools?  Are there particular needs and

18   interests of the African-American community in Montgomery

19   related to those levels of education?

16:37:57 20   A    Yes.  I am a lay advocate for children, primarily children

21   with special needs, as well.  So I see our special needs

22   children being thrown out to alternative schools and then

23   really getting arrested.  Most time they're autistic, ODD, ADHD

24   combined, but severe issues in special needs that usually have

16:38:26 25   those children instead of individuals who understand them,

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 221**

         1  pushed out into the criminal -- the juvenile system.  So it's
         2  really the school to prison pipeline at an early age as early
         3  as elementary, and I see that.
         4  Q    Does the African-American community in Montgomery, based
16:38:47 5  on your work there, have particular needs or interests relating
         6  to criminal justice?
         7  A    Oh, yes.  While working on voter registration and voter
         8  education, we have individuals to come in for expungement or to
         9  ask about expungement because they owe so much restitution.
16:39:08 10 Sometimes a lot of them owe on restitution, but they can't get
        11  a job.  They can't get a job because we also have a debtor's
        12  prison, debtor's court in Montgomery.
        13       So if they don't have ID or their driver's license, even
        14  the temporary agencies, they won't hire them because you must
16:39:26 15 have ID.  So I say a hungry man is an angry man.  They have to
        16  do what they have to do to eat.
        17       I don't condone illegal activities.  But they often find
        18  themselves in a predicament.  And so the criminal is bad.
        19  Q    What about the specific relationship between the black
16:39:54 20 community in Montgomery and law enforcement?
        21  A    It's bad because of the lack of jobs, accessibility to get
        22  the jobs.  And if you don't have a driver's license or if you
        23  are driving, you're profiled and targeted.  And usually if you
        24  get stopped, you're going to get not one ticket, usually four.
16:40:22 25      And we've basically, those of us who are in the community,

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 222**

 1  kind of basically know the first three things that -- a pattern

 2  that the police will stop you for -- not fully stopping, not

 3  using your signal, proper signal, lane, and improper turn.  And

 4  so those are the three categories that we've nailed down.  And

16:40:51 5  then from there, you're going to at least get three to four

 6  more tickets on top of that.

 7  Q    And have there been recent instances in Montgomery that

 8  has affected the relationship between the African-American

 9  community and law enforcement?

16:41:05 10 A    Yes.  Three years ago.  I think it's been about

 11 three years.

 12     My childhood neighbor, Greg Gunn, was walking home

 13 unarmed, never got charged for anything.  A white officer, new

 14 officer, rookie, Aaron Cody Smith, he stopped him.  They beat

16:41:28 15 him with an ASP baton, and gave him a one-inch gash in the back

 16 of his head, tased him multiple times, shot at him seven times.

 17 Five bullets struck -- three in the front, twice in the back.

 18 He was just only probably from me to you to his front door of

 19 his house.  Never was charged for anything.  He was just

16:41:49 20 walking home.

 21     So that kind of caused a schism between the community and

 22 the police department.  Where we had kind of a good

 23 relationship under Chief Kevin Murphy, and he was forced to

 24 resign after he made a statement about apologizing for the

16:42:12 25 action of Montgomery Police Department during the Civil Rights

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 223**

era, and John Lewis gave him a ribbon.  We had a good, good

connection in the community.

    But when this -- just atrocious act of assassination of an

unarmed black man walking back home happened, it kind of --

16:42:34  everybody's on edge right now because the trial hasn't started,

and they moved it to Dale County where he won't have a jury of

his peers.

    And Ms. Gunn, she just died maybe two months ago.  So we

kind of in our feelings about it right now.

16:42:49 Q    What about employment?  Does the African-American

community in Montgomery have particular needs and interests

related to employment?

A    We do.

Q    What are those?

16:42:58 A    There's little to no jobs.  Job availability, again, due

to people -- their driver's license.  And I wish they would do

a work permit -- would allow people if they have tickets paying

on them to allow them to drive during certain hours to get to

and from work that would at least help them pay on tickets.  I

16:43:26 raised that to the city council, too, before.  Or the bus

transportation where it would take you in a car maybe

15 minutes to get somewhere.  If you ride the city line, it may

take you up to two hours if that driver stops and pick you up

at the stop because sometimes I don't know why they keep

16:43:47 driving by.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1    But it's -- and nobody's really hiring now.

2 Q    And those transportation issues, do they translate to

3 employment issues?

4 A    They do.

16:43:57 5 Q    And why is that?

6 A    Because most of our -- and I used to be on Montgomery

7 transportation coalition.  So I kind of know that most of the

8 transportation, they don't go to the industrialized areas, like

9 the Hyundai subsidiaries and plants like that where they can

16:44:18 10 go.  They don't go out that far.  And for the disabled

11 community, and they don't go to certain communities.  So it's a

12 lot going on with our public transit system.

13 Q    Does the African-American community in Montgomery have

14 particular needs and interests related to affordable housing?

16:44:36 15 A    Oh, yes.  I tried to assist with others.  Most

16 homelessness has increased in Montgomery tremendously where if

17 they're not living under the bridges or whatever, they are

18 using the hotels as apartments because even if parents or a

19 family have jobs, it's not enough to afford the apartments now.

16:45:05 20 So the affordability of it, you making 7, $8, you can't afford

21 a nice apartment.

22    And then with the public housing, they closed down a lot

23 of them, and then they're remodeling some.  But the list is so

24 long.  And I couldn't believe it when I moved back to

16:45:25 25 Montgomery.  So I said I'm going to apply just to see.  Well, I

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 225**

```
 1    got my approval letter probably year before last, and I had
 2    applied in 2009.
 3    Q    And, finally, what about access to useful utilities or
 4    sewage?  Does the African-American community in Montgomery have
 5    issues related to that?
 6    A    Oh, the electricity bills are just ridiculous.  And I try
 7    to refer people to 211 and call 211 and ask for utility
 8    assistance.  If they receive food stamps, they can ask their
 9    caseworker for all available assistance.  But their utility
10    bills now -- I think Alabama Power went up about maybe, I think
11    maybe 20 percent or so.  But most family utility bills range
12    from 500 to $1,100.
13         We have triple -- triple-digit heat.  So most of the
14    houses that some lower income families do get a chance to live
15    in, they have -- not central heat and air, but the air
16    conditioners that you put in the windows, which draws a lot.
17    Q    What about sewage?  Are there -- have there been issues
18    relating to the black community and access to working sewage?
19    A    Oh, my God, yes.  Water and the flooding and in no man's
20    land.  Believe it or not in 2019 the sewage and the flooding in
21    what we call no man's land -- that's out past Madison Park, Ty
22    Rove area (phonetic), Hunter's Station area, community areas,
23    the Vineyard.
24    Q    And are these predominantly black communities?
25    A    Predominantly black and low income areas.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 226**

```
          1  Q    So we just ran through a long list of issues that you've
          2  told us about.  Are you saying that the white residents of
          3  Alabama don't have interests in these particular issues or
          4  needs relating to these issues?
16:47:35  5  A    They may do.  But most times they get their situations
          6  taken care of and have resources made readily available from
          7  what I notice.
          8       And because I'm with the Poor People's Campaign and other
          9  organizations, and as an advocate, I'm not limited to
16:48:00 10  Montgomery County.  I go all over the state to help parents and
         11  to help people.  So I see.  And as compared to Montgomery being
         12  the capital city, the capital county, is an embarrassment that
         13  we have these issues in 2019.
         14  Q    So is it -- it's the level to which the African-American
16:48:24 15  community is affected by these issues that sets them apart from
         16  white residents' interaction with these issues?
         17  A    It is.
         18  Q    Ms. Jones, do you regularly follow political campaigns in
         19  Alabama?
16:48:40 20  A    Yes, I do.
         21  Q    And have you observed any instances in which candidates in
         22  Alabama have referred to race as a reason to vote for or
         23  against a particular candidate?
         24  A    They don't do it blatantly.  But they do, do it
16:49:03 25  subliminally through the pronouns.  You can hear the
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 227**

228

 1    undertones, the racial undertones -- "those people," "they,"

 2    "them," "us," "we."

 3    Q    Does this happen often in Alabama?

 4    A    Yes, it does.

16:49:18  5    Q    Let's talk about a few specific instances.  Have you

 6    personally heard a member of Congress from Alabama make a

 7    statement invoking race as a -- as part of candidacy or

 8    political campaign?

 9    A    Yeah.  Mo Brooks.

16:49:35 10    Q    What did you hear Mo Brooks say?

11    A    He had a commercial, and it was something to the effect of

12    that he would shoot immigrants -- be able to shoot immigrants,

13    and that was -- I had to find it on YouTube to make sure I

14    heard what he said.  And it was -- that was terrible.  I think

16:49:59 15    most terrible thing for somebody in government to blatantly

16    say.

17    Q    And when specifically did you hear him make the statement?

18    A    Probably about 2017 when he was running -- 2017, 2018.

19    Q    What does that statement regarding shooting undocumented

16:50:23 20    immigrants, what does that have to do with race?

21    A    It has a lot to do with race, because as a person of

22    color, to me, it implied people of color.  And it invoked -- it

23    invoked to me white superiority, white supremacy.  It invoked a

24    type of racism and the green light for others who believe in

16:50:56 25    what he was saying that it was okay.  Because if he's in

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 228**

1   government and saying it's okay to do it, it would lead crazies

2   out here to believe it's okay to do it.

3   Q    In the most recent race for Alabama's governor, did you

4   hear any candidate make statements invoking race as a reason to

16:51:16 5   vote for or against someone?

6   A    It -- in the gubernatorial race?

7   Q    Uh-huh.

8   A    I didn't hear anything about, you know, blatantly race.

9   But Governor Kay Ivey did make a statement about preserving the

16:51:37 10   Confederate monuments and statutes.  And that hit kind of hard

11   in the black community because what about our history?  What

12   about the symbolism that it reflects to black people and people

13   of color, the Native Americans?  When you say preserve

14   Confederate statutes and monuments and memorials, you didn't

16:51:59 15   say anything about enhancing black status, memorials, and any

16   symbols that, you know, mean -- matter to the black community

17   or people of color.

18   Q    To you and to the people in your community, based on

19   conversations you have had in your work, what does the

16:52:20 20   preservation of Confederate monuments mean to the black

21   community?

22   A    When I heard that commercial, it -- I felt like she was

23   saying white supremacy forever, you know, white nationalism

24   forever, not anything to embrace unity and diversity.  But

16:52:42 25   clearly we're going to recognize these treasonous white

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 229**

 1    supremacists and hold them to a higher level, and nothing is to

 2    ever change that.

 3        I mean, the bill says that it -- forever basically you

 4    cannot do anything, remove or alter any statue or anything that

16:53:05  5    has to do with a Confederate soldier.  And when we as a black

 6    person have to hear that, that that -- I mean, we want to bring

 7    change, you know.  It really is bad.  And it's terrible.

 8    Q    And then what about in the most recent mayoral race in

 9    your town?  Were there any statements regarding race, invoking

16:53:34 10    race to sway people's votes?

 11    A    In the August 27th race, it was good, you know.

 12    Everything was fine.  But then when it came down to a runoff

 13    between a white male, David Woods, versus a black male, Steven

 14    Reed, I don't know what happened.  But the mudslinging, it was

16:54:01 15    -- it was ugly.

 16        And David Woods had -- it was a survey out, and they

 17    called your phone, selected people phones.  And they called my

 18    mom's phone.  And I was there.  And asked about 24 questions.

 19    Q    Did any of those questions relate to race?

16:54:20 20    A    Yes, they did.  Basically, not specifically, he's black,

 21    you know, Steven Reed's black, don't vote for him.

 22        But like it just told like where he lived, as if that

 23    mattered.  That he lived in a certain community, as if black

 24    people couldn't afford to live in that community in which he

16:54:47 25    lives.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 230**

231

```
 1        That was -- that was -- I mean, most of the questions were
 2   very incendiary and invoked some racial overtones, not
 3   undertones.  It was really ugly.
 4   Q    Did David Woods make a part of his platform being tough on
16:55:10  5   crime?
 6   A    Yes.  And that was very interesting that he wanted to
 7   create more police stations and hire more police.
 8        He also has a show.  He's over WCOV television station.
 9   So his show promotes like cops in Montgomery, like that type of
16:55:33 10   show.  But most time whenever they show it, you see black
11   people being arrested.  They film it.
12        And so when he starts saying we're going to be tough on
13   crime, we're going to hire more police, we're going to put more
14   police stations, and to us, it's not finding the root cause of
16:55:59 15   what's going on because we do have white people performing
16   crimes.  But it's as if he wants to invoke some type of martial
17   law with all these police, what he wants to create.
18        And so it's not a good time, being that we still have an
19   open case with a white officer who assassinated an unarmed
16:56:22 20   black man for walking while black, is still being paid by the
21   city of Montgomery.  They didn't fire him.  And this black man
22   wasn't charged with anything.
23        So it wasn't the time for him to even bring that up.
24   Q    Do these sort of statements, how do they make you feel as
16:56:42 25   an African-American Alabamian?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 231**

232

```
         1   A    I have seven brothers, five older, plenty of nephews and
         2   great nephews.  And it -- it's frustrating.  And it makes me
         3   angry that if you want to be over entire city diversity -- but
         4   the majority of black, over 60 percent black, and you talking
16:57:07 5   about some issues that are going to drive us apart.  It's
         6   frustrating because we thought we would -- you know, it's 2019,
         7   so...
         8   Q    Ms. Jones, are you a member of a political party?
         9   A    Yes.
16:57:26 10  Q    And do you prefer -- what party do you prefer?
        11   A    Democratic party.
        12   Q    And you prefer the democratic party over the Republican
        13   party?
        14   A    Yes.
16:57:36 15  Q    Tell us why that is.
        16   A    For me, the democratic party's platforms and individuals
        17   who run as a Democrat, their platforms focus on issues
        18   pertaining to what I am in alignment with and what the black
        19   community is in alignment with -- health care issues, mental
16:57:57 20  health.  When I say health care, I mean affordable health care,
        21   criminal justice system, and just climate, you know, ecological
        22   issues.
        23   Q    Is there something about the relationship between the
        24   Republican party and race that makes you prefer the democratic
16:58:24 25  party over the Republican party?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 232**

233

```
          1  A    Yes.

          2  Q    What is that?

          3  A    Being a Republican for me, seeing somebody who is a

          4  Republican right now tells me that they're racist because

16:58:35  5  nothing I've heard a Republican say is in alignment with the

          6  platform that will help the interests of the black community.

          7  Q    And does that view of the Republican party, is that

          8  connected to statements that members of the Republican party

          9  have made?

16:58:58 10  A    Yes.

         11  Q    Any in particular that we've talked about today?

         12  A    Yeah.  I was talking about so much statistics.

         13  Q    Would you agree that it relates to being -- allowing such

         14  statements to be made by members of the Republican party that

16:59:22 15  informs this view?

         16  A    Yes.

         17  Q    Based on your work relating to voting and voting

         18  registration, do black citizens of Montgomery encounter

         19  barriers when trying to vote?

16:59:36 20  A    Yes.

         21  Q    Tell me about actually registering to vote.  What sort of

         22  barriers do African-Americans residents in Montgomery encounter

         23  when trying to register to vote?

         24  A    Some of them are afraid to register to vote because of

16:59:50 25  what they feel like they've -- if they were locked up before,
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 233**

even though I tell them they banned the box on the application,

they still feel like, man, they're going to reject it.  They're

going to find out I'm a felon.  I have to educate them because

the moral turpitude laws have changed, which have decreased

17:00:12  most of the moral turpitude laws.

So that's a major factor that I see when I'm out

registering doing voter registration drives.  That's a major

thing.

Q    And does the disproportionate incarceration and criminal

17:00:33  records of the black community impact their ability to restore

their voting rights?

A    It does.  Most of the individuals are black males

primarily.  I've had very few black females with former felons.

But black males primarily are very disenfranchised.  Their

17:00:58  restitution when they get out, you know, to pay for

restitution.  So if they have tickets, say, for instance, they

can't get ID.  So you can't get ID, you are can't really get a

job.  Not only that, you can't -- if you can't work, you can't

pay the restitution and also with child support.  They can't

17:01:23  pay child support.

And so it's a number of elements that affects voter

registration and people.  And primarily with -- when I go out

and do these voter registration drives.

Q    What about actually casting a vote?  Do African-American

17:01:40  residents of Montgomery encounter barriers actually casting a

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 234**

```
 1   vote even if they're registered?
 2   A    Oh, my God, yes.  Their names are what I've been seeing in
 3   the last few elections, because Montgomery has had so many
 4   elections in the last three years, it's ridiculous, special
 5   elections.  So a lot of their names are not showing up on the
 6   rosters.
 7        When they go there to the precinct, the precincts have
 8   changed.  So they say that they send notices out, but I know
 9   they don't because I'm an avid voter.  And I haven't received
10   my voter registration card that they said they sent out to
11   everybody.  I had to call the board of registrars and say, hey,
12   I didn't get mine.  Everybody else is saying they have theirs.
13   Make sure that I am listed as an active voter, I'm still on the
14   roll because I don't have a middle name.  So I want to make
15   sure that Karen no-middle-name Jones is on the roll as active.
16        And so take a typical person may not know to call the
17   board of registrars.  And it's frustrating for them if they've
18   been living behind a church that is a precinct for all these
19   years, and then abruptly something changes that they have to
20   now go about two, three miles over to the library.
21   Q    And does someone with fewer resources, would they be able
22   to handle the situation that you handled as well as you were
23   able to?
24   A    No.  They get frustrated.  They'll call me and tell me
25   about it and I'm about to just leave, you know.  And I said,
```

17:02:01 (line 5)
17:02:27 (line 10)
17:02:46 (line 15)
17:03:13 (line 20)
17:03:29 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

Caster Plaintiffs' Exhibit 84, Page 235

1   don't go anywhere.  Just ask for a provisional ballot, and we

2   will work out everything later.  It's really frustrating.

3       I worked for the first time at a white precinct last

4   year -- no.  Yeah.  It was last year.  And it was so smooth,

17:03:54  5   people just came in, they went to the line and got -- it was so

6   smooth.  I hadn't ever experienced a smooth transition like

7   that.  And I was like, why is this so smooth over here?  It

8   didn't take them a good 10 minutes from the time they came in

9   the building to leave out.  Where as with us, you know, the

17:04:19 10   power is not working, your name's not on the list.  It's

11   just -- where's your ID.  And then you have to educate people

12   if they don't have ID.  If two people at the precinct and

13   recognize them, they still can vote.

14       So it's a lot of disenfranchisement at the black precincts

17:04:45 15   that I was just -- I was in amazement when I was down Vaughn

16   Road, way down Vaughn Road.  It was like a whole other

17   experience.  I was like, wow, it really can happen, just go in

18   and vote and go home without a problem.

19   Q    Ms. Jones, have you done organizing work in Mobile?

17:05:03 20   A    I helped with the Alabama Poor People's Campaign.

21   Q    And do you interact with people who live in Mobile?

22   A    Some of the organizers when we have our Poor People's

23   Campaign training and meetings, yeah.

24   Q    And based on that work, do you have a sense of whether

17:05:21 25   there's similarities between the cities of Mobile and

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 236**

      1   Montgomery?

      2   A     Yes.  They have a same --

      3             THE COURT:  Just a minute, Ms. Jones.  I'm not sure if

      4   you said that you had actually done work in Mobile or that you

17:05:33  5   know people who have done work in Mobile.

      6             THE WITNESS:  I know people who have done work in

      7   Mobile.

      8             THE COURT:  But you have not actually done work there

      9   yourself?

17:05:42 10             THE WITNESS:  I've gone to the rallies and --

     11             THE COURT:  In terms of voter registration and things

     12   of that nature?

     13             THE WITNESS:  No.

     14   BY MR. OSHER:

17:05:53 15   Q     Have you had conversations with people who live in Mobile

     16   about the issues that they -- the African-American community

     17   faces?

     18   A     Yes.

     19   Q     In Mobile?

17:06:01 20             MS. HOWELL:  Your Honor, I am going to object to that

     21   as hearsay.

     22             THE COURT:  If we go further than has she had

     23   conversations, yes, it would be hearsay.

     24   BY MR. OSHER:

17:06:08 25   Q     Would you say that you have had many conversations with

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 237**

```
  1   people in Mobile during your organizing work?
  2   A    Yes.
  3   Q    That was -- thank you.  Based on those conversations, have
  4   you learned a general sense of the issues that
17:06:22  5  African-Americans are facing in Mobile?
  6           MS. HOWELL:  Your Honor, I am going to renew my
  7   objection.
  8           THE COURT:  Sustained.  It doesn't matter how many
  9   people have told her something, that's still hearsay, is it
17:06:31 10  not?
 11           MR. OSHER:  Your Honor, based on her actual organizing
 12   work she's done with the Poor People's Campaign, it's the same
 13   organization, she could develop a lay opinion as to what is
 14   going on Mobile.
17:06:44 15           MS. HOWELL:  Your Honor, she's already testified that
 16   she did not directly work with them.
 17           THE COURT:  I sustain the objection.
 18           MR. OSHER:  Thank you, Your Honor.  No further
 19   questions.  Thank you.
17:06:59 20           THE COURT:  Cross-examination?
 21           MS. HOWELL:  Yes, Your Honor.
 22                      CROSS-EXAMINATION
 23   BY MS. HOWELL:
 24   Q    Hi, Ms. Jones.
17:07:33 25  A    Hi.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 238**

1   Q    Thank you for taking the time to come up today.  We

2   appreciate it.

3   A    You're welcome.

4   Q    I wanted to ask you a few follow-up questions about what

17:07:40  5   your counsel was just asking you.

6        So you talked about having moved back to Montgomery in

7   2009; is that correct?

8   A    Yes.

9   Q    Okay.  So you've lived in Montgomery since the 2011

17:07:53 10   districts were drawn; is that right?

11   A    Yes.

12   Q    Okay.  And you, in fact, attended a hearing about those

13   districts, did you not?

14   A    A public hearing, yes.

17:08:01 15   Q    Okay.  And you actually spoke at that hearing, correct?

16   A    Yes.

17   Q    Okay.  And you spoke about a couple of things, right?  And

18   we talked about those at your deposition, didn't we?

19   A    Yes.  But you know I had a stroke.  So you have to refresh

17:08:17 20   my memory.

21   Q    All right.

22   A    For specifics.

23   Q    I'm happy to do that.

24        MS. HOWELL:  So and, Your Honor, I have here this -- I

17:08:41 25   had taken an excerpt from Defendant's Exhibit 3, which I

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 239**

1  recognize that plaintiffs' counsel had objected to at least in

2  part.  That's the preclearance submission from the 2011 act.

3     This is just a transcript of the Montgomery hearing.  I'm

4  not offering it for -- I believe what the grounds of the

17:09:00  5  objection were for relevance relating to the state of mind of

6  the legislators as they were passing the Act.  And my aim here

7  is only to get Ms. Jones' testimony on the record, so --

8      THE COURT:  Okay.  Is there any objection to that

9  component?

17:09:15  10      MR. OSHER:  That doesn't involve our objection to the

11  exhibit.

12      THE COURT:  Okay.  Ms. Howell, are you wanting to

13  offer this as an exhibit?

14      MS. HOWELL:  Yeah.  If -- if I could, Your Honor, that

17:09:45  15  would be -- that would be my preference to offer this as an

16  exhibit.

17      THE COURT:  All right.  Do you want brand new number,

18  or do you want to do this like Defendant's Exhibit 3-A, or

19  however?

17:10:00  20      MR. DAVIS:  Do a brand new number.

21      THE COURT:  Okay.

22      MS. HOWELL:  I will defer to my co-counsel.

23      MR. WALKER:  313.

24      THE COURT:  So Defendant's Exhibit 313?  Is there any

17:10:12  25  objection to that being admitted?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 240**

```
         1          MR. OSHER:  No objection, Your Honor.

         2          THE COURT:  Okay.  Thank you.

         3          MS. HOWELL:  I do, Your Honor, have copies of the

         4   excerpt that I am working with if the deputy -- if the Judge or

17:10:22 5   the witness would care to see it in a place of other than on

         6   the Elmo.

         7          THE COURT:  I'm fine with it there for now.

         8          MS. HOWELL:  Your Honor, may I approach?

         9          THE COURT:  You may.

17:10:44 10  BY MS. HOWELL:

        11   Q    Ms. Jones, and if you will flip to -- it's 383.  It has

        12   the number at the bottom when you start speaking.

        13        Okay.  So now that you have your testimony from the

        14   hearing that's in front of you, if you want to take a minute to

17:11:13 15  read it, I'm happy to give that to you.  But it appears that

        16   the only two things that you talked about at the hearing were

        17   wanting more notice about it and the need for legislators who

        18   were working on the district to pay attention to communities of

        19   interest.

17:11:28 20       Does that seem correct to you?

        21   A    No.  I talked about the lack of notice given in a timely

        22   manner.  I talked about fair representation and having a

        23   commission for citizens to be in the redistricting process.

        24        As you can see, when I stated that we needed a

17:11:57 25  redistricting -- I saw it better over here -- that we needed a
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 241**

```
 1  redistricting commission, a citizens redistricting commission.

 2  I also talked about legislators allowed to choose their voters

 3  instead of voters choosing their legislators by being in the

 4  writing of the district's process.  And so they can kind of

 5  cherry pick who gets their vote.

 6  Q    So it would be fair to say, then, that you covered a fair

 7  amount of ground in your short speech --

 8  A    Yes.

 9  Q    -- at the public hearing?

10      Okay.  Do you see anywhere in there that you requested the

11  drawing of a second majority-minority district in Alabama?

12  A    No.

13  Q    Okay.  And did you, in fact, request such a district be

14  drawn in 2011?

15  A    No.

16  Q    I'm sorry.  Was that no?

17  A    Yes, that was no.

18  Q    Okay.  So you waited until 2018 and filing this case to

19  request a second majority-minority district be drawn in

20  Alabama; is that correct?

21  A    Yes.

22  Q    Okay.  You also talked about several different things with

23  your counsel.  Particularly, I want to draw your attention to

24  certain things that you had said about the local election that

25  recently took place in Montgomery.  And the candidates in that
```

17:12:24 — line 5
17:12:35 — line 10
17:12:48 — line 15
17:13:18 — line 20
17:13:35 — line 25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 242**

```
        1   election were as you mentioned David Woods, correct?  And

        2   Steven Reed was the other candidate?

        3   A    For the runoff.

        4   Q    For the runoff.

17:13:45 5   A    Yes.

        6   Q    All right.  And can you tell me who won that election?

        7   A    The black male, Steven Reed.

        8   Q    Okay.  And he won actually in a landslide; is that a fair

        9   characterization?

17:13:58 10  A    Yes.

        11  Q    Okay.  You also talked a lot about interests that you

        12  thought that you characterized as being interests of the black

        13  community, I believe.  You talked about affordable health care,

        14  correct?

17:14:21 15  A    Yes.

        16  Q    Okay.  And education needs?

        17  A    Yes.

        18  Q    And criminal justice?

        19  A    Yes.

17:14:27 20  Q    And also employment, right?

        21  A    Yes.

        22  Q    Okay.  Would you not agree that all of those are interests

        23  common to any number of voters in Alabama?

        24  A    No.

17:14:39 25  Q    Why not?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 243**

1  A    Because there's a significant disenfranchisement in the

2  black community in education, in criminal justice, in having

3  health care.

4       If you look at the statistics, you will see that whereas

17:14:54  5  they tout we just may have 9 percent unemployment in Alabama in

6  the black community, it's probably three to four times as high.

7  So it's kind of when they give statistics they show a general

8  number.  They don't actually show what's going on in the black

9  community.

17:15:17 10       A black person's going to get more time for crack cocaine

11  than a white person will get for powder cocaine, and we know

12  this.  So the numbers are kind of skewed, if you would, when we

13  see them on the news in the headlines.  And these are facts.

14       We can look at bonds being given to a black person who

17:15:42 15  commits murder versus a white person who commits murder.  The

16  bonds are really ridiculous and racial.  And it is what it is.

17  Q    And I do hear what you are saying, Ms. Jones.  But white

18  people, too, are concerned about affordable health care, are

19  they not?

17:16:04 20  A    I don't know.  I'm black.  I don't -- I'm telling you from

21  my point of view.

22       When we are talking about health care, and I'm standing in

23  line and have to wake up at 3:00 a.m. to try to get heart

24  medication and seizure pills, you know who's in that line?

17:16:26 25  Majority is black people in that line.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 244**

1    Q    Let me reframe this for you, Ms. Jones.  Do you know of

2    anybody who wants unaffordable health care?

3    A    I haven't asked.

4    Q    You haven't asked.  Do you know of anyone who wants

17:16:39  5    unaffordable health care?

6    A    I don't know.  I have not asked.  You -- that's just

7    like -- do you know anyone who would want -- who would not want

8    a Louis Vuitton bag?  It depends on what that person values.

9        If you can afford health care, it wouldn't matter to you

17:17:00  10   whether you wanted affordable health care because you got money

11   to pay for your doctor bill.  I can't pay -- I can't get my

12   heart medications when I didn't have insurance.  And when you

13   looking at 13 pills and you on a waiting list, it's a

14   difference for an indigent person who is impoverished person

17:17:24  15   with no options versus someone who has money and it doesn't

16   matter whether they're down to their last medication because

17   they can go get some more.  It's a big difference.

18   Q    You also talked about how you feel right now that someone

19   who votes Republican is racist, correct?

17:17:47  20   A    Yes.

21   Q    Does voting for Republican candidates render the voter

22   racist?

23   A    Yes.

24   Q    Haven't you voted for Republican candidates?

17:17:55  25   A    Yes.  But I'm black, and I can't be racist by definition.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 245**

|  |  |  |
|---|---|---|
| | 1 | Q     Thank you, Ms. Jones. |
| | 2 | A     You're welcome. |
| | 3 | THE COURT:  Any redirect? |
| | 4 | MR. OSHER:  Just a brief redirect, Your Honor. |
| 17:18:25 | 5 | REDIRECT EXAMINATION |
| | 6 | BY MR. OSHER: |
| | 7 | Q     Do you still have that document in front of you? |
| | 8 | A     I do. |
| | 9 | Q     Do you see it on the screen? |
| 17:18:46 | 10 | A     Yes. |
| | 11 | Q     This paragraph here that I'm pointing to that starts at |
| | 12 | dates and times.  The last sentence, you're referring to the |
| | 13 | citizen redistricting commission that you were discussing |
| | 14 | earlier; is that correct? |
| 17:19:01 | 15 | A     Yes. |
| | 16 | Q     Can you read for us? |
| | 17 | A     "The citizens redistricting commission will consider |
| | 18 | public input in legal and expert advice to meet the Voting |
| | 19 | Rights Act's requirement." |
| 17:19:15 | 20 | Q     Did you know that you might have a legal right to a second |
| | 21 | majority-minority district in Alabama in 2011? |
| | 22 | A     I didn't.  When I called about redistricting to the |
| | 23 | legislative reference office, you will get transferred umpteen |
| | 24 | number of times. |
| 17:19:37 | 25 | THE COURT:  Okay.  I think you answered the question. |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 246**

```
  1    Thank you.

  2              THE WITNESS:  Oh, okay.

  3              MR. OSHER:  Thank you, Your Honor.  No further

  4    questions.

  5              THE COURT:  Anything further?

  6              MS. HOWELL:  Nothing further, Your Honor.

  7              THE COURT:  Thank you.  Thank you, Ms. Jones.  You may

  8    step down.

  9         And I think this is a good time to recess for the day.  I

 10    know our court security officers will be glad to know that.

 11         All right.  Thank you.  I think you said you've got some

 12    material for me or something to discuss?  We can do that up

 13    here, or if you want to take a break and come back to the

 14    office, whatever.

 15              (Whereupon, the above proceedings were concluded at

 16         5:20 p.m.)

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 84, Page 247**

1                          <u>CERTIFICATE</u>

2

3

4          I certify that the foregoing is a correct

5     transcript from the record of proceedings in the

6     above-entitled matter.

7

8

9

10

11     _____          <u>11-15-19</u>

12     Christina K. Decker, RMR, CRR                 Date

13     Federal Official Court Reporter

14     ACCR#:   255

15

16

17

18

19

20

21

22

23

24

25

**Caster Plaintiffs' Exhibit 84, Page 248**

```
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ALABAMA
2                     SOUTHERN DIVISION

3

   LAKEISHA CHESTNUT,  an individual; *
4  MARLENE MARTIN, an individual;     *   2:18-cv-00907-KOB
   BOBBY DUBOSE, an individual;       *   November 5, 2019
5  RODNEY LOVE, an individual; KAREN  *   Birmingham, Alabama
   JONES, an individual; JANICE       *   9:00 a.m.
6  WILLIAMS, an individual; RODERICK  *
   CLARK, an individual; JOHN HARRIS, *
7  an individual,                     *
           Plaintiffs,                *
8                                     *
   vs.                                *
9                                     *
   JOHN H. MERRILL, in his official   *
10 capacity as Alabama Secretary of   *
   State,                             *
11         Defendant.                 *
   **********************************

12

13           TRANSCRIPT OF BENCH TRIAL
                    VOLUME II
14       BEFORE THE HONORABLE KARON O. BOWDRE
          CHIEF UNITED STATES DISTRICT JUDGE

15

16 FOR THE PLAINTIFFS:
   Abha Khanna, Esq.
17 PERKINS COIE LLP
   1201 Third Avenue
18 Suite 4900
   Seattle, Washington 98101
19 (206) 359-9000

20 Bruce V. Spiva, Esq.
   PERKINS COIE LLP
21 700 13th Street, NW
   Suite 600
22 Washington, DC 20005
   (202) 654-6338

23

24

25
```

CHRISTINA K. DECKER, RMR, CRR
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

Caster Plaintiffs' Exhibit 85, Page 1

```
 1        Richard P. Rouco, Esq.
          QUINN CONNOR WEAVER DAVIES & ROUCO LLP
 2        2 20th Street North
          Suite 930
 3        Birmingham, Alabama 35203
          (205) 870-9989
 4
          Daniel C. Osher, Esq.
 5        PERKINS COIE LLP
          700 13th Street NW
 6        Suite 600
          Washington, DC 20005
 7        (202) 654-6338

 8        Lalitha D. Madduri, Esq.
          PERKINS COIE LLP
 9        700 13th Street NW
          Suite 600
10        Washington, DC 20005
          (202) 654-6322

11

12
          FOR THE DEFENDANT:
13        James W. Davis, Esq.
          Laura E. Howell, Esq.
14        OFFICE OF THE ATTORNEY GENERAL
          501 Washington Avenue
15        P.O. Box 300152
          Montgomery, Alabama 36130-0152
16        (334) 242-7300

17        J. Dorman Walker, Esq.
          BALCH & BINGHAM LLP
18        P.O. Box 78
          Montgomery, Alabama 36101
19        (334) 834-6500

20
          COURTROOM DEPUTY:  Sarah Hollingsworth
21

22        COURT REPORTER:  Christina K. Decker, RMR, CRR

23     Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
       pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
24        and Procedures Vol. VI, Chapter III, D.2.  Transcript
                    produced by computerized stenotype.
25
```

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 2**

1                              **I N D E X**

2       DR. PEYTON MCCRARY                            252
        DIRECT EXAMINATION                           252
3       BY MR. SPIVA
        CROSS-EXAMINATION                            313
4       BY MS. HOWELL
        REDIRECT EXAMINATION                         327
5       BY MR. SPIVA

6

        JOHN KNIGHT                                  333
7       DIRECT EXAMINATION                           334
        BY MS. MADDURI
8       CROSS-EXAMINATION                            383
        BY MS. HOWELL

9

10      LAKEISHA CHESTNUT                            416
        DIRECT EXAMINATION                           417
11      BY MS. KHANNA
        CROSS-EXAMINATION                            451
12      BY MS. HOWELL
        REDIRECT EXAMINATION                         457
13      BY MS. KHANNA
        RECROSS-EXAMINATION                          458
14      BY MS. HOWELL

15

        SHEILA TYSON                                 459
16      DIRECT EXAMINATION                           459
        BY MR. SPIVA

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 3**

<u>**P R O C E E D I N G S**</u>

1                     <u>**P R O C E E D I N G S**</u>

2                          (In open court.)

3              THE COURT:  You may be seated.  Plaintiff may call

4     your next witness.

09:05:28 5          MR. SPIVA:  Thank you, Your Honor.

6          Your Honor, plaintiffs call Dr. Peyton McCrary.

7                          DR. PEYTON MCCRARY,

8     having been first duly sworn by the Courtroom Deputy Clerk, was

9     examined and testified as follows:

09:05:54 10         THE COURTROOM DEPUTY CLERK:  Will you please state

11    your name into the microphone for the record?

12             THE WITNESS:  My name is Peyton McCrary.

13             THE COURTROOM DEPUTY CLERK:  Thank you.

14                        DIRECT EXAMINATION

09:06:02 15   BY MR. SPIVA:

16    Q    Good morning, Dr. McCrary.

17    A    Good morning, Mr. Spiva.

18    Q    One thing -- you're doing fine so far -- but the court

19    reporter asked us to remind all of our witnesses to just speak

09:06:14 20   into the microphone because it helps her with taking down the

21    transcript.  You know, sometimes when we put things on the

22    screen, it's natural to turn away from it to see what's on the

23    screen, but if you can just keep that in mind.

24    A    Good advice.

09:06:26 25   Q    Dr. McCrary, you've been retained as an expert by the

**Caster Plaintiffs' Exhibit 85, Page 4**

1 plaintiffs in this case; is that right?

2 A    Yes.

3 Q    Let's begin with a little bit of your background.  Can you

4 please describe for us your educational history?

09:06:43 5 A    Well, I received a B.A. and M.A. from the University of

6 Virginia in history, and a Ph.D. from Princeton University in

7 1972 also in the department of history.

8 Q    And what did you do after receiving your doctorate?

9 A    I was already teaching at the University of Minnesota,

09:07:04 10 where I taught from 1969 to '76.  I then taught for two years

11 at Vanderbilt University in Tennessee.  And then from 1978 to

12 1990, I was a professor of history at the University of South

13 Alabama in Mobile.

14 Q    Okay.  And let's turn to Plaintiffs' Exhibit 81.  And in

09:07:29 15 particular -- first of all, is Plaintiffs' Exhibit 81 the first

16 declaration that you submitted in this case, Dr. McCrary?

17 A    Yes.

18 Q    Okay.  If we could turn to the back of that where your

19 curriculum vitae appears, which is just after the report

09:07:46 20 itself.

21 A    Yes, sir.

22 Q    And is this your curriculum vitae?

23 A    Yes, it is.  I prepared it, and it's up to date to the

24 best of my recollection.

09:08:02 25 Q    Okay.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 5**

```
 1            THE COURT:  For the record, that's page 39, right?
 2            MR. SPIVA:  Thank you, Your Honor.
 3   BY MR. SPIVA:
 4   Q    And, Dr. McCrary, what did you teach at the universities
 5   that you taught at?
 6   A    Well, in addition to teaching the standard United States
 7   history course, I taught courses in history of the south.  I
 8   taught courses in some of those institutions in the American
 9   party system.  I taught a course in quantitative methods at the
10   University of South Alabama.  And I taught African-American
11   history one year at Vanderbilt.
12   Q    And what type of quantitative methods did you teach?
13   A    Well, I taught students about the analysis of legislative
14   behavior using roll call voting analysis, the statistical
15   methods used to analyze voting behavior.
16        One of my graduate students did a master's thesis
17   following that course in which she analyzed racially polarized
18   voting in Mobile County, as I recall.
19   Q    And after you finished your teaching at the University of
20   South Alabama, where did you go after that?
21   A    Well, I was employed for 26 years as a social science
22   analyst in the Department of Justice in the Civil Rights
23   Division in the section that enforced the Voting Rights Act.
24   Q    And what was your role while employed at DOJ's Civil
25   Rights Division?
```

09:08:24, 09:08:42, 09:09:07, 09:09:29, 09:09:48

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 6**

A    One of my principal responsibilities was to help the

attorneys understand the factual evidence in cases, to

determine which disciplines would be the logical place to look

for appropriate expert witnesses, suggesting appropriate expert

09:10:08  witnesses, and giving the attorneys a choice of persons who

could do the analysis needed, working with the lawyers and the

experts to make sure that they understood one another, and

helping the lawyers to assess the evidence of experts -- expert

testimony from opposing parties.

09:10:26 Q    And during that time, did you personally testify as an

expert in Section 2 cases?

A    Not ordinarily.  I did once testify in a case in Alabama

back I think in 1991 because I had -- before being employed by

the Department, I had been an expert witness for the plaintiffs

09:10:50 in that case.

And as I recall, Judge Dubina accepted the motion from

that attorney that the Department of Justice be asked to

participate on an amicus basis for the purpose of putting on my

testimony.  Otherwise, I did not testify except through written

09:11:17 declarations in certain circumstances in cases during my

employment by the Department.

Q    Did you receive any special recognition relating to your

work at DOJ?

A    Yes.  I think it was in 2011 I received the Maceo Hubbard

09:11:31 Award for sustained commitment to the enforcement of the Voting

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 7**

1   Rights Act.

2   Q    Have you published literature on the subject of voting

3   rights?

4   A    Yes.  For the last 35 years, almost all of my scholarly

09:11:47  5   writing and publications has been concerned with the history of

6   discriminatory election laws in the south, the enforcement, the

7   adoption and enforcement of the Voting Rights Act, methods used

8   by expert witnesses in addressing issues in voting rights

9   litigation, and the impact of enforcement of the Voting Rights

09:12:10 10  Act on minority representation in Alabama and also in South

11  Carolina.

12  Q    And I take it from your last answer, you have written

13  specifically about voting rights in Alabama?

14  A    Yes, in a variety of those publications.

09:12:22 15  Q    Can you tell us what the publications were?  And if we can

16  go to page 5 of Plaintiff's Exhibit 81, paragraph 8.  And it's

17  actually on pages 4 and 5.  I'm sorry.

18       And if you could actually describe for us what you have

19  written about voting rights in Alabama?

09:12:50 20  A    Well, let me start with a chapter that I coauthored as the

21  senior author in a book published by Princeton University Press

22  in 1994 called *Quiet Revolution of the South:  The Impact of*

23  *the Voting Rights Act*.  I was the senior author of the Alabama

24  chapter in that book.  There were chapters on each of the

09:13:10 25  states covered by Section 5 of the Voting Rights Acts.  I also

**Caster Plaintiffs' Exhibit 85, Page 8**

1  was the coauthor on the South Carolina chapter.

2      In a recent volume of essays honoring my -- the second

3  reader on my dissertation, Shelton Hackney, just before he

4  passed away of Lou Gehrig's disease, I had an essay that

09:13:32 5  focused on the evidence in *Dillard vs. Crenshaw County, Alabama*

6  in which I was an expert back in the 1980s.

7      I also discussed Alabama evidence in a journal article I

8  published on the subject of racially polarized voting, looking

9  at expert testimony in Alabama cases, analyzing not only the

09:13:57 10  degree to which voting patterns were polarized along racial

11  lines, but also looking at the racial disparities in

12  socioeconomic circumstances cited by an expert in addressing

13  the totality of circumstances test under Section 2 of the

14  Voting Rights Act.

09:14:16 15  Q    Did you also write a book chapter about the evidence

16  presented in city of Mobile?

17  A    Yes.  As a matter of fact, I forgot about that.  That was

18  my first publication dealing with voting rights matters in a

19  collection published in 1984 called "Minority Vote Dilution."

09:14:35 20  That essay summarized the historical evidence that I had

21  presented as an expert witness in the two Mobile voting rights

22  cases in 1981.  And it originated as written testimony to the

23  subcommittee on civil and constitutional rights of the House

24  Judiciary Committee, which was a part of the record before

09:14:55 25  Congress in amending Section 2 of the Voting Rights Act in

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 9**

1   1982.

2   Q    And you mentioned that you submitted, I guess, written

3   testimony in connection with the 1982 amendments to the Voting

4   Rights Act?

09:15:11 5   A    Yes.

6   Q    And did you also testify live before Congress before those

7   amendments?

8   A    No, I didn't; only submitting written testimony.

9   Q    Okay.  Have you provided any other congressional testimony

09:15:26 10  on voting rights?

11  A    Yes.  Most recently, I gave both written and oral

12  testimony before a subcommittee on -- of the House Judiciary

13  Committee regarding the facts that Congress should know in

14  considering new voting rights litigation.  The staff member who

09:15:50 15  explained what my task was in that instance, he said it was to

16  provide history 101 on the Voting Rights Act.

17          THE COURT:  And when was that, Dr. McCrary?

18          THE WITNESS:  That was in March of this year.

19          THE COURT:  Okay.

09:16:05 20  BY MR. SPIVA:

21  Q    Have you published on aspects of the totality of the

22  circumstances test under Section 2?

23  A    Yes.  In several of my journal articles, in explaining

24  both the case law and explaining how experts have applied

09:16:21 25  quantitative evidence in addressing the totality of

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 10**

    1   circumstances test set out in the Senate's report 1982, I have
    2   addressed that.
    3   Q    Have you published literature regarding statistical
    4   analysis of voting behavior?
09:16:37 5   A    Yes.  The article to which I referred earlier regarding
    6   racially polarized voting explains the evolution of the
    7   statistical methods used by expert witnesses in voting rights
    8   cases in the 1970s and 1980s.  It was published almost 30 years
    9   ago.
09:16:54 10  Q    And during your time at DOJ and then after your retirement
   11   from DOJ, did you continue to teach?
   12   A    Yes.  I'm in my 13th year of co-teaching a course on
   13   voting rights law at G. W. Law -- George Washington University
   14   Law School in the district where I co-teach the course with a
09:17:18 15  former colleague of mine in the Civil Rights Division of the
   16   Department of Justice.
   17   Q    I don't know if you mentioned it.  What's that course
   18   concerning?
   19   A    Voting rights law.
09:17:26 20  Q    Okay.
   21   A    However, I am not an attorney.
   22   Q    How many times have you testified in court as an expert
   23   relating to voting rights?
   24   A    I think this is my 18th time in court, 17 or 18.
09:17:45 25  Q    Okay.  And turning to paragraph 6 and 7 of Plaintiffs'

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 11**

Exhibit 81, which is your first declaration, which I think
summarized some of your testimony, can you describe the subject
matter of those cases that you testified in?

A    In most of the cases in Alabama in which I testified, I
was addressing the history of discrimination affecting voting
and the degree to which laws that were being challenged were
adopted with a racially discriminatory purpose.

In one case, *Harris vs. Graddick*, I was testifying about a
small part of the historical evolution of the laws regarding
the appointment of poll officials in Alabama.

And in the years since my retirement, I've testified in
one case, a case last year tried in Montgomery before Judge
Watkins, regarding the method of electing statewide judicial
officers in Alabama.

Q    Is that the case that is often called the Alabama Judges'
Case?

A    Yes.

Q    And have you also testified concerning the Senate factors
in any of those cases?

A    Yes.  In that case, as I recall, and also in a Georgia
case, which was settled following my deposition in the case.

Q    Okay.  Let's see.  Were you qualified by the Court as an
expert in each of the cases that you testified in?

A    Yes.

Q    And let me ask you -- you've confirmed that Plaintiffs'

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0080/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 12**

1  Exhibit 81 is your first declaration.

2       Let's turn briefly to Plaintiffs' Exhibit 82, and ask you

3  if you can confirm that that's the second declaration or

4  rebuttal report that you submitted in this case.

09:20:10  5  A    That's correct.

6  Q    Okay.  Are the opinions and conclusions that you reached

7  in this case contained in those two declarations?

8  A    Yes.

9  Q    And have you changed your opinions or conclusions in any

09:20:25 10  way?

11  A    Only in clarifying an error I made in my deposition

12  answers to a question which I addressed in an errata sheet.

13  Q    Okay.  But in terms of the opinions and conclusions that

14  you reach in the declarations, you haven't changed any of

09:20:48 15  those, I take it?

16  A    No.

17  Q    And can you just briefly describe the materials you

18  reviewed in creating your expert declarations?

19  A    Well, I reviewed the sort of documents that both

09:21:04 20  historians and political scientists address in -- or

21  investigate in describing all of the subject matter that I --

22  with which I'm dealing in this report, and look at the

23  secondary literature that is, say, writing by social scientists

24  and other qualified scholars on the issues that are relevant to

09:21:32 25  the case, look at the government documents that are relevant to

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 13**

the issues in the case, including census data when appropriate.

I examined documents that are somewhat unusual in extensive review of expert witness reports and expert witness testimony in voting rights cases.  I look at records submitted under Section 5 review during the period before *Shelby County vs. Holder* was decided by the Supreme Court in 2013.  I also look at court decisions which often provide important factual evidence.

I also sometimes write about the evolution of the case law and teach that subject matter in court -- in the course I teach at G. W. Law school, but I have never addressed the legal questions in any expert witness testimony that I have given.

Q    And I don't know if you mentioned this.  I assume you also reviewed secondary sources written by historians and political scientists, including yourself?

A    That's actually where I started.

Q    Oh, okay.  Sorry.  I missed that.

MR. SPIVA:  Your Honor, at this time, I'd like to offer Dr. McCrary as an expert in the -- as a historian, particularly the history of discrimination affecting voting including in Alabama and in statistical methods in racially polarized voting.

THE COURT:  Any objection?

MS. HOWELL:  I'm so sorry.

THE COURT:  Any objection?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 14**

1        MR. SPIVA:  I just offered him as an expert.  We
2    already stipulated to his expertise.
3        MS. HOWELL:  Correct.  I'm sorry.  Could you restate
4    what you were offering him as an expert in?
09:23:18 5        MR. SPIVA:  Sure.  Your Honor, we offer Dr. McCrary as
6    an expert historian, particularly in the history of
7    discrimination affecting voting including in Alabama, and in
8    statistical methods particularly concerning racially polarized
9    voting.
09:23:33 10       MS. HOWELL:  Your Honor, I had not understood
11   Dr. McCrary to be testifying as to the statistical methods
12   underlying racially polarized voting.  I had understood him to
13   be only an expert on the history of discrimination.
14       MR. SPIVA:  Only the history of racially polarized
09:23:49 15  voting.  Anything that he is going to testify about that is in
16   his report.  And we have stipulated to him being able to
17   testify about anything that's in his report.
18       In other words, he's not going to rerun the testimony of
19   Dr. Palmer.  But he talks about the history of racially
09:24:10 20  polarized voting in his report.
21       THE COURT:  Not about statistical methods.
22       MR. SPIVA:  I mean, he's not going to go through the
23   things that Dr. Palmer did yesterday.  But in testifying about
24   the history of racially polarized voting, it may touch on, you
09:24:27 25  know, the statistical methods that are used to do that.  But

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 15**

1    it's not -- it's going to be a very, you know -- it would be

2    ten -- it would be a very minor part of what he might say.

3              THE COURT:  Do either of his reports talk about

4    statistical methods?

09:24:45 5              MR. SPIVA:  They do.  I will amend the request, Your

6    Honor.

7              THE COURT:  Okay.

8              MR. SPIVA:  So instead of saying statistical methods,

9    why don't I say racially polarized voting -- the history of

09:24:57 10   racially polarized voting.

11             MS. HOWELL:  Your Honor, we have no objection to that.

12             THE COURT:  Okay.  All right.  Then I recognize him as

13   an expert in the historical aspects of voting, discrimination

14   in voting, and racially polarized voting.

09:25:47 15             MR. SPIVA:  Thank you, Your Honor.

16   BY MR. SPIVA:

17   Q    So, Dr. McCrary, could you first just please explain what

18   you were asked to analyze for your initial report in this case?

19   A    I was asked to analyze the history of racial

09:26:08 20   discrimination affecting voting in Alabama, including laws

21   adopted by the state over the years and the degree to which

22   there appear to be continuing effects of that history in more

23   recent voting behavior and patterns of representation in the

24   state.

09:26:29 25   Q    Okay.  And did you also look at devices that enhance the

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 16**

1    opportunity for discrimination in voting?

2    A    That's a part of the history of discrimination that I

3    described in summary.

4    Q    Okay.  I take it you looked at several of the Senate

09:26:58  5    factors in the factual analysis of several of the Senate

6    factors?

7    A    Yes.  It happens that my testimony addresses a number of

8    factors set out in the Senate report in 1982 as criteria for

9    assessing the totality of circumstances evidence in a case.

09:27:17 10    Q    And I know you said you're not a lawyer.  In your

11    experience in testifying in voting rights cases, is it common

12    for social scientists to become familiar with the relevant case

13    law in this area?

14    A    Yes.  In order to be of use to the Court, we need to

09:27:34 15    understand the legal context that the Court has to address the

16    facts in, and so it's helpful to understand the Court

17    decisions.

18    Q    Okay.  And is it common for historians in the area of

19    voting rights to use Court decisions in their scholarly work?

09:27:53 20    A    Yes.

21    Q    And do you often incorporate court decisions in your own

22    scholarly work?

23    A    Yes.

24    Q    And can you please explain what you understand the purpose

09:28:04 25    of the totality of the circumstances analysis under Section 2

**Caster Plaintiffs' Exhibit 85, Page 17**

1   to be?

2   A    Well, the totality of circumstances test was adopted by

3   Congress in 1982 with the intention of relying on the criteria

4   that the Supreme Court set out in *White versus Regester* in 1973

5   in which the old Fifth Circuit elaborated on in *Zimmer vs.*

6   *McKeithen* I think in 1974, in which the courts had been

7   following as ways of assessing problems of minority vote

8   dilution in the 1970s before the Supreme Court handed down *City*

9   *of Mobile vs. Bolden.*

10  Q    Let's maybe walk through the various Senate factors that

11  your reports address, or particularly your first report.  Let's

12  begin with the first factor the extent of any history of

13  official discrimination in the state or political subdivision

14  that touches the right of the members of the minority group to

15  register to vote or to otherwise participate in the democratic

16  process.

17       What overall conclusion did you reach regarding the first

18  Senate factor?

19  A    That there was an extensive history of racial

20  discrimination affecting voting in Alabama which continues to

21  have effects in current election circumstances in Alabama.

22  Q    And did you also look at the history of discrimination in

23  social and economic life in addition to political life?

24  A    Yes.  I looked at the racial disparities in socioeconomic

25  characteristics, both in the period before the adoption of the

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 18**

1  Voting Rights Act and in more recent decades.

2  Q    And what historical period did you consider in reaching

3  the conclusion you mentioned a minute ago?

4  A    My primary focus is the period since the end of the white

09:30:06  5  primary in the mid-1940s up through more or less the present

6  period.

7  Q    But did you also look to some extent at history from

8  Reconstruction through the period of the white primary?

9  A    Very briefly in introducing the -- or explaining, I should

09:30:29 10  say, the changes that began in the mid-1940s.

11  Q    Okay.  And let me begin by asking you just a couple of

12  questions about the post-Reconstruction period.

13      Can you provide, I guess, just a brief history of the

14  post-Reconstruction period and then discuss the period around

09:30:55 15  1901?

16  A    Well, anyone who's studied Alabama history knows that

17  African-Americans were enfranchised during the Reconstruction

18  period, and they continued to be able to vote in elections in

19  Alabama until really the work of the 1901 constitutional

09:31:14 20  convention, which is usually referred to by Alabama historians

21  as the state's disenfranchising convention.

22      That convention adopted various tests or devices,

23  including a literacy test to be implemented or enforced, I

24  should say, by local boards of registrars, a poll tax that

09:31:39 25  further served to make it difficult for persons who were poor

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 19**

to vote, and subsequent to the convention the establishment of

a white primary that had been in practice in some localities

long before the 1901 convention.

Q    And did the 1901 convention adopt any other devices such

as property qualifications or disqualification of voters who

had been convicted of crimes?

A    There were property qualifications for voting which would

have had an effect of disenfranchising poor whites, as well as

poor African-Americans.  And so there was a provision that

allowed persons whose ancestors may have fought in the

Confederate Army to participate in elections despite not

meeting the property qualifications.

      The Constitution included felon disfranchisement

provision, which actually antedated 1901, but was modified in

the convention.  And in particular, including a provision of

the Constitution known for decades as the petty crimes

provision specifying certain misdemeanors that were also

disqualifying beyond the felonies.  And those particular

methods were cited by one of the delegates to the

constitutional convention as crimes typically committed by

Negroes, and, therefore, an appropriate way of limiting black

participation in the political process.

Q    And how did you reach the conclusion that the provisions

that were adopted by the 1901 convention were intended to

prevent African-Americans from voting?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 20**

```
 1  A    First of all, it's undisputed among all the historians who
 2  have written about the subject, including most prominently
 3  Malcolm McMillan, whose published dissertation was a study of
 4  constitutional development in Alabama, and for many years a
09:33:55 5  professor of history at Auburn, as I recall.
 6       But in addition to that, I had occasion to analyze the
 7  debates in the constitutional convention in earlier research,
 8  so I'm familiar with the language of the delegates.  And that
 9  history has been discussed also in numerous judicial decisions,
09:34:17 10 which means that incidentally I reviewed the language of the
11  convention over the time I've worked on the history of Alabama.
12  Q    Am I understanding you correctly that there was -- that
13  the purpose of these provisions was explicitly stated by the
14  people who convened the convention?
09:34:36 15 A    Repeatedly.
16  Q    I'm sorry?
17  A    Repeatedly.
18  Q    Okay.  And let's maybe pull up paragraph 16 of your first
19  report, Plaintiffs' Exhibit 81, which is on page 10.
09:34:57 20      What effect did these provisions that were adopted in the
21  state's constitution in 1901 have on black voter registration?
22  A    The impact was to eliminate virtually all black registered
23  voters from the voter rolls.  The numbers I cite in that
24  paragraph were 181,000 registered before the 1901 constitution,
09:35:27 25 and two years later, 3,000 were left on the rolls.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 21**

Q    Okay.  And what effect, if any, did the provisions have on
the partisan landscape of the state of Alabama?

A    Well, African-Americans had been voting predominantly
Republican during the 19th century.  And the Democratic party
was proud to call itself the white supremacy party.  It was
overwhelmingly white.  The disenfranchising convention
essentially eliminated the Republican party from effective
politics in Alabama for decades.

Q    And what effect, if any, did the rise of one party rule on
the state have on the competitiveness of Alabama elections?

A    Well, they were competitive as long as you were white;
that is to say African-Americans weren't allowed to participate
in the primary by party rules that were sanctioned by state law
most of the time.

Q    And so you're referring there to the white primaries that
you referenced earlier?

A    Yes, sir.

Q    And what happened to the white primaries ultimately?

A    Well, following the outlawing of the white primary in
Texas in *Smith vs. Allwright* by the Supreme Court in 1944, each
of the southern states that had conducted white primaries
ultimately had to concede that African-Americans could
participate in democratic primaries even though some adopted
measures trying to retain the white primary.

Q    And how did the state of Alabama react to that decision?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 22**

1   And it might be helpful to pull up paragraph 17 just for

2   reference.

3   A    Well, in 1946, following the outlawing of the Alabama

4   white primary, an amendment to the state constitution was

09:37:26 5   proposed by, as I recall, E.C. Boswell from one of the north

6   Alabama counties, which was popularly known as the Boswell

7   Amendment, which would add to the literacy test adopted in

8   1901, a requirement that individual -- an individual seeking to

9   register be able to read and interpret any provision of the

09:37:51 10  federal constitution.

11       That was ratified by the voters in 1946.  And it was

12  originally proposed by Gessner McCorvey of Mobile, who was a

13  longtime chair of the Alabama State Democratic Executive

14  Committee and whose -- and I happen to have read the records of

09:38:16 15  the Alabama State Democratic Executive Committee for the years

16  of the 1940s, '50s, and early 1960s, so I ran across his

17  comments there.  But they have also been quoted in several

18  historical studies that I cite in my report.

19  Q    What was the effect of the Boswell Amendment?

09:38:38 20  A    Well, it would have had a significant effect on reducing

21  African-American voting registration, except that it was struck

22  down by the federal courts in *Davis vs. Schnell* in 1949, I

23  think.

24  Q    And before it was struck down, though, what effect did it

09:38:54 25  have, in terms of giving registrars discretion?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 23**

A     Well, it certainly gave registrars maximum discretion.  I
haven't examined the numbers of persons who were turned away
from voter registration.  And I don't recall that other
historians have examined the statistical effects of the
09:39:18 5  quantitative effects, I should say, in that brief period when
it was implemented.

       But it gave, as the Court noted in *Davis vs. Schnell,* it
gave considerable discretion to local registrars, most of whom
were only high school graduates.  Almost none of whom had ever
09:39:37 10 been to law school.  And as the Court noted, there are
provisions of the state -- of the U.S. Constitution which are
difficult for lawyers to explain.

Q     That's for sure.

       THE COURT:  I think we could get an amen on that.

09:39:59 15 BY MR. SPIVA:

Q     And so you mentioned a minute ago that the Boswell
Amendment was, I guess -- the Supreme Court struck it down in
1949.  How did the state of Alabama react to the Schnell
decision striking that down?

09:40:18 20 A     The legislature came up with another constitutional
amendment, which was ratified by the voters in 1951, I think,
the voter qualification amendment.

Q     And what was the purpose of the voter qualification
amendment?

09:40:31 25 A     Well, according to a study by the Alabama -- University of

**Caster Plaintiffs' Exhibit 85, Page 24**

1    Alabama political scientist Donald Strong in the mid-1950s, it

2    was adopted with a racially discriminatory purpose.

3         And what it did was to require that the literacy test be

4    constructed by the Alabama State Supreme Court, which it

09:40:54  5    continued to do until that literacy test was eliminated by the

6    adoption of the Voting Rights Act in 1965.

7    Q    And then let me ask you:  In addition to restrictions --

8    do you have water up there?

9    A    I do.

09:41:13 10    Q    Okay.  Good.  In addition to restrictions on voter

11    registration, were there other methods of election used

12    pre-1965 that were designed to eliminate the ability of

13    African-Americans to elect their candidates of choice?

14    A    Yes.  In 1951, for example, the legislature adopted an

09:41:37 15    anti-single shot law for municipal elections in the state of

16    Alabama.

17    Q    What's an anti-single shot law?

18    A    Single-shot voting was used throughout the country by

19    minority voters -- and not just African-Americans, but other

09:41:52 20    minority voters and political minorities, as well -- to provide

21    a means of obtaining some representation in local government by

22    voting in an at-large election system for the one candidate

23    they preferred so as to increase the mathematical weight of the

24    votes they cast.

09:42:13 25         And, therefore, an anti-single shot law -- also known as a

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 25**

1  full slate law -- would eliminate the possibilities of

2  providing token representation, if you will, or some

3  representation for minority voters by requiring that anyone who

4  didn't vote for all the seats up for election at a given moment

09:42:38 5  have their ballot disqualified.

6  Q    Okay.  And if we could just step -- take one step back,

7  because I think the -- we may have missed the kind of the

8  premise or the reason these anti-single shot laws were passed.

9       Can you tell us about the use of at-large elections rather

09:42:59 10  than single-member districts during this period of time?

11  A    Well, at-large elections are -- were a dominant feature of

12  Alabama election law for many years.  Although after the

13  disfranchisement of African-Americans in 1901, a significant

14  number of counties moved back to single-member districts, and

09:43:25 15  after the end of the white primary began moving back to the use

16  of at-large elections.  It's the case that at-large elections

17  make it difficult, if not impossible, for voters who are in a

18  minority in a jurisdiction to elect candidates of their choice

19  where there is racially polarized voting.

09:43:49 20      And that's why in order to understand the way in which an

21  at-large election system operates, analyzing racially polarized

22  voting is necessary.  Where there's no racially polarized

23  voting, at-large elections would not likely have a

24  discriminatory effect.  And the same thing would likely to be

09:44:06 25  true of an anti-single shot law.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 26**

1  Q    And this is probably an obvious question, but during this

2  period of time that you have been talking about, roughly the

3  '40s through the '65 Act, was the there racially polarized

4  voting in Alabama?

09:44:19  5  A    Yes.

6  Q    And so then can you explain how the anti-single shot law

7  interacts with at-large voting to undermine African-American

8  voting participation?

9  A    Well --

09:44:45 10  Q    And I know you probably partly described that, but you can

11  kind of consider me a slow undergrad guy, so...

12  A    Well, the effect of the anti-single shot laws is most

13  evident in the municipal elections that were the focus of it.

14      African-Americans had reached significant voting strength

09:45:04 15  in the city of Tuskegee, Alabama, also to some extent in Mobile

16  and Montgomery and in Birmingham.  And it was in that context

17  that the legislature decided, after explicit explanation of the

18  racial effects of an anti-single shot law, to prevent the black

19  vote from increasing or from having a chance to elect

09:45:29 20  candidates in those elections by member of the legislature.

21      The effect of these laws was to make it impossible for

22  African-Americans to elect a candidate of their choice in those

23  places where they were reaching a level where that would be

24  possible.

09:45:51 25  Q    And what about the numbered place requirement?  What is

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 27**

1  that?  And how does that relate to the discussion we've been

2  having?

3  A    Well, numbered place requirements had been used for some

4  elections in Alabama before 1961.  But in 1961, the legislature

09:46:09  5  adopted Act Number 221, which set forth a requirement that all

6  at-large elections or multi-member district elections in

7  legislatures require candidates to qualify for a specific

8  place -- Place Number 1, Place Number 2, Place Number 3, and so

9  on.

09:46:31 10      And the effect of that was to convert all elections in an

11  at-large system into head-to-head contests for a particular

12  place.  And it has the effect of eliminating the possibility of

13  single-shot voting; thereby making the 1951 municipal election

14  law prohibiting single-shot voting irrelevant.

09:46:56 15  Q    And with respect to these provisions -- the anti-single

16  shot law, the numbered place requirement -- who typically

17  passed that?  Were they passed at the local level?  The state

18  level?

19  A    In Alabama in that period, especially and for decades

09:47:18 20  afterwards, almost all jurisdictions lacked the authority to

21  set their own method of election.  The Alabama Legislature did

22  so.  And when localities wanted to change the method of

23  election, they had to operate through the local legislative

24  delegation from the county in which they were located.

09:47:44 25      And so there were a few cities that had home rule

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 28**

provisions under the Alabama municipal election code, as I

recall.  But other than home rule cities, the legislative

delegation was typically granted local courtesy by the entire

legislature in passing those laws.

09:48:08 Q    Can you put up paragraph 24 of Plaintiffs' Exhibit 81,

which appears on pages 15 and 16?

     And I'll just ask you:  What was the purpose of these

provisions -- the anti-single shot, the numbered place

requirement?  What was the purpose of those provisions?

09:48:31 A    To limit African-American abilities to elect

representatives of their choice.

Q    And how did you reach that conclusion?

A    I already referred to the racially explicit justification

for the anti-single shot law in 1951.  The evidence is in some

09:48:49 ways more dramatic, in regard to the 1961 numbered place law.

And I cite some of that specific evidence in my report in that

paragraph or in successive paragraphs.

Q    Okay.  What is the language that you're referring to, in

terms of the 1961 plan?

09:49:13 A    There is one news article in which Bob Ingram of *The*

*Montgomery Advertiser* said explicitly that the new law, Act

221, was -- and I'm quoting -- "aimed at Negroes as much as

anything else," end of quote.

     Mr. Ingram actually testified as a witness in the 1991

09:49:41 trial where I was an expert and did not recall that.  But he

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 29**

|   | | |
|---|---|---|
| 1 | | did write that in 1961. |
| 2 | Q | Is that in paragraph 26?  Is that quoted in paragraph 26? |
| 3 | A | Actually, that's quoted in paragraph 25 of the report. |
| 4 | Q | Okay. |
| 09:49:59 5 | A | But the most dramatic evidence is cited in paragraph 26 -- |
| 6 | Q | If we could pull that up, please? |
| 7 | A | -- in an indented quote. |
| 8 | Q | Paragraph 26, next page? |
| 9 | A | This was a speech given by Frank Mizell who was active in |
| 09:50:19 10 | | the democratic party leadership before the Alabama State |
| 11 | | Democratic Executive Committee in January of 1962. |
| 12 | | He was explaining to the executive committee why the |
| 13 | | democratic primaries would have to employ the numbered place |
| 14 | | requirement adopted by the legislature in 1961.  And he |
| 09:50:41 15 | | explained its purposes in, shall we say colorful language that |
| 16 | | it would no longer be considered politically correct. |
| 17 | Q | Yeah.  It's explicitly racist language; is that right? |
| 18 | A | Yes. |
| 19 | Q | Okay.  And that's seen in the indented paragraph in |
| 09:51:06 20 | | paragraph 26 of your first report? |
| 21 | A | Yes. |
| 22 | Q | Okay.  What effect, if any, did Jim Crow laws have on |
| 23 | | these provisions, or how did they interact with these |
| 24 | | provisions? |
| 09:51:25 25 | A | Well, recall that the state of Alabama, like the state of |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 30**

```
 1    Virginia in which I grew up, was operating under a system of
 2    official racial discrimination in all walks of life.  And so
 3    the social context in which the election process operated was
 4    affected by that.
```
09:51:43
```
 5         For example, I cite evidence of the racial disparities in
 6    educational levels of African-Americans and whites in Alabama
 7    cited in --
 8    Q    Pull up paragraph 28, which appears on pages 18 and 19.
 9    A    -- cited in Donald Strong's study of voter registration in
```
09:52:02
```
10    Alabama in 1956.
11         And that evidence I'm familiar with from a book I assigned
12    in teaching Alabama history Horace Mann Bond's classic study of
13    *Negro Education in Alabama*, which was his desecration at the
14    University of Chicago in 1939, where he first used per pupil
```
09:52:24
```
15    expenditure data by race for the funding of the white schools
16    and the Negro schools in the Jim Crow system, demonstrating
17    that there were quite remarkable racial disparities in the
18    funding for black and white schools at that time.  And other
19    studies have shown using similar data that this continued.
```
09:52:44
```
20         And consequently, every time the census measured
21    educational achievement, there was a racial disparity observed
22    even then in the 1950s and '60s between whites and blacks.  And
23    since the level of education of voters is considered by
24    political scientists analyzing the degree of political
```
09:53:04
```
25    participation from the 1960s forward to be the single most --
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 31**

1  usually the single most important determinative of voter

2  participation rates, certainly augmented by other social and

3  economic characteristics, such as poverty levels and access to

4  vehicles, educational disparities have a marked impact on the

09:53:30  5  degree to which poor people are able to register and vote --

6  poor people, whether white or black.

7  Q    What role, if any, did violence play in this history that

8  you have been discussing?

9  A    Well, violence was a significant factor in the late 19th

09:53:48  10  century.  And there were instances reported in studies of

11  Alabama, like other states, where there was sometimes physical

12  intimidation of persons seeking to register and vote.  But the

13  evidence on that score that I've examined is a lot less

14  dramatic than, say, in Mississippi.

09:54:09  15      But there were, of course, in -- well, in Birmingham in

16  the 1950s there were the bombing of various black churches not

17  directly related to the political process, but creating an

18  atmosphere of racial intimidation.  They were, of course, not

19  carried out by officials, but by members of the Klu Klux Klan,

09:54:35  20  or other similar organizations.

21      But in that period, of course, Birmingham was sometimes

22  referred to in the press as "Bombingham".

23  Q    Can you tell us what, if anything, you found regarding the

24  state's role in political violence against African-Americans at

09:54:53  25  any point in this history?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 32**

```
 1  A    Other than in the late 19th century, I can't recall any
 2  violence until the incident at the Edmund Pettus Bridge in
 3  Selma in 1965 where state troopers did attack physically Civil
 4  Rights marchers with the implicit authorization of Governor
 5  George Wallace in what was often referred to in the press as
 6  "Bloody Sunday".
 7  Q    And you mentioned in that last answer that other than in
 8  the late 19th century.  What in the late -- just briefly in the
 9  late 19th century, what role did the state either sponsored or
10  violence under the color of law play?
11  A    The only things I recall are local officials who were
12  involved as in Mobile, where I remember in the 1870s at one
13  point a piece of field artillery was rolled out into the
14  streets and pointed at the polls in the seventh ward of the
15  heavily black ward of Mobile in the 1870s.  But I don't think
16  that had anything to do with state officials.
17  Q    And going back to the "Bloody Sunday" violence that you
18  mentioned a moment ago, did this violence prompt intervention
19  from the federal government?
20  A    Yes.
21  Q    And how so?
22  A    Well, it played a significant role in stimulating voting
23  support in the Congress for the adoption of the Voting Rights
24  Act of 1965.
25  Q    So now I'd like to focus on the period after the Voting
```

09:55:23  5
09:55:44 10
09:56:05 15
09:56:24 20
09:56:38 25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 33**

1  Rights Act of 1965.  What effect did the Voting Rights Act have

2  on black registration in Alabama?

3  A    Well, because it struck down the use of tests or devices,

4  such as the literacy test, and understanding clauses, and the

09:57:00  5  requirement that new registrants have an existing registered

6  voter vouch for them when seeking to register, the Voting

7  Rights Act also provided for the use of federal examiners and

8  federal observers.

9      And in the early period -- in the early years after the

09:57:22  10  adoption of the Voting Rights Act, some Alabama counties did

11  have federal examiners who were sent in to register voters if

12  there was a determination in the federal government that that

13  was necessary to provide effective voter registration

14  opportunities.

09:57:43  15      Federal observers were sent in and continued to be sent in

16  right on through the 2006 Reauthorization Act in elections

17  where it was believed by federal authorities that there was a

18  possibility of interference with elections on the part of the

19  people running them against the interest of minority voters.

09:58:09  20      The federal examiners were rarely used, but the threat of

21  using federal examiners played a role, according to most of the

22  studies of this period, in encouraging local officials to

23  cooperate with the -- with the requirements of the Voting

24  Rights Act.

09:58:27  25      And in a few instances in Alabama -- I remember writing

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 34**

1   about two or three of them -- the state courts sought to

2   prevent the enforcement of the Voting Rights Act in their

3   jurisdiction.  And their decisions were overturned by federal

4   courts.

09:58:45 5   Q    And how did the state respond to the passage of the '65

6   Voting Rights Act?

7   A    Well, the state was one of many southern states that

8   supplied an amicus brief before the Supreme Court decision in

9   *South Carolina vs. Katzenbach.*

09:59:07 10  Q    And did the state or local jurisdictions in Alabama adopt

11  any dilutive practices after the passage of the '65 Act?

12  A    There were a number of counties as I recall which had not

13  yet adopted at-large elections that did shift back to use of

14  at-large elections.

09:59:26 15      The Wallace administration also encouraged private efforts

16  of voter mobilization.  And that's been studied by political

17  scientists.  And they think that plays a role in the fact that

18  while the Voting Rights Act enfranchised African-Americans in

19  Alabama, it also enfranchised a lot of white people who had

09:59:47 20  been -- who had previously not been voting, in part because not

21  only the Voting Rights Act, but a federal court determination

22  that the Alabama poll tax was unconstitutional.

23  Q    And what role did the Department of Justice, the federal

24  Department of Justice play in this process between 1965 and

10:00:11 25  1982?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 35**

1    A    Well, first of all, the Department of Justice -- I didn't

2    address this in my report.  But the Department of Justice did

3    play a substantial role in drafting the Voting Rights Act.

4         But what I did discuss in my report is that the

10:00:26  5    Department, in addition to sending federal observers or federal

6    examiners to which I've also already referred, was enforcing

7    the provisions of Section 5 of the Voting Rights Act which

8    required all voting changes --

9    Q    Paragraph 31, please, on Page 20.  Sorry to interrupt.

10:00:46 10    A    -- which required all voting changes from many

11    jurisdictions covered under the formula set out in Section 4 to

12    get federal approval of those voting changes either by

13    administrative review by the Department of Justice or by a

14    three-judge court in the District of Columbia.

10:01:07 15         Thus, the Department of Justice played a substantial role

16    in either preclearing, as they did most of the time, for

17    changes in voting in Alabama, but sometimes objecting when

18    there were changes that appeared to have racially

19    discriminatory -- the possibility of a racially discriminatory

10:01:27 20    effect, or were adopted with a racially discriminatory purpose.

21    Q    And do you discuss in your report how many times the

22    Department of Justice objected to proposed changes to elections

23    procedures in Alabama?

24    A    Yes.  I cite numerical data regarding objections in the

10:01:48 25    1970s, '80s, '90s, and the early 21st century.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 36**

1  Q    Okay.  And did you also cite data concerning the number of

2  times the federal government sent observers to Alabama?

3  A    I think I did at one period in the 1970s.

4  Q    Is that reflected in paragraph 31 of your report, which is

10:02:09 5  up on the screen?

6  A    Yes.

7  Q    Okay.  And did federal courts play a role in identifying

8  discriminatory conduct by Alabama officials during this period?

9  A    Yes.

10:02:30 10  Q    Can you discuss that?  I guess particularly with regard to

11  Hale County, Marengo County?

12  A    Well, the Hale County case that I cite in paragraph 32 was

13  a case decided by a District of Columbia court under Section 5

14  of the Voting Rights Act.

10:03:05 15      Hale County filed a lawsuit seeking a declaratory judgment

16  by the three-judge court in D.C. as I recall after the

17  Department of Justice had objected to a change from district to

18  at-large elections.  And the federal court enforced an

19  objection -- determined de novo to refuse preclearance to the

10:03:31 20  change.

21      The Marengo County case was a long running case which I've

22  studied a good bit.  And it began as an equal protection

23  challenge to the Fourteenth Amendment in the 1970s.  And I

24  think the first trial was held when the Equal Protection Clause

10:03:52 25  was the operative legal issue under which the Court was

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 37**

1    reviewing the matter.  But it was eventually decided, I think

2    in 1984, where Section 2, as amended in 1982, was the operative

3    legal basis for the Court's decision.  And the evidence in that

4    case was very substantial.  And it required a change from

10:04:14  5    at-large elections to the use of a fairly drawn single-member

6    district plan.

7    Q    And was there a similar court case in 1982 in the city of

8    Mobile?

9    A    Well, actually, the two Mobile cases -- one challenging

10:04:30  10   the county school board's at-large elections and the city

11   commission elections for the city of Mobile -- was decided in

12   1982 before the revision of the Voting Rights Act.  So it was

13   actually decided under the Equal Protection Clause, under the

14   intent standard before the creation of a Section 2 results

10:04:50  15   test.

16   Q    And what was the result of that case?

17   A    A change to single-member districts under which

18   African-Americans were able to elect representatives of their

19   choice.

10:04:59  20   Q    And was there a finding concerning discriminatory intent

21   in that case?

22   A    Yes.

23   Q    What was that finding?

24   A    That the adoption of at-large elections for the county

10:05:10  25   school board in 1876, and the adoption of at-large elections

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 38**

1  for the city commission in 1911 were adopted with a racially

2  discriminatory purpose and with a racially discriminatory

3  effect.

4  Q     Dr. McCrary, how was the 1982 amendment to Section 2 of

10:05:38 5  the Voting Rights Act relevant to your analysis of official

6  voting-related discrimination in Alabama?

7  A     Well, a part of the amended Section 2 sets out a totality

8  of circumstances case -- or a test under which the very first

9  factor was the history of racial discrimination affecting

10:06:02 10  voting about which you've been asking me.

11  Q     And after the 1982 amendments, what role did the

12  Department of Justice play in limiting voting-related

13  discrimination in Alabama?

14      And if we could put up paragraph 33, please.

10:06:18 15  A     Well, the Department brought numerous voting rights

16  lawsuits under Section 2 as it had under the Equal Protection

17  Clause focusing on Black Belt counties in Alabama.

18      But what I discussed in that paragraph is a case involving

19  the city of Pleasant Grove, Alabama, which initiated -- was

10:06:49 20  initiated from a Section 5 lawsuit by the city seeking

21  preclearance of changes involving annexations to which the

22  Department of Justice had objected.  Of course, the Department

23  was defending the interests of the United States in that

24  litigation.

10:07:08 25      That was a case that I have written about extensively,

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 39**

```
 1   including the legal issues used by the city in its -- and its
 2   treatment by the Supreme Court in deciding how to interpret the
 3   requirements of Section 5 of the Voting Rights Act.
 4        But as a practical matter, what the Court was doing was
 5   refusing to preclear certain annexations because they were a
 6   part of a pattern of racially selective annexations by the city
 7   in which efforts by surrounding black communities to seek
 8   admission into the city boundaries were rejected, whereas white
 9   jurisdiction -- white areas were routinely annexed as a part of
10   municipal policies.
11        And the city's defense was there were no black voters in
12   Pleasant Grove, so there couldn't be anything that would
13   signify retrogression because they had prevented them from
14   coming in.  And that was ultimately rejected by the federal
15   courts, including the United States Supreme Court, in the
16   decision I cite there.
17   Q    And how many times did the DOJ object to preclearance
18   submissions between 1982 and 2006 from Alabama?
19   A    I don't remember the precise numbers, but I set them out
20   in the report.
21   Q    Is it set out in paragraph 33 that's on the screen?
22   A    Yes.  I identify there seven objections from the state of
23   Alabama as a whole, and 39 from local jurisdictions, and that's
24   for the years between 1982 and 2006.
25        And I also note that the Department of Justice sent
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 40**

1   federal observers to monitor elections during that period to

2   Alabama jurisdictions 91 times.

3   Q    And can you just explain what -- is the sending of federal

4   observers, is that what you were discussing earlier when you --

10:09:28  5   I think -- I don't know if you called them observers or

6   inspectors?

7   A    I referred earlier to the use of federal examiners and

8   federal observers beginning in the late 1960s.

9        And while federal examiners were rarely used after 1980 to

10:09:44 10   my recollection, federal observers continued to be used to

11   observe elections where there were reports that there might be

12   racial problems at the polls.

13   Q    And was that the purpose -- or what under what

14   circumstances were federal observers sent?

10:10:06 15   A    Where there were reports from persons in a particular

16   jurisdiction, or knowledgeable observers, or sometimes actually

17   local officials that were relayed usually by telephone to the

18   Department of Justice staff and sometimes by written letters.

19   Q    Do you talk in your report about the case of *Harris vs.*

10:10:37 20   *Graddick* in 1984?

21   A    Yes.

22   Q    And what is the -- what did you -- what is the discussion

23   of that case?

24        And we can take down that paragraph.  Thanks.

10:10:45 25   A    Well, *Harris vs. Graddick* which in a later phase of the

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 41**

1    case was entitled *Harris vs. Siegelman,* when the Attorney

2    General was a different person -- involved the procedures for

3    appointing poll officials in local jurisdictions, which had

4    resulted in virtually no African-American poll officials.

10:11:13  5    And the evidence in the case before Judge Myron Thompson

6    documented that there was an intimidation factor in the

7    operation of elections in all-white polling, when all the poll

8    officials were white in a jurisdiction which was both minority

9    black and in majority black jurisdictions, especially for older

10:11:41  10   voters.

11   Q    And what happened in that case?

12   A    Well, as I recall, Judge Thompson issued a preliminary

13   injunction initially in *Harris vs. Graddick* that set up

14   procedures for trying to equalize the appointment of poll

10:12:02  15   officials, you know, governed by state law.

16   Q    And was that an important change in voting in Alabama?

17   A    Yes.  Along with many other changes, it increased the

18   opportunity for African-Americans to register and vote.

19   And the increasing parity between black registration and

10:12:24  20   white registration, or between black turnout and white turnout

21   that continued right up into the present day, the tendency to

22   merge toward parity, though never quite reaching parity, was we

23   think significantly influenced by the appointment of black poll

24   officials.

10:12:42  25   Q    And what's the importance of having black poll officials

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 42**

1   present at the polls?

2   A    It was intended, I suspect, and certainly had the effect

3   of giving the appearance of welcoming to voters whatever their

4   race.

10:13:04 5   Q    Were there any other decisions during this period --

6   roughly 1982 to 2006 -- that indicated racial discrimination in

7   voting in Alabama?

8   A    Well, the most important is *Dillard vs. Crenshaw County,*

9   *Alabama*, a case about which I've written extensively.  And that

10:13:24 10   was a case in which I served as an expert witness at the

11   preliminary injunction phase of the case in 1986.

12   Q    And what was the issue there?

13   A    The issue was the use of at-large elections where the

14   plaintiffs were arguing that there was a state policy of using

10:13:40 15   at-large elections to dilute minority voting strength whenever

16   African-Americans were in a position of substantial voting

17   strength where they could affect the outcome of elections.

18   Q    And what was the outcome of that?

19   A    The Court enjoined the further use of at-large elections

10:14:01 20   in the nine county commissions that were initially involved in

21   the litigation as defendants.

22        The plaintiffs then amended their complaint to add all the

23   municipalities and school boards in the state, where, as I

24   recall, there were at-large elections and no African-Americans

10:14:21 25   elected to public office.

**Caster Plaintiffs' Exhibit 85, Page 43**

1          Eventually, I think about 175 or 176 jurisdictions agreed

2    to go, and signed consent decrees agreeing to go from at-large

3    elections to either fairly drawn single-member district plans,

4    or to cumulative or limited voting plans if they preferred,

10:14:43 5   which allowed very substantial increases in minority

6    representation in local governing bodies.

7    Q    I'm going to turn to redistricting issues -- the history

8    of redistricting issues in Alabama.  And let me -- if we can

9    put up paragraph 37, please, of your report, which appears on

10:15:06 10  pages 23 and 24 of Plaintiffs' Exhibit 81.

11         And just beginning with the 1980s, can you please describe

12   what you found regarding the DOJ's preclearance submissions for

13   districting maps?

14   A    Well, the Department of Justice objected to state

10:15:31 15  legislative redistricting plans at least twice.  Initially on

16   the grounds that the plan was retrogressive because it reduced

17   the number of majority-minority districts from the benchmark

18   plan.  And in the second instance because it appeared

19   intentionally to fragment or crack minority voting strength in

10:15:58 20  some portion of the Black Belt counties.

21         Eventually, black plaintiffs filed a lawsuit, and the

22   Court ordered an interim plan for the 1982 elections.  And the

23   state agreed to a new redistricting plan in 1983, which was a

24   compromise with the plaintiffs that I suppose resulted in a

10:16:24 25  consent decree.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 44**

1  Q    Can we pull up paragraph 38 of Plaintiffs' Exhibit 81,

2  which appears on pages 24 -- just page 24?

3       In the 1990s redistricting cycle, what objections, if any,

4  did DOJ make to the state's congressional plan?

10:16:48 5  A    Well, the congressional plan was objected to by the

6  Department because an intentionally fragmented black population

7  concentrations in order to dilute minority voting strength.

8  And there was also a separate lawsuit in federal court and a

9  three-judge court ordered the use of an interim redistricting

10:17:14 10  plan for congressional seats.

11       And that interim plan, like the state legislative plan to

12  which the Department had objected, had only a single black

13  majority district, but it was the first black majority

14  congressional district in the state and allowed the election of

10:17:33 15  the first African-American to Congress since the Reconstruction

16  period.

17  Q    And were there any issues -- did DOJ object -- turning

18  from the 1990s, did the DOJ issue any objections to Alabama's

19  redistricting plan after the 2000 census?

10:17:57 20  A    No.

21  Q    And if we could put up paragraph 42, please.

22       And then looking at this last redistricting period, was

23  there a racial pattern in Alabama's legislators' vote for or

24  against the congressional plan that resulted from the 2011

10:18:23 25  redistricting?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 45**

1   A     Well, when I was reviewing the adoption of the 2011 plan,

2   one of the documents I examined carefully was the preclearance

3   submission from the state of that 2011 plan, because I'd always

4   found the submission documents to have very important

10:18:45 5   information.  And one of the things that the preclearance

6   submission letter from the state emphasized was the importance

7   of the fact that the legislature was now controlled by the

8   Republican party.

9        Now, the Republican party had not been in control of a

10:19:07 10   majority in the legislature throughout most of the period I've

11   been describing.  It was under Democratic control.

12        Beginning in the mid 1960s -- usually we attribute it to

13   the 1964 presidential election -- there was a growing tendency

14   of white voters to leave the Democratic party and go into the

10:19:28 15   Republican party.  Political scientists describe the pattern at

16   issue as a secular realignment; that is, a realignment that is

17   more gradual, not a critical realignment, but a gradual

18   realignment of voters.  And in this case, the white voters were

19   gradually leaving the Democratic party and going into the

10:19:51 20   Republican party with increasing tendency to switch parties

21   that culminated finally in Republican victories earlier than

22   2011.

23        But in 2010 the elections dramatically increased the

24   strength of the Republican party in the Alabama Legislature,

10:20:14 25   leading the state to emphasize the significance of that fact as

Caster Plaintiffs' Exhibit 85, Page 46

```
 1  a background factor in the redistricting plan adopted in 2011.
 2  Q    In your opinion, what caused the secular shift that you
 3  just described?
 4  A    Well, this is not something I've analyzed in my own
 5  research, but the studies by political scientists who have
 6  written about that process in Alabama, as in other southern
 7  states, emphasize the racial concerns that white voters had
 8  with the operation of the national Democratic party.
 9       Of course, there were antecedents to that in the Dixiecrat
10  movement in 1948, and objections in the party before 1965.
11  But, you know, this is a -- this is a subject that political
12  scientists have looked at, to answer your question.
13  Q    Okay.
14       MS. HOWELL:  Your Honor, before we go any further, I
15  need to belatedly lodge an objection.  That opinion is not
16  expressed anywhere Dr. McCrary's report, nor is anything about
17  the political shift or the partisan shift -- excuse me -- and
18  party affiliations in Alabama addressed anywhere in his report.
19       MR. SPIVA:  Well, it's addressed in -- the party
20  affiliations and the split in the vote is addressed right here.
21       But this is, I think is just a part of the history.  I
22  mean, he's discussing the history of racial issues in Alabama.
23  And it's pretty closely linked, I think, to the rest of his
24  opinion.
25       THE COURT:  Well --
```

Timestamps in left margin:
10:20:30 (line 5)
10:20:50 (line 10)
10:21:09 (line 15)
10:21:25 (line 20)
10:21:45 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 47**

```
 1              MR. SPIVA:  I don't intend to go any further with
 2        this.  That was --
 3              THE COURT:  Dr. McCrary said that he had not analyzed
 4        it himself, anyway.  So I wasn't giving a lot of weight to
10:21:58 5     that.
 6           But the report merely states a fact that the Republican
 7        party gained control in 2010.  I don't think there's any
 8        dispute about that.
 9           So sustained and overruled at the same time.  Okay?
10:22:14 10          MS. HOWELL:  Thank you, Your Honor.
11              THE COURT:  You may proceed.
12        BY MR. SPIVA:
13        Q   Let me turn to Senate Factor 2, Dr. McCrary, the existence
14        of racially --
10:22:29 15          THE COURT:  Well, are we leaving the 2011 submission?
16              MR. SPIVA:  Yes.  Yes.
17              THE COURT:  Okay.
18              MR. SPIVA:  Do you have questions?
19              THE COURT:  Well, that plan was precleared, was it
10:22:44 20     not?
21              THE WITNESS:  Yes, ma'am.
22              THE COURT:  Okay.  Thank you.
23        BY MR. SPIVA:
24        Q   Turn just briefly to racially polarized voting, the second
10:22:56 25     Senate factor.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0080/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 48**

1        And you were not asked to examine the extent of present

2    racially polarized voting in Alabama; is that correct?

3    A    That's correct.

4    Q    But did you examine the historical racially polarized

10:23:12  5    voting in Alabama?

6    A    Yes.  I cited a good bit of evidence about the history of

7    racially polarized voting in Alabama.

8    Q    Okay.  And maybe if we can put up paragraph 53 of your

9    report, which is on pages 32 to 33 of Plaintiffs' Exhibit 81.

10:23:43 10        First of all, what conclusion did you reach regarding the

11    history of racially polarized voting in Alabama?

12    A    Well, I reached the conclusion that racially polarized

13    voting was a dominant trend in Alabama voting practices from

14    the late 1940s, when blacks began voting in significant numbers

10:24:02 15    in elections that were meaningful, right on up through the last

16    period that I discussed; that is to say, up until recently.

17    And that this was a critical reason why the use of at-large

18    elections effectively diluted minority voting strength in the

19    past.  And so that's the general conclusion.

10:24:25 20    Q    Let me turn to Senate Factor 3, the use of mechanisms that

21    enhance the opportunity for discrimination.

22        And, Dr. McCrary, is it fair to say that you discussed

23    that in your discussion of the history of discrimination, some

24    of the things we've already been talking about this morning?

10:24:49 25    A    Yes.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 49**

```
      1    Q     Okay.  And that would be things like at-large elections,
      2    anti-single shot voting, et cetera?
      3    A     Well, at-large elections aren't classified as an enhancing
      4    device.  The term means to designate provisions that enhance
10:25:06  5    the discriminatory potential of at-large elections, which
      6    includes the use of anti-single shot laws, and numbered place
      7    laws, and other circumstances in other states.  It also
      8    includes majority vote requirements.
      9         And, you know, there's evidence that I cited in the
10:25:27 10    history of the use of enhancing devices that we've already
     11    covered.
     12    Q     And does the state engage in any such practices today?
     13    A     No.  It's -- I believe it's correct to say it's prohibited
     14    by federal court decisions.
10:25:44 15    Q     What about in terms of at-large elections?  Does the state
     16    continue to have at-large elections for certain offices?
     17    A     In some cases, yes.  Not in the legislature.  But, of
     18    course, there are at-large elections for judicial office in the
     19    state of Alabama.
10:26:07 20    Q     And you've served as an expert in a case challenging that,
     21    I take it?
     22    A     Actually in two cases involving judicial elections.
     23             THE COURT:  What were the results of those cases?
     24             THE WITNESS:  Well, in 1991 the plaintiffs failed to
10:26:26 25    prevail in SCLC vs. Evans or Siegelman, whatever the final
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 50**

```
 1   style of the case was.  And the more recent case is still
 2   pending before Judge Watkins, I believe.
 3   BY MR. SPIVA:
 4   Q    And that's the Alabama, I think, state conference NAACP
 5   case?
 6   A    Yes.  Yes.
 7   Q    Regarding Senate Factor 4, exclusion from slating process,
 8   that's not something that you looked at, correct?
 9   A    That's correct.
10   Q    And then -- and that's because there is no slating process
11   or was no slating process in Alabama?
12   A    That's correct, to my knowledge.
13   Q    And Senate Factor 5, the extent to which members of the
14   minority group bear the effects of discrimination, can you tell
15   us what conclusions you reached regarding this factor?
16        And if we could pull up paragraphs 54 and 55 of
17   Dr. McCrary's report, that would be good.  It's on pages 33
18   through 34.
19   A    Once again, I am not considering the current evidence of
20   racial disparities in socioeconomic characteristics and how
21   that affects the ability of African-Americans to participate in
22   office.  That's something that I -- that another expert has
23   testified about.
24        I was considering the history of socioeconomic
25   characteristics and their impact on political participation
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 51**

         1    rates relying primarily on the expert witness reports from a
         2    variety of cases, and relying on findings by -- factual
         3    findings by federal courts.
         4        I also have examined the census data, when looking at
10:28:27 5    expert witness reports, to confirm that I agreed with an
         6    expert's assessment in past cases; not in this case.
         7    Q    I mean, do you disagree with any of the plaintiffs'
         8    experts' assessment in this case?
         9    A    No.
10:28:42 10   Q    Okay.
        11    A    But that wasn't my charge.
        12    Q    Yeah.  And what does the social science literature about
        13    socioeconomic status and political participation state?
        14        And maybe if we can pull up paragraph 56 of his report?
10:29:04 15   A    Well, as I said in the report, there's little dispute
        16    among political scientists that lower socioeconomic
        17    characteristics tend to deter voter participation by everyone,
        18    not just along race lines.  But because African-Americans are,
        19    generally speaking, in most places substantially poorer and
10:29:29 20   less well-educated than whites in those jurisdictions, it
        21    naturally has a racial implication, as well.
        22        And the political scientists who have looked at the racial
        23    aspects of this -- of this question, agreed readily with
        24    that -- that extension.
10:29:47 25   Q    Did you reach any conclusions about whether

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 52**

|     |                                                                      |
| --- | -------------------------------------------------------------------- |
| 1   | African-Americans participate politically in Alabama at the          |
| 2   | same rate as non-Hispanic whites?                                    |
| 3   | A    Yes.  Relying on studies --                                     |
| 4   | Q    Paragraph 57, please.                                           |

10:30:00  5   A    -- relying on studies by political scientists that I cite

6   in my report, and also relying for the 1970s on reports by the

7   United States Commission on Civil Rights, I concluded that

8   there never has been complete parity in political participation

9   rates in Alabama.  Although we have, as I said earlier, moved

10:30:26 10   in the direction of parity over time as a result of the

11   enforcement of the Voting Rights Act and various federal court

12   orders.

13   Q    And did you review registration and turnout information

14   from more recent elections in Alabama?

10:30:42 15   A    Yes.  I looked at the Secretary of State's website in

16   Alabama and found that there continue to be, according to the

17   official records of the state, modest disparities between white

18   and black participation rates in 2018, which I think is the

19   first time racial turnout by race was reported by the Secretary

10:31:03 20   of State's office.

21              THE COURT:  And by "modest disparities," what do you

22   mean?

23              THE WITNESS:  I'm sorry, Your Honor.  I didn't hear

24   your question.

10:31:13 25              THE COURT:  I'm sorry.  By "modest disparities," what

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 53**

```
 1  do you mean?
 2          THE WITNESS:  That they were not as great as they used
 3  to be.  You know, I cite, I think, the specific numbers in the
 4  report from 2018, and also in the earlier decade from studies
10:31:30  5  published by political scientists.
 6          MR. SPIVA:  I'm trying to find the reference, Your
 7  Honor.
 8          MS. HOWELL:  Your Honor, I believe that's paragraph 60
 9  of his report.
10:31:40 10          MR. SPIVA:  Thank you.
11          THE COURT:  Thank you.
12          THE WITNESS:  Yes.
13  BY MR. SPIVA:
14  Q    And what do you report in paragraph 60, just for the
10:31:49 15  record?
16  A    That in 2018 -- in the 2018 general election, black
17  turnout remained lower than white turnout; 52.2 percent for
18  blacks, 55.1 percent for whites.
19          THE COURT:  So that's what you mean by "modest"?
10:32:05 20          THE WITNESS:  Yes.
21          THE COURT:  I am not a mathematician, but about a
22  3-point difference, 3 percentage point difference?
23          THE WITNESS:  In terms -- yes.  Yes, that's correct.
24  BY MR. SPIVA:
10:32:15 25  Q    And with regard to Senate Factor 6, racial appeals, that
```

**Caster Plaintiffs' Exhibit 85, Page 54**

```
 1    was not something that you were asked to look at in this case;
 2    is that right?
 3    A     No.  That's correct.
 4    Q     And with regard to Senate Factor 7, the extent to which
 5    the minority group has been elected to public office in the
 6    jurisdiction, what conclusion did you reach regarding this
 7    factor?
 8          And if we could maybe pull up paragraph 46 of
 9    Dr. McCrary's report which is on pages 28 and 29 of Plaintiffs'
10    Exhibit 81.
11    A     Well, in that paragraph, I report data from a 1981 report
12    that was prepared by lawyers in Alabama and became a part of
13    the record before Congress in regard to the amendments of
14    Section 2 -- of the Voting Rights Act in 1982.
15          And there were virtually no blacks elected to office in
16    Alabama except in black majority jurisdictions, or in a small
17    number of instances in single-member districts, which appear to
18    have been majority-minority districts.  But they were only a
19    handful of districts.
20    Q     Can we put up paragraph 48, which is on pages 29 to 30 of
21    Plaintiffs' Exhibit 81, of Dr. McCrary's first declaration?
22          Dr. McCrary, between Reconstruction and 1992, how many
23    African-American members of Congress were elected from Alabama?
24    A     None.
25    Q     And does that include U.S. senators?
```

Time stamps in left margin: 10:32:30 (line 5), 10:32:57 (line 10), 10:33:17 (line 15), 10:33:37 (line 20), 10:34:04 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 55**

304

1   A     Yes.

2   Q     And after 1992 how many African-American Congress people

3   have there been in Alabama?

4   A     One.

10:34:25   5   Q     Okay.  And do you describe in your report in paragraph 49

6   the history of election to statewide offices in Alabama?

7   A     Yes.

8   Q     What did you find?

9   A     That no African-Americans were elected to statewide office

10:34:54  10   in Alabama except in the context of judicial elections where

11   African-Americans were appointed to fill a vacancy in some

12   judicial office and then ran as incumbents for reelection,

13   beginning with Oscar Adams in, I think, 1982, early 1980s, and

14   continuing through the 1990s, when Ralph Cook and John England

10:35:20  15   were both appointed and elected to judicial office.

16        But beginning in the year 2000, even incumbent

17   African-American judges running for election have been

18   defeated, so that in the 21st century no black judges have been

19   elected statewide in the state of Alabama.

10:35:41  20   Q     And between 2000 and 2008, were there black candidates who

21   ran for statewide office that lost?

22   A     Yes.  I cite several in the report.  But all of them lost,

23   whether incumbents or not.

24   Q     Okay.  And Alabama has never had an African-American

10:36:18  25   governor?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 56**

```
 1   A    No.
 2   Q    And let me ask you about state legislative elections.
 3   What conclusion did you reach about African-American
 4   representation in the state legislature?
 5   A    Well, almost all African-Americans elected to the state
 6   legislature in Alabama have been elected under court-ordered
 7   single-member district plans.
 8        Beginning with the early 1970s -- 1973 or '4, something
 9   like that -- and the study of elections to legislative office
10   in Quiet Revolution in the South includes data on Alabama that
11   substantiates that for the period up through the end of the
12   1980s.  But I know that that continues to be the case.
13   Q    And let me just turn to the one additional relevant factor
14   in the -- articulated in the Senate report, the tenuousness of
15   the plan.
16        What is the tenuousness consideration, Dr. McCrary?
17   A    Well, under the Senate factors that were, as I said, taken
18   from the Supreme Court's criteria in White vs. Regester back in
19   1973, one of the factors that a court can consider is whether
20   the reasons given for the adoption of a particular election
21   method are tenuous.  And, of course, the way it's phrased by
22   the Court and by the Congress is somewhat ambiguous, but it is
23   essentially raising the question of assessing the credibility
24   of the reasons asserted for the adoption of the plan.
25   Q    Let me ask if we can put up paragraphs 44 and 45, which
```

10:36:31  5
10:36:59 10
10:37:29 15
10:37:50 20
10:38:15 25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 57**

          1   are on pages 27 and 28 of Dr. McCrary's first declaration,
          2   Plaintiffs' Exhibit 81.
          3        And let me ask you:  What was your opinion that you
          4   reached and reported in your report concerning the connection
10:38:41  5   between the past redistricting plan and -- well, let me strike
          6   that.  Let me get a better question.
          7        What opinion, if any, did you reach concerning tenuousness
          8   and the passage of the 2011 congressional plan?
          9   A    Well, when I examined the reasons asserted by the state in
10:39:03 10   its preclearance submission, which included legislative
         11   documents such as the guidelines adopted by the reapportionment
         12   committee, I concluded that the justification offered for the
         13   racial composition of Congressional District 7 were tenuous.
         14   Q    And how did you reach that conclusion?
10:39:29 15   A    Well, first, I reviewed what, of course, the state said
         16   its reasons for adopting the plan were.  And that's set out in
         17   the guidelines adopted by the legislature, which are very close
         18   parallels to the guidelines established in the 2000, 2001,
         19   which was actually what the state cited in its preclearance
10:39:55 20   submission.
         21        And those reasons included an awareness that all of the
         22   criteria that the state set out had to be subordinated if there
         23   were a conflict between the one person one vote requirement of
         24   the Voting Rights Act and compliance with the requirements of
10:40:20 25   the -- I'm sorry -- the one person one vote standard sent down

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 58**

1   in federal courts decisions since 1962 and '64, and also with

2   compliance with Voting Rights Act.

3   Q    Let me ask you:  Did the analysis of the electoral results

4   in CD 7, both before and after passage of the plan, weigh into

10:40:51 5   your analysis of tenuousness?

6   A    Yes, they did.

7   Q    And how so?

8   A    Well, in addition to the point I initially stated, the

9   guidelines set out an understanding of the requirements of

10:41:06 10   Section 5 of the Voting Rights Act as to retrogression.

11       And the standards that it set out to govern the adoption

12   of a congressional redistricting plan were the same as the

13   guidelines for adopting legislative plans.

14       And as the Court I'm sure is well aware, the Alabama --

10:41:28 15   the U.S. Supreme Court found that that -- that guideline

16   provision was not a correct interpretation of the retrogression

17   standard under Section 5, and was a part of the evidence the

18   Court considered in reaching a conclusion that the legislative

19   plans were racial gerrymandering.

10:41:54 20   Q    What about the margins by which the representative of CD 7

21   had been elected both before and after the adoption of the

22   plan, which is reported in paragraph 44 of your report?

23   A    Well, the incumbent in Congressional District 7 had been

24   elected with over 70 percent of the vote, which indicates that

10:42:15 25   the racial -- the African-American composition of the district

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 59**

1  was far higher than necessary to provide a fair opportunity to

2  elect candidates of their choice for minority voters.  And in

3  fact, the margins for prior congressional elections in

4  Congressional District 7 going back into the 1990s was also far

10:42:39  5  higher than needed to provide a fair opportunity to elect.

6       Recall that the standards set out in the Department of

7  Justice's guidelines for the administration of Section 5, as

8  the Court notes in the ALBC case, have always required a

9  functional analysis of the electoral process in order to assess

10:43:04 10  the degree to which the effect of a plan, the expected effect

11  of a plan would be retrogressive.

12       In other words, the Department of Justice, like the

13  federal courts, and like all the expert witnesses in addressing

14  redistricting questions, considers the level of registration

10:43:27 15  and turnout by minority voters -- I'm sorry -- by the minority

16  population and the majority group in the population.  It

17  considers the role of primary elections and general elections

18  in the outcome, because sometimes that can affect the level of

19  functionality.  It depends on an assessment of the degree to

10:43:54 20  which there is, despite racially polarized voting, a sufficient

21  degree of white crossover voting to provide an opportunity to

22  elect foreign minority voters if they are in coalition with

23  that white crossover group.

24       So all of these are a functional analysis that the

10:44:15 25  Department of Justice and federal courts have always followed

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 60**

1   really since the 1970s in assessing a redistricting -- a

2   particular district in a redistricting plan.  And where a

3   district is significantly higher than it needs to be under that

4   functional analysis, political scientists and historians and

10:44:37 5   the courts refer to that as packing.

6        And, you know, there were periods in the past where a

7   district might be 70 or 80 percent black, and that certainly

8   would constitute packing.  But it's not necessary to understand

9   the meaning of the term packing that it be that high.  If it is

10:44:58 10   far higher than it needs to be, then the plan is packed.

11   Congressional District 7 was already packed, and it continued

12   to be packed.

13        In the 2011 plan, the justification offered was tenuous in

14   the sense that the state took the position, and it states this

10:45:17 15   in its preclearance submission that there -- that you could

16   not -- that the jurisdiction could not reduce the minority

17   percentage in the district without violating the retrogression

18   standard of Section 5, and that's just incorrect.  And I say

19   that not as a matter of law, but by observing how the

10:45:37 20   Department of Justice has administered the plan over the last

21   few decades during a quarter century, of which I was actually

22   involved in the enforcement of Section 5.

23   Q    Thank you.

24        THE COURT:  We've been going for a while.  I kept

10:45:53 25   waiting for a time, but I'm not sure this is a good one, but I

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 61**

310

1   think we're going to go on and take a break.  We will come back

2   at 11:00 o'clock.

3           MR. SPIVA:  Thank you, Your Honor.

4           (Recess.)

11:03:31  5           THE COURT:  You may proceed.

6           MR. SPIVA:  Thank you, Your Honor.

7   BY MR. SPIVA:

8   Q    Dr. McCrary, I think we left off before the break with

9   Your Honor's question about preclearance of the 2011 plan.

11:03:48 10       Does the fact that the 2011 plan was precleared, i.e.,

11   determined not to be retrogressive indicate it also complies

12   with Section 2 of the Voting Rights Act?

13   A    No.  Every preclearance letter contains boilerplate

14   language saying that determination under Section 5 doesn't

11:04:08 15   signify that the voting change is in compliance with Section 2

16   of the Voting Rights Act, or I think the Fourteenth and

17   Fifteenth Amendments.

18   Q    And are you saying DOJ should not have precleared the plan

19   because of packing?

11:04:25 20   A    No.

21   Q    And why is that?

22   A    Well, the analysis of packing is only a part of what would

23   make a plan objectionable if there is other evidence of

24   discriminatory purpose in the decision-making process.  So that

11:04:48 25   if there were such evidence, the Department could object under

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 62**

1    the purpose prong of Section 5.

2        But I have no idea whether the Department considered or

3    found any evidence that would have justified a purpose

4    objection.  So as far as I'm aware, the plan, which was

11:05:10 5    challenged in federal court as well as in the Department's

6    administrative process, was assessed under the purpose prong.

7    I didn't work on that case.

8    Q    Let me turn to your rebuttal report, Dr. McCrary, which is

9    Plaintiffs' Exhibit 82 and just ask you a couple of questions

11:05:31 10   about that.

11       In your rebuttal report or your second declaration, were

12   you responding to defendant's experts' assertions that the

13   definition of black for purposes of the *Gingles* analysis should

14   exclude multiracial and/or ethnically Hispanic

11:05:54 15   African-Americans?

16   A    Yes.  I was asked to respond to only that specific point.

17   Q    And can you describe or can you state your response to

18   that assertion?

19   A    Well, what I said in my report was, first of all, that all

11:06:10 20   the expert witness reports that I've examined over the years

21   are consistent with the approach that Mr. Cooper takes in his

22   analysis in his report in this case, and that it's also

23   consistent with the way the term black has been -- or Negro in

24   earlier decades -- has been assessed in Alabama, both in

11:06:34 25   Alabama law, as I understand it, and in practice.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 63**

```
 1   Q     All right.  And you're referring to the one drop rule?

 2   A     Yes, among other things.

 3   Q     Okay.  What was the one drop rule?

 4   A     Well, the idea was that any degree of Negro ancestry makes

 5   a person a Negro.  And that, of course, was something that

 6   could practically be enforced only if there were visible

 7   evidence or local knowledge of the race of the person.  But

 8   that's what the law required.

 9         And in all of the segregated societies of the south, if a

10   person were of Negro parentage, that would -- meant that they

11   would go to a racially segregated school -- school for Negro

12   students.

13   Q     Based on your experience working in voting rights and in

14   the DOJ, what is the proper way to define African-American in

15   this case?

16   A     I'm not sure precisely what you're asking me.

17   Q     In terms of any-part black and single-race black.

18   A     Well, first of all, in most jurisdictions, it doesn't make

19   much difference which definition you use unless you're in a

20   jurisdiction with numerous racial groups and attitudes toward

21   race that are different from southern states such as Alabama.

22         But the usual procedure is to use any -- any evidence of

23   blackness.  Remember we're talking about reported data in most

24   cases here, unless the expert has to rely on census data and

25   states that don't have racial identification of registered
```

11:06:55 (line 5)
11:07:17 (line 10)
11:07:37 (line 15)
11:07:57 (line 20)
11:08:25 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 64**

```
      1  voters and so on.
      2       So any-part black is the most logical racial variable to
      3  use in an exercise such as Mr. Cooper's engaging in.  But it
      4  wouldn't make any practical difference if he used an
11:08:49 5  alternative definition in most instances, and I suspect in
      6  Alabama.  If there were evidence to the contrary, I would
      7  certainly consider it.  But I wouldn't expect to see it.
      8  Q    Thank you, Dr. McCrary.  I have no further questions.
      9            THE COURT:  Cross-examination?
11:09:05 10           MS. HOWELL:  Thank you, Your Honor.
     11                    CROSS-EXAMINATION
     12  BY MS. HOWELL:
     13  Q    All right.  Good morning, Dr. McCrary.  I think we're
     14  still in morning.
11:10:15 15  A    Good morning, Ms. Howell.
     16  Q    I'm going to tell you on the front end I'm going to try
     17  and use the Elmo to show you parts of your report on a less
     18  tech savvy scale than what plaintiffs' counsel was able to do.
     19  But if that doesn't work out, then I do have hard copies that I
11:10:33 20  can give to you and to the Court to facilitate questioning.
     21       So you were brought on as an expert in this case to talk
     22  about the history of racial discrimination in Alabama; is that
     23  right?
     24  A    Among other things, yes.
11:11:00 25  Q    Okay.  And you've been qualified as an expert in the
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 65**

```
 1  history of voting discrimination in Alabama?
 2  A    Yes.
 3  Q    Okay.  So -- we'll start back.  Does Alabama have a white
 4  primary today?
11:11:25  5  A    No.
 6  Q    Okay.  How long has it been since Alabama has had a white
 7  primary?
 8  A    Since 1945.
 9  Q    Does Alabama have a poll tax today?
11:11:34 10  A    No.
11  Q    How long has it been since Alabama had a poll tax?
12  A    Since 1966, I believe.
13  Q    Okay.  Does Alabama use a literacy test today?
14  A    No.
11:11:42 15  Q    How long has it been since we had a literacy test in
16  Alabama?
17  A    Since 1965.
18  Q    And you don't know of anyone from the 1901 constitutional
19  convention who is still alive and kicking and legislating in
11:11:57 20  Alabama today, do you?
21  A    I certainly do not.
22  Q    Okay.  Your report addresses an awful lot of history that
23  occurred prior to 1965 and the passage of the Voting Rights
24  Act; is that correct?
11:12:13 25  A    That's correct.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 66**

1    Q    Okay.  And the bulk of it up until probably paragraph 33,

2    I think, only addresses events that occurred prior to about

3    1985.  Would that be a fair characterization?

4    A    That's probably right, yes.

11:12:30  5    Q    And 1985 was about 30 years ago or so, right?

6    A    34.

7         THE COURT:  We don't do math around here.  We're

8    lawyers.

9    A    Pardon?

11:12:45 10        THE COURT:  We're lawyers.  We don't do math.

11   BY MS. HOWELL:

12   Q    You talked a lot about at-large elections and their use

13   across the state of Alabama, and local jurisdictions in

14   particular, correct?

11:13:12 15   A    Yes.

16   Q    The state of Alabama doesn't use at-large elections to

17   elect its Congressmen or women, does it?

18   A    No, not anymore.

19   Q    And it hasn't since about 1970, right?

11:13:24 20   A    Since it was outlawed by the Congress of the United States

21   in 1967, I think it's required to use single-member districts.

22   Q    I want to talk to you a little bit about a paragraph in

23   your report that plaintiffs' counsel didn't really take up with

24   you, but which you mentioned in one of your opening comments,

11:13:53 25   which is paragraph 36.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 67**

```
 1          Now, this is really in your narrative of a history in
 2     voting registration in Alabama.  This is really the only
 3     paragraph that deals with something we might call relatively
 4     current.  Is that a fair characterization?
11:14:31  5  A    If you consider 2011 not current, yes.
 6     Q    But occurring at approximately the same time that the
 7     congressional districts were passed that are at issue in this
 8     case?
 9     A    I'm not sure I understand the question, Ms. Howell.
11:14:55 10  Q    Sure.
11     A    If you could pare it down.
12     Q    Let me rephrase that.  Current being things that happened
13     at approximately the same time or in the same era even as the
14     time that the congressional districts that are at issue in this
11:15:06 15  case were passed?
16     A    Well, I did talk about 2018 data in regard to assessing
17     the levels of registration and turnout in Alabama.  And I
18     talked about election history going up to shortly before the
19     2011 redistricting plan.  But my report is primarily focused on
11:15:30 20  the period before the adoption of the plan.
21     Q    Okay.  Thank you.
22          So in this paragraph, in paragraph 36, you talk about the
23     implementation of the voter ID law in Alabama?
24     A    Yes.
11:15:43 25  Q    And your report concluded, and we discussed this in your
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 68**

         1   deposition, that the voter ID law disproportionately burdened

         2   African-American voters; is that right?

         3   A    That's correct.

         4   Q    And when we discussed it at your deposition, I showed you

11:15:58 5   the opinion in that case, did I not?

         6   A    You did.

         7   Q    And then you subsequently went back in your errata and

         8   made a correction that you didn't believe that the statement

         9   that you made in this paragraph of the report, that the voter

11:16:11 10  ID law disproportionately burdened African-American voters was

        11   incorrect?

        12   A    That's correct.

        13   Q    Okay.  So that case was decided by a court in 2017,

        14   correct?

11:16:41 15  A    I don't remember the precise day, but I will take your

        16   word for it.

        17   Q    Okay.  I'll just show to you that -- oh.

        18   A    Actually it was 2018, according to the --

        19   Q    Yes.

11:16:56 20  A    -- document you just put up.

        21   Q    I have gotten my years mixed up.  We don't do math here.

        22   I do recall.

        23   A    How do you deal with birthdays?

        24        THE COURT:  Forget them.

11:17:09 25        MS. HOWELL:  Or allow your parents to remember them in

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 69**

           1   some instances.
           2          THE WITNESS:  Sorry for that, Your Honor.  I didn't
           3   mean to be --
           4          THE COURT:  That's okay.  I have forgotten many
11:17:21   5   birthdays of mine.
           6   BY MS. HOWELL:
           7   Q    Now, can you tell me which court issued a decision in this
           8   case?
           9   A    This was decided by the district court in the Northern
11:17:42  10   District of Alabama.
          11   Q    Okay.  Which is the same court that we're currently
          12   before, right?
          13   A    Yes.
          14   Q    And that case is still on appeal, correct?
11:17:49  15   A    I actually don't know that.  I will take your word for it.
          16          MS. HOWELL:  Your Honor, may I approach the witness
          17   with a copy of this opinion?
          18          THE COURT:  You may.
          19          MS. HOWELL:  And would Your Honor like a copy of the
11:18:04  20   opinion?
          21          THE COURT:  Sure.  I don't have enough to read in this
          22   case.
          23   BY MS. HOWELL:
          24   Q    So on the copy that I've given you, and which I'm going to
11:18:25  25   try and negotiate here on the Elmo, as well, there is a page

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 70**

1  that is tabbed.

2  A    Yes.

3          MS. HOWELL:  Your Honor, it's page 15 of the opinion.

4  BY MS. HOWELL:

11:18:59 5  Q    So on the copy that is on the Elmo, you'll see that I have

6  highlighted a portion.  And I wondered if you could read that

7  highlighted portion for me.

8  A    This highlighted portion says, "Frankly, the discrepancy

9  in photo ID possession rates among white, black, and Hispanic

11:19:18 10  registered voters in Alabama is minuscule.  In other words, it

11  appears that very few registrants of any racial group may

12  presently be affected by the photo ID law."

13  Q    Okay.  So when your report said that the voter ID law

14  disproportionately burdened African-American voters, do the

11:19:48 15  Court's words give you any pause about whether it reached the

16  same conclusion?

17  A    Not in those two sentences.  But the Court does say there

18  is a statistical disparity in the possession of photo ID

19  requirements.  And my recollection is that in another portion

11:20:03 20  of the opinion the Court notes that Secretary of State Merrill

21  conceded that there were numerical disparities in possession of

22  photo ID.

23       What the Court says here is that the rate is minuscule, in

24  the Court's words, or it's not great enough to worry about; not

11:20:23 25  that there were no racial disparities.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 71**

320

1    Q    Okay.  Is a racial disparity -- is a disparity in

2    possession rates the same thing in your mind as a

3    disproportionate burden?

4    A    It depends on the circumstances.  The Court here reaches

11:20:38  5    the conclusion that because they could -- as I recall the

6    opinion, because they could get photo ID documents that would

7    satisfy the requirements of the Alabama law, that this is not

8    burdensome.  And the Court has legal reasoning that I don't

9    recall that would further buttress that opinion.

11:21:04 10       The Court reached the conclusion that isn't inconsistent

11   with the fact that I cited that there's a racial disparity in

12   possession, which I interpreted as creating a burden.

13   Q    Okay.  Well, your report, in fact, doesn't make any

14   mention of a disparate possession rate, but it does say that it

11:21:25 15   disproportionately burdened African-American voters?

16   A    Well, that's what I meant by possession rate is evidence

17   of burden.

18   Q    Okay.  So I've moved the opinion down a little bit and

19   have further highlighting.  And if I could also get you to read

11:21:40 20   those portions that are highlighted, as well.

21   A    The Court says, "Anyone without a photo ID can obtain one

22   for the sole" --

23   Q    I'm sorry, Dr. McCrary.

24   A    I'm sorry.  You asked me about Dr. Siskin's estimate?

11:21:56 25   Q    Yes.  And we'll clarify for the record, Dr. Siskin was one

**Caster Plaintiffs' Exhibit 85, Page 72**

1  of plaintiffs' experts in that case, correct?

2  A    Yes.  I'm sorry.  I skipped that passage.

3  Q    No.  That's quite all right.

4  A    "But in the end, Dr.  Siskin's estimate does not

11:22:08 5  matter" -- that is, his estimate that found a racial disparity

6  in the possession rate.  "This is because a person who does not

7  have a photo ID today is not prevented from voting if he or she

8  can easily get one.  And it is so easy to get a photo ID in

9  Alabama, no one is prevented from voting."

11:22:28 10  Q    Okay.  And would you mind continuing with the further

11  highlighted portion?

12  A    "Anyone without a photo ID can obtain one for the sole

13  purpose of voting, free of charge.  These IDs can be obtained

14  at Secretary Merrill's office at the state capital building in

11:22:43 15  Montgomery, any board of registrars' office located in each

16  county and open during daily business hours, or to an event

17  where the secretary's mobile ID unit is visiting."

18  Q    Okay.  Thank you.

19       And that takes me to actually the very next sentence in

11:23:01 20  your paragraph 36, where you say "Subsequently, the state

21  closed 31 driver's license offices located in predominantly

22  poor and African-American areas making it disproportionally

23  more difficult for black voters to acquire the identification

24  necessary to vote."  Did I read that correctly?

11:23:24 25  A    Yes.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 73**

322

| | |
|---|---|
| 1 | Q    But what the opinion actually says, right, is that there |
| 2 | are far more opportunities in other places to get the required |
| 3 | photo ID under that law; is that correct? |
| 4 | A    That's correct. |
| 11:23:35 5 | Q    Okay.  So that whether those driver's license offices were |
| 6 | closed or were, in fact, subsequently reopened as they were, |
| 7 | that would not have been the thing that prevented any voter |
| 8 | from getting the identification necessary to vote? |
| 9 | A    I'm uncertain about the dates of those closures in |
| 11:23:56 10 | relation to the Court's ruling.  They were -- were they before |
| 11 | the Court's decision in 2018?  I mean, I read about them in the |
| 12 | newspapers, and I just don't remember the exact period in which |
| 13 | it occurred. |
| 14 | Q    Certainly.  But the Court's point was, in fact, was it |
| 11:24:15 15 | not, that other IDs were available and readily so for no charge |
| 16 | whatsoever regardless of what the driver's license offices' |
| 17 | availability was? |
| 18 | A    Yeah.  That's correct.  I don't remember that the Court |
| 19 | referred to the closing of DMV offices. |
| 11:24:36 20 | Q    Okay.  Now, you talked some about racially polarized |
| 21 | voting in Alabama in your report as part of the historical |
| 22 | context for understanding the history of voting discrimination |
| 23 | in Alabama, right? |
| 24 | A    Yes. |
| 11:25:19 25 | Q    Okay.  And you are not discussing racially polarized |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 74**

1 voting as a statistical expert in this case, right?

2 A    That's correct.

3 Q    Okay.  But based on the testimony that you have given this

4 morning, isn't voting going to be racially polarized in any

11:25:40 5 state where a majority of white voters tend to vote Republican?

6 A    Well, it depends on the racial composition of the voters

7 who identify as Republican.  In most states, that would

8 certainly be true.

9      In the sense that the Republican party has become

11:25:58 10 overwhelmingly a party of white voters and the Democratic party

11 is cohesively supported by a substantial majority of

12 African-Americans, that's a reflection of the racial disparity

13 in party identification.

14 Q    So in a state like Alabama, where the vast majority of

11:26:16 15 black voters vote for Democratic candidates, and the vast

16 majority of whites voters vote for Republican candidates, there

17 will always be racially polarized voting in a state where white

18 voters vote Republican?

19 A    Not always, but usually.

11:26:30 20 Q    Okay.  Now, you also talked about the history a little bit

21 of objections to Alabama's prior congressional districts.  And

22 I believe that's at paragraph 38 of your report -- or

23 paragraphs 37 and 38.

24      And, specifically, you talked about the objections that

11:27:08 25 the Department of Justice lodged in 1992 to Alabama's

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 75**

```
 1  congressional district, right?

 2  A    One objection, I think.

 3  Q    Okay.  And Alabama was ordered to/agreed to draw a single

 4  majority-minority district in response to that, correct?

 5  A    Well, my recollection is that simultaneously there was a

 6  lawsuit in federal court and that -- I don't remember the

 7  precise connection between the DOJ objection and the Court's

 8  order, but I know that the Court ordered an interim

 9  redistricting plan to be in effect.

10  Q    Okay.  But that redistricting plan had just the single

11  majority black district, correct?

12  A    That's correct.

13  Q    Okay.  And that is what your report says, right?

14  A    Yes.

15  Q    Okay.  Alabama has never been ordered to draw a second

16  majority-minority district, has it?

17  A    Not to my knowledge.

18  Q    Okay.  You also talked some about the tenuousness of

19  rationales given for making a particular election law or

20  electoral change, I guess.  That was in paragraph 45 of your

21  report.  Do you recall talking about that?

22  A    Yes.  But let me get paragraph 45 to see precisely what

23  you're referring to.  Sorry.

24  Q    But your conclusion about the tenuousness of the

25  rationales given for drawing Alabama's congressional districts
```

Timestamps in left margin: 11:27:25 (line 5), 11:27:49 (line 10), 11:27:58 (line 15), 11:28:22 (line 20), 11:29:10 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 76**

1  in 2011 was that nothing but tenuous justifications had been

2  given, and that's what you indicate in the last sentence of

3  that paragraph?

4  A    No, not that nothing was ever asserted, but that the

11:29:28  5  assertions didn't require maintaining the same racial

6  composition or higher composition of blacks in the district.

7  Q    Are you able to distinguish that from passage of the 2011

8  congressional plan?

9  A    No.  I'm referring to the comparison with other criteria

11:29:54 10  that are set out in the guidelines.  And because the drawing of

11  the district falls into the category that political scientists

12  would and historians would characterize as packing, and under

13  some circumstances, that is to say, if there was Section 2

14  voting rights lawsuit, then that issue would have become an

11:30:21 15  issue that wasn't an issue in the Section 5 review, that

16  compliance with Section 2 of the Voting Rights Act would have

17  to take into account the fact that the district was packed.

18      And all the other criteria was supposed to be subordinated

19  to compliance with the Voting Rights Act, the one person one

11:30:42 20  vote requirement in federal reapportionment law, and the Equal

21  Protection Clause.

22  Q    Okay.  But your paragraph ends with the conclusion that

23  the justifications for drawing Congressional District 7 the way

24  that it was drawn appear to have been tenuous, at best; is that

11:31:04 25  correct?

**Caster Plaintiffs' Exhibit 85, Page 77**

326

```
 1  A    Yes.
 2  Q    And you're not an expert in legislative intent, are you?
 3  A    Well, I've testified about discriminatory intent in all
 4  manner of cases over the last 40 -- I'm sorry -- 39 years.
 5  So, you know, I am routinely considered an expert on
 6  assessing the degree to which the intent underlying the
 7  adoption of any law or redistricting plan is racially
 8  discriminatory.
 9  Q    Do you know who had input into the drawing of
10  Congressional District 7?
11  A    I didn't make that examination.  I only examined the
12  documents submitted for Section 5 review by the state.
13            THE COURT:  So is your answer that you do not know who
14  had input?
15            THE WITNESS:  Well, I know it was the legislature.
16  But beyond that, I don't know anything -- any details about it.
17  I haven't investigated that.
18  BY MS. HOWELL:
19  Q    Okay.  And you don't know the intent of any of the
20  legislators or other people who had any kind of input into the
21  drawing of that district?
22  A    No.  I wasn't asked to assess the intent behind the plan.
23  Q    Do you consider obtaining preclearance from the Department
24  of Justice to be a tenuous justification?
25  A    No.  That's one consideration in drawing the plan, as the
```

The timestamps in the left margin: 11:31:16 (line 5), 11:31:33 (line 10), 11:31:49 (line 15), 11:32:00 (line 20), 11:32:16 (line 25).

**Caster Plaintiffs' Exhibit 85, Page 78**

```
    1  guidelines indicate.
    2  Q    Okay.  And you were, in fact, employed at the Department
    3  of Justice when the 2011 congressional plan was precleared,
    4  right?
11:32:27 5  A    That's correct.
    6  Q    Okay.
    7         MS. HOWELL:  Your Honor, could I have a moment?
    8         THE COURT:  You sure may.
    9         MS. HOWELL:  Dr. McCrary, I think that's all I have
11:33:14 10  for you at the moment.  Thank you.
   11         THE COURT:  Any redirect?
   12         MR. SPIVA:  Yes.
   13         THE WITNESS:  Ms. Howell, do you need this document
   14  back?
11:33:21 15         MS. HOWELL:  No.  You're free to keep it if you'd
   16  like.
   17                     REDIRECT EXAMINATION
   18  BY MR. SPIVA:
   19  Q    Dr. McCrary, I'd like to begin with the discussion of
11:33:52 20  voter ID.  You recall the discussion of that on your
   21  cross-examination where Ms. Howell had you read certain
   22  portions of the Merrill vs -- Greater Birmingham Ministries vs.
   23  Merrill decision?
   24  A    Yes.
11:34:08 25  Q    And when you were deposed, did you have an opportunity to
```

**Caster Plaintiffs' Exhibit 85, Page 79**

```
  1   review the full opinion?

  2   A    No.  I foolishly agreed to answer questions based on a

  3   cursory examination during the deposition, which didn't give me

  4   an opportunity to read the entire opinion.  And thus I gave an

  5   incorrect answer in the deposition.

  6   Q    And did you submit an errata upon reviewing your

  7   deposition transcript?

  8   A    I did.  And I corrected my concession that I had been

  9   wrong in the declaration about the numerical disparity in the

 10   possession of photo IDs.

 11   Q    That's right.  Dr. McCrary, as I tell my kids, I have made

 12   a mistake before.  I thought I was wrong, but I wasn't.

 13          MR. SPIVA:  If I can use the Elmo -- and this is going

 14   to really test my skills, Your Honor.

 15   BY MR. SPIVA:

 16   Q    Dr. McCrary, you recall that Ms. Howell had you read a

 17   couple of portions of this opinion?

 18   A    Yes.

 19   Q    And I want you to -- I'd like to ask you to read a couple

 20   of the portions around the portions she asked you to read.

 21          THE COURT:  Can you identify which page number that's

 22   on, please?

 23          MR. SPIVA:  Yes.  Yes, Your Honor.  This appears on

 24   page 15 in the printed Westlaw copy.

 25   BY MR. SPIVA:
```

11:34:33 (line 5)
11:34:47 (line 10)
11:35:05 (line 15)
11:35:23 (line 20)
11:35:38 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0080/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 80**

1  Q    And if you could read the highlighted portions of this --

2  of the opinion that surround the areas that Ms. Howell had you

3  read.

4  A    Okay.  It begins with data from the plaintiffs' expert in

11:35:52 5  that case, Dr. Siskin.

6       "1.37 percent of white registered voters, 2.44 percent of

7  black registered voters, and 2.29 percent of Hispanic

8  registered voters may not currently have an acceptable photo

9  ID."

11:36:10 10  Q    And then further down after the section that Ms. Howell

11  had you read it says -- where it says "nonetheless"?

12  A    "Nonetheless, the numbers show that black and Latino

13  registered voters are almost twice as likely as white voters to

14  lack an acceptable photo ID for voting."

11:36:25 15  Q    Okay.  Thank you.

16       And do you know in terms of when -- you're familiar with

17  Shelby County, the Shelby County decision?

18  A    Yes.  I worked on the case.

19  Q    Okay.  And that eliminated essentially the preclearance

11:36:44 20  regime under the Voting Rights Act?

21  A    Yes.  By finding that the formula for coverage of Section

22  5 to be unconstitutional, the Court's decision effectively

23  eliminated the preclearance review process.

24  Q    And do you know whether Alabama's photo ID law was

11:37:03 25  passed -- was enacted before or after the Shelby County

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 81**

330

```
        1  decision was issued?
        2  A    My understanding is it was after the elimination of
        3  preclearance review.
        4  Q    Okay.  And so does that mean -- was Alabama's voter ID law
11:37:20 5  subject to preclearance?
        6  A    No.
        7  Q    Okay.  You recall Ms. Howell asked you some questions
        8  about the closure of the DMV offices, the 31 DMV offices
        9  located in predominantly poor and African-American areas that
11:37:43 10 you reported in paragraph 36 of your report?
       11  A    Yes.
       12  Q    And are you aware that those offices were opened back up
       13  prior to the photo ID opinion pursuant to an agreement between
       14  Alabama and the U.S. Department of Transportation?
11:38:07 15 A    That's my recollection, that the closure of the driver's
       16  license offices was several years, probably two or three years
       17  at least prior to the Court's decision.
       18  Q    So that situation had been remedied at the time that the
       19  Court issued its decision saying that it would be easy in the
11:38:26 20 Court's findings to obtain a free ID?
       21  A    Well, the closure of those offices had been remedied, yes.
       22  Q    Correct.  And were you aware that the U.S. Department of
       23  Transportation had made a finding that the closings
       24  disproportionately hurt black residents?
11:38:45 25 A    I recall that from news coverage, but I didn't factor that
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 82**

331

| | |
|---|---|
| 1 | into my declaration. |
| 2 | THE COURT:  Do you know how long those offices were |
| 3 | closed? |
| 4 | THE WITNESS:  I don't recall, Your Honor.  My |
| 11:39:00  5 | recollection is it was for some months. |
| 6 | THE COURT:  A few months as opposed to years? |
| 7 | THE WITNESS:  That's my recollection. |
| 8 | BY MR. SPIVA: |
| 9 | Q    Dr. McCrary, you were asked some questions about how long |
| 11:39:16 10 | it had been since Alabama had a poll tax, since Alabama, you |
| 11 | know, had a literacy test, et cetera. |
| 12 | Do you recall Ms. Howell asking those questions? |
| 13 | A    I do. |
| 14 | Q    And do you believe that the history pre-1965 of voting |
| 11:39:40 15 | discrimination in Alabama is irrelevant to the state of race |
| 16 | relations in Alabama today? |
| 17 | A    No.  But in regard to the concessions about which you |
| 18 | asked, all of them, as I recall, were found to be in violation |
| 19 | of federal law. |
| 11:40:00 20 | Q    And do you believe that that history is relevant to the |
| 21 | issues of access to voting or electoral participation among |
| 22 | African-Americans today? |
| 23 | A    Yes.  For example, the educational disparities that I |
| 24 | testified about on direct are things that have a long-lasting |
| 11:40:17 25 | effect.  There are African-Americans in Alabama's electorate |

**Caster Plaintiffs' Exhibit 85, Page 83**

1   today who were raised in a public school system that was

2   racially discriminatory in its operation, with poor funding for

3   African-American students in segregated schools.

4        Moreover, parents' level of education affects the level of

11:40:45  5   education achieved by their children.  That is to say, children

6   of parents who are of limited educational background are often

7   subject to burdens in acquiring the quality of education in

8   their own life so that the educational disparities, for

9   example, contribute over decades to the socioeconomic

11:41:13  10  characteristics that measure educational achievement, which are

11  the very things that the census report documents down into the

12  present day.

13       And with regard to other aspects of the way in which the

14  Jim Crow system operated, there are numerous court decisions in

11:41:31  15  which courts have agreed with social scientists that the

16  effects of the Jim Crow era are extended into the continued

17  racially polarized voting in southern states.  So that that's

18  why evidence about the history of racially polarized voting is

19  relevant to an assessment of the current levels of racially

11:41:57  20  polarized voting, though they can, and, of course, are directly

21  measured by statistical evidence, and in this case, presented

22  by another expert.

23  Q   And does the history of discrimination in voting by the

24  state of Alabama have any current relevance to political

11:42:18  25  participation by African-Americans today?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 84**

```
 1  A    Well, I think I've already answered the question.  It
 2  does.
 3  Q    Okay.
 4         MR. SPIVA:  If I can just have one second to confer.
 5  Thank you.  I have no further questions.
 6         THE COURT:  Any further cross, Ms. Howell?
 7         MS. HOWELL:  No, Your Honor.
 8         THE COURT:  Okay.  Do we want to get started with a
 9  new witness, or wait until after lunch to do that?  Whatever
10  y'all want to do.
11         MR. SPIVA:  We have another witness here, Your Honor,
12  so we could start.  I don't think we would finish before lunch,
13  but we could get started, if Your Honor wants.
14         THE COURT:  Okay.  I'm good with that.
15      All right.  Thank you, Dr. McCrary.  You may step down.  I
16  should have said that first.  I apologize.
17      And the plaintiff may call your next witness.
18         MR. SPIVA:  Ms. Madduri is going to call the next
19  witness, Your Honor.
20         THE COURT:  Okay.  Is that going to be Representative
21  Knight?
22         MS. MADDURI:  Yes.  Plaintiffs call Representative
23  John Knight.
24         THE COURT:  I thought I recognized him sitting out
25  there.
```

11:42:32  (line 5)
11:42:47  (line 10)
11:43:02  (line 15)
11:43:18  (line 20)
11:43:50  (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 85**

```
 1                      JOHN KNIGHT,

 2   having been first duly sworn by the courtroom deputy clerk, was

 3   examined and testified as follows:

 4           THE COURTROOM DEPUTY CLERK:  Please state your name

 5   for the record.

 6           THE WITNESS:  John Knight, Jr.

 7           THE COURTROOM DEPUTY CLERK:  Thank you.

 8                   DIRECT EXAMINATION

 9   BY MS. MADDURI:

10   Q    Good morning, Representative Knight.

11   A    Good morning.

12   Q    We can get started with some background information.

13   Where do you currently live?

14   A    Montgomery, Alabama.

15   Q    And where were you born?

16   A    Montgomery, Alabama.

17   Q    And where did you grow up?

18   A    Montgomery, Alabama.

19   Q    Have you lived in Alabama all of your life?

20   A    I have.

21   Q    Did you serve in the military at any point?

22   A    I did.

23   Q    How long were you in the military?

24   A    For two years.

25   Q    After you served, did you return to Montgomery?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

Caster Plaintiffs' Exhibit 85, Page 86

```
          1   A    I did.

          2   Q    Approximately when was that?

          3   A    1969.

          4   Q    And did you attend college?

11:44:58  5   A    I did.

          6   Q    Where did you attend college?

          7   A    Alabama State University.

          8   Q    Where is Alabama State University?

          9   A    Montgomery.

11:45:08 10        THE COURT:  Montgomery.

         11   BY MS. MADDURI:

         12   Q    And when did you graduate, sir?

         13   A    1974.

         14   Q    Is Alabama State University a historically black college?

11:45:18 15   A    It is, yes.

         16   Q    And what race do you identify as?

         17   A    I'm black.

         18   Q    What is your current occupation?

         19   A    Retired.

11:45:28 20   Q    And what job did you hold before you retired?

         21   A    I retired from Alabama State University after 38 years of

         22   employment.

         23   Q    And what was the last position you held there?

         24   A    Executive vice-president.

11:45:41 25   Q    Did you work anywhere else prior to working at Alabama
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 87**

|  |  |
|--|--|
| 1 | State University? |
| 2 | A    Throughout my life? |
| 3 | Q    Maybe after you graduated college. |
| 4 | A    Oh, after I graduated college, yeah.  I worked at Alabama |
| 11:45:56  5 | Public Service Commission.  I worked for the United States Post |
| 6 | Office. |
| 7 | Q    And are you involved with any community organizations? |
| 8 | A    I am, yes. |
| 9 | Q    What are those? |
| 11:46:07 10 | A    I am involved with the Montgomery County Democratic |
| 11 | Conference.  I'm involved with the Montgomery Improvement |
| 12 | Association, the NAACP, YMCA, Leadership Montgomery, Leadership |
| 13 | Alabama, and a number of other organizations. |
| 14 | Q    Do these organizations work throughout the state of |
| 11:46:33 15 | Alabama? |
| 16 | A    Some of them do, and some are restricted -- not |
| 17 | necessarily restricted, but work basically in Montgomery. |
| 18 | Q    Understood.  And have you ever held elected office? |
| 19 | A    I was on the county commission of Montgomery for 12 years. |
| 11:46:47 20 | Q    And approximately when did you start serving on the |
| 21 | Montgomery commission? |
| 22 | A    Montgomery County Commission, my memory serves -- around |
| 23 | 1980.  I served 12 years until 1992. |
| 24 | Q    Okay.  Have you held any other elected office? |
| 11:47:02 25 | A    Member of the Alabama Legislature. |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 88**

|  |  |
|--|--|
| 1 | Q     And approximately when were you elected? |
| 2 | A     1993, and I came out in 2018. |
| 3 | Q     What district did you represent when you were in the |
| 4 | legislature? |
| 11:47:16  5 | A     Montgomery, Alabama, District 77. |
| 6 | Q     Is that a majority black district? |
| 7 | A     It is. |
| 8 | Q     Was it a majority black district when you were elected? |
| 9 | A     It was. |
| 11:47:27 10 | Q     When you were in the legislature, what committees did you |
| 11 | serve on? |
| 12 | A     I served on the Ways and Means Committee.  I served on |
| 13 | public safety.  And I served on health.  I served on local |
| 14 | government, contract review.  Those are the committees. |
| 11:47:49 15 | Q     Were you a member of any caucus? |
| 16 | A     I was a member of the legislative black caucus and the |
| 17 | minority caucus, as well as the Democratic caucus. |
| 18 | Q     Did you share any of those caucuses? |
| 19 | A     I shared the legislative black caucus for eight years. |
| 11:48:05 20 | Q     Did you ever serve on the reapportionment committee? |
| 21 | A     No, I did not. |
| 22 | Q     When you were in the legislature, what were the issues |
| 23 | that your constituents were bringing up with you most often? |
| 24 | A     Oh, they would bring up education, economic development in |
| 11:48:23 25 | terms of jobs, making certain that jobs would come to |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 89**

1   Montgomery and to Alabama.

2       They were also bringing up the criminal justice system,

3   health care, the general issues that people are concerned

4   about.

11:48:35 5       And it depended on who you're talking to.  Different

6   people would have different issues.

7   Q    Do you think any of these issues affected the black

8   community differently than they affected the white community?

9   A    I do, yes.

11:48:48 10  Q    In what ways?

11  A    Well, in many ways the criminal justice system mainly

12  because you find more blacks incarcerated than you do whites in

13  the state of Alabama, as well as the problems that we've had in

14  our Alabama criminal justice system.

11:49:02 15      The education issue relative to being able to get a

16  quality education in the state of Alabama, not having to leave

17  Alabama as you had to do years ago in order to go to graduate

18  schools and things of that nature.

19      And many other things that would impact the day-to-day

11:49:20 20  living of the people within the state of Alabama.  These are

21  the type things that I find that were of interest.

22  Q    Have you observed a need for affordable housing in

23  Montgomery?

24  A    Yes.  I also served -- I forgot and left that off.  I

11:49:35 25  serve on the Montgomery Housing Authority Board.  I have been

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 90**

          1  there for a number of years.  And that has been one of my
          2  passions to try to provide affordable housing within the city
          3  of Montgomery.
          4  Q    And is there an area that the board focuses on in terms of
11:49:51  5  housing?
          6  A    Well, right now, we are focusing away from the traditional
          7  aspect of public housing moving towards affordable housing.
          8  And what I mean by that is trying to have mixed housing
          9  communities rather than just public housing projects and trying
11:50:08 10  to have market rate rents, Section 8 vouchers, and all of that
         11  combined to build communities and to strengthen communities
         12  rather than just having large -- with all poor people stacked
         13  together.
         14       So we have gone in that direction just recently under my
11:50:24 15  leadership trying to make certain that we stabilize and sustain
         16  low-income areas of the city of Montgomery.
         17  Q    In terms of the people who are looking for low-income
         18  housing -- and you mentioned public housing, as well -- do you
         19  know approximately how many people in Montgomery are currently
11:50:45 20  looking for that?
         21  A    Right now on our waiting list, the last time I checked, we
         22  had approximately 8,000 people on the waiting list for public
         23  housing or subsidized housing in the Montgomery area.
         24  Q    Do you know what the demographic makeup of that waiting
11:51:02 25  list is?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 91**

1  A    Majority black.

2  Q    In your experience -- you mentioned criminal justice as an

3  issue of interest.  In your experience, have you observed any

4  criminal justice disparities between black and white children?

11:51:21  5  A    Well, what I've observed, it seems like black children are

6  incarcerated faster than others.  They are charged with -- many

7  people are incarcerated for possession of marijuana and things

8  of that nature.  And it seems like within the criminal justice

9  system itself there's a disproportionate number of

11:51:46 10  African-Americans that happen to be criminalized within the

11  Alabama correctional system.

12  Q    In your time in the legislature, did you work on any

13  issues that were affecting Mobile?

14  A    Mobile?  Well, yeah.  I chaired the Ways and Means

11:52:05 15  Committee for 12 years.  So in that position, I would have the

16  opportunity to work with legislators and representatives from

17  the Mobile area relative to the things that were of interest to

18  them, things such as the docks in Mobile.  I passed a bond

19  issue of raising money for the docks in Mobile, and a number of

11:52:28 20  other things relative to the funding for the school system in

21  the Mobile area.  Just a number of things that would be of

22  interest to the local legislative delegation of the people from

23  Mobile.

24  Q    Did you observe any issues that affected the black

11:52:42 25  residents of Montgomery and also the black residents of Mobile?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 92**

1  A     Well, yes.  Yes.  That would be -- in many cases, some of

2  the same issues, with the exception of where Mobile is located

3  that affected Mobile or affected people in Montgomery.

4       When it came to the criminal justice system, people were

11:53:03 5  equally concerned about that.  When it comes to education, I

6  found there was an interest in that.  When it came to health

7  care, all of these things are things that are common whether

8  you are in Mobile or Montgomery.

9  Q    When you served as a legislator, were you a member of a

11:53:18 10  political party?

11  A     Yes.

12  Q    Which one?

13  A     Democratic party.

14  Q    And are you a member of the Democratic party today?

11:53:26 15  A    I am.

16  Q    Do you have views on whether African-Americans in Alabama

17  tend to support a particular political party?

18  A     The majority of African-Americans support the Democratic

19  party in Alabama.

11:53:46 20  Q    What are your views of the party, in terms of race and

21  racial justice in Alabama?

22  A     My views of the Democratic party?

23  Q    Sure, as concerns the Democratic party.

24  A    I am a member of the Democratic party because I feel

11:54:03 25  comfortable within the Democratic party.  I have never felt

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 93**

1    welcome in the Republican party in the state of Alabama.

2         I feel that the Democratic party represents those core

3    values that I believe in, in terms of making sure that people

4    are treated fairly, making certain that you have good

11:54:19  5    education, making certain that we have fair wages, that we

6    concentrate as well on bringing jobs to Alabama.  All of those

7    things are of interest and a priority for the Democratic party.

8         But the things that helps me most is the broad tint that

9    comprise the Democratic party where all people should feel

11:54:40 10    welcome and want to be a part.  Even if you don't totally agree

11    on everything, the ability to work together collectively as a

12    group of people, I find that to be very interesting and the

13    reason that I share most of the views of the Democratic party,

14    not necessarily all views, but most of the views.

11:54:58 15    Q    I think you said you feel comfortable in the Democratic

16    party.  Why is that?  What did you mean by that?

17    A    Well, because I can interact with other people of my race,

18    as well as other people that would be in my situation, or

19    moderate income situation, things of that nature.

11:55:16 20         And you have things in common that you can talk about and

21    that you can relate to -- educational issues, economic

22    development issues, health care, criminal justice reform.

23    Those are the type things that I find is very appealing and

24    challenging when it comes to trying to address in this state.

11:55:35 25    Q    And are there race or racial justice issues that draw you

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 94**

|   |   |
|---|---|
| 1 | to the Democratic party? |
| 2 | A    Well, I think the Democratic party with its broad tint are |
| 3 | as fair as it possibly can be when it comes to racial issues. |
| 4 | When it comes to trying to work across racial lines and things |
| 11:55:58 5 | of that nature, I think that they do a good job of trying to do |
| 6 | that. |
| 7 | Q    So we're discussing the Democratic party.  I asked you why |
| 8 | you think most African-Americans in Alabama -- I'm sorry.  I |
| 9 | asked you whether you had views about the Democratic party in |
| 11:56:23 10 | terms of race and racial justice. |
| 11 |     Do you have any views about the Republican party in |
| 12 | Alabama in terms of race and racial justice? |
| 13 | A    Well, my view is basically -- has been based on my |
| 14 | experience with the Republican party here in Alabama, that it |
| 11:56:38 15 | seems to be kind of one-sided when it comes to racial justice. |
| 16 |     People that run under the Republican banner, just an |
| 17 | example, Attorney General, things of that nature, will talk |
| 18 | about how tough they're going to be on crime.  I think it was |
| 19 | one Attorney General that ran that they're going to lock them |
| 11:56:57 20 | up and keep them until -- until the eyeballs popped out, or |
| 21 | something of that nature, talking about the electric chair. |
| 22 |         THE COURT:  I think that was Graddick, was it not? |
| 23 |         THE WITNESS:  I couldn't remember exactly. |
| 24 |         THE COURT:  Back when we had the Yellow Mama. |
| 11:57:14 25 |         THE WITNESS:  That's what it was. |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 95**

1          THE COURT:  Some of us still remember that.

2          THE WITNESS:  I do.  I certainly do.

3          THE COURT:  Yeah.  Not the high point in Alabama

4    elections, I don't think.

11:57:23 5          THE WITNESS:  No, it's not.

6          THE COURT:  Sorry.

7          MS. MADDURI:  No problem, Your Honor.

8          THE COURT:  Well, during this little break that I've

9    created -- and I apologize -- you were talking about criminal

11:57:40 10   justice reform, and I understand that Cam Ward has been

11   somewhat of a leader in criminal justice reform.  And which

12   party is he affiliated with?

13         THE WITNESS:  He is affiliated with the Republican

14   party.  He really should be a Democrat.

11:57:57 15         THE COURT:  I won't tell him you said that.  But there

16   are some Republicans that are interested in criminal justice

17   reform.

18         THE WITNESS:  Well, I have had the opportunity --

19   there have been some Republicans interested in criminal justice

11:58:10 20   reform.

21       And, you know, as I chaired the Ways and Means Committee,

22   you know, I have had opportunity to work with some Republicans.

23   We were able to.  But just overall, the party itself has not

24   been that receptive to include some of the blacks that have

11:58:26 25   been in the Republican party.  They wished they would be able

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 96**

     1   to progress much more within the ranks of the party than they

     2   are able to progress.

     3   BY MS. MADDURI:

     4   Q     Since Your Honor brought up Charlie Graddick, do you know,

11:58:43  5   Representative Knight, whether Mr. Graddick is currently

     6   serving in the criminal justice system in Alabama?

     7   A     Yes.  Surprising to me, he served as chair of the Pardon

     8   and Paroles Board for the state of Alabama at this point.

     9   That's an oxymoron, but it's...

11:59:05 10   Q     And you --

    11         THE COURT:  Between those times, do you recall what he

    12   was doing?

    13         THE WITNESS:  I think he was district judge in Mobile,

    14   if I'm not mistaken.

11:59:21 15         THE COURT:  Was he a District Attorney there?

    16         THE WITNESS:  I may be wrong.  It may have been

    17   District Attorney.  But...

    18         MS. MADDURI:  He does have a judge title, so...

    19         THE COURT:  But he was elected in Mobile, whatever the

11:59:34 20   position was?

    21         THE WITNESS:  Yes, Your Honor.

    22   BY MS. MADDURI:

    23   Q     You mentioned some of the statements you remember

    24   Mr. Graddick saying.  In your opinion, how did those -- how do

11:59:47 25   those statements relate to race?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 97**

346

```
         1   A    Well, I just think it was a code word for race at that
         2   particular time during -- it was in the heat of a campaign, if
         3   I recall correctly.  It was just code words to excite his base
         4   and to get people to turn out and vote.
12:00:04 5   Q    When you say his base, who do you mean?
         6   A    Which would be his white constituents.
         7   Q    Okay.  I think we have established you have a lot of
         8   experience with Montgomery.  So let's talk about Montgomery for
         9   a moment.
12:00:24 10       Are you aware of if Montgomery County is currently
        11   majority black?
        12   A    It is, yes.
        13   Q    And are you familiar with the current configuration of
        14   Montgomery in the congressional district map?
12:00:39 15  A    In the congressional district map, I think we have three
        16   congressional districts in Montgomery.
        17   Q    So Montgomery County is split between three congressional
        18   districts?
        19   A    That is correct, yes.
12:00:57 20  Q    In your view, does that configuration have any impact on
        21   the county of Montgomery?
        22   A    Oh, absolutely.  I think when you have -- when you pick up
        23   just a small portion of a congressional district, it decreases
        24   your impact within the district or with your congressperson
12:01:17 25  that's representing that district.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 98**

1    I think that if you had a greater portion of Montgomery in

2    the congressional district, you would have more impact because

3    a person only represents, say, a few thousand people within

4    that particular county, would take very little interest in the

12:01:33  5    county, or that's been what I have seen in terms of experience.

6    They would -- they would tend to pay more attention to the

7    areas with the largest population.

8    Q    And how does -- if it does, how does that affect the

9    residents of Montgomery?

12:01:48 10    A    Well, I think the residents think that you don't get some

11    of the services that you think you should get or some of the

12    things that you would ordinarily receive from your

13    congressperson representing you, dilute having some time the

14    congressional people that represent your district.

12:02:05 15    Q    Do you think there are any benefits to Montgomery by being

16    split three ways?

17    A    No.  Other than saying that you have three congressional

18    representatives.

19    Q    Do you know if Montgomery has always been split that way?

12:02:24 20    A    No.  I think that -- the only other time we've been split

21    with two congressional districts.

22        THE COURT:  Doesn't that mean you have got two more

23    people you can pick up the phone and call and say we need help

24    here?

12:02:42 25        THE WITNESS:  It does.  But the ones with very little

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 99**

```
 1  population will pay you little attention.
 2          THE COURT:  Okay.
 3  BY MS. MADDURI:
 4  Q    How do you think that being in a single district would
 5  help the county of Montgomery?
 6  A    I think -- I think it's extremely important for the county
 7  of Montgomery.  One thing would be important about it is
 8  Montgomery is the capital city of the state.  So you need
 9  strong representation on a congressional level.
10       And with the things that are taking place -- in
11  particular, Montgomery now with all the growth and things of
12  that nature, I think that if you didn't have the congressional
13  district split as much as they are, you could get more, in
14  terms of tourism, getting dollars to come into the state
15  relative to the history of Montgomery, and more attention paid
16  on the congressional level to Montgomery than what has been
17  paid in the past.  And I think that, you know, if you had a
18  good strong representative representing Montgomery, it would
19  bring dollars to the capital city, and the capital city could
20  be a showplace to this nation.
21  Q    Representative Knight, approximately when were you born?
22  And I won't ask you for an exact year.
23  A    You want an exact year, or you don't want an exact year?
24  Q    It's up to you.
25          THE COURT:  Well, he told us when he finished the
```

12:03:02  5
12:03:17 10
12:03:35 15
12:03:57 20
12:04:12 25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 100**

```
 1  military.
 2          MS. MADDURI:  That's true.  But like you said, Judge,
 3  we're not so good with the math in here.
 4          THE WITNESS:  Okay.  I was born June 7th, 1945.
 5  BY MS. MADDURI:
 6  Q    And I know you said you grew up in Montgomery.  So what
 7  was your childhood like?
 8  A    Well, I grew up on Hall Street, kind of central
 9  Montgomery.  I remember my first house, a shotgun house and
10  outdoor facilities.  And I remember when we got indoor
11  facilities probably when I was about five or six years of age.
12       I remember -- the most dramatic thing that I remember
13  about Hall Street was when the Klan marched down Hall Street.
14  Hall Street was located not far from Dr. Martin Luther King's
15  house and not far from Dr. Ralph Abernathy.  So there was Klan
16  activity during that particular time, and they marched down
17  Hall street.  And I can remember my dad making us get under the
18  bed and stuff like that.
19  Q    Do you recall any bombings in your neighborhood when you
20  were growing up?
21  A    Yes.  Ralph Abernathy's house was bombed, and Dr. King's
22  house was bombed, and a service station on the corner of High
23  and Jackson was bombed.
24  Q    What kind of work did your parents do?
25  A    My father was in the military, World War II veteran.  My
```

12:04:24 5
12:04:44 10
12:05:13 15
12:05:30 20
12:05:46 25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 101**

1   mother was a domestic worker.

2   Q    And what was your -- what was your schooling like?

3   A    Oh, I went to a segregated -- I went to Booker T.

4   Washington High School.  Well, I started off in elementary

12:06:05 5   school.  I started off at Saint John's Catholic School because

6   my parents wanted me to go with Catholic school, started off

7   with what they considered to be a good education.

8        I stayed there three years, and asked if I could go to

9   public schools because in the neighborhood that I lived in, in

12:06:20 10   the Catholic schools, we had to wear uniforms and ties.  So

11   coming back home was not a good experience coming back home

12   through the neighborhood.

13        They finally, after the third grade, said I could go to

14   Booker T. Washington.  And then went to McDavid Elementary

12:06:34 15   School and finished Booker T. Washington High School, which was

16   a segregated high school in 1963.

17   Q    Other than schooling, did segregation affect other parts

18   of your life growing up?

19   A    It did.  I mean, I recall the times when, you know, water

12:06:49 20   fountains were separate, riding on the back of the bus.  We

21   lived one block from a park that we couldn't -- couldn't use,

22   couldn't play in.

23        And, you know, it's just -- it's just southern life the

24   way it was at that particular time.  And, you know, as a kid,

12:07:08 25   sometimes you didn't think about those things.  But as you grew

**Caster Plaintiffs' Exhibit 85, Page 102**

```
 1  up and as I became of age, that's the reason that I took an
 2  active role in the community because I wanted to make a
 3  difference and make things change.
 4  Q    Was part of that active role in the community in the Civil
 5  Rights movement?
 6  A    It was.  I was not a leader in the Civil Rights movement,
 7  but I participated.  During the Civil Rights movement, you
 8  know, in high school, I would participate in some of the
 9  marches and demonstrations.
10       I have to be very candid under oath.  At that time, I
11  didn't know what some of them were all about, but it was just a
12  way to get out of school.  So we participated in that.
13       But I -- after finishing high school, I got more involved
14  working with SCLC and other organizations with the various
15  demonstrations and marches in Montgomery and other areas, as
16  well.
17  Q    And why did you choose to get more involved after high
18  school?
19  A    Well, at that particular time, it was because -- I mean,
20  it was just so much excitement about the opportunity to make a
21  difference, and for things to change and not to accept the
22  status quo of the way things had been, and not have to go
23  through things that your parents had to go through.
24       You know, my father was a sharecropper.  So, you know,
25  those are the type things you want to make certain that you
```

12:07:29 (line 5)
12:07:44 (line 10)
12:08:01 (line 15)
12:08:16 (line 20)
12:08:34 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 103**

352

1    make it better for your kids.

2    Q    Are there any particular demonstrations or marches that

3    stick out in your mind today?

4    A    Well, one was when we marched for the state capital.  And

12:08:59 5    I don't know what the issue was at that particular time, but I

6    was in that particular march.  And we were surrounded by state

7    troopers.  We couldn't leave.

8        And my parents happened to see me on TV, came down to try

9    to get me out of the march, but they wouldn't allow them to do

12:09:17 10   so.  That was one time because I was really talked to very

11   harshly about being in the march without them knowing it.

12       Another time is we marched from Alabama State University

13   to the state capital.  And I remember the police officers going

14   into the crowd with horses, and things of that nature.

12:09:39 15      I remember some marches where we marched, and the Klu Klux

16   Klan was lined up down the streets, with all types of names,

17   and things of that nature.

18       I mean, there was just all kind of marches during that

19   time.

12:09:54 20   Q    Do you think conditions for African-Americans in Alabama

21   have improved since that time?

22   A    Oh, yes.  Things have -- there have been improvements.

23   There's no question about it.

24       I mean, I realize that a lot of very young people said,

12:10:15 25   well, nothing has changed.  But much has changed.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 104**

1    But I have seen things seem to -- I have seen some

2    regression taking place in recent years, and that's very

3    troubling to me.  I think we made a lot of progress in the

4    Civil Rights movement, and we opened a lot of doors.  But I've

12:10:33 5    seen regression in the last several years that's very

6    discouraging.

7    Q    What are some of the ways or areas in which you've seen

8    regression?

9    A    Well, the one area that concerns me happens to be

12:10:46 10    education, a lack of funding for education, the lack of

11    emphasis on education.  The other thing has been, as I said

12    earlier, the criminal justice system itself and the way that

13    people are incarcerated.  And the lack of funding for mental

14    health, and those things that really impact families in so many

12:11:08 15    different ways.

16    And I found that a lot of people in Alabama are being

17    incarcerated.  And in many cases, they have no health

18    insurance, but they can't get the treatment that's necessary to

19    sustain them so that they will stay out of the criminal justice

12:11:24 20    system itself.  And for us not to pay attention to that is very

21    disturbing.

22    And at one time, you know, there were opportunities -- I

23    would say opportunities were opening up after the Civil Rights

24    movement and affirmative action plans, and things of that

12:11:44 25    nature.  But now you find in many cases opportunities in

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 105**

354

```
 1    Alabama the doors are shut.  That's why we lose so many young
 2    people.
 3         If they go to college and get a degree -- just like we
 4    tried to encourage all our kids.  If you go get an education,
 5    you will be able to sustain yourself and your family.
 6         Well, what happens is when they get an education to
 7    include advanced degrees, in many cases they have to leave the
 8    state of Alabama and go to New York, go to California, or even
 9    go oversees somewhere to be gainfully employed to be able to
10    establish themselves and get the careers that are necessary for
11    what they have been trained for.
12         So I find that very disturbing and discouraging,
13    especially after all the efforts that we put into the Civil
14    Rights movement -- the marches, the demonstrations, the -- I
15    mean, the intimidation of parents being intimidated, afraid
16    that they would lose their jobs because of what they were
17    fighting for, and things of that nature.
18         So where we are now, it seems like there's been some
19    regression taking place.
20    Q    In terms of the disparities you're speaking of and the
21    opportunities for employment in Alabama, am I right in
22    understanding that you believe that the situation that you just
23    described affects African-Americans differently than it affects
24    white folks?
25    A    Yes.  That's what I am talking about -- African-Americans.
```

12:11:59 5
12:12:14 10
12:12:29 15
12:12:48 20
12:13:09 25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 106**

You see, in my generation, we encourage our daughters and sons,
look, you go get an education and things are going to be okay.
With the anticipation that they do that, that they will be
welcome and they can stay in Alabama.

12:13:24       But you look at Montgomery, for example.  It may be a
little differently in Birmingham.  You look at Montgomery.  You
look at the banking industry.  You see very few blacks as
presidents of a bank or vice-presidents of a bank.  You look at
the high-level jobs.  I am not talking about entry-level jobs.
12:13:39 I'm talking about high-level jobs and opportunities for blacks.
In many cases, they're just not there.

       Because what happened is you have -- so often progress
comes down through the family.  So where you have families who
have been successful throughout their lives, had money and
12:14:06 economic growth, then their children benefit from that.  In the
African-American family, you don't have as much of that.

       So you have to -- you have first generations of young
people trying to get into the workforce, trying to get into
high-level positions that they've never been in before.  And a
12:14:23 lot of that is missing as from what I have seen within the
state of Alabama.

       Even though we have gone out -- and I worked very hard to,
as a matter of fact, for the Republican governor trying to do
economic development and bring industry to the state.  We
12:14:38 brought companies like Hyundai, Mercedes, Honda to have

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 107**

```
 1  manufacturing jobs and things of that nature for people to be
 2  gainfully employed.  And I think it's extremely important to do
 3  that.
 4  Q    I think you mentioned that African-Americans, when they
 5  leave the state of Alabama for places like New York or
 6  California, they have different job opportunities.  Can you
 7  tell me more about that?
 8  A    Well, it's almost like when I was coming up as a kid.  For
 9  summer jobs, we would leave Alabama.  We would go to New York,
10  wait tables and do things of that nature to make enough money
11  to come back home.
12       But now you can go to college, and you're unable -- with
13  the exception -- I have nothing against this.  Unless you to
14  happen to have been a star athlete at one of the major
15  schools -- Alabama, Auburn -- you can come back if you're
16  African-American and get a high-level job.  But just the
17  average working Joe out there that go and get a quality
18  education, it's extremely difficult for them to be able to come
19  back within the environment that we have here in this state and
20  be gainfully employed at that level.
21  Q    What do you mean by the environment in the state?
22  A    The way that the structure is set up.  The -- and in terms
23  of being able to get the type of jobs that you're qualified
24  for.
25  Q    And so you think that African-Americans who leave Alabama
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 108**

357

are able to get the jobs that they're qualified for outside of
Alabama?

A    Oh, yeah.  I mean, I know kids that's gone to University
of Alabama engineering program, get an engineering degree, but
12:16:20 to get a job they go to Detroit.  I know people that have
gotten Ph.D. degrees, but to get a job they have to go
somewhere else to have the type of position that they feel
they're qualified for.

Q    In your experience, do white folks also have to leave
12:16:41 Alabama to get those same kinds of opportunities?

A    I don't think necessarily they have to, but I think some
of them do.  But I think it's not a matter of choice for
African-American kids.  I think many of them have to because
there are no jobs -- the jobs are just not here and available
12:16:59 to them in this state.

Q    Do you think those disparities in job opportunities
between African-Americans and white folks in Alabama, do you
think that leads to income disparities?

A    Oh, absolutely.

12:17:19 Q    Can you tell me more about that?

A    Well, I mean, because you have the low paying job for
African-Americans in this state, they don't have the high-level
jobs as I was explaining.  There's certainly going to be a
disparity in terms of income and wealth, and that's what you
12:17:34 see in the state.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 109**

| | | |
|---|---|---|
| | 1 | Q    These incomes -- sorry.  These disparities in education |
| | 2 | and income, do you believe that those affect voting? |
| | 3 | A    Oh, it does.  I mean, the less education you have, the |
| | 4 | less likely you are to have faith in the system and want to go |
| 12:17:59 | 5 | vote. |
| | 6 |     I mean, I run into people each day in the neighborhood |
| | 7 | that say, Well, why, my vote doesn't count.  Why should I go |
| | 8 | and vote?  Those are the type things you run into with less |
| | 9 | education.  And I think that adversely impacts |
| 12:18:13 | 10 | African-Americans in this state. |
| | 11 | Q    And what about the income disparities?  Does that also |
| | 12 | affect people's voting? |
| | 13 | A    It does.  It does.  And it reminds me of when I first got |
| | 14 | elected to the legislature.  I had no idea what I was getting |
| 12:18:32 | 15 | into and what I would encounter. |
| | 16 |     And the first thing that I encountered was in Alabama a |
| | 17 | family of four making $3,500 had to start paying Alabama income |
| | 18 | taxes.  I mean, that was unconscionable to think if you have a |
| | 19 | family of four, you are making $3,500, and you have to start |
| 12:18:48 | 20 | paying Alabama income taxes.  But you would have large |
| | 21 | multimillion dollar corporation that would be paying zero in |
| | 22 | taxes. |
| | 23 |     I was able to work -- I tried to get it up to the poverty |
| | 24 | level.  And I was able to work to get it up to $12,500 for a |
| 12:19:07 | 25 | family of four.  And that was working with -- even though -- |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 110**

```
 1  working with a Republican governor to do that.  So it was the
 2  black caucus and the Republican governor that worked together
 3  do that.
 4      The other thing I have tried to do in this state that is
 5  very regressive is we have a sales tax on food and groceries.
 6  I have tried to get that removed.  That is -- I have not been
 7  successful over the length of time that I spent in the Alabama
 8  Legislature trying to get that done.  But I hope some day that
 9  somebody will be able to get it done.
10  Q    So these two taxes you mentioned -- taxing very low
11  incomes and also taxing food, do you think that
12  disproportionately impacts African-Americans in Alabama?
13  A    It does, because we are disproportionately lower incomes
14  than others.  When we elevated the tax for the family of four,
15  I think the total amount of it at that time, I think, was
16  $60 million.
17  Q    In terms of when someone has a lower income or a lower
18  paying job, have you observed any practical barriers that get
19  in their way when they go to vote or want to vote?
20  A    I'm sorry.  I don't --
21  Q    I can --
22  A    Okay.
23  Q    In terms of when somebody has a lower paying job or, like
24  you said, the manufacturing job like these hourly jobs?
25  A    Okay.
```

12:19:26
12:19:40
12:20:03
12:20:24
12:20:40

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 111**

1  Q     Something like that or a lower income one, does that --

2  A     Well, and if I'm not understanding your question

3  correctly -- but I think it depends on the type of job that you

4  have.

12:20:51  5       There are some people that I work with they can only go

6  vote during their lunch hour.  So if you have a large election,

7  they go during the lunch hour, when they go to the polls, they

8  see a long line, well, on their mind, they have got to get back

9  to work or they're going to lose their job.  They are not going

12:21:08 10  to stay in a long line and cast their vote.  They are going to

11  go back to their job.

12       The other thing is there are many people that work two and

13  three jobs.  And the polls open at 7:00, close at 7:00.  There

14  needs to be a way that the voting is more available more than

12:21:27 15  just on election day, early voting, and things of that nature,

16  so it will be convenient for people that have jobs such as that

17  to be able to go vote.

18       And there are still people that feel intimidated if they

19  tell the people that they're working for that they want to take

12:21:47 20  off to go vote because years ago it was an intimidating factor

21  if you worked in a certain environment to tell people that you

22  were going to go and vote without losing your job, or something

23  of that nature.

24       So you still have some of those factors that's commonplace

12:22:06 25  in certain areas of the state and in certain households.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 112**

1  Q     You touched on a few things, so I will take them one by

2  one.

3        The intimidation you mentioned.  Can you tell me a little

4  bit more about that?

12:22:20  5  A     Intimidation at the polls, or you mean intimidation to go

6  vote, or what?

7  Q     Either one.  We can start with you said intimidation about

8  potentially I think being discouraged from your employer or

9  something related to your employment?

12:22:36 10  A     I was talking about if a person has a job where they only

11  have an hour off for lunch and they choose to go and vote

12  during that hour, if they -- if it's a long line and confusion

13  at the polls, they're not going to stay there and go vote.

14        And then you say, Well, will you come back after you get

12:22:55 15  off?  Well, then most of them got to go pick up their kids or

16  something of that nature.

17        There's all these types of things that come into play when

18  it comes to that.  And I think that's the reason that we have

19  not been able to have legislation that will allow people to do

12:23:11 20  early voting.

21        Now, we do have absentee voting.  But the affidavits and

22  all that have to be signed, that's intimidating to many people

23  because you have to swear that you are going to be out of town

24  or something of that nature to go vote.  And people are afraid

12:23:24 25  that if they do that and something happens and they're not,

**Caster Plaintiffs' Exhibit 85, Page 113**

1  that they will be arrested, or be charged with voter fraud, or

2  something of that nature.

3      And that's been -- and in the state of Alabama, there has

4  been a lot of talk about voter fraud in the Black Belt, or

12:23:41 5  absentee voter fraud, things of that nature, which puts up a

6  red flag in the minds of a lot of good people that would love

7  to work in the voting process but are afraid that if they do

8  so, that they're going to be charged with a crime, in terms of

9  absentee voter fraud and things of that nature.  And you

12:24:01 10  haven't found much of that.

11      As a matter of fact, in my experience in working in the

12  community, I worked there for a number of years.  You have to

13  beg people almost to go vote.  Nobody is running over you to go

14  vote.  To say that if it's convenient for people to go vote

12:24:16 15  that you would have all this voter fraud, I mean, it's just

16  another way of intimidating voters and keeping them afraid of

17  the process.

18      Because, see, within certain communities, there were times

19  when people were just afraid to go to the courthouse.  So when

12:24:31 20  you go and you trying to get people to fill out affidavits or

21  things of that nature, nobody wants to spend, or even have the

22  money to hire lawyers to defend them once they're charged with

23  voter fraud, or something of that nature.

24  Q    When you say certain communities, what do you mean?

12:24:46 25  A    In African-American communities.  Those are the ones that

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 114**

            1  I've worked in all of my life.

            2  Q    And does the intimidation that you're talking about --

            3  intimidation and the fear in African-American communities --

            4  does that actually lead to people not voting?

12:25:02    5  A    Oh, absolutely.

            6  Q    Even today?

            7  A    Yes.  Yes.  It's not as -- it's not as pervasive today as

            8  it was years ago.

            9        I remember in Montgomery at one time when we had a mayor

12:25:15   10  there that was a very strong mayor, at certain voting places,

           11  you would have city police officers stationed out there on

           12  motorcycles in front of every polling place.  Well, I mean, we

           13  challenged that.  We challenged.  We finally eliminated that.

           14        One other instance during one period during the polling

12:25:36   15  places, they would have a white gentleman with dark glasses

           16  standing at the front door.  People are thinking those are FBI

           17  agents so they wouldn't go in and vote.

           18        These are the type things that I have actually seen.  And

           19  we've challenged a lot of that.  We got it eliminated.  But

12:25:52   20  it's still in the minds of many.  You still have a lot of

           21  things where they are intimidated about going to vote.

           22  Q    You mentioned that it can be difficult for people who have

           23  jobs where they have just an hour off at lunch or something

           24  like that to go vote.  In your experience, do African-Americans

12:26:27   25  disproportionately hold those kind of jobs?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 115**

364

```
          1   A    Yes.  Hold many of those jobs, yes, and still do.  That
          2   hasn't changed in a number of years.
          3   Q    You also mentioned that there are occasions where people
          4   are working two to three jobs or something like that --
12:26:41  5   A    Yeah.
          6   Q    -- which might also make it difficult to vote on election
          7   day.  Are those jobs also disproportionately held by
          8   African-Americans in your experience?
          9   A    Yes.  You have more African-Americans having to work two
12:26:52 10   and three jobs.  Don't get me wrong.  I don't want to imply
         11   that there are not others that do the same thing.  But
         12   disproportionately, African-Americans are affected.
         13   Q    You also discussed intimidation around absentee voting.
         14   Can you tell me more about that?
12:27:10 15   A    There's been quite of that here within the state of
         16   Alabama where there have been accusations about voter fraud and
         17   illegal absentee voting especially in the Black Belt area; not
         18   as much in the Montgomery area, but in the Black Belt area of
         19   our city, which happens to be where a majority of the blacks
12:27:29 20   live.
         21        That -- and most of it has not turned out to be actual or
         22   factual information.  It's just been out there where people are
         23   intimidated when it comes to the absentee ballot process.
         24   Q    You've mentioned education a number of times since we
12:28:11 25   began speaking.  Are there disparities at the lower education
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 116**

```
 1   level in the K-12 space that you've observed?
 2   A    In the K-12?
 3   Q    Uh-huh.
 4   A    When you say disparities, you mean in funding or?
 5   Q    Either in quality of education, or funding for education,
 6   or access to education, and just generally in the education
 7   realm for that group?
 8   A    I can't speak too much on that particular on K-12.  I can
 9   speak on higher ed.
10        But in the K-12, in Montgomery, the public school system's
11   composed majority -- I'll say 85 to 90 percent of blacks are in
12   public education.  White kids go to private schools.  The
13   public education system has been underfunded.
14        In Montgomery you have the lowest millage rate of any
15   other schools in the state.
16             THE COURT:  Have the lowest what rate?
17             THE WITNESS:  Millage rate.  Property tax.
18             THE COURT:  Okay.  Thank you.
19             THE WITNESS:  It's the bare minimum that's required by
20   state law, and that has been a problem in terms of funding for
21   the educational system there in the state of Alabama.
22        And the reason that that has prevailed in Montgomery is
23   because most of the white kids are in private schools.  So to
24   be able to get the rate increase there in Montgomery, we have
25   had it on the ballot I think twice.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

BY MS. MADDURI:

Q    And it's failed?

A    It's failed, yes.  Uh-huh.

Q    Do you have an understanding of how --

THE COURT:  Just a minute.  Doesn't Montgomery have, I think, the highest rated high school in the state?

THE WITNESS:  That's very interesting you ask that question, but that is correct.  But that's the magnet program.

THE COURT:  Yeah.  I grew up in Montgomery.

THE WITNESS:  Okay.

THE COURT:  So, you know, have a lot of ties there myself.  But the magnet school?

THE WITNESS:  The magnet school.

My position on that is I feel like every school should be a magnet school.  And when you take the smartest kids out and put them all into one program, then you leave very little incentives for average kids -- I know I was an average student.

So coming up, if I didn't have somebody that made better grades than I did or something to strive for, you know, it just -- I don't know if I would have had the effort or the energy to --

THE COURT:  Yeah.  I think we would probably agree a lot on education issues.

But I did note that as a point of pride for a lot of folks in Montgomery that they do have the best high school in the

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 118**

1  state.

2           THE WITNESS:  Oh, yes.  Yes.  Uh-huh.

3           THE COURT:  Okay.

4           THE WITNESS:  And it's interesting, because as we

12:31:04 5  attract industry there, I look at the public school system.

6  And you see what takes place in the public school system for

7  some of the kids that's coming from overseas, the Korean

8  students.  I mean, there are programs there and they do very

9  well.

12:31:17 10      And the magnet program, all of the kids in the magnet

11  program do very well.  So if we --

12           THE COURT:  We shouldn't leave the rest behind.

13           THE WITNESS:  Right.

14           THE COURT:  I agree with you on that.

12:31:33 15  BY MS. MADDURI:

16  Q    You said that the public school system in Montgomery is I

17  believe you said 85 to 90 percent black.  And then most of the

18  white children or students are in private schools.

19      Do you have a sense or understanding of how that division

12:31:49 20  occurred, or has it just always been that way?

21  A    Well, when I grew up, I was -- I grew up in the segregated

22  system.  When integration came, as I recall -- and I think

23  during that period of time, I was in between college and the

24  military.

12:32:08 25      When integration came, they would close the black schools,

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 119**

368

```
  1  and the black kids had to go to the white schools.  And the one

  2  thing that concerned me about that was why couldn't it not be

  3  just the reverse?  Because I felt like Booker T. Washington was

  4  one of the greatest high schools there in the city.  Why

12:32:24  5  couldn't you have an equal sharing of transfer of students?

  6  But it didn't end up that way.

  7       All of the black kids had to go and the teachers, and

  8  transfer.  And Booker T. Washington -- I think Carver

  9  maintained, but Booker T. Washington did not.  And they turned

12:32:42 10  it into what they called a magnet program.

 11       And Booker T. Washington is one of the magnet programs for

 12  performing arts.

 13  Q   You said that they closed the black schools, and then the

 14  black children went to white schools?

12:32:55 15  A   Well, they didn't close -- well, yeah.  As we would know

 16  the schools.

 17       What I was saying is to me the ideal plan would have been

 18  to have -- it was Booker T. Washington or Carver and then -- I

 19  just use these as the examples of -- Lee and Lanier.

12:33:13 20           THE COURT:  And Jeff Davis.  Let's not forget Jeff

 21  Davis.

 22           THE WITNESS:  My daughter finished at Jeff Davis.

 23  It's hard -- and Jeff Davis.

 24       But so that if you could take and keep Booker T.

12:33:28 25  Washington, just mix the students in that way from, say,
```

**Caster Plaintiffs' Exhibit 85, Page 120**

```
 1  Lanier, and then have students from Carver going to Lee,
 2  something of that nature rather than getting rid of the black
 3  schools itself.  That happened during that particular time.
 4          THE COURT:  But Carver High School was maintained.
 5          THE WITNESS:  Yeah.  Carver has maintained, and it's
 6  still there, yes.  Uh-huh.
 7  BY MS. MADDURI:
 8  Q    So, then, when the these closings were or consolidations
 9  happened, did the schools become integrated fully?
10  A    Yeah.  Well, they -- yeah.  They became integrated, yes.
11  Q    And do they --
12  A    You had busing.  You had all of the ingredients that took
13  place as it relates to that.
14  Q    So what happened between then and now where the schools
15  are now 90 percent black?
16  A    Because you had a proliferation of private schools.
17  Q    And white children went to private schools?
18  A    Yes, over a period of time.  That's what has happened.
19  Q    Based on what you have observed, is it your belief that
20  African-American students and white students are getting equal
21  education in Alabama?
22  A    Not in Montgomery.
23  Q    And what about in the higher education level, in terms of
24  college or graduate school?  Are there disparities that you
25  observed there?
```

12:33:48 (line 5)
12:33:59 (line 10)
12:34:17 (line 15)
12:34:33 (line 20)
12:34:54 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 121**

A    Yes, I did.  And I filed a lawsuit on it.  *Knight v.*

*Alabama*.  I felt that -- well, what happened years ago in the

higher education arena, they created the school systems:  one

for blacks and one for white -- separate but equal.

12:35:16  You had Auburn University, and you had Alabama.  You had

Alabama A&M, and you had Alabama State University.  Alabama A&M

was created as the counterpart basically for Auburn University

which would have been the land grant programs in the state; and

Alabama State University created for blacks, which would have

12:35:33  been the equivalent of Alabama.

But they were never funded at the same level.  They were

separate, but they were not equal.

So I filed a lawsuit January 15th, I think it was 1981,

alleging that there still existed in the state the remnants of

12:35:53  a dual system of higher education.  And that suit went on for a

greater portion of my adult life hood.

Q    Does the state fund those schools?

A    They're partially funded by the state, yes.  They're

state-supported schools, yes.  Not fully.  You have tuition,

12:36:13  and you have other things that make up the complete budget for

higher ed.

Q    What was the outcome of that case?

A    I was eventually successful in that.  And there were

remedies put in place by the Court.

12:36:27  Q    And what did the Court find in the case?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 122**

1  A   That there still remained in Alabama the vestiges of a

2  dual system of higher ed and to order the state to come up with

3  corrective actions.

4  Q   Was there a finding of intentional discrimination on the

12:36:44  5  part of the state?

6  A   I don't -- I can't recall whether there was a finding of

7  intentional.  I don't -- I was just so happy to get the

8  funding.  I don't know about the details.

9  Q   I understand.  That's lot of details for lawyers.

12:37:02  10     What was the remedy that was ordered?

11  A   The remedy was -- well, initially we were asking for money

12  to make up for the disparities that were taking place.  And I

13  really didn't like the remedy initially, but I think the more

14  that I looked at it, I think it was a good remedy.

12:37:24  15     There were -- Alabama State and A&M were awarded certain

16  what they call high demand programs, a certain amount of money

17  for both schools.  But it was also given an opportunity to

18  develop new programs over a period of time that were not

19  competing programs by the other universities.

12:37:45  20     As a matter of fact, in the Montgomery area, one of the

21  allegations were that in order to keep the schools segregated

22  that you had the branch campus of your major universities

23  located in Montgomery with a population of less than 200,000.

24  You had a branch campus of Auburn University, and you had a

12:38:04  25  branch campus of Troy.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 123**

1        So given a choice, white students would go to the branch

2   campus of Troy or the branch campus of Auburn before they would

3   come to an HBCU.  So that made it extremely difficult for an

4   HBCU to attract white students especially from the state of

12:38:23  5   Alabama or that particular area there.

6        So it froze the program for those schools.  They couldn't

7   bring on any new programs that would duplicate what was being

8   offered at Alabama State and Alabama A&M.  And that gave

9   Alabama State and Alabama A&M an opportunity to have what would

12:38:44  10   be known as high demand programs.

11        Alabama State was given several doctoral programs or given

12   forensic science, physical therapy, programs such as that.

13   Alabama A&M -- they combined the extension program with Auburn.

14   So now it's called the Alabama Extension Program.

12:39:02  15        So Alabama A&M participates fully in the extension program

16   with Alabama A&M, and they were given some advanced programs as

17   well.  So that's kind of a summary.

18        Oh, the other thing which was the most controversial part

19   was the Court order that Alabama State and Alabama A&M had to

12:39:20  20   recognize that they were traditionally or historically black.

21   But they were not black universities.  So they gave minority

22   scholarships.

23        So that was controversial because you had whites getting

24   scholarships to the black college campus.  And some of the

12:39:36  25   black students were a little upset about that because they

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 124**

1    couldn't get scholarships otherwise.

2         But it worked out to integrate or to bring whites onto the

3    campus of Alabama State, as well as onto the campus of Alabama

4    A&M.

12:39:50  5    Q    Was there a monetary award in the remedy?

6    A    There was a monetary award.  I mean, over a period of

7    time, like I said, initially we really wanted some cash up

8    front, but we got -- I think it was -- I don't remember the

9    exact amount initially.

12:40:11  10        But over a period of time, it's been millions of dollars

11   that's gone to Alabama State, as well as Alabama A&M not only

12   for physical growth but for the new programs, as well.

13   Q    And was there -- was part of that remedy in order to

14   correct the disparate findings that African-American --

12:40:30  15   historically black colleges had in Alabama?

16   A    Well, I don't think it insisted on correctly because it

17   was such a large gap that it's almost impossible -- when you

18   look at what has happened over the period of time since 1874,

19   you know, Alabama State and Alabama A&M with the lack of

12:40:55  20   funding, but it was to take us from where we were at that

21   particular time, given new programs and the opportunity to take

22   it from there.  I think that was basically kind of the way that

23   the order was written.

24        It didn't give us a large amount of money that would make

12:41:11  25   up for the disparities of the past, but it gave an opportunity

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 125**

1   to move from that point forward and try to do some things as it

2   relates to equalizing the playing field.

3           THE COURT:  Ms. Madduri, would this be a good time to

4   take a break?

12:41:32 5           MS. MADDURI:  Yes.  I apologize.  Yes, that would be

6   great.

7           THE COURT:  I don't know what time it is.  We'll come

8   back at 1:45.

9           MS. MADDURI:  Thank you.

12:41:45 10           THE COURT:  Thank you.

11           (Recess.)

12           THE COURT:  Ms. Madduri, are you ready to proceed?

13           MS. MADDURI:  Yes, ma'am.

14           THE COURT:  You may do so.

13:46:55 15   BY MS. MADDURI:

16   Q    Mr. Knight, do you believe that there is official

17   voting-related discrimination in Alabama today?

18   A    Yes, I do.

19   Q    Are you familiar with the current voter ID law in Alabama?

13:47:16 20   A    Vaguely, yes.  Uh-huh.

21   Q    In your opinion, is the voter ID law a form of

22   voter-related discrimination?

23   A    I was against the voter ID law because I think it created

24   such an issue for people having to go and get their ID to be

13:47:33 25   able to vote.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 126**

1    As a matter of fact, we tried to come up with legislation

2    that would address that issue and make it possible where almost

3    any form of ID you would be able to identify.  I come from the

4    train of thought that if you were a resident of Montgomery, you

13:47:48 5    shouldn't have to go through a lot of hassle to be able to

6    register and vote for the candidate of your choice.  It should

7    be open, and there shouldn't be any barriers put up.

8    Now, having said that, I do think there has to be

9    accountability.  You do have to have some form.  But it doesn't

13:48:05 10   have to be as strict as Alabama has.  I would think there could

11   be some better ways to do it.

12   The special technology the way it is now and the way that

13   you can identify people, there are so many ways now that I

14   think you could make it easier for people to vote and then be

13:48:19 15   able to take advantage of everybody having that opportunity.

16   Q    In terms of the current law that Alabama does have, do you

17   think that disparately impacts African-Americans in Alabama?

18   A    I think so.  I think that any time you put barriers like

19   that in place it has an adverse impact on low-income families

13:48:41 20   and people that -- working families, things of that nature

21   rather than professional families.  And I think

22   African-Americans make up the majority of that.  Not that it

23   will not have an adverse impact on anybody to fill in that

24   category, but African-Americans are more affected by it.

13:48:56 25   Q    Have you observed any issues with DMV offices in the Black

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 127**

1    Belt in the last few years?

2    A    If I recall correctly, it was Governor Bentley at that

3    time.  Something came up in the legislative process that he was

4    not satisfied with relative to the black caucus.  And I think a

13:49:22  5    way of punishment was closing some of the -- the offices in the

6    Black Belt.

7         I'm trying to think of what that issue may have been, but

8    I don't recall at this time.  But it -- the Governor got very

9    upset with the black caucus on some bill or legislation that he

13:49:43 10    wanted that we were opposed to.  And when we looked up, he had

11    closed all of the voting places in some of the Black Belt

12    areas, voter ID places in the Black Belt area.

13    Q    How would the closing of the DMV offices impact

14    African-Americans differently than it might white voters?

13:50:05 15    A    Well, the feedback that I got -- and I'm not in the Black

16    Belt -- but people would have to drive sometimes an hour to get

17    to a location where they would be able to get their ID to be

18    able to vote.  And I mean, that's a lot just to go get an ID to

19    be able to go vote.

13:50:27 20         So, and then there was some problems with the hours.  I'm

21    not thoroughly familiar with all of the details because most of

22    the legislators from that particular area handled that issue

23    with the Governor in trying to make the corrections.  But it

24    was a tremendous, you know, burden on people in the Black Belt

13:50:48 25    to be able to do that.  Somebody from that area will probably

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 128**

```
      1  have more information than I on that.
      2  Q    Certainly.  Have you --
      3           THE COURT:  Do you know how long that was a problem?
      4           THE WITNESS:  For some reason, we were very aggressive
13:51:05  5  and adamant about -- to include, we started filibustering in
      6  the legislature.  So I don't know.  It may have been 30 days or
      7  so.  I'm not certain on the exact time on that.
      8           THE COURT:  But it wasn't a period of years?
      9           THE WITNESS:  No, ma'am.
13:51:21 10           THE COURT:  Okay.
     11  BY MS. MADDURI:
     12  Q    Mr. Knight, have you observed any issues with
     13  African-Americans not being on the voter rolls when they go to
     14  vote?
13:51:31 15  A    Yeah.  That's interesting you would ask that question.  I
     16  ran for Senate this last election, and I've been a Democrat all
     17  my life.  And when I got to the polls to vote in the election,
     18  I was told that -- it was in the runoff election -- and I was
     19  told that I had voted in the Republican primary so I couldn't
13:51:55 20  vote in the Democratic runoff election.  And it took me almost
     21  half a day to correct that.
     22  Q    Have you observed the same thing happening to other
     23  African-Americans?
     24  A    Yes.  I work -- I worked the polling places on election
13:52:15 25  day, and there are all kind of problems many times on election
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 129**

day.  People going to vote, names not on the list, they be told

by people that -- election officials -- that they have to go to

the courthouse to correct it.

Some election officials will allow them to vote

provisional ballots.  Others would not.

There have been instances where polling places are not

open on time.  But they have allowed -- when they were not open

on time and we complained about it, they would extend the hours

and keep the polling place open for that length of time that

they were closed.

There have been instances where the 30-foot rule, 30-feet

rule that you have to stand 30 feet from the poll if you have

any campaign material, where in some polling places, they would

not allow people to have campaign material at all whether it

was 30 feet or anywhere on the property.

So there have been -- I mean, just about in every election

you have some problems that you are going to deal with on

election day.  And now, these are precincts in the

African-American community.  I focus my attention basically in

those African-American communities in the city of Montgomery.

        THE COURT:  So you don't know if there are similar

problems in any of the white precincts?

        THE WITNESS:  No, ma'am, I don't.  Huh-uh.

BY MS. MADDURI:

Q    Have you received complaints from African-Americans about

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 130**

1  these issues?

2  A    I have, yes.

3  Q    Have you received any complaints from white voters?

4  A    Not at the same level.  Maybe two or three.  I know the

13:53:59 5  issue of dealing with my name not being -- where there was a

6  mixup on whether somebody voted Republican or Democrat, I think

7  a few whites had a problem with that, as well.

8  Q    Mr. Knight, do you know how many African-Americans have

9  been elected to statewide office in Alabama?

13:54:33 10  A    I know Justice Adams was elected statewide to the Supreme

11  Court.  Justice England, I think -- I know he was appointed.  I

12  think he was elected, as well.  Justice Cook was appointed, but

13  I don't think he was subsequently elected.

14      So that would be two that I could think of immediately.  I

13:55:08 15  can think of those two that's been elected.

16  Q    And in the Alabama state legislature, are you aware of

17  approximately how many African-Americans are in the house?

18  A    It's 27.

19  Q    Are any of them elected from non-majority black districts?

13:55:30 20  A    All of them are elected from majority black districts.

21  There's one district that I would consider kind of marginal.

22  That's the one that -- the Locy Baker district down in Houston

23  County.  It may be -- it may be kind of even.  That's the only

24  one that would be considered marginal in my mind.  All the rest

13:56:02 25  of them are majority black.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 131**

```
 1              THE COURT:  The one in Houston County, what did you
 2   call it?
 3              THE WITNESS:  The Locy Baker -- he's the
 4   representative that got elected from that district.
 5              THE COURT:  Do you know how to spell Locy?
 6              THE WITNESS:  L-O-C-Y.
 7              THE COURT:  Okay.  Thank you.
 8   BY MS. MADDURI:
 9   Q    Do you think the fact that no African-Americans have been
10   elected statewide have an effect on --
11   A    Let me -- there was -- there is a district.  James Fields
12   got elected from a district in Cullman, Alabama.
13   Q    And James Fields is African-American?
14   A    He's African-American, yes.  He's no longer there.  He got
15   elected one term from a district in Cullman, Alabama.  I
16   remember that.
17   Q    Do you remember approximately when that was?
18   A    That was in -- not this past session, but the session of
19   the legislature before that.
20              THE COURT:  And do you know the racial makeup of
21   Cullman?
22              THE WITNESS:  It's white.  I don't know --
23              THE COURT:  It's predominantly white, isn't it?
24              THE WITNESS:  Yes.  I think so.  It is.
25   BY MS. MADDURI:
```

13:56:15  5
13:56:32 10
13:56:49 15
13:57:04 20
13:57:19 25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 132**

Q    Do you think that the fact that no African-Americans have
been elected statewide has an impact on the African-American
community in Alabama?

A    Well, yes.  I think that anytime you can't have
representation it's going to have an impact on it.  You like to
feel like you have people that will have at least not
everything that you stand for that you believe in, but at least
represent some of the views that you might have and that you --
you have that type of representation on all levels.

Q    When you were in the state legislature, were you involved
in the passage of any laws in relation to the composition of
boards, city boards in Montgomery?

A    That was -- I was involved in that around 19 -- around
1993 -- at the time that Montgomery changed from the council
form of government to the -- from the mayor-council to the
commission form of government -- from the commission to the
mayor-council form of government.

     I passed a bill in the Alabama Legislature that would add
diversity to all of the municipal boards.  It was a bill that
gave the council the authority to make -- to make
recommendations -- to make appointment to municipal boards,
where in the past the mayor had made appointments to all
municipal boards.  So most of them were basically white.

     When we passed that bill, that bill gave African-Americans
an opportunity to be represented on municipal boards because we

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 133**

|   |   |
|---|---|
| 1 | had a council form of government where you had four blacks and |
| 2 | five whites -- nine-member council.  So you at least have four |
| 3 | African-Americans on all your municipal boards within the city |
| 4 | of Montgomery. |
| 13:59:19 5 | Q    I'm just about done with you.  I promise. |
| 6 | Were you ever the victim of a crime in your home?  At your |
| 7 | home? |
| 8 | A    A crime in my home?  Oh.  Well, yes, it was a crime.  I |
| 9 | mean, I had a cross burned in my yard. |
| 14:00:00 10 | Q    Can you tell me about that? |
| 11 | A    That was in 19 -- it had to be around 1981 or so. |
| 12 | At the time, there was a lot of controversy in the city of |
| 13 | Montgomery.  I led the protest on the demonstration |
| 14 | concerning -- I'm trying to think exactly now what the issue |
| 14:00:20 15 | was at that time.  I was working with Montgomery improvement |
| 16 | association.  It was a controversial dealing with the police |
| 17 | department and something that had happened.  I think it may |
| 18 | have been an African-American that got shot in the back or |
| 19 | something of that nature.  And we were holding demonstrations. |
| 14:00:38 20 | And one Sunday morning, my neighbors called, and there was |
| 21 | a cross in my yard, a big telephone pole and a cross that |
| 22 | was -- I mean, it was like daylight. |
| 23 | Q    Did you find out who did -- who did it?  Who committed the |
| 24 | crime? |
| 14:01:00 25 | A    The best that I could remember -- at that time, I think |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 134**

```
 1   the Attorney General was Jimmy Evans.  And they were able, with
 2   the Southern Poverty Law Center, I think they -- they were able
 3   to find some people for that, along with some other things that
 4   had been planned.  Because at one of the demonstrations there
14:01:25  5   had been a plan to blow up a bridge or something that we were
 6   going to march over.
 7        So they were able to gather that information.  I think
 8   they tied all of it together.  I don't know all the details
 9   about the outcome of it or when it happened.  But I do know
14:01:40 10   that something did happen as it relates to them being able to
11   identify some of the people that were involved in it.
12   Q    Do you recall who those people were?
13   A    No, I do not.
14   Q    That's all my questions for you right now.
14:02:00 15   A    Thank you.
16            THE COURT:  Cross-examination?
17            MS. HOWELL:  Briefly, Your Honor.
18                    CROSS-EXAMINATION
19   BY MS. HOWELL:
14:02:40 20   Q    Hi, Representative Knight.  I didn't get to meet you
21   earlier.  I'm Laura Howell, and it is nice to meet you in
22   person finally.  I've heard a lot about you.
23   A    I hope it has been good.
24   Q    It has been.
14:02:53 25        And you have covered a lot of ground.  So please forgive
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 135**

384

```
     1   me if I take a little bit longer than maybe I should just
     2   asking you a bunch of questions.
     3        So you've talked a lot about -- and it sounds like you're
     4   very passionate about improvements for the city of Montgomery;
14:03:10 5   is that a fair statement?
     6   A    I would want to think so, yes.  Uh-huh.
     7   Q    And you talked about sort of your perspective on having
     8   Montgomery split between three congressional districts, right?
     9   A    Yes.
14:03:25 10  Q    And how you felt like that diluted the influence that
    11   someone might have there, right?
    12   A    Yes.
    13   Q    Okay.  You also said that there was probably less interest
    14   in looking after the city of Montgomery; is that correct?  Did
14:03:46 15  I understand you correctly?
    16   A    I don't know exactly what -- the intent on what I'm saying
    17   on that is I think that if you have a person that represents
    18   30,000 people opposed to somebody that only represent 3,000,
    19   that you would have more impact, in terms of the
14:04:02 20  decision-making process with that individual in terms of their
    21   priorities.
    22        Say, for instance, in politics, you establish your
    23   priorities.  If you got something that you can deliver to
    24   30,000 people, you're going to do that before you deliver to
14:04:17 25  3,000 people.  That's kind of --
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 136**

385

```
      1  Q     I understand.  So we have three Congress people that
      2  represent some part of the city of Montgomery, correct?
      3  A     We do, yes.
      4  Q     And one of them is Terri Sewell, correct?
14:04:32  5  A     That's correct.
      6  Q     And one of them is Martha Roby?
      7  A     Yes.
      8  Q     Those are the two bigger ones at issue, I think, in this.
      9  A     And Mike Rogers.
14:04:40 10  Q     And Mike Rogers is in District 3, right?
     11  A     Yes.
     12  Q     Do you know where Martha Roby lives?
     13  A     No, I don't.  I could guess, but I do not know.
     14  Q     So you don't know that she lives in Montgomery?
14:04:54 15  A     Oh, no.  She lives in Montgomery.  I thought you meant the
     16  street address or something.
     17  Q     Oh, no, sir.  I wouldn't ask you that in open court.
     18  A     Oh.  She lives in Montgomery.  Yes.  I'm sorry.
     19  Q     Do you think she's doing an effective job representing her
14:05:07 20  portion of the city of Montgomery?
     21  A     I think she's a good representative, yes.
     22  Q     Do you think that her ability to represent the city of
     23  Montgomery depends on her living in Montgomery?  Do you think
     24  that she represents it -- I'm sorry.  That's compound.
14:05:21 25        Do you think that she represents it well living there?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 137**

1  A    I think based -- because she happens to be who she is, and

2  she served on the city council there in Montgomery, I think

3  that's had an added impact in terms of her ability to represent

4  Montgomery.

14:05:39  5  Q    So in wanting -- I presume you would like a congressperson

6  who would represent Montgomery probably better and more fully

7  than someone represents it now?

8  A    Well, I would just want the best representation that we

9  could get for Montgomery.  Mainly because it's the capital

14:06:02 10  city, as I said.  And I think with all of the things that's

11  taken place in the capital city with the possibility of tourism

12  and the amount of revenue that could come in, that good

13  representation, you know, in Montgomery will certainly be a

14  plus.

14:06:19 15  Q    Sure.  But are you saying that the current representatives

16  are not representing it as well as they could?

17  A    No.  I'm not going to say that -- not as well as they

18  could necessarily.  I'm just saying if a person only had

19  3,000 -- if Martha Roby only had 3,000 people from Montgomery

14:06:38 20  district, and she had 30 or 40,000 from Houston County, then

21  the emphasis would be more on Houston County than Montgomery,

22  and her priorities would be more in Houston County than

23  Montgomery.  That's all.

24         THE COURT:  But wait a minute.  The Montgomery

14:06:51 25  representative isn't divided with Houston County, right?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 138**

1          THE WITNESS:  I just used that hypothetical as an

2     example.

3          THE COURT:  Okay.  All right.  So Mike Rogers

4     represents part of Montgomery, Macon, Russell, Lee, Tallapoosa

14:07:11 5  Chambers, Randolph, Clay -- oh, he has a big one -- St. Clair,

6     Calhoun, Cleburne, and Cherokee roughly for District 3?

7          THE WITNESS:  Right.  I assume.

8          THE COURT:  So you're saying that because he only has

9     a small part of Montgomery County, he would be less receptive

14:07:31 10 to issues that affect Montgomery County?

11         THE WITNESS:  Yes.  It's just to me -- it's just -- I

12    mean, it's just natural that you have got all those other

13    counties with much larger population, more population and

14    voters, that you have got to take care of those before you take

14:07:47 15 care of a small population there.

16    BY MS. HOWELL:

17    Q    Okay.  So let me ask you this, then:  Have you seen any of

18    the illustrative plans drawn by plaintiffs' experts in this

19    case?

14:07:58 20 A    No, I have not.

21    Q    Okay.  So then you might not know that certain of those

22    illustrative plans combine portions of Mobile County with

23    Montgomery County in a proposed second majority black district.

24         Do you think that a potential future congressperson's

14:08:17 25 attentions would be divided between Mobile County or even the

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 139**

388

1   city of Mobile and the city of Montgomery if they were to

2   represent portions of both?

3   A    Now, when it comes to the congressional districts, I have

4   looked at several districts.  You have the one that's in the

14:08:33  5   seventh, and I know sometime ago we had another one similar to

6   the board of education district, and there's one dealing with

7   Mobile.  I'm not familiar with the details of the Mobile.  The

8   only one I'm familiar with partially would be the one that

9   exists at the present time.

14:08:48 10        I do think that as you draw those that you have

11   communities of interest.  Say, for instance, Mobile and

12   Montgomery would have some things in common that a

13   representative could very well represent both -- both of those

14   areas equally and be very successful in doing so.

14:09:09 15        But when you get down to having three like we have in

16   Montgomery at the present time, I think that you could get very

17   little, in terms of attention from, say, Mike Rogers' district.

18   I know Mike, so -- I mean Representative Rogers.  He's a good

19   representative.  But I can understand where he would pay more

14:09:28 20   attention to the -- he would pay more attention to Talladega

21   maybe rather than he would Alabama State University, if that --

22   Q    Sure.  But I thought -- I understood that part of your

23   point had to do with the proportion of the population that they

24   were representing.  And so in the instance where Mobile, the

14:09:52 25   city of Mobile, and the city of Montgomery were in a single

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 140**

1   district, the city of Mobile is larger than the city of

2   Montgomery, isn't it?

3   A    I don't know what the population is.  But it may be a

4   little larger.  But I mean, if it's the entire city, I think

14:10:10 5   that would depend on the total number of the population.  And

6   to me, that would determine your interests.  If you split it

7   half and half or what your interests might be.

8        But there will be some areas of commonality to Montgomery,

9   as well as Mobile, because both of them are urban areas.  And

14:10:26 10  some of the needs and concerns would be for both areas.

11  Q    Sure.  But the same could also be said for the current

12  congressional districts, right?  So Mobile -- or, excuse me --

13  Montgomery is an urban area the same way that perhaps Dothan is

14  also a small urban area, right?

14:10:41 15  A    It could be said possibly, yes.

16  Q    And Montgomery is also an urban area that's represented in

17  part by Terri Sewell in the same way that Birmingham is in part

18  represented by her, and that's also an urban area, right?

19  A    Right.

14:10:55 20  Q    And you're not contending today as part of your testimony

21  that the city of Montgomery could only be represented

22  effectively by a black representative, correct?

23  A    Could only be by a black representative?

24  Q    Correct.

14:11:14 25  A    No.  I would -- what I am contending is I think blacks

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 141**

```
 1   should have the opportunity that if they want to elect a black,
 2   they should have the opportunity to do so.  And if you don't
 3   have a majority black district, you limit your opportunity to
 4   be able to do that presently in Alabama the way that the voting
 5   trends are.
 6   Q    But, for example, Representative Roby could, in fact,
 7   represent Montgomery just as effectively as Representative
 8   Sewell could?
 9   A    I don't know if I want to answer that question.  Martha --
10   Representative Roby is a very good representative.
11   Representative Sewell is a very good representative.
12   Q    A very diplomatic answer from a legislator, sir.
13        You also talked about -- a little bit about party
14   affiliation.  And we --
15        THE COURT:  May I ask a question before you leave that
16   completely?
17        Are you aware, Representative Knight, of circumstances
18   where Representative Sewell and Representative Roby have worked
19   together to accomplish things for their respective districts?
20        THE WITNESS:  Yes, I am.  And they work very well
21   together.  I'm very familiar with that.  They have -- I mean,
22   they have put together a great alliance, in terms of working
23   together.  There's no question about that.
24        THE COURT:  And in that sense, sometimes having two
25   people working together to accomplish things can get more done
```

14:11:31 (line 5)
14:11:48 (line 10)
14:12:05 (line 15)
14:12:26 (line 20)
14:12:46 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 142**

```
 1    in the House of Representatives than one person trying to get
 2    something done.
 3             THE WITNESS:  In that particular instance, I would
 4    have to agree with you on that.
 5             THE COURT:  Thank you.
 6    BY MS. HOWELL:
 7    Q    You also talked earlier in your testimony about your
 8    political affiliation.  And you are -- you associate with the
 9    Democratic party, correct?
10    A    I'm a Democrat.
11    Q    And you told us, I believe, that you felt comfortable
12    within the Democratic party in part because of shared
13    characteristics, including race, right?  Of other members of
14    the party?
15    A    I think that's correct.
16    Q    Did you feel comfortable in the party when it was not
17    predominantly black members?
18    A    Oh, yes, I was comfortable in the party.  I mean, we had
19    within the Democratic party -- now, I'm not going to say that
20    we agreed on everything or -- but I felt comfortable because, I
21    mean, there were other blacks in the party, and there were
22    whites in the party that in some cases totally disagreed with
23    the views of the black caucus.  And we would fight and debate
24    and everything else.  But there was a comfort level because all
25    of us were members of the same party.
```

14:13:00 — line 5
14:13:16 — line 10
14:13:32 — line 15
14:13:56 — line 20
14:14:19 — line 25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 143**

```
  1   Q     Right.  And you felt comfortable working with them?

  2   A     Yes.  Yes.

  3   Q     And that was regardless of their race, right?

  4   A     I have been able to work across not only racial lines, but

  5   I've been able to work across political lines, as well.

  6   Q     Okay.  And, in fact, some of the people that were

  7   especially state legislators used to be members of the

  8   Democratic party and have since shifted over to the Republican

  9   party, correct?

 10   A     That is correct.

 11   Q     Are you still comfortable working with them even though

 12   they are members of the Republican party?

 13   A     I feel comfortable working with them.  But once they

 14   changed to the Republican party, some of their ideas changed

 15   dramatically.  But they still remain the same individuals.

 16   Q     Okay.  And you've served in the state legislature for a

 17   good long time, right?

 18   A     Yes, I think 20 -- 20 years.

 19   Q     Yeah.  I'm attempting to do more math.  We were talking

 20   about the difficulties inherent in that earlier today for

 21   lawyers.  And I believe it's 25 years that you served?

 22   A     25, okay.

 23   Q     And the Democrats were, in fact, the majority political

 24   party in the state legislature until 2010, weren't they?

 25   A     That is correct.
```

14:14:32 (line 5)
14:14:46 (line 10)
14:14:59 (line 15)
14:15:19 (line 20)
14:15:36 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

393

```
        1   Q    And then that shifted in 2010, right?

        2   A    Yes.

        3   Q    So that the Republican -- I'm sorry.  So that the

        4   Republicans became the majority political party?

14:15:47 5   A    Yeah.  They call it storming the statehouse.

        6   Q    And just to follow that a little bit more.

        7        So the Democrats were the minority political party at the

        8   time that the current congressional districts were drawn,

        9   right?

14:16:04 10  A    The -- we were the minority, yes.  We were the minority

       11   party, yes.

       12   Q    The minority caucus, I guess?

       13   A    Caucus.

       14   Q    You also told us that you were the chair of the Alabama

14:16:22 15  Legislative Black Caucus; is that correct?

       16   A    That's correct.

       17   Q    And that you served for eight years, I think?

       18   A    That's correct.

       19   Q    Do you recall what years you served as chair of the

14:16:30 20  caucus?

       21   A    The eight -- let's see.  '15 -- two consecutive years from

       22   '15 back -- from '18 back.  I'm sorry.

       23   Q    Two consecutive terms?

       24   A    Terms, yes.

14:16:51 25  Q    Okay.  So from 2010 to 2018, does that sound right?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 145**

```
 1  A     2010 to 2018.  That would be correct, yes.
 2  Q     Okay.  And in that capacity, did you have any role in
 3  helping draft or draw up the new congressional districts that
 4  were passed in 2011?
 5  A     If my memory serves me correctly on that, I think most of
 6  the work on the congressional districts were dealt with, with
 7  the congressional delegation.  We got -- I think we got a
 8  recommendation of the plans that came down.  I didn't -- I
 9  didn't personally work on any congressional plan, no.
10  Q     Okay.  So you didn't personally work on putting together
11  even a map or anything like that?  Do you know if the black
12  caucus did?
13  A     Well, I'm sure we put together a map because we would have
14  to introduce the maps, yes.
15  Q     Okay.  Do you know if any maps were introduced by a member
16  of the black caucus?
17  A     There were -- I don't remember -- I think Representative
18  McClammy introduced at least one or two maps on behalf of the
19  legislative black caucus for the congressional district.
20        I may be -- Representative McClammy or Representative
21  Laura Hall.  I'm not certain on that, but there were some that
22  were introduced or were provided to districts in the state for
23  African-Americans.
24  Q     Do you happen to know when those plans were introduced in
25  the legislature?
```

14:17:23
14:17:45
14:18:02
14:18:21
14:18:37

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0080/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 146**

```
 1   A    No, I do not.

 2   Q    Okay.  So you don't know whether that was before or after

 3   the congressional plan had passed the legislature?

 4   A    I don't.  I don't recall.

14:18:46  5   Q    Okay.  Do you recall having any discussions with members

 6   of the majority party -- of the Republican party when those

 7   plans were being drafted?

 8   A    I'm sure I may have.  I'm not certain.  I know that we --

 9   on the behalf of the caucus, we were trying to convince them

14:19:06 10   that we would like to have two majority black districts.

11   Q    Okay.  Did you personally do that?  Or did someone else in

12   the caucus do that?

13   A    I probably personally talked to some members on the

14   legislature on that.  That would have been on the

14:19:23 15   reapportionment committee.  Whoever from the caucus -- and I

16   think it was Representative McClammy or Representative Laura

17   Hall.  I'm not certain which one at this point.

18   Q    But they either Representative McClammy or Representative

19   Hall would have spoken to someone?

14:19:37 20   A    Yes.  Or someone on the legislative black caucus would

21   have spoken to someone.

22   Q    But you have no personal knowledge of that?

23   A    I don't think so.

24   Q    Okay.

14:19:45 25   A    You're talking about congressional district, not
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 147**

396

```
        1  legislative district?

        2  Q    Correct.

        3  A    Okay.

        4  Q    Did you work with anyone on the state legislative

14:19:55 5  districts?

        6  A    Oh, yes.

        7  Q    Okay.  Did you spend a significant amount of time on

        8  those?

        9  A    Yes, ma'am.

14:20:01 10  Q    Okay.  And you submitted plans presumably for those, as

       11  well?

       12  A    We submitted several plans, yes.

       13  Q    And then subsequently the legislative black caucus decided

       14  to file suit over those state legislative plans, didn't it?

14:20:22 15  A    That is correct.

       16  Q    Okay.  And do you recall what the claims were in that

       17  case?

       18  A    They are too complex for me.  But, I mean, we went all the

       19  way -- those are the plans, I think, if you're talking about

14:20:35 20  the same one.  We went all the way to the Supreme Court on

       21  that.

       22  Q    And that was before a three-judge court in Montgomery went

       23  all the way up, came all the way back down, right?

       24  A    Yes.

14:20:44 25  Q    And resulted in changes to the state legislative
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 148**

```
 1  districts, correct?
 2  A    It did.
 3  Q    But that case did not bring any claims against the
 4  congressional districts in Alabama, did it?
 5  A    That case, to my recollection, was strictly on the
 6  legislative districts, not the -- you said the congressional
 7  districts?
 8  Q    Yes, sir.
 9  A    Not that I am aware of.  I don't think -- I don't think
10  that was included in that.
11  Q    So it only concerned the state legislative districts?
12  A    The state legislative districts, yes.
13  Q    Okay.  Now --
14  A    I wouldn't mind including the congressional districts in
15  there.
16  Q    Well, why did you not?
17  A    I don't -- we were only addressing the legislative
18  districts.
19  Q    Okay.  You also talked a lot about the different problems
20  that have faced Montgomery that you've seen while you've been a
21  legislator.  You mentioned a lack of emphasis on education, and
22  a lack of funding for mental health, and seeking criminal
23  justice reform.  I believe those were three big ones that you
24  mentioned, correct?
25  A    Yes.
```

14:20:54 (line 5)
14:21:08 (line 10)
14:21:22 (line 15)
14:21:50 (line 20)
14:22:07 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1  Q    Would you characterize those as concerns that are specific
 2  to Alabama, or do you think that those are nationwide concerns?
 3  A    Well, I mean, I can speak for what I -- what I experienced
 4  here in Alabama.  I don't know on the national level whether
 5  they have the same issues and/or concerns or not.  I think they
 6  have some that are very similar.  But I think that when it
 7  comes to the correctional department, when it comes to mental
 8  health, it's much more pervasive here than other areas from
 9  what I've seen.
10       When you look at the number of people that's incarcerated,
11  you look at the complaints even from corrections, in terms of
12  being unable to handle the caseload when it comes to mental
13  health patients that they have within the corrections facility,
14  there's an ongoing lawsuit on that at the present time.
15       So I mean, it's just -- I mean, it's -- it's at a boiling
16  point here in Montgomery.  And something has to be done from a
17  legislative perspective to address it.
18  Q    But you think that those concerns are particular to
19  Alabama?
20  A    I'm not going to say they're particular to Alabama, but
21  I'm just saying that the concerns are real here in Alabama.  I
22  can speak for that being here.
23       And having been in the legislative process and knowing
24  what it takes to actually try to address those which would be
25  additional funding and the difficulty in terms of trying to get
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 150**

1    the funding to do what's necessary.  So I can speak to that.

2    But I can't say on the rest of the country what it might be.

3    Q    You also talked about a lack of opportunities for, in

4    particular, younger people in Alabama, and noted that people

14:23:55 5    are leaving the state to seek other opportunities, especially

6    members of the black community; is that correct?

7    A    Yes.  Uh-huh.

8    Q    And you said that you didn't think -- that you were very

9    concerned about leaving -- leaving children in a better

14:24:13 10    position than their parents were in when they were their age;

11    is that fair?

12    A    I think that's fair.  I want to make sure that they are in

13    a better position than their parents, yes.

14    Q    And I framed that very badly, and you put it more

14:24:28 15    eloquently than I did.

16         Do you have kids?

17    A    I do.

18    Q    Do you think that they're in a better position than you

19    were in when you were their age?

14:24:36 20    A    Oh, yes.

21    Q    Okay.  You also discussed some problems that at least you

22    have seen a very particular side of in Montgomery and mentioned

23    particularly -- I'm thinking of the millage rate and that being

24    on the ballot twice in Montgomery, to raise the millage for

14:25:05 25    public education; is that right?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 151**

```
 1   A    That's correct.

 2   Q    And you said it had failed twice.  Do you know when that

 3   was on the ballot?

 4   A    I should -- I can't give you the dates.  I remember

 5   because -- I can't remember when it was on the ballot, no.

 6   Q    Do you know if it was in like the last five years?

 7   A    No, not the last five years.

 8   Q    Okay.  More than a decade ago, maybe?  Before 2008?

 9   A    Maybe.

10   Q    So --

11   A    I can give you the name of the people --

12   Q    The names of the people that?

13   A    That -- that was supportive of it because it was a good

14   cross-section of people that supported it, but it just didn't

15   pass.  I'm sorry.

16   Q    We're all a little looser after lunch.  Apparently, it's

17   nap time.

18        So when you talked about the millage increase being voted

19   down, you also had mentioned at a different point in time in

20   your testimony that the city of Montgomery and Montgomery

21   County are both majority black, are they not?

22   A    They are now, yes.

23   Q    Do you know when that became the case?

24   A    Just recently within the last four years possibly.

25   Q    Okay.  All right.  You also talked about -- you were asked
```

14:25:17 (line 5)
14:25:31 (line 10)
14:25:51 (line 15)
14:26:04 (line 20)
14:26:18 (line 25)

**Caster Plaintiffs' Exhibit 85, Page 152**

```
         1  questions about problems with voter rolls and with polling

         2  places in Montgomery.  Do you remember that?

         3  A    Yes.

         4  Q    And you talked specifically about, you know, places not

14:26:39 5  being open when they were supposed to be, or being moved

         6  around, and other things of that nature, I believe; is that

         7  right?

         8  A    I did.

         9  Q    Well, first, do you recall -- or do you know actually

14:26:53 10 whether polling places are run by local officials or by state

        11  officials?

        12  A    Well, the polling places are supervised by the Secretary

        13  of State's office, as I understand it.

        14  Q    Do you know who is in charge of deciding where polling

14:27:08 15 places are?

        16  A    The county commission on the local level --

        17  Q    Okay.

        18  A    -- would be.

        19  Q    Do you know if the probate judge plays a role in that?

14:27:14 20 A    I don't think the probate judge decides.  I think the

        21  county commission decides the location of polling places.  I

        22  think the probate judge can make recommendations.

        23  Q    Okay.  But the -- excuse me.  The probate judge is in

        24  charge of making sure the polling places are staffed and

14:27:30 25 operational --
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 153**

402

```
     1   A     Yes.
     2   Q     -- is that fair?
     3         Can you tell me when you encountered these problems at the
     4   polling places?
14:27:41 5  A    There have been problems at the polling places ever since
     6   I was working the polling places even before I was an elected
     7   official.  And there are still problems we encounter at the
     8   polling places.
     9   Q    And so you've even encountered problems at the polling
14:27:58 10  places while they have been under the supervision of the
    11   current probate -- well, the probate judge who was recently
    12   elected mayor?
    13   A    Yes.  I have -- I personally have some problems at the
    14   polling places there.  But I'm saying there have been problems
14:28:13 15  at the polling places.
    16        I worked at polling places every election just about, and
    17   there have been various problems from people names not being on
    18   the voting list; people that registered to vote, but their name
    19   did not appear there, and they thought they were registered
14:28:28 20  voters but somehow the forms had not been turned in; people
    21   going to the polling places and saying that their name's not on
    22   the list, and they should be able even if their name is not on
    23   the list, they should be eligible to vote a provisional ballot,
    24   but the polling officials tell them they have to go to the
14:28:49 25  courthouse and register -- couldn't vote in that election.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 154**

```
 1        There's just a number of problems such as that that I have
 2   seen take place at the polling places.
 3   Q    But those are all by and large either created by or
 4   resolved by local election officials, are they not?
 5   A    Well, but you have -- I couldn't just pin it down to just
 6   local officials, because the way the whole process operates, as
 7   I understand it, is the Secretary of State on the state level
 8   is responsible for the operations in state elections.
 9        You also have voter registrars that's responsible for
10   voter registration, making sure everybody's on the voter list.
11   And the registrars are appointed by the Governor, the
12   Agricultural Commissioner, and one other person.  But it's a
13   three-member panel that appoint all of the registrars.
14        Say, for instance, Montgomery right now is a majority
15   black county, but we have three white board members on the
16   board of registrars.
17   Q    And the black probate judge, correct?
18   A    And you have a black probate judge that recently got
19   elected.
20   Q    Yes.  Steven Reed has now been elected mayor?
21   A    Yes.
22   Q    In a landslide, right?
23   A    It was.
24   Q    But you would agree with me that these elections are meant
25   to be run and operated by and are currently, at least in
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 155**

          1    Montgomery County, by both black and white officials alike?

          2    A    At the present time, yes.

          3    Q    I'm going to loop back really quickly.

          4         We had talked about the Democratic party and your

14:30:48  5    leadership roles in the Democratic party.  Would you say that

          6    it's true that basically everywhere in the United States black

          7    voters tend to vote for Democratic candidates?

          8    A    I -- I can't speak for everywhere.  I say in Alabama that

          9    is basically the case.  And when you look at it across the

14:31:09 10    country, it seems that way.

         11    Q    Representative Knight, just a couple more questions for

         12    you.

         13         We had talked earlier about the legislative black caucus

         14    being involved in the redistricting process for congressional

14:32:41 15    districts.  Do you remember that?

         16    A    Yes.

         17    Q    And you said that Representative McClammy had by and

         18    large, you thought, been in charge of introducing plans on

         19    behalf of the caucus; is that right?

14:32:52 20    A    I said he had introduced some.  I mean, a number of people

         21    introduce plans.  I don't remember everybody.  I think I

         22    introduced plans myself.

         23    Q    For the congressional districts?

         24    A    Oh, not the congressional districts.  No.  I thought you

14:33:05 25    said on reapportionment.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 156**

```
 1   Q    Oh, I'm sorry.  I should have been more specific.  For the
 2   congressional redistricting?
 3   A    I don't -- I mean, I think Representative McClammy, I knew
 4   he had a plan.  Now, whether he introduced it or not, I'm not
14:33:18 5   certain.
 6   Q    Okay.
 7   A    Or a plan was introduced, if I'm not mistaken.
 8   Q    I wanted to show you a couple of maps from one of the
 9   defendants exhibits, Exhibit 3, and ask you -- well, just to
14:33:31 10  confirm with you that these are the plans that were introduced
11   by Representative McClammy.
12        MS. MADDURI:  Objection.
13        MS. HOWELL:  He's says that he's in charge of the
14   legislative black caucus, and these were introduced on behalf
14:33:45 15  of the legislative black caucus.  Unless you wish to withdraw
16   your statement that Representative McClammy was acting on
17   behalf of the caucus.
18        MS. MADDURI:  He testified that he's not familiar with
19   the maps, or he's not even sure if they were introduced.
14:33:57 20       THE COURT:  Well, I think it would be super human
21   amazing if he could, in fact, remember without seeing anything
22   what may have been introduced in 2010.  So I have no problem
23   with Ms. Howell showing him the map and seeing if he remembers
24   it, or, you know, if he does, great.  If not, that's another
14:34:19 25  thing.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 157**

```
 1        And so which exhibit are you referring to?
 2            MS. HOWELL:  This is Defendant's Exhibit 3, Your
 3   Honor.  And I'm currently looking at -- it will be Exhibit C-10
 4   of the preclearance submission.  And it's Chestnut Defense 179.
 5   Or actually let me see if I can get 179 and 180 on there at the
 6   same time.
 7            THE COURT:  So it's part of Defendant's Exhibit 3?  Is
 8   that what you said?
 9            MS. HOWELL:  Yes, ma'am.
10            THE COURT:  What page?
11            MS. HOWELL:  I believe it will be pages 179 and 180
12   we're looking at.
13   BY MS. HOWELL:
14   Q    And, Representative Knight, is that on your screen up
15   there, or no?
16   A    No, it's not.
17   Q    It might take a minute to pull up.
18   A    It is now.
19   Q    And can you read the top part of that page what it says?
20   A    It says -- it says, "McClammy 2010 U.S. congressional
21   plan."
22   Q    And then on the next page, which is Chestnut?
23            THE COURT:  Well, just before we leave that, you may
24   be able to recognize Montgomery County a little better than I
25   do.  But does that plan still show three districts in part of
```

14:34:43
14:35:01
14:35:15
14:35:34
14:36:01

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 158**

1    Montgomery County?

2              THE WITNESS:  I think it only shows one.  Well,

3    maybe --

4              THE COURT:  Seems like the blue from 3.

14:36:25  5              THE WITNESS:  Yeah.

6              THE COURT:  Comes in there, and a little of the pink

7    from 7 still comes in there.

8    BY MS. HOWELL:

9    Q    So does that map also appear to split Montgomery County

14:36:51 10    three ways?

11    A    This map here?  If the blue comes in, yes.  And if the

12    pink comes in, it will split it three ways.

13         If I'm reading it correctly here based on what I --

14    Q    I'm going to refer you --

14:37:15 15              THE COURT:  And, Ms. Howell, I believe that this was

16    one of the exhibits that had not been pre admitted; is that

17    correct?

18              MS. HOWELL:  That is correct, Your Honor.  But I

19    believe that the only objection to the exhibit was to the

14:37:27 20    extent that it was offered as evidence of the legislature's

21    intent in passing the plans; unless plaintiffs articulate

22    another objection.

23              THE COURT:  What's the objection to this information

24    that's in Defendant's Exhibit 3, which is the preclearance

14:37:51 25    submission?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 159**

```
 1          MS. MADDURI:  Your Honor, Ms. Howell's correct.  Our
 2   objection is to the extent that the maps are offered as an
 3   intent of legislators at the time.
 4          THE COURT:  Overruled.
 5          MS. MADDURI:  Or, no -- I'm sorry.  I'm trying to say
 6   that we agree with her.  We're not objecting to the extent that
 7   it's not being used for -- the intent of legislators.
 8          THE COURT:  Okay.  All right.  Got it.
 9          MS. HOWELL:  My apologies.
10   BY MS. HOWELL:
11   Q    And, Representative Knight, I'm very sorry for my lack of
12   facility with all the technology.  But we will flip to the next
13   page that's in this.  And then if you can see right there, it's
14   very small print.
15          THE COURT:  Ms. Howell, when you're away from the
16   microphone, you may need to speak just a little bit louder.
17   BY MS. HOWELL:
18   Q    So on this next page, it talks about -- or it's a
19   population summary of the plan.  Do you see that at the top?
20   A    I do.
21   Q    And I wonder if you can read -- I'm sorry.
22   A    No.
23   Q    I'm struggling.  The number that is highlighted in yellow
24   there at the bottom, if you can take a quick look at this chart
25   and tell me how many of the districts in this plan have a
```

Timestamps: 14:38:06 (line 5), 14:38:22 (line 10), 14:38:45 (line 15), 14:39:07 (line 20), 14:39:31 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 160**

1  majority black population?

2  A    It looks like one.

3  Q    Okay.

4  A    Okay.

14:39:59 5         THE COURT:  And just to be clear, this population

6  summary report on page 180 of Defendant's Exhibit 3 deals with

7  which congressional district plan?  Can you tell,

8  Representative Knight?

9         THE WITNESS:  It says plan -- it says Plan McClammy

14:40:25 10  Congressional B.  I don't know what that is.

11        THE COURT:  Okay.  But this is not a population report

12  for the 2011 congressional redistricting plan that's at issue

13  here, right?  Or Ms. Howell?

14        MS. HOWELL:  Correct.

14:40:47 15        THE COURT:  Not that I'm taking testimony from an

16  attorney.

17        MS. HOWELL:  This is all submitted.  I apologize for

18  lack of preparedness.  But this is all part of the same single

19  exhibit to preclearance submission.

14:41:14 20  BY MS. HOWELL:

21  Q    So that first plan -- that first plan only appears to have

22  one majority black district in it?

23  A    That particular plan, yes.

24        THE COURT:  And it's District 7, right?

14:41:37 25        THE WITNESS:  Yes.  It's District 7.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 161**

```
         1   BY MS. HOWELL:
         2   Q    And so that was one plan submitted by Representative
         3   McClammy on -- presumably on behalf of the legislative black
         4   caucus?
14:41:53 5   A    I can't say it was on behalf of the caucus.
         6        The way the legislative process operates, every legislator
         7   has a right to introduce a plan.  And there was several --
         8   there may have been several plans that were introduced.  I'm
         9   just not certain.
14:42:09 10  Q    Do you have any reason to dispute that all of the plans
         11  that were submitted would be in the preclearance submission?
         12  A    Would be in the preclearance submission?
         13  Q    Yes, sir.  To the Department of Justice?
         14  A    No.  I don't know.  I don't know.
14:42:29 15  Q    I direct you to the next plan that was submitted by
         16  Representative McClammy.  Can you see from -- I apologize for
         17  being terrible with technology.
         18            THE COURT:  You're doing fine.
         19  BY MS. HOWELL:
14:42:57 20  Q    Can you see from this view that's on your screen that this
         21  is another of the congressional plans submitted by
         22  Representative McClammy?
         23  A    I can, yes.
         24  Q    So it says, "2010 McClammy Congressional Plan 2M;" is that
14:43:14 25  right?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 162**

411

```
 1   A     Congressional Plan 2M, yes.

 2   Q     And then I switch to -- this is page 194, which is --

 3         THE COURT:  If you just give it a minute, it will kind

 4   of adjust itself, and then you can adjust it in or out more.

14:43:34  5   BY MS. HOWELL:

 6   Q     And, Representative Knight, can you see up in the corner

 7   of that page -- I'm going to mark it on mine, and hopefully

 8   that shows up on yours -- and read back for me what that says

 9   at the top?

14:43:56 10   A     It says, "McClammy Congress 2M" it looks like.

11   Q     Okay.  So that appears to match the description on the

12   page before that it would be a plan submitted by Representative

13   McClammy?

14   A     It appears to be, yes.

14:44:12 15   Q     Okay.  And then on the next page over, which I may have to

16   zoom again -- is that clear enough to read?

17   A     I think I can make the numbers out here.  Okay.  Yes.

18   Q     And can you read for me the part that I'm underlying on

19   the screen?

14:44:53 20   A     "Plan McClammy Congress" -- I can't make out that.

21   Q     Would you have any reason to dispute it if I told you it

22   said, "Plan McClammy Congress 2M?

23   A     2 what?

24   Q     2M?

14:45:10 25   A     2M?
```

**Caster Plaintiffs' Exhibit 85, Page 163**

412

```
 1  Q    You wouldn't have any reason to dispute that?

 2  A    I wouldn't have a reason to dispute it or not.

 3  Q    You've watched me flip through this book over here,

 4  correct?  So it probably and presumably goes with the other

 5  things that read "McClammy Congress 2M"?

 6  A    Okay.

 7  Q    And can you see and read on here how many -- take a second

 8  and look at the chart, and tell me how many majority black

 9  districts are included in this plan?

10  A    I see one, which is 420 -- looks like 425.  425,000 black.

11  And then there's another one that's -- I don't know, is that 3

12  or 2?

13  Q    I believe that is a 3.

14  A    3?  Okay.  That would be 2, then.  If that is a 3.  I

15  can't make that number out.

16          THE COURT:  That would be District 7 and District 3;

17  is that correct?  Can you see that?

18          THE WITNESS:  Yes.  I can see the districts.

19  BY MS. HOWELL:

20  Q    So this plan, in fact, did have two majority black

21  districts as part of it?

22  A    According to what I see here, yes.

23  Q    And then, Representative Knight, can you tell me what this

24  page says at the bottom?

25  A    "Congressional Plan PPB," it looks like --
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 164**

413

```
         1          THE COURT:  What page is that on, please, Ms. Howell?

         2          MS. HOWELL:  That is on page 209, Your Honor.

         3          THE COURT:  Thank you.

         4   BY MS. HOWELL:

14:47:34 5   Q    And I will flip from there over to page 210, and then get

         6   you, Representative Knight, to confirm that the writing up at

         7   the top right there also says "McClammy Congress PPB"?

         8   A    It does, yes.

         9   Q    And does that appear to be a partial plan to you?

14:47:54 10  A    It's like a partial plan, or the map has been cut off

        11   here.

        12   Q    Yes.  It does look like that.

        13   A    It's not the entire state.

        14   Q    Right.  It does look like the map was cut off, which I

14:48:15 15  cannot vouch for the copying over at the state legislature.

        16   I'm sorry.

        17   A    I can't either.

        18   Q    Let's see.  I've now flipped over to page 211 of this

        19   submission.

14:48:34 20          THE COURT:  Representative, let me let you have the

        21   book that I have.

        22          THE WITNESS:  Yes, ma'am.  Thank you.

        23          THE COURT:  That may help you read it a little better.

        24   BY MS. HOWELL:

14:48:49 25  Q    And can you see up in the top left-hand corner that this
```

**Caster Plaintiffs' Exhibit 85, Page 165**

414

1  also says "McClammy Congress PPB"?

2  A    Yes.  In the left, yes, "Congress PPB."

3  Q    And it looks like, in fact, the map might have just been

4  cut off, doesn't it?  Because there are numbers for all seven

14:49:07 5  districts, as opposed to just the three that were shown on the

6  map?

7  A    There's numbers for all seven districts --

8  Q    Okay.

9  A    -- on this report, yes.

14:49:15 10  Q    Yes.  And according to this report, how many of the

11  districts does it look like contain a majority black

12  population?

13  A    District 7 is the -- District 7 it looks like on this one.

14  Q    Okay.

14:49:36 15  A    One.  One district.

16  Q    Thank you.  And do you have any reason to believe that

17  Representative McClammy submitted any other districting plans

18  that we wouldn't know about from this preclearance submission?

19  A    I would have no idea.  Like I say, legislators introduce

14:49:59 20  bills every day, so I would -- Mr. McClammy would have to

21  respond to that.  I wouldn't know how many plans he would have

22  introduced.

23  Q    But, to your knowledge, the legislative black caucus did

24  not present any other plans for the congressional redistricting

14:50:14 25  cycle in 2011 that contained two majority black districts

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 166**

1  outside of the one that we just reviewed that Representative

2  McClammy put forward?

3  A    To my knowledge, I'm not familiar with one.  I'm not going

4  to say that one was not introduced on behalf of the caucus.

14:50:32 5  But I don't recall another one.  I know that was a plan that

6  created two districts.

7  Q    And that would be the middle plan that we looked at,

8  correct?

9  A    From the one that I've seen here today, yes.

14:50:42 10 Q    Thank you.

11            THE COURT:  Ms. Howell, were you offering these

12 exhibits at this time?

13            MS. HOWELL:  Yes, Your Honor.  We would offer Defense

14 Exhibit 3 just for the purpose of showing those plans and what

14:51:07 15 was offered.

16            THE COURT:  Okay.  And should we just excerpt those

17 that you showed him, or are you -- trying to figure out what we

18 are wanting to do with this huge big book.  And if you're not

19 offering it for the intent of the legislature, I think there's

14:51:31 20 not an objection to it now?

21            MS. HOWELL:  That is my understanding, Your Honor,

22 that all of it would be admissible as long as it's not to show

23 intent.

24            THE COURT:  Is that correct?

14:51:44 25            MS. MADDURI:  We would withdraw our objection to

**Caster Plaintiffs' Exhibit 85, Page 167**

1  preclearance.

2         THE COURT:  So Defendant's Exhibit 3 is admitted,

3  then.

4         MS. HOWELL:  Thank you.  And thank you, Representative

14:51:54 5  Knight.  I apologize for all of the technical difficulties.  I

6  know I am a millennial, but I'm really not.

7         THE COURT:  Any redirect?

8         MS. MADDURI:  No, Your Honor.

9         THE COURT:  All right.  Thank you, Representative

14:52:12 10  Knight.  We appreciate you being here today.  And you may step

11  down.

12         THE WITNESS:  Thank you.  Thank you.

13         THE COURT:  Do you want a short break before we get to

14  our next witness?

14:52:23 15         MR. SPIVA:  That would be good, Your Honor.

16         THE COURT:  Okay.  We'll come back at five after 3:00?

17  10 after 3:00.

18         MR. SPIVA:  Thank you.

19         (Recess.)

15:13:29 20         THE COURT:  Plaintiffs may call your next witness.

21         MS. KHANNA:  Thank you, Your Honor.  Plaintiffs call

22  Lakeisha Chestnut.

23                      LAKEISHA CHESTNUT,

24  having been first duly sworn by the courtroom deputy clerk, was

15:13:35 25  examined and testified as follows:

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 168**

```
  1              THE CLERK:  Please state your name for the record in

  2    the microphone.

  3              THE WITNESS:  My name is Lakeisha Chestnut.

  4              THE COURTROOM DEPUTY CLERK:  Thank you.

15:13:54  5                      DIRECT EXAMINATION

  6    BY MS. KHANNA:

  7    Q    Good afternoon, Ms. Chestnut.

  8    A    Good afternoon.

  9    Q    Ms. Chestnut, are you a plaintiff in this case?

15:14:00 10    A    Yes, I am.

 11    Q    Do you live in Alabama?

 12    A    Yes, I do.

 13    Q    What county do you reside in?

 14    A    Mobile.

15:14:06 15    Q    And what city do you reside in?

 16    A    Mobile.

 17    Q    Do you have family in Alabama?

 18    A    Yes, I do.

 19    Q    Which family?

15:14:12 20    A    My husband, my kids, my mom, aunts, and uncles live in

 21    Mobile County.  I have family in Marengo, Wilcox County.  And I

 22    have family right here in Birmingham.

 23    Q    And how long have you lived in Alabama?

 24    A    I've been in Alabama since I was 17 months old.  I moved

15:14:35 25    away when I was 20 in 1996.  I've been off and on in Alabama
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 169**

|       |   |
|-------|---|
| 1     | for a while.  And then I officially came home in May of 2016. |
| 2     | Q    And what is it that you do for a living? |
| 3     | A    I am a licensed sales agent and a team technical expert at |
| 4     | Results Companies in Mobile, Alabama. |
| 15:14:59 5 | Q    And can you tell me a little bit about your educational |
| 6     | background? |
| 7     | A    So I attended Murphy High School, got my GED in 1995, been |
| 8     | to college off and on.  And now I'm currently a college student |
| 9     | at Academy of Art University in San Francisco, California where |
| 15:15:19 10 | I attend online study and screenwriting. |
| 11    | Q    Ms. Chestnut, are you registered to vote in Alabama? |
| 12    | A    Yes, I am. |
| 13    | Q    When did you first register? |
| 14    | A    When I was 18. |
| 15:15:30 15 | Q    When you moved out of Alabama -- I believe you said 1996? |
| 16    | A    Yes. |
| 17    | Q    Did you change your voter registration? |
| 18    | A    Yes, I did. |
| 19    | Q    And when you moved back to Alabama in May of 2016, did you |
| 15:15:41 20 | re-register in Alabama? |
| 21    | A    Yes, I did. |
| 22    | Q    Do you vote regularly? |
| 23    | A    Yes, I do. |
| 24    | Q    Would you say that voting is important to you? |
| 15:15:50 25 | A    It's very important to me. |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 170**

1  Q    Why?

2  A    Because my vote is my voice.  It makes me hold the people

3  that represent me accountable for everything that they do,

4  whether it's a local level, state level, or even federal level.

15:16:02  5  Q    And what congressional district do you live in?

6  A    I'm in Congressional District 1.

7  Q    Who currently represents Congressional District 1 in

8  Alabama?

9  A    Bradley Byrne.

15:16:14  10  Q    Have you supported him in congressional elections?

11  A    No.

12  Q    Have you voted for Bradley Byrne?

13  A    No.

14  Q    As far as you know, have Mr. Byrne's congressional races

15:16:23  15  been competitive --

16  A    No.

17  Q    -- since you returned to Alabama in 2016?

18  A    No, they have not.

19  Q    And what makes you say that?

15:16:30  20  A    Because in the first time that he ran, he has run

21  unopposed.  He has had some -- some opponents, I think, in one

22  primary, and a couple opponents in the general election.

23       In 2018, there was a young man by the named of Robert

24  Kennedy, Jr., who ran against him, and he lost by 30 points.

15:16:57  25  Q    Ms. Chestnut, you grew up in the city of Mobile; is that

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 171**

420

| | |
|---|---|
| 1 | right? |
| 2 | A     That is correct. |
| 3 | Q     And since you moved back to Alabama, you've lived in |
| 4 | Mobile; is that right? |
| 15:17:09 5 | A     That is correct. |
| 6 | Q     Did you go to public school in Mobile? |
| 7 | A     Yes, I did. |
| 8 | Q     Do you have children who went to public school in Mobile? |
| 9 | A     Yes, I did. |
| 15:17:15 10 | Q     Based on your experiences in the area, does the |
| 11 | African-American community in Mobile have unique needs and |
| 12 | interests related to public education? |
| 13 | A     Yes, they do. |
| 14 | Q     And what would -- what are those? |
| 15:17:27 15 | A     So -- excuse me -- our public schools are failing.  A lot |
| 16 | of the black students that go to predominantly black schools |
| 17 | are basically struggling to survive, struggling to get, you |
| 18 | know, get their education.  They are trying to do the best that |
| 19 | they can with what they have. |
| 15:17:58 20 | We have a few of our majority black schools that are |
| 21 | currently on the failing list.  I don't think there's like a |
| 22 | couple of white schools that are on that list from Mobile |
| 23 | County. |
| 24 | But they work hard.  They try their best.  But and some of |
| 15:18:20 25 | them want to go to really good schools.  But they -- some end |

**Caster Plaintiffs' Exhibit 85, Page 172**

1   up going to community college and then transferring to a

2   different, you know, transferring to another school.  Some just

3   go straight from high school to the workforce.

4       So it's -- the struggle for having a really great public

15:18:47 5   education is truly real.

6   Q    And you mentioned -- what about white -- white students in

7   Mobile or white families in Mobile?  Do they -- don't they have

8   an interest in public education, as well?

9   A    They do.  But their needs are different than ours.

15:19:02 10      White kids don't -- when I was in school -- I will put it

11  to you like this.  When I was in high school, I went to Murphy

12  High School.  Murphy was, first of all, the first school that

13  was integrated in Mobile County.  Second, it was a majority

14  white school when I went there.  Now it's a majority black

15:19:19 15  school because all the students that attend Murphy or were in

16  Murphy's district are either going to private schools, like

17  Saint Paul's or Saint -- or UMS-Wright or McGill-Toolen, or

18  they're going to school further out west that have majority

19  white students that attend there.  So they're not going to like

15:19:43 20  schools like Williamson or Blount or Vigor.  They're going to

21  like Baker or Alma Bryant.  Those are the schools that they're

22  attending.

23  Q    And what about higher education?  Are there any, in

24  particular, interests within the African-American community in

15:20:00 25  Mobile regarding access to higher education?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 173**

1    A    We can't afford it.  I am a product of that.  I don't have

2    a Pell Grant.  I actually had to take the semester off because

3    I couldn't afford my classes this semester.  My student loan

4    was only enough to pay for maybe one and a half of my classes.

15:20:20 5    So I have to wait until next semester to see if I have enough

6    in student loans just so I can attend my -- my classes next

7    semester.  After that, I don't even know.

8         I just feel like I'm going to have to give up on my dream

9    of being a screen writer.  You have to -- you -- student --

15:20:42 10   black students have to see if they can get a scholarship just

11   to attend school.

12        My daughter just graduated a few years ago.  My

13   daughter -- she attended -- she wanted to attend Harvard.  That

14   was her dream school.  But she thought her grades weren't good

15:21:02 15   enough so she could attend Harvard.  So she ended up at Bishop

16   State Community College, and then turned around and transferred

17   to Troy and switched her major a couple of times, but now she

18   is a chemical engineering major.  And that's because that's the

19   only way she could afford to go to school.

15:21:21 20        So affordability, having the resources to be able to go to

21   school, not going into debt, you know, to get our degrees?  I

22   mean, I'm 43 years old, and I'm still trying to go back to

23   school, and I can't even afford it.

24        So, yes, so those are one of our immediate concerns with

15:21:38 25   higher education.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 174**

423

1   Q    Does the African-American community in which you live in

2   Mobile have any unique needs or interests relating to criminal

3   justice?

4   A    Yes.

15:21:49 5   Q    And what are those?

6   A    We're more concerned with a lot of police brutality.

7        My husband walks everywhere that he wants -- that he needs

8   to go.  I can't begin to tell you how many times that my

9   husband has come home and said that he's been pulled over by

15:22:09 10  the police just because he looked like somebody that committed

11  a crime.  Every night when he goes out for his nightly walk,

12  I'm afraid that he may never come home.

13       The last time he got pulled over by the police, they held

14  him for an hour and a half for a shooting that happened in the

15:22:28 15  opposite direction that he was going because he went to

16  Wal-Mart to go grab dinner for the night.  And when he was

17  coming back, that's when the police stopped him.

18       So that's a concern.  It's a concern for me.

19       I be at home alone sometimes.  What if one of my neighbors

15:22:46 20  like what happened to the young lady in Fort Worth?  What if

21  one of my neighbors got concerned and saw me in the window and

22  shoots me in my own home?  You know.

23       My stepson, 15 -- well, actually 16, just turned 16, I

24  worry about him.

15:23:04 25       So we worry about those things.  We worry about the high

**Caster Plaintiffs' Exhibit 85, Page 175**

1  incarceration rates, how a lot of our black young black men are

2  being incarcerated at higher rates than whites.  It is an

3  issue.

4       And I wish that we had more -- somebody who actually

15:23:25  5  represented us that actually addressed those concerns.

6  Q    Has Congressman Byrne taken any actions in Congress

7  related to criminal justice?

8  A    Yes, he did.

9  Q    What did he do?

15:23:36 10  A    He voted against the First Step Act.

11  Q    And what is the First Step Act, as far as you know?

12  A    The First Step Act is a bill that was passed that allowed

13  first-time offenders who get out on parole to get help with

14  education opportunities, job opportunities, housing, whatever

15:24:00 15  they need once they are released from jail.

16       And so that's a good first step.  There needs to be more.

17       But for him to vote against that, something that is

18  helpful in the way, really kind of made me a little mad, little

19  upset about it.

15:24:23 20  Q    Are there any particular needs or interests among the

21  African-American community in Mobile relating to employment?

22  A    So Mobile is -- as far as jobs are concerned, the major

23  employers in Mobile are Austal, Airbus, and some people might

24  consider the docks.  But the two biggest ones is Austal and

15:24:53 25  Airbus.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

Caster Plaintiffs' Exhibit 85, Page 176

1       And with Austal, there is an apprenticeship program for

2   Austal.  But, one, you need a GE -- you know, you need a high

3   school diploma or GED.  You do need a clean record in order

4   to -- in order to be any part of this program.

15:25:15  5       Another one, of course, Airbus.  You got to have a degree,

6   I know, because I looked.  Because I was thinking about working

7   for Airbus at one point.  But you have to have a degree of some

8   sort to work for Airbus.  And also, another, clean record.

9       And a lot of young men don't have clean records.  They

15:25:37 10  have a felony, and they can't get a job at Austal, or they

11  can't get a job at Airbus.

12      They work -- there are a lot of young men that have to

13  either start they own business if they can, like my nephew who

14  started his own power washing business.  They have to work like

15:25:59 15  a fast food, like Burger King, or McDonald's, or retail, or

16  restaurants like Olive Garden.

17      I mean, there really is not a whole lot in the way of

18  good-paying jobs in Mobile unless you're working at a call

19  center or the other two places that I just mentioned.

15:26:22 20  Q    Do you feel like the issues that you had mentioned about

21  African-Americans in the fields of education, criminal justice,

22  affect the abilities of African-Americans to obtain good

23  employment in Mobile?

24  A    Yes.

15:26:33 25  Q    Are there any particular needs or interests relating to

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 177**

health care among the African-American community in Mobile?

A    This is one of my biggest issues.  I am a daughter of a nurse -- actually a granddaughter of a nurse.  I have seen the level of care and the access to care go down since my grandmother was alive.  And my grandmother passed away in 2001.

It's harder now when you go to the hospital, especially if you have to go to the emergency room, and you have to get, like get seen.  If you're really sick, you have to wait.  Sometimes you have to wait four, five, even six hours in an emergency room just to get seen.  And even once you do get seen, you still have to wait.  I have known people that have been in the hospital six hours before they even got in the back.

My daughter has sickle cell.  She gets pain episodes probably once every two to three months.  She's also pregnant again.  And she can't even afford sometimes to go to the hospital.  She has to just grin and bear the pain at home because she can't afford it.

So, yeah.  Access, limited resources, stuff like that impacts health --

Q    Has Congressman Byrne taken any actions in Congress that you are aware of relating to health care?

A    He voted to repeal the Affordable Care Act.

Q    And do you believe that the African-American community in Mobile benefitted or benefits from the Affordable Care Act?

A    I am one of those people that benefitted from the

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 178**

1    Affordable Care Act.  If it wasn't for the Affordable Care Act,

2    I wouldn't be able to have insurance at all even with my job.

3         So, yeah.  I am one of those people that would

4    definitely -- and I also have a preexisting condition.  I have

15:28:51  5    diabetes.  And I'm -- and I also had asthma as a kid.

6    Q    Does the African-American community in Mobile have any

7    particular needs or interests related to affordable housing?

8    A    Yes.  So the latest news out of Mobile is the Mobile

9    Housing Board in January is closing the Section 8 department.

15:29:20 10    They're firing everybody -- all the staff from Section 8, and

11    they're going to outsource it to a private company.

12         The waiting list for Section 8 is anywhere from five to

13    seven years long.  There have been people that have been on

14    there for a long time.

15:29:43 15         My mom was homeless when she came home in 2017.  My mother

16    is 67 years old.  My mother has two bad knees, diabetes, high

17    blood pressure.  She also has sleep apnea.  My mother had to

18    sleep in her car.  My mother had to couch surf.

19         My mother ended up in a homeless shelter.  It wasn't until

15:30:14 20    October of last year she finally got hooked up with a program

21    that put her in an apartment that she could afford.

22         So we have a homeless population that is insane.  We don't

23    have any public housing because they're getting -- doing away

24    with all the public housing.  It's just hard to find an

15:30:42 25    affordable place to live in Mobile unless you have got a really

**Caster Plaintiffs' Exhibit 85, Page 179**

428

```
     1  great job.

     2  Q    Ms. Chestnut, is it your understanding that the city of

     3  Mobile is a majority-minority city?

     4  A    Yes.

15:30:58  5  Q    And Mobile is currently entirely located within a single

     6  congressional district; is that right?

     7  A    That is correct.

     8  Q    And what congressional district is that?

     9  A    Congressional District 1.

15:31:10 10  Q    Do you feel that having the city of Mobile wholly

    11  contained within that one congressional district has served

    12  Mobile citizens well?

    13  A    No.

    14  Q    If the city of Mobile were divided between CD 1 and a new

15:31:24 15  majority-minority district, do you feel the interests of the

    16  city of Mobile residents would be better served?

    17  A    Yes.

    18  Q    And, Ms. Chestnut, I believe you were in the courtroom

    19  while Ms. Howell was questioning Representative Knight and

15:31:37 20  asked whether having two people working together to represent

    21  Montgomery can, in fact, benefit the residents of Montgomery.

    22  Were you here for that?

    23  A    Yes, I was.

    24  Q    Do you believe that Mobile could benefit from having

15:31:51 25  representation by more than one representative?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 180**

```
       1  A    Yes.
       2  Q    Ms. Chestnut, do you regularly follow political campaigns
       3  in Alabama?
       4  A    Yes, I do.
15:32:07 5  Q    Have you observed any instances in which a candidate in
       6  Alabama has referred to race as a reason to vote for or against
       7  a given candidate?
       8  A    Yes.
       9  Q    Does that happen often in Alabama?
15:32:19 10 A    Quite a few times I've heard a couple of things that kind
      11  of made me upset and mad and frustrated.
      12  Q    Let's talk about some specifics.  Have you personally
      13  heard members of Congress from Alabama make any such statements
      14  about race recently?
15:32:40 15 A    Mo Brooks.
      16  Q    What did you hear Mo Brooks say?
      17  A    Something about the war on white people.  I'm still trying
      18  to figure that one out.
      19  Q    And where did you hear Mo Brooks talk about war on white
15:33:03 20 people?
      21  A    He did an interview, radio interview I heard that I almost
      22  threw my phone clean across the room when I heard it.  But I
      23  held my composure because my phone is expensive.
      24       But I'm still trying to figure out what he means by a war
15:33:22 25 on white people.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 181**

430

 1   Q     What did that statement mean to you?

 2   A     It means that white people should be afraid of people that

 3   don't look like them, people that look like me, people that

 4   look like my husband, you know, people that look like my

15:33:39  5   granddaughter.  So that's what it means to me.

 6         Fear.  It incites fear.

 7   Q     Did you personally hear any such statements regarding race

 8   made during Alabama's special election for Senate in 2017?

 9   A     Yes.

15:33:53 10   Q     From whom?

11   A     Roy Moore.

12   Q     And what did you hear Roy Moore say?

13   A     So in September of 2018, he did a rally in Florence,

14   Alabama.  And I'm paraphrasing here.  I could be wrong, but I'm

15:34:14 15   kind of paraphrasing here.  But that families were together and

16   happy during the time of slavery.  So that made me think that

17   so that slavery was good.

18   Q     Is that what you heard when you heard?

19   A     That's kind of -- that's kind of what I, you know, kind of

15:34:37 20   interpreted a little bit.

21         I wasn't born during that time.  I don't even -- none of

22   my -- I think my ancestors were.  But I get -- I'm sorry.  I

23   just get mad when I hear things like that.

24   Q     Did it affect you when you heard Roy Moore talk about a

15:35:07 25   time of slavery is when families were happier?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 182**

```
 1  A    Yes.  I would think families were happier even during the
 2  time of Jim Crow, even during the time of Civil Rights, you
 3  know, during the '80s.
 4       Dynamics change, yes.  I was raised by a single parent.
 5  But that doesn't mean we weren't happy.  We were very happy.
 6  Q    What does it mean to you when you hear -- when you heard a
 7  candidate running for office indicate that families might have
 8  been happier during the time of slavery?
 9  A    Makes me mad.  Makes me -- you know how it makes me feel?
10  That I don't matter.  I'm sorry.  It makes me feel like I'm a
11  second class citizen in a state that I love.
12       I love the state.  I may go away.  I may be away from --
13  for a very long time, but this is my home.  And I love my home.
14  And I want to be treated equally across the board.  And I want
15  my voice to be heard.  I'm sorry.
16  Q    That's okay.  Take your time.
17  A    I'm sorry.
18  Q    No.  You're fine.  Do you need a break or something?
19  A    No.  I'm good.  I'm good.  I knew it was coming.  I
20  just --
21  Q    Ms. Chestnut, did you personally hear any statements
22  regarding race made during the most recent Alabama Supreme
23  Court election?
24  A    Yes, I did.
25  Q    From whom?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 183**

432

```
       1  A     Tom Parker.

       2  Q     Do you recall in what forum you saw or heard Tom Parker?

       3  A     There were two videos that I saw.  One came across my

       4  YouTube feed.

15:37:18 5        And just so anybody don't understand anything about

       6  YouTube and feeds, when you are on YouTube and you go to your

       7  home -- your home portion of YouTube, it shows you different

       8  videos that you may have an interest in or that you watch

       9  before you may want to watch another one again.

15:37:36 10       In this case, because I had been watching a few political

      11  ads on my YouTube, this particular video showed up on my feed.

      12  Q     Do you recall when -- when this happened?

      13  A     This was during the -- this was during the election -- the

      14  election proceedings.  And the video that I saw was -- the

15:38:01 15  beginning of it was a -- you saw a group of Latinos at a -- I

      16  think at a fence, and they were talking about an invasion.  And

      17  how Tom Parker talked about how he took on the ALCU and the

      18  Southern Poverty Law Center, which --

      19            MR. WALKER:  This goes to two of the exhibits about

15:38:30 20  which we made an objection.

      21            MS. KHANNA:  Sure, Your Honor.  I haven't actually

      22  sought to admit the exhibit yet, but I will offer to admit them

      23  now, and we can discuss the exhibit, if that works for you.

      24            MR. WALKER:  No.  I'm sorry if --

15:38:45 25            MS. KHANNA:  That's fine.  I was going to ask her to
```

**Caster Plaintiffs' Exhibit 85, Page 184**

```
 1  pull up the exhibits so we could identify it, and I'm happy to
 2  discuss it now if, Your Honor --
 3          THE COURT:  All right.  Normally we do side bars for
 4  that, and even though we don't have a jury, I think we probably
 5  should because of a witness presence, as well.  So come up here
 6  and talk to me about it.
 7      (Bench conference:)
 8          MR. WALKER:  Your Honor, we objected to those two
 9  exhibits because they weren't disclosed prior to being on the
10  exhibit list.  And our position is --
11          THE COURT:  Which ones are they?  What numbers are
12  they?
13          MR. WALKER:  I'm sorry --
14          MS. KHANNA:  They're 85 and 86.
15          MR. WALKER:  And our position is that if we had known
16  about them in discovery, we could have done discovery on when
17  they were shown, if they were shown, what formats they were
18  shown in, who had seen them, and that sort of thing.  But we
19  don't have any of that information now.
20          MS. KHANNA:  If I may respond.
21      So I believe that their objection is under Rule 37(c)(1).
22  And that provides that the evidence could be excluded if --
23  unless it is substantially justified for lack of disclosure or
24  harmless.
25      And here I think it's both.  There was actually no
```

15:38:59
15:39:27
15:39:38
15:39:51
15:40:06

**Caster Plaintiffs' Exhibit 85, Page 185**

434

1    discovery request asking for anything resembling these

2    exhibits.  And these exhibits have never actually been in

3    plaintiffs' custody or control.  They're on the Internet.

4        In fact, plaintiffs' counsel didn't even become aware of

15:40:21 5    them until after the close of discovery.  And we disclosed them

6    on the pretrial list.

7        The defendants, Secretary Merrill and his counsel, were

8    present over a year ago at a trial where these videos were

9    played well before our witnesses were deposed.  And, in fact,

15:40:36 10   Ms. Chestnut was -- even if we had disclosed them, you know, by

11   the close of discovery, Ms. Chestnut was deposed well before

12   the close of discovery.

13       I'm not sure how they would have been prejudiced by not --

14   they knew of these things existence on the Internet before we

15:40:51 15   even did.

16           THE COURT:  Okay.  But how did they know that they

17   were going to be used in this case?

18           MS. KHANNA:  I think that we've -- we've never

19   actually been asked to identify all things in the public domain

15:41:01 20   that might be used in this case.

21           THE COURT:  Okay.  If this is something, though, that

22   you're relying on in your case in chief, why wasn't it part of

23   disclosures when you found out about it?

24           MS. KHANNA:  Oh, when we found out about it, we did

15:41:14 25   disclose it.  That was just after the close of the -- I think

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 186**

```
 1    the objection is it was after the close of discovery.  We did
 2    disclose it on the pretrial list after we found it about.
 3              THE COURT:  But disclosing it on the pretrial list
 4    doesn't mean you disclosed it as soon as you found out about
 5    it.
 6              MS. KHANNA:  Well, I can say that we did -- I can
 7    assure you we did disclose it very shortly after we had found
 8    out about it.
 9              MR. WALKER:  I don't question -- I'm just saying that
10    it's unfortunate perhaps for them when they found out about it,
11    but, nonetheless, we did not have the opportunity to do
12    discovery that we would have done to show its context, to show
13    who saw it, and various other things of that nature.
14              THE COURT:  Okay.  Well, I'm afraid I remember seeing
15    at least one of these myself.
16          Off the record.
17                  (Discussion off the record.)
18              THE COURT:  How is it really prejudicial, Dorman?  I
19    mean, what would you have done, in terms of where it was shown
20    and -- you know, it was on TV, wasn't it?
21              MR. WALKER:  Well, it was -- I think the testimony was
22    it was on YouTube.  I don't know if it's actually -- I don't
23    know.  I don't know if it was shown on -- I mean, the -- I
24    guess to the extent that what they ultimately seek to show is
25    the use of race in political appeals.  Whether or not it was
```

**Caster Plaintiffs' Exhibit 85, Page 187**

          1  run on TV is relevant to how broadly that appeal was.

          2          THE COURT:  Yeah.

          3          MR. WALKER:  Whether it was beneficial advertisement

          4  in the Tom Parker campaign.

15:42:58  5          THE COURT:  And I think we're also at that point in

          6  our world that you can't believe everything that you see and

          7  hear in one of these things.

          8      I saw something the other day that had been completely cut

          9  and pasted and was totally, completely false.

15:43:21 10          MR. WALKER:  Let me just say that Ms. Khanna is

         11  indicating I went beyond the scope of our objection.  And Jim

         12  was actually going to argue this.  So I didn't mean to -- and I

         13  withdraw --

         14          MS. KHANNA:  I was actually going to say that I

15:43:33 15  believe that they stipulated to the authentication of it, that

         16  it was, in fact, linked to Tom Parker's campaign.  Yeah, we

         17  provided that.

         18          THE COURT:  Okay.  Well, I hate to rule against you

         19  when Jim's not here.

15:43:45 20          MR. WALKER:  That's quite all right.

         21          THE COURT:  And I had intended several times this

         22  morning to ask him about his father-in-law.

         23              (Discussion off the record.)

         24          THE COURT:  Okay.  All right.  Well, I'm going to

15:44:15 25  overrule your objection.  But you can tell Jim that you fought

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 188**

```
          1  it valiantly.

          2          (End of side bar.)

          3          THE COURT:  So Plaintiffs' Exhibits 85 and 86 may be

          4  admitted.

15:44:40  5          MS. KHANNA:  Thank you, Your Honor.

          6      Heather, can you --

          7          THE COURT:  You may publish those, if you'd like.

          8          MS. KHANNA:  Can you please pull up Plaintiffs'

          9  Exhibit 85?

15:45:04 10  BY MS. KHANNA:

         11  Q    Ms. Chestnut, based on what you see on your screen, can

         12  you identify if this is one of the videos that you mentioned

         13  popped up on your YouTube feed?

         14  A    Yes.

15:45:16 15          MR. WALKER:  I'm sorry.  We don't have it.  We're

         16  good.

         17          MS. KHANNA:  Heather, can you please play the video?

         18          (Whereupon, Plaintiffs' Exhibit 85 was played in open

         19      court.)

15:46:10 20  BY MS. KHANNA:

         21  Q    Ms. Chestnut, the beginning of this ad mentioned an

         22  invasion of -- an invasion -- I believe it is what you had

         23  remembered, as well.  And I think you saw the pictures of what

         24  purported to be a bunch of immigrants coming in to some place.

15:46:28 25      When you saw that part of the ad, what did it -- what did
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 189**

```
 1   it make you think?  How did you feel?
 2   A     Angry.
 3   Q     Why is that?
 4   A     This country was founded by immigrants.  My ancestral
 5   background is Native American, part of it, anyway.  The other
 6   part of it is Irish.  I found that out.
 7   Q     Did you understand that reference to an invasion to be a
 8   statement about race?
 9   A     Yes.  Because the word "invasion" means that you're
10   invading someone -- you're invading somewhere, which means
11   you're coming in, and you're going to take something, as well.
12         What are people taking?  I -- my ancestors didn't invade
13   this country.  They were brought over here on ships.  They were
14   sent somewhere else on reservations.  They didn't invade.  We
15   didn't take anything.
16         So why would you not allow at least a humane way to let
17   people who are running from persecution and violence find a
18   safe harbor here in this country?
19   Q     So in what portion -- in what way did you see this to be a
20   statement about race?
21   A     The word "if they."  Who's "they"?  Am I "they"?  Is my
22   husband "they"?  Is my friends who are Hispanic, are they
23   "they"?  Who is this "they"?
24   Q     Do you believe "they" to refer to Hispanics?
25   A     Yes.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 190**

1    Q    Can we pull up Plaintiffs' Exhibit 86, as well, just the

2    top of it?

3         And I believe, Ms. Chestnut you testified that you had

4    seen a couple of video ads from Justice Parker's campaign; is

15:49:05 5    that right?

6    A    Yes.

7    Q    And do you recall seeing -- does this video that -- from

8    what you can see on the screen, is this a video you have seen

9    before?

15:49:12 10   A    Yes.

11   Q    Do you recall when?

12   A    It was on my husband's Facebook timeline.

13   Q    And just for the record, what does that mean it was on his

14   Facebook timeline?

15:49:22 15   A    So when he pulls up his Facebook, or I pull up my

16   Facebook, if someone posts something, it usually goes onto like

17   what they call a news feed.  So we call it a timeline.  But it

18   comes in a news feed.

19        So you see what your friends posted, you know, or pages

15:49:39 20   that you liked what they posted.  And one of his family members

21   posted this.

22   Q    Do you recall when you saw it?

23   A    It was during the election season.

24   Q    Can we please play the video?

15:49:51 25        (Whereupon, Plaintiffs' Exhibit 86

**Caster Plaintiffs' Exhibit 85, Page 191**

```
         1          was played in open court.)
         2  BY MS. KHANNA:
         3  Q    Ms. Chestnut, when you saw this ad, when you saw Justice
         4  Parker's reference to having taken on the Southern Poverty Law
15:51:01 5  Center, did you view that to be a statement about race?
         6  A    Yes.
         7  Q    Why?
         8  A    Because Southern Poverty Law Center Is a Civil Rights
         9  organization.
15:51:10 10         I always felt -- there is the reason why I didn't go into
        11  law.  I always thought that law should be applied equally
        12  across the board, no matter if you walk in someone's courtroom
        13  whether you're white, black, Asian, pink, purple, it should be
        14  equally across the board.
15:51:30 15         So why would you go up against an organization whose main
        16  objective is to make sure that everyone in this country, in
        17  this state, have the same rights as everybody else?
        18  Q    Is it your understanding that the Southern Poverty Law
        19  Center has worked primarily on issues of racial justice?
15:51:55 20  A    Yes.
        21  Q    And when you saw the portion of the ad discussing mob rule
        22  and depicting Maxine Waters giving a speech, along with the
        23  fires burning and the people running, did you view that to be a
        24  statement or a sentiment about race?
15:52:15 25  A    Yes.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 192**

441

```
       1   Q      And why?
       2   A      Because they make it seem like black people are mobs.
       3   We're just unruly.  We just do whatever we want to do.  We
       4   don't respect nothing.  We don't have -- you know, we don't
15:52:33  5   have no morals, no scruples, no nothing.  We're out here
       6   running willy-nilly.
       7   Q      And you can take this down.  Thank you, Heather.
       8          Ms. Chestnut, how do these types of statements make you
       9   feel as an African-American voter?
15:52:47 10   A      As I said earlier in my testimony, it makes me angry.
      11   Makes me frustrated.  It makes me feel like I'm a second-class
      12   citizen.  Makes me think that people don't care.
      13   Q      And what effect do these types of statements have on race
      14   relations in Mobile?
15:53:12 15   A      It divides us.  There is a lot of people who are on --
      16   used to be a lot of time when you can talk to your friends even
      17   when you guys don't agree on everything.  But you still had
      18   respect for one another.  You still was there for one another.
      19          Nowadays we're so deeply divided, it's like you can't even
15:53:35 20   be friends on Facebook.  And I've lost quite a few friends on
      21   Facebook because I've disagreed with them on something.  I've
      22   said something, you know, your opinion's not a fact.  It's just
      23   an opinion.
      24          But they want to believe everything they hear about black
15:53:57 25   people in general -- that we're lazy, that we don't do
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 193**

442

```
 1  anything, that all we want to do is collect entitlements, and
 2  stuff like that.  They just don't care.
 3      And so my job is to prove everybody wrong.
 4  Q   Do you believe that the ads like the ones we've just seen
15:54:20 5  deepen the racial divides within Mobile?
 6  A   Yes.
 7  Q   Ms. Chestnut, do you travel to Baldwin County often?
 8  A   No.  Not like I used to.
 9  Q   Why not?
15:54:31 10  A   One, I don't have a car that would help.  But Baldwin
11  County frightens me.  It scares me a little bit.  The stigma
12  that Baldwin County has is that it is a sundown county.
13  Q   What is a sundown county?
14  A   A sundown town.  So a sundown county or town is a town or
15:54:58 15  a county that if you as an African-American are in after a
16  certain time, there's a possibility you may not make it out of
17  that area.  You may be chased by white supremacists.  You may
18  be followed by the police.  You may be harassed the whole
19  entire time.
15:55:26 20      Yeah.  You don't -- Baldwin County has always had that
21  stigma.
22  Q   What makes your view of Baldwin County as a sundown town
23  or a place where African-Americans might not feel safe after a
24  given hour?
15:55:39 25  A   So I have a little story to tell everybody.  In 1981 there
```

**Caster Plaintiffs' Exhibit 85, Page 194**

```
 1  was a young black man by the name of Michael Donald.  He was

 2  19 years old.  He was in a black neighborhood.  He had just

 3  left the store to buy his sister a pack of cigarettes.

 4      Two Klu Klux Klansmen under the guise of giving them

 5  directions to a local black club kidnapped Michael, brought him

 6  over to Baldwin County.  When he tried to run away, they beat

 7  him with a tree limb.  They tied him to a tree limb and still

 8  continuously beat him with a tree limb.

 9      They brought him back over to Mobile County --

10  Q   Baldwin County?

11  A   No.  They brought him to Baldwin County.  Then they

12  brought him back to Mobile County.  And they hung him as a

13  reminder to every black person in that -- in Mobile, Baldwin,

14  wherever you live -- that you can't escape the Klan.

15  Q   How old were you at the time of this incident?

16  A   I was five years old.

17  Q   And what do you remember about that incident?

18  A   My mother served on that jury that convicted the man that

19  killed Michael Donald.

20  Q   Does this history from Baldwin County continue to impact

21  your view of Baldwin County --

22  A   It does.

23  Q   -- today?

24  A   It does.  It impacts not only my view, it impacts a lot of

25  my friends' reviews.  It impacts my husband's view.
```

Time stamps: 15:56:04 (line 5), 15:56:29 (line 10), 15:56:49 (line 15), 15:57:03 (line 20), 15:57:14 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 195**

1      I was willing to take a chance for our anniversary and go

2  over to Applebee's because it's the only Applebee's in the area

3  is in Baldwin County, and for our anniversary celebrating our

4  one year.  And my husband pushed back the whole time.  No, I

15:57:38 5  don't want to go.  Baby, it's not safe.  Baby, I don't want to

6  go.  Baby, we don't need to be over there.  It -- we don't need

7  to be over there.  I had to convince him that we're going to go

8  with friends.  We'll be fine.

9      Well, luckily, our friends backed out.  So we ended up at

15:57:58 10  Fridays and had our anniversary dinner.

11      But, yeah, he -- we don't -- we're -- it's -- the fear

12  is -- the fear is real about Baldwin County.

13  Q    Have you had any personal experiences in Baldwin County

14  that would validate those fears or strengthen them?

15:58:19 15  A    Yes.  So when I first got my car in 2004, I had went over

16  to Fairhope beach and Parrish, which is one of my favorite

17  places to go during -- you know, during safe time of the day.

18  I went over there to kind of like clear my head and just relax

19  by the beach.  And it was getting late.

15:58:41 20      So I said, well, I need to go, because I got to get up in

21  the morning and go to work.  And as I was leaving Fairhope and

22  leaving going into -- coming almost into Daphne, there was a

23  Fairhope police officer that followed me the entire way until I

24  got to the -- to Daphne city limits.

15:59:05 25      He didn't pull over, didn't stop me.  I wasn't doing

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 196**

1  anything.  I was driving the speed limit.  I was -- you know,

2  had all the lights on, you know, properly made lane changes if

3  I need to.  I was literally scared.  I was in the car by

4  myself.  I was so glad when I got to Daphne because I knew in

15:59:24 5  the next 10 minutes I would be at I-10 going west, going back

6  to Mobile County.

7      The last time I was really in Baldwin County, I went to

8  Fairhope for a protest.  Yeah.  I do that sometimes.

9  Protesting Roy Moore.  Almost got ran over by a Roy Moore

15:59:47 10  supporter in front of the police.  They didn't even do

11  anything.  They just sent him on his merry way.

12      My friend who happened to go inside to kind of hear what

13  was being said -- the protest was over.  I forgot where she had

14  parked her truck.  It was raining.  I was getting soaked.  I

16:00:10 15  was texting her, saying, Come on, I'm getting wet.  Can you

16  hurry up?  And she was like, I'm on my way out.  And while I

17  was standing there, a guy who claims that he was security had

18  nothing on him that said he was security basically called me

19  everything but a child of God.  I was all kinds of N-words,

16:00:33 20  N-itches.  I was -- I didn't feel safe.

21      It was luckily one of my friends who was actually

22  leaving -- was actually leaving told me to get in her car, and

23  she was going to drive me off the property until I could meet

24  up with my other friend who had brought me there.

16:00:51 25      I was a nervous wreck.  I cried.  I was -- I was -- I was

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 197**

1   ready to go.

2   Q    Ms. Chestnut, have you spent any time in Montgomery?

3   A    I have been to Montgomery quite a few times.

4   Q    And in your view, does the city of Mobile have more in

16:01:07 5   common with Montgomery County or Baldwin County?

6   A    They're more in common with Montgomery County.  It's an

7   urban center.  They both are urban centers.  It's just like

8   Birmingham.

9        Birmingham is an urban center.  They have the same, you

16:01:22 10   know, same concerns, same issues -- education, health care,

11   jobs, affordable housing.

12       Baldwin County is filled with -- no offense -- old white

13   retirees.  There is -- there's -- I mean, there are retirees in

14   Mobile, but Mobile is starting to become a young and, you know,

16:01:48 15   fresh kind of, you know, city now.

16       It's more -- they're trying to be more things that's

17   geared to a lot of people my age, like in their 40s and

18   millennials.  I mean, it's starting to kind of get younger and

19   hipper.  So there's not like a whole lot there.

16:02:09 20       You go to -- if you go to Baldwin County, there's not that

21   big city feel as if you go to Mobile.  They got that -- because

22   we have Mardi Gras, you know, different music festivals.  We

23   have a cruise that leaves out of Mobile.

24       So it's got -- it's just got more there between Montgomery

16:02:29 25   County and Mobile County than Baldwin.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 198**

447

```
      1  Q    Do you feel like there are certain cultural and economic
      2  similarities between Mobile and Montgomery?
      3  A    Yes, there are.  I mean, of course, both of them are --
      4  and no lie -- they're both majority black cities and counties.
16:02:49 5  I know Montgomery just recently became more majority black.
      6       But there's, you know, like I said, same concerns, you
      7  know, as far as like the different issues that we all have
      8  concerns about.  So there's a lot more in common between Mobile
      9  and Montgomery.
16:03:05 10  Q    How easy is the -- sorry.
     11       How easy is it to get from the city of Mobile to
     12  Montgomery?
     13  A    Oh, all you got to do is hit I-65 and go north, and you
     14  will be in Montgomery in no time.
16:03:18 15  Q    Are there public transportation options between the two
     16  cities?
     17  A    There's a Greyhound and a megabus.
     18  Q    Ms. Chestnut, are you a member of a political party?
     19  A    Yes, I am.
16:03:30 20  Q    What party is that?
     21  A    I'm a Democrat.
     22  Q    What are your views of the two parties in Alabama when it
     23  comes to issues of race and racial justice?
     24  A    So I've been a Democrat since I was 16.  I always kind
16:03:50 25  of -- when I was growing up, my grandmother made sure I watched
```

**Caster Plaintiffs' Exhibit 85, Page 199**

both national conventions every four years.  She didn't tell me

to not watch Democrats.  She didn't tell me to watch the

Republicans.  She made me watch both of them because she knew

eventually I was going to have to choose a party when I got

16:04:11  older and I was ready to vote.

She always told me to vote along my convictions and what I

believe.  And my beliefs line up more with the Democratic party

than the Republican party.

I feel comfortable as a black woman because they have the

16:04:30  core -- my core principles -- racial justice, social justice,

equal pay, equal -- equal rights for everybody.  I align with

those thoughts in the Democratic party.

Do I -- do I agree with everything that the Democratic

party does?  Not all the time.  But I am -- you know, but I do

16:04:59  vote my convictions.  I vote my -- my concerns.  And the

Democratic party aligns right along with those.

The Republican party?  I have friends who are Republicans.

Love them to death.  We agree to disagree.  But I can't feel

comfortable in a party that allows -- well, that's hospitable

16:05:27  to hate.  I'm not saying everything that's a Republican is a

racist.  But what I feel is -- and I gave this analogy

earlier -- if I'm sitting -- if I have a friend -- you know, if

you have got a friend named Joe, and Joe's sitting next to you,

and he is saying the most vile and disgusting things that you

16:05:50  have heard -- you've heard, and it goes against your core

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 200**

```
     1  principles, your feelings, and if you don't stand there and
     2  say, Hey, Joe, why are you saying that?  Man, you know that's
     3  wrong.  You know, stop saying that.  You know, and distance
     4  yourself from them, then you've said volumes.
16:06:14  5       But if you're sitting there and you're letting him spew
     6  all this hatred, all this vileness out of his mouth, and you
     7  don't say anything, of course people are going to group you in
     8  the same group.  Of course it's going to happen.
     9       So why would I want to associate myself with somebody --
16:06:34 10  with a party that allows that to happen?  Like I said, I
    11  know -- look, like I say, I got friends who are Republicans.
    12  We agree to disagree.  But they're not racists, and I know
    13  that.
    14       Some of them I've been friends with for 25 years or more.
16:06:51 15  I went to high school with them.  But we don't sit there and --
    16  you know, they hadn't never said anything that made me just
    17  want to, you know, backhand them, or anything like that.
    18       They -- you know, so I know where their hearts is.  I know
    19  where they -- you know.  But some people, sometimes you don't
16:07:11 20  know where they heart is because of they're not speaking up and
    21  they're not speaking out.
    22  Q    Do you feel -- as a black woman, do you feel welcome
    23  within the Republican party in Alabama?
    24  A    No.  I hate to say it.  It needs to be -- can I say
16:07:28 25  something real quick?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 201**

1          There needs to be more unity in this state.  The reality

2    is, is that we're all equal.  We're all the same.  We're

3    Alabamians first before we're Americans.  This is our home

4    state.

16:07:48   5          I love Alabama.  I love it to death.  I defend it to

6    death.  When I lived up north, I would have people say bad

7    things about Alabama all the time.  And you know what?  I

8    wouldn't let nobody say anything bad about my home state.

9          We need to come together.  We need to stop all this

16:08:10  10   division.  It is time.  And if this is the way for it to

11   happen, I'm all for it.

12          I'm not saying that I need another congressional district

13   so I can vote for a black candidate.  Heck, it could be a white

14   candidate that could do the same thing -- represent the people

16:08:32  15   of this -- of this district the same way that they represent

16   District 7, that Terri Sewell represent the same district in

17   District 7.

18          I just want to be able to have a seat at the table.  And

19   if I got to make my own table and put my own seat at it, that's

16:08:52  20   exactly what I'm about to do.

21   Q    Thank you, Ms. Chestnut.

22   A    Thank you.

23          MS. KHANNA:  No further questions on direct.

24          THE COURT:  Any cross-examination?

16:09:04  25          MS. HOWELL:  Yes, Your Honor.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 202**

                          CROSS-EXAMINATION

BY MS. HOWELL:

Q    Hi, Ms. Chestnut.

A    Hello.

16:09:43  Q    You covered a lot of ground in your testimony here today,

and I just wanted to ask you a few follow-up questions about

it.

     You moved back to Alabama in 2016, right?

A    That is correct.

16:09:56  Q    Okay.  And you talked about -- well, some things that it

sounds like you've seen since then.  And I want to ask you

particularly about the racial appeals that you talked about

hearing in elections.

A    Uh-huh.

16:10:10  Q    When do you recall having heard Mo Brooks talk about --

make the racial appeals that you were discussing earlier?

A    Oh, let's see.  I have heard him say it this year.  I

heard him say it last year.

     The most recent was an -- like I said, it was a radio

16:10:27  interview that I heard him, I heard him say that.

Q    Do you recall which radio station you heard him on?

A    I couldn't tell you.  It was -- I can't really -- it's

like some northern -- up here in northern Alabama radio

station.

16:10:44  Q    Okay.  But you live in Mobile County, do you not?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 203**

```
 1  A     Yes, I do.  I do have iHeartRadio.

 2  Q     Okay.  So you heard it on your phone on the radio

 3  streaming on your phone?

 4  A     Yes.

 5  Q     Okay.  Thank you.

 6        You also talked about Roy Moore making racial appeals in

 7  the 2017 campaign for a Senate seat for the state, right?

 8  A     Uh-huh.

 9  Q     And Roy Moore did not win that election, did he?

10  A     No, he didn't.

11  Q     Who won that election?

12  A     Doug Jones.

13  Q     And Doug Jones is a Democrat, is he not?

14  A     Yes, he is.

15  Q     He defeated the Republican candidate, did he not?

16  A     Yes, he did.

17  Q     You also talked about the interests that you have in

18  various sort of issues facing the state -- public education,

19  law enforcement, a couple of more things like that, affordable

20  housing, right?

21  A     Yes.

22  Q     Do you know whether public education is typically dealt

23  with by state or federal government?

24  A     It starts at the federal, goes down to the state, and it

25  trickles down to the school boards.
```

**Caster Plaintiffs' Exhibit 85, Page 204**

453

| | | |
|---|---|---|
| | 1 | Q    Okay.  And school boards are local bodies, are they not? |
| | 2 | A    Yes, they are. |
| | 3 | Q    They're usually state officials, right? |
| | 4 | A    No.  In Mobile County -- in Mobile County, we have -- we |
| 16:12:15 | 5 | elect our school board. |
| | 6 | Q    Right.  But that's as a part of state government, right? |
| | 7 | As opposed to federal government, right? |
| | 8 | A    Yes.  Part of state government. |
| | 9 | Q    The same is true as far as law enforcement, right?  Those |
| 16:12:30 | 10 | are usually state officers rather than federal? |
| | 11 | A    Yes. |
| | 12 | Q    And those issues are typically dealt with on the state |
| | 13 | level? |
| | 14 | A    I would think so, yeah. |
| 16:12:40 | 15 | Q    So a congressperson plays a more distant role in those |
| | 16 | policy decisions? |
| | 17 | A    But even if they don't -- even if it's a state issue, it's |
| | 18 | also a federal issue, too.  People's rights are being violated. |
| | 19 | That's the bottom line to this -- to this whole thing. |
| 16:13:04 | 20 | My husband -- look.  My husband has a right to go wherever |
| | 21 | he wants to go.  If he wants to go to the store, he can go to |
| | 22 | the store.  If he has to go pay a bill, he can go pay a bill. |
| | 23 | Unless he's doing something absolutely wrong, or he's walking |
| | 24 | in the middle of the street, or walking naked somewhere, he |
| 16:13:22 | 25 | should be able to do that without being accosted by the police. |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 205**

1          I can't count on this hand -- on these two hands how many

2     times in the three years that me and my husband been together,

3     how many times he been stopped by the police for doing nothing.

4          We can appeal to the -- I can appeal to the mayor, the

16:13:44 5     city council, the governor, my state legislator, all day long,

6     but something has to start on the federal level and --

7     Q    What are you hoping that your congressperson will do

8     differently to address those issues?

9     A    I would hope that some type of piece of legislation will

16:14:01 10    make sure that if something happens, that police officers are

11    held accountable for their actions.  I mean, because apparently

12    it's not happening on the local level, and it's definitely not

13    happening on the state level.

14    Q    Have you taken any actions to see if anything can be done

16:14:20 15    on the local or state level?

16    A    There was a young lady by the name of Shakeisha

17    (phonetic).

18          THE COURT:  I'm sorry.  That calls for a yes-or-no

19    answer.

16:14:31 20          THE WITNESS:  Okay.  That calls for yes or no?  Okay.

21    Repeat that question again.

22    BY MS. HOWELL:

23    Q    Have you done -- have you taken any actions on the state

24    or local level --

16:14:40 25    A    Yes.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 206**

```
 1   Q    -- to press those issues?

 2   A    Yes.

 3   Q    What are you hoping to accomplish in this lawsuit that

 4   would address those issues?

 5   A    I want representation.  I want a seat at the table.

 6        I'm tired of being disfranchised.  I'm tired of every time

 7   I go to vote, I don't have nobody that I can vote for.  There

 8   is no competition.  We want a seat at the table.

 9        I am tired of hearing my fellow African-Americans in

10   Mobile County say the following to me:  I don't vote because

11   they vote in who they want in.  I don't want to vote.  I don't

12   want to vote because why?  My voice don't matter.

13        That's what is time for this to end.

14   Q    And you --

15   A    We have seven -- we have seven congressional districts.

16             THE COURT:  I think you've answered the question.

17   Thank you.

18             THE WITNESS:  I'm sorry.  I just --

19             THE COURT:  I know.

20   BY MS. HOWELL:

21   Q    Do you think that redrawing the congressional districts

22   would motivate for people to vote?

23   A    Yes.  Sorry.  I don't mean to sound kind of, you know,

24   forceful there, but, yes.

25        I have kids.  I encourage them to vote.
```

Time stamps in margin:
16:14:46 (line 5), 16:15:12 (line 10), 16:15:36 (line 15), 16:15:45 (line 20), 16:15:56 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 207**

456

1        When I talk to young folks about voting, they don't want

2    to vote because they don't have a reason to vote.  They don't

3    feel like they voiced -- their voice will be heard.

4        And like I said, they need -- we want a seat at the table.

16:16:18  5    How can I -- how can I get a seat at the table if my voice is

6    not being heard?

7    Q    You talked toward the end of your direct examination about

8    a need for more unity in the state.  Do you believe that

9    redrawing the congressional districts will accomplish that?

16:16:36  10   A    Yes.

11   Q    How?

12   A    Because we will have a voice.

13   Q    Do you think that filing a lawsuit accomplishes more unity

14   in the state?

16:16:47  15   A    If it's to get y'all attention, yes.

16   Q    Who is "y'all"?

17   A    The state of Alabama, my home state.

18   Q    I will ask you one final question.  Do you believe that

19   Representative Sewell up in Congressional District 7 represents

16:17:08  20   her district better than Representative Byrne down in your

21   district represents his?

22   A    Yes.

23   Q    Why?

24   A    Because she has -- because she has connections in every

16:17:22  25   part of her district.  She has connections in Tuscaloosa.  She

**Caster Plaintiffs' Exhibit 85, Page 208**

```
 1  has connections here in Birmingham.  She has connections in

 2  Selma.

 3      I know Terri.  I've actually went to convention with

 4  Terri.  So I know Terri.  I know what her -- she's going --

 5  she's -- I knew she was going to do a good job representing

 6  District 7.

 7  Q    Do you know if Representative Sewell had any role in

 8  drawing her congressional district?

 9  A    No, I do not.

10  Q    Okay.  Thank you very much, Ms. Chestnut.

11  A    You're welcome.

12          THE COURT:  Any redirect?

13          MS. KHANNA:  Briefly, Your Honor.

14          THE COURT:  All right.

15                      REDIRECT EXAMINATION

16  BY MS. KHANNA:

17  Q    Just a few quick questions, Ms. Chestnut.

18  A    Uh-huh.

19  Q    Do you believe that your member of Congress has the

20  ability to ask the Department of Justice to investigate

21  situations within a state?

22  A    Yes.

23  Q    Do you believe that your member of Congress has the

24  ability to write a letter to local officials if he or she

25  thinks that the state needs to take action?
```

The timestamps in the left margin: 16:17:38 (line 5), 16:17:50 (line 10), 16:17:58 (line 15), 16:18:08 (line 20), 16:18:19 (line 25).

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 209**

| | |
|---|---|
| 1 | A    Yes. |
| 2 | Q    Do you believe that your representative in Congress has |
| 3 | the ability to vote to repeal mandatory minimums? |
| 4 | A    Yes. |
| 16:18:28 5 | Q    Do you believe that your representative in Congress has |
| 6 | the ability to vote for more funding for poor schools? |
| 7 | A    Yes. |
| 8 | Q    Do you believe that your representative in Congress has |
| 9 | the ability to vote to decriminalize the possession of |
| 16:18:44 10 | marijuana? |
| 11 | A    Yes. |
| 12 | Q    Do you believe that your representative in Congress has |
| 13 | the ability to vote for more affordable -- more funding for |
| 14 | affordable housing? |
| 16:18:55 15 | A    Yes. |
| 16 | Q    Section 8 is a federal program; is that correct? |
| 17 | A    Yes. |
| 18 | Q    You testified about Section 8 housing today? |
| 19 | A    Yes.  Yes. |
| 16:19:00 20 | Q    Thank you, Ms. Chestnut. |
| 21 | THE COURT:  Any recross? |
| 22 | MS. HOWELL:  Just one question, Your Honor. |
| 23 | THE COURT:  Okay. |
| 24 | RECROSS-EXAMINATION |
| 16:19:14 25 | BY MS. HOWELL: |

**Caster Plaintiffs' Exhibit 85, Page 210**

| | |
|---|---|
| 1 | Q    Your counsel just asked you a few questions about your |
| 2 | congressperson writing letters to those state and local |
| 3 | officials, correct? |
| 4 | A    Uh-huh. |
| 16:19:25 5 | Q    When those congress people write those letters, who has to |
| 6 | take the actions? |
| 7 | A    The local -- local people. |
| 8 | Q    Thank you. |
| 9 |         THE COURT:  Anything else? |
| 16:19:36 10 |         MS. KHANNA:  Oh, sorry.  No.  Nothing further, Your |
| 11 | Honor. |
| 12 |         THE COURT:  Thank you, Ms. Chestnut.  You may step |
| 13 | down. |
| 14 |     Call your next witness. |
| 16:20:02 15 |         MR. SPIVA:  Yes, Your Honor.  Plaintiffs call |
| 16 | commissioner -- County Commissioner Sheila Tyson. |
| 17 |                         SHEILA TYSON, |
| 18 | having been first duly sworn by the courtroom deputy clerk, was |
| 19 | examined and testified as follows: |
| 16:20:42 20 |         THE COURTROOM DEPUTY CLERK:  Please state your name |
| 21 | for the record in the microphone. |
| 22 |         THE WITNESS:  Sheila Tyson. |
| 23 |                     DIRECT EXAMINATION |
| 24 | BY MR. SPIVA: |
| 16:20:58 25 | Q    Good afternoon, Commissioner Tyson.  Where do you live? |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 211**

460

```
 1  A    I stay in West End in the City of Birmingham at 1233, 14th

 2  Place Southwest, 25211.

 3  Q    Okay.  Thank you, Commissioner.  How long have you lived

 4  in Birmingham?

 5  A    I have stayed in Birmingham all of my life.  I left for

 6  about 17 years and came back.

 7  Q    In which congressional district do you live in?

 8  A    I stay in Congresswoman Sewell's district, and it's 7.

 9  Q    Have you -- and you said you had left Birmingham for a

10  time.  What were you doing -- well, where did you go when you

11  left Birmingham?

12  A    I was in the military, and I traveled all over.  And I

13  worked -- also worked for the military.

14  Q    And how long did you serve in the military?

15  A    I served four years in active duty.

16  Q    And then how long with the reserve time?

17  A    I actually had several jobs.  I worked in the post office.

18  I worked with several other disabled veteran units all over.

19  Q    And that was all with the military?

20  A    No.  No.  Some with the military and some wasn't.  So, no,

21  it was federal government.

22  Q    Okay.  And which one branch of the military were you in?

23  A    The Army.

24  Q    And what was your position in the military?

25  A    I was actually a warehouse specialist in a chemical
```

16:21:16 (line 5)
16:21:36 (line 10)
16:21:53 (line 15)
16:22:13 (line 20)
16:22:30 (line 25)

**Caster Plaintiffs' Exhibit 85, Page 212**

```
 1   warehouse.
 2   Q    And when did you return to Alabama?
 3   A    I returned to Alabama in '82.  Left, came back, and
 4   returned back in '88.  Left, came back, returned back in the
 5   '90s.
 6   Q    Okay.  And have you -- have you been then living again in
 7   Alabama since the early '90s?
 8   A    Yes.
 9   Q    And did you attend college, Commissioner Tyson?
10   A    No.  I went to the Quartermaster School in the military.
11   Q    And which high school did you attend in Birmingham?
12   A    West End High.
13   Q    When did you graduate?
14   A    '79.
15   Q    And can you describe your upbringing in Birmingham?
16   A    When I grew up in -- my mother and father had seven
17   children.  I had both parents.  They were married.
18        I grew up in part of Smithfield.  That was my early years.
19   Q    When you say 'early years' -- sorry to interrupt.  But in
20   Smithfield about --
21   A    It was from to the third grade we stayed on Ninth Avenue
22   West.  And that was right down the street from Graymont
23   Elementary School.  And we moved out from over there when I was
24   in the third grade when my father -- my father died when I was
25   like five or six.  I can't remember.  But I was of age when he
```

**Caster Plaintiffs' Exhibit 85, Page 213**

1  died.

2  Q    Tell me about your early schooling experience in

3  Smithfield.  Did you go to a segregated school?

4  A    Yes.  We went to a segregated school.  I went to ---

16:24:29 5  Graymont was the first school I went to.  And that was when --

6  they was first segregated in, I think it was 1963 or '64.  I

7  went in '64, maybe '65.

8  Q    To Graymont?

9  A    To Graymont Elementary School, along with my brothers.

16:24:48 10  And my other sister they was at -- it was me, Scooter,

11  Rosalind.  And Jerome and Amanda, they was at Parker.

12  Q    Okay.

13  A    And Jerome was at Holy Family.

14  Q    So when you were at Graymont, did you say around the '64

16:25:09 15  time period -- did you say that that was around the time it was

16  first being desegregated, or --

17  A    It was then -- it was blacks being brought in to Graymont

18  Elementary School.  We weren't the first ones brought in there.

19  But we were a big part of the groups that came in.

16:25:25 20  Q    Uh-huh.

21  A    And --

22  Q    Tell me about that experience.

23  A    It was horrible.  I was little, and so I really wasn't

24  able to really protect myself and fight.  But my brothers were.

16:25:38 25  They were -- they were big teenagers.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 214**

1    And it was just hell every day.  You had to -- when you

2    got to school, they tried to stop you from coming to school.

3    And on your way back, you got rocks throwed at you.

4         We used to call this coming off of -- we used to call it

16:26:01  5    turnpike because the road kind of twisted.  So it was downhill

6    running, you know, every day.  They had the smaller kids, they

7    had to grab each one of our hands on each side because we would

8    fall.  And we had to run from the school about -- probably

9    about six blocks until we made it home.

16:26:24  10  Q    And because of the treatment that you received at

11   Graymont, did your family make a change, in terms of where you

12   went to school next?

13   A    We didn't -- my family didn't make a change.  The system

14   made a change because of the fighting.  They started fighting

16:26:43  15  back.

16        So they moved us to Wilkerson Elementary School.  And we

17   had to walk from Ninth Avenue to Wilkerson, which the freeway

18   wasn't there.  It was just a bunch of red dirt.  So we used to

19   have to cut across.

16:26:59  20       And I remember it good because I was -- it was a dog -- it

21   was First Baptist Graymont Church.  It was a dog in a fence

22   next door.  And we used to have to cut across Graymont in order

23   to -- First Baptist Graymont in order to get across the red

24   dirt to the school.  If not, it would add like some -- a whole

16:27:21  25  lot of more blocks on to the distance to walk.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 215**

1    And I was so afraid of that dog if -- because I used to

2  have to walk sometime if I -- if my brother -- they had to go

3  to basketball practice, or something like that earlier, we -- I

4  would have to go by myself.

16:27:38 5    And my mom, she was sick.  So she would walk halfway.  And

6  when she get to the church, I used to have to walk the rest of

7  the way over the red dirt to get to Wilkerson.

8  Q    Let me ask you:  Was Wilkerson an integrated school?

9  A    It was a black school.

16:27:54 10 Q    Okay.  So after your experience at Graymont, the system

11  moved you back to a segregated school?

12  A    Yes.  It's because -- and it was because of the fights.

13  It was the -- it was the white kids against the black kids.

14  And as long as the white kids was beating us up, nothing was

16:28:15 15 said, you know.  It was -- you know, we reported it, but it was

16  all right.

17    But then black kids started beating the white kids back

18  up.  That's when they moved us.

19  Q    And how long did you go to the Wilkerson -- to Wilkerson?

16:28:29 20 A    I left Wilkerson and went -- in the third grade and went

21  to -- that's when we moved.  My mother got insurance money off

22  of my father death.  And we built a house in West End.

23  Q    And what was West End like racially, the area that you all

24  moved to when you were in third grade?

16:28:47 25 A    They thought we were the moving company when we first

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 216**

1 moved in because she actually built a house.  So it was like --

2 and I can't remember -- I was in the third grade, so I had have

3 to go back the years and count.

4     When we first moved in the house, we were like probably

16:29:04 5 one or two people moving in at the same time that was

6 African-American.  It was solid white.

7     And I remember a lady coming over with a basket.  And I

8 was like -- I told you in the third grade.  And she said that,

9 Is a lady of the house here?  And I called my mom.  And she

16:29:27 10 came, and she said, I was just wanted to, you know, meet the

11 family that was moving in.

12     She said, Well, how you doing?  And the stare the lady

13 gave her was like you can't possibly being built a split-level

14 home in this area.  And it was a corner lot.

16:29:44 15     So right then I was just looking because I knew my mother

16 actually was a foot soldier.  So I'm looking like, oh, my God.

17 And she gave my mother the basket, and she took the basket.

18 And they didn't shake hands, but she did give her the basket.

19 Q    And just to make sure the record is clear.  So the lady

16:30:06 20 who came over to the house, she was expecting to see a white

21 family?

22 A    Yes.

23 Q    And so she was white, the neighbor?

24 A    Yes.

16:30:12 25 Q    Okay.  And so what happened after that?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 217**

```
 1   A    Gradually the families started moving out, out the
 2   community, just one at a time within like -- it wasn't no years
 3   or no months.  This was like you wake up and a family gone.
 4        It was like -- and my mother kept telling my brothers
 5   the -- two neighbors across the street had girls.  And the
 6   girls was, you know, kept trying to talk to them.  And she
 7   said, I told you to stay out from over there.  You going to end
 8   up in jail.  And they -- the girls wouldn't stop.  And
 9   gradually within a couple of weeks, them people, they were
10   gone.  I'm talking like dominoes.  Just gradually everyone was
11   moving, moving, moving.
12        And about time I got in the eighth grade, all of the --
13   all of the whites in that community was gone.
14   Q    And did the neighborhood become a predominantly black
15   neighborhood then?
16   A    It became -- we had one older lady.  I cannot think of
17   this lady's name for nothing.  There was one older lady stayed.
18   And she stayed across the street on the -- she stayed, like it
19   was about four doors down.  And we used to help her, you know,
20   cut her grass.  And my mama used to go over there and help her
21   also because she was really up in age.  And that was the only
22   lady that stayed over there.
23   Q    Only white lady that stayed?
24   A    That was the only one.  And I just think she was, you
25   know, satisfied that, you know, that she just didn't try to
```

16:30:39 (line 5)
16:30:59 (line 10)
16:31:20 (line 15)
16:31:41 (line 20)
16:31:58 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 218**

```
 1  move, I don't believe.  I was so young.  I really didn't focus,

 2  you know, on that.

 3  Q    Where did you go to school during this period at the West

 4  End neighborhood after Wilkerson?  Did you go through high

 5  school there?

 6  A    Went to Jackson Elementary School, which was right in our

 7  back door.

 8  Q    Uh-huh.

 9  A    So that was like nowhere to walk.

10  Q    Was that school predominantly black or predominantly white

11  when you got there?

12  A    It was -- it was really, really white when we got there in

13  West End.  It was really white.  And gradually they -- they

14  left.

15  Q    Uh-huh.

16  A    And before I was in the eighth grade, it was all black.

17  Might have been one or two white students left.

18  Q    Uh-huh.

19  A    But I can guarantee you it wasn't many.

20  Q    Uh-huh.  And then where did you graduate from high school?

21  A    At West End.

22  Q    Uh-huh.

23  A    I graduated, I think it was -- I'm almost -- because we

24  just had a class reunion.  It was 360 graduated in my class.

25  We might have had 25, maybe, whites.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 219**

```
 1   Q    When you graduated?

 2   A    When I graduated.

 3   Q    When you first started at -- sorry.  I lost the name --

 4   West End?

 5   A    Yes.  West End.

 6   Q    When you first started there, was it -- was it integrated

 7   at that point?

 8   A    It was well mixed.  It was well mixed.  It was -- behind

 9   the high school, it was a lot of white people stayed behind in

10   that area.  It was a lot of people stayed behind there.

11   Q    When you graduated from high school, Commissioner, is that

12   when you first went into the military?

13   A    I went in the military, yes.

14   Q    Why did you decide to go into the military at that point?

15   A    Well, when I was in high school, I was very good in

16   volleyball.  I had an opportunity, actually, to go to college.

17   And both of my parents had died by then.  And it was my sister

18   at the age of 21 raised five children.  And I wanted to help

19   her.

20       And I was a community activist all the way from ten years

21   old all the way until I graduated.  And I just -- I just felt

22   like I needed go because I wasn't going to stop doing what I

23   was doing.  And I had her worried.  That's when Bonita Carter

24   had died, got killed by the police.  And we were sneaking out

25   of school, marching in the Civil Rights movement trying to get
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 220**

```
 1   Richard Arrington in office.
 2        It was just, you know -- it was just a political thing
 3   after every -- just protesting, protesting.  And I had I -- I
 4   just -- I felt like I needed to leave because if I didn't, I
 5   was going to end up in some bad trouble because I wasn't going
 6   to stop protesting.
 7   Q     Uh-huh.
 8   A     And my --
 9   Q     When you said you needed to leave, you mean you needed to
10   leave Alabama?
11   A     I needed to leave Alabama because we wasn't stopping.  We
12   kept protesting.
13        And my -- I got so -- and I'm so glad social media wasn't
14   back then because I probably would have got more whippings than
15   I did because she didn't want me, you know, taking, sneaking
16   out of school going to protest.  And we did it.  I did it
17   anyway.
18        And she wanted me to graduate.  And I graduated.  And when
19   I graduated, I needed -- I wanted to leave.  They wanted --
20   when I went in the military, they wanted me to wait until 1980
21   to leave, but I had to leave.
22        And they, most of the time when they send you off, they
23   send you to the closest base and that's in Georgia.  I would
24   have went to Fort -- to training, basic training.  But I ended
25   up going to New Jersey because I wanted to leave so soon.  So
```

16:34:59 (line 5)
16:35:08 (line 10)
16:35:22 (line 15)
16:35:40 (line 20)
16:36:00 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 221**

1   they sent me on December the 5th.  So I had to leave then.

2   Q    Uh-huh.

3   A    Because we was still protesting.  It was still so many

4   issues in the community.  And I was still going to protests.

16:36:16  5   Q    Let me ask you about that, because you said you'd been an

6   activist since the age of ten?

7   A    Yes.

8   Q    What did these protests involve, you know, from then

9   through the time that you were leaving Alabama?

16:36:27 10  A    It was equal rights to vote.  My mother did it, and, you

11  know, back then you took your children with you.  And out of

12  seven kids, I was the one that decided to be a foot soldier

13  with my mom.

14        And we used to do voter registration.  We used to do

16:36:47 15  marches to the poll.  We was trying to get more people of

16  African-American on the city council in the City of Birmingham.

17  And we had the coalition back then.

18        I was a member of the coalition back in -- when they used

19  young people to actually lead a lot of the marches.  And I was

16:37:12 20  within that group.

21  Q    What kind of reaction did you get from local or state

22  officials to these marches and protests?

23  A    Well, a lot of them, you know, they didn't like what we

24  were doing.  You know, they used to -- I never got bit by a

16:37:33 25  dog.  I never did experience that because all of that was gone

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 222**

```
 1   by then.  But we used to get cursed out and spit on, different
 2   things.
 3       Not so much about public officials, but it was just the
 4   people who we were protesting against the different issues that
 5   was going on within the City of Birmingham.  It wasn't a
 6   community thing.  It was actually a city thing.  And we were
 7   leading the marches that we came together with the coalition
 8   and met about.
 9   Q   Uh-huh.
10   A   And most of the marches was led by children, young people,
11   because I wasn't a child then.  I was a young adult.  I was 18.
12   And it was by women.
13   Q   Uh-huh.  Uh-huh.  Let me turn to the present day for a
14   minute.  What is your current occupation?
15   A   I'm a county commissioner for Jefferson County District 2.
16   Q   And can you describe your district, in terms of
17   demographically and racially?
18   A   I have a large portion of African-American, low income.  I
19   have a percentage of whites in my district.  But majority of
20   them are -- it's not -- I don't believe it's a median income.
21   You're either poor or you're rich, so they in the rich
22   category.
23   Q   But these are some portion of your constituents?
24   A   Yes.
25   Q   And where do they stay?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 223**

1    A     Downtown, the south side, Lakeview.

2    Q     Uh-huh.

3    A     In that area.

4    Q     And what -- what's the kind of -- the larger portion of

16:39:15  5  your district?

6    A     It's poor from the southwest Titusville.  I have Druid

7    here, Evergreen bottom, Fountain Heights.  All of that is

8    behind the civic center.  If you look behind the civic center,

9    all of that is nothing but poverty.

16:39:34 10       You go to Norwood.  Norwood is kind of trying to build

11    itself up, but I have only like two streets off of Norwood.

12    Once you stopped right there at Uptown, everything back there

13    is nothing but low income.

14    Q     Uh-huh.

16:39:49 15    A     You skip over downtown, all that's money.  Even within

16    the -- the low income apartments that's downtown, those are

17    mixed-use apartments.  So you have a lot of upper-scale

18    citizens that stay in those apartments.  You have a lot of low

19    income.

16:40:08 20    Q     Uh-huh.

21    A     Now, it's always a small portion -- I think it's maybe

22    like ten percent that live over there.

23    Q     Uh-huh.

24    A     And I have -- there's south town, which is low income.

16:40:21 25    That's about 525 units there.  But all of the south side is

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 224**

```
 1  like an upper-scale income.

 2       And then you go to Titusville, that's low income.  All the

 3  way -- and you pull all the way back through Ensley,

 4  Smithville, West End, Hillman Estates, all of that back there,

 16:40:47 5  you go to Lipscomb, is very poor.  And it's a lot of poor

 6  whites and Latinos there in Lipscomb and Brighton.

 7       You go all the way through to Bessemer, and that's where

 8  my district stop at.

 9  Q    Okay.  And then the area that you described at first that

 16:41:02 10  you said was -- you said it was all kind of very deep poverty,

 11  what's the racial makeup of that portion of your district?

 12  A    It's black.

 13  Q    And what are some of the concerns that your -- in the poor

 14  areas of your district that your constituents have?

 16:41:20 15  A    They are not being represented.  And that's one of the

 16  main reasons that I ran for this position.

 17  Q    Do they have -- in terms of issues, do they have health

 18  care concerns?

 19  A    Yes.  They closed our county hospital.  They had been

 16:41:38 20  chipping away at the county hospital since 1999.  They finally

 21  closed the -- they sold the beds back in 2012.

 22  Q    Uh-huh.

 23  A    And they did a study three years ago.  Diseases that was

 24  back in the '60s, they are starting to pop back up now because

 16:41:58 25  of the county hospital closing.  And people now don't have
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 225**

1 anywhere to go to be treated.

2 Q    And are these individuals who don't have health insurance?

3 A    They do not have health insurance.  They are all indigent

4 care patients.

16:42:15 5 Q    How important is the Affordable Care Act to your

6 constituents, Obamacare?

7 A    I don't know how they came up with that name Obamacare.  I

8 guess because he the one that talked about it.

9     But health care is so important.  And I don't understand

16:42:36 10 how we are not taking advantage of this here in the state of

11 Alabama.  And it's not -- it's hurting -- it's hurting so many

12 people.

13     The mortality rate of pregnant women here in the state of

14 Alabama, African-American women, it's the highest in the world.

16:42:59 15 How can that possibly happen?  And we're not the largest state

16 in the United States.  How can that -- how could that happen?

17     Diseases that you find in third-world countries are here

18 in Alabama.  They see it in Jefferson County a lot.  How is

19 that happening here when we have the -- the best hospital --

16:43:26 20 UAB -- in the country?

21 Q    How about affordable housing?  Is that a concern of some

22 of your constituents?

23 A    They are chipping away affordable housing.  If you look at

24 it -- you're making 7.25.  Most of these jobs, if you're making

16:43:47 25 7.25, and you get 40 hours a week, that's still not enough to

**Caster Plaintiffs' Exhibit 85, Page 226**

475

```
     1    pay.  The lowest rent you going to get is at least 750 a month.
     2    And that's where I live at.  And I stay in a bad area in West
     3    End.
     4    Q    Uh-huh.
16:44:07 5   A    So you going to pay $750 to live in West End.
     6         That's -- if you're going to get just a halfway decent
     7    place, if you paid 325 or anything -- and I have been talking
     8    about this for I don't know how many years.  If you pay 325
     9    here in Jefferson County, you going to be in a slum shotgun
16:44:32 10  house not fit for a dog to live in.
     11        So affordable housing is very important.  It's needed here
     12   in this state.  It's critically needed in this state.
     13   Q    And, Commissioner Tyson, what about criminal justice
     14   issues and criminal justice reform?  Is that something of
16:44:54 15  concern to you and your constituents?
     16   A    Of course it is.  It's -- I actually -- we just -- we
     17   had -- we just got through protesting.  Yes.  I am a
     18   commissioner that protests still.
     19        A young man just served two years in Bessemer jail, city
16:45:13 20  jail, for a crime that he was on camera where he was at work.
     21   He had 100-something people saying he was at work.  His time
     22   clock said he was at work.
     23        But he sat in the jail two years -- two years -- and a man
     24   they just let out serve 59 years in jail for $5.
16:45:36 25       So criminal justice is very important, and it's needed
```

**Caster Plaintiffs' Exhibit 85, Page 227**

1    here.

2    Q    Commissioner Tyson, I wanted to ask you was your district

3    a majority African-American district before you won?

4    A    Yes.

16:45:51 5    Q    And when were you elected?

6    A    Last year.  November the 14th, I will have been serving in

7    the county commission seat a year.

8    Q    Okay.  And did you run affiliated with a political party?

9    A    Yes.

16:46:05 10   Q    Which party?

11   A    I'm a Democrat.

12   Q    And have you held any elected office other than Jefferson

13   County Commissioner?

14   A    Yes.  I was a city council person.

16:46:18 15   Q    And I take it city council here in Birmingham?

16   A    In Birmingham.

17   Q    And how long were you city councilwoman?

18   A    I was appointed in 2013.  I think I -- they left that seat

19   open for nine months before they appointed anyone because they

16:46:34 20   didn't want to appoint me.  And I served, I think nine months.

21   And then I turned around, and I ran and won that seat.  And I

22   was in five years.

23   Q    And what part of Birmingham did you represent as a city

24   councilwoman?

16:46:48 25   A    District 6.  And it's a portion of the area that I have

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 228**

477

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | now.  I still -- I have all of my city council district and my |
|       | 2  | county commission district.                                  |
|       | 3  | Q    And was the city council position a non-partisan position? |
|       | 4  | A    Yes, it is.                                             |
| 16:47:02 | 5 | Q    And have you ever held any other elected offices?      |
|       | 6  | A    Yes.  I was the neighborhood president.  You have to vote |
|       | 7  | for that, and that's over the West End community.  Then I was |
|       | 8  | a -- the Citizen Advisory Board president.  That's over all 99 |
|       | 9  | neighborhoods in Birmingham.  So that's really over the whole |
| 16:47:26 | 10 | city.  I was the neighborhood president.                    |
|       | 11 | Q    Uh-huh.  And in these various elected positions, have you |
|       | 12 | met regularly with your constituents or with your potential  |
|       | 13 | constituents when you were campaigning for office?           |
|       | 14 | A    Yes.  We had monthly meetings when I was at the Citizen |
| 16:47:48 | 15 | Advisory Board.  We met every month.                        |
|       | 16 | Q    Uh-huh.                                                 |
|       | 17 | A    And as my city council, I met every quarter.  And as a |
|       | 18 | county commissioner, we have been meeting every quarter.     |
|       | 19 | Q    Okay.  And can you describe what the Citizen Advisory   |
| 16:48:09 | 20 | Board is?                                                    |
|       | 21 | A    Yes.                                                    |
|       | 22 | Q    Sorry.  You were president of the Citizen Advisory Board? |
|       | 23 | A    Yes.                                                    |
|       | 24 | Q    Can you describe what that is?                          |
| 16:48:17 | 25 | A    The City of Birmingham has 99 neighborhoods and 23      |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 229**

```
  1    communities.  And then we have an advisory board which is a hub

  2    that convenes over all 99 neighborhoods.  And I was the

  3    president of that board.

  4         And what we do, we talk to the citizens and find out the

16:48:39  5    issues.  And we are the liaison between the mayor and the

  6    citizens.

  7    Q    Uh-huh.  And can you please describe your work in other

  8    community organizations that you are involved with?

  9    A    I'm a member of the NAACP.  I'm a member of the -- I'm the

16:49:03 10    chair of the Veterans of America.  I'm a lifetime member of

 11    Disabled Veterans.  I'm an SELC member.  I am the convenor for

 12    the Alabama coalition on blacks city participation.  I'm a

 13    convenor for the Black Women's Round Table.  I'm also the

 14    second chair for Ignite Alabama, which is a women's group.  And

16:49:30 15    I'm also the chair of the board for Black Youth Vote.  And I

 16    also sit on the board for the Community Advisory Committee,

 17    which is the one that -- we have the largest Martin Luther King

 18    breakfast in the United States.

 19    Q    Can you describe for the Court, Commissioner Tyson, when

16:49:57 20    you sleep?  Sorry.  I was just --

 21         But so can you tell me a little bit about the work of the

 22    Women's -- I may not get the title right -- women's coalition I

 23    think you had mentioned?  This is an organization that you take

 24    to Washington, D.C. on an annual basis or women's round table,

16:50:19 25    I believe?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 230**

```
 1   A    Yes.  I'm the convenor for the state.

 2        And what we do, we go into low income areas --

 3             THE COURT:  First of all, could you give me what the

 4   correct name of the organization is?

 5             THE WITNESS:  It's the -- it's the Alabama Coalition

 6   on Black Civic Participation.  Up under that umbrella, we have

 7   Black Youth Vote and Black Women's Round Table.

 8        And we go into low income communities, and we educate,

 9   motivate, and mobilize the communities around voting, and

10   voting and laws that will improve the quality of life of each

11   and every citizen.

12        And that's a non-partisan organization.

13   BY MR. SPIVA:

14   Q    As part of that organization, Commissioner Tyson, have you

15   done work all around the state of Alabama?

16   A    All around the state of Alabama.

17   Q    Have you done work in Montgomery County?

18   A    Montgomery.

19   Q    How about Mobile?

20   A    Mobile.

21   Q    Can you describe the type of work you do with that

22   organization?

23   A    We go in, and it's the -- it's depending on what issue

24   they're having.

25        Majority of the -- the reason we're in the neighborhoods
```

16:50:34 (line 5)
16:50:58 (line 10)
16:51:13 (line 15)
16:51:21 (line 20)
16:51:32 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

Caster Plaintiffs' Exhibit 85, Page 231

480

and in the city is to advocate for voting, and encouraging and

registering people to vote.

    And when we get there, we also mobilize them on other

issues -- environment.  Some of them environmental issues,

some -- I'd say racial discrimination issues, criminal justice.

You name it.  We have had to do so many things concerning the

citizens.  It's no different than NAACP, but we just -- we are

on the ground more than that average -- of that group too.

    I'm also a member of national action network.  I forgot to

tell you that.

Q    Okay.  And so, Commissioner Tyson, you said we're on the

ground more.  So have you been on the ground doing that type of

work in Mobile County?

A    Yes.

Q    And in Mobile city?

A    Yes.

Q    Okay.  And have you gone block by block and knocked on

doors and sat in people's homes?

A    Block by block, knocking on doors, all over Mobile.

Q    In Montgomery?

A    Montgomery, yes.  Huntsville.  Selma.

Q    Uh-huh.

A    Camden, Alabama, Perry County.

Q    Uh-huh.  What observations have you made about -- is this

predominantly in the African-American communities in those?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 232**

A     In the African-American community, we -- we really -- when
we go in, we go in and we pull up really the poverty rate in
these counties.  And we look at the voting numbers.

Q     Uh-huh.

16:53:27  A     And that's how we can tell the need of where we need to
actually go.  And, yes, majority of them are African-American
counties.

Q     Uh-huh.  What kinds of concerns have you heard in doing
that work -- strike that.

16:53:48  What have you observed, in terms of the concerns of the
people in those neighborhoods that you've met with in Mobile
County?

A     They are concerned about health care.  They are concerned
about housing, criminal justice, environmental concerns, and
16:54:10  the poverty level, and the condition that they are living in.

Q     Would you say, based on your experience, that they -- that
the African-American and poor neighborhoods that you have
worked in Mobile share many of the same concerns that you have
talked about earlier that the African-American community has in
16:54:35  Birmingham and in Montgomery?

A     Yes.

Q     And do you do voter registration and get out the vote
efforts in connection with that work?

A     Yes.

16:54:45  Q     Can you tell me about that?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 233**

482

```
 1   A    We go in and it's the -- okay.  Just say that when we

 2   go -- we went to Pritchard.  You have to find a person to

 3   partner with in there.

 4        So we -- number one, we go to the largest churches, and

 5   actually we connect with them.  And it's always some type of

 6   group -- NAACP, different groups that's out there advocating

 7   for voting.  We partner with those groups.  And we educate them

 8   on the process of voting and on the laws and the laws that has

 9   been changed.

10        And we go out, and we go into the areas where it's low

11   voting at.  And we go door to door.  We go into the gymnasiums.

12   We go churches, schools, clubs, corner stores, wherever is

13   bodies, wherever is people.  And we talk about voting and

14   educate them.  And we try to get them to register to vote.  And

15   we try to mobilize them and also just build up infrastructure

16   and where they can actually start their own organization and

17   become a part of our group.

18   Q    What kinds of challenges have you experienced or have the

19   people that you have been trying to mobilize experienced in

20   trying to register and actually vote?

21   A    You know, they don't trust the system.  They have been

22   purged from the voting list.  A lot of them have been purged

23   from the voting list.

24        They said that every time they go vote, they have to go to

25   another box.  They said they no longer vote at that site again.
```

16:55:02 (line 5)
16:55:23 (line 10)
16:55:50 (line 15)
16:56:07 (line 20)
16:56:23 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 234**

1   So they have to go to another site.  And the polling places are

2   too far from their residence.

3      And they're not -- I say, well, what about the provisional

4   ballot?  They don't know what a provisional ballot is because

16:56:44 5   no one has ever offered them a provisional ballot.

6      And they also talked about that their ID have to have

7   their address on it.  But if you are transit -- and really the

8   working poor and you don't have a sufficient income to pay

9   because of minimum wage being so low, it's hard to keep

16:57:07 10   somewhere to stay at.  So that mean every time you move, you

11   got to get your -- another ID.  And if it's not an ID, it's a

12   driver's license.  And that costs.

13   Q   Uh-huh.

14   A   Every time that you move in order to match up with your

16:57:22 15   voting, that's on your voting record.  And it's just -- they

16   said the process is too hard.  And it's set up and it don't

17   make no -- well, our vote is not going to matter, and, you

18   know, and sometime, you know, they push back on us.

19   Q   Have you found that there's a certain level of distrust in

16:57:44 20   the system among the communities that you work -- you've done

21   work in?

22   A   A lot of distrust.  Especially when they was purged off

23   the list.

24   Q   I want to ask you more about that, the purging.  Have you

16:57:55 25   actually kind of personally encountered that either in your

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 235**

484

1    campaigns, or work here in Birmingham, or elsewhere?

2    A    Yes.

3    Q    This issue of people having been purged off the list?

4    A    Yes.  Yes.  And we have talked to the Secretary of State

16:58:08 5  about it.  Actually, trying to get the list with New South and

6    trying to actually get the list from the secretary of the

7    people that they took off of the list.  And they wouldn't give

8    it to us.  They said that we have to go to court.  And we don't

9    have the money to go to court to sue to get the list.

16:58:34 10 Q    And what -- you mentioned a New South.  I don't know if

11   you've described that already.

12   A    No.  I left it out.  I forgot to tell you.

13        We just had a meeting Saturday.  It's New South Coalition.

14   It's another advocate group that advocate for voting and to

16:58:54 15  change laws.

16   Q    Uh-huh.  And you attended a meeting with the Secretary of

17   State at one point and asked them about the purged voter list?

18   A    Yes.  It was at the -- Representative Rolanda Hollis had

19   the meeting at the YWCA over in Roebuck.  And we asked him

16:59:12 20  about the list.  And he said that they were on the list --

21   purged off the list because they hadn't voted in the last

22   couple of elections.

23        So I asked him, How did you decide who would get purged

24   off the list?  Because it looked like all the African-American

16:59:32 25  people were the ones that I have been talking to were the ones

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 236**

```
 1   that was purged off the list.  And I said, How many was purged
 2   off the list?  And he said that he didn't have the number in
 3   front of him.
 4       I said, So how can I get it?  I wrote his office.  They
 5   did not give us the list.  I -- I talked to him several times,
 6   and he would not give me the list.  And they said I would have
 7   to go to court.
 8       And when I actually finally talked to someone up there,
 9   they told me they said, Well, I'll lose my job if I give it to
10   you.  But I can tell you it's over 700,000 people that's been
11   purged off the list over the last couple of years.
12   Q   How do you know that?
13   A   Because one of the employees told us that.  And they
14   didn't want -- I don't know the person, anyway, because I don't
15   live down there.
16   Q   Was it an employee of the Secretary of State?
17   A   Yes.  In the voting office.
18   Q   Let me ask you:  Have you either as a candidate or in your
19   capacity as a county commissioner had election day reports from
20   people who say, Hey, I can't vote because I'm not on the list?
21   A   We have -- we have a command center set up during each
22   election where they send attorneys, and they give us the number
23   of the attorneys from the Poverty Law Center to call about
24   election complaints.
25       And you hear all day long that, I'm not on the list.  They
```

Timestamps: 16:59:45 (line 5), 17:00:05 (line 10), 17:00:22 (line 15), 17:00:39 (line 20), 17:01:00 (line 25)

**Caster Plaintiffs' Exhibit 85, Page 237**

1    changed me from Democrat to Republican.  They keep changing my

2    polling places.  This is the third place I have went to and

3    it -- this is every election.

4    Q    Uh-huh.

17:01:20  5    A    Every -- every election.

6    Q    You mentioned the Poverty Law Center.  Is that the

7    Southern Poverty Law Center?

8    A    The Southern Poverty Law Center.  They give us attorneys,

9    a list of attorneys.  And also the national coalition on blacks

17:01:33 10  and participation.  They give us a list of attorneys that's in

11   our state.

12   Q    Uh-huh.

13   A    That we can call with the problems.

14   Q    Uh-huh.

17:01:40 15  A    That we have in the -- and it's all we can do.  And they

16   file -- they can file something, but you won't hear nothing

17   until after the election.

18   Q    Uh-huh.

19   A    And every answer that we have ever received is that they

17:01:54 20  were purged off the list because they didn't vote on the last

21   election, or they notified them, they moved their polling

22   spots, and they were notified.  But for some reason, the person

23   never get the notification.  And, well, that polling site was

24   closed.  Well, did y'all send out anything?  No.  They put a

17:02:19 25  note on the door.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 238**

         1      So if the people go over there, they would know that their

         2   polling site was changed to this place.  But everyone said when

         3   they went over there wasn't no note on the door.

         4   Q    Uh-huh.

17:02:32 5   A    So they just come up with all types of reasons.  But we

         6   still are left with this person not having a fair opportunity

         7   to vote, not even had an opportunity to do a provisional ballot

         8   because they don't even give them a provisional ballot.

         9   Q    And you have done -- personally done work to try to

17:02:51 10  educate people about their right to vote with the provisional

        11   ballot?

        12   A    Yes.

        13   Q    That's a violation of federal law to deny somebody a

        14   provisional ballot?

17:03:02 15  A    They don't tell them that they can do one.

        16   Q    Okay.  And so, Commissioner Tyson, the majority of these

        17   reports that you hear in your work as a commissioner or in the

        18   voter -- get out the vote work, do they predominantly come from

        19   one race or the other?

17:03:21 20  A    The majority of the people that I deal with is

        21   African-Americans and Latino because of the area that I cover.

        22   And those are the ones that's being disenfranchised.

        23   Q    Have you heard any reports from either any of your

        24   colleagues or any -- from anyone else about predominantly white

17:03:47 25  areas having the same kinds of issues?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 239**

488

```
        1  A    No.
        2  Q    Let me ask you about the polling place.  You mentioned
        3  polling place, I think, movement and closing.  Is that what you
        4  were talking about earlier?
17:03:58 5  A    Yes.
        6  Q    Did you actually have a personal experience where your
        7  polling place was moved without notification?
        8  A    Yes.  They actually moved my polling place, and I wasn't
        9  notified.  And I checked my mail every day.  And I know when
17:04:13 10 I -- when I -- when I'm ever given a polling slip, I put mine
        11 on the refrigerator.
        12 Q    Uh-huh.
        13 A    And I was not notified that they moved my polling place
        14 from Harrison Park to Hemphill Elementary School.
17:04:31 15 Q    Let me ask you:  You also -- well, let me ask you one more
        16 question about that.
        17      And have you -- and have you received or been -- or seen
        18 yourself others who have been affected by the same thing in
        19 terms of polling place changes without notification?
17:04:48 20 A    Yes.  Yes.
        21 Q    And then you mentioned voter ID and the challenges of
        22 people when their address changes.
        23      Do people in your -- the communities that you represent
        24 and that you work in, do they -- do many of them frequently
17:05:08 25 have to move?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 240**

489

```
         1  A    Yes, they do.

         2  Q    And why is that?

         3  A    Because of the working poor.  They are not able to meet

         4  their rent.  And they have to end up moving to try to find a

17:05:23 5  cheaper place, you know.

         6       I just had one Carla McGee -- I asked her could I use her

         7  name.  She had to move from Avondale, which is on the south

         8  side.  They raised her rent to $750.  Now she stay in West End

         9  with her daughter until she can find somewhere to stay on her

17:05:48 10 own that's more affordable.

        11  Q    How often do you receive calls like that of people who are

        12  suffering from housing instability?

        13  A    Every day.  Like I told you, I'm a county commissioner,

        14  but I just, you know, was elected.  And this work I have been

17:06:06 15 doing since I was ten.

        16       My mother did it.  She ran the commodities for the

        17  community.

        18       And we have a -- a list of agencies that we can help

        19  people get their utilities paid and find them somewhere to

17:06:24 20 stay.  And so most people do call me for different things like

        21  that.  So I get calls like that every day.

        22  Q    And how have you found -- just going back to the voter ID

        23  issue.  How does this housing issue relate to the challenges

        24  people have to vote?

17:06:41 25 A    If you stay -- like Carla stayed in Avondale.  Her ID,
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 241**

 1   which is her driver's license -- license going to have Avondale

 2   address on it.  So if she change her address on her voting

 3   roster to West End, that means she got to turn around and

 4   change it on her driver's license in order to vote in March.

17:07:10  5   So if she find a house or somewhere else to live after March,

 6   she going to have to turn around, change her voting box in

 7   order to vote in November, and turn around again and change her

 8   ID.  That means she going to have to go back and pay another

 9   40-something dollars and get another ID in order for her to

17:07:34 10   vote in November.  So that's right there is like almost a

 11   hundred dollars in order to do that.

 12   Q   Do some of your constituents work two and three jobs in

 13   order to try to make ends meet?

 14   A   The majority of the people I know work two to three jobs.

17:07:53 15   And I -- I do too.  So I -- I'm -- I fall right in that

 16   category.

 17   Q   You worked more than two or three jobs, Commissioner.  I

 18   think we established that.

 19   A   Yes.  So I understand it and I get it.  That's why in the

17:08:13 20   area I live in, I don't know -- I don't know anyone I know

 21   don't work two and three jobs, really, just thinking about it.

 22   Just thinking about it.  I -- let me see.  I really don't

 23   unless they are older.

 24   Q   Right.  Well, let me ask you:  So do the people that you

17:08:31 25   know that work two, three jobs, do they have a lot of time to

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 242**

|     |                                                                           |
| --- | ------------------------------------------------------------------------- |
| 1   | go and change their address every time they move?                         |
| 2   | A    No.  They don't have a lot of times.  We actually do a                |
| 3   | campaign on different social media outlets.  If you need an                |
| 4   | address change, we try to give them the form they can fill out            |

17:08:54 5  online in order to change their address.

6        But with the ID, you can get a free ID, but you can't get

7  a free ID if you already have one.

8  Q    Uh-huh.

9  A    And with the homeless community, you can get free IDs, but

17:09:09 10  you have to actually be homeless and have no income coming in,

11  in order to qualify for that ID.  So we have two, three places

12  that do that.

13         THE COURT:  Mr. Spiva, might this be an okay time to

14  break?  I don't think we'll be able to get through cross

17:09:29 15  tonight, so I think Ms. Tyson will need to come back tomorrow.

16  Can you do that?

17         THE WITNESS:  I will if I have to.

18         THE COURT:  I mean, it's after 5:00, and I just -- I

19  don't see this winding up in time for us to finish cross.

17:09:48 20        MR. SPIVA:  That's probably right, Your Honor.  And

21  sorry.  I think I might have mistimed.

22         THE COURT:  That's all right.  As my mother always

23  said, things always take longer than they do.

24      All right.  So we will be adjourned until in the morning

17:10:04 25  at 9:00 o'clock.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 243**

492

```
 1            MR. SPIVA:  Yes, Your Honor.  If the Commissioner's

 2   schedule doesn't permit her to start at 9:00, can we start with

 3   another witness and then come back to her?

 4            THE COURT:  Certainly.  Certainly.

 5            MR. SPIVA:  I haven't actually talked to her about it

 6   yet, but I'll find out.

 7            THE COURT:  We can be very flexible, if we need to.

 8            (Whereupon, the above proceedings were concluded at

 9       5:10 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 85, Page 244**

493

1                         CERTIFICATE

2

3

4        I certify that the foregoing is a correct

5   transcript from the record of proceedings in the

6   above-entitled matter.

7

8

9

10

11                                              11-15-19

12   Christina K. Decker, RMR, CRR                Date

13   Federal Official Court Reporter

14   ACCR#:   255

15

16

17

18

19

20

21

22

23

24

25

Caster Plaintiffs' Exhibit 85, Page 245

```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ALABAMA
 2                          SOUTHERN DIVISION

 3

 4   LAKEISHA CHESTNUT,  an individual; *
     MARLENE MARTIN, an individual;     *  2:18-cv-00907-KOB
 5   BOBBY DUBOSE, an individual;       *  November 6, 2019
     RODNEY LOVE, an individual; KAREN  *  Birmingham, Alabama
 6   JONES, an individual; JANICE       *  9:00 a.m.
     WILLIAMS, an individual; RODERICK  *
 7   CLARK, an individual; JOHN HARRIS, *
     an individual,                     *
 8           Plaintiffs,                *
                                        *
 9   vs.                                *
                                        *
10   JOHN H. MERRILL, in his official   *
     capacity as Alabama Secretary of   *
11   State,                             *
             Defendant.                 *
12   *********************************** *

13                  TRANSCRIPT OF BENCH TRIAL
                           VOLUME III
14            BEFORE THE HONORABLE KARON O. BOWDRE
                CHIEF UNITED STATES DISTRICT JUDGE
15

16   FOR THE PLAINTIFFS:
     Abha Khanna, Esq.
17   PERKINS COIE LLP
     1201 Third Avenue
18   Suite 4900
     Seattle, Washington 98101
19   (206) 359-9000

20   Bruce V. Spiva, Esq.
     PERKINS COIE LLP
21   700 13th Street, NW
     Suite 600
22   Washington, DC 20005
     (202) 654-6338

23

24

25
```

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 1**

```
 1          Richard P. Rouco, Esq.
            QUINN CONNOR WEAVER DAVIES & ROUCO LLP
 2          2 20th Street North
            Suite 930
 3          Birmingham, Alabama 35203
            (205) 870-9989
 4
            Daniel C. Osher, Esq.
 5          PERKINS COIE LLP
            700 13th Street NW
 6          Suite 600
            Washington, DC 20005
 7          (202) 654-6338
 8          Lalitha D. Madduri, Esq.
            PERKINS COIE LLP
 9          700 13th Street NW
            Suite 600
10          Washington, DC 20005
            (202) 654-6322
11
12          FOR THE DEFENDANT:
            James W. Davis, Esq.
13          Laura E. Howell, Esq.
            OFFICE OF THE ATTORNEY GENERAL
14          501 Washington Avenue
            P.O. Box 300152
15          Montgomery, Alabama 36130-0152
            (334) 242-7300
16
            J. Dorman Walker, Esq.
17          BALCH & BINGHAM LLP
            P.O. Box 78
18          Montgomery, Alabama 36101
            (334) 834-6500
19
20          COURTROOM DEPUTY:  Sarah Hollingsworth
21
            COURT REPORTER:  Christina K. Decker, RMR, CRR
22
         Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
23       pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
            and Procedures Vol. VI, Chapter III, D.2.  Transcript
24              produced by computerized stenotype.
25
```

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 2**

1                                  **I N D E X**

2     DIRECT EXAMINATION OF COMMISSIONER TYSON          497
      CONTINUED
3     BY MR. SPIVA
      CROSS-EXAMINATION                                 511
4     BY MS. HOWELL
      REDIRECT EXAMINATION                              524
5     BY MS. HOWELL
      RECROSS-EXAMINATION                               526
6     BY MS. HOWELL

7
      HENRY SANDERS                                     527
8     DIRECT EXAMINATION                                527
      BY MS. MADDURI
9     CROSS-EXAMINATION                                 570
      BY MR. WALKER
10    REDIRECT EXAMINATION                              601
      BY MS. MADDURI
11    RECROSS-EXAMINATION                               603
      BY MR. WALKER
12

13
      GERALD DIAL                                       605
      DIRECT EXAMINATION                                606
14    BY MR. WALKER
      CROSS-EXAMINATION                                 644
15    BY MS. MADDURI
      REDIRECT EXAMINATION                              657
16    BY MR. WALKER

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 3**

**P R O C E E D I N G S**

1
2                    (In open court.)

3              THE COURTROOM DEPUTY CLERK:  I would like to remind

4    you that you are still under the same oath you took yesterday.

09:10:23 5              THE WITNESS:  Okay.

6              MR. SPIVA:  Is it all right to proceed, Your Honor?

7              THE COURT:  Yes, it is.

8         DIRECT EXAMINATION OF COMMISSIONER TYSON CONTINUED

9    BY MR. SPIVA:

09:10:36 10   Q    Good morning, Commissioner Tyson.

11   A    Good morning.

12   Q    I just have a few more questions for you this morning.  I

13   know yesterday you kind of described a number of organizations

14   that you're involved with.  And is there one -- let me ask

09:10:54 15   you -- I think it was the Black Women's Round Table is one of

16   those?

17   A    Yes.  Yes, sir.

18   Q    With that organization, do you ever go to Washington, D.C.

19   to try to visit with Congress people?

09:11:04 20   A    Yes.  We've been going -- this -- 2020 will be our -- I

21   think our ninth year.  We leave March the 4th through the 8th.

22   Q    Uh-huh.

23   A    Next year.

24   Q    And who do you meet with when you go there?

09:11:19 25   A    This organization is nationwide, so it's several states

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 4**

```
  1    there.  And you actually meet with your Congress and senators.
  2         So we call -- like right now we are sending e-mails for
  3    March the 4th.  And that's the day on the Hill.  We pick
  4    between March the 4th and March the 8th.  We pick one or two of
09:11:47 5    those days to go out -- to go up on the Hill and talk to your
  6    Congress and our senators.  And so we notify them, you know,
  7    way ahead enough time where they can give us an answer, and we
  8    meet with them.  So out of all the states, Alabama gets the
  9    less meetings.
09:12:12 10  Q    Okay.  So let me ask you:  Who from Alabama goes, in terms
  11   of -- what types of people -- younger people, older people, a
  12   mix?
  13   A    We take high school students, majority of mine are 12th
  14   grade, college students, regular citizens from all over the
09:12:30 15  state of Alabama.
  16   Q    And about how many people go up?
  17   A    From --
  18   Q    Just approximately.
  19   A    40.
09:12:39 20  Q    Uh-huh.
  21   A    We trying to get more next year because it's -- the
  22   finances is the reason we take -- we have a limited amount.
  23   Q    Sure.  And is it a nonpartisan group?
  24   A    It's a nonpartisan group.
09:12:51 25  Q    And in -- how many years did you say you've been doing
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 5**

1   this?

2   A    Next year I think will be the ninth year.

3   Q    When you go there -- when you've gone there in the past,

4   have you attempted to schedule meetings with all of the Alabama

09:13:07  5   congressional delegation and each of Alabama senators?

6   A    Yes, we have.

7   Q    And have you been able to meet with the -- each of the

8   congressional members and each of the senators?

9   A    No.

09:13:22 10   Q    Who have you been able to meet with?

11   A    Congresswoman Sewell and Doug Jones, Senator Doug Jones.

12   Q    And why haven't you met with the other members of the

13   congressional delegation?

14   A    Because they refuse to meet with us.  They don't have

09:13:39 15   time.

16        Senator Shelby, his assistant let us come in the office

17   and meet with us and then gave us a bag of peanuts, but they

18   never give us an answer to the questions.  We have folders to

19   present to them with the outline of questions ahead of time.

09:13:58 20   And then we have a packet when we get there with the same

21   questions to go over with them that we gave them ahead of time.

22   They never really have no answers for us when we get there.

23        And one of the senators -- I think it's the one out of

24   Mobile because you never really -- we never see their face, you

09:14:19 25   know.  So I really couldn't -- I think it was Bradley Byrne.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 6**

```
 1  It might have been him -- the one out of Mobile.  They wouldn't
 2  even let us in the office.  They made us stand in the hallway
 3  and embarrassed us in front of all those states and wouldn't
 4  allow us to come in his office.  When we went to the door and
09:14:41 5  we said that we sent an e-mail prior to coming to -- prior to
 6  coming to actually meet with the senator and we wanted to
 7  know --
 8  Q    This is Congressman Byrne?
 9  A    Yes.
09:14:55 10  Q    Uh-huh.
11  A    And the senators in the state of Alabama -- I cannot
12  remember which one of them, but I'm almost positive it's the
13  one out of Mobile.
14  Q    Okay.  And you have been saying senators.  Do you mean the
09:15:12 15  House of Representatives delegates, congressional delegates?
16  A    Yes.  Congresswoman Sewell and Doug Jones, the ones that's
17  with Doug Jones, Shelby -- Shelby was -- out of all of those --
18  out of the senators, Doug Jones was the only one that
19  personally met with us.
09:15:25 20  Q    Uh-huh.  Okay.
21  A    Shelby let us come in his office and meet with his
22  assistant.
23  Q    Uh-huh.
24  A    None of the rest of them ever --
09:15:32 25  Q    Uh-huh.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 7**

| | |
|---|---|
| 1 | A    -- replied or -- they -- when we called they talked to us |
| 2 | on the phone. |
| 3 | Q    Uh-huh. |
| 4 | A    But they never gave us an opening time within the -- that |
| 09:15:43 5 | period that we was going to be down there that we could come |
| 6 | and see them. |
| 7 | Q    Uh-huh. |
| 8 | A    So when we was up there, we just dropped by their office |
| 9 | anyway. |
| 09:15:51 10 | Q    Uh-huh. |
| 11 | A    And they wouldn't let us in.  They made us stand in the |
| 12 | hallway. |
| 13 | Q    That was Congressman's Byrne's office? |
| 14 | A    I'm almost for sure it was.  I can't be absolutely |
| 09:16:01 15 | positive. |
| 16 | Q    Uh-huh. |
| 17 | A    But I know who met with us and I know who didn't. |
| 18 | Q    Okay. |
| 19 | A    And that was Shelby and -- we met with his assistant. |
| 09:16:09 20 | Q    Okay. |
| 21 | A    And Doug Jones has always met with us -- |
| 22 | Q    Okay. |
| 23 | A    -- since he's been there.  And Congresswoman Sewell has |
| 24 | been the only one on the Congress side that has -- has met with |
| 09:16:21 25 | us.  None of them -- they do the same thing.  They won't even |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 8**

```
     1  let us in they office.
     2  Q    Okay.  And so let me ask you:  So it sounds like
     3  Congresswoman Sewell and Senator Jones meet with you in person
     4  themselves personally?
09:16:36 5  A    Yes.
     6  Q    Okay.  And has Congresswoman Sewell done that each time
     7  you've gone up to Washington, D.C.?
     8  A    Each time we come up there, she's even given us a luncheon
     9  and -- to actually go over some of the bills that they're
09:16:50 10 trying to pass.
    11  Q    Uh-huh.
    12  A    And then she also participates in our press conference
    13  that we have --
    14  Q    Uh-huh.
09:16:58 15 A    -- on the Hill that's actually covering black women's
    16  issues.
    17  Q    Uh-huh.
    18  A    So it's just not Alabama up there.
    19  Q    Uh-huh.
09:17:05 20 A    It's several states up.
    21  Q    Uh-huh.
    22  A    But after we go to our debriefing, Alabama is the only one
    23  that's not able to meet with their Congress people and the
    24  senators.
09:17:15 25 Q    Okay.  And then you mentioned Senator Jones also met with
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 9**

```
 1  you personally.  Has he met with you personally each time
 2  you've gone up there since he has been a senator?
 3  A    Yes, he has.
 4  Q    Okay.  And you mentioned also that -- I think you said you
 5  thought it was Congressman Byrne who had had you meet out in
 6  the hall.  Did he meet with you personally out in the hall
 7  or --
 8  A    No.  His assistants.  They wouldn't let us in the door,
 9  like in the office way.
10  Q    Uh-huh.
11  A    They told us to step out in the hallway.
12  Q    Okay.  Have you ever through this organization gotten a
13  personal meeting with any of the Congress people when you've
14  gone to Washington other than Congresswoman Sewell or Senator
15  Jones?
16  A    No, I have not.  I've never had a meeting with none -- and
17  I go with several organizations.  And the same two -- that's
18  the same two we always meet with.
19  Q    And you've requested a meeting, though, with each of the
20  Congress people from Alabama each time you've gone?
21  A    Yes.
22  Q    Okay.  Let me ask you:  Have you -- and you mentioned
23  something about a packet that you leave with them.  Is that
24  something that where you're asking for answers to questions
25  after the meeting or after your visit to Washington?
```

**Caster Plaintiffs' Exhibit 86, Page 10**

```
      1  A    We send them the questions before.

      2  Q    Uh-huh.

      3  A    And then we take a packet with us and leave it with them.

      4  Q    Okay.

09:18:42  5  A    In case they say they didn't get it.

      6  Q    And has Congresswoman Sewell or Senator Jones responded to

      7  those questions after you left Washington?

      8  A    When we get there, they already have the answers, and they

      9  go over the packet with us.

09:18:56 10  Q    Okay.  And do they send you something later in writing, as

     11  well?

     12  A    They send us something later in writing.  And now they are

     13  getting ready to start doing televised meeting with us.

     14  Q    Uh-huh.

09:19:08 15  A    Out of my office.

     16  Q    Okay.  And have any of the other Congress people that

     17  you've requested meetings with, other than Congresswoman Sewell

     18  and Senator Jones, ever provided you responses either in person

     19  or in writing later to the questions that you posed?

09:19:29 20  A    No.

     21  Q    And you've sent -- have you provided the same package to

     22  each of the other Congress people as you provide to

     23  Congresswoman Sewell and Senator Jones?

     24  A    Yes.  We look at their committees that they sit on.  And

09:19:45 25  that's how we target our questions to each one of the
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 11**

```
         1  representatives.  We have never gotten an answer from anyone

         2  but Congresswoman Sewell and Senator Doug Jones.

         3  Q    Have you gone to Washington with any other of the

         4  organizations that you're involved with?

09:20:04 5  A    Yes, I have.  I went -- I've went to Washington, D.C. with

         6  the national action network.  I've went to Washington, D.C.

         7  with neighborhood housing services.  I've went there with them

         8  also.  I've went with the NAACP, and the same thing.

         9  Q    And the ones that you just listed, all of those are

09:20:33 10 nonpartisan organizations?

        11  A    All of them are nonpartisan organizations.

        12  Q    And have you been able to secure meetings with any of the

        13  congressional delegation or senators other than Senator Jones

        14  or Congresswoman Sewell in connection with your visits with any

09:20:52 15 of those other organizations?

        16  A    No.  We have not.  But the NAACP was a pastor alliance

        17  group that actually went up there, and they wouldn't even

        18  hardly they went let us in the building really.

        19  Q    Uh-huh.

09:21:12 20 A    We was out in the hallway.  And they had security out

        21  there.

        22  Q    Did Congresswoman Sewell or Senator Jones meet with that

        23  group?

        24  A    Yes, they did.

09:21:22 25 Q    Okay.  And have they consistently taken meetings with the
```

**Caster Plaintiffs' Exhibit 86, Page 12**

506

```
         1  various groups that -- they being Congresswoman Sewell or
         2  Senator Jones -- have they consistently taken meetings with the
         3  groups that you have gone to Washington with?
         4  A    Yes.
09:21:37 5  Q    And have those groups also consistently requested meetings
         6  from the other members of Alabama's congressional delegation?
         7  A    Yes.
         8  Q    And I think you've already said that you have not received
         9  those meetings?
09:21:50 10 A    Have not received a meeting.
        11  Q    Let me ask you, Commissioner Tyson, have you -- have you
        12  ever seen or -- any racial appeals in campaigns in Alabama?
        13  A    Yes.
        14  Q    What have you seen?
09:22:12 15 A    I know when the -- it was a judge race with -- I think it
        16  was Parker and Vance.  I think that's who it was because I go
        17  to a breakfast on Sundays with the -- with Vance.  I think
        18  that's his name.
        19  Q    Uh-huh.
09:22:38 20 A    They had -- had a commercial.  And also when Doug Jones
        21  was running, I seen some commercials and several other
        22  candidates that was running.
        23  Q    What about when President Obama was either in office or
        24  running for office, did you see any racial appeals in
09:23:11 25 connection with President Obama?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 13**

A     Yes.  There were a lot of those with the joker face

stretched out like with the joker face and with the turban hat

on.

Q     This is images of President Obama like that?

09:23:23  A     With the hat on.  His wife looked like a monkey.  They had

her like a monkey and had President Obama like he was in Iraq.

Q     Uh-huh.

A     Like that.

Q     What impact did that have on you personally when you saw

09:23:46  those kinds of appeals?

A     Racist.  Racist.  And I -- I never really -- I've been

dealing with stuff like this all my life.  So why would you --

if you were running a judge race, or you running for senator,

why are you talking about the President?

09:24:12  Q     Uh-huh.  Uh-huh.

A     So -- and I just -- that bothered me.

Q     Uh-huh.

A     A lot.  And when you dealing with young people -- because

even my daughter, she was -- she was -- she was in a private

09:24:27  school.  So she went to school with a lot of majority of white

kids.  And she -- it bothered her --

Q     Uh-huh.

A     -- you know, when she seen it.  And she said, Now, why

would they do that?

09:24:43  Q     Uh-huh.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 14**

```
  1  A    You know.  And I really couldn't -- I told her I said,
  2  Well, you know, it's racism, but, you know, she really
  3  basically didn't understand it.
  4  Q    Uh-huh.
09:24:53  5  A    And I know exactly what it was.
  6  Q    Uh-huh.
  7  A    And it was to make sure that every person that disliked
  8  people because of their color would come out and vote against
  9  any Democrat that would be in office -- that would even run for
09:25:14 10  office.
 11  Q    Did you see some kind of an ad on social media that had
 12  Doug Jones as an overseer of a slave camp?
 13  A    Yes.  I seen that also.
 14  Q    Okay.  And what kind of impact did that -- did that have a
09:25:29 15  similar impact on you?
 16  A    Pure racism.  Racism.  Had him with aborting a baby.  Had
 17  Doug Jones aborting a baby.
 18       It -- just -- I have never in my life -- and you will
 19  think since it's the 21st century this wouldn't happen.  But
09:25:48 20  this state that I live in, that I was raised in, and I served
 21  the country for this state and for this country is so racist to
 22  it really -- to it -- it makes you look outside-eyed at
 23  everybody.  So you don't know who to trust because it's so
 24  blatant and bold, and they're not trying to hide it.
09:26:17 25  Q    Uh-huh.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 15**

509

```
 1   A      It's just everywhere.

 2   Q      Uh-huh.

 3   A      And it's no one is being punished and nothing is being

 4   done about it.

 5   Q      Uh-huh.

 6   A      It's -- it's like it's a secret people trying to keep

 7   hidden, but it's so far out in the public to where you can't

 8   hide it.

 9          And I -- I know people right now when I was running they

10   didn't -- they said that I was too dark to be a county

11   commissioner, that I would vote for a black girl, but she needs

12   to be light skinned.

13              THE COURT:  Who said things like that to you, that you

14   had to be light skinned?

15              THE WITNESS:  Candidates and people who I asked to

16   vote for me.

17          I went to Princeton Towers, and there was some white

18   senior citizens there, and I was trying to get them to vote for

19   me.  She said, Well, I guess I can vote for you, even though

20   you a nigger.  And I just -- I told her, Well, thank you, and

21   just walked off.

22              THE COURT:  My question was:  Who said that you had to

23   be light skinned?

24              THE WITNESS:  Candidates.

25              THE COURT:  Okay.  Were those white or black
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 16**

1  candidates?

2         THE WITNESS:  They were white.  They felt like I

3  needed to be a lighter complected.

4      I was trying to raise funding for my election.  They said,

09:27:51 5  Well, we really can't really support you because we don't feel

6  like you stand a chance.  Maybe if you was lighter skinned and

7  an African-American you would stand a chance to run for this

8  seat and win.

9  BY MR. SPIVA:

09:28:10 10 Q    Do you think that there's less racism in Alabama than

11  there was 40 years ago?

12 A    No.  It's just -- they just use that in another way, you

13  know.  It's just being covered up, and it's being displayed in

14  another way.

09:28:32 15      And I see it every day because I'm a person that be out in

16  the community a lot.  I see it every day.  It's not a day that

17  I don't see it.  And a lot of times I ignore it.

18      You know, I see it from the way they charge me with my

19  water and sewer bill, from my light bill.  I see it from the

09:28:58 20 way they take care of the community that I live in.  And they

21  take care of the community on the other side of town that I

22  represent.  I see it in my health care.  I see it in my child's

23  school, my grandbabies.  I see it in her school.

24      So it's there.  It's just in another form.  You know,

09:29:20 25 because they allow us to live in -- in their communities, don't

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 17**

511

|  | |
|--|--|
| 1 | mean that it's not there. |
| 2 | Q    Thank you, Commissioner Tyson.  I have no further |
| 3 | questions. |
| 4 | THE COURT:  Cross? |
| 09:29:37 5 | MS. HOWELL:  Yes, Your Honor. |
| 6 | CROSS-EXAMINATION |
| 7 | BY MS. HOWELL: |
| 8 | Q    Good morning, Commissioner. |
| 9 | A    Good morning. |
| 09:30:13 10 | Q    You've talked a little bit this morning, but I want to go |
| 11 | back to some of the things that you were talking about |
| 12 | yesterday afternoon.  You -- we discussed the composition of |
| 13 | the district that you represent as a Jefferson County |
| 14 | Commissioner? |
| 09:30:30 15 | A    Uh-huh. |
| 16 | Q    And you said that that includes both some poor black |
| 17 | citizens and some wealthier white citizens, correct? |
| 18 | A    Right. |
| 19 | Q    And you consider yourself a representative for all of your |
| 09:30:41 20 | constituents, don't you? |
| 21 | A    Absolutely. |
| 22 | Q    Okay.  So that's for your white constituents, as well? |
| 23 | A    Yes. |
| 24 | Q    That you are a representative for them? |
| 09:30:47 25 | A    Right. |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 18**

|   |   |
|---|---|
| 1 | Q    Do you think it's any different for a congressperson? |
| 2 | A    They supposed to represent all of us. |
| 3 | Q    And that's all of their constituents, right? |
| 4 | A    Every last one of them. |
| 09:30:58 5 | Q    And that's regardless of their race, correct? |
| 6 | A    Yes.  That's what they supposed to do. |
| 7 | Q    Okay.  You also talked about problems that there had been |
| 8 | with the people that -- I think you were saying specifically |
| 9 | the people that you've represented as commissioner and then |
| 09:31:24 10 | before that when you were on city council, I believe? |
| 11 | A    Yes. |
| 12 | Q    Not trusting the system, and so they wouldn't go and vote; |
| 13 | is that right? |
| 14 | A    Right. |
| 09:31:32 15 | Q    So is that happening in -- that is happening in Jefferson |
| 16 | County, correct? |
| 17 | A    Yes, it is. |
| 18 | Q    And that's all happening in Congresswoman Sewell's |
| 19 | district? |
| 09:31:42 20 | A    It's -- |
| 21 | Q    I'm not saying it happens only there, but it does happen |
| 22 | there, as well? |
| 23 | A    Yes.  It happens all over the state. |
| 24 | Q    Okay.  You also talked some about polling places being |
| 09:31:54 25 | moved around without any prior notice, and you gave a specific |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 19**

513

1    example of that that had happened to you, correct?

2    A    Absolutely.

3    Q    And when you figured out that your polling place had been

4    moved, you went and found the correct polling place, right?

09:32:06  5    A    Yes; after I went to three polling places.  But I had a

6    car.

7    Q    Okay.  But you did eventually find the correct polling

8    place?

9    A    Yes.

09:32:12 10    Q    Okay.  And you were able to vote when you got there,

11    right?

12    A    Yes.

13    Q    Okay.  And you said that there had been a lack of notice

14    involved in not -- let me strike that.

09:32:25 15        You said that part of the problem had been you hadn't

16    received any notice that your polling place had been moved,

17    right?

18    A    Right.

19    Q    And you got there, and the doors were closed, and there

09:32:33 20    was just a sign?

21    A    Yes.

22    Q    Okay.

23    A    No.  No.  I didn't say that.

24    Q    Oh, I'm sorry.

09:32:40 25    A    When I got there, I gave them my ID.  They said that, You

**Caster Plaintiffs' Exhibit 86, Page 20**

1   don't vote at this box.  I said, So what box do I vote at?  She

2   said, I can't tell you.  I don't know which box you vote at.

3   Q    Okay.  So the polling place was still open, but it was no

4   longer your polling place?

09:32:54  5   A    It wasn't my polling place.  But some more people went to

6   a polling place in their -- there was a note on the door saying

7   that it was moved to More Than Conquerors.

8   Q    Okay.  So just going back for a second to just your

9   polling place.  Do you know who's in charge of giving the

09:33:13 10   notice about when a polling place has been moved?

11   A    Yes.

12   Q    Who is that?

13   A    The clerk's office.

14   Q    Okay.  And that's the clerk for Jefferson County, correct?

09:33:19 15   A    The clerk for Jefferson County.  And if it's a city

16   election, it's the city clerk.

17   Q    Okay.  And the clerk for Jefferson County is an elected

18   official, correct?

19   A    Yes.

09:33:31 20   Q    Do you know if they're a Republican or Democrat in

21   Jefferson County?

22   A    It's a Democrat in there now.

23   Q    Okay.  You had also mentioned just in passing now that you

24   had been speaking to other people, and they had encountered

09:33:49 25   similar problems to you?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 21**

515

```
 1  A    Yes.
 2  Q    Was that in your capacity as a county commissioner for
 3  Jefferson County?
 4  A    No.  I've been a community activist since I was ten years
 5  old.  I have only been a county commissioner for a year.  So it
 6  did -- it has happened within this year, but I've always did
 7  voting.  So it has always have happened.
 8  Q    Okay.  And so when people have told you these stories,
 9  have you had any way of verifying whether what they're telling
10  you is true or correct?  You've just taken them at your word,
11  haven't you?
12  A    No, huh-uh.  I actually take them around to the polls and
13  make sure they vote.
14       We take -- we pick people up and take them and vote.  This
15  is every election.  We have an election coming up on November
16  the 19th.  We will be there transporting people to the polls.
17  Q    But when people tell you, for example, that they have a
18  problem with their ID?
19  A    Uh-huh.
20  Q    You take them at their word that what their problem --
21  whatever their problem is, it is actually their problem?
22  A    No.
23  Q    No.
24  A    I give them the 1-800 number for the attorneys that was
25  given to us to help us with voting fraud.  I call Judge King.
```

09:34:00
09:34:18
09:34:33
09:34:45
09:34:59

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 22**

516

```
        1  I take them back to the poll and find out what their problem
        2  was; why this person cannot vote.  And they tell me it's
        3  because the address do not match up with the address that's on
        4  this voting roster.
09:35:18 5  Q    Okay.  And the attorneys tell you that?
        6  A    No.  We report it to the attorneys from NAACP.
        7  Q    Uh-huh.
        8  A    We report it to those attorneys, and I ask them can they
        9  vote provisional ballot.  And then they let them vote
09:35:35 10 provisional ballot.
       11       But they never tell them that they can vote provisional
       12  ballot.  They have to ask for a provisional ballot.
       13  Q    So I think you have said two things; that, first, you were
       14  talking to the attorneys; is that correct?
09:35:48 15 A    We report it to the attorneys.
       16  Q    Okay.  But then you're going to the polling places?
       17  A    I'm going to the polling place.  And I don't do it by
       18  myself.
       19  Q    Okay.
09:35:56 20 A    It's a lot of us out there.
       21  Q    Okay.
       22  A    It's not just me.
       23  Q    But you're talking to the local election officials?
       24  A    Yes.
09:36:03 25 Q    Okay.  And getting them to give provisional ballots?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 23**

```
          1   A     Yes.
          2   Q     Have you ever had any problems getting them to give
          3   someone a provisional ballot once you've asked for it?
          4   A     Yes.  They run out.
09:36:15  5   Q     But they have given them to you anytime there have been
          6   some available?
          7   A     Yes.  But they shouldn't run out of provisional ballots.
          8   Q     Okay.  You also talked some about racial appeals in
          9   campaigns.  And you actually listed some racial appeals in, I
09:36:37 10   believe, President Obama's possibly re-election campaign?
         11   A     Yes.
         12   Q     That was a national contest, right?  President is a
         13   nationwide office?
         14   A     Yes.  But it was a local election, and that's what I never
09:36:50 15   understood.  It was a local election, and the whole -- the
         16   whole campaign was talking about Obamacare, and we're going to
         17   abolish Obamacare, and we are going to make sure that we get
         18   rid of this with Obama, and this with Obama.
         19         And I'm like, what does that have to do with the person
09:37:14 20   that's running?  That's not -- we're not voting for President.
         21   But everything was targeted toward the President.
         22   Q     But you considered that a racial appeal, as opposed to an
         23   issue-based appeal?
         24   A     Yes.  If your face stretched like a joker and you got a
09:37:33 25   turban hat on and you in a tank with a rifle.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 24**

518

```
          1   Q     Okay.  Do you know who made those ads?
          2   A     No.  I remember one of them -- I know all of them was
          3   dealing with either judge elections or Congress -- dealing --
          4   something dealing with Congress, or some type of election like
09:38:03  5   that.
          6   Q     Okay.
          7   A     That had to go -- that they had to go to and hold a seat
          8   in D.C.
          9   Q     Okay.  But it sounds like you don't remember which
09:38:12 10   specific election it was?
         11   A     No.  It had to be when he was in office.  I do remember
         12   that.
         13   Q     Okay.  So going back for a second, you talked about
         14   different problems that people had experienced with the laws
09:38:37 15   and with getting health care, and other things.  Do you know if
         16   white people have also experienced those same sorts of
         17   problems?
         18   A     I doubt it.  No.  I haven't had one to actually tell me
         19   that.
09:38:51 20   Q     Okay.  But just because they haven't told you that doesn't
         21   mean that they've never experienced the problem, right?
         22   A     Well, yeah.  Yeah.
         23   Q     And I apologize.  I'm jumping around a little bit.
         24   A     That's fine.
09:39:17 25   Q     Going back to those racial appeals you heard about in
```

**Caster Plaintiffs' Exhibit 86, Page 25**

519

```
        1  campaigns.  You talked about a particular ad that I believe you
        2  have seen on Facebook during Doug Jones' campaign for Senate?
        3  A    Uh-huh.
        4  Q    You said that you saw it on Facebook.  Do you know if that
09:39:32  5  was made by one of his opponents, or by just a private
        6  individual posting something like that?
        7  A    It was by one of his opponents.
        8  Q    Okay.  Do you recall which one?
        9  A    It was the -- it was the cowboy with the one -- what's his
09:39:47 10  name that ride the -- the child molester.  What is that man --
       11  I cannot remember his name.  The one that ride the horse.
       12  Q    Are you referring to Roy Moore?
       13  A    Oh, yeah.  That's who it is.
       14  Q    Okay.  And Roy Moore did, in fact, lose that election,
09:40:07 15  didn't he?
       16  A    Yes, he did.
       17  Q    Which is how you came to be visiting with Doug Jones as
       18  Senator in Washington, D.C.?
       19  A    Right.
09:40:15 20  Q    And you -- you talked a lot about going with an
       21  organization -- and forgive me if I missed the name of the
       22  organization that you go up with every year.  Can you remind me
       23  again what organization that's with?
       24  A    It's the National Coalition on Black City Participation,
09:40:34 25  and the Black Women's Round Table is the conference that we go
```

**Caster Plaintiffs' Exhibit 86, Page 26**

520

|   |   |
|---|---|
| 1 | to. |
| 2 | Q    Okay.  And that conference is in Washington, D.C.? |
| 3 | A    It's in Washington, D.C.  Yeah.  Our home office is in |
| 4 | Washington, D.C. |

09:40:44 5    Q    And you talked about trying to meet with, I believe,

6    Congressperson Byrne, who represents the Mobile area at

7    present?

8    A    Uh-huh.

9    Q    And you said that -- well, you said that they had been

09:40:54 10   unable to meet with you in the first place, right?

11   A    Right.

12   Q    And that when you arrived, you went and tried to visit his

13   office anyway and were unable to get in; is that right?

14   A    Yes.  They made us stand in the hallway.

09:41:05 15   Q    Okay.  And when you went to visit Congresswoman Sewell,

16   did she meet with you in her actual office?

17   A    Of course.  And fed us lunch, and gave us lunch, and gave

18   us tours.

19   Q    But let me take a step back.  Did you meet with her in her

09:41:20 20   actual office office?

21   A    In her office office.

22   Q    Okay.  And it wasn't in some other room in the building?

23   A    We have met with her -- each time we meet with her in her

24   office and we take a picture around her desk with all of the

09:41:34 25   people that we bring down.  And --

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 27**

1          THE COURT:  How many people is that?

2          THE WITNESS:  Sometimes we -- most of the time we

3    bring -- now, last year I took 15.  The year -- that was 2018.

4    2017 we took 40.

09:41:53 5      So it's depending on how much money we raise.  We take

6    different amount of people.

7    BY MS. HOWELL:

8    Q    Okay.  But those offices are fairly small, aren't they?

9    A    Yes.  But we all pack up in there.  I have a bunch of

09:42:04 10  pictures because they souvenirs for the students.  And how many

11   people actually get a chance to go to D.C. to meet their

12   congressperson?

13   Q    That is a good point.  But if you had other people

14   visiting your office, perhaps it would be difficult to fit

09:42:20 15  everybody into the office; is that fair?

16   A    Yeah.  But she know we want a picture of that seal that

17   she has.  And that's why she stuff us all in her office to make

18   sure we get -- and she give us a pin, also.

19   Q    That was nice.

09:42:44 20       Just one last question.  You were elected to city council

21   in 2013; is that right?

22   A    I was appointed in 2013.

23   Q    Appointed to city council.  But in 2013; is that right?

24   A    Yes.

09:42:58 25  Q    Were you politically active in 2011?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 28**

522

```
     1   A    Of course.
     2   Q    Sorry.  Let me clarify.  Were you an elected official in
     3   2011?
     4   A    No.  I was a neighborhood officer.  I guess that would --
09:43:11 5   I'm still -- yeah.  I was elected by the citizens for that,
     6   too.
     7   Q    Okay.  And you've considered yourself an activist since
     8   you were ten, right?
     9   A    Yes.
09:43:19 10  Q    Did you play any role in the redrawing of the
    11   congressional districts back in 2011?
    12   A    I tried to, but I actually protested the drawing of the
    13   one that was back in 2011.
    14   Q    Okay.  When did you protest it?
09:43:38 15  A    At the Five Points West library when they was drawing it.
    16   Q    Okay.
    17   A    And that's when Carole Smitherman was the city council
    18   person.  That was the drawing of the city council district now.
    19   I ain't talking about the Congress district.
09:44:08 20           THE COURT:  Wait a minute.  I want to make sure I
    21   understand.  What did you protest?
    22           THE WITNESS:  The drawing of District 6, city council.
    23           THE COURT:  The city council?
    24           THE WITNESS:  The city council district.
09:44:18 25           THE COURT:  I think Ms. Howell was asking you about
```

**Caster Plaintiffs' Exhibit 86, Page 29**

```
 1   the congressional district map that we're here talking about
 2   this week.
 3             THE WITNESS:  Oh, I'm sorry.
 4   BY MS. HOWELL:
 5   Q    That's quite all right.  My question might not have been
 6   clear.  So did you participate in redrawing the congressional
 7   map in 2011?
 8   A    Oh, no, ma'am.
 9   Q    That's what I wanted to clarify.  You also mentioned that
10   some very hurtful things were said to you when you were running
11   for county commissioner about your complexion being too dark;
12   is that right?
13   A    Yes.
14   Q    Can you tell me -- who were you trying to raise money from
15   when you ran for commissioner?
16   A    Well, it definitely my neighborhood -- I stay in a poor
17   neighborhood, and the people that I know are poor people.  So I
18   was branching out going to different people that -- the
19   candidate that I was running from, I got their fund-raiser list
20   because it has to be turned in.  And so I was calling some of
21   the people that -- the donors that gave them money, and they
22   are the ones that told me that.
23   Q    Okay.  Do you -- do you know what race those people were
24   of that you were calling?
25   A    They were white.
```

09:44:26 (line 5)
09:44:40 (line 10)
09:44:52 (line 15)
09:45:13 (line 20)
09:45:27 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 30**

Q     How do you know that they were white when you were calling

them?

A     Just like I would know if you was white if I called you;

your voice, your tone of your voice.

09:45:37 Q     Okay.  Do you know whether the people that you were trying

to raise money from were with Democratic organizations or

Democratic voters, as opposed to Republican voters?

A     I really didn't -- I really don't know whether they were

democratic or Republicans, but I requested some funding from

09:46:02 them, and I didn't get it, so...

Q     You did get it?

A     I didn't.

Q     Didn't.  Okay.

          MS. HOWELL:  Could I have a moment, Your Honor?

09:46:13          THE COURT:  Certainly.

BY MS. HOWELL:

Q     Ms. Tyson, I think that's all I have for you.  Thank you

for coming in this morning.

          THE COURT:  Any redirect?

09:46:31          MR. SPIVA:  Yes, Your Honor.  Just briefly.

                    REDIRECT EXAMINATION

BY MS. HOWELL:

Q     Commissioner Tyson, you recall you were asked on

cross-examination whether Congress people are supposed to

09:46:43 represent all of their constituents, whether they're black or

**Caster Plaintiffs' Exhibit 86, Page 31**

1  white.  Do you recall that?

2  A    Yes.

3  Q    And other than Senator Jones, do you think that the

4  Congress -- do you think that the Congress people in Alabama

09:47:04 5  actually represent all -- excuse me.  Let me step back.

6    Other than Representative Sewell and Senator Jones, do you

7  think that the other -- the rest of the congressional

8  delegation in Alabama represents both black and white

9  interests?

09:47:22 10  A    No, they do not.

11  Q    And why do you say that?

12  A    It's no compromise with the Republicans.  It's either --

13  Congresswoman Sewell and Doug Jones, they always talk about

14  compromising and working across the aisle trying to get

09:47:43 15  benefits and bills passed for the citizens in their district.

16    Republicans, it's either their way or no way, or you are

17  going to get run over.

18    It's no reason we shouldn't have health care expansion

19  here in this state with illness that's popping up from back in

09:48:02 20  the '60s that they've really thought they had cleared.  And if

21  you don't want to pass a law to make sure we can get that,

22  you're definitely not representing everyone.

23    And if you don't want to increase minimum wage, and you

24  know for a fact that the working poor is not surviving and

09:48:25 25  thriving in the state that you are supposed to love, it's no

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 32**

```
  1   way that you can represent all of the people in your district.

  2        And if you're not putting money in education that you know

  3   that we need these young people in order to take care of us

  4   when we get old, you're not representing all of us.

09:48:43  5        They know the condition of this state.  They know that

  6   the -- the condition of the rural areas in the state of Alabama

  7   are like a third-world country.  They are very aware of it, and

  8   they are not passing any bills or laws or doing anything to

  9   make sure that that population is all taken care of.

09:49:07 10   Q    Thank you, Commissioner Tyson.  I have no further

 11   questions.

 12             MS. HOWELL:  Your Honor, just one question.

 13             THE COURT:  Okay.

 14                        RECROSS-EXAMINATION

09:49:23 15   BY MS. HOWELL:

 16   Q    Ms. Tyson, do you personally feel that a congressman has

 17   to support Democratic initiatives to represent everyone in his

 18   constituency?

 19   A    Yes, I do.

09:49:34 20   Q    Okay.

 21             MS. HOWELL:  Thank you very much.

 22             THE COURT:  Anything else?

 23             MR. SPIVA:  No, Your Honor.

 24             THE COURT:  Thank you, Commissioner.  You may step

09:49:45 25   down.  Thank you for coming back today.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 33**

```
 1          Plaintiff may call your next witness.

 2              MS. MADDURI:  Plaintiffs call Senator Hank Sanders, or

 3     Henry Sanders.

 4                          HENRY SANDERS,

 5     having been first duly sworn by the courtroom deputy clerk, was

 6     examined and testified as follows:

 7              THE COURTROOM DEPUTY CLERK:  Please state your name in

 8     the microphone for the record.

 9              THE WITNESS:  Sure.  My name is Henry Sanders, but

10     nobody knows me as Henry Sanders.  Everybody knows me as Hank

11     Sanders.

12                          DIRECT EXAMINATION

13     BY MS. MADDURI:

14     Q    Good morning, Mr. Sanders.  I forgot to mention this to

15     you before we started, but if you can try to speak into the

16     microphone just for the court reporter's ease of taking down

17     your testimony today.

18     A    I will do that.

19     Q    Thank you.  Senator Sanders, where do you live?

20     A    Selma, Alabama.

21     Q    And how long have you lived there?

22     A    48 years.

23     Q    Selma has a unique place in Alabama Civil Rights history,

24     doesn't it?

25     A    It does.
```

09:50:12 5
09:50:40 10
09:50:50 15
09:51:03 20
09:51:18 25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 34**

1   Q    Can you tell us a little bit about that?

2   A    Well, in the '60s, there were tremendous efforts to try to

3   get the right to vote for African-Americans, and it was

4   happening all over the south.  But it came to a head in Selma.

09:51:39 5   So Selma became a symbol not only in Alabama, and not only

6   in this country, but in other places.

7   And it had to do with during those struggles in Selma and

8   surrounding areas, Jimmy Lee Jackson got killed -- well, he got

9   shot in Perry County.  He died in Selma.

09:52:06 10   And out of that came the "Bloody Sunday" where people were

11   beaten on the bridge.  Out of that came the Selma -- the

12   Montgomery March and other attempted marches called Turnaround

13   Tuesday.

14   All of those gave Selma a unique place.  And so you not

09:52:34 15   only run into Selma being recognized as a symbol here.  But in

16   many other countries, I've run into it.  So it certainly has a

17   unique place.

18   Q    And what is your current occupation?

19   A    I'm an attorney.

09:52:51 20   Q    What's the name of your firm?

21   A    Chestnut, Sanders & Sanders, LLC.

22   Q    And what type of law do you practice?

23   A    I practice Civil Rights law.  I practice governmental law,

24   because we represent a couple of small commissions, a couple of

09:53:11 25   small boards of education, small town.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1        I've practiced -- the truth is when you're in a small
 2   town, you really have a general practice.  So I've done some
 3   personal injury, some contract.  You might say sometime
 4   whatever comes through the door.
```
09:53:36 5   Q    Okay.  What type of Civil Rights law have you practiced?
```
 6   A    I have -- I have practiced -- I've done some voting
 7   rights.  I've done some police brutality.  I've done some black
 8   farmer issues.  I was one of three key council persons in the
 9   Black Farmers Litigation.  And I was an attorney in the other
```
09:54:15 10  one.  They were two national nationwide class action dealing
```
11   with issues where the United States Government had
12   discriminated against black farmers, in terms of loans and
13   programs and other kinds of things.
14   Q    When was that case filed originally approximately?
```
09:54:39 15  A    The first case was filed in 1997.  The second case was
```
16   filed in 2008.
17   Q    And what was the -- what was the monetary -- was there a
18   monetary award in the case?
19   A    Yes.  In the first case, over a billion dollars was
```
09:55:03 20  distributed to black farmers across the country.
```
21        In the second case, $1.25 billion was distributed.
22   Q    Were any of the farmers in the case from Alabama?
23   A    Yes.
24   Q    And where are you originally from?
```
09:55:26 25  A    I'm from Baldwin County, Alabama.  I'm -- and I rush to

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 36**

1  say that I'm from north Baldwin, which is Tensaw River, those

2  kinds of areas.  Most people think of Orange Beach and Gulf

3  Shores.  But I'm from north Baldwin, Alabama.

4  Q    When did you first leave Alabama?

09:55:49 5  A    I first left Alabama in 1961.

6  Q    Where did you go?

7  A    I went to New York City.

8  Q    How did New York City compare to Alabama for you?

9  A    It was a world of difference.  I -- in New York City, I

09:56:17 10  was no longer afraid that when I left home I may not come back.

11     In New York City, I still got the lowest jobs on the

12  lowest rung, but they were not as hard, and they didn't -- and

13  pay as little as in Alabama.

14     In New York City, I must say that people treated people

09:56:52 15  from the south as kind of like immigrants.  You were on the low

16  end of the totem pole, but it was still so much better than it

17  was in Alabama.

18     In New York City, I graduated high school without taking

19  any math course.  And I was able to go to William Cullen Bryant

09:57:17 20  High School at night and be able to get math.  I was able to go

21  to RCA school in electronics and eventually get a skill.

22     So it was a world of difference.  But the most striking

23  thing, though, is when you can talk to a white person and not

24  have to be afraid that you may say the wrong thing.  You may

09:57:47 25  say it the wrong way, or you may look at them in the eyes a

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 37**

531

```
  1  wrong way.
  2       So that -- it's hard for people to understand how -- what
  3  a weight that is, that if something happened to somebody you
  4  love and care about you can defend them or you can defend
09:58:11 5  yourself.  So...
  6  Q    Did you have any interactions in Alabama with white folks
  7  where you didn't feel like you could do that?
  8  A    Yes.
  9  Q    Can you tell us about those or one of those?
09:58:24 10 A    Well, I was a -- I was a terrible child.  I always in
 11  fights and struggles and stuff with folks in my family.  So
 12  when my mother was going to the grocery store, she would often
 13  take me.  I was the second of 13 children.  But she would often
 14  take me so I wouldn't get in fights with my sisters and
09:58:57 15 brothers.
 16       And on one occasion, I was sitting outside in the car.  I
 17  had the door open.  I had my feet outside the door.  And a
 18  white woman came along and -- and I just looked up and looked
 19  right back down.  It was only seconds.  And it might not even
09:59:19 20 have been a good second.  And a white man came over to me and
 21  said, I saw you looking at that white woman, and I'm going to
 22  teach you a lesson.  And I said -- I told him, I just looked up
 23  and I just looked right back down.  And said he was going to
 24  teach me a lesson.
09:59:38 25      So I snatched my feet back in the car and closed the door.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 38**

532

```
      1  And I was trying to wind up the window, and he was struggling

      2  there.

      3        And my mother came out, and my mother was probably what

      4  you would call a cursing Christian.  She started cursing him

10:00:00  5  and telling him to get away.  And he kept insisting that he was

      6  going to teach me a lesson.  And she told him that she was

      7  going to teach him a lesson.  And eventually he -- he walked

      8  away slowly.  So...

      9        So that's one example.

10:00:26 10  Q     What did that --

     11  A     My brother.

     12  Q     What did that experience mean to you?

     13  A     It -- what it did was reenforced the concept that I was

     14  not free to even look up and look down; that you always in a --

10:00:50 15  in danger of being beaten, or being killed, or being oppressed

     16  in some other way.

     17        It's just a heavy weight to know that if you have the

     18  wrong facial expression, if you have the wrong tone in your

     19  voice, that that's enough to have you harmed or even killed,

10:01:22 20  so...

     21              THE COURT:  Senator Sanders, approximately when was

     22  that?

     23              THE WITNESS:  Okay.  That was -- would have been in

     24  the late 1950s.

10:01:40 25  BY MS. MADDURI:
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 39**

```
 1   Q    Senator, did you read a lot when you were growing up?
 2   A    Yes.  I loved to read, but we didn't have -- we didn't
 3   have much things to read.  So when I would -- on the school
 4   bus, I not only read all of my books all the way to the end,
 5   but I read books from students in higher levels.
 6        And when you -- when you living in a house that's a
 7   three-room house and you got -- and you got 11 people living in
 8   a three-room house -- and I don't mean a three-bedroom house.
 9   I mean a kitchen, middle room, and front room.  And you really
10   don't have things to read.  So...
11        So when opportunity come up to read something, I would
12   read it.  In fact, reading stuff was what caused me to be a
13   lawyer.
14        When I was -- my mother worked for a large landowner in
15   Baldwin County named Thomas Earl, who not only owned
16   thousands -- well, I don't know.  He owned at least a thousand
17   acres.  But she worked in the house.  And she would bring
18   magazines and newspapers and things that were -- after they no
19   longer wanted them.  But she didn't bring them home for us to
20   read.  She brought them home for us to use as toilet paper.
21   And I read about Thurgood Marshall.
22        And every Friday the teachers would have us say what we
23   were going to be when we grow up.  And they did that on
24   Fridays.  So on the weekend we would stay focused.
25        And so the next Friday, I stood up and said I was going to
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 40**

```
  1 │ be a lawyer when I grow up.  And the whole class started
  2 │ laughing at me.  And the boy right next to me before they
  3 │ started laughing, he started snickering under his breath.  And
  4 │ the boy next to him started snickering, and it wasn't under his
10:04:12 5 │ breath.  And after a while, the whole class was just laughing.
  6 │ And the teacher tried to get them to stop.  And she couldn't
  7 │ get them to stop.  She tried to get me to sit down.  And I was
  8 │ in too much of a shock.
  9 │     So the more I cried, the more they laughed.  The more they
10:04:32 10 │ laughed, the more I cried.  And finally she came over and put
 11 │ her left arm around me and put her right hand on my stomach and
 12 │ got me to sit down.
 13 │     When I sat down, I -- I said, If they going to laugh at
 14 │ me, I ain't going to be nothing.  And then I thought about it
10:04:53 15 │ and said, They don't expect me to be nothing anyway.  And I
 16 │ decided that if it was the last thing I did, that I was going
 17 │ to be a lawyer if it killed me.
 18 │     But I also decided I wasn't going to tell nobody because I
 19 │ didn't want to be laughed at.  And I didn't -- it took me years
10:05:14 20 │ to understand why they were laughing at me.
 21 │     I'm sorry.
 22 │ Q   That's okay, Senator.  Thank you for sharing that story
 23 │ with us.
 24 │         THE COURT:  Senator Sanders, just to be clear, your
10:05:45 25 │ classmates who were laughing at you, were they
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 41**

1    African-American?

2            THE WITNESS:  Yes.

3            THE COURT:  I know it doesn't matter what color your

4    classmates are when they're laughing at you.  It's not

10:06:01 5    pleasant.

6            THE WITNESS:  I understand.

7        But what you -- the first thing I thought about, I said,

8    They laughing at us because we're from this big family which

9    eventually grew to be 13 children, a mother, and a father.  And

10:06:14 10   then I said, but, you know, they knew that all along.

11       And then I thought that they were laughing at us because

12   we were real poor because food would sometimes run out on a

13   Wednesday, and we would just have grits, no butter, no egg nor

14   anything for the rest of the week.

10:06:34 15      And then I thought that they were laughing because I

16   stuttered.  And it took me years to understand that they were

17   laughing because not only could they not visualize me as a

18   lawyer, they couldn't visualize them or anybody in that room as

19   a lawyer.  It was beyond their experiences.

10:06:57 20      It was only my experience because my mother brought home

21   those things, and I read about Thurgood Marshall.  So -- but it

22   took years to understand that.  Because I hadn't seen a lawyer.

23   Nobody in there hadn't seen a lawyer.  And we certainly hadn't

24   seen a black lawyer.  And it was hard to conceive of that.

10:07:23 25   BY MS. MADDURI:

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 42**

536

```
 1   Q    And where did you go on to go to law school?

 2   A    Okay.  I went to -- I went to Harvard Law School.  But

 3   before that, I came back south from New York and went to

 4   Talladega College.

 5   Q    Is Talladega College a historically black college?

 6   A    Yes.

 7   Q    And do you identify as an African-American?

 8   A    Yes.

 9   Q    When did you return to Alabama following law school?

10   A    I returned in 1971.  When I graduated from law school in

11   1970, I went to Africa for a year on a fellowship.  And so I

12   returned in 1971.

13   Q    And you said, I think, that you have been living in Selma

14   for 48 years?

15   A    Yes.

16   Q    So you moved there around 1971?

17   A    Yes.

18   Q    Are you involved in community work?

19   A    Yes.

20   Q    What groups are you involved with?

21   A    I'm involved with a number of organizations.  I'm involved

22   with 21st Century Youth Leadership Movement.  We have started

23   McRae Learning Center, which I still support.

24        THE COURT:  You started what kind of learning center?

25        THE WITNESS:  McRae Learning Center.  It's a
```

Timestamps: 10:07:37 (line 5), 10:07:51 (line 10), 10:08:13 (line 15), 10:08:21 (line 20), 10:08:44 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1    preschool.

2             THE COURT:  Okay.  Thank you.

3             THE WITNESS:  I've been involved with the Alabama

4    Lawyer's Association.  I've been involved with Alabama New

10:09:03 5    South Coalition and Alabama New South Alliance.

6         I've been involved in SOS, which is Save Ourselves

7    coalition for justice and democracy.

8         I've been involved in National Voting Rights Museum.  I've

9    been involved in the what they call a slavery museum, but the

10:09:38 10   name of it -- ancient Africa and enslavement museum.

11        I've been involved in a lot more.

12   BY MS. MADDURI:

13   Q    What type of issues are these organizations focused on?

14   A    Nearly all of them in one way or another involve efforts

10:10:01 15  to include those who are left out and lift those who are down.

16   All of those organizations are a nonpartisan except for the

17   Alabama New South Alliance.  All of them are -- they just try

18   to fight on each front to try to include those who left out --

19   lift those who are down.

10:10:30 20  Q    Are voting rights one of the issues that --

21   A    Yes.

22   Q    -- organizations?

23   A    Yes.

24   Q    Does your work as a lawyer and as a very active community

10:10:41 25  member take you -- result in you traveling around Alabama a

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 44**

538

1   lot?

2   A    Yes.

3   Q    Are there particular --

4   A    And some -- and my practice of law.

10:10:51  5   Q    Of course.  Are there particular parts of the state that

6   you have traveled to the most?

7   A    Well, I guess it would be across the Alabama black belt,

8   particularly the west Alabama black belt.

9   Q    Anywhere else?

10:11:12 10   A    Well, I've traveled to Mobile.  I've traveled to

11   Birmingham.  I've traveled to Tuscaloosa.  I've traveled to

12   Montgomery.  I've traveled to Dothan.  I've traveled to Auburn.

13        Before, when I first began the practice of law, much of my

14   practice was dealing with helping black people and poor people

10:11:40 15   save their land because the land was being taken going and

16   coming.  So I -- I traveled all over Alabama from Huntsville to

17   Mobile, from Auburn to Sumter County.

18   Q    A better question might have been:  Where have you not

19   traveled in Alabama?

10:12:02 20   A    I think I've been to virtually every county in Alabama.

21   Q    And have you held elected office?

22   A    I have.

23   Q    What office have you held?

24   A    I was a member of the Alabama State Senate.

10:12:18 25   Q    When did you first run for Senate?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 45**

539

```
     1   A    I first ran for Senate in 1982, and I was not elected.
     2   But I was elected the year afterward in 1983 but came back.
     3   And they declared -- the jurors declared those districts as
     4   unconstitutional.  So we had an election a year later, and I
10:12:43  5   was elected.
     6   Q    When you were elected, was the district -- had the
     7   district become a majority black district?
     8   A    Yes.
     9   Q    Did you run affiliated with a political party?
10:12:59 10   A    I did.
    11   Q    Which one was that?
    12   A    Democratic party.
    13   Q    Do you still consider yourself a Democrat today?
    14   A    Yes.
10:13:08 15   Q    When did you first begin to identify with the Democratic
    16   party?
    17   A    I -- my best guess on that would have been in the 1970s.
    18   Q    And why did you start identifying with the Democratic
    19   party?
10:13:29 20   A    Well, I -- it seems that that the people who were in the
    21   Democratic party, at least some of them, certainly want me to
    22   be there.
    23        The Republican party seemed to have been greatly
    24   identified with Senator Barry Goldwater who had been against
10:14:03 25   the -- I believe the 1963 Civil Rights Act.  So I -- somewhere
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 46**

```
 1  in there, I began to identify with the Democratic party.

 2  Q    You said that it seemed like the Democratic party wanted

 3  you.  Do you mean you as a black man?

 4  A    As a black person, yes.

 5  Q    Based on your experience, do you have an opinion on

 6  whether African-Americans in Alabama affiliate more with the

 7  Democratic party or the Republican party?

 8  A    I have an opinion.

 9  Q    What is that?

10  A    Nearly all African-Americans affiliate with the Democratic

11  party if they affiliate with a party.

12  Q    Does that general preference among African-Americans for

13  the Democratic party have anything to do with race?

14  A    Yes.

15  Q    Can you tell us more about that?

16  A    Well, when you have been excluded all your life, like I

17  have been much of my life, it becomes important to feel that

18  you are wanted by somebody within the context of that group.

19       And although the Democratic party certainly back in the

20  '60s and the part of the '70s had plenty of people who were not

21  exactly welcoming to black people, the Republican party seemed

22  that it was not only not welcome, but it was adverse to the

23  interests of black people.

24       When I ran in 1982 and '83, that was right after

25  President -- he wasn't President at the time, but President --
```

Timestamps in left margin:
10:14:22 (line 5)
10:14:36 (line 10)
10:14:55 (line 15)
10:15:33 (line 20)
10:16:11 (line 25)

**Caster Plaintiffs' Exhibit 86, Page 47**

541

```
        1  I'm having trouble pulling up the name.  President Reagan.
        2  They kicked off his campaign in Philadelphia, Mississippi.  And
        3  Philadelphia, Mississippi was burned into not only my memory,
        4  but my very being because that's where those three -- three
10:16:40 5  boys, three young men had been killed.
        6      And so there was those kinds of things that helped me to
        7  run as a Democrat.
        8  Q    Do you think the same things are true today?  Do
        9  African-Americans in Alabama have a general preference for the
10:17:05 10 Democratic party today because of race?
       11  A    Yes.
       12  Q    And do you see the same issues with the Republican party
       13  today in Alabama?
       14  A    Yes.  You know, but the way it's expressed is different.
10:17:32 15     For example, you know that -- the role that the
       16  Confederate monuments and all of those kinds of things and
       17  played -- which to me have strong racial implications.  And it
       18  always says to me that I'm not -- I'm not just wanted, but I'm
       19  expected to be on the bottom.
10:18:07 20     So it manifests itself in various kinds of way.
       21  Q    You mentioned that when you first joined the party or
       22  started to affiliate with it there was still a number of white
       23  folks who held, perhaps, racially charged views.  When did you
       24  observe that start to change?
10:18:46 25 A    I think it -- I observed it starting to change in the
```

**Caster Plaintiffs' Exhibit 86, Page 48**

1  '70s.

2      In 1965, I participated in the last leg of the Selma to

3  Montgomery March.  In 1966, I came -- I was still a student at

4  Talladega, and I came back to Lowndes County to work to try to

10:19:18  5  get African-Americans elected.  And the county was like

6  nearly -- nearly 80 percent African-American, 70, 80 percent.

7  I don't remember.  But we weren't able to elect a single

8  person.

9      And the Democratic party at that time was still very much

10:19:40 10  anti-African-American voters.  And they -- it was -- the

11  candidates were on NDPA.  But starting in the '70s, it became a

12  different kind of situation.

13          THE COURT:  Wait a minute.  You said NDPA.

14          THE WITNESS:  Yes.  That was National Democratic Party

10:20:02 15  of Alabama.

16          THE COURT:  Okay.

17          THE WITNESS:  It was a -- see, the Democratic party

18  had the white rooster, and it had been excluding

19  African-Americans.

10:20:17 20      So a political party was started, and it was called NDPA,

21  which is National Democratic Party of Alabama.

22  BY MS. MADDURI:

23  Q    And so when did the transition happen when white folks

24  left the Democratic party in Alabama approximately?

10:20:45 25  A    Well, it's a funny kind of thing.  Because in 1964, that's

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 49**

1    when it began.  But it took many years to come to full

2    fruition.

3         Because when I went in the Senate in 1983, if I remember

4    correctly, there was -- I remember one Republican that might

10:21:19  5    have been three.  But I -- so it was a slow process.

6         And the more active African-Americans became in the

7    Democratic party, the more whites began to go to the Republican

8    party.

9         So it took a long time.  But it was a constant growing

10:21:49  10    movement.

11    Q    What areas did you represent when you were a senator?

12    A    The first time I ran, I represented Dallas -- I mean, the

13    first time I -- the first time I was in Alabama Senate I

14    represented Lowndes, Dallas, Wilcox, Perry, Hale, Greene,

10:22:24  15    Sumter, Choctaw, and Marengo, all or parts of those counties.

16    Q    And would you consider your district part of the Black

17    Belt?

18    A    Yes.

19    Q    What is the Black Belt?

10:22:37  20    A    The Black Belt is an area of Alabama where the soil is

21    very black.  And it was very conducive to raising cotton.  So

22    that also meant a lot of enslaved people were in those areas.

23         And even though it's tied to the soil, the designation,

24    most of those counties will be either majority African-American

10:23:09  25    or have high percentage of African-American.  So a lot of

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 50**

1  people think that somehow it's the Black Belt because black

2  people are there.  And black people are there because the soil

3  was black.

4  Q    And how long did you serve in the Alabama Senate?

10:23:27  5  A    I served 35 years.  But after -- after 1992, the district

6  changed substantially.

7  Q    And what committees did you serve on over the years?

8  A    I served on education.  I served on the finance and

9  taxation committee.  I've served on -- and when the committee

10:24:00 10  was divided, I became chair of the finance and taxation

11  education committee, which handled the Alabama budget, the

12  budget -- education budget.  But I served on judiciary.

13       I've served on banking and insurance.  I've served on -- I

14  can't pull it up now, but the -- the committee that would deal

10:24:28 15  with utilities, whether that was Alabama Power, Alabama Gas,

16  those kind.  The name changed from time to time.  And they

17  would put transportation in there.

18       I've served on the local legislation committee.  And I

19  can't pull up the others at this moment.

10:24:49 20  Q    Did you ever serve on the reapportionment committee?

21  A    Not that I recall.  I don't think I did.

22  Q    When you first returned to Alabama after attending law

23  school, I think we said it was 1971?

24  A    Yeah.

10:25:11 25  Q    At that time, do you believe that there was official

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 51**

```
 1   discrimination in Alabama against African-Americans related to
 2   voting?
 3   A    Yes.
 4   Q    How about since that time?  Has that discrimination gone
 5   away?
 6   A    No.  It's -- it has changed forms.  It has diminished in
 7   some kinds of ways.
 8        But when I came to Alabama, we agreed to stay just
 9   five years.  And that was partly because my wife never wanted
10   to -- to go to Selma.  But we thought that somehow in
11   five years the Voting Rights Act would be fully implemented,
12   and, therefore, you know, we wouldn't -- we -- the burden
13   wouldn't be so heavy to stay in Alabama because she really
14   wanted to live in Harlem, New York.  She had -- as a student,
15   she had gone there in the summer.
16        But, and here it is 40 -- 48 years later since we went to
17   Selma, we still have to struggle for the right to vote.
18        I mean, in 2011, I worked hard because we had a
19   referendum.  And I -- and they was going to provide some money
20   for help.  And I -- so when I got to the polls -- I had been in
21   the Alabama State Senate then for 24 years.  I got to the poll,
22   and my name was not on the list.
23        And so the polling official said, Well, we know you vote
24   here all the time.  Let us call the Board of Registrars.  They
25   called the Board of Registrars, and I could hear the one end of
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 52**

```
 1  the conversation.  And they would not agree for me to vote in a
 2  place I had voted all the while.
 3      So then they put me on the phone with one of the voting
 4  registrars.  They told me -- she told me -- he told me that
 5  I -- that I couldn't vote.  He said, You haven't been voting.
 6  I said, Well, I'm in the Alabama State Senate.  I got -- I know
 7  I had to vote for myself.
 8      Then he said, Well, you must have moved.  And I said, I
 9  haven't been moved.  I've been in the same house since 1978,
10  '79.  And then he said -- he kept coming up with reasons why I
11  wasn't on -- on the voting list.
12      And finally he told me I needed to go to other voting
13  places to try to see if my name was on the list.  He was there
14  in the -- in the Board of Registrars.  He could've looked.  So
15  I told him I wasn't going to do that.
16      And then I decided I wasn't -- I wasn't going to go vote
17  as a protest.  But then I thought the referendum might lose by
18  one vote, and I would have contributed to that.  So I voted in
19  a provisional ballot.
20      And here I was the highest elected official there in that
21  county, and I knew him, and he knew me because I was working
22  with economic development, and his brother was the head of
23  that.  So, of course, that also had something to do with my --
24  my wife because they had appointed all whites in the Board of
25  Registrars.  And she had led protests against that.  And
```

10:27:36
10:27:54
10:28:24
10:28:47
10:29:19

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 53**

547

```
     1    eventually they took off one white and put one black on in a
     2    county that's 70 percent African-American.
     3         And I think that they just -- my assumption was that they
     4    wanted to show -- show me if they could do that to me, they
10:29:49 5    could do it to anybody.
     6    Q    Have you ever observed other African-Americans finding
     7    that they are no longer on the voting rolls when they've gone
     8    to vote?
     9    A    Yes.  When I would -- part of my service was when -- on
10:30:15 10   election day was when there was election problems was to try to
    11    deal with them.
    12         So even before election day, when the people would be
    13    taken off voting rolls, and many times they didn't know it --
    14    so we would designate people in various counties to -- to look
10:30:42 15   at those lists because our experience had told us that most of
    16    the folks who were on there by far would be African-American.
    17         So they would look at the lists.  And sometimes I would
    18    look at them.  But most of the time, I coordinated people
    19    looking at them so that they could -- we could try to find ways
10:31:04 20   to get them back on.
    21    Q    What -- can you clarify just for the Court what were the
    22    lists you were looking at?
    23    A    Well, when they would remove people off the list, they
    24    would run something -- before an election, they had to print
10:31:26 25   the lists of all the voters in a particular county.  So that's
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 54**

548

              1  one of the lists we looked at.

              2       And also, there were -- when -- when -- it was my

              3  understanding that when people were removed, they were supposed

              4  to let folks know.  But we -- that was an ongoing effort across

10:31:54      5  the communities to try to make sure that people were not

              6  excluded from voting by being taken off the list, or whatever.

              7  Q    So did they also create a list of voters who had been

              8  removed?

              9  A    Yes.

10:32:14     10  Q    And did you review those lists, as well, or you or the

             11  people that you coordinated with?

             12  A    Yes.  When -- yes.  There were times.

             13  Q    Did you get a sense when you were reviewing these lists or

             14  when you were working with the folks reviewing these lists,

10:32:35     15  could you tell if more African-Americans were being removed

             16  from the rolls, or if it was white folks?

             17  A    It was nearly always black people in those counties.

             18  Q    And approximately when did you observe these issues?

             19  A    I have observed those issues over the years.

10:33:00     20       In the 70s, the '80s, the '90s, 2000, 2010.  It's been a

             21  constant struggle.

             22  Q    Did you raise this particular issue with anyone in the

             23  state government, or Secretary of State, or anyone like that?

             24  A    No, because I -- I didn't think that they would do

10:33:21     25  anything about it.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 55**

```
  1         When I was taken off, I went to the local probate judge,

  2    and he went over there and dealt with it.

  3         I thought it was real sad that I was an elected official

  4    all these years, and I had to go to the local white probate

10:33:44  5    judge to try to get my name straightened out on the voting

  6    list.

  7              THE COURT:  Did he take care of that for you?

  8              THE WITNESS:  Yes, he did.

  9    BY MS. MADDURI:

10:34:00 10    Q    When you -- sorry.

 11    A    No.  He took care of me -- for me.  But I couldn't help

 12    but think of all the people who had that problem who couldn't

 13    go to him or who couldn't be treated the same way.

 14         I had the status of an elected official.  I had the status

10:34:20 15    of a lawyer.  I had the status of a person who had worked in

 16    the community across lines.  And I had to have help.

 17    Q    Are you familiar with, in the 1980s, any prosecutions that

 18    occurred relating to voter fraud?

 19    A    Yes.

10:34:48 20    Q    Can you tell us about those?

 21    A    Yes.  In the '70s in these majority black counties, we

 22    had -- white people voted huge number of absentees.  And we

 23    would document that many of them were actually deceased.  You'd

 24    go to the graveyard and be able to do it.

10:35:19 25         And so we went to -- we sent a delegation to the U.S.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 56**

Justice Department to complain.  And the Justice Department

said, We can't do anything about it.  Y'all need to learn to

use absentee ballots.

　　　　And so we came back.  And I looked up the law.  And I

10:35:47　taught classes in Perry County on how to follow the law and to

do absentee voting.

　　　　And so in 19 -- the election in 1984 had sprung out about

211 different indictments for what's called voter fraud.  And

we called it voter persecution cases.  So it was something we

10:36:26　were extremely concerned about.  And I was the only lawyer

initially, but then I recruited other lawyers.  And we had to

fight it on -- felt like we had to fight it on every ground.

Because we felt legally you could fight and you could lose and

you could still have the community so afraid to vote.  We

10:36:47　needed to fight it on political ground, as well, and public

relation grounds.  And it was just a tremendous struggle.  And

we had to fight on all those fronts.

Q　　I think you said there were 211 charges filed?

A　　Yeah.

10:37:04　Q　　Were those filed primarily against African-Americans or

white folks?

A　　No.  All of those were against African-Americans, except

there was a white lady in Greene County who worked closely with

African-Americans on voter registration, voter mobilization.  I

10:37:23　think her name was Bobbie Simmons.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 57**

551

```
         1  Q     And do you remember who the prosecuting attorneys were?
         2  A     Well, I remember the prosecuting attorney in Perry County
         3  in the Southern District was Jeff Sessions.  And I don't recall
         4  who the prosecuting attorney was in Greene County at the time.
10:37:50 5  But it was all a coordinated effort.
         6  Q     Were any of those cases tried?
         7  A     Yes.
         8  Q     And what happened?
         9  A     I think one case I think somebody pleaded -- might have
10:38:03 10 pled guilty to a misdemeanor.  But all 210 other cases, they
        11  were found not guilty.
        12  Q     I think you said you had to fight these -- when this
        13  happened, you had to fight on another different ground.  I
        14  think you said legal --
10:38:28 15 A     Different levels.
        16  Q     -- legally, politically, et cetera.
        17        What are some of the impacts of cases like this or
        18  instances like this where something happens that feels targeted
        19  towards the African-American community?  What kind of impact
10:38:47 20 does that have on the community?
        21  A     It has a powerful impact.  Because when you have been
        22  prevented from voting for these hundreds of years, or hundreds
        23  and some years and then all of a sudden these charges are
        24  brought in the federal -- I mean in -- brought by federal
10:39:12 25 officials, which we thought ought to have been, you know,
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 58**

1  helping us to expand the voting right -- fear is such a

2  powerful thing in the black community based upon all of what

3  has happened over the years.  So and people -- even after we

4  won, people were afraid to vote.

10:39:41  5      And so particularly with absentees, but they were afraid

6  in general.  And we had to work year after year to try to --

7  try to overcome that.

8  Q    Does that fear that results from things like this, does

9  that have an impact on whether African-Americans actually go

10:39:59  10  out to vote?

11  A    Yes.

12  Q    Have you seen any instances more recently where this kind

13  of fear has prevented African-Americans from voting?

14  A    Yes.  I think it was 2017 a group of us met in Montgomery

10:40:29  15  to -- people who worked to try to mobilize and encourage people

16  to vote.  We have all of these theories about why people do

17  not -- not vote.

18      And so we decided that it wasn't enough for us just to

19  make those assumptions.  So we gathered in Montgomery.  And we

10:41:01  20  were -- all of us had to bring some people who did not vote so

21  we could listen to them, as well.

22      And we just assumed that it was because they didn't think

23  it was going to be -- was going to do any good because you

24  would hear that.  And we were amazed at the number of people

10:41:29  25  who talked about fear.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 59**

```
 1        And much of that fear was tied to the criminal justice
 2   system in some kind of way.  They thought -- well, they said,
 3   Well, they probably ain't going to do something to me.  But
 4   they'll do something to my son, or my daughter, or my children,
 5   or my grandchildren.
 6        Fear is still a very powerful factor in the
 7   African-American community that suppresses the vote.
 8   Q    Do you think those fears are rational?
 9   A    Yes.  They're rational when you know that they've lynched
10   people in the past for trying to vote.  When you know that
11   people off their land for trying to vote.  When you know that
12   people have lost their jobs for it.  It's absolutely rational
13   in my opinion.
14        Because people -- this might not make any sense.  But
15   every time I drive and I get stopped by a policeman, I don't
16   know whether I will drive away from there.
17        So fear doesn't have to be rational in the sense that it's
18   going to happen every time.  Fear is rational if it can happen
19   any time.
20        So I -- and I've had -- my wife is an attorney.  And they
21   stopped her from voting in Selma.  So I had to go down there
22   and start cursing just for her to be able to vote.
23        So it's real in the black community.
24   Q    Senator Sanders, are you familiar with the law that's
25   passed in the last ten years that's limited how political --
```

Time stamps in left margin:
10:41:50 (line 5)
10:42:20 (line 10)
10:42:48 (line 15)
10:43:16 (line 20)
10:44:03 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 60**

554

| | |
|---|---|
| 1 | limited how political organizations can contribute money to |
| 2 | each other? |
| 3 | A    Yes. |
| 4 | Q    Can you tell us about that? |
| 10:44:14  5 | A    It was -- I think it was passed in the -- in December of |
| 6 | 2010 right after the election.  And it was called PAC-to-PAC |
| 7 | transfer.  That bill came up in the legislature over the years, |
| 8 | and we had always been able to defeat it. |
| 9 |      PAC-to-PAC transfer says that if you are a PAC, you can't |
| 10:44:45 10 | transfer money to other PACs except to a particular elected |
| 11 | official. |
| 12 |      And one of the ways to deal with that was -- before the |
| 13 | law came along was if I ran and I did not have a strong |
| 14 | opponent and I had extra money, I could transfer it and help |
| 10:45:10 15 | out to different organizations.  I could transfer it to other |
| 16 | elected officials and stuff.  And so when PAC-to-PAC transfer |
| 17 | came in, I was one of those who went to Washington, D.C. to try |
| 18 | to fight against the preclearance of that. |
| 19 |      We didn't succeed.  But that meant that organizations that |
| 10:45:44 20 | usually get out to vote in various kinds of ways, it was much |
| 21 | harder for them to get funds or resources to be able to do |
| 22 | that. |
| 23 |           THE COURT:  So was this a federal law? |
| 24 |           THE WITNESS:  No.  It was a state law. |
| 10:45:57 25 |           THE COURT:  Okay.  But I thought you said you went to |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 61**

555

```
  1  Washington, D.C to fight against it.
  2          THE WITNESS:  We asked them to preclear -- not to
  3  preclear it.
  4          THE COURT:  Okay.
10:46:08  5          THE WITNESS:  We went to the U.S. Justice Department.
  6          THE COURT:  Okay.
  7          THE WITNESS:  Okay.
  8  BY MS. MADDURI:
  9  Q    I think you said that these organizations helped get out
10:46:17 10  the vote and do other -- other sorts of things like that.
 11      Do African-Americans depend disproportionately on those
 12  kinds of organizations?
 13  A    Yes.
 14  Q    In what ways?
10:46:29 15  A    Well, because of the history of African-Americans not
 16  voting, it's not enough to say, well, this candidate is better
 17  than the other one, or to look at television, or to listen to a
 18  radio.  You really have to get out and be able to do that
 19  partly to overcome the fear, partly to overcome a range of
10:47:00 20  things.  So it takes resources to do that.
 21      So with the PAC-to-PAC transfer, it just made it very
 22  difficult to be able to get resources to do that kind of
 23  mobilization.
 24          THE COURT:  Let me see if I can clarify.  When you
10:47:22 25  refer to PAC-to-PAC transfers, are you referring to a law that
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 62**

556

```
         1  allows PAC-to-PAC transfers or a law that prohibits PAC-to-PAC
         2  transfers?
         3          THE WITNESS:  A law that prohibits PAC-to-PAC
         4  transfers.
10:47:38 5          THE COURT:  You were just referring to it at
         6  PAC-to-PAC transfers.  So I wanted to make sure that it was
         7  clear that it was a law that precluded that.
         8          MS. MADDURI:  Thank you, Your Honor.
         9          THE WITNESS:  I really appreciate that.
10:47:50 10 BY MS. MADDURI:
         11 Q    Do you remember if there were justifications given for why
         12 this law was being passed?
         13 A    I'm sure there were, but I -- I don't -- I'm trying to
         14 pull up in my mind now exactly what those justifications were.
10:48:14 15 But I don't -- I don't.  I don't -- I can't pull it up.  That
         16 happens to you when you're 77 years old.
         17         THE COURT:  It also happens to you when you're in your
         18 60s.
         19 BY MS. MADDURI:
10:48:31 20 Q    Senator Sanders, are you familiar with how judges are
         21 elected to the Alabama Supreme Court and the Alabama Courts of
         22 Appeals?
         23 A    Yes.
         24 Q    How is that?
10:48:43 25 A    They are elected statewide, and they're elected from what
```

**Caster Plaintiffs' Exhibit 86, Page 63**

```
 1  they call place.  On the ballot, it will be statewide.  But
 2  you'll be Place 1 or, Place 2, or Place 3, or 4.
 3  Q    Is that system also referred to as at-large elections?
 4  A    Yes.
10:48:56 5  Q    In your experience, do at-large elections for these
 6  positions enhance the opportunity for discrimination?
 7  A    Yes.
 8  Q    How so?
 9  A    Well, Alabama is about 25 percent, 26 percent
10:49:14 10  African-American.  And you have a number of positions in court.
11  If they ran from district, African-Americans would have a very
12  good chance of being represented on those -- on the Alabama
13  Supreme Court, Alabama Court of Criminal Appeals, Alabama Court
14  of Civil Appeals.  But since they're elected at large and
10:49:43 15  elected from place -- if they were elected at large and you
16  could just vote for one, then it wouldn't be so oppressive.
17  But the way it's set up, you don't stand a real chance of
18  winning.
19  Q    Is it important to you that there are African-Americans
10:50:02 20  elected to those courts?
21  A    Absolutely.
22       You know, there are times when people don't start out
23  trying to do something that's -- that's racial.  But then they
24  don't understand all of the different dynamics, the in and out,
10:50:28 25  how this particular act is going to have that kind of impact.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

558

1    It's just not in their experience.

2        And so if you had one person or two persons on that

3    Alabama Supreme Court, they could help the other court members

4    to see the different kinds of ramification.

10:50:47  5        But when the way they're elected, you don't get anybody on

6    there to talk about those ramifications, so...

7    Q    So you think it would be important to have that range of

8    perspective from the African-American experience in the justice

9    system?

10:51:04 10   A    Absolutely.

11   Q    Do you know how many African-Americans have been elected

12   to statewide office in Alabama?

13   A    Yes.

14   Q    How many is that?

10:51:13 15   A    Two.

16   Q    Do you remember roughly when the last time an

17   African-American was elected to a statewide office?

18   A    My best guess is like '94 or '96, somewhere -- now, three

19   African-Americans have served statewide and -- that I can

10:51:37 20   recall.  But one was appointed.  All of them were appointed

21   before they were elected, which makes a lot of difference, you

22   know.  Because people say, well, you know, they -- they all

23   right.  They were appointed.  They have the stamp of approval,

24   you know, from -- from the higher-ups.

10:51:56 25        So Oscar Adams was appointed in the late '70s, early '80s.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 65**

1   I can't remember.  And then Ralph Cook.  I should say Justice

2   Oscar Adams and Justice Ralph Cook was appointed.  And then

3   Justice John England was appointed like 2000, or something like

4   that.

10:52:24 5       But the last ones all went out in, I think, 2002, or

6   something in that time frame.

7   Q    How does the lack of African-Americans elected statewide

8   affect the African-American community?

9   A    It has a profound impact.  Because in the political system

10:52:56 10  in Alabama and in this country, a great number of decisions are

11  made all the time.  They're made when people act in their

12  elected position.  Then they appoint people who do regulations

13  and other kinds of stuff.

14       So literally, every aspect of our life is affected one way

10:53:27 15  or another by government.  And from the air we breathe to the

16  food we eat to the water we drink to birth and death, all of

17  these things.  It's impacted there.

18       And so when -- when anybody's left out, it's a problem.

19  But if you have been historically left out down through for

10:53:58 20  hundreds of years, then it's even more important that you be

21  represented -- that that particular group be represented in

22  government.

23       Because all of these decisions have that kind of impact.

24       MS. MADDURI:  Your Honor, would this be a good time to

10:54:27 25  take a break?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 66**

```
         1          THE COURT:  It's fine with me if it's good for you.
         2     We will come back at 11:10.
         3          MS. MADDURI:  Thank you.
         4          (Recess.)
11:11:23 5          THE COURT:  Ms. Madduri, you may proceed.
         6          MS. MADDURI:  Thank you, Your Honor.
         7     BY MS. MADDURI:
         8     Q    Senator, in your time in the legislature, in the Senate,
         9     did you ever introduce any voting rights legislation?
11:11:42 10    A    Yes.
         11    Q    Can you tell us about that?
         12    A    I introduced legislation that would allow people to
         13    register to vote up until -- up until the day of voting.  I
         14    introduced legislation to -- I may have -- I'm trying to -- I
11:12:20 15    know I had legislation drawn up.  I think I introduced it
         16    through -- I have -- to try to make it easier to register.  It
         17    might have been automatic registration.
         18         I -- over the --
         19         THE COURT:  What do you mean by automatic
11:12:42 20    registration?
         21         THE WITNESS:  There are some states that have
         22    legislation have -- that when you become 18, you automatically
         23    are registered.  You don't have to go through the process.
         24         I was trying to pull up -- trying to pull up, but -- to
11:13:11 25    have it -- to have people make it much easier for folks to
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 67**

561

```
        1  vote.  And there were others, but I can't pull them up right
        2  now.  They may pop up in a minute.
        3  BY MS. MADDURI:
        4  Q    Okay.  And approximately how many times would you say
11:13:33 5  you've introduced legislation related to either automatic
        6  registration, or same day, or late registration, I think as you
        7  said?
        8  A    I don't know how many.  Because when you've been around
        9  35 years, you can't pull it up.
11:13:54 10  Q    Any efforts in the last five years that you were in the
       11  legislature?
       12  A    Yes.  I know I -- I know there were two bills.  It might
       13  have been as late as 2018.
       14  Q    And did any of those bills ever pass?
11:14:15 15  A    No.  No.  I never expected them to pass.  I simply
       16  introduced them because it was a statement that was important
       17  that we address those issues.
       18       But, no, they -- no.
       19  Q    When we were going over the committees that you had served
11:14:49 20  on, you mentioned the finance, taxation, and education
       21  committee, right?
       22  A    Yes.
       23  Q    How long did you serve on that committee?
       24  A    I was chair of the committee for 16 years.  I think the
11:15:02 25  most anybody chaired a single committee.  But that committee
```

**Caster Plaintiffs' Exhibit 86, Page 68**

| | |
|---|---|
| 1 | was only in existence from '95 until starting in '95. |
| 2 | So I was -- but the dealing with the budget committee, I |
| 3 | think I was on the budget committee before '95.  But that |
| 4 | particular committee started in '95. |
| 11:15:34 5 | Q    Okay.  Do you believe that African-Americans in Alabama |
| 6 | bear the effects of discrimination in education? |
| 7 | A    Yes. |
| 8 | Q    In what way? |
| 9 | A    When I -- when I became chair of finance and taxation, the |
| 11:15:53 10 | first thing I tried to do was change the formula for |
| 11 | educating -- for allocating funds to try to make it easier for |
| 12 | poor areas, make it easier for rural areas.  And there were |
| 13 | changes, but it was not enough. |
| 14 | The way Alabama fund education is much of it from the |
| 11:16:24 15 | state but some of it from the local level.  And so if you're in |
| 16 | an area that's got a lot of poverty, a lot of lower income |
| 17 | people, then you end up with less money to educate when the |
| 18 | problems are, in fact, are greater and need more. |
| 19 | So it's -- I think time after time you see education |
| 11:17:01 20 | struggling a lot more in African-American communities.  And |
| 21 | that's, you know, one of the things that I think that strike me |
| 22 | the most is that the farther you down on the status pole, the |
| 23 | farther you're down on the education pole, the farther you're |
| 24 | down on the economic pole, the less you see where your |
| 11:17:44 25 | education is going to make a difference. |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 69**

1      When you higher on the status pole, you can see where more
2  education going to help you.  You can see where more education
3  going to help you when you higher on the job, or higher on the
4  economic scale, higher on the social scale.
11:18:03 5      When you down at the bottom, it's hard for students to be
6  able to see that.  And, therefore, all of those things come
7  together in a way that you have a vast number of people getting
8  less education.  They need more resources, but they're getting
9  less resources.
11:18:25 10  Q    And are those people primarily African-American in
11  Alabama?
12  A    Yes.
13  Q    Or more often than not?
14  A    Yes.  Primarily.
11:18:33 15  Q    And how does being lower on the totem pole or the status
16  pole in education and income, how does that impact whether or
17  not African-Americans are able to vote?
18  A    When you have to jump through hoops to be able to vote,
19  then you have to see where it's going to make a difference in
11:19:02 20  your life if you are able to vote.
21      And so if you are -- if the polling place is a problem, if
22  you have to have transportation to get there, then you need
23  more encouragement to vote.
24      But, in fact, you're encouraged less because it's harder
11:19:31 25  for you to see how this is going to make a difference.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 70**

1    I -- one time there was a lady, she was -- I can't think
2  of her name.  But she was traveling over the country trying to
3  encourage young people to vote.  And she came to Selma.  And so
4  we went out to the 21st Century Youth Leadership camp.  And we
11:20:02 5  did a demonstration.  We asked her -- we asked the students --
6  we had some students.  And so we asked them name something that
7  voting does not impact.  That's what we asked the students.

8    And then they would start out with things like air.  And
9  then we would explain that people put all kind of things in the
11:20:24 10  air, and you have the Environmental Protection Agency trying to
11  stop it.  So the very air that you breathe.

12    And then they'd say food.  And we'd talk about the Food
13  and Drug Administration.

14    And they'd talk about water.  And we'd talk about how
11:20:42 15  water, whether it's local or federal, all of that --

16    So they went on down to talk about religion.  And then we
17  will say, point out -- how we ask them can they organize in the
18  schools.

19    So what we were doing was demonstrating that every single
11:21:01 20  thing is affected by voting.  And you don't see that when
21  you're poor.  You don't see that when you're low on the
22  education pole -- totem pole.  You don't see that when you're
23  low on the education and economics, and all of that.

24    So the higher you are on those totem poles, the more
11:21:27 25  likely you are able to see where voting would make a

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 71**

difference.  The lower you are on there, you worried about

whether you're going to be able to get food to eat.  You're

worried about -- whether you're going to be able to get to and

from work, to and from school, all those kinds of things.

And the one of the things that people really don't

understand that if you have one of those, that that's a burden.

If you have one of them, that's an obstacle.  If you have two

of them, that's a burden.  If you have three of those, then

it's prohibitive.

You know, we see them separately.  But the impact of them

is collective.

Q    Would you say that conditions for African-Americans in

Alabama today are better than they were in the 1960s or '70s?

A    Yes.  Things are definitely better than they were in the

1960s and 1970s.  Because in the 1960s, there were times when I

had to get off the sidewalk if a white person was coming in the

opposite direction.  So I had to get off and let them go.

And every single thing was segregated.  And every single

thing was holding us down in ways.  So it's definitely better.

In the 1970s, things improved some.  But it was in 1972

that I went -- my wife was pregnant, and she didn't know she

was pregnant, but she wanted fudge.  And she does not like

fudge.  But all of a sudden she wanted fudge.  So --

THE COURT:  You should have known something was

getting right with her.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 72**

THE WITNESS:  I should have when I looked back.

So I took her to this place.  It was called Dairy Queen,
or Dairy Dream, or something.  It was right there in Selma on
80 and Lapsley Street or Summerfield Road.

11:24:01    And I pulled up, and she got out and went to stand in
line.  And when they stood in line, all of a sudden this white
man came up and pushed her down.  And he was standing over her.

So I jumped out and ran over there and hit him and he fell
down.  And I started trying to get her up.  And she -- and he
11:24:22 got up, and he stabbed me in the left side.  To even today, I
have a reduced kidney where I was stabbed.

So I swore out a warrant against him.  She wore out a
warrant against him.  He swore out a warrant against us --
against me.  And the judge dismissed all the charges against
11:24:45 him even though he had stabbed me and even though he had
knocked her down.

The judge did give a $20 fine against him for pushing her
down.  And so I -- I was just absolutely shocked.  But then he
sentenced me to jail.

11:25:06    So when I went to jail, I refused to make bond.  I said,
you know, this is so unfair.  I'm going to just stay here in
jail.  My wife and I talked, and we agreed she was not going to
bond me out or let nobody bond me out.

Then the probate -- I mean, after a few hours, the police
11:25:27 chief came and he said, Somebody's bonded you out.  And I said,

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 73**

1   Well, we agreed that we weren't going to be bonded out.  So --

2   he said, But you were bonded out.  I said, Well, who bonded me

3   out?  He said, I'm not going to tell you.  I said, People --

4   that's public information.  He said, Not in this jail.

11:25:48 5       So then I told him I said, Well, I'm going to just stay

6   right here.  And he said, You're not going to stay right here.

7   You're getting out of here.

8       I got out.  I appealed the case.  And then when it didn't

9   show up in circuit court, I went over -- eventually went over

11:26:07 10  to find out what happened to it.  All of the records had

11  disappeared.  All of the arrest records, all of the court

12  records, everything.  And I haven't been able to find them to

13  this day.  I keep thinking that that's going to show up at the

14  bar association any time.

11:26:27 15       So I mean, that was -- that was in 1972.  And you had had

16  the Civil Rights Act in 1963.  You had the Voting Rights Act in

17  1965.  But it was just so powerful.

18       Even so, things have gotten better.  Whenever I look at

19  it, things got better from the '60s, got better in the '70s,

11:26:56 20  got better in the '80s.

21       And in the '90s, I -- things seemed to be slowing down.

22  And eventually, in 2010, whatever things -- my impression was

23  things were going back.

24       So when you say are they better today than they were?  And

11:27:19 25  when I look at that, they were getting better.  Now, there's a

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 74**

1  serious question about whether they're getting worse.

2  BY MS. MADDURI:

3  Q    I think at the beginning of your testimony you mentioned

4  that you marched part of the Selma to Montgomery, the last leg

11:27:42  5  of it?

6  A    Yeah.

7  Q    What was that like?

8  A    It was -- it was such a powerful experience because we

9  didn't -- well, only 300 people marched all the way.

11:27:58  10    But we were so far back down the line because it was like

11  25, 35,000 people there.  But you couldn't see -- you could see

12  the outline of Dr. King, but you couldn't see his face.  You

13  could hear him because he had those big speakers.

14    And whenever he got into this rhythm where he would say,

11:28:20  15  How long?  And initially, when we would say, How long?  He

16  would say, Not long.  But then after while when he would say,

17  How long?  The crowd responded saying, Not long.

18    And I left there thinking that it really won't be long

19  before we have the right the -- the full right to vote.  And

11:28:46  20  then the Voting Rights Act was passed in August and was signed

21  on August the 6th, 1965, I could never conceive of the idea

22  that 50 years later I would still be struggling and fighting to

23  implement it.  I should have known that "how long" was

24  Biblical, not months, not years.

11:29:16  25    In 1966, when we couldn't elect a single person, I should

**Caster Plaintiffs' Exhibit 86, Page 75**

1   have known that it took until 1988 -- two incumbents that had

2   60 and 70 percent -- black people to be able to elect to county

3   commission and board of education -- a majority.  I should have

4   known.  I didn't know.  I just kept thinking that "how long"

11:29:43 5   meant 5 years, then 10 years, then 20 years, then 30 years.

6       But it was one of the more powerful experience to see all

7   those people -- black and white, old and young, fighting,

8   marching for the right to vote.

9   Q   Why have you chosen to stay so involved and done so much

11:30:11 10   work for the right to vote?

11   A   I think that President Johnson may have put it best

12   whenever he was talking about the right to vote in 1965.

13       First, the vote is the only thing where everybody starts

14   out even.  You get one vote.  So everybody starts out equal.

11:30:43 15       Second, there's the vote is the only thing that can

16   stop -- that can protect every other right.  It's not an

17   accident that the right to vote was the last major bill -- the

18   last major Civil Rights legislation to pass.

19       Even in 1963, when they did public accommodation, when

11:31:11 20   they then did employment discrimination, whatever.  But the

21   right to vote came last because it protects every other right.

22       And the right to vote, the only vote that you can use --

23   the thing you can use to change things without resorting to

24   violence and other kinds of things.  So it's the most powerful

11:31:39 25   right that we have because it protects every other right.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

570

```
       1   Q     Thank you, Senator.  That's all my questions for you right

       2   now.

       3              THE COURT:  Any cross?

       4              MR. WALKER:  Yes, ma'am, Your Honor.

11:31:53 5              THE COURT:  Mr. Walker?

       6                      CROSS-EXAMINATION

       7   BY MR. WALKER:

       8   Q     Good morning, Senator Sanders.  Nice to see you.

       9   A     It's good to see you again.

11:32:07 10  Q     I'd like to start by asking you some questions about what

      11   you've already testified about today, sir.

      12   A     Sure.

      13   Q     And I think you -- you testified about the Pigford case?

      14   A     Yes.

11:32:30 15  Q     Was that the former class action case?

      16   A     Yes.  That was the first one.

      17   Q     And who was the defendant, or what was the defendant in

      18   that case, if you recall?

      19   A     The defendant was the United States Department of

11:32:44 20  Agricultural, USDA.

      21   Q     Do you recall the second case, the style of that case?

      22   A     Yes.  It was discrimination litigation.  It was a black

      23   farmers discrimination litigation.

      24   Q     And the defendant in that case was also the United States

11:32:59 25  Department of Education?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 77**

```
 1  A    Yes -- no.  United States Department of Agriculture.

 2  Q    Sorry.  Thank you.

 3  A    Yeah.

 4  Q    You mentioned some voter fraud prosecutions that occurred

 5  in west Alabama, and I believe you associated those with Jeff

 6  Sessions?

 7  A    Yes.

 8  Q    And he brought those as U.S. Attorney for the Southern

 9  District of Alabama; is that correct?

10  A    Yes.

11  Q    Do you know whether or not --

12  A    He brought some of them, yeah.

13  Q    And then the U.S. Attorney for the northern district

14  brought some?

15  A    Yes.

16  Q    Okay.  Do you know whether or not those U.S. Attorneys

17  were required to get approval from main Justice before they

18  filed those lawsuits?

19  A    No.  I do not know.  But I think we were -- we were just

20  shocked that we -- that we complained and nothing happened.

21  Q    I understand.

22  A    And they told us to learn to use absentee ballots.

23  Q    You talked with some sense about -- some sense of

24  frustration about bills that you've not been able to get passed

25  in the legislature.  And it would be true that every legislator
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 78**

```
 1  has bills that they strongly believe in and can't get passed;
 2  is that correct?
 3  A    That's correct.
 4  Q    And I want to give you an opportunity to be clear about
 5  something.  Were you saying that all Republican members of the
 6  legislature were racists?
 7  A    No.
 8  Q    Okay.
 9  A    But what I am saying is that race is such a powerful
10  factor.
11       I don't use the term racist because it cuts off
12  conversation.  The moment you say somebody's a racist, you
13  don't have any conversation.
14       But race is a very powerful factor.
15  Q    You talked about some bills that you wished you had been
16  able to pass.  And one of them -- let's see if I can find my
17  notes.  And I apologize, sir.
18       One of them was to allow voting registration up to the day
19  of voting?
20  A    Yeah.
21  Q    And the other one I think was to allow automatic voting or
22  require automatic voting when you register for a driver's
23  license?
24  A    Automatic?  No.
25  Q    Did I misunderstand?
```

Timestamps: 11:34:45 (line 5), 11:34:59 (line 10), 11:35:11 (line 15), 11:35:43 (line 20), 11:35:52 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 79**

```
 1  A    I think it was automatic registration.

 2  Q    Automatic -- I said voting, and I meant registration.  And

 3  I apologize.

 4       So to be clear since I've muddled things up, one was to

 5  allow people to register to vote up to the day -- up to

 6  election day?

 7  A    Yeah.

 8  Q    And one of them was to allow automatic registration when

 9  people went to get a driver's license?

10  A    No.  No.

11  Q    Just --

12  A    When they became 18.

13  Q    When they became 18?

14  A    Yeah.

15  Q    Just automatic registration?

16  A    Yeah.

17  Q    Okay.  Is there any reason you could not have proposed

18  those bills before 2010 when the Democrats were in power in the

19  legislature?

20  A    No.  I don't think there was any reason -- it simply

21  didn't come up at that time.

22  Q    And --

23  A    And --

24  Q    I'm sorry.

25  A    Go ahead.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 80**

```
         1   Q     No.  Please go ahead, sir.
         2   A     Well, see, the thing you have to understand was there
         3   was -- even when Democrats were in control, there were
         4   tremendous limitations on things that affected
11:37:15 5   African-American.  So it was -- it became to a much greater
         6   degree.  But there were -- I don't want to suggest that race
         7   was only an issue with Republicans.
         8         Race became more of an issue because we were not in that
         9   structure.  But there were many Democrats who had reservations
11:37:42 10  to -- they grew up in the system, as well.
         11  Q     And just to be clear, from let's say 1901 until 2010,
         12  state government in Alabama was controlled by the Democratic
         13  party; is that correct?
         14  A     From?
11:38:02 15  Q     1901 or 1900?
         16  A     Yeah.  Well --
         17  Q     No.
         18  A     From 1819 --
         19  Q     Until?
11:38:11 20  A     No.  No.  Yeah.  From 1819 except for maybe a brief
         21  period.
         22  Q     During Reconstruction?
         23  A     Reconstruction.
         24  Q     Okay.  The state was controlled by Democrats until 2010?
11:38:25 25  A     Yes.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 81**

```
       1  Q     Thank you.

       2  A     Well, I wouldn't say until -- the legislature was

       3  controlled by Democrats until 2010.  But the governor and a lot

       4  of other office some happened before 2010.

11:38:41 5  Q     So before 2010, the legislature was controlled by

       6  Democrats.  And after 2010, it became controlled by

       7  Republicans?

       8  A     Yes.

       9  Q     Thank you, sir.

11:39:08 10       Senator Sanders, you testified about reasons why

      11  African-Americans may be afraid to vote.  And I understand

      12  that.  And we both understand that our state has a very sorry

      13  history as we go back of Civil Rights.  And I don't mean to

      14  minimize that.

11:39:31 15       But you said three things:  That people were afraid to

      16  vote because in the past African-Americans have been lynched

      17  for voting, and people have lost their jobs for voting, and

      18  people have lost their land for trying to vote.

      19  A     Put off the land.

11:39:58 20  Q     Different from --

      21  A     The reason I say put off the land -- in 1966, when I went

      22  to Lowndes County, every black person who would try to register

      23  to vote, they were put off the land.  They -- so they had tent

      24  city right there on 80 between Selma and Montgomery because all

11:40:20 25  these people were put off the land.  And so they would live in
```

**Caster Plaintiffs' Exhibit 86, Page 82**

```
 1   tents and stuff, yeah.
 2   Q    I understand that.  And you and I grew up roughly --
 3   you're a little bit older than me, but we --
 4   A    A few years on the front end and on the back end make a
 5   lot of difference.  In the middle, it's not much.
 6   Q    It's been a long time since any of those things happened
 7   to a black person who tried to vote, has it not?
 8   A    It's been a long time since a person was lynched who was
 9   trying to vote.  It's been a long time since people were put
10   off the land.  And it's been a long time.
11        But the memory of those in our collective memory is so
12   powerful.  And it's handed down from generation to generation.
13   So it's still there in a very powerful way.
14   Q    I understand that.  Thank you.
15        There's been testimony throughout this trial that I would
16   generally summarize as saying that -- and I think you were
17   sitting in the courtroom today when the commissioner who
18   preceded you testified.  And it may be fair -- and if you feel
19   like I'm misstating her testimony, let me know, because that's
20   not my intent.
21        But some of what she said was that it would be good to
22   have another African-American congressperson because the white
23   people in Congress don't represent their black constituents,
24   and that there should -- for that reason, there should be a --
25   an area drawn with majority a black district that could elect a
```

Timestamps: 11:40:38 (line 5), 11:41:05 (line 10), 11:41:32 (line 15), 11:41:58 (line 20), 11:42:24 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 83**

```
 1   majority black -- I mean, that could elect the African-American
 2   candidate of choice who, in most cases, would probably be
 3   African-American.
 4       Does that -- I'm not sure she said all of that --
11:42:42  5   A   Neither am I.
 6       But let me address it this way.  No white person can fully
 7   understand all of the ramifications and manifestations that
 8   race impact on things.  So even the ones who try very hard
 9   can't do it because it affects everything in one way or
11:43:19 10  another.  So -- so since that's the case, if you -- and in
11   Alabama if you don't get a majority district, you don't get
12   black people elected.
13       As far as I can recall on the state level, there was only
14   one black person elected in a majority white district.  And
11:43:49 15  that was up in Cullman County.  I forget his name.  And he only
16   served one term.
17       So the only way that black people -- since the state is
18   majority white, the only way black people get in office
19   essentially is through district.  And that's true in Congress,
11:44:08 20  as well.
21       And the county -- the state is 25 percent, 26 percent
22   African-American.  And there's no doubt in my mind that the
23   county representation will end up being different because they
24   have different experiences that they went through things.
11:44:32 25      I think Congresswoman Terri Sewell, she was among -- as I
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 84**

1    recall, she may be -- she might not have been among the ones

2    who desegregated schools, but she -- part of her experience

3    would have been that.

4         So all of that informs how you understand issues and,

11:44:53 5    therefore, how you respond to issues.

6         When -- if somebody thinks everything is hunky-dory, then

7    they're not going to respond the way you want -- you may want

8    them to respond.  So I -- it just makes a big difference.

9         One of the things that I have noticed when I -- in the

11:45:19 10    Senate -- maybe I said this.  But when white people came to see

11    me -- and a lot of white people came for representation -- they

12    always came with a proposal to advance them being in the

13    system.  And most of the time when black folks came to see me,

14    they came with ideas of how black people as a group can get

11:45:52 15    within the system.

16         So that was a completely different thing because white

17    people usually came with a proposal saying specifically, Here's

18    what I want you to do for me or for my group that's a small

19    group.  And black people came saying, how do we get in

11:46:11 20    economically?  How do we get in educationally?  How do we get

21    in all of these other kinds of ways?

22         So it was just a profound difference.  I was willing to

23    see all of them.  I was willing to work with all of them.  But

24    they came differently.

11:46:24 25    Q    I asked my question perhaps poorly and maybe misdirected

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 85**

1  you in where I meant to go.

2      Let me ask you the question this way:  You talked about

3  fact that we have at-large elections for the Supreme Court and

4  the Court of Civil Appeals.

11:46:41  5  A    Yeah.

6  Q    And I think both of us agree that the state is better

7  served when we have people from all backgrounds on those

8  courts.  I don't in any way disagree with you on that.

9      But did you mean to say that the use of the state -- that

11:46:57 10  the state's reliance on statewide at-large elections is

11  necessarily race based?

12      And let me ask that question a little bit differently.

13  Doesn't the state have a legitimate argument -- you may not

14  agree with it -- but at least one that reasonable people could

11:47:16 15  think was valid, that if people are elected from districts,

16  they may feel like they're supposed to represent their

17  districts, as opposed to other voters, and that we don't want

18  our judges on the Supreme Court and the Court of Criminal and

19  Civil Appeals to feel like they have a constituency other than

11:47:39 20  all the people of the state as a whole.

21      And so my question is:  Would you at least agree that that

22  is not necessarily a racially motivated point of view, even if

23  it's not one you would agree with?

24  A    It may not be racially motivated.  It certainly has

11:47:58 25  powerful racial impact.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 86**

1        And by your argument, then they all are elected by the

2   Republican party.  So that means that by your argument, that

3   that he would -- they are likely to serve the interests of the

4   Republican party.

11:48:20  5        So to me, it makes sense to end up having inclusion where

6   everybody's at the table.  Even though you are in a minority,

7   you are still at the table.  So you have a chance to try to

8   educate others who are there making a decision.

9   Q    Would you agree with me that the manner in which we fund

11:48:41 10   schools in Alabama is very complicated, perhaps needlessly very

11   complicated?

12   A    Very complicated, yes.

13   Q    And that since I've been an adult, at least, for the last

14   30 years, at least, a lot of people, black and white, have been

11:49:01 15   working very hard with not as much success perhaps as we would

16   hope, but working very hard to change the way that we fund our

17   schools and to create better schools that are better funded?

18   A    I don't know about a lot of people.  Some people have

19   worked hard to try to have better funding of education.

11:49:26 20   Q    And that would be black people and white people?

21   A    Yes.  Some whites and some black.

22   Q    And do you know whether or not the poverty rate among

23   African-Americans in Alabama has gone up or down since 2000?

24   A    I don't know that for a fact.

11:49:49 25   Q    Do you know whether the lifespan of African-Americans in

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 87**

581

1    Alabama has gone up or down since 2000?

2    A    I don't know.

3    Q    Do you know whether the per capita income of

4    African-Americans in Alabama has gone up or down in 2000?

11:50:07  5    A    Per capita?  I think so.  But I don't know for a fact.  I

6    haven't looked at these figures.

7    Q    Do you know if the rate of Internet access among

8    African-Americans in Alabama has gone up or down since 2000?

9    A    I'm sure it's gone up.  There wasn't hardly any Internet

11:50:28 10   before 2000 among black people.  I'm sure it's gone up.

11   Q    I think maybe you have me there.

12        What about 2010?  Do you know whether or not the rates of

13   Internet access among African-Americans in Alabama has gone up

14   since 2010?

11:50:41 15   A    I don't know for a fact, but I believe it has.

16   Q    And do you know whether health outcomes for

17   African-Americans on average have gone up since 2010?

18   A    I don't know that for a fact, but I hope and pray it has.

19   Q    And I do too.

11:51:00 20        Let me change subjects just a little bit, Senator Sanders.

21   You mentioned earlier two things, one of which kind of caught

22   my ear because I didn't know the difference.

23        You mentioned the Alabama New South Coalition, and I'd

24   like to ask you some questions about that.  But you actually

11:51:20 25   also -- I thought I heard -- and the acoustics in this

**Caster Plaintiffs' Exhibit 86, Page 88**

1  courtroom are not good.  But I thought I heard you mention the

2  Alabama New South Alliance.

3  A    Alliance, yeah.

4  Q    What's the difference between the New South Coalition and

11:51:30 5  the New South Alliance?

6  A    Well, when Alabama New South was created, it not only did

7  voter registration, voter mobilization, and voter

8  participation, voter education, but it also endorsed

9  candidates.

11:51:48 10    And after the -- after the PAC-to-PAC transfer of things

11  came in, that that created all kinds of problem.  So Alabama

12  New South Coalition ceased to endorse candidates.  And

13  candidates are actually endorsed by Alabama New South Alliance.

14  Q    Oh, so you did that because of the PAC-to-PAC problem?

11:52:13 15  A    Yeah.

16  Q    I see.  By the way, you mentioned the PAC-to-PAC

17  legislation.  And did you say that was in 2010 or 2011?

18  A    I thought it was in 2010.  I thought it was passed in

19  December -- the election was in November, and then there was a

11:52:30 20  special session in 2010 in December.

21  Q    I think you're right.  And you mentioned that you were

22  part of the delegation of people who went -- excuse me, sir --

23  to Washington to lobby the Attorney General not to preclear

24  that bill; is that correct?

11:52:47 25  A    Yes.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 89**

1    Q    Did y'all meet with the Attorney General at that time?

2    A    I don't -- I don't know whether we met with the Attorney

3    General on that occasion.  We met with some people in the Civil

4    Rights Division.

11:53:04  5    Q    And, ultimately, I guess they concluded that the

6    PAC-to-PAC transfer would not have a retrogressive effect on

7    the opportunities for African-Americans to elect the voters of

8    their choice and participate in elections; is that correct?

9    A    No.  No.  What they decided was somehow this kind of

11:53:25 10    legislation does not come within the purview of Section 5.

11    Q    So they said was not preclearable, not within their

12    jurisdiction?

13    A    Yes.

14    Q    Who was the Attorney General at that time?  Do you recall?

11:53:42 15    A    Yes.  As I recall, it was -- because he was there during

16    most of the Obama administration.  I can't think of his --

17    Q    Let me tell you that I believe the Attorney General from

18    2009 to 2015 was Eric Holder?

19    A    It was Eric Holder.

11:53:59 20    Q    Thank you.

21    A    See, that's that 77 years again.

22    Q    I'm right there with you.  If I hadn't looked it up on

23    Google while you were talking, I wouldn't have known.

24         Can you tell us what the Alabama Democratic Conference is?

11:54:13 25    A    Yes.  The Alabama Democratic Conference is a caucus within

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 90**

584

1   the Democratic party.

2   Q    And is it fair to say for a long time -- I don't know if

3   it still is -- but that by and large, that was created and led

4   by a man named Joe Reed?

11:54:31 5   A    Yes -- well, it wasn't created, but it was led by him for

6   many years.

7   Q    Okay.  And many people would call Joe Reed the dean of

8   Alabama redistricting.  Have you ever referred to him -- heard

9   him referred to in terms like that?

11:54:49 10  A    No, but -- but we give him a lot of credit for his work in

11  redistricting.

12  Q    And do you know whether or not he has played a role since

13  at least 1980 in drawing the state legislative and

14  congressional districts when they were passed by the

11:55:19 15  legislature?

16  A    I know for a fact that he played a significant role in

17  legislative districts.  I'm not sure about exactly what

18  happened.  But I think that he may have been involved when the

19  one black district was created in 1991-'92.

11:55:39 20  Q    Are you a member of the ADC?

21  A    No.

22  Q    And you haven't been a member of the ADC since you were

23  one of the cofounders of the New South Coalition; is that

24  correct?

11:55:51 25  A    Yes.  I haven't been a member of the ADC since 1980 --

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 91**

```
 1  well, it started a little before -- it was created in '86.  But

 2  I went out in, I think, in '80 -- '84.

 3  Q    And why did you cofound the Alabama Democratic Coalition?

 4  A    Okay --

 5  Q    Excuse me.  Alabama Democratic Conference.  Sorry.

 6  A    Ask the question --

 7  Q    Excuse me.  Let me ask my question again.  I got all

 8  messed up.

 9       Why did you, Senator Sanders, co-found the New South

10  Coalition?

11  A    There were two major things that led to it.  We were in

12  the seventh district, and the ADC elected chairs -- elected the

13  chair of each district.

14       And we -- some of us got together and elected Judge Branch

15  from Eutaw.  He was probate judge over there as the seventh

16  district chair.

17       Dr. Reed did not want him as chair.  So the election got

18  set aside.  And then they called another meeting.  He wanted

19  the mayor of Uniontown, and the meeting was in Uniontown.  So

20  they called a second meeting.  And when the second meeting was

21  called, we gathered again, and we elected Judge Branch again,

22  and it was set aside again.

23       And then the meeting was set in Chilton County.  And we

24  didn't bother to go.  That was -- that was one thing that had a

25  very profound impact.
```

Timestamps: 11:56:15 (line 5), 11:56:27 (line 10), 11:56:54 (line 15), 11:57:16 (line 20), 11:57:36 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

Caster Plaintiffs' Exhibit 86, Page 92

1       The other one was when Jesse Jackson was running in 1984.

2   And so we all went to Mobile to participate.  And most folks

3   there were supportive of Jesse Jackson.

4       And there was a motion put on the floor and second and

11:58:12  5   passed in very -- like seconds.  And so people were very upset.

6       And the last part of that was in 1985, I received word

7   that Dr. Reed was opposed to me in the Senate, although I was

8   already in the Senate.

9       And so all of those things came together.  And we said we

11:58:56 10   wanted to create an organization that was not limited to one

11   race or it was open to whites, as well as blacks.  We wanted to

12   create an entity that was not tied to the Democratic party or

13   any other party.

14       And we -- if I'm going on too long, let me stop.

11:59:17 15   Q    No.  I think you've answered my question, sir.

16       THE COURT:  May I ask, is that the same Dr. Reed that

17   seems to be at outs with other members of the Democratic party

18   in Alabama right now?

19       THE WITNESS:  It's the same Dr. Reed that's been in a

11:59:33 20   struggle with some other members of the Democratic party.

21       THE COURT:  Okay.

22   BY MR. WALKER:

23   Q    Senator Sanders, ever since I've been voting, I have been

24   seeing yellow ballots handed out outside of polling places

11:59:47 25   where I vote.  And what would those be?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 93**

```
 1   A     That yellow ballot is the ADC ballot.  The blue ballot is
 2   the Alabama New South Alliance ballot.
 3   Q     And --
 4   A     Of course, other organizations will sometimes put out a
 5   yellow ballot or a blue ballot.
 6   Q     Yeah.  But the ADC routinely outside of polls hands out
 7   ballots that tells people who are interested in the ADC's
 8   position how to vote.
 9         And the New South Coalition, of course, does the same
10   thing, and other groups may do the same thing too.  I'm not
11   saying there's anything wrong with that.
12   A     Yeah.
13   Q     And is the position that the New South Coalition takes
14   always the same as the position that ADC takes?
15   A     No.
16   Q     Okay.  Are they mostly different, or do you know?
17   A     When you say mostly different, you have a number of
18   positions on the ballot.  Sometimes you have 30-something --
19   30-something positions.  And I would -- if I had to answer
20   that, I would say most of the positions are probably the same
21   person --
22   Q     Let me rephrase my question.  Do the ADC and the New South
23   Coalition independently come up with who they decide to endorse
24   and support?
25   A     Yes.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 94**

588

| | | |
|---|---|---|
| | 1 | Q     And sometimes it's not the same person? |
| | 2 | A     Yes. |
| | 3 | Q     Okay.  And, in fact, I'm not sure if it was the first |
| | 4 | time, but I think it was the first time that Ms. Sewell ran for |
| 12:01:26 | 5 | District 7, the New South Coalition endorsed, I believe, Earl |
| | 6 | Hilliard, did it not? |
| | 7 | A     It -- |
| | 8 | Q     In the primary? |
| | 9 | A     In the primary, it endorsed Earl Hilliard.  In the runoff, |
| 12:01:44 | 10 | it endorsed Congresswoman Sewell.  ADC endorsed, I think, |
| | 11 | Sheila -- from Jefferson County.  Sheila... |
| | 12 | Q     I can't think of her last name right now. |
| | 13 | A     She was on the county commission at that time. |
| | 14 | Q     Sheila Smoot? |
| 12:02:00 | 15 | A     Sheila Smoot.  Yeah.  If I remember correctly.  That's |
| | 16 | been a while. |
| | 17 | Q     Well, that's what my research showed. |
| | 18 | You were in the legislature -- your -- when did you give |
| | 19 | up your seat, sir? |
| 12:02:15 | 20 | A     I went out in November. |
| | 21 | Q     Of this November or last November? |
| | 22 | A     This -- no.  I went out in November of 2018. |
| | 23 | Q     Okay. |
| | 24 | A     I've been out a year. |
| 12:02:25 | 25 | Q     And you've been succeeded by your daughter -- one of your |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 95**

1  daughters, rather, at any rate, I believe?

2  A    Yes.

3  Q    And she was elected without opposition?

4  A    No.  She was elected.  An independent ran against her who

12:02:43 5  was a -- who was a Republican member of the Dallas County Board

6  of Education.  But he ran as an independent, so...

7  Q    And did she win by a landslide?

8  A    She won by a very good margin.

9  Q    I'll take that.  And congratulations.

12:03:06 10  A    Thank you.

11  Q    But you were in the legislature in 2011 when the

12  legislature took up congressional redistricting, were you not?

13  A    Yes.

14  Q    So I'd like to ask you about that, please, sir.

12:03:15 15  A    Okay.

16  Q    Do you need some water or anything?

17  A    I'm fine.

18  Q    Okay.  Did you ever talk with Ms. Sewell about her

19  district?

12:03:24 20  A    In the 2011?

21  Q    Yes, sir.  When the new plan came up, did you ever talk to

22  her about her district?

23  A    I didn't have a conversation with her.

24  Q    Do you know whether or not she designed her district

12:03:37 25  herself or with her staff?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 96**

```
 1  A    No, I do not know.

 2  Q    Do you know whether or not she approved that district?

 3  A    I do not know.  But I -- I know it was very common for

 4  people to be consulted about their particular district, but I

 5  do not know that.

 6  Q    If Senator Dial were to testify that she told him she

 7  approved that district, you would not disagree with that, would

 8  you?

 9          MS. MADDURI:  Objection.  Calls for speculation.

10          THE COURT:  Overruled.

11          THE WITNESS:  If Senator Dial said it, I don't know

12  whether I would agree with it, but I could envision that

13  possibility.

14  BY MR. WALKER:

15  Q    Okay.  Did you, at the time the legislature was taking up

16  the 2010 congressional districts, suggest to anybody that there

17  should be two majority black districts?

18  A    I don't know whether I suggested it, but I know there was

19  discussion of that.

20  Q    Was that discussion with any of the chairs of the

21  redistricting committee so far as you know?

22  A    I didn't have any discussion with the chairs of the

23  redistricting commission.

24  Q    Was that discussion among members of the Alabama

25  legislative black caucus?
```

Timestamps: 12:03:53 (line 5), 12:04:05 (line 10), 12:04:17 (line 15), 12:04:39 (line 20), 12:04:55 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 97**

591

```
         1  A    I know it was discussions among members of -- yeah,
         2  members of the black caucus.  Yeah.  Yes.  Among
         3  African-Americans in the legislature.
         4  Q    Do you know if they --
12:05:13 5  A    Which it may be different from the black caucus.
         6  Q    Uh-huh.  Do you think when the legislature is looking at a
         7  redistricting plan, one of the considerations is whether or not
         8  that's a plan that can be passed?  Is that a legitimate
         9  consideration?
12:05:32 10 A    Yes.
        11  Q    Okay.
        12  A    Because I know that there are things that we think would
        13  certainly be fair or better, but we also know that they are not
        14  likely to pass, so...
12:05:59 15 Q    I understand.  Do you recall coming to a hearing that we
        16  held when we were doing the legislative -- not congressional
        17  redistricting -- in Selma?
        18  A    I recall.
        19  Q    And I think it was at the Saint James Hotel?
12:06:20 20 A    I recall that.
        21  Q    And do you recall that at that time you testified that you
        22  believed that a majority black district should have about
        23  62 percent African-American population?
        24  A    A majority black legislative district.
12:06:38 25 Q    Yes, sir.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 98**

```
 1  A     Yes.
 2  Q     Okay.  About 62 percent is what you told the committee; is
 3  that correct?
 4  A     Yes.
 5  Q     And was that a decision that you had just made that day,
 6  or was it based on your experience over time as a legislator?
 7  A     Well, it was a decision that I had arrived to over time
 8  because there was a time when I thought it should be higher --
 9  Q     Uh-huh.
10  A     -- than been 62.  But as time went along, that continued
11  to change.  And the percentage continued to go down because
12  there are so many different factors that are involved.
13  Q     That would not be your opinion today, would it?
14  A     62 percent?
15  Q     Yes, sir.
16  A     No.
17  Q     But it was -- that was your opinion at the time based on
18  your experience as a successful African-American politician?
19  A     Well, I don't know whether it was based on my experience,
20  but that was my position at that time.
21        In fact, it was commonly thought back at that time that
22  you needed 65 percent.
23  Q     Uh-huh.
24  A     But that just kept going down because you would see
25  developments that indicate that you could win with less than
```

12:06:43 (line 5)
12:07:08 (line 10)
12:07:27 (line 15)
12:07:43 (line 20)
12:08:00 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 99**

```
 1  62 -- less than 65, less than 60 percent.

 2  Q    And what were those developments?

 3  A    Well, when you are looking at whether somebody can be

 4  elected in addition to the number of African-Americans, you are

 5  also looking at what kind of organization exists in that.  You

 6  are also looking at what's the education level of people.  You

 7  are looking at how many people have criminal records.  You're

 8  looking at what kind of -- what's the economic kind of

 9  situation.

10       Because in those districts -- and I've run in them enough

11  to know -- that the smaller the district is the more difficult

12  it is to elect an African-American.  You would think it would

13  be the other way around.

14       So because when local people decide they don't want you,

15  they can come together and bring things together.  So when you

16  are talking about a bigger district, then it makes a

17  difference.

18       So all of those factors come there, and they have

19  continued to evolve over the years.

20  Q    When you have a -- and when you have a -- an experienced

21  and successful politician with good name recognition, like

22  Ms. Sewell is in District 7, can you have a lower black

23  population and still think of that as a majority black district

24  than if you have an unknown black candidate?

25  A    Well, I wouldn't -- I wouldn't recommend deciding a
```

**Caster Plaintiffs' Exhibit 86, Page 100**

1 district based upon the person that's in that office because

2 they're not going to always be there.  So I wouldn't recommend

3 that.

4       You know, I ran for that district once.  I ran in 1992.

12:10:11 5 There were 76,000 votes.  And I lost by 400, 500 votes.  So

6 I'm -- I was familiar with that district from that experience.

7 Q    One last question.

8       When you --

9            THE COURT:  Well, before we leave that, may I ask one?

12:10:32 10            MR. WALKER:  Yes, ma'am.

11            THE COURT:  Okay.  So from that -- I think the records

12 show that in the last election Representative Sewell carried

13 the vote by 70-something percent?  I'm asking the attorneys if

14 I'm wrong.

12:10:58 15            MR. WALKER:  I don't have that in front of me, Your

16 Honor.

17            THE COURT:  Seems like I can remember 74, something

18 like that.

19       Would the fact that she has had such a large majority of

12:11:10 20 the votes in that district -- should that fact affect the way

21 the redistricting commission looks at the percentage of

22 African-American population in that district in deciding to add

23 to or shrink that district, or should other factors come into

24 play?

12:11:39 25            THE WITNESS:  I wouldn't base that at all because the

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 101**

```
 1   candidates who have run against her have not been strong
 2   candidates.
 3        So if strong candidates was out there, it might be a very
 4   different thing.  So I -- I would say you have to look at all
 5   of those factors and all of those dynamics.
 6              THE COURT:  And as much as we all love Representative
 7   Sewell -- I do -- she may not run for that district forever,
 8   right?
 9              THE WITNESS:  That's right.  She may run for U.S.
10   Senate.
11              THE COURT:  I didn't say anything.  I didn't --
12   anyway.
13        But the next candidate may not have it as easy as she has
14   had it, I guess is what I'm trying to get around to.
15        So...
16              THE WITNESS:  Well --
17              THE COURT:  I mean, in looking at the voting trends in
18   that district, it seems to me -- and these attorneys are going
19   to educate me on it -- that the mere fact that she's been able
20   to carry it with such a strong high percentage doesn't mean
21   that it would necessarily be as easy for the next candidate to
22   run without her presence there to be elected, I guess is what
23   I'm trying to say.
24              THE WITNESS:  Well, she --
25              THE COURT:  When you have a good candidates, it's
```

Timestamps: 12:11:57 (line 5), 12:12:15 (line 10), 12:12:32 (line 15), 12:12:49 (line 20), 12:13:09 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 102**

 1  easier to get a more cohesive base for election than if you

 2  have one that's not as well known in the district even though

 3  that candidate may be a good one, too.

 4        THE WITNESS:  Well, if I remember correctly, most of

12:13:25  5  the people who have run against her have been other

 6  African-Americans.  So I don't think you can tell anything

 7  from -- from that.

 8     It may -- there may have been -- I was trying to think if

 9  I'd known of any white who ran against her.  There may have

12:13:48 10  been one, but I don't know.  It depends on who the candidates

11  are.  It depends on the resources that they have.  It depends

12  on what's the makeup of that district, but all of those other

13  kinds of things.

14     So I can't -- I can't say -- because I considered running

12:14:14 15  in 2010 when she was elected.  But people strongly encouraged

16  me to stay in the Alabama Legislature.

17     So all of those kinds of things, it doesn't mean that -- I

18  don't think you can tell anything about that because it's so

19  many factors and so many dynamics.

12:14:38 20        THE COURT:  Thank you.

21  BY MR. WALKER:

22  Q    Senator Sanders, you're a lawyer, too, and you know when a

23  lawyer says I have one more question...

24  A    That's the exact thing that ran through my mind.  In all

12:14:55 25  my 48 years of practicing law, I have not known one single

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 103**

597

```
 1   lawyer who to say that and it was just one more question.
 2   Q    Well --
 3             THE COURT:  I actually had one.
 4             THE WITNESS:  One.
 5             THE COURT:  In a case a tried two weeks ago.
 6             THE WITNESS:  Oh.
 7             THE COURT:  Said one question and only had one.
 8             THE WITNESS:  That's was your first time.
 9             THE COURT:  I made note of that -- one of the rare
10   times.
11   BY MR. WALKER:
12   Q    I'm not going to be that lawyer today.  I've got more than
13   one now.
14        You talked about when you have a good candidate.  And what
15   makes a good candidate?
16   A    For me, a good candidate is a person who understands what
17   the district is like, who understands all of the dynamics in
18   the committee, who has a personality that connects with people,
19   who can raise a minimum amount of resources.
20        And I say a minimum amount because when I ran for -- I was
21   always underfunded compared to other committees until the last
22   few years.
23        But a good candidate has a vision that he or she can share
24   with the people and can tell them how they can plug into that
25   vision.
```

***Christina K. Decker, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 104**

1  Q    Does name recognition, is that one of the factors that

2  relates to electoral success?

3  A    That can be a factor.  But there have been times when

4  people didn't have name recognition at the beginning, but

12:16:47  5  various organizations supported them and helped in spite of the

6  fact they didn't have name recognition.

7  Q    Senator Sanders, I now want to put you on the spot a

8  little bit, and I'm sorry to do that.

9  A    I would be disappointed if you didn't.

12:17:04 10  Q    Okay.  Well, thank you.

11       I want to ask you about something that happened in 2010,

12  and I'm going to ask you about the robocall and give you a

13  chance to explain that, please.

14  A    Sure.

12:17:14 15  Q    And here is the text of the robocall that I understand you

16  made in 2010.

17  A    Yes.

18  Q    It was, quote, This is Hank Sanders, Alabama State

19  Senator, and I'm still mad as hell.  I say, hell, no.  I ain't

12:17:35 20  going back to the cotton fields of Jim Crow days.  I'm going

21  forward with Ron Sparks, Jim Folsom, and others who would do

22  right by all of us.  I hope you're mad as hell and will not go

23  back.  And you have the power to choose.  I will stand until

24  hell freezes over.

12:17:58 25       Was that the text from the robocall, sir?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 105**

1  A    Yes.

2  Q   And I have to say to me and to a lot of people -- and you

3  were questioned by Anderson Cooper about this -- I thought that

4  was a racist appeal.  So I want to give you a chance to explain

12:18:14  5  that.

6  A   It was not racist at all.  What -- there were a lot of ads

7  saying that we have to take our country back.  All of those ads

8  about taking our country back.  And I was responding to that by

9  this ad.

12:18:33  10     And I was saying -- because I viewed them as saying take

11  our country back as talking about going back to segregation,

12  going back to that.  And I was saying, Hell, no.  We ain't

13  going back.  And I didn't consider that racist.

14     In fact, that was a response to a racist ads and racist

12:18:54  15  statements.

16  Q   Well, did -- I believe that the people who were running

17  against Ron Sparks and Jim Folsom were the person who became

18  Governor Bentley and Kay Ivey.  Am I correct on that?

19  A   I think so.

12:19:13  20  Q   Did either Mr. -- or Dr. Bentley -- Bentley or Kay Ivey

21  run any ads that you thought were racist or say, let's take

22  something back, with regard to Civil Rights?

23  A   What -- there were -- I don't know whether they ran an ad

24  specifically.  But ads were being run saying, Let's take our

12:19:38  25  country back.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
1    Q      Okay.
2    A      And the people who were saying that was supporting them.
3    And I was saying, no, we need to fight.  We can't go back.
4           That -- it's like Make America Great Again.  And you asked
12:19:53 5   when was America great again?  And then they say, well, during
6    slavery or during segregation.  So I was responding to that
7    concept.
8    Q      Thank you, Senator Sanders, for letting me ask you
9    questions.
12:20:09 10  A      Thank you.
11              THE COURT:  Any redirect?
12              Senator, it's getting into the lunch hour.  Are you
13   okay to go on a for a little while?
14              THE WITNESS:  Oh, yes.  I hope to finish and they'll
12:20:23 15  let me go.  I need to be in Greene County for a legal matter.
16              THE COURT:  Okay.  We'll see if we can finish and get
17   you out.  I just didn't want you to be sitting there starving.
18              THE WITNESS:  No.  I'm fine.
19              THE COURT:  Okay.
12:20:38 20              THE WITNESS:  Maybe she will say one more question and
21   mean it.
22              MS. MADDURI:  I'm not going to promise one more
23   question.  But it won't be very many questions.
24              THE WITNESS:  Okay.
12:20:49 25              THE COURT:  Just about every time a lawyer says that,
```

**Caster Plaintiffs' Exhibit 86, Page 107**

```
 1   you can pretty well be assured they're telling a story, can't
 2   you?
 3                  THE WITNESS:  Yes.
 4                         REDIRECT EXAMINATION
 5   BY MS. MADDURI:
 6   Q    Senator, Mr. Walker talked to you about the comment you
 7   made about 62 percent in a legislative district about ten years
 8   ago.
 9        On that occasion, were you speaking about legislative --
10   sorry -- you were speaking about legislative districts?
11   A    Yes.
12   Q    Were you offering any opinion about the level of black
13   voting age population that was required in a congressional
14   district?
15   A    No.
16   Q    Are you familiar with the fact that state legislative
17   races have a much lower rate of participation than
18   congressional races?
19   A    Yes.
20   Q    Are you familiar with the fact that state legislative
21   races are typically far less well publicized than congressional
22   races?
23   A    Yes.
24   Q    Are you familiar with the fact that state legislative
25   races have much lower levels of fund-raising and spending than
```

12:21:00  5
12:21:10 10
12:21:20 15
12:21:32 20
12:21:50 25

**Caster Plaintiffs' Exhibit 86, Page 108**

1    congressional races?

2    A    Yes.

3    Q    Are you familiar with the fact that far fewer people as a

4    percentage vote in the state legislative races than

12:22:07 5    congressional races?

6    A    Yes.

7    Q    In your opinion, would all of these factors impact the

8    level of black voting age population that would be needed to

9    ensure that African-Americans have an opportunity to elect

12:22:20 10   their candidates of choice?

11   A    Yes.

12   Q    When you gave testimony at that hearing, did you also

13   offer testimony about the fact requesting that

14   African-Americans do not be packed into districts in the

12:22:34 15   legislature -- in legislative districts?

16   A    I don't recall at the moment what I -- whether I did or

17   not.  I know that's a concern.  But I can't recall whether I

18   testified on that or not.

19   Q    Okay.  Have you ever been involved with redistricting for

12:22:53 20   congressional districts?

21   A    Not really.  There was a -- when the district was created,

22   the seventh district was created, I remember interacting with

23   some people in discussions and stuff.  But I've never been

24   really involved in the creation of congressional district.

12:23:25 25   Q    Isn't it true that Terri Sewell won 72 percent of the vote

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 109**

```
 1  the first time she ran for Congress?

 2  A    I don't recall.

 3  Q    What do you understand the opportunity to elect to mean?

 4  A    Opportunity to elect means that you have a reasonable

 5  chance to elect.  Reasonable chance doesn't mean that you will

 6  be elected.  It doesn't mean that the odds are with you.  It

 7  simply means that you -- that you -- you have an opportunity,

 8  you have a chance.  You have a reasonable chance.  It may be

 9  40.  It may be 50.  It may be 60.  But it means that all of

10  these different factors could come together, and you have a

11  reasonable chance to prevail.

12  Q    Thank you, Senator.  That's all for me.

13            THE COURT:  Any recross, Mr. Walker?

14            MR. WALKER:  Yes, ma'am.  A short recross.

15            THE COURT:  We gave him an opportunity to think a

16  little bit before.

17                      RECROSS-EXAMINATION

18  BY MR. WALKER:

19  Q    Senator Sanders, just a few more questions, please, sir.

20  A    I notice you avoid one more question.

21  Q    I did deliberately avoid one more question.

22       If you had been asked in 2010 what the African-American

23  population of District 7 should be, the minimum

24  African-American population, what would you have told the

25  legislature, given that in 2011 you thought it should be about
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 110**

1   62 percent?

2   A    Well, first, I don't know what I would have told them

3   because I know it's a very different situation with a

4   congressional district than it is with legislative district.

12:25:28  5   So I don't know what I would have told them.

6        But I would have said -- you know, there are so many

7   different factors, and you have to take them all into

8   consideration.  I'm sure I would have said that it needed to be

9   at least 50 percent.

12:25:39 10   Q    Do you know Terri Sewell?

11   A    Yes.

12   Q    Do you believe that she has the best interests of

13   African-Americans at heart?

14   A    I think that she has -- that she's a good representative.

12:25:55 15   Q    Okay.  Do you believe --

16   A    For the state of Alabama, whether that's black people,

17   white people.

18   Q    Fair enough.

19        Do you think that she would agree to a plan if she

12:26:11 20   understood that it packed or cracked African-American

21   populations?

22            MS. MADDURI:  Objection.  Calls for speculation.

23            THE COURT:  Overruled.

24            THE WITNESS:  I know -- I know elected officials --

12:26:27 25   and I know every elected official wants the best district for

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 111**

1  their election.  They're not thinking about what's the best

2  district for all black people, or all white people, or all

3  other people.  They want the best district for them.

4      That's -- I've seen it over and over and over again that

12:26:52 5  people want a district that's going to assure their

6  re-election.  And that's a reasonable response for their

7  interest.  That's not a reasonable response for the interest of

8  the people who have been excluded.

9  BY MR. WALKER:

12:27:14 10  Q    Thank you very much, Senator Sanders.  I appreciate it.

11  A    Thank you.

12          THE COURT:  Anything else, Ms. Madduri?

13          MS. MADDURI:  No, Your Honor.

14          THE COURT:  Okay.  Well, I think we can let Senator

12:27:23 15  Sanders go so he make his other commitment.  And we will take

16  lunch and be back at 1:30.

17          THE WITNESS:  Thank you, Judge.

18          MR. WALKER:  Thank you, Your Honor.

19          (Recess.)

13:34:32 20          THE COURT:  Okay.  Where is our next witness?

21          MR. SPIVA:  The plaintiffs have no further witnesses,

22  Your Honor.

23          THE COURT:  Does defense have any witnesses?  Let's

24  get your witness up here.

13:34:47 25                    GERALD DIAL,

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 112**

```
      1  having been first duly sworn by the courtroom deputy clerk, was

      2  examined and testified as follows:

      3          THE COURTROOM DEPUTY CLERK:  Please state your name in

      4  the microphone.

13:35:23  5          THE WITNESS:  My name is Gerald Dial.

      6          THE CLERK:  Thank you.

      7          THE COURT:  We're waiting on you, Mr. Walker.

      8          MR. WALKER:  Thank you, Your Honor.

      9                    DIRECT EXAMINATION

13:36:26 10  BY MR. WALKER:

     11  Q    Senator Dial, would you state your name for the record?

     12  A    My name is Gerald Dial.

     13  Q    I'm calling you Senator Dial.  Are you still in the

     14  Alabama Legislature?

13:36:37 15  A    No.  I retired in November of 2018.

     16  Q    And were you in the Alabama Legislature?

     17  A    Yes.  I served in the legislature two terms in the House

     18  from '74 to '84.  And I was elected to the Senate in '83,

     19  served until 2006, was defeated, and then ran again in 2010,

13:36:58 20  and served until November of 2018.

     21  Q    What was your Senate district, please, sir?

     22  A    Senate District 13, which was mostly east Alabama.

     23  Q    Does that include Lineville and Clay County?

     24  A    Yes.

13:37:12 25  Q    And is Lineville where you're from in Clay County?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 113**

```
 1  A    Yes.

 2  Q    What do you do for a living?

 3  A    I'm retired at this time.  I retired in 2018.

 4  Q    What are you retired from?

13:37:25 5  A    I retired from the legislature, and I was in the real

 6  estate development business.

 7  Q    And during the time, did you have any elected office other

 8  than member of the House or member of the Senate?

 9  A    I had other jobs, but not elected job.  But I -- that's

13:37:45 10  the only elected job that I had.

11  Q    Okay.  Would you tell the Court a little bit about your

12  educational background, please?

13  A    I graduated with a B.S. degree from West Alabama

14  University, and I got my education requirement degree from

13:38:01 15  Jacksonville University.

16  Q    And I believe you coached for a while?

17  A    I -- after graduation, I returned to Lineville, Alabama,

18  where I coached football, basketball, and taught American

19  history and political science.

13:38:16 20  Q    What civic activities were you involved in, in Lineville

21  in Clay County over the course of your life?

22  A    Oh, well, I've been involved in quite a few things.  I was

23  elected to the school board once I retired from education.

24  When I got out of education, I was elected to the school board.

13:38:36 25  I was elected to city council.  I served two years on the local
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 114**

```
 1  city council after that.  And I was elected to the legislature.
 2      I was a member of the Baptist church there for 50 years.
 3  And I was also a member of the Clay County exchange club, and
 4  the quarterback club, which you have got to be a member of the
 5  quarterback club if you live in Clay County.
 6  Q    When you were first elected for office, what party were
 7  you in?
 8  A    I was a Democrat.
 9  Q    Okay.  Did you at some point become a Republican?
10  A    Yes.  In 1983, I ran and was elected as an independent.
11  And then in 2010, I had briefly joined the Republican party and
12  elected as a Republican in 2010.
13  Q    Why did you join the Republican party?
14  A    Well, at that time, in 2010, Governor -- who was later
15  elected Governor Riley.  Bob Riley was running for Governor was
16  a Republican.  He was from my home county, and so I endorsed
17  him.
18      I felt like the philosophy and ideas of the Republican
19  party were much more aligned to my beliefs and ideas than the
20  Democratic party.  When I went to the legislature, it was only
21  Democrats, but there's always been a two-faction member of the
22  legislature.  And there was a conservative pro-business side of
23  the legislature, and there was the -- the more liberal side
24  than the -- basically the teacher union side.
25      And so the legislature's always -- even though we had one
```

13:38:53 (line 5)
13:39:07 (line 10)
13:39:32 (line 15)
13:39:49 (line 20)
13:40:07 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 115**

609

party, there were two divisions in that, and my division was
more of a conservative business-oriented side.

And as the Democratic party continued to lean in the other
direction, then basically, it was not with my philosophy, so I
13:40:26 became a Republican.

Q    Did becoming a Republican have anything to do with race or
racial concerns?

A    None.

Q    You've also been active in the military, have you not?

13:40:39 A    Yes, sir.  I served 36 years in the Alabama National
Guard.

Q    Okay.  And what was your rank when you retired?

A    I retired as a brigadier general.

Q    Will you tell the Court something about boards and other
13:40:54 things like that that you've served on?

A    I presently serve on the university -- Troy University
board of trustees.  I served for eight years chairman of that
and rotated off just in November this past year because we have
term limits of years years.  And I still serve on the board.
13:41:10 I'm just not the chairman.

I serve as the chairman of the Southern Union Community
College Foundation Board.  I serve as the chairman of the
International Motor Sports Hall of Fame and Museum board.

Q    Is that in Talladega?

13:41:24 A    In Talladega at the race track.  I passed the legislation

**Caster Plaintiffs' Exhibit 86, Page 116**

```
 1  that created that.  I have been the chairman ever since.  I
 2  serve as the chairman of the space board authority board.  And
 3  I'm probably leaving out a couple.  But that's a pretty good
 4  full-time job that I have got doing those since I've retired.
```
13:41:44  5  Q    There's a Rosa Parks Museum in Montgomery.  Are you
```
 6  familiar with that?
 7  A    Very much so.  Troy University owned the property where
 8  Rosa Parks boarded the bus in Montgomery.  And as we began to
 9  look at expanding Troy University, we wanted to build a new
```
13:42:09 10  facility on that piece of property.  And the board did not want
```
11  to diminish or do anything to take away the attention of what
12  Rosa Parks had done.  So we created the Rosa Parks Museum
13  there.
14       That's something we're very extremely proud of.  And as
```
13:42:26 15  Troy University, it's world renowned and one of the largest
```
16  tourist attractions in Alabama and something we're very proud
17  of.
18       And Mr. Lamar Higgins, who works on my board, was able
19  to -- he had connection with Ms. Rosa Parks before she passed
```
13:42:41 20  away, and she was able to approve us for doing that and using
```
21  her name.  And today it's part of Troy University and one of
22  our flagship operations that we're most proud of at Troy.
23  Q    During your time in the legislature, did Alabama celebrate
24  its Civil Rights history, in terms of creating Civil Rights
```
13:43:04 25  trails or funding Civil Rights tours to Alabama?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 117**

```
        1  A    I would say yes.  And if you'll just look at what's
        2  happened in Montgomery and Selma with the -- of course, now
        3  it's federally recognized the Selma to Montgomery marches.
        4       And then just recently, our tourism department under Mr.
13:43:24 5  Sentell has been the leader in creating the heritage trail
        6  for -- the black heritage trail, which begins in Montgomery and
        7  goes all the way out to the midwest.  And we were the leaders
        8  in that.  We've supported other endeavors that have gone on in
        9  Montgomery, as well.
13:43:43 10 Q    Let's talk about things you did when you were in the
       11  legislature.  What committees did you serve on?
       12  A    Well, the most recent committee -- and if I went back
       13  40 years, we'd be here until next week.
       14  Q    Let's not do that.
13:43:57 15 A    In the last session, I served as a chairman of the local
       16  legislation.  I served as chairman of the health committee.  I
       17  served on the education committee.  I served on the education
       18  and finance committee.  And I served on the long-range
       19  transportation committee.  And I chaired the reapportionment
13:44:17 20 committee.
       21  Q    I'm going to get back to the reapportionment committee in
       22  just a second.  But can you tell the Court about some of the
       23  bills that you've sponsored that you're most proud of?
       24  A    Well, I've -- in my tenure, I've been fortunate to sponsor
13:44:32 25 a number of bills.  And I guess one of the bills that receives
```

**Caster Plaintiffs' Exhibit 86, Page 118**

612

1  very little attention, but that it's important to me because

2  the legislative political office said it saved the taxpayers a

3  billion dollars.  I created the five-year tag bill.

4      Most of us in this room are too old to remember.  But you

13:44:51 5  used to have to get a new tag every year and you had to put it

6  on your car, and you had to take the old one off and put it on

7  the barn.

8      I came up with the idea years ago to do a five-year tag,

9  keep at that tag for five years and just put a decal on it.  So

13:45:03 10  the savings on the cost of not having to reproduce that tag

11  which costs about $1.10 of metal each year is -- over the term

12  that I passed that bill, it saved the state over a billion

13  dollars to the taxpayers.

14      I've been real active in education.  I passed the Alabama

13:45:25 15  Ahead Act.

16  Q   Our court reporter wants you to slow down some.

17          THE COURT:  You're getting too excited about those

18  bills.

19          THE WITNESS:  I am.  I am, Judge, because I spent a

13:45:34 20  lot of time and effort in that arena.

21          THE COURT:  I understand.

22          THE WITNESS:  And it's something exciting to me.  And

23  the Alabama Ahead Act is one that I'm very excited about.

24          THE COURT:  Okay.  Are you saying Hat Act?

13:45:46 25          THE WITNESS:  Alabama Ahead Act.

**Caster Plaintiffs' Exhibit 86, Page 119**

1            THE COURT:  Ahead.  Okay.

2            THE WITNESS:  The Ahead Act.  That bill is designed to

3    replace all textbooks with digital devices.  And we're well on

4    the way to doing that.  So I'm very proud of that.

13:46:03 5        Other bills -- I was instrumental in passing a bill that

6    regulates sports agents.  And you say, well, that's not

7    important.  Part of that, when our college athletes would leave

8    college and sign with the pros, the sports agents would get

9    most of their money.  You're talking about dealing with mostly

13:46:24 10   minorities who had very little education and very little

11   financial knowledge.  They would sign with the agents, and the

12   agents would sign them massive contracts, and the agents would

13   get most of the money.

14        I passed a bill that limited -- put a cap that they could

13:46:40 15   not get but 10 percent.  That was the first time ever in

16   America, and that bill is has now been adopted with every

17   state.  And it saves our athletes that go into the professional

18   sports, whatever, the opportunity to retain most of the money

19   that they earn and not give to it sports agents.  I'm very

13:46:58 20   proud of that.  It's not something that is a growing thing on

21   my resume, but it has saved millions and millions of dollars

22   and put it back into the athletes' pocket rather than to the

23   agents' pocket.

24        Other bills -- I worked diligent on the transportation

13:47:15 25   bill.  And laid the foundation for the bill that we just --

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 120**

```
 1   they just passed this past session, which provides adequate
 2   funding to redo our roads and bridges, make them safe.
 3        I was the father of the seat belt bill.  I was the person
 4   who passed the bill that required you to wear a seat belt.  And
 5   when you look at statistics, they tell me that bill has saved
 6   thousands and thousands of lives this year in Alabama.
 7        I could go on, but I know we've got a time limit.
 8   BY MR. WALKER:
 9   Q    That's a good illustration.  Now, you just got back from
10   Korea, did you not?
11   A    Yes.
12   Q    What was the purpose of your trip to Korea?
13   A    I started an organization years ago called ACEEP --
14   Alabama Career Economic and Education Plan.  And we partner
15   with people in Korea to bring Korean students to Alabama
16   two weeks and learn about our culture.  We, in turn, sent 20
17   kids to Korea each year and let them learn the Korean culture
18   because Korea is a vital part of Alabama's economy.
19        ACEEP worked well for many years until the Korean
20   government withdrew their funding.  So we kept ACEEP together.
21   And now we're working on a plan to try to recruit qualified
22   math and science teachers from Korea to Alabama.
23        Today, we have about 52 vacancies with qualified math
24   teachers in Alabama, mostly rural Alabama.  We have P.E.
25   teachers teaching math, and that's just not good.  So if we can
```

The timestamps in the left margin are: 13:47:35 (line 5), 13:47:51 (line 10), 13:48:05 (line 15), 13:48:32 (line 20), 13:48:55 (line 25).

**Caster Plaintiffs' Exhibit 86, Page 121**

        1   work a program --

        2           THE COURT:  It would be worse if it was lawyers

        3   teaching math.

        4           THE WITNESS:  I cut you a little slack, ma'am.

13:49:09  5       But we hope to recruit -- and we worked out an MOU with

        6   the education commissioner that they will help us as we do this

        7   to pay the cost for those teachers to come and get acclimated

        8   into Alabama.  We think this may be a solution.

        9       I wish we could grow our own, but a student today

13:49:30 10   finishing college with a math degree can make three times more

       11   in the private sector than they can in the public sector, and

       12   they're just not willing to go into education.

       13       And if you're any what familiar with the recent report on

       14   Alabama education, we're at the bottom in math and science.  At

13:49:47 15   the bottom of all 50 states.  So we've got to think outside the

       16   box.  And I don't get paid for this.  It's just something I

       17   have an interest in.

       18       I went to Korea with a state superintendent, six

       19   legislators, and six superintendents to view their colleges,

13:50:05 20   their schools so that the superintendents who will eventually

       21   hire those people will feel comfortable in being able to retain

       22   them and bring them to America.  And we hope this will be an

       23   example for us and other states to follow.

       24   BY MR. WALKER:

13:50:18 25   Q    Thank you.  Let's talk about the legislature now, and in

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 122**

```
  1  particular, the reapportionment committee.  That's referred to
  2  as the joint committee.  What does that mean?
  3  A    Means you have equal number from the House and the Senate.
  4  Q    And how are they appointed?
13:50:31  5  A    The lieutenant governor appoints in the Senate.  The
  6  lieutenant governor and the speaker pro tem appoints members.
  7  And in the House -- the Speaker of the House appoints members.
  8  Q    And in years when the legislature is doing redistricting,
  9  I believe the committee has more people than in other years; is
13:50:51 10  that correct?
 11  A    That's correct.  They have one from each congressional
 12  district.  In the off years, when you're not doing the
 13  redistricting or re -- then you have three members from each
 14  House.
13:50:59 15  Q    And do the members of the committee include members of
 16  both parties?
 17  A    Correct.
 18  Q    And that was the case when the committee was looking at
 19  congressional redistricting in 2011?
13:51:11 20  A    Correct.
 21  Q    Who was the other cochair?
 22  A    In 2011, it was Senator McClendon, who was a House member.
 23  Q    At that time, he was a Representative McClendon?
 24  A    Yeah.  Now, he's in the Senate today.
13:51:25 25  Q    And what plans is the reapportionment committee
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 123**

1    responsible for giving to the legislature?

2    A    We have to do both the legislative, the House, and the

3    Senate, the congressional plans and the state board of

4    education plan.

13:51:42  5    Q    Might be losing that last one, the state board of

6    education plan?

7    A    Well, it may be.  That's to be seen.

8    Q    Does the reapportionment committee have a staff?

9    A    Yes.

13:51:55 10    Q    And what does the staff do?

11    A    The staff keeps records.  They keep all the -- they

12    collect all the census data.  They program it into their

13    computers.  They keep all the maps and the directions.

14         Not only do they work for us in the legislature, but they

13:52:12 15    also assist cities and counties in doing their redistricting

16    while they're doing theirs in the years that we're not.  But

17    they're basically responsible for producing the maps.

18         Because any piece of legislation dealing with

19    reapportionment has to first go to the reapportionment

13:52:36 20    committee and be programed into their system so that any

21    amendment, or any changes, or any substitutes would be

22    susceptible to having the correct boundaries and correct

23    numbers in them.

24    Q    So are you saying that the reapportionment committee has

13:52:45 25    the state's redistricting system?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 124**

```
         1    A     Correct.

         2    Q     And they operate that?

         3    A     Correct.

         4    Q     So can any member of the legislature go in and draw a

13:52:52 5    plan?

         6    A     They can draw it, but they first have to go to the

         7    legislative redistricting reapportionment committee and work

         8    with them to make sure that they are within the guidelines, and

         9    then it has to be put into their system.

13:53:06 10   Q     I didn't ask my question well.  If I'm a member of the

        11    legislature, and I think I wanted to draw let's say a

        12    congressional plan, do I have the ability or the right to go to

        13    the reapportionment office and say, work with me to draw a

        14    plan?

13:53:21 15   A     Yes, you do.

        16    Q     And will that plan be kept confidential until I say so?

        17    A     Yes.

        18    Q     Okay.  And I can also draw a plan outside of the

        19    reapportionment office; is that correct?

13:53:36 20   A     You can draw one, but you can't present it because it's

        21    first got to go to the reapportionment committee and be put

        22    into their system to ensure that what you have drawn does not

        23    lie outside the boundaries of where it should operating.

        24    Q     Okay.  So there are two ways to have a plan drawn; one is

13:53:55 25   on the state's redistricting system, and one is on some other
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 125**

```
  1   system.  But then it has to be imported into the state's
  2   redistricting system before it can be introduced?
  3   A    Correct.  If it has errors when it's presented to the
  4   redistricting committee, it would have to be corrected before
13:54:11  5   they can put it into the system.
  6   Q    And the legislative session of 2011, do you remember the
  7   dates of at that session?  Let me refresh your memory if I can.
  8        Do you remember if that was March 1 to June 9 to 2011?
  9   A    Sounds close to being correct.
13:54:28 10   Q    Okay.  Was the legislature passing plans --
 11   reapportionment plans during that 2011 legislative session?
 12   A    We were only passing congressional plans.
 13   Q    Were you also passing state board of education?
 14   A    Yes.
13:54:42 15   Q    Okay.  And why weren't you passing legislative plans that
 16   year?
 17   A    We were not passing legislative plans that year.
 18   Q    Right.  And my question is:  Why were you only passing the
 19   first two?
13:54:55 20   A    Oh, okay.  I'm sorry.
 21   Q    I'm sorry.
 22   A    The reason we were passing those was two reasons:  One was
 23   the election was pending because congressional districts run
 24   every two years.  So we had to get that plan finished so that
13:55:08 25   those people seeking office in those congressional districts,
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 126**

1    not only the incumbents, but anyone seeking office would know

2    they were living -- what district they lived in.  So it was

3    imperative we get that done within the time frame that we had.

4         And also we had certain members of the school board who

13:55:24 5    would be running in that same cycle.  We have eight school

6    boards, and they are on staggered terms.  Some of the -- some

7    of them were running, as well.  We had to get those ready, too,

8    so that at the upcoming election they would know the districts

9    and where to qualify and where to run from.

13:55:40 10   Q    So if the members of Congress, that is, members of the

11   House of Representatives were going to be running for their

12   seats again in 2012, when would they start campaigning for

13   those and raising funds for those seats?

14   A    Well, they would start -- they would start in early -- in

13:56:01 15   the early spring -- January, February, March, April time

16   frame -- in the time frame in which we were working.

17   Q    And so was that one of the reasons that you were concerned

18   to make sure that the bill was passed during that legislative

19   session so you wouldn't interfere with congressional elections?

13:56:15 20   A    That was one of the main ones.  And had we not gotten it

21   finished in that session, we would not have another session

22   before the election, so we would were faced with the Governor

23   having to call a special session and costing the taxpayers a

24   tremendous amount of money just to address that issue.  So the

13:56:33 25   idea was to save the taxpayers money to get them a district

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 127**

621

1    drawn where they know their boundaries.  And they began

2    campaigning on the time frame that would meet the schedule in

3    which the election would be held.

4    Q    So did the legislature pass new congressional districts in

13:56:49 5    2011?

6    A    Yes.

7    Q    And those are the districts that we're talking about

8    today, in fact.

9         Do you know how the districting plan that was ultimately

13:56:59 10   passed by the legislature came to be?

11   A    Yes.

12             MS. MADDURI:  Objection, Your Honor.  We object to

13   this entire line of questioning for lack of relevance.

14             THE COURT:  Overruled.

13:57:11 15            MS. MADDURI:  May I explain my objection?

16             THE COURT:  This whole case is about the redistricting

17   in 2011, is it not?

18             MS. MADDURI:  It is, Your Honor.  But what actually

19   happened in 2011, the understandings of the intentions or the

13:57:26 20   beliefs or even the information available to the legislators

21   who drew the map are not relevant to the Section 2 results base

22   plan.

23             THE COURT:  Overruled.

24   BY MR. WALKER:

13:57:42 25   Q    Senator Dial, can you please tell the Court how the plan

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 128**

1  that came to be passed as a 2011 Alabama congressional plan,

2  came into existence?

3  A    The plan that we eventually passed was developed by a

4  gentleman named Randy Hinaman, was retained by the

13:58:02  5  congressional delegation.  All the congressional delegation

6  members I understand retained him to begin to work and draw a

7  plan that they would agree upon.

8       He brought to me a plan and told me that they had agreed

9  upon this plan, the seven sitting congressional members, and

13:58:19 10  this was the plan they wanted to go with.  I, in turn, to be

11  assured that there was no dissension among the members of

12  Congress, asked him to get a conference call together for all

13  the congressional members.

14       That conference call was conducted with me in my office in

13:58:37 15  Montgomery.  All the congressional delegates were --

16  congressional members on that call, I think, except one.  I

17  can't be sure.  But I'm almost sure that there may have been

18  one that was not.

19       I went down the line.  And each one of those assured me

13:58:57 20  that --

21            MS. MADDURI:  Objection, Your Honor.  Hearsay.

22            THE COURT:  Overruled.

23            THE WITNESS:  They assured me on the phone that they

24  were okay and the plan was something that we could pass.

13:59:12 25       And so with that amount of information and that

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 129**

623

```
            1   confidence, I introduced the plan, and the plan was eventually

            2   passed.

            3   BY MR. WALKER:

            4   Q     Did Representative Sewell participate in that conference

13:59:24    5   call?

            6   A     Yes.

            7   Q     Did you ask her if she supported the plan and supported

            8   her district as drawn?

            9   A     I asked her.  I said, is there any objection to this plan,

13:59:32   10   and she said no.

           11   Q     Okay.  And I'll ask you to look at the map which -- I mean

           12   to look at the screen in front of you, which is showing

           13   Plaintiffs' Exhibit 15, which is the 2011 plan.  And I will ask

           14   you is that the congressional plan that was enacted and passed

13:59:55   15   into law?

           16   A     Yes.

           17   Q     Thank you.

           18         Do you recall at the start of redistricting process --

           19   there are, of course, population shifts that occurred over the

14:00:13   20   decades since the last census.  That's the whole reason for

           21   redistricting?

           22   A     Yes.

           23   Q     Do you recall how many people needed to be moved into

           24   Representative Sewell's district in order to comply with the

14:00:28   25   one person one vote equal population requirement?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

Caster Plaintiffs' Exhibit 86, Page 130

624

```
 1  A    Approximately 70,000.  I don't know the exact number, but
 2  I remember it was somewhere near 70,000.
 3  Q    Was that -- I actually think it was 700 -- almost 80,000.
 4  Do you recall?
```
14:00:45
```
 5  A    Okay.  I knew it was in the 70s, somewhere in that
 6  neighborhood, maybe.
 7  Q    Do you recall if that was the largest deviation of all the
 8  plans?
 9  A    Yes.
```
14:00:55
```
10  Q    Okay.  Did you rely on Representative Sewell to develop a
11  district that she could be reelected in?
12  A    I was certain that she had reviewed the plan and felt
13  comfortable with it and that she could be reelected in that
14  district.
```
14:01:22
```
15  Q    What were you and members of the committee concerned that
16  the legislature had to pass a plan that could get precleared by
17  the Attorney General under Section 5 of the Voting Rights Act?
18  A    Correct.
19  Q    Why was that important?
```
14:01:39
```
20  A    Well, if it's not precleared, we've got to go back and do
21  a new plan if it fails to be cleared.
22       So I had two objectives:  One was I had to have a plan I
23  could pass through both houses of the legislature, because this
24  is a bill just like any other bill, and it has to receive
```
14:01:58
```
25  them -- it has to be introduced.  It has to go to committee,
```

**Caster Plaintiffs' Exhibit 86, Page 131**

1  has to get favorable report in the committee, has to come back

2  to the floor of the legislature, has to pass both houses in the

3  same form.  That was my first objective.  If I can't pass it

4  there, then I'm not going any further.

14:02:13  5  And the second was I had to have a plan that we felt

6  comfortable would pass the scrutiny of the Justice Department

7  and get precleared so it could move on with the election.

8  Q    What would have been the consequence if Justice had not

9  precleared that plan?

14:02:27 10  A    I would assume that they would send it back and ask us to

11  draw another plan, and we would go to a special session.

12  Q    And that would -- that would interrupt the schedule for

13  congressional elections, would it not?

14  A    It certainly would have -- it would have changed the

14:02:46 15  process in which -- of course, it depends on how soon they did

16  and if we can get an another special session and get another

17  bill through.

18  But it certainly would disrupt the plans that -- where

19  they had already starting money, where they knew where the

14:03:01 20  district lines were, and they knew what people they would be

21  representing.  So it would certainly disrupt the plan for many

22  congressional members standing.  And anyone who had intentions

23  of running against one of those people would be certainly --

24  their intentions would be delayed, as well.

14:03:16 25  Q    And if the legislature had had to pass a new plan, that

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 132**

```
 1  plan also would have had to be precleared by the Attorney

 2  General, correct?

 3  A    Correct.

 4  Q    And there was no guarantee that a second plan would be

 5  precleared, was it?

 6  A    Correct.

 7  Q    So it was important to get it done right the first time?

 8  A    Correct.

 9  Q    During that process, when the -- when the proposal from

10  the representatives of their districts was under consideration,

11  did -- and until the bill was passed, did any member of the

12  legislature tell you that they thought it was possible to draw

13  a congressional plan with two majority black districts?

14  A    During the session?

15  Q    Yes, sir.

16  A    No.

17  Q    Do you know Joe Reed?

18  A    Very well.

19  Q    There was some testimony earlier, and I think you may have

20  been in the court when I asked Senator Sanders about Joe Reed.

21  And I asked him if he was considered or at least sometimes

22  referred to as the dean of redistricting in Alabama.  Do you

23  recall that?

24  A    Correct.  And you were correct.  You were on spot.

25  Q    He has been involved in every redistricting effort in a
```

The timestamps in the left margin are: 14:03:29 (line 5), 14:04:02 (line 10), 14:04:23 (line 15), 14:04:32 (line 20), 14:04:46 (line 25).

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 133**

```
         1  significant way since at least 1980; would that be correct?
         2  A    That's correct.
         3  Q    Has Joe Reed over the course of his career been an
         4  effective advocate for the interests of African-Americans in
14:05:05 5  the legislature?
         6  A    Absolutely.
         7  Q    Have you ever known him to leave a lot on the table, in
         8  terms of his negotiated positions?
         9  A    No.  Never.  And I've negotiated with him many times.
14:05:17 10 Q    Did Joe Reed ever come to you and say, Senator Dial, I
        11  think we can draw two majority black districts, and I want that
        12  to do?
        13 A    No.
        14 Q    Did any other African-American leaders come to you and say
14:05:32 15 that?
        16 A    No.  Not until the session was over when I was advised of
        17  a plan that had been drawn after -- after we'd already passed
        18  this bill.
        19 Q    Was that a plan drawn by Mr. McClammy -- excuse me -- by
14:05:53 20 Representative McClammy?
        21 A    It was presented by Representative McClammy.  It was
        22  presented to the reapportionment office.  And the clerk of the
        23  committee called me and said, We've just got a new plan in.
        24  And so I went down to review the plan.  And she said, It's a
14:06:07 25 congressional plan, and it creates a second minority district,
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 134**

1    and that was the intent of it.  That was as far as I went

2    because we'd already passed the other plan.  It had already

3    been signed by the Governor and gone forward.  So that was the

4    extent of that.

14:06:23  5        The only conversation I had later on with Representative

6    McClammy was in the hall where he said to me, I've introduced a

7    plan.  I said, Well, you know it's too late.  We've already

8    passed this plan.

9    Q    When he said introduced, did he mean introduced into the

14:06:37 10   reapportionment office or introduced into the legislature?

11   A    Introduced in the reapportionment office.

12   Q    I will ask you to look, Senator Dial, at what's on your

13   screen now.  And I will represent that this is Defendant's

14   Exhibit 3, page 194, and ask you if that is the plan that

14:06:58 15   Representative McClammy submitted to the reapportionment office

16   with two majority black districts?

17   A    I understand it is.  I didn't review it that close at that

18   time in the office.  But since that time, I've reviewed it, and

19   this is the McClammy plan.

14:07:15 20   Q    Senator Dial, would you describe District 7 as drawn in

21   the McClammy plan to the Court?

22   A    Well, District 7 extends all the way up into what we call

23   the Tennessee Valley area.  It goes all the way over into

24   Madison, Huntsville area.  It gets Limestone and up all the way

14:07:43 25   in and picks up part of Lauderdale, which is totally removed

629

1   from the basic foundation of District 7, which was in Dallas

2   and Jefferson and Tuscaloosa.

3   Q     So District 7 extends all the way from Washington County

4   in south Alabama up to Madison County in north Alabama?

14:08:10  5   A     Correct.

6   Q     Does it keep together communities of interest?

7   A     Definitely not.

8   Q     Does it preserve the cores of existing districts?

9   A     No.

14:08:20 10   Q     Is it compact?

11   A     No.

12   Q     Look at District 2.  And would you describe District 2 for

13   the Court, please?

14   A     District 2 is the congressional district I live in.  And

14:08:36 15   it goes from -- it almost extends the whole length of the

16   state.  And it takes away community of interest.

17         It takes away -- it's just a district that's totally

18   disconnected in three or four different areas because there's

19   not even a major highway you can go from one end of that

14:08:56 20   district to the other without crossing into other districts.

21   It's just not compatible with anything that -- that Congressman

22   Rogers or anybody running that district would be -- be happy at

23   all with.

24   Q     I'm sorry.  Go ahead, sir.

14:09:11 25   A     Go ahead.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 136**

630

```
 1  Q    Has there ever been a District 2 that looked anything like
 2  that?
 3  A    Never; not that I've seen.
 4  Q    And I ask you one more time, Senator Dial, to look at
14:09:23  5  District 3 and describe where that begins and where that ends,
 6  please.
 7  A    It appears that District 3 begins in Calhoun County and
 8  goes almost to Mobile meandering through the eastern part of
 9  the state through Talladega County and then down part of the
14:09:45 10  Black Belt and on into -- it even gets a part of Clarke County.
11       So that's totally -- when you talk about communities of
12  interest and governmental identity that associates with each
13  other, that's totally disconnected.
14  Q    Is it compact?
14:10:06 15  A    No.
16  Q    Does it preserve the core of any existing districts?
17  A    No, sir.
18  Q    Let me ask you the same questions about District 2 as
19  presented in this plan.
14:10:16 20       Does it respect any community of interests that you can
21  identify?
22  A    Which district?
23  Q    District 2.
24  A    Well, there are some.  But when you get south of the
14:10:29 25  interstate, you have moved into a totally different area of
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 137**

```
  1   interest political subdivisions or -- as I said in the
  2   deposition, you even get -- you divide the state, and you take
  3   away that interest, and you take away those areas that have
  4   universities that people coalish around that become a very
14:10:53 5   important part of those communities that keep them together.
  6   And it divides that up, as well.
  7   Q    And would you consider District 2 compact?
  8   A    No.
  9   Q    If this plan had been introduced into the legislature in a
14:11:14 10   timely manner, could you have passed it?
 11   A    No.
 12   Q    Now, how can you say that, Senator Dial?
 13   A    I can say first is I don't believe any of the members of
 14   the sitting congressional delegation would have supported this.
14:11:28 15   Q    Why would that matter?
 16   A    That matters in the fact that they mobilize their
 17   legislators, their House members, and their senators to be
 18   opposed to it and make amendments to it, and, therefore, my
 19   opportunity to pass it through and get a majority is greatly
14:11:44 20   diminished.
 21   Q    Any other considerations?
 22   A    That would be the main one.  And I'm not too sure -- of
 23   course, I can't answer for Justice, but I'm not too sure you
 24   can get this precleared with Justice because my understanding
14:12:02 25   it regresses District 7 in the minority population to a point
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 138**

1  of about 51, 50 percent.

2  Q    Let me ask you about -- oh, I'm sorry.

3  A    Go ahead.

4  Q    Let me ask you about the people up in Madison County.

14:12:18 5  Independent of what any congressperson wants, do you think

6  that, for example, the legislators across north Alabama would

7  have supported this plan?

8  A    No.  The -- as you know, geographically the TVA area is

9  always considered the north part of Alabama, and they always

14:12:36 10 have so much of common interest because of the TVA area and

11 that portion of economic development that they are very -- very

12 attuned to what goes on there, and that gets them a

13 congressman, who would be basically from Dallas County who

14 would not be acceptable to them not because it's a minority,

14:12:56 15 but because it's geographically.

16     They would not accept it if District 2 ran into the

17 Tennessee Valley area because they want a congressman from that

18 area because you have Huntsville and NASA and all the things

19 that's going on up there.  And they're very attuned to having

14:13:13 20 someone who is really supportive of that concept of what's

21 being developed in the Huntsville area.

22 Q    And the same question for south Alabama.  Independent of

23 what the members of the congressional delegation might want or

24 not want, would the senators and representatives from south

14:13:33 25 Alabama have supported this plan?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 139**

633

```
      1   A     No.  They would have been very similar to the people in
      2   the north Alabama and the people in east Alabama.  I don't
      3   see -- I don't see any -- any group of -- there might be some
      4   individual legislators with some ideas that they like this plan
14:13:53 5   because it would put them in a district that they might run for
      6   Congress from, but I don't see any group of legislators
      7   supporting this in any manner.
      8   Q     Thank you.
      9         Earlier I put up on the table in front of you a copy of
14:14:25 10   the reapportionment guidelines.  Do you see those?
     11   A     Yes.
     12   Q     And that's part of exhibit -- Defendant's Exhibit 3, pages
     13   260 through 275.  And I'd like to ask you, please, sir, to turn
     14   to page 267 and let me know when you get there.  I've got it up
14:14:54 15   on the screen if you want to look there.
     16   A     Okay.  I see it.
     17   Q     Okay.  And this is the paragraph that defines communities
     18   of interest.  Are you familiar with that?
     19   A     Correct.  Yes.
14:15:04 20   Q     And it talks about governmental and regional interests?
     21   A     Yes.
     22   Q     And it talks about boundaries of county municipalities and
     23   voting precincts.
     24         Let me ask you this:  Has the legislature consistently
14:15:24 25   understood this guideline to include the concept of preserving
```

**Caster Plaintiffs' Exhibit 86, Page 140**

634

1   the cores of existing districts?

2   A     Yes.  And that's pretty well pointed out in governmental

3   regions.

4   Q     Okay.

14:15:36 5   A     And the core in which you work from.  You -- in

6   reapportionment congressional district, you take the core from

7   which you are already existing and work from there rather than

8   try to create new districts and create havoc among the system.

9   Q     You've talked about the importance of being able to pass a

14:15:58 10  bill.  And I think is it fair to say, if you can't pass a bill,

11  you can't do anything?  Could you pass a legislative

12  redistricting bill -- excuse me -- a congressional

13  redistricting bill that does not preserve the cores of existing

14  districts?

14:16:16 15  A     No.

16  Q     Is that just a reality of life --

17  A     It is.

18  Q     -- in the legislature?

19  A     It is.  And it boils down to those legislators within that

14:16:23 20  district and those constituents that they are going to have

21  that's going to impact upon how their vote is and why they

22  should or should not vote for it.  It's not going to be simply

23  left up to that individual legislator.

24        But the constituency, the governmental identities within

14:16:42 25  his district is going to have a big influence on how he or she

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 141**

```
      1  votes on any redistricting plan.
      2  Q    Look again, if you will, Senator Dial, at Plaintiffs'
      3  Exhibit 15, which is the 2011 plan that you have testified was
      4  created by the members of the House of Representatives of
14:17:01 5  Congress and passed by the legislature.
      6       And look in particular at District 7, which you've
      7  testified was drawn by the consultant hired by the members of
      8  Congress, including Representative Sewell and approved by her.
      9       And let me ask you this:  What if you had gone back to
14:17:26 10 Representative Sewell and said, Representative Sewell, we
     11  don't -- we don't like your district.  We've got this
     12  alternative map with two minority districts, or with some other
     13  alternative map, and we're going to pass that instead.  What do
     14  you think would have happened?
14:17:43 15       MS. MADDURI:  Objection, Your Honor.  Calls for
     16  speculation.
     17            MR. WALKER:  Your Honor, I'm asking for his --
     18            THE COURT:  Overruled.
     19            THE WITNESS:  I think that it -- of course, it depends
14:17:54 20  a lot.  But if we're going to change her district from what
     21  she's agreed to, then she's immediately going to go to the
     22  other members of the congressional delegation and say we had an
     23  agreement.  You're breaking our agreement.
     24       And she would begin to ignite or get her people who are
14:18:13 25  close to her and in her delegation, senators and
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 142**

1    representatives begin to do an alternative plan to either put

2    it back like she had it or get them to try to kill the bill on

3    the floor.

4    BY MR. WALKER:

14:18:27  5    Q    In other words, is it -- was it your judgment at the time

6    that if you had tried to change her district materially, it

7    would have resulted in a bill that could not be passed?

8    A    Let's be practical.  The first thing we knew we had to do

9    was make sure that she was happy with her district.  If she's

14:18:43 10   not happy with her district, then we're going to have

11   difficulty, tremendously difficulty in getting any kind of plan

12   through the legislature.

13   Q    Did you also have some concern that she had friends in

14   Washington that she could call?

14:18:55 15   A    Well, you know, I understand that she was Ms. Obama's

16   roommate in college certainly would have an impact on her, and

17   then the U.S. Attorney General, who was a classmate of hers at

18   Harvard, was certainly someone she could call on.

19        So, you know, basically as we said, we understood the

14:19:16 20   practicality that she had to be okay with any plan that we

21   passed.

22   Q    Let me show you -- and I believe I put up before you the

23   four alternative maps proposed by the plaintiffs.  Do you see

24   those, sir?  And I'll show you right here --

14:19:48 25        THE COURT:  What's the exhibit number, please?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

637

BY MR. WALKER:

Q    Plaintiffs' Exhibit 61, which is Revised Plan 1; and
Plaintiffs' Exhibit 67, which is Revised Plan 2; Plaintiffs'
Exhibit 73, which is Revised Plan 3; and Illustrative Plan 4,
which is Plaintiffs' Exhibit 40.  Do you see those, sir?

A    Yes.

Q    Now, all of those have District 1 that extends from Mobile
County to Houston County.  So I'll just use Plaintiffs'
Exhibit 61, Revised Plan 1, as an example.

     Do you see that, sir?  It's on the screen in front of you?

A    Yes.

Q    Okay.  Now, let me ask you:  Is that the plan that was
passed by the legislature?

A    No.

Q    Is that the plan that was agreed upon by the members of
Congress?

A    No.

Q    Does District 1 respect well-established communities of
interest in Alabama?

A    No.

Q    Can you explain your answer, please?

A    Mobile and Baldwin County are very closely connected, only
separated by the river and the bay flowing between them, and
they have a very strong economic ties between those two areas.

     When you go over to eastern Alabama, you've got Dale and

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 144**

638

Coffee, and Geneva, and Henry, and Houston, which is part of
the Wiregrass area, which has the military base there at
Enterprise, and it also is very closely connected in the
Wiregrass.  They have the Wiregrass Chamber of Commerce.  They
14:21:34  have the Wiregrass Economic Development Council.  And so all of
those identities are totally separated.

And, again, you have no major road to get from Baldwin.
If you are congressman, you've got to go into Florida to get to
your district.  Mainly, there's no major thoroughfare through
14:21:54  there.  You could go I-10 and then get off and go up to
Houston, I guess.  But you'd have to travel a long way through
Florida to get to your district.

So it's just not practical.  And there's no economic ties
between those two geographical areas.

14:22:08  Q    Let me show you Plaintiffs' Exhibit 15 again, which is the
plan that was passed, and ask you about District 2 as passed.

Is there a community of interest or communities of
interest between the Wiregrass area and the Montgomery area?

And I will start by asking you:  Where are the military
14:22:38  bases?

A    Well, the military bases at Maxwell and Gunter in
Montgomery and the military base in Enterprise down in Coffee
County.  And that's the two major military facilities in our
state, and they're very closely related.

14:22:53  If you're going to represent the military -- and that's

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 145**

639

```
  1  why that congressman from that district has always been on the
  2  military affairs committee, because it has the two major
  3  military operations within their congressional districts.  And
  4  it gives them a bond and a common interest in supporting the
14:23:10 5  military in that district.
  6  Q    And do you happen to know -- where is Maxwell Air Force
  7  Base?
  8  A    It's in Montgomery.
  9  Q    And does Maxwell Air Force Base, as we use that term, now
14:23:22 10  include what we used to call Gunter Air Force Base?
 11  A    Yes.
 12  Q    Two separate locations within the city of Montgomery?
 13  A    Yes.
 14         THE COURT:  On two different sides of town, too.
14:23:31 15         THE WITNESS:  Correct.  Two different sides of town.
 16  BY MR. WALKER:
 17  Q    And do you know whether or not people who live and work
 18  and are stationed at Maxwell and Gunter live in Montgomery,
 19  Autauga, and Elmore counties?
14:23:44 20  A    Many of them live in the Prattville area and the Elmore
 21  area and drive into -- and the way you can verify that is be on
 22  the interstate at 7:30 in the morning and at 5:30 in the
 23  afternoon.
 24  Q    I'm on my bike on Bell Street at about 6:00 o'clock in the
14:24:05 25  morning.  I can tell you they're all coming in from Elmore
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 146**

| | |
|---|---|
| 1 | County. |
| 2 | And within the Wiregrass, where is the Army base? |
| 3 | A   It's in Coffee at Enterprise. |
| 4 | Q   Okay.  And are the counties around Coffee and between -- |
| 14:24:19 5 | A   It's in Dale.  I'm sorry.  Enterprise is in Dale. |
| 6 | Q   Are the counties that surround Dale, do they have |
| 7 | defense-related industries located in those counties? |
| 8 | A   They do.  And between that and Montgomery and Troy, you |
| 9 | have -- you have two major military suppliers in those two -- |
| 14:24:40 10 | in that area alone.  And a lot of the support for military in |
| 11 | that area has grown up around the base. |
| 12 | Q   And do the people who -- I'm having a senior moment.  I |
| 13 | can't think of the name of the base down there. |
| 14 | A   Fort Rucker. |
| 14:24:57 15 | Q   Fort Rucker.  Thank you. |
| 16 | Do the people who live and work at Fort Rucker live in |
| 17 | Dale County and the counties that surround that? |
| 18 | A   Yes.  And Houston and -- Dothan and Houston counties are |
| 19 | major larger area of where they go to do most of their trade. |
| 14:25:12 20 | It's the largest Metropolitan area in that area.  And that's |
| 21 | their center of trade for that area. |
| 22 | Q   That's also where they go for their health care unless |
| 23 | they go on to -- |
| 24 | A   Yeah.  On base.  Yeah. |
| 14:25:29 25 | THE COURT:  Are there major roads between -- what were |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 147**

```
 1    we looking at -- Montgomery and Houston County?
 2              THE WITNESS:  Yes, ma'am.  431 is the major highway,
 3    and 280 -- I believe 280 is another one.  And then the 2 --
 4    it's -- oh, it's the Montgomery to Panama City.
 5              THE COURT:  231?
 6              THE WITNESS:  It's 231.  Yes, ma'am.  I was just on it
 7    Saturday.
 8              MR. WALKER:  Your Honor, may I approach Senator Dial
 9    to give him this?
10              THE COURT:  Yes, you may.
11    BY MR. WALKER:
12    Q    Senator Dial, I'm going to give you what's marked as
13    Defendant's Exhibit 1, and I will ask you to look at it,
14    please.  Take a moment and look at it while I walk back to the
15    podium.
16         And I will represent to you that it shows Alabama's
17    congressional districts on -- this is Defendant's Exhibit 1,
18    and it's page 3017.  On 3017, are the congressional districts
19    that were passed in 2011; is that correct?
20    A    Correct.
21    Q    And then if you'll look at the next page, 3018, and I'll
22    ask you if you know whether or not those are the congressional
23    districts from 2020?
24              THE COURT:  From what?
25    BY MR. WALKER:
```

14:25:52 — line 5
14:26:04 — line 10
14:26:14 — line 15
14:26:41 — line 20
14:26:58 — line 25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 148**

|   |   |   |
|---|---|---|
| | 1 | Q      Excuse me.   From 2002? |
| | 2 | A      2002. |
| | 3 | Q      I'm a little dyslexic.   2002. |
| | 4 | A      Yes. |
| 14:27:05 | 5 | Q      And I will represent to you that the next page, 3019, is |
| | 6 | the 1992 congressional districts.   Do you see that? |
| | 7 | A      Yes.   Yes. |
| | 8 | Q      And the next page I will represent to you is the 1980 |
| | 9 | congressional districts.   That's page 3019.1? |
| 14:27:27 | 10 | A      Yes. |
| | 11 | Q      And then let's take it back to 1970, page 3020, the 1970 |
| | 12 | congressional districts.   Do you see that? |
| | 13 | A      Yes. |
| | 14 | Q      From looking at these maps, can you form a conclusion as |
| 14:27:43 | 15 | to whether or not the Alabama Legislature has consistently |
| | 16 | sought to preserve the cores of existing districts when it |
| | 17 | reapportioned or redrew the Alabama congressional districts? |
| | 18 | A      Yes.   It's quite obvious that they used the same core and |
| | 19 | only extended where they had to extend the boundaries because |
| 14:28:00 | 20 | of gain or loss in population. |
| | 21 | Q      Do you know Terri Sewell, sir? |
| | 22 | A      Yes. |
| | 23 | Q      Do you believe that Terri Sewell would ask the legislature |
| | 24 | to pass a plan that discriminated against African-Americans? |
| 14:28:16 | 25 | A      No. |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

| | |
|---|---|
| 1 | Q    Do you believe it's appropriate when you're conducting |
| 2 | redistricting to rely on the advice of an African-American |
| 3 | Congress person as to what she needs based on her experience to |
| 4 | win in her district? |
| 14:28:33  5 | A    Yes. |
| 6 | Q    Did she ever tell you that you should reduce the number of |
| 7 | African-Americans in her district? |
| 8 | A    No. |
| 9 |      MS. MADDURI:  Objection.  Hearsay, Your Honor. |
| 14:28:47 10 |      THE COURT:  Overruled. |
| 11 | BY MR. WALKER: |
| 12 | Q    Were you aware that in the past the Department of Justice |
| 13 | had refused to preclear plans where the percentage of black |
| 14 | voters had been lowered? |
| 14:29:03 15 | A    Yes. |
| 16 | Q    Did you have an understanding at the time the |
| 17 | congressional plan was being passed from talking to other |
| 18 | African-American politicians of what their belief -- of their |
| 19 | belief of what was necessary, in terms of percentage of the |
| 14:29:30 20 | black population for them to have an opportunity to be |
| 21 | reelected? |
| 22 | A    Well, the only -- as Senator Sanders testified is his |
| 23 | testimony to the legislative delegation, as we were drawing |
| 24 | legislative districts in his district, when he informed us that |
| 14:29:47 25 | he thought it needed to be at least 65, 62 to 65 percent. |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 150**

644

```
       1  Q    Thank you very much, Senator Dial.
       2  A    Thank you.
       3            THE COURT:  Cross?
       4                      CROSS-EXAMINATION
14:30:01 5  BY MS. MADDURI:
       6  Q    Good afternoon, Senator Dial.
       7  A    Good afternoon.
       8  Q    I don't know if you know that we've met, but I was on the
       9  other side of the video conference when we took your
14:30:32 10 deposition.
      11  A    Okay.
      12  Q    So I could see you, but I don't think you could see me.
      13  A    I could.
      14  Q    Senator, Mr. Walker showed you some of the illustrative
14:30:52 15 plans that plaintiffs have proposed in this case, correct?
      16  A    Correct.
      17  Q    And I understand that you have certain criticisms of the
      18  proposed plans, correct?
      19  A    Correct.
14:31:01 20 Q    And one of those criticisms is that it breaks up
      21  communities of interest, correct?
      22  A    Correct.
      23  Q    Is it fair to say that you view the meaning of a community
      24  of interest as focused on economic ties?
14:31:15 25 A    Not solely, but that's part of it, yes.
```

**Caster Plaintiffs' Exhibit 86, Page 151**

645

```
          1   Q    Senator, do you recall having your deposition taken in
          2   this case?
          3   A    Yes.
          4   Q    And you were asked about that issue, I think?
14:31:31  5   A    Yes.
          6         MS. MADDURI:  Heather, can you pull up page 49?
          7   BY MS. MADDURI:
          8   Q    Senator, I will direct your attention to line 18.
          9   A    Yes.
14:32:15 10   Q    You were asked:  Is it fair to say that a community of
         11   interest is based on economic factors, then?  And you said,
         12   Very much economic interests, yes.
         13   A    Yes.  I said very much.  I didn't say that was all.
         14   Q    And Mr. Walker also asked you about the reapportionment
14:32:50 15   committee's guidelines on redistricting, correct?
         16   A    Correct.
         17   Q    And you were involved in drafting and adopting those
         18   guidelines, correct?
         19   A    Correct.
14:33:00 20   Q    And you adopted a set of guidelines in 2011 prior to
         21   passing the plan that we're talking about here, correct?
         22   A    Correct.
         23         MS. MADDURI:  Heather, can you pull up Plaintiffs'
         24   Exhibit 84 at page 4?  Actually can you stay on the first page
14:33:26 25   for a moment?  Sorry.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 152**

646

BY MS. MADDURI:

Q    Are these those guidelines, Senator, to the best of your

knowledge?

A    Best of my knowledge, yes.

14:33:33  Q    And then we can turn to page 4.

Is it fair to say that the reapportionment committee

worked to comply with these guidelines when enacting the 2011

plan?

A    Yes.

14:33:53  Q    Is it fair to say the reapportionment committee also

worked to comply with these guidelines when enacting the state

board of education plan?

A    Yes.

Q    And the guidelines, they outline a number of factors that

14:34:11  should be considered when redistricting, correct?

A    Correct.

Q    And one of those factors is communities of interest, yes?

A    Correct.

Q    And I will draw your attention to paragraph -- it looks

14:34:26  like paragraph B on this page towards the top.

A    What page?

Q    Oh, it's actually on your screen, or would you prefer a

hard copy?

A    That's okay.  I can see it.

14:34:36  Q    Are these the -- is this the definition that the committee

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 153**

```
 1  enacted in 2011?
 2  A    Correct.
 3  Q    And does that definition -- that definition does not
 4  include economic interests, correct?
14:34:53  5  A    Well, it would come under recognized similar --
 6  similarities of interests would be economic.
 7  Q    But it does not recognize economic interests, correct?
 8  A    Well, it -- if you're -- it's not spelled out there, but
 9  when you talk about recognizing similarities of interests,
14:35:20 10  certainly would be economics.
11  Q    Would you agree that it's not always possible to protect
12  communities of interest?
13  A    I agree.
14  Q    And Mr. Walker, I think, showed you another set of these
14:35:41 15  same guidelines.
16          MS. MADDURI:  So, Heather, would you mind putting up
17  Defendant's Exhibit 3 at page 267 in addition to this?
18  BY MS. MADDURI:
19  Q    Senator, I think Mr. Walker talked to you about the page,
14:36:29 20  the page 267 of Defendant's Exhibit 3 that's on the right side
21  of your screen.  And I want to draw your attention to letter D
22  at the bottom of that page.  So these guidelines were in place
23  prior to the ones you adopted in 2011, correct?
24  A    Correct.
14:36:49 25  Q    And these plans noted that the plan, the redistricting
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 154**

1   plan, whichever one it was would attempt to preserve the cores

2   of existing districts, correct?

3   A    Correct.

4   Q    And the guidelines the committee passed when you were the

14:37:04 5   co-chair in 2011 did not contain that requirement, correct?

6   A    I'm -- I can't answer that.

7   Q    I can draw your -- excuse me.  Senator Dial, in 2011, you

8   were co-chairman of the reapportionment committee, correct?

9   A    Correct.

14:38:03 10   Q    And you were responsible for helping to prepare the

11   congressional district map that was adopted, correct?

12   A    Correct.

13   Q    But you were not actually involved in drawing the map,

14   correct?

14:38:12 15   A    Correct.

16   Q    The congressional delegation hired an outside consultant

17   for that, correct?

18   A    Correct.

19   Q    And that consultant his name, I believe, was Randy

14:38:23 20   Hinaman, correct?

21   A    Correct.

22   Q    And Mr. Hinaman was not hired by the reapportionment

23   committee, correct?

24   A    Correct.

14:38:29 25   Q    And Mr. Hinaman did not consult with the reapportionment

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 155**

```
 1   committee in preparing the 2011 plan, correct?

 2   A    Correct.

 3   Q    Mr. Hinaman brought you the congressional plan he

 4   prepared, correct?

 5   A    Correct.

 6   Q    And that plan was adopted with minimal changes; is that

 7   correct?

 8   A    Correct.

 9   Q    And Mr. Hinaman was hired by the congressional -- sorry.

10   I already asked you that.

11        You also discussed during your testimony a call that you

12   had with the congressional delegation regarding the 2011 plan.

13   That call involved, I think you said six of the seven members

14   of the delegation, correct?

15   A    Correct.  I'm not sure if one of the congressmen was on

16   it, Congressman Aderholt.  I think he was, but I'm not sure.  I

17   think he was on and had to leave.  But I just can't be certain

18   on that.

19   Q    Understood.  That call was quite brief, correct?

20   A    Relatively brief, yes.

21   Q    And, Senator, you've never had any other communication

22   with Congresswoman Sewell regarding the 2011 plan, correct?

23   A    Correct.

24   Q    Congresswoman Sewell never told you anything about how to

25   comply with the Voting Rights Act on that call, correct?
```

Timestamps: 14:38:42 (line 5), 14:38:56 (line 10), 14:39:14 (line 15), 14:39:32 (line 20), 14:39:54 (line 25)

650

```
           1  A     Correct.
           2  Q     And she never told you that she thought the black voting
           3  age population in her district needed to comply with Section 2
           4  of the Voting Rights Act, correct?
14:40:09   5  A     Correct.
           6  Q     And she never told you her thoughts on what the Black
           7  Voting Age Population would need to be to comply with Section
           8  2, correct?
           9  A     Correct.
14:40:25  10  Q     And, Senator Dial, the committee did not do any analysis
          11  to determine whether a second black congressional district --
          12  black majority congressional district could have been created
          13  in 2011, correct?
          14  A     Correct.
14:40:39  15  Q     The committee did not consider whether it was possible to
          16  draw that second majority black district in 2011, correct?
          17  A     Correct.
          18  Q     The committee did not actually consider any plans that
          19  proposed a second majority-minority district, correct?
14:40:58  20  A     Correct.
          21  Q     And neither you nor anyone else on the committee did any
          22  analysis to determine the percentage of black voters that
          23  needed to be in CD 7 in order for black voters to be able to
          24  elect their candidates of choice, correct?
14:41:12  25  A     Correct.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0080/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 157**

651

```
 1   Q     And you did not review the election history of
 2   Congressional District 7 prior to adopting the plan, correct?
 3   A     Correct.
 4   Q     And you're not aware of anyone else on the committee who
 5   reviewed the election history of Congressional District 7 prior
 6   to adopting that plan, correct?
 7   A     Correct.
 8   Q     You also testified earlier that there were a number of
 9   voters that had to be -- or citizens who had to be added to CD
10   7 between the -- as a result of the population shifts between
11   2001 and 2011.  Do you remember that?
12   A     Correct.  Yes.
13   Q     But you were not actually aware of the racial composition
14   of the voters that were added to CD 7 to meet that gap,
15   correct?
16   A     Correct.  We just tried to keep counties contiguous as
17   possible.
18   Q     You would agree that it would have made sense, if
19   necessary, to extend Terri Sewell's district into Mobile,
20   correct?
21   A     Say again.
22   Q     You would agree that it would have made sense to extend
23   Terri Sewell's district into Mobile 7 -- into Mobile in CD 7,
24   correct?
25   A     It would have made sense -- if she had approved the
```

14:41:28 (line 5)
14:41:43 (line 10)
14:42:02 (line 15)
14:42:28 (line 20)
14:42:38 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 158**

```
      1   already plan that we had given, it would not make sense to

      2   deviate from what she had already approved and to create

      3   opposition to the plan that the seven-member legislative

      4   delegation had approved.

14:43:00 5      So to expand anything above what they had given me would

      6   have created opposition to the plan as we saw it.  And so it

      7   made no sense to do anything other than what they had agreed

      8   upon.

      9   Q    Senator, you totally support maintaining one

14:43:20 10  majority-minority congressional district in Alabama, correct?

      11  A    Correct.

      12  Q    And, Senator, you believe that allowing minorities to have

      13  representation that is more than the proportion of the

      14  population that they make up would violate the ideas and

14:43:38 15  philosophy of the state and would violate the state

      16  constitution, correct?

      17       MR. WALKER:  Objection, Your Honor.  The part of

      18  Senator Dial's deposition that is being referred to now was

      19  when he was being asked questions about the 2020 six-district

14:43:59 20  plan which the Court has ruled is irrelevant.

      21       MS. MADDURI:  May I respond?

      22       THE COURT:  All right.

      23       MS. MADDURI:  I am not going to ask him any questions

      24  about a future district or 2020 district.

14:44:14 25       MR. WALKER:  But that's what these questions were
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 159**

```
        1    about.

        2            MS. MADDURI:  I haven't actually -- I'm asking him a

        3    question right now, Your Honor.

        4            THE COURT:  Right.

14:44:25 5            MR. WALKER:  She wants to ask him about testimony that

        6    he gave when he was being asked about the 2020 six-district

        7    plan.

        8            THE COURT:  Okay.  In other words, set the context for

        9    your question or allow him to answer a different question than

14:44:42 10   what was asked at the deposition.

        11        Do you understand what I'm saying?  In other words, don't

        12   be taking his testimony at a deposition out of context with a

        13   question you're asking now.

        14           MS. MADDURI:  May I confer for a moment?

14:44:59 15          THE COURT:  Yes, you may.

        16           MS. MADDURI:  Thank you, Your Honor.

        17   BY MS. MADDURI:

        18   Q    So, Senator, I just want to ask you:  Do you believe that

        19   allowing minorities to have more representation than their

14:46:51 20   proportion of the population would violate the ideas and

        21   philosophies of the state of Alabama?

        22   A    Do I believe that having a district with more than a

        23   majority members of a minority population would violate the

        24   Constitution?

14:47:11 25   Q    No.  I asked if you believe that allowing minorities to
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 160**

```
  1  have representation that exceeds their proportion of the
  2  population in Alabama would violate the ideas and philosophies
  3  of the state?
  4  A    Yes.
14:47:27 5  Q    Alabama currently has one majority black district,
  6  correct?
  7  A    Correct.
  8  Q    And that's about 14 percent of the districts.  Does that
  9  sound right to you?  One of seven?  I know we're not good at
14:48:04 10 math in here.  But I can represent to you that that's about
  11 14 percent.
  12 A    Okay.
  13 Q    Is that right?
  14 A    You want me to get my calculator out?  We need math
14:48:17 15 teachers in Alabama.
  16           THE COURT:  We sure do.
  17           THE WITNESS:  I am sure you're probably correct.
  18 BY MS. MADDURI:
  19 Q    I used a calculator.  I didn't do it in my head.  I'm also
14:48:30 20 very inept in that field.
  21       So right now, would you agree that African-Americans in
  22 Alabama have a lower proportion of representation than their
  23 share of the population?
  24 A    At 14 percent?
14:48:44 25 Q    They currently have 14 percent of the seats in the
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 161**

 1   delegation.  And I can represent to you -- would you -- let me

 2   back up.

 3       Would you agree with me that African-Americans right now

 4   in the state of Alabama make up about a quarter of the

14:48:54  5   population?

 6   A    Correct.

 7   Q    So would you agree with me that African-Americans in

 8   Alabama have a lower proportion of the representation out of

 9   the seats in the congressional delegation than their share of

14:49:07 10   the population?

11   A    Yes.

12   Q    And currently six of the seven congressional districts are

13   majority white, correct?

14   A    Correct.

14:49:28 15   Q    And would you -- do you have any reason to dispute that

16   67 percent of the state's population right now is white?

17   A    I'm not -- I don't have those statistics, but -- I can't

18   answer that.  I don't know.

19   Q    Do you have any reason to disagree with me that that's --

14:49:51 20   A    I have no reason to disagree or agree.

21   Q    And -- I can represent to you that the population right

22   now in Alabama is about 67 percent non-Hispanic white.

23   A    Before this census?

24   Q    Correct.  As of 2010 census data, correct.

14:50:12 25   A    Okay.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 162**

```
           1   Q    And we're going to keep doing math.  Would you agree with
           2   me six out of seven is about 86 percent?  I can represent to
           3   you that it is.
           4   A    Okay.
14:50:27   5   Q    So is the fact that there is a greater proportion of
           6   majority white districts in the population in Alabama, is that
           7   consistent with the ideas and the philosophies of the state in
           8   your opinion?
           9   A    Say again.
14:50:41  10   Q    Is the fact that there's a greater proportion of majority
          11   white districts right now in Alabama than the white population,
          12   is that consistent with the ideas and philosophies of the state
          13   of Alabama?
          14   A    No.  I don't -- but -- you're boxing me in.  I can't
14:51:00  15   create two districts and reach what you want to.  And so
          16   neither one of the numbers will work for me.
          17        If we want to get into a numbers game, you're talking
          18   about the population.  You're talking about what the six
          19   congressional districts are, and then what the seventh district
14:51:24  20   are.  And then if I'm going to create two, then I'm going to
          21   create a disproportionate on the other side.
          22   Q    No, sir.  I'm not asking you about a situation where
          23   there's six districts.  I'm asking you about the current map
          24   that has seven districts.
14:51:37  25        THE COURT:  He was talking about seven.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 163**

BY MS. MADDURI:

Q    Yes?

A    I'm talking about seven.  I'm saying if you are going to make me take one of my six and make a minority, then I'm going to disproportion the other way.

     The question -- you're boxing me in if I answer yes or no either way it's -- it's no easy answer to that question.

Q    Sure.  Would you agree with me that two out of seven is about 28 percent?

A    Probably 20, a little over 28, probably, yeah.

Q    And I can represent to you that the African-American population right now as of the 2010 census in Alabama is over 26 percent?

A    Okay.

Q    That's all I have.

          THE COURT:  Redirect?

          MR. WALKER:  Just a little bit, Your Honor.

          THE COURT:  Or do you want to take a break?

          MR. WALKER:  I think just one or two questions.

          THE COURT:  Okay.  We never say one; but one or two.

          MR. WALKER:  I didn't say one.  I said one or two.

                    REDIRECT EXAMINATION

BY MR. WALKER:

Q    Senator Dial, you were asked whether or not the committee assessed whether or not you could draw two majority

**Caster Plaintiffs' Exhibit 86, Page 164**

```
 1   African-American -- two majority minority -- minority-majority
 2   districts.  Do you recall that?
 3   A    Yes.
 4   Q    When you accepted the plan, were you relying on the
 5   expertise of Terri Sewell as a successful African-American
 6   politician to tell you what she needed for her district?
 7   A    Yes.
 8   Q    And were you also relying on the experience of Randy
 9   Hinaman to tell you what was needed?
10   A    Yes.
11   Q    And did you also rely on what you understood from your
12   conversations from Senator Sanders or other members of the
13   African-American legislative delegation to be necessary for a
14   successful minority-majority district?
15   A    Yes.
16   Q    And let me clear this up.  You're not against
17   African-American members of the Congress, are you?
18   A    No.
19   Q    If all seven districts elected African-American congress
20   people, you would be fine with that?
21   A    I certainly would.
22        MR. WALKER:  I have nothing else.  Thank you, sir.
23        THE COURT:  Any cross?
24        MS. MADDURI:  No, Your Honor.
25        THE COURT:  Okay.  All right.  Thank you.  Thank you,
```

Timestamps: 14:53:05 (line 5), 14:53:22 (line 10), 14:53:43 (line 15), 14:53:56 (line 20), 14:54:08 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 165**

```
 1    Senator Dial.  We appreciate you educating us about this

 2    process.

 3                   (Discussion off the record.)

 4              MR. WALKER:  Your Honor, that's the last witness we

 5    have today.

 6                   THE COURT:  Okay.  All right.

 7                   (Discussion off the record.)

 8         (Whereupon, the above proceedings were concluded at 2:55

 9    p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 86, Page 166**

660

```
1                         CERTIFICATE

2

3

4        I certify that the foregoing is a correct

5   transcript from the record of proceedings in the

6   above-entitled matter.

7

8

9

10

11                                          11-13-19

12   Christina K. Decker, RMR, CRR                Date

13   Federal Official Court Reporter

14   ACCR#:  255

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ALABAMA
 2                          SOUTHERN DIVISION

 3

 4      LAKEISHA CHESTNUT,  an individual; *
        MARLENE MARTIN, an individual;     * 2:18-cv-00907-KOB
        BOBBY DUBOSE, an individual;       * November 8, 2019
 5      RODNEY LOVE, an individual; KAREN  * Birmingham, Alabama
        JONES, an individual; JANICE       * 9:00 a.m.
 6      WILLIAMS, an individual; RODERICK  *
        CLARK, an individual; JOHN HARRIS, *
 7      an individual,                     *
                 Plaintiffs,               *
 8                                         *
        vs.                                *
 9                                         *
        JOHN H. MERRILL, in his official   *
10      capacity as Alabama Secretary of   *
        State,                             *
11               Defendant.                *
        **********************************

12

13                  TRANSCRIPT OF BENCH TRIAL
                           VOLUME V
14            BEFORE THE HONORABLE KARON O. BOWDRE
                CHIEF UNITED STATES DISTRICT JUDGE

15

16      FOR THE PLAINTIFFS:
        Abha Khanna, Esq.
17      PERKINS COIE LLP
        1201 Third Avenue
18      Suite 4900
        Seattle, Washington 98101
19      (206) 359-9000

20      Bruce V. Spiva, Esq.
        PERKINS COIE LLP
21      700 13th Street, NW
        Suite 600
22      Washington, DC 20005
        (202) 654-6338

23

24

25
```

***CHRISTINA K. DECKER, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1        Richard P. Rouco, Esq.
          QUINN CONNOR WEAVER DAVIES & ROUCO LLP
 2        2 20th Street North
          Suite 930
 3        Birmingham, Alabama 35203
          (205) 870-9989
 4
          Daniel C. Osher, Esq.
 5        PERKINS COIE LLP
          700 13th Street NW
 6        Suite 600
          Washington, DC 20005
 7        (202) 654-6338
 8        Lalitha D. Madduri, Esq.
          PERKINS COIE LLP
 9        700 13th Street NW
          Suite 600
10        Washington, DC 20005
          (202) 654-6322
11
12
          FOR THE DEFENDANT:
13        James W. Davis, Esq.
          Laura E. Howell, Esq.
14        OFFICE OF THE ATTORNEY GENERAL
          501 Washington Avenue
15        P.O. Box 300152
          Montgomery, Alabama 36130-0152
16        (334) 242-7300
17        J. Dorman Walker, Esq.
          BALCH & BINGHAM LLP
18        P.O. Box 78
          Montgomery, Alabama 36101
19        (334) 834-6500
20
21        COURTROOM DEPUTY:  Kecia Lightner
22
          COURT REPORTER:  Christina K. Decker, RMR, CRR
23
      Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
24    pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
        and Procedures Vol. VI, Chapter III, D.2.  Transcript
25               produced by computerized stenotype.
```

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 2**

869

1                           **I N D E X**

2       M. V. Hood, III                                 870
        DIRECT EXAMINATION                             870
3       BY MR. DAVIS
        CROSS-EXAMINATION                              895
4       BY MS. KHANNA
        REDIRECT EXAMINATION                           946
5       BY MR. DAVIS
        RECROSS-EXAMINATION                            957
6       BY MS. KHANNA
        FURTHER REDIRECT EXAMINATION                   957
7       BY MR. DAVIS

8
        DOUGLAS JOHNSON                                958
9       DIRECT EXAMINATION                             959
        BY MR. WALKER
10      CROSS-EXAMINATION                              998
        BY MS. KHANNA
11      REDIRECT EXAMINATION                          1039
        BY MR. WALKER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 3**

|     |                                                              |
| --- | ------------------------------------------------------------ |
| 1   | **P R O C E E D I N G S**                                    |
| 2   | (In open court.)                                             |
| 3   | THE COURT:  Will the defendant call your next witness?       |
| 4   | MR. DAVIS:  Your Honor, the defendant calls Dr. Trey         |
| 5   | Hood.                                                         |
| 6   | M. V. Hood, III,                                             |
| 7   | having been first duly sworn by the Courtroom Deputy Clerk, was |
| 8   | examined and testified as follows:                           |
| 9   | THE COURTROOM DEPUTY CLERK:  Please state your name          |
| 10  | for the record.                                              |
| 11  | THE WITNESS:  M. V. Hood, III.                               |
| 12  | THE CLERK:  And spell your first and last name for the       |
| 13  | record.                                                      |
| 14  | THE WITNESS:  M, period, V, period, H-O-O-D, I-I-I.          |
| 15  | THE COURTROOM DEPUTY CLERK:  Thank you.                      |
| 16  | MR. DAVIS:  Ready?                                           |
| 17  | THE COURT:  You may proceed.                                 |
| 18  | DIRECT EXAMINATION                                           |
| 19  | BY MR. DAVIS:                                                |
| 20  | Q    Good morning, Dr. Hood.                                 |
| 21  | A    Good morning.                                           |
| 22  | Q    You go by Trey, do you not?                             |
| 23  | A    That's fine.                                            |
| 24  | Q    Okay.                                                   |
| 25  | A    Yes, I do.                                              |

09:03:38 (line 5)
09:03:41 (line 10)
09:04:06 (line 15)
09:04:14 (line 20)
09:04:19 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1   Q   Dr. Hood, you've been retained by the defendants as an

2   expert in this case, correct?

3   A   Correct.

4   Q   And what is your field?

09:04:27 5   A   I'm a political scientist at the University of Georgia.

6   Q   In front of you, Dr. Hood, you'll see a copy of

7   Defendant's Exhibit 11.  And is that a copy of the report that

8   you submitted in this case?

9   A   Yes.

09:04:43 10   Q   And did you attach a copy of your CV to that report?

11   A   Yes.

12       MR. DAVIS:  Your Honor, we submit Dr. Hood as an

13   expert in political science and for the matters discussed in

14   his report.

09:05:03 15       MS. KHANNA:  No objection, Your Honor.

16       THE COURT:  Thank you.  Recognized as an expert.

17   BY MR. DAVIS:

18   Q   Dr. Hood, I'll refer you to page 4 of your report, please.

19       And as part of your analysis in this case, did you assess

09:05:26 20   the level of African-American majorities in the districts in

21   plaintiffs' illustrative plans?

22   A   I did.

23   Q   And how did you perform that analysis?

24   A   I had block-level data that had census data attached to it

09:05:44 25   relating to the racial makeup of each census block.  And I

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 5**

872

1  simply aggregated them into the districts as presented by

2  Mr. Cooper's plans.

3  Q    And what measurement did you use for African-American

4  voting strengths?

09:06:00  5  A    So I used single-race black non-Hispanic as my metric.

6  Q    What measurement do you commonly use in your academic

7  research, Dr. Hood?

8  A    That would be the exact same measure I would use in my

9  academic research.

09:06:14 10  Q    Single-race black?

11  A    Single-race black non-Hispanic.

12  Q    Are you aware of any research, Dr. Hood, in this case or

13  elsewhere which shows that persons who identify as any-part

14  black vote cohesively with persons who identify as single-race

09:06:31 15  black?

16  A    I'm not.  Again, I typically separate individuals in that

17  subset into another category.

18  Q    And, Dr. Hood, I've put on the screen a copy of your Table

19  1.  Would you walk us through and tell us about the results of

09:06:48 20  your analysis?

21  A    Sure.  These -- the first column to the left is simply

22  Mr. Cooper's calculations based on his report for CD 7 and 2

23  for his hypothetical plans.  And you can also see the enacted

24  districts as they stand right there.

09:07:09 25  Q    Okay.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 6**

873

```
 1   A    And then the columns to the right are for CD 2 and 7 for
 2   my racial calculations for those districts for each one of the
 3   four hypothetical plans Mr. Cooper drew.
 4   Q    Okay.  And when you performed the analysis using the
 5   single-race measurement, were African-Americans a majority of
 6   voting age population in Districts 2 and 7 in each of
 7   plaintiffs' illustrative plans?
 8   A    No.
 9   Q    Where were they not?
10   A    Hypothetical 1 and 2.  Excuse me.  Sorry.  Hypothetical 3
11   and 4 there's at least one of the districts in Mr. Cooper's
12   plan that's not majority black voting age population.
13   Q    Now, Dr. Hood, there was testimony earlier in this case
14   from one of plaintiffs' experts, Dr. McCrary, who referred to
15   the so-called one-drop rule.  Are you familiar with that?
16   A    Yes.
17   Q    And what is the one-drop rule?
18   A    Well, I mean, it was -- it was a metric put in place by
19   the state a long time ago for racial discrimination
20   essentially.  So if you were any-part black, you were
21   essentially considered to be black.
22   Q    And that rule was -- was that rule discriminatory in
23   origin?
24   A    Yes.  Certainly.
25   Q    Would it be appropriate to adopt such a policy for use in
```

Timestamps: 09:07:28 (line 5), 09:07:42 (line 10), 09:08:06 (line 15), 09:08:25 (line 20), 09:08:37 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 7**

874

```
         1   the social sciences?

         2   A    Well, I wouldn't adopt that rule, no.

         3   Q    I refer you now, Dr. Hood, to page 5 of your report,

         4   which, again, is Defendant's Exhibit 11.

09:09:01 5        Did you perform a core retention analysis of plaintiffs'

         6   illustrative districts?

         7   A    I did, yes.  For each one of the hypothetical plans.

         8        THE COURT:  And by hypothetical plan, is that the same

         9   as the plaintiffs' illustrative plan number-wise?  I mean, I'm

09:09:26 10  trying to make sure that I understand that we're comparing

        11   apples and apples.  And Hypothetical 1 is not what --

        12        MR. DAVIS:  I can answer your question, Judge, and I

        13   think the answer is yes.  But let me ask a question of Dr. Hood

        14   to make sure it's appropriately in the record.

09:09:43 15       THE COURT:  Okay.

        16   BY MR. DAVIS:

        17   Q    Dr. Hood, when you say hypothetical plans, do you mean the

        18   four plans that Bill Cooper has submitted in this case as a way

        19   of suggesting how Alabama might draw two majority black

09:09:54 20  districts?

        21   A    Yes.

        22   Q    Okay.

        23        THE COURT:  And are we talking about the original

        24   plans or the revised plans from Mr. Cooper?

09:10:06 25  BY MR. DAVIS:
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 8**

1   Q    Did you assess the plans as submitted in Dr. Cooper's

2   original report, Dr. Hood, or did you assess the plans that he

3   had tweaked in a supplemental report?

4   A    I don't know that I had access to the supplemental report.

09:10:24 5   I believe these are the original.

6           MR. DAVIS:  The revised illustrative plans, Your

7   Honor, had not been prepared at the time of our expert

8   designations.

9           THE COURT:  Okay.

09:10:36 10   BY MR. DAVIS:

11   Q    Dr. Hood, is it your understanding that when Mr. Cooper

12   revised three of the four illustrative plans that he was making

13   minor adjustments in Jefferson County?

14   A    That's my understanding, yes.

09:10:47 15   Q    And that was to ensure, was it not, that Congresswoman

16   Terri Sewell's residence was, in fact, included in District 7?

17   A    That was my understanding, yes.

18   Q    Would that materially change your analysis in any way?

19   A    I don't believe so, no.

09:11:02 20   Q    Now, tell us what a core retention analysis is, Dr. Hood.

21   A    So a core retention analysis asks the question for a given

22   congressional district or a district of any kind how many of

23   the residents in the new district were carried over from the

24   previous district?  So in this case, I'm comparing the

09:11:23 25   illustrative for hypothetical plans Mr. Cooper drew to the

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 9**

876

```
 1   enacted plan that was put in place in 2011.
 2   Q    Okay.  And are you assessing -- I think you just said
 3   this, but I want to be clear.  Are you assessing how much
 4   geography of District 1 in this plan is included in the
 5   geography of District 1 in that plan, or how many of the
 6   people?
 7   A    This is population based.
 8   Q    Population?
 9   A    Voting age population to be more specific.
10   Q    And how did you perform this analysis?  What data did you
11   use?
12   A    Well, again, I had block-level census data files, and I
13   had the district allocation numbers for each block for the
14   hypothetical or the illustrative plans and the enacted plans.
15   Q    Okay.
16   A    So I just compared each one of the blocks -- of course, I
17   didn't do this manually.  But I'm looking to see where Block 1
18   was in the enacted plan and where it ended up in the
19   hypothetical or the illustrative plan.
20   Q    Okay.  So let's look at your Table 2, Dr. Hood.  And I see
21   there District 1.  And if I go along that row under the heading
22   Hypothetical 1, I see the number 58.42.  What does that number
23   58.42 tell us about District 1 in Hypothetical Plan 1?
24   A    Well, it means specifically that 58.42 percent of the
25   population in Hypothetical District 1 resided in Enacted
```

Column timestamps (left margin):
09:11:40 (line 5), 09:11:51 (line 10), 09:12:01 (line 15), 09:12:19 (line 20), 09:12:43 (line 25)

**Caster Plaintiffs' Exhibit 87, Page 10**

1  District 1 previously.

2  Q    Okay.  So Mr. Cooper's plan includes 58.42 percent of the

3  persons who reside within District 1, or at least who did as of

4  the 2010 census?

09:12:59 5  A    Correct.

6  Q    Okay.  And did you draw any conclusions from performing

7  this analysis?

8  A    Well, district core retention levels are fairly high for

9  six of the seven districts.  For District 2, though, district

09:13:16 10  core retention levels for these illustrative plans are fairly

11  low; 28.34 percent in Hypothetical 1; 39.50 percent

12  Hypothetical 2; 29.19 in Hypothetical 3; and 28.46 in

13  Hypothetical 4.

14  Q    Okay.  So would it be fair to say, if you look, say, at

09:13:44 15  District 5, that if the Alabama Legislature switched from its

16  enacted plan to one of Mr. Cooper's plan, it would be

17  preserving almost entirely the core of District 5?

18  A    Virtually, yes.

19  Q    Okay.  And it would be preserving a very small amount of

09:14:01 20  the core of District 2?

21  A    Correct.

22  Q    Okay.  So does this suggest to you, Dr. Hood, that in

23  order to enact one of Mr. Cooper's hypothetical or illustrative

24  plans, that that -- that would require losing a lot of the core

09:14:21 25  of District 2?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 11**

1    A    Yes.  From this analysis, that would be the conclusion.

2    Q    That would suggest that it would not take merely minor

3    tweaks in the plan in order to draw a second majority black

4    district?

09:14:33  5    A    Fairly large population movements would be required.

6    Q    Now, look at page 6 of your report, Dr. Hood.  And you

7    performed, did you not, an analysis of population shifts?

8    A    Yes.

9    Q    How is that different from the core retention analysis?

09:14:51 10    A    Well, in some ways, it's similar.  But here I'm looking at

11    racial groups that are being moved in and out of particular

12    districts.

13         If you were to draw a hypothetical plan, say, 1, as

14    compared to the enacted plan, it's a little more detail here.

09:15:10 15    Q    Okay.  And actually, on the next page, on page 7 of your

16    report, I see Table 3.  And first off, use this if you want to

17    answer this question, but just tell us how you did the

18    population shift analysis.

19    A    Okay.  Well, again, I'm using the same block-level

09:15:28 20    population data.  Again, this has racial data appended to these

21    files.  So it's the same set of files I'm using for the

22    analysis.

23         And here I'm just looking to see, again, racially speaking

24    where people are being moved in and out of these districts in

09:15:49 25    order to create one of these hypothetical plans.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 12**

1          THE COURT:  Okay.  So Table 2 just looked at the shift

2    of -- or the maintaining of the core for population in general?

3          THE WITNESS:  Yes.  Yes, Your Honor.

4          THE COURT:  And then Table 3 is breaking it down by

09:16:06  5    race?

6          THE WITNESS:  Yes, Your Honor.

7          THE COURT:  Okay.

8    BY MR. DAVIS:

9    Q    Okay.  Did you see any relationship, Dr. Hood, in who

09:16:15 10   Mr. Hood was moving in and out of districts and race?

11   A    Yes.  There is definite patterns here.  And I did some

12   statistical testing, as well, for these tables.  And that's

13   reported in the footnotes.

14   Q    Yeah.  You know, I want to try asking that last question

09:16:34 15   again.  You understood what I meant and you answered it well,

16   but it was a horrible question.

17        Was there a pattern, Dr. Hood, in your opinion, between

18   race and the people that Mr. Hood -- that Mr. Cooper was moving

19   in and out of the districts?

09:16:47 20   A    Yes.  There's definitely a pattern.

21   Q    Okay.  And what is that pattern?

22   A    Well, it varies, but, for instance, if you look at Table

23   3, so this would be illustrative or Hypothetical Plan 1, as

24   compared to the benchmark plan.

09:17:03 25        So, again, I just did this for Districts 2 and 7 for each

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 13**

```
 1  one of these plans.
 2      If you look at District 2, if you look at the column that
 3  says moved out of district, 20 percent of those residents in
 4  the current District 2 that were moved were black residents
09:17:24 5  versus almost 75 percent of those that were moved out of the
 6  district who were white residents.
 7      Of those moved into the district, the majority,
 8  53.1 percent, were black versus 42.8 percent who were white.
 9      Again, I applied a very simple and straightforward
09:17:44 10 statistical test to these tables.  It's called the chi-square
11  test.  It's very old.  It's been around a long time.  And it
12  asks the questions -- in this case, are race and population
13  movement independent of one another?  I can definitively reject
14  that null hypothesis in this case and say that race and
09:18:07 15 population movement are related.
16  Q   Okay.
17  A   Statistically speaking.
18  Q   Now, you said the chi-square test?
19  A   Chi-square.
09:18:14 20 Q   And that's C-H-I like the Greek letter Chi?
21  A   C-H-I dash square.
22      And it's footnoted in the report.
23  Q   And you did a similar analysis, did you not, for all of
24  the hypothetical plans?
09:18:28 25 A   I did.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 14**

```
 1  Q    Yes.  And those are presented -- well, did you find a
 2  similar pattern or a connection between race and population
 3  movements in each of Mr. Cooper's illustrative plans?
 4  A    Yes.  The overall patterns there, the degree to which it
 5  may be present, varies by hypothetical plan.
 6  Q    Dr. Hood, on page 11 of your report, you looked, did you
 7  not, at turnout rates in Alabama?
 8  A    I did.
 9  Q    How did you perform that analysis?
10  A    This was a set of data I received from the Alabama
11  Secretary of State's office.  So these are voter registration
12  and history files.
13       So I'm looking at turnout as a percentage of registrants
14  in this case.  And I had data for the 2010 through 2018
15  election cycles.
16       And, again, in Alabama, it's requested that registrants
17  record their race.  And so we're not estimating that.  I'm
18  using this from the voter file again -- race of registrant,
19  that is.  So we can compare turnout rates by race -- white,
20  black in this case.
21  Q    I'll refer you to Table 7, Dr. Hood, which is on page 11
22  of your report.  And tell us about your conclusions.
23  A    Well, a little bit about the table.  Again, these are
24  white and black turnout rates for Alabama.  Again, these are
25  statewide turnout rates, I want to emphasize, for the 2010,
```

09:18:46 (line 5)
09:19:08 (line 10)
09:19:28 (line 15)
09:19:48 (line 20)
09:20:06 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 15**

 1  '12, '14, '16, and '18 election cycles.  So I have it broken

 2  down for each cycle.  And then I have a difference measure over

 3  there.  And then at the bottom I have some different mean

 4  figures, the average across all elections cycles, the average

09:20:25  5  for midterm election cycles, and the average for presidential

 6  election cycles.

 7      So with the exception of one election cycle, which was

 8  2012, there is a gap between black and white turnout rates in

 9  Alabama.  Maybe it's best to look at the mean numbers down at

09:20:41 10  the bottom.

11      Across all elections that I analyze election cycles, the

12  black white turnout rate gap is 4.8.  For midterm elections

13  it's 5.6, and for presidential elections it's 3.6.

14          THE COURT:  And that gap goes which way?

09:21:02 15          THE WITNESS:  There's more white turnout than black

16  turnout, Your Honor, with the exception of the 2012

17  presidential election.

18          THE COURT:  I want to make sure that -- we've had a

19  lot of jokes this week about how lawyers aren't mathematicians

09:21:17 20  or not good at math -- and I want to make sure I'm looking at

21  these numbers correctly.

22          THE WITNESS:  Okay.

23          THE COURT:  The percentage you have for -- for

24  example, we'll just take 2010.  The 52.4 percent white, is that

09:21:34 25  the 52.4 percent of the white registered voters turned out to

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 16**

```
 1  vote?  Is that what that number reflects?

 2          THE WITNESS:  Yes, Your Honor.

 3          THE COURT:  Okay.  I just wanted to make sure that my

 4  very non-math mind was following that and understood that.

 5      Thank you.

 6          THE WITNESS:  And it is the -- I usually footnote the

 7  calculations in the report.  So if you have any questions, it's

 8  usually footnoted.

 9          THE COURT:  All right.  Thank you.

10          THE WITNESS:  I think it's footnote 21 in this case.

11          THE COURT:  Okay.  Thank you.

12  BY MR. DAVIS:

13  Q   Dr. Hood, if there is a gap between white turnout and

14  black turnout in a particular election, is that relevant

15  information when you're assessing whether a district that is

16  close to 50 percent black voting age population will, in fact,

17  result in the election of the candidate of choice of the

18  African-American voters?

19  A   Yes.  And certainly in this case in Alabama I think it's

20  been established probably that there are high levels of

21  racially polarized voting.  To the extent to which that's the

22  case, it's very important to look at the racial composition of

23  the district.

24  Q   And to be clear, again, you're not saying this is the gap

25  in turnout in any particular congressional district?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 17**

884

```
         1  A     These are statewide turnout numbers.

         2  Q     Statewide results?

         3  A     Yes.

         4  Q     I am going to refer you now to page 14 of your report.

09:23:17 5        There's a section in your report, Dr. Hood, that's headed

         6  Black Voting Patterns.  What analysis were you performing here?

         7  A     I was asked to analyze black voting patterns in Alabama

         8  and in other states, as well.  And in order to do that, I

         9  chose, of course, Alabama, and I also looked at 20 other states

09:23:41 10 that had a black population of at least 10 percent or greater.

        11  And those states are listed on page 14 under Section 6.

        12  Q     Okay.  Did the states that you reviewed include southern

        13  states?

        14  A     All the southern states.

09:23:57 15 Q     Okay.

        16  A     Or at least the way I defined the south.

        17  Q     And did it include northern states?

        18  A     Yes.

        19  Q     So there I see under black voting patterns about the third

09:24:07 20 line under this district you say these states are Arkansas,

        21  Connecticut, Delaware, Florida, et cetera.  And that's a

        22  listing of all the states that you reviewed?

        23  A     Yes.

        24  Q     And these are states where African-Americans are

09:24:21 25 10 percent or more of the total population?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1  A    Yes.

2  Q    Okay.  And what did you find when you looked at these

3  voting patterns?

4  A    Well, I guess a little more background.  I looked at two

09:24:32  5  different data sources for this -- the national exit polls that

6  occur on election day typically after general election cycles

7  in the U.S.; and also another data source, the CCES, the

8  Cooperative Congressional Election Study, which is a very

9  common form of -- which is a very common survey that's used in

09:24:55  10  a lot of research in political science.

11       So I'm not estimating these voting patterns.  I'm using

12  these survey data to make these inferences.

13       And, again, I think I went -- it looks like I went from

14  2008 to 2018 on this analysis.

09:25:15  15  Q    Let's look at the results when you were reviewing the

16  national exit polls, Dr. Hood.  I'll refer you to Table 9 on

17  page 15 of your report.

18  A    So there were three different offices that I was able to

19  analyze using the national exit polls -- President, Governor,

09:25:41  20  and Senate again for 2008 through 2018.  And those figures are

21  compiled in Table 9.  There are more detailed tables for each

22  year in office by state in the appendix of the report.  So this

23  is sort of a summary table here.

24       What you find consistently are very high levels of black

09:26:06  25  support for Democratic candidates both in these comparison

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 19**

1  states and in Alabama.  So Table 10 is the same thing just for

2  Alabama.

3  Q    Okay.  So looking at the top table, Table 9, I see in the

4  year 2008 under President, 95.6 percent?

09:26:18  5  A    Correct.

6  Q    What does -- 95.6 percent of what?  And what does that

7  mean?

8  A    95.6 percent of African-Americans in these comparison

9  states voted for the Democratic candidate for president in

09:26:32 10  2008.

11  Q    Okay.  So that's of the 21 states where African-Americans

12  are 10 percent or more of the population, Table 10 singles out

13  Alabama, and Table 9 is averaging up the results from the other

14  20 states?

09:26:46 15  A    Correct.  Right.  So Alabama is not part of the average in

16  Table 9, just to be clear.

17  Q    Right.  Overall, what's the result for all races,

18  Dr. Hood?

19  A    Across -- again, this is 135 different races in different

09:27:06 20  states.  The black support rate for Democratic candidates from

21  this data set was 91.1 percent.

22  Q    And what did you find for the state of Alabama again when

23  you looked at the national exit polls?

24  A    Again, there are far fewer comparison points just simply

09:27:22 25  for Alabama.  But the support rate in Alabama was 94.3 percent

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 20**

           1  for Democratic candidates.
           2  Q    Now, if you will turn the page, Dr. Hood, I'm going to put
           3  Tables 11 and 12 up on the screen.
           4       These are on page 16 of the report, Defendant's
09:27:48   5  Exhibit 11.  And are these the results from the CCES data?
           6  A    Yes.
           7  Q    And what did you find?
           8  A    Very similar patterns; very high rates of support for
           9  Democratic candidates among African-Americans either in the
09:28:07  10  comparison states or in Alabama.
          11  Q    Okay.
          12  A    It's 91.5 percent in the comparison states across all
          13  these races versus 90.9 percent in Alabama.
          14  Q    Okay.
09:28:20  15  A    And in this particular analysis, I was able to include
          16  some data from U.S. House races, as well, in addition to
          17  President, Senate, and Governor.
          18  Q    Is there any significant difference that you saw,
          19  Dr. Hood, in African-American support for Democratic candidates
09:28:39  20  in Alabama and African-American support for Democratic
          21  candidates in other states?
          22  A    It's very similar.
          23  Q    And that includes states outside the south?
          24  A    Correct.
09:28:51  25  Q    Throughout the country?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 21**

888

```
 1  A     Right.  As long as they have an African-American
 2  population of 10 percent or greater.
 3  Q     Dr. Hood, this actually goes back to some of the
 4  population shift analysis, and I forgot to ask this:  You
 5  mentioned at one point when you're looking at the relationship
 6  between race and the people that Mr. Cooper was moving in and
 7  out of districts, and you say that the relationship is
 8  statistically significant, correct?
 9  A     Correct, in that case.
10  Q     What does that mean, statistically significant?
11  A     Well, using the specific Chi-square test that I was
12  talking about, statistically significant in that case means
13  that there's a relationship between population movement and
14  race.  Now, that's where it ends with that particular test.  I
15  can't make any inferences beyond that.
16       The null hypothesis in that case would be that there's no
17  relationship between race and population movement, that those
18  factors are independent of one another.  But that's not what I
19  found.
20  Q     I'd like to go back now, Dr. Hood, to page 13 of your
21  report.
22       I've put Table 8 on the screen from page 13 of your
23  report.  Can you tell me what you were looking at here?
24  A     So I'm looking at population in Mr. Cooper's study area as
25  he defined it.  Again, these are whole counties.  I'm not using
```

09:29:06 5
09:29:20 10
09:29:40 15
09:30:00 20
09:30:34 25

**Caster Plaintiffs' Exhibit 87, Page 22**

1  partial counties for this particular analysis.  But I'm looking

2  at what's happening with the black voting age population in

3  2010 as compared to 2017, which is the last year that I had

4  data that was usable for this comparison.

09:30:55 5          MS. KHANNA:  Objection, Your Honor.  I believe this

6  goes to the post-2020 considerations that we've already agreed

7  are not relevant in this case.

8          MR. DAVIS:  Your Honor, it is in the section of his

9  report titled Post-2020 Considerations, but we think the fact

09:31:12 10 that there are shifts in population is relevant to our mootness

11 argument.

12      We're not suggesting that -- we're only suggesting that

13 the fact -- I think as Dr. Hood would testify if you allow it,

14 that there's loss of population in some areas and gain of

09:31:28 15 population in others that would show that the illustrative

16 districts could not, in fact, be passed as they are after 2020,

17 meaning in our view it's moot.

18          THE COURT:  Well, that's not the question of the

19 mootness that I've asked to be briefed.  There's more of a

09:31:49 20 legal issue that we discussed yesterday.

21      I think that we all can acknowledge, or at least I hope we

22 can, that the 2020 census may well be very different from the

23 2010 census, and that it will be the 2020 census that will

24 determine how districts will be drawn in reapportionment or

09:32:17 25 redistricting then.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 23**

1     So I didn't let the plaintiffs get into the -- I think
2  2018 was when I stopped them.  So I think I'll stop you with
3  2017.

4           MR. DAVIS:  I will move on.
09:32:31 5           THE COURT:  Okay.  Thank you.
6           MS. KHANNA:  Thank you, Your Honor.

7  BY MR. DAVIS:
8  Q    Dr. Hood, when you looked at the black support of
9  Democratic candidates, did you find overall that
09:32:55 10 African-Americans supported Democratic candidates over
11 90 percent in every state you reviewed?
12 A    Well, it wasn't always over 90 percent.  That was the
13 average figure.
14 Q    The average overall, of all the elections you reviewed was
09:33:09 15 over 90 percent?
16 A    Yes.  Yes.
17 Q    And that's in Alabama and outside Alabama?
18 A    Right.  So black support for Democratic candidates is
19 fairly monolithic is the way I would put it, which is not a
09:33:21 20 surprise, given -- I hadn't studied all these states, but
21 certainly I studied the south quite a bit, and these patterns
22 were not a surprise to me.  But they are documented here.
23 Q    Now, look at page 17 of your report, Dr. Hood.  And
24 Section 7 is titled Racial Comparison.  Tell me what you were
09:33:44 25 looking at here.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 24**

A     So I'm comparing black and white citizens on a number of
sociodemographic characteristics.  I think there were nine in
all, if I recall correctly.  Most of these data are coming from
the Census Bureau, some of it from the Centers For Disease
Control, some of it from the Bureau of Labor Statistics.  So
they're all government agencies.

So I'm looking at various disparity rates between black
and white citizens in Alabama and again in these 20 comparison
states that have a black population of at least 10 percent.

Q     Okay.  So let's look at Table 13, which is from page 18 of
your report, Dr. Hood.  And we're not going to do this for each
category you reviewed, but using this as an example, tell us
what data you used, how you assessed this, and what your
findings were.

A     Okay.  So these are education levels, and these data come
from the American Community Survey, which is the census run by
the Census Bureau.  And this is from 2017, specifically.

So the column to the left I'm looking at the percentage of
citizens in each one of these racial categories, blacks and
whites, who obtained at least a high school degree or
equivalent.

And in the column to the right, I'm looking at least a
college education -- a B.S. degree or higher.

Q     And what is the column on the far right, for example, that
just says difference?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 25**

1    A    So literally that's just the subtraction between the white

2    column and the black column.

3    Q    Okay.

4    A    So to run through an example, maybe, using Alabama high

09:35:34 5    school or equivalent, 87.7 percent of the white population in

6    Alabama has a high school or equivalency degree versus

7    81.6 percent of black citizens in Alabama.  So the arithmetic

8    there is just 6.1 percent, the literal difference between those

9    two.

09:35:59 10   Q    And what patterns did you find, if any, in the other

11   states that you reviewed?

12   A    Well, the difference measure varies by state.  Certainly

13   you can just look down the column and see that.

14        And the question I'm not really -- I'm not really asking

09:36:16 15   the question is, is the difference measure larger or smaller in

16   Alabama versus these other states, just whether or not a

17   disparity exists between blacks and whites on these various

18   sociodemographic characteristics in these other states and in

19   Alabama, as well.  And the answer is, yes.

09:36:35 20        So in this case, the positive difference measure would

21   mean that there's a disparity between black and white education

22   rates.

23   Q    Okay.

24   A    And you can see there's a positive number all the way down

09:36:48 25   the column.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 26**

```
 1              THE COURT:  Positive number meaning what?

 2              THE WITNESS:  The disparity rate -- in this particular

 3    case, there are more whites who have a high school or

 4    equivalency degree than blacks.

 5  BY MR. DAVIS:

 6    Q    So if we're going to summarize your Table 13, you found,

 7    did you not, that according to the data you reviewed, which

 8    includes census and other data, that there is a gap between the

 9    number of white citizens in Alabama or white persons in Alabama

10    who have a high school degree or greater and African-Americans

11    in Alabama who have a high school diploma or equivalent?

12    A    Yes.

13    Q    Okay.  And did you --

14    A    There's a similar gap for all these other 20 states.

15    Q    You found --

16    A    It's not the exact same figure, necessarily, but there's a

17    similar gap.

18    Q    Yeah.  The amount of the gap may vary, but you found such

19    a gap in each state that you reviewed, did you not?

20    A    Correct.

21    Q    Okay.  Now, we're not going to take up court time,

22    Dr. Hood, going in detail of the other categories you looked

23    at.  But if you would, flip through your report and just tell

24    the Court what other categories -- what other socioeconomic

25    categories you reviewed.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 27**

894

```
           1   A     So in addition to education levels, I looked at food stamp
           2   provision, median household income, per capita income, poverty
           3   rate, home ownership rates, unemployment rates, and infant
           4   mortality rates.
09:38:23   5   Q     Dr. Hood, was there any category in any state you reviewed
           6   where you did not find a gap?
           7   A     No.
           8   Q     That's true in Alabama and in all of the states that you
           9   reviewed, correct?
09:38:40  10   A     Correct.  All these factors.
          11   Q     So that would include states that were below the Mason
          12   Dixon line and states above the Mason Dixon line?
          13   A     Correct.
          14   Q     Dr. Hood, you mentioned in your report that in 2011
09:39:03  15   Alabama was subject to the retrogression standard of Section 5
          16   of the Voting Rights Act, correct?
          17   A     Correct.
          18   Q     Dr. Hood, if a district is 65 percent African-American
          19   voting age population, would you agree that at least in most
09:39:22  20   cases it is likely that the African-American voters would be
          21   able to elect their candidate of choice?
          22   A     Yes, I would agree with that.
          23   Q     Is that likelihood 100 percent iron-clad guarantee in
          24   every election?
09:39:35  25   A     No.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 28**

```
 1  Q    Would you agree that if the voting age population is

 2  dropped to 50.1 percent, that the likelihood has been somewhat

 3  lessened that African-Americans would be able to elect their

 4  candidate of choice?

 5  A    In that case, the probability would have been decreased,

 6  yes.

 7          MR. DAVIS:  Your Honor, may I have a moment?

 8          THE COURT:  Yes, you may.

 9          MR. DAVIS:  Your Honor, I pass the witness.

10          THE COURT:  Cross-examination?

11          MS. KHANNA:  Yes, Your Honor.

12                      CROSS-EXAMINATION

13  BY MS. KHANNA:

14  Q    Good morning, Dr. Hood.

15  A    Good morning.

16  Q    It's good to see you again.

17  A    You, too.

18  Q    Dr. Hood, at the top of page 3 of your report, which is

19  marked Defendant's Exhibit 11, you write that, I have been

20  asked by counsel for the defendant to provide a response to

21  reports by plaintiffs' experts, Mr. William Cooper, and

22  Professor Maxwell Palmer.  Did I read that correctly?

23  A    Yes.

24  Q    And you provided no response to the expert report of

25  Dr. Peyton McCrary regarding the history of voting-related
```

09:39:53 (line 5)
09:40:18 (line 10)
09:40:38 (line 15)
09:40:55 (line 20)
09:41:10 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 29**

896

```
 1  racial discrimination in Alabama; is that correct?

 2  A    That's correct.

 3  Q    And while you do respond to Mr. Cooper's expert report, at

 4  no point do you offer an opinion that plaintiffs are unable to

 5  satisfy the first Gingles precondition; is that correct?

 6  A    Well, I raised questions about that, yes.

 7  Q    Do you ever opine on whether or not plaintiffs have

 8  satisfied the first Gingles precondition?

 9  A    Not directly.

10  Q    And you do not dispute Mr. Cooper's conclusion that there

11  are racial disparities across key indicators of socioeconomic

12  well-being in Alabama generally and in the Black Belt region

13  specifically?

14  A    Well, I document those myself.  I may have used different

15  variables, but I can't argue with that.

16  Q    Now, you mentioned in the scope of your report that you

17  were asked by counsel to provide a response to Dr. Palmer's

18  initial report, as well; is that right?

19  A    Yes.

20  Q    And Dr. Palmer's initial report concluded that voting is

21  racially polarized in Congressional Districts 1, 2, 3, and 7

22  individually and combined; is that right?

23  A    Well, I'll take your word for that.

24  Q    Is that your recollection?

25  A    Yes, that's my recollection.
```

09:41:24 5
09:41:38 10
09:41:56 15
09:42:08 20
09:42:25 25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 30**

1  Q    And you provide no opinion regarding the existence of

2  racially polarized voting in Alabama, correct?

3  A    Correct.

4  Q    And, in fact, you performed no analysis at all of racially

09:42:38  5  polarized voting in Alabama generally or in any region of

6  Alabama?

7  A    That's correct.

8  Q    Are you familiar with ecological inference, which is the

9  method that Dr. Palmer used to evaluate racially polarized

09:42:51  10  voting?

11  A    Yes.

12  Q    And you have used that method before in other cases in

13  order to analyze racially polarized voting; is that right?

14  A    Yes.

09:42:58  15  Q    And, in fact, in one of your previous reports in a

16  different case you stated that, It is my contention that of the

17  current statistical tools that can be employed to aid in vote

18  dilution analyses, the EI technique provides the most reliable

19  and realistic estimates of voter choice; is that correct?  Do

09:43:19  20  you recall that?

21  A    I recall saying something like that, yes.

22  Q    And you stand by that?

23  A    Yes, of course.

24  Q    But you offer no EI analysis here?

09:43:27  25  A    I do not.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 31**

898

|   |   |
|---|---|
| | 1 |
Q     And at no point in your report do you refute Dr. Palmer's

2  conclusion that African-Americans in the areas he examined are

3  politically cohesive; is that right?

4  A     Correct.

09:43:41  5  Q     And at no point in your report do you refute Dr. Palmer's

6  conclusion that African-American voters and white voters in the

7  areas he examined consistently prefer different candidates?

8  A     Correct.  I mean, that's just another way of saying

9  there's racially polarized voting.

09:43:58 10  Q     That's right.

11  A     Right.

12  Q     And at no point in your report do you refute Dr. Palmer's

13  conclusions that the candidates preferred by white voters in

14  the areas he examined usually defeat the candidates preferred

09:44:10 15  by black voters?

16  A     Right.  They don't offer an opinion on that.

17  Q     So also in the background section on page 3 of your

18  report, you provide a review of redistricting in Alabama; is

19  that right?

09:44:31 20  A     A paragraph, yes.

21  Q     And you note in that section that, In 2011 the map drawers

22  in Alabama saw to ensure that the proposed plan would not be

23  rejected under the retrogression standard enunciated in Section

24  5.  Did I read that correctly?

09:44:49 25  A     Yes.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 32**

899

```
        1  Q    And you did not participate in Alabama's redistricting
        2  process following the 2010 census, correct?
        3  A    That's correct.
        4  Q    And it's fair to say that any documents or data that you
09:44:59 5  relied upon in drafting your report is listed in your report in
        6  the footnote usually; is that right?
        7  A    Certainly, yes.
        8  Q    And at no point does your report indicate that you
        9  received information from the map drawers of the 2011 plan,
09:45:12 10 correct?
       11  A    That's correct.
       12  Q    And, in fact, you never conferred with the map drawers of
       13  the 2011 plan in preparing your report?
       14  A    That is correct.
09:45:18 15 Q    And you reviewed the state's preclearance submission in
       16  preparing your report?
       17  A    Yes.
       18  Q    And isn't it a fact that you can't recall any sort of
       19  analysis from the preclearance submission of whether an
09:45:38 20 increase in black voting age population from 58.33 to 60.55 in
       21  CD 7 was necessary in order to maintain the ability of minority
       22  voters in CD 7 to elect their preferred candidates?
       23  A    I believe I said at deposition I could not recall any kind
       24  of specific statistical analysis.
09:45:58 25 Q    And you don't recall any today, as well?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 33**

```
 1  A    Right.  That's not changed.  I was just clarifying.

 2  Q    Thank you.

 3       And certainly you have performed no analysis to determine

 4  whether an increase in the black voting age population in CD 7

 5  was necessary in order to comply with Section 5 and maintain

 6  the ability to elect for African-Americans?

 7  A    That's correct.

 8  Q    So in the next section, in Section 4 of your report, you

 9  discuss Mr. Cooper's illustrative plans; is that right?

10  A    Yes.

11  Q    And the first aspect you examined is the racial

12  composition of Mr. Cooper's illustrative districts, correct?

13  A    Correct.

14  Q    And on page 4, you state that it is your understanding

15  that the Alabama reapportionment office defines black as only

16  those individuals who identify as single-race non-Hispanic

17  black?

18  A    That's my understanding, yes.

19  Q    And that understanding is based solely on information you

20  received from counsel for the defendant in this case; is that

21  right?

22  A    As recorded in the report, yes.

23  Q    In what -- oh, in your own report.

24  A    Yes, as recorded in my report, yes.

25  Q    And you received no document from counsel confirming that
```

09:46:12 (line 5)
09:46:34 (line 10)
09:46:50 (line 15)
09:47:06 (line 20)
09:47:16 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 34**

```
 1   the Alabama reapportionment office, in fact, defined black in
 2   that manner; is that right?
 3   A    That's correct.
 4   Q    Are you aware that Dr. Johnson has referenced a different
 5   metric for calculating who should count as African-American in
 6   this case?
 7   A    I'm aware of that, yes.
 8   Q    And you've seen Mr. Cooper's reply report or rebuttal
 9   report in this case; is that right?
10   A    Yes.
11   Q    And you're aware that Mr. Cooper has stated his
12   understanding that, in fact, the Alabama Legislature had relied
13   on a single-race black category that includes Hispanics in the
14   2011 redistricting documents and previous Alabama litigation.
15   Do you recall seeing that?
16   A    Yes.  I mean, that's what he states.  I guess there's a
17   dispute about who used what at this point.  That wasn't the
18   information I received.
19   Q    Fair enough.  Yeah.  I wasn't asking if you --
20   A    Okay.
21   Q    -- agreed with it.  I just wanted to make sure that you
22   recalled that.
23        You have no specific information other than what your
24   counsel told you -- or rather what defendant's counsel told you
25   that contradicts the statements made by Mr. Cooper; is that
```

09:47:31
09:47:45
09:48:02
09:48:14
09:48:26

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 35**

1    right?

2    A    Except for that information I received through counsel,

3    no.

4    Q    So -- you said you reviewed Alabama's preclearance

09:48:41 5    submission in drafting your report; is that right?

6    A    Yes.

7    Q    And on page 3 of your report, you cite to page 424 of that

8    preclearance submission when discussing the black voting age

9    population of CD 7; is that right?

09:48:59 10   A    According to footnote 3, yes.

11   Q    All right.  Can we please call up Plaintiffs' Exhibit 83,

12   page 424?

13        So Plaintiffs' Exhibit 83 is the exhibits to Alabama's

14   preclearance submission.  And I believe this is the page that

09:49:19 15   you were referring to in -- in footnote 3 of your report; is

16   that right?

17   A    It's been quite a while, but this looks familiar.

18   Q    Okay.  Now, you note on page 3 of your report that in the

19   2011 plan the map drawers increased the BVAP of CD 7 from

09:49:39 20   58.33 percent to 60.55 percent.  Am I reading that correctly

21   from page 3 of your report?

22   A    Yes.

23   Q    And those are the same numbers reflected here on the

24   screen on PX-83 page 424 in the submission drafted by the state

09:49:55 25   of Alabama to the U.S. Department of Justice; is that right?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 36**

903

```
        1  A    Correct.

        2  Q    But you used the definition obtained by counsel in

        3  calculating the percentages in Table 1 of your report, which is

        4  on page 4 of your report; is that right?

09:50:12 5  A    Correct.  So as I've said, the definition in Table 1 is

        6  single-race non-Hispanic black, which is also the definition I

        7  used in social science research.

        8  Q    So if we look at your Table 1 on page 4 of your report,

        9  based on your calculation, using single-race non-Hispanic

09:50:43 10 black, you report the black voting age population of District 7

        11 under the 2011 plan as 60.34.  Do you see that?

        12 A    Yes.

        13 Q    And that's a different BVAP number than reported in the

        14 state of Alabama's preclearance submission for that same

09:51:02 15 district under the 2011 plan; is that right?

        16 A    Yes.  Slightly different.  Yes.

        17 Q    And, in fact, it's different than the BVAP reported by you

        18 in just the previous page of your report, in the background

        19 section of your report?

09:51:20 20 A    Right.  Which is taken from the preclearance submission.

        21 Q    There's about a two-tenths of a percentage point between

        22 those two metrics, right?

        23 A    Correct.

        24        THE COURT:  And where did you get your data for the

09:51:35 25 BVAP of District 7 in 2011?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 37**

```
 1        THE WITNESS:  Well, those -- that was from
 2   calculations I made, Your Honor.  I think I was using
 3   Mr. Cooper's data files, the block equivalency files.
 4        Now, I may have -- I'm trying to reconstruct what I did.
 5   I may have added to those block equivalency files.  I may have
 6   gone back to the census and merged the demographic data back
 7   in, from what I remember.
 8   BY MS. KHANNA:
 9   Q    And just to clarify, Dr. Hood, I'm not asking about any of
10   Mr. Cooper's illustrative plans right now.  I'm talking solely
11   about the enacted 2011 plan and your calculation of the BVAP in
12   that plan.  And if I understand you correctly, your calculation
13   of the BVAP in that plan is lower than the BVAP reported by the
14   state of Alabama; is that right?
15   A    Yes.
16   Q    Does the fact that that number is lower, does it give you
17   reason to believe that Mr. Cooper's statement that the state of
18   Alabama actually used black Hispanics in its count of
19   African-Americans for preclearance purposes, does it give you
20   reason to believe that that statement is true?
21   A    Not on its face.  I would have to look into it.
22   Q    But there's some discrepancy there that would require some
23   further investigation; is that right?
24   A    I think that's fair.
25   Q    And you did not perform any analysis to determine why the
```

09:51:54
09:52:10
09:52:30
09:52:46
09:52:56

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 38**

|   | |
|---|---|
| 1 | number reported in the preclearance report is different than |
| 2 | the number reported on Table 1 of your report; is that right? |
| 3 | A    That's correct. |
| 4 | Q    Dr. Hood, I believe you testified on direct that you're |
| 09:53:28 5 | not aware of any evidence or studies that would show that |
| 6 | African-Americans who are single-race non-Hispanics black vote |
| 7 | cohesively with African-Americans who might have other minority |
| 8 | affiliations as well; is that right?  I apologize if I |
| 9 | misstated that.  You can correct me. |
| 09:53:50 10 | A    I think that's pretty close.  I mean, what I am trying to |
| 11 | say is that typically -- at least in the social sciences when |
| 12 | I'm doing this type of research, you know, we look at people |
| 13 | who have identified by one racial category who are non-Hispanic |
| 14 | to do the analysis, if that makes sense. |
| 09:54:10 15 |         THE COURT:  So you rely on self-identification of race |
| 16 | by people in -- when you're doing your studies of them? |
| 17 |         THE WITNESS:  Yes.  I mean, certainly any census data |
| 18 | is self-identification.  We have allowed -- the Census Bureau |
| 19 | is allowing the individual to identify with the racial and |
| 09:54:31 20 | ethnic categories that they want to. |
| 21 |         THE COURT:  Okay.  And if -- I don't know if this is |
| 22 | true or not -- but if the voter registration document only |
| 23 | allowed a choice of -- I don't know -- hypothetically, white, |
| 24 | black, other, would you be using those who identified as black? |
| 09:55:00 25 |         THE WITNESS:  Yes.  Yes, Your Honor. |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 39**

|   |   |
|---|---|
| | 1 |  THE COURT:  Okay. |
| | 2 |  THE WITNESS:  Yes. |
| | 3 | BY MS. KHANNA: |
| | 4 | Q    And if I understand your position correctly, before you |
| 09:55:13 | 5 | would countenance the inclusion of, for example, black |
| | 6 | Hispanics, someone who is both black and Hispanic at the same |
| | 7 | time in the metric of black voting age population, you would |
| | 8 | need to see some kind of evidence of cohesion between blacks |
| | 9 | and Hispanics; is that right? |

1      THE COURT:  Okay.

2      THE WITNESS:  Yes.

3  BY MS. KHANNA:

4  Q    And if I understand your position correctly, before you

5  would countenance the inclusion of, for example, black

6  Hispanics, someone who is both black and Hispanic at the same

7  time in the metric of black voting age population, you would

8  need to see some kind of evidence of cohesion between blacks

9  and Hispanics; is that right?

10  A    Well, I would just say that if -- again, just to back up

11  for a second.  Black is a racial category.  Hispanic is an

12  ethnicity.  So you can be both black and Hispanic.

13      Now, in my own research in political science, anyone that

14  identifies themselves as Hispanic, I count as Hispanic, whether

15  they identify as white, black, Asian, American Indian.  However

16  they identify racially, I identify them as Hispanic because

17  they have said ethnically they're Hispanic.  So I think that --

18  hopefully that answers that.

19      I would not categorize someone who said they were a black

20  and Hispanic as black.  I would categorize them as Hispanic.

21  Q    I understand.

22  A    And I have done that consistently for more than 20 years I

23  think, so...

24  Q    And I believe you testified both in your report and on

25  direct that before you would ever categorize or consider

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 40**

```
 1  categorizing someone who is both black and Hispanic as
 2  African-American, you would need to see some evidence of
 3  cohesion between those racial and ethnic groups; is that right?
 4  A    Well, I think that's one reason you don't classify -- or I
 5  don't classify them as black versus Hispanic.  Again, I would
 6  keep them in the Hispanic category.  Now, you can do an
 7  analysis and say, How are Hispanics voting?  You know, that's a
 8  different question, though.
 9  Q    Dr. Hood, you are aware that Dr. Palmer's study of
10  racially polarized voting relied on voting registration data,
11  right?
12  A    Yes.
13  Q    And you provide no basis in your report to refute
14  Dr. Palmer's analysis of the extent to which African-Americans
15  vote cohesively; is that right?
16  A    That's correct.
17  Q    You would agree that unlike the census form, Alabama's
18  voter registration form specifically instructs individuals to
19  choose only one race or ethnicity; is that right?
20  A    That is correct.
21  Q    They're not -- they can't check both black and Hispanic on
22  that form, or they're not instructed to?
23  A    They're not supposed to, I guess is the way to put it.
24  Q    So it's entirely possible that someone who is both black
25  and Hispanic would mark both boxes on the census form, and then
```

09:56:43 (line 5)
09:57:03 (line 10)
09:57:16 (line 15)
09:57:26 (line 20)
09:57:38 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 41**

1    when following the instructions on Alabama's voter registration

2    form, would choose only black?

3    A    It's possible.

4    Q    And the same goes for someone who self-identifies as both

09:57:55 5    black and white on the census form, that person may well choose

6    just black on their voter registration form following a

7    different set of instructions; is that right?

8    A    It's possible, yes.

9    Q    And you would agree that there's really no way to figure

09:58:09 10    out what percentage of individuals self-identified as bi-racial

11    or black and Hispanic on the census form also self-identified

12    as black on their voter registration form; is that right?

13    A    I think we can agree on that, yes.  There's no way to

14    determine that.

09:58:24 15    Q    So as I just mentioned and as we already discussed, you

16    state on page 4 of your report that you're unaware of any

17    research that would indicate that black citizens exhibit

18    cohesive voting patterns with people who are both black and

19    Hispanic, correct?

09:58:41 20    A    Correct.

21    Q    Are you aware of any analysis presented by plaintiffs

22    indicating that Alabama's relatively small Hispanic and

23    multi-race population exhibits cohesive voting patterns with

24    black citizens?

09:58:55 25    A    I am not aware, no.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 42**

1 Q    Could we please pull up Dr. Palmer's report, which is

2 Plaintiffs' Exhibit 79 on page 17?

3       Now, Dr. Hood, you reviewed Dr. Palmer's report before

4 drafting your own report; is that right?

09:59:11 5 A    That is correct.

6 Q    In fact, you were specifically tasked with responding to

7 Dr. Palmer's report; is that right?

8 A    That is correct.

9 Q    Now, this is Table 1 of Dr. Palmer's report reflecting his

09:59:21 10 county-wide racially polarized voting analysis.  And Dr. Palmer

11 explained in his report that the other category on the very far

12 right-hand side includes Hispanics, Asians, native Americans,

13 and people who did not identify race on their voter

14 registration forms.  Do you recall that?

09:59:41 15 A    Yes.

16 Q    And that -- he also noted in his report that approximately

17 3 percent of the population fell into that other category?

18 A    I mean, I believe that's right.  It's been quite a while

19 since I looked at it.

09:59:53 20 Q    Okay.  Now, you would agree that according to Dr. Palmer's

21 analysis, the point estimates of the other vote share here

22 indicate that a majority of the other category votes in favor

23 of the African-American preferred candidate; is that right?

24 A    Well, the point estimate, yes.  If you look at the

10:00:10 25 credible interval, though, it drops below 50 percent.  For

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 43**

1  instance, U.S. President, the point estimate is 62.7, but the

2  range is 30.6 to 91.8.

3  Q    And you were -- sorry.

4  A    So we're really not sure.

10:00:27  5  Q    And you weren't in the courtroom when Dr. Palmer

6  testified, were you?

7  A    I just got here yesterday.

8  Q    I know.  For the record.

9       And so Dr. Palmer agreed that in the county-level analysis

10:00:41 10  there was just too few data points, too few numbers to make the

11  confidence interval more narrow.

12      If we could turn to Table 3 of this same report on page

13  19.  This is Dr. Palmer's precinct-level analysis of

14  Congressional District 1.  You see here that according to

10:01:04 15  Dr. Palmer's analysis over 70 percent of the other category

16  votes in favor of the African-American preferred candidate in

17  CD 1?

18  A    Yes.

19  Q    And all of the confidence intervals exceed 50 percent; is

10:01:19 20  that right?  Except for, looks like one, which is 49.3?

21  A    For lieutenant governor, yes.

22  Q    Could we please turn to Table 4 on the next page?

23      And here we see even a higher percentage of the other

24  category voting in favor of the African-American preferred

10:01:37 25  candidate in CD 2; is that right?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 44**

911

| | |
|---|---|
| 1 | A    Yes. |
| 2 | Q    And here the point estimates are well above 60 percent at |
| 3 | the very least; is that right? |
| 4 | A    Yes. |
| 10:01:49  5 | Q    Let's go to Table 5 on the next page. |
| 6 | We see a similar story in Congressional District 3, where |
| 7 | the vast majority of people in the other category are voting |
| 8 | alongside the African-American group for the African-American |
| 9 | preferred candidate.  Would you agree with that? |
| 10:02:08 10 | A    Yes. |
| 11 | Q    And can we please turn to Table 6 on the next page? |
| 12 | Similar story in CD 7.  Would you agree?  We see -- |
| 13 | A    Well, except for Governor, it looks like.  Otherwise, |
| 14 | similar story, yes. |
| 10:02:28 15 | Q    Okay.  If we turn to Table 7 on the next page. |
| 16 | This table reflects Dr. Palmer's precinct level-analysis |
| 17 | of racial voting patterns in the focus area as a whole.  You |
| 18 | would agree, Dr. Hood, wouldn't you, that according to |
| 19 | Dr. Palmer's analysis, over 86 percent of the other category |
| 10:02:48 20 | votes cohesively with African-Americans for the |
| 21 | African-American preferred candidate? |
| 22 | A    According to that table, yes. |
| 23 | Q    And you provide no response to Dr. Palmer's analysis of |
| 24 | racial voting patterns in this table or any other pattern; is |
| 10:03:04 25 | that right? |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 45**

912

```
 1  A    Correct.
 2         THE COURT:  We're still talking about the population
 3  that -- or voting age population that's roughly 3 percent,
 4  correct?
10:03:15  5         MS. KHANNA:  Yes, Your Honor.
 6         THE COURT:  Okay.
 7  BY MS. KHANNA:
 8  Q    Dr. Hood, is it your position that anyone who is both
 9  black and Hispanic should not be considered African-American?
10:03:35 10  A    Well, they can personally identify however they want to.
11  I'm just talking about the way I conduct social science
12  research.
13         Again, I take anyone who's identified ethnically as
14  Hispanic and consider them to be Hispanic in my own research.
10:03:54 15  Q    And you take a similar approach to anyone who
16  self-identifies as both black and another race; is that right?
17  A    Yes.
18  Q    If they identify as both black and white, they are
19  neither?  What are they, as far as --
10:04:09 20  A    Well, they would be in the other category --
21  Q    Okay.
22  A    -- like Dr. Palmer had.
23  Q    Now --
24  A    I would create another category for those individuals.
10:04:17 25  Q    Okay.  So in your own academic literature, you have
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 46**

1  referred to President Barack Obama as this country's first

2  black president, haven't you?

3  A   I'm sure I have at some point.

4  Q   And you would agree that President Obama had a black

10:04:34  5  father and a white mother; is that correct?

6  A   Yes.

7  Q   But according to your definition that you advance in your

8  report in this case, as a statistical matter, President Obama

9  would not qualify as an African-American in your studies; is

10:04:47 10  that right?

11  A   Not according to that definition, no.

12  Q   Dr. Hood, you would agree that at least one of the reasons

13  that African-Americans vote cohesively is because they share a

14  common history of discrimination; is that right?

10:05:01 15  A   Yes, that's part of it.

16  Q   Dr. Hood, you are aware that Mr. Cooper used the AP black

17  category from the census to determine the black voting age

18  population in his illustrative district; is that right?

19  A   Yes.

10:05:24 20  Q   And it's fair to say that you are not aware of what metric

21  courts use in voting rights cases to determine who is

22  considered black when looking at illustrative districts; is

23  that right?

24  A   I guess it could vary potentially.

10:05:39 25  Q   Are you aware one way or the other what metric courts tend

**Caster Plaintiffs' Exhibit 87, Page 47**

914

|     |   |     |
|-----|---|-----|
|     | 1 | to use? |
|     | 2 | A    No. |
|     | 3 | Q    And you have no reason to dispute Mr. Cooper's statement |
|     | 4 | that courts in Section 2 cases generally use the AP black |
| 10:05:55 | 5 | metric; is that right? |
|     | 6 | A    Well, I don't necessarily know that that's true or false I |
|     | 7 | guess is what I would say. |
|     | 8 | Q    You have no reason to dispute it one way or the other? |
|     | 9 | A    I don't have any information one way or the other. |
| 10:06:07 | 10 | Q    So, Dr. Hood, you would agree that even using your |
|     | 11 | preferred definition of black to mean single-race non-Hispanic |
|     | 12 | black, Districts 2 and 7 are both over 50 percent black voting |
|     | 13 | age population in Mr. Cooper's illustrative plan 1; is that |
|     | 14 | right? |
| 10:06:27 | 15 | A    That is correct. |
|     | 16 | Q    And even using your definition of black, you would agree |
|     | 17 | that Districts 2 and 7 are both over 50 percent black voting |
|     | 18 | age population in Mr. Cooper's Illustrative Plan 2; is that |
|     | 19 | right? |
| 10:06:41 | 20 | A    That is correct. |
|     | 21 | Q    We'll move on to your discussion of district core |
|     | 22 | retention. |
|     | 23 |      Now, you defined core retention as the percentage of a |
|     | 24 | district's population that is held over from the previous |
| 10:07:01 | 25 | version of that district, correct? |

**Caster Plaintiffs' Exhibit 87, Page 48**

```
            1   A      Correct.
            2   Q      And you note in your report that core retention is one of
            3   the stated redistricting criteria in the legislature's adopted
            4   guidelines governing the redistricting process.  Do you see
10:07:16    5   that?
            6   A      Yes.
            7   Q      And you relied on those guidelines in drafting your
            8   report?
            9   A      I certainly looked at them, yes.
10:07:20   10   Q      And I believe on page 6, footnote 10 of your report, you
           11   cite to the document marked Chestnut Defense 0267 in referring
           12   to those guidelines; is that right?
           13   A      Yes.
           14   Q      And you write there that, This criterion was a stated
10:07:40   15   objective of the 2011 congressional plan; is that correct?
           16   A      Yes.
           17   Q      Can we please call up Plaintiffs' Exhibit 83, page 267,
           18   and you'll see here that the Bates number here is Chestnut
           19   Defense 0267.
10:08:03   20         Is this the page that you're referring to when you were
           21   drafting your report?
           22   A      Well, that is the page number that's listed there.
           23   Q      And there you'll see at the bottom in 7D it says, The plan
           24   will attempt to preserve the cores of existing districts.  Do
10:08:27   25   you see that?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 49**

```
 1  A    Yes.
 2  Q    I also want to call out paragraph 7 at the top.  Here it
 3  says, The following redistricting policies are embedded in the
 4  political values, traditions, customs, and usages of the state
10:08:40 5 of Alabama and shall be observed to the extent that they do not
 6  violate or subordinate the foregoing policies prescribed by the
 7  Constitution and laws of the United States and of the state of
 8  Alabama.  Did I read that correctly?
 9  A    Yes.
10:08:56 10 Q    And we can delete those out now.
11        And also included in Section 7 is avoiding contests
12  between incumbents.  You see that in 7A?
13  A    Correct.  Correct.
14  Q    Right?  And we also see another paragraph about
10:09:16 15 communities of interest in 7B, is that right?
16  A    Correct.
17  Q    Could we turn back a few pages to the first page of
18  this -- of this part of the document, to page 260 of
19  Plaintiffs' Exhibit 83?
10:09:29 20       This is the -- the first page of the guidelines that you
21  were referring to, Dr. Hood.  Would you agree with me that
22  based on the first paragraph that these guidelines actually
23  apply to the 2000 redistricting cycle and not the 2010
24  redistricting cycle?
10:09:47 25 A    That's what it says.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 50**

1    Q    Were you aware of that at the time you wrote this report?

2    A    No.

3    Q    Can we please pull up Plaintiffs' Exhibit 84?

4         So, Dr. Hood, have you -- did you review this document in

10:10:16  5    preparing your report?

6    A    I may have.  I'm not certain.

7    Q    You don't cite to this document in any of the footnotes in

8    your report; is that right?

9    A    I believe that's correct.

10:10:27 10    Q    And I'll represent to you that these are the

11   reapportionment committee's adopted guidelines for the 2011

12   cycle.

13        If we can please turn to page 3 of Plaintiffs' Exhibit 84.

14   There at the bottom we see the same language from Section 7

10:10:46 15   that we saw in the previous version; is that right?

16   A    Yes.

17   Q    If we could turn to the next page.

18        Here we see the criterion for avoiding incumbent contests?

19   A    Right.

10:11:02 20   Q    We see a paragraph on communities of interest.  Do you see

21   that?

22   A    Yes.

23   Q    And it's actually a different paragraph, a different

24   definition than the previous version.

10:11:16 25        But nothing in that section mentions core preservation; is

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 51**

918

| | |
|---|---|
| 1 | that correct? |
| 2 | A    I don't see it. |
| 3 | Q    And if I told you that the word core did not appear once |
| 4 | in the guidelines that governed the 2011 redistricting process, |
| 10:11:31 5 | would that affect your opinion of whether that criterion, in |
| 6 | fact, was a stated objective of the 2011 congressional plan? |
| 7 | A    Well, if it wasn't stated, it wasn't stated. |
| 8 | Q    Dr. Hood, you would agree that whether based on the |
| 9 | guidelines or anything else, the attempt to preserve cores of |
| 10:11:52 10 | existing districts may not trump compliance with the Voting |
| 11 | Rights Act, correct? |
| 12 | A    Well, in footnote 10, I state that essentially. |
| 13 | Q    In footnote 10 you say, quote, I am not arguing that this |
| 14 | criterion overrides all redistricting criteria, as it certainly |
| 10:12:12 15 | does not; is that right? |
| 16 | A    Right.  That's what I am referring to. |
| 17 | Q    Right.  And so specifically I'm saying it does not -- you |
| 18 | would agree that it does not and cannot trump compliance with |
| 19 | Section 2 of the Voting Rights Act, correct? |
| 10:12:23 20 | A    That's correct. |
| 21 | Q    In determining the district core retention of plaintiffs' |
| 22 | illustrative plans, you compare each of those illustrative |
| 23 | plans to the enacted 2011 plan; is that right? |
| 24 | A    Yes. |
| 10:12:38 25 | Q    And you report how each illustrative district fares on |

**Caster Plaintiffs' Exhibit 87, Page 52**

919

1  your measure of core retention?

2  A    Yes.

3  Q    But you did not report how the 2011 plan fares on your

4  measure of core retention relative to the previous districts,

10:12:55  5  correct?

6  A    That's correct.

7  Q    And you performed no analysis of the core retention of the

8  2011 plan, as compared to the previous 2001 plan?

9  A    That's correct.

10:13:02  10  Q    So you determine on page 5 of your report that plaintiffs'

11  illustrative plans to a large extent do, in fact, preserve the

12  cores of districts under the enacted plan with the exception of

13  one district; is that right?

14  A    Yes.

10:13:19  15  Q    I believe you testified on direct, as well, that district

16  core retention is fairly high for six of the seven districts;

17  is that right?

18  A    Yes.

19  Q    And that includes District 1, correct?

10:13:31  20  A    Yes.

21  Q    The only exception to that -- your conclusion in that

22  regard was District 2, according to your report; is that right?

23  A    Correct.

24  Q    Dr. Hood, you're familiar with the *Gingles* preconditions,

10:13:46  25  are you not?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 53**

920

 1   A    Yes.

 2   Q    You would agree that the first *Gingles* precondition

 3   requires Section 2 plaintiffs to actually draw a new

 4   minority-majority district where previously there was not one;

10:13:57  5   is that right?

 6   A    Yes.

 7   Q    And you understand that plaintiffs here claim that the

 8   Alabama congressional plan should contain a second

 9   majority-minority district, as opposed to its current

10:14:07 10   configuration, which includes only one such district?

11   A    Correct.

12   Q    And you understand that plaintiffs' illustrative plans

13   propose that District 2 be transformed from a non

14   majority-minority district into a majority-minority district,

10:14:24 15   correct?

16   A    Yes.

17   Q    So by your own calculation in Table 1, CD 2 under the

18   enacted plan had a BVAP of 28.26 percent, correct?

19   A    Yes.

10:14:38 20   Q    And it's fair to say that is decidedly not a majority

21   black district?

22   A    I think my calculation was 27.76.

23   Q    Fair enough.  27.76?

24   A    Yes.

10:14:52 25   Q    Under your metric?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 54**

921

```
        1  A    Right.
        2  Q    Still not a majority-minority district, correct?
        3  A    Correct.
        4  Q    And by your calculation, at least three of plaintiffs'
10:15:07  5  illustrative plans redraw CD 2 to have a BVAP of over
        6  50 percent; is that right?
        7  A    Yes.
        8  Q    And you have performed no analysis whatsoever to determine
        9  whether it would be possible to draw an additional
10:15:25 10  majority-minority district in the congressional plan while
       11  retaining a higher percentage of the core of the 2011 version
       12  of the district than plaintiffs' illustrative plans do,
       13  correct?
       14  A    I did not perform that analysis.
10:15:37 15  Q    And you would agree that you can't create a second
       16  majority-minority district, as *Gingles 1* requires plaintiffs to
       17  do, without shifting a fair bit of population in that district
       18  as compared to the 2011 plan, correct?
       19  A    There would have to be quite a bit of population shifting,
10:15:55 20  yes.
       21  Q    You've been involved in Section 2 cases before?
       22  A    Yes.
       23  Q    Isn't it true that you can't recall a single case in which
       24  a proposed majority-minority district has been rejected because
10:16:08 25  it was considered to inadequately retain the core of the
```

**Caster Plaintiffs' Exhibit 87, Page 55**

922

| | |
|---|---|
| 1 | enacted plan? |
| 2 | A    I think that's a fair statement, yes. |
| 3 | Q    And you expressed no opinion in your report about whether |
| 4 | the African-American population is, in the 2011 plan, cracked |
| 10:16:25  5 | among CDs 1, 2, and 3, do you? |
| 6 | A    No, I don't. |
| 7 | Q    And you express no opinion in your report about whether |
| 8 | the African-American population is packed within CD 7 under the |
| 9 | 2011 plan, correct? |
| 10:16:37 10 | A    Correct. |
| 11 | Q    Moving on to your analysis of population shifts. |
| 12 | Now, here you provide an analysis of population shifts in |
| 13 | plaintiffs' illustrative plans relative to the 2011 plan, |
| 14 | correct? |
| 10:17:03 15 | A    Correct. |
| 16 | Q    You provide no analysis of population shifts in the 2011 |
| 17 | plan relative to the 2001 plan, do you? |
| 18 | A    No. |
| 19 | Q    So it's fair to say that the reason you performed this |
| 10:17:21 20 | particular analysis comparing the illustrative plans to the |
| 21 | 2011 plan is because if a remedy map were granted in this case, |
| 22 | the Court would be starting from the 2011 enacted plan; is that |
| 23 | right? |
| 24 | A    I think that's fair.  I thought that was the best |
| 10:17:38 25 | comparison point. |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 56**

923

```
          1   Q    And are you aware, Dr. Hood, that the Court has already

          2   decided that it will not be issuing a remedy plan regardless of

          3   whether the current plan violates Section 2?

          4   A    I am aware of that, yes.

10:17:49  5   Q    So you calculate that in plaintiffs' illustrative plans a

          6   majority of the individuals that moved into District 2 are

          7   African-American, correct?

          8   A    Yes.

          9   Q    And a majority of the individuals moved out of District 2

10:18:09 10   are white?

         11   A    Yes.  As compared to the enacted plan.

         12   Q    And District 2 is plaintiffs' proposed new

         13   majority-minority district, correct?

         14   A    Correct.  When you say -- can I ask a clarification?

10:18:25 15   Q    Oh, absolutely.

         16   A    So when you a majority-minority, are we saying majority

         17   black?  Is that fair?

         18   Q    I'm using those terms interchangeably.  Thank you for

         19   clarifying.

10:18:33 20   A    Okay.

         21   Q    But is it your understanding that Mr. Cooper's

         22   illustrative plans propose that District 2 be drawn as a

         23   majority BVAP district?

         24   A    Okay.  I'm -- I just wanted to make sure we had the same

10:18:55 25   terminology.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 57**

924

```
 1          THE COURT:  And she changed the terminology on you --
 2    BY MS. KHANNA:
 3    Q    I changed it on you.
 4          THE COURT:  -- didn't she?
10:19:01  5  BY MS. KHANNA:
 6    Q    Majority-minority district in this context refers to a
 7    majority black district --
 8    A    Okay.
 9    Q    -- as far as my questions are concerned.
10:19:08 10   A    Okay.  That's fine.
11    Q    And maybe you already answered this, but section --
12    District 2 is, in fact, that proposed majority-minority
13    district as far as plaintiffs' maps are concerned, correct?
14    A    Correct.
10:19:22 15   Q    And, as we've already discussed, Section 2 plaintiffs are
16    required to propose a new majority-minority district under the
17    first Gingles precondition, correct?
18    A    Correct.
19    Q    Dr. Hood, you do not know whether it would be possible to
10:19:37 20   draw a second majority-minority district without the racial
21    pattern you observe, correct?
22    A    Well, there are many permutations that might be possible.
23    I was looking at the four permutations provided by the
24    plaintiffs -- by Mr. Cooper specifically.
10:19:55 25   Q    But you do not know, as you testified today or in drafting
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0080/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 58**

```
 1  your report, whether it would be possible to draw a second
 2  majority-minority district without the racial pattern that you
 3  observe; is that right?
 4  A    I don't know definitively, because, again, there are many,
 5  many possibilities out there.
 6           THE COURT:  That wasn't your job, was it?
 7           THE WITNESS:  No, Your Honor.
 8  BY MS. KHANNA:
 9  Q    You also don't know whether it would be possible to draw a
10  second majority-minority district in a manner in which race and
11  population movements are entirely unrelated; is that right?
12  A    Again, I'll say it hypothetically could be possible.
13  Q    But you didn't perform any such analysis here?
14  A    No.
15  Q    You didn't even attempt such an analysis here, correct?
16  A    Well, I wasn't asked to do that.
17  Q    Okay.  I'm going to -- let's hypothetically assume we have
18  a district with 100 voting age individuals.
19  A    Okay.
20  Q    Let's assume that 28 of those voting age individuals are
21  black and 72 of those individuals are white.  So far so good?
22  A    Okay.  I'm with you.
23  Q    Now, that's time one.  That's District 1 time one, right?
24  Let's assume that time two, we have that same district, that
25  district has now been redrawn, and the redrawn version has the
```

10:20:11  (line 5)
10:20:33  (line 10)
10:20:48  (line 15)
10:21:06  (line 20)
10:21:29  (line 25)

**Caster Plaintiffs' Exhibit 87, Page 59**

926

```
      1  same number of voting age individuals -- still 100 -- except
      2  now 51 of those individuals are black and 49 are white.
      3  A    Okay.
      4  Q    You with me?
10:21:44  5  A    I'm -- so far.
      6  Q    Now, let's assume that the process -- how you got from
      7  between time one and time two, let's assume the process was
      8  perfectly consistent with traditional districting principles.
      9  It's a perfect circle of a district, there was no counties
10:22:03 10  split, everything at the end -- everything is as clean as it
     11  ever can possibly be in any hypothetical world.  But it just so
     12  happens at the end of this process, 51 of the voting age
     13  individuals are black and 49 are white.  Sound good?
     14  A    Okay.
10:22:21 15  Q    Is there any mathematical way for this transformation from
     16  a 100-person district with 28 black voters to a 100-person
     17  district with 51 black voters to occur without having a
     18  majority of the voting age population move into the district be
     19  black?
10:22:40 20       MR. DAVIS:  Your Honor, before he responds, I would
     21  like to object.  Thank goodness my expert's a lot smarter than
     22  I am.  There would be too many numbers for me to follow without
     23  there being something up on the board.
     24       If Dr. Hood is comfortable answering, I will sit down and
10:22:54 25  withdraw my objection.  But this is an awful lot of numbers to
```

**Caster Plaintiffs' Exhibit 87, Page 60**

```
 1   try to keep in a person's head.

 2            THE COURT:  Can you answer that question?

 3            THE WITNESS:  Can you say it one more -- the

 4   question -- the question part one more time?

 5   BY MS. KHANNA:

 6   Q    So let's assume that the districts are always 100 people?

 7   A    I'm with you.

 8   Q    You're with me on that?

 9   A    Just read the --

10            THE COURT:  I think he may have the numbers.

11   BY MS. KHANNA:

12   Q    Is there any mathematical way for this district -- for

13   this transformation from a district with 28 black voters to a

14   district with 51 black voters to occur without having a

15   majority of the individuals moved into the district be black?

16   A    Well, I would say in answer that, to some degree, there

17   would have to be blacks citizens shifted into that hypothetical

18   district to create a black majority.  And there would have to

19   be white citizens shifted out of that district to, again,

20   create that black majority.

21        I mean, that's the way I would answer that.

22   Q    There's no mathematical way for it to be otherwise,

23   correct?  If you are going to go from a district where 28 out

24   of 100 black voters to a district with 51 out of 100 black

25   voters?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 61**

Timestamps: 10:23:08 (line 5), 10:23:14 (line 10), 10:23:29 (line 15), 10:23:52 (line 20), 10:24:06 (line 25)

928

```
 1  A    In terms of whose -- so are we asking -- are we at the
 2  point now where we are having to say you would have to shift in
 3  more black voters and shift out more white voters?
 4  Q    Yes.
 5  A    Something like that would have to occur to reach those
 6  numbers.
 7  Q    Now, you conclude in your report that race and population
 8  movement are related in plaintiffs' illustrative plans; is that
 9  right?
10  A    Correct.
11  Q    You would agree that in order to draw a majority-minority
12  district in Alabama one is -- one would have to consider race
13  to some extent, correct?
14  A    Correct.
15  Q    And you expressed no opinion as to whether race actually
16  predominated in the drawing of any of the illustrative plans,
17  correct?
18  A    That is correct.
19  Q    Now, in the next section of your report regarding district
20  functionality, you expressed concern about whether plaintiffs'
21  proposed majority-minority districts will actually provide
22  African-Americans the opportunity to elect their preferred
23  candidates, correct?
24  A    That's fair.
25  Q    And you've heard the term functional analysis before as it
```

Timestamps: 10:24:22 (line 5), 10:24:37 (line 10), 10:24:46 (line 15), 10:25:11 (line 20), 10:25:26 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 62**

```
 1   applies to majority-minority districts?
 2   A    Yes.
 3   Q    And a functional analysis determines whether a
 4   hypothetical district could function as a minority opportunity
10:25:39 5   to elect district if it were put into place; is that right?
 6   A    That's the idea behind it, yes.
 7   Q    So if a district could, in fact, function as a minority
 8   opportunity district, then that means, while there's no
 9   guarantee that it's possible, that the minority group in the
10:25:55 10  district that comprises the majority would be able to elect
11   their candidate of choice?
12   A    There's no guarantee.  It's a hypothetical.
13   Q    It's an opportunity is what it is, correct?
14   A    Right.  But the functional part is a hypothetical.
10:26:10 15  Q    It's a hypothetical -- a functional analysis is, in fact,
16   an actual analysis that experts can perform to help answer this
17   question of what the opportunity to elect would be?
18   A    Well, I'm not saying that the analysis is hypothetical.
19   I'm saying it's based on a hypothetical set of circumstances.
10:26:26 20  Q    Because nobody can look in the future and tell you exactly
21   what will happen in the next election, right?
22   A    Exactly.  That's what I am saying.
23   Q    And you did not perform any functional analysis of any of
24   the illustrative districts in Mr. Cooper plan, correct?
10:26:40 25  A    Correct.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 63**

930

1   Q    So what you did do in on page 11 of your report is analyze

2 voter turnout statewide in Alabama; is that right?

3   A    Correct.

4   Q    And you say that you did this to draw some inferences

10:26:53 5 about the functionality of plaintiffs' illustrative districts,

6 correct?

7   A    Correct.

8   Q    So you note that the implication of your statewide look at

9 voter turnout is that a bare voting age majority of a racial

10:27:07 10 group may not be able to actually function as such electorally

11 speaking.  Did I read that correctly?

12   A    Yes.

13   Q    You never actually examined turnout in plaintiffs'

14 illustrative districts, do you?

10:27:18 15   A    No.

16   Q    You just look at the state as a whole?

17   A    That's correct.

18   Q    And you look at the percentage of each racial group's

19 registered voters who turned out, correct?

10:27:29 20   A    That is how turnout is measured, yes.

21   Q    You did not look at each racial group's percentage of the

22 voters who turned out as a whole?

23   A    No.

24   Q    So you note on Table 7 that five of the six elections this

10:27:57 25 decade -- for five of those six elections that you analyzed,

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 64**

931

1    white registrants turned out in higher proportions than black

2    registrants; is that right?

3    A     Yes.

4    Q     By an average of around 5 percent?

10:28:10  5    A     Yeah.  4.8.  Yes.

6    Q     There was one election for which that was not true,

7    correct?

8    A     That is correct.

9    Q     That was the 2012 presidential election?

10:28:19 10    A     Yes.

11    Q     In which black turnout was .9 percentage points higher

12    than white turnout?

13    A     That is correct.

14    Q     So in that instance, not only was the margin between white

10:28:32 15    and black voting narrowed, it was flipped?

16    A     That's correct.

17    Q     And that was the presidential election between

18    Presidential Obama and Mitt Romney; is that right?

19    A     Correct.

10:28:42 20    Q     You would agree that it's possible that having a viable

21    black candidate on the ballot would, in fact, drive higher

22    black turnout?

23    A     Certainly possible, yes.

24    Q     You would agree there are many factors that can affect

10:28:55 25    turnout rates in given district in a given election, correct?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 65**

932

```
 1  A     There are a multitude of factors that affect turnout.

 2  Q     That would include enthusiasm for the election, correct?

 3  A     Correct.

 4  Q     And it would include the possibility that one's preferred

 5  candidate might actually have a chance at winning, correct?

 6  A     The perception of that, yes.

 7  Q     Now, at the beginning of this section of your report, you

 8  note that none of plaintiffs' experts have produced any

 9  analysis to determine if these illustrative districts could,

10  indeed, function as black opportunity to elect districts.  Do

11  you see that?

12  A     Right.

13  Q     And you are aware that subsequently Dr. Palmer in his

14  reply report did provide such an analysis; is that right?

15  A     Correct.

16  Q     And Dr. Palmer calculated black turnout as a percentage of

17  total turnout in plaintiffs' illustrative Districts 2 and 7; is

18  that right?

19  A     From what I remember, yes.

20  Q     And he also measured the racial breakdown of the actual

21  voters in the 2018 election in plaintiffs' illustrative

22  Districts 2 and 7.  Do you recall that?

23  A     Yes.

24  Q     You would agree the issue you raised earlier in your

25  report regarding how to determine who gets counted as black
```

10:29:05 — line 5
10:29:24 — line 10
10:29:36 — line 15
10:29:47 — line 20
10:30:02 — line 25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 66**

```
 1  does not apply to any of Dr. Palmer's analyses, correct?
 2  A    Right.  I believe he is using black as defined by those
 3  who check the box "black" on the voter registration form.
 4  Q    And you don't have any qualms with Dr. Palmer's
 5  calculations in his functionality analysis, correct?
 6  A    No.
 7  Q    You would agree that Dr. Palmer's analysis and his
 8  rebuttal report shows that the African-American preferred
 9  candidates are winning and would win in both Districts 2 and 7
10  in all the illustrative plans, correct?
11  A    According to his calculations, yes.
12  Q    And you would agree that, based on what he's reported in
13  his rebuttal report, Dr. Palmer's analysis shows that Districts
14  2 and 7 in the illustrative plans would function as
15  African-American opportunity districts, correct?
16  A    According to his calculations, yes.
17  Q    Now, on page 14 of your report, you discuss -- you have a
18  section entitled Black Voting Patterns that you also discussed
19  with counsel on direct, correct?
20  A    Correct.
21  Q    And, basically, what you do here is you examine survey
22  data to see the levels at which African-Americans vote for the
23  Democratic party both inside and outside of Alabama?
24  A    That's correct.
25  Q    And you agree, based on your findings here, that
```

10:30:20   5
10:30:35  10
10:30:48  15
10:31:09  20
10:31:21  25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 67**

934

1 African-Americans in Alabama vote cohesively, correct?

2 A  Yes.

3 Q  And you provide no analysis of the extent of white

4 crossover voting in any of these jurisdictions, correct?

10:31:38  5 A  That's not what I was asked to do.

6 Q  You would agree --

7 A  But the answer is, yes, I didn't.

8 Q  You would agree that the extent to which white voters vote

9 for or against minority preferred candidates likely varies

10:31:50 10 across all of the jurisdictions that you looked at?

11 A  There's variance, yes.

12 Q  In many cases significance variance?

13 A  Well, I didn't perform that analysis.

14 Q  You didn't look at white crossover voting at all?

10:32:02 15 A  That is correct.

16    THE COURT:  Would this be an okay time for a break, or

17 are you almost finished?

18    MS. KHANNA:  I can finish with this section on black

19 voting patterns and then maybe take a break, if that's all

10:32:20 20 right.

21    THE COURT:  Okay.

22    MS. KHANNA:  Actually, no, I apologize, Your Honor.  I

23 think now we can take a break.  Thank you.

24    THE COURT:  Okay.  We will come back at 10:50.

10:32:29 25    (Recess.)

**Caster Plaintiffs' Exhibit 87, Page 68**

935

```
  1              THE COURT:  You may continue with cross.
  2              MS. KHANNA:  Thank you, Your Honor.
  3    BY MS. KHANNA:
  4    Q     Dr. Hood, before the break, we were talking about the
10:53:58 5    section of your report entitled Black Voting Patterns, correct?
  6    A     Correct.
  7    Q     And you conclude in the section that African-American
  8    voters both inside and outside of Alabama have almost
  9    monolithic voting patterns; is that correct?
10:54:16 10   A     Yes.
 11    Q     You offer no opinion based on this analysis as to why
 12    these voting patterns exist, do you?
 13    A     No.
 14    Q     Dr. Hood, as a political scientist, wouldn't you agree
10:54:27 15   that groups tend to vote for candidates that they perceive to
 16    be protective of their interests?
 17    A     I think that's certainly a part of it, yes.
 18    Q     In fact, there's research that suggests that
 19    African-Americans tend to vote for Democratic party candidates
10:54:40 20   because they perceive that party to be aligned with their
 21    interests, correct?
 22    A     Yes.
 23    Q     And white voters similarly tend to vote for candidates
 24    they believe to be protective of their interests, correct?
10:54:51 25   A     I think that's part of the calculus.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 69**

936

Q    And, in fact, research has shown that there was an
association between resentment of minority races and voting for
President Trump; is that correct?

A    Yes.

10:55:12     I mean, now, if we want to go off into that area, we can.
Racial resentment's a pretty complicated construct.  What
you're saying is correct.

    I've also seen people that have high racial resentment
scores be more than apt to vote for black conservative
10:55:29 candidates.  So it can cut both ways.  In fact, my own research
says that.

Q    Speaking of your own research, on page 2 of your report,
you state you are an expert in American politics, specifically
in the area of electoral politics, racial politics, election
10:55:48 administration, and southern politics; is that right?

A    Yes.

Q    And one of the articles listed in your CV, I believe it's
on page 51 of Defendant's Exhibit 11, but we don't have to call
it up.

10:56:09     It's called "Black mobilization and Republican growth in
the south.  The more things change, the more they stay the
same."  Do you recall that article?

A    Okay.  What page on my vitae is it on, if you can tell me
that?

10:56:40          THE COURT:  Are you referring to his CV?

**Caster Plaintiffs' Exhibit 87, Page 70**

1          MS. KHANNA:  Yes, Your Honor.  I'm just trying to find

2   the right page.

3   Q    Looks like it's on page 10 -- Roman numeral X at the very

4   top of your CV.

10:57:11 5   A    Okay.

6   Q    Do you recall that article?

7   A    That's a conference paper.

8   Q    It's a conference paper that you wrote?

9   A    Yes.

10:57:16 10  Q    And is it fair to say that in that paper you discuss

11  partisan change in the south after enactment of the Voting

12  Rights Act?

13  A    Well, I would really refer to the book I wrote rather than

14  a conference paper -- on the same topic.

10:57:30 15  Q    But are there any opinions in that conference paper that

16  you don't stand by today?

17  A    I wouldn't say that, but I haven't looked at that

18  conference paper in eons.

19  Q    Okay.

10:57:42 20         THE COURT:  When was that paper presented, for the

21  record?

22         THE WITNESS:  Was it presented at a conference?

23         THE COURT:  When?

24         THE WITNESS:  Oh, when?  2010 is what it says, Your

10:57:52 25  Honor.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 71**

938

1          THE COURT:  Thank you.  And was that kind of an

2     excerpt out of a book you had written?

3          THE WITNESS:  Well, that work grew into a book.

4          THE COURT:  Grew into a book, okay.  What is the book?

10:58:05  5     THE WITNESS:  So the book is listed -- it should be on

6     the first page of my vitae.  *The Rational Southerner.*

7     BY MS. KHANNA:

8     Q    Dr. Hood, in the course of both the article and the book,

9     you discuss partisan change in the south after enactment of the

10:58:27 10   Voting Rights Act; is that correct?

11    A    I certainly do.

12    Q    And you specifically discuss the partisan realignment that

13    happened in the south among black and white voters after the

14    Voting Rights Act, correct?

10:58:36 15   A    That is correct.

16    Q    Isn't it correct that once African-Americans were re-

17    enfranchised in the mid-1960s due to the Voting Rights Act,

18    African-American southerners fairly quickly realigned to the

19    Democratic party in the south?

10:58:51 20   A    I think that's almost a quote from me.

21    Q    It is, in fact, a quote.

22    A    Okay.  I'm glad I'm not going crazy.

23    Q    No.  You're paying attention.

24         They were an almost uniformly Democratic electorate from

10:59:04 25   the time they were re-enfranchised, correct?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 72**

```
 1  A     From what my research shows, yes.
 2  Q     Prior to that realignment, white southerners had
 3  overwhelmingly preferred or voted for the Democratic party; is
 4  that right?
```
10:59:15
```
 5  A     In the south, yes.  Now, again, there was only one
 6  party --
 7  Q     And you --
 8  A     -- the Democratic party.
 9  Q     That's right.  Before that time.
```
10:59:24
```
10  A     Correct.
11  Q     And you observe in your research that after the Voting
12  Rights Act white southerners subsequently realigned to
13  affiliate with the Republican party; is that right?
14  A     A very slow secular -- when I say the word "secular," I
```
10:59:38
```
15  mean slow overtime change.  I'm not talking about religion
16  there.
17        A very slow secular realignment began in the mid-1960s
18  among white southerners, yes.
19  Q     And you also observe in your research that this
```
10:59:55
```
20  realignment is primarily a function of racial and political
21  dynamics, is that correct?
22  A     Yes.
23  Q     And that is the story from 1960s through today; is that
24  right?
```
11:00:01
```
25  A     I think we went through 2008.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 73**

1   Q    So you would agree that prior to the Voting Rights Act of

2   1965, many African-Americans couldn't participate in elections,

3   period, right?

4   A    In the south, yes.

11:00:15  5   Q    They were disenfranchised?

6   A    That's correct.

7   Q    And you observed in your article that the transformation

8   we just discussed was in part due to the Voting Rights Act,

9   correct?

11:00:23 10   A    Certainly, yes.

11   Q    Specifically, your research states that the increasingly

12   liberal orientation of the National Democratic Party on the

13   issue of Civil Rights affected white southerners, correct?

14   A    Correct.

11:00:37 15   Q    And you also state that, in fact, the VRA was a milestone

16   in the development of the Republican party in the south; is

17   that correct?

18   A    Correct.

19   Q    There was also a transition at the national level at this

11:00:54 20   time where the Democratic party became more liberal on the

21   issue of civil rights for African-Americans, and the Republican

22   party became more conservative on that same issue during that

23   time; is that correct?

24   A    That's correct.

11:01:09 25   Q    Specifically, the Republican party was increasingly viewed

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 74**

```
 1  as the party of racial conservatism; is that correct?

 2  A    Yes.

 3  Q    Black mobilization led directly to the transition of

 4  whites in the Republican party -- into the Republican party in

 5  the south; is that correct?

 6  A    That's what our research finds, yes.

 7  Q    And your research also finds that Republican party growth

 8  also resulted in black mobilization; is that correct?

 9  A    In the deep south.  It's countercyclical.  Not in the rim

10  south.

11  Q    In fact, President Johnson said after the passage of the

12  1964 Civil Rights Act, that the Democratic party had lost the

13  south for a generation; is that right?

14  A    I believe that's correct.  I don't -- I don't know that we

15  quote that in the book.

16  Q    Okay.  And you would agree that that has -- seems to have

17  come to fruition?

18  A    Seems to, yes.

19          THE COURT:  Is there any particular part of the Voting

20  Rights Act that seems to have more of an effect than another?

21          THE WITNESS:  Well, I would say we're not really

22  imputing motives necessarily in terms of why someone decides to

23  join one party or the other.

24      I mean, what the Voting Rights Act did, though, was to

25  re-enfranchise African-Americans in the south.  So now there's
```

11:01:25 (line 5)
11:01:42 (line 10)
11:01:54 (line 15)
11:02:15 (line 20)
11:02:32 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 75**

942

1  a new political power block, and that's what started this

2  change, if that makes -- that makes sense.

3          THE COURT:  Okay.  Thank you.

4          THE WITNESS:  Literally the mobilization of

11:02:48 5  African-Americans into the electorate.

6          THE COURT:  Uh-huh.

7          THE WITNESS:  So...

8  BY MS. KHANNA:

9  Q   Dr. Hood, the final section of your report is entitled

11:02:58 10  Racial Comparisons.  And you testified about that section on

11  direct; is that right?

12  A   Yes.

13  Q   And you note on page 17 of your report, The key question

14  being examined is not whether disparity rates in Alabama are

11:03:12 15  higher or lower than the comparison states, but whether the

16  same pattern of black and white disparities also exists in

17  other states.  Did I read that correctly?

18  A   Yes.

19  Q   This key question as you put it, that was a question posed

11:03:29 20  to you by counsel for the defendant, correct?

21  A   The defendant -- counsel for the defendant asked me to

22  analyze this question, yes.

23  Q   You would agree that, based on your understanding of

24  Section 2, that is not the key question under Section 2; is

11:03:44 25  that correct?

**Caster Plaintiffs' Exhibit 87, Page 76**

943

|       |    |                                                                              |
|-------|----|------------------------------------------------------------------------------|
|       | 1  | A     Correct.                                                               |
|       | 2  |          THE COURT:  Was that the key question of your entire                 |
|       | 3  | report?                                                                       |
|       | 4  |          THE WITNESS:  No, Your Honor; just this section.                     |
| 11:03:53 | 5  |          THE COURT:  Thank you.                                            |
|       | 6  | BY MS. KHANNA:                                                                |
|       | 7  | Q    In fact, as of the time that you wrote your report, you                  |
|       | 8  | didn't know what relevance this question had to the Section 2                 |
|       | 9  | case; is that right?                                                          |
| 11:04:03 | 10 | A    Again, I answered this question because I was asked to               |
|       | 11 | answer the question.                                                          |
|       | 12 | Q    You did not know the relevance to Section 2 at the time                  |
|       | 13 | you wrote your report?                                                        |
|       | 14 | A    Well, I'm aware of the Senate factors and such.  Again, I                |
| 11:04:17 | 15 | was asked to answer this question, and I did.                              |
|       | 16 | Q    When you were asked about, well, how is this relevant to                 |
|       | 17 | Section 2 during your deposition, you did not know; is that                   |
|       | 18 | correct?                                                                      |
|       | 19 | A    I believe so, yes.                                                       |
| 11:04:28 | 20 |          MR. DAVIS:  Your Honor, we haven't designated Dr. Hood            |
|       | 21 | as an expert on the law or Section 2 requirements.                           |
|       | 22 |          THE COURT:  I understand.                                            |
|       | 23 | BY MS. KHANNA:                                                                |
|       | 24 | Q    Dr. Hood, you mentioned earlier that you have been                       |
| 11:04:41 | 25 | involved in Section 2 cases before; is that correct?                      |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 77**

|   | |
|---|---|
| 1 | A    Yes. |
| 2 | Q    You've never provided an analysis -- of similar to this |
| 3 | racial comparison's analysis in any other expert report you |
| 4 | have written in any other Section 2 case; is that right? |
| 11:04:55  5 | A    That's correct. |
| 6 | Q    You would agree that there is, in fact, a significant |
| 7 | racial disparity in the socioeconomic indicators you looked at |
| 8 | in Alabama, including education, employment, and health; is |
| 9 | that right? |
| 11:05:09 10 | A    Yes. |
| 11 | Q    You'd also agree that the fact that racial disparities may |
| 12 | exist in one state does not mean that the racial disparities |
| 13 | present in Alabama do not impact the ability by |
| 14 | African-Americans to participate in the electoral process; is |
| 11:05:25 15 | that correct? |
| 16 | A    That's correct. |
| 17 | Q    Regardless of whether those disparities exist in other |
| 18 | states, it does not suggest that the racial disparities in |
| 19 | Alabama don't impact the opportunity to elect for |
| 11:05:41 20 | African-Americans; is that correct? |
| 21 | A    Correct. |
| 22 | Q    Dr. Hood, on page 2 of your report you list all of the |
| 23 | cases in which you offered expert testimony during the past |
| 24 | four years; is that right? |
| 11:05:57 25 | A    Yes. |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 78**

945

Q     And one of those cases you list is the *Bethune Hill vs*
*Virginia State Board of Elections* case, correct?

A     Correct.

Q     And isn't it right that the court rejected your analysis
in that case as vague and unsubstantiated?

A     I will certainly let the Court's opinion speak for itself.

Q     You do recall that, though, correct?

A     Something like that.

Q     You also list the *Northeast Ohio Coalition vs. Husted*,
correct?

A     Correct.

Q     And isn't it a fact that the Court in that case found your
testimony, in large part, irrelevant to the issues before the
Court, and also reflected methodological errors that undermined
your conclusions?  Do you recall that?

A     If you're representing that's what the Court said, then
yes.

Q     You also listed *V.C. vs. Perry*, correct?

A     Correct.

Q     And in that case, the Court found your testimony also had
significant methodological oversights, correct?

A     Actually, I don't think it's listed here, but I did
testify in that trial.

Q     Now, you've testified in other cases other than those
listed on page 2; is that right?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 79**

A     Right.  This is the last four years.

Q     Okay.  You testified in a case called *Common Cause vs. Billups*.  Do you recall that?

A     Yes.  Yes.

11:07:14 Q     And your testimony was, in fact -- you were excluded from testifying as an expert in that case because the Court deemed your method as not reliable; is that right?

          MR. DAVIS:  Your Honor, I object.  I know it's fine to play gotcha with another witness.  But the sides have 11:07:33 stipulated to each other's expertise.  He's already in as an expert.

          MS. KHANNA:  Your Honor, I'm not questioning whether or not he should be excluded under *Daubert*, but I do believe that his history, including the testimony that he says is 11:07:42 relevant to his expertise in this case, does go to the weight and credibility that this Court should afford the expert.

          THE COURT:  I think I am capable of making that decision.

          MS. KHANNA:  Thank you, Your Honor. 11:07:55 Thank you, Dr. Hood.

          THE WITNESS:  Thank you.

          MS. KHANNA:  No further questions.

          THE COURT:  Any redirect, Mr. Davis?

          MR. DAVIS:  Yes, Your Honor.

11:08:02                           REDIRECT EXAMINATION

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 80**

947

```
     1  BY MR. DAVIS:
     2  Q    Dr. Hood, when you're retained as an expert, do you just
     3  show up and submit a report on any topic you want, or do you
     4  wait for guidance from the attorneys who hire you?
11:08:33 5  A    I usually wait to see what they want me to look into.
     6  Q    So if a court did find something irrelevant, that's
     7  probably -- you're just submitting a report on what you were
     8  asked to address, correct?
     9  A    Correct.
11:08:44 10 Q    You've been around a lot of redistricting cases, is it
    11  fair to say?
    12  A    Some, yes.
    13  Q    Some.  In your experience, do they often involve a lot of
    14  districts, and a lot of maps, and a lot of reports, and a lot
11:09:15 15 of charts?
    16  A    I'd say too many.
    17  Q    I would, too.
    18        Would it be surprising to you if, in fact, there were
    19  sometimes inconsistencies in the way the same party measured
11:09:33 20 demographics?  They might in this chart cite to one category,
    21  in this cite to another?
    22  A    That can happen, yeah.
    23  Q    What I've put on the screen, Dr. Hood, is Table 3 from
    24  Dr. Max Palmer's report.
11:09:54 25       MR. DAVIS:  Your Honor, since I brought up this page,
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 81**

948

```
 1  I don't recall the exhibit number for that.
 2          THE COURT:  Uh-oh.  We need to have the exhibit
 3  number.
 4          MS. KHANNA:  Plaintiffs' Exhibit 79.
11:10:05  5          MR. DAVIS:  Plaintiffs' Exhibit 79.
 6          THE COURT:  Thank you.  Plaintiffs' Exhibit 79.  And
 7  this is Table 3.  Do we know what page it might be on?
 8          MR. DAVIS:  It is page 19 of his report, Your Honor.
 9          THE COURT:  Okay.  Thank you.
11:10:17 10  BY MR. DAVIS:
11  Q    This is one of the tables that you were asked about,
12  Dr. Hood.  You see the reported for different elections, the
13  percentage voting for black candidate of choice, a black,
14  white, and other, correct?
11:10:34 15  A    Correct.
16  Q    Okay.  If a person identifies as Native American, which
17  category would they appear on?
18  A    I'm assuming they're going in the other category here.
19  Q    And Hispanic?
11:10:44 20  A    Other.
21  Q    And Asian?
22  A    Other.
23  Q    And someone who doesn't check anything because they don't
24  think it's anybody's business?
11:10:50 25  A    Other.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 82**

1  Q    So can you look at this other category and conclude that

2  one of these racial categories votes a particular way?

3  A    Not necessarily.

4  Q    You -- and it's not your fault, Dr. Hood, if the state

11:11:13 5  back in 2011 included the wrong version of the guidelines in

6  their preclearance submission.

7       Were you aware that Senator -- former Senator Gerald Dial

8  testified in this trial that even though the new guidelines may

9  not include the words preserve core of districts, that, in

11:11:30 10  fact, the language does reflect that philosophy?

11  A    Yes.

12  Q    I want to put this on the screen first.  This is Exhibit

13  D-1, Dr. Hood.

14            THE COURT:  Defendant's Exhibit 1, page...

11:11:53 15            MR. DAVIS:  Defendant's Exhibit 1 -- it's a ten-page

16  -- and the version I have does not have the page numbers.

17       But this particular map is a 2000 --

18            THE COURT:  Can you pull it down so we can see how

19  it's identified at the top?  Okay.

11:12:09 20            MR. DAVIS:  It's the 2011 districts.

21            THE COURT:  Okay.

22            MR. DAVIS:  And what I am going to hand --

23            THE COURT:  For the record, that is 3017.

24            MR. DAVIS:  Thank you.  And I'm going to hand

11:12:22 25  Dr. Hood, with Your Honor's permission, the similar maps for

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 83**

1   the 2002 districts, the 1992 districts.

2            THE COURT:  Are these all from Exhibit 1?

3            MR. DAVIS:  All from Defendant's Exhibit 1.

4            MS. KHANNA:  And, Your Honor --

11:12:39  5            THE COURT:  And with your permission, I will try to

6   make sure we have the page numbers referenced as he discusses

7   each one.

8            MR. DAVIS:  Thank you.

9            THE COURT:  Okay.

11:12:47 10            MS. KHANNA:  Your Honor, I would just object because

11   it's beyond the scope of his report.  At no time did Dr. Hood

12   ever consider this in -- his expert analysis in his report.

13            THE COURT:  You questioned him about whether he did.

14   So I think having raised some question about the completeness

11:13:10 15   of his report because he didn't, that he should be allowed to

16   at least respond to that.

17            MS. KHANNA:  Yes, Your Honor.

18            THE COURT:  I assume that's --

19            MR. DAVIS:  Your Honor, this is the question I would

11:13:23 20   like to ask him.  He was asked by plaintiffs' counsel if

21   Alabama seemed to have abandoned the traditional district

22   principle of preserving the core of districts since -- if there

23   was some problem with that.

24        I'd like him to look at a few plans and to see if it

11:13:40 25   appears, just from the shape of the districts, if in his

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 84**

1    opinion, Alabama has disregarded the traditional districting

2    principle of reserving the core of districts.

3            THE COURT:  Okay.

4            MR. DAVIS:  So I have been helpfully handed a better

11:13:53 5    version that includes page numbers.

6            THE COURT:  Good.  Thank you.

7            MR. DAVIS:  Defendant's Exhibit 1, 2011 congressional

8    districts, Chestnut Defense 3017; 2002 congressional districts,

9    3018; '92 congressional districts, 3019; 1980 districts,

11:14:45 10   3019.1; and 1970 districts, 3020.

11       And may I hand these to the witness, Your Honor?

12           THE COURT:  You may.

13   BY MR. DAVIS:

14   Q    And, Dr. Hood, as you look at these districts going back

11:15:21 15   to the '70s, do you have an opinion as to whether Alabama

16   appears to care about the traditional districting principles of

17   preserving the core of districts?

18   A    Well, again, population has to be equalized across

19   redistricting cycles.  That's the chief goal always.

11:15:45 20       But with that in mind, looking at these districts from

21   1970 to 2011, they're fairly remarkable in the sense that they

22   have, for the most part, stayed in the same place.  Of course,

23   the boundaries are shifting some.  But they look remarkably

24   similar.

11:16:03 25   Q    They have to shift some, do they not?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 85**

```
 1   A     Certainly.  I mean, you have to equalize population.
 2   Q     So does the pattern seem the hold, even going from the
 3   2000 cycle to the 2010 cycle?
 4   A     Well, yes.  There's a lot of geographic congruity between
 5   those two.
 6   Q     Thank you.
 7         Now, you did not replicate or test Dr. Palmer's polarized
 8   voting analysis, did you?
 9   A     Correct.
10   Q     You weren't asked to?
11   A     Correct.
12   Q     And when Dr. Palmer says that African-American voting
13   appears -- that African-Americans appear to vote cohesively in
14   Alabama, your own research suggests the same, does it not?
15   A     Correct.
16   Q     You were asked if a history of -- a shared history of
17   discrimination is a factor that may lead to African-American
18   vote cohesiveness, correct?
19   A     Correct.
20   Q     Aren't there a lot of issues that lead to a voter
21   supporting a particular political party?
22   A     There can be quite a few, yes.
23   Q     Now, your research that showed ties to the Voting Rights
24   Act, does that tell us why any voter today supports the
25   Democratic or the Republican party?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 86**

1    A    Not necessarily.

2    Q    Okay.

3    A    Again, that goes back 50 years now.

4    Q    Right.  Some of us -- some voters weren't alive at the

11:17:38  5    time or weren't voting at the time the Voting Rights Act was

6    passed, were they?

7    A    Some voters literally weren't alive either.

8    Q    Have you seen research that suggests that religion and

9    matters of faith may drive political choices in some

11:17:54 10   circumstances?

11   A    Yes.  I mean, there was another realignment among white

12   southerners in the late '70s, early '80s, along religious

13   lines.  So that's another component.  Economic issues, as well.

14   Foreign policy.

11:18:09 15       So there are a lot of things that can figure into the

16   calculus of which party to support or not support.

17   Q    And you were asked if groups -- if African-Americans vote

18   as a group or who is perceived to be in their interests.

19   Actually, groups don't vote, do they?  Individuals vote.

11:18:32 20   A    Right.

21   Q    And as a social scientist, can you say that any individual

22   or collection of individuals are voting the way they do today

23   because of the passage of the Voting Rights Act?

24   A    I think that would be a difficult causal inference to

11:18:47 25   draw.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 87**

```
 1   Q    And you said that your research didn't address motives at
 2   all?
 3   A    We do not look at motives, no, just what happens.
 4   Q    Are you familiar with the language that's often used
 5   dividing states into red states, blue states, and purple
 6   states?
 7   A    Yes.
 8   Q    What do they mean?
 9   A    Well, typically what they're talking -- I can't remember
10   what election cycle this grew out of.  But some media group
11   adopted this.  So a red state would be a Republican state, a
12   blue state a Democratic state, and a purple state sort of a
13   swing state, a battleground state.
14   Q    What's Alabama?
15   A    I would say it's red.
16   Q    A lot of --
17   A    Maybe here I would say crimson.
18        THE COURT:  You're right.  He is so right.  Thank you.
19        I have wondered why all along Alabama wasn't designated as
20   a crimson state instead of a red one, but I guess there are
21   some folks that like the blue and orange that might argue with
22   that.
23        Sorry.  I haven't said much today.  I had to perk up a
24   little bit here.
25   BY MR. DAVIS:
```

11:19:02 (line 5)
11:19:11 (line 10)
11:19:28 (line 15)
11:19:42 (line 20)
11:19:57 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 88**

1  Q    Would you agree that a lot of voters in Alabama, like

2  other southern states, are fairly conservative in their

3  political philosophy?

4  A    Certainly white voters are, yes.

11:20:08  5  Q    And would you agree that a voter's views on issues, a

6  variety of issues and not just those related to race, can lead

7  a person to support a particular political party?

8  A    Certainly.  In the current party alignment, of course, the

9  Republican party is the home for conservatives, and the

11:20:28 10  Democratic party is the home for liberal adherence, so...

11  Q    And, of course, you're not casting judgment on anyone's

12  choice of which party to support, are you?

13  A    No.

14  Q    Would you agree that the major political parties are more

11:20:46 15  polarized today than they were in previous decades?

16  A    Well, from political science research, yes, certainly so.

17  Q    Is that only on issues related to race?

18  A    No.  It's all issues essentially.

19  Q    Have you seen any evidence in this case from the charts

11:21:15 20  the way Alabama reported districts, that Alabama uses the

21  any-part black category routinely?

22  A    I haven't seen evidence of that, no.

23  Q    Would you agree, Dr. Hood -- well, let's take a

24  hypothetical district.  And I'm not going to cite numbers

11:21:46 25  because I can't keep up in my head.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 89**

1    But let's say Alabama drew a congressional district, and

2    it turned out to be close to 50 percent African-American.  And

3    then it could, by switching one county for another, result in a

4    district that was over 50 percent African-American.  In that

11:22:06 5    event, Alabama might be able to switch from a one

6    majority-minority district plan to a two majority-minority

7    district plan without major shifts in population.  Would you

8    agree with that?

9    A    Probably so under that hypothetical scenario.

11:22:22 10   Q    Okay.  Did your analysis show that, at least in this case,

11   going from one majority black district to two would require

12   some pretty major restructuring in the southern half of the

13   state?

14   A    Yes.

11:22:39 15   Q    It would require putting entirely different areas of the

16   state together that haven't traditionally been put in the

17   districts?

18   A    Right.  The districts geographically would like quite a

19   bit different, especially in the southern part of the state.

11:23:08 20        MR. DAVIS:  May I have a moment, Judge?

21        THE COURT:  Certainly.

22        MR. DAVIS:  That's all, Your Honor.

23        Thank you, Dr. Hood.

24        THE WITNESS:  Thank you.

11:23:18 25        THE COURT:  Any recross?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 90**

1          MS. KHANNA:  One moment, Your Honor.  Briefly, Your

2     Honor.

3                          RECROSS-EXAMINATION

4     BY MS. KHANNA:

11:23:37 5     Q    Dr. Hood, I believe you testified on redirect that a lot

6     of issues -- there are a lot of issues that lead to a voter

7     supporting a political party; is that correct?

8     A    There could be more than one, yes.

9     Q    Based on your research, can you say that race is not one

11:23:51 10    of them?

11    A    No, certainly not.

12    Q    And, in fact, in the book that you discussed when we

13    talked earlier, you state, We argue that a complete

14    understanding of southern party politics requires a full

11:24:08 15    appreciation for the role that race has played and continues to

16    play in the region; is that correct?

17    A    Yes.

18          MS. KHANNA:  Thank you, Dr. Hood.

19          THE WITNESS:  Thank you.

11:24:19 20                      FURTHER REDIRECT EXAMINATION

21    BY MR. DAVIS:

22    Q    And in that statement, were you assessing what it took to

23    understand southern history over time, or how to address the

24    reason a particular voter votes the way they do today?

11:24:37 25    A    That was a historical analysis.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

958

1          MR. DAVIS:  Thank you.

2          THE COURT:  Anything else?

3          MS. KHANNA:  No, Your Honor.  Thank you.

4          THE COURT:  All right.  Thank you.

11:24:46  5     Thank you, Dr. Hood.  You may step down.

6          THE WITNESS:  Thank you, Your Honor.

7          THE COURT:  Do you want to start on your next witness

8  now, or do you want to break for lunch early and then come back

9  and start?  I'm at y'all's mercy today.

11:25:02  10     MR. WALKER:  I'd be just as happy to break so that he

11  can be presented in one go, if that suits Your Honor.

12          THE COURT:  That suits me fine.  So we'll come back at

13  12:30.

14          (Recess.)

12:33:36  15     THE COURT:  You may be seated and you may call your

16  next witness.

17          MR. WALKER:  Your Honor, I am going to use with this

18  witness some larger pictures that are more clear of what he has

19  in his report, and I would like to give you a copy of it.

12:34:01  20     THE COURT:  Okay.  Thank you.

21                    DOUGLAS JOHNSON,

22  having been first duly sworn by the courtroom deputy clerk, was

23  examined and testified as follows:

24          THE COURTROOM DEPUTY CLERK:  Please state your name

12:34:13  25  for the record.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 92**

| | |
|---|---|
| 1 | THE WITNESS:  Douglas Mark Johnson. |
| 2 | THE COURTROOM DEPUTY CLERK:  And spell your first and |
| 3 | last names for the record. |
| 4 | THE WITNESS:  D-O-U-G-L-A-S; and J-O-H-N-S-O-N. |
| 12:34:40  5 | DIRECT EXAMINATION |
| 6 | BY MR. WALKER: |
| 7 | Q    Good afternoon.  It's Dr. Douglas Johnson, is it not? |
| 8 | A    Yes. |
| 9 | Q    Okay.  And I've got -- I placed in front of you a copy of |
| 12:34:50 10 | Defendant's Exhibit 13, which is a copy of your report.  Would |
| 11 | you look at that, please? |
| 12 | A    Yes. |
| 13 | Q    Okay.  And please turn to paragraphs 2 through 9, and I'll |
| 14 | ask you:  Are those the -- your qualifications to testify as a |
| 12:35:10 15 | political scientist and your experience as a political |
| 16 | scientist? |
| 17 | A    Yes. |
| 18 | Q    Okay. |
| 19 | MR. WALKER:  Your Honor, the parties have stipulated |
| 12:35:19 20 | that the experts in this case are qualified to testify to the |
| 21 | matters in their reports, and so I tender Dr. Johnson. |
| 22 | MS. KHANNA:  No objection. |
| 23 | THE COURT:  He's received as an expert. |
| 24 | BY MR. WALKER: |
| 12:35:32 25 | Q    Look at paragraph 11, please, and tell the Court what you |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 93**

960

            1 | were asked to do in this report, please.

            2 | A    I was asked to review Mr. Cooper's work and to show my

            3 | opinions of them; in particular, looking at whether the

            4 | illustrative maps follow traditional redistricting principles

12:35:53    5 | or whether race predominated in the drawing of those maps.

            6 | Q    You used the term "traditional redistricting principles,"

            7 | and I, by habit, may sometimes lapse into the term I use, which

            8 | is "traditional redistricting criteria."

            9 |      But can we understand that we're referring to the same

12:36:12   10 | thing by those two terms?

           11 | A    Yes.

           12 | Q    Okay.  Thank you.

           13 |      Dr. Johnson, there's been a lot of testimony throughout

           14 | this trial about whether it's appropriate to use -- which

12:36:27   15 | measure of the black population is appropriate to use when

           16 | drawing single-member districts such as Mr. Cooper has done.

           17 | And one is single-race black, and the other is any-part black.

           18 |      And would you explain to the Court, please, the

           19 | differences between those and which one is appropriate to use

12:36:49   20 | when you're drawing single-member districts such as Dr. Cooper

           21 | has done?  And you may wish to refer to paragraphs 11 and 12 of

           22 | your report for that purpose.

           23 |        THE COURT:  And just for clarification, the report has

           24 | two paragraph 11s, I believe.

12:37:04   25 |        MR. WALKER:  It does have two paragraph 11s.  And this

**Caster Plaintiffs' Exhibit 87, Page 94**

       1  would be the paragraph 11 -- thank you, Your Honor -- after

       2  Roman Numeral III, Opinions and Analysis.

       3          THE WITNESS:  So the challenge is that the census

       4  allows people to choose multiple categories.  It started with

12:37:24 5  introduction of the Hispanic ethnicity question, and then a

       6  separate race question.

       7      And then starting with the 2000 census, the Census Bureau

       8  now allows people to mark in the decennial census as many

       9  ethnic and racial categories as they want.

12:37:43 10 BY MR. WALKER:

      11  Q    For example?

      12  A    For example, they can mark Hispanic, black,

      13  African-American, Asian American, white, as many of those as

      14  they self-identify as being a part of.

12:37:52 15 Q    How many of them are there?

      16  A    Well, when the -- all the different combinations come

      17  together, the Census Bureau reports a data for each individual

      18  combination.  And there are 255 possible racial categories that

      19  the census tabulates.

12:38:08 20      And, of course, 255 or so is, you know, far too many to be

      21  useful in any kind of analysis.  If you're breaking out, you

      22  know, voting cohesion studies, or anything like that, 255

      23  fields would be useless.

      24  Q    Yeah.

12:38:28 25 A    So what people debate, what economics debate is whether to

**Caster Plaintiffs' Exhibit 87, Page 95**

1  look -- what grouping of those to put together.

2      If you go with the any-part black, it counts as black, as

3  Mr. Cooper tends to focus on, although he uses different

4  measures, as well, in his report.  But if anyone marks any

12:38:49 5  black or African-American category, regardless of what else

6  they put, do you count them?  Or do you only count what we call

7  the single-race black where they only mark black, and we just

8  focus on those.

9      So when the Census Bureau decided to -- was directed by

12:39:11 10  Congress to allow people to choose multiple categories, the

11  Department of Justice got together with the Office of

12  Management and Budget and put out guidelines for the purpose of

13  redistricting.  And, technically, it's mainly focused on the

14  jurisdictions that were preclearance jurisdictions back then,

12:39:29 15  but, of course, it became guidelines for everyone because

16  everyone's covered by Section 2.

17      They put out guidelines saying how to group these

18  different groups.  And they said the primary way to look at

19  them is -- it's controversial.  It was fought over, but their

12:39:45 20  guidance was if someone marks Hispanic, you count them as

21  Hispanic.  It doesn't matter what else they mark.  They go down

22  as Hispanic.  And for the primary groupings, you would ignore

23  anything else they would mark.

24      If someone marks white in one of the other categories

12:40:01 25  other than Hispanic, then they are counted as that other

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 96**

1    category -- African-American, Asian American, whatever it is.

2    And the white is ignored.

3        If they mark African-American and Asian American, or any

4    other combination of non-white non-Hispanic groups, then they

12:40:17  5    go into a multi-race category.

6        So once you follow those different guidelines, you end up

7    with the groupings listed on page 5 that -- so we're taking

8    those -- the giant pool of categories and narrowed it down to

9    eight essentially useful categories.

12:40:37 10    They also gave guidance saying kind of secondarily that

11   they will -- you know, where they find it relevant, they will

12   also look at single-race or any-part black, and they kept the

13   door open to that.  But this is their primary data, which was

14   also reflected when Department of Justice went to the Census

12:40:59 15   Bureau and said, We need citizen voting age population data

16   broken down by a census block group.

17       So the Census Bureau releases the citizens voting age data

18   by a tract, which are units that roughly have about 4,000

19   people in them.  So they're not very small.  There are big

12:41:18 20   neighborhoods.

21       And the Department of Justice -- oh, and when people like

22   me ask the bureau to give us more detailed data, the bureau

23   said, no, it's not statistically reliable at smaller

24   geographies.  We can't put out that data.

12:41:31 25   When people like me asked, they said, no.  When the

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 97**

964

```
        1  Department of Justice asks, they do it.  And so they did put it
        2  out at the block group level.
        3      And in that case, they only followed the primary method.
        4  You can't get single-race black data that includes Hispanics in
12:41:41 5  the citizen voting age special tabulations from the Department
        6  of Justice.  It only has non-Hispanic black and non-Hispanic
        7  black and African-American combined.
        8  Q    For the CVAP?
        9  A    For the CVAP, yes.
12:42:02 10      So it's both the primary focus and their guidance, and the
       11  only data available in the Department of Justice's citizen
       12  voting age population.
       13      And I went to -- and I spoke at multiple conferences of
       14  the National Conference of State Legislatures where DOJ would
12:42:17 15  be there, and the Census Bureau would be there.  And we would
       16  have these debates in 2010 and going into early 2011.  And the
       17  DOJ was very clear about their primary guidance.
       18          THE COURT:  Okay.  So just to make sure I am clear on
       19  the DOJ's primary guidance.  It is what?
12:42:34 20          THE WITNESS:  It is --
       21  BY MR. WALKER:
       22  Q    Dr. Johnson, look at the eight categories.
       23  A    Right.
       24  Q    And please let the Court which one is the correct
12:42:42 25  category.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 98**

    1   A     Yeah.  So in -- for the focus here where we're looking at
    2   black or African-American in these districts, the DOJ guidance
    3   would be non-Hispanic black, plus non-Hispanic black and white.
    4   So very close to single-race black non-Hispanic with a -- the
12:43:02 5  people who marked black and white also included in there.
    6             THE COURT:  Okay.  So --
    7             THE WITNESS:  So single race is the closest.
    8             THE COURT:  So you're looking at these eight
    9   categories that are in paragraph -- second paragraph 11, and
12:43:18 10  it's on page 5 of your report; is that right?
   11             THE WITNESS:  Correct.
   12             THE COURT:  Okay.  And so the category to use in
   13   determining the African-American/black population is
   14   non-Hispanic black plus non-Hispanic black and white?
12:43:40 15            THE WITNESS:  Correct.  Yeah.
   16       In the Maptitude data that Mr. Cooper and I both use, or
   17   the software that we use for mapping, the company actually
   18   processes the census data for all their clients, and they
   19   actually call this category DOJ black.
12:43:56 20            THE COURT:  DOJ black.  Okay.
   21       What is CVAP?  I missed that.
   22             THE WITNESS:  It's citizen voting age population.
   23             THE COURT:  Okay.  All right.  I got that.
   24             THE WITNESS:  Yeah.
12:44:06 25            THE COURT:  I'm sorry.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 99**

966

```
        1        THE WITNESS:  It's not as prominent in this case as it
        2   generally is.  I suspect given the growth of the Latino
        3   population in the next round of redistricting, it will be much
        4   more prominent.
12:44:17 5   BY MR. WALKER:
        6   Q    That's prominent in California where you do a lot of work,
        7   I suppose?
        8   A    Yes.  Anywhere that has large non-citizen populations,
        9   that tends to be more of the focus.
12:44:26 10  Q    Dr. Johnson, looking at the list of the eight categories
       11   in the second paragraph 11 on page 5, which category did
       12   Mr. Cooper use to populate his districts?
       13   A    The numbers he reports are not in this list.  He used the
       14   all-part or -- I'm sorry -- any-part black.  So if someone
12:44:47 15  marked black and anything else, he counted them when he
       16   compiled his data for the illustrative maps.
       17        And he talks about his view, that's the historic way and
       18   could very well be true.  I haven't looked back.
       19        But as his data points out, 20 years ago in 1990, even in
12:45:04 20  2000, the number of Hispanics and Asian Americans in the state
       21   was really small.  So that difference between any-part black
       22   and the single-race black was probably minuscule.
       23        Now, of course, as Mr. Cooper himself puts out in the
       24   data, the Latino population has grown very fast.  The Asian
12:45:27 25  population has grown.  And now we see it in the two reports.
```

**Caster Plaintiffs' Exhibit 87, Page 100**

```
 1        The margins on these illustrative districts are so narrow
 2   that those few people who mark African-American and Asian
 3   American, or African-American and white, they make the
 4   difference by whether or not you cross that 50 percent
12:45:46 5   threshold.
 6   Q    Well, let me ask you about that.  And I will represent to
 7   you that I am showing you a chart --
 8             MR. WALKER:  Your Honor, this is a chart from
 9   Document 102, page 8.  It happens to be --
12:46:00 10            THE COURT:  Plaintiffs' or defendant's?
11             MR. WALKER:  It's the plaintiffs' pretrial brief.
12        The reason I'm using it is I came with my own charts, but
13   Mr. Cooper had made some adjustments that didn't get carried
14   over to my charts.  So there were minor adjustments, and we
12:46:16 15   didn't contest them.  But there is a correct chart.  So I'm
16   using it for that purpose.
17             THE COURT:  Wait.  This is from plaintiffs' brief?
18             MR. WALKER:  Yes, ma'am.
19             THE COURT:  Okay.
12:46:27 20            MR. WALKER:  I'm just using the chart.
21             THE COURT:  For the record, do we know the CMECF
22   document number?
23             MR. WALKER:  102.
24             THE COURT:  Okay.  All right.  Thank you.  Just wanted
12:46:39 25   to make sure we've got it straight.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 101**

| | |
|---|---|
| 1 | And whose chart is that?  And where did it come from? |
| 2 | MR WALKER:  They've cited it to some of their exhibits |
| 3 | there just below the chart, Your Honor. |
| 4 | THE COURT:  Okay. |
| 12:47:01 5 | MR. WALKER:  And we don't contest these numbers. |
| 6 | THE COURT:  All right. |
| 7 | MR. WALKER:  Except that we do, but for different |
| 8 | reasons. |
| 9 | THE COURT:  Okay. |
| 12:47:20 10 | BY MR. WALKER: |
| 11 | Q    Dr. Johnson, if you'd look at the chart, and tell me if |
| 12 | Mr. Cooper had used what you said Maptitude refers to as DOJ |
| 13 | black, would all of Mr. Cooper's plans have two majority black |
| 14 | districts?  And you may want to look at your paragraph 14 of |
| 12:47:44 15 | your report. |
| 16 | A    No, they would not. |
| 17 | Q    What would happen? |
| 18 | A    Revised Plans 3 and 4 drop below -- it's weird to see your |
| 19 | hand up here next to me. |
| 12:48:02 20 | Q    Oh, I'm sorry.  Go ahead. |
| 21 | A    So the Revised Plans 3 and 4 would no longer have a second |
| 22 | majority black district. |
| 23 | Q    So explain that with regard to each plan, please. |
| 24 | A    So I have the numbers here.  So in paragraph 14, I talk |
| 12:48:18 25 | about -- that's on page 6 of my report -- the voting age |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 102**

| | |
|---|---|
| 1 | population in District 7 of Illustrative Plan 3. |
| 2 | So we're here on the chart he's reporting 50.34 percent. |
| 3 | It drops down to 49.9.  And the voting age population District |
| 4 | 2 in Illustrative Plan 4 is only 49.8. |
| 12:48:42  5 | So even though they're really small numbers of people |
| 6 | marking multiple categories in these areas, the margins on how |
| 7 | he's drawing these districts are so razor thin that it trips |
| 8 | them below the 50 percent threshold. |
| 9 | MR. ROUCO:  I thought it said 49.8. |
| 12:49:13  10 | THE WITNESS:  Correct. |
| 11 | MR. ROUCO:  Not 49.08. |
| 12 | MR. WALKER:  Oh.  49.8.  I'm sorry. |
| 13 | THE COURT:  It's that math again. |
| 14 | BY MR. WALKER: |
| 12:49:20  15 | Q    And the other one was 49? |
| 16 | A    .9. |
| 17 | Q    .9.  I wrote them down both wrong.  My bad. |
| 18 | Let's take the numbers that Mr. Cooper used at face value, |
| 19 | okay?  And assume that those are -- were the correct numbers to |
| 12:49:48  20 | use.  Would you still have any problems with the districts that |
| 21 | he drew, in terms of demonstrating the possibility of complying |
| 22 | with the *Gingles 1*'s requirement? |
| 23 | A    Yes.  The Census Bureau loves the fact that census data |
| 24 | often gets treated as perfect and cited as being perfect.  But, |
| 12:50:08  25 | you know, when we all step back and think about it, we know |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 103**

970

1    it's not, you know.

2        There's no margin of error in the decennial census because

3    of the way math works.  You can't calculate a statistical

4    margin of error.  But we've all heard about, you know, every

12:50:23 5   census has an undercount.  Let's discuss every census it that

6    has an over count of different groups.

7        And so even at the point the census is taken, there's

8    error in it.  And when the data comes out eight months later,

9    you know, people have moved.  That area has grown.

12:50:42 10      So we know that there's changes.  And we know that things

11   change over time.  So whenever I see just, you know, 50.1 or

12   bare, bare majority numbers, it always makes me nervous that --

13   Q    And by bare majority numbers, are you referring to the

14   numbers that are displayed -- that Mr. Cooper put into his

12:51:03 15  Districts 2 and 7 in Plans 1 through 4?

16   A    Exactly.  They're an example.  And I see this fairly often

17   as people talk about -- in my work in redistricting.

18       But like him claiming 50.3, that's an awful big reliance

19   on the data being perfect with almost no margin for error.

12:51:24 20  Q    And is it your testimony that the margins that Mr. Cooper

21   has given to his Districts 2 and 7 in Plans 1 through 4 are

22   well within the probable error of the census?

23   A    Certainly.

24   Q    Yeah.

12:51:40 25  A    You know, there's no doubt, you know, and especially

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 104**

nine years later.  But when we're looking at the time of

adoption, we want to be sure that the district's going to meet

the threshold and perform, both when it's adopted and in the

elections that are going to take place over that decade.

12:51:54 5    And so having a .3 margin is razor thin.  And it's kind of

a coin toss whether that city is actually majority

African-American or not.

Q    In your work with redistricting, would you be comfortable

representing to a court districts with margins such as these as

12:52:14 10 evidence of compliance with the *Gingles* 1 requirement?

A    No.  It would be -- maybe it's not 50/50.  Maybe it's

52/48 percent that it is or isn't in compliance.  But those are

very narrow margins for a court to rely on.

Q    If a district is drawn with a 60 percent -- let's say

12:52:37 15 about 60 percent BVAP, would that guarantee black success every

time?

A    No.  There's -- nothing guarantees success every time in

any election.

Q    Does that give you a reasonable opportunity that a

12:52:53 20 minority will be able to elect a candidate of their choice as a

district -- as that district changes over the decade?

A    It gives a much more solid belief that it is going to stay

majority African-American, or meet that threshold throughout

the decade, and certainly at the time of adoption.

12:53:18 25 Q    Let's move from population numbers to compactness.  And

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 105**

I'll show you a map or actually a figure.  This is from
Defendant's Exhibit 13 on page 7, and it's four views of
District 1; that is, it's each one of the District 1s drawn by
Mr. Cooper.

12:53:46     And, first of all, what are the ways in which compactness
can be measured?

A    There are lots of measurements out there of compactness.
I think there's now eight of them built into the redistricting
software that we use.

12:54:03     A couple of years ago, actually, the U.S. Mathematics
Association had a whole panel at their annual conference on new
mathematical ways to measure compactness and redistricting.

    And all of the math formulas have strengths and
weaknesses.  And really what they're all trying to do is
12:54:26 numerically measure what we can all see in the maps.

    The famous phrase in redistricting literature, as someone
wrote, The best compactness test remains the interocular test,
which is just a professor saying, I'll know it when I see it.
And each one has its own focus, and each one has its own flaws.

12:54:46     What really we're trying to measure, and what all of them
are trying to measure is are we bypassing one group of people
to get to another group of people?  Are we wrapping around one
area and not putting them in because we don't like them in our
district for some reason in order to get to another group of
12:55:02 people that we prefer to have in our district?  And that really

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 106**

```
 1  is the heart of what people really mean when they say
 2  gerrymandering.
 3  Q    So the more you bypass one group of people to get to
 4  another group of people, the less compact the district becomes?
 5  A    Exactly.
 6  Q    Okay.  And would that be a description of the original
 7  Shaw District?
 8  A    Yes, exactly.
 9  Q    Could you describe, if you could, the shape of the
10  original Shaw District?
11          THE COURT:  First, what is the Shaw District?
12  BY MR. WALKER:
13  Q    Sorry.  Sorry.  Would you explain to the Court what the
14  original Shaw District was?
15  A    Sure.  So there were a string of U.S. Supreme Court cases
16  about the -- really defined racial gerrymandering in a going
17  too far approach; decide the voting rights where we didn't go
18  far enough in cases.
19          And so the Shaw cases came out in North Carolina where one
20  of the plaintiffs I think are -- one of the parties was named
21  Shaw.  And this is where Justice O'Connor wrote that
22  appearances matter.
23          And the Shaw District was a freeway.  It was literally the
24  four lanes or eight lanes of the freeway.  And then at
25  different off ramps, the district would stretch out and grab
```

12:55:17 (line 5)
12:55:28 (line 10)
12:55:36 (line 15)
12:55:57 (line 20)
12:56:14 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 107**

African-American pockets of population.  And then it would go

back to the freeway up to the next town and stretch off.  And

so they --

Q    And that went on for quite some distance, did it not?

A    Yeah, it did.  It was going through kind of rural North

Carolina and picking up different towns along the way until it

got to the necessary population and percentages.

And what the Court said was -- that's where the rule that

race can't be the predominant factor came from.  Is looking at

appearances -- this looks really weird.  Is it a sign that

something's wrong?  Do we need to investigate this and see was

race a predominant factor, or does something else explain this?

I actually was part of drawing one of the ugliest

districts ever drawn which was Arizona's first district in 2001

that literally used the Colorado River through the Grand Canyon

to connect two parts of the district.  It was ugly.  We made a

lot of posters after that where people said gerrymandering.

But the reality was -- and that was ugly and that totally met

Justice O'Connor's rule of if this looks ugly, we need to

investigate.

Well, what it was, was the Hopi Nation was completely

surrounded by the Navajo Nation.  And we had hours and hours

and thousands of pages of testimony from both groups saying

they didn't get along.  And the Hopi wanted to be in a

different district so that they could get federal funding.  So

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 108**

1  that neck had a purpose that was very community of interest

2  driven.

3       So lack of compactness isn't a conviction.  It's a trigger

4  for a deeper investigation to see is there some other factor,

12:57:58 5  traditional criteria or traditional principle that would

6  justify this district.

7  Q    And I want to ask you whether or not you see a lack of

8  compactness in these maps.  But I realize I forgot to ask you

9  something when we were talking about numbers and percentages

12:58:12 10 and the risk presented by relatively low percentages of

11 African-Americans in a district that purports to be a *Gingles*

12 1 district.  And can you give a recent example from Mississippi

13 of that?

14 A    Yes.  This was just actually in the news this morning is

12:58:29 15 that Mississippi had a state senate district that was drawn to

16 be 51 percent African-American in 2011, and it consistently

17 elected a white Republican.

18 Q    So it was drawn to be a majority African-American

19 district, and it consistently elected the Republican candidate?

12:58:51 20 A    Exactly.

21 Q    And in Mississippi, do African-Americans identify

22 typically with the Republican party?

23 A    No.  Their voting patterns are very similar to what has

24 been set up in the record in this case.

12:59:00 25 Q    So there's a very high degree of congruence between race

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 109**

         1  and party identification in Mississippi as in Alabama?

         2  A    That's my understanding.

         3  Q    And African-Americans in Mississippi --

         4          Ms. KHANNA:  Objection, Your Honor.  This is beyond

12:59:09 5  the scope of his report.  I don't remember him testifying about

         6  Mississippi at all.

         7  BY MR. WALKER:

         8  Q    I will withdraw those questions and ask if you just want

         9  to tell us about the example of the risk of a low margin as

12:59:24 10 illustrated in Mississippi?

        11  A    Sure.

        12          MS. KHANNA:  Objection, Your Honor.  Again, that

        13  example is not provided anywhere in his report.

        14          THE COURT:  I believe that's because it was something

12:59:34 15 in the news today; is that correct?

        16          THE WITNESS:  Right.  I had not followed the case

        17  closely until the election was just held.  But it was a lawsuit

        18  that overturned the 51 percent seat as not sufficient and

        19  imposed a remedy district that's 57 percent.  And then just

12:59:49 20 today the news came out that the African-American won that seat

        21  by 4 percent, so moving it from 51 -- when the lawsuit moved it

        22  from 51 to 57, that gave a 4 percent --

        23          THE COURT:  Do you remember the name of that lawsuit?

        24          THE WITNESS:  I'm horrible with lawsuit names.  I'm

13:00:05 25 sorry.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 110**

|   |   |
|---|---|
| 1 | THE COURT:  I can relate. |
| 2 | THE WITNESS:  It's the Mississippi State Senate. |
| 3 | THE COURT:  Okay. |
| 4 | THE WITNESS:  Case. |

13:00:09  5      THE COURT:  Thank you.  *Thomas V. Bryant*?

6      MR. WALKER:  I believe that's it, Your Honor.

7      THE COURT:  Let the record reflect that Alex Davis

8 came forward with that name.  I've hired smart law clerks.

9 BY MR. WALKER:

13:00:33 10 Q    So you have before you this page that has all four

11 districts together on it.  And then behind those, you have

12 expanded views of each district.  And what I would like for you

13 to do, please, Dr. Johnson, is look at each one of these, and

14 I'll show you -- this is illustration 1, the Illustrative Plan

13:00:55 15 1, the District 1 from that, and that that's Defendant's

16 Exhibit 13 on page 25, and ask you if you see any problems with

17 this district, in terms of compactness and your definition of

18 compactness?

19 A    Yes.  So as you look at this map, the pink is District 1.

13:01:12 20 The white area is the other districts.  And over in Mobile on

21 the left-hand side, the white is Mr. Cooper's new proposed

22 district coming into Mobile County.

23      And the kind of brownish lines on there are the county

24 borders, obviously.  You have Henry and Houston.  And where you

13:01:30 25 don't see a thick black line, the district border is following

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 111**

1    the county border.

2        And so we come across the south, and when you get into

3    Mobile County, you can see the thick black line appear with all

4    the zigs and zags and jigs and jogs as the district crosses

13:01:48 5    using the I-10 bridge as it's contiguity, and then comes down

6    in essentially the smallest geographic edge he could along --

7    Q    Am I pointing to the right place?  The slender neck?

8    A    Yes.  Yes -- along the bay side of the city of Mobile.

9    Because he's avoiding picking up the Mobile voters in District

13:02:11 10    1.  He's keeping all those voters in the heart of Mobile out.

11    Q    What voters?

12    A    The voters in the heart of Mobile who are mostly

13    African-American.

14    Q    Okay.

13:02:20 15    A    He's keeping them -- he's going around them and keeping

16    them out of the district to then get around and pick up the

17    south and west parts of the city of Mobile and the areas -- the

18    outlying areas to the west and south of the city, which are,

19    again, largely white voters he's putting into District 1.

13:02:39 20    Q    Does it appear to you that he has gone around one group of

21    people to get to another group of people in drawing this

22    district?

23    A    Exactly.  He's going around one group to get to another.

24    And the only apparent justification that he can give for that

13:02:56 25    is race.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 112**

1    Q     Let me show you an expansion of Illustrative Plan 2 and

2    ask you:  Does this also illustrate that Mr. Cooper went around

3    one group of people to get to another group of people?

4    A     Yes.  In Illustrative Map 2 that we're looking at now,

13:03:15  5    he's actually cutting through both Baldwin and Mobile counties.

6    He's picking up -- or he's picking up almost all of Baldwin

7    County except for some far north areas that are actually

8    relatively heavily African-American, and then, again, coming

9    down and using the Interstate 10 bridge and a very, very narrow

13:03:36 10    connector along the bay on the east side of the city to go

11    around those African-Americans in Mobile in another very jagged

12    zigs and zags approach that has no, you know, basis or reason

13    other -- given other than the race of the residents in those

14    areas in order to get around Mobile and again pick up the

13:04:00 15    southwest city residents and the rural residents who are

16    largely white in District 1.

17    Q     He could have put all of Mobile County into District 2,

18    could he not have?

19    A     I presume.

13:04:15 20    Q     What would be the consequence of that?

21    A     District 2 would not have been majority African-American.

22    Q     Let me show you Illustrative Plan 3 and ask for your

23    opinion of District 1 in that plan.  Does it also illustrate

24    that he went around one group of people to get to another group

13:04:33 25    of people?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 113**

980

```
      1  A    Exactly.  Again, it's the kind of hooking around the city
      2  using the I-10 freeway bridge across.  And then at the bay
      3  front edge of the city -- again, he's getting as little
      4  territory of the city as possible on the bay front, and then
13:04:52 5  wrapping around picking up the south and west parts of the city
      6  which are more white after going around that more
      7  African-American parts of the area.
      8  Q    And, finally, Illustrative Plan 4, again, your testimony,
      9  please?
13:05:06 10 A    I give him points for creativity on this one.  In this
     11  case, he's using more of a fishhook.  Instead of coming across
     12  and going around the population with District 1, in this case,
     13  it's his remedy district coming around and fishhook around
     14  District 1 aiming at the same population of heavily
13:05:28 15 African-Americans in the Mobile area.
     16      But in this case, he's connecting them -- instead of
     17  coming down along the county line, he's coming down along the
     18  state line.  In those areas, they look whiter out in the rural
     19  areas, but that's just one VTDY.  He's just picking the minimum
13:05:48 20 number of VTDs with as few people as he can to get around to
     21  the populated area in the city.
     22  Q    So just to be clear on this map, which is from the
     23  Defendant's Exhibit 13, page 26, within mobile County, the
     24  white area is District 2, and that's actually the area where
13:06:02 25 the relatively high concentration of African-American
```

**Caster Plaintiffs' Exhibit 87, Page 114**

```
 1   population?
 2   A    Yes.  The area along the state line is isn't heavily
 3   African-American, but he's just getting as few people as he can
 4   to hook around and get in to where the population is that that
 5   fishhook contains, which is almost entirely in the
 6   African-American neighborhoods of Mobile.
 7            MR. WALKER:  And, Your Honor, just because I wasn't as
 8   scrupulous about this -- the maps, the expanded maps that I
 9   have shown were from Defendant's Exhibit 13, pages 25 and 26.
10            THE COURT:  Got it.  Thank you.
11   BY MR. WALKER:
12   Q    Not to beat a dead horse, Dr. Johnson, but let's do the
13   same thing with exhibit -- with the proposed District 2s.
14            And I'm showing you Defendant's Exhibit 13, page 8, which
15   are the four views of Defendant's Exhibit 2.  And I'll ask you
16   to look at each one of these and say whether or not you think
17   it's compact.
18            And let me stop there.  Your testimony was that in all
19   four of the versions of District 1 that we just looked at,
20   Mr. Cooper went around one group of people to get to another
21   group of people; is that correct?
22   A    Yes.
23   Q    And does it follow that you have an opinion as to whether
24   those districts are compact?
25   A    Exactly, yeah.  By definition, they would not be compact.
```

13:06:16 (line 5)
13:06:33 (line 10)
13:06:59 (line 15)
13:07:17 (line 20)
13:07:27 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 115**

1   Q    And, now, if you would give us your testimony as to

2   Illustrative District 1 version of District 2, please.

3   A    Yeah.  So these are the mere image or the puzzle pieces

4   that fit into the districts we were just looking at.  And they

13:07:51 5   highlight how the map again is coming down into Mobile County.

6        In the case of Illustrative Map 1, it's getting the north

7   end of the county and then coming down into that heavily

8   African-American area mostly in Mobile and the surrounding

9   cities and picking up the African-American neighborhoods; not

13:08:12 10   picking up the whole city, just the African-American parts of

11   those cities and putting them into District 2.

12        And my -- my analysis has all been fairly heavily focused

13   on highlighting what's going on in Mobile.  But you can see in

14   this map in Illustrative 1, he's also got these jigs and jogs

13:08:29 15   going through Marengo County.  So, again, he hasn't given any

16   explanation or justification other than the --

17             MS. KHANNA:  Objection, Your Honor.  Outside the scope

18   of his report.  There is no analysis on Marengo county.

19             MR. WALKER:  I don't recall if -- if Ms. Khanna says

13:08:50 20   there's no analysis on Marengo County, I will go with that.

21             THE COURT:  All right.

22             MR. WALKER:  I'll withdraw that part of his testimony.

23   BY MR. WALKER:

24   Q    Look, if you would, please, at Exhibit -- Defendant's

13:09:05 25   Exhibit 13, page 31, which shows Illustrative Map 2, please.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 116**

|       |                                                               |
|-------|---------------------------------------------------------------|
| 1     | And does that also, within Mobile County and Baldwin County,  |
| 2     | illustrate a lack of compactness in the drawing of that       |
| 3     | district?                                                     |
| 4     | A    Yes.  Exactly.  It's stretching through the north kind of |

13:09:29 5   African-American -- heavily African-American part of Baldwin
6   County, and then the largely unpopulated Delta area in order to
7   use a narrow, narrow neck to get down into the African-American
8   neighborhoods in the Mobile area, in the city of Mobile area
9   that are being added in while bypassing all those populations
13:09:50 10   that they went -- you know, that they narrowly squeezed
11   through.
12   Q    And the same with Illustrative Map -- I mean Illustrative
13   Map 3, District 2.
14   A    Yes.  This is, again, highlighting the area that District
13:10:08 15   2's picking up and forcing District 1 to wrap around as he
16   draws his districts, and just barely gets to that -- by his own
17   numbers, 50 percent, and by my numbers doesn't quite get to
18   that 50 percent number.
19   Q    Okay.  And, finally, Illustrative Map 4, District 2, a
13:10:28 20   hook or whatever it is?
21   A    Rights.  Again, this really -- the blue really shows the
22   fishhook through Mobile County.  And it really highlights the
23   tip of the fishhook is that very densely, heavily populated
24   part of the city that is the goal that he's trying to get into
13:10:45 25   District 2 in all four of these maps just using various

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 117**

984

```
      1  different creative necks and arms to squeeze in there while
      2  bypassing the more white population that he doesn't want to put
      3  in there.
      4  Q    And so do you have an opinion of whether District 2 in all
13:11:03  5  four versions of the districting plan presented by Mr. Cooper,
      6  does District 2 meet your definition of compactness?
      7  A    No, it does not.
      8  Q    Okay.
      9          MR. WALKER:  And, Your Honor, those maps were from
13:11:19 10  Defendant's Exhibit 13, page 8 -- excuse me -- and then
     11  Defendant's Exhibit 13, pages 31 and 32.
     12          THE COURT:  Thank you.
     13  BY MR. WALKER:
     14  Q    Mr. Johnson, go through the stack that I have got -- we're
13:11:38 15  going to skip over some of that.  I think we have made our
     16  point.
     17          And go to this map (indicating), which is Defendant's
     18  Exhibit 13, page 35.
     19  A    Okay.
13:11:48 20  Q    And I'll ask you to explain this map to the Court, please.
     21  A    So this is zoomed in on Illustrative Map 2.  And this is
     22  that neck that comes down to the north part of Baldwin County
     23  and down into Mobile County, the neck of District 2.
     24          The colors that are shown here are highlighting the
13:12:11 25  African-American percentage.  And I'm using the all-part
```

**Caster Plaintiffs' Exhibit 87, Page 118**

        1   African-American because those are numbers Mr. Cooper said he

        2   was looking at or using when he drew his maps.

        3        And so the red census blocks are where African-Americans

        4   are 75 percent or more of the voting age population.  By that,

13:12:31 5   all parts count -- or any parts count.  The yellow are 65 to

        6   75 percent of the population is African-American.  And the

        7   green is 50 percent to 65 percent.

        8        So the greens, yellows, and reds are where the

        9   African-Americans are the majority.  And then the blues --

13:12:48 10  Q    Let me stop you there and ask you a question.

       11   A    Oh.  Sure.

       12   Q    Does this tell you the percentage of ethnicity in a given

       13   census block?  Is that what it tells you?

       14   A    Exactly.

13:12:59 15  Q    Okay.  But it doesn't tell you the number of people who

       16   live in an area?

       17   A    Correct.

       18   Q    Okay.  So this area of west Mobile that I'm looking at, as

       19   we read this map, what it tells us is that's primarily a white

13:13:14 20  area, but it doesn't tell us anything about the level of

       21   population in that area?

       22   A    Exactly.  The only population numbers you can tell are --

       23   the areas that are colored in as white, we know those are zero

       24   population.

13:13:29 25  Q    Okay.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 119**

986

1   A    But other than that, we don't know whether it's one person

2   or a thousand people in a given census block.

3   Q    So looking at this map from Defendant's Exhibit 13, page

4   35, what, in summary, does it show?

13:13:42 5   A    It shows how, in Illustrative Map 2, District 2 is coming

6   through, and you can see the mostly red and yellow and green

7   areas in the north part of Baldwin County, coming through that

8   neck, and then using mostly unpopulated territory to come down

9   south to get into where the -- the dense concentration of red,

13:14:06 10  yellow, and green census blocks are in the city.

11  Q    And where you have the word Mobile, does that mean the

12  city of Mobile -- the densely populated city of Mobile is in

13  that area?

14  A    Yes.  That's that geographic center of the city.

13:14:19 15  Q    Let me show you a map that's from Defendant's Exhibit 13,

16  page 36, and ask you to explain this to the Court, please.

17  A    So this is the same color scheme and same demographics

18  being shown.  In this case though, it's Illustrative Map 4.

19  This is the fishhook map.

13:14:40 20       So you can see District 2 coming along through -- granted

21  the white areas -- the purple meaning less than 25 percent

22  black or African-American.  But, again, as we were just

23  discussing, they're very sparsely populated out along the state

24  line hooking down along the south edge and then up into Mobile

13:15:01 25  to capture that same pocket of green, yellow, and red census

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 120**

|    | |
|----|--|
| 1 | blocks. |
| 2 | Q    One more.  This is from Defendant's Exhibit 13, page 34. |
| 3 | If you'll explain this one, and then we'll move on. |
| 4 | A    Yes.  So this is that same map we just looked at.  This is |
| 13:15:22 5 | the tip of the fishhook coming up into Mobile. |
| 6 | So the black line is the district border.  And, again, you |
| 7 | can see the colored-in census blocks.  And it really shows how |
| 8 | closely aligned the district borders are to those majority |
| 9 | black or African-American census blocks. |
| 13:15:46 10 | Q    Thank you.  Excuse me, Dr. Johnson.  Next I want to show |
| 11 | you this map from Defendant's Exhibit 13, page 14, and ask you |
| 12 | what it shows? |
| 13 | A    So this is showing an overlay of the 2011 adopted map with |
| 14 | the 2001 benchmark or predecessor map. |
| 13:16:16 15 | So the colors -- the pink, blue, green, yellow, and |
| 16 | brown -- are the districts as adopted in 2011.  And the thick |
| 17 | black lines are the 2001 district lines. |
| 18 | So this is showing how kind of at a glance you can see how |
| 19 | closely aligned the two districts were -- or I'm sorry -- the |
| 13:16:39 20 | two maps were. |
| 21 | Q    So when the legislature adopted the 2011 congressional |
| 22 | map, does it appear that the legislature was conscious of and |
| 23 | sought to preserve the cores of existing districts? |
| 24 | A    Certainly. |
| 13:16:54 25 | Q    Why would the legislature want to do that?  What's the |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 121**

1   value, in terms of democracy and the functioning of democracy,

2   in preserving the cores of existing districts?

3   A    It gets to actually what other districts have talked about

4   already, which is most, if -- certainly a lot, if not most, of

13:17:14 5   the issues that members of Congress and other elected officials

6   deal with are long-term problems; you know, trying to expand

7   the bridge, trying to deal with education issues in a district,

8   trying to bring economic development to an area, trying to

9   build a new freeway.

13:17:34 10       All of these major issues that members of Congress deal

11   with all the time, these are long-term issues.  And so by

12   preserving the core of the districts, you keep the

13   relationships that are working on those issues.  The member of

14   Congress knows the local officials.  They know the, you know,

13:17:52 15   civil servants who are working on these projects.  And they

16   have their own expertise on that issue.

17       You have had other witnesses talking about their detailed

18   knowledge of the economic engines of each of their districts

19   and what needs to be done to improve the economic needs in each

13:18:12 20   district.

21       So when we say preserving the cores of a district, or, you

22   know, when the U.S. Supreme Court cites that as a traditional

23   criteria, it's a very -- you know, I'm a demographer -- it's a

24   very generic vanilla demographer's term.

13:18:28 25       But what they're talking about is maintaining all that

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 122**

1   history and all that work that's going on in those

2   relationships that exist so that they can continue to work

3   going forward.

4   Q    I believe you were in the courtroom -- you may have been

13:18:42 5   in the courtroom yesterday when Representative Byrne testified

6   about the importance of getting a bridge across the Mobile Bay.

7   Is that something that he could handle in a two-year term?

8            MS. KHANNA:  Objection, Your Honor.  Beyond the scope

9   of his report.

13:18:56 10            THE COURT:  Sustained.

11   BY MR. WALKER:

12   Q    Look, if you will, at Defendant's Exhibit 13, page 15, and

13   tell the Court what this map is, please.

14   A    So the black lines on here are, again, the same as in the

13:19:15 15   previous map.  They are the 2001 map lines that were in place

16   before the 2011 redistricting.

17            But the color shadings in this case have been replaced now

18   with the Illustrative Map 3 drawn by Mr. Cooper.  So now you

19   can see the difference between those thick black lines, and the

13:19:34 20   colors underneath show much more extensive changes that have

21   been drawn into this map compared to the previous map.

22   Q    Does it appear that this -- at least in Illustrative Map 3

23   that Mr. Cooper showed regard for the cores of existing

24   districts?

13:19:57 25   A    Definitely not.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 123**

990

Q    Okay.  And do you know whether the Supreme Court has
stated that the cores of existing districts is a conditional
redistricting principle or criteria?

A    Multiple times.  The best known was in *Karcher v.*
*Daggett* -- K-A-R-C-H-E-R, V --

Q    Which, as I recall, was a congressional redistricting
case?

A    Yes, I believe so.  And then that's been cited in
subsequent cases, as well.

Q    I am now showing you Defendant's Exhibit 13, page 20.
What does this map show, please, Dr. Johnson?

A    So, this is Mr. Cooper's map showing the area that he put
together into the District 2 and District 7 in his illustrative
maps.

So the thick black line that you see kind of weaving
through the central and south part of the state, that's the
outer border of the combination of those two districts combined
over all of his maps.  And the color shading that I'm pretty
sure has been discussed before, this is the African-American
percentage of the county as a whole for each of the counties in
the state.

And then highlighted in the bottom left with the purple
arrow is this weird pocket that he includes.  And that's the
arrow I added.  The pocket is in his map.  It's the kind of
south and west edge of Mobile and the areas outside it which

**Caster Plaintiffs' Exhibit 87, Page 124**

         1   are heavily white that he went around in every one of his maps.

         2   So when he overlays all four, that pocket is left out.

         3   Q     In every one of his maps, that pocket is left out?

         4   A     Exactly.

13:21:51 5   Q     Would that affect the population count for the districts

         6   to which that pocket would have been assigned?

         7   A     Yes.  That small area has -- I spelled it out in my

         8   report, I think 94,000 people in it.  And when you put it into

         9   the rest of the outlined area, it's so much more heavily white

13:22:12 10  that it actually drops the African-American percentage of the

        11   area as a whole by about 2 percent.

        12   Q     Thank you.

        13         I'd like to show you -- ask you to look at, please,

        14   Dr. Johnson, paragraphs 28 and 29 of your report.  And I will

13:22:34 15  show you Figure 10 from your report, which is Defendant's

        16   Exhibit 13, page 16.  Again, Figure 10.  And ask you to explain

        17   this to the Court, please.

        18   A     So this is looking at the percentage of the population

        19   that was moved into new districts between the -- compared to

13:23:01 20  the 2001 map.  So this is numerically showing what we were just

        21   looking at in the overlay maps.

        22         And you can see the adopted 2011 map at the far left,

        23   where it says 10.4 percent, the short bar, shows the state

        24   really made minimal changes.  You know, the 70-something

13:23:24 25  thousand people had to be added into District 7 because it was

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 125**

 1  short of what the population needed according to the 2010

 2  census.

 3  Q    Did you say 70,000?

 4  A    I think it was 70,000 -- yes.  Oh, here in paragraph 31 is

13:23:42  5  the specific number.  It's 79,467.

 6  Q    About 500 less than 80,000?

 7  A    Yes, exactly.  So some people had to move.  That district

 8  was short.  Other districts were over.  So that's why we

 9  restrict is people have to move.

13:24:01  10       So the adopted map kind of was minimal changes you might

 11  describe it, and only 10 percent of the state's population

 12  moved.

 13       Then the other bars you can see how much more population

 14  moved.  25 to 31 percent of the state's population were changed

13:24:19  15  from their old district to the new district, which means new

 16  relationships, getting to know new representatives, having to

 17  educate the new representative on the issue of their areas,

 18  and, to some degree, start over in whatever projects each

 19  community had going with their old representative, and

13:24:38  20  hopefully convincing the new representative to be just as

 21  interested in the project as the old representative was.  You

 22  use that buy-in that you had before.

 23  Q    Well, if the state, when it drew the maps in 2011 only

 24  needed to move 10.4 percent of the population, and in the

13:24:59  25  process of that had to repopulate Representative Sewell's

**Caster Plaintiffs' Exhibit 87, Page 126**

1    district, which was almost 800,000 -- I mean, excuse me --

2    80,000 people short of ideal population, why did Mr. Cooper

3    need to move in his Illustrative Plan 1, 30 percent of the

4    state's population; and in Illustrative Plan 2, 25.3 percent of

13:25:21 5    the state's population; and in Illustrative Plan 3,

6    28.8 percent of the state's population; and in Illustrative

7    Plan 4, 30.9 percent of the state's population?

8    A    Well, this is the core of the whole of my report where I

9    kind of walk through all these other criteria of looking for an

13:25:40 10   explanation.  Was he trying to make the map more compact?  Was

11   he trying to respect cities and other communities of interest

12   better than the adopted map?  Was he trying to retain the core?

13   Was he trying to follow any of the traditional redistricting

14   principles in drawing the lines a different way and in moving

13:25:59 15   all these additional people?

16        And, you know, you can't check any of those boxes.  None

17   of those traditional criteria explain it.  The only thing that

18   explains it is race.

19   Q    So Mr. Cooper seemed to indicate in his testimony that it

13:26:15 20   was important to try to keep counties whole.  Did he keep

21   Mobile County whole in any of his plans?

22   A    No.

23   Q    Did he respect communities of interest in Mobile County in

24   his plans?

13:26:27 25   A    No.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 127**

```
 1   Q    Did he respect communities of interest between Mobile and
 2   Baldwin County in his plan?
 3           MS. KHANNA:  Objection, Your Honor.  There's no
 4   testimony about the communities of interest in his report.
 5           MR. WALKER:  That's not correct.  There is.
 6   BY MR. WALKER:
 7   Q    Dr. Johnson, if you can find the report I'm looking for,
 8   feel free to speak up.
 9   A    Yeah.  So on page 22, paragraph 44, where I summarize it,
10   I list -- page 22, paragraph 44, it's subpoint B, as in boy, I
11   list out the traditional redistricting principles I look at,
12   and I find that Mr. Cooper does not justify the changes based
13   on any of them, including respecting communities of interest
14   such as counties, cities, and VTDs.
15           THE COURT:  Which subparagraph of paragraph 44 is
16   that?
17           THE WITNESS:  B, as in boy.
18           THE COURT:  Thank you.  You may proceed.
19           MR. WALKER:  I beg your pardon?
20           THE COURT:  You may proceed.
21           MR. WALKER:  Thank you, Your Honor.
22   BY MR. WALKER:
23   Q    So you looked at -- we've talked about communities of
24   interest.  We've talked about compactness.  We've talked about
25   contiguity.
```

13:26:40 (line 5)
13:27:43 (line 10)
13:28:02 (line 15)
13:28:32 (line 20)
13:28:45 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 128**

```
 1          Is his plan any more or less contiguous than -- do all the
 2     districts in his plan link up or connect to each other?
 3     A    Technically, yes.  They all are geographic contiguous.  Is
 4     that the extreme definition?  As I mentioned, in three of these
 5     maps he's only using the I-10 bridge for contiguity, but...
 6     Q    Maybe threadbare, but it's contiguous?
 7     A    Yes.
 8     Q    Does he have significantly less or even less in all of his
 9     plans splits of cities, counties, and VTDs than the state did
10     in its 2010 plan?
11     A    I didn't find any disagreements with his counts where he
12     talks about he had the same number -- or I think in some of the
13     maps he said he had one or fewer splits.  The one or fewer
14     split claims are a little extreme because what he's counting is
15     up in Jackson County.
16          MS. KHANNA:  Objection, Your Honor.  Not in his
17     report.
18     BY MR. WALKER:
19     Q    Dr. Johnson, do you talk about VTD splits in the reports?
20     I think it's in the same paragraphs that we just looked at that
21     says respecting communities of interest such as counties,
22     districts, and VTDs?
23          MS. KHANNA:  Your Honor, Dr. Johnson is providing a
24     lot of color on -- well, he did -- on new criticisms of
25     Mr. Cooper's plans that are just not included in his report.
```

The timestamps in the left margin are: 13:29:08 (line 5), 13:29:26 (line 10), 13:29:46 (line 15), 13:29:59 (line 20), 13:30:14 (line 25).

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 129**

```
 1   It's very difficult to rebut something that you are learning
 2   for the first time at trial.
 3           MR. WALKER:  Dr. Johnson was deposed, and they were
 4   free to ask any question they wanted about any part of this
 5   exhibit.
 6           MS. KHANNA:  Based on his report.
 7           THE COURT:  Did you ask him what VTDs did you mean?
 8           MS. KHANNA:  No.  We did not ask him whether or not he
 9   had additional criticisms other than what's in his report.  And
10   if he did, I think that would still be beyond the scope of his
11   report.
12           THE COURT:  Did you ask what VTDs he was referring to
13   on page 22?
14           MS. KHANNA:  We certainly discussed VTD at his
15   deposition.
16           THE COURT:  Did he discuss Jackson County?
17           MS. KHANNA:  Not that I recall.
18           MR. WALKER:  I don't actually recall whether he did.
19   We will withdraw the comment about Jackson County if that helps
20   us move forward, Your Honor.
21           THE COURT:  Okay.
22   BY MR. WALKER:
23   Q    Let me just bring this to a close.
24        Does respect for communities of interest explain the
25   difference in the districts that Mr. Cooper drew and the
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 130**

```
 1  state's 2011 districts?

 2  A    No.

 3  Q    Does compactness explain that difference?

 4  A    No.

13:31:28 5  Q    Does contiguity explain that difference?

 6  A    No.

 7  Q    Does minimizing splits explain that difference?

 8  A    No.

 9  Q    Does protecting incumbents explain that difference?

13:31:41 10  A    No.

11  Q    Or preserving the cores of existing districts?

12  A    No.

13  Q    So what are we left with?

14  A    The only explanation is that race is the predominant

13:31:51 15  factor in Mr. Cooper's maps.

16  Q    Thank you much, Dr. Johnson.

17       MR. WALKER:  Your Honor, I pass the witness.

18       THE COURT:  If we could -- I need to take a short

19  break.  I have got a phone call I need to return.

13:32:05 20       We'll come back at -- let's just go on and say 1:45.

21       MS. KHANNA:  Yes, Your Honor.

22       MR. WALKER:  Thank you, Your Honor.

23       (Recess.)

24       THE COURT:  You may proceed.

13:47:40 25       MS. KHANNA:  Thank you, Your Honor.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 131**

```
 1                    CROSS-EXAMINATION
 2  BY MS. KHANNA:
 3  Q    Good afternoon, Dr. Johnson.
 4  A    Good afternoon.
13:47:44 5  Q    Your task in this case was to review the expert report and
 6  illustrative maps submitted by Mr. Cooper and to share your
 7  opinions of them; is that correct?
 8  A    Along with looking at the data, yes.
 9  Q    And you provide no response to Dr. Palmer's initial report
13:48:02 10  on racially polarized voting in Alabama?
11  A    Correct.
12  Q    And you have no reason to dispute Dr. Palmer's conclusions
13  on functionality in his rebuttal report, correct?
14  A    I don't think I even read them.
13:48:15 15  Q    And you did not dispute any part of Mr. Cooper's analysis
16  of socioeconomic disparities between blacks and whites in
17  Alabama?
18  A    Correct.
19  Q    And you have no reason to dispute any of the conclusions
13:48:28 20  in Dr. McCrary's report relating to the history of
21  discrimination in voting?
22  A    Correct.
23  Q    On page 4 of your report, you discuss what you believe to
24  be the proper metric of African-American; is that right?
13:48:47 25  A    Proper in that it's the Department of Justice guidelines,
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 132**

1   yes.

2   Q    And your preferred metric, as reflected in your report, is

3   made without reference to any understanding you had about what

4   Alabama actually uses when it tabulates black voting age

13:49:10  5   population, correct?

6   A    Right.  I was not relying on what the state had done.

7   Q    And is it fair to say that your metric, metric that you

8   advance is different than the metric that Dr. Hood advances?

9   A    Slightly different, yes.

13:49:26 10   Q    Is it your opinion that Dr. Hood's position -- sorry.  Is

11   it your position that Dr. Hood is using the wrong metric?

12   A    Well, depends on his purposes.  If he's trying to evaluate

13   the *Gingles* majority test, then, yeah, it would be the wrong

14   metric.  It may be the right metric for his purposes.

13:49:49 15   Q    But you do not argue that Dr. -- that Mr. Cooper is, in

16   fact, using the wrong metric to calculate BVAP, do you?

17   A    I'm sorry?

18   Q    How about this:  Is it your position that Mr. Cooper is

19   using the wrong metric according to the DOJ guidelines for

13:50:08 20   assessing black voting age population?

21   A    Yes; that he's using the wrong measure.  And when you use

22   the right measure, the two lesser maps don't meet the

23   50 percent threshold.

24   Q    So in your report, don't you say in paragraph -- on page

13:50:26 25   5, footnote 3 that both the DOJ guidance and the OMB guidance

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 133**

1  provide the option to follow Mr. Cooper's approach?

2  A    I don't know about -- I wouldn't describe it as an option.

3  It's a secondary analysis that DOJ reserves the right to do if

4  they find it's justified in using that instead of the original

13:50:51 5  approach.  And, again, as I mentioned, when you get into

6  citizen voting age cases, you can't do the secondary method

7  because that data is not available.

8  Q    And the cases in which you're talking about that often get

9  into the issues of citizen voting age population, those are

13:51:07 10 cases that are often involving large Latino populations; is

11 that correct?

12 A    Some of them are not so large, but, yes, they tend to

13 involve Latino or Asian American communities.

14 Q    And oftentimes where the minority group at issue is either

13:51:23 15 exclusively or includes the Latino population; is that correct?

16 A    It also comes into play in Asian-America jurisdictions,

17 but in addition to Latinos areas.

18 Q    The vast majority of your work has been in California and

19 the American southwest; is that correct?

13:51:37 20 A    Yes.

21 Q    Where there are significant Latino populations and Asian

22 populations; is that correct?

23 A    Certainly Latino in just about all of them, and Asian in

24 many of them.

13:51:46 25 Q    Certainly relative to southern Alabama, larger populations

```
      1  of those minority groups?

      2  A    Certainly larger in Latino -- you have some pockets of

      3  fairly large Asian American population here.  But, yes, not --

      4  Alabama doesn't have percentages that California does, for

13:52:03  5  example.

      6  Q    Fair enough.  So you refer to the DOJ guidelines in your

      7  report; is that correct?

      8  A    Yes.

      9  Q    Can we please pull up Plaintiffs' Exhibit 125?

13:52:17 10       So Plaintiffs' Exhibit 125 is the DOJ's guidance

     11  concerning redistricting under Section 5 of the Voting Rights

     12  Act; is that correct?

     13  A    Yes.

     14  Q    And it's dated in February of 2011, right?

13:52:32 15  A    Yes.

     16  Q    And this is the document that you cite in your report

     17  discussing how to allocate African-American population?

     18  A    Yes.  There are earlier versions, and there's an OMB

     19  guidance too, but they're all essentially the same.

13:52:46 20  Q    Well, this is the version that would have governed the

     21  redistricting process in 2011, correct?

     22  A    Yes; along with Department of Justice speeches.

     23  Q    So does this version refer to Department of Justice

     24  speeches?

13:53:04 25  A    No.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 135**

| | | |
|---|---|---|
| | 1 | Q    It's the written document actually published by the |
| | 2 | Department of Justice, correct? |
| | 3 | A    Yes.  When I refer to speeches, the head of the Section 5 |
| | 4 | unit comes to the National Conference of the State Legislature |
| 13:53:15 | 5 | redistricting seminars, and we talk about these guidelines and |
| | 6 | how they would be interpreted and implemented. |
| | 7 | Q    So you have heard some speeches from DOJ officials before, |
| | 8 | right? |
| | 9 | A    Yes, many times. |
| 13:53:25 | 10 | Q    So you would agree that the standard for determining |
| | 11 | racial categories in the Section 5 context is the standard to |
| | 12 | be applied in the Section 2 case, as well; is that right? |
| | 13 | A    In my experience, they tend to be the same standard. |
| | 14 | There may be some legal intricacies that are more lawyerly than |
| 13:53:50 | 15 | my work, but, yes, generally, they would correspond. |
| | 16 | Q    If we could turn to page 4 of this document.  I won't ask |
| | 17 | you to read the very fine print on this whole thing.  Although |
| | 18 | I think it's -- there we go. |
| | 19 | But you do see the heading called The Use of the 2010 |
| 13:54:17 | 20 | Census Data -- |
| | 21 | A    Yes. |
| | 22 | Q    -- in the middle of the page? |
| | 23 | And you would agree that that is where the DOJ guidance |
| | 24 | discusses the various racial categories on the census, correct? |
| 13:54:28 | 25 | A    In this register, yes. |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 136**

| | |
|---|---|
| 1 | Q    And at no point in this DOJ guidance does the DOJ list the |
| 2 | eight categories of race data that your report lists, correct? |
| 3 | A    I don't remember if it would be here or in the OMB |
| 4 | guidance. |
| 13:54:49 5 | Q    Okay.  But it's not listed here.  We will take a look at |
| 6 | that in a second. |
| 7 | A    Okay. |
| 8 | Q    Is that fair? |
| 9 | A    I -- it's not listed on the page you're showing.  I don't |
| 13:54:57 10 | know if it's on another page or not. |
| 11 | Q    Can I -- can we show the next page, as well? |
| 12 | You agree it's not listed in the section called, The Use |
| 13 | of 2010 Census Data? |
| 14 | A    Well, actually in the third column, it does -- it doesn't |
| 13:55:23 15 | list them.  It describes them. |
| 16 | Q    In your interpretation, you believe that those eight |
| 17 | categories come from the text of this document? |
| 18 | A    Well, no.  Here it's describing them.  It's summarizing |
| 19 | the OMB guidance. |
| 13:55:38 20 | Q    Okay.  If we can go back to the page 4 of the document. |
| 21 | So you did mention that the DOJ guidelines refer to a separate |
| 22 | document issued by the OMB, correct? |
| 23 | A    Yes. |
| 24 | Q    And that's a lot of acronyms.  The OMB, for the record, is |
| 13:56:01 25 | what office? |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 137**

1004

|   |   |
|---|---|
| 1 | A    Office of Management and Budget. |
| 2 | Q    Okay.  And in this document toward the -- in the third |
| 3 | column toward the bottom, you'll see that DOJ specifically |
| 4 | cites to footnote 1 of the *Georgia v. Ashcroft* opinion; is that |
| 5 | correct? |
| 6 | A    Yes. |
| 7 | Q    And they do that in the discussion of how to allocate |
| 8 | multi-race responses, correct? |
| 9 | A    They're talking about their secondary approach would be |
| 10 | allocating those numbers off. |
| 11 | Q    They're -- you said secondary approach.  But I'm just |
| 12 | looking at the beginning of the paragraph.  The department will |
| 13 | then move to the second step in its application of the census |
| 14 | data. |
| 15 | Are you referring to that second step as a secondary |
| 16 | approach? |
| 17 | A    Yes. |
| 18 | Q    Okay.  Are you familiar with the *Georgia v. Ashcroft* |
| 19 | opinion? |
| 20 | A    I'm aware of it.  I couldn't quote it to you. |
| 21 | Q    Luckily, I can. |
| 22 | In fact, Mr. Cooper actually cites to that exact same |
| 23 | footnote in *Georgia v. Ashcroft* in his rebuttal report -- or |
| 24 | actually in his initial report, correct? |
| 25 | A    I don't recall off top of my head. |

Timestamps in left margin:
13:56:18 (line 5)
13:56:48 (line 10)
13:57:00 (line 15)
13:57:11 (line 20)
13:57:29 (line 25)

**Caster Plaintiffs' Exhibit 87, Page 138**

```
         1   Q    Do you want me to show you?  Do you believe me?
         2   A    It's up to you.  Yes.
         3   Q    We'll just pull up Plaintiffs' Exhibit 1, please, at page
         4   5.
13:57:48 5        And here this is Dr. Cooper's initial -- sorry --
         6   Mr. Cooper's -- I just promoted him -- Mr. Cooper's initial
         7   report.  And you see in his footnote on page 5, he says, It is
         8   my understanding that following the U.S. Supreme Court decision
         9   in Georgia v. Ashcroft that the any-part definition is the
13:58:05 10  appropriate census classification to use in most Section
        11   2 cases?  Correct?
        12   A    That's what it says.
        13   Q    Okay.  And --
        14        THE COURT:  Is that based on a footnote in that
13:58:17 15  Ashcroft case -- Georgia v. Ashcroft case?
        16        MS. KHANNA:  Yes.  And I'm happy to pull up the
        17   footnote, if that's easier.
        18        THE COURT:  No.  But if it's a footnote, that's not a
        19   holding or a determination in the case, is it?
13:58:42 20       MS. KHANNA:  That may well be, Your Honor.  But I
        21   believe that the questions that I am posing of Dr. Johnson are
        22   what his understandings of the guidelines are.  And the
        23   guidelines do specifically cite to a footnote in the Georgia v.
        24   Ashcroft opinion.
13:58:55 25  BY MS. KHANNA:
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 139**

1006

1   Q    In fact, if we can go back to the guidelines, Plaintiffs'
2   Exhibit 125, page 4.
3        And we already saw that the *Georgia v. Ashcroft* opinion is
4   specifically cited here, footnote 1.
13:59:13 5        MS. KHANNA:  And actually, Heather, can you pull up
6   the *Georgia v. Ashcroft* opinion?
7        THE COURT:  Are we going to look at the holding of the
8   case, or are we going to look at a footnote?
9        MS. KHANNA:  We're going to look at the actual
13:59:30 10  footnote to which the DOJ guidelines cite.
11       And if we can scroll down -- I apologize.  I don't have
12  the pdf number -- to footnote 1.  Here we go.
13  BY MS. KHANNA:
14  Q    Footnote 1 here you'll see, Dr. Johnson, the Court notes
13:59:55 15  that Georgia and the United States in this case had different
16  figures depending on, quote, whether the total number of blacks
17  included those people who self-identify as both black and a
18  member of another minority group such as Hispanic.
19       Do you see that?
14:00:12 20  A    Yes.
21  Q    Okay.  And I'll just direct your attention to the kind of
22  second half of that footnote where it says, moreover.
23       Moreover, the United States does not count all persons who
24  identify themselves as black.  It counts those who say they are
14:00:32 25  black and those who say that they are both back and white.  But

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 140**

1    it does not count those who say they are both black and a

2    member of another minority group.  Using the United States'

3    numbers may have more relevance if the case involves a

4    comparison of different minority groups.

14:00:51 5        And then it cites to some cases there.

6        Here, however, the case involves an examination of only

7    one minority group's effective exercise of the electoral

8    franchise.  In such circumstances, we believe it is proper to

9    look at all individuals who identify themselves as black.

14:01:09 10       Did I read that correctly?

11   A    I believe so.

12   Q    And that's the footnote cited by DOJ; is that correct?

13   A    Yes.

14   Q    You also mentioned the OMB guidance, as well.  If we could

14:01:25 15  pull up Plaintiffs' Exhibit 126.

16       And this is the OMB bulletin that you cite in your report,

17   is it not?

18   A    Yes.

19   Q    And if we could please turn to page 3 of this document.

14:01:45 20  Here at the top we see a section entitled, Guidance on

21   Aggregation and Allocation of Multiple Race Responses For Use

22   in Civil Rights Monitoring and Enforcement.  Correct?

23   A    Yes.

24   Q    Okay.  And at the bottom we see a section entitled,

14:02:00 25  Allocation Guidance.  It's Roman Numeral II.

**Caster Plaintiffs' Exhibit 87, Page 141**

|  | | |
|---|---|---|
| | 1 | A    Yes. |
| | 2 | Q    And there it is says that, Federal agencies will use the |
| | 3 | following rules to allocate multiple race respondents for use |
| | 4 | in Civil Rights monitoring and enforcement.  Do you see that |
| 14:02:17 | 5 | paragraph? |
| | 6 | A    Yes. |
| | 7 | Q    And it lists several bullet points underneath that.  That |
| | 8 | third bullet point there says, Responses that include two or |
| | 9 | more minority races are allocated as follows:  If the |
| 14:02:34 | 10 | enforcement action is in response to a complaint, allocate to |
| | 11 | the race that the complainant alleges the discrimination is |
| | 12 | based on. |
| | 13 | Do you see that? |
| | 14 | A    Yes. |
| 14:02:47 | 15 | Q    So you would agree that according to the OMB guidance that |
| | 16 | you cite in your report, if the minority group upon which the |
| | 17 | complaint is based is African-American, then individuals who |
| | 18 | identify themselves as black and one or more other minority |
| | 19 | races should be assigned to the African-American category, |
| 14:03:05 | 20 | correct? |
| | 21 | THE COURT:  Excuse me.  Is this an enforcement action |
| | 22 | in response to a complaint? |
| | 23 | MS. KHANNA:  Is this present case an enforcement |
| | 24 | action?  No, it is a -- but it is the guidance that Dr. Johnson |
| 14:03:25 | 25 | has said is relevant in deciding what the appropriate metric is |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 142**

```
 1  in this case.
 2            THE COURT:  I'm confused.  Is this the guidance that
 3  you were relying on?
 4            THE WITNESS:  No.  Since this is not the methodology
 5  that we use in developing databases for redistricting.
 6            THE COURT:  All right.
 7            THE WITNESS:  And it's not -- it's not the methodology
 8  that the Department of Justice asked the Census Bureau to
 9  follow when it asked the Census Bureau to calculate the
10  citizens voting age population.
11  BY MS. KHANNA:
12  Q    I'm going to turn your attention to your report,
13  Defendant's Exhibit 13, page 5, footnote 3.
14       I believe the Court just asked you if that OMB guidance
15  was the guidance you were relying on.  Do you not cite that
16  exact OMB document in your footnote 3 on your report?
17  A    Yes.
18  Q    So it is, in fact, the guidance that your report is
19  relying upon, correct?
20  A    Not the sentence you're reading there about the
21  enforcement action.
22  Q    Can you -- and you would agree that the DOJ guidelines
23  that you also cite in your report refer to that same OMB
24  document, correct?
25            THE COURT:  I don't think he's disputing the document.
```

14:03:38 (line 5)
14:03:53 (line 10)
14:04:08 (line 15)
14:04:19 (line 20)
14:04:34 (line 25)

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 143**

1    I think he's disputing that one sentence that you pointed out

2    to him that appears to apply to an enforcement action.

3    BY MS. KHANNA:

4    Q    Can we go back to Plaintiffs' 126?  Let's start from the

14:05:07 5    first page.  So this is a four-page document, and this is the

6    document that you cite in your report, and it's the document

7    that DOJ relies upon, as far as you're concerned in its

8    guidelines, correct?

9    A    That's my understanding.

14:05:20 10    Q    Can you take -- and take your time.  Take a look at the

11    four-page document and tell me what it is that you cite it for.

12    A    Well, I refer to it because it's referred to in the DOJ

13    guidance.  And I would note right in that DOJ guidance is their

14    initial method is not the method you're reading here from the

14:05:39 15    OMB process.

16         So their initial method in the DOJ guidance that I'm

17    reading is not what's listed in that enforcement action

18    paragraph.  It's to allocate them as I have described.

19    Q    So when you cite the OMB guidance, this document in your

14:05:54 20    report, you're actually not citing it for any particular

21    proposition stated in the OMB guidance?

22    A    It's -- as you saw in the DOJ guidance, it's all rolled

23    together, so they tend to get cited together.  And that's where

24    the data -- the data we compile comes from is that guidance

14:06:14 25    from DOJ, which focuses on what DOJ says is their initial

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 144**

1    method of reviewing these cases.

2        And, yes, this is in as a second method as an option.  And

3    it really highlights -- you know, this goes to the key point

4    I'm bringing up of Mr. Cooper's plans -- that the debate over

14:06:34 5   whether we include or not include African-Americans who also

6    marked Asian, who also marked Hispanic, who also marked Native

7    American which way that debate goes decides whether his maps

8    work -- if they meet the threshold because his margins are so

9    narrow.  And that --

14:06:54 10  Q    I appreciate your testimony.  That's not exactly what I

11   asked.  I'm really just trying to find out what you are relying

12   on for what you determined to be the proper metric of BVAP.

13   That's about three or four pages of report.  And so I just want

14   to completely understand.  You are relying on the DOJ

14:07:10 15  guidelines that we've already looked at, correct?

16   A    Yes.

17   Q    And those guidelines cite *Georgia v. Ashcroft,* footnote 1?

18   A    In their secondary approach.

19   Q    And what you're referring to as the secondary approach is,

14:07:34 20  in fact, DOJ's second step of its approach, correct?

21   A    Sure.

22   Q    You could see how maybe those are different things, a

23   first step and a second step?

24   A    I am not a lawyer, so I'll let you -- I will let the

14:07:48 25  lawyers debate that.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 145**

1012

1    Q    Dr. Johnson, you would agree that Mr. Cooper's approach is

2    not wrong under the DOJ guidance read as a whole, correct?

3    A    I would say it fails under one approach and barely passes

4    under the other approach.

14:08:34  5    Q    Because you are reviewing the DOJ guidance as two separate

6    approaches rather than an initial step and a second step,

7    correct?

8    A    I'm not sure I see the difference there.

9    Q    You would agree that Mr. Cooper's approach is not wrong

14:08:52 10   under the U.S. Supreme Court's guidance in *Georgia v. Ashcroft*,

11   footnote 1?

12   A    From what we've just looked at, it seems to follow that.

13   I have -- I don't know -- I'm not enough of an expert to know

14   how much of the Voting Rights Act reauthorization -- I know it

14:09:14 15   reversed some of the *Georgia v. Ashcroft* precedents, but I

16   don't know if it reversed that part or not.

17   Q    On page 5 of your report, in paragraph 5, you state that,

18   Of the Alabama residents who marked black, African-American on

19   their 2010 census form, 11,026 or 1.2 percent of them also

14:09:35 20   marked some either other category.  Mr. Cooper counts them all

21   in his BVAP figures, but his report provides no analysis or

22   even anecdotes that these 11,026 people vote cohesively with

23   those who meet the traditional Department of Justice definition

24   of African-American for redistricting purposes.

14:09:55 25        Did I read that correctly?

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 146**

 1  A     Yes.

 2  Q     And that 11,026 number that you cull out, that includes

 3  people who are both black and white, correct?

 4  A     Yes.

14:10:08  5  Q     But according to you, those people should, in fact, be

 6  counted as African-American in this Section 2 analysis,

 7  correct?

 8  A     Yes.

 9  Q     Regardless of whether blacks and whites vote cohesively

14:10:23 10  with one another?

 11  A     Under the DOJ guidance, correct.

 12  Q     And, in fact, we know from racial voting patterns in the

 13  area that blacks and whites don't vote cohesively with one

 14  another?

14:10:35 15  A     People who are black and people who are white.  We don't

 16  have any data on people who self-identified both.

 17  Q     But regardless, is it your opinion that we should be

 18  including both people black and white in that figure?

 19  A     I follow DOJ's guidance on that.

14:10:53 20  Q     I want to make sure, because you talk about an 11,026 that

 21  I think you're suggesting Mr. Cooper should have not included,

 22  but that number includes people that you think should be

 23  included in the determination of BVAP, correct?

 24  A     I didn't break them out, so I don't know the number in

14:11:13 25  there, but some fraction of 11,000.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 147**

1     And, again, we're back to the margins on these districts

2  are so narrow that 11,000 people swings them over or under the

3  *Gingles* threshold -- G-I-N-G-L-E-S.

4  Q    Well, I won't cross-examine you on whether it's pronounced

14:11:42 5  *Gingles* or *Jingles*.

6         THE COURT:  I won't either.

7  BY MS. KHANNA:

8  Q    Is it fair to say that neither the DOJ guidance that we

9  looked at -- Plaintiffs' Exhibit 125 -- or the OMB guidance

14:12:03 10  ever mentions the word cohesive or cohesion in its discussion

11  about how to allocate the races?

12  A    You're right.  They don't mention it directly.  But

13  obviously it would be part of their review if they're looking

14  to see if a cohesive voting block is experiencing polarized

14:12:25 15  voting.  They would want to know if -- by definition they would

16  need to know if it's cohesive.

17  Q    You state in your report that, Even if the those

18  multi-race, multi-ethnic voters really do vote cohesively with

19  African-American voters, a 1 percent error in the census

14:13:01 20  numbers would mean that Illustrative Maps 3 and 4 have zero

21  majority African-American districts.  An illustrative map would

22  have only one.  In pursuit of a stated goal to create two

23  districts where African-Americans could elect their preferred

24  candidates, the illustrative maps could end up with zero such

14:13:19 25  districts.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 148**

1015

```
         1      Did I read that correctly?

         2   A   Which paragraph are you reading?

         3   Q   I am looking at -- did I not refer you to a number?

         4   A   No.

14:13:31 5   Q   Paragraph 15, I think, starting on page 6.  And I believe

         6   I started reading on --

         7   A   Correct.

         8   Q   -- the third to the last line.

         9       So isn't it a fact that there is no statistical margin of

14:13:51 10  error for the census?

        11   A   The margin of error can't be statistically measured.

        12   There is an error.

        13   Q   It cannot be calculated?

        14   A   Correct.

14:14:02 15  Q   And you have not provided any estimate that the

        16   statistical - or any calculation -- or reason to believe that

        17   the statistical margin or error for the census is 1 percent, or

        18   .1 percent, or 3 percent, correct?

        19   A   I have not cited the studies because they're --

14:14:22 20  Q   Because the number can't be calculated?

        21   A   Yeah.  There are estimates out there.  The Census Bureau

        22   itself puts out estimates of what it thinks the undercount is

        23   of different groups and what the over count is of other groups.

        24   But they're all specific to those studies.

14:14:38 25      There's no statistical number.  And this is the key to
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 149**

1   statistics is we have statistically measurable error, and then

2   we have systematic error.  And so we know there's systematic

3   error.  We just don't know how big.

4   Q    And you have chosen 1 percent not based on any particular

14:14:53 5   study or reason to believe that that would be the right

6   calculation in a world where you could calculate it?

7   A    It's an often cited sample number when you're talking

8   about the overall error in the census.  Lots of people throw

9   out 1 percent as a general rule, because we know it's pretty

14:15:10 10   good.  It better be.  We use it for every opinion poll and

11   every other study in the country.  But we also know that

12   there's some error.

13       We know that -- for example, for African-Americans and

14   Latinos, most undercount estimates are around 2 or 3 percent.

14:15:29 15   College students are actually over counted.

16       So 1 percent is a fairly reasonable guess.  But, again,

17   we're looking at systematic here.  We can't confirm it.

18   Q    And you don't have any citation for that, correct?

19   A    No.  I didn't put any in my report.

14:15:43 20   Q    Dr. Johnson, you are not aware of any instance in which

21   any type of error in the decennial census was determined to

22   have an effect on whether a district could be considered a

23   majority-minority district, are you?

24   A    I'm not aware of any federal case where the remedy

14:16:02 25   district -- or the illustrative district was so close that it

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 150**

 1  would have mattered.

 2  Q    It would not surprise you to learn that there are, in

 3  fact, a number of majority black districts across the country

 4  that are less than 52 percent BVAP, would it?

14:16:17  5  A    I mean, there are three in California less than 33 percent

 6  BVAP.

 7  Q    There's three majority-minority districts in California

 8  that are less than 33 percent BVAP?

 9  A    There are three voting rights driven districts in Los

14:16:32 10  Angeles that are less than 33 percent that are -- that

11  consistently elect African-Americans.

12  Q    Thank you.

13       So you would agree that there probably are majority black

14  districts that are less than 52 percent minority voting age

14:16:46 15  population, correct?

16  A    I know the three from California off the top of my head.

17  Q    Which are far less than 52 percent, correct?

18  A    Yes.  And also don't meet the *Gingles* threshold.

19  Q    But as you just testified, they do provide opportunities

14:17:06 20  to elect for minority voters, correct?

21  A    Yes.  One of them recently failed, but historically they

22  have.

23  Q    Dr. Johnson, you are familiar with the *Gingles 1* standard

24  as articulated by the U.S. Supreme Court?

14:17:21 25  A    Yes.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 151**

1018

1   Q    You applied it in your analysis in this case and others?

2   A    And in my work almost daily.

3   Q    So you're familiar with the *Bartlett v. Strickland* case

4   defining the numerical threshold for that standard?

14:17:41 5   A    Yes.

6   Q    Can we please pull up *Bartlett v. Strickland*?  If we could

7   turn to page 8 of the document?

8        You'll see the highlighted portion on your screen.

9   Provides the majority my -- actually why don't you read it

14:18:04 10  because I'm tired of reading?

11  A    The majority-minority rule relies on an objective,

12  numerical test:  Do minorities make up more than 50 percent of

13  the voting age population in the relevant geographic area?

14  That rule provides straightforward guidance to courts and to

14:18:21 15  those officials charged with drawing district lines to comply

16  with Section 2.

17  Q    Dr. Johnson, this does not say that the objective

18  numerical test is 50 percent minus an estimate or guess at the

19  level of error in the census, does it?

14:18:37 20  A    No.  It says what I read.

21  Q    And it doesn't say that the objective numerical test is

22  50 percent plus whatever specific percentage in that area would

23  provide a functional opportunity based on analysis of turnout

24  and voter registration in the area?  Does it?

14:18:55 25  A    No.  It says what I read.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 152**

```
 1  Q    Because you would agree with me that it would hardly
 2  provide straightforward guidance to courts and officials
 3  charged with drawing district lines if different people were to
 4  provide guesses at a supposed error that you just testified
14:19:12  5  can't be calculated, correct?
 6  A    No.  I wouldn't agree with everything wrapped into that
 7  statement.
 8  Q    So I asked whether or not the Bartlett v. Strickland test
 9  incorporates in this language an error rate in the census, and
14:19:31 10  you, I believe, testified it does not?
11  A    No.  I said that it did not -- that written in here was
12  not the line that you had read.
13  Q    Fair enough.  Written in the language that I read --
14  written in the highlighted language.  It says nothing about a
14:19:45 15  census error, correct?
16  A    It talks about more than 50 percent, a number that has to
17  be measurable, and the Court would have to be confident of that
18  number.
19      An error -- you know, it's not the total population rule,
14:20:04 20  you know.  It's not this artificial one person thing.
21      It's pretty clear to me that that language says the
22  50 percent number needs to be a reliable number.  We can't be
23  50/50 it is.  We can't be -- you know, we can't be 52/48 that
24  it is 50 percent.  It doesn't apply to me that we should guess
14:20:27 25  or be that close.  When we know there's error in the data, we
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 153**

1020

```
            1  want to be safe.
            2  Q    So your understanding is that this language implies that
            3  we should guess at the census error rate which cannot be
            4  calculated?
14:20:38    5  A    No.
            6  Q    And that that would be straightforward guidance?
            7          MR. WALKER:  Your Honor, if I may.  This is a matter
            8  that we will be glad to brief to the Court.
            9          THE COURT:  Sustained.
14:20:46   10          MR. WALKER:  It's not appropriate to continue to ask
           11  this witness about that.
           12          THE COURT:  It's a legal matter.  I think it's
           13  appropriate for the Court, not for the witness.
           14          MS. KHANNA:  Understood, Your Honor.
14:20:57   15  BY MS. KHANNA:
           16  Q    To be clear, Dr. Johnson, you performed no analysis
           17  whatsoever of the effectiveness of the illustrative districts
           18  in Mr. Cooper's plans, correct?
           19  A    Correct.
14:21:12   20  Q    You had performed no analysis about the extent to which
           21  they would actually provide an opportunity to elect minority
           22  preferred candidates?
           23  A    Correct.
           24  Q    And you are not asserting any opinion on the effectiveness
14:21:25   25  of those districts, are you?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 154**

1    A    Correct.  I've seen lots of districts like this drawn and

2    seen what they've done, but I did not write that up in my

3    report.

4    Q    You certainly provide no analysis to that effect, correct?

14:21:40 5  A    Correct.

6    Q    So, Dr. Johnson, I believe you testified on direct that

7    Plaintiffs' illustrative plans fail to comply with the

8    traditional districting criterion of compactness, correct?

9    A    Yes.

14:21:57 10 Q    And that's based on your visual review of the districts?

11   A    And just about any measure of that southern district, in

12   particular.

13   Q    So you would agree, wouldn't you, that under *Gingles 1*

14   plaintiffs must establish that the minority community is

14:22:19 15 sufficiently numerous and geographically compact to comprise a

16   majority of the voting age population in a new congressional

17   district, correct?

18   A    Yes.

19   Q    And you would agree that the compactness aspect of the

14:22:30 20 first *Gingles* precondition refers to the compactness of the

21   minority population, not the compactness of any given district,

22   correct?

23   A    No.  I disagree with that.

24   Q    So your understanding of the *Gingles 1* standard is that it

14:23:12 25 looks at -- it does not look at the compactness of the minority

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 155**

1022

```
        1  population, but looks at the compactness of a minority
        2  district?
        3  A    The remedy district -- or the illustrative district --
        4  sorry -- the illustrative district would need to be
14:23:28 5  geographically compact to meet the language of the Gingles.
        6  Q    I guess we'll save that legal dispute for another day.
        7       You looked at the Reock scores of the illustrative plans
        8  on page 10 of your report; is that right?
        9  A    Yes.
14:24:03 10 Q    And in your opinion, there are no thresholds in the Reock
        11 score that would classify a district as objectively compact or
        12 objectively non-compact; is that correct?
        13 A    Not built into the test itself.  The jurisdictions often
        14 set a floor.
14:24:19 15 Q    But you don't actually have a threshold that you apply,
        16 correct?
        17 A    Well, it would vary based on the jurisdiction.  The scores
        18 are heavily driven by the shape of the jurisdiction.  So you
        19 couldn't set -- it would be impossible to set an effective
14:24:33 20 universal Reock score.  It has to be done jurisdiction by
        21 jurisdiction.
        22 Q    I believe you testified on direct about an instance in
        23 which the Hopi and the Navajo didn't get along, and, therefore,
        24 it made sense they would be drawn into different districts.
14:24:50 25 Did I understand that correctly?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

|     |     |
| --- | --- |
| 1 | A    Yes.  That was -- the request given their history was to |
| 2 | be drawn in different districts. |
| 3 | Q    Given their history? |
| 4 | A    Yes. |
| 14:24:59 5 | Q    And so if two groups -- your opinion was that in those two |
| 6 | Native American nations didn't get along it made sense to draw |
| 7 | them in different districts; is that correct? |
| 8 | MR. WALKER:  Object, Your Honor. |
| 9 | THE COURT:  Sustained. |
| 14:25:10 10 | BY MS. KHANNA: |
| 11 | Q    Dr. Johnson, you would agree that when you're drawing a |
| 12 | plan to add a new majority-minority district, that plan will |
| 13 | often look different from the prior plan because of that |
| 14 | change? |
| 14:25:28 15 | A    Are you citing something I said up here or something I |
| 16 | wrote? |
| 17 | Q    I'm asking you a question. |
| 18 | A    I'm sorry.  What was the question? |
| 19 | Q    You would agree that when you are drawing a plan to add a |
| 14:25:45 20 | new majority-minority district, that plan will often look |
| 21 | different from the prior plan because of that change? |
| 22 | A    The degree of difference will vary depending on the |
| 23 | situation, but obviously it will be a different plan, so |
| 24 | something would be different. |
| 14:26:01 25 | Q    You would be putting a new district into an area where it |

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 157**

1  wasn't before, so, yes, it would look different from the prior

2  plan, correct?

3  A    Not necessarily.

4  Q    Do you recall having your deposition taken in this case?

14:26:25 5  A    Yes.

6  Q    If we could call up Dr. Johnson's deposition page 120.

7        You see at the bottom on line 18 you were asked:  When you

8  draw a plan and add a new majority-minority district, does that

9  plan or that district often look different from the prior plan

14:26:42 10 because you're adding a majority-minority district?

11       If you could turn to the next page.  Your answer was:

12 Yes.  You're putting a new district into an area where it

13 wasn't before, so yes.

14       Is that what you testified to?

14:26:53 15 A    Yes.  What I was referring to now is that you don't

16 necessarily need to put a new district.  It can sometimes be a

17 small adjustment to an existing district.

18 Q    Understood.  If the plan adds a majority-minority district

19 that wasn't there before, core retention in that district will

14:27:15 20 be less; is that correct?

21 A    Usually.  Depends on how it's drawn.

22 Q    And you would agree that if we were to look at some of the

23 plans that you have drawn over the course of your career, it is

24 likely we would find that in those plans that have added a new

14:27:31 25 majority-minority seat that wasn't there before, the core

1025

1  retention of the surrounding districts will have decreased,

2  correct?

3  A    I am sure there is examples of that.  I mean, it all goes

4  back to whether you're having to erase a part of the map and

14:27:49 5  draw something all new or just slightly adjust one of the

6  existing districts, or if you're adding a whole new district to

7  the state, like Arizona when they -- when you add a whole

8  another congressional district.

9  Q    I believe you testified on direct to a legal case --

14:28:04 10        THE COURT:  Just a minute.  Would that also be the

11  same if you're losing a district, as opposed to adding a

12  district?

13        THE WITNESS:  You would get very funny core retention

14  numbers because one of the old districts would now go to zero

14:28:20 15  because it doesn't exist anymore.

16        So there you would have to carefully review what you're --

17  what my numbers would say about core retention.  And you have

18  to exclude that one piece and only look at the other seven, I

19  guess, or whatever the remaining number are.

14:28:39 20  BY MS. KHANNA:

21  Q    And, Dr. Johnson, I believe you testified with counsel on

22  direct about a case called *Karcher v. Daggett*.  That's a case

23  you brought up; is that right?

24  A    Yes.

14:28:48 25  Q    That's a 1983 one person one vote case.  Is that what you

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 159**

```
 1  recall?
 2  A    I remember.  I cite it for the core constituency.  I don't
 3  remember the details of it versus another case.
 4  Q    Well, in that case, the Court cites core retention of the
 5  government interest that might justify population deviations.
 6  Does that sound familiar?
 7  A    Yes.  That's how the Supreme Court defines all traditional
 8  criteria is things beyond the federal laws, obviously, which I
 9  intend to separate federal laws are not traditional criteria.
10  They kind of top everything.
11       And then the traditional criteria are essentially things
12  the courts have approved as appropriate justifications for
13  deviation.
14  Q    You would agree that a congressional plan cannot have any
15  population deviation outside of one person deviation; is that
16  correct?
17  A    There are exceptions to that, but they're pretty rare.
18  Q    All right.  Dr. Johnson, you present the opinion that race
19  predominated in Mr. Cooper's illustrative plans; is that right?
20  A    Yes.  In the absence of any other explanation, that's the
21  only remaining explanation left standing.
22  Q    So you base your determination on Mr. Cooper's
23  explanations about what he did and did not consider; is that
24  right?
25  A    I'm not aware of any other available information to base
```

Timestamps: 14:29:03 (line 5), 14:29:21 (line 10), 14:29:33 (line 15), 14:29:53 (line 20), 14:30:05 (line 25)

1    it on.

2    Q    You weren't in the courtroom on Monday when Mr. Cooper

3    testified about what he considered and didn't consider in

4    drawing illustrative plans, were you?

14:30:18  5    A    No.

6    Q    And you agree that Mr. Cooper says in his report that race

7    was not his predominant consideration?

8    A    Of course he does.

9    Q    And he testified in open court under oath to that same

14:30:32 10    effect, or I can represent to you that he testified since you

11    weren't here to hear him.

12    A    Okay.

13    Q    Would you be surprised to learn that no Court has ever

14    rejected Mr. Cooper's Section 2 illustrative plans on the basis

14:30:45 15    of race predominating?

16          MR. WALKER:  Objection, Your Honor.  She is asking the

17    witness to vouch for Mr. Cooper, which is simply not

18    appropriate.

19          MS. KHANNA:  Your Honor, I believe this witness'

14:30:52 20    testimony is based entirely on whether or not Mr. Cooper's

21    explanations are what he deems to be credible.  And I think

22    that Mr. Cooper's explanation --

23          THE COURT:  I think the question of credibility is

24    left for the Court.  I observed and heard Mr. Cooper's

14:31:09 25    testimony.  He did not.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 161**

1028

| | |
|---|---|
| 1 | BY MS. KHANNA: |
| 2 | Q    I want to turn to the maps that your counsel showed you. |
| 3 | And I am going to have to use the Elmo.  I'm not sure if I can. |
| 4 | THE COURT:  It's not so terribly hard. |
| 14:31:27 5 | MS. KHANNA:  I just didn't know if I had the power. |
| 6 | THE COURT:  You've got the power. |
| 7 | MS. KHANNA:  I've got the power. |
| 8 | Thank you, Your Honor. |
| 9 | BY MS. KHANNA: |
| 14:31:34 10 | Q    So this is from Defendant's Exhibit 13, page 35.  This is |
| 11 | the blowup map that your counsel talked with you about; is that |
| 12 | right? |
| 13 | A    Yes. |
| 14 | Q    I appreciate my assistant's help. |
| 14:31:54 15 | MR. SPIVA:  I told her I'd be her Vanna White. |
| 16 | THE COURT:  All right, good. |
| 17 | BY MS. KHANNA: |
| 18 | Q    And this is a portion -- a blown-up portion of |
| 19 | Illustrative Plan 2; is that correct? |
| 14:32:04 20 | A    Yes. |
| 21 | Q    And I believe you testified on direct that this, what you |
| 22 | call a foot, reflects a racial predominance; is that correct? |
| 23 | A    Yes. |
| 24 | Q    You would agree that there are pockets of high density |
| 14:32:27 25 | African-American or rather high BVAP populations right outside |

**Caster Plaintiffs' Exhibit 87, Page 162**

1  this district, say in Citronelle, or at the very bottom of this

2  district, that green square right there (indicating)?

3  A    Actually, once you get outside of the core area, the

4  numbers of people per census block get very low.  And the other

14:32:50  5  piece is that this map is showing census block by census block.

6       And to his credit, Mr. Cooper was at least staying in the

7  VTD level of geography.  So one of the problems of these maps

8  is you can't see how many people are in each block.  So I don't

9  know and I have significant doubt that the red and yellow

14:33:09  10  pockets that are a little ways outside the district have any

11  significant number of people in them or that they're in a VTD,

12  they would be majority African-American.

13  Q    And you would agree that Dr. Cooper -- sorry -- Mr. Cooper

14  did follow VTD lines in drawing this map, correct?

14:33:24  15  A    As he discussed, he had to split the VTDs along the bay

16  front as he squeaked along the edge there.  But otherwise, yes.

17  Q    In fact, you mentioned that there might not be too much

18  population out here in the rural area like over here

19  (indicating); is that correct?

14:33:41  20  A    I'm sorry.  I didn't see where you're pointing.  You're

21  pointing on the Elmo.

22  Q    In the Citronelle area.  You said there might not be too

23  much population there?

24  A    Well, Citronelle has people.  It's a city.  But the

14:33:55  25  question is how many people are in that one census block that

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 163**

1030

1      pops up as red in that field of purple.

2    Q     You don't know, correct?

3    A     I don't know.  But the odds are its not much, or he

4      probably would have grabbed it.

14:34:09  5    Q     That's probably true for some of these predominantly white

6      areas that are in the relatively rural part; is that correct?

7    A     Yeah.  I already discussed the white areas along the state

8      border are very sparsely populated.

9            Now, that's not true in Mobile where we're in the city and

14:34:24 10    actually incorporated areas that are fairly densely populated.

11    Q     You would agree that in this portion of District 2

12      Mr. Cooper does include large pockets of white areas as well;

13      is that correct?

14    A     There are some that he could not get around.

14:34:42 15            THE COURT:  And just to be clear for the record.  When

16      we're talking about white areas, what are we referring to when

17      looking at this map?

18      BY MS. KHANNA:

19    Q     Well, I can clarify the way I was using the term, and

14:34:59 20    maybe you can clarify if you were using a similar definition?

21            THE COURT:  Well, this is his map, so I would like to

22      hear from Dr. Johnson as to what the white portions of the map

23      represent.

24            THE WITNESS:  Sure.  So I understand the confusion

14:35:14 25    definitely.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 164**

1    The areas shown on the map in the color white are

2 unpopulated areas that have no people in them.  I believe what

3 we are discussing is the areas where the demographic of the

4 block is white unless it's shown as purple or dark blue.

14:35:27 5    THE COURT:  Okay.  And how would we know the

6 difference between a white color on the map that's unpopulated

7 and an area where white people populate the map?

8    THE WITNESS:  So where the white people live are shown

9 as purple and blue.  And then the area that's colored white

14:35:55 10 is -- it's mainly Delta, but it's -- no one lives there at all.

11    THE COURT:  Thank you.

12 BY MS. KHANNA:

13 Q   I'm glad to learn that we're both using the same

14 definition of white.

14:36:08 15    THE COURT:  I just wanted to make sure that the record

16 reflects that.

17    MS. KHANNA:  Yes.  I appreciate that, Your Honor.  And

18 I realize that there could be some confusion.

19 BY MS. KHANNA:

14:36:15 20 Q   You would agree that -- this is Illustrative Plan 2; is

21 that correct?

22 A   Yes.

23 Q   You would agree that if we were looking at, say,

24 Illustrative Plan 1, that plan would include something along

14:36:27 25 these lines, some things -- a line that is more west than the

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 165**

1032

```
 1  District 2 line in Illustrative Plan 2?
 2  A    Yes.  If you go back to the -- the zoomed-in blue maps you
 3  can see Exhibit 13, page 31.  Oh, I was going to the next one.
 4  It's the blue map showing -- yeah.
14:37:03 5  Q    Actually, I'm going to look at Defendant's Exhibit 13,
 6  page 7, and I believe what we were just discussing was
 7  Illustrative Plan 1 and how it actually extends more west into
 8  those predominantly white areas.  Would you agree with that?
 9  A    Yes.  Instead of coming south to get the rest of the
14:37:29 10  population, it doesn't come as far south, it goes west.
11  Q    And in so doing, it has more predominantly white areas in
12  that portion of that extension, correct, into Mobile County?
13  A    On the very fringe.  I don't know if it's more white than
14  the southern tip of Illustrative 2.  I presume in each case --
14:37:53 15  the end of the district tends to be where you're just get
16  getting to the final population count and doing as well as you
17  can.
18       So I presume in the four maps, since the numbers came out
19  fairly similar, the demographics are fairly similar, regardless
14:38:05 20  of whether you took the southern tip of Illustrative 2 or the
21  western edge of Illustrative 1.
22  Q    You don't know if this part has more white population than
23  this part, is that what you are saying?
24  A    Correct.  Again, we're in the density of the population at
14:38:20 25  issue.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 166**

1033

```
 1  Q    But you don't actually provide a racial schematic analysis

 2  of Illustrative Plan 1 at all; is that right?

 3  A    No, I didn't.  No.

 4  Q    And you would agree -- sorry.  You would agree that

 5  looking at your Defendant's Exhibit 13, page 7, those four

 6  maps, Illustrative Plan 2 shows perhaps the narrowest and

 7  longest extension into Mobile County; is that correct?

 8  A    It's a hotly contested debate between Illustrative 2 and

 9  then the fishhook in Illustrative 4.

10  Q    Both of which you present analyses of in your report,

11  correct?

12  A    Yes.

13  Q    And you provide no analysis -- racial schematic analysis

14  of Illustrative Plan 1 or Illustrative Plan 2; is that correct?

15  A    You mean Illustrative 1 or 3?

16  Q    Exactly.  Thank you for correcting the record.  You

17  provide no racial schematic analysis of Illustrative Plan 1 or

18  Illustrative Plan 3; is that correct?

19  A    Correct.  As you've done, it's easy enough to flip between

20  the amount of maps that I did do and just compare where the

21  lines go.

22  Q    Dr. Johnson, you would agree that all of Mr. Cooper's

23  plans comply with the equal population principle?

24  A    Yes.

25  Q    And you would agree that Mr. Cooper's plans keep the same
```

14:38:40 5
14:39:02 10
14:39:13 15
14:39:30 20
14:39:51 25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 167**

1034

1 number of counties whole as the 2011 plan, and in some cases

2 preserve more whole counties than in the 2011 plan, correct?

3 A    No.  I think the county splits that he claims to reduce is

4 he takes one -- Jackson County from having two splits to just

14:40:16 5 one split in it.  So I don't think he's reducing the number of

6 counties split.

7         THE COURT:  That's if we look at his maps as a whole,

8 as opposed to just Districts 1 and 2?

9         THE WITNESS:  Correct.  Yeah.  Districts 1 and 2 are

14:40:33 10 definitely splitting more counties -- at least District 1 is

11 splitting more counties in his map than it does in the adopted.

12 BY MS. KHANNA:

13 Q    Maybe I can make this clearer and quicker.

14      Do you have any reason -- you have no reason to dispute

14:40:48 15 Mr. Cooper's analysis on the number of county and VTD splits

16 for each of his illustrative plans; is that correct?  As

17 reported in his report; is that correct?

18 A    One of them's fairly ticky-tack.  I didn't go into detail

19 about it, but -- the numbers are close enough that clearly the

14:41:08 20 number of county splits doesn't just -- improving -- improving

21 the number of county splits doesn't justify the massive changes

22 he's making because he didn't -- even by his own numbers, he

23 didn't make that big of an improvement.

24      But whether it's one or zero, I didn't go into, even

14:41:25 25 though that Jackson County thing is a bit of an overriding

**Caster Plaintiffs' Exhibit 87, Page 168**

1035

```
 1  legislative decision just to have a fun number to put in his
 2  report.
 3  Q    I am going to repeat my question.
 4          THE COURT:  I think that's something that the Court
 5  can count, even if it is counting numbers.
 6  BY MS. KHANNA:
 7  Q    You provided no such analysis of that split in either your
 8  report or your deposition when discussing the number of county
 9  splits; is that correct?
10  A    Right.  It didn't go to the point of my report which is
11  does -- is that a traditional criteria that would justify how
12  he drew these lines, and explain how it's a basis other than
13  race.  And it does not.
14  Q    You would agree that Mr. Cooper's illustrative plans are
15  contiguous, correct?
16  A    As we discussed, just barely.  But, yes, they do meet the
17  technical definition of contiguous.
18  Q    And you would agree his illustrative plans do not pair any
19  incumbents as based on the revised plans; is that correct?
20  A    Yes, as revised.
21  Q    And you do not dispute Mr. Cooper's claim that he follows
22  VTD lines; is that correct?
23  A    I agree with his description that generally he does.
24  There are a couple of exceptions.  But I agree with how he
25  describes it.
```

The timestamps in the left margin: 14:41:36 (line 5), 14:41:51 (line 10), 14:42:07 (line 15), 14:42:22 (line 20), 14:42:38 (line 25).

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 169**

1036

1  Q    As he reports?

2  A    Yes.

3  Q    Dr. Johnson, on page 3 of your report, you list other

4  cases in which you've testified as an expert; is that correct?

14:42:53  5  A    Yes.

6  Q    On one case that does not appear on that list is one that

7  just happened this summer called *Common Cause v. Lewis* in which

8  you testified?

9       MR. WALKER:  Your Honor, I'm sorry.  I didn't mean to

14:43:04 10  interrupt my colleague.  But I do want to make an objection

11  when it's appropriate.

12       THE COURT:  Do you know what she's going to ask, or

13  should we let her ask her question and then you can object?

14       MR. WALKER:  I'm pretty sure what I know what she's

14:43:20 15  going to ask.  She is going to ask about some cases that he has

16  participated in.

17     And I would make the same objection that my colleague

18  Mr. Davis made when earlier she asked about cases that Dr. Hood

19  had participated in.  The point being that the parties have

14:43:37 20  stipulated to the expertise of these expert witnesses.

21       MS. KHANNA:  Your Honor, I believe on direct

22  Mr. Walker specifically asked about previous cases that

23  Dr. Johnson has testified in, whether he would or would not

24  point out various flaws or would present various arguments in a

14:43:59 25  Section 2 case.  And I believe he's certainly opened the door

**Caster Plaintiffs' Exhibit 87, Page 170**

                     1  to question Dr. Johnson on opinions he's had in other cases on

                     2  these similar topics.

                     3         MR. WALKER:  Your Honor, I believe that I -- I may

                     4  recall incorrectly.  But my recollection is that I very

14:44:19   5  generally said, Do these paragraphs indicate cases in which you

                     6  have testified?  And he said, yes.  And I think we moved on.

                     7         MS. KHANNA:  Well --

                     8         THE COURT:  I don't remember any significant

                     9  conversation about prior testimony.

14:44:36  10         MS. KHANNA:  I believe he asked Dr. Johnson whether or

                    11  not he would present an analysis in a certain way to a Court in

                    12  a Section 2 case, whether he would have provided those numbers.

                    13         THE COURT:  Well, if there's a case that occurred

                    14  after his report, I think we could easily update his report

14:45:00  15  with a reference to a more recent case.  Is that what you're

                    16  trying to do?

                    17         MS. KHANNA:  Yes, Your Honor.

                    18         THE COURT:  Okay.  Do you want to ask him if he's

                    19  testified more recently than his report which was submitted --

14:45:17  20  I don't know if it's got a date on it or not.

                    21         MR. WALKER:  Your Honor, if I may get a point of

                    22  clarification.

                    23         THE COURT:  Okay.  His report was dated May 6th, 2019.

                    24  So are you asking him about something subsequent to the report?

14:45:35  25         MS. KHANNA:  Yes, Your Honor.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 171**

1038

1       MR. WALKER:  If she wants a stipulation that he

2   participated in a case, we would agree to that.

3       If she wants to talk about that in a way that attacks his

4   expertise, we would say that the parties have agreed to the

14:45:51  5   expertise of the experts.  And that and consistent with the

6   ruling Your Honor made earlier today about with Dr. Hood under

7   the same circumstance, that that line of inquiry should be

8   foreclosed.

9       THE COURT:  Okay.  Well, I'd like to know if he

14:46:08 10   testified in another case more recently.  So I'd like to have

11   an answer to that question, if I may.  Is that what you're

12   asking him?

13       MS. KHANNA:  That would be the first question I was

14   going to ask, Your Honor, yes.

14:46:22 15   BY MS. KHANNA:

16   Q    Dr. Johnson, is it -- you did testify this summer in a

17   case in North Carolina called *Common Cause v. Lewis*; is that

18   correct?

19   A    Yes.

14:46:30 20   Q    Do you recall how the Court -- whether the Court rejected

21   your testimony in that case?

22   A    I recall.

23   Q    You recall that it did?

24   A    No, it did not.

14:46:43 25   Q    Do you recall whether the Court stated that you testified

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 172**

1    as a live witness in four cases previously, and the courts in

2    all four cases have rejected your analysis?

3          MR. WALKER:  Objection, Your Honor.

4          MS. KHANNA:  Your Honor, he just said the Court did

14:47:02 5    not reject his analysis, and I'm correcting him or attempting

6    to impeach him.

7          MR. WALKER:  She's attempting to impeach his

8    expertise, but the parties have stipulated to the expertise.

9          MS. KHANNA:  Your Honor, I would just like to renew

14:47:17 10   the argument about the weight and credibility of the expert's

11   testimony.  We are not trying to exclude his testimony, but we

12   believe this is relevant to the weight and credibility of his

13   testimony, particularly since it's a case not included in his

14   report.

14:47:26 15         THE COURT:  That was why I wanted to know the name of

16   it.  Thank you.  That's all I need.

17         MS. KHANNA:  Thank you, Your Honor.

18      Thank you, Dr. Johnson.

19         THE COURT:  Redirect, Mr. Walker?

14:47:45 20         MR. WALKER:  A very little bit, Your Honor.  More than

21   one question, but a very little bit.

22                     REDIRECT EXAMINATION

23   BY MR. WALKER:

24   Q    Dr. Johnson, you were asked about the primary method that

14:48:04 25   DOJ uses and then a secondary method that it uses.

1040

```
 1        Does DOJ ever skip the primary method and go to the second
 2   method?
 3   A    No.
 4   Q    It always uses the primary method?  That's why it's called
14:48:18 5   the primary method?
 6   A    Yeah, or the initial method, yes.
 7   Q    Okay.  Now, would you agree with me that for the Voting
 8   Rights Act to work for all of this to matter, when an election
 9   is held enough African-Americans have got to show up at the
14:48:38 10   polls for African-Americans to have a reasonable opportunity to
11   elect their candidate of choice?
12   A    Yes.
13   Q    And do Dr. Cooper's plans, his proposed District 1s,
14   embedded in those is the assumption that persons who identify
14:48:58 15   as part black and part something else, that those people vote
16   together with people who identify as DOJ black?
17   A    Right.  My entire understanding is the reason to bring a
18   challenge is to get a remedy.
19   Q    Yeah.  And if that assumption fails, if people who do not
14:49:21 20   identify or who -- people who identify as part black and part
21   something else do not vote cohesively with DOJ black, then I
22   believe it's your testimony that in at least two of the
23   districts, there's no majority black district; is that correct?
24   A    Correct.
14:49:41 25   Q    Okay.  You were asked some questions about compactness.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 174**

```
 1    And the Gingles 1 requirement is to demonstrate that the

 2    African-American population is significant -- is sufficiently

 3    populous and geographically compact to be able to draw a

 4    district; is that correct?

 5    A    Exactly.

 6    Q    So if the African-American population of Alabama were

 7    spread across the state, that population would not be

 8    sufficiently compact to be able to draw a district.  Would that

 9    be correct?

10    A    I think that's exactly the point both the Gingles and, I

11    think it was LULAC in Texas.  That was the whole point of that

12    case.

13    Q    So the point is, I think, that you've got to have a

14    population that's in an area of reasonable compactness so that

15    you can draw a district around it; is that correct?

16    A    Exactly.  I suppose --

17    Q    Well, just -- yeah.  Is that correct?

18    A    Yes.

19    Q    Okay.  But in addition, traditional districting criteria

20    require that districts be compact, do they not?

21    A    It is certainly one of the traditional goals of

22    redistricting.

23    Q    So the minority population has to be compact enough that

24    you can fit it inside one district, and that district itself

25    has to meet the traditional districting criteria of compactness
```

14:50:15 5
14:50:31 10
14:50:51 15
14:51:03 20
14:51:18 25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 175**

    1  without race predominating; is that correct?  Is that your
    2  understanding?
    3  A    Yes.  I suppose once you got there you could have a
    4  non-compact arm for some other reason as long as that wasn't
14:51:34  5  what was getting --
    6  Q    As long as race is not predominant?
    7  A    Yeah.
    8  Q    As long as you were not bypassing one group of people to
    9  get to another group of people?
14:51:42 10  A    Exactly.
   11  Q    And that's what Dr. Cooper did; is that correct?
   12  A    Yes.
   13  Q    That's all I have.  Thank you.
   14        THE COURT:  Any recross?
14:51:51 15        MS. KHANNA:  Nothing further, Your Honor.
   16        THE COURT:  All right.  Thank you.  Dr. Johnson, you
   17  may step down.
   18     Anything else from defense?
   19        MR. WALKER:  Your Honor, I get to say defense rests.
14:52:01 20        THE COURT:  Mr. Davis had jumped up, as well.  I'm
   21  surprised Ms. Howell didn't also jump up to say --
   22        MR. DAVIS:  I was too.
   23        THE COURT:  They all rest.
   24     Anything else from the plaintiff?
14:52:11 25        MR. SPIVA:  Your Honor, we just want to submit two

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 176**

1043

```
     1  proposed exhibits as rebuttal, but we don't have a witness.
     2       We've shown -- you have an objection or -- oh, I should
     3  tell you what they are.
     4       It's simply the House resolution regarding President
14:52:29 5  Trump's tweets and the vote roll call.
     6            THE COURT:  Okay.
     7            MR. SPIVA:  It's concerning the testimony yesterday
     8  from Congress Byrne.
     9       I'm sorry.  I didn't know you were waiting for me.
14:53:30 10            MR. DAVIS:  I wasn't sure you were finished.
    11            MR. SPIVA:  I was done.  I just wanted to tell you
    12  what they were, yeah.
    13            THE COURT:  Do they have numbers?
    14            MR. SPIVA:  Well, I was going to -- the discussion we
14:53:38 15  were having is should I write it on there, or would the Court
    16  prefer that we first, you know, do them electronically.
    17       They would be PX-130, which we're proposing as the
    18  resolution itself, Your Honor, and then the roll call vote from
    19  the -- which -- I guess is from the congressional record is --
14:53:57 20  I mean, the vote from the congressional record would be PX-131.
    21            THE COURT:  Okay.  Mr. Davis, have you seen those?
    22            MR. DAVIS:  We have seen them.
    23            THE COURT:  Do you have any objections to them?
    24            MR. DAVIS:  We do.  We don't understand the relevance
14:54:12 25  of this.  If the relevance is how a particular congressman
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 177**

1044

1    voted, only one testified that day, and they could have asked

2    him about it then.  I think they did, and that provided

3    sufficient testimony.

4            THE COURT:  Well, I think he testified about it

14:54:25 5   yesterday, and wasn't -- the resolution wasn't shown to him,

6    and so Congressman Byrne refused to commit, not having the

7    resolution to see.  I think that was his testimony that, you

8    know --

9            MR. SPIVA:  Yes, Your Honor.

14:54:45 10          THE COURT:  -- there are a lot of resolutions, and

11   they often cover a lot of things.  And until he could read it,

12   he wasn't going to commit to how he voted on it.

13          MR. SPIVA:  Right.  He couldn't remember how he voted,

14   I think was his testimony.

14:54:57 15          THE COURT:  Well, I think he also had questions about

16   the resolution itself.  But the record will be clear on that

17   when we get it.

18       So I understand that's why it's being offered.

19          MR. DAVIS:  Offered just to show how he voted, but,

14:55:12 20  well --

21          THE COURT:  Or to show what the resolution was and how

22   he voted on it, and I guess in essence to impeach his

23   recollection of the resolution.

24          MR. DAVIS:  Without him here, I don't see the

14:55:25 25  relevance of any Trump tweet.  We do object on grounds of

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 178**

1045

1  relevancy, Your Honor.

2        THE COURT:  I will overrule.  I understand it's being

3  offered as impeachment, and it's a little unusual.  I don't

4  know that I would allow it in a jury trial without the

14:55:40 5  opportunity of the person to rebut it.

6     But I think Congressman Byrne's testimony is what it was,

7  and this record is what it is.

8     So, I mean --

9        MR. SPIVA:  Thank you, Your Honor.

14:55:54 10        THE COURT:  So I will allow those two exhibits in.

11        MR. SPIVA:  Should I hand up a copy at this point?

12  I've got copies of it.  That's why -- I don't know how many

13  copies the Court requires.

14        THE COURT:  We'll need one official and I guess one

14:56:11 15  for me.

16        MR. SPIVA:  Okay.

17        THE COURT:  Assuming that defense already has one.

18        MR. SPIVA:  If you don't mind my scribbles on it, I'll

19  just put the exhibit number on both of them.

14:56:23 20        THE COURT:  I'm not the keeper of the exhibits.

21  Ms. Kecia is.

22        MR. SPIVA:  Ms. Kecia, do you mind my scribbles?

23        THE COURTROOM DEPUTY CLERK:  I don't.  As long as I

24  can make the numbers out.

14:56:34 25        MR. SPIVA:  Yeah.  There are two sets of them.  130,

**Caster Plaintiffs' Exhibit 87, Page 179**

```
 1  131.  130, 131.  Thank you.
 2           MR. DAVIS:  Mr. Spiva, what were those exhibit
 3  numbers, please?
 4           MR. SPIVA:  Oh, yes.  I labeled the resolution itself
 5  as PX-130, and the roll call vote is PX-131.
 6      I won't note that Ms. Howell is one step ahead of you, you
 7  know, but...
 8           MR. DAVIS:  That is not unusual.
 9           THE COURT:  Okay.  Anything else from the plaintiff,
10  then?  Is that the extent of your rebuttal?
11           MR. SPIVA:  That is the extent of our rebuttal.
12           THE COURT:  Okay.  Great.
13           MR. SPIVA:  We -- if Your Honor wants closings, we did
14  prepare one, but if -- you know, it's up to you.
15           THE COURT:  Defense wants to close?
16           MR. WALKER:  Your Honor, we're happy to if you want
17  to.  But we would defer to have the opportunity --
18           THE COURT:  Ms. Howell wants to.
19           MR. WALKER:  Ma'am?
20           THE COURT:  Ms. Howell wants to.
21           MR. WALKER:  We would prefer to have the opportunity
22  to look at the record and give you our arguments in a brief.
23           THE COURT:  Well, I think we talked about yesterday
24  allowing y'all to do that on certain points, and I kind of
25  outlined those.
```

14:56:47 (line 5)
14:57:06 (line 10)
14:57:21 (line 15)
14:57:31 (line 20)
14:57:45 (line 25)

**Caster Plaintiffs' Exhibit 87, Page 180**

1047

1     If there are other things that y'all want to emphasize --
2   how much time, Mr. Spiva?
3         MR. SPIVA:  About 25 minutes, Your Honor.  For our
4   side it would be given by my much more eloquent and concise
14:58:03 5   partner actually, so -- and --
6         THE COURT:  I don't know that I want to sit for
7   25 minutes.  I mean, I think y'all have done a really good job
8   presenting your case, both sides, from the very beginning.  You
9   gave me very good pretrial briefs.
14:58:28 10    And I really think it may be more effective to have
11  written summations, particularly after you have the benefit of
12  the transcript, if you want those.  And as we discussed
13  yesterday, if after reading those and digesting everything that
14  I have heard this week, and studying it a bit more and -- oh, I
14:58:58 15  can't wait to get into this over the holiday break, which looks
16  like that will be when it will be.
17    If I have additional questions, we can reconvene for oral
18  argument, which, when I have them, is more oral
19  questioning-and-answer session.  I think that would be more
14:59:21 20  helpful and effective to me.
21        MR. SPIVA:  That makes sense, Your Honor.  And I was
22  joking about the eloquence.  I mean, she is more eloquent than
23  I am.  But it's focused on the legal issues.  So I just wanted
24  to make sure that was clear.
14:59:35 25        THE COURT:  Oh, yeah.  I understand.  She can make

**Caster Plaintiffs' Exhibit 87, Page 181**

1    that argument at the bar tonight, or on the way home, or

2    whatever.

3        But I think at this point, the other plan would be just a

4    lot more helpful and effective for me.  Okay?

14:59:53  5            MR. SPIVA:  All right.  Thank you.

6            THE COURT:  Case closed.  We talked about it last

7    night -- yeah.

8            MR. SPIVA:  The exhibits?

9            THE COURT:  Yeah.  I want those.  What did we decide?

15:00:10  10   A week?

11            MR. SPIVA:  Yeah --

12            THE COURTROOM DEPUTY CLERK:  That was two weeks.

13            THE COURT:  Okay.  All right.

14            MR. DAVIS:  Is it one week or two?

15:00:21  15            THE COURT:  That's what we were discussing.

16        We can do this off the record.

17                (Discussion off the record.)

18            (Whereupon, the above proceedings were concluded at

19        3:10 p.m.)

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Caster Plaintiffs' Exhibit 87, Page 182**

1049

1      <u>CERTIFICATE</u>

2

3

4          I certify that the foregoing is a correct

5    transcript from the record of proceedings in the

6    above-entitled matter.

7

8

9

10

11   _____         <u>11-15-19</u>

12   Christina K. Decker, RMR, CRR                  Date

13   Federal Official Court Reporter

14   ACCR#:   255

15

16

17

18

19

20

21

22

23

24

25

Caster Plaintiffs' Exhibit 87, Page 183

Randy Hinaman
December 09, 2021

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

EVAN MILLIGAN, et al.,      )

                           )          CIVIL CASE NO.

        Plaintiffs,        )      2:21-CV-01530-AMM

VS.                        )      VIDEO DEPOSITION OF:

JOHN MERRILL, et al.,      )        RANDY HINAMAN

                           )

        Defendants.        )

S T I P U L A T I O N S

        IT IS STIPULATED AND AGREED, by and

between the parties through their respective

counsel, that the deposition of:

                RANDY HINAMAN,

may be taken before LeAnn Maroney, Notary Public,

State at Large, at the law offices of Balch &

Bingham, 105 Tallapoosa Street, Montgomery,

Alabama, 36104, on December 9, 2021, commencing at

9:13 a.m.

Caster Plaintiffs' Exhibit 88, Page 1

Randy Hinaman
December 09, 2021

**Page 2**

```
1          IT IS FURTHER STIPULATED AND AGREED that
2   the signature to and reading of the deposition by
3   the witness is waived, the deposition to have the
4   same force and effect as if full compliance had
5   been had with all laws and rules of Court relating
6   to the taking of depositions.
7
8          IT IS FURTHER STIPULATED AND AGREED that
9   it shall not be necessary for any objections to be
10  made by counsel to any questions, except as to form
11  or leading questions, and that counsel for the
12  parties may make objections and assign grounds at
13  the time of the trial, or at the time said
14  deposition is offered in evidence, or prior
15  thereto.
16
17
18                          ***
19
20
21
22
23
24
25
```

**Page 4**

```
1          DAVIN M. ROSBOROUGH (Via Zoom)
2          JULIE A. EBENSTEIN
3          Attorneys at Law
4          American Civil Liberties Union Foundation
5          125 Broad Street
6          New York, New York  10004
7          drosborough@aclu.org
8
9          LaTISHA GOTELL FAULKS (Via Zoom)
10         Attorney at Law
11         American Civil Liberties Union of Alabama
12         P.O. Box 6179
13         Montgomery, Alabama  36106
14         tgfaulks@aclualabama.org
15
16  FOR THE SINGLETON PLAINTIFFS: (Via Zoom)
17         JAMES URIAH BLACKSHER
18         Attorney at Law
19         825 Linwood Road
20         Birmingham, Alabama  35222
21         jublacksher@gmail.com
22
23
24
25
```

**Page 3**

```
1          A P P E A R A N C E S
2
3   FOR THE MILLIGAN PLAINTIFFS:
4          MICHAEL L. TURRILL
5          Attorney at Law
6          Hogan Lovells US LLP
7          1999 Avenue of the Stars, Ste. 1400
8          Los Angeles, California  90067
9          michael.turrill@hoganlovells.com
10
11         BLAYNE R. THOMPSON
12         Attorney at Law
13         Hogan Lovells US LLP
14         609 Main Street, Ste. 4200
15         Houston, Texas  77002
16         blayne.thompson@hoganlovells.com
17
18         DEUEL ROSS (Via Zoom)
19         Attorney at Law
20         NAACP Legal Defense & Educational Fund
21         700 14th Street N.W., Ste. 600
22         Washington, DC  20005
23         dross@naacpldf.org
24
25
```

**Page 5**

```
1   MYRON C. PENN
2          Attorney at Law
3          Penn & Seaborn
4          1971 Berry Chase Place
5          Montgomery, Alabama  36117
6          myronpenn28@hotmail.com
7
8   ELI J. HARE
9          Attorney at Law
10         Dicello Levitt Gutzler
11         420 20th Street North, Ste. 2525
12         Birmingham, Alabama  35203
13         Ehare@dicellolevitt.com
14
15         HENRY C. QUILLEN (Via Zoom)
16         Attorney at Law
17         Whatley Kallas, LLP
18         159 Middle Street, Ste. 2C
19         Portsmouth, New Hampshire  03801
20         hquillen@whatleykallas.com
21
22
23
24
25
```

**Caster Plaintiffs' Exhibit 88, Page 2**

Randy Hinaman
December 09, 2021

Page 6

1  FOR THE CASTER PLAINTIFFS: (Via Zoom)
2      LALI MADDURI
3      Attorney at Law
4      Elias Law Group
5      10 G Street NE, Ste. 600
6      Washington, DC  20002
7      lmadduri@elias.law
8
9  FOR DEFENDANT JOHN H. MERRILL:
10      JIM DAVIS
11      Assistant Attorney General
12      Office of the Attorney General
13      501 Washington Avenue
14      Montgomery, Alabama  36130
15      jim.davis@alabamaag.gov
16
17  FOR THE DEFENDANTS JIM McCLENDON & CHRIS PRINGLE:
18      DORMAN WALKER
19      Attorney at Law
20      Balch & Bingham
21      105 Tallapoosa Street, Ste. 200
22      Montgomery, Alabama  36104
23      dwalker@balch.com
24
25

Page 7

1  ALSO PRESENT:
2      Paige Ali, Videographer
3      Elizabeth Baggett
4
5
6           I N D E X
7  MR. THOMPSON:    11-197
8  MR. BLACKSHER:   197-229
9
10
11        E X H I B I T   L I S T
12                                        PAGE
13  Plaintiff's Exhibit 1  -          14
14  (Depo notice)
15  Plaintiff's Exhibit 2  -          14
16  (Subpoena)
17  Plaintiff's Exhibit 3  -          21
18  (CV)
19  Plaintiff's Exhibit 4  -          25
20  (Declaration)
21  Plaintiff's Exhibit 5  -          92
22  (2021 Alabama Congressional Plan, RC 000553)
23  Plaintiff's Exhibit 6  -          93
24  (2011 Congressional Districts)
25  Plaintiff's Exhibit 7  -          135

Page 8

1  (5-5-21 Reapportionment Committee
2   Redistricting Guidelines)
3  Plaintiff's Exhibit 8  -          160
4  (District 1-7 maps, RC 000556-562)
5  Plaintiff's Exhibit 9  -          179
6  (List of 2021 congressional plans)
7  Plaintiff's Exhibit 10 -          201
8  (State of AL v. US Department of Commerce
9   Introduction)
10  Plaintiff's Exhibit 11 -          203
11  (9-1-21 public hearing transcript excerpt)
12  Plaintiff's Exhibit 12 -          208
13  (Whole County Plan)
14  Plaintiff's Exhibit 13 -          213
15  (Tuscaloosa and Montgomery Whole)
16  Plaintiff's Exhibit 14 -          213
17  (Data table)
18
19
20
21
22
23
24
25

Page 9

1       I, LeAnn Maroney, a Court Reporter of
2  Birmingham, Alabama, and a Notary Public for the
3  State of Alabama at Large, acting as commissioner,
4  certify that on this date, pursuant to the Federal
5  Rules of Civil Procedure and the foregoing
6  stipulation of counsel, there came before me on
7  December 9, 2021, RANDY HINAMAN, witness in the
8  above cause, for oral examination, whereupon the
9  following proceedings were had:
10              * * * * *
11       THE VIDEOGRAPHER:  This marks the
12  beginning of the deposition of Randy Hinaman in the
13  matter of Evan Milligan, et al, versus John H.
14  Merrill, et al., Civil Case Number 2:21-CV-01530-AMM
15  filed in the United States District Court for the
16  Northern District of Alabama.  The date is December
17  9, 2021.  The time is 9:13 a.m
18       All attorneys present, will you please
19  state your names and whom you represent.
20       MR. HARE:  Eli Hare on behalf of the
21  Singleton plaintiffs.
22       MR. DAVIS:  Jim Davis for Secretary
23  Merrill.
24       MR. WALKER:  Dorman Walker for the
25  Committee Chairs, Senator Jim McClendon and

Caster Plaintiffs' Exhibit 88, Page 3

Randy Hinaman
December 09, 2021

Page 10

1  Representative Chris Pringle.
2          MR. PENN:  Myron Penn for the Singleton
3  plaintiffs.
4          MR. TURRILL:  Mike Turrill for the
5  Milligan plaintiffs.
6          MR. THOMPSON:  And Blain Thompson for
7  the Milligan plaintiffs.
8          MR. BLACKSHER:  And Jim Blacksher for
9  the Singleton plaintiffs.  I'll be asking questions
10  virtually.
11          MS. MADDURI:  Lali Madduri for the
12  Caster plaintiffs.
13          MR. QUILLEN:  Henry Quillen for the
14  Singleton plaintiffs.
15          MR. ROSS:  Deuel Ross for the Milligan
16  plaintiffs.
17          MR. ROSBOROUGH:  Davin Rosborough for
18  the Milligan plaintiffs.
19          MS. EBENSTEIN:  Good morning.  Julie
20  Ebenstein for the Milligan plaintiffs.
21          MS. FAULKS:  Good morning.  Tish Faulks
22  for the Milligan plaintiffs.
23          MS. BAGGETT:  Good morning.  It's
24  Elizabeth Baggett for the Milligan plaintiffs.  I'm
25  a law clerk, not an attorney.

Page 11

1          THE VIDEOGRAPHER:  Court Reporter, will
2  you please swear in the witness.
3                  RANDY HINAMAN,
4  having been duly sworn, was examined and testified
5                  as follows:
6          THE REPORTER:  Usual stipulations?
7          MR. WALKER:  The ones that we've just
8  discussed.
9          MR. THOMPSON:  Yes.
10          Mr. Walker, did you want to say
11  something before we begin?
12          MR. WALKER:  Yes.  I'd like to put on
13  the record that the committee chair, Senator Jim
14  McClendon, and Representative Chris Pringle have
15  asserted their legislative privilege and immunity in
16  this case.  Of course, the Court has not yet ruled
17  on that.  Thank you.
18  EXAMINATION BY MR. THOMPSON:
19  Q.          Good morning, sir.
20  A.          Good morning.
21  Q.          Please state your name for the record.
22  A.          Randy Hinaman.
23  Q.          Mr. Hinaman, you understand that you're
24  testifying under oath right now?
25  A.          I do.

Page 12

1  Q.          Is there anything that might prevent you
2  from understanding my questions or answering
3  truthfully today?
4  A.          No.
5  Q.          Are you being represented by a lawyer
6  today?
7  A.          Dorman Walker with the reapportionment
8  committee.
9  Q.          Are you paying Mr. Walker to be your
10  lawyer today?
11  A.          I am not.
12  Q.          Do you assume that plaintiffs or the
13  State of Alabama is paying Mr. Walker to be your
14  lawyer today?
15  A.          I do.
16  Q.          Have you ever been deposed before?
17  A.          I have.
18  Q.          How many times?
19  A.          Once.  Once is all I remember, not
20  counting trial.
21  Q.          And was that in the ALBC versus the
22  State of Alabama lawsuit?
23  A.          Yes, sir.
24  Q.          All right.  So I'll go over a few of the
25  key rules.

Page 13

1          I think that last deposition was about
2  eight years ago.  Is that correct?
3  A.          Yes, sir.
4  Q.          Okay.  So I'll be asking questions
5  today.  And then after I'm done, there will be
6  several other people asking questions, as well.
7          If you don't understand a question, just
8  let me know.  Is that okay?
9  A.          Yes, sir.
10  Q.          If you answer a question, I will assume
11  that you understood it.  Is that fair?
12  A.          Yes.
13  Q.          Also, as you can see, we have a court
14  reporter here who is doing an amazing job typing
15  everything that we say as we go.  But it's very
16  important, because she's typing it, that we both
17  speak one at a time.  So I'll do my best to wait
18  until you're done answering questions.  And if you
19  can do the same, that will help her out a lot.  Is
20  that all right?
21  A.          Yes.
22  Q.          And then we'll take a break about every
23  hour.  If you need a break before then, just let us
24  know, and we can do that as long as there's not a
25  question pending.  Fair?

Caster Plaintiffs' Exhibit 88, Page 4

Randy Hinaman
December 09, 2021

Page 14

1  A.          Very well.

2

3               (Plaintiff's Exhibits 1&2

4          were marked for identification.)

5

6  Q.          I'm handing you what's been marked as

7  Exhibit 1 and Exhibit 2.

8          MR. THOMPSON:  I've got copies for

9  everyone else to the extent you would like one.

10 Q.          This is a copy of the deposition notice

11 and subpoena.

12         MR. WALKER:  Which one is which?

13         MR. THOMPSON:  Exhibit 1 is the notice.

14         MR. WALKER:  Okay.

15         MR. THOMPSON:  And Exhibit 2 is the

16 subpoena.

17         MR. WALKER:  Thanks.

18 Q.          Have you seen a copy of these documents

19 before today?

20 A.          I have.

21 Q.          Both of them?

22 A.          Yes, sir.

23 Q.          Who provided them to you?

24 A.          Dorman Walker.

25 Q.          And when was that?

Page 15

1  A.          The end of last week.  Friday maybe.

2  Q.          All right.  You can set those aside.

3               Without disclosing the content of any

4  discussions that you had with your attorneys, what

5  did you do to prepare for your deposition today?

6  A.          I met with Dorman Walker and Jim Davis

7  and others and did some -- just reviewed numbers and

8  talked about the process we followed.

9  Q.          When did you meet with them?

10 A.          Monday and Tuesday, Monday morning and

11 -- Monday afternoon really and Tuesday morning of

12 this week.

13 Q.          About how long would you say you met

14 with them?

15 A.          I guess about four -- four or five hours

16 on Monday.  We also had lunch in there.  And three

17 hours on Tuesday.

18 Q.          Did you meet with anyone who was not an

19 attorney?

20 A.          No, I don't believe so.

21 Q.          Did you review any documents in

22 preparation for today?

23 A.          I just reviewed some of the census

24 numbers and the guidelines, the committee

25 guidelines.  That would be about it.

Page 16

1  Q.          Did you review any of the complaints in

2  this lawsuit?

3  A.          No, I didn't.

4  Q.          Did you review any maps?

5  A.          Yeah.  I looked -- I looked at the

6  current -- the map that was passed.  And I also

7  looked briefly at some of the other maps that were

8  offered to the legislature.

9  Q.          Which other maps did you look at?

10 A.          The Singleton --

11         MR. BLACKSHER:  Randy needs to speak up

12 a little bit, please.

13         THE WITNESS:  Sure.

14 A.          The Singleton maps, the Coleman map, and

15 the Hatcher map, I believe.

16 Q.          Had you reviewed those maps, any of

17 those maps, before preparing for your deposition?

18         MR. WALKER:  Objection to form.

19 Q.          You mentioned that you reviewed several

20 of those maps in preparation for your deposition,

21 correct?

22 A.          Correct.

23 Q.          Before then, had you reviewed any of

24 those maps?

25 A.          I looked at them when they were offered

Page 17

1  on the floor of either -- whatever body they were

2  offered in.

3  Q.          Other than in preparation for your

4  deposition last Monday and Tuesday, have you

5  discussed this lawsuit with anyone?

6  A.          No.

7  Q.          Did you do anything else to prepare for

8  your deposition today?

9  A.          I did not.

10 Q.          Are you being compensated by anyone for

11 being here today?

12 A.          I assume I am.  I haven't -- I haven't

13 billed anybody yet.  But I'm planning to.

14 Q.          And who do you plan to bill for today?

15 A.          The attorney general's office.

16 Q.          How much do you plan to bill the

17 attorney general's office for your time today?

18 A.          $400 an hour.

19 Q.          Is that pursuant to some agreement that

20 you have with the attorney general's office?

21 A.          Well, we really haven't even discussed

22 it, honestly.  I guess I'll send them the bill, and

23 we'll see if they pay it.

24 Q.          Fair enough.

25               Similarly, do you expect to be

Caster Plaintiffs' Exhibit 88, Page 5

Randy Hinaman
December 09, 2021

Page 18

1 compensated in any way to testify at trial?
2 A.        I would assume the same arrangement.
3 Q.        By the attorney general's office, as
4 well?
5 A.        Yes.
6 Q.        All right.  Taking a step back and just
7 talking about your background a little bit, can you
8 please state your date of birth?
9 A.        5-5-57.
10 Q.       What's your address?
11 A.       33267 River Road, Orange Beach, Alabama,
12 36561.
13 Q.       Is that your full-time address now here
14 in Alabama?
15 A.       Yes, sir.
16 Q.       You previously lived in Virginia; is
17 that correct?
18 A.       That's correct.
19 Q.       When did you make that move?
20 A.       I bought this property about five years
21 ago.  But I really technically moved probably about
22 three years ago.
23 Q.       Do you have a telephone number?
24 A.       Just my cell phone.
25 Q.       What's that number?

Page 19

1 A.        (703)598-8383.
2 Q.        Do you have an email account?
3 A.        I do.
4 Q.        What is that?
5 A.        Sharh1@comcast.net.
6 Q.        Do you have any other email addresses?
7 A.        I do not.
8 Q.        Have you ever been involved in any other
9 lawsuits?
10 A.       No.  I mean, not as a witness or -- no.
11 Q.       What's the highest level of education
12 you've completed?
13 A.       I attended Cornell University.
14 Q.       Was that for undergraduate?
15 A.       Yes.
16 Q.       Did you graduate?
17 A.       I did not.
18 Q.       What did you study at Cornell?
19 A.       Political science.  Really they called
20 it government.
21          MR. WALKER:  Called it what?
22          THE WITNESS:  Government.  Anywhere else
23 on earth, it would be political science.
24 Q.       And if you don't mind me asking, you
25 said you did not graduate.  Is there a reason why?

Page 20

1 A.        Yeah.  In the middle of that, I was
2 offered a position with the Reagan campaign, which
3 was sort of my dream job to work for his
4 presidential race.  So I left to take on that
5 responsibility for the national field director for
6 the Reagan Youth Campaign.
7 Q.        How far along had you gotten in your
8 studies when you left?
9 A.        Two years.
10 Q.       Do you have any other -- excuse me.  Do
11 you have any educational certificates or anything
12 like that?
13 A.       No.
14 Q.       Do you have any certain specializations
15 in anything?
16 A.       No.
17 Q.       Mr. Hinaman, what do you do for a
18 living?
19 A.       I do political consulting and lobbying.
20 Q.       Where do you work?
21 A.       I work for my own company out of my
22 residence in Orange Beach.
23 Q.       What's the name of that company?
24 A.       R. Hinaman, LLC.
25 Q.       And what is your -- do you have a formal

Page 21

1 title within R. Hinaman, LLC?
2 A.        I guess I would be the president of R.
3 Hinaman, LLC.
4 Q.        Are there other employees of that
5 company?
6 A.        There are not.
7 Q.        If you can, explain to me briefly what
8 you do as a political consultant and lobbyist.
9 A.        Sure.  On the political consulting
10 front, I usually do -- I consult political
11 campaigns, usually on the federal level, mostly
12 congress, put together the campaign team for various
13 candidates to get elected to those offices.
14          On the lobbying side, which I'm doing
15 less and less of, I did lobbying on the
16 federal level for various companies and
17 organizations.
18
19          (Plaintiff's Exhibit 3 was
20          marked for identification.)
21
22 Q.        I think I can short-circuit our
23 discussion about your background a little bit here.
24 This is Exhibit 3.
25          MR. THOMPSON:  I can get you a copy, as

Caster Plaintiffs' Exhibit 88, Page 6

Randy Hinaman
December 09, 2021

Page 22

1   well, Mr. Walker.
2   Q.        And I'll state for the record that this
3   is a copy of your resume that was shown to you in a
4   prior deposition that you gave on June 25, 2013.  I
5   believe this was PX3 in that deposition.
6             Do you recognize this document?
7   A.        I do.
8   Q.        Does this appear to be a true and
9   correct copy of your resume as of June 25, 2013?
10  A.        It does.
11  Q.        Is this resume up to date?
12  A.        It is not.
13  Q.        What has changed?
14  A.        Well, technically, the name of my
15  company changed because I moved from Virginia to
16  Alabama.  Obviously, my address has changed, again
17  because of moving.  Obviously, I've had some
18  additional clients since 2013.
19  Q.        Who have your additional clients been?
20  A.        I was afraid you would ask me that.
21            Congressman Ben Cline, I did his
22  campaign to replace Bob Goodlatte who retired in
23  2018.  Let's see.  The American Dental Association
24  is on there.
25            That's the major one.  I can't say there

Page 23

1   wasn't another campaign in there.
2   Q.        On here, it says that your company name
3   is Hinaman & Company, Inc.  Did that change at some
4   point?
5   A.        Yeah, when I moved.  That was an LLC in
6   Virginia.  And when I moved to Alabama, I formed a
7   new LLC.
8   Q.        And when was that?
9   A.        Again, approximately about three years
10  ago.
11  Q.        Does a more current version of your
12  resume exist anywhere?
13  A.        Yeah, I'm sure it does.
14  Q.        Is that something that you could produce
15  in this case if you were asked to?
16  A.        Yes.
17  Q.        What experience do you have working with
18  redistricting?
19  A.        Obviously, I drew three of the four maps
20  for Alabama ten years ago, 2011, 2012.  I drew the
21  congressional maps and the two legislative maps.  I
22  also worked for the republican congressmen in
23  Virginia to draw their map in 2012.
24            And before that, I worked with
25  Congressman Callahan, who was my -- I was his chief

Page 24

1   of staff at one point and then his consultant in
2   Alabama, and helped draw a map in 1992 which was
3   then put into practice by a federal court.
4   Q.        Anything beyond that?
5   A.        No.  I mean, I assisted the majority
6   leader of the Virginia senate in some of his efforts
7   on redistricting ten years ago.  Actually, it was
8   more like 20 years ago.  But I wasn't really the
9   lead on it.  I was just assisting his office.
10  Q.        Outside of Alabama and Virginia, have
11  you ever worked in redistricting for any other
12  states?
13  A.        I have not.
14  Q.        How did you get involved in drawing maps
15  originally?
16  A.        Well, my first effort, I guess, was way
17  back in 1992 when the legislature failed to draw a
18  map for congress in Alabama.  I was working for
19  Congressman Callahan.  And with him and some of the
20  other members of the delegation, we decided that we
21  needed to file a lawsuit to remedy that situation.
22  And so I helped produce a map that was filed with
23  that lawsuit.  That was my first endeavor.
24  Q.        Had you ever drawn a map before then?
25  A.        I had not.

Page 25

1   Q.        So how did they come about saying,
2   "Randy, we want you to draw this map"?
3   A.        I guess we drew straws and I lost.
4   Q.        Fair enough.
5
6             (Plaintiff's Exhibit 4 was
7             marked for identification.)
8
9   Q.        I'm going to hand you another exhibit
10  here.  This is being marked as Plaintiff's Exhibit
11  4.  This is also from the ALBC versus Alabama
12  lawsuit.  This is a declaration that was signed by
13  you.
14            And you can see at the top there,
15  there's a date that says this was filed on June 17,
16  2013, in the Alabama Legislative Black Caucus for
17  the State of Alabama lawsuit.  Do you see that?
18  A.        I do.
19  Q.        Do you recognize this document?
20  A.        Not particularly.
21  Q.        If you can, flip to Page 7.  Do you see
22  there's a signature?
23  A.        Yes.
24  Q.        And your name?
25  A.        Yes.

Caster Plaintiffs' Exhibit 88, Page 7

Randy Hinaman
December 09, 2021

Page 26

1 Q.        Does that appear to be your signature?
2 A.        Yes, sir.
3 Q.        Does this appear to be a true and
4 correct copy of your declaration?
5 A.        Again, it doesn't ring a bill.  But I
6 have no reason to believe it isn't.
7 Q.        Take a look at paragraph two.  It
8 states, "I have substantial experience in drafting
9 redistricting plans in Alabama, including drawing
10 the congressional plan adopted by the three-judge
11 federal district court in Mobile in 1992 and work on
12 the 2011 congressional plan."  Excuse me.  "And work
13 on the 2001 congressional plan.  In 2011, I
14 developed the redistricting plan for the Alabama
15 congressional delegation.  In that work, I worked
16 within the guidelines for redistricting adopted by
17 the reapportionment committee."
18          Do you see that?
19 A.        I do.
20 Q.        Is that an accurate description of your
21 experience in drafting redistricting plans in
22 Alabama?
23 A.        It is.  I mean, I don't know what that
24 -- the sentence on 2001, I did not draft the 2001
25 plans.  But I did work with the leaders in the

Page 27

1 legislature who did draft those plans.  I didn't
2 want it to imply that I drew those maps.  I don't
3 know that it does imply that.
4 Q.        Okay.  Well, let's go to the first part
5 there where you said that you -- your experience did
6 include drawing the congressional plan adopted in
7 1992.  Does that mean that you did draw that map?
8 A.        I did, yes.
9 Q.        Is that the map that was used for the
10 Alabama congressional elections in the '90s?
11 A.        Yes, sir.
12 Q.        Did that map serve as the starting
13 point, then, for the congressional map that was
14 drafted for 2001?
15 A.        I didn't draw that map.
16 Q.        You said you worked on drawing that map.
17 What does that mean?
18 A.        The legislature at that time was
19 controlled by the democrats, and I was representing
20 some republican Congressman in just interacting with
21 them.  But they -- they drew the map.  I was just
22 trying to give our point of view to it.
23 Q.        Are you familiar at all with how that
24 map was drawn in 2001?
25 A.        Vaguely, but not -- not the specifics of

Page 28

1 it.
2 Q.        What's your understanding?
3 A.        Well, it was essentially a continuation
4 of the 1992 map, just updated for the most part for
5 population shift.
6 Q.        And you said you were working with the
7 republican legislators?
8 A.        I was working with Congressman Callahan
9 at that point.
10 Q.        Did you have any role whatsoever in
11 drawing that map in 2001?
12 A.        I had no official role other than I was
13 working with the leaders -- the democratic leaders
14 who were working on that map.  I would occasionally,
15 you know, talk to them about the changes that were
16 made, and for especially Congressman Callahan's
17 district.  But I didn't -- I didn't have control of
18 the process, if that makes any sense.
19 Q.        Do you know who did draw the map?
20 A.        Senator Enfinger, I believe.
21 Q.        Did he --
22 A.        Well, that's who the -- he was the -- I
23 don't know who he hired.  That's who I interfaced
24 with.  Let's put it that way.
25 Q.        Understood.  That was going to be my

Page 29

1 next question.
2          You said you spoke to several members of
3 the legislature.  Do you remember who you spoke to?
4 A.        In 2001?
5 Q.        Yes.
6 A.        My primary -- my primary interface on
7 that map was Senator Enfinger.
8 Q.        When you spoke with Senator Enfinger,
9 did you provide any sort of input or recommendations
10 about how the map should be drawn?
11 A.        Only as to how -- he had a draft, I
12 believe, and was talking about the changes he wanted
13 to make in various districts.  And my primary focus
14 was the first district because I was working for
15 Congressman Callahan.
16          So he had come with some suggestions,
17 and we just talked about those.  They were not -- I
18 don't think I had any tremendously substantive
19 changes to recommend.  So I think it was pretty much
20 what he had drawn, we were comfortable with.
21 Q.        Did you provide any other sort of
22 feedback in drawing the 2001 congressional map
23 beyond what you just mentioned with District 1?
24 A.        I did not.
25 Q.        Do you know if it was a goal in the 2001

Caster Plaintiffs' Exhibit 88, Page 8

Randy Hinaman
December 09, 2021

Page 30

1 congressional map to make sure that District 7
2 remained a majority black district?
3 A.        I do not.
4 Q.        Do you know if it was considered in 2001
5 to draw two majority black districts?
6 A.        I do not, no.
7 Q.        Let's go back to the 1992 congressional
8 map.  Because you said you did draw that one,
9 correct?
10 A.        Yes, sir.
11 Q.        The 1992 congressional map created the
12 first majority black congressional district in
13 Alabama history; is that correct?
14 A.        I believe so, yes.
15 Q.        And you said you drafted that map?
16 A.        I did.
17 Q.        So you drafted District 7 as it stood in
18 1992?
19 A.        Yes, sir.
20 Q.        Who asked you to draw that map?
21 A.        I was working for Congressman Callahan
22 and some of the other members of the Alabama
23 delegation.
24 Q.        Did you work with Senator Larry Dixon in
25 drafting the map?

Page 31

1 A.        Probably, yes.
2           I will point out that this was 30 years
3 ago.  So if you ask me a specific question, it's
4 probably going to be hard for me to answer.
5 Q.        Understood.
6           Do you remember any other legislators
7 that you worked with directly in drafting the 1992
8 map?
9 A.        I do not.  As you know, the legislature
10 did not ultimately pass a map.  So we went -- it was
11 a court action that imposed this map.
12 Q.        Were you asked to create a majority
13 black district in drawing the 1992 map?
14 A.        I guess -- I guess I was, yeah.
15 Q.        Who asked you to do that?
16 A.        I think the -- well, Congressman
17 Callahan and the delegation probably in concert with
18 the NRCC.
19 Q.        Do you know why you were asked to do
20 that?
21 A.        At the time, I believe they thought that
22 was the proper thing to do under the Voting Rights
23 Act.
24 Q.        Did you receive any instructions from
25 the court?

Page 32

1 A.        No, sir.
2 Q.        Did you draw District 7 with the intent
3 to make it a majority black district?
4 A.        I did.
5 Q.        How did you make sure that District 7
6 would have a majority black voting age population?
7 A.        I just included areas of high
8 concentration of African American voters.
9 Q.        How did you do that?
10 A.        By assigning counties and precincts that
11 fit that definition.
12 Q.        Did you have a particular percentage of
13 black voters that you were shooting for?
14 A.        I did not.
15 Q.        How did you go about choosing District 7
16 to be the district that has the majority black
17 voting age population?
18 A.        I don't -- I mean, I think it was a
19 function of geography, I mean, where areas with
20 concentration of black voters were.
21 Q.        And how did you gather that information?
22 A.        Census data.
23 Q.        What specifically?
24 A.        Just the census data from the -- related
25 to population and race.

Page 33

1 Q.        So when you were drawing it, you were
2 able to pull up and see black voters, white voters
3 in different areas?
4 A.        Yes.
5           MR. WALKER:  Objection to form.
6 Q.        How did you see that information when
7 you were drawing the map in 1992?
8 A.        I'm not sure I understand your question.
9 Q.        Did you use a software to draw the map
10 in 1992?
11 A.        As I remember -- again, it was 30 years
12 ago -- I believe I used the computers at the Alabama
13 reapportionment office to draw the map.  So I don't
14 know what their software was, to be honest with you.
15 Q.        What specific racial data did you have
16 in front of you when you were drawing that map?
17 A.        I would have total pop, total African --
18 total black, and voting age data.
19 Q.        Was that broken down by county,
20 precinct, neighborhood, block?
21 A.        County, precinct, block, yes.  Yes, sir.
22 Q.        And I realize it was 30 years ago.  How
23 did you go about drawing District 7 in 1992?
24 A.        Again, it was 30 years ago.  I don't
25 remember the machinations that went into drawing the

Caster Plaintiffs' Exhibit 88, Page 9

Randy Hinaman
December 09, 2021

Page 34

1  map.
2  Q.        Did you have in your mind a certain
3  black voting age population that you were shooting
4  for?
5  A.        No.
6  Q.        So you just drew general lines and you
7  found that it came to a certain percentage of black
8  voting age population, and you thought that was
9  good?
10  A.        Obviously, I was -- I had in my mind
11  that we wanted it to be majority black district.
12  But in terms of above 50 percent, I didn't have a
13  specific number in mind.
14  Q.        Did you take into account any other
15  characteristics of the black voting age population
16  that you were looking at when you drew that map in
17  1992?
18  A.        Such as?
19  Q.        For instance, did you look at any
20  socioeconomic factors?
21  A.        I did not.
22  Q.        Did you look at attitudes?
23  A.        I did not.
24  Q.        Interests?
25  A.        (Witness shakes head).

Page 35

1  Q.        Type of employment?
2  A.        I did not.
3  Q.        Income?
4  A.        I did not.
5  Q.        Educational level?
6  A.        No.
7  Q.        Voter turnout?
8  A.        No.
9  Q.        Election results to assess party
10  affiliation amongst the black voting age population?
11  A.        No, I don't believe so.
12  Q.        When you drew District 7 in 1992, did
13  you determine that to be a community of interest?
14  A.        Yeah.  Well, I think it included most of
15  the black belt.  I would say they had a community of
16  interest along -- yeah.  So yes.
17  Q.        And what was the basis for that
18  determination?
19  A.        Well, geography and like demographics.
20  Q.        And race?
21  A.        And race.
22  Q.        Was race the main factor you considered
23  in drawing District 7?
24  A.        It was a major factor.
25  Q.        Was there a more predominant factor than

Page 36

1  race?
2  A.        Other than geography and deviation.
3  Those would be the top -- obviously, things had to
4  be contiguous.
5  Q.        If District 7 did not have a majority
6  black population, would it have passed?
7  A.        Passed what?
8  Q.        Would it have been approved?
9  A.        You're asking me to question what three
10  federal judges would approve?
11  Q.        You were asked to draw a map that had a
12  majority black district, correct?
13  A.        Yes.
14  Q.        If you had turned in a map that did not
15  have a majority black district, would you have done
16  what you were asked to do?
17  A.        You mean turned into Congressman
18  Callahan?
19  Q.        Correct.
20  A.        No.  I think our goal was to draw a
21  majority black district.
22  Q.        Why did you draw only one majority black
23  district?
24  A.        That was our -- that was our goal, to
25  draw a district.

Page 37

1  Q.        Your goal was to draw only one district?
2  A.        Well, I'm not sure at that -- I don't
3  remember the numbers exactly.  I'm not sure -- I'm
4  not sure whether it would have been possible to draw
5  two or not.  I don't know that it would have.
6  Q.        Did you consider drawing two majority
7  black districts?
8  A.        I did not.
9  Q.        Did anyone suggest to you to draw that?
10  A.        They did not.
11  Q.        Did you review or comment on any other
12  maps that contained two majority black districts at
13  the time?
14  A.        I don't --
15        MR. WALKER:  Objection to form.
16        I don't remember seeing any majority two
17  district maps.
18  Q.        Did you consider race in drawing any of
19  the other districts in 1992?
20  A.        I did not.  I mean, other than -- I did
21  not, no.
22  Q.        Skipping ahead to the 2011 congressional
23  map.  You also drew that map, correct?
24  A.        Yes.  But may I go back just one?
25  Q.        Sure.

Caster Plaintiffs' Exhibit 88, Page 10

Randy Hinaman
December 09, 2021

Page 38

1  A.        Obviously, we drew this map -- I drew
2  this map, and it was submitted in a lawsuit.  I had
3  no idea what would happen to it from there.  So it's
4  not like I -- you know, I didn't know whether the
5  judges would change it or what would happen.
6  Q.        That's a good point.  Did the judges
7  change it after you submitted it?
8  A.        I don't -- no, I don't believe they did.
9            Sorry.  Go ahead.
10 Q.        So you stated that you also drew the
11 2011 congressional map, correct?
12 A.        Yes, sir.
13 Q.        That one is a little bit more recent,
14 ten years ago.  Do you recall the general method
15 that you used in drawing that map?
16 A.        Yeah.  I mean, essentially it was
17 updating the 2001 map based on demographic changes
18 that had happened over the last ten years and
19 working with the -- all of the -- I was hired by all
20 of the members to update the map and submit a --
21 submit a map to the legislature for approval.
22 Q.        So correct me if I'm wrong.  But
23 generally when you're drawing these maps, it's more
24 of a redrawing than a drawing from scratch.  Is that
25 fair to say?

Page 39

1  A.        That is fair to say.
2  Q.        So the general process is that you will
3  use the existing map from the prior census data and
4  update it with the new census data, correct?
5  A.        That's correct.  And obviously, whether
6  it's a congressional map or any other maps, you have
7  officeholders who have an interest in, for the most
8  part, keeping the voters that they've had for the
9  last ten years.  So, most of them would not go into
10 a redistricting process looking for wholesale
11 change.
12 Q.        So the 2021 map, for instance, can be
13 traced back to the 2011 map, the 2001 map, and the
14 1992 map in that order, correct?
15 A.        Yeah.  Preserving cores of existing
16 districts was a guideline for the 2021 map.
17 Q.        For instance, the 2001 map used the 1992
18 map as a starting point, true?
19 A.        I didn't draw that map.
20 Q.        Do you have any other understanding of
21 how that map was drawn?
22 A.        I mean, if you look at it, it looks like
23 it was continuing that map, yes.  But I didn't --
24 the democratic legislature drew that map.
25 Q.        Is it a fair assumption to say that they

Page 40

1  probably used the 1992 map in drawing the 2001 map?
2  A.        That's an -- a fair assumption, I guess.
3  Q.        And the 2011 map then that you drew used
4  the 2001 map as its starting point?
5  A.        Yes, sir.
6  Q.        And then the 2021 map that you drew used
7  the 2011 map as its starting point?
8  A.        Yes, sir.
9  Q.        In drawing the 2011 congressional map,
10 did you speak to members of congress?
11 A.        I spoke to all of them, yes, sir.
12 Q.        All seven of the incumbents?
13 A.        Yes.
14 Q.        And what did you speak to them about?
15 A.        We're talking about 2011?
16 Q.        Correct.
17 A.        I spoke to them about the over and under
18 nature of their districts, whether they needed to
19 gain population or lose population.  And based on
20 that, where they would like to gain or where they
21 would like to -- where they would be -- you know,
22 like to lose.
23            And I tried to work with adjacent
24 districts to make sure that if person X wanted to
25 give up this county, that the other person would be

Page 41

1  amenable to taking it.  So I tried to negotiate a
2  map that everybody was happy with.
3  Q.        Did you consult the state's
4  redistricting criteria in drawing that map?
5  A.        I did.
6  Q.        Did you review election returns in
7  drawing that map?
8  A.        They were part of it, yes.
9  Q.        What data did you have on that?
10 A.        I don't remember if all their races were
11 in there.  But I had the latest last three or four
12 state-wide races that were available.
13 Q.        And how did you use that information?
14 A.        I didn't use it all that much.  It was a
15 common -- you know, a common question from a member
16 might be, you know, what did the governor get in my
17 district?  And if we make this change -- or what did
18 whomever ran for president in the race before that,
19 whoever that was.
20            But I didn't use it so much in drawing
21 the map.  It was more of confirming to them that
22 their district was going to perform similarly to how
23 the previous district had performed electorally.
24 Q.        Did that data give you information on
25 party affiliation?

Caster Plaintiffs' Exhibit 88, Page 11

Randy Hinaman
December 09, 2021

Page 42

1  A.          I don't believe so.  I think it was just
2  election returns.
3  Q.          Was that aggregate election returns?  Or
4  was that by individual counties or precincts?  Does
5  that make sense?
6  A.          Yeah.  It was precinct-based.  But then
7  it was aggregate for counties and then for the
8  districts.
9  Q.          You can look at all of that?
10 A.          Yes.
11 Q.          Understood.
12             Did you look at any racial polarization
13 data in drawing the 2011 map?
14 A.          I did not.
15 Q.          Did you look at any other voter behavior
16 data?
17 A.          I did not.
18 Q.          Was it a goal in drafting the 2011
19 congressional map to make sure that District 7
20 remained a majority black district?
21             (Zoom interruption.)
22 A.          What is that?
23 Q.          It sounds like we might have a singer.
24             MR. TURRILL:  Someone is off on mute on
25 the line there.

Page 43

1  Q.          I think we're good now.
2  A.          Can you ask -- I'm sorry.  Can you ask
3  that again?
4  Q.          No problem.
5              Was it a goal in drafting the 2011
6  congressional map to make sure that District 7
7  remained a majority black district?
8  A.          Yeah.  Obviously, Congresswoman Sewell
9  was one of my -- one of my clients for that map.
10 And she wanted to maintain her majority black
11 district, yes.
12 Q.          When you say that she was one of your
13 clients, what do you mean?
14 A.          She was one of the members of congress
15 who paid me to draw the map.
16 Q.          Did you have a contract with those
17 members of congress?
18 A.          Verbally.
19 Q.          You didn't have a written contract?
20 A.          No.
21 Q.          What was the verbal contract?
22 A.          That they would all put in $10,000 to
23 draw -- each to draw -- pay me to draw this map.
24 Q.          That each individual congressman or
25 woman would put in $10,000?

Page 44

1  A.          Their campaigns, yes.
2  Q.          Was that the extent of the verbal
3  agreement?
4  A.          It was.
5  Q.          Was it a goal in drafting that 2011
6  congressional map to make sure that District 7 kept
7  a 60 percent black voting age population?
8  A.          No.
9  Q.          Was there any sort of specific black
10 voting age population percentage that you were
11 shooting for?
12 A.          No.
13 Q.          Were you successful in making sure that
14 District 7 remained a majority black district?
15 A.          We were.
16 Q.          How did you make sure of that?
17 A.          By whatever -- you know, whatever -- and
18 I don't even remember the various counties ten years
19 ago.  If you handed me a map, I could probably tell
20 you.
21             But by what we added county and
22 precinct-wise to make sure it did not dramatically
23 alter the makeup of the district.
24 Q.          Explain that to me a little bit further.
25 So what changes were you making in 2011?

Page 45

1  A.          Again, I don't even know how much -- I'm
2  going to hazard a guess that District 7 was
3  underpopulated in 2011.  I don't remember the exact
4  numbers.  It was ten years ago.
5              But I'm going to guess that it was
6  underpopulated.  And so then the discussion with
7  Congresswoman Sewell would be, you know, where --
8  what areas would we add to your district to get your
9  district to ideal population.
10             And, obviously, in looking at those
11 areas, we, you know, wanted to make sure that we
12 preserved the majority black district.
13 Q.          I know some of this was discussed in
14 your deposition eight years ago.  So I'll try not to
15 tread the same water too much.
16             But explain to me just a little bit
17 about the process when you were drawing the 2011
18 congressional map.  So did you start with District
19 7?
20 A.          I probably did start with District 7.  I
21 don't really remember, to be honest with you.  I
22 mean, I -- you know, I was meeting -- I met with the
23 entire delegation to start.  And then we went from
24 there.
25             But preserving Congresswoman Sewell's

Caster Plaintiffs' Exhibit 88, Page 12

Randy Hinaman
December 09, 2021

Page 46

1 majority black district was a priority for the
2 delegation.
3 Q.        And that was the priority for you, as
4 well?
5 A.        Yes.
6 Q.        Do you remember generally what sort of
7 changes you made to District 7 in 2011?
8 A.        I really don't.  I mean, I apologize.
9 But I did so many maps and plans in the last ten
10 years that I don't.
11 Q.        What other maps and plans have you done
12 in the last ten years?
13 A.        Well, we just did four in the last
14 couple of months.
15 Q.        Anything else?
16 A.        Those are the ones that are mostly stuck
17 in my brain.
18 Q.        Are there any others?
19 A.        No.
20        MR. WALKER:  What was the question
21 again?
22        MR. THOMPSON:  He said there were so
23 many maps that he had drawn in the last ten years.
24 And I asked him which ones, and he said just the
25 four that he just did.

Page 47

1 A.        Well, "drawn" is -- we could find the
2 exact number.  But I think in this last legislative
3 session, there were something like 41 various maps
4 and plans that were submitted to the legislature.
5 So while I certainly didn't draw most of those, I
6 did look at them.
7        So to ask me to go back ten years, it's
8 hard to -- when you have some 41 pieces of 41 maps
9 in your head, it's hard to expand back ten years.
10 Q.        So you reviewed all 41 maps that were
11 submitted?
12 A.        I didn't review them all, but I looked
13 at most of them.
14 Q.        What's the difference between looking at
15 them and reviewing them?
16 A.        Well, reviewing them would take more
17 time.  Looking at them would be, okay, this is a --
18 this is a house map or a senate map or whatever.  I
19 just looked at the cover sheet and maybe the overall
20 numbers, but didn't review -- didn't -- some of them
21 were never offered, obviously.  So if they weren't
22 offered, I didn't look at them more seriously than
23 that.
24 Q.        Did you review all of the maps that were
25 offered?

Page 48

1 A.        I looked at --
2        MR. WALKER:  And you're talking about --
3 Q.        We're talking about 2021 now.  Did you
4 review all the maps that were offered in the
5 legislature in 2021?
6 A.        Yes, I tried to.  Some of -- some of
7 that may have been a very short review because some
8 of those maps were literally submitted 24 hours
9 before they were offered either on the floor or at
10 committee.  So it's not like it was a long review.
11 Q.        One more question going back to the 2011
12 congressional map.  Did you consider race -- excuse
13 me.  A couple more questions, to be fair.
14        Did you consider race in drawing any of
15 the other districts other than District 7 in 2011?
16        MR. WALKER:  Congressional.
17 Q.        The congressional map in 2011.
18 A.        Not specifically.  I mean, I'm not sure
19 I know what "consider" means.  But, obviously, all
20 that information was available on each district.
21 But --
22 Q.        Did you review the racial data for each
23 district when you were drawing the 2011
24 congressional map?
25 A.        As a matter of course, yeah.  I mean,

Page 49

1 it's all there.
2 Q.        Explain that.
3 A.        Well, when you finish -- when you draw a
4 map, obviously, you've got seven districts.  And
5 you're going to have -- if you look at the, you
6 know, top data for each district, it's going to have
7 race and voting age, black, so forth and so on for
8 each district.  It's not like it just only comes up
9 on the majority black district.  It would come up on
10 all of them, obviously.
11 Q.        Did you review that data for each
12 district?
13 A.        I looked at it.
14 Q.        What did that data tell you?
15 A.        Nothing specifically.
16 Q.        Did you do anything with that data?
17 A.        I did not.
18 Q.        Did you consider drawing two majority
19 black districts when you drew the 2011 congressional
20 map?
21 A.        I really did not.
22 Q.        Why not?
23 A.        Well, primarily because the people who
24 were paying me to draw these maps preferred the
25 districts similar to how they were.

Caster Plaintiffs' Exhibit 88, Page 13

Randy Hinaman
December 09, 2021

Page 50

1  Q.        Did the people that were paying you to
2  draw the map prefer not to have a second majority
3  black district?
4  A.            I don't know about that.  But they
5  preferred to have their districts as close to what
6  they had under that map going forward.
7  Q.            Did you discuss with anyone the
8  possibility of creating a second majority black
9  district?
10 A.            I don't believe so.
11 Q.            Were you aware of requests in the
12 legislature in 2011 to create a second majority
13 black district?
14 A.            Again, I don't have a -- I don't have a
15 complete recollection of ten years ago what maps
16 were offered or not offered on the -- I don't want
17 to guess on what was offered and what wasn't
18 offered.
19 Q.            Do you know if it would have been
20 possible to create a second majority black district
21 in 2011?
22            MR. DAVIS:  Object to the form.
23            MR. WALKER:  Objection.  Go ahead.
24 A.            I did not do it.  So I -- I don't have
25 an opinion on whether it was possible.

Page 51

1  Q.            To be clear for the timeline, I'm moving
2  ahead now to 2021 for the most recent maps that were
3  drawn.
4  A.            Yes, sir.
5  Q.            And I'm going to refer now to the 2021
6  congressional map.  When I refer to that, I mean the
7  one that was enacted.  It was also referred to, I
8  believe, as HB-1 and then ultimately Act 2021-555.
9  Is that fair?
10 A.            Yes, sir.
11 Q.            And I'll refer to that either as the
12 2021 map or the 2021 congressional map.  Is that
13 okay?
14 A.            Yes, sir.
15 Q.            When were you first approached about
16 drawing the 2021 congressional map?
17 A.            That probably would have been the end --
18 sometime in September or October of 2020.
19 Q.            Of 2020 or 2021?
20 A.            2020.  About a year out, I would say.
21 Q.            Who approached you?
22 A.            Senator McClendon and Representative
23 Pringle on behalf of the republican leadership.
24 Q.            What were you asked to do?
25 A.            They asked me if I would be interested

Page 52

1  in drawing all four maps that they -- the
2  congressional, as well as the other maps that needed
3  to be drawn in this session.
4  Q.            And those four would be the
5  congressional, the house and senate for the state
6  legislature, and the board of education?
7  A.            Yes, sir.
8  Q.            Did you agree to draw all four?
9  A.            I did.
10 Q.            When were you officially retained?
11 A.            Around that time, I would think.  Like
12 maybe October of 2020.
13 Q.            And who officially retained you?
14 A.            Well, I was working for the two chairs
15 of the -- the house chair, Representative Pringle,
16 and the senate chair, Senator McClendon.
17 Q.            Did you sign a contract?
18 A.            I did.
19 Q.            When did you sign that contract?
20 A.            Again, I don't have that in front of me.
21 But September or October of 2020, I would imagine.
22 Q.            Is the contract with you individually,
23 or is it with your company?
24 A.            It was with R. Hinaman, yes.
25 Q.            And who is the other party that you

Page 53

1  contracted with?
2  A.            Citizens for Fair -- Citizens for Fair
3  Representation.  Or maybe Alabamians for Fair
4  Representation.
5  Q.            Do you recall which one it is?
6  A.            Not off the top of my head.
7  Q.            Who is Citizens for Fair Representation
8  or Alabamians or Fair Representation?  Whichever the
9  name is, who is that group?
10 A.            It's a 501(c)(4) which also paid me to
11 do the map drawing that I did in 2011.
12 Q.            And what's your understanding of why you
13 were contracted by this particular group?
14 A.            Meaning?
15 Q.            As opposed to the State of Alabama, the
16 legislature, anyone else.  Why this 501(c)(4)
17 organization?
18 A.            The leadership had set up that (c)(4)
19 for the purpose of drawing districts in 2020 -- 2011
20 and then continued it for 2021.
21 Q.            So this 501(c)(4) organization was
22 created for the purpose of drawing the redistricting
23 in the state of Alabama?
24 A.            In 2011, that's my understanding, yes.
25 Q.            Do you know if that organization does

Caster Plaintiffs' Exhibit 88, Page 14

Randy Hinaman
December 09, 2021

Page 54

1  anything else?
2  A.        I do not.
3  Q.        The contract that you signed around
4  September, October of 2020, did you draft that
5  contract?
6  A.        I did.
7  Q.        What does the contract call for you to
8  do?
9  A.        It calls for me to work with the two
10 chairs and the leadership of the house and the
11 senate to draw four maps, congressional, state
12 senate, state house, and state board of education.
13 And to the extent practical and possible, meet with
14 the officeholders for those four maps to get their
15 interest in changes and so forth.
16 Q.        In that last part, you said "to meet
17 with the officeholders"?
18 A.        Yes.
19 Q.        Is that basically the incumbents for
20 each of the various districts on each of those maps?
21 A.        Correct.
22 Q.        Do you have a copy of that contract?
23 A.        Not with me.  But yes, I do.
24 Q.        Is that something that you could produce
25 if you were requested in this case?

Page 55

1  A.        Yes.
2  Q.        What were the terms of your compensation
3  in that contract?
4  A.        Four payments spaced out over various
5  months, four payments of $50,000 spaced out over the
6  length of the contract.
7            I believe when we actually signed the
8  contract back in September or October, we were
9  hoping or planning to do a special session in July.
10 So we didn't at that time know that COVID was going
11 to delay the census numbers and so forth and so on.
12           So when I started the process at the end
13 of 2020, the theory was we would, you know, probably
14 have a special session in June or July sometime to
15 pass these maps.
16 Q.        You said you started the process around
17 the end of 2020.  What do you --
18 A.        Well, when I signed the contract.
19 Q.        You also said that there was -- a
20 contract called for four payments of $50,000.  Is
21 that four separate payments of 50,000 each, for a
22 total of --
23 A.        Yes, sir.
24 Q.        -- 200,000?
25 A.        Yes, sir.

Page 56

1  Q.        Have you been fully paid at this point?
2  A.        I have.
3  Q.        Was any part of your compensation
4  contingent on anything?
5  A.        No.  However, the -- just to be clear on
6  the payment, because the time frame of the project
7  changed -- I mean, when we initially signed the
8  contract, the theory was, again, we would have the
9  census data in March and we would pass a plan in
10 July.  Obviously, that didn't happen.
11           So my timeline for when I was supposed
12 to get those four payments I modified so that they
13 didn't have to pay me before I had actually even had
14 census data.  So we changed the timeline.  But yes.
15 Q.        Were you able to do any work on the maps
16 before you got the census data?
17 A.        Yeah.  We -- especially the state-wide
18 ones such as congress and state board of education.
19 We had to -- we had the estimates, county estimates,
20 from the census bureau.  I guess it would have been
21 the 2019 numbers.
22           So it was possible to look at them and
23 say, okay, this district is likely to be under, this
24 district is likely to be over, which on the
25 congressional level allowed me to start meeting with

Page 57

1  members before we had the official census data which
2  we didn't get until the end of August.
3  Q.        So you didn't get the official census
4  data until the end of August.  But you had
5  unofficial estimates from the census before then?
6  A.        Correct.
7  Q.        And when did you receive those
8  unofficial results?
9  A.        I don't -- I don't know when the 2019
10 numbers were updated.  But I'm going to say around
11 the end of -- somewhere around the end of 2020.  But
12 I don't know that exactly.
13 Q.        Did you begin working on the
14 congressional map before you received the official
15 census data?
16 A.        Yes, sir.
17 Q.        When did you begin working on that map?
18 A.        In earnest probably in May of 2021.
19 Q.        What do you mean "in earnest"?
20 A.        Well, meeting with members and talking
21 substantively about potential changes.
22 Q.        Before we get into the specifics of
23 that, just on your compensation real quick, were you
24 paid or retained by anyone else?
25 A.        No.  I mean, I assume you mean relative

Caster Plaintiffs' Exhibit 88, Page 15

Randy Hinaman
December 09, 2021

Page 58

1  to redistricting.
2  Q.        Certainly.  You've received other
3  payments --
4  A.        Yes.
5  Q.        -- for other --
6  A.        Consulting.
7  Q.        Correct.
8          So you stated that you began drawing the
9  2021 map in earnest in May of 2021.  Did you do
10 anything else in preparation for drawing the maps
11 before that date?
12 A.        No.  I mean, I had conversations with
13 members of the congressional delegation.  And as you
14 may -- may know, there was considerable
15 concerns/discussion about whether Alabama would have
16 seven members of congress or six.
17          And until we really knew the answer to
18 that -- which I think we were told by the census
19 bureau in April, sometime in April what the answer
20 to that question was -- there really wasn't much --
21 I didn't -- my position with the congressmen was it
22 would not make sense to work on a map until we knew
23 how many districts we were going to have.
24          Because, obviously, working on a
25 six-person map where somebody would be paired with

Page 59

1  somebody was not going to be a lot of fun.  And
2  there was no need to do that if we didn't ever have
3  to.
4  Q.        Certainly.  So the census bureau
5  informed --
6  A.        All the states, I think, in April of how
7  many -- how many members of congress they would
8  have.  And then that allowed me to set up meetings
9  and work off of the estimates of 2019 to talk about
10 whether your district was over or under and so
11 forth.
12 Q.        And you began those meetings around May
13 of --
14 A.        I went to DC with the goal to meet with
15 everybody in May, yes, sir.
16 Q.        So you said you went to DC.  So I assume
17 that you're referring to meetings with the
18 congressional members.
19 A.        Yes.
20 Q.        Did you meet with any other -- for
21 instance, did you meet with anybody in the Alabama
22 state legislature in the spring of 2021?
23 A.        Well, I met with the two co-chairs to
24 talk about my plan to how to -- you know, how to
25 move forward on the congressional, that we would

Page 60

1  wait until we knew how many districts the state
2  would have.  And then I would go to Washington and
3  meet with the members and start formulating a plan
4  from there to hopefully reach some consensus on a
5  map.
6  Q.        Before you received word from the census
7  bureau that there were going to be seven districts
8  in Alabama again, did you do anything else in
9  furtherance of drawing the 2021 congressional map?
10 A.        I did not.
11 Q.        When did you actually begin redrawing
12 the 2021 congressional map?
13 A.        After my May round of meetings in
14 Washington.
15 Q.        You say after then.  Would that have
16 been in May?  Or June, July?
17 A.        I think the end of May, beginning --
18 again, this was all based on estimates.  We did not
19 have the real census data.  So I just -- I probably
20 roughed out a map sometime in May or June based off
21 of the estimates, knowing full well they were not
22 going to be completely accurate.
23 Q.        From the time that you started drawing
24 the 2021 congressional map until it was completed,
25 about how much time did you spend in terms of hours

Page 61

1  on drawing that map?
2  A.        I have no idea.  I guess I would make a
3  bad lawyer.
4  Q.        Well, I don't want you to guess.
5          When was the map completed for the 2021
6  congressional?
7  A.        Complete.  When was I done with what I
8  was doing with it?
9  Q.        Correct.
10 A.        Probably the Friday before the week we
11 went into session.  So whatever that -- October 23rd
12 or -- I'm making up that date.  Whatever the Friday
13 before we went into session was.
14 Q.        And you're referring to the special
15 session that was called in the fall of 2021?
16 A.        Correct.
17 Q.        Going back to how much time it took you
18 in terms of hours.  Would you say that you spent
19 more than 100 hours drawing the congressional map in
20 2021?
21 A.        Well, if you're including meetings and
22 discussions about it, yeah, probably.
23 Q.        Would you say you spent more than 150
24 hours?
25 A.        I don't know.  I just -- I don't really

Caster Plaintiffs' Exhibit 88, Page 16

Randy Hinaman
December 09, 2021

1  have a -- I didn't think of it in terms of hours.
2  My contract didn't -- my contract was just you were
3  going to draw these four maps.  And whether it took
4  123 hours or 217 was irrelevant to what I was doing.
5  Q.       Right.  I'm just trying to get an idea
6  about how long it took you.  I know there were
7  months involved.
8           But how much time you were actually
9  spending on this in that time frame, would you say
10  it took you more than 200 hours?
11  A.       I have no way of even guessing that.  I
12  really -- I apologize, but I don't.
13  Q.       Were you doing other things work-wise
14  between May 2021 and -- when was the special
15  session?  Was it in October?
16  A.       October of 2021, yes.
17  Q.       Between May 2021 and October 2021, were
18  you doing anything else work-wise other than drawing
19  these four maps?
20  A.       Not very much because it was an
21  off-year, obviously.  I had clients that I did
22  things for, obviously, in 2020, working up to the
23  November 2020 election.  But -- and I still had an
24  ongoing relationship with some of -- a couple of my
25  clients.  But there wasn't a lot of work that needed

1  to be done in the off-year.
2  Q.       Were you working full 40-hour weeks
3  during that entire time?
4  A.       By and large, yes.
5  Q.       Did you take any trips or personal
6  vacation time during that time period?
7  A.       Well, it was during COVID.  So I didn't
8  travel a whole lot.  But it was a crazy time, as you
9  all remember.
10  Q.       Did you take any time off?
11  A.       Sure.
12  Q.       About how long did you take off?
13  A.       I don't know.  A couple of weeks.
14  Q.       And in that -- you had mentioned that
15  you weren't able to begin redrawing the
16  congressional map before you received the census
17  estimates in April of 2021.  Does that apply to all
18  --
19  A.       Before I received how many districts we
20  had in April of 2021.
21  Q.       Correct.  Does that --
22  A.       I think we had the census estimates
23  before that.  I'm saying we just didn't know how
24  many districts there were.
25  Q.       Fair enough.  Thank you for the

1  clarification.
2           Does that apply to all four of the maps
3  that you were drawing?
4  A.       No.  That's obviously the -- the only
5  one that the census determined how many members
6  there would be would be -- was congress.
7  Q.       Because you said you had unofficial
8  census data on, I guess, population prior to that?
9  A.       By county, yes.
10  Q.       And did you use that unofficial data for
11  the other maps?
12  A.       I used it -- I used it to start working
13  with the state school board members.
14           It was less effective at the senate and
15  house levels, virtually useless at the house level
16  because it was mostly county data at the beginning.
17  And so most house districts are not made up of full
18  counties, obviously.  So it was less valuable in
19  those maps and more valuable in the statewide maps.
20  Q.       When did you begin drawing the state
21  house and senate maps in 2021?
22  A.       I did not start on a house map until we
23  actually had all of our census data at the end of
24  August.  I had roughed out a few of the rural senate
25  districts based on some of the estimates.  But it

1  wasn't particularly effective.
2           So I would -- I would really say I
3  didn't seriously start drawing those maps until
4  August of 2021.
5  Q.       And what about the board of education
6  map?
7  A.       The board of education I was doing
8  simultaneously to congress because that was
9  obviously a statewide map.  And the county numbers
10  were more usable in that type of map than they were
11  in a 105-member state house map.
12  Q.       So you began drawing the board of
13  education map around --
14  A.       The same times as congress.
15  Q.       Which was around May of 2021?
16  A.       Correct.  I think I started meeting with
17  those members in May, as well.
18  Q.       We've been going about an hour.  Do you
19  want to take a break?
20  A.       Sure.
21           THE VIDEOGRAPHER:  We're off the record.
22  The time is 10:17 a.m.
23           (Recess was taken.)
24           THE VIDEOGRAPHER:  We are back on the
25  record.  The time is now 10:35 a.m.

Caster Plaintiffs' Exhibit 88, Page 17

Randy Hinaman
December 09, 2021

Page 66

1  Q.        Mr. Hinaman, when we left off, we were
2  talking about the preparation that you did starting
3  to get into the beginnings of drawing the 2021 map.
4           Prior to May 2021, did you anything in
5  furtherance of drawing the 2021 congressional map?
6  A.        Other than reviewing the 2019 census
7  estimates by county, no.
8  Q.        And what did you do when you were
9  reviewing the --
10 A.        I was trying to get a feel for what
11 districts would be underpopulated and what districts
12 would be overpopulated based on those estimates.
13          And while the estimates in the end
14 didn't turn out to be obviously particularly close
15 to the actual numbers, in order -- they were -- they
16 were close in that they did predict the three
17 districts that would be under and the four districts
18 that would be over.
19          So it was helpful to pay attention to
20 that when I started to do my round of meetings with
21 the members of congress.
22 Q.        Did you do anything else prior to May
23 2021 in furtherance of drawing the 2021
24 congressional map?
25 A.        No.  I mean, obviously, I -- at some

Page 67

1  point in that time frame, the reapportionment
2  committee met and passed their guidelines.
3  Obviously, I reviewed those and how they would
4  impact the drawing of the maps.  But that was --
5  that was about the May time frame, as well.  It may
6  have been early May rather than later May.
7  Q.        You met with members of congress in DC
8  in May of 2021, correct?
9  A.        Yes.
10 Q.        Was that the first thing that you did
11 after the census data came out in 2021?
12 A.        Well, the data --
13 Q.        Let me take a step back there.
14          You said that prior to May 2021, the
15 only thing that you had done was review some of the
16 unofficial census data to get a feel for
17 underpopulation, overpopulation?
18 A.        Yes.
19 Q.        Then the census bureau announced around
20 April 2021 that there will be seven congressional
21 districts again in Alabama?
22 A.        Correct.
23 Q.        Was the next step that you did flying to
24 DC to meet with the congressional members?
25 A.        Yes.  And that was, again, after

Page 68

1  guidelines had been passed in early May.
2           The only other thing in there, obviously
3  I had talked -- before we knew seven to six, I had
4  talked to, obviously, all of the offices, the
5  congressional offices, about what my -- what our
6  proposed timeline was going to be based on the fact
7  that the census data was delayed, and that hopefully
8  we would be able to set up a round of meetings in
9  May and then we would get our data in August or
10 whatever, and then we would fine tune it from there.
11 Q.        So those were more of administrative
12 coordination discussions?
13 A.        Yes, sir.
14 Q.        You flew to DC, you said, in May of 2021
15 to meet with the congressional members.  Did you
16 meet with each -- all seven congressional members?
17 A.        I met with five in person, one by Zoom.
18 And one of the members declined to meet because they
19 were more interested in running for a different
20 office, I guess.
21 Q.        Which member was that that declined to
22 meet?
23 A.        Mo Brooks.  I met with his chief of
24 staff, but I did not meet with Congressman Brooks
25 directly.

Page 69

1  Q.        You met with each of the other
2  congressional members?
3  A.        Five in person and one by Zoom.
4  Q.        Who was the one you met with by Zoom?
5  A.        Congresswoman Sewell.  She was back in
6  Alabama on a personal matter.  So I met with her by
7  Zoom.
8  Q.        Did you meet personally with Congressman
9  Sewell by Zoom?
10 A.        Yes.
11 Q.        And when was that?
12 A.        During the May trip.  Is that what
13 you're asking me?
14 Q.        Correct.  Because you went to DC to meet
15 with some of them.
16 A.        Yes.  And she was not in DC because of a
17 personal matter.  So we did a Zoom call.
18 Q.        You were in DC when you had the
19 Zoom call?
20 A.        And she was in Birmingham, I believe.
21 Q.        Was it just one call that you had with
22 Congressman Sewell?
23 A.        During that trip, just one call.
24 Q.        Have you had other meetings with
25 Congressman Sewell?

Caster Plaintiffs' Exhibit 88, Page 18

Randy Hinaman
December 09, 2021

Page 70

1  A.          I've had other Zoom meetings with her.
2  Microsoft Teams, technically.  But yes, Zoom
3  meetings.
4  Q.          Have you had any in-person meetings with
5  Congressman Sewell?
6  A.          No, I don't think I did this time.  I
7  mean, as -- in-person meetings were rather
8  difficult.  It was actually May when I went to --
9  the house office buildings were actually closed and
10  didn't allow visitors.  So meeting anybody in person
11  was a bit challenging during that time.
12              I would have met with her in person on
13  that trip had she been in town.  But she was not.
14  But the other members that I met with were all
15  off-campus, so to speak, because we couldn't go to
16  -- I couldn't go to their offices.
17  Q.          As far as Congressman Brooks goes, you
18  said you met with somebody from his staff?
19  A.          I met with his chief of staff, yes.
20  Q.          And what did you discuss with these
21  representatives when you met with them in May of
22  2021?
23  A.          I discussed the over and under nature of
24  their district.  And if their district was
25  underpopulated based on the estimates, I said, you

Page 71

1  know, "Where would you envision picking up
2  population?"  If you were over populated, "What
3  areas of your district would you envision
4  potentially losing?"
5  Q.          Did you discuss anything other than
6  population changes with them?
7  A.          Population changes and potential
8  timelines and when we might get the real census
9  data.
10  Q.          Anything else that you discussed with
11  them?
12  A.          That was about it.
13  Q.          What did you do next after meeting with
14  the representatives in May of 2021?
15  A.          I took -- took back that information and
16  looked at it in terms of a map, and then waited for
17  the real census data to come to see where we really
18  were.
19  Q.          You said you took back that information.
20  What sort of information did you get from these
21  meetings?
22  A.          When somebody said if I need to lose
23  10,000, I would like to lose them in county X or
24  place Y or whatever.
25  Q.          And so you said you took that

Page 72

1  information.  And then what did you do with it?
2  A.          Tried to rough it out in an estimated
3  map, but again knowing that it was going to change
4  because the estimates were not going to be
5  completely accurate.
6              And, again, I didn't want to -- if there
7  was a conflict somewhere between some -- two members
8  wanted county X, I didn't really want to litigate
9  that until we had real numbers because it may become
10  irrelevant when it turns out that their district was
11  10,000 off of what the estimate said.
12              So I tried not to get into any
13  negotiations at that point.
14  Q.          Were there some disputes in the
15  recommendations and requests that you received?
16  A.          Minorly, yeah.
17  Q.          Were there specific counties that more
18  than one representative wanted?
19  A.          Yeah.  I mean, for example, the 1st
20  District was going to be over.  The 1st District was
21  going to be overpopulated, and it was going to have
22  to lose some.  And the 1st District congressman
23  wanted to probably lose some to the 2nd in Monroe,
24  but the 2nd District congressman wanted to gain some
25  from the 1st in Escambia, just things like that.

Page 73

1  They were not major.
2              But, again, it really wasn't worth the
3  point of negotiating it fully until we knew the real
4  numbers.  Because as it turned out, it only ended up
5  being 739 people, and it wasn't particularly
6  important which county it was in the scheme of
7  717,000 voters or citizens in a district.
8  Q.          You said you then took that information
9  from those meetings with the representatives and
10  roughed out a map.  What does that mean?
11  A.          It means I took the -- we had the
12  estimates on Maptitude at the state reapportionment
13  office.  And I just roughed without -- I mean, I
14  didn't get anywhere close to zero deviation because
15  there was no point in it.
16              I just generally roughed out based on
17  what we had discussed in DC, knowing that it was all
18  going to change when we got the real numbers.  But
19  just explored some of the potential.
20  Q.          And to be clear, for somebody that
21  doesn't draw maps, what does "roughed out" mean?
22  A.          Meaning assigned various counties to
23  districts just in an effort to get things closer to
24  the ideal population.
25  Q.          Kind of playing with the numbers, just

Caster Plaintiffs' Exhibit 88, Page 19

Randy Hinaman
December 09, 2021

Page 74

1  kind of seeing what works as a preliminary
2  standpoint, I guess?
3  A.        Yes.  And just to be clear, that was all
4  on total population.  Because I certainly didn't
5  have the ability or trust the internals of any of
6  those -- I mean, I wouldn't have trusted like BVAP
7  or anything else to the extent it wouldn't have made
8  any sense to look at it at that point.
9  Q.        Did you have any data on the black
10  voting age population at that --
11  A.        I don't know what the estimates had.
12  But I didn't even look at it because I knew it
13  wasn't going to be significant to what we were
14  doing.
15  Q.        Did you do anything else before you
16  received the official census data in August of 2021?
17  A.        No.
18  Q.        Did you review any other materials in
19  that time frame before August 2021?
20  A.        Obviously, I reviewed the guidelines and
21  had discussions with the two chairs of how we will
22  proceed once we get the data in terms of all the
23  maps.
24  Q.        What were those discussions like?
25  A.        Just mostly timing and how we would --

Page 75

1  how we would go forward.  And hopefully we could get
2  some consensus on the state school board members and
3  some consensus with the congressional members.
4          And, obviously, the house map I couldn't
5  do anything with until we got the real numbers.  The
6  senate map I could do next to nothing with.  I mean,
7  I could look at a few of the more rural districts
8  because they were whole counties.  But once you got
9  into major metropolitan areas, I couldn't come up
10  with too many suggestions for that then.
11  Q.        Other than Pringle and McClendon, did
12  you meet with any other members of the Alabama
13  legislature?
14  A.        I don't believe so at that time.
15  Q.        And "that time" being before August
16  2021, correct?
17  A.        Correct.
18  Q.        Did you review any election returns in
19  that time frame?
20  A.        I did not.
21  Q.        Did you review any voter registration
22  info in that time frame?
23  A.        I did not.
24  Q.        Did you review any voter primary
25  participation data in that time frame?

Page 76

1  A.        No, sir.
2  Q.        And then in August 2021, you received
3  the official census data, correct?
4  A.        Correct.
5  Q.        What did you do once you received that
6  data?
7  A.        Well, the State received it.
8  Q.        And then ultimately it was passed on to
9  you, correct?
10  A.        Well, it was -- I used the state
11  computer.  So their -- that data was then given to
12  Maptitude.  This is my understanding.  I did not do
13  any of this.
14          That data was given to Maptitude, and
15  Maptitude turned it into their workable -- put it
16  into their program and sent it back to the State.
17  And the State loaded it into their computers, which
18  all took another week.  And then I was able to
19  manipulate it on -- use it on a computer at that
20  point.
21  Q.        So walk me through that.  So Maptitude
22  is a software on a computer, correct?
23  A.        Yes.
24  Q.        A map-drawing software?
25  A.        Correct.

Page 77

1  Q.        Is it the same software that you had
2  used previously in drawing maps?
3  A.        I used it in 2011, yes, sir.
4  Q.        Did you ever use it before then?
5          THE WITNESS:  I used it in 2011.  The
6  State used ESRI.
7  A.        Excuse me?
8  Q.        Did you use it before 2011?
9  A.        I don't think so.
10  Q.        And you were clarifying with Mr. Walker
11  that you used in 2011 --
12  A.        Yeah.  In 2011, I had a computer, and I
13  had Maptitude on it.  The State used -- the State of
14  Alabama used a different software, I think, called
15  ESRI.
16          THE REPORTER:  Called what?
17  A.        ESRI.
18  Q.        Can you spell that?
19  A.        I don't know.
20          MR. WALKER:  E-S-R-I, all capital
21  letters.
22  Q.        And what is ESRI?
23  A.        It's just a -- it's similar to Maptitude
24  software for using the census data.
25  Q.        So in 2011, you drew the map using your

Caster Plaintiffs' Exhibit 88, Page 20

Randy Hinaman
December 09, 2021

Page 78

1  own computer and your own software?
2  A.        Correct.
3  Q.        Was that then imported into ESRI for the
4  State?
5  A.        Yes, sir.
6  Q.        The file types can be imported from one
7  to the other?
8  A.        Yes, sir.
9  Q.        Then in 2021, you did not use your own
10 computer and software, correct?
11 A.        That's correct.
12 Q.        You used the State's computers and
13 software?
14 A.        Entirely.
15 Q.        Where was that physically?
16 A.        In the reapportionment office at the
17 state house, Room 317.
18 Q.        So any time that you wanted to actually
19 work on redrawing the map, you had to --
20 A.        Physically be there.
21 Q.        How often --
22 A.        Sorry.  I didn't mean to finish your
23 sentences.
24 Q.        That's fine.  And we're doing a pretty
25 decent job.  But let's try to remember to let each

Page 79

1  other finish so that the court reporter can type
2  everything down.
3           How often -- starting in August 2021,
4  how often would you go to the -- what did you say it
5  was?  The reapportionment office?
6  A.        Reapportionment office.
7  Q.        How often would you go to the
8  reapportionment office after August 2021?
9  A.        Once the -- once the material was loaded
10 into the computer, which was probably the last week
11 of August maybe, I was there once or twice a week
12 for the next week or so.  And then after that, I was
13 there four or five days a week until we were through
14 the special session.  I basically lived in
15 Montgomery.  For all intents and purposes, I lived
16 in Montgomery for a couple of months.
17 Q.        From, say, the beginning of September
18 through the end of October?
19 A.        Yeah.  Certainly Labor Day until the end
20 of October.
21 Q.        Would you work on weekends, as well?
22 A.        Rarely.  I mean, once we got very close
23 to the session, yes.  But not -- not normally.
24 Q.        Of the four maps you were -- you were
25 working on all four maps in that time frame, right,

Page 80

1  starting in August 2021 through October 2021?
2  A.        Yes.
3  Q.        And all four maps, you were doing the
4  same process using the State's computers and using
5  Maptitude, correct?
6  A.        Correct.
7  Q.        Were there any of those maps that took a
8  significantly larger portion of your time to draw?
9  A.        Well, obviously, including meetings with
10 members.  105 house members are significantly more
11 meetings than you, know, seven for congress and
12 eight for school board.
13          So, obviously, the house map probably
14 took a lot longer just in terms of meeting with 105
15 different -- I didn't meet with everybody.  But the
16 vast majority of 105 people -- and sometimes more
17 than once -- took a lot longer than meeting with
18 seven congressmen, for example.
19 Q.        In addition to meeting, I assume that
20 drawing 105 districts probably takes a lot more of
21 your time to do than just drawing seven.  Is that
22 fair?
23 A.        That's fair.
24 Q.        If you had to put very rough percentages
25 on the amount of time you spent on the congressional

Page 81

1  map versus the other ones, about how much of your
2  time would you say you spent?
3  A.        Now you're -- now you're making me a
4  lawyer again.  And I'm not good at this.
5           I really -- I don't really know how to
6  do that.  I mean, you would be correct that the
7  majority -- I mean, I put more time into the house
8  map than I put into the state school board and the
9  congressional.  But I really don't have a way to
10 quantify that.
11 Q.        Did you put more time into the senate
12 map, as well?
13 A.        Yeah.  Obviously, it's 35 members versus
14 seven or eight.  It just takes longer to do the
15 meetings and follow-ups and so forth.
16 Q.        And the state school board --
17 A.        Is eight members.
18 Q.        Eight members.  Did that take you about
19 the same amount of time to draw as the --
20 A.        Yeah.
21 Q.        Sorry.  Let me make sure that I can
22 finish.
23          Did drawing the state school board map
24 take you about the same amount of time as it did for
25 drawing the congressional map, given that they have

Caster Plaintiffs' Exhibit 88, Page 21

Randy Hinaman
December 09, 2021

Page 82

1 about the same number of districts?
2 A.        Yes.
3 Q.        Going back to the software, this
4 Maptitude software, you said that it took about a
5 week for the census information to be uploaded; is
6 that correct?
7 A.        Yeah, that's what I said.
8 Q.        What does that mean?
9 A.        Again, this was not part of my
10 responsibility.  But the State got the data, as I
11 understood it, and gave it to Maptitude.  Maptitude
12 translated it into their software and sent it back
13 to the State to be loaded on the State computer.
14        But, again, this is all my secondhand
15 knowledge of what was going on.  I was not doing
16 this.
17 Q.        From your perspective, once you arrived
18 around the end of August looking at Maptitude and
19 the software, you were able to see what information
20 has been uploaded, correct?
21 A.        Well, once it's -- yeah.  Once it's
22 uploaded, yes.
23 Q.        What sort of information is -- was
24 available to you on the Maptitude software regarding
25 the districts?

Page 83

1 A.        Once it's all loaded in, I have, you
2 know, total population and voting age population and
3 race down to the block level.
4 Q.        Is there any other information that's
5 available to you in Maptitude?
6 A.        I don't believe so.
7 Q.        Did you, yourself, upload any additional
8 information into Maptitude?
9 A.        I did not.
10 Q.        Did you review any other data in
11 preparing the maps?
12 A.        I did not.
13 Q.        Did you meet with anyone between August
14 2021 and the time that you submitted the maps before
15 the special session in furtherance of drawing the
16 2021 congressional map?
17 A.        Well, I met with virtually all of the
18 officeholders.
19 Q.        You met with each of the seven
20 congressional representatives again?
21 A.        Oh, yeah.  I had Zoom calls with -- with
22 them.  And then -- are you talking just
23 congressional now, or all of it?
24 Q.        Focusing on the 2021 congressional map.
25 A.        Yes.

Page 84

1 Q.        Who did you meet with to discuss the
2 drawing of the map between August 2021 and when you
3 submitted the map in the week before the special
4 session?
5 A.        Once we had the real data, I went back
6 and had Zoom calls with all of the members of
7 congress or their -- or their chief of staff to talk
8 about what the differences were from the estimates
9 versus the actual census data and to reiterate, you
10 know, what we discussed in May, what was still
11 operable and what maybe needed to be slightly
12 revised based on what our thoughts were.
13        Then after those round of Zoom calls, I
14 went back and drew a proposed map.  Which I then did
15 another round of calls, Zoom calls with, to look at
16 the final -- semifinal, final version, I guess.
17 Q.        In those meetings, did you discuss
18 anything with the representatives other than changes
19 that needed to be made for population deviation?
20 A.        No.
21 Q.        How many meetings would you say you had
22 with each of the representatives in that time frame?
23 A.        It varied.  For example, Mo Brooks would
24 be zero because he again was not interested to
25 participate.  Others took, you know, three, four,

Page 85

1 five phone calls.  Some were one or two.
2        In the final end, Representative Palmer
3 decided not to do the final call.  So I didn't have
4 a final call with him.  But everybody else, I had at
5 least two, if not more.
6 Q.        Were all of the meetings with the
7 representatives from August 2021 through the special
8 session by Zoom?
9 A.        Yes.
10 Q.        When you had those meetings, would you
11 share your screen to be able to show what the map
12 looks like?
13 A.        Exactly, yes.
14 Q.        Did you discuss with each of the
15 representatives the map as a whole or just their
16 specific districts?
17 A.        Their specific districts and an adjacent
18 district if there was some change there.
19 Q.        You stated for the 2011 congressional
20 map that you were actually hired by the seven
21 congressional representatives, correct?
22 A.        Correct.
23 Q.        That was not the case for 2021, correct?
24 A.        That's correct.
25 Q.        Why not?

Caster Plaintiffs' Exhibit 88, Page 22

Randy Hinaman
December 09, 2021

Page 86

1  A.        That was not my -- the leadership
2  decided that they would, you know, hire me through
3  the 501(c)(4), which -- which is how they hired me
4  for legislative.  I did the legislative maps in
5  2021, and I guess they preferred that model over the
6  other one.  I don't know.  That was their choice,
7  not mine.
8  Q.        Did you receive any other instructions
9  or requests from the congressional representatives
10 other than changes to make to account for population
11 deviation?
12 A.        No.
13 Q.        Did you meet with any members of the
14 Alabama state legislature to discuss the 2021
15 congressional maps?
16 A.             Just -- just the two co-chairs, two
17 chairs.
18 Q.        And that's --
19 A.             Senator McClendon and Representative
20 Pringle.
21 Q.        What did you discuss with Senator
22 McClendon and Representative Pringle?
23 A.             I would just update them on our progress
24 and discussions with various members.  And to the
25 extent that there were conflicts like the one I

Page 87

1  described between the 1st and the 2nd, I just
2  updated on that in case they were to receive a call
3  from somebody, they would know what was happening.
4  Q.             In these meetings with Senator McClendon
5  and Representative Pringle, were you pretty much
6  just providing information to them?
7  A.             Yeah, pretty much.
8  Q.        Did you receive any feedback or
9  particular requests from them about how to draw the
10 map?
11 A.        No.
12 Q.        Beyond anything that you were told from
13 the congressional -- U.S. congressional
14 representatives, were you given any instructions or
15 requests about how to draw the 2021 congressional
16 map from anyone?
17 A.        No.
18 Q.        And how many times did you meet with
19 Representative Pringle and Senator McClendon in
20 preparation for drawing the 2021 congressional maps?
21 A.        I don't -- I mean, this was during the
22 course in time when they were also in town doing
23 meetings with their colleagues.  So maybe I updated
24 them every other week.  It was rather -- I mean, it
25 wasn't a formally structured we meet every Tuesday

Page 88

1  at 10:00 o'clock.  It was just when they were both
2  there or singularly there, I would just give them a
3  quick update.
4  Q.        Were these updates by phone or email or
5  in person?
6  A.        Usually in person.
7  Q.        Were there ever communications by email
8  with them?
9  A.        No.
10 Q.        Did you attend any of the public
11 hearings in preparation for the 2021 congressional
12 maps?
13 A.             I didn't.  They were happening
14 simultaneously with me being in Montgomery.  And I
15 would occasionally walk in the room while they were
16 happening to talk to somebody else or whatever.  But
17 I didn't officially attend them.
18 Q.        There were a few that you walked into
19 the room while they were going, you said?
20 A.             Well, they were being done in an
21 adjacent room, and I occasionally walked in.  And I
22 would also occasionally -- either the co-chairs or
23 Dorman Walker or somebody would come back and update
24 me as to something somebody said if they thought it
25 was significant to my drawing.

Page 89

1  Q.        Do you recall what any of those sort of
2  comments would have been?
3  A.        Yeah.  For example -- and this was
4  already in process, so it wasn't a tremendous shock.
5  But there were comments, for example, in the
6  Montgomery meeting that they didn't want to be split
7  into three districts as they were in 2001, that they
8  would prefer Montgomery not -- probably they
9  preferred it not to be split at all.  But if it were
10 going to be split, to certainly not three ways and
11 have it be two, which was a feature of a map I was
12 already working on.  But things like that.
13 Q.        Do you remember any other specific
14 feedback that you received from the public hearings?
15 A.        Just areas like the Shoals area wanted
16 to be kept as intact as possible.  And people in
17 Madison and Morgan wanted to be -- they thought
18 there was obviously a lot of community of interest
19 between those areas in north Alabama.  People in
20 Baldwin and Mobile wanted to be kept together.
21 There was a lot of community of interest between
22 those counties.  Things like that.
23 Q.        When you refer to "the Shoals area,"
24 you're referring to Muscle Shoals?
25 A.        Yes.

Caster Plaintiffs' Exhibit 88, Page 23

Randy Hinaman
December 09, 2021

Page 90

1 Q.        Any other specific feedback that you
2 recall receiving from the public hearings?
3 A.        Not on congressional.  There was a lot
4 of feedback on state maps that we also talked about.
5 Q.        And did you ever personally sit in on
6 any of these hearings or hear anything that was
7 being said personally?
8 A.        I did for ten-minute snippets
9 occasionally when I was waiting to talk to somebody
10 in that room.
11 Q.        Did you gather anything from the time
12 that you spent in the hearing personally?
13 A.        Nothing other than observations that I
14 relayed to you a minute ago.
15 Q.        You mentioned that Montgomery County,
16 the public hearings provided feedback that they
17 didn't want to be split.  Do you remember why that
18 was?
19 A.        I think -- I think both in Montgomery
20 County and most any county when you have split
21 counties or split precincts, there's confusion as to
22 who somebody's -- who their representative may be.
23          And it was a -- it was obviously a
24 guideline of the committees on all these maps to try
25 to split less precincts and less counties.

Page 91

1 Q.        Do you know when Montgomery County was
2 originally split?
3 A.        Originally split?
4 Q.        Correct.
5 A.        No.  I mean -- no, I don't.
6 Q.        The first map you drew was in 1992.  Was
7 Montgomery County already split prior to that?
8 A.        I have no idea.  I'm sorry.  I don't
9 even remember the map I drew, whether it was split,
10 to be honest with you.
11 Q.        Did any of the information that you
12 received from the public hearings impact the way you
13 drew the 2021 congressional map?
14 A.        No, other than things like I said, not
15 splitting Montgomery three ways, putting as much of
16 the Shoals area together, keeping Mobile and Baldwin
17 together, keeping Madison and Morgan together.
18 Q.        Was that something that you specifically
19 made changes to your map to accommodate?
20 A.        No.  Most of those features were already
21 happening.  It just -- I kept it in mind.  For
22 example, when -- we eventually had to split
23 Lauderdale County between 5 and 4.  And when we were
24 doing that, I was trying to keep Florence and Muscle
25 Shoals together as much as possible when we were

Page 92

1 doing that split.  So yes, it was in my mind when we
2 were, for example, doing that split.
3 Q.        Other than the accommodations for the
4 Lauderdale, Muscle Shoals area, did any of the
5 public feedback that you received from the public
6 hearings tangibly impact a change that you made on
7 the map?
8 A.        Not so much a change.  But it did -- it
9 did confirm that our theory of putting -- not
10 splitting Montgomery three ways was a worthy goal.
11 And I worked to get Congressmen Rogers to agree to
12 come out of Montgomery County because he was
13 partially in Montgomery County.
14 Q.        Since we're talking about it, this may
15 help a bit.
16
17          (Plaintiff's Exhibit 5 was
18          marked for identification.)
19
20 Q.        I'm handing you Exhibit 5.  I don't want
21 this to be a memory test for you.  So this is a copy
22 of the 2021 --
23 A.        I've had enough -- I've had enough of
24 those already.
25 Q.        This is a copy of the 2021 congressional

Page 93

1 map.  Do you recognize this?
2 A.        I do.
3 Q.        Does this appear to be a true and
4 correct of the 2021 congressional map?
5 A.        It does.
6 Q.        We were talking about Montgomery County
7 here not wanting to be split.
8 A.        Three ways, yes.
9
10          (Plaintiff's Exhibit 6 was
11          marked for identification.)
12
13 Q.        I'm also going to hand you what's being
14 marked as Plaintiff's Exhibit 6 for your reference.
15 This is a copy of the 2011 congressional map.
16          So looking at Montgomery County, it
17 looks like in -- well, first off, Plaintiff's
18 Exhibit 6, does that appear to be a true and correct
19 copy of the 2011 congressional map, to your
20 knowledge?
21 A.        It does.
22 Q.        We were -- and you used this 2011
23 congressional map as the starting point in drafting
24 the 2021 congressional map, correct?
25 A.        I used the cores of the existing

**Caster Plaintiffs' Exhibit 88, Page 24**

Randy Hinaman
December 09, 2021

Page 94

1  districts as a starting point, yes.
2  Q.      Is that different from using this map as
3  the starting point?
4  A.      I don't know.  I don't think so.
5  Q.      When you began drawing the 2021
6  congressional map, you didn't start from scratch,
7  right?
8  A.      No.  Correct.
9  Q.      You started using the 2011 congressional
10  map?
11  A.      Correct.
12  Q.      Looking at Montgomery County, so that
13  was split into three districts in 2011; is that
14  right?
15  A.      That's correct.
16  Q.      Do you know why that was split into
17  three districts at the time?
18  A.      Not specifically, other than, obviously,
19  it had been -- Congressman Mike Rogers in the 3rd
20  District had had an office in Montgomery, that part
21  of Montgomery County, and had represented it for a
22  while and probably didn't -- didn't want to lose
23  that base of support and financial support and so
24  forth.
25  Q.      In the 2011 congressional map, District

Page 95

1  7 reaches into a portion in the middle of Montgomery
2  County.  Do you know why it does that?
3  A.      To gain population for that district.
4  Q.      Was District 7 reaching into a portion
5  of Montgomery County in the prior 2001 congressional
6  map?
7  A.      I don't know.
8  Q.      Do you remember if Montgomery County --
9  do you remember if District 7 reached into a portion
10  of Montgomery County in the 1992 congressional map
11  that you drew?
12  A.      I do not remember, no.  I'm sure
13  somebody has a map and could tell me.  But I don't
14  know.
15  Q.      So it looks like from the 2011
16  congressional map to the 2021 congressional map, you
17  were able to take District 3 out of Montgomery so
18  that it's not split three ways anymore and is only
19  split two ways; is that correct?
20  A.      That's correct.
21  Q.      Is there a reason why it still needed to
22  be split into two different districts?
23  A.      Yeah.  I mean, obviously, the 7th
24  District was underpopulated.  So if you took it all
25  the way out of Montgomery, then you would have to

Page 96

1  add a number of different counties to make up that
2  population.
3  Q.      Well, it looks like District 7 also
4  includes only a portion of Tuscaloosa County and
5  Jefferson County, correct?
6  A.      That's correct.
7  Q.      So could you not have taken more of
8  either Tuscaloosa County or Jefferson County and
9  then been able to leave Montgomery County as being
10  solely in one district?
11  A.      Well, yeah, it would have been possible
12  certainly in Jefferson.  I don't know about
13  Tuscaloosa.  I don't think actually -- I think there
14  are many more people in the 7th District portion of
15  Montgomery than there are in the 4th District
16  portion of Tuscaloosa.  But yes, certainly in
17  Jefferson that would have been possible.
18          But as you know, they -- these all have
19  to fit back together at the end.  So what might have
20  been a perfect map for somebody in Montgomery may
21  not have created a perfect situation for whatever
22  member represented Jefferson or wherever.
23  Q.      Did you consider moving -- did you
24  consider making Montgomery County solely District 2?
25  A.      I did not.

Page 97

1  Q.      Why not?
2  A.      Because, again, I didn't think it --
3  while that may look like geographically not a very
4  large area, it has a considerable number of voters
5  in it.  And it would have been hard to take that out
6  of 7 and make up the population somewhere else.
7          About the only place, as you pointed
8  out, to do that might have been Jefferson.  But,
9  again, we have two representatives in Jefferson
10  County right now.  And it would have been hard to
11  eliminate one from that process.
12  Q.      Is there anything in particular about
13  this specific portion of Montgomery County that's in
14  District 7 that makes it a community of interest or
15  something that ties it into District 7 versus
16  District 2?
17  A.      Not necessarily.  I mean, obviously,
18  geographically it's next to -- it's adjacent to
19  Lowndes County.
20  Q.      Did you look at racial data in including
21  that portion of Montgomery County in District 7?
22  A.      I didn't.  When we started doing -- I
23  didn't initially.  When we started filling in this
24  -- all these discussions we've had up until now have
25  all been based on total pop.  I didn't look at race

Caster Plaintiffs' Exhibit 88, Page 25

Randy Hinaman
December 09, 2021

Page 98

1  at all on the computer when we were adding folks to
2  these districts or subtracting folks from these
3  districts.
4          So at this point, I've basically just
5  been looking at total pop and where do you get the
6  total pop to get the districts back to ideal
7  population.  So at that point, there was no
8  discussion of race.  It was all a discussion of
9  total pop.
10 Q.        You say "at this point."  Where are we
11 talking in the timeline?
12 A.        Up until -- up until we finished the
13 map.
14 Q.        Finishing the map being the week before
15 the special session?
16 A.        Correct.
17 Q.        So is it your testimony that you did not
18 look at race at all in 2021 before submitting the
19 maps to the special session?
20 A.        No, I did not look at it up until the
21 week before we submitted the maps, when at that
22 point we did turn on race and look at the racial
23 breakdowns in the various maps.
24 Q.        Why did you look at the racial breakdown
25 that week before the special session?

Page 99

1  A.        Well, to -- obviously, we wanted to see
2  what the, you know, outcomes of our changes were.
3  Q.        What do you mean?
4  A.        We wanted to see what -- the changes we
5  had made to get the population balanced among all
6  these districts, if it changed any of the, you know,
7  racial makeup of the districts.
8  Q.        Why did you want to know that?
9  A.        Well, one of our guidelines is to comply
10 with the Voting Rights Act.
11 Q.        And you say "we wanted."  Who is "we"?
12 A.        The two co-chairs, myself, and legal
13 counsel.
14 Q.        "Legal counsel" being Mr. Dorman --
15 A.        Yes.
16 Q.        -- Walker?
17 A.        Yes.
18 Q.        And prior to that week before the
19 special session, it's your testimony that you did
20 not look at any of the racial data at all for any
21 of the districts in drawing the 2021 congressional
22 map?
23 A.        That's correct.
24 Q.        What data did you look at?
25 A.        Just -- just total pop and geography.

Page 100

1  Q.        Anything else?
2  A.        That's it.
3  Q.        Other than modifying the existing
4  district lines to account for population changes,
5  did you make any other changes from the 2011
6  congressional map?
7  A.        I'm not sure I follow that.
8  Q.        You made changes to the 2011
9  congressional map for the 2021 map based on changes
10 in population, correct?
11 A.        Correct.
12 Q.        Did you make any changes based on any
13 other factors?
14 A.        Are we talking -- we're talking the 2021
15 map?
16 Q.        Correct.  So in drawing the 2021 map,
17 you made certain changes from the prior map based on
18 changes in population, correct?
19 A.        Correct.
20 Q.        Did you make any changes based on any
21 other factors?
22 A.        No.  I didn't make any changes.
23 Obviously, where members lived was a consideration.
24 I certainly would be mindful -- when I was moving a
25 precinct in Jefferson County, for example, I

Page 101

1  couldn't move Congresswoman Sewell out of her
2  district, for example.  But I didn't make any
3  changes based on that.
4  Q.        Other than population data and race data
5  starting the week before the map was submitted, did
6  you review any other data about the constituents or
7  the districts when drawing the 2021 map?
8  A.        I did not.
9  Q.        If any changes were made to the 2021
10 map, would you have been the one to physically make
11 those changes on the computer?
12 A.        Yes.
13 Q.        Was there anyone else who physically sat
14 on the computer and made any changes for the 2021
15 map?
16 A.        I don't believe so.  I mean, Donna
17 Loftin, who heads the reapportionment office,
18 certainly was capable of doing that.  But I don't
19 believe she ever -- she's not really authorized to
20 change a map, I guess, without me asking her to.
21 Q.        Do you know if she made any changes?
22 A.        I don't believe she did, no.
23 Q.        Did anyone else assist you in drawing
24 the map?
25 A.        Nobody assisted me in drawing the map.

Caster Plaintiffs' Exhibit 88, Page 26

Randy Hinaman
December 09, 2021

Page 102

1  Q.        When did you have a -- when did you
2  first have an initial draft map completed?
3  A.        Using the real data?  I mean, not an
4  estimate.
5  Q.        Did you have an initial draft made from
6  the estimates?
7  A.        I had a -- I roughed -- again, it wasn't
8  -- it wasn't something that would have -- it wasn't
9  to zero deviation.  It was just roughed-out
10 counties.
11          So yes, when I came back from my May
12 meetings, I roughed out a map using the estimates on
13 Maptitude just to get a feel for what areas needed
14 to be added and subtracted from various districts.
15          But, again, it was -- it was not -- it
16 was not to deviation and it was knowing that the
17 estimates were going to be off by thousands, if not
18 tens of thousands, which they turned out to be.
19 Q.        When was that draft completed?
20 A.        The end of May.
21 Q.        Did you save a copy of that draft?
22 A.        No.
23 Q.        After that, when was the next draft
24 using official data completed?
25 A.        After my round of calls in September.

Page 103

1  So probably mid -- mid to late September would have
2  been the next draft.  And then I did a round of
3  calls to go over those maps and make any last
4  changes before the last week.
5  Q.        A round of calls being the calls that
6  you discussed with the U.S. congress
7  representatives?
8  A.        Yes.
9  Q.        Did you make any further changes to the
10 draft based on any feedback you received from those
11 calls?
12 A.        Very minorly.  Congresswoman Sewell, I
13 had split a precinct in Montgomery County that she
14 did not want split.  So I put it back together and
15 split in a different -- an adjacent precinct.  But
16 very, very minorly.
17 Q.        What precinct was that?
18 A.        It was the Acadome precinct.  I had
19 split the university into two different districts,
20 and she, I think wanted it all in her district.  So
21 I put that back together.
22 Q.        Do you know why she wanted that all in
23 her district?
24 A.        I don't.  I mean, other than that was
25 one of her principles in this redistricting process.

Page 104

1  She felt strongly about picking up facilities and
2  universities and things rather than just random
3  citizens.
4  Q.        And what precinct did you take out from
5  District 7 in exchange?
6  A.        Well, it was a split at an adjacent
7  precinct.  Whitfield, I think, was the name of it.
8  Q.        How do you choose that precinct?
9  A.        It just was adjacent to it.
10 Q.        That was the only factor?
11 A.        That was the only factor.
12 Q.        So you had the draft completed, you
13 said, mid September?
14 A.        Yeah.  And just to give a more complete
15 answer, I also had to do a -- change the split a
16 little bit in Lauderdale based on conversations with
17 Congressman Adderholt.  I had conversations with
18 Representative -- Congressman Moore's
19 representative, Bill Harris, about he would have
20 preferred a change in Monroe rather than the way I
21 did it in Escambia.
22          So they were each -- not every district.
23 But a number of districts had these little minor
24 things that we talked through at that point.
25 Q.        Beyond any minor changes -- and I assume

Page 105

1  this is more kind of a precinct-by-precinct type
2  change that you're referring to there, correct?
3  A.        Yes, sir.
4  Q.        Beyond that, were there any changes that
5  you made based on those calls that you would
6  consider to be significant changes?
7  A.        No.
8  Q.        So once you had the draft completed in
9  mid September and then had the calls with the
10 various representatives to go over that, then you
11 made whatever minor changes you could based on that
12 feedback.
13          When did you have the next draft
14 completed?
15 A.        Going into the last -- the next to last
16 week of October.  And in some of these -- as you
17 well know, with congressional schedules, it's not
18 like I had seven congressmen lined up to talk to me
19 at 9:00 o'clock on a Monday morning.  This took over
20 a course of weeks.  I would, you know, schedule, and
21 move and change for voting schedules and all the
22 wonderful things that go on with dealing with
23 congressmen.
24 Q.        And in that same time frame, you were
25 also drawing three other maps?

Caster Plaintiffs' Exhibit 88, Page 27

Randy Hinaman
December 09, 2021

Page 106

1  A.          Correct.
2  Q.          And meeting with all of the
3  representatives and senators and all of that?
4  A.          Yes, sir.
5  Q.          Was there any other drafts that you had
6  other than the first one that you made using the
7  unofficial data in the summer of 2021, the next
8  draft that you made using the official data in mid
9  September 2021, and then the draft that you had
10 based on the congressional representatives' feedback
11 that was completed the week before the special
12 session in October of 2021?  Were there any other
13 drafts that you made of the 2021 congressional map?
14 A.          No.
15 Q.          Between those last two drafts that we
16 discussed, between September 2021 and the special
17 session, did you meet with anyone else to discuss
18 the redrawing of the 2021 map, congressional map,
19 other than the seven representatives and Senator
20 McClendon and Representative Pringle?
21 A.          And legal counsel.
22 Q.          Anyone else?
23 A.          No.
24 Q.          At that time, did you consider
25 Mr. Walker to be your attorney?

Page 107

1  A.          I considered him to be the
2  reapportionment committee's attorney.
3  Q.          Did you consider him to represent you
4  personally?
5  A.          I don't know how to answer that.  I
6  didn't -- I didn't feel I needed representation at
7  that point personally.
8  Q.          Did you have any sort of retention
9  agreement with Mr. Walker or his office?
10 A.          No.
11 Q.          Once you had the draft completed of the
12 2021 congressional map the week before the special
13 session, who did you provide it to?
14 A.          Well, obviously, all of the members saw
15 their districts.  But they didn't really see the
16 rest of the map.  The members of congress saw their
17 district, but they didn't really -- and adjacent
18 districts.  But they didn't really see the rest of
19 the map.
20             I think at that last week, I went
21 through that map with Representative Pringle and
22 Senator McClendon and Dorman Walker.  Obviously,
23 Donna Loftin, who runs the office, was in the
24 background during most of this.
25 Q.          What sort of feedback did you receive

Page 108

1  when you met with Senator McClendon and
2  Representative Pringle about the draft map?
3             MR. WALKER:  I'm going to object to
4  attorney-client privilege to the extent that I was
5  present in the room and we were having an
6  attorney-client communication.  If you had any
7  communications with them that I was not present, you
8  may answer the question.
9  A.          There were -- they just looked at the
10 map.  There was nothing substantive in terms of a
11 response.
12 Q.          And are you going to refuse to answer
13 any questions that I were to ask you that would
14 involve any discussions that you had where
15 Mr. Walker was present?
16             MR. WALKER:  I would instruct him not to
17 answer those questions if other conditions
18 indicating it was an attorney-client privilege were
19 present.
20             Let me -- let me clarify that for you.
21 If I believed we had a conversation that was an
22 attorney-client privilege, I would -- I would
23 instruct him not to answer the question.  I don't
24 think that all the conversations I had with him were
25 covered by the privilege.

Page 109

1             MR. THOMPSON:  When you say you don't
2  think that all of the conversations you had with
3  him, do you mean nonsubstantive conversations like
4  lunch and dinner?
5             MR. WALKER:  Certainly that would be
6  included.  What I'm saying is there -- I can think
7  of times when he and I were speaking, although I may
8  not know exactly what we were talking about, when
9  there were other people in the room who were not
10 within the privilege.  And we may have been talking
11 about the map.  I just don't know.
12             But there were certain times when I
13 reviewed with him specifically the map.  And I would
14 contend that that's covered by the attorney-client
15 privilege.
16             MR. THOMPSON:  Understood.  And you
17 would instruct him not to answer on those.
18             MR. WALKER:  Yeah.
19 Q.          And would you follow that instruction?
20 A.          Yes.
21 Q.          So walk me through the timeline, then,
22 once you provided the draft to Senator McClendon and
23 Representative Pringle.  What happened with the map
24 at that point?
25 A.          I mean, once it was finalized and they

Caster Plaintiffs' Exhibit 88, Page 28

Randy Hinaman
December 09, 2021

Page 110

1 made no changes to it, it was submitted to be drawn
2 up into a bill and prepared to be presented at the
3 -- be sent out to the members of the reapportionment
4 committee the following Monday and then voted on in
5 committee on Tuesday.
6 Q.        Were there any changes made to the map
7 by the reapportionment committee?
8 A.        No.
9 Q.        Were there any changes made to the map
10 after it was submitted to the legislature?
11 A.        No.
12 Q.        So the version of the map that you
13 completed the week before the special session was
14 identical to the version of the map that was
15 ultimately enacted that we've marked as Exhibit 5,
16 Plaintiff's Exhibit 5, correct?
17 A.        Correct.
18 Q.        Did you save any drafts of the 2021
19 congressional map?
20 A.        No, sir.  The way Maptitude works is it
21 just -- every time you make a change, it saves -- it
22 saves the map at that point.  So previous iterations
23 don't -- don't really exist.
24 Q.        Did you print out any copies of any
25 drafts?

Page 111

1 A.        No.
2 Q.        Do you have any notes that you took or
3 used while drafting the 2021 congressional map?
4 A.        No.  I mean, I'm sure I had a scrap of
5 paper somewhere that said Congressman Moore would
6 rather split Escambia and Congressman Carl would
7 rather split Monroe.  But they were -- all these
8 things were so -- there were not very many of them.
9 There weren't too may.  I didn't need notes to
10 remember that.
11 Q.        Do you have any of those notes saved?
12 A.        No.
13 Q.        If you needed to modify the maps now, do
14 you have any estimate of about how long that would
15 take you to do?
16 A.        Modify in what way?
17 Q.        For instance, are you familiar with what
18 this lawsuit is about?
19 A.        Well, it's three different lawsuits, if
20 I understand it correctly.
21 Q.        What is your understanding of the three
22 different lawsuits?
23 A.        I think two of the -- well, two of the
24 lawsuits I think would have preferred two majority
25 black districts.  And the Singleton lawsuit would

Page 112

1 have preferred sort of a whole county map with
2 two -- I would call them influence districts.
3        THE REPORTER:  What districts?
4 A.        Influence districts
5 Q.        Would that be the same as -- I've heard
6 "opportunity district."  Would "influence district"
7 and "opportunity district" be about the same?
8 A.        Yes, sir.
9 Q.        And what's your understanding of what an
10 influence district or opportunity district is?
11 A.        It would be a district that would be
12 less than a majority of BVAP, but still have a
13 substantial population of minorities that could
14 potentially impact the election of a candidate of
15 their choice.
16 Q.        And when we say "minorities" here
17 specifically, are we referring to the black voting
18 age population?
19 A.        Primarily here in Alabama, you would be
20 referring to the black voting age population.
21 Q.        So if in this case the court were to
22 find that the maps do not comply with the Voting
23 Rights Act or the 14th Amendment and they needed to
24 be modified, do you expect that you would be the one
25 that would be asked to make those modifications?

Page 113

1 A.        I don't have a crystal ball.  I can't
2 predict the future.
3 Q.        Is that something that's covered in your
4 contract?
5 A.        It is not.
6 Q.        If you were asked to modify the map to
7 make changes to comply with the Voting Rights Act or
8 the 14th Amendment, in that situation, do you have
9 any estimate about how long it would take you to do
10 that?
11 A.        No.  I mean, asked by whom?
12 Q.        The Alabama state legislature, the
13 courts, Mr. Walker, any of us.
14 A.        No.  I mean, I -- conceptually, I guess
15 that would depend on what the court deemed changes
16 were.
17 Q.        Is that something that you think you
18 could complete within a month?
19 A.        I would hope so.  I don't know.
20 Q.        Is it something you think you could
21 complete within a week?
22 A.        You're asking me a hypothetical about
23 something that hasn't happened, and I don't have a
24 clue what the changes would be.
25 Q.        When you met with Congressman Sewell,

U.S. Legal Support | www.uslegalsupport.com 110 to 113

Randy Hinaman
December 09, 2021

Page 114

1  did you receive any specific instructions from her
2  about how to draw District 7?
3  A.        No, not specifically.  Again, it was
4  more of -- our initial meetings were more of here is
5  what the estimates show, here is -- you're
6  obviously -- the district is going to be
7  underpopulated.  Let's talk about areas where you
8  may -- may pick up population to get closer to the
9  ideal.
10       As I said earlier, she was interested in
11  facilities and universities and some companies and
12  military, like Maxwell, and so forth.  So she was
13  interested in things above and beyond just picking
14  up additional voters or citizens.  So we talked
15  about that briefly.
16       And then we just went through the most
17  likely areas where she could pick up additional
18  population.  And the most likely in my mind, again,
19  to present to her as options were counties that were
20  split.
21       For example, Clarke County was -- under
22  this map, the 2011 map, was split between 7 and 1.
23  We know 1 is going to be over.  We knew -- at the
24  beginning, we didn't know how much.  But we knew 1
25  would be over, and we knew 7 would be under.

Page 115

1       So a logical thing, in my mind anyway,
2  would be let's put Clarke County back together.  And
3  whatever population that is, let's put that into 7.
4       And also we talked about some of the
5  changes that would happen that would cascade to her
6  from north Alabama.  As we knew, District 5 would be
7  over.  The only place District 5 can go to is to
8  District 4 because it's the only district adjacent
9  to it.  And that would then put District 4 over.
10  And one of the options was for her to pick up some
11  more of District 4 in Tuscaloosa.  So we talked
12  about that.
13       And then we talked about potential
14  changes in Jefferson, another area where she could
15  pick up additional population.
16  Q.       You mentioned that she wanted
17  universities in her district.  What were the names
18  of the universities she wanted?
19  A.        She wanted to make sure that whatever
20  changes we made in Tuscaloosa, we kept the
21  University of Alabama in her district.  She was
22  interested in picking up Maxwell Air Force Base in
23  Montgomery, if that was a possibility.
24       As I discussed earlier, I had split a
25  precinct that had a university in Montgomery.  And

Page 116

1  she wanted that in her district not split.  So we
2  talked about things like that.
3  Q.       Do you remember the name of that
4  university in Montgomery?
5  A.        Yeah, I do.  I'm blanking on it at the
6  moment.  Alabama -- is it State?
7       MR. WALKER:  Alabama State, ASU.
8  A.        ASU.  ASU.  Sorry.
9  Q.       Other than those things that you just
10  discussed, did you receive any other instructions or
11  feedback from Congressman Sewell about how to draw
12  District 7?
13  A.        No, not at that time.  We did -- in the
14  next round of those talks after we had real numbers,
15  we did talk about some of the changes in Jefferson.
16       In this -- in the 2011 map, some of the
17  precincts of Homewood -- I think there were three or
18  four Homewood precincts.  Some were in her district,
19  and some were in 6.  She thought that maybe it might
20  make sense for all of them to be in one district.
21  She would be happy if they were hers, which I did.
22       So we talked about a few things like
23  that in the next round of discussions.
24  Q.       Did you discuss anything else with her
25  about how to draw her map?

Page 117

1  A.        No.
2  Q.       Did you discuss race at all with
3  Congressman Sewell?
4  A.        No.
5  Q.       Did she give you any instructions or
6  requests about a certain black voting age population
7  percentage that she wanted in District 7?
8  A.        She did not, other than I think there
9  was -- we both assumed, and I think she would
10  confirm, that she wanted a majority -- a majority
11  black district for her district.
12       And she also, I should add -- there was
13  one other thing.  When we initially asked every
14  member for their home addresses so we made sure we
15  had them inside their own districts, she actually
16  sent in two addresses, knowing that only one of them
17  was her official home address.
18       One of them was also her home -- her
19  mother's home or whatever in Dallas County.  And she
20  wanted -- would prefer that both of those addresses
21  be inside her district.  So that was one request she
22  made.
23  Q.       Was that an accommodation you had to
24  change the map to --
25  A.        No.  They were -- it was already

Caster Plaintiffs' Exhibit 88, Page 30

Randy Hinaman
December 09, 2021

Page 118

1 happening.  They both were -- they both under this
2 map were in her district, and they both under this
3 map were in her district.
4 Q.          Going back to your prior statement, you
5 said that you didn't discuss race with Congressman
6 Sewell; is that correct?
7 A.          Not at that point.
8 Q.          Did you at some point?
9 A.          In the last week, she did ask what was
10 the BVAP of my -- her district.
11 Q.          And what did you tell her?
12 A.          I told her it was 54.22.
13 Q.          And what did she say?
14 A.          She didn't -- I mean, she was
15 comfortable with that, I guess.  She didn't comment
16 further.  She didn't ask me to make any changes, I
17 guess, if that's what you're asking me.
18 Q.          You said before then that you both
19 assumed that she wanted a majority black population.
20 What are you basing that off of?
21 A.          I don't even know if it's an assumption.
22 I think she -- I think she did say that, that she
23 would prefer to continue to have a majority black
24 district.
25 Q.          You think she said that, or you know she

Page 119

1 said that?
2 A.          I think she -- yeah, I think -- I think
3 she said that.
4 Q.          But you don't know for certain?
5 A.          I'm pretty confident she said that, yes.
6 Q.          Are you certain that she said that?
7 A.          I'm pretty confident she said that.
8 Q.          Just to be clear, pretty confident, but
9 not 100 percent certain, fair?
10 A.          Sure.
11 Q.          Did she say anything about any sort of
12 percentage of black voting age population that she
13 wanted in District 7?
14 A.          No.
15 Q.          Did you discuss race with any of the
16 other representatives?
17 A.          I did not.
18 Q.          So Congressman Sewell was the only
19 Congressman you discussed race with?
20 A.          Well, she's the only one who asked at
21 the end of the process what her black -- black
22 voting age population was.
23 Q.          Other than the U.S. congressional
24 representatives and Senator McClendon and
25 Representative Pringle, did you speak with any other

Page 120

1 Alabama legislators or their staff about the 2021
2 congressional maps?
3 A.          No.  Maybe -- maybe right before we went
4 to the floor, I think I probably had a conversation
5 with the pro tem and speaker just briefly to say
6 that the members of congress were reasonably in
7 agreement on this map.  But it was just sort of a
8 pro forma discussion, not about the details of the
9 map.
10 Q.          Did you speak with anyone else?
11 A.          No.
12 Q.          Did you correspond with anyone by email
13 regarding the redistricting process?
14 A.          No.
15 Q.          Did you make any recommendations to the
16 committee, the reapportionment committee, about how
17 the map should be drawn beyond just providing them a
18 copy of the map?
19 A.          No.
20 Q.          Did the reapportionment committee make
21 any requests or recommendations to you about how the
22 map should be drawn or changed?
23 A.          None other than the guidelines they
24 passed.
25 Q.          Did you receive any requests or

Page 121

1 instructions about how to draw the 2021
2 congressional map from anyone else that we haven't
3 discussed yet?
4 A.          No.
5 Q.          Did you receive any feedback from anyone
6 else that we haven't discussed yet about the way
7 that the 2021 congressional map was drawn?
8 A.          No.  I'm assuming you're including
9 chiefs of staff as a subset of a congressman.
10 Q.          Certainly.  No one other than the
11 congressmen or their chiefs of staff or anyone else
12 that we've discussed?
13 A.          Right.
14          MR. THOMPSON:  Dorman, I think we've
15 been going a little over an hour.  We're approaching
16 that lunch time.  We could go a little bit longer,
17 or we could go ahead and break now.  What do you
18 prefer?
19          MR. WALKER:  I'm happy with whatever
20 y'all want to do.
21          MR. THOMPSON:  Are you hungry, sir?
22          THE WITNESS:  Not overly.  But I'm happy
23 to --
24          MR. WALKER:  I usually go to lunch at
25 11:30.  So I'm happy to take a lunch break.

Caster Plaintiffs' Exhibit 88, Page 31

Randy Hinaman
December 09, 2021

Page 122

1    MR. THOMPSON:  Let's -- let's take a
2  lunch break, then.
3    MR. WALKER:  All right.
4    THE VIDEOGRAPHER:  We're off the record.
5  The time is 11:42 a.m.
6    (Lunch break was taken.)
7    THE VIDEOGRAPHER:  We are back on the
8  record.  The time is 12:57 p.m.
9  Q.    Mr. Hinaman, before we broke for lunch,
10 we had discussed some of the conversations that you
11 had with the seven U.S. congressmen.  Do you recall
12 that?
13 A.    Yes.
14 Q.    And we went into some specifics about
15 your discussions with Congressman Sewell.  Or
16 Congresswoman Sewell.  Excuse me.  I would like to
17 discuss some of the specifics with the other
18 representatives.  So I just kind of want to go down
19 the line.
20    So starting with Representative Carl in
21 District 1, can you tell me what specifics you
22 recall from your discussions with him?
23 A.    Yes.  But just to be clear, are we --
24 you just want -- over the whole time frame, just
25 capsulize it?  Or are you talking about a specific

Page 123

1  time frame?
2  Q.    At any point in the discussions you had
3  with them in drawing the 2021 congressional map.
4  A.    Okay.  So essentially from May to
5  October?
6  Q.    Correct.
7  A.    Okay.  Yeah.  So we talked about Clarke
8  County which was split, of course, between 7 and
9  District 1.  And we talked that the 1st District
10 would likely be over or was over after we got the
11 real numbers, and that one of the solutions to that
12 would be putting Clarke County back together and be
13 putting it in 7.
14    And then whatever else the overage was,
15 which turned out to be 739 people, that we would
16 take those out of either -- initially we said Monroe
17 or Escambia.  And as it turned out, we fine tuned it
18 to Escambia.  And that's where we made that change.
19    And those are basically the discussions
20 with the 1st District congressman.
21 Q.    Did he have any objections to putting
22 all of Clarke County in District 7?
23 A.    He did not.
24 Q.    All right.  Tell me what specifics you
25 recall from your discussions with Congressman Moore

Page 124

1  in District 2.
2  A.    Well, we talked again about making
3  Montgomery County only split between 7 and 2 and
4  getting the 3rd District out of Montgomery County,
5  which was good because 2 was under anyway.  So they
6  needed to pick up some people.
7    Initially I said, well, depending on
8  what the numbers are, we might need to split off a
9  little bit of Elmore to balance out 3 if we're not
10 splitting Montgomery.  But as it turned out, we
11 didn't have to do that.  We did -- we did make some
12 changes to 3 in Coosa and Chilton, but we made no
13 further changes in the 2nd.
14    We talked a little bit about the
15 Escambia and Monroe thing.  Again, he would have
16 preferred not to have picked up another county.  But
17 unfortunately, that was not in the cards by 739
18 people.  So he needed to -- he did end up picking up
19 Escambia.
20    And we talked about just geographically
21 making the 7th District a little more compact in
22 Montgomery from where the 2011 lines were versus to
23 what they are now in the 2021 plan.
24    And at the end of it -- I mean, we had
25 some discussions about Maxwell going into the 7th,

Page 125

1  which surprisingly he wasn't too excited about
2  initially, but at the end was comfortable with I
3  think primarily because there was some talk of
4  another BRAC, base closing commission.
5    And Congressman Moore probably thought
6  it would be helpful to have Terri representing part
7  -- that part of Maxwell that she would have, and he
8  represents another part of Maxwell, the annex, in
9  his district.  So two congresspeople fighting that
10 was maybe better than one.
11 Q.    Where is Maxwell?
12 A.    Maxwell is in the northern little part
13 of Montgomery County here that was -- in 2011 was in
14 the 2nd, but is now in the 7th.
15 Q.    With Congressman Sewell, especially in
16 the area you were just discussing there, it had
17 gotten as granular was this college or whatnot.  Did
18 you have discussions to that detail with either of
19 the two representatives in District 1 or 2?
20 A.    No, other than the Maxwell, Maxwell
21 annex thing we just talked about with Congressman
22 Moore.  He wanted to make sure he still had one of
23 them.  And he has the annex one, which is further
24 west in Montgomery, but not the actual base itself.
25 Q.    Do you know why he wanted that in his

Caster Plaintiffs' Exhibit 88, Page 32

Randy Hinaman
December 09, 2021

Page 126

1 district?
2 A.        Again, so they had two voices on base
3 closing issues rather than one.
4 Q.        Do you recall anything else specifically
5 from your discussions with Congressman Moore?
6 A.        No.
7 Q.        How about Congressman Rogers in District
8 3?
9 A.        Well, we talked briefly.  There was a
10 little piece of Cherokee County that was split off
11 in the last redistricting, which was really somewhat
12 needless.  So we talked about putting that back
13 together.
14        We talked about again him getting out of
15 Montgomery County so that it would only be split two
16 ways instead of three.  And then we talked about
17 what that might mean in terms of where he would pick
18 up.
19        Coosa had been in the 3rd in some
20 earlier maps, meaning 2001 or sometime back in the
21 past.  So he was fine picking up Coosa County from
22 6.  And then for population -- obviously, population
23 reasons, he needed a little more than that.  So we
24 took, I think, like 12,000 people from Chilton and
25 put it into 3 to get his population to where it

Page 127

1 needed to be.
2 Q.        Anything else you recall?
3 A.        No.
4 Q.        What about Congressman Adderholt in
5 District 4?
6 A.        Yeah, I talked to him numerous times.
7 Part of it is, obviously, he was going to pick up a
8 lot of folks from the 5th district.  And there was
9 initial discussion on which end of the 5th, should
10 we take them from Jackson County or should we take
11 them from Lauderdale, and how was the best way to do
12 that.
13        And we had a couple of different
14 discussions about that, and finally decided that
15 putting the Shoals -- Muscle Shoals area back
16 together as much as possible in Lauderdale was the
17 preferable way to do that.  And that's what we
18 talked about.
19        And then, obviously, that required him
20 to lose some of Tuscaloosa, a few precincts in
21 Tuscaloosa, to make up for -- to get the population
22 to equal out.
23        And also he had a little chunk of Blount
24 County, as well, from 6.  And we talked about making
25 Blount whole again and not splitting it between two

Page 128

1 congressional districts.
2 Q.        Did you have any discussions with him
3 about which specific areas of Tuscaloosa to include
4 or not include?
5 A.        A little bit.  I mean, we talked about
6 the precincts, the next most likely geographical
7 precincts to add into 7.  We talked about them.  It
8 was sort of obvious geographically where he had to
9 go next.  So there wasn't much discussion about it.
10 Q.        How did you choose the precincts you
11 chose other than geography?
12 A.        Well, that's -- population and geography
13 were the only two ways to choose them.
14 Q.        Do you recall anything else, specifics
15 about your conversations with Congressman Adderholt?
16 A.        No.  And then at the end -- as I said, I
17 had splint a precinct in Lauderdale to get to zero
18 deviation in District 5, and he referred a different
19 precinct split.  So I changed it to the one he
20 preferred.  So that was -- that was one of the final
21 changes at the end that we made.
22 Q.        Moving on to Congressman Brooks in
23 District 5.  What do you recall from those
24 conversations?
25 A.        Well, there weren't any because

Page 129

1 Congressman Brooks decided not to meet -- this is my
2 presumption -- because he was running for the senate
3 and had less interest in how this was going to come
4 out.
5        I did meet the first time with his chief
6 of staff just to talk about keeping Morgan and
7 Madison together.  But that was -- that was about
8 it.
9 Q.        What was the discussion there about
10 keeping Morgan and Madison together?
11 A.        The community of interest.  And a number
12 of people that, obviously, live in northern Morgan
13 work in Huntsville, in Madison County, and so forth,
14 and thought it was a good combination to keep them
15 whole and together.
16 Q.        Other than that first meeting -- and I
17 guess that would have been back in May --
18 A.        May.
19 Q.        -- of 2021 with the chief of staff for
20 Congressman Brooks, did you meet with anybody else
21 on behalf of Congressman Brooks or his office?
22 A.        No.  I called his chief of staff back
23 once we had, you know, roughed out a -- gotten the
24 math from the real data.  And he -- he didn't call
25 me back.  I called him a couple of times.  And I

Caster Plaintiffs' Exhibit 88, Page 33

Randy Hinaman
December 09, 2021

1 assumed that meant he was less interested in how
2 this was going to go.
3 Q.        And then finally, what about Congressman
4 Palmer in District 6?  What do you recall about
5 those conversations?
6 A.        Well, I talked to him about again
7 putting Blount back together and giving that all to
8 him.  I talked to him -- in the meantime, he had --
9 he had initially, I thought, lived in Jefferson
10 County.  And then he had moved to Shelby.
11        So I talked a little bit about making
12 sure I had the right home address for him.  Because
13 I initially thought he still lived in Jefferson, but
14 he didn't.  So we did have the right address in
15 Shelby.  So that was fine.
16        I talked about that he may loose Coosa to the
17 3rd and a little part of Chilton.  He was
18 comfortable with that.  And I talked to him about
19 some of the changes in Jefferson in the 7th District
20 where geographically I was trying to make the 7th
21 District's footprint in Jefferson more compact by
22 adding western Jefferson and shortening the district
23 on the top.  And I wanted him to be aware of that.
24        But as I said earlier, we had initial
25 meetings and even a follow-up call.  But when the

1 final map was done, meaning that last week of
2 October, he -- he allowed as how he didn't really
3 want to -- his chief of staff told me that the
4 congressman did not really want to talk about it,
5 that he was convinced we were going to go to court,
6 and he didn't really see a need to discuss it.
7 Q.        Who was that that told you that?
8 A.        Congressman Palmer's chief of staff.
9 Q.        And when was that discussion?
10 A.        That was in mid October.
11 Q.        And why did he say that he was convinced
12 that this was going to go to court?
13 A.        I don't know.  He was -- the chief of
14 staff said that -- the chief of staff said that he
15 had been told, I think, by the NRCC that this map
16 was going to go to court, and that Congressman
17 Palmer had decided to not discuss it further.
18 Q.        Did you ask him why he thought it was
19 going to court?
20 A.        No.  I accepted his answer.
21 Q.        Did you have any idea about why this
22 would go to court based on that discussion?
23 A.        No.
24 Q.        And you didn't care to ask?
25 A.        It was his opinion.  I didn't think it

1 was relevant to what I was doing.
2 Q.        Jefferson County, the way it's split in
3 the 2021 congressional map, is not exactly a
4 straight line.  How did you decide which areas of
5 Jefferson County would move from District 6 to
6 District 7?
7 A.        I was looking geographically to widen
8 the face of the protrusion into Jefferson -- if you
9 want to call it that, into Jefferson County.  I was
10 looking to not split precincts.  Those are all,
11 except for one that's split for deviation -- well,
12 two, technically.  One Congressman Sewell --
13 Congresswoman Sewell lives in and another one.
14        But I was trying not to split precincts.
15 I was picking whole precincts.  And I was trying to
16 make the district more compact, meaning widen it as
17 it goes into Jefferson County and eliminate some of
18 the longer, further-away ones at the northern part
19 of the county.
20 Q.        So how does that process work when
21 you're choosing which precincts to pick up?  Are you
22 just kind of choosing at random geographically as
23 you move up and seeing what works?  Or are there
24 other factors at play that you're considering?
25 A.        No, that's exactly it, seeing what works

1 numerically and making something, in my mind, look
2 more compact geographically.
3 Q.        Are there any other factors or data that
4 you're considering when you're choosing which
5 precincts to include?
6 A.        No.  I mean, other than -- we had that
7 discussion about Homewood where she allowed that --
8 we had split a couple of Homewood precincts, some on
9 one side of her line in 7 and some on the other side
10 in 6, and thought it might be good to group them all
11 together.
12 Q.        You mentioned that there were two
13 precincts that were split for deviation purposes,
14 one of which Congressman Sewell lives in you said.
15 What were those two precincts?
16 A.        The names?
17 Q.        Do you recall?
18 A.        I do not.
19 Q.        This isn't a memory test.  I just --
20 A.        I do not.
21 Q.        Okay.
22 A.        And the reason it's not one -- I was
23 trying to make the split just solely in one
24 precinct.  But unfortunately the census blocks
25 didn't cooperate very much.  And when I got to where

Caster Plaintiffs' Exhibit 88, Page 34

Randy Hinaman
December 09, 2021

Page 134

1  I got to geographically in the one -- the precinct
2  she lived in, I was hoping I could pick up the right
3  number of populations.
4          But unfortunately I hit a situation
5  where there was like a 550 block next to it, and
6  that was too many.  So that was not going to work.
7  So I had to split another precinct to get to zero
8  deviation.
9  Q.        Do you recall anything else specifically
10 from your discussions with Congressman Palmer or his
11 chief of staff in furtherance of drawing the 2021
12 congressional map?
13 A.        No.
14 Q.        And I think we discussed this earlier.
15 But in any of those discussions with any of those
16 congressmen, Congressmen Carl, Moore, Rogers,
17 Aderholt, Brooks, Palmer, did race ever come up in
18 your discussions with any of them or their staff?
19 A.        No.
20          I mean, I'll amend that slightly.  I do
21 think in the final when I went through with
22 everybody, I think maybe Congressman Moore's
23 district director, Bill Harris, who I was talking
24 to, may have asked, "Can you tell me what the BVAP
25 of the 2nd District is now?"  I think I probably

Page 135

1  gave him that number.
2  Q.        And when was that?
3  A.        In the last -- that last week when we
4  turned race on.
5  Q.        You gave him the --
6  A.        He asked --
7  Q.        -- black voting age population?
8  A.        Yeah.  He asked what the BVAP for that
9  district was, and I gave him that number.
10 Q.        Was there any further discussion about
11 it?
12 A.        No.
13
14          (Plaintiff's Exhibit 7 was
15          marked for identification.)
16
17 Q.        I'm handing you what's been marked as
18 Plaintiff's Exhibit 7.  This is a copy of the
19 reapportionment committee redistricting guidelines
20 that was produced in this lawsuit.  The Bates number
21 at the bottom is RC 043723, and it's dated May 5th
22 2021.
23          Do you see that?
24 A.        I do.
25 Q.        Do you recognize this document?

Page 136

1  A.        I do.
2  Q.        What is this document?
3  A.        These are the guidelines that were
4  approved by the reapportionment committee for
5  drawing the four maps.
6  Q.        Were you provided a copy of these
7  redistricting guidelines before you drafted the 2021
8  congressional map?
9  A.        I was.
10 Q.        Who provided it to you?
11 A.        The two co-chairs, probably with Dorman
12 Walker, as well.  I'm not sure who handed it to me.
13 Q.        And when was that?
14 A.        It would have been around the time it
15 was passed, May 5th.
16 Q.        What --
17 A.        Which very importantly happens to be my
18 birthday.
19 Q.        That is an important note.  Thank you
20 for letting me know.  Happy belated birthday.
21 A.        Thank you.
22 Q.        What were you told when you were
23 provided these guidelines?
24 A.        I was told these were the guidelines for
25 drawing the four maps that you've been contracted to

Page 137

1  draw, and to follow them to the best of my
2  abilities.
3  Q.        Anything else that you recall?
4  A.        No.
5  Q.        And did you, in fact, follow these
6  guidelines in drawing the 2021 congressional map?
7  A.        I did.
8  Q.        Let's take a look at the criteria that's
9  listed here.  So starting on Page 1, you see Line 10
10 there.  It says Section II, Criteria for
11 Redistricting.
12 A.        Yes, sir.
13 Q.        I want to talk through these with you.
14 So Sections II a and b both state that the
15 congressional district should equalize total
16 population and have minimal population deviation.
17          Do you see that?
18 A.        I do.
19 Q.        What does minimal population deviation
20 mean to you?
21 A.        I took that to mean for the
22 congressional districts, that that was -- they
23 should be zero for six of the districts and plus one
24 for the remaining district because the population
25 was not divisible by seven.  So six were to zero

Caster Plaintiffs' Exhibit 88, Page 35

Randy Hinaman
December 09, 2021

Page 138

1 deviation, and one should be plus one.
2 Q.          Which district did you choose to be the
3 plus one deviation?
4 A.          I knew you would ask me that.  I don't
5 -- I would have to look.  I think it was the 6th
6 maybe.  I would have to look at a map.  I don't have
7 numbers.  I'm sorry.
8 Q.          Was it District 7?
9 A.          No, I don't think so.  I think it was 2
10 or 6, but I can't remember which.
11 Q.          And what did you do to make sure that
12 your map complied with that zero deviation for six
13 of the districts and plus or minus one for the
14 other?
15 A.          I moved -- I split seven precincts down
16 to the census block level to get to zero deviation
17 for six of the districts and plus one for the
18 seventh one.
19 Q.          Did anyone tell you that zero percent
20 deviation was required or that there was a certain
21 cutoff that you had to reach to satisfy this
22 criteria?
23          MR. WALKER:  Objection to form.  You can
24 answer.
25 A.          I was told that it was literally zero

Page 139

1 deviation, meaning zero -- not percent, but zero
2 people except for the one that had to be plus one.
3 Q.          Is that plus one person?
4 A.          Yes.
5 Q.          Understood.
6 A.          Sorry.  Plus one person.
7 Q.          And who told you --
8 A.          Dorman Walker, legal counsel.
9 Q.          Section II c looks like it's about
10 legislative and board of education districts.  So I
11 don't think that would apply to the congressional
12 map.  Is that correct?
13 A.          Correct.
14 Q.          Section II d says that the plan must
15 comply with the one person, one vote principle of
16 the Equal Protection Clause of the 14th Amendment of
17 the United States Constitution.
18          Do you understand what the one person,
19 one vote principle is?
20 A.          I think I do.
21 Q.          What's your understanding?
22 A.          Again, that's so no -- so people have
23 equal representation, the representatives in those,
24 in the congressional case, should be representing
25 the same number of people.

Page 140

1 Q.          So that goes back to the population
2 deviation?
3 A.          Correct.
4 Q.          And where does that understanding come
5 from?
6 A.          Where does my understanding come from?
7 I'm sure if I had any questions about it, I asked
8 legal counsel.
9 Q.          So other than what you just discussed
10 doing for Sections II a and b in adjusting for the
11 population, did you do anything else to make sure
12 that your plan complies with the one person, one
13 vote principle?
14 A.          No.
15 Q.          Section II e looks like it just states
16 that a plan that does not comply with the population
17 requirements above will not be approved.
18          Is there anything additional you needed
19 to consider here for this section e beyond what
20 we've already discussed?
21 A.          I don't believe so.
22 Q.          Section II f states, "Districts shall be
23 drawn in compliance with the Voting Rights Act of
24 1965 as amended.  A redistricting plan shall have
25 neither the purpose nor the effect of diluting

Page 141

1 minority voting strength, and shall comply with
2 Section 2 of the Voting Rights Act and the United
3 States Constitution."
4          Are you familiar with the Voting Rights
5 Act of 1965?
6 A.          I'm not a lawyer, but I'm familiar with
7 it.
8 Q.          What is your understanding?
9 A.          Well, that the -- a plan should not have
10 the intent or purpose of discriminating against any
11 minority population.
12 Q.          Where does that understanding come from?
13 A.          Just conversations with legal counsel
14 and others during the process.
15 Q.          Are you familiar with Section 2 of the
16 Voting Rights Act?
17 A.          Again, I'm not a lawyer.  But vaguely.
18 Q.          Have you ever read Section 2 of the
19 Voting Rights Act?
20 A.          I'm not sure I have.
21 Q.          What is your understanding of what
22 Section 2 requires?
23 A.          Where there -- I guess my understanding
24 of it, a layman's understanding of it, would be
25 where there's a sufficient and compact enough

Caster Plaintiffs' Exhibit 88, Page 36

Randy Hinaman
December 09, 2021

Page 142

1 population of -- minority population to create a
2 district, a congressional district in this case,
3 that a district should be drawn if it's compact and
4 sort of meets the Gingles, I guess, requirements,
5 compact, contiguous population.
6 Q.        Where there would be a majority black
7 district?
8 A.        Right, and would have the opportunity to
9 elect a candidate of their choice.
10 Q.        And does that understanding come from
11 the same sources, conversations with counsel?
12 A.        Yes, sir.
13 Q.        What did you do to make sure that your
14 plan complies with Section 2 of the Voting Rights
15 Act?
16 A.        Again, once it was done and we turned on
17 race, we talked about it.  No one asked me to make
18 any other changes.  And I talked to legal counsel
19 and, I guess, concluded that it satisfies Section 2
20 of the Voting Rights Act.
21 Q.        Anything else?
22 A.        No.
23 Q.        Did you personally make a determination
24 that your plan does not have the purpose or effect
25 of diluting minority voting strength?

Page 143

1 A.        I'm -- I'm not a lawyer, so I don't know
2 that I can make that -- I don't know that it's my
3 job to make that distinction.  But I don't believe
4 it discriminated against anyone.
5 Q.        Did you do anything to make that
6 determination yourself?
7 A.        Other than talk to legal counsel, no.
8 Q.        Other than potentially legal counsel,
9 did you have discussions with anyone else about
10 whether your plan complied with Section II of the
11 Voting Rights Act?
12 A.        No.
13 Q.        In making the determination, whether
14 that's through conversation with legal counsel or
15 not, about whether your plan complies with this
16 policy, did that require you to review the racial
17 makeup of the districts?
18 A.        Well, yeah.  I mean, race -- at that
19 point, we had turned race on.  So the BVAPs and
20 numbers were available.
21 Q.        And you say they were available.  So
22 then you had to review them, as well, to make sure
23 that everything was in compliance with this policy?
24 A.        Well, we -- the numbers were then
25 revealed or available, and we discussed the various

Page 144

1 numbers related to the map.
2 Q.        Did you have anyone other than
3 Mr. Walker or someone with his firm analyze your map
4 at any point to confirm that it complies with
5 Section 2 of the Voting Rights Act?
6 A.        I did not.
7 Q.        Do you know if anyone reviewed the map
8 to determine whether it complies with Section 2 of
9 the Voting Rights Act, other than potentially
10 Mr. Walker and his firm?
11 A.        I do not, no.
12 Q.        And other than what we've discussed
13 already, did you do anything else to make sure that
14 your plan complies with Section 2 of the Voting
15 Rights Act?
16 A.        I did not.
17 Q.        Moving on to the next criteria, Section
18 II g.  This one is a little longer.
19          It states, "No district will be drawn in
20 a manner that subordinates race-neutral districting
21 criteria to considerations of race, color, or
22 membership in a language-minority group, except that
23 race, color, or membership in a language-minority
24 group may predominate over race-neutral districting
25 criteria to comply with Section 2 of the Voting

Page 145

1 Rights Act, provided there is a strong basis in
2 evidence in support of such a race-based choice.  A
3 strong basis in evidence exists when there is good
4 reason to believe that race must be used in order to
5 satisfy the Voting Rights Act."
6          Do you see that?
7 A.        I do.
8 Q.        What is your understanding of what that
9 section requires?
10 A.        My understanding of what that section
11 requires is that's why -- when we made all of our
12 changes to the districts by adding or subtracting
13 population, that's why race was not on.  We did it
14 based on total population.  And then at the end of
15 the process, we did turn race on to look at various
16 districts.
17          And because we were doing a number of
18 these maps at the same time, there were a couple of
19 instances in the other maps where we did look at
20 race to add to a district.  But that did not come
21 into play in congressional.
22 Q.        What, if anything, did you do to make
23 sure that specific congressional districts complied
24 with this policy?
25 A.        I made sure that when I added -- I used

Caster Plaintiffs' Exhibit 88, Page 37

Randy Hinaman
December 09, 2021

Page 146

1  traditional redistricting principles of total pop
2  and geography considerations to add and subtract to
3  these districts, and that that was not based on
4  race.
5  Q.        Flip the page to Page 2.  The next
6  section is Section 2 h, and it states that districts
7  must be composed of contiguous and reasonably
8  compact geography.
9            What is your understanding of what this
10 section requires?
11 A.        Yeah, obviously contiguous counties
12 and/or precincts had to be adjacent, to be hooked
13 together, to form a district.  You couldn't have
14 part of Madison County tied to Mobile or something
15 crazy like that.
16           And to the extent possible, I was trying
17 to, when changing things inside a county as
18 Jefferson, I was trying to make -- or Montgomery,
19 for that matter, tried to make districts more
20 geographically compact so they were not as spread
21 out.
22 Q.        Beyond what you just mentioned with
23 Montgomery -- sorry.  Was that Jefferson County?
24 A.        And Montgomery, too.
25 Q.        And Montgomery County.  Beyond that,

Page 147

1  what did you do to make sure that your plan complies
2  with this policy?
3  A.        That's about it.
4  Q.        Moving on to the next section, Section
5  II i.  It lists several requirements of the Alabama
6  Constitution.  I'm not going to read all of them
7  here.
8            Did you consider these factors in
9  drawing your map?
10 A.        I did.
11 Q.        It appears, just by looking at them,
12 that most of them do not apply to the congressional
13 map.  Rather, they talk about Alabama senate and
14 Alabama house.  Is that right?
15 A.        Correct.
16 Q.        How did you consider these factors here
17 under Section II i in drawing the congressional map?
18 A.        Well, I don't know how far down this
19 list -- I don't know how far down this list you're
20 counting.
21 Q.        It looks likes II i.  It's from Line 3
22 down to Line 20 on Page 2 of Exhibit 7.
23 A.        As you say, most of them don't really
24 apply.  They are all -- all districts will be
25 single-member districts, they're contiguous.  That's

Page 148

1  already basically been covered in other things we've
2  discussed.
3  Q.        Anything else that you had to take into
4  account to comply with this policy?
5  A.        I don't think so.
6  Q.        Section II j starting at Line 21 there.
7  Section II j lists six redistricting policies.  Do
8  you see that?
9  A.        Uh-huh.
10 Q.        Sorry.  Can you answer verbally?
11 A.        Yes.  Sorry.
12 Q.        That's fine.
13           Did you consider these redistricting
14 policies when drawing your map?
15 A.        I did.
16 Q.        How?
17 A.        Well, I wanted to make sure that no --
18 to the extent possible that no incumbents were put
19 together, which they were not, in the congressional
20 map.  While continuity by water was allowed, I was
21 trying to not use that.  Which I don't think we did.
22           I don't know how far down your --
23 Q.        I can walk through them with you.  That
24 might make more sense.
25           First off, did anyone explain to you

Page 149

1  what these policies mean?
2  A.        No.  I'm sure if I had a question, I
3  would have asked legal counsel.  But I don't
4  remember asking.
5  Q.        Similarly, did anyone explain to you how
6  to apply these policies in drawing the map?
7  A.        No.
8  Q.        What is your understanding of the
9  priority amongst these various policies?
10 A.        I think the only two that are paramount
11 to the rest of them would be one person, one vote
12 and the Voting Rights Act.
13           The rest of them are somewhat -- can
14 occasionally be in conflict.  And it depends on the
15 various situations where one might trump the other
16 or vice versa.
17           You may have two incumbents that live
18 very close to one another.  Maybe they need to be
19 split apart.  That may make the districts not quite
20 as compact as you would like.  But one of those --
21 you know, you couldn't put the two incumbents
22 together.  So sometimes they are in conflict, and
23 you have to resolve that.
24 Q.        Other than the two you just mentioned,
25 one person, one vote and the Voting Rights Act, did

Caster Plaintiffs' Exhibit 88, Page 38

Randy Hinaman
December 09, 2021

Page 150

1 you place any greater importance on one of these
2 policies over the other?
3 A.        No.
4 Q.        Let's walk through these.  So the first
5 policy under Section J starting on Line 25 there
6 states, "Contests between incumbents will be avoided
7 whenever possible."
8            What's your understanding of what this
9 requires?
10 A.        That when -- certainly when possible, I
11 would not put incumbents in the same district.
12 Q.        What did you do to make sure that you
13 complied with that?
14 A.        Retrieved -- made sure that we retrieved
15 all of the home addresses and looked to where they
16 were and made sure two of them were not in the same
17 district.
18 Q.        You might have answered this earlier.
19 But did you have to make any modifications to your
20 map to comply with this?
21 A.        Not the congressional map.
22 Q.        This factor applies equally to both
23 parties, correct?
24 A.        Certainly, yes.
25 Q.        So you applied it equally to all

Page 151

1 incumbents, both the republicans and to the
2 democrat, correct?
3 A.        Correct.
4 Q.        The second policy there, Section II
5 j(ii) starting on Line 26, states -- I don't know
6 why I'm having trouble pronouncing the word.
7 "Contiguity by water is allowed, but point-to-point
8 contiguity and long-lasso contiguity is not."
9            What is your understanding of what that
10 policy requires?
11 A.        I'm not sure I even know what long-lasso
12 contiguity is, to be honest with you.
13            But point-to-point, occasionally you can
14 have a precinct or a census block that connects to
15 the next one just by one point in space.  And that's
16 not -- under their guidelines, not allowable in
17 terms of connecting them together.
18            Again, on the congressional map, it
19 didn't come into play very much because I tried not
20 to split -- I only split seven precincts and tried
21 not to have situations where census blocks were --
22 weren't any -- weren't close to any of those options
23 there.
24 Q.        Did you have to do anything else to make
25 sure your plan complied with this policy?

Page 152

1 A.        No.
2 Q.        Did you have to make any modifications
3 to your map to comply with this policy?
4 A.        I did not.
5 Q.        The third one -- the third policy, which
6 is Section II j(iii,) states, "Districts shall
7 respect communities of interest, neighborhoods, and
8 political subdivisions to the extent practicable and
9 in compliance with paragraphs a through i."
10            What is your understanding of what this
11 policy requires?
12 A.        It requires -- like I said earlier, in
13 areas; for example, Mobile and Baldwin that wanted
14 to stay together or Madison and Morgan that had
15 specific communities of interest, it was to keep
16 areas together that have similar -- and, obviously,
17 there are lots of different communities of interest.
18 So I tried to keep areas, to the extent possible,
19 together.
20            Obviously, this comes into conflict with
21 county lines, precinct lines, other things.  So it's
22 not always -- and everybody has -- a number of
23 people have different views of what communities of
24 interest are.  So it's certainly not always possible
25 to keep all of them together.

Page 153

1 Q.        What is your definition of a community
2 of interest?
3 A.        My definition of community of interest,
4 it can be geographic, it can be economic, where
5 people work, it can be racial, it could be
6 geography, it could be people on the bay, for
7 example, for Mobile and Baldwin counties.  A host
8 of -- a host of communities of interest.
9 Q.        What do you consider to be communities
10 of interest in Alabama?
11 A.        All those things I just listed.
12 Q.        Is there any sort of particular
13 communities of interest that are well established or
14 a list of any of these?  Or is this just something
15 that is subjectively known but doesn't really exist
16 in writing anywhere?
17 A.        I don't know of a definitive list of all
18 the communities of interest in Alabama.
19 Q.        Are there any specific communities of
20 interest that come to mind for you right now?
21 A.        No, other than the ones I listed.  I
22 mean, precincts can be -- counties are, I guess,
23 communities of interest sometimes.  I mean, it's --
24 there are a whole host of things.
25 Q.        It sounds like communities of interest

**Caster Plaintiffs' Exhibit 88, Page 39**

Randy Hinaman
December 09, 2021

Page 154

1 can be somewhat fluid.  Is that fair to say?
2 A.        It is fair to say.
3 Q.        One area, say, where we're sitting right
4 now in Montgomery, could be part of three, four,
5 five, six different communities of interest
6 depending on what factors you're looking at?
7 A.        Yeah, whether they're economic or racial
8 or social or everybody roots for the same football
9 team, I suppose.
10 Q.        Do they?
11 A.        No.
12 Q.        I see.  I see.  That would be a
13 community of interest perhaps.
14          Are you familiar with the black belt?
15 You mentioned that earlier.
16 A.        I am.
17 Q.        What is the black belt?
18 A.        It's a group of mostly rural counties
19 that have a -- for the most part have a majority
20 black population.
21 Q.        Do you know what counties are in the
22 black belt?
23 A.        I'm not sure I can list every one.  But
24 yeah, in general, I do.
25 Q.        What counties would you say are in the

Page 155

1 black belt?
2 A.        I would say Sumpter, Greene, Choctaw,
3 Marengo, Hale, Perry, Dallas, Wilcox, Lowndes, I
4 guess Macon and Bullock.  Some would say Montgomery.
5 Q.        Do you consider the black belt to be a
6 community of interest?
7 A.        I do.
8 Q.        So in drawing your map, what did you do
9 to make sure that your plan complies with this
10 policy, that it respected communities of interest?
11 A.        Again, I mean, because there are so many
12 different communities of interest, they're not -- I
13 mean, no plan is going to respect all of them.  So
14 there are trade-offs.
15          There are also -- you know, the entire
16 black belt I imagine if you made into a
17 congressional district would accomplish -- would hit
18 up against other one person, one vote issues and
19 other issues in here, as well.  So they are
20 sometimes in conflict.  So you can't -- you can't
21 satisfy all communities of interest.
22 Q.        Did you have to make any specific
23 modifications to your map to make sure that you were
24 respecting communities of interest?
25 A.        No.  Although, again, I tried to keep,

Page 156

1 for example, the Muscle Shoals area together in
2 the -- in the 4th District when we split Lauderdale.
3 Not that it was at issue, but the people in Mobile
4 and Baldwin very much wanted to be together because
5 they share the bay.  But that didn't require a
6 change.  It just is a . . .
7 Q.        Other than the modification for the
8 Muscle Shoals community, are there any other
9 specific modifications that you felt like you made
10 in drawing the 2021 map?
11 A.        No, not specifically.
12 Q.        Does your map split any communities of
13 interest?
14 A.        Oh, I'm sure it does.  I mean, all maps
15 split some communities of interest.
16 Q.        And part of that is because of what we
17 just discussed, that communities of interest can
18 mean lots of different things?
19 A.        To different people, I'm sure.
20 Q.        Looking at the bottom of Section II
21 j(iii,) that third policy, it gives a definition.
22 It says, "The term communities of interest" --
23 excuse me.
24          It says, "A community of interest is
25 defined as an area with recognized similarities of

Page 157

1 interests, including but not limited to ethnic,
2 racial, economic, tribal, social, geographic, or
3 historical identities.  The term communities of
4 interest may in certain circumstances include
5 political subdivisions such as counties, voting
6 precincts, municipalities, tribal lands and
7 reservations, or school districts."
8          Did you review any ethnic, racial,
9 tribal, or other similar data to identify
10 communities of interest?
11 A.        I did not.
12 Q.        Moving to the next policy, the fourth
13 policy, Section II j(iv.)  It states, "The
14 legislature shall try to minimize the number of
15 counties in each district."
16          I think that's pretty self-explanatory.
17 But what is your understanding of what that policy
18 requires?
19 A.        Yeah, that's sort of a compactness
20 thing.  I was trying to keep the fewest number of
21 counties necessary to -- and it's not always --
22 there are other -- the next one down says
23 "preserving cores of existing districts."
24          I mean, some of these things come into
25 conflict.  But to where possible, I tried to deal in

Caster Plaintiffs' Exhibit 88, Page 40

Randy Hinaman
December 09, 2021

Page 158

1 whole counties, keeping counties whole, and the
2 minimum number to reach the ideal population.
3 Q.        Did you have to make any specific
4 modifications to your map to comply with that
5 policy?
6 A.        No.  Although it does come into effect
7 when people were talking about adding -- where you
8 split a -- for example, the Escambia County split,
9 you know, where does that go.
10       I was trying to keep districts so that
11 not all of the splits were in the same district and
12 the number of counties in a particular district
13 didn't grow a lot.  Because for a congressional
14 office, that takes on local governments and more
15 work.  So I tried to be mindful of that when looking
16 at it.
17 Q.        Other than trying to be mindful of that,
18 did you have to make any specific changes?
19 A.        No.
20 Q.        You referenced it just now.  The next
21 policy, the fifth policy, Section II j(v) states,
22 "The legislature shall try to preserve the cores of
23 existing districts."
24       What is your understanding of what that
25 policy requires?

Page 159

1 A.        That's basically the cores of the -- of
2 existing districts or the counties that make up the
3 majority of those districts, to keep them together
4 in the same district.
5       Obviously, incumbents have a preference
6 to not have to add folks they haven't represented
7 when they can continue to keep the folks they have
8 been representing.
9 Q.        What, in your mind, is the core of an
10 existing district?
11 A.        The core of an existing district is
12 basically -- I view it as geography.  It's the
13 county -- the key counties that make up the current
14 district, current as in 2001.
15 Q.        Where --
16 A.        Or 2011 I mean.
17 Q.        Where does that understanding come from?
18 A.        I don't know.  That understanding comes
19 from what the cores of a district are.
20 Q.        Your understanding of what a core of a
21 district is comes from --
22 A.        I mean, that's what the definition of
23 those words are to me anyway.
24 Q.        Did you have some sort of metric to use
25 when determining what the core of an existing

Page 160

1 district is?
2 A.        I did not.
3 Q.        Does maintaining the core of districts
4 require considerations of racial data?
5 A.        I don't think it does, no.
6
7       (Plaintiff's Exhibit 8 was
8       marked for identification.)
9
10 Q.        I'm handing you what's been marked as
11 Plaintiff's Exhibit 8.  This is a document that was
12 produced in this lawsuit.  The Bates number in the
13 corner is RC 00056.  It's a seven-page document.
14 Each page has one of the seven congressional
15 districts from the 2021 congressional map.
16       Do you see that?
17 A.        I do.
18 Q.        Have you seen this document before?
19 A.        I have not.
20 Q.        And you can take a look through it if
21 you don't believe me.  But these are the seven --
22 these are maps of each of the seven congressional
23 districts in the 2021 map that you drew; is that
24 correct?
25 A.        Yes, sir.

Page 161

1 Q.        Looking at page one here, District 1,
2 show me on here where the core of District 1 is.
3 A.        Well, the core of District 1 to me would
4 be Mobile and Baldwin counties.
5 Q.        Flipping over to -- and why do you
6 consider those two --
7 A.        Well, that's --
8 Q.        -- to be the core?
9 A.        Those are the two predominant counties.
10 They have the vast majority of the population in the
11 district.
12 Q.        Flipping the page to District 2.  What
13 do you consider to be the core of District 2?
14 A.        The core of District 2 is a little more
15 complicated than that, I guess.  You have the Wire
16 -- you have Dothan, which is Houston County, you
17 have the Wiregrass region, you have Montgomery, and
18 then you have Autauga and Elmore on top -- of top of
19 them.
20 Q.        And why do you consider those counties
21 to be the core of this district?
22 A.        Again, that's where the majority of the
23 population is.  And they've been for the most part
24 consistently inside the 2nd District for a
25 considerable period of time.

Caster Plaintiffs' Exhibit 88, Page 41

Randy Hinaman
December 09, 2021

Page 162

1  Q.        Moving the page to District 3, the same
2  question.  What do you consider to be the core of
3  District 3?
4  A.        The core of District 3 would be Calhoun
5  and St. Clair.  And then obviously more down, Lee
6  and Russell, which are very fast-growing counties,
7  especially Lee County.  That would be the core of
8  the district to me.
9  Q.        And why do you say that?
10 A.        Again, it's the vast majority of the
11 population.  It's also -- those areas have been
12 pretty much continuously in the 3rd District.
13 Q.        Turning the page to District 4, same
14 question.  What do you consider to be the core of
15 District 4?
16 A.        The core of District 4 would be sort of
17 the Winston, Walker, Cullman area, and then northern
18 Tuscaloosa which was only added ten years ago but
19 certainly plays a key role in the district now.  And
20 then sort of Marshall, Etowah, again large
21 population, have been in the district a considerable
22 amount of time.
23 Q.        Is your answer for why those are the
24 core based on population again?
25 A.        Population, yeah.

Page 163

1  Q.        Flipping the page to District 5, same
2  question.  What's the core there?
3  A.        The core would be Madison and Morgan and
4  Limestone, which is now rapidly growing, as well.
5  Again, population, and they've been in that district
6  for a considerable period of time.
7  Q.        Any other reasons?
8  A.        No.
9  Q.        Turning the page to District 6, same
10 question.
11 A.        District 6, obviously Shelby and then
12 Jefferson because of population would be, in my
13 mind, the core of that district.
14 Q.        Any other reasons?
15 A.        No.  It's population primarily.
16 Q.        Finally flipping the page to District 7.
17 What would you consider to be the core of District
18 7?
19 A.        I would say the core of District 7 is
20 the black belt counties that we talked about earlier
21 from Choctaw through to Lowndes, and then also the
22 portions of Tuscaloosa and Jefferson.
23 Q.        What are the reasons for considering
24 those to be the core?
25 A.        Again, population and that they've been

Page 164

1  in that district for a long period of time.
2  Q.        And going through each of these counties
3  that you consider to be the core of each district,
4  is that a determination that you made?  Or is that
5  something that you were told by someone else?
6  A.        That's a determination I made.
7  Q.        Have you discussed what you consider to
8  be the core of each of these districts with anyone
9  else?
10 A.        I may have discussed it with legal
11 counsel.  But I don't have a specific recollection
12 of the discussion.
13 Q.        Has anyone ever told you before what the
14 core of each district is?
15 A.        No.
16 Q.        Looking back at the policy that we were
17 referencing here about preserving the cores of each
18 of the districts, what did you do to make sure that
19 your plan preserved the core of each of these
20 districts?
21 A.        I kept the areas we referenced by
22 district inside that district.
23 Q.        Did you have to make any specific
24 modifications to comply with this?
25 A.        No.

Page 165

1  Q.        Where did this policy rank in comparison
2  to the other policies?
3  A.        It was equal to all except one person,
4  one vote and the Voting Rights Act.
5  Q.        We're almost through the criteria here.
6  The last policy, Section II j(vi) states, "In
7  establishing legislative districts, the
8  reapportionment committee shall give due
9  consideration to all the criteria herein.  However,
10 priority is to be given to the compelling state
11 interests requiring equality of population among
12 districts and compliance with the Voting Rights Act
13 of 1965, as amended, should the requirements of
14 those criteria conflict with any other criteria."
15          That sounds to be pretty much what you
16 just said to me, correct?
17 A.        Correct.
18 Q.        To your knowledge, was there any
19 conflict between the five policies we just discussed
20 and the requirements regarding equality of
21 population?
22 A.        No.  I mean, obviously, there can be
23 conflicts between one person, one vote and
24 communities of interest and one person, one vote and
25 how many counties are in a district.  But not on

Caster Plaintiffs' Exhibit 88, Page 42

Randy Hinaman
December 09, 2021

Page 166

1 that level, I guess.  You would have to ask me that
2 one again.
3 Q.        And did you run into any of those
4 conflicts?  Did you have to make any modifications
5 based on any sort of conflict like that in drawing
6 the map?
7 A.        Well, I mean, I didn't run into them.
8 But, I mean, I kept those in mind when we were doing
9 our initial additions or subtractions to the plan.
10 Q.        Same question.  To your knowledge, was
11 there any conflict between those five policies we
12 just discussed and the requirements under the Voting
13 Rights Act of 1965?
14 A.        No.  As I stated, when I added
15 population to the 7th district, for example, I was
16 not looking at race.  So there was no conflict with
17 any of it to the Voting Rights Act.
18        THE REPORTER:  There was no conflict
19 what?
20 A.        With any of those to the Voting Rights
21 Act.
22 Q.        I don't think it's another policy.  But
23 looking down here at the bottom, g, the last section
24 under the criteria.  Section g states that the six
25 policies we just discussed in paragraphs j(i)

Page 167

1 through (vi) are not listed in order of precedence,
2 and in each instance where they conflict, the
3 legislature shall at its discrimination determine
4 which takes priority.
5        Were you given any instruction on which
6 policy should take priority over the others?
7 A.        No, other than section 6 that says
8 clearly one person, one vote and the Voting Rights
9 Act.  But other than that, no.
10 Q.        Is there anything else in Exhibit 8,
11 which is the reapportionment committee redistricting
12 guidelines, that you considered other than the
13 criteria we just discussed in Section II?
14 A.        No.
15 Q.        In looking back at these criteria in
16 Exhibit 8, Section II, were these the main factors
17 that you considered when drawing the 2021
18 congressional map?
19 A.        They were.
20 Q.        Did you consider any other factors when
21 drawing the 2021 congressional map?
22 A.        I did not.
23 Q.        Are you aware of any racial polarization
24 analysis that was done on any of the districts on
25 the 2021 congressional map?

Page 168

1 A.        I'm not.
2 Q.        What is your understanding of what a
3 racial polarization analysis entails?
4 A.        I think it -- I've never done one, and
5 I'm not an expert.  But my understanding -- a
6 layman's understanding of it, it is an analysis of
7 performance of how a district would perform in terms
8 of electing a candidate of choice for a minority
9 candidate.
10 Q.        Do you know why a racial polarization
11 analysis was not conducted?
12 A.        I do -- that was -- I do not.
13 Q.        Did you ever suggest one?
14 A.        I did not.
15 Q.        Why not?
16 A.        It wasn't under my purview.
17 Q.        What do you mean?
18 A.        It wasn't part of my -- I was asked to
19 draw four maps and submit them to the legislature.
20 Q.        Did anyone ever talk to you about a
21 racial polarization analysis?
22 A.        Counsel.  We talked -- we've talked
23 about --
24        MR. WALKER:  Objection to form.
25 Q.        Without going into any discussion that

Page 169

1 you had with Mr. Walker, did anyone else ever talk
2 to you about any racial polarization analysis being
3 done for the 2021 congressional map?
4 A.        No.
5        MR. THOMPSON:  For the record, Counsel,
6 I have a copy here of the joint stipulated facts
7 that were agreed to by counsel and filed this past
8 Friday.  I only have one copy.
9        MR. WALKER:  Do you want me to get a
10 copy made, copies made?
11        MR. THOMPSON:  We can.  I just have a
12 question about one of these.  So if it works, I can
13 just read it into the record and show the witness.
14        MR. WALKER:  That's fine.
15 Q.        Paragraph 62 of -- for your knowledge,
16 sir, this is a document titled Joint Stipulated
17 Facts for Preliminary Injunction Proceedings.  And
18 this was a document of stipulated facts that the
19 parties in the three lawsuits here have agreed to.
20 Does that make sense?
21 A.        Yes.
22        MR. DAVIS:  Actually, there are
23 differences.  What one set of counsel agreed to with
24 us may not be exactly what another set of counsel
25 agreed to with us.  So you might want to clarify for

Caster Plaintiffs' Exhibit 88, Page 43

Randy Hinaman
December 09, 2021

Page 170

1 the record in which case those stipulations are.
2          MR. THOMPSON:  This is the Milligan
3 plaintiffs versus Merrill stipulations.
4 Q.          All right.  Paragraph 62 in this -- and
5 I'll read it to you, and then I can show it to you.
6          It states, "In recent litigation,
7 Secretary Merrill stated that CD 7," which is
8 Congressional District 7, "appears to be racially
9 gerrymandered, with a finger sticking up from the
10 black belt for the sole purpose of grabbing the
11 black population of Jefferson County.  Defendant
12 does not believe that the law would permit Alabama
13 to draw that district today if the finger into
14 Jefferson County was for the predominant purpose of
15 drawing African American voters into the district."
16 And that's from Secretary of State Merrill's
17 pretrial brief in Chestnut v. Merrill.
18          And I'll show that to you.  Just let me
19 know when you've had a chance to look at it.
20 A.          Okay.
21 Q.          Do you agree with Secretary Merrill that
22 District 7 appears to be racially gerrymandered?
23          MR. DAVIS:  Object to the form.
24          MR. WALKER:  Object to the form.
25          MR. DAVIS:  Which District 7?  What

Page 171

1 year?
2          MR. THOMPSON:  I believe this was in
3 reference to the 2011 --
4          MR. WALKER:  Right.
5          MR. THOMPSON:  -- congressional map.
6 Correct?
7          MR. DAVIS:  I just want to make sure
8 it's clear if, in fact, you're asking him about the
9 2011 district, that y'all are on the same page.
10          MR. THOMPSON:  Thank you.
11 Q.          So do you agree with Secretary Merrill
12 that District 7 in the 2011 Alabama congressional
13 map appears to be racially gerrymandered?
14 A.          Well, again, I'm not a lawyer nor an
15 expert.  But I think it's clear there is a racial
16 component to the finger that goes into Jefferson
17 County.
18 Q.          And why do you say that?
19 A.          Well, I think because of shape and size
20 and what have you.  And, again, I haven't done -- I
21 haven't looked at it specifically.  But I imagine,
22 obviously, the majority of the folks inside that
23 finger, for lack of a better word, are probably
24 African American and the majority of folks on the
25 outside probably aren't.

Page 172

1 Q.          And you drew the original District 7
2 back in 1992, we discussed, right?
3 A.          Correct.
4 Q.          So you drew that original, for lack of
5 better terms, finger that extends into District 6?
6 A.          Yeah.  And I'm not sure it looked
7 exactly like that.  But yes, I did.
8 Q.          And why did you draw that long finger
9 extension into District 6?
10 A.          Well, it partially probably had to do
11 with where the incumbent lived at that point.  But
12 also to create a majority black district.
13 Q.          Moving ahead to the 2021 congressional
14 map.  Were you asked to do anything to District 7 so
15 that it does not appear to be racially
16 gerrymandered?
17 A.          I wasn't asked to do anything.  But when
18 I was looking at adding population to District 7, I
19 was hoping -- my goal was to make it more compact
20 and geographically comprehensible in terms of, for
21 example, Jefferson County.  So that's why I was
22 adding west Jefferson County and gaining population
23 there.
24 Q.          Did you do anything specifically in
25 drawing the 2021 congressional map to modify it so

Page 173

1 that District 7 does not appear to be racially
2 gerrymandered?
3 A.          I don't know how to answer that other
4 than I tried to make it more geographically compact
5 in shape.
6 Q.          Other than that, did you make --
7 A.          And not -- and not split precincts.
8 Which I think a number of precincts were split in
9 this version.
10 Q.          Other than trying to make it
11 geographically compact and not splitting precincts,
12 did you make any other changes for that purpose?
13 A.          No.
14          MR. WALKER:  Just so the record is
15 clear, the witness' reference to "this version" was
16 to the 2011 version.
17 A.          When I said they were split.  Is that
18 what you're talking -- yeah.
19          MR. THOMPSON:  Thank you.
20 Q.          And I'm referring to when you were
21 drawing the 2021 map now.  So thank you for the
22 clarification.
23          Did you specifically make any changes in
24 drawing the 2021 map to ensure that District 7 does
25 not appear to be racially gerrymandered?

Caster Plaintiffs' Exhibit 88, Page 44

Randy Hinaman
December 09, 2021

Page 174

1  A.        No, other than -- other than making the
2  district more compact and more geographically
3  contiguous.
4  Q.        Anything else?
5  A.        And not split precincts.
6  Q.        Anything beyond that?
7  A.        No.
8  Q.        Do you know if District 7 would still be
9  majority black without that finger sticking up into
10 Jefferson County?
11 A.        I do not.
12 Q.        Have you looked at that?
13 A.        No.  But, of course, it's not really a
14 finger anymore.  It was basically the southwestern
15 part of the county.
16 Q.        In drawing the 2021 congressional map,
17 were you asked to consider anything about race when
18 drawing District 7?
19 A.        No.
20 Q.        Did you consider anything about race
21 when drawing District 7?
22 A.        No.
23 Q.        And you say "No."  That was before the
24 week before you submitted this to the special
25 session, correct?

Page 175

1  A.        Correct.  But even once we turned race
2  on, nobody asked me to make any changes to District
3  7 or any other district.
4  Q.        And did you make any changes to District
5  7 at that point?
6  A.        No.
7  Q.        Did you look at the racial makeup of
8  certain neighborhoods that week before the special
9  session?
10 A.        I did not.
11 Q.        Did you take into account any of the
12 other characteristics of the black voting age
13 population when drawing District 7?
14 A.        Help me with that one.
15 Q.        Similar to what I asked before.  Did you
16 take into account different socioeconomic factors
17 within the black voting age population?
18 A.        No, sir, I did not.
19 Q.        Attitudes?
20 A.        No, sir.
21 Q.        Interests?
22 A.        No.
23 Q.        Type of employment?
24 A.        No.
25 Q.        Income?

Page 176

1  A.        No.
2  Q.        Educational level?
3  A.        No.
4  Q.        Favorite football team?
5  A.        No.
6  Q.        Voter turnout?
7  A.        No, sir.
8  Q.        Election results to assess party
9  affiliation?
10 A.        No.
11 Q.        Were you asked to consider anything
12 about race when drawing any of the other districts?
13 A.        I was not.
14 Q.        Did you consider anything about race
15 when drawing Districts 1 through 6?
16 A.        I did not.
17 Q.        Did you consider whether it would be
18 possible to create a second black majority district
19 when drawing the 2021 congressional map?
20 A.        I did.
21 Q.        When did you make that -- when did you
22 consider that?
23        MR. WALKER:  I'm going to asset the
24 attorney-client privilege.
25        THE REPORTER:  I'm sorry?

Page 177

1        MR. WALKER:  I'm asserting the
2  attorney-client privilege in response to that
3  question.
4        MR. THOMPSON:  To the question of when?
5        MR. WALKER:  He can answer when.
6  Q.        When did you consider whether making a
7  -- excuse me.  Let me ask the question again.
8        When did you consider whether it would
9  be possible to create a second majority black
10 district?
11 A.        After we got the final census results.
12 So early September.
13 Q.        Did anyone ask you to consider that?
14        MR. WALKER:  Objection.
15        MR. THOMPSON:  Was that an instruction
16 not to answer, or just an objection?
17        MR. WALKER:  I think he can tell you
18 that I asked him to consider that.
19 Q.        I'll go ahead and let you --
20 A.        Dorman Walker asked me to take -- to
21 look at it, yes.
22 Q.        Did you attempt to draw such a plan?
23        MR. WALKER:  Objection.  I instruct the
24 witness not to answer.  It's privileged.
25 Q.        Beyond your discussion with Mr. Walker,

Caster Plaintiffs' Exhibit 88, Page 45

Randy Hinaman
December 09, 2021

Page 178

1 did you discuss with anyone else the possibility of
2 creating a second majority black district?
3 A.        I did not.
4 Q.        Do you agree that it would be possible
5 to create a second majority black district in
6 Alabama?
7           MR. DAVIS:  Object to the form.
8           MR. WALKER:  Same objection.
9           THE WITNESS:  Does that mean I'm not
10 supposed to answer?
11           MR. WALKER:  It's an objection to the
12 form of the question.
13 A.        I think it would be possible.  It's a
14 question of whether -- how many counties and
15 precincts you feel comfortable splitting to do so
16 and how -- what the shape and size and scope of it
17 would be.
18 Q.        Would it be possible to create a second
19 majority black district and still comply with the
20 reapportionment committee redistricting guidelines?
21 A.        I would not think so.
22 Q.        Why not?
23 A.        Well, I can't say every -- some of the
24 plans that were submitted that did that either
25 paired incumbents or disallowed cores of districts

Page 179

1 or made an inordinate number of splits or had 20
2 counties in a congressional district or some other
3 thing that was not positive in our guidelines.
4 Q.        You said some of the other plans that
5 were submitted.  I know we referenced this way back
6 earlier this morning --
7 A.        Yes.
8 Q.        -- that there were, you said,
9 approximately 41 plans that were offered at some
10 point in the special --
11 A.        Not congressional.  All the -- all the
12 whole.  That was all.  That was legislative, that
13 was everything.
14 Q.        Understood.  This may help.
15
16           (Plaintiff's Exhibit 9 was
17           marked for identification.)
18
19 Q.        I'm marking Plaintiff's Exhibit 9.  This
20 is another document that was produced in this
21 lawsuit.  It's Bates number RC 000007.  And I will
22 represent to you that the file name for this
23 document is Congressional Plans Introduced in 2021
24 Special Session.
25           Have you seen this document before?

Page 180

1 A.        I don't think I have.
2 Q.        Does this appear to be a list of the
3 congressional plans that were introduced in the 2021
4 special session?
5 A.        It does.
6 Q.        Did you review any of these maps?
7 A.        I looked at most all of them, yes.
8 Q.        Earlier today you made a distinction
9 between looking at and reviewing.
10 A.        Well, because a couple of these plans I
11 know were put into the system very, very late in the
12 process.  So my quote, unquote review of them may
13 have been ten minutes.
14 Q.        Which plans were those?
15 A.        Well, Senator Coleman's plan.  Senator
16 Hatcher's plan, I think, came in very late.  A
17 couple of these others which are full plans,
18 obviously, but they were more amendments.  Like
19 Waggoner and Barfoot were done on the last day.  So
20 I looked at them, but I didn't have very long to
21 look at them.
22 Q.        Did you have an opportunity to review
23 the Holmes congressional plan?
24 A.        Yeah.  Again, that was basically a
25 change for Congressman Moore when we were discussing

Page 181

1 the whole Escambia versus Monroe thing.  So it
2 was -- it was not really a whole -- it was a whole
3 plan.  But the changes were very specific to
4 Congressman Moore.  So yes, I'm familiar with it.
5 Q.        Did you have an opportunity to review
6 the Faulkner congressional plan two?
7 A.        I did.  Those were changes that were
8 primarily in Jefferson County.  Again, the vast
9 majority of the plan was the same this as the
10 Pringle plan.  So I was familiar with those changes.
11 Q.        You may or may not know the answer to
12 this.  There's only one Faulkner plan listed here,
13 but it's numbered two.  Do you know if there was a
14 Faulkner plan one?
15 A.        I don't know.  I don't know.
16 Q.        It seems to be like the school prank
17 where you number the pigs one, two, and four.
18 A.        One would guess there would be a one.
19 But I don't -- I don't know that.
20           MR. WALKER:  I think that's the best
21 extraneous comment in a deposition I've ever heard.
22 Q.        Understood.
23           Then did you review the Singleton
24 congressional plans?  And there's three of those
25 here.

Caster Plaintiffs' Exhibit 88, Page 46

Randy Hinaman
December 09, 2021

Page 182

1  A.        The first one, the whole county plan, I
2  did because that was a plan that was submitted to
3  public hearings along the way and had been in the
4  office for quite a while.  So yes, I did.  I did
5  have more time to look at that one, yes.
6  Q.        And that's plan one, the --
7  A.        Plan one, yeah, SB-10.  Yes, sir.
8  Q.        I'm sorry.  Go ahead.
9  A.        Yes, plan one, SB-10.
10  Q.        And are you aware that that one was
11  submitted by the League of Women Voters?
12  A.        Yes, sir.
13  Q.        And there is also two other plans, plan
14  two and plan three.  Did you have an opportunity to
15  review those?
16  A.        Much more quickly.  I mean, they were
17  offshoots of the initial plan that just changed
18  deviation for the most part.
19  Q.        I want to walk through those, the Holmes
20  plan, the Faulkner plan, and the Singleton plan.
21            Starting with the Holmes plan, why did
22  you review that one?
23  A.        I reviewed that because that was put in
24  essentially for Congressman Moore because he did not
25  want to pick up another county.  And instead of

Page 183

1  splitting Escambia between 1 and 2, he wanted to
2  split Monroe between 1 and 7 so that District 7
3  would pick up an additional county and he would not,
4  and then make the corresponding change in Montgomery
5  to offset the 739 people that were needed to get 1
6  to zero deviation.  To my knowledge, those were the
7  only changes.
8  Q.        You had had conversations with
9  Congressman Moore when you were creating your map,
10  correct?
11  A.        Correct.
12  Q.        Were these changes in the Moore --
13  excuse me.
14            Were these changes in the Holmes plan
15  changes that you did not want to or did not for some
16  reason make in the 2021 map that you drew?
17  A.        That's correct.
18  Q.        And why did you not make those changes?
19  A.        Because I didn't think it was fair to
20  put the majority of split counties into the 7th
21  District.
22  Q.        Why not?
23  A.        I just didn't think any one district
24  should have to have four split counties when other
25  districts only had one.

Page 184

1  Q.        Was that the only reason you didn't make
2  those changes?
3  A.        Primarily.  I didn't think it was a good
4  -- first of all, it's 739 people.  It's not really
5  -- you couldn't make a case that Congressman Moore
6  was going to lose re-election over gaining 739
7  republicans in Escambia County.
8            So I was not concerned about what it did
9  to his district.  I was concerned about the fairness
10  issue of putting all of the splits in one
11  congressional district.
12  Q.        Were there any other reasons why you
13  didn't incorporate those changes in the Holmes plan
14  into your map?
15  A.        That was -- that was the primary reason.
16  Q.        Were you asked by anybody to review the
17  Holmes congressional plan?
18  A.        Well, when it was offered on the
19  floor -- I'm not sure where it was offered.  The
20  house floor maybe.  This doesn't say on here.
21            But whatever chair where that was being
22  offered asked me to, I'm sure, tell him what I knew
23  about the Holmes plan.
24  Q.        What did you tell him?
25            MR. WALKER:  You can tell him.

Page 185

1            THE WITNESS:  I thought you didn't want
2  me to --
3            MR. WALKER:  You can tell him.
4  A.        I told him that I didn't -- I didn't
5  think that a good change to our map because,
6  again, it put all of -- not all.  But put another
7  split into the 7th District.  Which I didn't think
8  it was equitable to put most of the splits in one
9  congressional district.
10  Q.        Did you tell him anything else?
11  A.        That's basically it.
12  Q.        Did you provide any evaluations or
13  recommendations regarding that map?
14  A.        Other than voting it down, no.  I
15  suggested they not vote for it.
16  Q.        Moving to the Faulkner congressional
17  plan two.
18  A.        Yes.
19  Q.        Why did you review that map?
20  A.        That was the change where I had put
21  Homewood back together that made a few people in
22  Jefferson County, I guess, unhappy.
23            So representative Faulkner, who is from
24  Jefferson County, had a map that took the three
25  Homewood precincts out of District 7 and put them

Caster Plaintiffs' Exhibit 88, Page 47

Randy Hinaman
December 09, 2021

Page 186

1  into District 6, and took four precincts in the
2  Center Point area, which is the northern end of
3  District 7, and put those back into District 7.  So
4  I reviewed those changes.
5  Q.        Similar to before, were you asked by
6  anybody to review that plan?
7  A.        I was.  And whatever -- again, I think
8  these were offered in the house.  So I think it
9  probably would have been Representative Pringle that
10 asked me for a quick analysis of what the plan
11 changes were.
12 Q.        And what did you tell him?
13 A.        I told him that it moved the Homewood
14 area into District 6, and it took those four
15 precincts at the northern end of district -- who
16 were in District 7 and added them back into District
17 7.
18           And I allowed as how I didn't think that
19 was really a good thing to do because it eliminated
20 some of my geographical compactness of what I was
21 trying to do when we were adding in western
22 Jefferson and not extending the quote, unquote
23 finger further north into Jefferson County.
24 Q.        To your knowledge, did any of the
25 changes from your plan to the Faulkner plan have to

Page 187

1  do with any racial factors?
2  A.        I don't know -- I mean, I don't know
3  about the motivations of who drew the Faulkner plan.
4  Q.        Are you aware of any racial
5  considerations that were taken in account in drawing
6  the Faulkner plan?
7  A.        I'm not.
8           MR. WALKER:  Objection to form.  You may
9  answer.
10 Q.        What about the Singleton plan?  Why did
11 you review that plan?
12 A.        Well, that was one that -- the initial
13 Singleton plan was one that was offered at a number
14 of public -- virtually every public hearing, I
15 believe.  It had been in existence for quite a
16 while.
17           So I looked at it for what it -- what it
18 know, for what it was doing.  And I had a little
19 more time to look at it, actually, than some of
20 these other ones that came in at the last minute.
21 Q.        Do you know what feedback there was from
22 the public hearings on the Singleton plan?
23 A.        Not specifically.  I really don't.
24 Q.        Did you ever hear of any public feedback
25 on the Singleton plan?

Page 188

1  A.        Not that comes to mind, no.
2  Q.        Were you asked by anybody to review the
3  Singleton plan?
4  A.        Again, I was when it was offered in the
5  house or senate -- I guess it was offered on the
6  senate floor maybe first.  Whichever chair of
7  wherever it was offered, I was asked to comment on
8  it.
9  Q.        And what did you tell that chairperson?
10 A.        Well, the initial Singleton plan was not
11 a zero deviation plan.  So it really didn't meet our
12 guidelines.  I also think it paired a couple of
13 incumbents, if I'm remembering correctly,
14 in the 3rd District.  I think it put in -- put maybe
15 Shelby County in the 3rd.  So it would have paired
16 Gary Palmer and Mike Rogers.  And it wasn't to zero
17 deviation.  Also, it didn't have a majority black
18 district in it.
19 Q.        Was that an issue to you, that there's
20 not a majority black district?
21 A.        Yeah.  Well, it -- it was an observation
22 that it did not have a majority black district.
23 Q.        Does that matter for any particular
24 reason to you?
25 A.        Well, it matters -- again, I'm not a

Page 189

1  lawyer.  But I suppose there would be some question
2  to how well it comported with Section 2 of the
3  Voting Rights Act.  But, again, that wasn't my major
4  concern with it.
5  Q.        There were two subsequent Singleton
6  plans, plan two and three.
7  A.        Yeah.
8  Q.        Both of which you stated -- and it
9  describes here in Exhibit 9 as having adjustments
10 for population deviation.
11           Were there any other changes in
12 Singleton plan two and three other than changes to
13 deviation, to your knowledge?
14 A.        Not to my knowledge.  And, again, I
15 looked at -- I didn't look at these plans
16 extensively.  But to my knowledge, it was just a
17 change in deviation.
18 Q.        Were those other observations that you
19 made to Singleton plan one regarding incumbents
20 being paired up against each other, a lack of a
21 black majority district, any other observations you
22 made, were any of those addressed with Singleton
23 plan two or three?
24 A.        Not that I'm aware of.
25 Q.        Were you asked by anybody to review

Caster Plaintiffs' Exhibit 88, Page 48

Randy Hinaman
December 09, 2021

Page 190

1 Singleton plan two and three?
2 A.        Again, in whatever body they were
3 offered in, the chair would have asked me about
4 them, yes.
5 Q.        Do you recall what recommendations or
6 observations you provided?
7 A.        Basically the same ones.  The narrow
8 deviation, again while a more narrow deviation, was
9 not to zero deviation.  And I think it still paired
10 the incumbents.  And as I remember, the BVAPs on the
11 districts were very similar between -- among the
12 three.  So I don't think it changed any of those
13 things.
14 Q.        You also mentioned that you looked at
15 briefly the Coleman plan, Hatcher plan, Waggoner
16 plan, and Barfoot --
17 A.        Yeah.
18 Q.        -- plan.
19 A.        Yes, sir.
20 Q.        Did you make any observations from your
21 looking at or review of those?
22 A.        No.  Well, the Barfoot plan was sort of
23 just the senate version of the Holmes plan making
24 the change for Representative Moore.
25           The Wagner plan was basically Faulkner

Page 191

1 and Barfoot put together or Barfoot and Holmes put
2 together.  It also made the Moore change, but made
3 the Faulkner change in Jefferson County.  So they
4 were just sort of different versions or compilations
5 of those two things.
6 Q.        I'm going to stop you right there
7 because I think there's -- it looks like there's two
8 Waggoner plans here.  Which one are you referring
9 to, three or one?
10 A.        Three was the combination.  One -- one
11 was essentially the Faulkner version of the plan,
12 only in a -- drawn up by a senator or offered by a
13 senator.
14 Q.        And I interrupted you there.  I think
15 the only other plan we haven't discussed yet is the
16 Hatcher plan.
17 A.        Right.  And, again, that came in, if I
18 remember correctly, the night before it was offered
19 on the floor.  So I really looked at it for
20 literally ten minutes before whoever -- wherever it
21 was offered.  I guess on the senate side.  So I
22 didn't do a very deep analysis of the Hatcher plan.
23 Q.        For each of these plans that you said
24 you just looked at briefly, the Coleman plan, the
25 Waggoner plans, the Barfoot plan, and the Hatcher

Page 192

1 plan, is it a similar response as you had to the
2 other ones, that you were asked to look at those by
3 whoever was presenting them on the floor?
4 A.        Whoever was managing the time, the time
5 on the floor.
6 Q.        And as to each of those, do you recall
7 what your feedback was?
8 A.        Yeah.  I mean, obviously, the Waggoner
9 plan was the same as the Faulkner plan.  So I didn't
10 think it was a good change.  And the Barfoot plan
11 was essentially the same as the Holmes plan.  So I
12 didn't think that was a good change.  And the
13 Waggoner three was just a compilation of the two of
14 them added together, which didn't do anything to
15 move the bar.
16 Q.        What about the Coleman plan?
17 A.        The Coleman plan, again, I didn't look
18 -- didn't have a chance to look at very much.  I
19 believe it paired two incumbents in, in District
20 1, Carl and Moore.  And it certainly didn't respect
21 the cores of districts because I think it had
22 District -- District 7 went from Mobile to
23 Tuscaloosa maybe.
24           Anyway, again, I didn't spend a lot of
25 time on either of those, looking at either of those

Page 193

1 plans.
2 Q.        What about the Hatcher plan?
3 A.        The Hatcher plan I think was obviously a
4 two black district plan.
5           THE REPORTER:  Two?
6 A.        Two black district plan.  I do think it
7 -- I think it paired incumbents, but maybe I'm
8 wrong.  Again, geographically it was not very
9 compact.  I think it went from Mobile to Russell
10 essentially on one of the black districts.
11           So I didn't think it -- I didn't think
12 it followed our guidelines very well in terms of
13 compactness.
14 Q.        Other than compactness --
15 A.        And splits.  I think it also had like 13
16 county splits, where the Pringle plan had six.  I
17 think it split a lot more precincts.
18 Q.        Other than compactness and splitting
19 precincts, was there any other reason that you felt
20 that the Hatcher plan did not comply with the
21 guidelines?
22 A.        Those were the main issues.
23 Q.        Were there any other issues?
24 A.        I don't think so.
25 Q.        And with the Singleton plan, were there

Caster Plaintiffs' Exhibit 88, Page 49

Randy Hinaman
December 09, 2021

Page 194

1 any reasons why you felt that the Singleton plan did
2 not comply with the redistricting guidelines?
3 A.        Yeah.  Well, the initial Singleton plan
4 was not to zero deviation.  It did pair incumbents
5 again in the 6th -- in the 3rd District, it had two
6 incumbents together, Moore and -- not Moore.  Palmer
7 and Mike Rogers.
8 Q.        Any other reasons?
9 A.        And, again, it didn't have a majority
10 black district.
11 Q.        Speaking of that, when you drew your
12 map -- which on this table, I would assume that's
13 the Pringle congressional plan.  Correct?
14 A.        Yes, sir.
15 Q.        When you drew the 2021 congressional
16 map -- remind me.  Did you start with drawing
17 District 7?
18 A.        No.  Actually, I started -- I started
19 with District 5 because I knew it had to spill into
20 4.  And I had to do that before I could do much else
21 there.
22 Q.        What order did you go in for drawing the
23 districts after that?
24 A.        I basically moved down -- moved down the
25 state.  I did 5 to 4.  And then the changes that 4

Page 195

1 -- putting Cherokee back together in 3, putting
2 Blount back together in 6, corresponding changes in
3 Tuscaloosa in 7.  I basically worked down the map
4 from there.
5 Q.        And you stated that you did not look at
6 the racial data in drawing the 2021 map until the
7 week before the special session, correct?
8 A.        Correct.
9 Q.        When you did review the racial data, if
10 it had shown that District 7 was below 50 percent
11 black voting age population, what would you have
12 done?
13 A.        I would have talked to legal counsel
14 about what steps to take at that point.
15 Q.        Do you believe that you would have
16 needed to make modifications to make the black
17 voting age population percentage higher than 50
18 percent?
19        MR. WALKER:  Object to the form, calls
20 for speculation.
21 Q.        You can answer.
22 A.        I'm sorry.  Say that again.
23        MR. THOMPSON:  Can I have the question
24 read back?
25        (Record read.)

Page 196

1 A.        I think if it had come back under 50
2 percent, in consultation with legal counsel, I
3 assume we would have, under the guidelines, looked
4 for a basis and evidence to see if one existed to
5 add African Americans to the district.
6 Q.        Did you draw any other maps other than
7 -- let me take a step back.
8        Did you draw any other congressional
9 maps other than the HB-1 Pringle congressional plan
10 that was ultimately enacted?
11 A.        This cycle -- I don't know what time
12 frame we're talking about.
13 Q.        I'll try again.  Sorry.
14        In drawing the 2021 congressional maps,
15 through that process you drew the map that was
16 ultimately enacted, correct?
17 A.        Yes, sir.
18 Q.        Did you draw any other maps in that
19 cycle --
20        MR. WALKER:  I'm going to --
21 Q.        -- for the congressional plan?
22        MR. WALKER:  -- object to the extent
23 that -- and you may not be intending to.  You're
24 asking him whether he tried to draw a two majority
25 black district --

Page 197

1 Q.        I'm just asking if you drew any other
2 maps at all.
3        MR. WALKER:  And my instruction to you
4 is if you did anything at the instruction of me
5 alone, then that would not be part of your answer.
6 A.        Other than that, no.
7 Q.        I've gone a little over an hour there,
8 but I wanted to finish up.  I think I'm done with my
9 questions for now.  So I think we'll take a break
10 and then allow some other folks to ask you some
11 questions.  Is that fair?
12 A.        That's fair.
13        THE VIDEOGRAPHER:  We are off the
14 record.  The time is 2:28 p.m.
15        (Recess was taken.)
16        THE VIDEOGRAPHER:  We are back on the
17 record.  The time is now 2:47 p.m.
18        MR. THOMPSON:  At this time, I'm going
19 to pass the questions to Mr. Blacksher.
20 EXAMINATION BY MR. BLACKSHER:
21 Q.        Good afternoon, Mr. Hinaman.
22 A.        Good afternoon.
23 Q.        So it was Dorman Walker who told you
24 you were required to achieve zero population deviation;
25 is that right?

Caster Plaintiffs' Exhibit 88, Page 50

Randy Hinaman
December 09, 2021

Page 198

1    MR. WALKER:  Object to the form.
2 Q.    You know, I'm having -- I've had trouble
3 hearing you throughout.  So I'm going to have to ask
4 you to speak up a little louder.
5    What was your last response?
6    MR. WALKER:  Are you talking to me, Jim?
7    MR. BLACKSHER:  The witness didn't
8 respond?  That was you?
9    MR. WALKER:  That was I who said "Object
10 to the form."  He doesn't make objections.
11    MR. BLACKSHER:  Oh, you said objection?
12    MR. WALKER:  Yes.
13 Q.    Okay.  I'm going back to what you said
14 in your examination, your direct examination, I
15 guess we call it, where you said you were advised
16 that you needed to use zero deviation in your plan.
17 Is that right?
18 A.    That's correct.  Under two criteria for
19 redistricting, B, "Congressional districts shall
20 have minimal population deviation."
21    I was told by counsel that that was zero
22 for six districts and plus one for one district.
23 Q.    And when you say "by counsel," you mean
24 -- well, I didn't ask you.  Were you advised by
25 lawyers other than Dorman Walker?

Page 199

1 A.    No.
2 Q.    So it was Dorman who told you that
3 minimal deviation means zero deviation?
4 A.    That's correct.
5 Q.    Okay.  So you also drew the plan in
6 1992.  And did you read the opinion of the court in
7 West v. Hunt, the 1992 opinion that adopted your
8 plan?
9 A.    I'm sure I did in 1992 or '93.  But I
10 sure don't remember it today.
11 Q.    You don't recall -- well, let me ask you
12 this:  Did counsel tell you or remind you that in
13 that decision, the three-judge court said that
14 because it was a court-approved plan, a
15 court-ordered plan, it felt constrained to have
16 perfect or zero deviation.  But that if the
17 legislature had drawn the plan itself, it would have
18 had greater leeway with respect to deviation?
19    MR. WALKER:  Objection.
20 Q.    Do you recall reading that?
21    MR. WALKER:  Jim, you've asked that
22 question several ways.  And one -- it could be
23 interpreted in one way to be whether or not I gave
24 him advice on that.  If that's what you're asking, I
25 object to that.

Page 200

1 Q.    Okay.  So if you read the West v. Hunt
2 opinion -- let me ask this question -- do you recall
3 the court saying that it felt compelled, because it
4 was a court-ordered plan, to use zero deviation?
5 A.    I do not.  As I said, I probably read it
6 30 years ago.  I certainly don't remember what it
7 said today.
8 Q.    Were you advised to use zero deviation
9 by anybody -- any lawyers in Washington, say,
10 connected with the republican party, the RNC or --
11 what was that other organization that you used
12 letters for?  NRRC or something?
13 A.    No.  In terms of the -- are you talking
14 about the 2021 plan?
15 Q.    The 2021 plan, yes.
16 A.    No, I did not speak to anybody at the
17 NRCC or the RNC or anybody in Washington other than
18 members of congress and their staffs.
19 Q.    Okay.  NRCC, what does that stand for?
20 A.    National Republican Congressional
21 Committee.
22 Q.    Okay.  But they didn't give you any
23 instructions or any advice about zero deviation?
24 A.    No, sir.
25 Q.    What about the members of congress in

Page 201

1 the Alabama delegation?  Did they give you any
2 instructions to use zero deviation?
3 A.    No, sir.
4    MR. BLACKSHER:  Eli, did I print out a
5 copy of the passage from State of Alabama versus
6 U.S. Department of Commerce that you can show him?
7    MR. HARE:  Let me see here.
8    MR. BLACKSHER:  It's got a highlighted
9 section in it.
10    MR. HARE:  Yes.
11    MR. BLACKSHER:  Okay.  Can you mark that
12 as -- what did you say, PX 10?
13    MR. HARE:  Right.  It's PX 10.
14
15    (Plaintiff's Exhibit 10 was
16    marked for identification.)
17
18    MR. BLACKSHER:  And show that to
19 Mr. Hinaman.
20 Q.    That, Randy, is the document that was
21 filed by the State of Alabama, as you can see, in
22 Montgomery's federal court against the census bureau
23 and styled 21-211.
24    And would you please read the
25 highlighted part in Paragraph 116 of the State's

Caster Plaintiffs' Exhibit 88, Page 51

Randy Hinaman
December 09, 2021

Page 202

1 complaint?
2 A.        The part --
3 Q.        Read it into the record.
4 A.        I must admit highlighting in it in blue
5 makes it rather hard to read.  But nevertheless.
6             "Even at the higher census geography of
7 Alabama's congressional districts, the November 2020
8 demonstration data indicated that the differential
9 privacy algorithm skewed the data enough to create
10 population deviation on a level that courts have
11 found in other contexts to violate the supreme
12 court's equal population jurisprudence."
13 Q.        Thank you.
14             And under that language is a table that
15 shows what the State thought were errors caused by
16 differential privacy in the demonstration.  And they
17 were congressional districts.
18             Did counsel tell you that the State of
19 Alabama thought that the zero deviation requirement
20 was using flawed data, in their opinion?
21             MR. WALKER:  Objection to form.  And I
22 instruct the witness not to answer.
23 Q.        Okay.  Are you going to follow counsel's
24 advice not to answer my question, Mr. Hinaman?
25 A.        I am.

Page 203

1 Q.        So aside from what counsel told you,
2 were you aware that the State of Alabama took the
3 position in federal court that the -- that the 2020
4 census, because of differential privacy, would not
5 be reliable enough to use for zero -- for separating
6 people at that level?
7 A.        I was not.
8             MR. BLACKSHER:  Eli, if you can find
9 that passage from the public hearing at Northeast
10 Alabama Community College.
11             MR. HARE:  I've got it right here.
12             MR. BLACKSHER:  And mark that as Exhibit
13 11, please.
14
15             (Plaintiff's Exhibit 11 was
16             marked for identification.)
17
18             MR. BLACKSHER:  And show that to Randy,
19 to Mr. Hinaman.
20 Q.        As you can see, this is a transcript of
21 the reapportionment committee's hearing on September
22 1 at Northeast Alabama Community College.  And I've
23 printed out Page 12 and highlighted it.
24             Would you read the highlighted statement
25 of one Toni McGriff who lives in Dutton?  Would you

Page 204

1 read into that into the record, please?
2             MR. WALKER:  You haven't highlighted the
3 whole statement.  You've highlighted Lines 5 through
4 16.  Is that what you want him to read?
5             MR. BLACKSHER:  Yes, the highlighted
6 lines, please.
7 A.        "Most of Jackson County, particularly
8 all of Jackson County -- practically all of Jackson
9 County is in Congressional District 5.  But there is
10 a tiny little sliver of southern Jackson County
11 that's in 4.  And I understand about trying to get
12 everything equalized in terms of population.  But
13 the very few people who live there very frequently
14 think they're in District 5 and do not know who to
15 vote for.  And I would ask that you consider that
16 when you are redistricting so that you don't have
17 that tiny little sliver out of that county.  It is
18 in a section called Macedonia.  Senator Livingston
19 would know where I'm talking about, I'm sure."
20 Q.        Thank you.
21             So did anyone on the reapportionment
22 committee, the chairs or counsel, show you or tell
23 you about that testimony?
24             MR. WALKER:  Objection as to what he may
25 have been told my counsel.  Otherwise, he may answer

Page 205

1 the question.
2 A.        I was not familiar with that testimony.
3 But I did, of course, put Jackson County back
4 together.
5 Q.        You sure did.  And who paid the price
6 for that?  Lauderdale County?
7 A.        Well, you're comparing 17 people to
8 43,000 or something.  I'm not sure that's a fair
9 comparison.  But yes.
10 Q.        Was it 17 people in Jackson County?
11 A.        I'm making up that number.  You're
12 comparing a few people to many tens of thousands.
13 But nevertheless.
14 Q.        In most of the cases on the 2021 plan,
15 the enacted plan, for example, down in Escambia
16 County where you had to put the eastern slice of
17 Escambia into 2?
18 A.        Yeah, 739 people.
19 Q.        739 people.  Do you think that they're
20 going to share the sentiment of Mr. Toni McGriff in
21 Jackson County?
22 A.        They may very well.
23 Q.        And what I'm saying, what I'm trying to
24 point out, can't we agree that most of these tiny
25 splits to achieve zero population result in people

Caster Plaintiffs' Exhibit 88, Page 52

Randy Hinaman
December 09, 2021

Page 206

1  being basically separated from their home county and
2  put in a district where they really don't have much
3  influence at all over the member of congress, right?
4  A.        In the Escambia County case, I would
5  agree with that.  Although looking at the map, there
6  aren't many examples of that.  Because most of the
7  other splits in the enacted map are much larger
8  segments of folks.
9  Q.        Okay.  Now, you said that you began
10 working on the congressional plan in May at some
11 point; is that correct, when you found out that
12 Alabama would have seven seats in congress
13 apportioned to it?
14 A.        Yes, once we found out seven.  And also
15 the guidelines were passed on May 5th.  I started
16 work thereafter.
17 Q.        And you were using estimated census data
18 to sort of rough out what that plan might look like;
19 is that correct?
20 A.        That's correct.
21 Q.        And those estimated census data were
22 only available for whole counties, right?
23 A.        I believe that's the case, yes.
24 Q.        So you were having to work with whole
25 counties.  And when the final census data came out,

Page 207

1  you simply had to adjust with the correct 2020
2  legacy data; is that correct?
3  A.        That's correct.  Although while the
4  estimates captured the flavor of the changes that
5  happened over the last ten years, meaning four
6  districts were over and three districts were under
7  and the estimates properly identified those
8  districts, they didn't really capture the magnitude
9  of it.
10         Because I think the estimates had the
11 7th District being 30,000 and some odd number under
12 when it ended up being 54, and it had the 5th
13 District being something like 23,000 over when it
14 was really 43.
15         So while it captured the over/under
16 nature of the districts, it didn't -- it didn't do a
17 particularly good job of capturing the ultimate
18 numbers.
19 Q.        Did you attempt drawing a whole county
20 plan at that point in May of 2021?
21 A.        No.  I just -- no.
22 Q.        Why not?
23 A.        Well, I don't even consider it a plan.
24 I mean, I was just lumping together -- and I do
25 think I was able to split.  I just don't think the

Page 208

1  answers were very accurate on what Maptitude had for
2  estimates.
3         So I didn't -- I didn't -- I lumped some
4  counties together and I split some larger counties
5  based on precincts, knowing that those numbers were
6  not going to be very accurate, and then waited until
7  we got the real numbers.
8  Q.        Okay.  And when you got the real
9  numbers, did you attempt to draw a whole county
10 plan?
11 A.        I did not.
12 Q.        And why did you not attempt to do that?
13 A.        No one asked me to do that.  And, again,
14 my understanding of our guidelines would be that
15 that would not have followed the proper deviation.
16 Q.        Take a look at our whole county --
17         MR. BLACKSHER:  Can you mark a copy -- I
18 don't think it's been passed around yet -- just so
19 we can be talking from something, the same thing?
20         MR. HARE:  This will be Plaintiff's
21 Exhibit 12.
22
23         (Plaintiff's Exhibit 12 was
24         marked for identification.)
25

Page 209

1  Q.        So think along with me, Mr. Hinaman,
2  about how you might have attempted to reproduce your
3  starting point of the plan, which was the 2011 plan,
4  right?
5  A.        Yes, sir.
6  Q.        And if you were going to attempt to take
7  the 2011 plan and create whole districts and you
8  start with Congressional District 7, then you would
9  try to make Jefferson, Tuscaloosa, and Montgomery
10 whole.  And that's what this plan does, doesn't it?
11 A.        It does.
12 Q.        You would have attempted to keep as much
13 of the black belt together as you could.  And that's
14 what this plan does, doesn't it?
15         MR. WALKER:  Objection.  I'm not sure,
16 Jim, the way you're phrasing your questions, what
17 you're asking him.  You seem to be telling him what
18 he would have been doing and then -- I'm just
19 confused.
20         MR. BLACKSHER:  I'm asking leading
21 questions, Counsel.  Is that all right?
22         MR. WALKER:  Well, you're allowed to ask
23 leading questions.  I just didn't understand what
24 you were doing.  So go ahead, if that's what you
25 want to do.

Caster Plaintiffs' Exhibit 88, Page 53

Randy Hinaman
December 09, 2021

Page 210

1      MR. BLACKSHER:  Can you read the
2  question back, please, Court Reporter?  I'm sorry.
3           (Record read.)
4      MR. WALKER:  Objection to form.
5  A.      It does, I guess.  Hale and Perry I
6  think would be considered part of the black belt,
7  and that's in a different district.  But by and
8  large, you're correct, yes.
9  Q.      Switching gears for a minute.  When you
10  met with Congresswoman Sewell, do I understand you
11  to say that she -- your testimony was that
12  Congresswoman Sewell wanted to keep her district the
13  way it is, adjusted for the population deviation
14  known; is that correct?
15  A.      I would phrase it this way:  I met with
16  Congresswoman Sewell and told her district was
17  54,000 under.  And I gave her some options of where
18  it made, in my opinion anyway, sense to gain folks
19  to make up that 54,000 difference.  And then we
20  worked through that on the map.  That's how I would
21  phrase it.
22  Q.      Did Congresswoman Sewell tell you she
23  was opposed to attempting to draw two districts in
24  which blacks could elect candidates of their choice?
25  A.      She did not.  She didn't offer an

Page 211

1  opinion, to my knowledge, on that issue.
2  Q.      Say again.
3  A.      She didn't offer an opinion on that, to
4  my knowledge.
5  Q.      And you didn't ask her about it?
6  A.      I did not.
7  Q.      Were you aware of all of the
8  nongovernmental organizations and grass roots
9  organizations in Alabama who have been urging the
10  legislature to draw two districts from which blacks
11  can elect candidates of their choice?
12  A.      I'm not sure that I was that aware of it
13  in our initial meetings in May.  Obviously, once
14  public hearings were held and your whole county plan
15  came out and so forth and so on, I was obviously
16  more aware of it at that point.
17  Q.      Okay.  So what you're saying is that you
18  simply sat down with Ms. Sewell and made suggestions
19  on how to increase -- get 53,000 and some odd
20  additional population in District 7, correct?
21  A.      That's correct, and keeping her existing
22  -- the core of her existing district together.
23  Q.      And didn't I hear you say you suggested
24  that one option might be to making Tuscaloosa County
25  and Montgomery County whole; that is, swapping the

Page 212

1  population in Montgomery -- in Tuscaloosa County,
2  north Tuscaloosa County, with a population that
3  extends into Montgomery County?
4  A.      I didn't offer that.
5  Q.      What did -- you said something in your
6  earlier examination about considering that option.
7  A.      If I did, I didn't mean to.  I did not
8  consider that option.
9  Q.      You did not consider that option?
10  A.      No, I did not.
11  Q.      Why not?
12  A.      Because I started with her existing
13  cores of districts and I looked at what she needed
14  to gain, and I suggested areas that she may wish to
15  gain in.  And we worked through the map and made
16  those changes.
17  Q.      Well, I mean, was the -- is the little
18  -- the extension of District 7 that goes into
19  Montgomery County part of the core of that
20  district, in your opinion?
21  A.      It may be now.  It probably wasn't at
22  the -- obviously, I don't think it existed at the
23  beginning.  It's a lot of people.  I mean, I don't
24  know the exact number.  We can obviously look it
25  up.  But it's --

Page 213

1  Q.      Well, I can tell you that based on the
2  data that Dorman Walker and the reapportionment
3  committee provided to us, the population of
4  District 7 in Montgomery County is 62,519.
5  A.      Okay.
6  Q.      And the population of the portion of
7  Tuscaloosa County that's in District 4, the
8  northern part of Tuscaloosa County, is 42,770.  So
9  there's about a 20,000 difference between those two
10  split counties making them whole in District 7.
11      MR. BLACKSHER:  So I'm going to ask
12  Eli, if he would, to mark up those two documents
13  that show -- that are labeled Plan Tuscaloosa and
14  Montgomery Whole and show it to Mr. Hinaman.
15      MR. HARE:  I'm going to mark them as
16  -- the map as Plaintiff's 13, and then the chart or
17  the data sheet as Plaintiff's 14, Jim.
18
19           (Plaintiff's Exhibits 13&14
20           were marked for identification.)
21
22  Q.      I'll tell you, Mr. Hinaman, that I did
23  this with Dave's Redistricting app.  Are you
24  familiar with Dave's Redistricting app?
25  A.      I've heard of it.  I've never used it.

Caster Plaintiffs' Exhibit 88, Page 54

Randy Hinaman
December 09, 2021

Page 214

1  Q.        Okay.  And I did exactly what I just
2  suggested.  I made -- took Montgomery County
3  completely out of District 7, and I put all of
4  Tuscaloosa County into District 7.  And that 20,000
5  difference I got out of Jefferson County.
6             Otherwise, it looks pretty close to
7  the map that you ended up drawing and that was
8  enacted.  But, of course, would you -- would agree
9  that it otherwise (inaudible) the one that you
10 drew?
11 A.        Yeah.  Obviously, there's a split in
12 Blount and a split in Etowah that I don't have.
13 But yeah.
14 Q.        Well, this is a good point.  When you
15 talk about making changes in District 7 like I just
16 did with Dave's, you end up requiring changes in
17 several of the surrounding districts.
18            I mean, for example, because District
19 6 lost population to District 7, I elected to get
20 some population out of Blount.  And that ended up
21 splitting Blount.
22 A.        Right.
23 Q.        And because Montgomery County went
24 into District 2, I ended up having to do a little
25 split of Elmore County, right?

Page 215

1  A.        Yes, sir.
2  Q.        And on up the line, if you will.  But,
3  of course, I didn't have to interfere with the
4  split you made in Lauderdale County.  And these are
5  -- and this is not zero deviation.
6             If you look to the left in that table,
7  you will see that there are as many as 471 people
8  in District 2 who are going to have to be -- I'm
9  sorry.  District 3 who are going to have to be
10 taken out, right?
11 A.        Yeah.  I'll take -- I can't find that
12 number on this sheet.  But I'll take your word for
13 it.
14 Q.        Well, it's on the map.
15 A.        Oh, I'm sorry.  Yeah, I see it.  Thank
16 you.  I was looking on the corresponding number
17 sheet.  Sorry.
18 Q.        The point I want to make here is isn't
19 it true when you're drawing maps and you get to 471
20 people who have to be moved in order to get to zero
21 deviation, you go down to the block level, right?
22 A.        Most times, yeah.  Precincts aren't
23 going to have an exact number or that small a
24 number.
25 Q.        And I'll represent to you that I

Page 216

1  didn't -- this is drawn with precincts.  So you're
2  going to have to split some precincts, right?
3  A.        Yes, sir.
4  Q.        But that usually can be done after you
5  have achieved the goal you set out to in broader
6  terms in your districting scheme, right?
7  A.        Sure.
8  Q.        There are a lot of ways that you can
9  split precincts or counties in order to achieve
10 this -- this sacred zero deviation objective.  And
11 yet you didn't consider this option at all when you
12 were going over the plan with Congresswoman Sewell;
13 is that correct?
14 A.        That's correct.
15 Q.        She did not -- she did not have an
16 option to consider this arrangement, right?
17         MR. WALKER:  Objection to form.
18 A.        Obviously, she could have said how
19 about if I get all of Tuscaloosa County and come
20 out of Montgomery?  Which she said neither.
21 Q.        Well, I wonder if the reason she said
22 neither is because it turns out that doing that
23 reduces the BVAP, the black voting age population,
24 to 49.79 percent?
25         MR. WALKER:  For CD 7?

Page 217

1             THE REPORTER:  For what?
2             MR. WALKER:  CD 7.
3  Q.        Do you see that in the statistical
4  table?
5  A.        Yes, sir, I do.
6  Q.        So would that have been a problem for
7  Terri Sewell based on what she was telling you were
8  her objectives?
9  A.        I don't know specifically.  I don't
10 think she considered this map.  So I can't -- I
11 don't really know how to answer your question.
12 Q.        Okay.  Did you and Congresswoman
13 Sewell discuss the whole county plan, the League of
14 Women Voters' whole county plan?
15 A.        We did not.  I don't think it -- in
16 our initial meetings, I don't think it existed.  Or
17 at least I was not aware of it.  I don't think she
18 was.  So we really did not.
19 Q.        It didn't exist in May, but it did
20 exist before you finalized the plan that became
21 HB-1, right?
22 A.        Correct.
23 Q.        And September 1, 2021, was the first
24 public hearing of the reapportionment committee.
25 And the League of Women Voters was the first

Caster Plaintiffs' Exhibit 88, Page 55

Randy Hinaman
December 09, 2021

Page 218

1  witness at the first hearing offering that plan;
2  isn't that correct?
3  A.          I wasn't at that hearing.  But I'll
4  take your word for it.
5  Q.          So you're telling us that the
6  whole county plan offered by the League of Women
7  Voters was never discussed at all when you were
8  communicating with Congresswoman Sewell?
9  A.          I don't believe it -- maybe it was
10  discussed at the very end about what other plans
11  are out there.  We may have had a minor discussion
12  about -- frankly, I think at that point in time
13  yours would have been the only other publicly
14  acknowledged congressional plan.  So she may have
15  mentioned it.  But we didn't have a very healthy
16  discussion about it.  Let's put it that way.
17  Q.          What do you mean not healthy?
18  A.          Very long, very detailed.  She was
19  asking what other plans have you heard about.  And
20  I think at that point, yours was the only one that
21  was public at that point in time.
22  Q.          Did she tell you she would object to
23  that plan?
24  A.          We didn't have that detailed a
25  discussion about it.

Page 219

1  Q.          So we don't know -- we don't know
2  whether Congresswoman Sewell would be happy with
3  the whole county plan or not; is that correct?
4  A.          I do not know, no.  You may know.
5  Q.          Sir?
6  A.          I don't know.  I mean, you may have
7  talked to her about it.  I don't have any knowledge
8  of it directly.
9  Q.          I understand.
10              Can you take another look at the
11  whole county plan map, please?
12  A.          Yes, sir.
13  Q.          And compare it -- and compare it with
14  the map of the 55 -- 555 plan, HB-1, the enacted
15  plan.
16  A.          Yes, sir.  Exhibit 5.
17  Q.          If the court wanted to -- was drawing
18  a remedial plan in this case, just for the sake of
19  argument, it had reached the point where it was
20  going to draw its own plan, and it wanted to change
21  the whole county plan to look more like the plan
22  that the legislature enacted, that would simply be
23  a matter of changing the array between Districts 5
24  and 4, correct?
25  A.          No.  I mean -- well, first of all,

Page 220

1  Terri Sewell doesn't even live in District 7 under
2  your whole county plan.  She lives in District 6.
3  Q.          I'm sorry.  I'm not being clear, and
4  my question was not understood by you.
5              I'm just asking if the court wanted to
6  change the array -- if it was drawing a
7  court-ordered plan and it wanted to make the whole
8  county plan 5 and 4 look more like the --
9  like the 5 and 4 districts in the enacted plan, it
10  would simply be a matter of balancing out the
11  populations between 4 and 5, correct, splitting
12  some counties as needed?
13  A.          Yeah.  Obviously, 4 has changes in
14  Tuscaloosa and St. Clair that are different than
15  the enacted plan.
16  Q.          Every -- every change has a ripple
17  effect, right?
18  A.          Yes, sir.
19  Q.          All right.  But there would be no
20  problem in putting Lauderdale, Colbert, and
21  Franklin in CD 4 and moving Morgan County back up
22  into CD 5 if the court wanted to do that and made
23  the splits necessary to bring it into population
24  equality; isn't that correct?
25  A.          Yeah.  These hypothetical the court

Page 221

1  wants to change things are hard for me.  But yes, I
2  guess that's correct.
3  Q.          I'm looking at the map of the plan you
4  drew in 1992 that was adopted by the three-judge
5  court in West versus Hunt.  Did that map ever get
6  shown to you today, or not?
7  A.          It has not been shown to me today.
8              MR. BLACKSHER:  Okay.  I'm looking at
9  it in the amended complaint.  I don't know if
10  anyone has a copy there that they can show
11  Mr. Hinaman or not.
12              But do you recall, Mr. Hinaman, that
13  the plan you drew in 1992 included all of the same
14  counties that are in the plan you drew in 2021?
15  A.          I'm not sure I -- I'm not sure I know
16  what that -- I'm not sure I know what you mean by
17  that.
18  Q.          The plan that you drew in 1992 had
19  Clarke split, it had Pickens split, Tuscaloosa and
20  Jefferson split, and Montgomery County split.
21              Now, your plan in 2021 leaves Pickens
22  whole, correct?
23  A.          Correct, and Clarke whole.
24  Q.          And Clarke whole.  But Tuscaloosa,
25  Jefferson, and Montgomery are still split?

Caster Plaintiffs' Exhibit 88, Page 56

Randy Hinaman
December 09, 2021

Page 222

1  A.        Yes, sir.
2  Q.        So your 2021 plan, the plan you drew
3  and that was enacted by the legislature in 2021,
4  preserves the core of the 1992 plan that you drew;
5  is that correct?
6  A.        It's -- it's correct.  But you've
7  missed a few steps along the way, obviously.
8  Because as we discussed earlier in the deposition
9  testimony, it more preserves the cores of the 2011
10  districts, which I guess by chain preserve some of
11  the 2001 districts, which the legislature preserved
12  some of the 1992 districts, if that made any sense.
13        In other words, I did not use the 1992
14  map as the starting point for my 2021 map.
15  Q.        No.  You used the 2011 plan, correct?
16  A.        Correct.
17  Q.        And isn't it true that the 2002 plan
18  and the 2011 plan preserved the cores -- the core
19  of the 1992 plan?
20  A.        For the most part.
21  Q.        Can we sum up your testimony about how
22  you went about drawing the 2021 enacted plan by
23  saying that you drew the plan so that it satisfied
24  what each incumbent member of the Alabama
25  congressional delegation wanted?  That was your

Page 223

1  primary guideline, right?
2  A.        Well, that was a part of it.  My
3  primary guidelines were the guidelines given to me
4  by the reapportionment committee, and then based
5  off of the subsequent population shifts over the
6  last ten years to repopulate or take away from,
7  depending on the over/under of each district,
8  population, and geography to reach the required
9  guidelines of zero deviation and preserving the
10  cores of districts.
11        And, of course, where possible -- and
12  we've had a couple of minor cases where it wasn't,
13  as we discussed with Representative Moore and so
14  forth.  But preserving what the incumbents would
15  have -- would like to accomplish, as well.
16  Q.        But your testimony is that nobody else
17  but the members of the Alabama congressional
18  delegation had any input into the decisions you
19  made about how to draw that plan; isn't that
20  correct?
21  A.        That's pretty much correct, yes, sir.
22  Q.        No member of the Alabama legislature's
23  reapportionment committee, including its chairs,
24  had any input into that plan; isn't that correct?
25  A.        They had all the input they wanted

Page 224

1  into the plan.  But they chose to allow the members
2  of congress to talk about what areas they wanted to
3  gain and lose underneath the guidelines that they
4  had already passed.
5  Q.        And, in fact, in 19 -- let's see.
6  Excuse me.
7        In 2011, that's what the legislature
8  did, as well.  They simply deferred to what the
9  congressional delegation wanted in redrawing that
10  plan, right?
11  A.        No, that's not -- that was the goal I
12  had.  But that's not what happened.  When we got --
13  as you may remember, when we got to the senate
14  floor, there were some members of the senate who
15  may have wanted to run in one district or another
16  who moved some things around.
17        My map -- my initial map in 2011
18  didn't even have the 4th District in Tuscaloosa.
19  It had the 6th District in Tuscaloosa.
20        So there were numerous changes made on
21  the senate floor and probably subsequently the
22  house floor from the map that the members and I
23  worked on, members of congress and I worked on.
24  Q.        But that didn't happen in 2021?
25  A.        It did not happen in 2021.  The map

Page 225

1  that came out of -- the map that I gave to the
2  chairs that was offered at the reapportionment
3  committee was not amended through the process.  So
4  it was identical to what was passed into law and
5  signed by the governor.
6  Q.        Okay.  So let me just go over -- I
7  think I'm about finished here.  I want to make sure
8  I understand what your testimony is.
9        You considered no other plans that did
10  not have a zero deviation; is that correct?  You
11  never considered drawing a plan that did not have a
12  zero deviation?
13  A.        That's correct.  My understanding and
14  -- my understanding of the guidelines required us
15  to be at zero deviation.
16  Q.        And you understood, didn't you, that
17  Jefferson County was now at a population level that
18  was smaller than an ideal congressional district
19  and, therefore, no longer needed to be split?  You
20  were aware of that, weren't you?
21  A.        I'm aware of it.  I'm not sure I
22  focused on it.  But what you say is true.
23  Q.        It wasn't -- it wasn't a priority for
24  you to try to make Jefferson County whole?  That's
25  what you're saying?

Caster Plaintiffs' Exhibit 88, Page 57

Randy Hinaman
December 09, 2021

Page 226

1 A.          That's correct.

2          And, frankly, when I started the

3 meetings, I didn't even -- at the time I started

4 the meetings -- subsequently I realized it.  But at

5 the time I started the meetings, I actually thought

6 that both Representative -- Congresswoman Sewell

7 and Congressman Palmer both lived in Jefferson

8 County.  As I turned out, he had -- Representative

9 Palmer had moved over the last few years into

10 Shelby.

11          But at the time, I would have thought

12 that that wasn't possible under our guidelines.

13 Because when I started the process, I thought they

14 both lived in Jefferson County.

15 Q.          But, in fact, you found out that

16 Congressman Gary Palmer lives about three blocks

17 south of the Jefferson County line in Shelby

18 County, and Congresswoman Sewell lives about a mile

19 away from where Palmer lives.  But she's on the

20 Jefferson side of the line in Lake Cyrus, right?

21 A.          That's correct, yeah.

22 Q.          But I also understood you to say that

23 Congresswoman Sewell considered making her

24 residence, for purpose of redistricting, Dallas

25 County.  Am I correct?

Page 227

1 A.          I'm not sure I would phrase it that

2 way.

3          When asked what residence -- when

4 asked for her residence address so it could be put

5 in the computer so that we would make sure she was

6 inside her district, she gave us both her address

7 where she votes at, which is obviously Jefferson

8 County, and her ancestral home.  I don't know the

9 right way to phrase it.  Where she grew up in

10 Dallas County.

11 Q.          She grew up in Selma, right?

12 A.          Yes.  Yes, sir.

13 Q.          Okay.  And you're aware, aren't you,

14 that there is no residency requirement for members

15 of congress, aren't you?

16 A.          I am aware.  I'm also aware it's

17 exceedingly difficult to get elected when you're

18 outside of your district.  It makes a rather good

19 TV spot.

20 Q.          So even though congress -- Congressman

21 Palmer still lives in the city of Birmingham, he's

22 in that part that extends into Shelby County, he

23 would not feel comfortable representing the

24 Birmingham area again; is that right?

25 A.          I don't know that.  He may feel

Page 228

1 perfectly comfortable.  But I've -- I've seen in

2 other races where, you know, the fact that somebody

3 doesn't reside in their district is not a positive

4 when you get around to campaigning.

5 Q.          Okay.  I think I'm about done here.  I

6 need one more look at my notes.

7          That's it.  Thank you very much,

8 Mr. Hinaman.

9 A.          Thank you.

10          MS. MADDURI:  This is Lali Madduri for

11 the Caster plaintiffs.  We don't have any

12 questions.

13          MR. THOMPSON:  I think that's all the

14 questions that I have at this time, too.  So on

15 behalf of all the plaintiffs, I'll pass the witness

16 at this time.

17          MR. WALKER:  Let us have a few

18 minutes.

19          THE VIDEOGRAPHER:  We're off the

20 record.  The time is 3:34 p.m.

21          (Recess was taken.)

22          THE VIDEOGRAPHER:  We are back on the

23 record.  The time is 3:39 p.m.

24          MR. WALKER:  We have nothing to ask

25 Mr. Hinaman.  So I guess we're done.  Thank you

Page 229

1 very much, everyone.

2          THE VIDEOGRAPHER:  This ends the

3 deposition of Randy Hinaman.  The time is now

4 3:40 p.m.

5

6          (DEPOSITION ENDED AT 3:40 P.M.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Caster Plaintiffs' Exhibit 88, Page 58

Randy Hinaman
December 09, 2021

Page 230

1  STATE OF ALABAMA )
2  JEFFERSON COUNTY )
3
4          I hereby certify that the above
5  proceedings were taken down by me and transcribed
6  by me using computer-aided transcription and that
7  the above is a true and correct transcript of said
8  proceedings taken down by me and transcribed by me.
9          I further certify that I am neither of
10 kin nor of counsel to any of the parties nor in
11 anywise financially interested in the result of
12 this case.
13          I further certify that I am duly
14 licensed by the Alabama Board of Court Reporting as
15 a Certified Court Reporter as evidenced by the ACCR
16 number following my name found below.
17          So certified on December 9, 2021.
18
19
20
21
22     _____
       LeAnn Maroney, Commissioner
23     ACCR# 134, Expires 9/30/25
        505 North 20th Street, Suite 1250
24     Birmingham, AL  35203
25

Caster Plaintiffs' Exhibit 88, Page 59

Randy Hinaman
December 09, 2021

---

**Exhibits**

---

**EX 0001 Randy
Hinaman 1209
21**
  7:13 14:7,13
**EX 0002 Randy
Hinaman 1209
21**
  7:15 14:7,15
**EX 0003 Randy
Hinaman 1209
21**
  7:17 21:19,
  24
**EX 0004 Randy
Hinaman 1209
21**
  7:19 25:6,
  10,11
**EX 0005 Randy
Hinaman 1209
21**
  7:21 92:17,
  20 110:15,16
  219:16
**EX 0006 Randy
Hinaman 1209
21**
  7:23 93:10,
  14,18
**EX 0007 Randy
Hinaman 1209
21**
  7:25 135:14,
  18 147:22
**EX 0008 Randy
Hinaman 1209
21**
  8:3 160:7,11
  167:10,16
**EX 0009 Randy
Hinaman 1209
21**
  8:5 179:16,
  19 189:9

**EX 0010 Randy
Hinaman 1209
21**
  8:7 201:15
**EX 0011 Randy
Hinaman 1209
21**
  8:10 203:12,
  13,15
**EX 0012 Randy
Hinaman 1209
21**
  8:12 208:21,
  23
**EX 0013 Randy
Hinaman 1209
21**
  8:14
**EX 0014 Randy
Hinaman 1209
21**
  8:16

---

**$**

---

**$10,000**
  43:22,25
**$400**
  17:18
**$50,000**
  55:5,20

---

**(**

---

**(c)(4)**
  53:18

---

**0**

---

**000007**
  179:21
**00056**
  160:13
**043723**
  135:21

---

**1**

---

**1**
  14:7,13
  29:23
  114:22,23,24
  122:21 123:9
  125:19 137:9
  161:1,2,3
  176:15
  183:1,2,5
  192:19,20
  203:22
  217:23
**1&2**
  14:3
**10**
  137:9
  201:12,13,15
**10,000**
  71:23 72:11
**100**
  61:19 119:9
**105**
  80:10,14,16,
  20
**105-member**
  65:11
**10:00**
  88:1
**10:17**
  65:22
**10:35**
  65:25
**11**
  203:13,15
**116**
  201:25
**11:30**
  121:25
**11:42**
  122:5
**12**
  203:23
  208:21,23

**12,000**
  126:24
**123**
  62:4
**12:57**
  122:8
**13**
  193:15
  213:16
**13&14**
  213:19
**14**
  213:17
**14th**
  112:23 113:8
  139:16
**150**
  61:23
**16**
  204:4
**17**
  25:15 205:7,
  10
**19**
  224:5
**1965**
  140:24 141:5
  165:13
  166:13
**1992**
  24:2,17
  26:11 27:7
  28:4 30:7,
  11,18 31:7,
  13 33:7,10,
  23 34:17
  35:12 37:19
  39:14,17
  40:1 91:6
  95:10 172:2
  199:6,7,9
  221:4,13,18
  222:4,12,13,
  19
**1st**
  72:19,20,22,
  25 87:1

---

**Caster Plaintiffs' Exhibit 88, Page 60**

Randy Hinaman
December 09, 2021

123:9,20

**2**

**2**
14:7,15
96:24 97:16
124:1,3,5
125:19 138:9
141:2,15,18,
22 142:14,19
144:5,8,14,
25 146:5,6
147:22
161:12,13,14
183:1 189:2
205:17
214:24 215:8
**20**
24:8 147:22
179:1
**20,000**
213:9 214:4
**200**
62:10
**200,000**
55:24
**2001**
26:13,24
27:14,24
28:11 29:4,
22,25 30:4
38:17 39:13,
17 40:1,4
89:7 95:5
126:20
159:14
222:11
**2002**
222:17
**2011**
23:20 26:12,
13 37:22
38:11 39:13
40:3,7,9,15
42:13,18
43:5 44:5,25

45:3,17 46:7
48:11,15,17,
23 49:19
50:12,21
53:11,19,24
77:3,5,8,11,
12,25 85:19
93:15,19,22
94:9,13,25
95:15 100:5,
8 114:22
116:16
124:22
125:13
159:16
171:3,9,12
173:16
209:3,7
222:9,15,18
224:7,17
**2012**
23:20,23
**2013**
22:4,9,18
25:16
**2018**
22:23
**2019**
56:21 57:9
59:9 66:6
**2020**
51:18,19,20
52:12,21
53:19 54:4
55:13,17
57:11 62:22,
23 202:7
**2021**
9:7,17
39:12,16
40:6 48:3,5
51:2,5,12,
16,19 53:20
57:18 58:9
59:22 60:9,
12,24 61:5,
15,20 62:14,

16,17 63:17,
20 64:21
65:4,15
66:3,4,5,23
67:8,11,14,
20 68:14
70:22 71:14
74:16,19
75:16 76:2
78:9 79:3,8
80:1 83:14,
16,24 84:2
85:7,23
86:5,14
87:15,20
88:11 91:13
92:22,25
93:4,24 94:5
95:16 98:18
99:21 100:9,
14,16 101:7,
9,14 106:7,
9,12,13,16,
18 107:12
110:18 111:3
120:1 121:1,
7 123:3
124:23
129:19 132:3
134:11
135:22 136:7
137:6 156:10
160:15,23
167:17,21,25
169:3
172:13,25
173:21,24
174:16
176:19
179:23 180:3
183:16
194:15 195:6
196:14
200:14,15
205:14
207:20
217:23
221:14,21
222:2,3,14,

22 224:24,25
**2021-555**
51:8
**21**
148:6
**21-211**
201:23
**217**
62:4
**23,000**
207:13
**23rd**
61:11
**24**
48:8
**25**
22:4,9 150:5
**26**
151:5
**2:21-CV-
01530-AMM**
9:14
**2:28**
197:14
**2:47**
197:17
**2nd**
72:23,24
87:1 124:13
125:14
134:25
161:24

**3**

**3**
21:19,24
95:17 124:9,
12 126:8,25
147:21
162:1,3,4
195:1 215:9
**30**
31:2 33:11,
22,24 200:6
**30,000**
207:11

Caster Plaintiffs' Exhibit 88, Page 61

Randy Hinaman
December 09, 2021

**317**
78:17
**33267**
18:11
**35**
81:13
**36561**
18:12
**3:34**
228:20
**3:39**
228:23
**3:40**
229:4,6
**3rd**
94:19 124:4
126:19
130:17
162:12
188:14,15
194:5

---

**4**

**4**
25:6,11
91:23 115:8,
9,11 127:5
162:13,15,16
194:20,25
204:11 213:7
219:24
220:8,9,11,
13,21
**40-hour**
63:2
**41**
47:3,8,10
179:9
**42,770**
213:8
**43**
207:14
**43,000**
205:8
**471**
215:7,19

**49.79**
216:24
**4th**
96:15 156:2
224:18

---

**5**

**5**
91:23 92:17,
20 110:15,16
115:6,7
128:18,23
163:1
194:19,25
204:3,9,14
219:16,23
220:8,9,11,
22
**5-5-57**
18:9
**50**
34:12
195:10,17
196:1
**50,000**
55:21
**501(c)(4)**
53:10,16,21
86:3
**53,000**
211:19
**54**
207:12
**54,000**
210:17,19
**54.22**
118:12
**55**
219:14
**550**
134:5
**555**
219:14
**5th**
127:8,9
135:21

**136:15**
206:15
207:12

---

**6**

**6**
93:10,14,18
116:19
126:22
127:24 130:4
132:5 133:10
138:10
163:9,11
167:7 172:5,
9 176:15
186:1,14
195:2 214:19
220:2
**60**
44:7
**62**
169:15 170:4
**62,519**
213:4
**6th**
138:5 194:5
224:19

---

**7**

**7**
25:21 30:1,
17 32:2,5,15
33:23 35:12,
23 36:5
42:19 43:6
44:6,14
45:2,19,20
46:7 48:15
95:1,4,9
96:3 97:6,
14,15,21
104:5 114:2,
22,25 115:3
116:12 117:7
119:13

**123:8,13,22**
124:3 128:7
132:6 133:9
135:14,18
138:8 147:22
163:16,18,19
170:7,8,22,
25 171:12
172:1,14,18
173:1,24
174:8,18,21
175:3,5,13
183:2 185:25
186:3,16,17
192:22
194:17
195:3,10
209:8 211:20
212:18
213:4,10
214:3,4,15,
19 216:25
217:2 220:1
**703 598-8383**
19:1
**717,000**
73:7
**739**
73:5 123:15
124:17 183:5
184:4,6
205:18,19
**7th**
95:23 96:14
124:21,25
125:14
130:19,20
166:15
183:20 185:7
207:11

---

**8**

**8**
160:7,11
167:10,16

Caster Plaintiffs' Exhibit 88, Page 62

Randy Hinaman
December 09, 2021

---

**9**

**9**
9:7,17
179:16,19
189:9
**90s**
27:10
**93**
199:9
**9:00**
105:19
**9:13**
9:17

---

**A**

**a.m**
9:17
**a.m.**
65:22,25
122:5
**abilities**
137:2
**ability**
74:5
**able**
33:2 56:15
63:15 68:8
76:18 82:19
85:11 95:17
96:9 207:25
**above**
9:8 34:12
114:13
140:17
**Acadome**
103:18
**accepted**
131:20
**accommodate**
91:19
**accommodation**
117:23

**accommodations**
92:3
**accomplish**
155:17
223:15
**account**
19:2 34:14
86:10 100:4
148:4
175:11,16
187:5
**accurate**
26:20 60:22
72:5 208:1,6
**achieve**
197:24
205:25 216:9
**achieved**
216:5
**acknowledged**
218:14
**Act**
31:23 51:8
99:10 112:23
113:7 140:23
141:2,5,16,
19 142:15,20
143:11
144:5,9,15
145:1,5
149:12,25
165:4,12
166:13,17,21
167:9 189:3
**acting**
9:3
**action**
31:11
**actual**
66:16 84:9
125:24
**add**
45:8 96:1
117:12 128:7
145:20 146:2
159:6 196:5

**added**
44:21 102:14
145:25
162:18
166:14
186:16
192:14
**Adderholt**
104:17 127:4
128:15
134:17
**adding**
98:1 130:22
145:12 158:7
172:18,22
186:21
**addition**
80:19
**additional**
22:18,19
83:7 114:14,
17 115:15
140:18 183:3
211:20
**additions**
166:9
**address**
18:10,13
22:16 117:17
130:12,14
227:4,6
**addressed**
189:22
**addresses**
19:6 117:14,
16,20 150:15
**adjacent**
40:23 85:17
88:21 97:18
103:15
104:6,9
107:17 115:8
146:12
**adjust**
207:1
**adjusted**
210:13

**adjusting**
140:10
**adjustments**
189:9
**administrative**
68:11
**admit**
202:4
**adopted**
26:10,16
27:6 199:7
221:4
**advice**
199:24
200:23
202:24
**advised**
198:15,24
200:8
**affiliation**
35:10 41:25
176:9
**afraid**
22:20
**African**
32:8 33:17
170:15
171:24 196:5
**afternoon**
15:11
197:21,22
**age**
32:6,17
33:18 34:3,
8,15 35:10
44:7,10 49:7
74:10 83:2
112:18,20
117:6
119:12,22
135:7
175:12,17
195:11,17
216:23
**aggregate**
42:3,7

---

Caster Plaintiffs' Exhibit 88, Page 63

Randy Hinaman
December 09, 2021

ago
  13:2 18:21,
  22 23:10,20
  24:7,8 31:3
  33:12,22,24
  38:14 44:19
  45:4,14
  50:15 90:14
  162:18 200:6
agree
  52:8 92:11
  170:21
  171:11 178:4
  205:24 206:5
  214:8
agreed
  169:7,19,23,
  25
agreement
  17:19 44:3
  107:9 120:7
ahead
  37:22 38:9
  50:23 51:2
  121:17
  172:13
  177:19 182:8
  209:24
Air
  115:22
Alabama
  9:2,3,16
  12:13,22
  18:11,14
  22:16 23:6,
  20 24:2,10,
  18 25:11,16,
  17 26:9,14,
  22 27:10
  30:13,22
  33:12 53:15,
  23 58:15
  59:21 60:8
  67:21 69:6
  75:12 77:14
  86:14 89:19
  112:19
  113:12

  115:6,21
  116:6,7
  120:1 147:5,
  13,14
  153:10,18
  170:12
  171:12 178:6
  201:1,5,21
  202:19
  203:2,10,22
  206:12 211:9
  222:24
  223:17,22
Alabama's
  202:7
Alabamians
  53:3,8
ALBC
  12:21 25:11
algorithm
  202:9
allow
  70:10 197:10
  224:1
allowable
  151:16
allowed
  56:25 59:8
  131:2 133:7
  148:20 151:7
  186:18
  209:22
alter
  44:23
amazing
  13:14
amenable
  41:1
amend
  134:20
amended
  140:24
  165:13 221:9
  225:3
Amendment
  112:23 113:8
  139:16

amendments
  180:18
American
  22:23 32:8
  170:15
  171:24
Americans
  196:5
amount
  80:25 81:19,
  24 162:22
analysis
  167:24
  168:3,6,11,
  21 169:2
  186:10
  191:22
analyze
  144:3
ancestral
  227:8
and/or
  146:12
annex
  125:8,21,23
announced
  67:19
answer
  13:10 31:4
  58:17,19
  104:15 107:5
  108:8,12,17,
  23 109:17
  131:20
  138:24
  148:10
  162:23 173:3
  177:5,16,24
  178:10
  181:11 187:9
  195:21 197:5
  202:22,24
  204:25
  217:11
answered
  150:18

answering
  12:2 13:18
answers
  208:1
anybody
  17:13 59:21
  70:10 129:20
  184:16 186:6
  188:2 189:25
  200:9,16,17
anymore
  95:18 174:14
anyone
  15:18 17:5,
  10 37:9 50:7
  53:16 57:24
  83:13 87:16
  101:13,23
  106:17,22
  120:10,12
  121:2,5,11
  138:19
  143:4,9
  144:2,7
  148:25 149:5
  164:8,13
  168:20 169:1
  177:13 178:1
  204:21
  221:10
apart
  149:19
apologize
  46:8 62:12
app
  213:23,24
appears
  147:11
  170:8,22
  171:13
applied
  150:25
applies
  150:22
apply
  63:17 64:2
  139:11

Caster Plaintiffs' Exhibit 88, Page 64

Randy Hinaman
December 09, 2021

147:12,24
149:6
**apportioned**
206:13
**approached**
51:15,21
**approaching**
121:15
**approval**
38:21
**approve**
36:10
**approved**
36:8 136:4
140:17
**approximately**
23:9 179:9
**April**
58:19 59:6
63:17,20
67:20
**area**
89:15,23
91:16 92:4
97:4 115:14
125:16
127:15 154:3
156:1,25
162:17
186:2,14
227:24
**areas**
32:7,19 33:3
45:8,11 71:3
75:9 89:15,
19 102:13
114:7,17
128:3 132:4
152:13,16,18
162:11
164:21
212:14 224:2
**argument**
219:19
**around**
52:11 54:3
55:16 57:10,

11 59:12
65:13,15
67:19 82:18
136:14
208:18
224:16 228:4
**arrangement**
18:2 216:16
**array**
219:23 220:6
**arrived**
82:17
**asked**
23:15 30:20
31:12,15,19
36:11,16
46:24 51:24,
25 112:25
113:6,11
117:13
119:20
134:24
135:6,8
140:7 142:17
149:3 168:18
172:14,17
174:17
175:2,15
176:11
177:18,20
184:16,22
186:5,10
188:2,7
189:25 190:3
192:2 199:21
208:13
227:3,4
**asking**
10:9 13:4,6
19:24 36:9
69:13 101:20
113:22
118:17 149:4
171:8 196:24
197:1 199:24
209:17,20
218:19 220:5

**asserted**
11:15
**asserting**
177:1
**assess**
35:9 176:8
**asset**
176:23
**assigned**
73:22
**assigning**
32:10
**assist**
101:23
**assisted**
24:5 101:25
**assisting**
24:9
**Association**
22:23
**assume**
12:12 13:10
17:12 18:2
57:25 59:16
80:19 104:25
194:12 196:3
**assumed**
117:9 118:19
130:1
**assuming**
121:8
**assumption**
39:25 40:2
118:21
**ASU**
116:7,8
**attempt**
177:22
207:19
208:9,12
209:6
**attempted**
209:2,12
**attempting**
210:23
**attend**
88:10,17

**attended**
19:13
**attention**
66:19
**attitudes**
34:22 175:19
**attorney**
10:25 15:19
17:15,17,20
18:3 106:25
107:2
**attorney-
client**
108:4,6,18,
22 109:14
176:24 177:2
**attorneys**
9:18 15:4
**August**
57:2,4 64:24
65:4 68:9
74:16,19
75:15 76:2
79:3,8,11
80:1 82:18
83:13 84:2
85:7
**Autauga**
161:18
**authorized**
101:19
**available**
41:12 48:20
82:24 83:5
143:20,21,25
206:22
**avoided**
150:6
**aware**
50:11 130:23
167:23
182:10 187:4
189:24 203:2
211:7,12,16
217:17
225:20,21
227:13,16

**Caster Plaintiffs' Exhibit 88, Page 65**

Randy Hinaman
December 09, 2021

---

**B**

---

**back**
18:6 24:17
30:7 37:24
39:13 47:7,9
48:11 55:8
61:17 65:24
67:13 69:5
71:15,19
76:16 82:3,
12 84:5,14
88:23 96:19
98:6 102:11
103:14,21
115:2 118:4
122:7 123:12
126:12,20
127:15
129:17,22,25
130:7 140:1
164:16
167:15 172:2
179:5 185:21
186:3,16
195:1,2,24
196:1,7
197:16
198:13 205:3
210:2 220:21
228:22
**background**
18:7 21:23
107:24
**bad**
61:3
**Baggett**
10:23,24
**balance**
124:9
**balanced**
99:5
**balancing**
220:10
**Baldwin**
89:20 91:16
152:13 153:7

156:4 161:4
**ball**
113:1
**bar**
192:15
**Barfoot**
180:19
190:16,22
191:1,25
192:10
**base**
94:23 115:22
125:4,24
126:2
**based**
38:17 40:19
60:18,20
64:25 66:12
68:6 70:25
73:16 84:12
97:25 100:9,
12,17,20
101:3 103:10
104:16
105:5,11
106:10
131:22
145:14 146:3
162:24 166:5
208:5 213:1
217:7 223:4
**basically**
54:19 79:14
98:4 123:19
148:1 159:1,
12 174:14
180:24
185:11
190:7,25
194:24 195:3
206:1
**basing**
118:20
**basis**
35:17 145:1,
3 196:4
**Bates**
135:20

160:12
179:21
**bay**
153:6 156:5
**Beach**
18:11 20:22
**began**
58:8 59:12
65:12 94:5
206:9
**begin**
11:11 57:13,
17 60:11
63:15 64:20
**beginning**
9:12 60:17
64:16 79:17
114:24
212:23
**beginnings**
66:3
**behalf**
9:20 51:23
129:21
228:15
**behavior**
42:15
**belated**
136:20
**believe**
15:20 16:15
22:5 26:6
28:20 29:12
30:14 31:21
33:12 35:11
38:8 42:1
50:10 51:8
55:7 69:20
75:14 83:6
101:16,19,22
140:21 143:3
145:4 160:21
170:12 171:2
187:15
192:19
195:15
206:23 218:9

**believed**
108:21
**below**
195:10
**belt**
35:15
154:14,17,22
155:1,5,16
163:20
170:10
209:13 210:6
**Ben**
22:21
**best**
13:17 127:11
137:1 181:20
**better**
125:10
171:23 172:5
**bill**
17:14,16,22
26:5 104:19
110:2 134:23
**billed**
17:13
**Birmingham**
9:2 69:20
227:21,24
**birth**
18:8
**birthday**
136:18,20
**bit**
16:12 18:7
21:23 38:13
44:24 45:16
70:11 92:15
104:16
121:16
124:9,14
128:5 130:11
**black**
25:16 30:2,
5,12 31:13
32:3,6,13,
16,20 33:2,
18 34:3,7,

Caster Plaintiffs' Exhibit 88, Page 66

Randy Hinaman
December 09, 2021

11,15 35:10,
15 36:6,12,
15,21,22
37:7,12
42:20 43:7,
10 44:7,9,14
45:12 46:1
49:7,9,19
50:3,8,13,20
74:9 111:25
112:17,20
117:6,11
118:19,23
119:12,21
135:7 142:6
154:14,17,
20,22 155:1,
5,16 163:20
170:10,11
172:12 174:9
175:12,17
176:18 177:9
178:2,5,19
188:17,20,22
189:21
193:4,6,10
194:10
195:11,16
196:25
209:13 210:6
216:23
**blacks**
210:24
211:10
**Blacksher**
10:8 16:11
197:19,20
198:7,11
201:4,8,11,
18 203:8,12,
18 204:5
208:17
209:20 210:1
213:11 221:8
**Blain**
10:6
**blanking**
116:5

**block**
33:20,21
83:3 134:5
138:16
151:14
215:21
**blocks**
133:24
151:21
226:16
**Blount**
127:23,25
130:7 195:2
214:12,20,21
**blue**
202:4
**board**
52:6 54:12
56:18 64:13
65:5,7,12
75:2 80:12
81:8,16,23
139:10
**Bob**
22:22
**body**
17:1 190:2
**bottom**
135:21
156:20
166:23
**bought**
18:20
**BRAC**
125:4
**brain**
46:17
**break**
13:22,23
65:19
121:17,25
122:2,6
197:9
**breakdown**
98:24
**breakdowns**
98:23

**brief**
170:17
**briefly**
16:7 21:7
114:15 120:5
126:9 190:15
191:24
**bring**
220:23
**broader**
216:5
**broke**
122:9
**broken**
33:19
**Brooks**
68:23,24
70:17 84:23
128:22
129:1,20,21
134:17
**buildings**
70:9
**Bullock**
155:4
**bureau**
56:20 58:19
59:4 60:7
67:19 201:22
**BVAP**
74:6 112:12
118:10
134:24 135:8
216:23
**BVAPS**
143:19
190:10

———————

C

**Calhoun**
162:4
**call**
54:7 69:17,
19,21,23
85:3,4 87:2
112:2 129:24

**brief**
130:25 132:9
198:15
**Callahan**
23:25 24:19
28:8 29:15
30:21 31:17
36:18
**Callahan's**
28:16
**called**
19:19,21
55:20 61:15
77:14,16
129:22,25
204:18
**calls**
54:9 83:21
84:6,13,15
85:1 102:25
103:3,5,11
105:5,9
195:19
**campaign**
20:2,6 21:12
22:22 23:1
**campaigning**
228:4
**campaigns**
21:11 44:1
**candidate**
112:14 142:9
168:8,9
**candidates**
21:13 210:24
211:11
**capable**
101:18
**capital**
77:20
**capsulize**
122:25
**capture**
207:8
**captured**
207:4,15
**capturing**
207:17

Caster Plaintiffs' Exhibit 88, Page 67

Randy Hinaman
December 09, 2021

**cards**
124:17
**care**
131:24
**Carl**
111:6 122:20
134:16
192:20
**cascade**
115:5
**case**
9:14 11:16
23:15 54:25
85:23 87:2
112:21
139:24 142:2
170:1 184:5
206:4,23
219:18
**cases**
205:14
223:12
**Caster**
10:12 228:11
**Caucus**
25:16
**caused**
202:15
**CD**
170:7 216:25
217:2
220:21,22
**cell**
18:24
**census**
15:23 32:22,
24 39:3,4
55:11 56:9,
14,16,20
57:1,3,5,15
58:18 59:4
60:6,19
63:16,22
64:5,8,23
66:6 67:11,
16,19 68:7
71:8,17

74:16 76:3
77:24 82:5
84:9 133:24
138:16
151:14,21
177:11
201:22 202:6
203:4
206:17,21,25
**Center**
186:2
**certain**
20:14 34:2,7
100:17
109:12 117:6
119:4,6,9
138:20 157:4
175:8
**certainly**
47:5 58:2
59:4 74:4
79:19 89:10
96:12,16
100:24
101:18 109:5
121:10
150:10,24
152:24
162:19
192:20 200:6
**certificates**
20:11
**certify**
9:4
**chain**
222:10
**chair**
11:13 52:15,
16 184:21
188:6 190:3
**chairperson**
188:9
**chairs**
9:25 52:14
54:10 74:21
86:17 204:22
223:23 225:2

**challenging**
70:11
**chance**
170:19
192:18
**change**
23:3 38:5,7
39:11 41:17
72:3 73:18
85:18 92:6,8
101:20
104:15,20
105:2,21
110:21
117:24
123:18 156:6
180:25 183:4
185:5,20
189:17
190:24
191:2,3
192:10,12
219:20
220:6,16
221:1
**changed**
22:13,15,16
56:7,14 99:6
120:22
128:19
182:17
190:12
**changes**
28:15 29:12,
19 38:17
44:25 46:7
54:15 57:21
71:6,7 84:18
86:10 91:19
99:2,4
100:4,5,8,9,
12,17,18,20,
22 101:3,9,
11,14,21
103:4,9
104:25
105:4,6,11
110:1,6,9

113:7,15,24
115:5,14,20
116:15
118:16
124:12,13
128:21
130:19
142:18
145:12
158:18
173:12,23
175:2,4
181:3,7,10
183:7,12,14,
15,18 184:2,
13 186:4,11,
25 189:11,12
194:25 195:2
207:4 212:16
214:15,16
220:13
224:20
**changing**
146:17
219:23
**characteristi
cs**
34:15 175:12
**chart**
213:16
**Cherokee**
126:10 195:1
**Chestnut**
170:17
**chief**
23:25 68:23
70:19 84:7
129:5,19,22
131:3,8,13,
14 134:11
**chiefs**
121:9,11
**Chilton**
124:12
126:24
130:17
**Choctaw**
155:2 163:21

**Caster Plaintiffs' Exhibit 88, Page 68**

Randy Hinaman
December 09, 2021

**choice**
86:6 112:15
142:9 145:2
168:8 210:24
211:11

**choose**
104:8
128:10,13
138:2

**choosing**
32:15
132:21,22
133:4

**chose**
128:11 224:1

**Chris**
10:1 11:14

**chunk**
127:23

**circumstances**
157:4

**citizens**
53:2,7 73:7
104:3 114:14

**city**
227:21

**Civil**
9:5,14

**Clair**
162:5 220:14

**clarification**
64:1 173:22

**clarify**
108:20
169:25

**clarifying**
77:10

**Clarke**
114:21 115:2
123:7,12,22
221:19,23,24

**Clause**
139:16

**clear**
51:1 56:5
73:20 74:3
119:8 122:23

171:8,15
173:15 220:3

**clearly**
167:8

**clerk**
10:25

**clients**
22:18,19
43:9,13
62:21,25

**Cline**
22:21

**close**
50:5 66:14,
16 73:14
79:22 149:18
151:22 214:6

**closed**
70:9

**closer**
73:23 114:8

**closing**
125:4 126:3

**clue**
113:24

**co-chairs**
59:23 86:16
88:22 99:12
136:11

**Colbert**
220:20

**Coleman**
16:14 190:15
191:24
192:16,17

**Coleman's**
180:15

**colleagues**
87:23

**college**
125:17
203:10,22

**color**
144:21,23

**combination**
129:14
191:10

**come**
25:1 29:16
49:9 71:17
75:9 88:23
92:12 129:3
134:17
140:4,6
141:12
142:10
145:20
151:19
153:20
157:24 158:6
159:17 196:1
216:19

**comes**
49:8 152:20
159:18,21
188:1

**comfortable**
29:20 118:15
125:2 130:18
178:15
227:23 228:1

**comment**
37:11 118:15
181:21 188:7

**comments**
89:2,5

**Commerce**
201:6

**commission**
125:4

**commissioner**
9:3

**committee**
9:25 11:13
12:8 15:24
26:17 48:10
67:2 110:4,
5,7 120:16,
20 135:19
136:4 165:8
167:11
178:20
200:21
204:22 213:3
217:24

223:4,23
225:3

**committee's**
107:2 203:21

**committees**
90:24

**common**
41:15

**communicating**
218:8

**communication**
108:6

**communications**
88:7 108:7

**communities**
152:7,15,17,
23 153:8,9,
13,18,19,23,
25 154:5
155:10,12,
21,24
156:12,15,
17,22 157:3,
10 165:24

**community**
35:13,15
89:18,21
97:14 129:11
153:1,3
154:13 155:6
156:8,24
203:10,22

**compact**
124:21
130:21
132:16 133:2
141:25
142:3,5
146:8,20
149:20
172:19
173:4,11
174:2 193:9

**compactness**
157:19
186:20
193:13,14,18

Caster Plaintiffs' Exhibit 88, Page 69

Randy Hinaman
December 09, 2021

companies
  21:16 114:11
company
  20:21,23
  21:5 22:15
  23:2,3 52:23
compare
  219:13
comparing
  205:7,12
comparison
  165:1 205:9
compelled
  200:3
compelling
  165:10
compensated
  17:10 18:1
compensation
  55:2 56:3
  57:23
compilation
  192:13
compilations
  191:4
complaint
  202:1 221:9
complaints
  16:1
complete
  50:15 61:7
  104:14
  113:18,21
completed
  19:12 60:24
  61:5 102:2,
  19,24 104:12
  105:8,14
  106:11
  107:11
  110:13
completely
  60:22 72:5
  214:3
compliance
  140:23
  143:23 152:9

165:12
complicated
  161:15
complied
  138:12
  143:10
  145:23
  150:13
  151:25
complies
  140:12
  142:14
  143:15
  144:4,8,14
  147:1 155:9
comply
  99:9 112:22
  113:7 139:15
  140:16 141:1
  144:25 148:4
  150:20 152:3
  158:4 164:24
  178:19
  193:20 194:2
component
  171:16
comported
  189:2
composed
  146:7
comprehensibl
e
  172:20
computer
  76:11,19,22
  77:12 78:1,
  10 79:10
  82:13 98:1
  101:11,14
  227:5
computers
  33:12 76:17
  78:12 80:4
concentration
  32:8,20
conceptually
  113:14

concern
  189:4
concerned
  184:8,9
concerns/
discussion
  58:15
concert
  31:17
concluded
  142:19
conditions
  108:17
conducted
  168:11
confident
  119:5,7,8
confirm
  92:9 117:10
  144:4
confirming
  41:21
conflict
  72:7 149:14,
  22 152:20
  155:20
  157:25
  165:14,19
  166:5,11,16,
  18 167:2
conflicts
  86:25 165:23
  166:4
confused
  209:19
confusion
  90:21
congress
  21:12 24:18
  40:10 43:14,
  17 56:18
  58:16 59:7
  64:6 65:8,14
  66:21 67:7
  80:11 84:7
  103:6 107:16
  120:6

200:18,25
  206:3,12
  224:2,23
  227:15,20
congressional
  23:21 26:10,
  12,13,15
  27:6,10,13
  29:22 30:1,
  7,11,12
  37:22 38:11
  39:6 40:9
  42:19 43:6
  44:6 45:18
  48:12,16,17,
  24 49:19
  51:6,12,16
  52:2,5 54:11
  56:25 57:14
  58:13 59:18,
  25 60:9,12,
  24 61:6,19
  63:16 66:5,
  24 67:20,24
  68:5,15,16
  69:2 75:3
  80:25 81:9,
  25 83:16,20,
  23,24 85:19,
  21 86:9,15
  87:13,15,20
  88:11 90:3
  91:13 92:25
  93:4,15,19,
  23,24 94:6,
  9,25 95:5,
  10,16 99:21
  100:6,9
  105:17
  106:10,13,18
  107:12
  110:19 111:3
  119:23 120:2
  121:2,7
  123:3 128:1
  132:3 134:12
  136:8 137:6,
  15,22
  139:11,24

Caster Plaintiffs' Exhibit 88, Page 70

Randy Hinaman
December 09, 2021

142:2
145:21,23
147:12,17
148:19
150:21
151:18
155:17
158:13
160:14,15,22
167:18,21,25
169:3 170:8
171:5,12
172:13,25
174:16
176:19
179:2,11,23
180:3,23
181:6,24
184:11,17
185:9,16
194:13,15
196:8,9,14,
21 198:19
200:20
202:7,17
204:9 206:10
209:8 218:14
222:25
223:17 224:9
225:18
congressman
22:21 23:25
24:19 27:20
28:8,16
29:15 30:21
31:16 36:17
43:24 68:24
69:8,22,25
70:5,17
72:22,24
94:19
104:17,18
111:5,6
113:25
116:11 117:3
118:5
119:18,19
121:9 122:15
123:20,25

125:5,15,21
126:5,7
127:4
128:15,22
129:1,20,21
130:3 131:4,
8,16 132:12
133:14
134:10,22
180:25 181:4
182:24 183:9
184:5 226:7,
16 227:20
congressmen
23:22 58:21
80:18 92:11
105:18,23
121:11
122:11
134:16
congresspeopl
e
125:9
Congresswoman
43:8 45:7,25
69:5 101:1
103:12
122:16
132:13
210:10,12,
16,22 216:12
217:12 218:8
219:2 226:6,
18,23
connected
200:10
connecting
151:17
connects
151:14
consensus
60:4 75:2,3
consider
37:6,18
48:12,14,19
49:18 96:23,
24 105:6
106:24 107:3

140:19
147:8,16
148:13 153:9
155:5 161:6,
13,20 162:2,
14 163:17
164:3,7
167:20
174:17,20
176:11,14,
17,22 177:6,
8,13,18
204:15
207:23
212:8,9
216:11,16
considerable
58:14 97:4
161:25
162:21 163:6
consideration
100:23 165:9
consideration
s
144:21 146:2
160:4 187:5
considered
30:4 35:22
107:1
167:12,17
210:6 217:10
225:9,11
226:23
considering
132:24 133:4
163:23 212:6
consistently
161:24
constituents
101:6
Constitution
139:17 141:3
147:6
constrained
199:15
consult
21:10 41:3

consultant
21:8 24:1
consultation
196:2
consulting
20:19 21:9
58:6
contained
37:12
contend
109:14
content
15:3
Contests
150:6
contexts
202:11
contiguity
151:7,8,12
contiguous
36:4 142:5
146:7,11
147:25 174:3
contingent
56:4
continuation
28:3
continue
118:23 159:7
continued
53:20
continuing
39:23
continuity
148:20
continuously
162:12
contract
43:16,19,21
52:17,19,22
54:3,5,7,22
55:3,6,8,18,
20 56:8 62:2
113:4
contracted
53:1,13
136:25

Caster Plaintiffs' Exhibit 88, Page 71

Randy Hinaman
December 09, 2021

control
  28:17
controlled
  27:19
conversation
  108:21 120:4
  143:14
conversations
  58:12
  104:16,17
  108:24
  109:2,3
  122:10
  128:15,24
  130:5 141:13
  142:11 183:8
convinced
  131:5,11
cooperate
  133:25
coordination
  68:12
Coosa
  124:12
  126:19,21
  130:16
copies
  14:8 110:24
  169:10
copy
  14:10,18
  21:25 22:3,9
  26:4 54:22
  92:21,25
  93:15,19
  102:21
  120:18
  135:18 136:6
  169:6,8,10
  201:5 208:17
  221:10
core
  159:9,11,20,
  25 160:3
  161:2,3,8,
  13,14,21
  162:2,4,7,
  14,16,24

163:2,3,13,
17,19,24
164:3,8,14,
19 211:22
212:19
222:4,18
cores
  39:15 93:25
  157:23
  158:22
  159:1,19
  164:17
  178:25
  192:21
  212:13
  222:9,18
  223:10
Cornell
  19:13,18
corner
  160:13
correct
  13:2 16:21,
  22 18:17,18
  22:9 26:4
  30:9,13
  36:12,19
  37:23 38:11,
  22 39:4,5,14
  40:16 54:21
  57:6 58:7
  61:9,16
  63:21 65:16
  67:8,22
  69:14 75:16,
  17 76:3,4,9,
  22,25 78:2,
  10,11 80:5,6
  81:6 82:6,20
  85:21,22,23,
  24 91:4
  93:4,18,24
  94:8,11,15
  95:19,20
  96:5,6 98:16
  99:23
  100:10,11,
  16,18,19

105:2 106:1
110:16,17
118:6 123:6
139:12,13
140:3 147:15
150:23
151:2,3
160:24
165:16,17
171:6 172:3
174:25 175:1
183:10,11,17
194:13
195:7,8
196:16
198:18 199:4
206:11,19,20
207:1,2,3
210:8,14
211:20,21
216:13,14
217:22 218:2
219:3,24
220:11,24
221:2,22,23
222:5,6,15,
16 223:20,
21,24
225:10,13
226:1,21,25
correctly
  111:20
  188:13
  191:18
correspond
  120:12
corresponding
  183:4 195:2
  215:16
counsel
  9:6 99:13,14
  106:21 139:8
  140:8 141:13
  142:11,18
  143:7,8,14
  149:3 164:11
  168:22
  169:5,7,23,

24 195:13
196:2
198:21,23
199:12
202:18 203:1
204:22,25
209:21
counsel's
  202:23
counties
  32:10 42:4,7
  44:18 64:18
  72:17 73:22
  75:8 89:22
  90:21,25
  96:1 102:10
  114:19
  146:11
  153:7,22
  154:18,21,25
  157:5,15,21
  158:1,12
  159:2,13
  161:4,9,20
  162:6 163:20
  164:2 165:25
  178:14 179:2
  183:20,24
  206:22,25
  208:4 213:10
  216:9 220:12
  221:14
counting
  12:20 147:20
county
  33:19,21
  40:25 44:21
  56:19 64:9,
  16 65:9 66:7
  71:23 72:8
  73:6 90:15,
  20 91:1,7,23
  92:12,13
  93:6,16
  94:12,21
  95:2,5,8,10
  96:4,5,8,9,
  24 97:10,13,

**Caster Plaintiffs' Exhibit 88, Page 72**

Randy Hinaman
December 09, 2021

19,21 100:25
103:13 112:1
114:21 115:2
117:19
123:8,12,22
124:3,4,16
125:13
126:10,15,21
127:10,24
129:13
130:10
132:2,5,9,
17,19
146:14,17,
23,25 152:21
158:8 159:13
161:16 162:7
170:11,14
171:17
172:21,22
174:10,15
181:8 182:1,
25 183:3
184:7
185:22,24
186:23
188:15 191:3
193:16
204:7,8,9,
10,17 205:3,
6,10,16,21
206:1,4
207:19
208:9,16
211:14,24,25
212:1,2,3,19
213:4,7,8
214:2,4,5,
23,25 215:4
216:19
217:13,14
218:6 219:3,
11,21 220:2,
8,21 221:20
225:17,24
226:8,14,17,
18,25 227:8,
10,22

couple
46:14 48:13
62:24 63:13
79:16 127:13
129:25 133:8
145:18
180:10,17
188:12
223:12
course
11:16 48:25
87:22 105:20
123:8 174:13
205:3 214:8
215:3 223:11
court
9:1,15 11:1,
16 13:13
24:3 26:11
31:11,25
79:1 112:21
113:15
131:5,12,16,
19,22 199:6,
13 200:3
201:22 203:3
210:2 219:17
220:5,22,25
221:5
court's
202:12
court-
approved
199:14
court-ordered
199:15 200:4
220:7
courts
113:13
202:10
cover
47:19
covered
108:25
109:14 113:3
148:1
COVID
55:10 63:7

crazy
63:8 146:15
create
31:12 50:12,
20 142:1
172:12
176:18 177:9
178:5,18
202:9 209:7
created
30:11 53:22
96:21
creating
50:8 178:2
183:9
criteria
41:4 137:8,
10 138:22
144:17,21,25
165:5,9,14
166:24
167:13,15
198:18
crystal
113:1
Cullman
162:17
current
16:6 23:11
159:13,14
cutoff
138:21
cycle
196:11,19
Cyrus
226:20

_____

D

Dallas
117:19 155:3
226:24
227:10
data
32:22,24
33:15,18
39:3,4 41:9,

24 42:13,16
48:22 49:6,
11,14,16
56:9,14,16
57:1,4,15
60:19 64:8,
10,16,23
67:11,12,16
68:7,9 71:9,
17 74:9,16,
22 75:25
76:3,6,11,14
77:24 82:10
83:10 84:5,9
97:20 99:20,
24 101:4,6
102:3,24
106:7,8
129:24 133:3
157:9 160:4
195:6,9
202:8,9,20
206:17,21,25
207:2 213:2,
17
date
9:4,16 18:8
22:11 25:15
58:11 61:12
dated
135:21
Dave's
213:23,24
214:16
Davin
10:17
Davis
9:22 15:6
50:22 169:22
170:23,25
171:7 178:7
day
79:19 180:19
days
79:13
DC
59:14,16
67:7,24

Caster Plaintiffs' Exhibit 88, Page 73

Randy Hinaman
December 09, 2021

68:14 69:14,
16,18 73:17
**deal**
157:25
**dealing**
105:22
**December**
9:7,16
**decent**
78:25
**decide**
132:4
**decided**
24:20 85:3
86:2 127:14
129:1 131:17
**decision**
199:13
**decisions**
223:18
**declaration**
25:12 26:4
**declined**
68:18,21
**deemed**
113:15
**deep**
191:22
**Defendant**
170:11
**deferred**
224:8
**defined**
156:25
**definition**
32:11 153:1,
3 156:21
159:22
**definitive**
153:17
**delay**
55:11
**delayed**
68:7
**delegation**
24:20 26:15
30:23 31:17

45:23 46:2
58:13 201:1
222:25
223:18 224:9
**democrat**
151:2
**democratic**
28:13 39:24
**democrats**
27:19
**demographic**
38:17
**demographics**
35:19
**demonstration**
202:8,16
**Dental**
22:23
**Department**
201:6
**depend**
113:15
**depending**
124:7 154:6
223:7
**depends**
149:14
**deposed**
12:16
**deposition**
9:12 13:1
14:10 15:5
16:17,20
17:4,8 22:4,
5 45:14
181:21 222:8
229:3,6
**described**
87:1
**describes**
189:9
**description**
26:20
**detail**
125:18
**detailed**
218:18,24

**details**
120:8
**determination**
35:18 142:23
143:6,13
164:4,6
**determine**
35:13 144:8
167:3
**determined**
64:5
**determining**
159:25
**Deuel**
10:15
**developed**
26:14
**deviation**
36:2 73:14
84:19 86:11
102:9,16
128:18
132:11
133:13 134:8
137:16,19
138:1,3,12,
16,20 139:1
140:2 182:18
183:6
188:11,17
189:10,13,17
190:8,9
194:4 197:24
198:16,20
199:3,16,18
200:4,8,23
201:2
202:10,19
208:15
210:13
215:5,21
216:10 223:9
225:10,12,15
**difference**
47:14 210:19
213:9 214:5
**differences**
84:8 169:23

**different**
33:3 68:19
77:14 80:15
94:2 95:22
96:1 103:15,
19 111:19,22
127:13
128:18
152:17,23
154:5 155:12
156:18,19
175:16 191:4
210:7 220:14
**differential**
202:8,16
203:4
**difficult**
70:8 227:17
**diluting**
140:25
142:25
**dinner**
109:4
**direct**
198:14
**directly**
31:7 68:25
219:8
**director**
20:5 134:23
**disallowed**
178:25
**disclosing**
15:3
**discriminated**
143:4
**discriminating**
141:10
**discrimination**
167:3
**discuss**
50:7 70:20
71:5 84:1,17
85:14 86:14,
21 106:17

Caster Plaintiffs' Exhibit 88, Page 74

Randy Hinaman
December 09, 2021

116:24 117:2
118:5 119:15
122:17
131:6,17
178:1 217:13
**discussed**
11:8 17:5,21
45:13 70:23
71:10 73:17
84:10 103:6
106:16
115:24
116:10
119:19
121:3,6,12
122:10
134:14
140:9,20
143:25
144:12 148:2
156:17
164:7,10
165:19
166:12,25
167:13 172:2
191:15
218:7,10
222:8 223:13
**discussing**
125:16
180:25
**discussion**
21:23 45:6
98:8 120:8
127:9 128:9
129:9 131:9,
22 133:7
135:10
164:12
168:25
177:25
218:11,16,25
**discussions**
15:4 61:22
68:12 74:21,
24 86:24
97:24 108:14
116:23

122:15,22
123:2,19,25
124:25
125:18 126:5
127:14 128:2
134:10,15,18
143:9
**disputes**
72:14
**distinction**
143:3 180:8
**district**
9:15,16
26:11 28:17
29:14,23
30:1,2,12,17
31:13 32:2,
3,5,15,16
33:23 34:11
35:12,23
36:5,12,15,
21,23,25
37:1,17
41:17,22,23
42:19,20
43:6,7,11
44:6,14,23
45:2,8,9,12,
18,20 46:1,7
48:15,20,23
49:6,8,9,12
50:3,9,13,20
56:23,24
59:10 70:24
71:3 72:10,
20,22,24
73:7 85:18
94:20,25
95:3,4,9,17,
24 96:3,10,
14,15,24
97:14,15,16,
21 100:4
101:2
103:20,23
104:5,22
107:17
112:6,7,10,

11 114:2,6
115:6,7,8,9,
11,17,21
116:1,12,18,
20 117:7,11,
21 118:2,3,
10,24 119:13
122:21
123:9,20,22
124:1,4,21
125:9,19
126:1,7
127:5,8
128:18,23
130:4,19,22
132:5,6,16
134:23,25
135:9
137:15,24
138:2,8
142:2,3,7
144:19
145:20
146:13
150:11,17
155:17 156:2
157:15
158:11,12
159:4,10,11,
14,19,21
160:1 161:1,
2,3,11,12,
13,14,21,24
162:1,3,4,8,
12,13,15,16,
19,21 163:1,
5,9,11,13,
16,17,19
164:1,3,14,
22 165:25
166:15 168:7
170:8,13,15,
22,25 171:9,
12 172:1,5,
9,12,14,18
173:1,24
174:2,8,18,
21 175:2,3,
4,13 176:18

177:10
178:2,5,19
179:2 183:2,
21,23 184:9,
11 185:7,9,
25 186:1,3,
14,15,16
188:14,18,
20,22 189:21
192:19,22
193:4,6
194:5,10,17,
19 195:10
196:5,25
198:22
204:9,14
206:2
207:11,13
209:8 210:7,
12,16
211:20,22
212:18,20
213:4,7,10
214:3,4,15,
18,19,24
215:8,9
220:1,2
223:7
224:15,18,19
225:18
227:6,18
228:3
**District's**
130:21
**districting**
144:20,24
216:6
**districts**
29:13 30:5
37:7,12,19
39:16 40:18,
24 42:8
48:15 49:4,
19,25 50:5
53:19 54:20
58:23 60:1,7
63:19,24
64:17,25

**Caster Plaintiffs' Exhibit 88, Page 75**

Randy Hinaman
December 09, 2021

66:11,17
67:21 73:23
75:7 80:20
82:1,25
85:16,17
89:7 94:1,
13,17 95:22
98:2,3,6
99:6,7,21
101:7 102:14
103:19
104:23
107:15,18
111:25
112:2,3,4
117:15 128:1
137:22,23
138:13,17
139:10
140:22
143:17
145:12,16,23
146:3,6,19
147:24,25
149:19 152:6
157:7,23
158:10,23
159:2,3
160:3,15,23
164:8,18,20
165:7,12
167:24
176:12,15
178:25
183:25
190:11
192:21
193:10
194:23
198:19,22
202:7,17
207:6,8,16
209:7 210:23
211:10
212:13
214:17
219:23 220:9
222:10,11,12
223:10

**divisible**
137:25
**Dixon**
30:24
**document**
22:6 25:19
135:25 136:2
160:11,13,18
169:16,18
179:20,23,25
201:20
**documents**
14:18 15:21
213:12
**doing**
13:14 21:14
61:8 62:4,
13,18 65:7
74:14 78:24
80:3 82:15
87:22 91:24
92:1,2 97:22
101:18 132:1
140:10
145:17 166:8
187:18
209:18,24
216:22
**Donna**
101:16
107:23
**Dorman**
9:24 12:7
14:24 15:6
88:23 99:14
107:22
121:14
136:11 139:8
177:20
197:23
198:25 199:2
213:2
**Dothan**
161:16
**draft**
26:24 27:1
29:11 54:4
102:2,5,19,

21,23 103:2,
10 104:12
105:8,13
106:8,9
107:11 108:2
109:22
**drafted**
27:14 30:15,
17 136:7
**drafting**
26:8,21
30:25 31:7
42:18 43:5
44:5 93:23
111:3
**drafts**
106:5,13,15
110:18,25
**dramatically**
44:22
**draw**
23:23 24:2,
17 25:2
27:7,15
28:19 30:5,
8,20 32:2
33:9,13
36:11,20,22,
25 37:1,4,9
39:19 43:15,
23 47:5
49:3,24 50:2
52:8 54:11
62:3 73:21
80:8 81:19
87:9,15
114:2
116:11,25
121:1 137:1
168:19
170:13 172:8
177:22
196:6,8,18,
24 208:9
210:23
211:10
219:20
223:19

**drawing**
24:14 26:9
27:6,16
28:11 29:22
31:13 33:1,
7,16,23,25
35:23 37:6,
18 38:15,23,
24 40:1,9
41:4,7,20
42:13 45:17
48:14,23
49:18 51:16
52:1 53:11,
19,22 58:8,
10 60:9,23
61:1,19
62:18 64:3,
20 65:3,12
66:3,5,23
67:4 77:2
80:20,21
81:23,25
83:15 84:2
87:20 88:25
94:5 99:21
100:16
101:7,23,25
105:25 123:3
134:11
136:5,25
137:6 147:9,
17 148:14
149:6 155:8
156:10 166:5
167:17,21
170:15
172:25
173:21,24
174:16,18,21
175:13
176:12,15,19
187:5
194:16,22
195:6 196:14
207:19 214:7
215:19
219:17 220:6
222:22

**Caster Plaintiffs' Exhibit 88, Page 76**

Randy Hinaman
December 09, 2021

225:11
drawn
  24:24 27:24
  29:10,20
  39:21 46:23
  47:1 51:3
  52:3 110:1
  120:17,22
  121:7 140:23
  142:3 144:19
  191:12
  199:17 216:1
dream
  20:3
drew
  23:19,20
  25:3 27:2,21
  34:6,16
  35:12 37:23
  38:1,10
  39:24 40:3,6
  49:19 77:25
  84:14 91:6,
  9,13 95:11
  160:23
  172:1,4
  183:16 187:3
  194:11,15
  196:15 197:1
  199:5 214:10
  221:4,13,14,
  18 222:2,4,
  23
due
  165:8
duly
  11:4
Dutton
  203:25

E

E-S-R-I
  77:20
earlier
  114:10
  115:24

126:20
130:24
134:14
150:18
152:12
154:15
163:20 179:6
180:8 212:6
222:8
early
  67:6 68:1
  177:12
earnest
  57:18,19
  58:9
earth
  19:23
eastern
  205:16
Ebenstein
  10:19,20
economic
  153:4 154:7
  157:2
education
  19:11 52:6
  54:12 56:18
  65:5,7,13
  139:10
educational
  20:11 35:5
  176:2
effect
  140:25
  142:24 158:6
  220:17
effective
  64:14 65:1
effort
  24:16 73:23
efforts
  24:6
eight
  13:2 45:14
  80:12 81:14,
  17,18

either
  17:1 48:9
  51:11 88:22
  96:8 123:16
  125:18
  178:24
  192:25
elect
  142:9 210:24
  211:11
elected
  21:13 214:19
  227:17
electing
  168:8
election
  35:9 41:6
  42:2,3 62:23
  75:18 112:14
  176:8
elections
  27:10
electorally
  41:23
Eli
  9:20 201:4
  203:8 213:12
eliminate
  97:11 132:17
eliminated
  186:19
Elizabeth
  10:24
Elmore
  124:9 161:18
  214:25
email
  19:2,6 88:4,
  7 120:12
employees
  21:4
employment
  35:1 175:23
enacted
  51:7 110:15
  196:10,16
  205:15 206:7

214:8
219:14,22
220:9,15
222:3,22
end
  15:1 51:17
  55:12,17
  57:2,4,11
  60:17 64:23
  66:13 79:18,
  19 82:18
  85:2 96:19
  102:20
  119:21
  124:18,24
  125:2 127:9
  128:16,21
  145:14
  186:2,15
  214:16
  218:10
endeavor
  24:23
ended
  73:4 207:12
  214:7,20,24
  229:6
ends
  229:2
Enfinger
  28:20 29:7,8
ensure
  173:24
entails
  168:3
entire
  45:23 63:3
  155:15
Entirely
  78:14
envision
  71:1,3
equal
  127:22
  139:16,23
  165:3 202:12

Caster Plaintiffs' Exhibit 88, Page 77

Randy Hinaman
December 09, 2021

equality
  165:11,20
  220:24
equalize
  137:15
equalized
  204:12
equally
  150:22,25
equitable
  185:8
errors
  202:15
Escambia
  72:25 104:21
  111:6
  123:17,18
  124:15,19
  158:8 181:1
  183:1 184:7
  205:15,17
  206:4
ESRI
  77:6,15,17,
  22 78:3
essentially
  28:3 38:16
  123:4 182:24
  191:11
  192:11
  193:10
established
  153:13
establishing
  165:7
estimate
  72:11 102:4
  111:14 113:9
estimated
  72:2 206:17,
  21
estimates
  56:19 57:5
  59:9 60:18,
  21 63:17,22
  64:25 66:7,
  12,13 70:25

72:4 73:12
74:11 84:8
102:6,12,17
114:5 207:4,
7,10 208:2
et al
  9:13,14
ethnic
  157:1,8
Etowah
  162:20
  214:12
evaluations
  185:12
Evan
  9:13
eventually
  91:22
everybody
  41:2 59:15
  80:15 85:4
  134:22
  152:22 154:8
everyone
  14:9 229:1
evidence
  145:2,3
  196:4
exact
  45:3 47:2
  212:24
  215:23
exactly
  37:3 57:12
  85:13 109:8
  132:3,25
  169:24 172:7
  214:1
examination
  9:8 11:18
  197:20
  198:14 212:6
examined
  11:4
examples
  206:6

exceedingly
  227:17
exchange
  104:5
excited
  125:1
excuse
  20:10 26:12
  48:12 77:7
  122:16
  156:23 177:7
  183:13 224:6
exhibit
  14:7,13,15
  21:19,24
  25:6,9,10
  92:17,20
  93:10,14,18
  110:15,16
  135:14,18
  147:22
  160:7,11
  167:10,16
  179:16,19
  189:9 201:15
  203:12,15
  208:21,23
  219:16
Exhibits
  14:3 213:19
exist
  23:12 110:23
  153:15
  217:19,20
existed
  196:4 212:22
  217:16
existence
  187:15
existing
  39:3,15
  93:25 100:3
  157:23
  158:23
  159:2,10,11,
  25 211:21,22
  212:12

exists
  145:3
expand
  47:9
expect
  17:25 112:24
experience
  23:17 26:8,
  21 27:5
expert
  168:5 171:15
explain
  21:7 44:24
  45:16 49:2
  148:25 149:5
explored
  73:19
extending
  186:22
extends
  172:5 212:3
  227:22
extension
  172:9 212:18
extensively
  189:16
extent
  14:9 44:2
  54:13 74:7
  86:25 108:4
  146:16
  148:18
  152:8,18
  196:22
extraneous
  181:21

                F

face
  132:8
facilities
  104:1 114:11
fact
  68:6 137:5
  171:8 224:5
  226:15 228:2

Caster Plaintiffs' Exhibit 88, Page 78

Randy Hinaman
December 09, 2021

factor
  35:22,24,25
  104:10,11
  150:22
factors
  34:20
  100:13,21
  132:24 133:3
  147:8,16
  154:6
  167:16,20
  175:16 187:1
facts
  169:6,17,18
failed
  24:17
fair
  13:11,25
  17:24 25:4
  38:25 39:1,
  25 40:2
  48:13 51:9
  53:2,3,7,8
  63:25 80:22,
  23 119:9
  154:1,2
  183:19
  197:11,12
  205:8
fairness
  184:9
fall
  61:15
familiar
  27:23 111:17
  141:4,6,15
  154:14
  181:4,10
  205:2 213:24
far
  20:7 70:17
  147:18,19
  148:22
fast-growing
  162:6
Faulkner
  181:6,12,14
  182:20

185:16,23
186:25
187:3,6
190:25
191:3,11
192:9
Faulks
  10:21
Favorite
  176:4
feature
  89:11
features
  91:20
federal
  9:4 21:11,16
  24:3 26:11
  36:10 201:22
  203:3
feedback
  29:22 87:8
  89:14 90:1,
  4,16 92:5
  103:10
  105:12
  106:10
  107:25
  116:11 121:5
  187:21,24
  192:7
feel
  66:10 67:16
  102:13 107:6
  178:15
  227:23,25
felt
  104:1 156:9
  193:19 194:1
  199:15 200:3
fewest
  157:20
field
  20:5
fifth
  158:21
fighting
  125:9

file
  24:21 78:6
  179:22
filed
  9:15 24:22
  25:15 169:7
  201:21
filling
  97:23
final
  84:16 85:2,
  3,4 128:20
  131:1 134:21
  177:11
  206:25
finalized
  109:25
  217:20
finally
  127:14 130:3
  163:16
financial
  94:23
find
  47:1 112:22
  203:8 215:11
fine
  68:10 78:24
  123:17
  126:21
  130:15
  148:12
  169:14
finger
  170:9,13
  171:16,23
  172:5,8
  174:9,14
  186:23
finish
  49:3 78:22
  79:1 81:22
  197:8
finished
  98:12 225:7
Finishing
  98:14

firm
  144:3,10
first
  24:16,23
  27:4 29:14
  30:12 51:15
  67:10 91:6
  93:17 102:2
  106:6 129:5,
  16 148:25
  150:4 182:1
  184:4 188:6
  217:23,25
  218:1 219:25
fit
  32:11 96:19
five
  15:15 18:20
  68:17 69:3
  79:13 85:1
  154:5 165:19
  166:11
flavor
  207:4
flawed
  202:20
flew
  68:14
flip
  25:21 146:5
flipping
  161:5,12
  163:1,16
floor
  17:1 48:9
  120:4
  184:19,20
  188:6 191:19
  192:3,5
  224:14,21,22
Florence
  91:24
fluid
  154:1
flying
  67:23

Caster Plaintiffs' Exhibit 88, Page 79

Randy Hinaman
December 09, 2021

focus
  29:13
focused
  225:22
Focusing
  83:24
folks
  98:1,2 127:8
  159:6,7
  171:22,24
  197:10 206:8
  210:18
follow
  100:7 109:19
  137:1,5
  202:23
follow-up
  130:25
follow-ups
  81:15
followed
  15:8 193:12
  208:15
following
  9:9 110:4
follows
  11:5
football
  154:8 176:4
footprint
  130:21
Force
  115:22
foregoing
  9:5
form
  16:18 33:5
  37:15 50:22
  138:23
  146:13
  168:24
  170:23,24
  178:7,12
  187:8 195:19
  198:1,10
  202:21 210:4
  216:17

forma
  120:8
formal
  20:25
formally
  87:25
formed
  23:6
formulating
  60:3
forth
  49:7 54:15
  55:11 59:11
  81:15 94:24
  114:12
  129:13
  211:15
  223:14
forward
  50:6 59:25
  75:1
found
  34:7 202:11
  206:11,14
  226:15
four
  15:15 23:19
  41:11 46:13,
  25 52:1,4,8
  54:11,14
  55:4,5,20,21
  56:12 62:3,
  19 64:2
  66:17 79:13,
  24,25 80:3
  84:25 116:18
  136:5,25
  154:4 168:19
  181:17
  183:24
  186:1,14
  207:5
fourth
  157:12
frame
  56:6 62:9
  67:1,5 74:19
  75:19,22,25

79:25 84:22
105:24
122:24 123:1
196:12
Franklin
  220:21
frankly
  218:12 226:2
frequently
  204:13
Friday
  15:1 61:10,
  12 169:8
front
  21:10 33:16
  52:20
full
  60:21 63:2
  64:17 180:17
full-time
  18:13
fully
  56:1 73:3
fun
  59:1
function
  32:19
further-away
  132:18
furtherance
  60:9 66:5,23
  83:15 134:11
future
  113:2

_____

G

_____

gain
  40:19,20
  72:24 95:3
  210:18
  212:14,15
  224:3
gaining
  172:22 184:6
Gary
  188:16

226:16
gather
  32:21 90:11
gave
  22:4 82:11
  135:1,5,9
  199:23
  210:17 225:1
  227:6
gears
  210:9
general
  34:6 38:14
  39:2 154:24
general's
  17:15,17,20
  18:3
generally
  38:23 46:6
  73:16
geographic
  153:4 157:2
geographical
  128:6 186:20
geographicall
  y
  97:3,18
  124:20 128:8
  130:20
  132:7,22
  133:2 134:1
  146:20
  172:20
  173:4,11
  174:2 193:8
geography
  32:19 35:19
  36:2 99:25
  128:11,12
  146:2,8
  153:6 159:12
  202:6 223:8
gerrymandered
  170:9,22
  171:13
  172:16
  173:2,25

Caster Plaintiffs' Exhibit 88, Page 80

Randy Hinaman
December 09, 2021

get all
  216:19
getting
  124:4 126:14
Gingles
  142:4
give
  27:22 40:25
  41:24 88:2
  104:14 117:5
  165:8 200:22
  201:1
given
  76:11,14
  81:25 87:14
  165:10 167:5
  223:3
giving
  130:7
goal
  29:25 36:20,
  24 37:1
  42:18 43:5
  44:5 59:14
  92:10 172:19
  216:5 224:11
goes
  70:17 132:17
  140:1 171:16
  212:18
going
  25:9 28:25
  31:4 41:22
  45:2,5 48:11
  49:5,6 50:6
  51:5 55:10
  57:10 58:23
  59:1 60:7,22
  61:17 62:3
  65:18 68:6
  72:3,4,20,21
  73:18 74:13
  82:3,15
  88:19 89:10
  93:13 102:17
  105:15
  108:3,12
  114:6,23

118:4 121:15
124:25 127:7
129:3 130:2
131:5,12,16,
19 134:6
147:6 155:13
164:2 168:25
176:23 184:6
191:6 196:20
197:18
198:3,13
202:23
205:20 208:6
209:6
213:11,15
215:8,9,23
216:2,12
219:20
good
  10:19,21,23
  11:19,20
  34:9 38:6
  43:1 81:4
  124:5 129:14
  133:10 145:3
  184:3 185:5
  186:19
  192:10,12
  197:21,22
  207:17
  214:14
  227:18
Goodlatte
  22:22
government
  19:20,22
governments
  158:14
governor
  41:16 225:5
grabbing
  170:10
graduate
  19:16,25
granular
  125:17
grass
  211:8

greater
  150:1 199:18
Greene
  155:2
grew
  227:9,11
group
  53:9,13
  133:10
  144:22,24
  154:18
grow
  158:13
growing
  163:4
guess
  15:15 17:22
  21:2 24:16
  25:3 31:14
  40:2 45:2,5
  50:17 56:20
  61:2,4 64:8
  68:20 74:2
  84:16 86:5
  101:20
  113:14
  118:15,17
  129:17
  141:23
  142:4,19
  153:22 155:4
  161:15 166:1
  181:18
  185:22 188:5
  191:21
  198:15 210:5
  221:2 222:10
  228:25
guessing
  62:11
guideline
  39:16 90:24
  223:1
guidelines
  15:24,25
  26:16 67:2
  68:1 74:20
  99:9 120:23

135:19
136:3,7,23,
24 137:6
151:16
167:12
178:20 179:3
188:12
193:12,21
194:2 196:3
206:15
208:14
223:3,9
224:3 225:14
226:12

_____

H

Hale
  155:3 210:5
hand
  25:9 93:13
handed
  44:19 136:12
handing
  14:6 92:20
  135:17
  160:10
happen
  38:3,5 56:10
  115:5
  224:24,25
happened
  38:18 109:23
  113:23 207:5
  224:12
happening
  87:3 88:13,
  16 91:21
  118:1
happy
  41:2 116:21
  121:19,22,25
  136:20 219:2
hard
  31:4 47:8,9
  97:5,10
  202:5 221:1

Caster Plaintiffs' Exhibit 88, Page 81

Randy Hinaman
December 09, 2021

**Hare**
  9:20 201:7,
  10,13 203:11
  208:20
  213:15
**Harris**
  104:19
  134:23
**Hatcher**
  16:15 190:15
  191:16,22,25
  193:2,3,20
**Hatcher's**
  180:16
**hazard**
  45:2
**HB-1**
  51:8 196:9
  217:21
  219:14
**head**
  34:25 47:9
  53:6
**heads**
  101:17
**healthy**
  218:15,17
**hear**
  90:6 187:24
  211:23
**heard**
  112:5 181:21
  213:25
  218:19
**hearing**
  90:12 187:14
  198:3 203:9,
  21 217:24
  218:1,3
**hearings**
  88:11 89:14
  90:2,6,16
  91:12 92:6
  182:3 187:22
  211:14
**held**
  211:14

**help**
  13:19 92:15
  175:14
  179:14
**helped**
  24:2,22
**helpful**
  66:19 125:6
**Henry**
  10:13
**high**
  32:7
**higher**
  195:17 202:6
**highest**
  19:11
**highlighted**
  201:8,25
  203:23,24
  204:2,3,5
**highlighting**
  202:4
**Hinaman**
  9:7,12 11:3,
  22,23 20:17,
  24 21:1,3
  23:3 52:24
  66:1 122:9
  197:21
  201:19
  202:24
  203:19 209:1
  213:14,22
  221:11,12
  228:8,25
  229:3
**hire**
  86:2
**hired**
  28:23 38:19
  85:20 86:3
**historical**
  157:3
**history**
  30:13
**hit**
  134:4 155:17

**Holmes**
  180:23
  182:19,21
  183:14
  184:13,17,23
  190:23 191:1
  192:11
**home**
  117:14,17,
  18,19 130:12
  150:15 206:1
  227:8
**Homewood**
  116:17,18
  133:7,8
  185:21,25
  186:13
**honest**
  33:14 45:21
  91:10 151:12
**honestly**
  17:22
**hooked**
  146:12
**hope**
  113:19
**hoping**
  55:9 134:2
  172:19
**host**
  153:7,8,24
**hour**
  13:23 17:18
  65:18 121:15
  197:7
**hours**
  15:15,17
  48:8 60:25
  61:18,19,24
  62:1,4,10
**house**
  47:18 52:5,
  15 54:10,12
  64:15,17,21,
  22 65:11
  70:9 75:4
  78:17 80:10,

**13** 81:7
  147:14
  184:20 186:8
  188:5 224:22
**Houston**
  161:16
**hungry**
  121:21
**Hunt**
  199:7 200:1
  221:5
**Huntsville**
  129:13
**hypothetical**
  113:22
  220:25

---

**I**

**idea**
  38:3 61:2
  62:5 91:8
  131:21
**ideal**
  45:9 73:24
  98:6 114:9
  158:2 225:18
**identical**
  110:14 225:4
**identification**
  14:4 21:20
  25:7 92:18
  93:11 135:15
  160:8 179:17
  201:16
  203:16
  208:24
  213:20
**identified**
  207:7
**identify**
  157:9
**identities**
  157:3
**II**
  137:10,14

Caster Plaintiffs' Exhibit 88, Page 82

Randy Hinaman
December 09, 2021

139:9,14
140:10,15,22
143:10
144:18
147:5,17,21
148:6,7
151:4 152:6
156:20
157:13
158:21 165:6
167:13,16
**imagine**
52:21 155:16
171:21
**immunity**
11:15
**impact**
67:4 91:12
92:6 112:14
**imply**
27:2,3
**importance**
150:1
**important**
13:16 73:6
136:19
**importantly**
136:17
**imported**
78:3,6
**imposed**
31:11
**in-person**
70:4,7
**inaudible**
214:9
**include**
27:6 128:3,4
133:5 157:4
**included**
32:7 35:14
109:6 221:13
**includes**
96:4
**including**
26:9 61:21
80:9 97:20

121:8 157:1
223:23
**Income**
35:3 175:25
**incorporate**
184:13
**increase**
211:19
**incumbent**
172:11
222:24
**incumbents**
40:12 54:19
148:18
149:17,21
150:6,11
151:1 159:5
178:25
188:13
189:19
190:10
192:19 193:7
194:4,6
223:14
**indicated**
202:8
**indicating**
108:18
**individual**
42:4 43:24
**individually**
52:22
**influence**
112:2,4,6,10
206:3
**info**
75:22
**information**
32:21 33:6
41:13,24
48:20 71:15,
19,20 72:1
73:8 82:5,
19,23 83:4,8
87:6 91:11
**informed**
59:5

**initial**
102:2,5
114:4 127:9
130:24 166:9
182:17
187:12
188:10 194:3
211:13
217:16
224:17
**initially**
56:7 97:23
117:13
123:16 124:7
125:2 130:9,
13
**Injunction**
169:17
**inordinate**
179:1
**input**
29:9 223:18,
24,25
**inside**
117:15,21
146:17
161:24
164:22
171:22 227:6
**instance**
34:19 39:12,
17 59:21
111:17 167:2
**instances**
145:19
**instruct**
108:16,23
109:17
177:23
202:22
**instruction**
109:19 167:5
177:15
197:3,4
**instructions**
31:24 86:8
87:14 114:1
116:10 117:5

121:1 200:23
201:2
**intact**
89:16
**intending**
196:23
**intent**
32:2 141:10
**intents**
79:15
**interacting**
27:20
**interest**
35:13,16
39:7 54:15
89:18,21
97:14 129:3,
11 152:7,15,
17,24 153:2,
3,8,10,13,
18,20,23,25
154:5,13
155:6,10,12,
21,24
156:13,15,
17,22,24
157:4,10
165:24
**interested**
51:25 68:19
84:24
114:10,13
115:22 130:1
**interests**
34:24 157:1
165:11
175:21
**interface**
29:6
**interfaced**
28:23
**interfere**
215:3
**internals**
74:5
**interpreted**
199:23

Caster Plaintiffs' Exhibit 88, Page 83

Randy Hinaman
December 09, 2021

interrupted
  191:14
interruption
  42:21
introduced
  179:23 180:3
involve
  108:14
involved
  19:8 24:14
  62:7
irrelevant
  62:4 72:10
issue
  156:3 184:10
  188:19 211:1
issues
  126:3
  155:18,19
  193:22,23
iterations
  110:22

_____

          J
_____

j(i)
  166:25
j(ii)
  151:5
j(iii,)
  152:6 156:21
j(iv.)
  157:13
j(v)
  158:21
j(vi)
  165:6
Jackson
  127:10
  204:7,8,10
  205:3,10,21
Jefferson
  96:5,8,12,
  17,22 97:8,9
  100:25
  115:14
  116:15

130:9,13,19,
21,22 132:2,
5,8,9,17
146:18,23
163:12,22
170:11,14
171:16
172:21,22
174:10 181:8
185:22,24
186:22,23
191:3 209:9
214:5
221:20,25
225:17,24
226:7,14,17,
20 227:7
Jim
  9:22,25 10:8
  11:13 15:6
  198:6 199:21
  209:16
  213:17
job
  13:14 20:3
  78:25 143:3
  207:17
John
  9:13
joint
  169:6,16
judges
  36:10 38:5,6
Julie
  10:19
July
  55:9,14
  56:10 60:16
June
  22:4,9 25:15
  55:14 60:16,
  20
jurisprudence
  202:12

_____

          K
_____

keep
  91:24 129:14
  152:15,18,25
  155:25
  157:20
  158:10
  159:3,7
  209:12
  210:12
keeping
  39:8 91:16,
  17 129:6,10
  158:1 211:21
kept
  44:6 89:16,
  20 91:21
  115:20
  164:21 166:8
key
  12:25 159:13
  162:19
kind
  73:25 74:1
  105:1 122:18
  132:22
knew
  58:17,22
  60:1 68:3
  73:3 74:12
  114:23,24,25
  115:6 138:4
  184:22
  194:19
know
  13:8,24
  26:23 27:3
  28:15,19,23
  29:25 30:4
  31:9,19
  33:14 37:5
  38:4 40:21
  41:15,16
  44:17 45:1,
  7,11,13,22
  48:19 49:6

50:4,19
53:25 55:10,
13 57:9,12
58:14 59:24
61:25 62:6
63:13,23
71:1 74:11
77:19 80:11
81:5 83:2
84:10,25
86:2,6 87:3
91:1 94:4,16
95:2,7,14
96:12,18
99:2,6,8
101:21
103:22
105:17,20
107:5 109:8,
11 113:19
114:23,24
118:21,25
119:4 125:25
129:23
131:13
136:20
143:1,2
144:7
147:18,19
148:22
149:21
151:5,11
153:17
154:21
155:15 158:9
159:18
168:10
170:19 173:3
174:8 179:5
180:11
181:11,13,
15,19 187:2,
18,21 196:11
198:2
204:14,19
212:24
217:9,11
219:1,4,6
221:9,15,16

Caster Plaintiffs' Exhibit 88, Page 84

Randy Hinaman
December 09, 2021

227:8,25
228:2
knowing
60:21 72:3
73:17 102:16
117:16 208:5
knowledge
82:15 93:20
165:18
166:10
169:15 183:6
186:24
189:13,14,16
211:1,4
219:7
known
153:15
210:14

L

labeled
213:13
Labor
79:19
lack
171:23 172:4
189:20
Lake
226:20
Lali
10:11 228:10
lands
157:6
language
202:14
language-
minority
144:22,23
large
9:3 63:4
97:4 162:20
210:8
larger
80:8 206:7
208:4

Larry
30:24
late
103:1
180:11,16
latest
41:11
Lauderdale
91:23 92:4
104:16
127:11,16
128:17 156:2
205:6 215:4
220:20
law
10:25 170:12
225:4
lawsuit
12:22 16:2
17:5 24:21,
23 25:12,17
38:2 111:18,
25 135:20
160:12
179:21
lawsuits
19:9 111:19,
22,24 169:19
lawyer
12:5,10,14
61:3 81:4
141:6,17
143:1 171:14
189:1
lawyers
198:25 200:9
layman's
141:24 168:6
lead
24:9
leader
24:6
leaders
26:25 28:13
leadership
51:23 53:18
54:10 86:1

leading
209:20,23
League
182:11
217:13,25
218:6
Leann
9:1
leave
96:9
leaves
221:21
Lee
162:5,7
leeway
199:18
left
20:4,8 66:1
215:6
legacy
207:2
legal
99:12,14
106:21 139:8
140:8 141:13
142:18
143:7,8,14
149:3 164:10
195:13 196:2
legislative
11:15 23:21
25:16 47:2
86:4 139:10
165:7 179:12
legislators
28:7 31:6
120:1
legislature
16:8 24:17
27:1,18 29:3
31:9 38:21
39:24 47:4
48:5 50:12
52:6 53:16
59:22 75:13
86:14 110:10
113:12

157:14
158:22 167:3
168:19
199:17
211:10
219:22
222:3,11
224:7
legislature's
223:22
length
55:6
letters
77:21 200:12
letting
136:20
level
19:11 21:11,
16 35:5
56:25 64:15
83:3 138:16
166:1 176:2
202:10 203:6
215:21
225:17
levels
64:15
likes
147:21
Limestone
163:4
limited
157:1
line
42:25 122:19
132:4 133:9
137:9
147:21,22
148:6 150:5
151:5 215:2
226:17,20
lined
105:18
lines
34:6 100:4
124:22
152:21

Caster Plaintiffs' Exhibit 88, Page 85

Randy Hinaman
December 09, 2021

204:3,6
**list**
147:19
153:14,17
154:23 180:2
**listed**
137:9
153:11,21
167:1 181:12
**lists**
147:5 148:7
**literally**
48:8 138:25
191:20
**litigate**
72:8
**litigation**
170:6
**little**
16:12 18:7
21:23 38:13
44:24 45:16
104:16,23
121:15,16
124:9,14,21
125:12
126:10,23
127:23 128:5
130:11,17
144:18
161:14
187:18 197:7
198:4
204:10,17
212:17
214:24
**live**
129:12
149:17
204:13 220:1
**lived**
18:16 79:14,
15 100:23
130:9,13
134:2 172:11
226:7,14
**lives**
132:13

133:14
203:25 220:2
226:16,18,19
227:21
**living**
20:18
**Livingston**
204:18
**LLC**
20:24 21:1,3
23:5,7
**loaded**
76:17 79:9
82:13 83:1
**lobbying**
20:19 21:14,
15
**lobbyist**
21:8
**local**
158:14
**Loftin**
101:17
107:23
**logical**
115:1
**long**
13:24 15:13
48:10 62:6
63:12 111:14
113:9 164:1
172:8 180:20
218:18
**long-lasso**
151:8,11
**longer**
80:14,17
81:14 121:16
132:18
144:18
225:19
**look**
16:9 26:7
34:19,22
39:22 42:9,
12,15 47:6,
22 49:5

56:22 74:8,
12 75:7
84:15 97:3,
20,25 98:18,
20,22,24
99:20,24
133:1 137:8
138:5,6
145:15,19
160:20
170:19 175:7
177:21
180:21 182:5
187:19
189:15
192:2,17,18
195:5 206:18
208:16
212:24 215:6
219:10,21
220:8 228:6
**looked**
16:5,7,25
47:12,19
48:1 49:13
71:16 108:9
150:15
171:21 172:6
174:12
180:7,20
187:17
189:15
190:14
191:19,24
196:3 212:13
**looking**
34:16 39:10
45:10 47:14,
17 82:18
93:16 94:12
98:5 132:7,
10 147:11
154:6 156:20
158:15 161:1
164:16
166:16,23
167:15
172:18 180:9

190:21
192:25 206:5
215:16
221:3,8
**looks**
39:22 85:12
93:17 95:15
96:3 139:9
140:15
147:21 191:7
214:6
**loose**
130:16
**lose**
40:19,22
71:22,23
72:22,23
94:22 127:20
184:6 224:3
**losing**
71:4
**lost**
25:3 214:19
**lot**
13:19 59:1
62:25 63:8
80:14,17,20
89:18,21
90:3 127:8
158:13
192:24
193:17
212:23 216:8
**lots**
152:17
156:18
**louder**
198:4
**Lowndes**
97:19 155:3
163:21
**lumped**
208:3
**lumping**
207:24
**lunch**
15:16 109:4

**Caster Plaintiffs' Exhibit 88, Page 86**

Randy Hinaman
December 09, 2021

121:16,24,25
122:2,6,9

---

**M**

---

**Macedonia**
204:18
**machinations**
33:25
**Macon**
155:4
**Madduri**
10:11 228:10
**made**
28:16 46:7
64:17 74:7
84:19 91:19
92:6 99:5
100:8,17
101:9,14,21
102:5 105:5,
11 106:6,8,
13 110:1,6,9
115:20
117:14,22
123:18
124:12
128:21
145:11,25
150:14,16
155:16 156:9
164:4,6
169:10 179:1
180:8 185:21
189:19,22
191:2 210:18
211:18
212:15 214:2
215:4 220:22
222:12
223:19
224:20
**Madison**
89:17 91:17
129:7,10,13
146:14
152:14 163:3

**magnitude**
207:8
**main**
35:22 167:16
193:22
**maintain**
43:10
**maintaining**
160:3
**major**
22:25 35:24
73:1 75:9
189:3
**majority**
24:5 30:2,5,
12 31:12
32:3,6,16
34:11 36:5,
12,15,21,22
37:6,12,16
42:20 43:7,
10 44:14
45:12 46:1
49:9,18
50:2,8,12,20
80:16 81:7
111:24
112:12
117:10
118:19,23
142:6 154:19
159:3
161:10,22
162:10
171:22,24
172:12 174:9
176:18 177:9
178:2,5,19
181:9 183:20
188:17,20,22
189:21 194:9
196:24
**make**
18:19 29:13
30:1 32:3,5
40:24 41:17
42:5,19 43:6
44:6,16,22

45:11 58:22
61:2 81:21
86:10 96:1
97:6 100:5,
12,20,22
101:2,10
103:3,9
110:21
112:25 113:7
115:19
116:20
118:16
120:15,20
124:11
125:22
127:21
130:20
132:16
133:23
138:11
140:11
142:13,17,23
143:2,3,5,22
144:13
145:22
146:18,19
147:1
148:17,24
149:19
150:12,19
151:24 152:2
155:9,22,23
158:3,18
159:2,13
164:18,23
166:4 169:20
171:7 172:19
173:4,6,10,
12,23 175:2,
4 176:21
183:4,16,18
184:1,5
190:20
195:16
198:10 209:9
210:19
215:18 220:7
225:7,24
227:5

**makes**
28:18 97:14
202:5 227:18
**makeup**
44:23 99:7
143:17 175:7
**making**
44:13,25
61:12 81:3
96:24 124:2,
21 127:24
130:11 133:1
143:13 174:1
177:6 190:23
205:11
211:24
213:10
214:15
226:23
**managing**
192:4
**manipulate**
76:19
**manner**
144:20
**map**
16:6,14,15
23:23 24:2,
18,22,24
25:2 27:7,9,
12,13,15,16,
21,24 28:4,
11,14,19
29:7,10,22
30:1,8,11,
15,20,25
31:8,10,11,
13 33:7,9,
13,16 34:1,
16 36:11,14
37:23 38:1,
2,11,15,17,
20,21 39:3,
6,12,13,14,
16,17,18,19,
21,23,24
40:1,3,4,6,
7,9 41:2,4,

**Caster Plaintiffs' Exhibit 88, Page 87**

7,21 42:13,
19 43:6,9,
15,23 44:6,
19 45:18
47:18 48:12,
17,24 49:4,
20 50:2,6
51:6,12,16
53:11 57:14,
17 58:9,22,
25 60:5,9,
12,20,24
61:1,5,19
63:16 64:22
65:6,9,10,
11,13 66:3,
5,24 71:16
72:3 73:10
75:4,6 77:25
78:19 80:13
81:1,8,12,
23,25 83:16,
24 84:2,3,14
85:11,15,20
87:10,16
89:11 91:6,
9,13,19 92:7
93:1,4,15,
19,23,24
94:2,6,10,25
95:6,10,13,
16 96:20
98:13,14
99:22 100:6,
9,15,16,17
101:5,7,10,
15,20,24,25
102:2,12
106:13,18
107:12,16,
19,21 108:2,
10 109:11,
13,23 110:6,
9,12,14,19,
22 111:3
112:1 113:6
114:22
116:16,25
117:24

118:2,3
120:7,9,17,
18,22 121:2,
7 123:3
131:1,15
132:3 134:12
136:8 137:6
138:6,12
139:12
144:1,3,7
147:9,13,17
148:14,20
149:6
150:20,21
151:18 152:3
155:8,23
156:10,12
158:4
160:15,23
166:6
167:18,21,25
169:3 171:5,
13 172:14,25
173:21,24
174:16
176:19
183:9,16
184:14
185:5,13,19,
24 194:12,16
195:3,6
196:15
206:5,7
210:20
212:15
213:16 214:7
215:14
217:10
219:11,14
221:3,5
222:14
224:17,22,25
225:1
**map-drawing**
76:24
**maps**
16:4,7,9,14,
16,17,20,24

23:19,21
24:14 27:2
37:12,17
38:23 39:6
46:9,11,23
47:3,8,10,24
48:4,8 49:24
50:15 51:2
52:1,2
54:11,14,20
55:15 56:15
58:10 62:3,
19 64:2,11,
19,21 65:3
67:4 73:21
74:23 77:2
79:24,25
80:3,7
83:11,14
86:4,15
87:20 88:12
90:4,24
98:19,21,23
103:3 105:25
111:13
112:22 120:2
126:20
136:5,25
145:18,19
156:14
160:22
168:19 180:6
196:6,9,14,
18 197:2
215:19
**Maptitude**
73:12 76:12,
14,15,21
77:13,23
80:5 82:4,
11,18,24
83:5,8
102:13
110:20 208:1
**March**
56:9
**Marengo**
155:3

**mark**
201:11
203:12
208:17
213:12,15
**marked**
14:4,6 21:20
25:7,10
92:18 93:11,
14 110:15
135:15,17
160:8,10
179:17
201:16
203:16
208:24
213:20
**marking**
179:19
**marks**
9:11
**Maroney**
9:1
**Marshall**
162:20
**material**
79:9
**materials**
74:18
**math**
129:24
**matter**
9:13 48:25
69:6,17
146:19
188:23
219:23
220:10
**matters**
188:25
**Maxwell**
114:12
115:22
124:25
125:7,8,11,
12,20

**Caster Plaintiffs' Exhibit 88, Page 88**

Randy Hinaman
December 09, 2021

**Mcclendon**
9:25 11:14
51:22 52:16
75:11 86:19,
22 87:4,19
106:20
107:22 108:1
109:22
119:24
**Mcgriff**
203:25
205:20
**mean**
19:10 24:5
26:23 27:7,
17 32:18,19
36:17 37:20
38:16 39:22
43:13 45:22
46:8 48:18,
25 51:6 56:7
57:19,25
58:12 66:25
70:7 72:19
73:10,13,21
74:6 75:6
78:22 79:22
81:6,7 82:8
87:21,24
91:5 95:23
97:17 99:3
101:16 102:3
103:24
109:3,25
111:4
113:11,14
118:14
124:24
126:17 128:5
133:6 134:20
137:20,21
143:18 149:1
153:22,23
155:11,13
156:14,18
157:24
159:16,22
165:22

166:7,8
168:17 178:9
182:16 187:2
192:8 198:23
207:24
212:7,17,23
214:18
218:17
219:6,25
221:16
**meaning**
53:14 73:22
126:20 131:1
132:16 139:1
207:5
**means**
48:19 73:11
199:3
**meant**
130:1
**meantime**
130:8
**meet**
15:9,18
54:13,16
59:14,20,21
60:3 67:24
68:15,16,18,
22,24 69:8,
14 75:12
80:15 83:13
84:1 86:13
87:18,25
106:17
129:1,5,20
188:11
**meeting**
45:22 56:25
57:20 65:16
70:10 71:13
80:14,17,19
89:6 106:2
129:16
**meetings**
59:8,12,17
60:13 61:21
66:20 68:8
69:24 70:1,

3,4,7 71:21
73:9 80:9,11
81:15 84:17,
21 85:6,10
87:4,23
102:12 114:4
130:25
211:13
217:16
226:3,4,5
**meets**
142:4
**member**
41:15 68:21
96:22 117:14
206:3 222:24
223:22
**members**
24:20 29:2
30:22 38:20
40:10 43:14,
17 57:1,20
58:13,16
59:7,18 60:3
64:5,13
65:17 66:21
67:7,24
68:15,16,18
69:2 70:14
72:7 75:2,3,
12 80:10
81:13,17,18
84:6 86:13,
24 100:23
107:14,16
110:3 120:6
200:18,25
223:17
224:1,14,22,
23 227:14
**membership**
144:22,23
**memory**
92:21 133:19
**mentioned**
16:19 29:23
63:14 90:15
115:16

133:12
146:22
149:24
154:15
190:14
218:15
**Merrill**
9:14,23
170:3,7,17,
21 171:11
**Merrill's**
170:16
**met**
15:6,13
45:22 59:23
67:2,7
68:17,23
69:1,4,6
70:12,14,18,
19,21 83:17,
19 108:1
113:25
210:10,15
**method**
38:14
**metric**
159:24
**metropolitan**
75:9
**Microsoft**
70:2
**mid**
103:1 104:13
105:9 106:8
131:10
**middle**
20:1 95:1
**Mike**
10:4 94:19
188:16 194:7
**mile**
226:18
**military**
114:12
**Milligan**
9:13 10:5,7,
15,18,20,22,

Caster Plaintiffs' Exhibit 88, Page 89

Randy Hinaman
December 09, 2021

24 170:2

**mind**
19:24 34:2,
10,13 91:21
92:1 114:18
115:1 133:1
153:20 159:9
163:13 166:8
188:1

**mindful**
100:24
158:15,17

**mine**
86:7

**minimal**
137:16,19
198:20 199:3

**minimize**
157:14

**minimum**
158:2

**minor**
104:23,25
105:11
218:11
223:12

**minorities**
112:13,16

**minority**
141:1,11
142:1,25
168:8

**minorly**
72:16
103:12,16

**minus**
138:13

**minute**
90:14 187:20
210:9

**minutes**
180:13
191:20
228:18

**missed**
222:7

**Mo**
68:23 84:23

**Mobile**
26:11 89:20
91:16 146:14
152:13 153:7
156:3 161:4
192:22 193:9

**model**
86:5

**modification**
156:7

**modifications**
112:25
150:19 152:2
155:23 156:9
158:4 164:24
166:4 195:16

**modified**
56:12 112:24

**modify**
111:13,16
113:6 172:25

**modifying**
100:3

**moment**
116:6

**Monday**
15:10,11,16
17:4 105:19
110:4

**Monroe**
72:23 104:20
111:7 123:16
124:15 181:1
183:2

**Montgomery**
79:15,16
88:14 89:6,8
90:15,19
91:1,7,15
92:10,12,13
93:6,16
94:12,20,21
95:1,5,8,10,
17,25 96:9,
15,20,24

97:13,21
103:13
115:23,25
116:4 124:3,
4,10,22
125:13,24
126:15
146:18,23,
24,25 154:4
155:4 161:17
183:4 209:9
211:25
212:1,3,19
213:4,14
214:2,23
216:20
221:20,25

**Montgomery's**
201:22

**month**
113:18

**months**
46:14 55:5
62:7 79:16

**Moore**
111:5 123:25
125:5,22
126:5 134:16
180:25 181:4
182:24
183:9,12
184:5 190:24
191:2 192:20
194:6 223:13

**Moore's**
104:18
134:22

**Morgan**
89:17 91:17
129:6,10,12
152:14 163:3
220:21

**morning**
10:19,21,23
11:19,20
15:10,11
105:19 179:6

**mother's**
117:19

**motivations**
187:3

**move**
18:19 59:25
101:1 105:21
132:5,23
192:15

**moved**
18:21 22:15
23:5,6
130:10
138:15
186:13
194:24
215:20
224:16 226:9

**moving**
22:17 51:1
96:23 100:24
128:22
144:17 147:4
157:12 162:1
172:13
185:16
220:21

**municipalitie
s**
157:6

**Muscle**
89:24 91:24
92:4 127:15
156:1,8

**mute**
42:24

**Myron**
10:2

**N**

**name**
11:21 20:23
22:14 23:2
25:24 53:9
104:7 116:3
179:22

Caster Plaintiffs' Exhibit 88, Page 90

Randy Hinaman
December 09, 2021

**names**
    9:19 115:17
    133:16
**narrow**
    190:7,8
**national**
    20:5 200:20
**nature**
    40:18 70:23
    207:16
**necessarily**
    97:17
**necessary**
    157:21
    220:23
**need**
    13:23 59:2
    71:22 111:9
    124:8 131:6
    149:18 228:6
**needed**
    24:21 40:18
    52:2 62:25
    84:11,19
    95:21 102:13
    107:6 111:13
    112:23
    124:6,18
    126:23 127:1
    140:18 183:5
    195:16
    198:16
    212:13
    220:12
    225:19
**needless**
    126:12
**needs**
    16:11
**negotiate**
    41:1
**negotiating**
    73:3
**negotiations**
    72:13
**neighborhood**
    33:20

**neighborhoods**
    152:7 175:8
**never**
    47:21 168:4
    213:25 218:7
    225:11
**night**
    191:18
**nongovernment
al**
    211:8
**nonsubstantiv
e**
    109:3
**north**
    89:19 115:6
    186:23 212:2
**Northeast**
    203:9,22
**northern**
    9:16 125:12
    129:12
    132:18
    162:17
    186:2,15
    213:8
**Notary**
    9:2
**note**
    136:19
**notes**
    111:2,9,11
    228:6
**notice**
    14:10,13
**November**
    62:23 202:7
**NRCC**
    31:18 131:15
    200:17,19
**NRRC**
    200:12
**number**
    9:14 18:23,
    25 34:13
    47:2 82:1
    96:1 97:4

    104:23
    129:11 134:3
    135:1,9,20
    139:25
    145:17
    152:22
    157:14,20
    158:2,12
    160:12 173:8
    179:1,21
    181:17
    187:13
    205:11
    207:11
    212:24
    215:12,16,
    23,24
**numbered**
    181:13
**numbers**
    15:7,24 37:3
    45:4 47:20
    55:11 56:21
    57:10 65:9
    66:15 72:9
    73:4,18,25
    75:5 116:14
    123:11 124:8
    138:7
    143:20,24
    144:1 207:18
    208:5,7,9
**numerically**
    133:1
**numerous**
    127:6 224:20

---

**O**

**oath**
    11:24
**object**
    50:22 108:3
    170:23,24
    178:7 195:19
    196:22
    198:1,9
    199:25

    218:22
**objection**
    16:18 33:5
    37:15 50:23
    138:23
    168:24
    177:14,16,23
    178:8,11
    187:8 198:11
    199:19
    202:21
    204:24
    209:15 210:4
    216:17
**objections**
    123:21
    198:10
**objective**
    216:10
**objectives**
    217:8
**observation**
    188:21
**observations**
    90:13
    189:18,21
    190:6,20
**obvious**
    128:8
**obviously**
    22:16,17
    23:19 34:10
    36:3 38:1
    39:5 43:8
    45:10 47:21
    48:19 49:4,
    10 56:10
    58:24 62:21,
    22 64:4,18
    65:9 66:14,
    25 67:3
    68:2,4 74:20
    75:4 80:9,13
    81:13 89:18
    90:23 94:18
    95:23 97:17
    99:1 100:23
    107:14,22

**Caster Plaintiffs' Exhibit 88, Page 91**

Randy Hinaman
December 09, 2021

114:6 126:22
127:7,19
129:12
146:11
152:16,20
159:5 162:5
163:11
165:22
171:22
180:18 192:8
193:3
211:13,15
212:22,24
214:11
216:18
220:13 222:7
227:7

**occasionally**
28:14 88:15,
21,22 90:9
149:14
151:13

**October**
51:18 52:12,
21 54:4 55:8
61:11 62:15,
16,17 79:18,
20 80:1
105:16
106:12 123:5
131:2,10

**odd**
207:11
211:19

**off-campus**
70:15

**off-year**
62:21 63:1

**offer**
210:25 211:3
212:4

**offered**
16:8,25 17:2
20:2 47:21,
22,25 48:4,9
50:16,17,18
179:9
184:18,19,22

186:8 187:13
188:4,5,7
190:3
191:12,18,21
218:6 225:2

**offering**
218:1

**office**
17:15,17,20
18:3 24:9
33:13 68:20
70:9 73:13
78:16 79:5,
6,8 94:20
101:17
107:9,23
129:21
158:14 182:4

**officeholders**
39:7 54:14,
17 83:18

**offices**
21:13 68:4,5
70:16

**official**
28:12 57:1,
3,14 74:16
76:3 102:24
106:8 117:17

**officially**
52:10,13
88:17

**offset**
183:5

**offshoots**
182:17

**okay**
13:4,8 14:14
27:4 47:17
51:13 56:23
123:4,7
133:21
170:20
198:13 199:5
200:1,19,22
201:11
202:23 206:9
208:8 211:17

213:5 214:1
217:12 221:8
225:6 227:13
228:5

**once**
12:19 74:22
75:8 76:5
79:9,11,22
80:17 82:17,
21 83:1 84:5
105:8 107:11
109:22,25
129:23
142:16 175:1
206:14
211:13

**one**
13:17 14:9,
12 22:25
24:1 30:8
36:22 37:1,
24 38:13
43:9,12,14
48:11 51:7
53:5 64:5
68:17,18
69:3,4,21,23
72:18 78:6
85:1 86:6,25
96:10 97:11
99:9 101:10
103:25 106:6
112:24
115:10
116:20
117:13,16,
18,21 119:20
121:10
123:11
125:10,22,23
126:3
128:19,20
132:11,12,13
133:9,14,22,
23 134:1
137:23
138:1,3,13,
17,18 139:2,

3,6,15,18,19
140:12
142:17
144:18
149:11,15,
18,20,25
150:1 151:15
152:5 154:3,
23 155:18
157:22
160:14 161:1
165:3,4,23,
24 166:2
167:8 168:4,
13 169:8,12,
23 175:14
181:12,14,
17,18 182:1,
5,6,7,9,10,
22 183:23,25
184:10 185:8
187:12,13
189:19
191:8,9,10
193:10 196:4
198:22
199:22,23
203:25
208:13
211:24 214:9
218:20
224:15 228:6

**ones**
11:7 46:16,
24 56:18
81:1 132:18
153:21
187:20 190:7
192:2

**ongoing**
62:24

**operable**
84:11

**opinion**
50:25 131:25
199:6,7
200:2 202:20
210:18

**Caster Plaintiffs' Exhibit 88, Page 92**

Randy Hinaman
December 09, 2021

211:1,3
212:20
**opportunity**
112:6,7,10
142:8 180:22
181:5 182:14
**opposed**
53:15 210:23
**option**
211:24
212:6,8,9
216:11,16
**options**
114:19
115:10
151:22
210:17
**oral**
9:8
**Orange**
18:11 20:22
**order**
39:14 66:15
145:4 167:1
194:22
215:20 216:9
**organization**
53:17,21,25
200:11
**organizations**
21:17 211:8,
9
**original**
172:1,4
**originally**
24:15 91:2,3
**outcomes**
99:2
**outside**
24:10 171:25
227:18
**over/under**
207:15 223:7
**overage**
123:14
**overly**
121:22

**overpopulated**
66:12 72:21
**overpopulatio
n**
67:17

_____

**P**

_____

**p.m.**
122:8
197:14,17
228:20,23
229:4,6
**page**
25:21 137:9
146:5 147:22
160:14
161:1,12
162:1,13
163:1,9,16
171:9 203:23
**paid**
43:15 53:10
56:1 57:24
205:5
**pair**
194:4
**paired**
58:25 178:25
188:12,15
189:20 190:9
192:19 193:7
**Palmer**
85:2 130:4
131:17
134:10,17
188:16 194:6
226:7,9,16,
19 227:21
**Palmer's**
131:8
**paper**
111:5
**paragraph**
26:7 169:15
170:4 201:25

**paragraphs**
152:9 166:25
**paramount**
149:10
**part**
27:4 28:4
39:8 41:8
54:16 56:3
82:9 94:20
125:6,7,8,12
127:7 130:17
132:18
146:14
154:4,19
156:16
161:23
168:18
174:15
182:18 197:5
201:25 202:2
210:6 212:19
213:8 222:20
223:2 227:22
**partially**
92:13 172:10
**participate**
84:25
**participation**
75:25
**particular**
32:12 53:13
87:9 97:12
153:12
158:12
188:23
**parties**
150:23
169:19
**party**
35:9 41:25
52:25 176:8
200:10
**pass**
31:10 55:15
56:9 197:19
228:15
**passage**
201:5 203:9

**passed**
16:6 36:6,7
67:2 68:1
76:8 120:24
136:15
206:15
208:18 224:4
225:4
**past**
126:21 169:7
**pay**
17:23 43:23
56:13 66:19
**paying**
12:9,13
49:24 50:1
**payment**
56:6
**payments**
55:4,5,20,21
56:12 58:3
**pending**
13:25
**Penn**
10:2
**people**
13:6 49:23
50:1 73:5
80:16 89:16,
19 96:14
109:9 123:15
124:6,18
126:24
129:12
139:2,22,25
152:23
153:5,6
156:3,19
158:7 183:5
184:4 185:21
203:6 204:13
205:7,10,12,
18,19,25
212:23
215:7,20
**percent**
34:12 44:7
119:9 138:19

**Caster Plaintiffs' Exhibit 88, Page 93**

Randy Hinaman
December 09, 2021

139:1
195:10,18
196:2 216:24
**percentage**
32:12 34:7
44:10 117:7
119:12
195:17
**percentages**
80:24
**perfect**
96:20,21
199:16
**perfectly**
228:1
**perform**
41:22 168:7
**performance**
168:7
**performed**
41:23
**period**
63:6 161:25
163:6 164:1
**permit**
170:12
**Perry**
155:3 210:5
**person**
40:24,25
68:17 69:3
70:10,12
88:5,6
139:3,6,15,
18 140:12
149:11,25
155:18
165:3,23,24
167:8
**personal**
63:5 69:6,17
**personally**
69:8 90:5,7,
12 107:4,7
142:23
**perspective**
82:17

**phone**
18:24 85:1
88:4
**phrase**
210:15,21
227:1,9
**phrasing**
209:16
**physically**
78:15,20
101:10,13
**pick**
114:8,17
115:10,15
124:6 126:17
127:7 132:21
134:2 182:25
183:3
**picked**
124:16
**Pickens**
221:19,21
**picking**
71:1 104:1
114:13
115:22
124:18
126:21
132:15
**piece**
126:10
**pieces**
47:8
**pigs**
181:17
**place**
71:24 97:7
115:7 150:1
**plaintiff's**
14:3 21:19
25:6,10
92:17 93:10,
14,17 110:16
135:14,18
160:7,11
179:16,19
201:15

203:15
208:20,23
213:16,17,19
**plaintiffs**
9:21 10:3,5,
7,9,12,14,
16,18,20,22,
24 12:12
170:3
228:11,15
**plan**
17:14,16
26:10,12,13,
14 27:6 56:9
59:24 60:3
124:23
139:14
140:12,16,24
141:9
142:14,24
143:10,15
144:14 147:1
151:25
155:9,13
164:19 166:9
177:22
180:15,16,23
181:3,6,9,
10,12,14
182:1,2,6,7,
9,13,14,17,
20,21 183:14
184:13,17,23
185:17
186:6,10,25
187:3,6,10,
11,13,22,25
188:3,10,11,
13 189:6,12,
19,23 190:1,
15,16,18,22,
23,25
191:11,15,
16,22,24,25
192:1,9,10,
11,16,17
193:2,3,4,6,
16,20,25

194:1,3,13
196:9,21
198:16
199:5,8,14,
15,17 200:4,
14,15
205:14,15
206:10,18
207:20,23
208:10
209:3,7,10,
14 211:14
213:13
216:12
217:13,14,20
218:1,6,14,
23 219:3,11,
14,15,18,20,
21 220:2,7,
8,9,15
221:3,13,14,
18,21 222:2,
4,15,17,18,
19,22,23
223:19,24
224:1,10
225:11
**planning**
17:13 55:9
**plans**
26:9,21,25
27:1 46:9,11
47:4 178:24
179:4,9,23
180:3,10,14,
17 181:24
182:13
189:6,15
191:8,23,25
193:1
218:10,19
225:9
**play**
132:24
145:21
151:19
**playing**
73:25

Caster Plaintiffs' Exhibit 88, Page 94

Randy Hinaman
December 09, 2021

**plays**
162:19
**please**
9:18 11:2,21
16:12 18:8
201:24
203:13
204:1,6
210:2 219:11
**point**
23:4 24:1
27:13,22
28:9 31:2
38:6 39:18
40:4,7 56:1
67:1 72:13
73:3,15 74:8
76:20 93:23
94:1,3 98:4,
7,10,22
104:24 107:7
109:24
110:22
118:7,8
123:2 143:19
144:4 151:15
172:11 175:5
179:10 186:2
195:14
205:24
206:11
207:20 209:3
211:16
214:14
215:18
218:12,20,21
219:19
222:14
**point-to-
point**
151:7,13
**pointed**
97:7
**polarization**
42:12 167:23
168:3,10,21
169:2

**policies**
148:7,14
149:1,6,9
150:2 165:2,
19 166:11,25
**policy**
143:16,23
145:24 147:2
148:4 150:5
151:4,10,25
152:3,5,11
155:10
156:21
157:12,13,17
158:5,21,25
164:16
165:1,6
166:22 167:6
**political**
19:19,23
20:19 21:8,
9,10 152:8
157:5
**pop**
33:17 97:25
98:5,6,9
99:25 146:1
**populated**
71:2
**population**
28:5 32:6,
17,25 34:3,
8,15 35:10
36:6 40:19
44:7,10 45:9
64:8 71:2,6,
7 73:24
74:4,10 83:2
84:19 86:10
95:3 96:2
97:6 98:7
99:5 100:4,
10,18 101:4
112:13,18,20
114:8,18
115:3,15
117:6 118:19
119:12,22

126:22,25
127:21
128:12 135:7
137:16,19,24
140:1,11,16
141:11
142:1,5
145:13,14
154:20 158:2
161:10,23
162:11,21,
24,25 163:5,
12,15,25
165:11,21
166:15
170:11
172:18,22
175:13,17
189:10
195:11,17
197:24
198:20
202:10,12
204:12
205:25
210:13
211:20
212:1,2
213:3,6
214:19,20
216:23
220:23
223:5,8
225:17
**populations**
134:3 220:11
**portion**
80:8 95:1,4,
9 96:4,14,16
97:13,21
213:6
**portions**
163:22
**position**
20:2 58:21
203:3
**positive**
179:3 228:3

**possibility**
50:8 115:23
178:1
**possible**
37:4 50:20,
25 54:13
56:22 89:16
91:25 96:11,
17 127:16
146:16
148:18
150:7,10
152:18,24
157:25
176:18 177:9
178:4,13,18
223:11
226:12
**potential**
57:21 71:7
73:19 115:13
**potentially**
71:4 112:14
143:8 144:9
**practicable**
152:8
**practical**
54:13
**practically**
204:8
**practice**
24:3
**prank**
181:16
**precedence**
167:1
**precinct**
33:20,21
100:25
103:13,15,
17,18 104:4,
7,8 115:25
128:17,19
133:24
134:1,7
151:14
152:21

Caster Plaintiffs' Exhibit 88, Page 95

Randy Hinaman
December 09, 2021

precinct-
based
  42:6
precinct-by-
precinct
  105:1
precinct-wise
  44:22
precincts
  32:10 42:4
  90:21,25
  116:17,18
  127:20
  128:6,7,10
  132:10,14,
  15,21 133:5,
  8,13,15
  138:15
  146:12
  151:20
  153:22 157:6
  173:7,8,11
  174:5 178:15
  185:25
  186:1,15
  193:17,19
  208:5 215:22
  216:1,2,9
predict
  66:16 113:2
predominant
  35:25 161:9
  170:14
predominate
  144:24
prefer
  50:2 89:8
  117:20
  118:23
  121:18
preferable
  127:17
preference
  159:5
preferred
  49:24 50:5
  86:5 89:9
  104:20

111:24 112:1
124:16
128:20
preliminary
  74:1 169:17
preparation
  15:22 16:20
  17:3 58:10
  66:2 87:20
  88:11
prepare
  15:5 17:7
prepared
  110:2
preparing
  16:17 83:11
present
  9:18 108:5,
  7,15,19
  114:19
presented
  110:2
presenting
  192:3
preserve
  158:22
  222:10
preserved
  45:12 164:19
  222:11,18
preserves
  222:4,9
preserving
  39:15 45:25
  157:23
  164:17
  223:9,14
president
  21:2 41:18
presidential
  20:4
presumption
  129:2
pretrial
  170:17
pretty
  29:19 78:24

87:5,7
119:5,7,8
157:16
162:12
165:15 214:6
223:21
prevent
  12:1
previous
  41:23 110:22
previously
  18:16 77:2
price
  205:5
primarily
  49:23 112:19
  125:3 163:15
  181:8 184:3
primary
  29:6,13
  75:24 184:15
  223:1,3
principle
  139:15,19
  140:13
principles
  103:25 146:1
Pringle
  10:1 11:14
  51:23 52:15
  75:11 86:20,
  22 87:5,19
  106:20
  107:21 108:2
  109:23
  119:25
  181:10 186:9
  193:16
  194:13 196:9
print
  110:24 201:4
printed
  203:23
prior
  22:4 39:3
  64:8 66:4,22
  67:14 91:7

95:5 99:18
100:17 118:4
priority
  46:1,3 149:9
  165:10
  167:4,6
  225:23
privacy
  202:9,16
  203:4
privilege
  11:15 108:4,
  18,22,25
  109:10,15
  176:24 177:2
privileged
  177:24
pro
  120:5,8
probably
  18:21 31:1,
  4,17 40:1
  44:19 45:20
  51:17 55:13
  57:18 60:19
  61:10,22
  72:23 79:10
  80:13,20
  89:8 94:22
  103:1 120:4
  125:5 134:25
  136:11
  171:23,25
  172:10 186:9
  200:5 212:21
  224:21
problem
  43:4 217:6
  220:20
Procedure
  9:5
proceed
  74:22
proceedings
  9:9 169:17
process
  15:8 28:18

Caster Plaintiffs' Exhibit 88, Page 96

Randy Hinaman
December 09, 2021

39:2,10
45:17 55:12,
16 80:4 89:4
97:11 103:25
119:21
120:13
132:20
141:14
145:15
180:12
196:15 225:3
226:13
**produce**
23:14 24:22
54:24
**produced**
135:20
160:12
179:20
**program**
76:16
**progress**
86:23
**project**
56:6
**pronouncing**
151:6
**proper**
31:22 208:15
**properly**
207:7
**property**
18:20
**proposed**
68:6 84:14
**Protection**
139:16
**protrusion**
132:8
**provide**
29:9,21
107:13
185:12
**provided**
14:23 90:16
109:22
136:6,10,23

145:1 190:6
213:3
**providing**
87:6 120:17
**public**
9:2 88:10
89:14 90:2,
16 91:12
92:5 182:3
187:14,22,24
203:9 211:14
217:24
218:21
**publicly**
218:13
**pull**
33:2
**purpose**
53:19,22
140:25
141:10
142:24
170:10,14
173:12
226:24
**purposes**
79:15 133:13
**pursuant**
9:4 17:19
**purview**
168:16
**put**
11:12 21:12
24:3 28:24
43:22,25
76:15 80:24
81:7,8,11
103:14,21
115:2,3,9
126:25
148:18
149:21
150:11
180:11
182:23
183:20
185:6,8,20,
25 186:3

188:14 191:1
205:3,16
206:2 214:3
218:16 227:4
**putting**
91:15 92:9
123:12,13,21
126:12
127:15 130:7
184:10 195:1
220:20
**PX**
201:12,13
**PX3**
22:5

---

**Q**

**quantify**
81:10
**question**
13:7,10,25
29:1 31:3
33:8 36:9
41:15 46:20
48:11 58:20
108:8,23
149:2 162:2,
14 163:2,10
166:10
169:12
177:3,4,7
178:12,14
189:1 195:23
199:22 200:2
202:24 205:1
210:2 217:11
220:4
**questions**
10:9 12:2
13:4,6,18
48:13
108:13,17
140:7 197:9,
11,19
209:16,21,23
228:12,14

**quick**
57:23 88:3
186:10
**quickly**
182:16
**Quillen**
10:13
**quite**
149:19 182:4
187:15
**quote**
180:12
186:22

---

**R**

**race**
20:4 32:25
35:20,21,22
36:1 37:18
41:18 48:12,
14 49:7 83:3
97:25 98:8,
18,22 101:4
117:2 118:5
119:15,19
134:17 135:4
142:17
143:18,19
144:21,23
145:4,13,15,
20 146:4
166:16
174:17,20
175:1
176:12,14
**race-based**
145:2
**race-neutral**
144:20,24
**races**
41:10,12
228:2
**racial**
33:15 42:12
48:22 97:20
98:22,24

Caster Plaintiffs' Exhibit 88, Page 97

Randy Hinaman
December 09, 2021

99:7,20
143:16 153:5
154:7 157:2,
8 160:4
167:23
168:3,10,21
169:2 171:15
175:7 187:1,
4 195:6,9

**racially**
170:8,22
171:13
172:15
173:1,25

**ran**
41:18

**random**
104:2 132:22

**Randy**
9:7,12 11:3,
22 16:11
25:2 201:20
203:18 229:3

**rank**
165:1

**rapidly**
163:4

**Rarely**
79:22

**RC**
135:21
160:13
179:21

**re-election**
184:6

**reach**
60:4 138:21
158:2 223:8

**reached**
95:9 219:19

**reaches**
95:1

**reaching**
95:4

**read**
141:18 147:6
169:13 170:5

195:24,25
199:6 200:1,
5 201:24
202:3,5
203:24
204:1,4
210:1,3

**reading**
199:20

**Reagan**
20:2,6

**real**
57:23 60:19
71:8,17 72:9
73:3,18 75:5
84:5 102:3
116:14
123:11
129:24
208:7,8

**realize**
33:22

**realized**
226:4

**reapportionme
nt**
12:7 26:17
33:13 67:1
73:12 78:16
79:5,6,8
101:17 107:2
110:3,7
120:16,20
135:19 136:4
165:8 167:11
178:20
203:21
204:21 213:2
217:24
223:4,23
225:2

**reason**
19:25 26:6
95:21 133:22
145:4 183:16
184:1,15
188:24
193:19

216:21

**reasons**
126:23
163:7,14,23
184:12
194:1,8

**recall**
38:14 53:5
89:1 90:2
122:11,22
123:25 126:4
127:2
128:14,23
130:4 133:17
134:9 137:3
190:5 192:6
199:11,20
200:2 221:12

**receive**
31:24 57:7
86:8 87:2,8
107:25 114:1
116:10
120:25 121:5

**received**
57:14 58:2
60:6 63:16,
19 72:15
74:16 76:2,
5,7 89:14
91:12 92:5
103:10

**receiving**
90:2

**recent**
38:13 51:2
170:6

**recess**
65:23 197:15
228:21

**recognize**
22:6 25:19
93:1 135:25

**recognized**
156:25

**recollection**
50:15 164:11

**recommend**
29:19

**recommendatio
ns**
29:9 72:15
120:15,21
185:13 190:5

**record**
11:13,21
22:2 65:21,
25 122:4,8
169:5,13
170:1 173:14
195:25
197:14,17
202:3 204:1
210:3
228:20,23

**redistricting**
23:18 24:7,
11 26:9,14,
16,21 39:10
41:4 53:22
58:1 103:25
120:13
126:11
135:19 136:7
137:11
140:24 146:1
148:7,13
167:11
178:20 194:2
198:19
204:16
213:23,24
226:24

**redrawing**
38:24 60:11
63:15 78:19
106:18 224:9

**reduces**
216:23

**refer**
51:5,6,11
89:23

**reference**
93:14 171:3
173:15

Caster Plaintiffs' Exhibit 88, Page 98

Randy Hinaman
December 09, 2021

referenced
158:20
164:21 179:5
referencing
164:17
referred
51:7 128:18
referring
59:17 61:14
89:24 105:2
112:17,20
173:20 191:8
refuse
108:12
regarding
82:24 120:13
165:20
185:13
189:19
region
161:17
registration
75:21
reiterate
84:9
related
32:24 144:1
relationship
62:24
relative
57:25
relayed
90:14
relevant
132:1
reliable
203:5
remained
30:2 42:20
43:7 44:14
remaining
137:24
remedial
219:18
remedy
24:21

remember
12:19 29:3
31:6 33:11,
25 37:3,16
41:10 44:18
45:3,21 46:6
63:9 78:25
89:13 90:17
91:9 95:8,9,
12 111:10
116:3 138:10
149:4 190:10
191:18
199:10 200:6
224:13
remembering
188:13
remind
194:16
199:12
replace
22:22
repopulate
223:6
reporter
9:1 11:1,6
13:14 77:16
79:1 112:3
166:18
176:25 193:5
210:2 217:1
represent
9:19 107:3
179:22
215:25
representatio
n
53:3,4,7,8
107:6 139:23
representativ
e
10:1 11:14
51:22 52:15
72:18 85:2
86:19,22
87:5,19
90:22
104:18,19

106:20
107:21 108:2
109:23
119:25
122:20
185:23 186:9
190:24
223:13
226:6,8
representativ
es
70:21 71:14
73:9 83:20
84:18,22
85:7,15,21
86:9 87:14
97:9 103:7
105:10
106:3,19
119:16,24
122:18
125:19
139:23
representativ
es'
106:10
represented
12:5 94:21
96:22 159:6
representing
27:19 125:6
139:24 159:8
227:23
represents
125:8
reproduce
209:2
republican
23:22 27:20
28:7 51:23
200:10,20
republicans
151:1 184:7
request
117:21
requested
54:25

requests
50:11 72:15
86:9 87:9,15
117:6
120:21,25
require
143:16 156:5
160:4
required
127:19
138:20
197:24 223:8
225:14
requirement
202:19
227:14
requirements
140:17 142:4
147:5
165:13,20
166:12
requires
141:22
145:9,11
146:10 150:9
151:10
152:11,12
157:18
158:25
requiring
165:11
214:16
reservations
157:7
reside
228:3
residence
20:22 226:24
227:3,4
residency
227:14
resolve
149:23
respect
152:7 155:13
192:20
199:18

Caster Plaintiffs' Exhibit 88, Page 99

Randy Hinaman
December 09, 2021

respected
  155:10
respecting
  155:24
respond
  198:8
response
  108:11 177:2
  192:1 198:5
responsibilit
y
  20:5 82:10
rest
  107:16,18
  149:11,13
result
  205:25
results
  35:9 57:8
  176:8 177:11
resume
  22:3,9,11
  23:12
retained
  52:10,13
  57:24
retention
  107:8
retired
  22:22
retrieved
  150:14
returns
  41:6 42:2,3
  75:18
revealed
  143:25
review
  15:21 16:1,4
  37:11 41:6
  47:12,20,24
  48:4,7,10,22
  49:11 67:15
  74:18 75:18,
  21,24 83:10
  101:6
  143:16,22

157:8 180:6,
12,22 181:5,
23 182:15,22
184:16
185:19 186:6
187:11 188:2
189:25
190:21 195:9
reviewed
  15:7,23
  16:16,19,23
  47:10 67:3
  74:20 109:13
  144:7 182:23
  186:4
reviewing
  47:15,16
  66:6,9 180:9
revised
  84:12
right
  11:24 12:24
  13:20 15:2
  18:6 62:5
  79:25 94:7,
  14 97:10
  120:3 121:13
  122:3 123:24
  130:12,14
  134:2 142:8
  147:14
  153:20 154:3
  170:4 171:4
  172:2 191:6,
  17 197:25
  198:17
  201:13
  203:11
  206:3,22
  209:4,21
  214:22,25
  215:10,21
  216:2,6,16
  217:21
  220:17,19
  223:1 224:10
  226:20
  227:9,11,24

Rights
  31:22 99:10
  112:23 113:7
  140:23
  141:2,4,16,
  19 142:14,20
  143:11
  144:5,9,15
  145:1,5
  149:12,25
  165:4,12
  166:13,17,20
  167:8 189:3
ring
  26:5
ripple
  220:16
River
  18:11
RNC
  200:10,17
Road
  18:11
Rogers
  92:11 94:19
  126:7 134:16
  188:16 194:7
role
  28:10,12
  162:19
room
  78:17 88:15,
  19,21 90:10
  108:5 109:9
roots
  154:8 211:8
Rosborough
  10:17
Ross
  10:15
rough
  72:2 80:24
  206:18
roughed
  60:20 64:24
  73:10,13,16,
  21 102:7,12

129:23
roughed-out
  102:9
round
  60:13 66:20
  68:8 84:13,
  15 102:25
  103:2,5
  116:14,23
ruled
  11:16
rules
  9:5 12:25
run
  166:3,7
  224:15
running
  68:19 129:2
runs
  107:23
rural
  64:24 75:7
  154:18
Russell
  162:6 193:9

───────────

S

───────────

sacred
  216:10
sake
  219:18
sat
  101:13
  211:18
satisfied
  222:23
satisfies
  142:19
satisfy
  138:21 145:5
  155:21
save
  102:21
  110:18
saved
  111:11

Caster Plaintiffs' Exhibit 88, Page 100

Randy Hinaman
December 09, 2021

saves
  110:21,22
saying
  25:1 63:23
  109:6 200:3
  205:23
  211:17
  222:23
  225:25
says
  23:2 25:15
  137:10
  139:14
  156:22,24
  157:22 167:7
SB-10
  182:7,9
schedule
  105:20
schedules
  105:17,21
scheme
  73:6 216:6
school
  64:13 75:2
  80:12 81:8,
  16,23 157:7
  181:16
science
  19:19,23
scope
  178:16
scrap
  111:4
scratch
  38:24 94:6
screen
  85:11
seats
  206:12
second
  50:2,8,12,20
  151:4 176:18
  177:9 178:2,
  5,18
secondhand
  82:14

Secretary
  9:22 170:7,
  16,21 171:11
section
  137:10
  139:9,14
  140:15,19,22
  141:2,15,18,
  22 142:14,19
  143:10
  144:5,8,14,
  17,25 145:9,
  10 146:6,10
  147:4,17
  148:6,7
  150:5 151:4
  152:6 156:20
  157:13
  158:21 165:6
  166:23,24
  167:7,13,16
  189:2 201:9
  204:18
Sections
  137:14
  140:10
see
  13:13 17:23
  22:23 25:14,
  17,21 26:18
  33:2,6 71:17
  82:19 99:1,4
  107:15,18
  131:6 135:23
  137:9,17
  145:6 148:8
  154:12
  160:16 196:4
  201:7,21
  203:20
  215:7,15
  217:3 224:5
seeing
  37:16 74:1
  132:23,25
segments
  206:8

self-
explanatory
  157:16
Selma
  227:11
semifinal
  84:16
senate
  24:6 47:18
  52:5,16
  54:11,12
  64:14,21,24
  75:6 81:11
  129:2 147:13
  188:5,6
  190:23
  191:21
  224:13,14,21
senator
  9:25 11:13
  28:20 29:7,8
  30:24 51:22
  52:16 86:19,
  21 87:4,19
  106:19
  107:22 108:1
  109:22
  119:24
  180:15
  191:12,13
  204:18
senators
  106:3
send
  17:22
sense
  28:18 42:5
  58:22 74:8
  116:20
  148:24
  169:20
  210:18
  222:12
sentence
  26:24
sentences
  78:23

sentiment
  205:20
separate
  55:21
separated
  206:1
separating
  203:5
September
  51:18 52:21
  54:4 55:8
  79:17 102:25
  103:1 104:13
  105:9 106:9,
  16 177:12
  203:21
  217:23
seriously
  47:22 65:3
serve
  27:12
session
  47:3 52:3
  55:9,14
  61:11,13,15
  62:15 79:14,
  23 83:15
  84:4 85:8
  98:15,19,25
  99:19
  106:12,17
  107:13
  110:13
  174:25 175:9
  179:24 180:4
  195:7
set
  15:2 53:18
  59:8 68:8
  169:23,24
  216:5
seven
  40:12 49:4
  58:16 60:7
  67:20 68:3,
  16 80:11,18,
  21 81:14
  83:19 85:20

Caster Plaintiffs' Exhibit 88, Page 101

Randy Hinaman
December 09, 2021

105:18
106:19
122:11
137:25
138:15
151:20
160:14,21,22
206:12,14
seven-page
160:13
seventh
138:18
several
13:6 16:19
29:2 147:5
199:22
214:17
Sewell
43:8 45:7
69:5,9,22,25
70:5 101:1
103:12
113:25
116:11 117:3
118:6 119:18
122:15,16
125:15
132:12,13
133:14
210:10,12,
16,22 211:18
216:12
217:7,13
218:8 219:2
220:1 226:6,
18,23
Sewell's
45:25
shakes
34:25
shape
171:19 173:5
178:16
share
85:11 156:5
205:20

Sharh1@
comcast.net.
19:5
sheet
47:19 213:17
215:12,17
Shelby
130:10,15
163:11
188:15
226:10,17
227:22
shift
28:5
shifts
223:5
Shoals
89:15,23,24
91:16,25
92:4 127:15
156:1,8
shock
89:4
shooting
32:13 34:3
44:11
short
48:7
short-circuit
21:22
shortening
130:22
show
85:11 114:5
161:2 169:13
170:5,18
201:6,18
203:18
204:22
213:13,14
221:10
shown
22:3 195:10
221:6,7
shows
202:15

side
21:14 133:9
191:21
226:20
sign
52:17,19
signature
25:22 26:1
signed
25:12 54:3
55:7,18 56:7
225:5
significant
74:13 88:25
105:6
significantly
80:8,10
similar
49:25 77:23
152:16 157:9
175:15 186:5
190:11 192:1
similarities
156:25
similarly
17:25 41:22
149:5
simply
207:1 211:18
219:22
220:10 224:8
simultaneousl
y
65:8 88:14
singer
42:23
single-member
147:25
Singleton
9:21 10:2,9,
14 16:10,14
111:25
181:23
182:20
187:10,13,
22,25 188:3,
10 189:5,12,

19,22 190:1
193:25
194:1,3
singularly
88:2
sir
11:19 12:23
13:3,9 14:22
18:15 26:2
27:11 30:10,
19 32:1
33:21 38:12
40:5,8,11
51:4,10,14
52:7 55:23,
25 57:16
59:15 68:13
76:1 77:3
78:5,8 105:3
106:4 110:20
112:8 121:21
137:12
142:12
160:25
169:16
175:18,20
176:7 182:7,
12 190:19
194:14
196:17
200:24 201:3
209:5 215:1
216:3 217:5
219:5,12,16
220:18 222:1
223:21
227:12
sit
90:5
sitting
154:3
situation
24:21 96:21
113:8 134:4
situations
149:15
151:21

Caster Plaintiffs' Exhibit 88, Page 102

Randy Hinaman
December 09, 2021

six-person
  58:25
size
  171:19
  178:16
skewed
  202:9
Skipping
  37:22
slice
  205:16
slightly
  84:11 134:20
sliver
  204:10,17
small
  215:23
smaller
  225:18
snippets
  90:8
social
  154:8 157:2
socioeconomic
  34:20 175:16
software
  33:9,14
  76:22,24
  77:1,14,24
  78:1,10,13
  82:3,4,12,
  19,24
sole
  170:10
solely
  96:10,24
  133:23
solutions
  123:11
somebody's
  90:22
sort
  20:3 29:9,21
  44:9 46:6
  71:20 82:23
  89:1 107:8,
  25 112:1

119:11 120:7
128:8 142:4
153:12
157:19
159:24
162:16,20
166:5 190:22
191:4 206:18
sounds
  42:23 153:25
  165:15
sources
  142:11
south
  226:17
southern
  204:10
southwestern
  174:14
space
  151:15
spaced
  55:4,5
speak
  13:17 16:11
  40:10,14
  70:15 119:25
  120:10 198:4
  200:16
speaker
  120:5
speaking
  109:7 194:11
special
  55:9,14
  61:14 62:14
  79:14 83:15
  84:3 85:7
  98:15,19,25
  99:19
  106:11,16
  107:12
  110:13
  174:24 175:8
  179:10,24
  180:4 195:7

specializatio
ns
  20:14
specific
  31:3 33:15
  34:13 44:9
  72:17 85:16,
  17 89:13
  90:1 97:13
  114:1 122:25
  128:3 145:23
  152:15
  153:19
  155:22 156:9
  158:3,18
  164:11,23
  181:3
specifically
  32:23 48:18
  49:15 91:18
  94:18 109:13
  112:17 114:3
  126:4 134:9
  156:11
  171:21
  172:24
  173:23
  187:23 217:9
specifics
  27:25 57:22
  122:14,17,21
  123:24
  128:14
speculation
  195:20
spell
  77:18
spend
  60:25 192:24
spending
  62:9
spent
  61:18,23
  80:25 81:2
  90:12
spill
  194:19

splint
  128:17
split
  89:6,9,10
  90:17,20,21,
  25 91:2,3,7,
  9,22 92:1,2
  93:7 94:13,
  16 95:18,19,
  22 103:13,
  14,15,19
  104:6,15
  111:6,7
  114:20,22
  115:24 116:1
  123:8 124:3,
  8 126:10,15
  128:19
  132:2,10,11,
  14 133:8,13,
  23 134:7
  138:15
  149:19
  151:20
  156:2,12,15
  158:8 173:7,
  8,17 174:5
  183:2,20,24
  185:7 193:17
  207:25 208:4
  213:10
  214:11,12,25
  215:4 216:2,
  9 221:19,20,
  25 225:19
splits
  158:11 179:1
  184:10 185:8
  193:15,16
  205:25 206:7
  220:23
splitting
  91:15 92:10
  124:10
  127:25
  173:11
  178:15 183:1
  193:18

Caster Plaintiffs' Exhibit 88, Page 103

Randy Hinaman
December 09, 2021

214:21
220:11
**spoke**
29:2,3,8
40:11,17
**spot**
227:19
**spread**
146:20
**spring**
59:22
**St**
162:5 220:14
**staff**
24:1 68:24
70:18,19
84:7 120:1
121:9,11
129:6,19,22
131:3,8,14
134:11,18
**staffs**
200:18
**stand**
200:19
**standpoint**
74:2
**start**
45:18,20,23
56:25 60:3
64:12,22
65:3 94:6
194:16 209:8
**started**
55:12,16
60:23 65:16
66:20 94:9
97:22,23
194:18
206:15
212:12
226:2,3,5,13
**starting**
27:12 39:18
40:4,7 66:2
79:3 80:1
93:23 94:1,3

101:5 122:20
137:9 148:6
150:5 151:5
182:21 209:3
222:14
**state**
9:3,19 11:21
12:13,22
18:8 22:2
25:17 52:5
53:15,23
54:11,12
56:18 59:22
60:1 64:13,
20 65:11
73:12 75:2
76:7,10,16,
17 77:6,13
78:4,17
81:8,16,23
82:10,13
86:14 90:4
113:12
116:6,7
137:14
165:10
170:16
194:25
201:5,21
202:15,18
203:2
**state's**
41:3 78:12
80:4 201:25
**state-wide**
41:12 56:17
**stated**
38:10 58:8
85:19 166:14
170:7 189:8
195:5
**statement**
118:4 203:24
204:3
**states**
9:15 24:12
26:8 59:6
139:17

140:15,22
141:3 144:19
146:6 150:6
151:5 152:6
157:13
158:21 165:6
166:24 170:6
**statewide**
64:19 65:9
**statistical**
217:3
**stay**
152:14
**step**
18:6 67:13,
23 196:7
**steps**
195:14 222:7
**sticking**
170:9 174:9
**stipulated**
169:6,16,18
**stipulation**
9:6
**stipulations**
11:6 170:1,3
**stood**
30:17
**stop**
191:6
**straight**
132:4
**straws**
25:3
**strength**
141:1 142:25
**strong**
145:1,3
**strongly**
104:1
**structured**
87:25
**stuck**
46:16
**studies**
20:8

**study**
19:18
**styled**
201:23
**subdivisions**
152:8 157:5
**subjectively**
153:15
**submit**
38:20,21
168:19
**submitted**
38:2,7 47:4,
11 48:8
83:14 84:3
98:21 101:5
110:1,10
174:24
178:24 179:5
182:2,11
**submitting**
98:18
**subordinates**
144:20
**subpoena**
14:11,16
**subsequent**
189:5 223:5
**subsequently**
224:21 226:4
**subset**
121:9
**substantial**
26:8 112:13
**substantive**
29:18 108:10
**substantively**
57:21
**subtract**
146:2
**subtracted**
102:14
**subtracting**
98:2 145:12
**subtractions**
166:9

Caster Plaintiffs' Exhibit 88, Page 104

Randy Hinaman
December 09, 2021

| | | | |
|---|---|---|---|
| successful | 141:20 | 47:16 63:5, | 123:7,9 |
| 44:13 | 142:13 | 10,12 65:19 | 124:2,14,20 |
| sufficient | 143:22 | 67:13 81:18, | 125:21 |
| 141:25 | 144:13 | 24 95:17 | 126:9,12,14, |
| suggest | 145:23,25 | 97:5 104:4 | 16 127:6,18, |
| 37:9 168:13 | 147:1 148:17 | 111:15 113:9 | 24 128:5,7 |
| suggested | 149:2 | 121:25 122:1 | 130:6,8,11, |
| 185:15 | 150:12,14,16 | 123:16 | 16,18 |
| 211:23 | 151:11,25 | 127:10 137:8 | 142:17,18 |
| 212:14 214:2 | 154:23 | 148:3 160:20 | 163:20 |
| suggestions | 155:9,23 | 167:6 | 168:22 |
| 29:16 75:10 | 156:14,19 | 175:11,16 | 195:13 219:7 |
| 211:18 | 164:18 171:7 | 177:20 | talking |
| sum | 172:6 | 195:14 196:7 | 18:7 29:12 |
| 222:21 | 184:19,22 | 197:9 208:16 | 40:15 48:2,3 |
| summer | 199:9,10 | 209:6 | 57:20 66:2 |
| 106:7 | 204:19 | 215:11,12 | 83:22 92:14 |
| Sumpter | 205:5,8 | 218:4 219:10 | 93:6 98:11 |
| 155:2 | 209:15 | 223:6 | 100:14 |
| support | 211:12 216:7 | taken | 109:8,10 |
| 94:23 145:2 | 221:15,16 | 65:23 96:7 | 122:25 |
| suppose | 225:7,21 | 122:6 187:5 | 134:23 158:7 |
| 154:9 189:1 | 227:1,5 | 197:15 | 173:18 |
| supposed | surprisingly | 215:10 | 196:12 198:6 |
| 56:11 178:10 | 125:1 | 228:21 | 200:13 |
| supreme | surrounding | takes | 204:19 |
| 202:11 | 214:17 | 80:20 81:14 | 208:19 |
| sure | swapping | 158:14 167:4 | talks |
| 16:13 21:9 | 211:25 | taking | 116:14 |
| 23:13 30:1 | swear | 18:6 41:1 | tangibly |
| 32:5 33:8 | 11:2 | talk | 92:6 |
| 37:2,3,4,25 | Switching | 28:15 59:9, | team |
| 40:24 42:19 | 210:9 | 24 84:7 | 21:12 154:9 |
| 43:6 44:6, | sworn | 88:16 90:9 | 176:4 |
| 13,16,22 | 11:4 | 105:18 114:7 | Teams |
| 45:11 48:18 | system | 116:15 125:3 | 70:2 |
| 63:11 65:20 | 180:11 | 129:6 131:4 | technically |
| 81:21 95:12 | | 137:13 143:7 | 18:21 22:14 |
| 100:7 111:4 | | 147:13 | 70:2 132:12 |
| 115:19 | **T** | 168:20 169:1 | telephone |
| 117:14 | | 214:15 224:2 | 18:23 |
| 119:10 | table | talked | tell |
| 125:22 | 194:12 | 15:8 29:17 | 44:19 49:14 |
| 130:12 | 202:14 215:6 | 68:3,4 90:4 | 95:13 118:11 |
| 136:12 | 217:4 | 104:24 | 122:21 |
| 138:11 | take | 114:14 | 123:24 |
| 140:7,11 | 13:22 20:4 | 115:4,11,13 | 134:24 |
| | 26:7 34:14 | 116:2,22 | 138:19 |

**Caster Plaintiffs' Exhibit 88, Page 105**

Randy Hinaman
December 09, 2021

177:17
184:22,24,25
185:3,10
186:12 188:9
199:12
202:18
204:22
210:22
213:1,22
218:22
**telling**
209:17 217:7
218:5
**tem**
120:5
**ten**
23:20 24:7
38:14,18
39:9 44:18
45:4 46:9,
12,23 47:7,9
50:15 162:18
180:13
191:20 207:5
223:6
**ten-minute**
90:8
**tens**
102:18
205:12
**term**
156:22 157:3
**terms**
34:12 55:2
60:25 61:18
62:1 71:16
74:22 80:14
108:10
126:17
151:17 168:7
172:5,20
193:12
200:13
204:12 216:6
**Terri**
125:6 217:7
220:1

**test**
92:21 133:19
**testified**
11:4
**testify**
18:1
**testifying**
11:24
**testimony**
98:17 99:19
204:23 205:2
210:11
222:9,21
223:16 225:8
**thank**
11:17 63:25
136:19,21
171:10
173:19,21
202:13
204:20
215:15
228:7,9,25
**Thanks**
14:17
**theory**
55:13 56:8
92:9
**thing**
31:22 67:10,
15 68:2
115:1 117:13
124:15
125:21
157:20 179:3
181:1 186:19
208:19
**things**
36:3 62:13,
22 72:25
73:23 89:12,
22 91:14
104:2,24
105:22 111:8
114:13
116:2,9,22
146:17 148:1
152:21

153:11,24
156:18
157:24
190:13 191:5
221:1 224:16
**think**
13:1 21:22
29:18,19
31:16 32:18
35:14 36:20
42:1 43:1
47:2 52:11
58:18 59:6
60:17 62:1
63:22 65:16
70:6 77:9,14
90:19 94:4
96:13 97:2
103:20 104:7
107:20
108:24
109:2,6
111:23,24
113:17,20
116:17
117:8,9
118:22,25
119:2 120:4
121:14 125:3
126:24
131:15,25
134:14,21,
22,25 138:5,
9 139:11,20
148:5,21
149:10
157:16 160:5
166:22 168:4
171:15,19
173:8 177:17
178:13,21
180:1,16
181:20
183:19,23
184:3 185:5,
7 186:7,8,18
188:12,14
190:9,12
191:7,14

192:10,12,21
193:3,6,7,9,
11,15,17,24
196:1 197:8,
9 204:14
205:19
207:10,25
208:18 209:1
210:6 212:22
217:10,15,
16,17
218:12,20
225:7 228:5,
13
**third**
152:5 156:21
**Thompson**
10:6 11:9,18
14:8,13,15
21:25 46:22
109:1,16
121:14,21
122:1 169:5,
11 170:2
171:2,5,10
173:19
177:4,15
195:23
197:18
228:13
**thought**
31:21 34:8
88:24 89:17
116:19 125:5
129:14
130:9,13
131:18
133:10 185:1
202:15,19
226:5,11,13
**thoughts**
84:12
**thousands**
102:17,18
205:12
**three**
15:16 18:22
23:9,19 36:9

Caster Plaintiffs' Exhibit 88, Page 106

Randy Hinaman
December 09, 2021

41:11 66:16
84:25 89:7,
10 91:15
92:10 93:8
94:13,17
95:18 105:25
111:19,21
116:17
126:16 154:4
169:19
181:24
182:14
185:24
189:6,12,23
190:1,12
191:9,10
192:13 207:6
226:16
**three-judge**
26:10 199:13
221:4
**tied**
146:14
**ties**
97:15
**time**
9:17 13:17
17:17 27:18
31:21 37:13
47:17 52:11
55:10 56:6
60:23,25
61:17 62:8,9
63:3,6,8,10
65:22,25
67:1,5 70:6,
11 74:19
75:14,15,19,
22,25 78:18
79:25 80:8,
21,25 81:2,
7,11,19,24
83:14 84:22
87:22 90:11
94:17 105:24
106:24
110:21
116:13

121:16
122:5,8,24
123:1 129:5
136:14
145:18
161:25
162:22 163:6
164:1 182:5
187:19
192:4,25
196:11
197:14,17,18
218:12,21
226:3,5,11
228:14,16,
20,23 229:3
**timeline**
51:1 56:11,
14 68:6
98:11 109:21
**timelines**
71:8
**times**
12:18 65:14
87:18 109:7,
12 127:6
129:25
215:22
**timing**
74:25
**tiny**
204:10,17
205:24
**Tish**
10:21
**title**
21:1
**titled**
169:16
**today**
12:3,6,10,14
13:5 14:19
15:5,22
17:8,11,14,
17 170:13
180:8 199:10
200:7 221:6,
7

**told**
58:18 87:12
118:12
131:3,7,15
136:22,24
138:25 139:7
164:5,13
185:4 186:13
197:23
198:21 199:2
203:1 204:25
210:16
**Toni**
203:25
205:20
**top**
25:14 36:3
49:6 53:6
130:23
161:18
**total**
33:17,18
55:22 74:4
83:2 97:25
98:5,6,9
99:25 137:15
145:14 146:1
**town**
70:13 87:22
**traced**
39:13
**trade-offs**
155:14
**traditional**
146:1
**transcript**
203:20
**translated**
82:12
**travel**
63:8
**tread**
45:15
**tremendous**
89:4
**tremendously**
29:18

**trial**
12:20 18:1
**tribal**
157:2,6,9
**trip**
69:12,23
70:13
**trips**
63:5
**trouble**
151:6 198:2
**true**
22:8 26:3
39:18 93:3,
18 215:19
222:17
225:22
**trump**
149:15
**trust**
74:5
**trusted**
74:6
**truthfully**
12:3
**try**
45:14 78:25
90:24 157:14
158:22
196:13 209:9
225:24
**trying**
27:22 62:5
66:10 91:24
130:20
132:14,15
133:23
146:16,18
148:21
157:20
158:10,17
173:10
186:21
204:11
205:23
**Tuesday**
15:10,11,17

Caster Plaintiffs' Exhibit 88, Page 107

Randy Hinaman
December 09, 2021

17:4 87:25
110:5
tune
68:10
tuned
123:17
turn
66:14 98:22
145:15
turned
36:14,17
73:4 76:15
102:18
123:15,17
124:10 135:4
142:16
143:19 175:1
226:8
Turning
162:13 163:9
turnout
35:7 176:6
turns
72:10 216:22
Turrill
10:4 42:24
Tuscaloosa
96:4,8,13,16
115:11,20
127:20,21
128:3 162:18
163:22
192:23 195:3
209:9 211:24
212:1,2
213:7,8,13
214:4 216:19
220:14
221:19,24
224:18,19
TV
227:19
twice
79:11
two
20:9 23:21
26:7 30:5

37:5,6,12,16
49:18 52:14
54:9 59:23
72:7 74:21
85:1,5 86:16
89:11 95:19,
22 97:9
99:12 103:19
106:15
111:23,24
112:2 117:16
125:9,19
126:2,15
127:25
128:13
132:12
133:12,15
136:11
149:10,17,
21,24 150:16
161:6,9
181:6,13,17
182:13,14
185:17
189:5,6,12,
23 190:1
191:5,7
192:13,19
193:4,5,6
194:5 196:24
198:18
210:23
211:10
213:9,12
type
35:1 65:10
79:1 105:1
175:23
types
78:6
typing
13:14,16

---

U

U.S.
87:13 103:6
119:23

122:11 201:6
Uh-huh
148:9
ultimate
207:17
ultimately
31:10 51:8
76:8 110:15
196:10,16
undergraduate
19:14
underneath
224:3
underpopulate
d
45:3,6 66:11
70:25 95:24
114:7
underpopulati
on
67:17
understand
11:23 13:7
33:8 111:20
139:18
204:11
209:23
210:10 219:9
225:8
understanding
12:2 28:2
39:20 53:12,
24 76:12
111:21 112:9
139:21
140:4,6
141:8,12,21,
23,24 142:10
145:8,10
146:9 149:8
150:8 151:9
152:10
157:17
158:24
159:17,18,20
168:2,5,6
208:14
225:13,14

understood
13:11 28:25
31:5 42:11
82:11 109:16
139:5 179:14
181:22 220:4
225:16
226:22
unhappy
185:22
United
9:15 139:17
141:2
universities
104:2 114:11
115:17,18
university
19:13 103:19
115:21,25
116:4
unofficial
57:5,8 64:7,
10 67:16
106:7
unquote
180:12
186:22
update
38:20 39:4
86:23 88:3,
23
updated
28:4 57:10
87:2,23
updates
88:4
updating
38:17
upload
83:7
uploaded
82:5,20,22
urging
211:9
usable
65:10

Caster Plaintiffs' Exhibit 88, Page 108

Randy Hinaman
December 09, 2021

useless
  64:15
Usual
  11:6

_____

V

vacation
  63:6
vaguely
  27:25 141:17
valuable
  64:18,19
varied
  84:23
various
  21:12,16
  29:13 44:18
  47:3 54:20
  55:4 73:22
  86:24 98:23
  102:14
  105:10
  143:25
  145:15
  149:9,15
vast
  80:16 161:10
  162:10 181:8
verbal
  43:21 44:2
verbally
  43:18 148:10
versa
  149:16
version
  23:11 84:16
  110:12,14
  173:9,15,16
  190:23
  191:11
versions
  191:4
versus
  9:13 12:21
  25:11 81:1,
  13 84:9

97:15 124:22
170:3 181:1
201:5 221:5
vi
  167:1
vice
  149:16
VIDEOGRAPHER
  9:11 11:1
  65:21,24
  122:4,7
  197:13,16
  228:19,22
  229:2
view
  27:22 159:12
views
  152:23
violate
  202:11
Virginia
  18:16 22:15
  23:6,23
  24:6,10
virtually
  10:10 64:15
  83:17 187:14
visitors
  70:10
voices
  126:2
vote
  139:15,19
  140:13
  149:11,25
  155:18
  165:4,23,24
  167:8 185:15
  204:15
voted
  110:4
voter
  35:7 42:15
  75:21,24
  176:6
voters
  32:8,13,20

33:2 39:8
73:7 97:4
114:14
170:15
182:11
217:25 218:7
Voters'
  217:14
votes
  227:7
voting
  31:22 32:6,
  17 33:18
  34:3,8,15
  35:10 44:7,
  10 49:7
  74:10 83:2
  99:10 105:21
  112:17,20,22
  113:7 117:6
  119:12,22
  135:7 140:23
  141:1,2,4,
  16,19
  142:14,20,25
  143:11
  144:5,9,14,
  25 145:5
  149:12,25
  157:5 165:4,
  12 166:12,
  17,20 167:8
  175:12,17
  185:14 189:3
  195:11,17
  216:23

_____

W

Waggoner
  180:19
  190:15
  191:8,25
  192:8,13
Wagner
  190:25
wait
  13:17 60:1

waited
  71:16 208:6
waiting
  90:9
walk
  76:21 88:15
  109:21
  148:23 150:4
  182:19
walked
  88:18,21
Walker
  9:24 11:7,
  10,12 12:7,
  9,13 14:12,
  14,17,24
  15:6 16:18
  19:21 22:1
  33:5 37:15
  46:20 48:2,
  16 50:23
  77:10,20
  88:23 99:16
  106:25
  107:9,22
  108:3,15,16
  109:5,18
  113:13 116:7
  121:19,24
  122:3 136:12
  138:23 139:8
  144:3,10
  162:17
  168:24
  169:1,9,14
  170:24 171:4
  173:14
  176:23
  177:1,5,14,
  17,20,23,25
  178:8,11
  181:20
  184:25 185:3
  187:8 195:19
  196:20,22
  197:3,23
  198:1,6,9,
  12,25

**Caster Plaintiffs' Exhibit 88, Page 109**

Randy Hinaman
December 09, 2021

| | | | |
|---|---|---|---|
| 199:19,21 | 223:25 | **weekends** | **Wiregrass** |
| 202:21 | 224:2,9,15 | 79:21 | 161:17 |
| 204:2,24 | **wanting** | **weeks** | **witness** |
| 209:15,22 | 93:7 | 63:2,13 | 9:7 11:2 |
| 210:4 213:2 | **Washington** | 105:20 | 16:13 19:10, |
| 216:17,25 | 60:2,14 | **went** | 22 34:25 |
| 217:2 | 200:9,17 | 31:10 33:25 | 77:5 121:22 |
| 228:17,24 | **water** | 45:23 59:14, | 169:13 |
| **want** | 45:15 148:20 | 16 61:11,13 | 177:24 178:9 |
| 11:10 25:2 | 151:7 | 69:14 70:8 | 185:1 198:7 |
| 27:2 50:16 | **way** | 84:5,14 | 202:22 218:1 |
| 61:4 65:19 | 18:1 24:16 | 107:20 | 228:15 |
| 72:6,8 89:6 | 28:24 62:11 | 114:16 120:3 | **witness'** |
| 90:17 92:20 | 81:9 91:12 | 122:14 | 173:15 |
| 94:22 99:8 | 95:25 104:20 | 134:21 | **woman** |
| 103:14 | 110:20 | 192:22 193:9 | 43:25 |
| 121:20 | 111:16 121:6 | 214:23 | **Women** |
| 122:18,24 | 127:11,17 | 222:22 | 182:11 |
| 131:3,4 | 132:2 179:5 | **west** | 217:14,25 |
| 132:9 137:13 | 182:3 199:23 | 125:24 | 218:6 |
| 169:9,25 | 209:16 | 172:22 199:7 | **wonder** |
| 171:7 | 210:13,15 | 200:1 221:5 | 216:21 |
| 182:19,25 | 218:16 222:7 | **western** | **wonderful** |
| 183:15 185:1 | 227:2,9 | 130:22 | 105:22 |
| 204:4 209:25 | **ways** | 186:21 | **word** |
| 215:18 225:7 | 89:10 91:15 | **whatnot** | 60:6 151:6 |
| **wanted** | 92:10 93:8 | 125:17 | 171:23 |
| 29:12 34:11 | 95:18,19 | **whatsoever** | 215:12 218:4 |
| 40:24 43:10 | 126:16 | 28:10 | **words** |
| 45:11 72:8, | 128:13 | **Whichever** | 159:23 |
| 18,23,24 | 199:22 216:8 | 53:8 188:6 | 222:13 |
| 78:18 89:15, | **week** | **white** | **work** |
| 17,20 99:1, | 15:1,12 | 33:2 | 20:3,20,21 |
| 4,11 103:20, | 61:10 76:18 | **Whitfield** | 26:11,12,15, |
| 22 115:16, | 79:10,11,12, | 104:7 | 25 30:24 |
| 18,19 116:1 | 13 82:5 84:3 | **wholesale** | 40:23 54:9 |
| 117:7,10,20 | 87:24 98:14, | 39:10 | 56:15 58:22 |
| 118:19 | 21,25 99:18 | **whomever** | 59:9 62:25 |
| 119:13 | 101:5 103:4 | 41:18 | 78:19 79:21 |
| 125:22,25 | 105:16 | **widen** | 129:13 |
| 130:23 | 106:11 | 132:7,16 | 132:20 134:6 |
| 148:17 | 107:12,20 | **Wilcox** | 153:5 158:15 |
| 152:13 156:4 | 110:13 | 155:3 | 206:16,24 |
| 183:1 197:8 | 113:21 118:9 | **Winston** | **work-wise** |
| 210:12 | 131:1 135:3 | 162:17 | 62:13,18 |
| 219:17,20 | 174:24 175:8 | **Wire** | **workable** |
| 220:5,7,22 | 195:7 | 161:15 | 76:15 |
| 222:25 | | | |

**Caster Plaintiffs' Exhibit 88, Page 110**

Randy Hinaman
December 09, 2021

**worked**
23:22,24
24:11 26:15
27:16 31:7
92:11 195:3
210:20
212:15
224:23
**working**
23:17 24:18
28:6,8,13,14
29:14 30:21
38:19 52:14
57:13,17
58:24 62:22
63:2 64:12
79:25 89:12
206:10
**works**
74:1 110:20
132:23,25
169:12
**worth**
73:2
**worthy**
92:10
**writing**
153:16
**written**
43:19
**wrong**
38:22 193:8

────────────

**Y**

────────────

**y'all**
121:20 171:9
**yeah**
16:5 20:1
23:5,13
31:14 35:14,
16 38:16
39:15 42:6
43:8 48:25
56:17 61:22
72:16,19
77:12 79:19

81:13,20
82:7,21
83:21 87:7
89:3 95:23
96:11 104:14
109:18 116:5
119:2 123:7
127:6 135:8
143:18
146:11
154:7,24
157:19
162:25 172:6
173:18
180:24 182:7
188:21 189:7
190:17 192:8
194:3 205:18
214:11,13
215:11,15,22
220:13,25
226:21
**year**
51:20 171:1
**years**
13:2 18:20,
22 20:9
23:9,20
24:7,8 31:2
33:11,22,24
38:14,18
39:9 44:18
45:4,14
46:10,12,23
47:7,9 50:15
162:18 200:6
207:5 223:6
226:9
**Youth**
20:6

────────────

**Z**

────────────

**zero**
73:14 84:24
102:9 128:17
134:7
137:23,25

138:12,16,
19,25 139:1
183:6
188:11,16
190:9 194:4
197:24
198:16,21
199:3,16
200:4,8,23
201:2 202:19
203:5 205:25
215:5,20
216:10 223:9
225:10,12,15
**zoom**
42:21 68:17
69:3,4,7,9,
17,19 70:1,2
83:21 84:6,
13,15 85:8

**Caster Plaintiffs' Exhibit 88, Page 111**

**In The Matter Of:**

**Evan Milligan,et al v. John H.Merrill, et al.**

Chris Pringle

*December 17, 2021*

US Legal

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | FOR THE NORTHERN DISTRICT OF ALABAMA |
| 3 | |
| 4 | |
| 5 | |
| 6 | EVAN MILLIGAN, et al., ) |
| 7 | )       CIVIL CASE NO. |
| 8 | Plaintiffs,   )    2:2021-CV-01530-AMM |
| 9 | VS.          )    VIDEO DEPOSITION OF: |
| 10 | JOHN MERRILL, et al.,  )    CHRIS PRINGLE |
| 11 | ) |
| 12 | Defendants.    ) |
| 13 | |
| 14 | |
| 15 | |
| 16 | S T I P U L A T I O N S |
| 17 | IT IS STIPULATED AND AGREED, by and between |
| 18 | the parties through their respective counsel, that |
| 19 | the deposition of: |
| 20 | CHRIS PRINGLE, |
| 21 | may be taken before LeAnn Maroney, Notary Public, |
| 22 | State at Large, at the law offices of Balch & |
| 23 | Bingham, 105 Tallapoosa Street, Montgomery, Alabama, |
| 24 | 36104, on December 17, 2021, commencing at 9:14 a.m. |
| 25 | Page 1 |

| | |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | |
| 3 | FOR THE MILLIGAN PLAINTIFFS: |
| 4 | MICHAEL L. TURRILL |
| 5 | Attorney at Law |
| 6 | Hogan Lovells US LLP |
| 7 | 1999 Avenue of the Stars, Ste. 1400 |
| 8 | Los Angeles, California  90067 |
| 9 | michael.turrill@hoganlovells.com |
| 10 | |
| 11 | KATHRYN SADASIVAN |
| 12 | Attorney at Law |
| 13 | NAACP Legal Defense & Educational Fund |
| 14 | 40 Rector Street, FL 5 |
| 15 | New York, New York  10006 |
| 16 | ksadasivan@naacpldf.org |
| 17 | |
| 18 | DEUEL ROSS (Via Zoom) |
| 19 | Attorney at Law |
| 20 | NAACP Legal Defense & Educational Fund |
| 21 | 700 14th Street N.W., Ste. 600 |
| 22 | Washington, DC  20005 |
| 23 | dross@naacpldf.org |
| 24 | |
| 25 | Page 3 |

| | |
|---|---|
| 1 | IT IS FURTHER STIPULATED AND AGREED that the |
| 2 | signature to and reading of the deposition by the |
| 3 | witness is waived, the deposition to have the same |
| 4 | force and effect as if full compliance had been had |
| 5 | with all laws and rules of Court relating to the |
| 6 | taking of depositions. |
| 7 | |
| 8 | IT IS FURTHER STIPULATED AND AGREED that it |
| 9 | shall not be necessary for any objections to be made |
| 10 | by counsel to any questions, except as to form or |
| 11 | leading questions, and that counsel for the parties |
| 12 | may make objections and assign grounds at the time |
| 13 | of the trial, or at the time said deposition is |
| 14 | offered in evidence, or prior thereto. |
| 15 | |
| 16 | |
| 17 | *** |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | Page 2 |

| | |
|---|---|
| 1 | JULIE A. EBENSTEIN |
| 2 | DAVIN M. ROSBOROUGH |
| 3 | Attorneys at Law |
| 4 | American Civil Liberties Union Foundation |
| 5 | 125 Broad Street |
| 6 | New York, New York  10004 |
| 7 | drosborough@aclu.org |
| 8 | |
| 9 | KAITLIN WELBORN |
| 10 | LaTISHA GOTELL FAULKS |
| 11 | Attorneys at Law |
| 12 | American Civil Liberties Union of Alabama |
| 13 | P.O. Box 6179 |
| 14 | Montgomery, Alabama  36106 |
| 15 | kwelborn@aclualabama.org |
| 16 | |
| 17 | FOR THE SINGLETON PLAINTIFFS: (Via Zoom) |
| 18 | JAMES URIAH BLACKSHER |
| 19 | Attorney at Law |
| 20 | 825 Linwood Road |
| 21 | Birmingham, Alabama  35222 |
| 22 | jublacksher@gmail.com |
| 23 | |
| 24 | |
| 25 | Page 4 |

Page: 1 (1 - 4)

Caster Plaintiffs' Exhibit 89, Page 2

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

```
 1 FOR THE CASTER PLAINTIFFS: (Via Zoom)
 2      DAN OSHER
 3      Attorney at Law
 4      Elias Law Group
 5      10 G Street NE, Ste. 600
 6      Washington, DC  20002
 7      dosher@elias.law
 8
 9 FOR DEFENDANT JOHN H. MERRILL:
10      JIM DAVIS
11      Assistant Attorney General
12      Office of the Attorney General
13      501 Washington Avenue
14      Montgomery, Alabama  36130
15      jim.davis@alabamaag.gov
16
17 FOR THE DEFENDANTS JIM McCLENDON & CHRIS PRINGLE:
18      DORMAN WALKER
19      Attorney at Law
20      Balch & Bingham
21      105 Tallapoosa Street, Ste. 200
22      Montgomery, Alabama  36104
23      dwalker@balch.com
24
25                              Page 5
```

```
 1 ALSO PRESENT:
 2      Paige Ali, Videographer
 3      Elizabeth Baggett
 4
 5
 6           I N D E X
 7      MS. WELBORN:    9-120
 8      MR. OSHER:    120-125
 9      MR. BLACKSHER: 125-140
10      MR. DAVIS:    140-141
11
12        E X H I B I T   L I S T
13                              PAGE
14      Plaintiff's Exhibit 1 -      12
15      (Depo notice)
16      Plaintiff's Exhibit 2 -      52
17      (Reapportionment Guidelines)
18      Plaintiff's Exhibit 3 -      55
19      (Proposed guidelines handout)
20      Plaintiff's Exhibit 4 -     104
21      (Transcript of 10-26-21)
22      Plaintiff's Exhibit 5 -     116
23      (Transcript of 11-1-21)
24      Plaintiff's Exhibit 6 -     119
25      (2021 Congressional map)
                                Page 6
```

```
 1          I, LeAnn Maroney, a Court Reporter of
 2 Birmingham, Alabama, and a Notary Public for the
 3 State of Alabama at Large, acting as commissioner,
 4 certify that on this date, pursuant to the Federal
 5 Rules of Civil Procedure and the foregoing
 6 stipulation of counsel, there came before me on
 7 December 17, 2021, CHRIS PRINGLE, witness in the
 8 above cause, for oral examination, whereupon the
 9 following proceedings were had:
10                * * * * *
11          THE VIDEOGRAPHER:  This marks the
12 beginning of the deposition of Chris Pringle in the
13 matter of Evan Milligan, et al., versus John H.
14 Merrill, et al., Civil Case Number 2:21-CV-01530-AMM
15 filed in the United States District Court for the
16 Northern District of Alabama.  The date is December
17 17, 2021.  The time is 9:14 a.m.
18          All attorneys present, will you please
19 state your names and whom you represent.
20          MS. WELBORN:  Kaitlin Welborn from the
21 ACLU of Alabama representing the plaintiffs.
22          MS. FAULKS:  LaTisha Gotell Faulks, ACLU
23 of Alabama, representing the plaintiffs.
24          MR. WALKER:  Dorman Walker, Balch &
25 Bingham, representing the intervenor defendants,
                                Page 7
```

```
 1 Senator Jim McClendon and Representative Chris
 2 Pringle.
 3          MR. DAVIS:  Jim Davis, Alabama Attorney
 4 General's office, representing Secretary of State
 5 John Merrill.
 6          THE VIDEOGRAPHER:  All attorneys on
 7 Zoom.
 8          MS. SADASIVAN:  This is Kathryn
 9 Sadasivan from LDF for the Milligan plaintiffs.
10          MR. ROSS:  Deuel Ross for the Milligan
11 plaintiffs.
12          MR. TURRILL:  Michael Turrill for the
13 Milligan plaintiffs.
14          MR. OSHER:  Hi.  This is Dan Osher from
15 Elias Law Group representing the Caster plaintiffs.
16 Good to see you all.
17          MR. WALKER:  Good to see you, Dan.
18          MR. ROSBOROUGH:  Good morning.  I'm
19 Davin Rosborough for the Milligan plaintiffs.
20          MS. EBENSTEIN:  Julie Ebenstein for the
21 Milligan plaintiffs.
22          MR. BLACKSHER:  Jim Blacksher for the
23 Singleton plaintiffs.
24          MS. BAGGETT:  Elizabeth Baggett.  I'm a
25 law clerk with the ACLU, not an attorney, for the
                                Page 8
```

**Caster Plaintiffs' Exhibit 89, Page 3**

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 Milligan plaintiffs.
2          THE VIDEOGRAPHER:  Court reporter, will
3 you please swear in the witness.
4             CHRIS PRINGLE,
5 having been duly sworn, was examined and testified
6          as follows:
7          THE REPORTER:  Usual stipulations?
8     MS. WELBORN:  Yes.
9       MR. WALKER:  Yeah.  Kaitlin, that means
10 -- okay.
11     MS. WELBORN:  Yes, I understand.
12 EXAMINATION BY MS. WELBORN:
13 Q.       Representative Pringle, my name is
14 Kaitlin Welborn from the ACLU of Alabama.  I
15 represent the Milligan plaintiffs.
16          Could you please state your full name
17 for the record?
18 A.       **Christopher Paul Pringle.**
19 Q.       And do you understand that you're
20 testifying under oath right now?
21 A.       **I do.**
22 Q.       Is there anything that might prevent you
23 from understanding my questions or answering
24 truthfully today?
25 A.       **No.**
                                        Page 9

1 Q.       Are you represented by a lawyer today?
2 A.       **Yes.**
3 Q.       And who is that lawyer?
4 A.       **Dorman Walker.**
5 Q.       And is he the same lawyer who represents
6 plaintiffs -- or defendants in this lawsuit?
7 A.       **Yes.**
8 Q.       And --
9      MR. WALKER:  I'm not sure what the
10 question is.
11 A.       **The defendants are --**
12     MS. WELBORN:  That's okay.
13 Q.       The intervenors.  He represents the
14 intervenors --
15 A.       **Yes.**
16 Q.       -- is that correct?  Okay.
17          And are you paying Mr. Walker to be your
18 lawyer today?
19 A.       **No.**
20 Q.       And do you assume that the State of
21 Alabama is paying Mr. Walker to be your lawyer?
22 A.       **Yes.**
23 Q.       Have you ever been deposed before?
24 A.       **One time.**
25 Q.       And when was that?
                                        Page 10

1 A.       **2003.**
2 Q.       And what was the case?
3 A.       **Mr. Blacksher, redistricting.**
4 Q.       Okay.  And what was it -- it was about
5 redistricting.  Do you know what the result of that
6 case was?
7 A.       **No.**
8 Q.       So I'll just go over some key rules of
9 the road as a refresher.  I'll ask the questions.
10 And if you don't understand a question, let me know,
11 just like you did just now.  And if you answer a
12 question, I will assume that you understood that
13 question.  Is that fair?
14 A.       **Yes.**
15 Q.       The court reporter is here, and she's
16 typing everything you and I say and everybody else
17 says.  And she'll type everything said by anyone in
18 the room or on Zoom.
19          It's really important that only one
20 person speaks at a time.  So if you could just allow
21 me to finish my questions and sentences, and I'll do
22 my best to allow you to finish your answers before
23 jumping on to the next question.  Okay?
24          I'd like to introduce my first exhibit,
25 which is the deposition notice.
                                        Page 11

1      MR. WALKER:  Are you -- are you
2 numbering these sequentially from the last --
3      MS. WELBORN:  We'll start over.  So this
4 will be Plaintiff's Exhibit Number 1.
5
6          (Plaintiff's Exhibit 1 was
7          marked for identification.)
8
9 Q.       So have you seen this document before?
10 A.       **Yes, ma'am.**
11 Q.       And without disclosing the content of
12 any discussions with your attorney, what did you do
13 to prepare for your deposition today?
14 A.       **We met yesterday to discuss the**
15 **deposition.**
16 Q.       With Mr. Walker?
17 A.       **Yes.**
18 Q.       With anybody else?
19 A.       **Mr. Davis and Senator McClendon.**
20 Q.       Okay.  And for how long did you meet?
21 A.       **An hour an 45 minutes, two hours maybe.**
22 **It wasn't long.**
23 Q.       Okay.  And other than Senator McClendon,
24 did you meet with anyone who's not an attorney?
25 A.       **No.**
                                        Page 12

Evan Milligan,et al v. John H.Merrill, et al.                    Chris Pringle
                                                                 12/17/2021

1        MS. WELBORN: I'm sorry. I don't know
2 if you're an attorney or not.
3              MR. McCLENDON: No.
4        MS. WELBORN: I'm from DC. I just
5 assume everybody is an attorney.
6        MR. WALKER: He's an eye doctor, if you
7 have any issues there. But he's not an attorney.
8        MS. WELBORN: Well, clearly, I do.
9 Q.       Okay. And did you review any documents
10 for today?
11 A.      No.
12 Q.      Okay. You didn't review the complaint
13 for this case?
14 A.      No.
15 Q.      And have you discussed this case with
16 anyone other than your attorney, Mr. Davis, and
17 Senator McClendon?
18 A.      No.
19 Q.      And have you discussed your deposition
20 with anyone?
21 A.      I told people I was being deposed. But
22 that was the extent of it.
23 Q.      Okay. And who first told you that this
24 lawsuit had been filed?
25 A.      Was this the one that was filed before
                                                    Page 13

1 we even introduced a bill?
2 Q.       No.
3 A.       Okay. So I have no recollection.
4 Q.       And who first told you that your
5 deposition had been requested?
6 A.       My attorney.
7 Q.       And when was that? Do you remember?
8 A.       Shortly after y'all noticed it.
9 Q.       Okay. Which was --
10 A.      Just a couple of days ago.
11 Q.      Just a few days ago.
12        Are you being compensated by anyone to
13 be here today?
14 A.      I'm getting my usual legislative per
15 diem for travel, which all state employees are
16 entitled to.
17 Q.      Right. And do you expect to be
18 compensated in any way if you testify at trial?
19 A.      I will receive the same compensation for
20 travel that all state employees are entitled to.
21 Q.      Okay. Do you have an email account?
22 A.      Yes.
23 Q.      And what is that email account?
24 A.      My private personal is
25 chrispringle@southerntimberlands.com. My state
                                                    Page 14

1 government, I couldn't even tell you.
2 Q.       And that's your legislative --
3 A.       Yes.
4 Q.       -- email address?
5        Do you have any other email accounts?
6 A.       No.
7 Q.       Do you have an email account for any
8 PAC, for example?
9 A.       No.
10 Q.      So everything goes to either your
11 legislative account or your personal account?
12 A.      Yes.
13 Q.      Okay. Do you have any personal social
14 media accounts?
15 A.      I have a Facebook page.
16 Q.      So Twitter, anything like that, for
17 personal use?
18 A.      Not for me, no.
19 Q.      Okay.
20 A.      I mean, there -- there are Twitter
21 accounts for me, but I didn't use them. I didn't --
22 they had my name on them, but I never used them.
23 Q.      Okay. And on your personal Facebook
24 account, it's just your name on the account; is that
25 correct?
                                                    Page 15

1 A.       Yes.
2 Q.       Okay. And have you been involved in any
3 lawsuits other than the redistricting one with
4 Mr. Blacksher?
5 A.       No.
6 Q.       Okay. What's the highest level of
7 education that you've completed?
8 A.       A graduate of the University of Alabama.
9 Q.       And when was that?
10 A.      August 11th 1984.
11 Q.      And what degree did you obtain?
12 A.      I got a degree in communications with a
13 minor in political science.
14 Q.      Okay. Do you have any certificates or
15 any specialties, any certifications in anything?
16 A.      I'm a licensed realtor. I'm a licensed
17 homebuilder. I'm a licensed general contractor.
18 And until I let it expire, I was a certified control
19 burn specialist.
20        THE REPORTER: Control what?
21 A.      Control burn. You know when you see the
22 woods on fire? Guys like me are burning it on
23 purpose.
24 Q.      Okay. Well, if I need to fix anything
25 in my apartment, it sounds like you're the person to
                                                    Page 16

Caster Plaintiffs' Exhibit 89, Page 5

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

**Page 17**

1 come to.

2 A.        I don't fight fires.

3 Q.        Well, no fires.  I hope there's not a

4 fire in my apartment.

5           So what do you do for a living other

6 than burn things?

7 A.        I actually quit doing that.  I am a real

8 estate agent with Southern Timberlands.  We

9 specialize in timberland sales and acquisitions.

10 And I am a licensed homebuilder and a licensed

11 general contractor.  I build houses, hunting camps,

12 and I do commercial remodeling work.

13 Q.       Who so is your employer?  I'm sorry.

14 A.        Southern Timberlands.

15 Q.       Okay.  And so all of those, the realtor

16 and being a contractor, et cetera, that's all for

17 that company, correct?

18 A.        No.

19 Q.        No?

20 A.        My real estate license is held at

21 Southern Timberlands, a division of Cooper &

22 Company, Incorporated.

23 Q.        Okay.

24 A.        My contracting license are held under

25 Chris Pringle, Incorporated.

**Page 18**

1 Q.        Okay.  Any other employers?

2 A.        Alabama House of Representatives.

3 Q.        Right.  And at Southern Timberlands,

4 what's your title?

5 A.        Realtor, agent.

6 Q.        Right.  Okay.  And how long have you

7 worked there?

8 A.        27 plus years.

9 Q.        Okay.  And how long have you been a

10 contractor?

11 A.        Since about 2007.

12 Q.        And what's your current role in the

13 legislature?

14 A.        I'm a state representative from House

15 District 101 in Mobile.

16 Q.        I'm sorry.  Could you repeat that?

17 A.        State representative from House District

18 101.

19 Q.        Okay.  And what portion of the state is

20 that?

21 A.        Mobile.

22 Q.        Okay.  And how long have you been in

23 office?

24 A.        I was elected in 1994.  I served two

25 terms.  I left in 2002.  I was re-elected in '14.

**Page 19**

1 So seven years now.  I mean seven years my second

2 term.

3 Q.        Okay.

4 A.        So about 15 years.

5 Q.        And currently are you on any committees?

6 A.        Yes.

7 Q.        Which ones?

8 A.        I chair the committee on state

9 government.  I am cochairman of the house --

10 cochairman of the reapportionment committee.  I

11 serve on constitution, campaigns, and elections;

12 internal affairs; the oversight committee of public

13 examiners; contract review.  I believe that's all.

14 Q.        Okay.  And during your first stint in

15 the legislature -- is that your first two terms.

16 I'll just refer to it as your first stint.  Is that

17 okay?

18 A.        That's fine.

19 Q.        Or is there a different term that you --

20 A.        That works.

21 Q.        -- prefer?

22           Okay.  And what district did you

23 represent at that time?

24 A.        101.

25           Okay.  So the same district?

**Page 20**

1 A.        Yes.

2           And were you on any committees then?

3 A.        Yes.

4 Q.        Do you remember which ones?

5 A.        I know I served on reapportionment.  I

6 served on boards and commissions, I served on

7 health, I served on constitution, campaigns, and

8 elections, I served on contract review.  And that's

9 all I can remember right now.

10 Q.        Okay.  Did you chair any of those

11 committees?

12 A.        No.

13 Q.        Okay.  I'm sorry.

14 A.        We were in the superminority at that

15 time.

16 Q.        Right.  Well, were you the ranking

17 member in any of the committees?

18 A.        No.

19 Q.        And why did you leave office?

20 A.        I decided not to run and sought higher

21 office and was defeated.

22 Q.        And other than serving in the house of

23 representatives, have you served in any other public

24 office?

25 A.        No.

Caster Plaintiffs' Exhibit 89, Page 6

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 Q.          Okay.  And you mentioned that you were
2 on the reapportionment committee during your
3 first --
4 A.          Yes.
5 Q.          -- stint in the legislature.  So you
6 were involved in the redistricting process, correct?
7 A.          Yes.
8 Q.          And what role did you have in the
9 redistricting process?
10 A.          I was the ranking minority party member
11 in the house, not the senate.
12 Q.          Okay.  For the republicans, the minority
13 party, correct?
14 A.          Yes.
15 Q.          And why did you become involved in
16 redistricting?
17 A.          Congressman Sonny Callahan, who I had
18 previously worked for in Washington, wanted me to
19 serve on the committee because they were trying to
20 draw him out of his district.  He believed they were
21 trying to draw him out of his district.  Let me --
22 Q.          I see.  Any other reason?
23 A.          No, ma'am.  I like serving.
24 Q.          And so that redistricting process ended
25 in 2001; is that correct?

Page 21

1 A.          January of 2002.
2 Q.          Of 2002.  Okay.
3 A.          In the special session.
4 Q.          Okay.  So the special session was in
5 January of 2002?
6 A.          Yes, ma'am.
7 Q.          Okay.  And what was the result of that
8 redistricting?
9 A.          The democratic leadership drew the plans
10 and passed them.
11 Q.          And how did you become a cochair -- I'm
12 sorry.  What is your role in the 2021 redistricting
13 process?
14 A.          I'm the house cochairman.
15 Q.          Okay.  And is that a nonpartisan role?
16 A.          I was elected by the members of the --
17 the house members of the committee.
18 Q.          Okay.  And why did you decide to seek
19 that role?
20 A.          The house member that chaired it prior
21 to me was leaving, and we needed somebody with
22 experience to step up and be the house chairman.
23 Q.          And other than currently and the 2002
24 redistricting cycle, have you been involved in any
25 other redistricting process?

Page 22

1 A.          No.
2 Q.          So the 2002 congressional map, can you
3 be a little more specific about what your
4 involvement was in helping to draw that map?
5 A.          Virtually none.
6 Q.          Okay.
7 A.          Those maps were drawn off -- what we
8 call off campus.  They were not drawn in the state
9 house.
10 Q.          Can you explain more about what that
11 means?
12 A.          They were drawn by somebody off -- they
13 were not drawn in the reapportionment office in the
14 state house.
15 Q.          Okay.  So they were drawn by somebody
16 other than someone in the legislature?
17 A.          Yes.
18 Q.          Do you know who that was?
19 A.          No.
20 Q.          Did you work with anyone to change the
21 map at all?
22 A.          Yes.
23 Q.          Who was that?
24 A.          Randy Hinaman.
25 Q.          Okay.  And what did you do with him?

Page 23

1 A.          We were in contact with Congressman
2 Callahan.  And he was in contact with the other
3 members of the congressional delegation who had
4 actually -- this is my memory, now.
5 Q.          Sure.
6 A.          The members of congress hired
7 Mr. Hinaman to represent them on drawing --
8 redrawing the congressional maps in 2002.
9 Q.          And so ultimately do you know who drew
10 the 2002 map?
11 A.          I do not know who the democrats
12 retained, no, ma'am.
13 Q.          Okay.  But it was the democratic party
14 of Alabama?
15 A.          They had somebody, yes.  I don't know
16 who.
17 Q.          Do you know the general method that was
18 used to draw the map?
19 A.          I would -- I'm assuming that the
20 guidelines we adopted in 2002 were used by them to
21 draw the 2002 plan.
22 Q.          Do you know the software that was used
23 to draw the maps?
24 A.          No, ma'am.
25 Q.          Do you know the data that was used to

Page 24

Caster Plaintiffs' Exhibit 89, Page 7

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 draw the maps?

2 A.        No, ma'am.

3 Q.        So the 1992 congressional map created

4 the first majority black congressional district in

5 Alabama history.  That's District 7.  Do you know if

6 that map served as the starting point for the 2002

7 congressional map?

8 A.        You are -- that is the Reed Buskey plan,

9 correct?

10 Q.        To be honest, I don't know.  I don't

11 know the answer to that question.

12 A.        I'm pretty sure that's what we refer to

13 as the Reed Buskey plan.

14 Q.        Okay.

15 A.        That was -- that was the first time that

16 a map was drawn where a majority minority

17 congressional district was created.

18 Q.        And so --

19 A.        And I know that the guidelines in 2002

20 said we shall use the core of existing districts and

21 not -- use the core of existing districts.

22 Q.        Okay.  So is it fair to say that Reed --

23 well, who drew the 1992 map?  You don't know?

24 A.        I just know it's referred as the Reed

25 Buskey plan because Representative Buskey and I

Page 25

1 served together, and he's a personal friend of mine.

2 Q.        Okay.  So you said that it was in the

3 legislative guidelines to maintain the cores of

4 prior districts?

5 A.        If I remember the 2002 guidelines

6 correctly, that's been a longstanding tradition of

7 the Alabama legislature.

8 Q.        Okay.  Do you know if it was -- and

9 we're talking still about the 2002 redistricting

10 process -- if it was a primary goal of the

11 legislature to keep the racial demographics of each

12 district the same?

13 A.        I couldn't answer that.  I don't know.

14 Q.        Okay.  So you wouldn't know if it was a

15 primary goal to keep about a 60 percent black

16 population in District 7?

17 A.        I don't remember.  I have no -- no

18 recollection of that.

19 Q.        Do you know if the legislature took into

20 account any other characteristics other than keeping

21 the core of each district the same?

22 A.        In 2002?

23 Q.        Yes.

24 A.        No, ma'am.

25 Q.        Okay.

Page 26

1 A.        Now, we're talking just the

2 congressional plan, correct?

3 Q.        Yes.  That's right.  And that's

4 throughout this -- throughout the deposition we're

5 referring to the congressional plans.  If we refer

6 to any other plans, I'll make sure to be more

7 specific.

8        MR. OSHER:  I'm sorry to interrupt.

9 Would it be possible to move the microphone a little

10 closer to the witness?

11        (Discussion held off the record.)

12 Q.        Okay.  So for the 2001 congressional

13 map, do you know the -- did you know the racial

14 makeup of districts other than District 7?

15 A.        No.

16 Q.        Did you know the racial makeup of

17 District 7?

18 A.        No.  I mean, after the maps were passed,

19 yes, we knew it.

20 Q.        Okay.

21 A.        But going into it --

22 Q.        Do you recall what they were?

23 A.        No.

24 Q.        And do you know if the legislature

25 considered race in drawing any districts other than

Page 27

1 District 7?

2 A.        In 2001?

3 Q.        That's right.

4 A.        Those maps were drawn off campus.

5 That's the reason that ten-day rule comes into --

6 into play.  If you draw a map outside of the

7 legislature reapportionment office, you have to

8 submit it ten days before it can be introduced into

9 the legislature so it can be put into the computer

10 and analyzed.

11        And those maps were drawn exactly ten

12 days out at the last minute before the special

13 session in 2020 -- in 2002.

14 Q.        And when did that rule come into play?

15 A.        It was there in 2002.  Now, when it came

16 into the guidelines, I don't know.

17 Q.        Okay.  Do you know if in -- during the

18 2001-2002 process if any legislators advocated for

19 two majority black districts?

20 A.        Not to my recollection.

21 Q.        And if the 2000 -- well, did you vote

22 for the 2002 congressional map?  Did you vote to

23 approve it?

24 A.        Yes.

25 Q.        And if --

Page 28

Caster Plaintiffs' Exhibit 89, Page 8

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 A.         To the best of my recollection, I did.
2 It protected Congressman Sonny Callahan and his
3 district, so I'm assuming I voted for it.
4 Q.         Okay.  And all of this is to the best of
5 your --
6 A.         Yes.
7 Q.         -- recollection.
8 A.         Yes.
9 Q.         If the 2002 map had contained two
10 majority black districts, would you have voted for
11 it?
12 A.         I can't answer that.
13 Q.         Why not?
14 A.         Because I didn't look at how they would
15 have drawn it.
16 Q.         Okay.
17 A.         It was never presented to me.  So I
18 can't tell you how I would vote on something I've
19 never seen.
20 Q.         Do you think that the legislature as a
21 whole would have approved a congressional map like
22 that?
23 A.         I'm not going to speak to that.
24 Q.         Did you play a role in the 2011
25 congressional redistricting process?
Page 29

1 A.         No.
2 Q.         Okay.  And do you happen to know, even
3 though you weren't there, if the 2001 congressional
4 map or 2002 congressional map was considered as the
5 starting point for the 2011 congressional map?
6 A.         No.
7 Q.         So you are the cochair of the
8 reapportionment committee for this year's
9 congressional redistricting process.  What does it
10 mean to be the cochair of the reapportionment
11 committee?
12 A.         I work with members of the Alabama house
13 on drawing their districts, their legislative
14 districts.
15 Q.         And for congress, as well?
16 A.         No.
17 Q.         So who works on the congressional map?
18 A.         Mr. Hinaman worked with members of
19 congress to help -- for them to draw the maps.
20 Q.         Okay.
21 A.         To have input from the members of
22 congress on their districts, what they wanted.
23 Q.         So what is the role of the
24 reapportionment committee with respect to
25 congressional maps or the congressional map?
Page 30

1 A.         We adopted the guidelines.  If you read
2 the guidelines, they lay out what we expect the
3 committee and the plans to look like, to respect
4 communities of interest, not to pit incumbents
5 against each other.  There's a whole list of things
6 that we put into the guidelines that we wanted to
7 see in our plans.
8          And Mr. Hinaman was given those
9 guidelines and instructed to draw those plans in a
10 race-neutral manner following the guidelines and
11 work with members of congress in how they wanted
12 their districts drawn.
13 Q.         And as a member of the reapportionment
14 committee, do you have any input on how the
15 congressional maps are drawn?
16 A.         We voted on the guidelines.
17 Q.         Okay.  You voted on --
18 A.         We gave -- we gave Mr. Hinaman the
19 guidelines and told him to follow those guidelines
20 and to draw those -- those maps in a race-neutral
21 manner.
22 Q.         Okay.  Any other way that the members of
23 the reapportionment committee are involved in
24 drawing the congressional map?
25 A.         Once they were finished, we looked at
Page 31

1 them in committee.
2 Q.         Okay.  And anything else?
3 A.         Not that I can remember right now.
4 Q.         Okay.  And what are your
5 responsibilities as the cochair of the
6 reapportionment committee?
7 A.         We -- we set -- we oversaw the public
8 hearings, the 28 public hearings we had dealing with
9 congressional, state board of education, state
10 senate, and state house maps and districts.
11          And I worked with members of the Alabama
12 house to work on their districts and what they
13 wanted and how we could address communities of
14 interest.
15          But on congressional, I allowed
16 Mr. Hinaman to meet with members of congress and
17 take the information we gathered in the public
18 hearings that was available to him and the
19 guidelines.
20 Q.         Any other responsibilities?
21 A.         Not that I can think of right now.
22 Q.         And so what was the starting point for
23 drawing the 2021 congressional map?
24 A.         I would say the guidelines.  And part of
25 our guidelines are preserve the core of the existing
Page 32

Caster Plaintiffs' Exhibit 89, Page 9

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 districts and not pit incumbents against each other.
2 Q.        And so is it fair to say that the 2011
3 congressional map served as the starting point for
4 the 2021 congressional map?
5 A.        I would assume it would.  But I wasn't
6 there when Mr. Hinaman started drawing them.
7 Q.        Did you instruct him to use the 2011 map
8 as a starting point?
9 A.        I mean, the guidelines say preserve the
10 core of the existing districts.  So I would assume
11 that if the committee told him to start with the
12 core of the existing districts, he would start with
13 the core of the existing districts.
14 Q.        Which is the 2011 congressional map,
15 correct?
16 A.        Yes, ma'am.
17 Q.        And just really quickly going back to
18 the 2001, 2002 redistricting process.  You mentioned
19 that it was a priority to protect Senator Callahan's
20 district, correct?
21 A.        For Sonny Callahan, yes, and me.
22 Q.        And for you?
23 A.        Yes.
24 Q.        Right.  Did you have any other
25 priorities for the 2002 congressional map?

Page 33

1 A.        No.  Just protect the congressman --
2 Q.        Okay.
3 A.        -- who I worked for at one time.
4 Q.        Right.  So you were -- you worked for
5 him before you were in the --
6 A.        Yes.
7 Q.        -- Alabama legislature.  So when you
8 were in the Alabama legislature, you wanted to
9 protect his seat, correct?
10 A.        Yes.
11 Q.        Okay.  So that was really your
12 motivation?
13 A.        Yes.
14 Q.        Anything else?
15 A.        I was trying to see if we could draw
16 legislative districts.  But that's not the point
17 today.
18 Q.        I'm sorry?
19 A.        State legislative districts, also.
20 Q.        Right.
21 A.        But that was a different story.
22 Q.        Okay.  Thank you.
23        So now back to today's redistricting
24 process.  When did you first start planning for the
25 2021 redistricting process?

Page 34

1 A.        Probably 2019.  You know, we were
2 working on trying to come up with some type of
3 schedule.  But with the census being delayed and
4 getting the numbers so late, we were working on a
5 schedule of public hearings and working on the
6 guidelines.
7 Q.        Do you remember when in 2019 you
8 started?
9 A.        No, ma'am.
10 Q.        So what was your first step?
11 A.        We had a -- the first step was actually
12 getting me reelected house chairman after the 2018
13 election.  Because I was -- I assumed -- I came on
14 the committee in 2000 and, I want to tell you, 17
15 when Mr. Davis stepped down.  And then after the
16 election, I had to be reelected by my colleagues to
17 serve as the house -- the house cochairman.
18        Then we began the process of updating
19 the guidelines to conform with what we considered to
20 be the law dealing with reapportionment and
21 redistricting to make sure our guidelines complied
22 with the law.
23        Then we had extensive conversations,
24 Mr. Davis and Mr. Dorman and Senator McClendon and
25 I, in the reapportionment office about public

Page 35

1 hearings and how we were going to address public
2 hearings, which all changed because of COVID-19.
3        We began the process of laying out
4 those -- talking about those meetings and where we
5 were going to have them and how we were going to
6 publicize them and conduct them.
7 Q.        Okay.  So do you recall when you first
8 started thinking about updating the reapportionment
9 guidelines?
10 A.        2019, 2000.  I can't remember the exact
11 date.  But that was one of the first things we
12 addressed, making sure our guidelines were updated
13 based on the current reapportionment law and court
14 cases.
15 Q.        Is it required to update the guidelines
16 every redistricting cycle?
17 A.        Well, the law changes.  So yes, you have
18 to update your guidelines.  I mean, the courts are
19 constantly telling us -- handing down their rulings.
20 And we have to update based on those rulings.
21 Q.        But it's not required by Alabama law or
22 by any legislative rule to update the guidelines
23 every -- you know, every cycle?
24 A.        I can't imagine not updating the
25 guidelines going into this process if you know the

Page 36

Caster Plaintiffs' Exhibit 89, Page 10

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 law has changed.  You have to.
2 Q.        If you could just give a broad overview
3 or a timeline of the 2021 redistricting process for
4 me.
5 A.        We were supposed to receive our initial
6 numbers at the end of January.  Then they -- then we
7 were going to get our finals in April.
8 Q.        I'm sorry?
9 A.        We were supposed to get our initial --
10 if I remember this correctly, we were supposed to
11 get our initial census numbers in, I think, January.
12 Yeah, January.  And then we would get our final
13 numbers in April.
14        That all got bumped to -- we didn't get
15 any numbers until the middle of August.  And we
16 were trying to work out a schedule of public
17 hearings from the spring and the summer.  But we
18 couldn't -- we couldn't engage in those public
19 hearings because we had no numbers.
20        And when we finally got our numbers in
21 the middle of August, we immediately -- we laid out
22 a series of public hearings, sent a notice to all
23 the members of the committee.  I think it was 22
24 public hearings we had -- we proposed.
25        Representative Hall sent us a letter

Page 37

1 requesting six additional public hearings in various
2 parts of the state.  We accepted her request and
3 added the six additional public hearings Ms. Hall
4 asked for, then published a list to everybody in the
5 media and advertised that those are the public
6 hearings we would be holding all over the state.  As
7 soon as we could get it to, we got it to.
8        And as soon as those meetings were over,
9 we took that information and began drawing
10 districts.  Because the secretary of state had given
11 us a deadline of the 1st of November to have our
12 plans passed in order for all the work behind the
13 scenes that has to be done to get ready for the next
14 election to occur.
15 Q.        So you started drawing the maps after
16 the public hearings; is that correct?
17 A.        Yes, ma'am.
18 Q.        Okay.  And when you said "we," who do
19 you mean?
20 A.        Well, Randy Hinaman.  And we began
21 meeting with the individual house members about
22 their -- their individual districts.
23 Q.        Okay.  But for the congressional map,
24 you mean primarily Mr. Hinaman?
25 A.        Yes.

Page 38

1 Q.        And then what happened after that point?
2 A.        We worked right up to the last possible
3 minute drawing those -- meeting with members, trying
4 to adjust the districts to make sure the members
5 were happy with them.
6        But I'm talking about the state
7 legislature.
8 Q.        Right.  Right.
9 A.        The congressional, Mr. Hinaman met with
10 the members of congress, and he worked on that.  He
11 -- I didn't.  I was busy working on the state house.
12 Q.        Okay.  For the congressional districts,
13 what happened for you in between the public hearings
14 and the reapportionment committee meeting at the end
15 of October?
16 A.        Mr. Hinaman met with the members of
17 congress.  I did not.
18 Q.        Did you do anything else during that
19 time with respect to the congressional map?
20 A.        No, ma'am.  The closest I came, I walked
21 in the room and he was on a team call with a member
22 of congress.  I picked up my paper and walked out of
23 the room.  I wasn't there but just a minute.
24 Q.        Okay.
25 A.        I didn't participate in any of those

Page 39

1 meetings.
2 Q.        And what happened -- I'm just trying to
3 get like a timeline of events rather than the
4 specifics.
5        So after the reapportionment committee
6 met on, I think, October 26th of 2020, what happened
7 after that point?
8 A.        We adopted the plans.  And we were in
9 special session dealing with the prisons.  So we
10 went -- we went straight into special session
11 dealing with the prison system.
12        I was not there that week.  I was only
13 there one day.  I had a prior contractual obligation
14 to finish a construction project that I had to stay
15 on.  So I came one day that week, and that was it.
16 Q.        Okay.  And regarding redistricting, what
17 was the first thing that happened for redistricting
18 after the reapportionment committee on October 26th?
19 A.        I don't understand the question.
20 Q.        Well, what happened next?  How --
21 eventually the maps were passed and signed by the
22 governor, including the congressional map.  So they
23 made it out of the reapportionment committee.  Then
24 what happened?
25 A.        They made it out of the committee.  They

Page 40

Caster Plaintiffs' Exhibit 89, Page 11

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 became public.  And when we went into the special
2 session for redistricting, they were introduced in
3 bill form.
4 Q.            Okay.  And can you explain in sort of a
5 Schoolhouse Rock way how that bill became a law?
6 A.            It was brought up -- it was introduced
7 into the house.  It passed.  It was assigned to the
8 state government committee where it passed.  It was
9 given a second reading on the floor.  It was put on
10 the calendar.  It was brought up on the floor, and
11 it was passed by the members of the Alabama house of
12 representatives.
13 Q.            And then what happened?
14 A.            It was sent to the senate --
15 A.            Okay.
16 A.            -- where it went to committee, went to
17 the floor, and passed, was signed by the governor.
18 Q.            So I just wanted to make sure that I had
19 the full -- the full process.
20 A.            All nine steps occurred.
21 Q.            Okay.  Well, I'm glad that I paid
22 attention to Schoolhouse Rock, then.
23            I'm sorry to keep jumping back and
24 forth, but I'm just going to go back to the 2001,
25 2002 process really quickly.
                                              Page 41

1            Which district did Representative
2 Callahan represent?
3 A.            The 1st congressional district.
4 Q.            And what area of the state is that?
5 A.            At that time, it was Mobile, Washington,
6 Clarke, Monroe, Escambia, and Baldwin County.
7 Q.            Okay.
8 A.            I believe it lost Wilcox County in -- I
9 believe the Buskey Reed plan took Wilcox County out
10 of the 1st congressional district, I believe.
11 Q.            Okay.  And do you remember the racial
12 makeup of Representative Callahan's district?
13 A.            No, ma'am.
14 Q.            Do you have any sense at all?
15 A.            No, ma'am.
16 Q.            10 percent black, 90 percent black?
17 A.            No, ma'am.
18 Q.            None at all?
19 A.            No.
20 Q.            Let's say that Representative Callahan's
21 district had -- previously had 40 percent black
22 population.  If, in the redistricting cycle, his
23 district had an increase of black voters in the
24 district to 50 percent, would that be something that
25 you would have supported?
                                              Page 42

1 A.            I can't answer that.  That's
2 speculation.  I don't know.
3 Q.            Okay.  When you said that you were
4 protecting Representative Callahan's seat, what does
5 that mean?
6 A.            There was a plan produced that used the
7 Mobile ship channel to come up.  They turned and
8 used the Dog River channel.  And they hit
9 Congressman Callahan's property line, and they came
10 down his property line to the road and went up the
11 road to the other side and back down his property
12 line and back out into the Dog River ship channel
13 and back out into the Mobile ship channel.  They
14 carved just his house into the 1st congressional
15 district and sent it all the way to Dothan.
16 Q.            So what was your -- what was your
17 response to that?
18 A.            It's quicker to drive to Huntsville,
19 Alabama, from Mobile than it is to drive to Dothan.
20 Think about that.  It's quicker for us to get in a
21 car and drive to Huntsville, Alabama, than it is to
22 drive to Dothan or Henry County.  The congressman
23 was adamant that we would not do that to him.
24 Q.            So what was the ideal outcome of the --
25 of that situation?
                                              Page 43

1 A.            We kept the core of the existing 1st
2 Congressional District intact.  We kept Washington,
3 Clarke, Mobile, Monroe, Escambia, and Baldwin
4 County.
5 Q.            Okay.  And what about Representative
6 Callahan's house?
7 A.            All of Mobile County was in the
8 district.
9 Q.            Okay.
10 A.            All of Mobile, all of Baldwin, all of
11 Washington, all of Monroe, all of Escambia.  And I
12 believe that was the first time Clarke County was
13 split to achieve zero deviation.
14 Q.            So your aim was -- is it fair to say
15 that your aim was to keep Senator Callahan's
16 residence within his district?
17 A.            Yes, ma'am.
18 Q.            Okay.  Is that what you mean by
19 protecting his district?
20 A.            Well, I mean, to draw just the lot his
21 house is on out of the district using a ship channel
22 or a boat channel, we didn't consider that to be
23 reasonable.
24 Q.            So what would be reasonable?
25 A.            Well, I mean, they didn't have the
                                              Page 44

Caster Plaintiffs' Exhibit 89, Page 12

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1  Gingles test then.  But we didn't consider that to
2  be compact, concise, or a community of interest to
3  send one lot in Mobile County and share it with
4  Dothan in Houston and Henry County.
5  Q.        Do you mean -- were there any other ways
6  that you wanted to protect Representative Callahan's
7  seat?
8  A.        Well, of course.  He was elected by the
9  people in that district, and they -- he wanted to
10 continue to represent those people.  That's why he
11 won reelection so overwhelmingly every time he ran.
12 Q.        Is it fair to say that you wanted to
13 make sure that Representative Callahan remained in
14 the 1st District so that he could win reelection?
15 A.        I wanted to make sure he continued to
16 represent the people that had elected him, yes.  And
17 they continued to reelect him overwhelmingly for
18 years.
19 Q.        So you mentioned that one of the first
20 steps of the 2021 redistricting cycle were updating
21 the reapportionment committee redistricting
22 guidelines; is that correct?
23 A.        (Witness nods head).
24 Q.        When did that happen?
25 A.        I'm going to yield to the attorneys.

Page 45

1  But I remember sitting at a table with Mr. Davis,
2  Representative McClendon, and Mr. Walker, and we
3  began the process of working on those guidelines to
4  update.
5            MR. OSHER:  We can't hear you.
6  A.        I remember sitting at a table in the
7  reapportionment office with Mr. Davis, Senator
8  McClendon, Mr. Walker, and myself, and we began
9  reviewing the guidelines from the past
10 redistricting.  And the discussion to update them
11 based on new -- the current law and court rulings.
12            I think the Gingles test came into play
13 first.  Because I don't think Gingles was in effect
14 in 2011.  But I'm not an attorney.
15            MR. WALKER:  I'm going to instruct you,
16 given that Mr. Davis and I were there, not to
17 discuss what we discussed at that meeting because it
18 was an attorney-client meeting.
19            THE WITNESS:  Okay.
20 Q.        When did that meeting occur?
21 A.        2019 or '20.
22 Q.        Do you have any sense of what time of
23 the year?
24 A.        No, ma'am, I don't remember.
25 Q.        And did you bring any materials to that

Page 46

1  meeting?
2  A.        No, ma'am.
3  Q.        And was anybody in -- was anybody else
4  in attendance other than Mr. Walker, Mr. Davis, and
5  Senator McClendon?
6  A.        Not to my recollection, no.
7            MS. SADASIVAN:  The audio has stopped
8  again.
9            MS. WELBORN:  Can you hear me, Kathryn?
10           MS. SADASIVAN:  I can hear you now.  But
11 the audio keeps coming in and out.
12 Q.        Did you -- was that your only meeting to
13 talk about revising the reapportionment committee
14 redistricting guidelines?
15 A.        No.
16 Q.        How many other meetings did you have, if
17 you recall?
18 A.        I don't recall.
19 Q.        Do you have a sense of how many meetings
20 you had?
21 A.        I would hate to put a number on it.  But
22 it was several.
23 Q.        Five, let's say?
24 A.        It was several meetings.
25 Q.        Okay.  But less than ten?

Page 47

1  A.        I would -- I would say that, yes.
2  Q.        Okay.  And who was at those meetings?
3  A.        I remember Mr. Davis, Senator McClendon,
4  Mr. Walker, and myself.
5  Q.        Anybody else?
6  A.        I'm going to say maybe a member of the
7  reapportionment staff was there.
8  Q.        From the reapportionment office?
9  A.        Yes.
10 Q.        And do you know who that was?
11 A.        To err on the safe side, I would say
12 Ms. Overton.
13 Q.        And what's her role?
14 A.        She is the director of the
15 reapportionment staff.
16 Q.        And do you remember when that meeting
17 occurred?
18 A.        No, ma'am.
19 Q.        And what was the goal of these meetings?
20 A.        To write committee guidelines that we
21 thought would conform with the existing
22 reapportionment law.
23 Q.        So on May 5th 2001 there was a meeting
24 of the reapportionment committee; is that right?
25 A.        I believe you.

Page 48

Caster Plaintiffs' Exhibit 89, Page 13

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 Q.          Okay.  Well, when were there meetings of
2 the reapportionment committee since 2019?
3 A.          I -- I couldn't answer that.  I just
4 don't remember.
5 Q.          Do you remember any --
6           MR. ROSBOROUGH:  I'm sorry.  Everyone's
7 audio has completely dropped out again.
8           MS. FAULKS:  We should take a break.
9           MS. SADASIVAN:  I think we should break
10 possibly to resolve the audio issues quickly because
11 we keep going in and out.
12           THE VIDEOGRAPHER:  We are off the
13 record.  The time is 10:03 a.m.
14               (Recess was taken.)
15           THE VIDEOGRAPHER:  We are back on the
16 record.  The time is 10:22 a.m.
17           THE WITNESS:  Can they hear me now?  Is
18 this better?
19           MS. SADASIVAN:  Right.  Thank you so
20 much.
21 Q.          So before the break, we were talking
22 about the reapportionment committee.  How many times
23 has the reapportionment committee met in 2021, if
24 you can recall?
25 A.          I don't remember.  20 --
                                                    Page 49

1 A.          This year.
2 A.          I don't remember the exact number.
3 Q.          A handful?
4 A.          Yes.
5 Q.          Okay.  Is there a regular schedule for
6 the reapportionment committee to have meetings?
7 A.          No reapportionment committee I've ever
8 served on had a regular schedule.
9 Q.          So how --
10 A.          I mean, like my state government
11 committee meets every Wednesday at 3:00 o'clock.
12 Q.          Right.
13 A.          Reapportionment doesn't do that.
14 Q.          So how do you decide when you have to
15 have a meeting?
16 A.          When we have something to discuss.
17 Q.          Okay.
18           MS. WELBORN:  So if there -- so we know
19 that there was a reapportionment committee meeting
20 on May 5th and one on October 26th.  Mr. Walker, if
21 there were any other committee meetings for the
22 reapportionment committee, we would request any
23 records or recordings of those.
24           MR. WALKER:  Let me represent to you
25 that I'm not aware of any other reapportionment
                                                    Page 50

1 committee meetings in 2021 except for the May 5th
2 and the October 26th meetings.
3           MS. WELBORN:  Okay.  Thank you.  I just
4 wanted to double-check.
5 Q.          So for the May 5th meeting, do you --
6 did you do anything to prepare for the meeting that
7 you recall?
8 A.          Nothing out of the -- that's -- that's
9 the day we voted on the guidelines.
10 Q.          That's correct.
11 A.          Yes.  I mean, I read the proposed
12 guidelines and went over them with the attorney.
13 Q.          Okay.  Did you do anything else to
14 prepare?
15 A.          No, ma'am.
16 Q.          And other than the meetings with the
17 attorneys and Senator McClendon to talk about the
18 revised guidelines, did you talk to anyone else
19 about the May 5th meeting ahead of time?
20 A.          I may have talked to the committee
21 members in the house, but I don't recall any
22 specific conversations.
23 Q.          So at the May 5th meeting, what
24 happened?
25 A.          The guidelines were sent to the members
                                                    Page 51

1 prior to the meeting for their review and input.
2 And at the meeting, we talked about the guidelines.
3 And if I remember correctly, the attorney explained
4 them to the members of the committee, and we passed
5 them.  We adopted them.
6 Q.          And do you remember when the proposed
7 guidelines were sent to members of the committee?
8 A.          No, ma'am.  I know it was prior to the
9 meeting.
10 Q.          And did you take any notes at the
11 meeting?
12 A.          No, ma'am.
13
14               (Plaintiff's Exhibit 2 was
15                 marked for identification.)
16
17 Q.          So I would like to introduce as
18 Plaintiff's Exhibit 2 the reapportionment committee
19 redistricting guidelines from May 5th of 2021.
20 There's a copy.
21           And did you have any role in drafting
22 this document?
23 A.          It was reviewed with me by Mr. Walker
24 and we discussed it.
25 Q.          Okay.  Did you have any other role in
                                                    Page 52

Caster Plaintiffs' Exhibit 89, Page 14

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 drafting the document?

2 A.            No, ma'am.

3 Q.            Who drafted the document?

4 A.            I would say Mr. Walker.  Now, who he was

5 in conjunction with, I do not know.

6 Q.            And is that normal to have an attorney

7 draft the guidelines, would you say?

8 A.            Attorneys draft about everything we do.

9 I'm not an attorney.  I make no bones about it.

10 Q.           So the members of the reapportionment

11 committee did not draft this document; is that

12 correct?

13 A.           They were -- they reviewed it and the

14 attorneys explained it to them.

15 Q.           Okay.  Did anyone on the reapportionment

16 committee make any changes to the document at that

17 -- at the May 5th meeting?

18 A.           Not that I remember.

19 Q.           Do you know if they made any changes

20 after the meeting?  I guess they couldn't have if

21 you voted on them.

22 A.           Right.

23 Q.           Sorry.  I answered my own question for

24 you.

25              So what are these guidelines?

Page 53

1 A.            That's the parameters that we used in

2 order to draw districts we thought complied with the

3 Voting Rights Act and the 14th amendment to the

4 Constitution and the court rulings that the courts

5 had handed down in redistricting.

6 Q.            And so what is your understanding --

7 when you say "comply" with the Voting Rights Act or

8 the constitution and court rulings, what do you mean

9 by that?

10 A.           I mean, it deals with drawing districts

11 on a race neutral -- race neutral.  We didn't look

12 at race while we were drawing the districts.  And it

13 complies with not putting incumbents together and

14 respecting single-member districts and eliminating

15 contests between incumbents.  Everything is spelled

16 out here.  That was just a few of the highlights.

17 Q.           And other than compliance with federal

18 laws, are there any other reasons why you have the

19 guidelines?

20 A.           Just a road map for everybody to follow

21 when we're drawing lines.  It's agreed to by the

22 committee and the members of the committee and what

23 we prioritize as what we need to do.

24 Q.           And do you recall what updates there

25 were to the law that needed to be put into the

Page 54

1 guidelines?

2 A.            I don't recall any specifics.  But there

3 were a -- there were a handful of changes to update.

4 But I don't remember the exact specifics.

5 Q.            And who provided you with those

6 specifics?

7 A.            Our attorney.

8 Q.            Mr. Walker?

9 A.            Yes.

10 Q.           And do you know -- do you know why those

11 specifics were chosen?

12 A.           It was my understanding that the courts

13 had handed down additional rulings since the last

14 reapportionment guidelines were adopted.  And we

15 updated them to reflect those changes in the law.

16 Q.           And do you know how those specifics were

17 chosen?

18 A.           Changes in the law in courtrooms.

19

20              (Plaintiff's Exhibit 3 was

21              marked for identification.)

22

23 Q.           Let me introduce Plaintiff's Exhibit 3.

24 This is the proposed guidelines handout.

25              Do you recognize this document?

Page 55

1 A.            It looks like the one I saw earlier,

2 yes, ma'am, back in May.

3 Q.            And when you say you saw it earlier,

4 could you explain?

5 A.            Back during the discussion of the

6 guidelines.

7 Q.            And who provided this document to you?

8 A.            Mr. Walker.

9 Q.            And do you know when he provided it to

10 you?

11 A.           Prior to -- I believe every member of

12 the committee saw these -- the existing, the

13 proposed changes, and the enrolled changes prior to

14 the meeting for their review.

15 Q.           And did you see it before -- as a

16 cochair, did you see it before any of the other

17 members of the reapportionment committee?

18 A.           Yes, ma'am.

19 Q.           Did you have any role in drafting this

20 document?

21 A.           No, ma'am, other than it was reviewed

22 with me prior to that.

23 Q.           Okay.  But you did discuss revisions to

24 the guidelines prior to this document --

25 A.           Yes, ma'am.

Page 56

Caster Plaintiffs' Exhibit 89, Page 15

Evan Milligan,et al v. John H.Merrill, et al.                    Chris Pringle
                                                                  12/17/2021

1 Q.            -- being drafted?
2 A.            Yes, ma'am.
3 Q.            Do you know if any of your discussions
4 went into the creation of this document?
5 A.            I couldn't answer that question.
6 Q.            Okay.  Do you know if any of the updates
7 that you wanted to make to the guidelines made it
8 into this document?
9 A.            I know I was in favor of the 5 percent
10 deviation.
11 Q.           And that's for the state --
12 A.           Yes.
13 Q.           -- legislative maps, correct?
14              Anything else?
15 A.           Not that I recall.
16 Q.           Okay.  Do you know what the process was
17 for drafting this document?
18 A.           Our attorney met with us and we went
19 over the old guidelines, some proposed changes, and
20 what we thought we needed to update to comply with
21 the law.
22 Q.           And did you suggest any changes?
23 A.           The 5 percent.
24 Q.           Anything else?
25 A.           Not that I recall.
                                                Page 57

1 Q.            And just to make sure, other than
2 Mr. Walker, Mr. Davis, and Senator McClendon, and
3 perhaps one member of the reapportionment committee,
4 did you speak to anyone else about revising the
5 guidelines prior to the May 5th meeting?
6 A.            I can't recall.
7 Q.            Were the -- so on this document there
8 are the 2010 guidelines.  Would you say that it's
9 fair -- is it fair to say that those were the basis
10 for the 2021 guidelines?
11 A.           I would say that, yes.
12 Q.           Why did you choose to rely on the 2010
13 guidelines rather than starting from scratch?
14 A.           Because the 2010 were based off the 2002
15 guidelines, I would assume.  I wasn't there.
16 Q.           Right.
17 A.           But I would just assume that they used
18 the 2002 as the basis for the 2010, and we used them
19 for the 2020.
20 Q.           Is there a reason why you would want to
21 rely on the past documents?
22 A.           Because we had passed plans that were
23 approved by the justice department under Section 5.
24 In 2002, remember our plan -- our congressional plan
25 was precleared by the United States Department of
                                                Page 58

1 Justice under Section 5.
2 Q.            Okay.
3 A.            And they were -- they were drawn fairly
4 closely alined with the committee guidelines at that
5 time.
6 Q.            And so you believe that the 2010
7 guidelines, then, were based on the 2002 guidelines
8 for that reason?
9 A.            What I remember from 2002, when they
10 brought the 2010, I saw similarities that I
11 remembered from both of them to the -- to the 2020
12 guidelines, yes.
13 Q.            Okay.  So one of the reasons that the
14 2021 guidelines are based on the 2010 guidelines is
15 because you believe that they would be -- they would
16 have complied with Section 5 of the Voting Rights
17 Act had that -- if that were still in effect?
18 A.            They would comply with Section 1 of the
19 Voting Rights Act.  I mean Section 2.  I'm sorry.
20 Section 2 of the Voting Rights Act.  But they were
21 precleared under Section 5.
22 Q.            Right.
23 A.            And I also thought they would comply
24 with the 14th Amendment, one man, one vote.
25 Q.            Okay.  Is there any other reason why you
                                                Page 59

1 based the 2021 guidelines off of the 2010 guidelines
2 other than that you think that it would -- that they
3 would have complied with federal law?
4 A.            Well, when I read the 2010, they were
5 very similar to what I remember the 2002 guidelines.
6 I remember specifically the ten-day rule was there
7 in 2002.
8 Q.            Is it a principle that the committee
9 follows to generally use what has come before, use
10 materials that have come before?
11 A.           Yes.
12 Q.           Out of ease of use or out of tradition
13 or because the -- you know, because you believe that
14 they comply with the law?  What -- what is the
15 reason for reusing?
16 A.           I would say all three of those.
17 Q.           Is anything more important, any of those
18 more important than the other?
19 A.           Complying with the law.
20 Q.           That's pretty important, huh?
21 A.           Yeah.
22 Q.           I think we all can agree on that.
23              And do you know how the 2010 guidelines
24 were created --
25 A.           No.
                                                Page 60

Caster Plaintiffs' Exhibit 89, Page 16

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1  Q.          -- other than being based off of the
2  2002?
3  A.          No, ma'am.
4  Q.          Who would know how the 2010 guidelines
5  were created?
6  A.          I would say Mr. Walker.
7  Q.          Okay.  Anybody else?
8  A.          I wasn't there.
9  Q.          Okay.
10 A.          I take that back.  I said Senator
11 McClendon was there in 2010.  I wasn't.
12 Q.          Let's see.  If you could flip to Pages 7
13 and 8.  Let's start with 7.  And as you'll see, that
14 third box is entirely striked out in the middle with
15 the proposed changes.
16 A.          Uh-huh.
17 Q.          That's the section on communities of
18 interest.  If you'd like to read through those boxes
19 on Pages 7 and 8, it might be helpful.
20 A.          Okay.
21 Q.          So it looks to me like this subsection
22 was entirely rewritten.  Do you know why?
23 A.          I can't answer with certainty.  But I
24 believe it goes back -- and I'm just supposing -- to
25 the Gingles test.

Page 61

1  Q.          And what's your understanding of the
2  Gingles test?
3  A.          Compactness, contiguity, and communities
4  of interest, I would assume.  I don't know.
5  Q.          Can you think of any other reason why
6  the section on communities of interest would be
7  entirety rewritten?
8  A.          Other than a court ruling that gave a
9  better definition, I don't know.
10 Q.          Did you have any role in this particular
11 change?
12 A.          No, ma'am.
13 Q.          Do you know who made this particular
14 change on the document?
15 A.          You would have to talk to the attorney.
16 Q.          Talk to Mr. Walker?
17 A.          Mr. Walker.
18 Q.          In this section, if you compare the 2010
19 guidelines to the enrolled guidelines, the 2021
20 guidelines eliminate partisan interest from the
21 definition of communities of interest.
22             So in 2010, partisan interests were part
23 of the definition of community of interest.  But in
24 2021, they're not.  Do you know why that is?
25 A.          No, ma'am.

Page 62

1  Q.          Who would know why?
2  A.          I would suggest you talk to my attorney.
3  Q.          Okay.
4  A.          When you get into legal definitions --
5  Q.          I understand that lawyers are pretty
6  fond of legal definitions.
7             So in the May 5th meeting, you mentioned
8  that Mr. Walker discussed these proposed changes.
9  Do you know if there were any other changes made at
10 that meeting other than the ones proposed by
11 Mr. Walker?
12             MR. WALKER:  I think the way that
13 question is asked, I need to assert the
14 attorney-client privilege.
15 Q.          I guess what I'm saying is did any --
16 are there any differences between these proposed
17 changes that were presented in the meeting and the
18 final version in Exhibit 2, the final guidelines?
19 Did anybody suggest any other changes?
20 A.          Not that I recall.
21 Q.          So the version that is here of these
22 proposed changes, they were accepted in whole and no
23 other changes were made?
24 A.          No changes were made after the committee
25 adopted them.

Page 63

1  Q.          Well, I guess I'm talking about at the
2  -- at the committee meeting.
3  A.          I don't -- I don't remember.
4  Q.          Okay.  And did you talk to anyone about
5  the May 5th meeting after it happened?
6  A.          I'm sure I did.  But I don't recall.
7  Q.          Do you recall what you would have talked
8  about?
9  A.          The general guidelines that we adopted,
10 the guidelines that would control the committee's --
11 the way we drew plans.  But they were public record
12 at that point.
13 Q.          So what happened next in the
14 redistricting process?
15 A.          Then we began trying to work on public
16 hearings and how we were going to handle public
17 hearings with COVID-19.
18 Q.          Okay.
19 A.          So we had -- we had to come up with a
20 way to handle the public hearings and where we were
21 going to hold them and how we were going to hold
22 them.
23 Q.          So why did you hold public meetings?
24 A.          It's part of the guidelines, and it's
25 tradition.  They've been held -- I've heard they did

Page 64

Page: 16 (61 - 64)

Caster Plaintiffs' Exhibit 89, Page 17

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 them in 2010.  I know we did them in 2002.
2 Q.          And what's the purpose of the public
3 meetings?
4 A.          To take input from the community at
5 large, the people that live in the communities and
6 what they like or dislike about the existing plan
7 and what they would like to see changed.
8 Q.          Was there a draft -- when you say
9 "existing plan," what do you -- what do you mean by
10 that?
11 A.          The plan that we were currently
12 operating under.
13 Q.          So you mean the 2011 map?
14 A.          Yes.
15 Q.          So the purpose of the public meetings is
16 for people to express what they like or do not like
17 about the current setup?
18 A.          Yes.
19 Q.          Is there any other reason why public
20 meetings are held?
21 A.          Well, we go to the public and show them
22 the existing plans and where the population has
23 shifted and how they would like to see the lines
24 drawn.
25 Q.          So you mentioned that there were public
Page 65

1 meetings that were also held in 2001 when you were
2 part of that redistricting process.  Do you think
3 that people's -- do you recall if people's -- their
4 concerns are different now than they were then?
5 A.          Explain what you mean by that question.
6 Q.          Well, I guess I'm not talking about the
7 nitty-gritty little, you know, this block here, this
8 block there, but general opinions about how maps
9 should be drawn or what a community of interest is
10 or anything like that.
11          Do people -- do you think that people
12 felt the same way at public meetings back in 2001 as
13 they did in the meetings this year?
14 A.          I would say, generally speaking, they
15 held the same views.
16 Q.          And what sorts of views are those?
17 A.          I mean, some communities wanted to --
18 I'm having -- I would have to separate congressional
19 from --
20 Q.          Right.
21 A.          -- legislative.
22          Some people wanted to see maps drawn
23 differently.  There was numerous people there to
24 present the map for the League of Women Voters and
25 discuss it.  They asked us to look at that map.  And
Page 66

1 there were people that liked their members of
2 congress and wanted the maps to stay the way they
3 were.
4 Q.          Was there a draft of the congressional
5 map prepared before the public meetings occurred?
6 A.          No, ma'am.
7 Q.          And when did the public meetings occur?
8 Not every single one, but in general.
9 A.          As soon as we had numbers from the
10 census bureau and we could tell the people whether
11 their congressional district was overpopulated or
12 underpopulated and how many people they had to gain
13 or lose based on the new -- we didn't know what the
14 number was going to be to get to zero deviation on
15 the congressional map until we had the census
16 numbers.
17          So we couldn't go out and talk to people
18 about how they wanted to see their congressional
19 district change in order to comply with one man, one
20 vote.
21 Q.          Why is it -- why was it necessary to
22 have the census numbers if you don't have a map yet?
23 I guess I'm curious why the -- why the census
24 numbers are necessary to hold the public hearings.
25 A.          We had a map.
Page 67

1 Q.          The 2010?
2 A.          The existing map.
3 Q.          Okay.
4 A.          And then after we got the numbers, we
5 knew which congressional district was over and which
6 congressional districts were underpopulated and the
7 amount of people we needed in each congressional
8 district in order to comply with one man, one vote.
9 Q.          Okay.
10 A.          The same thing we did in 2001.  We
11 presented the existing map to the people in all the
12 public hearings.  And after the public meetings,
13 then and only then was a map produced.  And we had a
14 lot more time in '01.
15 Q.          Right.
16          Did the public have access to the
17 numbers of people that would need to move between
18 districts, about the overpopulation and
19 underpopulation numbers?  Did they have access to
20 that?
21 A.          That was gone over in every public
22 hearing.
23 Q.          Okay.  Why was it necessary to have
24 those numbers before holding the public hearings?
25 A.          So we could -- we knew how many people
Page 68

Page: 17 (65 - 68)

Caster Plaintiffs' Exhibit 89, Page 18

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 went into a district and how many people were in the
2 current district.
3 Q.          Well, I guess people have concerns about
4 -- well, did people have concerns about districts
5 other than, you know, the pure numbers?  Did they
6 have opinions about how maps should be drawn period
7 regardless of the census numbers?  Do you understand
8 what I'm saying?
9 A.          If you are referring to the League of
10 Women Voters who sent somebody to virtually every --
11 Q.          I'm talking in general.
12 A.          There were people there every -- every
13 meeting that had their talking points that basically
14 read them that all said the same thing.  They wanted
15 to adopt another plan that created two majority
16 minority districts.
17 Q.          Well, I assume that there were people at
18 the meetings who didn't share that view.
19 A.          Yeah.
20 Q.          Do you think -- I guess wouldn't it be
21 possible to have that opinion before the census
22 numbers were even out?
23 A.          Well, they did have the opinion before
24 the numbers were out.
25 Q.          Okay.  I guess I'm just not really

Page 69

1 Q.          Well, there are people -- so the map
2 changed between 2010 and today, right?
3 A.          Yes.
4 Q.          And there are members who have kept
5 their -- there are citizens who have kept their
6 representatives even though the lines of the
7 districts have changed, right?
8 A.          Correct.
9 Q.          So you could keep your representative
10 even though the line of the district changes,
11 correct?
12 A.          Correct.
13 Q.          So when people are saying "I'm happy
14 with my representative," are they just saying that
15 they don't want the district to change at all?  Or
16 what -- what do you think that they're saying?
17 A.          I would hate to interpret what they
18 would mean by that.  They said they were happy with
19 their representative.
20 Q.          Okay.  And how many of the public
21 hearings did you participate in?
22 A.          All 28.
23 Q.          Did you go in person --
24 A.          Yes.
25 Q.          -- to all 28?

Page 71

1 understanding why the -- why you had to wait to hold
2 the public hearings until the census numbers were
3 out.
4 A.          Accuracy.
5 Q.          Okay.  So you had mentioned that at the
6 public meetings, public hearings, some people liked
7 their members of congress and wanted to keep them.
8 What did you mean by that?
9 A.          They were happy with the representation
10 they were receiving from their elected
11 representatives.
12 Q.          So what does that mean for those
13 representatives' districts?  Would they want to keep
14 them the same or --
15 A.          Our guidelines say we try to protect the
16 core of the existing districts, yes.
17 Q.          Well, I guess if you're happy with your
18 representative, that doesn't mean that -- you could
19 still live in the district and have the rest of the
20 district change and still keep your representative
21 if like, you know, they're on the margins.  The rest
22 of the district could change.  If you live in the
23 center of the district, you're still going to keep
24 your representative, right?
25 A.          I couldn't answer that question.

Page 70

1 A.          Yes.  I want to say I -- I don't
2 remember missing any of them, no.
3 Q.          Okay.  And how were the public meetings
4 held?
5 A.          Virtually, just like this meeting.  We
6 were -- we were in COVID and we had to get as many
7 locations as we could to get as much input as we
8 could in a very compressed time period.  So we did
9 it remotely.
10 Q.          And in person?
11 A.          Yes.  We had one in the state house.
12 Q.          But 27 out of 28 were only held
13 virtually; is that right?
14 A.          Just like this meeting, yes, ma'am.
15 Q.          Okay.  And what was your role in the
16 public meetings?
17 A.          I was to go over the -- to listen to the
18 house, when they talked about the state house
19 districts.  And I listened to all the house,
20 congressional, senate, state school board, yes.
21 Q.          And were you just there to listen?  Or
22 did you do anything else?
23 A.          I listened.
24 Q.          And did you answer any questions from
25 the public?

Page 72

Page: 18 (69 - 72)

**Caster Plaintiffs' Exhibit 89, Page 19**

Evan Milligan,et al v. John H.Merrill, et al.                    Chris Pringle
                                                                12/17/2021

Page 73

1  A.        I believe I answered one.
2  Q.        And what was that question?
3  A.        I don't remember.
4  Q.        Was it about the congressional map?
5  A.        I don't remember.
6  Q.        And was Mr. Walker present at these
7  public meetings?
8  A.        He was our moderator.  Yes, ma'am.
9  Q.        Okay.  And what does that mean?
10 A.        He conducted the meeting.
11 Q.        Okay.  And is it fair to say that
12 Mr. Walker primarily addressed or answered audience
13 questions during the hearings?
14 A.        There was a time when people could
15 either ask a question or submit a question
16 electronically.
17 Q.        Okay.
18 A.        And he would address those questions.
19 Q.        And he addressed most of -- I'm sorry.
20 Of the questions that were answered, Mr. Walker was
21 the one who answered most of them?
22 A.        Yes, ma'am.
23 Q.        Okay.  And did audience members ever
24 direct questions to you specifically?
25 A.        I can't remember.

Page 74

1  Q.        And do you know if they directed
2  questions to Senator McClendon specifically?
3  A.        I don't remember.
4  Q.        Did you prepare for any of the public
5  meetings?
6  A.        We had the maps in front of us and the
7  demographic shifts in front of us.  And we would --
8  I would read those as we went through the meetings.
9  Q.        And by "the maps," you mean the 2011 --
10 A.        Yes.
11 Q.        -- maps?  Because you didn't have draft
12 maps of the 2021 --
13 A.        No.
14 Q.        -- at that time.  Okay.
15           And what demographic figures are you
16 talking about?
17 A.        The over and underpopulations, whether
18 they had too many or too few people in them to stay
19 within -- of course, I'm kind of talking legislative
20 here and not congressional.  Because congressional,
21 we went to zero deviation.  But we looked at the
22 congressional districts to see which ones were
23 overpopulated and which ones were underpopulated.
24 Q.        Okay.
25 A.        And how many people would have to change

Page 75

1  in order to get to zero deviation.
2  Q.        And who created that document?
3  A.        I'm not sure.
4  Q.        Do you know -- sorry.
5           Did you take any notes during any of the
6  public meetings?
7  A.        Any notes I took, I turned over in my
8  evidence.  They were handwritten on those -- those
9  documents.
10 Q.        But you did take some --
11 A.        Very few.
12 Q.        -- notes?  Okay.
13           Did you take any notes after any of the
14 public meetings?
15 A.        No, ma'am.
16 Q.        And did you talk to anyone about the --
17 what happened in the public hearings?
18 A.        I'm sure I did.  But I don't recall
19 specifics.
20 Q.        Did you talk to Mr. Hinaman about what
21 happened in the public meetings?
22 A.        Yes, ma'am.
23 Q.        And what did you tell him?
24 A.        Most of the conversations at the public
25 hearings were dealing with state legislative races,

Page 76

1  if I remember correctly.
2  Q.        But occasionally people talked about
3  congress, right?
4  A.        Yes.  But we had not seen -- I had not
5  seen the numbers on any plans until after they were
6  submitted to reapportionment.
7           So until I saw the -- you know, that
8  ten-day rule kicked in and these plans that had been
9  drawn off campus were submitted to the
10 reapportionment office.  Then and only then could we
11 look at the demographics, the population changes,
12 and the deviations in those districts.
13 Q.        Well, you had the demographic shift
14 numbers to get to zero deviation during the public
15 meetings, right?
16 A.        I had the number that we needed to get
17 to, correct.
18 Q.        So you did talk to Mr. Hinaman about
19 what was brought up at the public hearings about
20 congress, correct?
21 A.        We talked -- I would assume we discussed
22 it, yes.
23 Q.        And do you recall any specifics of what
24 you talked about?
25 A.        Just the difference -- we were trying to

Caster Plaintiffs' Exhibit 89, Page 20

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 **get to zero deviation.**
2 Q.        Did you relay any specific concerns that
3 someone had at a public meeting about the
4 congressional map to Mr. Hinaman?
5 **A.        I was concerned about the deviations in**
6 **any other proposed plans.**
7 Q.        Well, the public, though, I'm talking
8 about, what they brought up at the public hearings.
9 Did you relay any of those specifics to Mr. Hinaman?
10 **A.        I don't remember.**
11 Q.        Do you recall discussing any of those
12 kinds of specifics that the public had about
13 congress to anyone else?
14 **A.        I'm sure we did.  I mean, it was the**
15 **same talking points at every public hearing on the**
16 **congressional plan.**
17 Q.        I mean, that suggests that there was
18 really only one view about the congressional map
19 coming up at the public hearings.
20 **A.        Well, it was the plan produced by the**
21 **League of Women Voters.  Every -- if I remember**
22 **correctly, almost every single public hearing we**
23 **had, somebody stood up with their talking points and**
24 **read them to us and entered them into the record.**
25 Q.        But not everybody who attended the
Page 77

1 **public hearings would have known about the League of**
2 **Women Voters' map, right?**
3 **A.        Somebody was there at virtually every**
4 **meeting that I remember to talk about it.**
5 Q.        Did anyone discuss anything about the
6 congressional map that wasn't related to the League
7 of Women Voters' map that you recall?
8 **A.        I don't recall.**
9 Q.        Do you know how many of the 28 meetings
10 were held on weekdays during working hours, 9:00 to
11 5:00?
12 **A.        Like this one here, all but one of them.**
13 Q.        Okay.  And most people are working on
14 weekdays during working hours from 9:00 to 5:00,
15 right?
16         That's a yes?
17 **A.        That's -- I know a lot of people that**
18 **work different hours.**
19 Q.        But most people work on weekdays from
20 the hours of around 9:00 to 5:00, would you say?
21 **A.        I would say it's very common, yes.**
22 Q.        Okay.  Do you think that that had an
23 impact on who could attend the public meetings?
24 **A.        I don't know.**
25 Q.        I mean, if I'm at work, I tend to not be
Page 78

1 doing other things that aren't work related during
2 the work hours.  Do you think that that would have
3 had an impact at all on --
4 **A.        Well, the schedule of the public**
5 **hearings was public.  It was released.  The links**
6 **were public.  You might not have been able to make**
7 **one specific meeting, but you could have logged into**
8 **any of the other 28 at any given time on any given**
9 **day that we held them and listened and interjected**
10 **into the congressional plan.**
11 Q.        Well --
12 **A.        I mean, you had 28 opportunities to log**
13 **on over a three-week period that you could have come**
14 **in and watched.  It's not like you had to drive to a**
15 **location like in the old days when you had to drive**
16 **somewhere during the daytime to come hear us.  You**
17 **were able to listen at any time.**
18 Q.        But even so, if you work at McDonald's
19 from 9:00 to 5:00 and you're at the cash register,
20 how are you going to attend one of those meetings?
21 **A.        There are 28 different meetings at all**
22 **different times of the day.**
23 Q.        Well, not -- they're all between 9:00
24 and 5:00 except for one.
25 **A.        Then you could have logged in that night**
Page 79

1 **and watched.**
2 Q.        For that one meeting?
3 **A.        Exactly.  And you could have spoken your**
4 **mind or emailed in your questions or your concerns**
5 **at that time.**
6 Q.        Okay.  But you and others from the
7 reapportionment committee set the times of those
8 meetings, correct?
9 **A.        Yes, ma'am.**
10 Q.        Primarily you and Senator McClendon; is
11 that right?
12 **A.        In conjunction with the other members.**
13 **Like I said, we produced a list of 22.  And Ms. Hall**
14 **asked us to add six meetings in communities she**
15 **thought did not have enough representation or enough**
16 **opportunities.  So we added those additional six**
17 **meetings and included them in our press releases so**
18 **anybody could log in.**
19 Q.        Did you consider holding more meetings
20 in the evening other than just the one?
21 **A.        I couldn't answer that question.**
22 Q.        Before the public hearings happened,
23 Senator McClendon told the press that the new maps
24 wouldn't cause, quote, any surprises for the
25 candidates or for the voters.  I'll just represent
Page 80

Page: 20 (77 - 80)

**Caster Plaintiffs' Exhibit 89, Page 21**

Evan Milligan,et al v. John H.Merrill, et al.                          Chris Pringle
                                                                      12/17/2021

---

1 to you that that happened.
2          Do you know what the basis was for that
3 statement?
4 **A.          You'll have to ask Senator McClendon.**
5 Q.          Do you agree with that statement, that
6 even before the public hearings would have happened,
7 that there wouldn't be surprises for candidates or
8 for the voters?
9 **A.          I think every time you change the lines,**
10 **you surprise people.**
11 Q.          But on the whole, would you say that
12 that statement was true?
13 **A.          Well, when your guidelines are to keep**
14 **the core of the existing districts intact as much as**
15 **practicable, it shouldn't be too earth shattering,**
16 **some of the changes around the edges.**
17 Q.          And do you know if any work had been
18 conducted in drafting the congressional map prior to
19 the public hearings?
20 **A.          No, ma'am.**
21 Q.          Do you know if any decisions on the
22 lines for the congressional maps had been made
23 before holding the public hearings?
24 **A.          No, ma'am.**
25 Q.          Are you familiar with the black belt
                                                          Page 81

---

1 counties in Alabama, that term?
2 **A.          I sell timberland.  I work all through**
3 **the black belt.**
4 Q.          Okay.
5 **A.          I've spent more time in the black belt**
6 **than . . .**
7 Q.          And what's your understanding of the
8 black belt?
9 **A.          It's a region in the middle of the state**
10 **of Alabama that got its name because of the rich**
11 **soils.**
12 Q.          And what counties are in it?
13 **A.          It's like 28 counties, I think,**
14 **something like that.  I spend most of my time in**
15 **Wilcox, Marengo, Lowndes, Perry, Hale, those areas.**
16 Q.          And if you could just describe what
17 portion of the state are we talking about.
18 **A.          Central Alabama.**
19 Q.          Do you recall if anyone discussed the
20 black belt at any of the public hearings?
21          MR. WALKER:  What was --
22          MS. WELBORN:  If anyone at the public
23 meetings discussed the black belt.
24 **A.          It's a term that's often used in**
25 **Alabama.  But I don't remember specifically.**
                                                          Page 82

---

1 Q.          Would you agree that the black belt is a
2 community of interest?
3 **A.          It's a very broad area that stretches**
4 **from one side of the state to the other.  I believe**
5 **it has some communities of interest in it, yes.**
6 Q.          But as a whole, is the black belt a
7 community of interest?
8 **A.          I couldn't answer that.**
9 Q.          Why not?
10 **A.          Because while I work in Wilcox and**
11 **Marengo and Perry, I don't go to Macon or the**
12 **counties on the other side.  So I don't really know**
13 **much about them.**
14 Q.          But that's true for other communities of
15 interest in other parts of the state, right?
16 **A.          Explain that one to me.**
17 Q.          I guess if the legislature -- if the
18 reapportionment committee is tasked with approving a
19 congressional map that keeps, you know, communities
20 of interest together, you don't personally know
21 about every community of interest in the same way
22 that you do know about those particular counties,
23 right?
24 **A.          I mean, you know, I'm from Mobile.  And**
25 **we run up and -- it's the river system.  So many of**
                                                          Page 83

---

1 the families in Mobile come from northern counties
2 because of the way the river system is.  We have
3 very little to nothing in common with the people in
4 the Wiregrass.  It's not -- it's almost a totally
5 different state over there.
6          So I don't know -- if you're asking me
7 do the people in Wilcox County have something in
8 common with the people in Macon County, I can't
9 answer that.  But I know the people in Wilcox
10 County.  We go up and down the rivers.
11 Q.          Right.  I guess what I'm saying is you
12 still approve a map even though you don't have
13 personal experience with every single community of
14 interest, right?
15 **A.          The state legislature approved the map,**
16 **yes, ma'am.**
17 Q.          Well, you voted for it, right?
18 **A.          Yes.**
19 Q.          So just going back to the black belt.
20 Even though you don't necessarily have personal
21 experience with every single county, can you still
22 form an opinion about in general whether that is a
23 community of interest?
24 **A.          I know it's a very rural part of the**
25 **state of Alabama.**
                                                          Page 84

---

**Caster Plaintiffs' Exhibit 89, Page 22**

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

---

1 Q.          Does that make it a community of
2 interest?
3 A.          I don't know what your definition of a
4 community of interest is.
5 Q.          Well, the reapportionment committee has
6 a definition of community of interest, right?
7 A.          Yes.
8 Q.          So looking at that definition, would you
9 consider the black belt to be a community of
10 interest?
11 A.          Our definition of community of interest
12 is in certain circumstances to include political
13 subdivisions such as counties, voting precincts,
14 municipalities, tribal lands, reservations, or
15 school districts.  Those counties -- the counties
16 are a community of interest.
17 Q.          Well, it also includes ethnic, racial,
18 economic, tribal, social, geographic, and historical
19 identities.
20 A.          Yes.
21 Q.          Under any of those aspects, does the
22 black belt constitute a community of interest?
23 A.          I know it's -- it is predominantly
24 African American.
25 Q.          And the black belt is a historical term,

Page 85

---

1 right?
2 A.          Based on the soil, yes, ma'am.
3 Q.          Okay.  And that term goes back quite a
4 long time?
5 A.          It was developed because of the rich
6 soil in that area.
7 Q.          So yes or no, under these guidelines,
8 does the black belt constitute a community of
9 interest?
10 A.          I couldn't answer that question.  I just
11 couldn't answer that.
12 Q.          I don't understand why not.
13 A.          Because I'm not sure they are
14 politically cohesive and compact and contiguous
15 enough to constitute one.
16 Q.          What, if anything, did you learn or take
17 away from the public hearings?
18 A.          What do you mean by that?
19 Q.          Well, did you learn anything from what
20 you heard at the public hearings?
21 A.          I walked away thinking most people in
22 the state of Alabama were happy with their
23 representation the way it was in congress.
24 Q.          And do you recall any specifics about --
25 about that?

Page 86

---

1 A.          The general public -- I mean, every
2 committee meeting had somebody standing up and
3 reading the talking points on the League of Women
4 Voters' plan.  So if you read the record, it's all
5 in there.  They all talked about that specific plan
6 on their talking points.
7 Q.          But the --
8 A.          I don't remember the general public
9 being dissatisfied with the members of congress.
10 Q.          Meaning other people at the -- at the
11 public meetings --
12 A.          Yes.
13 Q.          -- were not --
14 A.          I don't remember them being
15 dissatisfied, no, ma'am.
16 Q.          Okay.  So how -- but you still took away
17 the idea that the general public was happy with
18 their current representation?
19 A.          Yes, ma'am.
20 Q.          Okay.  And what did you do with that
21 information?
22 A.          I mean, it's all part of the permanent
23 record.  I remembered it because I listened to all
24 of it.
25 Q.          Right.

Page 87

---

1 A.          We put it in the record.  It's all
2 there.
3 Q.          After -- after the meetings, what did
4 you do with that information?
5 A.          It was put into the official record of
6 the committee.
7 Q.          I guess I'm -- did any of what you
8 learned at the public hearings influence how the
9 congressional map was drawn?
10 A.          I can't answer that.  I don't -- I
11 wasn't a member -- that map was drawn by Mr. Hinaman
12 and in conjunction with the members of congress.
13 Q.          But you did discuss what you learned
14 about the public meetings with Mr. Hinaman with
15 respect to the congressional meetings at some point?
16 A.          That somebody had come to every meeting
17 and read the League of Women Voters' talking points,
18 yes.
19 Q.          But did you express to Mr. Hinaman your
20 sentiment that the general public was happy with
21 their representation?
22 A.          I don't remember.
23 Q.          Do you remember telling him, about the
24 congressional map, anything other than about the --
25 from the public hearings other than the League of

Page 88

---

Evan Milligan,et al v. John H.Merrill, et al.                    Chris Pringle
                                                                 12/17/2021

```
 1 Women Voters' talking points?
 2 A.          Not that I can recall.
 3 Q.          And how much weight did you give to
 4 those -- the sentiment that the general public was
 5 happy with their representation in terms of its
 6 importance in drawing the map?
 7 A.          We listened to the people.  I was
 8 anxious to see what the League of Women Voters' map
 9 turned out to be.
10 Q.          Did you -- did you consider it to be
11 more important when the congressional map was being
12 drawn that the general public was satisfied with
13 their representation compared to what was said about
14 the League of Women Voters' map?
15 A.          You know, when every meeting somebody
16 stands up and reads the same talking points and you
17 could tell they've been prompted just to go say that
18 to get it into the record, I put more weight on the
19 people who came out of a true sense of wanting to
20 express their opinion, not the opinion that was
21 written down on a piece of paper form them by an
22 attorney.  What I assume was an attorney.  I'm
23 sorry.
24 Q.          So you gave less weight to those League
25 of Women Voter talking points than you did the
                                                Page 89
```

```
 1 people who were discussing on their own that they
 2 were happy with their representation?
 3 A.          Somebody that was put in the room to put
 4 statements into the record is not, in my opinion,
 5 the same as somebody who comes on their own free
 6 will and their own fruition to express their
 7 personal opinion about their representation.
 8 Q.          So did you give any instructions to
 9 Mr. Hinaman to change anything about the
10 congressional map because of the public hearings?
11 A.          Not that I recall.
12 Q.          Did you give instructions to anyone else
13 about changing the map because of the public
14 hearings?
15 A.          Not that I recall.
16 Q.          At the public hearings, do you recall
17 anyone discussing the need to have two majority
18 black districts for congress?
19 A.          Two majority black congressional
20 districts, yes, ma'am.
21 Q.          Yes.  Who mentioned that?
22 A.          I don't recall specifically.
23 Q.          Was it mentioned often, would you say?
24 A.          I don't remember.
25 Q.          Was it something that only came up once
                                                Page 90
```

```
 1 or twice?
 2 A.          I don't remember the number of times.
 3 But it came up a few.
 4 Q.          A few.  But not at every meeting?
 5 A.          I don't remember it coming up at every
 6 meeting, no.
 7 Q.          What was your response to the suggestion
 8 that there should be two majority black
 9 congressional districts?
10 A.          If somebody could show me a plan that
11 met the guidelines, I would be interested in looking
12 at it.
13 Q.          And what do you mean by "interested in
14 looking at it"?
15 A.          I mean I would give it due consideration
16 if it met the guidelines.
17 Q.          If you have competing maps that all meet
18 the guidelines, how do you choose one over the
19 other?
20 A.          I would go with the one that's most in
21 line with the guidelines.
22 Q.          How do you determine what is most in
23 line with the guidelines?
24 A.          The number of county splits, the
25 deviations.
                                                Page 91
```

```
 1 Q.          Okay.  Is something -- is one of those
 2 factors more important than the other?
 3 A.          Deviations.
 4 Q.          That's the most important factor, in
 5 your opinion?
 6 A.          Yes, ma'am.
 7 Q.          And how important are the county splits?
 8 A.          Well, we tried to split as the few
 9 counties as possible in order to achieve the zero
10 deviation.
11 Q.          Just quickly going back to talking about
12 this sentiment that people were happy with their
13 representation.  How did you know or how did you
14 determine who was there with their talking points
15 and who was there, you know, coming of their own
16 volition?
17 A.          If they're reading a piece of paper and
18 it's the same talking points you've heard, I would
19 assume they were sent there to read it.  If they're
20 talking extemporaneously and they don't line up with
21 the talking points you've heard before, I would
22 assume they were talking of their own fruition.
23 Q.          Did you ask anyone at any of the public
24 meetings if they were part of a particular group?
25 A.          They were instructed by Mr. Dorman to
                                                Page 92
```

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 state their name and who they represented.
2 Q.        And did you ask any of them if they were
3 sent there by somebody else?
4 A.        No.  They -- when they were called to
5 speak, they were to state their name and who they
6 represented.
7 Q.        Okay.  And did you -- did you consider
8 -- if someone came there, you know, with a prepared
9 set of talking points, did you consider their
10 opinion to be less -- less important to drawing the
11 map than someone who came there to speak
12 extemporaneously, like you said?
13 A.        I believe I answered that question
14 already, didn't I?
15 Q.        Do you know if a map with two majority
16 minority districts was proposed at any point?
17 A.        During the legislative process when we
18 were in session, yes, ma'am.
19 Q.        Do you know if any were proposed before
20 the special session?
21 A.        We have a rule that any plan drawn off
22 campus, outside the reapportionment office, has to
23 be turned over ten days before it can be introduced
24 as a bill.
25        So after they were turned over, at

Page 93

1 Q.        What --
2 A.        Until it -- until it reaches that bill
3 form and we can analyze it based on the population
4 and the deviations, I don't consider it a plan.
5 Q.        Okay.  What all information could you
6 look at from any plan at that point?
7 A.        At that point?
8 Q.        Uh-huh.
9 A.        After it's introduced from the outside
10 source?
11 Q.        Yes.
12 A.        Then we look at the population, we look
13 at the deviations, we look at the county splits, and
14 we look at the BVAP, we look at the racial makeup of
15 the district.
16        And when you say "BVAP," just for the
17 record, what do you mean?
18 A.        Black voting age population.
19 Q.        And is that all black or any part black?
20 Do you know?
21 A.        No, I couldn't answer that.  I've seen
22 both columns, but I don't know.
23 Q.        So just to clarify, you did not see a
24 map for two majority minority or majority black
25 congressional districts prior to the ten-day mark?

Page 95

1 whatever point they were turned over and we could get the
2 put through our computers and we could get the
3 information on them, the deviations and the county
4 splits, we looked at them then.
5 Q.        So if someone submitted an outside plan,
6 let's say, 30 days before the special session, so
7 more than ten days, when would you have had access
8 to that plan?
9 A.        I don't remember seeing the demographics
10 of any plan that was introduced earlier than that.
11 Q.        I'm sorry.  Could you --
12 A.        I don't remember seeing a plan that was
13 submitted before then.
14 Q.        Before the ten days?
15 A.        Ten days, yes, ma'am.
16 Q.        Okay.  And once a plan is submitted by
17 outside groups, what happens?
18 A.        It's put through the computer and turned
19 into what we call bill form.  And then you have to
20 find a member of the legislature that's willing to
21 introduce it.
22 Q.        Okay.  But you mentioned deviation and
23 demographic data.  Does the computer program also
24 give you that information?
25 A.        Yes.

Page 94

1 A.        I did not see a plan that had the
2 deviations in the populations until then.  There's a
3 difference between just color coding a map and
4 letting me see an actual plan.
5 Q.        Okay.  What's the difference?
6 A.        Well, you can -- you can draw anything
7 you want to on a map.  But until you actually have
8 the census numbers and the demographic numbers in
9 it, I don't consider it a plan.
10 Q.        And why not?
11 A.        Because until I know the population in
12 that district -- the whole basis of redistricting is
13 the 14th Amendment to the Constitution, equal
14 protection, that my vote for a member of congress
15 counts the same as another person in the state of
16 Alabama's vote.  That's the reason why we go through
17 this process.  It's one man, one vote.  And until I
18 look at a plan and the numbers associated with that
19 plan, I don't consider it a full plan.
20 Q.        So I just want to make sure that I'm
21 getting this right.  I'm not trying to ask you over
22 and over and over again.
23        Is it right that you did not look at
24 what you considered to be a plan, so an analyzed,
25 you know, map with all that demographic information

Page 96

Caster Plaintiffs' Exhibit 89, Page 25

Evan Milligan,et al v. John H.Merrill, et al.                    Chris Pringle
                                                                 12/17/2021

1 and deviation information, until after that ten-day
2 mark?
3 A.          Until after it was analyzed and I could
4 get the numbers, yes.
5 Q.          Okay.
6 A.          Then we looked at it to see what the
7 deviation was, the overall deviation of the plan,
8 and how many splits there were in counties and what
9 counties were split.
10 Q.         Okay.  And at that point, were there any
11 maps that were -- had two majority black districts?
12 A.         I don't remember seeing two majority
13 black districts.  I remember seeing one -- two of
14 what they call opportunity districts, what they were
15 calling -- the districts were not 50 percent
16 minority.
17 Q.         Could you define your understanding of
18 an opportunity district?
19 A.         That's what they were calling them.
20 They called them opportunity districts, and they
21 were both under 50 percent minority.
22            THE REPORTER:  Under 50 percent what?
23 A.         Minority population.
24 Q.         And who is *they*?
25 A.         The people who introduced them, the

Page 97

1 League of Women Voters and -- I can't remember who
2 introduced the bill in the house.
3 Q.         Okay.  And -- sorry.  One second.
4            If a district has under a 50 percent
5 minority population, what is the importance of that
6 number, I guess?  Why was that number important?
7 A.         Under Section 2 of the Voting Rights
8 Act, we can't do anything to diminish the ability or
9 protect a class of minority citizens from electing
10 or defeating a candidate of their choice.
11 Q.         So if a district has under 50 percent
12 voting age population -- sorry.  Under 50 percent
13 minority population, does that automatically
14 diminish their ability to choose a candidate of
15 their choice under Section 2?
16 A.         You're asking an attorney question.
17 Q.         Well, I mean, ultimately it's your
18 responsibility to --
19 A.         It would -- it would -- I would give
20 great caution in order to draw a district that was
21 less than 50 percent, yes.
22 Q.         Under 50 percent minority population?
23 A.         Yes.  I would be very cautious.
24 Q.         Okay.  And by "very cautious," does that
25 mean you are -- what does that mean?

Page 98

1 A.          I'm afraid we would run afoul of Section
2 of the Voting Rights Act.
3 Q.          Okay.
4            MR. DAVIS:  Can I ask how we're doing on
5 time?  This was -- I know we had a break, a long
6 break, for audio.  This was a two-hour deposition
7 that was noticed.  We've got three PI motions we
8 need to get back to work on.  This seems to be
9 really dragging.
10            MS. WELBORN:  Well, I mean, we have up
11 to 7 hours under the Rules of Federal Procedure.
12            MR. DAVIS:  You're going to take 14?
13            MS. WELBORN:  I would hope -- I would
14 really like to not do that.  But it certainly is our
15 right to do that.  I can't really tell you at this
16 point exactly how much longer.  But I'm happy to
17 take a break right now to help confer --
18            MR. DAVIS:  I'm hearing a lot of
19 repetition and a lot of arguing with the witness.
20 If you're going to do this discovery before the
21 preliminary injunction hearing, it needs to get
22 pretty focused and be a little sensitive and
23 courteous towards everything that we've got to do on
24 the defense side to get ready to respond to your
25 motions.

Page 99

1            MS. WELBORN:  I understand what you're
2 saying.
3            MR. ROSBOROUGH:  Counsel, I thought we
4 were going to refrain from speaking objections.
5            MR. DAVIS:  What did he say?
6            THE REPORTER:  Refrain from speaking
7 objections.
8            MS. WELBORN:  Let's take a break.  Let's
9 go off the record.  And we'll come back and talk
10 after that.
11            THE VIDEOGRAPHER:  We are off the
12 record.  The time is 11:26 a.m.
13            (Recess was taken.)
14            THE VIDEOGRAPHER:  We are back on the
15 record.  The time is 12:06 p.m.
16 Q.         So I'd like to talk about the October
17 26th reapportionment committee meeting.  Do you
18 remember if you did anything to prepare for that
19 meeting?
20 A.         Yes.  We sent the proposed maps to all
21 the members for their review prior to the meeting.
22 Q.         And by "we," who do you mean?
23 A.         The staff at the reapportionment
24 committee.
25 Q.         Okay.  And do you remember how far in

Page 100

Caster Plaintiffs' Exhibit 89, Page 26

Evan Milligan,et al v. John H.Merrill, et al.                    Chris Pringle
                                                                  12/17/2021

1 advance you sent them out?
2 A.        As fast as we could.  Remember this
3 whole process was very condensed, very condensed.
4 Q.        I think it was the day before the
5 meeting.  Is that right?
6 A.        Yes, ma'am, which is standard operating
7 procedure.  We get bills usually about a day before.
8 Q.        Okay.
9 A.        Usually.  Not all the time.
10 Q.        And did you talk to anyone about this
11 meeting beforehand?
12 A.        I approached the members of my -- the
13 house members of the committee to make sure they
14 read their information and make sure they came to
15 the meeting.
16 Q.        And other than the maps themselves, did
17 you provide any materials to the members of the
18 committee?
19 A.        Whatever the committee sent with the
20 notice.
21 Q.        With the -- I'm sorry.  What do you mean
22 by the notes?
23 A.        They were sent an email notifying them
24 of the meeting.  Whatever was contained in that
25 notification of the meeting.
                                              Page 101

1 Q.        Who decides whether a racial
2 polarization analysis should be done for a
3 particular district?
4 A.        Not me.
5 Q.        Do you know who does decide?
6 A.        I would -- I would assume it would be
7 our attorney.
8 Q.        Why that assumption?
9 A.        Because he's an attorney and he
10 understands Section 2.
11 Q.        But the actual analysis itself is math,
12 right?
13 A.        I would assume.  But I've never -- never
14 done it.
15 Q.        Okay.  Would anyone other than your
16 attorneys make the decision to have a racial
17 polarization analysis done for a particular
18 district?
19 A.        Not that I'm aware of.  I'm sure if I
20 asked for one, I could get it.
21 Q.        Okay.  Can anyone ask for it?
22 A.        I don't know the answer to that
23 question.
24 Q.        Well, could a member of the
25 reapportionment committee ask for it and have it be
                                              Page 103

1 Q.        And do you know who sent that email?
2 A.        Somebody on the reapportionment staff.
3 Q.        Okay.  So a considerable portion of that
4 meeting was about racial polarization analysis,
5 which I'll also refer to as RPV.  Does that --
6 A.        RP what?
7 Q.        RPV.  Have you heard that term before?
8 A.        I've heard of racial population
9 analysis.
10 Q.        I'll try to refer to it as racial
11 polarization analysis.  But that's also a lot of
12 words.
13 A.        You can use the acronym.
14 Q.        So what's your understanding of racial
15 polarization analysis?
16 A.        My understanding is that is done
17 particularly for the courts to determine whether we
18 either on purpose -- intentionally or
19 unintentionally violated Section 2 of the Voting
20 Rights Act and denied a group of protected class of
21 minority citizens from electing or defeating a
22 candidate of their choice based on the analysis of
23 the historical vote.
24 Q.        And do you know how it's done?
25 A.        No, ma'am.
                                              Page 102

1 performed?
2 A.        I'm sure if a member of the
3 reapportionment committee wanted one, they could
4 approach the legal counsel of the committee and
5 request one.
6 Q.        How do you decide which district a
7 racial polarization analysis should be done for?
8 A.        I didn't make that decision.
9 Q.        So you don't play any role in deciding
10 district X should have a racial polarization
11 analysis done?
12 A.        I did not, no.
13 Q.        Okay.  Do you know if there are any
14 written guidelines for how someone should decide
15 whether a racial polarization analysis should be
16 done?
17 A.        I don't recall ever seeing any.
18 Q.        Do you know if there are any informal
19 guidelines?
20 A.        I don't recall ever seeing any.
21 Q.        Or hearing of any?
22 A.        No.
23
24         (Plaintiff's Exhibit 4 was
25         marked for identification.)
                                              Page 104

Evan Milligan,et al v. John H.Merrill, et al.                    Chris Pringle
                                                                12/17/2021

1
2 Q.        I'd like to introduce Exhibit 4.  This
3 is a transcript of the reapportionment committee
4 meeting from October 26th.
5         MS. WELBORN:  And we will provide
6 electronic copies.
7         MR. WALKER:  I understand.  My only
8 caveat is while I don't have any reason to believe
9 that these are inaccurate, we haven't had a chance
10 to check it.
11        MS. WELBORN:  Of course.
12 Q.        I'll get to that in a second.
13        But do you know when a racial
14 polarization analysis is conducted?  At what point
15 in the process, I mean.
16 A.        I was under the assumption that after we
17 passed the bills, that a racial polarization
18 analysis would be done for the lawsuits.
19 Q.        Okay.  So after they are already
20 enacted, right?
21 A.        Well, given the timeline.
22 Q.        Okay.
23 A.        We didn't have time to.
24 Q.        If you could turn to Page 20.  I'm
25 sorry.  It's Page 18.  And at the very bottom,
                                            Page 105

1 Senator McClendon says, *Can I ask something?  The
2 question you're asking, the answer is our attorney,
3 mine and your attorney, set that data off for
4 districts that it looked like there might possibly
5 be a racial issue.*
6         And this is referring to a racial
7 polarization analysis.  That is, that racial
8 polarization is done -- analysis is done for
9 districts where it looked like there might possibly
10 be a racial issue.
11        Is that your understanding of when
12 racial polarization -- that that is why a racial
13 polarization analysis is done, is because there
14 might possibly be a racial issue?
15 A.        I read that as our attorney was going to
16 make that determination.
17 Q.        And is it your understanding that
18 looking like there might possibly be a racial issue
19 is the criteria for determining whether a racial
20 polarization analysis should be conducted for a
21 particular district?
22 A.        Again, I was leaving that to the
23 attorney to determine, what we would have to prepare
24 for court cases.
25 Q.        So talking about might possibly be a
                                            Page 106

1 racial issue, do you have an understanding of what
2 that means?
3 A.        You would have to ask Mr. -- Senator
4 McClendon.
5 Q.        Okay.  Did you encounter any possible
6 racial -- racial issues over the course of the
7 redistricting process?
8         MR. WALKER:  Objection to form.  I'm
9 just not sure what you mean.
10 Q.        When did you take race into account in
11 the redistricting process?
12 A.        Mr. Hinaman was directed by the
13 committee to follow the guidelines and to draw those
14 plans race neutral, without looking at race until
15 after he had developed a plan.  That's my
16 understanding.  The plan was developed, and race was
17 not looked at until after it was drawn.
18 Q.        And then how was -- it was looked at
19 after the plan was drawn?
20 A.        After the plan was drawn, yes, ma'am, in
21 conjunction with the members of congress.
22 Q.        And do you know how it was looked at?
23 A.        No.  He met with members of congress to
24 go over it.
25 Q.        And do you know what data was looked at?
                                            Page 107

1 A.        No, ma'am.
2         MR. WALKER:  Did you say date?
3         MS. WELBORN:  Data.
4 Q.        And do you know anything that would have
5 changed because race was taken into account in the
6 congressional map?
7 A.        No, ma'am.
8 Q.        And when you said the committee gave
9 instructions to Mr. Hinaman, who are you referring
10 to specifically?
11 A.        I would say Chairman McClendon and I
12 told Mr. Hinaman to follow the guidelines in drawing
13 these maps.
14 Q.        And in doing so, that means taking a
15 race-neutral approach to drawing the first map; is
16 that right?
17 A.        Yes, ma'am.  The congressional map, yes,
18 ma'am.
19 Q.        Did you give any other instructions to
20 Mr. Hinaman?
21 A.        Follow the guidelines.
22 Q.        But that's it?
23 A.        That's the reason why we adopted the
24 guidelines.
25 Q.        And how did you communicate with
                                            Page 108

Caster Plaintiffs' Exhibit 89, Page 28

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 Mr. Hinaman?

2 A.          I would see him in the reapportionment

3 office, and on the telephone.

4 Q.          Okay.  Did you ever email with him?

5 A.          No, ma'am.  I'm not a big email person.

6 A.          I suppose that means you didn't text him

7 either.

8 A.          Nothing of substance.

9 Q.          Okay.

10 A.          And I'll be glad to show you the texts.

11 Q.          So are you aware of any racial

12 polarization analysis that was done for any district

13 in the 2001 -- or 2021 congressional map prior to

14 this meeting on October 26th?

15 A.          No, ma'am.

16 Q.          So not for District 7?

17 A.          No, ma'am.

18 Q.          Had a racial polarization analysis been

19 done for some state legislative districts?

20 A.          No, ma'am.

21 Q.          Was any racial polarization analysis

22 conducted for any of the maps at any point before

23 October 26th?

24 A.          No, ma'am.

25 Q.          So a racial polarization analysis

Page 109

1 couldn't be taken into account for drawing the

2 initial map?

3 A.          We drew them race blind.

4 Q.          Do you know when the first time a racial

5 polarization analysis was conducted for any district

6 for the congressional map?

7 A.          My understanding, they were sent off

8 sometime after the bills at the end of the special

9 session.

10 Q.          Do you know who requested that?

11 A.          I believe Mr. Walker.

12 Q.          And do you know why that request was

13 made?

14 A.          Because we already had a lawsuit filed.

15 We had a lawsuit filed against us before we ever

16 filed a bill.

17 Q.          Who -- do you know who did the racial

18 polarization analysis?

19 A.          No, ma'am.

20 Q.          Do you know if a consultant was hired to

21 do it?

22 A.          There was somebody hired.  I do not know

23 who.

24 Q.          So just to be clear, nothing changed as

25 a part of the maps after the racial polarization

Page 110

1 analysis was done because the maps had already

2 passed, right?

3 A.          Yes.

4 Q.          Sorry.  I'm not trying to trick you.

5 A.          No.  I had to think about it.  Yes,

6 we -- we passed the maps.

7 Q.          Okay.  Did you ever suggest having a

8 racial polarization analysis done before the maps

9 were passed?

10 A.          I didn't consider it an option.  We were

11 under such a tight timeline.  We knew we would have

12 to do it because of the lawsuit that had already

13 been filed before we ever filed a bill, and we knew

14 it would be done.  We just didn't have time to . . .

15 Q.          To get it done?

16 A.          To get it done.

17 Q.          Do you know how long it takes to perform

18 a racial polarization analysis?

19 A.          No, ma'am.

20 Q.          Do you know if anyone suggested doing a

21 racial polarization analysis prior to the bill's

22 passing?

23 A.          It came up in the committee meeting.

24 And we assured them that we were going to perform

25 them, the ones that our attorneys deemed necessary,

Page 111

1 and we would get that to them when we had the

2 information.

3 Q.          Do you know if a racial polarization

4 analysis had been done for congressional maps in

5 previous redistricting cycles?

6 A.          I have no knowledge.

7 Q.          You don't remember from the 2001, 2002

8 cycle if that happened?

9 A.          Remember we were under Section 5

10 preclearance at the time.  And once they called and

11 said we had been precleared -- I had never heard the

12 term before that.

13 Q.          Okay.  So do you know when the racial

14 polarization analysis for the congressional map was

15 finished?

16 A.          I have not seen it.

17 Q.          You have not seen it?

18 A.          I have not seen it.

19 Q.          Okay.  Have you asked to look at it?

20 A.          No, ma'am.

21 Q.          Have you talked to anyone about it?

22 A.          You.

23 Q.          So why don't you do the racial

24 polarization analysis for all districts just as a

25 matter of course?  And I'm not talking -- I

Page 112

Page: 28 (109 - 112)

Caster Plaintiffs' Exhibit 89, Page 29

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 understand there's a time crunch here.  But in
2 general, why isn't it done for all of the districts
3 just because?
4 A.        I don't see a need for some of the
5 districts.  They're not being challenged in court,
6 are they?
7 Q.           Well, Districts 1, 2, and 3 are also
8 being challenged.
9 A.        Okay.
10 Q.           And when you say you don't see a need,
11 why is that?
12 A.        If you're not challenging them in court,
13 I mean, I don't see the need to do an analysis on
14 them.
15 Q.           Okay.  But four of seven districts are
16 being challenged in this lawsuit.
17 A.        Okay.
18 Q.           If you turn to Page 19, Senator
19 McClendon and Representative England have a
20 back-and-forth here about a number, 54 percent of
21 black voting age population for District 7.  So 54
22 percent BVAP.
23           And Representative England is asking
24 that a racial polarization analysis be done.  And
25 Senator McClendon says that he was told by

Page 113

1 Mr. Walker that a racial polarization analysis for
2 District 7 is unnecessary because District 7 has a
3 BVAP of around 54 percent.
4           Why would it be unnecessary to conduct a
5 racial polarization analysis if a district has a
6 BVAP of around 54 percent?
7 A.        I think you need to ask Senator
8 McClendon that.  I didn't say that.
9 Q.           But do you have an opinion on that?
10 A.        No, ma'am.
11 Q.           Do you think that having a BVAP of
12 around 54 percent for a particular district is
13 important?
14 A.        I -- it's my understanding that's --
15 that's the plan that Congresswoman Sewell agreed to.
16 Q.           And what do you mean by that?
17 A.        Mr. Hinaman worked with the members of
18 congress, and they signed off on the map that he had
19 drawn and said they agreed to it and would accept
20 it.  I was not privy to that conversation, though.
21 That's secondhand.  I was just told that.
22 Q.           Who told you that?
23 A.        I don't remember.
24 Q.           So do you have any opinion on whether
25 District 7 should have a BVAP of around 54 percent?

Page 114

1 A.        No, ma'am, I have no opinion.
2 Q.           Do you know what the relationship is
3 between having a BVAP of 54 percent and the decision
4 to do a racial polarization analysis?
5 A.        No, ma'am.
6 Q.           Do you know at what percent of BVAP a
7 district would have that you would need to do a
8 racial polarization analysis?
9 A.        No, ma'am.
10 Q.           So would you agree with the statement
11 that if a black district has a BVAP of under 54
12 percent, that requires a racial polarization
13 analysis?
14 A.        I can't agree or disagree with that
15 statement.  I think it depends on the district.  But
16 I don't know.
17 Q.           What would -- what do you mean by
18 "depends on the district"?
19 A.        I've seen majority minority districts
20 elect nonminorities.
21 Q.           I would like to introduce another
22 exhibit.  This is the transcript of the floor
23 debate, Plaintiff's Exhibit 5, on November 1st.
24 A.        All right.
25

Page 115

1           (Plaintiff's Exhibit 5 was
2           marked for identification.)
3
4 Q.           And if you'll flip to Page 20.
5           MR. WALKER:  And, Kaitlin, I'll just put
6 on the record that we also have not had a chance to
7 check this.  I don't have any reason to believe it's
8 inaccurate.  But I just note that for the record.
9           MS. WELBORN:  Yes.  We will stipulate to
10 that for all of the transcripts.
11           MR. WALKER:  Okay.
12 Q.           So you're having a back-and-forth here
13 with Representative England who again is asking why
14 a racial polarization analysis was not done on
15 District 7.
16           And at the very bottom of the page, you
17 said, "We thought it was necessary, but they cut it
18 off, I think, at 51 percent.  Anything under 51
19 percent they did it on.  Anyone over that, they
20 didn't do it."
21           Do you know what you mean -- what you
22 meant by that statement?
23 A.        I don't remember.  I really -- I think
24 that what I was talking about at that point was
25 trying to get something done rapidly, as fast as

Page 116

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 possible.  And we didn't have time to do 140
2 legislative districts, eight school board digits,
3 and seven congressional districts given the time
4 frame we had.
5 Q.        And the 51 percent is BVAP.  I'll tell
6 you that that.
7           Okay.  And when you said, "We thought it
8 was necessary," do you know who you were referring
9 to?
10 A.        I would assume it was Mr. Walker and
11 Mr. Hinaman and myself.
12 Q.        Okay.  And when you said they --
13 A.        Because on that floor -- at this time,
14 I'm sure you have my talking points.
15 Q.        Yes.
16 A.        I was going -- I was using my talking
17 points.  And remember this was rapid fire, as fast
18 as -- and I was -- this was late into the session.
19           And Mr. England is a very skilled
20 attorney and chairman of the democratic party.  So
21 he is quite, quite gifted in the way he can ask
22 questions and get people that are not attorneys to
23 answer them.
24 Q.        And so when you said that they cut it
25 off at 51 percent, do you know who the "they" is?

Page 117

1 A.        I would assume I was referring to
2 Mr. Walker and Mr. Hinaman.
3 Q.        And how was that 51 percent number
4 chosen?
5 A.        I'm sure I was just reading the talking
6 point.
7 Q.        And who prepared those talking points?
8 A.        Mr. Walker and, I believe, Mr. Hinaman.
9 Q.        And did you discuss those talking points
10 with either Mr. Walker or Mr. Hinaman?
11 A.        They were getting them to me as fast as
12 they could.  This was rapid fire.
13 Q.        What is your understanding of how you
14 can tell whether minorities can elect their
15 candidate of choice?
16 A.        In the congressional maps?
17 Q.        Yes.
18 A.        I don't really understand that question.
19 Would you repeat it, please?
20 Q.        How can you tell whether minorities can
21 elect their candidate of choice in a particular
22 district?
23 A.        In a particular congressional district?
24 Q.        Well, any district.  But in this case,
25 yes, we're talking about a congressional district.

Page 118

1 A.        That's a question I really can't -- I
2 don't think there's a magic number that exists to
3 guarantee the election or defeat of a minority
4 candidate.
5 Q.        Is there some range?
6 A.        Again, I was told that Congresswoman
7 Sewell was comfortable with the plan that had been
8 presented and was in support of that plan.  And the
9 other members of congress were in support of it.
10 Q.        I would like to introduce Plaintiff's
11 Exhibit 6, which is the final 2021 map for congress.
12
13        (Plaintiff's Exhibit 6 was
14        marked for identification.)
15
16 Q.        And District 7 is the one in brown.
17 Would you agree that District 7 appears to be
18 racially jerrymandered?
19 A.        I think just District 7 is in large part
20 the same district that was drawn under the Reed
21 Buskey, just adjusted for population increases.
22 Q.        And how would you describe the shape of
23 District 7?
24 A.        Again, we try and maintain the core of
25 existing districts.  And this district was created

Page 119

1 in 1992 by the Reed Buskey plan.
2           MS. WELBORN:  I would like to take just
3 a short break.  We might be finished.  I just want
4 to double-check.
5           MR. WALKER:  Would you like for us to
6 leave the room?
7           MS. WELBORN:  Let's go off the record.
8           THE VIDEOGRAPHER:  We are off the
9 record.  The time is 12:33 p.m.
10           (Recess was taken.)
11           THE VIDEOGRAPHER:  We are back on the
12 record.  The time is 12:40 p.m.
13           MS. WELBORN:  The Milligan plaintiffs
14 are finished asking questions.  I'm not sure if the
15 Singleton or Caster plaintiffs have any questions
16 for you.  But after that, we can break for lunch and
17 you'll be done.
18           MR. WALKER:  Yay.
19           MS. WELBORN:  Yay.
20           MS. FAULKS:  Do the Caster plaintiffs
21 have any questions?
22           MR. OSHER:  Can you hear me?
23           (Discussion held off the record.)
24 EXAMINATION BY MR. OSHER:
25 Q.        I only have a few questions.  So this

Page 120

Caster Plaintiffs' Exhibit 89, Page 31

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 should be -- this should be very quick.
2 Representative, thank you for your time.  My name is
3 Daniel Osher.  I am an attorney for the plaintiffs
4 in the Caster litigation.
5           You might have said this before.  And I
6 apologize if you did, Representative.  How long have
7 you served in the Alabama legislature?
8 **A.          I was first elected in 1994.  I served**
9 **two terms.  I left in 2002.  And I was reelected in**
10 **2014 and '18.**
11 Q.      Okay.  So that's roughly how many years?
12 **A.      12.  How many years total?  I'll be 16**
13 **years in the legislature with a 12-year gap.**
14 Q.           Great.  Thank you.
15           And have you been a member of the
16 republican party that whole time?
17 **A.          I've been an elected republican**
18 **official.  But I've never been an official member of**
19 **the Alabama Republican Party.**
20 Q.           I understand.  Have you always
21 considered yourself a republican?
22 **A.      Yes, sir.**
23 Q.           Based on your 16 years serving in the
24 legislature, in your view, do the views of members
25 of the democratic party in Alabama differ from the

Page 121

1 members of the republican party in Alabama when it
2 comes to removing confederate monuments from public
3 spaces?
4 **A.          I mean, you're asking me to suppose what**
5 **other people are thinking.  But I would say yes.**
6 Q.           And based -- based on your 16 years in
7 the legislature, do the views of members of the
8 democratic party in Alabama differ from the members
9 of the republican party in Alabama when it comes to
10 affirmative action?
11           MR. WALKER:  Objection to form.  Dan,
12 I'm not sure that we have a clear understanding of
13 what affirmative action is these days.
14           MR. OSHER:  I didn't catch that, Dorman.
15 Can you say that again?
16           MR. WALKER:  Yeah.  I'm not sure that I
17 would have a clear understanding of what affirmative
18 action is these days.
19           MR. OSHER:  Sure.
20 Q.           Representative, in your 16 years of
21 service in the legislature, have you had an
22 opportunity to view what the general views of each
23 of the major parties in the state are?
24 **A.      On which issue?**
25 Q.      On various issues.

Page 122

1 **A.          I'm assuming that I've had numerous**
2 **conversations with both republicans and democrats,**
3 **yes.**
4 Q.           And do you have a general sense of how
5 one party views a major issue in Alabama as opposed
6 to another party?
7 **A.          I'm sure we differ on specific issues,**
8 **yes.**
9 Q.           Okay.  So based on your 16 years serving
10 in the legislature, do the views of members of the
11 democratic party in Alabama generally differ from
12 the members of the republican party in Alabama
13 generally when it comes to affirmative action?
14 **A.          Again, your definition of affirmative**
15 **action I don't know.**
16 Q.           Policies implementing a preference for
17 individuals while considering their race.
18 **A.          I think given my history of being in the**
19 **Alabama legislature when the democrats were in**
20 **supermajority, it's a pretty wide spectrum across**
21 **political lines.**
22 Q.           So you're saying that the two major
23 parties in Alabama do not have the -- have the same
24 view when it comes to affirmative action?
25 **A.          I couldn't answer that.  I've run across**

Page 123

1 **varying opinions in different members.**
2 Q.           Okay.  Based on your 16 years in the
3 legislature, do the views of members of the
4 democratic party in Alabama generally differ from
5 members of the republican party in Alabama generally
6 when it comes to criminal justice reform?
7 **A.          I think -- I think there's a divide,**
8 **yes.  But I know some -- some conservatives that are**
9 **in favor of criminal justice reform themselves.**
10 Q.           And just to clarify, you're saying that
11 there is a difference between the general views of
12 the democratic party -- members of the democratic
13 party and members of the republican party when it
14 comes to criminal justice reform?
15 **A.      There could be, yes.**
16 Q.           Is it -- in your view, is there a divide
17 between the members of the party or not?
18 **A.      I think some members hold different**
19 **opinions, yes.**
20 Q.           And the same question.  Based on your
21 experience in serving in the legislature, do the
22 views of the members of the democratic party
23 generally in Alabama differ from the members of the
24 republican party generally in Alabama when it comes
25 to the view of whether there's a significant amount

Page 124

Page: 31 (121 - 124)

Caster Plaintiffs' Exhibit 89, Page 32

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

---

1 of discrimination against black individuals in the
2 state?
3 **A.        Yes.**
4           MR. OSHER:  Okay.  That's all I have.
5 Thank you very much for your time, Representative.
6           MR. WALKER:  Thank you.  Thank you,
7 Daniel.
8           MS. FAULKS:  Singleton plaintiffs, do
9 you have any questions?
10          MR. BLACKSHER:  Did I get called?
11          MR. WALKER:  You did.  You did, Jim.
12          MR. BLACKSHER:  Well, thank you.
13 EXAMINATION BY MR. BLACKSHER:
14 Q.        Representative Pringle, I hope you make
15 it back to Mobile before the night is over.
16 **A.        Thank you.  So do I.**
17 Q.        I wouldn't want to stay in Montgomery
18 overnight if I could get back to Mobile on a Friday
19 night.
20 **A.        See, we have a lot in common,**
21 **Mr. Blacksher.**
22 Q.        Yeah.
23 **A.        I'm not --**
24 Q.        I just have a --
25          MR. WALKER:  Go ahead.

Page 125

---

1 Q.        I just have -- I have very few
2 questions.
3           Representative Pringle, you said that --
4 and I haven't been in on your whole discussion.  I
5 confess I had to jump off on some other calls while
6 it was all going on.  So I apologize if I go over
7 something that you've already spoken about.
8           But I did hear you say with a smile on
9 your face that there was a lawsuit filed even before
10 you passed a plan.  And that would be referring to
11 the Singleton case, right?
12 **A.        I refer to it as the League of Women**
13 **Voters.  But yes, sir.**
14 Q.        The League of Women Voters.  It was the
15 lawsuit that was advocating the League of Women
16 Voters whole county plan?
17 **A.        Yes, sir.**
18 Q.        Okay.  And who informed you that that
19 suit had been filed?  It was Mr. Walker, wasn't it?
20 **A.        Yes, sir.**
21 Q.        And did you get a chance to read the
22 complaint?
23 **A.        No, sir.**
24 Q.        And did Mr. Walker tell you what the
25 lawsuit was about?

Page 126

---

1 **A.        You were asking for a plan that had all**
2 **whole counties that created two opportunity**
3 **districts.**
4 Q.        Did he tell you that the lawsuit
5 contended that the plan that was enacted in 2011 was
6 racially jerrymandered?
7           MR. WALKER:  I'm going to -- I'm going
8 to assert privilege.  You might be able to ask that
9 question a different way, Jim.  But I think the way
10 you've asked it, it calls -- or could call for an
11 attorney-client communication.
12 Q.        Okay.  I lost you.  All I see is a
13 telephone screen now.  Oh, there you are up in the
14 corner.
15           Let me ask it this way, Representative
16 Pringle.  Were you aware and are you aware now that
17 the Singleton complaint alleged, when it was filed
18 September 27th, that the plan enacted in 2011 was
19 unconstitutional because it was racially
20 jerrymandered?
21 **A.        Not specifically.**
22 Q.        Okay.  Were you aware that the state
23 attorney general's office had said in a lawsuit in
24 Birmingham in 2019 that the 2011 plan was racially
25 jerrymandered?

Page 127

---

1           MR. DAVIS:  Object to the form.
2           MR. WALKER:  Jim, did you hear that
3 objection to form from Jim Davis?
4           MR. BLACKSHER:  Yes.
5           MR. DAVIS:  That's not what it said.
6 Q.        Are you aware that that is what the
7 complaint that Singleton filed alleged, that the
8 state attorney general had conceded in federal court
9 in 2019 that the 2011 plan was racially
10 jerrymandered?  Were you aware of that?
11          MR. DAVIS:  Object to the form.
12          MR. WALKER:  Object to form.
13 Q.        You -- you can answer.
14          MR. WALKER:  I'm sorry.  You can answer,
15 if you can.
16 **A.        No.**
17 Q.        You weren't aware of that.
18          Were you aware -- did anyone tell you
19 that the lawsuit contended that when drawing a new
20 congressional plan with 2020 census data, that the
21 legislature had a constitutional obligation to
22 remedy a racial jerrymandering?
23 **A.        No.**
24 Q.        Okay.  And as chair of the
25 reapportionment committee, you can testify that

Page 128

---

Caster Plaintiffs' Exhibit 89, Page 33

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 there was no effort made by the reapportionment
2 committee to remedy any racial jerrymandering in the
3 2011 claim; isn't that correct?
4 **A.        I testified that Mr. Hinaman was**
5 **directed to draw those seven congressional districts**
6 **based on the guidelines of the committee.**
7 Q.        Yeah.  And no one informed you, and you
8 -- excuse me.
9          The committee never attempted to remedy
10 a racial jerrymandering; is that correct?
11 **A.        I did not know there was a  --**
12 Q.        Racial jerrymandering?
13 **A.        Yes.**
14 Q.        Okay.  Now, my understanding from your
15 testimony is that Mr. Walker advised you as chair of
16 the reapportionment committee that the congressional
17 redistricting plan had to have zero deviation; is
18 that correct?
19 **A.        Yes.**
20 Q.        So did anyone else give you that advice,
21 zero deviation?
22 **A.        Mr. Hinaman.**
23 Q.        So Mr. Hinaman advised you that the plan
24 had to be zero deviation?
25 **A.        Well, Mr. Blacksher, was not the 2011**
                                                Page 129

1 **and the 2002 plans all zero deviations, and the 1992**
2 **plan?**
3 Q.        Well, what I asked -- the question was
4 did Mr. Hinaman advise you that it needed to be zero
5 deviation.
6 **A.        Again, Mr. Hinaman has been part of this**
7 **for years.  And I think every plan has been drawn to**
8 **zero deviation.**
9 Q.        Okay.  Does that mean that he did advise
10 you to keep it at zero deviation?
11 **A.        Yes.  Because all the other plans had**
12 **been drawn to zero deviation.**
13 Q.        Okay.  That's fine.
14          And did anyone besides Mr. Walker and
15 Mr. Hinaman advise the committee that the plan had
16 to keep a zero deviation?
17 **A.        Not to my knowledge.**
18 Q.        Did the -- did you as chair or did
19 anyone on the committee seek the advice of the
20 Alabama attorney general's office on whether it
21 needed to have zero deviation?
22 **A.        I did not.**
23 Q.        Are you aware of anyone on the
24 committee who did?
25 **A.        No, sir.**
                                                Page 130

1 Q.        Are you aware of any -- anyone -- did
2 Mr. Walker, by the way, advise you that he had
3 consulted other lawyers to reach this opinion?
4          MR. WALKER:  Jim, I'm going to object on
5 the grounds of privilege to that.  You can ask it
6 some other way.
7 Q.        I'm just trying to get everything you
8 knew or did not know about the requirement of zero
9 deviation.
10          And what I've heard you say,
11 Representative Pringle, is that you were aware,
12 since you've been involved in one way or the other
13 with redistricting, that it had been going on for
14 several decades, right?
15 **A.        Zero deviation in congressional races?**
16 Q.        Yes.
17 **A.        Yes.**
18 Q.        Okay.  And when it came to drawing the
19 2020 plan, you were advised that that needed to
20 continue, zero deviation needed to continue.  And
21 that advice came from Mr. Walker and Mr. Hinaman; is
22 that correct?
23          MR. WALKER:  Objection to form to the
24 extent it calls for an attorney-client
25 communication.
                                                Page 131

1 Q.        But you can answer, I think.
2          MR. BLACKSHER:  Counsel, can he answer?
3 Q.        Okay.  Let me ask another question.
4          Did Mr. Walker also advise you that in
5 order to comply with the Voting Rights Act, the
6 congressional redistricting plan had to have a
7 majority black district?  Is that correct?
8          MR. WALKER:  Objection, attorney-client
9 privilege.
10 Q.        Well, that's in the talking points,
11 isn't it?  Isn't that -- isn't the requirement of a
12 majority black district one of the things that's in
13 the talking points that you've exchanged with us
14 that you -- that you read from on the floor of the
15 legislature?
16 **A.        I don't have any direct recollection of**
17 **that at this time.**
18 Q.        So did anyone advise you, as chair of
19 the reapportionment committee, that in order to
20 comply with the Voting Rights Act, the plan had to
21 have one majority black district, at least one
22 majority black district?
23          MR. WALKER:  Object to the question to
24 the extent it calls for an attorney-client
25 communication.  Otherwise, you can answer.
                                                Page 132

Page: 33 (129 - 132)

**Caster Plaintiffs' Exhibit 89, Page 34**

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 A.        We instructed Mr. Hinaman, quoting the
2 guidelines, to protect the core of the existing
3 districts to the extent possible and to draw it to
4 zero deviation.
5 Q.        Okay.  Representative Pringle, there's
6 absolutely no mention of majority black in the
7 guidelines.
8           So the question is:  In complying -- the
9 guidelines say that you had to comply with the
10 Voting Rights Act, right?
11 A.        Yes, sir.
12 Q.        Okay.  But it doesn't say majority
13 black, right?
14 A.        The guidelines, I don't recall them
15 saying that.
16 Q.        Right.  So the question is:  Were you
17 advised that to comply with the Voting Rights Act,
18 there had to be a majority black district?
19           MR. WALKER:  Objection that I've made
20 before to the extent it calls for attorney-client
21 communication.  Otherwise, he can answer.
22 A.        Again, those plans are drawn in a
23 race-neutral manner based on the guidelines to
24 preserve the core of the existing congressional
25 districts.
                                              Page 133

1 understand that you needed to have a majority black
2 district.
3 A.        I understood that we needed to draw
4 districts to help protect the incumbent, yes.
5 Q.        And to you, that meant a majority black
6 district, protecting the incumbent.  Is that your
7 answer?
8 A.        Well, I acquiesced to Mr. Hinaman who
9 met with the members of the congress and talked to
10 them about their districts and what they wanted and
11 how they wanted them drawn.  And he presented a plan
12 to me that he said the members of congress agreed to
13 that were seeking reelection, that they had agreed
14 to.
15 Q.        Okay.  Let's talk for just a second
16 about the League of Women Voters' whole county plan.
17           According to the talking points, you
18 were advised that that plan would be
19 unconstitutional because its deviation was too
20 large; isn't that correct?
21 A.        That was in my -- the analysis I
22 received, yes.
23 Q.        And that information came from whoever
24 wrote the talking points?
25 A.        Yes.  That would be Mr. Hinaman and
                                              Page 135

1 Q.        Yes, sir.  I've heard that testimony.
2           My question, though, is were you advised
3 that the Voting Rights Act required there to be a
4 majority black district?
5           MR. WALKER:  Same objection.
6 A.        The Voting Rights Act requires that we
7 in no way intentionally nor unintentionally diminish
8 the ability of a protected class of minority
9 citizens from electing or defeating a candidate of
10 their choosing.
11 Q.        And did that mean a majority black
12 district?
13 A.        It means we had -- we drew a district
14 that would allow -- that maintained the core of an
15 existing minority district.  But we did it in a
16 race-neutral way.
17 Q.        Your understanding of the requirement of
18 maintaining the cores and drawing a race-neutral
19 plan meant that you needed to end up with a majority
20 black district.  Am I hearing you correctly?
21 A.        We -- we made every opportunity to
22 protect the incumbents who were seeking reelection.
23 Q.        That's not the question I asked you
24 about the incumbent.
25           I asked if you were advised and did you
                                              Page 134

1 Mr. Walker.
2 Q.        Okay.  And the talking points also
3 advised, didn't they, that the League of Women
4 Voters' plan would violate the Voting Rights Act
5 because it did not have a majority black district;
6 isn't that correct?
7 A.        It could potentially violate Section 2
8 by diminishing the ability of a protected class of
9 citizens from electing or defeating a candidate of
10 their choosing, yes.
11 Q.        I'm just asking if the talking points
12 said -- you know, I don't have them in front of me.
13 You've probably been looking at them all morning.
14 A.        Actually, I haven't.
15 Q.        The talking points actually said, didn't
16 it -- the talking points actually said that the
17 League of Women Voters' whole county plan would
18 violate the Voting Rights Act because it did not
19 have a majority black district.
20           Now, did you -- did anyone else give you
21 that advice other than what was in the talking
22 points?
23           MR. DAVIS:  Object to the form.
24           MR. WALKER:  Object to the form.
25           THE WITNESS:  Can I answer?
                                              Page 136

Page: 34 (133 - 136)

Caster Plaintiffs' Exhibit 89, Page 35

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1  MR. WALKER:  You can answer to the
2  extent that you do not discuss any communication you
3  may have received from an attorney, in particular
4  one from the AG's office.
5  A.  I was reading the talking points that
6  you have before you.
7  Q.  Actually, I don't have them before me.
8  I'm sorry.
9  But in any event, let me -- let me wrap
10 this up this way.  Was the -- was the committee ever
11 presented in writing a statement that the League of
12 Women Voters' whole county plan violated the Voting
13 Rights Act?
14 A.  If my memory serves me correctly, we did
15 not yet have the official League of Women Voters'
16 plan in the computer at the time of the committee
17 meeting.  I think it was introduced later.
18 Q.  Okay.  You're going to have to listen to
19 the question again.
20 MR. BLACKSHER:  Could I ask the court
21 reporter to read the question back, please?
22 (Record read.)
23 A.  Was the committee ever presented --
24 MR. WALKER:  Was the committee ever
25 presented in writing.
Page 137

1  "minimal deviation," you interpreted that on your
2  own as meaning zero deviation; is that correct?
3  A.  Based on my knowledge and history of
4  reapportionment, congressional reapportionment, and
5  the fact that we have drawn zero deviation
6  districts, yes, sir.
7  Q.  Okay.  So that would -- and you reached
8  that conclusion independently of anybody's advice,
9  right?
10 A.  Well, Mr. Walker and Mr. Hinaman and I
11 all concurred that minimum deviation means zero.
12 And based on my readings, I would concur with that,
13 what I read.
14 Q.  Thank you, Representative Pringle.
15 Those are the only questions that I have.
16 A.  Mr. Blacksher, it's always a pleasure.
17 Q.  I hope to see you again soon.
18 A.  I'm sure you will.
19 MR. WALKER:  I think that can be
20 arranged.
21 MS. FAULKS:  Dorman, with that, I think
22 that we are done.  For lunch, how long do we want to
23 break?
24 MR. WALKER:  Wait.  Can we have 30
25 seconds to confer?
Page 139

1  A.  I have no recollection of that.
2  Q.  Okay.  Thank you.
3  And was the committee ever presented in
4  writing a statement that the League of Women Voters
5  -- I'm sorry.  Let me strike that.  Let me start
6  over.
7  Was the committee ever presented in
8  writing a statement that the congressional plan had
9  to have zero deviation?
10 A.  I don't understand the question.
11 Q.  Did the committee have in writing a
12 statement that the congressional plan had to have
13 zero deviation?
14 A.  The guidelines called for it, which has
15 been done for -- as you know, for years and years.
16 For decades, we've always drawn down to zero
17 deviation in congressional.
18 Q.  Okay.  So the guidelines say that the
19 congressional plan must have minimal deviation.
20 A.  Which we interpret to be -- which we
21 interpret to be zero deviation just like it was, you
22 know, in 2011, 2002, 1992.
23 Q.  Okay.  That's good.
24 So in other words, when you saw, as
25 chair of the committee, that the guidelines said
Page 138

1  THE VIDEOGRAPHER:  We're off the record.
2  The time is 1:05 p.m.
3  (Recess was taken.)
4  THE VIDEOGRAPHER:  We're back on the
5  record.  The time is 1:08 p.m.
6  EXAMINATION BY MR. DAVIS:
7  Q.  Representative Pringle, this is Jim
8  Davis.  I represent Secretary Merrill in this
9  lawsuit.  I have just a couple of follow-up
10 questions.
11 Did you instruct Mr. Hinaman to -- when
12 he drew a congressional plan, that it had to include
13 a majority black district?
14 A.  No.
15 Q.  Did you instruct him to include
16 districts with any particular demographics?
17 A.  No.
18 Q.  Are you aware of any member on the
19 reapportionment committee who gave him such
20 instructions?
21 A.  No.
22 Q.  Did you decide in advance that there had
23 to be a majority black district in Alabama's
24 congressional plan?
25 A.  No.
Page 140

Caster Plaintiffs' Exhibit 89, Page 36

Evan Milligan,et al v. John H.Merrill, et al.                          Chris Pringle
                                                                       12/17/2021

```
 1              MR. DAVIS:  Thank you.  No other
 2 questions.
 3              THE VIDEOGRAPHER:  This ends the
 4 deposition of Chris Pringle.  The time is now
 5 1:09 p.m.
 6
 7              (DEPOSITION ENDED AT 1:09 P.M.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                          Page 141
```

```
 1 STATE OF ALABAMA )
 2 JEFFERSON COUNTY )
 3
 4              I hereby certify that the above
 5 proceedings were taken down by me and transcribed by
 6 me using computer-aided transcription and that the
 7 above is a true and correct transcript of said
 8 proceedings taken down by me and transcribed by me.
 9              I further certify that I am neither of
10 kin nor of counsel to any of the parties nor in
11 anywise financially interested in the result of this
12 case.
13              I further certify that I am duly
14 licensed by the Alabama Board of Court Reporting as
15 a Certified Court Reporter as evidenced by the ACCR
16 number following my name found below.
17              So certified on December 17, 2021.
18
19
20
21
22
23              LeAnn Maroney, Commissioner
                 ACCR# 134, Expires 9/30/25
                  505 North 20th Street, Suite 1250
24                Birmingham, AL  35203
25
                                          Page 142
```

Caster Plaintiffs' Exhibit 89, Page 37

Evan Milligan,et al v. John H.Merrill, et al.                    Chris Pringle
                                                                12/17/2021

#### WORD INDEX

< 0 >
01    68:14

< 1 >
1    6:14    12:4,
6    59:18    113:7
1:05    140:2
1:08    140:5
1:09    141:5, 7
10    5:5    42:16
10:03    49:13
10:22    49:16
10004    4:6
10006    3:15
101    18:15, 18
19:24
10-26-21    6:21
104    6:20
105    1:23    5:21
11:26    100:12
11-1-21    6:23
116    6:22
119    6:24
11th    16:10
12    6:14    121:12
12:06    100:15
12:33    120:9
12:40    120:12
120-125    6:8
125    4:5
1250    142:23
125-140    6:9
12-year    121:13
134    142:23
14    18:25    99:12
140    117:1
1400    3:7
140-141    6:10
14th    3:21
54:3    59:24
96:13
15    19:4
16    121:12, 23
122:6, 20
123:9    124:2
17    1:24    7:7,
17    35:14
142:17
18    105:25

121:10
19    113:18
1984    16:10
1992    25:3, 23
120:1    130:1
138:22
1994    18:24
121:8
1999    3:7
1st    38:11
42:3, 10    43:14
44:1    45:14
115:23

< 2 >
2    6:16    52:14,
18    59:19, 20
63:18    98:7, 15
99:2    102:19
103:10    113:7
136:7
2:2021-CV-01530-
AMM    1:8
2:21-CV-01530-AMM
7:14
20    46:21
49:25    105:24
116:4
200    5:21
2000    28:21
35:14    36:10
20002    5:6
20005    3:22
2001    21:25
27:12    28:2
30:3    33:18
41:24    48:23
66:1, 12    68:10
109:13    112:7
2001-2002    28:18
2002    18:25
22:1, 2, 5, 23
23:2    24:8, 10,
20, 21    25:6, 19
26:5, 9, 22
28:13, 15, 22
29:9    30:4
33:18, 25
41:25    58:14,
18, 24    59:7, 9
60:5, 7    61:2
65:1    112:7

121:9    130:1
138:22
2003    11:1
2007    18:11
2010    58:8, 12,
14, 18    59:6, 10,
14    60:1, 4, 23
61:4, 11    62:18,
22    65:1    68:1
71:2
2011    29:24
30:5    33:2, 7,
14    46:14
65:13    74:9
127:5, 18, 24
128:9    129:3,
25    138:22
2014    121:10
2018    35:12
2019    35:1, 7
36:10    46:21
49:2    127:24
128:9
2020    28:13
40:6    58:19
59:11    128:20
131:19
2021    1:24
6:25    7:7, 17
22:12    32:23
33:4    34:25
37:3    45:20
49:23    51:1
52:19    58:10
59:14    60:1
62:19, 24
74:12    109:13
119:11    142:17
20th    142:23
22    37:23    80:13
26th    40:6, 18
50:20    51:2
100:17    105:4
109:14, 23
27    18:8    72:12
27th    127:18
28    32:8    71:22,
25    72:12    78:9
79:8, 12, 21
82:13

< 3 >

121:9    130:1
138:22

3    6:18    55:20,
23    113:7
3:00    50:11
30    94:6    139:24
35203    142:24
35222    4:21
36104    1:24
5:22
36106    4:14
36130    5:14

< 4 >
4    6:20    104:24
105:2
40    3:14    42:21
45    12:21

< 5 >
5    3:14    6:22
57:9, 23    58:23
59:1, 16, 21
112:9    115:23
116:1
5:00    78:11, 14,
20    79:19, 24
50    42:24
97:15, 21, 22
98:4, 11, 12, 21,
22
501    5:13
505    142:23
51    116:18
117:5, 25    118:3
52    6:16
54    113:20, 21
114:3, 6, 12, 25
115:3, 11
55    6:18
5th    48:23
50:20    51:1, 5,
19, 23    52:19
53:17    58:5
63:7    64:5

< 6 >
6    6:24    119:11,
13
60    26:15
600    3:21    5:5
6179    4:13

< 7 >

Evan Milligan,et al v. John H.Merrill, et al.                    Chris Pringle
                                                                12/17/2021

**7**    25:5    26:16
  27:14, 17    28:1
  61:12, 13, 19
  99:11    109:16
  113:21    114:2,
  25    116:15
  119:16, 17, 19,
  23
**700**    3:21

**< 8 >**
**8**    61:13, 19
**825**    4:20

**< 9 >**
**9/30/25**    142:23
**9:00**    78:10, 14,
  20    79:19, 23
**9:14**    1:24    7:17
**90**    42:16
**90067**    3:8
**9-120**    6:7

**< A >**
**a.m**    1:24    7:17
  49:13, 16
  100:12
**ability**    98:8,
  14    134:8    136:8
**able**    79:6, 17
  127:8
**absolutely**    133:6
**accept**    114:19
**accepted**    38:2
  63:22
**access**    68:16,
  19    94:7
**According**    135:17
**account**    14:21,
  23    15:7, 11, 24
  26:20    107:10
  108:5    110:1
**accounts**    15:5,
  14, 21
**ACCR**    142:15, 23
**Accuracy**    70:4
**achieve**    44:13
  92:9
**ACLU**    7:21, 22
  8:25    9:14
**acquiesced**    135:8

**acquisitions**
  17:9
**acronym**    102:13
**Act**    54:3, 7
  59:17, 19, 20
  98:8    99:2
  102:20    132:5,
  20    133:10, 17
  134:3, 6    136:4,
  18    137:13
**acting**    7:3
**action**    122:10,
  13, 18    123:13,
  15, 24
**actual**    96:4
  103:11
**adamant**    43:23
**add**    80:14
**added**    38:3
  80:16
**additional**    38:1,
  3    55:13    80:16
**address**    15:4
  32:13    36:1
  73:18
**addressed**    36:12
  73:12, 19
**adjust**    39:4
**adjusted**    119:21
**adopt**    69:15
**adopted**    24:20
  31:1    40:8
  52:5    55:14
  63:25    64:9
  108:23
**advance**    101:1
  140:22
**advertised**    38:5
**advice**    129:20
  130:19    131:21
  136:21    139:8
**advise**    130:4, 9,
  15    131:2
  132:4, 18
**advised**    129:15,
  23    131:19
  133:17    134:2,
  25    135:18
  136:3
**advocated**    28:18
**advocating**

  126:15
**affairs**    19:12
**affirmative**
  122:10, 13, 17
  123:13, 14, 24
**afoul**    99:1
**afraid**    99:1
**African**    85:24
**age**    95:18
  98:12    113:21
**agent**    17:8
  18:5
**ago**    14:10, 11
**agree**    60:22
  81:5    83:1
  115:10, 14
  119:17
**AGREED**    1:17
  2:1, 8    54:21
  114:15, 19
  135:12, 13
**AG's**    137:4
**ahead**    51:19
  125:25
**aim**    44:14, 15
**al**    1:6, 10
  7:13, 14    142:24
**ALABAMA**    1:2, 23
  4:12, 14, 21
  5:14, 22    7:2,
  3, 16, 21, 23
  8:3    9:14
  10:21    16:8
  18:2    24:14
  25:5    26:7
  30:12    32:11
  34:7, 8    36:21
  41:11    43:19,
  21    82:1, 10, 18,
  25    84:25
  86:22    121:7,
  19, 25    122:1, 8,
  9    123:5, 11, 12,
  19, 23    124:4, 5,
  23, 24    130:20
  142:1, 14
**Alabama's**    96:16
  140:23
**Ali**    6:2
**alined**    59:4
**alleged**    127:17
  128:7

**allow**    11:20, 22
  134:14
**allowed**    32:15
**amendment**    54:3
  59:24    96:13
**American**    4:4,
  12    85:24
**amount**    68:7
  124:25
**analysis**    102:4,
  9, 11, 15, 22
  103:2, 11, 17
  104:7, 11, 15
  105:14, 18
  106:7, 8, 13, 20
  109:12, 18, 21,
  25    110:5, 18
  111:1, 8, 18, 21
  112:4, 14, 24
  113:13, 24
  114:1, 5    115:4,
  8, 13    116:14
  135:21
**analyze**    95:3
**analyzed**    28:10
  96:24    97:3
**Angeles**    3:8
**answer**    11:11
  25:11    26:13
  29:12    43:1
  49:3    57:5
  61:23    70:25
  72:24    80:21
  83:8    84:9
  86:10, 11
  88:10    95:21
  103:22    106:2
  117:23    123:25
  128:13, 14
  132:1, 2, 25
  133:21    135:7
  136:25    137:1
**answered**    53:23
  73:1, 12, 20, 21
  93:13
**answering**    9:23
**answers**    11:22
**anxious**    89:8
**anybody**    12:18
  47:3    48:5
  61:7    63:19

Caster Plaintiffs' Exhibit 89, Page 39

Evan Milligan,et al v. John H.Merrill, et al.                                    **Chris Pringle**
**12/17/2021**

80:18
**anybody's**   139:8
**anywise**   142:11
**apartment**   16:25
17:4
**apologize**   121:6
126:6
**appears**   119:17
**approach**   104:4
108:15
**approached**
101:12
**approve**   28:23
84:12
**approved**   29:21
58:23   84:15
**approving**   83:18
**April**   37:7, 13
**area**   42:4
83:3   86:6
**areas**   82:15
**arguing**   99:19
**arranged**   139:20
**asked**   38:4
63:13   66:25
80:14   103:20
112:19   127:10
130:3   134:23,
25
**asking**   84:6
98:16   106:2
113:23   116:13
120:14   122:4
127:1   136:11
**aspects**   85:21
**assert**   63:13
127:8
**assign**   2:12
**assigned**   41:7
**Assistant**   5:11
**associated**   96:18
**assume**   10:20
11:12   13:5
33:5, 10   58:15,
17   62:4   69:17
76:21   89:22
92:19, 22
103:6, 13
117:10   118:1
**assumed**   35:13
**assuming**   24:19
29:3   123:1

**assumption**
103:8   105:16
**assured**   111:24
**attempted**   129:9
**attend**   78:23
79:20
**attendance**   47:4
**attended**   77:25
**attention**   41:22
**Attorney**   3:5,
12, 19   4:19
5:3, 11, 12, 19
8:3, 25   12:12,
24   13:2, 5, 7,
16   14:6   46:14
51:12   52:3
53:6, 9   55:7
57:18   62:15
63:2   89:22
98:16   103:7, 9
106:2, 3, 15, 23
117:20   121:3
127:23   128:8
130:20   137:3
**attorney-client**
46:18   63:14
127:11   131:24
132:8, 24
133:20
**Attorneys**   4:3,
11   7:18   8:6
45:25   51:17
53:8, 14
103:16   111:25
117:22
**audience**   73:12,
23
**audio**   47:7, 11
49:7, 10   99:6
**August**   16:10
37:15, 21
**automatically**
98:13
**available**   32:18
**Avenue**   3:7
5:13
**aware**   50:25
103:19   109:11
127:16, 22
128:6, 10, 17,
18   130:23

131:1, 11
140:18

**< B >**
**back**   33:17
34:23   41:23,
24   43:11, 12,
13   49:15   56:2,
5   61:10, 24
66:12   84:19
86:3   92:11
99:8   100:9, 14
120:11   125:15,
18   137:21
140:4
**back-and-forth**
113:20   116:12
**Baggett**   6:3
8:24
**Balch**   1:22
5:20   7:24
**Baldwin**   42:6
44:3, 10
**based**   36:13, 20
46:11   58:14
59:7, 14   60:1
61:1   67:13
86:2   95:3
102:22   121:23
122:6   123:9
124:2, 20
129:6   133:23
139:3, 12
**basically**   69:13
**basis**   58:9, 18
81:2   96:12
**began**   35:18
36:3   38:9, 20
46:3, 8   64:15
**beginning**   7:12
**believe**   19:13
42:8, 9, 10
44:12   48:25
56:11   59:6, 15
60:13   61:24
73:1   83:4
93:13   105:8
110:11   116:7
118:8
**believed**   21:20
**belt**   81:25
82:3, 5, 8, 20,

23   83:1, 6
84:19   85:9, 22,
25   86:8
**best**   11:22
29:1, 4
**better**   49:18
62:9
**big**   109:5
**bill**   14:1
41:3, 5   93:24
94:19   95:2
98:2   110:16
111:13
**bills**   101:7
105:17   110:8
**bill's**   111:21
**Bingham**   1:23
5:20   7:25
**Birmingham**   4:21
7:2   127:24
142:24
**black**   25:4
26:15   28:19
29:10   42:16,
21, 23   81:25
82:3, 5, 8, 20,
23   83:1, 6
84:19   85:9, 22,
25   86:8   90:18,
19   91:8   95:18,
19, 24   97:11,
13   113:21
115:11   125:1
132:7, 12, 21,
22   133:6, 13,
18   134:4, 11,
20   135:1, 5
136:5, 19
140:13, 23
**BLACKSHER**   4:18
6:9   8:22
11:3   16:4
125:10, 12, 13,
21   128:4
129:25   132:2
137:20   139:16
**blind**   110:3
**block**   66:7, 8
**board**   32:9
72:20   117:2
142:14

**Caster Plaintiffs' Exhibit 89, Page 40**

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

boards   20:6
boat   44:22
bones   53:9
bottom   105:25
   116:16
Box   4:13   61:14
boxes   61:18
break   49:8, 9,
21   99:5, 6, 17
   100:8   120:3,
16   139:23
bring   46:25
Broad   4:5
   37:2   83:3
brought   41:6,
10   59:10
   76:19   77:8
brown   119:16
build   17:11
bumped   37:14
bureau   67:10
burn   16:19, 21
   17:6
burning   16:22
Buskey   25:8, 13,
25   42:9
   119:21   120:1
busy   39:11
BVAP   95:14, 16
   113:22   114:3,
6, 11, 25   115:3,
6, 11   117:5

< C >
calendar   41:10
California   3:8
call   23:8
   39:21   94:19
   97:14   127:10
Callahan   21:17
   24:2   29:2
   33:21   42:2
   45:13
Callahan's
   33:19   42:12,
20   43:4, 9
   44:6, 15   45:6
called   93:4
   97:20   112:10
   125:10   138:14
calling   97:15,
19

calls   126:5
   127:10   131:24
   132:24   133:20
campaigns   19:11
   20:7
camps   17:11
campus   23:8
   28:4   76:9
   93:22
candidate   98:10,
14   102:22
   118:15, 21
   119:4   134:9
   136:9
candidates
   80:25   81:7
car   43:21
carved   43:14
CASE   1:7   7:14
   11:2, 6   13:13,
15   118:24
   126:11   142:12
cases   36:14
   106:24
cash   79:19
CASTER   5:1
   8:15   120:15,
20   121:4
catch   122:14
cause   7:8
   80:24
caution   98:20
cautious   98:23,
24
caveat   105:8
census   35:3
   37:11   67:10,
15, 22, 23   69:7,
21   70:2   96:8
   128:20
center   70:23
Central   82:18
certain   85:12
certainly   99:14
certainty   61:23
certificates
   16:14
certifications
   16:15
certified   16:18
   142:15, 17

certify   7:4
   142:4, 9, 13
cetera   17:16
chair   19:8
   20:10   128:24
   129:15   130:18
   132:18   138:25
chaired   22:20
chairman   22:22
   35:12   108:11
   117:20
challenged
   113:5, 8, 16
challenging
   113:12
chance   105:9
   116:6   126:21
change   23:20
   62:11, 14
   67:19   70:20,
22   71:15
   74:25   81:9
   90:9
changed   36:2
   37:1   65:7
   71:2, 7   108:5
   110:24
changes   36:17
   53:16, 19   55:3,
15, 18   56:13
   57:19, 22
   61:15   63:8, 9,
17, 19, 22, 23,
24   71:10
   76:11   81:16
changing   90:13
channel   43:7, 8,
12, 13   44:21, 22
characteristics
   26:20
check   105:10
   116:7
choice   98:10,
15   102:22
   118:15, 21
choose   58:12
   91:18   98:14
choosing   134:10
   136:10
chosen   55:11,
17   118:4

CHRIS   1:10, 20
   5:17   7:7, 12
   8:1   9:4
   17:25   141:4
chrispringle@south

erntimberlands.com
   14:25
Christopher   9:18
circumstances
   85:12
citizens   71:5
   98:9   102:21
   134:9   136:9
CIVIL   1:7   4:4,
12   7:5, 14
claim   129:3
clarify   95:23
   124:10
Clarke   42:6
   44:3, 12
class   98:9
   102:20   134:8
   136:8
clear   110:24
   122:12, 17
clearly   13:8
clerk   8:25
closely   59:4
closer   27:10
closest   39:20
cochair   22:11
   30:7, 10   32:5
   56:16
cochairman   19:9,
10   22:14   35:17
coding   96:3
cohesive   86:14
colleagues   35:16
color   96:3
columns   95:22
come   17:1
   28:14   35:2
   43:7   60:9, 10
   64:19   79:13,
16   84:1   88:16
   100:9
comes   28:5
   90:5   122:2, 9
   123:13, 24
   124:6, 14, 24

Evan Milligan, et al v. John H. Merrill, et al.

**Chris Pringle**
**12/17/2021**

comfortable
  119:7
coming    47:11
  77:19    91:5
  92:15
commencing    1:24
commercial    17:12
commissioner
  7:3    142:22
commissions    20:6
committee    19:8,
  10, 12    21:2, 19
  22:17    30:8, 11,
  24    31:3, 14, 23
  32:1, 6    33:11
  35:14    37:23
  39:14    40:5, 18,
  23, 25    41:8, 16
  45:21    47:13
  48:20, 24    49:2,
  22, 23    50:6, 7,
  11, 19, 21, 22
  51:1, 20    52:4,
  7, 18    53:11, 16
  54:22    56:12,
  17    58:3    59:4
  60:8    63:24
  64:2    80:7
  83:18    85:5
  87:2    88:6
  100:17, 24
  101:13, 18, 19
  103:25    104:3,
  4    105:3
  107:13    108:8
  111:23    128:25
  129:2, 6, 9, 16
  130:15, 19, 24
  132:19    137:10,
  16, 23, 24
  138:3, 7, 11, 25
  140:19
committees    19:5
  20:2, 11, 17
committee's
  64:10
common    78:21
  84:3, 8    125:20
communicate
  108:25
communication
  127:11    131:25

132:25    133:21
  137:2
communications
  16:12
communities
  31:4    32:13
  61:17    62:3, 6,
  21    65:5    66:17
  80:14    83:5, 14,
  19
community    45:2
  62:23    65:4
  66:9    83:2, 7,
  21    84:13, 23
  85:1, 4, 6, 9,
  11, 16, 22    86:8
compact    45:2
  86:14
Compactness    62:3
company    17:17,
  22
compare    62:18
compared    89:13
compensated
  14:12, 18
compensation
  14:19
competing    91:17
complaint    13:12
  126:22    127:17
  128:7
completed    16:7
completely    49:7
compliance    2:4
  54:17
complied    35:21
  54:2    59:16
  60:3
complies    54:13
comply    54:7
  57:20    59:18,
  23    60:14
  67:19    68:8
  132:5, 20
  133:9, 17
Complying    60:19
  133:8
compressed    72:8
computer    28:9
  94:18, 23
  137:16

computer-aided
  142:6
computers    94:2
conceded    128:8
concerned    77:5
concerns    66:4
  69:3, 4    77:2
  80:4
concise    45:2
conclusion    139:8
concur    139:12
concurred    139:11
condensed    101:3
conduct    36:6
  114:4
conducted    73:10
  81:18    105:14
  106:20    109:22
  110:5
confederate
  122:2
confer    99:17
  139:25
confess    126:5
conform    35:19
  48:21
congress    24:6
  30:15, 19, 22
  31:11    32:16
  39:10, 17, 22
  67:2    70:7
  76:3, 20    77:13
  86:23    87:9
  88:12    90:18
  96:14    107:21,
  23    114:18
  119:9, 11
  135:9, 12
Congressional
  6:25    23:2
  24:3, 8    25:3,
  4, 7, 17    27:2,
  5, 12    28:22
  29:21, 25    30:3,
  4, 5, 9, 17, 25
  31:15, 24    32:9,
  15, 23    33:3, 4,
  14, 25    38:23
  39:9, 12, 19
  40:22    42:3, 10
  43:14    44:2
  58:24    66:18

67:4, 11, 15, 18
  68:5, 6, 7
  72:20    73:4
  74:20, 22    77:4,
  16, 18    78:6
  79:10    81:18,
  22    83:19    88:9,
  15, 24    89:11
  90:10, 19    91:9
  95:25    108:6,
  17    109:13
  110:6    112:4,
  14    117:3
  118:16, 23, 25
  128:20    129:5,
  16    131:15
  132:6    133:24
  138:8, 12, 17,
  19    139:4
  140:12, 24
Congressman
  21:17    24:1
  29:2    34:1
  43:9, 22
Congresswoman
  114:15    119:6
conjunction
  53:5    80:12
  88:12    107:21
conservatives
  124:8
consider    44:22
  45:1    80:19
  85:9    89:10
  93:7, 9    95:4
  96:9, 19    111:10
considerable
  102:3
consideration
  91:15
considered
  27:25    30:4
  35:19    96:24
  121:21
considering
  123:17
constantly    36:19
constitute
  85:22    86:8, 15
constitution
  19:11    20:7
  54:4, 8    96:13

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

constitutional
128:21
construction
40:14
consultant
110:20
consulted   131:3
contact   24:1, 2
contained   29:9
101:24
contended   127:5
128:19
content   12:11
contests   54:15
contiguity   62:3
contiguous   86:14
continue   45:10
131:20
continued   45:15,
17
contract   19:13
20:8
contracting
17:24
contractor
16:17   17:11,
16   18:10
contractual
40:13
control   16:18,
20, 21   64:10
conversation
114:20
conversations
35:23   51:22
75:24   123:2
Cooper   17:21
copies   105:6
copy   52:20
core   25:20, 21
26:21   32:25
33:10, 12, 13
44:1   70:16
81:14   119:24
133:2, 24
134:14
cores   26:3
134:18
corner   127:14
correct   10:16
15:25   17:17
21:6, 13, 25

25:9   27:2
33:15, 20   34:9
38:16   45:22
51:10   53:12
57:13   71:8, 11,
12   76:17, 20
80:8   129:3, 10,
18   131:22
132:7   135:20
136:6   139:2
142:7
correctly   26:6
37:10   52:3
76:1   77:22
134:20   137:14
counsel   1:18
2:10, 11   7:6
100:3   104:4
132:2   142:10
counties   82:1,
12, 13   83:12,
22   84:1   85:13,
15   92:9   97:8,
9   127:2
counts   96:15
County   42:6, 8,
9   43:22   44:4,
7, 12   45:3, 4
84:7, 8, 10, 21
91:24   92:7
94:3   95:13
126:16   135:16
136:17   137:12
142:2
couple   14:10
140:9
course   45:8
74:19   105:11
107:6   112:25
COURT   1:1   2:5
7:1, 15   9:2
11:15   36:13
46:11   54:4, 8
62:8   106:24
113:5, 12
128:8   137:20
142:14, 15
courteous   99:23
courtrooms   55:18
courts   36:18
54:4   55:12

102:17
COVID   72:6
COVID-19   36:2
64:17
created   25:3,
17   60:24   61:5
69:15   75:2
119:25   127:2
creation   57:4
criminal   124:6,
9, 14
criteria   106:19
crunch   113:1
curious   67:23
current   18:12
36:13   46:11
65:17   69:2
87:18
currently   19:5
22:23   65:11
cut   116:17
117:24
cycle   22:24
36:16, 23
42:22   45:20
112:8
cycles   112:5

< D >
DAN   5:2   8:14,
17   122:11
Daniel   121:3
125:7
data   24:25
94:23   106:3
107:25   108:3
128:20
date   7:4, 16
36:11   108:2
DAVIN   4:2   8:19
DAVIS   5:10
6:10   8:3
12:19   13:16
35:15, 24   46:1,
7, 16   47:4
48:3   58:2
99:4, 12, 18
100:5   128:1, 3,
5, 11   136:23
140:6, 8   141:1

day   40:13, 15
51:9   79:9, 22
101:4, 7
days   14:10, 11
28:8, 12   79:15
93:23   94:6, 7,
14, 15   122:13,
18
daytime   79:16
DC   3:22   5:6
13:4
deadline   38:11
dealing   32:8
35:20   40:9, 11
75:25
deals   54:10
debate   115:23
decades   131:14
138:16
December   1:24
7:7, 16   142:17
decide   22:18
50:14   103:5
104:6, 14
140:22
decided   20:20
decides   103:1
deciding   104:9
decision   103:16
104:8   115:3
decisions   81:21
deemed   111:25
defeat   119:3
defeated   20:21
defeating   98:10
102:21   134:9
136:9
DEFENDANT   5:9
Defendants   1:12
5:17   7:25
10:6, 11
Defense   3:13,
20   99:24
define   97:17
definition   62:9,
21, 23   85:3, 6,
8, 11   123:14
definitions
63:4, 6
degree   16:11, 12
delayed   35:3
delegation   24:3

democratic    22:9
  24:13    117:20
  121:25    122:8
  123:11    124:4,
  12, 22
democrats    24:11
  123:2, 19
demographic
  74:7, 15    76:13
  94:23    96:8, 25
demographics
  26:11    76:11
  94:9    140:16
denied    102:20
department
  58:23, 25
depends    115:15,
  18
Depo    6:15
deposed    10:23
  13:21
DEPOSITION    1:9,
  19    2:2, 3, 13
  7:12    11:25
  12:13, 15
  13:19    14:5
  27:4    99:6
  141:4, 7
depositions    2:6
describe    82:16
  119:22
determination
  106:16
determine    91:22
  92:14    102:17
  106:23
determining
  106:19
DEUEL    3:18
  8:10
developed    86:5
  107:15, 16
deviation    44:13
  57:10    67:14
  74:21    75:1
  76:14    77:1
  92:10    94:22
  97:1, 7    129:17,
  21, 24    130:5, 8,
  10, 12, 16, 21
  131:9, 15, 20
  133:4    135:19

138:9, 13, 17,
  19, 21    139:1, 2,
  5, 11
deviations
  76:12    77:5
  91:25    92:3
  94:3    95:4, 13
  96:2    130:1
diem    14:15
differ    121:25
  122:8    123:7,
  11    124:4, 23
difference
  76:25    96:3, 5
  124:11
differences
  63:16
different    19:19
  34:21    66:4
  78:18    79:21,
  22    84:5    124:1,
  18    127:9
differently
  66:23
digits    117:2
diminish    98:8,
  14    134:7
diminishing
  136:8
direct    73:24
  132:16
directed    74:1
  107:12    129:5
director    48:14
disagree    115:14
disclosing    12:11
discovery    99:20
discrimination
  125:1
discuss    12:14
  46:17    50:16
  56:23    66:25
  78:5    88:13
  118:9    137:2
discussed    13:15,
  19    46:17
  52:24    63:8
  76:21    82:19, 23
discussing
  77:11    90:1, 17
Discussion
  27:11    46:10

56:5    120:23
  126:4
discussions
  12:12    57:3
dislike    65:6
dissatisfied
  87:9, 15
DISTRICT    1:1, 2
  7:15, 16    18:15,
  17    19:22, 25
  21:20, 21    25:4,
  5, 17    26:12, 16,
  21    27:14, 17
  28:1    29:3
  33:20    42:1, 3,
  10, 12, 21, 23,
  24    43:15    44:2,
  8, 16, 19, 21
  45:9, 14    67:11,
  19    68:5, 8
  69:1, 2    70:19,
  20, 22, 23
  71:10, 15
  95:15    96:12
  97:18    98:4, 11,
  20    103:3, 18
  104:6, 10
  106:21    109:12,
  16    110:5
  113:21    114:2,
  5, 12, 25    115:7,
  11, 15, 18
  116:15    118:22,
  23, 24, 25
  119:16, 17, 19,
  20, 23, 25
  132:7, 12, 21,
  22    133:18
  134:4, 12, 13,
  15, 20    135:2, 6
  136:5, 19
  140:13, 23
districts    25:20,
  21    26:4    27:14,
  25    28:19
  29:10    30:13,
  14, 22    31:12
  32:10, 12    33:1,
  10, 12, 13
  34:16, 19
  38:10, 22    39:4,
  12    54:2, 10, 12,

14    68:6, 18
  69:4, 16    70:13,
  16    71:7    72:19
  74:22    76:12
  81:14    85:15
  90:18, 20    91:9
  93:16    95:25
  97:11, 13, 14,
  15, 20    106:4, 9
  109:19    112:24
  113:2, 5, 7, 15
  115:19    117:2,
  3    119:25
  127:3    129:5
  133:3, 25
  135:4, 10
  139:6    140:16
divide    124:7, 16
division    17:21
doctor    13:6
document    12:9
  52:22    53:1, 3,
  11, 16    55:25
  56:7, 20, 24
  57:4, 8, 17
  58:7    62:14
  75:2
documents    13:9
  58:21    75:9
Dog    43:8, 12
doing    17:7
  79:1    99:4
  108:14    111:20
DORMAN    5:18
  7:24    10:4
  35:24    92:25
  122:14    139:21
dosher@elias.law
  5:7
Dothan    43:15,
  19, 22    45:4
double-check
  51:4    120:4
draft    53:7, 8,
  11    65:8    67:4
  74:11
drafted    53:3
  57:1
drafting    52:21
  53:1    56:19
  57:17    81:18
dragging    99:9

Evan Milligan,et al v. John H.Merrill, et al.                                  Chris Pringle
                                                                              12/17/2021

draw    21:20, 21
  23:4    24:18, 21,
  23    25:1    28:6
  30:19    31:9, 20
  34:15    44:20
  54:2    96:6
  98:20    107:13
  129:5    133:3
  135:3
drawing    24:7
  27:25    30:13
  31:24    32:23
  33:6    38:9, 15
  39:3    54:10, 12,
  21    89:6    93:10
  108:12, 15
  110:1    128:19
  131:18    134:18
drawn    23:7, 8,
  12, 13, 15
  25:16    28:4, 11
  29:15    31:12,
  15    59:3    65:24
  66:9, 22    69:6
  76:9    88:9, 11
  89:12    93:21
  107:17, 19, 20
  114:19    119:20
  130:7, 12
  133:22    135:11
  138:16    139:5
drew    22:9
  24:9    25:23
  64:11    110:3
  134:13    140:12
drive    43:18, 19,
  21, 22    79:14, 15
dropped    49:7
drosborough@aclu.o
  rg    4:7

dross@naacpldf.org
  3:23
due    91:15
duly    9:5
  142:13
dwalker@balch.com
  5:23

< E >
earlier    56:1, 3

94:10
earth    81:15
ease    60:12
EBENSTEIN    4:1
  8:20
economic    85:18
edges    81:16
education    16:7
  32:9
Educational
  3:13, 20
effect    2:4
  46:13    59:17
effort    129:1
eight    117:2
either    15:10
  73:15    102:18
  109:7    118:10
elect    115:20
  118:14, 21
elected    18:24
  22:16    45:8, 16
  70:10    121:8, 17
electing    98:9
  102:21    134:9
  136:9
election    35:13,
  16    38:14    119:3
elections    19:11
  20:8
electronic    105:6
electronically
  73:16
Elias    5:4    8:15
eliminate    62:20
eliminating
  54:14
Elizabeth    6:3
  8:24
email    14:21, 23
  15:4, 5, 7
  101:23    102:1
  109:4, 5
emailed    80:4
employees    14:15,
  20
employer    17:13
employers    18:1
enacted    105:20
  127:5, 18
encounter    107:5

ended    21:24
  141:7
ends    141:3
engage    37:18
England    113:19,
  23    116:13
  117:19
enrolled    56:13
  62:19
entered    77:24
entirely    61:14,
  22
entirety    62:7
entitled    14:16,
  20
equal    96:13
err    48:11
Escambia    42:6
  44:3, 11
estate    17:8, 20
et    1:6, 10
  7:13, 14    17:16
ethnic    85:17
EVAN    1:6    7:13
evening    80:20
event    137:9
events    40:3
eventually    40:21
everybody    11:16
  13:5    38:4
  54:20    77:25
Everyone's    49:6
evidence    2:14
  75:8
evidenced    142:15
exact    36:10
  50:2    55:4
exactly    28:11
  80:3    99:16
examination    7:8
  9:12    120:24
  125:13    140:6
examined    9:5
examiners    19:13
example    15:8
exchanged    132:13
excuse    129:8
Exhibit    6:14,
  16, 18, 20, 22,
  24    11:24    12:4,
  6    52:14, 18
  55:20, 23

63:18    104:24
  105:2    115:22,
  23    116:1
  119:11, 13
existing    25:20,
  21    32:25
  33:10, 12, 13
  44:1    48:21
  56:12    65:6, 9,
  22    68:2, 11
  70:16    81:14
  119:25    133:2,
  24    134:15
exists    119:2
expect    14:17
  31:2
experience
  22:22    84:13,
  21    124:21
expire    16:18
Expires    142:23
explain    23:10
  41:4    56:4
  66:5    83:16
explained    52:3
  53:14
express    65:16
  88:19    89:20
  90:6
extemporaneously
  92:20    93:12
extensive    35:23
extent    13:22
  131:24    132:24
  133:3, 20    137:2
eye    13:6

< F >
face    126:9
Facebook    15:15,
  23
fact    139:5
factor    92:4
factors    92:2
fair    11:13
  25:22    33:2
  44:14    45:12
  58:9    73:11
fairly    59:3
familiar    81:25
families    84:1
far    100:25

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

fast   101:2
116:25   117:17
118:11
FAULKS   4:10
7:22   49:8
120:20   125:8
139:21
favor   57:9
124:9
Federal   7:4
54:17   60:3
99:11   128:8
felt   66:12
fight   17:2
figures   74:15
filed   7:15
13:24, 25
110:14, 15, 16
111:13   126:9,
19   127:17
128:7
final   37:12
63:18   119:11
finally   37:20
finals   37:7
financially
142:11
find   94:20
fine   19:18
130:13
finish   11:21,
22   40:14
finished   31:25
112:15   120:3,
14
fire   16:22
17:4   117:17
118:12
fires   17:2, 3
first   11:24
13:23   14:4
19:14, 15, 16
21:3   25:4, 15
34:24   35:10,
11   36:7, 11
40:17   44:12
45:19   46:13
108:15   110:4
121:8
Five   47:23
fix   16:24
FL   3:14

flip   61:12
116:4
floor   41:9, 10,
17   115:22
117:13   132:14
focused   99:22
follow   31:19
54:20   107:13
108:12, 21
following   7:9
31:10   142:16
follows   9:6
60:9
follow-up   140:9
fond   63:6
force   2:4
foregoing   7:5
form   2:10
41:3   84:22
89:21   94:19
95:3   107:8
122:11   128:1,
3, 11, 12
131:23   136:23,
24
forth   41:24
found   142:16
Foundation   4:4
four   113:15
frame   117:4
free   90:5
Friday   125:18
friend   26:1
front   74:6, 7
136:12
fruition   90:6
92:22
full   2:4   9:16
41:19   96:19
Fund   3:13, 20
FURTHER   2:1, 8
142:9, 13

< G >
gain   67:12
gap   121:13
gathered   32:17
General   5:11,
12   16:17
17:11   24:17
64:9   66:8
67:8   69:11

84:22   87:1, 8,
17   88:20   89:4,
12   113:2
122:22   123:4
124:11   128:8
generally   60:9
66:14   123:11,
13   124:4, 5, 23,
24
General's   8:4
127:23   130:20
geographic   85:18
getting   14:14
35:4, 12   96:21
118:11
gifted   117:21
Gingles   45:1
46:12, 13
61:25   62:2
give   37:2
89:3   90:8, 12
91:15   94:24
98:19   108:19
129:20   136:20
given   31:8
38:10   41:9
46:16   79:8
105:21   117:3
123:18
glad   41:21
109:10
go   11:8   41:24
65:21   67:17
71:23   72:17
83:11   84:10
89:17   91:20
96:16   100:9
107:24   120:7
125:25   126:6
goal   26:10, 15
48:19
goes   15:10
61:24   86:3
going   27:21
29:23   33:17
36:1, 5, 25
37:7   41:24
45:25   46:15
48:6   49:11
64:16, 21
67:14   70:23
79:20   84:19

92:11   99:12,
20   100:4
106:15   111:24
117:16   126:6
127:7   131:4,
13   137:18
Good   8:16, 17,
18   138:23
GOTELL   4:10
7:22
government   15:1
19:9   41:8
50:10
governor   40:22
41:17
graduate   16:8
great   98:20
121:14
grounds   2:12
131:5
Group   5:4
8:15   92:24
102:20
groups   94:17
guarantee   119:3
guess   53:20
63:15   64:1
66:6   67:23
69:3, 20, 25
70:17   83:17
84:11   88:7
98:6
Guidelines   6:17,
19   24:20
25:19   26:3, 5
28:16   31:1, 2,
6, 9, 10, 16, 19
32:19, 24, 25
33:9   35:6, 19,
21   36:9, 12, 15,
18, 22, 25
45:22   46:3, 9
47:14   48:20
51:9, 12, 18, 25
52:2, 7, 19
53:7, 25   54:19
55:1, 14, 24
56:6, 24   57:7,
19   58:5, 8, 10,
13, 15   59:4, 7,
12, 14   60:1, 5,
23   61:4   62:19,

Caster Plaintiffs' Exhibit 89, Page 46

Evan Milligan,et al v. John H.Merrill, et al.

**Chris Pringle**
**12/17/2021**

20    63:18    64:9,
10, 24    70:15
81:13    86:7
91:11, 16, 18,
21, 23    104:14,
19    107:13
108:12, 21, 24
129:6    133:2, 7,
9, 14, 23
138:14, 18, 25
Guys    16:22

< H >
Hale    82:15
Hall    37:25
38:3    80:13
handed    54:5
55:13
handful    50:3
55:3
handing    36:19
handle    64:16, 20
handout    6:19
55:24
handwritten    75:8
happen    30:2
45:24
happened    39:1,
13    40:2, 6, 17,
20, 24    41:13
51:24    64:5, 13
75:17, 21
80:22    81:1, 6
112:8
happens    94:17
happy    39:5
70:9, 17    71:13,
18    86:22
87:17    88:20
89:5    90:2
92:12    99:16
hate    47:21
71:17
head    45:23
health    20:7
hear    46:5
47:9, 10    49:17
79:16    120:22
126:8    128:2
heard    64:25
86:20    92:18,
21    102:7, 8

112:11    131:10
134:1
hearing    68:22
77:15, 22
99:18, 21
104:21    134:20
hearings    32:8,
18    35:5    36:1,
2    37:17, 19, 22,
24    38:1, 3, 6,
16    39:13
64:16, 17, 20
67:24    68:12,
24    70:2, 6
71:21    73:13
75:17, 25
76:19    77:8, 19
78:1    79:5
80:22    81:6, 19,
23    82:20
86:17, 20    88:8,
25    90:10, 14, 16
held    17:20, 24
27:11    64:25
65:20    66:1, 15
72:4, 12    78:10
79:9    120:23
help    30:19
99:17    135:4
helpful    61:19
helping    23:4
Henry    43:22
45:4
Hi    8:14
higher    20:20
highest    16:6
highlights    54:16
Hinaman    23:24
24:7    30:18
31:8, 18    32:16
33:6    38:20, 24
39:9, 16    75:20
76:18    77:4, 9
88:11, 14, 19
90:9    107:12
108:9, 12, 20
109:1    114:17
117:11    118:2,
8, 10    129:4, 22,
23    130:4, 6, 15
131:21    133:1

135:8, 25
139:10    140:11
hired    24:6
110:20, 22
historical
85:18, 25
102:23
history    25:5
123:18    139:3
hit    43:8
Hogan    3:6
hold    64:21, 23
67:24    70:1
124:18
holding    38:6
68:24    80:19
81:23
homebuilder
16:17    17:10
honest    25:10
hope    17:3
99:13    125:14
139:17
hour    12:21
hours    12:21
78:10, 14, 18,
20    79:2    99:11
House    18:2, 14,
17    19:9    20:22
21:11    22:14,
17, 20, 22    23:9,
14    30:12
32:10, 12
35:12, 17
38:21    39:11
41:7, 11    43:14
44:6, 21    51:21
72:11, 18, 19
98:2    101:13
houses    17:11
Houston    45:4
huh    60:20
hunting    17:11
Huntsville
43:18, 21

< I >
idea    87:17
ideal    43:24
identification
12:7    52:15

55:21    104:25
116:2    119:14
identities    85:19
imagine    36:24
immediately
37:21
impact    78:23
79:3
implementing
123:16
importance    89:6
98:5
important    11:19
60:17, 18, 20
89:11    92:2, 4,
7    93:10    98:6
114:13
inaccurate
105:9    116:8
include    85:12
140:12, 15
included    80:17
includes    85:17
including    40:22
Incorporated
17:22, 25
increase    42:23
increases    119:21
incumbent
134:24    135:4, 6
incumbents    31:4
33:1    54:13, 15
134:22
independently
139:8
individual
38:21, 22
individuals
123:17    125:1
influence    88:8
informal    104:18
information
32:17    38:9
87:21    88:4
94:3, 24    95:5
96:25    97:1
101:14    112:2
135:23
informed    126:18
129:7
initial    37:5, 9,

Evan Milligan,et al v. John H.Merrill, et al.                    Chris Pringle
                                                                12/17/2021

11   110:2

injunction   99:21
input   30:21
31:14   52:1
65:4   72:7
instruct   33:7
46:15   140:11,
15
instructed   31:9
92:25   133:1
instructions
90:8, 12   108:9,
19   140:20
intact   44:2
81:14
intentionally
102:18   134:7
interest   31:4
32:14   45:2
61:18   62:4, 6,
20, 21, 23   66:9
83:2, 5, 7, 15,
20, 21   84:14,
23   85:2, 4, 6,
10, 11, 16, 22
86:9
interested
91:11, 13
142:11
interests   62:22
interjected   79:9
internal   19:12
interpret   71:17
138:20, 21
interpreted
139:1
interrupt   27:8
intervenor   7:25
intervenors
10:13, 14
introduce   11:24
52:17   55:23
94:21   105:2
115:21   119:10
introduced   14:1
28:8   41:2, 6
93:23   94:10
95:9   97:25
98:2   137:17
involved   16:2
21:6, 15   22:24

31:23   131:12
involvement   23:4
issue   106:5, 10,
14, 18   107:1
122:24   123:5
issues   13:7
49:10   107:6
122:25   123:7
its   82:10
89:5   135:19

< J >
JAMES   4:18
January   22:1, 5
37:6, 11, 12
JEFFERSON   142:2
jerrymandered
119:18   127:6,
20, 25   128:10
jerrymandering
128:22   129:2,
10, 12
JIM   5:10, 17
8:1, 3, 22
125:11   127:9
128:2, 3   131:4
140:7
jim.davis@alabamaa
g.gov   5:15
JOHN   1:10   5:9
7:13   8:5
jublacksher@gmail.
com   4:22
JULIE   4:1   8:20
jump   126:5
jumping   11:23
41:23
justice   58:23
59:1   124:6, 9,
14

< K >
KAITLIN   4:9
7:20   9:9, 14
116:5
KATHRYN   3:11
8:8   47:9
keep   26:11, 15
41:23   44:15
49:11   70:7, 13,
20, 23   71:9

81:13   130:10,
16
keeping   26:20
keeps   47:11
83:19
kept   44:1, 2
71:4, 5
key   11:8
kicked   76:8
kin   142:10
kind   74:19
kinds   77:12
knew   27:19
68:5, 25
111:11, 13
131:8
know   11:5, 10
13:1   16:21
20:5   23:18
24:9, 11, 15, 17,
22, 25   25:5, 10,
11, 19, 23, 24
26:8, 13, 14, 19
27:13, 16, 24
28:16, 17   30:2
35:1   36:23, 25
43:2   48:10
50:18   52:8
53:5, 19   55:10,
16   56:9   57:3,
6, 9, 16   60:13,
23   61:4, 22
62:4, 9, 13, 24
63:1, 9   65:1
66:7   67:13
69:5   70:21
74:1   75:4
76:7   78:9, 17,
24   81:2, 17, 21
83:12, 19, 20,
22, 24   84:6, 9,
24   85:3, 23
89:15   92:13,
15   93:8, 15, 19
95:20, 22
96:11, 25   99:5
102:1, 24
103:5, 22
104:13, 18
105:13   107:22,
25   108:4
110:4, 10, 12,

17, 20, 22
111:17, 20
112:3, 13
115:2, 6, 16
116:21   117:8,
25   123:15
124:8   129:11
131:8   136:12
138:15, 22
knowledge   112:6
130:17   139:3
known   78:1
ksadasivan@naacpld
f.org   3:16
kwelborn@acluialaba
ma.org   4:15

< L >
laid   37:21
lands   85:14
Large   1:22
7:3   65:5
119:19   135:20
late   35:4
117:18
LaTISHA   4:10
7:22
law   1:22   3:5,
12, 19   4:3, 11,
19   5:3, 4, 19
8:15, 25   35:20,
22   36:13, 17,
21   37:1   41:5
46:11   48:22
54:25   55:15,
18   57:21   60:3,
14, 19
laws   2:5   54:18
lawsuit   10:6
13:24   110:14,
15   111:12
113:16   126:9,
15, 25   127:4,
23   128:19
140:9
lawsuits   16:3
105:18
lawyer   10:1, 3,
5, 18, 21
lawyers   63:5
131:3

Caster Plaintiffs' Exhibit 89, Page 48

lay    31:2
laying    36:3
LDF    8:9
leadership    22:9
leading    2:11
League    66:24
   69:9    77:21
   78:1, 6    87:3
   88:17, 25    89:8,
   14, 24    98:1
   126:12, 14, 15
   135:16    136:3,
   17    137:11, 15
   138:4
LeAnn    1:21
   7:1    142:22
learn    86:16, 19
learned    88:8, 13
leave    20:19
   120:6
leaving    22:21
   106:22
left    18:25
   121:9
Legal    3:13, 20
   63:4, 6    104:4
legislative
   14:14    15:2, 11
   26:3    30:13
   34:16, 19
   36:22    57:13
   66:21    74:19
   75:25    93:17
   109:19    117:2
legislators
   28:18
legislature
   18:13    19:15
   21:5    23:16
   26:7, 11, 19
   27:24    28:7, 9
   29:20    34:7, 8
   39:7    83:17
   84:15    94:20
   121:7, 13, 24
   122:7, 21
   123:10, 19
   124:3, 21
   128:21    132:15
letter    37:25
letting    96:4
level    16:6

Liberties    4:4,
12
license    17:20,
24
licensed    16:16,
17    17:10
   142:14
liked    67:1
   70:6
line    43:9, 10,
12    71:10
   91:21, 23    92:20
lines    54:21
   65:23    71:6
   81:9, 22    123:21
links    79:5
Linwood    4:20
list    31:5
   38:4    80:13
listen    72:17,
21    79:17
   137:18
listened    72:19,
23    79:9    87:23
   89:7
litigation    121:4
little    23:3
   27:9    66:7
   84:3    99:22
live    65:5
   70:19, 22
living    17:5
LLP    3:6
location    79:15
locations    72:7
log    79:12
   80:18
logged    79:7, 25
long    12:20, 22
   18:6, 9, 22
   86:4    99:5
   111:17    121:6
   139:22
longer    99:16
longstanding
   26:6
look    29:14
   31:3    54:11
   66:25    76:11
   95:6, 12, 13, 14
   96:18, 23
   112:19

looked    31:25
   74:21    94:4
   97:6    106:4, 9
   107:17, 18, 22,
   25
looking    85:8
   91:11, 14
   106:18    107:14
   136:13
looks    56:1
   61:21
Los    3:8
lose    67:13
lost    42:8
   127:12
lot    44:20
   45:3    68:14
   78:17    99:18,
   19    102:11
   125:20
Lovells    3:6
Lowndes    82:15
lunch    120:16
   139:22

< M >
ma'am    12:10
   21:23    22:6
   24:12, 24    25:2
   26:24    33:16
   35:9    38:17
   39:20    42:13,
   15, 17    44:17
   46:24    47:2
   48:18    51:15
   52:8, 12    53:2
   56:2, 18, 21, 25
   57:2    61:3
   62:12, 25    67:6
   72:14    73:8, 22
   75:15, 22    80:9
   81:20, 24
   84:16    86:2
   87:15, 19
   90:20    92:6
   93:18    94:15
   101:6    102:25
   107:20    108:1,
   7, 17, 18    109:5,
   15, 17, 20, 24
   110:19    111:19

112:20    114:10
   115:1, 5, 9
Macon    83:11
   84:8
magic    119:2
maintain    26:3
   119:24
maintained
   134:14
maintaining
   134:18
major    122:23
   123:5, 22
majority    25:4,
16    28:19
   29:10    69:15
   90:17, 19    91:8
   93:15    95:24
   97:11, 12
   115:19    132:7,
   12, 21, 22
   133:6, 12, 18
   134:4, 11, 19
   135:1, 5    136:5,
   19    140:13, 23
makeup    27:14,
16    42:12    95:14
making    36:12
man    59:24
   67:19    68:8
   96:17
manner    31:10,
21    133:23
map    6:25    23:2,
4, 21    24:10, 18
   25:3, 6, 7, 16,
   23    27:13    28:6,
   22    29:9, 21
   30:4, 5, 17, 25
   31:24    32:23
   33:3, 4, 7, 14,
   25    38:23
   39:19    40:22
   54:20    65:13
   66:24, 25    67:5,
   15, 22, 25    68:2,
   11, 13    71:1
   73:4    77:4, 18
   78:2, 6, 7
   81:18    83:19
   84:12, 15    88:9,
   11, 24    89:6, 8,

Caster Plaintiffs' Exhibit 89, Page 49

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

11, 14    90:10,
13    93:11, 15
95:24    96:3, 7,
25    108:6, 15,
17    109:13
110:2, 6
112:14    114:18
119:11
maps    23:7
24:8, 23    25:1
27:18    28:4, 11
30:19, 25
31:15, 20
32:10    38:15
40:21    57:13
66:8, 22    67:2
69:6    74:6, 9,
11, 12    80:23
81:22    91:17
97:11    100:20
101:16    108:13
109:22    110:25
111:1, 6, 8
112:4    118:16
Marengo    82:15
83:11
margins    70:21
mark    95:25
97:2
marked    12:7
52:15    55:21
104:25    116:2
119:14
marks    7:11
Maroney    1:21
7:1    142:22
materials    46:25
60:10    101:17
math    103:11
matter    7:13
112:25
McCLENDON    5:17
8:1    12:19, 23
13:3, 17    35:24
46:2, 8    47:5
48:3    51:17
58:2    61:11
74:2    80:10, 23
81:4    106:1
107:4    108:11
113:19, 25

114:8
McDonald's    79:18
mean    15:20
19:1    27:18
30:10    33:9
36:18    38:19,
24    43:5    44:18,
20, 25    45:5
50:10    51:11
54:8, 10    59:19
65:9, 13    66:5,
17    70:8, 12, 18
71:18    73:9
74:9    77:14, 17
78:25    79:12
83:24    86:18
87:1, 22    91:13,
15    95:17
98:17, 25
99:10    100:22
101:21    105:15
107:9    113:13
114:16    115:17
116:21    122:4
130:9    134:11
Meaning    87:10
139:2
means    9:9
23:11    107:2
108:14    109:6
134:13    139:11
meant    116:22
134:19    135:5
media    15:14
38:5
meet    12:20, 24
32:16    91:17
meeting    38:21
39:3, 14    46:17,
18, 20    47:1, 12
48:16, 23
50:15, 19    51:5,
6, 19, 23    52:1,
2, 9, 11    53:17,
20    56:14    58:5
63:7, 10, 17
64:2, 5    69:13
72:5, 14    73:10
77:3    78:4
79:7    80:2
87:2    88:16
89:15    91:4, 6

100:17, 19, 21
101:5, 11, 15,
24, 25    102:4
105:4    109:14
111:23    137:17
meetings    36:4
38:8    40:1
47:16, 19, 24
48:2, 19    49:1
50:6, 21    51:1,
2, 16    64:23
65:3, 15, 20
66:1, 12, 13
67:5, 7    69:18
70:6    72:3, 16
73:7    74:5, 8
75:6, 14, 21
76:15    78:9, 23
79:20, 21    80:8,
14, 17, 19
82:23    87:11
88:3, 14, 15
92:24
meets    50:11
member    20:17
21:10    22:20
31:13    39:21
48:6    56:11
58:3    88:11
94:20    96:14
103:24    104:2
121:15, 18
140:18
members    22:16,
17    24:3, 6
30:12, 18, 21
31:11, 22
32:11, 16
37:23    38:21
39:3, 4, 10, 16
41:11    51:21,
25    52:4, 7
53:10    54:22
56:17    67:1
70:7    71:4
73:23    80:12
87:9    88:12
100:21    101:12,
13, 17    107:21,
23    114:17
119:9    121:24
122:1, 7, 8

123:10, 12
124:1, 3, 5, 12,
13, 17, 18, 22,
23    135:9, 12
memory    24:4
137:14
mention    133:6
mentioned    21:1
33:18    45:19
63:7    65:25
70:5    90:21, 23
94:22
MERRILL    1:10
5:9    7:14    8:5
140:8
met    12:14
39:9, 16    40:6
49:23    57:18
91:11, 16
107:23    135:9
method    24:17
MICHAEL    3:4
8:12
michael.turrill@ho
ganlovells.com
3:9
microphone    27:9
middle    37:15,
21    61:14    82:9
MILLIGAN    1:6
3:3    7:13    8:9,
10, 13, 19, 21
9:1, 15    120:13
mind    80:4
mine    26:1
106:3
minimal    138:19
139:1
minimum    139:11
minor    16:13
minorities
118:14, 20
minority    21:10,
12    25:16
69:16    93:16
95:24    97:16,
21, 23    98:5, 9,
13, 22    102:21
115:19    119:3
134:8, 15
minute    28:12

Evan Milligan,et al v. John H.Merrill, et al.

**Chris Pringle**
**12/17/2021**

39:3, 23
minutes 12:21
missing 72:2
Mobile 18:15,
21 42:5 43:7,
13, 19 44:3, 7,
10 45:3 83:24
84:1 125:15, 18
moderator 73:8
Monroe 42:6
44:3, 11
Montgomery 1:23
4:14 5:14, 22
125:17
monuments 122:2
morning 8:18
136:13
motions 99:7, 25
motivation 34:12
move 27:9
68:17
municipalities
85:14

< N >
N.W 3:21
NAACP 3:13, 20
name 9:13, 16
15:22, 24
82:10 93:1, 5
121:2 142:16
names 7:19
NE 5:5
necessarily
84:20
necessary 2:9
67:21, 24
68:23 111:25
116:17 117:8
need 16:24
54:23 63:13
68:17 90:17
99:8 113:4, 10,
13 114:7 115:7
needed 22:21
54:25 57:20
68:7 76:16
130:4, 21
131:19, 20
134:19 135:1, 3
needs 99:21
neither 142:9

neutral 54:11
107:14
never 15:22
29:17, 19
103:13 112:11
121:18 129:9
New 3:15 4:6
46:11 67:13
80:23 128:19
night 79:25
125:15, 19
nine 41:20
nitty-gritty
66:7
nods 45:23
nonminorities
115:20
nonpartisan
22:15
normal 53:6
North 142:23
NORTHERN 1:2
7:16 84:1
Notary 1:21
7:2
note 116:8
notes 52:10
75:5, 7, 12, 13
101:22
notice 6:15
11:25 37:22
101:20
noticed 14:8
99:7
notification
101:25
notifying 101:23
November 38:11
115:23
Number 7:14
12:4 47:21
50:2 67:14
76:16 91:2, 24
98:6 113:20
118:3 119:2
142:16
numbering 12:2
numbers 35:4
37:6, 11, 13, 15,
19, 20 67:9, 16,
22, 24 68:4, 17,
19, 24 69:5, 7,

22, 24 70:2
76:5, 14 96:8,
18 97:4
numerous 66:23
123:1

< O >
oath 9:20
Object 128:1,
11, 12 131:4
132:23 136:23,
24
Objection 107:8
122:11 128:3
131:23 132:8
133:19 134:5
objections 2:9,
12 100:4, 7
obligation
40:13 128:21
obtain 16:11
occasionally
76:2
occur 38:14
46:20 67:7
occurred 41:20
48:17 67:5
o'clock 50:11
October 39:15
40:6, 18 50:20
51:2 100:16
105:4 109:14,
23
offered 2:14
Office 5:12
8:4 18:23
20:19, 21, 24
23:13 28:7
35:25 46:7
48:8 76:10
93:22 109:3
127:23 130:20
137:4
offices 1:22
official 88:5
121:18 137:15
Oh 127:13
okay 9:10
10:12, 16 11:4,
23 12:20, 23
13:9, 12, 23
14:3, 9, 21

15:13, 19, 23
16:2, 6, 14, 24
17:15, 23 18:1,
6, 9, 19, 22
19:3, 14, 17, 22,
25 20:10, 13
21:1, 12 22:2,
4, 7, 15, 18
23:6, 15, 25
24:13 25:14,
22 26:2, 8, 14,
25 27:12, 20
28:17 29:4, 16
30:2, 20 31:17,
22 32:2, 4
34:2, 11, 22
36:7 38:18, 23
39:12, 24
40:16 41:4, 15,
21 42:7, 11
43:3 44:5, 9,
18 46:19
47:25 48:2
49:1 50:5, 17
51:3, 13 52:25
53:15 56:23
57:6, 16 59:2,
13, 25 61:7, 9,
20 63:3 64:4,
18 68:3, 9, 23
69:25 70:5
71:20 72:3, 15
73:9, 11, 17, 23
74:14, 24
75:12 78:13,
22 80:6 82:4
86:3 87:16, 20
92:1 93:7
94:16, 22 95:5
96:5 97:5, 10
98:3, 24 99:3
100:25 101:8
102:3 103:15,
21 104:13
105:19, 22
107:5 109:4, 9
111:7 112:13,
19 113:9, 15,
17 116:11
117:7, 12
121:11 123:9
124:2 125:4

**Caster Plaintiffs' Exhibit 89, Page 51**

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

126:18    127:12,
22    128:24
129:14    130:9,
13    131:18
132:3    133:5,
12    135:15
136:2    137:18
138:2, 18, 23
139:7
old    57:19
79:15
Once    31:25
90:25    94:16
112:10
ones    19:7
20:4    63:10
74:22, 23
111:25
operating    65:12
101:6
opinion    69:21,
23    84:22
89:20    90:4, 7
92:5    93:10
114:9, 24
115:1    131:3
opinions    66:8
69:6    124:1, 19
opportunities
79:12    80:16
opportunity
97:14, 18, 20
122:22    127:2
134:21
opposed    123:5
option    111:10
oral    7:8
order    38:12
54:2    67:19
68:8    75:1
92:9    98:20
132:5, 19
OSHER    5:2    6:8
8:14    27:8
46:5    120:22,
24    121:3
122:14, 19
125:4
outcome    43:24
outside    28:6
93:22    94:5, 17

95:9
overall    97:7
overnight    125:18
overpopulated
67:11    74:23
overpopulation
68:18
oversaw    32:7
oversight    19:12
Overton    48:12
overview    37:2
overwhelmingly
45:11, 17

< P >
p.m    100:15
120:9, 12
140:2, 5    141:5,
7
P.O    4:13
PAC    15:8
PAGE    6:13
15:15    105:24,
25    113:18
116:4, 16
Pages    61:12, 19
paid    41:21
Paige    6:2
paper    39:22
89:21    92:17
parameters    54:1
part    32:24
62:22    64:24
66:2    84:24
87:22    92:24
95:19    110:25
119:19    130:6
participate
39:25    71:21
particular
62:10, 13
83:22    92:24
103:3, 17
106:21    114:12
118:21, 23
137:3    140:16
particularly
102:17
parties    1:18
2:11    122:23
123:23    142:10

partisan    62:20,
22
parts    38:2
83:15
party    21:10, 13
24:13    117:20
121:16, 19, 25
122:1, 8, 9
123:5, 6, 11, 12
124:4, 5, 12, 13,
17, 22, 24
passed    22:10
27:18    38:12
40:21    41:7, 8,
11, 17    52:4
58:22    105:17
111:2, 6, 9
126:10
passing    111:22
Paul    9:18
paying    10:17, 21
people    13:21
45:9, 10, 16
65:5, 16    66:11,
22, 23    67:1, 10,
12, 17    68:7, 11,
17, 25    69:1, 3,
4, 12, 17    70:6
71:1, 13    73:14
74:18, 25    76:2
78:13, 17, 19
81:10    84:3, 7,
8, 9    86:21
87:10    89:7, 19
90:1    92:12
97:25    117:22
122:5
people's    66:3
percent    26:15
42:16, 21, 24
57:9, 23    97:15,
21, 22    98:4, 11,
12, 21, 22
113:20, 22
114:3, 6, 12, 25
115:3, 6, 12
116:18, 19
117:5, 25    118:3
perform    111:17,
24
performed    104:1

period    69:6
72:8    79:13
permanent    87:22
Perry    82:15
83:11
person    11:20
16:25    71:23
72:10    96:15
109:5
personal    14:24
15:11, 13, 17,
23    26:1    84:13,
20    90:7
personally    83:20
PI    99:7
picked    39:22
piece    89:21
92:17
pit    31:4    33:1
Plaintiffs    1:8
3:3    4:17    5:1
7:21, 23    8:9,
11, 13, 15, 19,
21, 23    9:1, 15
10:6    120:13,
15, 20    121:3
125:8
Plaintiff's
6:14, 16, 18, 20,
22, 24    12:4, 6
52:14, 18
55:20, 23
104:24    115:23
116:1    119:10,
13
plan    24:21
25:8, 13, 25
27:2    42:9
43:6    58:24
65:6, 9, 11
69:15    77:16,
20    79:10    87:4,
5    91:10    93:21
94:5, 8, 10, 12,
16    95:4, 6
96:1, 4, 9, 18,
19, 24    97:7
107:15, 16, 19,
20    114:15
119:7, 8    120:1
126:10, 16
127:1, 5, 18, 24

Caster Plaintiffs' Exhibit 89, Page 52

Evan Milligan,et al v. John H.Merrill, et al.                                    **Chris Pringle**
**12/17/2021**

128:*9, 20*
129:*17, 23*
130:*2, 7, 15*
131:*19*   132:*6,*
*20*   134:*19*
135:*11, 16, 18*
136:*4, 17*
137:*12, 16*
138:*8, 12, 19*
140:*12, 24*
planning   34:*24*
plans   22:*9*
  27:*5, 6*   31:*3,*
*7, 9*   38:*12*
  40:*8*   58:*22*
  64:*11*   65:*22*
  76:*5, 8*   77:*6*
  107:*14*   130:*1,*
*11*   133:*22*
play   28:*6, 14*
  29:*24*   46:*12*
  104:*9*
please   7:*18*
  9:*3, 16*   118:*19*
137:*21*
pleasure   139:*16*
plus   18:*8*
point   25:*6*
  30:*5*   32:*22*
  33:*3, 8*   34:*16*
  39:*1*   40:*7*
  64:*12*   88:*15*
  93:*16*   94:*1*
  95:*6, 7*   97:*10*
  99:*16*   105:*14*
  109:*22*   116:*24*
  118:*6*
points   69:*13*
  77:*15, 23*   87:*3,*
*6*   88:*17*   89:*1,*
*16, 25*   92:*14,*
*18, 21*   93:*9*
  117:*14, 17*
  118:*7, 9*
  132:*10, 13*
  135:*17, 24*
  136:*2, 11, 15,*
*16, 22*   137:*5*
polarization
  102:*4, 11, 15*
  103:*2, 17*
  104:*7, 10, 15*

105:*14, 17*
106:*7, 8, 12, 13,*
*20*   109:*12, 18,*
*21, 25*   110:*5,*
*18, 25*   111:*8,*
*18, 21*   112:*3,*
*14, 24*   113:*24*
  114:*1, 5*   115:*4,*
*8, 12*   116:*14*
Policies   123:*16*
political   16:*13*
  85:*12*   123:*21*
politically
  86:*14*
population
  26:*16*   42:*22*
  65:*22*   76:*11*
  95:*3, 12, 18*
  96:*11*   97:*23*
  98:*5, 12, 13, 22*
  102:*8*   113:*21*
  119:*21*
populations   96:*2*
portion   18:*19*
  82:*17*   102:*3*
possible   27:*9*
  39:*2*   69:*21*
  92:*9*   107:*5*
  117:*1*   133:*3*
possibly   49:*10*
  106:*4, 9, 14, 18,*
*25*
potentially
  136:*7*
practicable
  81:*15*
precincts   85:*13*
preclearance
  112:*10*
precleared
  58:*25*   59:*21*
  112:*11*
predominantly
  85:*23*
prefer   19:*21*
preference
  123:*16*
preliminary
  99:*21*
prepare   12:*13*
  51:*6, 14*   74:*4*
  100:*18*   106:*23*

prepared   67:*5*
  93:*8*   118:*7*
PRESENT   6:*1*
  7:*18*   66:*24*
  73:*6*
presented   29:*17*
  63:*17*   68:*11*
  119:*8*   135:*11*
  137:*11, 23, 25*
  138:*3, 7*
preserve   32:*25*
  33:*9*   133:*24*
press   80:*17, 23*
pretty   25:*12*
  60:*20*   63:*5*
  99:*22*   123:*20*
prevent   9:*22*
previous   112:*5*
previously
  21:*18*   42:*21*
primarily   38:*24*
  73:*12*   80:*10*
primary   26:*10,*
*15*
principle   60:*8*
PRINGLE   1:*10,*
*20*   5:*17*   7:*7,*
*12*   8:*2*   9:*4,*
*13, 18*   17:*25*
  125:*14*   126:*3*
  127:*16*   131:*11*
  133:*5*   139:*14*
  140:*7*   141:*4*
prior   2:*14*
  22:*20*   26:*4*
  40:*13*   52:*1, 8*
  56:*11, 13, 22,*
*24*   58:*5*   81:*18*
  95:*25*   100:*21*
  109:*13*   111:*21*
priorities   33:*25*
prioritize   54:*23*
priority   33:*19*
prison   40:*11*
prisons   40:*9*
private   14:*24*
privilege   63:*14*
  127:*8*   131:*5*
  132:*9*
privy   114:*20*
Probably   35:*1*
  136:*13*

Procedure   7:*5*
  99:*11*   101:*7*
proceedings   7:*9*
  142:*5, 8*
process   21:*6, 9,*
*24*   22:*13, 25*
  26:*10*   28:*18*
  29:*25*   30:*9*
  33:*18*   34:*24,*
*25*   35:*18*   36:*3,*
*25*   37:*3*   41:*19,*
*25*   46:*3*   57:*16*
  64:*14*   66:*2*
  93:*17*   96:*17*
  101:*3*   105:*15*
  107:*7, 11*
produced   43:*6*
  68:*13*   77:*20*
  80:*13*
program   94:*23*
project   40:*14*
prompted   89:*17*
property   43:*9,*
*10, 11*
Proposed   6:*19*
  37:*24*   51:*11*
  52:*6*   55:*24*
  56:*13*   57:*19*
  61:*15*   63:*8, 10,*
*16, 22*   77:*6*
  93:*16, 19*
  100:*20*
protect   33:*19*
  34:*1, 9*   45:*6*
  70:*15*   98:*9*
  133:*2*   134:*22*
  135:*4*
protected   29:*2*
  102:*20*   134:*8*
  136:*8*
protecting   43:*4*
  44:*19*   135:*6*
protection   96:*14*
provide   101:*17*
  105:*5*
provided   55:*5*
  56:*7, 9*
Public   1:*21*
  7:*2*   19:*12*
  20:*23*   32:*7, 8,*
*17*   35:*5, 25*
  36:*1*   37:*16, 18,*

**Caster Plaintiffs' Exhibit 89, Page 53**

Evan Milligan,et al v. John H.Merrill, et al.                    **Chris Pringle**
                                                                **12/17/2021**

22, 24    38:1, 3,
5, 16    39:13
  41:1    64:11, 15,
16, 20, 23    65:2,
15, 19, 21, 25
  66:12    67:5, 7,
24    68:12, 16,
21, 24    70:2, 6
  71:20    72:3, 16,
25    73:7    74:4
  75:6, 14, 17, 21,
24    76:14, 19
  77:3, 7, 8, 12,
15, 19, 22    78:1,
23    79:4, 5, 6
  80:22    81:6, 19,
23    82:20, 22
  86:17, 20    87:1,
8, 11, 17    88:8,
14, 20, 25    89:4,
12    90:10, 13,
16    92:23    122:2
**publicize**    36:6
**published**    38:4
**pure**    69:5
**purpose**    16:23
  65:2, 15    102:18
**pursuant**    7:4
**put**    28:9    31:6
  41:9    47:21
  54:25    88:1, 5
  89:18    90:3
  94:2, 18    116:5
**putting**    54:13

**< Q >**
**question**    10:10
  11:10, 12, 13,
23    25:11
  40:19    53:23
  57:5    63:13
  66:5    70:25
  73:2, 15    80:21
  86:10    93:13
  98:16    103:23
  106:2    118:18
  119:1    124:20
  127:9    130:3
  132:3, 23
  133:8, 16
  134:2, 23

137:19, 21
138:10
**questions**    2:10,
11    9:23    11:9,
21    72:24
  73:13, 18, 20,
24    74:2    80:4
  117:22    120:14,
15, 21, 25
  125:9    126:2
  139:15    140:10
  141:2
**quick**    121:1
**quicker**    43:18,
20
**quickly**    33:17
  41:25    49:10
  92:11
**quit**    17:7
**quite**    86:3
  117:21
**quote**    80:24
**quoting**    133:1

**< R >**
**race**    27:25
  54:11, 12
  107:10, 14, 16
  108:5    110:3
  123:17
**race-neutral**
  31:10, 20
  108:15    133:23
  134:16, 18
**races**    75:25
  131:15
**racial**    26:11
  27:13, 16
  42:11    85:17
  95:14    102:4, 8,
10, 14    103:1,
16    104:7, 10,
15    105:13, 17
  106:5, 6, 7, 10,
12, 14, 18, 19
  107:1, 6
  109:11, 18, 21,
25    110:4, 17,
25    111:8, 18,
21    112:3, 13,
23    113:24
  114:1, 5    115:4,

8, 12    116:14
  128:22    129:2,
10, 12
**racially**    119:18
  127:6, 19, 24
  128:9
**ran**    45:11
**Randy**    23:24
  38:20
**range**    119:5
**ranking**    20:16
  21:10
**rapid**    117:17
  118:12
**rapidly**    116:25
**reach**    131:3
**reached**    139:7
**reaches**    95:2
**read**    31:1
  51:11    60:4
  61:18    69:14
  74:8    77:24
  87:4    88:17
  92:19    101:14
  106:15    126:21
  132:14    137:21,
22    139:13
**reading**    2:2
  41:9    87:3
  92:17    118:5
  137:5
**readings**    139:12
**reads**    89:16
**ready**    38:13
  99:24
**real**    17:7, 20
**really**    11:19
  33:17    34:11
  41:25    69:25
  77:18    83:12
  99:9, 14, 15
  116:23    118:18
  119:1
**realtor**    16:16
  17:15    18:5
**Reapportionment**
  6:17    19:10
  20:5    21:2
  23:13    28:7
  30:8, 10, 24
  31:13, 23    32:6
  35:20, 25    36:8,

13    39:14    40:5,
18, 23    45:21
  46:7    47:13
  48:7, 8, 15, 22,
24    49:2, 22, 23
  50:6, 7, 13, 19,
22, 25    52:18
  53:10, 15
  55:14    56:17
  58:3    76:6, 10
  80:7    83:18
  85:5    93:22
  100:17, 23
  102:2    103:25
  104:3    105:3
  109:2    128:25
  129:1, 16
  132:19    139:4
  140:19
**reason**    21:22
  28:5    58:20
  59:8, 25    60:15
  62:5    65:19
  96:16    105:8
  108:23    116:7
**reasonable**
  44:23, 24
**reasons**    54:18
  59:13
**recall**    27:22
  36:7    47:17, 18
  49:24    51:7, 21
  54:24    55:2
  57:15, 25    58:6
  63:20    64:6, 7
  66:3    75:18
  76:23    77:11
  78:7, 8    82:19
  86:24    89:2
  90:11, 15, 16,
22    104:17, 20
  133:14
**receive**    14:19
  37:5
**received**    135:22
  137:3
**receiving**    70:10
**Recess**    49:14
  100:13    120:10
  140:3
**recognize**    55:25

**Caster Plaintiffs' Exhibit 89, Page 54**

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

**recollection**
14:3   26:18
28:20   29:1, 7
47:6   132:16
138:1
**record**   9:17
27:11   49:13,
16   64:11
77:24   87:4, 23
88:1, 5   89:18
90:4   95:17
100:9, 12, 15
116:6, 8   120:7,
9, 12, 23
137:22   140:1, 5
**recordings**   50:23
**records**   50:23
**Rector**   3:14
**redistricting**
11:3, 5   16:3
21:6, 9, 16, 24
22:8, 12, 24, 25
26:9   29:25
30:9   33:18
34:23, 25
35:21   36:16
37:3   40:16, 17
41:2   42:22
45:20, 21
46:10   47:14
52:19   54:5
64:14   66:2
96:12   107:7,
11   112:5
129:17   131:13
132:6
**redrawing**   24:8
**Reed**   25:8, 13,
22, 24   42:9
119:20   120:1
**reelect**   45:17
**reelected**   35:12,
16   121:9
**re-elected**   18:25
**reelection**
45:11, 14
134:22   135:13
**refer**   19:16
25:12   27:5
102:5, 10
126:12
**referred**   25:24

**referring**   27:5
69:9   106:6
108:9   117:8
118:1   126:10
**reflect**   55:15
**reform**   124:6, 9,
14
**refrain**   100:4, 6
**refresher**   11:9
**regarding**   40:16
**regardless**   69:7
**region**   82:9
**register**   79:19
**regular**   50:5, 8
**related**   78:6
79:1
**relating**   2:5
**relationship**
115:2
**relay**   77:2, 9
**released**   79:5
**releases**   80:17
**rely**   58:12, 21
**remained**   45:13
**remedy**   128:22
129:2, 9
**remember**   14:7
20:4, 9   26:5,
17   32:3   35:7
36:10   37:10
42:11   46:1, 6,
24   48:3, 16
49:4, 5, 25
50:2   52:3, 6
53:18   55:4
58:24   59:9
60:5, 6   64:3
72:2   73:3, 5,
25   74:3   76:1
77:10, 21   78:4
82:25   87:8, 14
88:22, 23
90:24   91:2, 5
94:9, 12   97:12,
13   98:1
100:18, 25
101:2   112:7, 9
114:23   116:23
117:17
**remembered**
59:11   87:23

**remodeling**   17:12
**remotely**   72:9
**removing**   122:2
**repeat**   18:16
118:19
**repetition**   99:19
**Reporter**   7:1
9:2, 7   11:15
16:20   97:22
100:6   137:21
142:15
**Reporting**   142:14
**represent**   7:19
9:15   19:23
24:7   42:2
45:10, 16
50:24   80:25
140:8
**representation**
70:9   80:15
86:23   87:18
88:21   89:5, 13
90:2, 7   92:13
**Representative**
8:1   9:13
18:14, 17
25:25   37:25
42:1, 12, 20
43:4   44:5
45:6, 13   46:2
70:18, 20, 24
71:9, 14, 19
113:19, 23
116:13   121:2,
6   122:20
125:5, 14
126:3   127:15
131:11   133:5
139:14   140:7
**Representatives**
18:2   20:23
41:12   70:11,
13   71:6
**represented**
10:1   93:1, 6
**representing**
7:21, 23, 25
8:4, 15
**represents**   10:5,
13
**republican**
121:16, 17, 19,

21   122:1, 9
123:12   124:5,
13, 24
**republicans**
21:12   123:2
**request**   38:2
50:22   104:5
110:12
**requested**   14:5
110:10
**requesting**   38:1
**required**   36:15,
21   134:3
**requirement**
131:8   132:11
134:17
**requires**   115:12
134:6
**reservations**
85:14
**residence**   44:16
**resolve**   49:10
**respect**   30:24
31:3   39:19
88:15
**respecting**   54:14
**respective**   1:18
**respond**   99:24
**response**   43:17
91:7
**responsibilities**
32:5, 20
**responsibility**
98:18
**rest**   70:19, 21
**result**   11:5
22:7   142:11
**retained**   24:12
**reusing**   60:15
**review**   13:9, 12
19:13   20:8
52:1   56:14
100:21
**reviewed**   52:23
53:13   56:21
**reviewing**   46:9
**revised**   51:18
**revising**   47:13
58:4
**revisions**   56:23
**rewritten**   61:22
62:7

**Caster Plaintiffs' Exhibit 89, Page 55**

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

rich    82:10
86:5
right    9:20
14:17    18:3, 6
20:9, 16    27:3
28:3    32:3, 21
33:24    34:4, 20
39:2, 8    48:24
49:19    50:12
53:22    58:16
59:22    66:20
68:15    70:24
71:2, 7    72:13
76:3, 15    78:2,
15    80:11
83:15, 23
84:11, 14, 17
85:6    86:1
87:25    96:21,
23    99:15, 17
101:5    103:12
105:20    108:16
111:2    115:24
126:11    131:14
133:10, 13, 16
139:9
Rights    54:3, 7
59:16, 19, 20
98:7    99:2
102:20    132:5,
20    133:10, 17
134:3, 6    136:4,
18    137:13
River    43:8, 12
83:25    84:2
rivers    84:10
Road    4:20
11:9    43:10, 11
54:20
Rock    41:5, 22
role    18:12
21:8    22:12, 15,
19    29:24
30:23    48:13
52:21, 25
56:19    62:10
72:15    104:9
room    11:18
39:21, 23    90:3
120:6

ROSBOROUGH    4:2
8:18, 19    49:6
100:3
ROSS    3:18    8:10
roughly    121:11
RP    102:6
RPV    102:5, 7
rule    28:5, 14
36:22    60:6
76:8    93:21
rules    2:5    7:5
11:8    99:11
ruling    62:8
rulings    36:19,
20    46:11    54:4,
8    55:13
run    20:20
83:25    99:1
123:25
rural    84:24

< S >
SADASIVAN    3:11
8:8, 9    47:7,
10    49:9, 19
safe    48:11
sales    17:9
satisfied    89:12
saw    56:1, 3, 12
59:10    76:7
138:24
saying    63:15
69:8    71:13, 14,
16    84:11
100:2    123:22
124:10    133:15
says    11:17
106:1    113:25
scenes    38:13
schedule    35:3,
5    37:16    50:5,
8    79:4
school    72:20
85:15    117:2
Schoolhouse
41:5, 22
science    16:13
scratch    58:13
screen    127:13
seat    34:9
43:4    45:7

second    19:1
41:9    98:3
105:12    135:15
secondhand
114:21
seconds    139:25
Secretary    8:4
38:10    140:8
Section    58:23
59:1, 16, 18, 19,
20, 21    61:17
62:6, 18    98:7,
15    99:1
102:19    103:10
112:9    136:7
see    8:16, 17
16:21    21:22
31:7    34:15
56:15, 16
61:12, 13    65:7,
23    66:22
67:18    74:22
89:8    95:23
96:1, 4    97:6
109:2    113:4,
10, 13    125:20
127:12    139:17
seeing    94:9, 12
97:12, 13
104:17, 20
seek    22:18
130:19
seeking    134:22
135:13
seen    12:9
29:19    76:4, 5
95:21    112:16,
17, 18    115:19
sell    82:2
senate    21:11
32:10    41:14
72:20
Senator    8:1
12:19, 23
13:17    33:19
35:24    44:15
46:7    47:5
48:3    51:17
58:2    61:10
74:2    80:10, 23
81:4    106:1

107:3    113:18,
25    114:7
send    45:3
sense    42:14
46:22    47:19
89:19    123:4
sensitive    99:22
sent    37:22, 25
41:14    43:15
51:25    52:7
69:10    92:19
93:3    100:20
101:1, 19, 23
102:1    110:7
sentences    11:21
sentiment    88:20
89:4    92:12
separate    66:18
September    127:18
sequentially
12:2
series    37:22
serve    19:11
21:19    35:17
served    18:24
20:5, 6, 7, 8,
23    25:6    26:1
33:3    50:8
121:7, 8
serves    137:14
service    122:21
serving    20:22
21:23    121:23
123:9    124:21
session    22:3, 4
28:13    40:9, 10
41:2    93:18, 20
94:6    110:9
117:18
set    32:7    80:7
93:9    106:3
setup    65:17
seven    19:1
113:15    117:3
129:5
Sewell    114:15
119:7
shape    119:22
share    45:3
69:18
shattering    81:15

Caster Plaintiffs' Exhibit 89, Page 56

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

she'll   11:17
shift   76:13
shifted   65:23
shifts   74:7
ship   43:7, 12, 13   44:21
short   120:3
Shortly   14:8
show   65:21
91:10   109:10
side   43:11
48:11   83:4, 12
99:24
signature   2:2
signed   40:21
41:17   114:18
significant
124:25
similar   60:5
similarities
59:10
single   67:8
77:22   84:13, 21
single-member
54:14
SINGLETON   4:17
8:23   120:15
125:8   126:11
127:17   128:7
sir   121:22
126:13, 17, 20, 23   130:25
133:11   134:1
139:6
sitting   46:1, 6
situation   43:25
six   38:1, 3
80:14, 16
skilled   117:19
smile   126:8
social   15:13
85:18
software   24:22
soil   86:2, 6
soils   82:11
somebody   22:21
23:12, 15
24:15   69:10
77:23   78:3
87:2   88:16
89:15   90:3, 5

91:10   93:3
102:2   110:22
Sonny   21:17
29:2   33:21
soon   38:7, 8
67:9   139:17
sorry   13:1
17:13   18:16
20:13   22:12
27:8   34:18
37:8   41:23
49:6   53:23
59:19   73:19
75:4   89:23
94:11   98:3, 12
101:21   105:25
111:4   128:14
137:8   138:5
sort   41:4
sorts   66:16
sought   20:20
sounds   16:25
source   95:10
Southern   17:8, 14, 21   18:3
spaces   122:3
speak   29:23
58:4   93:5, 11
speaking   66:14
100:4, 6
speaks   11:20
special   22:3, 4
28:12   40:9, 10
41:1   93:20
94:6   110:8
specialist   16:19
specialize   17:9
specialties
16:15
specific   23:3
27:7   51:22
77:2   79:7
87:5   123:7
specifically
60:6   73:24
74:2   82:25
90:22   108:10
127:21
specifics   40:4
55:2, 4, 6, 11, 16   75:19

76:23   77:9, 12
86:24
spectrum   123:20
speculation   43:2
spelled   54:15
spend   82:14
spent   82:5
split   44:13
92:8   97:9
splits   91:24
92:7   94:4
95:13   97:8
spoken   80:3
126:7
spring   37:17
staff   48:7, 15
100:23   102:2
standard   101:6
standing   87:2
stands   89:16
Stars   3:7
start   12:3
33:11, 12
34:24   61:13
138:5
started   33:6
35:8   36:8
38:15
starting   25:6
30:5   32:22
33:3, 8   58:13
State   1:22
7:3, 19   8:4
9:16   10:20
14:15, 20, 25
18:14, 17, 19
19:8   23:8, 14
32:9, 10   34:19
38:2, 6, 10
39:6, 11   41:8
42:4   50:10
57:11   72:11, 18, 20   75:25
82:9, 17   83:4, 15   84:5, 15, 25
86:22   93:1, 5
96:15   109:19
122:23   125:2
127:22   128:8
142:1
statement   81:3, 5, 12   115:10,

15   116:22
137:11   138:4, 8, 12
statements   90:4
STATES   1:1
7:15   58:25
stay   40:14
67:2   74:18
125:17
Ste   3:7, 21
5:5, 21
step   22:22
35:10, 11
stepped   35:15
steps   41:20
45:20
stint   19:14, 16
21:5
stipulate   116:9
STIPULATED   1:17
2:1, 8
stipulation   7:6
stipulations   9:7
stood   77:23
stopped   47:7
story   34:21
straight   40:10
Street   1:23
3:14, 21   4:5
5:5, 21   142:23
stretches   83:3
strike   138:5
striked   61:14
subdivisions
85:13
submit   28:8
73:15
submitted   76:6, 9   94:5, 13, 16
subsection   61:21
substance   109:8
suggest   57:22
63:2, 19   111:7
suggested   111:20
suggestion   91:7
suggests   77:17
suit   126:19
Suite   142:23
summer   37:17
supermajority
123:20

Evan Milligan,et al v. John H.Merrill, et al.

**Chris Pringle**
**12/17/2021**

superminority
  20:14
support   119:8, 9
supported   42:25
suppose   109:6
  122:4
supposed   37:5,
9, 10
supposing   61:24
sure   10:9
  24:5   25:12
  27:6   35:21
  36:12   39:4
  41:18   45:13,
  15   58:1   64:6
  75:3, 18   77:14
  86:13   96:20
  101:13, 14
  103:19   104:2
  107:9   117:14
  118:5   120:14
  122:12, 16, 19
  123:7   139:18
surprise   81:10
surprises   80:24
  81:7
swear   9:3
sworn   9:5
system   40:11
  83:25   84:2

< T >
table   46:1, 6
take   32:17
  49:8   52:10
  61:10   65:4
  75:5, 10, 13
  86:16   99:12,
  17   100:8
  107:10   120:2
taken   1:21
  49:14   100:13
  108:5   110:1
  120:10   140:3
  142:5, 8
takes   111:17
talk   47:13
  51:17, 18
  62:15, 16   63:2
  64:4   67:17
  75:16, 20
  76:18   78:4

  100:9, 16
  101:10   135:15
talked   51:20
  52:2   64:7
  72:18   76:2, 21,
  24   87:5
  112:21   135:9
talking   26:9
  27:1   36:4
  39:6   49:21
  64:1   66:6
  69:11, 13
  74:16, 19   77:7,
  15, 23   82:17
  87:3, 6   88:17
  89:1, 16, 25
  92:11, 14, 18,
  20, 21, 22   93:9
  106:25   112:25
  116:24   117:14,
  16   118:5, 7, 9,
  25   132:10, 13
  135:17, 24
  136:2, 11, 15,
  16, 21   137:5
Tallapoosa   1:23
  5:21
tasked   83:18
team   39:21
telephone   109:3
  127:13
tell   15:1
  29:18   35:14
  67:10   75:23
  89:17   99:15
  117:5   118:14,
  20   126:24
  127:4   128:18
telling   36:19
  88:23
ten   28:8, 11
  47:25   93:23
  94:7, 14, 15
tend   78:25
ten-day   28:5
  60:6   76:8
  95:25   97:1
term   19:2, 19
  82:1, 24   85:25
  86:3   102:7
  112:12

terms   18:25
  19:15   89:5
  121:9
test   45:1
  46:12   61:25
  62:2
testified   9:5
  129:4
testify   14:18
  128:25
testifying   9:20
testimony
  129:15   134:1
text   109:6
texts   109:10
Thank   34:22
  49:19   51:3
  121:2, 14
  125:5, 6, 12, 16
  138:2   139:14
  141:1
thereto   2:14
thing   40:17
  68:10   69:14
things   17:6
  31:5   36:11
  79:1   132:12
think   29:20
  32:21   37:11,
  23   40:6   43:20
  46:12, 13   49:9
  60:2, 22   62:5
  63:12   66:2, 11
  69:20   71:16
  78:22   79:2
  81:9   82:13
  101:4   111:5
  114:7, 11
  115:15   116:18,
  23   119:2, 19
  123:18   124:7,
  18   127:9
  130:7   132:1
  137:17   139:19,
  21
thinking   36:8
  86:21   122:5
third   61:14
thought   48:21
  54:2   57:20
  59:23   80:15

  100:3   116:17
  117:7
three   60:16
  99:7
three-week   79:13
tight   111:11
timberland   17:9
  82:2
Timberlands
  17:8, 14, 21
  18:3
time   2:12, 13
  7:17   10:24
  11:20   19:23
  20:15   25:15
  34:3   39:19
  42:5   44:12
  45:11   46:22
  49:13, 16
  51:19   59:5
  68:14   72:8
  73:14   74:14
  79:8, 17   80:5
  81:9   82:5, 14
  86:4   99:5
  100:12, 15
  101:9   105:23
  110:4   111:14
  112:10   113:1
  117:1, 3, 13
  120:9, 12
  121:2, 16
  125:5   132:17
  137:16   140:2,
  5   141:4
timeline   37:3
  40:3   105:21
  111:11
times   49:22
  79:22   80:7
  91:2
title   18:4
today   9:24
  10:1, 18   12:13
  13:10   14:13
  34:17   71:2
today's   34:23
told   13:21, 23
  14:4   31:19
  33:11   80:23
  108:12   113:25

Caster Plaintiffs' Exhibit 89, Page 58

Evan Milligan,et al v. John H.Merrill, et al.

**Chris Pringle**
**12/17/2021**

---

114:21, 22
119:6
total   121:12
totally   84:4
tradition   26:6
60:12   64:25
transcribed
142:5, 8
Transcript   6:21,
23   105:3
115:22   142:7
transcription
142:6
transcripts
116:10
travel   14:15, 20
trial   2:13
14:18
tribal   85:14, 18
trick   111:4
tried   92:8
true   81:12
83:14   89:19
142:7
truthfully   9:24
try   70:15
102:10   119:24
trying   21:19,
21   34:15   35:2
37:16   39:3
40:2   64:15
76:25   96:21
111:4   116:25
131:7
turn   105:24
113:18
turned   43:7
75:7   89:9
93:23, 25   94:1,
18
TURRILL   3:4
8:12
twice   91:1
Twitter   15:16,
20
two   12:21
18:24   19:15
28:19   29:9
69:15   90:17,
19   91:8   93:15
95:24   97:11,

12, 13   121:9
123:22   127:2
two-hour   99:6
type   11:17
35:2
typing   11:16

< U >
Uh-huh   61:16
95:8
ultimately   24:9
98:17
unconstitutional
127:19   135:19
underpopulated
67:12   68:6
74:23
underpopulation
68:19
underpopulations
74:17
understand   9:11,
19   11:10
40:19   63:5
69:7   86:12
100:1   105:7
113:1   118:18
121:20   135:1
138:10
understanding
9:23   54:6
55:12   62:1
70:1   82:7
97:17   102:14,
16   106:11, 17
107:1, 16
110:7   114:14
118:13   122:12,
17   129:14
134:17
understands
103:10
understood
11:12   135:3
unintentionally
102:19   134:7
Union   4:4, 12
UNITED   1:1
7:15   58:25
University   16:8
unnecessary
114:2, 4

update   36:15,
18, 20, 22   46:4,
10   55:3   57:20
updated   36:12
55:15
updates   54:24
57:6
updating   35:18
36:8, 24   45:20
URIAH   4:18
use   15:17, 21
25:20, 21   33:7
60:9, 12   102:13
Usual   9:7
14:14
usually   101:7, 9

< V >
various   38:1
122:25
varying   124:1
version   63:18,
21
versus   7:13
VIDEO   1:9
Videographer
6:2   7:11   8:6
9:2   49:12, 15
100:11, 14
120:8, 11
140:1, 4   141:3
view   69:18
77:18   121:24
122:22   123:24
124:16, 25
views   66:15, 16
121:24   122:7,
22   123:5, 10
124:3, 11, 22
violate   136:4,
7, 18
violated   102:19
137:12
Virtually   23:5
69:10   72:5, 13
78:3
volition   92:16
vote   28:21, 22
29:18   59:24
67:20   68:8
96:14, 16, 17
102:23

voted   29:3, 10
31:16, 17   51:9
53:21   84:17
Voter   89:25
voters   42:23
66:24   69:10
77:21   78:2, 7
80:25   81:8
87:4   88:17
89:1, 8, 14
98:1   126:13,
14, 16   135:16
136:4, 17
137:12, 15
138:4
Voting   54:3, 7
59:16, 19, 20
85:13   95:18
98:7, 12   99:2
102:19   113:21
132:5, 20
133:10, 17
134:3, 6   136:4,
18   137:12
VS   1:9

< W >
wait   70:1
139:24
waived   2:3
walked   39:20,
22   86:21
WALKER   5:18
7:24   8:17
9:9   10:4, 9,
17, 21   12:1, 16
13:6   46:2, 8,
15   47:4   48:4
50:20, 24
52:23   53:4
55:8   56:8
58:2   61:6
62:16, 17   63:8,
11, 12   73:6, 12,
20   82:21
105:7   107:8
108:2   110:11
114:1   116:5,
11   117:10
118:2, 8, 10
120:5, 18
122:11, 16

**Caster Plaintiffs' Exhibit 89, Page 59**

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

125:*6*, *11*, *25*
126:*19*, *24*
127:*7*   128:*2*,
*12*, *14*   129:*15*
  130:*14*   131:*2*,
*4*, *21*, *23*   132:*4*,
*8*, *23*   133:*19*
  134:*5*   136:*1*,
*24*   137:*1*, *24*
139:*10*, *19*, *24*
**want**   35:*14*
  58:*20*   70:*13*
  71:*15*   72:*1*
  96:*7*, *20*   120:*3*
  125:*17*   139:*22*
**wanted**   21:*18*
  30:*22*   31:*6*, *11*
  32:*13*   34:*8*
  41:*18*   45:*6*, *9*,
*12*, *15*   51:*4*
  57:*7*   66:*17*, *22*
  67:*2*, *18*   69:*14*
  70:*7*   104:*3*
  135:*10*, *11*
**wanting**   89:*19*
**Washington**   3:*22*
  5:*6*, *13*   21:*18*
  42:*5*   44:*2*, *11*
**watched**   79:*14*
  80:*1*
**way**   14:*18*
  31:*22*   41:*5*
  43:*15*   63:*12*
  64:*11*, *20*
  66:*12*   67:*2*
  83:*21*   84:*2*
  86:*23*   117:*21*
  127:*9*, *15*
  131:*2*, *6*, *12*
  134:*7*, *16*
  137:*10*
**ways**   45:*5*
**Wednesday**   50:*11*
**week**   40:*12*, *15*
**weekdays**   78:*10*,
*14*, *19*
**weight**   89:*3*, *18*,
*24*
**WELBORN**   4:*9*
  6:*7*   7:*20*   9:*8*,
*11*, *12*, *14*
  10:*12*   12:*3*

13:*1*, *4*, *8*
  47:*9*   50:*18*
  51:*3*   82:*22*
  99:*10*, *13*
  100:*1*, *8*   105:*5*,
*11*   108:*3*
  116:*9*   120:*2*, *7*,
*13*, *19*
**Well**   13:*8*
  16:*24*   17:*3*
  20:*16*   25:*23*
  28:*21*   30:*15*
  36:*17*   38:*20*
  40:*20*   41:*21*
  44:*20*, *25*   45:*8*
  49:*1*   60:*4*
  64:*1*   65:*21*
  66:*6*   69:*3*, *4*,
*17*, *23*   70:*17*
  71:*1*   76:*13*
  77:*7*, *20*   79:*4*,
*11*, *23*   81:*13*
  84:*17*   85:*5*, *17*
  86:*19*   92:*8*
  96:*6*   98:*17*
  99:*10*   103:*24*
  105:*21*   113:*7*
  118:*24*   125:*12*
  129:*25*   130:*3*
  132:*10*   135:*8*
  139:*10*
**went**   40:*10*
  41:*1*, *16*   43:*10*
  51:*12*   57:*4*, *18*
  69:*1*   74:*8*, *21*
**we're**   26:*9*
  27:*1*, *4*   54:*21*
  99:*4*   118:*25*
  140:*1*, *4*
**We've**   99:*7*, *23*
  138:*16*
**wide**   123:*20*
**Wilcox**   42:*8*, *9*
  82:*15*   83:*10*
  84:*7*, *9*
**willing**   94:*20*
**win**   45:*14*
**Wiregrass**   84:*4*
**witness**   2:*3*
  7:*7*   9:*3*
  27:*10*   45:*23*

46:*19*   49:*17*
  99:*19*   136:*25*
**Women**   66:*24*
  69:*10*   77:*21*
  78:*2*, *7*   87:*3*
  88:*17*   89:*1*, *8*,
*14*, *25*   98:*1*
  126:*12*, *14*, *15*
  135:*16*   136:*3*,
*17*   137:*12*, *15*
  138:*4*
**won**   45:*11*
**woods**   16:*22*
**words**   102:*12*
  138:*24*
**work**   17:*12*
  23:*20*   30:*12*
  31:*11*   32:*12*
  37:*16*   38:*12*
  64:*15*   78:*18*,
*19*, *25*   79:*1*, *2*,
*18*   81:*17*   82:*2*
  83:*10*   99:*8*
**worked**   18:*7*
  21:*18*   30:*18*
  32:*11*   34:*3*, *4*
  39:*2*, *10*   114:*17*
**working**   35:*2*, *4*,
*5*   39:*11*   46:*3*
  78:*10*, *13*, *14*
**works**   19:*20*
  30:*17*
**wrap**   137:*9*
**write**   48:*20*
**writing**   137:*11*,
*25*   138:*4*, *8*, *11*
**written**   89:*21*
  104:*14*
**wrote**   135:*24*

**< Y >**
**y'all**   14:*8*
**Yay**   120:*18*, *19*
**Yeah**   9:*9*
  37:*12*   60:*21*
  69:*19*   122:*16*
  125:*22*   129:*7*
**year**   46:*23*
  50:*1*   66:*13*
**years**   18:*8*
  19:*1*, *4*   45:*18*
  121:*11*, *12*, *13*,

*23*   122:*6*, *20*
  123:*9*   124:*2*
  130:*7*   138:*15*
**year's**   30:*8*
**yesterday**   12:*14*
**yield**   45:*25*
**York**   3:*15*   4:*6*

**< Z >**
**zero**   44:*13*
  67:*14*   74:*21*
  75:*1*   76:*14*
  77:*1*   92:*9*
  129:*17*, *21*, *24*
  130:*1*, *4*, *8*, *10*,
*12*, *16*, *21*
  131:*8*, *15*, *20*
  133:*4*   138:*9*,
*13*, *16*, *21*
  139:*2*, *5*, *11*
**Zoom**   3:*18*
  4:*17*   5:*1*   8:*7*
  11:*18*

Caster Plaintiffs' Exhibit 89, Page 60

**In The Matter Of:**

**Evan Milligan,et al v. John H.Merrill, et al.**

Jim McClendon

*December 17, 2021*

US Legal

Caster Plaintiffs' Exhibit 90, Page 1

Evan Milligan,et al v. John H.Merrill, et al.                                    Jim McClendon
                                                                                   12/17/2021

```
 1          UNITED STATES DISTRICT COURT
 2      FOR THE NORTHERN DISTRICT OF ALABAMA
 3
 4
 5
 6 EVAN MILLIGAN, et al.,  )
 7                         )      CIVIL CASE NO.
 8       Plaintiffs,       )    2:2021-CV-01530-AMM
 9 VS.                     )    VIDEO DEPOSITION OF:
10 JOHN MERRILL, et al.,   )      JAMES McCLENDON
11                         )
12       Defendants.       )
13
14
15
16      S T I P U L A T I O N S
17          IT IS STIPULATED AND AGREED, by and between
18 the parties through their respective counsel, that
19 the deposition of:
20              JAMES McCLENDON,
21 may be taken before LeAnn Maroney, Notary Public,
22 State at Large, at the law offices of Balch &
23 Bingham, 105 Tallapoosa Street, Montgomery, Alabama,
24 36104, on December 17, 2021, commencing at 1:57 p.m.
25                                              Page 1
```

```
 1          IT IS FURTHER STIPULATED AND AGREED that the
 2 signature to and reading of the deposition by the
 3 witness is waived, the deposition to have the same
 4 force and effect as if full compliance had been had
 5 with all laws and rules of Court relating to the
 6 taking of depositions.
 7
 8          IT IS FURTHER STIPULATED AND AGREED that it
 9 shall not be necessary for any objections to be made
10 by counsel to any questions, except as to form or
11 leading questions, and that counsel for the parties
12 may make objections and assign grounds at the time
13 of the trial, or at the time said deposition is
14 offered in evidence, or prior thereto.
15
16
17                  ***
18
19
20
21
22
23
24
25                                              Page 2
```

```
 1          A P P E A R A N C E S
 2
 3 FOR THE MILLIGAN PLAINTIFFS:
 4          MICHAEL L. TURRILL
 5          Attorney at Law
 6          Hogan Lovells US LLP
 7          1999 Avenue of the Stars, Ste. 1400
 8          Los Angeles, California  90067
 9          michael.turrill@hoganlovells.com
10
11          KATHRYN SADASIVAN
12          Attorney at Law
13          NAACP Legal Defense & Educational Fund
14          40 Rector Street, FL 5
15          New York, New York 10006
16          ksadasivan@naacpldf.org
17
18          DEUEL ROSS (Via Zoom)
19          Attorney at Law
20          NAACP Legal Defense & Educational Fund
21          700 14th Street N.W., Ste. 600
22          Washington, DC  20005
23          dross@naacpldf.org
24
25                                              Page 3
```

```
 1          JULIE A. EBENSTEIN
 2          Attorney at Law
 3          American Civil Liberties Union Foundation
 4          125 Broad Street
 5          New York, New York  10004
 6          jebenstein@aclu.org
 7
 8          KAITLIN WELBORN
 9          Attorney at Law
10          American Civil Liberties Union of Alabama
11          P.O. Box 6179
12          Montgomery, Alabama  36106
13          kwelborn@aclualabama.org
14
15 FOR THE CASTER PLAINTIFFS: (Via Zoom)
16          DAN OSHER
17          Attorney at Law
18          Elias Law Group
19          10 G Street NE, Ste. 600
20          Washington, DC  20002
21          dosher@elias.law
22
23
24
25                                              Page 4
```

Page: 1 (1 - 4)

**Caster Plaintiffs' Exhibit 90, Page 2**

Evan Milligan,et al v. John H.Merrill, et al.                                    Jim McClendon
                                                                                  12/17/2021

```
 1 FOR DEFENDANT JOHN H. MERRILL:
 2      JIM DAVIS
 3      Assistant Attorney General
 4      Office of the Attorney General
 5      501 Washington Avenue
 6      Montgomery, Alabama  36130
 7      jim.davis@alabamaag.gov
 8
 9 FOR THE DEFENDANTS JAMES McCLENDON & JAMES
10 McCLENDON:
11      DORMAN WALKER
12      Attorney at Law
13      Balch & Bingham
14      105 Tallapoosa Street, Ste. 200
15      Montgomery, Alabama  36104
16      dwalker@balch.com
17
18
19 ALSO PRESENT:
20      Paige Ali, Videographer
21
22
23
24
25                                    Page 5
```

```
 1               I, LeAnn Maroney, a Court Reporter of
 2 Birmingham, Alabama, and a Notary Public for the
 3 State of Alabama at Large, acting as commissioner,
 4 certify that on this date, pursuant to the Federal
 5 Rules of Civil Procedure and the foregoing
 6 stipulation of counsel, there came before me on
 7 December 17, 2021, JAMES McCLENDON, witness in the
 8 above cause, for oral examination, whereupon the
 9 following proceedings were had:
10                    * * * * *
11          THE VIDEOGRAPHER:  This marks the
12 beginning of the deposition of Jim McClendon in the
13 matter of Evan Milligan, et al., versus John H.
14 Merrill, et al., Civil Case Number 2:21-CV-01530-AMM
15 filed in the United States District Court for the
16 Northern District of Alabama.  The date is December
17 17, 2021.  The time is 1:57 p.m.
18          All attorneys present, will you please
19 state your names and whom you represent.
20          MR. DAVIS:  Jim Davis, Alabama Attorney
21 General's Office, for Secretary of State John
22 Merrill.
23          MR. WALKER:  Dorman Walker, Balch &
24 Bingham, for Senator Jim McClendon.
25          MS. SADASIVAN:  This is Kathryn
                                           Page 7
```

```
 1               I N D E X
 2 MS. SADASIVAN:   9-103
 3 MR. OSHER:     104-111
 4 MR. DAVIS:     111-114
 5
 6
 7         E X H I B I T   L I S T
 8                                        PAGE
 9 Plaintiff's Exhibit 1 -            35
10 (Talk points)
11 Plaintiff's Exhibit 2 -            36
12 (2011 reapportionment guidelines)
13 Plaintiff's Exhibit 3 -            47
14 (Montgomeryadvertiser.com)
15 Plaintiff's Exhibit 4 -            61
16 (Public hearing schedule)
17 Plaintiff's Exhibit 5 -            64
18 (2021 reapportionment guidelines)
19 Plaintiff's Exhibit 6 -            76
20 (Transcript of October 26, 2021)
21 Plaintiff's Exhibit 7 -            94
22 (Transcript of November 3, 2021)
23 Plaintiff's Exhibit 8 -           100
24 (Hall request for additional meetings)
25                                    Page 6
```

```
 1 Sadasivan for plaintiffs Evan Milligan, Shalela
 2 Dowdy, Letetia Jackson, Greater Birmingham
 3 Ministries, and the NAACP of Alabama.
 4          I'm still having trouble hearing you
 5 all, though.  The audio is going out.  Are you able
 6 to move the place where -- anything towards the
 7 witness, a phone, audio of some sort?
 8          (Discussion held off the record.)
 9          THE VIDEOGRAPHER:  Okay.  The attorneys
10 that are on Zoom, if you'll do your introductions.
11          MR. TURRILL:  Michael Turrill of Hogan
12 Lovells on behalf of the Milligan plaintiffs.
13          MR. ROSS:  Deuel Ross for the Milligan
14 plaintiffs.
15          MR. OSHER:  Dan Osher for the Caster
16 plaintiffs.
17          MS. EBENSTEIN:  Julie Ebenstein for the
18 Milligan plaintiffs.
19          THE VIDEOGRAPHER:  Do you want to swear
20 him in?
21          JAMES McCLENDON,
22 having been duly sworn, was examined and testified
23              as follows:
24          THE REPORTER:  Usual stipulations?
25          MR. WALKER:  Meaning that the only
                                           Page 8
```

Caster Plaintiffs' Exhibit 90, Page 3

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 objections that need to be made are to the form of
2 the question.  Yes, Katherine?
3          MS. SADASIVAN:  Yes.
4          THE VIDEOGRAPHER:  We are off the
5 record.  The time is 1:59 p.m.
6          (Recess was taken.)
7          THE VIDEOGRAPHER:  We are back on the
8 record.  The time is 2:04 p.m.
9 EXAMINATION BY MS. SADASIVAN:
10 Q.        Good afternoon, Mr. McClendon.  My name
11 is Kathryn Sadasivan and I work for the NAACP Legal
12 Defense & Educational Fund.  I represent the
13 plaintiffs in this case, Milligan versus Merrill.
14 Thank you for making yourself available for today's
15 deposition.
16          Do you understand that you're here today
17 because you've been served with a notice of
18 deposition and you are a defendant in Milligan
19 versus Merrill in your official capacity as cochair
20 of the Alabama permanent legislative committee on
21 reapportionment?
22 A.        I do.
23 Q.        Before going any further, can you please
24 state and spell your name for the record?
25 A.        **James H. McClendon, M-c-C-L-E-N-D-O-N.**
                                                    Page 9

1 Q.        And your first name, as well, please.
2 A.        **J-A-M-E-S.**
3 Q.        Have you ever been deposed before?
4 A.        **Yes.**
5 Q.        When?
6 A.        **Roughly ten years ago during**
7 **redistricting last time.**
8 Q.        And what was your role in the
9 litigation?
10 A.        **I was house chairman of redistricting at**
11 **that time.**
12 Q.        Were you a defendant?
13 A.        **Yes.**
14 Q.        Were you -- have you been involved in
15 any other cases?
16 A.        **Any?  No.**
17 Q.        You are sworn and under oath.  Do you
18 understand that for purposes of my questioning, you
19 must testify truthfully and as completely as
20 possible as though we were before a judge in a
21 courtroom?
22 A.        **Yes.**
23 Q.        Is there any reason you cannot give
24 truthful and complete testimony today?
25 A.        **No.**
                                                    Page 10

1 Q.        Are you taking any medication that might
2 affect your ability to understand the questions that
3 I ask or provide answers to those questions?
4 A.        **No.**
5 Q.        Do you have any condition that would
6 affect your ability to understand the questions that
7 I ask and provide answers to the questions?
8 A.        **No.**
9 Q.        Do you understand that today's
10 deposition is being conducted via web
11 videoconference?
12 A.        **Yes.**
13 Q.        Do you understand that a court reporter
14 is transcribing this deposition, meaning that they
15 are writing down everything that you, your counsel,
16 and I say today?
17 A.        **Yes.**
18 Q.        It's important that all of your answers
19 are verbal.  This will allow the court reporter to
20 record our statements.  The court reporter won't be
21 able to record gestures or nodding.  Do you
22 understand?
23 A.        **I do.**
24 Q.        Likewise, it's important that we don't
25 speak over one another.  I will wait until you
                                                    Page 11

1 finish your answer, and I ask that you please wait
2 until I finish my question before answering.  Do you
3 understand?
4 A.        **I do.**
5 Q.        If you don't understand a question that
6 I ask, please just let me know, and I'll rephrase
7 it.  If at any point you recall additional
8 information that is responsive to a question that I
9 asked you earlier, please let me know, and I will
10 allow you to clarify the record.  Do you understand?
11 A.        **I do.**
12 Q.        Please do not guess or assume when
13 answering.  Be sure to state only that which you
14 know to be true based on your personal knowledge.
15 Will you do that?
16 A.        **Yes.**
17 Q.        You may hear your attorney, Mr. Walker,
18 object to a question from time to time.  His
19 objections are being made for the record, and you
20 are still required to answer my question unless you
21 are instructed by your attorney not to answer.  Do
22 you understand?
23 A.        **I'm not sure about that.  Maybe say it**
24 **again.  Let me hear you say that one more time.**
25 Q.        You may hear your attorney object to a
                                                    Page 12

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

| | |
|---|---|
| 1 question from time to time throughout this | 1 A.        Correct.  Yes, it is. |
| 2 deposition.  Those objections are made largely for | 2          MR. WALKER:  Kathryn, can I ask that |
| 3 the record.  And you understand you are still | 3 this personal information be redacted with anything |
| 4 required to respond to my question unless you are | 4 you file with the court? |
| 5 instructed by your attorney not to? | 5 Q.        Do you have any other phone numbers? |
| 6 A.        Okay. | 6 A.        Well, I do have a phone in my office in |
| 7 Q.        Do you understand that? | 7 the Alabama state house, but I'm not sure what the |
| 8 A.        I've got it. | 8 number is. |
| 9 Q.        Is that a yes? | 9 Q.        Do you have an email account? |
| 10 A.        Yes. | 10 A.        I do.  I have two. |
| 11 Q.        Thank you. | 11 Q.        And what are they? |
| 12          Since we're conducting this deposition | 12 A.        My personal email is |
| 13 remotely and we're not together in the same room, I | 13 jimmcc@windstream.net.  My senate email is |
| 14 ask that you please keep your cell phone off unless | 14 jim.mcclendon@alsenate.gov. |
| 15 we are on a break.  Can you do that? | 15 Q.        Do you have any personal social media |
| 16 A.        I understand. | 16 accounts? |
| 17 Q.        Please don't refer to any documents or | 17 A.        Facebook, yes. |
| 18 other materials during our conversation today.  Will | 18 Q.        You just have a Facebook account? |
| 19 you do that? | 19 A.        Correct. |
| 20 A.        Did you say don't refer to any materials | 20 Q.        No Twitter? |
| 21 or documents today?  Is that what you said? | 21 A.        No Twitter. |
| 22 Q.        Do you have any documents with you? | 22 Q.        And where were you born? |
| 23 A.        I do not. | 23 A.        Mobile, Alabama. |
| 24          MR. WALKER:  Oh, did you mean don't look | 24 Q.        And where did you go to high school? |
| 25 at any documents? | 25 A.        Springville, Alabama. |
| Page 13 | Page 15 |
| 1 Q.        Do you have any -- if you don't have any | 1 Q.        Where did you go to college? |
| 2 documents with you, please don't look at any | 2 A.        My undergraduate degree is from |
| 3 documents other than those that I will give you.  Do | 3 Birmingham Southern College in Birmingham, and my |
| 4 you understand that? | 4 doctorate is from the University of Houston, |
| 5 A.        I do. | 5 Houston, Texas. |
| 6 Q.        Thank you.  Sorry for all the | 6 Q.        And what is your doctorate in? |
| 7 preparatory language. | 7 A.        Optometry. |
| 8          Finally, if you need a break at any | 8 Q.        And what courses did you take at |
| 9 time, please just let me know.  If there's a | 9 Birmingham Southern? |
| 10 question pending, I just ask that you answer that | 10 A.        Just pretty much premed-type courses. |
| 11 question before going on a break.  Do you | 11 Q.        And have you studied anywhere else? |
| 12 understand? | 12 A.        No, other than continuing education |
| 13 A.        I do. | 13 courses required to maintain my optometry license. |
| 14 Q.        Thank you. | 14 Q.        So you are an optometrist? |
| 15          I'm going to ask you some background | 15 A.        Correct.  Yes, I am. |
| 16 questions to get to know you a little bit better. | 16 Q.        Have you -- are you married? |
| 17          What is your date of birth? | 17 A.        I am. |
| 18 A.        1-10-43. | 18 Q.        How long have you been married? |
| 19 Q.        That's January 10, 1943? | 19 A.        26 years. |
| 20 A.        Correct. | 20 Q.        Congratulations. |
| 21 Q.        What's your address? | 21          Do you have kids? |
| 22 A.        361 Jones Road, Springville, Alabama. | 22 A.        I do. |
| 23 Q.        And your telephone number? | 23 Q.        How many? |
| 24 A.        (205)999-8096. | 24 A.        One child. |
| 25 Q.        Is that a mobile phone number? | 25 Q.        One child.  And how old are they? |
| Page 14 | Page 16 |

Caster Plaintiffs' Exhibit 90, Page 5

Evan Milligan,et al v. John H.Merrill, et al.                    Jim McClendon
                                                                  12/17/2021

| | |
|---|---|
| 1 A. She is 50. | 1 Q. Did you review any documents? |
| 2 Q. And what does she do for a living? | 2 A. Yes. |
| 3 A. A school teacher. | 3 Q. Which documents? |
| 4 Q. In Alabama? | 4 A. There were two. Actually, I can't say I |
| 5 A. Yes. | 5 reviewed them. I looked at the cover. One of them |
| 6 Q. Where? | 6 had to do with the notes -- the bullet points we |
| 7 A. In the Jefferson County system. | 7 used on the floor, in my case on the floor of the |
| 8 Q. And where do you work? | 8 senate. |
| 9 A. I'm a -- I'm retired from optometry. | 9    And the other one -- I can't even |
| 10 Q. So you are not employed currently? | 10 remember what the other one was. But I gave them |
| 11 A. As an optometrist, no, I am not. | 11 back to my attorney. I didn't take them home and |
| 12 Q. Are you employed anywhere currently? | 12 read them or study them. |
| 13 A. Only as an Alabama senator. | 13 Q.    So I am going to try to drop in the chat |
| 14 Q. So you're working as an Alabama senator? | 14 a document that I'll ask the court reporter to mark |
| 15 A. Well, I am a senator, and we do work | 15 as Exhibit 1. And I can show it on my screen, as |
| 16 from time to time. | 16 well. |
| 17 Q. Are you paid? | 17    Is this the document that you reviewed |
| 18 A. Yes. | 18 in advance of your deposition today? Let me share |
| 19 Q. Do you know why you're here today? | 19 my screen. |
| 20 A. Yes. | 20    Senator McClendon, is this the document |
| 21 Q. Why? | 21 that you were referring to? |
| 22 A. A lawsuit concerning redistricting that | 22 A.    I really can't read that. I see talking |
| 23 we just completed in the Alabama legislature. | 23 points -- okay. Scroll it up and let me see it. |
| 24 Q.    Did you read the complaint in the case | 24 Well, that looks similar. I don't know if that's |
| 25 in which you're sitting for a deposition today? | 25 exactly the same document. But that's sort of the |
| Page 17 | Page 19 |
| 1 A.    I didn't quite understand. Did you say | 1 format that was used. |
| 2 will you read or did you read? | 2 Q.    I'll represent that this was produced in |
| 3 Q. Did you read. | 3 this litigation and that I have given it to the |
| 4 A. I have not read it, no. | 4 court reporter and hopefully you also have a copy. |
| 5 Q. Do you know what the case is about? | 5    And what was this document? |
| 6 A. Yes. This case has to deal with the | 6 A.    What you and I were just discussing was |
| 7 congressional districts. | 7 talking points that I was provided by our attorney |
| 8 Q. Are you represented by counsel today? | 8 when the issue of the congressional map came before |
| 9 A. I am. | 9 the senate as a body. |
| 10 Q. Who is your counsel? | 10 Q.    And who gave you this document? |
| 11 A. Dorman Walker. | 11 A. Pardon? |
| 12 Q.    And how did you prepare for this | 12 Q. Who gave that document to you? |
| 13 deposition today? | 13 A.    One of the staff members of the |
| 14 A.    I came in yesterday and we met for a | 14 redistricting -- not committee, but the |
| 15 couple of hours and we sort of talked about how this | 15 redistricting department there in the state house. |
| 16 works and what to expect. But that was the only | 16 Q.    What is the difference between the |
| 17 preparation. | 17 redistricting committee and the redistricting |
| 18 Q. And who is "we"? | 18 department? |
| 19 A. Jim Davis was here and Chris -- | 19 A.    Well, the redistricting office is |
| 20 Representative Pringle was here and I was here. So | 20 staffed by state employees. And the redistricting |
| 21 it was four of us present. | 21 committee is composed of elected senators and |
| 22 Q.    So you -- the only preparation you did | 22 representatives. |
| 23 for this deposition was to meet with Chris Pringle, | 23 Q.    So you were given this document when? |
| 24 Jim Davis, and Mr. Walker yesterday for a few hours? | 24 A.    Well, prior to it going on the floor for |
| 25 A. That is correct. | 25 debate, and not much sooner than that. |
| Page 18 | Page 20 |

Caster Plaintiffs' Exhibit 90, Page 6

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 Q.         Prior to what going on the floor for
2 debate?
3 A.         The congressional bill.
4 Q.         And do you remember when that was?
5          MR. WALKER:  Hang on.  Kathryn, when you
6 say "this document," are you talking about Talking
7 Points for Likely Issues No. 1?  Or are you talking
8 about the collection of talking points?
9 Q.         Well, does that change your answer?
10 A.         Well, I don't think it does.  I got that
11 prior to the bill going on the floor for debate.  In
12 fact, I may have gotten it prior to the committee --
13 the standing committee meeting.  That would -- that
14 would make sense.
15 Q.         And what standing committee meeting are
16 you talking about?
17 A.         The bills that -- the redistricting
18 committee is considered an interim committee.  And
19 the bills that come out of interim committees must
20 go to a standing committee before they can go to
21 rules in order to get on the floor.
22          So there was a standing committee --
23 which happened to be general fund -- that was
24 handling not only a general fund bill but all the
25 redistricting bills, as well.  So that would have

Page 21

1 Q.         Besides the talking points, what other
2 documents did you look at?
3 A.         It may have been a summary of this
4 lawsuit.  But I'm not -- Kathryn, I'm really not --
5 I really don't remember what it was.  I didn't pay
6 much attention to it.
7 Q.         You say "a summary of this lawsuit."
8 Would you mind giving me a summary of this lawsuit?
9 A.         I can't do it.  Sorry.  I wish I could.
10 Q.         You testified earlier that you were a
11 party to a lawsuit in the last redistricting cycle;
12 is that correct?
13 A.         Correct.
14 Q.         Was that a redistricting case?
15 A.         Yes.
16 Q.         And you were deposed?
17 A.         Yes.
18 Q.         Did you testify at trial?
19 A.         I'm sorry.  I didn't understand you.
20 Q.         Sorry.  Did you testify at trial?
21 A.         Yes.
22 Q.         And what was that case about?
23 A.         That case, I believe, was -- legislative
24 was the target, not congressional.  The issue was --
25 Q.         And when you say --

Page 23

1 been the standing committee that this bill went to
2 after it came to the senate from the house.
3 Q.         You said you reviewed the talking points
4 that we discussed.  And what else before this
5 deposition?
6 A.         What did I review?  Well, no.  The
7 talking points was the -- that was the purpose of
8 having the talking points, is I had a summary of the
9 main points that needed to be shared with the
10 standing committee members so they would be able to
11 vote however they wanted to.
12 Q.         I'm sorry.  I meant -- just going back,
13 what documents other than this talking points did
14 you look at to prepare for this deposition today?
15 A.         Well, I looked at a number of documents
16 during the process of the bill going through the
17 redistricting committee.  But there wasn't anything
18 in particular that I did to review that prior to the
19 meeting of the standing committee.  They were all
20 summarized.  So --
21 Q.         For this deposition, though, you
22 mentioned that you met yesterday with Mr. Davis,
23 Mr. Walker, and Mr. Pringle and that you looked at
24 several documents.
25 A.         Yes.

Page 22

1 A.         I'm sorry.
2 A.         I'm sorry.
3 A.         It's my turn?
4          My point is that case was not
5 congressional.  That had do with house and senate
6 districts.
7 Q.         And when you say "the target," you mean
8 what?
9 A.         That the object, the goal of the case
10 was to challenge the way house and senate districts
11 were drawn.
12 Q.         And do you remember under what law those
13 were challenged?
14 A.         No.
15 Q.         So let's talk about your career in
16 public service.  When were you first elected to
17 public office?
18 A.         2001.
19 Q.         And what were you elected -- where were
20 you elected?
21 A.         What or where?  Which one do you want?
22 I was elected --
23 Q.         What district (inaudible.)
24 A.         Alabama house of representatives, House
25 District 50.

Page 24

Caster Plaintiffs' Exhibit 90, Page 7

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 Q.          And did you run as a -- with the support
2 of a political party?
3 A.          Well, there was a primary with
4 republican -- I don't think the republican party
5 endorsed any of the republican candidates.
6 Q.          You ran as a republican?
7 A.          Yes, I did.
8 Q.          Why did you run as a republican?
9 A.          Why did I run as a republican?  Is that
10 what you said?
11 Q.          Yes, sir.
12 A.          Because I am a republican.
13 Q.          What does it mean to be a republican?
14 A.          I would say the first word that comes to
15 mind would be "conservative."  And that would be
16 socially conservative and fiscally conservative.
17 Q.          And when you say "socially
18 conservative," what do you mean?
19 A.          It has to do with policies that we make
20 that are conservative in nature.
21 Q.          And what is a policy that is
22 conservative in nature?
23 A.          I would say one of the things that
24 conservatives believe in is law and order.
25 Q.          Okay.  So how long did you serve in
Page 25

1 house district 50?
2 A.          I served three four-year terms.  I went
3 into office -- well, I went into office in 2021.  So
4 three four-year terms.
5 Q.          And are you currently a member of the
6 house of representatives?
7 A.          No.  I'm a member of the Alabama senate.
8 Q.          And when were you first elected to the
9 Alabama senate?
10 A.          It must have been '14.  Yeah, 2014.
11 Q.          Prior to --
12 A.          Your turn.
13 Q.          I'm so sorry.  I said don't cut each
14 other off, and I'm cutting you off.  I'm sorry.
15 A.          I answered your -- 2014, which is the
16 answer to the question.
17 Q.          Thank you.  Sorry again.
18           What legislative committees have you
19 served on during your very long tenure in the
20 Alabama legislature?
21 A.          Well, in the senate, I'm currently on
22 the health committee, I am on the general fund
23 committee, I am on the education trust fund
24 committee, and I am on education policy.  And I
25 chair the health committee.
Page 26

1 Q.          Those are all of the committees that you
2 have ever served on?
3 A.          No.  No.  In the house, I served on
4 several different committees over three terms.  And,
5 of course, I served on redistricting, as well, ten
6 years ago and became -- and was house chair of
7 redistricting.
8 Q.          And when you say "redistricting," you
9 mean the permanent -- the Alabama legislative
10 committee on reapportionment?
11 A.          That's exactly what I mean.
12 Q.          Okay.  So if I say redistricting for the
13 reapportionment committee or if you say those
14 things, you mean the permanent committee on
15 reapportionment?
16           Is that a yes?
17 A.          You know, there's a little difference in
18 there.  During the interim years where there's not
19 redistricting activity going on, there is a
20 permanent redistricting committee composed of three
21 members of the house and three of the senate.
22           And then as we approach the
23 redistricting time period where the activity goes
24 up, then -- then it converts over to 11 and 11 for
25 the actual process.
Page 27

1 Q.          That makes sense.  So it's the same
2 committee, just getting bigger or larger or smaller
3 based on the time period?
4 A.          Correct.
5 Q.          What was your role in Alabama's 2011
6 redistricting process?
7 A.          I was house chairman.
8 Q.          And what are the responsibilities of the
9 house chairman for redistricting?
10 A.          Well, part of -- essentially part of a
11 leadership team that makes preparations for the
12 actual process, meets with the attorney and can meet
13 with the person that draws the maps, and begins
14 discussions and review, for example, of our
15 guidelines to see if they need to be updated or
16 changed, and also help time the scheduling of the
17 actual meeting of the full redistricting committee.
18 Q.          Do you have any other responsibilities?
19 A.          No.  I think that pretty well summarizes
20 it.  I'm sure there's some other things that we do
21 that are not big items.  But I think that summarizes
22 the things worth discussing.
23 Q.          And when you said you meet with the
24 attorney and you -- as the cochair, you meet with
25 the attorney and you meet with the person who draws
Page 28

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 the map, what do you -- what do you do during those
2 meetings?  Or what is your role during those
3 meetings?
4          MR. WALKER:  I'll instruct you not to
5 discuss anything that I may have told you or you may
6 have told me during those meetings.
7 A.         Yes, ma'am.  Do you mind me correcting
8 you on a phrase?
9          Actually, if you look at the law, there
10 is a house chair and a senate chair.  They are not
11 cochairs, although that seems to be a well-kept
12 secret.  But now you know.
13          So now --
14 Q.        The secret is out.
15          So as the house chair of the
16 redistricting committee, what do you mean -- what
17 was your responsibility with respect to your
18 meetings with the attorney and the meetings with the
19 person who draws the map?
20          MR. WALKER:  Same instruction.
21          THE WITNESS:  Okay.  Well, stop me if I
22 go astray here.
23          MR. WALKER:  Okay.
24 A.         Of course, probably the single most
25 important role of the attorney is to help the

Page 29

1 elected members of this committee know what the law
2 is and what -- and keep us up to date on recent
3 court cases so we can do our best to be in
4 compliance with what the law says and what the
5 courts have subsequently interpreted.
6 Q.        So as the house chair of the
7 reapportionment committee, what were -- what was
8 your role in those meetings?
9 A.         Well, I guess my role was to be there
10 and to make sure that we stay -- are we -- I guess
11 we're talking generically here.  We're not talking
12 about 2011 or 2021.  Are we just talking about being
13 a chair, a redistricting chair?  Is that what the
14 discussion is?  Or are we talking about a certain
15 time period?
16 Q.        So when I asked you what your
17 responsibilities were as house chair of the
18 reapportionment committee, you said, among other
19 things, you meet with the attorney, you meet with
20 the person who draws the map, meeting with the
21 reapportionment committee.  And I'm just asking what
22 you meant by that as your role.
23          What was your role in those meetings
24 with the attorney and with the drawer?
25 A.         To discuss the -- one of the issues, of

Page 30

1 course, is the time schedule on when we can carry
2 out the duties and when we need to carry out the
3 duties.  And then another thing has to do with
4 making sure that we stay in compliance with the
5 courts and the law and recent court cases.
6 Q.        Who selected the attorney?
7          MR. WALKER:  At what time are you
8 talking about?
9          MS. SADASIVAN:  In 2011.
10 A.        I do not know the answer to that.
11 Q.        Did you have any involvement in the
12 selection of the attorney --
13 A.        No.
14 Q.        -- for the reapportionment committee?
15 A.        No.
16 Q.        Did you have any role in the selection
17 of the demographer as the house chair of the
18 reapportionment committee?
19 A.        No.
20 Q.        Do you know who made the decision?
21 A.        I do not.
22 Q.        How were you selected to serve as the
23 house chair of the reapportionment committee?
24 A.        By the speaker of the house.
25 Actually --

Page 31

1 Q.        Who was that?
2 A.        -- I was -- he selected me to be on the
3 committee.  And then the house members on that
4 committee elected the house chair.
5 Q.        I see.  So you were elected by the other
6 house members of the reapportionment committee to
7 serve as the house chair?
8 A.         Correct.
9 Q.        And who was the senate chair of the
10 reapportionment committee in 2011?
11 A.         Gerald Dial.
12          THE REPORTER:  Gerald who?
13 A.         D-I-A-L.
14 Q.        And was the starting point -- what was
15 the starting point for drawing the congressional
16 maps in 2011?
17 A.         The starting point would be the existing
18 lines.
19 Q.        What existing lines?
20 A.         The congressional lines that were
21 current at that time.
22 Q.        And how did you go about deciding how to
23 update those lines based on the census data in 2011?
24 A.         Actually, I didn't make those decisions.
25 Q.        Who did?

Page 32

Page: 8 (29 - 32)

**Caster Plaintiffs' Exhibit 90, Page 9**

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

---

1 A.          The map drawer met with and talked to
2 the members of the congressional delegation.  And,
3 of course, once we had the data, the population
4 numbers, then they knew if a district needed to have
5 an increase or a decrease in population.
6 Q.          Did the legislature conduct public
7 hearings in the redistricting process?
8 A.          Yes.
9 Q.          Following the (inaudible.)
10 A.         What was the last thing you said?
11 Following?
12 Q.          The 2010 census.
13 A.         Yeah, the -- correct, we did have public
14 hearings.
15 Q.          How many?
16 A.         22.
17 Q.          And when did those hearings occur?
18 A.         I just -- I do not remember.  I don't
19 remember those dates.
20 Q.          How many meetings did the
21 reapportionment committee hold in 2011?
22 A.         I can't tell you exactly.  I don't know
23 the exact number.  I don't -- I don't remember the
24 exact number.
25 Q.          Was it more than one?

Page 33

---

1 A.          Yes.
2 Q.          Was it more than two meetings?
3 A.          I'm sorry?  What was the last word you
4 said?  It came out fuzzy.
5 Q.          Was it more that two meetings?
6 A.          I'm just guessing.  And I can't answer
7 that question because I don't remember.
8 Q.          What was the role of the reapportionment
9 committee in the map drawing process in 2011?
10 A.         Are we talking congressional maps?
11 Q.          Yes.
12 A.         The role of the reapportionment
13 committee was to take the map that was submitted,
14 that was put together by the -- with the approval of
15 the congressional delegation, and to approve or
16 disapprove that map and submit it for introduction
17 to the legislature.
18 Q.          And how did the committee go about
19 approving or disapproving of the map drawn?
20 A.         A roll call vote.
21 Q.          Were members given any guidance on how
22 to vote?
23 A.         I don't quite understand that -- that
24 question, were they given guidance.
25 Q.          Any information on how to vote or how to

Page 34

---

1 look at a map?
2 A.          Well, the map and the data was put
3 before them at the committee meeting.
4 Q.          I'm dropping into the chat and I will
5 ask the court reporter to mark as McClendon Exhibit
6 2 --
7          MR. WALKER:  Kathryn, what was Exhibit
8 1?  I'm sorry.  Was that the talking points?
9          MS. SADASIVAN:  Yes, sir.
10          MR. WALKER:  Okay.  Let me -- let me --
11 I'm your secretary in this.  So let me take care of
12 it.
13          MS. SADASIVAN:  Oh, thank you so much,
14 Dorman.  I'm sorry about that.  I appreciate it.
15          MR. WALKER:  We're a full-service law
16 firm.
17          MS. WELBORN:  I'm happy to play the
18 role.
19          MR. WALKER:  Well, I've got them spread
20 out over here.
21
22          (Plaintiff's Exhibit 1 was
23          marked for identification.)
24
25 Q.          Senator McClendon, do you have the

Page 35

---

1 document that I've asked the court reporter to mark
2 as McClendon Exhibit 2 in front of you?
3          MR. WALKER:  I'm sorry.  Which one is
4 it?  Tell me.
5 A.          Exhibit what?
6          MR. WALKER:  No.  Don't say anything.
7 Exhibit 2, just tell me what it is.
8 Q.          Do you recognize the document in front
9 of you?
10          MS. WELBORN:  What is the document,
11 Kathryn?  Which one is it?
12          MS. SADASIVAN:  I just dropped it into
13 the chat.  It is the 2011 legislative
14 reapportionment committee guidelines.
15          MR. DAVIS:  The chat is not going to
16 work because the system is pretty far away from us
17 all.  Nobody can get to the chat easily.
18          MS. SADASIVAN:  Okay.  Would it help if
19 I pull it up so you can see it?
20          MR. WALKER:  The May 2011 guidelines?
21          MS. SADASIVAN:  This is the document
22 we're looking at.
23
24          (Plaintiff's Exhibit 2 was
25          marked for identification.)

Page 36

---

**Caster Plaintiffs' Exhibit 90, Page 10**

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

```
 1
 2 Q.            Do you recognize this document, Senator
 3 McClendon?
 4 A.            Yes.  It looks -- it looks familiar.
 5 Q.            How do you recognize this document?
 6 A.            The first part of what you said was cut
 7 off.  Say it again.
 8 Q.            How do you recognize this document?
 9 A.            How do I recognize it?  I mainly
10 recognize it by the fact that it's reapportionment
11 committee guidelines.  And I recall going through
12 that process and the adoption of those guidelines.
13 Q.            Do you know who drafted the document?
14 A.            Did I draft the document?
15 Q.            Do you know who drafted the 2011
16 reapportionment --
17 A.            Do I know who drafted it.  I think I
18 have a good idea.  But I can't say that I'm a
19 hundred percent certain who drafted the document.
20 So the answer to the question would be no.
21 Q.            Who do you think drafted it?
22 A.            I imagine it was our attorney at the
23 time.  But I'm just not sure about that.
24 Q.            Can you read please on Page 1 under May
25 2011 the paragraph beginning with "Pursuant"?
                                          Page 37
```

```
 1 Q.            It's in the sentence beginning with
 2 "Accordingly."
 3 A.            Yeah, I see it.
 4               Well, that means the committee, the
 5 reapportionment committee, adopted the guidelines,
 6 had a vote and said that's our guidelines.
 7 Q.            Will you please go to page two and read
 8 under numeral III Voting Rights Act, and read the
 9 two paragraphs below it?
10 A.            "Districts shall be drawn in accordance
11 with the laws of the United States and the State of
12 Alabama, including compliance with protections
13 against the unwarranted retrogression or dilution of
14 racial or ethnic minority voting strength.  Nothing
15 in these guidelines shall be construed to require or
16 permit any districting policy or action that is
17 contrary to the U.S. Constitution or the Voting
18 Rights Act."
19               Number 2, "Redistricting plans are
20 subject to the preclearance process established in
21 Section 5 of the Voting Rights Act."
22 Q.            I'm sorry.  I'll just have you read Page
23 4, Paragraph 2 and 3 under Plans Produced by
24 Legislators.  2, 3, and 4.  I apologize.
25 A.            2, 3, and 4 under Roman numeral V.  Is
                                          Page 39
```

```
 1 A.            I see that.
 2 Q.            Could you read it, please?
 3 A.            To myself or to you?
 4 Q.            Out loud.  Thank you.
 5 A.            "Pursuant to the constitution of the
 6 United States and the Constitution of the State of
 7 Alabama, the Alabama state legislature is required
 8 to review 2010 federal decennial census data
 9 provided by the U.S. Bureau of the Census to
10 determine if it is necessary redistrict Alabama's
11 congressional, legislative, and state board of
12 education districts because of population changes
13 since the 2000 census.
14               Accordingly, the following guidelines
15 for congressional, legislative, and state board of
16 education redistricting have been established by the
17 legislature's permanent joint legislative committee
18 on reapportionment, (hereinafter referred to as the
19 'reapportionment committee.')
20               There you go.
21 Q.            Thank you.
22               In the paragraph that you just read
23 where you said that the guidelines were established
24 by the committee, what does that mean?
25 A.            Okay.  Let me find it.
                                          Page 38
```

```
 1 that what you're asking for?  It must be.  That's
 2 the only 2, 3, and 4 on the page.
 3               "A proposed redistricting plan will be
 4 public information upon its introduction as a bill
 5 in the legislative process, or upon presentation for
 6 consideration by the reapportionment committee."
 7               "Access to the legislative
 8 reapportionment office computer system, census
 9 population data, and redistricting work maps will be
10 available to all members of the legislature upon
11 request.  Reapportionment office staff will provide
12 technical assistance to all legislators who wish to
13 develop proposals."
14               Number 4, "In accordance with Rule 23 of
15 the joint rules of the Alabama legislature (2011)
16 all amendments or revisions to the redistricting
17 plans, following introduction as a bill, shall be
18 drafted by the reapportionment office."
19 Q.            I'm going to ask you to quickly scan the
20 lest of the guidelines and then let me know if you
21 followed those guidelines in 2011.
22               MR. WALKER:  Objection to form.  You may
23 answer the question.
24 A.            Yes, ma'am, it's my belief that we
25 followed the guidelines.
                                          Page 40
```

Page: 10 (37 - 40)

Caster Plaintiffs' Exhibit 90, Page 11

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 Q.        And how did you go about following the
2 guidelines in the map-drawing process?
3 A.        Well, you just read the guidelines and
4 try to stay -- and try to do what it says.
5 Q.        What action did you take to make sure
6 that the guidelines were followed?
7 A.        What action did I take to make sure they
8 were followed.  I consulted with the attorney and
9 with the person drawing the map to make sure that
10 they were following the rules that we had before us.
11 Q.        And how did you do that?
12 A.        I just looked them in the eye.
13 Q.        You looked them in the eye and what?
14 A.        And said, "Are we staying within the
15 guidelines?"  I'm not even sure I said that.  We did
16 -- we did talk about the importance of the
17 guidelines.  And it was understood everybody would
18 use that as exactly what they're called, guidelines.
19 Q.        And so when you said you talked about
20 the guidelines and that they were important, were
21 you explaining the guidelines to the demographer?
22 A.        I was not explaining them, no.  We would
23 talk about them from time to time.  But it was just
24 so well known that we followed the guidelines.
25 That's what we did.  That's our job.
                                              Page 41

1 Q.        Do you know if anyone else talked to the
2 person -- the attorney or to the map drawer about
3 the guidelines?
4 A.        Do I know?  No, I do not.
5 Q.        How many congressional redistricting
6 plans were considered by the reapportionment
7 committee in 2011?
8 A.        I don't recall.
9 Q.        How did the reapportionment committee
10 decide on which Alabama congressional map to
11 introduce?
12 A.        We took the map that the members of the
13 congressional delegation had -- proved to be
14 satisfied with.
15 Q.        That was the starting point in the 2001
16 map?
17 A.        Yes.
18 Q.        Was the goal in drafting to make sure
19 the congressional districts remained roughly the
20 same as in 2001?
21 A.        One of the goals is that we keep the
22 core of the districts recognizable, or we attempt to
23 do that.
24 Q.        Was it a primary goal to keep the same
25 racial demographics for each district?
                                              Page 42

1 A.        To keep the what demographics?
2 Q.        The racial demographics.
3 A.        Racial demographics.  In 2011, you know,
4 I don't know the answer to that.
5 Q.        Was it a primary goal to keep District 7
6 the same black population as in 2001?
7 A.        I do not know the answer to that
8 question.
9 Q.        Did you consider race in drawing any of
10 the districts in 2011?
11 A.        No.
12 Q.        Why was there only one district with a
13 majority black voting age population in 2011?
14         THE REPORTER:  I'm sorry.  Could you say
15 that question over?
16 Q.        Why was there only one district with a
17 majority black voting age population in 2011?
18 A.        Well, I -- I don't need to speculate.  I
19 will say I do not know why.
20 Q.        What is Section 5 of the Voting Rights
21 Act?
22 A.        Section 5 has to do with racial
23 injustice or racial problems when it comes to
24 elections.  And it provides some solutions to that.
25 Or remedy, I should say.
                                              Page 43

1 Q.        What is a racial problem?
2 A.        What is a racial problem?  Are you
3 asking for an example or something?  I don't quite
4 -- I don't understand your question, what is a
5 racial problem.
6 Q.        I'm asking you what you meant by your
7 statement.  Do you want your court reporter to read
8 your answer about what Section 5 is back?
9 A.        To make sure that every -- every group,
10 subgroup, race had a fair opportunity to express
11 themselves at the polls.
12 Q.        And why did Section 5 apply to Alabama?
13         THE REPORTER:  I'm sorry.  What?
14 Q.        Why did Section 5 apply to Alabama?
15 A.        You know, I could -- I could guess at
16 that.  But I don't want to do that.  So I'll say I
17 don't know.
18 Q.        You don't know why Section 5 applied to
19 Alabama?
20 A.        Like I said, I could guess at it.  But I
21 don't want to do that.  So I don't know.
22 Q.        And I'm just asking you don't know why
23 Section 5 applied to Alabama?
24 A.        Correct.
25 Q.        The guidelines mention preclearance
                                              Page 44

Page: 11 (41 - 44)

Caster Plaintiffs' Exhibit 90, Page 12

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 under Section 5 of the VRA.  What involvement did
2 you have in obtaining justice department
3 preclearance of a proposed congressional plan in
4 2011?
5 A.         None.
6 Q.         Did you have any role in proposing
7 judicial preclearance of the 2021 map?
8 A.         Did I have any -- I'm really having a
9 time understanding you.  Did I have any -- okay.
10 Say that -- say that again, please, ma'am.
11 Q.         Did you have any role in proposing
12 judicial preclearance in the redistricting process
13 in 2011?
14 A.         No.
15 Q.         Did you introduce any proposed
16 redistricting plans for the Alabama congressional
17 delegation in 2011?
18 A.         I do not recall if the bill started in
19 the house or in the senate.  I don't know.  So I
20 can't answer the question.
21 Q.         Did you introduce any redistricting
22 bills in the 2011 legislative session?
23 A.         Any redistricting bill.  So we've gone
24 outside of congressional.
25             Yes, I'm sure I introduced the house
Page 45

1 bill in the house.  I don't remember who did the BOE
2 bill, who started it.  I don't remember who started
3 the congressional bill.
4 Q.         Did you consider a plan permitting two
5 majority minority districts in 2011?
6 A.         Not to my knowledge.
7 Q.         Why?
8 A.         It wasn't brought before us.
9 Q.         It wasn't brought before who?
10 A.         That is correct.
11 Q.         Who?  You said, "It wasn't brought
12 before us."  It wasn't brought before who?
13 A.         The redistricting committee.
14 Q.         Did you have the opportunity to consider
15 a map with two majority minority districts in the
16 legislature?
17 A.         No, I don't think so.
18 Q.         You did not?
19 A.         I don't remember that at all, if we did.
20 Q.         I'm going to -- I'm dropping it in the
21 chat, as well, in case it's helpful.  I know it's
22 probably not.
23             I am going to show you what I ask the
24 court reporter to mark as McClendon Exhibit 3.  And
25 let me just share my screen quickly.  It is exhibit,
Page 46

1 and then the number after it is SOS 001929.  And
2 this is what the document looks like.
3             MR. WALKER:  Can you describe it,
4 please?
5             THE WITNESS:  Look up here.
6             MR. WALKER:  Oh, that.  Okay.  We've got
7 it.
8
9             (Plaintiff's Exhibit 3 was
10             marked for identification.)
11
12 Q.         Do you recognize this document, Senator
13 McClendon?
14 A.         No.
15 Q.         I will represent to you that this is a
16 news article produced by the secretary of state, a
17 defendant in this case.  In it, Brian Lyman is
18 discussing a plan put forward by Mr. Buskey which
19 would have created two majority minority districts.
20             And in this article, you were quoted as
21 saying -- on Page 2, the second paragraph on Page 2,
22 as saying, The Buskey plan would lead to
23 "retrogression," or a retreat from minority
24 population benchmarks set by the department of
25 justice.  Under the Voting Rights Act, the DOJ must
Page 47

1 approve the state's redistricting plan before it can
2 be implemented.  If the redistricting plan retreats
3 from the justice department benchmarks, such as
4 reducing minority population in a
5 previously-approved congressional district, the
6 state must show that it had no discriminatory
7 purpose in the move and did not reduce minority
8 voters' effective exercise of the electoral
9 franchise.
10             Does that sound familiar to you?
11             MR. WALKER:  Are you asking him if he
12 said that, or what?
13 Q.         I'm just asking if that helps refresh
14 your memory.
15 A.         Well, it provides a memory.  I don't --
16 I don't remember this.
17 Q.         So you don't know why you believed that
18 the map introduced by Representative Buskey would
19 have led to retrogression?
20 A.         So what did he introduce?  No.  I'm
21 really lost on trying to decipher this.
22 Q.         So is that -- did you say the quote that
23 I just read to you?
24 A.         I don't recall saying it.  I don't
25 recall the article.
Page 48

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 Q.         How about I give you a few minutes to
2 look through the article, and then I'll ask you some
3 questions again.
4              MR. WALKER:  Kathryn, we've been going
5 for about an hour, and I need to step out for a
6 second.  Would you mind if we took a five-minute
7 break?
8              MS. SADASIVAN:  If you don't mind, we'll
9 just finish this question after Senator McClendon
10 has a chance to look at it.  And then after that, we
11 can take a break.
12             MR. WALKER:  Certainly.  No problem.
13             MS. SADASIVAN:  Thank you so much,
14 Dorman.
15 **A.         I'm ready when you are.**
16 Q.         Do you have any reason to believe that
17 quote is inaccurate?
18 **A.         Now, what did you --**
19             MR. WALKER:  Which quote?
20 **A.         Yeah.  My question is what quote are you**
21 **talking about?**
22 Q.         On Page 2 of the exhibit I just shared
23 with you beginning with Rep Jim McClendon,
24 R-Springville, who carried the plan in the house.
25 There are two paragraphs where Senator McClendon
                                          Page 49

1 quoted.  And I'm asking if you have any reason to
2 believe that that quote is inaccurate.
3 **A.         Well, there are no -- the only quotation**
4 **marks are around the word "retrogression" and around**
5 **the words "effective exercise of the electoral**
6 **franchise."  There's no -- I don't see where I was**
7 **attributed a quote in those paragraphs.**
8 Q.         Do you have any reason to believe that
9 that paragraph discussing -- beginning with "Rep Jim
10 McClendon" and continuing on until "This plan, as
11 far as the justice department and Voting Rights Act
12 goes, it's a failure," do you have any reason to
13 believe that that is inaccurate?
14 **A.         Well, the only part that has quotes is**
15 **the one you just read.  And I do not recall making**
16 **that statement.**
17 Q.         So you don't think that that was an
18 accurate reflection of what you thought at the time?
19             MR. WALKER:  Objection to form.  You may
20 answer it.
21 **A.         I just -- I don't recall making the**
22 **statement.**
23 Q.         And you don't recall having the
24 opportunity to see two majority minority districts
25 in a congressional plan?
                                          Page 50

1 **A.         I do not.**
2              MR. DAVIS:  Are we breaking now?
3              MS. SADASIVAN:  No.  I'm sorry.  I asked
4 a question.
5              MR. DAVIS:  And he answered it.
6 Q.         You don't recall seeing two majority
7 minority districts in the Alabama congressional plan
8 in 2011?
9 **A.         I do not recall it.**
10 Q.         Okay.  Thank you so much.
11             MR. SADASIVAN:  We can take a break now.
12             MR. WALKER:  Thank you.
13             THE VIDEOGRAPHER:  We are off the
14 record.  The time is 3:09 p.m.
15             (Recess was taken.)
16             THE VIDEOGRAPHER:  We are back on the
17 record.  The time is 3:22 p.m.
18 Q.         Senator McClendon, I just want to
19 clarify really quickly Exhibit 3.  You stated that
20 you don't remember being interviewed for that
21 article, right?
22 **A.         I do not.**
23 Q.         And you don't remember saying anything
24 about retrogression?
25 **A.         Yes.  The answer is the same as it was**
                                          Page 51

1 **before.  I do not remember.**
2 Q.         If there was a plan in 2011 that
3 complied with all the districting principles and the
4 guidelines and created two majority minority
5 districts, would you have voted for it?
6 **A.         Okay.  Say that again.  We're having a**
7 **hard time.**
8              THE REPORTER:  I think if you would slow
9 down just a little bit, that would help.
10             MS. SADASIVAN:  If I come in a little
11 bit, is this better?
12             MR. WALKER:  No.  Slow down.
13 Q.         If there was a plan that complied with
14 the redistricting guidelines and created two
15 majority minority districts in 2011, would you have
16 voted for it?
17 **A.         Thank you.  I -- I understood you very**
18 **well.**
19 **          I would certainly have considered it and**
20 **would -- but part of that is looking at what else is**
21 **available.  So I would have put it on the list for**
22 **consideration, yes.**
23 Q.         Let's move to the 2021 redistricting
24 process.
25 **A.         Good.**
                                          Page 52

**Caster Plaintiffs' Exhibit 90, Page 14**

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 Q.          What was your role in the
2 reapportionment committee in 2021?
3 A.          Senate chair.
4 Q.          And what were your responsibilities as
5 senate chair?
6 A.          Pretty much the same as it was as house
7 chair, to confer with the attorney and the map
8 drawer, to help try to set the schedule of events as
9 they were going to unfold.
10 Q.          And when you say "confer with the
11 attorney and map drawer, I'm not asking for
12 attorney-client information.  But generally as
13 senate chair, what responsibilities did conferring
14 with the attorney and map drawer entail?
15 A.          Well, for quite some time, we were
16 trying to decide when we could actually get started
17 on the process.  And we spent a little bit of time
18 wondering when we were going to get the data.  We
19 spent a lot of time wondering when we were going to
20 get the data.  And we shared some speculation about
21 when it would show up.  So we did the timing of the
22 -- and sequence of events is one of the things
23 initially that we talked about.
24 Q.          And so conferring with the attorney and
25 the map drawer, you were trying to reach decisions
Page 53

1 about the timeline?
2 A.          Correct.
3 Q.          Anything else?
4 A.          That's the main -- at that point, that
5 was the main thing, when can we get started.
6 Q.          At what point?
7 A.          Was that a question?
8 Q.          Yes.  You said "at that point."  And I'm
9 just asking at what point was that the main --
10 A.          That was prior to receiving the data
11 from the census bureau.
12 Q.          And did your responsibilities to confer
13 with the attorney and the map drawer change after
14 you received census data?
15 A.          I'm not sure I understand your question.
16 Do it again and let me listen carefully.
17 Q.          You just shared that your
18 responsibilities before the census numbers came out
19 with respect to the attorney and the map drawer as
20 senate chair of the reapportionment committee was to
21 determine a timeline.
22          And I'm asking if your responsibilities
23 as senate chair of the reapportionment committee
24 with respect to conferring with the attorney and map
25 drawer changed once you received census data.
Page 54

1 A.          Well, no.  It was just part of a
2 continuum of setting the schedule and seeing when
3 things would work out, how things -- in what order
4 things needed to unfold in order to get the job done
5 in a timely manner.
6 Q.          And other than you and the map drawer
7 and the attorney, who else was involved in that
8 decision-making?
9 A.          Representative Pringle.
10 Q.          Anybody else?
11 A.          No.
12 Q.          So you, the attorney, Representative
13 Pringle, and the map drawer determined when you
14 would begin the public hearings or the
15 reapportionment committee meetings?
16 A.          Well, the staff, the reapportionment
17 staff, had some input into it.  Although the public
18 hearings, we gave -- we gave a time frame to the
19 community -- the community college system.  The
20 chancellor loaned us one of his personnel to help us
21 coordinate those public hearings.  And so he's the
22 one that actually set up the dates, locations, and
23 times for the public hearings.
24          I think we told him we wanted to get
25 this done the first couple of weeks in September.
Page 55

1 And then one of the representatives asked for
2 additional meetings, so it spilled over into the
3 third week into September.
4 Q.          So just going back to your role as
5 senate chair of the reapportionment committee and
6 your responsibilities to confer with the attorney
7 and the map drawer, what were -- the public hearings
8 -- strike that.
9          Going back to your role as senate chair
10 of the reapportionment committee and your
11 responsibilities to confer with the attorney and map
12 drawer, what other timelines did you discuss?
13 A.          We also needed to be able to give some
14 idea as to when we would actually be prepared for a
15 legislative session, for the governor to call a
16 special session to consider redistricting.
17 Q.          And how did you arrive at that
18 information of when that should be?
19 A.          There was -- we just sort of projected
20 forward saying we need -- we'll need X amount of
21 time for the public hearings and then we'll need X
22 amount of time to meet with the legislators and the
23 congressional delegation and the board of education.
24          And then we basically set a timeline and
25 said we can -- and then at this point we'll be ready
Page 56

Caster Plaintiffs' Exhibit 90, Page 15

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 to ask the governor to call a special session.
2 Q.        And were other members of the
3 reapportionment committee besides House Chair
4 Pringle involved in that decision?
5 A.        No.
6 Q.        When did you start planning for the 2021
7 redistricting process?
8 A.        We probably started thinking about it a
9 year and a half ahead of time or more, two years
10 maybe ahead of time.
11 Q.        And what were the first steps that you
12 took to prepare for the redistricting process?
13 A.        The first thing that I personally tried
14 to figure out was what the timeline was going to be.
15 And, of course, that proved to be futile because of
16 the delay in receiving the data and another delay
17 and another delay.
18 Q.        When was your first meeting on
19 redistricting in 2021?
20 A.        You know, I don't know the date.
21 Q.        Do you know who it was with?
22 A.        Are you talking about the redistricting
23 committee?  Or who are -- what kind of meeting are
24 you talking about?
25 Q.        I'm talking about a meeting between you,
Page 57

1 to it.
2        So we sort of had to work on that before
3 we actually announced it.  And I don't know the
4 final date that we came out with it.
5 Q.        And that's Representative Laura Hall?
6 A.        Yes.
7 Q.        And there was no deadline to decide on
8 public hearings?
9 A.        Well, there was a deadline.  June 30th.
10 Q.        Who set the deadline?
11 A.        But on June -- I think it was June 29th,
12 we received communication from her.  So we sort of
13 scrapped the deadline in order to the comply with
14 her request.
15 Q.        Is there a time to determine public
16 hearings set by law in Alabama?
17 A.        Ask that again, now.
18 Q.        Is there any law governing public
19 redistricting hearings in Alabama?
20 A.        Not to my knowledge.
21 Q.        Was there any committee deadline or a
22 committee -- rather a committee rule setting a
23 deadline to determine public hearings?
24 A.        Not to my knowledge.
25 Q.        Who developed the deadline on
Page 59

1 Senator McClendon, and any other person about
2 redistricting in 2021.
3 A.        Okay.  I don't know the answer to that
4 question.
5 Q.        What role did you play in setting the
6 schedule of the public hearings on redistricting?
7 A.        I talked to the chancellor of the
8 two-year system and asked him to designate someone
9 to work with our staff.  And then they worked it out
10 from there and came back with a schedule and a plan.
11 Q.        Did you review the locations of the
12 public hearings?
13 A.        Yes, I looked at what they put together.
14 And we were just about ready to announce it when
15 Representative Hall requested that we add some more,
16 which we did.
17 Q.        When were you preparing to announce the
18 dates and locations of the public hearings?
19 A.        You know, I don't know why I would
20 remember this, but I think June 30th was our target
21 date to do that.  And then I believe it was the day
22 before we got a letter, an email maybe -- I didn't
23 get it.  The staff received communications from one
24 of the members of our redistricting committee
25 requesting that there be another half dozen added on
Page 58

1 determining the time, location, and manner of public
2 hearings?
3 A.        I think the staff, in conjunction with a
4 representative from the community system, said we
5 feel like we can get it done by this date, and
6 actually communicated with members of the
7 redistricting committee for suggestions and asked
8 that they have those suggestions in by June 30.
9 Q.        When did you discuss public hearings
10 with the reapportionment committee?
11 A.        When did who?
12 Q.        When did you discuss -- you or other
13 members of the legislative delegation of the
14 reapportionment committee discuss the public
15 hearings?
16 A.        I don't know the answer.
17 Q.        What venues did you consider in
18 Montgomery for public hearings?
19 A.        Well, we held one at the -- public
20 one was at the state house.
21 Q.        Were there any others?
22 A.        I don't know the answer to that.  I
23 don't have that schedule in front of me.  I would be
24 surprised if we had more than one, but I don't know
25 for sure.
Page 60

**Caster Plaintiffs' Exhibit 90, Page 16**

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

| | |
|---|---|
| 1     MS. SADASIVAN:  I am going to drop into<br>2 the chat -- again, I know you all can't see it.  So<br>3 I will share my screen.<br>4          But I would ask the court reporter to<br>5 mark it as McClendon Exhibit 4.  It is a document<br>6 that says 2021 Legislative Reapportionment Public<br>7 Hearings Final.<br>8          Do you have that before you, Senator<br>9 McClendon?<br>10          MR. WALKER:  Give me just a second.<br>11<br>12          (Plaintiff's Exhibit 4 was<br>13          marked for identification.)<br>14<br>15          MR. WALKER:  Is this it?  Is that what<br>16 she's showing?<br>17          THE WITNESS:  That looks like it.  It's<br>18 hard to tell.  It does look similar to it.<br>19          MS. WELBORN:  That's it.<br>20 A.          Does yours start off with Drake State in<br>21 the upper left?<br>22 Q.          Yes, sir.<br>23 A.          Okay.  Then we probably have -- I<br>24 probably have that document before me, yes.<br>25 Q.          And can you look through that document<br>Page 61 | 1 A.          22.<br>2          MR. WALKER:  No.  Meetings.<br>3 A.          Oh, meetings.  I can think of two<br>4 meetings that we had.  I don't know if there was a<br>5 third or not.<br>6 Q.          What were the dates of those meetings?<br>7 A.          I'm thinking the first one was during<br>8 the legislative session, probably the very -- toward<br>9 the very end of the regular session, which would<br>10 have put it in May.  We did it because we had -- you<br>11 know, everybody was in town.<br>12          And then the next meeting that I am<br>13 thinking about was held just prior to the special<br>14 session that was called for consideration of the<br>15 bills, the redistricting bills.<br>16          MS. SADASIVAN:  So I am going to drop in<br>17 the chat an exhibit that I'll ask the court reporter<br>18 to mark as McClendon Exhibit 4.  I'm going to pull<br>19 it up on my screen and share my screen with you so<br>20 you can see it.<br>21          MR. WALKER:  I think this is five.<br>22          MS. SADASIVAN:  I'm sorry.  Five.  Thank<br>23 you.<br>24 Q.          Can you see my screen?<br>25 A.          Reapportionment Committee Redistricting<br>Page 63 |
| 1 and just see if you had any other public hearings in<br>2 Montgomery?<br>3 A.          Well, I don't see any.<br>4 Q.          Did you consider any historically black<br>5 colleges or universities when you were scheduling<br>6 the public hearings?<br>7 A.          Well, I wasn't doing the considering.<br>8 It was the staff in the two-year college.<br>9          The original idea started with having<br>10 these meetings at our two-year colleges because they<br>11 are spread all over the state.  And so that's why we<br>12 got a liaison from them to help schedule these<br>13 things.<br>14          So whether they -- I think I saw one<br>15 with Troy on here.  And if I recall -- yeah, here is<br>16 one at Trojan Center Ballroom.  And that's because<br>17 there was not a community college close by or<br>18 something like that.<br>19          So by and large, we focused on our<br>20 community college system to host us, to host these<br>21 meetings.  So --<br>22 Q.          How many meetings did --<br>23 A.          I'm sorry.  Go ahead.  Your turn.<br>24 Q.          I was just asking how many meetings did<br>25 the reapportionment committee hold in 2021?<br>Page 62 | 1 Guidelines, May 5th.  Okay.<br>2<br>3          (Plaintiff's Exhibit 5 was<br>4          marked for identification.)<br>5<br>6 Q.          Have you seen this document before,<br>7 Senator McClendon?<br>8 A.          Give me a second to look at it.  Yes.<br>9 It looks -- it looks familiar.<br>10 Q.          Where have you seen this document<br>11 before?<br>12 A.          Where?  At the state house.<br>13 Q.          How do you recognize it?<br>14 A.          I'm just looking at -- well, I look at<br>15 the title, I look at the date, I look at the plus or<br>16 minus 5 percent, and some of the other topics.  And<br>17 those all appear to be the guidelines that we --<br>18 that the redistricting or reapportionment committee<br>19 adopted prior to the map-making process.<br>20 Q.          And did you endeavor to comply with<br>21 these policies in the 2021 redistricting --<br>22 A.          Did I --<br>23 Q.          -- process?<br>24 A.          Did I try to comply with these policies?<br>25 Is that your question?<br>Page 64 |

Caster Plaintiffs' Exhibit 90, Page 17

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 Q.          Did you comply with these -- yes.  Did
2 you comply with these policies in the 2021
3 redistricting process as senate chair of the
4 reapportionment committee?
5 A.          I did.
6 Q.          Section II f states, "Districts shall be
7 drawn in compliance with the Voting Rights Act of
8 1965, as amended.  A redistricting plan shall have
9 neither the purpose nor the effect of diluting
10 minority voting strength, and shall comply with
11 Section 2 of the Voting Rights Act and the United
12 States Constitution."
13          How did you go about complying with
14 Section 2 of the Voting Rights Act?
15          MR. WALKER:  Are you -- may I ask,
16 Kathryn, are you talking about for the congressional
17 plan?
18          MS. SADASIVAN:  I'm asking -- he said
19 Senator McClendon tried to comply with these
20 guidelines as senate chair of the redistricting
21 committee.  I'm asking how in general did Senator
22 McClendon, as senate chair of the reapportionment
23 committee, go about ensuring compliance with this
24 particular policy.
25 A.          Well, subsequent to us adopting these

Page 65

1 guidelines, then I was dependent on the attorney,
2 Dorman Walker, and the map drawer during the
3 process, once they started actually putting lines
4 down on paper, to stay inside those guidelines.
5 Q.          So your role was overseeing the
6 map-drawing process to ensure that it complied with
7 the guidelines?
8 A.          One of my goals was to be in compliance
9 with the Voting Rights Act of 1965.  That was one of
10 my jobs.  And, of course --
11 Q.          It was your job to ensure compliance
12 with the Voting Rights Act of 1965?
13 A.          Yes.
14 Q.          And how did you go about doing that?
15 A.          Well, I counted on these experts that
16 were working for me and working for the committee to
17 follow those guidelines and be familiar with the
18 court cases and with the law and with the rulings.
19 Q.          And what is required to determine if a
20 map complies with Section 2 of the Voting Rights
21 Act?
22 A.          Say that again.  Once again -- something
23 about the audio.  It could be me.  But go ahead and
24 try it again.
25 Q.          It's probably me.  I'm also a

Page 66

1 southerner, so I talk quickly, and I'm probably
2 using too many adjectives.
3          I was asking you what is required to
4 determine whether a map complies with the Voting
5 Rights Act.
6 A.          Well, it's -- I would say it's a legal
7 opinion first to be familiar with the Voting Rights
8 Act and subsequent cases, and then to be able to
9 compare what we have produced, what's in front of
10 us, with the knowledge of the requirement of the
11 Constitution and the Voting Rights Act.
12 Q.          And when did you compare what was
13 produced by your demographer with the requirements
14 of the Voting Rights Act?
15 A.          I think probably every time we talked,
16 this was part of it.  It came up in the conversation
17 as we went through the map-drawing process.  And
18 both the attorney and the map drawer would be quick
19 to say that could -- that particular line moved over
20 there could be a problem, and we need to look at it.
21 Q.          And when you say "could be a problem,"
22 you mean could be a problem under the Voting Rights
23 Act?
24 A.          Yes.
25 Q.          And what was your understanding of what

Page 67

1 was required to comply with the Voting Rights Act?
2 A.          Well, as far as what's in the Voting
3 Rights Act, I couldn't quote it.  But that's why I
4 have an attorney.
5 Q.          How many times did you have a
6 conversation where the map drawer said if you move
7 this line, you could have a problem under the Voting
8 Rights Act?
9 A.          I can say I heard that several times.
10 Q.          And who did you hear that from?
11 A.          I heard it both from the attorney and
12 the map drawer, not necessarily at the same time.
13 Q.          You were --
14 A.          Pardon?
15 Q.          You were advised several times by your
16 attorney and by the map drawer that the way that a
17 particular line was drawn could violate the Voting
18 Rights Act?
19 A.          Or the way a line was proposed to go.
20 That was their job.
21 Q.          And did that occur with respect to the
22 congressional map?
23 A.          Not to my knowledge.  Because I was not
24 involved in drawing the congressional map.
25 Q.          Who was involved in drawing the

Page 68

Page: 17 (65 - 68)

Caster Plaintiffs' Exhibit 90, Page 18

Evan Milligan,et al v. John H.Merrill, et al.                    Jim McClendon
                                                                12/17/2021

1 congressional map?
2 A.          The map drawer met with the
3 congressional delegation or their representative
4 sometimes in person, sometimes virtually like this,
5 and really worked this out with the members of the
6 congressional delegation.
7 Q.          Were the members of the congressional
8 delegation responsible for ensuring that map
9 complied with the Voting Rights Act?
10 A.         That's a good question.  I don't know
11 the answer to that question.
12 Q.         Were you responsible for ensuring that
13 the congressional map complied with the Voting
14 Rights Act?
15 A.         Yes.  I would say that was one of my
16 responsibilities.
17 Q.         In the conversations that you had
18 regarding potential violations of the Voting Rights
19 Act, did you or anyone else discuss racial
20 polarization analysis?
21 A.         No.  No.
22 Q.         Do you know what the basis for -- in
23 these conversations when you heard there might be a
24 potential Voting Rights Act violation, do you know
25 what that was based upon?
                                                   Page 69

1 A.          Well, I think at different times there
2 were different issues.
3 Q.          Such as?
4 A.          On the congressional side, I cannot --
5 as far as the congressional districts go, I can't
6 give you a single example because I simply wasn't
7 involved in that process.
8 Q.          When did you adopt the guidelines that
9 we're talking about right now?
10 A.         Maybe May the 5th of 2021.  That's the
11 date on the document.  And that was one of the
12 purposes of -- objectives of that particular meeting
13 of the committee, was to have the guidelines in
14 place before we got the data and before we started
15 working with the elected officials.
16 Q.         So the third policy in Section II j
17 (iii) in McClendon Exhibit 5 that we're talking
18 about now, the May 5, 2021, redistricting criteria,
19 says, "Districts shall respect communities of
20 interest, neighborhoods, and political subdivisions
21 to the extent practicable and in compliance with
22 paragraphs a through 1."
23            What is your understanding of what that
24 policy requires?
25 A.         Well, when possible, it's good to keep
                                                   Page 70

1 communities of interest, communities that have a
2 particularly common political interest, keep them
3 together, keep them in the same whatever it is,
4 house direct, congressional district, BOE district,
5 if possible.
6 Q.          You said "common political interests."
7 Is that your definition of community of interest?
8 A.          There's a -- there's a definition right
9 here in whatever this is on Line 30.  Line 30
10 through 32 is a definition of communities of
11 interest.
12 Q.         So you just mentioned a common political
13 interest, and I was wondering if that was part of
14 your definition of communities of interest.
15 A.         Oh, that's just one -- that's just one
16 part of it, one part -- one way you could have a
17 community of interest.  There's a lot of different
18 ways you can have a community of interest.
19 Q.         What do you consider to be communities
20 of interest in Alabama?
21 A.         There are -- there's not a community of
22 interest in Alabama.  There are many communities of
23 interest.
24 Q.         Such as?
25 A.         Well, a city.  A city is a community of
                                                   Page 71

1 interest.
2 Q.          Is Montgomery a community of interest?
3 A.          Yes.  Montgomery is a city.
4 Q.          What are some other communities of
5 interest?
6 A.          You can have parts of a city that are a
7 community of interest.  There are -- a county is a
8 community of interest.
9 Q.          What is the black belt in Alabama?
10 A.         It's a geographic area pretty much
11 across the middle of the state from east to west.
12 And it has to do with the rich soil that's found in
13 that area.
14 Q.         Do you know what counties are in the
15 black belt?
16 A.         I couldn't name -- I could name a few
17 counties.  But I cannot -- I cannot name the
18 counties in the black belt.
19 Q.         Is there anything other than the soil
20 that might define the black belt?
21 A.         I don't know what you're fishing for.
22 Q.         I can ask the question again.
23            What are other characteristics that you
24 know of of the black belt?
25 A.         That's a better question.
                                                   Page 72

Caster Plaintiffs' Exhibit 90, Page 19

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1      Well, I think there's a perception that
2 there's a lower socioeconomic income level across
3 the black belt.  There's probably -- there may be --
4 that would probably be the main thing.
5 Q.      Do you consider the black belt a
6 community of interest?
7 A.      No, not necessarily, because it's
8 multiple counties, multiple communities.
9 Q.      Going back to your testimony earlier
10 about maintaining the core of districts.  Does
11 maintaining the core of the existing congressional
12 districts require consideration of racial data?
13 A.      Say that again and slow down again.  I'm
14 not listening very fast today.
15 Q.      I'm sorry.  I'm speaking quickly.  And I
16 like that term, "listening fast."
17      So what I asked was you testified
18 earlier that you were maintaining -- or attempting
19 to maintain the core of exhibiting districts in the
20 congressional map.  And I'm asking whether that
21 requires the consideration of racial data.
22 A.      Well, we don't -- no.  We don't -- we
23 don't use racial data except after the fact.
24 Q.      After what fact do you use racial data?
25 A.      After the lines are drawn.
Page 73

1 Q.      And how do you see that racial data when
2 you decide to look at it?
3 A.      The software will produce that.
4 Q.      What software?
5 A.      The software used to draw the maps.
6 Q.      Do you know what that software is?
7 A.      Give me a multiple choice, and I'll give
8 it to you.  Not right off the bat, no.  You know,
9 it's like I know it when I see it.  But, you know, I
10 never used it.  But it's a new system for us.  We
11 recently adopted it.
12 Q.      When was the second meeting of the
13 reapportionment committee in 2021?
14 A.      If, in fact, there were just the two
15 meetings, it would have been immediately -- let me
16 see.  It would have been on the Tuesday prior to the
17 special session convening on a Thursday.  So
18 whatever those dates are.
19 Q.      Do you have reason to believe that there
20 was another meeting of the reapportionment committee
21 other than the two we're discussing now?
22 A.      No, I don't.  But I wouldn't be
23 surprised.  But I just don't believe there was.
24 Q.      I unfortunately don't have the exhibits
25 (inaudible) the meetings, so we'll just move on.
Page 74

1      So you said you met the Tuesday before
2 the Alabama special legislative session began on
3 redistricting?
4 A.      Correct.
5 Q.      And that was the second meeting in your
6 memory of the reapportionment committee?
7 A.      That is -- I believe that is correct,
8 yes.
9 Q.      Were there other meetings of the
10 reapportionment committee outside of those two to
11 draw the map that we're discussing today?
12 A.      No, not of the -- not the committee.
13 Not a regular committee meeting, no.
14 Q.      What about a subset of the committee?
15 A.      What about what?
16      MS. WELBORN:  A subset.
17 Q.      Were there other meetings of a subset of
18 the committee?
19 A.      No.
20 Q.      What was the agenda for your October
21 26th meeting, reapportionment committee meeting?
22 A.      To select -- so is that the date,
23 October 26th?  That was meeting number two?
24      A goal for that committee was to select
25 the bills, the maps, that would be introduced to the
Page 75

1 legislature on Thursday.
2 Q.      And how many congressional maps did the
3 members of the reapportionment committee vote on?
4 A.      I think just the one.  But I can't -- I
5 can't swear to that.
6 Q.      So when you say "select the map," you
7 mean to vote on the one map?
8 A.      I can't remember if a substitute
9 congressional map was offered or not.
10 Q.      I am going to drop into chat, and I will
11 share my screen, as well.  I will represent to you
12 that this is a certified transcript of the October
13 26, 2021, meeting of the reapportionment committee.
14
15      (Plaintiff's Exhibit 6 was
16      marked for identification.)
17
18 Q.      Do you see this?
19 A.      I do.
20      MS. SADASIVAN:  I'm going to ask
21 Mr. Walker if you would be so kind to mark this as
22 Exhibit 6.
23      MR. WALKER:  I have done so.  It is
24 marked.
25      MS. SADASIVAN:  Thank you, sir.
Page 76

Caster Plaintiffs' Exhibit 90, Page 20

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1  Q.           I'll let you quickly scan -- it's quite
2  a long document.  I'll let you just scan through it.
3  And if you wouldn't mind just letting me know if
4  this looks familiar to you.
5  A.           Well, I've glanced through it.  It looks
6  familiar.  But it's really --
7  Q.           Okay.  Again, I'll represent to you that
8  it's a transcript of the October 26, 2021, meeting
9  of the reapportionment committee, as you likely
10 remember.  And as you can see from the transcript, a
11 considerable portion of the meeting was about racial
12 polarization analysis.
13            What is your understanding of racial
14 polarization in voting?
15 A.           In this case, this -- this is an
16 additional evaluation or test of the data to any
17 place it's suspicious that there could be racial
18 discrimination.  It's an extra test tacked on to
19 what we normally do to see if, in fact, we are in or
20 out of compliance with the Voting Rights Act and our
21 own guidelines and the court cases.
22 Q.           And what would give rise to suspicious
23 racial discrimination that would require a racial
24 polarization analysis?
25 A.           What would -- what would make you think
                                                    Page 77

1  that that's an issue?  Is that what you're asking,
2  that racial discrimination is an issue?
3            I guess, you know, the first thing I
4  would say is if we had an incumbent minority person
5  and there was such a change in the composition of
6  the voters in that district, that that -- that
7  district may no longer have -- have less of a chance
8  of having a minority representative.  That would be
9  -- I think that would be a red flag.
10 Q.           So a suspicious racial issue would be if
11 a minority representative were no longer able to win
12 an election in their district?
13 A.           Or threatened if they -- yeah.  Roughly
14 what you said.  I don't exactly agree word for word.
15 But yeah, that's the idea.
16 Q.           What is your understanding of why RPV --
17 and when I say RPV, I mean racially polarized
18 voting.  What is your understanding of why RPV was
19 discussed in the October 26th meeting?
20 A.           Wait a minute.  I missed one word I
21 didn't understand.  Why is it what in the meeting?
22      MS. WELBORN:  Discussed.
23 A.           "Discussed," is that the word you used?
24 Q.           Yes, sir.
25 A.           Oh, okay.  Well, it was brought up by
                                                    Page 78

1  one of the committee members.
2  Q.           Who?
3  A.           It might have been Representative
4  England.  I think that's who it was.  I'm not a
5  hundred percent sure.  I think he had a good bit to
6  say about it.
7  Q.           And why did -- what was your
8  understanding of why Representative England was
9  concerned about racially polarized voting?
10 A.           I didn't have an understanding of why he
11 was concerned.  He just let it be known that he was
12 concerned.
13 Q.           Did anyone else express concerns about
14 racially polarized voting?
15 A.           I don't remember.
16 Q.           What was the conversation?
17 A.           I don't know.  If we've got the
18 transcript, we can take a look at it.
19            I think there was someone that may have
20 even suggested we should have evaluated all 140
21 races for this.  I don't remember who that was.
22 Q.           So if you wouldn't mind turning to Page
23 17 of McClendon Exhibit 5.
24      MS. WELBORN:  I think it's Exhibit 6.
25 Q.           Exhibit 6.  I apologize.
                                                    Page 79

1  A.           I'm on Page 17.  Yep, Smitherman.
2  Q.           All right.  So you'll see that
3  Representative Laura Hall asked you about a racially
4  polarized voting study done.
5            Can you read where it says Senator
6  McClendon beginning with "Because"?
7  A.           "Because of the black age voting
8  population in Congressional District 7, there was
9  not one needed because it was over 54 percent black
10 voting age population."
11 Q.           And then will you also read what
12 Representative Hall said in response?
13 A.           "So you're saying that we don't have a
14 black -- we don't have a polarization, racially
15 polarization study?"
16 Q.           And then please read your response.
17 A.           "None.  Because the voting age" -- well,
18 I suspect that's a transcript error.  "What is it?
19 I got it right here."
20            "Because the voting age is 54."  Don't
21 you think that's the VAP, 54, instead of the voting
22 age?
23 Q.           And then -- I'm sorry.  Can you please
24 just read it as it is on the transcript, what
25 Representative Hall said after that beginning with
                                                    Page 80

Caster Plaintiffs' Exhibit 90, Page 21

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 "And"?

2 A.        "And you use District 7 as the basis for

3 not having such a study done?"

4 Q.        And then please read your response.

5 A.        The black vote -- "The black VAP of the

6 district is sufficient to where you don't need a

7 study done."

8 Q.        Who makes the decision to undertake an

9 RPV analysis?

10 A.        The attorney.

11 Q.        If you asked the attorney to undertake

12 an RPV analysis, what would happen?

13 A.        We would discuss whether, in his

14 opinion, the issue was actually there or not and

15 needed to be decided and further information

16 gathered on the outside.  I mean, his job is not

17 just to jump.

18 Q.        If you asked Mr. Walker to conduct an

19 RPV analysis, would one be conducted?

20 A.        First, I don't think -- I would not ask

21 Mr. Walker to do something.  I would ask Mr. Walker,

22 "What is your opinion?  Do we need to do this or

23 not?"  That's how it works.

24 Q.        I understand.  And if you asked him to

25 undertake a racial polarization analysis, would one

Page 81

1 A.        You know, I don't know the answer to

2 that question.

3 Q.        You don't know whether or not you could

4 undertake --

5 A.        I don't know.  The only way I would know

6 is if I had exercised that and see how it worked

7 out.  But I've never exercised it, never thought

8 about exercising it.  So I don't know the answer to

9 that.

10 Q.        You didn't think about asking for an RPV

11 analysis when Representative England and

12 Representative Hall asked for one to be undertaken?

13 A.        It's like -- it's highly probable that

14 we discussed doing that afterwards, after the

15 meeting.  I may have discussed it with Mr. Walker.

16 And if he had thought it was of value and worthwhile

17 to do and would give us additional information that

18 we needed, it would have been ordered.  And if he

19 had felt like it was an exercise in futility and a

20 waste of time and money, he would have made that

21 expression, as well.

22 Q.        And did you ask Mr. Walker to undertake

23 an RPV analysis after the October 26th meeting?

24 A.        We may have talked about it.  But I

25 don't remember exactly doing that.

Page 83

1 be undertaken?

2 A.        You know, that's a hypothetical.  And

3 I'm not going to do a hypothetical.

4 Q.        Do you have the power, as senate chair

5 of the reapportionment committee, to ensure that the

6 individuals, the attorney, and the map drawer, for

7 example, comply with the Voting Rights Act?

8 A.        Well, yes.  That's their responsibility.

9 Q.        And if you decided that you needed a

10 racially polarized voting study done, could you

11 insist that they undertake one?

12 A.        Well, once again, you're doing something

13 hypothetical.  I depend on Mr. Walker for his legal

14 opinion and his experience.  He's got many more

15 years of experience than I do.

16 And what I most likely do with him is

17 say, "Dorman, what do you think about this?  Do we

18 need to do this or not?  Does it make any sense?"

19 Q.        Senator McClendon, I understand that

20 you're very personable and you rely on the opinions

21 of your attorneys.

22 What I'm asking you is if you have the

23 power to insist, as senate chair of the

24 reapportionment committee, that a racially polarized

25 voting study be undertaken?

Page 82

1 Q.        How much did Alabama's population change

2 between 2011 and 2021?

3 A.        I believe it increased about 5 percent.

4 I think it went from 4.88 to a little over 5

5 million, 5,020,000 or something like that.

6 Q.        In this redistricting cycle, was

7 District 7 over or underpopulated?

8 A.        I think it was under.  Yes, I'm sure it

9 was under.

10 Q.        I'm going to go back to McClendon

11 Exhibit 6.  If you wouldn't mind please turning to

12 Page 19.

13 And if you could look at the second

14 paragraph on the page after Representative England

15 said, "It would appear that District 7 would look

16 like that would need to be done," referring to an

17 RPV analysis.

18 He goes on, "So it appears to me that if

19 we're doing this in the logical way, that District 7

20 just -- as it appears on a map, would produce a

21 certain percentage."

22 And he asks, "And what is the

23 relationship between the 54 percent that you're

24 citing and the actual results or potential results

25 of a racial polarization study?  What is the

Page 84

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 relationship between the two?"

2 A.        Let me --

3           Would you read your response?

4 A.        I'm sorry.  I thought you were done.  Go

5 ahead.

6 Q.        Would you please read your response?

7 A.        Let me read this sentence you just read.

8 So I would like to request that the study be done on

9 District 7.  And what is the relationship between

10 the 54 percent that you're citing and a racial

11 polarization study?  What is the relationship?

12          My response is, "I got no clue."

13 Q.       Does this seem like an accurate

14 representation of your conversation in the meeting,

15 the October 26 reapportionment committee meeting?

16 A.        I think it's fairly accurate.  I've

17 certainly found some errors in here.  But it's

18 probably close enough.

19 Q.       And do you still have no clue what the

20 relationship between the 54 percent number that you

21 cited earlier as not a threshold by which you would

22 consider an RPV analysis and the actual or potential

23 results of a racial polarization analysis?

24 A.        Okay.  Give me -- break that up.  That

25 was a couple of questions.  Give me the first one.

Page 85

1 Q.        It's just one question, but it's long.

2           I'm asking you if you still have no clue

3 with respect to the question that Representative

4 England asked you and that you just read?

5 A.        Here -- here's the issue.

6 Representative England apparently was targeting that

7 number of 54 percent of BVAP as if it were some sort

8 of threshold of do or die.

9           And even the courts, to my knowledge,

10 have never come up with a number that says you've

11 got to have this percent or you can't go below this

12 percent.  It's never happened.

13          So when somebody picks out a number of

14 54 percents and says that's good or bad, well,

15 Congresswoman Sewell was happy with it.  And she's

16 probably got a whole lot more information on her

17 electability in her own district than I have.

18 Q.        So I'm just going to point you back to

19 Page 17 of the transcript of your October 26th

20 meeting of the reapportionment committee where

21 before Representative England brought that up, you

22 had said, "Because of the black voting age

23 population in Congressional District 7, there was

24 not one needed," referring to an RPV analysis,

25 because it was over 54 percent BVAP.

Page 86

1           What did you mean by that?

2 A.        What I meant by that was it didn't look

3 like it was -- that a minority congresswoman was at

4 risk.  If she wanted to be elected again -- and

5 apparently she does -- there was nothing to suggest

6 it was close enough to think there was a threat to

7 her reelection.

8 Q.        And how is that related to the black

9 voting age population in District 7 at 54 percent?

10 A.        Well, most of the voters are a minority.

11 Q.       And so you were assuming that black

12 voters would vote for a black representative?

13 A.        That's pretty -- a pretty safe bet here

14 in Alabama.

15 Q.       And where did the 54 percent number come

16 from?

17 A.        Those -- those numbers are generated by

18 the software when the district is drawn.  But they

19 are generated after the district is drawn.

20 Q.       Did you talk to Representative Sewell

21 about the black voting age population in her

22 district?

23 A.        No, I did not.

24 Q.       Did you talk to Representative Sewell

25 about the congressional map?

Page 87

1 A.        No, I did not.

2 Q.        How do you know that Representative

3 Sewell was okay with the district, as you suggested,

4 based on the BVAP?

5 A.        I was told that by the map drawer who

6 interviewed Representative Sewell I think once in

7 person and once virtually.  Or it may have been a

8 staff person.  But they were okay with the district.

9 Q.        So you wanted to ensure that the BVAP in

10 districts with a minority candidate representing

11 them was not too low?

12 A.        Correct.

13 Q.        Did you take any steps to ensure that

14 the BVAP in any district was not too high?

15 A.        Not to my knowledge.

16 Q.        Who drew the maps for you in 2021?

17 A.        Randy Hinaman.

18 Q.        What is Randy Hinaman's role in the

19 redistricting process?

20 A.        He's the map drawer.

21 Q.        When did you first meet with Mr. Hinaman

22 about the redistricting cycle in 2021?

23 A.        In the spring of 2021, I guess.  I

24 don't -- I don't remember an exact date.

25 Q.        Who did you meet with Mr. Hinaman with?

Page 88

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

**Page 89 (left column)**

```
 1 A.        I don't remember who was there.
 2 Q.     What was discussed?
 3 A.        Pardon me?  What was what?
 4 Q.     What did -- what did you all discuss?
 5 A.        I would just guess.  And I would say we
 6 probably discussed when are we going to see the data
 7 so we can go to work.
 8 Q.        Did you provide any instructions to
 9 Mr. Hinaman in the spring of 2021?
10 A.     No.
11 Q.     Why not?
12 A.        He was -- he was more experienced than
13 me.
14 Q.        Did you provide Mr. Hinaman with any
15 materials throughout any of the process of him
16 drawing the 2021 Alabama maps?
17 A.     No.
18 Q.     Why?
19 A.        There was no need to.
20 Q.     Why was there no need to?
21 A.        Well, he was the map drawer.  He knew
22 his job.
23 Q.     Where was his job description?
24 A.        Where was his job description?
25 Q.     Defined.
                                         Page 89
```

**Page 91 (right column)**

```
 1 BVAP of around 54 percent?
 2 A.        I was told that in any of the districts
 3 that were drawn that needed this additional
 4 analysis, it had been requested.
 5 Q.     Can you repeat your answer, please?
 6 A.        I was told that any of the districts
 7 that needed additional analysis, that that analysis
 8 had been requested.
 9 Q.        And were you told which districts
10 required analysis?
11 A.     No.
12 Q.        Did you know any criteria for which
13 districts required an analysis?
14 A.        I did not know the criteria.
15 Q.        When did you determine that your plan
16 didn't violate the Voting Rights Act?
17 A.        Well, sometime -- sometime prior to
18 submitting it to the redistricting committee for
19 consideration.  That was like part of the process,
20 to make sure we were in compliance before
21 introducing it for consideration for the other
22 committee members.
23 Q.        And when did you submit the
24 congressional redistricting bill for consideration
25 by the reapportionment committee?
                                         Page 91
```

```
 1 A.        You know, he -- I don't know the answer
 2 to that.
 3          MS. SADASIVAN:  Would you mind if we
 4 take a five-minute break?
 5          THE VIDEOGRAPHER:  We are off the
 6 record.  The time is 4:26 p.m.
 7             (Recess was taken.)
 8          THE VIDEOGRAPHER:  We are back on the
 9 record.  The time is 4:37 p.m.
10 Q.        Senator McClendon, thank you again for
11 sitting for the deposition and for your time.
12          Following up on McClendon Exhibit 6
13 where we were discussing the quote where you said
14 that because of the black voting age population in
15 Congressional District 7, there was not one needed
16 with respect to an RPV analysis because the district
17 was over 54 percent BVAP.  That was the October 26th
18 meeting of the reapportionment committee.
19          Did Mr. Walker tell you that a racial
20 polarization analysis was unnecessary because
21 District 7 had a BVAP of 54 percent?
22          MR. WALKER:  Object on the basis of
23 attorney-client privilege.
24 Q.        Were you told that a racial polarization
25 analysis was unnecessary because District 7 had a
                                         Page 90
```

**Page 92 (right column)**

```
 1 A.        The date -- the date we met that Tuesday
 2 prior to the special session convening on Thursday.
 3 Q.        So you determined before the October
 4 26th meeting that your map, the congressional
 5 redistricting map you introduced, didn't violate the
 6 VRA?
 7 A.        I felt confident that was the case, yes.
 8 Q.        Do you know if an RPV analysis was
 9 conducted for Congressional District 1?
10 A.        Do I know if it was conducted?  Is that
11 your question?
12          No, I don't know if it was conducted.
13 Q.     Who would know?
14 A.        The attorney.
15 Q.     And who is that?
16 A.        His name is Dorman Walker.
17 Q.        When did the special legislative session
18 on redistricting begin in Alabama in 2021?
19 A.        The Thursday of that week following the
20 redistricting committee meeting.  And I don't
21 remember what the date was.
22 Q.        Did you do anything to prepare for the
23 special session?
24 A.        Well, yes.
25 Q.        What did you do to prepare for the
                                         Page 92
```

Evan Milligan,et al v. John H.Merrill, et al.                                    Jim McClendon
                                                                                 12/17/2021

1 special session?
2 A.        I tried to get the -- first, we handled
3 -- the senate handled the senate and the BOE map
4 first.  And so I wanted my information in place in
5 my hand that I would present to the standing
6 committee and ultimately to the senate floor.  So my
7 preparation was to have my bullet points convenient
8 before those meetings.
9 Q.        Did you review any maps of two majority
10 black districts in 2021?
11 A.        No.
12 Q.        Did you have the opportunity to vote on
13 any two majority black congressional district plans
14 in 2021?
15          MR. WALKER:  Did you say have the
16 opportunity to vote?
17          MS. SADASIVAN:  Yes.
18          MR. WALKER:  Okay.
19 A.        There may -- I don't -- and I'm not
20 certain.  But I think one was introduced on the
21 senate floor.  But I'm not sure.
22 Q.        You think that a bill creating two
23 majority minority districts was introduced on the
24 senate floor?
25          MR. WALKER:  May.
                                              Page 93

1 A.        May have been introduced on the senate
2 floor.  Introduced on the senate floor.
3 Q.        So I am dropping into the chat and I'll
4 ask Mr. Walker to mark as Exhibit 7 or McClendon
5 Exhibit 7 a document that is the transcript of the
6 senate floor debate in Alabama on November 3, 2021.
7          Do you recognize the document?  It's on
8 my screen so you can see it.
9          MR. WALKER:  Oh, okay.  This is 7?
10          MS. WELBORN:  Yes.
11          MS. SADASIVAN:  Yes, sir.
12
13          (Plaintiff's Exhibit 7 was
14          marked for identification.)
15
16 Q.        And I have the exhibit pulled up, as
17 well.  Take a minute to look at it, Senator
18 McClendon, please.
19 A.        What did you say?
20 Q.        Will you just take a minute to look at
21 the transcript, and at the end confirm yes or no
22 whether it generally appears accurate of the senate
23 floor debate in 2021 on the various redistricting
24 bills in the special legislative session.
25 A.        Where does this start dealing with the
                                              Page 94

1 congressional plan?
2 Q.        Let me just scroll down.
3          I guess my question was initially -- and
4 I'm seeing on Page 27 there's the beginning of a
5 discussion between Senator McClendon and Senator
6 Singleton.
7          But I had first asked, Senator
8 McClendon, if you could look through the transcript
9 and see if it generally appears accurate of the
10 senate floor debate on November 3, 2021, in the
11 Alabama senate.  I will represent to you that it's
12 the transcript from the video that we received.
13 A.        And I'll accept that, that it is a
14 transcript of the senate floor.
15 Q.        And in this transcript, you vote against
16 a map introduced by Senator Singleton and Senator
17 Hatcher.  Can you --
18 A.        What page is that on?
19 Q.        I believe the motion is -- the
20 substitute was offered by Senator Hatcher on Page
21 39.
22 A.        Okay.
23 Q.        And Senator McClendon moved it for an up
24 or down vote on Page 40, and then votes against it
25 on Page 41.  Do you see that?
                                              Page 95

1 A.        Okay.  Yeah, I do.  I do.
2 Q.        Can you tell me why you voted against
3 Senator Hatcher's two majority minority district
4 plan?
5 A.        You know, if I recall correctly, his map
6 pitted -- put two incumbent congressional members in
7 the same district.
8          Did you hear me?
9 Q.        I can.  I asked you why you voted
10 against Senator Hatcher's plan.
11 A.        And my response was that, among other
12 things, the most blatant thing and easiest to notice
13 was that he had put two incumbents in the same
14 district.
15 Q.        You agree that the black voting age
16 population of the state of Alabama is approximately
17 27 percent of the state?
18 A.        Approximately.
19 Q.        Did that factor in to how you voted on
20 Senator Hatcher's map?
21 A.        It had nothing to do with it.
22 Q.        Did you have the opportunity to vote on
23 Senator Singleton's proposed map?
24 A.        I did.
25 Q.        And how did you vote?
                                              Page 96

Page: 24 (93 - 96)

**Caster Plaintiffs' Exhibit 90, Page 25**

Evan Milligan,et al v. John H.Merrill, et al.                          Jim McClendon
                                                                       12/17/2021

1 A.        A nay.
2 Q.              And why did you vote nay?
3 A.        I think the blatant problem with his map
4 was that no minority candidate had a majority
5 district.  He had --
6 Q.              And when you say a minority candidate
7 had a majority district, what do you mean?
8 A.        I think he drew two districts they
9 called opportunity districts.  But no minority
10 candidate had a majority of the voters in either of
11 those districts.
12 Q.              With respect to Senator Hatcher's map,
13 you said you voted against it because two incumbents
14 were paired?
15 A.        I think that is -- I think that's
16 correct.
17 Q.              And what is -- in terms of your
18 understanding of the law, what is a more important
19 criteria for a map proposed by the Alabama
20 legislature?  Compliance with federal law and the
21 Voting Rights Act or ensuring incumbents are not
22 paired?
23 A.        You're asking me to say what's most
24 important among those three or what takes precedent?
25 Is that what your question is?
                                                    Page 97

1 Q.              Yes, sir.
2 A.        Well, you always have to assume that
3 federal law supersedes state law.  But in this case,
4 it was -- it didn't matter.  It was just -- it was
5 an -- it was an inappropriate situation.
6           Actually, what happens when you pit two
7 incumbents, suddenly the redistricting committee is
8 picking winners and losers.  And that should be up
9 to the voters.
10 Q.              The reapportionment committee -- just to
11 go back a little bit to the public hearings that you
12 held on redistricting.  How many were there?
13 A.        Still 28.
14 Q.              And how many occurred between the hours
15 of 9:00 and 5:00?
16 A.        Well, I don't know.  I would have to --
17 I would have to go back.  I think most -- most of
18 them did, yeah.
19 Q.              If I say the McClendon exhibit, I'm
20 afraid I will get it wrong.  But it has the schedule
21 of the public hearings.
22 A.        That would be Number 4.
23 Q.              Thank you, sir.
24 A.        Okay.  What is your question, now?
25 Q.              I asked how many of the 28 public
                                                    Page 98

1 hearings occurred between the hours of 9:00 a.m. and
2 5:00 p.m.
3 A.        Most all of them did.  I guess there's
4 one exception to that.  And that would have been the
5 meeting at the state house in Montgomery.
6 Q.              How many public hearings were held at
7 the same time as another public hearing?
8 A.        Zero.
9 Q.              In other words, how many public hearings
10 overlapped with another one of the public hearings?
11 A.        Zero.
12 Q.              No public hearings occurred at the same
13 time as another public hearing?
14 A.        Correct.
15 Q.              And when did you finalize the times of
16 the public hearings?
17 A.        It would have been sometime in July,
18 early July.  Actually, it was done twice.  The first
19 time, it was targeted to be completed by June 30th.
20 And then we added six more, and that just tacked
21 them on the end.  So it was in the early part of
22 July.
23 Q.              So you added six more why?
24 A.        Representative Hall requested it.
25 Q.              How did she request additional hearings?
                                                    Page 99

1 A.        Email.
2 Q.              Sir, I am going to drop in the chat and
3 I will share my screen and ask Mr. Walker if he
4 could please mark this as, I believe, McClendon
5 Exhibit 7.
6           MR. WALKER:  Eight.
7           MS. SADASIVAN:  Eight.  Gosh.  Why am I
8 always one off?  It's Friday.
9 Q.              So I'm showing you what I've asked
10 Mr. Walker to mark as McClendon Exhibit 8.  I'm
11 scrolling down to the bottom where it says RC
12 045704.
13           MS. WELBORN:  Kathryn, can you scroll
14 all the way up?  We don't know what the document is.
15           MS. SADASIVAN:  So the document says RC
16 045697.  This was produced by Mr. Walker yesterday.
17           MS. WELBORN:  What does it look like on
18 the first page so we can figure out which one it is?
19           MS. SADASIVAN:  It looks like this.
20           MR. WALKER:  Okay.
21
22           (Plaintiff's Exhibit 8 was
23           marked for identification.)
24
25 A.        Is this -- okay.  Exhibit 8.
                                                    Page 100

Evan Milligan,et al v. John H.Merrill, et al.                                    Jim McClendon
                                                                                  12/17/2021

| Page 101 | Page 103 |
|---|---|
| 1       MR. WALKER:  She's turned it back a page | 1 **A.**      **But I cannot discuss what he said to me.** |
| 2 or two. | 2 Q.      You stated earlier that the time and |
| 3 Q.      So if you look on Page 12 of the exhibit | 3 manner of the public hearings is not governing by |
| 4 that Mr. Walker handed you, it's marked at the | 4 Alabama law, correct? |
| 5 bottom with Bates number RC 045712. | 5 **A.**      **Not to my knowledge.** |
| 6 **A.**      **712.  Okay.  I've got 712.  What page?** | 6 Q.      So when Representative Hall asked for |
| 7 Q.      045712.  It's page 12 of that PDF. | 7 other times for the public hearings, was there any |
| 8 **A.**      **712.  I've got Page 1.** | 8 legal constraints to the times that you could select |
| 9 Q.      Do you recognize on Page -- I guess the | 9 for the public hearings? |
| 10 page that we just landed on, did you recognize the | 10 **A.**      **Not to my knowledge.** |
| 11 document that you're looking at, Mr. McClendon? | 11 Q.      Why did you not change the times of the |
| 12 **A.**      **Yes.  Well, I have it in front of me.** | 12 public hearings based on this email? |
| 13 **Let me look at it.** | 13 **A.**      **That was being -- we used our staff and** |
| 14       **Yes, I've seen this before.** | 14 **we used our liaison from the community college** |
| 15 Q.      Where have you seen it before? | 15 **system to contact the local community colleges and** |
| 16 **A.**      **I probably -- I probably received a copy** | 16 **locations and to see what would work out for** |
| 17 **of it, of the email.** | 17 **everybody involved.  And that's how it came about.** |
| 18 Q.      What is this that you're looking at? | 18       MS. SADASIVAN:  I think that's all the |
| 19 **A.**      **This is Representative Hall, I guess.** | 19 questions I have.  The Singleton and the Caster |
| 20 **Yes.  This is when she made a request for additional** | 20 plaintiffs may have questions. |
| 21 **meetings.  And she sent that to the staff office and** | 21       MR. OSHER:  I have a few questions. |
| 22 **they forward a copy to me.** | 22 Jim, if you want to go first for Singleton, you're |
| 23 Q.      So in her email that we're looking at | 23 more than welcome to.  He might not be on. |
| 24 right now, Representative Hall says, "During the May | 24       Okay.  Senator, give me one moment, sir. |
| 25 5th committee meeting, members agreed to hearing | 25 |

| Page 102 | Page 104 |
|---|---|
| 1 locations that would not require constituents to | 1 EXAMINATION BY MR. OSHER: |
| 2 travel more than one county.  However, the proposed | 2 Q.      Senator McClendon, can you hear me? |
| 3 location map will require interested parties to | 3 **A.**      **I can hear you very well.** |
| 4 travel significant distances to participate." | 4 Q.      Oh, well that's a surprise.  That never |
| 5       Going down, it says, "While it may not | 5 happens.  Thank you for your time today.  I just |
| 6 be feasible for all committee members to attend | 6 have a few questions. |
| 7 every public hearing, the proposed schedule requires | 7       I believe -- am I correct that you were |
| 8 members to 'pick and choose' hearings and will not | 8 in the room when Representative Pringle was taking |
| 9 have the full benefit of the public hearing | 9 his deposition? |
| 10 testimony and discussion of any alternative maps | 10 **A.**      **You are correct.** |
| 11 introduced." | 11 Q.      Or I should say was having his |
| 12       On the second page -- on the following | 12 deposition taken. |
| 13 page, which is Bates number RC 045713, | 13       And so I assume that you heard the |
| 14 Representative Hall says, "In addition, the timing | 14 questions that I asked him.  Is that correct? |
| 15 of each hearing is unsatisfactory.  Hearings held | 15 **A.**      **That is correct.** |
| 16 during working days cannot be viewed objectively as | 16 Q.      I'm just going to ask you the same |
| 17 providing the opportunity for public input." | 17 questions. |
| 18       How did you respond to Representative | 18       How long have you been serving in the |
| 19 Hall's concerns about the timing of the public | 19 Alabama legislature? |
| 20 hearings? | 20 **A.**      **19 years.** |
| 21 **A.**      **I think I called my attorney and** | 21 Q.      19 years.  And have you been a member of |
| 22 **basically said, "How do you want to handle this?** | 22 the republican party that whole time? |
| 23 **What do you think we need to do?"  And --** | 23 **A.**      **Well, I've always run as a republican.** |
| 24       MR. WALKER:  Do not discuss what I said | 24 **And I believe I've been a dues-paying member of the** |
| 25 to you. | 25 **county republican group that whole time.** |

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 Q.        And have you -- have you always been a
2 member of the republican party?
3 A.        Well, "always been" goes back a long
4 way.  I think I've been a member of the republican
5 party as long as I've been a candidate or an elected
6 official.
7 Q.        And how long does that date back until
8 in the -- in the past?
9 A.        2001.
10 Q.        Okay.  Based your 19 years serving in
11 the legislature, in your view, do the views of the
12 members of the democratic party in Alabama generally
13 differ from the members of the republican party in
14 Alabama when it comes to the issue of removing
15 confederate monuments from public spaces?
16 A.        You know, I think if you make that broad
17 and say generally, I think I can agree with that
18 statement.  There -- there are definitely
19 exceptions.  But I think with the "general" in
20 there, I can say I generally agree with your
21 statement.
22 Q.        So the answer to my question was yes?
23 A.        Yes.
24        MR. WALKER:  Objection to form.  He
25 answered that he can generally agree.
                                              Page 105

1 Q.        My question was do the members of the
2 democratic party, generally do their views generally
3 -- I should start over.
4        Do the views of the members of the
5 democratic party generally differ from the views of
6 the members of the republican party in Alabama
7 generally when it comes to removal of confederate
8 monuments in public spaces?
9 A.        I think I can agree with that.
10 Q.        You think you can agree?  Can you give
11 me a yes or no answer on that question?
12        MR. DAVIS:  Objection, asked and
13 answered.
14        THE WITNESS:  So objection, what does
15 that mean for me?
16        MR. WALKER:  That means you don't
17 answer.
18 Q.        Well, it doesn't mean you don't answer.
19 I believe that's a form objection.
20        MR. WALKER:  Excuse me.  Forgive me.
21 You're right.  Sorry, Dan.
22        MR. OSHER:  That's okay.
23 Q.        Senator, if you wouldn't mind answering
24 the question.
25 A.        Yes.
                                              Page 106

1 Q.        Thank you.  I appreciate it.  A few
2 more.
3        Based on your 19 years in the Alabama
4 legislature, do the views of the members of the
5 democratic party in Alabama generally differ from
6 the members of the republican party in Alabama when
7 it comes to the issue of affirmative action?
8 A.        And we'll get back to the discussion you
9 had earlier on affirmative action.  I'm not even
10 exactly sure of a definition of affirmative action.
11 I remember hearing that term some years ago.  But it
12 hasn't been around in a while.  So I'm real hesitant
13 about answering that question.
14        One other thing I would like to point
15 out.  You're talking about members of the democratic
16 party, members of the republican party, right?
17 That's who you're asking me about.
18        Well, I don't attend any of the
19 democratic party meetings.  Now, I know a lot of
20 democrats that are in the legislature.  So I'm more
21 likely to have a feeling for a democratic rather
22 than a member of the democratic party.  Do you
23 understand what I'm saying?
24 Q.        So let me ask you this:  In your 19
25 years serving in the -- in the Alabama legislature,
                                              Page 107

1 have you worked with your democratic party -- your
2 democratic party colleagues on issues related to
3 pending legislation?
4 A.        Yes.
5 Q.        And have you worked with republican
6 members of the Alabama legislature on pending
7 legislation and other issues?
8 A.        Yes.
9 Q.        And in that time, have you gained a
10 general view of what the democratic party in Alabama
11 supports and what the republican party in Alabama
12 supports?
13 A.        Yes.
14 Q.        Okay.  So you -- in terms of affirmative
15 action, let's define affirmative action as giving
16 preference to individual -- considering individual
17 race when making certain decisions about admission
18 to programs or access to benefits.
19        Using that definition, based on your
20 experience in the legislature, do the views of the
21 democratic party in Alabama generally differ from
22 the members -- the views of the members of the
23 republican party in Alabama?
24 A.        I really don't have an opinion on that.
25 And the reason is the issue simply has not come up,
                                              Page 108

Caster Plaintiffs' Exhibit 90, Page 28

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

| | |
|---|---|
| 1 it's not in front of me, and I have no experience | 1         MR. DAVIS:  Any questions from the |
| 2 with members of the democrats or the republicans on | 2 Singleton plaintiffs? |
| 3 that issue.  So I can't speak for something that | 3         I've got just a couple. |
| 4 hasn't happened. | 4 EXAMINATION BY MR. DAVIS: |
| 5 Q.         Sure. | 5 Q.         Hello, Senator. |
| 6         Based of your experience in the Alabama | 6 A.         Hello. |
| 7 legislature, do the views of members of the | 7 Q.         Jim Davis representing Secretary |
| 8 democratic party in Alabama generally differ from | 8 Merrill. |
| 9 the members of the republican party in Alabama when | 9         Senator, how many members are there of |
| 10 it comes to criminal justice reform? | 10 the Alabama senate? |
| 11 A.         Okay.  And your question is they have | 11 A.         35. |
| 12 disparate or different views?  Republicans have | 12 Q.         And do they all have a vote on |
| 13 different views from democrats on criminal justice | 13 legislation? |
| 14 reform?  That's your question, correct? | 14 A.         Yes, they do. |
| 15 Q.         As a general matter, correct. | 15 Q.         Does that include redistricting |
| 16 A.         As a general matter, I agree with that | 16 litigation? |
| 17 statement. | 17 A.         That is correct. |
| 18 Q.         And based on your experience in the | 18 Q.         Excuse me.  I said "litigation."  I |
| 19 legislature, do the views of the members of the | 19 meant legislation. |
| 20 democratic party in Alabama differ from the views of | 20 A.         Legislation. |
| 21 the members of the republican party in Alabama when | 21 Q.         Do all senators' votes count the same? |
| 22 it comes to whether there is a significant amount of | 22 A.         Yes. |
| 23 discrimination against black residents of the state | 23 Q.         Do you know why any other member of the |
| 24 today? | 24 Alabama senate voted for or against a redistricting |
| 25 A.         Once again, I need to take a party | 25 plan? |
| Page 109 | Page 111 |
| 1 business out.  I see the party as these two | 1 A.         No.  That's an individual decision. |
| 2 organizations.  These people I know claim to be | 2 Q.         And how many members are there of the |
| 3 democrats.  Some of them claim to be republicans. | 3 Alabama house of representatives? |
| 4 Whether they belong to -- are active in a party or | 4 A.         105. |
| 5 not, I have no idea. | 5 Q.         And they all have votes on legislation? |
| 6         Now let's go back to the heart of your | 6 A.         They certainly do. |
| 7 question, and I'll try to answer it.  With that in | 7 Q.         Including redistricting legislation? |
| 8 mind, ask me your -- ask me your question.  What is | 8 A.         Correct. |
| 9 the topic here? | 9 Q.         And their votes all count the same as |
| 10 Q.         The fourth topic that I'm asking if the | 10 one anothers? |
| 11 members -- if the views of the members of the | 11 A.         That's correct. |
| 12 democratic party generally differ from the views of | 12 Q.         Do you know why any member of the |
| 13 the members of the republican party generally. | 13 Alabama house of representatives voted for or |
| 14         Based on your experience working in the | 14 against any plan, any redistricting plan? |
| 15 legislature with members of both parties, do their | 15 A.         No.  That's an individual decision. |
| 16 views generally differ when it comes to the issue of | 16 Q.         Did you instruct Randy Hinaman to be |
| 17 whether there is a significant amount of | 17 sure to include a majority black district in an |
| 18 discrimination against black residents of Alabama | 18 Alabama congressional plan draft? |
| 19 today? | 19 A.         I did not. |
| 20 A.         Yes. | 20 Q.         Did you decide ahead of time that |
| 21         MR. OSHER:  Thank you very much.  That's | 21 Alabama's plan must include a majority black |
| 22 all I have for you.  Thank you for your time, | 22 district? |
| 23 Senator. | 23 A.         I did not. |
| 24 A.         You're very welcome. | 24 Q.         Was your understanding that those |
| 25         MR. WALKER:  Are we done? | 25 districts, when drafted, would be done so without |
| Page 110 | Page 112 |

Caster Plaintiffs' Exhibit 90, Page 29

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

| | |
|---|---|
| 1 consideration of race? | 1 STATE OF ALABAMA ) |
| 2 **A.**        **That is correct.** | 2 JEFFERSON COUNTY ) |
| 3 Q.        To the best of your knowledge, was that, | 3 |
| 4 in fact, how it was done? | 4        I hereby certify that the above |
| 5 **A.**        **That is exactly how it was done.** | 5 proceedings were taken down by me and transcribed by |
| 6    MR. DAVIS:  Thank you, Senator. | 6 me using computer-aided transcription and that the |
| 7 **A.**        **You're welcome.** | 7 above is a true and correct transcript of said |
| 8    MR. WALKER:  Do we have anything | 8 proceedings taken down by me and transcribed by me. |
| 9 further? | 9        I further certify that I am neither of |
| 10        MS. SADASIVAN:  Nothing from the | 10 kin nor of counsel to any of the parties nor in |
| 11 Milligan plaintiffs.  Thank you, Senator, for your | 11 anywise financially interested in the result of this |
| 12 time and sitting for the deposition.  I appreciate | 12 case. |
| 13 it. | 13        I further certify that I am duly |
| 14        MR. OSHER:  Nothing from the Caster | 14 licensed by the Alabama Board of Court Reporting as |
| 15 plaintiffs.  Thank you all. | 15 a Certified Court Reporter as evidenced by the ACCR |
| 16        MR. WALKER:  Kathryn, I need to get to | 16 number following my name found below. |
| 17 you, in addition to my privilege log, the final | 17        So certified on December 17, 2021. |
| 18 statement of -- you know, the sheet where I state | 18 |
| 19 the request for production and then I state | 19 |
| 20 underneath the documents.  Can I get that to you on | 20 |
| 21 Monday?  You've got all the documents.  I just need | 21 |
| 22 to give you the sheet that says which ones refer to | 22        LeAnn Maroney, Commissioner |
| 23 which of your requests. | 23        ACCR# 134, Expires 9/30/25 |
| 24        THE REPORTER:  Are we on the record? | 24        505 North 20th Street, Suite 1250 |
| 25        MS. WELBORN:  Can we go off the record | 25        Birmingham, AL  35203 |
| Page 113 | Page 115 |

| | |
|---|---|
| 1 now? | |
| 2        MR. WALKER:  Yeah, sure. | |
| 3        THE VIDEOGRAPHER:  This ends the | |
| 4 deposition of Jim McClendon.  The time is now | |
| 5 5:12 p.m. | |
| 6 | |
| 7        (DEPOSITION ENDED AT 5:12 P.M.) | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| Page 114 | |

**Caster Plaintiffs' Exhibit 90, Page 30**

**Evan Milligan,et al v. John H.Merrill, et al.**

**Jim McClendon**
**12/17/2021**

## WORD INDEX

< 0 >
**001929**   47:*1*
**045697**   100:*16*
**045704**   100:*12*
**045712**   101:*5, 7*
**045713**   102:*13*

< 1 >
**1**   6:*9*   19:*15*
   21:*7*   35:*8, 22*
   37:*24*   70:*22*
   92:*9*   101:*8*
**1:57**   1:*24*   7:*17*
**1:59**   9:*5*
**10**   4:*19*   14:*19*
**100**   6:*23*
**10004**   4:*5*
**10006**   3:*15*
**104-111**   6:*3*
**105**   1:*23*   5:*14*
   112:*4*
**11**   27:*24*
**1-10-43**   14:*18*
**111-114**   6:*4*
**12**   101:*3, 7*
**125**   4:*4*
**1250**   115:*23*
**134**   115:*23*
**14**   26:*10*
**140**   79:*20*
**1400**   3:*7*
**14th**   3:*21*
**17**   1:*24*   7:*7,*
*17*   79:*23*   80:*1*
   86:*19*   115:*17*
**19**   84:*12*
   104:*20, 21*
   105:*10*   107:*3,*
*24*
**1943**   14:*19*
**1965**   65:*8*
   66:*9, 12*
**1999**   3:*7*

< 2 >
**2**   6:*11*   35:*6*
   36:*2, 7, 24*
   39:*19, 23, 24,*
*25*   40:*2*   47:*21*

**49**:*22*   65:*11,*
*14*   66:*20*
**2:04**   9:*8*
**2:2021-CV-01530-**
**AMM**   1:*8*
**2:21-CV-01530-AMM**
   7:*14*
**200**   5:*14*
**2000**   38:*13*
**20002**   4:*20*
**20005**   3:*22*
**2001**   24:*18*
   42:*15, 20*   43:*6*
   105:*9*
**2010**   33:*12*
   38:*8*
**2011**   6:*12*
   28:*5*   30:*12*
   31:*9*   32:*10, 16,*
*23*   33:*21*   34:*9*
   36:*13, 20*
   37:*15, 25*
   40:*15, 21*   42:*7*
   43:*3, 10, 13, 17*
   45:*4, 13, 17, 22*
   46:*5*   51:*8*
   52:*2, 15*   84:*2*
**2014**   26:*10, 15*
**2021**   1:*24*
   6:*18, 20, 22*
   7:*7, 17*   26:*3*
   30:*12*   45:*7*
   52:*23*   53:*2*
   57:*6, 19*   58:*2*
   61:*6*   62:*25*
   64:*21*   65:*2*
   70:*10, 18*
   74:*13*   76:*13*
   77:*8*   84:*2*
   88:*16, 22, 23*
   89:*9, 16*   92:*18*
   93:*10, 14*   94:*6,*
*23*   95:*10*
   115:*17*
**205)999-8096**
   14:*24*
**20th**   115:*23*
**22**   33:*16*   63:*1*
**23**   40:*14*
**26**   6:*20*   16:*19*
   76:*13*   77:*8*
   85:*15*

**26th**   75:*21, 23*
   78:*19*   83:*23*
   86:*19*   90:*17*
   92:*4*
**27**   95:*4*   96:*17*
**28**   98:*13, 25*
**29th**   59:*11*

< 3 >
**3**   6:*13, 22*
   39:*23, 24, 25*
   40:*2*   46:*24*
   47:*9*   51:*19*
   94:*6*   95:*10*
**3:09**   51:*14*
**3:22**   51:*17*
**30**   60:*8*   71:*9*
**30th**   58:*20*
   59:*9*   99:*19*
**32**   71:*10*
**35**   6:*9*   111:*11*
**35203**   115:*24*
**36**   6:*11*
**361**   14:*22*
**36104**   1:*24*
   5:*15*
**36106**   4:*12*
**36130**   5:*6*
**39**   95:*21*

< 4 >
**4**   6:*15*   39:*23,*
*24, 25*   40:*2, 14*
   61:*5, 12*   63:*18*
   98:*22*
**4.88**   84:*4*
**4:26**   90:*6*
**4:37**   90:*9*
**40**   3:*14*   95:*24*
**41**   95:*25*
**47**   6:*13*

< 5 >
**5**   3:*14*   6:*17*
   39:*21*   43:*20,*
*22*   44:*8, 12, 14,*
*18, 23*   45:*1*
   64:*3, 16*   70:*17,*
*18*   79:*23*   84:*3,*
*4*
**5,020,000**   84:*5*

**5:00**   98:*15*
   99:*2*
**5:12**   114:*5, 7*
**50**   17:*1*   24:*25*
   26:*1*
**501**   5:*5*
**505**   115:*23*
**54**   80:*9, 20, 21*
   84:*23*   85:*10,*
*20*   86:*7, 14, 25*
   87:*9, 15*   90:*17,*
*21*   91:*1*
**5th**   64:*1*
   70:*10*   101:*25*

< 6 >
**6**   6:*19*   76:*15,*
*22*   79:*24, 25*
   84:*11*   90:*12*
**600**   3:*21*   4:*19*
**61**   6:*15*
**6179**   4:*11*
**64**   6:*17*

< 7 >
**7**   6:*21*   43:*5*
   80:*8*   81:*2*
   84:*7, 15, 19*
   85:*9*   86:*23*
   87:*9*   90:*15, 21,*
*25*   94:*4, 5, 9,*
*13*   100:*5*
**700**   3:*21*
**712**   101:*6, 8*
**76**   6:*19*

< 8 >
**8**   6:*23*   100:*10,*
*22, 25*

< 9 >
**9/30/25**   115:*23*
**9:00**   98:*15*
   99:*1*
**90067**   3:*8*
**9-103**   6:*2*
**94**   6:*21*

< A >
**a.m**   99:*1*
**ability**   11:*2, 6*

**Caster Plaintiffs' Exhibit 90, Page 31**

Evan Milligan,et al v. John H.Merrill, et al.                    Jim McClendon
                                                                  12/17/2021

able   8:5
   11:21   22:10
   56:13   67:8
   78:11
accept   95:13
Access   40:7
   108:18
accordance
   39:10   40:14
account   15:9, 18
accounts   15:16
ACCR   115:15, 23
accurate   50:18
   85:13, 16
   94:22   95:9
Act   39:8, 18,
   21   43:21
   47:25   50:11
   65:7, 11, 14
   66:9, 12, 21
   67:5, 8, 11, 14,
   23   68:1, 3, 8,
   18   69:9, 14, 19,
   24   77:20   82:7
   91:16   97:21
acting   7:3
action   39:16
   41:5, 7   107:7,
   9, 10   108:15
active   110:4
activity   27:19,
   23
actual   27:25
   28:12, 17
   84:24   85:22
add   58:15
added   58:25
   99:20, 23
addition   102:14
   113:17
additional   6:24
   12:7   56:2
   77:16   83:17
   91:3, 7   99:25
   101:20
address   14:21
adjectives   67:2
admission   108:17
adopt   70:8
adopted   39:5
   64:19   74:11

adopting   65:25
adoption   37:12
advance   19:18
advised   68:15
affect   11:2, 6
affirmative
   107:7, 9, 10
   108:14, 15
afraid   98:20
afternoon   9:10
age   43:13, 17
   80:7, 10, 17, 20,
   22   86:22   87:9,
   21   90:14   96:15
agenda   75:20
ago   10:6   27:6
   107:11
agree   78:14
   96:15   105:17,
   20, 25   106:9,
   10   109:16
AGREED   1:17
   2:1, 8   101:25
ahead   57:9, 10
   62:23   66:23
   85:5   112:20
al   1:6, 10
   7:13, 14   115:24
ALABAMA   1:2, 23
   4:10, 12   5:6,
   15   7:2, 3, 16,
   20   8:3   9:20
   14:22   15:7, 23,
   25   17:4, 13, 14,
   23   24:24   26:7,
   9, 20   27:9
   38:7   39:12
   40:15   42:10
   44:12, 14, 19,
   23   45:16   51:7
   59:16, 19
   71:20, 22   72:9
   75:2   87:14
   89:16   92:18
   94:6   95:11
   96:16   97:19
   103:4   104:19
   105:12, 14
   106:6   107:3, 5,
   6, 25   108:6, 10,
   11, 21, 23
   109:6, 8, 9, 20,

21   110:18
   111:10, 24
   112:3, 13, 18
   115:1, 14
Alabama's   28:5
   38:10   84:1
   112:21
Ali   5:20
allow   11:19
   12:10
alternative
   102:10
amended   65:8
amendments   40:16
American   4:3, 10
amount   56:20,
   22   109:22
   110:17
analysis   69:20
   77:12, 24   81:9,
   12, 19, 25
   83:11, 23
   84:17   85:22,
   23   86:24
   90:16, 20, 25
   91:4, 7, 10, 13
   92:8
Angeles   3:8
announce   58:14,
   17
announced   59:3
anothers   112:10
answer   12:1, 20,
   21   14:10   21:9
   26:16   31:10
   34:6   37:20
   40:23   43:4, 7
   44:8   45:20
   50:20   51:25
   58:3   60:16, 22
   69:11   83:1, 8
   90:1   91:5
   105:22   106:11,
   17, 18   110:7
answered   26:15
   51:5   105:25
   106:13
answering   12:2,
   13   106:23
   107:13
answers   11:3, 7,

18
Anybody   55:10
anywise   115:11
apologize   39:24
   79:14
apparently   86:6
   87:5
appear   64:17
   84:15
appears   84:18,
   20   94:22   95:9
applied   44:18,
   23
apply   44:12, 14
appreciate
   35:14   107:1
   113:12
approach   27:22
approval   34:14
approve   34:15
   48:1
approving   34:19
approximately
   96:16, 18
area   72:10, 13
arrive   56:17
article   47:16,
   20   48:25   49:2
   51:21
asked   12:9
   30:16   36:1
   51:3   56:1
   58:8   60:7
   73:17   80:3
   81:11, 18, 24
   83:12   86:4
   95:7   96:9
   98:25   100:9
   103:6   104:14
   106:12
asking   30:21
   40:1   44:3, 6,
   22   48:11, 13
   50:1   53:11
   54:9, 22   62:24
   65:18, 21   67:3
   73:20   78:1
   82:22   83:10
   86:2   97:23
   107:17   110:10
asks   84:22

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

assign   2:12
assistance   40:12
Assistant   5:3
assume   12:12
  98:2   104:13
assuming   87:11
astray   29:22
attempt   42:22
attempting   73:18
attend   102:6
  107:18
attention   23:6
Attorney   3:5,
  12, 19   4:2, 9,
  17   5:3, 4, 12
  7:20   12:17, 21,
  25   13:5   19:11
  20:7   28:12, 24,
  25   29:18, 25
  30:19, 24   31:6,
  12   37:22   41:8
  42:2   53:7, 11,
  14, 24   54:13,
  19, 24   55:7, 12
  56:6, 11   66:1
  67:18   68:4, 11,
  16   81:10, 11
  82:6   92:14
  102:21
attorney-client
  53:12   90:23
attorneys   7:18
  8:9   82:21
attributed   50:7
audio   8:5, 7
  66:23
available   9:14
  40:10   52:21
Avenue   3:7   5:5

< B >
back   9:7
  19:11   22:12
  44:8   51:16
  56:4, 9   58:10
  73:9   84:10
  86:18   90:8
  98:11, 17
  101:1   105:3, 7
  107:8   110:6
background   14:15
bad   86:14

Balch   1:22
  5:13   7:23
Ballroom   62:16
based   12:14
  28:3   32:23
  69:25   88:4
  103:12   105:10
  107:3   108:19
  109:6, 18
  110:14
basically   56:24
  102:22
basis   69:22
  81:2   90:22
bat   74:8
Bates   101:5
  102:13
began   75:2
beginning   7:12
  37:25   39:1
  49:23   50:9
  80:6, 25   95:4
begins   28:13
behalf   8:12
belief   40:24
believe   23:23
  25:24   49:16
  50:2, 8, 13
  58:21   74:19,
  23   75:7   84:3
  95:19   100:4
  104:7, 24
  106:19
believed   48:17
belong   110:4
belt   72:9, 15,
  18, 20, 24   73:3,
  5
benchmarks
  47:24   48:3
benefit   102:9
benefits   108:18
best   30:3
  113:3
bet   87:13
better   14:16
  52:11   72:25
big   28:21
bigger   28:2
bill   21:3, 11,
  24   22:1, 16
  40:4, 17   45:18,

23   46:1, 2, 3
  91:24   93:22
bills   21:17, 19,
  25   45:22
  63:15   75:25
  94:24
Bingham   1:23
  5:13   7:24
Birmingham   7:2
  8:2   16:3, 9
  115:24
birth   14:17
bit   14:16
  52:9, 11   53:17
  79:5   98:11
black   43:6, 13,
  17   62:4   72:9,
  15, 18, 20, 24
  73:3, 5   80:7,
  9, 14   81:5
  86:22   87:8, 11,
  12, 21   90:14
  93:10, 13
  96:15   109:23
  110:18   112:17,
  21
blatant   96:12
  97:3
board   38:11, 15
  56:23   115:14
body   20:9
BOE   46:1   71:4
  93:3
born   15:22
bottom   100:11
  101:5
Box   4:11
break   13:15
  14:8, 11   49:7,
  11   51:11
  85:24   90:4
breaking   51:2
Brian   47:17
Broad   4:4
  105:16
brought   46:8, 9,
  11, 12   78:25
  86:21
bullet   19:6
  93:7
Bureau   38:9

54:11
business   110:1
Buskey   47:18,
  22   48:18
BVAP   86:7, 25
  88:4, 9, 14
  90:17, 21   91:1

< C >
California   3:8
call   34:20
  56:15   57:1
called   41:18
  63:14   97:9
  102:21
candidate   88:10
  97:4, 6, 10
  105:5
candidates   25:5
capacity   9:19
care   35:11
career   24:15
carefully   54:16
carried   49:24
carry   31:1, 2
CASE   1:7   7:14
  9:13   17:24
  18:5, 6   19:7
  23:14, 22, 23
  24:4, 9   46:21
  47:17   77:15
  92:7   98:3
  115:12
cases   10:15
  30:3   31:5
  66:18   67:8
  77:21
CASTER   4:15
  8:15   103:19
  113:14
cause   7:8
cell   13:14
census   32:23
  33:12   38:8, 9,
  13   40:8   54:11,
  14, 18, 25
Center   62:16
certain   30:14
  37:19   84:21
  93:20   108:17

Certainly   49:12
52:19   85:17
112:6
certified   76:12
115:15, 17
certify   7:4
115:4, 9, 13
chair   26:25
27:6   29:10, 15
30:6, 13, 17
31:17, 23   32:4,
7, 9   53:3, 5, 7,
13   54:20, 23
56:5, 9   57:3
65:3, 20, 22
82:4, 23
chairman   10:10
28:7, 9
challenge   24:10
challenged   24:13
chance   49:10
78:7
chancellor
55:20   58:7
change   21:9
54:13   78:5
84:1   103:11
changed   28:16
54:25
changes   38:12
characteristics
72:23
chat   19:13
35:4   36:13, 15,
17   46:21   61:2
63:17   76:10
94:3   100:2
child   16:24, 25
choice   74:7
choose   102:8
Chris   18:19, 23
cited   85:21
citing   84:24
85:10
city   71:25
72:3, 6
CIVIL   1:7   4:3,
10   7:5, 14
claim   110:2, 3
clarify   12:10
51:19

close   62:17
85:18   87:6
clue   85:12, 19
86:2
cochair   9:19
28:24
cochairs   29:11
colleagues   108:2
collection   21:8
college   16:1, 3
55:19   62:8, 17,
20   103:14
colleges   62:5,
10   103:15
come   21:19
52:10   86:10
87:15   108:25
comes   25:14
43:23   105:14
106:7   107:7
109:10, 22
110:16
commencing   1:24
commissioner
7:3   115:22
committee   9:20
20:14, 17, 21
21:12, 13, 15,
18, 20, 22   22:1,
10, 17, 19
26:22, 23, 24,
25   27:10, 13,
14, 20   28:2, 17
29:16   30:1, 7,
18, 21   31:14,
18, 23   32:3, 4,
6, 10   33:21
34:9, 13, 18
35:3   36:14
37:11   38:17,
19, 24   39:4, 5
40:6   42:7, 9
46:13   53:2
54:20, 23
55:15   56:5, 10
57:3, 23   58:24
59:21, 22   60:7,
10, 14   62:25
63:25   64:18
65:4, 21, 23
66:16   70:13
74:13, 20   75:6,

10, 12, 13, 14,
18, 21, 24   76:3,
13   77:9   79:1
82:5, 24   85:15
86:20   90:18
91:18, 22, 25
92:20   93:6
98:7, 10
101:25   102:6
committees
21:19   26:18
27:1, 4
common   71:2, 6,
12
communicated
60:6
communication
59:12
communications
58:23
communities
70:19   71:1, 10,
14, 19, 22   72:4
73:8
community   55:19
60:4   62:17, 20
71:7, 17, 18, 21,
25   72:2, 7, 8
73:6   103:14, 15
compare   67:9, 12
complaint   17:24
complete   10:24
completed   17:23
99:19
completely   10:19
compliance   2:4
30:4   31:4
39:12   65:7, 23
66:8, 11   70:21
77:20   91:20
97:20
complied   52:3,
13   66:6   69:9,
13
complies   66:20
67:4
comply   59:13
64:20, 24   65:1,
2, 10, 19   68:1
82:7
complying   65:13

composed   20:21
27:20
composition   78:5
computer   40:8
computer-aided
115:6
concerned   79:9,
11, 12
concerning   17:22
concerns   79:13
102:19
condition   11:5
conduct   33:6
81:18
conducted   11:10
81:19   92:9, 10,
12
conducting   13:12
confederate
105:15   106:7
confer   53:7, 10
54:12   56:6, 11
conferring
53:13, 24   54:24
confident   92:7
confirm   94:21
Congratulations
16:20
congressional
18:7   20:8
21:3   23:24
24:5   32:15, 20
33:2   34:10, 15
38:11, 15   42:5,
10, 13, 19   45:3,
16, 24   46:3
48:5   50:25
51:7   56:23
65:16   68:22,
24   69:1, 3, 6,
7, 13   70:4, 5
71:4   73:11, 20
76:2, 9   80:8
86:23   87:25
90:15   91:24
92:4, 9   93:13
95:1   96:6
112:18
Congresswoman
86:15   87:3
conjunction   60:3

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

**conservative**
25:*15, 16, 18,
20, 22*
**conservatives**
25:*24*
**consider**   43:*9*
46:*4, 14*   56:*16*
60:*17*   62:*4*
71:*19*   73:*5*
85:*22*
**considerable**
77:*11*
**consideration**
40:*6*   52:*22*
63:*14*   73:*12,
21*   91:*19, 21,
24*   113:*1*
**considered**
21:*18*   42:*6*
52:*19*
**considering**
62:*7*   108:*16*
**constituents**
102:*1*
**constitution**
38:*5, 6*   39:*17*
65:*12*   67:*11*
**constraints**
103:*8*
**construed**   39:*15*
**consulted**   41:*8*
**contact**   103:*15*
**continuing**
16:*12*   50:*10*
**continuum**   55:*2*
**contrary**   39:*17*
**convenient**   93:*7*
**convening**   74:*17*
92:*2*
**conversation**
13:*18*   67:*16*
68:*6*   79:*16*
85:*14*
**conversations**
69:*17, 23*
**converts**   27:*24*
**coordinate**   55:*21*
**copy**   20:*4*
101:*16, 22*
**core**   42:*22*
73:*10, 11, 19*

**Correct**   14:*20*
15:*1, 19*   16:*15*
18:*25*   23:*12,
13*   28:*4*   32:*8*
33:*13*   44:*24*
46:*10*   54:*2*
75:*4, 7*   88:*12*
97:*16*   99:*14*
103:*4*   104:*7,
10, 14, 15*
109:*14, 15*
111:*17*   112:*8,
11*   113:*2*   115:*7*
**correcting**   29:*7*
**correctly**   96:*5*
**counsel**   1:*18*
2:*10, 11*   7:*6*
11:*15*   18:*8, 10*
115:*10*
**count**   111:*21*
112:*9*
**counted**   66:*15*
**counties**   72:*14,
17, 18*   73:*8*
**County**   17:*7*
72:*7*   102:*2*
104:*25*   115:*2*
**couple**   18:*15*
55:*25*   85:*25*
111:*3*
**course**   27:*5*
29:*24*   31:*1*
33:*3*   57:*15*
66:*10*
**courses**   16:*8,
10, 13*
**COURT**   1:*1*   2:*5*
7:*1, 15*   11:*13,
19, 20*   15:*4*
19:*14*   20:*4*
30:*3*   31:*5*
35:*5*   36:*1*
44:*7*   46:*24*
61:*4*   63:*17*
66:*18*   77:*21*
115:*14, 15*
**courtroom**   10:*21*
**courts**   30:*5*
31:*5*   86:*9*
**cover**   19:*5*
**created**   47:*19*

52:*4, 14*
**creating**   93:*22*
**criminal**   109:*10,
13*
**criteria**   70:*18*
91:*12, 14*   97:*19*
**current**   32:*21*
**currently**   17:*10,
12*   26:*5, 21*
**cut**   26:*13*   37:*6*
**cutting**   26:*14*
**cycle**   23:*11*
84:*6*   88:*22*

**< D >**
**DAN**   4:*16*   8:*15*
106:*21*
**data**   32:*23*
33:*3*   35:*2*
38:*8*   40:*9*
53:*18, 20*
54:*10, 14, 25*
57:*16*   70:*14*
73:*12, 21, 23,
24*   74:*1*   77:*16*
89:*6*
**date**   7:*4, 16*
14:*17*   30:*2*
57:*20*   58:*21*
59:*4*   60:*5*
64:*15*   70:*11*
75:*22*   88:*24*
92:*1, 21*   105:*7*
**dates**   33:*19*
55:*22*   58:*18*
63:*6*   74:*18*
**DAVIS**   5:*2*   6:*4*
7:*20*   18:*19, 24*
22:*22*   36:*15*
51:*2, 5*   106:*12*
111:*1, 4, 7*
113:*6*
**day**   58:*21*
**days**   102:*16*
**DC**   3:*22*   4:*20*
**deadline**   59:*7,
9, 10, 13, 21, 23,
25*
**deal**   18:*6*
**dealing**   94:*25*

**debate**   20:*25*
21:*2, 11*   94:*6,
23*   95:*10*
**December**   1:*24*
7:*7, 16*   115:*17*
**decennial**   38:*8*
**decide**   42:*10*
53:*16*   59:*7*
74:*2*   112:*20*
**decided**   81:*15*
82:*9*
**deciding**   32:*22*
**decipher**   48:*21*
**decision**   31:*20*
57:*4*   81:*8*
112:*1, 15*
**decision-making**
55:*8*
**decisions**   32:*24*
53:*25*   108:*17*
**decrease**   33:*5*
**DEFENDANT**   5:*1*
9:*18*   10:*12*
47:*17*
**Defendants**   1:*12*
5:*9*
**Defense**   3:*13,
20*   9:*12*
**define**   72:*20*
108:*15*
**Defined**   89:*25*
**definitely**
105:*18*
**definition**   71:*7,
8, 10, 14*
107:*10*   108:*19*
**degree**   16:*2*
**delay**   57:*16, 17*
**delegation**   33:*2*
34:*15*   42:*13*
45:*17*   56:*23*
60:*13*   69:*3, 6,
8*
**democratic**
105:*12*   106:*2,
5*   107:*5, 15, 19,
21, 22*   108:*1, 2,
10, 21*   109:*8,
20*   110:*12*
**democrats**
107:*20*   109:*2,
13*   110:*3*

**Caster Plaintiffs' Exhibit 90, Page 35**

Evan Milligan,et al v. John H.Merrill, et al.                          Jim McClendon
                                                                       12/17/2021

demographer
  31:17    41:21
  67:13
demographics
  42:25    43:1, 2,
3
department
  20:15, 18    45:2
  47:24    48:3
  50:11
depend    82:13
dependent    66:1
deposed    10:3
  23:16
DEPOSITION    1:9,
19    2:2, 3, 13
  7:12    9:15, 18
  11:10, 14    13:2,
12    17:25
  18:13, 23
  19:18    22:5, 14,
21    90:11
  104:9, 12
  113:12    114:4, 7
depositions    2:6
describe    47:3
description
  89:23, 24
designate    58:8
determine    38:10
  54:21    59:15,
23    66:19    67:4
  91:15
determined
  55:13    92:3
determining    60:1
DEUEL    3:18
  8:13
develop    40:13
developed    59:25
Dial    32:11
D-I-A-L    32:13
die    86:8
differ    105:13
  106:5    107:5
  108:21    109:8,
20    110:12, 16
difference
  20:16    27:17
different    27:4
  70:1, 2    71:17

109:12, 13
diluting    65:9
dilution    39:13
direct    71:4
disapprove    34:16
disapproving
34:19
discrimination
  77:18, 23    78:2
  109:23    110:18
discriminatory
48:6
discuss    29:5
  30:25    56:12
  60:9, 12, 14
  69:19    81:13
  89:4    102:24
  103:1
discussed    22:4
  78:19, 22, 23
  83:14, 15    89:2,
6
discussing    20:6
  28:22    47:18
  50:9    74:21
  75:11    90:13
Discussion    8:8
  30:14    95:5
  102:10    107:8
discussions
28:14
disparate    109:12
distances    102:4
DISTRICT    1:1, 2
  7:15, 16    24:23,
25    26:1    33:4
  42:25    43:5, 12,
16    48:5    71:4
  78:6, 7, 12
  80:8    81:2, 6
  84:7, 15, 19
  85:9    86:17, 23
  87:9, 18, 19, 22
  88:3, 8, 14
  90:15, 16, 21,
25    92:9    93:13
  96:3, 7, 14
  97:5, 7    112:17,
22
districting
  39:16    52:3

districts    18:7
  24:6, 10    38:12
  39:10    42:19,
22    43:10    46:5,
15    47:19
  50:24    51:7
  52:5, 15    65:6
  70:5, 19    73:10,
12, 19    88:10
  91:2, 6, 9, 13
  93:10, 23    97:8,
9, 11    112:25
doctorate    16:4,
6
document    19:14,
17, 20, 25    20:5,
10, 12, 23    21:6
  36:1, 8, 10, 21
  37:2, 5, 8, 13,
14, 19    47:2, 12
  61:5, 24, 25
  64:6, 10    70:11
  77:2    94:5, 7
  100:14, 15
  101:11
documents    13:17,
21, 22, 25    14:2,
3    19:1, 3
  22:13, 15, 24
  23:2    113:20, 21
doing    62:7
  66:14    82:12
  83:14, 25    84:19
DOJ    47:25
DORMAN    5:11
  7:23    18:11
  35:14    49:14
  66:2    82:17
  92:16
dosher@elias.law
  4:21
Dowdy    8:2
dozen    58:25
draft    37:14
  112:18
drafted    37:13,
15, 17, 19, 21
  40:18    112:25
drafting    42:18
Drake    61:20
draw    74:5
  75:11

drawer    30:24
  33:1    42:2
  53:8, 11, 14, 25
  54:13, 19, 25
  55:6, 13    56:7,
12    66:2    67:18
  68:6, 12, 16
  69:2    82:6
  88:5, 20    89:21
drawing    32:15
  34:9    41:9
  43:9    68:24, 25
  89:16
drawn    24:11
  34:19    39:10
  65:7    68:17
  73:25    87:18,
19    91:3
draws    28:13, 25
  29:19    30:20
drew    88:16
  97:8
drop    19:13
  61:1    63:16
  76:10    100:2
dropped    36:12
dropping    35:4
  46:20    94:3

dross@naacpldf.org
  3:23
dues-paying
  104:24
duly    8:22
  115:13
duties    31:2, 3
dwalker@balch.com
  5:16

< E >
earlier    12:9
  23:10    73:9, 18
  85:21    103:2
  107:9
early    99:18, 21
easiest    96:12
easily    36:17
east    72:11
EBENSTEIN    4:1
  8:17

Caster Plaintiffs' Exhibit 90, Page 36

Evan Milligan,et al v. John H.Merrill, et al.                                                  Jim McClendon
                                                                                                12/17/2021

education   16:12
 26:23, 24
 38:12, 16   56:23
Educational
 3:13, 20   9:12
effect   2:4
 65:9
effective   48:8
 50:5
Eight   100:6, 7
either   97:10
electability
 86:17
elected   20:21
 24:16, 19, 20,
 22   26:8   30:1
 32:4, 5   70:15
 87:4   105:5
election   78:12
elections   43:24
electoral   48:8
 50:5
Elias   4:18
email   15:9, 12,
 13   58:22
 100:1   101:17,
 23   103:12
employed   17:10,
 12
employees   20:20
endeavor   64:20
ENDED   114:7
endorsed   25:5
ends   114:3
England   79:4, 8
 83:11   84:14
 86:4, 6, 21
ensure   66:6, 11
 82:5   88:9, 13
ensuring   65:23
 69:8, 12   97:21
entail   53:14
error   80:18
errors   85:17
essentially
 28:10
established
 38:16, 23   39:20
et   1:6, 10
 7:13, 14
ethnic   39:14

evaluated   79:20
evaluation   77:16
EVAN   1:6   7:13
 8:1
events   53:8, 22
everybody   41:17
 63:11   103:17
evidence   2:14
evidenced   115:15
exact   33:23, 24
 88:24
exactly   19:25
 27:11   33:22
 41:18   78:14
 83:25   107:10
 113:5
examination   7:8
 9:9   104:1
 111:4
examined   8:22
example   28:14
 44:3   70:6
 82:7
exception   99:4
exceptions
 105:19
Excuse   106:20
 111:18
exercise   48:8
 50:5   83:19
exercised   83:6,
 7
exercising   83:8
Exhibit   6:9, 11,
 13, 15, 17, 19,
 21, 23   19:15
 35:5, 7, 22
 36:2, 5, 7, 24
 46:24, 25   47:9
 49:22   51:19
 61:5, 12   63:17,
 18   64:3   70:17
 76:15, 22
 79:23, 24, 25
 84:11   90:12
 94:4, 5, 13, 16
 98:19   100:5,
 10, 22, 25   101:3
exhibiting   73:19
exhibits   74:24
existing   32:17,

19   73:11
expect   18:16
experience
 82:14, 15
 108:20   109:1,
 6, 18   110:14
experienced
 89:12
experts   66:15
Expires   115:23
explaining
 41:21, 22
express   44:10
 79:13
expression   83:21
extent   70:21
extra   77:18
eye   41:12, 13

< F >
Facebook   15:17,
 18
fact   21:12
 37:10   73:23,
 24   74:14
 77:19   113:4
factor   96:19
failure   50:12
fair   44:10
fairly   85:16
familiar   37:4
 48:10   64:9
 66:17   67:7
 77:4, 6
far   36:16
 50:11   68:2
 70:5
fast   73:14, 16
feasible   102:6
Federal   7:4
 38:8   97:20
 98:3
feel   60:5
feeling   107:21
felt   83:19
 92:7
figure   57:14
 100:18
file   15:4
filed   7:15
final   59:4

61:7   113:17
finalize   99:15
Finally   14:8
financially
 115:11
find   38:25
finish   12:1, 2
 49:9
firm   35:16
first   10:1
 24:16   25:14
 26:8   37:6
 55:25   57:11,
 13, 18   63:7
 67:7   78:3
 81:20   85:25
 88:21   93:2, 4
 95:7   99:18
 100:18   103:22
fiscally   25:16
fishing   72:21
five   63:21, 22
five-minute
 49:6   90:4
FL   3:14
flag   78:9
floor   19:7
 20:24   21:1, 11,
 21   93:6, 21, 24
 94:2, 6, 23
 95:10, 14
focused   62:19
follow   66:17
followed   40:21,
 25   41:6, 8, 24
following   7:9
 33:9, 11   38:14
 40:17   41:1, 10
 90:12   92:19
 102:12   115:16
follows   8:23
force   2:4
foregoing   7:5
Forgive   106:20
form   2:10   9:1
 40:22   50:19
 105:24   106:19
format   20:1
forward   47:18
 56:20   101:22
found   72:12

Caster Plaintiffs' Exhibit 90, Page 37

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

85:17   115:16
**Foundation**   4:3
**four**   18:21
**fourth**   110:10
**four-year**   26:2,
4
**frame**   55:18
**franchise**   48:9
50:6
**Friday**   100:8
**front**   36:2, 8
60:23   67:9
101:12   109:1
**full**   2:4
28:17   102:9
**full-service**
35:15
**Fund**   3:13, 20
9:12   21:23, 24
26:22, 23
**FURTHER**   2:1, 8
9:23   81:15
113:9   115:9, 13
**futile**   57:15
**futility**   83:19
**fuzzy**   34:4

< G >
**gained**   108:9
**gathered**   81:16
**General**   5:3, 4
21:23, 24
26:22   65:21
105:19   108:10
109:15, 16
**generally**   53:12
94:22   95:9
105:12, 17, 20,
25   106:2, 5, 7
107:5   108:21
109:8   110:12,
13, 16
**General's**   7:21
**generated**   87:17,
19
**generically**
30:11
**geographic**   72:10
**Gerald**   32:11, 12
**gestures**   11:21
**getting**   28:2

**give**   10:23
14:3   49:1
56:13   61:10
64:8   70:6
74:7   77:22
83:17   85:24,
25   103:24
106:10   113:22
**given**   20:3, 23
34:21, 24
**giving**   23:8
108:15
**glanced**   77:5
**go**   15:24   16:1
21:20   29:22
32:22   34:18
38:20   39:7
41:1   62:23
65:13, 23
66:14, 23
68:19   70:5
84:10   85:4
86:11   89:7
98:11, 17
103:22   110:6
113:25
**goal**   24:9
42:18, 24   43:5
75:24
**goals**   42:21
66:8
**goes**   27:23
50:12   84:18
105:3
**going**   8:5
9:23   14:11, 15
19:13   20:24
21:1, 11   22:12,
16   27:19
36:15   37:11
40:19   46:20,
23   49:4   53:9,
18, 19   56:4, 9
57:14   61:1
63:16, 18   73:9
76:10, 20   82:3
84:10   86:18
89:6   100:2
102:5   104:16
**Good**   9:10
37:18   52:25

69:10   70:25
79:5   86:14
**Gosh**   100:7
**gotten**   21:12
**governing**   59:18
103:3
**governor**   56:15
57:1
**Greater**   8:2
**grounds**   2:12
**Group**   4:18
44:9   104:25
**guess**   12:12
30:9, 10   44:15,
20   78:3   88:23
89:5   95:3
99:3   101:9, 19
**guessing**   34:6
**guidance**   34:21,
24
**guidelines**   6:12,
18   28:15
36:14, 20
37:11, 12
38:14, 23   39:5,
6, 15   40:20, 21,
25   41:2, 3, 6,
15, 17, 18, 20,
21, 24   42:3
44:25   52:4, 14
64:1, 17   65:20
66:1, 4, 7, 17
70:8, 13   77:21

< H >
**half**   57:9
58:25
**Hall**   6:24
58:15   59:5
80:3, 12, 25
83:12   99:24
101:19, 24
102:14   103:6
**Hall's**   102:19
**hand**   93:5
**handed**   101:4
**handle**   102:22
**handled**   93:2, 3
**handling**   21:24
**Hang**   21:5
**happen**   81:12

**happened**   21:23
86:12   109:4
**happens**   98:6
104:5
**happy**   35:17
86:15
**hard**   52:7
61:18
**Hatcher**   95:17,
20
**Hatcher's**   96:3,
10, 20   97:12
**health**   26:22, 25
**hear**   12:17, 24,
25   68:10   96:8
104:2, 3
**heard**   68:9, 11
69:23   104:13
**hearing**   6:16
8:4   99:7, 13
101:25   102:7,
9, 15   107:11
**hearings**   33:7,
14, 17   55:14,
18, 21, 23   56:7,
21   58:6, 12, 18
59:8, 16, 19, 23
60:2, 9, 15, 18
61:7   62:1, 6
98:11, 21   99:1,
6, 9, 10, 12, 16,
25   102:8, 15,
20   103:3, 7, 9,
12
**heart**   110:6
**held**   8:8
60:19   63:13
98:12   99:6
102:15
**Hello**   111:5, 6
**help**   28:16
29:25   36:18
52:9   53:8
55:20   62:12
**helpful**   46:21
**helps**   48:13
**hereinafter**
38:18
**hesitant**   107:12
**high**   15:24
88:14
**highly**   83:13

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

Hinaman   88:17,
21, 25   89:9, 14
112:16
Hinaman's   88:18
historically
62:4
Hogan   3:6   8:11
hold   33:21
62:25
home   19:11
hopefully   20:4
host   62:20
hour   49:5
hours   18:15, 24
98:14   99:1
house   10:10
15:7   20:15
22:2   24:5, 10,
24   26:1, 6
27:3, 6, 21
28:7, 9   29:10,
15   30:6, 17
31:17, 23, 24
32:3, 4, 6, 7
45:19, 25   46:1
49:24   53:6
57:3   60:20
64:12   71:4
99:5   112:3, 13
Houston   16:4, 5
hundred   37:19
79:5
hypothetical
82:2, 3, 13

< I >
idea   37:18
56:14   62:9
78:15   110:5
identification
35:23   36:25
47:10   61:13
64:4   76:16
94:14   100:23
II   65:6   70:16
III   39:8   70:17
imagine   37:22
immediately
74:15
implemented   48:2
importance   41:16

important   11:18,
24   29:25
41:20   97:18, 24
inaccurate
49:17   50:2, 13
inappropriate
98:5
inaudible   24:23
33:9   74:25
include   111:15
112:17, 21
including   39:12
112:7
income   73:2
increase   33:5
increased   84:3
incumbent   78:4
96:6
incumbents
96:13   97:13,
21   98:7
individual
108:16   112:1,
15
individuals   82:6
information
12:8   15:3
34:25   40:4
53:12   56:18
81:15   83:17
86:16   93:4
initially   53:23
95:3
injustice   43:23
input   55:17
102:17
inside   66:4
insist   82:11, 23
instruct   29:4
112:16
instructed
12:21   13:5
instruction
29:20
instructions
89:8
interest   70:20
71:1, 2, 7, 11,
13, 14, 17, 18,
20, 22, 23   72:1,
2, 5, 7, 8   73:6

interested
102:3   115:11
interests   71:6
interim   21:18,
19   27:18
interpreted   30:5
interviewed
51:20   88:6
introduce   42:11
45:15, 21   48:20
introduced
45:25   48:18
75:5   92:5
93:20, 23   94:1,
2   95:16   102:11
introducing
91:21
introduction
34:16   40:4, 17
introductions
8:10
involved   10:14
55:7   57:4
68:24, 25   70:7
103:17
involvement
31:11   45:1
issue   20:8
23:24   78:1, 2,
10   81:14   86:5
105:14   107:7
108:25   109:3
110:16
Issues   21:7
30:25   70:2
108:2, 7
items   28:21
its   40:4

< J >
Jackson   8:2
JAMES   1:10, 20
5:9   7:7   8:21
9:25
J-A-M-E-S   10:2
January   14:19
jebenstein@aclu.or
g   4:6
Jefferson   17:7
115:2
JIM   5:2   7:12,
20, 24   18:19,

24   49:23   50:9
103:22   111:7
114:4
jim.davis@alabamaa
g.gov   5:7
jim.mcclendon@alse
nate.gov   15:14
jimmcc@windstream.
net   15:13
job   41:25
55:4   66:11
68:20   81:16
89:22, 23, 24
jobs   66:10
JOHN   1:10   5:1
7:13, 21
joint   38:17
40:15
Jones   14:22
judge   10:20
judicial   45:7,
12
JULIE   4:1   8:17
July   99:17, 18,
22
jump   81:17
June   58:20
59:9, 11   60:8
99:19
justice   45:2
47:25   48:3
50:11   109:10,
13

< K >
KAITLIN   4:8
Katherine   9:2
KATHRYN   3:11
7:25   9:11
15:2   21:5
23:4   35:7
36:11   49:4
65:16   100:13
113:16
keep   13:14
30:2   42:21, 24
43:1, 5   70:25
71:2, 3
kids   16:21
kin   115:10
kind   57:23
76:21

Evan Milligan, et al v. John H. Merrill, et al.

Jim McClendon
12/17/2021

knew    33:4
89:21
know    12:6, 9,
14    14:9, 16
17:19    18:5
19:24    27:17
29:12    30:1
31:10, 20
33:22    37:13,
15, 17    40:20
42:1, 4    43:3,
4, 7, 19    44:15,
17, 18, 21, 22
45:19    46:21
48:17    57:20,
21    58:3, 19
59:3    60:16, 22,
24    61:2    63:4,
11    69:10, 22,
24    72:14, 21,
24    74:6, 8, 9
77:3    78:3
79:17    82:2
83:1, 3, 5, 8
88:2    90:1
91:12, 14    92:8,
10, 12, 13    96:5
98:16    100:14
105:16    107:19
110:2    111:23
112:12    113:18
knowledge    12:14
46:6    59:20, 24
67:10    68:23
86:9    88:15
103:5, 10    113:3
known    41:24
79:11
ksadasivan@naacpld
f.org    3:16
kwelborn@aclualaba
ma.org    4:13

< L >
landed    101:10
language    14:7
Large    1:22
7:3    62:19
largely    13:2
larger    28:2
Laura    59:5
80:3

law    1:22    3:5,
12, 19    4:2, 9,
17, 18    5:12
24:12    25:24
29:9    30:1, 4
31:5    35:15
59:16, 18
66:18    97:18,
20    98:3    103:4
laws    2:5    39:11
lawsuit    17:22
23:4, 7, 8, 11
lead    47:22
leadership    28:11
leading    2:11
LeAnn    1:21
7:1    115:22
led    48:19
left    61:21
Legal    3:13, 20
9:11    67:6
82:13    103:8
legislation
108:3, 7
111:13, 19, 20
112:5, 7
legislative
9:20    23:23
26:18    27:9
36:13    38:11,
15, 17    40:5, 7
45:22    56:15
60:13    61:6
63:8    75:2
92:17    94:24
Legislators
39:24    40:12
56:22
legislature
17:23    26:20
33:6    34:17
38:7    40:10, 15
46:16    76:1
97:20    104:19
105:11    107:4,
20, 25    108:6,
20    109:7, 19
110:15
legislature's
38:17
lest    40:20

Letetia    8:2
letter    58:22
letting    77:3
level    73:2
liaison    62:12
103:14
Liberties    4:3,
10
license    16:13
licensed    115:14
Likewise    11:24
line    67:19
68:7, 17, 19
71:9
lines    32:18, 19,
20, 23    66:3
73:25
list    52:21
listen    54:16
listening    73:14,
16
litigation    10:9
20:3    111:16, 18
little    14:16
27:17    52:9, 10
53:17    84:4
98:11
living    17:2
LLP    3:6
loaned    55:20
local    103:15
location    60:1
102:3
locations    55:22
58:11, 18
102:1    103:16
log    113:17
logical    84:19
long    16:18
25:25    26:19
77:2    86:1
104:18    105:3,
5, 7
longer    78:7, 11
look    13:24
14:2    22:14
23:2    29:9
35:1    47:5
49:2, 10    61:18,
25    64:8, 14, 15
67:20    74:2
79:18    84:13,

15    87:2    94:17,
20    95:8
100:17    101:3,
13
looked    19:5
22:15, 23
41:12, 13    58:13
looking    36:22
52:20    64:14
101:11, 18, 23
looks    19:24
37:4    47:2
61:17    64:9
77:4, 5    100:19
Los    3:8
losers    98:8
lost    48:21
lot    53:19
71:17    86:16
107:19
loud    38:4
Lovells    3:6
8:12
low    88:11
lower    73:2
Lyman    47:17

< M >
ma'am    29:7
40:24    45:10
main    22:9
54:4, 5, 9    73:4
maintain    16:13
73:19
maintaining
73:10, 11, 18
majority    43:13,
17    46:5, 15
47:19    50:24
51:6    52:4, 15
93:9, 13, 23
96:3    97:4, 7,
10    112:17, 21
making    9:14
31:4    50:15, 21
108:17
manner    55:5
60:1    103:3
map    20:8    29:1,
19    30:20    33:1
34:9, 13, 16, 19
35:1, 2    41:9

Caster Plaintiffs' Exhibit 90, Page 40

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

42:2, 10, 12, 16
45:7   46:15
48:18   53:7, 11,
14, 25   54:13,
19, 24   55:6, 13
56:7, 11   66:2,
20   67:4, 18
68:6, 12, 16, 22,
24   69:1, 2, 8,
13   73:20
75:11   76:6, 7,
9   82:6   84:20
87:25   88:5, 20
89:21   92:4, 5
93:3   95:16
96:5, 20, 23
97:3, 12, 19
102:3
**map-drawing**
41:2   66:6
67:17
**map-making**   64:19
**maps**   28:13
32:16   34:10
40:9   74:5
75:25   76:2
88:16   89:16
93:9   102:10
**mark**   19:14
35:5   36:1
46:24   61:5
63:18   76:21
94:4   100:4, 10
101:4
**marks**   7:11
50:4
**Maroney**   1:21
7:1   115:22
**married**   16:16,
18
**materials**   13:18,
20   89:15
**matter**   7:13
98:4   109:15, 16
**McCLENDON**   1:10,
20   5:9, 10
7:7, 12, 24

8:21   9:10, 25
19:20   35:5, 25
36:2   37:3
46:24   47:13
49:9, 23, 25
50:10   51:18
58:1   61:5, 9
63:18   64:7
65:19, 22
70:17   79:23
80:6   82:19
84:10   90:10,
12   94:4, 18
95:5, 8, 23
98:19   100:4,
10   101:11
104:2   114:4
**M-c-C-L-E-N-D-O-N**
9:25
**mean**   13:24
24:7   25:13, 18
27:9, 11, 14
29:16   38:24
67:22   76:7
78:17   81:16
87:1   97:7
106:15, 18
**Meaning**   8:25
11:14
**means**   39:4
106:16
**meant**   22:12
30:22   44:6
87:2   111:19
**media**   15:15
**medication**   11:1
**meet**   18:23
28:12, 23, 24,
25   30:19
56:22   88:21, 25
**meeting**   21:13,
15   22:19
28:17   30:20
35:3   57:18, 23,
25   63:12
70:12   74:12,
20   75:5, 13, 21,
23   76:13   77:8,
11   78:19, 21
83:15, 23
85:14, 15
86:20   90:18

92:4, 20   99:5
101:25
**meetings**   6:24
29:2, 3, 6, 18
30:8, 23   33:20
34:2, 5   55:15
56:2   62:10, 21,
22, 24   63:2, 3,
4, 6   74:15, 25
75:9, 17   93:8
101:21   107:19
**meets**   28:12
**member**   26:5, 7
104:21, 24
105:2, 4
107:22   111:23
112:12
**members**   20:13
22:10   27:21
30:1   32:3, 6
33:2   34:21
40:10   42:12
57:2   58:24
60:6, 13   69:5,
7   76:3   79:1
91:22   96:6
101:25   102:6,
8   105:12, 13
106:1, 4, 6
107:4, 6, 15, 16
108:6, 22
109:2, 7, 9, 19,
21   110:11, 13,
15   111:9   112:2
**memory**   48:14,
15   75:6
**mention**   44:25
**mentioned**   22:22
71:12
**MERRILL**   1:10
5:1   7:14, 22
9:13, 19   111:8
**met**   18:14
22:22   33:1
69:2   75:1
92:1
**MICHAEL**   3:4
8:11
**michael.turrill@ho**
**ganlovells.com**
3:9
**middle**   72:11

**MILLIGAN**   1:6
3:3   7:13   8:1,
12, 13, 18   9:13,
18   113:11
**million**   84:5
**mind**   23:8
25:15   29:7
49:6, 8   77:3
79:22   84:11
90:3   106:23
110:8
**Ministries**   8:3
**minority**   39:14
46:5, 15   47:19,
23   48:4, 7
50:24   51:7
52:4, 15   65:10
78:4, 8, 11
87:3, 10   88:10
93:23   96:3
97:4, 6, 9
**minus**   64:16
**minute**   78:20
94:17, 20
**minutes**   49:1
**missed**   78:20
**mobile**   14:25
15:23
**moment**   103:24
**Monday**   113:21
**money**   83:20
**Montgomery**   1:23
4:12   5:6, 15
60:18   62:2
72:2, 3   99:5
**Montgomeryadvertis**
**er.com**   6:14
**monuments**
105:15   106:8
**motion**   95:19
**move**   8:6   48:7
52:23   68:6
74:25
**moved**   67:19
95:23
**multiple**   73:8
74:7

**< N >**
**N.W**   3:21
**NAACP**   3:13, 20
8:3   9:11

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

---

name    9:10, 24
  10:1    72:16, 17
  92:16    115:16
names    7:19
nature    25:20, 22
nay    97:1, 2
NE    4:19
necessarily
  68:12    73:7
necessary    2:9
  38:10
need    9:1    14:8
  28:15    31:2
  43:18    49:5
  56:20, 21
  67:20    81:6, 22
  82:18    84:16
  89:19, 20
  102:23    109:25
  113:16, 21
needed    22:9
  33:4    55:4
  56:13    80:9
  81:15    82:9
  83:18    86:24
  90:15    91:3, 7
neighborhoods
  70:20
neither    65:9
  115:9
never    74:10
  83:7    86:10, 12
  104:4
New    3:15    4:5
  74:10
news    47:16
nodding    11:21
normally    77:19
North    115:23
NORTHERN    1:2
  7:16
Notary    1:21
  7:2
notes    19:6
notice    9:17
  96:12
November    6:22
  94:6    95:10
Number    7:14
  14:23, 25    15:8
  22:15    33:23,
  24    39:19

40:14    47:1
  75:23    85:20
  86:7, 10, 13
  87:15    98:22
  101:5    102:13
  115:16
numbers    15:5
  33:4    54:18
  87:17
numeral    39:8, 25

< O >
oath    10:17
object    12:18,
  25    24:9    90:22
Objection    40:22
  50:19    105:24
  106:12, 14, 19
objections    2:9,
  12    9:1    12:19
  13:2
objectively
  102:16
objectives    70:12
obtaining    45:2
occur    33:17
  68:21
occurred    98:14
  99:1, 12
October    6:20
  75:20, 23
  76:12    77:8
  78:19    83:23
  85:15    86:19
  90:17    92:3
offered    2:14
  76:9    95:20
Office    5:4
  7:21    15:6
  20:19    24:17
  26:3    40:8, 11,
  18    101:21
offices    1:22
official    9:19
  105:6
officials    70:15
Oh    13:24
  35:13    47:6
  63:3    71:15
  78:25    94:9
  104:4

Okay    8:9    13:6
  19:23    25:25
  27:12    29:21,
  23    35:10
  36:18    38:25
  45:9    47:6
  51:10    52:6
  58:3    61:23
  64:1    77:7
  78:25    85:24
  88:3, 8    93:18
  94:9    95:22
  96:1    98:24
  100:20, 25
  101:6    103:24
  105:10    106:22
  108:14    109:11
old    16:25
once    33:3
  54:25    66:3, 22
  82:12    88:6, 7
  109:25
ones    113:22
opinion    67:7
  81:14, 22
  82:14    108:24
opinions    82:20
opportunity
  44:10    46:14
  50:24    93:12,
  16    96:22    97:9
  102:17
optometrist
  16:14    17:11
Optometry    16:7,
  13    17:9
oral    7:8
order    21:21
  25:24    55:3, 4
  59:13
ordered    83:18
organizations
  110:2
original    62:9
OSHER    4:16
  6:3    8:15
  103:21    104:1
  106:22    110:21
  113:14
outside    45:24
  75:10    81:16

overlapped    99:10
overseeing    66:5

< P >
p.m    1:24    7:17
  9:5, 8    51:14,
  17    90:6, 9
  99:2    114:5, 7
P.O    4:11
PAGE    6:8
  37:24    39:7, 22
  40:2    47:21
  49:22    79:22
  80:1    84:12, 14
  86:19    95:4, 18,
  20, 24, 25
  100:18    101:1,
  3, 6, 7, 8, 9, 10
  102:12, 13
paid    17:17
Paige    5:20
paired    97:14, 22
paper    66:4
paragraph    37:25
  38:22    39:23
  47:21    50:9
  84:14
paragraphs    39:9
  49:25    50:7
  70:22
Pardon    20:11
  68:14    89:3
part    28:10
  37:6    50:14
  52:20    55:1
  67:16    71:13,
  16    91:19    99:21
participate
  102:4
particular
  22:18    65:24
  67:19    68:17
  70:12
particularly
  71:2
parties    1:18
  2:11    102:3
  110:15    115:10
parts    72:6
party    23:11
  25:2, 4    104:22
  105:2, 5, 12, 13

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

106:*2, 5, 6*
107:*5, 6, 16, 19,*
*22*   108:*1, 2, 10,*
*11, 21, 23*
109:*8, 9, 20, 21,*
*25*   110:*1, 4, 12,*
*13*
**pay**   23:*5*
**PDF**   101:*7*
**pending**   14:*10*
108:*3, 6*
**people**   110:*2*
**percent**   37:*19*
64:*16*   79:*5*
80:*9*   84:*3, 23*
85:*10, 20*   86:*7,*
*11, 12, 25*   87:*9,*
*15*   90:*17, 21*
91:*1*   96:*17*
**percentage**   84:*21*
**percents**   86:*14*
**perception**   73:*1*
**period**   27:*23*
28:*3*   30:*15*
**permanent**   9:*20*
27:*9, 14, 20*
38:*17*
**permit**   39:*16*
**permitting**   46:*4*
**person**   28:*13,*
*25*   29:*19*
30:*20*   41:*9*
42:*2*   58:*1*
69:*4*   78:*4*
88:*7, 8*
**personable**   82:*20*
**personal**   12:*14*
15:*3, 12, 15*
**personally**   57:*13*
**personnel**   55:*20*
**phone**   8:*7*
13:*14*   14:*25*
15:*5, 6*
**phrase**   29:*8*
**pick**   102:*8*
**picking**   98:*8*
**picks**   86:*13*
**pit**   98:*6*
**pitted**   96:*6*
**place**   8:*6*
70:*14*   77:*17*
93:*4*

**Plaintiffs**   1:*8*
3:*3*   4:*15*   8:*1,*
*12, 14, 16, 18*
9:*13*   103:*20*
111:*2*   113:*11,*
*15*
**Plaintiff's**   6:*9,*
*11, 13, 15, 17,*
*19, 21, 23*
35:*22*   36:*24*
47:*9*   61:*12*
64:*3*   76:*15*
94:*13*   100:*22*
**plan**   40:*3*
45:*3*   46:*4*
47:*18, 22*   48:*1,*
*2*   49:*24*   50:*10,*
*25*   51:*7*   52:*2,*
*13*   58:*10*   65:*8,*
*17*   91:*15*   95:*1*
96:*4, 10*
111:*25*   112:*14,*
*18, 21*
**planning**   57:*6*
**plans**   39:*19, 23*
40:*17*   42:*6*
45:*16*   93:*13*
**play**   35:*17*
58:*5*
**please**   7:*18*
9:*23*   10:*1*
12:*1, 6, 9, 12*
13:*14, 17*   14:*2,*
*9*   37:*24*   38:*2*
39:*7*   45:*10*
47:*4*   80:*16, 23*
81:*4*   84:*11*
85:*6*   91:*5*
94:*18*   100:*4*
**plus**   64:*15*
**point**   12:*7*
24:*4*   32:*14, 15,*
*17*   42:*15*   54:*4,*
*6, 8, 9*   56:*25*
86:*18*   107:*14*
**points**   6:*10*
19:*6, 23*   20:*7*
21:*7, 8*   22:*3,*
*7, 8, 9, 13*
23:*1*   35:*8*
93:*7*

**polarization**
69:*20*   77:*12,*
*14, 24*   80:*14,*
*15*   81:*25*
84:*25*   85:*11,*
*23*   90:*20, 24*
**polarized**   78:*17*
79:*9, 14*   80:*4*
82:*10, 24*
**policies**   25:*19*
64:*21, 24*   65:*2*
**policy**   25:*21*
26:*24*   39:*16*
65:*24*   70:*16, 24*
**political**   25:*2*
70:*20*   71:*2, 6,*
*12*
**polls**   44:*11*
**population**   33:*3,*
*5*   38:*12*   40:*9*
43:*6, 13, 17*
47:*24*   48:*4*
80:*8, 10*   84:*1*
86:*23*   87:*9, 21*
90:*14*   96:*16*
**portion**   77:*11*
**possible**   10:*20*
70:*25*   71:*5*
**potential**   69:*18,*
*24*   84:*24*   85:*22*
**power**   82:*4, 23*
**practicable**
70:*21*
**precedent**   97:*24*
**preclearance**
39:*20*   44:*25*
45:*3, 7, 12*
**preference**
108:*16*
**premed-type**
16:*10*
**preparation**
18:*17, 22*   93:*7*
**preparations**
28:*11*
**preparatory**   14:*7*
**prepare**   18:*12*
22:*14*   57:*12*
92:*22, 25*
**prepared**   56:*14*
**preparing**   58:*17*

**PRESENT**   5:*19*
7:*18*   18:*21*
93:*5*
**presentation**
40:*5*
**pretty**   16:*10*
28:*19*   36:*16*
53:*6*   72:*10*
87:*13*
**previously-**
**approved**   48:*5*
**primary**   25:*3*
42:*24*   43:*5*
**principles**   52:*3*
**Pringle**   18:*20,*
*23*   22:*23*   55:*9,*
*13*   57:*4*   104:*8*
**prior**   2:*14*
20:*24*   21:*1, 11,*
*12*   22:*18*
26:*11*   54:*10*
63:*13*   64:*19*
74:*16*   91:*17*
92:*2*
**privilege**   90:*23*
113:*17*
**probable**   83:*13*
**probably**   29:*24*
46:*22*   57:*8*
61:*23, 24*   63:*8*
66:*25*   67:*1, 15*
73:*3, 4*   85:*18*
86:*16*   89:*6*
101:*16*
**problem**   44:*1, 2,*
*5*   49:*12*   67:*20,*
*21, 22*   68:*7*
97:*3*
**problems**   43:*23*
**Procedure**   7:*5*
**proceedings**   7:*9*
115:*5, 8*
**process**   22:*16*
27:*25*   28:*6, 12*
33:*7*   34:*9*
37:*12*   39:*20*
40:*5*   41:*2*
45:*12*   52:*24*
53:*17*   57:*7, 12*
64:*19, 23*   65:*3*
66:*3, 6*   67:*17*

Caster Plaintiffs' Exhibit 90, Page 43

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

70:7   88:19
89:15   91:19
**produce**   74:3
84:20
**produced**   20:2
39:23   47:16
67:9, 13   100:16
**production**
113:19
**programs**   108:18
**projected**   56:19
**proposals**   40:13
**proposed**   40:3
45:3, 15   68:19
96:23   97:19
102:2, 7
**proposing**   45:6,
11
**protections**
39:12
**proved**   42:13
57:15
**provide**   11:3, 7
40:11   89:8, 14
**provided**   20:7
38:9
**provides**   43:24
48:15
**providing**   102:17
**Public**   1:21
6:16   7:2
24:16, 17   33:6,
13   40:4   55:14,
17, 21, 23   56:7,
21   58:6, 12, 18
59:8, 15, 18, 23
60:1, 9, 14, 18,
19   61:6   62:1,
6   98:11, 21, 25
99:6, 7, 9, 10,
12, 13, 16
102:7, 9, 17, 19
103:3, 7, 9, 12
105:15   106:8
**pull**   36:19
63:18
**pulled**   94:16
**purpose**   22:7
48:7   65:9
**purposes**   10:18
70:12

**pursuant**   7:4
37:25   38:5
**put**   34:14
35:2   47:18
52:21   58:13
63:10   96:6, 13
**putting**   66:3

**< Q >**
**question**   9:2
12:2, 5, 8, 18,
20   13:1, 4
14:10, 11
26:16   34:7, 24
37:20   40:23
43:8, 15   44:4
45:20   49:9, 20
51:4   54:7, 15
58:4   64:25
69:10, 11
72:22, 25   83:2
86:1, 3   92:11
95:3   97:25
98:24   105:22
106:1, 11, 24
107:13   109:11,
14   110:7, 8
**questioning**
10:18
**questions**   2:10,
11   11:2, 3, 6,
7   14:16   49:3
85:25   103:19,
20, 21   104:6,
14, 17   111:1
**quick**   67:18
**quickly**   40:19
46:25   51:19
67:1   73:15
77:1
**quite**   18:1
34:23   44:3
53:15   77:1
**quotation**   50:3
**quote**   48:22
49:17, 19, 20
50:2, 7   68:3
90:13
**quoted**   47:20
50:1
**quotes**   50:14

**< R >**
**race**   43:9
44:10   108:17
113:1
**races**   79:21
**racial**   39:14
42:25   43:2, 3,
22, 23   44:1, 2,
5   69:19   73:12,
21, 23, 24   74:1
77:11, 13, 17,
23   78:2, 10
81:25   84:25
85:10, 23
90:19, 24
**racially**   78:17
79:9, 14   80:3,
14   82:10, 24
**ran**   25:6
**Randy**   88:17, 18
112:16
**RC**   100:11, 15
101:5   102:13
**reach**   53:25
**read**   17:24
18:2, 3, 4
19:12, 22
37:24   38:2, 22
39:7, 8, 22
41:3   44:7
48:23   50:15
80:5, 11, 16, 24
81:4   85:3, 6,
7   86:4
**reading**   2:2
**ready**   49:15
56:25   58:14
**real**   107:12
**really**   19:22
23:4, 5   45:8
48:21   51:19
69:5   77:6
108:24
**reapportionment**
6:12, 18   9:21
27:10, 13, 15
30:7, 18, 21
31:14, 18, 23
32:6, 10   33:21
34:8, 12   36:14
37:10, 16

38:18, 19   39:5
40:6, 8, 11, 18
42:6, 9   53:2
54:20, 23
55:15, 16   56:5,
10   57:3   60:10,
14   61:6   62:25
63:25   64:18
65:4, 22   74:13,
20   75:6, 10, 21
76:3, 13   77:9
82:5, 24   85:15
86:20   90:18
91:25   98:10
**reason**   10:23
49:16   50:1, 8,
12   74:19
108:25
**recall**   12:7
37:11   42:8
45:18   48:24,
25   50:15, 21,
23   51:6, 9
62:15   96:5
**received**   54:14,
25   58:23
59:12   95:12
101:16
**receiving**   54:10
57:16
**Recess**   9:6
51:15   90:7
**recognizable**
42:22
**recognize**   36:8
37:2, 5, 8, 9,
10   47:12
64:13   94:7
101:9, 10
**record**   8:8
9:5, 8, 24
11:20, 21
12:10, 19   13:3
51:14, 17   90:6,
9   113:24, 25
**Rector**   3:14
**red**   78:9
**redacted**   15:3
**redistrict**   38:10
**redistricting**
10:7, 10   17:22
20:14, 15, 17,

Caster Plaintiffs' Exhibit 90, Page 44

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

*19, 20   21:17,*
*25   22:17*
  *23:11, 14   27:5,*
*7, 8, 12, 19, 20,*
*23   28:6, 9, 17*
  *29:16   30:13*
  *33:7   38:16*
  *39:19   40:3, 9,*
*16   42:5   45:12,*
*16, 21, 23*
  *46:13   48:1, 2*
  *52:14, 23*
  *56:16   57:7, 12,*
*19, 22   58:2, 6,*
*24   59:19   60:7*
  *63:15, 25*
  *64:18, 21   65:3,*
*8, 20   70:18*
  *75:3   84:6*
  *88:19, 22*
  *91:18, 24   92:5,*
*18, 20   94:23*
  *98:7, 12*
  *111:15, 24*
  *112:7, 14*
**reduce**   48:7
**reducing**   48:4
**reelection**   87:7
**refer**   13:17, 20
 113:22
**referred**   38:18
**referring**   19:21
 84:16   86:24
**reflection**   50:18
**reform**   109:10,
*14*
**refresh**   48:13
**regarding**   69:18
**regular**   63:9
 75:13
**related**   87:8
 108:2
**relating**   2:5
**relationship**
 84:23   85:1, 9,
*11, 20*
**rely**   82:20
**remained**   42:19
**remedy**   43:25
**remember**   19:10
 21:4   23:5
 24:12   33:18,

*19, 23   34:7*
 46:1, 2, 19
 48:16   51:20,
*23   52:1   58:20*
 76:8   77:10
 79:15, 21
 83:25   88:24
 89:1   92:21
 107:11
**remotely**   13:13
**removal**   106:7
**removing**   105:14
**Rep**   49:23   50:9
**repeat**   91:5
**rephrase**   12:6
**Reporter**   7:1
 8:24   11:13, 19,
*20   19:14   20:4*
 32:12   35:5
 36:1   43:14
 44:7, 13   46:24
 52:8   61:4
 63:17   113:24
 115:15
**Reporting**   115:14
**represent**   7:19
 9:12   20:2
 47:15   76:11
 77:7   95:11
**representation**
 85:14
**Representative**
 18:20   48:18
 55:9, 12   58:15
 59:5   60:4
 69:3   78:8, 11
 79:3, 8   80:3,
*12, 25   83:11,*
*12   84:14   86:3,*
*6, 21   87:12, 20,*
*24   88:2, 6*
 99:24   101:19,
*24   102:14, 18*
 103:6   104:8
**representatives**
 20:22   24:24
 26:6   56:1
 112:3, 13
**represented**   18:8
**representing**
 88:10   111:7

**republican**   25:4,
*5, 6, 8, 9, 12,*
*13   104:22, 23,*
*25   105:2, 4, 13*
 106:6   107:6,
*16   108:5, 11,*
*23   109:9, 21*
 110:13
**republicans**
 109:2, 12   110:3
**request**   6:24
 40:11   59:14
 85:8   99:25
 101:20   113:19
**requested**   58:15
 91:4, 8   99:24
**requesting**   58:25
**requests**   113:23
**require**   39:15
 73:12   77:23
 102:1, 3
**required**   12:20
 13:4   16:13
 38:7   66:19
 67:3   68:1
 91:10, 13
**requirement**
 67:10
**requirements**
 67:13
**requires**   70:24
 73:21   102:7
**residents**
 109:23   110:18
**respect**   29:17
 54:19, 24
 68:21   70:19
 86:3   90:16
 97:12
**respective**   1:18
**respond**   13:4
 102:18
**response**   80:12,
*16   81:4   85:3,*
*6, 12   96:11*
**responsibilities**
 28:8, 18   30:17
 53:4, 13   54:12,
*18, 22   56:6, 11*
 69:16
**responsibility**
 29:17   82:8

**responsible**
 69:8, 12
**responsive**   12:8
**result**   115:11
**results**   84:24
 85:23
**retired**   17:9
**retreat**   47:23
**retreats**   48:2
**retrogression**
 39:13   47:23
 48:19   50:4
 51:24
**review**   19:1
 22:6, 18   28:14
 38:8   58:11
 93:9
**reviewed**   19:5,
*17   22:3*
**revisions**   40:16
**rich**   72:12
**right**   51:21
 70:9   71:8
 74:8   80:2, 19
 101:24   106:21
 107:16
**Rights**   39:8, 18,
*21   43:20*
 47:25   50:11
 65:7, 11, 14
 66:9, 12, 20
 67:5, 7, 11, 14,
*22   68:1, 3, 8,*
*18   69:9, 14, 18,*
*24   77:20   82:7*
 91:16   97:21
**rise**   77:22
**risk**   87:4
**Road**   14:22
**role**   10:8
 28:5   29:2, 25
 30:8, 9, 22, 23
 31:16   34:8, 12
 35:18   45:6, 11
 53:1   56:4, 9
 58:5   66:5
 88:18
**roll**   34:20
**Roman**   39:25
**room**   13:13
 104:8
**ROSS**   3:18   8:13

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

Roughly    10:6
42:19    78:13
RPV    78:16, 17,
18    81:9, 12, 19
83:10, 23
84:17    85:22
86:24    90:16
92:8
R-Springville
49:24
Rule    40:14
59:22
rules    2:5    7:5
21:21    40:15
41:10
rulings    66:18
run    25:1, 8, 9
104:23

< S >
SADASIVAN    3:11
6:2    7:25    8:1
9:3, 9, 11
31:9    35:9, 13
36:12, 18, 21
49:8, 13    51:3,
11    52:10    61:1
63:16, 22
65:18    76:20,
25    90:3    93:17
94:11    100:7,
15, 19    103:18
113:10
safe    87:13
satisfied    42:14
saw    62:14
saying    47:21,
22    48:24
51:23    56:20
80:13    107:23
says    30:4
41:4    61:6
70:19    80:5
86:10, 14
100:11, 15
101:24    102:5,
14    113:22
scan    40:19
77:1, 2
schedule    6:16
31:1    53:8
55:2    58:6, 10

60:23    62:12
98:20    102:7
scheduling
28:16    62:5
school    15:24
17:3
scrapped    59:13
screen    19:15,
19    46:25    61:3
63:19, 24
76:11    94:8
100:3
Scroll    19:23
95:2    100:13
scrolling    100:11
second    47:21
49:6    61:10
64:8    74:12
75:5    84:13
102:12
secret    29:12, 14
Secretary    7:21
35:11    47:16
111:7
Section    39:21
43:20, 22    44:8,
12, 14, 18, 23
45:1    65:6, 11,
14    66:20    70:16
see    19:22, 23
28:15    32:5
36:19    38:1
39:3    50:6, 24
61:2    62:1, 3
63:20, 24    74:1,
9, 16    76:18
77:10, 19    80:2
83:6    89:6
94:8    95:9, 25
103:16    110:1
seeing    51:6
55:2    95:4
seen    64:6, 10
101:14, 15
select    75:22,
24    76:6    103:8
selected    31:6,
22    32:2
selection    31:12,
16
senate    15:13
19:8    20:9

22:2    24:5, 10
26:7, 9, 21
27:21    29:10
32:9    45:19
53:3, 5, 13
54:20, 23    56:5,
9    65:3, 20, 22
82:4, 23    93:3,
6, 21, 24    94:1,
2, 6, 22    95:10,
11, 14    111:10,
24
Senator    7:24
17:13, 14, 15
19:20    35:25
37:2    47:12
49:9, 25    51:18
58:1    61:8
64:7    65:19, 21
80:5    82:19
90:10    94:17
95:5, 7, 16, 20,
23    96:3, 10, 20,
23    97:12
103:24    104:2
106:23    110:23
111:5, 9    113:6,
11
senators    20:21
111:21
sense    21:14
28:1    82:18
sent    101:21
sentence    39:1
85:7
September    55:25
56:3
sequence    53:22
serve    25:25
31:22    32:7
served    9:17
26:2, 19    27:2,
3, 5
service    24:16
serving    104:18
105:10    107:25
session    45:22
56:15, 16    57:1
63:8, 9, 14
74:17    75:2
92:2, 17, 23
93:1    94:24

set    47:24
53:8    55:22
56:24    59:10, 16
setting    55:2
58:5    59:22
Sewell    86:15
87:20, 24    88:3,
6
Shalela    8:1
share    19:18
46:25    61:3
63:19    76:11
100:3
shared    22:9
49:22    53:20
54:17
sheet    113:18, 22
show    19:15
46:23    48:6
53:21
showing    61:16
100:9
side    70:4
signature    2:2
significant
102:4    109:22
110:17
similar    19:24
61:18
simply    70:6
108:25
single    29:24
70:6
Singleton    95:6,
16    103:19, 22
111:2
Singleton's
96:23
sir    25:11
35:9    61:22
76:25    78:24
94:11    98:1, 23
100:2    103:24
sitting    17:25
90:11    113:12
situation    98:5
six    99:20, 23
slow    52:8, 12
73:13
smaller    28:2
Smitherman    80:1
social    15:15

Caster Plaintiffs' Exhibit 90, Page 46

Case 2:21-cv-01536-AMM   Document 75-8   Filed 12/23/21   Page 1112 of 1115

Evan Milligan,et al v. John H.Merrill, et al.                     Jim McClendon
                                                                  12/17/2021

socially   25:16, 17
socioeconomic   73:2
software   74:3, 4, 5, 6   87:18
soil   72:12, 19
solutions   43:24
somebody   86:13
sooner   20:25
Sorry   14:6   22:12   23:9, 19, 20   24:1, 2   26:13, 14, 17   34:3   35:8, 14   36:3   39:22   43:14   44:13   51:3   62:23   63:22   73:15   80:23   85:4   106:21
sort   8:7   18:15   19:25   56:19   59:2, 12   86:7
SOS   47:1
sound   48:10
Southern   16:3, 9
southerner   67:1
spaces   105:15   106:8
speak   11:25   109:3
speaker   31:24
speaking   73:15
special   56:16   57:1   63:13   74:17   75:2   92:2, 17, 23   93:1   94:24
speculate   43:18
speculation   53:20
spell   9:24
spent   53:17, 19
spilled   56:2
spread   35:19   62:11
spring   88:23   89:9
Springville   14:22   15:25

staff   20:13   40:11   55:16, 17   58:9, 23   60:3   62:8   88:8   101:21   103:13
staffed   20:20
standing   21:13, 15, 20, 22   22:1, 10, 19   93:5
Stars   3:7
start   57:6   61:20   94:25   106:3
started   45:18   46:2   53:16   54:5   57:8   62:9   66:3   70:14
starting   32:14, 15, 17   42:15
State   1:22   7:3, 19, 21   9:24   12:13   15:7   20:15, 20   38:6, 7, 11, 15   39:11   47:16   48:6   60:20   61:20   62:11   64:12   72:11   96:16, 17   98:3   99:5   109:23   113:18, 19   115:1
stated   51:19   103:2
statement   44:7   50:16, 22   105:18, 21   109:17   113:18
statements   11:20
STATES   1:1   7:15   38:6   39:11   65:6, 12
state's   48:1
stay   30:10   31:4   41:4   66:4
staying   41:14
Ste   3:7, 21   4:19   5:14
step   49:5

steps   57:11   88:13
STIPULATED   1:17   2:1, 8
stipulation   7:6
stipulations   8:24
stop   29:21
Street   1:23   3:14, 21   4:4, 19   5:14   115:23
strength   39:14   65:10
strike   56:8
studied   16:11
study   19:12   80:4, 15   81:3, 7   82:10, 25   84:25   85:8, 11
subdivisions   70:20
subgroup   44:10
subject   39:20
submit   34:16   91:23
submitted   34:13
submitting   91:18
subsequent   65:25   67:8
subsequently   30:5
subset   75:14, 16, 17
substitute   76:8   95:20
suddenly   98:7
sufficient   81:6
suggest   87:5
suggested   79:20   88:3
suggestions   60:7, 8
Suite   115:23
summarized   22:20
summarizes   28:19, 21
summary   22:8   23:3, 7, 8
supersedes   98:3
support   25:1
supports   108:11, 12

sure   12:13, 23   15:7   28:20   30:10   31:4   37:23   41:5, 7, 9, 15   42:18   44:9   45:25   54:15   60:25   79:5   84:8   91:20   93:21   107:10   109:5   112:17   114:2
surprise   104:4
surprised   60:24   74:23
suspect   80:18
suspicious   77:17, 22   78:10
swear   8:19   76:5
sworn   8:22   10:17
system   17:7   36:16   40:8   55:19   58:8   60:4   62:20   74:10   103:15

< T >
tacked   77:18   99:20
take   16:8   19:11   34:13   35:11   41:5, 7   49:11   51:11   79:18   88:13   90:4   94:17, 20   109:25
taken   1:21   9:6   51:15   90:7   104:12   115:5, 8
takes   97:24
Talk   6:10   24:15   41:16, 23   67:1   87:20, 24
talked   18:15   33:1   41:19   42:1   53:23   58:7   67:15   83:24

Evan Milligan,et al v. John H.Merrill, et al.                    Jim McClendon
                                                                12/17/2021

talking    19:22
 20:7    21:6, 7,
8, 16    22:3, 7,
8, 13    23:1
 30:11, 12, 14
 31:8    34:10
 35:8    49:21
 57:22, 24, 25
 65:16    70:9, 17
 107:15
Tallapoosa    1:23
 5:14
target    23:24
 24:7    58:20
targeted    99:19
targeting    86:6
teacher    17:3
team    28:11
technical    40:12
telephone    14:23
tell    33:22
 36:4, 7    61:18
 90:19    96:2
ten    10:6    27:5
tenure    26:19
term    73:16
 107:11
terms    26:2, 4
 27:4    97:17
 108:14
test    77:16, 18
testified    8:22
 23:10    73:17
testify    10:19
 23:18, 20
testimony    10:24
 73:9    102:10
Texas    16:5
Thank    9:14
 13:11    14:6, 14
 26:17    35:13
 38:4, 21    49:13
 51:10, 12
 52:17    63:22
 76:25    90:10
 98:23    104:5
 107:1    110:21,
22    113:6, 11, 15
thereto    2:14
thing    31:3
 33:10    54:5
 57:13    73:4

78:3    96:12
 107:14
things    25:23
 27:14    28:20,
22    30:19
 53:22    55:3, 4
 62:13    96:12
think    21:10
 25:4    28:19, 21
 37:17, 21
 46:17    50:17
 52:8    55:24
 58:20    59:11
 60:3    62:14
 63:3, 21    67:15
 70:1    73:1
 76:4    77:25
 78:9    79:4, 5,
19, 24    80:21
 81:20    82:17
 83:10    84:4, 8
 85:16    87:6
 88:6    93:20, 22
 97:3, 8, 15
 98:17    102:21,
23    103:18
 105:4, 16, 17,
19    106:9, 10
thinking    57:8
 63:7, 13
third    56:3
 63:5    70:16
thought    50:18
 83:7, 16    85:4
threat    87:6
threatened    78:13
three    26:2, 4
 27:4, 20, 21
 97:24
threshold    85:21
 86:8
Thursday    74:17
 76:1    92:2, 19
time    2:12, 13
 7:17    9:5, 8
 10:7, 11    12:18,
24    13:1    14:9
 17:16    27:23
 28:3, 16    30:15
 31:1, 7    32:21
 37:23    41:23
 45:9    50:18

51:14, 17    52:7
 53:15, 17, 19
 55:18    56:21,
22    57:9, 10
 59:15    60:1
 67:15    68:12
 83:20    90:6, 9,
11    99:7, 13, 19
 103:2    104:5,
22, 25    108:9
 110:22    112:20
 113:12    114:4
timeline    54:1,
21    56:24    57:14
timelines    56:12
timely    55:5
times    55:23
 68:5, 9, 15
 70:1    99:15
 103:7, 8, 11
timing    53:21
 102:14, 19
title    64:15
today    9:16
 10:24    11:16
 13:18, 21
 17:19, 25    18:8,
13    19:18
 22:14    73:14
 75:11    104:5
 109:24    110:19
today's    9:14
 11:9
told    29:5, 6
 55:24    88:5
 90:24    91:2, 6,
9
topic    110:9, 10
topics    64:16
town    63:11
transcribed
 115:5, 8
transcribing
 11:14
Transcript    6:20,
22    76:12    77:8,
10    79:18
 80:18, 24
 86:19    94:5, 21
 95:8, 12, 14, 15
 115:7

transcription
 115:6
travel    102:2, 4
trial    2:13
 23:18, 20
tried    57:13
 65:19    93:2
Trojan    62:16
trouble    8:4
Troy    62:15
true    12:14
 115:7
trust    26:23
truthful    10:24
truthfully    10:19
try    19:13
 41:4    53:8
 64:24    66:24
 110:7
trying    48:21
 53:16, 25
Tuesday    74:16
 75:1    92:1
turn    24:3
 26:12    62:23
turned    101:1
turning    79:22
 84:11
TURRILL    3:4
 8:11
twice    99:18
Twitter    15:20,
21
two    15:10
 19:4    34:2, 5
 39:7, 9    46:4,
15    47:19
 49:25    50:24
 51:6    52:4, 14
 57:9    63:3
 74:14, 21
 75:10, 23    85:1
 93:9, 13, 22
 96:3, 6, 13
 97:8, 13    98:6
 101:2    110:1
two-year    58:8
 62:8, 10

< U >
U.S    38:9    39:17
ultimately    93:6

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

undergraduate
16:2
underneath
113:20
underpopulated
84:7
understand    9:16
10:18    11:2, 6,
9, 13, 22    12:3,
5, 10, 22    13:3,
7, 16    14:4, 12
18:1    23:19
34:23    44:4
54:15    78:21
81:24    82:19
107:23
understanding
45:9    67:25
70:23    77:13
78:16, 18    79:8,
10    97:18
112:24
understood
41:17    52:17
undertake    81:8,
11, 25    82:11
83:4, 22
undertaken    82:1,
25    83:12
unfold    53:9
55:4
unfortunately
74:24
Union    4:3, 10
UNITED    1:1
7:15    38:6
39:11    65:11
universities
62:5
University    16:4
unnecessary
90:20, 25
unsatisfactory
102:15
unwarranted
39:13
update    32:23
updated    28:15
upper    61:21
use    41:18
73:23, 24    81:2

Usual    8:24

< V >
value    83:16
VAP    80:21    81:5
various    94:23
venues    60:17
verbal    11:19
versus    7:13
9:13, 19
VIDEO    1:9
95:12
videoconference
11:11
Videographer
5:20    7:11
8:9, 19    9:4, 7
51:13, 16    90:5,
8    114:3
view    105:11
108:10
viewed    102:16
views    105:11
106:2, 4, 5
107:4    108:20,
22    109:7, 12,
13, 19, 20
110:11, 12, 16
violate    68:17
91:16    92:5
violation    69:24
violations    69:18
virtually    69:4
88:7
vote    22:11
34:20, 22, 25
39:6    76:3, 7
81:5    87:12
93:12, 16
95:15, 24
96:22, 25    97:2
111:12
voted    52:5, 16
96:2, 9, 19
97:13    111:24
112:13
voters    48:8
78:6    87:10, 12
97:10    98:9
votes    95:24
111:21    112:5, 9

Voting    39:8, 14,
17, 21    43:13,
17, 20    47:25
50:11    65:7, 10,
11, 14    66:9, 12,
20    67:4, 7, 11,
14, 22    68:1, 2,
7, 17    69:9, 13,
18, 24    77:14,
20    78:18    79:9,
14    80:4, 7, 10,
17, 20, 21    82:7,
10, 25    86:22
87:9, 21    90:14
91:16    96:15
97:21
VRA    45:1    92:6
VS    1:9

< W >
wait    11:25
12:1    78:20
waived    2:3
WALKER    5:11
7:23    8:25
12:17    13:24
15:2    18:11, 24
21:5    22:23
29:4, 20, 23
31:7    35:7, 10,
15, 19    36:3, 6,
20    40:22    47:3,
6    48:11    49:4,
12, 19    50:19
51:12    52:12
61:10, 15    63:2,
21    65:15    66:2
76:21, 23
81:18, 21
82:13    83:15,
22    90:19, 22
92:16    93:15,
18, 25    94:4, 9
100:3, 6, 10, 16,
20    101:1, 4
102:24    105:24
106:16, 20
110:25    113:8,
16    114:2
want    8:19
24:21    44:7, 16,

21    51:18
102:22    103:22
wanted    22:11
55:24    87:4
88:9    93:4
Washington    3:22
4:20    5:5
waste    83:20
way    24:10
68:16, 19
71:16    83:5
84:19    100:14
105:4
ways    71:18
web    11:10
week    56:3
92:19
weeks    55:25
WELBORN    4:8
35:17    36:10
61:19    75:16
78:22    79:24
94:10    100:13,
17    113:25
welcome    103:23
110:24    113:7
well    10:1
15:6    17:15
19:16, 24
20:19, 24    21:9,
10, 25    22:6, 15
25:3    26:3, 21
27:5    28:10, 19
29:21    30:9
35:2, 19    39:4
41:3, 24    43:18
46:21    48:15
50:3, 14    52:18
53:15    55:1, 16
59:9    60:19
62:3, 7    64:14
65:25    66:15
67:6    68:2
70:1, 25    71:25
73:1, 22    76:11
77:5    78:25
80:17    82:8, 12
83:21    86:14
87:10    89:21
91:17    92:24
94:17    98:2, 16
101:12    104:3,

Caster Plaintiffs' Exhibit 90, Page 49

**Evan Milligan, et al v. John H. Merrill, et al.**

4, 23    105:3
106:18    107:18
**well-kept**    29:11
**went**    22:1
26:2, 3    67:17
84:4
**we're**    13:12, 13
30:11    35:15
36:22    52:6
70:9, 17    74:21
75:11    84:19
101:23
**west**    72:11
**we've**    45:23
47:6    49:4
79:17
**win**    78:11
**winners**    98:8
**wish**    23:9
40:12
**witness**    2:3
7:7    8:7
29:21    47:5
61:17    106:14
**wondering**    53:18,
19    71:13
**word**    25:14
34:3    50:4
78:14, 20, 23
**words**    50:5
99:9
**work**    9:11
17:8, 15    36:16
40:9    55:3
58:9    59:2
89:7    103:16
**worked**    58:9
69:5    83:6
108:1, 5
**working**    17:14
66:16    70:15
102:16    110:14
**works**    18:16
81:23
**worth**    28:22
**worthwhile**    83:16
**writing**    11:15
**wrong**    98:20

**< Y >**
**Yeah**    26:10
33:13    39:3

49:20    62:15
78:13, 15    96:1
98:18    114:2
**year**    57:9
**years**    10:6
16:19    27:6, 18
57:9    82:15
104:20, 21
105:10    107:3,
11, 25
**Yep**    80:1
**yesterday**    18:14,
24    22:22
100:16
**York**    3:15    4:5

**< Z >**
**Zero**    99:8, 11
**Zoom**    3:18
4:15    8:10