FILED
2021 Dec-23 PM 06:21
U.S. DISTRICT COURT
N.D. OF ALABAMA


security, that is so important. And we try to do all of that as best we possibly can for everybody who calls into my office or comes and asks for our help.

Q Do you campaign in African-American neighborhoods?

11:25:56 A I do.

Q Do you seek support in your elections from people of all races in your district?

A Of course. I mean, I would like to win 100 percent of the vote. I know I'm not. And, frankly, I know certain areas that 11:26:09 are not likely to vote for a Republican. But I try to go there and campaign because I still believe that they need to see me campaigning. And I'm still going to fight for their vote right down to the end.

Q Speaking of health care, when you spoke to the community 11:26:23 health centers, Congressman, one of your constituents testified in this case, and she disagreed with your vote on a bill that would have repealed the Affordable Care Act.

A Uh-huh.

Q Why did you vote to repeal the Affordable Care Act?

11:26:36 A So I represent everybody in my district. And I listen to everybody. The vast, vast, vast majority of the people in my district who have expressed themselves to me are adamantly opposed to the Affordable Care Act and want it repealed and replaced.

11:26:52 When I ran in my special election the fall of 2013, that

1  was the precise point in time that the way that law worked,

2  that health insurance companies were sending out notices to

3  people to tell them that their health insurance plan was being

4  canceled.

5  So I distinctly remember being at a football game in

6  Citronelle High School.  This would have been in October,

7  September, October of 2013.  And I'm passing out my fliers.

8  And word got around that somebody that was running for

9  Congress was there.  And people went out to their cars to get

10  the notices they had just received to show me the notices that

11  said, We have canceled your health plan.  And they were

12  outraged.  Some of them were crying.  And that continued after

13  I went into office.

14  So to represent my constituents, yes, I voted to repeal

15  and replace the Affordable Care Act because I didn't know want

16  to just repeal it.  I wanted something in its place that would

17  try to meet the same needs as the intent of the Affordable Care

18  Act in a way that made more sense for my constituents and I

19  think for most people in the United States of America.

20  And the people in my district have strongly supported me

21  in doing that.

22  Q    Was your position on that bill based at all on race?

23  A    No.  I've had African-Americans come up to me and complain

24  about the Affordable Care Act.

25  Q    Congressman, this same constituent disagreed with your

1 vote on a bill concerning the First Step Act.

2 A     Yeah.

3 Q     What position did you take on that bill?

4 A     I voted against it.

11:28:25 5 Q     Why?

6 A     There was some things in that bill that I liked.  When I

7 ran the two-year college system in Alabama, we did the

8 education and workforce training inside Alabama state

9 penitentiaries.  And so I saw the benefit of some of the things

11:28:40 10 they were trying to do in there.

11      But I was concerned the bill went too far in providing

12 some leniency to people who were involved in significant drug

13 trades and people involved in violent crime.  And I didn't

14 think I would be representing my constituency, who by the way,

11:28:55 15 strongly supported me in that if I had voted for that bill.

16      Every congressman has to go through that calculus when you

17 vote for a bill because you are always going to have people in

18 your district that will disagree.  That's okay.  But where are

19 the vast majority of my constituents?  On that bill, I knew

11:29:12 20 exactly where they were, and I voted that way.

21 Q     Is your decision to run as a member of the Republican

22 party based on race?

23 A     No.

24 Q     Why do you run as a member of the Republican party?

11:29:31 25 A     I have a fundamental belief that the most important thing

1  in America are the people, not the government.  And when I look

2  at the philosophy of the Democratic party, it's about the

3  government, not about the people.

4       When I look the philosophy of the Republican party, it's

11:29:47 5  let's keep the government smaller, less invasive, so people can

6  decide things for themselves, whether it's health care or

7  whatever.  So the basic philosophy of the Republican party is

8  not just more in keeping with my personal philosophy.  It's

9  more with keeping with the vast majority of my constituents.

11:30:06 10      That's not to say that I don't understand and respect the

11  policy positions and the philosophy of the Democratic party.  I

12  do.  I work with Democrats a lot in the House.  If you are

13  going to be successful, you have to do that.

14      But in America, there are two political parties.  And the

11:30:22 15  Republican party more closely lines up with my beliefs and the

16  beliefs of my constituents.  The Democratic party does not.

17  Q    Do you have friendships with people who run as Democrats?

18  A    Absolutely.  I have lots of friendships with Democrats.

19  And one of the most rewarding parts of my experience in

11:30:38 20  Congress is not only to develop those relationships on a

21  personal basis, but to turn them into legislation.  I will give

22  you an example.

23      A few years ago, you recall the "Me Too" movement got

24  started.  And, you know, you found out these horrible things

11:30:52 25  that were going on in the entertainment industry, journalism,

United States Congress too.  And I found out to my shock that

the same processes that the private sector is subject to under

Title VII of the 1964 Act are not the same that are applicable

to Congress.  In fact, Congress was running a taxpayer funded

11:31:14 slush fund to pay off sexual harassment claims.  As a former

labor and employment attorney who represented these small to

medium-sized businesses insisting they follow that, I was

outraged that Congress wasn't.

Well, I wasn't the only one.  There was a woman from

11:31:30 California named Jackie Speier, a very liberal Democrat, who

has been an outspoken visionary, I would say, about that issue.

And when she and I found out that we shared that view, she and

I partnered on the piece of legislation that brought Congress

through the "Me Too" era into where we have to comply with the

11:31:52 same rules as everybody else, did away with the slush funds.

That piece of legislation passed the House unanimously, the

Senate unanimously, and it's a law today.  And I'm proud of

that.

And Jackie Speier, who loves to tell the story about the

11:32:05 far-left Democrat from the California and the conservative

Republican from Alabama working together on a piece of

legislation that was morally right.

Q    Congressman, I know you're busy representing the first

district and all of your other obligations.  Why are you

11:32:22 interested enough in these district lines to take time out of

1    your schedule to come talk to the Court today?

2    A    Because I know how important this is both as a constituent

3    having dealt with congressional offices, but also as a member

4    of Congress. If we get it wrong, it destroys the ability of

11:32:42 5    our Congressmen to represent us, a Congresswoman to represent

6    us, and destroys our ability to work together in the different

7    regions of the state to continue to move our state forward.

8        I think it's extremely important to get the districts

9    right. And if you make districts based upon race, you're

11:33:00 10    making them wrong. Because at fundamental, people are people

11    are people are people, and we need to be serving the people.

12    And to let an artificial construct like race become the

13    defining characteristic for our congressional districts, it's

14    not only economically antithetical to our interest, I think

11:33:18 15    it's morally reprehensible.

16    Q    And do you believe even if everyone in Alabama were of the

17    same race that the districts that the plaintiffs propose would

18    be harmful to the economic interest of Mobile?

19    A    Yeah. You know, I've been spending a lot of time in

11:33:32 20    Huntsville recently. I love Huntsville. Great place. But the

21    economic, social interests, et cetera of Huntsville and

22    Tennessee Valley are very different from my part of the state.

23    If you don't believe me, you go up there. They'll tell you

24    that.

11:33:46 25        So part of the job of a congressman is to make sure that

1  you're representing those differences that you're focusing on.

2  That doesn't mean that I'm going to fight with Mo Brooks about

3  what he is trying to do up there.  To the contrary.  Mo will

4  define for us, Here are the things that are important in my

11:34:02 5  district.  Please help me, and I will do that.

6      Now, if you are a statewide official, if you're a governor

7  or a senator, you have to look at the statewide interests.

8  That's your job.  When you're a congressman, your focus has to

9  be on your district, and you have to know the different parts

11:34:16 10  of the state are not better or worse.  They're just different

11  from one another.

12      I don't have a Redstone Arsenal in my district.  But if I

13  did, I would be as focused on that as Mo Brooks was.  And I

14  hope that we'll continue to have congress people that

11:34:29 15  understand that that's our job.

16  Q    Congressman, there was testimony earlier in this case.  A

17  witness had brought a group to Washington, D.C. requesting a

18  meeting.  She thought that it may have been with your office,

19  but she wasn't sure.  And the testimony was that whichever

11:34:49 20  congressman it was declined that meeting and, in fact, made the

21  group wait out in the hallway when they showed up.

22      If a constituent or someone from Alabama requested a

23  meeting from you, would you try to accommodate that?

24  A    Always.

11:35:03 25  Q    Is that true regardless of race?

1    A    Of course.

2    Q    Is that true regardless of party affiliation?

3    A    Of course.  Because I don't always know the party

4    affiliation.  Most of the time I don't.

11:35:15  5    Q    Would you ever turn down such a meeting and make a group

6    wait in the hall if they came to see you?

7    A    No, sir.  And if I found out my staff did it, I would fire

8    them.

