FILED
2021 Dec-23  PM 07:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

102

1    percent or more of the population is black.  A

2    federal investigation determined that these

3    closures had a disparate and adverse effect based

4    upon race.

5         The state was ordered to reopen the

6    offices, but many of the offices are reopened on a

7    very limited schedule.  For example, a person in

8    Sumter County, which is a majority-black county,

9    can only visit the driver's license office on the

10   2nd and 4th Tuesday of the month from 8:00 to

11   12:00 and from 12:30 to 2:30 to get a driver's

12   license.  If they arrive without the proper

13   paperwork, of course, you don't get the

14   identification.  They must wait a significant

15   amount of time, if you can even get back for

16   another chance, not to mention the work

17   requirements and traveling.  And if someone has

18   very low income, it's difficult to get up there.

19        As the Commission should know, in-person

20   voter fraud is virtually nonexistent across the

21   country.  And in Alabama, as stated in the recent

22   case of Greater Birmingham Ministries versus

23   Merrill -- this decision just came out in January

1    -- where the Court said, "Cases of proven
2    in-person voter fraud in Alabama are extremely
3    rare."  This case also states substantial numbers
4    of Alabama voters are adversely affected with
5    minority voters disproportionately so.  So over
6    20,000 black registered voters in Alabama have no
7    valid photo ID that is accepted under the photo ID
8    law.  So they're registered voters, but they don't
9    have the ID to vote.  It's over 20,000, which,
10   obviously, can make a huge difference in an
11   election.
12          This translates, of course, into the
13   thousands of individuals adversely affected by
14   this, what we would call, an unnecessary law.  So
15   instead, you know, we would request that the
16   Secretary of State maybe not -- you know, it's not
17   necessary to show up to every, you know, peach
18   festival and peanut festival.  We would -- we
19   would hope that he would work to kind of get rid
20   of this voter ID law instead because it makes it
21   extremely difficult for people of color to vote,
22   as statistics show.
23          Second, we have had trouble with Mobile

1   County.  The ACLU of Alabama, my organization, set

2   up a hotline to report difficulties in voting on

3   election day for the special senate election here

4   this past December, the one where Senator Jones

5   won, and we received complaints all day on our

6   hotline.  On election day in particular, we got

7   word of dozens and dozens of people prohibited

8   from voting in Mobile County because the address

9   on their driver's license does not match the

10   address on the registration rolls.  That is not a

11   requirement.  For example, you can use your

12   government employee ID or your university ID or

13   your passport to vote.  Those don't contain

14   addresses.  So why in Mobile County are they

15   requiring an address match between what's on the

16   roll and what's on the driver's license?

17           As people know, people move frequently.

18   Especially if you're of lower income, then you

19   might be renting and moving to different places.

20   As for the individuals in Mobile, we heard that

21   many just left when they were told by the election

22   officials that their address doesn't match.  They

23   have to get back to work or they only had a

1    certain amount of time, not to mention the lines.

2    Some of them stayed and they were told to get into

3    the line for a provisional ballot, but that line

4    was long.  For some people, it was like an hour

5    and a half up to two hours.

6          I had actually been on the phone with the

7    probate judge and, you know, I told him that, you

8    know, get some more computers down there or

9    something if you're going to force people at least

10   to go into these provisional lines.  But they

11   shouldn't be checking them -- addresses exactly

12   like that anyway.  So many people left that line

13   because it was taking too long.  So if they didn't

14   leave the first line, they did leave the second

15   line.  We have heard that this particular probate

16   judge in Mobile County has been doing this for

17   years, which is troublesome.

18          Third, a law went into effect last August

19   that now defines what a crime of moral turpitude

20   is.  Moral turpitude laws were created in 1901 in

21   Alabama, effectively to disenfranchise black

22   voters.  Because there was no definition of moral

23   turpitude for over 100 years, election officials

1   could broadly prevent individuals from getting the

2   right to vote, which is worrisome.  A new Alabama

3   law was passed last year that finally actually

4   defined what crimes are crimes of moral turpitude.

5           Many people have asked the Secretary of

6   State if you could notify these people that

7   they're eligible to vote.  Secretary Merrill

8   claimed it was not his responsibility to notify

9   those voters that they are eligible to vote again.

10  So largely, that task has been left to nonprofit

11  entities without the same resources.  And also, we

12  don't have the records, but whereas, we've been

13  just trying to get people registered to vote again

14  and get their voting rights restored, entities

15  like the Legal Services of Alabama, The Ordinary

16  People Society, and the ACLU of Alabama.

17          Fourth, I should mention in the moral

18  turpitude law, the State did not repeal the

19  provision that requires fees and fines to be paid

20  off to vote again.  This means that the State

21  directly discriminates against the poor.  Many

22  poor people cannot vote simply because they are

23  poor.

1           Fifth, another law passed last year that

2    made crossover voting illegal, meaning that

3    someone voting in one party's primary could face

4    fines and jail time if they voted in the other

5    primary's runoff.  Following the republican

6    primary runoff between front-runners Roy Moore and

7    Luther Strange, Secretary Merrill said that 674

8    people who voted in the runoff had also voted in a

9    democratic primary and recommended that they be

10   prosecuted to the full extent of the law and given

11   up to five years in prison for voting.  That was

12   his suggestion.  And this crossover voting law, as

13   you know, as I just mentioned, was brand new.

14           To us, it seems that it was occurring --

15   if this was occurring, if people were, you know,

16   accidentally or maybe intentionally, you know,

17   voting in the runoff, it could have easily been

18   stopped by the election officials.  It seems like

19   it was probably a result of lack of training if it

20   was happening or at least instructions to the

21   election officials.  They could have stopped any

22   of this from occurring.  They had the voting

23   records immediately available to them.  But

1    instead, the Secretary of State urged five years
2    in prison for voting.
3            Eventually, it came out that it was mostly
4    administrative error, I think as you've heard
5    today, but the damage was already done with many
6    individuals worried that maybe making a mistake
7    while voting might land them in prison.  And as
8    we'll get to later, the bureaucracy of voting is
9    very complicated, so I am worried myself, am I
10   going to make a mistake, am I not going to have
11   the right person signing it over my shoulder.  You
12   know, so many asked Secretary Merrill to clarify
13   that the crossover voting law does not apply to
14   the general election because there's this fear
15   that, wow, we might go to prison if we make a
16   mistake.  He said, quote, That doesn't confuse me,
17   and I don't know why it would confuse anybody
18   that's a thinking person in the state, end quote.
19           Sixth, we have concerns about the
20   bureaucracy of having to vote.  In order to have
21   your vote counted in an election in Alabama, you
22   need to register to vote 14 days before the
23   election, which -- which you can do online which

1    is great, but only -- you can only vote online if

2    you have an Alabama driver's license or a

3    nondriver ID.  Otherwise, it has to be mailed in

4    or filed in person.  If you miss the deadline,

5    you're out of luck.  Can't vote.

6          Seventh, absentee voting should not be so

7    difficult.  To vote absentee, you should -- you

8    should -- you need to apply for an absentee ballot

9    five days before an election, return it one day

10    before the election, unless you have a work or

11    medical emergency and then only if you have

12    verifiable proof that you can satisfy one of five

13    -- five reasons for being unable to vote during

14    normal polling hours.  People in my own family

15    have interestingly not even gotten their absentee

16    ballot for the last election, so they weren't even

17    able to vote.  So I'm still actually confused on

18    the absentee.  And I look over the process, and it

19    confuses me almost every time.  And then with the

20    fear of potentially going to prison, it's -- it's

21    worrisome that, you know, people won't be voting.

22          Eighth, I do not completely understand

23    putting active voters on the inactive voting list.

1    So I'm going to read from Alabama Code 17-4-9

2    which states, "Any voter who fails to vote for

3    four years in his or her county shall have his or

4    her name placed on an inactive voter list by the

5    local board of registrar" -- "registrars."  Excuse

6    me.  So that's if you're not voting for four

7    years, you get put on the list.  That's what it

8    seems like to me, but we've had individuals --

9    many individuals that voted in the 2016

10   presidential election, then they could not vote in

11   the special senate election a few months later in

12   2017, in the primary or the regular election.

13   That was not four years of inactivity; they had

14   just voted less than a year ago.  However, they

15   were marked as inactive.

16          Secretary Merrill -- I wasn't here for his

17   portion.  I mean, he would even tell you that Mo

18   Brooks -- many members of Mo Brooks' family

19   couldn't even vote on his election day, and he was

20   on the ballot for U.S. Senator, because of the

21   inactive voter confusion.  Mo Brooks was inactive

22   and so were his, I think, his son and his

23   daughter-in-law, I believe.

1          So at the ACLU of Alabama, we simply

2     believe that people should be allowed to

3     participate in democracy.  It's kind of easy.  We

4     want voter ID laws to be repealed.  You know, we

5     -- we want there to be fairness in elections.  But

6     we question some of the -- the reasons that have

7     gone into the voter ID laws that have even been

8     admitted in statements.

9          We would also suggest the implementation

10    of automatic voter registration for all eligible

11    citizens.  Automatic voter registration lowers

12    costs.  It reduces the potential for voter fraud,

13    which seems like a good idea, and keeps the rolls

14    updated.  It keeps a very clean roll.  Any time

15    anyone interacts with any government services, it

16    can be automatically corrected so their address

17    can be updated every time they move, pay a new

18    power bill, or whatever that they might be doing.

19         If for some reason reducing the potential

20    for voting fraud and saving money are not what the

21    State of Alabama would like, I mean, we just

22    simply ask that the Secretary of State's office

23    and the Alabama legislature explore many of the

1    other possible options designed to make it easier

2    for eligible citizens to register to vote and cast

3    their vote.

4           For example, same-day or election-day

5    registration, early voting, and no-excuse absentee

6    ballots are just a few examples of laws designed

7    to increase voter participation.  So we sincerely

8    hope to expand voting in Alabama.  Unfortunately,

9    but the Alabama Secretary of State, he admits he

10   doesn't necessarily want to make it easy to vote.

11   He was quoted as saying, quote, As long as I'm

12   Secretary of State of Alabama, you're going to

13   have to show some initiative to become a

14   registered voter in this state, end quote.  That's

15   my statement.

16          MS. CARROLL:  Great.  Thank you.  So with

17   those statements complete from the panels, we'll

18   now turn to the question portion.  As always, if

19   you can indicate to me if you would like to have a

20   question.  I'd like to start with you, Mr. Park.

21   So you had indicated in your discussion, I

22   believe, of the Wetumpka County case that folks --

23   and I may be wrong about that -- but that folks

1    were voting that had used business addresses; is

2    that correct?

3            MR. PARK:  Yes.

4            MS. CARROLL:  And so I'm curious, what

5    information -- what informational efforts were

6    made to make sure people understood which address

7    they were supposed to provide and then just to

8    give you kind of a follow-up, Mr. Boone had

9    indicated that an address requirement is not

10   necessary for -- to cast the ballot.  A, is that

11   true?  And B, were you speaking of an address that

12   failed to match the registration or were you

13   speaking of an address that was improperly given

14   with regard to the ID that they were provided?

15           MR. PARK:  If you go back to 1994, there

16   was a highly contested election, where in Greene

17   County, there were suitcases of absentee ballots

18   delivered to the polling place on election eve.

19   And they were frequent -- those absentee ballots

20   frequently went to business addresses and to --

21   like county offices and places like that.  So

22   Alabama changed its law, and you're supposed to

23   get an absentee ballot at your -- at your home.

1    For in-person, you're supposed to keep your

2    driver's license up to date.  Now, I can't speak

3    to Mobile, but Mobile is only one of 67 counties

4    in Alabama.  One would think that focus in Mobile

5    should be where -- where things should be.

6            MS. CARROLL:  Okay.  But, I guess, getting

7    back to my question though in terms of information

8    about the example that you gave.

9            MR. PARK:  In Wetumpka?

10           MS. CARROLL:  I believe, yeah.  You had

11   indicated that the absentee ballots were

12   problematic because the voters had used a business

13   address.

14           MR. PARK:  No.  This was Phenix -- Phenix

15   City when they --

16           MS. CARROLL:  Phenix City.  I'm sorry.

17           MR. PARRK:  -- reviewed -- when they

18   reviewed voter registrations.

19           MS. CARROLL:  Okay.  So it was the

20   registration itself.  And what information is out

21   there for voters to understand which address they

22   should use?

23           MR. PARK:  It's a matter of state law that

1    you -- you register at your home.

2          MS. CARROLL:  I understand it's a matter

3    of state law, but I guess this is a similar

4    question to what Ms. Shearer was asking earlier to

5    the Secretary of State to the extent that we hope

6    that folks will follow state laws.  And the goal

7    is to allow people to vote.  It seems like we

8    would have an incentive to make sure that -- that

9    folks understood what the state law was.  What

10   efforts are being made that you know of to ensure

11   that?

12         MR. PARK:  I don't know of any efforts

13   that are being made specifically to ensure that,

14   but, you know, we just need to review the voter

15   rolls and -- and those people we can contact and

16   tell them we re-changed their registration.

17         MS. CARROLL:  All right.  So I guess as a

18   follow-up to that then too -- and I'm sorry to

19   pepper you with this, but I just want to try to

20   nail down this point.  My understanding is that

21   Secretary of State Merrill has made a statement

22   that when a registrar confirms that an address is

23   valid, quote, they are not in the business of

1   confirming whether it's a residential or a

2   business address, end quote.  If that's the

3   Secretary of State's position, I guess I'm a

4   little baffled by your response that you want to

5   make sure that the rolls are correct.

6          MR. PARK:  That's -- that's the Secretary

7   of State's view, but the -- the local

8   jurisdictions are the ones that are responsible

9   for their voter rolls.  There -- there is supposed

10  to be -- there was when I was here -- an effort to

11  some of the statewide database, but the probate

12  judges were not all on board with that.

