FILED

2021 Dec-23 PM 07:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

factors, and I think you have to get this down, this is very important, aside from population, that satisfies the one-person, one-vote theory, but there are some other practical effect that one must look at.

Also you get to the question of your VAP, your voting age population. Your voting age population varies from as much 3, I guess, to 5% from your total population. Which means if your total population, let's say is, I'll just pull out a figure, 60%, then you're voting age population, let's pull out a figure, is 56%, maybe 4% less. Then once you get to your voting age population, then you've got to get your voter registration figures, which are usually among blacks less than whites. That may be as much, as high as a 3% variation.

Then you get, not only your voter registration population, then you've got to get your voter turnout. Then even aside from your voter turnout, when you take in the fact that many blacks have not yet, even this day and time, never still because of education and what have you, don't have all of the political skills that whites have had who have been operating government for hundred and hundred of years, then that's another factor.

Then you get into your factor, your economic factor in a campaign, that's your raising money. Most black candidates can't raise money among poor black folks, they don't have any. We're unemployed and you also get your quasi-captive vote. What's the captive vote, that's the quasi-captive, that's the vote that white folks still control among black folks, that's the best way to put it.

We used to call it captive vote where they use to load them up on the truck and take them down and vote them. That had happened, though, during a period of reconstruction. But I'm talking about now where you've got a quasi-captive vote where many blacks are still subjected to the influence of their employers and so forth where they simply don't know.

So all these factors, we put all these elements together, I have not seen a plan that put these elements together that will give us hope of electing two black congressmen. I wish that I had a plan that could to that.

10

Mr. Gray, one of the state's most effective and knowledgeable political organizers and the person chiefly responsible for ADC's field operations, shared Mr. Reed's view:

> There has been some discussion regarding whether two majority black districts can be created in the State of Alabama. And I have seen the proposed NAACP proposal and have talked with some of their attorneys about the plan that they have floated around in this state. **I've looked at the plan and I have serious reservations regarding whether blacks can get elected in either one of the districts under their proposed plan.**
>
> The plan proposes, it's a partial plan, you don't see the whole plan, so that certainly concerns me that you're looking at just a piece of the puzzle. And they based the plan on precinct data and you really don't have the whole plan in front of you to analyze. And they do cut up a lot of counties in drawing the two proposed majority black districts.
>
> The one thing -- the one concern that I have is Joe outlined the things we look at in terms of whether we think a district will be able to elect a black candidate. And looking at those two districts they're right on the borderline, about 61%. Looking at the voting age population in both those districts, the voting age population falls under 55% in terms of black voting age population in those two districts.
>
> And if you look at the counties that make up the two districts, even though they rely upon urban centers for picking up their population, but they also combine a lot of rural counties in their plan, their proposed plan.
>
> And one thing I know that is, in trying to turn out the black vote in rural areas it's more difficult because you have, you know, more miles to cover, more folk, you know, longer distance to go pick up folk and it's just more difficult to turn out folks when you have more counties involved and more rural areas making up that proposed district.
>
> The NAACP has used the argument that there are districts around the nation where blacks have won in less than, say, 65%, that is true. But if you look at the black congressmen who have won in districts that are less than 65% black they're virtually all in urban centers.

11

The only district, congressional district that I know of, a nationwide black district where you have a black congressman, is in Mississippi where you have a district that's less than 65% that's not in an urban area. You have -- Mike Epsey does have Jackson, and it goes out in the Mississippi Delta, but that's the only other place. Every other black congressional district is located almost totally within an urban center where it's easier to turn out the vote and mobilize your voting population.

