# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

MARCUS CASTER, LAKEISHA
CHESTNUT, BOBBY LEE DUBOSE,
BENJAMIN JONES, RODNEY ALLEN
LOVE, MANASSEH POWELL,
RONALD SMITH, and WENDELL
THOMAS,

               Plaintiffs,

   v.

JOHN H. MERRILL, in his official
capacity as Alabama Secretary of State,

               Defendant,

   and

CHRIS PRINGLE and JIM
McCLENDON,

               Intervenor-Defendants.

Case No. 2:21-CV-1536-AMM

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION
## FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.  Introduction ........................................................................................1

II. Argument ............................................................................................2

    A.  Plaintiffs are substantially likely to succeed in showing HB 1
        violates Section 2. ........................................................................2

      i.  Plaintiffs satisfy *Gingles* Precondition 1. ............................2

          a.  The Illustrative Plans contain two majority-Black districts.........3

          b.  The Illustrative Plans adhere to traditional redistricting
              principles. .......................................................................5

          c.  Plaintiffs' Illustrative Plans do not violate the Constitution......14

      ii.  Plaintiffs satisfy *Gingles* Preconditions 2 and 3 ..............................19

      iii.  The totality of circumstances shows HB 1 dilutes the voting
          strength of Black Alabamians in south and central Alabama. .........21

    B.  Section 2 contains a private right of action............................................38

    C.  The remaining preliminary injunction factors weigh heavily in favor of
        relief......................................................................................42

III. Conclusion ........................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Legis. Black Caucus v. Alabama,*
   231 F. Supp. 3d 1026 (N.D. Ala. 2017)..................................................17

*Alabama v. United States,*
   198 F. Supp. 3d. 1263 (N.D. Ala. 2016)..............................................41

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of*
   *Albany,*
   281 F. Supp. 2d 436 (N.D.N.Y. 2003)................................................23

*Askew v. City of Rome,*
   127 F.3d 1355 (11th Cir. 1997) .........................................................26

*Bartlett v. Strickland,*
   556 U.S. 1 (2009)...............................................................................3

*Bethune-Hill v. Va. State Bd. of Elections,*
   137 S. Ct. 788 (2017).........................................................................17

*Bone Shirt v. Hazeltine,*
   336 F. Supp. 2d 976 (D.S.D. 2004) .............................................23, 24

*Bush v. Vera,*
   517 U.S. 952 (1996)...........................................................................16

*Charles H. Wesley Educ. Found., Inc. v. Cox,*
   408 F.3d 1349 (11th Cir. 2005) .........................................................42

*Chen v. City of Houston,*
   206 F.3d 502 (5th Cir. 2000) ..............................................................8

*Chestnut v. Merrill,*
   446 F. Supp. 3d 908 (N.D. Ala. 2020)................................................9

*City of Carrollton Branch of the NAACP v. Stallings,*
   829 F.2d 1547 (11th Cir. 1987) ...................................................*passim*

*Covington v. North Carolina,*
   270 F. Supp. 3d 881 (M.D.N.C. 2017) ...............................................43

*Covington v. North Carolina,*
   316 F.R.D. 117 (M.D.N.C. 2016) ........................................................4

*Davis v. Chiles,*
   139 F.3d 1414 (11th Cir. 1998) ........................................5, 14, 15, 16

*Fusilier v. Landry,*
   963 F.3d 447 (5th Cir. 2020) ..............................................................4

*Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs,*
   118 F. Supp. 3d 1338 (N.D. Ga. 2015)........................................*passim*

*Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs,*
   950 F. Supp. 2d 1294 (N.D. Ga. 2013)........................................*passim*

*Georgia v. Ashcroft,*
   539 U.S. 461 (2003)............................................................................3

*Holloway v. City of Va. Beach,*
   531 F. Supp. 3d 1015 (E.D. Va. 2021) ..............................................35

*Hous. Lawyers' Ass'n v. Att'y Gen.,*
   501 U.S. 419 (1991)..........................................................................39

*In re Hubbard,*
   803 F.3d 1298 (11th Cir. 2015) ........................................................18

*Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.,*
   4 F.3d 1103 (3d Cir. 1993) ...............................................................31

*Johnson v. De Grandy,*
   512 U.S. 997 (1994)..........................................................................23

*Jones v. Jefferson Cnty. Bd. of Educ.,*
   No. 2:19-cv-1821-MHH, 2019 WL 7500528 (N.D. Ala. Dec. 16,
   2019) ................................................................................................25

*Larios v. Cox,*
   305 F. Supp. 2d 1335 (N.D. Ga. 2004)..............................................43

*LULAC v. Abbott*,
  No. EP-21-cv-259-DCJ-JES-JVB, 2021 WL 5762035 (W.D. Tex.
  Dec. 3, 2021)...................................................................................39

*LULAC v. Perry*,
  548 U.S. 399 (2006)...........................................................2, 5, 39

*Mi Familia Vota v. Abbott*,
  497 F. Supp. 3d 195 (W.D. Tex. 2020) ...........................................39

*Miller v. Johnson*,
  515 U.S. 900 (1995)..........................................................................16

*Miss. Republican Exec. Comm. v. Brooks*,
  469 U.S. 1002 (1984).......................................................................40

*Mo. State Conf. NAACP et al. v. Ferguson-Florissant Sch. Dist.*,
  201 F. Supp. 3d 1006 (E.D. Mo. 2016) ..............................................4

*Mobile v. Bolden*,
  446 U.S. 55 (1980)............................................................................28

*Morse v. Republican Party of Va.*,
  517 U.S. 186 (1996)...........................................................38, 39, 40

*Nipper v. Smith*,
  39 F.3d 1494 (11th Cir. 1994) ...................................................15, 29

*Pope v. Cnty. of Albany*,
  687 F.3d 565 (2d Cir. 2012) ............................................................20

*Reno v. Bossier Par. Sch. Bd.*,
  520 U.S. 471 (1997)............................................................................1

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*,
  490 U.S. 477 (1989)..........................................................................41

*S. Christian Leadership Conf. v. Sessions*,
  56 F.3d 1281 (11th Cir. 1995) ...................................................15, 27

*Seminole Tribe of Fla. v. Florida*,
  517 U.S. 44 (1996)............................................................................39

- iv -

*Shaw v. Reno (Shaw I)*,
    509 U.S. 630 (1993) ....................................................................6, 15

*Sixty-Seventh Minn. State Senate v. Beens*,
    406 U.S. 187 (1972) ........................................................................43

*Solomon v. Liberty Cnty.*,
    899 F.2d 1012 (11th Cir. 1990) (en banc) ........................................28

*Solomon v. Liberty Cnty.*,
    957 F. Supp. 1522 (N.D. Fla. 1997) ............................................27, 28

*Solomon v. Liberty Cnty. Comm'rs*,
    221 F.3d 1218 (11th Cir. 2000) (en banc) ........................................27

*Terrebonne Branch NAACP v. Jindal*,
    No. 3:14-CV-69-JJB-EWD, 2019 WL 4398509 (M.D. La. Apr. 29,
    2019) ..........................................................................................10, 13

*Terrebonne Par. Branch NAACP v. Jindal*,
    274 F. Supp. 3d 395 (M.D. La. 2017) ................................................4

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) ....................................................................*passim*

*United States v. Blaine Cnty.*,
    363 F.3d 897 (9th Cir. 2004) ..........................................................40

*United States v. Marengo Cnty. Com'n*,
    731 F.2d 1546 (11th Cir. 1984) ......................................................18

*United States v. McGregor*,
    824 F. Supp. 2d 1339 (M.D. Ala. 2011) ..........................................24

*Wright v. Sumter Cnty. Bd. of Elections & Registration*,
    301 F. Supp. 3d 1297 (M.D. Ga. 2018) ......................................*passim*

**Statutes**

52 U.S.C. § 10301 ....................................................................*passim*

52 U.S.C. § 10302 ....................................................................25, 40

52 U.S.C. § 10310 ............................................................................40

# I.     Introduction

HB 1 cracks and packs Alabama's large and geographically compact population of Black voters—a quarter of the state's population—with the effect of confining their influence to one out of the state's seven congressional districts. This is quintessential vote dilution that Section 2 of the Voting Rights Act was "designed as a means of eradicating." *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 479 (1997).

Though Defendants' 130-page brief attempts to obfuscate what is plain (and in some cases, what has been plain for decades), Black Alabamians are entitled to a second majority-minority congressional district under Section 2. For the reasons explained in their motion and below, Plaintiffs have demonstrated that two majority-minority districts can be drawn consistent with traditional redistricting principles, and that absent a second majority-Black district, Alabama's electoral process will remain unequally open to its Black citizens for yet another decade.

Defendants seek to deny Plaintiffs their fundamental rights by imposing requirements on Plaintiffs' demonstrative plans found nowhere in federal law or Alabama's own redistricting guidelines and by pressing distorted interpretations of Section 2 that depart from decades of case law. In doing so, they largely leave Plaintiffs' evidence untouched. That evidence—and a proper application of the law—requires entry of the preliminary injunction that Plaintiffs seek here.

