FILED

2021 Dec-27  PM 09:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 3

**In The Matter Of:**

**Evan Milligan,et al v. John H.Merrill, et al.**

---

Jim McClendon

*December 17, 2021*

---

US Legal

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

```
 1            UNITED STATES DISTRICT COURT
 2        FOR THE NORTHERN DISTRICT OF ALABAMA
 3
 4
 5
 6 EVAN MILLIGAN, et al.,  )
 7                         )      CIVIL CASE NO.
 8      Plaintiffs,        )    2:2021-CV-01530-AMM
 9 VS.                     )   VIDEO DEPOSITION OF:
10 JOHN MERRILL, et al.,   )    JAMES McCLENDON
11                         )
12      Defendants.        )
13
14
15
16         S T I P U L A T I O N S
17        IT IS STIPULATED AND AGREED, by and between
18 the parties through their respective counsel, that
19 the deposition of:
20            JAMES McCLENDON,
21 may be taken before LeAnn Maroney, Notary Public,
22 State at Large, at the law offices of Balch &
23 Bingham, 105 Tallapoosa Street, Montgomery, Alabama,
24 36104, on December 17, 2021, commencing at 1:57 p.m.
25
                                              Page 1
```

```
 1        IT IS FURTHER STIPULATED AND AGREED that the
 2 signature to and reading of the deposition by the
 3 witness is waived, the deposition to have the same
 4 force and effect as if full compliance had been had
 5 with all laws and rules of Court relating to the
 6 taking of depositions.
 7
 8        IT IS FURTHER STIPULATED AND AGREED that it
 9 shall not be necessary for any objections to be made
10 by counsel to any questions, except as to form or
11 leading questions, and that counsel for the parties
12 may make objections and assign grounds at the time
13 of the trial, or at the time said deposition is
14 offered in evidence, or prior thereto.
15
16
17                   ***
18
19
20
21
22
23
24
25
                                              Page 2
```

```
 1            A P P E A R A N C E S
 2
 3 FOR THE MILLIGAN PLAINTIFFS:
 4        MICHAEL L. TURRILL
 5        Attorney at Law
 6        Hogan Lovells US LLP
 7        1999 Avenue of the Stars, Ste. 1400
 8        Los Angeles, California  90067
 9        michael.turrill@hoganlovells.com
10
11        KATHRYN SADASIVAN
12        Attorney at Law
13        NAACP Legal Defense & Educational Fund
14        40 Rector Street, FL 5
15        New York, New York  10006
16        ksadasivan@naacpldf.org
17
18        DEUEL ROSS (Via Zoom)
19        Attorney at Law
20        NAACP Legal Defense & Educational Fund
21        700 14th Street N.W., Ste. 600
22        Washington, DC  20005
23        dross@naacpldf.org
24
25
                                              Page 3
```

```
 1        JULIE A. EBENSTEIN
 2        Attorney at Law
 3        American Civil Liberties Union Foundation
 4        125 Broad Street
 5        New York, New York  10004
 6        jebenstein@aclu.org
 7
 8        KAITLIN WELBORN
 9        Attorney at Law
10        American Civil Liberties Union of Alabama
11        P.O. Box 6179
12        Montgomery, Alabama  36106
13        kwelborn@aclualabama.org
14
15 FOR THE CASTER PLAINTIFFS: (Via Zoom)
16        DAN OSHER
17        Attorney at Law
18        Elias Law Group
19        10 G Street NE, Ste. 600
20        Washington, DC  20002
21        dosher@elias.law
22
23
24
25
                                              Page 4
```

Evan Milligan,et al v. John H.Merrill, et al.                    Jim McClendon
                                                                    12/17/2021

1 FOR DEFENDANT JOHN H. MERRILL:

2      JIM DAVIS

3      Assistant Attorney General

4      Office of the Attorney General

5      501 Washington Avenue

6      Montgomery, Alabama  36130

7      jim.davis@alabamaag.gov

8

9 FOR THE DEFENDANTS JAMES McCLENDON & JAMES

10 McCLENDON:

11     DORMAN WALKER

12     Attorney at Law

13     Balch & Bingham

14     105 Tallapoosa Street, Ste. 200

15     Montgomery, Alabama  36104

16     dwalker@balch.com

17

18

19 ALSO PRESENT:

20     Paige Ali, Videographer

21

22

23

24

25
                                                          Page 5

1              I N D E X

2 MS. SADASIVAN:   9-103

3 MR. OSHER:      104-111

4 MR. DAVIS:      111-114

5

6

7        E X H I B I T   L I S T

8                                              PAGE

9 Plaintiff's Exhibit 1 -              35

10 (Talk points)

11 Plaintiff's Exhibit 2 -             36

12 (2011 reapportionment guidelines)

13 Plaintiff's Exhibit 3 -             47

14 (Montgomeryadvertiser.com)

15 Plaintiff's Exhibit 4 -             61

16 (Public hearing schedule)

17 Plaintiff's Exhibit 5 -             64

18 (2021 reapportionment guidelines)

19 Plaintiff's Exhibit 6 -             76

20 (Transcript of October 26, 2021)

21 Plaintiff's Exhibit 7 -             94

22 (Transcript of November 3, 2021)

23 Plaintiff's Exhibit 8 -            100

24 (Hall request for additional meetings)

25
                                                          Page 6

1              I, LeAnn Maroney, a Court Reporter of

2 Birmingham, Alabama, and a Notary Public for the

3 State of Alabama at Large, acting as commissioner,

4 certify that on this date, pursuant to the Federal

5 Rules of Civil Procedure and the foregoing

6 stipulation of counsel, there came before me on

7 December 17, 2021, JAMES McCLENDON, witness in the

8 above cause, for oral examination, whereupon the

9 following proceedings were had:

10                     * * * * *

11              THE VIDEOGRAPHER:  This marks the

12 beginning of the deposition of Jim McClendon in the

13 matter of Evan Milligan, et al., versus John H.

14 Merrill, et al., Civil Case Number 2:21-CV-01530-AMM

15 filed in the United States District Court for the

16 Northern District of Alabama.  The date is December

17 17, 2021.  The time is 1:57 p.m.

18              All attorneys present, will you please

19 state your names and whom you represent.

20              MR. DAVIS:  Jim Davis, Alabama Attorney

21 General's Office, for Secretary of State John

22 Merrill.

23              MR. WALKER:  Dorman Walker, Balch &

24 Bingham, for Senator Jim McClendon.

25              MS. SADASIVAN:  This is Kathryn
                                                          Page 7

1 Sadasivan for plaintiffs Evan Milligan, Shalela

2 Dowdy, Letetia Jackson, Greater Birmingham

3 Ministries, and the NAACP of Alabama.

4              I'm still having trouble hearing you

5 all, though.  The audio is going out.  Are you able

6 to move the place where -- anything towards the

7 witness, a phone, audio of some sort?

8              (Discussion held off the record.)

9              THE VIDEOGRAPHER:  Okay.  The attorneys

10 that are on Zoom, if you'll do your introductions.

11              MR. TURRILL:  Michael Turrill of Hogan

12 Lovells on behalf of the Milligan plaintiffs.

13              MR. ROSS:  Deuel Ross for the Milligan

14 plaintiffs.

15              MR. OSHER:  Dan Osher for the Caster

16 plaintiffs.

17              MS. EBENSTEIN:  Julie Ebenstein for the

18 Milligan plaintiffs.

19              THE VIDEOGRAPHER:  Do you want to swear

20 him in?

21              JAMES McCLENDON,

22 having been duly sworn, was examined and testified

23              as follows:

24              THE REPORTER:  Usual stipulations?

25              MR. WALKER:  Meaning that the only
                                                          Page 8

Evan Milligan,et al v. John H.Merrill, et al.                    Jim McClendon
                                                                  12/17/2021

1 objections that need to be made are to the form of
2 the question.  Yes, Katherine?
3            MS. SADASIVAN:  Yes.
4            THE VIDEOGRAPHER:  We are off the
5 record.  The time is 1:59 p.m.
6            (Recess was taken.)
7            THE VIDEOGRAPHER:  We are back on the
8 record.  The time is 2:04 p.m.
9 EXAMINATION BY MS. SADASIVAN:
10 Q.         Good afternoon, Mr. McClendon.  My name
11 is Kathryn Sadasivan and I work for the NAACP Legal
12 Defense & Educational Fund.  I represent the
13 plaintiffs in this case, Milligan versus Merrill.
14 Thank you for making yourself available for today's
15 deposition.
16            Do you understand that you're here today
17 because you've been served with a notice of
18 deposition and you are a defendant in Milligan
19 versus Merrill in your official capacity as cochair
20 of the Alabama permanent legislative committee on
21 reapportionment?
22 **A.        I do.**
23 Q.         Before going any further, can you please
24 state and spell your name for the record?
25 **A.        James H. McClendon, M-c-C-L-E-N-D-O-N.**
                                                    Page 9

1 Q.         And your first name, as well, please.
2 **A.        J-A-M-E-S.**
3 Q.         Have you ever been deposed before?
4 **A.        Yes.**
5 Q.         When?
6 **A.        Roughly ten years ago during**
7 **redistricting last time.**
8 Q.         And what was your role in the
9 litigation?
10 **A.        I was house chairman of redistricting at**
11 **that time.**
12 Q.         Were you a defendant?
13 **A.        Yes.**
14 Q.         Were you -- have you been involved in
15 any other cases?
16 **A.        Any?  No.**
17 Q.         You are sworn and under oath.  Do you
18 understand that for purposes of my questioning, you
19 must testify truthfully and as completely as
20 possible as though we were before a judge in a
21 courtroom?
22 **A.        Yes.**
23 Q.         Is there any reason you cannot give
24 truthful and complete testimony today?
25 **A.        No.**
                                                    Page 10

1 Q.         Are you taking any medication that might
2 affect your ability to understand the questions that
3 I ask or provide answers to those questions?
4 **A.        No.**
5 Q.         Do you have any condition that would
6 affect your ability to understand the questions that
7 I ask and provide answers to the questions?
8 **A.        No.**
9 Q.         Do you understand that today's
10 deposition is being conducted via web
11 videoconference?
12 **A.        Yes.**
13 Q.         Do you understand that a court reporter
14 is transcribing this deposition, meaning that they
15 are writing down everything that you, your counsel,
16 and I say today?
17 **A.        Yes.**
18 Q.         It's important that all of your answers
19 are verbal.  This will allow the court reporter to
20 record our statements.  The court reporter won't be
21 able to record gestures or nodding.  Do you
22 understand?
23 **A.        I do.**
24 Q.         Likewise, it's important that we don't
25 speak over one another.  I will wait until you
                                                    Page 11

1 finish your answer, and I ask that you please wait
2 until I finish my question before answering.  Do you
3 understand?
4 **A.        I do.**
5 Q.         If you don't understand a question that
6 I ask, please just let me know, and I'll rephrase
7 it.  If at any point you recall additional
8 information that is responsive to a question that I
9 asked you earlier, please let me know, and I will
10 allow you to clarify the record.  Do you understand?
11 **A.        I do.**
12 Q.         Please do not guess or assume when
13 answering.  Be sure to state only that which you
14 know to be true based on your personal knowledge.
15 Will you do that?
16 **A.        Yes.**
17 Q.         You may hear your attorney, Mr. Walker,
18 object to a question from time to time.  His
19 objections are being made for the record, and you
20 are still required to answer my question unless you
21 are instructed by your attorney not to answer.  Do
22 you understand?
23 **A.        I'm not sure about that.  Maybe say it**
24 **again.  Let me hear you say that one more time.**
25 Q.         You may hear your attorney object to a
                                                    Page 12

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 question from time to time throughout this
2 deposition.  Those objections are made largely for
3 the record.  And you understand you are still
4 required to respond to my question unless you are
5 instructed by your attorney not to?
6 **A.        Okay.**
7 Q.          Do you understand that?
8 **A.        I've got it.**
9 Q.          Is that a yes?
10 **A.       Yes.**
11 Q.         Thank you.
12            Since we're conducting this deposition
13 remotely and we're not together in the same room, I
14 ask that you please keep your cell phone off unless
15 we are on a break.  Can you do that?
16 **A.       I understand.**
17 Q.         Please don't refer to any documents or
18 other materials during our conversation today.  Will
19 you do that?
20 **A.       Did you say don't refer to any materials**
21 **or documents today?  Is that what you said?**
22 Q.         Do you have any documents with you?
23 **A.       I do not.**
24            MR. WALKER:  Oh, did you mean don't look
25 at any documents?
                                                    Page 13

1 Q.          Do you have any -- if you don't have any
2 documents with you, please don't look at any
3 documents other than those that I will give you.  Do
4 you understand that?
5 **A.        I do.**
6 Q.          Thank you.  Sorry for all the
7 preparatory language.
8            Finally, if you need a break at any
9 time, please just let me know.  If there's a
10 question pending, I just ask that you answer that
11 question before going on a break.  Do you
12 understand?
13 **A.       I do.**
14 Q.         Thank you.
15            I'm going to ask you some background
16 questions to get to know you a little bit better.
17            What is your date of birth?
18 **A.       1-10-43.**
19 Q.         That's January 10, 1943?
20 **A.       Correct.**
21 Q.         What's your address?
22 **A.       361 Jones Road, Springville, Alabama.**
23 Q.         And your telephone number?
24 **A.       (205)999-8096.**
25 Q.         Is that a mobile phone number?
                                                    Page 14

1 **A.        Correct.  Yes, it is.**
2            MR. WALKER:  Kathryn, can I ask that
3 this personal information be redacted with anything
4 you file with the court?
5 Q.          Do you have any other phone numbers?
6 **A.        Well, I do have a phone in my office in**
7 **the Alabama state house, but I'm not sure what the**
8 **number is.**
9 Q.          Do you have an email account?
10 **A.       I do.  I have two.**
11 Q.         And what are they?
12 **A.       My personal email is**
13 **jimmcc@windstream.net.  My senate email is**
14 **jim.mcclendon@alsenate.gov.**
15 Q.         Do you have any personal social media
16 accounts?
17 **A.       Facebook, yes.**
18 Q.         You just have a Facebook account?
19 **A.       Correct.**
20 Q.         No Twitter?
21 **A.       No Twitter.**
22 Q.         And where were you born?
23 **A.       Mobile, Alabama.**
24 Q.         And where did you go to high school?
25 **A.       Springville, Alabama.**
                                                    Page 15

1 Q.          Where did you go to college?
2 **A.        My undergraduate degree is from**
3 **Birmingham Southern College in Birmingham, and my**
4 **doctorate is from the University of Houston,**
5 **Houston, Texas.**
6 Q.          And what is your doctorate in?
7 **A.        Optometry.**
8 Q.          And what courses did you take at
9 Birmingham Southern?
10 **A.       Just pretty much premed-type courses.**
11 Q.         And have you studied anywhere else?
12 **A.       No, other than continuing education**
13 **courses required to maintain my optometry license.**
14 Q.         So you are an optometrist?
15 **A.       Correct.  Yes, I am.**
16 Q.         Have you -- are you married?
17 **A.       I am.**
18 Q.         How long have you been married?
19 **A.       26 years.**
20 Q.         Congratulations.
21            Do you have kids?
22 **A.       I do.**
23 Q.         How many?
24 **A.       One child.**
25 Q.         One child.  And how old are they?
                                                    Page 16

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1  A.      She is 50.

2  Q.      And what does she do for a living?

3  A.      A school teacher.

4  Q.      In Alabama?

5  A.      Yes.

6  Q.      Where?

7  A.      In the Jefferson County system.

8  Q.      And where do you work?

9  A.      I'm a -- I'm retired from optometry.

10 Q.      So you are not employed currently?

11 A.      As an optometrist, no, I am not.

12 Q.      Are you employed anywhere currently?

13 A.      Only as an Alabama senator.

14 Q.      So you're working as an Alabama senator?

15 A.      Well, I am a senator, and we do work

16 from time to time.

17 Q.      Are you paid?

18 A.      Yes.

19 Q.      Do you know why you're here today?

20 A.      Yes.

21 Q.      Why?

22 A.      A lawsuit concerning redistricting that

23 we just completed in the Alabama legislature.

24 Q.      Did you read the complaint in the case

25 in which you're sitting for a deposition today?

                                          Page 17

1  A.      I didn't quite understand.  Did you say

2  will you read or did you read?

3  Q.      Did you read.

4  A.      I have not read it, no.

5  Q.      Do you know what the case is about?

6  A.      Yes.  This case has to deal with the

7  congressional districts.

8  Q.      Are you represented by counsel today?

9  A.      I am.

10 Q.      Who is your counsel?

11 A.      Dorman Walker.

12 Q.      And how did you prepare for this

13 deposition today?

14 A.      I came in yesterday and we met for a

15 couple of hours and we sort of talked about how this

16 works and what to expect.  But that was the only

17 preparation.

18 Q.      And who is "we"?

19 A.      Jim Davis was here and Chris --

20 Representative Pringle was here and I was here.  So

21 it was four of us present.

22 Q.      So you -- the only preparation you did

23 for this deposition was to meet with Chris Pringle,

24 Jim Davis, and Mr. Walker yesterday for a few hours?

25 A.      That is correct.

                                          Page 18

1  Q.      Did you review any documents?

2  A.      Yes.

3  Q.      Which documents?

4  A.      There were two.  Actually, I can't say I

5  reviewed them.  I looked at the cover.  One of them

6  had to do with the notes -- the bullet points we

7  used on the floor, in my case on the floor of the

8  senate.

9          And the other one -- I can't even

10 remember what the other one was.  But I gave them

11 back to my attorney.  I didn't take them home and

12 read them or study them.

13 Q.      So I am going to try to drop in the chat

14 a document that I'll ask the court reporter to mark

15 as Exhibit 1.  And I can show it on my screen, as

16 well.

17          Is this the document that you reviewed

18 in advance of your deposition today?  Let me share

19 my screen.

20          Senator McClendon, is this the document

21 that you were referring to?

22 A.      I really can't read that.  I see talking

23 points -- okay.  Scroll it up and let me see it.

24 Well, that looks similar.  I don't know if that's

25 exactly the same document.  But that's sort of the

                                          Page 19

1  format that was used.

2  Q.      I'll represent that this was produced in

3  this litigation and that I have given it to the

4  court reporter and hopefully you also have a copy.

5          And what was this document?

6  A.      What you and I were just discussing was

7  talking points that I was provided by our attorney

8  when the issue of the congressional map came before

9  the senate as a body.

10 Q.      And who gave you this document?

11 A.      Pardon?

12 Q.      Who gave that document to you?

13 A.      One of the staff members of the

14 redistricting -- not committee, but the

15 redistricting department there in the state house.

16 Q.      What is the difference between the

17 redistricting committee and the redistricting

18 department?

19 A.      Well, the redistricting office is

20 staffed by state employees.  And the redistricting

21 committee is composed of elected senators and

22 representatives.

23 Q.      So you were given this document when?

24 A.      Well, prior to it going on the floor for

25 debate, and not much sooner than that.

                                          Page 20

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 Q.          Prior to what going on the floor for
2 debate?
3 A.          The congressional bill.
4 Q.          And do you remember when that was?
5          MR. WALKER:  Hang on.  Kathryn, when you
6 say "this document," are you talking about Talking
7 Points for Likely Issues No. 1?  Or are you talking
8 about the collection of talking points?
9 Q.          Well, does that change your answer?
10 A.          Well, I don't think it does.  I got that
11 prior to the bill going on the floor for debate.  In
12 fact, I may have gotten it prior to the committee --
13 the standing committee meeting.  That would -- that
14 would make sense.
15 Q.          And what standing committee meeting are
16 you talking about?
17 A.          The bills that -- the redistricting
18 committee is considered an interim committee.  And
19 the bills that come out of interim committees must
20 go to a standing committee before they can go to
21 rules in order to get on the floor.
22          So there was a standing committee --
23 which happened to be general fund -- that was
24 handling not only a general fund bill but all the
25 redistricting bills, as well.  So that would have

Page 21

1 been the standing committee that this bill went to
2 after it came to the senate from the house.
3 Q.          You said you reviewed the talking points
4 that we discussed.  And what else before this
5 deposition?
6 A.          What did I review?  Well, no.  The
7 talking points was the -- that was the purpose of
8 having the talking points, is I had a summary of the
9 main points that needed to be shared with the
10 standing committee members so they would be able to
11 vote however they wanted to.
12 Q.          I'm sorry.  I meant -- just going back,
13 what documents other than this talking points did
14 you look at to prepare for this deposition today?
15 A.          Well, I looked at a number of documents
16 during the process of the bill going through the
17 redistricting committee.  But there wasn't anything
18 in particular that I did to review that prior to the
19 meeting of the standing committee.  They were all
20 summarized.  So --
21 Q.          For this deposition, though, you
22 mentioned that you met yesterday with Mr. Davis,
23 Mr. Walker, and Mr. Pringle and that you looked at
24 several documents.
25 A.          Yes.

Page 22

1 Q.          Besides the talking points, what other
2 documents did you look at?
3 A.          It may have been a summary of this
4 lawsuit.  But I'm not -- Kathryn, I'm really not --
5 I really don't remember what it was.  I didn't pay
6 much attention to it.
7 Q.          You say "a summary of this lawsuit."
8 Would you mind giving me a summary of this lawsuit?
9 A.          I can't do it.  Sorry.  I wish I could.
10 Q.          You testified earlier that you were a
11 party to a lawsuit in the last redistricting cycle;
12 is that correct?
13 A.          Correct.
14 Q.          Was that a redistricting case?
15 A.          Yes.
16 Q.          And you were deposed?
17 A.          Yes.
18 Q.          Did you testify at trial?
19 A.          I'm sorry.  I didn't understand you.
20 Q.          Sorry.  Did you testify at trial?
21 A.          Yes.
22 Q.          And what was that case about?
23 A.          That case, I believe, was -- legislative
24 was the target, not congressional.  The issue was --
25 Q.          And when you say --

Page 23

1 A.          I'm sorry.
2 Q.          I'm sorry.
3 A.          It's my turn?
4          My point is that case was not
5 congressional.  That had do with house and senate
6 districts.
7 Q.          And when you say "the target," you mean
8 what?
9 A.          That the object, the goal of the case
10 was to challenge the way house and senate districts
11 were drawn.
12 Q.          And do you remember under what law those
13 were challenged?
14 A.          No.
15 Q.          So let's talk about your career in
16 public service.  When were you first elected to
17 public office?
18 A.          2001.
19 Q.          And what were you elected -- where were
20 you elected?
21 A.          What or where?  Which one do you want?
22 I was elected --
23 Q.          What district (inaudible.)
24 A.          Alabama house of representatives, House
25 District 50.

Page 24

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 Q.         And did you run as a -- with the support
2 of a political party?
3 A.         Well, there was a primary with
4 republican -- I don't think the republican party
5 endorsed any of the republican candidates.
6 Q.         You ran as a republican?
7 A.         Yes, I did.
8 Q.         Why did you run as a republican?
9 A.         Why did I run as a republican?  Is that
10 what you said?
11 Q.         Yes, sir.
12 A.         Because I am a republican.
13 Q.         What does it mean to be a republican?
14 A.         I would say the first word that comes to
15 mind would be "conservative."  And that would be
16 socially conservative and fiscally conservative.
17 Q.         And when you say "socially
18 conservative," what do you mean?
19 A.         It has to do with policies that we make
20 that are conservative in nature.
21 Q.         And what is a policy that is
22 conservative in nature?
23 A.         I would say one of the things that
24 conservatives believe in is law and order.
25 Q.         Okay.  So how long did you serve in

Page 25

1 house district 50?
2 A.         I served three four-year terms.  I went
3 into office -- well, I went into office in 2021.  So
4 three four-year terms.
5 Q.         And are you currently a member of the
6 house of representatives?
7 A.         No.  I'm a member of the Alabama senate.
8 Q.         And when were you first elected to the
9 Alabama senate?
10 A.         It must have been '14.  Yeah, 2014.
11 Q.         Prior to --
12 A.         Your turn.
13 Q.         I'm so sorry.  I said don't cut each
14 other off, and I'm cutting you off.  I'm sorry.
15 A.         I answered your -- 2014, which is the
16 answer to the question.
17 Q.         Thank you.  Sorry again.
18          What legislative committees have you
19 served on during your very long tenure in the
20 Alabama legislature?
21 A.         Well, in the senate, I'm currently on
22 the health committee, I am on the general fund
23 committee, I am on the education trust fund
24 committee, and I am on education policy.  And I
25 chair the health committee.

