FILED

2021 Dec-27  PM 09:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 4

**In The Matter Of:**

**Evan Milligan,et al v. John H.Merrill, et al.**

---

Chris Pringle

*December 17, 2021*

---

US Legal

**Evan Milligan,et al v. John H.Merrill, et al.**

**Chris Pringle**
**12/17/2021**

| | |
|---|---|
| 1  UNITED STATES DISTRICT COURT | 1  A P P E A R A N C E S |
| 2  FOR THE NORTHERN DISTRICT OF ALABAMA | 2 |
| 3 | 3  FOR THE MILLIGAN PLAINTIFFS: |
| 4 | 4   MICHAEL L. TURRILL |
| 5 | 5   Attorney at Law |
| 6  EVAN MILLIGAN, et al., ) | 6   Hogan Lovells US LLP |
| 7   ) CIVIL CASE NO. | 7   1999 Avenue of the Stars, Ste. 1400 |
| 8   Plaintiffs, ) 2:2021-CV-01530-AMM | 8   Los Angeles, California  90067 |
| 9  VS.   ) VIDEO DEPOSITION OF: | 9   michael.turrill@hoganlovells.com |
| 10 JOHN MERRILL, et al., ) CHRIS PRINGLE | 10 |
| 11   ) | 11   KATHRYN SADASIVAN |
| 12   Defendants.  ) | 12   Attorney at Law |
| 13 | 13   NAACP Legal Defense & Educational Fund |
| 14 | 14   40 Rector Street, FL 5 |
| 15 | 15   New York, New York  10006 |
| 16   S T I P U L A T I O N S | 16   ksadasivan@naacpldf.org |
| 17    IT IS STIPULATED AND AGREED, by and between | 17 |
| 18 the parties through their respective counsel, that | 18   DEUEL ROSS (Via Zoom) |
| 19 the deposition of: | 19   Attorney at Law |
| 20    CHRIS PRINGLE, | 20   NAACP Legal Defense & Educational Fund |
| 21 may be taken before LeAnn Maroney, Notary Public, | 21   700 14th Street N.W., Ste. 600 |
| 22 State at Large, at the law offices of Balch & | 22   Washington, DC  20005 |
| 23 Bingham, 105 Tallapoosa Street, Montgomery, Alabama, | 23   dross@naacpldf.org |
| 24 36104, on December 17, 2021, commencing at 9:14 a.m. | 24 |
| 25                            Page 1 | 25                            Page 3 |
| 1    IT IS FURTHER STIPULATED AND AGREED that the | 1  JULIE A. EBENSTEIN |
| 2 signature to and reading of the deposition by the | 2  DAVIN M. ROSBOROUGH |
| 3 witness is waived, the deposition to have the same | 3  Attorneys at Law |
| 4 force and effect as if full compliance had been had | 4  American Civil Liberties Union Foundation |
| 5 with all laws and rules of Court relating to the | 5  125 Broad Street |
| 6 taking of depositions. | 6  New York, New York  10004 |
| 7 | 7  drosborough@aclu.org |
| 8    IT IS FURTHER STIPULATED AND AGREED that it | 8 |
| 9 shall not be necessary for any objections to be made | 9  KAITLIN WELBORN |
| 10 by counsel to any questions, except as to form or | 10  LaTISHA GOTELL FAULKS |
| 11 leading questions, and that counsel for the parties | 11  Attorneys at Law |
| 12 may make objections and assign grounds at the time | 12  American Civil Liberties Union of Alabama |
| 13 of the trial, or at the time said deposition is | 13  P.O. Box 6179 |
| 14 offered in evidence, or prior thereto. | 14  Montgomery, Alabama  36106 |
| 15 | 15  kwelborn@aclualabama.org |
| 16 | 16 |
| 17    *** | 17  FOR THE SINGLETON PLAINTIFFS: (Via Zoom) |
| 18 | 18   JAMES URIAH BLACKSHER |
| 19 | 19   Attorney at Law |
| 20 | 20   825 Linwood Road |
| 21 | 21   Birmingham, Alabama  35222 |
| 22 | 22   jublacksher@gmail.com |
| 23 | 23 |
| 24 | 24 |
| 25                            Page 2 | 25                            Page 4 |

**Evan Milligan,et al v. John H.Merrill, et al.**

```
 1 FOR THE CASTER PLAINTIFFS: (Via Zoom)
 2         DAN OSHER
 3         Attorney at Law
 4         Elias Law Group
 5         10 G Street NE, Ste. 600
 6         Washington, DC  20002
 7         dosher@elias.law
 8
 9 FOR DEFENDANT JOHN H. MERRILL:
10         JIM DAVIS
11         Assistant Attorney General
12         Office of the Attorney General
13         501 Washington Avenue
14         Montgomery, Alabama  36130
15         jim.davis@alabamaag.gov
16
17 FOR THE DEFENDANTS JIM McCLENDON & CHRIS PRINGLE:
18         DORMAN WALKER
19         Attorney at Law
20         Balch & Bingham
21         105 Tallapoosa Street, Ste. 200
22         Montgomery, Alabama  36104
23         dwalker@balch.com
24
25                                          Page 5
```

```
 1 ALSO PRESENT:
 2         Paige Ali, Videographer
 3         Elizabeth Baggett
 4
 5
 6              I N D E X
 7 MS. WELBORN:    9-120
 8 MR. OSHER:     120-125
 9 MR. BLACKSHER: 125-140
10 MR. DAVIS:     140-141
11
12       E X H I B I T   L I S T
13                               PAGE
14    Plaintiff's Exhibit 1 -        12
15    (Depo notice)
16    Plaintiff's Exhibit 2 -        52
17    (Reapportionment Guidelines)
18    Plaintiff's Exhibit 3 -        55
19    (Proposed guidelines handout)
20    Plaintiff's Exhibit 4 -       104
21    (Transcript of 10-26-21)
22    Plaintiff's Exhibit 5 -       116
23    (Transcript of 11-1-21)
24    Plaintiff's Exhibit 6 -       119
25    (2021 Congressional map)
                                     Page 6
```

```
 1         I, LeAnn Maroney, a Court Reporter of
 2 Birmingham, Alabama, and a Notary Public for the
 3 State of Alabama at Large, acting as commissioner,
 4 certify that on this date, pursuant to the Federal
 5 Rules of Civil Procedure and the foregoing
 6 stipulation of counsel, there came before me on
 7 December 17, 2021, CHRIS PRINGLE, witness in the
 8 above cause, for oral examination, whereupon the
 9 following proceedings were had:
10              * * * * *
11         THE VIDEOGRAPHER:  This marks the
12 beginning of the deposition of Chris Pringle in the
13 matter of Evan Milligan, et al., versus John H.
14 Merrill, et al., Civil Case Number 2:21-CV-01530-AMM
15 filed in the United States District Court for the
16 Northern District of Alabama.  The date is December
17 17, 2021.  The time is 9:14 a.m.
18         All attorneys present, will you please
19 state your names and whom you represent.
20         MS. WELBORN:  Kaitlin Welborn from the
21 ACLU of Alabama representing the plaintiffs.
22         MS. FAULKS:  LaTisha Gotell Faulks, ACLU
23 of Alabama, representing the plaintiffs.
24         MR. WALKER:  Dorman Walker, Balch &
25 Bingham, representing the intervenor defendants,
                                              Page 7
```

```
 1 Senator Jim McClendon and Representative Chris
 2 Pringle.
 3         MR. DAVIS:  Jim Davis, Alabama Attorney
 4 General's office, representing Secretary of State
 5 John Merrill.
 6         THE VIDEOGRAPHER:  All attorneys on
 7 Zoom.
 8         MS. SADASIVAN:  This is Kathryn
 9 Sadasivan from LDF for the Milligan plaintiffs.
10         MR. ROSS:  Deuel Ross for the Milligan
11 plaintiffs.
12         MR. TURRILL:  Michael Turrill for the
13 Milligan plaintiffs.
14         MR. OSHER:  Hi.  This is Dan Osher from
15 Elias Law Group representing the Caster plaintiffs.
16 Good to see you all.
17         MR. WALKER:  Good to see you, Dan.
18         MR. ROSBOROUGH:  Good morning.  I'm
19 Davin Rosborough for the Milligan plaintiffs.
20         MS. EBENSTEIN:  Julie Ebenstein for the
21 Milligan plaintiffs.
22         MR. BLACKSHER:  Jim Blacksher for the
23 Singleton plaintiffs.
24         MS. BAGGETT:  Elizabeth Baggett.  I'm a
25 law clerk with the ACLU, not an attorney, for the
                                              Page 8
```

Evan Milligan,et al v. John H.Merrill, et al.

**Page 9**

1 Milligan plaintiffs.

2          THE VIDEOGRAPHER:  Court reporter, will

3 you please swear in the witness.

4          CHRIS PRINGLE,

5 having been duly sworn, was examined and testified

6          as follows:

7          THE REPORTER:  Usual stipulations?

8          MS. WELBORN:  Yes.

9          MR. WALKER:  Yeah.  Kaitlin, that means

10 -- okay.

11          MS. WELBORN:  Yes, I understand.

12 EXAMINATION BY MS. WELBORN:

13 Q.          Representative Pringle, my name is

14 Kaitlin Welborn from the ACLU of Alabama.  I

15 represent the Milligan plaintiffs.

16          Could you please state your full name

17 for the record?

18 **A.          Christopher Paul Pringle.**

19 Q.          And do you understand that you're

20 testifying under oath right now?

21 **A.          I do.**

22 Q.          Is there anything that might prevent you

23 from understanding my questions or answering

24 truthfully today?

25 **A.          No.**

**Page 11**

1 A.          **2003.**

2 Q.          And what was the case?

3 **A.          Mr. Blacksher, redistricting.**

4 Q.          Okay.  And what was it -- it was about

5 redistricting.  Do you know what the result of that

6 case was?

7 **A.          No.**

8 Q.          So I'll just go over some key rules of

9 the road as a refresher.  I'll ask the questions.

10 And if you don't understand a question, let me know,

11 just like you did just now.  And if you answer a

12 question, I will assume that you understood that

13 question.  Is that fair?

14 **A.          Yes.**

15 Q.          The court reporter is here, and she's

16 typing everything you and I say and everybody else

17 says.  And she'll type everything said by anyone in

18 the room or on Zoom.

19          It's really important that only one

20 person speaks at a time.  So if you could just allow

21 me to finish my questions and sentences, and I'll do

22 my best to allow you to finish your answers before

23 jumping on to the next question.  Okay?

24          I'd like to introduce my first exhibit,

25 which is the deposition notice.

**Page 10**

1 Q.          Are you represented by a lawyer today?

2 **A.          Yes.**

3 Q.          And who is that lawyer?

4 **A.          Dorman Walker.**

5 Q.          And is he the same lawyer who represents

6 plaintiffs -- or defendants in this lawsuit?

7 **A.          Yes.**

8 Q.          And --

9          MR. WALKER:  I'm not sure what the

10 question is.

11 **A.          The defendants are --**

12          MS. WELBORN:  That's okay.

13 Q.          The intervenors.  He represents the

14 intervenors --

15 **A.          Yes.**

16 Q.          -- is that correct?  Okay.

17          And are you paying Mr. Walker to be your

18 lawyer today?

19 **A.          No.**

20 Q.          And do you assume that the State of

21 Alabama is paying Mr. Walker to be your lawyer?

22 **A.          Yes.**

23 Q.          Have you ever been deposed before?

24 **A.          One time.**

25 Q.          And when was that?

**Page 12**

1          MR. WALKER:  Are you -- are you

2 numbering these sequentially from the last --

3          MS. WELBORN:  We'll start over.  So this

4 will be Plaintiff's Exhibit Number 1.

5

6          (Plaintiff's Exhibit 1 was

7          marked for identification.)

8

9 Q.          So have you seen this document before?

10 **A.          Yes, ma'am.**

11 Q.          And without disclosing the content of

12 any discussions with your attorney, what did you do

13 to prepare for your deposition today?

14 **A.          We met yesterday to discuss the**

15 **deposition.**

16 Q.          With Mr. Walker?

17 **A.          Yes.**

18 Q.          With anybody else?

19 **A.          Mr. Davis and Senator McClendon.**

20 Q.          Okay.  And for how long did you meet?

21 **A.          An hour an 45 minutes, two hours maybe.**

22 **It wasn't long.**

23 Q.          Okay.  And other than Senator McClendon,

24 did you meet with anyone who's not an attorney?

25 **A.          No.**

**Evan Milligan,et al v. John H.Merrill, et al.**

1 MS. WELBORN:  I'm sorry.  I don't know
2 if you're an attorney or not.
3 MR. McCLENDON:  No.
4 MS. WELBORN:  I'm from DC.  I just
5 assume everybody is an attorney.
6 MR. WALKER:  He's an eye doctor, if you
7 have any issues there.  But he's not an attorney.
8 MS. WELBORN:  Well, clearly, I do.
9 Q.      Okay.  And did you review any documents
10 for today?
11 A.      No.
12 Q.      Okay.  You didn't review the complaint
13 for this case?
14 A.      No.
15 Q.      And have you discussed this case with
16 anyone other than your attorney, Mr. Davis, and
17 Senator McClendon?
18 A.      No.
19 Q.      And have you discussed your deposition
20 with anyone?
21 A.      I told people I was being deposed.  But
22 that was the extent of it.
23 Q.      Okay.  And who first told you that this
24 lawsuit had been filed?
25 A.      Was this the one that was filed before
Page 13

1 we even introduced a bill?
2 Q.      No.
3 A.      Okay.  So I have no recollection.
4 Q.      And who first told you that your
5 deposition had been requested?
6 A.      My attorney.
7 Q.      And when was that?  Do you remember?
8 A.      Shortly after y'all noticed it.
9 Q.      Okay.  Which was --
10 A.      Just a couple of days ago.
11 Q.      Just a few days ago.
12 Are you being compensated by anyone to
13 be here today?
14 A.      I'm getting my usual legislative per
15 diem for travel, which all state employees are
16 entitled to.
17 Q.      Right.  And do you expect to be
18 compensated in any way if you testify at trial?
19 A.      I will receive the same compensation for
20 travel that all state employees are entitled to.
21 Q.      Okay.  Do you have an email account?
22 A.      Yes.
23 Q.      And what is that email account?
24 A.      My private personal is
25 chrispringle@southerntimberlands.com.  My state
Page 14

1 government, I couldn't even tell you.
2 Q.      And that's your legislative --
3 A.      Yes.
4 Q.      -- email address?
5 Do you have any other email accounts?
6 A.      No.
7 Q.      Do you have an email account for any
8 PAC, for example?
9 A.      No.
10 Q.      So everything goes to either your
11 legislative account or your personal account?
12 A.      Yes.
13 Q.      Okay.  Do you have any personal social
14 media accounts?
15 A.      I have a Facebook page.
16 Q.      So Twitter, anything like that, for
17 personal use?
18 A.      Not for me, no.
19 Q.      Okay.
20 A.      I mean, there -- there are Twitter
21 accounts for me, but I didn't use them.  I didn't --
22 they had my name on them, but I never used them.
23 Q.      Okay.  And on your personal Facebook
24 account, it's just your name on the account; is that
25 correct?
Page 15

1 A.      Yes.
2 Q.      Okay.  And have you been involved in any
3 lawsuits other than the redistricting one with
4 Mr. Blacksher?
5 A.      No.
6 Q.      Okay.  What's the highest level of
7 education that you've completed?
8 A.      A graduate of the University of Alabama.
9 Q.      And when was that?
10 A.      August 11th 1984.
11 Q.      And what degree did you obtain?
12 A.      I got a degree in communications with a
13 minor in political science.
14 Q.      Okay.  Do you have any certificates or
15 any specialties, any certifications in anything?
16 A.      I'm a licensed realtor.  I'm a licensed
17 homebuilder.  I'm a licensed general contractor.
18 And until I let it expire, I was a certified control
19 burn specialist.
20 THE REPORTER:  Control what?
21 A.      Control burn.  You know when you see the
22 woods on fire?  Guys like me are burning it on
23 purpose.
24 Q.      Okay.  Well, if I need to fix anything
25 in my apartment, it sounds like you're the person to
Page 16

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

---

**Page 17**

1 come to.

2 A.          I don't fight fires.

3 Q.          Well, no fires.  I hope there's not a

4 fire in my apartment.

5          So what do you do for a living other

6 than burn things?

7 A.          I actually quit doing that.  I am a real

8 estate agent with Southern Timberlands.  We

9 specialize in timberland sales and acquisitions.

10 And I am a licensed homebuilder and a licensed

11 general contractor.  I build houses, hunting camps,

12 and I do commercial remodeling work.

13 Q.          Who so is your employer?  I'm sorry.

14 A.          Southern Timberlands.

15 Q.          Okay.  And so all of those, the realtor

16 and being a contractor, et cetera, that's all for

17 that company, correct?

18 A.          No.

19 Q.          No?

20 A.          My real estate license is held at

21 Southern Timberlands, a division of Cooper &

22 Company, Incorporated.

23 Q.          Okay.

24 A.          My contracting license are held under

25 Chris Pringle, Incorporated.

---

**Page 18**

1 Q.          Okay.  Any other employers?

2 A.          Alabama House of Representatives.

3 Q.          Right.  And at Southern Timberlands,

4 what's your title?

5 A.          Realtor, agent.

6 Q.          Right.  Okay.  And how long have you

7 worked there?

8 A.          27 plus years.

9 Q.          Okay.  And how long have you been a

10 contractor?

11 A.          Since about 2007.

12 Q.          And what's your current role in the

13 legislature?

14 A.          I'm a state representative from House

15 District 101 in Mobile.

16 Q.          I'm sorry.  Could you repeat that?

17 A.          State representative from House District

18 101.

19 Q.          Okay.  And what portion of the state is

20 that?

21 A.          Mobile.

22 Q.          Okay.  And how long have you been in

23 office?

24 A.          I was elected in 1994.  I served two

25 terms.  I left in 2002.  I was re-elected in '14.

---

**Page 19**

1 So seven years now.  I mean seven years my second

2 term.

3 Q.          Okay.

4 A.          So about 15 years.

5 Q.          And currently are you on any committees?

6 A.          Yes.

7 Q.          Which ones?

8 A.          I chair the committee on state

9 government.  I am cochairman of the house --

10 cochairman of the reapportionment committee.  I

11 serve on constitution, campaigns, and elections;

12 internal affairs; the oversight committee of public

13 examiners; contract review.  I believe that's all.

14 Q.          Okay.  And during your first stint in

15 the legislature -- so that's your first two terms.

16 I'll just refer to it as your first stint.  Is that

17 okay?

18 A.          That's fine.

19 Q.          Or is there a different term that you --

20 A.          That works.

21 Q.          -- prefer?  And what district did you

22          Okay.  And what district did you

23 represent at that time?

24 A.          101.

25 Q.          Okay.  So the same district?

---

**Page 20**

1 A.          Yes.

2 Q.          And were you on any committees then?

3 A.          Yes.

4 Q.          Do you remember which ones?

5 A.          I know I served on reapportionment.  I

6 served on boards and commissions, I served on

7 health, I served on constitution, campaigns, and

8 elections, I served on contract review.  And that's

9 all I can remember right now.

10 Q.          Okay.  Did you chair any of those

11 committees?

12 A.          No.

13 Q.          Okay.  I'm sorry.

14 A.          We were in the superminority at that

15 time.

16 Q.          Right.  Well, were you the ranking

17 member in any of the committees?

18 A.          No.

19 Q.          And why did you leave office?

20 A.          I decided not to run and sought higher

21 office and was defeated.

22 Q.          And other than serving in the house of

23 representatives, have you served in any other public

24 office?

25 A.          No.

Evan Milligan,et al v. John H.Merrill, et al.                    Chris Pringle
                                                                  12/17/2021

1 Q.          Okay.  And you mentioned that you were
2 on the reapportionment committee during your
3 first --
4 A.          Yes.
5 Q.          -- stint in the legislature.  So you
6 were involved in the redistricting process, correct?
7 A.          Yes.
8 Q.          And what role did you have in the
9 redistricting process?
10 A.          I was the ranking minority party member
11 in the house, not the senate.
12 Q.          Okay.  For the republicans, the minority
13 party, correct?
14 A.          Yes.
15 Q.          And why did you become involved in
16 redistricting?
17 A.          Congressman Sonny Callahan, who I had
18 previously worked for in Washington, wanted me to
19 serve on the committee because they were trying to
20 draw him out of his district.  He believed they were
21 trying to draw him out of his district.  Let me --
22 Q.          I see.  Any other reason?
23 A.          No, ma'am.  I like serving.
24 Q.          And so that redistricting process ended
25 in 2001; is that correct?
                                                    Page 21

1 A.          No.
2 Q.          So the 2002 congressional map, can you
3 be a little more specific about what your
4 involvement was in helping to draw that map?
5 A.          Virtually none.
6 Q.          Okay.
7 A.          Those maps were drawn off -- what we
8 call off campus.  They were not drawn in the state
9 house.
10 Q.          Can you explain more about what that
11 means?
12 A.          They were drawn by somebody off -- they
13 were not drawn in the reapportionment office in the
14 state house.
15 Q.          Okay.  So they were drawn by somebody
16 other than someone in the legislature?
17 A.          Yes.
18 Q.          Do you know who that was?
19 A.          No.
20 Q.          Did you work with anyone to change the
21 map at all?
22 A.          Yes.
23 Q.          Who was that?
24 A.          Randy Hinaman.
25 Q.          Okay.  And what did you do with him?
                                                    Page 23

1 A.          January of 2002.
2 Q.          Of 2002.  Okay.
3 A.          In the special session.
4 Q.          Okay.  So the special session was in
5 January of 2002?
6 A.          Yes, ma'am.
7 Q.          Okay.  And what was the result of that
8 redistricting?
9 A.          The democratic leadership drew the plans
10 and passed them.
11 Q.          And how did you become a cochair -- I'm
12 sorry.  What is your role in the 2021 redistricting
13 process?
14 A.          I'm the house cochairman.
15 Q.          Okay.  And is that a nonpartisan role?
16 A.          I was elected by the members of the --
17 the house members of the committee.
18 Q.          Okay.  And why did you decide to seek
19 that role?
20 A.          The house member that chaired it prior
21 to me was leaving, and we needed somebody with
22 experience to step up and be the house chairman.
23 Q.          And other than currently and the 2002
24 redistricting cycle, have you been involved in any
25 other redistricting process?
                                                    Page 22

1 A.          We were in contact with Congressman
2 Callahan.  And he was in contact with the other
3 members of the congressional delegation who had
4 actually -- this is my memory, now.
5 Q.          Sure.
6 A.          The members of congress hired
7 Mr. Hinaman to represent them on drawing --
8 redrawing the congressional maps in 2002.
9 Q.          And so ultimately do you know who drew
10 the 2002 map?
11 A.          I do not know who the democrats
12 retained, no, ma'am.
13 Q.          Okay.  But it was the democratic party
14 of Alabama?
15 A.          They had somebody, yes.  I don't know
16 who.
17 Q.          Do you know the general method that was
18 used to draw the map?
19 A.          I would -- I'm assuming that the
20 guidelines we adopted in 2002 were used by them to
21 draw the 2002 plan.
22 Q.          Do you know the software that was used
23 to draw the maps?
24 A.          No, ma'am.
25 Q.          Do you know the data that was used to
                                                    Page 24

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 draw the maps?

2 A.          No, ma'am.

3 Q.          So the 1992 congressional map created

4 the first majority black congressional district in

5 Alabama history.  That's District 7.  Do you know if

6 that map served as the starting point for the 2002

7 congressional map?

8 A.          You are -- that is the Reed Buskey plan,

9 correct?

10 Q.          To be honest, I don't know.  I don't

11 know the answer to that question.

12 A.          I'm pretty sure that's what we refer to

13 as the Reed Buskey plan.

14 Q.          Okay.

15 A.          That was -- that was the first time that

16 a map was drawn where a majority minority

17 congressional district was created.

18 Q.          And so --

19 A.          And I know that the guidelines in 2002

20 said we shall use the core of existing districts and

21 not -- use the core of existing districts.

22 Q.          Okay.  So is it fair to say that Reed --

23 well, who drew the 1992 map?  You don't know?

24 A.          I just know it's referred as the Reed

25 Buskey plan because Representative Buskey and I

Page 25

1 served together, and he's a personal friend of mine.

2 Q.          Okay.  So you said that it was in the

3 legislative guidelines to maintain the cores of

4 prior districts?

5 A.          If I remember the 2002 guidelines

6 correctly, that's been a longstanding tradition of

7 the Alabama legislature.

8 Q.          Okay.  Do you know if it was -- and

9 we're talking still about the 2002 redistricting

10 process -- if it was a primary goal of the

11 legislature to keep the racial demographics of each

12 district the same?

13 A.          I couldn't answer that.  I don't know.

14 Q.          Okay.  So you wouldn't know if it was a

15 primary goal to keep about a 60 percent black

16 population in District 7?

17 A.          I don't remember.  I have no -- no

18 recollection of that.

19 Q.          Do you know if the legislature took into

20 account any other characteristics other than keeping

21 the core of each district the same?

22 A.          In 2002?

23 Q.          Yes.

24 A.          No, ma'am.

25 Q.          Okay.

Page 26

1 A.          Now, we're talking just the

2 congressional plan, correct?

3 Q.          Yes.  That's right.  And that's

4 throughout this -- throughout the deposition we're

5 referring to the congressional plans.  If we refer

6 to any other plans, I'll make sure to be more

7 specific.

8          MR. OSHER:  I'm sorry to interrupt.

9 Would it be possible to move the microphone a little

10 closer to the witness?

11          (Discussion held off the record.)

12 Q.          Okay.  So for the 2001 congressional

13 map, do you know the -- did you know the racial

14 makeup of districts other than District 7?

15 A.          No.

16          Did you know the racial makeup of

17 District 7?

18 A.          No.  I mean, after the maps were passed,

19 yes, we knew it.

20 Q.          Okay.

21 A.          But going into it --

22 Q.          Do you recall what they were?

23 A.          No.

24 Q.          And do you know if the legislature

25 considered race in drawing any districts other than

Page 27

1 District 7?

2 A.          In 2001?

3 Q.          That's right.

4 A.          Those maps were drawn off campus.

5 That's the reason that ten-day rule comes into --

6 into play.  If you draw a map outside of the

7 legislature reapportionment office, you have to

8 submit it ten days before it can be introduced into

9 the legislature so it can be put into the computer

10 and analyzed.

11          And those maps were drawn exactly ten

12 days out at the last minute before the special

13 session in 2020 -- in 2002.

14 Q.          And when did that rule come into play?

15 A.          It was there in 2002.  Now, when it came

16 into the guidelines, I don't know.

17 Q.          Okay.  Do you know if in -- during the

18 2001-2002 process if any legislators advocated for

19 two majority black districts?

20 A.          Not to my recollection.

21 Q.          And if the 2000 -- well, did you vote

22 for the 2002 congressional map?  Did you vote to

23 approve it?

24 A.          Yes.

25 Q.          And if --

Page 28

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

**Page 29**

1 A.        To the best of my recollection, I did.
2 It protected Congressman Sonny Callahan and his
3 district, so I'm assuming I voted for it.
4 Q.        Okay.  And all of this is to the best of
5 your --
6 A.        Yes.
7 Q.        -- recollection.
8 A.        Yes.
9 Q.        If the 2002 map had contained two
10 majority black districts, would you have voted for
11 it?
12 A.        I can't answer that.
13 Q.        Why not?
14 A.        Because I didn't look at how they would
15 have drawn it.
16 Q.        Okay.
17 A.        It was never presented to me.  So I
18 can't tell you how I would vote on something I've
19 never seen.
20 Q.        Do you think that the legislature as a
21 whole would have approved a congressional map like
22 that?
23 A.        I'm not going to speak to that.
24 Q.        Did you play a role in the 2011
25 congressional redistricting process?

**Page 30**

1 A.        No.
2 Q.        Okay.  And do you happen to know, even
3 though you weren't there, if the 2001 congressional
4 map or 2002 congressional map was considered as the
5 starting point for the 2011 congressional map?
6 A.        No.
7 Q.        So you are the cochair of the
8 reapportionment committee for this year's
9 congressional redistricting process.  What does it
10 mean to be the cochair of the reapportionment
11 committee?
12 A.        I work with members of the Alabama house
13 on drawing their districts, their legislative
14 districts.
15 Q.        And for congress, as well?
16 A.        No.
17 Q.        So who works on the congressional map?
18 A.        Mr. Hinaman worked with members of
19 congress to help -- for them to draw the maps.
20 Q.        Okay.
21 A.        To have input from the members of
22 congress on their districts, what they wanted.
23 Q.        So what is the role of the
24 reapportionment committee with respect to
25 congressional maps or the congressional map?

