FILED

2022 Jan-14  PM 11:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| MARCUS CASTER, LAKEISHA CHESTNUT, BOBBY LEE DUBOSE, BENJAMIN JONES, RODNEY ALLEN LOVE, MANASSEH POWELL, RONALD SMITH, and WENDELL THOMAS, | Case No. 2:21-CV-1536-AMM |
| Plaintiffs, | |
| v. | |
| JOHN H. MERRILL, in his official capacity as Alabama Secretary of State, | |
| Defendant, | |
| and | |
| CHRIS PRINGLE and JIM McCLENDON, | |
| Intervenor-Defendants. | |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

I.  PROPOSED FINDINGS OF FACT ......................................................................2

   A.  Plaintiffs .......................................................................................................2

   B.  Likelihood of Success on the Merits ............................................................4

      1.  First *Gingles* Precondition: The Black population in Alabama is sufficiently populous and geographically compact to comprise a second majority-Black congressional district ..........................................4

         a.  Proper Measure of Black Population ....................................................6

         b.  *Gingles* 1: Numerosity .......................................................................10

         c.  *Gingles* 1: Geographic Compactness .................................................14

            i.   Alabama's Redistricting Guidelines ............................................14

            ii.  Population Equality ......................................................................18

            iii. Contiguity .....................................................................................19

            iv.  Compactness .................................................................................19

            v.   Communities of Interest ...............................................................25

            vi.  Incumbency Protection .................................................................38

            vii. Core Retention ..............................................................................40

            viii.  Racial Considerations .................................................................46

      2.  Second *Gingles* Precondition: Black voters in Alabama vote extremely cohesively. ..............................................................................47

      3.  Third *Gingles* Precondition: White voters in Alabama vote as a bloc usually to defeat Black voters' candidates of choice. ............................50

      4.  Totality of the Circumstances: All relevant factors weigh decisively in favor of a finding of vote dilution. ...........................................54

         a.  HB1 suffers from severe disproportionality. ......................................54

         b.  Senate Factor One: Alabama has a history of voting-related discrimination against Black voters. ..................................................55

            i.   Pre-Voting Rights Act ..................................................................55

            ii.  Post-Voting Rights Act ................................................................58

            iii. Redistricting-Related Discrimination ..........................................63

iv. Political Violence Against Black Alabamians ........................... 65

    c. Senate Factor Two: Voting in Alabama is extremely polarized along racial lines. ............................................................................... 67

    d. Senate Factor Three: Alabama and its jurisdictions have long used electoral schemes that enhance the opportunity for discrimination against Black Alabamians. ................................................. 72

    e. Senate Factor Four: Alabama does not use slating processes for congressional elections. ...................................................... 73

    f. Senate Factor Five: Black voters today suffer from the vestiges of Alabama's centuries of discrimination. ............................................. 73

    g. Senate Factor Six: Overt and subtle racial appeals are common in Alabama politics. .............................................................. 85

    h. Senate Factor Seven: Black Alabamians are significantly underrepresented in elected office. .................................................. 88

    i. Senate Factor Eight: Alabama and its congressional delegation are unresponsive to the needs and interests of Black Alabamians. ........ 90

    j. Senate Factor Nine: Defendants' justifications for HB1's lack of a second congressional district are tenuous. ........................................ 93

C. The risk of irreparable harm to Plaintiffs, balance of the equities, and public interest all weigh in favor of relief. ........................................................ 94

    1. Use of the Enacted Plan in the 2022 elections will irreparably harm Plaintiffs and other Black Alabamians. ................................................. 94

    2. There is sufficient time to for a new congressional plan to be drawn for use in the 2022 elections. ......................................................... 96

II. PROPOSED CONCLUSIONS OF LAW ........................................................ 99

A. Plaintiffs are substantially likely to succeed on the merits of their Section 2 claim. ......................................................................................................... 99

    1. Plaintiffs have satisfied the first *Gingles* precondition. ........................ 101

    a. AP BVAP is the appropriate measurement of Black population in this case. ............................................................................... 102

    b. Alabama's Black population is sufficiently numerous to form a second majority-Black congressional district. ................................ 103

      c.   Alabama's Black population is sufficiently compact to establish two majority-Black congressional districts............................................105

2.  Plaintiffs have satisfied the second *Gingles* precondition....................118

3.  Plaintiffs have satisfied the third *Gingles* precondition. ......................120

4.  The totality of circumstances demonstrates that HB1 denies Black Alabamians an equal opportunity to elect their candidates of choice in congressional elections.........................................................................122

      a.   Legal Framework ...........................................................................122

      b.   Each relevant consideration in the totality-of-circumstances analysis points towards a conclusion of vote dilution. .................................126

5.  Section 2 provides a private right of action...........................................136

6.  This case is properly before a single district court judge......................139

B.  The remaining preliminary injunction factors weigh heavily in favor of relief. ....................................................................................................141

C.  The remedial plan must contain two districts in which Black voters have a demonstrable opportunity to elect candidates of their choice. ..............145

III.  PROPOSED ORDER GRANTING INJUNCTIVE RELIEF ........................147

Plaintiffs respectfully submit the following proposed findings of fact, proposed conclusions of law, and proposed order granting preliminary injunctive relief.

This case presents a straightforward application of decades-settled case law governing Section 2 of the Voting Rights Act. Plaintiffs have demonstrated numerous ways in which Alabama's congressional plan could have two, reasonably compact majority-Black districts. They have further shown that Alabama's severely racially polarized voting deprives Black voters in majority-white congressional districts of an opportunity to elect their candidates of choice. The totality of the circumstances makes clear that Alabama's current congressional plan denies Black voters an equal opportunity to participate in the political process and elect candidates of their choice. This Court can and should provide Plaintiffs and Black Alabamians the seat at the table that the Voting Rights Act promises.

Defendants' response is simply that Alabama should be able to keep its congressional plan the way it is because it has been that way for a long time. Pointing to irrelevant evidence and inapposite case law, Defendants assert that simply applying the basic tenets of the Voting Rights Act to Alabama's congressional plan would somehow produce an unconstitutional result. In doing so, they entirely fail to rebut Plaintiffs' arguments and evidence that plainly establishes a violation of Section 2.

- 1 -

Alabama should not get a free pass on its unlawful plan. There is plenty of time for the Court to order the implementation of a new plan in a primary election that is still four and a half months away. Because allowing Alabama to dilute the voting strength of Black voters would cause far more irreparable harm than the administrative inconvenience of implementing a new congressional plan, this Court should grant Plaintiffs' requested relief.

## I.    PROPOSED FINDINGS OF FACT

### A.    Plaintiffs

1.    Plaintiff Marcus Caster is a Black resident of Washington County who is registered to vote. ECF No. 56-8 at 1 ¶¶ 2-3. Under the 2021 Enacted Plan, Dr. Caster resides in Congressional District 1. *Id.* at 1 ¶ 4. Under each of Caster Plaintiffs' illustrative plans, Dr. Caster would reside in Congressional District 2. CPX18; CPX23; CPX28; CPX33; CPX38; CPX43; CPX61.[1]

2.    Plaintiff LaKeisha Chestnut is a Black resident of Mobile County who is registered to vote. ECF No. 56-9 at 1 ¶ 2-3. Under the 2021 Enacted Plan, Ms. Chestnut resides in Congressional District 1. *Id.* at 1 ¶ 4. Under each of Caster Plaintiffs' illustrative plans, Ms. Chestnut would reside in Congressional District 2. CPX18; CPX23; CPX28; CPX33; CPX38; CPX43; CPX61.

---

[1] Citations to the *Caster* Plaintiffs' preliminary injunction hearing exhibits are designated as "CPX." Citations to the *Milligan* Plaintiffs' preliminary injunction hearing exhibits are designated as "MPX."

3.     Plaintiff Bobby DuBose is a Black resident of Jefferson County who is registered to vote. ECF No. 44 at 56-10 at 1 ¶ 2-3. Under the 2021 Enacted Plan, Mr. DuBose resides in Congressional District 7. *Id.* at 1 ¶ 4. Under each of Caster Plaintiffs' illustrative plans, Mr. DuBose would reside in Congressional District 7. CPX18; CPX23; CPX28; CPX33; CPX38; CPX43; CPX61.

4.     Plaintiff Benjamin Jones is a Black resident of Montgomery County who is registered to vote. ECF No. 56-11 at 1 ¶ 2-3. Under the Enacted Plan, Mr. Jones resides in Congressional District 2. *Id.* at 1 ¶ 4. Under each of Caster Plaintiffs' illustrative plans, Mr. Jones would reside in Congressional District 2. CPX18; CPX23; CPX28; CPX33; CPX38; CPX43; CPX61.

5.     Plaintiff Rodney Love is a Black resident of Jefferson County who is registered to vote. ECF No. 56-12 at 1 ¶ 2-3. Under the 2021 Enacted Plan, Mr. Love resides in Congressional District 7. *Id.* at 1 ¶ 4. Under each of Caster Plaintiffs' illustrative plans, Mr. Love would reside in Congressional District 7. CPX18; CPX23; CPX28; CPX33; CPX38; CPX43; CPX61.

6.     Plaintiff Manasseh Powell is a Black resident of Montgomery County who is registered to vote. ECF No. 56-13 at 1 ¶ 2-3. Under the 2021 Enacted Plan, Mr. Powell resides in Congressional District 2. *Id.* at 1 ¶ 4. Under each of Caster Plaintiffs' illustrative plans, Mr. Powell would reside in Congressional District 2. CPX18; CPX23; CPX28; CPX33; CPX38; CPX43; CPX61.

7.     Plaintiff Ronald Smith is a Black resident of Bullock County who is registered to vote. ECF No. 56-14 at 1 ¶ 2-3. Under the 2021 Enacted Plan, Mr. Smith resides in Congressional District 2. *Id.* at 1 ¶ 4. Under each of Caster Plaintiffs' illustrative plans, Mr. Smith would reside in Congressional District 2. CPX18; CPX23; CPX28; CPX33; CPX38; CPX43; CPX61.

8.     Plaintiff Wendell Thomas is a Black resident of Montgomery County who is registered to vote. ECF No. 56-15 at 1 ¶ 2-3. Under the 2021 Enacted Plan, Mr. Thomas resides in Congressional District 2. *Id.* at 1 ¶ 4. Under five of Caster Plaintiffs' illustrative plans, Mr. Thomas would reside in Congressional District 2. CPX28; CPX33; CPX38; CPX43; CPX61.

### B.    Likelihood of Success on the Merits

9.     Plaintiffs are substantially likely to succeed on the merits of their Section 2 claim.

### 1.    First *Gingles* Precondition: The Black population in Alabama is sufficiently populous and geographically compact to comprise a second majority-Black congressional district.

10.    Through 11 separate and unique illustrative plans, five expert reports, and extensive testimony *Caster* Plaintiffs' expert, Mr. William S. Cooper, and *Milligan* Plaintiffs' expert, Dr. Moon Duchin, demonstrated that Alabama's Black population—which has steadily grown as a percentage share of the state's overall population for decades—is sufficiently large and geographically compact to form a

majority of the voting-age population in two congressional districts. Plaintiffs' experts' illustrative plans adhere to traditional redistricting considerations and Alabama's 2021 Redistricting Guidelines (the "Redistricting Guidelines" or the "Guidelines").

11.    Defendants' *Gingles* 1 expert, Mr. Thomas Bryan, does not dispute that Plaintiffs' illustrative plans create two majority-Black districts. In fact, he concedes that they do. Hr'g Tr. Vol. 4 at 914:23-915:3; *see also id.* at 863:15-865:24; *id.* at 1040:13-1041:6. He also concedes that Plaintiffs' illustrative plans comply with the principle of one-person, one-vote. *Id.* at 930:18-931:1.

12.    Mr. Bryan conceded that Plaintiffs' illustrative plans comply with a host of other traditional redistricting criteria, including respect for political subdivision splits, Hr'g Tr. Vol. 4 at 932:3-11, and contiguity, *id.* at 931:10-24 ("[T]here was no issue with contiguity in Mr. Cooper's plan). Mr. Bryan further agreed that several of Plaintiffs' illustrative plans are "comparable" to the enacted plan in terms of compactness, *id.* at 977:10-13, and avoid unnecessarily pairing incumbents, *id.* at 962:5-9. Mr. Bryan does not contend that any of Plaintiffs' illustrative plans are not "reasonably compact" in accordance with the 2021 Redistricting Guidelines, *id.* at 979:1-9 ("I have no opinion on what is reasonable and what is not reasonable.").

13.    Mr. Bryan's report instead makes subjective comparisons of Plaintiffs'

illustrative plans to the Enacted Plan on a select few traditional redistricting criteria that Alabama expressly gave limited weight in its own Redistricting Guidelines. Accordingly, Defendants' evidence shows neither that Plaintiffs' illustrative plans lack two majority-Black districts nor that Plaintiffs' experts failed to comply with traditional redistricting criteria.

14.    The Court has accepted Mr. Cooper in this case as qualified to testify as an expert in demographics and redistricting. Hr'g Tr. Vol. 2 at 422:21-423:3. The Court finds Mr. Cooper credible, his analysis methodologically sound, and his conclusions reliable. The Court credits Mr. Cooper's testimony and conclusions.

15.    The Court has accepted Dr. Duchin in this case as qualified to testify as an expert in redistricting, applied mathematics, quantitative redistricting analysis, and demography and use of census data. Hr'g Tr. Vol. 3 at 554:23-555:14. The Court finds Dr. Duchin credible, her analysis methodologically sound, and her conclusions reliable. The Court credits Dr. Duchin's testimony and conclusions.

16.    In sum, the Court credits the analysis and conclusions of each of Plaintiffs' *Gingles* 1 experts individually, and the Court concludes that the findings of these experts, each using different methodologies, demonstrates that the Plaintiffs have satisfied the factual predicates of the first *Gingles* precondition.

### a.    Proper Measure of Black Population

17.    The Court first turns to the appropriate metric for measuring Alabama's

Black Population.

18.     Mr. Cooper and Dr. Duchin both advocate for the use of the Any Part Black Voting Age Population ("AP BVAP") metric. CPX1 at 3, n.3; MPX3 at 7 & n.4.

19.     AP BVAP refers to the population of people who self-identify as Black on the Census form, whether in combination with other races or not. CPX1 at 3, n.3; MPX3 at 7 & n.4; Hr'g Tr. Vol 3 at 558:23-559:10 (Duchin); Hearing Test. Vol. 2 at 426:17-427:2 (Cooper).

20.     Dr. Duchin and Mr. Cooper testified that AP BVAP is the most appropriate measure of Alabama's Black voting age population because it captures every Alabamian who self-identifies as Black. Hr'g Tr. Vol. 3 at 560:4-11 (Duchin); Hr'g Tr. Vol. 2 at 427:12- 428:3 (Cooper); CPX81 at 2-5 ¶¶ 4-16. Mr. Cooper also testified that he "routinely report[s] the any-part definition" of Black as an expert in redistricting cases, and that in at least two cases where the appropriate measure of the Black population was disputed, courts concluded that AP BVAP was appropriate to use. Hr'g Tr. Vol. 2 at 428:4-15.

21.     Dr. Bridgett King, a tenured and award-winning political scientist at Auburn University, further explained that from a political-science perspective the AP BVAP definition is superior to the Single Race ("SR") BVAP definition because it takes into account how people actually identify in real life. CPX81 at 1-5 ¶¶ 3-16;

Hr'g Tr. Vol. 6 at 1529:4-1531:24 (King). Dr. King further explained that adoption of the SR BVAP definition would "strip" those who have identified as Black "of that identity that they have clearly and effectively asserted and chosen to identify with," which "is in many ways a new manifestation of" Alabama's sordid history of forcing a particular racial definition upon its Black residents. Hr'g Tr. Vol. 6 at 1530:20-1531:9.

22.    The Court has accepted Dr. King as qualified to testify as an expert in the fields of political science research methodology, history of voting and elections in the United States and Alabama, voting behavior, and the matters discussed in her reports. Hr'g Tr. Vol. 6 at 1506:17-1507:3. The Court finds Dr. King credible, her analysis methodologically sound, and her conclusions reliable. The Court credits Dr King's testimony and conclusions.

23.    Defendants' expert Mr. Bryan reports AP BVAP in his reports. Hr'g Tr. Vol 4 at 840:16-841:14; DX4 at 6-10. He testified that the 2000 Census allowed respondents to select more than one race to give people "the opportunity to self-identify whatever they were." Hr'g Tr. Vol 4 at 895:1-17.

24.    Although Mr. Bryan wrote in his report that the SR BVAP measure is the "most defensible from a political science / Gingles 2 voting behavior perspective," DX4 at 6, he conceded at the hearing that he is "not a political scientist" and is not "offering an opinion in this case on the *Gingles* II voting behavior" factor,

Hr'g Tr. Vol 4 896:1-6. Mr. Bryan further clarified that he was "definitely not making a judgment that one [measure] is right or wrong or better or worse," Hr'g Tr. Vol 4 898:20-899:3. In fact, after conceding he could not cite a single authority to support this assertion, he ultimately downplayed this assertion as just a "passing comment" in his report. *Id.* at 898:3-17.

25.    As Mr. Bryan's report explains, the Department of Justice issued guidance in September 2021 instructing that in Section 2 cases, such as this one, it is appropriate for the Department to consider the AP BVAP measure. DX4 at 6-7 ("In order to facilitate analysis that reflects current DOJ guidance, we will include analysis containing both Black alone or in combination . . . in this report as appropriate."); *see also* CPX105. He testified that under the DOJ's guidance, "there is authority" to use the "any-part black metric." Hr'g Tr. Vol. 4 at 903:3-8.

26.    During Mr. Bryan's testimony, he agreed that the Supreme Court's decision in *Georgia v. Ashcroft*, 539 U.S. 461 (2003), explains that in cases involving "one minority group's effective exercise of the electoral franchise . . . we believe it is proper to look at all individuals who identify themselves as black." Hr'g Tr. Vol. 4 at 907:14-24, 909:5-11.

27.    Mr. Cooper also reports Non-Hispanic Single-Race Black Citizen Voting Age Population ("NH SR BCVAP") figures in his reports. CPX17; CPX22; CPX27; CPX32; CPX37; CPX42; CPX60; Hr'g Tr. Vol 2 at 452:17-453:5. NH SR

BCVAP, reported from the U.S. Census Bureau's American Community Survey ("ACS"), refers to Alabama's population of non-Hispanic, voting-age citizens who identify as Black and no other race. MPX3 at 7 & n.5. NH SR BCVAP is the most conservative measure of the State's Black population. Hr'g Tr. Vol 2 at 453:6-10 (Cooper).

28.      Mr. Bryan does not dispute Mr. Cooper's use of the NH SR BCVAP metric. Hr'g Tr. Vol. 4 at 916:13-19, 922:23-923:16. In fact, in an amicus brief he filed before the U.S. Supreme Court, Mr. Bryan expressly advocated for the use of the CVAP metric as "an indispensable feature in voting rights litigation under Section 2." CPX106 at 14-34; Hr'g Tr. Vol. 4 at 923:17-22, 924:23-925:8.

29.      After reviewing the expert reports and testimony in this case, the Court credits the testimony of Mr. Cooper, Dr. Duchin, and Dr. King, as well as the corroborating testimony of Mr. Bryan, and concludes that AP BVAP and NH SR BCVAP are appropriate demographical measures for determining the size of Alabama's Black voting-age population for purposes of the first *Gingles* precondition.

### b.      *Gingles* 1: Numerosity

30.      The Court concludes that Mr. Cooper and Dr. Duchin have established that the Black population in Alabama is sufficiently numerous to comprise a majority of the voting-age population in two congressional districts.

31.    Under the 2020 Census, Alabama's AP Black population rose to 1,364,736 residents, which constitutes 27.16% of the state's total population. MPX3 at 2; CPX1 at 5. This constitutes a 6.53% rise in Alabama's Black population since 2010, which is 34% of the state's entire population increase between 2010 and 2020. CPX1 at 6-7. In fact, all of Alabama's population increase over the last decade is owed to its minority populations: between 2010 and 2020, Alabama's white population fell by 33,051 people, a 1.03% decrease. *Id.* at 6. Accordingly, white Alabamians now comprise only 63.12% of the State's population. *Id.*

32.    According to the 2020 Census, nearly half of Black Alabamians are concentrated in the urban counties of Jefferson, Mobile, Montgomery, and Madison, and the state's historic Black Belt[2] contains almost 10% of the state's Black population alone. CPX1 at 7.

33.    Analyzing these demographics, both Mr. Cooper and Dr. Duchin concluded that it is "possible to draw two majority-Black congressional districts, while adhering to traditional redistricting principles." CPX1 at 20; MPX3 at 2.

34.    To show this, Mr. Cooper drafted seven illustrative plans, each with a majority-Black district under the AP BVAP metric. Hr'g Tr. Vol. 2 at 455:18-456:1.

---

[2] Dr. Duchin defined the Black Belt region as "Barbour, Bullock, Butler, Choctaw, Crenshaw, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Montgomery, Perry, Pickens, Pike, Russell, Sumter, and Wilcox" Counties. MPX 3 at 10. Defendants have stipulated to this definition. ECF No. 56-3 at 12-13 ¶¶ 60-61.

35.    In Illustrative Plan 1, District 2 has an AP BVAP of 50.09% and District 7 has an AP BVAP of 53.28%. CPX17.

36.    In Illustrative Plan 2, District 2 has an AP BVAP of 50.88% and District 7 has an AP BVAP of 53.79%. CPX22.

37.    In Illustrative Plan 3, District 2 has an AP BVAP of 50.27% and District 7 has an AP BVAP of 50.09%. CPX27.

38.    In Illustrative Plan 4, District 2 has an AP BVAP of 50.07% and District 7 has an AP BVAP of 50.09%. CPX32.

39.    In Illustrative Plan 5, District 2 has an AP BVAP of 50.24% and District 7 has an AP BVAP of 50.09%. CPX37.

40.    In Illustrative Plan 6, District 2 has an AP BVAP of 51.28% and District 7 has an AP BVAP of 51.09%. CPX42.

41.    In Illustrative Plan 7, District 2 has an AP BVAP of 51.88% and District 7 has an AP BVAP of 50.31%. CPX60.

42.    Each of Mr. Cooper's illustrative plans are also majority-Black under the NH SR BCVAP measure. Hr'g Tr. Vol. 2 at 455:18-456:1; CPX17; CPX22; CPX27; CPX32; CPX37; CPX42; CPX60 (Cooper).

43.    Dr. Duchin drafted four illustrative plans.

44.    In Illustrative Plan A, District 2 has an AP BVAP of 51.37% and District 7 has an AP BVAP of 51.50%. MPX3 at 7.

- 12 -

45.     In Illustrative Plan B, District 2 has an AP BVAP of 51.06% and District 7 has an AP BVAP of 50.24%. *Id.*

46.     In Illustrative Plan C, District 2 has an AP BVAP of 50.06% and District 7 has an AP BVAP of 53.50%. *Id.*

47.     And in Illustrative Plan D, District 2 has an AP BVAP of 50.05% and District 7 has an AP BVAP of 51.73%. *Id.*

48.     Defendants' expert Mr. Bryan does not dispute these conclusions. In fact, he testified that, "using the any-part black metric," each of Mr. Cooper's and Dr. Duchin's illustrative plans "have two majority-black districts." Hr'g Tr. Vol. 4 at 914:23-915:3l; *see also id.* at 863:15-866:4, 1040:13-1041:6.

49.     As for NH SR BCVAP, Mr. Bryan did not analyze this aspect of Mr. Cooper's plans and does not dispute that Mr. Cooper's reports contain two majority-Black districts under this measure. Hr'g Tr. Vol. 4 at 926:2-14.

50.     Finally, Plaintiffs' experts also stated that apart from AP BVAP and apart from NH SR BCVAP, their illustrative plans contain two majority-Black districts using the SR Black voter registration data. CPX59 at ¶¶ 34-39; Hr'g Tr. Vol. 3 at 582:23-584:3 (Duchin). After analyzing Alabama's active voter registration statistics, Mr. Cooper concluded that Districts 2 and 7 in each of his plans both contain populations composed of over 50% SR Black registered voters. Hr'g Tr. Vol. 2 at 453:21-454:8.

51.    Based on the expert reports and testimony provided in this case, the Court concludes that Mr. Cooper's and Dr. Duchin's plans each contain two majority-Black districts under the AP BVAP measure and that Mr. Cooper's plans each contain two majority-Black districts using the NH SR BCVAP measure. The Court further concludes that Plaintiffs' illustrative plans each contain two majority-SR Black districts when analyzed using Alabama's active voter registration data.

### c.    *Gingles* 1: Geographic Compactness

52.    Plaintiffs' illustrative plans also demonstrate that the Black population in Alabama is sufficiently geographically compact to constitute a voting-age majority in two congressional districts.

53.    The illustrative plans are consistent with traditional redistricting principles.

### i.    Alabama's Redistricting Guidelines

54.    In 2021, the Alabama Legislature expressed its traditional redistricting principles in a document titled "Reapportionment Committee Redistricting Guidelines," promulgated by its reapportionment committee. CPX82.

55.    Mr. Cooper and Dr. Duchin specifically referred to the Redistricting Guidelines in their reports, CPX1 at 20 ¶ 42; MPX3 at 5, and they each testified that the Guidelines instructed their drawing of their illustrative plans, Hr'g Tr. Vol. 2 at 448:1-3 (Cooper); Hr'g Tr. Vol. 3 at 569:14-16 (Duchin).

