FILED
2022 Jan-18 PM 03:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

1                IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ALABAMA
2                      SOUTHERN DIVISION

3

4    BOBBY SINGLETON, et al.,        *
                Plaintiffs,          *   2:21-cv-1291-AMM
5                                    *   January 7, 2022
     vs.                             *   Birmingham, Alabama
6                                    *   8:30 a.m.
     JOHN MERRILL, in his official   *
7    capacity as Alabama Secretary   *
     of State, et al.,               *
8               Defendants.          *
     ******************************* *
9                                    *
     EVAN MILLIGAN, et al.,          *
10              Plaintiffs,          *   2:21-cv-1530-AMM
                                     *
11   vs.                             *
                                     *
12   JOHN MERRILL, in his official   *
     capacity as Alabama Secretary   *
13   of State, et al.,               *
                Defendants.          *
14   ******************************* *
                                     *
15   MARCUS CASTER, et al.,          *
                Plaintiffs,          *   2:21-cv-1536-AMM
16                                   *
     vs.                             *
17                                   *
     JOHN MERRILL, in his official   *
18   capacity as Alabama Secretary   *
     of State, et al.,               *
19              Defendants.          *
     ******************************* *
20

21

             TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
22                      VIA ZOOM CONFERENCE
                           VOLUME IV
23            BEFORE THE HONORABLE ANNA M. MANASCO,
                THE HONORABLE TERRY F. MOORER,
24              THE HONORABLE STANLEY MARCUS

25

                 *CHRISTINA K. DECKER, RMR, CRR*
                  Federal Official Court Reporter
                      101 Holmes Avenue, NE
                       Huntsville, AL 35801
               256-506-0085/ChristinaDecker.rmr.crr@aol.com

1

2      Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
3    pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
       and Procedures Vol. VI, Chapter III, D.2.  Transcript
4                 produced by computerized stenotype.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          APPEARANCES

2

        FOR THE SINGLETON PLAINTIFFS:
3
        James Uriah Blacksher
4       JAMES U. BLACKSHER, ATTORNEY
        825 Linwood Road
5       Birmingham, AL 35222
        205-612-3752
6       Fax: 866-845-4395
        Email: Jublacksher@gmail.com
7
        Myron C Penn
8       PENN & SEABORN LLC
        53 Highway 110
9       PO Box 5335
        Union Springs, AL 36089
10      334-738-4486
        Fax: 334-738-4432
11      Email: Myronpenn28@hotmail.com

12      Joe R Whatley, Jr
        WHATLEY KALLAS LLP
13      2001 Park Place North Suite 1000
        Birmingham, AL 35203
14      205-488-1200
        Fax: 800-922-4851
15      Email: Jwhatley@whatleykallas.com

16      Henry C Quillen
        WHATLEY KALLAS LLP
17      159 Middle Street Suite 2D
        Portsmouth, NH 03801
18      603-294-1591
        Fax: 800-922-4851
19      Email: Hquillen@whatleykallas.com

20      W Tucker Brown
        WHATLEY KALLAS LLC
21      P.O. Box 10968
        Birmingham, AL 35202-0968
22      205-488-1200
        Fax: 800-922-4851
23      Email: Tbrown@whatleykallas.com

24

25

```
 1          Diandra "Fu" Debrosse Zimmermann
            DICELLO LEVITT GUTZLER
 2          420 20th Street North
            Suite 2525
 3          Birmingham, AL 35203
            205-855-5700
 4          Fax: 205-855-5784
            Email: Fu@dicellolevitt.com
 5
            Eli Joseph Hare
 6          DICELLO LEVITT GUTZLER LLC
            420 20th Street North, Suite 2525
 7          Birmingham, AL 35203
            205-855-5700
 8          Fax: 205-855-5784
            Email: Ehare@dicellolevitt.com
 9

10          FOR THE MILLIGAN PLAINTIFFS:

11
            Deuel Ross
12          NAACP LEGAL DEFENSE &
            EDUCATIONAL FUND, INC.
13          700 14th Street N.W. Ste. 600
            Washington, DC 20005
14          (202) 682-1300
            Dross@naacpldf.org
15
            Leah Aden
16          Stuart Naifeh
            Kathryn Sadasivan
17          Brittany Carter
            NAACP LEGAL DEFENSE &
18          EDUCATIONAL FUND, INC.
            40 Rector Street, 5th Floor
19          New York, NY 10006
            (212) 965-2200
20          Laden@naacpldf.org
            Snaifeh@naacpldf.org
21
            Davin M. Rosborough
22          Julie Ebenstein
            AMERICAN CIVIL LIBERTIES
23          UNION FOUNDATION
            125 Broad St.
24          New York, NY 10004
            (212) 549-2500
25          Drosborough@aclu.org
            Jebenstein@aclu.org
```

```
 1        Kaitlin Welborn
          LaTisha Gotell Faulks
 2        AMERICAN CIVIL LIBERTIES UNION
          OF ALABAMA
 3        P.O. Box 6179
          Montgomery, AL 36106-0179
 4        (334) 265-2754
          Kwelborn@aclualabama.org
 5        Tgfaulks@aclualabama.org

 6        David Dunn
          HOGAN LOVELLS US LLP
 7        390 Madison Avenue
          New York, NY 10017
 8        (212) 918-3000
          David.dunn@hoganlovells.com
 9
          Michael Turrill
10        Harmony A. Gbe
          HOGAN LOVELLS US LLP
11        1999 Avenue of the Stars
          Suite 1400
12        Los Angeles, CA 90067
          (310) 785-4600
13        Michael.turrill@hoganlovells.com
          Harmony.gbe@hoganlovells.com
14
          Shelita M. Stewart
15        Jessica L. Ellsworth
          HOGAN LOVELLS US LLP
16        555 Thirteenth Street, NW
          Washington, D.C. 20004
17        (202) 637-5600
          Shelita.stewart@hoganlovells.com
18
          Blayne R. Thompson
19        HOGAN LOVELLS US LLP
          609 Main St., Suite 4200
20        Houston, TX 77002
          (713) 632-1400
21        Blayne.thompson@hoganlovells.com

22

23

24

25
```

```
 1      Sidney M. Jackson
        Nicki Lawsen
 2      WIGGINS CHILDS PANTAZIS
        FISHER & GOLDFARB, LLC
 3      301 19th Street North
        Birmingham, AL 35203
 4      Phone: (205) 341-0498
        Sjackson@wigginschilds.com
 5      Nlawsen@wigginschilds.com

 6

 7      FOR THE CASTER PLAINTIFFS:

 8      Abha Khanna
        ELIAS LAW GROUP LLP
 9      1700 Seventh Avenue, Suite 2100
        Seattle, WA 98101
10      206-656-0177
        Email: AKhanna@elias.law

11

12      Aria C Branch
        ELIAS LAW GROUP LLP
13      10 G St NE, Suite 600
        Washington, DC 20002
14      202-968-4490
        Fax: 202-968-4498
15      Email: ABranch@elias.law

16      Daniel C Osher
        ELIAS LAW GROUP
17      10 G Street NE
        Suite 600
18      Washington, DC 20002
        202-968-4490
19      Email: DOsher@elias.law

20      Joseph N. Posimato
        Elias Law Group LLP
21      10 G Street, NE; Suite 600
        Washington, DC 20002
22      202-968-4518
        Email: Jposimato@elias.law

23      Lalitha D Madduri
        ELIAS LAW GROUP LLP
24      10 G Street NE, Suite 600
        Washington, DC 20002
25      202-968-4490
        Email: Lmadduri@elias.law
```

```
 1     Olivia N. Sedwick
       Elias Law Group LLP
 2     10 G Street, NE; Suite 600
       Washington, DC 20002
 3     202-968-4518
       Email: Osedwick@elias.law
 4

 5     Richard P Rouco
       QUINN CONNOR WEAVER DAVIES & ROUCO LLP
 6     Two North Twentieth Street
       2 20th Street North
 7     Suite 930
       Birmingham, AL 35203
 8     205-870-9989
       Fax: 205-803-4143
 9     Email: Rrouco@qcwdr.com

10

11

12     FOR THE DEFENDANT:

13     Andrew Reid Harris
       OFFICE OF THE ATTORNEY GENERAL
14     CONSTITUTIONAL DEFENSE DIVISION
       501 Washington Avenue
15     Montgomery, AL 36130
       334-353-8891
16     Email: Reid.Harris@AlabamaAG.gov

17     Benjamin Matthew Seiss
       ALABAMA OFFICE OF THE ATTORNEY GENERAL
18     P.O. Box 300152
       501 Washington Ave (36104)
19     Montgomery, AL 36130
       334-353-8917
20     Fax: 334-353-8400
       Email: Ben.seiss@alabamaag.gov
21
       Brenton Merrill Smith
22     OFFICE OF THE ATTORNEY GENERAL OF ALABAMA
       P.O. Box 300152
23     501 Washington Avenue
       Montgomery, AL 36130
24     334-353-4336
       Fax: 334-353-8400
25     Email: Brenton.Smith@AlabamaAG.gov
```

1     Edmund Gerard LaCour, Jr.
     OFFICE OF THE ATTORNEY GENERAL
2     501 Washington Avenue
     P.O. Box 300152
3     Montgomery, AL 36104
     334-242-7300
4     Fax: 334-242-4891
     Email: Edmund.Lacour@AlabamaAG.gov
5

6     James W Davis
     OFFICE OF THE ATTORNEY GENERAL
     501 Washington Avenue
7     P O Box 300152
     Montgomery, AL 36130-0152
8     334-242-7300
     Fax: 334-353-8400
9     Email: Jim.davis@alabamaag.gov

10    Misty Shawn Fairbanks Messick
     OFFICE OF THE ATTORNEY GENERAL
11    FOR THE STATE OF ALABAMA
     501 Washington Avenue
12    P O Box 300152
     Montgomery, AL 36130-0152
13    334-242-7300
     Fax: 334-353-8440
14    Email: Misty.Messick@AlabamaAG.gov

15    Alexander Barrett Bowdre
     OFFICE OF THE ALABAMA ATTORNEY GENERAL
16    P.O. Box 300152
     Montgomery, AL 36130
17    334-242-7300
     Fax: 334-353-8400
18    Email: Barrett.Bowdre@alabamaAG.gov

19    Thomas Alexander Wilson
     STATE OF ALABAMA
20    OFFICE OF THE ATTORNEY GENERAL
     501 Washington Street
21    Montgomery, AL 36103
     334-242-7300
22    Fax: 334-353-8400
     Email: Thomas.wilson@alabamaAG.gov

23

24

25

1    J Dorman Walker
     BALCH & BINGHAM LLP
2    P O Box 78
     Montgomery, AL 36101
3    334-834-6500
     Fax: 334-269-3115
4    Email: Dwalker@balch.com

5

6

7

8

9    COURTROOM DEPUTY:  Frankie N. Sherbert

10

11   COURT REPORTER:  Christina K. Decker, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           <u>I N D E X</u>

2

3    DIRECT EXAMINATION OF THOMAS BRYAN CONTINUED        800
     BY MR. DAVIS
4    CROSS-EXAMINATION                                   877
     BY MS. KHANNA
5    CROSS-EXAMINATION                                  1014
     BY MR. DUNN
6    CROSS-EXAMINATION                                  1073
     BY MR. BLACKSHER
7    FURTHER REDIRECT EXAMINATION                       1098
     BY MR. DAVIS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**P R O C E E D I N G S**

(In open court.)

JUDGE MARCUS:  Good morning to everyone.  I take it counsel are ready to proceed for the Secretary of State. Mr. Davis, you are ready to proceed?

MR. DAVIS:  We are, Your Honor.

JUDGE MARCUS:  You have your witness, Mr. Bryan, here. And we have Ms. Khanna for the Caster plaintiffs, Mr. Blacksher for Singleton, Mr. Dunn for Milligan.  So we are ready to proceed with the direct examination.

Before we did, there's one thing I wanted to raise with you.  Judges Moorer, Manasco and I took a look at scheduling and we wanted to make one brief change in the scheduling order that we have already entered.

We had asked the parties to submit proposed findings of fact and conclusions of law within 5 days of the completion of the preliminary injunction hearing, whether the hearing ends on Tuesday or Wednesday, I am not quite sure.  You will take whatever time you need to do it and do it right.

But we are going to accelerate the time for filing those proposed findings of fact and conclusions of law, and we would ask you to submit them to the Court no later than the end of next Friday, January 14th.  So we are not talking about the end of business, but really at the end of the day.

So by the end of next Friday, we will ask you to submit

1  any proposed findings of fact and conclusions of law.  But we

2  wanted to give you at least seven or eight days notice of that,

3  which is why we decided to share that change with you this

4  morning.

08:33:16  5       Having said that, we're ready to proceed, Mr. Davis, with

6  your witness.  You may proceed on your direct.  Thank you.

7            DIRECT EXAMINATION OF THOMAS BRYAN CONTINUED

8  BY MR. DAVIS:

9  Q    Thank you, Your Honor.  Good morning, Mr. Bryan.

08:33:30 10  A    Good morning.

11  Q    Mr. Bryan, did you assess the whole county plan presented

12  by the Singleton plaintiffs?

13  A    I did.

14  Q    I will share with you Defendants' Exhibit 1.  This is

08:33:49 15  page 53 of your first report.  Is this the whole county plan

16  that you assessed?

17  A    This looks correct, yes.

18            MR. DAVIS:  And I will say for the benefit of the

19  court and the other parties, we will first go through

08:34:02 20  Mr. Bryan's Singleton report, then his analysis of the Hatcher

21  plan, and third, his supplemental report.

22       It will be a bit slow going through the Singleton plan

23  because for each analysis Mr. Bryan will be explaining what he

24  did.  There will be no need to repeat that for the Hatcher and

08:34:20 25  the for the other two reports.  Those will go more quickly.

| | |
|---|---|
| 1 | JUDGE MARCUS:  Thank you, Mr. Davis.  And, again, you |
| 2 | take the time you need. |
| 3 | MR. DAVIS:  Thank you, Your Honor. |
| 4 | BY MR. DAVIS: |
| 08:34:30 5 | Q    What do the Singleton plaintiffs do with counties in this |
| 6 | map that they presented, Mr. Bryan? |
| 7 | A    My assessment is that the plaintiffs used whole county |
| 8 | geography, that is, they did not split counties or conform to |
| 9 | any other piece of administrative geography beside counties. |
| 08:34:55 10 | They used the -- can we bring the exhibit up please? |
| 11 | Q    Of course. |
| 12 | A    Thank you.  They used the 67 counties, and then appears to |
| 13 | have built seven different districts by aggregating whole |
| 14 | county units in a unique way to generate a plan that I believe |
| 08:35:27 15 | ended up -- because of the use of whole counties -- had |
| 16 | approximately a 2.5 percent population deviation. |
| 17 | Q    Okay.  Are you aware of any requirement in Alabama law |
| 18 | that requires Alabama to keep counties whole in this |
| 19 | congressional plans? |
| 08:35:45 20 | A    I am not aware. |
| 21 | Q    Are there any states that keep counties whole in their |
| 22 | congressional districts?  And I should say states with more |
| 23 | than one congressional districts. |
| 24 | A    Yes.  Thank you for that. |
| 08:35:58 25 | Our research showed that we are certain that there are |

1  two.  We examined the redistricting rules for all of the states

2  and note for certain that Iowa uses counties, and that West

3  Virginia uses them.

4       There are other states that may use counties for other

08:36:21  5  types of redistricting, but not for the entire state.

6  Q    So other than Iowa and West Virginia, other states, to the

7  best of your knowledge, that have more than one congressional

8  district split at least some counties?

9  A    That is correct, to the best of my knowledge.  I wouldn't

08:36:39 10  assume there may not be some other state out of all of them

11  that we may have missed, but we believe for certain that Iowa

12  and West Virginia at a minimum have them.  But it's a very

13  uncommon practice.

14  Q    Remind us what a community interest is to your way of

08:36:57 15  thinking.

16  A    Sure.  Yeah.  It's a group of people, a collection of

17  people, and they can generally be thought of as being

18  geographically defined, a universe of people with often times

19  similar, you know, attitude, beliefs, behaviors, things that

08:37:14 20  help define them as staying in common.

21       As Dr. Duchin testified yesterday, a point which I agree,

22  that those communities of interest can oftentimes work in

23  conflict with each other.  There is no uniform widely known

24  right or prevailing community of interest over any other.  It's

08:37:36 25  a subjective and difficult concept to try and apply to

1    redistricting.

2    Q    Do you have any opinion as a demographer on the relative

3    importance of counties as a community of interest as opposed to

4    say some type of economic bond?

08:37:56 5    A    In different states, different communities of interest can

6    mean different things.  The plaintiffs mentioned in their

7    complaint, they refer to Georgia, and Georgia is a unique state

8    insofar as it has I think 159 counties.  It has many, many more

9    units of county geography.

08:38:24 10    So it's both more relevant and easier to use counties in

11    that case in that state just because that is a more prevailing

12    and easier to use a piece of geography than it may be in a

13    state like Alabama where counties at one point a long time may

14    have been used to define districts in the state, but they are

08:38:44 15    no longer.  And it is, in fact, difficult, it is more difficult

16    to use counties in a state like Alabama because there are

17    relatively fewer counties to use to do redistricting.

18    Q    Are counties as important as -- are these important today

19    as they were 50 or a hundred years ago?

08:39:02 20    A    Yeah.  I would say no.  I wrote at some length about the

21    origins and uses of counties and there's obviously still legacy

22    use of counties in the administration of the state, but there

23    are other prevailing communities of interest today.  We could

24    say such as economic bonds, social bonds, bonds within cities

08:39:26 25    or other pieces of geography that prevail over counties as a

1  community of interest.  I think that's reflected by the long
2  recent history in Alabama of not using them.  They use other
3  things instead.
4  Q    Do the Singleton plaintiffs ever say why they consider
08:39:47 5  counties so important that you saw in your review of their
6  complaint?
7  A    I read the complaint carefully, and I did not see a strong
8  argument for why.  It just -- the -- my interpretation of the
9  report is that they said that their defense was that they were
08:40:05 10  used historically and they want to use them now.  But I didn't
11  see a strong defense of why they should be used over other
12  communities of interest.
13  Q    You said review of the report.  Did you mean review of the
14  complaint?
08:40:18 15  A    Yes, that's correct.
16  Q    Thank you.  What does a demographer mean by core
17  retention?
18  A    Yeah.  So core retention for a demographer in the process
19  of redistricting is a quantitative method that we use to
08:40:35 20  measure the degree to which a district is changed in the
21  process of redistricting.
22       Typically, we will begin with a count of the population of
23  the districts that we are going to redistrict, and we will make
24  an assessment of how many people are in those districts
08:40:56 25  currently using the most recent decennial census data.

1          The exercise of core retention then goes on to measure how

2     much those districts are changed and how population are moved

3     among them forensically from one district to another to the

4     person to make an assessment of how many people are displaced,

08:41:22  5     and how many people are retained in the what we would call the

6     core district.  That gives us the ability to see how much

7     retention and how much displacement there is in the process of

8     redistricting.

9     Q    In your experience as a demographer working on plans in

08:41:40 10     different jurisdictions, is it common for folks to desire to

11     preserve the core of previous districts?

12     A    It is common.  It is one of the NCSL standards.  It's one

13     of the standards in the Georgia, the reapportionment

14     guidelines.  And they are numbers that we look carefully at, no

08:42:07 15     matter what redistricting plan that we are working on.  It's an

16     important consideration and something that you think hard about

17     for the continuity of representation.

18     Q    Did you assess how well or poorly Alabama did preserving

19     the core that 2011 districts in its new plan?

08:42:31 20     A    Yes, I did.

21     Q    Is that reflected in this Figure 5.1 on page 22 of Defense

22     Exhibit 1?

23     A    Yes, it does.  Figure 5.1 shows the percent of the

24     population that was retained in the original seven districts

08:42:53 25     through the process of redistricting.

1          The blue line shows the percent of the total population

2     that was retained.  And then given the nature of this case,

3     that there is an interest consideration of the black population

4     and the impact to the black population.  We extended this

08:43:14  5     analysis to do a core retention of the black-alone population

6     incremental to the total population.

7          And the purpose of that analysis was to determine whether

8     there was a significant disproportionate impact on the black

9     population through the process of redistricting.  It's -- from

08:43:37 10     a demographer's point of view, you would always want to know if

11     there's been a disproportionate impact on a population that's

12     different from everybody else.

13     Q    Okay.  So would it be a fair interpretation of this map,

14     looking here at District 1 on the left side, that this blue

08:43:54 15     line means that between 2011 and 2021 Alabama retained

16     98.8 percent of the population of old District 1 in new

17     District 1?

18     A    That's correct.

19     Q    And then 98.6 percent of the black population of old

08:44:12 20     District 1 in new District 1?

21     A    That's correct.  Virtually identical.  It would be no --

22     what I would refer to as differential impact to the black

23     population with the core retention of District 1.

24     Q    Okay.  Let's look at the next page, your Table 5.1.

08:44:33 25     A    Yes.

1  Q    This is page 23 of Defense Exhibit 1.

2        Interpret this table for us, Mr. Bryan.  Maybe start with

3  District 1 and show us what you are telling us in this table.

4  A    Sure.  Thank you.

08:44:47 5        In the first column, what we have done is we've made an

6  identifier for the what I will call the base district or the

7  original district that was subjected to the redistricting

8  process.  Then what I've done in the second column is I have

9  identified districts with population that were changed from the

08:45:11 10 first or the original base district that we did redistricting

11 on.

12        So in District 1, as we look and read across the rows, you

13 can see base District 1, new District 1, the total population

14 was 717,754.  When you read the second line, you can see there

08:45:37 15 was a very small number, 739 people, that were moved into

16 District 2.

17        And then lastly, there were approximately 7,800 people who

18 were moved into District 7.

19        We can see here this last line where it says one total

08:45:55 20 where it says 726,276 that was the total population that we

21 started with when we began the redistricting process.  That

22 number at the top, again, 717,754, that is the target

23 population for the districts in the redistricting plan.

24        As you continue to the right, you see the same analysis

08:46:21 25 for the total, except for the black-alone population.  In this

```
 1  case, there was 185,771 thousand blacks who were originally in
 2  District 1 who remained in District 1.  Again, a small number
 3  were moved into District 2, and also a small number -- a
 4  relatively small number were moved into District 7.
08:46:43  5       This analysis continues down with each district showing
 6  the pieces that were retained and the pieces that were moved
 7  into different districts.
 8       If you look at District 4, for example, District 4 was
 9  moved into five different pieces.  District 5 was split into
08:47:01 10  two different pieces, and so forth.
11       This gives us the forensic ability to see exactly how many
12  of what kind of people were moved between different districts
13  and the redistricting process.
14  Q    Okay, Mr. Bryan, did you assess how well the Singleton
08:47:24 15  plan did with core retention?
16  A    I did.
17  Q    Then we'll refer you to your Figure 5.2 that is on page 24
18  of Defense Exhibit 1.
19  A    Thank you.
08:47:33 20  Q    Tell us what your Figure 5.2 shows, please.
21  A    Sure.  Thank you.
22       In Figure 5.2, we show a chart that is consistent with the
23  state of Alabama chart that we just walked through.  So in this
24  case, if you look at District 1, it would say that 94.1 percent
08:47:58 25  of the total population was retained in District 1 and also
```

1   92.5 percent of the black population.

2       So consistent with the Alabama plan, this plan has a very

3   high level of core retention in District 1.  This plan also has

4   somewhat high retention in District 5.  We know this already,

08:48:25  5   but when we start looking at the other districts that were

6   changed in the redistricting process, you can see that there

7   was a signi -- two features -- a significantly lower amount of

8   core retention by district, and also a significantly higher

9   impact to the black population separate from the total

08:48:46 10   population.

11  Q    What do you mean by higher impact to the black population?

12  A    Yes.  So, for example, if you examine in this chart

13  District 2, District 2 would show that 66 percent of the total

14  population was retained; that is, their continuity of

08:49:10 15  representation is ensured.

16      By comparison, only 50 percent of the black population in

17  District 2 were retained.  So that is there were approximately

18  16 percentage points more of black population who lose their

19  continuity of representation in this plan for the blacks

08:49:31 20  compared to the total.

21      That same feature plays through if you look at District 4.

22  But in that case, it is even more severe.  There's 63 percent

23  of the total is retained.  Again, much lower than the State of

24  Alabama's plan, but then you look at the black population,

08:49:51 25  33.7 percent, there was, you know, over -- nearly a 70 percent

1   displacement of blacks, preventing their continuity of

2   representation in District 4.

3   Q   Thank you.

4       And the next page, page 25, Table 5.2.  What is Table 5.2?

08:50:17 5   A   Yeah.  Table 5.2 is a companion to the earlier table we

6   just walked through.  This table shows the comparison of the

7   existing districts with the Singleton plan as opposed to the

8   distribution that you would have arrived at with the state of

9   Alabama plan.

08:50:36 10   Q   Thank you.

11       Mr. Bryan, what does a demographer mean by incumbency

12   protection?

13   A   Yeah.  The way we think about incumbency protection is

14   through the lens of generally accepted rules for traditional

08:50:57 15   redistricting principles, which is that, again, part of

16   continuity of representation, you generally want to avoid

17   pitting incumbents that may have a longstanding relationship

18   and a deep knowledge of their constituency from having to run

19   against each other and compete and losing the knowledge or

08:51:17 20   experience that may come with that representation.

21   Q   If the state ignores incumbency protection, would that

22   give the majority party the ability to get rid of political

23   rivals by making their opponents run against each other,

24   putting them in the same districts?

08:51:36 25   A   It is possible.  And we have seen that happen even

```
 1  recently.
 2  Q    Did you assess how Alabama's plan did with incumbency
 3  protection?
 4  A    I did.
 5  Q    What did you find?
 6  A    I found that there was no pairing of incumbents.
 7  Q    Did you assess whether the Singleton plan created any
 8  incumbent conflict?
 9  A    Yes.  There was a set of paired incumbents in the
10  Singleton plan.  I don't have the name of the pair in front of
11  me, but it should be in my report.
12  Q    You assess that on page 27 of your report.
13  A    Yeah.  This is correct.  So the plaintiffs plan pairs
14  Palmer/Rogers in a proposed District 3 leaving District 7
15  unrepresented.  I would know that that pairing, which you can
16  see in the very center of the map, those two incumbents are
17  literally right on the edge of the border there between
18  District 3.
19  Q    Thank you.
20       So the Singleton plan does have a district with two
21  incumbents in the same district?
22  A    It does.  Yes.  And it would be very difficult from here
23  to have adapted this plan to avoid that.  You can see that the
24  location of the pairing next to the number 3 on the map is
25  still quite a ways away -- geographically is quite a ways away
```

08:51:47  5
08:52:05 10
08:52:24 15
08:52:46 20
08:53:05 25

 1  from anywhere in District 7 where another incumbent would have

 2  to be so that you would not pair incumbents.

 3  Q    Thank you.  You present some alternative whole county

 4  plans in your report, do you not?

08:53:27  5  A    I do, yes.

 6  Q    And would those be available for viewing in the map

 7  appendices of Defense Exhibit 1?

 8  A    Yes, they would.

 9  Q    Did you find any combinations of counties in alternative

08:53:41 10  whole county plans that avoids incumbent conflicts?

11  A    Yes, we did.  We did not pursue that as an objective of

12  it, but there were, I believe, at least -- at least two

13  different ways which you could group counties to comply with

14  that tradition of redistricting principle.

08:54:04 15  Q    Okay.  What does it mean to a demographer for a district

16  to be compact?

17  A    Yeah.  As Dr. Duchin discussed yesterday, she shares a

18  point of view with which I agree, is that it features

19  geographic compactness and would not have a necessary or

08:54:30 20  extraneous other pieces of the geography that would perhaps

21  stick out or impose into it that would make it unusual,

22  unwieldy, or have an uncommon geographic feature that may be

23  for some other redistricting purpose.  It's a -- generally a

24  benefit to have geographically compact districts.

08:54:55 25  Q    I want to go to Page 45 of Defense Exhibit 1.

1  A    Yeah.

2  Q    What are some of the ways that demographers measure

3  compactness of a district?

4  A    Sure.  It's important to know that compactness is an area

08:55:23  5  of mathematics.  It's an area of analytics where there is no

6  agreement.  There's not a right way.  There is a very famous

7  article, a great paper by Dr. King of Harvard that says

8  compactness is just -- you'll know it when you see it, right?

9       So there have been several very prominent, very good

08:55:47 10  mathematicians that have tried to tackle this problem by

11  looking at things such as, you know, the ratio of the area of a

12  district to a circle that circumscribes it or outer bounds it,

13  right?

14       So as Dr. Duchin said yesterday, there's two very

08:56:03 15  common -- and I agree, there are two most common methods.

16  Those would be Polsby-Popper and the Reock scores they use to

17  assess the compactness of a plan.

18  Q    Just briefly in layman's term, how does the Polsby-Popper

19  measurement work?

08:56:19 20  A    Yeah.  So basically it's taking the ratio of the -- I want

21  to get my language exactly right here because there is some

22  precision in the mathematics.  Polsby-Popper is the ratio of

23  the area to the area of the circle whose circumference equals

24  the perimeter of the district.

08:56:47 25  Q    Okay.

1  A    It's a lot of words, but it's just a distillation of some

2  mathematics that say it's the ratio of this area to a circle.

3  And as Dr. Duchin pointed out, the circle is kind of the

4  optimal feature, and things that you elongate or go outside of

08:57:07  5  a circle would be detrimental to its compactness.

6  Q    And there's a Schwartzberg measure?

7  A    Yes.  Which this is a close companion measure to the

8  Polsby-Popper.  The Schwartzberg method that I use is actually

9  an adaptation of the historic, probably the more well known,

08:57:26 10  the original mathematic derivation of the Schwartzberg method,

11  but we can talk about that if you'd like.

12  Q    Sure.  Well, the plaintiffs have said -- some of the

13  plaintiffs' experts have said that they disagree with the way

14  you presented Schwartzberg measurements.  So what is your

08:57:49 15  response to that?

16  A    They're correct.  The pure mathematics of Schwartzberg are

17  different than what I presented.  What I present for

18  Schwartzberg is what I would call an adaptation, a useful

19  adaptation of that method.

08:58:03 20      The Schwartzberg method will generate results that can go

21  from 1, you know, in theory, to infinity.  And so what we do,

22  in order to make the Schwartzberg number more comparable,

23  compatible, easier to interpret compared to other measures, is

24  we rescale that to a value that's between 0 and 1.  It is not

08:58:27 25  conventional, but I am not the first one who has used it.

08:58:51

 1          When we did that adaptation of the Schwartzberg method, we

 2     did rigorous statistical tests to see how it compared with its

 3     companion measure, the Polsby-Popper.  And the statistical test

 4     that we ran suggested that it was so consistent with our

 5     findings for Polsby-Popper, we probably didn't even need it.

 6          So it's a useful metric, it's an interesting metric.  But

 7     no matter whether you use the original mathematic derivation of

 8     it or our adapted method of it, the outcome is the same.  And

 9     it would be exactly consistent with the statistics we had with

10     Polsby-Popper, which Dr. Duchin, I believe, suggested we match

11     our conclusions there exactly.

12     Q    When we discussed your qualifications yesterday afternoon,

13     you said, did you not, that you have experience in statistical

14     transformation?

15     A    Yes, I do.

16     Q    Okay.  And is that what you were doing here, converting

17     the Schwartzberg scale to use the same scale as other

18     compactness measures?

19     A    Yes.  Yes, it is.

20     Q    Thank you.  That's enough of the measures.

21          Let's look -- you measured compactness of the Alabama plan

22     and the Singleton plans, did you not?

23     A    I did.

24     Q    Let's turn to page 29 of Defense Exhibit 1.  Actually,

25     let's move on to the next page.

1      What scores are you showing here in Table 5.4 on page 30

2 of Defense Exhibit 1?

3 A     All right.  Thank you.

4      The table you see here is color coded.  The Christmas tree

09:00:35 5 coloring of red to green shows the red scores being the lowest

6 scores, the green scores being the highest scores.

7      There's two different ways that I summarize the statistics

8 in this table.  The first is by summing each column.  So for

9 Polsby-Popper as you add up these different values we would get

09:00:59 10 a score of 1.55.  You sum up my adapted Schwartzberg, it's

11 3.28.  Reock is 2.67.  The convex hull is 5.01.

12      So these are numbers that you would then take for this

13 plan and then say, ah, let us compare these with the sum of the

14 figures for another plan and then we can come to a useful

09:01:22 15 determination, if in aggregate, one plan is more compact than

16 another plan, right?

17      The other way that I summarize these data is by row.  And

18 the reason that I do this is because it's very difficult to

19 just look at all of these different numbers and say, with all

09:01:45 20 these different fractions, which one in aggregate -- which

21 district in aggregate is better than another.  So I emphasize

22 there is no one right way of doing it.  This is how I've done

23 it.  It has been useful to judges and courts and experts and to

24 informed discussions about in general which plans in which

09:02:09 25 districts perform better than the other.

1    There was criticism of this approach by Dr. Duchin in her

2    rebuttal report saying that this, from a pure mathematics

3    standpoint, is not pure, if you will.  I mean, it's subject to

4    some variation, perhaps different interpretations because of

09:02:29  5    different distributions of numbers within here.

6    So I would like to acknowledge and concede that, yes,

7    there is no one perfect way to aggregate or summarize different

8    methods for individual districts, but I would argue it as one

9    useful way in general to be able to see which ones are better,

09:02:51 10    and in general which ones are worse.

11    The reason that we provide all of the data for all of the

12    districts for all of the methods is so that the readers, the

13    experts, the courts, can look and see for individual methods

14    what those numbers are for each one individually.

09:03:10 15    This prevents us from having the perception that we are

16    trying to hide any information.  We're trying to be fully

17    transparent and share everything we know and fully document how

18    we got there because there is no known or agreed upon way to

19    summarize or tabulate these data.

09:03:29 20  Q    Have you found these totals that you present to be a

21    useful way to judge the compactness of the district or a plan?

22  A    Yes.  In summary, it's a very useful way just to look at a

23    glance and say which ones are higher or which ones are lower.

24    They do not have the mathematic precision that Dr. Duchin

09:03:57 25    points out, but that does not detract from the fact that they

1  have utility in helping a reader quickly see which ones are

2  higher or which ones are lower.

3      If you go into the individual methods, the Polsby-Popper,

4  Schwartzberg, Reock, convex hull, and you look at those

09:04:15  5  individually, you will find that they will generally follow the

6  same pattern as this number does in aggregate.  This number

7  tries to take a lot of different information and put it

8  together in one summary statistic.  But, again, we leave all of

9  the information here for the reader.  So if they know, familiar

09:04:33  10  with these different methods, they're more than welcome to look

11  at those and focus on those individually as well.

12  Q    You present measurements for the Singleton plan, do you

13  not?

14  A    Sure.  Yes.

09:04:45  15  Q    And is that in Table 5.5 on the bottom of page 30 of

16  Defense Exhibit 1?

17  A    Yes, that is correct.

18  Q    How does the compactness of the Singleton plan compare to

19  the compactness of Alabama's 2011 plan -- excuse me -- 2021

09:05:04  20  plan?

21  A    Sure.  Yes.  Thank you.

22      So when we -- when we compare tables 5.4 and 5.5, what I

23  would look here to is the sum.  Basically, the row at the

24  bottom of each one of these tables to say is there a difference

09:05:23  25  or not.

1       And so when we look at Polsby-Popper and Schwartzberg, as

2  I said earlier, the adapted Schwartzberg score is very, very

3  close.  You can look at the rank order of them and the sum, and

4  you can see that there's basically no difference in

09:05:39 5  Polsby-Popper for the enacted plan compared to the

6  Polsby-Popper for Singleton.

7       Similarly, as you would expect, the Schwartzberg score or

8  adapted Schwartzberg score is within 1/100th as well.  So by

9  those two measures you would say the Alabama plan and the

09:05:57 10  Singleton plan here would be comparable.

11       Some of these other measures, the Reock, for example,

12  which is the other measure that Dr. Duchin presents in her

13  work, would show -- the Reock score here would show higher for

14  the Alabama plan.  And then a fourth method that I find useful,

09:06:19 15  it's not always used in redistricting, but it's still a very

16  useful measure of compactness, called convex hull.  The convex

17  hull measure here also scores the Alabama plan higher than the

18  Singleton plan.

19  Q    Thank you.  Did you assess the demographics of the

09:06:38 20  Singleton plan?

21  A    Yes, I did.

22  Q    Let's go to page 15 of Defense Exhibit 1.

23  A    Great.

24  Q    Table 4.1.  What, if anything, did you note by reviewing

09:07:00 25  the total population of the districts in the Singleton plan?

```
 1  A    Yes.  As we noted earlier, because the plan was built with
 2  counties and was not built down to the degree where you had
 3  one person of deviation, you see a reflection, a manifestation
 4  of that two-and-a-half percent deviation here.
 5       So you see a low score here of -- a low population of
 6  709,514 in District 2.  And then I think the high -- the high
 7  population figure here, the watermark, is 727,206.
 8  Q    Okay.  What does it mean for voters if there's population
 9  deviation among the districts?
10  A    Sure.  So this is a core tenent that -- related to
11  one person, one vote.  And the idea here, you know, part of the
12  reason we have a census, part of the reason we go and check and
13  see what the population is every 10 years is so that we can
14  balance the population equally in each district.
15       The impact of balancing that population is important
16  because per one person, one vote, you want to have each
17  individual citizen's vote count as closely as possible, if not
18  exactly the same amount as the citizen next to them.  You would
19  seek to have as close to an equitable one person, one vote as
20  possible.
21  Q    If I am in a district with a hundred people, does my vote
22  count the same as -- of somebody in a district with 50 people?
23  A    No.
24  Q    If a plan has 2.5 percent deviation today, does that mean
25  that the deviation will remain at 2.5 percent over the course
```

09:07:27
09:07:54
09:08:18
09:08:41
09:09:01

1  of the decade that the districts are used?

2  A    Yes.  I would say regardless of what a deviation is now,

3  whether at 0 or 2 or 5, my experience is that no matter what,

4  invariably, that that deviation can and will grow over time,

09:09:22 5  and that is almost a universal truth in demography.

6  Q    And you told us yesterday, did you not, that you have

7  experience in estimating population shifts?

8  A    I do.

9  Q    Did you assess how the deviation of the Singleton plan in

09:09:49 10  Alabama's 2021 plan are likely to change over the course of the

11  coming decade?

12  A    Yes, I did.

13  Q    Tell us what you're showing us in Figure 5.7 of Page 33 of

14  Defense Exhibit 1.

09:10:08 15  A    Thank you.

16      In performing this analysis, I independently ran a series

17  of rigorous population projections at the county level.  I

18  projected the county population by year, out to the year 2030.

19  I then aggregated those county-level projections into the

09:10:40 20  districts that are represented in the Singleton plan.

21      I then compared that with population projections that I

22  built using the exact same methodology for the Alabama plan.

23      The outcome of this is that the Alabama plan, starting

24  obviously at 0.0 percent deviation in 2020, you can see it

09:11:07 25  starts going up almost immediately.  You can see by 2021 the

1    current number, the Alabama plan would already have 1.4 percent

2    deviation, but the 2.5 percent deviation in the plaintiffs'

3    plan, we estimate to already be 2.9 percent.

4        If you follow those trends of the population projections

09:11:31  5    out over time, our estimate is that the total deviation by the

6    year 2030, if you stick with the Alabama plan, would only be

7    7.2 percent.  And that number is a very common amount of

8    deviation that you would find at a time of redistricting -- 7,

9    6, 5 percent, those are the kinds of numbers of deviation we

09:11:56 10    commonly find.

11        By comparison, if you start a plan already handicapped

12    with a 2.5 percent deviation to begin with, what will happen is

13    that deviation is going to grow in a -- much more likely to

14    grow higher and higher than a plan that started with zero

09:12:16 15    deviation to begin with.

16        So in this regard, I would strongly advocate this analysis

17    as a way to understand and represent the utility of the

18    district plan over the course of the decade.  Not just the year

19    that it begins, but for all the years that this plan is

09:12:38 20    supposed to support the people of Alabama.

21    Q    So if Alabama -- just to sum this up -- if Alabama were to

22    adopt the Singleton plan today --

23    A    Right.

24    Q    -- what do you estimate the total deviation to be among

09:12:53 25    congressional districts by the end of the decade?

```
 1  A     11.6 percent.

 2  Q     Did you form the same analysis, Mr. Bryan, for the

 3  alternative plans, the whole county plans that you drew?

 4  A     Yes, I did.

 5  Q     Tell us what you're showing us in Figure 5.8 on Page 34 of

 6  Defense Exhibit 1.

 7  A     Sure.  Thank you.

 8        So in this map, we just show a variety of lines.  It looks

 9  a little messy.  But basically, we're showing the different

10  potential outcomes, given some different combinations of the

11  plans that we came up with built on counties.  And we did

12  not -- we did not design these plans to optimize the forecasts.

13  All the forecasts were done after the plans were designed.

14        As you can see, there's some plans that start high and end

15  even higher.  And there are some plans -- Plan 4, for example,

16  that starts low.  That one even gets better for a time before

17  it goes up.  But the outcome is that if you are starting with

18  a zero percent deviation to begin with, as we see in the green

19  line, that you are going to end up with the lowest deviation

20  over the course of the whole decade compared to any other way

21  you would build this with counties.

22  Q     Gotcha.  This might be a good time to talk about the

23  alternative plans in general.

24        Did you draw any of the alternative whole county plans

25  with any particular goals in mind, other than trying to achieve
```

1   minimum deviation?

2   A    No, we did not.  There is many, many ways that you could

3   draw the plans based on counties to the point where they

4   became, for example, hopelessly not compact, irregular or

09:14:56  5   perhaps that they may have really large deviations.

6        So my analysis here and my determination to cut this off,

7   whatever, 13 different plans, was subjective.  It was a point

8   where there wasn't any incremental benefit from destroying more

9   and more plans.  It would be inferior to these combinations

09:15:16 10   that we had already come up with.

11   Q    Well, just looking at the left side of Figure 5.8, did you

12   draw some whole county plans that had lower deviation than the

13   Singleton plan at the beginning?

14   A    Yes.

09:15:29 15   Q    And did you draw some that had greater deviation than the

16   Singleton plan at the beginning?

17   A    Yes.  They were both higher and lower than the Singleton

18   plan.

19   Q    From your estimates, Mr. Bryan, did you find any whole

09:15:42 20   county plans that would, by the end of the decade, present

21   lower deviation than Alabama's 2021 plan?

22   A    No.  There was one, Plan 4, that is close, but at the end,

23   the Alabama plan, because of its zero deviation starting point,

24   prevails as having the lowest overall deviation for the entire

09:16:07 25   decade of their utility.

1    Q    Mr. Bryan, Singleton plaintiffs allege, do they not, that

2    if their plan were in use, that two of those districts in past

3    elections would have voted for the Democratic candidate?  Do

4    you understand that to be the case?

09:16:36  5    A    I understand that to be the case, yes.

6    Q    And I want to refer you now to page 37 --

7    A    Great.

8    Q    -- of your report.  What are you showing us in

9    Figure 5.10?  And, again, that is page 37 of Defense Exhibit 1.

09:17:05 10    A    Thank you.

11         What we tried to do here is create a data visualization

12    that enabled the reader to be able to quickly and easily see

13    what the rank order of the political performance would be in

14    each district under each plan.

09:17:24 15         So, for example, if you read this vertically, the number

16    to the highest, this is percent Republican voting.  The number

17    at the highest is the highest percent Republican district in

18    that plan.  The numbers at the bottom represent the lowest

19    Republican performing plans.  And those were plans where

09:17:43 20    consistent with the plaintiffs' assertion of the use of black

21    registered voters in the 40 percent range as being a performing

22    district, we looked for versions of this plan that had either

23    one or two districts that had Democratic performing districts

24    in that range, the 40 to 45 percent range.

09:18:07 25    Q    So this is just a hypothetical plan.  You're just showing

1  us how to read a chart here, correct?

2  A    Yep.  It's just a -- it's a setup because it's a lot of

3  information.  Yep.

4  Q    Now, your alternative plans, do you find that if you keep

09:18:22 5  counties whole that it's necessarily the case that you will end

6  up with two districts likely to elect a Democratic candidate?

7  A    No.  That, in fact, was not the case, and that's not

8  surprising to me.

9  Q    Okay.  Let's look at Figure 5.1.

09:18:38 10  A    Okay.

11  Q    On page 38 of Defense Exhibit 1.

12  A    Sure.

13  Q    Explain this chart for us, please.

14  A    Sure.  So on the left, we have the distribution of seven

09:18:52 15  districts for the plaintiff plan.  You can see a seven dots

16  there ranked from lowest to highest.  And, you know, the

17  plaintiffs, I believe it's page 26 of their complaint, talk

18  about the percent black registered voters.  This is a little

19  bit -- little bit different way of looking at the information.

09:19:14 20      Here we're looking at the percent Republican votes in the

21  2018 governor's race, as there's nothing magical about that

22  race.  We looked at some other races and findings were

23  consistent.

24      So what this would say is that if you look to the left,

09:19:31 25  the plaintiff plan would show there would be two strong

1   Democrat performing districts and five Republican ones.

2       As you read across the right, you will see some of my

3   different alternate plans, that there are some cases where

4   there are one and some cases where there are two Democrat

09:19:49 5   performing districts.  And then you can see on the far right,

6   the state of Alabama plan has one very strong performing

7   Democratic district.

8   Q    Let's be clear.  You are not a political scientist, are

9   you, Mr. Bryan?

09:20:09 10  A    No.

11  Q    And have you prepared any estimates of how these districts

12  are likely to perform in the future?

13  A    I have not, and I have no idea.  I wouldn't know how to do

14  that.

09:20:23 15  Q    Okay.  So let's -- just to make sure we're all on the

16  page, this one here is one of your alternative plans, correct?

17  A    That is correct.

18  Q    And this plan number 1, is it true that what you're

19  showing -- in this plan there's one district where in the 2018

09:20:45 20  governor's race a majority of voters supported the Democratic

21  candidate?

22  A    That's correct.

23  Q    And there are six districts in that hypothetical -- in

24  that plan that supported the Republican candidate in the 2018

09:20:59 25  gubernatorial election?

```
 1   A     That is correct.
 2   Q     Of the 13 plans that you drew, how many resulted in two
 3   districts that supported the Democratic candidate in that one
 4   election?
09:21:13  5   A     I believe there were two districts that had two Democrat.
 6   Q     Okay.  The Singleton plan had two districts that were over
 7   40 percent African-American Voting Age Population; is that
 8   correct?
 9   A     Can you please say the question again?
09:21:41 10   Q     Sure.  Is it true, Mr. Bryan, that the Singleton plan has
11   two districts that had over 40 percent African-American Voting
12   Age Population?
13   A     Yeah.  There is, I believe, two, or perhaps one more,
14   three.  I'm going off of memory, but, yeah, there were a
09:22:00 15   couple.
16   Q     I understand.  Let's look at your Figure 5.13.
17   A     Sure.
18   Q     Page 39.
19   A     Yep.
09:22:13 20   Q     Defense Exhibit 1.
21   A     Yeah.
22   Q     Tell us what you're showing us in this chart.
23   A     Sure.  So this is a similar data visualization as we just
24   saw with the political performance, except that now what we are
09:22:30 25   doing is looking at the percent black population for each one
```

1  of the plans by district under each one of these different

2  scenarios.

3      So as we start to the left, no surprise.  We can see kind

4  of two dots above the line for the plaintiff plan and then as

09:22:50  5  you read across to the right, then you can see that there's,

6  you know, several districts here where there are one district

7  in my alternative plans that are above 40 percent, and there's

8  a couple instances here where there were two above 40 percent.

9      At the end of this data visualization on the far right,

09:23:12 10  you can see the state of Alabama plan, and that has one black

11  district that's up in 50, mid-50 percent range.

12  Q    Got it.

13      So looking at plaintiffs' plan, is it true that this chart

14  tells us that in the Singleton plan there is a district with

09:23:34 15  approximately -- looks like 48, 49 percent African-American --

16  A    Yeah.

17  Q    -- population?

18  A    48.8.

19  Q    Now, I may have used imprecise language.  Are you telling

09:23:45 20  us what the total black population is in the district, or the

21  total Black Voting Age Population in the district?

22  A    I am going off of memory.  I believe this is the total

23  population.  I want to be cautious.  I don't recall precisely,

24  but I think it's the total population.

09:24:15 25  Q    That will be made clear in the language of your report,

1   would it not have?

2   A    Yeah.

3   Q    Yeah.  Yeah.  We won't dig around for that.

4        Out of the alternative whole county plans you drew, how

09:24:29  5   many plans had two districts that were more than 40 percent

6   single-race black?

7   A    Yeah.

8   Q    Oh, no, no, no.  You said all black.  So how many had more

9   than two districts that were over 40 percent all black?

09:24:44 10   A    Looks like we have three here.

11   Q    Okay.

12   A    I may have said two, but, yeah, I think there is three in

13   here.  But out of -- it's three out of 13.  So the majority of

14   them only have one.

09:24:58 15   Q    Mr. Bryan, if a court were to order that Alabama had to

16   keep counties whole in this congressional plan, would that, in

17   your view, eliminate the possibility of racial gerrymandering?

18   A    No.

19   Q    Why not?

09:25:19 20   A    Because we're able to demonstrate that there are different

21   ways of combining counties to achieve different political and

22   racial outcomes.

23   Q    Okay.  And to go back, to be clear, when you were drawing

24   your alternative plans, were you purposely trying to either be

09:25:40 25   sure to draw the districts with certain minority population or

1  to avoid doing so?

2  A    The characteristics of the districts had no bearing,

3  except that we sought to identify combinations that achieved

4  the lowest population deviations.  And at that point, we

09:25:58 5  stopped until we got to the plaintiff about 5 or 6 percent

6  deviation and then we did no more.  I had no idea what the

7  characteristics were when I drew them.

8  Q    If a state wanted to keep counties whole in its

9  congressional plan --

09:26:15 10  A    Uh-huh.

11  Q    -- could it racially gerrymander by choosing which

12  counties to group with other counties based on the minority

13  population in those counties?

14  A    You could choose to do that.

09:26:27 15  Q    I wanted to go back to Defense Exhibit 1 and have you

16  explain to us some of the maps that you have presented in the

17  appendices of your report.

18  A    Sure.

19  Q    Let's look at Map Appendix 18 on Page 71 of your report.

09:26:57 20      Tell us what you are making in this map, Mr. Bryan.

21  A    Sure.  So this map has two -- what I will refer to as

22  layers.  So we have one layer.  There's an outline that's shown

23  in blue.  And that is the outline of the 2021 plans for

24  Alabama.

09:27:25 25      And then what we see with the different color shading from

```
 1  red to orange, yellow, light green, dark green, are
 2  progressively higher and higher number of population for the
 3  counties.
 4  Q    Thank you.  So we can look at this map and tell
09:27:50  5  immediately which counties are the most populous in the state,
 6  then; is that right?
 7  A    Sure.  Yes.
 8  Q    And you can spot areas that have low total population?
 9  A    Easily, yes.
09:28:00 10  Q    Okay.  Pick District 7, for example, in the state '21
11  plan.
12  A    Yep.
13  Q    Where is most of the population coming from that's in
14  District 7?
09:28:12 15  A    I am going to refer to my report, if I may.
16  Q    Sure.  Yes.
17       Maybe I could ask a clearer question.
18  A    Sure.
19  Q    Which counties in District 7 are the most populous?
09:28:34 20  A    Yeah.  If I may, I just would like to refer to -- there's
21  another map adjacent to this in my report.
22  Q    Okay.  Do you want me to go to --
23  A    Yeah, can you.
24  Q    This one?
09:28:52 25  A    Yeah.  That -- that's much more helpful.
```

```
 1            So, yeah, in Jefferson, like we'd look up into the central
 2     part of the state, it's -- this is the -- this is obviously
 3     black alone.  Just looking for the district identifiers here.
 4     I didn't put it on the earlier maps.  But, yes, so if you want
09:29:11  5     to go back up, you can see that there's a lot of population
 6     distributed around the west -- the southern and western part.
 7     There's a lot of small population counties that populate the
 8     rest of District 7.
 9     Q    Sure.  But we're looking -- we're looking here on this map
09:29:29 10     on Page 71 of your report, just where -- where there are lots
11     of people --
12     A    Yeah.
13     Q    -- no matter what the race is.
14     A    Yeah.  Around -- obviously, you look at the Birmingham
09:29:41 15     area, right in the center, sort of the majority of all the
16     population is that's driving 7 and the intersection with 6.
17     Q    Gotcha.
18            Now, let's go to the next page at the map we looked at
19     briefly.
09:29:55 20     A    Thank you.
21     Q    Page 72 of your report Defense Exhibit 1.
22     A    Yep.
23     Q    Tell us what this map depicts.
24     A    Sure.  So this is a map.  It's a companion map to what we
09:30:12 25     just saw earlier.  As we discussed yesterday, there is another
```

1    layer of geography that can be used to measure and analyze and

2    report population data, and those are called VTDs or voting tab

3    districts.  They are close companion to voting precincts,

4    right?  So it's a very useful way, a smaller level of geography

09:30:33 5    that gives us greater granularity, clearer pictures of where

6    the populations are.

7         In this case, what I have done is calculated the percent

8    black-alone Voting Age Population by VTD.  In this case, the

9    red areas show where there are low percentages of black alone.

09:30:55 10   Orange shows progressively higher and yellow higher yet.  The

11   green areas, the dark green areas show where there are the

12   highest concentrations of black population by VTD in the state.

13   Q    Thank you, Mr. Bryan.

14        What on the map do you show on page 73 of Defense

09:31:21 15   Exhibit 1?  Tell us what's in this map.

16   A    Yeah.  So this map, again, it's a companion to the earlier

17   county-level map showing Voting Age Population by VTD.  And,

18   again, it just shows a more granularity, for example, in

19   District 7, the high concentration of population driving

09:31:41 20   District 7.

21   Q    Thank you.

22        You prepared similar maps for the Singleton plan, did you

23   not?

24   A    I have.

09:31:49 25   Q    Let's look at some of those.  We'll go to page 75 of your

1 report, Map Appendix 21.  Tell us what's in this map.

2 A    No, this -- this map shows the outline of the Singleton

3 plan.  And it shows the percent black population by county

4 relative to the boundaries of the Singleton plan.

09:32:17 5 Q    Okay.  Let's go to the next page, 76 of Defense Exhibit 1.

6    What are you showing us here?

7 A    Yeah.  So this map then would show the Voting Age

8 Population by county relative to the Singleton plan.

9 Q    Okay.  So this map -- this district in the middle, I don't

09:32:49 10 remember which number district this is in the Singleton plan,

11 the one that includes Jefferson County, Bibb, Hale and Perry, I

12 believe.  The vast majority of the total population of this

13 district is coming from Jefferson County, is it not?

14 A    Yeah.  Virtually all of it, yes.

09:33:08 15 Q    Okay.  This other district that includes some of the Black

16 Belt in Tuscaloosa County, looks like a significant amount of

17 the total population of that district comes from Tuscaloosa and

18 Montgomery counties.  Would you agree with that?

19 A    Yes.

09:33:28 20 Q    Okay.

21 A    Yeah.

22 Q    Now, let's go to page 77 of Defense Exhibit 1.  And tell

23 us, Mr. Bryan, what you are showing us in this map, which is

24 Map Appendix 23.

09:33:42 25 A    So yes.  So this map shows the percent black alone of the

Voting Age Population by VTD in relationship to the boundaries

of the Singleton plan.

Q    Thank you, Mr. Bryan.

Let's turn now to your next report, Defense Exhibit 2.

09:34:17  You prepared a report for the Milligan and Caster cases, did

you not?

A    I did.

Q    Let's -- district -- excuse me.  Defense Exhibit 2 is that

report, correct?

09:34:37  A    That is correct.  Yes.

Q    Yes.  Okay.  Did you assess the Hatcher plan in this

report?

A    I did.

Q    Okay.  And for the Court's benefit, is the Hatcher plan

09:34:54  the plan that was presented in the Milligan plaintiffs'

complaint?  To the best of your knowledge.  If you need to

review something, Mr. Bryan, let me know.  The names may be

confusing.

I will represent to you that the plan presented the

09:35:25  Milligan complaint was also introduced into the legislature by

Senator Hatcher?

A    Yeah.  That's my understanding, correct.

Q    So if it confuses you for me to call it either the Hatcher

plan or the Milligan plan, let me know and we will get on the

09:35:43  same page with the language.

1    A    I am clear.

2    Q    I want to share Defense Exhibit 75 and ask you is that the

3    Hatcher plan that you assess in your report that was submitted

4    as Defense Exhibit 2?

09:36:02  5    A    This -- it appears to be.  This is not my map.  But this

6    appears to be the same map.

7    Q    Thank you.

8         Now, this is somewhat different from the various plans

9    presented by Dr. Duchin and Mr. Cooper as demonstrative plans,

09:36:21 10    is it not?

11    A    It is.

12    Q    Okay.  How does the general structure of this plan compare

13    to the various demonstrative plans you've reviewed?

14    A    Sure.  So the key features of this plan, the first major

09:36:39 15    difference is this is not a county-based plan.  It has

16    geography that builds their districts going all the way down to

17    the block level.  My observation is they generally used -- the

18    authors of these plans used VTDs, but there were cases in order

19    to achieve precise population balance where those VTDs were

09:37:04 20    split and blocks were used.

21         As a more general observation I have here, the most

22    impactful changes are that there are changes to where the

23    boundaries of District 7 are drawn, I have up and around the

24    Birmingham area.  We can look around Birmingham relative to

09:37:24 25    where the existing districts are.

1          We can kind of see where these plaintiffs' plans went,

2     with regards -- and relative to and with regards to the

3     existing plan.  But I also think importantly that we can see

4     that there's been a really significant change in District 2,

09:37:43 5     insofar as it now kind of stretches from the far, you know,

6     western to the eastern side of the state.  And then also

7     extends southward dividing Mobile and Baldwin counties.

8     Q     All right.  Let's go back then to your report and look in

9     more detail at your assessment of this Hatcher plan.

09:38:16 10          Did you assess the demographics of the Hatcher plan?

11     A     Yes.

12     Q     I will refer to page 12 of Defense Exhibit 2.  And tell us

13     what you saw in reviewing the demographics of the districts in

14     the Hatcher plan.

09:38:35 15     A     Yes.  Thank you.

16          My first observation, just as I discussed with the last

17     plan, was to look at the total population in Table 4.1.  It

18     appears that the Hatcher plan is able to achieve a plus and

19     minus 1 percent deviation.  That is the low is 717,753, high

09:38:59 20     717,755.

21          As I read across this table, I see that the percent black

22     population of the districts were 51.3 percent -- 51.5 percent

23     for black alone in District 2 and 53.4 all black, or any-part

24     black.  And in District 7, there's a stronger black majority in

09:39:30 25     that district with 54.3 percent black alone, and 55.8 percent

1    all black or any-part black.

2    Q    Okay.  What do you mean when you say this next to last

3    column going left to right, black alone?

4    A    The black-alone population?

09:39:57 5    Q    Correct.  How -- what do you mean by the term black alone

6    versus the term you use in the next column, all black?

7    A    Sure.  So the black-alone population, the way that I

8    define it and the way I think it's commonly defined in

9    demography is that, as Dr. Duchin mentioned yesterday, there's

09:40:17 10    the option to check if you are black in the census form, as

11    there is options to check if you are any number of other races,

12    including white, Asian, American Indian, Native Hawaiian,

13    Pacific Islander, and so forth.

14         The way that the Census Bureau then follows up, they ask a

09:40:38 15    question about what they call ethnicity or Hispanic origin.

16    And so Hispanic origin is as a separate construct.  It's a

17    separate concept from race.

18         Hispanic is not race.  So for every race you can pivot

19    that to say whether that race is by Hispanic or not.  So there

09:40:59 20    are Asian Hispanics.  There are Native Hawaiian Hispanics.

21    There are black Hispanics.

22         So when we look at the black-alone population, I think of

23    that as being the most limiting -- that's the smallest possible

24    number, the lowest guardrail.  If you were to say what number

09:41:20 25    can you be really, really sure there is this number of blacks

at a bare minimum, this is the number you would refer to

because this number does not refer to black in combination with

anything else, not even Hispanic.

Q    Okay.  Some experts have used the language single-race

black and any-part black.

A    Sure.

Q    Is single-race black the same as black alone, as you

understand it?  Are you talking about the same thing?

A    I -- not knowing their work, but hearing their

characterization of the definition, my belief is that we are

using the same definition.

Q    Gotcha.

     And any-part black, is that as far as you know, the same

as what the term you use, all black?

A    That is my understanding.

Q    Why do you present both measures in your report,

Mr. Bryan?

A    Yeah.  So I'm not a political scientist.  But I have

worked with political scientists for many years on these

projects.  And the input that I have gotten from them is that

it is beneficial for them to have these numbers so they are

able to understand the size and the characteristics of the

black population in context.

     From a demographic perspective, for me it's beneficial

because having reviewed numerous reports from numerous other

1  experts, it is very common that other experts either do not

2  know or do not understand the definition of the black

3  population and will use numbers that they find in reports and

4  documents or references that they themselves do not know or

09:43:13 5  understand.

6      So for the benefit of my reports, personally from my

7  analytics, it is beneficial for me to have both of these

8  numbers so we know what the lowest possible number is that

9  blacks can be, as well as the greatest possible numbers.

09:43:29 10     When we're talking about a Voting Rights Act case, it is

11  beneficial to know what both of those are.  Because in

12  different kinds of cases and in different venues, some of those

13  numbers will serve different purposes for different parts of

14  the case.

09:43:44 15  Q   Okay.  You refer to the use of black alone or single-race

16  black as being more defensible in Voting Rights Act cases.

17  A   That's correct.

18  Q   What do you mean by that?

19  A   So, again, I am not a political scientist, but I have

09:44:04 20  worked closely with political scientists for many, many years

21  in the cases.  And so I refer to my experience with them that

22  when they ask me for the number, size, location of the

23  population, that they need to make claims about the political

24  cohesion or the political performance of that population, the

09:44:25 25  political scientists that I have worked with have told me that

1   it is easier to defend the political performance, the political

2   voting behavior of the more homogenous, smallest, most cohesive

3   black population.

4        It was notable to me yesterday, I believe I heard a

09:44:46 5   political scientist in this case refer to the fact that he had

6   been using the black-alone population for his political

7   analytics.

8        So it's a common thing to use those.  I have no opinion

9   whether one is right or wrong or better or worse.  I simply

09:45:07 10  refer to my experience and what has been asked of me by

11  political scientists.

12  Q    Let's move on now, Mr. Bryan, to a discussion of

13  communities of interest.

14       Have you ever been hired to draw a plan for a state or

09:45:26 15  geographical area that was unfamiliar to you?

16  A    Frequently I do work across the United States and am

17  oftentimes called upon to participate in cases, either

18  critiquing plans or drawing new plans for areas that I have

19  never been before.

09:45:43 20  Q    When you're put in that position, do you consider it

21  important -- do you consider it important to educate yourself

22  about communities of interest in the area before you draw the

23  plan?

24  A    I'd say it's very important.  It's a leading criteria.

09:46:04 25  The rules that many states use and the NCSL advocates is

1    knowing what those communities of interest are.

2         It's one criteria that, obviously, if you are going to

3    serve the people as in this case, the great people of the state

4    of Alabama, it is in the best interest of me as an expert to

09:46:22  5    know what I can, familiarize myself.

6    Q    So what are some things you might do to educate yourself

7    about the communities of interest in an area that is new to

8    you?

9    A    Sure.  So, typically, what I would do is I would find

09:46:44 10    people who are experts, people who are residents, maybe people

11    who used to work as representatives for the areas, used to have

12    experience with the political system, state and local

13    officials, or people who I personally know who may be able to

14    give me valuable insights on what's actually going on in a

09:47:06 15    state like Alabama.  And in the case of Alabama, that's exactly

16    what I did.

17    Q    Now, I won't pull this up, but you have a notebook with

18    our exhibits in it.  I would ask you to look at Defense

19    Exhibit 171.

09:47:25 20         We provided you with copies of the testimony of Jo Bonner

21    and Bradley Byrne from the Chestnut litigation, did we not?

22    A    Yes, you did.

23    Q    And is that --

24    A    I am looking at it.

09:47:36 25    Q    Yeah.  Is Defense Exhibit 171 the testimony that we

```
 1   provided you with?

 2   A    Yes.

 3   Q    Okay.  Did you review it?

 4   A    Yes.

 5   Q    What were your impressions from that testimony in terms of

 6   whether it offered any information of value to you as a

 7   demographer?

 8   A    I mean, I think it was as good of information as you could

 9   possibly get in knowing and understanding social, economic,

10   geographic characteristics of an area.

11        The Byrne/Bonner testimony talked in some detail

12   especially about District 1 and about the details and

13   characteristics of Mobile and Baldwin that were detailed,

14   factual and insightful and very beneficial for my understanding

15   of that area.

16   Q    As a demographer, did you find that testimony persuasive

17   if you were considering whether or not there is a community of

18   interest around the Gulf Coast counties?

19   A    It was very compelling in discussing the socioeconomic

20   political cohesion of the area.  I am hard pressed to think of

21   another document or testimony that I could refer to that would

22   be any more enlightening than what the Byrne and Bonner

23   testimony provided.

24   Q    Okay.  Now, of course, they weren't purporting to be

25   discussing every possible community of interest in the state of
```

09:47:45 (line 5)
09:48:09 (line 10)
09:48:31 (line 15)
09:48:54 (line 20)
09:49:14 (line 25)

```
 1  Alabama, were they?
 2  A    For sure, no.
 3  Q    Yeah.  But in terms of that one community of interest, did
 4  you find that information that would be valuable to you if you
 5  were retained to draw a congressional plan for the state of
 6  Alabama?
 7  A    Yes, definitely.
 8  Q    When you draw plans, Mr. Bryan, do you assume as a
 9  demographer that all the white voters in the jurisdiction have
10  one set of interest and all the black voters in a jurisdiction
11  have a different set of interests?
12  A    I would never consider that.
13  Q    Would you consider that to be an appropriate approach to
14  redistricting?
15  A    Definitely not.
16  Q    Are you aware, Mr. Bryan, that some of the witnesses for
17  the plaintiffs have mentioned the Black Belt in Alabama as a
18  community of interest?
19  A    I am aware.
20  Q    Are you familiar with the general area that most people
21  consider to be the Black Belt?
22  A    I am generally familiar.
23  Q    When a community of interest is identified to you as a
24  demographer, Mr. Bryan, do you understand that to be an
25  argument that the area should be included in one district or
```

```
 1  split among several?

 2  A     Again, when you are discussing communities of interest,

 3  there can be different competing overlapping communities of

 4  interest.  But generally if you have one community of interest

 5  that is very important and prevails and especially if you are

 6  presenting a competitive plan that advocates for significant

 7  deviation from an existing plan, I would be looking for the

 8  degree to which a plan kept a community of interest whole.

 9  Q     We'll talk more about the plans presented by Mr. Cooper

10  and Dr. Duchin shortly.  But to the best of your knowledge, do

11  any of the plans you've reviewed in this case, whether it is

12  the Hatcher plan, the plans presented by Dr. Duchin or the

13  plans presented by Mr. Cooper; do any of those keep the Black

14  Belt counties in a single district?

15  A     No.

16  Q     I want to share my screen again.

17        Look at a different part of your report that we have

18  submitted as Defense Exhibit 2.

19        I want to go to page 24 of that report.

20        Mr. Bryan, did you do a core retention analysis of the

21  Hatcher plan that is discussed in Defense Exhibit 2?

22  A     I did.

23  Q     Well, let's see.  This is actually --

24  A     I believe that's the existing Alabama map.

25  Q     That's the existing plan.  Yeah.  Look at Figure 5.2 on
```

09:51:03 (line 5), 09:51:23 (line 10), 09:51:42 (line 15), 09:52:11 (line 20), 09:52:32 (line 25)

page 24.  Tell us what we see in that chart, what you're
analyzing and what you are showing us.

A    So this is the core retention of the Hatcher plan.  We see
in this case that there was a -- as we know from the design of
09:53:01 the plan and see visually, that Districts 1 and 2 were
significantly impacted.

We can see that there's relatively low retention,
approximately 59 percent in District 1, less than half of that
with black retention in District 1.  So in this case, the
09:53:22 continuity of representation is significantly detrimental to
the black population in District 1.

In District 2, District 2 kind of becomes a core, a locus
of population where you need to move other population around in
order to improve the black performance there.  And that is why
09:53:43 in this case, the what -- the non-black or the total population
is significantly lower than the black population.  Because
white and other non-black populations had to be moved out of it
in order to enable its black performance.

Some of the other districts -- District 3, for example,
09:54:04 has somewhat good and balanced retention.  In Districts 4
and 5, I think these are very consistent.  There was not much
change made up in those districts, so their core retention is
very good.  Again, there was some difference, lower performing
core retention in District 6 with a notable differential impact
09:54:27 to the black population.

1     And then, again, in District 7, I think there was less

2    impact there, and there was comparable performance of core

3    retention there between black and the total population.

4    Q     Which plan does better with preserving the core of

09:54:47  5    existing districts?  The Hatcher plan or Alabama's 2021 plan?

6    A     It's -- the core retention overall for the Alabama plan is

7    significantly higher.  I don't remember the exact number.  It

8    may have been a million more people perhaps, or retained in

9    their core districts in the Alabama plan than in the Hatcher

09:55:10 10    plan.

11    Q     And which plan shows more distinction between how white

12    and black persons are treated, in terms of core retention?

13    A     Sure.  There's obviously significantly more differential

14    impact of the subpopulations in the Hatcher plan than in the

09:55:33 15    total plan.  There's virtually no differential impact in the

16    Alabama plan between total and black.

17    Q     Table 5.2 appears on page 26 of your report.  And let's

18    just say for the record, I'm referring to the filing page

19    number.  Actually, the page number that originally appeared on

09:56:06 20    Mr. Bryan's report is page 25.  I may have been a little sloppy

21    going through these reports and which one I was referring to.

22    Hopefully by stating which table precisely we're looking at

23    will be clear.

24        In Table 5.2 of Defense Exhibit 2, Mr. Bryan --

09:56:25 25    A     Yes.

1   Q    -- would you tell us what you are showing us here?

2   A    Yes.  So this is a core retention analysis of the existing

3   plan because where we started all of our core retention

4   analysis with the Hatcher plan.  And as you can see looking at

09:56:43  5   District 1, there were 426,386 people from the original

6   existing District 1 who remained there.  And then there was

7   significant displacement, as we know, with the development of

8   District 2.  There was 285,000 people that got moved into

9   District 2.

09:57:05 10   Q    Okay.  So this is similar to a chart that we reviewed when

11   you were analyzing the Singleton plan.

12   A    Yes.  Yes.  This is the exact same analytic technique.

13   Q    Okay.  I am going to move to your discussion of

14   incumbency.

09:57:27 15   A    Sure.

16   Q    What does the Hatcher plan do with avoiding incumbent

17   conflicts?  And I will refer you to page 28 as is shown on the

18   top of the page of Defense Exhibit 2.

19   A    Yes.  Thank you.  So interestingly, there's actually

09:57:53 20   two pairs here.  So the plaintiffs' plan pairs the Moore --

21   Representatives Moore and Carl.  In District 1 you can see that

22   down in the south, that they're not on the edge, they're not on

23   the border of the districts, they're wholly contained inside of

24   District 1, leaving District 2 unrepresented.

09:58:16 25        And then it goes on, as we saw in several plans, that

```
 1   Sewell and Palmer were both in District 6, leaving District 7
 2   unrepresented.
 3        So the two districts -- Districts 2 and Districts 7 here
 4   are left without any incumbent representation at all.
 5        MR. DAVIS:  Your Honors, I'm quite content to continue
 6   for a little longer.  I am about to move into a slightly
 7   different subject, as we're going to discuss compactness.
 8        JUDGE MARCUS:  I think this might be a convenient
 9   point.  We wanted to give our reporter a break after about an
10   hour and a half, and we are -- we are just about at that point.
11        So this would be a good breaking point.  Let me just ask
12   you a quick question:  What's your sense on the balance of your
13   examination of Mr. Bryan?
14        MR. DAVIS:  My best judgment, Judge Marcus, would be
15   that I have about an hour to go.  It could be a little less.
16        JUDGE MARCUS:  Okay.  Why don't we do this -- I have
17   exactly 10:00 o'clock Central Standard Time or almost 10:00
18   o'clock, 9:59, and almost 11:00 o'clock Eastern Time.  Why
19   don't we take a 15-minute break, and we will pick up, then, at
20   10:15 Central Standard Time?  Thank you all.  We will take a
21   short break.
22             (Recess.)
23        JUDGE MARCUS:  Do you have an order in which the
24   cross-examination is going to proceed?  Have the plaintiffs
25   settled on that?
```

```
 1              MS. KHANNA:  Yes, Your Honor.  The Caster plaintiffs
 2       will cross-examine Mr. Bryan first, and I believe then
 3       Milligan.  And then Singleton.
 4              JUDGE MARCUS:  Okay.
10:17:42 5              MR. DUNN:  That's my understanding, as well, Your
 6       Honor.
 7              JUDGE MARCUS:  Mr. Blacksher, that's your
 8       understanding, as well?
 9              MR. BLACKSHER:  Yes, Your Honor.  That's why I was
10:17:50 10      worried about bumping up against Mr. Bryan's timeline since I
11       am at the tail end.
12              JUDGE MARCUS:  Don't worry.  You will have all the
13       time you need.
14              MR. BLACKSHER:  Thank you.
10:17:58 15              JUDGE MARCUS:  Mr. Davis, let's proceed.  Thank you.
16       BY MR. DAVIS:
17       Q    Mr. Bryan, did you assess the compactness of the Hatcher
18       plan?
19       A    I did.
10:18:09 20      Q    I will share page 31 of Defense Exhibit 2.
21              Your scores of the Hatcher plan appear in Table 5.5.
22       A    That's correct.
23       Q    Okay.  Tell me -- summarize how the Hatcher plan's
24       compactness scores compare to Alabama's 2021 plan.  Does it
10:18:38 25      perform better, worse, the same?
```

A     Yeah.  Sure.  Sure.  So again, there are two different
ways that you can summarize compactness.  You can summarize it
for the plan as a whole, and then you can summarize it by
district.

10:19:03      And as we discussed earlier and as Dr. Duchin has pointed
out, the total metric here is just a layman's simple summary
statistic to help us understand relatively for one plan versus
another plan how a district performs.

      So when we look at the Alabama plan versus the Hatcher
10:19:26 plan, pretty much across the board as we look at the
Polsby-Popper, the adapted Schwartzberg score, the Reock
scores, and the convex hull scores, if you look at all four of
these different measures, you see that the Alabama plan is much
higher.  It performs much, much better.

10:19:52      There's -- in one area, it's around District 4, I believe,
where there is a little bit lower score for the state of
Alabama.  You can see that my total score for the state of
Alabama there, low at 1.6.  Similarly, around District 6, also
at about 1.55, those two relatively low areas.

10:20:22      Those are driven by some physical features at the
intersection of these districts.  I refer to it as the Bankhead
Lake area.  There's a lot of water features, a lot of curvy
lines and things in those districts, just by their physical
features, less compact.  And that is part of the reason that
10:20:39 when you compare those specific districts with the couple of

1  comparable districts in the Hatcher plan, you may see a couple

2  of instances there where the Hatcher plan is not as low, just

3  because it does not have boundaries that exactly follow those

4  physical features.  But in aggregate, across the board, every

10:21:01  5  measure that you would look at would say the Alabama plan is

6  superior, sometimes significantly so to the Hatcher plan.

7  Q    Got it.  But the Court, if it wants to look at Table 5.4

8  and 5.5 and compare the scores for each district in the Hatcher

9  plan and the state's plan; is that right?

10:21:24  10  A    Right.

11  Q    Okay.  Let's look at some of the maps you prepared for the

12  Hatcher plan, Mr. Bryan.  I want to turn now to Page 44 of your

13  report, Page 44 according to the filing information on the top

14  of the page.

10:21:45  15      What do we see in this map, Mr. Bryan?  This Map

16  Appendix 5?

17  A    Sure.

18  Q    Tell us what you are showing us in this map.

19  A    Sure.  So this is a -- this is consistent with some of the

10:22:07  20  other maps that we've produced for different plans.  It's an

21  outline of the Hatcher plan, and it shows the percent black

22  alone by -- let's see -- this is actually mislabeled.  This is

23  a black alone by county map.  So I would disregard the label

24  within the map and refer to the map appendix, the title of the

10:22:33  25  map.  This is black alone by VTD -- by county.

1    Q      Thank you.

2           Now, this District 2 -- you see my cursor moving, I take

3    it, on the screen?

4    A      Yes, I see.

10:22:49 5    Q      District 2, which takes part of Mobile County and then

6    goes east, and District 7 which includes this finger into

7    Jefferson County, those are the two majority-black districts in

8    the Hatcher plan, are they not?

9    A      That's correct.

10:23:01 10   Q      Is there any county in the state that is more than

11   40 percent black population that is not included in either

12   District 7 or District 2 in the Hatcher plan?

13   A      There's only two pieces that I see.  There's, again, in

14   Jefferson, there's a little portion of the district that goes

10:23:28 15   outside of 7.  And then, I think similarly, you move your

16   cursor down and over to the right, that county with 79 percent

17   goes just over the edge.  And that's slightly split by

18   district, as well.

19          But other than that, yeah.  And 43 right there.  Other

10:23:48 20   than that, there's no other 40 percent or greater wholly

21   contained counties in any other districts.

22   Q      Let's move to the next map, Map Appendix 6.  What are you

23   showing us here?

24   A      Yeah.  So this would be the Voting Age Population by

10:24:06 25   county overlaid with the Hatcher plan, again showing the high

 1  concentrations of population in Jefferson County and Mobile and

 2  Baldwin counties.

 3  Q    Where does it appear, according to this map, that

 4  District 7 is getting most of the people that populate this

10:24:26 5  district?  Most of the people, regardless of race.

 6  A    Yeah.  The biggest piece would be coming from the area in

 7  Jefferson County.

 8  Q    And where would District 2 be getting most of its total

 9  population?

10:24:44 10  A    It's a little less clear here because you've -- it is

11  intersecting the Mobile and the Baldwin counties to the

12  southwest.  But there is another also another populous county

13  in north central -- 177,427, right in there.  So that's a

14  corner, just given that we have 700-and-some thousand

10:25:07 15  population, that county would be contributing

16  disproportionately to the overall plan.

17  Q    Yeah.  This is Montgomery County, correct?

18  A    Yeah.  Correct.  It's not labeled on my map, but, yeah, I

19  believe that's correct.

10:25:19 20  Q    Let's look at Map Appendix 7 on the next page.

21  A    Sure.

22  Q    What do we see here, Mr. Bryan?

23  A    Yeah.  So this is the -- this is the plan that shows the

24  percent black alone by the VTDs overlaid with the Hatcher plan.

10:25:37 25  Q    Okay.  What, if anything, is indicative to you of the map

drawers' intention when you look at the splits of, say,
Jefferson County, here between 7 and 6, and Mobile County
between Districts 2 and 1?

A    Sure.  I'll be careful to put myself in the mindset or
speak for the intention of the map drawer.  I will speak more
so to the appearance or the outcome of the map, if that is all
right.

Q    Assume that's what I asked.  Is this any appearance here
that jumps out to as an a demographer?

A    Yes.  I would be more precise if I focus on that than
intent.

      As you follow the new District 2 starting kind of over on
the eastern edge of the state near the border, near where
Columbus is, and you see that the northern edge of District 2
starts tracing from east to west across the central part of the
state, you can see easily that that line almost precisely
exactly follows the contours of the very highest black
population VTDs -- can literally go from one to the next and
look on the northern edge of that line and see what I call the
yellow, red, you know, 10 percent, 20 percent black, and then
you go below that line and you immediately see a 60 percent or
more black.  It is literally like the dividing line of black
and much less black population.

      As you follow that boundary around to the central part of
the state through the Black Belt, District 2 turns south and

         1    goes down towards Mobile and Baldwin counties.  You can see

         2    that the map -- and the map that District 2, the boundaries of

         3    it go down around Mobile.  I think we have another map that may

         4    show it in more detail.  But we can illustrate that in this

10:27:57 5    plan the boundaries of District 2 went around Mobile, not

         6    following a city boundary or any other administrative

         7    boundaries.  It just followed the edge of where black

         8    population was and was not.

         9         Similarly, in District 7, you can see that it captures

10:28:18 10   large portions, very carefully captures large portions of black

        11    populations.  And as you go into Birmingham, Jefferson County,

        12    you can see that it nearly perfectly outer bounds only the

        13    exact black population VTDs in the northeast corner of

        14    Birmingham.

10:28:35 15   Q    Why don't we go ahead and look at some of the close-up

        16    maps that you prepared.

        17         Let's look at Map Appendix 9?

        18    A    Right.

        19    Q    What do we see here, Mr. Bryan?

10:28:52 20   A    Sure.  So the dark line, if you can see carefully enough

        21    it's kind of dark black and a purple line.  That's the existing

        22    district boundaries.

        23         The --

        24    Q    Let me interrupt you.  By existing, do you mean the 2011

10:29:08 25   plan?

```
 1   A     Yes.

 2   Q     Okay.

 3   A     Thank you.

 4         The existing 2011 district plan.  And what I have done

 5   here is I have overlaid, again, with a blue outline where the

 6   Hatcher plan boundaries are.  And if you look, what the Hatcher

 7   plan does, is it kind of follows closely along where the

 8   existing districts were, but then I have shown with little blue

 9   dots here where the Hatcher plan did what we call an outer

10   bound.  That is it went beyond the existing districts and

11   grabbed just the precincts that had the highest concentrations

12   of black population.

13         You can see that there are plenty of VTDs surrounding

14   Birmingham that are colored yellow and orange, reflecting lower

15   black population concentrations.  And the plan just really

16   prioritized -- appears to have prioritized making sure that it

17   got the highest black concentration VTDs into the plan.

18   Q     Thank you.

19         Let's look at the next map, Map Appendix 10.

20   A     Sure.

21   Q     What are you showing us with this map, Mr. Bryan?

22   A     Yeah.  So one of the -- in just looking at the data for

23   the new Alabama plan, what I suspected we were going to find is

24   that there were some VTDs -- I did not know where, but there

25   would be some VTDs where there was black population that would
```

be disgorged, displaced, moved out to other districts.

This was the 5 percent of, you know, several thousand blacks that we had talked about earlier today.  And I found this part of Birmingham to be the area where that displacement took place.  I know that was not the intent of the mapmaker. It's an effect of their efforts to draw a more compact plan.

MR. DUNN:  Your Honor, could I ask that he not testify or try to testify as to the intent of the mapmaker?  I don't know how he can possibly do so.

JUDGE MARCUS:  I think the point is well taken.  I don't think that was the thrust of your question in any event, Mr. Davis.

MR. DAVIS:  That's correct.

MR. DUNN:  I don't think it was a problem with the question, Your Honor, but I think it's a problem with the answer.

JUDGE MARCUS:  I understand, Mr. Dunn.  So Mr. Bryan, focus specifically on the question as it's put by Mr. Davis, if you would.  He's asking about appearance rather than intent.

BY MR. DAVIS:

Q    Yeah.  Let me rephrase, Mr. Bryan, and ask you what moves do you see were made in this part of Jefferson County between the 2011 and the 2021 plan?

A    So there is a black and white line across the middle of the map.  And above that black and white line, there are

                  several squares, as opposed to the circles I mentioned earlier.

                  Those squares identify high black concentration VTDs.  Those

                  high black concentration VTDs have previously been in the

                  existing plan or in, as you can see by the location of the new

10:32:43    5     line, those black VTDs are no longer contained in District 7.

                       The black line has the geometry effect of making the

                  boundaries of the district here more compact and more simple.

                  Q    Thank you.

                       Now, let's look at Map Appendix 11, it will be the last

10:33:08   10     map in the Hatcher plan.

                  A    Yep.

                  Q    Tell us what we see here.

                  A    Right.  So this is a view of the Hatcher plan.  You can

                  see in the northern parts, just a little bit of the existing

10:33:23   15     2011 congressional plan.  And so what we're looking at here is

                  a close-up of where the boundaries of District 2 go down into

                  Mobile County in the population that is added to District 2 in

                  this plan.

                       And what we can see is that in the areas surrounding the

10:33:43   20     intersections of District 1 and District 2, that there is lots

                  of VTDs that have very low black populations.  This is

                  represented by red, orange, and yellow areas.

                       And what we see here is that with this plan, District 2

                  extends down into Mobile, again, not following any other

10:34:07   25     administrative or physical geography and grabs only the pieces

1  of Mobile shown in dark black, which represent the highest

2  concentration of black population in the county.

3  Q    These dark green precincts, you mean?

4  A    Yes.  As you can see, especially in eastern Mobile, the

10:34:38  5  line goes down.  There's very low black population to the right

6  edge of that line.  There's very high black population to the

7  left edge of the line.  And if it was one black VTD, I could

8  pass it off as happenstance.  But there's obviously several of

9  those here illustrating that.

10:35:00  10  Q    Thank you.

11      Now, Mr. Bryan, I want to refer you to page 32 of your

12  report, going by the filing number.

13  A    Yes.

14  Q    What is your conclusion, if any, from your analysis of the

10:35:18  15  Hatcher plan?

16  A    In looking at the changes that were made in the two

17  districts that sought to be black majority districts, they

18  appear to be racial gerrymanders because of the way that the

19  lines were drawn to precisely include just black populations

10:35:52  20  and to precisely exclude non-black populations.

21      MR. DUNN:  Your Honor, again, he is straying over into

22  testifying about intent.  I object to that and move to strike

23  the last answer to the extent it does that.

24      JUDGE MARCUS:  Overruled.  He said there appeared to

10:36:19  25  be racial gerrymandering, including blacks in one way,

1   excluding whites in the other way.

2       I didn't take it as bearing on intent.  Overruled.  You

3   may proceed.

4   BY MR. DAVIS:

10:36:32  5   Q    Mr. Bryan, did you review the reports that were submitted

6   in this case by Mr. Bill Cooper and Dr. Moon Duchin?

7   A    I did.

8   Q    And does your analysis appear in a report supplemental

9   report that's been marked as Defense Exhibit 4?

10:36:51 10   A    Yes.

11  Q    Okay.  Did you review the demographics of the plans that

12  Dr. Duchin submitted?

13  A    I did.

14  Q    And this is a summary of one of her plans on page 27 of

10:37:17 15  Defense Exhibit 4.

16  A    That is correct.

17  Q    Okay.  Do Dr. Duchin's plans include two majority-black

18  districts?

19  A    By both metrics of black alone and all black or any-part

10:37:35 20  black, they do.  I would like to acknowledge that I have done

21  an analysis comparing my all black with the any-part black from

22  her reports, and I believe that our statistics are representing

23  her plans match precisely between both of our analyses insofar

24  as the all black and any-part black.

10:37:55 25  Q    Do Dr. Duchin's plans present majority-black districts

| | |
|---|---|
| 1 | when you consider only Voting Age Population? |
| 2 | A    In that case, the answer would be it depends. |
| 3 |     In the -- in this particular -- would you like me to speak |
| 4 | to Duchin plan D, what I see on the screen? |
| 10:38:22 5 | Q    That would be fine.  Let's -- for the record and for the |
| 6 | Court's benefit, you present the demographics of all of her |
| 7 | plans, correct? |
| 8 | A    Yes, I do. |
| 9 | Q    And that begins in the appendix of your -- in Defense |
| 10:38:42 10 | Exhibit 4, it begins on page 25 of Defense Exhibit 4.  Then you |
| 11 | see each of her plans addressed in turn, correct? |
| 12 | A    Yes. |
| 13 | Q    Why don't we ap dress this plan, her plan A? |
| 14 | A    Great. |
| 10:38:57 15 | Q    Tell us whether Dr. Duchin's plan A presents |
| 16 | majority-black districts of Voting Age Population? |
| 17 | A    It does.  By both black alone and any-part black. |
| 18 | Q    And what about her plan B? |
| 19 | A    In this plan, the black-alone statistics do not rise to |
| 10:39:22 20 | meet the majority threshold.  The percent all black, any-part |
| 21 | black statistics in this case do rise to the 50 percent or |
| 22 | greater majority threshold. |
| 23 | Q    Okay.  And C? |
| 24 | A    Yes.  So in this particular case, District 2 does not rise |
| 10:39:46 25 | to the majority threshold for black alone, but it does rise to |

```
 1  majority threshold for all black or any-part black.
 2       District 7 in her plan would be a majority, whether black
 3  alone or all black.
 4  Q    Okay.  And, now, what about plan D or plan 4?
 5  A    Yeah.  So consistent with plan C, in District 2, there's
 6  by black alone, it would be a minority, would not rise to the
 7  majority threshold.  By all black, it is a fair majority of
 8  50.05 percent.  With District 7, they look solid majorities at
 9  50.55 percent black alone and 51.7 for all black or any-part
10  black.
11  Q    Okay.  And next in your report, on the next page,
12  page 28 --
13  A    Yes, sir.
14  Q    -- you start to present demographics of the plans that
15  Mr. Cooper offered?
16  A    Right.  That's correct.
17  Q    All right.  Let's look at his plan 1?
18  A    Right.
19  Q    Does it contain two majority-black districts when you
20  consider Voting Age Population?
21  A    Yes.  In District 2, by the black-alone measure, it does
22  not, but by all black it does.  In District 7, both by all --
23  by black alone and all black, they are definitive black
24  majority districts.
25  Q    Great.
```

```
 1          District -- excuse me.  What about plan 2, does it have
 2   two majority-black districts considering Voting Age Population?
 3   A    Yes, sir.  As with one, black alone in District 2 is not a
 4   majority, all black is.  And District 7, again, has majority by
 5   both black alone and all black or any-part black.
 6   Q    What about for plan 3?
 7   A    In this particular plan, neither District 2 nor District 7
 8   would rise to the 50 percent threshold.  The all black
 9   definition would achieve a majority in District 2 of
10   50.3 percent, and would achieve a bare majority, 50.09 percent
11   in District 7.
12   Q    Plan 4?
13   A    Yeah.  In this case as well, by the black-alone measure,
14   Districts 2 and District 7 would not be a majority by black
15   alone, but would be a majority under all black, District 2, a
16   fair majority, 50.07, and District 7 at 50.09.
17   Q    What about Cooper plan 5?
18   A    Yeah.  So, again, in this case, just as with some of the
19   other plans Cooper has presented, the percent black-alone
20   statistic, you would not rise to a majority in Districts 2 or
21   7, but you would rise to a majority -- more definitive majority
22   in this plan with 50.2 percent all black in District 2 and
23   50.09 percent in District 7.
24   Q    Finally, Cooper plan 6.
25   A    Sure.  Again, in this case, similar to the previous plans,
```

Timestamps: 10:41:35 (line 5), 10:42:00 (line 10), 10:42:22 (line 15), 10:42:49 (line 20), 10:43:10 (line 25)

1  neither his District 2 or 7 rise to be a majority.  They're

2  close, but are not a majority by the black-alone measure, but

3  both of them are majority districts by the all black or

4  any-part black measure.

10:43:31  5  Q    Okay.  By the way, Mr. Bryan, did you find similarities

6  between the plans presented by Dr. Duchin and Mr. Cooper with

7  the Hatcher plan that we discussed earlier?

8  A    There were general similarities, yes.

9  Q    You assess -- did a core retention analysis of the plans

10:43:59 10  that Dr. Duchin and Mr. Cooper presented, did you not?

11  A    Yes, I did.

12  Q    Just generally -- we will not go through all ten plans.

13  A    Okay.

14  Q    Tell us generally how they performed with core retention.

10:44:13 15  A    Sure.  And thank you for that.

16        The performance of the core retention for the Duchin plans

17  are similar with the Hatcher and with many of the features of

18  the Cooper plans as well.  We see especially in District 1 the

19  total population's core retention is relatively low, 64 percent

10:44:34 20  core retention of the blacks is much lower at 32.5 percent.

21  This is consistent with what we found in District 6 as well.

22  And just reflects the significant rearranging of the black

23  population for the effort to create two black majority

24  districts.

10:44:54 25  Q    Okay.  So your core retention analyses begin appearing on

```
 1  page 34?
 2  A     Yes.
 3  Q     If the Court wishes to find details about your analysis,
 4  could they find parts of this sort for each of the plans
 5  presented by Dr. Duchin and Mr. Cooper?
 6  A     There will be -- there are details of the plans and the
 7  core retention throughout my report, yes.
 8  Q     So is it true for all of the plans presented by Dr. Duchin
 9  and Mr. Cooper that they performed more poorly than Alabama's
10  plan in core retention and in the differential treatment of
11  black voters?
12  A     That is true in both regards.  The core retention of the
13  total population in the different Duchin and Cooper plans
14  were -- for the total population were in the 50 percent to
15  60 percent range, compared with the 90 percent for the state of
16  Alabama plans.
17        And then the performance of the black core retention was
18  lower, obviously, because of the rearranging of the black
19  population.  So those numbers were more commonly in the
20  50 percent and sometimes lower range.
21  Q     Did you assess whether the plan submitted by Dr. Duchin
22  and Mr. Cooper created any incumbent conflicts?
23  A     I did.
24  Q     And what did you find?
25  A     I found that the evidence in the Duchin plans was that
```

```
 1    there was not any regard to incumbency in the drawing of the
 2    plans.  So, for example, in plan A, there is an instance where
 3    Representative Sewell, Representative Palmer, Representative
 4    Rogers are all one district, and Representatives Moore and Carl
 5    are in District 1's, leaving three districts unrepresented.
 6         There were similar pairings in each of her plans.  And
 7    there was also pairings in Cooper's plans, as well.
 8    Q    Thank you.  And can the Court find details of your
 9    analysis on page 16 of Defense Exhibit 4?
10    A    Yes.
11    Q    Before we turn to compactness, Mr. Bryan, the transcript
12    will show us precisely what was said, but I believe yesterday I
13    heard Dr. Duchin say or refer to as minority opportunity to
14    elect as a traditional districting principle.  Perhaps to be
15    more clear, she said protecting or preserving minority
16    opportunity to elect.
17         Would you consider any of those things to be a traditional
18    districting principle?
19    A    I have not ever heard that as a traditional or
20    contemporary redistricting principle and I would not agree with
21    that.
22    Q    Thank you.
23         Did you assess compactness of the plans submitted by
24    Dr. Duchin and Mr. Cooper?
25    A    Yes.
```

10:47:04 on line 5, 10:47:23 on line 10, 10:47:50 on line 15, 10:48:07 on line 20, 10:48:21 on line 25

1  Q     Okay.  And in your analyses we found beginning on page 57

2  of Defense Exhibit 4, right?

3  A     Yes.

4  Q     Let's look at Dr. Duchin's plan A.  How does the average

10:48:38 5  score for the entire plan compare to Alabama's plan?

6  A     Generally her plans outperform the Alabama plan across all

7  these metrics.

8  Q     Do each of her districts perform better than Alabama's?

9  Not each plan, but each districts within the plan.

10:48:59 10  A     Right.  Right.  This was something that I noted in her

11  report.  Dr. Duchin presented the summary statistics that you

12  see below in each one of her plans for Polsby-Popper and, I

13  believe, Reock.  She did not in her original report present

14  information on the compactness by district.

10:49:21 15      I understand she may have in a subsequent report, but I

16  did not see that report or those findings.  I refer here only

17  to my own observations and findings from my analysis.

18      My findings and observations in my analysis is that in the

19  districts that were more heavily focused on in order to achieve

10:49:43 20  the two black majority population districts that she said she

21  was seeking to achieve, those districts' compactness suffer

22  tremendously.  They're much lower because they had to be drawn

23  in a very specific way, disregarding other traditional

24  redistricting principles in order to achieve her objective.

10:50:05 25      So you can see here in Districts 1 and 2 in particular,

1  that the compactness scores for her plans in these areas were

2  low.  And it's understandable, given what she was seeking to

3  achieve there.

4       What is notable to me, though, is that compactness was

10:50:26  5  sacrificed in this part of the plan, but compactness was

6  prioritized -- appeared to be prioritized in the drawing of

7  other parts of her plan.

8       So, for example, if you look at Districts 4 and

9  Districts 5, the area that you see in my charts as being

10:50:47 10  highlighted in bright green, those areas were drawn in such a

11  way to significantly improve compactness.  It impacted the core

12  retention of those areas for sure, but it sacrificed core

13  retention for the benefit of compactness.

14       So the overall outcome, the summary statistic of

10:51:10 15  Dr. Duchin's compactness analysis really, I think, masks some

16  important details, which is that compactness took different

17  roles in different parts at different times of the design of

18  her districts.

19  Q    In Districts 1 and 2 in Dr. Duchin's plans, are those the

10:51:30 20  districts that appear in the southernmost part of the state?

21  A    Yes, I believe so.

22  Q    And are 4 and 5 the districts in Dr. Duchin's plan that

23  appear in the northernmost portion of Alabama?

24  A    Yes, I believe so.

10:51:43 25  Q    You present similar analyses of Mr. Cooper's districts, do

1  you not?

2  A      Right.  Yes, I do.

3  Q      And how did the compactness of Mr. Cooper's plans compare

4  to the state of Alabama's?

10:51:57  5  A      Generally, they were poorer performing compactness

6  compared to the state of Alabama.

7  Q      I will represent to you, Mr. Bryan, that Mr. Cooper

8  presented an additional plan in a supplemental report.  Was

9  that available at the time you prepared this report?

10:52:15 10  A      No.

11  Q      So you have not analyzed districts -- Cooper's plan

12  number 7 in this report, correct?

13  A      I am aware of the report.  I have not analyzed the report.

14  Q      Thank you.

10:52:36 15        Let's look now at some of the maps you prepared.

16        Showing you now Map Appendix 5, which appears on page 68

17  of Defense Exhibit 4.  Would you tell us what this map shows

18  us, Mr. Bryan?

19  A      Sure.  So this map shows, again, kind of the dark

10:53:04 20  outlines, the dark contours here.  Those are the outline of

21  existing historic 2011 congressional districts.  And then there

22  is a lighter green outline that shows the outline of Duchin

23  plan A overlaid with the existing historic Alabama plan.

24  Q      Thank you.

10:53:30 25        So you can see the lines here of the 2011 Alabama plan and

1   Dr. Duchin's plan A, correct?

2   A     Yes, that is correct.

3   Q     Then next, in Map Appendix 5A.  What do you present?

4   A     Can we go back to the previous map for a moment?

10:53:51  5   Q     Yes.

6   A     Okay.  And so I want to make an additional comment here on

7   compactness.

8   Q     Yes.

9   A     Districts 4 and 5 in the northern part of the state really

10:54:09 10   have nothing to do with the objective of achieving two black

11   majority districts, which I heard and understand to have been

12   the overriding objective of the plan.

13       So in looking at this map, in looking at the existing

14   Districts 4 and 5 and the new Districts 4 and 5, I do not see

10:54:33 15   any other reason for the new Districts 4 and 5 as being drawn

16   except for potentially for the purposes of compactness.  They

17   were unrelated to the objective of the black majority district

18   drawing.

19       I just wanted to state that as an observation.

10:54:51 20   Q     In the various plans you have reviewed, whether it's the

21   Hatcher plan or Mr. Cooper's plan or Dr. Duchin's plan, have

22   you seen any of them draw African-American population from say

23   the northernmost third of the state in order to populate their

24   majority-minority districts?

10:55:10 25   A     I have not.

```
 1  Q    Okay.  Let's go on now, then, to Map Appendix 5A.
 2  A    Yes, sir.
 3  Q    Tell us what you are showing us in these maps.
 4  A    Sure.  Yeah.  So this -- this map presents Dr. Duchin's --
10:55:29 5  can you please zoom out?  Thank you.
 6       This map shows Dr. Duchin's plan A outlined in black
 7  outline overlaid with the percent black-alone Voting Age
 8  Population by VTD in Alabama.
 9  Q    Okay.  And did you present the same two maps --
10:56:05 10  A    Sure.
11  Q    -- for each of the plans presented by Dr. Duchin and
12  Mr. Cooper?  First the map comparing the 2011 plan with
13  whichever plan plaintiffs' expert is presenting, followed by a
14  map of defendants' experts plans overlaid with VTDs color coded
10:56:25 15  by concentration of African-American population?
16  A    Yes, that's the process.
17  Q    So those will all appear in the map appendices should the
18  Court wish to review them for any plan?
19  A    Yes.
10:56:40 20  Q    I will refer you to page 19, Defense Exhibit 4, Mr. Bryan.
21       Tell us, as a demographer, what is your overall conclusion
22  after analyzing the plans presented by Dr. Duchin and
23  Mr. Cooper?
24  A    I think there's really two key takeaways.
10:57:16 25       The first one is that they use -- they're able to use
```

 1   sub-county geography in order to achieve a balanced population,

 2   and more often than not, to achieve a black majority population

 3   in two districts.  Again, it's depending on the definition, the

 4   exact plan.  But generally, that's what they were able to

10:57:42  5   accomplish.

 6       In achieving that, there were other traditional

 7   redistricting principles that were generally sacrificed.  And

 8   by that, I mean there were cases where there is less

 9   compactness, the core retention is sacrificed significantly.

10:58:07 10       So, therefore, the continuity of representation because of

11   the cracking and packing of the incumbents and then the --

12   mostly based on the -- mostly based on the incumbents, but also

13   based on the core retention analysis, there is a significant

14   impact to the continuity of representation in these plans.

10:58:31 15       And so I would say on the whole, that there were numerous

16   traditional redistricting principles that were traded off,

17   sacrificed in the pursuit of these other goals.

18   Q    I want to go back to the map we were reviewing a moment

19   ago.  Map Appendix 5A.

10:59:07 20   A    Sure.

21   Q    In which -- Dr. Duchin's plan A.

22       Mr. Bryan, as a demographer, as one who is drawn and

23   critiqued many redistricting plans, are you aware of any

24   redistricting criteria that would lead a map drawer to draw

10:59:33 25   this congressional map than by Dr. Duchin's plan A?

```
 1   A     I'm not aware of a traditional or combination of
 2   traditional redistricting principles that would lead this to be
 3   drawn in this precise way.
 4   Q     Okay.  Are you aware of any need that Mobile County in
 5   order to follow the traditional districting criteria of
 6   compactness triggers?
 7   A     Can you please restate the question?
 8   Q     Yes, of course.
 9         Would a desire to make districts compact lead a map drawer
10   to split Mobile County?
11   A     No.
12   Q     No.  Would a desire to preserve communities of interest
13   preserve -- lead a map drawer to split Mobile County?
14   A     No.  My research would suggest it would not.
15   Q     Do you need to split Mobile County in order to avoid
16   putting incumbents in the same district?
17   A     No.
18   Q     Do you need to split Mobile County to preserve the core of
19   existing districts?
20   A     No.
21   Q     Do you need to split Mobile County to equalize population
22   among the districts?
23   A     No.
24   Q     Your experience as a demographer, Mr. Bryan, do you see
25   anything that would lead a map drawer to draw this map other
```

10:59:58  (line 5)
11:00:14  (line 10)
11:00:32  (line 15)
11:00:42  (line 20)
11:01:01  (line 25)

```
 1  than a desire to divide voters by race in order to draw two

 2  majority-black districts?

 3  A    I do not.

 4  Q    Would you give the same answers if we went through each of

11:01:20  5  these maps of Dr. Duchin's and Mr. Cooper's plans?

 6  A    Yes.

 7  Q    Mr. Bryan, in your opinion, as a demographer, have the

 8  Caster and Milligan plaintiffs proven that it is possible to

 9  draw two majority-black districts without splitting Jefferson

11:01:47 10  and Mobile counties along racial lines?

11  A    No.

12  Q    In your opinion, as a demographer, have the plaintiffs

13  proven that it is possible to draw two majority-black

14  congressional districts in Alabama without sacrificing

11:02:02 15  traditional districting criteria?

16  A    No.

17         MR. DAVIS:  Your Honor, may I have a moment to consult

18  with my colleagues?

19         JUDGE MARCUS:  You sure can.

11:02:12 20         (Counsel confers with co-counsel.)

21         MR. DAVIS:  We have no further questions for Mr. Bryan

22  at this time, Judge Marcus.  Thank you.

23         JUDGE MARCUS:  All right.  Thank you very much.  We

24  will take a break for lunch now and reconvene at 1:10 Central

11:02:45 25  Standard Time.  It's a little less than an hour and 10 minutes
```

```
 1  from now.  That would be 2:10 eastern time.  Do I have that
 2  right?
 3              MR. DUNN:  No.  I think it's 12 -- 11:00 Central.
 4              JUDGE MARCUS:  I'm sorry.  So we're -- right now you
 5  are 11:00 o'clock Central Standard Time.  So we really do have
 6  some time to proceed with cross.  Are you ready to proceed,
 7  Ms. Khanna?
 8              MS. KHANNA:  I am, Your Honor.
 9              JUDGE MARCUS:  All right.  Let's proceed with
10  cross-examination.
11              MS. KHANNA:  If you will give me one moment.
12              JUDGE MARCUS:  Do you want a short break, a 5-minute
13  break?
14              MS. KHANNA:  I think I can jump in.  Just give me
15  two seconds to get my notes in order.
16         All right.  I think I am ready to go.
17              JUDGE MARCUS:  Thank you.  You may proceed.
18                        CROSS-EXAMINATION
19  BY MS. KHANNA:
20  Q    Good morning, Mr. Bryan.
21  A    Good morning.
22  Q    My name is Abha Khanna.  I don't think we have met before,
23  and I met with, I think, the Caster plaintiffs in this case.
24  A    It's a pleasure to meet you.  Thank you.
25  Q    Same here.  So you produced two reports in the cast -- in
```

Timestamps: 11:03:12 (line 5), 11:03:26 (line 10), 11:03:39 (line 15), 11:04:29 (line 20), 11:04:38 (line 25)

```
 1  the Caster case; is that right?

 2  A    Yes.

 3  Q    And that was the first one, I believe is marked

 4  Defendants' Exhibit 2 on December 10th, and the second marked

 5  Defendants' Exhibit 4 on December 20th; is that right?

 6  A    That sounds right.

 7  Q    And just to clarify.  You have not seen any of the Caster

 8  plaintiffs' expert reports at the time you submitted your first

 9  report in this Caster case; is that right?

10  A    I don't believe so.

11  Q    And you had not seen any of Mr. Cooper's illustrative

12  plans at the time you first submitted or submitted your first

13  report in this case; is that right?

14  A    No, I did not see either Mr. Cooper or Dr. Duchin's plans

15  until later in the case.

16  Q    So only -- so later in the case is -- during your

17  supplemental report, that's the only time --

18  A    Yeah.

19  Q    -- where you actually analyzed any of Mr. Cooper's plans;

20  is that right?

21  A    Yeah.  Uh-huh.

22  Q    Did you provide any response or analysis regarding

23  Dr. Palmer's expert report on racially polarized voting?

24  A    No.  I have no -- I am not a political scientist.  I offer

25  no opinion on any of the political science related reports.
```

Timestamps in left margin: 11:04:53 (line 5), 11:05:09 (line 10), 11:05:25 (line 15), 11:05:37 (line 20), 11:05:58 (line 25)

```
 1   Q     And you don't provide anything to refute Dr. Palmer's
 2   conclusions regarding the performance of black-preferred
 3   candidates in any of Mr. Cooper's illustrative plans; is that
 4   right?
 5   A     No.
 6   Q     You also don't dispute any of Mr. Cooper's analyses on
 7   socioeconomic disparities between blacks and whites in Alabama?
 8   A     No.
 9   Q     And nor do you address any of the conclusions in
10   Dr. Bridgett King's report relating to the history of
11   discrimination in Alabama?
12   A     No.
13   Q     So you have been retained as an expert on behalf of the
14   Secretary of State in this case; is that right?
15   A     Yes.
16   Q     When were you first retained?
17   A     I do not know the exact date that I was retained.  Is that
18   something I can consult with my colleagues to get an exact
19   date?  Is that necessary?  It's --
20   Q     I don't need an exact date.
21   A     -- three months this fall, you know.  I apologize.  I
22   don't have the precise date.  It's been probably about three
23   months ago when I was originally contacted on the case.
24   Q     Do you know if it was before or after the congressional
25   plan for Alabama was adopted and enacted on November 4th?
```

Timestamps: 11:06:10 (line 5), 11:06:27 (line 10), 11:06:40 (line 15), 11:06:59 (line 20), 11:07:24 (line 25)

1   A    I would have had conversations about the case before the

2   enacted plan, but I could not have begun the work on the plan

3   until after that date.

4   Q    And do you know if it was before or after mid August, when

11:07:47 5   the census data was released?

6   A    It would have been after mid August.

7   Q    Mr. Bryan, this is your first time testifying in a federal

8   court; is that right?

9   A    That's correct.

11:07:59 10   Q    Or in any court?

11   A    Yes.

12   Q    So in your report, and I think several times during your

13   testimony as well, you mentioned that we observed this or you

14   referred to our analysis.  Did anyone else assist you in

11:08:15 15   preparing your analysis in this case?

16   A    I have -- I own a company and I have an analyst and a

17   director of analytics that help me execute some of the

18   technical parts of my analytics.

19   Q    So when you refer to we or our conclusions, are you

11:08:35 20   referring to anyone other than your own analyses and

21   conclusions?

22   A    The conclusions, the interpretation of those are mine and

23   mine alone.

24   Q    And I believe you mentioned during your direct examination

11:08:47 25   that you're not a political scientist, but you have often

| | |
|---|---|
| 1 | worked with political scientists? |
| 2 | A    That's correct. |
| 3 | Q    Consulted -- |
| 4 | A    Yeah. |
| 11:08:56 5 | Q    Were there any political scientists that you consulted in |
| 6 | preparation for your work in this case? |
| 7 | A    Not that I consulted for my work, no.  There is another |
| 8 | political scientist who is working on the case, but my work was |
| 9 | not done in correspondence with his work in this case. |
| 11:09:19 10 | Q    I am going to turn to your census demography analysis.  I |
| 11 | am looking at page 5 of your supplemental report.  Here you |
| 12 | include -- I think we can pull it up as well. |
| 13 | A    Yeah.  Thank you. |
| 14 | Q    I think here you include -- you see at the top? |
| 11:09:46 15 | A    Yeah. |
| 16 | Q    The title Census Race Definitions; is that right? |
| 17 | A    Yeah, that's correct. |
| 18 | Q    Okay.  And if I am reading correctly in the first |
| 19 | paragraph of -- on this page, you say here that you were -- you |
| 11:09:59 20 | tried to define and document the true black population of the |
| 21 | two black districts in each of plaintiffs' illustrative plans? |
| 22 | A    Yeah, that's correct.  Uh-huh. |
| 23 | Q    And you also note that it was unclear why here plaintiffs |
| 24 | refer to undocumented voting strength statistics rather than |
| 11:10:20 25 | census Black Voting Age Population. |

1          Did I read that correctly?

2     A     Yeah.  That's correct.

3     Q     Can you explain what you mean by undocumented voting

4     strength statistics?

11:10:32 5     A     Yeah.  Typically, in cases like this, when we're measuring

6     the performance, the racial performance and characteristics of

7     a district, we would use the decennial census data that are

8     used by law to define, draw, and characterize a district.

9          I typically would not use, at least for the design and

11:10:54 10     characterization of a plan, would not ever use the voting

11     strength or voting characteristics or voting behavior.  We

12     typically leave that to the political scientists to focus on

13     that.

14          So when the plaintiffs have a chance and they have the

11:11:13 15     opportunity to characterize the plan by the race data that is

16     from the census and use voting data instead, that was

17     inconsistent to me.  I understood it, but it was inconsistent.

18     Q     So was it your position that Mr. Cooper used undocumented

19     voting strengths statistics in creating any of his or

11:11:39 20     evaluating any of his illustrative plans in his report?

21     A     I just -- insofar as it's undocumented, I didn't see where

22     they came from.  I have no -- because we don't use those in our

23     analysis, I have no ability to verify those.  And we did not

24     analyze those, so I can't speak to those statistics or why he

11:11:58 25     used them.

```
 1    Q    Can you explain what specific statistics you are referring
 2    to in Mr. Cooper's report?
 3    A    I cannot.  I would have to go -- pull up a copy of his
 4    report and look at it in some detail to answer that.  But I
 5    would stand by my assertion that we would focus exclusively on
 6    the census data that is the public law data and not on any
 7    voting related data for the design and characterization of a
 8    plan.
 9    Q    But it's your understanding that Mr. Cooper used voting
10    strengths statistics in his illustrative plans or in his
11    reports?
12    A    Yeah.  Among other things, yes.
13    Q    And can you give me an example of what a voting strength
14    statistic would be?
15    A    Yeah.  I would have to pull up his report to make a
16    specific reference to it, but it's generally a characterization
17    of the number or the percent of the population that by race
18    voted in a particular way.
19    Q    So your understanding of voting strength statistics is
20    something that measures the voting behavior of individual
21    voters in the state; is that right?
22    A    Yeah.  I would be very cautious since I am not a political
23    scientist and I do not study those statistics or use those
24    statistics in my analysis, I would not want to represent myself
25    as someone who has deep expertise in voting strength by race
```

11:12:14  5
11:12:32 10
11:12:44 15
11:13:03 20
11:13:20 25

1   and recognize it.  I know what it is, but I am not an expert in

2   it and I don't use that in my analysis.

3   Q    Do you dispute that Mr. Cooper used census data in

4   constructing or in evaluating his illustrative plans as

11:13:39 5   reported in his expert reports?

6   A    He did use some census data, yes.

7   Q    Used some census data?

8   A    Beg your pardon?

9   Q    Did you say he used some census data?

11:13:50 10  A    He did, in some cases correctly, and some cases

11  incorrectly, but, yes, he has tables of census data in his

12  report.

13  Q    Do you have an example of a place where he has used census

14  data incorrectly?

11:14:06 15  A    Yeah.  May I refer to a part of my report?

16  Q    Sure.

17  A    Thank you.  I am reading from my report.

18       In his plan 4, he reports the total population

19  incorrectly.

11:14:40 20       In plan 5, he reports total population by district

21  incorrectly.

22       He reports the -- in plan 5 VAP population incorrectly.

23  While those numbers were incorrect, his reported percent VAP

24  black and percent white were reported correctly.  So his tables

11:15:04 25  had internal inconsistencies.

         1          Let's see.  In his plan 6, the VAP population 18 plus is

         2    reported incorrectly.  And his VAP 18 plus population is also

         3    reported incorrectly.  So there were places where there was

         4    inconsistencies within and across his different census tables.

11:15:28 5    I was able to identify with my analysis of the census data.

         6    Q    I understand.  Thank you for the clarification.

         7    A    Thank you.

         8    Q    Were you present or were you in trial -- in our Zoom trial

         9    when Mr. Cooper testified?

11:15:41 10   A    I was not.  I was not present and I do not know anything

        11    about his testimony.

        12    Q    So you didn't hear him explain that the figures that you

        13    just talked about in his report were actually typographical

        14    errors that are accurate in the exhibits attached to his

11:15:59 15   report?

        16    A    No.

        17    Q    Did you measure the -- did you evaluate the data as

        18    reflected in the exhibits, the detailed exhibits attached to

        19    Mr. Cooper's report?

11:16:08 20   A    No.  I didn't examine any subsequent exhibits.  And in

        21    this business, if it's an error, it's an error.  Whatever the

        22    explanation or the root cause of it is, it is either right or

        23    it's wrong.  And when I refer to his report, I saw the numbers

        24    and they were not correct.

11:16:23 25   Q    So you are familiar, I imagine, that when Mr. Cooper

1  submitted his first report, he included with it a number of

2  detailed exhibits with charts, tables, and maps, correct?

3  A    Yeah.  I recalled that there are those exhibits, yes.

4  Q    Those were not subsequent to his initial reports, those

11:16:41 5  were alongside his report?

6  A    Yeah.  I am recalling.  I believe so.

7  Q    And you did not review those exhibits in evaluating his

8  plans; is that correct?

9  A    I only reviewed the detailed -- the maps and the census

11:16:57 10  data characteristics of his plans.

11  Q    I just want to make sure I am clear.

12  A    Yeah.

13  Q    When you discuss the data in his report, you only looked

14  at his written report, the declaration, not the exhibits

11:17:13 15  detailed, the census data, the maps that were attached to that

16  report?

17  A    Right.

18  Q    And the same would be true of his supplemental report, you

19  reviewed only his report, but not any of the exhibits attached

11:17:29 20  to it?

21  A    I mean, I -- I reviewed the -- all of the pages that were

22  in his supplemental report, but focused on the data.  Again, I

23  did not examine his plan 7.  I didn't have time to when I was

24  preparing here.

11:17:48 25  Q    Okay.

```
 1   A     Thank you.

 2   Q     Going back to the quote that you have on page 5 of your

 3   report, Defendants' Exhibit 4, where you say it's unclear why

 4   the plaintiffs referred to undocumented voting strength

 5   statistics rather than census Black Voting Age Population.

 6             JUDGE MARCUS:  Let's take our time and read it more

 7   slowly if you would, Ms. Khanna.

 8             MS. KHANNA:  My apologies.  I certainly will.

 9   BY MS. KHANNA:

10   Q     So you see --

11             JUDGE MARCUS:  You want to read from 3, Census Race

12   Definition?

13             MS. KHANNA:  I'm not sure I understand.  I can read

14   the highlighted language again.

15             JUDGE MARCUS:  I thought you were reading some of it.

16   I may have misunderstood.

17             MS. KHANNA:  I probably was.  I will say it again.

18   BY MS. KHANNA:

19   Q     So here, Mr. Bryan, where you say, It is unclear why here

20   plaintiffs refer to undocumented voting strength statistics

21   rather than census Black Voting Age Population.  Did I read

22   that right?

23   A     Yeah.  That seems to be right.

24   Q     You don't dispute that the census reports the any-part

25   Black Voting Age Population, do you?
```

1  A     Reports it in great detail of course, yes.

2  Q     So the any-part Black Voting Age Population reported in

3  Mr. Cooper's plan is, in fact, census Black Voting Age

4  Population under your definition, correct?

11:19:21 5  A     It's a definition.

6  Q     Do you understand that to be census Black Voting Age

7  Population as you used that term here?

8  A     When I refer to census Black Voting Age Population, I

9  refer to it in the context that I discussed earlier, which is a

11:19:44 10  range of values from black alone to any-part black or all

11  black, depending on the analysis and the context, including

12  some internal definitions within that, that the DOJ advocates,

13  such as black alone or black plus white.  I do not refer to any

14  one specific precise Black Voting Age Population here.  I just

11:20:09 15  refer to it in the context of census data that describes Black

16  VAP.

17  Q     Okay.  Thank you for that clarification.

18  A     Yes.  For sure.

19  Q     If we can go to -- turn to page 6 of this report.

11:20:22 20  Defendants' Exhibit 4.

21        Here you observed the different absolute numbers and

22  percentages of the black-alone population and then the black

23  alone in combination population, correct?

24  A     Yeah, that's correct.

11:20:35 25  Q     And I believe you touched on this with Mr. Davis, but do

1  these categories correspond to what we've also talked about as

2  the single-race black population and the any-part black

3  population?

4  A    Yes.  That's correct.  That's consistent.

11:20:49 5  Q    And you note that -- let me see -- you note in the first

6  paragraph here that the latter category, the any-part black

7  population is 1,364,736 people.  Did I read that correctly?

8  A    Yeah, that's correct.

9  Q    And that comprises 27.2 percent of the population?

11:21:19 10  A    That's correct.

11  Q    And you also say that this represents an additional 68,574

12  blacks, compared to the number of people in the black-alone

13  category?

14  A    That's correct.

11:21:33 15  Q    And those 68,000 people comprise about 5.08 percent of the

16  total Alabama black population?

17  A    Yes, that is correct.

18  Q    Mr. Bryan, you don't dispute, do you, that those 68,574

19  blacks are, in fact, black, do you?

11:21:58 20  A    Black is a measure of self identification.  There are

21  people who identify themselves as being black and black alone.

22  And there's people who can self identify as being black and

23  black in combination with other races.

24     I do not have any experience or knowledge of the

11:22:22 25  identification of people in combination with other races.  What

1  they may answer is their prevailing characteristic.  All I know
2  is those people identify as at least being some part black.
3  Q    So all of those 68,574 people identify as black?
4  A    As one of their racial characteristics, yes.
11:22:47 5  Q    And as you state here, the total Alabama black population
6  is 1,364,736, that more inclusive figure, correct?
7  A    That is correct, yes.  And that's a very interesting
8  number in demography a number that has changed dramatically in
9  the last decade, which is why it has it has particular
11:23:13 10  relevance in the redistricting case today.
11  Q    And as in the next paragraph, you also provide that the
12  Alabama Black Voting Age Population is 1,014,372 people
13  correct?
14  A    That looks correct, yes.
11:23:35 15  Q    And that's inclusive of black alone and anyone else who
16  identifies themselves as black?
17  A    That's right.
18  Q    Let's turn to the next paragraph down here, and
19  specifically there is a sentence here where you say, and I will
11:23:51 20  read it out loud, The alone definition is one of the most
21  consistently used history -- one -- sorry -- is the one most
22  consistently used historically in VRA cases?
23  A    Yeah.
24  Q    Because A, a multi-race classification did not exist prior
11:24:08 25  to 2000; and, B, the alone definition has been most defensible

1  from the political science *Gingles II* voting behavior

2  perspective?

3  A    Yeah.

4  Q    Did I read that correctly?

11:24:17 5  A    That is correct.

6  Q    Okay.  I want to break this down into its component parts.

7  A    No problem.

8  Q    Let's talk first about the subject subheading A here.

9        In 2000, the U.S. Census Bureau added the option for

11:24:31 10  people to choose more than one race on their census form; is

11  that right?

12  A    That's correct.

13  Q    And before that, an individual had to select one and only

14  one race?

11:24:40 15  A    That's right.

16  Q    So are you suggesting here that because there was no

17  any-part black category before 2000, we should not count the

18  any-part black category in 2021, even though the census now

19  calculates that figure and has for the last two decades?

11:25:01 20  A    I want to be careful and precise with my language here.

21        I'm not advocating that any one measure should or should

22  not be used for the purpose of *Gingles II* or for how a

23  political scientist would use it, and there's nothing in

24  history that would create a precedent for if and how different

11:25:26 25  definitions should be used today.  I base my comment on my

1  experience and working with professional political scientists,

2  and when we ask me for demographic data for the purpose of

3  doing their work, their characterization to me is that there is

4  a race group that is race alone, it is easier for them, and it

11:25:50 5  is more defensible for them to try and do their political

6  science work for a homogenous racial population than a more

7  heterogenous more probably defined racial population.  And that

8  is what -- the comment that I make is based on that experience.

9  Q    And, again, was there any particular political scientist

11:26:11 10  who you were directing this information in your report?

11  A    I have worked with multiple political scientists

12  throughout my career.  And I have heard this is a frequent

13  request and frequent feedback to me in their work.

14  Q    Did any particular political scientist request this

11:26:28 15  information for your report in this case?

16  A    The political scientist in this case was Trey Hood.  I did

17  not provide my data to him directly, but I assume that it made

18  its way to him.  I worked with Mr. Trey Hood in the past.

19  Q    You would agree that the Voting Rights Act protects

11:27:01 20  African-American voting strengths -- voting rights; is that

21  right?

22  A    Yes, that's what it does.

23  Q    That was before 2000?

24  A    Yes.  Since its inception.

11:27:12 25  Q    And it's certainly true today?

```
 1  A     Yep.
 2  Q     So let's say we have a black Alabama resident who is both
 3  black and Asian.  Let's say before the 2000 census when they
 4  had to choose one race, they selected black?
 5  A     Right.
 6  Q     You would agree that the person -- that person would be
 7  considered black for purposes of Section 2 of the Voting Rights
 8  Act?
 9  A     At that time, yes.
10  Q     Okay.  So let's say that after the 2000 census, they now
11  have the option to choose more than one race, they choose both
12  black and Asian, which is an accurate representation of their
13  heritage, correct?
14  A     Yep.
15  Q     Is it your position that that person would no longer be
16  considered black for purposes of the Voting Rights Act?
17         MR. DAVIS:  Your Honor, I'd like to pose an objection
18  to this question.  Ms. Khanna is asking how Mr. Bryan would
19  view this one thing, but asking him whether a person is of
20  which race for purpose of the Act, I believe is calling for a
21  legal conclusion from Mr. Bryan.  And he does not purport to be
22  an attorney.
23         JUDGE MARCUS:  Ms. Khanna, are you asking for a legal
24  conclusion?
25         MS. KHANNA:  I am not, Your Honor.  I am really trying
```

1  to understand what Mr. Bryan considers to be black under

2  this -- under the various classifications before and after

3  2000.

4          JUDGE MARCUS:  I think you should rephrase your

11:28:35 5  question.  The objection is sustained as to the form.

6          MS. KHANNA:  Thank you, Your Honor.

7  BY MS. KHANNA:

8  Q    Is it your position, Mr. Bryan, that this person would --

9  should -- would no longer be considered black when evaluating

11:28:55 10  whether a -- whether a district that includes this person is

11  majority black?

12  A    Again, I would leave that to an interpretation by the

13  political scientists, and I would also defer an interpretation

14  to the guidance that was recently provided by the Department of

11:29:17 15  Justice.  The Department of Justice's recent guidance -- I

16  don't have it in front of me -- but advocates starting with the

17  race alone, and then expands that definition procedurally to

18  include black and -- black and white.  And then as a next

19  extension to black in combination with any other races.  I'm

11:29:41 20  not an attorney, and I am not a political scientist.  I do not

21  know what the triggers are for each one of those steps in the

22  progression to the different definitions, and I am not in a

23  position to state whether one definition is right or wrong.

24  Q    Thank you.  I appreciate that.

11:29:58 25  A    Thank you.

Q    Is it your position, Mr. Bryan, that the effect of adding
the multi-race option to the census in 2000 would be to shut
out individuals from belonging -- multi-race individuals from
belonging to any racial group?

A    Since I worked at the Census Bureau during the development
of that question, I can say that that is not the case.  The
objective of adding race was to -- as part of the question
development program in the 1990s was to try and give people in
a rapidly developing more dynamic more diverse universe that we
live in the United States the opportunity to self identify
whatever they were.

     Now, that did not decide or preclude how that data would
end up being used in law or how that data would end up being
used by political scientists.  At the time, the intent of that
question was to afford people the opportunity to identify
personally as accurately as possible all the different things
that they possibly could self identify that they were.

Q    Understood.

     I want to move to the second -- the part B quote that we
read from your report.

A    Great.

Q    This is where you state that, The alone definition has
been most defensible from a political science/*Gingles II* voting
behavior perspective?

A    Yeah.

```
 1  Q    As you mentioned several times, you are not a political
 2  scientist, correct?
 3  A    No.  No.
 4  Q    And you are not offering an opinion in this case on the
 5  Gingles II voting behavior?
 6  A    Definitely not.
 7  Q    You don't cite any political scientist for this statement
 8  that the black-alone definition is most defensible, correct?
 9  A    No.  There's no literature that I refer to, only my
10  personal experience with numerous cases and interacting with
11  political scientists.
12       It is also grounded in just basic demographic analytic
13  concept, which is that any time you have a group that is more
14  homogeneous, uniform in their characteristics, it is easier to
15  analyze and understand their attitudes, their beliefs, their
16  behaviors, and the rest of their characteristics.  Yes, it is a
17  universal demographic truth that the more homogenous population
18  you have the better job you can do with that.
19       The more that you add heterogeneity to this homogenous
20  population, that is people with different characteristics, they
21  may have part or one characteristics, but then they have parts
22  of other characteristics, whether it's in political law or
23  sociology or anthropology, it is harder and harder the more
24  heterogeneity you add to a group to understand consistently and
25  reliably their attitudes, beliefs, and behaviors.
```

Timestamps: 11:31:37 (line 5), 11:31:54 (line 10), 11:32:16 (line 15), 11:32:38 (line 20), 11:32:57 (line 25)

```
 1    Q    So the testimony you just provided about attitudes and
 2    behaviors of various voting groups, that's just your opinion;
 3    is that correct?
 4    A    That's correct.
 5    Q    That's not informed by any specific expertise that you
 6    have in voting behavior or political science, correct?
 7    A    Has no grounding in my own personal experience with voting
 8    behavior.  It's only what the expertise provided to me by
 9    political scientists I work with.
10    Q    So when you say in your report that the black alone is
11    most defensible, you were just basing that on your own beliefs
12    and observations?
13    A    No.  I have been in cases where plaintiffs have presented
14    a black-majority population that was 49 percent black, for
15    example, black alone, and only achieved majority status of
16    greater than 50 percent by adding the black in combination with
17    other races.  And some of those cases where you don't quite
18    have a black majority because you only have black alone of less
19    than 50 percent have turned into what I have witnessed to be
20    hard fought battles.
21    Q    You don't cite any of the cases in your report, do you?
22    A    No, that wasn't the point of my report.
23    Q    But when you characterized the use of the black-alone
24    figure as most defensible, you are basing this on some cases,
25    perhaps, some information that you have that you have not
```

1  cited, correct?

2  A    That's correct.

3  Q    You don't point to a single case in your report that has

4  used the black-alone definition in determining whether the

11:34:40 5  first *Gingles* precondition is satisfied, do you?

6  A    No.  And to me, it doesn't matter.  This is the land of

7  the political scientists, and it's a reflection of my

8  experience with them.  I don't advocate one as being right or

9  wrong.  The breadth -- this is a secondary passing comment

11:34:58 10  about the facts of my professional experience in this field.

11  The reason that I present black alone and black in combination

12  is to provide full, complete, context and understanding of the

13  race alone and race in combination to help me better understand

14  plaintiffs' representation of the black population, which is

11:35:20 15  almost always not documented, inaccurate, or incomplete.  That

16  is why we do the complete job that we do.  Not to try and prove

17  a point about *Gingles II*.

18  Q    I really appreciate that clarification.  And I understand.

19  A    Thank you.

11:35:32 20  Q    What you just mentioned, that that was just a passing

21  comment in your report.  I am sure you understand that we

22  have -- I need to ask you:  You wrote in your report that this

23  is the most defensible, and as I understand you saying now, you

24  actually don't mean to be concluding whether one is

11:35:49 25  defensible -- one use of a metric is defensible or better; is

1  that right?

2  A    That is correct.  I am not -- I am definitely not making a

3  judgment that one is right or wrong or better or worse.

4  Q    And you have cited -- or can cite no authority whether

11:36:07  5  it's legal precedent, demographics, and political science that

6  the notion that the black-alone definition is the most

7  defensible, correct?

8  A    No.  Personal experience.

9  Q    You mentioned the DOJ guidance, and we can turn to that

11:36:22 10  now.

11  A    Sure.

12  Q    Because you do -- you quote that paragraph on page 6 of

13  your supplemental report.

14  A    Yeah.

11:36:31 15  Q    This is from the DOJ's guidance under Section 2 of the

16  Voting Rights Act for redistricting in method of electing

17  government bodies?

18  A    That's right.

19  Q    And if I am reading it correctly, this guidance provides

11:36:48 20  for two steps in determining who belongs in which racial

21  category for purposes of Section 2 of the Voting Rights Act,

22  correct?

23  A    Yes.  This is -- that's right.  That's their guidance.

24  That's correct.

11:37:02 25  Q    So let's just walk through this.  Can you please read

```
 1   aloud the first two sentences of the block quote DOJ guidance
 2   that you report?
 3   A    Yeah.  The department's initial review based on
 4   allocation, any response that includes white and one of the
 5   five other race categories identified in the response.
 6        I should state that while that is the guidance, the
 7   incremental white to black population, for example, is almost
 8   always very small and is rarely used.  But this is the
 9   guidance, yes.
10   Q    And can you please read the second sentence of that
11   paragraph, as well?
12   A    Sure.  Yeah.  My pleasure.
13        Thus, the total numbers for black, Asian, American Indian,
14   Alaska native, native Hawaiian or some other race reflect
15   single race in combinations with minority and white.
16   Q    I'm sorry.  Were you reading right from the DOJ guidance
17   there?
18   A    I'm sorry?
19   Q    I'm looking specifically at the block quote that you
20   include in your report.
21   A    Yeah.  Uh-huh.  That's what I was reading.
22   Q    Okay.  And it says that the total numbers of black
23   African-American as well as the other minority groups?
24   A    Yep.
25   Q    Reflect the total of the single-race responses and the
```

multiple responses in which an individual selected a minority

race and white race.  Correct?

A    That's correct.

Q    So just to make sure I'm understanding this first step

11:38:49  correctly under the DOJ's initial review, they count the total

number of black population to mean the number of people who

identified as single-race black, plus those who identified as

both black and white; is that right?

A    That's right.

11:39:08  Q    And that's just step one?

A    Yes.

Q    So already step one, we have the DOJ would count more than

just the black-alone category?

A    I would say in a DOJ VRA case, this is the guidance that

11:39:27  they would use, and my experience many of these cases do not

follow the DOJ guidance.  But in a DOJ VRA case, yes, this is

their road map.

Q    And this is the guidance you thought was important to

provide as authority in your report, correct?

11:39:42  A    Well, it's important context to know what all the

different rules are, provide all the information for how people

think about race.  And that's the purpose of this section of my

report, to provide all the information to give clear ideas of

what the different rules are, depending on what the work is

11:39:58  you're trying to accomplish.

```
 1   Q    Okay.  Great.  Can you read the second part, the last two
 2   sentences of that block quote from the DOJ guidance, which I
 3   think goes on to the second step?
 4   A    Yeah.  So where I see there's significant numbers to such
11:40:14 5   responses, the department will as, as required by OMB allocate
 6   those responses on an iterative basis to each of the component
 7   single-race categories for analysis.
 8   Q    And the sentence before that says that the department will
 9   then move to the second step in its application of the census
11:40:31 10  data by reviewing the other multiple-race category?
11   A    Right.
12   Q    Which is comprised of all multiple-race responses
13   consisting of more than one-minority race?
14   A    Yep.
11:40:42 15  Q    So under the second step, where there are significant
16   numbers of people who indicated they belonged to more than one
17   racial group, they will then be allocated to each component
18   racial group; is that right?
19   A    They get allocated.  They didn't get all just allocated
11:41:04 20  just to black.
21   Q    So the person who identifies as both black and Asian, as I
22   understand this guidance, would -- the second step be allocated
23   to the black category and to the Asian category.  Is that your
24   understanding, as well?
11:41:18 25  A    That is my understanding.  I do not know the exact
```

1   allocation algorithm that the DOJ or the Census Bureau would

2   use to do that.  It's --

3   Q    But based on the guidance that you have quoted in your

4   report, you would agree that the DOJ's guidance provides

11:41:41 5   authority for the use of the any-part black metric?

6   A    There is authority for the use of it for sure.  It's one

7   of many different scenarios that can play out in this type of

8   analysis in these types of cases.

9   Q    And I believe in this -- in the same passage that you just

11:42:05 10   read, the DOJ notes that this calculation of how it determines

11   the black population or any minority population --

12   A    Uh-huh.

13   Q    -- is required by both OMB guidance and judicial opinions;

14   is that right?

11:42:18 15   A    That -- yes, that is true.  That does not mean that all

16   redistricting cases end up relying on these definitions.

17   That's different.

18   Q    But, in fact, the DOJ guidance does cite one judicial

19   opinion in particular; is that right?

11:42:35 20   A    I am in complete agreement with that.  That is one

21   universe, and this is the rules that apply in that universe,

22   and I agree with you enthusiastically.

23   Q    That is *Georgia v. Ashcroft*?

24   A    I beg your pardon?

11:42:48 25   Q    That case it cites is *Georgia vs. Ashcroft*?

```
 1  A    I do not have the cite in front of me.  I'm sorry.  I
 2  can't speak to that.
 3  Q    That's okay.
 4       Well, I am just looking at your report, and at the end of
 5  the DOJ guidance, you have a footnote that cites to Georgia vs.
 6  Ashcroft?
 7  A    Okay.
 8  Q    Am I --
 9  A    I believe you.
10  Q    Am I saying that correctly -- I think it's on the screen.
11       Do you see on the -- in your report on page 6?
12  A    Yes.
13  Q    Footnote 11?
14  A    Yeah.  I see that.  Yep.
15  Q    Actually, can we also -- can also pull up the DOJ guidance
16  itself, just to make sure we're speaking about the same
17  document?  This is the document -- this is the document that
18  you quoted in your report; is that right?
19  A    Yeah, I believe so.  Yes, that's correct.
20  Q    If we can just scroll to page 13 of this document.  I'm
21  sorry.  Maybe it's -- actually, yes.  Starting on page 12.
22  A    Yeah, that's probably where I got that reference from
23  there.
24  Q    Okay.  Great.
25  A    Good.  Yeah.  Thank you.
```

11:44:25

11:44:39

11:44:55

11:45:03

11:45:23

```
 1  Q     So the DOJ specifically cites to Georgia v. Ashcroft 539
 2  U.S. 461, page 473, footnote 1; is that right?
 3  A     Yes.
 4  Q     And that's the same cite that you include in your report?
 5  A     Yeah.
 6            MS. KHANNA:  Your Honor, I don't believe this has
 7  actually been marked as an exhibit.  I am happy to mark it as
 8  plaintiffs' exhibit.  I believe we are on 105 and offer it into
 9  evidence.
10            JUDGE MARCUS:  Just so I have this right, Plaintiff
11  Caster 105 is the Justice Department's guidelines, right?
12            MS. KHANNA:  Yes, Your Honor.
13            JUDGE MARCUS:  Are you offering that?
14            MS. KHANNA:  I am offering that into evidence right
15  now.
16            JUDGE MARCUS:  Any objection?
17            MR. DAVIS:  No objection from the Secretary of State,
18  Your Honor.
19            JUDGE MARCUS:  Anyone else have any objection?
20        Seeing none, we will receive Plaintiffs' Caster 105 in the
21  cases before us.
22            MS. KHANNA:  Thank you, Your Honor.  And we can take
23  this down.
24  BY MS. KHANNA:
25  Q     So have you read the Georgia v. Ashcroft opinion that you
```

1  cite in your report?

2  A    Have I read what?

3  Q    The *Georgia v. Ashcroft* judicial opinion from the U.S.

4  Supreme Court that you cite in footnote 11 of your report?

11:45:36  5  A    Yeah, not for a long time.  Probably been -- it's been

6  many years.

7  Q    Did you read it in preparation for your report?

8  A    No.

9  Q    If we could just pull up that case and specifically, if

11:45:57 10  you could go to footnote 1.

11        This is a long footnote.  I won't make you read it all out

12  loud.  But I will represent to you that it's basically about

13  the question about what metric of black to use in a given case

14  where different parties are advocating for different metrics.

11:46:21 15  Here it was the United States and the state of Georgia.

16        Could you please read out loud starting with, Moreover in

17  the beginning of the -- in the middle of the footnote?

18            MR. DAVIS:  Can I request that if Ms. Khanna would

19  like something read into the record that she do so, and then

11:46:36 20  I'm sure Mr. Bryan would be happy to comment on whether or not

21  you read it correctly.  He's been talking an awfully lot this

22  morning.

23            JUDGE MARCUS:  I leave it to you, Ms. Khanna.  Do you

24  want to read it or him?

11:46:45 25            MS. KHANNA:  I would actually prefer that he read it

1   just to make sure we're both understanding.

2          JUDGE MARCUS:  Okay.  Make sure you have underscored

3   the portion that you want him to read so he can see that and we

4   can all see that clearly.  You are asking him to read from

11:46:59 5   footnote 1 of *Georgia vs. Ashcroft*, correct?

6          MS. KHANNA:  Yes, Your Honor.  Yes.

7          JUDGE MARCUS:  Mr. Bryan, do you see the highlighted

8   portion she's asking you to read?

9          THE WITNESS:  I do.

11:47:12 10         JUDGE MARCUS:  Would you read it aloud for us, please?

11         THE WITNESS:  Yes, sir.  Moreover, the United States

12  does not count all persons who identify themselves as black.

13  BY MS. KHANNA:

14  Q   Can you please keep reading to the end of the footnote, as

11:47:25 15  well?

16  A   It counts those who say they are black, those who say they

17  are black and white, but it does not count those who say they

18  are both black and a member of another minority group.  Using

19  the United States' numbers may have more relevance if the case

11:47:41 20  involves a comparison of different minority groups.

21  References.  Here, however, the case involves an examination of

22  only one minority group's effective exercise of the electoral

23  franchise.  In such circumstances, we believe it is proper to

24  look at all individuals who identify themselves as black.

11:48:02 25  Q   Thanks.  Thank you for reading that.

1          So you would agree that the present Section 2 case as you

2     understand it involves an examination of only one minority

3     group's effective exercise of the electoral franchise?

4     A    I'm sorry.  Can you restate the question?

11:48:23  5     Q    Do you understand that the present Section 2 case involves

6     the examination of only one minority group's effective exercise

7     of the electoral franchise?

8     A    That's correct, yes.  That's my understanding.

9     Q    We are not comparing the voting strength of one minority

11:48:40 10    group to another minority group?

11    A    No.  Not that I know of.  But, again, I am not focused in

12    my report, my analysis, or my expertise on voting strength.  So

13    I am a little bit out of my sandbox going there.

14    Q    You didn't see anything in the reports -- Mr. Cooper's

11:48:59 15    report to which you responded that suggests that plaintiffs

16    were trying to build a minority coalition district or compare

17    black voting strength or Hispanic majority district or anything

18    like that, correct?

19    A    I did not.  I found that it was relevant to be able to

11:49:18 20    present both black alone, as well as the black alone in

21    combination to provide useful context for where different

22    plaintiffs' plans fell because there were so many of them that

23    by one measure were just above and by another measure were just

24    below 50 percent.

11:49:33 25         So for the benefit of the Court, I thought it useful for

them to see and understand where those numbers fell using

different definitions.  I leave it to the Court and other

experts to decide which definition is most appropriate for this

case.

11:49:48  Q    And just to clarify, you know, in these circumstances, as

reflected by the Supreme Court's guidance in the case that you

cite in your report, it is proper to look at all individuals

who identify themselves as black, correct?

A    In this case, that is what that says.  I do not have an

11:50:08 opinion of whether that is the appropriate measure for this

case or not.

Q    Okay.

        MR. DAVIS:  I will withdraw an objection.

        JUDGE MARCUS:  I'm sorry.  Did we get the full answer

11:50:22 to the question?

        MS. KHANNA:  I believe we did.

        JUDGE MARCUS:  All right.  Thank you.

        THE WITNESS:  Thank you, Your Honor.  What else?

BY MS. KHANNA:

11:50:31  Q    Let's see.  Let's turn back to your report, and if we go

to page 9 of your supplemental report, you -- this is where you

discuss Mr. Cooper's plans; is that right?

A    Yes.  That looks correct.

Q    And you state here that your first order of business was

11:50:56 to assess Mr. Cooper's statement that he is able to create two

1  majority-black districts?

2  A    Yes, that's what he alleged that he was doing, so my goal

3  was to analyze the degree to which he accomplished that.

4  Q    And we can zoom out from that.  But for the remainder of

11:51:15  5  that page and to the next page, you then go on to report the

6  black-alone figure for District 2 in each of his illustrative

7  plans, correct?

8  A    I believe in the analysis we provide an analysis of both

9  black alone and in combination measures.

11:51:34 10  Q    I think you're right when it comes to the tables that you

11  include in your appendix.  But I'm -- just want to clarify if

12  we can look at the text on page 9.  For instance, let's start

13  with the second paragraph.

14       For Cooper plan 1, I show in Cooper demographic

11:51:57 15  characteristics Table 3.10.  You see that sentence there?

16  A    Yeah.  I got it.

17  Q    Am I right that you only report the black-alone figure for

18  District 2 in Mr. Cooper's illustrative plan here?

19  A    In that case, yes, that's correct.

11:52:14 20  Q    But for District 7, you report both the black alone and

21  the black in combination figure, the more inclusive figure?

22  A    Yeah.  I think that that is an important point because

23  what this says is that in District 2, it's a minority reported

24  as black-alone majority as alone in combination, whereas the

11:52:38 25  distinction here is that in District 7 it is a majority by both

definitions.  And it's a strong defensible majority by both

definitions.  So I think it's important to highlight that.

No matter which definition you use, that plan has -- or

that district in that plan has a strong defensible black

11:52:58 majority population, no matter which population is used.

Q    When you say strong and defensible majority-black

population, I don't see those terms here.  What does that refer

to?

A     Yeah.  Typically, there is no hard and fast rule for what

11:53:14 a majority defensible strong majority is.  The courts, to my

knowledge, the expertise in the field don't have a strong

over/under number.  I have done a significant amount of

statistical analysis in this area, and when I look at numbers

that are 50.01 percent, 50.02 percent, 50.03, so forth, those

11:53:37 types of plans, when you do statistical analysis on them, you

can find that they ought -- the chances -- the statistical

probabilities of them really being a majority, sometimes can be

questionable, certainly when you put together multiple

districts with those small majority fractional majority

11:53:59 populations.  But in my experience, when you have districts

that have 52 percent or 53 percent, certainly in a black-alone

district, I have never seen anyone argue that those may or may

not be a black majority district.  It's a subjective threshold.

Q    When you say strong and defensible, you are talking about

11:54:23 whether or not the demographic figure is accurate?

           1  A    Whether that -- whether that number is representing a

           2  black majority district or not.  And I have seen numbers --

           3  when the number is 50.01 percent, then there is usually lots of

           4  dialogue around that about whether that really is a majority or

11:54:48   5  not.  If it's -- well by the law 50 plus -- 50 percent plus

           6  one person is the law, but those types of numbers very close to

           7  50 percent elicit much more conversation about whether it's a

           8  black majority than a 52 or 53 percent district would.

           9  Q    Just to be --

11:55:06  10  A    I have never heard that debated.

          11  Q    Just to be clear, you provide no opinions, conclusions, or

          12  analysis about whether any of the illustrative plans that you

          13  reviewed in this case provide strong defensible majority-black

          14  populations, do you?

11:55:23  15  A    I'm just explaining that as my opinion and response to

          16  your questioning.  It's not appropriate in this report to

          17  say -- to defend one as being strongly defensible or not.  I

          18  simply state the facts.

          19  Q    So as you noted, you do, in fact, include both the

11:55:52  20  any-part black figure and the black-alone figure in your tables

          21  in the appendix to your report, correct?

          22  A    Yeah, that's correct.

          23  Q    And just to -- and you also have now testified that you

          24  are offering no opinion that use of the any-part black figure

11:56:24  25  is wrong in this case, correct?

```
 1   A     No, it is -- it is neither right nor wrong.  It is one of
 2   two numbers that gives the Court and the experts useful context
 3   for where the numbers that plaintiffs' plans lie.
 4   Q     If we can scroll back or go back to your report, page 5,
 5   at the top, and, again, at the first paragraph here?
 6   A     Right.
 7   Q     You note that in this section you will try to define and
 8   document the true black population of the two black districts
 9   in plaintiffs' alternative plans?
10   A     Yeah.  That's correct.
11   Q     But at no point in your report do you conclude that the
12   true black population in Alabama is defined as only the
13   single-race black population?
14   A     Yeah.  That's correct.  What I'm seeking to do, for
15   example, referring to Dr. Duchin's work, where she does nicely
16   document what her population is, I appreciate the accuracy and
17   the clarity of her analysis.  She is very transparent that her
18   work represents all-part black, and that's great.  Very
19   frequently other plaintiffs don't.  And in reading through the
20   bodies of work that I have looked at as part of this case in
21   Singleton, Caster, and looking at other work, for example, that
22   Cooper has done, there are many instances where it is not clear
23   what the black population is that they're referring to.
24         So part of my exercise is to do the analysis and the
25   research to make sure I know that when I see a number that says
```

```
        1   this district is 50 percent black or 55 percent black, because
        2   those are not oftentimes not documented, I take it as my
        3   responsibility as the demographic expert to find out what those
        4   true black populations are that they are referring to.  It is
11:58:25 5   much of benefit for clarity and the definition.  It is not a
        6   judgment of which is right or wrong.
        7   Q    And I just want to make sure that we are talking about
        8   this case and the reports in this case.  You mentioned
        9   plaintiffs generally maybe even Mr. Cooper's reports in other
11:58:40 10   cases.  Is it your position that Mr. Cooper did not clarify in
       11   his report where and when he was using the any-part black
       12   calculation?
       13   A    No.  In this particular report, it's -- he provides two
       14   columns of data that show what his numbers are.  But given my
11:59:02 15   experience with tables that I have reviewed for Mr. Cooper and
       16   errors I have found in those tables, I felt it was important to
       17   make sure that those numbers were correct.  And as I found out
       18   in my analysis, in some cases they were not.  So it was still a
       19   worthwhile exercise even though he represented them as being
11:59:21 20   all black or any-part black or black alone.  It's still a
       21   useful purposeful exercise because it uncovers things like
       22   this.
       23   Q    And when you went back to check those figures, you would
       24   agree that using the any-part black metric as stated in the --
11:59:39 25   as approved by the Supreme Court and the Department of Justice,
```

1   each of Mr. Cooper's maps have two majority-black districts,

2   correct?

3   A    I -- in any-part black metric, yes, I agree with that.

4           MR. DAVIS:  Before you continue, Ms. Khanna, I

11:59:55 5   apologize for interrupting.  But, Your Honors, our expert has

6   been going for some time now.  I don't mean to interrupt

7   Ms. Khanna's flow, but I would ask her and the Court if we

8   might be able to take a break before too long at the

9   appropriate time.

12:00:11 10           JUDGE MARCUS:  Fair enough.  What's your sense,

11   Ms. Khanna -- I don't want to break you in the middle of a

12   thread.  But you tell me what would be a convenient time to

13   break.

14           MS. KHANNA:  I'm happy to break here, Your Honor.  I

12:00:25 15   think we've kind of closed out this portion of his report, and

16   we can move on to the next topic after lunch.

17           JUDGE MARCUS:  You have closed the loop on this?  On

18   -- and we will take a break, and then you will come back with

19   the balance of your cross; is that right?

12:00:44 20           MS. KHANNA:  Yes, Your Honor.

21           JUDGE MARCUS:  If I hear you right.  All right.  I

22   have 12:00 o'clock Central Standard Time.  I want to be sure I

23   am right.  It's 1:00 o'clock here in south Florida.

24       We will reconvene in one hour, which will be 1:00 o'clock

12:01:00 25   Central Standard Time, 2:00 o'clock Eastern Standard Time.

1          Thank you all.  We will be in recess until that time.

2              (Recess.)

3              JUDGE MARCUS:  I think we have everybody assembled.

4     Ms. Khanna, you're in the midst of your cross, and you may

13:02:08  5     proceed with Mr. Bryan.  Thank you.

6              MS. KHANNA:  Thank you, Your Honor.

7     BY MS. KHANNA:

8     Q     Good afternoon, Mr. Bryan.

9     A     Hi, Abha.

13:02:17 10     Q     Before the break, we spoke about the any-part black metric

11     versus the single-race black metric; is that right?

12     A     That's correct.  Mr. Cooper also.

13     Q     Mr. Cooper also reported in his reports the non-Hispanic

14     single-race black Black Voting Age Population for each of the

13:02:42 15     districts in his illustrative plans.  Do you recall that?

16     A     I did see those statistics, yes.

17     Q     You don't address that metric at all in your discussion of

18     the demographic data?

19     A     That is correct.

13:02:55 20     Q     And you do not contest the use of CVAP, Citizen Voting Age

21     Population data in evaluating whether plaintiffs have satisfied

22     the first *Gingles* precondition, do you?

23     A     I would say that the -- the PL census data would be the

24     data of record for the purposes of establishing *Gingles* I, not

13:03:27 25     CVAP.  The CVAP would be more appropriate for assessing voting

 1   strength particularly in populations such as Hispanic

 2   populations, which may have lower citizenship rates as a

 3   minority population.

 4   Q    Okay.  If we could go to your first report in the -- in

13:03:50  5   this case, in the Caster case, Defendants' Exhibit 2.  Let's go

 6   to page 3.

 7   A    Great.  Thank you.

 8   Q    Here, about four lines down?

 9   A    Yeah.

13:04:06 10   Q    Note that in 2015 you served in a leadership role in

11   writing an amicus brief to the U.S. Supreme Court in the

12   *Evenwel* case; is that right?

13   A    That's correct.  I worked with a team of demographers and

14   Census Bureau experts to write that brief, but I was one of the

13:04:26 15   lead authors.

16   Q    That brief was specifically about the use of CVAP data in

17   redistricting; is that correct?

18   A    That's correct, yes.

19   Q    If we could call up that brief?

13:04:39 20   A    There it is.

21   Q    There it is.  You see your name?

22   A    I remember it real well.

23   Q    That's the brief to which you are referring?

24   A    Yes, ma'am.

13:04:46 25        MS. KHANNA:  And I don't believe this has been marked

1  as an exhibit yet.  I would like to mark this as Plaintiffs'

2  Exhibit -- Caster Plaintiffs' Exhibit 106 and offer it into

3  evidence.

4        JUDGE MARCUS:  Was marked for identification.  You may

13:04:58 5  proceed.

6        MS. KHANNA:  I would also like to offer it into

7  evidence, Your Honor.  Or would you like me to lay the

8  foundation first?

9        JUDGE MARCUS:  Is there an objection?

13:05:06 10        MR. DAVIS:  Your Honor, if it's okay, I would like to

11  hear how Ms. Khanna intends to use this.  I certainly have no

12  objection to it being was marked for identification.  Whether

13  in evidence, I would like to hear how she intends to use it to

14  see if we can assess if it's relevant.

13:05:22 15        JUDGE MARCUS:  Fair enough.  Lay the foundation if you

16  would.

17        MS. KHANNA:  Will do.  Thank you, Your Honor.

18  BY MS. KHANNA:

19  Q    Mr. Bryan, this brief, if you would look -- let's go to

13:05:35 20  page 15 of this brief.

21  A    Great.

22  Q    Toward the bottom of page 15, you write that the U.S.

23  Supreme Court's recent Section 2 cases have accepted CVAP as

24  the yard stick when assessing minority voting strength; is that

13:06:00 25  right?

```
 1  A     In the middle of the census for districting litigation,
 2  yes.
 3  Q     Okay.
 4  A     Not for the purposes of the decennial census based
 5  political redistricting exercise.
 6  Q     Interesting.  If we could go to page 70.  The very top of
 7  page 17, you write, Likewise, in Bartlett v. Strickland, the
 8  Court and litigants relied on CVAP to evaluate the first
 9  Gingles requirement.  Did I read that correctly?
10  A     Yeah, that looks right.
11  Q     And you note in the footnote that that case, like this
12  one, involved a Section 2 claim on behalf of black voters,
13  correct?
14  A     Yes, in that litigation it was true.  Yeah.
15  Q     And that was litigation -- it was a Section 2 litigation
16  based on the in 2011; is that right?  I'm sorry.  2009?
17  A     It was not a -- if I recall correctly, it was not part of
18  a state redistricting exercise.  It was post-redistricting
19  litigation.
20  Q     To your understanding?
21  A     Yes, that's correct.
22  Q     Is it your understanding that the Bartlett v. Strickland
23  case is the Supreme Court precedent on how to establish the
24  first Gingles precondition?
25  A     For Voting Rights Act litigation?  Yes.  I would draw a
```

1  distinction between that and drawing districts based on the
2  decennial census data.
3  Q    But for Section 2 Voting Rights Act cases, that is the
4  governing case?
13:07:58 5  A    Yes.  I would frequently -- I frequently would use and
6  report both the decennial census data the total population as
7  well as the CVAP data, which is an exercise we actually pursued
8  in the *Evenwel* case.
9  Q    Okay.  You further recognize in this brief that these
13:08:19 10  numbers can make a significant difference sometimes, correct?
11  A    It can for a lot of reasons.  Some based in what they're
12  measuring, and some based in their accuracy.
13  Q    So if we look at the bottom of page 18 of this brief
14  toward the top of page 19, here you say, Every fraction of a
13:08:41 15  percentage point is of intense interest to the political
16  players in this process.
17  A    Yeah.
18  Q    They trust that CVAP is a reliable data source for this
19  sensitive work.
13:08:53 20       Did I read that correctly?
21  A    That's -- yeah.  That's how it is used.  There's obviously
22  always debate and questions about the accuracy of the data
23  every time that it's used, but that -- the number is used as it
24  is.  And for that purpose, yes, every tenth of a percent is of
13:09:09 25  interest to parties in cases like this.  That's true.

1  Q    But in this report, in this case, you don't question or

2  debate the accuracy of the CVAP data reported in Mr. Cooper's

3  plans?

4  A    I will say this about that:  The ACS, which is a survey

13:09:25  5  that I participated in the development of almost 20 years ago

6  is a survey that's called a continuous measurement survey.  And

7  that survey is designed to fill in information that was

8  historically given by the long form, the one-in-six long form

9  sample many years ago.

13:09:47 10       And so that survey is in some sense renewed.  There are

11  many parts of it that are updated and refined and enhanced

12  during the decennial and immediately following the decennial

13  census.

14       It is my experience, having been part of the development

13:10:07 15  of the American Communities Survey, and using it intensively

16  for many years, that the farther and the farther that you get

17  away from that base decennial year, the poorer and poorer

18  quality that ACS data is going to be.  This is widely known in

19  the demographic community.

13:10:27 20       So by the time you get to the ACS file that we are using

21  today, which is what we would call the 2015 to 2019 file, it's

22  a five-year data file, this file is the furthest out from the

23  last decennial census of any ACS data that will be available.

24  And soon, in the next year or two, it will be renewed again and

13:10:52 25  re-grounded in the reality that it's the current census.

1          In my analysis of a recent very large-scale intense

2     redistricting exercise that was the Texas Legislature, I

3     studied the CVAP data for the state, and I studied the

4     decennial census for the state intensively.  And my findings in

13:11:12 5     this very large sample of ACS data, compared to the decennial

6     census data was that there were dramatic numerous significant

7     differences in what the ACS reported was the Citizen Voting Age

8     Population and what the decennial census said was a companion

9     Voting Age Population.

13:11:34 10          The differences were so significant and so vast that it is

11    my professional opinion that using the current ACS CVAP data

12    which is based in 2010 census concurrently with the 2020

13    decennial census is both an unnecessary exercise, and I also

14    think that it's a very risky one because the data from the ACS

13:11:58 15    now, nine years out from the last census, are at a much more

16    perilous state than they were in *Strickland* only one year out

17    from the census.

18    Q    That opinion that you just expressed is not an opinion you

19    expressed anywhere in your reports in this case, correct?

13:12:13 20    A    It's not in this report, but I have written about it.  I

21    have presented on it, and I have discussed it extensively in

22    the professional community.

23    Q    You were presented with Mr. Cooper's illustrative plans

24    and his report?

13:12:28 25    A    Yeah.

1   Q    As well as his calculation of the non-Hispanic single-race

2   black Citizen Voting Age Population of the districts in those

3   illustrative plans, correct?

4   A    I saw that.  I was aware that that was in the report.

13:12:45  5   That's correct.

6   Q    You provided an analysis of the racial demographics in

7   Mr. Cooper's plans, correct?

8   A    I did.

9   Q    You had the opportunity to find or dispute or address in

13:13:00  10   any way his assessment of the Citizen Voting Page Population

11   demographics in this plan?

12   A    I did not feel it was appropriate or necessary.  And if I

13   did, I wouldn't have had the time to anyways.

14   Q    You did not include any discussion or response on the

13:13:20  15   Citizen Voting Age Population in your report, correct?

16   A    I did not.

17   Q    If we can go back to the brief shortly, the *Evenwel* brief

18   that we just mentioned, let's go to the top of page 20.

19        Here you write, in short, CVAP is now an indispensable

13:13:44  20   feature in voting rights litigation under Section 2.  Did I

21   read that correctly?

22   A    Yeah, that's correct for sure.

23   Q    We can take this down.

24   A    I would derive distinction between voting rights

13:13:56  25   litigation and certainly voting rights litigation late in the

1 decade versus using decennial census data which are required by

2 law.  ACS data are not required by law for purposes of

3 redistricting.  So I do not know or understand why Mr. Cooper

4 or anyone would choose to use ACS for the development of a

13:14:15 5 redistricting plan.

6 Q    You don't draw that distinction in your brief to the

7 Supreme Court in *Evenwel*, correct?

8 A    The inference when I say the ACS CVAP data is instrumental

9 for litigation, if I had meant that ACS data was critical for

13:14:32 10 redistricting, I would have said so.  And it's not, so I did

11 not.

12 Q    You just said that it's critical for evaluation in a

13 Section 2 Voting Rights Act case?

14 A    Yeah.  Typically, post-redistricting litigation,

13:14:46 15 especially as it pertains to Hispanics, as was the case in

16 *Evenwel*.  It's especially important measuring one person one

17 vote and voting strength.  And I strongly agree with that.  For

18 that purpose, it's absolutely instrumental.  It is not

19 instrumental.  It is not required by law.  Law doesn't say

13:15:03 20 anything about using CVAP data to develop a political

21 redistricting plan.  And I do not ever see it done, and I don't

22 do it.

23 Q    So the distinction you're drawing is that the law does not

24 require the use of CVAP data for a legislature drawing a

13:15:20 25 congressional plan.  Is that what you are saying?

```
 1  A    It's not required that.  That's -- the purpose of the

 2  decennial census is for the purpose of apportionment and for

 3  redistricting.  The purpose of the ACS is not for political

 4  redistricting or for apportionment.
```

13:15:36
```
 5  Q    But the in the Evenwel brief you agree that the use of

 6  CVAP data is relevant, at the very least, in Section 2 Voting

 7  Rights Act lit indication, correct?

 8  A    Yes.  I would agree.  And when this case goes, I am sure

 9  that that will have some role in it.  I don't believe it has a
```

13:15:58
```
10  role now.  I would emphasize that because black citizenship,

11  especially in the state of Alabama, is so high that we would

12  typically as demographers look at black CVAP, Black VAP as

13  being virtually indistinguishable.  In fact, when I am looking

14  at the number of black Hispanics in the state of Alabama, I see
```

13:16:23
```
15  8,000 black Hispanics out of 1.3 million.  So my assertion that

16  they are indistinguishable I think is fair and valid.

17       When you look at Section 2 Voting Rights Act claims with

18  Hispanics, those citizenship rates can and do vary wildly,

19  which is why the ACS CVAP data is so particularly important in
```

13:16:45
```
20  those cases, particularly pertaining to Hispanics.  It's

21  virtually irrelevant for the purposes of assessing blacks.  It

22  adds virtually no incremental value and can be deceiving as

23  what I believe I see in Mr. Cooper's report in representing

24  Black VAP because it is so far antiquated based on the 2010
```

13:17:11
```
25  census data versus data that we literally have right now about
```

1   what's really going on here in the state of Alabama.

2   Q    Mr. Bryan, you do not dispute in your reports that each of

3   Mr. Cooper's illustrative plans contain two districts that are

4   majority-black according to the non-Hispanic single-race black

13:17:31 5   Citizen Voting Age Population metric, do you?

6   A    I have no way of knowing because I did not run that

7   analysis myself.  If his numbers are right, which they have

8   been in some cases; in this case, been shown not to be, I don't

9   know.  I can't give an opinion.

13:17:42 10   Q    And you didn't offer an opinion on that?

11   A    And I do not offer an opinion, no.

12   Q    And you certainly didn't dispute it in your report,

13   correct?

14   A    Don't dispute it.  Don't know.  No opinion.

13:17:52 15   Q    Okay.  Let's turn to your supplemental report.  Let's go

16   back now to page 4 of that and your discussion of traditional

17   redistricting principles.

18   A    Yeah.  Great.

19   Q    So here, you quote a passage from the Congressional

13:18:23 20   Research Service listing common redistricting principles; is

21   that right?

22   A    Yeah.  The congressional service here is talking more

23   about the importance of it.  And I use the NCSL more as an

24   inventory of the ones that are most important.

13:18:40 25   Q    But you specifically quote on page 4 a passage from the

1   Congressional Research Service regarding traditional

2   redistricting principles, right?

3   A     Yeah.  That's correct.  And as I was asked in direct why

4   there is -- what is important about using traditional

13:19:06  5   redistricting principles, part of my opinion in that exam was

6   elaborating on this, why it's a common set of rules, enhancing

7   fairness, minimizing gerrymandering, and so forth.  That's why

8   this is more of an explanation of why we have the traditional

9   redistricting principles that we do and why we use them.

13:19:27 10  Q     Let's highlight the quote that you include, the block

11  quote that you include in your report, starting with, Many of

12  the rules?

13  A     Yeah.  Great.

14  Q     Will you please read that out loud to the Court?

13:19:45 15  A     Many of the rules or criteria for drawing congressional

16  boundaries are meant to enhance fairness and impact of

17  gerrymandering.  These rules, standards, or criteria include

18  assuring population equality among districts within the same

19  state; protecting racial and language minorities from vote

13:20:15 20  dilution, while at the same time not promoting racial

21  segregation; promoting geographic compactness and contiguity

22  when drawing districts; minimizing the number of split

23  political subdivisions and communities of interest within

24  congressional districts; and preserving the historical

13:20:39 25  stability in the cores of previous congressional districts.

1   Q    Thank you.  I believe -- I believe you testified on direct

2   that you have never heard of minority voting rights protection

3   used as a traditional redistricting principle.  Did I hear that

4   right?

13:20:57 5   A    I have not seen the use of minority voting rights as a

6   principle drawing to a minority voting right target certainly

7   in subordination of any other traditional redistricting

8   principle.

9   Q    The very paragraph that you cite in your report as an

13:21:24 10   authority in your discussion of traditional redistricting

11   principles specifically includes as the second criterion

12   protecting racial and language minorities from vote dilution,

13   correct?

14   A    Yes, that's part of the process.  Sure.  That can be a

13:21:50 15   part of the process.

16   Q    Okay.  So the redistricting principles listed here in this

17   paragraph include in the following order:  Population equality,

18   non-dilution of racial minority voting strength, compactness,

19   contiguity, minimizing political subdivision splits, minimizing

13:22:15 20   community of interest splits, and core preservation.

21        Am I reading that the same way you are?

22   A    Yeah.  I would not literally take those in order as most

23   important to least important.  Population equality is certainly

24   the most important.  In look at protecting racial and language

13:22:35 25   minorities, I think it's very easy to fall into a trap of very

1      detailed subtle nuances in language, what that exactly means.

2          Protecting race or protecting voting strength is an

3      extremely broad area.  And exactly how you draw boundaries or

4      if you draw boundaries towards those is a very murky area.

13:22:57 5   Q    But you would agree with me that I read right, I singled

6      out the individual criteria listed in this paragraph in the

7      order listed in this paragraph; is that right?

8      A    I don't necessarily agree with the order.  It's an

9      inventory.  This is so often the case.  I would agree with the

13:23:15 10  legal requirement, the population equality is the first,

11     balancing one person, one vote for sure.

12     Q    So you may not agree with the order as it's presented here

13     in the paragraph that you cite in your report, but do you agree

14     that I accurately represented the individual criteria in the

13:23:37 15  order they are listed in this paragraph?

16     A    Yeah.  That's true.

17     Q    If we could turn to page 11 of your second report.  This

18     is Defendants' Exhibit 4, again, page 11.  Okay.  Here is where

19     you begin your analysis of Mr. Cooper's illustrative plans?

13:24:02 20  A    Right.

21     Q    Using just three redistricting principles; is that right?

22     A    Yeah, that's correct.

23     Q    And those three principles that you chose to analyze are

24     in this order:  Core retention, incumbency, and compactness?

13:24:21 25  A    It's because that order or that -- there's no particular

1   meaning to that order, but those three were used subsequent to

2   the establishment that they were legal plans with equally

3   balanced population that would support one person, one vote.

4   So checking that box, I moved on to these other issues.

13:24:42 5   Q    I'm sorry.  Can you explain that one more time?  I am not

6   sure I understood.

7   A    Yes.  I -- there was no need to do an in-depth analysis of

8   the equitable distribution of population because it's factual

9   at face value.  I looked at it.  It is -- there's no need to do

13:25:02 10   a deep dive or a detailed analysis on whether they did a -- the

11   traditional redistricting principle of equally balancing

12   population was met or not.

13        It was at face value, it is evident that it was.  So

14   there's no need to create a section and write in detail about

13:25:24 15   if and how it was.  It was.

16   Q    Okay.  We can take down the exhibit.  Just to make sure --

17   A    Thank you.

18   Q    Just to make sure I understand.  As you just testified,

19   you offer no analysis of Mr. Cooper's plans with respect to

13:25:41 20   population equality, correct?

21   A    No.

22   Q    You offer no conclusion that Mr. Cooper's plans failed to

23   abide by population equality, correct?

24   A    No, the total population numbers that I reviewed in his

13:25:55 25   tables and that I confirmed suggest that he meets that

```
 1  criteria.
 2  Q    Okay.  You also provide no analysis of non-dilution of
 3  racial minorities in either the enacted plan or any of
 4  Mr. Cooper's plan, correct?
 5  A    No.
 6  Q    And you certainly offer no conclusion that Mr. Cooper's
 7  plans failed to abide by the principle of non-dilution of
 8  minority voting strength?
 9  A    No.  I have no opinion.
10  Q    You also provide no analysis of the traditional
11  redistricting principle of contiguity in any of Mr. Cooper's
12  illustrative plans, correct?
13  A    That is correct.
14  Q    And you offer no conclusion that Mr. Cooper's plans failed
15  to abide by the principle of contiguity?
16  A    Yeah.  That, again, is a fact that was self-evident and I
17  found that to be true and not an item to write a detailed
18  analysis on.  The only analysis or time when I did focus on
19  that was on Dr. Duchin's report where there was an instance of
20  non-contiguity.
21       It was immaterial, an easy mistake and trivial.  Had no
22  material impact on the outcome, but it was simply one worth
23  noting.  Because there was no such issue with contiguity in
24  Mr. Cooper's plan, I did not raise it as an issue to analyze.
25  Q    You also provide no analysis of the extent to which
```

Timestamps in left margin: 13:26:10 (line 5), 13:26:25 (line 10), 13:26:42 (line 15), 13:27:08 (line 20), 13:27:25 (line 25)

```
 1  Mr. Cooper's plan split political subdivisions; is that right?
 2  A    Yes, that's correct.
 3  Q    You offer no conclusion that Mr. Cooper's plans failed to
 4  minimize political subdivision splits?
13:27:44 5  A    I'm sorry.  You broke up for a moment.  Can you please
 6  repeat?
 7  Q    I can.  Can you hear me now?
 8  A    Yeah, I can hear you.  I got you.  No worries.
 9  Q    And you offer no conclusion that Mr. Cooper's illustrative
13:27:58 10  plans failed to minimize political subdivision splits?
11  A    I did not, no.
12  Q    So in that paragraph from the congressional -- what was
13  it, the Congressional Research Service --
14  A    Right.
13:28:16 15  Q    -- on traditional redistricting principles, that paragraph
16  did not even mention the word incumbents, correct?
17  A    That was does not.  That's why I used that in conjunction
18  with the authoritative list provided by the NCSL.  Some
19  different organizations may provide different lists.
13:28:41 20  Incumbency is a very widely used one for sure.
21  Q    But not used in the list that you quoted first in your
22  analysis of traditional redistricting principles?
23  A    Yeah.  That's why I thought it was important to provide
24  the context, the importance that the Congressional Research
13:28:59 25  Service provided, and then the inventory of NCSL, so we would
```

1   have a thorough, comprehensive, exhaustive view of what the

2   authoritative agencies on this would say about the matter.

3   Q    Okay.  So --

4   A    It was just the completeness.  I'm sorry.

13:29:15  5   Q    Okay.  Thank you.

6        JUDGE MARCUS:  Just slow down.  Allow each of you to

7   finish your answer and your question so the reporter can get it

8   down.  And equally important so that Judges Manasco, Moorer and

9   I can receive it.  So just take your time, please.

13:29:36 10        MS. KHANNA:  Yes, sir.  Thank you, Your Honor.

11        THE WITNESS:  Yes, sir.  Thank you.

12   BY MS. KHANNA:

13   Q    Let's turn to core retention which is the first principle

14   that you analyze in this report.

13:29:47 15   A    It is.  Thank you.

16   Q    Is it fair to say that your analysis prioritizes core

17   retention above other criteria?

18   A    I don't think that's accurate.  The order in which I

19   present my information or the details that I present are not

13:30:07 20   proportionate to their importance.  Core retention is a very

21   complex, detailed, hard analysis to run.  It just is.  And in

22   order to deeply understand it, in order to execute it, you have

23   to do a lot of detailed work.

24        The fact that there is a lot of pages and a lot of charts

13:30:30 25   and a lot of tables only reflects the complexity of the

1  analysis, not necessarily the relative importance of it.

2      The outcome of it, I would say is important, not just

3  because there are significant differences in core retention in

4  the plans, but also because there is a significant differential

13:30:51 5  impact to a minority population.

6      And as an expert, this is something that I am trained to

7  look at because there are cases where minority populations --

8  and I am not suggesting this was the case here -- but it is the

9  risk and certainly the perception that if you are moving

13:31:12 10  populations and breaking their continuity of representation, if

11  you do that disproportionately to a minority population, that

12  you should pay particular care and attention in studying where

13  and why and how that happens to ensure that you are protecting

14  their continuity of representation as much as the rest of the

13:31:34 15  population.

16  Q   So as the map drawer you would want to make sure that you

17  are protecting the voting rights of minority populations in

18  particular?

19  A   I would argue that the motivation is less to ensure that

13:31:55 20  you are protecting them more so to deeply understand and

21  measure them and understand it and know where and why and what

22  the tradeoffs are if you are making significant changes to an

23  existing districting plan.

24      It's not to judge and say that you should do it, or you

13:32:14 25  should not do it.  It's more of an identification, a

```
 1  quantifiable measure to say it is happening so that you can

 2  remediate it and understand it, deal with it and acknowledge

 3  whether it's a necessary tradeoff or not.

 4  Q    Mr. Bryan, are you familiar with the redistricting

 5  guidelines adopted by the Alabama reapportionment committee to

 6  govern this redistricting cycle?

 7  A    Yes, ma'am, I am.  I have them available as an exhibit

 8  right next to me.

 9  Q    Okay.  Great.  Let's pull them up so we can all be looking

10  at the same thing?

11  A    Thank you.

12  Q    Caster plaintiffs' Exhibit 82.

13  A    I am just looking to make sure these are the same as what

14  I am looking at.

15  Q    Sure.

16  A    They are.  Yes, ma'am.  The documents -- this is a

17  consistent document with what I have.  Thank you.

18  Q    Okay.  So if we look under Roman Numeral II, we see the

19  criteria for redistricting.

20  A    Yes.

21  Q    Under which the committee lists all the criteria, correct?

22  A    That's right.  Yes, ma'am.

23  Q    I will -- I won't make you sit here and read all the

24  criteria.

25  A    That's all right.  I will.  It's okay.
```

```
 1   Q     I know we've all done it a few times now.

 2   A     It's okay.

 3   Q     But as you review this document, do you agree that the

 4   first five of those criteria, subsections A through E, all have

 5   to do with population equality?

 6   A     Let me pause one moment.  Yes, I agree with that.

 7   Q     And then the next two criteria, subsections F and G,

 8   pertain to the Voting Rights Act, correct?

 9   A     That's correct, yeah.

10   Q     Then if we move on to paragraph H, this paragraph provides

11   that districts should be contiguous and reasonably compact?

12   A     Yes, that's correct.

13   Q     Then paragraph I addresses various requirements embedded

14   in the Alabama State Constitution --

15   A     That's right.

16   Q     -- largely for state legislative districts, correct?

17   A     Yes.  Yes.  That's correct.  May I add, on page 3 there

18   was a sentence that says the legislature shall try to preserve

19   the cores of the existing districts.  I would -- what I was

20   looking at earlier was that statement because to me that almost

21   is a -- is a part of the conversation about minimizing

22   population, deviations, balance populations.  It's just -- it's

23   a little bit out of place in this document to me, to me it

24   would also be kind of tied in some sense to those first

25   requirements you brought up.
```

```
 1   Q     Okay.

 2   A     Sorry for interrupting.

 3   Q     No.  I think you actually are anticipating some of my

 4   questions as well.  So let's actually first go to paragraph J.

 5   A     Okay, let's do.

 6   Q     And we can highlight that paragraph for your ease of

 7   reference.

 8         This is --

 9   A     21 J.  Yeah.  I may be -- okay.  Yeah, I see.

10   Q     Okay?  And paragraph J appears before the paragraph that

11   you just mentioned about core preservation, correct?

12   A     I believe so, yes.

13   Q     Can you please read paragraph J out loud?

14   A     Yeah.  The following redistricting policies are embedded

15   in the political -- if you don't mind, I am going to read off

16   of mine because your face is actually covering that half of the

17   paragraph.  I apologize.

18         The following redistricting policies are embedded in the

19   political values, traditions, customs, usages of the State of

20   Alabama and shall be observed to the extent they do not violate

21   or thwart any foregoing policies prescribed by the Constitution

22   of the United States and the State of Alabama.

23   Q     Okay.  And the custom --

24   A     There we go.

25   Q     -- and the custom of avoiding contest between incumbents
```

```
 1 and core retention are included as subparagraphs to that

 2 paragraph J; is that right?

 3 A    Yes, that's correct.

 4 Q    So you would agree -- I'm sorry.  Go ahead?

 5 A    No, please, ma'am, after you.

 6 Q    You would agree, wouldn't you, that under Alabama's

 7 redistricting guidelines, compliance with the Voting Rights Act

 8 expressly trumps the criteria that you chose to focus on, core

 9 retention and incumbency.

10         MR. DAVIS:  I object, Mr. Bryan.  Just one second.  I

11 think this is asking for a legal conclusion if you're asking

12 for Mr. Bryan's statement as to whether as a matter of law one

13 has priority over another.

14         JUDGE MARCUS:  No, I don't think the question was

15 asking him to tell us what the law is and he's not equipped to

16 do that.  I think the question was simply asking him to focus

17 on the language used in the Alabama Legislature's guidelines.

18 And asked specifically whether these two interests -- core

19 retention being one and incumbency protection in the plan are

20 listed as subordinated to the Voting Rights Act at least

21 insofar as the legislature has expressed its view on these

22 priorities.

23     He's not here to tell us whether something is more or less

24 importantly as a matter of law so much as she's just asking him

25 to read from the form.  Do I have the essence of the question?
```

Timestamps (left margin): 13:36:58 (line 5), 13:37:17 (line 10), 13:37:33 (line 15), 13:38:00 (line 20), 13:38:19 (line 25)

| | |
|---|---|
| 1 | MS. KHANNA:  That's correct, Your Honor. |
| 2 | JUDGE MARCUS:  All right.  Do you understand the |
| 3 | question, Mr. Bryan?  Or do you want her to repeat it? |
| 4 | THE WITNESS:  No.  I believe I understand the |
| 13:38:31 5 | question.  I would like to say two things about this. |
| 6 | First, I look at the universe of traditional redistricting |
| 7 | principles from the state of Alabama as a refinement.  An |
| 8 | improvement, something very specific to the state of Alabama |
| 9 | that's a subset of the congressional redistricting service and |
| 13:38:53 10 | of the NCSL.  And it adds tremendous value and clarity in the |
| 11 | direction of the redistricting exercise for the state. |
| 12 | I am reluctant to offer an opinion that says because of |
| 13 | the order that these are written or how they are written that |
| 14 | one is necessarily more important than another. |
| 13:39:15 15 | In assessing the state of Alabama's plan, it is my |
| 16 | understanding and was my expectation that any care, any |
| 17 | concern, any regard for Voting Rights Act compliance was |
| 18 | accommodated and taken care of and considered in the drawing of |
| 19 | the plan. |
| 13:39:36 20 | I was not asked to and I did not expect to offer an |
| 21 | opinion on if or how much the plan did or did not comply with |
| 22 | the Voting Rights Act.  I acknowledge it's a high and important |
| 23 | criteria.  It is not one that was part of my opinion. |
| 24 | The other items that I investigated were areas that I felt |
| 13:40:01 25 | were important and areas that I have expertise in, and that I |

1  was able to offer an expert opinion in.  I am not in the

2  position to say which of these is more or less important than

3  the other if I understand Ms. Khanna's question.

4  BY MS. KHANNA:

13:40:17 5  Q    Thank you for the clarification.  And to be clear, I am

6  not asking you what you believe to be most important when it

7  comes to evaluating or drawing these plans.

8         But you did evaluate this document --

9  A    Yes.

13:40:29 10  Q    -- in preparation of your report, correct?

11  A    I did, yeah.

12  Q    And you would agree that according to these guidelines as

13  provided by the Alabama reapportionment committee, compliance

14  with the Voting Rights Act expressly trumps the criteria that

13:40:47 15  you chose to focus on?

16  A    I am careful to answer around the word chose to focus on.

17  I did not deliberately choose not to focus on the degree to

18  which this plan complied with the Voting Rights Act.

19  Q    Then maybe I can refine my question.  You would agree that

13:41:12 20  under these guidelines, compliance with the Voting Rights Act

21  expressly trumps compliance with a core retention principle,

22  correct?

23  A    I am not an authority to prioritize or offer an opinion on

24  which traditional redistricting criteria are more important

13:41:41 25  than the other.  I can offer an opinion that compliance with

```
 1  the Voting Rights Act is a big and important criteria and is
 2  one of the highest criteria that we must consider, along with
 3  equalizing population.
 4       I am not in a position to exactly rank order that with
 5  other traditional redistricting criteria.
 6  Q    And, again, Mr. Bryan, I am not asking you, again, to tell
 7  me what you believe is most important.  I understand you don't
 8  have -- you are not offering that opinion.
 9       But I'm asking you to -- about the guidelines in front of
10  you right now --
11  A    Right.
12  Q    -- that you reviewed in preparing your report.  Under
13  these guidelines as you read them, the Voting Rights Act --
14  compliance with the Voting Rights Act expressly trumps core
15  retention, correct?
16  A    The requirement for Voting Rights Act compliance, in order
17  of this document, is written before core retention.  I do not
18  take that as a literal interpretation that that means or how
19  much more it means just by its placement in this document, that
20  it is more important or how much more important it is.
21       The Voting Rights Act compliance was not part of my
22  analysis because I took it at face value that a plan that I was
23  presented with to analyze had already taken that into
24  consideration.  I was -- so if that were the case, then -- I'm
25  sorry.  Go ahead.
```

13:42:01 (line 5)
13:42:18 (line 10)
13:42:34 (line 15)
13:43:00 (line 20)
13:43:22 (line 25)

1  Q    So when you evaluated this document in preparing your

2  report in this case --

3  A    Yes.

4  Q    -- you did not understand it to be saying whether the --

13:43:36 5  whether compliance with the Voting Rights Act was more or less

6  important than compliance with a core preservation principle?

7  A    Yeah.  I think that's very fair and helpful.  Thank you.

8       Whether it was or was not, if there was a question or a

9  concern about whether the state's plan was compliant with the

13:44:01 10  Voting Rights Act or not, I was not presented with that

11  question.  I was not presented with that task.  It was not part

12  of my analysis.  But retroactively I can say in looking at the

13  state's plan with the percent black in District 7 that is

14  consistent with the last redistricting exercise, yes, there is

13:44:25 15  at least one district that is a majority-black district.

16       But other than that as a thought exercise, my analysis did

17  not go any farther than that.  I was not asked to go any

18  farther than that and explore the scenarios or dive into the

19  Voting Rights Act.

13:44:44 20  Q    Just to clarify -- the question I am asking you is about

21  your reading of the guidelines in front of you --

22  A    Yeah.

23  Q    Right now.  In preparation for your report, when you read

24  these guidelines --

13:44:58 25  A    Yes.

1   Q    -- you did not understand them to provide any kind of

2   hierarchy of criteria of the ones that they list here; is that

3   right?

4   A    I didn't, except for the very first sentence, which says

13:45:13  5   they must equalize population.  That's common in a list of

6   priorities to cite the legal requirement first.  After that,

7   the prioritization of VRA, core retention, contiguity, these

8   things I found in a variety of sort orders in different

9   documents like this in my experience.  So I am careful not to

13:45:33 10  prioritize -- literally prioritize one over the other just

11  because the order that they're presented in the document.

12       And I apologize.  I am not trying to be obtuse or

13  difficult.  I'm just reflecting on my understanding and

14  interpretation of the document.  I'm trying to answer as best

13:45:51 15  as I can.

16  Q    I completely understand.  And I just want to make sure

17  that we're both reading the guidelines the same way.

18  A    Thank you.  And it may be.  It may be the case that the

19  authors of this and the state's interpretation of this in

13:46:05 20  developing their plan was to do these in rank order and that's

21  how they arrived at the plan they did.  I don't know.

22  Q    We can take the guidelines down.

23  A    Thank you.

24  Q    Mr. Bryan, are you familiar with how plaintiffs in

13:46:22 25  Section 2 cases are required -- or generally show that they can

```
 1  satisfy the Gingles first precondition?
 2  A    Yes.  I have participated in many cases where they do that
 3  and we do that ourselves on both sides of these cases.
 4  Q    So plaintiffs in Section 2 cases have to demonstrate that
 5  a new majority-minority district could be drawn, correct?
 6  A    That's correct, yes.  With other criteria.
 7  Q    One that does not already exist in the map on -- being
 8  challenged?
 9  A    I'm sorry.  I don't understand the question.  Can you
10  please repeat it?
11  Q    Sure.  So you understand that the plaintiffs -- any
12  plaintiffs in any Section 2 case have to demonstrate that a new
13  majority-minority district could be drawn, and that new
14  majority-minority district is a district that does not exist in
15  the plan that they're challenging under Section 2, correct?
16  A    It may or may not be an adaptation of an existing plan or
17  it may be an entirely new plan as is frequently the case in
18  cases changing at-large voting districts to district-based
19  voting districts.
20       So the answer is it would be depend on what kind of case
21  it was.  But, yes, they would have to show a plan had a
22  majority-minority and be -- satisfy the other major criteria.
23  I agree with that, yes.
24  Q    They have to draw a new plan, correct?
25  A    Yes, ma'am.  Yes.
```

1  Q    One that's different than the existing plan that they're

2  challenging?

3  A    Frequently, if it is an adaptation of an existing

4  district-based plan, that would be the case, again, if it's an

13:48:13  5  at-large plan, then it would frequently be drawn from scratch.

6  And that oftentimes happens.

7  Q    So in a case such as this one, where the plaintiffs are

8  challenging an existing district-based plan?

9  A    Yes.

13:48:26 10  Q    You would -- you would agree that by design, the first

11  *Gingles* precondition requires plaintiffs to present plans that

12  look different from the enacted plan in this regard?

13  A    If they were seeking to design a plan to a new standard

14  that required two districts instead of one district, then, yes,

13:48:54 15  they would have -- if that were the objective, setting aside

16  whether that is a legal objective or not, then, yes, the

17  existing plan would need to be adapted and this is my opinion

18  and understanding that so long as that adaptation does not make

19  race prevail in the design of the districts, then that is a

13:49:20 20  reasonable thing to do.

21  Q    Do you know how many majority-minority districts were

22  included in the 2011 Alabama congressional plan?

23  A    The -- there was -- you're asking about congressional?

24  Q    Yes.

13:49:39 25  A    Yeah.  There was -- I believe there was one and there is

```
 1  one again today, the 7th, I believe.
 2  Q    Right.  So you -- in fact, you characterized the enacted
 3  plan, the 2021 plan, as a least changed plan, correct?
 4  A    Yes, I did.  And that's frequently -- a common use
 5  language in the design of plans like this, where you see
 6  minimum boundary changes necessary to comply with the law.
 7  That's a -- one of several strategies to design a map.
 8  Q    It looks pretty similar, the 2021 plan to the 2011 plan.
 9  A    Yes.  In some regards, I would characterize it as an
10  improvement.  They reduced the -- the degree to which the black
11  population was concentrated in District 7, and, in appearances,
12  they improved compactness and were able to successfully
13  rebalance the population.
14       So there's many traditional redistricting criteria that
15  they appear to have succeeded in fulfilling in the design of
16  that plan.
17  Q    Both the 2021 plan and the 2011 plan included one
18  majority-black district, correct?
19  A    That's my understanding, yes.
20  Q    And you're aware that the Caster plaintiffs in this case
21  are seeking the creation of or an additional majority-black
22  district, correct?
23  A    Yes, that is my understanding throughout all these -- all
24  the plaintiffs, not just the Caster, were all seeking two
25  plans -- two districts.
```

```
 1  Q    And that additional black district does not exist in the
 2  2021 plan, of course?
 3  A    Sure, yeah.
 4  Q    And it did not exist in the 2011 plan, correct?
 5  A    That's correct, yes.
 6  Q    You would agree that if a plan adds a majority-minority
 7  district that wasn't there before, the core retention of that
 8  plan will be less than a plan that retains the same number of
 9  majority-minority districts as the previous plan?
10  A    Yes.  That can often times be the case.  And as an expert,
11  when you are analyzing situations like that, we would look for
12  the degree to which core retention is changed as part of that
13  process.
14       If you are able to adapt an existing plan, and, again,
15  this is -- it's subjective, but if you are able to adapt an
16  existing plan and still not create a significant detriment to,
17  for example, compactness or significantly change core retention
18  or significantly change the geographic boundaries in, you know,
19  materially in a different direction to cover areas that just
20  have never been in one district before, those would be areas
21  where I would look at closely because the effort to create the
22  second district significantly impacted the rest of the
23  traditional redistricting principles.
24       And that's within we start looking at whether these other
25  criteria were subordinated or perhaps even ignored for the
```

13:51:29
13:51:49
13:52:11
13:52:34
13:52:54

1  singular pursuit of the drawing of those two black districts.

2  Q    And the traditional districting principle in this part of

3  the analysis that you focus on is core preservation, correct?

4  A    Yes.  There were, again, I think three main ones.  It was

13:53:17 5  incumbency, core retention and the compactness analysis.  Those

6  were the kind of three that we looked carefully at it as a

7  result of this effort to draw two districts.

8  Q    Okay.  Let's go back to your report, Defendants'

9  Exhibit 4, page 15.

13:53:41 10  A    Yes.  Great.  4, 5, 6, yeah.  This is preceded by several

11  other pages of for context core retention of other Cooper plans

12  and Duchin plans.

13  Q    Right.  And I am actually going to focus on the paragraph

14  at the bottom of these tables?

13:54:00 15  A    Great.  Okay.

16  Q    And here you write, This superior record for the state's

17  plan reflects the advantage of a least change approach --

18  A    Yes.

19  Q    -- simply adjusting existing boundaries where necessary,

13:54:17 20  instead of completely redrawing all districts, as plaintiffs

21  did.

22       Did I?

23  A    Yes.

24  Q    Read that correctly?

13:54:23 25  A    That is correct, yes.

```
 1   Q    You would agree, Mr. Bryan, wouldn't you, that if the plan
 2   under review violates the Voting Rights Act, any advantages of
 3   a least change approach, as you call it, would be superseded by
 4   the need to comply with federal law?
13:54:45 5  A   I can't offer an opinion on that.
 6   Q    You do not offer an opinion on the relative advantages of
 7   a least change approach compared to one that includes an
 8   additional black -- majority-black district?
 9   A    Yeah.  The -- the judgment of that is outside of my scope,
13:55:13 10  and I have no opinion on which one of those is more or less
11   important in the design of a plan.
12   Q    You also --
13              JUDGE MARCUS:  I'm sorry.  You can finish your answer,
14   please.
13:55:26 15             THE WITNESS:  No.  Thank you.  I'm done, sir.
16              JUDGE MARCUS:  All right.  Thank you.
17   BY MS. KHANNA:
18   Q    You also write here that the differences in core retention
19   shows that the significant incremental loss of continuity of
13:55:40 20  representation is borne disproportionally by Alabama's black
21   population; is that right?
22   A    Yes.  That is correct.
23   Q    We can take down the report and so we can see each other
24   better.
13:55:56 25  A   And it is -- factually, it is true.
```

```
 1  Q    Okay.  We can take down the exhibits.  Thanks.
 2  A    Okay.  No problem.
 3  Q    As I understand that conclusion of yours, your position is
 4  that black voters are primarily the ones who suffer from a loss
 5  of continuity of representation in the illustrative plans; is
 6  that right?
 7  A    Suffer is a strong word.  They are disproportionately
 8  impacted, sometimes significantly disproportionately impacted.
 9  Q    You -- you conclude that they are disadvantaged on this
10  metric of continuity of representation in the illustrative
11  plans, correct?
12  A    Yeah.  It's the concept of continuity of representation,
13  whether it is through paired incumbents or through losses shown
14  by core retention analysis, would say that losing your
15  representation is a disadvantage.  It's just -- I represent
16  that not as a professional political scientist, but as a basic
17  core tenent of redistricting in my layman's knowledge of the
18  idea.
19  Q    So black voters disproportionately bear that loss of
20  continuity of representation.  That's your interpretation,
21  correct?
22  A    That's accurate, yeah.  That would be my assessment.
23  Q    Did you consult any -- did you consult any black voters in
24  forming that conclusion?
25  A    I did not speak to any black Alabama voters and I would
```

Timestamps: 13:56:14 (line 5), 13:56:40 (line 10), 13:57:00 (line 15), 13:57:17 (line 20), 13:57:32 (line 25)

1  believe the impact to black voters of the understanding of the

2  impact to the black voters outside of the simple linear

3  interpretation of less representation is worse than more --

4  continuous representation.

13:58:00  5      I would leave the details of those analyses and the

6  interpretation to our political scientist, Trey Hood.  I think

7  he could speak very nicely to that.

8  Q    So your report shows that Mr. Cooper's illustrative

9  plans 1 through 6 retain less of the core of District 2 than

13:58:23  10  the enacted plan; is that right?

11  A    I believe in virtually all of the districts, the retention

12  is lower by district, as well as an aggregate.

13  Q    So Mr. Cooper's District 2 in his illustrative plans is

14  less similar to the 2011 version of District 2 under the

13:58:45  15  Alabama congressional map, correct?

16  A    You mean insofar as compared to the enacted Alabama map?

17  Yes.

18  Q    Yes.

19  A    Yes.  Yeah.  Okay.  Thank you for the clarity.

13:58:58  20      Yeah.  The statistics would show that the percent

21  retention -- I'm going off the top of my head -- would have

22  been in the 90 percent for both black and total population in

23  the Alabama plan and, again, I don't have Mr. Cooper's chart in

24  front of me, but they were much lower -- 30s, 40, 50 percent.

13:59:19  25  I can't speak to the exact number.  Yes.  Lower.

```
 1   Q     You would agree that under the 2011 plan, black voters
 2   were not a majority of the Voting Age Population in District 2?
 3   A     Sorry.  Could you say the question again, please?
 4   Q     Sure.  Under the 2011 congressional plan, District 2 was
 5   not a majority-black district, correct?
 6   A     I do not know whether it was at the time of enactment.  I
 7   know that as of the 2020 census, the enacted plan, District 2
 8   was not a majority district.  That's correct.
 9   Q     Do you know whether black voters had an opportunity to
10   elect their preferred candidates in District 2 under the
11   previous plan?
12   A     I do not know.
13   Q     Do you believe that the current representative of
14   District 2 is the candidate of choice among black voters?
15   A     I do not know the answer to that.  That would be in the
16   scope of our political scientists and outside my expertise.
17   Q     So is it your position that black voters in District 2 are
18   better off remaining in a district in which they have
19   continuity of representation than in a district where they
20   would form a majority of the Voting Age Population?
21   A     Good question.  I would step back and make my assessment
22   more broadly across all districts, which is to say, in general,
23   unless there is an in-depth detailed analysis of a specific
24   district that shows whether or not a specific minority group is
25   satisfied with their representative and want the continuity of
```

1    representation, in general, unless you do that and you look at

2    this measure of continuity of representation and core retention

3    holistically, the starting position is there is a disadvantage

4    to populations who lose their continuity of representation

14:01:26  5    until and unless it is shown that there is some reason that

6    there needs to be a change in that continuity and the change

7    benefits them more than the continuity that they lose.

8         Did I say that in a clear way?  Does that make sense?

9    Q    I believe so.  I --

14:01:44 10    A    Okay.  Thank you.

11    Q    I just want to make sure -- I am going to go back to the

12    transcript to make sure my question was clear.

13    A    Yeah.  I want to make sure I got it right for you.

14    Q    I am going to restate the question as I'm reading it in

14:02:01 15    the transcript just to make sure we're speaking about the same

16    thing.

17    A    Sure.

18    Q    Is it your position that black voters in District 2 are

19    better off remaining in a district in which they have

14:02:12 20    continuity of representation than in a district where they

21    would form a majority of the Voting Age Population?

22    A    So I cannot answer that question specific to District 2.

23    I can say holistically for all districts, if there is a

24    population that loses their core retention, and particularly if

14:02:39 25    there is a minority population that disproportionately bears

1  the brunt of a loss of their core retention, then there would

2  be need to be additional in-depth analysis of a specific

3  district, such as the one you're leading to, District 2, to

4  deeply understand whether the tradeoff, because of an

14:02:57 5  understanding of whether the representation is representation

6  they want or not, is real.  And it's something they want.

7       It's hard to tell without knowing holistically, but the

8  starting point is until that analysis is done, the assumption

9  is if you have great loss of representation, you need to be

14:03:17 10  able to go on and show that there is some benefit for the

11  significant loss of representation that we're measuring.

12       I did not do that analysis.  I simply measured how much

13  core retention there is and set the stage for how much of a

14  difference there is for the new plans, the plaintiff plans,

14:03:36 15  compared to the enacted Alabama plan.  And I can quantify that

16  difference.

17  Q    Okay.  Great.  I think you just answered my next question,

18  which is you did not provide any analysis of the tradeoffs

19  between the advantages on one metric and the disadvantages on

14:03:51 20  another?

21  A    No.  I really -- that's outside of my scope and my

22  expertise.

23  Q    Okay.  Great.  Let's go to your incumbency analysis, which

24  is the next --

14:04:00 25  A    Thank you.

1   Q    The next criterion on which you analyze the illustrative

2   plans.  And I think we can turn to page 16 of your report.

3   A    Yes, ma'am.

4   Q    In this top paragraph here at the end of that paragraph,

14:04:20  5   you say that the Duchin and Cooper plans do not -- you're

6   referring to the previous sentence -- you said that they pack

7   incumbents.  Do you see that?  What do you mean by --

8   A    Do not -- that might be -- it says do not unpack -- it

9   should read Duchin and Cooper plans do not unpack incumbents as

14:04:44  10   follows.  It may not say do not and unpack.

11       The crux of the statement is that the Duchin and Cooper

12   plans pack incumbents.

13   Q    Okay.  Great.  Can you explain to me what you mean by

14   packing incumbents?

14:05:02  15   A    Yes.  I use that not as a precise scientific term.  You

16   could also say as pairing incumbents, grouping incumbents.

17   It's the practice of putting more than one incumbent in a

18   different -- in a district and leaving other districts

19   unrepresented.

14:05:26  20   Q    So I think on your direct testimony, you mentioned -- I

21   think you even used the term cracking and packing incumbents.

22   Does that sound right?

23   A    It was convenient language.  It may not have been

24   appropriate to use that redistricting context, but the idea is

14:05:39  25   that in the practice of redistricting, if you put multiple

```
 1   incumbents in one district, you're pairing them, and then in
 2   other districts that you leave abandoned, you can be leaving
 3   them -- you're leaving them essentially without any
 4   representation or certainly no continuity of representation.
 5   So I apologize for the confusion in the language.
 6   Q    No.  I appreciate that because as you know in
 7   Section 2 cases, the words packing and cracking do have certain
 8   connotations.
 9   A    Yeah.  Thank you for the critique.
10   Q    So when you talk about packing incumbents, what you mean
11   is pairing incumbents?
12   A    Yes, ma'am.
13   Q    Okay.  And it's your opinion that the Alabama enacted plan
14   respects incumbents, correct?
15   A    Yes.  We performed an independent analysis.  We put the
16   incumbents to the best of our ability where we understand their
17   residences are.  We overlaid the existing Alabama plan.  And
18   our analysis suggests that none of the incumbents -- there is
19   not more or less than one incumbent in any given district.
20        We did not find that in our analysis of other plaintiff
21   plans.
22   Q    You can take down the exhibit.
23   A    Great.  Thank you.
24   Q    Maybe you have already answered this question.  But can
25   you explain why do you believe that protecting incumbents is an
```

Timestamps in left margin:
14:06:01 (line 5)
14:06:17 (line 10)
14:06:31 (line 15)
14:06:55 (line 20)
14:07:10 (line 25)

1    important redistricting principle?

2    A    Yeah.  That's a great question and an important one.

3         You know, in representation, representation of a

4    population, historically there's a lot of evidence to suggest

14:07:32  5    that a representative, political representative, whether it's

6    local, county, state, or even a U.S. representative, that those

7    representatives over time and only with time have the

8    opportunity to deeply learn, know and understand the geography

9    that they represent, their constituency, the economy, the

14:08:07  10   demographics, the characteristics of the area that they

11   represent.

12        And so if you have a situation where you have a

13   representative and you turned that representative over

14   four years, every time, no matter what, and you don't give an

14:08:29  15   incumbent the time to build that long tenure and relationship

16   with their constituency and the deep knowledge of the geography

17   they represent, you kind of put yourself in an environment

18   where whoever the new freshman representative is, is spending

19   all the time in the first term learning their constituency and

14:08:51  20   learning all these valuable things, that they don't ever have

21   time to go actually leverage that deep penetrating insight and

22   knowledge of their constituency to benefit them.

23        Terms can frequently run out before they have even gotten

24   started.  And it's a generalization, but it's I believe it's a

14:09:09  25   fair one.

1  Q    So if I understood your testimony correctly, you believe

2  that the longer an incumbent has served in their district, the

3  better able they are to know about the needs of their

4  constituents?

14:09:26 5  A    Generally, it is true.  And the decision as to whether or

6  not an incumbent should remain and represent the values,

7  beliefs, and the needs of their people with policy should be in

8  the hands of the people.

9     The decision as to whether an incumbent should or should

14:09:45 10  not continue representation of their constituency should not be

11  decided as part of a redistricting practice that can pit

12  multiple incumbents that may both be doing a very good job

13  against each other and one of them losing all of that

14  experience and representation just because of the design of a

14:10:07 15  plan.

16  Q    And just so I'm clear, the your position in your testimony

17  about the benefits of protecting incumbents, is that -- that's

18  not based on your demographic expertise, is it?

19  A    No, that is not.

14:10:23 20  Q    That's just your personal opinion?

21  A    Again, I would base that on my knowledge and experience in

22  working with the political scientists that I work with on my

23  case and my general knowledge of the Democratic system.

24  Q    All right.  So it's based on your knowledge working with

14:10:40 25  political scientists, but it's not based on any political

1  science expertise that you bring to bear on the issue?

2  A    I certainly agree with that.  It's my responsibility as a

3  demographer and an expert in these cases to at least have some

4  amount of knowledge about each one of these traditional

14:10:57 5  redistricting criteria and I think I have enough of that to be

6  able to represent my knowledge and why it's important.

7  Q    And if I understand --

8  A    Expertise.  Sorry.  Go ahead.

9  Q    And if I understand your testimony correctly, you -- your

14:11:13 10  position is that more senior members of Congress are better

11  able to serve their districts than more junior members; is that

12  fair?

13  A    That would be a general statement.  I would not pick on

14  any particular freshman or tenured Congressman in that at all.

14:11:34 15  I'll tread carefully.

16  Q    I am not trying to trap you in that, don't worry.

17  A    No problem.  Thank you.  But in general, yes, if people

18  have been around longer and they know their constituency and

19  know the halls of Congress, then they are probably going to do

14:11:48 20  a good job for their people.

21  Q    Sounds good.  Let's actually turn to your incumbency

22  analysis of Mr. Cooper's plans.

23  A    Thank you.

24  Q    On page 16 of your supplemental report, Defendants'

14:12:02 25  Exhibit 4.

```
 1   A    Yeah.  There's both Duchin and Cooper on this one.

 2   Q    I am going to leave it to the Milligan plaintiffs' counsel

 3   to discuss Dr. Duchin's plans, but I will focus on just that

 4   last bullet point.

 5   A    Okay, great.

 6   Q    That's the one that addresses Mr. Cooper's plans, correct?

 7   A    Yeah.  Yeah.

 8   Q    And there you conclude that Mr. Cooper's plans 1, 2, 3, 4

 9   and 6 pair incumbents; is that right?

10   A    Yeah, I believe that's the case.  Again, we did our best

11   job to join where we believe the representatives to be with our

12   best, most accurate knowledge of the boundaries of his plans.

13   Q    So you don't make any mention of Mr. Cooper's Illustrative

14   Plan 5 in this analysis, correct?

15   A    Yeah.  I don't believe that plan 5 -- I will be careful

16   here.  Mr. Cooper did not present a boundary file for plan 5.

17   My team had to build it.

18        I don't remember honestly whether when we did our

19   incumbency analysis whether plan 5 is omitted because we did

20   not have a plan 5 for Mr. Cooper or because plan 5 manages to

21   not pair any incumbents.  It is one of those two.  I honestly

22   do not remember which -- in the rapid sequence of events, which

23   one of those two it was that --

24   Q    So --

25   A    -- did not pair.
```

1   Q     -- your -- so your understanding is that Mr. Cooper did

2   not provide a shapefile for Illustrative Plan 5?

3   A     Yeah, we did not.  I'm sorry for interrupting.

4   Q     But he did provide that -- those shapefiles for the other

14:13:57  5   illustrative plans; is that correct?

6   A     Yes, ma'am.  And to be precise, when we realized we did

7   not have a plan 5 shapefile, my team, who are experts in this,

8   were able to build a plan 5 from what is known as his block

9   correspondence file.  So we did have it.  I just don't know if

14:14:16  10   that's why it's not mentioned in this piece or not.

11   Q     Did you ever request the block shape -- the shapefile or

12   the block equivalency file for Mr. Cooper's Illustrative Plan 5

13   and note that it was missing?

14   A     Yeah.  No.  We actually did not.  There was no time for

14:14:34  15   that.  We were able to build it very quickly and put it into --

16   put it into practice before we would have gotten the file from

17   Mr. Cooper.

18   Q     Do you feel like you had an opportunity to evaluate

19   Mr. Cooper's Illustrative Plan 5 in writing your report in this

14:14:53  20   case?

21   A     Yes, ma'am.  We did.  And I believe that our creation of

22   the plan 5 was accurate because the statistics that we were

23   able to generate that were -- we were able to get those to foot

24   back to some of Mr. Cooper's statistics for plan 5, so I

14:15:12  25   believe we did an accurate job with that.  I just don't know

1   whether we had the incumbencies before or after we drew that.

2   Q    Isn't it true, Mr. Bryan, that Mr. Cooper's Illustrative

3   Plan 5 does not pair any incumbents?

4   A    I don't know the answer to that.  It is possibly true.

14:15:35 5   Q    If we assume for the moment that Mr. Cooper's Illustrative

6   Plan 5 does not pair any incumbents, you would agree that by

7   your definition, it respects incumbents, correct?

8   A    If that is the case, then, yes, I would agree with that

9   statement.

14:15:54 10   Q    Okay.  In your bullet point here, you note that

11   Mr. Cooper's illustrative plans 1, 2, 3, 4, and 6 pair just one

12   set of incumbents; is that right?

13   A    That is correct.  Moore -- they were the same for each

14   plan, Moore and Carl.

14:16:20 15   Q    The incumbents from Districts 1 and 2?

16   A    Yes.  Correct.

17   Q    Okay.  We can take down the exhibit.

18        And I believe you just mentioned this, but do you know who

19   the current representative of District 2 is?

14:16:36 20   A    I think they may have been just in the last exhibit.  I

21   don't know off the top of my head.  I'm sorry.

22   Q    I will represent to you that the current representative of

23   District 2 is Barry Moore.

24   A    Moore.  Okay.  Yeah.  That sounds correct.

14:16:52 25   Q    And Mr. Moore was just newly elected in 2020, correct?

```
 1   A    I don't know the answer to that.
 2              MR. DAVIS:  Pardon me, Ms. Khanna, excuse me, Judges.
 3   If it would be possible sometime in the near future when it's
 4   convenient, Ms. Khanna, to have a brief recess.
 5              JUDGE MARCUS:  Sure.
 6              MR. DAVIS:  It's a little early.
 7              JUDGE MARCUS:  I understand.  We are usually going to
 8   go about 90 minutes per break.  Ms. Khanna, do you want to just
 9   take the next 10 minutes and we will break, or what's your
10   pleasure?
11              MS. KHANNA:  If I could just finish up on this
12   incumbency, please, I will be happy to take a break then.
13              JUDGE MARCUS:  You sure can.
14              MR. DAVIS:  Thank you.
15   BY MS. KHANNA:
16   Q    So you don't know when Mr. Moore was elected to
17   congressional District 2, right?
18   A    No.  No.  And when people were elected had no bearing in
19   my incumbency analysis.  It was they are representative.  They
20   are in or they are out.  It's as black and white as that.
21   Q    But you did -- you did testify that one of the reasons you
22   believe that incumbency protection is important is because the
23   longer that an incumbent has served a district, the better able
24   they are to serve that district; is that right?
25   A    Yeah.  Yes, that's absolutely true, for sure.
```

The timestamps in the left margin are: 14:17:14 (line 5), 14:17:26 (line 10), 14:17:35 (line 15), 14:17:50 (line 20), 14:18:08 (line 25).

1    Q    So it would be relevant to your opinion on that score that

2    whether or not the incumbent in District 2, which is paired in

3    Mr. Cooper's Illustrative Plans 1, 2, 3, 4, and 6, has served

4    for a long time or was newly elected in 2020, correct?

14:18:27  5    A    Yeah.  I would say it makes -- it would make some

6    difference, and not one that I can quantify, whether they have

7    been a long-serving representative or not, but I would say that

8    certainly if you look at the events of the past two years in

9    our great nation, that anyone who has been through that

14:18:47 10    experience has learned a lot about their districts, their state

11    and the role that they have on Capitol Hill.

12    Q    So I take it you do not or do you know who represented

13    District 2 before Congressman Moore?

14    A    No.

14:19:06 15    Q    I will represent to you that Representative Martha Roby

16    represented District 2 for over -- for a decade prior to that.

17    A    Great.  Okay.

18    Q    Do you know who the current representative of District 1

19    is?

14:19:23 20    A    No.  The names of the representatives by district were not

21    a relevant part of my analysis.  It was binary.  Are they

22    paired or are they not paired.

23    Q    I'm sorry.  I don't mean to quiz you on it.

24    A    No.  It's okay.  Go ahead.

14:19:40 25    Q    I know I took down the exhibit, but in the last bullet

1    point of your incumbency analysis, you note that

2    Representatives Moore and Representatives Carl in Districts 1

3    and 2 are the ones that are paired in Mr. Cooper's plans.

4    A    I believe so.  That's -- I would have just taken those

14:19:58 5    names from the file when I performed the analysis.

6    Q    So the representative of District 1 that you mentioned in

7    your analysis is Representative Jerry Carl; is that right?

8    A    I believe so.

9    Q    And Mr. Carl was also newly elected in 2020, correct?

14:20:15 10    A    I don't know.

11    Q    But you are familiar with who represented District 1

12    before Mr. Carl; is that right?

13    A    I -- I will -- if we want to just go quickly through this,

14    I do not know the election history by district for the state of

14:20:35 15    Alabama.  So we could go one by one, or I can just tell you I

16    don't know who was the preceding U.S. representatives in any of

17    the districts or how long they served for.  It was a binary,

18    black or white exercise.

19    Q    I believe in your report you do refer to the testimony of

14:20:53 20    Representative Bradley Byrne; is that right?

21    A    Yeah.  There was, you know, relevant to the conversation

22    about communities of interest and part of my education on

23    communities of interest, especially in Alabama, and I'm

24    sorry -- in Mobile and Baldwin counties, yeah, there was some

14:21:15 25    pre -- there were two previous representatives there that I

1    relied on, some of their testimony in a previous case to help

2    me learn better about what the Mobile-Baldwin County

3    environment was.  That is true.  But, again, how long those two

4    representatives served for, what the circumstances of their

14:21:33  5    departure are, I don't -- I don't know the answer to that.

6    Q    Okay.  I will represent to you that Bradley Byrne was the

7    representative of CD 1 prior to Mr. Carl.

8    A    Sounds good.

9    Q    So, Mr. Bryan, is it your position that it is important

14:21:52  10   for continuity of representation to ensure that both of the

11   incumbents of Districts 1 and 2 remain in their districts?

12   A    I'm sorry.  I may have lost your audio for just a moment

13   at the end of your statement.  Can you please restate so I make

14   sure I get all of it?

14:22:11  15   Q    I sure can.  And I just wanted to make sure.  Can

16   everybody hear me now?

17         JUDGE MARCUS:  We hear you fine.  Just put the

18   question again, please.

19   BY MS. KHANNA:

14:22:19  20   Q    Mr. Bryan, is it your position that it is important for

21   continuity of representation to ensure that both of the

22   incumbents of Districts 1 and 2 remain in their districts, even

23   though they have served less than one year in office?

24   A    My opinion is that any representative who has had any

14:22:43  25   amount of time in office is more seasoned and has more tenure

```
 1   and experience with their constituency than one who has had
 2   none.  And I don't differentiate Districts 1 and 2 versus any
 3   others.  I say incumbency and continuity of representation is a
 4   theme that is important, and any amount of experience is
 5   valuable and important.  And certainly pitting even two
 6   freshmen representatives against each other will assure that
 7   some -- even limited number of years of experience in the House
 8   are going to be lost that are going to then be replaced.
 9   Q    Okay.
10        MS. KHANNA:  I believe that closed up my questions on
11   the incumbency please, Your Honor.  If this is a good place to
12   break, I'm happy to break now.
13        JUDGE MARCUS:  We will take our 15-minute break at
14   this point.  We will come back and pick up the thread of your
15   cross-examination.  Thank you.
16        (Recess.)
17        JUDGE MARCUS:  Are the parties ready to proceed?
18     Ms. Khanna, you may proceed.
19        MS. KHANNA:  Thank you, Your Honor and actually,
20   before I ask my next line of questions, I just wanted to make
21   sure that I offered into evidence the Evenwel brief that we had
22   it marked for identification earlier.  I would offer it as
23   plaintiffs' exhibit -- Caster Plaintiffs' Exhibit 106 into
24   evidence.
25        JUDGE MARCUS:  Any objection?
```

14:23:05   5
14:23:25  10
14:23:39  15
14:38:25  20
14:38:42  25

1          MR. DAVIS:  Judge, obviously no objection to it being

2   marked to an impeachment exhibit to memorialize the

3   conversation, but it's been so long since I have seen it, I

4   don't know what else may be in it that we didn't talk about it

14:38:54  5   before.

6          JUDGE MARCUS:  Why don't you do this:  At your

7   leisure, take a look at it, and then come back Monday and let

8   us know.  We have the opportunity to redact it and just receive

9   those portions that the bore directly on the questions and

14:39:09 10   answers, if you would like, as well.  But we will reserve on

11   that, Mr. Davis and Ms. Khanna, just to give the Secretary of

12   State's counsel a chance to review it because it was a long

13   brief filed with the Supreme Court.  I know it was used

14   fundamentally for the purposes of impeachment.

14:39:30 15      We will leave that issue open and you come back and let us

16   know on Monday your pleasure, Mr. Davis.

17          MR. DAVIS:  Thank you, Judge.

18          JUDGE MARCUS:  Ms. Khanna, you may proceed.

19          MS. KHANNA:  Thank you, Your Honor.

14:39:41 20   BY MS. KHANNA:

21   Q    Mr. Bryan, let's turn to your compactness analysis.

22   A    Thank you.

23   Q    That's the third criteria on which you evaluate

24   Mr. Cooper's plans.

14:39:52 25      Mr. Bryan, when we went over the redistricting

```
 1  guidelines -- I won't pull them up again -- but those provide

 2  that districts should be composed of reasonably compact

 3  geography; is that right?

 4  A    Yes.

 5  Q    Your report does not set out any threshold or standard by

 6  which to judge whether a map is considered reasonably compact;

 7  is that right?

 8  A    There are no such standards.  Dr. Duchin elaborated on

 9  this yesterday.  It can depend on numerous factors and there's

10  no commonly accepted numbers.  It's relative from one plan to

11  another.

12  Q    Great.  So no objective standard about when a district or

13  a map is objectively compact versus non-compact?

14  A    It's typically regarded as a relative comparing those

15  statistics from one plan to another plan, not universally in

16  the business.

17  Q    And you're not aware of any requirement that illustrative

18  plans in a Section 2 case be as compact or more compact than

19  the enacted plan, are you?

20  A    I am not aware.

21  Q    So your compactness analysis with respect to Mr. Cooper's

22  illustrative plans is contained on pages 17 through 19 on your

23  supplemental report and Appendix 5 to that report; is that

24  right?

25  A    Okay.
```

14:40:07 5
14:40:26 10
14:40:46 15
14:41:02 20
14:41:24 25

1   Q    In the interest of time, I won't pull that up to show you.

2   You can peruse that if you have the report in front of you.

3            JUDGE MARCUS:  If you need it on the board, you just

4   let us know, Mr. Bryan.

14:41:37 5            MR. DAVIS:  I will stipulate Ms. Khanna gave the

6   correct page number.

7            JUDGE MARCUS:  Okay.  Great.

8            THE WITNESS:  Great.  Sounds good.

9            JUDGE MARCUS:  My concern, Mr. Davis, was not that she

14:41:48 10  gave the right one, but that he might not recall everything in

11  it without seeing it.

12            THE WITNESS:  Your Honor, I have the compactness

13  scores right here next to me if you would like me to refer to

14  them.

14:41:58 15            JUDGE MARCUS:  I leave it up to you and counsel.  You

16  may proceed, Ms. Khanna.

17            THE WITNESS:  Thank you, sir.

18            MS. KHANNA:  Thank you, Your Honor.

19  BY MS. KHANNA:

14:42:04 20  Q    Mr. Bryan, I will be sure to direct you to any specific

21  portion of that analysis as we go through it.

22            Your analysis contained in your report, your compactness

23  analysis consists entirely of the numerical metrics of

24  compactness on a number of different measures; is that right?

14:42:21 25  A    That is correct.

1  Q     Your compactness analysis does not contain any analysis of

2  the contours of specific districts in Mr. Cooper's illustrative

3  plans; is that right?

4  A     I'm sorry.  I do not understand the question.

14:42:38 5  Q     When you are evaluating the compactness of Mr. Cooper's

6  illustrative plans --

7  A     Uh-huh.

8  Q     -- you evaluate them solely based on their metrics, the

9  Reock score, the Polsby-Popper score, the Schwartzberg score,

14:42:57 10  and the convex hull score?

11  A     Yes, that's correct.

12  Q     You do not analyze any of the specific contours of the

13  districts actually drawn other than their compactness scores?

14  A     Yes.  As a practice in compactness, except for

14:43:17 15  diagnostics, you would not go analyze any specific contour or

16  detail or part of a district.  There's one number that

17  represents the plan.

18  Q     You provide no analysis to the extent to which county or

19  city or VTD boundaries informs the compactness of a given

14:43:39 20  district in Mr. Cooper's illustrative plans?

21  A     I do not.  But the decision to comply with county

22  boundaries or other boundaries that they create better

23  compactness or poorer compactness, as was the case with some

24  districts in Alabama, is solely at the discretion of the drawer

14:44:03 25  of the plan.

1  Q    And you don't provide any analysis of the extent to which

2  highways and rivers inform the compactness of any given

3  district in Mr. Cooper's illustrative plans?

4  A    Not in Mr. Cooper's plan.  I do offer some analysis of

14:44:17  5  that in other plans where it was relevant, for example, in the

6  Alabama plan where there was some districts with lower

7  compactness scores.  Those were a result of some geographic

8  features.  I found no strong prevailing geographic features

9  that in particular hindered Mr. Cooper's compactness scores.

14:44:39 10  Q    Well, you don't provide any analysis at all of the

11  geographic or political boundaries of his districts as it

12  relates to their compactness?

13  A    I did not identify any features -- specific features of

14  the plan that were specifically very detrimental, and I defer

14:44:58 15  to Mr. Cooper's expertise and judgment in drawing plans that

16  are either compact or not compact.

17  Q    Toward the end of your direct examination with Mr. Davis,

18  I believe he asked you some questions about whether plaintiffs

19  illustrative plans draw lines that appear to you to be based on

14:45:18 20  race or other traditional districting principles.  Am I

21  recalling that correctly?

22  A    That is correct.

23  Q    But at no point in your report do you provide any analysis

24  of the way in which specific districts in Mr. Cooper's

14:45:35 25  illustrative plans are configured outside of their objective

1  compactness scores.

2  A     Except insofar as to acknowledge how they were precisely

3  drawn to exclude white population and include black population

4  to achieve the majority district status that he was seeking.

14:45:54 5  Q     Can you point me to where in your supplemental report you

6  speak about that topic in Mr. Cooper's illustrative plans?

7  A     It may be in the map -- just give me a moment, let me see

8  if I can track it.

9  Q     Sure.

14:46:58 10  A     It appears I may not have written text about that finding.

11  I would refer to the map of the Cooper's plans to support my

12  observation.

13       I cannot quickly find text if I wrote any about the

14  observations because, as I stated earlier on my direct with

14:47:19 15  Mr. Davis, the performance in the outline of these plans were

16  very consistent with the Hatcher plan, which I did document the

17  degree to which it followed these boundaries exactly.  And in

18  looking at the Cooper plans, as I am now, one after the next,

19  the degree to which they follow black populations and exclude

14:47:41 20  white populations around Birmingham and Mobile are consistent

21  with every one of the other plaintiff plans that I reviewed.

22  So I'll stick with that.

23  Q     And that analysis that you just provided, including the

24  analysis in response to Mr. Davis's questions are not

14:47:59 25  actually --

```
 1              JUDGE MARCUS:  I am not sure we heard the whole
 2    question.  I'm sorry.  Ms. Khanna?  Have we frozen up
 3    completely?  Mr. Davis, can you hear me?  Judge Manasco?
 4              MR. DAVIS:  I can hear you, Your Honor.  I just
 5    believe Ms. Khanna's screen has frozen momentarily.
 6              MR. DUNN:  I think it's Ms. Khanna's screen that's
 7    frozen, Your Honor.
 8              MR. DAVIS:  There she is.  She is back.
 9              JUDGE MARCUS:  Ms. Khanna?
10        Hi, Ms. Khanna.  I think we lost you for a moment.
11              MS. KHANNA:  I apologize, Your Honor.
12              JUDGE MARCUS:  That's all right.  Why don't you start
13    over and ask your question again.
14              MS. KHANNA:  Can everybody hear and see me now?
15              JUDGE MARCUS:  We hear you fine.
16              MS. KHANNA:  Thanks.  Give me one second to
17    reconfigure my screen.  It closed out for a second.
18              JUDGE MARCUS:  Sure.
19    BY MS. KHANNA:
20    Q    Okay.  I am not sure where I got cut off, but my question
21    was the analysis that you just provided about --
22    A    Yeah.
23    Q    -- about how the lines were drawn in Mr. Cooper's
24    illustrative plans --
25    A    Yeah.
```

14:48:26  5
14:48:40 10
14:48:51 15
14:49:22 20
14:49:34 25

```
 1  Q    -- is not an analysis that we will find anywhere written
 2  in your report about Mr. Cooper's illustrative plans, correct?
 3  A    No.  I think that part of the report and the analysis was
 4  pretty light and I think that I was mostly led by the fact that
 5  his plan and Dr. Duchin's plan, all of these plans were
 6  following a very similar pattern.  And if you look at the map,
 7  you will see that they do the same thing as in other plans that
 8  we documented, where we show it follows precisely where black
 9  population is and is not -- I concede that that analysis and
10  that finding is not -- does not appear to be written up in my
11  summary of findings.
12  Q    You provide no analysis in any of the text about the
13  configuration of the districts in Mr. Cooper's plans outside of
14  their objective compactness scores, core preservation scores
15  and incumbency protection scores?
16  A    Yes.  My observation about their consistency in
17  performance in including or excluding black populations is as I
18  am reciting to you right now, looking at the maps that I drew.
19  Q    But not an opinion you expressed in your report?
20  A    Yes, ma'am, that's correct.
21  Q    And at no point in your report do you offer any
22  conclusions or opinions as to the apparent basis of any
23  individual line drawing decisions in Mr. Cooper's illustrative
24  plans?
25  A    I did not.  Yep.  That's correct.
```

The timestamps in the left margin are: 14:49:52 (line 5), 14:50:11 (line 10), 14:50:28 (line 15), 14:50:45 (line 20), 14:50:59 (line 25).

1   Q     So your report analyzes Mr. Cooper's Illustrative Plans 1

2   through 6, correct?

3   A     That's correct.

4   Q     And just to clarify, it does not provide any analysis of

14:51:13  5   the compactness of Mr. Cooper's Illustrative Plan 7 since you

6   did not have that plan in front of you when you wrote your

7   supplemental report?

8   A     Yeah, that's correct.

9   Q     So you offer no opinions or conclusions on Illustrative

14:51:29 10   Plan 7, including its compactness, correct?

11  A     I do not.  And if there is significant evidence of a

12  revelatory or new different plan that is a breakthrough in this

13  case, then I probably would have been alerted to that and I was

14  not.

14:51:43 15  Q     Okay.  Have you actually reviewed Illustrative Plan 7?

16  A     No.

17  Q     Before your testimony today?

18  A     No.

19  Q     You have not even seen that plan?

14:51:53 20  A     It's in my e-mail somewhere.  I have not had a chance to

21  review it.  I'm sorry.

22  Q     So among Mr. Cooper's Illustrative Plans 1 through 6, if I

23  am reading your report correctly, and I am referring you to

24  page 18 of your report, you conclude that Illustrative Plan 4

14:52:14 25  has compactness scores that you believe are comparable to the

|  | |
|---|---|
| 1 | enacted plan; is that right? |
| 2 | A    May I refer to my report? |
| 3 | Q    Please do. |
| 4 | A    Thank you. |
| 14:52:22 5 | Q    Page 18 is specifically where I am looking. |
| 6 | A    Okay.  Great.  I see on page 18 the enacted plan |
| 7 | compactness scores.  Is what you are referring to?  Yeah. |
| 8 | That's it.  Yeah.  Terrific.  Yes.  Yes.  I recognize this. |
| 9 | Yep. |
| 14:52:50 10 | Q    And in the paragraph, the last paragraph on page 18, you |
| 11 | note that only Cooper plan 4 has comparable scores to the other |
| 12 | plans.  Am I reading that correctly? |
| 13 | A    Yes.  That looks like what that says. |
| 14 | Q    And there you further conclude that Mr. Cooper's |
| 14:53:11 15 | Illustrative Plans 1 to 3 and 5 and 6 have inferior compactness |
| 16 | scores to the Duchin plans; is that right? |
| 17 | A    Yes.  That is correct.  Dr. Duchin's plans, because of the |
| 18 | additional compactness she drew into Districts 4 and 5, |
| 19 | outperform in total Mr. Cooper's plans. |
| 14:53:33 20 | Q    Okay.  If we go to the next page to your conclusion |
| 21 | paragraph on page 19 of your report. |
| 22 | A    Yep. |
| 23 | Q    There you say, My analysis of compactness shows that |
| 24 | Dr. Duchin's plans perform generally better on average than the |
| 14:53:51 25 | enacted state of Alabama plans -- |

1    A     Yes.

2    Q     -- although some districts are significantly less compact

3    than Alabama's and significantly better than Bill Cooper's

4    plans.  Did I read that correctly?

14:54:03  5    A     Yeah.  This would be the -- what I would call the -- when

6    I say in aggregate, that's literally the summary across all

7    districts within the plans.  That is correct, yes.

8    Q     So your conclusion as to the compactness of Mr. Cooper's

9    plans here is how they fare relative to Dr. Duchin's plans; is

14:54:26 10    that right?

11    A     It is and also relative as you see in the top two lines to

12    the 2011 existing and 2021 exact -- enacted.

13    Q     But the statement here about the Duchin plans being

14    significantly better than Mr. Cooper's plans, that does not

14:54:49 15    apply to Mr. Cooper's Illustrative Plan 4, which you said was

16    comparable, correct?

17    A     That is the only plan that was remotely close in

18    compactness, as you can see in this Table 3, to the other

19    plans.  And then, in that regard, in Polsby-Popper and

14:55:10 20    Schwartzberg, it is comparable, and Reock, it was not.  Convex

21    hull, it was.  So there's one plan where three of the four

22    metrics were almost comparable with the enacted plans.

23    Q     And that conclusion, of course, does not apply to

24    Illustrative Plan 7, which you haven't reviewed in this case?

14:55:33 25    A     No, ma'am.  I cannot offer an opinion.

1  Q    Okay.  We can take down the exhibit.  Mr. Bryan, at no

2  point in your report do you offer any opinion or conclusion

3  that any of Mr. Cooper's illustrative plans are not reasonably

4  compact, do you?

14:55:52 5  A    I have no opinion on what is reasonable and what is not

6  reasonable.  There's no such standard in the industry.  I

7  present it in relative terms to other potential options that

8  the state of Alabama could consider for their redistricting

9  solution.

14:56:14 10  Q    Let's move on to your discussion of communities of

11  interest.

12        I believe that the three traditional redistricting

13  principles on which you evaluated Mr. Cooper's plans were the

14  ones we just discussed -- core preservation, incumbency and

14:56:30 15  compactness; is that right?

16  A    Uh-huh.

17  Q    Your supplemental report does not analyze any of

18  Mr. Cooper's illustrative plans based on communities of

19  interest, correct?

14:56:39 20  A    There's only one major finding of communities of interest

21  in the -- the Hatcher, the Duchin and the Cooper plans, which

22  is the disruption of the community of interest in Mobile and

23  Baldwin counties.

24  Q    And that analysis of communities of interest is included

14:57:00 25  in your first report, correct, not your second?

```
 1  A     Yes, ma'am, correct.
 2  Q     You had not reviewed any of Mr. Cooper's plans at that
 3  time?
 4  A     No.  But they are -- given the consistency of those plans
 5  with the original plan, I would make the same assessment and
 6  generalize my findings on the Mobile community of interest to
 7  Cooper and Duchin's plans.
 8  Q     So if I am looking at the same conclusion paragraph that
 9  we just discussed in your supplemental report, you say that the
10  plans provided by Mr. Cooper have generally similar features
11  and performance as the Hatcher plan; is that right?
12  A     That's correct, yes.
13  Q     What do you mean by performance?
14  A     So I mean performance insofar as the demographic
15  characteristics of it, the compactness of it, the impact to
16  incumbency, the traditional redistricting principles that we
17  assessed Hatcher with were the same ones that we looked at the
18  Cooper and the Duchin plans.
19        Geographically speaking, the performance of the plans were
20  similar geographically insofar as they change the boundaries
21  around Birmingham.  They extend to District 2, all the way to
22  the eastern -- generally to the eastern edge of Alabama and
23  also pushed the district down into Mobile and Baldwin counties.
24  Geographically that's what I -- in a very high level what I
25  would mean in terms of geographic performance.
```

1  Q    So your analysis of the Hatcher plan is entirely included

2  in your first report; is that right?

3  A    Yes, ma'am.

4  Q    And there are a few features of the Hatcher plan that you

14:58:52 5  thought it was important to emphasize in your first report?

6  A    Yes.

7  Q    So one of the features that you emphasize in your first

8  report -- and I am referring specifically to Defendants'

9  Exhibit 2 at page 6 for your reference.

14:59:12 10  A    Okay.

11  Q    You note that the Hatcher plan contains numerous county

12  splits; is that right?

13  A    Yes.  It was not a county-based plan.

14  Q    We can take down the exhibit.  I just wanted to make sure

14:59:26 15  we were looking at the right document.

16        You never mentioned the number of county splits in

17  Mr. Cooper's plans in either of your reports, correct?

18  A    No, I did not.

19  Q    The Hatcher plan, in fact, splits 13 counties; is that

14:59:44 20  right?

21  A    That sounds right.

22  Q    Mr. Cooper's plans -- illustrative plans, however, most of

23  them split only six counties, isn't that right?

24  A    That sounds right.

14:59:57 25  Q    The same number as the enacted plan?

1  A     Could be.

2  Q     And that number -- and six is, of course, fewer than half

3  of the number of splits in the Hatcher plan, correct?

4  A     Based still -- I did not differentiate how many different

15:00:17  5  counties were split except to say that they were.  There was no

6  split counties in the Singleton plan.  There were some -- more

7  number of counties that were split in these other plans.  It's

8  my understanding Hatcher had more, but they all had some.

9         Again, to emphasize, I did not do a detailed split

15:00:58 10  geography analysis.  I just saw what I saw while I was doing my

11  York in these other areas.

12  Q     But when you were evaluating the Hatcher plan in your

13  first report, you believed it was important to note that it

14  split numerous counties, correct?

15:01:19 15  A     Yeah.  I think that was a fair observation, given that

16  plan was presented subsequent to a plan that was purported to

17  have no county splits at all.  So in the context of the

18  previous plaintiffs' plan, I thought it was important to note

19  and emphasize that only insofar as the differences from the no

15:01:41 20  county split plan that had been presented earlier.

21  Q     And for Mr. Cooper's plans that split six counties like

22  the enacted plan, you don't contend that those plans include

23  numerous county splits, correct?

24  A     That's an object -- a subjective statement to say whether

15:02:00 25  it's numerous or many.  There are less numerous than there is

1   in the other plan.  I am sure there are plans and other ways of

2   doing this where there could be less than six county splits as

3   well.

4       I don't have an opinion as to whether Mr. Cooper, in the

15:02:16 5   development of his plans, optimized not splitting counties or

6   not.  This is the type of thing, again, I look for when I do my

7   compactness analysis and whether you use counties as whole

8   pieces of geography are generally reflected in whether you have

9   good compactness scores or not.

15:02:35 10      In his case, even though he split fewer counties than in

11   Hatcher, he still ended up with poorer compactness scores

12   because of the way his districts are configured.

13   Q    You also note in your evaluation of the Hatcher plan that

14   it does not respect incumbents because it pairs two sets of

15:02:54 15   incumbents; is that right?

16   A    That's correct.  Yes.  I am not looking at the exhibit,

17   but I recall that to be true.

18   Q    And just so you make sure you have all the information in

19   front of you, I am looking specifically at page 27 of

15:03:09 20   Defendants' Exhibit 2, your first report in this case.

21   A    Do you have it?

22   Q    I sure can.  I can pull it up.

23   A    I have it.  Yes.  So, yes, the Alabama enacted plan

24   respects incumbents.  There's really not a mention in the

15:03:39 25   plaintiff plan about incumbents, but I noted that the

984

```
 1  plaintiffs' plan pairs, like I said, Moore and Carl in 1,
 2  leaves 2 unrepresented.  Pairs Sewell and Palmer in 6,
 3  leaving 7 unrepresented.
 4  Q    So the Hatcher plan pairs four incumbents, two sets of
 5  incumbents, right?
 6  A    Yes, that's correct.  Two pairs, leaving two districts
 7  unrepresented.
 8  Q    Mr. Cooper's plans, however, only pair one set of
 9  incumbents where they pair incumbents, correct?
10  A    That is correct.
11  Q    Mr. Cooper's Illustrative Plan 5 actually pairs no
12  incumbents; is that right?
13  A    Again, I am uncertain.  I -- if -- you are stating that as
14  a known fact, I cannot confirm that right now.  I believe you
15  if you say it's true.
16  Q    If we assume that it's true, you would agree that in that
17  respect Mr. Cooper's plans are not similar to the Hatcher plan?
18  A    I would say that the difference is whether a plan pairs
19  incumbents or does not pair incumbents.  I don't do degrees of
20  measure of how badly they do it.  The fact that Duchin's plans
21  pair them even more is notable, but the differentiating point
22  is whether you do so or if you do not do so, not how badly you
23  do so.
24       But if Mr. Cooper would like credit for having fewer
25  pairs, but still paired incumbents, then I will concede that.
```

 1  Q    So it's your understanding that the question for whether

 2  or not -- whether or not a plan respects incumbents, is whether

 3  it pairs any incumbents or doesn't pair any incumbents, not the

 4  number of incumbents?

15:05:33  5  A    If there are competing plans that pair incumbents, if

 6  there is, in this case, one pair of incumbents or two pairs of

 7  incumbents as the case may be, I would not draw a distinction

 8  that that means by inference that one plan is somehow superior

 9  in traditional redistricting principles than the other.  It may

15:05:56  10  garner a nod or some small benefit, but the fact that they

11  still split them is the major problem.

12  Q    Mr. Bryan, you recently submitted an expert report in the

13  Wisconsin Supreme Court; is that right?

14  A    I did.

15:06:15  15  Q    And that expert report was in support of a redistricting

16  map put forward by the Wisconsin legislature; is that right?

17  A    That is correct.

18  Q    If we could call up that report.  This is the report that

19  we have been discussing from Wisconsin; is that right?

15:06:46  20  A    Yes.  This is my report.

21  Q    If we could turn to page 6 of that report.

22  A    Great.

23  Q    I believe on page 6 you conclude that the Wisconsin

24  Legislature has proposed assembly plan, was able to conform

15:07:14  25  with numerous traditional redistricting principles including

1  avoiding pairing incumbents; is that right?

2  A    That is correct.

3  Q    And, in fact, the assembly plan that you said respects

4  incumbents or avoids pairing with incumbents in fact did pair

15:07:33  5  six incumbents; is that right?

6  A    Yes.  Yes.  That was mathematically impossible not to do

7  that.  It was not optional in the case of Alabama.  All of

8  these plans pair incumbents unnecessarily.

9  Q    But --

15:07:51  10  A    Please.

11  Q    You would agree that the Wisconsin plan that you endorsed

12  pairs incumbents, correct?

13  A    It -- by necessity, by mathematic necessity, it did, yes.

14  Q    You believe that it avoided pairing incumbents in

15:08:08  15  conformance with traditional redistricting principles?

16  A    The plan avoided in every instance except where it was

17  mathematically impossible not to avoid it, it did successfully

18  avoid pairing incumbents.  The PMC plan and now the other

19  plaintiffs' plans submitted in that case have dozens of pairs

15:08:36  20  by comparison and there is strong evidence that there is

21  partisan politics that are playing into those pairings because

22  many of them are Republican pairs in those plans.  So not only

23  were they not necessary, but they also appear to have a

24  partisan bias.

15:08:54  25       The Wisconsin plan from the legislature did not have a

1  partisan bias.  In fact, they paired two of their own

2  Republican representatives in this, in one of those plans.

3  And, again, it is by mathematic necessity, not out of choice.

4  Q    So when you evaluate -- we can take down the exhibit.

15:09:15  5       When you evaluated incumbent pairings in Wisconsin, you

6  did look at who, in fact, the incumbents were that were being

7  paired, as well as then provide an analysis?

8  A    We were asked by counsel for the legislature to look at

9  the party affiliations of the representatives that were paired

15:09:38 10  and my team of experts did, in fact, analyze that and present

11  findings that were accepted in that report.

12  Q    And when -- I'm sorry.  When you say accepted in that

13  report, has the Court accepted that report or those findings?

14  A    My belief that they have.  I have been busy with a few

15:09:58 15  other things the last few days.

16  Q    I understand.

17  A    Yeah.

18  Q    And in your analysis in that Wisconsin report, you

19  believed it was important to note that the plan that you were

15:10:13 20  endorsing or that you are supporting in your expert report

21  paired fewer incumbents than other plans?

22  A    The -- there was two points, one was the number of the

23  pairs, and then the other was pointing out the significant

24  partisanship of the pairs that were coming from the plaintiffs

15:10:34 25  in that case.  And, yeah, that was -- in conversations with

```
 1   experts and counsel, that became a decisive point in the
 2   analysis and the reason that I fulfilled that.
 3   Q    All right.  Let's go back to the Hatcher plan that you
 4   discussed in your first report in this case.
 5        If we look to Defendants' Exhibit 2, page 16.  We can pull
 6   that up so that everyone is looking at the same thing.  Here up
 7   in the top paragraph you say --
 8   A    Yes.
 9   Q    -- no effort was made to try and conform the boundaries of
10   District 2 to the existing city boundary of Mobile; is that
11   correct?
12   A    Yes.  I looked at this carefully.  The municipal
13   boundaries of Mobile are complex, and, nevertheless, the
14   boundaries of the plan slices through them.  I do not have a
15   count of how many sometimes it splits the boundaries of Mobile.
16   Conventionally, if you were going to make this big of a
17   deviation in a plan to go grab a piece of geography that is out
18   of bounds, such as Mobile, you would do so by trying to include
19   administrative geography such as the city boundaries.
20        This -- the boundaries of the Hatcher plan, the Duchin
21   plans and the Cooper plans in my analysis do not make appear to
22   make any effort to conform to any other administrative
23   geography, rather only to try and capture the most densely
24   black population of Mobile.
25   Q    Just to be clear.  The sentence that's highlighted on the
```

Timestamps in left margin:
15:10:55 (line 5)
15:11:27 (line 10)
15:11:45 (line 15)
15:12:03 (line 20)
15:12:23 (line 25)

```
  1    screen right now is from your first report?
  2    A     Yes.
  3    Q     And it refers only to the Hatcher plan, correct?
  4    A     Yes, ma'am.  That is correct.  Yes.
15:12:34  5    Q     You had not seen any of the Cooper plans at the time you
  6    wrote this report?
  7    A     No.  My statement reflects subsequent observations of the
  8    other plaintiff plans.  I'm sorry.  Retract.
  9    Q     Okay.  Let's pull up Mr. Cooper's Illustrative Plan 6 and
15:12:53 10    let's specifically look at District 2.  That's going to be
 11    Plaintiffs' Exhibit 44.  This was included as an exhibit to
 12    Mr. Cooper's first report.
 13         And if I recall your previous testimony, you did not
 14    review any of the exhibits attached to Mr. Cooper's reports; is
15:13:14 15    that right?
 16    A     No, my analysis was based on the information that I
 17    received -- the electronic information I received that I used
 18    in my geographic information system to perform an analysis that
 19    would be in essence a replication of this map that I'm seeing
15:13:33 20    now.  I did not use or refer to this exact map.  I referred to
 21    my own company's representation of this map in my analysis.
 22    Q     Okay.  But looking at Mr. Cooper's illustrative plan, his
 23    map right here, you would agree that, in fact, District 2 does
 24    keep the city of Mobile whole by conforming to municipal
15:13:56 25    boundaries, correct?
```

1  A    It's difficult to see where that boundaries of the city of

2  Mobile are in this map.  I can't give an opinion.  It may be

3  the case, but I can't tell from this map.  But whether the map

4  contains it is -- would be a misleading statement because you

15:14:21  5  can have a geography that can outer bound a city and capture

6  numerous pieces of irregular geography around it.  Because it

7  contains it does not mean it follows it.  And the benefit of

8  following administrative geography in redistricting is because

9  it captures pieces of administrative geography that enable that

15:14:41 10  district to represent people with similar administrative

11  geography and policy interests and concerns.

12      So stating that this outer bounds, the city of Mobile does

13  not necessarily mean that that means that it's an accurate

14  capture of Mobile.

15:14:56 15      A visual examination of this plan shows a highly irregular

16  draw into the county of Mobile anyway.  So some other thing was

17  happening when Mr. Cooper drew this in this very unusual and

18  unique way, into the otherwise very geometrical simple

19  geography of Mobile.

15:15:18 20  Q    So you don't know sitting here today whether that -- the

21  drawing of District 2 in Mobile County conforms to the

22  boundaries of the city of Mobile; is that right?

23  A    I -- it may -- I want to be precise with my language.

24  That district may outer bound, that is, fully contain the city

15:15:38 25  of Mobile.  I do not believe just looking at this map, which is

1   not precise, whether it exactly follows the boundaries of the

2   city of Mobile or not.  I don't believe that it is.  But I

3   cannot say that definitively.

4   Q    You would agree that if it does exactly follow the

15:15:55 5   boundaries of the city of Mobile, that would make a significant

6   difference between its configuration and the Hatcher plan that

7   you criticize; is that right?

8   A    If this exactly followed the city boundaries of Mobile,

9   that would certainly give it some credence, but that does not

15:16:14 10   change the highly irregular features and the draw that was made

11   to go into Mobile County.  There's no way a map drawer could

12   look at this draw and not avoid the highly irregular draws in

13   and out and around the county.

14   Q    So when you were evaluating whether a district looks

15:16:37 15   irregular, you are doing that without respect to whether or not

16   it's following municipal boundaries; is that right?

17   A    In this particular case, Mobile is only a part of Mobile

18   County and so my visual observation of this draw is showing

19   significant irregularities that are clearly outside of the city

15:17:00 20   of Mobile here.

21   Q    So your understanding is this district -- the district

22   lines of CD 2 do not conform with the city of Mobile

23   boundaries; is that right?

24   A    I am not able to say with certainty whether they do or do

15:17:19 25   not.  It does not visually appear to, given my knowledge of the

1   area.  I would have to see something much more detailed to be

2   able to prove that or not.

3       My assessment is that the draw in Mobile County in this

4   case appears, given the geometric simplicity of the county,

15:17:37 5   that there was some motivation to draw a highly irregular

6   boundary within the county.  And not all of that -- not -- it

7   is not possible to that all of those irregularities were

8   determined simply by the municipal administrative unit of

9   geography known as the city of Mobile.

15:17:54 10   Q    And you mentioned there were motivations, but you, of

11   course, have no knowledge, information or opinion about any of

12   the motivations, correct?

13   A    I don't know what the motivations were.  All I know from

14   my own analysis and maps are that the lines that go down into

15:18:10 15   Mobile across all these different plans, I am speaking

16   generally, not to any one particular plan, go down into Mobile

17   and surgically go into and out of white VTDs and black VTDs,

18   including the black ones and excluding the white ones.

19       If that was the motivation, I would believe that a

15:18:29 20   mapmaker would have just gone into Mobile and taken the whole

21   county.  Otherwise there is no reason to have gone in here and

22   so surgically and forensically grabbed just very precise pieces

23   of the city of Mobile, which we know to be the most densely

24   black portion of the county.

15:18:44 25   Q    And, again, your testimony about which pieces of the city

1  of Mobile may or may not be included in District 2 --

2  A    Right.

3  Q    -- is not about this district that we're looking at right

4  now, you're speaking generally about some of the illustrative

15:19:02 5  plans?

6  A    Yes, ma'am.

7  Q    And about the Hatcher plan?

8  A    That, too.

9  Q    Let's turn -- let's actually look at your depiction of

15:19:10 10  Mr. Cooper's Illustrative Plan 6.  And I think that's going to

11  be at page 88 of your supplemental report.  Defendants'

12  Exhibit 4.  Does this look familiar to you?

13  A    It does, yes.

14  Q    This is your depiction of Mr. Cooper's Illustrative Plan 6

15:19:31 15  color coded by the concentration of black population; is that

16  right?

17  A    Yep, that is correct.

18  Q    And sitting here today, you can't tell me whether the

19  District 2 boundaries depicted in this map conform to the city

15:19:45 20  of Mobile boundaries; is that right?

21  A    I cannot determine that from this map.  I could in a

22  matter of minutes if it's an important point, but I cannot tell

23  from this whether it definitively is or is not.

24  Q    But you can tell from this map that Mr. Cooper's

15:20:08 25  District 2 includes a lot of those red and orange VTDs on your

 1  illustration here; is that right?

 2  A    Are you speaking specifically to the area around what

 3  we're going to characterize as the area around Mobile city?

 4  Q    I'm actually -- I'm looking at a southwest corner of this

 5  map.

 6  A    Okay.

 7  Q    Maybe we can zoom in on it.

 8  A    Sure.  Yeah.

 9  Q    If I am understanding your testimony correctly, you

10  criticize the Hatcher plan and apparently some other plans for

11  excluding white VTDs and including black VTDs into District 2;

12  is that right?

13  A    That's correct.  And just -- this is not one of my

14  close-in maps.  I am not sure I have a close-in map of Cooper,

15  but even with this grainy picture, you can see that there was

16  a -- basically a fish hook where the district was run down the

17  western edge of the state, excluding lots of red, orange,

18  yellow, you know, low black concentrated VTDs and then wrapping

19  around very low population areas in the south corner and

20  reaching up to grab, as you can see the line of the boundary of

21  the district, grabs just the green areas exactly around the

22  city of Mobile.

23       If this plane was not motivated by grabbing just that

24  population, I would have expected the drop to go geometrically

25  just simply straight down from the north and just capture one

```
 1  irregular geometrically continuous space, rather than this
 2  highly irregular draw, fish hooking around just to grab this
 3  black population in this corner of Mobile.
 4  Q    And when you analyze this plan, you did not know whether
 5  those boundaries of District 2 were decisions that Mr. Cooper
 6  made or the lines of the city of Mobile, correct?
 7  A    Yes.  I -- I looked at the city boundaries of Mobile
 8  compared to many of these plans and I cannot give a forensic
 9  accounting off the top of my head.  Every one that I looked at
10  of the plaintiffs' plans did not conform to the municipal
11  boundaries.  If this happens to be one instance where
12  Mr. Cooper got in one that does in some sense follow the
13  municipal boundaries, it may be the case.  But it doesn't look
14  like it from here.
15  Q    And you would agree looking at Mr. Cooper's District 2 in
16  Mobile County, along the west side it includes red and orange
17  VTDs and along the bottom it includes multiple red and orange
18  VTDs before it goes up in that fish hook; is that right?
19  A    It's my understanding that these are very -- that is
20  correct.  It is my understanding those are low population
21  geographies that were used with the intention of connecting
22  District 2 around and up into a much higher population and
23  dense black population around Mobile.
24  Q    Again, you use the word intention and I just want to
25  clarify.  You don't opine on the intent behind any of these
```

15:22:26
15:22:54
15:23:10
15:23:41
15:24:01

1    illustrative maps, correct?

2    A    That is correct.  I do not know the intention.  I can see

3    the effects of an effort to maintain the contiguity of

4    District 2.  It was drawn in such a way -- virtual -- you can

15:24:21 5    see it virtually goes down to a one-lane road on the western

6    border before it expands again and circles up to grab that

7    green high dense black population.

8        So the appearance is that the effort was to draw and

9    connect District 2 as efficiently as possible to get access to

15:24:43 10    that black population in Mobile.  The appearance, if I may.

11    Q    You are drawing inferences of an effort based on the

12    appearance of the district; is that right?

13    A    Yes.  The population to the north of Mobile in this map

14    has more population, and, again, this is my independent opinion

15:25:07 15    and observation, that if Mr. Cooper had drawn this district

16    straight down into Mobile with this configuration, that he

17    would not necessarily have been able to achieve the black

18    majority.  He may have only -- again, it's an opinion, may have

19    only been able to achieve this by connecting that area in

15:25:31 20    Mobile with very low population, admittedly low black

21    population VTDs in order to get there.

22    Q    That's not an opinion you express anywhere in your report,

23    correct?

24    A    That's correct.  Yeah.  This is just an observation

15:25:45 25    looking at the map and then studying this with other maps as I

1  observed these draws to go get Mobile.

2  Q    We can take down this exhibit.

3       You mentioned already that you did not look at

4  Mr. Cooper's Illustrative Plan 7 submitted alongside his

15:26:11  5  supplemental report; is that right?

6  A    Yes, that's correct.

7  Q    So you don't know if Illustrative Plan 7 kept the city of

8  Mobile whole in District 2, correct?

9  A    Do not.

15:26:26 10  Q    Turning back to your first report on your analysis of the

11  Hatcher plan.  You criticize the Hatcher plan on page 20 of

12  that report for expanding the existing boundaries around

13  Birmingham in a very nearly exact way to only add heavily black

14  VTDs and to avoid less black VTDs; is that right?

15:27:05 15  A    Yes, ma'am.

16  Q    Birmingham is in the center part of Jefferson County; is

17  that right?

18  A    Yes, that is correct.

19  Q    And you know from your experience in mapping and

15:27:24 20  evaluating these maps that the western portion of Jefferson

21  County is the heavily white portion of Jefferson County; is

22  that right?

23  A    More so, for sure, yes.

24  Q    And the Hatcher plan, as you recall, does not extend to

15:27:39 25  the western boundary, the western border of Jefferson County?

```
 1  A    Yes.  I recall that.  I am going from memory, but I
 2  believe that's true.
 3  Q    Okay.  Let's pull up Mr. Cooper's Illustrative Plan 1, and
 4  specifically District 7 in that plan.
15:27:58 5       This is plaintiffs' exhibit -- Caster Plaintiffs'
 6  Exhibit 20.  This was included in the exhibits to Mr. Cooper's
 7  report and those again are exhibits that you had not reviewed
 8  in preparing your own report, correct?
 9  A    Yes.  Yes, that's correct.
15:28:19 10  Q   So do you see here how Mr. Cooper's configuration of
11  District 7 includes the western portion of Jefferson County?
12  A    Yes, I do.
13  Q    And in the interest of time, I'm going to represent to you
14  that it does this in at least three other illustrative plans
15:28:40 15  that Mr. Cooper provides.  Does that sound right, based on your
16  memory or your evaluation of these plans?
17  A    It sounds about right.
18  Q    So in that respect you would agree that Mr. Cooper's
19  illustrative plans, including this one, differ from the Hatcher
15:28:56 20  plan, correct?
21  A    There are -- without a doubt there are some similarities
22  and some differences between the plans.  When I talk about them
23  being similar, it is a very high level, again, focusing on some
24  similarities and how adjustments were made in parts of
15:29:15 25  Birmingham, some similarities in how District 2 gets stretched
```

```
 1  and some similarities in how Mobile ends up getting wrapped in,

 2  seemingly unavoidably, to create a second black

 3  majority-minority district.

 4      Beyond that, details such as whether we go into the

 5  western side of Jefferson County or not to me are smaller

 6  details and nuances that, of course, yes, we see that in

 7  Duchin's plan as well, but there are details like that that --

 8  subtle differentiations between the plans, but I subordinate

 9  those in my analysis to the larger ones that actually drive the

10  concentration of black populations in these two districts.

11  Q    When you were evaluating the Hatcher plan you believed it

12  was important to note that in Jefferson County the plan

13  included the heavily black areas of Jefferson County around

14  Birmingham, and excluded the heavily white areas in Jefferson

15  County, correct?

16  A    My analysis showed that to be the case and we provided an

17  exhibit with some detailed maps that illustrate that to be

18  true.

19  Q    In the Hatcher plan?

20  A    Yes, ma'am.

21  Q    You did not similarly assess the extent which Mr. Cooper's

22  plans included the heavily black portions of Jefferson County

23  and excluded the heavily white portions of Jefferson County,

24  correct?

25  A    I did not.  To be precise, I did not include that in my
```

```
 1  report, but the degree that his plan goes up into and around
 2  Pinson and Gardendale, even though I can't see the exact
 3  boundary compared to my maps, yes, there are places where his
 4  maps draw captures black population in the north east corner of
 5  Jefferson County and in some cases there, excludes adjacent
 6  white VTD -- more predominantly white VTDs.  It's not easy to
 7  illustrate that from this map, but it is true.
 8  Q    Let's go to your map, and I don't have that at the ready,
 9  which map we're looking at.
10       But the one that you say would show the BVAP or the black
11  concentration.  Do you know what map we're looking at in your
12  report for that?
13  A    One of the Hatcher.
14  Q    Oh, I'm sorry.  I want to look specifically at
15  Illustrative Plan 1 as depicted in your report.  Mr. Cooper's
16  Illustrative Plan 1.
17  A    Plan 1.
18            MR. DAVIS:  Ms. Khanna, I have that -- turned to that
19  map.  Would you like me to share the page number?
20            MS. KHANNA:  That would be great.  Thank you, Mr.
21  Davis.
22            THE WITNESS:  78.
23  BY MS. KHANNA:
24  Q    Excellent.  Can you --
25  A    78 in my report.
```

15:31:05  5
15:31:26 10
15:31:49 15
15:32:12 20
15:32:16 25

1   Q     Let's pull that up, page 78 of Defendants' Exhibit 4.

2   Thank you, Mr. Davis.  Thank you, Mr. Bryan.

3   A     Yeah, that's correct.

4   Q     Okay.  Make sure I'm looking at that.  So you would --

15:32:30   5   sorry.  Go ahead.

6   A     This map shows my point that when you look at the

7   northeast corner of District 7 in Birmingham, you don't really

8   even have to zoom in to see that where the black line is drawn,

9   everything outside the black line is the lower density black

15:32:53  10   population and very carefully everything inside the black line

11   as part of District 7 is green to dark green, high density

12   black population.

13   Q     You can see here that the western portion of Jefferson

14   County, which is the heavily white portion of Jefferson County

15:33:19  15   is included in Mr. Cooper's illustrative District 7 in a way

16   that it was excluded in the Hatcher plan, correct?

17   A     Yes, I believe that to be true.  Each variation of

18   District 7 would need to include some white population,

19   somewhere in order to get up to the exact population threshold,

15:33:44  20   whether Mr. Cooper does it here, Dr. Duchin does it somewhere

21   else, or Hatcher does it somewhere else, isn't really material

22   or as material to me as the fact that each of these plans goes

23   very carefully to get exactly the black population out of

24   Birmingham necessary to create a black majority district.

15:34:03  25   Wherever the white people are after that to balance out the

```
 1  population is less relevant.
 2  Q    It's less relevant where the white people are.  Is that
 3  what you just said?
 4  A    Yeah.  When you are devising a plan for a black majority,
 5  the most important thing to ensure that you are going to get
 6  your 50 percent black majority is making sure you have an
 7  enumerator that has sufficient number of -- with geographically
 8  compact black population.  And the only way to do that is to
 9  make sure you build an enumerator with this large core
10  concentration of black people in and around Birmingham.
11  Q    But you made a point of criticizing the Hatcher plan for
12  including heavily black VTDs and avoiding less black VTDs,
13  correct?
14  A    Yes.  That's correct.
15  Q    You would agree that where a district includes less black
16  VTDs, under your own analysis of the Hatcher plan, that would
17  be relevant, correct?
18  A    I'm sorry.  Could you restate the question?
19  Q    Sure.  I know that was not clear.  If I understand your
20  testimony correctly, you are now saying it's more important to
21  look at whether a district includes the heavily black VTD s,
22  not the heavily white VTDs, correct?
23  A    Well, it's a comprehensive analysis.  You have to end up
24  looking at all of them.  But if you are looking at a plan to
25  say whether you form an opinion or an assessment of whether a
```

Timestamps (left margin): 15:34:23 (line 5), 15:34:44 (line 10), 15:35:00 (line 15), 15:35:21 (line 20), 15:35:36 (line 25)

1    draw was made for the purpose of including or excluding black

2    population, because you are trying to draw a black majority

3    district, it is most relevant to look at where and how those

4    lines were drawn, and if there are highly segregated black and

15:35:59 5    white populations in different VTDs, such as there are in

6    northeastern Birmingham, it's relevant to note that when the

7    map drawer had a choice, she or he drew a line in a very exact

8    way, just to include -- make sure just to include as

9    efficiently as possible all the dense black heavily populated

15:36:22 10   VTDs there that they needed to make sure District 7 got over

11   50 percent on the whole.

12   Q    It's also relevant to evaluate the extent to which that

13   map drawer included heavily white VTDs in the same district,

14   correct?

15:36:37 15   A    Yeah.  And they would have to somewhere in the plan.  And

16   I agree that there's probably some differences in where

17   Duchin -- and Dr. Duchin and Mr. Cooper and Hatcher acquired

18   that white population to get to the total, where to me it is

19   less important where they got it.  They all had to somewhere.

15:36:57 20   Mr. Cooper chose to get it here in western Jefferson County and

21   that's fine.

22   Q    So you would agree that in creating a district that is

23   majority black, a map drawer would have to include some

24   portions that are heavily black and some portions that are

15:37:11 25   heavily white?

A    I would agree with the assessment they would have to get

some portions -- the most important is they would have to get

half the population black, no matter how you define it, whether

the remainder is white, Asian, Native Hawaiians, multi-race is

15:37:31 less relevant.  It doesn't necessarily need to be expressly

non-Hispanic white population, but it's frequently the case.

Q    But some portions would be heavily black, some portions

will not be heavily black --

A    That's correct.  Yeah.  I like that better.

15:37:47 Q    We can take down the exhibit.  Mr. Bryan, in your initial

report in this case, pages 16 to 17, you discussed this

community of interest that you have spoken about between Mobile

and Baldwin counties; is that right?

A    Yes, that is correct.

15:38:09 Q    And that entire discussion is based on the trial testimony

of former Representatives Bonner and Byrne from the Chestnut

case; is that right?

A    In my report, I rely heavily on that testimony, but I

independently spent time looking at some of the history of

15:38:31 Mobile and Baldwin, the development of that area and the

evolution of their relationship together, just personal history

research in background.  So I rely in Byrne and Bonner in my

report.  I also did personal learning research on the area as

well.

15:38:52 MR. DUNN:  Your Honor, I object -- I was trying to let

1       Mr. Bryan finish.

2           I object to everything after the last three words and move

3       to strike.  It's not responsive and it's completely outside of

4       the scope of his report or his expertise.

15:39:05  5           JUDGE MARCUS:  Let's move on.  Denied.  But let's try,

6       Mr. Bryan, to answer the question as it's asked.  If there's

7       something else, it will be brought out on redirect by

8       Mr. Davis, I'm quite sure.

9           You may proceed, counsel.

15:39:25 10           THE WITNESS:  Yes, Your Honor.

11           MS. KHANNA:  Thank you, Your Honor.

12      BY MS. KHANNA:

13      Q    Your analysis of the community of interest between Mobile

14      and Baldwin counties as presented in your report relies

15:39:35 15      exclusively on the trial testimony of former Representatives

16      Bonner and Byrne; is that correct?

17      A    My testimony in the report did rely on that testimony by

18      Byrne and Bonner, yes.

19      Q    And to the extent you looked at anything outside of that

15:39:52 20      testimony, you have not cited any of that information in your

21      report?

22      A    Yes.

23      Q    On page 17 of your report, and we can pull that up -- this

24      is Defendants' Exhibit 2, page 17.  You state toward the

15:40:12 25      bottom, Due to time constraints, I will rely on this history,

1  evidence and testimony as my defense of why Mobile and Baldwin

2  counties are an inseparable COI.  Did I read that correctly?

3  A    Yes, that is correct.

4  Q    You can pull this down.

15:40:29 5      Just to be clear, that history, evidence and testimony

6  that you note there is the Bonner and Byrne trial testimony

7  that you cite in your report, correct?

8  A    That is correct.

9  Q    It's nothing more than that, there's nothing more that you

15:40:47 10  cite in your report, correct?

11  A    I read all of the testimony and selected those as

12  illustrative and valuable examples that I base my

13  conclusions on.

14  Q    When you discuss, quote, My defense of why Mobile and

15:41:07 15  Baldwin counties are an inseparable community of interest, why

16  did you feel it was the need to mount your defense about the

17  community of interest between Mobile and Baldwin counties?

18  A    As with any expert working on a case, trying to deeply

19  know and understand how and why maps are drawn as they are, I

15:41:34 20  felt it was personally important to deeply understand what the

21  environment is and whether there was cause or reason to divide

22  those or if there was any benefits or drawbacks to drawing the

23  map in that way because it deviated significantly from the way

24  that the map has been drawn in that corner of the state for a

15:41:55 25  long time.  I believe the 1970s, if I am not mistaken.

1    So the purpose of that was to ensure that I had an

2  understanding and was able to say that those were or were not a

3  community of interest.

4    If I had found no evidence that Baldwin and Mobile

15:42:14  5  counties were a community of interest, let alone potentially a

6  strong community of interest, then I would not have had as

7  strong of a personal offense, certainly I don't have the

8  expertise to say that it's unreasonable to try and draw a

9  district down into capture that population in Mobile the way it

15:42:36 10  was done in the plaintiffs' plans.

11  Q    Were you instructed by counsel to provide a defense of a

12  community of interest between Mobile and Baldwin counties, or

13  did you arrive at an independent conclusion that this was a

14  community of interest worth protecting?

15:42:57 15  A    I arrived at that conclusion on my own, given the

16  significant change from the existing plan.  I felt it important

17  to go investigate that and determine on my own, independently

18  form an opinion of whether that was a community of interest or

19  not.

15:43:17 20  Q    That was the only community of have you saw fit to

21  investigate?

22  A    Given that that part of the state was the most significant

23  departure from the existing plan and knowing that particular

24  area did have a very strong social and economic tie around that

15:43:40 25  area, that's the one I found to be most compelling and most

```
 1  notable if it was going to be split.
 2       There are other counties that were split, particularly
 3  around the edges of the Black Belt that were lower population,
 4  less social connection, less economic connection, that it did
 5  not appear in my expert opinion to make a difference or split a
 6  particular community of interest in other parts of the plan the
 7  way that it did in Mobile and Baldwin counties.
 8  Q     You are not from Alabama, correct?
 9  A     Certainly, no.  I am a Virginia boy.
10  Q     You have never lived in either Mobile or Baldwin counties?
11  A     No, ma'am.
12  Q     So your understanding of that community of interest that
13  you discussed between Mobile and Baldwin counties is based on
14  the lay witness testimony of Representatives Bonner and Byrne
15  that you were provided by counsel in this case, correct?
16  A     Primarily, yes.
17  Q     That's the entirety of your expert -- the basis of your
18  expert opinion in this case?
19  A     Yes.
20  Q     Did you also review the trial testimony of anybody else in
21  the Chestnut trial regarding the differences or similarities
22  between Mobile and Baldwin County?
23  A     Not that I recall.
24  Q     So you did not review the testimony of Lakeisha Chestnut
25  regarding her understanding of the differences between Mobile
```

15:43:57
15:44:12
15:44:31
15:44:41
15:45:02

1    and Baldwin counties; is that right?

2    A    I did not, no.  That was certainly not a lack of interest.

3    It was more expediency in trying to get whatever I could as

4    fast as I could for the preparation of my expert report.

15:45:23 5    Q    You were not provided with that testimony; is that right?

6    A    I don't recall.

7    Q    What about this trial and this case?  Did you review

8    Dr. Bagley's supplemental report on the similarities or

9    differences between Mobile and Baldwin counties?

15:45:48 10   A    Yeah.  There was a supplemental report by Bagley that was

11   provided.  I reviewed it briefly.

12   Q    And did you hear Captain Dowdy testify earlier in trial

13   about the differences between Mobile and Baldwin counties?

14   A    I don't recall that I did.

15:46:04 15   Q    Did you review any evidence regarding the differences

16   between Mobile and Baldwin counties when you were providing

17   your expert report in this case?

18   A    Yeah, of course.  In reviewing the history and the

19   development of the relationship of those counties to each

15:46:38 20   other, I learned a great deal about the evolution at the time

21   when Mobile County and Baldwin County were, in fact, separate

22   because of the day there, there was less transportation, less

23   communication, less connective tissue between those two

24   geographies, and they have since grown because of development

15:46:59 25   of infrastructure to be much more closely related than they

1   were historically.

2        I would characterize my analysis of the community of

3   interest of Mobile and Baldwin, frankly, to be more focused on

4   the excision, extraction of Mobile, the city of Mobile from

15:47:22 5   Mobile County probably more so than, you know, whether or not

6   the corner of Baldwin County is connected in District 2 to

7   Mobile County or not.  It's really the focus on the grab of the

8   city of Mobile, the black population of Mobile that caught my

9   attention.

15:47:41 10  Q    The evidence you reviewed in determining your analysis of

11  this community of interest was the lay witness testimony of two

12  witnesses who believed there was a community of interest

13  between Mobile and Baldwin County, correct?

14  A    Yes.

15:47:59 15  Q    You did not review any evidence, any contrary evidence

16  from any other witnesses on this issue, correct?

17  A    No.

18  Q    My last point, Mr. Bryan, you conclude in the passage we

19  just looked at that Mobile and Baldwin counties are an

15:48:21 20  inseparable community of interest; is that right?

21  A    That is the conclusion I arrived at from my research, yes.

22  Q    So it's your belief that those two counties cannot be

23  separated in a congressional plan, correct?

24  A    That is the conclusion I draw from the evidence that I

15:48:40 25  reviewed, yes.

```
 1  Q    Is it your understanding that the Alabama Legislature
 2  believed that those two counties were inseparable?
 3  A    I do not know.
 4  Q    You would agree there was no mention of Mobile or Baldwin
15:48:59 5  counties in the redistricting guidelines that we have gone
 6  over, correct?
 7  A    I don't believe there were any specific descriptions of
 8  secret communities of interest that could or could not be
 9  broken in the guidelines, no.
15:49:15 10  Q    Precisely.  They don't mandate that Mobile -- the Mobile
11  Baldwin community of interest stay together or any other
12  particular community of interest stay together, correct?
13  A    They do not specify, no.
14  Q    And certainly if the reapportionment committee believed
15:49:34 15  that a particular community of interest was so inviable, they
16  could have said as much in their guidelines, correct?
17  A    They could have said so.  My interpretation and analysis
18  says that given that those two counties have been together for
19  some 50 years now through multiple redistricting cycles, if
15:50:01 20  there was a need, an interest, value in separating them, that
21  may have come up in the past and it has not.  And my research
22  suggests that these counties are closer, have grown closer
23  socially and economically throughout that 50-year time period.
24       So with no evidence that any splits have been attempted
15:50:21 25  before for any reason, is my conclusion, especially given the
```

```
 1  expert testimony that I reviewed that those two districts are
 2  something that historically have been retained and the evidence
 3  I reviewed says there's close consecutive tissue that suggests
 4  suggests that they should remain retained.
```
15:50:42
```
 5  Q    I think you just said based on the expert testimony you
 6  reviewed.  You did not review any expert testimony --
 7  A    Byrne and Bonner.
 8  Q    Correct.
 9  A    Yes.
```
15:50:50
```
10  Q    You would agree that the redistricting community
11  guidelines do, in fact, express certain criteria that are
12  inviable, correct?
13  A    Yes.  That's correct.
14  Q    And what are those?
```
15:51:04
```
15  A    Well, complying with the law, making sure that you've got
16  equitable population for sure.
17  Q    And also complying with the Voting Rights Act, right?
18  A    Yes, ma'am.
19  Q    Thank you, Mr. Bryan, I have no --
```
15:51:23
```
20          JUDGE MARCUS:  I did not hear the answer to that
21  question.  Maybe it was me.  Did you answer that question,
22  Mr. Bryan?
23          THE WITNESS:  Yes, sir.  The answer was in the
24  affirmative, that is correct.  The Voting Rights Act it would
```
15:51:35
```
25  be the other inviable role.
```

 1              JUDGE MARCUS:  All right.  Thank you very much.  Did
 2      that conclude it for you, Ms. Khanna?
 3              MS. KHANNA:  It does, Your Honor.  Thank you,
 4      Mr. Bryan.  I pass the witness.
15:51:47 5              JUDGE MARCUS:  All right.  Mr. Dunn, do you need a
 6      break or do you want to get started?  What's your pleasure?
 7              MR. DUNN:  I know it's late, but I think we could
 8      probably --
 9              THE WITNESS:  Could I just -- 5 minutes to grab a
15:52:00 10      drink of water and I can --
11              JUDGE MARCUS:  Absolutely.
12              MR. DUNN:  We could use at least five.
13              JUDGE MARCUS:  We will absolutely take a short break
14      for you, Mr. Bryan and for all of us.
15:52:12 15         Quick question:  Just help me as I think through the rest
16      of the afternoon.
17         I ask the question not to cut you off, but just to get
18      some sense, because I know Mr. Blacksher is to use my baseball
19      lingo on deck.  So tell me how long you think you will be as
15:52:32 20      you go forward and you take the time you need.
21              MR. DUNN:  Ms. Khanna covered a lot of things that I
22      intended to cover.  I really have to do this on the fly.  I
23      will be an hour.  I will try not to be more than an hour and a
24      half, but it will be an hour, and we are looking at 5:00
15:52:50 25      o'clock.  I'm sorry.

| | |
|---|---|
| 1 | JUDGE MARCUS:  Okay.  And then we will follow with |
| 2 | you, Mr. Blacksher.  Thanks very much and we will take as much |
| 3 | time as you need to examine the witness.  We will take a |
| 4 | five-minute break at this point.  Thank you. |
| 15:53:06  5 | (Recess.) |
| 6 | JUDGE MARCUS:  Thank you.  I think we have everybody. |
| 7 | I thought we did.  We are going to begin with the |
| 8 | cross-examination of Mr. Dunn of Mr. Bryan. |
| 9 | Mr. Dunn, you may proceed.  Thank you. |
| 11:03:41 10 | CROSS-EXAMINATION |
| 11 | BY MR. DUNN: |
| 12 | Q    Thank you, Judge Marcus. |
| 13 | Good afternoon, Mr. Bryan.  Can you hear me? |
| 14 | A    Yes, sir.  Good afternoon. |
| 15:59:46 15 | Q    Okay.  If at any point in my examination my questions |
| 16 | aren't clear, you don't understand me, please indicate that. |
| 17 | We have a virtual connection.  I know it's been a long day, but |
| 18 | I will try and be as clear and succinct as I can. |
| 19 | Let me start with your background a little bit. |
| 16:00:10 20 | In your reports, you describe yourself as a demographer |
| 21 | and a political redistricting expert; is that correct? |
| 22 | A    Yes, that is accurate. |
| 23 | Q    But then, Mr. Davis, when he qualified you, also talked |
| 24 | about statistical transformation? |
| 16:00:31 25 | A    Yeah. |

1  Q     Which of those expertises that you referred to your report

2  includes statistical transformation?

3  A     Yes, sir.  It's -- statistical transformation is an area

4  of data science and analytics.  And in this particular case,

16:00:52 5  because of questions around the calculation of the Schwartzberg

6  compactness measure, I felt it reasonable to qualify myself as

7  having background and experience in a specific area of

8  mathematics that was relevant to my use of the adaptation of

9  the Schwartzberg measure.

16:01:11 10       It's a subset and I believe less relevant part of my

11  background and expertise than the top line demography and

12  political redistricting experience.

13  Q     Okay.  But so that's only related to the reformation of

14  Schwartzberg in connection with compactness, right?

16:01:29 15  A     Yeah.  Yeah.  That really doesn't have applicability

16  anywhere else.

17  Q     And it's in addition to the areas of expertise that are

18  referred to in your report?

19  A     Yes, sir.

16:01:38 20  Q     Okay.  Mr. Davis also mentioned predicting population

21  shifts.

22  A     Yes, sir.

23  Q     Where does that fit?

24  A     Part of my background and experience starting with my work

16:01:55 25  at the Census Bureau was developing population estimates and

```
 1  population projection techniques.  In this case, in Singleton
 2  in particular, it was important to me that when I saw that the
 3  use of counties was going to introduce some amount of
 4  population deviation, that I help the Court and I help the
 5  experts and I help counsel understand that the impact of having
 6  even a small population deviation at the beginning of the
 7  decade after redistricting is not the end of the consequences.
 8      The consequences of even a small deviation of population
 9  in a plan starting right now has far-reaching longstanding
10  significant consequences.
11      My experience in developing peer-reviewed professional
12  population estimates and projections, the relevance is that I
13  was able to use that expertise to develop those projections to
14  help the Court and help counsel understand what I would expect
15  to be the deviation at the end of 10 years compared to a plan
16  such as the state of Alabama's, which would be starting with
17  zero deviation.
18  Q    Okay.  So that area of expertise doesn't have anything to
19  do with your testimony vis-à-vis the Milligan case or
20  specifically Dr. Duchin's work, right?
21  A    Yes, sir, that's correct.  It's relevant to Singleton.
22  Q    Then I will let Mr. Blacksher worry about it.
23      Is there any other expertise you claim or utilized in
24  connection with this case other than what you have testified
25  about and we have discussed?
```

Line timestamps: 16:02:17 (5), 16:02:42 (10), 16:03:03 (15), 16:03:21 (20), 16:03:37 (25)

```
       1  A     No, I don't believe so.

       2  Q     Okay.  And you didn't bring to bear any other areas of

       3  expertise in drafting your reports in this case, did you?

       4  A     No, I don't believe so.

16:03:51 5  Q     Now, demography is the statistical study of human

       6  populations; is that right?

       7  A     Yes, sir.

       8  Q     And that's the area you have experience and training in,

       9  right?

16:04:04 10  A     Yes, it is.

      11  Q     And it focuses specifically on issues of size, density,

      12  and distribution of statistical characteristics, is that fair?

      13  A     That is the core of the study.  It can expand into other

      14  areas of sociology, economics, other spaces.  But you have the

16:04:26 15  core correct.

      16  Q     Okay.  And your formal educational training is in that

      17  area; is that correct?

      18  A     It's one part of my training, yes.

      19  Q     And what is the -- can you describe the expertise you have

16:04:41 20  in political redistricting?

      21  A     Sure.  So I have worked --

      22  Q     I don't want to know the experience.  I want to know the

      23  scope of what you think that means.

      24  A     Yeah.  So the scope of that for me and my area of

16:04:57 25  expertise has been the -- what I call in data science terms,
```

```
 1   it's called CMAR -- Collect, Manage, Analyze and Reporting of
 2   Data.  And that's demographic data relevant to redistricting.
 3        I have expertise in collecting demographic data, the
 4   management, the analysis, and the reporting of demographic data
 5   and conclusions of those demographic data to support
 6   districting and political redistricting cases.  I've leveraged
 7   that expertise in both small area and large area, drawing whole
 8   plans and defending plans and critiquing plans in my career.
 9   Q    Okay.  Anything else?
10   A    No, sir.
11   Q    Okay.  You have two master's degrees; is that correct?
12   A    Yes, sir.
13   Q    One is in management and information systems, right?
14   A    That is correct.
15   Q    And the other one is in statistics?
16   A    It is in urban studies and planning with a core of
17   demography in statistics.
18   Q    And that completed your education; is that right?
19   A    I have one other degree, a chief information officer
20   certification from the GSA.  That's the extent of my
21   professional formal higher education and training.
22   Q    And you haven't studied history since you were an
23   undergraduate, right?
24   A    I study history every day, but for my professional
25   training, no, not since my undergrad.
```

16:05:23
16:05:43
16:05:56
16:06:13
16:06:27

1  Q    And not in any formal matter?  I mean, we all read the

2  papers and keep ourselves informed of all sorts of things.

3  A    Of course.

4  Q    And by the same token, you don't consider yourself to be a

16:06:41  5  political scientist, even though you may keep yourself informed

6  of developments and government?

7  A    That is correct and the relationships, professional and

8  personal, that I maintain with people in redistricting who do

9  political work for sure.

16:06:57 10  Q    I will come to that.

11         And you never formally studied sociology, anthropology or

12  political science, right?

13  A    I did not study the anthropology or political science.  I

14  have studied sociology as part of my undergraduate and graduate

16:07:16 15  coursework, but I would not characterize myself as a sociology

16  expert.

17  Q    That's exactly what I was going to answer.  I appreciate

18  your anticipating my question.

19         Did you ever study the history of the U.S. census?

16:07:31 20  A    I have some knowledge and experience of the census.  I

21  would not consider myself to be Margo Anderson, the nation's

22  census historian.

23  Q    Do you have knowledge of how the census operated before

24  the time you were first involved with it in the 1990s?

16:07:46 25  A    I have some understanding of it, yes.

```
 1  Q    And what was -- where did you get that information?
 2  A    It was experience working as the director of the Oregon
 3  state data center, and that responsibility compelled me to know
 4  and understand the source of the census data statistics that
 5  were used to support the state data center.  It was learning on
 6  the job.
 7  Q    Okay.  Let me shift gears.  Who retained you in this case?
 8  A    The Secretary of State, and I have been working with
 9  Mr. Jim Davis of the Attorney General's Office.
10  Q    So it was Mr. Merrill himself who retained you?  Secretary
11  Merrill actually was involved in your hiring; is that your
12  testimony?
13  A    I would defer to the exact contractual agreement with --
14  and ask Mr. Jim Davis to answer that question what the sequence
15  of retention was.
16  Q    Well, I am not asking about the sequence of retention.  I
17  am asking about who was the person who hired you?
18  A    Jim Davis.
19  Q    Okay.  And he's the counsel who questioned you this
20  morning?
21  A    Yes.  Yes.
22  Q    When did he hire you?  I think you said sometime in the
23  fall, right?
24  A    Yeah.  It was about probably about three months ago.
25  Q    And you have a written retainer agreement?
```

16:08:08  5
16:08:24 10
16:08:44 15
16:08:58 20
16:09:07 25

```
 1   A     I do.

 2   Q     Does that describe the scope of what you were hired to do?

 3   A     There were two retainers.  There was an emergency retainer

 4   and then there was an ongoing retainer.  And, yes, both those

 5   documents described the scope of my work as being demographic

 6   analysis and critique of plans, areas I have written about.

 7   Q     Demographic analysis of what?

 8   A     Yes.  The characteristics of the original Alabama plan,

 9   the enacted Alabama plan.  And at the time, the Singleton plan,

10   anticipating that there were going to be other plaintiff plans.

11   So the anticipation was to be able to understand and

12   characterize the demographic features and performance of those

13   plans.

14   Q     What came to be the Duchin and Cooper plans?

15   A     And, yes, certainly with time.  Then there were Duchin and

16   Cooper plans were introduced as well.  And so I -- even with

17   the compressed timeframe, I did my best to apply the same type

18   of analytics to those plans as I did to the earlier Singleton

19   plan.

20   Q     I understand that and we will get to what you did.  I'm

21   just working on the scope right now, okay?

22   A     Yes, sir.

23   Q     In your reports, did you identify all of the information

24   that you relied upon in order to form the opinions you

25   expressed?
```

Timestamps in left margin: 16:09:25 (line 5), 16:09:55 (line 10), 16:10:12 (line 15), 16:10:29 (line 20), 16:10:43 (line 25)

```
 1  A     I believe I did.

 2  Q     Okay.  And you identified the sources that you used to

 3  obtain that information; is that correct?

 4  A     Yes, I did.

16:10:54  5  Q     Did you obtain any information at all directly from any

 6  legislators in Alabama?

 7  A     No, I did not.

 8  Q     Have you ever met a legislator in Alabama?

 9  A     No, I have not had the pleasure.

16:11:13 10  Q     So you are not -- your clients don't include the

11  intervenors in this case who are such legislators, right?

12  A     That's right.

13  Q     And you have never met the co-chairs of the legislative

14  reapportionment committee?

16:11:27 15  A     No, I have not.

16  Q     And what you know about -- what you relied upon in your

17  court in reference about what former Congressman Bonner and

18  former Congressman Byrne said came from reading testimony that

19  Mr. Davis provided to you, right?

16:11:44 20  A     That's correct.

21  Q     So you have never met any federal legislators or Congress

22  representatives either, in connection with this work, right?

23  A     No, I have not.

24  Q     Have you ever met any legislators in Alabama or

16:11:57 25  congressional representatives from Alabama in any other work in
```

```
 1  your life?
 2  A    No, I have not.
 3  Q    Okay.  Before this case, had you done any work in
 4  connection with Alabama?
 5  A    Yes, I have.
 6  Q    When was that?
 7  A    It was earlier in 2021.  I was connected to Mr. Davis in
 8  the Attorney General's Office with an interest in understanding
 9  the impact of a new innovative Census Bureau system called
10  differential privacy.  It's a new method of disclosure
11  avoidance.  I was asked to provide demographic expertise and
12  assessment of the impact of differential privacy on the census
13  data that would be used by the State of Alabama for the purpose
14  of redistricting.  And that work was completed in March, April,
15  May of 2021.
16  Q    So before 2021, did you have any experience working in
17  Alabama?
18  A    No.
19  Q    Had you ever been to Alabama for professional reasons?
20  A    Just for conferences and other personal relationships.
21  Q    You have friends that live in Alabama?
22  A    Not currently.
23  Q    Okay.  Now, you say at page 5 of your report that the plan
24  at issue in this case was drawn in compliance with the
25  published criteria for redistricting.  Do you remember saying
```

1  that?

2  A    The plan -- which plan are you referring to?  Is that

3  the --

4  Q    Well, I was going to ask you -- I apologize for having cut

16:13:52  5  you off.  I will try not to do it again.

6  A    Which is the plan that you are referring to?  I don't

7  recall the exact language.

8  Q    Okay.  You referred, I believe, to the plan at issue.

9  It's on page -- do you have a copy of your report?

16:14:10 10  A    I do.  It's the Singleton report?

11  Q    I think it's the Singleton report, yeah.

12  A    Okay.  The plan at issue could have been the enacted

13  Alabama or it could be the Singleton plan.  There was a lot at

14  issue.

16:14:30 15          JUDGE MARCUS:  The question, counsel, is are we

16  referring to the first report Mr. Bryan did and relates simply

17  to the Singleton plan, or are we referring to the second plan?

18  I think -- I think on the screen --

19          MR. DUNN:  There are three plans.  Hold on a second.

16:14:56 20  BY MR. DUNN:

21  Q    Yep.  I'm actually referring to your report in the Merrill

22  and Caster cases.  It's D-2, I believe.

23  A    All right.

24  Q    And you said -- yes, that's it right there.  If you look

16:15:11 25  at the screen, you will see plans were drawn in compliance with

the published criteria for redistricting.  Does that refresh

your recollection?

A    Yes.  Yes.

Q    Okay.  And what plans were you referring to when you said

that?

A    This was the Alabama congressional plan.

Q    Okay.  And then yesterday you testified in response to

Mr. Davis's question that the Legislature's 2021 plan was legal

and compliant.  Do you remember giving that testimony?

A    Yes, I do.

Q    Okay.  So first of all, when you said that those plans

were drawn in compliance with published criteria for

redistricting --

A    Uh-huh.

Q    -- what published criteria did you mean?

A    This would have been the reapportionment committee

redistricting guidelines.

Q    And you consider it within your expertise to be able to

form an opinion as to that?

A    If these were the guidelines that were used for the

drawing of the plan, I have an ability to look at those

guidelines and look at certain of them, not all of them, but

certain of them, such as minimum population deviation,

one person, one vote, compactness, yeah, I have expertise to

speak to several, but not all of the criteria that were

1  published and what I understand to be used for the drawing of

2  the plan.

3  Q    But some of them you don't have expertise to opine about?

4  A    Yes, that's correct.

16:17:01  5  Q    Okay.  And then you said the plan was legal and compliant?

6  A    Right.

7  Q    What's your basis to form an opinion about whether the

8  plan was legal?

9  A    Because when I looked at the minimum population deviation

16:17:15  10  and equalizing population, it met that criteria.  That's the

11  legal criteria as I said earlier.  I don't have a basis to form

12  an opinion of whether it was compliant with the Voting Rights

13  Act.  I took that as fact that that plan as it was submitted by

14  the experts who drew the plan that it was.  I am not a Voting

16:17:37  15  Rights Act expert.

16  Q    So in giving that testimony and writing that language, you

17  made an assumption of compliance with the Voting Rights Act; is

18  that what you are saying?

19  A    Yes.  And other things that are outside, I did not make a

16:17:51  20  complete inventory of which of these were in my expertise or

21  outside, but for the areas of my expertise, the plan conformed

22  with those areas with which I am an expert.

23  Q    So we can modify the language that I referred to, to say

24  to the extent of your expertise, that was your conclusion,

16:18:07  25  right?

```
 1   A     That's fair.

 2   Q     Good.  Do you know who drew the plan?

 3   A     I do not.

 4   Q     So you never communicated directly with whoever the drawer

 5   of the plan was?

 6   A     I don't even know their name.

 7   Q     And nobody ever gave you any information on what the

 8   drawers' activities were or qualifications were, or anything

 9   else about him or her or them?

10   A     Literally do not know anything about the -- whoever put

11   the map together.

12   Q     Did you ask for any of that information?

13   A     No, I did not.  I think it would have been inappropriate

14   and would have interfered with my expert assessment of the

15   plan.

16   Q     Now, you also said yesterday that race was not looked at

17   in drawing the legislature's plan.  Do you remember saying

18   that?

19   A     That's what I was told, yes.

20   Q     Oh, so the only way you know that is because somebody told

21   you that?

22   A     Yes.

23   Q     Who told you that?

24   A     Counsel.

25   Q     So you feel comfortable testifying under oath as to things
```

```
 1  counsel told you?

 2  A    If counsel tells me that race was not a factor in drawing

 3  it and the mapmaker did not consider that in the drawing of the

 4  maps, I have no reason not to believe that.  I was not part of

 5  the map drawing process, but if things are said about the

 6  drawing of the maps, then, yes I have to take that in faith

 7  that that's what happened.

 8  Q    Are there any other things in your report that you don't

 9  know personally, but you relied on Mr. Davis to tell you?

10  A    I would say that the testimony, for example, presented by

11  Byrne and Bonner was an illustrative example of information

12  that I was looking for to build my expertise that was provided

13  by Mr. Davis.

14  Q    Okay.  Anything else?

15  A    Not off the top of my head.  There may be some things, but

16  not that I recall.

17  Q    And the published criteria that you refer to are the

18  guidelines, I think there are at least two exhibits previously.

19  I have Exhibit 4.  I think they were Exhibit 82; is that right?

20  A    The exhibit I have is M-28.

21  Q    Okay.  I got the numbers reversed.  M-28.  And those are

22  the May 5th, 2021, guidelines; is that right?

23  A    Yes, sir, that's correct.

24  Q    And that document contains criteria for redistricting that

25  are contained in Section 2; is that correct?
```

16:19:47 (line 5)
16:20:05 (line 10)
16:20:25 (line 15)
16:20:46 (line 20)
16:21:06 (line 25)

1  A    That is correct.

2  Q    And do you understand that to be the governing document

3  that lays out the requirements for the development of

4  redistricting plans in Alabama?

16:21:20  5  A    It is my understanding, yes.

6  Q    And those criteria apply --

7          JUDGE MANASCO:  Your Honor, can I interrupt.  Just one

8  moment.  I think we may have a technical difficulty.  I can't

9  see Judge Moorer anymore, and it may just be my screen because

16:21:36 10  he's a small -- there he is.  Okay.  I just wanted to make sure

11  he was with us.

12          MR. DUNN:  No point in having this examination if we

13  don't have all the judges present, Judge Manasco, I really

14  appreciate you pointing that --

16:21:52 15          JUDGE MANASCO:  These little tiny blocks and if

16  somebody moves just a few inches, they slip out of their block.

17          MR. DUNN:  Thank you.

18          JUDGE MARCUS:  For the record, I am -- have been

19  monitoring the screens fastidiously, and I have seen Judge

16:22:07 20  Moorer from the corner of the screen, from time to time he's

21  moved over to the left side of the screen.  And you can only

22  just see a portion of his arm.  But I do want this record to be

23  crystal clear that I have observed Judge Moorer at every moment

24  of this testimony.

16:22:27 25          With that, you may proceed, Mr. Dunn.

1    MR. DUNN:  Thank you very much, Judge Marcus.

2  BY MR. DUNN:

3  Q    So we were talking about the criteria for redistricting

4  which are Exhibit M-28 in evidence, Mr. Bryan.  And the

16:22:44 5  question that I started to ask you was whether the criteria

6  that are set forth in Section 2 of that document apply as to

7  all redistricting in Alabama?

8  A    You mean all redistricting insofar as the legislature, the

9  senate and State Board of Education?

16:23:09 10  Q    Yes.

11    MR. DAVIS:  Pardon me.  I have no objection.  I want

12  to make sure Mr. Bryan has a copy of the document we are

13  talking about if he wishes --

14    Thank you.

16:23:20 15    JUDGE MARCUS:  I think he does.

16    THE WITNESS:  Yes, sir.

17    MR. DUNN:  And I want to make sure that he has it,

18  too, Mr. Davis, so I am glad you pointed that out.  Thank you.

19  I would put it up, but I'm just really trying to move along as

16:23:31 20  fast as we can and not burden us with exhibits except to the

21  extent that I have to.  But I am happy to put it up if that

22  would be of assistance.

23  BY MR. DUNN:

24  Q    If I mention any documents, Mr. Bryan, you don't have or

16:23:43 25  you need to refresh yourself with the language, you just let me

1    know and we will put them up, okay?

2    A    Yes, sir.  That sounds great.

3    Q    Thank you.  I appreciate that.

4    A    Thank you, sir.

16:23:51 5    Q    Okay.

6    A    In reading the document, it states at the beginning of the

7    document it's the intention of the provision to include from

8    use census data, da da da.  The inference of this document is

9    the criteria for redistricting as it is for all of the plans.

16:24:10 10   I only used this for the purpose of assessing the congressional

11   plans.  I did not assess the legislative, senate, or State

12   Board of Education plan.

13        So I do not have a basis for stating factually whether

14   these criteria were used for the development of those plans or

16:24:26 15   not.

16   Q    Well, you have seen in the course of this case some

17   reference to the State Board of Education districts and the

18   redistricting for that, right?

19   A    I have to be honest.  I have only heard about that work

16:24:42 20   and seen it and noted it peripherally.  I have had no State

21   Board of Education work as part of this case whatsoever.

22   Q    Do you know that the State Board of Education districts

23   were restricted as a result of the 2020 census in Alabama?

24   A    That's the -- about the extent of my awareness.  That's

16:25:00 25   what the legislature and senate -- yes.

1  Q    Okay.  So I want to go one step further.  Do you

2  understand that that redistricting that was done was done in

3  accordance with the guidelines that are Exhibit M-28?

4  A    I assume that they were.

16:25:13  5  Q    Okay.  Now, is it a fact that these guidelines require

6  compliance with the Voting Rights Act?

7  A    Yes.

8  Q    And do you understand the fundamental issues that brings

9  us here to this proceeding is the question of whether they do

16:25:38  10  so?

11  A    Yes.

12  Q    So just to be clear.  You have no opinion at all as to

13  whether the congressional plans at issue here, the 2021

14  redistricting plan, does or does not comply with the Voting

16:25:58  15  Rights Act?

16  A    I do not have an opinion, no.

17  Q    Now, in your report at page 8, and this is D-2.  Do you

18  have that?

19  A    Yes, sir.

16:26:17  20  Q    Maybe we should put this up?

21  A    Census --

22        JUDGE MARCUS:  Bear with me.  What you want to do is

23  put up on the screen what you are referring to, Mr. Dunn.

24  Could you tell us -- this is Defendant Exhibit D-2, the report

16:26:38  25  of Mr. Bryan.  Is this just for my help?  Report 1 or report 2?

1    I guess this is the second one, right?

2              MR. DUNN:  Judge Marcus, there are actually three.

3              JUDGE MARCUS:  I understand.  But is this the second

4    or the third of the three?

16:26:52  5              MR. DUNN:  This is the second.  This is -- this is the

6    first report in Merrill and Caster.

7              JUDGE MARCUS:  Gotcha.  Thanks very much.

8    BY MR. DUNN:

9    Q    Mr. Bryan, can you confirm that the document we're looking

16:27:06 10   at that's D-2 in evidence is the first one you wrote in the

11   Merrill and Caster cases?

12   A    Yes, sir.

13   Q    Okay.  Good.

14             MR. DUNN:  Mr. Davis, we all agree?

16:27:12 15             MR. DAVIS:  We do.

16             JUDGE MARCUS:  Let's proceed, counsel.

17   BY MR. DUNN:

18   Q    Now, in this report, you refer to criteria that are set

19   forth in by the Congressional Research Service on page 8; is

16:27:45 20   that correct?

21   A    Yes.

22   Q    Given that Alabama had specifically set forth its own

23   criteria in the redistricting guidelines, why did you choose to

24   refer to the more generic Congressional Research Service

16:28:05 25   reports instead of Alabama's own guidelines?

A    Yes.  My intent in providing this information, as it was
with all the reports, was to provide a complete picture, a
context, a national view of what traditional redistricting
principles are.  It is to ground the reader, ground the Court,
ground the counsel in what traditional redistricting principles
are, and why they are important.

       The intent here was to provide this larger scale
background and context of what these things were, and then to
funnel that information down into specifically what the rules
in Alabama were.  I was not challenging or changing the rules
for Alabama or trying to contravene them in any way.  It was
simply background and context of what they generally are and
their relevance.

Q    So certainly nothing in the Congressional Research Service
report would override or modify the specific criteria that
Alabama has articulated in its guidelines, right?

A    No, sir.

       THE COURT REPORTER:  Please do not talk over each
other.

Q    To the extent that I did that, I apologize.  I will try to
let you finish your answer before I ask my next question.

       You had a lot of discussion on Ms. Khanna's
cross-examination about the definition of black and what you
used as the definition of what you call true black.  Do you
recall that discussion?

1  A     The use of the word true in my report refers to my effort

2  to identify plaintiffs' reported black populations.

3  Oftentimes, I do not know what the black populations are that

4  they refer to.  I frequently see plaintiffs and other experts

16:30:23 5  refer to black populations that are either incorrect or may not

6  have a proper definition or reference.

7        My goal to identify what I refer to as the true black

8  population is not to pick one that is right or is wrong, but

9  rather to provide a set of guardrails, an in-depth

16:30:43 10  understanding of what the definitions are and then to try to

11  help the experts and the work that I see in the plaintiffs'

12  reports to know exactly what the black populations are that

13  they are using in their analysis.

14        That is the context of what I refer to as true.

16:31:00 15  Q     Did you think there was any ambiguity or uncertainty in

16  the definition of black that Dr. Duchin used in her work?

17  A     Dr. Duchin is exceptionally attentive to those details and

18  it's much appreciated.  There's no lack of clarity at all.

19  Q     So you didn't need to clarify the definition in analyzing

16:31:25 20  her work, did you?

21  A     I think specific to her plans, no.  In general, in my

22  experience in doing this work, this problem comes up

23  repetitively and it's an effort I make in my work to make sure

24  that there is clarity no matter what, however well or not well

16:31:45 25  someone may represent their work.

1     The other reason that I do this, as I mentioned earlier,

2  is not with the case of Dr. Duchin, but in the case of

3  Mr. Cooper, errors can and are made in this.  And so my effort

4  is to define my math and to double-check my math and make sure

16:32:05 5  that the data in his reports are, in fact, what they say that

6  they are.  And that was the intent of my effort here.

7  Q    Okay.  But as to Dr. Duchin, that was not an issue or a

8  problem, right?

9  A    No.  Dr. Duchin did a fine job.

16:32:17 10  Q    By the way, did you hear her testimony?

11  A    I heard most of it, yes.

12  Q    Okay.  What other testimony in this case have you been

13  able to observe?

14  A    I heard the testimony earlier today, but yesterday the --

16:32:40 15  my focus was really on Duchin's work.  I did not hear any of

16  Mr. Cooper's testimony.  I had not arrived in Montgomery in

17  time for that.

18  Q    Okay.  So you heard the Milligan expert, but not the

19  Caster expert testify?

16:32:57 20  A    Yes, sir.

21  Q    And you said you heard some other testimony yesterday?

22  A    Yeah.  There was a political scientist that spoke for some

23  time, although that was less relevant, while interesting, it

24  was less relevant to my work.

16:33:11 25  Q    Now, did you rely in your work on information that was

```
 1  provided to you by any political scientists?
 2  A    None of my work was informed by a political scientist.  I
 3  performed work, demographic, data science and analytic work
 4  that was subsequently provided to the political scientists for
 5  a small portion of their work.
 6  Q    What political scientist?
 7  A    I believe his name is Dr. Trey Hood.
 8  Q    And how do you know that your work was provided to
 9  Dr. Hood?
10  A    Through conversations with counsel, Jim Davis.  There was
11  a request for some information about the VTD boundaries,
12  location of voters in Washington County, which is an area of
13  expertise on my team.
14  Q    Is it correct that you have not, however, communicated
15  with Dr. Hood in connection with any of the work in your
16  report?
17  A    That's correct -- yeah, that's correct.
18  Q    And you haven't relied on anything that he had previously
19  told you?
20  A    No.
21  Q    And you knew Dr. Hood before; is that correct?
22  A    That's correct.
23  Q    You worked with him before?
24  A    Yeah.  There have been cases, sure.
25  Q    Any other political scientists?
```

```
      1   A     Not on this case.

      2   Q     Let me withdraw that.

      3   A     No.

      4   Q     There are no other political scientists you have

16:34:48  5   communicated with in connection with the preparation of your

      6   reports, right?

      7   A     No.

      8   Q     And you are not relying on anything that any other

      9   political scientist told you or information they provided to

16:34:59 10   you previously in connection with your report; is that right?

     11   A     Only insofar as that I am aware from a political science

     12   perspective what the preferences of the political scientists I

     13   work with are in terms of defining the race groups for the

     14   purpose of their Gingles II analyses.

16:35:27 15         That's the only extent to which I have used any previous

     16   knowledge of working with my political scientists in this case.

     17   It's just that historic knowledge and relationship.

     18   Q     So going back to where we were before, you understand

     19   there's a choice in defining the black population that you

16:35:48 20   made, correct?

     21   A     I do not make the choice.  I prepare the variety of

     22   options that are available.  And I provide that option in my

     23   analysis for my own critique of plaintiff plans and I also

     24   provide those options to political scientists who may use that

16:36:11 25   information for their analyses.
```

1    Q    So it's your testimony that you did not express a

2    preference for single-race black over any-part black in your

3    report and your work in this case?

4    A    I do not have a preference.  There is not a right or a

16:36:32 5    wrong way.  Both of the ways that you can measure this have

6    significant value and importance in these cases.  I believe my

7    statement with regard to the single-race is my understanding,

8    again, from my experience with political scientists that more

9    homogeneous groups are easier to characterize and to analyze

16:36:53 10    and to defend than more heterogeneous groups.  And that is no

11    way a judgment or ranking of one particular method over the

12    other.

13    Q    And you don't have any expertise to express a preference

14    for which should be used in connection with the analyses that

16:37:16 15    are at issue in this case; is that right?

16    A    I certainly do not.  No, that's correct.

17    Q    And you do understand, I take it, that Dr. Duchin made a

18    choice different from the one you're now talking about, that

19    she used any-part black, right?

16:37:31 20    A    Yeah.  Yeah.  That's correct.  And there's -- there can be

21    reasons individual experts may do that, and I know those and

22    respect those.  It's a fine choice if that's appropriate for

23    them.

24    Q    So when you critiqued her work --

16:37:45 25    A    Uh-huh.

1  Q     -- in terms of whether the districts that she proffered

2  were majority black on the basis of your analyses, you didn't

3  mean to express a judgment as to what definition of black was

4  appropriate for that?

16:38:03  5  A     No.  And that's why I do my analyses of these types of

6  plans consistently, same way every time, is that I present both

7  of the statistics in my assessment and my summary, just simply

8  state factually whether they do or do not rise to meet a

9  majority-minority threshold under one criteria or another.

16:38:26  10  There is no judgment or assessment of it failing or succeeding

11  based on one or the other.  It's a simple factual black and

12  white observation.

13  Q     And to cut to the chase with Dr. Duchin's work, you found

14  that even using the sole-race black criteria, one of her plans

16:38:49  15  qualified as a majority-black plan in both of the districts

16  that she identified, correct?

17  A     Yes, that's correct.

18  Q     And if you use the any-part black test, you confirmed her

19  analysis that all of her plans did so?

16:39:05  20  A     Yes, that's correct.

21  Q     And you understood that her plans, the four plans she

22  presented were representative plans, right?

23  A     Yes.

24  Q     That were designed specifically to cross the majority

16:39:18  25  threshold and demonstrate the possibility that in Alabama you

1  could design a plan that contained two majority-black

2  districts, right?

3  A    Yes.  She was clear that was her intent, the direction and

4  intention of her efforts, yes.

16:39:35 5  Q    And using her definition, she fully succeeded?

6  A    She appears to have, yes.

7  Q    Great.  And by the way, when we talk about majority, do

8  you understand that the definition of majority is anything

9  above 50 percent?

16:39:49 10  A    It's as a demographer following the law, it is literally

11  50 percent plus one person.

12  Q    Thank you.  Let me return to the committee guidelines.

13      I take it you did review those in connection with your

14  report?

16:40:06 15  A    Yes, I did.

16  Q    And you relied upon them in your report?

17  A    Yes, I did.

18  Q    Could we put them back up, please?  And I would like to

19  call your attention to Section 2(g)of the guidelines, if I

16:40:27 20  could, Mr. Bryan.  Could we highlight that, please?  Are you

21  familiar with this subsection?

22  A    I am familiar with it, but it was less relevant to my area

23  of expertise and my area of analysis in the case.

24  Q    Well, it says specifically that considerations of race,

16:41:01 25  color, or membership in a language minority group -- I'm sorry.

1    Let me back up.

2         No district shall be drawn in a manner that subordinates

3    race-neutral districting criteria?

4    A    Right.

16:41:16 5    Q    Those are the criteria that are discussed below in this

6    document, right?

7    A    That is correct.

8    Q    So they should not be subordinated to issues of race or

9    color, except race, color or membership in a language minority

16:41:35 10   group may predominate over race-neutral districting criteria to

11   comply with Section 2 of the Voting Rights Act.  Do you see

12   that?

13   A    Yes, sir.  Correct.

14   Q    So do you understand that if districts need to be reshaped

16:41:49 15   in order to comply with Section 2 of the Voting Rights Act,

16   that other criteria need to yield to those requirements?

17   A    I understand that that is the requirement.  It is outside

18   the scope of my expertise to determine whether one district or

19   two black majority-minority districts were necessary to comply

16:42:15 20   with the requirement.

21   Q    But if two districts were required, the plan the

22   legislature adopted only contained one, right?

23   A    Can you please rephrase the question?

24   Q    You know the plan the legislature adopted in 2021?

16:42:36 25   A    Yes.

```
 1  Q     Only contains one majority-black district?
 2  A     Correct.
 3  Q     So if two districts are required in order to comply with
 4  the Voting Rights Act, then this section would apply and
16:42:52  5  race-neutral criteria would have to yield to whatever is needed
 6  to be done to comply with the Voting Rights Act; is that
 7  correct?
 8  A     Not being an expert in that space, this would be my
 9  literal interpretation of this -- that statement would be
16:43:10 10  correct.
11          MR. DAVIS:  I would like to lodge an objection for the
12  sake of completeness of the transcript.  Mr. Dunn only read
13  part of the section.  I just wish to note that there is more to
14  the sentence regarding the guidelines reference to Section 2 of
16:43:31 15  the Voting Rights Act.
16          JUDGE MARCUS:  You will have every opportunity to
17  explore it on redirect.
18      You may proceed, sir.
19  BY MR. DUNN:
16:43:41 20  Q     And then as Ms. Khanna discussed with you, there are
21  certain criteria that are identified in subsection J.  Mr. Ang,
22  can we go down to subsection J?
23      And the -- specifically -- no, let's go back to the whole
24  page, please.  Because what I want to establish is that
16:44:07 25  subsection J is where considerations of contest between
```

           1   incumbents and communities of interest are placed in the

           2   guidelines; is that right?

           3   A    Yes.

           4   Q    And those criteria cannot be used to subordinate or impair

16:44:32   5   the requirements that are stated above them, can they?

           6   A    Yes, that's correct, that's my understanding.

           7   Q    And minimization of the number of counties is also a

           8   subsection J criteria, right?

           9   A    Yes, it is.

16:44:49  10   Q    And so is core preservation?

          11   A    Yes, correct.

          12   Q    So the same rules of priority apply with respect to them,

          13   correct?

          14   A    Yes.

16:44:58  15   Q    And subsection G says specifically that the criteria in

          16   paragraph J are not listed in order of importance, right?

          17   A    I do not see -- I apologize.  I do not see Section (g).

          18   Yes.

          19   Q    But the requirement --

16:45:27  20   A    I do.

          21   Q    -- the requirements for contiguity and compactness are way

          22   up above all of this, and they have priority; is that your

          23   understanding?

          24   A    That's my understanding.

16:45:40  25   Q    Thank you.

1    Now, if we could go back to your report, which is
2    Exhibit D-2 on page 8, you list traditional districting
3    principles.  And you list preservation of communities of
4    interest and continuity of representation above compactness and
16:46:19 5    contiguity.  Do you see that?
6    A    Yeah.  I would be -- caution the reader not to read this
7    literally as a hierarchal prioritization of these rules.  It's
8    more of an inventory.
9    Q    Okay.  Let's talk about compactness for a little bit if we
16:46:43 10    could.
11    A    Okay.
12    Q    You say at page 28, at the top of your discussion on
13    compactness in D-2, that compactness is a measure to ensure
14    that districts do not deviate from being reasonably shaped and
16:47:04 15    is intended as a deterrent to gerrymandering; is that correct?
16    Did I read that right?
17    A    Yeah.  That's the goal, for sure.
18    Q    But as I think you have indicated previously, measuring
19    compactness is a complicated subject?
16:47:22 20    A    Very.
21    Q    And there are no objective criteria for what is a compact
22    district versus a not compact district?
23    A    There are not.  It's typically regarded as a relative
24    measure within one set of plans for a specific state for a
16:47:41 25    specific redistricting exercise versus another set of plans for

```
 1  the same state for the same redistricting exercise.
 2  Q    And even though there are no objective standards, there
 3  are benchmarks or standard measures that you say are used by
 4  demographers regularly to measure and compare compactness; is
 5  that a fair characterization?
 6  A    Yes, sir, that is correct.
 7  Q    And you picked four particular measures of compactness to
 8  use; is that right?
 9  A    Yes, I do.
10  Q    And two of those measures are measures that were also used
11  and referenced by Dr. Duchin; is that right?
12  A    That is correct.
13  Q    And then she had an additional criteria.  Are you familiar
14  with that criteria?
15  A    Yes.  It's the -- it's an innovative technique she has
16  developed and I believe it is the block edge technique.  I
17  think it reflects how quickly this area is evolving and how
18  much change there is and how we are examining these things
19  right now.  I commend her work to come up with new techniques
20  to do this as well as possible.
21  Q    And then you also used what's referred to as the
22  Schwartzberg score to measure --
23  A    Yes, sir that's correct.
24  Q    -- compactness.  But you modified the Schwartzberg score
25  in your analysis; is that correct?
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

A     Yes, sir.

Q     And in adapting the Schwartzberg score, what did you do?

A     So the Schwartzberg score is different than many of the other generally accepted techniques.  The scores that you would have for Reock, for example, for Polsby-Popper, for convex hull, I mean, there's dozens of these techniques.  And virtually all of them give you values that rank from zero to 1, right?

What's both powerful, but as well difficult about the Schwartzberg score is it's a number that can stretch to infinity, right?  And so if you look at that score, most people, certainly not me, can look at a score of 100,000 or a hundred million or a billion or whatever the number may be and quickly say, oh, there is how much better a million is than a billion.  Our brains are just not wired to be able to do that quickly.

So other experts, other analysts adapted a version of Schwartzberg that basically just divided it by 1 and turned it into a fraction and rescaled it between zero and 1.  And largely the purpose of that is to help people look and say, ah, I know what the difference is between .5 and .6 or .5 and .7, right?  It's much easier to do than trying to figure out the difference between million and a billion.

So when we did that adaptation of Schwartzberg, one of the ways that we quality controlled it and assessed it was to do

1    what is called a regression analysis.  That is we compared it

2    with one of the techniques Dr. Duchin advocated, the

3    Polsby-Popper score, and what we found is that our adaptation

4    had almost a perfect correlation to the Polsby-Popper score.

16:51:31 5   That is as conceptually the mathematics, if you knew them, it

6    would sound, look, feel the same, and the math that we did

7    proved that it was the same.

8        So the outcome, or the effect is you're just duplicating

9    the Polsby-Popper score.  Through this experience, even though

16:51:48 10  we have shared this metric out with other judges and courts in

11   the past and it's beneficial, I have learned something from

12   this, that it doesn't really matter if you add Schwartzberg

13   into this combination of different methods or you don't.  The

14   Polsby-Popper basically serves the same function as the

16:52:08 15  Schwartzberg score does.  The adaptation makes no difference

16   whatsoever in the ranking or the performance overall of the

17   compactness, and would not change any of my conclusions whether

18   you included it or excluded it.

19   Q    And that's demonstrated because if you look at the tables

16:52:27 20  in your appendix, when you present the compactness of various

21   districts, the coloring and measurement in Polsby-Popper and

22   Schwartzberg are absolutely identical.

23   A    That's exactly right, yes.

24   Q    Okay.  So effectively, what you did was to create a

16:52:44 25  benchmark that mirrored Polsby-Popper, so in your tables where

       1  you are Schwartzberg and Polsby-Popper what you really have is

       2  Polsby-Popper and then a proxy that's exactly like

       3  Polsby-Popper again?

       4  A    Very closely, yes, sir, that's a great analysis.

16:52:59 5  Q    Good.   Then I'll stop there.   Let me ask you one more

       6  question.   In Appendix 3, where you talk about compactness

       7  measures in D-2, you reference a set of diagrams and discussion

       8  of the various benchmarks and you give an Internet site for

       9  your source.   Do you see that, this is page 34?

16:53:31 10  A    Yes.   I am familiar.   This is one illustrative.

      11  Q    What you referenced is an unpublished student paper; isn't

      12  that right?

      13  A    Yes, but the map is the same, regardless of wherever you

      14  looked.   It could be a high school paper or it could be a

16:53:50 15  Harvard mathematician paper.   The math is the same.

      16  Q    The math may be the same, but certainly an unpublished

      17  student paper is not something that ordinarily an expert in the

      18  field would rely upon, is it?

      19  A    I rely on the math no matter what the source is.

16:54:07 20  Q    That wasn't my question.

      21  A    I understand.   For the purposes of having a visual

      22  illustration of these scores, I am not aware of any site that

      23  has a better quick easy visual representation of these, what

      24  the impact of these difference compactness measures are.

16:54:30 25       If the purpose was to go into the ancient mathematic roots

of these, I would refer to a different source.  If I want

somebody to be able to look at one of these methods and

understand in 30 seconds how they work, I would send them to

this site.

16:54:45 Q    My question is general isn't it the case that experts

skilled in the area will refer to published professional

peer-reviewed papers, not to student works?

A    They could certainly do that.  I would challenge anyone

going into, for example, a wonderful document such as

16:55:09 Dr. Duchin's 2018 geometry report on these different measures

to figure out how these measures work through that paper in

hours, let alone 30 seconds.  The benefit of this is quick and

intuitive way to understand how they work.

Q    Would you agree that the models and the plans that

16:55:41 Dr. Duchin has proffered score as well or better than the plan

the state adopted for compactness?

A    There are two levels to this answers.  In aggregate, they

do.  By in order to understand compactness, you have to

understand the details that make up that overall score.

16:56:11     In Duchin's original report, and I did not see her

subsequent report, in Duchin's original report all she provided

us was the top line summary statistic.  This is the average

score for Polsby-Popper, the average score for Reock.

     What she did not show in the original report was that if

16:56:29 you look at the individual districts that comprise those

```
 1  scores, the districts that make up her two majority-minority

 2  districts perform much worse in terms of compactness because

 3  they had to be drawn in a very specific and one might say

 4  convoluted way in order to be able to capture just the black

 5  populations necessary to make the majority.

 6       She made up for that in some sense in other districts that

 7  did not need to be adjusted in the north.  Those will be

 8  Districts 4, for example, and Districts 5.  So by going into

 9  those districts that did not need to be adjusted for the

10  purpose of this case and making them very geometrically

11  compact, which is a great benefit, it belies the fact that

12  underlying that is a couple of districts that are very poor in

13  terms of compactness, and those are her majority-minority

14  districts, and they are in some sense offset or accounted for

15  by making adjustments in areas where it's just not relevant.

16  Q    Aren't all districts in a plan relevant?

17  A    For the purpose of drawing a majority-minority district,

18  you have to draw those in a specific way in order to achieve

19  her objective.

20       If she wanted to go on and make adjustments elsewhere, she

21  could have chosen to or did not choose to.  The fact is when

22  she drew her plan, she selectively used one criteria for one

23  part of her plan and used a different criteria for a different

24  part of her plan.

25  Q    What -- what difference in criteria do you claim she
```

1    applied?

2    A      So in the northern districts, in 4 and 5, she used

3    compactness and optimized and sought clearly -- she has said in

4    her algorithm that sought to optimize compactness in her

16:58:36 5    northern districts.  You didn't have do that to get, you know,

6    what she said was her primary goal of two majority-minority

7    districts.

8         So in those northern districts, she used compactness.  In

9    her southern districts, where she wanted to optimize for black

16:58:50 10    population, said, well, compactness doesn't matter.  She said

11    as much, all I want to do is make sure that I get two black

12    districts.

13         So what is unconventional that the plan is that while she

14    did achieve her two black majority districts, she did that

16:59:05 15    using one set of criteria there and then tried optimize a

16    different set of criteria somewhere else in the state.  It's

17    the result of those efforts why she achieved an overall better

18    compactness than the state of Alabama plan.

19         Had the state of Alabama sought to generalize and make

16:59:24 20    their northern districts more compact -- they didn't have to,

21    they sought a least change plan -- but if they had sought to do

22    that they could have just as easily met or exceeded the

23    compactness scores of Dr. Duchin.  The state deliberately

24    decided not to sacrifice core retention, not to change any more

16:59:44 25    than necessary just for the sake of compactness.

```
 1        Losing continuity of representation just so you say you
 2   made something that looks more like a circle is not a tradeoff
 3   the State of Alabama decided to make.
 4   Q    No district in any one of Dr. Duchin's plans has a lower
 5   compactness score than the lowest score in the state's plan,
 6   does it?
 7   A    I need to refresh my memory by looking at my report.
 8   Q    Going to tell us what you are looking at?
 9   A    Yeah.  I am looking at my report, the supplemental Cooper
10   and Duchin report.  This would be Document 76-4.
11        All right.  I am looking at it.
12   Q    This is Exhibit D-4; is that correct?
13   A    There's a compactness Table 2 for the Alabama enacted.
14   And then there's an Appendix 5.1, 4.2, 4.3, and 4.4.
15        So in looking at the Alabama enacted plan for
16   Polsby-Popper, the Polsby-Popper score in District 1 compared
17   to the Polsby-Popper score for Duchin in District 1, the
18   state's Polsby-Popper score is higher.  District 2 is higher,
19   District 3 is the same.  Districts 4 and 5, as I mentioned
20   earlier, are less.  District 6, Duchin is higher, and
21   District 7, Duchin is higher.  So there are some districts from
22   the state plan that are higher by district, and some districts
23   where the Duchin plan are higher.
24        JUDGE MARCUS:  You will have to speak into the machine
25   as you face away and look at the other screen.  Your voice gets
```

17:00:06 (line 5)
17:00:26 (line 10)
17:01:10 (line 15)
17:01:35 (line 20)
17:02:01 (line 25)

```
 1  muted and we have some difficulty.
 2       So take your time and speak right into that machine so we
 3  can hear you and our court reporter can get it down accurately.
 4  Thank you.
17:02:16  5            THE WITNESS:  Yes, sir.
 6       I compared the results of Polsby-Popper briefly just now.
 7  And looked at different districts for the state of Alabama
 8  plan, which was what I believe I'm being asked and comparing
 9  those different district scores by Polsby-Popper with one of
17:02:36 10 the Duchin plans, Duchin plan A.  And the results are that
11  there are some districts where Duchin's plans are better,
12  notably 4 and 5.  There are some plans where the compactness is
13  not as good.  That would be in Districts 1 and 2, I believe.  I
14  can present other findings if you would like me to.
17:02:56 15 BY MR. DUNN:
16  Q    No, that's fine.
17       Isn't it the case that Dr. Duchin attempted to optimize
18  compactness to the extent possible every where while creating a
19  majority-minority district?  Didn't you hear her testify to
17:03:14 20 that?
21  A    I heard her concede that in District 2 that it was not
22  compact because of the need to make it a black district.
23  That's why it was elongated and was not a compact district.
24  Q    When you say it was elongated, you mean it stretched from
17:03:31 25 one side of the state to the other?
```

```
 1  A    That's correct.  And that was her explanation of why it
 2  had an inferior compactness score, because she wanted to
 3  prioritize blackness.
 4  Q    Compared to other districts, you're talking about?
 5  A    That's correct.
 6  Q    There is no such thing, as you told us, of an inferior or
 7  superior compactness score in the objective.
 8  A    Relative to the other districts in her plans, certainly it
 9  had a lower score and she explained why.
10  Q    In the 2021 plan adopted by the legislature, how many
11  districts stretched from state border to state border east to
12  west?
13  A    Just not sure there is one.  Perhaps 5 at the very top,
14  District 5.
15  Q    Yes.
16  A    Yes, at the very top the narrowest part of the state, 5
17  would go from east to west.
18  Q    And District 4, no?
19  A    Yes, diagonally.  Yes, it would.
20  Q    And I was about to say, it not only goes from east to west
21  border to border, it goes diagonally, not straight across?
22  A    Yes, that's correct.
23  Q    And in Dr. Duchin's plan A, she, too, has two districts
24  that stretch from border to border, Districts 1 and District 2,
25  right?
```

```
 1  A     Yes.  Yes.  Those are -- are newly created east to west
 2  districts.  So I would concede that the same lower compactness
 3  scores in the Alabama plan for Districts 4 and 5, which Duchin
 4  sought to remedy at the expense of core retention and
 5  incumbency are the same types of scenarios that you see play
 6  out in her Districts 1 and 2.
 7  Q     And in summary, in your rebuttal report you concluded --
 8  this is page 18 -- quote, Dr. Duchin's plans A to D, all four
 9  of them, almost always score better than the enacted Alabama
10  plan on average; is that correct?
11  A     That is correct.  Yes.
12  Q     And, in fact, the only time Dr. Duchin's plans did not
13  outscore the enacted plan was plan C, and only on the
14  calculation under Reock, right?
15  A     I believe that to be the case, yes.
16  Q     So other than that for compactness, each of the Duchin
17  plans had an equal or higher scores when the benchmarks on
18  average were compared to the enacted plan?
19  A     Yes.  Yes, it was clear that was prioritized over other
20  traditional redistricting principles in her address, that's
21  correct.
22  Q     Okay.  I think I would like to move on to another subject.
23        Let's talk about communities of interest, if we could.  On
24  page 14 of D-4, you talk about communities of interest, I
25  think.  I'm sorry.  No.  It's on page 14 of D-2.  I'm sorry.  I
```

17:05:11  5
17:05:31 10
17:05:46 15
17:06:05 20
17:06:45 25

1    have the wrong report.

2    A    Yeah.  That looks correct.  Got it.

3    Q    Okay.  Now, you start here with a quotation, but you don't

4    say what source you are quoting from.

17:07:31 5    A    That's from the University of Michigan center for urban

6    study and local policy.  It's on the front page of their

7    website.

8    Q    Why did you quote a University of Michigan definition of

9    communities of interest when the Alabama guidelines themselves

17:07:56 10   contain a definition?

11   A    Yeah.  So, again, I think that this was one of the cases

12   where as an expert in the space I try to provide what I think

13   is the best definition, the best information is in national

14   context.  And then I would supplement that, refine it, and

17:08:16 15   tailor it based on what the Alabama specific or any other state

16   specific guidance is.

17        I think that this definition from CLOSUP is a particularly

18   clear and useful definition and a good starting point to

19   educate anyone who is interested in what is a community of

17:08:36 20   interest is.

21   Q    But the finishing point in terms of Alabama needs to be

22   the Alabama guidelines, Exhibit M-28, and they contain a

23   specific definition of communities of interest, don't they?

24   A    Yeah.

17:08:53 25   Q    Look at J-3 on page 2, please.

```
 1              JUDGE MARCUS:  Let him answer the question.  I'm

 2    sorry.  Before you go on, to just refine it.  Had you finished

 3    your answer?

 4              THE WITNESS:  Yes.

 5              JUDGE MARCUS:  Okay.  I'm sorry.

 6              THE WITNESS:  Thank you.

 7    BY MR. DUNN:

 8    Q    So let's look at M-28, if you would.  A community of

 9    interest is defined as an area with recognized similarities of

10    interest, including, but not limited to ethnic, racial,

11    economic, tribal, social, geographical, historical identities;

12    is that right?

13    A    That is correct.  Yes.

14    Q    Do consider that to be in any way fundamentally different

15    from the University of Michigan definition you quoted?

16    A    No.  It's specific refinements, specific to Alabama.  It's

17    not in conflict.

18    Q    Now, do you consider yourself to be an expert in

19    identifying communities of interest within a state that meet

20    that definition?

21    A    I would not consider myself a nationally recognized expert

22    in communities of interest.  I'm knowledgeable of them.  I've

23    researched them and used them extensively in my practice.

24    Q    Are there demographics that one looks at to determine

25    communities of interest?
```

Timestamps: 17:09:03 (line 5), 17:09:24 (line 10), 17:09:43 (line 15), 17:10:00 (line 20), 17:10:17 (line 25)

1059

```
 1  A    There certainly would be.  Those can be characterized by

 2  specific age groups, income groups, employment groups,

 3  different types of family structure.  For example, that those

 4  are some of many different communities of interest that combine

 17:10:39 5  a group of people together.

 6  Q    Racial composition?

 7  A    That can be one, although my experience is that there can

 8  be racial populations that have significant differences and

 9  even conflicts within the same racial groups, so one must be

 17:10:59 10  thoughtful and careful about generalizing, just based on race

 11  alone.

 12  Q    I didn't say race alone.  I said are they demographics

 13  about race that are relevant to whether a particular area is a

 14  community of interest?

 17:11:13 15  A    Sure.  In using race to define -- in using race to define

 16  a community of interest, it would be foolhardy just to assume

 17  one group defined as a specific race is somehow uniformly a

 18  community of interest.  So a similar attitude, beliefs, and

 19  behaviors.

 17:11:35 20  Q    I wasn't suggesting that it would, but certainly racial

 21  characteristics and commonality are specifically within the

 22  definition --

 23  A    Yes.

 24  Q    -- in Alabama and otherwise, right?

 17:11:44 25  A    Yes.
```

1   Q    And there are demographic statistics that could be looked

2 at to inform you about that?

3   A    Certainly.

4   Q    And all the other things you mentioned, right?

17:11:58 5   A    Yes.

6   Q    Did you look at any of those statistics in connection with

7 your work in this case?

8   A    I did.

9   Q    Did you mention that in your report?

17:12:08 10   A    I did not decompose subtle differences in black

11 populations within the Black Belt, for example, no.

12   Q    Well, you seem to be preoccupied with racial statistics.

13 I'm talking about age, income, employment, social, including

14 racial statistics.  All of those statistical categories, did

17:12:41 15 you look --

16   A    Yes.

17   Q    -- at that group of statistics to determine what

18 communities of interest exist in Alabama?

19   A    Yes.  So I looked at age characteristics, socioeconomic

17:12:56 20 status, income, types of employment and race and found that for

21 sure, there are differences in demographic characteristics in

22 different parts of the state of Alabama, but those being one of

23 many different communities of interest, I did not see an

24 instance, where, for example, differences in age structure, for

17:13:23 25 example, or racial structure prevailed to a degree where they

| | |
|---|---|
| 1 | would override other communities of interest. |
| 2 | So I is not find it worthwhile to try and contribute |
| 3 | information on demographic communities of interest that would |
| 4 | not have had a material outcome in the findings. |
| 17:13:45 5 | Q    Well, is there anything at all in any of your reports that |
| 6 | talks at all about your use of any statistical analysis in |
| 7 | connection with communities of interest? |
| 8 | A    Not a statistical analysis, no. |
| 9 | Q    Okay.  What nonstatistical analysis did you do? |
| 17:14:08 10 | A    I think the primary nonstatistical analysis I did was |
| 11 | covered in my earlier cross in discussing the area around |
| 12 | Mobile and Baldwin. |
| 13 | Q    And as to the area around Mobile and Baldwin, your due |
| 14 | diligence efforts consisted solely of reading the testimony of |
| 17:14:31 15 | two former congressmen that Mr. Davis provided you; is that |
| 16 | right? |
| 17 | A    That's correct.  Yes. |
| 18 | Q    And you didn't even read the testimony of other people in |
| 19 | that case? |
| 17:14:40 20 | A    I would not say that that was an act of negligence.  It |
| 21 | was an act of not sleeping for three weeks preparing this |
| 22 | testimony. |
| 23 | Q    So you had plenty of time to read Bonner and Byrne, but |
| 24 | you didn't have any time to read Chestnut.  Is that your |
| 17:14:57 25 | testimony?  Is that your testimony? |

1  A      I did not -- yes.

2  Q      Okay.  Did you talk to anybody -- did you talk to anybody

3  about the Mobile Baldwin community of interest that you found

4  so important?  And I will exclude Mr. Davis for the moment.

17:15:23  5  A      No.

6  Q      Okay.  And did you investigate any other communities of

7  interest besides Mobile or Baldwin?

8  A      Yes.  I particularly in places where districts crossed

9  administrative pieces of geography such as counties.  I

17:15:50 10  explored and investigated places where that happened to see if

11  there were any significant communities of interest there.

12  Cities, for example, that were going to get split by the

13  boundaries.  I didn't find any else where that seemed to be

14  relevant.

17:16:08 15      I acknowledged existing splits of Jefferson County and

16  those splits just exist in various degrees and various

17  different ways in the different plans now.  So there was no

18  other additional findings of a significant change in a

19  community of interest that I found besides what I explored in

17:16:27 20  Mobile.

21  Q      I wasn't talking about changes.  I was talking about

22  whether you even identified other communities of interest.

23  A      Yes, I did.

24  Q      Which other communities of interest do you discuss in your

17:16:40 25  report?

A     As I just suggested, I explored other communities of

interest to find any that may have been material and have an

impact on the borders, or the definition of what one of the

districts may have been, or why it was different than another

17:16:56  district.  And I did not find any other communities of interest

that seemed to have had a significant impact on the boundaries

that were decided upon.

All the plaintiff boundaries and the state boundaries were

decided either by least change for the state, or were driven by

17:17:12  the need for county boundary changes, or other changes

unrelated seemingly to any significant community of interest

elsewhere in the state.

Q     Did you give any consideration to whether the Black Belt

is a community of interest?

17:17:26  A     I did.  I looked at that carefully.  And it was notable

and interesting to me that in those 18 -- I think there's

different definitions, 18 or 19 counties that within the Black

Belt many of the plaintiff plans seemed to cut the Black Belt

into different pieces.  Two pieces.  I think there were some

17:17:49  cases I saw it was cut into three pieces in different plaintiff

plans, as well.

So I acknowledged it as a community of interest, but it

does not seem to be one that prevailed in the development of

these plans.

17:17:59  Q     Okay.  Mr. Bryan, I know it's getting late, but you have

```
 1  really got to listen to my question.  Do you agree the Black
 2  Belt is a community of interest?
 3  A    Yes.
 4  Q    Okay.  It's a rural area throughout, is it not?
 5  A    Yes, predominantly, yes.
 6  Q    It's heavily agricultural?
 7  A    Yes.
 8  Q    It has lower income levels than other parts of the state?
 9  A    Definitely.
10  Q    Lower education levels?
11  A    Yep.
12  Q    Lower infrastructure?
13  A    My understanding.
14  Q    And a shared history?
15  A    Yes.
16  Q    And it's racially significant because that's where --
17  those counties as you pointed out in your own work have
18  significantly higher percentages of blacks than other counties,
19  right?
20  A    They do.
21  Q    Now, is it -- so -- and one of the things that
22  Dr. Duchin's models perform is to aggregate the Black Belt more
23  than the existing plan or the 2011 plan, isn't that correct?
24  A    It appears so.
25  Q    So you would say on communities of interest with respect
```

17:18:12
17:18:22
17:18:32
17:18:44
17:19:07

```
 1  to the Black Belt community that her plan is better than the
 2  state's plan, right?
 3  A    I don't have enough detailed knowledge of every part of
 4  the Black Belt to say where she split the Black Belt results in
 5  a better performing Black Belt.  They're split and the
 6  precision of where they were split does not give me, with my
 7  knowledge, the ability to assess whether it is a better or
 8  worse combination of a split of the Black Belt than any other
 9  plan.
10  Q    Well --
11  A    Fewer splits are generally better.
12  Q    And she had fewer splits?
13  A    Yep.
14  Q    Okay.  Have you reviewed Dr. Duchin's supplemental report
15  dated December 27th?
16  A    I believe I have.
17       Let me make sure I have got the right one.  Is this the
18  rebuttal report to me.
19  Q    No.  This is the supplemental report that talks about the
20  voter registration data.
21  A    Oh, no, I did not.  I'm sorry for my confusion.  I
22  apologize.
23  Q    Okay.  Are you aware -- did anybody make you aware that
24  Dr. Duchin prepared and submitted a supplemental report that
25  analyzed her plans using voter registration data?
```

```
 1  A    Not until very recently.  I would say I became aware of it
 2  perhaps in the last week or two.
 3  Q    Okay.  But you haven't examined her analysis in that
 4  regard?
 5  A    No, I have not.
 6  Q    Are you aware that voter registration data can be used for
 7  the purpose of determining whether a plan contains districts
 8  that are majority black?
 9  A    It could, yes.
10  Q    Okay.  But as to her -- and would you consider it
11  reasonable or appropriate as a demographer to use such data?
12  A    It's a tool that can be used, yes.
13  Q    But you haven't done any analysis of her use of that data;
14  is that correct?
15  A    No, I have not.
16  Q    So you have no opinion on whether she did a good job, bad
17  job or whatever else, in that regard?
18  A    No.
19  Q    Mr. Bryan, did you provide testimony and expert opinion in
20  connection with a case called Harding versus County of Dallas?
21  A    I believe I did.  It's been a number of years.
22  Q    It's on your CV, I believe, as item 16.  Does that help
23  refresh your recollection?
24  A    Nope.  It is.  Yep.  I'm sorry.  I'm deeply focused on
25  this case right now.  I don't remember the details on that case
```

1  on the top of my head.  What would you like to know?

2  Q    Do you remember that you sponsored a plan, an alternative

3  plan to comply with the VRA in that case?

4  A    I honestly -- I do not recall the details of that plan

17:22:24  5  right now.  I'm sorry.

6  Q    Do you recall that the plan you sponsored in that case

7  preserved only 40 to 60 percent of the cores in the two

8  districts that were at issue?

9  A    No, I don't recall the circumstances or what the priority

17:22:40  10  of core retention was of that case at that time.  I'm sorry.

11  Q    Would you agree with me generally that when you adjust the

12  districts in a plan in order to create an additional new

13  district to comply with the VRA, that is going to have an

14  adverse effect on core retention by definition?

17:23:00  15  A    It can and sometimes severely for sure.

16  Q    And isn't that the reason that Dr. Duchin's plans suffer

17  in terms of core retention, because she created a new second

18  majority-black plan?

19  A    It appears to be the consequence of her effort to create

17:23:25  20  the second majority plan.  There is a relationship for sure.

21          MR. DUNN:  Your Honor, I think I've reached about the

22  end, but if I could have a 5-minute break to --

23          JUDGE MARCUS:  Sure.  Why don't we --

24          MR. DUNN:  We have been going quite a while.  I know

17:23:43  25  it's late.

```
 1              JUDGE MARCUS:  That's quite all right.  Why don't we
 2     take actually a 15-minute break.  We will finish up with you,
 3     or you may have nothing more, and then, Mr. Blacksher, we will
 4     start with you.  Will that be okay?
17:23:55  5              MR. BLACKSHER:  That will be fine.  Thank you, Your
 6     Honor.
 7              JUDGE MARCUS:  All right.  We will take a 15-minute
 8     break at this point.  Thank you all.
 9              (Recess. )
17:40:08 10              JUDGE MARCUS:  I take it we have everybody assembled.
11          Mr. Dunn, did you have anything further for Mr. Bryan?
12              MR. DUNN:  Yeah.  Just a couple of questions.  I will
13     try and be as brief as possible, Your Honor.
14              JUDGE MARCUS:  Sure.
17:40:21 15     BY MR. DUNN:
16     Q    Okay.  Mr. Bryan, in identifying communities of interest,
17     you said one of the things you would do would be to meet with
18     congressional, state and local elected officials to help you
19     identify communities of interest; is that right?
17:40:35 20     A    As a general practice, I would try to do that.  I didn't
21     have the opportunity to do that this time.
22     Q    Okay.  Elected officials may have different views on the
23     communities of interest than their constituents, though,
24     wouldn't they?
17:40:50 25     A    It's possible, yes, but I try to get and process and
```

1  manage the information that I get from these people in the most

2  objective and fair way possible.

3  Q    Elected officials tend to be focused on the people who

4  they think will vote for them, right?

17:41:09 5  A    Yes.  But I do not necessarily limit my education about

6  communities of interest just to people who are elected

7  officials.  You don't really get a chance to go pick and choose

8  every kind of random person knowledgeable about communities of

9  interest in an area when you go into a case, but I do my best

17:41:27 10  to get what information I can when I can get it.

11  Q    How about community organizers?  Do you think they would

12  be people to talk to?

13  A    They would for sure be community organizations.  The most

14  valuable source of information in Central Virginia where I come

17:41:40 15  from is a community organization known as CARITAS, and they

16  care for drug and alcohol impacted people, homeless people,

17  people who have lost their jobs, and I think they're one of the

18  very best sources of information about what is going on locally

19  and what the community needs are.

17:41:57 20  Q    And did anybody tell you about the testimony in this case

21  of Captain Dowdy in that regard?

22  A    I'm not aware of that testimony.

23  Q    Okay.  Now, you focused in your report with respect to

24  community of interest on the Mobile-Baldwin community, right?

17:42:14 25  A    Primarily, yes, that's correct.

```
 1   Q     And you focused particularly on its coastal nature and the
 2   Port of Mobile, correct?
 3   A     That's correct.
 4   Q     Are you aware that the largest industry in Mobile is
 5   health care?
 6   A     Yeah.  I understand there's a transportation,
 7   manufacturing, aerospace, health care, there's a variety of
 8   industries that are down there that flesh out that economy, for
 9   sure.
10   Q     Okay.  I know it's late.  But my question was are you
11   aware that the largest industry employer in Mobile is health
12   care?
13   A     I believe it's the largest or one of the largest, yes.
14   Q     That doesn't have anything to do with the port?
15   A     Right.
16   Q     Or the waterways?
17   A     Right.  And certainly the provision of health care in an
18   area such as a peninsula is something that would be very
19   relevant and important.  If you had a health care system and
20   you had a congressional district that cuts straight across the
21   middle of it, it would obviously impact policy decisions for
22   one district opposed to another district, right through the
23   middle of Mobile would impact the provision of health care from
24   an organization like that.
25   Q     Mr. Bryan, it's very late.  The only question I asked was
```

17:42:33  (line 5)
17:42:47  (line 10)
17:43:07  (line 15)
17:43:21  (line 20)
17:43:38  (line 25)

```
 1  whether health care as an industry has anything to do with the
 2  port?
 3  A    Yes.  Does the health care have anything to do with the
 4  port?  Only insofar as providing health care for port workers
 5  and their families.
 6  Q    Got it.  The second largest industry is retail.  Did you
 7  know that?
 8  A    It's one of the major industries, sure, as with any urban
 9  area, yes.
10  Q    And retail isn't specifically related to the port or the
11  coastline either, is it?
12  A    Not insofar -- except insofar as it provides economic
13  support for the people who work there.
14  Q    And you also said that -- I'm quoting, the county, meaning
15  Mobile County, is a national leader in training and workforce
16  development.  Do you remember saying that?
17  A    Yes.  I've heard that.  It's a big part of that area,
18  sure.
19  Q    Where did you get that information?
20  A    From the testimony that I told you earlier that I got most
21  of my information about that area from.
22  Q    So the only thing you know about Mobile County as a
23  training and workforce development area is what you read in the
24  testimony of Bonner and Byrne; is that right?
25  A    Uh-huh.  Additionally the information I collected on my
```

17:43:51 (line 5)
17:44:04 (line 10)
17:44:22 (line 15)
17:44:36 (line 20)
17:44:52 (line 25)

own, knowing about its transportation manufacturing aerospace,

medicine.  Those are the areas.

Q    You collected?  You collected information about training

and workforce development?

A    It's -- in reading the testimony and going on to

Wikipedia, it's not hard to find information about what is the

primary drivers of the economy in Mobile and Baldwin counties.

Q    And what are the largest training and workforce

development programs in Mobile?

A    I'm sorry.  I didn't have the opportunity to go in-depth

and learn every one of those individually.  I'm sorry.  In this

case, it was a matter of learning it was an economic area of

interest, not to do a deep dive economic analysis or what the

drivers were.

Q    Do people from the Black Belt migrate to Mobile for work?

A    My understanding is that there is a majority of the people

that migrate to Mobile for work will come from more likely

Baldwin County.

Q    That wasn't my question.  My question was do people

migrate from the Black Belt to Mobile?

A    It's possible.  I don't know the exact number.

Q    You didn't explore that issue, did you?

A    No.  No.  Doing migrate and intra-Black Belt migrational

analysis in Mobile-Baldwin and Black Belt counties was not in

the scope of the work.

1          MR. DUNN:  No further questions, Your Honor.

2          JUDGE MARCUS:  Thank you.  Our next examiner would be

3    Mr. Blacksher.  Are you ready to go forward at this point?

4    Would that be fine with you?

17:46:31  5          MR. BLACKSHER:  Yes, Your Honor.

6          JUDGE MARCUS:  All right.  And as we do, if anyone

7    needs a break, let me know.  And depending on how long

8    Mr. Davis's redirect would be, it would be our intention to

9    take a half hour break after Mr. Blacksher and before you

17:46:49 10   proceed, unless you want to just go right through.  But as we

11   do this, Mr. Bryan, if at any point you need to take a break,

12   you just let us know and we will be happy to accommodate you.

13          THE WITNESS:  Thank you, Your Honor.

14          JUDGE MARCUS:  Thank you all.

17:47:05 15       And Mr. Blacksher, you may proceed.

16                      CROSS-EXAMINATION

17   BY MR. BLACKSHER:

18   Q    Good evening, Mr. Bryan.  I'm Jim Blacksher, one of the

19   Singleton plaintiffs.  And I am going to ask you a little bit

17:47:21 20   about your report which causes you to shift gears from

21   interrogation about Voting Rights Act issues to racial

22   gerrymander issues in the Singleton case.

23          I am going to try to share my screen here.  Did that work?

24   A    I do see a highlighted screen, sir, yes.  Thank you.

17:47:59 25   Q    This is your Singleton report, which is marked as

Exhibit D-1.  And I'm on page 17, where I've highlighted some

language that I want to refer to, to begin the questioning,

where you say, For the purposes of independent comparison and

context, I attempted to develop additional Alabama

17:48:34 5  redistricting plans using the plaintiffs' method of whole

counties.  Our goal was to determine whether the plaintiffs'

plan was the only way to develop Alabama congressional

districts using whole counties.

    The only way of knowing whether their exact use of whole

17:48:56 10  counties is the best remedy to a questionable harm, I need to

know the breadth of outcomes possible with plaintiffs' proposed

remedy.  Is it the strategy and methodology of using whole

counties that provides the needed potential relief, or is it

the exact combination of counties they propose?

17:49:19 15    So you're asking the right questions, it seems to us,

Mr. Bryan.  And let me go to three side-by-side maps.

        MR. BLACKSHER:  Your Honor, I would like to have this

demonstrative marked as Singleton Exhibit 70.

        JUDGE MARCUS:  Singleton 70 is marked for ID.

17:49:47 20  BY MR. BLACKSHER:

Q    On the left, you can see is the 2011 plan.  In the middle

is the 2021 plan that was enacted in the October/November

session.  And on the right is the Singleton whole county plan.

    So Mr. Bryan, as you know and as you say in your

17:50:23 25  complaint, the plaintiffs allege that District 7 in the 2011

1   plan, was racially gerrymandered, and that it was -- the

2   gerrymander was accomplished by splitting the county boundaries

3   of Montgomery County, Tuscaloosa County, Jefferson County and

4   Clarke County so as to add black population to District 7 to

17:50:58 5   the extent possible.

6        You are aware that that's the allegation in the

7   complaint -- in the amended complaint as you read it, correct?

8   A    Yes.  Yes, sir.  I'm clear that's the allegation.

9   Q    Okay.  And the allegation further of the amended complaint

17:51:13 10   is that to remedy that racial gerrymander, the legislature

11   should have and the Court may have to go back to traditional

12   districting principles, which in Alabama, the complaint

13   alleges, historically is the use of whole counties.

14        Therefore, the using the allegations of the amended

17:51:47 15   complaint, the first step in eliminating the gerrymander would

16   be to restore whole these four counties.  Do you agree with

17   that?

18   A    That would be one approach, yes.

19   Q    Okay.  Well, that was the approach that is alleged in the

17:52:08 20   complaint.  I am not going to try to argue with you about

21   what's best legally or anything else.  I'm just trying to get

22   into your report about how you examined what we did.

23        All right.

24   A    Yes, sir.

17:52:24 25   Q    So I -- if you make whole Clarke County, Tuscaloosa

1  County, Jefferson, and Montgomery, the first thing you

2  notice -- and I'm sure you have -- is that when you make

3  Jefferson County whole, you've got yourself an almost perfect

4  congressional district with one county.  It's about 43,000

17:52:52  5  persons short of being an ideal district size, correct?

6  A    That's correct.

7  Q    And that pretty much -- that pretty much limits the

8  opportunities for connecting other counties with Jefferson in

9  order to reach 717,754 people, more or less.  And so the plan

17:53:23  10  that the amended complaint settled on was to link it with these

11  rural counties south of Jefferson County, correct?

12  A    That is correct.

13  Q    Bibb, Perry and Hale.

14      Once that is done, once Jefferson County's made whole,

17:53:48  15  obviously, District 7 will need to find additional population

16  elsewhere because that's a whole bunch of folks that are taken

17  out of District 7.  Almost 200,000, right?

18  A    Yes.

19  Q    And so what the plaintiffs proposed was to, first of all,

17:54:10  20  you are get a little bit more, you get about 42,000 out of

21  making Tuscaloosa County whole, and then you go over and you

22  add all of Montgomery County, and Macon and Bullock County, two

23  other Black Belt counties, and then proceeding further south,

24  counties elsewhere in the Black Belt or bordering the Black

17:54:34  25  Belt, that's what this plan does, correct?

1077

1    A     Yes.

2    Q     Okay.  And once that was done, it had little -- it had

3    some effect on Mobile County because in the 2011 plan, Mobile

4    County and Baldwin County in District 1 were connected with

5    Washington and Monroe counties, and to gain population for 7,

6    Washington and Monroe County went into the plaintiffs' proposed

7    whole county plan.  Do you see that?

8    A     Yes.

9    Q     And that meant District 1 had to expand eastward along the

10   Florida border to pick up Covington County.

11         That's going to create a problem for District 2, correct?

12   A     It would, yes.

13   Q     And in fact, it pushed District 2, which was all down here

14   in the southeastern part of the state that we call the

15   Wiregrass, it pushed District 2 and the Wiregrass part farther

16   up the Georgia/Alabama border through Barbour, which is a Black

17   Belt county, Russell, Lee, Chambers, Tallapoosa, Elmore.

18         Well, anyway, I'm just trying to, first of all, set the

19   stage here by examining what the plaintiffs' amended complaint

20   alleged was a proper way to remedy their alleged racial

21   gerrymander of the 2011 plan.  And then I want go and look at

22   the way you have explored the questions you asked.

23         Are there other ways to do this using whole counties,

24   okay?

25   A     Yes.

1  Q    All right.  Let's go down to page 31.  I'm sorry, page 32

2  of your report.

3  A    I'm referring to my report here, so...

4  Q    27, 28, 29, 31, 32.

17:57:08 5  A    There it is.

6  Q    There you go.  There's the table that summarizes the

7  alternative plans using whole counties that you attempted to

8  draw.

9       So they're labeled a little confusingly, but S-1, S-2, 1,

17:57:34 10  2, 3, 4, 5, 1-B, 2-B, 3-B, down to 6-B.

11       The next column is deviation.  Now, when it says

12  deviation, that's maximum deviation, correct?

13  A    That is correct.

14  Q    And remind the Court what maximum deviation means.

17:57:52 15  A    So that would be the number of percentage points above and

16  below zero deviation as represented by what percentage of the

17  population deviates from a perfect deviation both above and

18  below the perfect target of 717,754 people.

19  Q    So to get maximum deviation, you simply take the district

17:58:23 20  that's most overpopulated and add that percentage to the

21  district that's least populated and those two percentage added

22  arithmetically is the maximum deviation?

23  A    That is correct.

24  Q    Excuse me.  The third column, incumbents safe, question

17:58:43 25  mark.  When you mean safe, do you mean are they in a district

```
 1  with some other incumbent or is there some other measure you're
 2  using here?
 3  A    Yes.  This is an indicator of whether the incumbents are
 4  paired or are not.  In District 2, as to District 3, the
 5  incumbents are all in their own districts.  In the Alabama plan
 6  they're in their own districts.  The remainder have two or more
 7  incumbents paired.
 8  Q    Okay.  The fourth column says 2018 election, governor.
 9  And I remember from your direct examination that you just
10  selected this as one of many election returns over the past
11  decade that you scanned and thought that this was
12  representative of what those other election results look like;
13  is that correct?
14  A    Yes, sir.
15  Q    All right.  This column then says, first of all, the
16  number of and percent of D districts, that means Democratic
17  districts?
18  A    Yes.
19  Q    And you picked Democratic districts because the undisputed
20  testimony, including the testimony of Trey Hood is soon -- soon
21  to be, appears that in Alabama, black voters support -- over
22  90 percent of the black voters, I think you said 92 percent, at
23  some point support Democratic candidates; is that correct?
24  A    I did not listen to the testimony of Trey Hood, but that
25  is a fact that I believe to be true.
```

17:59:05  5
17:59:28  10
17:59:42  15
18:00:04  20
18:00:27  25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1  Q    Okay.  I'm sorry.  Getting ahead.
 2       All right.  So if you go to the first alternative district
 3  that you drew, it says it produces -- it produces one
 4  Democratic district; is that correct?
18:00:57 5  A    That's correct.
 6  Q    And your report says that you computed the -- the
 7  performance data, the election return performance data by going
 8  to the precinct level, getting the election results and then
 9  aggregating them at the county level; is that correct?
18:01:24 10  A    That's correct.
11  Q    And I guess you might have done that because you were also
12  trying to ascertain what the performance -- the election
13  performance results would be in the plans -- the plan enacted
14  by the state, which cuts county boundaries, and, therefore, you
18:01:45 15  have to go to the precinct level.  Is that why you did that?
16  A    Yeah, exactly.
17  Q    Rather than just using the election returns for the whole
18  county that you can get right off the Secretary of State's
19  website?
18:01:56 20  A    That is correct.
21  Q    Okay.  But they should be the same.  These should -- the
22  data you used should correspond with the election returns for
23  each county in Districts 6 and 7 of the proposed whole county
24  plan, right?
18:02:13 25  A    Yes.
```

```
 1   Q    Okay.  And then this percentage here, 41.3, what does that

 2   mean?

 3   A    You know, I think the label here where it says percent D,

 4   this may actually be the percent Republican, which reflects

 5   that the majority, the percent majority Democrat in that

 6   district -- I'm trying to think.  I'm sorry, James.  Let me

 7   just think a minute.

 8   Q    I think it's --

 9   A    It is the percent Democrat.  It is the percent Democrat in

10   those districts.  That's correct.  Percent Democrat.

11   Q    I think somewhere in this report you say it represents the

12   percent of BVAP in that district?

13   A    Yeah.  There's two.  There's one -- the first column is

14   percent Democrat and the second one is percent BVAP.  So the

15   second -- the last column there shows the percent BVAP and what

16   the BVAP percentages are in those districts -- in those

17   different alternative districts.

18   Q    Okay.  And the 41.3 is what?

19   A    That's the percent -- the number of what we would call the

20   number of the at least Democrat influenced districts and the

21   percent Democrat in those districts.  So there would be one

22   Democratic district.  In the plaintiff plan there would be two,

23   41 -- that are over 40 percent.  41.4 and 44 percent.  I

24   believe numbers that closely relate to the percent of

25   registered back voters and also to the Democratic performance
```

The time stamps in the left margin are: 18:02:38 (line 5), 18:02:56 (line 10), 18:03:21 (line 15), 18:03:38 (line 20), 18:04:05 (line 25).

1    in those districts.

2    Q    Well, I mean, in order to have one performing Democratic

3    district, the election returns had to show a majority for the

4    Democratic candidate, right?

18:04:21  5    A    Yeah.  I think that that -- the analysis of the number is

6    just my own analysis.

7    Q    So the 41.3 might be percent Republican, you say?

8    A    I really apologize.  I'm flooded with numbers right now.

9    I would have to look at my table.  I apologize.  But I believe

18:04:44 10    that's the case.

11    Q    All right.  And then the last column, the number and

12    percent of black districts greater than 40 percent?

13    A    Yes, sir.

14    Q    How did you land on 40 percent as a metric?

18:05:00 15    A    Yeah.  That was an arbitrary number.  It's a cutoff

16    number.  And I kind of base that on the report that showed the

17    percent black registered voters in the analysis of the

18    complaint, I believe was about 42 or 43 percent.  That was the

19    lower of the two thresholds for BVAP population in the

18:05:29 20    plaintiff districts.

21        So I used that as kind of an arbitrary cutoff to say what

22    would the number have to be in order to be a candidate black

23    influenced district in one of my candidate plans.

24    Q    Yeah.  And if 43.0 percent in your alternative district

18:05:51 25    S-1 --

```
 1   A     Yes.
 2   Q     -- is the BVAP in that district, in that one district that
 3   performs?
 4   A     Right.
```
18:06:02 `5   Q     Okay?  Excuse me.  That BVAP figure is really sort of`
```
 6   superfluous, isn't it?  Once you determine that the district
 7   went Democrat, it really doesn't matter what the black
 8   percentage was, does it?
 9   A     Yeah.  That's correct.  So the assessment here when you
```
18:06:24 `10   look at the number of Democrat districts and then the black`
```
11   percentage there, it's not a coincidence that those numbers
12   look very similar as you go down through the analysis.
13   Q     The feature of drawing districts using whole counties is
14   that instead of focusing on the race of the voters, the
```
18:06:50 `15   geographic dispersion of the demographics, or anything else,`
```
16   you simply have to look at what the total population is once
17   the districts -- the counties are aggregated.  And if whether
18   or not -- if you are looking at whether or not it conforms with
19   the Voting Rights Act, you would want to know whether or not
```
18:07:20 `20   candidates favored by blacks are able to win in that district,`
```
21   correct?
22   A     That is correct.
23   Q     Okay.
24   A     I want to state for the record that I am not a political
```
18:07:36 `25   scientist.  And my analysis here of the political performance`

1  of the districts was purely diagnostic and not a reflection of

2  my expertise in that area.

3  Q    That's great.  And I'm not holding you to that.  I just

4  want to understand and let the Court understand what you have

18:07:53  5  found in this experiment that you undertook.

6       I'm going to go down to the maps now.

7  A    Thank you.

8  Q    And since I'm not clever, I can't separate out this table

9  we were just looking at.  We are going to -- I have it in front

18:08:10  10  of me.  Any chance you can get it in front of you?

11  A    I've got a copy of the maps in front of me.

12  Q    I mean a copy of the table.  I am going to have the maps

13  up on the screen.

14  A    Yep.  Hang on a minute.  I've got it.  Okay.  Yeah.  I

18:08:32  15  have the percent black and then the -- also have the percent

16  Democrat --

17  Q    Okay.

18  A    -- tables in front of me.

19  Q    And the table, on the second column where you have maximum

18:08:44  20  deviation, your plans all the way down to Plan Number 5 are

21  supposedly -- are listed as being smaller in deviation than the

22  2.47 percent maximum deviation in the whole county plan, the

23  Singleton whole county plan?

24  A    I think that's right.

18:09:14  25  Q    Okay.

```
 1  A    Yeah.  Found it.
 2  Q    Okay.  So if -- if the Singleton map drawer was trying to
 3  minimize the maximum deviation when he was aggregating counties
 4  into districts, these plans down to Number 5 would indicate
 5  options he might have taken to get even a smaller maximum
 6  deviation, right?
 7  A    Yes.  Those are possible scenarios with lower deviation.
 8  Q    Okay.  So let's look at them one at a time.
 9       Here is plan S -- well, that's the plaintiffs' plan.
10  A    Yeah.
11  Q    S-1.  Okay.
12  A    Right.
13  Q    S-1 says it's a maximum deviation of 0.6 percent and it's
14  got one performing district.
15       Now, let's stop right now.  That one performing district
16  is a Jefferson County district, right?
17  A    Yes.
18  Q    I mean, there ain't no way you can keep Jefferson County
19  whole and not have one Democratic performing district, right?
20  A    Yes.
21  Q    Okay.  And, in fact, all of your -- all of your
22  alternative plans either connect Jefferson County with -- in
23  this case it's with Greene instead of Perry, but --
24  A    Yeah.
25  Q    -- the rural counties to the south, or you've got two
```

Timestamps in left margin:
18:09:40 (line 5)
18:09:58 (line 10)
18:10:14 (line 15)
18:10:29 (line 20)
18:10:46 (line 25)

1086

1    further down we will get to that connect it with Blount.

2         But the Blount ones -- when you connect it with Blount it

3    goes over the 2.47 maximum deviation to the plaintiffs' one.

4         All right.  So let's look at this one.  This is

18:11:05 5  0.6 percent.  And to achieve this, you've got in addition to

6    the Jefferson County district, you have got a district

7    something or other here.  What is the Greene district number?

8    7.  That's the --

9    A    7.  Right.

18:11:25 10 Q    So you had to connect -- you had to take 7 all the way up

11   to Lauderdale County.  You had to take the District 7

12   representative up to Tennessee, right?

13   A    Yes.

14   Q    Okay.  And that's on one end.  And on the other end you've

18:11:46 15 got to take him over to the Georgia border.

16   A    Yes.

17   Q    So tour the whole state.  So you did not provide in your

18   report any core analyses for these alternative plans like you

19   did for all the ones you just testified about; is that right?

18:12:08 20 A    Yeah.  That's correct.  I presented these, you know,

21   really just as scenarios to say was it possible under any

22   circumstance no matter what -- except with regards to the

23   deviation -- was there any way to use the county-based method

24   to combine counties in any other way.  And in some of those

18:12:32 25 ways, those combinations end up with a good mathematic outcome,

```
 1  but are ridiculous looking maps, I will concede.
 2  Q    This one is not compact and it just destroys the core,
 3  right?
 4  A    It would, yes.
 5  Q    Okay.
 6  A    County-based, small deviation is pretty much the two
 7  criteria we used here.
 8  Q    Okay.  Then we go to S-2, plan S-2, and it is a
 9  1.0 percent maximum deviation, again with just one Democratic
10  performing district.  And that is the Jefferson County
11  district.
12  A    Yes.  Yes.
13  Q    Now, this plan is not quite as ridiculous, is it?
14  A    It's -- I will agree.
15  Q    But it does make a hash out of the Black Belt.  I mean,
16  you have got Black Belt counties Wilcox, Lowndes and Montgomery
17  hooked up all the way up north to Cherokee County.  And you
18  have got whatever this purple district is, 4?  District 4?
19  Okay.  It doesn't matter.
20           JUDGE MARCUS:  Let's focus the questions specifically,
21  if you would, Mr. Blacksher.
22           MR. BLACKSHER:  Am I taking too long with the
23  questions?
24           JUDGE MARCUS:  No.  I think if you cut it down and
25  make it shorter, it will be easier to get an answer from him.
```

1           MR. BLACKSHER:  Okay.  Okay.

2   BY MR. BLACKSHER:

3   Q    Let me just put it this way:  This -- isn't it true that

4   this plan also, S-2, violates the traditional districting

18:14:23 5   requirements of preserving the core in compactness?

6   A    Are you -- it is definitely not optimized for compactness

7   or for core retention.  It was optimized for balancing

8   population and maintaining counties as building blocks and

9   minimizing the deviation.  That's it.

18:14:47 10   Q    Okay.  Alabama plan 1 is next.  And this one is

11   2.1 percent maximum deviation.  Both S-2 and S-1, by the way,

12   prevent any incumbents from being paired.  These are the two --

13           JUDGE MARCUS:  Is that a question, Mr. Blacksher?

14           MR. BLACKSHER:  It's a leading question, Your Honor.

18:15:13 15           JUDGE MARCUS:  All right.  Let's get a question mark

16   at the end of it and let's get an answer.

17           MR. BLACKSHER:  I'm -- I'm trying to speed things up

18   by saying isn't that what it shows.

19           THE WITNESS:  Yes.

18:15:25 20   BY MR. BLACKSHER:

21   Q    Okay.  Once again, isn't it true that this plan has to

22   split up the Black Belt?

23   A    Yes.

24   Q    Isn't it true that this plan has to take District 2 and

18:15:46 25   run it almost the entire eastern boundary of the state of

```
 1  Alabama?
 2  A    Yes.
 3  Q    So this plan 1 is also a failure when it comes to
 4  preserving cores or compactness, right?
18:16:01 5  A    On those metrics, yes.
 6  Q    Okay.  Plan 2 is 2.1 percent.  It also has only one and
 7  it's the Jefferson County district.  And I'm just going to
 8  move -- I know the Court is tired and doesn't --
 9        JUDGE MARCUS:  I am not tired in the slightest,
18:16:27 10  Mr. Blacksher.  The problem I'm having is that it is a compound
11  question stringing together three concepts.  I think it would
12  be easier if you just crisply refine the question to each issue
13  unless you need a broader explanation for the question.
14  BY MR. BLACKSHER:
18:16:48 15  Q    How about if I ask does this plan work for you, Mr. Bryan?
16  A    I can help this by saying that virtually all of these
17  plans violate core retention and compactness and are simply
18  illustrations of different combinations of counties that can
19  minimize deviation.  Those were the only two objectives for any
18:17:14 20  of them.  And they will all virtually fail if you hold them to
21  any other criteria.
22        They were simply designed to illustrate all the different
23  possible combinations of counties that you could possibly
24  achieve if we use the plaintiffs' proposed methods of building
18:17:28 25  on counties.  Because the building of counties subordinates in
```

1 the report and the complaint that I saw, it subordinates the

2 other traditional redistricting principles.  And that is why we

3 took the liberty of creating these options.

4 Q    But to go back to the District 7 composite of three maps,

18:17:49 5 it is true, isn't it, that the plaintiffs' proposed plan

6 preserves the core of District 6, which is Jefferson County,

7 and pre serves the core of District 7, which is the Alabama

8 Black Belt?

9 A    Yes, that appears to be so.

18:18:06 10 Q    Okay.  I wanted to go down to -- I will skip down to Plan

11 Number 5, because your -- your chart says that the maximum

12 deviation for this plan is 0.7 percent.  And it's much closer

13 to the plan that the plaintiffs -- it's in the plaintiffs'

14 amended complaint.

18:18:38 15     Can you -- I need you to recheck that 0.7 percent because

16 I tried to check the maximum deviations in your table, but

17 since I -- I don't have Maptitude, I'm using a poor man's

18 Maptitude.  I'm using Dave's redistricting map.  Are you

19 familiar with Dave's?

18:19:01 20 A    Yes, I am very familiar.

21 Q    Okay.  So let me just show you that when I put -- and by

22 the way, excuse me.  That's the wrong thing.  Here we go.

23     This is your plan 5, as I inserted it into Dave's.  And

24 isn't the reapportionment committee through counsel,

18:19:31 25 Mr. Walker, provided everybody with the block equivalency files

```
 1   for most of these plans.  But I did not use any block

 2   equivalency files here.  I just built it to look like your

 3   plan 5, all right?

 4          JUDGE MARCUS:  Mr. Bryan, do you understand what he

 5   has done here?

 6          THE WITNESS:  Yes.

 7          JUDGE MARCUS:  That's the predicate for his next

 8   question.

 9          THE WITNESS:  It appears as if he has replicated my

10   plan and may have a deviation that's somewhat different than

11   the plan that was reported by my analytic team.  It's possible.

12   We can certainly look at where and why there may be a

13   population deviation that's different.

14          JUDGE MARCUS:  I don't think that was the question.

15   So bear with his questions if you would.

16   BY MR. BLACKSHER:

17   Q    The question is:  Is it possible that your deviation is,

18   in fact, 5.99 percent?

19   A    If -- it's possible.  We created a limit for the deviation

20   in our plans of not more than 6 percent.  So it's possible that

21   the name of one of the plans slipped from -- given that there

22   was 13 of them -- that one slipped from one plan to another

23   plan.  But at no instance were these combinations greater than

24   6 percent total deviation.

25   Q    Let me go to plan 1-B.  Alabama plan 1-B is 2.5 percent
```

18:20:00
18:20:07
18:20:25
18:20:43
18:21:01

1  maximum deviation and has two performing Democratic

2  districts -- Jefferson County, of course.  And district --

3  well, the one that's marked purple here.

4  A    Be 4, I believe.

18:21:41 5  Q    You have labeled it 4 out of -- I would have thought it

6  would be more 7.  It's usually where 7 is, right?

7       So --

8           JUDGE MARCUS:  Bear with me.  I may be the only one

9  who missed it, but I did not get your answer, Mr. Bryan.

18:21:58 10          THE WITNESS:  Yes, that is correct.

11          JUDGE MARCUS:  All right.  Thank you.

12  BY MR. BLACKSHER:

13  Q    So when you compare plan -- Alabama plan 1-B with the

14  plaintiffs' proposed whole county plan, the only major

18:22:12 15  difference, isn't it, is that you have substituted Greene

16  County for Perry County?  Or did I miss something?

17  A    It's possible, yeah.

18  Q    Okay.  So this -- this shows that as long as you keep the

19  Black Belt whole and you keep Jefferson County district whole,

18:22:37 20  you are going to come up with something around 2.5 percent,

21  right?

22  A    Yes, that would be my conclusion.

23  Q    Okay.  The other plan that had two performing black

24  districts was District 5-B.  Go down to it.

18:22:58 25       And once again, it comes very close to the plaintiffs'

```
 1  plan, except that you have got Clarke County and Washington
 2  County in District 1, right?
 3  A    Yes.
 4  Q    Okay.  But, again, both these plans -- this plan 5-B has a
18:23:16 5  maximum deviation of 6.0 percent, right?  So my question to
 6  you, based on your alternative plans, isn't it true that the
 7  plan proposed in the plaintiffs' complaint, the whole county
 8  plan that they proposed, is, for practical purposes, as low a
 9  population deviation you can get with the whole counties and
18:23:46 10  still make some kind of districting sense for Alabama.
11  A    You have the criteria of making some districting sense,
12  yes, that's a fair assessment.
13  Q    Let me go down finally -- I am going to go down to one
14  other place in your report that I need to ask a question about,
18:24:33 15  and it's on page 40.  And this is the page where you are
16  talking about racial composition and where --
17  A    Sure.
18  Q    -- you say that you paused to reflect on the possibility
19  that the Singleton plan is a racial gerrymander.
18:25:05 20      Now, going over these -- what is the evidence you cite
21  here for -- that suggests that it's a racial gerrymander?
22  A    The evidence is that District 6 was extended in the only
23  direction and in the only way to capture as much black
24  population as is possible to get it to a point -- I'm reading
18:25:44 25  here -- of semi-equitability with race and political
```

1  performance as District 7.

2      It was drawn in such a way, and the only way that it could

3  possibly have achieved the same performance.  There's no other

4  direction or way District 6 could have been extended beyond

18:26:05  5  Birmingham.

6      So the evidence that I submit is that if there's only one

7  way to do it and that was the only way and that was the only

8  way that the plan was drawn to try and get District 6 up to

9  this competitive district, that that could be argued to be a

18:26:24 10  gerrymander as well.

11  Q    Even though it's the only way to achieve population

12  equality, substantial population -- practicable equality?

13  A    There are -- if we -- go ahead.

14  Q    If you are going to make Jefferson County whole, it's got

18:26:48 15  to go in that direction unless it goes up to Blount County and

16  has a bigger deviation, right?

17  A    Yeah.  So there's -- another option, but they are limited,

18  I can see.

19  Q    In fact, the gerrymander in all the maps that the Court

18:27:07 20  has seen, both in the Voting Rights Act case and this case, all

21  have one focal point and that is Jefferson County, isn't that

22  correct?

23  A    It is true, yes.

24  Q    It is Jefferson County that drives redistricting in the

18:27:22 25  state of Alabama when it comes to congressional districts?

```
 1  A     Yes.

 2  Q     To split or not to split.  That is the question, right?

 3  A     Right.

 4  Q     There are several places you say, for example, on page 20,

 5  that in order to -- let me just use this as a way to

 6  demonstrate the argument.

 7        Isn't it true that what your exercise shows is that when

 8  you do employ whole counties to draw congressional districts in

 9  Alabama, it will constrain the ways in which the districts can

10  be gerrymandered?

11        JUDGE MARCUS:  Do you understand the question,

12  Mr. Bryan?

13        THE WITNESS:  I am sorry.  I didn't hear that posed

14  in --

15        JUDGE MARCUS:  All right.

16        THE WITNESS:  -- as a question.  If the argument is

17  does it -- does it limit the ways in which it can be

18  gerrymandered, I would say yes.  Does it prevent gerrymandering

19  as a method and preclude it and stop it, I would say no.

20  BY MR. BLACKSHER:

21  Q     There's probably nothing in the world that can prevent

22  gerrymandering.  My question was whether it definitely

23  constrains the options for either incumbent gerrymandering,

24  racial gerrymandering, or partisan gerrymandering, whatever; is

25  that correct?
```

```
 1   A     It restricts those dimensions of redistricting.

 2   Q     You point in several places -- page 20, page 31,

 3   page 40 -- I have got written right down here on page 40 that

 4   without -- you say the argument is made that the black -- blah
```
18:29:48 5   blah blah -- without counties as the determining factor, I
```
 6   could argue that there are innumerable geographic combinations

 7   besides those constrained by counties that could potentially

 8   meet and even exceed the performance touted by plaintiffs if

 9   that was their objective.
```
18:30:06 10        What -- first of all, that concedes that until you start
```
11   cutting the county boundary, you have some constraints on what

12   your options are for gerrymandering, right?

13   A     Well, the constraints are not limited just to

14   gerrymandering, but to other traditional redistricting
```
18:30:25 15   principles.  They also prevent you from optimizing compactness.
```
16   It also has an impact on core retention and it certainly has an

17   impact on deviation, the limitations of using county alone are

18   not limited simply to the impact of gerrymandering.

19   Q     My question simply was about gerrymandering, okay?
```
18:30:47 20   A     It limits the gerrymandering.
```
21   Q     Okay.  And you have said elsewhere in the report in order

22   to identify other communities of interest as a basis for

23   drawing districts, you have to go to the sub-county level;

24   isn't that correct?
```
18:31:08 25   A     As we discussed earlier, there are numerous communities of

1   interest across Alabama.  Some I focused on more than others,

2   but there are many -- if you were to use the Black Belt as an

3   example as a community of interest, it spans across multiple

4   different counties and even when that is the case, the Black

18:31:33 5   Belt and almost every plaintiff plan we have looked at today

6   still ends up getting split by different plaintiff plans.

7   Q    Let me go to page 31.  I have highlighted this language

8   here, the number of alternative plans using sub-county

9   geography such as voting precincts or even census blocks is

18:32:16 10   immeasurable.

11   A    Yes.

12   Q    Okay.  So what we can say about using whole counties is at

13   least those alternatives are relatively measurable?

14   A    I would agree, yes.

18:32:31 15   Q    Okay.  So the question is -- I know you are not a lawyer,

16   but the question that this plan that the plaintiffs drew

17   whether or not it's -- it can be adopted by the legislature or

18   by a court is, A, whether it complies with one person, one

19   vote, and, B, whether it complies with the Voting Rights Act,

18:33:09 20   right?

21   A    Those would be the key questions, yes.

22   Q    Okay.  I think I am about through, Judge, if you will just

23   give me a second.

24           JUDGE MARCUS:  You take your time.  I think something

18:33:37 25   has popped up on the screen here, Mr. Blacksher.  It looks like

1    e-mails I don't think belong on this screen.

2         MR. BLACKSHER:  No, they don't.  I'm chatting with my

3    colleagues to see if they had any more questions for me.

4         JUDGE MARCUS:  No.  I understand.  You take your time.

18:33:54 5   Let me know if you want to take a short break.

6         MR. BLACKSHER:  What I need to do is stop sharing the

7    screen.  There.  That's much better.  I'm sorry, Your Honor.

8         JUDGE MARCUS:  That's all right.

9         MR. BLACKSHER:  I have no further questions.

18:34:10 10       JUDGE MARCUS:  All right.  Mr. Davis, tell me about

11   your pleasure, do you need a break or do you want to roll right

12   through?

13        MR. DAVIS:  I am at the court's pleasure.  Unless

14   Mr. Bryan needs a break, I'm happy to proceed.

18:34:23 15       JUDGE MARCUS:  How are you doing?

16        THE WITNESS:  I am ready to go, Your Honor.

17        JUDGE MARCUS:  How long do you expect that you will be

18   on your redirect?

19        MR. DAVIS:  Between 10 and 15 minutes, Your Honor.

18:34:35 20       JUDGE MARCUS:  Okay.  Fire away.

21                    REDIRECT EXAMINATION

22   BY MR. DAVIS:

23   Q   Mr. Bryan, when we talk about incumbent protection, even

24   if incumbents are not paired, voters still retain the ability

18:34:53 25  to vote out a representative if they're unhappy with the

1   representation, right?

2   A    That is correct.

3   Q    I want to look at the Singleton Report 1 and take care of

4   a couple of issues.  Let's see if we can't clear something up.

18:35:16  5   I am going to look at page 38.

6         Can you see your Figure 5.11?

7   A    Yeah.  Those numbers were percent Republican.

8   Q    I see it.

9   A    They may have been labeled percent Democrat in the other

18:35:34 10  table, but, yeah, that's correct.  Those correspond to percent

11  Republican.  Thank you for the clarification.

12  Q    So if we go back up to page 32, look at Table 5.6.  The

13  numbers we see in the one, two, three, fourth column, for

14  plan 1, 41.3 percent, that's the percent of the Republican vote

18:35:56 15  in that district?

16  A    That's correct.  Yes.

17  Q    And that means that a majority of voters in that district

18  during that 2018 election supported the Democrat?

19  A    That's correct, yes.

18:36:07 20  Q    Mr. Blacksher -- excuse me -- Mr. Bryan, did you receive

21  shapefiles or block allocation files for all of the plans that

22  you have assessed?

23  A    Can you please be specific to which plan or are you

24  referring to all of the plaintiff plans that we worked on?

18:36:30 25  Q    Thank you.  I meant all of the plaintiffs' plans that you

1      look -- that you address in the reports that we've talked about

2      today.

3      A     Yeah.  So I have received shapefiles and/or block

4      allocation files for all of the plans, including the state of

18:36:45 5    Alabama plans.

6      Q     Explain to us what you do with a shapefile or block

7      allocation file.

8      A     Sure.  What I would do with a shapefile is I would use it

9      in two ways.  There's two different layers of geography that we

18:37:01 10   use in our geographic information systems.  One is what we

11     would call a block file.  This is the file that has the most

12     granular units of geography for the state.  They're called

13     census blocks.  They're at the bottom of the spine, as you

14     will, for census geography.

18:37:19 15        Those blocks, the way they come from the Census Bureau do

16     not have any demographic data associated with them at all.  So

17     part of my practice as a demographic expert is to join the

18     demographic data that we have from the census with those

19     blocks.

18:37:36 20        So just because I receive a block assignment file from a

21     plaintiff or from the State of Alabama does not mean that I

22     have all the census data that I need to perform my analysis.

23     Q     Fair enough.  But if you have the block allocation file or

24     shapefile --

18:37:53 25   A     Right.

| | |
|---|---|
| 1 | Q    -- does that allow you to load one of the plaintiffs' |
| 2 | plans on to your system? |
| 3 | A    Indeed it does.  That brings me to the second layer that |
| 4 | we use, which are what we call an outline shapefile.  It's just |
| 18:38:06 5 | basically whatever the perimeter or the boundary is of that so |
| 6 | we can ascertain which blocks belong in which districts to |
| 7 | perform our analysis. |
| 8 | Q    Okay.  So in all of these tests you have run on the |
| 9 | different plaintiffs' plans in your report, did you run those |
| 18:38:24 10 | by looking at the plaintiffs' reports and exhibits, or did you |
| 11 | run those by loading the plaintiffs' plans on to your system |
| 12 | and performing the tests on your demographic software? |
| 13 | A    All of those plans were independently run, tested, and |
| 14 | quality controlled on my own system, and then compared where |
| 18:38:42 15 | possible with the exhibits presented by the plaintiffs. |
| 16 | Q    Thank you. |
| 17 | In our discussion of the youth of single-race black or |
| 18 | any-part black, Mr. Bryan, now, you present both metrics in |
| 19 | your report, correct? |
| 18:38:56 20 | A    I do, yes. |
| 21 | Q    Are you intending to question any person's self-identity? |
| 22 | A    I would never. |
| 23 | Q    Are you offering an opinion to this Court in this lawsuit |
| 24 | as to whether the Court should or should not use any specific |
| 18:39:13 25 | measure? |

```
 1  A    I do not.

 2  Q    Are you offering opinion as to whether any measurement is

 3  correct or incorrect?

 4  A    I do not.

 5  Q    Okay.  Now, in redistricting cases -- and you have been a

 6  part of many different redistricting cases, correct?

 7  A    Yes, I have.

 8  Q    Including Section 2 cases?

 9  A    Yes, I have.

10  Q    So you understand, do you not, that you demographers do

11  your thing, that's generally related to the Gingles I?

12  A    We did.

13  Q    And that addresses among other things whether you can get

14  to 50 percent plus 1 in a single member district; is that

15  correct?

16  A    In my area of analysis, I prepare and present both of

17  those numbers in support of Section 2 claims.

18  Q    Right.  There are other folks, political scientists, who

19  do other parts of the analysis, is that your understanding?

20  A    That is correct.

21  Q    And they're addressing voting behavior, would you agree?

22  A    I would agree.

23  Q    And that's not what you do?

24  A    It is not.

25  Q    Okay.  So you're looking at whether the minority
```

Timestamps in left margin: 18:39:21 (line 5), 18:39:33 (line 10), 18:39:52 (line 15), 18:40:10 (line 20), 18:40:19 (line 25)

```
 1   population is a majority and the political scientists are
 2   looking at how the minority population votes.  Is that a fair
 3   summary -- maybe very generalized, but is that a fair summary
 4   of what you experts are doing?
18:40:36  5   A    It is accurate and it characterizes the division of labor
 6   between our two professions.
 7   Q    And do you consider it important whether -- or relevant to
 8   your analysis as to whether when you guys, demographers, are
 9   talking about whether the minority populations are majority,
18:40:55 10   whether you are looking at the same minority population as the
11   political scientists guys who are addressing voting behavior?
12   A    Those are -- oftentimes they turn out to be two different
13   numbers and may be used the same way or in different ways by
14   the courts.  I have seen as in testimony in this case that
18:41:16 15   black alone was used as a measure by a political scientist.  I
16   see other cases sometimes where it's used alone in combination.
17        Similarly, for Gingles I, different courts, different
18   circumstances will call upon the use of black alone or Hispanic
19   or alone in combination.  They are not necessarily
18:41:38 20   intrinsically intertwined or dependent on each other.
21   Q    Mr. Bryan, would you consider the one person, one vote
22   requirement to be a legal requirement that applies any time a
23   plan is drawn or as a traditional districting criteria?
24   A    I would consider it to be a legal requirement and then
18:42:00 25   conformance with that legal requirement is reflected in the
```

```
 1  plan drawn by the state of Alabama and most of the other
 2  plaintiff plans that were presented.
 3  Q    And would you as a demographer consider the laws
 4  prohibiting racial discrimination to be a legal requirement
 5  that applies whenever a plan is drawn, or a traditional
 6  districting criteria that you might balance with other
 7  traditional criteria?
 8  A    They're laws.  Laws are laws.
 9  Q    Is there a traditional districting criteria of a
10  requirement to draw every possible majority-black district no
11  matter how non-compact it might be, or how much it butchers
12  communities of interest?
13  A    There is not a requirement to my knowledge.
14  Q    If non --
15            JUDGE MARCUS:  Just -- will you stop?  I think
16  Mr. Dunn is trying to interpose an objection.  I see him
17  speaking, but he is muted.  So we cannot hear him.  We cannot
18  hear you, Mr. Dunn, because you have your microphone muted.
19            MR. DUNN:  Can you hear me now, Your Honor?
20            JUDGE MARCUS:  I sure can.
21            MR. DUNN:  I am sorry.  I apologize.
22            JUDGE MARCUS:  We did not hear what you were saying.
23            MR. DUNN:  I was trying to object to this line of
24  questioning.  He is asking him to testify to things that are
25  obviously legal conclusions and way beyond the scope of cross.
```

The timestamps in the left margin are: 18:42:19 (line 5), 18:42:34 (line 10), 18:42:51 (line 15), 18:43:24 (line 20), 18:43:37 (line 25).

1      JUDGE MARCUS:  The objection is sustained.  If you

2   would like to refrain your question, you may, Mr. Davis.

3      MR. DAVIS:  Very well.  I do not know to which

4   objections Mr. -- which questions Mr. Dunn's objection apply

18:43:54  5   to.

6      JUDGE MARCUS:  I think the very last one seemed to

7   call for some kind of legal analysis or conclusion.

8      To the extent that was the thrust, Mr. Bryan's opinion

9   might be interesting, but it's of no help to us in this case

18:44:09 10   because he has not been qualified as an expert on the law.

11      MR. DAVIS:  Very well.

12   BY MR. DAVIS:

13   Q    Mr. Bryan, as a demographer, do you understand there to be

14   a traditional districting criteria that requires a jurisdiction

18:44:25 15   to draw any possible majority-black district no matter how

16   non-compact that district might be?

17   A    I'm not aware.

18   Q    I believe you agreed that if a party is required to show

19   that -- or is required to present a plan that includes an

18:44:52 20   additional majority-black district than in the previous plan,

21   that that's going to impact that plan's core retention score.

22   Did you agree with plaintiffs' counsel on that point?

23   A    I agree.

24   Q    Is it not still true that the amount of displaced voters

18:45:11 25   and the larger impact of core retention scores can be

1   instructive as to show you how much the traditional districting

2   criteria policy of core retention must be sacrificed in order

3   to draw that additional majority-black district?

4           MR. DUNN:  Your Honor, I know it's really late, but he

18:45:30 5   is just testifying.  He's leading the witness.  He has got to

6   let the witness testify and not make speeches.  I object.  This

7   is really inappropriate.

8           JUDGE MARCUS:  I will take the answer.  Overruled.

9       Mr. Bryan, do you understand the question?

18:45:47 10           THE WITNESS:  Please state the question again.

11   BY MR. DAVIS:

12   Q    I'll try.  Mr. Bryan, in any -- in assessing any of these

13   plaintiffs' plans, does the amount of -- does the core

14   retention score -- can it be instructive to tell us how much

18:46:12 15   the traditional districting policy of core retention has to be

16   sacrificed in order to draw an additional majority-black

17   district?

18           JUDGE MARCUS:  Do you understand the question,

19   Mr. Bryan?

18:46:22 20           THE WITNESS:  Yes, Your Honor, I do.

21           JUDGE MARCUS:  All right.  You may answer.

22           THE WITNESS:  I would say that the core retention

23   analysis and I think particularly the differential core

24   retention analysis showing how much more a minority population

18:46:36 25   is impacted than the population as a whole would be the metric

1  that one would use to assess what the consequences are to core

2  retention if you are going to seek some other goal besides

3  compactness or core retention as your primary goal.  I agree.

4  BY MR. DAVIS:

18:47:01 5  Q    We've spoken of common features that we might see in the

6  Hatcher plan and in Dr. Duchin's plan and in Mr. Cooper's

7  plans.  So I want to point out some things, and you tell me if

8  those are common features of all of these plans.

9       Do they all split Mobile County?

18:47:20 10  A    Yes.

11  Q    Do they all join the inner city part of Mobile County, the

12  part is more African-American with the counties in the western

13  Black Belt?

14  A    Yes.

18:47:34 15  Q    I misspoke.  I said the county -- I meant the counties in

16  the eastern?

17  A    Eastern.  I understood.  Yes.  It is correct in the

18  eastern.  To some cases not all the way to the eastern border

19  but eastern through the Black Belt for sure.

18:47:48 20  Q    And do all of these plans join the less African-American

21  portions of Mobile County with the Wiregrass counties along the

22  Florida line?

23  A    Yes, they do.

24  Q    Sometimes all the way out to Houston County, correct?

18:48:04 25  A    All the way.

1108

```
 1   Q     In the report that you prepared for the State of
 2   Wisconsin, I believe it was the Wisconsin Legislature,
 3   Mr. Bryan, was it possible in that matter to draw a map that
 4   avoided any incumbent conflicts?
18:48:23  5   A     It was not mathematically possible.
 6   Q     Is it your belief that the plan that you were testifying
 7   about does as good a job as is possible in Wisconsin of
 8   avoiding incumbent conflicts?
 9   A     It did.
18:48:39 10   Q     Have we asked you to express an opinion in this case of
11   the legislature's intent in passing these plans?
12   A     No.
13   Q     Do you have some understandings of what has occurred in
14   depositions in this case?  Just based on information that we
18:49:07 15   shared with you.
16   A     Some, but not all.
17   Q     But we have not asked you to express an opinion as to
18   whether that is correct, would you agree with that?
19   A     Yes.
18:49:20 20   Q     From your review of Dr. Duchin's plans and Mr. Cooper's
21   plans, do you believe as a demographer that it is necessary to
22   sacrifice compactness to some extent to draw two majority-black
23   districts in Alabama?
24   A     Yes.
18:49:47 25   Q     You conceded that you're not some national expert in
```

communities of interest, but as a demographer, have you become

familiar over the years with the concept of community of

interest?

A    Yes.

18:50:05 Q    And have you gained an ability -- how to assess and weigh

communities of interest against one another?

A    I have some ability.  It is a subjective difficult

exercise that is frequently very specific to the areas that we

are analyzing and can be a changing target.

18:50:28 Q    Mr. Bryan, if Dr. Duchin's plans split the Black Belt

three ways, I mean, among three different districts, and if the

Alabama plan splits the black plan three ways among three

different districts, can you say whether one plan does better

than the other, in terms of treating the Black Belt as a

18:50:53 community of interest?

A    I cannot.

Q    I believe you recognized, Mr. Bryan, that a community

organizer can be a valuable source of information about

communities of interest?

18:51:10 A    I agree.

Q    Would you, nonetheless, need to review any specific

testimony from a community organizer before you can make a

judgment about whether that specific testimony is reliable and

sensible from a demographer's standpoint?

18:51:30 A    That would be preferable and the more information a

```
 1    demographer or an expert has in understanding the expert
 2    opinions that are being provided to help inform them, the
 3    better.
 4             MR. DAVIS:  One moment, if I may, Your Honor.
18:51:48 5       JUDGE MARCUS:  Sure.
 6             MR. DAVIS:  Thank you, Mr. Bryan.  Your Honor, I have
 7    no further questions on direct.
 8             JUDGE MARCUS:  Thank you, Mr. Davis.  Judge Manasco,
 9    do you have questions?
18:52:07 10      JUDGE MANASCO:  I do.  I have two things I would like
11    to ask about.  Mr. Bryan, so I heard you say several times -- I
12    believe it began in your conversation with Ms. Khanna for the
13    Caster plaintiffs, and continued in your examination by
14    Mr. Dunn, the Milligan plaintiffs, that you are reluctant to
18:52:28 15   opine that any one particular redistricting principle ought to
16    be placed in a hierarchy above the others, setting aside
17    one person, one vote, which I understand you regard as a legal
18    requirement, not a traditional redistricting principle.  Did I
19    understand that correctly?
18:52:48 20      THE WITNESS:  Correct.
21             JUDGE MANASCO:  So will you look with me at the last
22    page, please, of your rebuttal report in Milligan and Caster.
23    I think it's Defense Exhibit 4 on page 19.  Just let me know
24    when you're there.
18:53:18 25      THE WITNESS:  Would this be the document, Your Honor?
```

1        JUDGE MANASCO:  That's it.  So the next to last

2   sentence says, My analysis of compactness shows the that

3   Dr. Duchin's plans perform generally better on average than the

4   enacted state of Alabama plans.

18:53:41  5        THE WITNESS:  That's correct.

6        JUDGE MANASCO:  Although some districts are

7   significantly less compact than Alabama's and significantly

8   better than Bill Cooper's plans.

9        THE WITNESS:  That's correct.

18:53:52 10        JUDGE MANASCO:  The last sentence says, In the

11   hierarchy of redistricting criteria priorities, I assess the

12   benefit of this accomplishment as being more than offset by the

13   significant detrimental impact to the continuity of

14   representation.

18:54:12 15        THE WITNESS:  That is correct.

16        JUDGE MANASCO:  So what I'm trying to understand is,

17   do you or don't you put the traditional districting principles

18   into a hierarchy as part of your analysis, and if you do, help

19   me understand where the hierarchy comes from; and if you don't,

18:54:32 20   my question would be do you adhere to the last sentence of your

21   rebuttal report.

22        THE WITNESS:  Thank you, Your Honor.  I would answer

23   this as follows:  I do not follow a rule that says any one in

24   any given instance higher or lower than any other one.  I

18:54:49 25   assess all of these redistricting criteria concurrently,

1  simultaneously watching what for the benefits and the drawbacks

2  are of applying one particular redistricting criteria over or

3  under another.

4      What is unique about the Duchin plan is that compactness

18:55:08  5  is selectively applied only in part of the plan and is not

6  applied in part of the plan where she is seeking to optimize

7  two black populations.  In the area where she significantly

8  changes, manipulates the districts, that being Districts 4

9  and 5, if I recall correctly, there is no other reason for

18:55:27 10  compactness to be changed or for those districts to be changed

11  except solely for the purpose of compactness.

12      And it is my assessment that if a district -- in that

13  case, if a district is significantly changed and the continuity

14  of representation of that district is significantly disrupted

18:55:47 15  just for the sake of saying that the long historic bonds of a

16  group of people that have been represented in the same area by

17  the same representative for a long period of time, that, to me,

18  is not a fair or good tradeoff.

19      You're sacrificing the continuity of representation of

18:56:07 20  these people just to say that your district looks more like a

21  circle so that you can say it looks like a circle.

22      So in that instance, in that tradeoff, my professional

23  assessment is that the fact that it looks more like a circle is

24  not worth the tradeoff due the significant damage to continuity

18:56:23 25  of representation.  That is not a hard and fast rule and

there's no fixed hierarchy that plays universally across all of
those judgments.

JUDGE MANASCO:  Understood.  Okay.  So for my second
question, I want to return to the conversation about the metric
for measuring the Black Voting Age Population and whether it
should be any-part black or black alone.  And I think you and
Ms. Khanna for the Caster plaintiffs discussed the Georgia
versus Ashcroft citation in your first report in Milligan and
Caster.  You don't have to refer to it specifically.  I'm just
going to ask you a general question about it.

THE WITNESS:  Thank you.

JUDGE MANASCO:  No problem.  I know it's been a long
day.  And I took your testimony to be that in the course of
preparing your analytics and in your report that you might rely
on data analysis prepared by team members who worked for and
with you in this kind of enterprise.  Is that correct?

THE WITNESS:  Yes, I do, and they're my direct
supervision.

JUDGE MANASCO:  Okay.  And I heard you say that you
had reviewed the Ashcroft decision some time ago, but not
directly in the course of preparing this report.

THE WITNESS:  Yes.

JUDGE MANASCO:  And I assume your data analysts would
not be doing that kind of work, they would be --

THE WITNESS:  They had nothing to do with that.

1          JUDGE MANASCO:  Okay.  Is there any other material

2    that is cited in any expert report you have prepared and filed

3    that you did not personally review or have one of your team

4    members review in connection with the preparation of the

18:58:02  5    report?

6          THE WITNESS:  Nope.

7          JUDGE MANASCO:  Thank you.

8          JUDGE MARCUS:  Judge Moorer?  Any questions?

9          JUDGE MOORER:  Yes, sir.

18:58:14 10       Mr. Bryan, there's no perfect redistricting plan that's

11   possible to be drawn anywhere, is there?

12          THE WITNESS:  No, Your Honor.

13          JUDGE MOORER:  And every ten years, virtually, every

14   state is going to make some changes to their redistricting to

18:58:30 15   take into account population shifts and whatnot, right?

16          THE WITNESS:  Yes, Your Honor.

17          JUDGE MOORER:  And every plan is going to involve

18   tradeoffs of compactness.

19          THE WITNESS:  They always do, Your Honor.

18:58:43 20          JUDGE MOORER:  Incumbency.

21          THE WITNESS:  Yes.

22          JUDGE MOORER:  And incumbency, when two incumbents are

23   pitted in the same district because of redistricting, is

24   something that incumbents can solve themselves if they want to

18:58:58 25   by moving to another district, right?

```
 1              THE WITNESS:  If they choose to do so, yes.
 2              JUDGE MOORER:  Or staying in a district and running
 3    against whomever.
 4              THE WITNESS:  That is their choice, yes, Your Honor.
18:59:12  5              JUDGE MOORER:  And no matter the incumbent, there's no
 6    rule that other people who are not incumbents cannot run and
 7    win against incumbents.
 8              THE WITNESS:  That's correct, Your Honor.
 9              JUDGE MOORER:  Whether that incumbent is pitted
18:59:29 10   against somebody else who might be an incumbent or not.
11              THE WITNESS:  Yes, Your Honor.
12              JUDGE MOORER:  And sometimes people who were
13    incumbents before run against current incumbents and win, don't
14    they?
18:59:44 15              THE WITNESS:  Yes, Your Honor, they do.
16              JUDGE MOORER:  Do you know if the state looked at
17    whether they could draw two minority districts when they were
18    going through the redistricting process.
19              THE WITNESS:  Allow me to restate the question to make
19:00:15 20   sure I'm clear.  You asked if --
21              JUDGE MOORER:  Let me ask you a more clear question.
22              THE WITNESS:  Thank you, Your Honor.
23              JUDGE MOORER:  Did the state map drawer as far as you
24    know look at and draw potentially districts that would include
19:00:35 25   two minority districts?
```

1          THE WITNESS:  Your Honor, I have already testified

2    that I have no knowledge of who the map drawer is, what their

3    process was or what the iterations were that they went through

4    and would be inappropriate for me to know so.

19:00:50  5          JUDGE MOORER:  Okay.  That's fine.  I don't think I

6    have any other questions.

7          JUDGE MARCUS:  Thank you.  I have one for you,

8    Mr. Bryan.

9       You testified earlier that one of the areas of expertise

19:01:12 10  that you had was in estimating population shifts.

11          THE WITNESS:  Yes, Your Honor.

12          JUDGE MARCUS:  And you testified about that in a

13   specific context when you were looking at population deviations

14   and how they grew over a ten-year decennial period, right?

19:01:32 15         THE WITNESS:  Yes, Your Honor.

16          JUDGE MARCUS:  Did you review and is there anything in

17   any of your reports that projected population splits based on

18   race going back in time and going forward?  For example, we

19   know from this record what the African-American population was,

19:01:57 20  say, circa 1992, and then we have numbers in the year 2000 from

21   the census and years in 2010 and 2020.

22       And if you look at those, you see a drop in the white

23   population if the numbers I saw in one of these reports is

24   right from roughly 73 percent to 63 percent of the Voting Age

19:02:24 25  Population.  And conversely, the African-American population

1   grew somewhere between three and four from, say, 23 to 27,

2   something roughly like that.  That's in the record, right?

3             THE WITNESS:  We performed no such population

4   projections by race for the purpose of this analytic exercise,

19:02:47 5   Your Honor.

6             JUDGE MARCUS:  Okay.  So you didn't make any

7   projection from '21 to '31?

8             THE WITNESS:  No, Your Honor.

9             JUDGE MARCUS:  That's all I wanted to know.  Thank you

19:02:56 10  very much.

11       Any follow-up questions by any of the lawyers?  Let me

12  start with you, Ms. Khanna, and then turn to Mr. Dunn, and then

13  finally Mr. Blacksher, and Mr. Davis, we will give you the last

14  word because he's your witness.

19:03:12 15       Ms. Khanna?  I'm sorry.  You are muted.  He did not hear

16  you.  Fire away.  Thank you.

17            MS. KHANNA:  Nothing from me, Your Honor.  I would

18  like to thank Mr. Bryan and the Court for its patience today.

19            THE WITNESS:  Thank you, Ms. Khanna.

19:03:31 20            JUDGE MARCUS:  Do you have anything further that you

21  would like to ask, Mr. Dunn?

22            MR. DUNN:  No.  I think we have all had enough for

23  today, Your Honor.

24            JUDGE MARCUS:  Mr. Blacksher, anything further to

19:03:42 25  follow up on anything the judges asked?

1          MR. BLACKSHER:  No, Your Honor.

2          JUDGE MARCUS:  All right.  Thank you much.  Finally,

3    Mr. Davis?

4          MR. DAVIS:  No questions from me, Your Honor.

19:03:51  5          JUDGE MARCUS:  All right.  I thank you all.

6       We will adjourn for the day.  We will reconvene Monday

7    morning at 9:00 o'clock the usual time we had set, Central

8    Standard Time.  That would be 10:00 a.m. Eastern Standard Time.

9       Thank you all.  We are in recess.

19:04:17 10          (Whereupon, the above proceedings were concluded at

11       7:04 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1               <u>CERTIFICATE</u>

2

3

4        I certify that the foregoing is a correct

5    transcript from the record of proceedings in the

6    above-entitled matter.

7

8

9

10

11                                              <u>01-07-2022</u>

12    Christina K. Decker, RMR, CRR              Date

13    Federal Official Court Reporter

14    ACCR#:  255

15

16

17

18

19

20

21

22

23

24

25