9             MR. DAVIS:  May I confer, Your Honor?

11:35:27 10             THE COURT:  Yes, you may.

11             MR. DAVIS:  Your Honor, I pass the witness.

12             THE COURT:  Who's going to do cross-examination?

13             MR. SPIVA:  That would be me, Your Honor.

14             THE COURT:  Okay.

11:35:39 15                     CROSS-EXAMINATION

16    BY MR. SPIVA:

17    Q    Good morning, Congressman Byrne.  We met in the Rayburn

18    building in Washington, D.C. this morning at your deposition.

19    And we appreciated getting some of your time at that point.

11:35:54 20    It's good to see you again this morning.

21    A    Good to see you.

22    Q    Let me start with one of the things you talked about on

23    direct examination, Congressman Byrne.

24             You mentioned the mayor -- or the current mayor of the

11:36:06 25    city of Mobile, Mr. Sandy Stimpson and his One Mobile pledge.

1  Do you think that's been accomplished in the city of Mobile?

2  A   I think they made dramatic progress.

3  Q   And, of course, you're aware that Mr. Stimpson defeated

4  twice the first elected African-American mayor of the city of

11:36:31 5  Mobile?

6  A   Yeah.  Sam Jones, who I supported in his first runs for

7  office.

8  Q   And do you know what the racial breakdown was in the vote

9  in the city of Mobile?

11:36:43 10  A   I have no idea.

11  Q   Would you be surprised that Mr. Stimpson in the last

12  election in 2017 received only 10 percent of the black vote?

13  A   I wouldn't be surprised or not surprised.  I just don't

14  know enough about the election returns to be able to respond to

11:37:01 15  it.

16  Q   And in certain predominantly white areas of the city of

17  Mobile, Mr. Stimpson received upwards of 90 percent of the

18  white vote.  Are you aware of that?

19  A   I'm not.  I don't know how you break it down that way

11:37:14 20  because the city's becoming so integrated.  So I don't know how

21  you would be able to tell which was a white vote, which was a

22  black vote.

23  Q   And I mean -- well, if that's the case, would that --

24  would that suggest to you that -- that the city has really

11:37:32 25  moved that far towards the admittedly ideal of one -- One

1  Mobile?

2  A    No.  That would tell me the person that made that analysis

3  doesn't know what they're talking about.

4  Q    So if either polling organizations or political scientists

11:37:50 5  had done an analysis and shown that that was the breakdown of

6  the vote, that would be your response?

7  A    I'm sorry I'm laughing.  But I have seen so many polls

8  that say so many different things.  The thing I've learned

9  about polls is that how you draw your sample, how you ask your

11:38:07 10  question has a great determining factor on what the outcome is.

11  And I have seen so many bad polls that until I see all the

12  underlying things in the poll, I tend not to believe it.

13      As you may know, I am running for U.S. Senate right now.

14  I have seen so many different polls that show so many people

11:38:23 15  are winning or losing the race that it's just a joke.  So I

16  haven't seen these polls.

17      But I know how Mobile has been integrating, and I don't

18  know how you can seriously determine how many people in this

19  precinct or how many people in that precinct were white or

11:38:39 20  black and voted for Sandy Stimpson or voted against Sandy

21  Stimpson.  I don't know how you know that.

22  Q    So moving to a slightly different topic.  You had

23  mentioned some of the integration that was going on and how

24  united Baldwin and Mobile is.  Are you aware that some of your

11:38:57 25  constituents view Baldwin County as a sundown county?

```
 1  A    I'm sorry.  I don't know what a sundown county is.
 2  Q    A county where it's not safe for black people to go after
 3  sundown?
 4  A    I've never heard of that before.  But I see
 5  African-Americans after sundown all over Baldwin County doing
 6  all sorts of things -- working, going to school activities,
 7  participating in, you know, various entertainment and social
 8  events.  So anybody that feels that way doesn't know Baldwin
 9  County.
10  Q    So if a constituent of yours testified in court under oath
11  that she feels uncomfortable and has been harassed in Baldwin
12  County after sundown, you would question whether that
13  constituent --
14  A    No, no, no.  I'm not going to question somebody's
15  individual experience.  I wasn't there with them, so I don't
16  know whether it was or wasn't.  But I would say that is
17  certainly not a practice.  And if anybody's done that in
18  Baldwin County, they would be going against the great weight of
19  what our public opinion is about what's appropriate and what's
20  not.
21       I guarantee if you go to any of the high school football
22  stadiums in Baldwin County this Friday night that are playing
23  playoff games, you will see black and white cheering for their
24  teams.  And if they're on the same team, they're cheering
25  together.
```

1   Q     That's great.  Would you agree, though, it's sometimes

2   difficult for a member of the majority to really know the fears

3   and tribulations of members of the minority?

4   A     No, I don't agree with that.  I think it's true that it's

11:40:24  5   very difficult for any one human being to know exactly what's

6   going inside the life and head of another human being.  But I

7   would not make a generalization based upon race like you just

8   did.

9   Q     You don't know precisely the demographics of your

11:40:38 10   district; is that fair?

11   A     Well, I don't know what you mean by precisely, but I can't

12   give you precise percentages, no.

13   Q     Do you know what percentage African-American Mobile County

14   is?

11:40:49 15   A     No.  I think you asked me that in my deposition.  I don't

16   remember what it is.

17   Q     Okay.  And you don't know what percentage African-American

18   Mobile city is, either?

19   A     No, I don't.  It doesn't matter to me.

11:41:01 20   Q     But you do know that there is a substantial black

21   population in Mobile County?

22   A     Oh, certainly, yeah.

23   Q     And there's also a substantial black population in the

24   city of Mobile?

11:41:11 25   A     Certainly.

1  Q     And in the city of Pritchard?

2  A     Yeah.

3  Q     And you don't know whether the vast majority of

4  African-Americans in your district have voted for your opponent

11:41:24  5  in your past elections?

6  A     Well, I'm told that.  One time when I did a town hall in

7  the city of Pritchard, the local newspaper reported on it and

8  said how extraordinary it was that I did a town hall in there

9  when I got seven votes out of the city of Pritchard.  But it

11:41:39 10  didn't matter to me that I only got seven votes in the city of

11  Pritchard.  The people of Pritchard wanted me to be there, and

12  I'm going to be there.

13  Q     That's not something you pay close attention to whether

14  you were the candidate of choice of African-Americans?

11:41:49 15  A     I really don't.

16  Q     You don't know the current president of the Alabama state

17  conference of the NAACP, do you?

18  A     No.

19  Q     And I take it from that you haven't met with the president

11:42:01 20  of the state conference of the NAACP since you have been a

21  congressman?

22  A     Never had a request for a meeting with that person.

23  Q     And you've never met as a group with representatives of

24  the state NAACP; is that fair?

11:42:14 25  A     Well, I think we talked about this in my deposition.  I

1  don't whether I have or haven't because people don't always

2  identify what groups they're with when they come to see me.  So

3  I may have without knowing about it.  But no one came into my

4  office and said We're with this group.  So what we do when

11:42:29  5  groups meet --

6  Q    Let me clarify the question.  Maybe I can ask a better

7  question than I asked in the deposition.

8  A    Right.

9  Q    You have never officially met with representatives of the

11:42:39 10  state of Alabama NAACP; is that fair?

11  A    Well, I may have and I didn't know it.  They may have not

12  identified themselves as such.

13       And what I was getting ready to say is this:  Is that we

14  respond to requests from groups to come see me.  If they make a

11:42:53 15  request -- you heard what I said earlier.  We accommodate them.

16       To my knowledge, we've never had a request by that group

17  to some see me.  If they have, I would have said, Fine, come

18  see me.

19  Q    Just so the record is clear, I mean, whether it was

11:43:08 20  pursuant to a request, by you or by them, you've never had a

21  meeting with a delegation from the state NAACP where they

22  announced to that they were from the NAACP?

23  A    Not -- not identified as such.

24  Q    Okay.  And I take it the same is true of the local NAACP,

11:43:27 25  say the Mobile County NAACP or the city of Mobile NAACP?

```
 1   A    They've never requested a meeting with me.

 2   Q    Okay.  And you haven't met with them?

 3   A    Because they've never requested one.

 4   Q    And you have never requested one of them either?

 5   A    Well, I don't normally requests meetings of other people.

 6   They normally request meetings with me.  That's the way it

 7   works.

 8   Q    Sure.  I can understand that.

 9        Have you ever heard of the Black Women's Round Table?

10   A    I'm sorry.  The what?

11   Q    The Black Women's Round Table?

12   A    I have not heard of it.

13   Q    I take it from that you have never personally met, again,

14   with people who announced themselves as being from the Black

15   Women's Round Table?

16   A    They've never requested a meeting with me.

17   Q    And have you heard of the National Coalition of Black

18   Civic Participation?

19   A    No.

20   Q    And I take it the same; you have never had a meeting with

21   them?

22   A    They've never requested a meeting with me.

23   Q    And have you met with a delegation from the national or

24   from the Alabama Urban League?

25   A    They've never requested a meeting with me.
```

1    Q     Have you ever had a meeting with the national or the

2    Alabama Chapter of the Southern Christian Leadership

3    Conference?

4    A     They've never asked for a meeting with me.

11:44:32  5    Q     You have a sizeable and growing Hispanic population in

6    your district, do you not?