13         MS. CARROLL:  All right.  And then the

14  next question I had -- and I apologize to the rest

15  of the Committee.  And I will try to do all of

16  these at once, and then y'all can have your turn

17  too.

18         In terms of -- and this was the Circuit

19  Court of Elmore County decision that you

20  referenced the eight absentee ballots that were

21  illegally cast.  That was Judge Sibley Reynolds'

22  ruling in the Lewis Washington case that they were

23  neither signed nor witnessed.  I mean, that --

1   that suggests that they were insufficient as

2   opposed to necessarily fraudulent; is that

3   correct.

4        MR. PARK:  There was some -- I have seen

5   Judge Reynolds' order, and what -- what there was

6   was proof that either the voter didn't sign the

7   application or the witness didn't sign the

8   application.  Al Agricola represented the winning

9   party.  Al is a lawyer here in Montgomery, and he

10   had -- he had a handwriting expert express an

11   opinion on the validity of the signatures.  So

12   they passed initial muster, but they were

13   fraudulent because the wrong person signed them.

14   I mean, I can't sign an absentee -- I shouldn't

15   sign an absentee ballot for somebody else.

16        MS. CARROLL:  Okay.  And then, Mr. Boone,

17   I have one question for you.  You spoke in terms

18   of Mobile County as your second point and the

19   hotline that the ACLU had set up.  Can you -- can

20   you give us some indication of the number of folks

21   we're talking about that -- that the ACLU suspects

22   did not cast a vote that were entitled to vote?

23        MR. BOONE:  We're not exactly sure on the

1    exact number because a lot of the people that were

2    contacted -- we had, you know, almost a dozen --

3    over a dozen that probably -- that called us, but

4    they were standing there basically telling us

5    everyone that's leaving in the lines.

6         So there -- so it could be -- I mean, I'm

7    worried about it could possibly -- it could be up

8    to 100 or more.  I'm not sure because it was

9    happening throughout the day, and I don't know how

10   many precincts it was occurring.  I don't even

11   know how many precincts in elections there are in

12   Mobile.

13        But if that was the instruction from --

14   which is what I fear is that if the instruction

15   came from the probate judge, that's basically --

16   that's the manual that the election officials are

17   looking at or if they're going off the probate

18   judge's instructions to check every address, then

19   it could be -- I have no idea however many voters

20   are in Mobile and who don't have a correct --

21   their address just happens to match that data.

22        MS. CARROLL:  And did the ACLU make a

23   record of the calls that they received?

1          MR. BOONE:  We kept -- we -- no.  It was

2    coming in pretty -- we didn't keep every single

3    phone call.  We kept a record of some of them that

4    we were able to write down.  But we didn't write

5    down every single call and name, and some people

6    don't give up, you know, all of their information,

7    for example.  And because we care rightly about

8    privacy, it's one of our big issues, we don't

9    necessarily ask for that information.

10         MS. CARROLL:  Would it be possible for you

11   in written comments to provide us with information

12   about the number of calls that you received?

13         MR. BOONE:  I think I can do that.  I

14   would have to just check with my executive

15   director, but I don't think that should be a

16   problem.

17         MS. CARROLL:  So I am going to go down the

18   line this way, and then I'll come back this way.

19   So I'm going to start with Member Maurie Shevin,

20   and then if you could pass to Member Angela Lewis,

21   who will be next.

22         MR. SHEVIN:  Thank you.  Also, Mr. Boone,

23   to your second point, I want to make sure that I

1   understand this correctly.  When the address on

2   the driver's license does not match the address on

3   the voter rolls in Mobile County, those ballots

4   were being challenged or those voters were being

5   challenged; is that correct?

6          MR. BOONE:  What do you -- I guess -- what

7   do you mean by challenged I guess?  Question --

8          MR. SHEVIN:  Well, the voter was not free

9   to cast a ballot.

10          MR. BOONE:  They were, from what I've

11   heard -- you know, I wasn't there.  But from what

12   I heard, they were told, oh, sorry, you -- you

13   have to have this matching address.  So at that

14   point, some people would just leave and be like,

15   well, look, I don't -- I got to go, and some would

16   say, well, you -- and then if they -- if they

17   would say, I still want to vote.  I mean, this is

18   me.  This is my picture, which is what we believe

19   it comes down to, what's on the actual photo which

20   is what the law says, it's about the

21   identification on the photo, but other people were

22   told, well, you can go check.

23          And there's a head election official, I

1  think, at each precinct, and that person is

2  supposed to be able to either give them a

3  provisional or if they can verify -- I think it's

4  like their county of birth and stuff -- they might

5  be able to get a regular ballot.  I don't know the

6  procedure exactly, but that's my understanding.

7  So then some others were gone to the provisional

8  line.

9        MR. SHEVIN:  And a quick follow-up

10  question, is it a legitimate issue to be concerned

11  with a voter's address?

12        MR. BOONE:  I'm not -- you know, I don't

13  -- I don't have a direct answer on that one.  It's

14  not something we've talked about within our

15  organization since I'm representing them today.

16  My -- my initial thought is, you know, it just

17  seems this is -- it's one in a series of keeping

18  people from accessing the vote.  I mean, if it's

19  their photo and it's that person and they're at

20  the correct precinct, which you would know from

21  the rolls, I can't imagine -- just because you

22  happened to have moved to a new apartment in the

23  next month or maybe you had to move in with a

1   parent, I can't believe you'd lose your right to

2   vote, which is so important to the Constitution

3   because of something so technical.

4          I mean, technical and -- because it's

5   technical and because something -- we want

6   everything to be fair, of course, of course.  But

7   it seems like there's so many obstacles and

8   barriers put in the way.  Myself, I feel like I

9   could -- you know, I do this -- I'm a staff

10  attorney for the ACLU.  I feel like I could

11  potentially make a mistake.  And if I feel like I

12  can make that mistake, I know that there's plenty

13  of people out there who live very busy lives and

14  it's difficult to even make time to vote much less

15  check every single box that the State of Alabama

16  requires.

17         And like I said at the end, I mean, I'm

18  just interested in people participating in

19  democracy, not being left off because of these

20  technicalities that have nothing to do with voter

21  fraud.

22         MS. CARROLL:  Dr. Lewis.

23         DR. LEWIS:  Thank you for coming today and

1    sharing your information with us.  My first

2    question is for Mr. Park.  You spoke about the

3    voter fraud in several counties -- Wetumpka,

4    Phenix City, and Guntersville.  And my question

5    is, would the current Alabama photo -- photo ID

6    law that we have in place have stopped those

7    instances of fraud or those elections being

8    overturned?

9         MR. PARK:  It wouldn't have stopped

10   Wetumpka because Wetumpka is absentee ballot, so

11   it's a different question.  Let's see.

12   Guntersville, I think -- Guntersville was also

13   absentee ballot, so it's a different question.

14   Phenix City, the question is because people who

15   may have been registered and may be residents of

16   Georgia might have voted.  You know, again,

17   that -- that would be a -- an in-person thing that

18   I would think -- I don't know that any -- any of

19   those problems -- their voters.  They are problems

20   with the registration roles.

21        DR. LEWIS:  So can I assume your answer to

22   my question would be no?

23        MR. PARK:  The answer is no because they

1    are different problems.

2          DR. LEWIS:  All right.  Thank you.  My --

3    my second question is, you talked about instilling

4    confidence in the electoral system and gave a lot

5    of statistics about how people feel about voting

6    in America.  Is the photo ID law the only way to

7    instill public confidence in the U.S. electoral

8    system?

9          MR. PARK:  No, Dr. Lewis.  I don't -- I

10   don't believe it is.  I think one -- one thing you

11   can do is prosecute instances of voter fraud when

12   you find them.

13         DR. LEWIS:  Are there other ways besides

14   prosecuting and the photo ID?

15         MR. PARK:  Well, I think those things

16   attest to the integrity of the system and then,

17   you know, every election there is a flash fire.

18   Mobile may be the flash fire.  Baldwin County one

19   time was the flash fire.  Tuscaloosa was the flash

20   fire.

21         There's -- they go around and you've got

22   -- what you've got to do is look past -- past the

23   fact.  But otherwise, the election is going to --

1    elections run as they're supposed.  And you want

2    to run the election as well as you can.  That's --

3    that builds confidence in the system.

4         DR. LEWIS:  A question for Mr. Boone.  In

5    reference to the hotline, what -- and I know you

6    have a concern for privacy for those people who

7    called.  Do you have any record or -- of the

8    number of calls or any recordings or any of those

9    individuals who called would be willing to submit

10   public testimony to -- via e-mail or whichever

11   form they see fit to make that a part of our

12   official record today?

13        MR. BOONE:  I think it -- that might be

14   possible, and I can reach out to some of those

15   individuals.  And the individuals I would be

16   thinking of are the individuals who kept calling

17   just to check and see.  You know, they seemed like

18   they were very engaged, and then they were asking

19   their friends did you have trouble and they were

20   -- their friends were having trouble.  And then

21   they were on Facebook messaging some of their

22   family members did you have trouble in your

23   precinct.  Yes, I had trouble in my precinct.

1          There's some individuals that I might be

2     able to contact because I did keep some of those

3     names.  Like I said, I was kind of jotting down

4     notes as they were coming in, so I don't have all

5     of it.  But I'd probably be able to check back in

6     my notes, and I starred, I think, the people who

7     were calling back frequently.

8          DR. LEWIS:  Thank you.

9          MS. CARROLL:  And we have a question from

10    Member Daiquiri Steele.

11         MS. STEELE:  Thank you.  This question is

12    for Mr. Boone.  You have already spoken about the

13    individuals who had trouble on election day, and

14    so, of course, you had the hotline set up, as many

15    organizations do, to gather information about

16    possible problems on election day.  Does your

17    organization do any work with respect to any

18    possible problems with the voter registration

19    process itself?  For instance, our Secretary of

20    State came this morning and he gave us a number of

21    about 900,000 new registered voters in the state.

22    But that number is more of a numerator, and I'd be

23    interested to know what the denominator is.  So

```
 1    of the people who actually got to register, how
 2    many attempted to?  Does your organization collect
 3    any of that information or happen to have a
 4    hotline set up to collect that information?
 5            MR. BOONE:  We don't when it comes to
 6    voter registration.  We've -- we make attempts at
 7    trying to help people get registered.  Recently
 8    though, part of our focus has been on the
 9    restoration of rights, actually, since the new law
10    was passed and because that's a whole new
11    demographic of individuals that need to be, you
12    know, educated on the somewhat complicated moral
13    turpitude law.  And it's very confusing.
14            And I think someone mentioned it earlier
15    today.  It's hard to even know what you were
16    charged with or if you've paid all your fines or
17    if you're still on supervision.  It's very
18    complicated.  So our efforts recently have been
19    into restoration of rights.  So we haven't had as
20    much time for registration, and I don't know the
21    denominator.  I don't know the percentages of the
22    Secretary of State.  That's not the number we
23    have, but we have been focusing a little bit more
```

1    on the moral turpitude law.

2            MS. STEELE:  Okay.  And one more thing,

3    madam chair has already requested information

4    concerning some of these assets and Dr. Lewis some

5    of the information concerning --

6            THE COURT REPORTER:  I'm sorry.  Can you

7    speak up a little bit?  I'm sorry.

8            MS. STEELE:  That better?  So inasmuch as

9    the information has already been requested, I

10   would just ask that to the extent -- and I know

11   you may or may not have it.  But to the extent you

12   have any information also on the demographics of

13   the individuals who are -- who are calling in,

14   would you submit that as part of your testimony as

15   well?

16           MR. BOONE:  Calling in the hotline on the

17   day of the election?

18           MS. STEELE:  So the same information that

19   the chair has requested.  If you have any

20   information on the demographics of those

21   individuals, can you just include that?

22           MR. BOONE:  I will check.  That's not

23   necessarily questions we were asking.  We mostly

```
 1   just have names and like precinct numbers.  Yes,
 2   but I'll look and see what I can do.
 3        MS. CARROLL:  Well, certainly, if you can
 4   put people in touch with us, as Dr. Lewis
 5   suggested, that might be something we could
 6   inquire into as well.  I love that I've also been
 7   speaking out of dead mic in the meeting.  So I
 8   believe Member Jones has a question.
 9        MR. JONES:  So this question is for you,
10   Mr. Park.  Again, thanks for being here.  The
11   first thing you note were kind of national
12   statistics about our -- our kind of faith in
13   elections, but you noted a lot of local issues.
14   And so can you give me a sense or at least talk
15   about, you know, differences across counties or
16   how we might think about how -- or look into how
17   counties look over this process, both in
18   registration and kind of going through to voting
19   day?
20        MR. PARK:  I'm not -- not -- the
21   statistics are -- are national.  Instances of
22   prosecution of absentee ballot fraud are local.
23   We know that, for the most part, we don't hear
```

1    about problems with elections.  I'm going back --

2    when I talked about Baldwin County, I think that

3    was the gubernatorial election between Siegelman

4    and Riley where the complaints were coming out of

5    Baldwin County.

6              You know, this election, they come out of

7    Mobile.  You know, for the most part, it's a dog

8    that doesn't bark.  And I think that should attest

9    to the efforts that local officials and local

10   election officials and county officials are making

11   because they're the ones most responsible for

12   pulling this off.

13             MR. JONES:  So is there --

14             MR. PARK:  Is that responsive?

15             MR. JONES:  Well, can you talk a little

16   bit more about that -- how we might think about

17   those efforts, so how Madison County might differ

18   from Baldwin County and in how they run those

19   things and those efforts to prevent voter fraud

20   and also encourage voter participation?