But under these two districts that's proposed by the NAACP, they rely upon a lot of rural counties to make up that population base to create those two districts. **And I have serious concerns about whether either one of those districts could elect a black.**

Albert Turner of Perry County voiced a similar view at a public hearing on August 21, 1991:

In my philosophizing of this plan, I had been told from the black community that it was various black people who had an interest in running for the congressional seat. And by the way, I want to dispel all theory, I have no intention at all of trying to support a two black congressional seats in Alabama. I think it's ludicrous, to be honest with you. **I don't see no possibility of having two seats that black folks can win in Alabama.** In fact, I have a problem in trying to get one that they can win knowing the black belt of Alabama and the State of Alabama, and I intend to take that position with Justice and anybody else. I'm not interested in trying to take a fold of the population of Alabama and try to make two black seats out of it. I do not buy that theory that a 50% black seat or a 55% black seat is electable.

So, my sole interest was to develop a plan that was as fair as possible and as close as possible to a 65% black. My theory is that we would like to have one seat in congress that we can say we sent somebody to. I feel very strongly that if it's 50% or 55% whoever wins that plan will win as a result of whatever the whites in that district does. And I'm interested in trying to have at least one out of seven. I would like for the record to show that and I intend to take that position all the way.

12

Ms. Jackson of the NAACP made it clear that her organization does not endorse any effort to create two majority black districts, explaining as follows:

> Good morning. I do represent the Alabama State Conference of Branches of the National Association for the Advancement of Colored People. And I think first off I need to, perhaps clarify something that has transpired that may have caused some confusion. The NAACP has not submitted a plan with two districts. I think a suggestion came down from our national office and inadvertently, perhaps, a copy was submitted to this committee as well. And I think there are some other persons, perhaps, who are supporting that plan. But that is not the plan that the NAACP in Alabama is supporting.
>
> **We have some very serious problems with a two district plan.** We believe that a plan that only has 60% black population is not what we would consider a safe district. And it would have only approximately a 56% voting age population. We think that a plan would need to have, at least, 65% blacks in a district with at least 61% voting age population.
>
> We see a number of other problems with a two district plan as well. We do have a large number of rural counties. And I don't want to go into a lot of things, repeat what has already been said, but it is a very strong concern of the NAACP, and we are a nonpartisan organization, but we are very concerned in political matters.
>
> And in Alabama, in a black district, regardless if it's one or two, it would have to encompass a large number of rural areas. And history has proven that we have more difficulty in getting people registered to vote in rural areas; more difficulty in getting them to the polls to vote and, therefore, we would have very serious problems with a plan that would only have about a 60% black population.
>
> Realistically it would lessen the chances of getting a minority or a black elected to congress. It would weaken our ability to raise funds or the candidate's ability because the resources would be greatly split.
>
> So, at this point, we have looked at a number of plans that have been submitted to this committee. And the NAACP here in Alabama set up a committee, we studied the ones that have

13

been submitted to you, and we have decided and taken a vote that the plan that we see at this particular point that we would most support would be the plan that was drawn by Representative Buskey and some others.

So I do want to clear the record. We do not support a two district plan. Currently we support the plan that Mr. Buskey worked on and I believe that is one that people are referring to as the ADC plan. Thank you.

These black leaders pointed out that any predominantly black district would necessarily have to include substantial rural areas, and voiced concern that unless a district had a substantial black majority (about 65%), there would be a real threat of black voters being unable to elect a candidate of their choice in that district. An attempt to create two majority black districts, they observed, would likely lead to black voters being unsuccessful in both districts. While clear in their view that two black districts were preferable if such districts were really feasible, these leaders pointed out that neither through their own analyses or those of others had they discovered any reasonable way to fashion two sound black districts.

As noted in the testimony highlighted above, there were efforts to draw a district plan with two predominantly black districts. No such plan was ever submitted to the Committee nor introduced in the Legislature.[19] But enough study was done to clearly support the conclusion of the black leaders described above that a sensible and racially fair plan should not feature two marginal black districts, but rather should contain a single district with a solid black majority.