## II.    Argument

### A.    Plaintiffs are substantially likely to succeed in showing HB 1 violates Section 2.

This case demands a straightforward application of Section 2. Plaintiffs have shown that: (1) Black Alabamians are "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) they are "politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986). Because those preconditions are easily met here, the Court must proceed to "the totality of the circumstances," which confirms that "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation." *Id.* at 43-44. Each of Defendants' arguments to the contrary relies on misinterpretations of binding case law, a rewriting of Alabama's own redistricting guidelines, and red herrings designed to distract the Court. Under a proper application of the law, Plaintiffs are substantially likely to succeed on their Section 2 claim.

### i.    Plaintiffs satisfy *Gingles* Precondition 1.

To satisfy *Gingles* 1, Plaintiffs must show that the Black population in Alabama is "sufficiently large and geographically compact to constitute a majority in a single-member district." *LULAC v. Perry*, 548 U.S. 399, 425 (2006) (quoting *Johnson v. De Grandy,* 512 U.S. 997, 1006–1007 (1994)). As demonstrated by Mr.

Cooper's seven Illustrative Plans, this requirement is easily met. Defendants' arguments to the contrary transform traditional redistricting principles from a range of reasonable compliance to a self-serving bright-line test found nowhere in the law.

### a. The Illustrative Plans contain two majority-Black districts.

The numerosity aspect of *Gingles* 1 requires a "straightforward," "objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?" *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009). The answer to this question is emphatically yes.

Each of Mr. Cooper's seven Illustrative Plans contains two districts with a Black voting age population ("BVAP") above 50%. Expert Rep. of William S. Cooper ("Cooper I"), ECF No. 48, at 21-22 ¶ 48; Second Expert Rep. of William S. Cooper ("Cooper II"), ECF No. 65, at 2 ¶ 7. Defendants do not dispute this fact. Instead, ignoring Supreme Court guidance, Defendants quibble with the use of Any-Part Black VAP ("AP BVAP"), a metric used in dozens of cases across the country.

Where, as here, "the case involves an examination of only one minority group's effective exercise of the electoral franchise," it is "proper to look at *all* individuals who identify themselves as black." *Georgia v. Ashcroft*, 539 U.S. 461, 473 n.1 (2003). That clear instruction makes eminent sense: there is no better way to determine who qualifies as Black than by relying on the very people who identify as such. *See* Rebuttal Expert Rep. of Dr. Bridgett King ("King II"), ECF No. 50, at

1-5 ¶¶ 3-16. Following the Supreme Court's lead, courts across the country have relied on the AP BVAP metric in Section 2 cases, *see, e.g.*, *Terrebonne Par. Branch NAACP v. Jindal*, 274 F. Supp. 3d 395, 419-20 (M.D. La. 2017) (using AP BVAP), *rev'd sub nom. on other grounds Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020); *Covington v. North Carolina*, 316 F.R.D. 117, 125 n.2 (M.D.N.C. 2016) (utilizing the "'total black' portion of the voting-age population, i.e., the portion that is 'any-part black'"), including in cases in which Mr. Cooper has served as an expert, *see, e.g.*, *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338 (N.D. Ga. 2015) (issuing preliminary injunction); *Mo. State Conf. NAACP et al. v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006 (E.D. Mo. 2016). In apparent recognition of the widespread use of AP BVAP in Section 2 cases, even Defendants' own expert included AP BVAP in his analysis of Mr. Cooper's Illustrative Plans. Decl. of Thomas Bryan, ECF No. 51-2, at 7. Defendants' position on this point is not well founded.

Nevertheless, Mr. Cooper's Illustrative Plans also satisfy *Gingles* 1 under other measures, including the most restrictive measure possible: non-Hispanic single-race citizen BVAP ("NH SR BCVAP"). This category includes only "Black Alone" eligible voters who have no Hispanic ethnicity. Districts 2 and 7 in each illustrative plan have a NH SR BCVAP between 50.80% and 55.58%. ECF Nos. 48-16, 48-21, 48-26, 48-31, 49-36, 48-41, No. 65-1. The same is true when considering

registered Alabama voters—Mr. Cooper's Districts 2 and 7 in each plan have a Black registered voter population between 51.7% and 58.3%. Cooper II at 38 ¶ 38, Fig. 4. And as Defendants note, Alabama's voter registration form does not allow for "multiple or combination answers" for race. Defs.' Resp. in Opp. to Pls.' Mots. for Prelim. Inj. ("Opp."), ECF No. 71, at 53-54; *see* Ex. 1 (State of Alabama Voter Registration Form) (instructing applicants to "check one" of the race options).[1]

Defendants do not challenge Plaintiffs' ability to satisfy the *Gingles* numerosity requirement, or even their choice of population metric for drawing majority-minority districts. Accordingly, Plaintiffs easily satisfy this element of the first *Gingles* precondition.

### b. The Illustrative Plans adhere to traditional redistricting principles.

Alabama's Black population is also reasonably compact to support a second majority-minority district. Plaintiffs satisfy the *Gingles* 1 compactness requirement by showing that it is "possible to design an electoral district, consistent with traditional districting principles." *Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998). The Court's lodestar in this analysis is reasonableness—there is no bright line rule defining compactness under Section 2. *LULAC*, 548 U.S. at 433 ("While no precise rule has emerged governing § 2 compactness, the inquiry should take into

---

[1] Alabama's current voter registration form can be found online at: https://www.sos.alabama.gov/sites/default/files/voter-pdfs/nvra-2.pdf.

account traditional districting principles . . . .") (internal quotations omitted). Mr. Cooper's Illustrative Plans demonstrate that an additional majority-minority district can be drawn consistent with traditional redistricting principles such as "compactness, contiguity, and respect for political subdivisions," *Shaw v. Reno (Shaw I)*, 509 U.S. 630, 647 (1993).

Consider first compactness. The Illustrative Plans' compactness scores are comparable to, if not superior to, the compactness scores of the 2021 Enacted Plan. Cooper I at 36, fig. 22; Cooper II at 7, fig. 3; *see also* Cooper II at 2 ¶ 4 (noting "there is no threshold score to determine sufficient compactness"). Illustrative Plan 7, for instance, has an average Reock score of .41, as compared to .38 for the enacted plan. And even where the districts in the Illustrative Plans are slightly less compact than those in the 2021 Enacted Plan, they remain within the normal range of compactness scores for districts in Alabama and across the country more generally. Cooper II at 8 ¶ 23; *id.*, Exs. B-1-B-7; Cooper I at 35 ¶ 82. Indeed, when compared to Texas's 2021 congressional map, for which Defendants' expert served as an advisor, Mr. Cooper's Illustrative Districts outscore several districts by wide margins. Cooper II at 9 ¶¶ 24-28.

The Illustrative Plans comply in equal measure with each of the remaining traditional redistricting considerations. Mr. Cooper's districts are contiguous and contain virtually equal population. Cooper I at 21 ¶ 46; Cooper II at 5-6 ¶ 16. They

also respect county boundaries and minimize county splits. The Illustrative Plans include one plan with one *fewer* county splits, four plans with equal county splits, and two plans with one more county split as compared to the 2021 Enacted Plan. Cooper I at 22 ¶ 48; Cooper II at 2 ¶ 6.

Defendants offer little to dispute the Illustrative Plans' compliance with these criteria. Instead, they attempt to convince this Court of the inviolability of only certain traditional redistricting factors, claiming that "Plaintiffs' proposed remedies demand that the State disregard the three most important districting principles in its traditional criteria: preserving the cores of existing districts; maintaining communities of interest; and avoiding contests between incumbents." Opp. 7. This argument fails on both the law and the facts.

First, not only is Defendants' selection of these "three most important redistricting criteria" unsupported by any case law, it is undermined by the State's own redistricting guidelines. As Alabama explained in its 2021 Redistricting Guidelines, prime among the State's hierarchy of redistricting criteria are (1) minimal population deviation; (2) the construction of contiguous and "reasonably compact geography;" and (3) compliance "with Section 2 of the Voting Rights Act." ECF No. 56-1 at 1:11-25. Only where these criteria are not "violate[d] or subordinate[d]" may the State observe discretionary policies such as avoiding the pairing of incumbents, respecting communities of interest, and the preserving the

"cores of existing districts." *Id.* at 2:21-24. And even within these second-tier factors, the guidelines offer "discretion" to "determine which takes priority," no doubt in recognition of the fact that these factors often compete with one another. *Id.* at 3:12-14. Defendants' prioritization of core preservation, communities of interest, and incumbency therefore bear no resemblance to the State's actual priorities when drawing the 2021 enacted plan.

Second, Defendants' suggestion of a bright-line test for compliance with traditional redistricting principles has no foundation in law. To the contrary, "there is more than one way to draw a district so that it can reasonably be described as meaningfully adhering to traditional principles." *Chen v. City of Houston*, 206 F.3d 502, 519 (5th Cir. 2000); *see also Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1326 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020) (approving "far from perfect" illustrative plan as satisfying *Gingles* 1). There is thus no obligation for a *Gingles* 1 demonstrative map to be the *least* or *most* anything—it must simply reasonably adhere to traditional redistricting principles, as Plaintiffs' Illustrative Plans clearly do.