Page 26

1 Q.         Those are all of the committees that you
2 have ever served on?
3 A.         No.  No.  In the house, I served on
4 several different committees over three terms.  And,
5 of course, I served on redistricting, as well, ten
6 years ago and became -- and was house chair of
7 redistricting.
8 Q.         And when you say "redistricting," you
9 mean the permanent -- the Alabama legislative
10 committee on reapportionment?
11 A.         That's exactly what I mean.
12 Q.         Okay.  So if I say redistricting for the
13 reapportionment committee or if you say those
14 things, you mean the permanent committee on
15 reapportionment?
16          Is that a yes?
17 A.         You know, there's a little difference in
18 there.  During the interim years when there's not
19 redistricting activity going on, there is a
20 permanent redistricting committee composed of three
21 members of the house and three of the senate.
22          And then as we approach the
23 redistricting time period where the activity goes
24 up, then -- then it converts over to 11 and 11 for
25 the actual process.

Page 27

1 Q.         That makes sense.  So it's the same
2 committee, just getting bigger or larger or smaller
3 based on the time period?
4 A.         Correct.
5 Q.         What was your role in Alabama's 2011
6 redistricting process?
7 A.         I was house chairman.
8 Q.         And what are the responsibilities of the
9 house chairman for redistricting?
10 A.         Well, part of -- essentially part of a
11 leadership team that makes preparations for the
12 actual process, meets with the attorney and can meet
13 with the person that draws the maps, and begins
14 discussions and review, for example, of our
15 guidelines to see if they need to be updated or
16 changed, and also help time the scheduling of the
17 actual meeting of the full redistricting committee.
18 Q.         Do you have any other responsibilities?
19 A.         No.  I think that pretty well summarizes
20 it.  I'm sure there's some other things that we do
21 that are not big items.  But I think that summarizes
22 the things worth discussing.
23 Q.         And when you said you meet with the
24 attorney and you -- as the cochair, you meet with
25 the attorney and you meet with the person who draws

Page 28

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 the map, what do you -- what do you do during those
2 meetings?  Or what is your role during those
3 meetings?
4              MR. WALKER:  I'll instruct you not to
5 discuss anything that I may have told you or you may
6 have told me during those meetings.
7 A.          Yes, ma'am.  Do you mind me correcting
8 you on a phrase?
9              Actually, if you look at the law, there
10 is a house chair and a senate chair.  They are not
11 cochairs, although that seems to be a well-kept
12 secret.  But now you know.
13              So now --
14 Q.          The secret is out.
15              So as the house chair of the
16 redistricting committee, what do you mean -- what
17 was your responsibility with respect to your
18 meetings with the attorney and the meetings with the
19 person who draws the map?
20              MR. WALKER:  Same instruction.
21              THE WITNESS:  Okay.  Well, stop me if I
22 go astray here.
23              MR. WALKER:  Okay.
24 A.          Of course, probably the single most
25 important role of the attorney is to help the

Page 29

1 elected members of this committee know what the law
2 is and what -- and keep us up to date on recent
3 court cases so we can do our best to be in
4 compliance with what the law says and what the
5 courts have subsequently interpreted.
6 Q.          So as the house chair of the
7 reapportionment committee, what were -- what was
8 your role in those meetings?
9 A.          Well, I guess my role was to be there
10 and to make sure that we stay -- are we -- I guess
11 we're talking generically here.  We're not talking
12 about 2011 or 2021.  Are we just talking about being
13 a chair, a redistricting chair?  Is that what the
14 discussion is?  Or are we talking about a certain
15 time period?
16 Q.          So when I asked you what your
17 responsibilities were as house chair of the
18 reapportionment committee, you said, among other
19 things, you meet with the attorney, you meet with
20 the person who draws the map, meeting with the
21 reapportionment committee.  And I'm just asking what
22 you meant by that as your role.
23              What was your role in those meetings
24 with the attorney and with the drawer?
25 A.          To discuss the -- one of the issues, of

Page 30

1 course, is the time schedule on when we can carry
2 out the duties and when we need to carry out the
3 duties.  And then another thing has to do with
4 making sure that we stay in compliance with the
5 courts and the law and recent court cases.
6 Q.          Who selected the attorney?
7              MR. WALKER:  At what time are you
8 talking about?
9              MS. SADASIVAN:  In 2011.
10 A.          I do not know the answer to that.
11 Q.          Did you have any involvement in the
12 selection of the attorney --
13 A.          No.
14 Q.          -- for the reapportionment committee?
15 A.          No.
16 Q.          Did you have any role in the selection
17 of the demographer as the house chair of the
18 reapportionment committee?
19 A.          No.
20 Q.          Do you know who made the decision?
21 A.          I do not.
22 Q.          How were you selected to serve as the
23 house chair of the reapportionment committee?
24 A.          By the speaker of the house.
25 Actually --

Page 31

1 Q.          Who was that?
2 A.          -- I was -- he selected me to be on the
3 committee.  And then the house members on that
4 committee elected the house chair.
5 Q.          I see.  So you were elected by the other
6 house members of the reapportionment committee to
7 serve as the house chair?
8 A.          Correct.
9 Q.          And who was the senate chair of the
10 reapportionment committee in 2011?
11 A.          Gerald Dial.
12              THE REPORTER:  Gerald who?
13 A.          D-I-A-L.
14 Q.          And was the starting point -- what was
15 the starting point for drawing the congressional
16 maps in 2011?
17 A.          The starting point would be the existing
18 lines.
19 Q.          What existing lines?
20 A.          The congressional lines that were
21 current at that time.
22 Q.          And how did you go about deciding how to
23 update those lines based on the census data in 2011?
24 A.          Actually, I didn't make those decisions.
25 Q.          Who did?

Page 32

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 A.          The map drawer met with and talked to
2 the members of the congressional delegation.  And,
3 of course, once we had the data, the population
4 numbers, then they knew if a district needed to have
5 an increase or a decrease in population.
6 Q.          Did the legislature conduct public
7 hearings in the redistricting process?
8 A.          Yes.
9 Q.          Following the (inaudible.)
10 A.          What was the last thing you said?
11 Following?
12 Q.          The 2010 census.
13 A.          Yeah, the -- correct, we did have public
14 hearings.
15 Q.          How many?
16 A.          22.
17 Q.          And when did those hearings occur?
18 A.          I just -- I do not remember.  I don't
19 remember those dates.
20 Q.          How many meetings did the
21 reapportionment committee hold in 2011?
22 A.          I can't tell you exactly.  I don't know
23 the exact number.  I don't -- I don't remember the
24 exact number.
25 Q.          Was it more than one?

Page 33

1 A.          Yes.
2 Q.          Was it more than two meetings?
3 A.          I'm sorry?  What was the last word you
4 said?  It came out fuzzy.
5 Q.          Was it more that two meetings?
6 A.          I'm just guessing.  And I can't answer
7 that question because I don't remember.
8 Q.          What was the role of the reapportionment
9 committee in the map drawing process in 2011?
10 A.          Are we talking congressional maps?
11 Q.          Yes.
12 A.          The role of the reapportionment
13 committee was to take the map that was submitted,
14 that was put together by the -- with the approval of
15 the congressional delegation, and to approve or
16 disapprove that map and submit it for introduction
17 to the legislature.
18 Q.          And how did the committee go about
19 approving or disapproving of the map drawn?
20 A.          A roll call vote.
21 Q.          Were members given any guidance on how
22 to vote?
23 A.          I don't quite understand that -- that
24 question, were they given guidance.
25 Q.          Any information on how to vote or how to

Page 34

1 look at a map?
2 A.          Well, the map and the data was put
3 before them at the committee meeting.
4 Q.          I'm dropping into the chat and I will
5 ask the court reporter to mark as McClendon Exhibit
6 2 --
7          MR. WALKER:  Kathryn, what was Exhibit
8 1?  I'm sorry.  Was that the talking points?
9          MS. SADASIVAN:  Yes, sir.
10          MR. WALKER:  Okay.  Let me -- let me --
11 I'm your secretary in this.  So let me take care of
12 it.
13          MS. SADASIVAN:  Oh, thank you so much,
14 Dorman.  I'm sorry about that.  I appreciate it.
15          MR. WALKER:  We're a full-service law
16 firm.
17          MS. WELBORN:  I'm happy to play the
18 role.
19          MR. WALKER:  Well, I've got them spread
20 out over here.
21
22          (Plaintiff's Exhibit 1 was
23          marked for identification.)
24
25 Q.          Senator McClendon, do you have the

Page 35

1 document that I've asked the court reporter to mark
2 as McClendon Exhibit 2 in front of you?
3          MR. WALKER:  I'm sorry.  Which one is
4 it?  Tell me.
5 A.          Exhibit what?
6          MR. WALKER:  No.  Don't say anything.
7 Exhibit 2, just tell me what it is.
8 Q.          Do you recognize the document in front
9 of you?
10          MS. WELBORN:  What is the document,
11 Kathryn?  Which one is it?
12          MS. SADASIVAN:  I just dropped it into
13 the chat.  It is the 2011 legislative
14 reapportionment committee guidelines.
15          MR. DAVIS:  The chat is not going to
16 work because the system is pretty far away from us
17 all.  Nobody can get to the chat easily.
18          MS. SADASIVAN:  Okay.  Would it help if
19 I pull it up so you can see it?
20          MR. WALKER:  The May 2011 guidelines?
21          MS. SADASIVAN:  This is the document
22 we're looking at.
23
24          (Plaintiff's Exhibit 2 was
25          marked for identification.)

Page 36

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

```
 1
 2 Q.          Do you recognize this document, Senator
 3 McClendon?
 4 A.          Yes.  It looks -- it looks familiar.
 5 Q.          How do you recognize this document?
 6 A.          The first part of what you said was cut
 7 off.  Say it again.
 8 Q.          How do you recognize this document?
 9 A.          How do I recognize it?  I mainly
10 recognize it by the fact that it's reapportionment
11 committee guidelines.  And I recall going through
12 that process and the adoption of those guidelines.
13 Q.          Do you know who drafted the document?
14 A.          Did I draft the document?
15 Q.          Do you know who drafted the 2011
16 reapportionment --
17 A.          Do I know who drafted it.  I think I
18 have a good idea.  But I can't say that I'm a
19 hundred percent certain who drafted the document.
20 So the answer to the question would be no.
21 Q.          Who do you think drafted it?
22 A.          I imagine it was our attorney at the
23 time.  But I'm just not sure about that.
24 Q.          Can you read please on Page 1 under May
25 2011 the paragraph beginning with "Pursuant"?
                                             Page 37
```

```
 1 Q.          It's in the sentence beginning with
 2 "Accordingly."
 3 A.          Yeah, I see it.
 4              Well, that means the committee, the
 5 reapportionment committee, adopted the guidelines,
 6 had a vote and said that's our guidelines.
 7 Q.          Will you please go to page two and read
 8 under numeral III Voting Rights Act, and read the
 9 two paragraphs below it?
10 A.          "Districts shall be drawn in accordance
11 with the laws of the United States and the State of
12 Alabama, including compliance with protections
13 against the unwarranted retrogression or dilution of
14 racial or ethnic minority voting strength.  Nothing
15 in these guidelines shall be construed to require or
16 permit any districting policy or action that is
17 contrary to the U.S. Constitution or the Voting
18 Rights Act."
19              Number 2, "Redistricting plans are
20 subject to the preclearance process established in
21 Section 5 of the Voting Rights Act."
22 Q.          I'm sorry.  I'll just have you read Page
23 4, Paragraph 2 and 3 under Plans Produced by
24 Legislators.  2, 3, and 4.  I apologize.
25 A.          2, 3, and 4 under Roman numeral V.  Is
                                             Page 39
```

```
 1 A.          I see that.
 2 Q.          Could you read it, please?
 3 A.          To myself or to you?
 4 Q.          Out loud.  Thank you.
 5 A.          "Pursuant to the constitution of the
 6 United States and the Constitution of the State of
 7 Alabama, the Alabama state legislature is required
 8 to review 2010 federal decennial census data
 9 provided by the U.S. Bureau of the Census to
10 determine if it is necessary redistrict Alabama's
11 congressional, legislative, and state board of
12 education districts because of population changes
13 since the 2000 census.
14              Accordingly, the following guidelines
15 for congressional, legislative, and state board of
16 education redistricting have been established by the
17 legislature's permanent joint legislative committee
18 on reapportionment, (hereinafter referred to as the
19 'reapportionment committee.')
20              There you go.
21 Q.          Thank you.
22              In the paragraph that you just read
23 where you said that the guidelines were established
24 by the committee, what does that mean?
25 A.          Okay.  Let me find it.
                                             Page 38
```

```
 1 that what you're asking for?  It must be.  That's
 2 the only 2, 3, and 4 on the page.
 3              "A proposed redistricting plan will be
 4 public information upon its introduction as a bill
 5 in the legislative process, or upon presentation for
 6 consideration by the reapportionment committee."
 7              "Access to the legislative
 8 reapportionment office computer system, census
 9 population data, and redistricting work maps will be
10 available to all members of the legislature upon
11 request.  Reapportionment office staff will provide
12 technical assistance to all legislators who wish to
13 develop proposals."
14              Number 4, "In accordance with Rule 23 of
15 the joint rules of the Alabama legislature (2011)
16 all amendments or revisions to the redistricting
17 plans, following introduction as a bill, shall be
18 drafted by the reapportionment office."
19 Q.          I'm going to ask you to quickly scan the
20 lest of the guidelines and then let me know if you
21 followed those guidelines in 2011.
22              MR. WALKER:  Objection to form.  You may
23 answer the question.
24 A.          Yes, ma'am, it's my belief that we
25 followed the guidelines.
                                             Page 40
```

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

| | |
|---|---|
| 1 Q.        And how did you go about following the | 1 A.        To keep the what demographics? |
| 2 guidelines in the map-drawing process? | 2 Q.        The racial demographics. |
| 3 A.        Well, you just read the guidelines and | 3 A.        Racial demographics.  In 2011, you know, |
| 4 try to stay -- and try to do what it says. | 4 I don't know the answer to that. |
| 5 Q.        What action did you take to make sure | 5 Q.        Was it a primary goal to keep District 7 |
| 6 that the guidelines were followed? | 6 the same black population as in 2001? |
| 7 A.        What action did I take to make sure they | 7 A.        I do not know the answer to that |
| 8 were followed.  I consulted with the attorney and | 8 question. |
| 9 with the person drawing the map to make sure that | 9 Q.        Did you consider race in drawing any of |
| 10 they were following the rules that we had before us. | 10 the districts in 2011? |
| 11 Q.        And how did you do that? | 11 A.        No. |
| 12 A.        I just looked them in the eye. | 12 Q.        Why was there only one district with a |
| 13 Q.        You looked them in the eye and what? | 13 majority black voting age population in 2011? |
| 14 A.        And said, "Are we staying within the | 14        THE REPORTER:  I'm sorry.  Could you say |
| 15 guidelines?"  I'm not even sure I said that.  We did | 15 that question over? |
| 16 -- we did talk about the importance of the | 16 Q.        Why was there only one district with a |
| 17 guidelines.  And it was understood everybody would | 17 majority black voting age population in 2011? |
| 18 use that as exactly what they're called, guidelines. | 18 A.        Well, I -- I don't need to speculate.  I |
| 19 Q.        And so when you said you talked about | 19 will say I do not know why. |
| 20 the guidelines and that they were important, were | 20 Q.        What is Section 5 of the Voting Rights |
| 21 you explaining the guidelines to the demographer? | 21 Act? |
| 22 A.        I was not explaining them, no.  We would | 22 A.        Section 5 has to do with racial |
| 23 talk about them from time to time.  But it was just | 23 injustice or racial problems when it comes to |
| 24 so well known that we followed the guidelines. | 24 elections.  And it provides some solutions to that. |
| 25 That's what we did.  That's our job. | 25 Or remedy, I should say. |
| Page 41 | Page 43 |
| 1 Q.        Do you know if anyone else talked to the | 1 Q.        What is a racial problem? |
| 2 person -- the attorney or to the map drawer about | 2 A.        What is a racial problem?  Are you |
| 3 the guidelines? | 3 asking for an example or something?  I don't quite |
| 4 A.        Do I know?  No, I do not. | 4 -- I don't understand your question, what is a |
| 5 Q.        How many congressional redistricting | 5 racial problem. |
| 6 plans were considered by the reapportionment | 6 Q.        I'm asking you what you meant by your |
| 7 committee in 2011? | 7 statement.  Do you want your court reporter to read |
| 8 A.        I don't recall. | 8 your answer about what Section 5 is back? |
| 9 Q.        How did the reapportionment committee | 9 A.        To make sure that every -- every group, |
| 10 decide on which Alabama congressional map to | 10 subgroup, race had a fair opportunity to express |
| 11 introduce? | 11 themselves at the polls. |
| 12 A.        We took the map that the members of the | 12 Q.        And why did Section 5 apply to Alabama? |
| 13 congressional delegation had -- proved to be | 13        THE REPORTER:  I'm sorry.  What? |
| 14 satisfied with. | 14 Q.        Why did Section 5 apply to Alabama? |
| 15 Q.        That was the starting point in the 2001 | 15 A.        You know, I could -- I could guess at |
| 16 map? | 16 that.  But I don't want to do that.  So I'll say I |
| 17 A.        Yes. | 17 don't know. |
| 18 Q.        Was the goal in drafting to make sure | 18 Q.        You don't know why Section 5 applied to |
| 19 the congressional districts remained roughly the | 19 Alabama? |
| 20 same as in 2001? | 20 A.        Like I said, I could guess at it.  But I |
| 21 A.        One of the goals is that we keep the | 21 don't want to do that.  So I don't know. |
| 22 core of the districts recognizable, or we attempt to | 22 Q.        And I'm just asking you don't know why |
| 23 do that. | 23 Section 5 applied to Alabama? |
| 24 Q.        Was it a primary goal to keep the same | 24 A.        Correct. |
| 25 racial demographics for each district? | 25 Q.        The guidelines mention preclearance |
| Page 42 | Page 44 |

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 under Section 5 of the VRA.  What involvement did
2 you have in obtaining justice department
3 preclearance of a proposed congressional plan in
4 2011?
5 **A.        None.**
6 Q.          Did you have any role in proposing
7 judicial preclearance of the 2021 map?
8 **A.         Did I have any -- I'm really having a**
9 **time understanding you.  Did I have any -- okay.**
10 **Say that -- say that again, please, ma'am.**
11 Q.          Did you have any role in proposing
12 judicial preclearance in the redistricting process
13 in 2011?
14 **A.        No.**
15 Q.          Did you introduce any proposed
16 redistricting plans for the Alabama congressional
17 delegation in 2011?
18 **A.        I do not recall if the bill started in**
19 **the house or in the senate.  I don't know.  So I**
20 **can't answer the question.**
21 Q.          Did you introduce any redistricting
22 bills in the 2011 legislative session?
23 **A.         Any redistricting bill.  So we've gone**
24 **outside of congressional.**
25           **Yes, I'm sure I introduced the house**

1 **bill in the house.  I don't remember who did the BOE**
2 **bill, who started it.  I don't remember who started**
3 **the congressional bill.**
4 Q.          Did you consider a plan permitting two
5 majority minority districts in 2011?
6 **A.         Not to my knowledge.**
7 Q.          Why?
8 **A.         It wasn't brought before us.**
9 Q.          It wasn't brought before who?
10 **A.         That is correct.**
11 Q.          Who?  You said, "It wasn't brought
12 before us."  It wasn't brought before who?
13 **A.         The redistricting committee.**
14 Q.          Did you have the opportunity to consider
15 a map with two majority minority districts in the
16 legislature?
17 **A.        No, I don't think so.**
18 Q.          You did not?
19 **A.         I don't remember that at all, if we did.**
20 Q.          I'm going to -- I'm dropping it in the
21 chat, as well, in case it's helpful.  I know it's
22 probably not.
23           I am going to show you what I ask the
24 court reporter to mark as McClendon Exhibit 3.  And
25 let me just share my screen quickly.  It is exhibit,

1 and then the number after it is SOS 001929.  And
2 this is what the document looks like.
3           MR. WALKER:  Can you describe it,
4 please?
5           THE WITNESS:  Look up here.
6           MR. WALKER:  Oh, that.  Okay.  We've got
7 it.
8
9           (Plaintiff's Exhibit 3 was
10           marked for identification.)
11
12 Q.        Do you recognize this document, Senator
13 McClendon?
14 **A.        No.**
15 Q.        I will represent to you that this is a
16 news article produced by the secretary of state, a
17 defendant in this case.  In it, Brian Lyman is
18 discussing a plan put forward by Mr. Buskey which
19 would have created two majority minority districts.
20           And in this article, you were quoted as
21 saying -- on Page 2, the second paragraph on Page 2,
22 as saying, The Buskey plan would lead to
23 "retrogression," or a retreat from minority
24 population benchmarks set by the department of
25 justice.  Under the Voting Rights Act, the DOJ must

1 approve the state's redistricting plan before it can
2 be implemented.  If the redistricting plan retreats
3 from the justice department benchmarks, such as
4 reducing minority population in a
5 previously-approved congressional district, the
6 state must show that it had no discriminatory
7 purpose in the move and did not reduce minority
8 voters' effective exercise of the electoral
9 franchise.
10           Does that sound familiar to you?
11           MR. WALKER:  Are you asking him if he
12 said that, or what?
13 Q.        I'm just asking if that helps refresh
14 your memory.
15 **A.        Well, it provides a memory.  I don't --**
16 **I don't remember this.**
17 Q.        So you don't know why you believed that
18 the map introduced by Representative Buskey would
19 have led to retrogression?
20 **A.        So what did he introduce?  No.  I'm**
21 **really lost on trying to decipher this.**
22 Q.        So is that -- did you say the quote that
23 I just read to you?
24 **A.        I don't recall saying it.  I don't**
25 **recall the article.**

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 Q.         How about I give you a few minutes to
2 look through the article, and then I'll ask you some
3 questions again.
4               MR. WALKER:  Kathryn, we've been going
5 for about an hour, and I need to step out for a
6 second.  Would you mind if we took a five-minute
7 break?
8               MS. SADASIVAN:  If you don't mind, we'll
9 just finish this question after Senator McClendon
10 has a chance to look at it.  And then after that, we
11 can take a break.
12               MR. WALKER:  Certainly.  No problem.
13               MS. SADASIVAN:  Thank you so much,
14 Dorman.
15 A.         **I'm ready when you are.**
16 Q.         Do you have any reason to believe that
17 quote is inaccurate?
18 A.         **Now, what did you --**
19               MR. WALKER:  Which quote?
20 A.         **Yeah.  My question is what quote are you**
21 **talking about?**
22 Q.         On Page 2 of the exhibit I just shared
23 with you beginning with Rep Jim McClendon,
24 R-Springville, who carried the plan in the house.
25 There are two paragraphs where Senator McClendon
                                                    Page 49

1 quoted.  And I'm asking if you have any reason to
2 believe that that quote is inaccurate.
3 A.         **Well, there are no -- the only quotation**
4 **marks are around the word "retrogression" and around**
5 **the words "effective exercise of the electoral**
6 **franchise."  There's no -- I don't see where I was**
7 **attributed a quote in those paragraphs.**
8 Q.         Do you have any reason to believe that
9 that paragraph discussing -- beginning with "Rep Jim
10 McClendon" and continuing on until "This plan, as
11 far as the justice department and Voting Rights Act
12 goes, it's a failure," do you have any reason to
13 believe that that is inaccurate?
14 A.         **Well, the only part that has quotes is**
15 **the one you just read.  And I do not recall making**
16 **that statement.**
17 Q.         So you don't think that that was an
18 accurate reflection of what you thought at the time?
19               MR. WALKER:  Objection to form.  You may
20 answer it.
21 A.         **I just -- I don't recall making the**
22 **statement.**
23 Q.         And you don't recall having the
24 opportunity to see two majority minority districts
25 in a congressional plan?
                                                    Page 50