**Page 31**

1 A.        We adopted the guidelines.  If you read
2 the guidelines, they lay out what we expect the
3 committee and the plans to look like, to respect
4 communities of interest, not to pit incumbents
5 against each other.  There's a whole list of things
6 that we put into the guidelines that we wanted to
7 see in our plans.
8          And Mr. Hinaman was given those
9 guidelines and instructed to draw those plans in a
10 race-neutral manner following the guidelines and
11 work with members of congress in how they wanted
12 their districts drawn.
13 Q.        And as a member of the reapportionment
14 committee, do you have any input on how the
15 congressional maps are drawn?
16 A.        We voted on the guidelines.
17 Q.        Okay.  You voted on --
18 A.        We gave -- we gave Mr. Hinaman the
19 guidelines and told him to follow those guidelines
20 and to draw those -- those maps in a race-neutral
21 manner.
22 Q.        Okay.  Any other way that the members of
23 the reapportionment committee are involved in
24 drawing the congressional map?
25 A.        Once they were finished, we looked at

**Page 32**

1 them in committee.
2 Q.        Okay.  And anything else?
3 A.        Not that I can remember right now.
4 Q.        Okay.  And what are your
5 responsibilities as the cochair of the
6 reapportionment committee?
7 A.        We -- we set -- we oversaw the public
8 hearings, the 28 public hearings we had dealing with
9 congressional, state board of education, state
10 senate, and state house maps and districts.
11          And I worked with members of the Alabama
12 house to work on their districts and what they
13 wanted and how we could address communities of
14 interest.
15          But on congressional, I allowed
16 Mr. Hinaman to meet with members of congress and
17 take the information we gathered in the public
18 hearings that was available to him and the
19 guidelines.
20 Q.        Any other responsibilities?
21 A.        Not that I can think of right now.
22 Q.        And so what was the starting point for
23 drawing the 2021 congressional map?
24 A.        I would say the guidelines.  And part of
25 our guidelines are preserve the core of the existing

Evan Milligan,et al v. John H.Merrill, et al.                    Chris Pringle
                                                                12/17/2021

1 districts and not pit incumbents against each other.
2 Q.          And so is it fair to say that the 2011
3 congressional map served as the starting point for
4 the 2021 congressional map?
5 A.          I would assume it would.  But I wasn't
6 there when Mr. Hinaman started drawing them.
7 Q.          Did you instruct him to use the 2011 map
8 as a starting point?
9 A.          I mean, the guidelines say preserve the
10 core of the existing districts.  So I would assume
11 that if the committee told him to start with the
12 core of the existing districts, he would start with
13 the core of the existing districts.
14 Q.          Which is the 2011 congressional map,
15 correct?
16 A.          Yes, ma'am.
17 Q.          And just really quickly going back to
18 the 2001, 2002 redistricting process.  You mentioned
19 that it was a priority to protect Senator Callahan's
20 district, correct?
21 A.          For Sonny Callahan, yes, and me.
22 Q.          And for you?
23 A.          Yes.
24 Q.          Right.  Did you have any other
25 priorities for the 2002 congressional map?
                                                    Page 33

1 A.          No.  Just protect the congressman --
2 Q.          Okay.
3 A.          -- who I worked for at one time.
4 Q.          Right.  So you were -- you worked for
5 him before you were in the --
6 A.          Yes.
7 Q.          -- Alabama legislature.  So when you
8 were in the Alabama legislature, you wanted to
9 protect his seat, correct?
10 A.          Yes.
11 Q.          Okay.  So that was really your
12 motivation?
13 A.          Yes.
14 Q.          Anything else?
15 A.          I was trying to see if we could draw
16 legislative districts.  But that's not the point
17 today.
18 Q.          I'm sorry?
19 A.          State legislative districts, also.
20 Q.          Right.
21 A.          But that was a different story.
22 Q.          Okay.  Thank you.
23           So now back to today's redistricting
24 process.  When did you first start planning for the
25 2021 redistricting process?
                                                    Page 34

1 A.          Probably 2019.  You know, we were
2 working on trying to come up with some type of
3 schedule.  But with the census being delayed and
4 getting the numbers so late, we were working on a
5 schedule of public hearings and working on the
6 guidelines.
7 Q.          Do you remember when in 2019 you
8 started?
9 A.          No, ma'am.
10 Q.          So what was your first step?
11 A.          We had a -- the first step was actually
12 getting me reelected house chairman after the 2018
13 election.  Because I was -- I assumed -- I came on
14 the committee in 2000 and, I want to tell you, 17
15 when Mr. Davis stepped down.  And then after the
16 election, I had to be reelected by my colleagues to
17 serve as the house -- the house cochairman.
18           Then we began the process of updating
19 the guidelines to conform with what we considered to
20 be the law dealing with reapportionment and
21 redistricting to make sure our guidelines complied
22 with the law.
23           Then we had extensive conversations,
24 Mr. Davis and Mr. Dorman and Senator McClendon and
25 I, in the reapportionment office about public
                                                    Page 35

1 hearings and how we were going to address public
2 hearings, which all changed because of COVID-19.
3           We began the process of laying out
4 those -- talking about those meetings and where we
5 were going to have them and how we were going to
6 publicize them and conduct them.
7 Q.          Okay.  So do you recall when you first
8 started thinking about updating the reapportionment
9 guidelines?
10 A.          2019, 2000.  I can't remember the exact
11 date.  But that was one of the first things we
12 addressed, making sure our guidelines were updated
13 based on the current reapportionment law and court
14 cases.
15 Q.          Is it required to update the guidelines
16 every redistricting cycle?
17 A.          Well, the law changes.  So yes, you have
18 to update your guidelines.  I mean, the courts are
19 constantly telling us -- handing down their rulings.
20 And we have to update based on those rulings.
21 Q.          But it's not required by Alabama law or
22 by any legislative rule to update the guidelines
23 every -- you know, every cycle?
24 A.          I can't imagine not updating the
25 guidelines going into this process if you know the
                                                    Page 36

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1  law has changed.  You have to.
2  Q.          If you could just give a broad overview
3  or a timeline of the 2021 redistricting process for
4  me.
5  A.          We were supposed to receive our initial
6  numbers at the end of January.  Then they -- then we
7  were going to get our finals in April.
8  Q.          I'm sorry?
9  A.          We were supposed to get our initial --
10  if I remember this correctly, we were supposed to
11  get our initial census numbers in, I think, January.
12  Yeah, January.  And then we would get our final
13  numbers in April.
14          That all got bumped to -- we didn't get
15  any numbers until the middle of the August.  And we
16  were trying to work out a schedule of public
17  hearings from the spring and the summer.  But we
18  couldn't -- we couldn't engage in those public
19  hearings because we had no numbers.
20          And when we finally got our numbers in
21  the middle of August, we immediately -- we laid out
22  a series of public hearings, sent a notice to all
23  the members of the committee.  I think it was 22
24  public hearings we had -- we proposed.
25          Representative Hall sent us a letter
Page 37

1  requesting six additional public hearings in various
2  parts of the state.  We accepted her request and
3  added the six additional public hearings Ms. Hall
4  asked for, then published a list to everybody in the
5  media and advertised that those are the public
6  hearings we would be holding all over the state.  As
7  soon as we could get it to, we got it to.
8          And as soon as those meetings were over,
9  we took that information and began drawing
10  districts.  Because the secretary of state had given
11  us a deadline of the 1st of November to have our
12  plans passed in order for all the work behind the
13  scenes that has to be done to get ready for the next
14  election to occur.
15  Q.          So you started drawing the maps after
16  the public hearings; is that correct?
17  A.  Yes, ma'am.
18  Q.          Okay.  And when you said "we," who do
19  you mean?
20  A.          Well, Randy Hinaman.  And we began
21  meeting with the individual house members about
22  their -- their individual districts.
23  Q.          Okay.  But for the congressional map,
24  you mean primarily Mr. Hinaman?
25  A.          Yes.
Page 38

1  Q.          And then what happened after that point?
2  A.          We worked right up to the last possible
3  minute drawing those -- meeting with members, trying
4  to adjust the districts to make sure the members
5  were happy with them.
6          But I'm talking about the state
7  legislature.
8  Q.          Right.  Right.
9  A.          The congressional, Mr. Hinaman met with
10  the members of congress, and he worked on that.  He
11  -- I didn't.  I was busy working on the state house.
12  Q.          Okay.  For the congressional districts,
13  what happened for you in between the public hearings
14  and the reapportionment committee meeting at the end
15  of October?
16  A.          Mr. Hinaman met with the members of
17  congress.  I did not.
18  Q.          Did you do anything else during that
19  time with respect to the congressional map?
20  A.          No, ma'am.  The closest I came, I walked
21  in the room and he was on a team call with a member
22  of congress.  I picked up my paper and walked out of
23  the room.  I wasn't there but just a minute.
24  Q.          Okay.
25  A.          I didn't participate in any of those
Page 39

1  meetings.
2  Q.          And what happened -- I'm just trying to
3  get like a timeline of events rather than the
4  specifics.
5          So after the reapportionment committee
6  met on, I think, October 26th of 2020, what happened
7  after that point?
8  A.          We adopted the plans.  And we were in
9  special session dealing with the prisons.  So we
10  went -- we went straight into special session
11  dealing with the prison system.
12          I was not there that week.  I was only
13  there one day.  I had a prior contractual obligation
14  to finish a construction project that I had to stay
15  on.  So I came one day that week, and that was it.
16  Q.          Okay.  And regarding redistricting, what
17  was the first thing that happened for redistricting
18  after the reapportionment committee on October 26th?
19  A.          I don't understand the question.
20  Q.          Well, what happened next?  How --
21  eventually the maps were passed and signed by the
22  governor, including the congressional map.  So they
23  made it out of the reapportionment committee.  Then
24  what happened?
25  A.          They made it out of the committee.  They
Page 40

Evan Milligan,et al v. John H.Merrill, et al.

1 became public.  And when we went into the special
2 session for redistricting, they were introduced in
3 bill form.
4 Q.          Okay.  And can you explain in sort of a
5 Schoolhouse Rock way how that bill became a law?
6 A.          It was brought up -- it was introduced
7 into the house.  It passed.  It was assigned to the
8 state government committee where it passed.  It was
9 given a second reading on the floor.  It was put on
10 the calendar.  It was brought up on the floor, and
11 it was passed by the members of the Alabama house of
12 representatives.
13 Q.          And then what happened?
14 A.          It was sent to the senate --
15 Q.          Okay.
16 A.          -- where it went to committee, went to
17 the floor, and passed, was signed by the governor.
18 Q.          So I just wanted to make sure that I had
19 the full -- the full process.
20 A.          All nine steps occurred.
21 Q.          Okay.  Well, I'm glad that I paid
22 attention to Schoolhouse Rock, then.
23          I'm sorry to keep jumping back and
24 forth, but I'm just going to go back to the 2001,
25 2002 process really quickly.

Page 41

1 Which district did Representative
2 Callahan represent?
3 A.          The 1st congressional district.
4 Q.          And what area of the state is that?
5 A.          At that time, it was Mobile, Washington,
6 Clarke, Monroe, Escambia, and Baldwin County.
7 Q.          Okay.
8 A.          I believe it lost Wilcox County in -- I
9 believe the Buskey Reed plan took Wilcox County out
10 of the 1st congressional district, I believe.
11 Q.          Okay.  And do you remember the racial
12 makeup of Representative Callahan's district?
13 A.          No, ma'am.
14 Q.          Do you have any sense at all?
15 A.          No, ma'am.
16 Q.          10 percent black, 90 percent black?
17 A.          No, ma'am.
18 Q.          None at all?
19 A.          No.
20 Q.          Let's say that Representative Callahan's
21 district had -- previously had 40 percent black
22 population.  If, in the redistricting cycle, his
23 district had an increase of black voters in the
24 district to 50 percent, would that be something that
25 you would have supported?

Page 42

1 A.          I can't answer that.  That's
2 speculation.  I don't know.
3 Q.          Okay.  When you said that you were
4 protecting Representative Callahan's seat, what does
5 that mean?
6 A.          There was a plan produced that used the
7 Mobile ship channel to come up.  They turned and
8 used the Dog River channel.  And they hit
9 Congressman Callahan's property line, and they came
10 down his property line to the road and went up the
11 road to the other side and back down his property
12 line and back out into the Dog River ship channel
13 and back out into the Mobile ship channel.  They
14 carved just his house into the 1st congressional
15 district and sent it all the way to Dothan.
16 Q.          So what was your -- what was your
17 response to that?
18 A.          It's quicker to drive to Huntsville,
19 Alabama, from Mobile than it is to drive to Dothan.
20 Think about that.  It's quicker for us to get in a
21 car and drive to Huntsville, Alabama, than it is to
22 drive to Dothan or Henry County.  The congressman
23 was adamant that we would not do that to him.
24 Q.          So what was the ideal outcome of the --
25 of that situation?

Page 43

1 A.          We kept the core of the existing 1st
2 Congressional District intact.  We kept Washington,
3 Clarke, Mobile, Monroe, Escambia, and Baldwin
4 County.
5 Q.          Okay.  And what about Representative
6 Callahan's house?
7 A.          All of Mobile County was in the
8 district.
9 Q.          Okay.
10 A.          All of Mobile, all of Baldwin, all of
11 Washington, all of Monroe, all of Escambia.  And I
12 believe that was the first time Clarke County was
13 split to achieve zero deviation.
14 Q.          So your aim was -- is it fair to say
15 that your aim was to keep Senator Callahan's
16 residence within his district?
17 A.          Yes, ma'am.
18 Q.          Okay.  Is that what you mean by
19 protecting his district?
20 A.          Well, I mean, to draw just the lot his
21 house is on out of the district using a ship channel
22 or a boat channel, we didn't consider that to be
23 reasonable.
24 Q.          So what would be reasonable?
25 A.          Well, I mean, they didn't have the

Page 44

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1  Gingles test then.  But we didn't consider that to
2  be compact, concise, or a community of interest to
3  send one lot in Mobile County and share it with
4  Dothan in Houston and Henry County.
5  Q.         Do you mean -- were there any other ways
6  that you wanted to protect Representative Callahan's
7  seat?
8  A.         Well, of course.  He was elected by the
9  people in that district, and they -- he wanted to
10 continue to represent those people.  That's why he
11 won reelection so overwhelmingly every time he ran.
12 Q.         Is it fair to say that you wanted to
13 make sure that Representative Callahan remained in
14 the 1st District so that he could win reelection?
15 A.         I wanted to make sure he continued to
16 represent the people that had elected him, yes.  And
17 they continued to reelect him overwhelmingly for
18 years.
19 Q.         So you mentioned that one of the first
20 steps of the 2021 redistricting cycle were updating
21 the reapportionment committee redistricting
22 guidelines; is that correct?
23 A.         (Witness nods head).
24 Q.         When did that happen?
25 A.         I'm going to yield to the attorneys.

Page 45

1  But I remember sitting at a table with Mr. Davis,
2  Representative McClendon, and Mr. Walker, and we
3  began the process of working on those guidelines to
4  update.
5              MR. OSHER:  We can't hear you.
6  A.         I remember sitting at a table in the
7  reapportionment office with Mr. Davis, Senator
8  McClendon, Mr. Walker, and myself, and we began
9  reviewing the guidelines from the past
10 redistricting.  And the discussion to update them
11 based on new -- the current law and court rulings.
12             I think the Gingles test came into play
13 first.  Because I don't think Gingles was in effect
14 in 2011.  But I'm not an attorney.
15             MR. WALKER:  I'm going to instruct you,
16 given that Mr. Davis and I were there, not to
17 discuss what we discussed at that meeting because it
18 was an attorney-client meeting.
19             THE WITNESS:  Okay.
20 Q.         When did that meeting occur?
21 A.         2019 or '20.
22 Q.         Do you have any sense of what time of
23 the year?
24 A.         No, ma'am, I don't remember.
25 Q.         And did you bring any materials to that

Page 46

1  meeting?
2  A.         No, ma'am.
3  Q.         And was anybody in -- was anybody else
4  in attendance other than Mr. Walker, Mr. Davis, and
5  Senator McClendon?
6  A.         Not to my recollection, no.
7              MS. SADASIVAN:  The audio has stopped
8  again.
9              MS. WELBORN:  Can you hear me, Kathryn?
10             MS. SADASIVAN:  I can hear you now.  But
11 the audio keeps coming in and out.
12 Q.         Did you -- was that your only meeting to
13 talk about revising the reapportionment committee
14 redistricting guidelines?
15 A.         No.
16             How many other meetings did you have, if
17 you recall?
18 A.         I don't recall.
19             Do you have a sense of how many meetings
20 you had?
21 A.         I would hate to put a number on it.  But
22 it was several.
23 Q.         Five, let's say?
24 A.         It was several meetings.
25 Q.         Okay.  But less than ten?

Page 47

1  A.         I would -- I would say that, yes.
2  Q.         Okay.  And who was at those meetings?
3  A.         I remember Mr. Davis, Senator McClendon,
4  Mr. Walker, and myself.
5  Q.         Anybody else?
6  A.         I'm going to say maybe a member of the
7  reapportionment staff was there.
8  Q.         From the reapportionment office?
9  A.         Yes.
10 Q.         And do you know who that was?
11 A.         To err on the safe side, I would say
12 Ms. Overton.
13 Q.         And what's her role?
14 A.         She is the director of the
15 reapportionment staff.
16 Q.         And do you remember when that meeting
17 occurred?
18 A.         No, ma'am.
19 Q.         And what was the goal of these meetings?
20 A.         To write committee guidelines that we
21 thought would conform with the existing
22 reapportionment law.
23 Q.         So on May 5th 2001 there was a meeting
24 of the reapportionment committee; is that right?
25 A.         I believe you.

Page 48

Evan Milligan,et al v. John H.Merrill, et al.                                                    Chris Pringle
                                                                                                12/17/2021

1 Q.          Okay.  Well, when were there meetings of
2 the reapportionment committee since 2019?
3 A.          I -- I couldn't answer that.  I just
4 don't remember.
5 Q.          Do you remember any --
6           MR. ROSBOROUGH:  I'm sorry.  Everyone's
7 audio has completely dropped out again.
8           MS. FAULKS:  We should take a break.
9           MS. SADASIVAN:  I think we should break
10 possibly to resolve the audio issues quickly because
11 we keep going in and out.
12           THE VIDEOGRAPHER:  We are off the
13 record.  The time is 10:03 a.m.
14           (Recess was taken.)
15           THE VIDEOGRAPHER:  We are back on the
16 record.  The time is 10:22 a.m.
17           THE WITNESS:  Can they hear me now?  Is
18 this better?
19           MS. SADASIVAN:  Right.  Thank you so
20 much.
21 Q.          So before the break, we were talking
22 about the reapportionment committee.  How many times
23 has the reapportionment committee met in 2021, if
24 you can recall?
25 A.          I don't remember.  20 --
                                                      Page 49

1 Q.          This year.
2 A.          I don't remember the exact number.
3 Q.          A handful?
4 A.          Yes.
5 Q.          Okay.  Is there a regular schedule for
6 the reapportionment committee to have meetings?
7 A.          No reapportionment committee I've ever
8 served on had a regular schedule.
9 Q.          So how --
10 A.          I mean, like my state government
11 committee meets every Wednesday at 3:00 o'clock.
12 Q.          Right.
13 A.          Reapportionment doesn't do that.
14 Q.          So how do you decide when you have to
15 have a meeting?
16 A.          When we have something to discuss.
17 Q.          Okay.
18           MS. WELBORN:  So if there -- so we know
19 that there was a reapportionment committee meeting
20 on May 5th and one on October 26th.  Mr. Walker, if
21 there were any other committee meetings for the
22 reapportionment committee, we would request any
23 records or recordings of those.
24           MR. WALKER:  Let me represent to you
25 that I'm not aware of any other reapportionment
                                                      Page 50

1 committee meetings in 2021 except for the May 5th
2 and the October 26th meetings.
3           MS. WELBORN:  Okay.  Thank you.  I just
4 wanted to double-check.
5 Q.          So for the May 5th meeting, do you --
6 did you do anything to prepare for the meeting that
7 you recall?
8 A.          Nothing out of the -- that's -- that's
9 the day we voted on the guidelines.
10 Q.          That's correct.
11 A.          Yes.  I mean, I read the proposed
12 guidelines and went over them with the attorney.
13 Q.          Okay.  Did you do anything else to
14 prepare?
15 A.          No, ma'am.
16 Q.          And other than the meetings with the
17 attorneys and Senator McClendon to talk about the
18 revised guidelines, did you talk to anyone else
19 about the May 5th meeting ahead of time?
20 A.          I may have talked to the committee
21 members in the house, but I don't recall any
22 specific conversations.
23 Q.          So at the May 5th meeting, what
24 happened?
25 A.          The guidelines were sent to the members
                                                      Page 51

1 prior to the meeting for their review and input.
2 And at the meeting, we talked about the guidelines.
3 And if I remember correctly, the attorney explained
4 them to the members of the committee, and we passed
5 them.  We adopted them.
6 Q.          And do you remember when the proposed
7 guidelines were sent to members of the committee?
8 A.          No, ma'am.  I know it was prior to the
9 meeting.
10 Q.          And did you take any notes at the
11 meeting?
12 A.          No, ma'am.
13
14           (Plaintiff's Exhibit 2 was
15           marked for identification.)
16
17 Q.          So I would like to introduce as
18 Plaintiff's Exhibit 2 the reapportionment committee
19 redistricting guidelines from May 5th of 2021.
20 There's a copy.
21           And did you have any role in drafting
22 this document?
23 A.          It was reviewed with me by Mr. Walker,
24 and we discussed it.
25 Q.          Okay.  Did you have any other role in
                                                      Page 52

Evan Milligan, et al v. John H. Merrill, et al.

Chris Pringle
12/17/2021

1  drafting the document?

2  A.          No, ma'am.

3  Q.          Who drafted the document?

4  A.          I would say Mr. Walker.  Now, who he was

5  in conjunction with, I do not know.

6  Q.          And is that normal to have an attorney

7  draft the guidelines, would you say?

8  A.          Attorneys draft about everything we do.

9  I'm not an attorney.  I make no bones about it.

10  Q.          So the members of the reapportionment

11  committee did not draft this document; is that

12  correct?

13  A.          They were -- they reviewed it and the

14  attorneys explained it to them.

15  Q.          Okay.  Did anyone on the reapportionment

16  committee make any changes to the document at that

17  -- at the May 5th meeting?

18  A.          Not that I remember.

19  Q.          Do you know if they made any changes

20  after the meeting?  I guess they couldn't have if

21  you voted on them.

22  A.          Right.

23  Q.          Sorry.  I answered my own question for

24  you.

25              So what are these guidelines?

Page 53

1  A.          That's the parameters that we used in

2  order to draw districts we thought complied with the

3  Voting Rights Act and the 14th amendment to the

4  Constitution and the court rulings that the courts

5  had handed down in redistricting.

6  Q.          And so what is your understanding --

7  when you say "comply" with the Voting Rights Act or

8  the constitution and court rulings, what do you mean

9  by that?

10  A.          I mean, it deals with drawing districts

11  on a race neutral -- race neutral.  We didn't look

12  at race while we were drawing the districts.  And it

13  complies with not putting incumbents together and

14  respecting single-member districts and eliminating

15  contests between incumbents.  Everything is spelled

16  out here.  That was just a few of the highlights.

17  Q.          And other than compliance with federal

18  laws, are there any other reasons why you have the

19  guidelines?

20  A.          Just a road map for everybody to follow

21  when we're drawing lines.  It's agreed to by the

22  committee and the members of the committee and what

23  we prioritize as what we need to do.

24  Q.          And do you recall what updates there

25  were to the law that needed to be put into the

Page 54

1  guidelines?

2  A.          I don't recall any specifics.  But there

3  were a -- there were a handful of changes to update.

4  But I don't remember the exact specifics.

5  Q.          And who provided you with those

6  specifics?

7  A.          Our attorney.

8  Q.          Mr. Walker?

9  A.          Yes.

10  Q.          And do you know -- do you know why those

11  specifics were chosen?

12  A.          It was my understanding that the courts

13  had handed down additional rulings since the last

14  reapportionment guidelines were adopted.  And we

15  updated them to reflect those changes in the law.

16  Q.          And do you know how those specifics were

17  chosen?

18  A.          Changes in the law in courtrooms.

19

20              (Plaintiff's Exhibit 3 was

21              marked for identification.)

22

23  Q.          Let me introduce Plaintiff's Exhibit 3.

24  This is the proposed guidelines handout.

25              Do you recognize this document?

Page 55

1  A.          It looks like the one I saw earlier,

2  yes, ma'am, back in May.

3  Q.          And when you say you saw it earlier,

4  could you explain?

5  A.          Back during the discussion of the

6  guidelines.

7  Q.          And who provided this document to you?

8  A.          Mr. Walker.

9  Q.          And do you know when he provided it to

10  you?

11  A.          Prior to -- I believe every member of

12  the committee saw these -- the existing, the

13  proposed changes, and the enrolled changes prior to

14  the meeting for their review.

15  Q.          And did you see it before -- as a

16  cochair, did you see it before any of the other

17  members of the reapportionment committee?

18  A.          Yes, ma'am.

19  Q.          Did you have any role in drafting this

20  document?

21  A.          No, ma'am, other than it was reviewed

22  with me prior to that.

23  Q.          Okay.  But you did discuss revisions to

24  the guidelines prior to this document --

25  A.          Yes, ma'am.

Page 56

Page: 14 (53 - 56)

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 Q.         -- being drafted?
2 A.         Yes, ma'am.
3 Q.         Do you know if any of your discussions
4 went into the creation of this document?
5 A.         I couldn't answer that question.
6 Q.         Okay.  Do you know if any of the updates
7 that you wanted to make to the guidelines made it
8 into this document?
9 A.         I know I was in favor of the 5 percent
10 deviation.
11 Q.        And that's for the state --
12 A.        Yes.
13 Q.        -- legislative maps, correct?
14          Anything else?
15 A.        Not that I recall.
16 Q.        Okay.  Do you know what the process was
17 for drafting this document?
18 A.        Our attorney met with us and we went
19 over the old guidelines, some proposed changes, and
20 what we thought we needed to update to comply with
21 the law.
22 Q.        And did you suggest any changes?
23 A.        The 5 percent.
24 Q.        Anything else?
25 A.        Not that I recall.
                                                Page 57

1 Q.         And just to make sure, other than
2 Mr. Walker, Mr. Davis, and Senator McClendon, and
3 perhaps one member of the reapportionment committee,
4 did you speak to anyone else about revising the
5 guidelines prior to the May 5th meeting?
6 A.         I can't recall.
7 Q.         Were the -- so on this document there
8 are the 2010 guidelines.  Would you say that it's
9 fair -- is it fair to say that those were the basis
10 for the 2021 guidelines?
11 A.        I would say that, yes.
12 Q.        Why did you choose to rely on the 2010
13 guidelines rather than starting from scratch?
14 A.        Because the 2010 were based off the 2002
15 guidelines, I would assume.  I wasn't there.
16 Q.        Right.
17 A.        But I would just assume that they used
18 the 2002 as the basis for the 2010, and we used them
19 for the 2020.
20 Q.        Is there a reason why you would want to
21 rely on the past documents?
22 A.        Because we had passed plans that were
23 approved by the justice department under Section 5.
24 In 2002, remember our plan -- our congressional plan
25 was precleared by the United States Department of
                                                Page 58

1 Justice under Section 5.
2 Q.         Okay.
3 A.         And they were -- they were drawn fairly
4 closely alined with the committee guidelines at that
5 time.
6 Q.         And so you believe that the 2010
7 guidelines, then, were based on the 2002 guidelines
8 for that reason?
9 A.         What I remember from 2002, when they
10 brought the 2010, I saw similarities that I
11 remembered from both of them to the -- to the 2020
12 guidelines, yes.
13 Q.        Okay.  So one of the reasons that the
14 2021 guidelines are based on the 2010 guidelines is
15 because you believe that they would be -- they would
16 have complied with Section 5 of the Voting Rights
17 Act had that -- if that were still in effect?
18 A.        They would comply with Section 1 of the
19 Voting Rights Act.  I mean Section 2.  I'm sorry.
20 Section 2 of the Voting Rights Act.  But they were
21 precleared under Section 5.
22 Q.        Right.
23 A.        And I also thought they would comply
24 with the 14th Amendment, one man, one vote.
25 Q.        Okay.  Is there any other reason why you
                                                Page 59

1 based the 2021 guidelines off of the 2010 guidelines
2 other than that you think that it would -- that they
3 would have complied with federal law?
4 A.         Well, when I read the 2010, they were
5 very similar to what I remember from the guidelines.
6 I remember specifically the ten-day rule was there
7 in 2002.
8 Q.         Is it a principle that the committee
9 follows to generally use what has come before, use
10 materials that have come before?
11 A.        Yes.
12 Q.        Out of ease of use or out of tradition
13 or because the -- you know, because you believe that
14 they comply with the law?  What -- what is the
15 reason for reusing?
16 A.        I would say all three of those.
17 Q.        Is anything more important, any of those
18 more important than the other?
19 A.        Complying with the law.
20 Q.        That's pretty important, huh?
21 A.        Yeah.
22 Q.        I think we all can agree on that.
23          And do you know how the 2010 guidelines
24 were created --
25 A.        No.
                                                Page 60

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

Page 61

```
1 Q.          -- other than being based off of the
2 2002?
3 A.          No, ma'am.
4 Q.          Who would know how the 2010 guidelines
5 were created?
6 A.          I would say Mr. Walker.
7 Q.          Okay.  Anybody else?
8 A.          I wasn't there.
9 Q.          Okay.
10 A.         I take that back.  I said Senator
11 McClendon was there in 2010.  I wasn't.
12 Q.         Let's see.  If you could flip to Pages 7
13 and 8.  Let's start with 7.  And as you'll see, that
14 third box is entirely striked out in the middle with
15 the proposed changes.
16 A.         Uh-huh.
17 Q.         That's the section on communities of
18 interest.  If you'd like to read through those boxes
19 on Pages 7 and 8, it might be helpful.
20 A.         Okay.
21 Q.         So it looks to me like this subsection
22 was entirely rewritten.  Do you know why?
23 A.         I can't answer with certainty.  But I
24 believe it goes back -- and I'm just supposing -- to
25 the Gingles test.
```

Page 62

```
1 Q.          And what's your understanding of the
2 Gingles test?
3 A.          Compactness, contiguity, and communities
4 of interest, I would assume.  I don't know.
5 Q.          Can you think of any other reason why
6 the section on communities of interest would be
7 entirety rewritten?
8 A.          Other than a court ruling that gave a
9 better definition, I don't know.
10 Q.         Did you have any role in this particular
11 change?
12 A.         No, ma'am.
13 Q.         Do you know who made this particular
14 change on the document?
15 A.         You would have to talk to the attorney.
16 Q.         Talk to Mr. Walker?
17 A.         Mr. Walker.
18 Q.         In this section, if you compare the 2010
19 guidelines to the enrolled guidelines, the 2021
20 guidelines eliminate partisan interest from the
21 definition of communities of interest.
22            So in 2010, partisan interests were part
23 of the definition of community of interest.  But in
24 2021, they're not.  Do you know why that is?
25 A.         No, ma'am.
```

Page 63

```
1 Q.          Who would know why?
2 A.          I would suggest you talk to my attorney.
3 Q.          Okay.
4 A.          When you get into legal definitions --
5 Q.          I understand that lawyers are pretty
6 fond of legal definitions.
7             So in the May 5th meeting, you mentioned
8 that Mr. Walker discussed these proposed changes.
9 Do you know if there were any other changes made at
10 that meeting other than the ones proposed by
11 Mr. Walker?
12            MR. WALKER:  I think the way that
13 question is asked, I need to assert the
14 attorney-client privilege.
15 Q.          I guess what I'm saying is did any --
16 are there any differences between these proposed
17 changes that were presented in the meeting and the
18 final version in Exhibit 2, the final guidelines?
19 Did anybody suggest any other changes?
20 A.          Not that I recall.
21 Q.          So the version that is here of these
22 proposed changes, they were accepted in whole and no
23 other changes were made?
24 A.          No changes were made after the committee
25 adopted them.
```

Page 64

```
1 Q.          Well, I guess I'm talking about at the
2 -- at the committee meeting.
3 A.          I don't -- I don't remember.
4 Q.          Okay.  And did you talk to anyone about
5 the May 5th meeting after it happened?
6 A.          I'm sure I did.  But I don't recall.
7 Q.          Do you recall what you would have talked
8 about?
9 A.          The general guidelines that we adopted,
10 the guidelines that would control the committee's --
11 the way we drew plans.  But they were public record
12 at that point.
13            So what happened next in the
14 redistricting process?
15 A.          Then we began trying to work on public
16 hearings and how we were going to handle public
17 hearings with COVID-19.
18 Q.          Okay.
19 A.          So we had -- we had to come up with a
20 way to handle the public hearings and where we were
21 going to hold them and how we were going to hold
22 them.
23 Q.          So why did you hold public meetings?
24 A.          It's part of the guidelines, and it's
25 tradition.  They've been held -- I've heard they did
```

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

---

1 them in 2010.  I know we did them in 2002.