56.     In his report, Defendants' expert, Mr. Bryan, referred to redistricting criteria identified by the Congressional Research Service. DX4 at 4. Nevertheless, Mr. Bryan testified that he was "familiar with the redistricting guidelines adopted by the Alabama reapportionment committee," Hr'g Tr. Vol. 4 at 935:4-8, and that "nothing in the Congressional Research Service report would override or modify the specific criteria that Alabama has articulated in its guidelines," *id.* at 1034:14-17. Mr. Bryan explained in his report that redistricting criteria beyond those supplied by the "U.S. Constitution and the Voting Rights Act" may be adopted by the states in "constitutions or statutes, or may be adopted by a legislature, chamber, or committee, or by a court that is called upon to draw a plan when the legislative process fails." DX4 at 4. Finally, Mr. Bryan testified that he understood the Guidelines "to be the governing document that lays out the requirements for the development of redistricting plans in Alabama," Hr'g Tr. Vol. 4 at 1029:2-5, and that he "review[ed]" and "relied" on those Guidelines in connection with drafting his report, *id.* at 1041:12-17.

57.     Alabama's Guidelines reflect Alabama's traditional redistricting criteria.

58.     The Redistricting Guidelines create a two-tiered hierarchy of redistricting criteria. CPX82. In the first tier, the Guidelines instruct that a reapportionment map must: (1) comply with the principle of one-person, one-vote;

(2) be contiguous; (3) be "reasonably compact" (4) comply "with the Voting Rights Act of 1965;" and (5) may not subordinate "race-neutral districting criteria to considerations of race . . . except that race, color, or membership in a language-minority group may predominate over race-neutral districting criteria to comply with Section 2 of the Voting Rights Act . . . when there is good reason to believe that race must be used in order to satisfy the Voting Rights Act." CPX82 at 2-3 ¶¶ II(a)-(h).

59.    In the second tier, the Guidelines instruct that the following factors "shall be observed to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and law of the United States and of the State of Alabama." CPX82 at 3-4 ¶ II(j). Those factors include: (1) incumbency protection; (2) respect for communities of interest; (3) preserving the cores of existing districts; and (5) minimization of the number of counties in each district. *Id.*

60.    The Guidelines make plain that complying with the second tier of criteria is a balancing act: "in each instance where" the second-tier criteria "conflict, the Legislature shall at its discretion determine which takes priority." But in no circumstance shall the second-tier criterion supersede any first-tier criterion. CPX82 at 3 ¶ II.j.

61.    Plaintiffs' experts testified that they understand Alabama's Guidelines to create precisely this two-tiered hierarchy. Hr'g Tr. Vol. 2 at 515:22-519:25 (Cooper); Hr'g Tr. Vol. 3 at 574:16-575:21 (Duchin). Dr. Duchin testified that "the

committee guidelines create a . . . hierarchy" in which criteria like "incumbency consideration and core preservation" cannot take precedence over "federal requirements." Hr'g Tr. Vol. 3 at 575:8-17. She also testified that Alabama's hierarchy of guidelines is "consistent with what [she] see[s] in numerous other states." *Id.* at 575:18-21.

62.     Dr. Duchin further explained that the criteria set forth in the Guidelines are often in tension. "[I]t's common place," she explained, for one criterion to conflict with another. Hr'g Tr. Vol. 3 at 576:1-16. By way of example, Dr. Duchin offered that "exact population balance requires you to break up units and so its [in tension] with respecting political boundaries." *Id.* And "compactness can be [in tension] with communities of interest. If you have a well-identified community with important shared interests that itself is residentially located in [an] elongated configuration, then you have a choice to make" between "keeping that community whole" and the "compactness of your district." *Id.* In sum, Dr. Duchin stated that "redistricting is all about . . . trade offs." *Id.* at 576:17-20.

63.     Mr. Cooper testified to the same, explaining that "each of [his] illustrative plans balances traditional districting principles in different ways." Hr'g Tr. Vol. 2 at 474:13-16; *see also id.* at 521:18-23 ("The key to drawing a good plan is to balance. . . .").

64.     Defendants' expert Mr. Bryan testified similarly, stating that

- 17 -

Alabama's Guidelines "express certain criteria that are inviolable" like compliance "with the Voting Rights Act" and creating "equitable population[s]." Hr'g Tr. Vol 4 at 1012:10-18 (Bryan). He further testified that "if two districts are required in order to comply with the Voting Rights Act," the Guidelines require that "race-neutral criteria would have to yield to whatever is needed to be done to comply with the Voting Rights Act." *Id*. at 1043:3-10. Finally, Bryan testified that criteria such as protecting incumbents and communities of interest, minimizing the number of counties in each district, and core preservation "cannot be used to subordinate or impair" the criteria "stated above them" in the Guidelines, such as population equality, VRA compliance, and respect for political subdivision boundaries. *Id.* at 1043:23-1044:14.

### ii.     Population Equality

65.     The Court finds that Plaintiffs' illustrative plans comply with the principle of one-person, one-vote.

66.     There is no factual dispute on this front. Mr. Cooper and Dr. Duchin each testified that their plans each contain minimal population deviation. CPX1 at 21 ¶ 46; Hr'g Tr. Vol. 2 at 441:11-19 (Cooper); Hr'g Tr. Vol. 3 at 590:4-8 (Duchin). And Defendants' expert, Mr. Bryan, agreed, testifying that "the total population numbers that [he] reviewed in [Cooper's] tables and that [he] confirmed suggest that [Cooper] meets that criteria." Hr'g Tr. Vol. 4 at 930:18-931:1 (Bryan).

### iii.    Contiguity

67.    The Court finds that Plaintiffs' illustrative plans contain contiguous districts.

68.    On this score, there is also no dispute. Plaintiffs' experts, as well as Mr. Bryan, testified that each of the illustrative plans respect the principle of contiguity. CPX1 at 21 ¶ 46; Hr'g Tr. Vol. 3 at 624:20-625:1 (Duchin); Hr'g Tr. Vol. 4 at 931:10-20 (Bryan).

### iv.    Compactness

69.    The Court finds that Plaintiffs' eleven illustrative plans have comparable compactness scores to Alabama's 2021 Enacted Plan.

70.    As Defendants' expert Mr. Bryan explained, compactness is not an objective measure, but instead a "relative measure within one set of plans for a specific state for a specific redistricting exercise versus another set of plans for the same state for the same redistricting exercise." Hr'g Tr. Vol. 4 at 1045:21-1046:1.

71.    The parties' experts each evaluated the 2021 Enacted Plan and Plaintiffs' illustrative plans using the Reock and Polsby-Popper analyses, two commonly used measures of a district's compactness.

72.    Dr. Duchin also made use of the "Block Edge" test, and Mr. Bryan included Convex-Hull and Schwartzberg metrics. Because every expert made use of the Reock and Polsby-Popper tests, the Court focuses on those metrics in its analysis.

73.     As Mr. Cooper explained, the Reock test is "an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible. For each district, the Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district. The measure is always between 0 and 1, with 1 being the most compact." CPX1 at n.21; *see also* MPX3 at 6; Hr'g Tr. Vol. 3 at 590:9-591:9 (Duchin).

74.     The Polsby-Popper test, by contrast, measures "the ratio of the district area to the area of a circle with the same perimeter. The measure is always between 0 and 1, with 1 being the most compact." CPX1 at n.22; *see also* MPX3 at 6; Hr'g Tr. Vol. 3 at 590:9-591:9 (Duchin).

75.     Although "these metrics . . . measure different things," the Polsby-Popper metric is, "by far, the most common in redistricting." Hr'g Tr. Vol. 3 at 591:22-24 (Duchin).

76.     The table provided in Mr. Bryan's report below measures the compactness of the 2021 Enacted Plan using several different measures. The table shows that, under the Polsby-Popper metric, the Plan has a range of scores from .15 to .32, with an average score of .22. DX4 at 18. Under the Reock metric, the 2021 Enacted Plan has as score range between .3 and .5, with an average score of .38. *Id.*

**Compactness Table 2 Alabama 2021 Enacted Plan Compactness Scores**

| District | Polsby-Popper | Schwartzberg | Reock | Convex_Hull | Total |
|----------|---------------|--------------|-------|-------------|-------|
| 1 | 0.20 | 0.44 | 0.40 | 0.71 | 1.75 |
| 2 | 0.26 | 0.51 | 0.50 | 0.76 | 2.02 |
| 3 | 0.25 | 0.50 | 0.36 | 0.77 | 1.88 |
| 4 | 0.19 | 0.44 | 0.36 | 0.61 | 1.60 |
| 5 | 0.32 | 0.56 | 0.30 | 0.80 | 1.98 |
| 6 | 0.15 | 0.39 | 0.31 | 0.68 | 1.55 |
| 7 | 0.19 | 0.44 | 0.43 | 0.68 | 1.74 |
| Sum | 1.55 | 3.28 | 2.67 | 5.01 | |
| Average | 0.22 | 0.47 | 0.38 | 0.72 | |

77.    The compactness scores of Dr. Duchin's illustrative plans are generally superior to the scores obtained by the 2021 Enacted Plan. As reported in the chart below, taken from MPX3 at 6, the average Polsby-Popper scores of each of Dr. Duchin's four illustrative plans outpaces the average score obtained by the 2021 Enacted Plan. And the average Reock score of those same plans is only slightly lower than the average Reock score of the Enacted Plan.

**Compactness**

| | block cut edges (lower is better) | average Polsby-Popper (higher is better) | average Reock (higher is better) |
|------|---------------|---------------|---------------|
| HB-1 | 3230 | 0.222 | 0.427 |
| Plan A | 3417 | 0.256 | 0.378 |
| Plan B | 3127 | 0.282 | 0.365 |
| Plan C | 3774 | 0.255 | 0.338 |
| Plan D | 3540 | 0.249 | 0.399 |

78.    According to Dr. Duchin, "[a]ll four of [her] plans are significantly more compact than the state's enacted plan by . . . the average Polsby-Popper score." Hr'g Tr. Vol. 3 at 593:1-5.

79.    Mr. Cooper's seven illustrative plans fall within a similar range of

- 21 -

compactness scores.

80.     As shown in the chart below, Mr. Cooper's illustrative plans 1 through 6 generally score just a few one-hundredths below the average score obtained by the 2021 Enacted Plan under both the Polsby-Popper and Reock measures. Mr. Cooper's Illustrative Plan 4 equals the average score obtained by the 2021 Enacted Plan under the Polsby-Popper measure. Mr. Cooper's Illustrative Plan 7, meanwhile, scores higher than the 2021 Enacted Plan under the Reock measure and comes just .01 shy of matching the 2021 Enacted Plan's Polsby-Popper score.

| Cooper – Compactness Scores | | | | | | | |
|---|---|---|---|---|---|---|---|
| Plan | Reock | | | | Polsby-Popper | | |
| **2021 U.S. Congressional Plan** | | Low | High | | | Low | High |
| All Districts (Mean Avg.) | .38 | .30 | .50 | | .22 | .15 | .32 |
| CD 2 | .50 | | | | .26 | | |
| CD 7 | .43 | | | | .19 | | |
| **Illustrative Plan 1** | | | | | | | |
| All Districts (Mean Avg.) | .34 | .21 | .47 | | .18 | .13 | .33 |
| CD 2 | .36 | | | | .18 | | |
| CD 7 | .37 | | | | .13 | | |
| **Illustrative Plan 2** | | | | | | | |
| All Districts (Mean Avg.) | .34 | .21 | .52 | | .18 | .12 | .33 |
| CD 2 | .31 | | | | .12 | | |
| CD 7 | .40 | | | | .13 | | |
| **Illustrative Plan 3** | | | | | | | |
| All Districts (Mean Avg.) | .34 | .20 | .47 | | .18 | .12 | .33 |
| CD 2 | .33 | | | | .14 | | |
| CD 7 | .37 | | | | .13 | | |
| **Illustrative Plan 4** | | | | | | | |
| All Districts (Mean Avg.) | .33 | .20 | .41 | | .22 | .13 | .34 |
| CD 2 | .33 | | | | .24 | | |
| CD 7 | .41 | | | | .24 | | |
| **Illustrative Plan 5** | | | | | | | |
| All Districts (Mean Avg.) | .29 | .19 | .39 | | .18 | .11 | .33 |
| CD 2 | .39 | | | | .19 | | |
| CD 7 | .23 | | | | .11 | | |
| **Illustrative Plan 6** | | | | | | | |

| All Districts (Mean Avg.) | .31 | .24 | .35 | | .16 | .10 | .34 |
|---|---|---|---|---|---|---|---|
| CD 2 | .29 | | | | .11 | | |
| CD 7 | .34 | | | | .11 | | |
| **Illustrative Plan 7** | | | | | | | |
| All Districts (Mean Avg.) | .41 | .20 | .56 | | .21 | .13 | .39 |
| CD 2 | .39 | | | | .19 | | |
| CD 7 | .37 | | | | .13 | | |

81.    Mr. Cooper's "illustrative plans [a]re . . . comparable" to "the other Alabama statewide plans including the enacted congressional plan." Hr'g Tr. Vol. 2 at 458:25-459:6 (Cooper).

82.    The record also shows that Plaintiffs' illustrative plans fall within the normal range of the 2021 Enacted Plan and other congressional plans. CPX76; CPX1 at 35-36 ¶¶ 82-84, Figure 22; CPX59 at 6-9 ¶¶ 17-28. Texas's 2021 Congressional Plan, for instance, contains several districts that score well below the lowest Reock score of Mr. Cooper's illustrative plans, and several more that score below the lowest Polsby-Popper score of those same plans. CPX76; CPX59 at 8-9 ¶¶ 23-28. Indeed, three congressional districts in Texas have Reock scores at .19 or lower and one district that has as Polsby-Popper score as low as .04. *Compare* CPX76; *with* CPX59 at 6-8 ¶¶ 17-22.

83.    According to Defendants' expert Mr. Bryan, Dr. Duchin's illustrative plans "[g]enerally . . . outperform the Alabama plan across all" compactness measurements used by the experts. Hr'g Tr. Vol. 4 at 869:1-7. As for Mr. Cooper's plans, Mr. Bryan testified and wrote in his report that Illustrative Plan 4 "has

- 23 -

comparable scores to the" 2021 Enacted Plan and that "Illustrative Plans 1 to 3 and 5 and 6 have inferior compactness scores to the Duchin plans." *Id.* at 977:10-978:10. Mr. Bryan offered "no opinions or conclusions on" Mr. Cooper's Illustrative Plan 7. *Id.* at 976:9-14.

84.    Nevertheless, Mr. Bryan did *not* conclude that either Mr. Cooper's or Dr. Duchin's illustrative plans were not reasonably compact. In fact, Mr. Bryan testified that there is no "threshold or standard by which to judge whether a map is considered reasonably compact." Hr'g Tr. Vol. 4 at 969:5-11. He also conceded that he is "not aware of any requirement that illustrative plans in a Section 2 case be as compact or more compact than the enacted plan." *Id.* at 969:17:20.

85.    After reviewing the compactness measures supplied by the expert reports received in this case and listening to the expert testimony provided at the preliminary injunction hearing, the Court concludes that the districts in Mr. Cooper's and Dr. Duchin's illustrative plans are reasonably compact. Dr. Duchin's plans have compactness scores generally superior to those obtained by the 2021 Enacted Plan, and Mr. Cooper's illustrative plans have compactness scores that are generally comparable to the scores obtained by the 2021 Enacted Plan.

86.    The Court finds that Plaintiffs' illustrative plans are consistent with the traditional districting principle of compactness.

- 24 -

### v.   Communities of Interest

87.     Based on the record, the Court concludes that Mr. Cooper's and Dr. Duchin's illustrative plans comply with the redistricting criterion of respecting communities of interest.

88.     A community of interest exists in the Black Belt and between Black Alabamians living in the Black Belt, Montgomery County, and Mobile County. The geographic configuration of District 2 in both Mr. Cooper and Dr. Duchin's illustrative plans preserve this community of interest far better than the 2021 Enacted Plan.

89.     Alabama's Redistricting Guidelines define communities of interest quite broadly: "an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities. The term communities of interest may, in certain circumstances, include political subdivisions such as counties, voting precincts, municipalities, tribal lands and reservations, or school districts." CPX82 at 2-3 ¶ j(iii).

90.     Plaintiffs' experts, as well as their lay witnesses, demonstrated that Alabama's Black Belt, Montgomery County, and the City of Mobile comprise of communities of interest.

91.     Dr. Duchin bore communities of interest "in mind when drawing [her] illustrative plans." Hr'g Tr. Vol. 3 at 594:15-19. Despite Alabama's failure to define

specific communities of interests it deems important (as other states have), *id.* at
595:6:15, Dr. Duchin identified two overlapping communities of interest: (1) "the
cores of cities in Alabama" and (2) "the Black Belt across the state," *id.* at 595:16-
23. She explained in her report that the Black Belt counties "have a long shared
history from plantation slavery to sharecropping to Jim Crow and up to the present"
and as such "constitute very clear communities of interest by the Guidelines
definition." MPX3 at 10.

92.     Under Alabama's guidelines, an entire congressional district need not
"form a single community of interest"; rather, "communities should be taken into
account when [one] draw[s] . . . districts." Hr'g Tr. Vol. 3 at 596:23-597:12
(Duchin). Dr. Duchin explained that individuals can be members of more than one
community of interest; as a result, protecting communities will require "trade offs,
because communities can and will overlap. . . . [S]ometimes it's impossible to
preserve one [community] without breaking another." *Id.* at 597:24-598:11.

93.     Taking this into account, Dr. Duchin testified that she drew her
illustrative plans to place the lion's share of the Black Belt in a majority-Black
district and to preserve counties and keep urban cores that form the center of
municipal communities whole. Hr'g Tr. Vol. 3 at 598:21-599:12.

94.     Defendants' assertion that Plaintiffs' illustrative plans fail to place the
*entire* Black Belt into a single district does not alter the Court's conclusion that those

plans respect communities of interest. As Dr. Duchin explained, "communities can be of all sizes and are not necessarily the exact size of congressional districts. . . . [C]ommunities should be taken into account when you draw so that either they're kept whole within a district, or if it's appropriate, split among several in a way that amplifies their opportunity to be heard by their representative." *Id.* at 596:23-597:12. Plaintiffs' plans achieve this goal by giving the Black Belt counties a meaningful voice in two districts where they can elect their preferred candidates.

95.     Mr. Cooper showed a similar respect for communities in the Black Belt and within municipal boundaries. Like Dr. Duchin, Mr. Cooper relied on the specific definition of communities of interest included in the Redistricting Guidelines. Hr'g Tr. Vol. 2 at 447:6-449:18 (Cooper). Mr. Cooper testified that he considered "communities of interest to include political subdivisions like counties and towns and cities" and "that the minority population in and of itself can be a community of interest." *Id.* at 447:6-16. On this latter note, Mr. Cooper identified his "knowledge of historical boundaries" in Alabama as guiding his illustrative plans' respect for the Black Belt, *id.*, as well as scholarship on Alabama's history, CPX1 at 7 ¶ 16 & n.6.

96.     District 2 in each of Mr. Cooper's illustrative plans "includes African American communities in Mobile County, Montgomery County and the central and eastern rural Black Belt counties." CPX1 at 22. His inspiration for the configuration of his District 2 was the 2021 State Board of Education ("SBOE") plan recently

enacted by the Alabama Legislature, *id.*, which was created pursuant to the same Redistricting Guidelines that governed the Legislature's creation of the 2021 Enacted Plan. Hr'g Tr. Vol. 4 at 1030:3-1032:4 (Bryan). District 5 in the 2021 SBOE plan encompasses part of the Black Belt and pairs Mobile and Montgomery Counties together while combining only part of Mobile County with Baldwin County. Hr'g Tr. Vol. 2 at 435:10-436:1 (Cooper).

97.     Senator Dial, former co-chairman of the Legislature's Reapportionment Committee, recently testified in federal court that the 2011 BOE plan—which configured District 5 the same way as the 2021 SBOE Plan—was drawn to respect "[t]he integrity of communities of interest." CPX86 at 646:10-13.

98.     *Milligan* Plaintiffs' expert Dr. Joseph Bagley confirmed Dr. Duchin's and Mr. Cooper's understanding that the Black Belt, Montgomery County, and the City of Mobile form a community of interest. The Court has accepted Dr. Bagley as qualified to testify as an expert in Alabama political history, political analysis, and historical methodology. Hr'g Tr. Vol. 5 at 1142:1-13. The Court finds Dr. Bagley credible, his analysis methodologically sound, and his conclusions reliable. The Court credits Dr. Bagley testimony and conclusions.

101.    Dr. Bagley testified that the Black Belt in Alabama is scarred by the State's history of slavery. Hr'g Tr. Vol. 5 at 1161:18-1163:10. The Black Belt derives its name from "the deep rich black soil" which "was perfect for growing

long-staple cotton." *Id.* at 1162:7-18. White Alabamians earned fortunes off this land and the slaves they used to work it. *Id.*

102.   After Reconstruction, white landowners in the Black Belt retained their property, leaving newly emancipated Black Alabamians "landless tenant farmers [and] sharecroppers." Hr'g Tr. Vol. 5 at 1162:19-1163:4 (Bagley). The "legacy" of these events are "very long and profound": the "Black Belt remains characterized by its mostly black population [and] by the fact that it is stricken by poverty." *Id.*

103.   Dr. Bagley also testified that over multiple migrations during the 20th Century, Black Alabamians in the Black Belt moved to urban centers in Alabama— "especially Mobile," Hr'g Tr. Vol. 5 at 1163:5-21—because white landowners refused to pass down federal aid to their Black sharecropping tenant farmers. MPX9 at 1-2. Consequently, many residents of the City of Mobile share a common "history with [B]lack people in the Black Belt." *Id.* at 1163:11-21 (Bagley). Indeed, many Black families in the City of Mobile are Black Belt migrants or the descendants thereof. MPX9 at 3. White flight out of Mobile has also left most public schools east of I-65 in Mobile overwhelmingly Black. *Id.* In sum, "the Black communities of Mobile and the Black Belt share significant historic, demographic, and socioeconomic interests." *Id.*

104.   Plaintiffs also proffered extensive lay testimony supporting the existence of the community of interest identified by Dr. Duchin, Dr. Bagley, and Mr.

Cooper.

105.   *Milligan* Plaintiff Shalela Dowdy is a Captain in the United States Army who grew up, and currently resides, in Mobile. Hr'g Tr. Vol. 2 at 364:8-22 (Dowdy). She is a fellow at the Community Redistricting Organization Working For Democracy ("CROWD"), where she works on redistricting and voter advocacy in southern Alabama. *Id.* at 365:20-367:4.

106.   Captain Dowdy testified that Black Belt and Mobile population share common interests and struggles due to poverty and poor access to health care and education. Hr'g Tr. Vol. 2 at 372:24-375:4. She explained that many Black Alabamians living in the Black Belt and Mobile lack access to hospitals and medical insurance and suffer from debilitating diseases like HIV. *Id.* And these same folks lack access to early education because of disappearing pre-K programs in these communities and the inability for Black parents to afford childcare. *Id.* These problems arise, she explained, from a shared poverty affecting Black Alabamians living in the Black Belt and Mobile County. *Id.* They also run through familial ties between those living in Mobile and the Black Belt. *Id.* at 372:24-373:23 (Dowdy).

107.   Captain Dowdy also testified that Black residents of Black Belt counties north of Mobile work at the Mobile port. Hr'g Tr. Vol. 2 at 372:20-23. Putting a fine point on it, Captain Dowdy explained that "[B]lack people in the Black Belt [and] [B]lack people in the central lower half of Alabama are all dealing with

the same issues." *Id.* at 382:2-7.

108.   *Milligan* Plaintiff Evan Milligan testified similarly with respect to the connection between the Black Belt, Montgomery, and the City of Mobile. Mr. Milligan is the Executive Director of Alabama Forward, a coalition of non-profit groups working to make voting systems in Alabama fair and accessible. Hr'g Tr. Vol. 1 at 127:1-17 (Milligan). In his role, Mr. Milligan supervises a team providing grants and assistance to 28 non-profit organizations around the state, all of which are devoted in different ways to making "the electorate diverse" and expanding voter engagement, education, and protection. *Id.* Mr. Milligan spent most of his childhood in Montgomery County, where he currently lives. *Id.* at 126:4-9.

109.   Mr. Milligan testified that a second majority-Black district was necessary in the state to remedy "the lack of agency that black voters feel . . . in Montgomery" and "throughout the Black Belt and throughout the southwest part of the state." Hr'g Tr. Vol. 1 at 136:23-137:6. He explained that an additional majority-Black district "would provide more buy-in for those communities and . . . incentive[s] to make . . . longer term commitments." *Id.* Moreover, the additional political representation would allow Black residents of this region to "see themselves as leaders of those communities." *Id.*

110.   Mr. Milligan further testified that he and countless other Alabamians living in Montgomery are also connected to the Black Belt Counties by family and

family history. Hr'g Tr. Vol. 1 at 140:11-141:5. He explained that Black communities in Montgomery County and the Black Belt share similar socioeconomic challenges in education, job training, public transportation, access to health care, food deserts, and access to quality food. *Id.* at 142:8-22. This bond between communities is deepened by a shared "sense of frustration and sometimes isolation from opportunity." *Id.* at 142:23-25.

111.   Mr. Milligan has observed many of the same unifying challenges in the Black communities in Mobile. He testified that his experience of the folks living in Mobile "layered directly on to what [he] was seeing [in] Washington County, Wilcox, Dallas, and more rural parts of Montgomery County," as well as "Macon County." Hr'g Tr. Vol. 1 at 143:7-22. He described that many of the socioeconomic obstacles facing residents of the Black Belt and Montgomery also face the Black community in Mobile, and he identified a similar ancestral and familial bond between Mobile County and the Black Belt that exists in Montgomery. *Id.* at 143:23-144:22. He also explained that this shared history is unique to these communities: "[T]he historical thread that informs their understanding of the root causes of their problems," the ways "the state government has enabled those problems, or failed to adequately respond to them, . . . would be a pretty unique feature for the Black Belt, Montgomery County, and the part of Mobile County that I'm referring to." *Id.* at 146:11-147:9. Mr. Milligan continued: the problems facing these communities are

"as unique as the types of accents and the types of cultural traditions that we have in our communities," which "have been forged over decades of close continuous relationship of different community members." *Id.* at 148:8-24.