7    A     Well, sizeable might be a little exaggerated.  I do have a

8    Hispanic population.  It has expanded some and also contracted

9    some during the recession.

11:44:49  10   Q     Okay.  But you have a growing Hispanic population in your

11   district; is that fair?

12   A     Growing some, but not very fast.

13   Q     Have you ever had a meeting with the League of United

14   Latin American Citizens?

11:45:02  15   A     I'm not familiar with them.

16   Q     Ever heard of an organization LULAC?  That's sometimes the

17   acronym for that organization.

18   A     No, sir.

19   Q     And do you currently live in the city of Mobile,

11:45:20  20   Congressman?

21   A     No.

22   Q     You live in Baldwin County?

23   A     I do.

24   Q     And do you believe that as a congressman that you are in a

11:45:29  25   position to help residents of Alabama on issues of education,

|    |   |   |
|----|---|---|
| 1 | | for instance? |
| 2 | A | Of course. |
| 3 | Q | Criminal justice? |
| 4 | A | Of course. |
| 11:45:36 5 | Q | Health care? |
| 6 | A | Of course. |
| 7 | Q | Affordable housing? |
| 8 | A | Of course. |
| 9 | Q | Employment opportunities? |
| 11:45:43 10 | A | Sure. |

11  Q    And you would agree with me that you have responsibilities

12  to your constituency, with regard to those types of issues?

13  A    I have responsibility to my constituents regarding a wide

14  variety of issues.  Those would be among them.

11:45:59 15  Q    Okay.  And you would agree with me, wouldn't you,

16  Congressman Byrne, that a disproportionate number of

17  African-American children are going to some of the worse

18  schools in Alabama and in your district?

19  A    Yes.  I think it's one of the biggest problems facing the

11:46:15 20  state of Alabama.  It's something I've tried to do something

21  about starting back with my state school board service.

22       I think we have really missed a tremendous opportunity to

23  move Alabama forward by consigning African-American children

24  because of where they live to perennially failing schools.

11:46:35 25  That's one of the reasons why I have been such an advocate of

1  charter schools, to give the parents of those children a chance
2  to send their children to high performing schools.
3        I think it's the great civil rights issue of our time that
4  we find a way to get better education to all children, but
11:46:48 5  particularly to African-American children who have been forced
6  into schools that continue to fail.
7  Q    Congressman, thank you for that.
8        Let me ask you about a couple of other issues along the
9  same lines.  You don't know whether the average income level of
11:47:05 10  blacks in your district is lower than the average income of
11  whites in your district, do you?
12  A    Yeah.  I think you asked me in this deposition.  I don't
13  know.
14  Q    Okay.  And you don't know whether African-Americans on
11:47:14 15  average in your district have lower health care outcomes or
16  greater health care needs than whites on average in your
17  district?
18  A    I don't know.
19  Q    And you, as I think you discussed on direct, you voted to
11:47:25 20  repeal the Affordable Care Act?
21  A    Repeal and replace it with a different program.
22  Q    Okay.
23  A    That I thought would work better for my people.
24  Q    Okay.  Fair enough.
11:47:34 25        But you don't know whether the majority of the

```
 1  African-Americans in your district were against the repeal of
 2  the Affordable Care Act?
 3  A    I had very few people white or black come up to me and
 4  speak to me that they were in favor of the Affordable Care Act.
11:47:48  5  I had a large number of people, African-American and white, who
 6  were opposed to the Affordable Care Act.
 7  Q    You've never, for instance, seen any polling that suggests
 8  that African-Americans in your district were for the repeal of
 9  the Affordable Care Act?
11:48:00  10  A    No.
11  Q    And you haven't seen any polling data, I take it, whether
12  blacks either in Alabama or nationwide support the repeal of
13  the Affordable Care Act?
14  A    I don't think I have, no.  If I did, I don't remember.
11:48:13  15  Q    And you are against restoring Sections 4 and 5 of the
16  Voting Rights Act?  I think you've noted the formula or
17  preclearance provisions?
18  A    Yeah.  I get the -- which one is which, but I'm against
19  any sort of formula because I think we should have -- if we're
11:48:31  20  going to have a Voting Rights Act provision with regard to
21  preclearance, it should apply to every part of the United
22  States of America.  So you wouldn't need a formula.
23  Q    And we did discuss this at your issue.  You don't really
24  mean preclearance, right?  You mean the Department of Justice
11:48:45  25  should have enforcement authority, correct?
```

1   A     Yeah.  Well, if we're going to have preclearance,

2   everybody should go through it.  But I think it's better to

3   have a situation where local governments, et cetera, would

4   simply send their information to the voting rights division of

11:48:58  5   the Justice Department saying we're about to go X, and the

6   Justice Department have plenty of time to make up their time

7   whether we need to go to court under existing provisions of the

8   Voting Rights Act to block that situation so that they could

9   make sure the voting rights are not being interfered with, and

11:49:14 10   that's a better way to do it.

11         Otherwise in a preclearance, you're certainly reversing

12   the burden of proof.  You're making political entities, you

13   know, municipalities, counties, et cetera, prove that they're

14   not guilty.  That's not America.

11:49:29 15   Q     Well, I mean, you would agree with me, wouldn't you,

16   Congressman, that at least in 1965 there was a very good reason

17   to reverse that burden, wouldn't you?

18   A     Absolutely.  And I -- I understand why it was put there

19   that way.  But I think we all have to understand that was

11:49:42 20   extraordinary.  That should only be done under extraordinary

21   circumstances.

22         I mean, I grew up in Alabama in the '50s, '60s, and '70s.

23   I know it was like.  It was terrible.  We needed to do some of

24   those things.  But it's not the '50s, '60s, '70s anymore.

11:49:59 25   Alabama is a different place.

1       You find things that are happening in other parts of

2  America that are -- I think very offensive that you don't see

3  happening in Alabama anymore.  So I wonder why we would single

4  out Alabama or any other state in having a provision like that.

11:50:15  5       So I'm not for forming it.  If we're going to do anything,

6  apply it to everybody.

7  Q    Just to be clear, you would not be in favor of a

8  preclearance regime even if it were applied to every state in

9  the union; isn't that right?

11:50:25 10  A    No, sir.  I don't -- I don't think preclearance -- the

11  reversal of the burdens is appropriate under these

12  circumstances that aren't extraordinary anymore.  But if you

13  are going to do it, apply it to every part of the United States

14  of America.  Don't pick on Alabama.

11:50:38 15  Q    And you've never talked to any of your black constituents

16  about whether they think there's a continued need for

17  preclearance under the Voting Rights Act?

18  A    I think we talked about this during my deposition.  I

19  think.

11:50:52 20  Q    I'm asking you fair questions.  Not asking anything for

21  the first time.  Sorry to interrupt you, Congressman.  I was

22  trying to make a light moment.

23       You go ahead.  Go ahead.

24  A    I think what I told you is that Burt LeFlore, who ran

11:51:07 25  against me the first two times I ran for Congress -- I think

```
 1   Burt Lefler mentioned it as part of the campaign.  But other
 2   than Burton doing that, I don't recall anybody every saying
 3   anything to me about it.
 4   Q    And you don't know what the position of the NAACP in
 5   Alabama is on that, do you?  On whether the preclearance regime
 6   should be restored?
 7   A    They've never talked to me about it.
 8   Q    You don't know what their position is?
 9   A    No, sir.
10   Q    And I think you discussed on direct that you are familiar
11   with the First Step Act which reformed federal sentencing laws;
12   is that correct?
13   A    I am.
14   Q    And you opposed the First Step Act?
15   A    I did.  There were parts I liked; parts I didn't like.
16   Q    And President Trump actually signed that into law,
17   correct?
18   A    He did.  He's very proud of it.
19   Q    Let me talk to you for a minute about President Trump,
20   Congressman.  You recall the Charlottesville marches and riots
21   by white supremacists there?
22   A    I do.  A shameful episode in the history of America.
23   Q    It was.  I agree with you on that, Congressman.
24        And you recall a young woman killed by one of those white
25   supremacists?
```

11:51:20
11:51:29
11:51:42
11:51:55
11:52:17

1 A     Yes.  Tragedy.

2 Q     You recall an African-American man was run down by that

3 same white supremacist who killed her?

4 A     Tragedy.

11:52:23 5 Q     And you recall that other African-Americans and some

6 whites were beaten by those white supremacists?