21             MR. PARK:  Well, one thing the Committee

22   might do is ask -- invite like the local registrar

23   here in Montgomery County, if you're sitting in

1    Montgomery County, to talk about the efforts that

2    they made because they're -- they're the ones on

3    the ground.  You might -- if you go to Huntsville,

4    you could ask for the registrar in Madison County.

5    So those are the things that the Committee might

6    -- steps that the Committee might take that would

7    be enlightening to them, to the Committee.

8         MR. JONES:  Okay.  And I've got a

9    follow-up question, and as long as I have time, I

10   also have one question for Mr. Boone.  But you

11   talked a little bit about disparate impact with

12   the laws, and you said something about the laws --

13   I just need you to clarify this, that as long as

14   the laws have a neutral intention, even if there

15   are disparate effects, that might not be a

16   constitutional issue.  Can you clear up a little

17   bit what you -- that for me?

18        MR. PARK:  Correct.  Treating someone

19   differently because of their race is

20   unconstitutional.  That's known as disparate

21   treatment.  Federal law and the Voting Rights Act

22   as well prohibit things that not just are intended

23   to but have the result of.  And in the terms of

1    the Voting Rights Act, what it talks about have

2    the result of giving minority citizens less than

3    an equal opportunity to elect the candidate of

4    their choice.  So -- so it would be a neutral -- a

5    state law that has a disproportionate impact on

6    minority citizens.

7              MR. JONES:  Regardless of intention of the

8    law?

9              MR. PARK:  Correct.

10             MR. JONES:  Is that -- okay.  Thank you.

11             MR. PARK:  Correct.  And the Supreme Court

12   has said that disparate impact itself is not

13   unconstitutional but it's also prohibited by

14   federal statutory law.

15             MR. JONES:  Okay.  And if I've got time,

16   madam chair.

17             MS. CARROLL:  We're great.  Yeah.

18             MR. JONES:  Mr. Boone, so the hotlines of

19   interest, did you take steps to intervene and also

20   kind of investigate?  So -- so rather, if you

21   could describe the process.  You received the

22   call.  Did you send people out to the polling

23   places to see if this was happening, kind of how

1    widespread it was?  And did you also take steps to

2    intervene?

3            MR. BOONE:  What we did was whenever we

4    would get a call, we would try to keep the notes

5    on which ones were of value, and sometimes we

6    didn't get all the notes down, I think.  But what

7    I did mostly was if someone did call, I would -- I

8    would try to do an investigation just on the fly,

9    basically.  So I would try to call.  I was in

10   touch with the Secretary of State's office that

11   day, can you please call this precinct and tell

12   them to do the right thing?

13           I was on the phone -- I got -- it took a

14   while, but I got ahold of the probate judge in

15   Mobile County.  I called him multiple times

16   throughout the day.  You know, can you please

17   inform your election officials to go by the manual

18   and can you also -- you know, there's lines that

19   are over an hour in some places.  Can you get some

20   more computers there or individuals or another

21   head election official because people are leaving

22   your lines because it's taking too long.  So

23   whenever I would hear about a precinct that was, I

1    guess, in trouble or -- then I would try to let

2    him know.  So I was mostly just trying to call

3    Secretary of State's office and the probate judge

4    in Mobile County.

5         And then we had instances of police

6    intimidation or individuals who felt like it was

7    police intimidation where cops are right outside

8    the voting precincts like when you come into the

9    door, which has worried us in the ACLU for over

10   100 years because, you know, that discriminates

11   against people who might have something on their

12   record or they're worried about what the police

13   might stop them and question them or if a police

14   officer is standing behind where they're giving

15   their information to -- or showing their ID.

16        So, you know, that could have a deterrence

17   on certain populations from voting.  So what I

18   would do in those cases was if it was a sheriff's

19   -- if it was someone who's a deputy sheriff, I'd

20   call the local sheriff.  If it was a city cop, I'd

21   talk to the police chief and say, you know, can

22   you please explain or at least tell your officer

23   not to stand right by the door or can he park his

1  car across the street if there is -- you know,

2  have there been any safety concerns?  Why is there

3  an officer standing outside the door and why is he

4  there when everyone is giving their name.

5        As you know, there's a history of

6  discrimination in Alabama.  So -- so usually, I

7  was just intervening on the fly and then, you

8  know, from some of the information we would take

9  down, we did speak with other groups to discuss

10  whether or not any of this information or if

11  possibly if there were to be some type of lawsuit

12  in the future, if we needed to contact these

13  individuals again or investigate the likelihood of

14  a lawsuit.  And so I guess it was for that purpose

15  as well -- just, of course, with those

16  individual's permission.  We're not going to

17  instigate a lawsuit unless a plaintiff was

18  completely on board.  So --

19        MS. CARROLL:  All right.  I'm going to

20  turn on the mic.  I've got a few more questions.

21  So Mr. Park, you recommended, I think, hopefully

22  that we reach out to local registrars.  Would you

23  also recommend I take it reaching out to probate

1  judges?  Because it sounds like they're also in

2  charge of enforcing the voting regulations.

3          MR. PARK:  I think that -- that's right.

4          MS. CARROLL:  All right.  Another question

5  for you, Mr. Park, going back to the figures you

6  provided with regard to voter confidence, those

7  are statistics that were gathered by polling

8  places with regard to confidences opposed to

9  evidence or fraud itself, correct?

10          MR. PARK:  That's correct.

11          MS. CARROLL:  All right.  Mr. Boone, going

12  to -- you referenced section 17-4-9 of the Alabama

13  Code with regard to inactive voter list.  I think

14  this actually goes to your point about the absence

15  of clarity in some of the electoral law.  I've got

16  a copy of that section in front of me now.

17  According to that -- to the Code itself -- and I

18  just want to read this for the record.

19          This portion, it deals with, Any voter who

20  fails to vote for four years in his or her county

21  shall have his or her name placed on an inactive

22  voter list by the local board of registrars.  Once

23  on the inactive list, the voters shall reidentify

1    with the local board, the registrars, in order to,

2    again, have his or her name placed on the active

3    voter registration list.  Notwithstanding the

4    foregoing, if a voter on the inactive list goes to

5    his or her polling place to vote on an election

6    day and identifies him or herself to the election

7    official responsible for the voter registration

8    list update.  Such a voter shall be permitted to

9    vote provided the voter completes a voter

10   reidentification form.

11           My reading of the statute would suggest

12   that even for a voter who had been removed, they

13   would have been permitted to cast a regular

14   ballot, not a provisional ballot, but a regular

15   ballot under the terms of this Code.  Are you

16   saying that did not happen in these cases?

17           MR. BOONE:  I guess what I was saying was,

18   it's problematic because people will leave -- they

19   will leave the first table that they go to.  Once

20   they're told that they're an inactive voter, they

21   might not stay around.  And it's --

22           MS. CARROLL:  And --

23           MR. BOONE:  Yes.  Sure.

1          MS. CARROLL:  I'm sorry to interrupt.  But

2     to your knowledge, is there any information that's

3     being given to voters that the language of this

4     statute permits them to identify and fill out a

5     reidentification card and cast a ballot -- a

6     ballot?

7          MR. BOONE:  Ask that again.  So --

8          MS. CARROLL:  So -- so I guess this goes

9     back to your question that you were asking,

10    Ms. Shearer, about information, right?  To the

11    extent that we have these laws, to the extent

12    there's some confusion and -- and possibly having

13    to change line to make the trains run on time and

14    people are trying to vote, what sorts of

15    information are being given to folks?  So if I

16    show up, I'm told I'm inactive.  Am I told, look,

17    all you have to do is prove where you live, that

18    you're a member of this -- this precinct entitled

19    to vote here, and you can fill out this

20    reidentification card and cast a ballot under the

21    terms of this statute?  Is that information

22    provided at the polling place?

23          MR. BOONE:  I have heard of it being

1    provided.  I've heard of other people not hearing

2    it exactly like you read it.  And I think that's

3    where I'm worried.  If the training isn't there or

4    if the election officials don't have the codes or

5    the manual in front of them, I don't know what

6    they're telling.  I mean, every precinct, and like

7    you've kind of heard already, every county can be

8    different.  Every registrar might run their county

9    a little bit differently.  And so I don't know

10   exactly what's being told to each person.

11        MS. CARROLL:  And who is the state

12   official that's responsible for ensuring that

13   consistent information is given to voter from

14   precinct to precinct?

15        MR. BOONE:  The Secretary of State

16   provides a manual, from my understanding, that's

17   supposed to be uniform, and every precinct is

18   supposed to do the exact same thing.  Now,

19   conveniently or, you know, however you want to

20   interpret it, the Secretary of State also has the

21   ability to say, well, I can't help what the

22   registrars do in their particular county.

23        So, you know, where does -- you know, not

1   really a true liability -- but like where does the

2   liability in a figurative sense, you know, lie?

3   Is it with the Secretary of State giving the

4   manual?  Was the manual correct?  You know, I hope

5   it is, but then how is the training.

6          MS. CARROLL:  All right.  I -- I have a

7   general question for both of you.  We haven't

8   talked at all at this hearing about other

9   impediments to access, things like the hours that

10  polling places are kept open, the -- you spoke a

11  little bit to the presence of law enforcement at

12  some polling places but not all polling places.  I

13  mean, what's your sense of what impact do those

14  have in voter participation and access?

15         MR. BOONE:  You can go ahead, Mr. Park.

16         MR. PARK:  My -- my instinct is they would

17  be episodic at best.  And not gentle.

18         MR. BOONE:  I don't have the studies

19  offhand, but it seems that there should be -- you

20  know, to us, from our ACLU perspective, we want as

21  many people to vote as possible.  I mean, I think

22  we would -- I'm personally -- I don't know if this

23  is ACLU's position, but I wish election day was a

```
 1    holiday so individuals who are working and have
 2    kids, have to pick kids up from day care,
 3    practice, or whatever would be able to -- it would
 4    be easier for them to vote.  And then if there's
 5    long lines or other types of impediments, I think
 6    voting should be -- anyway, whatever the
 7    statistics might show to get fuller participation
 8    is where I usually land myself.  I'm not sure
 9    about the organization.  Generally, the
10    organization is on the line of we want more people
11    participating in our democracy.
12         MS. CARROLL:  And just one quick follow-up
13    question, and then I'm going to send it down to
14    Michael Innis-Jimenez who also has a question.
15    But who set the hours at these polling places?  Is
16    that statewide legislative set or is it done by
17    the probate judges or county commissioners?
18         MR. BOONE:  I'm under the impression that
19    it was -- it's somewhere in the state code.  Do --
20    I'm not sure if --
21         MR. PARK:  The polling hours are
22    established by state law so that they're common
23    across the state.
```

1      MS. CARROLL:  Okay.  Thank you.  Michael

2  Innis-Jimenez.

3      MR. INNIS-JIMENEZ:  I've got a question

4  for Mr. Park.  You talked about early voting.  The

5  goal -- I guess our goal and the goal of the

6  democratic society is to have as many people

7  participate who are -- who are legally eligible

8  to.

9      You mentioned at the very beginning that

10  early voting -- you see early voting as not really

11  helping as far as turnout.  My question is, is it

12  hurting turnout at all and is there a reason to

13  not take that affirmative step to make it easier?

14  That's one.  And two, some states have gone to

15  instant -- instant registration.  Do you see a

16  problem with that in the state or are you

17  registering on the day of election.

18      MR. PARK:  With respect to -- to early

19  voting, I can't -- I can't say that, you know, it

20  doesn't -- that it doesn't have the opposite

21  effect.  But the studies show that it doesn't

22  increase turnout.  It moves it around.  And so

23  it's a question of do you want to spend the money

1    to make it easier for some folks who would

2    otherwise vote to vote early?  And that's a --

3    that's a -- that's a matter of cost.  I've -- I've

4    lost your second question.

5            MR. INNIS-JIMENEZ:  It was about

6    registration, you know --

7            MR. PARK:  Instant registration?  I think

8    people should be able to opt out.

9            MR. INNIS-JIMENEZ:  I mean, at the polling

10   place, if you --

11           MR. PARK:  Same day?

12           MR. INNIS-JIMENEZ:  Same-day registration.

13           MR. PARK:  I would see it, as an election

14   official, as problematic.

15           MS. CARROLL:  Mr. Ayers.

16           MR. AYERS:  Mr. Boone, you mentioned the

17   Secretary of State's manual that gets sent out to

18   all the different polling areas.  Do you have any

19   information at all that anything in that manual is

20   in any way inaccurate?

21           MR. BOONE:  I don't have any information

22   was on that.

23           MR. AYERS:  Okay.

1          MR. BOONE:  I haven't -- I haven't --

2    actually, I asked for a copy.  I don't know if the

3    Secretary of State's office might have forgotten,

4    but I didn't -- I didn't get a copy.  So I wasn't

5    able to review what's -- you know, page by page

6    what's in the manual.

7          MR. AYERS:  But there hasn't been anything

8    to your knowledge that like, well, the Secretary

9    of State is telling everybody to do this and it

10   turns out that's not correct under state law?

11         MR. BOONE:  Not to my knowledge.

12         MR. AYERS:  Because I mean, we're kind of

13   -- this is one of the overarching points is making

14   sure that it's uniform and making sure that

15   they're getting the correct guidance.  You

16   mentioned that -- that, well, perhaps somebody's

17   not following his guidance perfectly and so forth.

18   And I mean, that -- that type of thing, you'd have

19   to have -- you said the word "conveniently."  It

20   kind of threw me off as though there was like this

21   kind of a scheme to do this.

22         But I mean, there's always going to be

23   situations where somebody doesn't like somebody

1    that's local isn't doing exactly what they need to

2    be doing.  I mean, that's going to be --

3    obviously, the goal is to try to minimize that as

4    much as possible, right?