The first contact with the Reapportionment Office regarding a potential plan with two black districts came in the form of a telephone call from Mr. Clifford Collins of the NAACP's Voter Participation Project. Mr. Collins advised the staff that his organization might submit a plan containing two predominantly black districts. On September 4, 1991, the Reapportionment Office received a facsimile transmission from Sam Walters, Assistant General Counsel of the NAACP in Baltimore (Exhibit 31). Mr. Walters provided a rough description of two majority black districts, but not a complete plan as required by the Redistricting Guidelines. The Committee met that same day, and Representative John Buskey of Montgomery -- a Committee member and chair of the state NAACP's redistricting committee -- advised the Reapportionment Office and the Committee leadership that the

---

[19] Except by Republican Representative Johnny Curry as a delaying tactic, as more fully explained hereinafter.

state NAACP did not support a two-district plan.[20] In any case, the NAACP proposal was not distributed because it was not a complete plan and had not been verified.

On September 20, 1991, Senator Earl Hilliard of Jefferson County sent the Reapportionment Office a computer diskette said to contain the data which had been faxed on September 4, 1991. Senator Hilliard, who is black, requested the staff to use the information from the fax and the diskette to try to build a plan with two majority black districts. The diskette was not formatted to be compatible with the Reapportionment Office's computer system, and despite the staff's efforts -- including calling in their computer consultant -- the diskette's information could not be loaded. Consequently, the staff took the written information in the fax as its starting point.

First, the staff built a plan around the two proposed black districts, which were determined to have black populations of 59.74% (55.47% VAP) and 59.70% (55.41% VAP), respectively. The overall plan split 29 counties (out of 67) and did not have an acceptable population deviation. See Exhibit 32. This plan, along with the refined version described below, were given to Senator Hilliard.

To meet Senator Hilliard's request, the staff modified the two-district plan in an effort to increase the black population percentages and get the deviation to zero. The resulting black districts were 60.07% (55.79% VAP) black and 61.18% (56.92% VAP) black. This version also split 29 counties. See Exhibit 33. This plan, too, was provided to Senator Hilliard, with the understanding that some fine-tuning was needed, but would be done only if he decided to pursue the plan.[21]

On December 10, 1991 -- while preparation for the trial of the federal lawsuit was going strong -- Senator Hilliard requested the staff to create a plan including a 65% black district in the south and a 55% black district in the north. The staff was able to draw a 59.33% (55.06% VAP) black district along with a 61.98% (57.75% VAP) black district. See Exhibit 34. This plan did not have a zero deviation and split 31 counties. It was this version of the Hilliard plan that was submitted to the three-judge court in Mobile as one of the alternatives suggested by the black plaintiffs-intervenors.

In January of 1992, while the three-judge court was considering the evidence presented at trial, the staff, at Senator Hilliard's request, furnished him with a refined version of the plan, having a zero population deviation and the following predominantly black districts: 59.41% (55.14% VAP) and 61.91% (57.68% VAP). See Exhibit 35. The

---

[20] This position is explained in the testimony of state NAACP leader Lillian Jackson which is quoted above.

[21] These events occurred around mid-October of 1991 when it was still hoped that Governor Hunt would call a special session.

plan split 29 counties. Despite their best efforts, the staff was unable to meet Senator Hilliard's 55%-65% request.

Between January 9 and January 17, 1992, Mr. Selwyn Carter of the Southern Regional Council in Atlanta came to the Reapportionment Office and spent considerable time in an effort to build a plan with two predominantly black districts. Mr. Carter concentrated on trying to achieve a 65% district and a 55% district, consistent with Senator Hilliard's earlier request. While Mr. Carter was working on that approach, a software problem developed which made it impossible to display a map of the plan on which he was working, and thus Mr. Carter never finished his effort. While a written report of the status of Mr. Carter's work is available (Exhibit 36), no map can be produced.[22] The staff cannot verify Mr. Carter's work, but believes that changes would have to be made to complete it, and that it is uncertain how those changes would affect the overall plan. As currently drawn, the plan splits 33 counties.