Third, a closer examination of each of Defendants' preferred redistricting principles further reveals the baselessness of their argument. Defendants elevate "preserving the cores of existing districts" above all else. Opp. 7. But not only do the State's guidelines mandate that core preservation *not* trump compliance with

Section 2, ECF No. 56-1 at 2:21-24; *Chestnut v. Merrill*, 446 F. Supp. 3d 908, 913 (N.D. Ala. 2020) (Defendants' expert Dr. Hood "admit[ing]" that the 2011 redistricting guidelines did not even mention core preservation and that, "regardless, an interest in core preservation could not trump compliance with § 2"), Defendants' cynical prioritization of core preservation would render it impossible for any Section 2 claim to succeed. This is because Section 2 plaintiffs are *required* to demonstrate that the State could have created a new majority-minority district that does not currently exist. Plaintiffs can hardly be faulted for failing to maintain the same district configurations they claim are unlawful.

Unsurprisingly, Defendants cannot identify a single case in which a proposed majority-minority district has been rejected under *Gingles* 1 because it inadequately retained the core of existing districts. Such a finding would turn the law on its head, effectively immunizing from Section 2 liability those states that have the longest-standing maps. Contrary to Defendants' suggestion, the State's failure to comply with Section 2 in the past does not absolve it from Section 2 liability in perpetuity. Notably, the Illustrative Plans only reconfigure districts to the extent necessary to comply with Section 2 and satisfy Plaintiffs' evidentiary threshold; almost all of Mr. Cooper's plans leave Districts 4 and 5 nearly unchanged from the enacted plan. Cooper I at figs. 10, 12, 14, 16, 18.

Defendants' emphasis on incumbency similarly fails. Once again, the

Legislature subordinated this criterion to Section 2 compliance in its 2021 Redistricting Guidelines. *See* ECF No. 56-1 at 1-3. And the pairing of incumbents in Mr. Cooper's illustrative plans hardly runs roughshod over this principle; one out of the seven plans—Illustrative Plan 5—does not pair any incumbents, and the rest pair only one set of incumbents. Supp. Rep. of Thomas Bryan, ECF No. 66-1, at 16.

Finally, contrary to Defendants' claims, the Illustrative Plans also respect communities of interest across the state.[2] Mr. Cooper based the location and contours of the new illustrative majority-Black district on a community of interest the State itself has recognized. As Mr. Cooper explained, "[n]ew majority-Black District 2 under the illustrative plans has a configuration that is similar to District 5 in the 2021 BOE Plan and the 2011 BOE Plan." Cooper I at 22 ¶ 48. And as Senator Dial, the former co-chairman of the Reapportionment Committee, confirmed, the 2011 BOE plan, which unites the City of Mobile with much of the Black Belt, was drawn to respect "[t]he integrity of communities of interest." ECF No. 56-5 ("*Chestnut* Tr. 3") at 646:10-13. So too do the Illustrative Plans. *Terrebonne Branch NAACP v. Jindal*, No. 3:14-CV-69-JJB-EWD, 2019 WL 4398509, at *5 (M.D. La. Apr. 29, 2019) (finding minority communities formed a community of interest where they shared a

---

[2] Citing a non-precedential and irrelevant decision, Opp. 73, Defendants imply that because Mr. Cooper did not explain each of the communities of interest his maps respect, he must not have paid any mind to this factor. But as explained here, Mr. Cooper's report and the record are full of evidence demonstrating how the Illustrative Plans respect communities of interest.

district under other districting plans). The State's redistricting guidelines reinforce Mr. Cooper's choice. *See* ECF No. 56-1 at 1-3 at 2-3 ("[C]ommunities of interest may . . . include political subdivisions such as . . . school districts.").

The State also wrongly claims that District 2 in each of the Illustrative Plans unites Black Alabamians "who may have little in common with one another but the color of their skin." Opp. 71 (citing *Shaw v. Reno*, 509 U.S. 630, 647 (1993)). On the contrary, the Illustrative Plans unite geographic, cultural, racial and ethnic, regional, historic, governmental, and social communities of interest that the current plan divides. The Illustrative Plans unite the Black Belt, which is currently cracked among *four* different districts, together in a single district, honoring a longstanding community of interest. *See, e.g.*, Ex. 2 at 3 (explaining "[t]he Black communities of Mobile and the Black Belt share significant historic, demographic, and socioeconomic interests"). As longtime state Senator Hank Sanders explained three years ago, the Black communities both within and near the Black Belt share an undisputable history of racial discrimination that continues to play an important role today. *Chestnut* Tr. 3 at 576:6-13 (Sanders) ("[Lynching and land confiscation] in our collective memory is so powerful . . . . [I]t's still there in a very powerful way.").

Additionally, residents of Mobile and Montgomery who are united in all of Plaintiffs' illustrative majority-Black districts share a host of similar interests and

needs.[3] Former state Representative John Knight testified, for example, that during his 25 years in the Alabama House he observed many of the same concerns from Black Alabamians in Montgomery and Mobile relating to education, criminal justice reform, and healthcare—issues relevant to a wide swath of Alabamians, but which impact African Americans in unique ways. ECF No. 56-4 ("*Chestnut* Tr. 2") at 340:14-15, 340:24-341:8. As for education, Plaintiff LaKeisha Chestnut explained that Mobile's predominantly Black public schools are failing, *Chestnut* Tr. 2 at 420:10-421:5, 421:6-421:22, while Rep. Knight identified the exact same issue in Montgomery, *id.* at 365:10-13; *see also* ECF No. 56-7 ("*Chestnut* Tr. 1") at 220:25-221:15 (Jones); *Chestnut* Tr. 2 421:23-422:7 (Chestnut). Rep. Knight, Ms. Chestnut, and Ms. Jones, another *Chestnut* plaintiff, also described criminal justice issues facing Black Alabamians in Mobile and Montgomery, such as disproportionately high incarceration rates, *Chestnut* Tr. 2 at 340:2-11 (Knight); *id.* at 423:25-424:5 (Chestnut); *Chestnut* Tr. 1 at 218:8-14 (Jones), police brutality and strained relationships with law enforcement, *Chestnut* Tr. 2 at 423:1-25 (Chestnut); *Chestnut* Tr. 1 at 222:19-224:9 (Jones), and reintegration of those leaving prison, *Chestnut* Tr. 2 at 424:6-19 (Chestnut); *Chestnut* Tr. 1 at 222:4-16 (Jones). They also spoke about the housing crises that Black communities face in both cities. *Chestnut* Tr. 2 at

---

[3] All Illustrative Plans unite parts of Mobile and Montgomery Counties. The Illustrative Plans also unite parts of Mobile and Baldwin Counties.

339:17-340:1 (Knight); *id.* at 427:6-14, 427:22-428:1 (Chestnut); *Chestnut* Tr. 1 at 225:13-226:2 (Jones). And they described similar employment issues facing Black Alabamians in both communities. *Chestnut* Tr. 1 at 224:10-225:12 (Jones); *Chestnut* Tr. 2 at 354:22-357:25, 358:13-359:16 (Knight); *id.* at 424:20-425:24 (Chestnut). Accordingly, the Illustrative Plans unite Black communities with common socioeconomic conditions currently divided among multiple districts. *See, e.g.*, Cooper I at Exs. N, O, P, R; *Terrebonne Branch NAACP*, No. 3:14-cv-69, 2019 WL 4398509, at *5 (M.D. La. Apr. 29, 2019) (finding minority population compact under *Gingles* 1 in part because Black residents in illustrative districts shared similar socioeconomic characteristics as compared to whites).

The State's primary evidence otherwise is testimony from two former white Congressmen elected in racially polarized elections who claim that Mobile and Baldwin form an inextricable community of interest. But as former Congressman Byrne made clear two years ago, he simply does not consider and is not aware of Black Alabamians' interests or needs. He did not know the Black composition of his district, he did not remember racially incendiary statements made by fellow politicians, and despite the universally recognized socioeconomic and other disparities discussed above, he sees no difference between the needs of his Black constituents and those of his white constituents. *E.g.*, ECF No. 72-9 at 717:1-19, 723:8-724:22, 728:8-729:3. It is thus unsurprising that Mr. Byrne's Black

constituents felt he did not adequately represent their interests. *See Chestnut* Tr. 2 at 424:6-19.

In sum, Mr. Cooper's Illustrative Plans not only include two majority-Black districts under multiple population metrics, they do so while respecting traditional redistricting principles, including communities of interest, and demonstrate multiple ways to strike this balance. Plaintiffs have thus more than satisfied their burden under *Gingles* 1.