1 A.         **I do not.**
2               MR. DAVIS:  Are we breaking now?
3               MS. SADASIVAN:  No.  I'm sorry.  I asked
4 a question.
5               MR. DAVIS:  And he answered it.
6 Q.         You don't recall seeing two majority
7 minority districts in the Alabama congressional plan
8 in 2011?
9 A.         **I do not recall it.**
10 Q.         Okay.  Thank you so much.
11               MR. SADASIVAN:  We can take a break now.
12               MR. WALKER:  Thank you.
13               THE VIDEOGRAPHER:  We are off the
14 record.  The time is 3:09 p.m.
15               (Recess was taken.)
16               THE VIDEOGRAPHER:  We are back on the
17 record.  The time is 3:22 p.m.
18 Q.         Senator McClendon, I just want to
19 clarify really quickly Exhibit 3.  You stated that
20 you don't remember being interviewed for that
21 article, right?
22 A.         **I do not.**
23 Q.         And you don't remember saying anything
24 about retrogression?
25 A.         **Yes.  The answer is the same as it was**
                                                    Page 51

1 **before.  I do not remember.**
2 Q.         If there was a plan in 2011 that
3 complied with all the districting principles and the
4 guidelines and created two majority minority
5 districts, would you have voted for it?
6 A.         **Okay.  Say that again.  We're having a**
7 **hard time.**
8               THE REPORTER:  I think if you would slow
9 down just a little bit, that would help.
10               MS. SADASIVAN:  If I come in a little
11 bit, is this better?
12               MR. WALKER:  No.  Slow down.
13 Q.         If there was a plan that complied with
14 the redistricting guidelines and created two
15 majority minority districts in 2011, would you have
16 voted for it?
17 A.         **Thank you.  I -- I understood you very**
18 **well.**
19               **I would certainly have considered it and**
20 **would -- but part of that is looking at what else is**
21 **available.  So I would have put it on the list for**
22 **consideration, yes.**
23 Q.         Let's move to the 2021 redistricting
24 process.
25 A.         **Good.**
                                                    Page 52

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 Q.        What was your role in the
2 reapportionment committee in 2021?
3 A.        Senate chair.
4 Q.        And what were your responsibilities as
5 senate chair?
6 A.        Pretty much the same as it was as house
7 chair, to confer with the attorney and the map
8 drawer, to help try to set the schedule of events as
9 they were going to unfold.
10 Q.        And when you say "confer with the
11 attorney and map drawer, I'm not asking for
12 attorney-client information.  But generally as
13 senate chair, what responsibilities did conferring
14 with the attorney and map drawer entail?
15 A.        Well, for quite some time, we were
16 trying to decide when we could actually get started
17 on the process.  And we spent a little bit of time
18 wondering when we were going to get the data.  We
19 spent a lot of time wondering when we were going to
20 get the data.  And we shared some speculation about
21 when it would show up.  So we did the timing of the
22 -- and sequence of events is one of the things
23 initially that we talked about.
24 Q.        And so conferring with the attorney and
25 the map drawer, you were trying to reach decisions
                                        Page 53

1 about the timeline?
2 A.        Correct.
3 Q.        Anything else?
4 A.        That's the main -- at that point, that
5 was the main thing, when can we get started.
6 Q.        At what point?
7 A.        Was that a question?
8 Q.        Yes.  You said "at that point."  And I'm
9 just asking at what point was that the main --
10 A.        That was prior to receiving the data
11 from the census bureau.
12 Q.        And did your responsibilities to confer
13 with the attorney and the map drawer change after
14 you received census data?
15 A.        I'm not sure I understand your question.
16 Do it again and let me listen carefully.
17 Q.        You just shared that your
18 responsibilities before the census numbers came out
19 with respect to the attorney and the map drawer as
20 senate chair of the reapportionment committee was to
21 determine a timeline.
22        And I'm asking if your responsibilities
23 as senate chair of the reapportionment committee
24 with respect to conferring with the attorney and map
25 drawer changed once you received census data?
                                        Page 54

1 A.        Well, no.  It was just part of a
2 continuum of setting the schedule and seeing when
3 things would work out, how things -- in what order
4 things needed to unfold in order to get the job done
5 in a timely manner.
6 Q.        And other than you and the map drawer
7 and the attorney, who else was involved in that
8 decision-making?
9 A.        Representative Pringle.
10 Q.        Anybody else?
11 A.        No.
12 Q.        So you, the attorney, Representative
13 Pringle, and the map drawer determined when you
14 would begin the public hearings or the
15 reapportionment committee meetings?
16 A.        Well, the staff, the reapportionment
17 staff, had some input into it.  Although the public
18 hearings, we gave -- we gave a time frame to the
19 community -- the community college system.  The
20 chancellor loaned us one of his personnel to help us
21 coordinate those public hearings.  And so he's the
22 one that actually set up the dates, locations, and
23 times for the public hearings.
24        I think we told him we wanted to get
25 this done the first couple of weeks in September.
                                        Page 55

1 And then one of the representatives asked for
2 additional meetings, so it spilled over into the
3 third week into September.
4 Q.        So just going back to your role as
5 senate chair of the reapportionment committee and
6 your responsibilities to confer with the attorney
7 and the map drawer, what were -- the public hearings
8 -- strike that.
9        Going back to your role as senate chair
10 of the reapportionment committee and your
11 responsibilities to confer with the attorney and map
12 drawer, what other timelines did you discuss?
13 A.        We also needed to be able to give some
14 idea as to when we would actually be prepared for a
15 legislative session, for the governor to call a
16 special session to consider redistricting.
17 Q.        And how did you arrive at that
18 information of when that should be?
19 A.        There was -- we just sort of projected
20 forward saying we need -- we'll need X amount of
21 time for the public hearings and then we'll need X
22 amount of time to meet with the legislators and the
23 congressional delegation and the board of education.
24        And then we basically set a timeline and
25 said we can -- and then at this point we'll be ready
                                        Page 56

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 to ask the governor to call a special session.
2 Q.        And were other members of the
3 reapportionment committee besides House Chair
4 Pringle involved in that decision?
5 A.        No.
6 Q.        When did you start planning for the 2021
7 redistricting process?
8 A.        We probably started thinking about it a
9 year and a half ahead of time or more, two years
10 maybe ahead of time.
11 Q.        And what were the first steps that you
12 took to prepare for the redistricting process?
13 A.        The first thing that I personally tried
14 to figure out was what the timeline was going to be.
15 And, of course, that proved to be futile because of
16 the delay in receiving the data and another delay
17 and another delay.
18 Q.        When was your first meeting on
19 redistricting in 2021?
20 A.        You know, I don't know the date.
21 Q.        Do you know who it was with?
22 A.        Are you talking about the redistricting
23 committee?  Or who are -- what kind of meeting are
24 you talking about?
25 Q.        I'm talking about a meeting between you,

Page 57

1 Senator McClendon, and any other person about
2 redistricting in 2021.
3 A.        Okay.  I don't know the answer to that
4 question.
5 Q.        What role did you play in setting the
6 schedule of the public hearings on redistricting?
7 A.        I talked to the chancellor of the
8 two-year system and asked him to designate someone
9 to work with our staff.  And then they worked it out
10 from there and came back with a schedule and a plan.
11 Q.        Did you review the locations of the
12 public hearings?
13 A.        Yes, I looked at what they put together.
14 And we were just about ready to announce it when
15 Representative Hall requested that we add some more,
16 which we did.
17 Q.        When were you preparing to announce the
18 dates and locations of the public hearings?
19 A.        You know, I don't know why I would
20 remember this, but I think June 30th was our target
21 date to do that.  And then I believe it was the day
22 before we got a letter, an email maybe -- I didn't
23 get it.  The staff received communications from one
24 of the members of our redistricting committee
25 requesting that there be another half dozen added on

Page 58

1 to it.
2            So we sort of had to work on that before
3 we actually announced it.  And I don't know the
4 final date that we came out with it.
5 Q.        And that's Representative Laura Hall?
6 A.        Yes.
7 Q.        And there was no deadline to decide on
8 public hearings?
9 A.        Well, there was a deadline.  June 30th.
10 Q.        Who set the deadline?
11 A.        But on June -- I think it was June 29th,
12 we received communication from her.  So we sort of
13 scrapped the deadline in order to the comply with
14 her request.
15 Q.        Is there a time to determine public
16 hearings set by law in Alabama?
17 A.        Ask that again, now.
18 Q.        Is there any law governing public
19 redistricting hearings in Alabama?
20 A.        Not to my knowledge.
21 Q.        Was there any committee deadline or a
22 committee -- rather a committee rule setting a
23 deadline to determine public hearings?
24 A.        Not to my knowledge.
25 Q.        Who developed the deadline on

Page 59

1 determining the time, location, and manner of public
2 hearings?
3 A.        I think the staff, in conjunction with a
4 representative from the community system, said we
5 feel like we can get it done by this date, and
6 actually communicated with members of the
7 redistricting committee for suggestions and asked
8 that they have those suggestions in by June 30.
9 Q.        When did you discuss public hearings
10 with the reapportionment committee?
11 A.        When did who?
12 Q.        When did you discuss -- you or other
13 members of the legislative delegation of the
14 reapportionment committee discuss the public
15 hearings?
16 A.        I don't know the answer.
17 Q.        What venues did you consider in
18 Montgomery for public hearings?
19 A.        Well, we held one at the -- the public
20 one was at the state house.
21 Q.        Were there any others?
22 A.        I don't know the answer to that.  I
23 don't have that schedule in front of me.  I would be
24 surprised if we had more than one, but I don't know
25 for sure.

Page 60

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

| | |
|---|---|
| 1      MS. SADASIVAN:  I am going to drop into | 1 A.        22. |
| 2 the chat -- again, I know you all can't see it.  So | 2              MR. WALKER:  No.  Meetings. |
| 3 I will share my screen. | 3 A.        Oh, meetings.  I can think of two |
| 4              But I would ask the court reporter to | 4 meetings that we had.  I don't know if there was a |
| 5 mark it as McClendon Exhibit 4.  It is a document | 5 third or not. |
| 6 that says 2021 Legislative Reapportionment Public | 6 Q.        What were the dates of those meetings? |
| 7 Hearings Final. | 7 A.        I'm thinking the first one was during |
| 8              Do you have that before you, Senator | 8 the legislative session, probably the very -- toward |
| 9 McClendon? | 9 the very end of the regular session, which would |
| 10             MR. WALKER:  Give me just a second. | 10 have put it in May.  We did it because we had -- you |
| 11 | 11 know, everybody in town. |
| 12             (Plaintiff's Exhibit 4 was | 12             And then the next meeting that I am |
| 13             marked for identification.) | 13 thinking about was held just prior to the special |
| 14 | 14 session that was called for consideration of the |
| 15             MR. WALKER:  Is this it?  Is that what | 15 bills, the redistricting bills. |
| 16 she's showing? | 16             MS. SADASIVAN:  So I am going to drop in |
| 17             THE WITNESS:  That looks like it.  It's | 17 the chat an exhibit that I'll ask the court reporter |
| 18 hard to tell.  It does look similar to it. | 18 to mark as McClendon Exhibit 5.  I'm going to pull |
| 19             MS. WELBORN:  That's it. | 19 it up on my screen and share my screen with you so |
| 20 A.        Does yours start off with Drake State in | 20 you can see it. |
| 21 the upper left? | 21             MR. WALKER:  I think this is five. |
| 22 Q.        Yes, sir. | 22             MS. SADASIVAN:  I'm sorry.  Five.  Thank |
| 23 A.        Okay.  Then we probably have -- I | 23 you. |
| 24 probably have that document before me, yes. | 24 Q.        Can you see my screen? |
| 25 Q.              And can you look through that document | 25 A.        Reapportionment Committee Redistricting |
| Page 61 | Page 63 |
| 1 and just see if you had any other public hearings in | 1 Guidelines, May 5th.  Okay. |
| 2 Montgomery? | 2 |
| 3 A.        Well, I don't see any. | 3             (Plaintiff's Exhibit 5 was |
| 4 Q.        Did you consider any historically black | 4             marked for identification.) |
| 5 colleges or universities when you were scheduling | 5 |
| 6 the public hearings? | 6 Q.        Have you seen this document before, |
| 7 A.        Well, I wasn't doing the considering. | 7 Senator McClendon? |
| 8 It was the staff in the two-year college. | 8 A.        Give me a second to look at it.  Yes. |
| 9             The original idea started with having | 9 It looks -- it looks familiar. |
| 10 these meetings at our two-year colleges because they | 10 Q.        Where have you seen this document |
| 11 are spread all over the state.  And so that's why we | 11 before? |
| 12 got a liaison from them to help schedule these | 12 A.        Where?  At the state house. |
| 13 things. | 13 Q.        How do you recognize it? |
| 14             So whether they -- I think I saw one | 14 A.        I'm just looking at -- well, I look at |
| 15 with Troy on here.  And if I recall -- yeah, here is | 15 the title, I look at the date, I look at the plus or |
| 16 one at Trojan Center Ballroom.  And that's because | 16 minus 5 percent, and some of the other topics.  And |
| 17 there was not a community college close by or | 17 those all appear to be the guidelines that we -- |
| 18 something like that. | 18 that the redistricting or reapportionment committee |
| 19             So by and large, we focused on our | 19 adopted prior to the map-making process. |
| 20 community college system to host us, to host these | 20 Q.        And did you endeavor to comply with |
| 21 meetings.  So -- | 21 these policies in the 2021 redistricting -- |
| 22 Q.        How many meetings did -- | 22 Q.        Did I -- |
| 23 A.        I'm sorry.  Go ahead.  Your turn. | 23 Q.        -- process? |
| 24 Q.        I was just asking how many meetings did | 24 A.        Did I try to comply with these policies? |
| 25 the reapportionment committee hold in 2021? | 25 Is that your question? |
| Page 62 | Page 64 |

Evan Milligan,et al v. John H.Merrill, et al.                                    Jim McClendon
                                                                                  12/17/2021

1  Q.        Did you comply with these -- yes.  Did
2  you comply with these policies in the 2021
3  redistricting process as senate chair of the
4  reapportionment committee?
5  A.        I did.
6  Q.        Section II f states, "Districts shall be
7  drawn in compliance with the Voting Rights Act of
8  1965, as amended.  A redistricting plan shall have
9  neither the purpose nor the effect of diluting
10 minority voting strength, and shall comply with
11 Section 2 of the Voting Rights Act and the United
12 States Constitution."
13          How did you go about complying with
14 Section 2 of the Voting Rights Act?
15 MR. WALKER:  Are you -- may I ask,
16 Kathryn, are you talking about for the congressional
17 plan?
18          MS. SADASIVAN:  I'm asking -- he said
19 Senator McClendon tried to comply with these
20 guidelines as senate chair of the redistricting
21 committee.  I'm asking how in general did Senator
22 McClendon, as senate chair of the reapportionment
23 committee, go about ensuring compliance with this
24 particular policy.
25 A.        Well, subsequent to us adopting these
                                                         Page 65

1  guidelines, then I was dependent on the attorney,
2  Dorman Walker, and the map drawer during the
3  process, once they started actually putting lines
4  down on paper, to stay inside those guidelines.
5  Q.        So your role was overseeing the
6  map-drawing process to ensure that it complied with
7  the guidelines?
8  A.        One of my goals was to be in compliance
9  with the Voting Rights Act of 1965.  That was one of
10 my jobs.  And, of course --
11 Q.        It was your job to ensure compliance
12 with the Voting Rights Act of 1965?
13 A.        Yes.
14 Q.        And how did you go about doing that?
15 A.        Well, I counted on these experts that
16 were working for me and working for the committee to
17 follow those guidelines and be familiar with the
18 court cases and with the law and with the rulings.
19 Q.        And what is required to determine if a
20 map complies with Section 2 of the Voting Rights
21 Act?
22 A.        Say that again.  Once again -- something
23 about the audio.  It could be me.  But go ahead and
24 try it again.
25 Q.        It's probably me.  I'm also a
                                                         Page 66

1  southerner, so I talk quickly, and I'm probably
2  using too many adjectives.
3          I was asking you what is required to
4  determine whether a map complies with the Voting
5  Rights Act.
6  A.        Well, it's -- I would say it's a legal
7  opinion first to be familiar with the Voting Rights
8  Act and subsequent cases, and then to be able to
9  compare what we have produced, what's in front of
10 us, with the knowledge of the requirement of the
11 Constitution and the Voting Rights Act.
12 Q.        And when did you compare what was
13 produced by your demographer with the requirements
14 of the Voting Rights Act?
15 A.        I think probably every time we talked,
16 this was part of it.  It came up in the conversation
17 as we went through the map-drawing process.  And
18 both the attorney and the map drawer would be quick
19 to say that could -- that particular line moved over
20 there could be a problem, and we need to look at it.
21 Q.        And when you say "could be a problem,"
22 you mean could be a problem under the Voting Rights
23 Act?
24 A.        Yes.
25 Q.        And what was your understanding of what
                                                         Page 67

1  was required to comply with the Voting Rights Act?
2  A.        Well, as far as what's in the Voting
3  Rights Act, I couldn't quote it.  But that's why I
4  have an attorney.
5  Q.        How many times did you have a
6  conversation where the map drawer said if you move
7  this line, you could have a problem under the Voting
8  Rights Act?
9  A.        I can say I heard that several times.
10 Q.        And who did you hear that from?
11 A.        I heard it both from the attorney and
12 the map drawer, not necessarily at the same time.
13 Q.        You were --
14 A.        Pardon?
15 Q.        You were advised several times by your
16 attorney and by the map drawer that the way that a
17 particular line was drawn could violate the Voting
18 Rights Act?
19 A.        Or the way a line was proposed to go.
20 That was their job.
21 Q.        And did that occur with respect to the
22 congressional map?
23 A.        Not to my knowledge.  Because I was not
24 involved in drawing the congressional map.
25 Q.        Who was involved in drawing the
                                                         Page 68

Evan Milligan, et al v. John H. Merrill, et al.

Jim McClendon
12/17/2021

---

1 congressional map?

2 A.          The map drawer met with the

3 congressional delegation or their representative

4 sometimes in person, sometimes virtually like this,

5 and really worked this out with the members of the

6 congressional delegation.

7 Q.          Were the members of the congressional

8 delegation responsible for ensuring that map

9 complied with the Voting Rights Act?

10 A.          That's a good question.  I don't know

11 the answer to that question.

12 Q.          Were you responsible for ensuring that

13 the congressional map complied with the Voting

14 Rights Act?

15 A.          Yes.  I would say that was one of my

16 responsibilities.

17 Q.          In the conversations that you had

18 regarding potential violations of the Voting Rights

19 Act, did you or anyone else discuss racial

20 polarization analysis?

21 A.          No.  No.

22 Q.          Do you know what the basis for -- in

23 these conversations when you heard there might be a

24 potential Voting Rights Act violation, do you know

25 what that was based upon?

Page 69

---

1 Well, I think at different times there

2 were different issues.

3 Q.          Such as?

4 A.          On the congressional side, I cannot --

5 as far as the congressional districts go, I can't

6 give you a single example because I simply wasn't

7 involved in that process.

8 Q.          When did you adopt the guidelines that

9 we're talking about right now?

10 A.          Maybe May the 5th of 2021.  That's the

11 date on the document.  And that was one of the

12 purposes of -- objectives of that particular meeting

13 of the committee, was to have the guidelines in

14 place before we got the data and before we started

15 working with the elected officials.

16 Q.          So the third policy in Section II j

17 (iii) in McClendon Exhibit 5 that we're talking

18 about now, the May 5, 2021, redistricting criteria,

19 says, "Districts shall respect communities of

20 interest, neighborhoods, and political subdivisions

21 to the extent practicable and in compliance with

22 paragraphs 1 through 1."

23          What is your understanding of what that

24 policy requires?

25 A.          Well, when possible, it's good to keep

Page 70

---

1 communities of interest, communities that have a

2 particularly common political interest, keep them

3 together, keep them in the same whatever it is,

4 house direct, congressional district, BOE district,

5 if possible.

6 Q.          You said "common political interests."

7 Is that your definition of community of interest?

8 A.          There's a -- there's a definition right

9 here in whatever this is on Line 30.  Line 30

10 through 32 is a definition of communities of

11 interest.

12 Q.          So you just mentioned a common political

13 interest, and I was wondering if that was part of

14 your definition of communities of interest.

15 A.          Oh, that's just one -- that's just one

16 part of it, one part -- one way you could have a

17 community of interest.  There's a lot of different

18 ways you can have a community of interest.

19 Q.          What do you consider to be communities

20 of interest in Alabama?

21 A.          There are -- there's not a community of

22 interest in Alabama.  There are many communities of

23 interest.

24 Q.          Such as?

25 A.          Well, a city.  A city is a community of

Page 71

---

1 interest.

2 Q.          Is Montgomery a community of interest?

3 A.          Yes.  Montgomery is a city.

4 Q.          What are some other communities of

5 interest?

6 A.          You can have parts of a city that are a

7 community of interest.  There are -- a county is a

8 community of interest.

9 Q.          What is the black belt in Alabama?

10 A.          It's a geographic area pretty much

11 across the middle of the state from east to west.

12 And it has to do with the rich soil that's found in

13 that area.

14 Q.          Do you know what counties are in the

15 black belt?

16 A.          I couldn't name -- I could name a few

17 counties.  But I cannot -- I cannot name the

18 counties in the black belt.

19 Q.          Is there anything other than the soil

20 that might define the black belt?

21 A.          I don't know what you're fishing for.

22 Q.          I can ask the question again.

23          What are other characteristics that you

24 know of of the black belt?