2 Q.          And what's the purpose of the public

3 meetings?

4 A.          To take input from the community at

5 large, the people that live in the communities and

6 what they like or dislike about the existing plan

7 and what they would like to see changed.

8 Q.          Was there a draft -- when you say

9 "existing plan," what do you -- what do you mean by

10 that?

11 A.          The plan that we were currently

12 operating under.

13 Q.          So you mean the 2011 map?

14 A.          Yes.

15 Q.          So the purpose of the public meetings is

16 for people to express what they like or do not like

17 about the current setup?

18 A.          Yes.

19 Q.          Is there any other reason why public

20 meetings are held?

21 A.          Well, we go to the public and show them

22 the existing plans and where the population has

23 shifted and how they would like to see the lines

24 drawn.

25 Q.          So you mentioned that there were public

Page 65

---

1 meetings that were also held in 2001 when you were

2 part of that redistricting process.  Do you think

3 that people's -- do you recall if people's -- their

4 concerns are different now than they were then?

5 A.          Explain what you mean by that question.

6 Q.          Well, I guess I'm not talking about the

7 nitty-gritty little, you know, this block here, this

8 block there, but general opinions about how maps

9 should be drawn or what a community of interest is

10 or anything like that.

11         Do people -- do you think that people

12 felt the same way at public meetings back in 2001 as

13 they did in the meetings this year?

14 A.          I would say, generally speaking, they

15 held the same views.

16 Q.          And what sorts of views are those?

17 A.          I mean, some communities wanted to --

18 I'm having -- I would have to separate congressional

19 from --

20 Q.          Right.

21 A.          -- legislative.

22         Some people wanted to see maps drawn

23 differently.  There was numerous people there to

24 present the map for the League of Women Voters and

25 discuss it.  They asked us to look at that map.  And

Page 66

---

1 there were people that liked their members of

2 congress and wanted the maps to stay the way they

3 were.

4 Q.          Was there a draft of the congressional

5 map prepared before the public meetings occurred?

6 A.          No, ma'am.

7 Q.          And when did the public meetings occur?

8 Not every single one, but in general.

9 A.          As soon as we had numbers from the

10 census bureau and we could tell the people whether

11 their congressional district was overpopulated or

12 underpopulated and how many people they had to gain

13 or lose based on the new -- we didn't know what the

14 number was going to be to get to zero deviation on

15 the congressional map until we had the census

16 numbers.

17         So we couldn't go out and talk to people

18 about how they wanted to see their congressional

19 district change in order to comply with one man, one

20 vote.

21 Q.          Why is it -- why was it necessary to

22 have the census numbers if you don't have a map yet?

23 I guess I'm curious why the -- why the census

24 numbers are necessary to hold the public hearings.

25 A.          We had a map.

Page 67

---

1 Q.          The 2010?

2 A.          The existing map.

3 Q.          Okay.

4 A.          And then after we got the numbers, we

5 knew which congressional district was over and which

6 congressional districts were underpopulated and the

7 amount of people we needed in each congressional

8 district in order to comply with one man, one vote.

9 Q.          Okay.

10 A.          The same thing we did in 2001.  We

11 presented the existing map to the people in all the

12 public hearings.  And after the public hearings,

13 then and only then was a map produced.  And we had a

14 lot more time in '01.

15 Q.          Right.

16         Did the public have access to the

17 numbers of people that would need to move between

18 districts, about the overpopulation and

19 underpopulation numbers?  Did they have access to

20 that?

21 A.          That was gone over in every public

22 hearing.

23 Q.          Okay.  Why was it necessary to have

24 those numbers before holding the public hearings?

25 A.          So we could -- we knew how many people

Page 68

---

Evan Milligan, et al v. John H. Merrill, et al.

Chris Pringle
12/17/2021

1 went into a district and how many people were in the
2 current district.
3 Q.          Well, I guess people have concerns about
4 -- well, did people have concerns about districts
5 other than, you know, the pure numbers?  Did they
6 have opinions about how maps should be drawn period
7 regardless of the census numbers?  Do you understand
8 what I'm saying?
9 A.          If you are referring to the League of
10 Women Voters who sent somebody to virtually every --
11 Q.          I'm talking in general.
12 A.          There were people there every -- every
13 meeting that had their talking points that basically
14 read them that all said the same thing.  They wanted
15 to adopt another plan that created two majority
16 minority districts.
17 Q.          Well, I assume that there were people at
18 the meetings who didn't share that view.
19 A.          Yeah.
20 Q.          Do you think -- I guess wouldn't it be
21 possible to have that opinion before the census
22 numbers were even out?
23 A.          Well, they did have the opinion before
24 the numbers were out.
25 Q.          Okay.  I guess I'm just not really

Page 69

1 understanding why the -- why you had to wait to hold
2 the public hearings until the census numbers were
3 out.
4 A.          Accuracy.
5 Q.          Okay.  So you had mentioned that at the
6 public meetings, public hearings, some people liked
7 their members of congress and wanted to keep them.
8 What did you mean by that?
9 A.          They were happy with the representation
10 they were receiving from their elected
11 representatives.
12 Q.          So what does that mean for those
13 representatives' districts?  Would they want to keep
14 them the same or --
15 A.          Our guidelines say we try to protect the
16 core of the existing districts, yes.
17 Q.          Well, I guess if you're happy with your
18 representative, that doesn't mean that -- you could
19 still live in the district and have the rest of the
20 district change and still keep your representative
21 if like, you know, they're on the margins.  The rest
22 of the district could change.  If you live in the
23 center of the district, you're still going to keep
24 your representative, right?
25 A.          I couldn't answer that question.

Page 70

1 Q.          Well, there are people -- so the map
2 changed between 2010 and today, right?
3 A.          Yes.
4 Q.          And there are members who have kept
5 their -- there are citizens who have kept their
6 representatives even though the lines of the
7 districts have changed, right?
8 A.          Correct.
9 Q.          So you could keep your representative
10 even though the line of the district changes,
11 correct?
12 A.          Correct.
13 Q.          So when people are saying "I'm happy
14 with my representative," are they just saying that
15 they don't want the district to change at all?  Or
16 what -- what do you think that they're saying?
17 A.          I would hate to interpret what they
18 would mean by that.  They said they were happy with
19 their representative.
20 Q.          Okay.  And how many of the public
21 hearings did you participate in?
22 A.          All 28.
23 Q.          Did you go in person --
24 A.          Yes.
25 Q.          -- to all 28?

Page 71

1 A.          Yes.  I want to say I -- I don't
2 remember missing any of them, no.
3 Q.          Okay.  And how were the public meetings
4 held?
5 A.          Virtually, just like this meeting.  We
6 were -- we were in COVID and we had to get as many
7 locations as we could to get as much input as we
8 could in a very compressed time period.  So we did
9 it remotely.
10 Q.          And in person?
11 A.          Yes.  We had one in the state house.
12 Q.          But 27 out of 28 were only held
13 virtually; is that right?
14 A.          Just like this meeting, yes, ma'am.
15 Q.          Okay.  And what was your role in the
16 public meetings?
17 A.          I was to go over the -- to listen to the
18 house, when they talked about the state house
19 districts.  And I listened to all the house,
20 congressional, senate, state school board, yes.
21 Q.          And were you just there to listen?  Or
22 did you do anything else?
23 A.          I listened.
24 Q.          And did you answer any questions from
25 the public?

Page 72

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

| | |
|---|---|
| 1 A.    I believe I answered one. | 1 in order to get to zero deviation. |
| 2 Q.    And what was that question? | 2 Q.    And who created that document? |
| 3 A.    I don't remember. | 3 A.    I'm not sure. |
| 4 Q.    Was it about the congressional map? | 4 Q.    Do you know -- sorry. |
| 5 A.    I don't remember. | 5    Did you take any notes during any of the |
| 6 Q.    And was Mr. Walker present at these | 6 public meetings? |
| 7 public meetings? | 7 A.    Any notes I took, I turned over in my |
| 8 A.    He was our moderator.  Yes, ma'am. | 8 evidence.  They were handwritten on those -- those |
| 9 Q.    Okay.  And what does that mean? | 9 documents. |
| 10 A.    He conducted the meeting. | 10 Q.    But you did take some -- |
| 11 Q.    And is it fair to say that | 11 A.    Very few. |
| 12 Mr. Walker primarily addressed or answered audience | 12 Q.    -- notes?  Okay. |
| 13 questions during the hearings? | 13    Did you take any notes after any of the |
| 14 A.    There was a time when people could | 14 public meetings? |
| 15 either ask a question or submit a question | 15 A.    No, ma'am. |
| 16 electronically. | 16 Q.    And did you talk to anyone about the -- |
| 17 Q.    Okay. | 17 what happened in the public hearings? |
| 18 A.    And he would address those questions. | 18 A.    I'm sure I did.  But I don't recall |
| 19 Q.    And he addressed most of -- I'm sorry. | 19 specifics. |
| 20 Of the questions that were answered, Mr. Walker was | 20 Q.    Did you talk to Mr. Hinaman about what |
| 21 the one who answered most of them? | 21 happened in the public meetings? |
| 22 A.    Yes, ma'am. | 22 A.    Yes, ma'am. |
| 23 Q.    Okay.  And did audience members ever | 23 Q.    And what did you tell him? |
| 24 direct questions to you specifically? | 24 A.    Most of the conversations at the public |
| 25 A.    I can't remember. | 25 hearings were dealing with state legislative races, |
| Page 73 | Page 75 |

| | |
|---|---|
| 1    And do you know if they directed | 1 if I remember correctly. |
| 2 questions to Senator McClendon specifically? | 2 Q.    But occasionally people talked about |
| 3 A.    I don't remember. | 3 congress, right? |
| 4 Q.    Did you prepare for any of the public | 4 A.    Yes.  But we had not seen -- I had not |
| 5 meetings? | 5 seen the numbers on any plans until after they were |
| 6 A.    We had the maps in front of us and the | 6 submitted to reapportionment. |
| 7 demographic shifts in front of us.  And we would -- | 7    So until I saw the -- you know, that |
| 8 I would read those as we went through the meetings. | 8 ten-day rule kicked in and these plans that had been |
| 9 Q.    And by "the maps," you mean the 2011 -- | 9 drawn off campus were submitted to the |
| 10 A.    Yes. | 10 reapportionment office.  Then and only then could we |
| 11 Q.    -- maps?  Because you didn't have draft | 11 look at the demographics, the population changes, |
| 12 maps of the 2021 -- | 12 and the deviations in those districts. |
| 13 A.    No. | 13 Q.    Well, you had the demographic shift |
| 14 Q.    -- at that time.  Okay. | 14 numbers to get to zero deviation during the public |
| 15    And what demographic figures are you | 15 meetings, right? |
| 16 talking about? | 16 A.    I had the number that we needed to get |
| 17 A.    The over and underpopulations, whether | 17 to, correct. |
| 18 they had too many or too few people in them to stay | 18 Q.    So you did talk to Mr. Hinaman about |
| 19 within -- of course, I'm kind of talking legislative | 19 what was brought up at the public hearings about |
| 20 here and not congressional.  Because congressional, | 20 congress, correct? |
| 21 we went to zero deviation.  But we looked at the | 21 A.    We talked -- I would assume we discussed |
| 22 congressional districts to see which ones were | 22 it, yes. |
| 23 overpopulated and which ones were underpopulated. | 23 Q.    And do you recall any specifics of what |
| 24 Q.    Okay. | 24 you talked about? |
| 25 A.    And how many people would have to change | 25 A.    Just the difference -- we were trying to |
| Page 74 | Page 76 |

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1  get to zero deviation.
2  Q.        Did you relay any specific concerns that
3  someone had a public meeting about the
4  congressional map to Mr. Hinaman?
5  A.        I was concerned about the deviations in
6  any other proposed plans.
7  Q.        Well, the public, though, I'm talking
8  about, what they brought up at the public hearings.
9  Did you relay any of those specifics to Mr. Hinaman?
10 A.        I don't remember.
11 Q.        Do you recall discussing any of those
12 kinds of specifics that the public had about
13 congress to anyone else?
14 A.        I'm sure we did.  I mean, it was the
15 same talking points at every public hearing on the
16 congressional plan.
17 Q.        I mean, that suggests that there was
18 really only one view about the congressional map
19 coming up at the public hearings.
20 A.        Well, it was the plan produced by the
21 League of Women Voters.  Every -- if I remember
22 correctly, almost every single public hearing we
23 had, somebody stood up with their talking points and
24 read them to us and entered them into the record.
25 Q.        But not everybody who attended the
                                                    Page 77

1  public hearings would have known about the League of
2  Women Voters' map, right?
3  A.        Somebody was there at virtually every
4  meeting that I remember to talk about it.
5  Q.        Did anyone discuss anything about the
6  congressional map that wasn't related to the League
7  of Women Voters' map that you recall?
8  A.        I don't recall.
9  Q.        Do you know how many of the 28 meetings
10 were held on weekdays during working hours, 9:00 to
11 5:00?
12 A.        Like this one here, all but one of them.
13 Q.        Okay.  And most people are working on
14 weekdays during working hours from 9:00 to 5:00,
15 right?
16         That's a yes?
17 A.        That's -- I know a lot of people that
18 work different hours.
19 Q.        But most people work on weekdays from
20 the hours of around 9:00 to 5:00, would you say?
21 A.        I would say it's very common, yes.
22 Q.        Okay.  Do you think that that had an
23 impact on who could attend the public meetings?
24 A.        I don't know.
25 Q.        I mean, if I'm at work, I tend to not be
                                                    Page 78

1  doing other things that aren't work related during
2  the work hours.  Do you think that that would have
3  had an impact at all on --
4  A.        Well, the schedule of the public
5  hearings was public.  It was released.  The links
6  were public.  You might not have been able to make
7  one specific meeting, but you could have logged into
8  any of the other 28 at any given time on any given
9  day that we held them and listened and interjected
10 into the congressional plan.
11 Q.        Well --
12 A.        I mean, you had 28 opportunities to log
13 on over a three-week period that you could have come
14 in and watched.  It's not like you had to drive to a
15 location like in the old days when you had to drive
16 somewhere during the daytime to come hear us.  You
17 were able to listen at any time.
18 Q.        But even so, if you work at McDonald's
19 from 9:00 to 5:00 and you're at the cash register,
20 how are you going to attend one of those meetings?
21 A.        There are 28 different meetings at all
22 different times of the day.
23 Q.        Well, not -- they're all between 9:00
24 and 5:00 except for one.
25 A.        Then you could have logged in that night
                                                    Page 79

1  and watched.
2  Q.        For that one meeting?
3  A.        Exactly.  And you could have spoken your
4  mind or emailed in your questions or your concerns
5  at that time.
6  Q.        Okay.  But you and others from the
7  reapportionment committee set the times of those
8  meetings, correct?
9  A.        Yes, ma'am.
10 Q.        Primarily you and Senator McClendon; is
11 that right?
12 A.        In conjunction with the other members.
13 Like I said, we produced a list of 22.  And Ms. Hall
14 asked us to add six meetings in communities she
15 thought did not have enough representation or enough
16 opportunities.  So we added those additional six
17 meetings and included them in our press releases so
18 anybody could log in.
19 Q.        Did you consider holding more meetings
20 in the evening other than just the one?
21 A.        I couldn't answer that question.
22 Q.        Before the public hearings happened,
23 Senator McClendon told the press that the new maps
24 wouldn't cause, quote, any surprises for the
25 candidates or for the voters.  I'll just represent
                                                    Page 80

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 to you that that happened.
2            Do you know what the basis was for that
3 statement?
4 **A.        You'll have to ask Senator McClendon.**
5 Q.        Do you agree with that statement, that
6 even before the public hearings would have happened,
7 that there wouldn't be surprises for candidates or
8 for the voters?
9 **A.        I think every time you change the lines,**
10 **you surprise people.**
11 Q.        But on the whole, would you say that
12 that statement was true?
13 **A.        Well, when your guidelines are to keep**
14 **the core of the existing districts intact as much as**
15 **practicable, it shouldn't be too earth shattering,**
16 **some of the changes around the edges.**
17 Q.        And do you know if any work had been
18 conducted on drafting the congressional map prior to
19 the public hearings?
20 **A.        No, ma'am.**
21 Q.        Do you know if any decisions on the
22 lines for the congressional maps had been made
23 before holding the public hearings?
24 **A.        No, ma'am.**
25 Q.        Are you familiar with the black belt

1 counties in Alabama, that term?
2 **A.        I sell timberland.  I work all through**
3 **the black belt.**
4 Q.        Okay.
5 **A.        I've spent more time in the black belt**
6 **than . . .**
7 Q.        And what's your understanding of the
8 black belt?
9 **A.        It's a region in the middle of the state**
10 **of Alabama that got its name because of the rich**
11 **soils.**
12 Q.        And what counties are in it?
13 **A.        It's like 28 counties, I think,**
14 **something like that.  I spend most of my time in**
15 **Wilcox, Marengo, Lowndes, Perry, Hale, those areas.**
16 Q.        And if you could just describe what
17 portion of the state are we talking about.
18 **A.        Central Alabama.**
19 Q.        Do you recall if anyone discussed the
20 black belt at any of the public hearings?
21            MR. WALKER:  What was --
22            MS. WELBORN:  If anyone at the public
23 meetings discussed the black belt.
24 **A.        It's a term that's often used in**
25 **Alabama.  But I don't remember specifically.**

1 Q.        Would you agree that the black belt is a
2 community of interest?
3 **A.        It's a very broad area that stretches**
4 **from one side of the state to the other.  I believe**
5 **it has some communities of interest in it, yes.**
6 Q.        But as a whole, is the black belt a
7 community of interest?
8 **A.        I couldn't answer that.**
9 Q.        Why not?
10 **A.        Because while I work in Wilcox and**
11 **Marengo and Perry, I don't go to Macon or the**
12 **counties on the other side.  So I don't really know**
13 **much about them.**
14 Q.        But that's true for other communities of
15 interest in other parts of the state, right?
16 **A.        Explain that one to me.**
17 Q.        I guess if the legislature -- if the
18 reapportionment committee is tasked with approving a
19 congressional map that keeps, you know, communities
20 of interest together, you don't personally know
21 about every community of interest in the same way
22 that you do know about those particular counties,
23 right?
24 **A.        I mean, you know, I'm from Mobile.  And**
25 **we run up and -- it's the river system.  So many of**

1 the families in Mobile come from northern counties
2 because of the way the river system is.  We have
3 very little to nothing in common with the people in
4 the Wiregrass.  It's not -- it's almost a totally
5 different state over there.
6            So I don't know -- if you're asking me
7 do the people in Wilcox County have something in
8 common with the people in Macon County, I can't
9 answer that.  But I know the people in Wilcox
10 County.  We go up and down the rivers.
11 Q.        Right.  I guess what I'm saying is you
12 still approve a map even though you don't have
13 personal experience with every single community of
14 interest, right?
15 **A.        The state legislature approved the map,**
16 **yes, ma'am.**
17 Q.        Well, you voted for it, right?
18 **A.        Yes.**
19 Q.        So just going back to the black belt.
20 Even though you don't necessarily have personal
21 experience with every single county, can you still
22 form an opinion about in general whether that is a
23 community of interest?
24 **A.        I know it's a very rural part of the**
25 **state of Alabama.**

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 Q.        Does that make it a community of
2 interest?
3 A.        I don't know what your definition of a
4 community of interest is.
5 Q.        Well, the reapportionment committee has
6 a definition of community of interest, right?
7 A.        Yes.
8 Q.        So looking at that definition, would you
9 consider the black belt to be a community of
10 interest?
11 A.        Our definition of community of interest
12 is in certain circumstances to include political
13 subdivisions such as counties, voting precincts,
14 municipalities, tribal lands, reservations, or
15 school districts.  Those counties -- the counties
16 are a community of interest.
17 Q.        Well, it also includes ethnic, racial,
18 economic, tribal, social, geographic, and historical
19 identities.
20 A.        Yes.
21 Q.        Under any of those aspects, does the
22 black belt constitute a community of interest?
23 A.        I know it's -- it is predominantly
24 African American.
25 Q.        And the black belt is a historical term,

Page 85

1 right?
2 A.        Based on the soil, yes, ma'am.
3 Q.        Okay.  And that term goes back quite a
4 long time?
5 A.        It was developed because of the rich
6 soil in that area.
7 Q.        So yes or no, under these guidelines,
8 does the black belt constitute a community of
9 interest?
10 A.        I couldn't answer that question.  I just
11 couldn't answer that.
12 Q.        I don't understand why not.
13 A.        Because I'm not sure they are
14 politically cohesive and compact and contiguous
15 enough to constitute one.
16 Q.        What, if anything, did you learn or take
17 away from the public hearings?
18 A.        What do you mean by that?
19 Q.        Well, did you learn anything from what
20 you heard at the public hearings?
21 A.        I walked away thinking most people in
22 the state of Alabama were happy with their
23 representation the way it was in congress.
24 Q.        And do you recall any specifics about --
25 about that?

Page 86

1 A.        The general public -- I mean, every
2 committee meeting had somebody standing up and
3 reading the talking points on the League of Women
4 Voters' plan.  So if you read the record, it's all
5 in there.  They all talked about that specific plan
6 on their talking points.
7 Q.        But the --
8 A.        I don't remember the general public
9 being dissatisfied with the members of congress.
10 Q.        Meaning other people at the -- at the
11 public meetings --
12 A.        Yes.
13 Q.        -- were not --
14 A.        I don't remember them being
15 dissatisfied, no, ma'am.
16 Q.        Okay.  So how -- but you still took away
17 the idea that the general public was happy with
18 their current representation?
19 A.        Yes, ma'am.
20 Q.        Okay.  And what did you do with that
21 information?
22 A.        I mean, it's all part of the permanent
23 record.  I remembered it because I listened to all
24 of it.
25 Q.        Right.

Page 87

1 A.        We put it in the record.  It's all
2 there.
3 Q.        After -- after the meetings, what did
4 you do with that information?
5 A.        It was put into the official record of
6 the committee.
7 Q.        I guess I'm -- did any of what you
8 learned at the public hearings influence how the
9 congressional map was drawn?
10 A.        I can't answer that.  I don't -- I
11 wasn't a member -- that map was drawn by Mr. Hinaman
12 and in conjunction with the members of congress.
13 Q.        But you did discuss what you learned
14 about the public meetings with Mr. Hinaman with
15 respect to the congressional meetings at some point?
16 A.        That somebody had come to every meeting
17 and read the League of Women Voters' talking points,
18 yes.
19 Q.        But did you express to Mr. Hinaman your
20 sentiment that the general public was happy with
21 their representation?
22 A.        I don't remember.
23 Q.        Do you remember telling him, about the
24 congressional map, anything other than about the --
25 from the public hearings other than the League of

Page 88

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

**Page 89**

1 Women Voters' talking points?

2 A.          Not that I can recall.

3 Q.          And how much weight did you give to
4 those -- the sentiment that the general public was
5 happy with their representation in terms of its
6 importance in drawing the map?

7 A.          We listened to the people.  I was
8 anxious to see what the League of Women Voters' map
9 turned out to be.

10 Q.          Did you -- did you consider it to be
11 more important when the congressional map was being
12 drawn that the general public was satisfied with
13 their representation compared to what was said about
14 the League of Women Voters' map?

15 A.          You know, when every meeting somebody
16 stands up and reads the same talking points and you
17 could tell they've been prompted just to go say that
18 to get it into the record, I put more weight on the
19 people who came out of a true sense of wanting to
20 express their opinion, not the opinion that was
21 written down on a piece of paper form them by an
22 attorney.  What I assume was an attorney.  I'm
23 sorry.

24 Q.          So you gave less weight to those League
25 of Women Voter talking points than you did the

**Page 90**

1 people who were discussing on their own that they
2 were happy with their representation?

3 A.          Somebody that was put in the room to put
4 statements into the record is not, in my opinion,
5 the same as somebody who comes on their own free
6 will and their own fruition to express their
7 personal opinion about their representation.

8 Q.          So did you give any instructions to
9 Mr. Hinaman to change anything about the
10 congressional map because of the public hearings?

11 A.          Not that I recall.

12 Q.          Did you give instructions to anyone else
13 about changing the map because of the public
14 hearings?

15 A.          Not that I recall.

16 Q.          At the public hearings, do you recall
17 anyone discussing the need to have two majority
18 black districts for congress?

19 A.          Two majority black congressional
20 districts, yes, ma'am.

21 Q.          Yes.  Who mentioned that?

22 A.          I don't recall specifically.

23 Q.          Was it mentioned often, would you say?

24 A.          I don't remember.

25 Q.          Was it something that only came up once

**Page 91**

1 or twice?

2 A.          I don't remember the number of times.
3 But it came up a few.

4 Q.          A few.  But not at every meeting?

5 A.          I don't remember it coming up at every
6 meeting, no.

7 Q.          What was your response to the suggestion
8 that there should be two majority black
9 congressional districts?

10 A.          If somebody could show me a plan that
11 met the guidelines, I would be interested in looking
12 at it.

13 Q.          And what do you mean by "interested in
14 looking at it"?

15 A.          I mean I would give it due consideration
16 if it met the guidelines.

17 Q.          If you have competing maps that all meet
18 the guidelines, how do you choose one over the
19 other?

20 A.          I would go with the one that's most in
21 line with the guidelines.

22 Q.          How do you determine what is most in
23 line with the guidelines?

24 A.          The number of county splits, the
25 deviations.

**Page 92**

1 factors more important than the other?

2 A.          Deviations.

3 Q.          That's the most important factor, in
4 your opinion?

5 A.          Yes, ma'am.

6 Q.          And how important are the county splits?

7 A.          Well, we tried to split as the few
8 counties as possible in order to achieve the zero
9 deviation.

10 Q.          Just quickly going back to talking about
11 this sentiment that people were happy with their
12 representation.  How did you know or how did you
13 determine who was there with their talking points
14 and who was there, you know, coming of their own
15 volition?