112.   Mr. Milligan also detailed the shared cultural identity and customs between the same regions, including Montgomery County and numerous Black Belt counties. He spoke of a common culture comprised of "idioms and ways of speaking, quilting and sewing, traditions, music traditions, whether it's blues or four-part harmony Gospel, different traditions of story telling, [and] family reunions." Hr'g Tr. Vol. 1 at 143:1-6.

113.   Mr. Milligan rejected as wrongheaded the notion that the community of interest he identified between Mobile, the Black Belt, and Montgomery is united simply by race. He explained that he does not "mean to [describe] some sort of litmus test that is only open to . . . race"; instead, the community of interest is united by the ways in which "racial experiences . . . shap[e] a lot of the features that I'm trying to describe, particularly because of the unique experiences of Alabamians." Hr'g Tr. Vol. 1 at 155:2-8.

114.   *Caster* Plaintiff Benjamin Jones reinforced Mr. Milligan's testimony. Mr. Jones lives in Montgomery but was raised in Barbour County. Hr'g Tr. Vol. 5 at 1342:17-25 (B. Jones). Mr. Jones currently serves as the CEO of Montgomery Community Action Agency and is a pastor of a church outside of Montgomery

County. *Id.* at 1343:19-25. Montgomery Community Action Agency is a non-profit agency that serves majority-Black communities by providing children and families, as well as senior citizens, programing intended to assist with socioeconomic problems. *Id.* at 1344:1-16.

115.   Mr. Jones testified that based on his work and experience in Alabama, the Black community in Montgomery is connected with the Black Belt community through shared socioeconomic obstacles they face in education, poverty, low tax bases, lack of health care and affordable housing, and problems in criminal justice. Hr'g Tr. Vol. 5 at 1359:3-15.  "Montgomery is tied to the Black Belt," Mr. Jones explained; "[i]t's almost one and the same for the [B]lack population." *Id.*

116.   *Caster* Plaintiff Dr. Marcus Caster—who lives in Washington County, grew up in northern Mobile County and worked for years in the City of Mobile— testified that Black residents in the Mobile area share more in common with the Black Belt region than they do with Baldwin County. Hr'g Tr. Vol. 6 at 1636:13-25.

117.   In contrast to the testimony outlined above, Mr. Bryan's only reference to communities of interest in his initial report relies on testimony from former Representatives Bonner and Byrne from the *Chestnut* proceeding and Wikipedia, which Mr. Bryan used "to find information about . . . the primary drivers of the economy in Mobile and Baldwin counties." DX2 at 16-17; Hr'g Tr. Vol. 4 at 1005:13-18, 1072:3-7 (Bryan). Based on this testimony, he claimed that "Mobile

and Baldwin counties are an inseparable" community of interest. *Id.* at 1005:23-1006:3. But he immediately conceded that he does not "have the expertise to say that it's unreasonable to try and draw a district" that splits part of Mobile County from Baldwin County. *Id.* at 1006:14-1007:10. And he also conceded that he did not "review the trial testimony of anybody else in the *Chestnut* trial regarding the differences or similarities between Mobile and Baldwin Count[ies]," *id.* at 1008:20-1009:4, including the testimony of numerous community members and organizers, who Mr. Bryan admits are the "very best sources of information about what is going on locally and what the community needs are." *Id.* at 1069:11-19.

118.   Nor does Mr. Bryan explain why, if Mobile and Baldwin Counties are "inseparable," the State's 2021 Board of Education Plan mirrors Plaintiffs' illustrative plans in joining the City of Mobile with the Black Belt counties and Montgomery. Mr. Bryan testified that he "did not assess the legislative, senate, or State Board of Education plan" as part of his expert analysis in this case. Hr'g Tr. Vol. 4 at 1031:11-12. And he assumed that all maps drawn by the legislature were drawn in compliance with Alabama's Guidelines. *Id*. at 1032:1-4.

119.   As noted, Mr. Bryan did not review conflicting testimony in *Chestnut* that described stark differences between Mobile and Baldwin Counties and identified shared bonds between Mobile, Montgomery, and the Black Belt Counties. This was a serious omission. The named plaintiff in the *Chestnut* case, LaKeisha

Chestnut, for instance, testified that Mobile County has more in common with Montgomery County than it does with Baldwin County, partly because Mobile and Montgomery both have major urban centers, but also because the demographics of the counties: Baldwin County is comprised of older white retirees, whereas Mobile County is trending younger and more urban. CPX85 at 446:4-25.

120. Ms. Chestnut also discussed how "Baldwin County frightens [her]" because of "[t]he stigma that Baldwin County is [sic] a sundown county," a reputation that stems from the lynching of Michael Donald in 1981. CPX85 at 442:7-443:25; *see infra* Section I.B.4.b. Among the several personal stories she shared, one was about a trip to the beach in Fairhope Parrish "during the safe time of the day," when as she was leaving the town late in the day, a police officer followed her the entire way until she reached the city limits of nearby Daphne. CPX85 at 444:1-446:1. Traveling alone, Ms. Chestnut was "literally scared" and followed all traffic laws and executed safe driving habits for fear of being pulled over by the officer. *Id.*

121. Other lay witnesses in *Chestnut* testified at length to the deep connections between Mobile and Montgomery Counties. Former state Representative John Knight testified, for example, that during his 25 years in the Alabama House he observed many of the same concerns from Black Alabamians in Montgomery and Mobile relating to education, criminal justice reform, and healthcare—issues relevant to a wide swath of Alabamians, but which impact

African Americans in unique ways. CPX85 at 340:12-341:8. As for education, Plaintiff LaKeisha Chestnut explained that Mobile's predominantly Black public schools are failing, *id.* at 420:10-421:5, 421:6-422:7, while Rep. Knight and community organizer Karen Jones identified the exact same issue in Montgomery, *id.* at 365:10-13 (Knight); CPX84 at 220:25-222:3 (K. Jones). Representative Knight, Ms. Chestnut, and Ms. Jones also described criminal justice issues facing Black Alabamians in Mobile and Montgomery, such as disproportionately high incarceration rates, CPX85 at 340:2-11 (Knight); *id.* at 423:25-424:5 (Chestnut); CPX84 at 234:9-23 (K. Jones), police brutality and strained relationships with law enforcement, CPX85 at 423:1-25 (Chestnut); CPX84 at 222:19-224:9 (K. Jones); and reintegration of those leaving prison, CPX85 at 424:6-19 (Chestnut); CPX84 at 222:4-16 (K. Jones). They also spoke about the housing crises that Black communities face in both cities. CPX85 at 339:17-340:1 (Knight); *id.* at 427:6-428:1 (Chestnut); CPX84 at 225:13-226:2 (K. Jones). And they described similar employment issues facing Black Alabamians in both communities. *Id.* at 224:10-225:12 (K. Jones); CPX85 at 354:20-357:25 (Knight); *id.* at 424:20-425:24 (Chestnut).

122.   Based on the Plaintiffs' expert and lay witnesses' extensive testimony on the communities of interest in Alabama and Mr. Bryan's unjustifiable partial reliance on the *Chestnut* record, the Court concludes that communities of interest

exist within the Black Belt and between the Black Belt and Mobile and Montgomery Counties. The Court further finds that while Mobile and Baldwin Counties may form a community of interest, they do not form an inviolable community of interest that must be prioritized over any others.

123.   The Court finds that Plaintiffs' illustrative plans respect communities of interest.

### vi.   Incumbency Protection

124.   The Court finds that Plaintiffs' illustrative plans respect incumbents.

125.   Mr. Cooper's Illustrative Plan 5 does not pair any incumbents, and the remainder of Plaintiffs' illustrative plans pair just two of seven incumbents as a consequence of respecting higher order or conflicting redistricting criteria identified in the State's Redistricting Guidelines.

126.  Incumbency protection is "not exactly a traditional redistricting principle, partly because incumbents constantly change." Hr'g Tr. Vol. 2 at 495:5-15 (Cooper). Nevertheless, Mr. Cooper strove to respect incumbents where possible. For instance, Mr. Cooper testified that his Illustrative Plan 5 demonstrated "that you can draw two majority-Black districts for the U.S. House in Alabama and protect all incumbents." *Id*. 2 at 468:9-17. And he explained that each of his remaining plans pairs only one set of incumbents but nevertheless could be "modified such that" those plans would not pair any incumbents. *Id.* at 483:11-484:12.

127.   Defendants' expert Mr. Bryan does not dispute that Mr. Cooper's Illustrative Plan 5 pairs no incumbents. Hr'g Tr. Vol. 4 at 960:13-962:9. And he admitted that if Illustrative Plan 5 does not pair incumbents, by his definition it would "respect[] incumbents." *Id.* at 962:5-9.[3]

128.   For her part, Dr. Duchin testified that while her plans pair incumbents, they did so as a result of her respect for higher order considerations in the state's redistricting guidelines such as compactness and county integrity. Hr'g Tr. Vol. 3 at 669:22-670:11. She explained that fewer or no incumbency pairings were possible in her plans but at the expense of sacrificing compactness and county integrity. *Id.* To put a finer point on the balancing required by conflicting redistricting criteria, Dr. Duchin noted because two paired incumbents live in the same county, just miles apart, "to keep those incumbents in different districts," one would have "to split that county." *Id.* at 671:3-10. In any event, Dr. Duchin stated that it was possible, as Mr. Cooper has shown, to "draw a plan that avoided any incumbent pairings and still contain two majority-minority districts without sacrificing the principle of contiguity." *Id.* at 692:24-693:3.

129.   Defendants' expert, Mr. Bryan, criticized Plaintiffs' illustrative plans

[3] In his testimony Mr. Bryan initially claimed that he could not remember whether he omitted Mr. Cooper's Illustrative Plan 5 in his incumbency analysis because he did not have the block file necessary to review it or because "plan 5 manages to not pair any incumbents." Hr'g Tr. Vol. 4 at 960:13-23. Later, however, he admitted that he "received shapefiles and/or black allocation files for all of" Plaintiffs' plans. *Id.* at 1099:20-1100:5.

for pairing incumbents in some illustrative districts. Hr'g Tr. Vol. 4 at 955:4-19.  Mr. Bryan explained that one of the main virtues of protecting incumbents is "that the longer an incumbent has served in their district, the better able they are to know about the need of their constituents." *Id.* at 958:1-15, 959:9:20. But Mr. Bryan also testified that when these incumbents "were elected had no bearing in [his] incumbency analysis." *Id.* at 963:16-20. He was unaware at the time of his analysis that the incumbents in Districts 1 and 2—who are paired in some illustrative plans— have only been in an office a year, *id.* at 962:10-16, 964:12:22, no matter his testimony "that one of the reasons [he] believe[s] that incumbency protection is important is because the longer that an incumbent has served a district, the better able they are to serve that district." *Id.* at 963:21-25.

130.   The Court concludes that Mr. Cooper's Illustrative Plan 5 does not pair incumbents and to the extent the remainder of Plaintiffs' experts' illustrative plans pair incumbents they do so only to balance higher-order or competing redistricting criteria.

131.   Accordingly, Plaintiffs' illustrative plans satisfy the redistricting criterion of respect for incumbents.

### vii.   Core Retention

132.   Under Alabama's Redistricting Guidelines, the effort to preserve existing district cores does not supersede a map drawer's obligation to comply with

the Voting Rights Act ("VRA"). Additionally, Plaintiffs' experts could not avoid drawing plans with lower core retention scores than the 2021 Enacted Map in light of their effort to satisfy the first *Gingles* precondition.

133.   The preservation of district cores refers to the practice of having "new districts . . . resemble the previous districts." Hr'g Tr. Vol. 3 at 599:17-23 (Duchin). This metric is measured by either "looking at the area of overlap or the territorial overlap between a new district and its corresponding [district] . . . in the older plan, or by looking at the population that's either retained or displaced" in the districts of the new plan. *Id.*

134.   As explained earlier, Alabama considers core retention, along with incumbency protection and the protection of communities of interest, to be a tier two redistricting consideration that must give way in the case of conflict with tier one factors such as contiguity and compliance with the VRA. CPX82. Under Alabama's Guidelines "core preservation [is] clearly lower ranked" than compliance with "federal requirements." Hr'g Tr. Vol. 3 at 575:11-17 (Duchin). Indeed, in Alabama's 2011 Guidelines, core retention was not even included as a redistricting consideration. DX138.

135.   Moreover, as Dr. Duchin explained it is "impossible to have as high of a core preservation as . . . the newly enacted plans, while also having two majority-black districts" because "it's . . . mathematically impossible to create two majority-

black districts without a significant level of population reassignment from one district to another." Hr'g Tr. Vol. 3 at 600:4-16.

136.   She also explained that she prioritized compactness over core retention, because the "guidelines put core displacement as a priority below compactness." Hr'g Tr. Vol. 3 at 600:17-24. She explained that this was just another example of balancing redistricting criteria and that "if core preservation were elevated" over compactness in the Guidelines, "it would be quite easy to reconfigure [her] four" plans "to more resemble the previous enacted plan" but "that you would be doing so expressly at the cost of compactness." *Id.* at 600:17-601:7.

137.   Mr. Cooper's explanation of his treatment of core preservation is in line with Dr. Duchin's approach. He testified that "core preservation" "cannot supersede the Voting Rights Act" based on his reading of the Guidelines and his understanding of "traditional redistricting principles." Hr'g Tr. Vol. 2 at 519:2-25.

138.   Consistent with this understanding, Mr. Cooper explained that he retained the cores of existing districts to the extent possible while still creating illustrative plans containing two majority-Black districts in satisfaction of the first *Gingles* precondition. Mr. Cooper said that while in six of his seven plans "District 5 in north Alabama" is "almost identical to the District 5" in the Enacted Plan, the "core retention numbers" in the rest of his plan "might not match the state's" as a consequence of creating a second majority-Black district that does not currently

exist. Hr'g Tr. Vol. 2 at 480:7-17.

139.   Mr. Cooper further explained that based on his expertise, any plan drawn to remedy a violation of the VRA will require "chang[ing] districts." Hr'g Tr. Vol. 2 at 480:7-17. In Alabama, this meant that creating majority-Black districts in District 2 and 7 would require "all the districts" in the state "except for District 5" to be altered. *Id.* at 480:18-481:14. In other words, Mr. Cooper protected as best he could the districts that could be protected while still satisfying *Gingles* 1. *Id.*

140.   Defendants' expert Mr. Bryan agreed that it will "often times be the case" that "if a plan adds a majority-minority district that wasn't there before, the core retention of that plan will be less than plan that retains the same number of majority-minority districts." Hr'g Tr. Vol. 4 at 947:6-13.

141.   Mr. Bryan further testified that while his analysis showed the core retention of the Enacted Plan to be higher than the illustrative plans, he was unable to "offer an opinion on the relative advantages of a" plan that preserves all preexisting districts compared to "one that includes an additional . . . majority-Black district." Hr'g Tr. Vol. 4 at 949:1-11. Nor did Mr. Bryan "provide any analysis of the tradeoffs between" creating a second majority-Black district in Alabama or retaining the cores of existing districts. *Id.* at 953:18-954:22.

142.   In sum, Mr. Bryan explained that he "simply measured how much core retention there is and set the stage for how much of a difference there is" between

"the plaintiff plans" and "the enacted Alabama plan" but offered no opinions on the consequences or advantages created by those differences. Hr'g Tr. Vol. 4 at 952:13-954:22.

143.   *Caster* Plaintiff Mr. Jones, however, testified that he believed a second majority-district would bring benefits not available under the districts as drawn. Mr. Jones, who lives in Congressional District 2 under the Enacted Plan, testified that, since 2012, congressional elections in District 2 have been decided by as large as "30-point margins" against the candidates preferred by Black voters. Hr'g Tr. Vol. 5 at 1346:19-1347:4. Mr. Jones brought this lawsuit to allow "[B]lacks in Montgomery" to elect a candidate who "represent[s] the interests of the [B]lack community" and to bring about that reality he is seeking the creation of second majority-Black district in Alabama. *Id.* at 1347:24-1348:11.

144.   Dr. Caster offered the same testimony as Mr. Jones but with respect to his experiences living in Congressional District 1, where the races have not been competitive in at least a decade. Hr'g Tr. Vol. 6 at 1623:23-1626:4. Dr. Caster echoed Mr. Jones's testimony that a change in representation would benefit the Black residents in his district, who are not being effectively represented under the 2021 Enacted Plan. *Id.* at 1626:22-1627:21.

145.   *Milligan* Plaintiffs echoed this testimony. Captain Dowdy testified that a second majority-Black district "is important for fair and equitable representation"

in Alabama. Hr'g Tr. Vol. 2 at 370:5-24. She explained that she does not feel "confident" that her representative—Representative Carl—"is adequately representing" her in Congress because he does not support legislation "that can help fix the issues" in her community. *Id.* Captain Dowdy put it sharply: "[W]hen you're able to elect someone who understands you, who comes from your community, then progress can be made. . . . It is necessary that we have a second [B]lack district." *Id.*

146.  Mr. Milligan testified similarly. He stated that a second majority-Black district is critical. Alabama's racially polarized voting does not allow for "the election of a non-white candidate in districts where you have . . . a close margin between white and non-white voters." Hr'g Tr. Vol. 1 at 135:22-136:5. A second majority-Black district is therefore necessary, Mr. Milligan explained, to "ensure[] that black voters, particularly in central and southwestern Alabama have an opportunity to elect a candidate of their choice, and that their votes . . . aren't discounted." *Id.* at 136:6-11.

147.  The Court concludes that Plaintiffs' illustrative plans comply with traditional redistricting principles and Alabama's Guidelines. Plaintiffs' illustrative plans preserve the cores of districts where possible and adhere to the hierarchy Alabama's guidelines provide. The Court further finds that Defendants have not identified any advantages or disadvantages brought upon by core retention.

### viii.   Racial Considerations

99.    The Court further concludes that neither Mr. Cooper nor Dr. Duchin subordinated traditional redistricting principle in favor of race-conscious considerations.

100.    Dr. Duchin testified that she drew these plans by first drawing relatively balanced districts at the county level. She then proceeded to tune the districts' population by using ever more granular units of population, terminating with census blocks data which she used to ensure equal population across districts. Hr'g Tr. Vol. 3 at 571:6-573:8. Dr. Duchin further explained that she chose where to place her district lines and which census precincts to split by using a priority system. *Id.* at 571:6-573:8. She first strove to protect the constitutional principle of one-person, one-vote, then to ensure her districts were compact, and only after "sometimes looked at race . . . to make sure that [she] was creating two districts over 50 percent" minority population. *Id.* "Beyond ensuring crossing the 50 percent line," Dr. Duchin explained, "there was no further consideration of race in choosing" where to draw lines in her plans. *Id.* at 572:19-573:8.

101. Mr. Cooper testified that race did not "predominate" in the "development of any of [his] illustrative plans" but rather was one of many factors he had to balance in drawing illustrative plans for a Section 2 lawsuit. Hr'g Tr. Vol. 2 at 441:2-5; *see also id.* at 444:5-13. He testified that he drew the plans to conform

to county boundaries, and split counties where necessary to comply with the principle of population equality. CPX 1 at 21 ¶ 47; Hr'g Tr. Vol. 2 at 442:9-12. He further testified that when deciding where to split precincts he "tried to follow municipal boundaries or main thoroughfares or census block groups, . . . areas designated by the Census Bureau as having some commonality." *Id.* at 524:5-16. And he made clear that race did not play a role in these decisions—when he had to split Census blocks he did so only to get to zero deviation. *Id.* at 525:3-11.

102. For his part, Defendants' expert Mr. Bryan testified that "at no point in [his] report" did he "offer any conclusions or opinions as to the apparent basis of any individual line drawing decisions in Mr. Cooper's illustrative plans." Hr'g Tr. Vol. 4 at 975:21-25 (Bryan).

103. The Court finds that race did not predominate in the drawing of any of Plaintiffs' illustrative plans.

## 2. Second *Gingles* Precondition: Black voters in Alabama vote extremely cohesively.

148. The Court has accepted Dr. Maxwell Palmer as qualified to testify as an expert regarding redistricting and data analysis. Hr'g Tr. Vol. 3 at 700:22-701:8. The Court finds Dr. Palmer credible, his analysis methodologically sound, and his conclusions reliable. The Court credits Dr. Palmer's testimony and conclusions.

149.   The Court has accepted Dr. Baodong Liu as qualified to testify as an expert regarding racial-polarization analysis and American political behavior. Hr'g Tr. Vol. 5 at 1254:19-1256:1.

150.   Dr. Palmer conducted a racially polarized voting analysis of CDs 1, 2, 3, 6, and 7, as a region ("Focus Area") and individually. Hr'g. Tr. Vol. 3 at 704:10-16 (Palmer).

151.   Dr. Palmer employed a statistical method called Ecological Inference ("EI") to derive estimates of the percentage of Black and white voters in the Focus Area that voted for each candidate in statewide elections for U.S. President, U.S. Senate, Governor, Lieutenant Governor, Secretary of State, Attorney General, State Auditor, Treasurer, Commissioner of Agriculture and Industries, Chief Justice of the State Supreme Court, and Associate Justice of the State Supreme Court from 2012-2020. CPX79 at 2 ¶ 10; Hr'g. Tr. Vol. 3 705:8-22 (Palmer).

152.   Dr. Palmer conducted three ecological inference analyses, one at the precinct level for the 2016, 2018, and 2020 general elections and the 2017 special election for U.S. Senate; one at the precinct level for the 2020 general elections; and one at the county level for the 2012 and 2014 general elections. CPX79 at 12-16, tbls. 2-9; Hr'g. Tr. Vol. 3 707:5-15 (Palmer).

153.   Dr. Palmer first examined each racial group's support for each candidate to determine if members of the group vote cohesively in support of a single

candidate in each election. CPX79 at 4 ¶ 14. If a significant majority of the group supported a single candidate, he then identified that candidate as the group's candidate of choice. *Id.* Dr. Palmer examined NH SR BCVAP. Hr'g. Tr. Vol. 3 744:16-24 (Palmer). Dr. Palmer next compared the preferences of white voters to the preferences of Black voters. CPX79 at 5 ¶ 14. Evidence of racially polarized voting is found when Black voters and white voters support different candidates. *Id.*

154.   In every election examined, in each congressional district and the Focus Area as a whole, Black voters had clearly identifiable candidates of choice. Hr'g. Tr. Vol. 3 at 701:22-702:4 (Palmer); CPX79 at 6, fig. 3; 7, fig. 4; 16, tbl. 9.

155.   In the 2016-2020 elections, Black voters on average supported their preferred candidates with an estimated vote share of 92.3%. CPX79 at 5 ¶ 16. The 2012-2014 elections exhibited similarly high and cohesive levels of Black voter support for their preferred candidates. *Id*. at 7, fig. 4.

156.   Dr. Liu conducted an ecological inference analysis similar to Dr. Palmer's for some of the same and some different elections. All 16 of the elections Dr. Liu examined involved one Black candidate and one white candidate. MPX4 at 4; MPX8 at 3-4; Hr'g. Tr. Vol. 5 at 1268:21-1269:3. Dr. Liu examined congressional, statewide, and federal elections. *Id.* Like Dr. Palmer, Dr. Liu found that Black voters cohesively supported their preferred candidates in all of the elections examined. Hr'g. Tr. Vol. 5 at 1257:1-4.

157.   Defendant's expert, Dr. Hood, does not dispute Dr. Palmer's conclusions as to the second *Gingles* precondition. Hr'g. Tr. Vol. 6 at 1445:12-1446:24 (Hood).

### 3.   Third *Gingles* Precondition: White voters in Alabama vote as a bloc usually to defeat Black voters' candidates of choice.

158.   In each congressional district and the Focus Area as a whole, white voters had clearly identifiable candidates of choice for every election examined. Hr'g. Tr. Vol. 3 at 701:22-702:4 (Palmer); CPX79 at 6, fig. 3; 7, fig. 4; 16, tbl.

159.   In the 2016-2020 elections, white voters were highly cohesive in voting in opposition to the Black candidate of choice in every election. On average, Dr. Palmer found that white voters supported Black-preferred candidates with an average of just 15.4% of the vote. CPX79 at 5 ¶ 17. In other words, white voters on average supported their preferred candidates with an estimated vote share of 85.6%. *Id.* The 2012-2014 elections exhibited similarly high and cohesive levels of white voting against Black-preferred candidates. *Id.* at 7, fig. 4.

160.   Overall, Dr. Palmer found "very strong evidence of racially polarized voting" across the Focus Area as a whole and in each individual congressional district he examined. Hr'g. Tr. Vol. 3 at 701:22-702:4 (Palmer); CPX79 at 6-7 ¶¶ 18, 19, 21, 22. Each of Dr. Palmer's three analyses revealed the same patterns of highly racially polarized voting. Hr'g. Tr. Vol. 3 at 715:21-25 (Palmer).

161.   As a result of this racially polarized voting, candidates preferred by Black voters have been consistently unable to win elections outside of majority-Black CD 7. Hr'g. Tr. Vol. 3 702:5-11 (Palmer). Of the twenty elections Dr. Palmer examined, the Black-preferred candidates were defeated by white bloc voting in 18 of them in the Focus Area. CPX79 at 7-8 ¶¶ 24-25. The only two times the Black-preferred candidate prevailed in the Focus Area, the white-preferred candidate was Roy Moore, a uniquely controversial figure in Alabama politics for various reasons, including that he has been accused by several women of sexually abusing or harassing them when they were teens. Hr'g. Tr. Vol. 3 at 702:5-11 (Palmer).

162.   Black preferred candidates never won in any individual congressional district outside of CD 7—that is, Black-preferred candidates lost in every district except the existing majority-Black CD 7. *Id.*; Hr'g. Tr. Vol. 3 at 717:23-5; 719:8-12 (Palmer).