7 A     A tragedy.

8 Q     And do you recall that following the killing of Heather

9 Heyer in Charlottesville that President Trump remarked that

11:52:40 10 there were fine people on both sides of that -- of those

11 marches in Charlottesville?

12 A     I don't recall that.  But I don't think there were fine

13 people on both sides.

14 Q     You don't recall President Trump saying that there were

11:52:52 15 fine people on both sides?

16 A     No, sir, I don't.

17 Q     And do you recall the President saying in July of this

18 year that several congresswomen, all of whom were minorities,

19 should quote, unquote, go back to the countries where they

11:53:14 20 originally came from?

21 A     I know he said something about that, but I don't remember

22 precisely what he said.  So I don't want to characterize what

23 he said.

24 Q     Do you recall that at a rally that the President held a

11:53:29 25 few days later that participants chanted, "Send her back," when

1  President Trump mentioned Representative Ilhan Omar, who is a

2  refugee from Somalia?

3  A    No, I don't remember that.

4  Q    And do you recall that there was a vote on the House of --

11:53:45 5  the floor of the House of Representatives condemning the

6  President for the tweets saying that these minority

7  representatives should be sent back?

8  A    I don't remember that.

9  Q    So you don't recall that you voted against the resolution

11:54:02 10 condemning those tweets?

11 A    Well, there are lots of resolutions on the floor of the

12 House of Representatives that say a lot of different things.  I

13 would have to see the resolution itself, because sometimes

14 they'll put one thing in a resolution and add a whole bunch of

11:54:18 15 other things in it.  And I voted against it because of the

16 other things.  So I would have to see the whole resolution.

17      That's what they do.  They try to sneak other things in

18 there.  I'm not going to get tricked into voting for something

19 I don't believe in.

11:54:30 20      THE COURT:  In other words, do you actually read

21 things before you vote on them?

22      THE WITNESS:  Your honor, I hope you would expect

23 people who are members of the bar that would actually read the

24 bills before we vote on them.

11:54:39 25      THE COURT:  I would hope everyone does.

1              THE WITNESS:  Yes, ma'am.  I do my best.

2    BY MR. SPIVA:

3    Q    This just happened this last spring.  You really don't

4    have a recollection of the tweets by the President?

11:54:48 5    A    No, sir, I don't.  And I'll tell you why.

6         I decided once we got -- President Trump was elected, that

7    because of the incredible attacks on him and on other people

8    around him that there are two different things going on in

9    American society.  There is the noise, and there is the

11:55:11 10    substance.

11        I and my staff are focused on the substance.  We are not

12    focused on the noise.  I'm not going to get myself or my staff

13    distracted from doing the substance of our jobs because there's

14    vast incredible noise out there.

11:55:25 15        So, no, sir, I don't pay attention to a lot of that stuff

16    because it has nothing to do the job that I do.

17    Q    Would you agree that the President is engaged in racial

18    appeals?

19    A    I don't know that he's engaged in racial appeals.

11:55:39 20    Q    The things that I just mentioned, would you agree that

21    those are racial appeals?

22    A    Well, I didn't hear them.  So I don't know what context or

23    anything else.  I think that there are people across America

24    who speak in racial terms, including liberals who speak in

11:55:57 25    racial terms that greatly disappoint me.

1          As someone that grew up in Alabama in the '50s, '60s, and

2     '70s, we paid a price.  And I would hope that we have gotten

3     past all of that.

4          And to find people, liberals and Democrats -- liberals and

11:56:11  5     conservatives alike who want to go back and go back through all

6     and make decisions based upon race goes exactly against what

7     Dr. King stood for.  And so I would hope all of us would get

8     over racial language and get on with the future of our country.

9     Q    And that would apply to the President, as well?

11:56:27 10    A    That would apply to everybody, including members of

11    Congress who are Democrats, including people who bring lawsuits

12    like this.

13    Q    Would it surprise you to learn that some of your

14    African-American constituents took a message from the

11:56:39 15    President's tweets and from his statements about the

16    Charlottesville incident that -- took a message from that, a

17    negative message from that?

18    A    Gosh, President Trump could get up in the morning and

19    clear his throat and people would take a negative message from

11:57:07 20    that.  They do.  We call it Trump Derangement Syndrome.

21    Q    Do you think any of the Hispanic constituents that you

22    have took a negative message from him in saying that Mexicans

23    were rapists?

24    A    I've never heard any Hispanic constituent complain to me

11:57:23 25    about President Trump.

```
 1  Q    You don't have an opinion on whether it would benefit the

 2  African-American community in Alabama to have a second majority

 3  African-American district?

 4  A    It would help everybody in Alabama to have congressmen and

 5  congresswomen that are focused on the needs of their district,

 6  and I don't think your race has anything to do with it.

 7  Q    Congressman Byrne, you would agree that it takes work to

 8  bridge the kinds of divides that we have been talking about,

 9  wouldn't you?

10  A    Oh, yes, sir, I do.

11  Q    And particularly racial divides?

12  A    Yes, sir, I do.

13  Q    And would you agree that blacks and whites sometimes come

14  at issues differently because of their experience growing up

15  either black or growing up white?

16  A    Of course, I do.

17  Q    And I know that you have said you don't really know what

18  the views of the majority of African-Americans in your district

19  are on some of these issues.  But would you agree with me that

20  if I'm an African-American in your district, and I don't really

21  feel that you are responsive to my concerns and needs, that it

22  would be better for me to be joined with other

23  African-Americans in the Black Belt and Montgomery who share my

24  perspective?

25  A    No, I don't agree with that.
```

1  Q    Let me shift gears, Congressman.

2       You work -- I think you testified to this on direct.  You

3  work with other congress people in Congress, including across

4  the aisle?

11:58:44  5  A    Yes, sir.

6  Q    You work with very well with Congresswoman Terri Sewell?

7  A    Absolutely.

8  Q    You have a good working relationship?

9  A    I have a good working relationship, and going back years

11:58:57 10  before we were in Congress, a good professional relationship.

11  Q    And you would work with another congresswoman or person --

12  that would be Terri Sewell, or whomever was representing a

13  different district -- if Mobile were, in fact, split and there

14  was a second district?

11:59:13 15  A    Yes, sir.  I -- the way we operate in the Alabama

16  congressional delegation is that we support one another when it

17  comes to things that are pertinent to the state of Alabama and

18  to our individual districts.  It doesn't have to be my

19  district.  I will support other people.  I supported

11:59:30 20  Congresswoman Sewell on a number of things of her district, as

21  she has mine.

22  Q    And you have continued the joint town halls that

23  Congressman Bonner used to have?

24  A    We have done some.  We haven't done any recently, but we

11:59:43 25  have done some.

```
 1  Q     And you would agree I take it that -- you are aware, of
 2  course, that Montgomery is split between -- Montgomery County
 3  is split between three different congressional delegations?
 4  A     I am.  I am.  I don't think that's good for Montgomery.
 5  Q     But you have no doubt that the three Congress people who
 6  work --
 7  A     No.
 8  Q     Let me get the question out first.  You would agree with
 9  me that the people who -- the three Congress people who
10  represent Montgomery work together to try to protect the
11  interests of Montgomery County?
12  A     They do.  They work very hard together.
13          THE COURT:  Representative Byrne, while we're talking
14  about that, will you remind me who the two other
15  representatives are for Montgomery County?
16          THE WITNESS:  Congresswoman Roby and Mike Rogers.
17          THE COURT:  That's right.
18          THE WITNESS:  Congresswoman Roby, I think, has the
19  southern part of the city of Montgomery, and Congressman Rogers
20  has the eastern part.  I said the city.  I should have said the
21  county of Montgomery.
22          THE COURT:  And Representative Sewell has the western
23  part?
24          THE WITNESS:  Right.  Yes, ma'am.
25          THE COURT:  Thank you.
```

```
 1   BY MR. SPIVA:
 2   Q    Congressman Byrne, I think that you had testified a lot
 3   about the history that Baldwin and Mobile shared together.  And
 4   it's true that they have been in one congressional district for
 5   about 50 years now; is that right?  Almost 50 years?
 6   A    At one point, they were split.  But I can't tell you how
 7   long ago it was.
 8   Q    Okay.
 9   A    I can tell you it's far better off for them to be
10   together.
11   Q    Let's maybe turn to -- this is Defendant's Exhibit 1.  If
12   we can turn to, I think it's page 6 of Exhibit 1.
13        And I will represent to you this is an exhibit that
14   defense counsel put into evidence.
15        This is a depiction --
16             THE COURT:  What is -- excuse me.  What is the number
17   at the bottom of that exhibit?
18             MR. SPIVA:  It should be Defendant's Exhibit 1, Your
19   Honor.
20             THE COURT:  Right.  But the page number.
21             MR. SPIVA:  I thought it was page Number 6.  But it
22   looks like on this version, it's just got the Bates number.
23             THE COURT:  That's what we've been using.  So if we
24   could use that one, it would help keep the record straight.
25             MR. SPIVA:  Will do, Your Honor.  That's Chestnut
```

 1   Defense 3021.

 2   BY MR. SPIVA:

 3   Q    And this is a depiction of the congressional districts

 4   from 1964.  And you would agree with me, Congressman Byrne,

12:02:21  5   that Baldwin and Mobile were split with Mobile County being in

 6   District 1 and Baldwin being in District 2?

 7   A    Yes, sir.  That's what it looks like.

 8   Q    And the District 2 in the 1964 map has Baldwin and

 9   Montgomery County both paired in District 2, correct?

12:02:41 10   A    That's what it appears to show, yes.