5          MR. BOONE:  Yes, sir.  I think -- I think

6    the reason I used the word "conveniently" is just

7    because, you know, if once we see something that's

8    wrong, I guess it's convenient for either the

9    local authority, whether it be the registrar's

10   office or the Secretary of State's office -- it's

11   hard for us to know exactly where it went wrong,

12   right?

13          Because Secretary of State's office can

14   point toward the registrars and say that was a

15   mistake on their end.  But they're saying, well,

16   we never were told that at our, you know, large

17   group meeting.  So it's fingers pointing both ways

18   which makes it difficult for us to say like who

19   exactly is, you know, like liable or who -- where

20   the fix should come from.  So I mean, I'm-- you

21   know, I'm just kind of at the point where do we

22   try to just fix both ends, both the local and

23   what's coming from Montgomery, from the Secretary

1    of State's office.

2            MR. AYERS:  Which, I guess, just

3    emphasizes the need to make sure that the manual

4    is accurate?

5            MR. BOONE:  Correct.

6            MR. AYERS:  Because that is on paper.  Now

7    we don't have to rely on he said, she said at that

8    point, which might be something we need.

9            MS. CARROLL:  So at this point, I would

10   recognize Mr. Jones.

11           MR. JONES:  So to that point, can you -- a

12   question for either of you.  You talk about the

13   process and how that manual -- so when -- when and

14   how the manual is distributed and then how the

15   information in that manual is consumed by those

16   actually doing the election process.  And I note

17   this just because, as a student and someone who

18   teaches students now, sometimes they get the

19   textbook, right, but they don't ever open it.  So

20   can you talk about the process of when they get

21   the manual and how -- the expectations of going

22   through the manual?  And a question for either of

23   you.

1            MR. PARK:  Well, I think the best way for

2    you to find that out is to talk to the --

3            MR. JONES:  So -- okay.  Okay.

4            MR. PARK:  -- people in the Secretary of

5    State's office about their distribution schedule

6    and then talk to -- if you go visit with

7    registrars or county election officials, find out

8    how that's distributed.  And my recollection is

9    that -- I believe that at least at the local

10   level, they'll do training sessions.

11           MR. JONES:  Mr. Boone, do you have a

12   sense?

13           MR. BOONE:  Yeah.  Just off -- you know,

14   what -- I agree with Mr. Park.  I would go to the

15   Secretary of State's office and ask them.  I asked

16   them their exact schedule.  I don't know.  From

17   what I recall, I think Secretary Merrill tries to

18   release it -- or he releases one in the summer,

19   which is because if there's any new laws that

20   happened during our legislative session -- which

21   makes sense -- over the spring, once that's over,

22   he can add those new laws that have signed by the

23   governor into the manual.  And I -- I think he

1    usually puts the statute in there, but then
2    hopefully there's some type of guidance as well to
3    explain the practical effects of the law.  I think
4    he releases it in the summer.  I'm not 100 percent
5    sure on that.
6          MS. CARROLL:  So I would recognize Member
7    Maurie Shevin.
8          MR. SHEVIN:  I want to get back to this
9    question of the issue you have addressed on a
10   photo ID not being the same as where the voter
11   shows up to vote at a precinct.  Recognizing that
12   there are down ballot races for city council or
13   for legislative -- you know, for the legislature,
14   is it -- in your judgment, Mr. Boone, is it
15   legitimate -- a legitimate concern for the State
16   to make sure that the voter is voting in the
17   correct -- in the precinct of his or her address?
18         MR. BOONE:  I'm not -- it seems like, I
19   guess, where they live does matter in some sense.
20   I guess what confuses me is that -- is that that's
21   not what's in the Alabama statute.  That's not in
22   the Code.  So, I mean, there's -- you can use your
23   United States passport -- as you probably know --

1  your employee ID, your university ID.  All of

2  those don't have your address on there.

3          I think what's most important is when you

4  register, you register -- I believe from what I

5  remember, you register from your home address.

6  And so you should -- as long as you're at the

7  right -- what I think I'm concerned about or what

8  we should all be concerned about is just to make

9  sure that they're at the right precinct.  I don't

10 -- if the person is at the right precinct, I don't

11 understand the need to check -- I mean, be refused

12 from voting just because the address doesn't

13 match.  I mean, it's -- and it's possible too -- I

14 know because I've heard from people that their --

15 their old address, the one that was on their

16 license, is still in the same precinct, and they

17 were still told, no, you can't vote.  So in that

18 case, it wouldn't have really mattered.

19         So I'm not so sure exactly why -- I think

20 it's important that people vote in the correct

21 precinct.  I'm not so sure how -- why we need an

22 extra technicality of checking everyone's address

23 whenever the photo ID law was there for

1    identification purposes.  And also, there's
2    questions of why the photo ID law was put in place
3    in the first place, in my opinion.
4         MS. CARROLL:  I would recognize Ms. -- or
5    Dr. Lewis.  I'm sorry.
6         DR. LEWIS:  Mr. Boone, you made a
7    statement how Secretary of State John Merrill --
8    your closing actual sentence -- do you know where
9    you received that information?  Was it a newspaper
10   article?  Was it a speech?  And when you submit
11   your written statement, can you provide us a
12   source so that we can go back and look at the
13   entire context of that statement?
14        MR. BOONE:  I will do that and I will find
15   it.  I don't think -- I feel -- I'm going off -- I
16   think it's from AL.com or it's possible it's from
17   his social media.  I'm trying to remember because
18   there's two different quotes I think I used.
19        DR. LEWIS:  Okay.  It was the very last
20   one about people have to show some initiative to
21   vote in Alabama.  If you could provide us with the
22   entire source for that so we can go back and
23   review, I would appreciate it.  Thank you.

1          MR. BOONE:  That makes sense.  I can do

2     that.  Thank you.

3          MS. CARROLL:  Do others have questions?  I

4     have a couple more questions.  I'm full of

5     questions.  I apologize.

6          So I want to go back also to the Phenix

7     City case.  I did a little more research on it in

8     the time we've been talking.  It looks like in

9     that, there was also some questions that were

10     raised by the NAACP about whether or not the

11     election law actually required a business or a

12     residential address.

13          Do you have any information on how -- I

14     understand how it was resolved ultimately, but in

15     terms of clarification of the law itself, do you

16     know if any clarifications were made.

17          MR. PARK:  I do not.  I do know that the

18     local NAACP called for the voter rolls in Phenix

19     City to be cleaned up.

20          MS. CARROLL:  Correct.  I remember you

21     said that.  All right.  Great.  In terms of fraud

22     -- have you found -- in terms of the statistics

23     about confidence in the vote, have you found

```
 1    there's any difference in terms of those
 2    statistics with the implementation of voter ID
 3    statutes?  So, for example, you gave quotes from
 4    August or studies, rather, from August of 2017 as
 5    well as the 2016 election.  Obviously, both of
 6    those were after the time Alabama had passed its
 7    voter ID law and national voter ID laws in many
 8    states were put into place.  Have you found that
 9    to have any effect in people's confidence in the
10    vote?
11              MR. PARK:  These are the most recent
12    studies that I've found.
13              MS. CARROLL:  Okay.
14              MR. PARK:  So I -- you know, they -- it
15    would postdate a lot of the photo ID -- the
16    enactment of photo ID laws, but people are still
17    concerned about fraud in voting.
18              MS. CARROLL:  All right.  So even with the
19    enactment of these laws, there's still, obviously,
20    54 and 41 percent, I believe, are the numbers you
21    gave us?
22              MR. PARK:  Yes.
23              MS. CARROLL:  Okay.
```

1      MR. PARK:  And that will be in my written

2  remarks.

3      MS. CARROLL:  Fabulous.  Thank you.  And

4  if you can include in your written remarks, if you

5  can find any studies that predate the voter ID

6  laws, I think that would be helpful to give us a

7  sense of how reassuring are these voter integrity

8  laws that -- that are being passed.  I would

9  appreciate that.

10      In terms of the early voting issue -- and

11  this is also for you, Mr. Park.  In terms of the

12  early voting concerns you raised, one of the

13  concerns you raised was the example that people

14  may change their minds as new information becomes

15  available about candidates.  We've seen that, as

16  you noted, in -- in numerous recent elections

17  where additional information is provided within a

18  month or so of when the election is designed to

19  take place.  And I understand that that is an

20  issue and a concern.  But isn't that also, to some

21  extent, a risk that a voter him or herself can

22  make a choice to take on as opposed to vesting the

23  decision-making process about when people have

1   access to vote entirely in the government?

2          MR. PARK:  That's correct.  But the

3   voter -- the voter may find that the choice they

4   made wasn't a good one and would make a

5   more-informed choice had they waited.

6          MS. CARROLL:  Of course, I feel like

7   that's half the time in politics as it is,

8   regardless of when I vote.  All right.  In terms

9   of the cost analysis, you indicated that you

10  believe that there was a higher cost, I believe,

11  to early voting or would increase the cost.  You

12  made a statement of you have to ask yourself the

13  question do you want to invest the additional

14  money in early voting.  Is -- is -- do you

15  actually have data that suggests that there's an

16  increased cost incurred by early voting?

17         MR. PARK:  You'd have to get the polling

18  places opened, you have to provide election

19  officials, so you are going to -- going to incur

20  costs.

21         MS. CARROLL:  Now, we heard from our

22  previous individual who testified, Mr. Crayton,

23  that there were instances of early voting that was

1   possible through mail-in balloting.  Is that

2   something that you believe would also increase

3   costs or is that something that does not tend to

4   have a significant cost impact?

5          MR. PARK:  Mail-in voting as a general

6   practice or mail-in voting as a --

7          MS. CARROLL:  Early -- early voting or

8   absentee voting by mail-in voting.  So you're

9   describing early voting where you actually go to a

10  physical location --

11         MR. PARK:  Correct.

12         MS. CARROLL:  -- and casting a ballot?

13         MR. PARK:  Correct.  That's -- that's what

14  we typically understand as early voting.  Your --

15  your absentee ballot may -- may be -- you know,

16  you might -- might get to pick it up early, but my

17  recollection was the -- talking about the state

18  law five days and a day.

19         MS. CARROLL:  All right.  And in terms of

20  the distribution of those costs, one of the

21  issues, also, that Mr. Crayton raised was that

22  early voting actually allowed for better

23  preparation with regard to voting, addressed some

1    of the issues of long lines that Mr. Boone alluded

2    to.

3             Do you have any information on how that

4    decreases the cost or increases a sense of

5    certainty about elections?

6             MR. PARK:  No.

7             MS. CARROLL:  All right.  Does anyone else

8    have any other questions?  Because otherwise, I

9    could just keep going.  I'm sorry.  You can

10   imagine what it's like at our supper table, the

11   four of us in the family.

12            All right.  So Mr. Boone, I had some

13   additional questions for you.  As I read section

14   1749, there's no differentiation between either a

15   federal or state election or a primary versus a

16   general election.  Have you found any data that

17   suggests that the differentiation you were

18   describing where individuals had voted, say, in a

19   federal presidential election, then showed up to

20   vote in a state primary election and were told

21   they had been removed from the rolls despite the

22   fact that they had voted within the past four

23   years?  Do you have any information that that's

1    either included in the election manual or -- or

2    there's widespread confusion about that?

3              MR. BOONE:  I don't have any --

4              MS. CARROLL:  Okay.

5              MR. BOONE:  -- evidence of

6    differentiations, you know, between state and

7    federal elections.

8              MS. CARROLL:  All right.  I think that's

9    actually all the questions that I have.  And just

10   for the record, the election manual is, in fact,

11   available online through the Alabama Law

12   Institute, so that's something that we can also

13   examine as a committee if we're interested in

14   doing that.  I think that Mr. Ayers' suggestion

15   that we look at that was a very good one.  I

16   actually -- I -- I was deceptive.  I apologize.  I

17   have one more question, Mr. Boone.

18              With regard to the identifications, we've

19   heard conflicting testimony just today about what

20   sorts of identifications are permissible under

21   Alabama state law.  As I understand it, as of June

22   3rd, 2014, included in what one can use is:  A

23   valid driver's license; a valid nondriver's ID; a

1    valid Alabama voter -- voter ID; a valid

2    state-issued ID from Alabama or any other state; a

3    valid federal-issued ID; a valid U.S. passport; a

4    valid employee ID from the federal government,

5    State of Alabama, county government, municipality,

6    board of authority, or other entity of this state;

7    valid student or employee ID from a university or

8    college in the State of Alabama; and a valid

9    military ID.

10         Are you aware of any restrictions or do

11   you have any sort of data about restrictions that

12   are in place with regard to the use of these

13   particular IDs?  In other words, are people being

14   turned away if they show up with their military

15   ID.

16         MR. BOONE:  I don't have evidence of that.

17   It's something that I've heard.  So I have heard

18   individuals say that, you know, the election

19   officials are like, I haven't seen one of these

20   before.  And then it's kind of -- which worries me

21   because then they might have to make a call to us

22   or, you know, call the Secretary of State, and the

23   Secretary of State has to call the, you know,

1    registrar for that county.  That registrar has to

2    then go to that particular precinct and say, no,

3    passports are allowed.

4          So because I've heard that makes me

5    wonder, you know, are they, again, being properly

6    trained or is -- I think what I would like is --

7    and I don't know this for a fact.  I don't know if

8    it's not there or if it's there.  It sounds to me

9    like it's not always there.  It seems like the

10   manual should be handy if you are -- if there's

11   questions at the polls.

12         So if someone says, a passport, I'm not

13   sure about those, or, you know, that's a Georgia

14   license; this is Alabama.  So, you know, can you

15   please check the manual.  I think that would be my

16   -- maybe a suggestion the Commission can make.

17   And I'm not 100 percent sure on, you know, where

18   -- if the manual is even close by or if it's not.