Mr. Albert Turner of Perry County, who is on record opposing any effort to create two black districts, also spent time in the Reapportionment Office in January studying once again -- particularly in light of Senator Hilliard's efforts -- whether a two-district plan could be drawn. After substantial efforts, Mr. Turner abandoned his effort, concluding that his original assessment was accurate.

At no time did any black legislator, political leader or other citizen present to the Reapportionment Committee or the Legislature a proposal containing two black districts; nor has such an approach ever been publicly advocated before the Committee or the Legislature. Indeed, the only time such a plan was brought forward at all was when Republican Representative Johnny Curry, apparently believing that by introducing a number of bills that might have to be read at length he could delay the House's vote on the plan which eventually passed, introduced several plans, including the Reed Plan, the Dixon Plan, the Court Plan, an earlier version of the plan adopted by the Legislature, and the Hilliard two-district plan. Mr. Curry's effort to delay was not successful.

## III

### Other Relevant Information

To the extent it is not fully provided in the preceding sections of this letter, the information required by 28 C.F.R. §51.27 is set out below.

(a)     A certified copy of Act No. 92-63 is included as Exhibit 37.

---

[22] The Reapportionment Office's software vendor, Public Systems Associates, has been working to remedy the problem, which it also experienced in Louisiana.

(b)     *Ala. Code* §17-20-1 (included as Exhibit 38) describes the existing congressional districts.  For an analysis of the population, by race, of the existing districts under the 1980 census, see Exhibit 39.  For a comparable analysis under the 1990 census, see Exhibit 1.

(c)     See Sections I and II.

(d)     This submission is being made by James H. Evans, Attorney General of the State of Alabama (205-242-7300); and David R. Boyd, Counsel to the Permanent Committee (205-834-6500).

(e)     The Alabama Legislature is the branch of state government responsible for the proposed change in congressional districts; the State of Alabama is the submitting authority.

(f)     Not applicable.

(g)     The Alabama Legislature is responsible for making the change by way of a legislative act.

(h)     The Legislature is authorized by the United States Constitution art. I, §2, cl.3 and art. I, §4, and the Constitution of Alabama (1901) art. IV, §44 to make the proposed change.  The required procedures are described in Section I.

(i)     Act No. 92-63 was passed by the Legislature on February 27, 1992 and became law on March 5, 1992.

(j)     The new congressional districts would take effect with party primaries on June 2, 1992, subject to the approval of the three-judge federal district court discussed in Section I.  If for any reason the proposed plan cannot be used for the 1992 elections, and the court's plan is used instead, the State intends for the proposed plan to be used in 1994 and thereafter.

(k)     The proposed districts have not yet been used.

(l)     Not applicable.

(m)     See Section I.

(n)     The proposed congressional districts will likely result in the election for the first time since Reconstruction of a black member of Congress from Alabama.  No adverse effect on black voters is anticipated; indeed, the proposed plan is racially fair in all respects.

(o)     See Section I for discussion of the proceedings before the three-judge court in the Southern District of Alabama.  There have been three other legal proceedings filed

over the general subject of congressional redistricting. On October 29, 1991, two black residents of Tuscaloosa County and Greene County, respectively, filed suit against Governor Guy Hunt and various other state officials, including legislative leaders, in the United States District Court for the Northern District of Alabama, Western Division. This suit, filed after the Wesch case, alleged that the existing congressional districts violated federal law and requested a three-judge court be convened to declare the existing districts unlawful and to order the Governor to call a special session to give the Legislature an opportunity to enact a new district plan, failing in which the court would order a plan implemented. See Exhibit 40. Other pleadings related to this action are also included as part of Exhibit 40. On December 4, 1991, United States District Judge Sam C. Pointer, Jr., for the three-judge court, ordered the case to be stayed pending the outcome of the Wesch case, and invited the plaintiffs to seek intervention in the case pending in Mobile. See Exhibit 40.