### c. Plaintiffs' Illustrative Plans do not violate the Constitution.

Defendants' primary argument, that Plaintiffs' demonstrative plans are "racially gerrymandered," *e.g.*, Opp. 112, rests upon an erroneous conflation of the Section 2 and racial gerrymandering doctrines and makes an argument that the Eleventh Circuit has previously rejected as a "misinterpret[ation of] the law regarding the role of race in assessing permissible remedies for violations of Section 2." *Davis*, 139 F.3d at 1426. Both the Supreme Court's and Eleventh Circuit's "precedents *require* [Section 2] plaintiffs to show that it would be possible to design an electoral district, consistent with traditional districting principles, in which minority voters could successfully elect a minority candidate." *Id.* at 1425 (emphasis added). In other words, Section 2 requires the intentional creation of a majority-minority district, and "[t]he intentional creation of a majority-minority district necessarily requires consideration of race." *Fayette Cnty.*, 118 F. Supp. 3d at 1345.

As the Eleventh Circuit properly recognized, "[t]o penalize [plaintiffs] . . . for attempting to make the very showing that *Gingles*, *Nipper* [*v. Smith*, 39 F.3d 1494 (11th Cir. 1994)], and [*Southern Christian Leadership Conference v. Sessions*, 56 F.3d 1281 (11th Cir. 1995)] demand would be to make it impossible, as a matter of law, for any plaintiff to bring a successful Section Two action." *Davis*, 139 F.3d at 1425. As a result, courts adjudicating a Section 2 claim should "not determine as part of the first *Gingles* inquiry whether Plaintiffs' Illustrative Plan[s] subordinate[] traditional redistricting principles to race." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1306 (N.D. Ga. 2013), *aff'd in part, vacated in part, & rev'd in part on other grounds*, 775 F.3d 1336 (11th Cir. 2015); *see also Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1344-45 (N.D. Ga. 2015) (reaffirming this principle on remand).

In any event, Mr. Cooper's Illustrative Maps "are not based predominantly on race": they "are compact; they are contiguous; and they respect precinct borders." *Davis*, 139 F.3d at 1425. And they comply with the State's remaining discretionary redistricting factors such as incumbent protection and respect for communities of interest. *See supra* Section II.A.i.b; *Shaw v. Reno*, 509 U.S. 630, 647 (1993) (observance of traditional redistricting factors "may serve to defeat a claim that a district has been gerrymandered on racial lines"). That Mr. Cooper was expressly engaged "to draw black majority" districts does not move the needle. *Davis*, 139

F.3d at 1425. "Certainly, race was a factor in [Mr. Cooper's] process of designing the proposed [districts]; under *Gingles*, *Nipper*, and *SCLC*, we *require* plaintiffs to show that it is possible to draw majority-minority voting districts." *Id.* at 1426. And as the Supreme Court has explained, "[s]trict scrutiny does not apply merely because redistricting is performed with consciousness of race." *Bush v. Vera*, 517 U.S. 952, 958 (1996).

But even if the racial gerrymandering doctrine could be applied to Plaintiffs' Section 2 claim (it cannot), and even if race did predominate over other factors in the Illustrative Plans (it did not), the Illustrative Plans still would not constitute racial gerrymanders because they are motivated by a compelling interest and are narrowly tailored to achieving that end. *See Miller v. Johnson*, 515 U.S. 900, 916, 920 (1995) (in racial gerrymandering cases, "[t]he plaintiff's burden is to show . . . that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district," after which the State must "satisfy strict scrutiny" by demonstrating that the plan "is narrowly tailored to achieve a compelling interest"); *see also Fayette Cnty.*, 950 F. Supp. 2d at 1305 (noting "a district created to comply with § 2 that uses race as the predominant factor in drawing district lines may survive strict scrutiny"); *Fayette Cnty.*, 118 F. Supp. 3d at 1344-45 (same).

As Defendants acknowledge, the Supreme Court has "assume[d], without

deciding, that . . . complying with the Voting Rights Act" is a compelling interest. *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 801 (2017). Notably, the State itself has expressly defined Section 2 compliance as a "compelling state interest." *See* ECF No. 56-1 at 3:7-11 ("[P]riority is to be given to the *compelling State interests requiring . . . compliance with the Voting Rights Act of 1965*, as amended, should the requirements of those criteria conflict with any other criteria."); *see also* Opp. 110 (recognizing "that the State's interest in complying with the Voting Rights Act [is] compelling" (citing *Bethune-Hill*, 137 S. Ct. at 801)).[4] And in this context, narrow tailoring does not "require an exact connection between the means and ends of redistricting" but rather just "*good reasons* to draft a district in which race predominated over traditional districting criteria." *Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1064 (N.D. Ala. 2017) (quotation marks omitted). Put another way, "[i]n the context of voting rights . . . narrow tailoring 'does not demand that a State's actions *actually be necessary* to achieve a compelling state interest in order to be constitutionally valid.'" *Id.* (citing *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015)). It is certainly an understatement to say that compliance with the federal VRA is a "good reason" to create a race-based

---

[4] While Defendants appear to concede that vindicating Section 2 would satisfy strict scrutiny, they argue that Plaintiffs seek "proportional (indeed, maximal) racial representation in Congress," Opp. 114, and that such relief is not afforded by the VRA. That is flatly incorrect. For all the reasons explained in Plaintiffs' motion and this brief, Plaintiffs seek no more and no less than that Alabama afford Black voters an equal opportunity to elect a candidate of their choice as it is required to do under Section 2.

district, even where there is flexibility on how best to draw such a district. Accordingly, Plaintiffs' Illustrative Plans, which strive to remedy vote dilution under Section 2 of the VRA, would satisfy the compelling interest and narrow tailoring requirements of strict scrutiny against a hypothetical racial gerrymandering claim.

At bottom, Defendants' contention that faithful application of Supreme Court case law in this case produces an "unconstitutional" result is, in reality, an argument that Section 2 itself is unconstitutional. Defendants' reluctance to say so only confirms that even asking the question requires ignoring decades of binding precedent, something this Court is not allowed to do. *See In re Hubbard*, 803 F.3d 1298, 1309 (11th Cir. 2015) (explaining "the fundamental rule that courts of this circuit are bound by the precedent of this circuit"). The Eleventh Circuit has held that "amended section 2 is a constitutional exercise of congressional enforcement power under the Fourteenth and Fifteenth Amendments." *United States v. Marengo Cnty. Com'n*, 731 F.2d 1546, 1550 (11th Cir. 1984). Contrary to Defendants' suggestion, the only question before the Court here is whether Plaintiffs have satisfied the first *Gingles* precondition. Because Plaintiffs have plainly demonstrated that the Black community in south and central Alabama is sufficiently large and geographically compact to support a second majority-Black congressional district, the answer to that question is emphatically yes.

### ii.     Plaintiffs satisfy *Gingles* Preconditions 2 and 3.

Plaintiffs are also likely to succeed in establishing that Black voters in Alabama are cohesive (*Gingles* 2) and that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate" (*Gingles* 3). *Gingles*, 478 U.S. at 51. As Plaintiffs explained in their opening brief, Dr. Palmer's analysis shows that Black Alabamians have remained "extremely cohesive" over nearly a decade of elections. Expert Rep. of Dr. Maxwell Palmer ("Palmer"), at 5 ¶ 16; Pls.' Mot. for Prelim. Inj. & Mot. in Supp. ("Mot."), ECF No. 56, at 7-8. Dr. Palmer also shows that Black voters' candidates of choice are regularly and repeatedly defeated by white bloc voting in districts where Black voters do not comprise a majority of eligible voters. Palmer at 5 ¶ 17, 24-25; Mot. 9-10. Courts have reached these same conclusions about racial voting patterns among Alabamians again and again. *See* Mot. 8-9.

Defendants do not challenge any of these conclusions. Instead, they claim that Plaintiffs improperly analyzed the state's AP BVAP population for *Gingles* 1 while using SR BVAP for their *Gingles* 2 and 3 analyses, Opp. 81, and insist that Plaintiffs "cannot argue one *Gingles* factor by reference to a particular minority group, only to recast the minority group in arguing another factor." Defs.' Br. at 51 (citing *Pope v. Cnty. of Albany*, 687 F.3d 565, 577 n.11 (2d Cir. 2012)). This argument misses the mark on every conceivable level.

As an initial matter, the legal proposition itself is dubious. In support, Defendants muster a footnote in a case decided in a separate circuit. *See Pope*, 687 F.3d at 577 n.11. And even then, the decision itself contains no analysis or conclusion on the second *Gingles* precondition. *See id.* at 577-78 (analyzing only first and third *Gingles* preconditions). Rather, after concluding that it "need not . . . consider" the relevant minority category for purposes of *Gingles* 1, the footnote in question goes on to discuss the debate between the use of "Any Part Black" or "DOJ Non-Hispanic Black" in satisfying the first *Gingles* precondition. *Id.* at 577 n.11. Buried in the last sentence of that lengthy footnote is dicta about use of the same metrics in a hypothetical *Gingles* 2 analysis (again, an analysis in which the court never actually engages), with a citation to a law review article theorizing that the "Any Part Black" metric "*may*" bear on a *Gingles* 2 analysis. *Id.* This is a thin reed indeed on which Defendants' entire *Gingles* 2 and 3 argument rests.