25 A.          That's a better question.

Page 72

---

Evan Milligan,et al v. John H.Merrill, et al.                          Jim McClendon
                                                                        12/17/2021

1           Well, I think there's a perception that
2  there's a lower socioeconomic income level across
3  the black belt.  There's probably -- there may be --
4  that would probably be the main thing.
5  Q.         Do you consider the black belt a
6  community of interest?
7  A.         No, not necessarily, because it's
8  multiple counties, multiple communities.
9  Q.         Going back to your testimony earlier
10 about maintaining the core of districts.  Does
11 maintaining the core of the existing congressional
12 districts require consideration of racial data?
13 A.         Say that again and slow down again.  I'm
14 not listening very fast today.
15 Q.         I'm sorry.  I'm speaking quickly.  And I
16 like that term, "listening fast."
17         So what I asked was you testified
18 earlier that you were maintaining -- or attempting
19 to maintain the core of exhibiting districts in the
20 congressional map.  And I'm asking whether that
21 requires the consideration of racial data.
22 A.         Well, we don't -- no.  We don't -- we
23 don't use racial data except after the fact.
24 Q.         After what fact do you use racial data?
25 A.         After the lines are drawn.
                                                        Page 73

1 Q.          And how do you see that racial data when
2 you decide to look at it?
3 A.          The software will produce that.
4 Q.          What software?
5 A.          The software used to draw the maps.
6 Q.          Do you know what that software is?
7 A.          Give me a multiple choice, and I'll give
8 it to you.  Not right off the bat, no.  You know,
9 it's like I know it when I see it.  But, you know, I
10 never used it.  But it's a new system for us.  We
11 recently adopted it.
12 Q.          When was the second meeting of the
13 reapportionment committee in 2021?
14 A.          If, in fact, there were just the two
15 meetings, it would have been immediately -- let me
16 see.  It would have been on the Tuesday prior to the
17 special session convening on a Thursday.  So
18 whatever those dates are.
19 Q.          Do you have reason to believe that there
20 was another meeting of the reapportionment committee
21 other than the two we're discussing now?
22 A.          No, I don't.  But I wouldn't be
23 surprised.  But I just don't believe there was.
24 Q.          I unfortunately don't have the exhibits
25 (inaudible) the meetings, so we'll just move on.
                                                        Page 74

1           So you said you met the Tuesday before
2 the Alabama special legislative session began on
3 redistricting?
4 A.          Correct.
5 Q.          And that was the second meeting in your
6 memory of the reapportionment committee?
7 A.          That is -- I believe that is correct,
8 yes.
9 Q.          Were there other meetings of the
10 reapportionment committee outside of those two to
11 draw the map that we're discussing today?
12 A.          No, not of the -- not of the committee.
13 Not a regular committee meeting, no.
14 Q.          What about a subset of the committee?
15 A.          What about what?
16          MS. WELBORN:  A subset.
17 Q.          Were there other meetings of a subset of
18 the committee?
19 A.          No.
20 Q.          What was the agenda for your October
21 26th meeting, reapportionment committee meeting?
22 A.          To select -- so is that the date,
23 October 26th?  That was meeting number two?
24          A goal for that committee was to select
25 the bills, the maps, that would be introduced to the
                                                        Page 75

1 legislature on Thursday.
2 Q.          And how many congressional maps did the
3 members of the reapportionment committee vote on?
4 A.          I think just the one.  But I can't -- I
5 can't swear to that.
6 Q.          So when you say "select the map," you
7 mean to vote on the one map?
8 A.          I can't remember if a substitute
9 congressional map was offered or not.
10 Q.          I am going to drop into chat, and I will
11 share my screen, as well.  I will represent to you
12 that this is a certified transcript of the October
13 26, 2021, meeting of the reapportionment committee.
14
15          (Plaintiff's Exhibit 6 was
16          marked for identification.)
17
18 Q.          Do you see this?
19 A.          I do.
20          MS. SADASIVAN:  I'm going to ask
21 Mr. Walker if you would be so kind to mark this as
22 Exhibit 6.
23          MR. WALKER:  I have done so.  It is
24 marked.
25          MS. SADASIVAN:  Thank you, sir.
                                                        Page 76

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 Q.        I'll let you quickly scan -- it's quite
2 a long document.  I'll let you just scan through it.
3 And if you wouldn't mind just letting me know if
4 this looks familiar to you.
5 A.        Well, I've glanced through it.  It looks
6 familiar.  But it's really --
7 Q.        Okay.  Again, I'll represent to you that
8 it's a transcript of the October 26, 2021, meeting
9 of the reapportionment committee, as you likely
10 remember.  And as you can see from the transcript, a
11 considerable portion of the meeting was about racial
12 polarization analysis.
13        What is your understanding of racial
14 polarization in voting?
15 A.        In this case, this -- this is an
16 additional evaluation or test of the data to any
17 place it's suspicious that there could be racial
18 discrimination.  It's an extra test tacked on to
19 what we normally do to see if, in fact, we are in or
20 out of compliance with the Voting Rights Act and our
21 own guidelines and the court cases.
22 Q.        And what would give rise to suspicious
23 racial discrimination that would require a racial
24 polarization analysis?
25 A.        What would -- what would make you think

Page 77

1 that that's an issue?  Is that what you're asking,
2 that racial discrimination is an issue?
3        I guess, you know, the first thing I
4 would say is if we had an incumbent minority person
5 and there was such a change in the composition of
6 the voters in that district, that that -- that
7 district may no longer have -- have less of a chance
8 of having a minority representative.  That would be
9 -- I think that would be a red flag.
10 Q.        So a suspicious racial issue would be if
11 a minority representative were no longer able to win
12 an election in their district?
13 A.        Or threatened if they -- yeah.  Roughly
14 what you said.  I don't exactly agree word for word.
15 But yeah, that's the idea.
16 Q.        What is your understanding of why RPV --
17 and when I say RPV, I mean racially polarized
18 voting.  What is your understanding of why RPV was
19 discussed in the October 26th meeting?
20 A.        Wait a minute.  I missed one word I
21 didn't understand.  Why is it what in the meeting?
22        MS. WELBORN:  Discussed.
23 A.        "Discussed," is that the word you used?
24 Q.        Yes, sir.
25 A.        Oh, okay.  Well, it was brought up by

Page 78

1 one of the committee members.
2 Q.        Who?
3 A.        It might have been Representative
4 England.  I think that's who it was.  I'm not a
5 hundred percent sure.  I think he had a good bit to
6 say about it.
7 Q.        And why did -- what was your
8 understanding of why Representative England was
9 concerned about racially polarized voting?
10 A.        I didn't have an understanding of why he
11 was concerned.  He just let it be known that he was
12 concerned.
13 Q.        Did anyone else express concerns about
14 racially polarized voting?
15 A.        I don't remember.
16 Q.        What was the conversation?
17 A.        I don't know.  If we've got the
18 transcript, we can take a look at it.
19        I think there was someone that may have
20 even suggested we should have evaluated all 140
21 races for this.  I don't remember who that was.
22 Q.        So if you wouldn't mind turning to Page
23 17 of McClendon Exhibit 5.
24        MS. WELBORN:  I think it's Exhibit 6.
25 Q.        Exhibit 6.  I apologize.

Page 79

1 A.        I'm on Page 17.  Yep, Smitherman.
2 Q.        All right.  So you'll see that
3 Representative Laura Hall asked you about a racially
4 polarized voting study done.
5        Can you read where it says Senator
6 McClendon beginning with "Because"?
7 A.        "Because of the black age voting
8 population in Congressional District 7, there was
9 not one needed because it was over 54 percent black
10 voting age population."
11 Q.        And then will you also read what
12 Representative Hall said in response?
13 A.        "So you're saying that we don't have a
14 black -- we don't have a polarization, racially
15 polarization study?"
16 Q.        And then please read your response.
17 A.        "None.  Because the voting age" -- well,
18 I suspect that's a transcript error.  "What is it?
19 I got it right here."
20        "Because the voting age is 54."  Don't
21 you think that's the VAP, 54, instead of the voting
22 age?
23 Q.        And then -- I'm sorry.  Can you please
24 just read it as it is on the transcript, what
25 Representative Hall said after that beginning with

Page 80

Evan Milligan,et al v. John H.Merrill, et al.                                    Jim McClendon
                                                                                    12/17/2021

1 "And"?

2 A.          "And you use District 7 as the basis for

3 not having such a study done?"

4 Q.          And then please read your response.

5 A.          The black vote -- "The black VAP of the

6 district is sufficient to where you don't need a

7 study done."

8 Q.          Who makes the decision to undertake an

9 RPV analysis?

10 A.          The attorney.

11 Q.          If you asked the attorney to undertake

12 an RPV analysis, what would happen?

13 A.          We would discuss whether, in his

14 opinion, the issue was actually there or not and

15 needed to be decided and further information

16 gathered on the outside.  I mean, his job is not

17 just to jump.

18 Q.          If you asked Mr. Walker to conduct an

19 RPV analysis, would one be conducted?

20 A.          First, I don't think -- I would not ask

21 Mr. Walker to do something.  I would ask Mr. Walker,

22 "What is your opinion?  Do we need to do this or

23 not?"  That's how it works.

24 Q.          I understand.  And if you asked him to

25 undertake a racial polarization analysis, would one

Page 81

1 be undertaken?

2 A.          You know, that's a hypothetical.  And

3 I'm not going to do a hypothetical.

4 Q.          Do you have the power, as senate chair

5 of the reapportionment committee, to ensure that the

6 individuals, the attorney, and the map drawer, for

7 example, comply with the Voting Rights Act?

8 A.          Well, yes.  That's their responsibility.

9 Q.          And if you decided that you needed a

10 racially polarized voting study done, could you

11 insist that they undertake one?

12 A.          Well, once again, you're doing something

13 hypothetical.  I depend on Mr. Walker for his legal

14 opinion and his experience.  He's got many more

15 years of experience than I do.

16          And what I most likely do with him is

17 say, "Dorman, what do you think about this?  Do we

18 need to do this or not?  Does it make any sense?"

19 Q.          Senator McClendon, I understand that

20 you're very personable and you rely on the opinions

21 of your attorneys.

22          What I'm asking you is if you have the

23 power to insist, as senate chair of the

24 reapportionment committee, that a racially polarized

25 voting study be undertaken?

Page 82

1 A.          You know, I don't know the answer to

2 that question.

3 Q.          You don't know whether or not you could

4 undertake --

5 A.          I don't know.  The only way I would know

6 is if I had exercised that and see how it worked

7 out.  But I've never exercised it, never thought

8 about exercising it.  So I don't know the answer to

9 that.

10 Q.          You didn't think about asking for an RPV

11 analysis when Representative England and

12 Representative Hall asked for one to be undertaken?

13 A.          It's like -- it's highly probable that

14 we discussed doing that afterwards, after the

15 meeting.  I may have discussed it with Mr. Walker.

16 And if he had thought it was of value and worthwhile

17 to do and would give us additional information that

18 we needed, it would have been ordered.  And if he

19 had felt like it was an exercise in futility and a

20 waste of time and money, he would have made that

21 expression, as well.

22 Q.          And did you ask Mr. Walker to undertake

23 an RPV analysis after the October 26th meeting?

24 A.          We may have talked about it.  But I

25 don't remember exactly doing that.

Page 83

1 Q.          How much did Alabama's population change

2 between 2011 and 2021?

3 A.          I believe it increased about 5 percent.

4 I think it went from 4.88 to a little over 5

5 million, 5,020,000 or something like that.

6 Q.          In this redistricting cycle, was

7 District 7 over or underpopulated?

8 A.          I think it was under.  Yes, I'm sure it

9 was under.

10 Q.          I'm going to go back to McClendon

11 Exhibit 6.  If you wouldn't mind please turning to

12 Page 19.

13          And if you could look at the second

14 paragraph on the page after Representative England

15 said, "It would appear that District 7 would look

16 like that would need to be done," referring to an

17 RPV analysis.

18          He goes on, "So it appears to me that if

19 we're doing this in the logical way, that District 7

20 just -- as it appears on a map, would produce a

21 certain percentage."

22          And he asks, "And what is the

23 relationship between the 54 percent that you're

24 citing and the actual results or potential results

25 of a racial polarization study?  What is the

Page 84

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 relationship between the two?"

2 A.          Let me --

3            Would you read your response?

4 A.          I'm sorry.  I thought you were done.  Go

5 ahead.

6 Q.          Would you please read your response?

7 A.          Let me read this sentence you just read.

8 So I would like to request that the study be done on

9 District 7.  And what is the relationship between

10 the 54 percent that you're citing and a racial

11 polarization study?  What is the relationship?

12            My response is, "I got no clue."

13 Q.          Does this seem like an accurate

14 representation of your conversation in the meeting,

15 the October 26 reapportionment committee meeting?

16 A.          I think it's fairly accurate.  I've

17 certainly found some errors in here.  But it's

18 probably close enough.

19 Q.          And do you still have no clue what the

20 relationship between the 54 percent number that you

21 cited earlier as not a threshold by which you would

22 consider an RPV analysis and the actual or potential

23 results of a racial polarization analysis?

24 A.          Okay.  Give me -- break that up.  That

25 was a couple of questions.  Give me the first one.

Page 85

1 Q.          It's just one question, but it's long.

2            I'm asking you if you still have no clue

3 with respect to the question that Representative

4 England asked you and that you just read?

5 A.          Here -- here's the issue.

6 Representative England apparently was targeting that

7 number of 54 percent of BVAP as if it were some sort

8 of threshold of do or die.

9            And even the courts, to my knowledge,

10 have never come up with a number that says you've

11 got to have this percent or you can't go below this

12 percent.  It's never happened.

13            So when somebody picks out a number of

14 54 percents and says that's good or bad, well,

15 Congresswoman Sewell was happy with it.  And she's

16 probably got a whole lot more information on her

17 electability in her own district than I have.

18 Q.          So I'm just going to point you back to

19 Page 17 of the transcript of your October 26th

20 meeting of the reapportionment committee where

21 before Representative England brought that up, you

22 had said, "Because of the black voting age

23 population in Congressional District 7, there was

24 not one needed," referring to an RPV analysis,

25 because it was over 54 percent BVAP.

Page 86

1            What did you mean by that?

2 A.          What I meant by that was it didn't look

3 like it was -- that a minority congresswoman was at

4 risk.  If she wanted to be elected again -- and

5 apparently she does -- there was nothing to suggest

6 it was close enough to think there was a threat to

7 her reelection.

8 Q.          And how is that related to the black

9 voting age population in District 7 at 54 percent?

10 A.          Well, most of the voters are a minority.

11 Q.          And so you were assuming that black

12 voters would vote for a black representative?

13 A.          That's pretty -- a pretty safe bet here

14 in Alabama.

15 Q.          And where did the 54 percent number come

16 from?

17 A.          Those -- those numbers are generated by

18 the software when the district is drawn.  But they

19 are generated after the district is drawn.

20 Q.          Did you talk to Representative Sewell

21 about the black voting age population in her

22 district?

23 A.          No, I did not.

24 Q.          Did you talk to Representative Sewell

25 about the congressional map?

Page 87

1 A.          No, I did not.

2 Q.          How do you know that Representative

3 Sewell was okay with the district, as you suggested,

4 based on the BVAP?

5 A.          I was told that by the map drawer who

6 interviewed Representative Sewell I think once in

7 person and once virtually.  Or it may have been a

8 staff person.  But they were okay with the district.

9 Q.          So you wanted to ensure that the BVAP in

10 districts with a minority candidate representing

11 them was not too low?

12 A.          Correct.

13 Q.          Did you take any steps to ensure that

14 the BVAP in any district was not too high?

15 A.          Not to my knowledge.

16 Q.          Who drew the maps for you in 2021?

17 A.          Randy Hinaman.

18 Q.          What is Randy Hinaman's role in the

19 redistricting process?

20 A.          He's the map drawer.

21 Q.          When did you first meet with Mr. Hinaman

22 about the redistricting cycle in 2021?

23 A.          In the spring of 2021, I guess.  I

24 don't -- I don't remember an exact date.

25 Q.          Who did you meet with Mr. Hinaman with?

Page 88

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

| | |
|---|---|
| 1 A.       I don't remember who was there. | 1 BVAP of around 54 percent? |
| 2 Q.       What was discussed? | 2 A.       I was told that in any of the districts |
| 3 A.       Pardon me?  What was what? | 3 that were drawn that needed this additional |
| 4 Q.       What did -- what did you all discuss? | 4 analysis, it had been requested. |
| 5 A.       I would just guess.  And I would say we | 5 Q.       Can you repeat your answer, please? |
| 6 probably discussed when are we going to see the data | 6 A.       I was told that any of the districts |
| 7 so we can go to work. | 7 that needed additional analysis, that that analysis |
| 8 Q.       Did you provide any instructions to | 8 had been requested. |
| 9 Mr. Hinaman in the spring of 2021? | 9 Q.       And were you told which districts |
| 10 A.       No. | 10 required analysis? |
| 11 Q.       Why not? | 11 A.       No. |
| 12 A.       He was -- he was more experienced than | 12 Q.       Did you know any criteria for which |
| 13 me. | 13 districts required an analysis? |
| 14 Q.       Did you provide Mr. Hinaman with any | 14 A.       I did not know the criteria. |
| 15 materials throughout any of the process of him | 15 Q.       When did you determine that your plan |
| 16 drawing the 2021 Alabama maps? | 16 didn't violate the Voting Rights Act? |
| 17 A.       No. | 17 A.       Well, sometime -- sometime prior to |
| 18 Q.       Why? | 18 submitting it to the redistricting committee for |
| 19 A.       There was no need to. | 19 consideration.  That was like part of the process, |
| 20 Q.       Why was there no need to? | 20 to make sure we were in compliance before |
| 21 A.       Well, he was the map drawer.  He knew | 21 introducing it for consideration for the other |
| 22 his job. | 22 committee members. |
| 23 Q.       Where was his job description? | 23 Q.       And when did you submit the |
| 24 A.       Where was his job description? | 24 congressional redistricting bill for consideration |
| 25           Defined. | 25 by the reapportionment committee? |
| Page 89 | Page 91 |
| 1 A.       You know, he -- I don't know the answer | 1 A.       The date -- the date we met that Tuesday |
| 2 to that. | 2 prior to the special session convening on Thursday. |
| 3           MS. SADASIVAN:  Would you mind if we | 3 Q.       So you determined before the October |
| 4 take a five-minute break? | 4 26th meeting that your map, the congressional |
| 5           THE VIDEOGRAPHER:  We are off the | 5 redistricting map you introduced, didn't violate the |
| 6 record.  The time is 4:26 p.m. | 6 VRA? |
| 7           (Recess was taken.) | 7 A.       I felt confident that was the case, yes. |
| 8           THE VIDEOGRAPHER:  We are back on the | 8 Q.       Do you know if an RPV analysis was |
| 9 record.  The time is 4:37 p.m. | 9 conducted for Congressional District 1? |
| 10 Q.       Senator McClendon, thank you again for | 10 A.       Do I know if it was conducted?  Is that |
| 11 sitting for the deposition and for your time. | 11 your question? |
| 12           Following up on McClendon Exhibit 6 | 12           No, I don't know if it was conducted. |
| 13 where we were discussing the quote where you said | 13 Q.       Who would know? |
| 14 that because of the black voting age population in | 14 A.       The attorney. |
| 15 Congressional District 7, there was not one needed | 15 Q.       And who is that? |
| 16 with respect to an RPV analysis because the district | 16 A.       His name is Dorman Walker. |
| 17 was over 54 percent BVAP.  That was the October 26th | 17 Q.       When did the special legislative session |
| 18 meeting of the reapportionment committee. | 18 on redistricting begin in Alabama in 2021? |
| 19           Did Mr. Walker tell you that a racial | 19 A.       The Thursday of that week following the |
| 20 polarization analysis was unnecessary because | 20 redistricting committee meeting.  And I don't |
| 21 District 7 had a BVAP of 54 percent? | 21 remember what the date was. |
| 22           MR. WALKER:  Object on the basis of | 22 Q.       Did you do anything to prepare for the |
| 23 attorney-client privilege. | 23 special session? |
| 24 Q.       Were you told that a racial polarization | 24 A.       Well, yes. |
| 25 analysis was unnecessary because District 7 had a | 25 Q.       What did you do to prepare for the |
| Page 90 | Page 92 |

Evan Milligan,et al v. John H.Merrill, et al.                    Jim McClendon
                                                                12/17/2021

1 special session?

2 A.          I tried to get the -- first, we handled

3 -- the senate handled the senate and the BOE map

4 first.  And so I wanted my information in place in

5 my hand that I would present to the standing

6 committee and ultimately to the senate floor.  So my

7 preparation was to have my bullet points convenient

8 before those meetings.

9 Q.          Did you review any maps of two majority

10 black districts in 2021?

11 A.          No.

12 Q.          Did you have the opportunity to vote on

13 any two majority black congressional district plans

14 in 2021?

15           MR. WALKER:  Did you say have the

16 opportunity to vote?

17           MS. SADASIVAN:  Yes.

18           MR. WALKER:  Okay.

19 A.          There may -- I don't -- and I'm not

20 certain.  But I think one was introduced on the

21 senate floor.  But I'm not sure.

22 Q.          You think that a bill creating two

23 majority minority districts was introduced on the

24 senate floor?

25           MR. WALKER:  May.

Page 93

1 A.          May have been introduced on the senate

2 floor.  Introduced on the senate floor.

3 Q.          So I am dropping into the chat and I'll

4 ask Mr. Walker to mark as Exhibit 7 or McClendon

5 Exhibit 7 a document that is the transcript of the

6 senate floor debate in Alabama on November 3, 2021.

7           Do you recognize the document?  It's on

8 my screen so you can see it.

9           MR. WALKER:  Oh, okay.  This is 7?

10           MS. WELBORN:  Yes.

11           MS. SADASIVAN:  Yes, sir.

12

13           (Plaintiff's Exhibit 7 was

14           marked for identification.)

15

16 Q.          And I have the exhibit pulled up, as

17 well.  Take a minute to look at it, Senator

18 McClendon, please.

19 A.          What did you say?

20 Q.          Will you just take a minute to look at

21 the transcript, and at the end confirm yes or no

22 whether it generally appears accurate of the senate

23 floor debate in 2021 on the various redistricting

24 bills in the special legislative session.

25 A.          Where does this start dealing with the

Page 94

1 congressional plan?

2 Q.          Let me just scroll down.

3           I guess my question was initially -- and

4 I'm seeing on Page 27 there's the beginning of a

5 discussion between Senator McClendon and Senator

6 Singleton.

7           But I had first asked, Senator

8 McClendon, if you could look through the transcript

9 and see if it generally appears accurate of the

10 senate floor debate on November 3, 2021, in the

11 Alabama senate.  I will represent to you that it's

12 the transcript from the video that we received.

13 A.          And I'll accept that, that it is a

14 transcript of the senate floor.

15 Q.          And in this transcript, you vote against

16 a map introduced by Senator Singleton and Senator

17 Hatcher.  Can you --

18 A.          What page is that on?

19 Q.          I believe the motion is -- the

20 substitute was offered by Senator Hatcher on Page

21 39.

22 A.          Okay.

23 Q.          And Senator McClendon moved it for an up

24 or down vote on Page 40, and then votes against it

25 on Page 41.  Do you see that?

Page 95

1 A.          Okay.  Yeah, I do.  I do.

2 Q.          Can you tell me why you voted against

3 Senator Hatcher's two majority minority district

4 plan?

5 A.          You know, if I recall correctly, his map

6 pitted -- put two incumbent congressional members in

7 the same district.

8           Did you hear me?

9 Q.          I can.  I asked you why you voted

10 against Senator Hatcher's plan.

11 A.          And my response was that, among other

12 things, the most blatant thing and easiest to notice

13 was that he had put two incumbents in the same

14 district.

15 Q.          You agree that the black voting age

16 population of the state of Alabama is approximately

17 27 percent of the state?

18 A.          Approximately.

19 Q.          Did that factor in to how you voted on

20 Senator Hatcher's map?

21 A.          It had nothing to do with it.

22 Q.          Did you have the opportunity to vote on

23 Senator Singleton's proposed map?

24 A.          I did.

25 Q.          And how did you vote?

Page 96

Evan Milligan,et al v. John H.Merrill, et al.                    Jim McClendon
                                                                    12/17/2021

1  A.       A nay.
2  Q.       And why did you vote nay?
3  A.       I think the blatant problem with his map
4  was that no minority candidate had a majority
5  district.  He had --
6  Q.       And when you say a minority candidate
7  had a majority district, what do you mean?
8  A.       I think he drew two districts they
9  called opportunity districts.  But no minority
10 candidate had a majority of the voters in either of
11 those districts.
12 Q.       With respect to Senator Hatcher's map,
13 you said you voted against it because two incumbents
14 were paired?
15 A.       I think that is -- I think that's
16 correct.
17 Q.       And what is -- in terms of your
18 understanding of the law, what is a more important
19 criteria for a map proposed by the Alabama
20 legislature?  Compliance with federal law and the
21 Voting Rights Act or ensuring incumbents are not
22 paired?
23 A.       You're asking me to say what's most
24 important among those three or what takes precedent?
25 Is that what your question is?
                                                    Page 97

1  hearings occurred between the hours of 9:00 a.m. and
2  5:00 p.m.
3  A.       Most all of them did.  I guess there's
4  one exception to that.  And that would have been the
5  meeting at the state house in Montgomery.
6  Q.       How many public hearings were held at
7  the same time as another public hearing?
8  A.       Zero.
9  Q.       In other words, how many public hearings
10 overlapped with another one of the public hearings?
11 A.       Zero.
12 Q.       No public hearings occurred at the same
13 time as another public hearing?
14 A.       Correct.
15 Q.       And when did you finalize the times of
16 the public hearings?
17 A.       It would have been sometime in July,
18 early July.  Actually, it was done twice.  The first
19 time, it was targeted to be completed by June 30th.
20 And then we added six more, and that just tacked
21 them on the end.  So it was in the early part of
22 July.
23 Q.       So you added six more why?
24 A.       Representative Hall requested it.
25 Q.       How did she request additional hearings?
                                                    Page 99

1  Q.       Yes, sir.
2  A.       Well, you always have to assume that
3  federal law supersedes state law.  But in this case,
4  it was -- it didn't matter.  It was just -- it was
5  an -- it was an inappropriate situation.
6           Actually, what happens when you pit two
7  incumbents, suddenly the redistricting committee is
8  picking winners and losers.  And that should be up
9  to the voters.
10 Q.       The reapportionment committee -- just to
11 go back a little bit to the public hearings that you
12 held on redistricting.  How many were there?
13 A.       Still 28.
14 Q.       And how many occurred between the hours
15 of 9:00 and 5:00?
16 A.       Well, I don't know.  I would have to --
17 I would have to go back.  I think most -- most of
18 them did, yeah.
19 Q.       If I say the McClendon exhibit, I'm
20 afraid I will get it wrong.  But it has the schedule
21 of the public hearings.
22 A.       That would be Number 4.
23 Q.       Thank you, sir.
24 A.       Okay.  What is your question, now?
25 Q.       I asked how many of the 28 public
                                                    Page 98