16 A.          If they're reading a piece of paper and
17 it's the same talking points you've heard, I would
18 assume they were sent there to read it.  If they're
19 talking extemporaneously and they don't line up with
20 the talking points you've heard before, I would
21 assume they came out of their own fruition.

22 Q.          Did you ask anyone at any of the public
23 meetings if they were part of a particular group?

24 A.          They were instructed by Mr. Dorman to

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1  state their name and who they represented.
2  Q.          And did you ask any of them if they were
3  sent there by somebody else?
4  A.          No.   They -- when they were called to
5  speak, they were to state their name and who they
6  represented.
7  Q.          Okay.  And did you -- did you consider
8  -- if someone came there, you know, with a prepared
9  set of talking points, did you consider their
10 opinion to be less -- less important to drawing the
11 map than someone who came there to speak
12 extemporaneously, like you said?
13 A.          I believe I answered that question
14 already, didn't I?
15 Q.          Do you know if a map with two majority
16 minority districts was proposed at any point?
17 A.          During the legislative process when we
18 were in session, yes, ma'am.
19 Q.          Do you know if any were proposed before
20 the special session?
21 A.          We have a rule that any plan drawn off
22 campus, outside the reapportionment office, has to
23 be turned over ten days before it can be introduced
24 as a bill.
25          So after they were turned over, at
                                              Page 93

1  whatever point they were turned over and they were
2  put through our computers and we could get the
3  information on them, the deviations and the county
4  splits, we looked at them then.
5  Q.          So if someone submitted an outside plan,
6  let's say, 30 days before the special session, so
7  more than ten days, when would you have had access
8  to that plan?
9  A.          I don't remember seeing the demographics
10 of any plan that was introduced earlier than that.
11 Q.          I'm sorry.  Could you --
12 A.          I don't remember seeing a plan that was
13 submitted before then.
14 Q.          Before the ten days?
15 A.          Ten days, yes, ma'am.
16 Q.          Okay.  And once a plan is submitted by
17 outside groups, what happens?
18 A.          It's put through the computer and turned
19 into what we call bill form.  And then you have to
20 find a member of the legislature that's willing to
21 introduce it.
22 Q.          Okay.  But you mentioned deviation and
23 demographic data.  Does the computer program also
24 give you that information?
25 A.          Yes.
                                              Page 94

1  Q.          What --
2  A.          Until it -- until it reaches that bill
3  form and we can analyze it based on the population
4  and the deviations, I don't consider it a plan.
5  Q.          Okay.  What all information could you
6  look at from any plan at that point?
7  A.          At that point?
8  Q.          Uh-huh.
9  A.          After it's introduced from the outside
10 source?
11 Q.          Yes.
12 A.          Then we look at the population, we look
13 at the deviations, we look at the county splits, and
14 we look at the BVAP, we look at the racial makeup of
15 the district.
16 Q.          And when you say "BVAP," just for the
17 record, what do you mean?
18 A.          Black voting age population.
19 Q.          And is that all black or any part black?
20 Do you know?
21 A.          No, I couldn't answer that.  I've seen
22 both columns, but I don't know.
23 Q.          So just to clarify, you did not see a
24 map for two majority minority or majority black
25 congressional districts prior to the ten-day mark?
                                              Page 95

1  A.          I did not see a plan that had the
2  deviations in the populations until then.  There's a
3  difference between just color coding a map and
4  letting me see an actual plan.
5  Q.          Okay.  What's the difference?
6  A.          Well, you can -- you can draw anything
7  you want to on a map.  But until you actually have
8  the census numbers and the demographic numbers in
9  it, I don't consider it a plan.
10 Q.          And why not?
11 A.          Because until I know the population in
12 that district -- the whole basis of redistricting is
13 the 14th Amendment to the Constitution, equal
14 protection, that my vote for a member of congress
15 counts the same as another person in the state of
16 Alabama's vote.  That's the reason why we go through
17 this process.  It's one man, one vote.  And until I
18 look at a plan and the numbers associated with that
19 plan, I don't consider it a full plan.
20 Q.          So I just want to make sure that I'm
21 getting this right.  I'm not trying to ask you over
22 and over and over again.
23          Is it right that you did not look at
24 what you considered to be a plan, so an analyzed,
25 you know, map with all that demographic information
                                              Page 96

Page: 24 (93 - 96)

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 and deviation information, until after that ten-day
2 mark?
3 A.          Until after it was analyzed and I could
4 get the numbers, yes.
5 Q.          Okay.
6 A.          Then we looked at it to see what the
7 deviation was, the overall deviation of the plan,
8 and how many splits there were in counties and what
9 counties were split.
10 Q.         Okay.  And at that point, were there any
11 maps that were -- had two majority black districts?
12 A.         I don't remember seeing two majority
13 black districts.  I remember seeing one -- two of
14 what they call opportunity districts, what they were
15 calling -- the districts were not 50 percent
16 minority.
17 Q.         Could you define your understanding of
18 an opportunity district?
19 A.         That's what they were calling them.
20 They called them opportunity districts, and they
21 were both under 50 percent minority.
22            THE REPORTER:  Under 50 percent what?
23 A.         Minority population.
24 Q.         And who is "they"?
25 A.         The people who introduced them, the
Page 97

1 League of Women Voters and -- I can't remember who
2 introduced the bill in the house.
3 Q.          Okay.  And -- sorry.  One second.
4            If a district has under a 50 percent
5 minority population, what is the importance of that
6 number, I guess?  Why was that number important?
7 A.          Under Section 2 of the Voting Rights
8 Act, we can't do anything to diminish the ability or
9 protect a class of minority citizens from electing
10 or defeating a candidate of their choice.
11 Q.         So if a district has under 50 percent
12 voting age population -- sorry.  Under 50 percent
13 minority population, does that automatically
14 diminish their ability to choose a candidate of
15 their choice under Section 2?
16 A.         You're asking an attorney question.
17 Q.         Well, I mean, ultimately it's your
18 responsibility to --
19 A.         It would -- it would -- I would give
20 great caution in order to draw a district that was
21 less than 50 percent, yes.
22 Q.         Under 50 percent minority population?
23 A.         Yes.  I would be very cautious.
24 Q.         Okay.  And by "very cautious," does that
25 mean you are -- what does that mean?
Page 98

1 A.          I'm afraid we would run afoul of Section
2 2 of the Voting Rights Act.
3 Q.          Okay.
4            MR. DAVIS:  Can I ask how we're doing on
5 time?  This was -- I know we had a break, a long
6 break, for audio.  This was a two-hour deposition
7 that was noticed.  We've got three PI motions we
8 need to get back to work on.  This seems to be
9 really dragging.
10            MS. WELBORN:  Well, I mean, we have up
11 to 7 hours under the Rules of Federal Procedure.
12            MR. DAVIS:  You're going to take 14?
13            MS. WELBORN:  I would hope -- I would
14 really like to not do that.  But it certainly is our
15 right to do that.  I can't really tell you at this
16 point exactly how much longer.  But I'm happy to
17 take a break right now to help confer --
18            MR. DAVIS:  I'm hearing a lot of
19 repetition and a lot of arguing with the witness.
20 If you're going to do this discovery before the
21 preliminary injunction hearing, it needs to get
22 pretty focused and be a little sensitive and
23 courteous towards everything that we've got to do on
24 the defense side to get ready to respond to your
25 motions.
Page 99

1            MS. WELBORN:  I understand what you're
2 saying.
3            MR. ROSBOROUGH:  Counsel, I thought we
4 were going to refrain from speaking objections.
5            MR. DAVIS:  What did he say?
6            THE REPORTER:  Refrain from speaking
7 objections.
8            MS. WELBORN:  Let's take a break.  Let's
9 go off the record.  And we'll come back and talk
10 after that.
11            THE VIDEOGRAPHER:  We are off the
12 record.  The time is 11:26 a.m.
13            (Recess was taken.)
14            THE VIDEOGRAPHER:  We are back on the
15 record.  The time is 12:06 p.m.
16 Q.         So I'd like to talk about the October
17 26th reapportionment committee meeting.  Do you
18 remember if you did anything to prepare for that
19 meeting?
20 A.         Yes.  We sent the proposed maps to all
21 the members for their review prior to the meeting.
22 Q.         And by "we," who do you mean?
23 A.         The staff at the reapportionment
24 committee.
25 Q.         Okay.  And do you remember how far in
Page 100

Evan Milligan,et al v. John H.Merrill, et al.

1 advance you sent them out?

2 A.          As fast as we could.  Remember this

3 whole process was very condensed, very condensed.

4 Q.          I think it was the day before the

5 meeting.  Is that right?

6 A.          Yes, ma'am, which is standard operating

7 procedure.  We get bills usually about a day before.

8 Q.          Okay.

9 A.          Usually.  Not all the time.

10 Q.          And did you talk to anyone about this

11 meeting beforehand?

12 A.          I approached the members of my -- the

13 house members of the committee to make sure they

14 read their information and make sure they came to

15 the meeting.

16 Q.          And other than the maps themselves, did

17 you provide any materials to the members of the

18 committee?

19 A.          Whatever the committee sent with the

20 notice.

21 Q.          With the -- I'm sorry.  What do you mean

22 by the notes?

23 A.          They were sent an email notifying them

24 of the meeting.  Whatever was contained in that

25 notification of the meeting.

Page 101

1 Q.          And do you know who sent that email?

2 A.          Somebody on the reapportionment staff.

3 Q.          Okay.  So a considerable portion of that

4 meeting was about racial polarization analysis,

5 which I'll also refer to as RPV.  Does that --

6 A.          RP what?

7 Q.          RPV.  Have you heard that term before?

8 A.          I've heard of racial population

9 analysis.

10 Q.          I'll try to refer to it as racial

11 polarization analysis.  But that's also a lot of

12 words.

13 A.          You can use the acronym.

14 Q.          So what's your understanding of racial

15 polarization analysis?

16 A.          My understanding is that is done

17 particularly for the courts to determine whether we

18 either on purpose -- intentionally or

19 unintentionally violated Section 2 of the Voting

20 Rights Act and denied a group of protected class of

21 minority citizens from electing or defeating a

22 candidate of their choice based on the analysis of

23 the historical vote.

24 Q.          And do you know how it's done?

25 A.          No, ma'am.

Page 102

1 Q.          Who decides whether a racial

2 polarization analysis should be done for a

3 particular district?

4 A.          Not me.

5 Q.          Do you know who does decide?

6 A.          I would -- I would assume it would be

7 our attorney.

8 Q.          Why that assumption?

9 A.          Because he's an attorney and he

10 understands Section 2.

11 Q.          But the actual analysis itself is math,

12 right?

13 A.          I would assume.  But I've never -- never

14 done it.

15 Q.          Okay.  Would anyone other than your

16 attorneys make the decision to have a racial

17 polarization analysis done for a particular

18 district?

19 A.          Not that I'm aware of.  I'm sure if I

20 asked for one, I could get it.

21 Q.          Okay.  Can anyone ask for it?

22 A.          I don't know the answer to that

23 question.

24 Q.          Well, could a member of the

25 reapportionment committee ask for it and have it be

Page 103

1 performed?

2 A.          I'm sure if a member of the

3 reapportionment committee wanted one, they could

4 approach the legal counsel of the committee and

5 request one.

6 Q.          How do you decide which district a

7 racial polarization analysis should be done for?

8 A.          I didn't make that decision.

9 Q.          So you don't play any role in deciding

10 district X should have a racial polarization

11 analysis done?

12 A.          I did not, no.

13 Q.          Okay.  Do you know if there are any

14 written guidelines for how someone should decide

15 whether a racial polarization analysis should be

16 done?

17 A.          I don't recall ever seeing any.

18 Q.          Do you know if there are any informal

19 guidelines?

20 A.          I don't recall ever seeing any.

21 Q.          Or hearing of any?

22 A.          No.

23

24          (Plaintiff's Exhibit 4 was

25          marked for identification.)

Page 104

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

**Page 105**

1

2 Q.            I'd like to introduce Exhibit 4.  This

3 is a transcript of the reapportionment committee

4 meeting from October 26th.

5        MS. WELBORN:  And we will provide

6 electronic copies.

7            MR. WALKER:  I understand.  My only

8 caveat is while I don't have any reason to believe

9 that these are inaccurate, we haven't had a chance

10 to check it.

11        MS. WELBORN:  Of course.

12 Q.        I'll get to that in a second.

13            But do you know when a racial

14 polarization analysis is conducted?  At what point

15 in the process, I mean.

16 **A.        I was under the assumption that after we**

17 **passed the bills, that a racial polarization**

18 **analysis would be done for the lawsuits.**

19 Q.        Okay.  So after they are already

20 enacted, right?

21 **A.        Well, given the timeline.**

22 Q.        Okay.

23 **A.        We didn't have time to.**

24 Q.        If you could turn to Page 20.  I'm

25 sorry.  It's Page 18.  And at the very bottom,

**Page 106**

1 Senator McClendon says, "Can I ask something?  The

2 question you're asking, the answer is our attorney,

3 mine and your attorney, set that data off for

4 districts that it looked like there might possibly

5 be a racial issue."

6            And this is referring to a racial

7 polarization analysis.  That is, that racial

8 polarization is done -- analysis is done for

9 districts where it looked like there might possibly

10 be a racial issue.

11            Is that your understanding of when

12 racial polarization -- that is why a racial

13 polarization analysis is done, is because there

14 might possibly be a racial issue?

15 **A.        I read that as our attorney was going to**

16 **make that determination.**

17 Q.        And is it your understanding that

18 looking like there might possibly be a racial issue

19 is the criteria for determining whether a racial

20 polarization analysis should be conducted for a

21 particular district?

22 **A.        Again, I was leaving that to the**

23 **attorney to determine, what we would have to prepare**

24 **for court cases.**

25 Q.        So talking about might possibly be a

**Page 107**

1 racial issue, do you have an understanding of what

2 that means?

3 **A.        You would have to ask Mr. -- Senator**

4 **McClendon.**

5 Q.        Okay.  Did you encounter any possible

6 racial -- racial issues over the course of the

7 redistricting process?

8        MR. WALKER:  Objection to form.  I'm

9 just not sure what you mean.

10 Q.        When did you take race into account in

11 the redistricting process?

12 **A.        Mr. Hinaman was directed by the**

13 **committee to follow the guidelines and to draw those**

14 **plans race neutral, without looking at race until**

15 **after he had developed a plan.  That's my**

16 **understanding.  The plan was developed, and race was**

17 **not looked at until after it was drawn.**

18 Q.        And then how was -- it was looked at

19 after the plan was drawn?

20 **A.        After the plan was drawn, yes, ma'am, in**

21 **conjunction with the members of congress.**

22 Q.        And do you know how it was looked at?

23 **A.        No.  He met with members of congress to**

24 **go over it.**

25 Q.        And do you know what data was looked at?

**Page 108**

1 **A.        No, ma'am.**

2        MR. WALKER:  Did you say date?

3        MS. WELBORN:  Data.

4 Q.        And do you know anything that would have

5 changed because race was taken into account in the

6 congressional map?

7 **A.        No, ma'am.**

8 Q.        And when you said the committee gave

9 instructions to Mr. Hinaman, who are you referring

10 to specifically?

11 **A.        I would say Chairman McClendon and I**

12 **told Mr. Hinaman to follow the guidelines in drawing**

13 **these maps.**

14 Q.        And in doing so, that means taking a

15 race-neutral approach to drawing the first map; is

16 that right?

17 **A.        Yes, ma'am.  The congressional map, yes,**

18 **ma'am.**

19 Q.        Did you give any other instructions to

20 Mr. Hinaman?

21 **A.        Follow the guidelines.**

22 Q.        But that's it?

23 **A.        That's the reason why we adopted the**

24 **guidelines.**

25 Q.        And how did you communicate with

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 Mr. Hinaman?

2 A.          I would see him in the reapportionment
3 office, and on the telephone.

4 Q.          Okay.  Did you ever email with him?

5 A.          No, ma'am.  I'm not a big email person.

6 A.          I suppose that means you didn't text him
7 either.

8 A.          Nothing of substance.

9 Q.          Okay.

10 A.          And I'll be glad to show you the texts.

11 Q.          So are you aware of any racial
12 polarization analysis that was done for any district
13 in the 2001 -- or 2021 congressional map prior to
14 this meeting on October 26th?

15 A.          No, ma'am.

16 Q.          So not for District 7?

17 A.          No, ma'am.

18 Q.          Had a racial polarization analysis been
19 done for some state legislative districts?

20 A.          No, ma'am.

21 Q.          Was any racial polarization analysis
22 conducted for any of the maps at any point before
23 October 26th?

24 A.          No, ma'am.

25 Q.          So a racial polarization analysis

Page 109

1 couldn't be taken into account for drawing the
2 initial map?

3 A.          We drew them race blind.

4 Q.          Do you know when the first time a racial
5 polarization analysis was conducted for any district
6 for the congressional map?

7 A.          My understanding, they were sent off
8 sometime after the bills at the end of the special
9 session.

10 Q.          Do you know who requested that?

11 A.          I believe Mr. Walker.

12 Q.          And do you know why that request was
13 made?

14 A.          Because we already had a lawsuit filed.
15 We had a lawsuit filed against us before we ever
16 filed a bill.

17 Q.          Who -- do you know who did the racial
18 polarization analysis?

19 A.          No, ma'am.

20 Q.          Do you know if a consultant was hired to
21 do it?

22 A.          There was somebody hired.  I do not know
23 who.

24 Q.          So just to be clear, nothing changed as
25 a part of the maps after the racial polarization

Page 110

1 analysis was done because the maps had already
2 passed, right?

3 A.          Yes.

4 Q.          Sorry.  I'm not trying to trick you.

5 A.          No.  I had to think about it.  Yes,
6 we -- we passed the maps.

7 Q.          Okay.  Did you ever suggest having a
8 racial polarization analysis done before the maps
9 were passed?

10 A.          I didn't consider it an option.  We were
11 under such a tight timeline.  We knew we would have
12 to do it because of the lawsuit that had already
13 been filed before we ever filed a bill, and we knew
14 it would be done.  We just didn't have time to . . .

15 Q.          To get it done.

16 A.          To get it done.

17 Q.          Do you know how long it takes to perform
18 a racial polarization analysis?

19 A.          No, ma'am.

20 Q.          Do you know if anyone suggested doing a
21 racial polarization analysis prior to the bill's
22 passing?

23 A.          It came up in the committee meeting.
24 And we assured them that we were going to perform
25 them, the ones that our attorneys deemed necessary,

Page 111

1 and we would get that to them when we had the
2 information.

3 Q.          Do you know if a racial polarization
4 analysis had been done for congressional maps in
5 previous redistricting cycles?

6 A.          I have no knowledge.

7 Q.          You don't remember from the 2001, 2002
8 cycle if that happened?

9 A.          Remember we were under Section 5
10 preclearance at the time.  And once they called and
11 said we had been precleared -- I had never heard the
12 term before that.

13 Q.          Okay.  So do you know when the racial
14 polarization analysis for the congressional map was
15 finished?

16 A.          I have not seen it.

17 Q.          You have not seen it?

18 A.          I have not seen it.

19 Q.          Okay.  Have you asked to look at it?

20 A.          No, ma'am.

21 Q.          Have you talked to anyone about it?

22 A.          You.

23 Q.          So why don't you do the racial
24 polarization analysis for all districts just as a
25 matter of course?  And I'm not talking -- I

Page 112

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 understand there's a time crunch here.  But in
2 general, why isn't it done for all of the districts
3 just because?
4 A.         I don't see a need for some of the
5 districts.  They're not being challenged in court,
6 are they?
7 Q.            Well, Districts 1, 2, and 3 are also
8 being challenged.
9 A.         Okay.
10 Q.           And when you say you don't see a need,
11 why is that?
12 A.         If you're not challenging them in court,
13 I mean, I don't see the need to do an analysis on
14 them.
15 Q.           Okay.  But four of seven districts are
16 being challenged in this lawsuit.
17 A.         Okay.
18 Q.           If you turn to Page 19, Senator
19 McClendon and Representative England have a
20 back-and-forth here about a number, 54 percent of
21 black voting age population for District 7.  So 54
22 percent BVAP.
23           And Representative England is asking
24 that a racial polarization analysis be done.  And
25 Senator McClendon says that he was told by

Page 113

1 Mr. Walker that a racial polarization analysis for
2 District 7 is unnecessary because District 7 has a
3 BVAP of around 54 percent.
4           Why would it be unnecessary to conduct a
5 racial polarization analysis if a district has a
6 BVAP of around 54 percent?
7 A.         I think you need to ask Senator
8 McClendon that.  I didn't say that.
9 Q.           But do you have an opinion on that?
10 A.         No, ma'am.
11 Q.           Do you think that having a BVAP of
12 around 54 percent for a particular district is
13 important?
14 A.         I -- it's my understanding that's --
15 that's the plan that Congresswoman Sewell agreed to.
16 Q.           And what do you mean by that?
17 A.         Mr. Hinaman worked with the members of
18 congress, and they signed off on the map that he had
19 drawn and said they agreed to it and would accept
20 it.  I was not privy to that conversation, though.
21 That's secondhand.  I was just told that.
22 Q.           Who told you that?
23 A.         I don't remember.
24 Q.           So do you have any opinion on whether
25 District 7 should have a BVAP of around 54 percent?

Page 114

1 A.         No, ma'am, I have no opinion.
2 Q.           Do you know what the relationship is
3 between having a BVAP of 54 percent and the decision
4 to do a racial polarization analysis?
5 A.         No, ma'am.
6 Q.           Do you know at what percent of BVAP a
7 district would have that you would need to do a
8 racial polarization analysis?
9 A.         No, ma'am.
10 Q.           So would you agree with the statement
11 that if a black district has a BVAP of under 54
12 percent, that requires a racial polarization
13 analysis?
14 A.         I can't agree or disagree with that
15 statement.  I think it depends on the district.  But
16 I don't know.
17 Q.           What would -- what do you mean by
18 "depends on the district"?
19 A.         I've seen majority minority districts
20 elect nonminorities.
21 Q.           I would like to introduce another
22 exhibit.  This is the transcript of the floor
23 debate, Plaintiff's Exhibit 5, on November 1st.
24 A.         All right.
25

Page 115

1           (Plaintiff's Exhibit 5 was
2           marked for identification.)
3
4 Q.           And if you'll flip to Page 20.
5           MR. WALKER:  And, Kaitlin, I'll just put
6 on the record that we also have not had a chance to
7 check this.  I don't have any reason to believe it's
8 inaccurate.  But I just note that for the record.
9           MS. WELBORN:  Yes.  We will stipulate to
10 that for all of the transcripts.
11           MR. WALKER:  Okay.
12 Q.           So you're having a back-and-forth here
13 with Representative England who again is asking why
14 a racial polarization analysis was not done on
15 District 7.
16           And at the very bottom of the page, you
17 said, "We thought it was necessary, but they cut it
18 off, I think, at 51 percent.  Anything under 51
19 percent they did it on.  Anyone over that, they
20 didn't do it."
21           Do you know what you mean -- what you
22 meant by that statement?
23 A.         I don't remember.  I really -- I think
24 that what I was talking about at that point was
25 trying to get something done rapidly, as fast as

Page 116

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 possible.  And we didn't have time to do 140
2 legislative districts, eight school board digits,
3 and seven congressional districts given the time
4 frame we had.
5 Q.          And the 51 percent is BVAP.  I'll tell
6 you that that.
7                Okay.  And when you said, "We thought it
8 was necessary," do you know who you were referring
9 to?
10 A.          I would assume it was Mr. Walker and
11 Mr. Hinaman and myself.
12 Q.          Okay.  And when you said they --
13 A.          Because on that floor -- at this time,
14 I'm sure you have my talking points.
15 Q.          Yes.
16 A.          I was going -- I was using my talking
17 points.  And remember this was rapid fire, as fast
18 as -- and I was -- this was late into the session.
19                And Mr. England is a very skilled
20 attorney and chairman of the democratic party.  So
21 he is quite, quite gifted in the way he can ask
22 questions and get people that are not attorneys to
23 answer them.
24 Q.          And so when you said that they cut it
25 off at 51 percent, do you know who the "they" is?
Page 117

1 A.          I would assume I was referring to
2 Mr. Walker and Mr. Hinaman.
3 Q.          And how was that 51 percent number
4 chosen?
5 A.          I'm sure I was just reading the talking
6 point.
7 Q.          And who prepared those talking points?
8 A.          Mr. Walker and, I believe, Mr. Hinaman.
9 Q.          And did you discuss those talking points
10 with either Mr. Walker or Mr. Hinaman?
11 A.          They were getting them to me as fast as
12 they could.  This was rapid fire.
13 Q.          What is your understanding of how you
14 can tell whether minorities can elect their
15 candidate of choice?
16 A.          In the congressional maps?
17 Q.          Yes.
18 A.          I don't really understand that question.
19 Would you repeat it, please?
20 Q.          How can you tell whether minorities can
21 elect their candidate of choice in a particular
22 district?
23 A.          In a particular congressional district?
24 Q.          Well, any district.  But in this case,
25 yes, we're talking about a congressional district.
Page 118

1 A.          That's a question I really can't -- I
2 don't think there's a magic number that exists to
3 guarantee the election or defeat of a minority
4 candidate.
5 Q.          Is there some range?
6 A.          Again, I was told that Congresswoman
7 Sewell was comfortable with the plan that had been
8 presented and was in support of that plan.  And the
9 other members of congress were in support of it.
10 Q.          I would like to introduce Plaintiff's
11 Exhibit 6, which is the final 2021 map for congress.
12
13                (Plaintiff's Exhibit 6 was
14                marked for identification.)
15
16 Q.          And District 7 is the one in brown.
17 Would you agree that District 7 appears to be
18 racially jerrymandered?
19 A.          I think just District 7 is in large part
20 the same district that was drawn under the Reed
21 Buskey, just adjusted for population increases.
22 Q.          And how would you describe the shape of
23 District 7?
24 A.          Again, we try and maintain the core of
25 existing districts.  And this district was created
Page 119

1 in 1992 by the Reed Buskey plan.
2            MS. WELBORN:  I would like to take just
3 a short break.  We might be finished.  I just want
4 to double-check.
5            MR. WALKER:  Would you like for us to
6 leave the room?
7            MS. WELBORN:  Let's go off the record.
8            THE VIDEOGRAPHER:  We are off the
9 record.  The time is 12:33 p.m.
10            (Recess was taken.)
11            THE VIDEOGRAPHER:  We are back on the
12 record.  The time is 12:40 p.m.
13            MS. WELBORN:  The Milligan plaintiffs
14 are finished asking questions.  I'm not sure if the
15 Singleton or Caster plaintiffs have any questions
16 for you.  But after that, we can break for lunch and
17 you'll be done.
18            MR. WALKER:  Yay.
19            MS. WELBORN:  Yay.
20            MS. FAULKS:  Do the Caster plaintiffs
21 have any questions?
22            MR. OSHER:  Can you hear me?
23            (Discussion held off the record.)
24 EXAMINATION BY MR. OSHER:
25 Q.          I only have a few questions.  So this
Page 120

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 should be -- this should be very quick.
2 Representative, thank you for your time.  My name is
3 Daniel Osher.  I am an attorney for the plaintiffs
4 in the Caster litigation.
5            You might have said this before.  And I
6 apologize if you did, Representative.  How long have
7 you served in the Alabama legislature?
8 **A.           I was first elected in 1994.  I served**
9 **two terms.  I left in 2002.  And I was reelected in**
10 **2014 and '18.**
11 Q.           Okay.  So that's roughly how many years?
12 **A.           12.  How many years total?  I'll be 16**
13 **years in the legislature with a 12-year gap.**
14 Q.           Great.  Thank you.
15            And have you been a member of the
16 republican party that whole time?
17 **A.           I've been an elected republican**
18 **official.  But I've never been an official member of**
19 **the Alabama Republican Party.**
20 Q.           I understand.  Have you always
21 considered yourself a republican?
22 **A.           Yes, sir.**
23 Q.           Based on your 16 years serving in the
24 legislature, in your view, do the views of members
25 of the democratic party in Alabama differ from the
                                                    Page 121

1 members of the republican party in Alabama when it
2 comes to removing confederate monuments from public
3 spaces?
4 **A.           I mean, you're asking me to suppose what**
5 **other people are thinking.  But I would say yes.**
6 Q.           And based -- based on your 16 years in
7 the legislature, do the views of members of the
8 democratic party in Alabama differ from the members
9 of the republican party in Alabama when it comes to
10 affirmative action?
11            MR. WALKER:  Objection to form.  Dan,
12 I'm not sure that we have a clear understanding of
13 what affirmative action is these days.
14            MR. OSHER:  I didn't catch that, Dorman.
15 Can you say that again?
16            MR. WALKER:  Yeah.  I'm not sure that I
17 would have a clear understanding of what affirmative
18 action is these days.
19            MR. OSHER:  Sure.
20 Q.           Representative, in your 16 years of
21 service in the legislature, have you had an
22 opportunity to view what the general views of each
23 of the major parties in the state are?
24 **A.           On which issue?**
25 Q.           On various issues.
                                                    Page 122