163.   In the 2019 *Chestnut* litigation, Dr. Palmer found that voting was also racially polarized in congressional elections in 2018 in then-existing CD 1, CD 2, and CD 3, and that Black-preferred candidates were defeated by white bloc voting. Hr'g. Tr. Vol. 3 719:19-720:23 (Palmer); CPX83 at 8 ¶ 33, 9 ¶ 38; CPX84 at 157:2-20, 158:1-4, 169:11-170:7 (Palmer).

164. Defendant's expert, Dr. Hood, does not dispute Dr. Palmer's conclusions as to the third *Gingles* precondition. Hr'g. Tr. Vol. 6 at 1445:12-1446:24 (Hood).

165. Dr. Hood used the same methodology as Dr. Palmer and arrived at the same conclusions regarding the existence of racially polarized voting for the geographies they both examined. Hr'g Tr. Vol. 6 at 1427:8-13, 1448:5-24 (Hood); Hr'g. Tr. Vol. 3 at 728:22-729:4 (Palmer). Although Dr. Hood raised speculative concerns about Dr. Palmer's data, DX6, he repeatedly admitted on cross-examination that he did not identify any errors that would affect Dr. Palmer's analyses or conclusions. *See, e.g.,* Hr'g. Tr. Vol. 6 at 1449:18-24; 1450:13-20; 1456:7-18; 1458:25-1459:12; 1461:3-10 (Hood).

166. This is not the first time Dr. Hood has offered such unhelpful opinions. For example, in *Bethune-Hill v. Virginia State Bd. of Elections*, the court "declined to credit Dr. Hood's testimony for several reasons," including "vague, unsubstantiated challenges to Dr. Palmer's analysis." 326 F. Supp. 3d 128, 179 n.60 (E.D. Va. 2018). Numerous other courts have similarly rejected Dr. Hood's analyses. *See, e.g.*, *Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 837 (D. Ariz. 2018) (finding Dr. Hood's opinions were "not useful" and "reflected an incomplete understanding of the laws" he "analyzed," and noting Dr. Hood's "testimony either has been rejected or given little weight in numerous other cases due to concerns over

its reliability"); *Florida v. United States*, 885 F. Supp. 2d 299, 324 (D.D.C. 2012) (rejecting Dr. Hood's opinions "because the analysis underlying his conclusions suffers from a number of methodological flaws"); *Veasey v. Perry*, 71 F. Supp. 3d 627, 663 (S.D. Tex. 2014) (finding "Dr. Hood's testimony and analysis unconvincing and giv[ing] it little weight" because of "significant methodological oversights"); *Ne. Ohio Coal. For the Homeless v. Husted*, No. 2:06-CV-896, 2016 WL 3166251, at *24 (S.D. Ohio June 7, 2016) (giving Dr. Hood's opinions "no weight" because his "testimony and report were in large part irrelevant to the issues before the Court and also reflected methodological errors that undermine his conclusions").

167.   Dr. Palmer also analyzed whether Mr. Cooper's illustrative majority-Black districts would elect Black-preferred candidates using actual election returns. He found that Black-preferred candidates were consistently elected in each of the majority-Black districts examined[4] with an average of 57% of the vote in illustrative district 2 and 65% of the vote in illustrative district 7. Hr'g. Tr. Vol. 3 at 721:15-22 (Palmer); *id.* at 722:15-23; CPX79 at 9 ¶¶ 26-27.

---

[4] Dr. Palmer analyzed all of Mr. Cooper's illustrative plans beside Illustrative Plan 7, which was drawn after Dr. Palmer completed his functional analysis.

168.   Like Dr. Palmer, Dr. Liu found that white bloc voting routinely defeated Black-preferred candidates in all of the elections he examined outside of CD 7. Hr'g. Tr. Vol. 5 at 1259:17-23 (Liu).

### 4.   Totality of the Circumstances: All relevant factors weigh decisively in favor of a finding of vote dilution.

169.   The Court finds that each of the relevant Senate Factors—which animate Section 2's totality-of-the-circumstances inquiry—point decisively in Plaintiffs' favor. It also finds that the 2021 Enacted Plan contains significant disproportionately with respect to the ability of Black and white voters to elect their congressional candidates of choice in Alabama.

### a.   HB1 suffers from severe disproportionality.

170.   Black Alabamians comprise more than 27% of Alabama's total population and more than 27% of the state's citizen voting age population. CPX1 at 6, fig. 1; *id.* at 9, fig. 3.

171.   Under the 2021 Enacted Plan, Black Alabamians are able to elect their candidates of choice in just 14% of Alabama's congressional districts. MPX5 at 28-29; ECF No. 44 at 19 ¶ 121.

172.   White Alabamians make up about 63% of Alabama's total population and less than 66% of Alabama's citizen voting age population. CPX1 at 6, fig. 1; *id.* at 9, fig. 3.

173.   Under the 2021 Enacted Plan, white Alabamians can elect their candidates of choice in 86% of Alabama's congressional districts. MPX5 at 28-29; ECF No. 44 at 19 ¶ 121.

174.   Under the 2021 Enacted Plan, just 30% of Black Alabamians live in a district in which they have the opportunity to elect their congressional candidate of choice, compared to 92% of white Alabamians. CPX1 at 14 ¶ 28.

175.   Mr. Cooper's and Dr. Duchin's illustrative plans would bring Alabama's congressional districts far closer to proportionality. Under those plans, Black Alabamians would be able to elect their preferred candidates in 28.5% of congressional districts (two out of seven districts), and white Alabamians would be able to elect their preferred candidates in the remaining 71.5% of congressional districts (five out of seven districts). CPX79 at 9 ¶¶ 26-27.

> **b.    Senate Factor One: Alabama has a history of voting-related discrimination against Black voters.**

176.   Alabama has a long and sordid history of voting-related discrimination that has touched the rights of Black individuals to participate in the political process. CPX80 at 6-23; MPX5 at 4-16; Hr'g Tr. Vol. 5 at 1146:4-1161:17 (Bagley).

> **i.    Pre-Voting Rights Act**

177.   During Reconstruction, Black Alabamians gained the ability to participate in the political process and elected many Black candidates to state legislative office. CPX80 at 49-50 ¶ 141.

178.   Following Reconstruction, however, Alabama ratified a new Constitution explicitly aimed at establishing "white supremacy in the State." CPX80 at 6 ¶ 20.

179.   To reach that goal, Alabama's 1901 Constitution contained numerous provisions that had the intended effect of preventing Black residents from voting, including literacy tests, a cumulative poll tax, employment and property requirements, and disenfranchisement of those convicted of minor crimes. CPX80 at 6-8 ¶¶ 20-23.

180.   The framers of the 1901 Constitution protected white voters from these onerous requirements by including targeted exemptions, including a clause allowing the registration of any adult male who was a veteran of a 19th Century American war or a descendent of a veteran, an exception very few Black residents could meet. CPX80 at 7-8 ¶ 22.

181.   The 1901 Constitution had a devastating effect on Black Alabamian's ability to participate in the political process, decreasing the number of registered Black voters from 181,000 in 1900 to 3,000 in 1903. By 1906, just two percent of the Black voting age population was registered to vote. CPX80 at 8 ¶ 24.

182.   During the first half of the 20th Century, Alabama prohibited Black residents from participating in Democratic primaries. Because the Democratic Party dominated Alabama politics during this time, the State's white-only primary

excluded Black residents from meaningfully participating in elections. CPX80 at 9 ¶ 26.

183.    After the U.S. Supreme Court invalidated white-only primaries in 1944, Alabama enacted the Boswell Amendment, which gave registrars broad discretion to deny registration applications from Black voters. CPX80 at 9 ¶ 26. A federal court found that "the circumstances and history surrounding the origin and adoption of the Boswell Amendment, and its subsequent application, demonstrate that its main object was to restrict voting on a basis of race or color." *Davis v. Schnell*, 81 F. Supp. 872, 880 (S.D. Ala. 1949), *aff'd*, 336 U.S. 933 (1949).

184.    In response to *Schnell*, Alabama imposed new literacy tests and understanding requirements, again with the purpose of giving registrars the ability to arbitrarily deny registration applications from Black residents. CPX80 at 10-11 ¶¶ 27-29.

185.    Alabama's counties also took independent action to prevent Black voters from electing their candidates of choice by shifting to at-large elections, requiring registration applicants to provide a white person to "vouch" for them, forcing Black applicants to wait in excessively long lines, providing no (or incorrect) information about registration, rejecting applications without notice or explanation, closing registration office, or simply refusing applications from Black residents. CPX80 at 10-13 ¶¶ 28-34.

186.   In 1951, Alabama enacted a law prohibiting single-shot voting in municipal elections, preventing Black voters from electing their candidates of choice. CPX80 at 13-14 ¶ 36; ECF No. 56-3 at 28 ¶ 144.

187.   In 1957, Alabama redrew the city boundaries of Tuskegee—home to a highly educated Black community—to exclude Black residents, preventing them from participating in municipal elections. CPX80 at 11-12 ¶ 31, 14 ¶ 39; *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

188.   In 1961, Alabama required that nearly all at-large elections use numbered-places. The intent of this requirement was to prevent Black residents from electing their candidates of choice. CPX80 at 14 ¶¶ 37-38.

189.   In 1966, a federal court found that Alabama's poll tax was intentionally discriminatory and thus violated the Fourteenth and Fifteenth Amendments to the U.S. Constitution. CPX80 at 7 ¶ 20; *United States v. Alabama*, 252 F. Supp. 95 (M.D. Ala. 1966).

### ii.   Post-Voting Rights Act

190.   Despite the Voting Rights Act's protections, Alabama has continued to engage in discriminatory actions that have harmed Black residents' ability to participate in the political process.

191.   Between 1965 and 1982, the Department of Justice ("DOJ") objected 58 times to proposed changes to election practices or procedures by Alabama and its

jurisdictions, and the DOJ sent observers to Alabama 107 times due to issues with voting-related discrimination. ECF No. 44 at 18 ¶ 117.

192.   In *Hale County v. United States*, a federal court found that Hale County had implemented at-large elections for the purpose of discriminating against Black voters. 496 F. Supp. 1206 (D.D.C. 1980).

193.   Between 1982 and 2006, the DOJ objected to preclearance submissions from Alabama and its jurisdictions 46 times and sent federal observers to monitor voting-related discrimination 91 times. ECF No. 44 at 18 ¶ 118.

194.   In *Buskey v. Oliver*, a federal court found that the City of Montgomery had redrawn its city council districts to dilute Black voting strength. 565 F. Supp. 1473 (M.D. Ala. 1983).

195.   In *Harris v. Graddick*, a federal court found that state and local officials in Alabama has in the past "intentionally created an atmosphere of fear and intimidation to keep black persons from voting" and that "[t]he present reality in Alabama is that many black citizens, in particularly the elderly and uneducated, still bear the scars of this past, and are still afraid to engage in the simple act of registering to vote and voting." 593 F. Supp. 128 (M.D. Ala. 1984).

196.   In *Dillard v. Crenshaw County*, 640 F. Supp. 1347 (M.D. Ala. 1986), a federal court found that the state laws requiring numbered posts for nearly every at-large voting system in Alabama had been intentionally enacted to dilute Black voting

strength, and that numbered posts had the effect of diluting Black voting strength in at-large elections. CPX80 at 15 ¶ 41; ECF No. 56-3 at 30 ¶ 150. Ultimately, a defendant class of 17 county commissions, 28 county school boards, and 144 municipalities were found to be employing at-large election systems designed and motivated by racial discrimination, resulting in settlement agreements with about 180 Alabama jurisdictions requiring them to adopt new election systems. CPX80 at 15 ¶ 41; ECF No. 56-3 at 30 ¶ 151; Hr'g Tr. Vol. 6 at 1151:12-1152:13 (Bagley).

197.   In 2010, a federal court found that Alabama state senators attempted to depress Black turnout in an election by keeping a referendum issue popular among Black voters off the ballot; in recorded conversations, the senators referred to Black Alabamians as "Aborigines" and "Indians." *United States v. McGregor*, 824 F. Supp. 2d 1339, 1345 (M.D. Ala. 2011).

198.   In 2011, Alabama enacted one of the most rigorous voter ID laws in the country. CPX80 at 16-17 ¶ 46. The State did not even attempt to get it precleared under the VRA. *Id.*

199.   In June 2013, the U.S. Supreme Court released Alabama from its preclearance obligations under Section 5 of the VRA. *Shelby Cnty. v. Holder*, 570 U.S. 529 (2013).

200.   In the election following *Shelby County*, the State began enforcing its strict voter ID law. ECF No. 44 at 20 ¶ 126. In retaliation against the Alabama Black

Legislative Caucus, Governor Bentley in 2015 closed 31 Motor Vehicle Division offices in disproportionately Black and rural areas, harming those residents' ability to obtain voter IDs. CPX80 at 17-18 ¶ 49; CPX85 at 376:2-19 (Knight). After the U.S. Department of Transportation concluded that these actions adversely impacted Black residents, the State reopened some of the office. CPX80 at 18 ¶ 50.

201.   In January 2014—six months after *Shelby County*—a federal court authorized federal observers to monitor elections in the City of Evergreen (in Conecuh County) and "bailed-in" the jurisdiction for preclearance under Section 3(c) of the VRA for more than six years. ECF No. 56-3 at 32 ¶ 157; *Allen v. City of Evergreen*, No. 13-cv-107-CG-M, 2014 WL 12607819, at *2 (S.D. Ala. Jan. 13, 2014).

202.   Soon after *Shelby County*, the State began enforcing its strict voter ID law. ECF No. 44 at 20 ¶ 126. In retaliation against the Alabama Black Legislative Caucus, Governor Bentley in 2015 closed 31 Motor Vehicle Division offices in disproportionately Black and rural areas, harming those residents' ability to obtain voter ID. CPX80 at 17-18 ¶ 49; CPX85 at 376:2-19 (Knight). After the U.S. Department of Transportation concluded that these actions adversely impacted Black residents, the State reopened some of the office. CPX80 at 18 ¶ 50.

203.   Some counties in the Black Belt still provide little to no information about office operation days and hours for their Motor Vehicle Division Offices. CPX80 at 18 ¶¶ 50-51.

204.   Only 43 of Alabama's 67 counties have websites providing information relating to voting and elections. CPX80 at 19 ¶ 52.

205.   Following *Shelby County*, Alabama closed 66 polling locations. In Daphne County, two of the three closed locations were where a majority of its Black population voted. CPX80 at 18 ¶ 53.

206.   In 2018, the U.S. Court of Appeals for the Eleventh Circuit affirmed a district court's judgment that "race was a motivating factor" behind the Gardendale City Board of Education's plan to secede four public schools from an existing district. *Stout by Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1007-09 (11th Cir. 2018).

207.   In 2019, a court in this district "bailed-in" the Jefferson County Board of Education and Probate Judge under the VRA until December 31, 2031, because it's at-large method of voting diluted Black voting strength and was enacted "at least in part for the purpose of limiting the influence of Black voters." *Jones v. Jefferson Cnty. Bd. of Educ.*, No. 2:19-cv-1281-MHH, 2019 WL 7500528, at *3, 5 (N.D. Ala. Dec. 16, 2019); ECF No. 56-3 at 32 ¶ 157.

208.   Alabama's Constitution continues to mandate separate schools for Black and white students. ECF No. 56-3 at 33 ¶ 161. In 2004 and 2012, a majority of Alabama voters rejected attempts to repeal this language. *Id.*

### iii.   Redistricting-Related Discrimination

209.   Alabama has an extensive history of discriminating against Black voters in the context of redistricting. CPX80 at 21-23 ¶¶ 59-64.

210.   In 1957, Alabama redrew the city boundaries of Tuskegee—home to a highly educated Black community—to exclude Black residents, preventing them from participating in municipal elections. CPX80 at 11-12 ¶ 31, 14 ¶ 39; *Gomillion*, 364 U.S. 339.

211.   After the U.S. Supreme Court forced Alabama to reapportion for the first time in half a century, the Alabama Legislature "intentionally aggregated predominantly Negro counties with predominantly white counties for the sole purpose of preventing the election of Negroes to [State] House membership." *Sims v. Baggett*, 247 F. Supp. 96, 108-09 (M.D. Ala. 1965); Hr'g Tr. Vol. 6 at 1149:23-1150:7 (Bagley).

212.   After the Legislature again failed to perform reapportionment following the 1970 Census and the task was given to a federal court, that court rejected the Alabama Secretary of State's proposed map because it had a "discriminatory effect"

- 63 -

on Black voters. *Sims v. Amos*, 336 F. Supp. 924, 936 (M.D. Ala. 1972); Hr'g Tr.

Vol. 6 at 1150:8-22 (Bagley).

213.   After the 1980 Census, the DOJ objected to Alabama's proposed state

legislative plans because of their discriminatory effect on Black voters in Jefferson

County and the Black Belt. CPX80 at 22 ¶ 62. The DOJ again objected to Alabama's

second attempt because the plan appeared intentionally to crack minority voters in

the Black Belt. *Id.* In litigation, a federal court rejected Alabama's proposed interim

maps because they "had the effect of reducing the number of 'safe' black districts"

in and near Jefferson County. *Burton v. Hobbie*, 543 F. Supp. 235, 238 (M.D. Ala.

1982); Hr'g Tr. Vol. 6 at 1150:23-1151:11 (Bagley).

214.   After the 1990 Census, Alabama submitted a congressional plan to the

DOJ that contained a majority-Black district. CPX80 at 23 ¶ 63. The DOJ objected

to the plan because it fragmented the Black community outside of the majority-Black

district, the result of a predisposition on the part of the state's political leadership to

limit black voting potential to a single district. *Id.*; Hr'g Tr. Vol. 6 at 1153:5-23

(Bagley).

215. After   the   2010   Census,   the   Alabama   Legislature   racially

gerrymandered 12 State House districts to dilute Black voting strength. *Ala. Legis.*

*Black Caucus v. Alabama*, 231 F. Supp. 3d 1026 (M.D. Ala. 2017); Hr'g Tr. Vol. 6

at 1154:3-1155:4 (Bagley).

### iv.    Political Violence Against Black Alabamians

216.    Black Alabamians have faced violence and intimidation meant to prevent them from participating in social, political, and economic life. CPX80 at 19 ¶ 54.

217.    Violence was central to suppressing the Black vote in the South during the 20th Century. CPX80 at 19 ¶ 54.

218.    After Reconstruction, White Democrats used violence to suppress the Republican Party, which had taken up Black civil rights as a cornerstone of its political platform. CPX80 at 19-20 ¶ 54.

219.    White Alabamians have lynched more than 400 Black Alabamians. Almost all of these actions were done with impunity and an assurance that the perpetrators would not face criminal charges. These actions have been motivated at least in significant part to suppress Black political participation. CPX80 at 20 ¶ 55.

220.    In 1963, a bomb was placed and exploded in the Sixteenth Street Baptist Church—a key political organizing location for the Civil Rights Movement—killing four young Black girls and injuring many others. CPX80 at 20 ¶ 55.

221.    In 1965, state and local police brutally attacked hundreds of activists demanding voting rights for Black Americans and protesting the recent murder of civil rights activist Jimmie Lee Jackson. CPX80 at 20-21 ¶ 55.

222.   In 1981, KKK members brutally murdered 19-year-old Michael Donald in Baldwin County and later left him hanging from a tree in Mobile, a horrific incident that continues to haunt the Mobile Black community, including Plaintiff LaKeisha Chestnut. CPX85 at 442:22-443:25 (Chestnut).

223.   In 1985, a federal court found that Black Alabamians "still bear the scars" of intimidation and violence against them and as a result "are still afraid to engage in the simple act of registering to vote and voting." *Harris v. Graddick*, 593 F. Supp. 128, 133 (M.D. Ala. 1984).

224.   Unfortunately, these scars have not yet healed. As former longtime State Senator Hank Sanders explained, that fear is "still a very powerful factor in the African-American community that suppresses the vote" and that being fearful to vote is "absolutely rational" given the history of voter intimidation in the state. CPX86 553:6-23; *see also id.* 575:10-576:13 (Sanders); CPX85 at 354:12-19, 361:3-363:21, 364:13-23 (Knight).

225.   The KKK and other racist organizations use cross burnings to terrorize Black Alabamians from participating in social, political, and economic life. CPX80 at 21 ¶ 57. In June 2020, a burning cross was placed over I-85 in Macon County, which has a population that is 80% Black and contains Tuskegee University, a Historically Black University that has a storied history of Black education and activism. *Id.* The FBI ruled this incident a hate crime. *Id.*

226.   This terror and persecution continue to stoke fear among African Americans, depressing political participation. CPX85 at 361:21-363:21 (Knight); CPX86 at 551:17-553:23 (Sanders).

c.   **Senate Factor Two: Voting in Alabama is extremely polarized along racial lines.**

227.   "Racially polarized voting is when voters of different racial or ethnic groups prefer different candidates." Hr'g. Tr. Vol. 3 702:23-24 (Palmer).

228.   As already discussed at length, *supra* Sections I.B.2, I.B.3, voting in Alabama is racially polarized: Black and white voters cohesively support opposing candidates. There is no factual dispute about the existence of racial polarization in the Focus Area, the relevant congressional districts, and Alabama more generally.

229.   As discussed in the Conclusions of Law below, the reason why Black and white voters overwhelmingly support opposing candidates in Alabama is irrelevant to Section 2's effects-based inquiry. *Infra* Section II.A.4.b. But even if those reasons were relevant, it is Defendants' burden to prove that policy ideology is the *only* reason this racially polarized voting exists. *Id.*

230.   Not only have Defendants woefully failed to show that race and issues relating to race play no role in Alabama's racially polarized voting; their own expert testified that this is "*certainly not*" the case. CPX87 at 957:9-11 (Hood) (emphasis added).

231.   The only evidence Defendants offered on this score is the simple fact that Black voters overwhelmingly prefer Democratic candidates, and white voters overwhelmingly support Republican candidates.

232.   The fact that Black and white voters overwhelmingly support different political parties in Alabama tells us nothing about the cause of Alabama's racially polarized voting, and it certainly does not exclude the possibility that race and issues related to race contribute to that polarization. Hr'g Tr. Vol. 6 at 1522:18-23 (King).

233.   Indeed, racial attitudes and racialized politics *do* influence the historical and ongoing partisan polarization among Black and white Alabamians. CPX80 at 23-27 ¶¶ 65–79.

234.   The partisan alignment of Black and white voters in Alabama is due in part to historical positions those two parties have taken on issues related to race, such as civil rights legislation. CPX80 at 24-26 ¶¶ 71-75; Hr'g Tr. Vol. 6 at 1510:21-2, 1522:24-1523:3 (King); CPX86 at 539:9-541:11, 541:21-543:10 (Sanders).

235.   That is still the case today: members of the Democratic and Republican Parties diverge deeply on issues inextricably linked to race both on a national level and in Alabama in particular. CPX81 at 7-8 ¶ 23; CPX89 at 121:23-122:5, 124:10-15, 124:20-125:3 (Pringle); CPX90 at 105:10-23, 109:6-17, 110:14-20 (McClendon); Hr'g Tr. Vol. 6 at 1518:21-1523:3 (King); CPX86 at 541:6-20 (Sanders).

236.   The personal testimony of those who live and vote in Alabama confirm that race and issues relating to race contribute meaningfully to the disparate voting behaviors between Black and white voters. *See* CPX85 at 447:18-449:25 (Chestnut); *id*. at 341:24-343:21 (Knight); CPX86 at 540:5-14; 541:6-20 (Sanders); Hr'g. Tr. Vol. 5 at 1357:19-1358:21 (B. Jones).

237.   Dr. Hood's identification of a single majority-white State House district that recently elected a Black candidate offers no indication as to whether race and issues relating to race influence Black and white voters' polarization in Alabama. Hr'g Tr. Vol. 6 at 1527:8-1529:1 (King); CPX81 at 9-12 ¶¶ 25-30. "Paschal's win is an outlier in the field of Black Republicans who have recently run for office but lost in the primary election." CPX81 at 9 ¶ 29. When one considers that context, *see id*. at 9-10 ¶ 29, it becomes clear that Mr. Paschal's "victory is more an exception than the rule," Hr'g Tr. Vol. 6 at 1528:22-23 (King).

238.   Dr. Hood also failed to discuss in his report the small number of votes cast in Mr. Paschal's primary, run-off, and general elections, as well as the fact that he won the primary run off by just 63 votes. Hr'g Tr. Vol. 6 at 1528:3-12 (King); *id.* at 1461:13-1463:20 (Hood).

239.   Ultimately, "[u]sing this example to extrapolate *any* conclusion about white voting behavior in Alabama would be scientifically unsound." CPX81 at 12 ¶ 30 (emphasis added); Hr'g Tr. Vol. 6 at 1527:14-18 (King).  Indeed, Dr. Hood

admitted as much. Hr'g Tr. Vol. 6 at 1465:6-18 (admitting "it is just one election, so we would have to base any kind of conclusion with a note of caution").

240.   Dr. Hood's separate assertion that white Republican support for minority candidates in states outside of Alabama offers any glimpse into the motivations of Alabama voters is similarly unsupportable from a political science perspective. CPX81 at 5-9 ¶¶ 17-24; Hr'g Tr. Vol. 6 at 1523:15-1525:25 (King).

241.   It is these sorts of methodologically unsound assertions by Dr. Hood that have caused numerous courts to discredit his expert testimony. *Supra* Section I.B.3.

242.   In any event, Dr. Hood's own testimony directly refutes Defendants' attempt to argue that racial considerations play no role in the polarization among Black and white voters in Alabama. Dr. Hood has studied partisan realignment in the south among Black and white voters following the passage of the Voting Rights Act. Hr'g. Tr. Vol. 6 1469:23-1470:3 (Hood).