11   Q    And if we could turn to the next page?

12            THE COURT:  Before we leave that, how many

13   congressional districts were there in 1964, according to that

14   map?

12:02:52 15            THE WITNESS:  Eight.

16            THE COURT:  Thank you.

17            THE WITNESS:  We lost a seat somewhere in there.  I

18   have forgotten exactly when.  I think maybe in 1980 or 1990.

19   BY MR. SPIVA:

12:03:03 20   Q    If we can turn to the next page.

21            This is Chestnut Defense 3022 at the bottom.  Defendant's

22   Exhibit 1.

23            And this is a 9th District map, but it's a 1950 map.  And

24   you would agree with me here that Baldwin and Mobile were also

12:03:27 25   split between congressional district -- Districts 1 and 2,

1  correct?

2  A    Yeah.  This is a very famous map.  Because after that,

3  Alabama went from nine to eight.  And instead of the

4  legislature figuring out to configure them, they let everybody

12:03:37  5  run.  And whoever was the guy that ran last was the odd guy

6  out.  Guess who the odd guy out was?  Frank Boykin from Mobile.

7  So in Mobile we are very sensitive about that.

8  Q    I can see -- I can understand that.

9      So let's take a look at page 3023 of Defendant's

12:04:07 10  Exhibit 1.  This is the 1940 congressional map.  And here,

11  too --

12  A    Counselor, I wasn't alive in 1940.  I want to make that

13  point for the record.

14      THE COURT:  And neither was I, just for the record.

12:04:22 15  BY MR. SPIVA:

16  Q    And neither was I.  Neither was I.

17      So Baldwin and Mobile are indeed split between 1 and 2

18  there, as well, aren't they?

19  A    They are.

12:04:32 20  Q    Okay.  And if we can go back to 1917, which I believe was

21  the last -- this is before *Baker vs. Car*, so I don't think they

22  did redistricting as often as they started to.  I guess 1940

23  was before *Baker vs. Car* too.  But for whatever reason, I

24  believe the previous map was from 1917.  And that's page 3024

12:04:55 25  of this Defendant's Exhibit 1.

1       And you'd agree with me here that Baldwin and Mobile are

2  also split between District 2 and District 1?

3  A    That's certainly what it appears to show.

4  Q    And let's just -- we won't -- I don't want to take too

12:05:13  5  much time.  But if we can just briefly show on the screen in

6  order pages 3025, which is the 1901 map; and page 3026, which

7  is the 1891 map; and page 3027, which is the 1867 map.

8       And would you agree with me, Congressman Byrne, that each

9  of those maps -- well, strike that.  Strike that.

12:05:47 10          THE COURT:  Right.  1867 is going to mess you up

11  there.

12  BY MR. SPIVA:

13  Q    Let me ask you:  Would you agree that in the 1901 and the

14  1891 maps that Baldwin and Mobile counties were split between

12:06:04 15  CDs 1 and 2?

16  A    That's what it appears to be.

17  Q    So prior to the 1970s, the last time that Baldwin and

18  Mobile were united in a congressional district was in 1867, it

19  appears, and that's from Chestnut 3027, Defendant's Exhibit 1?

12:06:24 20  A    Yeah.  If you look at it, one of the things that's

21  happened there is that Alabama has added congressional

22  districts.

23  Q    Uh-huh.

24  A    Which is a good thing.

12:06:31 25  Q    Yeah.

          1          THE COURT:  Well, between 1867, when it was four

          2    districts, to 1950, when it was nine, and then we've had a

          3    couple of other times when there's -- when it started

          4    decreasing.

12:06:47  5          MR. SPIVA:  I think 1867 was still -- was actually six

          6    districts, Your Honor.  But, yeah, increased then decreased.

          7    That is true.

          8          THE COURT:  Okay.  My eyes aren't seeing that much

          9    difference in the three different blue districts.  Sorry.

12:07:02 10          MR. SPIVA:  I think the coloring job that y'all did

         11    was pretty good for the most part.

         12    BY MR. SPIVA:

         13    Q    So -- and, of course, you discussed -- we can take that

         14    down.

12:07:15 15          You discussed, Congressman Byrne, on direct that the state

         16    board of education maps splits Mobile to some extent, at least

         17    part of the city of Mobile.  I think you already said -- you

         18    opposed that, correct?

         19    A    Yes, sir.  I opposed that.  But I understand what they did

12:07:32 20    in 2011, whenever it was.

         21    Q    And Ms. Ella Bell until she -- I'm sorry.  I know you knew

         22    her and worked with her when you were on the SBOE.  I heard

         23    about her passing.

         24    A    Uh-huh.

12:07:46 25    Q    That she represented District 5 prior to her death a few

1  days ago.  And do you have any reason to believe that she was

2  not able to effectively represent that district?

3  A    She was not able to effectively represent that part of the

4  district.

12:08:03  5  Q    And what about District 4?  Do you believe that the -- I'm

6  sorry.  I think the other district there is district --

7  District 1, the -- in the SBOE map?

8  A    Yeah.

9  Q    And do you believe that the representative who represents

12:08:25 10  District 1 is able to effectively represent their district?

11  A    Yes.  Because the difference is that that person is not

12  having to also represent the urban area of Montgomery.  They

13  only have one -- or part of one urban area, whereas the person

14  in District 5 has two.

12:08:43 15  Q    And you had mentioned on direct that it would be a

16  problem, I guess, joining the urban area of Montgomery with --

17  and I'm not talking about just on in terms of the SBOE map.  I

18  mean in terms of the congressional map.  There was a problem

19  with joining, I think the urban areas of Montgomery with the

12:09:02 20  urban area of Mobile; is that fair understanding?

21  A    Yes.  Not because they're urban, but because of the

22  different types of economy and culture, et cetera.

23  Q    Do you think there's a problem with Congresswoman Sewell

24  representing both Birmingham and Montgomery?

12:09:18 25  A    I've never really thought about it.  I think it would be

1  better if she had one and not two.

2       As I said earlier, I think it would be better if there

3  weren't three Congressmen representing Montgomery.  I think it

4  would be better if there was one.  I think it would be better

12:09:33 5  if there was one representing Birmingham and if there was one

6  representing Huntsville.

7       I'm not saying they are not trying to do the best they can

8  with what they have got.  They are.  They're good people doing

9  hard work.

12:09:44 10      If I only had to focus on Montgomery, I would be a better

11 congressman for Montgomery.  If I had to focus on Montgomery

12 and Mobile, I wouldn't be as good a congressman for either

13 area.

14      I have had the great benefit of only having to focus on

12:09:55 15 the Mobile urban area and the sort of economic thing that

16 spreads out from that.  And that's allowed me to really

17 understand my district, really understand their needs, and

18 focus on them and lead on them.

19 Q   Fair enough.  But you don't -- I guess my question is kind

12:10:09 20 of going more to the fact that Birmingham and Montgomery are

21 currently and have been I guess for some time in the same

22 district.  And you don't -- you believe that Congresswoman

23 Sewell effectively represents both of those area despite that?

24 A   Congresswoman Sewell can effectively represent a lot of

12:10:28 25 things.  She is extremely competent.  I'm saying take her or

1 anybody else out of it.  I think it would be better for each of

2 our metro areas to have one congressman representing that area

3 and looking out for the interests of that area.  And I don't

4 think it's good for Montgomery to be split up among three

12:10:42 5 different districts.

6 Q    And you mentioned at the beginning, I think of your direct

7 examination, that your district -- Congressional District 1 has

8 a lot of diverse interests.  You talked about it being very

9 rural and very urban, well-to-do, and not so well-to-do?

12:11:05 10 A    Yeah.

11 Q    And declining and increasing; and African-American,

12 Hispanic, and Asian; and having soybeans, and nurseries, and

13 tourism, and cotton, and timber, and lots of different

14 interests that you have to represent.  But, nonetheless, you

12:11:22 15 are able to, I take it, in your view you're able to effectively

16 represent all those interests?