19   So I don't have any information on that

20         MS. CARROLL:  Well, I will say just

21   looking at the shear page number online, it seems

22   quite voluminous.  So -- I mean, that's -- we

23   lawyers are paid, after all, by the word.  So, you

1    know, I guess that that goes back to the point you

2    were making, Mr. Ayers, that the training perhaps

3    is also something that we should look into.  Does

4    anyone else have any other questions?

5              DR. LEWIS:  I do.

6              MS. CARROLL:  Excellent.  Dr. Lewis.

7              DR. LEWIS:  So Mr. Park, I'm looking back

8    at your testimony.  You talked about photo ID and

9    in-person fraud, and you gave one example of it

10   occurring.  Do you have any statistics or evidence

11   or research that indicates that in-person fraud at

12   the polls occurs in Alabama?

13             MR. PARK:  There was a conviction in 2004.

14   We also have Hernandez Hernandez down in Mobile.

15   I don't have any statistics, but it's very

16   difficult to catch if you don't have -- if -- if

17   you have a photo ID requirement, it -- it deters

18   it.  But without it, it's difficult to catch.  In

19   that case, somebody voted, and her sister showed

20   up and was found -- in her sister's name, and her

21   sister showed up and was found she already voted,

22   which was not the case.

23             DR. LEWIS:  Okay.  Maybe -- let me maybe

1    rephrase the question.  Besides, I think you

2    mentioned two or three cases in Alabama, are there

3    other cases that we can refer to, to -- because of

4    one of the justifications for this law in Alabama

5    is fraud.  Is there any other evidence that we can

6    look at where this was rampant in Alabama to

7    provide us with evidence for that law?  Are there

8    justifications for that law besides those three

9    incidents?

10          MR. PARK:  I haven't seen any

11   convictions --

12          DR. LEWIS:  No.

13          MR. PARK:  -- if that's what you're

14   talking about.

15          DR. LEWIS:  Evidence that it occurred,

16   anything besides these instances you talk about

17   today.

18          MR. PARK:  I'm not -- I can't point to

19   any, but the only way we'd find out about it is if

20   there was a conviction.

21          DR. LEWIS:  Okay.  Thank you.

22          MS. CARROLL:  All right.  So at this

23   point, there's no other questions from any

1    Committee member.  We appreciate y'all's

2    information.  Just as a reminder, as I indicated

3    to other speakers, the record is open for 30 days.

4    We welcome your written comments and additional

5    information, and we appreciate y'all coming in and

6    appearing in person.  At this point, we will be in

7    recess for the lunch break until 1:00 p.m., at

8    which point we will resume with panel four.

9

10

11                  (A lunch recess was taken.)

12

13            MS. CARROLL:  So I'm calling the meeting

14   back to order.  We are on panel four, and we've

15   split the panel into two different groupings of

16   panel four.  So for the first iteration, we have

17   Jennifer Holmes from the NAACP Legal Defense Fund,

18   and we have Jonathan Barry-Blocker from the

19   Southern Poverty Law Center.  For both of my

20   speakers, you will have 15 minutes to present your

21   comments.  The timer will keep the 15 minutes.

22   When it's green, it means you're within your 15

23   minutes.  At three minutes, it'll go to yellow,

1    which is telling you to wrap it up.  At one

2    minute, you should pretty much finish what you're

3    saying because, otherwise, you risk getting

4    interrupted by me, and you don't want to be the

5    first panelist interrupted by me.

6              MR. BARRY-BLOCKER:  So much pressure.

7              MS. HOLMES:  Pressure.

8              MS. CARROLL:  Yeah.  I know it is.  It is.

9    So with that pressure in place, after you finish

10   your comments, members of the Committee will then

11   ask questions, but we'll wait until both of you

12   all are done.  So with that, I'm going to start

13   with you, Ms. Holmes.

14             MS. HOLMES:  Great.  Thank you.  Good

15   afternoon, madam chair and members of the

16   Committee.  My name is Jennifer Holmes, and I'm

17   the Eric H. Holder, Jr., Fellow at the NAACP Legal

18   Defense and Educational Fund, Inc., or LDF.  Thank

19   you for the opportunity to testify on this vital

20   topic of access to voting in Alabama.

21             Since its founding in 1940 by Thurgood

22   Marshall, LDF has been a leader in the struggle to

23   secure, protect, and advance voting rights for

```
1    black voters and other communities of color
2    through litigation, advocacy, and education.  Many
3    seminal voting rights lawsuits in which LDF has
4    been involved arose in Alabama, including Schnell
5    v. Davis which outlawed literacy tests; Dillard v.
6    Crenshaw County, which helped to integrate nearly
7    200 of Alabama's city councils, county
8    commissions, and school boards; and Shelby County
9    v. Holder in which LDF defended the
10   constitutionality of the Voting Rights Act.
11           My testimony will focus on the obstacles
12   to voting that black voters face in Alabama since
13   the Shelby County decision in 2013.  We heard
14   testimony earlier this morning about section five
15   of the Voting Rights Act and the preclearance
16   process.  For nearly 50 years, section five
17   required certain states, counties, cities, and
18   towns with a history of chronic racial
19   discrimination in voting to submit all proposed
20   voting changes to the U.S. Department of Justice
21   or a federal court in Washington, D.C. for
22   preapproval.  This requirement was known as
23   preclearance and was considered the crown jewel of
```

1  the Civil Rights Movement because it served as our

2  democracy's discrimination checkpoint by halting

3  discriminatory voting changes before they were

4  implemented.  The preclearance process provided a

5  quick and an efficient way of addressing America's

6  pervasive and persistent problem of voting

7  discrimination.

8          Under that framework, communities were

9  given broad public notice about proposed voting

10  changes and the status quo was preserved until the

11  effect of those proposed changes on voters of

12  color could be fully explored.  Section five

13  placed the burden of proof, time, and expense on

14  the state or locality to demonstrate that proposed

15  voting change was not discriminatory before that

16  change went into effect and could spread its harm.

17          This framework was important.  Between

18  1969 and 2015, the Department of Justice objected

19  to more than 90 proposed voting changes in Alabama

20  under section five, and other proposed voting

21  changes were withdrawn or altered after DOJ

22  requested more information.  Section five served

23  Alabama voters well as both a safeguard and a

deterrent against voting discrimination and voter
suppression.

In 2013, the Supreme Court immobilized the
preclearance process in its decision in Shelby
County.  The Court held that the formula for
determining which sections would be covered by
section five was unconstitutional, effectively
disabling section five and disabling the
preclearance process.

LDF continues to closely monitor how
Alabama and other formerly covered states and
localities respond in the wake of the Shelby
County decision and has been keeping a detailed
account of post Shelby County voting -- voting
changes in every state in our regularly updated
online publication, Democracy Diminished.

LDF attorneys also regularly engage with
communities of color across the nation that are
especially vulnerable to urge them to alert LDF of
any potentially discriminatory changes.  In the
last several years, LDF attorneys have met with
community leaders and individuals across Alabama
to investigate these complaints, and LDF staff are

on the ground conducting poll monitoring during

major elections over the past three years.

Based on LDF's work since the Shelby

County decision, I will provide a sampling of the

obstacles to voting that black voters currently

face in Alabama.  In the aftermath of Shelby

County, formerly covered jurisdictions were

emboldened to act.  Here in Alabama, for example,

the legislature passed a restrictive photo voter

ID law, of which we've heard a lot of testimony,

passed in June 2011.  But the State declined to

submit this law for preclearance for two years.

Indeed, the sponsor of the photo ID law

anticipated that if submitted for preclearance,

the law would result in a lengthy court battle.

Within days of the Shelby County decision with --

with the preclearance process effectively

scuttled, the Secretary of State's office

announced that it would now prepare to implement

the law.

In December 2015, LDF filed a lawsuit on

behalf of Greater Birmingham Ministries, the

Alabama NAACP, and four voters challenging

1    Alabama's photo ID law.  The lawsuit alleges that

2    the law has a discriminatory effect on black and

3    Latino voters and that the legislature enacted the

4    law for the purpose of discriminating against

5    people of color.  This is both a disparate

6    treatment and a disparate impact claim.

7            According to our expert in the litigation,

8    more than 118,000 registered voters lack a photo

9    ID that can be used to vote under the law, and

10   black and Latino voters are twice as likely than

11   white voters to lack such an ID.  This figure

12   breaks down as 50,000 registered voters who lack

13   any acceptable ID and 68,000 registered voters

14   who, although they have an ID, have discrepancies

15   in the name on the ID or other information on the

16   ID that would prevent them from using it to vote.

17           Although the Secretary of State disputes

18   this figure, the Secretary of State's expert in

19   the litigation does acknowledge that black and

20   Latino voters are twice as likely to lack an ID as

21   white voters.  Black and Latino voters without a

22   photo ID are also much more likely than their

23   white counterparts to lack access to vehicles, to

1    live in poverty, and to face other barriers to

2    obtaining an ID.

3             For example, black voters are three times

4    more likely than white voters to live more than

5    five miles from an ID-issuing office and to live

6    in a -- in a household without a vehicle.  In

7    October 2015, the governor made these travel

8    burdens even worse when he took the drastic step

9    of partially closing 31 driver's license issuing

10   offices, most of which were located in -- in

11   Alabama's rural Black Belt.

12            The governor closed driver's license

13   offices in eight of the ten counties with the

14   highest proportion of black voters.  These

15   important offices were opened only one day a month

16   for the entire 2016 election season, making it

17   more difficult for black voters in these poor and

18   rural communities to obtain the required photo ID.

19   The governor only agreed to reopen these offices

20   in December 2016 after the presidential election

21   and after an investigation by the U.S. Department

22   of Transportation that found that Alabama's

23   partial closure of the offices had a

1    discriminatory effect on black voters in violation

2    of title six of the Civil Rights Act.

3           Despite this compelling evidence, in

4    January -- last month -- the district court judge

5    dismissed our lawsuit.  We were surprised and

6    deeply disappointed by this ruling, but just

7    yesterday, LDF submitted our brief to the 11th

8    Circuit seeking a reversal and asking the circuit

9    court to provide relief in time to protect the

10   rights of Alabamians ahead of the November 2018

11   elections.

12          In 2014, 2016, and most recently in

13   December 2017, LDF has been on the ground for

14   Alabama's major primary and general elections to

15   assist voters.  In the 2017 special election, we

16   again conducted nonpartisan poll monitoring as

17   part of our Prepared to Vote initiative.  We had

18   more than 30 volunteers across five counties in

19   the state and we also operated a hotline that

20   voters could contact.

21          Unfortunately, we observed or received

22   reports of many systemic voting -- voting-related

23   problems on election day, including long lines at

1   predominantly black precincts, lack of or

2   malfunctioning voting machines, insufficient

3   numbers of ballots, and law enforcement officials

4   conducting warrant checks at polling places.  In

5   particular, we heard from frustrated voters whose

6   attempts to cast a ballot were stymied by the

7   photo ID law or Alabama's inactive voter

8   procedures.

9         As mentioned before by the ACLU of

10   Alabama, poll workers in Mobile County barred

11   people from voting or improperly forced voters to

12   cast provisional ballots when they presented an ID

13   with an address that did not match the address on

14   their registration record, even though the photo

15   ID law does not require a voter to present an ID

16   with an address at all.  Indeed, some of the

17   accepted IDs, such as passports, do not list an

18   address.

19         This misapplication of the voter ID -- of

20   the photo ID law is more likely to affect voters

21   who do not have an alternate form of ID or cannot

22   take additional time off from their workday to

23   contest a poll worker's decision or to retrieve an

1    alternate ID.

2         A second major frustration for voters was

3    Alabama's inactive voter procedures.  In January

4    2016 -- 2017, the Secretary of State's office sent

5    postcards to all registered Alabama voters.

6    Voters whose first card was returned undeliverable

7    and who did not reply to a second card were

8    designated as inactive.  This had nothing to do

9    with their voting record in the past four years.

10   This error-prone process for identifying purported

11   inactive voters resulted in widespread voter

12   confusion.

13        On election day, numerous voters were

14   alarmed to discover, at the polls, that they were

15   on this inactive list that they had never heard

16   of, despite having voted in recent elections.

17   Although inactive voters should have been

18   permitted to cast a regular ballot as long as they

19   updated their registration information at the

20   polls, LDF received many reports that poll workers

21   were turning away inactive voters or improperly

22   requiring them to cast provisional ballots or

23   answer immaterial and illegal questions, such as

the county of their birth, before allowing them to

cast a vote.

Shortly after the election, LDF notified

the Secretary of State of these two issues in a

series of letters.  We continue to urge Secretary

Merrill to investigate these problems and issue

public guidance about how his office intends to

avoid them in the future and how voters who are

denied the right to vote can remedy that outcome

in the immediate days after an election.

Even when applied as intended, Alabama's

photo ID law and its inactive voter list

procedures disproportionately burden poor, rural,

and transient voters who are often black or

Latino.  The erroneous application of these laws

only magnifies this effect.  As far as we know,

the Secretary of State has not investigated these

issues.

By contrast, the Secretary of State's

office did choose to investigate a young person of

color for voter fraud based on an off-the-cuff

remark he made during a newscast about people

coming "from different parts of the country to

pitch in and canvas for Doug Jones."
Unsurprisingly, the investigation concluded that
the man was a properly registered Alabama voter
and that the allegations of any widespread voter
fraud were a myth.

There is a belief that black voter turnout
in December's special election, in the election of
a candidate heavily supported by black voters mean
that Alabama's restrictions on voting did not have
a negative impact.  This is a fallacy.  First,
only about 40 percent of registered Alabamians
voted in the December 2017 election, whereas in
November 2016, turnout was in the mid 60s.
Although black voters constituted a higher
proportion of the electorate than usual in 2017,
turnout was down in the special election.