On about December 9, 1991, two residents of Barbour County, Alabama, filed suit in the circuit court of Barbour County against Governor Hunt and various other state officials requesting the circuit court to order Governor Hunt to call a special session of the Alabama Legislature to deal with the issue of congressional redistricting. See Exhibit 41. After pleadings and evidentiary proceedings, the circuit court issued a final order requiring Governor Hunt to call a special session of the Legislature on or before January 8, 1992, failing in which the court would itself fashion an appropriate remedy. Governor Hunt appealed and sought a stay of the circuit court's order. On January 7, 1992, the Alabama Supreme Court, in a unanimous decision highlighted by Justice Gorman Houston's special concurring opinion, granted the stay of the circuit court order, and that stay remains in effect. See Exhibit 41.

On about January 14, 1992, the Lieutenant Governor, the Speaker of the House, and a number of Alabama Legislators filed an original petition in the Supreme Court of Alabama requesting that the Supreme Court enter an order establishing interim congressional districts until the Legislature had an opportunity to adopt such districts. See Exhibit 42. The Supreme Court has taken no such action on the petition and, of course, the Legislature has now adopted the plan being submitted herewith.

(p)     The existing congressional district plan, to be replaced by the proposed plan, was precleared by the Attorney General on February 26, 1982. See Exhibit 43.

(q)     Reports showing 1990 total and voting age populations of counties, the existing congressional districts, and the proposed congressional districts are included as Exhibits 44, 1 and 22, respectively. As explained in the next section, we also presently intend to furnish information about the proposed district plan, the court-ordered plan, the Reed Plan, and perhaps other alternatives, on magnetic tape pursuant to 28 C.F.R. §51.20, as amended. Maps of the existing and proposed districts are included in Exhibits 1 and 22 and are appropriately labeled.

As suggested by the Section 5 regulations, the State is providing the following additional information: (1) the number of registered voters, by race, at the county level as of January, 1992 (Exhibit 45); (2) a map showing the location of black citizens in Alabama (Exhibit 46); (3) the names and addresses of a number of black citizens interested in the redistricting process (minorities highlighted in Exhibit 47); (4) numerous items identified in Section I demonstrating the publicity of redistricting activities and the extent of opportunity for minority participation; and (5) newspaper clippings covering essentially the entire redistricting process (lcoated in separate box).

As suggested by 28 C.F.R. §51.28(g), notice of the availability at the Reapportionment Office of a copy of this submission and all exhibits thereto will be sent to all the persons and organizations on the Reapportionment Office mailing list.

## IV

### Provision of Data on Magnetic Tape

Supplemental to the written materials submitted herewith and in accordance with 28 C.F.R. §51.20, as amended, the State of Alabama presently intends to submit descriptive data of its proposed congressional redistricting plan, as well as the court-ordered plan, the Reed Plan, and perhaps other alternatives, on magnetic tape. These materials will be provided through a supplement to this submission.

## V

### Request for Expedited Consideration

Pursuant to 28 C.F.R. §51.34 and for the reasons described herein, the Attorney General is requested to give this submission **EXPEDITED CONSIDERATION**. Assuming the legislation extending candidate qualifying to May 3, 1992 is precleared, preclearance of the proposed congressional districts is needed as far in advance of that date as possible. The very earliest consideration is requested in order to give candidates, voters and election officials as much time as possible to prepare for the June 2, 1992 primary elections.

## VI

## Conclusion

For the reasons explained above, and supported by the accompanying materials, the State of Alabama urges the Attorney General to give **EXPEDITED CONSIDERATION** to this submission and to act upon it favorably.

Respectfully submitted,

*James H. Evans*

James H. Evans
Attorney General

*David R. Boyd*

David R. Boyd
Counsel to Permanent Legislative Committee
on Reapportionment

DRB:tak

Enclosures

20