In any event, as a factual matter, Defendants' argument is plain wrong. Plaintiffs rely on the same population metric for each of the *Gingles* preconditions. As noted above, the Illustrative Plans satisfy the *Gingles* numerosity requirement using both AP BVAP *and* NH SR BCVAP, not just AP BVAP as Defendants assert. And it is this latter metric that underlies Plaintiffs' *Gingles* 2 and 3 analyses. Palmer at 2 ¶ 11. Mr. Cooper's reports *also* measure the NH SR BCVAP of each of his Illustrative Districts using the same data on which Dr. Palmer relies, demonstrating

that each of his proposed majority-minority districts have a NH SR BCVAP over 50%. ECF Nos. 48-16, 48-21, 48-26, 48-31, 48-36, 48-41; No. 65-1. Thus, Plaintiffs have established all three *Gingles* preconditions based on consistent use of the same metric. This alone resolves Defendants' challenge.

But even if Plaintiffs could only rely on AP BVAP to satisfy *Gingles* 1, Defendants' argument would still fail. As Mr. Cooper explained, the difference between the State's AP BVAP and SR BVAP populations is *de minimis*.[5] Analysis under either metric, therefore, effectively requires looking at the same populations. And indeed, Dr. Palmer's undisputed conclusions do not indicate that satisfaction of *Gingles* 2 and 3 hinges on the miniscule difference between AP BVAP and SR BVAP. To the contrary, racial polarization in Alabama is extreme, with more than 92% of Black voters voting for Black-preferred candidates and nearly 85% of white voters voting against them. Palmer at 5 ¶¶ 16-17. Defendants' myopic focus on the different categories of "Black" is thus irrelevant to the inquiry here.

### iii. The totality of circumstances shows HB 1 dilutes the voting strength of Black Alabamians in south and central Alabama.

When considered as a whole, the totality of circumstances makes clear that HB1 denies Black voters an equal voice in congressional elections. *Fayette Cnty.*, 775 F.3d at 1342 ("[I]t will be only the very unusual case in which the plaintiffs can

---

[5] The State's 2020 AP BVAP and its NH SR BVAP populations are separated by less than two percentage points. Cooper I at 6.

establish the existence of the three Gingles factors but still have failed to establish a violation of Section 2 under the totality of the circumstances." (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993))). This conclusion is particularly appropriate when focusing on the "most important" factors: success among Black candidates and racially polarized voting. *Gingles*, 478 U.S. at 51 n.15. Not only do those factors "point[] commandingly" in favor of liability here, *Fayette Cnty.*, 775 F.3d at 1347 n.9, each of the other relevant factors do as well.[6]

Defendants' attempt to place rose-colored lenses in front of Alabama's racialized politics simply ignores reality. Their opposition brief seeks, unsuccessfully, to poke holes in a small portion of Plaintiffs' evidence on each of the Senate Factors, but in doing so leaves the vast majority of Plaintiffs' evidence unrebutted. Defendants' overarching defense against the need for a second majority-Black congressional district in Alabama is that the statewide electorate largely consists of white voters who support the Republican party. *E.g.*, Opp. 92, 104. But just because Black voters are a minority of the electorate does not mean the State can run roughshod over Black voters' access to the political system.

---

[6] Defendants appear to suggest that the Court should disregard the Senate Factors because they "appear nowhere in the text of Section 2." Opp. 87. But controlling case law makes more than clear that the Senate Factors provide the authoritative roadmap for a Section 2 liability determination. *Wright*, 979 F.3d at 1306 ("The [district] court's [totality-of-the-circumstances] analysis . . . was guided, *as it ought to have been*, by the Senate Factors." (emphasis added)).

**Proportionality.** From the outset, Defendants' opposition ignores evidence relevant to Plaintiffs' claim. As Plaintiffs explain, HB 1 results in significant disproportionality by giving Black voters—who represent a quarter of the state's electorate—a say in just 14% of Alabama's congressional elections. Mot. 13-14.

Defendants say nothing about this fact. Instead, they offer a red herring assertion that the VRA does not require Alabama to provide Black voters proportional representation. Opp. 50, 114; *see* 52 U.S.C. § 10301(b). Plaintiffs have never suggested otherwise. But the Supreme Court has expressly instructed that proportionality is relevant to the Section 2 analysis*, see Johnson v. De Grandy*, 512 U.S. 997, 1021 (1994), and here, this is a "factor [that] weighs towards" liability, *Wright*, 301 F. Supp. 3d at 1323-24; *see also Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1049 (D.S.D. 2004) (finding "evidence of disproportionality" meant "this factor favors plaintiffs"); *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 281 F. Supp. 2d 436, 455-56 (N.D.N.Y. 2003) (considering "the disproportionality of the redistricting plan" and granting preliminary injunctive relief). Defendants' failure to so much as acknowledge the glaring disparity between the state's percentage of eligible Black voters and its percentage of Black-opportunity congressional districts speaks volumes.

HB 1's disproportionality is particularly relevant in light of 2020 Census data showing that, as has been the case for decades, Alabama's Black population is

growing while its white population shrinks. *See* Cooper I at 6, fig. 1. This trend makes the long-existing disproportionality in Alabama's congressional map increasingly difficult to justify. *See Bone Shirt*, 336 F. Supp. 2d at 1049 (emphasizing that the minority group was "rapidly increasing both their absolute numbers and share of the population").

*Factor One (History of Discrimination).* The State of Alabama's belief that it has "overcome its history" of centuries-long rampant and pervasive racial discrimination in the context of voting, Opp. 87, cannot minimize that history's impact on Black voters today. Aside from their assertion that the State's "most shameful actions" against Black voters are in the past, Defendants' opposition ignores almost the entirety of Plaintiffs' evidence relevant to this factor. It ignores that just a few years ago a federal court found that the State had engaged in intentionally discriminatory redistricting. Mot. 18. It ignores that discriminatory accusations of voter fraud by public officials continue to intimidate Black Alabamians out of exercising their fundamental right to vote. *Id.* at 19. It ignores that Black Alabamians today are haunted by racial violence intended to keep them politically and socially subjugated. *Id.* at 18-19. And it ignores a federal court's recent finding that "political exclusion through racism remains a real and enduring problem in this State" and racist "sentiments remain regrettably entrenched in the high echelons of state government." *United States v. McGregor*, 824 F. Supp. 2d

1339, 1347 (M.D. Ala. 2011).

Instead, Defendants attempt a response to just one item of Plaintiffs' evidence on this factor: the recent bailing-in of the City of Evergreen and the Jefferson County Board of Education under the VRA. *See* Mot. 17-18. According to Defendants, the Court should give these instances of discrimination limited weight because the governments forwent costly litigation and conceded their discriminatory practices violated federal law. Opp. 90-91. It would be illogical (and create perverse incentives) to give Alabama jurisdictions absolution over their discriminatory actions against minority voters so long as they admit fault once those minority voters spend resources to challenge such practices in federal court. Unsurprisingly, Defendants offer no authority suggesting that this is (or even should be) the case.[7]

In sum, Defendants' attempt to wave away centuries of discrimination that persist to the present day does nothing to undermine Plaintiffs' substantial evidence in support of the first Senate Factor. This factor weighs heavily in Plaintiffs' favor.

***Factor Two (Racially Polarized Voting).*** There can be (and, here, appears to be) no dispute that Black and white voters in Alabama are deeply divided in their candidates of choice. *Supra* Section II.A.ii. Because racially polarized voting is a

---

[7] Defendants are simply wrong in their claim that the Jefferson County Board of Education litigation did not involve VRA preclearance. Opp. 91. There, the district court ordered that, until 2032, the Board could implement "no changes to voting standards, practices, or procedures . . . unless or until [they] obtain the permission of the Court pursuant to 52 U.S.C. § 10302(c)," a direct citation to the VRA's bail-in provision. *Jones v. Jefferson Cnty. Bd. of Educ.*, No. 2:19-cv-1821-MHH, 2019 WL 7500528, at * 5 (N.D. Ala. Dec. 16, 2019).

basic fact of life in Alabama, the second Senate Factor weighs heavily in Plaintiffs' favor.

Defendants' argument that Alabama's racially polarized voting is of no moment because it also demonstrates a partisan pattern is both legally irrelevant and factually incorrect. Opp. 91. The Eleventh Circuit has never held that Section 2 requires a court to determine that voters are motivated by race when evaluating the existence of racially polarized voting. In fact, it has indicated the opposite, reversing a district court's decision that insisted a Section 2 plaintiff "indicate that race was an overriding or primary consideration in the election of a candidate." *City of Carrollton Branch of the NAACP v. Stallings*, 829 F.2d 1547, 1556 (11th Cir. 1987). In doing so, the court reiterated the *Gingles* plurality position on this issue: "[R]acially polarized voting, as it relates to claims of vote dilution, refers only to the existence of a correlation between the race of voters and the selection of certain candidates." *Id.* at 1557 (quoting *Gingles*, 478 U.S. at 74); *see also Gingles*, 478 U.S. at 73 ("All that matters under § 2 and under a functional theory of vote dilution is voter behavior, not its explanations."). Thus, "Plaintiffs need not prove causation or intent in order to prove a prima facie case of racial bloc voting and defendants may not rebut that case with evidence of causation or intent." *Carrollton NAACP*, 829 F.2d at 1557-58 (quoting *Gingles*, 478 U.S. at 74); *Askew v. City of Rome*, 127 F.3d 1355, 1382 (11th Cir. 1997) (Section 2 plaintiff need not "prove racism

determines the voting choices of the white electorate in order to succeed in a voting rights case").