1  A.       Email.
2  Q.       Sir, I am going to drop in the chat and
3  I will share my screen and ask Mr. Walker if he
4  could please mark this as, I believe, McClendon
5  Exhibit 7.
6           MR. WALKER:  Eight.
7           MS. SADASIVAN:  Eight.  Gosh.  Why am I
8  always one off?  It's Friday.
9  Q.       So I'm showing you what I've asked
10 Mr. Walker to mark as McClendon Exhibit 8.  I'm
11 scrolling down to the bottom where it says RC
12 045704.
13           MS. WELBORN:  Kathryn, can you scroll
14 all the way up?  We don't know what the document is.
15           MS. SADASIVAN:  So the document says RC
16 045697.  This was produced by Mr. Walker yesterday.
17           MS. WELBORN:  What does it look like on
18 the first page so we can figure out which one it is?
19           MS. SADASIVAN:  It looks like this.
20           MR. WALKER:  Okay.
21
22           (Plaintiff's Exhibit 8 was
23           marked for identification.)
24
25 A.       Is this -- okay.  Exhibit 8.
                                                    Page 100

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1          MR. WALKER:  She's turned it back a page
2 or two.
3    Q.          So if you look on Page 12 of the exhibit
4 that Mr. Walker handed you, it's marked at the
5 bottom with Bates number RC 045712.
6    A.          **712.  Okay.  I've got 712.  What page?**
7    Q.          045712.  It's page 12 of that PDF.
8    A.          **712.  I've got Page 1.**
9    Q.          Do you recognize on Page -- I guess the
10 page that we just landed on, did you recognize the
11 document that you're looking at, Mr. McClendon?
12   A.          **Yes.  Well, I have it in front of me.**
13 **Let me look at it.**
14               **Yes, I've seen this before.**
15   Q.          Where have you seen it before?
16   A.          **I probably -- I probably received a copy**
17 **of it, of the email.**
18   Q.          What is this that you're looking at?
19   A.          **This is Representative Hall, I guess.**
20 **Yes.  This is when she made a request for additional**
21 **meetings.  And she sent that to the staff office and**
22 **they forward a copy to me.**
23   Q.          So in her email that we're looking at
24 right now, Representative Hall says, "During the May
25 5th committee meeting, members agreed to hearing
                                              Page 101

1 locations that would not require constituents to
2 travel more than one county.  However, the proposed
3 location map will require interested parties to
4 travel significant distances to participate."
5               Going down, it says, "While it may not
6 be feasible for all committee members to attend
7 every public hearing, the proposed schedule requires
8 members to 'pick and choose' hearings and will not
9 have the full benefit of the public hearing
10 testimony and discussion of any alternative maps
11 introduced."
12               On the second page -- on the following
13 page, which is Bates number RC 045713,
14 Representative Hall says, "In addition, the timing
15 of each hearing is unsatisfactory.  Hearings held
16 during working days cannot be viewed objectively as
17 providing the opportunity for public input."
18               How did you respond to Representative
19 Hall's concerns about the timing of the public
20 hearings?
21   A.          **I think I called my attorney and**
22 **basically said, "How do you want to handle this?**
23 **What do you think we need to do?"  And --**
24               MR. WALKER:  Do not discuss what I said
25 to you.
                                              Page 102

1    A.          **But I cannot discuss what he said to me.**
2    Q.          You stated earlier that the time and
3 manner of the public hearings is not governing by
4 Alabama law, correct?
5    A.          **Not to my knowledge.**
6    Q.          So when Representative Hall asked for
7 other times for the public hearings, was there any
8 legal constraints to the times that you could select
9 for the public hearings?
10   A.          **Not to my knowledge.**
11   Q.          Why did you not change the times of the
12 public hearings based on this email?
13   A.          **That was being -- we used our staff and**
14 **we used our liaison from the community college**
15 **system to contact the local community colleges and**
16 **locations and to see what would work out for**
17 **everybody involved.  And that's how it came about.**
18               MS. SADASIVAN:  I think that's all the
19 questions I have.  The Singleton and the Caster
20 plaintiffs may have questions.
21               MR. OSHER:  I have a few questions.
22 Jim, if you want to go first for Singleton, you're
23 more than welcome to.  He might not be on.
24               Okay.  Senator, give me one moment, sir.
25
                                              Page 103

1 EXAMINATION BY MR. OSHER:
2    Q.          Senator McClendon, can you hear me?
3    A.          **I can hear you very well.**
4    Q.          Oh, well that's a surprise.  That never
5 happens.  Thank you for your time today.  I just
6 have a few questions.
7               I believe -- am I correct that you were
8 in the room when Representative Pringle was taking
9 his deposition?
10   A.          **You are correct.**
11   Q.          Or I should say was having his
12 deposition taken.
13               And so I assume that you heard the
14 questions that I asked him.  Is that correct?
15   A.          **That is correct.**
16   Q.          I'm just going to ask you the same
17 questions.
18               How long have you been serving in the
19 Alabama legislature?
20   A.          **19 years.**
21   Q.          19 years.  And have you been a member of
22 the republican party that whole time?
23   A.          **Well, I've always run as a republican.**
24 **And I believe I've been a dues-paying member of the**
25 **county republican group that whole time.**
                                              Page 104

**Evan Milligan,et al v. John H.Merrill, et al.**

**Jim McClendon**
**12/17/2021**

1 Q.          And have you -- have you always been a
2 member of the republican party?
3 A.          Well, "always been" goes back a long
4 way.  I think I've been a member of the republican
5 party as long as I've been a candidate or an elected
6 official.
7 Q.          And how long does that date back until
8 in the -- in the past?
9 A.          2001.
10 Q.          Okay.  Based your 19 years serving in
11 the legislature, in your view, do the views of the
12 members of the democratic party in Alabama generally
13 differ from the members of the republican party in
14 Alabama when it comes to the issue of removing
15 confederate monuments from public spaces?
16 A.          You know, I think if you make that broad
17 and say generally, I think I can agree with that
18 statement.  There -- there are definitely
19 exceptions.  But I think with the "general" in
20 there, I can say I generally agree with your
21 statement.
22 Q.          So the answer to my question was yes?
23 A.          Yes.
24          MR. WALKER:  Objection to form.  He
25 answered that he can generally agree.
                                              Page 105

1 Q.          My question was do the members of the
2 democratic party, generally do their views generally
3 -- I should start over.
4          Do the views of the members of the
5 democratic party generally differ from the views of
6 the members of the republican party in Alabama
7 generally when it comes to removal of confederate
8 monuments in public spaces?
9 A.          I think I can agree with that.
10 Q.          You think you can agree?  Can you give
11 me a yes or no answer on that question?
12          MR. DAVIS:  Objection, asked and
13 answered.
14          THE WITNESS:  So objection, what does
15 that mean for me?
16          MR. WALKER:  That means you don't
17 answer.
18 Q.          Well, it doesn't mean you don't answer.
19 I believe that's a form objection.
20          MR. WALKER:  Excuse me.  Forgive me.
21 You're right.  Sorry, Dan.
22          MR. OSHER:  That's okay.
23 Q.          Senator, if you wouldn't mind answering
24 the question.
25 A.          Yes.
                                              Page 106

1 Q.          Thank you.  I appreciate it.  A few
2 more.
3          Based on your 19 years in the Alabama
4 legislature, do the views of the members of the
5 democratic party in Alabama generally differ from
6 the members of the republican party in Alabama when
7 it comes to the issue of affirmative action?
8 A.          And we'll get back to the discussion you
9 had earlier on affirmative action.  I'm not even
10 exactly sure of a definition of affirmative action.
11 I remember hearing that term some years ago.  But it
12 hasn't been around in a while.  So I'm real hesitant
13 about answering that question.
14          One other thing I would like to point
15 out.  You're talking about members of the democratic
16 party, members of the republican party, right?
17 That's who you're asking me about.
18          Well, I don't attend any of the
19 democratic party meetings.  Now, I know a lot of
20 democrats that are in the legislature.  So I'm more
21 likely to have a feeling for a democratic rather
22 than a member of the democratic party.  Do you
23 understand what I'm saying?
24 Q.          So let me ask you this:  In your 19
25 years serving in the -- in the Alabama legislature,
                                              Page 107

1 have you worked with your democratic party -- your
2 democratic party colleagues on issues related to
3 pending legislation?
4 A.          Yes.
5 Q.          And have you worked with republican
6 members of the Alabama legislature on pending
7 legislation and other issues?
8 A.          Yes.
9 Q.          And in that time, have you gained a
10 general view of what the democratic party in Alabama
11 supports and what the republican party in Alabama
12 supports?
13 A.          Yes.
14 Q.          Okay.  So you -- in terms of affirmative
15 action, let's define affirmative action as giving
16 preference to individual -- considering individual
17 race when making certain decisions about admission
18 to programs or access to benefits.
19          Using that definition, based on your
20 experience in the legislature, do the views of the
21 democratic party in Alabama generally differ from
22 the members -- the views of the members of the
23 republican party in Alabama?
24 A.          I really don't have an opinion on that.
25 And the reason is the issue simply has not come up,
                                              Page 108

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1  it's not in front of me, and I have no experience
2  with members of the democrats or the republicans on
3  that issue.  So I can't speak for something that
4  hasn't happened.
5  Q.        Sure.
6            Based of your experience in the Alabama
7  legislature, do the views of members of the
8  democratic party in Alabama generally differ from
9  the members of the republican party in Alabama when
10 it comes to criminal justice reform?
11 A.        Okay.  And your question is they have
12 disparate or different views?  Republicans have
13 different views from democrats on criminal justice
14 reform?  That's your question, correct?
15 Q.        As a general matter, correct.
16 A.        As a general matter, I agree with that
17 statement.
18 Q.        And based on your experience in the
19 legislature, do the views of the members of the
20 democratic party in Alabama differ from the views of
21 the members of the republican party in Alabama when
22 it comes to whether there is a significant amount of
23 discrimination against black residents of the state
24 today?
25 A.        Once again, I need to take a party

Page 109

1  MR. DAVIS:  Any questions from the
2  Singleton plaintiffs?
3            I've got just a couple.
4  EXAMINATION BY MR. DAVIS:
5  Q.        Hello, Senator.
6  A.        Hello.
7  Q.        Jim Davis representing Secretary
8  Merrill.
9            Senator, how many members are there of
10 the Alabama senate?
11 A.        35.
12 Q.        And do they all have a vote on
13 legislation?
14 A.        Yes, they do.
15 Q.        Does that include redistricting
16 litigation?
17 A.        That is correct.
18 Q.        Excuse me.  I said "litigation."  I
19 meant legislation.
20 A.        Legislation.
21 Q.        Do all senators' votes count the same?
22 A.        Yes.
23 Q.        Do you know why any other member of the
24 Alabama senate voted for or against a redistricting
25 plan?

Page 111

1  business out.  I see the party as these two
2  organizations.  These people I know claim to be
3  democrats.  Some of them claim to be republicans.
4  Whether they belong to -- are active in a party or
5  not, I have no idea.
6            Now let's go back to the heart of your
7  question, and I'll try to answer it.  With that in
8  mind, ask me your -- ask me your question.  What is
9  the topic here?
10 Q.        The fourth topic that I'm asking if the
11 members -- if the views of the members of the
12 democratic party generally differ from the views of
13 the members of the republican party generally.
14            Based on your experience working in the
15 legislature with members of both parties, do their
16 views generally differ when it comes to the issue of
17 whether there is a significant amount of
18 discrimination against black residents of Alabama
19 today?
20 A.        Yes.
21            MR. OSHER:  Thank you very much.  That's
22 all I have for you.  Thank you for your time,
23 Senator.
24 A.        You're very welcome.
25            MR. WALKER:  Are we done?

Page 110

1  A.        No.  That's an individual decision.
2  Q.        And how many members are there of the
3  Alabama house of representatives?
4  A.        105.
5  Q.        And they all have votes on legislation?
6  A.        They certainly do.
7  Q.        Including redistricting legislation?
8  A.        Correct.
9  Q.        And their votes all count the same as
10 one anothers?
11 A.        That's correct.
12 Q.        Do you know why any member of the
13 Alabama house of representatives voted for or
14 against any plan, any redistricting plan?
15 A.        No.  That's an individual decision.
16 Q.        Did you instruct Randy Hinaman to be
17 sure to include a majority black district in an
18 Alabama congressional plan draft?
19 A.        I did not.
20 Q.        Did you decide ahead of time that
21 Alabama's plan must include a majority black
22 district?
23 A.        I did not.
24 Q.        Was your understanding that those
25 districts, when drafted, would be done so without

Page 112

Evan Milligan,et al v. John H.Merrill, et al.                    Jim McClendon
                                                                   12/17/2021

| | |
|---|---|
| 1 consideration of race? | 1 STATE OF ALABAMA ) |
| 2 **A.** **That is correct.** | 2 JEFFERSON COUNTY ) |
| 3 Q. To the best of your knowledge, was that, | 3 |
| 4 in fact, how it was done? | 4 I hereby certify that the above |
| 5 **A.** **That is exactly how it was done.** | 5 proceedings were taken down by me and transcribed by |
| 6 MR. DAVIS: Thank you, Senator. | 6 me using computer-aided transcription and that the |
| 7 **A.** **You're welcome.** | 7 above is a true and correct transcript of said |
| 8 MR. WALKER: Do we have anything | 8 proceedings taken down by me and transcribed by me. |
| 9 further? | 9 I further certify that I am neither of |
| 10 MS. SADASIVAN: Nothing from the | 10 kin nor of counsel to any of the parties nor in |
| 11 Milligan plaintiffs. Thank you, Senator, for your | 11 anywise financially interested in the result of this |
| 12 time and sitting for the deposition. I appreciate | 12 case. |
| 13 it. | 13 I further certify that I am duly |
| 14 MR. OSHER: Nothing from the Caster | 14 licensed by the Alabama Board of Court Reporting as |
| 15 plaintiffs. Thank you all. | 15 a Certified Court Reporter as evidenced by the ACCR |
| 16 MR. WALKER: Kathryn, I need to get to | 16 number following my name found below. |
| 17 you, in addition to my privilege log, the final | 17 So certified on December 17, 2021. |
| 18 statement of -- you know, the sheet where I state | 18 |
| 19 the request for production and then I state | 19 |
| 20 underneath the documents. Can I get that to you on | 20 |
| 21 Monday? You've got all the documents. I just need | 21 |
| 22 to give you the sheet that says which ones refer to | 22 |
| 23 which of your requests. | 23 LeAnn Maroney, Commissioner<br>ACCR# 134, Expires 9/30/25 |
| 24 THE REPORTER: Are we on the record? | 24 505 North 20th Street, Suite 1250<br>Birmingham, AL  35203 |
| 25 MS. WELBORN: Can we go off the record | 25 |
| Page 113 | Page 115 |

| | |
|---|---|
| 1 now? | |
| 2 MR. WALKER: Yeah, sure. | |
| 3 THE VIDEOGRAPHER: This ends the | |
| 4 deposition of Jim McClendon. The time is now | |
| 5 5:12 p.m. | |
| 6 | |
| 7 (DEPOSITION ENDED AT 5:12 P.M.) | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| Page 114 | |

Evan Milligan,et al v. John H.Merrill, et al.                                   Jim McClendon
                                                                              12/17/2021

### WORD INDEX

**< 0 >**
**001929**   47:*1*
**045697**   100:*16*
**045704**   100:*12*
**045712**   101:5, 7
**045713**   102:*13*

**< 1 >**
**1**   6:9   19:*15*
  21:*7*   35:*8, 22*
  37:*24*   70:*22*
  92:*9*   101:*8*
**1:57**   1:*24*   7:*17*
**1:59**   9:*5*
**10**   4:*19*   14:*19*
**100**   6:*23*
**10004**   4:*5*
**10006**   3:*15*
**104-111**   6:*3*
**105**   1:*23*   5:*14*
  112:*4*
**11**   27:*24*
**1-10-43**   14:*18*
**111-114**   6:*4*
**12**   101:3, 7
**125**   4:*4*
**1250**   115:*23*
**134**   115:*23*
**14**   26:*10*
**140**   79:*20*
**1400**   3:*7*
**14th**   3:*21*
**17**   1:*24*   7:7,
  *17*   79:*23*   80:*1*
  86:*19*   115:*17*
**19**   84:*12*
  104:*20, 21*
  105:*10*   107:*3,*
  *24*
**1943**   14:*19*
**1965**   65:*8*
  66:*9, 12*
**1999**   3:*7*

**< 2 >**
**2**   6:*11*   35:*6*
  36:2, 7, 24
  39:*19, 23, 24,*
  *25*   40:*2*   47:*21*

**49:*22*   65:*11,*
  *14*   66:*20*
**2:04**   9:*8*
**2:2021-CV-01530-**
  **AMM**   1:*8*
**2:21-CV-01530-AMM**
  7:*14*
**200**   5:*14*
**2000**   38:*13*
**20002**   4:*20*
**20005**   3:*22*
**2001**   24:*18*
  42:*15, 20*   43:*6*
  105:*9*
**2010**   33:*12*
  38:*8*
**2011**   6:*12*
  28:*5*   30:*12*
  31:*9*   32:*10, 16,*
  *23*   33:*21*   34:*9*
  36:*13, 20*
  37:*15, 25*
  40:*15, 21*   42:*7*
  43:*3, 10, 13, 17*
  45:*4, 13, 17, 22*
  46:*5*   51:*8*
  52:2, *15*   84:*2*
**2014**   26:*10, 15*
**2021**   1:*24*
  6:*18, 20, 22*
  7:7, *17*   26:*3*
  30:*12*   45:*7*
  52:*23*   53:*2*
  57:*6, 19*   58:*2*
  61:*6*   62:*25*
  64:*21*   65:*2*
  70:*10, 18*
  74:*13*   76:*13*
  77:*8*   84:*2*
  88:*16, 22, 23*
  89:*9, 16*   92:*18*
  93:*10, 14*   94:*6,*
  *23*   95:*10*
  115:*17*
**205)999-8096**
  14:*24*
**20th**   115:*23*
**22**   33:*16*   63:*1*
**23**   40:*14*
**26**   6:*20*   16:*19*
  76:*13*   77:*8*
  85:*15*

**26th**   75:*21, 23*
  78:*19*   83:*23*
  86:*19*   90:*17*
  92:*4*
**27**   95:*4*   96:*17*
**28**   98:*13, 25*
**29th**   59:*11*

**< 3 >**
**3**   6:*13, 22*
  39:*23, 24, 25*
  40:*2*   46:*24*
  47:*9*   51:*19*
  94:*6*   95:*10*
**3:09**   51:*14*
**3:22**   51:*17*
**30**   60:*8*   71:*9*
**30th**   58:*20*
  59:*9*   99:*19*
**32**   71:*10*
**35**   6:*9*   111:*11*
**35203**   115:*24*
**36**   6:*11*
**361**   14:*22*
**36104**   1:*24*
  5:*15*
**36106**   4:*12*
**36130**   5:*6*
**39**   95:*21*

**< 4 >**
**4**   6:*15*   39:*23,*
  *24, 25*   40:*2, 14*
  61:5, *12*   63:*18*
  98:*22*
**4.88**   84:*4*
**4:26**   90:*6*
**4:37**   90:*9*
**40**   3:*14*   95:*24*
**41**   95:*25*
**47**   6:*13*

**< 5 >**
**5**   3:*14*   6:*17*
  39:*21*   43:*20,*
  *22*   44:*8, 12, 14,*
  *18, 23*   45:*1*
  64:*3, 16*   70:*17,*
  *18*   79:*23*   84:*3,*
  *4*
**5,020,000**   84:*5*

**5:00**   98:*15*
  99:*2*
**5:12**   114:5, 7
**50**   17:*1*   24:*25*
  26:*1*
**501**   5:*5*
**505**   115:*23*
**54**   80:9, *20, 21*
  84:*23*   85:*10,*
  *20*   86:7, *14, 25*
  87:9, *15*   90:*17,*
  *21*   91:*1*
**5th**   64:*1*
  70:*10*   101:*25*

**< 6 >**
**6**   6:*19*   76:*15,*
  *22*   79:*24, 25*
  84:*11*   90:*12*
**600**   3:*21*   4:*19*
**61**   6:*15*
**6179**   4:*11*
**64**   6:*17*

**< 7 >**
**7**   6:*21*   43:*5*
  80:*8*   81:*2*
  84:7, *15, 19*
  85:*9*   86:*23*
  87:*9*   90:*15, 21,*
  *25*   94:4, 5, 9,
  *13*   100:*5*
**700**   3:*21*
**712**   101:6, *8*
**76**   6:*19*

**< 8 >**
**8**   6:*23*   100:*10,*
  *22, 25*

**< 9 >**
**9/30/25**   115:*23*
**9:00**   98:*15*
  99:*1*
**90067**   3:*8*
**9-103**   6:*2*
**94**   6:*21*

**< A >**
**a.m**   99:*1*
**ability**   11:*2, 6*

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

able   8:5
  11:21   22:10
  56:13   67:8
  78:11
accept   95:13
Access   40:7
  108:18
accordance
  39:10   40:14
account   15:9, 18
accounts   15:16
ACCR   115:15, 23
accurate   50:18
  85:13, 16
  94:22   95:9
Act   39:8, 18,
  21   43:21
  47:25   50:11
  65:7, 11, 14
  66:9, 12, 21
  67:5, 8, 11, 14,
  23   68:1, 3, 8,
  18   69:9, 14, 19,
  24   77:20   82:7
  91:16   97:21
acting   7:3
action   39:16
  41:5, 7   107:7,
  9, 10   108:15
active   110:4
activity   27:19,
  23
actual   27:25
  28:12, 17
  84:24   85:22
add   58:15
added   58:25
  99:20, 23
addition   102:14
  113:17
additional   6:24
  12:7   56:2
  77:16   83:17
  91:3, 7   99:25
  101:20
address   14:21
adjectives   67:2
admission   108:17
adopt   70:8
adopted   39:5
  64:19   74:11

adopting   65:25
adoption   37:12
advance   19:18
advised   68:15
affect   11:2, 6
affirmative
  107:7, 9, 10
  108:14, 15
afraid   98:20
afternoon   9:10
age   43:13, 17
  80:7, 10, 17, 20,
  22   86:22   87:9,
  21   90:14   96:15
agenda   75:20
ago   10:6   27:6
  107:11
agree   78:14
  96:15   105:17,
  20, 25   106:9,
  10   109:16
AGREED   1:17
  2:1, 8   101:25
ahead   57:9, 10
  62:23   66:23
  85:5   112:20
al   1:6, 10
  7:13, 14   115:24
ALABAMA   1:2, 23
  4:10, 12   5:6,
  15   7:2, 3, 16,
  20   8:3   9:20
  14:22   15:7, 23,
  25   17:4, 13, 14,
  23   24:24   26:7,
  9, 20   27:9
  38:7   39:12
  40:15   42:10
  44:12, 14, 19,
  23   45:16   51:7
  59:16, 19
  71:20, 22   72:9
  75:2   87:14
  89:16   92:18
  94:6   95:11
  96:16   97:19
  103:4   104:19
  105:12, 14
  106:6   107:3, 5,
  6, 25   108:6, 10,
  11, 21, 23
  109:6, 8, 9, 20,

  21   110:18
  111:10, 24
  112:3, 13, 18
  115:1, 14
Alabama's   28:5
  38:10   84:1
  112:21
Ali   5:20
allow   11:19
  12:10
alternative
  102:10
amended   65:8
amendments   40:16
American   4:3, 10
amount   56:20,
  22   109:22
  110:17
analysis   69:20
  77:12, 24   81:9,
  12, 19, 25
  83:11, 23
  84:17   85:22,
  23   86:24
  90:16, 20, 25
  91:4, 7, 10, 13
  92:8
Angeles   3:8
announce   58:14,
  17
announced   59:3
anothers   112:10
answer   12:1, 20,
  21   14:10   21:9
  26:16   31:10
  34:6   37:20
  40:23   43:4, 7
  44:8   45:20
  50:20   51:25
  58:3   60:16, 22
  69:11   83:1, 8
  90:1   91:5
  105:22   106:11,
  17, 18   110:7
answered   26:15
  51:5   105:25
  106:13
answering   12:2,
  13   106:23
  107:13
answers   11:3, 7,

  18
Anybody   55:10
anywise   115:11
apologize   39:24
  79:25
apparently   86:6
  87:5
appear   64:17
  84:15
appears   84:18,
  20   94:22   95:9
applied   44:18,
  23
apply   44:12, 14
appreciate
  35:14   107:1
  113:12
approach   27:22
approval   34:14
approve   34:15
  48:1
approving   34:19
approximately
  96:16, 18
area   72:10, 13
arrive   56:17
article   47:16,
  20   48:25   49:2
  51:21
asked   12:9
  30:16   36:1
  51:3   56:1
  58:8   60:7
  73:17   80:3
  81:11, 18, 24
  83:12   86:4
  95:7   96:9
  98:25   100:9
  103:6   104:14
  106:12
asking   30:21
  40:1   44:3, 6,
  22   48:11, 13
  50:1   53:11
  54:9, 22   62:24
  65:18, 21   67:3
  73:20   78:1
  82:22   83:10
  86:2   97:23
  107:17   110:10
asks   84:22