1 **A.           I'm assuming that I've had numerous**
2 **conversations with both republicans and democrats,**
3 **yes.**
4 Q.           And do you have a general sense of how
5 one party views a major issue in Alabama as opposed
6 to another party?
7 **A.           I'm sure we differ on specific issues,**
8 **yes.**
9 Q.           Okay.  So based on your 16 years serving
10 in the legislature, do the views of members of the
11 democratic party in Alabama generally differ from
12 the members of the republican party in Alabama
13 generally when it comes to affirmative action?
14 **A.           Again, your definition of affirmative**
15 **action I don't know.**
16 Q.           Policies implementing a preference for
17 individuals while considering their race.
18 **A.           I think given my history of being in the**
19 **Alabama legislature when the democrats were in**
20 **supermajority, it's a pretty wide spectrum across**
21 **political lines.**
22 Q.           So you're saying that the two major
23 parties in Alabama do not have the -- have the same
24 view when it comes to affirmative action?
25 **A.           I couldn't answer that.  I've run across**
                                                    Page 123

1 **varying opinions in different members.**
2 Q.           Okay.  Based on your 16 years in the
3 legislature, do the views of members of the
4 democratic party in Alabama generally differ from
5 members of the republican party in Alabama generally
6 when it comes to criminal justice reform?
7 **A.           I think -- I think there's a divide,**
8 **yes.  But I know some -- some conservatives that are**
9 **in favor of criminal justice reform themselves.**
10 Q.           And just to clarify, you're saying that
11 there is a difference between the general views of
12 the democratic party -- members of the democratic
13 party and members of the republican party when it
14 comes to criminal justice reform?
15 **A.           There could be, yes.**
16 Q.           Is it -- in your view, is there a divide
17 between the members of the party or not?
18 **A.           I think some members hold different**
19 **opinions, yes.**
20 Q.           And the same question.  Based on your
21 experience in serving in the legislature, do the
22 views of the members of the democratic party
23 generally in Alabama differ from the members of the
24 republican party generally in Alabama when it comes
25 to the view of whether there's a significant amount
                                                    Page 124

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 of discrimination against black individuals in the
2 state?
3 A.        Yes.
4              MR. OSHER:  Okay.  That's all I have.
5 Thank you very much for your time, Representative.
6              MR. WALKER:  Thank you.  Thank you,
7 Daniel.
8              MS. FAULKS:  Singleton plaintiffs, do
9 you have any questions?
10             MR. BLACKSHER:  Did I get called?
11             MR. WALKER:  You did.  You did, Jim.
12             MR. BLACKSHER:  Well, thank you.
13 EXAMINATION BY MR. BLACKSHER:
14 Q.        Representative Pringle, I hope you make
15 it back to Mobile before the night is over.
16 A.        Thank you.  So do I.
17 Q.        I wouldn't want to stay in Montgomery
18 overnight if I could get back to Mobile on a Friday
19 night.
20 A.        See, we have a lot in common,
21 Mr. Blacksher.
22 A.        Yeah.
23 A.        I'm not --
24 Q.        I just have a --
25             MR. WALKER:  Go ahead.
                                              Page 125

1 Q.        I just have -- I have very few
2 questions.
3             Representative Pringle, you said that --
4 and I haven't been in on your whole discussion.  I
5 confess I had to jump off on some other calls while
6 it was all going on.  So I apologize if I go over
7 something that you've already spoken about.
8             But I did hear you say with a smile on
9 your face that there was a lawsuit filed even before
10 you passed a plan.  And that would be referring to
11 the Singleton case, right?
12 A.        I refer to it as the League of Women
13 Voters.  But yes, sir.
14 Q.        The League of Women Voters.  It was the
15 lawsuit that was advocating the League of Women
16 Voters whole county plan?
17 A.        Yes, sir.
18 Q.        Okay.  And who informed you that that
19 suit had been filed?  It was Mr. Walker, wasn't it?
20 A.        Yes, sir.
21 Q.        And did you get a chance to read the
22 complaint?
23 A.        No, sir.
24 Q.        And did Mr. Walker tell you what the
25 lawsuit was about?
                                              Page 126

1 A.        You were asking for a plan that had all
2 whole counties that created two opportunity
3 districts.
4 Q.        Did he tell you that the lawsuit
5 contended that the plan that was enacted in 2011 was
6 racially jerrymandered?
7             MR. WALKER:  I'm going to -- I'm going
8 to assert privilege.  You might be able to ask that
9 question a different way, Jim.  But I think the way
10 you've asked it, it calls -- or could call for an
11 attorney-client communication.
12 Q.        Okay.  I lost you.  All I see is a
13 telephone screen now.  Oh, there you are up in the
14 corner.
15             Let me ask it this way, Representative
16 Pringle.  Were you aware and are you aware now that
17 the Singleton complaint alleged, when it was filed
18 September 27th, that the plan enacted in 2011 was
19 unconstitutional because it was racially
20 jerrymandered?
21 A.        Not specifically.
22 Q.        Okay.  Were you aware that the state
23 attorney general's office had said in a lawsuit in
24 Birmingham in 2019 that the 2011 plan was racially
25 jerrymandered?
                                              Page 127

1             MR. DAVIS:  Object to the form.
2             MR. WALKER:  Jim, did you hear that
3 objection to form from Jim Davis?
4             MR. BLACKSHER:  Yes.
5             MR. DAVIS:  That's not what it said.
6 Q.        Are you aware that that is what the
7 complaint that Singleton filed alleged, that the
8 state attorney general had conceded in federal court
9 in 2019 that the 2011 plan was racially
10 jerrymandered?  Were you aware of that?
11             MR. DAVIS:  Object to the form.
12             MR. WALKER:  Object to form.
13 Q.        You -- you can answer.
14             MR. WALKER:  I'm sorry.  You can answer,
15 if you can.
16 A.        No.
17 Q.        You weren't aware of that.
18 Q.        Were you aware -- did anyone tell you
19 that the lawsuit contended that when drawing a new
20 congressional plan with 2020 census data, that the
21 legislature had a constitutional obligation to
22 remedy a racial jerrymandering?
23 A.        No.
24 Q.        Okay.  And as chair of the
25 reapportionment committee, you can testify that
                                              Page 128

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 there was no effort made by the reapportionment
2 committee to remedy any racial jerrymandering in the
3 2011 claim; isn't that correct?
4 **A.        I testified that Mr. Hinaman was**
5 **directed to draw those seven congressional districts**
6 **based on the guidelines of the committee.**
7 Q.        Yeah.  And no one informed you, and you
8 -- excuse me.
9           The committee never attempted to remedy
10 a racial jerrymandering; is that correct?
11 **A.        I did not know there was a  --**
12 Q.        Racial jerrymandering?
13 **A.        Yes.**
14 Q.        Okay.  Now, my understanding from your
15 testimony is that Mr. Walker advised you as chair of
16 the reapportionment committee that the congressional
17 redistricting plan had to have zero deviation; is
18 that correct?
19 **A.        Yes.**
20 Q.        So did anyone else give you that advice,
21 zero deviation?
22 **A.        Mr. Hinaman.**
23 Q.        So Mr. Hinaman advised you that the plan
24 had to be zero deviation?
25 **A.        Well, Mr. Blacksher, was not the 2011**
Page 129

1 **and the 2002 plans all zero deviations, and the 1992**
2 **plan?**
3 Q.        Well, what I asked -- the question was
4 did Mr. Hinaman advise you that it needed to be zero
5 deviation.
6 **A.        Again, Mr. Hinaman has been part of this**
7 **for years.  And I think every plan has been drawn to**
8 **zero deviation.**
9 Q.        Okay.  Does that mean that he did advise
10 you to keep it at zero deviation?
11 **A.        Yes.  Because all the other plans had**
12 **been drawn to zero deviation.**
13 Q.        Okay.  That's fine.
14           And did anyone besides Mr. Walker and
15 Mr. Hinaman advise the committee that the plan had
16 to keep a zero deviation?
17 **A.        Not to my knowledge.**
18 Q.        Did the -- did you as chair or did
19 anyone on the committee seek the advice of the
20 Alabama attorney general's office on whether it
21 needed to have zero deviation?
22 **A.        I did not.**
23 Q.        Are you aware of anyone on the
24 committee who did?
25 **A.        No, sir.**
Page 130

1 Q.        Are you aware of any -- anyone -- did
2 Mr. Walker, by the way, advise you that he had
3 consulted other lawyers to reach this opinion?
4           MR. WALKER:  Jim, I'm going to object on
5 the grounds of privilege to that.  You can ask it
6 some other way.
7 Q.        I'm just trying to get everything you
8 knew or did not know about the requirement of zero
9 deviation.
10          And what I've heard you say,
11 Representative Pringle, is that you were aware,
12 since you've been involved in one way or the other
13 with redistricting, that it had been going on for
14 several decades, right?
15 **A.        Zero deviation in congressional races?**
16 Q.        Yes.
17 **A.        Yes.**
18 Q.        Okay.  And when it came to drawing the
19 2020 plan, you were advised that that needed to
20 continue, zero deviation needed to continue.  And
21 that advice came from Mr. Walker and Mr. Hinaman; is
22 that correct?
23          MR. WALKER:  Objection to form to the
24 extent it calls for an attorney-client
25 communication.
Page 131

1 Q.        But you can answer, I think.
2           MR. BLACKSHER:  Counsel, can he answer?
3 Q.        Okay.  Let me ask another question.
4           Did Mr. Walker also advise you that in
5 order to comply with the Voting Rights Act, the
6 congressional redistricting plan had to have a
7 majority black district?  Is that correct?
8           MR. WALKER:  Objection, attorney-client
9 privilege.
10 Q.       Well, that's in the talking points,
11 isn't it?  Isn't that -- isn't the requirement of a
12 majority black district one of the things that's in
13 the talking points that you've exchanged with us
14 that you -- that you read from on the floor of the
15 legislature?
16 **A.        I don't have any direct recollection of**
17 **that at this time.**
18 Q.       So did anyone advise you, as chair of
19 the reapportionment committee, that in order to
20 comply with the Voting Rights Act, the plan had to
21 have one majority black district, at least one
22 majority black district?
23          MR. WALKER:  Object to the question to
24 the extent it calls for an attorney-client
25 communication.  Otherwise, you can answer.
Page 132

Evan Milligan, et al v. John H. Merrill, et al.

Chris Pringle
12/17/2021

1  A.         We instructed Mr. Hinaman, quoting the
2  guidelines, to protect the core of the existing
3  districts to the extent possible and to draw it to
4  zero deviation.
5  Q.    Okay.  Representative Pringle, there's
6  absolutely no mention of majority black in the
7  guidelines.
8           So the question is:  In complying -- the
9  guidelines say that you had to comply with the
10 Voting Rights Act, right?
11 A.         Yes, sir.
12 Q.    Okay.  But it doesn't say majority
13 black, right?
14 A.         The guidelines, I don't recall them
15 saying that.
16 Q.         Right.  So the question is:  Were you
17 advised that to comply with the Voting Rights Act,
18 there had to be a majority black district?
19           MR. WALKER:  Objection that I've made
20 before to the extent it calls for attorney-client
21 communication.  Otherwise, he can answer.
22 A.         Again, those plans are drawn in a
23 race-neutral manner based on the guidelines to
24 preserve the core of the existing congressional
25 districts.
                                                Page 133

1  Q.    Yes, sir.  I've heard that testimony.
2           My question, though, is were you advised
3  that the Voting Rights Act required there to be a
4  majority black district?
5           MR. WALKER:  Same objection.
6  A.         The Voting Rights Act requires that we
7  in no way intentionally nor unintentionally diminish
8  the ability of a protected class of minority
9  citizens from electing or defeating a candidate of
10 their choosing.
11 Q.         And did that mean a majority black
12 district?
13 A.         It means we had -- we drew a district
14 that would allow -- that maintained the core of an
15 existing minority district.  But we did it in a
16 race-neutral way.
17 Q.         Your understanding of the requirement of
18 maintaining the cores and drawing a race-neutral
19 plan meant that you needed to end up with a majority
20 black district.  Am I hearing you correctly?
21 A.         We -- we made every opportunity to
22 protect the incumbents who were seeking reelection.
23 Q.         That's not the question I asked you
24 about the incumbent.
25           I asked if you were advised and did you
                                                Page 134

1  understand that you needed to have a majority black
2  district.
3  A.         I understood that we needed to draw
4  districts to help protect the incumbent, yes.
5  Q.         And to you, that meant a majority black
6  district, protecting the incumbent.  Is that your
7  answer?
8  A.         Well, I acquiesced to Mr. Hinaman who
9  met with the members of the congress and talked to
10 them about their districts and what they wanted and
11 how they wanted them drawn.  And he presented a plan
12 to me that he said the members of congress agreed to
13 that were seeking reelection, that they had agreed
14 to.
15 Q.         Okay.  Let's talk for just a second
16 about the League of Women Voters' whole county plan.
17           According to the talking points, you
18 were advised that that plan would be
19 unconstitutional because its deviation was too
20 large; isn't that correct?
21 A.         That was in my -- the analysis I
22 received, yes.
23 Q.         And that information came from whoever
24 wrote the talking points?
25 A.         Yes.  That would be Mr. Hinaman and
                                                Page 135

1  Mr. Walker.
2  Q.    Okay.  And the talking points also
3  advised, didn't they, that the League of Women
4  Voters' plan would violate the Voting Rights Act
5  because it did not have a majority black district;
6  isn't that correct?
7  A.         It could potentially violate Section 2
8  by diminishing the ability of a protected class of
9  citizens from electing or defeating a candidate of
10 their choosing, yes.
11 Q.         I'm just asking if the talking points
12 said -- you know, I don't have them in front of me.
13 You've probably been looking at them all morning.
14 A.         Actually, I haven't.
15 Q.         The talking points actually said, didn't
16 it -- the talking points actually said that the
17 League of Women Voters' whole county plan would
18 violate the Voting Rights Act because it did not
19 have a majority black district.
20           Now, did you -- did anyone else give you
21 that advice other than what was in the talking
22 points?
23           MR. DAVIS:  Object to the form.
24           MR. WALKER:  Object to the form.
25           THE WITNESS:  Can I answer?
                                                Page 136

Page: 34 (133 - 136)

Evan Milligan, et al v. John H. Merrill, et al.

Chris Pringle
12/17/2021

```
 1        MR. WALKER:  You can answer to the
 2 extent that you do not discuss any communication you
 3 may have received from an attorney, in particular
 4 one from the AG's office.
 5 A.        I was reading the talking points that
 6 you have before you.
 7 Q.        Actually, I don't have them before me.
 8 I'm sorry.
 9           But in any event, let me -- let me wrap
10 this up this way.  Was the -- was the committee ever
11 presented in writing a statement that the League of
12 Women Voters' whole county plan violated the Voting
13 Rights Act?
14 A.        If my memory serves me correctly, we did
15 not yet have the official League of Women Voters'
16 plan in the computer at the time of the committee
17 meeting.  I think it was introduced later.
18 Q.        Okay.  You're going to have to listen to
19 the question again.
20        MR. BLACKSHER:  Could I ask the court
21 reporter to read the question back, please?
22        (Record read.)
23 A.        Was the committee ever presented --
24        MR. WALKER:  Was the committee ever
25 presented in writing.
                                          Page 137
```

```
 1 "minimal deviation," you interpreted that on your
 2 own as meaning zero deviation; is that correct?
 3 A.        Based on my knowledge and history of
 4 reapportionment, congressional reapportionment, and
 5 the fact that we have drawn zero deviation
 6 districts, yes, sir.
 7 Q.        Okay.  So that would -- and you reached
 8 that conclusion independently of anybody's advice,
 9 right?
10 A.        Well, Mr. Walker and Mr. Hinaman and I
11 all concurred that minimum deviation means zero.
12 And based on my readings, I would concur with that,
13 what I read.
14 Q.        Thank you, Representative Pringle.
15 Those are the only questions that I have.
16 A.        Mr. Blacksher, it's always a pleasure.
17 Q.        I hope to see you again soon.
18 A.        I'm sure you will.
19        MR. WALKER:  I think that can be
20 arranged.
21        MS. FAULKS:  Dorman, with that, I think
22 that we are done.  For lunch, how long do we want to
23 break?
24        MR. WALKER:  Wait.  Can we have 30
25 seconds to confer?
                                          Page 139
```

```
 1 A.        I have no recollection of that.
 2 Q.        Okay.  Thank you.
 3           And was the committee ever presented in
 4 writing a statement that the League of Women Voters
 5 -- I'm sorry.  Let me strike that.  Let me start
 6 over.
 7           Was the committee ever presented in
 8 writing a statement that the congressional plan had
 9 to have zero deviation?
10 A.        I don't understand the question.
11 Q.        Did the committee have in writing a
12 statement that the congressional plan had to have
13 zero deviation?
14 A.        The guidelines called for it, which has
15 been done for -- as you know, for years and years.
16 For decades, we've always drawn down to zero
17 deviation in congressional.
18 Q.        Okay.  So the guidelines say that the
19 congressional plan must have minimal deviation.
20 A.        Which we interpret to be -- which we
21 interpret to be zero deviation just like it was, you
22 know, in 2011, 2002, 1992.
23 Q.        Okay.  That's good.
24           So in other words, when you saw, as
25 chair of the committee, that the guidelines said
                                          Page 138
```

```
 1        THE VIDEOGRAPHER:  We're off the record.
 2 The time is 1:05 p.m.
 3        (Recess was taken.)
 4        THE VIDEOGRAPHER:  We're back on the
 5 record.  The time is 1:08 p.m.
 6 EXAMINATION BY MR. DAVIS:
 7 Q.        Representative Pringle, this is Jim
 8 Davis.  I represent Secretary Merrill in this
 9 lawsuit.  I have just a couple of follow-up
10 questions.
11           Did you instruct Mr. Hinaman to -- when
12 he drew a congressional plan, that it had to include
13 a majority black district?
14 A.        No.
15 Q.        Did you instruct him to include
16 districts with any particular demographics?
17 A.        No.
18 Q.        Are you aware of any member on the
19 reapportionment committee who gave him such
20 instructions?
21 A.        No.
22 Q.        Did you decide in advance that there had
23 to be a majority black district in Alabama's
24 congressional plan?
25 A.        No.
                                          Page 140
```

Evan Milligan,et al v. John H.Merrill, et al.                    Chris Pringle
                                                                12/17/2021

```
1              MR. DAVIS:  Thank you.  No other
2  questions.
3              THE VIDEOGRAPHER:  This ends the
4  deposition of Chris Pringle.  The time is now
5  1:09 p.m.
6
7              (DEPOSITION ENDED AT 1:09 P.M.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                        Page 141
```

```
1  STATE OF ALABAMA )
2  JEFFERSON COUNTY )
3
4              I hereby certify that the above
5  proceedings were taken down by me and transcribed by
6  me using computer-aided transcription and that the
7  above is a true and correct transcript of said
8  proceedings taken down by me and transcribed by me.
9              I further certify that I am neither of
10 kin nor of counsel to any of the parties nor in
11 anywise financially interested in the result of this
12 case.
13              I further certify that I am duly
14 licensed by the Alabama Board of Court Reporting as
15 a Certified Court Reporter as evidenced by the ACCR
16 number following my name found below.
17              So certified on December 17, 2021.
18
19
20
21
22         LeAnn Maroney, Commissioner
23         ACCR# 134, Expires 9/30/25
           505 North 20th Street, Suite 1250
24         Birmingham, AL  35203
25
                                        Page 142
```

Page: 36 (141 - 142)

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

## WORD INDEX

**< 0 >**
**01**   68:14

**< 1 >**
**1**   6:14   12:4,
6   59:18   113:7
**1:05**   140:2
**1:08**   140:5
**1:09**   141:5, 7
**10**   5:5   42:16
**10:03**   49:13
**10:22**   49:16
**10004**   4:6
**10006**   3:15
**101**   18:15, 18
19:24
**10-26-21**   6:21
**104**   6:20
**105**   1:23   5:21
**11:26**   100:12
**11-1-21**   6:23
**116**   6:22
**119**   6:24
**11th**   16:10
**12**   6:14   121:12
**12:06**   100:15
**12:33**   120:9
**12:40**   120:12
**120-125**   6:8
**125**   4:5
**1250**   142:23
**125-140**   6:9
**12-year**   121:13
**134**   142:23
**14**   18:25   99:12
**140**   117:1
**1400**   3:7
**140-141**   6:10
**14th**   3:21
54:3   59:24
96:13
**15**   19:4
**16**   121:12, 23
122:6, 20
123:9   124:2
**17**   1:24   7:7,
17   35:14
142:17
**18**   105:25

**121:10**
**19**   113:18
**1984**   16:10
**1992**   25:3, 23
120:1   130:1
138:22
**1994**   18:24
121:8
**1999**   3:7
**1st**   38:11
42:3, 10   43:14
44:1   45:14
115:23

**< 2 >**
**2**   6:16   52:14,
18   59:19, 20
63:18   98:7, 15
99:2   102:19
103:10   113:7
136:7
**2:2021-CV-01530-**
**AMM**   1:8
**2:21-CV-01530-AMM**
7:14
**20**   46:21
49:25   105:24
116:4
**200**   5:21
**2000**   28:21
35:14   36:10
**20002**   5:6
**20005**   3:22
**2001**   21:25
27:12   28:2
30:3   33:18
41:24   48:23
66:1, 12   68:10
109:13   112:7
**2001-2002**   28:18
**2002**   18:25
22:1, 2, 5, 23
23:2   24:8, 10,
20, 21   25:6, 19
26:5, 9, 22
28:13, 15, 22
29:9   30:4
33:18, 25
41:25   58:14,
18, 24   59:7, 9
60:5, 7   61:2
65:1   112:7

**121:9**   130:1
138:22
**2003**   11:1
**2007**   18:11
**2010**   58:8, 12,
14, 18   59:6, 10,
14   60:1, 4, 23
61:4, 11   62:18,
22   65:1   68:1
71:2
**2011**   29:24
30:5   33:2, 7,
14   46:14
65:13   74:9
127:5, 18, 24
128:9   129:3,
25   138:22
**2014**   121:10
**2018**   35:12
**2019**   35:1, 7
36:10   46:21
49:2   127:24
128:9
**2020**   28:13
40:6   58:19
59:11   128:20
131:19
**2021**   1:24
6:25   7:7, 17
22:12   32:23
33:4   34:25
37:3   45:20
49:23   51:1
52:19   58:10
59:14   60:1
62:19, 24
74:12   109:13
119:11   142:17
**20th**   142:23
**22**   37:23   80:13
**26th**   40:6, 18
50:20   51:2
100:17   105:4
109:14, 23
**27**   18:8   72:12
**27th**   127:18
**28**   32:8   71:22,
25   72:12   78:9
79:8, 12, 21
82:13

**< 3 >**

**3**   6:18   55:20,
23   113:7
**3:00**   50:11
**30**   94:6   139:24
**35203**   142:24
**35222**   4:21
**36104**   1:24
5:22
**36106**   4:14
**36130**   5:14

**< 4 >**
**4**   6:20   104:24
105:2
**40**   3:14   42:21
**45**   12:21

**< 5 >**
**5**   3:14   6:22
57:9, 23   58:23
59:1, 16, 21
112:9   115:23
116:1
**5:00**   78:11, 14,
20   79:19, 24
**50**   42:24
97:15, 21, 22
98:4, 11, 12, 21,
22
**501**   5:13
**505**   142:23
**51**   116:18
117:5, 25   118:3
**52**   6:16
**54**   113:20, 21
114:3, 6, 12, 25
115:3, 11
**55**   6:18
**5th**   48:23
50:20   51:1, 5,
19, 23   52:19
53:17   58:5
63:7   64:5

**< 6 >**
**6**   6:24   119:11,
13
**60**   26:15
**600**   3:21   5:5
**6179**   4:13

**< 7 >**

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

**7**   25:5   26:16
27:14, 17   28:1
61:12, 13, 19
99:11   109:16
113:21   114:2,
25   116:15
119:16, 17, 19,
23
**700**   3:21

**< 8 >**
**8**   61:13, 19
**825**   4:20

**< 9 >**
**9/30/25**   142:23
**9:00**   78:10, 14,
20   79:19, 23
**9:14**   1:24   7:17
**90**   42:16
**90067**   3:8
**9-120**   6:7

**< A >**
**a.m**   1:24   7:17
49:13, 16
100:12
**ability**   98:8,
14   134:8   136:8
**able**   79:6, 17
127:8
**absolutely**   133:6
**accept**   114:19
**accepted**   38:2
63:22
**access**   68:16,
19   94:7
**According**   135:17
**account**   14:21,
23   15:7, 11, 24
26:20   107:10
108:5   110:1
**accounts**   15:5,
14, 21
**ACCR**   142:15, 23
**Accuracy**   70:4
**achieve**   44:13
92:9
**ACLU**   7:21, 22
8:25   9:14
**acquiesced**   135:8

**acquisitions**
17:9
**acronym**   102:13
**Act**   54:3, 7
59:17, 19, 20
98:8   99:2
102:20   132:5,
20   133:10, 17
134:3, 6   136:4,
18   137:13
**acting**   7:3
**action**   122:10,
13, 18   123:13,
15, 24
**actual**   96:4
103:11
**adamant**   43:23
**add**   80:14
**added**   38:3
80:16
**additional**   38:1,
3   55:13   80:16
**address**   15:4
32:13   36:1
73:18
**addressed**   36:12
73:12, 19
**adjust**   39:4
**adjusted**   119:21
**adopt**   69:15
**adopted**   24:20
31:1   40:8
52:5   55:14
63:25   64:9
108:23
**advance**   101:1
140:22
**advertised**   38:5
**advice**   129:20
130:19   131:21
136:21   139:8
**advise**   130:4, 9,
15   131:2
132:4, 18
**advised**   129:15,
23   131:19
133:17   134:2,
25   135:18
136:3
**advocated**   28:18
**advocating**

126:15
**affairs**   19:12
**affirmative**
122:10, 13, 17
123:13, 14, 24
**afoul**   99:1
**afraid**   99:1
**African**   85:24
**age**   95:18
98:12   113:21
**agent**   17:8
18:5
**ago**   14:10, 11
**agree**   60:22
81:5   83:1
115:10, 14
119:17
**AGREED**   1:17
2:1, 8   54:21
114:15, 19
135:12, 13
**AG's**   137:4
**ahead**   51:19
125:25
**aim**   44:14, 15
**al**   1:6, 10
7:13, 14   142:24
**ALABAMA**   1:2, 23
4:12, 14, 21
5:14, 22   7:2,
3, 16, 21, 23
8:3   9:14
10:21   16:8
18:2   24:14
25:5   26:7
30:12   32:11
34:7, 8   36:21
41:11   43:19,
21   82:1, 10, 18,
25   84:25
86:22   121:7,
19, 25   122:1, 8,
9   123:5, 11, 12,
19, 23   124:4, 5,
23, 24   130:20
142:1, 14
**Alabama's**   96:16
140:23
**Ali**   6:2
**alined**   59:4
**alleged**   127:17
128:7

**allow**   11:20, 22
134:14
**allowed**   32:15
**amendment**   54:3
59:24   96:13
**American**   4:4,
12   85:24
**amount**   68:7
124:25
**analysis**   102:4,
9, 11, 15, 22
103:2, 11, 17
104:7, 11, 15
105:14, 18
106:7, 8, 13, 20
109:12, 18, 21,
25   110:5, 18
111:1, 8, 18, 21
112:4, 14, 24
113:13, 24
114:1, 5   115:4,
8, 13   116:14
135:21
**analyze**   95:3
**analyzed**   28:10
96:24   97:3
**Angeles**   3:8
**answer**   11:11
25:11   26:13
29:12   43:1
49:3   57:5
61:23   70:25
72:24   80:21
83:8   84:9
86:10, 11
88:10   95:21
103:22   106:2
117:23   123:25
128:13, 14
132:1, 2, 25
133:21   135:7
136:25   137:1
**answered**   53:23
73:1, 12, 20, 21
93:13
**answering**   9:23
**answers**   11:22
**anxious**   89:8
**anybody**   12:18
47:3   48:5
61:7   63:19

80:18
anybody's   139:8
anywise   142:11
apartment   16:25
  17:4
apologize   121:6
  126:6
appears   119:17
approach   104:4
  108:15
approached
  101:12
approve   28:23
  84:12
approved   29:21
  58:23   84:15
approving   83:18
April   37:7, 13
area   42:4
  83:3   86:6
areas   82:15
arguing   99:19
arranged   139:20
asked   38:4
  63:13   66:25
  80:14   103:20
  112:19   127:10
  130:3   134:23,
  25
asking   84:6
  98:16   106:2
  113:23   116:13
  120:14   122:4
  127:1   136:11
aspects   85:21
assert   63:13
  127:8
assign   2:12
assigned   41:7
Assistant   5:11
associated   96:18
assume   10:20
  11:12   13:5
  33:5, 10   58:15,
  17   62:4   69:17
  76:21   89:22
  92:19, 22
  103:6, 13
  117:10   118:1
assumed   35:13
assuming   24:19
  29:3   123:1

assumption
  103:8   105:16
assured   111:24
attempted   129:9
attend   78:23
  79:20
attendance   47:4
attended   77:25
attention   41:22
Attorney   3:5,
  12, 19   4:19
  5:3, 11, 12, 19
  8:3, 25   12:12,
  24   13:2, 5, 7,
  16   14:6   46:14
  51:12   52:3
  53:6, 9   55:7
  57:18   62:15
  63:2   89:22
  98:16   103:7, 9
  106:2, 3, 15, 23
  117:20   121:3
  127:23   128:8
  130:20   137:3
attorney-client
  46:18   63:14
  127:11   131:24
  132:8, 24
  133:20
Attorneys   4:3,
  11   7:18   8:6
  45:25   51:17
  53:8, 14
  103:16   111:25
  117:22
audience   73:12,
  23
audio   47:7, 11
  49:7, 10   99:6
August   16:10
  37:15, 21
automatically
  98:13
available   32:18
Avenue   3:7
  5:13
aware   50:25
  103:19   109:11
  127:16, 22
  128:6, 10, 17,
  18   130:23