243.   Dr. Hood's research shows that the passage of the VRA was a milestone in the development of the Republican Party in the South. Hr'g. Tr. Vol. 6 at 1471:7-10 (Hood). While the National Democratic Party became more liberal on the issue of civil rights for Black Americans, the Republican Party was increasingly viewed as the party of racial conservatism. *Id*. at 1471:11-20 (Hood). And Black mobilization in the Democratic Party led directly to the transition of whites to the

Republican Party. *Id*. at 1471:21-24 (Hood); *see also* CPX86 at 542:23-543:8 (Sanders) ("[T]he more active African-Americans became in the Democratic party, the more whites began to go to the Republican party.").

244.  Dr. Hood explained how white Democratic Party members began feeling "crowded out . . . with opinions" relating to race that didn't "necessarily mesh" with their views, prompting them to switch parties. *Id*. at 1473:16-1474:1 (Hood).

245.  Dr. Hood testified that race and race-related issues play a role in partisan affiliations in Alabama today. When asked whether race is one of the issues voters consider in selecting which political party they affiliate with today in Alabama, Dr. Hood responded in the affirmative, explaining that race as an issue is "part of it." Hr'g. Tr. Vol. 6 at 1472:14-21 (Hood). Similarly, when asked whether partisan realignment due to the VRA's influences voting patterns today, he responded that "it's part of the calculus, but not all of the calculus." *Id*. at 1495:6-13 (Hood).

246.  Dr. Hood confirmed that a full understanding of southern party politics requires an appreciation of the role that race has played and continues to play in the region. Hr'g. Tr. Vol. 6 at 1495:6-13 (Hood). Dr. Hood explained: "It's not the only thing, but certainly you have to understand race to understand southern politics." *Id*. at 1474:17-24 (Hood).

247.    When asked whether, based on his research, Dr. Hood could say race does not factor into Alabama voters' partisan preferences, he answered: "No, certainly not." CPX87 at 957:9-11.

>    **d.    Senate Factor Three: Alabama and its jurisdictions have long used electoral schemes that enhance the opportunity for discrimination against Black Alabamians.**

248.    Alabama has an extensive history of employing voting procedures that increase the opportunity for discrimination against Black voters.

249.    After the U.S. Supreme Court outlawed white-only primaries, Alabama jurisdictions predominantly shifted to at-large elections to prevent Black voters from electing their candidates of choice. CPX80 at 28-30 ¶¶ 84-86; ECF No. 56-3 at 28 ¶ 144.

250.    In 1951, Alabama enacted a law prohibiting single-shot voting in municipal elections, the intent of which was to prevent Black voters from electing their candidates of choice. CPX80 at 13-14 ¶ 36; ECF No. 56-3 at 28 ¶ 144.

251.    In 1961, Alabama required that nearly all at-large elections use numbered-places. The intent of this requirement was to prevent Black residents from electing their candidates of choice. CPX80 at 14 ¶¶ 37-38.

252.    Courts have recently enjoined the use of discriminatory at-large voting systems in Alabama. ECF No. 56-3 at 30-31 ¶ 153; *Jefferson Cnty. Bd. of Educ.*,

2019 WL 7500528, at *4-5; *Ala. State Conf. of the NAACP v. City of Pleasant Grove*, No. 2:18-cv-02056, 2019 WL 5172371, at *1 (N.D. Ala. Oct. 11, 2019).

253.   Alabama jurisdictions continue to use at-large elections with numbered posts today. ECF No. 56-3 at 30 ¶ 152.

254.   Today, Alabama imposes a majority-vote requirement for primary elections.

255.   Today, Alabama holds statewide at-large elections for seats on its Supreme Court, Court of Criminal Appeals, and Court of Civil Appeals with numbered places.

256.   Federal law requires Alabama to use single-member districts to elect its congressional delegation. 2 U.S.C. § 2c.

> **e.     Senate Factor Four: Alabama does not use slating processes for congressional elections.**

257.   There is no slating process involved in Alabama's congressional elections.

> **f.     Senate Factor Five: Black voters today suffer from the vestiges of Alabama's centuries of discrimination.**

258.   As a result of Alabama's long history of discriminating against Black residents in nearly every aspect of daily life, the Black community currently suffers socioeconomic disparities that impair their ability to participate in the political process. CPX80 at 30-45 ¶¶ 88-127; CPX1 at 37-39 ¶¶ 85-86; MPX5 at 17-26.

- 73 -

259.   As the personal testimony of those who live in Alabama and seek to improve political participation among Black Alabamians demonstrates, the lower status among Black Alabamians in terms of employment, income, wealth, education, health, housing, directly impede their ability to participate in the political process. Because Black Alabamians disproportionately work multiple, lower-paying jobs, Hr'g Tr. Vol. 5 at 1351:6-20 (B. Jones), they have less opportunity to spend time and resources obtaining an ID, registering to vote, visiting a polling place, and standing in line to cast a ballot. CPX85 at 358:1-360:24, 363:22-364:12, 375:16-24 (Knight). Because they have fewer resources, Black Alabamians tend to move residences more often, and each time they do, they must pay a fee to alter the address on that ID before casting a ballot. *Id.* at 483:6-18, 488:21-491:12 (Tyson); *id.* at 427:6-428:1 (Chestnut). Ultimately, the cumulative effect of socioeconomic difficulties that Black Alabamians disproportionately face can make the process of voting "prohibitive." CPX86 at 564:24-565:11 (Sanders); *see also* CPX84 at 225:2-12, 233:17-235:6 (K. Jones); CPX85 at 479: 3-481:15 (Tyson).

260.   Today, Black Alabamians have significantly lower average educational achievement than their white counterparts. 14.9% of Black Alabamians have not finished high school, compared to 10.9% of white Alabamians. CPX1 at 38 ¶ 86. Only 19.4% of Black Alabamians have a bachelor's degree or higher, compared to 28.8% of white Alabamians. *Id.*

261.   Former Congressman Bradley Byrne testifies that he feels "strongly" that, today, Alabama does not "give a quality education to black people like we do the white people." Hr'g Tr. Vol. 7 at 1687:15-20.

262.   In the annual report produced pursuant to the Alabama Accountability Act, all 75 schools designated as "failing" have majority-Black student populations (and most overwhelmingly Black populations), most of which are located in or around Birmingham, Montgomery, Mobile, or the Black Belt. MPX5 at 24-25; Hr'g Tr. Vol. 6 at 1160:19-1161:3 (Bagley); *see also* CPX85 at 420:6-421:22 (Chestnut).

263.   The depressed educational achievement that Black Alabamians experience today is a direct result of the State's history of discrimination. Alabama long suppressed Black education out of a fear that an educated Black citizenry would lead to a "future race war." CPX80 at 30 ¶ 89. Alabama also refused to fund public schools because doing so would "disproportionately favor" Black children. *Id*. at 31 ¶ 89. In 2007, a court found that the state still had not satisfied its obligations to remedy the vestiges of its maintenance of segregated public schools. ECF No. 56-3 at 33 ¶ 163.

264.   A disproportionate amount of Alabama's public education funds go to white students. CPX80 at 31-32 ¶ 92. Differences in local property values result in differences in resources available to public schools in Alabama. *Id*. at 31-32 ¶ 92. Because Black Alabamians are more likely to live in poverty than their white

counterparts, this results in Black children attending schools with less adequate funding than white students. *Id*. at 32 ¶ 93.

265.   In Mobile, Washington, and Montgomery Counties, as well as in the Black Belt, Black students disproportionately attend public schools that lack sufficient resources. Hr'g Tr. Vol. 5 at 1348:18-1349:7, 1359:3-15 (B. Jones); CPX84 at 221:16-222:3 (K. Jones); CPX85 at 365:10-366:3 (Knight), *id.* at 420:6-421:22 (Chestnut); CPX86 at 562:5-25 (Sanders).

266.   In school, Black students in Alabama are more likely to face more severe disciplinary action than white students. CPX80 at 33 ¶ 98. The disproportionate punishment that Black students receive makes them more likely to drop out of school than white students. *Id*. at 34 ¶ 98. Black students in Alabama are also more likely to receive criminal referrals as a result of school disciplinary issues than white students. *Id*. at 34 ¶ 100.

267.   The educational disparities discussed above create significant barriers to political participation among the Black community in Alabama. Interactions with the education system and educational attainment affect political participation, resulting in more educated individuals participating more than those with less education. CPX80 at 32 ¶¶ 94-95. For those with less education, it is harder to participate in politics because they are less able to make sense of the political world, can less easily navigate voter registration requirements and other voting-related

processes, and are more likely to have the verbal skills that enable effective political participation; meanwhile, the classroom instruction and social networks gained by those with higher education have more opportunity to gain a sense of civic duty and are more exposed to elite recruitment efforts. *Id.* at 33 ¶¶ 96-97; CPX85 at 358:3-10 (Knight).

268.   Black Alabamians also experience significant disparities in economic security and wealth. The poverty rate among Black Alabamians (23.4%) is more than double that of white Alabamians (11.5%). CPX1 at 37 ¶ 86. The child poverty rate among Black Alabamians (34.1%) is nearly triple that of white Alabamians (13.2%). *Id*. at 38 ¶ 86. Black Alabamians' median household income ($35,900) is just 59.9% that of white Alabamians ($59,966). *Id.* Black Alabamians' per capita income is $20,402, compared to white Alabamians' $32,939. *Id.* Black households in Alabama rely on food stamps at triple the rate that white households do (25.4% of Black households; 8.2% of white households). *Id.*

269.   In Alabama, Black women on average make $0.59 for every dollar earned by white men. CPX80 at 36 ¶ 104.

270.   Black Alabamians also lag significantly behind white Alabamians in employment. Hr'g Tr. Vol. 5 at 1351:6-1352:4 (B. Jones); Hr'g Tr. Vol. 6 at 1628:4-1629:6 (Caster); CPX84 at 224:10-225:12 (K. Jones); CPX85 at 354:20-357:25, 359:10-16 (Knight); *id.* at 424:20-425:24 (Chestnut).

271.   The unemployment rate among Black Alabamians (7.7%) is more than double that of white Alabamians (3.8%). CPX1 at 38 ¶ 86. Whereas 40.3% of employed white Alabamians work in management or professional occupations, the rate among Black Alabamians is just 25.8%. *Id.*

272.   In 2019, the United Nations published a report identifying extreme poverty in the Black Belt, which has a predominantly Black population. MPX5 at 21; Hr'g Tr. Vol. 6 at 1164:22-1165:10 (Bagley).

273.   The unique employment-related needs of those in the Black community make it harder for them to access reliable childcare, which in turn makes it harder for those individuals to keep their jobs. Hr'g Tr. Vol. 5 at 1349:8-17 (B. Jones).

274.   Black Alabamians lag significantly behind white Alabamians with respect to housing. 77.1% of white households own their homes, compared to just 50.5% of Black households. CPX1 at 38-39 ¶ 86. And median home value among Black homeowners ($101,800) is just 61.4% of the median value among white homeowners ($165,800). *Id*. at 39 ¶ 86.

275.   Black Alabamians also uniquely lack access to affordable housing, particularly in Mobile, Montgomery, and the Black Belt. Hr'g Tr. Vol. 5 at 1359:11-12 (B. Jones); CPX84 at 225:13-226:2 (K. Jones); CPX85 at 338:22-340:1 (Knight); *id.* at 427:6-428:1 (Chestnut); *id.* at 474:21-475:12 (Tyson).

276.   As a result of Alabama's long history of discrimination relating to housing, Black Alabamians are more likely to live near environmental pollutants, wreaking severely adverse impacts on Black residents' health. MPX5 at 17, 21-22. For example, in Washington County, where Dr. Caster lives, predominantly Black neighborhoods are located close to factories, resulting in disproportionately high rates of cancer, lung disease, and other severe illnesses due to the factories' pollutants. Hr'g Tr. Vol. 6 at 1631:3-14 (Caster).

277.   The proportion of Black Alabamians who lack access to a vehicle (11.7%) is more than triple that among white Alabamians (3.8%). CPX1 at 39 ¶ 86. This disparate lack of access to a vehicle, combined with poor public transit options, creates an independent barrier to equal employment for Black Alabamians. Hr'g Tr. Vol. 6 at 1629:20-1630:2 (Caster); CPX84 at 225:2-12 (K. Jones).

278.   Black Alabamians in Washington and Montgomery counties also uniquely lack access to affordable and safe utilities. Hr'g Tr. Vol. 5 at 1354:7-15 (B. Jones); Hr'g Tr. Vol. 6 at 1632:8-17 (Caster); CPX84 at 226:3-25 (K. Jones).

279.   The economic disparities discussed above create significant barriers to political participation among the Black community in Alabama. Those with less economic resources have less ability to vote because they are more likely to have inflexible jobs schedules, *see* CPX85 at 359:17-360:25 (Knight), lack access to transportation, and lack access to childcare. ECF No. 56-3 at 32 ¶ 158; CPX80 at

36-37 ¶¶ 107-08; MPX5 at 17. They are also less likely to run for office and contribute to political campaigns. MPX5 at 17. Studies have also demonstrated that individuals in states that have high levels of income inequality, such as Alabama, are less likely to vote. CPX80 at 37 ¶ 107.

280.   Black Alabamians experience significant inequity in terms of their health and wellness, as well as access to quality and affordable health care. Hr'g Tr. Vol. 5 at 1352:23-1353:4 (B. Jones); Hr'g Tr. Vol. 6 at 1352:23-1352:4 (Caster); CPX84 at 220:3-24, 224:22-25, 244 (K. Jones); CPX85 at 425:25-427:5 (Chestnut); *id.* at 374:13-474:20 (Tyson).

281.   19% of Black Alabamians are uninsured, compared to 12.9% of their white counterparts. CPX80 at 43 ¶ 123. Because they live in poorer communities, they also have less access to healthcare services and have higher instances of chronic disease, including breast cancer among women and prostate cancer among men. *Id.* at 43-44 ¶¶ 123-24.

282.   The infant mortality rate among Black Alabamians (13.4 per 1,000 births) is more than double that of white Alabamians (6.5 per 1,000 births). *Id.* at 44 ¶ 123.

283.   Black Alabamians are significantly more likely to have and die from diabetes. *Id.* at 44 ¶125.

284.   The United Nations recently reported that Black Alabamians, particularly in the Black Belt region, lack equal access to proper sewage and reliable drinking water systems which harms their health. MPX5 at 21.

285.   The health-related issues Black Alabamians uniquely face has made them more vulnerable during the COVID-19 pandemic, an effect of the State's historical discrimination. MPX5 at 17-18 & n.56.

286.   These disparities in health and access to quality and affordable health care impede Black Alabamians' ability to participate in the political process. Low-income individuals with poor health are less likely to vote. CPX80 at 44 ¶ 126. When a state's population benefits from expanded Medicaid coverage (which Alabama refuses to do), turnout increases. *Id.* at 45 ¶ 127.

287.   Black Alabamians interact with the criminal justice system in Alabama in a much different way than white Alabamians. Hr'g Tr. Vol. 5 at 1355:24-1356:5 (B. Jones); Hr'g Tr. Vol. 6 at 1633:2-12 (Caster); CPX84 at 222:4-9 (K. Jones); CPX85 at 338:11-14, 340:2-11, 353:11-21 (Knight); *id.* at 423:1-424:5 (Chestnut); *id.* at 475:13-476:1 (Tyson).

288.   Black Alabamians are incarcerated at a grossly disproportionate rate, accounting for 53.5% of the state's inmate population despite their constituting only 26.8% of the state's population. CPX80 at 39 ¶ 112.

289.   When this significantly disproportionate number of Black Alabamians leave prison, they have a much harder time re-entering economic, political, and social life. CPX84 at 224:4-12 (K. Jones). The conditions in Alabama prisons are notoriously awful. MPX5 at 19-20; Hr'g Tr. Vol. 5 at 1167:8-22 (Bagley). A federal court recently found that the mental healthcare services in Alabama's prison system are "horrendously inadequate." *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1267 (M.D. Ala. 2017). And their conviction status makes it extremely difficult to obtain employment. Hr'g Tr. Vol. 5 at 1356:2-5 (B. Jones); *id.* at 1633:2-12 (Caster).

290.   Alabama's juvenile justice system also uniquely harms the Black community. CPX84 at 221:16-222:3 (K. Jones). A 2017 report found that racial disparities existed at "more or less every level of the juvenile justice system." Hr'g Tr. Vol. 5 at 1168:2-8 (Bagley); MPX5 at 20. It also found that Black individuals disproportionately represented those placed in detention and out-of-home diversion and disproportionately represent those in the Department of Youth Services. MPX5 at 20; Hr'g Tr. Vol. 5 at 1168:12-22 (Bagley). Little to nothing has been done to act on these findings. *Id*. at 1168:2-8, 1168:12-22 (Bagley).

291.   The dramatically different relationship the Black community has with the criminal justice system creates significant barriers to political participation. After the U.S. Supreme Court invalidated Alabama's existing criminal disenfranchisement law on the ground that it was intended to reduce Black political participation,

Alabama voters reinstated another such law. MPX5 at 20. As a result of Black Alabamians' disproportionate conviction rate, Black Alabamians are disenfranchised due to a criminal conviction at a rate double that of white Alabamians (15% among Black Alabamians; 7% among white Alabamians). MPX5 at 20; CPX80 at 39-40 ¶ 113; CPX84 at 233:17-234:23 (K. Jones). Alabama's criminal disenfranchise law disenfranchises Black voters at a rate that is doublethat of all other states in the country. MPX5 at 40 ¶ 113.

292.  The way Alabama has implemented its criminal disenfranchisement law has exacerbated its disparate effects. Until 2017, the state had no prescribed list of disenfranchising crimes, defining qualifying convictions only as "crime[s] of moral turpitude." CPX80 at 40 ¶ 115. This lack of clarity resulted in further disproportionate disenfranchisement of Black voters. *Id.* Despite clarifying the list of disenfranchising crimes in 2017 through legislation, the state has taken no effort to inform the thousands of voters who as of 2017 are no longer disenfranchised. *Id.* at 41 ¶¶ 116-17.

293.  The disproportionate incarceration of Black Alabamians also dilutes their voting strength. Many counties in Alabama count prisoners as residents of the area in which they are imprisoned as opposed to their actual residential address. CPX80 at 43 ¶ 121. In the 2010 Census, more than 34,000 Alabamians were counted as residents of their prison. *Id.* at 43 ¶ 122. By doing so, voting strength is artificially

shifted away from Black communities and towards communities that house prisons. *Id.* at 43 ¶ 121.

294.   Alabama's criminal disenfranchisement law exacerbates pre-existing inequalities in political power that disproportionately affect Black Alabamians. CPX80 at 42 ¶ 119.

295.   All of the socioeconomic disparities discussed above exist at the statewide level as well as in the region where the two majority-Black districts in Mr. Cooper's illustrative plans are located. CPX49, CPX50, CPX51, CPX52, CPX53, CPX54, CPX55, CPX56, CPX56, CPX58.

296.   In the 2010, 2012, 2014, 2016, and 2018 general elections in Alabama, the turnout rate among Black voters statewide was, on average, 4.8% lower than the turnout rate among non-Hispanic white voters. ECF No. 56-6 at 21-22 ¶ 154.

297.   The question of the extent to which Black registration and turnout rates in Alabama have improved in recent decades is irrelevant to this factor, which asks whether Black Alabamians suffer the effects of discrimination "which hinder their ability to participate effectively in the political process." *Thornburg v. Gingles*, 478 U.S. 30, 45 (1986). As discussed above, there is no dispute that the socioeconomic disparities discussed above hinder Black political participation in Alabama: those with less access to flexible working hours, reliable transportation, child care, and other resources will find it much harder to register and vote. To the extent

registration and turnout rates among Black Alabamians has improved recently, it has been *despite* these barriers to political participation these significant socioeconomic disparities create. Hr'g Tr. Vol. 6 at 1604:2-1606:4 (King). If these disparities did not exist, Black registration and turnout would be even higher than it is today. *Id.*

> g. **Senate Factor Six: Overt and subtle racial appeals are common in Alabama politics.**

298.   Overt and covert racial appeals are prevalent in Alabama political campaigns. CPX80 45 ¶ 128; Hr'g Tr. Vol. 5 at 1169:3-1171:10 (Bagley); CPX84 at 227:18-228:4 (K. Jones); CPX85 at 345:23-346:6 (Knight); *id.* at 429:2-432:19, 437:21-442:6 (Chestnut).

299.   Recent political campaigns in Alabama have reverted "towards more overt racial appeals," a development "attributable to [Alabama's] current members of Congress" and "candidates for those offices." MPX5 at 3 ¶ 6.

300.   As Plaintiff LaKeisha Chestnut has explained, racial appeals "deepen the racial divides" by preying on false racial stereotypes, such as that Black people are "lazy, that we don't do anything, that all we want to do is collect entitlements." CPX85 at 441:15-442:6.

301.   In addition to the personal impact that racial appeals have on Black voters, they also reinforce racially polarized voting. Hr'g Tr. Vol. 5 at 1171:6-10 (Bagley).

302.   In 2010, gubernatorial candidate Tim James ran a campaign ad in which he stated: "This is Alabama; we speak English. If you want to live here, learn it." CPX80 at 47 ¶ 134.

303.   Also in 2010, Alabama state senators were recorded discussing strategies to suppress Black voter turnout and referred to Black Alabamians as "Aborigines" and "Indians." The senators also stated that if a ballot measure to legalize electronic bingo was included on the ballot "every Black in this state will be bused to the polls . . . [e]very Black, every illiterate will be bused on HUD financed buses." CPX80 at 48 ¶ 138.

304.   Alabama Congressman Mo Brooks has routinely asserted that Democrats are "waging a war on whites." CPX80 at 48 ¶ 136; MPX5 at 27; Hr'g Tr. Vol. 5 at 1170:1-3 (Bagley); CPX85 at 429:12-430:6 (Chestnut).

305.   Representative Brooks has also referred to those who use the Supplemental Nutrition Assistance Program, or SNAP—who, in Alabama, are significantly more likely to be Black, CPX80 at 36 ¶ 105—as "slackers." MPX5 at 27.

306.   In 2018, Kay Ivey made the preservation of confederate monuments a focal point of her gubernatorial campaign, despite resounding protest and opposition from Black Alabamians. CPX80 at 48 ¶ 138. According to *Chestnut* plaintiff Karen Jones, this "hit kind of hard" with the Black community because it suggested that

Ivey "was saying white supremacy forever . . . white nationalism forever, not anything to embrace unity and diversity." CPX84 at 229:3-230:7.

307.   In the Montgomery mayoral race, white candidate David Woods' campaign conducted a telephone survey of various voters and asked questions that were "very incendiary and invoked some racial overtones" with respect to the Black candidate opposing him, Steven Reed. CPX84 at 230:8-231:3 (K. Jones).

308.   While running for the U.S. Senate, former Chief Justice of the Alabama Supreme Court Roy Moore suggested that the United States would be better off without any amendments to the federal Constitution following the 10th Amendment. This would include the 13th, 14th, and 15th Amendments. MPX2 at 27; Hr'g Tr. Vol. 5 at 1169:11-13 (Bagley).

309.   During the same campaign, Roy Moore told a crowd he thought America "was great at the time when families were united – even though we had slavery." MPX5 at 25; Hr'g Tr. Vol. 5 1169:16-18 (Bagley); CPX85 at 430:7-431:20 (Chestnut).

310.   While campaigning for Chief Justice of the Alabama Supreme Court, Tom Parker ran an ad attacking the Southern Poverty Law Center, a racial justice organization, and saying that "the leftist mob is trying to destroy our society" alongside an image of Congresswoman Maxine Waters. MPX5 at 27; Hr'g Tr. Vol. 5 1169:18-25 (Bagley); CPX85 at 431:21-432:18, 440:3-441:12 (Chestnut). A

federal court found that "one of the motives of th[is] ad was to draw attention to race." *Ala. State Conf. of NAACP v. Alabama*, No. 2:16-cv-731-WKW, 2020 WL 583803, at *56 (M.D. Ala. Feb. 5, 2020).

311.   Chief Justice Parker's ad made Plaintiff LaKeisha Chestnut "angry" because it made "it seem like black people are mobs," are "just unruly," and "have no morals, no scruples, no nothing." CPX85 at 441:2-12.

312.   In 2020, Chris Pringle ran a campaign ad in which he said: "If you look like me, . . . they call you a racist and blame you for everyone else's problems." MPX5 at 28; Hr'g Tr. Vol. 5 1170:8-12 (Bagley).

313.   According to Plaintiff LaKeisha Chestnut, racial appeals like the ones surveyed above "incite[] fear" by suggesting that "white people should be afraid of people that don't look like them, people, that look like me, people that look like my husband, . . . people that look like my granddaughter." CPX85 at 430:2-6. These appeals alienate Black Alabamians, make them feel as if they "don't matter," and imply they are "second class citizen[s]." *Id*. at 431:9-15, 441:4-6 (Chestnut); *see also* CPX86 at 541:12-20 (Sanders); CPX86 at 507:9-509:8 (Tyson).

> **h.   Senate Factor Seven: Black Alabamians are significantly underrepresented in elected office.**

314.   Black Alabamians have been almost entirely unable to succeed in running for office unless a majority of the relevant electorate is Black.

315.   Alabama has never had more than one Black congressional representative, and no Black candidate has been elected to the U.S. House of Representatives outside of the state's sole majority-Black district, CD 7. ECF No. 56-3 at 34 ¶ 166; CPX80 at 51 ¶ 147.

316.   None of Alabama's statewide officials are Black. ECF No. 56-3 at 34 ¶ 167; CPX80 at 51 ¶ 146.

317.   Only two Black candidates have ever been elected to statewide office in Alabama, and both ran as incumbents are being appointed to their position. ECF No. 56-3 at 34 ¶ 168. Both ultimately lost to white candidates. *Id.* at 34-35 ¶ 170; CPX80 at 51 ¶ 145.

318.   The overwhelming majority of Black members of the Alabama Legislature are elected from districts where a majority of the voters are Black. ECF No. 56-3 at 34 ¶ 169; CPX80 at 51 ¶ 146.