17 A    I am effectively able to do it.  I would be less effective

18 if I had to spread that same effort over a wider geographic

19 areas with other interests that aren't presently in my

12:11:37 20 district.

21        MR. SPIVA:  If I can confer for one minute, Your

22 Honor.

23        Thank you very much, Congressman.  I appreciate it.

24        THE COURT:  Any redirect?

12:11:54 25        MR. DAVIS:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. DAVIS:

Q    Congressman, if the Alabama NAACP would like to meet with you, would you be happy to try to accommodate that request?

A    Absolutely.

Q    Is that true of the Southern Christian Leadership Conference?

A    Yes.  Let me point out, at one point, I was a member of the Alabama NAACP.

Q    Is that true of the Urban League?

A    Yes, sir.

Q    Is that true of all of the groups that you were asked about?

A    Yes, sir.  If somebody asked for a meeting with me, we move heaven and earth to accommodate them, particularly if they're from the state of Alabama.

In Washington, my schedule is sometimes as such that a vote gets called, and I just can't be there.  And I have to leave it to a staff person.

But we try as much as we possibly can to have me there personally present when any group of people from Alabama come to see me in Washington.  And, of course, if it's in my district, I'm always there.

Q    And you said that normally people request meetings of you instead of you meeting -- requesting meeting with constituents.

1   Is that true just of you, or is that just the way a

2   congressman's office operates?

3   A    That's the way a congressman's office operates.  We have

4   so many people and groups that want to meet with us that it is

12:13:04 5   a struggle to try to accommodate everybody.  If you try to

6   accommodate everybody as we do, you're not really hunting for

7   other people to meet with because you don't have time to go

8   hunting for people to meet with.  You're just doing the best

9   you can to meet with people that are making a request.  And if

12:13:20 10  they have made a request, obviously they have something that's

11  important to them.  And so we're going to do everything we can

12  to accommodate them so we can hear what's important to them.

13  Q    So if you haven't reached out to any group of any kind of

14  any nature, that doesn't mean you're opposed to that group?

12:13:36 15  A    Counselor, I'm also a member of the Alabama State Bar.  I

16  have never reached out to Alabama State Bar for a meeting.  But

17  they have with me.  And so when they do, I will accommodate

18  them.  But I never call the Alabama State Bar for a meeting.

19  Q    Would you say that Mobile and Baldwin County are more

12:13:57 20  connected today than they were in the '60s and before?

21  A    Absolutely.

22          THE COURT:  Why is that?

23          THE WITNESS:  Well, because back in the -- before that

24  period of time, Your Honor, Baldwin County was a very sparsely

12:14:12 25  populated rural county and had connections to Mobile, but they

weren't economic connections so much.  As Baldwin County has
started to develop, the two economies have just merged with one
another.

So and this is the problem we've had with this interstate
bridge.  We have tens of thousands of people living on one side
of the bay and working on the other.  They're not all going one
way.  They're crossing one another.  So where I get my hair
cut, one of the ladies that cuts my hair lives in Mobile, but
she cuts my hair in Baldwin County.

When I have some checkups that I do at the outpatient
thing in Thomas Hospital there in Daphne, there are a lot of
women.  The nurses that work in there that know me, because I
have been there a couple of times, I know are from Mobile.

So you have got people going both ways.  We've just
integrated the two economies.  And that's been to our great
benefit.

It's also been to our benefit in the legislature because
when you add the Baldwin County delegation and the Mobile
County delegation working together, we have greater throw
weight in Montgomery.

BY MR. DAVIS:

Q    Were there many high-rise condominiums in Baldwin County
in the 1960s?

A    There were none.  The high-rise condominiums started after
Hurricane Frederick in 1979 and revolutionized the tourism

1  economy, which was basically zero in Baldwin County prior to
2  that time.
3  Q    Would you say that the transportation system in the Gulf
4  Coast region is better today than it was in the '60s?
12:15:47 5  A    It is better, but because of the vast increase in the
6  number of vehicles we've got coming, we are going to have to
7  continue to improve it.  So we have continuing challenges.
8        But one of the things that's really put those two counties
9  together is when they completed Interstate 10 across the Mobile
12:16:03 10  Bay and Interstate 65 across the Mobile River Delta.  That made
11  it easier to get back and forth.
12        THE COURT:  In the 1960s, for some in this room who
13  may not have been alive then or remember it, to get from
14  Montgomery to the city of Mobile, was the interstate completed
12:16:24 15  into the city in the '60s?
16        THE WITNESS:  No, ma'am.
17        THE COURT:  Do you remember where it was -- those of
18  who were going to Mobile from Montgomery would have to get off
19  the interstate?
12:16:33 20        THE WITNESS:  Yes, ma'am.  You got off at Alabama 225
21  and drove south about 20 miles to Spanish Fort, and you got on
22  what we call the causeway, which is U.S. 31 and 90 and 98.
23        THE COURT:  And if the weather was bad going across
24  that causeway, it could be somewhat treacherous, could it not?
12:16:54 25        THE WITNESS:  Yes, ma'am.

1        THE COURT:  Rain and wind, and stuff like that.

2        THE WITNESS:  And when the tide gets up and you get a

3   wind coming from certain direction, the bay will actually

4   overwhelm the causeway.  And you can't get across it.  So

12:17:08 5   building the raised interstate was a big step forward.

6        THE COURT:  And that wasn't finished until about when?

7        THE WITNESS:  They finished I-10 across Mobile Bay in,

8   I'm pretty sure 1976.

9        THE COURT:  Okay.  And so was it after the completion

12:17:24 10  of that interstate that Mobile and Baldwin really became more

11  united --

12        THE WITNESS:  Yes, ma'am.

13        THE COURT:  -- than they were previously?

14        THE WITNESS:  I think that had a lot to do it.

12:17:36 15      And then it's odd to think of this, but that hurricane,

16  Hurricane Frederick, had a way of bringing both counties

17  together.

18      And then you had more people who literally started living

19  full-time on the eastern shore of Mobile County, which went

12:17:50 20  from a very sparsely populated area to having over 100,000

21  people living there now.

22      So it dramatically changed the nature of Baldwin County

23  from being primarily a sparsely populated rural county to being

24  more of a suburban and tourism county.

12:18:07 25      And as I said, you've got this integration of people and

1  economics between two county.  They're much more tightly

2  connected now from when I was a child.

3         THE COURT:  I just remember going to Mobile to

4  Montgomery, and it would take us longer to go from that exit

12:18:25  5  where the interstate stopped that was in -- was it in Baldwin

6  County?

7         THE WITNESS:  Yes, ma'am.

8         THE COURT:  North Baldwin County.

9         THE WITNESS:  Stockton.

12:18:33 10        THE COURT:  Yeah.  It would take us longer to get from

11  there to the city of Mobile -- it was just that far on the map

12  (indicating) -- as it took to get from Montgomery to that area.

13        THE WITNESS:  Well, it greatly improved the ability to

14  get from the northern part of Baldwin County to the northern

12:18:49 15  part of Mobile County when they completed I-65 across the Delta

16  which I think was 1981 or '2, somewhere in there.

17        THE COURT:  Yeah.  So just a little history lesson for

18  some who may not be aware of traveling issues in Alabama in

19  that time zone time frame.

12:19:11 20        THE WITNESS:  Your Honor, I remember them well.

21        THE COURT:  Uh-huh.

22  BY MR. DAVIS:

23  Q    With these different developments, Congressman, is it more

24  feasible today for someone to live in Baldwin County and work

12:19:22 25  in Mobile than it would have been in the 1960s?

1    A    Completely different.  Much, much, much, more feasible.

2    And that's why you have literally tens of thousands of people

3    every day going back and forth.

4    Q    Congressman, I've put Plaintiffs' Exhibit 4 back on the

12:19:38 5    screen, which is the state board of education districts.

6         During your cross-examination, you were asked, I believe,

7    if the representative of District 5 could effectively represent

8    all areas of the district?

9    A    Yes.

12:19:51 10   Q    Did I understand that correctly?

11   A    Yes, sir.

12   Q    And you said that they could not?

13   A    They could not.

14   Q    Okay.  Is that because of some problem with the particular

12:19:58 15   representative, or is that because of the way the districts are

16   configured?

17   A    It's the way the district is configured.  I mean, I know

18   Ms. Bell who passed.  I know she would have liked to have spent

19   more time in Mobile.  But with so many hours in her day, you

12:20:15 20   look at her district, and she's got so many, many issues she's

21   having to deal with in Montgomery, she couldn't spend that time

22   in Mobile.  She didn't have the time in her calendar.

23   Q    I want to be clear.  You are not criticizing Ella Bell at

24   all?

12:20:29 25   A    No.

1   Q    But the Alabama Legislature gave her a district where it's

2   going to be really hard to do her job; is that your testimony?