Second, black voters showed amazing levels
of commitment and fortitude in the 2017 special
election braving the cold, the long lines, and a
web of restrictive voting measures in order to
make their voices heard.  While LDF is heartened
that some but not all voters were able to overcome
these obstacles, the Constitution and the Voting

1   Rights Act demand that such obstacles should have

2   never been erected in the first place.

3           In conclusion, the proliferation of

4   discriminatory and restrictive voting measures in

5   Alabama in the wake of the Shelby County decision

6   highlights the need for action.  LDF and other

7   civil rights organizations have tried to

8   aggressively combat the attacks on voting rights

9   in the absence of section five, but we cannot do

10  it alone.

11          Congress must pass one of the multiple

12  bipartisan bills that have been introduced since

13  2013 to restore the preclearance process of the

14  Voting Rights Act.  Alabama's legislature can also

15  pass its own voting rights protections.  At a

16  minimum, even under the current legal framework,

17  state and local officials should promote voter

18  access through increased poll hours and locations,

19  better-trained poll workers, adequate machines and

20  ballots, and more meaningful engagement with

21  communities of color.

22          Finally, the Secretary of State must be

23  responsive to complaints from voters and reports

1    from advocates on the ground and provide clear
2    guidance when voting issues arise.  We must all
3    play a role to encourage and safeguard full
4    participation in our democracy.  Thank you.
5         MS. CARROLL:  Thank you.  And we'll hear
6    from Mr. Barry-Blocker now.
7         MR. BARRY-BLOCKER:  Thank you.  Good
8    afternoon, everybody.  My name is Jonathan
9    Barry-Blocker.  I am a staff attorney with the
10   Southern Poverty Law Center.  The Southern --
11   Southern Poverty Law Center is a longtime
12   participant in support of voting rights advocacy.
13   In the 1970s and '80s, the Center filed two suits
14   to increase African-American representation in the
15   legislature in the judiciary.  And currently, the
16   Center's voting rights efforts cover the deep
17   south.
18        In collaboration with the NAACP, LDF, and
19   The Sentencing Project, we filed an amicus brief
20   in the appellate court highlighting the history of
21   racial discrimination inherent in Louisiana's
22   felony disenfranchisement law.  Our attorneys in
23   Florida have been canvassing and gathering

1    petitions to qualify a constitutional amendment on

2    voter restoration for the November 2018 ballot.

3    Then next week, the Center and a number of

4    grassroots organizations will submit a brief in

5    support of plaintiff's appellants challenging

6    Alabama's photo ID law.

7            Specifically, my testimony is going to

8    focus on my efforts with the restoration of the

9    formerly incarcerated.  That's the work I was

10   doing while I was at Legal Services Alabama and

11   which I will continue at Southern Poverty Law

12   Center.

13           Just to give you some background on what

14   my perspective is on this problem, there is a

15   history of disparate impact in Alabama.  I think

16   Hunter v. Underwood, 471 U.S. 222(1985) showed

17   that the registrars in Alabama denied higher

18   ratios of black citizens the right to vote based

19   on their criminal histories.  It appeared to be

20   indiscriminate, whether it was a felony or a

21   misdemeanor, partially because there was no firm

22   policy at the time.  That was back in the 1980s.

23           The legislature, after that provision in

1    the 1901 Constitution was struck down under Hunter

2    v. Underwood, the legislature passed an amendment

3    getting the definition of moral turpitude back in

4    as a functioning policy of the law.  Currently, in

5    Thompson v. Alabama, the Campaign Legal Center has

6    filed a lawsuit challenging -- let me make sure I

7    get this correct.  Yes, they are challenging the

8    moral turpitude provision and policy, and

9    currently they are actionable claims that have

10   survived dismissal, focused on intentional

11   discrimination under the 14th and 15th Amendments.

12           What a big focus of their lawsuit is, is

13   looking at court debt and whether or not it's

14   functioning as a poll tax.  Even though the Court

15   has chosen to dismiss that particular claim, the

16   fact that the court debt and outstanding legal

17   obligations are functioning as a major barrier is

18   relevant for consideration.

19           Just to let you know, approximately 15.1

20   percent of Alabama's black citizens cannot vote as

21   of a 2016 report by The Sentencing Project, and

22   based on population data from the census, that was

23   about 196,808 citizens.  Previously, it was 8.4

1   percent of black citizens could vote, and that was

2   in 1980.

3          Also, there's been a recent heavy

4   disenfranchisement in counties with notable black

5   populations.  And when I say notable black

6   populations, I'm specifically referring to those

7   with 20 percent black or higher.  So the largest

8   number of voters purged for felonies were in

9   Mobile, Montgomery, Houston, and Jefferson

10  Counties.  And respectfully, Mobile had 1,245

11  people purged for felonies, Montgomery had 782,

12  Houston County had 481, and Jefferson had 453.

13  That was as of a 2016 Election Administration &

14  Voting Survey report issued by the government.

15         The largest percentage of the population

16  being purged for felonies occurred in Macon, Dale,

17  Washington, and Dallas Counties.  Macon saw 31

18  percent of its voting population purged for

19  felonies, Dale saw 25 percent purged for felonies,

20  Washington County saw 20 percent, and Dallas saw

21  20 percent.  All of the counties that I mentioned

22  have a black population comprising at least 20

23  percent or more of the population.

1          I now want to transition to the recent act

2     that defined moral turpitude.  This was partially

3     as a response to the Campaign Legal Center's

4     lawsuit.  And the acts went ahead and set forth --

5     there were about 40 crimes that were going to be

6     considered crimes of moral turpitude.  Many of

7     these 40 crimes -- they are all felonies, but

8     they're not necessarily the original crimes of

9     moral turpitude set forth in the 1901

10     Constitution.

11          And in fact, what you'll notice upon

12     closer review is that most of these crimes are

13     street-level crimes, meaning crimes they expect

14     poor or black people to commit.  What you will

15     find missing are ethics crimes.  You will find

16     public corruption crimes missing and tax evasion.

17     Most frauds missing.  Basically, your white collar

18     crimes are nowhere in there.

19          So it can be inferred that the purpose of

20     this provision is still to disenfranchise the poor

21     and the -- the nonwhite.  So what is apparent

22     impact?  Well, two politicians who have recently

23     been convicted of corruption and ethics charges

1   technically still have the right to vote under the

2   definition of moral turpitude present in Alabama,

3   whereas as many black citizens or poor citizens

4   cannot because of the various crimes listed.

5          What I also would like to bring attention

6   to is drug trafficking.  Many of you may not be

7   aware, but drug trafficking is one of those war on

8   drugs crimes that come with stiff mandatory

9   minimum sentences, as well as stiff fines.  And we

10   are talking about mandatory minimum sentences that

11   range anywhere from 3 to about 25 years, day for

12   day.  And we're talking about fines that can start

13   anywhere as low as sometimes 25,000 and go up to

14   200,000.

15          The idea being that a drug trafficker,

16   someone like Pablo Escobar who had islands and

17   yachts and boats, and so the fines reflect as

18   much.  However, drug trafficking crimes do not

19   take into account the intent of the offender.  It

20   only takes into account the weight set by the

21   government, and these weights were in a sense set

22   arbitrarily at the height of the drug frenzy.  So

23   what you have are poor people who just happened to

1  have too much of one particular drug around them

2  or within their control being charged with drug

3  trafficking.

4       So what does this mean?  Once they're

5  convicted and they've served their mandatory

6  minimum sentence, they now have a stiff fine here

7  in Alabama of 25,000, 50,000, or 200,000 they must

8  pay off.  In Alabama, there is a law, codified in

9  section 12-17-225.4, which allows the district

10  attorney to go after outstanding court debt.  So

11  imagine, if you will, someone has served their

12  three- to ten-year minimum mandatory sentence.

13  They now have their $25,000 fine plus whatever

14  court fees have been assessed plus whatever

15  enhancements.

16       I'll give you a case in point.  I assisted

17  someone who came out.  He had a minimum of $50,000

18  fine.  I think his total debt was looking at about

19  a little closer to 60.  He got out of prison.  He

20  was paying it consistently.

21       However, under that law I cited, if you do

22  not pay your debt within 90 days, the district

23  attorney has the authority to initiate collections

1    against you and then levy a 30 percent interest

2    rate on what your outstanding debt is.  So while

3    he had started making headway, I think he knocked

4    off about 10,000, all of a sudden, that 30 percent

5    hit.  Last I spoke with him, he owed closed to

6    60,000, and he had just pretty much stopped trying

7    to make major payments.  He was making the minimum

8    monthly payment but no longer was he trying to

9    really make a dent because, as he said, there's no

10    way I'm going to be able to do it in my lifetime

11    with that much money.  He is otherwise a

12    functioning member of society, has a very good

13    job, he does what he's supposed to do, owns a

14    home, and everything else.

15         But what he cannot do is reclaim his right

16    to vote because under the current law, you must be

17    paid up on your court debt.  So what I would like

18    this Committee to bring attention to is the fact

19    that drug trafficking convictions will function as

20    a permanent bar to voting in Alabama because the

21    cost of the fine is so prohibitive and no other

22    crime under the criminal code imposes as much as a

23    financial burden as drug trafficking convictions

1  do.

2         And what you should be aware of is

3  currently, there's a fentanyl trafficking bill

4  working its way through the legislature, and they

5  have just decided to reduce the minimum wait to, I

6  think, at about -- they're looking at maybe one

7  gram triggering trafficking.  Heroin, which

8  usually is blended with fentanyl, is at four

9  grams.  So what they're saying is one gram of

10  fentanyl will trigger trafficking which will

11  trigger a $25,000 minimum fine.

12         And if it's going to be your poor

13  populations or your black populations that are

14  being caught with this drug, then what we're going

15  to have is a -- a pretty high bar for restoring

16  the citizens of Alabama.  So looking at that,

17  understanding that with the Act and its practical

18  application, what some of the -- the one drug

19  crime that is considered a crime of moral

20  turpitude, what are the hurdles to

21  enfranchisement.

22         Historically, the Board of Pardons and

23  Paroles was a little behind in processing

applications.  According to The Sentencing Project
in their 2016 report, only 16,000 restorations
happened from 2005 to 2015.  Now, I want you to
compare this number with the fact that -- they
estimate 250,000 citizens were disenfranchised as
of 2016.  So there is a delay in processing
claims.

          After speaking with people I was helping
at clinics and even prior clients who had done it
on their own, it is not uncommon for the pardon
process, which was the old process, to take
anywhere from five to eight years to get someone
restored.  And that the citizen will usually have
to be very adamant about reclaiming their rights.

          Alabama, next to New Mexico, has the
highest -- second highest percentage of voters
disenfranchised for felonies, approximately 10,793
as of 2016.  That's 9.2 -- .7 percent of the total
purged.  New Mexico is first with 48.55 percent of
total purges attributed to felonies.  And again --
but their number is 10,493 citizens.

          I spoke a little bit about court debt, and
court debt is critical because of new law.  To

1    reclaim your rights, you'll have to go for the

2    pardon or a certificate of -- certificate of

3    eligibility to register to vote or what we will

4    call CERV.  Those are your two pathways.  To get a

5    pardon, you usually have to have committed murders

6    or a sex crime or some type of child exploitation

7    crime.  Everything else is a CERV pathway.

8            What I can say is the Board of Pardon and

9    Paroles has been very responsive to making their

10   process more streamlined.  And so they have done a

11   very good job of making sure that anyone who files

12   a CERV application is addressed within 60 days,

13   and they note the status of their ability to

14   reclaim the right to vote.  If at ever they are

15   beyond the 60 days, they would tell us to call

16   them, and I would call, and the director of

17   pardons, Akisha Jones, would personally look into

18   the matter and usually resolve it within a day and

19   get some communication out.  So they have been

20   very responsive.

21           They also have updated their system so

22   that someone doesn't have to fill out a mystery

23   form or put together a mystery amount of

1    information and submit it to them.  As of right

2    now, the Board of Pardon and Paroles allows you to

3    submit simply by an e-mail the requisite

4    information to jump-start your CERV process.  So

5    they have been great with getting -- with trying

6    to address the backlog.

7            I want to make the Committee aware that

8    there was a report done or a study called

9    Discretionary Disenfranchisement, The Case of

10   Legal Financial Obligations 46 -- volume 46 of the

11   Journal of Legal Studies starting at page 309 that

12   look at the burden of court debt on citizens

13   trying to reclaim their right to vote.  They found

14   in their 2017 published study that one-third of

15   CERV applications were denied due to court debt,

16   that the median court debt for Alabama citizens is

17   $3,956, whereas they estimate the average annual

18   income of formerly incarcerated people is about

19   $9,000.

20           They saw that the fees -- court fees

21   compromise -- comprise about 57 percent of a

22   citizen's assessed court debt and there was strong

23   statistically significant correlation between

1    outstanding court debt and a citizen's use of the

2    public defender.  So they saw that 82.3 percent of

3    public defender users have a balance -- an

4    outstanding court debt balance compared to 67.1

5    percent of those who retain private counsel.

6          Blacks and nonblacks generally -- or I'm

7    sorry.  Black and nonblacks are generally assessed

8    similar amounts of court debt.  However, they were

9    noticing that blacks were less able to pay back

10   due to the systemic wealth gap.  However, they did

11   make note that blacks appeared more likely to

12   apply for restoration, and black women at a rate

13   that nearly doubled that of black men.

14         Something to also be aware of is

15   sentencing enhancements.  I'm a former prosecutor

16   from central Florida, and I find it very

17   interesting here in Alabama there are enhancements

18   upon enhancements upon enhancements.  Usually,

19   they apply additional mandatory incarceration as

20   well as additional thousands of dollars in fines.