The dicta that Defendants cite from *Solomon v. Liberty County Commissioners* did not alter Eleventh Circuit law on this issue. Opp. 85. That opinion's analysis focused on just two of the Senate Factors: the level of minority-candidate success and the tenuous justifications of the challenged electoral scheme. *See Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1228-34 (11th Cir. 2000) (en banc). In fact, the district court decision that the *Solomon* court affirmed had concluded that Section 2 liability is *not* dependent upon the subjective thoughts of voters. *See Solomon v. Liberty Cnty.*, 957 F. Supp. 1522, 1543 (N.D. Fla. 1997) (concluding "the presence or absence of racial bias within the voting community is not dispositive of whether liability has been established under Section 2").[8]

Defendants' theory that courts should be required to search the hearts and minds of voters when adjudicating Section 2 cases makes little sense. It would directly contradict Congress's explicit purpose in turning Section 2 into an entirely effects-based prohibition, which was to avoid "unnecessarily divisive [litigation] involv[ing] charges of racism on the part of individual officials *or entire*

---

[8] *Carrollton NAACP*'s position on this issue also remains unchanged following *SCLC of Alabama*, which merely held that alternative explanations for voting patterns can be *relevant* to the totality-of-circumstances analysis. 56 F.3d at 1292-94. It did not suggest any requirement that a Section 2 plaintiff prove a race-related cause of voting behavior or disprove potential non-racial causes.

*communities.*" S. Rep. No. 417, 97th Cong., 2s Sess. 36 (1982), U.S. Code Cong. & Admin. News 1982, p. 214 (emphasis added); *see also Solomon v. Liberty Cnty.*, 899 F.2d 1012, 1016 n.3 (11th Cir. 1990) (en banc) (Kravitch, J., specially concurring) (explaining this theory "would involve litigating the issue of whether or not the community as a whole was motivated by racism, a divisive inquiry that Congress sought to avoid by instituting the results test"). It would also erect an evidentiary burden that "would be all but impossible" for Section 2 plaintiffs to satisfy. *Gingles*, 478 U.S. at 73 (explaining the "inordinately difficult burden" this theory would place on plaintiffs (quotations omitted)); *Fayette Cnty.*, 950 F. Supp. 2d at 1321 n.29 (characterizing Defendants' theory as "unpersuasive," as it would make it "nearly impossible for § 2 plaintiffs because defendants could always point to some innocent explanation for the losing candidates' loss"); *Solomon*, 957 F. Supp. at 1545-46 (describing the "difficult, if not insurmountable" burden this requirement would impose on plaintiffs). "To accept this theory would frustrate the goals Congress sought to achieve by repudiating the intent test of *Mobile v. Bolden*, 446 U.S. 55 (1980), and would prevent minority voters who have clearly been denied an opportunity to elect representatives of their choice from establishing a critical element of a vote dilution claim." *Gingles*, 478 U.S. at 71.

In any event, this Court need not decide this question. Even under Defendants' theory, the record evidence confirms that voting in Alabama is racially polarized. As

then-Chief Judge Tjoflat—the champion of Defendants' theory—explained, under this theory it would be Defendants' burden to "affirmatively prove . . . that racial bias does *not* play a major role in the political community." *Nipper v. Smith*, 39 F.3d 1494, 1524-26 & nn.60, 64 (11th Cir. 1994) (opinion of Tjoflat, C.J.) (emphasis added).[9] Defendants have fallen woefully short of that burden. Their only evidence is the simple observation that the vast majority of Black Alabamians support Democratic candidates, while the vast majority of white Alabamians support Republican candidates. Opp. 92. But the mere existence of this partisan divide tells us nothing about *why* Black and white voters support candidates from those parties. As Dr. King explains, the modern party alignment to which Defendants point is the direct result of opposing stances the Democratic and Republican parties have taken on issues related to racial justice and civil rights. Expert Rep. of Dr. Bridgett King ("King I"), ECF No. 50, at 24-26 ¶¶ 71-75. Today, a significant driver of the division between Democratic and Republican voters are issues inextricably linked with race, both at the national level, King II at 7-8 ¶¶ 23(a)-(e), and within Alabama, Ex. 3 (Deposition of Senator Jim McClendon) at 104:18-106:25, 107:24-110:20 (discussing the general division among the parties in Alabama on the issues of the

---

[9] While his opinion is often referred to as the "plurality" opinion in *Nipper*, then-Chief Judge Tjoflat's discussion of this issue did *not* garner a plurality of judges. In fact, only one other judge joined this part of Chief Judge's Tjoflat's opinion. The remainder of the en banc court refused to join it either because it was unnecessary to reach the outcome of the case, *id.* at 1547 (Edmondson, J., concurring), or out of explicit disagreement, *id.* at 1548-57 (Kravitch, J., dissenting).

level of discrimination against Black Alabamians today, removal of confederate monuments, and criminal justice reform); Ex. 4 (Deposition of Representative Chris Pringle) at 121:5-125:3 (same). Indeed, race has become even more salient in Alabama's politics as of late, with support for and opposition to the Black Lives Matter movement emerging as a source of serious dispute among the major political parties.[10]

To be sure, issues unrelated to race may also contribute to the division between Democratic and Republican voters in Alabama today. But because those voters are also significantly divided on issues inextricably linked to race, Defendants cannot prove that racial considerations have *no* influence on voting patterns in Alabama simply by pointing to the general party preferences of Black and white voters.

Defendants get the law backwards in suggesting the recent election of a Black candidate in one Alabama State House district somehow disproves the existence of racially polarized voting in the entire state. Opp. 92-94. "Under Section 2, it is the status of the candidate as the chosen representative of a particular racial group, not

---

[10] *See, e.g.*, *Ala. Mayor Resigns After Post on Crimson Tide's BLM Video*, Assoc. Press (June 29, 2020), https://abcnews.go.com/Sports/wireStory/alabama-mayor-resigns-post-crimson-tides-blm-video-71509895; Jeff Eliasoph, *Commitment 2016: Candidates for US Congressional District 3 on Black Lives Matter*, WVTM (Nov. 1, 2016), https://www.wvtm13.com/article/commitment-2016-candidates-for-us-congressional-district-3-on-black-lives-matter/8075917#; Jeff Stein, *"Barack Obama is to blame": 13 Alabama Conservatives on Charlottesville*, Vox (Aug. 15, 2017), https://www.vox.com/policy-and-politics/2017/8/15/16148144/alabama-conservatives-on-charlottesville.

the race of the candidate that is important." *Carrollton NAACP*, 829 F.2d at 1557;

*see also id.* at 1558 (explaining "it is the race of the voter, not of the candidate, which

is of concern in racial polarization claims"); *Jenkins*, 4 F.3d at 1125. Unless

Defendants can prove that Black voters in District 73 joined white voters in

supporting Mr. Paschal—which they have not done—Mr. Paschal's election is

entirely irrelevant to this analysis.

More importantly, Defendants' suggestion that the election of a single

minority candidate by white voters in a single election demonstrates the absence of

racial bias in the statewide electorate is a deeply flawed assertion. *See Carrollton

NAACP*, 829 F.2d at 1560 ("According to the [Supreme] Court, the language of

Section 2 and its legislative history plainly demonstrate that proof that some minority

candidates have been elected does not preclude a § 2 claim."). As political science

scholarship demonstrates, white voters who harbor racially prejudiced views will

nonetheless support minority candidates under specific circumstances, such as when

the candidate makes clear he or she will not "threaten the racial hierarchy." King II

at 6-7 ¶¶ 20-22. Moreover, the overall number of ballots in Mr. Paschal's election

(less than 4,000), as well as his tiny margin of victory (63 votes), tells us nothing

about voters in Alabama statewide. "Using this example to extrapolate any

conclusion about white voting behavior in Alabama would be scientifically

unsound." *Id.* at 12 ¶ 30. That is particularly so considering the long list of Black

candidates who have lost in recent Republican primary races. *Id.* at 9-11 ¶ 29.

As has been the case for decades, Black and white voters in Alabama are deeply divided in their electoral choices, which leaves Black Alabamians unable to elect their candidates of choice unless they constitute a majority of voters. The reason for this division among Black and white voters is irrelevant to Section 2's effect-based inquiry. But even if it were relevant, Defendants have come nowhere close to showing that race has no impact on these entrenched voting patterns.