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

assign  2:12
assistance  40:12
Assistant  5:3
assume  12:12
  98:2  104:13
assuming  87:11
astray  29:22
attempt  42:22
attempting  73:18
attend  102:6
  107:18
attention  23:6
Attorney  3:5,
  12, 19  4:2, 9,
  17  5:3, 4, 12
  7:20  12:17, 21,
  25  13:5  19:11
  20:7  28:12, 24,
  25  29:18, 25
  30:19, 24  31:6,
  12  37:22  41:8
  42:2  53:7, 11,
  14, 24  54:13,
  19, 24  55:7, 12
  56:6, 11  66:1
  67:18  68:4, 11,
  16  81:10, 11,
  82:6  92:14
  102:21
attorney-client
  53:12  90:23
attorneys  7:18
  8:9  82:21
attributed  50:7
audio  8:5, 7
  66:23
available  9:14
  40:10  52:21
Avenue  3:7  5:5

< B >
back  9:7
  19:11  22:12
  44:8  51:16
  56:4, 9  58:10
  73:9  84:10
  86:18  90:8
  98:11, 17
  101:1  105:3, 7
  107:8  110:6
background  14:15
bad  86:14

Balch  1:22
  5:13  7:23
Ballroom  62:16
based  12:14
  28:3  32:23
  69:25  88:4
  103:12  105:10
  107:3  108:19
  109:6, 18
  110:14
basically  56:24
  102:22
basis  69:22
  81:2  90:22
bat  74:8
Bates  101:5
  102:13
began  75:2
beginning  7:12
  37:25  39:1
  49:23  50:9
  80:6, 25  95:4
begins  28:13
behalf  8:12
belief  40:24
believe  23:23
  25:24  49:16
  50:2, 8, 13
  58:21  74:19,
  23  75:7  84:3
  95:19  100:4
  104:7, 24
  106:19
believed  48:17
belong  110:4
belt  72:9, 15,
  18, 20, 24  73:3,
  5
benchmarks
  47:24  48:3
benefit  102:9
benefits  108:18
best  30:3
  113:3
bet  87:13
better  14:16
  52:11  72:25
big  28:21
bigger  28:2
bill  21:3, 11,
  24  22:1, 16
  40:4, 17  45:18,

23  46:1, 2, 3
  91:24  93:22
bills  21:17, 19,
  25  45:22
  63:15  75:25
  94:24
Bingham  1:23
  5:13  7:24
Birmingham  7:2
  8:2  16:3, 9
  115:24
birth  14:17
bit  14:16
  52:9, 11  53:17
  79:5  98:11
black  43:6, 13,
  17  62:4  72:9,
  15, 18, 20, 24
  73:3, 5  80:7,
  9, 14  81:5
  86:22  87:8, 11,
  12, 21  90:14
  93:10, 13
  96:15  109:23
  110:18  112:17,
  21
blatant  96:12
  97:3
board  38:11, 15
  56:23  115:14
body  20:9
BOE  46:1  71:4
  93:3
born  15:22
bottom  100:11
  101:5
Box  4:11
break  13:15
  14:8, 11  49:7,
  11  51:11
  85:24  90:4
breaking  51:2
Brian  47:17
Broad  4:4
  105:16
brought  46:8, 9,
  11, 12  78:25
  86:21
bullet  19:6
  93:7
Bureau  38:9

54:11
business  110:1
Buskey  47:18,
  22  48:18
BVAP  86:7, 25
  88:4, 9, 14
  90:17, 21  91:1

< C >
California  3:8
call  34:20
  56:15  57:1
called  41:18
  63:14  97:9
  102:21
candidate  88:10
  97:4, 6, 10
  105:5
candidates  25:5
capacity  9:19
care  35:11
career  24:15
carefully  54:16
carried  49:24
carry  31:1, 2
CASE  1:7  7:14
  9:13  17:24
  18:5, 6  19:7
  23:14, 22, 23
  24:4, 9  46:21
  47:17  77:15
  92:7  98:3
  115:12
cases  10:15
  30:3  31:5
  66:18  67:8
  77:21
CASTER  4:15
  8:15  103:19
  113:14
cause  7:8
cell  13:14
census  32:23
  33:12  38:8, 9,
  13  40:8  54:11,
  14, 18, 25
Center  62:16
certain  30:14
  37:19  84:21
  93:20  108:17

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

Certainly   49:12
52:19   85:17
112:6
certified   76:12
115:15, 17
certify   7:4
115:4, 9, 13
chair   26:25
27:6   29:10, 15
30:6, 13, 17
31:17, 23   32:4,
7, 9   53:3, 5, 7,
13   54:20, 23
56:5, 9   57:3
65:3, 20, 22
82:4, 23
chairman   10:10
28:7, 9
challenge   24:10
challenged   24:13
chance   49:10
78:7
chancellor
55:20   58:7
change   21:9
54:13   78:5
84:1   103:11
changed   28:16
54:25
changes   38:12
characteristics
72:23
chat   19:13
35:4   36:13, 15,
17   46:21   61:2
63:17   76:10
94:3   100:2
child   16:24, 25
choice   74:7
choose   102:8
Chris   18:19, 23
cited   85:21
citing   84:24
85:10
city   71:25
72:3, 6
CIVIL   1:7   4:3,
10   7:5, 14
claim   110:2, 3
clarify   12:10
51:19

close   62:17
85:18   87:6
clue   85:12, 19
86:2
cochair   9:19
28:24
cochairs   29:11
colleagues   108:2
collection   21:8
college   16:1, 3
55:19   62:8, 17,
20   103:14
colleges   62:5,
10   103:15
come   21:19
52:10   86:10
87:15   108:25
comes   25:14
43:23   105:14
106:7   107:7
109:10, 22
110:16
commencing   1:24
commissioner
7:3   115:22
committee   9:20
20:14, 17, 21
21:12, 13, 15,
18, 20, 22   22:1,
10, 17, 19
26:22, 23, 24,
25   27:10, 13,
14, 20   28:2, 17
29:16   30:1, 7,
18, 21   31:14,
18, 23   32:3, 4,
6, 10   33:21
34:9, 13, 18
35:3   36:14
37:11   38:17,
19, 24   39:4, 5
40:6   42:7, 9
46:13   53:2
54:20, 23
55:15   56:5, 10
57:3, 23   58:24
59:21, 22   60:7,
10, 14   62:25
63:25   64:18
65:4, 21, 23
66:16   70:13
74:13, 20   75:6,

10, 12, 13, 14,
18, 21, 24   76:3,
13   77:9   79:1
82:5, 24   85:15
86:20   90:18
91:18, 22, 25
92:20   93:6
98:7, 10
101:25   102:6
committees
21:19   26:18
27:1, 4
common   71:2, 6,
12
communicated
60:6
communication
59:12
communications
58:23
communities
70:19   71:1, 10,
14, 19, 22   72:4
73:8
community   55:19
60:4   62:17, 20
71:7, 17, 18, 21,
25   72:2, 7, 8
73:6   103:14, 15
compare   67:9, 12
complaint   17:24
complete   10:24
completed   17:23
99:19
completely   10:19
compliance   2:4
30:4   31:4
39:12   65:7, 23
66:8, 11   70:21
77:20   91:20
97:20
complied   52:3,
13   66:6   69:9,
13
complies   66:20
67:4
comply   59:13
64:20, 24   65:1,
2, 10, 19   68:1
82:7
complying   65:13

composed   20:21
27:20
composition   78:5
computer   40:8
computer-aided
115:6
concerned   79:9,
11, 12
concerning   17:22
concerns   79:13
102:19
condition   11:5
conduct   33:6
81:18
conducted   11:10
81:19   92:9, 10,
12
conducting   13:12
confederate
105:15   106:7
confer   53:7, 10
54:12   56:6, 11
conferring
53:13, 24   54:24
confident   92:7
confirm   94:21
Congratulations
16:20
congressional
18:7   20:8
21:3   23:24
24:5   32:15, 20
33:2   34:10, 15
38:11, 15   42:5,
10, 13, 19   45:3,
16, 24   46:3
48:5   50:25
51:7   56:23
65:16   68:22,
24   69:1, 3, 6,
7, 13   70:4, 5
71:4   73:11, 20
76:2, 9   80:8
86:23   87:25
90:15   91:24
92:4, 9   93:13
95:1   96:6
112:18
Congresswoman
86:15   87:3
conjunction   60:3

conservative
 25:15, 16, 18,
 20, 22
conservatives
 25:24
consider   43:9
 46:4, 14   56:16
 60:17   62:4
 71:19   73:5
 85:22
considerable
 77:11
consideration
 40:6   52:22
 63:14   73:12,
 21   91:19, 21,
 24   113:1
considered
 21:18   42:6
 52:19
considering
 62:7   108:16
constituents
 102:1
constitution
 38:5, 6   39:17
 65:12   67:11
constraints
 103:8
construed   39:15
consulted   41:8
contact   103:15
continuing
 16:12   50:10
continuum   55:2
contrary   39:17
convenient   93:7
convening   74:17
 92:2
conversation
 13:18   67:16
 68:6   79:16
 85:14
conversations
 69:17, 23
converts   27:24
coordinate   55:21
copy   20:4
 101:16, 22
core   42:22
 73:10, 11, 19

Correct   14:20
 15:1, 19   16:15
 18:25   23:12,
 13   28:4   32:8
 33:13   44:24
 46:10   54:2
 75:4, 7   88:12
 97:16   99:14
 103:4   104:7,
 10, 14, 15
 109:14, 15
 111:17   112:8,
 11   113:2   115:7
correcting   29:7
correctly   96:5
counsel   1:18
 2:10, 11   7:6
 11:15   18:8, 10
 115:10
count   111:21
 112:9
counted   66:15
counties   72:14,
 17, 18   73:8
County   17:7
 72:7   102:2
 104:25   115:2
couple   18:15
 55:25   85:25
 111:3
course   27:5
 29:24   31:1
 33:3   57:15
 66:10
courses   16:8,
 10, 13
COURT   1:1   2:5
 7:1, 15   11:13,
 19, 20   15:4
 19:14   20:4
 30:3   31:5
 35:5   36:1
 44:7   46:24
 61:4   63:17
 66:18   77:21
 115:14, 15
courtroom   10:21
courts   30:5
 31:5   86:9
cover   19:5
created   47:19

52:4, 14
creating   93:22
criminal   109:10,
 13
criteria   70:18
 91:12, 14   97:19
current   32:21
currently   17:10,
 12   26:5, 21
cut   26:13   37:6
cutting   26:14
cycle   23:11
 84:6   88:22

< D >
DAN   4:16   8:15
 106:21
data   32:23
 33:3   35:2
 38:8   40:9
 53:18, 20
 54:10, 14, 25
 57:16   70:14
 73:12, 21, 23,
 24   74:1   77:16
 89:6
date   7:4, 16
 14:17   30:2
 57:20   58:21
 59:4   60:5
 64:15   70:11
 75:22   88:24
 92:1, 21   105:7
dates   33:19
 55:22   58:18
 63:6   74:18
DAVIS   5:2   6:4
 7:20   18:19, 24
 22:22   36:15
 51:2, 5   106:12
 111:1, 4, 7
 113:6
day   58:21
days   102:16
DC   3:22   4:20
deadline   59:7,
 9, 10, 13, 21, 23,
 25
deal   18:6
dealing   94:25

debate   20:25
 21:2, 11   94:6,
 23   95:10
December   1:24
 7:7, 16   115:17
decennial   38:8
decide   42:10
 53:16   59:7
 74:2   112:20
decided   81:15
 82:9
deciding   32:22
decipher   48:21
decision   31:20
 57:4   81:8
 112:1, 15
decision-making
 55:8
decisions   32:24
 53:25   108:17
decrease   33:5
DEFENDANT   5:1
 9:18   10:12
 47:17
Defendants   1:12
 5:9
Defense   3:13,
 20   9:12
define   72:20
 108:15
Defined   89:25
definitely
 105:18
definition   71:7,
 8, 10, 14
 107:10   108:19
degree   16:2
delay   57:16, 17
delegation   33:2
 34:15   42:13
 45:17   56:23
 60:13   69:3, 6,
 8
democratic
 105:12   106:2,
 5   107:5, 15, 19,
 21, 22   108:1, 2,
 10, 21   109:8,
 20   110:12
democrats
 107:20   109:2,
 13   110:3

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

demographer
 31:17   41:21
 67:13
demographics
 42:25   43:1, 2,
3
department
 20:15, 18   45:2
 47:24   48:3
 50:11
depend   82:13
dependent   66:1
deposed   10:3
 23:16
DEPOSITION   1:9,
19   2:2, 3, 13
 7:12   9:15, 18
 11:10, 14   13:2,
12   17:25
 18:13, 23
 19:18   22:5, 14,
21   90:11
 104:9, 12
 113:12   114:4, 7
depositions   2:6
describe   47:3
description
 89:23, 24
designate   58:8
determine   38:10
 54:21   59:15,
23   66:19   67:4
 91:15
determined
 55:13   92:3
determining   60:1
DEUEL   3:18
 8:13
develop   40:13
developed   59:25
Dial   32:11
D-I-A-L   32:13
die   86:8
differ   105:13
 106:5   107:5
 108:21   109:8,
20   110:12, 16
difference
 20:16   27:17
different   27:4
 70:1, 2   71:17

 109:12, 13
diluting   65:9
dilution   39:13
direct   71:4
disapprove   34:16
disapproving
 34:19
discrimination
 77:18, 23   78:2
 109:23   110:18
discriminatory
 48:6
discuss   29:5
 30:25   56:12
 60:9, 12, 14
 69:19   81:13
 89:4   102:24
 103:1
discussed   22:4
 78:19, 22, 23
 83:14, 15   89:2,
6
discussing   20:6
 28:22   47:18
 50:9   74:21
 75:11   90:13
Discussion   8:8
 30:14   95:5
 102:10   107:8
discussions
 28:14
disparate   109:12
distances   102:4
DISTRICT   1:1, 2
 7:15, 16   24:23,
25   26:1   33:4
 42:25   43:5, 12,
16   48:5   71:4
 78:6, 7, 12
 80:8   81:2, 6
 84:7, 15, 19
 85:9   86:17, 23
 87:9, 18, 19, 22
 88:3, 8, 14
 90:15, 16, 21,
25   92:9   93:13
 96:3, 7, 14
 97:5, 7   112:17,
22
districting
 39:16   52:3

districts   18:7
 24:6, 10   38:12
 39:10   42:19,
22   43:10   46:5,
15   47:19
 50:24   51:7
 52:5, 15   65:6
 70:5, 19   73:10,
12, 19   88:10
 91:2, 6, 9, 13
 93:10, 23   97:8,
9, 11   112:25
doctorate   16:4,
6
document   19:14,
17, 20, 25   20:5,
10, 12, 23   21:6
 36:1, 8, 10, 21
 37:2, 5, 8, 13,
14, 19   47:2, 12
 61:5, 24, 25
 64:6, 10   70:11
 77:2   94:5, 7
 100:14, 15
 101:11
documents   13:17,
21, 22, 25   14:2,
3   19:1, 3
 22:13, 15, 24
 23:2   113:20, 21
doing   62:7
 66:14   82:12
 83:14, 25   84:19
DOJ   47:25
DORMAN   5:11
 7:23   18:11
 35:14   49:14
 66:2   82:17
 92:16
dosher@elias.law
 4:21
Dowdy   8:2
dozen   58:25
draft   37:14
 112:18
drafted   37:13,
15, 17, 19, 21
 40:18   112:25
drafting   42:18
Drake   61:20
draw   74:5
 75:11

drawer   30:24
 33:1   42:2
 53:8, 11, 14, 25
 54:13, 19, 25
 55:6, 13   56:7,
12   66:2   67:18
 68:6, 12, 16
 69:2   82:6
 88:5, 20   89:21
drawing   32:15
 34:9   41:9
 43:9   68:24, 25
 89:16
drawn   24:11
 34:19   39:10
 65:7   68:17
 73:25   87:18,
19   91:3
draws   28:13, 25
 29:19   30:20
drew   88:16
 97:8
drop   19:13
 61:1   63:16
 76:10   100:2
dropped   36:12
dropping   35:4
 46:20   94:3

dross@naacpldf.org
 3:23
dues-paying
 104:24
duly   8:22
 115:13
duties   31:2, 3
dwalker@balch.com
 5:16

< E >
earlier   12:9
 23:10   73:9, 18
 85:21   103:2
 107:9
early   99:18, 21
easiest   96:12
easily   36:17
east   72:11
EBENSTEIN   4:1
 8:17

education   16:12
  26:23, 24
  38:12, 16   56:23
Educational
  3:13, 20   9:12
effect   2:4
  65:9
effective   48:8
  50:5
Eight   100:6, 7
either   97:10
electability
  86:17
elected   20:21
  24:16, 19, 20,
  22   26:8   30:1
  32:4, 5   70:15
  87:4   105:5
election   78:12
elections   43:24
electoral   48:8
  50:5
Elias   4:18
email   15:9, 12,
  13   58:22
  100:1   101:17,
  23   103:12
employed   17:10,
  12
employees   20:20
endeavor   64:20
ENDED   114:7
endorsed   25:5
ends   114:3
England   79:4, 8
  83:11   84:14
  86:4, 6, 21
ensure   66:6, 11
  82:5   88:9, 13
ensuring   65:23
  69:8, 12   97:21
entail   53:14
error   80:18
errors   85:17
essentially
  28:10
established
  38:16, 23   39:20
et   1:6, 10
  7:13, 14
ethnic   39:14

evaluated   79:20
evaluation   77:16
EVAN   1:6   7:13
  8:1
events   53:8, 22
everybody   41:17
  63:11   103:17
evidence   2:14
evidenced   115:15
exact   33:23, 24
  88:24
exactly   19:25
  27:11   33:22
  41:18   78:14
  83:25   107:10
  113:5
examination   7:8
  9:9   104:1
  111:4
examined   8:22
example   28:14
  44:3   70:6
  82:7
exception   99:4
exceptions
  105:19
Excuse   106:20
  111:18
exercise   48:8
  50:5   83:19
exercised   83:6,
  7
exercising   83:8
Exhibit   6:9, 11,
  13, 15, 17, 19,
  21, 23   19:15
  35:5, 7, 22
  36:2, 5, 7, 24
  46:24, 25   47:9
  49:22   51:19
  61:5, 12   63:17,
  18   64:3   70:17
  76:15, 22
  79:23, 24, 25
  84:11   90:12
  94:4, 5, 13, 16
  98:19   100:5,
  10, 22, 25   101:3
exhibiting   73:19
exhibits   74:24
existing   32:17,

19   73:11
expect   18:16
experience
  82:14, 15
  108:20   109:1,
  6, 18   110:14
experienced
  89:12
experts   66:15
Expires   115:23
explaining
  41:21, 22
express   44:10
  79:13
expression   83:21
extent   70:21
extra   77:18
eye   41:12, 13

< F >
Facebook   15:17,
  18
fact   21:12
  37:10   73:23,
  24   74:14
  77:19   113:4
factor   96:19
failure   50:12
fair   44:10
fairly   85:16
familiar   37:4
  48:10   64:9
  66:17   67:7
  77:4, 6
far   36:16
  50:11   68:2
  70:5
fast   73:14, 16
feasible   102:6
Federal   7:4
  38:8   97:20
  98:3
feel   60:5
feeling   107:21
felt   83:19
  92:7
figure   57:14
  100:18
file   15:4
filed   7:15
final   59:4

61:7   113:17
finalize   99:15
Finally   14:8
financially
  115:11
find   38:25
finish   12:1, 2
  49:9
firm   35:16
first   10:1
  24:16   25:14
  26:8   37:6
  55:25   57:11,
  13, 18   63:7
  67:7   78:3
  81:20   85:25
  88:21   93:2, 4
  95:7   99:18
  100:18   103:22
fiscally   25:16
fishing   72:21
five   63:21, 22
five-minute
  49:6   90:4
FL   3:14
flag   78:9
floor   19:7
  20:24   21:1, 11,
  21   93:6, 21, 24
  94:2, 6, 23
  95:10, 14
focused   62:19
follow   66:17
followed   40:21,
  25   41:6, 8, 24
following   7:9
  33:9, 11   38:14
  40:17   41:1, 10
  90:12   92:19
  102:12   115:16
follows   8:23
force   2:4
foregoing   7:5
Forgive   106:20
form   2:10   9:1
  40:22   50:19
  105:24   106:19
format   20:1
forward   47:18
  56:20   101:22
found   72:12

Evan Milligan,et al v. John H.Merrill, et al.                    Jim McClendon
                                                                12/17/2021

85:17    115:16
Foundation    4:3
four    18:21
fourth    110:10
four-year    26:2,
4
frame    55:18
franchise    48:9
50:6
Friday    100:8
front    36:2, 8
60:23    67:9
101:12    109:1
full    2:4
28:17    102:9
full-service
35:15
Fund    3:13, 20
9:12    21:23, 24
26:22, 23
FURTHER    2:1, 8
9:23    81:15
113:9    115:9, 13
futile    57:15
futility    83:19
fuzzy    34:4

< G >
gained    108:9
gathered    81:16
General    5:3, 4
21:23, 24
26:22    65:21
105:19    108:10
109:15, 16
generally    53:12
94:22    95:9
105:12, 17, 20,
25    106:2, 5, 7
107:5    108:21
109:8    110:12,
13, 16
General's    7:21
generated    87:17,
19
generically
30:11
geographic    72:10
Gerald    32:11, 12
gestures    11:21
getting    28:2

give    10:23
14:3    49:1
56:13    61:10
64:8    70:6
74:7    77:22
83:17    85:24,
25    103:24
106:10    113:22
given    20:3, 23
34:21, 24
giving    23:8
108:15
glanced    77:5
go    15:24    16:1
21:20    29:22
32:22    34:18
38:20    39:7
41:1    62:23
65:13, 23
66:14, 23
68:19    70:5
84:10    85:4
86:11    89:7
98:11, 17
103:22    110:6
113:25
goal    24:9
42:18, 24    43:5
75:24
goals    42:21
66:8
goes    27:23
50:12    84:18
105:3
going    8:5
9:23    14:11, 15
19:13    20:24
21:1, 11    22:12,
16    27:19
36:15    37:11
40:19    46:20,
23    49:4    53:9,
18, 19    56:4, 9
57:14    61:1
63:16, 18    73:9
76:10, 20    82:3
84:10    86:18
89:6    100:2
102:5    104:16
Good    9:10
37:18    52:25

69:10    70:25
79:5    86:14
Gosh    100:7
gotten    21:12
governing    59:18
103:3
governor    56:15
57:1
Greater    8:2
grounds    2:12
Group    4:18
44:9    104:25
guess    12:12
30:9, 10    44:15,
20    78:3    88:23
89:5    95:3
99:3    101:9, 19
guessing    34:6
guidance    34:21,
24
guidelines    6:12,
18    28:15
36:14, 20
37:11, 12
38:14, 23    39:5,
6, 15    40:20, 21,
25    41:2, 3, 6,
15, 17, 18, 20,
21, 24    42:3
44:25    52:4, 14
64:1, 17    65:20
66:1, 4, 7, 17
70:8, 13    77:21

< H >
half    57:9
58:25
Hall    6:24
58:15    59:5
80:3, 12, 25
83:12    99:24
101:19, 24
102:14    103:6
Hall's    102:19
hand    93:5
handed    101:4
handle    102:22
handled    93:2, 3
handling    21:24
Hang    21:5
happen    81:12

happened    21:23
86:12    109:4
happens    98:6
104:5
happy    35:17
86:15
hard    52:7
61:18
Hatcher    95:17,
20
Hatcher's    96:3,
10, 20    97:12
health    26:22, 25
hear    12:17, 24,
25    68:10    96:8
104:2, 3
heard    68:9, 11
69:23    104:13
hearing    6:16
8:4    99:7, 13
101:25    102:7,
9, 15    107:11
hearings    33:7,
14, 17    55:14,
18, 21, 23    56:7,
21    58:6, 12, 18
59:8, 16, 19, 23
60:2, 9, 15, 18
61:7    62:1, 6
98:11, 21    99:1,
6, 9, 10, 12, 16,
25    102:8, 15,
20    103:3, 7, 9,
12
heart    110:6
held    8:8
60:19    63:13
98:12    99:6
102:15
Hello    111:5, 6
help    28:16
29:25    36:18
52:9    53:8
55:20    62:12
helpful    46:21
helps    48:13
hereinafter
38:18
hesitant    107:12
high    15:24
88:14
highly    83:13