131:1, 11
  140:18

< B >
back   33:17
  34:23   41:23,
  24   43:11, 12,
  13   49:15   56:2,
  5   61:10, 24
  66:12   84:19
  86:3   92:11
  99:8   100:9, 14
  120:11   125:15,
  18   137:21
  140:4
back-and-forth
  113:20   116:12
Baggett   6:3
  8:24
Balch   1:22
  5:20   7:24
Baldwin   42:6
  44:3, 10
based   36:13, 20
  46:11   58:14
  59:7, 14   60:1
  61:1   67:13
  86:2   95:3
  102:22   121:23
  122:6   123:9
  124:2, 20
  129:6   133:23
  139:3, 12
basically   69:13
basis   58:9, 18
  81:2   96:12
began   35:18
  36:3   38:9, 20
  46:3, 8   64:15
beginning   7:12
believe   19:13
  42:8, 9, 10
  44:12   48:25
  56:11   59:6, 15
  60:13   61:24
  73:1   83:4
  93:13   105:8
  110:11   116:7
  118:8
believed   21:20
belt   81:25
  82:3, 5, 8, 20,

23   83:1, 6
  84:19   85:9, 22,
  25   86:8
best   11:22
  29:1, 4
better   49:18
  62:9
big   109:5
bill   14:1
  41:3, 5   93:24
  94:19   95:2
  98:2   110:16
  111:13
bills   101:7
  105:17   110:8
bill's   111:21
Bingham   1:23
  5:20   7:25
Birmingham   4:21
  7:2   127:24
  142:24
black   25:4
  26:15   28:19
  29:10   42:16,
  21, 23   81:25
  82:3, 5, 8, 20,
  23   83:1, 6
  84:19   85:9, 22,
  25   86:8   90:18,
  19   91:8   95:18,
  19, 24   97:11,
  13   113:21
  115:11   125:1
  132:7, 12, 21,
  22   133:6, 13,
  18   134:4, 11,
  20   135:1, 5
  136:5, 19
  140:13, 23
BLACKSHER   4:18
  6:9   8:22
  11:3   16:4
  125:10, 12, 13,
  21   128:4
  129:25   132:2
  137:20   139:16
blind   110:3
block   66:7, 8
board   32:9
  72:20   117:2
  142:14

Evan Milligan,et al v. John H.Merrill, et al.                                                    Chris Pringle
                                                                                                  12/17/2021

**boards** 20:6
**boat** 44:22
**bones** 53:9
**bottom** 105:25
 116:16
**Box** 4:13  61:14
**boxes** 61:18
**break** 49:8, 9,
 21  99:5, 6, 17
 100:8  120:3,
 16  139:23
**bring** 46:25
**Broad** 4:5
 37:2  83:3
**brought** 41:6,
 10  59:10
 76:19  77:8
**brown** 119:16
**build** 17:11
**bumped** 37:14
**bureau** 67:10
**burn** 16:19, 21
 17:6
**burning** 16:22
**Buskey** 25:8, 13,
 25  42:9
 119:21  120:1
**busy** 39:11
**BVAP** 95:14, 16
 113:22  114:3,
 6, 11, 25  115:3,
 6, 11  117:5

< C >
**calendar** 41:10
**California** 3:8
**call** 23:8
 39:21  94:19
 97:14  127:10
**Callahan** 21:17
 24:2  29:2
 33:21  42:2
 45:13
**Callahan's**
 33:19  42:12,
 20  43:4, 9
 44:6, 15  45:6
**called** 93:4
 97:20  112:10
 125:10  138:14
**calling** 97:15,
 19

**calls** 126:5
 127:10  131:24
 132:24  133:20
**campaigns** 19:11
 20:7
**camps** 17:11
**campus** 23:8
 28:4  76:9
 93:22
**candidate** 98:10,
 14  102:22
 118:15, 21
 119:4  134:9
 136:9
**candidates**
 80:25  81:7
**car** 43:21
**carved** 43:14
**CASE** 1:7  7:14
 11:2, 6  13:13,
 15  118:24
 126:11  142:12
**cases** 36:14
 106:24
**cash** 79:19
**CASTER** 5:1
 8:15  120:15,
 20  121:4
**catch** 122:14
**cause** 7:8
 80:24
**caution** 98:20
**cautious** 98:23,
 24
**caveat** 105:8
**census** 35:3
 37:11  67:10,
 15, 22, 23  69:7,
 21  70:2  96:8
 128:20
**center** 70:23
**Central** 82:18
**certain** 85:12
**certainly** 99:14
**certainty** 61:23
**certificates**
 16:14
**certifications**
 16:15
**certified** 16:18
 142:15, 17

**certify** 7:4
 142:4, 9, 13
**cetera** 17:16
**chair** 19:8
 20:10  128:24
 129:15  130:18
 132:18  138:25
**chaired** 22:20
**chairman** 22:22
 35:12  108:11
 117:20
**challenged**
 113:5, 8, 16
**challenging**
 113:12
**chance** 105:9
 116:6  126:21
**change** 23:20
 62:11, 14
 67:19  70:20,
 22  71:15
 74:25  81:9
 90:9
**changed** 36:2
 37:1  65:7
 71:2, 7  108:5
 110:24
**changes** 36:17
 53:16, 19  55:3,
 15, 18  56:13
 57:19, 22
 61:15  63:8, 9,
 17, 19, 22, 23,
 24  71:10
 76:11  81:16
**changing** 90:13
**channel** 43:7, 8,
 12, 13  44:21, 22
**characteristics**
 26:20
**check** 105:10
 116:7
**choice** 98:10,
 15  102:22
 118:15, 21
**choose** 58:12
 91:18  98:14
**choosing** 134:10
 136:10
**chosen** 55:11,
 17  118:4

**CHRIS** 1:10, 20
 5:17  7:7, 12
 8:1  9:4
 17:25  141:4
**chrispringle@south**

**erntimberlands.com**
 14:25
**Christopher** 9:18
**circumstances**
 85:12
**citizens** 71:5
 98:9  102:21
 134:9  136:9
**CIVIL** 1:7  4:4,
 12  7:5, 14
**claim** 129:3
**clarify** 95:23
 124:10
**Clarke** 42:6
 44:3, 12
**class** 98:9
 102:20  134:8
 136:8
**clear** 110:24
 122:12, 17
**clearly** 13:8
**clerk** 8:25
**closely** 59:4
**closer** 27:10
**closest** 39:20
**cochair** 22:11
 30:7, 10  32:5
 56:16
**cochairman** 19:9,
 10  22:14  35:17
**coding** 96:3
**cohesive** 86:14
**colleagues** 35:16
**color** 96:3
**columns** 95:22
**come** 17:1
 28:14  35:2
 43:7  60:9, 10
 64:19  79:13,
 16  84:1  88:16
 100:9
**comes** 28:5
 90:5  122:2, 9
 123:13, 24
 124:6, 14, 24

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

comfortable
119:7
coming    47:11
77:19    91:5
92:15
commencing   1:24
commercial    17:12
commissioner
7:3   142:22
commissions    20:6
committee    19:8,
10, 12   21:2, 19
22:17   30:8, 11,
24   31:3, 14, 23
32:1, 6   33:11
35:14   37:23
39:14   40:5, 18,
23, 25   41:8, 16
45:21   47:13
48:20, 24   49:2,
22, 23   50:6, 7,
11, 19, 21, 22
51:1, 20   52:4,
7, 18   53:11, 16
54:22   56:12,
17   58:3   59:4
60:8   63:24
64:2   80:7
83:18   85:5
87:2   88:6
100:17, 24
101:13, 18, 19
103:25   104:3,
4   105:3
107:13   108:8
111:23   128:25
129:2, 6, 9, 16
130:15, 19, 24
132:19   137:10,
16, 23, 24
138:3, 7, 11, 25
140:19
committees    19:5
20:2, 11, 17
committee's
64:10
common    78:21
84:3, 8   125:20
communicate
108:25
communication
127:11   131:25

132:25   133:21
137:2
communications
16:12
communities
31:4   32:13
61:17   62:3, 6,
21   65:5   66:17
80:14   83:5, 14,
19
community    45:2
62:23   65:4
66:9   83:2, 7,
21   84:13, 23
85:1, 4, 6, 9,
11, 16, 22   86:8
86:14
compact    45:2
86:14
Compactness   62:3
company    17:17,
22
compare    62:18
compared   89:13
compensated
14:12, 18
compensation
14:19
competing    91:17
complaint   13:12
126:22   127:17
128:7
completed    16:7
completely   49:7
compliance    2:4
54:17
complied   35:21
54:2   59:16
60:3
complies   54:13
comply    54:7
57:20   59:18,
23   60:14
67:19   68:8
132:5, 20
133:9, 17
Complying   60:19
133:8
compressed   72:8
computer   28:9
94:18, 23
137:16

computer-aided
142:6
computers    94:2
conceded   128:8
concerned   77:5
concerns    66:4
69:3, 4    77:2
80:4
concise   45:2
conclusion   139:8
concur   139:12
concurred   139:11
condensed   101:3
conduct    36:6
114:4
conducted   73:10
81:18   105:14
106:20   109:22
110:5
confederate
122:2
confer   99:17
139:25
confess   126:5
conform   35:19
48:21
congress   24:6
30:15, 19, 22
31:11   32:16
39:10, 17, 22
67:2   70:7
76:3, 20   77:13
86:23   87:9
88:12   90:18
96:14   107:21,
23   114:18
119:9, 11
135:9, 12
Congressional
6:25   23:2
24:3, 8   25:3,
4, 7, 17   27:2,
5, 12   28:22
29:21, 25   30:3,
4, 5, 9, 17, 25
31:15, 24   32:9,
15, 23   33:3, 4,
14, 25   38:23
39:9, 12, 19
40:22   42:3, 10
43:14   44:2
58:24   66:18

67:4, 11, 15, 18
68:5, 6, 7
72:20   73:4
74:20, 22   77:4,
16, 18   78:6
79:10   81:18,
22   83:19   88:9,
15, 24   89:11
90:10, 19   91:9
95:25   108:6,
17   109:13
110:6   112:4,
14   117:3
118:16, 23, 25
128:20   129:5,
16   131:15
132:6   133:24
138:8, 12, 17,
19   139:4
140:12, 24
Congressman
21:17   24:1
29:2   34:1
43:9, 22
Congresswoman
114:15   119:6
conjunction
53:5   80:12
88:12   107:21
conservatives
124:8
consider    44:22
45:1   80:19
85:9   89:10
93:7, 9   95:4
96:9, 19   111:10
considerable
102:3
consideration
91:15
considered
27:25   30:4
35:19   96:24
121:21
considering
123:17
constantly   36:19
constitute
85:22   86:8, 15
constitution
19:11   20:7
54:4, 8   96:13

constitutional
128:21
construction
40:14
consultant
110:20
consulted    111:3
contact    24:1, 2
contained    29:9
101:24
contended    127:5
128:19
content    12:11
contests    54:15
contiguity    62:3
contiguous    86:14
continue    45:10
131:20
continued    45:15,
17
contract    19:13
20:8
contracting
17:24
contractor
16:17    17:11,
16    18:10
contractual
40:13
control    16:18,
20, 21    64:10
conversation
114:20
conversations
35:23    51:22
75:24    123:2
Cooper    17:21
copies    105:6
copy    52:20
core    25:20, 21
26:21    32:25
33:10, 12, 13
44:1    70:16
81:14    119:24
133:2, 24
134:14
cores    26:3
134:18
corner    127:14
correct    10:16
15:25    17:17
21:6, 13, 25

25:9    27:2
33:15, 20    34:9
38:16    45:22
51:10    53:12
57:13    71:8, 11,
12    76:17, 20
80:8    129:3, 10,
18    131:22
132:7    135:20
136:6    139:2
142:7
correctly    26:6
37:10    52:3
76:1    77:22
134:20    137:14
counsel    1:18
2:10, 11    7:6
100:3    104:4
132:2    142:10
counties    82:1,
12, 13    83:12,
22    84:1    85:13,
15    92:9    97:8,
9    127:2
counts    96:15
County    42:6, 8,
9    43:22    44:4,
7, 12    45:3, 4
84:7, 8, 10, 21
91:24    92:7
94:3    95:13
126:16    135:16
136:17    137:12
142:2
couple    14:10
140:9
course    45:8
74:19    105:11
107:6    112:25
COURT    1:1    2:5
7:1, 15    9:2
11:15    36:13
46:11    54:4, 8
62:8    106:24
113:5, 12
128:8    137:20
142:14, 15
courteous    99:23
courtrooms    55:18
courts    36:18
54:4    55:12

102:17
COVID    72:6
COVID-19    36:2
64:17
created    25:3,
17    60:24    61:5
69:15    75:2
119:25    127:2
creation    57:4
criminal    124:6,
9, 14
criteria    106:19
crunch    113:1
curious    67:23
current    18:12
36:13    46:11
65:17    69:2
87:18
currently    19:5
22:23    65:11
cut    116:17
117:24
cycle    22:24
36:16, 23
42:22    45:20
112:8
cycles    112:5

< D >
DAN    5:2    8:14,
17    122:11
Daniel    121:3
125:7
data    24:25
94:23    106:3
107:25    108:3
128:20
date    7:4, 16
36:11    108:2
DAVIN    4:2    8:19
DAVIS    5:10
6:10    8:3
12:19    13:16
35:15, 24    46:1,
7, 16    47:4
48:3    58:2
99:4, 12, 18
100:5    128:1, 3,
5, 11    136:23
140:6, 8    141:1

day    40:13, 15
51:9    79:9, 22
101:4, 7
days    14:10, 11
28:8, 12    79:15
93:23    94:6, 7,
14, 15    122:13,
18
daytime    79:16
DC    3:22    5:6
13:4
deadline    38:11
dealing    32:8
35:20    40:9, 11
75:25
deals    54:10
debate    115:23
decades    131:14
138:16
December    1:24
7:7, 16    142:17
decide    22:18
50:14    103:5
104:6, 14
140:22
decided    20:20
decides    103:1
deciding    104:9
decision    103:16
104:8    115:3
decisions    81:21
deemed    111:25
defeat    119:3
defeated    20:21
defeating    98:10
102:21    134:9
136:9
DEFENDANT    5:9
Defendants    1:12
5:17    7:25
10:6, 11
Defense    3:13,
20    99:24
define    97:17
definition    62:9,
21, 23    85:3, 6,
8, 11    123:14
definitions
63:4, 6
degree    16:11, 12
delayed    35:3
delegation    24:3

democratic   22:9
 24:13   117:20
 121:25   122:8
 123:11   124:4,
 12, 22
democrats   24:11
 123:2, 19
demographic
 74:7, 15   76:13
 94:23   96:8, 25
demographics
 26:11   76:11
 94:9   140:16
denied   102:20
department
 58:23, 25
depends   115:15,
 18
Depo   6:15
deposed   10:23
 13:21
DEPOSITION   1:9,
 19   2:2, 3, 13
 7:12   11:25
 12:13, 15
 13:19   14:5
 27:4   99:6
 141:4, 7
depositions   2:6
describe   82:16
 119:22
determination
 106:16
determine   91:22
 92:14   102:17
 106:23
determining
 106:19
DEUEL   3:18
 8:10
developed   86:5
 107:15, 16
deviation   44:13
 57:10   67:14
 74:21   75:1
 76:14   77:1
 92:10   94:22
 97:1, 7   129:17,
 21, 24   130:5, 8,
 10, 12, 16, 21
 131:9, 15, 20
 133:4   135:19

138:9, 13, 17,
 19, 21   139:1, 2,
 5, 11
deviations
 76:12   77:5
 91:25   92:3
 94:3   95:4, 13
 96:2   130:1
diem   14:15
differ   121:25
 122:8   123:7,
 11   124:4, 23
difference
 76:25   96:3, 5
 124:11
differences
 63:16
different   19:19
 34:21   66:4
 78:18   79:21,
 22   84:5   124:1,
 18   127:9
differently
 66:23
digits   117:2
diminish   98:8,
 14   134:7
diminishing
 136:8
direct   73:24
 132:16
directed   74:1
 107:12   129:5
director   48:14
disagree   115:14
disclosing   12:11
discovery   99:20
discrimination
 125:1
discuss   12:14
 46:17   50:16
 56:23   66:25
 78:5   88:13
 118:9   137:2
discussed   13:15,
 19   46:17
 52:24   63:8
 76:21   82:19, 23
discussing
 77:11   90:1, 17
Discussion
 27:11   46:10

56:5   120:23
 126:4
discussions
 12:12   57:3
dislike   65:6
dissatisfied
 87:9, 15
DISTRICT   1:1, 2
 7:15, 16   18:15,
 17   19:22, 25
 21:20, 21   25:4,
 5, 17   26:12, 16,
 21   27:14, 17
 28:1   29:3
 33:20   42:1, 3,
 10, 12, 21, 23,
 24   43:15   44:2,
 8, 16, 19, 21
 45:9, 14   67:11,
 19   68:5, 8
 69:1, 2   70:19,
 20, 22, 23
 71:10, 15
 95:15   96:12
 97:18   98:4, 11,
 20   103:3, 18
 104:6, 10
 106:21   109:12,
 16   110:5
 113:21   114:2,
 5, 12, 25   115:7,
 11, 15, 18
 116:15   118:22,
 23, 24, 25
 119:16, 17, 19,
 20, 23, 25
 132:7, 12, 21,
 22   133:18
 134:4, 12, 13,
 15, 20   135:2, 6
 136:5, 19
 140:13, 23
districts   25:20,
 21   26:4   27:14,
 25   28:19
 29:10   30:13,
 14, 22   31:12
 32:10, 12   33:1,
 10, 12, 13
 34:16, 19
 38:10, 22   39:4,
 12   54:2, 10, 12,

14   68:6, 18
 69:4, 16   70:13,
 16   71:7   72:19
 74:22   76:12
 81:14   85:15
 90:18, 20   91:9
 93:16   95:25
 97:11, 13, 14,
 15, 20   106:4, 9
 109:19   112:24
 113:2, 5, 7, 15
 115:19   117:2,
 3   119:25
 127:3   129:5
 133:3, 25
 135:4, 10
 139:6   140:16
divide   124:7, 16
division   17:21
doctor   13:6
document   12:9
 52:22   53:1, 3,
 11, 16   55:25
 56:7, 20, 24
 57:4, 8, 17
 58:7   62:14
 75:2
documents   13:9
 58:21   75:9
Dog   43:8, 12
doing   17:7
 79:1   99:4
 108:14   111:20
DORMAN   5:18
 7:24   10:4
 35:24   92:25
 122:14   139:21
dosher@elias.law
 5:7
Dothan   43:15,
 19, 22   45:4
double-check
 51:4   120:4
draft   53:7, 8,
 11   65:8   67:4
 74:11
drafted   53:3
 57:1
drafting   52:21
 53:1   56:19
 57:17   81:18
dragging   99:9

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

draw   21:20, 21
  23:4   24:18, 21,
  23   25:1   28:6
  30:19   31:9, 20
  34:15   44:20
  54:2   96:6
  98:20   107:13
  129:5   133:3
  135:3
drawing   24:7
  27:25   30:13
  31:24   32:23
  33:6   38:9, 15
  39:3   54:10, 12,
  21   89:6   93:10
  108:12, 15
  110:1   128:19
  131:18   134:18
drawn   23:7, 8,
  12, 13, 15
  25:16   28:4, 11
  29:15   31:12,
  15   59:3   65:24
  66:9, 22   69:6
  76:9   88:9, 11
  89:12   93:21
  107:17, 19, 20
  114:19   119:20
  130:7, 12
  133:22   135:11
  138:16   139:5
drew   22:9
  24:9   25:23
  64:11   110:3
  134:13   140:12
drive   43:18, 19,
  21, 22   79:14, 15
dropped   49:7
drosborough@aclu.o
  rg   4:7

dross@naacpldf.org
  3:23
due   91:15
duly   9:5
  142:13
dwalker@balch.com
  5:23

< E >
earlier   56:1, 3

94:10
earth   81:15
ease   60:12
EBENSTEIN   4:1
  8:20
economic   85:18
edges   81:16
education   16:7
  32:9
Educational
  3:13, 20
effect   2:4
  46:13   59:17
effort   129:1
eight   117:2
either   15:10
  73:15   102:18
  109:7   118:10
elect   115:20
  118:14, 21
elected   18:24
  22:16   45:8, 16
  70:10   121:8, 17
electing   98:9
  102:21   134:9
  136:9
election   35:13,
  16   38:14   119:3
elections   19:11
  20:8
electronic   105:6
electronically
  73:16
Elias   5:4   8:15
eliminate   62:20
eliminating
  54:14
Elizabeth   6:3
  8:24
email   14:21, 23
  15:4, 5, 7
  101:23   102:1
  109:4, 5
emailed   80:4
employees   14:15,
  20
employer   17:13
employers   18:1
enacted   105:20
  127:5, 18
encounter   107:5

ended   21:24
  141:7
ends   141:3
engage   37:18
England   113:19,
  23   116:13
  117:19
enrolled   56:13
  62:19
entered   77:24
entirely   61:14,
  22
entirety   62:7
entitled   14:16,
  20
equal   96:13
err   48:11
Escambia   42:6
  44:3, 11
estate   17:8, 20
et   1:6, 10
  7:13, 14   17:16
ethnic   85:17
EVAN   1:6   7:13
evening   80:20
event   137:9
events   40:3
eventually   40:21
everybody   11:16
  13:5   38:4
  54:20   77:25
Everyone's   49:6
evidence   2:14
  75:8
evidenced   142:15
exact   36:10
  50:2   55:4
exactly   28:11
  80:3   99:16
examination   7:8
  9:12   120:24
  125:13   140:6
examined   9:5
examiners   19:13
example   15:8
exchanged   132:13
excuse   129:8
Exhibit   6:14,
  16, 18, 20, 22,
  24   11:24   12:4,
  6   52:14, 18
  55:20, 23

63:18   104:24
  105:2   115:22,
  23   116:1
  119:11, 13
existing   25:20,
  21   32:25
  33:10, 12, 13
  44:1   48:21
  56:12   65:6, 9,
  22   68:2, 11
  70:16   81:14
  119:25   133:2,
  24   134:15
exists   119:2
expect   14:17
  31:2
experience
  22:22   84:13,
  21   124:21
expire   16:18
Expires   142:23
explain   23:10
  41:4   56:4
  66:5   83:16
explained   52:3
  53:14
express   65:16
  88:19   89:20
  90:6
extemporaneously
  92:20   93:12
extensive   35:23
extent   13:22
  131:24   132:24
  133:3, 20   137:2
eye   13:6

< F >
face   126:9
Facebook   15:15,
  23
fact   139:5
factor   92:4
factors   92:2
fair   11:13
  25:22   33:2
  44:14   45:12
  58:9   73:11
fairly   59:3
familiar   81:25
families   84:1
far   100:25

Evan Milligan,et al v. John H.Merrill, et al.                    Chris Pringle
                                                                 12/17/2021

**fast**   101:2
116:25   117:17
118:11
**FAULKS**   4:10
7:22   49:8
120:20   125:8
139:21
**favor**   57:9
124:9
**Federal**   7:4
54:17   60:3
99:11   128:8
**felt**   66:12
**fight**   17:2
**figures**   74:15
**filed**   7:15
13:24, 25
110:14, 15, 16
111:13   126:9,
19   127:17
128:7
**final**   37:12
63:18   119:11
**finally**   37:20
**finals**   37:7
**financially**
142:11
**find**   94:20
**fine**   19:18
130:13
**finish**   11:21,
22   40:14
**finished**   31:25
112:15   120:3,
14
**fire**   16:22
17:4   117:17
118:12
**fires**   17:2, 3
**first**   11:24
13:23   14:4
19:14, 15, 16
21:3   25:4, 15
34:24   35:10,
11   36:7, 11
40:17   44:12
45:19   46:13
108:15   110:4
121:8
**Five**   47:23
**fix**   16:24
**FL**   3:14

**flip**   61:12
116:4
**floor**   41:9, 10,
17   115:22
117:13   132:14
**focused**   99:22
**follow**   31:19
54:20   107:13
108:12, 21
**following**   7:9
31:10   142:16
**follows**   9:6
60:9
**follow-up**   140:9
**fond**   63:6
**force**   2:4
**foregoing**   7:5
**form**   2:10
41:3   84:22
89:21   94:19
95:3   107:8
122:11   128:1,
3, 11, 12
131:23   136:23,
24
**forth**   41:24
**found**   142:16
**Foundation**   4:4
**four**   113:15
**frame**   117:4
**free**   90:5
**Friday**   125:18
**friend**   26:1
**front**   74:6, 7
136:12
**fruition**   90:6
92:22
**full**   2:4   9:16
41:19   96:19
**Fund**   3:13, 20
**FURTHER**   2:1, 8
142:9, 13

< G >
**gain**   67:12
**gap**   121:13
**gathered**   32:17
**General**   5:11,
12   16:17
17:11   24:17
64:9   66:8
67:8   69:11

84:22   87:1, 8,
17   88:20   89:4,
12   113:2
122:22   123:4
124:11   128:8
**generally**   60:9
66:14   123:11,
13   124:4, 5, 23,
24
**General's**   8:4
127:23   130:20
**geographic**   85:18
**getting**   14:14
35:4, 12   96:21
118:11
**gifted**   117:21
**Gingles**   45:1
46:12, 13
61:25   62:2
**give**   37:2
89:3   90:8, 12
91:15   94:24
98:19   108:19
129:20   136:20
**given**   31:8
38:10   41:9
46:16   79:8
105:21   117:3
123:18
**glad**   41:21
109:10
**go**   11:8   41:24
65:21   67:17
71:23   72:17
83:11   84:10
89:17   91:20
96:16   100:9
107:24   120:7
125:25   126:6
**goal**   26:10, 15
48:19
**goes**   15:10
61:24   86:3
**going**   27:21
29:23   33:17
36:1, 5, 25
37:7   41:24
45:25   46:15
48:6   49:11
64:16, 21
67:14   70:23
79:20   84:19

92:11   99:12,
20   100:4
106:15   111:24
117:16   126:6
127:7   131:4,
13   137:18
**Good**   8:16, 17,
18   138:23
**GOTELL**   4:10
7:22
**government**   15:1
19:9   41:8
50:10
**governor**   40:22
41:17
**graduate**   16:8
**great**   98:20
121:14
**grounds**   2:12
131:5
**Group**   5:4
8:15   92:24
102:20
**groups**   94:17
**guarantee**   119:3
**guess**   53:20
63:15   64:1
66:6   67:23
69:3, 20, 25
70:17   83:17
84:11   88:7
98:6
**Guidelines**   6:17,
19   24:20
25:19   26:3, 5
28:16   31:1, 2,
6, 9, 10, 16, 19
32:19, 24, 25
33:9   35:6, 19,
21   36:9, 12, 15,
18, 22, 25
45:22   46:3, 9
47:14   48:20
51:9, 12, 18, 25
52:2, 7, 19
53:7, 25   54:19
55:1, 14, 24
56:6, 24   57:7,
19   58:5, 8, 10,
13, 15   59:4, 7,
12, 14   60:1, 5,
23   61:4   62:19,

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

20   63:18   64:9,
10, 24   70:15
81:13   86:7
91:11, 16, 18,
21, 23   104:14,
19   107:13
108:12, 21, 24
129:6   133:2, 7,
9, 14, 23
138:14, 18, 25
Guys   16:22

< H >
Hale   82:15
Hall   37:25
38:3   80:13
handed   54:5
55:13
handful   50:3
55:3
handing   36:19
handle   64:16, 20
handout   6:19
55:24
handwritten   75:8
happen   30:2
45:24
happened   39:1,
13   40:2, 6, 17,
20, 24   41:13
51:24   64:5, 13
75:17, 21
80:22   81:1, 6
112:8
happens   94:17
happy   39:5
70:9, 17   71:13,
18   86:22
87:17   88:20
89:5   90:2
92:12   99:16
hate   47:21
71:17
head   45:23
health   20:7
hear   46:5
47:9, 10   49:17
79:16   120:22
126:8   128:2
heard   64:25
86:20   92:18,
21   102:7, 8