319.   Senator Sanders testified that the lack of Black representation in statewide offices "profound[ly] impact[s]" the Black community because "every aspect of our life is affected one way or another by government." CPX86 at 559:7-23.

i.   **Senate Factor Eight: Alabama and its congressional delegation are unresponsive to the needs and interests of Black Alabamians.**

320.   The State has repeatedly ignored Black leaders' calls for a second majority-Black district since the 1990s. Hr'g. Tr. Vol. 5 1173:1-7 (Bagley).

321.   Alabama's failure to expand Medicaid has demonstrably disserved its Black community. Hr'g. Tr. Vol. 5 1174:7-14 (Bagley); CPX80 at 53 ¶ 154.

322.   The City of Birmingham's 2016 attempt to raise the minimum wage—a policy that would have disproportionately benefitted Black residents who are more likely to work low-paying jobs—was overridden by the Alabama Legislature. Hr'g. Tr. Vol. 5 1173:17-18 (Bagley); MPX5 at 19.

323.   The Alabama Office of the Attorney General and the Alabama Department of Environmental Management have consistently opposed cleaning up the 35th Avenue area in North Birmingham neighborhood, which has high amounts of highly toxic soil due to industrial pollution from heavy industrial factories in the area. MPX5 at 21-22; Hr'g. Tr. Vol. 5 at 1166:4-18 (Bagley).

324.   The representatives of Congressional Districts 1 and 2—Jerry Carl and Barry Moore, respectively—both voted against the recent infrastructure bill, which provides funds to increase access to public transit and high-speed internet, both of which Black Alabamians uniquely lack. Hr'g Tr. Vol. 5 at 1350:1-3 (B. Jones); Hr'g. Tr. Vol. 6 at 1630:5-22, 1633:20-1635:4 (Caster). These representatives' actions

were adverse to the interests of the Black communities in their districts. Hr'g Tr. Vol. 5 at 1350:24-1351:5 (B. Jones); Hr'g Tr. Vol. 6 at 1634:22-1635:4 (Caster).

325.   Jerry Carl and Barry Moore also voted against the Build Back Better Act, which would have ameliorated environmental pollution in Black neighborhoods and also covered those disproportionately Black individuals who would have benefitted had Alabama expanded Medicaid coverage under the Affordable Care Act. Hr'g. Tr. Vol. 6 at 1631:15-1633:1 (Caster); Hr'g. Tr. Vol. 5 at 1350:8-1351:5 (B. Jones); Hr'g Tr. Vol. 2 389:1-9 (Dowdy). Again, these actions were adverse to the interests of the Black communities in their districts. Hr'g Tr. Vol. 5 at 1350:24-1351:5 (B. Jones); Hr'g Tr. Vol. 6 at 1631:23-1633:1 (Caster).

326.   Jerry Carl and Barry Moore also voted against the American Rescue Plan, which contained provisions to assist the disproportionate number of Black individuals who have lost, or had to leave, their jobs during the COVID-19 pandemic. Hr'g Tr. Vol. 5 at 1351:21-1352:22 (B. Jones); Hr'g Tr. Vol. 6 at 1628:25-1629:19 (Caster). Again, these actions were adverse to the interests of the Black communities in their districts. *Id.*

327.   When in office, CD 1 Representative Bradley Byrne voted against the First Step Act, which provided relief to the disproportionate number of Black Alabamians charged and convicted of crimes. Hr'g Tr. Vol. 6 at 1633:2-19 (Caster);

CPX85 at 424:6-19 (Chestnut). These actions were adverse to the interests of the Black communities in their district. *Id.*

328.   Representative Byrne took no effort to determine whether his Black constituents supported the First Step Act before he voted against it. Hr'g Tr. Vol. 7 at 1724:24-1725:7 (Byrne).

329.   When in office, Representative Byrne took a leading role in trying to repeal the Affordable Care Act, which disproportionately benefited the Black individuals in his district that he knows have a harder time accessing quality and affordable health care. CPX84 at 426:20-427:5 (Chestnut); Hr'g Tr. Vol. 7 at 1706:15-24 (Byrne). Yet, Representative Byrne never bothered to try to decide whether the Black communities in his district wanted to keep the Affordable Care Act's policies that disproportionately benefitted them. *Id*. at 1723:20-1724:14 (Byrne).

330.   While serving in Congress, Representative Byrne assumed that his Black constituents were offended by Alabama's commemoration of a Confederate general in the Capitol's Statutory Hall, yet he did nothing about it. Hr'g Tr. Vol. 7 at 1725:24-1727:10 (Byrne). Indeed, he did not even attempt to determine how many of his constituents were Black because it "did not matter" to him. *Id.* at 1724:15-23.

331.   While serving in the Alabama Legislature, Representative Byrne assumed that his Black constituents were offended by the Monument to Confederate

Soldiers and Sailors—which was surrounded by the flags of the Confederate states and which sits at the foot of the State Capitol in Montgomery—yet did nothing about it. Hr'g Tr. Vol. 7 at 1727:11-1728:13 (Byrne). Instead, he "was busy doing other things" and did not "pay[] attention to stuff like that." *Id.* at 1727:17-1728:3.

> **j.      Senate Factor Nine: Defendants' justifications for HB1's lack of a second congressional district are tenuous.**

332.    There is no substantial justification for Alabama's failure to include a second majority-Black congressional district.

333.    The two justifications on which Defendants primarily rely in defending the enacted plan—core retention and respect for communities of interest—were expressly *de*-prioritized by the Legislature when it crafted its redistricting principles. CPX82 at 2-3 ¶ II(j) (explaining that core retention and respect for communities of interest can be observed only "to the extent that they do not violate or subordinate" other principles, including compliance with the Voting Rights Act).

334.    Since the 1990s, Black legislators and voters have sought a congressional plan that contains two majority-Black districts. ECF No. 44 at 13 ¶ 85.

335.    A congressional plan containing two majority-Black districts was offered in the Legislature, and several such maps were suggested to the Redistricting Committee. ECF No. 44 at 13-14 ¶¶ 86-88.

336.   HB 1 was met with resounding opposition from Black voters and legislators across the state. ECF No. 44 at 13 ¶¶ 79-84.

**C.    The risk of irreparable harm to Plaintiffs, balance of the equities, and public interest all weigh in favor of relief.**

337.   The Court finds that, in the absence of an injunction, Plaintiffs and other Black Alabamians will face irreparable harm in the upcoming 2022 elections. The Court further finds that such harm far outweighs any inconvenience an injunction will cause Defendants. Finally, the Court finds that an injunction would serve the public interest by vindicating Black Alabamians' fundamental voting rights.

**1.    Use of the Enacted Plan in the 2022 elections will irreparably harm Plaintiffs and other Black Alabamians.**

338.   The Court finds that because HB1 denies Plaintiffs and other Black Alabamians an equal opportunity to participate in Alabama's political process, conducting an election under HB 1 would cause them irreparable harm.

339.   This Court has no power to provide any form of relief to Plaintiffs with respect to the 2022 elections once those elections have passed. There are no "do-overs" in elections. As such, the harm Plaintiffs identify in this case is, by definition, irreparable once an election is held under the 2021 Enacted Plan.

340.   Plaintiffs' testimony underscores the grave rights at stake in this litigation.

341.   Benjamin Jones, who lives in CD 2 under the 2021 Enacted Plan, testified that voting is "extremely important to" him and that he has not "missed an election since" he became eligible to vote. *Id.* at 1345:2-10. "[V]oting is extremely critical," Mr. Jones explained, "it is the opportunity to be a part of the operation of local, state, and national government." *Id.* at 1345:21-24. Mr. Jones has long been represented by congressional representatives whom he and other Black residents of his district have overwhelmingly opposed. Hr'g Tr. Vol. 5 at 1346:4-1347:23 (B. Jones); CPX83 at 14, fig. 4; MPX4 at 9, tbl. 1. Since 2012, congressional races in Mr. Jones's district have been entirely uncompetitive, particularly when the Democratic nominee has been Black. Hr'g Tr. Vol. 5 at 1346:4-1347:2. As a result, Mr. Jones feels he does not have a voice in his district's congressional elections: it "is almost a foregone conclusion" that the candidate preferred by Black voters will lose. *Id.* at 1347:8-12. Mr. Jones brought this suit to give himself and other Black citizens in his community a voice by forcing the creation of a second majority-Black congressional district. *Id.* at 1347:24-1348:11.

342.   Dr. Marcus Caster, who lives in CD 1 under the 2021 Enacted Plan, testified similarly. Like Mr. Jones, Dr. Caster explained that "[v]oting is very important to [him]" and that "[i]t's something that [he] take[s] very seriously and that [he] instill that in [his] children." Hr'g Tr. Vol. 6 at 1623:16-22. For more than a decade, Dr. Caster and other Black voters have overwhelmingly opposed the

representatives of CD 1. Hr'g Tr. Vol. 6 at 1623:23-24; CPX83 at 13 fig.3; CPX85 at 418:19-419:24 (Chestnut); MPX4 at 9, tbl. 1. Despite that opposition, the elections in his district have been woefully uncompetitive. Hr'g Tr. Vol. 6 at 1625:6-8 (Caster). As a result, Dr. Caster feels as if he has no "voice in congressional elections in Alabama." *Id.* at 1625:9-15. Dr. Cater brought this lawsuit to remedy that problem by forcing the creation of a second district in which Black voters have an opportunity to elect their candidate of choice. *Id.* at 1625:16-1626:9.

**2.    There is sufficient time to for a new congressional plan to be drawn for use in the 2022 elections.**

343.   The Court finds that there is sufficient time for the Legislature (or, if necessary, this Court) to draw a map that complies with Section 2 for use in the State's May 24, 2022 primary election.

344.   The State's Enacted Plan was passed during a special legislative session called by Governor Kay Ivey on October 28, 2021. ECF No. 44 at 11-12 ¶ 76. Less than a week later, the Alabama Legislature passed the 2021 Enacted Map. *Id*. at 13 ¶ 81. Governor Ivey signed the map into law on November 4. *Id*.

345.   Plaintiffs in this case did not delay in filing suit. Indeed, they filed this suit just *hours* after the plan was enacted into law. ECF No. 3.

346.   Alabama's candidate filing deadline is on January 28, 2022. ECF No. 44 at 14 ¶ 91. The State's primary is scheduled for May 24, 2022. *Id.*

347. Alabama's 116-day period between the candidate filing deadline and the primary election is among the longest in the country.

348. Due to the enormous gap between the candidate filing deadline and the primary election, this Court can extend the filing deadline without creating any need to alter the primary election date.

349. Recent practices in other states indicate that there is plenty of time for Alabama to enact a new plan in time for the 2022 primary election.

350. Kentucky, one of the few states that has a similarly long filing period (over 110 days)—recently moved its candidate filing date by 18 days because of redistricting delays; this action did not impact the state's normally scheduled primary date. Ky. H.B. 172 (2022).

351. North Carolina law requires that when a court invalidates a redistricting plan, it can give the General Assembly as little as 14 days to craft a new plan. N.C. Gen. Stat. § 120-2.4(a). Despite not being bound by that rule, federal courts have followed the practice. After invalidating a congressional plan on February 5, 2016, the U.S. District Court for the Middle District of North Carolina gave the legislature until February 19 to enact a new plan. *Harris v. McCrory*, 159 F. Supp. 3d 600, 627 (M.D.N.C. 2016). Similarly, after invalidating a congressional plan on January 9, 2018, a court in the same district gave the legislature until January 24 to enact a new plan. *Common Cause v. Rucho*, 279 F. Supp. 3d 587, 691 (M.D.N.C. 2018), *stayed*

*and rev'd on other grounds by Rucho v. Common Cause*, 138 S. Ct. 823 (2018);

*Rucho v. Common Cause*, 139 S. Ct. 2484 (2019).

352.   Other federal courts have followed similar timelines. *See Larios v. Cox*, 300 F. Supp. 3d 1320, 1357 (N.D. Ga. 2004) (ordering Georgia General Assembly to enact a new plan within two and a half weeks in an order dated February 10 of an election year).

353.   After state courts invalidated North Carolina's congressional *and* state legislative plans in 2019, the North Carolina General Assembly drew a new congressional plan in less than 3 weeks and new state legislative plans (involving nearly 80 districts) in even less time. *See Harper v. Lewis,* No. 19-CVS-012667 (N.C. Super. Ct. Oct. 28, 2019); *Common Cause v. Lewis*, No. 18-CVS-014001, 2019 WL 4569584 (N.C. Super. Ct. Sep. 3, 2019).

354.   Just this week, after invalidating Ohio's state legislative plans, the Ohio Supreme Court ordered that new plans be drawn in just 10 days. *League of Women Voters of Ohio v. Ohio Redistricting Comm'n.*, --- N.E.3d ---, 2022 WL 110261, at *28 ¶ 137 (Ohio Jan. 12, 2022).

## II.    PROPOSED CONCLUSIONS OF LAW

355.    Plaintiffs have satisfied each of the four elements of a preliminary injunction by showing that: (1) they are substantially likely to succeed on the merits; (2) there is a substantial threat that Plaintiffs and other Black Alabamians will face irreparable harm in the absence of an injunction; (3) irreparable harm far outweighs any harm an injunction would cause to Defendants;, and (4) a preliminary injunction will serve the public interest. *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F. 3d 1349, 1354 (11th Cir. 2005).

### A.    Plaintiffs are substantially likely to succeed on the merits of their Section 2 claim.

356.    Plaintiffs have satisfied all elements of this straightforward Section 2 claim.

357.    Section 2 of the VRA renders unlawful any state "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

358.    A single-member congressional district plan that dilutes the voting strength of a minority community may violate Section 2. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 423–42 (2006) ("*LULAC*").

359.    "Dilution of racial minority group voting strength" in violation of Section 2 "may be caused by the dispersal of blacks into districts in which they

constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority." *Gingles*, 478 U.S. at 46 n.11.

360.   Dilution of a minority community's voting strength violates Section 2 if, under the totality of the circumstances, the "political processes leading to nomination or election in the State . . . are not equally open to participation by members of [a racial minority group] . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

361.   "The essence of a Section 2 claim . . . is that certain electoral characteristics interact with social and historical conditions to create an inequality in the minority and majority voters' ability to elect their preferred representatives." *City of Carrollton Branch of the NAACP v. Stallings*, 829 F.2d 1547, 1554–55 (11th Cir. 1987) ("*Carrollton Branch*").

362.   "[P]roof that a contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against minority voters[] is not required under Section 2 of the Voting Rights Act." *Carrollton Branch*, 829 F.2d at 1553.

363.   Rather, the question posed by a Section 2 claim is "whether as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." *Gingles*, 478 U.S. at 44 (internal quotation marks and citation omitted); *see also Ga. State*

*Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015) ("*Fayette Cnty.*") ("A discriminatory *result* is all that is required; discriminatory intent is not necessary.").

364.   While "federal courts are bound to respect the States' apportionment choices," they must intervene when "those choices contravene federal requirements," such as Section 2's prohibition of vote dilution. *Voinovich v. Quilter*, 507 U.S. 146, 156 (1993).

### 1.   Plaintiffs have satisfied the first *Gingles* precondition.

365.   To satisfy the first *Gingles* precondition, Plaintiffs must show that the Black population in Alabama is "sufficiently large and geographically compact to constitute a majority in a single-member district." *LULAC*, 548 U.S. at 425 (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1006-1007 (1994)).

366.   While "[p]laintiffs typically attempt to satisfy [the first *Gingles* precondition] by drawing hypothetical majority-minority districts," *Clark v. Calhoun Cnty.*, 88 F.3d 1393, 1406 (5th Cir. 1996), such illustrative plans are "not cast in stone" and are offered only "to demonstrate that a majority-[B]lack district is feasible." *Clark v. Calhoun Cnty.*, 21 F.3d 92, 95 (5th Cir. 1994); *see also Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) (same).

367.   The Court concludes that Plaintiffs have shown that Alabama's Black population is sufficiently numerous and geographically compact to support the

creation of a second majority-Black congressional district.

          **a.**      **AP BVAP is the appropriate measurement of Black population in this case.**

368.   In *Georgia v. Ashcroft*, the U.S. Supreme Court explained that in cases, such as this one, which "involve[] an examination of only one minority group's effective exercise of the electoral franchise," it is "proper to look at *all* individuals who identify themselves as black." 539 U.S. 461, 473 n.1 (2001).

369.   The parties refer to the metric described by the Supreme Court as the "Any Part Black" or "AP BVAP" metric. In the wake of *Georgia v. Ashcroft*, courts across the country have relied on the AP BVAP metric when conducting a numerosity analysis under *Gingles*. *See, e.g.*, *Terrebonne Par. Branch NAACP v. Jindal*, 274 F. Supp. 3d 395, 419-20 (M.D. La. 2017) (using AP BVAP), *rev'd sub nom. on other grounds Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020); *Covington v. North Carolina*, 316 F.R.D. 117, 125 n.2 (M.D.N.C. 2016) (utilizing the "'total black' portion of the voting-age population, i.e., the portion that is 'any-part black'"). And they have also done in cases in which Plaintiffs' expert Mr. Cooper has served as an expert. *See, e.g.*, *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338 (N.D. Ga. 2015) (issuing preliminary injunction); *Mo. State Conf. NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006 (E.D. Mo. 2016).

370.   *Caster* Plaintiffs' experts Mr. Cooper and Dr. King, and *Milligan*

Plaintiffs' expert Dr. Duchin agree that AP BVAP is the appropriate measure for determining whether Alabama's Black population is sufficiently numerous to support a second majority-Black district within the State.

371.   Defendants and their expert Mr. Bryan do not dispute that AP Black is the appropriate measurement for determining the Black population of a congressional district in this case. Indeed, Defendants' opposition to Plaintiffs' motion for a preliminary injunction did not challenge Plaintiffs' reliance on the AP BVAP metric. And while Mr. Bryan asserted in his reports that the "single-race Black" metric is more "defensible" from a political science perspective, he conceded that this was just a "passing" remark, that he was not a political scientist, and that he did not mean to suggest that one metric was more or less appropriate in this case. Hr'g Tr. Vol 4 898:20-899:3.

372.   In light of the Supreme Court's pronouncement in *Georgia v. Ashcroft* and the parties' apparent consensus on the use of the AP BVAP measure, the Court concludes that AP BVAP is the appropriate measure here to measure the size of Alabama's Black population.

> **b.**     **Alabama's Black population is sufficiently numerous to form a second majority-Black congressional district.**

373.   Plaintiffs have shown that Alabama's Black population is sufficiently large to constitute a majority in a second congressional district.

374.   Under the first *Gingles* precondition, the Court must answer an objective numerical question: "Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?" *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009).

375.   Plaintiffs' experts drew a combined eleven illustrative plans, each of which contains two majority-Black districts in congressional districts 2 and 7. *Supra* Section I.B.1.b. They accomplish this feat in different configurations and while balancing myriad traditional districting criteria.

376.   Neither Defendants nor their expert disputes that Plaintiffs have submitted eleven plans with two majority-Black districts. To the contrary, Mr. Bryan concedes that all of the plans he reviewed met this numerosity requirement.

377.   For these reasons, the Court concludes that Plaintiffs have shown that Alabama's Black population is large enough to constitute a majority in a second congressional district.

378.   Although that conclusion satisfies the numerosity requirement, the Court pauses before moving to compactness to note that the evidence demonstrates that Plaintiffs have also satisfied the numerosity requirement under the NH SR BCVAP metric. Mr. Cooper reports that his plans contains two majority-Black districts by relying on only those Alabamians who qualify as U.S. citizens and identify as single-race non-Hispanic Black. *Supra* Section I.B.1.b.

379.   Mr. Bryan testified that he did not analyze whether Plaintiffs' illustrative plans satisfy the numerosity requirement under this measure, but he did not dispute that Plaintiffs could satisfy the requirement using the NH SR BCVAP measure. *Supra* Section I.B.1.b.

380.   Accordingly, the Court concludes that even if AP BVAP were not appropriate in this case, Plaintiffs still satisfy the numerosity requirement according to the *most restrictive* definition of Black population.[5]

### c.   Alabama's Black population is sufficiently compact to establish two majority-Black congressional districts.

381.   The Court further concludes that Plaintiffs are likely to show that Alabama's Black population can form two congressional districts that are reasonably compact.

382.   Under the compactness requirement of the first *Gingles* precondition, Plaintiffs must show that it is "possible to design an electoral district[] consistent with traditional redistricting principles." *Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998).

---

[5] As such, there is nothing to Defendants' objection that Plaintiffs used different methodologies across their *Gingles* analysis to measure the State's Black population. First, Defendants' argument rests on a single footnote in a case decided in a separate circuit that itself cites only to a law review article. *See Pope v. Cnty. of Albany*, 687 F.3d 565, 577 n.11 (2d Cir. 2012). This is a thin reed indeed to hang Defendants' entire objection to Plaintiffs' satisfaction of the *Gingles* 1 numerosity requirement. But the argument is also wrong as a factual matter. Plaintiffs demonstrated that they are likely to satisfy the *Gingles* threshold requirements using a single metric, NH SR BCVAP, which both Mr. Cooper and Dr. Palmer utilized in their analyses. *See supra* ¶¶ 27-29, 42, 153.

383.   Alabama has promulgated Redistricting Guidelines that identify the criteria by which the State's reapportionment committee was to draw a new congressional map. These Guidelines set forth a two-tier hierarchy of redistricting factors. *Supra* Section I.B.1.c.i.

384.   The State's tier one or primary guidelines are found within Section II, Paragraphs (a) through (h) of the Guidelines and consist of: (1) minimal population deviation; (2) compliance with one-person, one-vote; (3) compliance with the Voting Rights Act; and (4) contiguity. CPX82 at 2-3 ¶ II(a)-(h). This Section also provides that "race, color, or membership in a language-minority group may predominate over race-neutral districting criteria to comply with Section 2 of the Voting Rights Act, provided there is a strong basis in evidence in support of such a race-based choice." *Id.* at 2 ¶ II(g).

385.   The Guidelines then identify redistricting policies that "shall be observed to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States and the State of Alabama." CPX82 at 3 ¶ II(j). These tier two criteria include: (1) avoiding contests between incumbents; (2) respect for communities of interest; (3) minimizing the number of counties in each district; and (4) preserving the cores of existing districts. *Id.* at §2(j)(i)-(v).

386.   Defendants' only challenge to Plaintiffs' compliance with Alabama's

tier-one factors turns on compactness. *See* Hr'g Tr. Vol. 4 at 930:18-931:1 (Bryan) (noting that Mr. Bryan "confirmed" that Mr. Cooper's plans meet the requirement of population equality). The remainder of Defendants' arguments and Mr. Bryan's analysis is devoted to analyzing Plaintiffs' illustrative plans under the tier-two factors incumbency, communities of interest, and core retention. *Id*. at 948:2-7.

387.   The Court disagrees with Defendants' arguments regarding the illustrative plans' compliance with the compactness criterion. It is important to emphasize that compliance with this criterion does *not* require that the illustrative plans be equally or more compact than the 2021 Enacted Plan; instead, this criterion requires only that the illustrative plans contain reasonably compact districts. An illustrative plan can be "far from perfect" in terms of compactness yet satisfy the first *Gingles* precondition. *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1326 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020).

388.   Plaintiffs' illustrative plans have compactness scores comparable to and, in many cases, superior to, compactness scores obtained by the 2021 Enacted Plan. *Supra* Section I.B.1.c.iv. Dr. Duchin and Defendants' expert Mr. Bryan testified that each of Dr. Duchin's four illustrative plans obtain average Polsby-Popper scores that exceed those obtained by the State's plan. Mr. Cooper's seven illustrative plans are of a piece. Each has a compactness score comparable to the 2021 Enacted Plan under each of the metrics used by the parties' experts. And in the

case of Illustrative Plan 7, Mr. Cooper's plan outstrips the State's plan's average Reock score. CPX59 at Figure 3.

389.   Even where the districts in Plaintiffs' illustrative plans score slightly lower on compactness measures than those in the 2021 Enacted Plan, Plaintiffs' experts testified (and Defendants' expert has not disputed) that they remain within the normal range of compactness scores for districts in Alabama. CPX59 at ¶¶ 23-28. Even Mr. Bryan agreed that compactness is a "relative measure," rather than objective, criterion. Hr'g Tr. Vol. 4 at 1045:21-1046:1.

390.   Plaintiffs' illustrative plans comply in equal measure with each of the remaining traditional redistricting criteria. Defendants' expert does not dispute that the illustrative plans are contiguous and contain virtually equal population. Hr'g Tr. Vol. 4 at 930:18-931:1 (Bryan). Plaintiffs' illustrative plans also respect county boundaries and minimize the number of counties in each district by minimizing county splits. There can be no dispute that is the case here: compared to the 2021 Enacted Plan, one of Mr. Cooper's plans contains *fewer* county splits, four plans have the same number of county splits, and two plans have just one additional county split. CPX1 at 21-22 ¶ 48; CPX59 at 2 ¶ 6.

391.   Defendants dispute none of this. Instead, they challenge Plaintiffs' illustrative plans based on three criteria: core retention, respect for communities of interest, and respect for incumbents. In their briefing, Defendants falsely asserted

that these criteria are "the three most important districting principles in [the State's] traditional criteria." ECF No. 71 at 79. This statement directly contradicts the 2021 Redistricting Guidelines and the testimony of their own expert. The 2021 Redistricting Guidelines relegated to secondary status the three criteria on which Defendants rely upon the most, expressly stating that they shall only be complied with to the extent they do not conflict with principles like compliance with the VRA, compactness, and population equality. *Supra* Section I.B.1.c.i. And among the second-tier criteria, the Redistricting Guidelines disavow any hierarchy, noting instead that each of the second-tier criteria should be given equal weight and must be balanced against one another. CPX82 at 3 ¶ II(j). Mr. Bryan testified to the same. Hr'g Tr. Vol 4 at 1012:10-18; *id.* at 1043:3-10; *id.* at 1043:23-1044:14. Accordingly, Defendants' prioritization of core preservation, communities of interest, and incumbency has no basis in the State's express Guidelines for drawing a congressional plan.