3   A    That district from a part-time school board member.

4        Remember, these are part-time positions.  That's almost an

12:20:39  5   impossible district.

6        And when you think of issues that are going on in the

7   Mobile County school system, the largest school system in the

8   state.  And the Montgomery County school system has all these

9   issues right now, I don't know any person that could adequately

12:20:53 10   cover those two as a part-time school board member.

11       So I am not being critical of Ms. Bell at all who I knew

12   very well.  I just think that that district's impossible.

13            THE COURT:  And let me ask you this:  Are the issues,

14   the school-related issues in Mobile and Montgomery that are

12:21:12 15   urban centers, different from the school issues in Marengo, and

16   Sumter, and Choctaw, and -- I can't read what that one is --

17   what is the one between Crenshaw -- well, Butler.  We'll just

18   say Butler.

19            THE WITNESS:  Those are all very different areas.

12:21:36 20            THE COURT:  Those are extremely rural areas, are they

21   not?

22            THE WITNESS:  Very rural.  They don't have a lot of

23   local funding, which is a big problem that they face.

24       Some places don't have broadband, which, as you know, is

12:21:50 25   very important to delivering certain types of technology to

schools.  So the problems that a lot of our rural schools in
Alabama face are different from the urban schools.

Mobile County has some extra problems because there are so
many different languages spoken in the southern part of Mobile
12:22:07 County and in the western part of Mobile County because the
University of South Alabama attracts a lot of different people
of different nationalities.  So the Mobile County school system
is struggling with English as a second language-type issues
that you will not see in Montgomery County.

12:22:23 Montgomery County has a number of people who are sending
their children to private schools and it drains people out of
public schools at the very time you have more and more people
coming in from places like Korea because of Hyundai, et cetera.

So both school systems face serious issues.  But they're
12:22:46 different types of issues.

THE COURT:  Uh-huh.  And those issues for Mobile and
Montgomery are very different from the rural school issues?

THE WITNESS:  Yes, ma'am, very different.

BY MR. DAVIS:

12:23:00 Q    Congressman, I believe you were asked during
cross-examination if you were aware that in the mayoral
election whether Sandy Stimpson was supported mainly by white
voters and his opponent meanly by African-American voters?

A    Yes, I was asked that.

12:23:16 Q    You weren't familiar with the racial patterns?

```
 1   A     No.

 2   Q     Congressman, I want to show you a part of the deposition

 3   of one of the plaintiffs in this case, Lakeisha Chestnut, one

 4   of your constituents, someone who lives in Mobile.  It was

 5   taken in June of this year.  And I want to show you -- I will

 6   represent to you --

 7             THE COURT:  Can you zoom in a little bit and see if we

 8   can get that a little clearer?

 9             MR. DAVIS:  Is that better, Your Honor?

10             THE COURT:  Yes.  Look at that.

11   BY MR. DAVIS:

12   Q     I will represent to you that she was asked what she was

13   looking for in a congressman and that she said on page 30 of

14   her deposition, beginning on line 8, that, quote, It doesn't

15   matter if that person is a man or a woman, black or white,

16   Democrat or Republican.

17         I'll give you a perfect example.  Sandy Stimpson, our

18   mayor, he not only -- not only did he reach out in the

19   Caucasian communities, he reached out to African-American

20   communities.  And he won overwhelmingly the African-American

21   support, and he's Republican.

22         My question to you, Congressman, is:  Is this more

23   consistent with the Mobile, Alabama that you know?

24   A     Yes.  And this doesn't start with Sandy Stimpson.  This

25   started a number of years ago.  But we've made our whole
```

leadership, civic, political, faith-based, et cetera, have made
a real effort for us to work across our community as one
community.  Sandy picked up the motto.  But he stated a motto
that simply states what we've been doing for a long time.

12:24:57    And what she's saying here is what I was saying earlier
when she said that he got a lot of African-American support.
So when I heard some polls saying he didn't, I've got questions
about that, because I know a lot of African-Americans who live
in the city of Mobile who are very strong supporters of Mayor
12:25:11 Stimpson because of the record that he's done there, and
because they have very much bought into this whole idea about
one Mobile.

Q    I'm going to see if I can get two maps on here at once.

        THE COURT:  And the two are which exhibits?

12:25:40        MR. DAVIS:  Plaintiffs' Exhibit 15, which is the 2011
plan; and Plaintiffs' Exhibit 61, which is Revised Plan 1.

BY MR. DAVIS:

Q    Congressman, the top one is a map of the districts as they
currently exist, and the bottom one is just a reminder of one
12:25:58 of Plaintiffs' proposals.

A    Right.

Q    Are you concerned with health care as it relates to your
constituents, Congressman?

A    Yes, sir, very much.

12:26:10 Q    Are you concerned that your constituents have access to

1  good education and opportunities?

2  A    Passionately so.

3  Q    Are you concerned that your constituents are part of an

4  area where the criminal justice system is fair?

12:26:27 5  A    Yes, sir.

6  Q    Is that true for your constituents of all races?

7  A    Yes, sir.

8  Q    When you're fighting for health care opportunities, good

9  health care, for a good education system, for criminal justice

12:26:42 10  system, are you going to be more effective doing it in the

11  districts as they are now, or if you're trying to run back from

12  west Mobile county to Dothan?

13  A    In the districts as they are now.

14  Q    When you're fighting for education and criminal justice

12:26:56 15  system, are you going to be more effective --

16          MR. SPIVA:  Your Honor, I'm trying to not object.  But

17  he's kind of testifying here.  He's -- leading is the

18  objection.

19          THE WITNESS:  I can answer the question without you

12:27:08 20  leading me.

21      I am going to be more effective representing my

22  constituents in anything in District 1 under Plaintiffs'

23  Exhibit 15 than I am in the other one.  It's just too broad a

24  district for me to be effective in.

12:27:21 25      I care about all those issues.  I'm going to work like

crazy on them.  I'm being practical.  There's so many hours in the day.  There's a lot of things to cover and lot of things going on in that district.

I want to say this about health care.  Alabama has been mistreated under the Medicare program for years.  The reimbursement rate that our hospitals receive compared to national average for Medicare services -- on average, we receive 20 percent less.

Now, that hurts all of our hospitals.  But it particularly hurts our rural hospitals that are hanging on by a thread.  So I started working on this when I first got to Congress.

When President Trump came in, he put a new person in charge of Medicare.  I got a meeting with her, expressed to her the problem.  To her great credit, she worked with us, came up with a new formula.

And as of October 1st of this year, Alabama hospitals, particularly the rural hospitals, are going to be receiving tens of millions more dollars.  That benefits all of my constituents, but it particularly benefits my rural constituents.  And it particularly benefits poor people in those rural areas, and particularly benefits African-American poor people in those rural areas.

And they were very much in my mind because without that hospital, they would have to drive from Monroeville or Brewton or Grove Hill to Mobile.  And some of them might not make it.

1   That stroke may mean when they got to the hospital they're

2   dead.  So when you're fighting, you have to have that sort of

3   thing in mind.

4       And if you're spread out and got to know so many rural

12:29:02  5   hospitals -- like all the rural hospitals in Mobile, Baldwin,

6   Escambia, Covington, you can get to know them, but not very

7   well.  I know rural hospitals in my area, because I have been

8   to every one multiple times.

9           THE COURT:  Thank you.

12:29:14 10           THE WITNESS:  Yes, ma'am.

11           MR. DAVIS:  And nothing further, Your Honor.

12           THE COURT:  I have a couple of questions, if I may.

13           THE WITNESS:  Sure.

14           THE COURT:  Okay?  You were shown some of

12:29:27 15   Ms. Chestnut's deposition testimony.

16           THE WITNESS:  Yes, ma'am.

17           THE COURT:  She also testified that -- I think it was

18   her, or was it Ms. Jones -- I'm sorry.  I'm getting my

19   witnesses confused maybe.

12:29:43 20       Oh, it was Commissioner Tyson, who testified about taking

21   a group up to D.C.

22           MR. SPIVA:  Yes, Your Honor.

23           THE COURT:  That's right.  And she said that she sent

24   an e-mail and requested a meeting, didn't get one, so went to

12:30:07 25   your office and had -- her group was told to wait outside.

```
 1        I've been to some of the offices of our congressional
 2   delegation in D.C.  Is your outer office large enough to hold
 3   15 people at one time?
 4             THE WITNESS:  15 would be pushing it.
 5             THE COURT:  Would everybody be standing up?
 6             THE WITNESS:  Oh, yes, ma'am.  I only have seats for
 7   about four or five people.
 8             THE COURT:  Could 40 people get in there?
 9             THE WITNESS:  No, ma'am.  Nowhere near 40 people could
10   get in my anteroom.
11             THE COURT:  So if I brought a group of high school
12   students up to see you, and I had 15 people with me, would we
13   be able to come in and wait in your little waiting area?
14             THE WITNESS:  Well, 15 wouldn't be in the waiting
15   area.  We would have to leave some people outside.  And then
16   when I was able to see them, then they would sort of bring them
17   all inside -- escort them into my office.
18        I don't have a desk in my office so I can leave it all as
19   a meeting area.  So I can handle in my office maybe 15 people.
20   But if it got bigger than that, we would have to go somewhere
21   else.
22        And a point of fact, I tend to meet with the high school
23   groups either on the steps of the capitol, or frankly, I have
24   met with them in a stairwell that was relatively quiet because
25   I just don't have room in my office to accommodate people of
```

1  that size.