21   So if there's a firearm involved, if it's near a

22   school, a church, whatever they've decided to make

23   an enhancement in this state, you are adding on

```
 1    another layer of debt and, therefore, impacting

 2    anyone's ability to reclaim their rights.

 3              What is worth mentioning is that the Board

 4    of Pardon and Parole -- even though the law is not

 5    clear on it, the Board of Pardon and Parole will

 6    consider any felony conviction in a federal court

 7    no matter what jurisdiction, the same as a felony

 8    conviction out of -- in Alabama state court, as

 9    long as the language of the conviction or the

10    language of the crime -- the federal crime

11    substantially matches or tracks the crime of moral

12    turpitude under Alabama state law.

13              So when you're looking at restoration for

14    people here in -- in the state, you have to ask

15    them not only what is their conviction under state

16    law, you need to know what are their convictions

17    in federal court.  So if someone was in the

18    military, if they're in Guam or protectorate,

19    Puerto Rico, U.S. Virgin Islands, you need to

20    know, did they have a conviction there.  It's also

21    worth noting that the Board of Pardon and Parole

22    will take into account your convictions in other

23    jurisdictions, such as other states or native
```

American ports, only if your restoration requires
a pardon.

Now, what's the wrinkle with that?
They're going to say, you need to go get your
pardon from that other jurisdiction before you can
get your pardon here in Alabama.  So what's
happening is other jurisdictions -- case in point,
someone had a conviction in Georgia.  Georgia
said, well, you're not a citizen.  We're not
really bothered about whether or not we're going
to pardon you so we're not going to.  He had done
everything he needed to do in Alabama.  Because he
could not take care of Georgia, he could not take
care of Alabama.

And lastly, before my time runs out, I
just want to stress, there is a lot of confusion.
There will need to be a lot of public education.
We were helping people at our clinics who were --
because of confusion, thought their conviction
solely in another state was blocking them for 40
years from being able to register here in the
State of Alabama.

Or someone had killed someone in

1    self-defense, served time in jail, but never

2    charged, and for 50 years never attempted to vote.

3    And he had to be dragged into the church to find

4    out that he could actually register that very day.

5    So it's a very big issue here, and I think on a

6    practical basis, we need to do a lot more public

7    education.  Thank you.

8         MS. CARROLL:  Great.  Thank you.  So we

9    will do questions for these two speakers.  We do

10   need to be really cognizant of time.  So we will

11   do questions for about seven or eight minutes,

12   which is much shorter than we've done so far.  So

13   everybody remember questions should be concise and

14   to the point.

15        I'm going to start out.  Ms. Holmes, I'm

16   going to start with you.

17        MS. HOLMES:  Sure.

18        MS. CARROLL:  You spoke of the --

19   dismantlement of section five of the Voting Rights

20   Act and the benefit of preclearance.  Section

21   three of the Voting Rights Acts -- Act also offers

22   remedies.  Can you speak to the difference in the

23   remedy that's available in terms of a restraining

order under section three versus the remedy that
you described under section five and how that can
impact populations?

MS. HOLMES:  Sure.  So I'm not going to be
able to talk about all the technicalities, but I
think the major thing is, is the order of
operations here.  The beauty of section five is
that it comes before the actual voting change is
put into effect.  You don't need litigation to
actually address it.  And, you know, you can root
out a problematic voting practice before it
actually is implemented.

Other remedies under the Voting Rights Act
in section three.  Section two are more of
after-the-fact remedies.  And when we're talking
about elections, you know, you're on a time clock.
Once a -- once a voting practice goes into effect,
elections happen and people suffer under those --
under those voting changes.  And even if they are
remedied after the fact, you've already sort of
lost out on people's rights in that interim.

So -- and we bring cases under section
two, and section three is also a viable vehicle.

1    But because of that delay, the -- the impact is

2    just not as -- as great because you have years

3    during which people's rights are being restricted.

4              MS. CARROLL:  All right.  And I have a

5    question -- thank you.  I have a question also for

6    you, Mr. Barry-Blocker.  And actually, I'm going

7    to go to the last thing you said, which was the

8    discussion about confusion and consistency.  That

9    was a big topic with our last panel as well.

10             I mean, what is your sense of a way to --

11   I mean, we -- we talked in the last panel about

12   the fact that the Secretary of State can issue the

13   manual, but it's up to the local county

14   commissioner to actually implement or the

15   probation judges -- or the probate judges, rather,

16   to make sure that the implementation is proper and

17   correct.  And as a result, you may have

18   inconsistencies.  What's your recommendation to

19   try to reduce some of this inconsistency?

20             MR. BARRY-BLOCKER:  From my perspective,

21   mobilize the people.  I'm not -- not overly

22   focused on trying to convince government agencies,

23   because they're already overwhelmed, to make sure

1    training is happening.  If enough people are

2    banging at the doors to see something happen or

3    get a clarification, people will have to do it

4    because they don't want bad press.

5          So my focus was always holding a clinic,

6    training people, and then just speaking with

7    people who need the assistance by any means

8    necessary, to get them to start asking questions,

9    to start making phone calls.  And I found that if

10   you harass someone with phone calls enough, you'll

11   get some type of response.

12         MS. CARROLL:  All right.  I'm going to

13   open the floor -- I'm going to just go around.  So

14   it's going to go Marc, Tari, and Dr. Lewis.  And,

15   again, please keep in mind brief because,

16   obviously, we have a lot of folks who want to ask

17   questions.

18         MR. AYERS:  Goodness.  That was way too

19   close.  One quick question for you, Jonathan.  The

20   30 percent interest which you mentioned, did you

21   -- I may have heard that wrong.  Did you say that

22   was discretionary or like the prosecutor could --

23         MR. BARRY-BLOCKER:  Correct.

1        MR. AYERS:  -- attach this?

2        MR. BARRY-BLOCKER:  Yes.  So the

3   prosecutor has to initiate the action to assess

4   the 30 percent and then seek to collect it or have

5   it added on to the outstanding court debt on that

6   particular case.  So -- but it is not automatic.

7   But they are warned, at least I've seen for the

8   Shelby County sentencing form, when an offender

9   gets their -- their paper, their sentencing, their

10  post colloquy, whatever you want to call it, it

11  does warn this is with 30 percent interest, but it

12  requires the prosecutor to start the process.

13       MR. AYERS:  And quickly, for -- for Jenny,

14  you had -- I think you're the one that said this

15  -- that black and Latino voters are twice as --

16  twice as more likely to not have an ID.  Is that

17  what -- is it twice as more likely to not have one

18  of the things on the voter ID list to take to the

19  polls or are we talking just about a specific ID?

20       MS. HOLMES:  It's any of -- any of the IDs

21  that are acceptable at the polls under the law.

22  So it's not just -- not just a driver's license

23  but any of the acceptable forms of ID.

```
 1              MR. AYERS:  The bills or the --
 2              MS. HOLMES:  Well, I don't believe a bill
 3    is an acceptable form of ID.
 4              MS. CARROLL:  That's correct.  It's not.
 5              MR. AYERS:  Oh, okay.
 6              MS. HOLMES:  But -- but like passport or a
 7    driver's license or an Alabama university student
 8    ID, et cetera.
 9              MR. AYERS:  All right.
10              MS. CARROLL:  All right.  So now we'll go
11    to Tari Williams.
12              MS. WILLIAMS:  This question is for Mr.
13    Barry-Blocker.
14              MR. AYERS:  It's off.  I don't know if you
15    need it.
16              MS. WILLIAMS:  That's okay.  It doesn't
17    matter.  When the Secretary of State gave
18    testimony earlier, he stated that the availability
19    of CERV applications didn't fall within his
20    office's responsibility, that that falls within
21    Pardon and Paroles.  And so my question is, do you
22    know whether or not Pardon and Paroles is actively
23    doing some type of public education or public
```

1    outreach to the community to make sure that those

2    applications are available?  And you also stated

3    that there had been some changes recently

4    regarding that if an application takes more than

5    60 days, someone can call and then they can now do

6    it by e-mail, and I'm just -- I just want to know

7    if people are aware of that.

8         MR. BARRY-BLOCKER:  All right.  So to your

9    first question, is the Board of Pardons and

10   Paroles doing outreach with regards to CERV

11   applications?  Initially, Board of Pardons and

12   Paroles did not even have a CERV application that

13   you could fill out.  So what -- in answer to your

14   question about just knocking on the door, I went

15   ahead and created a type of worksheet and they

16   would just tell them, submit this because it will

17   have all the information in one.  I guess they

18   didn't want all that, so they've since created an

19   an application.

20        As far as outreach, starting at a clinic I

21   did with the Vernon Crawford Bar Association in

22   Mobile, Director Akisha Jones did show up and

23   speak on behalf of the Board of Pardon and Parole.

1    And she did make us aware of the new online

2    application process, and she answered any

3    questions any citizen had.  She also makes herself

4    available to do outreach.  The last I spoke with

5    her, she had done an event in Huntsville, if I

6    recall.  I know it was in the northern part of the

7    state.  So she does make herself available to

8    leave Montgomery and go do outreach if invited.

9    And she's very forthright and welcoming when you

10   engage with her, so it doesn't feel strained.

11          As far as your second question, the law

12   requires that the Board of Pardon and Parole

13   address a CERV application within 60 days.  So

14   that is why there's that 60-day deadline.  And so

15   they do, for the most part I think, try pretty

16   good to get it going and reach it, but it -- just

17   a couple of times, it required us to make a phone

18   call to say, hey, someone hasn't heard.  But I

19   haven't seen it be egregious.  And so the

20   Secretary of State is right, that is the Board of

21   Pardon and Parole's responsibility, but they

22   appear to be handling it pretty well.

23          MS. CARROLL:  Dr. Williams -- or Dr.

1    Lewis.  I'm sorry.

2           DR. LEWIS:  That's okay.  This question is

3    for Ms. Holmes.  Thank you for coming to give us

4    the information today.  So you talked about the

5    Voting Rights Act, section five, and Mr. Park

6    talked about that a little bit earlier.  And this

7    may be too big of a question for us to answer

8    today.

9           He talked about, you know, the history of

10   why we have the formula in place for section five.

11   What approach would you think we would need to

12   take to deal with this huge problem of

13   preclearance and, you know, passing a new law or

14   how can Alabama deal with this?  What -- what

15   strategy as far as section five could we use to

16   deal with this?  I don't know if that's too broad

17   or --

18          MS. HOLMES:  No.  It's -- it's a great

19   question, and it's -- it's a huge question.  There

20   -- there are some bills that have been introduced

21   in Congress over the last couple of years that

22   have attempted to formulate -- create a new

23   formula for which states and what areas will be

1    covered by -- by section five.  You know, section

2    five itself was not struck down.  It was just the

3    formula that calculates which jurisdictions are

4    covered by section five.  And often, a critique is

5    that, oh, it only covers areas in the south.

6         So some of these bills take a -- an

7    approach that -- that is relatively neutral to --

8    in terms of coverage of different areas across the

9    country.  I think that's a great approach.  It's

10   not only areas in the south that have voting

11   problems, and I fully acknowledge that.  And I

12   think a -- a bill like that would be something

13   that -- that we support.

14        In terms of what we can do in Alabama, of

15   course, the Voting Rights Act sets only a floor.

16   So Alabama can -- the Alabama legislature is free

17   to pass any sort of voting protections that go

18   above and beyond what's required by the

19   Constitution or federal statute in its own

20   legislature.  And I don't know if that would

21   involve some sort of more internal preclearance

22   process or if it would have to go through the

23   Secretary of State.  I'm kind of just thinking of

something off the top of my head.  But you can be
creative and try to implement or create some sort
of check that will only apply to Alabama
elections, and you don't have to wait for the U.S.
Congress to act.

DR. LEWIS:  And can I follow up, Jenny?

MS. CARROLL:  Sure.

DR. LEWIS:  When you submit your written
testimony, can you put a reference to those bills
that have been in Congress?

MS. HOLMES:  Absolutely.  I think there
are three or four and we -- I'll put in references
to those.

DR. LEWIS:  Thank you.

MS. CARROLL:  All right.  Before we change
panels, I would ask, each of you cited some data
points in terms of your experience and contact.
If you could include those also in your written
comments, that would be extraordinarily helpful.

The other thing I want to point out is a
point of clarification in answer to the question
that Mr. Ayers raised inquiring about the 30
percent collection fee.  I've got the statute in

1  front of me, and it actually indicates that you

2  shall assess a collection fee of 30 percent.  So

3  it is not discretionary.  It appears --

4          MR. BARRY-BLOCKER:  Okay.

5          MS. CARROLL:  -- in addition it says that

6  -- and this is interesting and I think warrants

7  noting as well that 75 percent of the collection

8  fee is distributed to the attorney's office that

9  is -- that is collecting that fee.  So I'll also

10 suggest that there's a financial incentive to turn

11 over these collections.  So we will also include

12 the entirety of that in our record as well.

13          Thank you all so much.  I would ask that

14 you stick around in the event that we have

15 additional time for questions.  I know that y'all

16 raised a lot of great points, and my guess is

17 there are additional questions.  But thank you so

18 much for your testimony.

19          At this point, we will hear the second

20 half of panel four, and that will consist of

21 Charlotte Morrison from the Equal Justice

22 Initiative and Executive Director Scott Douglas of

23 the Greater Birmingham Ministries.  So welcome and

1    thank you all for coming.  Same advice I gave to

2    the last speakers with regard to time.  The time

3    period will be marked on this clock, and I just

4    ask you to abide by it.  And in the interest of

5    time, I'm going to start with you, Mr. Douglas.

6              MR. DOUGLAS:  Thank you.  Thank you for

7    this opportunity.  I'm Scott Douglas, executive

8    director of Greater Birmingham Ministries located

9    at 2304 12th Avenue North in Birmingham.  GBM, as

10   we call it, is a 49-year-old multi-faith

11   organization serving metropolitan Birmingham and

12   the State of Alabama.  We have Jews, Christians,

13   and Muslims, blacks, whites, and brown united in

14   providing emergency assistance to low-income

15   families and working together over the years to

16   improve those systems manifested in private and

17   corporate practices and public policies that

18   affect the poor unjustly.  Education is a system,

19   housing is a system, health care is a system,

20   transportation is a system, criminal justice is a

21   system, and certainly voting is a system.