***Factor Three (Electoral Schemes).*** Alabamians are no strangers to electoral schemes that enhance opportunities for discrimination. Mot. 20-21. Defendants' discussion of this factor misconstrues the plain language of the Senate Report, which instructs courts to consider the use of electoral practices that "may enhance the opportunity for discrimination against the minority group." *Gingles*, 478 U.S. at 37. Defendants' suggestion that Alabama's primary majority-vote requirement—an enumerated example of a scheme falling within this factor—may not be the *product* of intentional discrimination by the State is thus irrelevant. Opp. 94. Moreover, Defendants' suggestion that Alabama's numbered-place requirement—also an expressly enumerated scheme under this factor—did not enhance the ability of white voters to defeat Black-preferred candidates is historically inaccurate. King I at 14

¶ 37.[11]

***Factor Five (Socioeconomic Disparities).*** Defendants do not appear to dispute that Black Alabamians lag behind their white counterparts in essentially every aspect of socioeconomic wellbeing. *See* Opp. 95-98. Nor could they. *See* Mot. 21-24. Instead, their opposition attempts to distract the Court with incorrect and irrelevant claims. Contrary to Defendants' position, Plaintiffs *have* offered evidence of depressed political participation. Between 2010 and 2018, Black turnout in Alabama lagged behind white turnout by an average of nearly 5%. Mot. 21. Instead of engaging with that fact, Defendants' opposition compares Alabama's turnout and registration data to that of *other states*, Opp. 97-98, 106-107, a direct contravention of the blackletter rule that the Section 2 analysis is "an intensely *local* appraisal," *Gingles*, 478 U.S. at 78 (emphasis added) (quoting *White v. Regester*, 412 U.S. 755, 769-70 (1973)). Section 2 does not provide Alabama a safe harbor simply because Black voters in other states also encounter barriers to political access.

As Defendants' own opposition explains, because Plaintiffs offered evidence of depressed Black political participation, they need not show that such depressed participation is caused by socioeconomic disparities. *See* Opp. 96 (citing *Wright*, 979

---

[11] The *Alabama NAACP* court's discussion cited by Defendants referred to Alabama's 1927 numbered-place requirement. 2020 WL 583803, at *54. The numbered-place laws to which Plaintiffs refer here came decades later and unquestionably limited the success of Black-preferred candidates. *See* King I at 14 ¶ 37.

F.3d at 1294). Regardless, Plaintiffs did present such evidence of causation. *See* Mot. 21-22 (citing expert and fact witness testimony of such causation). Defendants' only response—that this evidence is "not race-specific" and thus "applies to whites and blacks alike," Opp. 97—is illogical. Black Alabamians systematically experience lower socioeconomic status compared to their white counterparts; as a result, they disproportionately suffer the adverse effects that depressed socioeconomic circumstances have on political participation.

Finally, Defendants cannot seriously argue that the socioeconomic disparities Black Alabamians experience today are not the legacy of Alabama's history of racial discrimination, which pervaded every aspect of social and economic life for centuries. They offer no controlling authority suggesting Plaintiffs must demonstrate such causation. Indeed, Eleventh Circuit case law suggests the exact opposite. *See Wright*, 979 F.3d at 1306 (finding no clear error in district court's conclusion that this factor weighed in plaintiffs' favor despite no discussion by the district court of evidence showing socioeconomic disparities resulted from historical discrimination). Once again, Defendants' only response on this issue is to point to irrelevant circumstances in other states. Opp. 97-98; *contra Gingles*, 478 U.S. at 78.

**Factor Six (Racial Appeals).** Plaintiffs have set forth numerous examples of modern-day racial appeals that are emblematic of Alabama's racialized politics. Mot. 25-28. Defendants choose not to engage seriously with this evidence, simply

opining that it all "reach[es] too far." Opp. 99. Their opposition entirely ignores Plaintiffs' expert evidence that the modern campaign strategy of using subtle imagery and coded language to trigger racial anxieties is a direct descendent of the Southern Strategy and George Wallace's infamous pro-segregation speech. Mot. 25; *see Gingles*, 478 U.S. at 37 (noting that this factor looks to overt *or subtle* racial appeals"); *Holloway v. City of Va. Beach*, 531 F. Supp. 3d 1015, 1090-91 (E.D. Va. 2021) (discussing the ability of "coded language to trigger deeply seated racial stereotypes"). The racial appeals Plaintiffs identify in their motion—accusations of "a war on whites"; complaints regarding "problem[s]" caused by civil rights legislation; celebrations of confederate leaders and slave owners; mixed images of contemporary minority political leaders and violence; warnings of an "invasion" of dark-skinned immigrants—fit squarely within this strategy. *Id.* at 26-27.

Candidates in Alabama appeal to racial anxieties because it is a successful, time-tested campaign strategy. As Plaintiffs have explained, such appeals entrench the racial divide in the electorate, inuring to the benefit of those seeking the support of the white majority. *Id.* at 27-28.

*Alabama NAACP* does not provide Defendants the support they claim. There, plaintiffs offered evidence regarding just "two candidates"—a far cry from the evidence Plaintiffs offer here—leaving the record with little evidence that campaigns were characterized by racial appeals. *Ala. NAACP*, 2020 WL 583803, at *56. Indeed,

the relevant portion of that court's discussion of this factor *supports* Plaintiffs here: after reviewing Justice Tom Parker's ads (included as just one of the examples in Plaintiffs' motion here, Mot. 26-27), the court suggested they *did* contain racial appeals. *See Ala. NAACP*, 2020 WL 583803, at *56 (explaining that the ad's inclusion of Congresswoman Waters was motivated at least in part "to draw attention to race" and the "invasion" ad was "racially tinged").[12]

**Factor Seven (Underrepresentation in Elected Offices).** With extremely rare exceptions, Black candidates in Alabama have failed in the last century to win elections where white voters comprise a majority of the electorate. Mot. 28-29. In the jurisdiction at issue here—congressional elections—Black candidates in the last century have been completely shut out of districts where the majority of the electorate is white, including, most importantly, the congressional districts covering the area where Plaintiffs propose that a second majority-Black district be drawn. *Id.*

Defendants' only response is to offer irrelevant successes by Black candidates in the much smaller jurisdictions of state legislative districts. Opp. 101. But the Eleventh Circuit has explained that reliance on minority candidate success in jurisdictions smaller than that at issue is "obviously misplaced." *Carrollton NAACP*,

---

[12] More broadly, the *Alabama NAACP* court approached this factor with an unnecessarily narrow lens, focusing solely on racial appeals occurring in statewide judicial elections. *Id.* at *58. Respectfully, no principled basis supports, and no controlling authority requires, minimizing the effect that racial appeals in other races on the ballot have on overall voting behavior.

829 F.2d at 1560. That is particularly the case here, where almost all Black state legislators are elected from majority-Black districts. Mot. 28-29.

**Factor Eight (Unresponsiveness of Elected Officials).** Defendants' opposition does little to rebut Plaintiffs' evidence that Alabama officials are largely unresponsive to Black residents' needs. *See* Mot. 29-32. Defendants' attempt to recast the State's failure to expand Medicaid as a "political" decision, Opp. 104, cannot minimize the disproportionate harm that choice has had on Black Alabamians, *see* Mot. 29-30. Indeed, Alabama's refusal to enact a policy that would disproportionately better the lives of Black residents because the majority-white electorate wishes not to pay for it, Opp. 104, is precisely the sort of elected-official unresponsiveness relevant to this factor. As is the State's consistent rejection of the Black community's requests for a second congressional district in which they have even a reasonable chance of electing their candidate of choice. *See* Mot. 3-4.

As for the State's disastrous failure to protect Black Alabamians from COVID-19 at the outset of the pandemic, *see* Mot. 30-31, Defendants' response is that the State started doing better once its stark failures become a matter of national news coverage, Opp. 102-04. And Defendants' reference to the fact that Lowndes County currently has the highest vaccination rate is not an indication of the State's responsiveness to Black needs, but more indicative of *community-led* efforts to mobilize a community with a high distrust of government health initiatives rooted in

a moral failure to address Black needs in the first place.[13]

**Factor Nine (Tenuousness of Justification).** HB 1's failure to include a second majority-Black district lacks any substantial justification. Mot. 32. Defendants' response that HB 1 was the result of "the same common-place process previous Legislatures had used" is precisely what makes it tenuous. Opp. 105. In simply copying last cycle's congressional plan, the Legislature failed to account for population shifts in the last decade, which saw Black population increase and white population decrease. And as already explained, *supra* Section II.A.i.a, Defendants cannot properly rely on core preservation as a justification for HB 1's dilutive effects, Opp. 105, because that outcome directly contravenes the low priority that the Legislature gave that criterion when crafting its redistricting principles.

## B. Section 2 contains a private right of action.

Controlling precedent forecloses Defendants' argument that Section 2 does not contain a private right of action. As a majority of the Supreme Court has explained, "the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965." *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (Stevens, J.) (plurality opinion on behalf of two justices) (quoting S. Rep. No. 97-417, pt. 1, p. 30 (1982)); *see also id.* at 240 (Breyer, J.,

---

[13] *See* Debbie Elliott, *In Tuskegee, Painful History Shadows Efforts to Vaccinate African Americans*, NPR (Feb. 16, 2021), https://www.npr.org/2021/02/16/967011614/in-tuskegee-painful-history-shadows-efforts-to-vaccinate-african-americans.

concurring) (expressly agreeing with Justice Stevens on this point on behalf of three justices).[14] *Morse*'s statement that there is a private right of action under Section 2 is thus binding on this Court. Defendants' assertion also flies in the face of over 50 years of privately enforced Section 2 litigation. *E.g.*, *LULAC v. Perry*, 548 U.S. 399 (2006); *Hous. Lawyers' Ass'n v. Att'y Gen.*, 501 U.S. 419 (1991); *Gingles*, 478 U.S. 30; *Wright*, 979 F.3d 1282; *Carollton NAACP*, 829 F.2d 1547.