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

Hinaman  88:17,
21, 25  89:9, 14
112:16
Hinaman's  88:18
historically
62:4
Hogan  3:6  8:11
hold  33:21
62:25
home  19:11
hopefully  20:4
host  62:20
hour  49:5
hours  18:15, 24
98:14  99:1
house  10:10
15:7  20:15
22:2  24:5, 10,
24  26:1, 6
27:3, 6, 21
28:7, 9  29:10,
15  30:6, 17
31:17, 23, 24
32:3, 4, 6, 7
45:19, 25  46:1
49:24  53:6
57:3  60:20
64:12  71:4
99:5  112:3, 13
Houston  16:4, 5
hundred  37:19
79:5
hypothetical
82:2, 3, 13

< I >
idea  37:18
56:14  62:9
78:15  110:5
identification
35:23  36:25
47:10  61:13
64:4  76:16
94:14  100:23
II  65:6  70:16
III  39:8  70:17
imagine  37:22
immediately
74:15
implemented  48:2
importance  41:16

important  11:18,
24  29:25
41:20  97:18, 24
inaccurate
49:17  50:2, 13
inappropriate
98:5
inaudible  24:23
33:9  74:25
include  111:15
112:17, 21
including  39:12
112:7
income  73:2
increase  33:5
increased  84:3
incumbent  78:4
96:6
incumbents
96:13  97:13,
21  98:7
individual
108:16  112:1,
15
individuals  82:6
information
12:8  15:3
34:25  40:4
53:12  56:18
81:15  83:17
86:16  93:4
initially  53:23
95:3
injustice  43:23
input  55:17
102:17
inside  66:4
insist  82:11, 23
instruct  29:4
112:16
instructed
12:21  13:5
instruction
29:20
instructions
89:8
interest  70:20
71:1, 2, 7, 11,
13, 14, 17, 18,
20, 22, 23  72:1,
2, 5, 7, 8  73:6

interested
102:3  115:11
interests  71:6
interim  21:18,
19  27:18
interpreted  30:5
interviewed
51:20  88:6
introduce  42:11
45:15, 21  48:20
introduced
45:25  48:18
75:25  92:5
93:20, 23  94:1,
2  95:16  102:11
introducing
91:21
introduction
34:16  40:4, 17
introductions
8:10
involved  10:14
55:7  57:4
68:24, 25  70:7
103:17
involvement
31:11  45:1
issue  20:8
23:24  78:1, 2,
10  81:14  86:5
105:14  107:7
108:25  109:3
110:16
Issues  21:7
30:25  70:2
108:2, 7
items  28:21
its  40:4

< J >
Jackson  8:2
JAMES  1:10, 20
5:9  7:7  8:21
9:25
J-A-M-E-S  10:2
January  14:19
jebenstein@aclu.or
g  4:6
Jefferson  17:7
JIM  5:2  7:12,
20, 24  18:19,

24  49:23  50:9
103:22  111:7
114:4
jim.davis@alabamaa
g.gov  5:7
jim.mcclendon@alse
nate.gov  15:14
jimmcc@windstream.
net  15:13
job  41:25
55:4  66:11
68:20  81:16
89:22, 23, 24
jobs  66:10
JOHN  1:10  5:1
7:13, 21
joint  38:17
40:15
Jones  14:22
judge  10:20
judicial  45:7,
12
JULIE  4:1  8:17
July  99:17, 18,
22
jump  81:17
June  58:20
59:9, 11  60:8
99:19
justice  45:2
47:25  48:3
50:11  109:10,
13

< K >
KAITLIN  4:8
Katherine  9:2
KATHRYN  3:11
7:25  9:11
15:2  21:5
23:4  35:7
36:11  49:4
65:16  100:13
113:16
keep  13:14
30:2  42:21, 24
43:1, 5  70:25
71:2, 3
kids  16:21
kin  115:10
kind  57:23
76:21

knew   33:4
89:21
know   12:6, 9,
14   14:9, 16
17:19   18:5
19:24   27:17
29:12   30:1
31:10, 20
33:22   37:13,
15, 17   40:20
42:1, 4   43:3,
4, 7, 19   44:15,
17, 18, 21, 22
45:19   46:21
48:17   57:20,
21   58:3, 19
59:3   60:16, 22,
24   61:2   63:4,
11   69:10, 22,
24   72:14, 21,
24   74:6, 8, 9
77:3   78:3
79:17   82:2
83:1, 3, 5, 8
88:2   90:1
91:12, 14   92:8,
10, 12, 13   96:5
98:16   100:14
105:16   107:19
110:2   111:23
112:12   113:18
knowledge   12:14
46:6   59:20, 24
67:10   68:23
86:9   88:15
103:5, 10   113:3
known   41:24
79:11
ksadasivan@naacpld
f.org   3:16
kwelborn@aclualaba
ma.org   4:13

< L >
landed   101:10
language   14:7
Large   1:22
7:3   62:19
largely   13:2
larger   28:2
Laura   59:5
80:3

law   1:22   3:5,
12, 19   4:2, 9,
17, 18   5:12
24:12   25:24
29:9   30:1, 4
31:5   35:15
59:16, 18
66:18   97:18,
20   98:3   103:4
laws   2:5   39:11
lawsuit   17:22
23:4, 7, 8, 11
lead   47:22
leadership   28:11
leading   2:11
LeAnn   1:21
7:1   115:22
led   48:19
left   61:21
Legal   3:13, 20
9:11   67:6
82:13   103:8
legislation
108:3, 7
111:13, 19, 20
112:5, 7
legislative
9:20   23:23
26:18   27:9
36:13   38:11,
15, 17   40:5, 7
45:22   56:15
60:13   61:6
63:8   75:2
92:17   94:24
Legislators
39:24   40:12
56:22
legislature
17:23   26:20
33:6   34:17
38:7   40:10, 15
46:16   76:1
97:20   104:19
105:11   107:4,
20, 25   108:6,
20   109:7, 19
110:15
legislature's
38:17
lest   40:20

Letetia   8:2
letter   58:22
letting   77:3
level   73:2
liaison   62:12
103:14
Liberties   4:3,
10
license   16:13
licensed   115:14
Likewise   11:24
line   67:19
68:7, 17, 19
71:9
lines   32:18, 19,
20, 23   66:3
73:25
list   52:21
listen   54:16
listening   73:14,
16
litigation   10:9
20:3   111:16, 18
little   14:16
27:17   52:9, 10
53:17   84:4
98:11
living   17:2
LLP   3:6
loaned   55:20
local   103:15
location   60:1
102:3
locations   55:22
58:11, 18
102:1   103:16
log   113:17
logical   84:19
long   16:18
25:25   26:19
77:2   86:1
104:18   105:3,
5, 7
longer   78:7, 11
look   13:24
14:2   22:14
23:2   29:9
35:1   47:5
49:2, 10   61:18,
25   64:8, 14, 15
67:20   74:2
79:18   84:13,

15   87:2   94:17,
20   95:8
100:17   101:3,
13
looked   19:5
22:15, 23
41:12, 13   58:13
looking   36:22
52:20   64:14
101:11, 18, 23
looks   19:24
37:4   47:2
61:17   64:9
77:4, 5   100:19
Los   3:8
losers   98:8
lost   48:21
lot   53:19
71:17   86:16
107:19
loud   38:4
Lovells   3:6
8:12
low   88:11
lower   73:2
Lyman   47:17

< M >
ma'am   29:7
40:24   45:10
main   22:9
54:4, 5, 9   73:4
maintain   16:13
73:19
maintaining
73:10, 11, 18
majority   43:13,
17   46:5, 15
47:19   50:24
51:6   52:4, 15
93:9, 13, 23
96:3   97:4, 7,
10   112:17, 21
making   9:14
31:4   50:15, 21
108:17
manner   55:5
60:1   103:3
map   20:8   29:1,
19   30:20   33:1
34:9, 13, 16, 19
35:1, 2   41:9

Case 2:21-cv-01536-AMM   Document 84-3   Filed 12/27/21   Page 42 of 51

Evan Milligan,et al v. John H.Merrill, et al.                                        Jim McClendon
                                                                                      12/17/2021

42:2, 10, 12, 16
45:7   46:15
48:18   53:7, 11,
14, 25   54:13,
19, 24   55:6, 13
56:7, 11   66:2,
20   67:4, 18
68:6, 12, 16, 22,
24   69:1, 2, 8,
13   73:20
75:11   76:6, 7,
9   82:6   84:20
87:25   88:5, 20
89:21   92:4, 5
93:3   95:16
96:5, 20, 23
97:3, 12, 19
102:3
**map-drawing**
41:2   66:6
67:17
**map-making**   64:19
**maps**   28:13
32:16   34:10
40:9   74:5
75:25   76:2
88:16   89:16
93:9   102:10
**mark**   19:14
35:5   36:1
46:24   61:5
63:18   76:21
94:4   100:4, 10
**marked**   35:23
36:25   47:10
61:13   64:4
76:16, 24
94:14   100:23
101:4
**marks**   7:11
50:4
**Maroney**   1:21
7:1   115:22
**married**   16:16,
18
**materials**   13:18,
20   89:15
**matter**   7:13
98:4   109:15, 16
**McCLENDON**   1:10,
20   5:9, 10
7:7, 12, 24

8:21   9:10, 25
19:20   35:5, 25
36:2   37:3
46:24   47:13
49:9, 23, 25
50:10   51:18
58:1   61:5, 9
63:18   64:7
65:19, 22
70:17   79:23
80:6   82:19
84:10   90:10,
12   94:4, 18
95:5, 8, 23
98:19   100:4,
10   101:11
104:2   114:4
**M-c-C-L-E-N-D-O-N**
9:25
**mean**   13:24
24:7   25:13, 18
27:9, 11, 14
29:16   38:24
67:22   76:7
78:17   81:16
87:1   97:7
106:15, 18
**Meaning**   8:25
11:14
**means**   39:4
106:16
**meant**   22:12
30:22   44:6
87:2   111:19
**media**   15:15
**medication**   11:1
**meet**   18:23
28:12, 23, 24,
25   30:19
56:22   88:21, 25
**meeting**   21:13,
15   22:19
28:17   30:20
35:3   57:18, 23,
25   63:12
70:12   74:12,
20   75:5, 13, 21,
23   76:13   77:8,
11   78:19, 21
83:15, 23
85:14, 15
86:20   90:18

92:4, 20   99:5
101:25
**meetings**   6:24
29:2, 3, 6, 18
30:8, 23   33:20
34:2, 5   55:15
56:2   62:10, 21,
22, 24   63:2, 3,
4, 6   74:15, 25
75:9, 17   93:8
101:21   107:19
**meets**   28:12
**member**   26:5, 7
104:21, 24
105:2, 4
107:22   111:23
112:12
**members**   20:13
22:10   27:21
30:1   32:3, 6
33:2   34:21
40:10   42:12
57:2   58:24
60:6, 13   69:5,
7   76:3   79:1
91:22   96:6
101:25   102:6,
8   105:12, 13
106:1, 4, 6
107:4, 6, 15, 16
108:6, 22
109:2, 7, 9, 19,
21   110:11, 13,
15   111:9   112:2
**memory**   48:14,
15   75:6
**mention**   44:25
**mentioned**   22:22
71:12
**MERRILL**   1:10
5:1   7:14, 22
9:13, 19   111:8
**met**   18:14
22:22   33:1
69:2   75:1
92:1
**MICHAEL**   3:4
8:11
**michael.turrill@ho
ganlovells.com**
3:9
**middle**   72:11

**MILLIGAN**   1:6
3:3   7:13   8:1,
12, 13, 18   9:13,
18   113:11
**million**   84:5
**mind**   23:8
25:15   29:7
49:6, 8   77:3
79:22   84:11
90:3   106:23
110:8
**Ministries**   8:3
**minority**   39:14
46:5, 15   47:19,
23   48:4, 7
50:24   51:7
52:4, 15   65:10
78:4, 8, 11
87:3, 10   88:10
93:23   96:3
97:4, 6, 9
**minus**   64:16
**minute**   78:20
94:17, 20
**minutes**   49:1
**missed**   78:20
**mobile**   14:25
15:23
**moment**   103:24
**Monday**   113:21
**money**   83:20
**Montgomery**   1:23
4:12   5:6, 15
60:18   62:2
72:2, 3   99:5
**Montgomeryadvertis
er.com**   6:14
**monuments**
105:15   106:8
**motion**   95:19
**move**   8:6   48:7
52:23   68:6
74:25
**moved**   67:19
95:23
**multiple**   73:8
74:7

< N >
**N.W**   3:21
**NAACP**   3:13, 20
8:3   9:11

name   9:10, 24
  10:1   72:16, 17
  92:16   115:16
names   7:19
nature   25:20, 22
nay   97:1, 2
NE   4:19
necessarily
  68:12   73:7
necessary   2:9
  38:10
need   9:1   14:8
  28:15   31:2
  43:18   49:5
  56:20, 21
  67:20   81:6, 22
  82:18   84:16
  89:19, 20
  102:23   109:25
  113:16, 21
needed   22:9
  33:4   55:4
  56:13   80:9
  81:15   82:9
  83:18   86:24
  90:15   91:3, 7
neighborhoods
  70:20
neither   65:9
  115:9
never   74:10
  83:7   86:10, 12
  104:4
New   3:15   4:5
  74:10
news   47:16
nodding   11:21
normally   77:19
North   115:23
NORTHERN   1:2
  7:16
Notary   1:21
  7:2
notes   19:6
notice   9:17
  96:12
November   6:22
  94:6   95:10
Number   7:14
  14:23, 25   15:8
  22:15   33:23,
  24   39:19

40:14   47:1
  75:23   85:20
  86:7, 10, 13
  87:15   98:22
  101:5   102:13
  115:16
numbers   15:5
  33:4   54:18
  87:17
numeral   39:8, 25

< O >
oath   10:17
object   12:18,
  25   24:9   90:22
Objection   40:22
  50:19   105:24
  106:12, 14, 19
objections   2:9,
  12   9:1   12:19
  13:2
objectively
  102:16
objectives   70:12
obtaining   45:2
occur   33:17
  68:21
occurred   98:14
  99:1, 12
October   6:20
  75:20, 23
  76:12   77:8
  78:19   83:23
  85:15   86:19
  90:17   92:3
offered   2:14
  76:9   95:20
Office   5:4
  7:21   15:6
  20:19   24:17
  26:3   40:8, 11,
  18   101:21
offices   1:22
official   9:19
  105:6
officials   70:15
Oh   13:24
  35:13   47:6
  63:3   71:15
  78:25   94:9
  104:4

Okay   8:9   13:6
  19:23   25:25
  27:12   29:21,
  23   35:10
  36:18   38:25
  45:9   47:6
  51:10   52:6
  58:3   61:23
  64:1   77:7
  78:25   85:24
  88:3, 8   93:18
  94:9   95:22
  96:1   98:24
  100:20, 25
  101:6   103:24
  105:10   106:22
  108:14   109:11
old   16:25
once   33:3
  54:25   66:3, 22
  82:12   88:6, 7
  109:25
ones   113:22
opinion   67:7
  81:14, 22
  82:14   108:24
opinions   82:20
opportunity
  44:10   46:14
  50:24   93:12,
  16   96:22   97:9
  102:17
optometrist
  16:14   17:11
Optometry   16:7,
  13   17:9
oral   7:8
order   21:21
  25:24   55:3, 4
  59:13
ordered   83:18
organizations
  110:2
original   62:9
OSHER   4:16
  6:3   8:15
  103:21   104:1
  106:22   110:21
  113:14
outside   45:24
  75:10   81:16

overlapped   99:10
overseeing   66:5

< P >
p.m   1:24   7:17
  9:5, 8   51:14,
  17   90:6, 9
  99:2   114:5, 7
P.O   4:11
PAGE   6:8
  37:24   39:7, 22
  40:2   47:21
  49:22   79:22
  80:1   84:12, 14
  86:19   95:4, 18,
  20, 24, 25
  100:18   101:1,
  3, 6, 7, 8, 9, 10
  102:12, 13
paid   17:17
Paige   5:20
paired   97:14, 22
paper   66:4
paragraph   37:25
  38:22   39:23
  47:21   50:9
  84:14
paragraphs   39:9
  49:25   50:7
  70:22
Pardon   20:11
  68:14   89:3
part   28:10
  37:6   50:14
  52:20   55:1
  67:16   71:13,
  16   91:19   99:21
participate
  102:4
particular
  22:18   65:24
  67:19   68:17
  70:12
particularly
  71:2
parties   1:18
  2:11   102:3
  110:15   115:10
parts   72:6
party   23:11
  25:2, 4   104:22
  105:2, 5, 12, 13

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

106:2, 5, 6
107:5, 6, 16, 19,
22   108:1, 2, 10,
11, 21, 23
109:8, 9, 20, 21,
25   110:1, 4, 12,
13
pay   23:5
PDF   101:7
pending   14:10
108:3, 6
people   110:2
percent   37:19
64:16   79:5
80:9   84:3, 23
85:10, 20   86:7,
11, 12, 25   87:9,
15   90:17, 21
91:1   96:17
percentage   84:21
percents   86:14
perception   73:1
period   27:23
28:3   30:15
permanent   9:20
27:9, 14, 20
38:17
permit   39:16
permitting   46:4
person   28:13,
25   29:19
30:20   41:9
42:2   58:1
69:4   78:4
88:7, 8
personable   82:20
personal   12:14
15:3, 12, 15
personally   57:13
personnel   55:20
phone   8:7
13:14   14:25
15:5, 6
phrase   29:8
pick   102:8
picking   98:8
picks   86:13
pit   98:6
pitted   96:6
place   8:6
70:14   77:17
93:4

Plaintiffs   1:8
3:3   4:15   8:1,
12, 14, 16, 18
9:13   103:20
111:2   113:11,
15
Plaintiff's   6:9,
11, 13, 15, 17,
19, 21, 23
35:22   36:24
47:9   61:12
64:3   76:15
94:13   100:22
plan   40:3
45:3   46:4
47:18, 22   48:1,
2   49:24   50:10,
25   51:7   52:2,
13   58:10   65:8,
17   91:15   95:1
96:4, 10
111:25   112:14,
18, 21
planning   57:6
plans   39:19, 23
40:17   42:6
45:16   93:13
play   35:17
58:5
please   7:18
9:23   10:1
12:1, 6, 9, 12
13:14, 17   14:2,
9   37:24   38:2
39:7   45:10
47:4   80:16, 23
81:4   84:11
85:6   91:5
94:18   100:4
plus   64:15
point   12:7
24:4   32:14, 15,
17   42:15   54:4,
6, 8, 9   56:25
86:18   107:14
points   6:10
19:6, 23   20:7
21:7, 8   22:3,
7, 8, 9, 13
23:1   35:8
93:7

polarization
69:20   77:12,
14, 24   80:14,
15   81:25
84:25   85:11,
23   90:20, 24
polarized   78:17
79:9, 14   80:4
82:10, 24
policies   25:19
64:21, 24   65:2
policy   25:21
26:24   39:16
65:24   70:16, 24
political   25:2
70:20   71:2, 6,
12
polls   44:11
population   33:3,
5   38:22   40:9
43:6, 13, 17
47:24   48:4
80:8, 10   84:1
86:23   87:9, 21
90:14   96:16
portion   77:11
possible   10:20
70:25   71:5
potential   69:18,
24   84:24   85:22
power   82:4, 23
practicable
70:21
precedent   97:24
preclearance
39:20   44:25
45:3, 7, 12
preference
108:16
premed-type
16:10
preparation
18:17, 22   93:7
preparations
28:11
preparatory   14:7
prepare   18:12
22:14   57:12
92:22, 25
prepared   56:14
preparing   58:17

PRESENT   5:19
7:18   18:21
93:5
presentation
40:5
pretty   16:10
28:19   36:16
53:6   72:10
87:13
previously-
approved   48:5
primary   25:3
42:24   43:5
principles   52:3
Pringle   18:20,
23   22:23   55:9,
13   57:4   104:8
prior   2:14
20:24   21:1, 11,
12   22:18
26:11   54:10
63:13   64:19
74:16   91:17
92:2
privilege   90:23
113:17
probable   83:13
probably   29:24
46:22   57:8
61:23, 24   63:8
66:25   67:1, 15
73:3, 4   85:18
86:16   89:6
101:16
problem   44:1, 2,
5   49:12   67:20,
21, 22   68:7
97:3
problems   43:23
Procedure   7:5
proceedings   7:9
115:5, 8
process   22:16
27:25   28:6, 12
33:7   34:9
37:12   39:20
40:5   41:2
45:12   52:24
53:17   57:7, 12
64:19, 23   65:3
66:3, 6   67:17

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

70:7   88:19
89:15   91:19
produce   74:3
84:20
produced   20:2
39:23   47:16
67:9, 13   100:16
production
113:19
programs   108:18
projected   56:19
proposals   40:13
proposed   40:3
45:3, 15   68:19
96:23   97:19
102:2, 7
proposing   45:6,
11
protections
39:12
proved   42:13
57:15
provide   11:3, 7
40:11   89:8, 14
provided   20:7
38:9
provides   43:24
48:15
providing   102:17
Public   1:21
6:16   7:2
24:16, 17   33:6,
13   40:4   55:14,
17, 21, 23   56:7,
21   58:6, 12, 18
59:8, 15, 18, 23
60:1, 9, 14, 18,
19   61:6   62:1,
6   98:11, 21, 25
99:6, 7, 9, 10,
12, 13, 16
102:7, 9, 17, 19
103:3, 7, 9, 12
105:15   106:8
pull   36:19
63:18
pulled   94:16
purpose   22:7
48:7   65:9
purposes   10:18
70:12

pursuant   7:4
37:25   38:5
put   34:14
35:2   47:18
52:21   58:13
63:10   96:6, 13
putting   66:3

< Q >
question   9:2
12:2, 5, 8, 18,
20   13:1, 4
14:10, 11
26:16   34:7, 24
37:20   40:23
43:8, 15   44:4
45:20   49:9, 20
51:4   54:7, 15
58:4   64:25
69:10, 11
72:22, 25   83:2
86:1, 3   92:11
95:3   97:25
98:24   105:22
106:1, 11, 24
107:13   109:11,
14   110:7, 8
questioning
10:18
questions   2:10,
11   11:2, 3, 6,
7   14:16   49:3
85:25   103:19,
20, 21   104:6,
14, 17   111:1
quick   67:18
quickly   40:19
46:25   51:19
67:1   73:15
77:1
quite   18:1
34:23   44:3
53:15   77:1
quotation   50:3
quote   48:22
49:17, 19, 20
50:2, 7   68:3
90:13
quoted   47:20
50:1
quotes   50:14

< R >
race   43:9
44:10   108:17
113:1
races   79:21
racial   39:14
42:25   43:2, 3,
22, 23   44:1, 2,
5   69:19   73:12,
21, 23, 24   74:1
77:11, 13, 17,
23   78:2, 10
81:25   84:25
85:10, 23
90:19, 24
racially   78:17
79:9, 14   80:3,
14   82:10, 24
ran   25:6
Randy   88:17, 18
112:16
RC   100:11, 15
101:5   102:13
reach   53:25
read   17:24
18:2, 3, 4
19:12, 22
37:24   38:2, 22
39:7, 8, 22
41:3   44:7
48:23   50:15
80:5, 11, 16, 24
81:4   85:3, 6,
7   86:4
reading   2:2
ready   49:15
56:25   58:14
real   107:12
really   19:22
23:4, 5   45:8
48:21   51:19
69:5   77:6
108:24
reapportionment
6:12, 18   9:21
27:10, 13, 15
30:7, 18, 21
31:14, 18, 23
32:6, 10   33:21
34:8, 12   36:14
37:10, 16