112:11   131:10
134:1
hearing   68:22
77:15, 22
99:18, 21
104:21   134:20
hearings   32:8,
18   35:5   36:1,
2   37:17, 19, 22,
24   38:1, 3, 6,
16   39:13
64:16, 17, 20
67:24   68:12,
24   70:2, 6
71:21   73:13
75:17, 25
76:19   77:8, 19
78:1   79:5
80:22   81:6, 19,
23   82:20
86:17, 20   88:8,
25   90:10, 14, 16
held   17:20, 24
27:11   64:25
65:20   66:1, 15
72:4, 12   78:10
79:9   120:23
help   30:19
99:17   135:4
helpful   61:19
helping   23:4
Henry   43:22
45:4
Hi   8:14
higher   20:20
highest   16:6
highlights   54:16
Hinaman   23:24
24:7   30:18
31:8, 18   32:16
33:6   38:20, 24
39:9, 16   75:20
76:18   77:4, 9
88:11, 14, 19
90:9   107:12
108:9, 12, 20
109:1   114:17
117:11   118:2,
8, 10   129:4, 22,
23   130:4, 6, 15
131:21   133:1

135:8, 25
139:10   140:11
hired   24:6
110:20, 22
historical
85:18, 25
102:23
history   25:5
123:18   139:3
hit   43:8
Hogan   3:6
hold   64:21, 23
67:24   70:1
124:18
holding   38:6
68:24   80:19
81:23
homebuilder
16:17   17:10
honest   25:10
hope   17:3
99:13   125:14
139:17
hour   12:21
hours   12:21
78:10, 14, 18,
20   79:2   99:11
House   18:2, 14,
17   19:9   20:22
21:11   22:14,
17, 20, 22   23:9,
14   30:12
32:10, 12
35:12, 17
38:21   39:11
41:7, 11   43:14
44:6, 21   51:21
72:11, 18, 19
98:2   101:13
houses   17:11
Houston   45:4
huh   60:20
hunting   17:11
Huntsville
43:18, 21

< I >
idea   87:17
ideal   43:24
identification
12:7   52:15

55:21   104:25
116:2   119:14
identities   85:19
imagine   36:24
immediately
37:21
impact   78:23
79:3
implementing
123:16
importance   89:6
98:5
important   11:19
60:17, 18, 20
89:11   92:2, 4,
7   93:10   98:6
114:13
inaccurate
105:9   116:8
include   85:12
140:12, 15
included   80:17
includes   85:17
including   40:22
Incorporated
17:22, 25
increase   42:23
increases   119:21
incumbent
134:24   135:4, 6
incumbents   31:4
33:1   54:13, 15
134:22
independently
139:8
individual
38:21, 22
individuals
123:17   125:1
influence   88:8
informal   104:18
information
32:17   38:9
87:21   88:4
94:3, 24   95:5
96:25   97:1
101:14   112:2
135:23
informed   126:18
129:7
initial   37:5, 9,

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

*11* 110:2
**injunction** 99:21
**input** 30:21
  31:14   52:1
  65:4   72:7
**instruct** 33:7
  46:15   140:11,
*15*
**instructed** 31:9
  92:25   133:1
**instructions**
  90:8, *12*   108:9,
*19*   140:20
**intact** 44:2
  81:14
**intentionally**
  102:18   134:7
**interest** 31:4
  32:14   45:2
  61:18   62:4, *6,
20, 21, 23*   66:9
  *83:2, 5, 7, 15,
20, 21*   84:*14,
23*   85:*2, 4, 6,
10, 11, 16, 22*
  86:9
**interested**
  91:11, *13*
  142:11
**interests** 62:22
**interjected** 79:9
**internal** 19:12
**interpret** 71:17
  138:*20, 21*
**interpreted**
  139:1
**interrupt** 27:8
**intervenor** 7:25
**intervenors**
  10:13, *14*
**introduce** 11:24
  52:17   55:23
  94:21   105:2
  115:21   119:10
**introduced** 14:1
  28:8   41:*2, 6*
  93:23   94:10
  95:9   97:25
  98:2   137:17
**involved** 16:2
  21:*6, 15*   22:24

  31:23   131:12
**involvement** 23:4
**issue** 106:5, *10,
14, 18*   107:1
  122:24   123:5
**issues** 13:7
  49:10   107:6
  122:25   123:7
**its** 82:10
  89:5   135:19

**< J >**
**JAMES** 4:18
**January** 22:1, *5*
  37:*6, 11, 12*
**JEFFERSON** 142:2
**jerrymandered**
  119:18   127:*6,
20, 25*   128:10
**jerrymandering**
  128:22   129:*2,
10, 12*
**JIM** 5:10, *17*
  8:*1, 3, 22*
  125:11   127:9
  128:*2, 3*   131:4
  140:7
**jim.davis@alabamaa
g.gov** 5:15
**JOHN** 1:10   5:9
  7:13   8:5
**jublacksher@gmail.
com** 4:22
**JULIE** 4:1   8:20
**jump** 126:5
**jumping** 11:23
  41:23
**justice** 58:23
  59:1   124:*6, 9,
14*

**< K >**
**KAITLIN** 4:9
  7:20   9:*9, 14*
  116:5
**KATHRYN** 3:11
  8:8   47:9
**keep** 26:11, *15*
  41:23   44:15
  49:11   70:*7, 13,
20, 23*   71:9

  81:13   130:*10,
16*
**keeping** 26:20
**keeps** 47:11
  83:19
**kept** 44:*1, 2*
  71:*4, 5*
**key** 11:8
**kicked** 76:8
**kin** 142:10
**kind** 74:19
**kinds** 77:12
**knew** 27:19
  68:*5, 25*
  111:*11, 13*
  131:8
**know** 11:*5, 10*
  13:1   16:21
  20:5   23:18
  24:*9, 11, 15, 17,
22, 25*   25:*5, 10,
11, 19, 23, 24*
  26:*8, 13, 14, 19*
  27:*13, 16, 24*
  28:*16, 17*   30:2
  35:1   36:*23, 25*
  43:2   48:10
  50:18   52:8
  53:*5, 19*   55:*10,
16*   56:9   57:*3,
6, 9, 16*   60:*13,
23*   61:*4, 22*
  62:*4, 9, 13, 24*
  63:*1, 9*   65:1
  66:7   67:13
  69:5   70:21
  74:1   75:4
  76:7   78:*9, 17,
24*   81:*2, 17, 21*
  83:*12, 19, 20,
22, 24*   84:*6, 9,
24*   85:*3, 23*
  89:15   92:*13,
15*   93:*8, 15, 19*
  95:*20, 22*
  96:*11, 25*   99:5
  102:*1, 24*
  103:*5, 22*
  104:*13, 18*
  105:*13*   107:*22,
25*   108:4
  110:*4, 10, 12,*

  *17, 20, 22*
  111:*17, 20*
  112:*3, 13*
  115:*2, 6, 16*
  116:21   117:*8,
25*   123:15
  124:8   129:11
  131:8   136:12
  138:*15, 22*
**knowledge** 112:6
  130:17   139:3
**known** 78:1
**ksadasivan@naacpld
f.org** 3:16
**kwelborn@aclualaba
ma.org** 4:15

**< L >**
**laid** 37:21
**lands** 85:14
**Large** 1:22
  7:3   65:5
  119:19   135:20
**late** 35:4
  117:18
**LaTISHA** 4:10
  7:22
**law** 1:22   3:*5,
12, 19*   4:*3, 11,
19*   5:*3, 4, 19*
  8:*15, 25*   35:*20,
22*   36:*13, 17,
21*   37:1   41:5
  46:11   48:22
  54:25   55:*15,
18*   57:21   60:*3,
14, 19*
**laws** 2:5   54:18
**lawsuit** 10:6
  13:24   110:*14,
15*   111:12
  113:16   126:*9,
15, 25*   127:*4,
23*   128:19
  140:9
**lawsuits** 16:3
  105:18
**lawyer** 10:*1, 3,
5, 18, 21*
**lawyers** 63:5
  131:3

lay 31:2
laying 36:3
LDF 8:9
leadership 22:9
leading 2:11
League 66:24
  69:9 77:21
  78:1, 6 87:3
  88:17, 25 89:8,
  14, 24 98:1
  126:12, 14, 15
  135:16 136:3,
  17 137:11, 15
  138:4
LeAnn 1:21
  7:1 142:22
learn 86:16, 19
learned 88:8, 13
leave 20:19
  120:6
leaving 22:21
  106:22
left 18:25
  121:9
Legal 3:13, 20
  63:4, 6 104:4
legislative
  14:14 15:2, 11
  26:3 30:13
  34:16, 19
  36:22 57:13
  66:21 74:19
  75:25 93:17
  109:19 117:2
legislators
  28:18
legislature
  18:13 19:15
  21:5 23:16
  26:7, 11, 19
  27:24 28:7, 9
  29:20 34:7, 8
  39:7 83:17
  84:15 94:20
  121:7, 13, 24
  122:7, 21
  123:10, 19
  124:3, 21
  128:21 132:15
letter 37:25
letting 96:4
level 16:6

Liberties 4:4,
  12
license 17:20,
  24
licensed 16:16,
  17 17:10
  142:14
liked 67:1
  70:6
line 43:9, 10,
  12 71:10
  91:21, 23 92:20
lines 54:21
  65:23 71:6
  81:9, 22 123:21
links 79:5
Linwood 4:20
list 31:5
  38:4 80:13
listen 72:17,
  21 79:17
  137:18
listened 72:19,
  23 79:9 87:23
  89:7
litigation 121:4
little 23:3
  27:9 66:7
  84:3 99:22
live 65:5
  70:19, 22
living 17:5
LLP 3:6
location 79:15
locations 72:7
log 79:12
  80:18
logged 79:7, 25
long 12:20, 22
  18:6, 9, 22
  86:4 99:5
  111:17 121:6
  139:22
longer 99:16
longstanding
  26:6
look 29:14
  31:3 54:11
  66:25 76:11
  95:6, 12, 13, 14
  96:18, 23
  112:19

looked 31:25
  74:21 94:4
  97:6 106:4, 9
  107:17, 18, 22,
  25
looking 85:8
  91:11, 14
  106:18 107:14
  136:13
looks 56:1
  61:21
Los 3:8
lose 67:13
lost 42:8
  127:12
lot 44:20
  45:3 68:14
  78:17 99:18,
  19 102:11
  125:20
Lovells 3:6
Lowndes 82:15
lunch 120:16
  139:22

< M >
ma'am 12:10
  21:23 22:6
  24:12, 24 25:2
  26:24 33:16
  35:9 38:17
  39:20 42:13,
  15, 17 44:17
  46:24 47:2
  48:18 51:15
  52:8, 12 53:2
  56:2, 18, 21, 25
  57:2 61:3
  62:12, 25 67:6
  72:14 73:8, 22
  75:15, 22 80:9
  81:20, 24
  84:16 86:2
  87:15, 19
  90:20 92:6
  93:18 94:15
  101:6 102:25
  107:20 108:1,
  7, 17, 18 109:5,
  15, 17, 20, 24
  110:19 111:19

112:20 114:10
  115:1, 5, 9
Macon 83:11
  84:8
magic 119:2
maintain 26:3
  119:24
maintained
  134:14
maintaining
  134:18
major 122:23
  123:5, 22
majority 25:4,
  16 28:19
  29:10 69:15
  90:17, 19 91:8
  93:15 95:24
  97:11, 12
  115:19 132:7,
  12, 21, 22
  133:6, 12, 18
  134:4, 11, 19
  135:1, 5 136:5,
  19 140:13, 23
makeup 27:14,
  16 42:12 95:14
making 36:12
man 59:24
  67:19 68:8
  96:17
manner 31:10,
  21 133:23
map 6:25 23:2,
  4, 21 24:10, 18
  25:3, 6, 7, 16,
  23 27:13 28:6,
  22 29:9, 21
  30:4, 5, 17, 25
  31:24 32:23
  33:3, 4, 7, 14,
  25 38:23
  39:19 40:22
  54:20 65:13
  66:24, 25 67:5,
  15, 22, 25 68:2,
  11, 13 71:1
  73:4 77:4, 7
  78:2, 6, 7
  81:18 83:19
  84:12, 15 88:9,
  11, 24 89:6, 8,

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

11, 14    90:10,
13    93:11, 15
95:24    96:3, 7,
25    108:6, 15,
17    109:13
110:2, 6
112:14    114:18
119:11
maps    23:7
24:8, 23    25:1
27:18    28:4, 11
30:19, 25
31:15, 20
32:10    38:15
40:21    57:13
66:8, 22    67:2
69:6    74:6, 9,
11, 12    80:23
81:22    91:17
97:11    100:20
101:16    108:13
109:22    110:25
111:1, 6, 8
112:4    118:16
Marengo    82:15
83:11
margins    70:21
mark    95:25
97:2
marked    12:7
52:15    55:21
104:25    116:2
119:14
marks    7:11
Maroney    1:21
7:1    142:22
materials    46:25
60:10    101:17
math    103:11
matter    7:13
112:25
McCLENDON    5:17
8:1    12:19, 23
13:3, 17    35:24
46:2, 8    47:5
48:3    51:17
58:2    61:11
74:2    80:10, 23
81:4    106:1
107:4    108:11
113:19, 25

114:8
McDonald's    79:18
mean    15:20
19:1    27:18
30:10    33:9
36:18    38:19,
24    43:5    44:18,
20, 25    45:5
50:10    51:11
54:8, 10    59:19
65:9, 13    66:5,
17    70:8, 12, 18
71:18    73:9
74:9    77:14, 17
78:25    79:12
83:24    86:18
87:1, 22    91:13,
15    95:17
98:17, 25
99:10    100:22
101:21    105:15
107:9    113:13
114:16    115:17
116:21    122:4
130:9    134:11
Meaning    87:10
139:2
means    9:9
23:11    107:2
108:14    109:6
134:13    139:11
meant    116:22
134:19    135:5
media    15:14
38:5
meet    12:20, 24
32:16    91:17
meeting    38:21
39:3, 14    46:17,
18, 20    47:1, 12
48:16, 23
50:15, 19    51:5,
6, 19, 23    52:1,
2, 9, 11    53:17,
20    56:14    58:5
63:7, 10, 17
64:2, 5    69:13
72:5, 14    73:10
77:3    78:4
79:7    80:2
87:2    88:16
89:15    91:4, 6

100:17, 19, 21
101:5, 11, 15,
24, 25    102:4
105:4    109:14
111:23    137:17
meetings    36:4
38:8    40:1
47:16, 19, 24
48:2, 19    49:1
50:6, 21    51:1,
2, 16    64:23
65:3, 15, 20
66:1, 12, 13
67:5, 7    69:18
70:6    72:3, 16
73:7    74:5, 8
75:6, 14, 21
76:15    78:9, 23
79:20, 21    80:8,
14, 17, 19
82:23    87:11
88:3, 14, 15
92:24
meets    50:11
member    20:17
21:10    22:20
31:13    39:21
48:6    56:11
58:3    88:11
94:20    96:14
103:24    104:2
121:15, 18
140:18
members    22:16,
17    24:3, 6
30:12, 18, 21
31:11, 22
32:11, 16
37:23    38:21
39:3, 4, 10, 16
41:11    51:21,
25    52:4, 7
53:10    54:22
56:17    67:1
70:7    71:4
73:23    80:12
87:9    88:12
100:21    101:12,
13, 17    107:21,
23    114:17
119:9    121:24
122:1, 7, 8

123:10, 12
124:1, 3, 5, 12,
13, 17, 18, 22,
23    135:9, 12
memory    24:4
137:14
mention    133:6
mentioned    21:1
33:18    45:19
63:7    65:25
70:5    90:21, 23
94:22
MERRILL    1:10
5:9    7:14    8:5
140:8
met    12:14
39:9, 16    40:6
49:23    57:18
91:11, 16
107:23    135:9
method    24:17
MICHAEL    3:4
8:12
michael.turrill@ho
ganlovells.com
3:9
microphone    27:9
middle    37:15,
21    61:14    82:9
MILLIGAN    1:6
3:3    7:13    8:9,
10, 13, 19, 21
9:1, 15    120:13
mind    80:4
mine    26:1
106:3
minimal    138:19
139:1
minimum    139:11
minor    16:13
minorities
118:14, 20
minority    21:10,
12    25:16
69:16    93:16
95:24    97:16,
21, 23    98:5, 9,
13, 22    102:21
115:19    119:3
134:8, 15
minute    28:12

39:3, 23
minutes   12:21
missing   72:2
Mobile   18:15,
21   42:5   43:7,
13, 19   44:3, 7,
10   45:3   83:24
84:1   125:15, 18
moderator   73:8
Monroe   42:6
44:3, 11
Montgomery   1:23
4:14   5:14, 22
125:17
monuments   122:2
morning   8:18
136:13
motions   99:7, 25
motivation   34:12
move   27:9
68:17
municipalities
85:14

< N >
N.W   3:21
NAACP   3:13, 20
name   9:13, 16
15:22, 24
82:10   93:1, 5
121:2   142:16
names   7:19
NE   5:5
necessarily
84:20
necessary   2:9
67:21, 24
68:23   111:25
116:17   117:8
need   16:24
54:23   63:13
68:17   90:17
99:8   113:4, 10,
13   114:7   115:7
needed   22:21
54:25   57:20
68:7   76:16
130:4, 21
131:19, 20
134:19   135:1, 3
needs   99:21
neither   142:9

neutral   54:11
107:14
never   15:22
29:17, 19
103:13   112:11
121:18   129:9
New   3:15   4:6
46:11   67:13
80:23   128:19
night   79:25
125:15, 19
nine   41:20
nitty-gritty
66:7
nods   45:23
nonminorities
115:20
nonpartisan
22:15
normal   53:6
North   142:23
NORTHERN   1:2
7:16   84:1
Notary   1:21
7:2
note   116:8
notes   52:10
75:5, 7, 12, 13
101:22
notice   6:15
11:25   37:22
101:20
noticed   14:8
99:7
notification
101:25
notifying   101:23
November   38:11
115:23
Number   7:14
12:4   47:21
50:2   67:14
76:16   91:2, 24
98:6   113:20
118:3   119:2
142:16
numbering   12:2
numbers   35:4
37:6, 11, 13, 15,
19, 20   69:9, 16,
22, 24   68:4, 17,
19, 24   69:5, 7,

22, 24   70:2
76:5, 14   96:8,
18   97:4
numerous   66:23
123:1

< O >
oath   9:20
Object   128:1,
11, 12   131:4
132:23   136:23,
24
Objection   107:8
122:11   128:3
131:23   132:8
133:19   134:5
objections   2:9,
12   100:4, 7
obligation
40:13   128:21
obtain   16:11
occasionally
76:2
occur   38:14
46:20   67:7
occurred   41:20
48:17   67:5
o'clock   50:11
October   39:15
40:6, 18   50:20
51:2   100:16
105:4   109:14,
23
offered   2:14
Office   5:12
8:4   18:23
20:19, 21, 24
23:13   28:7
35:25   46:7
48:8   76:10
93:22   109:3
127:23   130:20
137:4
offices   1:22
official   88:5
121:18   137:15
Oh   127:13
okay   9:10
10:12, 16   11:4,
23   12:20, 23
13:9, 12, 23
14:3, 9, 21

15:13, 19, 23
16:2, 6, 14, 24
17:15, 23   18:1,
6, 9, 19, 22
19:3, 14, 17, 22,
25   20:10, 13
21:1, 12   22:2,
4, 7, 15, 18
23:6, 15, 25
24:13   25:14,
22   26:2, 8, 14,
25   27:12, 20
28:17   29:4, 16
30:2, 20   31:17,
22   32:2, 4
34:2, 11, 22
36:7   38:18, 23
39:12, 24
40:16   41:4, 15,
21   42:7, 11
43:3   44:5, 9,
18   46:19
47:25   48:2
49:1   50:5, 17
51:3, 13   52:25
53:15   56:23
57:6, 16   59:2,
13, 25   61:7, 9,
20   63:3   64:4,
18   68:3, 9, 23
69:25   70:5
71:20   72:3, 15
73:9, 11, 17, 23
74:14, 24
75:12   78:13,
22   80:6   82:4
86:3   87:16, 20
92:1   93:7
94:16, 22   95:5
96:5   97:5, 10
98:3, 24   99:3
100:25   101:8
102:3   103:15,
21   104:13
105:19, 22
107:5   109:4, 9
111:7   112:13,
19   113:9, 15,
17   116:11
117:7, 12
121:11   123:9
124:2   125:4

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

126:18   127:12,
22   128:24
129:14   130:9,
13   131:18
132:3   133:5,
12   135:15
136:2   137:18
138:2, 18, 23
139:7
old   57:19
79:15
Once   31:25
90:25   94:16
112:10
ones   19:7
20:4   63:10
74:22, 23
111:25
operating   65:12
101:6
opinion   69:21,
23   84:22
89:20   90:4, 7
92:5   93:10
114:9, 24
115:1   131:3
opinions   66:8
69:6   124:1, 19
opportunities
79:12   80:16
opportunity
97:14, 18, 20
122:22   127:2
134:21
opposed   123:5
option   111:10
oral   7:8
order   38:12
54:2   67:19
68:8   75:1
92:9   98:20
132:5, 19
OSHER   5:2   6:8
8:14   27:8
46:5   120:22,
24   121:3
122:14, 19
125:4
outcome   43:24
outside   28:6
93:22   94:5, 17

95:9
overall   97:7
overnight   125:18
overpopulated
67:11   74:23
overpopulation
68:18
oversaw   32:7
oversight   19:12
Overton   48:12
overview   37:2
overwhelmingly
45:11, 17

< P >
p.m   100:15
120:9, 12
140:2, 5   141:5,
7
P.O   4:13
PAC   15:8
PAGE   6:13
15:15   105:24,
25   113:18
116:4, 16
Pages   61:12, 19
paid   41:21
Paige   6:2
paper   39:22
89:21   92:17
parameters   54:1
part   32:24
62:22   64:24
66:2   84:24
87:22   92:24
95:19   110:25
119:19   130:6
participate
39:25   71:21
particular
62:10, 13
83:22   92:24
103:3, 17
106:21   114:12
118:21, 23
137:3   140:16
particularly
102:17
parties   1:18
2:11   122:23
123:23   142:10

partisan   62:20,
22
parts   38:2
83:15
party   21:10, 13
24:13   117:20
121:16, 19, 25
122:1, 8, 9
123:5, 6, 11, 12
124:4, 5, 12, 13,
17, 22, 24
passed   22:10
27:18   38:12
40:21   41:7, 8,
11, 17   52:4
58:22   105:17
111:2, 6, 9
126:10
passing   111:22
Paul   9:18
paying   10:17, 21
people   13:21
45:9, 10, 16
65:5, 16   66:11,
22, 23   67:1, 10,
12, 17   68:7, 11,
17, 25   69:1, 3,
4, 12, 17   70:6
71:1, 13   73:14
74:18, 25   76:2
78:13, 17, 19
81:10   84:3, 7,
8, 9   86:21
87:10   89:7, 19
90:1   92:12
97:25   117:22
122:5
people's   66:3
percent   26:15
42:16, 21, 24
57:9, 23   97:15,
21, 22   98:4, 11,
12, 21, 22
113:20, 22
114:3, 6, 12, 25
115:3, 6, 12
116:18, 19
117:5, 25   118:3
perform   111:17,
24
performed   104:1

period   69:6
72:8   79:13
permanent   87:22
Perry   82:15
83:11
person   11:20
16:25   71:23
72:10   96:15
109:5
personal   14:24
15:11, 13, 17,
23   26:1   84:13,
20   90:7
personally   83:20
PI   99:7
picked   39:22
piece   89:21
92:17
pit   31:4   33:1
Plaintiffs   1:8
3:3   4:17   5:1
7:21, 23   8:9,
11, 13, 15, 19,
21, 23   9:1, 15
10:6   120:13,
15, 20   121:3
125:8
Plaintiff's
6:14, 16, 18, 20,
22, 24   12:4, 6
52:14, 18
55:20, 23
104:24   115:23
116:1   119:10,
13
plan   24:21
25:8, 13, 25
27:2   42:9
43:6   58:24
65:6, 9, 11
69:15   77:16,
20   79:10   87:4,
5   91:10   93:21
94:5, 8, 10, 12,
16   95:4, 6
96:1, 4, 9, 18,
19, 24   97:7
107:15, 16, 19,
20   114:15
119:7, 8   120:1
126:10, 16
127:1, 5, 18, 24

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

128:9, 20
129:17, 23
130:2, 7, 15
131:19   132:6,
20   134:19
135:11, 16, 18
136:4, 17
137:12, 16
138:8, 12, 19
140:12, 24
planning   34:24
plans   22:9
27:5, 6   31:3,
7, 9   38:12
40:8   58:22
64:11   65:22
76:5, 8   77:6
107:14   130:1,
11   133:22
play   28:6, 14
29:24   46:12
104:9
please   7:18
9:3, 16   118:19
137:21
pleasure   139:16
plus   18:8
point   25:6
30:5   32:22
33:3, 8   34:16
39:1   40:7
64:12   88:15
93:16   94:1
95:6, 7   97:10
99:16   105:14
109:22   116:24
118:6
points   69:13
77:15, 23   87:3,
6   88:17   89:1,
16, 25   92:14,
18, 21   93:9
117:14, 17
118:7, 9
132:10, 13
135:17, 24
136:2, 11, 15,
16, 22   137:5
polarization
102:4, 11, 15
103:2, 17
104:7, 10, 15

105:14, 17
106:7, 8, 12, 13,
20   109:12, 18,
21, 25   110:5,
18, 25   111:8,
18, 21   112:3,
14, 24   113:24
114:1, 5   115:4,
8, 12   116:14
Policies   123:16
political   16:13
85:12   123:21
politically
86:14
population
26:16   42:22
65:22   76:11
95:3, 12, 18
96:11   97:23
98:5, 12, 13, 22
102:8   113:21
119:21
populations   96:2
portion   18:19
82:17   102:3
possible   27:9
39:2   69:21
92:9   107:5
117:1   133:3
possibly   49:10
106:4, 9, 14, 18,
25
potentially
136:7
practicable
81:15
precincts   85:13
preclearance
112:10
precleared
58:25   59:21
112:11
predominantly
85:23
prefer   19:21
preference
123:16
preliminary
99:21
prepare   12:13
51:6, 14   74:4
100:18   106:23

prepared   67:5
93:8   118:7
PRESENT   6:1
7:18   66:24
73:6
presented   29:17
63:17   68:11
119:8   135:11
137:11, 23, 25
138:3, 7
preserve   32:25
33:9   133:24
press   80:17, 23
pretty   25:12
60:20   63:5
99:22   123:20
prevent   9:22
previous   112:5
previously
21:18   42:21
primarily   38:24
73:12   80:10
primary   26:10,
15
principle   60:8
PRINGLE   1:10,
20   5:17   7:7,
12   8:2   9:4,
13, 18   17:25
125:14   126:3
127:16   131:11
133:5   139:14
140:7   141:4
prior   2:14
22:20   26:4
40:13   52:1, 8
56:11, 13, 22,
24   58:5   81:18
95:25   100:21
109:13   111:21
priorities   33:25
prioritize   54:23
priority   33:19
prison   40:11
prisons   40:9
private   14:24
privilege   63:14
127:8   131:5
132:9
privy   114:20
Probably   35:1
136:13

Procedure   7:5
99:11   101:7
proceedings   7:9
142:5, 8
process   21:6, 9,
24   22:13, 25
26:10   28:18
29:25   30:9
33:18   34:24,
25   35:18   36:3,
25   37:3   41:19,
25   46:13   57:16
64:14   66:2
93:17   96:17
101:3   105:15
107:7, 11
produced   43:6
68:13   77:20
80:13
program   94:23
project   40:14
prompted   89:17
property   43:9,
10, 11
Proposed   6:19
37:24   51:11
52:6   55:24
56:13   57:19
61:15   63:8, 10,
16, 22   77:6
93:16, 19
100:20
protect   33:19
34:1, 9   45:6
70:15   98:9
133:2   134:22
135:4
protected   29:2
102:20   134:8
136:8
protecting   43:4
44:19   135:6
protection   96:14
provide   101:17
105:5
provided   55:5
56:7, 9
Public   1:21
7:2   19:12
20:23   32:7, 8,
17   35:5, 25
36:1   37:16, 18,

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

22, 24    38:1, 3,
5, 16    39:13
   41:1   64:11, 15,
16, 20, 23   65:2,
15, 19, 21, 25
   66:12   67:5, 7,
24   68:12, 16,
21, 24   70:2, 6
71:20   72:3, 16,
25   73:7   74:4
75:6, 14, 17, 21,
24   76:14, 19
   77:3, 7, 8, 12,
15, 19, 22   78:1,
23   79:4, 5, 6
   80:22   81:6, 19,
23   82:20, 22
86:17, 20   87:1,
8, 11, 17   88:8,
14, 20, 25   89:4,
12   90:10, 13,
16   92:23   122:2
**publicize**   36:6
**published**   38:4
**pure**   69:5
**purpose**   16:23
   65:2, 15   102:18
**pursuant**   7:4
**put**   28:9   31:6
   41:9   47:21
   54:25   88:1, 5
   89:18   90:3
   94:2, 18   116:5
**putting**   54:13

< Q >
**question**   10:10
   11:10, 12, 13,
23   25:11
   40:19   53:23
   57:5   63:13
   66:5   70:25
   73:2, 15   80:21
   86:10   93:13
   98:16   103:23
   106:2   118:18
   119:1   124:20
   127:9   130:3
   132:3, 23
   133:8, 16
   134:2, 23