392.   In any event, Plaintiffs' illustrative plans *do* respect each of the criteria on which Defendants rely to the extent possible while still complying with the Voting Rights Act and Alabama's Redistricting Guidelines

393.   First, aside from reconfiguring District 2 and those districts that surround it, almost all of Mr. Cooper's illustrative plans leave District 4 and 5 in Northern Alabama nearly unchanged from the enacted plan. Hr'g Tr. Vol. 2 at 480:7-

17. Dr. Duchin testified that while she altered Districts 4 and 5 to make her plans *more* compact than the 2021 Enacted Plan, she could easily reconfigure those districts so that they more closely resemble the existing districts in the Enacted Plan. Hr'g Tr. Vol. 3 at 600:4-601:7.

394.   Plaintiffs' experts similarly gave incumbency protection the respect owed under the Guidelines. One of Mr. Cooper's plans—Illustrative Plan 5—pairs no incumbents, and the rest pair only the incumbents in Districts 1 and 2, all while creating a second majority-Black district within the state and adhering to the state's emphasis on compactness. And Dr. Duchin explained that the incumbent pairings in her plans were the result of placing greater emphasis on compactness. Hr'g Tr. Vol. 3 at 669:22-670:11.

395. Dr. Duchin and Mr. Cooper's illustrative plans also respect communities of interest. As the evidence shows, the second majority-Black district in the illustrative plans captures most of the Black Belt to unite the historical Black community that resides in that region. *Supra* Section I.B.1.c.v. Moreover, Plaintiffs' illustrative plans tie together Black communities in Montgomery and Mobile to Black communities in the Black Belt with whom they share cultural ties and numerous socioeconomic obstacles, including access to healthcare and education, and a lack of economic opportunities. *Id.* The shared bonds of these communities was also supported by the extensive testimony of lay witnesses in the *Chestnut* case.

*Id.*

396.   Underscoring Plaintiffs' illustrative plans' respect for communities of interest is their resemblance to Alabama's 2021 Board of Education Plan, which was drawn according to the same exact Redistricting Guidelines. *Supra* Section I.B.1.c.v. The SBOE plan pairs Mobile with the Black Belt communities in the same manner as Plaintiffs' illustrative plans. CPX1 at 22; *see also Terrebonne Branch NAACP v. Jindal*, No. 3:14-CV-69-JJB-EWD, 2019 WL 4398509, at *5 (M.D. La. Apr. 29, 2019) (finding minority communities formed a community of interest where they shared a district under other districting plans).

397.   In response, Defendants assert that Plaintiffs' illustrative plans unite Black Alabamians "who may have little in common with one another but the color of their skin." ECF No. 71 at 71. This reductive view is belied by the evidence. The substantial lay witness testimony in this case and in *Chestnut* demonstrates that the Black Belt, Mobile, and Montgomery communities have deep cultural and familial ties that cannot be diminished by Defendants' simplified description of what Plaintiffs' illustrative plans accomplish. *Supra* Section I.B.1.c.v.

398.   Defendants' assertion that they have provided evidence of other communities of interest within the state that Plaintiffs' plans do not unite misses the point. For instance, Defendants claim that Mobile and Baldwin Counties form an inviolable community of interest that is broken in part in Plaintiffs' plans. But this

is wrong on the facts and the law. As an initial matter, Plaintiffs offered testimony supporting the contention that Montgomery and Baldwin Counties are in fact separate communities with separate interests and demographics. CPX85 at 446:4-25 (Chestnut); Hr'g Tr. Vol. 6 at 1636:7-1638:10 (Caster). But more importantly, the community of interest criterion does not require a Section 2 plaintiff to respect *every* community of interest that exists within a state and finds no basis in the redistricting guidelines themselves, which require only reasonableness and a balance of competing interests. *See* CPX82. For good reason: Such a rule would be impossible to satisfy. And the evidence for that is the 2021 Enacted Plan itself, which would violate that rule based on its failure to meaningfully capture the Black Belt region, an undisputable community of interest. *Supra* Section I.B.1.c.v.

399.   At bottom, Defendants argue that Plaintiffs' illustrative plans violate baseless bright-line tests for compliance with three traditional redistricting criteria they believe should be emphasized. But no such rules exist. Indeed, "there is more than one way to draw a district so that it can reasonably be described as meaningfully adhering to traditional principles." *Chen v. City of Hous.*, 206 F.3d 502, 519 (5th Cir. 2000); *see also Wright*, 301 F. Supp. 3d at 1326 (approving "far from perfect" illustrative plan as satisfying the first *Gingles* precondition). Contrary to Defendants' assertions, the first *Gingles* precondition does not require an illustrative plan to be superlative in any one of traditional redistricting criteria—let alone maximize all of

them. Rather, it must simply strive to respect and balance those principles, as Plaintiffs' illustrative plans do.

400.   Finally, Defendants' elevation of principles like core preservation and incumbency protection cannot be squared with the demands of federal law, as Defendant Secretary Merrill had previously admitted. In Defendant's own words: "[t]he State's interest in applying traditional districting criteria always must yield to its duty to comply with the federal Constitution and the Voting Rights Act." *Chestnut v. Merrill*, Case No. 2:18-CV-00907-KOB, ECF No. 115, Defendant's Post-Trial Brief at 4-5 n.1 (N.D. Ala. Dec. 13, 2019).

401.   As Plaintiffs' experts testified, every effort to draw an additional majority-Black district to satisfy the first *Gingles* precondition will unavoidably disrupt the existing plan's cores and will sometimes pair incumbents. Hr'g Tr. Vol. 3 at 600:4-16, 669:22-670:11 (Duchin); Hr'g Tr. Vol. 2 at 480:7-17 (Cooper). Under Defendants' theory, it would be impossible for a Section 2 Plaintiff ever to succeed on their claim. Unsurprisingly, Defendants fail to cite, and the Court has not found, a single case in which a proposed illustrative plan failed because it inadequately retained the cores of existing districts.

402.   Underlying Defendants' redistricting criteria arguments is their assertion that Plaintiffs' experts allowed race to predominate their plans. In support of this assertion, Defendants point to the different ways Mr. Cooper and Dr. Duchin

chose to balance competing factors and their adherence to the Guidelines' instruction that the VRA and compactness should be respected over criteria like the protection of incumbents, retaining district cores, and respecting communities of interest.

403.   But Defendants provided no evidence that race predominated in the drawing of any of the illustrative plans. In their testimony, Plaintiffs' experts provided race-neutral reasons for the countless choices that make up the illustrative plans they drew. Hr'g Tr. Vol. 2 at 441:2-5, 444:5-13 (Cooper explaining that race did not predominate his line drawing decisions); Hr'g Tr. Vol. 3 at 571:6-573:8 (Duchin describing the same). Defendants offered no evidence to rebut these accounts.

404.   Nor is it remarkable that Plaintiffs' experts testified that the creation of a second-majority district required some consideration of race. Both the Supreme Court's and Eleventh Circuit's "precedents *require* [Section 2] plaintiffs to show that it would be possible to design an electoral district, consistent with traditional districting principles, in which minority voters could successfully elect a minority candidate." *Davis*, 139 F.3d at 1425. Because Section 2 requires the intentional creation of a majority-Black district, it "necessarily requires considerations of race." *Fayette Cnty.*, 118 F. Supp. 3d at 1345. Therefore, "[t]o penalize [plaintiffs] . . . for attempting to make the very showing that *Gingles*, *Nipper* [*v. Smith*, 39 F.3d 1494 (11th Cir. 1994)], and [*Southern Christian Leadership Conference v. Sessions*, 56

F.3d 1281 (11th Cir. 1995),] demand would be to make it impossible, as a matter of law, for any plaintiff to bring a successful Section Two action." *Davis*, 139 F.3d at 1425.

405.   As a result, and contrary to Defendants' unsupported assertions, courts adjudicating Section 2 claims should "not determine as part of the first *Gingles* inquiry whether Plaintiffs' Illustrative Plan[s] subordinate[] traditional redistricting principles to race." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1306 (N.D. Ga. 2013), *aff'd in part, vacated in part, & rev'd in part on other grounds*, 775 F.3d 1336 (11th Cir. 2015); *see also Fayette Cnty. Bd. of Comm'rs*, 118 F. Supp. 3d at 1344-45 (reaffirming this principle on remand).

406.   Alabama's own Guidelines follow suit, instructing map drawers that race may be considered where the VRA requires such considerations. CPX82 at 2 ¶ II(g). Where, as here, Plaintiffs have shown that Alabama's Black population is sufficiently numerous to support a second majority-Black district while complying with one-person, one-vote and traditional redistricting principles, there is overwhelming evidence that the Voting Rights Act requires the drawing of a second majority-Black district and that other discretionary redistricting factors must give way to that effort.

407.   Defendants' focus on racial predominance is a misplaced application of racial gerrymandering case law, an independent area of law wholly distinct from the

claims the Caster Plaintiffs raise here. The Eleventh Circuit has previously rejected Defendants' attempt to conflate these doctrines—by, for example, relying in *Miller v. Johnson*, 515 U.S. 900 (1995)—finding the argument "unpersuasive" because they "address very different contexts." *Davis*, 139 F.3d at 1425 (rejecting the state's reliance on *Miller*).

408.   But even if racial predominance were a relevant consideration in a Section 2 case (it is not), and even if race did predominate in Plaintiffs' illustrative plans (it did not), Plaintiffs are still likely to succeed on the merits of their claim because their illustrative plans are motivated by an effort to comply with Voting Rights Act and are sufficiently tailored to achieving that end. *See Miller*, 515 U.S. at 916 (explaining in racial gerrymandering cases it is the "plaintiff's burden . . . to show . . . that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district[s]," after which the state must "satisfy strict scrutiny" by demonstrating that the plan "is narrowly tailored to achieve a compelling interest").

409.   The Supreme Court has "assume[d], without deciding, that . . . complying with the Voting Rights Act was compelling." *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 801 (2017). Alabama's Guidelines confirm that compliance with the Voting Rights Act is a "compelling State interest" to which "priority is to be given" should that requirement "conflict with any other criteria."

CPX82 at 3 ¶ II(j).

410.   Narrow tailoring does not "require an exact connection between the means and ends of redistricting" but rather just "*good reasons* to draft a district in which race predominated over traditional districting criteria." *Ala. Legis. Black Caucus*, 231 F. Supp. 3d at 1064 (quotation marks omitted). Indeed, "[i]n the context of voting rights . . . narrow tailoring 'does not demand that a State's actions *actually be necessary* to achieve a compelling state interest in order to be constitutionally valid.'" *Id.* (emphasis added) (citing *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015)).

411.   In other words, even if racial predominance were relevant here, Plaintiffs' compliance with Section 2 of the VRA constitutes "good reason" to create a race-based district, and the remedy would be narrowly tailored even if it was not the only manner in which to draw that district. Accordingly, even if strict scrutiny applied here (which it does not), Plaintiffs' illustrative plans satisfy it.

412.   In light of this precedent, Defendants' insistence that faithful application of Supreme Court case law produces an "unconstitutional" result would require the Court to find Section 2 of the VRA itself unconstitutional. But this Court may not ignore decades of precedent. Nearly four decades ago, the Eleventh Circuit held that Section 2 "is a constitutional exercise of the congressional enforcement power under the Fourteenth and Fifteenth Amendments." *United States v. Marengo*

*Cnty. Com'n*, 731 F.2d 1546, 1550 (11th Cir. 1984). We hold the same. *See In re Hubbard*, 803 F.3d 1298, 1309 (11th Cir. 2015) (explaining "the fundamental rule that courts of this circuit are bound by the precedent of this circuit").

413.   Nearly four decades ago, the Eleventh Circuit held that Section 2 "is a constitutional exercise of the congressional enforcement power under the Fourteenth and Fifteenth Amendments." *United States v. Marengo Cnty. Com'n*, 731 F.2d 1546, 1550 (11th Cir. 1984).

414.   Applying controlling Section 2 case law, the Court concludes that Plaintiffs have demonstrated that the Black population in Alabama is sufficiently large and geographically compact to support a second majority-Black congressional district.

### 2.     Plaintiffs have satisfied the second *Gingles* precondition.

415.   The second *Gingles* precondition requires that "the minority group must be able to show that it is politically cohesive." *Gingles*, 478 U.S. at 51.

416.   Plaintiffs can establish minority cohesiveness by showing that "a significant number of minority group members usually vote for the same candidates." *Solomon v. Liberty Cnty.* 899 F.2d 1012, 1019 (11th Cir. 1990) (Kravitch, J., concurring); *see also Gingles*, 478 U.S. at 56 ("A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim,

and, consequently, establishes minority bloc voting within the meaning of § 2." (internal citations omitted)).

417.   Courts rely on statistical analyses to estimate the proportion of each racial group that voted for each candidate. *See, e.g., Gingles*, 478 U.S. at 52-54; *Nipper v. Smith*, 39 F.3d 1494, 1505 n.20 (11th Cir. 1994) (citing *Nipper v. Chiles*, 795 F. Supp. 1525, 1533 (M.D. Fla. 1992)).

418.   Courts have recognized Ecological Inference as an appropriate analysis for determining whether a plaintiff has satisfied the second and third *Gingles* preconditions. *See, e.g.*, *Ala. State Conf. of NAACP*, 2020 WL 583803, at *29, n.27 (recognizing ecological inference as the "gold standard" for racially polarized voting analysis (quoting *Wright*, 301 F. Supp. 3d at 1305)); *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 691 (S.D. Tex. 2017); *Benavidez v. City of Irving*, 638 F. Supp. 2d 709, 723–24 (N.D. Tex. 2009); *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1003 (D.S.D. 2004), *aff'd* 461 F.3d 1011 (8th Cir. 2006).

419.   The second *Gingles* precondition is satisfied here because Black voters in Alabama are politically cohesive. *Gingles*, 478 U.S. at 49. "Bloc voting by blacks tends to prove that the black community is politically cohesive, that is, it shows that blacks prefer certain candidates whom they could elect in a single-member, black majority district." *Id*. at 68. Drs. Palmer and Liu's analyses clearly demonstrate high

levels of cohesiveness among Black Alabamians in supporting their preferred candidates. *Supra* Section I.B.2.

420.   Courts in Alabama have long found that Black Alabamians vote in a cohesive manner. *See Ala. State Conf. of NAACP*, 2020 WL 583803, at *35; *City of Pleasant Grove*, 372 F. Supp. 3d at 1340 ("Plaintiffs have also sufficiently alleged that Pleasant Grove's Black voters are 'politically cohesive' and that Pleasant Grove's 'white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate.'" (quoting *Gingles,* 478 U.S. at 51)); *Jefferson Cnty. Bd. of Educ.*, 2019 WL 7500528, at *2 (accepting parties' stipulation that "Black voters are politically cohesive"); *Dillard v. City of Greensboro*, 946 F. Supp. 946, 952-53 (M.D. Ala. 1996) (noting City of Greensboro conceded that its Black population is "politically cohesive"); *Dillard v. Baldwin Cnty. Bd. Of Educ.*, 686 F. Supp. 1459, 1465 (M.D. Ala. 1988). Defendants have offered no evidence suggesting this is no longer the case.

### 3.   Plaintiffs have satisfied the third *Gingles* precondition.

421.   The third *Gingles* precondition requires that "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51.

422.   No specific threshold percentage is required to demonstrate bloc voting, as "[t]he amount of white bloc voting that can generally 'minimize or cancel' black

voters' ability to elect representatives of their choice . . . will vary from district to district." *Gingles*, 478 U.S. at 56 (internal citations omitted).

423.   "[A] white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." *Gingles*, 478 U.S. at 56.

424.   The Court finds that Drs. Palmer and Liu's analyses clearly demonstrate high levels of white bloc voting in Alabama, the Focus Area, and in each congressional district analyzed. *Supra* Section I.B.3. The Court also finds that candidates preferred by Black voters are almost always defeated by white block voting. Black-preferred candidates are regularly defeated in Alabama, in the Focus Area, and in individual congressional districts outside of majority-Black CD 7. *Id.*

425.   Courts in Alabama have also long found that white bloc voting prevents Black voters from electing their preferred candidates. *See, e.g.*, *Ala. State Conf. of NAACP*, 2020 WL 583803, at *36 ("Plaintiffs have proven that . . . white bloc voting usually defeated the black-preferred candidate."); *Jefferson Cnty. Bd. of Educ.*, 2019 WL 7500528, at *2 (accepting undisputed fact that "White people vote sufficiently as a bloc to enable them to defeat Black voters' preferred candidates"); *City of Pleasant Grove*, 372 F. Supp. 3d at 1340 ("Plaintiffs have . . . sufficiently alleged that . . . [the] 'white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate.'" (quoting *Gingles,* 478 U.S. at 51)); *Brown v. Bd.*

*of Sch. Comm'rs of Mobile Cnty.*, 542 F. Supp. 1078, 1094 (S.D. Ala. 1982), *aff'd*, 706 F.2d 1103 (11th Cir. 1983), *aff'd* 464 U.S. 1005 (1983) ("Racial bloc voting by whites is attributable in part to past discrimination, and the past history of segregation and discrimination affects the choices of voters at the polls."). Again, Defendants offered no evidence suggesting this is no longer the case.

> **4.    The totality of circumstances demonstrates that HB1 denies Black Alabamians an equal opportunity to elect their candidates of choice in congressional elections.**

426.   The totality of the circumstances confirms what Plaintiffs' satisfaction of the *Gingles* preconditions indicate: HB1 denies Black voters in Alabama an equal opportunity to elect their congressional candidates of choice.

427.   Because each of the relevant considerations discussed below weigh in favor of a finding of vote dilution, Plaintiffs have demonstrated that HB1 violates Section 2 of the Voting Rights Act.

> **a.    Legal Framework**

428.   Because Plaintiffs have satisfied the three *Gingles* preconditions, the Court now considers whether the "totality of the circumstances results in an unequal opportunity for minority voters to participate in the political process and to elect representatives of their choosing as compared to other members of the electorate." *Fayette Cnty.*, 775 F.3d at 1342.

429.   "[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of the circumstances." *Fayette Cnty.*, 775 F.3d at 1342 (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993)). In fact, in cases where plaintiffs have satisfied the *Gingles* preconditions but the court determines the totality of the circumstances does not show vote dilution, "the district court must explain with particularity why it has concluded, under the particular facts of that case, that an electoral system that routinely results in white voters voting as a bloc to defeat the candidate of choice of a politically cohesive minority group is not violative of § 2 of the Voting Rights Act." *Jenkins*, 4 F.3d at 1135.

430.   To determine whether vote dilution exists under the totality of the circumstances, the Court uses "a searching practical evaluation of the past and present reality," which is an analysis "peculiarly dependent upon the facts of each case and requires an intensely local appraisal of the design and impact of the contested" district map. *Gingles*, 478 U.S. at 79 (internal quotation marks and citations omitted). In reaching this decision, "a court must assess the impact of the contested structure or practice on minority electoral opportunities on the basis of objective factors. The Senate Report [from the 1982 Amendments to the VRA]

specifies factors which typically may be relevant to a § 2 claim[.]" *Gingles*, 478 U.S.

at 44 (internal quotation marks omitted). The "Senate Factors" include:

> 1. the history of voting-related discrimination in the State or political subdivision;
> 2. the extent to which voting in the elections of the State or political subdivision is racially polarized;
> 3. the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting;
> 4. the exclusion of members of the minority group from candidate slating processes;
> 5. the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;
> 6. the use of overt or subtle racial appeals in political campaigns; and
> 7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Gingles*, 478 U.S. at 44-45.

431.   "The [Senate] Report notes also that evidence demonstrating that [(8)]

elected officials are unresponsive to the particularized needs of the members of the

minority group and [(9)] that the policy underlying the State's . . . use of the

contested practice or structure is tenuous may have probative value." *Gingles*, 478

U.S. at 45. However, "The authors of the Senate Report apparently contemplated

that unresponsiveness would be relevant only if the plaintiff chose to make it so, and

that although a showing of unresponsiveness might have some probative value a

showing of responsiveness would have very little." *Marengo Cnty.*, 731 F.2d at 1572.

432.    The Senate Report's "list of typical factors is neither comprehensive nor exclusive." *Gingles*, 478 U.S. at 45. "[T]here is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Marengo Cnty. Comm'n*, 731 F.2d at 1566 n.33 (quoting S. Rep. No. 97-417, at 29 (1982)).

433.    The most important Senate Factors are "the extent to which minority group members have been elected to public office in the jurisdiction and the extent to which voting in the elections of the state or political subdivision is racially polarized." *Gingles*, 478 U.S. at 48 n.15 (internal quotation marks and citations omitted). While the presence of other Senate factors might be "supportive of" a vote dilution challenge, they are "*not essential to*, a minority voter's claim" under Section 2. *Id*.

434.    In addition to analyzing the Senate Factors, the Court may also consider the extent to which there is a mismatch between the proportion of Alabama's population that is Black and the proportions of congressional districts in which they have an opportunity to elect their candidates of choice. *See De Grandy*, 512 U.S. at 1000. While the VRA expressly does not mandate proportionality, 52 U.S.C. § 10301(b), an inquiry into proportionality "provides some evidence of whether the

political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by a minority group. *LULAC*, 548 U.S. at 438 (internal quotation marks omitted).

435.    Though not dispositive, disproportionality is relevant to the totality of the circumstances analysis. *See Bone Shirt*, 336 F. Supp. 2d at 1049 (finding "evidence of disproportionality" meant "this factor favors plaintiffs"); *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 281 F. Supp. 2d 436, 455-56 (N.D.N.Y. 2003) (considering "the disproportionality of the redistricting plan" and granting preliminary injunctive relief).

> **b.      Each relevant consideration in the totality-of-circumstances analysis points towards a conclusion of vote dilution.**

436.   Each of the relevant Senate Factors, as well as the consideration of disproportionality, indicates that HB1 unlawfully dilutes the voting strength of Black Alabamians in congressional elections.

**<u>Disproportionality</u>**

437.   HB1 results in significant disproportionality between the portion of congressional districts in which Black voters can elect a candidate (14%), and their share of the population (27%). The same is true of the comparison of the portion of congressional districts in which white voters can elect their candidates of choice (86%) and their share of the population (66%).

438.   This disproportionality particularly weighs in favor of a finding of vote dilution due to the fact that Black Alabamians have been responsible for most of Alabama's population growth in the last decade. *Supra* Section I.B.4.a; *Bone Shirt*, 336 F. Supp. 2d at 1049 (accepting evidence from expert Mr. Cooper showing that the minority group's population "rapidly increas[ed] [in] both their absolute numbers and share of the population," and finding that plaintiffs "presented evidence of disproportionality").

439.   Because HB1 produces significant disproportionality—and Plaintiffs' illustrative plans would bring the State far closer to proportionality—this consideration weighs heavily in Plaintiffs' favor.

**Factor One: History of Discrimination**

440.   It is undisputable that Alabama has a long history of discrimination against Black Alabamians when it comes to voting and political participation. "The intersection of political strategy and purposeful racial prejudice" has remained a feature of Alabama's politics for centuries. *McGregor*, 824 F. Supp. 2d at 1346.

441.   The history discussed above, *supra* Section I.B.4.b, shows that this discrimination is, unfortunately, not just a thing of the past. Indeed, "it is still clear that [racist] sentiments remain regrettably entrenched in the high echelons of [Alabama] state government." *McGregor*, 824 F. Supp. 2d at 1347.

442.   As a result, the first Senate Factor weighs heavily in Plaintiffs' favor.

**Factor Two: Racially Polarized Voting**

443.   It is also indisputable that Black and white voters in Alabama consistently support opposing candidates. Dr. Palmer and Dr. Liu provide overwhelming evidence that this is the case. *Supra* Sections I.B.2, I.B.3.

444.   As a result, the second Senate Factor weighs heavily in Plaintiffs' favor.

445.   Defendants are wrong to suggest that this factor also asks the Court to look into the subjective minds of voters and ask why they are voting in a racially polarized manner. Eleventh Circuit case law makes clear that Plaintiffs are not required to prove that Alabama's racially polarized voting results from any particular racial attitudes. Plaintiffs are not required "to prove racism determines the voting choices of the white electorate in order to succeed in a voting rights case." *Askew v. City of Rome*, 127 F.3d 1355, 1382 (11th Cir. 1997); *Fayette Cnty.*, 950 F. Supp. 2d at 1321 n.29 (explaining that plaintiffs "are not required to prove[] racial animus" within the electorate).

446.   Because "racially polarized voting, as it relates to claims of vote dilution, refers only to the existence of a correlation between the race of voters and the selection of certain candidates," Plaintiffs "need not prove causation or intent in order to prove a prima facie case of racial bloc voting and defendants may not rebut that case with evidence of causation or intent." *Carrollton Branch*, 829 F.2d at 1557-78 (quoting *Gingles*, 478 U.S. at 74). "It is the *difference* between the choices made

by blacks and whites—not the reasons for that difference—that results in blacks having less opportunity than whites to elect their preferred representatives. Consequently, . . . under the 'results test' of § 2, only the correlation between race of voter and selection of certain candidates, not the causes of the correlation, matters." *Gingles*, 478 U.S. at 63 (plurality opinion). In other words, "[a]ll that matters under § 2 and under a functional theory of vote dilution is voter behavior, not its explanations." *Id.* at 73; *see also Marengo Cnty. Comm'n*, 731 F.2d at 1557 ("[R]acially polarized voting, as it relates to claims of vote dilution, refers only to the existence of a correlation between the race of voters and the selection of certain candidates." (quoting *Gingles*, 478 U.S. at 74)).