2          THE COURT:  So if you were, say, I don't know, in a

3  meeting with someone else or at the capitol, and a group that

4  was 40 people or 15 people came to see you, would it be

12:31:49 5  unusual -- or would it be an indication of disrespect if they

6  were asked to wait in the hallway?

7          THE WITNESS:  Well, let me just say this:  I don't

8  know that we've ever done that.  I'm not aware that we have.

9  But it certainly wouldn't be a sign of respect.  It's just the

12:32:06 10  practicality that we have so little space in there, and we

11  don't like to crowd people in those offices.  And they're

12  usually multiple groups going in and out.  So we can't just

13  accommodate one group at a time.

14      Sometimes people on their own congregate outside my

12:32:22 15  office.  They sort of gather up there.  And when it's time to

16  come in, they come in.  Usually they're coming in as another

17  group is walking out.  So that sometimes happens.

18      And we do take our pictures with certain groups outside my

19  office because inside my office is too small to take a picture.

12:32:38 20          THE COURT:  Okay.  All right.  You have also talked

21  about your work with the historically Black College and

22  University Caucus?

23          THE WITNESS:  Yes, ma'am.

24          THE COURT:  Do you have in District 1 an historic

12:32:54 25  black college?

1            THE WITNESS:  I do.  It's called Bishop State
2    Community College.

3            THE COURT:  And where is that?

4            THE WITNESS:  It's in downtown Mobile.  It started out
12:33:04 5   as a satellite of Alabama State.  And then when Alabama created
6    the two-year college in the '60s, it was turned into a two-year
7    college.  But it's always been and it's still understood under
8    federal laws and guidelines as an historically black college
9    and university as a number of other two-year colleges in
12:33:21 10  Alabama are.

11          So my first work with HBCUs when I was on the state school
12   board, but then I worked with Tuskegee, Alabama State, and
13   Alabama A&M when I was in the state legislature.  Then when I
14   was chancellor of the two-year college system, I had all the
12:33:37 15  HBCUs in the system.

16          So Ms. Adams, who is the cochair when she was elected and
17   decided to put together an HBCU caucus, she came to me because
18   she knew about my experience.  And she wanted to have somebody
19   that was a partner in that endeavor who had some substantial
12:33:55 20  experience with HBCUs.  And she knew of my philosophy, which is
21   the HBCUs offer another type of opportunity that's a good part
22   of the mix and the diversity of American higher education.

23            THE COURT:  Okay.  And you mentioned something about
24   an amendment that you tacked onto a bill.

12:34:12 25           THE WITNESS:  Yeah.

1          THE COURT:  And I didn't catch what that amendment

2     actually did or does.

3          THE WITNESS:  So what we passed through committee last

4     week was a substantial reauthorization and rewrite of the

12:34:25 5     Federal Higher Education Act, which covers a whole lot of

6     things in education.  And I didn't think it had adequately

7     provided for some programatic services that are provided for by

8     the federal money at HBCUs.

9        So I wrote an amendment that would expand what HBCUs could

12:34:47 10     do with the money and what kind of money they could access with

11     the federal government.  And we had to have a roll-call vote,

12     and just about every amendment came up that day, but that

13     amendment passed by voice unanimously.

14          THE COURT:  Okay.  But that's just in the House.  It

12:35:03 15     still has to go to the Senate, right?

16          THE WITNESS:  Yes, ma'am.  I don't know what the

17     trajectory is going forward to the Senate.  But that --

18          THE COURT:  But at least you did your part in the

19     House?

12:35:12 20          THE WITNESS:  That's what we can do, yes, ma'am.

21          THE COURT:  Okay.  All right.  I may well have caused

22     some additional questions from anybody.

23        And, Mr. Spiva, it's your turn anyway.  Do you have any

24     further?

12:35:26 25          MR. SPIVA:  Nothing further from me.

```
 1              MR. DAVIS:  No further questions, Judge.  We thank the
 2    Congressman for taking time to be here.
 3              THE COURT:  Thank you very much for being here.
 4              THE WITNESS:  I appreciate you and counsel
12:35:36  5    accommodating my schedule, Your Honor.  Thank you.
 6              THE COURT:  Certainly.  I hope we haven't kept you too
 7    long.
 8              THE WITNESS:  Thank you.
 9              THE COURT:  We had talked about taking a late lunch.
12:35:46 10    This isn't terribly late, but do you want to break now?
11              MR. DAVIS:  Your Honor, Mr. Bonner is not here yet.
12    He was planning to be here by 1:00, and he will be here by
13    1:00.  But I think this will be a good time for a lunch break.
14    And that would still allow ample opportunity for us to finish
12:36:02 15    Mr. Bonner today.
16              THE COURT:  Okay.  All right.
17         So we'll come back at 1:40.  How about that?
18              MR. DAVIS:  Thank you, Judge.
19              THE COURT:  If you will have your witness on the
12:36:16 20    stand, we will be ready to rock and roll for the afternoon.
21              MR. DAVIS:  He'll be ready to go.
22              THE COURT:  Okay.  Great.
23              (Recess.)
24              THE COURT:  Defense may call the next witness.
13:40:00 25              MR. DAVIS:  Defendants call the Honorable Joe Bonner,
```

1                           CERTIFICATE

2

3

4          I certify that the foregoing is a correct

5    transcript from the record of proceedings in the

6    above-entitled matter.

7

8

9

10

11   _Christina K. Decker_                    11-14-19

12   Christina K. Decker, RMR, CRR                 Date

13   Federal Official Court Reporter

14   ACCR#:   255

15

16

17

18

19

20

21

22

23

24

25

## 2011 Congressional Districts



# 2002 Congressional Districts



2002 Congressional Districts 1-30-02
1/31/02 11:32 AM

1992 Congressional

ALABAMA



ALABAMA
CONGRESSIONAL DISTRICTS
1980

1970

/ ' ε /

# ALABAMA'S CONGRESSIONAL DISTRICTS





ALABAMA

Act # 21
August 19, 1964
CONGRESS

145ₒ



ALABAMA'S
CONGRESSIONAL DISTRICTS



ALABAMA

1940 Code of Alabama
Title 17, Section 425
CONGRESS

CONGRESSIONAL DISTRICTS
Feb. 14, 1901 – Mar. 4, 1917



ALABAMA

● Not created.

No. 453        AN ACT        H. 1171
To detatch the county of Hale from the ninth
congressional district of Alabama, and attatch
it to the sixth congressional district.

Acts of Alabama, 1900–01
Page 1156.

W. Letford,
Archives & History.
June 20, 1961.

CONGRESSIONAL DISTRICTS
Feb. 13, 1891 – Feb. 14, 1901



ALABAMA

287        AN ACT        H. 1073
To divide the State of Alabama into Nine
Congressional Districts
Approved Feb. 13, 1891.

Acts of Alabama, 1890 –91
Page 627

● Not created.

W. Letford
Archives & History
June 20, 1961

CONGRESSIONAL DISTRICTS
FEB. 13, 1875 – Feb. 13, 1891



A L A B A M A   • Not created.

No. 25          AN ACT
To divide the State into eight Congressional
Districts.

Acts of Alabama, 1874-75
Page 115.

W. Letford
Archives & History
June 20, 1961

⑦ Cullman County added to 7th Congressional
District by Act No. 44, Approved 2/10/83
Acts of Alabama, 1882-83

CONGRESSIONAL DISTRICTS
UNDER CONSTITUTION OF 1867



ALABAMA

●Not created

ARTICLE III
CONGRESSIONAL DISTRICTS

§34 (31) SIX DISTRICTS

Code of Alabama, 1867
Page 100

W. Letford
Archives & History
June 20, 1961.

# 2011 State Board of Education Districts



Alabama -- U.S. House
Interstate
0    30    60    90
Miles
2011 Plan



Alabama -- U.S. House

Illustrative Plan 4

©2015 CALIPER



Alabama -- U.S. House
Interstate
0    30    60    90
Miles
Revised Plan 1

©2015 CALIPER



Alabama -- U.S. House

0   30   60   90

Miles

Revised Plan 2



Alabama -- U.S. House

0       30      60      90

Miles

Revised Plan 3