22             For decades, GBM has conducted voter

23   registration among.  2,000 plus families we serve

1    each year in need of utility, food, housing,

2    clothing, and other emergency assistance.  Since

3    2007, we have mounted, at various levels of scale,

4    voter registration drives beyond our doors, not

5    just those come to us in need, going into

6    low-income neighborhoods across our city.  And for

7    GBM, it is a principle for us that just as no one

8    should be denied access to housing, access to

9    education, access to health care, access to

10    transportation, access to justice, neither should

11    be denied access to the vote if they could

12    otherwise qualify.

13         It is a principle embedded in holy text,

14    not the least clear verse of which is Proverbs 31,

15    the 31st chapter, ninth verse which proclaims,

16    "Yes, speak up for the poor and helpless and see

17    that they get justice."  To the degree that access

18    to housing that is decent and affordable and

19    quality health care and transportation that is

20    reliable is the determined by public policies.

21         Access to vote for poor people is

22    fundamental in deciding who gets to make public

23    policies and how those public policies affect the

1  quality of their life and the quality of life of

2  us all.  When the voices of the poor are muted or

3  silenced, public policies reflect the absence of

4  the voices of the poor with often dire

5  consequences for their quality of life.

6        In Alabama, seeking justice for the poor

7  regarding the voting franchise has always been a

8  difficult venture, especially given our current

9  state constitution.  Conceived in infamy and

10  perpetrated by fraud, it was self-produced to

11  disenfranchise the black vote and seriously reduce

12  the vote of all poor people.  Disenfranchisement

13  was certainly the goal in the 1901 constitutional

14  convention.  As the convention president, John

15  Knox proudly proclaimed at the time of the

16  convention that what he wanted to do was, quote,

17  Establish white supremacy by law, unquote.

18        To facilitate the process -- this process

19  during the vote, on the 1901 constitution that was

20  produced by the convention, thousands upon

21  thousands of votes of black men in Alabama's Black

22  Belt that they cast against the new constitution

23  were counted by white vote counters and votes for

1    the new constitution.  In fact, if those votes had

2    not been corrupted, the new constitution would

3    have been fair.

4            If you're looking for vote fraud, the vote

5    of -- on the 1901 constitution is the pinnacle or

6    rather the pits of vote fraud, and it was

7    implemented not by voters but by a conspiracy of

8    state officials.  That conspiracy was so well

9    known, it was called at the time an open secret.

10   It was only decades later that the Voting Rights

11   Act, worn through the blood, the struggle,

12   persistence, and clarity of vision, shared by the

13   famous and the unnamed began to right that wrong.

14           So fast forward to Alabama's HB19 photo ID

15   law enacted in 2011 alongside HB56, the

16   anti-immigrant law that itself had a

17   voter-suppressive proof-of-citizenship clause.

18   The two together comprised a people-of-color

19   voter-suppression combo.  The photo ID law was

20   written not to come to effect immediately.  But by

21   that time, the -- by later -- by 2014, rather --

22   I'm sorry -- the Shelby case was decided in 2013,

23   and there was no longer a preclearance to be

1    demanded.

2            Without the protection of the guts of the

3    Voting Rights Act, preclearance, the changes in

4    Alabama's voter ID laws place a tremendous burden

5    on already economically and socially burdened

6    black and Latino families.

7            Money is obviously a burden, by

8    definition, for low-income people.  Scarce funds

9    are needed not only for even -- for even free so

10   called, unquote, state-issued photo IDs.  But

11   also, for the underlying documents that's needed,

12   like birth certificates to -- to get the IDs.

13           Transportation is a burden for low-income

14   people.  That is not so obvious of those of us who

15   have reliable transportation.  If you're poor and

16   happen to live in urban areas and there is public

17   transit, you still can't rely on public

18   transportation to get you to the polling place or

19   the DMV before work or after work on time.  Now,

20   that's a preexisting burden that existed before

21   the photo ID law, but the added burden is having

22   to get to the nearest DMV office in the urban

23   areas, and in many Black Belt counties, if there

1    is a car in the family, it's being used by the
2    breadwinner who has to use the car to commute back
3    and forth to work, often in a Black Belt
4    neighboring county.
5          As for GBM direct experience with
6    low-income people burdened by Alabama's photo ID
7    laws, there's a case of Elizabeth Ware.  Due to
8    Ms. Ware's fixed income, lack of reliable
9    transportation, and limited mobility, HB19
10   substantially burdens Ms. Ware's ability to vote.
11   Ms. Ware's income consists solely -- consisted
12   solely of Social Security Disability as a result
13   of a number of serious maladies, including bullet
14   fragments in her back.  Ms. Ware does not drive
15   and has limited transportation options.  The bus
16   stop is four to five blocks from her house and
17   walking that distance takes her over an hour and
18   causes her pain, and rides by car are unreliable
19   for Ms. Ware.
20         The nearest place to get a license where
21   Ms. Ware will go get an ID is not in walking
22   distance of her home, and a ride can cost 20 bucks
23   -- $20, a significant amount for someone with

1    Ms. Ware's fixed income.  Ms. Ware finally was
2    able to get the free voter ID card.  However, she
3    was wrongly denied -- I'm sorry.
4         She -- she attempted to get the free voter
5    ID card; however, she was wrongly denied the card
6    by the -- the ID by the staff member who had been
7    improperly trained who told her that because she
8    had an ID in the past, she was now ineligible for
9    the free voter ID card now, despite her
10   circumstances.
11        Finally, after becoming a plaintiff in our
12   lawsuit, Ms. Ware's attorneys aware -- arranged
13   for the Secretary of State's office mobile unit to
14   visit her home during her deposition, and she had
15   never heard of the mobile ID unit prior to
16   litigation.  The unit's process was deeply flawed
17   and faced many technical issues when attempting to
18   issue Ms. Ware an ID.  Ultimately, it took over an
19   hour to issue Ms. Ware a temporary ID, and she had
20   to wait for the permanent ID to be mailed to her.
21   This process clearly cannot be replicated for the
22   thousands and thousands of other people in Alabama
23   who do not have an ID, a personal home visit by a

1    mobile unit.

2         And now there's the -- and now there's the

3    deceased Debra Silvers who was unable to replace

4    her photo ID after a house fire destroyed both her

5    ID and the underlying documents that she would

6    need to replace it.  To begin replacing the

7    documents lost in her fire, Ms. Silvers had to pay

8    for a ride to various government agencies.  Each

9    trip costed her 15 to $20.  Ms. Silvers paid over

10   $100 in cost of transportation before getting a

11   temporary nondriver ID.  These costs were

12   especially substantial given that Ms. Silvers had

13   just lost everything in the fire and was in the

14   process of rebuilding her entire life.

15        Ms. Silvers was in such dire straits that

16   she had required the Red Cross to house herself

17   and her children.  Once Ms. Silvers had obtained a

18   temporary nondriver ID, she attempted to vote in

19   March 2016, but she was turned away because the

20   poll worker could not see the picture on the

21   temporary ID and that old ID had expired.  HB19

22   directly prohibited Ms. Silvers from participating

23   in the franchise.  And finally, Alabama photo ID

law is the new poll tax.  But the reason for the existence of the current new poll tax is the same reason for the existence of the first one.  Thank you.

MS. CARROLL:  Thank you.  We'll now hear from Ms. Charlotte Morrison.

MS. MORRISON:  Good afternoon, my name is Charlotte Morrison.  I'm a senior attorney with the Equal Justice Initiative here in Montgomery. Alabama today has one of the nation's highest disenfranchisement rates.  15 percent of African-American adults and nearly a third of African-American men in Alabama have lost the right to vote.  Alabama is one of only ten states where a person with a felony conviction may lose the right to vote permanently unless restoration is sought and all fines are paid.

We wanted to take our time on this panel to speak specifically about the voter restoration process and why this does very little to ameliorate the problem.  First, the vast majority of people in Alabama's prisons are serving a sentence for a conviction considered by law to be

1    one of moral turpitude.  These citizens are,

2    therefore, subject to permanent

3    disenfranchisement.  They must go through the

4    voter restoration process, either by applying for

5    a certificate of eligibility to vote or a pardon.

6        Certificates of eligibility to vote, or

7    the CERV, will not be issued to anyone who owes

8    fines or is on parole supervision.  This means

9    that the vast majority of people leaving Alabama's

10   prisons cannot apply for a CERV.  They are

11   ineligible for a CERV.  I just wanted to -- to

12   emphasize that most people leaving prison will

13   have to go through the pardon process in order to

14   restore their right to vote.

15       One reason that Alabama has one of the

16   highest incarceration rates in the nation, in a

17   nation that leads the world in incarceration

18   rates, is that it incarcerates people for longer

19   periods of time than almost any other state.  One

20   in four people incarcerated in Alabama is serving

21   a life or a virtual life sentence.  They will be

22   on parole for the rest of their lives.

23       Pardons are available to people on parole

supervision, but applications for voter
restoration through the pardon process are
available only to applicants who have successfully
served three years.  So you have to serve three
years before you are given an application.  It
takes the board then three additional years to
process your application.  So pardon applicants
typically wait six years before they can have
their voting rights restored.  All applicants who
have not paid their court fines will be denied.
This requirement that all fines be paid acts as a
permanent bar to voter restoration for tens of
thousands of people in Alabama.

        We wanted to talk specifically about one
case that is representative of this process.  Our
client, Stanley Washington, who is
African-American, who was originally sentenced to
life imprisonment without the possibility of
parole for possession of cocaine in 1995.
Ordinarily, this offense is punishable by a
mandatory minimum of three years' imprisonment.
However, because Mr. Washington had previously
pled guilty to possession of cocaine and

1    third-degree burglary, he was sentenced to a

2    mandatory death-in-prison sentence under Alabama's

3    felony offender act.  He was also fined $50,000.

4    That fine is mandatory under Alabama law.

5           Mr. Washington was one of the first

6    prisoners whose sentence was reduced after the

7    Alabama Supreme Court unanimously decided to allow

8    judges to reconsider sentences of life without

9    parole for nonviolent offenders.  In 2008, Mr.

10   Washington was paroled.  He was released in

11   January of 2009.  After his release,

12   Mr. Washington was hired by my office as a reentry

13   coordinator in our post-release educational

14   preparation program, a full-scale residential

15   reentry program here in Montgomery.

16          We represented Mr. Washington at his --

17   we -- at his hearing to restore his voting rights

18   in 2011.  His application was denied because he

19   had not paid the $50,000 fine.  It did not matter

20   that Mr. Washington was 63 years old, that he was

21   on SSI.  It did not matter that he had paid his

22   parole fees, $40 a month, consistently for six

23   years.

1          Alabama's disenfranchisement scheme and

2     moral turpitude test did not evolve in a vacuum.

3     Since emancipation in 1865, many states have tried

4     to block or restrict black people from voting.

5     After the 15th Amendment barring racial

6     discrimination in voting was adopted in 1870,

7     southern states continued to disenfranchise black

8     voters through poll taxes, literacy tests,

9     grandfather clauses, violent intimidation, killing

10    many black people who tried to vote.

11          State laws disenfranchising people

12    convicted of a felony also proliferated during

13    this period, especially in southern states as the

14    largest population of African-Americans where

15    lawmakers were explicit about the need to suppress

16    the black vote.  Alabama's long -- I'm sorry.  In

17    1901, Alabama amended its constitution to expand

18    disenfranchisement to all crimes involving moral

19    turpitude, which apply to misdemeanors and

20    noncriminal acts after the president of the

21    constitutional convention argued that the state

22    needed to avert the, quote, menace of negro

23    domination, unquote.  Alabama's long and violent

1   history of erecting insurmountable obstacles for

2   African-American voters and the undisputed

3   evidence that felony disenfranchisement laws have

4   a racially disparate impact should disqualify

5   Alabama from using convictions and fines as

6   mechanisms to deny the citizens -- deny citizens

7   the right to vote.  Thank you.

8          MS. CARROLL:  Thank you.  We do have, as

9   before, a limited time for questions.  So I have

10  two brief questions for each of you and then I

11  will -- I'll focus this time and work the opposite

12  way, so just let me know if you have a question.

13          Charlotte Morrison, for you, one question

14  I have is most states have some version of this

15  felon disenfranchisement -- and perhaps,

16  Mr. Blocker, you can also speak to this.  What's

17  -- what's the motivation behind it?  What's the

18  logic behind it?  Why is it important that we

19  disenfranchise felons.

20          MS. MORRISON:  No state disenfranchises --

21  has a permanent disenfranchisement -- I'm sorry --

22  most states don't have a permanent

23  disenfranchisement that is -- where the

 1    restoration is triggered only after you've paid

 2    your fines.  So that's where Alabama is unique.

 3    There's only a handful of states that -- that do

 4    that.

 5              MS. CARROLL:  But beyond that, I mean most

 6    states do have some restriction on enfranchisement

 7    based on a conviction, at least during the period

 8    of time you're serving or under some supervision.

 9    So what is the theory behind it?  Why would you do

10    that as a matter of election law or practice?

11              MS. MORRISON:  I think it's rooted

12    specifically in -- in the history of our country,

13    evolving from a country of enslaved people and

14    figuring out what to do moving from three-fifths

15    to the full voting rights.  And I think you'll

16    find the answer in -- in that connection.

17              MS. CARROLL:  And you would concur with

18    that?

19              MR. BARRY-BLOCKER:  I would concur.  And

20    I'm originally from Florida, and we would -- the

21    process there is you would have to apply to the

22    Board of Clemency, which is essentially the

23    governor and some other executive members.  And