It is thus unsurprising that courts have unanimously rejected the argument that Section 2 lacks a private right of action. *See LULAC v. Abbott*, No. EP-21-cv-259-DCJ-JES-JVB, 2021 WL 5762035, at *1 (W.D. Tex. Dec. 3, 2021) (three-judge court) ("Absent contrary direction from a higher court, we decline to break new ground on this particular issue."); *Mi Familia Vota v. Abbott*, 497 F. Supp. 3d 195, 223 (W.D. Tex. 2020) ("This Court concludes Plaintiffs have a private cause of action to sue for violation of Section 2 of the Voting Rights Act."). As far as Plaintiffs' counsel is aware, no court has ever found that Section 2 lacks a private right of action.

The interplay between Section 2 and other provisions of the VRA confirms

---

[14] The Court reached this conclusion as an essential part of its rationale for holding that another provision of the VRA, Section 10, includes a private right of action. It explained: "[i]t would be anomalous, to say the least, to hold that both § 2 and § 5 are enforceable by private action but § 10 is not, when all lack the same express authorizing language." *Id.* at 232 (Stevens, J.) (emphasis added); *see also id.* at 240 (Breyer, J., concurring) (similar). "When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which [lower courts] are bound." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996).

this conclusion. *See* 52 U.S.C. §§ 10302, 10310. Section 3 authorizes certain remedies "[w]henever the Attorney General or an *aggrieved person* institutes a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment." *Id.* § 10302(a) (emphasis added); *see also id.* § 10302(b) (similar). This authorization makes sense only if "aggrieved person[s]" other than the Attorney General may indeed sue under "statute[s] to enforce the voting guarantees of the fourteenth or fifteenth amendment." *Id.* § 10302(a). And Section 2—even as amended in 1982—is just such a statute. *See Miss. Republican Exec. Comm. v. Brooks*, 469 U.S. 1002 (1984), *aff'g Jordan v. Winter*, 604 F. Supp. 807, 811 (N.D. Miss. 1984) (holding that the amended Section 2 is a valid exercise of "Congress's enforcement power under the fifteenth amendment"); *see also United States v. Blaine Cnty.*, 363 F.3d 897, 904-05 (9th Cir. 2004) (same). Section 3's recognition that private rights of action were available to enforce such statutes confirms that "Congress must have intended [those statutes] to provide private remedies." *Morse*, 517 U.S. at 234 (Stevens, J.) (plurality op.); *see also id.* at 240 (Breyer, J., concurring). Similarly, Section 14 authorizes attorneys' fees for "the prevailing party, other than the United States," in "any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment," *id.* (quoting 52 U.S.C. § 10310(e)), an authorization that assumes private parties may sue under statutes enforcing such guarantees, including Section 2.

Contrary to Defendants' assertion, the Supreme Court's decision in *Sandoval* does not permit this Court to deviate from *Morse*'s settling of this issue. Opp. 118-19 (citing *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001)). Where "a precedent of [the Supreme] Court has direct application in a case," even if it "appears to rest on reasons rejected in some other line of decisions, [lower courts] should follow the case which directly controls, leaving to th[e Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). *Sandoval*, which did not involve a claim under the VRA, did not overturn *Morse*'s conclusion that Section 2 provides a right of action. Thus, this Court remains bound by *Morse*.

If there was any doubt left as to whether Congress intended for individuals to be able to sue under Section 2, the legislative history forecloses it. *See Alabama v. United States*, 198 F. Supp. 3d. 1263, 1269 (N.D. Ala. 2016) (looking to legislative history to ascertain congressional intent to create implied cause of action). As the authoritative Senate Report to the 1982 VRA amendments explained: "the Committee reiterates the existence of the private right of action under section 2, as has been clearly intended by Congress since 1965." S. Rep. 97-417 (1982), 30; *see also* H.R. Rep. No. 97-227 (1981), 30 ("It is intended that citizens have a private cause of action to enforce their rights under Section 2.").

This Court should reject Defendants' invitation to be the first to violate

binding precedent and conclude Section 2 provides no private right of action.

**C.      The remaining preliminary injunction factors weigh heavily in favor of relief.**

Defendants appear not to dispute that a Section 2 violation works an irreparable harm to minority voters such as Plaintiffs. Mot. 33. Nor do they appear to dispute that a government and the public have no interest implementing policies that dilute minority voting strength. *Id.* at 33-34. After all, an injunction protecting "Plaintiffs' [statutory] franchise-related rights is without question in the public interest." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005) (affirming preliminary injunction against violation of the National Voter Registration Act).

Defendants instead resort to hyperbole regarding the feasibility of this Court's vindicating Alabama voters' rights and preventing dilution of the Black community's voting strength in the 2022 elections. As an initial matter, denying preliminary relief simply because the first election of this redistricting cycle is approaching would create a perverse incentive for states seeking to delay judicial review of their districting plans. States could avoid judicial review for the election immediately following each Census simply by delaying enactment of those plans until it is "too late" for a court to provide redress. States do not enjoy such a free pass from complying with federal law.

In any event, this Court has plenty of time and authority to ensure that

Alabama effectively implements a lawful map during next year's elections. It took the State *nine days* to enact HB 1. The Legislature begins its new session in just a few weeks.[15] The primary election is not scheduled to occur for nearly six more months. And because Plaintiffs in this case and *Milligan* have offered a plethora of potential remedial plans, altering HB 1 to resolve its legal defect would take little time. Any "inconvenience" legislators face in having to fix an unlawful plan they enacted just a few months ago "does not rise to the level of a significant sovereign intrusion." *Covington v. North Carolina*, 270 F. Supp. 3d 881, 895 (M.D.N.C. 2017).

Defendants' concerns regarding the administrative burden of implementing a new congressional plan in time for next year's elections, Opp. 125-28, are simply overblown. As Defendants admit, absentee ballots and supplies need not be delivered until the end of March. Opp. 127. And to the extent the State's administrative apparatus needs more time to implement a remedial plan, this Court holds unquestionable authority to "extend the time limitations imposed by state law." *Sixty-Seventh Minn. State Senate v. Beens*, 406 U.S. 187, 201 n.11 (1972); *see Larios v. Cox*, 305 F. Supp. 2d 1335, 1343 (N.D. Ga. 2004) (noting this power and ordering new statewide maps be drawn in time for upcoming primary election). The 116-day period that Alabama law sets between its candidate filing deadline and primary

---

[15] *See* Ala. Legis., Regular Session 2022, http://alisondb.legislature.state.al.us/alison/default.aspx (indicating the 2022 Regular Session begins on January 11).

election is among the longest in the country.[16] Extending that deadline by just a short period would cause little if any disruption to the upcoming elections. Finally, while candidates and organizations might encounter sunk costs if congressional district lines are redrawn, Opp. 123-24, that harm is outweighed by the irreparable injury Black voters "would suffer by way of vote dilution," *Fayette Cnty.*, 118 F. Supp. 3d at 1348.

By enacting a lawful plan in the first place, Alabama could have avoided whatever administrative costs it fears will result from readjusting its congressional district lines at this point. Because it chose instead to enact a map that dilutes Black Alabamians' voting strength, it must bear the administrative cost necessary to vindicate those voters' rights.

## III. Conclusion

The Court should preliminarily enjoin HB 1's implementation prior to the 2022 elections.

---

[16] *See* Nat'l Conf. of State Legis., 2022 State Primary Election Dates & Filing Deadlines (Dec. 8, 2021), https://www.ncsl.org/research/elections-and-campaigns/2022-state-primary-election-dates-and-filing-deadlines.aspx.

Dated: December 27, 2021

Respectfully submitted,

By /s/ *Abha Khanna*

Richard P. Rouco
(AL Bar. No. 6182-R76R)
**Quinn, Connor, Weaver, Davies & Rouco LLP**
Two North Twentieth
2-20th Street North, Suite 930
Birmingham, AL 35203
Phone: (205) 870-9989
Fax: (205) 803-4143
Email: rrouco@qcwdr.com

Abha Khanna*
**Elias Law Group LLP**
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
Phone: (206) 656-0177
Email: AKhanna@elias.law

Lalitha D. Madduri*
Daniel C. Osher*
Joseph N. Posimato*
Olivia N. Sedwick*
**Elias Law Group LLP**
10 G St. NE, Suite 600
Washington, D.C. 20002
Phone: (202) 968-4518
Email: LMadduri@elias.law
Email: DOsher@elias.law
Email: JPosimato@elias.law
Email: OSedwick@elias.law

*Attorneys for Plaintiffs*
*\*Admitted Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 27, 2021, a copy of the foregoing was filed with the Clerk of Court using the CM/ECF system, which will provide electronic notice of filing to all counsel of record.

_/s/ Abha Khanna_
Abha Khanna
Counsel for Plaintiffs