38:18, 19   39:5
40:6, 8, 11, 18
42:6, 9   53:2
54:20, 23
55:15, 16   56:5,
10   57:3   60:10,
14   61:6   62:25
63:25   64:18
65:4, 22   74:13,
20   75:6, 10, 21
76:3, 13   77:9
82:5, 24   85:15
86:20   90:18
91:25   98:10
reason   10:23
49:16   50:1, 8,
12   74:19
108:25
recall   12:7
37:11   42:8
45:18   48:24,
25   50:15, 21,
23   51:6, 9
62:15   96:5
received   54:14,
25   58:23
59:12   95:12
101:16
receiving   54:10
57:16
Recess   9:6
51:15   90:7
recognizable
42:22
recognize   36:8
37:2, 5, 8, 9,
10   47:12
64:13   94:7
101:9, 10
record   8:8
9:5, 8, 24
11:20, 21
12:10, 19   13:3
51:14, 17   90:6,
9   113:24, 25
Rector   3:14
red   78:9
redacted   15:3
redistrict   38:10
redistricting
10:7, 10   17:22
20:14, 15, 17,

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

*19, 20   21:17,
25*   *22:17*
   *23:11, 14   27:5,
7, 8, 12, 19, 20,
23   28:6, 9, 17*
   *29:16   30:13*
   *33:7   38:16*
   *39:19   40:3, 9,
16   42:5   45:12,
16, 21, 23*
   *46:13   48:1, 2*
   *52:14, 23*
   *56:16   57:7, 12,
19, 22   58:2, 6,
24   59:19   60:7*
   *63:15, 25*
   *64:18, 21   65:3,
8, 20   70:18*
   *75:3   84:6*
   *88:19, 22*
   *91:18, 24   92:5,
18, 20   94:23*
   *98:7, 12*
   *111:15, 24*
   *112:7, 14*
**reduce**   *48:7*
**reducing**   *48:4*
**reelection**   *87:7*
**refer**   *13:17, 20*
   *113:22*
**referred**   *38:18*
**referring**   *19:21*
   *84:16   86:24*
**reflection**   *50:18*
**reform**   *109:10,
14*
**refresh**   *48:13*
**regarding**   *69:18*
**regular**   *63:9*
   *75:13*
**related**   *87:8*
   *108:2*
**relating**   *2:5*
**relationship**
   *84:23   85:1, 9,
11, 20*
**rely**   *82:20*
**remained**   *42:19*
**remedy**   *43:25*
**remember**   *19:10*
   *21:4   23:5*
   *24:12   33:18,*

*19, 23   34:7*
   *46:1, 2, 19*
   *48:16   51:20,
23   52:1   58:20*
   *76:8   77:10*
   *79:15, 21*
   *83:25   88:24*
   *89:1   92:21*
   *107:11*
**remotely**   *13:13*
**removal**   *106:7*
**removing**   *105:14*
**Rep**   *49:23   50:9*
**repeat**   *91:5*
**rephrase**   *12:6*
**Reporter**   *7:1*
   *8:24   11:13, 19,
20   19:14   20:4*
   *32:12   35:5*
   *36:1   43:14*
   *44:7, 13   46:24*
   *52:8   61:4*
   *63:17   113:24*
   *115:15*
**Reporting**   *115:14*
**represent**   *7:19*
   *9:12   20:2*
   *47:15   76:11*
   *77:7   95:11*
**representation**
   *85:14*
**Representative**
   *18:20   48:18*
   *55:9, 12   58:15*
   *59:5   60:4*
   *69:3   78:8, 11*
   *79:3, 8   80:3,
12, 25   83:11,
12   84:14   86:3,
6, 21   87:12, 20,
24   88:2, 6*
   *99:24   101:19,
24   102:14, 18*
   *103:6   104:8*
**representatives**
   *20:22   24:24*
   *26:6   56:1*
   *112:3, 13*
**represented**   *18:8*
**representing**
   *88:10   111:7*

**republican**   *25:4,
5, 6, 8, 9, 12,
13   104:22, 23,
25   105:2, 4, 13*
   *106:6   107:6,
16   108:5, 11,
23   109:9, 21*
   *110:13*
**republicans**
   *109:2, 12   110:3*
**request**   *6:24*
   *40:11   59:14*
   *85:8   99:25*
   *101:20   113:19*
**requested**   *58:15*
   *91:4, 8   99:24*
**requesting**   *58:25*
**requests**   *113:23*
**require**   *39:15*
   *73:12   77:23*
   *102:1, 3*
**required**   *12:20*
   *13:4   16:13*
   *38:7   66:19*
   *67:3   68:1*
   *91:10, 13*
**requirement**
   *67:10*
**requirements**
   *67:13*
**requires**   *70:24*
   *73:21   102:7*
**residents**
   *109:23   110:18*
**respect**   *29:17*
   *54:19, 24*
   *68:21   70:19*
   *86:3   90:16*
   *97:12*
**respective**   *1:18*
**respond**   *13:4*
   *102:18*
**response**   *80:12,
16   81:4   85:3,
6, 12   96:11*
**responsibilities**
   *28:8, 18   30:17*
   *53:4, 13   54:12,
18, 22   56:6, 11*
   *69:16*
**responsibility**
   *29:17   82:8*

**responsible**
   *69:8, 12*
**responsive**   *12:8*
**result**   *115:11*
**results**   *84:24*
   *85:23*
**retired**   *17:9*
**retreat**   *47:23*
**retreats**   *48:2*
**retrogression**
   *39:13   47:23*
   *48:19   50:4*
   *51:24*
**review**   *19:1*
   *22:6, 18   28:14*
   *38:8   58:11*
   *93:9*
**reviewed**   *19:5,
17   22:3*
**revisions**   *40:16*
**rich**   *72:12*
**right**   *51:21*
   *70:9   71:8*
   *74:8   80:2, 19*
   *101:24   106:21*
   *107:16*
**Rights**   *39:8, 18,
21   43:20*
   *47:25   50:11*
   *65:7, 11, 14*
   *66:9, 12, 20*
   *67:5, 7, 11, 14,
22   68:1, 3, 8,
18   69:9, 14, 18,
24   77:20   82:7*
   *91:16   97:21*
**rise**   *77:22*
**risk**   *87:4*
**Road**   *14:22*
**role**   *10:8*
   *28:5   29:2, 25*
   *30:8, 9, 22, 23*
   *31:16   34:8, 12*
   *35:18   45:6, 11*
   *53:1   56:4, 9*
   *58:5   66:5*
   *88:18*
**roll**   *34:20*
**Roman**   *39:25*
**room**   *13:13*
   *104:8*
**ROSS**   *3:18   8:13*

Roughly   10:6
42:19   78:13
RPV   78:16, 17,
18   81:9, 12, 19
83:10, 23
84:17   85:22
86:24   90:16
92:8
R-Springville
49:24
Rule   40:14
59:22
rules   2:5   7:5
21:21   40:15
41:10
rulings   66:18
run   25:1, 8, 9
104:23

< S >
SADASIVAN   3:11
6:2   7:25   8:1
9:3, 9, 11
31:9   35:9, 13
36:12, 18, 21
49:8, 13   51:3,
11   52:10   61:1
63:16, 22
65:18   76:20,
25   90:3   93:17
94:11   100:7,
15, 19   103:18
113:10
safe   87:13
satisfied   42:14
saw   62:14
saying   47:21,
22   48:24
51:23   56:20
80:13   107:23
says   30:4
41:4   61:6
70:19   80:5
86:10, 14
100:11, 15
101:24   102:5,
14   113:22
scan   40:19
77:1, 2
schedule   6:16
31:1   53:8
55:2   58:6, 10

60:23   62:12
98:20   102:7
scheduling
28:16   62:5
school   15:24
17:3
scrapped   59:13
screen   19:15,
19   46:25   61:3
63:19, 24
76:11   94:8
100:3
Scroll   19:23
95:2   100:13
scrolling   100:11
second   47:21
49:6   61:10
64:8   74:12
75:5   84:13
102:12
secret   29:12, 14
Secretary   7:21
35:11   47:16
111:7
Section   39:21
43:20, 22   44:8,
12, 14, 18, 23
45:1   65:6, 11,
14   66:20   70:16
see   19:22, 23
28:15   32:5
36:19   38:1
39:3   50:6, 24
61:2   62:1, 3
63:20, 24   74:1,
9, 16   76:18
77:10, 19   80:2
83:6   89:6
94:8   95:9, 25
103:16   110:1
seeing   51:6
55:2   95:4
seen   64:6, 10
101:14, 15
select   75:22,
24   76:6   103:8
selected   31:6,
22   32:2
selection   31:12,
16
senate   15:13
19:8   20:9

22:2   24:5, 10
26:7, 9, 21
27:21   29:10
32:9   45:19
53:3, 5, 13
54:20, 23   56:5,
9   65:3, 20, 22
82:4, 23   93:3,
6, 21, 24   94:1,
2, 6, 22   95:10,
11, 14   111:10,
24
Senator   7:24
17:13, 14, 15
19:20   35:25
37:2   47:12
49:9, 25   51:18
58:1   61:8
64:7   65:19, 21
80:5   82:19
90:10   94:17
95:5, 7, 16, 20,
23   96:3, 10, 20,
23   97:12
103:24   104:2
106:23   110:23
111:5, 9   113:6,
11
senators   20:21
111:21
sense   21:14
28:1   82:18
sent   101:21
sentence   39:1
85:7
September   55:25
56:3
sequence   53:22
serve   25:25
31:22   32:7
served   9:17
26:2, 19   27:2,
3, 5
service   24:16
serving   104:18
105:10   107:25
session   45:22
56:15, 16   57:1
63:8, 9, 14
74:17   75:2
92:2, 17, 23
93:1   94:24

set   47:24
53:8   55:22
56:24   59:10, 16
setting   55:2
58:5   59:22
Sewell   86:15
87:20, 24   88:3,
6
Shalela   8:1
share   19:18
46:25   61:3
63:19   76:11
100:3
shared   22:9
49:22   53:20
54:17
sheet   113:18, 22
show   19:15
46:23   48:6
53:21
showing   61:16
100:9
side   70:4
signature   2:2
significant
102:4   109:22
110:17
similar   19:24
61:18
simply   70:6
108:25
single   29:24
70:6
Singleton   95:6,
16   103:19, 22
111:2
Singleton's
96:23
sir   25:11
35:9   61:22
76:25   78:24
94:11   98:1, 23
100:2   103:24
sitting   17:25
90:11   113:12
situation   98:5
six   99:20, 23
slow   52:8, 12
73:13
smaller   28:2
Smitherman   80:1
social   15:15

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

socially   25:16, 17
socioeconomic   73:2
software   74:3, 4, 5, 6   87:18
soil   72:12, 19
solutions   43:24
somebody   86:13
sooner   20:25
Sorry   14:6   22:12   23:9, 19, 20   24:1, 2   26:13, 14, 17   34:3   35:8, 14   36:3   39:22   43:14   44:13   51:3   62:23   63:22   73:15   80:23   85:4   106:21
sort   8:7   18:15   19:25   56:19   59:2, 12   86:7
SOS   47:1
sound   48:10
Southern   16:3, 9
southerner   67:1
spaces   105:15   106:8
speak   11:25   109:3
speaker   31:24
speaking   73:15
special   56:16   57:1   63:13   74:17   75:2   92:2, 17, 23   93:1   94:24
speculate   43:18
speculation   53:20
spell   9:24
spent   53:17, 19
spilled   56:2
spread   35:19   62:11
spring   88:23   89:9
Springville   14:22   15:25

staff   20:13   40:11   55:16, 17   58:9, 23   60:3   62:8   88:8   101:21   103:13
staffed   20:20
standing   21:13, 15, 20, 22   22:1, 10, 19   93:5
Stars   3:7
start   57:6   61:20   94:25   106:3
started   45:18   46:2   53:16   54:5   57:8   62:9   66:3   70:14
starting   32:14, 15, 17   42:15
State   1:22   7:3, 19, 21   9:24   12:13   15:7   20:15, 20   38:6, 7, 11, 15   39:11   47:16   48:6   60:20   61:20   62:11   64:12   72:11   96:16, 17   98:3   99:5   109:23   113:18, 19   115:1
stated   51:19   103:2
statement   44:7   50:16, 22   105:18, 21   109:17   113:18
statements   11:20
STATES   1:1   7:15   38:6   39:11   65:6, 12
state's   48:1
stay   30:10   31:4   41:4   66:4
staying   41:14
Ste   3:7, 21   4:19   5:14
step   49:5

steps   57:11   88:13
STIPULATED   1:17   2:1, 8
stipulation   7:6
stipulations   8:24
stop   29:21
Street   1:23   3:14, 21   4:4, 19   5:14   115:23
strength   39:14   65:10
strike   56:8
studied   16:11
study   19:12   80:4, 15   81:3, 7   82:10, 25   84:25   85:8, 11
subdivisions   70:20
subgroup   44:10
subject   39:20
submit   34:16   91:23
submitted   34:13
submitting   91:18
subsequent   65:25   67:8
subsequently   30:5
subset   75:14, 16, 17
substitute   76:8   95:20
suddenly   98:7
sufficient   81:6
suggest   87:5
suggested   79:20   88:3
suggestions   60:7, 8
Suite   115:23
summarized   22:20
summarizes   28:19, 21
summary   22:8   23:3, 7, 8
supersedes   98:3
support   25:1
supports   108:11, 12

sure   12:13, 23   15:7   28:20   30:10   31:4   37:23   41:5, 7, 9, 15   42:18   44:9   45:25   54:15   60:25   79:5   84:8   91:20   93:21   107:10   109:5   112:17   114:2
surprise   104:4
surprised   60:24   74:23
suspect   80:18
suspicious   77:17, 22   78:10
swear   8:19   76:5
sworn   8:22   10:17
system   17:7   36:16   40:8   55:19   58:8   60:4   62:20   74:10   103:15

< T >
tacked   77:18   99:20
take   16:8   19:11   34:13   35:11   41:5, 7   49:11   51:11   79:18   88:13   90:4   94:17, 20   109:25
taken   1:21   9:6   51:15   90:7   104:12   115:5, 8
takes   97:24
Talk   6:10   24:15   41:16, 23   67:1   87:20, 24
talked   18:15   33:1   41:19   42:1   53:23   58:7   67:15   83:24

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

talking   19:22
20:7   21:6, 7,
8, 16   22:3, 7,
8, 13   23:1
30:11, 12, 14
31:8   34:10
35:8   49:21
57:22, 24, 25
65:16   70:9, 17
107:15
Tallapoosa   1:23
5:14
target   23:24
24:7   58:20
targeted   99:19
targeting   86:6
teacher   17:3
team   28:11
technical   40:12
telephone   14:23
tell   33:22
36:4, 7   61:18
90:19   96:2
ten   10:6   27:5
tenure   26:19
term   73:16
107:11
terms   26:2, 4
27:4   97:17
108:14
test   77:16, 18
testified   8:22
23:10   73:17
testify   10:19
23:18, 20
testimony   10:24
73:9   102:10
Texas   16:5
Thank   9:14
13:11   14:6, 14
26:17   35:13
38:4, 21   49:13
51:10, 12
52:17   63:22
76:25   90:10
98:23   104:5
107:1   110:21,
22   113:6, 11, 15
thereto   2:14
thing   31:3
33:10   54:5
57:13   73:4

78:3   96:12
107:14
things   25:23
27:14   28:20,
22   30:19
53:22   55:3, 4
62:13   96:12
think   21:10
25:4   28:19, 21
37:17, 21
46:17   50:17
52:8   55:24
58:20   59:11
60:3   62:14
63:3, 21   67:15
70:1   73:1
76:4   77:25
78:9   79:4, 5,
19, 24   80:21
81:20   82:17
83:10   84:4, 8
85:16   87:6
88:6   93:20, 22
97:3, 8, 15
98:17   102:21,
23   103:18
105:4, 16, 17,
19   106:9, 10
thinking   57:8
63:7, 13
third   56:3
63:5   70:16
thought   50:18
83:7, 16   85:4
threat   87:6
threatened   78:13
three   26:2, 4
27:4, 20, 21
97:24
threshold   85:21
86:8
Thursday   74:17
76:1   92:2, 19
time   2:12, 13
7:17   9:5, 8
10:7, 11   12:18,
24   13:1   14:9
17:16   27:23
28:3, 16   30:15
31:1, 7   32:21
37:23   41:23
45:9   50:18

51:14, 17   52:7
53:15, 17, 19
55:18   56:21,
22   57:9, 10
59:15   60:1
67:15   68:12
83:20   90:6, 9,
11   99:7, 13, 19
103:2   104:5,
22, 25   108:9
110:22   112:20
113:12   114:4
timeline   54:1,
21   56:24   57:14
timelines   56:12
timely   55:5
times   55:23
68:5, 9, 15
70:1   99:15
103:7, 8, 11
timing   53:21
102:14, 19
title   64:15
today   9:16
10:24   11:16
13:18, 21
17:19, 25   18:8,
13   19:18
22:14   73:14
75:11   104:5
109:24   110:19
today's   9:14
11:9
told   29:5, 6
55:24   88:5
90:24   91:2, 6,
9
topic   110:9, 10
topics   64:16
town   63:11
transcribed
115:5, 8
transcribing
11:14
Transcript   6:20,
22   76:12   77:8,
10   79:18
80:18, 24
86:19   94:5, 21
95:8, 12, 14, 15
115:7

transcription
115:6
travel   102:2, 4
trial   2:13
23:18, 20
tried   57:13
65:19   93:2
Trojan   62:16
trouble   8:4
Troy   62:15
true   12:14
115:7
trust   26:23
truthful   10:24
truthfully   10:19
try   19:13
41:4   53:8
64:24   66:24
110:7
trying   48:21
53:16, 25
Tuesday   74:16
75:1   92:1
turn   24:3
26:12   62:23
turned   101:1
turning   79:22
84:11
TURRILL   3:4
8:11
twice   99:18
Twitter   15:20,
21
two   15:10
19:4   34:2, 5
39:7, 9   46:4,
15   47:19
49:25   50:24
51:6   52:4, 14
57:9   63:3
74:14, 21
75:10, 23   85:1
93:9, 13, 22
96:3, 6, 13
97:8, 13   98:6
101:2   110:1
two-year   58:8
62:8, 10

< U >
U.S   38:9   39:17
ultimately   93:6

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

undergraduate
  16:2
underneath
  113:20
underpopulated
  84:7
understand   9:16
  10:18   11:2, 6,
  9, 13, 22   12:3,
  5, 10, 22   13:3,
  7, 16   14:4, 12
  18:1   23:19
  34:23   44:4
  54:15   78:21
  81:24   82:19
  107:23
understanding
  45:9   67:25
  70:23   77:13
  78:16, 18   79:8,
  10   97:18
  112:24
understood
  41:17   52:17
undertake   81:8,
  11, 25   82:11
  83:4, 22
undertaken   82:1,
  25   83:12
unfold   53:9
  55:4
unfortunately
  74:24
Union   4:3, 10
UNITED   1:1
  7:15   38:6
  39:11   65:11
universities
  62:5
University   16:4
unnecessary
  90:20, 25
unsatisfactory
  102:15
unwarranted
  39:13
update   32:23
updated   28:15
upper   61:21
use   41:18
  73:23, 24   81:2

Usual   8:24

< V >
value   83:16
VAP   80:21   81:5
various   94:23
venues   60:17
verbal   11:19
versus   7:13
  9:13, 19
VIDEO   1:9
  95:12
videoconference
  11:11
Videographer
  5:20   7:11
  8:9, 19   9:4, 7
  51:13, 16   90:5,
  8   114:3
view   105:11
  108:10
viewed   102:16
views   105:11
  106:2, 4, 5
  107:4   108:20,
  22   109:7, 12,
  13, 19, 20
  110:11, 12, 16
violate   68:17
  91:16   92:5
violation   69:24
violations   69:18
virtually   69:4
  88:7
vote   22:11
  34:20, 22, 25
  39:6   76:3, 7
  81:5   87:12
  93:12, 16
  95:15, 24
  96:22, 25   97:2
  111:12
voted   52:5, 16
  96:2, 9, 19
  97:13   111:24
  112:13
voters   48:8
  78:6   87:10, 12
  97:10   98:9
votes   95:24
  111:21   112:5, 9

Voting   39:8, 14,
  17, 21   43:13,
  17, 20   47:25
  50:11   65:7, 10,
  11, 14   66:9, 12,
  20   67:4, 7, 11,
  14, 22   68:1, 2,
  7, 17   69:9, 13,
  18, 24   77:14,
  20   78:18   79:9,
  14   80:4, 7, 10,
  17, 20, 21   82:7,
  10, 25   86:22
  87:9, 21   90:14
  91:16   96:15
  97:21
VRA   45:1   92:6
VS   1:9

< W >
wait   11:25
  12:1   78:20
waived   2:3
WALKER   5:11
  7:23   8:25
  12:17   13:24
  15:2   18:11, 24
  21:5   22:23
  29:4, 20, 23
  31:7   35:7, 10,
  15, 19   36:3, 6,
  20   40:22   47:3,
  6   48:11   49:4,
  12, 19   50:19
  51:12   52:12
  61:10, 15   63:2,
  21   65:15   66:2
  76:21, 23
  81:18, 21
  82:13   83:15,
  22   90:19, 22
  92:16   93:15,
  18, 25   94:4, 9
  100:3, 6, 10, 16,
  20   101:1, 4
  102:24   105:24
  106:16, 20
  110:25   113:8,
  16   114:2
want   8:19
  24:21   44:7, 16,

21   51:18
  102:22   103:22
wanted   22:11
  55:24   87:4
  88:9   93:4
Washington   3:22
  4:20   5:5
waste   83:20
way   24:10
  68:16, 19
  71:16   83:5
  84:19   100:14
  105:4
ways   71:18
web   11:10
week   56:3
  92:19
weeks   55:25
WELBORN   4:8
  35:17   36:10
  61:19   75:16
  78:22   79:24
  94:10   100:13,
  17   113:25
welcome   103:23
  110:24   113:7
well   10:1
  15:6   17:15
  19:16, 24
  20:19, 24   21:9,
  10, 25   22:6, 15
  25:3   26:3, 21
  27:5   28:10, 19
  29:21   30:9
  35:2, 19   39:4
  41:3, 24   43:18
  46:21   48:15
  50:3, 14   52:18
  53:15   55:1, 16
  59:9   60:19
  62:3, 7   64:14
  65:25   66:15
  67:6   68:2
  70:1, 25   71:25
  73:1, 22   76:11
  77:5   78:25
  80:17   82:8, 12
  83:21   86:14
  87:10   89:21
  91:17   92:24
  94:17   98:2, 16
  101:12   104:3,

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

*4, 23*   105:*3*
  106:*18*   107:*18*
**well-kept**   29:*11*
**went**   22:*1*
  26:*2, 3*   67:*17*
  84:*4*
**we're**   13:*12, 13*
  30:*11*   35:*15*
  36:*22*   52:*6*
  70:*9, 17*   74:*21*
  75:*11*   84:*19*
  101:*23*
**west**   72:*11*
**we've**   45:*23*
  47:*6*   49:*4*
  79:*17*
**win**   78:*11*
**winners**   98:*8*
**wish**   23:*9*
  40:*12*
**witness**   2:*3*
  7:*7*   8:*7*
  29:*21*   47:*5*
  61:*17*   106:*14*
**wondering**   53:*18,*
*19*   71:*13*
**word**   25:*14*
  34:*3*   50:*4*
  78:*14, 20, 23*
**words**   50:*5*
  99:*9*
**work**   9:*11*
  17:*8, 15*   36:*16*
  40:*9*   55:*3*
  58:*9*   59:*2*
  89:*7*   103:*16*
**worked**   58:*9*
  69:*5*   83:*6*
  108:*1, 5*
**working**   17:*14*
  66:*16*   70:*15*
  102:*16*   110:*14*
**works**   18:*16*
  81:*23*
**worth**   28:*22*
**worthwhile**   83:*16*
**writing**   11:*15*
**wrong**   98:*20*

**< Y >**
**Yeah**   26:*10*
  33:*13*   39:*3*

  49:*20*   62:*15*
  78:*13, 15*   96:*1*
  98:*18*   114:*2*
**year**   57:*9*
**years**   10:*6*
  16:*19*   27:*6, 18*
  57:*9*   82:*15*
  104:*20, 21*
  105:*10*   107:*3,*
*11, 25*
**Yep**   80:*1*
**yesterday**   18:*14,*
*24*   22:*22*
  100:*16*
**York**   3:*15*   4:*5*

**< Z >**
**Zero**   99:*8, 11*
**Zoom**   3:*18*
  4:*15*   8:*10*