137:19, 21
138:10
**questions**   2:10,
11   9:23   11:9,
21   72:24
73:13, 18, 20,
24   74:2   80:4
117:22   120:14,
15, 21, 25
125:9   126:2
139:15   140:10
141:2
**quick**   121:1
**quicker**   43:18,
20
**quickly**   33:17
   41:25   49:10
   92:11
**quit**   17:7
**quite**   86:3
117:21
**quote**   80:24
**quoting**   133:1

< R >
**race**   27:25
   54:11, 12
107:10, 14, 16
108:5   110:3
123:17
**race-neutral**
   31:10, 20
108:15   133:23
134:16, 18
**races**   75:25
131:15
**racial**   26:11
   27:13, 16
42:11   85:17
95:14   102:4, 8,
10, 14   103:1,
16   104:7, 10,
15   105:13, 17
106:5, 6, 7, 10,
12, 14, 18, 19
107:1, 6
109:11, 18, 21,
25   110:4, 17,
25   111:8, 18,
21   112:3, 13,
23   113:24
114:1, 5   115:4,

8, 12   116:14
128:22   129:2,
10, 12
**racially**   119:18
127:6, 19, 24
128:9
**ran**   45:11
**Randy**   23:24
38:20
**range**   119:5
**ranking**   20:16
21:10
**rapid**   117:17
118:12
**rapidly**   116:25
**reach**   131:3
**reached**   139:7
**reaches**   95:2
**read**   31:1
51:11   60:4
61:18   69:14
74:8   77:24
87:4   88:17
92:19   101:14
106:15   126:21
132:14   137:21,
22   139:13
**reading**   2:2
41:9   87:3
92:17   118:5
137:5
**readings**   139:12
**reads**   89:16
**ready**   38:13
99:24
**real**   17:7, 20
**really**   11:19
33:17   34:11
41:25   69:25
77:18   83:12
99:9, 14, 15
116:23   118:18
119:1
**realtor**   16:16
17:15   18:5
**Reapportionment**
6:17   19:10
20:5   21:2
23:13   28:7
30:8, 10, 24
31:13, 23   32:6
35:20, 25   36:8,

13   39:14   40:5,
18, 23   45:21
46:7   47:13
48:7, 8, 15, 22,
24   49:2, 22, 23
50:6, 7, 13, 19,
22, 25   52:18
53:10, 15
55:14   56:17
58:3   76:6, 10
80:7   83:18
85:5   93:22
100:17, 23
102:2   103:25
104:3   105:3
109:2   128:25
129:1, 16
132:19   139:4
140:19
**reason**   21:22
28:5   58:20
59:8, 25   60:15
62:5   65:19
96:16   105:8
108:23   116:7
**reasonable**
44:23, 24
**reasons**   54:18
59:13
**recall**   27:22
36:7   47:17, 18
49:24   51:7, 21
54:24   55:2
57:15, 25   58:6
63:20   64:6, 7
66:3   75:18
76:23   77:11
78:7, 8   82:19
86:24   89:2
90:11, 15, 16,
22   104:17, 20
133:14
**receive**   14:19
37:5
**received**   135:22
137:3
**receiving**   70:10
**Recess**   49:14
100:13   120:10
140:3
**recognize**   55:25

Evan Milligan,et al v. John H.Merrill, et al.                    Chris Pringle
                                                                12/17/2021

**recollection**
14:3   26:18
28:20   29:1, 7
47:6   132:16
138:1
**record**   9:17
27:11   49:13,
16   64:11
77:24   87:4, 23
88:1, 5   89:18
90:4   95:17
100:9, 12, 15
116:6, 8   120:7,
9, 12, 23
137:22   140:1, 5
**recordings**   50:23
**records**   50:23
**Rector**   3:14
**redistricting**
11:3, 5   16:3
21:6, 9, 16, 24
22:8, 12, 24, 25
26:9   29:25
30:9   33:18
34:23, 25
35:21   36:16
37:3   40:16, 17
41:2   42:22
45:20, 21
46:10   47:14
52:19   54:5
64:14   66:2
96:12   107:7,
11   112:5
129:17   131:13
132:6
**redrawing**   24:8
**Reed**   25:8, 13,
22, 24   42:9
119:20   120:1
**reelect**   45:17
**reelected**   35:12,
16   121:9
**re-elected**   18:25
**reelection**
45:11, 14
134:22   135:13
**refer**   19:16
25:12   27:5
102:5, 10
126:12
**referred**   25:24

**referring**   27:5
69:9   106:6
108:9   117:8
118:1   126:10
**reflect**   55:15
**reform**   124:6, 9,
14
**refrain**   100:4, 6
**refresher**   11:9
**regarding**   40:16
**regardless**   69:7
**region**   82:9
**register**   79:19
**regular**   50:5, 8
**related**   78:6
79:1
**relating**   2:5
**relationship**
115:2
**relay**   77:2, 9
**released**   79:5
**releases**   80:17
**rely**   58:12, 21
**remained**   45:13
**remedy**   128:22
129:2, 9
**remember**   14:7
20:4, 9   26:5,
17   32:3   35:7
36:10   37:10
42:11   46:1, 6,
24   48:3, 16
49:4, 5, 25
50:2   52:3, 6
53:18   55:4
58:24   59:9
60:5, 6   64:3
72:2   73:3, 5,
25   74:3   76:1
77:10, 21   78:4
82:25   87:8, 14
88:22, 23
90:24   91:2, 5
94:9, 12   97:12,
13   98:1
100:18, 25
101:2   112:7, 9
114:23   116:23
117:17
**remembered**
59:11   87:23

**remodeling**   17:12
**remotely**   72:9
**removing**   122:2
**repeat**   18:16
118:19
**repetition**   99:19
**Reporter**   7:1
9:2, 7   11:15
16:20   97:22
100:6   137:21
142:15
**Reporting**   142:14
**represent**   7:19
9:15   19:23
24:7   42:2
45:10, 16
50:24   80:25
140:8
**representation**
70:9   80:15
86:23   87:18
88:21   89:5, 13
90:2, 7   92:13
**Representative**
8:1   9:13
18:14, 17
25:25   37:25
42:1, 12, 20
43:4   44:5
45:6, 13   46:2
70:18, 20, 24
71:9, 14, 19
113:19, 23
116:13   121:2,
6   122:20
125:5, 14
126:3   127:15
131:11   133:5
139:14   140:7
**Representatives**
18:2   20:23
41:12   70:11,
13   71:6
**represented**
10:1   93:1, 6
**representing**
7:21, 23, 25
8:4, 15
**represents**   10:5,
13
**republican**
121:16, 17, 19,

21   122:1, 9
123:12   124:5,
13, 24
**republicans**
21:12   123:2
**request**   38:2
50:22   104:5
110:12
**requested**   14:5
110:10
**requesting**   38:1
**required**   36:15,
21   134:3
**requirement**
131:8   132:11
134:17
**requires**   115:12
134:6
**reservations**
85:14
**residence**   44:16
**resolve**   49:10
**respect**   30:24
31:3   39:19
88:15
**respecting**   54:14
**respective**   1:18
**respond**   99:24
**response**   43:17
91:7
**responsibilities**
32:5, 20
**responsibility**
98:18
**rest**   70:19, 21
**result**   11:5
22:7   142:11
**retained**   24:12
**reusing**   60:15
**review**   13:9, 12
19:13   20:8
52:1   56:14
100:21
**reviewed**   52:23
53:13   56:21
**reviewing**   46:9
**revised**   51:18
**revising**   47:13
58:4
**revisions**   56:23
**rewritten**   61:22
62:7

rich    82:10
86:5
right    9:20
14:17    18:3, 6
20:9, 16    27:3
28:3    32:3, 21
33:24    34:4, 20
39:2, 8    48:24
49:19    50:12
53:22    58:16
59:22    66:20
68:15    70:24
71:2, 7    72:13
76:3, 15    78:2,
15    80:11
83:15, 23
84:11, 14, 17
85:6    86:1
87:25    96:21,
23    99:15, 17
101:5    103:12
105:20    108:16
111:2    115:24
126:11    131:14
133:10, 13, 16
139:9
Rights    54:3, 7
59:16, 19, 20
98:7    99:2
102:20    132:5,
20    133:10, 17
134:3, 6    136:4,
18    137:13
River    43:8, 12
83:25    84:2
rivers    84:10
Road    4:20
11:9    43:10, 11
54:20
Rock    41:5, 22
role    18:12
21:8    22:12, 15,
19    29:24
30:23    48:13
52:21, 25
56:19    62:10
72:15    104:9
room    11:18
39:21, 23    90:3
120:6

ROSBOROUGH    4:2
8:18, 19    49:6
100:3
ROSS    3:18    8:10
roughly    121:11
RP    102:6
RPV    102:5, 7
rule    28:5, 14
36:22    60:6
76:8    93:21
rules    2:5    7:5
11:8    99:11
ruling    62:8
rulings    36:19,
20    46:11    54:4,
8    55:13
run    20:20
83:25    99:1
123:25
rural    84:24

< S >
SADASIVAN    3:11
8:8, 9    47:7,
10    49:9, 19
safe    48:11
sales    17:9
satisfied    89:12
saw    56:1, 3, 12
59:10    76:7
138:24
saying    63:15
69:8    71:13, 14,
16    84:11
100:2    123:22
124:10    133:15
says    11:17
106:1    113:25
scenes    38:13
schedule    35:3,
5    37:16    50:5,
8    79:4
school    72:20
85:15    117:2
Schoolhouse
41:5, 22
science    16:13
scratch    58:13
screen    127:13
seat    34:9
43:4    45:7

second    19:1
41:9    98:3
105:12    135:15
secondhand
114:21
seconds    139:25
Secretary    8:4
38:10    140:8
Section    58:23
59:1, 16, 18, 19,
20, 21    61:17
62:6, 18    98:7,
15    99:1
102:19    103:10
112:9    136:7
see    8:16, 17
16:21    21:22
31:7    34:15
56:15, 16
61:12, 13    65:7,
23    66:22
67:18    74:22
89:8    95:23
96:1, 4    97:6
109:2    113:4,
10, 13    125:20
127:12    139:17
seeing    94:9, 12
97:12, 13
104:17, 20
seek    22:18
130:19
seeking    134:22
135:13
seen    12:9
29:19    76:4, 5
95:21    112:16,
17, 18    115:19
sell    82:2
senate    21:11
32:10    41:14
72:20
Senator    8:1
12:19, 23
13:17    33:19
35:24    44:15
46:7    47:5
48:3    51:17
58:2    61:10
74:2    80:10, 23
81:4    106:1

107:3    113:18,
25    114:7
send    45:3
sense    42:14
46:22    47:19
89:19    123:4
sensitive    99:22
sent    37:22, 25
41:14    43:15
51:25    52:7
69:10    92:19
93:3    100:20
101:1, 19, 23
102:1    110:7
sentences    11:21
sentiment    88:20
89:4    92:12
separate    66:18
September    127:18
sequentially
12:2
series    37:22
serve    19:11
21:19    35:17
served    18:24
20:5, 6, 7, 8,
23    25:6    26:1
33:3    50:8
121:7, 8
serves    137:14
service    122:21
serving    20:22
21:23    121:23
123:9    124:21
session    22:3, 4
28:13    40:9, 10
41:2    93:18, 20
94:6    110:9
117:18
set    32:7    80:7
93:9    106:3
setup    65:17
seven    19:1
113:15    117:3
129:5
Sewell    114:15
119:7
shape    119:22
share    45:3
69:18
shattering    81:15

Case 2:21-cv-01536-AMM   Document 84-4   Filed 12/27/21   Page 58 of 61

Evan Milligan,et al v. John H.Merrill, et al.                    Chris Pringle
                                                                 12/17/2021

**she'll** 11:17
**shift** 76:13
**shifted** 65:23
**shifts** 74:7
**ship** 43:7, 12,
 13   44:21
**short** 120:3
**Shortly** 14:8
**show** 65:21
 91:10   109:10
**side** 43:11
 48:11   83:4, 12
 99:24
**signature** 2:2
**signed** 40:21
 41:17   114:18
**significant**
124:25
**similar** 60:5
**similarities**
 59:10
**single** 67:8
 77:22   84:13, 21
**single-member**
 54:14
**SINGLETON** 4:17
 8:23   120:15
 125:8   126:11
 127:17   128:7
**sir** 121:22
 126:13, 17, 20,
 23   130:25
 133:11   134:1
 139:6
**sitting** 46:1, 6
**situation** 43:25
**six** 38:1, 3
 80:14, 16
**skilled** 117:19
**smile** 126:8
**social** 15:13
 85:18
**software** 24:22
**soil** 86:2, 6
**soils** 82:11
**somebody** 22:21
 23:12, 15
 24:15   69:10
 77:23   78:3
 87:2   88:16
 89:15   90:3, 5

**Sonny** 21:17
 29:1   33:21
**soon** 38:7, 8
 67:9   139:17
**sorry** 13:1
 17:13   18:16
 20:13   22:12
 27:8   34:18
 37:8   41:23
 49:6   53:23
 59:19   73:19
 75:4   89:23
 94:11   98:3, 12
 101:21   105:25
 111:4   128:14
 137:8   138:5
**sort** 41:4
**sorts** 66:16
**sought** 20:20
**sounds** 16:25
**source** 95:10
**Southern** 17:8,
 14, 21   18:3
**spaces** 122:3
**speak** 29:23
 58:4   93:5, 11
**speaking** 66:14
 100:4, 6
**speaks** 11:20
**special** 22:3, 4
 28:12   40:9, 10
 41:1   93:20
 94:6   110:8
**specialist** 16:19
**specialize** 17:9
**specialties**
 16:15
**specific** 23:3
 27:7   51:22
 77:2   79:7
 87:5   123:7
**specifically**
 60:6   73:24
 74:2   82:25
 90:22   108:10
 127:21
**specifics** 40:4
 55:2, 4, 6, 11,
 16   75:19

**76:23**   77:9, 12
 86:24
**spectrum** 123:20
**speculation** 43:2
**spelled** 54:15
**spend** 82:14
**spent** 82:5
**split** 44:13
 92:8   97:9
**splits** 91:24
 92:7   94:4
 95:13   97:8
**spoken** 80:3
 126:7
**spring** 37:17
**staff** 48:7, 15
 100:23   102:2
**standard** 101:6
**standing** 87:2
**stands** 89:16
**Stars** 3:7
**start** 12:3
 33:11, 12
 34:24   61:13
 138:5
**started** 33:6
 35:8   36:8
 38:15
**starting** 25:6
 30:5   32:22
 33:3, 8   58:13
**State** 1:22
 7:3, 19   8:4
 9:16   10:20
 14:15, 20, 25
 18:14, 17, 19
 19:8   23:8, 14
 32:9, 10   34:19
 38:2, 6, 10
 39:6, 11   41:8
 42:4   50:10
 57:11   72:11,
 18, 20   75:25
 82:9, 17   83:4,
 15   84:5, 15, 25
 86:22   93:1, 5
 96:15   109:19
 122:23   125:2
 127:22   128:8
 142:1
**statement** 81:3,
 5, 12   115:10,

 15   116:22
 137:11   138:4,
 8, 12
**statements** 90:4
**STATES** 1:1
 7:15   58:25
**stay** 40:14
 67:2   74:18
 125:17
**Ste** 3:7, 21
 5:5, 21
**step** 22:22
 35:10, 11
**stepped** 35:15
**steps** 41:20
 45:20
**stint** 19:14, 16
 21:5
**stipulate** 116:9
**STIPULATED** 1:17
 2:1, 8
**stipulation** 7:6
**stipulations** 9:7
**stood** 77:23
**stopped** 47:7
**story** 34:21
**straight** 40:10
**Street** 1:23
 3:14, 21   4:5
 5:5, 21   142:23
**stretches** 83:3
**strike** 138:5
**striked** 61:14
**subdivisions**
 85:13
**submit** 28:8
 73:15
**submitted** 76:6,
 9   94:5, 13, 16
**subsection** 61:21
**substance** 109:8
**suggest** 57:22
 63:2, 19   111:7
**suggested** 111:20
**suggestion** 91:7
**suggests** 77:17
**suit** 126:19
**Suite** 142:23
**summer** 37:17
**supermajority**
 123:20

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

superminority
  20:14
support   119:8, 9
supported   42:25
suppose   109:6
  122:4
supposed   37:5,
9, 10
supposing   61:24
sure   10:9
  24:5   25:12
  27:6   35:21
  36:12   39:4
  41:18   45:13,
  15   58:1   64:6
  75:3, 18   77:14
  86:13   96:20
  101:13, 14
  103:19   104:2
  107:9   117:14
  118:5   120:14
  122:12, 16, 19
  123:7   139:18
surprise   81:10
surprises   80:24
  81:7
swear   9:3
sworn   9:5
system   40:11
  83:25   84:2

< T >
table   46:1, 6
take   32:17
  49:8   52:10
  61:10   65:4
  75:5, 10, 13
  86:16   99:12,
  17   100:8
  107:10   120:2
taken   1:21
  49:14   100:13
  108:5   110:1
  120:10   140:3
  142:5, 8
takes   111:17
talk   47:13
  51:17, 18
  62:15, 16   63:2
  64:4   67:17
  75:16, 20
  76:18   78:4

  100:9, 16
  101:10   135:15
talked   51:20
  52:2   64:7
  72:18   76:2, 21,
  24   87:5
  112:21   135:9
talking   26:9
  27:1   36:4
  39:6   49:21
  64:1   66:6
  69:11, 13
  74:16, 19   77:7,
  15, 23   82:17
  87:3, 6   88:17
  89:1, 16, 25
  92:11, 14, 18,
  20, 21, 22   93:9
  106:25   112:25
  116:24   117:14,
  16   118:5, 7, 9,
  25   132:10, 13
  135:17, 24
  136:2, 11, 15,
  16, 21   137:5
Tallapoosa   1:23
  5:21
tasked   83:18
team   39:21
telephone   109:3
  127:13
tell   15:1
  29:18   35:14
  67:10   75:23
  89:17   99:15
  117:5   118:14,
  20   126:24
  127:4   128:18
telling   36:19
  88:23
ten   28:8, 11
  47:25   93:23
  94:7, 14, 15
tend   78:25
ten-day   28:5
  60:6   76:8
  95:25   97:1
term   19:2, 19
  82:1, 24   85:25
  86:3   102:7
  112:12

terms   18:25
  19:15   89:5
  121:9
test   45:1
  46:12   61:25
  62:2
testified   9:5
  129:4
testify   14:18
  128:25
testifying   9:20
testimony
  129:15   134:1
text   109:6
texts   109:10
Thank   34:22
  49:19   51:3
  121:2, 14
  125:5, 6, 12, 16
  138:2   139:14
  141:3
thereto   2:14
thing   40:17
  68:10   69:14
things   17:6
  31:5   36:11
  79:1   132:12
think   29:20
  32:21   37:11,
  23   40:6   43:20
  46:12, 13   49:9
  60:2, 22   62:5
  63:12   66:2, 11
  69:20   71:16
  78:22   79:2
  81:9   82:13
  101:4   111:5
  114:7, 11
  115:15   116:18,
  23   119:2, 19
  123:18   124:7,
  18   127:9
  130:7   132:1
  137:17   139:19,
  21
thinking   36:8
  86:21   122:5
third   61:14
thought   48:21
  54:2   57:20
  59:23   80:15

  100:3   116:17
  117:7
three   60:16
  99:7
three-week   79:13
tight   111:11
timberland   17:9
  82:2
Timberlands
  17:8, 14, 21
  18:3
time   2:12, 13
  7:17   10:24
  11:20   19:23
  20:15   25:15
  34:3   39:19
  42:5   44:12
  45:11   46:22
  49:13, 16
  51:19   59:5
  68:14   72:8
  73:14   74:14
  79:8, 17   80:5
  81:9   82:5, 14
  86:4   99:5
  100:12, 15
  101:9   105:23
  110:4   111:14
  112:10   113:1
  117:1, 3, 13
  120:9, 12
  121:2, 16
  125:5   132:17
  137:16   140:2,
  5   141:4
timeline   37:3
  40:3   105:21
  111:17
times   49:22
  79:22   80:7
  91:2
title   18:4
today   9:24
  10:1, 18   12:13
  13:10   14:13
  34:17   71:2
today's   34:23
told   13:21, 23
  14:4   31:19
  33:11   80:23
  108:12   113:25

Evan Milligan,et al v. John H.Merrill, et al.                                      Chris Pringle
                                                                                   12/17/2021

114:*21, 22*
119:*6*
**total**   121:*12*
**totally**   84:*4*
**tradition**   26:*6*
60:*12*   64:*25*
**transcribed**
142:*5, 8*
**Transcript**   6:*21,*
*23*   105:*3*
115:*22*   142:*7*
**transcription**
142:*6*
**transcripts**
116:*10*
**travel**   14:*15, 20*
**trial**   2:*13*
14:*18*
**tribal**   85:*14, 18*
**trick**   111:*4*
**tried**   92:*8*
**true**   81:*12*
83:*14*   89:*19*
142:*7*
**truthfully**   9:*24*
**try**   70:*15*
102:*10*   119:*24*
**trying**   21:*19,*
*21*   34:*15*   35:*2*
37:*16*   39:*3*
40:*2*   64:*15*
76:*25*   96:*21*
111:*4*   116:*25*
131:*7*
**turn**   105:*24*
113:*18*
**turned**   43:*7*
75:*7*   89:*9*
93:*23, 25*   94:*1,*
*18*
**TURRILL**   3:*4*
8:*12*
**twice**   91:*1*
**Twitter**   15:*16,*
*20*
**two**   12:*21*
18:*24*   19:*15*
28:*19*   29:*9*
69:*15*   90:*17,*
*19*   91:*8*   93:*15*
95:*24*   97:*11,*

*12, 13*   121:*9*
123:*22*   127:*2*
**two-hour**   99:*6*
**type**   11:*17*
35:*2*
**typing**   11:*16*

**< U >**
**Uh-huh**   61:*16*
95:*8*
**ultimately**   24:*9*
98:*17*
**unconstitutional**
127:*19*   135:*19*
**underpopulated**
67:*12*   68:*6*
74:*23*
**underpopulation**
68:*19*
**underpopulations**
74:*17*
**understand**   9:*11,*
*19*   11:*10*
40:*19*   63:*5*
69:*7*   86:*12*
100:*1*   105:*7*
113:*1*   118:*18*
121:*20*   135:*1*
138:*10*
**understanding**
9:*23*   54:*6*
55:*12*   62:*1*
70:*1*   82:*7*
97:*17*   102:*14,*
*16*   106:*11, 17*
107:*1, 16*
110:*7*   114:*14*
118:*13*   122:*12,*
*17*   129:*14*
134:*17*
**understands**
103:*10*
**understood**
11:*12*   135:*3*
**unintentionally**
102:*19*   134:*7*
**Union**   4:*4, 12*
**UNITED**   1:*1*
7:*15*   58:*25*
**University**   16:*8*
**unnecessary**
114:*2, 4*

**update**   36:*15,*
*18, 20, 22*   46:*4,*
*10*   55:*3*   57:*20*
**updated**   36:*12*
55:*15*
**updates**   54:*24*
57:*6*
**updating**   35:*18*
36:*8, 24*   45:*20*
**URIAH**   4:*18*
**use**   15:*17, 21*
25:*20, 21*   33:*7*
60:*9, 12*   102:*13*
**Usual**   9:*7*
14:*14*
**usually**   101:*7, 9*

**< V >**
**various**   38:*1*
122:*25*
**varying**   124:*1*
**version**   63:*18,*
*21*
**versus**   7:*13*
**VIDEO**   1:*9*
**Videographer**
6:*2*   7:*11*   8:*6*
9:*2*   49:*12, 15*
100:*11, 14*
120:*8, 11*
140:*1, 4*   141:*3*
**view**   69:*18*
77:*18*   121:*24*
122:*22*   123:*24*
124:*16, 25*
**views**   66:*15, 16*
121:*24*   122:*7,*
*22*   123:*5, 10*
124:*3, 11, 22*
**violate**   136:*4,*
*7, 18*
**violated**   102:*19*
137:*12*
**Virtually**   23:*5*
69:*10*   72:*5, 13*
78:*3*
**volition**   92:*16*
**vote**   28:*21, 22*
29:*18*   59:*24*
67:*20*   68:*8*
96:*14, 16, 17*
102:*23*

**voted**   29:*3, 10*
31:*16, 17*   51:*9*
53:*21*   84:*17*
**Voter**   89:*25*
**voters**   42:*23*
66:*24*   69:*10*
77:*21*   78:*2, 7*
80:*25*   81:*8*
87:*4*   88:*17*
89:*1, 8, 14*
98:*1*   126:*13,*
*14, 16*   135:*16*
136:*4, 17*
137:*12, 15*
138:*4*
**Voting**   54:*3, 7*
59:*16, 19, 20*
85:*13*   95:*18*
98:*7, 12*   99:*2*
102:*19*   113:*21*
132:*5, 20*
133:*10, 17*
134:*3, 6*   136:*4,*
*18*   137:*12*
**VS**   1:*9*

**< W >**
**wait**   70:*1*
139:*24*
**waived**   2:*3*
**walked**   39:*20,*
*22*   86:*21*
**WALKER**   5:*18*
7:*24*   8:*17*
9:*9*   10:*4, 9,*
*17, 21*   12:*1, 16*
13:*6*   46:*2, 8,*
*15*   47:*4*   48:*4*
50:*20, 24*
52:*23*   53:*4*
55:*8*   56:*8*
58:*2*   61:*6*
62:*16, 17*   63:*8,*
*11, 12*   73:*6, 12,*
*20*   82:*21*
105:*7*   107:*8*
108:*2*   110:*11*
114:*1*   116:*5,*
*11*   117:*10*
118:*2, 8, 10*
120:*5, 16*
122:*11, 16*

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

125:6, 11, 25
126:19, 24
127:7   128:2,
12, 14   129:15
130:14   131:2,
4, 21, 23   132:4,
8, 23   133:19
134:5   136:1,
24   137:1, 24
139:10, 19, 24
want   35:14
58:20   70:13
71:15   72:1
96:7, 20   120:3
125:17   139:22
wanted   21:18
30:22   31:6, 11
32:13   34:8
41:18   45:6, 9,
12, 15   51:4
57:7   66:17, 22
67:2, 18   69:14
70:7   104:3
135:10, 11
wanting   89:19
Washington   3:22
5:6, 13   21:18
42:5   44:2, 11
watched   79:14
80:1
way   14:18
31:22   41:5
43:15   63:12
64:11, 20
66:12   67:2
83:21   84:2
86:23   117:21
127:9, 15
131:2, 6, 12
134:7, 16
137:10
ways   45:5
Wednesday   50:11
week   40:12, 15
weekdays   78:10,
14, 19
weight   89:3, 18,
24
WELBORN   4:9
6:7   7:20   9:8,
11, 12, 14
10:12   12:3

13:1, 4, 8
47:9   50:18
51:3   82:22
99:10, 13
100:1, 8   105:5,
11   108:3
116:9   120:2, 7,
13, 19
Well   13:8
16:24   17:3
20:16   25:23
28:21   30:15
36:17   38:20
40:20   41:21
44:20, 25   45:8
49:1   60:4
64:1   65:21
66:6   69:3, 4,
17, 23   70:17
71:1   76:13
77:7, 20   79:4,
11, 23   81:13
84:17   85:5, 17
86:19   92:8
96:6   98:17
99:10   103:24
105:21   113:7
118:24   125:12
129:25   130:3
132:10   135:8
139:10
went   40:10
41:1, 16   43:10
51:12   57:4, 18
69:1   74:8, 21
we're   26:9
27:1, 4   54:21
99:4   118:25
140:1, 4
We've   99:7, 23
138:16
wide   123:20
Wilcox   42:8, 9
82:15   83:10
84:7, 9
willing   94:20
win   45:14
Wiregrass   84:4
witness   2:3
7:7   9:3
27:10   45:23

46:19   49:17
99:19   136:25
Women   66:24
69:10   77:21
78:2, 7   87:3
88:17   89:1, 8,
14, 25   98:1
126:12, 14, 15
135:16   136:3,
17   137:12, 15
138:4
won   45:11
woods   16:22
words   102:12
138:24
work   17:12
23:20   30:12
31:11   32:12
37:16   38:12
64:15   78:18,
19, 25   79:1, 2,
18   81:17   82:2
83:10   99:8
worked   18:7
21:18   30:18
32:11   34:3, 4
39:2, 10   114:17
working   35:2, 4,
5   39:11   46:3
78:10, 13, 14
works   19:20
30:17
wrap   137:9
write   48:20
writing   137:11,
25   138:4, 8, 11
written   89:21
104:2
wrote   135:24

< Y >
y'all   14:8
Yay   120:18, 19
Yeah   9:9
37:12   60:21
69:19   122:16
125:22   129:7
year   46:23
50:1   66:13
years   18:8
19:1, 4   45:18
121:11, 12, 13,

23   122:6, 20
123:9   124:2
130:7   138:15
year's   30:8
yesterday   12:14
yield   45:25
York   3:15   4:6

< Z >
zero   44:13
67:14   74:21
75:1   76:14
77:1   92:9
129:17, 21, 24
130:1, 4, 8, 10,
12, 16, 21
131:8, 15, 20
133:4   138:9,
13, 16, 21
139:2, 5, 11
Zoom   3:18
4:17   5:1   8:7
11:18