447.   The dicta in *Solomon v. Liberty County Commissioners* did not alter Eleventh Circuit law on this issue. That opinion's analysis focused on just two of the Senate Factors: the level of minority candidate success and the tenuous justifications of the challenged electoral scheme. *See Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1228-34 (11th Cir. 2000) (en banc). In fact, the district court decision that the *Solomon* court affirmed had concluded that racially polarized voting is not dependent upon the subjective thoughts of voters. *See Solomon v. Liberty Cnty.*, 957 F. Supp. 1522, 1543 (N.D. Fla. 1997) (concluding "the presence or absence of racial bias within the voting community is not dispositive of whether liability has been established under Section 2").

448.    Putting case law aside, requiring courts to inquire into the reasons why Alabamians vote in a racially polarized manner would directly contradict Congress's explicit purpose in turning Section 2 into an entirely effects-based prohibition. That purpose was to avoid "unnecessarily divisive [litigation] involv[ing] charges of racism on the part of individual officials *or entire communities*." S. Rep. No. 417, 97th Cong., 2d Sess. 36 (1982), U.S. Code Cong. & Admin. News 1982, p. 214 (emphasis added); *see also Solomon v. Liberty Cnty.*, 899 F.2d 1012, 1016 n.3 (11th Cir. 1990) (en banc) (Kravitch, J., specially concurring) (explaining this theory "would involve litigating the issue of whether or not the community as a whole was motivated by racism, a divisive inquiry that Congress sought to avoid by instituting the results test"). It would also erect an evidentiary burden that "would be all but impossible" for Section 2 plaintiffs to satisfy. *Gingles*, 478 U.S. at 73 (explaining the "inordinately difficult burden" this theory would place on plaintiffs (quotations omitted)); *Fayette Cnty.*, 950 F. Supp. 2d at 1321 n.29 (characterizing Defendants' theory as "unpersuasive," as it would make it "nearly impossible for § 2 plaintiffs because defendants could always point to some innocent explanation for the losing candidates' loss"); *Solomon*, 957 F. Supp. at 1545-46 (describing the "difficult, if not insurmountable" burden this requirement would impose on plaintiffs), *aff'd* 221 F.3d 1218 (11th Cir. 2000) (en banc). "To accept this theory would frustrate the goals Congress sought to achieve by repudiating the intent test of *Mobile v. Bolden*,

446 U.S. 55 (1980), and would prevent minority voters who have clearly been denied an opportunity to elect representatives of their choice from establishing a critical element of a vote dilution claim." *Gingles*, 478 U.S. at 71.

449.   Even if the reasons why Black and white voters overwhelmingly support opposing candidates in Alabama is relevant to the totality of the circumstances analysis, it would be Defendants' "obligation to introduce evidence" and "affirmatively prove, under the totality of the circumstances, that racial bias does *not* play a major role in the political community." *Nipper*, 39 F.3d at 1524–26 nn.60, 64 (emphasis added). After all, "[t]he surest indication of race-conscious politics is a pattern of racially polarized voting." *Marengo Cnty. Comm'n*, 731 F.2d at 1567. Section 2 plaintiffs are therefore under "no obligation" to "search . . . out" such evidence "and disprove [non-racial explanations] preemptively." *Nipper*, 39 F.3d at 1525 n.64.

450.   Here, Defendants have woefully failed to prove "that racial bias does not play a major role in the political community." *Nipper*, 39 F.3d at 1524 n. 60. In support of their assertion that policy ideology, and not race, explains Alabama's racially polarized voting, Defendants offer the simple fact that Black voters prefer Democrats and white voters prefer Republicans. But as Plaintiffs have shown, *supra* Section I.B.4.c, that fact tells us nothing about whether race and issues inextricably linked to race impact the partisan preferences of Black and white voters. Indeed,

Plaintiffs offered substantial evidence that race and issues inextricably linked to race *do* play a part in those preference today. *Id.* And Defendants' expert agrees. Hr'g Tr. Vol. 6 at 1465:6-18 (Hood).

451.   In sum, the second Senate Factor pays no attention to the subjective motivations behind the racially polarized voting that occurs in Alabama. But even if it did, there has been no showing that partisan ideology, and not race, is causing that polarization.

452.   This factor weighs heavily in Plaintiffs' favor.

## Factor Three: Use of Electoral Schemes Enhancing the Opportunity for Discrimination

453.   As discussed above, *supra* Section I.B.4.d, Alabama's history is chock-full of electoral schemes that enhance the opportunity for discrimination against Black voters, including at-large elections, anti-single-shot laws, numbered-place requirements, and majority-vote requirements. *Id.* Indeed, some of these schemes continue to be used today. *Id.* As a result, this factor weighs heavily in Plaintiffs' favor.

454.   The fact that a federal district court recently concluded that Alabama's at-large, number-placed statewide judicial elections did not violate Section 2 does not impact this factor, which looks to electoral schemes that "*enhance the opportunity* for discrimination" against Black voters. *Gingles*, 478 U.S. at 45 (emphasis added); *cf. Davis*, 139 F.3d 1414 ("[I]n this circuit, Section Two of the

Voting Rights Act frankly cannot be said to apply, in any meaningful way, to at-large judicial elections.").

### Factor Four: Slating Processes

455.   It is undisputed that Alabama uses no slating process for its congressional elections. As a result, this factor is irrelevant to this case, and the Court does not consider it to weigh in either parties' favor.

### Factor Five: Effects of Discrimination

456.   Plaintiffs have offered reams of evidence that Black Alabamians today (and particularly those living in CDs 1, 2, and 3 under the 2021 Enacted Plan) suffer socioeconomic hardships stemming from Alabama's centuries-long racial discrimination, and that those hardships impede Black Alabamians' ability to participate in the political process. *Supra* Section I.B.4.f.

457.   Defendants do not dispute that Black Alabamians today suffer from socioeconomic disparities in essentially every area of life. Nor do they dispute that these socioeconomic disparities have the effect of making it harder for one to participate in the political process.

458.   Instead, Defendants argue that Alabama should not be held responsible for these facts because Black residents of *other* states also suffer from socioeconomic disparities. But this argument flies in the face the Supreme Court's admonition that a Section 2 inquiry be "dependent upon the facts of [*this*] case" and

"an intensely local appraisal of [HB1's] design and impact." *Gingles*, 478 U.S. at 78 (quoting *White v. Register*, 412 U.S. 755, 769-70 (1973)).

459.   Because Defendants entirely fail to rebut Plaintiffs' evidence on this factor, it weighs heavily in favor of a finding of vote dilution.

**Factor Six: Racial Appeals**

460.   The record evidence demonstrates that overt and subtle racial appeals are quite common in Alabama politics, and that those appeals have a detrimental effect on Alabama's electorate. *Supra* Section I.B.4.g.

461.   Defendants' only argument to this evidence is that Black Alabamians are simply overreacting to these racial appeals. But that bald, unsupported assertion does not rebut Plaintiffs' evidence on this issue.

462.   As a result, this factor weighs heavily in Plaintiffs' favor.

**Factor Seven: Underrepresentation in Elected Office**

463.   The evidence demonstrates that Black Alabamians are severely underrepresented in elected office in statewide and congressional offices in Alabama. *Supra* Section I.B.4.h.

464.   Defendants' reliance on Black candidates' success in the smaller jurisdictions of state legislative offices is "obviously misplaced" in this case, which pertains to congressional districting plans. *Carrollton Branch*, 829 F.2d at 1560 (rejecting same argument). In any event, those candidates' successes have come

almost entirely from majority-Black districts, demonstrating that the Voting Rights Act's protections are still sorely needed in Alabama.

465.   As a result, this factor weighs heavily in Plaintiffs' favor.

**Factor Eight: Unresponsiveness Among Elected Officials**

466.   The evidence demonstrates that Alabama's elected officials— particularly the current and past congressional representatives of CD 1 and CD 2— are unresponsive to (and at certain times unaware of) the interests and needs of Black Alabamians. *Supra* Section I.B.4.i.

467.   Defendants' attempt to cast these elected officials' unresponsiveness as partisan politics misses the point. Regardless of their reasons, those officials' actions have been unresponsive to the interests and needs of Black Alabamians. While, for example, those officials might have concluded certain policies that would disproportionately benefit Black Alabamians are not worth the cost, that does not change the fact that the failure to enact those policies adversely impacted Black Alabamians.

468.   As a result, this factor weighs heavily in Plaintiffs' favor.

**Factor Nine: Tenuousness of HB1's Justifications**

469.   Finally, Plaintiffs' evidence demonstrates that the justifications that Defendants have offered for HB1 are tenuous. *Supra* Section I.B.4.j. Defendants' insistence that core preservation and communities of interest justify HB1's failure

to include a second district in which Black voters could elect their candidate of choice is belied by the State's own redistricting principles, which make those justifications a low priority. *Id.* They are also refuted by the illustrative plans offered by Mr. Cooper and Dr. Duchin, which demonstrate that it is possible to create a plan with two majority-Black districts that still respect traditional redistricting principles.

470.   As a result, this factor weighs heavily in Plaintiffs' favor.

*       *       *

471.   Because Plaintiffs have satisfied the three *Gingles* preconditions and each of the considerations relevant to the totality-of-circumstances inquiry in this case suggest that HB1 denies Black Alabamians an equal opportunity to elect their candidates of choice in congressional elections, Plaintiffs have shown a substantial likelihood that HB1 violates Section 2 of the Voting Rights Act.

### 5.   Section 2 provides a private right of action.

472.   Controlling precedent forecloses any argument that Section 2 does not contain a private right of action. As a majority of the Supreme Court has explained, "the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965." *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (Stevens, J.) (plurality opinion on behalf of two justices) (quoting S. Rep. No. 97-417, pt. 1, p. 30 (1982)); *see also id.* at 240 (Breyer, J., concurring) (expressly agreeing with Justice Stevens on this point on behalf of three justices). *Morse*'s

statement that there is a private right of action under Section 2 is thus binding on this Court.

473. The assertion that Section 2 lacks a private right of action flies in the face of over 50 years of privately enforced Section 2 litigation. *E.g.*, *LULAC v. Perry*, 548 U.S. 399 (2006); *Hous. Lawyers' Ass'n v. Att'y Gen.*, 501 U.S. 419 (1991); *Gingles*, 478 U.S. 30; *Wright*, 979 F.3d 1282; *Carollton NAACP*, 829 F.2d 1547.

474. Courts have unanimously rejected the argument that Section 2 lacks a private right of action. *See LULAC v. Abbott*, No. EP-21-cv-259-DCG-JES-JVB, 2021 WL 5762035, at *1 (W.D. Tex. Dec. 3, 2021) (three-judge court) ("Absent contrary direction from a higher court, we decline to break new ground on this particular issue."); *Mi Familia Vota v. Abbott*, 497 F. Supp. 3d 195, 223 (W.D. Tex. 2020) ("This Court concludes Plaintiffs have a private cause of action to sue for violation of Section 2 of the Voting Rights Act."). In fact, no court has *ever* found that Section 2 lacks a private right of action.

475. The interplay between Section 2 and other provisions of the VRA confirms that it contains a private right of action. *See* 52 U.S.C. §§ 10302, 10310. Section 3 authorizes certain remedies "[w]henever the Attorney General or an aggrieved person institutes a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment." *Id.* § 10302(a) (emphasis

added); *see also id.* § 10302(b) (similar). This authorization makes sense only if "aggrieved person[s]" other than the Attorney General may indeed sue under "statute[s] to enforce the voting guarantees of the fourteenth or fifteenth amendment." *Id.* § 10302(a). And Section 2—even as amended in 1982—is just such a statute. *See Miss. Republican Exec. Comm. v. Brooks*, 469 U.S. 1002 (1984), *aff'g Jordan v. Winter*, 604 F. Supp. 807, 811 (N.D. Miss. 1984) (holding that the amended Section 2 is a valid exercise of "Congress's enforcement power under the fifteenth amendment"); *see also United States v. Blaine Cnty.*, 363 F.3d 897, 904-05 (9th Cir. 2004) (same). Section 3's recognition that private rights of action are available to enforce such statutes confirms that "Congress must have intended [those statutes] to provide private remedies." *Morse*, 517 U.S. at 234 (Stevens, J.) (plurality op.); *see also id.* at 240 (Breyer, J., concurring). Similarly, Section 14 authorizes attorneys' fees for "the prevailing party, other than the United States," in "any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment," *id.* (emphasis omitted) (quoting 52 U.S.C. § 10310(e)), an authorization that assumes private parties may sue under statutes enforcing such guarantees, including Section 2. These provisions make clear that Congress intended Section 2 to be prosecuted by private individuals.

476.   *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001), does not permit this Court to deviate from *Morse*'s settling of this issue. Where "a precedent of [the

Supreme] Court has direct application in a case," even if it "appears to rest on reasons rejected in some other line of decisions, [lower courts] should follow the case which directly controls, leaving to th[e Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). *Sandoval*, which did not involve a claim under the VRA, did not overturn *Morse*'s conclusion that Section 2 provides a right of action. Thus, this Court remains bound by *Morse*.

477.   If there was any doubt left as to whether Congress intended for individuals to be able to sue under Section 2, the legislative history forecloses it. *See Alabama v. United States*, 198 F. Supp. 3d. 1263, 1269 (N.D. Ala. 2016) (looking to legislative history to ascertain congressional intent to create implied cause of action). As the authoritative Senate Report to the 1982 VRA amendments explained: "the committee reiterates the existence of the private right of action under section 2, as has been clearly intended by Congress since 1965." S. Rep. 97-417, at 30 (1982); *see also* H.R. Rep. No. 97-227, at 32 (1981), ("It is intended that citizens have a private cause of action to enforce their rights under Section 2.").

### 6.   This case is properly before a single district court judge.

478.   This case is properly before this single-judge district court. Plaintiffs brought only a statutory claim under the Voting Rights Act and no constitutional claims. Therefore, their suit does not invoke a three-judge panel under 28 U.S.C

§ 2284(a), which is appropriate only in "an action . . . challenging the constitutionality of the apportionment of congressional districts." 28 U.S.C. § 2284(a); *see Singleton v. Merrill*, Case No. 2:21-cv-01291-AMM, ECF No. 45 at 7 (denying Secretary's request to consolidate this case with cases pending before three-judge panel).

479.    Courts across the country have held that actions that bring solely statutory challenges to congressional redistricting plans do not trigger § 2284's three-judge court requirement. Indeed, a court in this District recently concluded that a case challenging a congressional plan under only Section 2, like this one, falls outside of § 2284. *Chestnut v. Merrill*, 356 F. Supp. 3d 1351, 1354 (N.D. Ala. 2019) ("A claim solely alleging a Section 2 violation falls outside a plain reading of § 2284."); *see also Johnson v. Ardoin*, 2019 WL 2329319, at *3 (M.D. La. May 31, 2019) ("[Section 2284] applies only when the constitutionality of apportionment is being challenged."). Likewise, an en banc panel of the Fifth Circuit reached the same conclusion when they addressed this issue, finding that § 2284 does not provide for the convening of a three-judge court to hear purely statutory challenges to congressional maps. *See Thomas v. Reeves*, 961 F.3d 800, 802 (5th Cir. 2020) (en banc) (Costa, J., concurring) (writing on behalf of six judges that § 2284 "require[s] a three-judge court only for constitutional challenges" to both state and federal maps); *id*. at 811 (Willett, J., concurring) (writing on behalf of five judges that

- 140 -

although § 2284 may require a three-judge court for statutory challenges to state legislative maps, "only constitutional challenges to federal maps require three judges").

### B. The remaining preliminary injunction factors weigh heavily in favor of relief.

480.    Plaintiffs will suffer irreparable harm absent preliminary relief and remedying that harm is in the public interest.

481.    "Courts routinely deem restrictions on fundamental voting rights irreparable injur[ies]." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *see also, e.g., Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (similar); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) ("The registration applicants in this case would certainly suffer irreparable harm if their right to vote were impinged upon."). That is certainly case for Section 2 violations. *Dillard*, 640 F. Supp. at 1363 (concluding a Section 2 vote-dilution violation was "clearly" an irreparable harm). "Casting a vote has no monetary value. It is nothing other than the opportunity to participate in the collective decisionmaking of a democratic society and to add one's own perspective to that of his or her fellow citizens." *Jones v. Governor of Fla.*, 950 F.3d 795, 828-29 (11th Cir. 2020). Accordingly, "[t]he denial of the opportunity to cast a vote that a person may otherwise be entitled to cast—even once—is an irreparable harm." *Id.*

482.   Similarly, vindicating voting rights is in the public interest. The "cautious protection of the Plaintiffs' franchise-related rights is without question in the public interest." *Charles H. Wesley Educ. Found.*, 408 F.3d at 1355. "Ultimately, our conclusion that the plaintiffs have a substantial likelihood of success on the merits disposes of this question in short order. The public, of course, has every interest in ensuring that their peers who are eligible to vote are able to do so in every election." *Jones*, 950 F.3d at 831; *see also Husted*, 697 F.3d at 437 ("The public interest . . . favors permitting as many qualified voters to vote as possible.").

483.   The Section 2 violation found here will irreparably damage Plaintiffs' right to participate in the political process. As Mr. Jones and Dr. Caster testified during the hearing, they—and the Black community in their areas—have no opportunity to elect a candidate of their choice under the 2021 Enacted Plan. *Supra* Section I.C.1. If that plan is used in the upcoming election, Plaintiffs and other Black voters will be subjected to irreparable vote dilution.

484.   Accordingly, the Court finds that, absent preliminary injunctive relief, Plaintiffs will suffer irreparable harm if they are forced to vote under Alabama's currently enacted congressional plan. *Jones*, 950 F.3d at 830 ("[T]he public interest is served when constitutional rights are protected.").

485.   Plaintiffs did not sit on their hands in bringing this litigation. Quite the contrary: they filed this suit just *hours* after HB1 was enacted into law. *Supra* Section I.C.2.

486.   Defendants have not disputed, and have provided no evidence to undermine, Plaintiffs' assertion that they will suffer irreparable harm absent preliminary relief. Nor do they claim that granting that relief will not serve the public interest. Instead, they insist that the balance of the equities tilts in their favor because (1) the state will bear administrative costs if it is required to implement a new congressional plan prior to the 2022 elections, and (2) they worry time does not allow for a remedial plan to be put in place before the May 2022 primary elections.

487.   First, any "inconvenience" or administrative cost the state and congressional candidates may bear in remedying Alabama's unlawful congressional plan "does not rise to the level of a significant sovereign intrusion" to tilt the equities against vindicating Plaintiffs' voting rights. *Covington v. North Carolina*, 270 F. Supp. 3d 881, 895 (M.D.N.C. 2017).

488.   Moreover, Defendants' timing concerns are belied by the facts. Alabama's primary election is not for another *four and a half* months. It took the Legislature just nine days to enact the current congressional plan. Alabama has the benefit of eleven illustrative plans to consider when redrawing its congressional plan.

489.   In any event, to the extent the State needs more time to implement a remedial plan, the Court may "extend the time limitations imposed by state law" related to its election deadlines. *Sixty-Seventh Minn. State Senate v. Beens*, 406 U.S. 187, 201 n.11 (1972). As discussed above, given the *116-day* period between the current candidate filing deadline and the primary election, this Court can easily extend the candidate filing deadline while leaving the primary election date in place. *Supra* Section I.C.2.

490.   This case is nothing like *Favors v. Cuomo*, which involved a "one person, one vote claim[ that] rest[ed] on novel, contested legal grounds[s]." 881 F. Supp. 2d 356, 370 (E.D.N.Y. 2012). By contrast, the blackletter law governing Plaintiffs' Section 2 claim could not be clearer, nor could Plaintiffs' claim be more routine.

491.   Federal courts that have recently invalidated congressional districting plans during the first months of an election year have given the corresponding state legislature two weeks to enact new plans. *Supra* Section I.C.2; *Harris*, 159 F. Supp. 3d at 627; *Common Cause*, 279 F. Supp. 3d at 691. State courts have required maps to be drawn in even less time. *See, e.g., League of Women Voters of Ohio*, 2022 WL 110261, at *28 ¶ 137 (ordering new state legislative plans be drawn within 10 days).

492.   Countenancing Defendants' arguments on this point would create a perverse incentive: it would tell states that they can avoid judicial review of a

redistricting plan during the first election of a redistricting cycle. Given the grave rights at stake in this case, such administrative concerns cannot prevent this Court from vindicating Plaintiffs' right to vote.

    **C.**    **The remedial plan must contain two districts in which Black voters have a demonstrable opportunity to elect candidates of their choice.**

493. Having concluded that HB1 is substantially likely to violate Section 2 and that a preliminary injunction is appropriate under the circumstances, the Court turns to the question of what a proper remedial plan must contain.

494. While it is the case that, to establish liability, Plaintiffs must show the ability to draw two majority-Black districts, *Bartlett*, 556 U.S. at 18, it is not the case that a remedial district must contain two majority-Black districts. Instead, where, as here, Plaintiffs have established a Section 2 violation based on the State's failure to create two districts in which Black voters have an opportunity to elect their preferred candidates, a plan containing two districts in which Black voters have a demonstrable *opportunity* to elect their preferred candidates would remedy their injury.

495. A remedial plan containing two true opportunity districts would remedy HB1's current Section 2 violation because it would preclude satisfaction of the third *Gingles* precondition: such a plan would prevent "the white majority [from] vot[ing] sufficiently as a bloc to enable it . . . *usually* to defeat the minority's preferred candidate" in those districts. *Gingles*, 478 U.S. at 50 (emphasis added); *cf.*

*Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 565 (E.D. Va. 2016) (adopting plan remedying a successful racial gerrymander claim and explaining that while one of the districts at issue contained a BVAP below 50%, a functionality analysis revealed that the Black-preferred candidate in that district could receive 60% of the vote, meaning "a Section 2 challenge to [that district] would fail" due to the inability to satisfy the third *Gingles* precondition).

496.   So long as it is demonstrated that a remedial plan allows Black voters a true opportunity to elect their candidates in two congressional districts, that plan would remedy the Section 2 violation identified in this case.

497.   As a practical matter, Plaintiffs' expert Mr. Cooper has offered seven illustrative plans, all of which this Court has already determined contain two majority-Black districts in which Black voters would have the opportunity to elect their preferred candidates. *Supra* Section I.B.3. The experts' racially polarized voting analyses, moreover, indicate that in order for Black voters to have an opportunity to elect their preferred candidates, they likely need to comprise a voting-age majority or something close to a voting-age majority.

## III.   PROPOSED ORDER GRANTING INJUNCTIVE RELIEF

498.   Because all four of the preliminary injunction factors support relief, the Court GRANTS Plaintiffs' motion for a preliminary injunction.

499.   The Court ENJOINS Defendants, as well as their agents and successors in office, from using HB1 in any election, including the 2022 primary and general elections.

500.   Having found it substantially likely that HB1 violates Section 2 of the Voting Rights Act and that an injunction is warranted, the Court now addresses the appropriate remedy.

501.   The Court is conscious of the powerful concerns for comity involved in interfering with the state's legislative responsibilities. As the Supreme Court has repeatedly recognized, "redistricting and reapportioning legislative bodies is a legislative task with the federal courts should make every effort not to pre-empt." *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978). As such, it is "appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet" the requirements of Voting Rights Act "by adopting a substitute measure rather than for the federal court to devise . . . its own plan." *Id.* at 540.

502.   The Court also recognizes that Plaintiffs and other Black voters in Alabama whose voting rights have been injured by the violation of Section 2 of the Voting Rights Act have suffered significant harm. Those citizens are entitled to vote

- 147 -

as soon as possible for their representatives under a lawful apportionment plan. Therefore, the Court will require that a new congressional plan be drawn forthwith to remedy the Section 2 violation.

503.   In accordance with well-established precedent, the Court allows the legislature fourteen (14) days from this Order to adopt a remedial congressional plan.

504.   This Court retains jurisdiction to determine whether any remedial congressional plan adopted by the Legislature remedies the Section 2 violation by incorporating two districts in which Black voters have a demonstrable opportunity to elect their candidates of choice.

505.   A plan will be deemed to remedy the Section violation if it contains two districts with a voting-age population that is more than 50% Any-Part Black. If the plan does not contain two districts with a voting-age population that is more than 50% Any-Part Black, the burden will be on the proponent(s) of the plan to establish that the plan provides Black voters a meaningful opportunity to elect their candidates of choice in two districts.

506.   In the event that Alabama is unable or unwilling to enact a remedial plan within 14 days that satisfies the requirement set forth above, this Court will proceed to draw or adopt a remedial plan for use during the 2022 primary and general elections.

507.   The January 28, 2022, candidate qualifying deadline for congressional elections, *see* Ala. Code § 17-13-5(a), is stayed until further order of the Court.

Dated: January 14, 2022

Respectfully submitted,

By /s/ *Abha Khanna*

Richard P. Rouco
(AL Bar. No. 6182-R76R)
**Quinn, Connor, Weaver, Davies &
Rouco LLP**
Two North Twentieth
2-20th Street North, Suite 930
Birmingham, AL 35203
Phone: (205) 870-9989
Fax: (205) 803-4143
Email: rrouco@qcwdr.com

Abha Khanna*
**Elias Law Group LLP**
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
Phone: (206) 656-0177
Email: AKhanna@elias.law

Lalitha D. Madduri*
Daniel C. Osher*
Joseph N. Posimato*
Olivia N. Sedwick*
**Elias Law Group LLP**
10 G St. NE, Suite 600
Washington, D.C. 20002
Phone: (202) 968-4518
Email: LMadduri@elias.law
Email: DOsher@elias.law
Email: JPosimato@elias.law
Email: OSedwick@elias.law

*Attorneys for Plaintiffs*
*\*Admitted Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 14, 2022, a copy of the foregoing was filed with the Clerk of Court using the CM/ECF system, which will provide electronic notice of filing to all counsel of record.


*/s/ Abha Khanna*
Abha Khanna
Counsel for Plaintiffs