FILED
2022 Jan-18 PM 03:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ALABAMA
2                            SOUTHERN DIVISION

3

4        BOBBY SINGLETON, et al.,          *
                    Plaintiffs,            *    2:21-cv-1291-AMM
5                                          *    January 10, 2022
         vs.                               *    Birmingham, Alabama
6                                          *    9:00 a.m.
         JOHN MERRILL, in his official     *
7        capacity as Alabama Secretary     *
         of State, et al.,                 *
8                   Defendants.            *
         *******************************
9                                          *
         EVAN MILLIGAN, et al.,            *
10                  Plaintiffs,            *    2:21-cv-1530-AMM
                                           *
11       vs.                               *
                                           *
12       JOHN MERRILL, in his official     *
         capacity as Alabama Secretary     *
13       of State, et al.,                 *
                    Defendants.            *
14       *******************************
                                           *
15       MARCUS CASTER, et al.,            *
                    Plaintiffs,            *    2:21-cv-1536-AMM
16                                         *
         vs.                               *
17                                         *
         JOHN MERRILL, in his official     *
18       capacity as Alabama Secretary     *
         of State, et al.,                 *
19                  Defendants.            *
         *******************************
20

21

                    TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
22                            VIA ZOOM CONFERENCE
                                  VOLUME V
23              BEFORE THE HONORABLE ANNA M. MANASCO,
                    THE HONORABLE TERRY F. MOORER,
24               THE HONORABLE STANLEY MARCUS

25

                        CHRISTINA K. DECKER, RMR, CRR
                      Federal Official Court Reporter
                          101 Holmes Avenue, NE
                           Huntsville, AL 35801
                    256-506-0085/ChristinaDecker.rmr.crr@aol.com

1

2    Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
     pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
3      and Procedures Vol. VI, Chapter III, D.2.  Transcript
                  produced by computerized stenotype.
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          APPEARANCES

2

   FOR THE SINGLETON PLAINTIFFS:
3
   James Uriah Blacksher
4  JAMES U. BLACKSHER, ATTORNEY
   825 Linwood Road
5  Birmingham, AL 35222
   205-612-3752
6  Fax: 866-845-4395
   Email: Jublacksher@gmail.com
7
   Myron C Penn
8  PENN & SEABORN LLC
   53 Highway 110
9  PO Box 5335
   Union Springs, AL 36089
10 334-738-4486
   Fax: 334-738-4432
11 Email: Myronpenn28@hotmail.com

12 Joe R Whatley, Jr
   WHATLEY KALLAS LLP
13 2001 Park Place North Suite 1000
   Birmingham, AL 35203
14 205-488-1200
   Fax: 800-922-4851
15 Email: Jwhatley@whatleykallas.com

16 Henry C Quillen
   WHATLEY KALLAS LLP
17 159 Middle Street Suite 2D
   Portsmouth, NH 03801
18 603-294-1591
   Fax: 800-922-4851
19 Email: Hquillen@whatleykallas.com

20 W Tucker Brown
   WHATLEY KALLAS LLC
21 P.O. Box 10968
   Birmingham, AL 35202-0968
22 205-488-1200
   Fax: 800-922-4851
23 Email: Tbrown@whatleykallas.com

24

25

```
 1          Diandra "Fu" Debrosse Zimmermann
            DICELLO LEVITT GUTZLER
 2          420 20th Street North
            Suite 2525
 3          Birmingham, AL 35203
            205-855-5700
 4          Fax: 205-855-5784
            Email: Fu@dicellolevitt.com
 5
            Eli Joseph Hare
 6          DICELLO LEVITT GUTZLER LLC
            420 20th Street North, Suite 2525
 7          Birmingham, AL 35203
            205-855-5700
 8          Fax: 205-855-5784
            Email: Ehare@dicellolevitt.com
 9

10          FOR THE MILLIGAN PLAINTIFFS:

11
            Deuel Ross
12          NAACP LEGAL DEFENSE &
            EDUCATIONAL FUND, INC.
13          700 14th Street N.W. Ste. 600
            Washington, DC 20005
14          (202) 682-1300
            Dross@naacpldf.org
15
            Leah Aden
16          Stuart Naifeh
            Kathryn Sadasivan
17          Brittany Carter
            NAACP LEGAL DEFENSE &
18          EDUCATIONAL FUND, INC.
            40 Rector Street, 5th Floor
19          New York, NY 10006
            (212) 965-2200
20          Laden@naacpldf.org
            Snaifeh@naacpldf.org
21
            Davin M. Rosborough
22          Julie Ebenstein
            AMERICAN CIVIL LIBERTIES
23          UNION FOUNDATION
            125 Broad St.
24          New York, NY 10004
            (212) 549-2500
25          Drosborough@aclu.org
            Jebenstein@aclu.org
```

1        Kaitlin Welborn
         LaTisha Gotell Faulks
2        AMERICAN CIVIL LIBERTIES UNION
         OF ALABAMA
3        P.O. Box 6179
         Montgomery, AL 36106-0179
4        (334) 265-2754
         Kwelborn@aclualabama.org
5        Tgfaulks@aclualabama.org

6        David Dunn
         HOGAN LOVELLS US LLP
7        390 Madison Avenue
         New York, NY 10017
8        (212) 918-3000
         David.dunn@hoganlovells.com

9
         Michael Turrill
10       Harmony A. Gbe
         HOGAN LOVELLS US LLP
11       1999 Avenue of the Stars
         Suite 1400
12       Los Angeles, CA 90067
         (310) 785-4600
13       Michael.turrill@hoganlovells.com
         Harmony.gbe@hoganlovells.com
14
         Shelita M. Stewart
15       Jessica L. Ellsworth
         HOGAN LOVELLS US LLP
16       555 Thirteenth Street, NW
         Washington, D.C. 20004
17       (202) 637-5600
         Shelita.stewart@hoganlovells.com
18
         Blayne R. Thompson
19       HOGAN LOVELLS US LLP
         609 Main St., Suite 4200
20       Houston, TX 77002
         (713) 632-1400
21       Blayne.thompson@hoganlovells.com

22

23

24

25

```
 1        Sidney M. Jackson
          Nicki Lawsen
 2        WIGGINS CHILDS PANTAZIS
          FISHER & GOLDFARB, LLC
 3        301 19th Street North
          Birmingham, AL 35203
 4        Phone: (205) 341-0498
          Sjackson@wigginschilds.com
 5        Nlawsen@wigginschilds.com

 6

 7        FOR THE CASTER PLAINTIFFS:

 8        Abha Khanna
          ELIAS LAW GROUP LLP
 9        1700 Seventh Avenue, Suite 2100
          Seattle, WA 98101
10        206-656-0177
          Email: AKhanna@elias.law
11
          Aria C Branch
12        ELIAS LAW GROUP LLP
          10 G St NE, Suite 600
13        Washington, DC 20002
          202-968-4490
14        Fax: 202-968-4498
          Email: ABranch@elias.law
15
          Daniel C Osher
16        ELIAS LAW GROUP
          10 G Street NE
17        Suite 600
          Washington, DC 20002
18        202-968-4490
          Email: DOsher@elias.law
19
          Joseph N. Posimato
20        Elias Law Group LLP
          10 G Street, NE; Suite 600
21        Washington, DC 20002
          202-968-4518
22        Email: Jposimato@elias.law

23        Lalitha D Madduri
          ELIAS LAW GROUP LLP
24        10 G Street NE, Suite 600
          Washington, DC 20002
25        202-968-4490
          Email: Lmadduri@elias.law
```

```
1    Olivia N. Sedwick
     Elias Law Group LLP
2    10 G Street, NE; Suite 600
     Washington, DC 20002
3    202-968-4518
     Email: Osedwick@elias.law
4

5    Richard P Rouco
     QUINN CONNOR WEAVER DAVIES & ROUCO LLP
6    Two North Twentieth Street
     2 20th Street North
7    Suite 930
     Birmingham, AL 35203
8    205-870-9989
     Fax: 205-803-4143
9    Email: Rrouco@qcwdr.com

10

11

12   FOR THE DEFENDANT:

13   Andrew Reid Harris
     OFFICE OF THE ATTORNEY GENERAL
14   CONSTITUTIONAL DEFENSE DIVISION
     501 Washington Avenue
15   Montgomery, AL 36130
     334-353-8891
16   Email: Reid.Harris@AlabamaAG.gov

17   Benjamin Matthew Seiss
     ALABAMA OFFICE OF THE ATTORNEY GENERAL
18   P.O. Box 300152
     501 Washington Ave (36104)
19   Montgomery, AL 36130
     334-353-8917
20   Fax: 334-353-8400
     Email: Ben.seiss@alabamaag.gov
21
     Brenton Merrill Smith
22   OFFICE OF THE ATTORNEY GENERAL OF ALABAMA
     P.O. Box 300152
23   501 Washington Avenue
     Montgomery, AL 36130
24   334-353-4336
     Fax: 334-353-8400
25   Email: Brenton.Smith@AlabamaAG.gov
```

1    Edmund Gerard LaCour, Jr.
     OFFICE OF THE ATTORNEY GENERAL
2    501 Washington Avenue
     P.O. Box 300152
3    Montgomery, AL 36104
     334-242-7300
4    Fax: 334-242-4891
     Email: Edmund.Lacour@AlabamaAG.gov
5
     James W Davis
6    OFFICE OF THE ATTORNEY GENERAL
     501 Washington Avenue
7    P O Box 300152
     Montgomery, AL 36130-0152
8    334-242-7300
     Fax: 334-353-8400
9    Email: Jim.davis@alabamaag.gov

10   Misty Shawn Fairbanks Messick
     OFFICE OF THE ATTORNEY GENERAL
11   FOR THE STATE OF ALABAMA
     501 Washington Avenue
12   P O Box 300152
     Montgomery, AL 36130-0152
13   334-242-7300
     Fax: 334-353-8440
14   Email: Misty.Messick@AlabamaAG.gov

15   Alexander Barrett Bowdre
     OFFICE OF THE ALABAMA ATTORNEY GENERAL
16   P.O. Box 300152
     Montgomery, AL 36130
17   334-242-7300
     Fax: 334-353-8400
18   Email: Barrett.Bowdre@alabamaAG.gov

19   Thomas Alexander Wilson
     STATE OF ALABAMA
20   OFFICE OF THE ATTORNEY GENERAL
     501 Washington Street
21   Montgomery, AL 36103
     334-242-7300
22   Fax: 334-353-8400
     Email: Thomas.wilson@alabamaAG.gov

23

24

25

```
1        J Dorman Walker
         BALCH & BINGHAM LLP
2        P O Box 78
         Montgomery, AL 36101
3        334-834-6500
         Fax: 334-269-3115
4        Email: Dwalker@balch.com

5

6

7

8

9        COURTROOM DEPUTY:  Frankie N. Sherbert

10

11       COURT REPORTER:  Christina K. Decker, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1

<u>**I N D E X**</u>

2

3   JOSEPH BAGLEY                                          1137
    DIRECT EXAMINATION                                     1138
4   BY MS. SADASIVAN
    CROSS-EXAMINATION                                      1175
5   BY MR. HARRIS
    REDIRECT EXAMINATION                                   1241
6   BY MS. SADASIVAN

7

    BAODONG LIU                                            1251
8   DIRECT EXAMINATION                                     1252
    BY MR. ROSS
9   CROSS-EXAMINATION                                      1294
    BY MR. HARRIS
10  REDIRECT EXAMINATION                                   1333
    BY MR. ROSS

11

12  BENJAMIN JONES                                         1341
    DIRECT EXAMINATION                                     1342
13  BY MR. OSHER
    CROSS-EXAMINATION                                      1359
14  BY MR. SMITH

15

16

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**P R O C E E D I N G S**

1

2          (In open court.)

3          JUDGE MARCUS:  Before we begin with the next witness,

4   last week an objection was raised provisionally to one of the

09:00:12 5   exhibits Caster was offering in evidence.  It was a brief that

6   had been submitted to the Supreme Court.  I had raised that

7   issue after there was a preliminary objection, and we gave you

8   folks the opportunity to think about where we stood on that.  I

9   thought we would take that up at the outset.  Counsel, where

09:00:39 10   are we on that exhibit?  Do you remember the exhibit I'm

11   talking about?

12          MR. DAVIS:  I do, Your Honor.  We have reviewed the

13   brief.  We have no objection to the portions that were read

14   into the record coming in, the redacted version.  We would

09:00:54 15   object to the brief in its entirety.

16          JUDGE MARCUS:  Counsel, can you agree to redact it

17   with Mr. Davis so that you can then just give us a redacted

18   form?  I don't know that you need all of it, but if you do, we

19   will rule on it.  You tell me.

09:01:10 20          MS. KHANNA:  I think that's fine.  I just want to make

21   sure, Your Honor, that -- I am not sure I read everything

22   verbatim into the record.  I might have summarized some

23   portions of it, so I would like to go through and make sure we

24   are accurately reflecting what we discussed.  But I would be

09:01:25 25   happy to work with Mr. Davis on that.

```
 1          JUDGE MARCUS:  Why don't we leave it open.  That was

 2    106 to my recollection.  Caster 106, right?

 3          MS. KHANNA:  Yes, sir.

 4          JUDGE MARCUS:  Okay.  We will withhold ruling on that

 5    to give you, Mr. Davis, a chance to sit down at your leisure

 6    with Ms. Khanna and see if you can isolate the portions,

 7    perhaps the easiest way would be to have -- once you have

 8    agreed, to have Ms. Khanna read it right into the record so you

 9    don't actually have to put the whole thing in.  That works for

10    both of you?

11          MR. DAVIS:  That would be fine.  I am very happy to

12    continue a conversation with Ms. Khanna to make sure

13    everybody's interests are taken into account.

14          JUDGE MARCUS:  Okay, Ms. Khanna, when you are ready

15    with the offer, then you just let me know, and we will address

16    it as soon as you wish.

17          MS. KHANNA:  Will do.  Thank you.

18          JUDGE MARCUS:  With that, we have finished with the

19    testimony of Mr. Bryan.  We had taken him out of order to

20    accommodate the Secretary of State.  So we are going back now

21    to the plaintiffs' cases collectively.

22        So who would be the next witness?  You just let us know,

23    please.

24          MR. ROSS:  Your Honor, the next witness is Dr. Bagley,

25    but I wanted to ask a very quick question about closings if you
```

09:01:37 (line 5)
09:01:55 (line 10)
09:02:05 (line 15)
09:02:18 (line 20)
09:02:34 (line 25)

```
 1  didn't mind.

 2            JUDGE MARCUS:  Sure.

 3            MR. ROSS:  I guess our question was does the Court

 4  still expect to have closings, and if so, I think I'd like to

 5  propose either some time limits or just I guess we would like

 6  --

 7            JUDGE MARCUS:  I am happy to take that up right now,

 8  Mr. Ross.

 9       Originally, you folks indicated you did not wanted to make

10  openings, but you did want to make closings.  That's fine with

11  us if you want to make closing arguments.  I take it each of

12  the plaintiffs want to make a closing statement.  Do I have

13  that right, from Singleton, Milligan, and Caster?

14            MR. BLACKSHER:  Go ahead, Abha.

15            MS. KHANNA:  I was going to say not necessarily.  We

16  would be happy to do whatever the Court would find most

17  helpful.  If that really is just an opportunity to ask the

18  attorneys questions as opposed to formal closings, that will be

19  fine.  We will be happy to direct our -- whatever we would use

20  in our closing to our proposed findings and conclusions that

21  are due later this week.  We are entirely at your pleasure,

22  whatever would be most helpful to the Court in resolving the

23  case.

24            JUDGE MARCUS:  Mr. Ross, what's your pleasure?

25            MR. ROSS:  We have a preference for doing formal
```

09:02:45  (line 5)
09:02:59  (line 10)
09:03:16  (line 15)
09:03:31  (line 20)
09:03:47  (line 25)

1    closing.  We would agree to keep it to 30 minutes so it's not
2    too long.

3         JUDGE MARCUS:  And, Mr. Blacksher, what's your
4    pleasure?

09:03:57  5         MR. BLACKSHER:  I think we agree with Ms. Khanna, that
6    it would be better just to provide the Court an opportunity to
7    ask us questions.  The problem for closings is we would get
8    three consolidated cases that run separate courses with respect
9    to issues that were presented to the Court, and it can become
09:04:14 10   very confusing.  And it's much better handled especially since
11   you set a deadline of Friday for findings of fact and
12   conclusions of law.

13      It would just seem more economical to rely on that.

14         JUDGE MARCUS:  What is the pleasure of the Secretary
09:04:30 15   of State and the intervening defendants, as to closing
16   argument?

17         MR. LACOUR:  Your Honor, we would like to have the
18   opportunity for closing argument.  I think it would be helpful
19   that Your Honors have heard a lot of evidence and a lot of
09:04:43 20   argument in the briefing.  And I think the opportunity to try
21   to focus some of that and also hear areas where you all might
22   have concerns or questions, it would be very valuable to the
23   parties and to the Court.

24         JUDGE MARCUS:  And what about the intervening
09:05:00 25   defendants McClendon and Pringle?  Will you be making it for

1  them, as well, or do they want to make a separate one?

2  Mr. Walker, what is your pleasure?

3            MR. WALKER:  Your Honor, nothing to add to what

4  Mr. LaCour said.

09:05:15 5            JUDGE MARCUS:  Okay.  So you would want to make one,

6  too, or --

7            MR. WALKER:  Oh, no, sir.

8            JUDGE MARCUS:  -- or you would rest on the closing

9  argument made by the Secretary of State.

09:05:24 10            MR. WALKER:  Mr. LaCour will speak for all defendants.

11            JUDGE MARCUS:  Okay.  Well, since by my count a number

12  of the parties do wish to make closing statements, we will give

13  you leave to do that.  Why don't you think about how much time

14  each of you would like for it, and we will give you a setting

09:05:49 15  thereafter for the amount of time.

16       Last question, though, Mr. Ross, since you have raised it.

17  When do you think we will be getting to closing?  What's your

18  best guess?

19            MR. ROSS:  Your Honor, I -- we would like to have it

09:06:00 20  maybe Wednesday morning.  I think that we probably will get

21  done with all of the witnesses today and tomorrow.

22            JUDGE MARCUS:  Okay.  Well, we'll see where we go.  We

23  have Mr. Bagley from your end.  Who else do we have from

24  Milligan?

09:06:15 25            MR. ROSS:  For Milligan, Dr. Bagley and then Dr. Liu.

1    And then Caster I believe has one expert and two fact

2    witnesses.

3              JUDGE MARCUS:  Ms. Khanna?

4              MS. KHANNA:  Yes, Your Honor.  We have two of our

09:06:28 5    plaintiffs that testify.  They should be pretty short this

6    afternoon.  And that's Mr. Caster and Mr. Jones.  And then

7    Dr. King should be available either this afternoon or tomorrow

8    morning as -- or tomorrow as needed.

9              JUDGE MARCUS:  So you will have three witnesses.

09:06:45 10    Milligan has two.  Mr. Blacksher, I think you rested, but I

11    just wanted to be sure.  You didn't expect to call anyone else,

12    did you?

13              MR. BLACKSHER:  We have no more witnesses, Your Honor.

14    We just want to make sure our exhibits are admitted in

09:07:00 15    evidence.

16              JUDGE MARCUS:  Sure.  Finally, from the Secretary of

17    State, Mr. Davis?  You have already put on only one of your

18    witnesses so far.

19              MR. DAVIS:  Yes, Your Honor.  And we will next call

09:07:12 20    Dr. Trey Hood, another expert in the morning.  After that,

21    assuming his schedule permits it, we intend to call former

22    Congressman Bradley Byrne once the plaintiffs have put on all

23    of their witnesses.

24        I think Mr. Ross's assessment is correct, in that

09:07:27 25    Wednesday morning is a very reasonable estimate of when we

1    would be ready -- we would have concluded all witnesses and be
2    ready for closing.
3         JUDGE MARCUS:  So you figure the case will be ready
4    for closing argument by the end of business Tuesday, going
09:07:42 5    forward on Wednesday morning.
6         MR. DAVIS:  I think that likely.
7         JUDGE MARCUS:  Okay.  And we will address it further
8    -- how much time, by the way, Mr. Davis, do you think you or
9    Mr. LaCour wants for closing?  Obviously, you will be hearing
09:07:57 10   three closing arguments from three sets of plaintiffs.
11        MR. DAVIS:  Your Honor, I apologize.  I did not
12   understand the question.
13        JUDGE MARCUS:  How much time would you want for
14   closing given that you will be hearing three closing arguments
09:08:11 15   from each of Milligan, Singleton, and Caster?
16        MR. DAVIS:  Mr. LaCour can address that.
17        MR. LACOUR:  Your Honor, I think an hour would it.  I
18   hope as with the normal Eleventh Circuit argument that we have
19   the chance to answer a lot of questions that you all might
09:08:31 20   have.  I think the plaintiffs are making some key points that
21   we would want to make on behalf of the defendants.  And then
22   answering questions you might have.  But assume that could be
23   done in under an hour.
24        JUDGE MARCUS:  Fair enough.  We will just give you a
09:08:47 25   timeline before by the end of business tomorrow or maybe even

1   later today for how much time, but we would permit you to make

2   closing arguments each of the counsel.  And as I understand,

3   Mr. LaCour, you will be doing the closing not only for the

4   Secretary of State, but for the two intervening defendants

09:09:08 5   Pringle and McClendon, correct?

6          MR. LACOUR:  That's correct, Your Honor.

7          JUDGE MARCUS:  All right.  Thank you much.

8      So I have this right, Mr. Ross, you are going to go

9   forward with Dr. Bagley first, and then you are going to put on

09:09:21 10   Liu.  Is that the order?

11          MR. ROSS:  Yes, Your Honor.

12          JUDGE MARCUS:  And then, Ms. Khanna, you will proceed

13   with the two plaintiffs and Dr. King?

14          MS. KHANNA:  Yes, Your Honor.

09:09:31 15          JUDGE MARCUS:  And then the state will put on Dr. Hood

16   and perhaps form Congressman Byrne if I have that right.

17          MR. DAVIS:  That's correct.

18          JUDGE MARCUS:  All right.  Thanks so very much.  Let's

19   proceed with your first witness.  Mr. Ross, are you going to be

09:09:47 20   questioning Dr. Bagley?

21          MS. SADASIVAN:  No, Your Honors.  I am Kathryn

22   Sadasivan for the Milligan plaintiffs.  I will be putting

23   forward the testimony of Dr. Bagley.

24          JUDGE MARCUS:  Welcome.  Glad to have you.

09:09:59 25                JOSEPH BAGLEY,

1  having been first duly sworn, was examined and testified as

2  follows:

3          JUDGE MARCUS:  Would you be kind enough to state your

4  name your full name for the record?

09:10:15  5          THE WITNESS:  Yes, Your Honor.  Joseph Mark Bagley.

6  J-O-S-E-P-H, M-A-R-K, B-A-G-L-E-Y.

7          JUDGE MARCUS:  Thank you.  Welcome, and you may

8  proceed, counsel.

9          MS. SADASIVAN:  Thank you, Your Honor.

09:10:28 10                      DIRECT EXAMINATION

11  BY MS. SADASIVAN:

12  Q    Dr. Bagley, do you know why you are here today?

13  A    Yes.  I was retained by plaintiffs' counsel in this case.

14  Q    And what did plaintiffs' counsel retain you for?

09:10:39 15  A    They have asked me to perform a set of factors analysis

16  relative to HB-1 at issue in this mitigation.

17  Q    Dr. Bagley, I would like to just ask you your background

18  and experience first.

19          MS. SADASIVAN:  Eric, can you pull up Plaintiffs'

09:10:55 20  Exhibit M-5, which is ECF 68-2.

21  BY MS. SADASIVAN:

22  Q    Dr. Bagley, I am showing you what's been marked as

23  Plaintiffs' Exhibit M-5.  Do you recognize this document?

24  A    I do.  That is the report that I submitted in this case.

09:11:09 25          MS. SADASIVAN:  And, Eric, can you please go to page

1139

```
 1  33 of the report?  Thank you.
 2  BY MS. SADASIVAN:
 3  Q    And, Dr. Bagley, does page 33 of your report reflect a
 4  current version of your resume or CV?
 5  A    It does.
 6  Q    Dr. Bagley, where did you grow up?
 7  A    I grew up in Alabama in the Birmingham area in Helena,
 8  went to Pelham High School.  We moved and during my high school
 9  years to Opelika, graduated from Opelika and ended up at Auburn
10  University.
11  Q    And what is your educational background?
12  A    I got a B.A. and M.A. in history, as you see there from
13  Auburn, and got my Ph.D in history, as well, from Georgia State
14  University in 2013.
15  Q    And what's your current occupation?
16  A    I am assistant professor of history and honors program
17  Georgia State University Perimeter College.
18  Q    And how long have you taught at Georgia state?
19  A    I've been at GSU in one capacity or another since I
20  graduated in 2013.  I have been a visiting lecturer downtown.
21  I have been a lecturer and in my current tenure position since
22  2017.
23  Q    And what do you consider to be your areas of
24  specialization, Dr. Bagley?
25  A    20th Century United States constitutional legal history,
```

1  politics, race regulations, especially in Georgia and Alabama.

2  Q    Have you won any awards?

3  A    My dissertation won the departmental award for the best

4  one in a dissertation two-year cycle.

09:12:43  5  Q    What was the dissertation about?

6  A    It's entitled School Desegregation Law and Order and

7  Litigating Social Justice in Alabama.  In addition to being a

8  narrative of school desegregation between the '50s and up to

9  what was at the time present day, it examines how state law

09:12:59  10  makers learned to as I describe it color mask their laws that

11  are discriminatory so they can pass court tests, lessons

12  learned and fight against school desegregation.

13  Q    Have you been invited to lecture?

14  A    I have.  I have lectured a number of times at the Alabama

09:13:18  15  Department of Archives and History.  I have lectured at Auburn

16  for the critical studies working group in the College of

17  Education, lectured at the drawing center and the humanities

18  there at Auburn for the leaders and the voters in Jefferson

19  County, and so on.

09:13:34  20  Q    And have you been published, Dr. Bagley?

21  A    My book was published in 2018.  It's a distillation of my

22  dissertation.  It's entitled, The Politics of White Rights,

23  Race, Justice, and Integrating Alabama Schools.  It was

24  published by the University of Georgia Press.

09:13:50  25      I also published a number of book reviews.  I have

1  performed manuscript reviews and so on for the Alabama Review,

2  the Journal of Urban History, History of Education Quarterly,

3  Journal of Southern History, and so on.

4  Q    And you mentioned that your book was published.  What was

09:14:08 5  your book about?

6  A    It's a distillation of my dissertation as I say, so it

7  examines school desegregation between the 1950s and the '70s

8  and follows that up even to the present and looks at how law

9  makers in the state learned how to focus their attention on

09:14:27 10  tailoring laws that were discriminatory to pass court tests.

11  Lessons learned, if you will, in the fight against school

12  desegregation.

13  Q    Are you member of any professional organizations,

14  Dr. Bagley?

09:14:39 15  A    Yes.  The Organization of American Historians, the

16  American Historical Association, the Southern Historical

17  Association, the Alabama Historical Association, and the

18  American Society for Legal History.

19  Q    Have you testified as an expert in litigation before?

09:14:59 20  A    Yes.  I have testified in *People First vs. Merrill* in

21  2020.  I submitted a report in that case.  I was -- I testified

22  in a deposition and at trial, and my findings were cited to by

23  the Court in its opinion in that case.

24  Q    And you were qualified as an expert in *People First*?

09:15:22 25  A    Yes.

1    MS. SADASIVAN:  Your Honors, I would like to tender

2    Dr. Bagley as an expert witness in Alabama political history,

3    political analysis, and historical methodology.

4    JUDGE MARCUS:  Political history, political

09:15:36  5    methodology, and Alabama -- what particular focus is it going

6    to be on in Alabama history?

7    MS. SADASIVAN:  So Alabama political history, Your

8    Honor, political analysis, and historical methodology.

9    JUDGE MARCUS:  All right.  Is there any objection or

09:15:52 10    challenge to Dr. Bagley?  Mr. Harris?

11    MR. HARRIS:  No, sir, not as a historian.

12    JUDGE MARCUS:  All right.  We will receive your

13    testimony as an expert in the history that you have detailed.

14    You may proceed.  Thank you.

09:16:10 15    MS. SADASIVAN:  Eric, can you please pull up

16    Plaintiffs' Exhibit M-9 which is ECF 76-2.

17    BY MS. SADASIVAN:

18    Q    Dr. Bagley, do you recognize this document?

19    A    Yes.  That's the supplemental report that I submitted in

09:16:24 20    this case subsequent to my original report.

21    Q    Thank you, Dr. Bagley, if you wish to have any of the

22    pages from your report or your supplemental report pulled up,

23    please just let me know, and I or Eric will do so.  Otherwise,

24    I will phrase my questions about the report with the page

09:16:41 25    numbers, as well, so those who are listening can follow along.

```
 1  A     All right.
 2  Q     Let's turn now, Dr. Bagley, to your role in this case.
 3        On page 1 and 2 of your report, what do you describe as
 4  the subject of your report in this case?
 5  A     I was asked by plaintiffs' counsel to examine what I felt
 6  like were any relevant socio-historical factors, and how they
 7  might interact with HB-1 to possibly impair the ability of
 8  black voters to participate fully and equitably in the
 9  political process and to elect candidates of their choice.
10        And in essence, I was asked to perform a so-called Senate
11  Factors analysis.
12  Q     So let's talk about the methodology that you employed and
13  conducted in this analysis.
14        On the bottom of page 1, what do you say guided your
15  analysis?
16  A     Well, as a historian, I am guided by the common standards
17  of historiography obviously.  That just means that I examine a
18  number of different sources from the legislative record to the
19  judicial record, of course, relevant press coverage, campaign
20  literature, public statements, my own previous work, in this
21  case, recent archival work that I have done, you know, existing
22  scholarship, of course, and sometimes and including in this
23  case relevant published scientific reports and so on.
24        We weigh all of that collectively and against itself in
25  drawing our conclusions.  Also, as I mentioned before, I am
```

```
 1  guided in this particular inquiry by the Senate Factors,
 2  meaning the totality of the circumstances test as adopted by
 3  the Supreme Court in Thornburg vs. Gingles.
 4  Q    And are the sources -- before we talk more about the
 5  Senate Factors, are the sources that you relied upon in
 6  conducting your analysis typical of sources relied upon by
 7  historians?
 8  A    Absolutely.  Yeah.  We don't rely only on, you know,
 9  archival work that we have done ourselves.  We rely on what we
10  call secondary sources, and again, the essence of
11  historiographical inquiry, somewhat actually like the totality
12  and circumstances inquiry is weighing all of that against
13  itself and looking at it broadly.
14  Q    Dr. Bagley, what are the Senate factors?
15  A    So the Senate Factors were adopted by the Court in Gingles
16  taken from a report that the Senate judiciary committee put out
17  during the readoption of the Voting Rights Act in the early
18  1980s.  I focused my report on Factors 1 and then 5 through 8,
19  although I do discuss Senate Factor 3 in my discussion of 1.
20  If it's useful for me to run down very briefly what those are
21  individually, I'm happy do that.
22  Q    Yeah.  If you wouldn't mind just sharing the Senate
23  Factors that you applied and what they are before we move in,
24  we will discuss each Senate Factor in your report one by one.
25  And it's on page 3 of your report.
```

A     Sure.  So the first factor to consider as we're looking at
a piece of legislation in trying to determine you know is this
going to impair a minority voter's ability to participate fully
and equitably in the political process is, is there a history
of discrimination?  In this case, in the state of Alabama,
especially relevant to the minority group in this case black
voters' ability to access the franchise.

        Factor 2 is the extent to which voting in a state has been
racially polarized.

        Factor 3 asks us to examine the extent to which there have
been dilutive devices like at-large election schemes with
numbered posts and majority vote requirements and so on.

        Factor 4 asks if there has been a candidate slating
process and to what extent minority groups have had access to
that.

        Factor 5 asks us to examine the extent to which the
minority group bears the effects of past and ongoing
discrimination in certain areas.

        Factor 6 asks us whether political campaigns have been
characterized by overt or subtle racial appeals.

        Factor 7 asks us to what extent have minorities been
elected to public office in the state.

        And then there are two additional factors -- one, has
there been a lack of responsiveness on the part of elected
officials to the needs, the particularized needs of the

1    minority group.

2        And then the final additional factor is whether the policy

3    in question may be tenuous.

4    Q    Thank you, Dr. Bagley.  So let's now discuss the Senate

09:22:10 5    Factors that you analyzed one at a time.  Pages 8 through 16 of

6    your report discuss Senate Factor 1, which is the history of

7    official discrimination in the state of Alabama that touched on

8    the right to vote, the right to register and otherwise

9    participate in the political process in Alabama.

09:22:26 10        Before we get into the findings in Senate Factor 1, you

11    discussed in your report Alabama's current constitution.  When

12    was that first enacted?

13    A    It was enacted in 1901.  Alabama remains under that 1901

14    constitution.  That's important for a couple of reasons.  One,

09:22:49 15    I would say -- obviously, I don't think anyone disputes, and

16    courts have repeatedly recognized that the purpose of

17    establishing that constitution in the first place was to

18    establish white supremacy and to disenfranchise entirely black

19    voters very explicitly so.

09:23:12 20        Many of the provisions of that constitution throughout the

21    20th Century have been blocked or nullified.  But I would add

22    that has almost always been the case because of litigation

23    filed by black plaintiffs or otherwise protest action or

24    pushback from black plaintiffs and their allies.

09:23:36 25        So to note that a number of those provisions of the

1      original constitution are no longer active, I think we have to

2      add recognition of why that is the case.

3          A few other things to note, some of the plainly racist

4      language remains in that constitution are the discriminatory

09:23:57   5      language, at least.  There have been referenda to remove some

6      of that.  Sometimes it has passed, sometimes it has not.

7          For example, I believe the language regarding segregated

8      schools and the poll tax remains, although I think there is

9      another provision to perhaps remove that in play right now.

09:24:17  10          Some language has only lately been removed.  For example,

11      in the year 2000, what they would have called the state's

12      miscegenation statute was removed by referendum.  This was the

13      complication of the idea that anyone with so called one drop of

14      black blood, anyone who was any-part black could not marry a

09:24:42  15      white person.  Laws like that were invalidated, obviously, by

16      the *Loving* decision in the 1960s.  But, again, that language

17      was not removed until I think the year 2000.

18          So the specter of some of the worst parts of that

19      constitution serve angst over us still today I guess is the

09:25:06  20      point.

21      Q    So let's talk about your Senate Factor 1 analysis.  What

22      did your analysis in this report with respect to Senate Factor

23      1 focus on?

24      A    Well, I begin by talking a little bit about the state's

09:25:22  25      history from Reconstruction and to the first half of the 20th

1  Century.  But I tried not to spend too much time on that

2  because I think it's been more or less accepted by all parties

3  in this kind of litigation.  I think it's been recognized

4  repeatedly by federal courts.  And so what I have done is try

09:25:43  5  to focus this section of my report on the redistricting

6  process.

7       And so I began in earnest in the 1960s and looked at the

8  redistricting cycles and examined, you know, where can we see

9  this history of discrimination on the part of the state

09:26:04 10  manifests itself specifically in the redistricting process.

11  Q   So, then, pages 8 through 12 of your report, Dr. Bagley,

12  discuss the redistricting process in Alabama between the 1960s

13  and the '90s.  Could you please take us through that now?

14  A   Yes.  I began in the 1960s for a couple of reasons.  One,

09:26:28 15  in the 1901 constitution, it's stipulated that the state should

16  reapportion its state Legislature, it should redistrict with

17  every decennial census.

18       But the state had failed do that up until 1960.  The very,

19  very wealthy white land owners of the Black Belt in particular

09:26:50 20  had a sort of strangle hold on state politics and had resisted

21  very much efforts of the state to reapportion, because with the

22  growth of cities like Birmingham and Mobile, this would mean a

23  dilution of their power.

24       That being said, litigation was filed in the '60s that

09:27:08 25  forced the state to reckon with that.

1   Setting that aside for a second, the '60s are a useful
2   place to begin because 1960 was the year the Supreme Court
3   handed down the *McMillian* decision.
4   The state Legislature had enacted a law pushed through by
09:27:30 5   Macon County's Sam Engelhart that had redrawn the boundaries of
6   the city of Tuskegee excluding all black residents or nearly so
7   from the city limits and not any white people.  Tuskegee had
8   come sort of a seedbed at that time for black -- budding black
9   political activism, and so Mr. Engelhart wanted to shove black
09:27:52 10   people out from city politics, and the Supreme Court recognized
11   that in *Gomillion* in 1960 ruling that that was an
12   unconstitutional racial gerrymander.
13   I mentioned the litigation that was going to force the
14   state to reapportion.  That's the *Sims* litigation.  There are a
09:28:10 15   number of major rulings under the *Sims* mantel.  The first of
16   which is the *Sims v. Frank* decision, which I talk about on page
17   9 of my report.
18   The Court compelled the state to submit plans to
19   redistrict.  It submitted two.  And the Court found that both
09:28:30 20   of those were arbitrary, quote, irrational, and discriminatory,
21   and rejected those and held the state accountable moving
22   forward to attempt yet again, perhaps, to submit a plan.
23   The next ruling comes under the mantel of *Sims vs.*
24   *Baggett*.  And this is a mid 1960s, at which time the Voting
09:28:59 25   Rights Act had been passed.  And black litigants intervened in

*Sims* eventually with a Section 2 claim.  And so when the Court
rules and *Sims vs. Baggett*, it not only rules that these plans
are, as it had said before, arbitrary and irrational, they're
specifically discriminatory in that they were designed -- at
least the state's House plan was designed specifically so the
Court to prevent the election of a black member of the House of
Representatives.

        *Sims* is -- the state is still under injunction in *Sims*
going into the 1970s.  And it submits plans yet again to
redistrict the state House and the state Senate.  And at that
time, the Court finds yet again that the plans the state
submitted were unacceptable not only because they failed the
one person one vote test that the Supreme Court in *Sims* had
established, but also because they would have a discriminatory
effect.  So the Court at that point I believe gives the state
yet another chance.  This is the *Sims vs. Amos* styling to
submit plans that would past muster, and it had failed yet
again.

        So the upshot of that is by the 1970s, the state had
submitted at least four plans that the Court had found
unacceptable, at least partly because of their potential
discriminatory effect.

        I will take us through the 1980s, if I can.

        In the 1980s, new litigation was filed.  Black plaintiffs
filed a class action suit against the state at that time

1 arguing that its -- again, its state legislative plans were

2 racially discriminatory.  This is the *Burton vs. Hobby*

3 litigation.  The Court in that litigation gave the state

4 actually the opportunity to submit its plan to the Justice

09:31:09 5 Department so it would be deferred to the federal government.

6 　　　Alabama was, of course, by that time covered under Section

7 5 of the Voting Rights Act.  And so the Court deferred as I

8 said.  The state submitted its plan to the Justice Department.

9 And it found that the state's plans were retrogressive in terms

09:31:31 10 of black electoral power and blocked those plans through

11 Section 5 of preclearance.

12 　　　One last thing on the 1980s, this is just a couple of

13 years after that Section 5 objection that was rendered against

14 the state's plans.  The Court rules in the *Dillard* litigation,

09:31:51 15 *Dillard vs. Crenshaw County*.  *Dillard* does not concern

16 redistricting, but I think it is relevant particularly in terms

17 of Senate Factor 3.  The target in *Dillard* was the state's

18 numbered place law and how it interacted with at-large election

19 schemes.  It was sounded in *Dillard* litigation that the state's

09:32:15 20 numbered place law was put in place was passed specifically to

21 avoid the election of black candidates.

22 　　　Switching to at-large elections is something the state had

23 done during Reconstruction of the so-called redemption period

24 in the late 19th Century.  And there was a return to that in

09:32:33 25 the mid-20th Century.  And it was- the Court found explicitly

1  in *Dillard* that using these at-large schemes with numbered

2  places and staggered terms and majority vote requirements this

3  was collectively intended to prevent the election of black

4  candidates.  And through the course of the *Dillard* litigation,

09:32:53 5  I think 183 local governmental entities in the state of county

6  commissions, city counsels, so on were compelled in some way or

7  another to discard those at-large systems for single member

8  district election schemes.

9      That's in the final point here on the 1980s before we can

09:33:14 10 move on, very recently, still some local entities have been

11 compelled by litigation to discard those kind of schemes.  So

12 this is not something where we had an at-large diluted schemes,

13 there was *Dillard*, and then that's a thing of the past.

14      As recently as just a few years ago, 2019, as I note on

09:33:40 15 page 12 of my report, the -- this court in *Jones vs. Jefferson*

16 *County* heard a case that looked at the Jefferson County Board

17 of Education's way of electing its members, and the county

18 board actually agreed as part of that case to discard its

19 multi-member district slash single-member district at-large

09:34:08 20 voting scheme so that the board of education was compelled in

21 that case to discard that and to move to a new scheme.

22 Similarly, the city of Pleasant Grove faced litigation in that

23 same year and was also compelled to discard its at-large

24 electoral means of electing members to the city council.

09:34:29 25 Q    So let's talk now about the redistricting process

following the 1990 census which begins on page 13 of your

report.  Dr. Bagley, could you describe your findings with

respect to litigation following or challenges following the

1990 census?

09:34:43 A    Yes.  So in the 1990s, actually, initially, the state

failed to pass a plan redistricting its congressional

districts.  Then a challenge was brought in federal court in

the Southern District on a one person one vote basis because it

-- obviously, there had there had been significant changes in

09:35:11 terms of demographics in the state.  And at the moment the suit

was filed, there was no congressional plan.

       That litigation was eventually joined in by black

plaintiffs with a Section 2 claim, but while that litigation

was ongoing, the state actually did pass a congressional plan.

09:35:30 And it submitted that to the Justice Department.  And the

Justice Department objected to that plan citing a, quote,

predisposition on the part of the state to pack black voters

into the Seventh Congressional -- the newly created

majority-minority Seventh Congressional District and then to

09:35:53 crack their numbers elsewhere.

       So while that litigation, the *Wesch* litigation was ongoing

there, as the Civil Rights Division objection to a plan that

was passed down at the State Legislature.

Q    So on the bottom of page 14, Dr. Bagley, of your report,

09:36:12 you describe the Alabama redistricting process following the

1  2010 census.  Was Alabama's legislative redistricting process
2  challenged following the 2010 census?
3  A    Yet.  There was yet another challenge to the state
4  legislative plans in that cycle that was actually concurrent
09:36:33 5  with an FBI investigation into an alleged attempt to influence
6  gambling litigation -- or I'm sorry -- legislation in the
7  state.  That's relevant only because a state legislator was
8  wearing a wire for some of that investigation and caught --
9  recorded some sort of plainly racist statements made by some of
09:37:00 10  the law makers who were actually involved in at various stages
11  of the redistricting process.

12      To the redistricting process itself, then Representative
13  McClendon was in charge of the committee and reapportionment
14  and redistricting at the time along with then Senator Gerald
09:37:24 15  Dial.  That -- the process as I write about on the bottom of 14
16  and into 15 of actually drawing up the maps was handled by
17  Senator Dial, Representative McClendon, and a very, very select
18  number of individuals who were not members of the committee and
19  not members of the Legislature.  This is recognized in press
09:37:50 20  coverage and statements during and after the fact.  There are a
21  number of public statements from black lawmakers saying this
22  was a, quote, back-room deal.  It was not a transparent
23  process.  You know, they didn't find out the contours of the
24  maps until very late in the process and so on.  But in terms of
09:38:07 25  the challenge in court, this is the Alabama Legislative Black

1  Caucus litigation by which it was found that a number of the

2  districts drawn for the state's legislative plans the Court

3  found that race predominated in the drawing of a number of

4  those districts and that they could not stand.

09:38:30 5  Q    Before we move on, Dr. Bagley, to Senate Factor 5, you

6  mentioned briefly at the outset of your discussion of the 2010

7  redistricting process, the wire tap and a number of legislators

8  involved.  Would you mind just speaking a little bit more about

9  *United States vs. McGregor*?

09:38:47 10  A    Yes.  Mr. Beason, Senator Scott Beason was the one wearing

11  the wire and actually caught himself making racist statements

12  along with former Senator Larry Dixon.  At issue was the idea

13  that if the gambling referendum was on the ballot in the fall,

14  that quote unquote Aborigines, i.e. black people would be

09:39:20 15  bussed to the polls on HUD or Housing and Urban Development

16  that is federal buses, and that would not be beneficial to

17  these lawmakers.

18  Q    Let's move now to Senate Factor 5 covered in pages 17 to

19  26 of your report, Dr. Bagley, which discusses the extent to

09:39:35 20  which black people in the state of Alabama bear the effects of

21  discrimination in such areas as education, employment, and

22  health and living conditions, which hinder their ability to

23  participate effectively in the political process.

24      Dr. Bagley, can you briefly describe the summary of your

09:39:53 25  findings with respect to Senate Factor 5 on page 17 of your

1   report?

2   A    Yes.   I describe how indeed black people in Alabama do

3   face the ongoing effects of past discrimination in these areas

4   and a few more.  If you -- turn back to page 17.  If you

09:40:19 5   consider that white people in Alabama are more likely to be

6   able to afford a car, they're more likely to have broadband

7   Internet service, they're more likely to have a personal

8   computer, a tablet, a smart phone, they can take time off of

9   work, they can contribute to a political campaign, and so on.

09:40:41 10   In essence, they have more ability to engage politically.  And

11   that goes beyond just registration and turnout.

12        Two, if you look at the Census Bureau's most recently

13   published ACS data -- American Community Survey data -- you can

14   see that black Alabamians are less likely to have completed

09:41:02 15   high school.  They are more likely to live below the poverty

16   line.  They are more likely to be unemployed.  They are more

17   likely to work in a service industry job.  They are more likely

18   to rent rather than to own their home, more likely as I said

19   earlier to lack access to a vehicle.  And more likely to have a

09:41:23 20   significantly lower median household family income.

21   Q    Thank you, Dr. Bagley.  So let's take a look, and let's

22   start with health.  Can you describe your report's findings

23   with respect to discrimination in access to health, which

24   begins in your report on pages 17 and 18?  And you can start at

09:41:43 25   Reconstruction if you don't mind.

A     Sure.  I mean, I very briefly described that, you know,
priority the passage of the Civil Rights Act and other
legislation in the middle of the 20th Century, most black
people in Alabama, particularly in the Black Belt, were sort of
09:41:59  left to fend for themselves when it came to health, whether it
was the black -- the help of the Freedman's Bureau or the
immediate aftermath of the Civil War, or the Rosenwald Fund,
which is also instrumental in establishing the first black
schools in the South in the latter portion of the 19th Century.
09:42:17  Really, this is the reality in a lot of rural parts of Alabama
until the middle of the 20th Century and the enactment of great
society social welfare programs.
Q     So on the bottom of page 18, Dr. Bagley, 19 of your
report, you just identified discrimination in employment.  Can
09:42:38  you describe your findings, please?
A     Yes.  I cite to some figures published by the Federal
Equal Employment Opportunity Commission in 2020, specifically
claims of discrimination of work force discrimination.  If you
look at those numbers from state to state, Alabama has the
09:42:59  highest percentage of any state of the union when it comes to
racially-based claims.

      I also cite to a number of findings in federal courts over
the last 50 years, but even including in the last 10 years of
work force discrimination.  Some on the part of private
09:43:20  entities, firms, some on the part of local governments.  And

 1    then several on the part of various state entities.

 2    Q    And what about discrimination and access to transportation

 3    Dr. Bagley?

 4    A    I discuss in my report the finding of the Federal

09:43:43  5    Department of Transportation fairly recently that the state had

 6    essentially committed a Civil Rights violation, Title VI

 7    violation, when it closed Department of Motor Vehicle offices

 8    in predominantly black areas, especially in the Black Belt.

 9    The state was compelled to reverse that, as part of the

09:44:08 10    Department of Transportation's investigation.

11    Q    The state was compelled to sorry, what, Dr. Bagley?

12    A    To reopen those DMVs, a number of them, those offices.

13    Q    Thank you.  Let's turn to pages 24 and 26 of your report,

14    where you describe initial discrimination in education in

09:44:28 15    Alabama.  Can you please describe your findings with respect to

16    discrimination in education?

17    A    Sure.  Yes.  First, I think we should recognize that

18    segregated education was established in the 1901 constitution.

19    I think at least some of that language is still there.

09:44:49 20        Two, the *Brown* decision comes down in 1954, but as of

21    1963, there had been no desegregation in the state's public

22    schools whatsoever.  A number of cases were filed that year,

23    including the *Hereford vs. Huntsville* case which remains open

24    before this Court.  In that fall, four public school systems in

09:45:14 25    the state were forced to admit a handful of black school

1  children to public schools in Alabama for the first time.

2          Another of those cases, the Tuskegee-Macon County case,

3  *Lee vs. Macon County*, several years later in 1967 became the

4  vehicle for statewide desegregation.  Actually, the first

09:45:35  5  statewide structural injunction ever issued was issued against

6  Alabama in that case.  And ultimately 99 public school systems

7  were forced to desegregate under the *Lee v. Macon* mantel using

8  the freedom-of-choice methods of school desegregation.

9          Between that time and the early 1970s through a number of

09:45:58 10  cases including the Jefferson County case, which is also still

11  active before this Court, there is a shift from

12  freedom-of-choice desegregation, which led to a reality of

13  whites, formerly all-white schools with a few black students

14  being admitted by a court order and still all-black schools,

09:46:21 15  and the courts recognized especially the Fifth Circuit that it

16  was supposed to be -- supposed to have just schools quote

17  unquote.

18          And so there's a shift towards compulsory assignment

19  desegregation orders.  And so we don't see meaningful actual

09:46:37 20  integration until the 1970s.  But those cases continue on

21  contentiously into the 1980s into the 1990s.

22          I note in my report that the Huntsville case is still

23  active.  The Jefferson County case is still active.  And the

24  Huntsville case, the school board remains unable to meet the

09:47:03 25  Green factors, the *Green vs. New Kent County* litigation.  It's

laid out in there that there are certain factors school systems

must address to get -- it's now piecemeal that you can get

those orders lifted, but to get those fully lifted, Huntsville

has been unable do that with respect to student discipline,

09:47:24 which is continued to be found to be discriminatory, access to

advanced placement courses, for example.

        And then in the Jefferson County case, fairly recently the

city of Gardendale attempted to secede or sever from the county

system, which has happened before with cities like Trussville

09:47:45 and others.  But this Court found and as part of the *Stout* case

a couple of years ago that the part of the motivations for

Gardendale were racial.  And I think the Court may have even

used the word deplorable to refer to those motivations.  The

Court though actually allowed conditionally the severance to

09:48:11 move forward, that is, until the Eleventh Circuit, I believe,

including Judge Pryor actually reversed that and affirmed the

Court's finding with respect to racial motivation and actually

disallowed the severance.

        Finally, in terms of modern day relevance, when it comes

09:48:31 to education, I discuss on page 24 the Alabama Accountability

Act, which had passed in 2013, this establishes the

classification of failing schools in the state.  If you look at

the list of failing schools that's published every year,

invariably, it's majority black schools.  Many of them are

09:48:55 all-black schools.  They're often in majority black public

```
 1   school systems.  In fact, if you look at the most recent list,
 2   almost exclusively, it's public schools in the Black Belt, in
 3   Birmingham, or in the urban core of Mobile.
 4   Q    Thank you, Dr. Bagley.  What did your report determine in
 5   higher education?
 6   A    I talk briefly about the Knight litigation from the 1990s.
 7   The state's flagship universities were desegregated by a
 8   litigation in the 1960s.  So Auburn and Alabama were
 9   desegregated at that time.  But in the 1990s, in Knight vs.
10   Alabama litigation, the Court found there were still, quote,
11   vestiges of segregation in those institutions and in the --
12   proposed at that time satellites of those institutions that
13   were being built in Huntsville and Montgomery respectively.
14   And it entered in a remedial decree similar to that in Lee v.
15   Macon where it oversaw the process of trying to eliminate those
16   vestiges over the course of a ten-year period up into the
17   2000s.
18   Q    So, Dr. Bagley, when you were discussing schools, you
19   mentioned the Black Belt of Alabama on pages 1 and 2 of your
20   supplemental report, which is Plaintiffs' Exhibit M-9, you
21   discuss the Black Belt in Alabama.  Can you tell me a little
22   bit about the history of the Black Belt of Alabama?
23   A    Yeah.  So the Black Belt broadly speaking is an
24   agricultural region that stretches all across the deep south.
25        So from all the way up into Virginia and the whole
```

tidewater, tobacco-growing regions through the rice-growing

regions of the low country and through the heart of the sort of

deep south.  In Alabama, it stretches through south central

Alabama from roughly Russell and Barbour counties through

Montgomery and widening out sort of from Sumter County down to

Washington County on the Mississippi state line.

This is the area of the state when the state was very

young when native Americans were forcibly removed from that

area.  White settlers flooded in down the federal road from

Georgia either bringing with them enslaved persons or

purchasing them at slave markets at a time where people

realized the deep rich black soil, where the name Black Belt

comes from, and the climate of the South was perfect for

growing long-staple cotton at just the right time where via

mechanization industrialization cotton was becoming the go-to

material in textile production.  So the upshot is it made a lot

of white land owners very, very rich, and the labor was being

done of course primarily by enslaved black persons.

In terms of relevance to this case, as I talk about in my

supplemental report, there was never a land redistribution

program.  Land was never systematically taken from white land

owners after the Civil War and distributed to former slaves.

Even when the so-called radical Republicans in Congress were in

charge of Reconstruction, that never happened.

And so most of the poorer states become landless tenant

farmers, sharecroppers.  The legacy of that is very, very long and profound.  The Black Belt remains characterized by its mostly black population by the fact that it is stricken by poverty.

09:52:56    And the -- I should add that where I'm going with this in the supplemental report is to say that over time a lot of black people leave the Black Belt.  I think that's widely known when it comes to the so-called great migration that black people leave the poorer areas of the South and move to cities in the

09:53:20    Midwest or the Northeast.

What I tried to emphasize, though, in my report is that also black people leave the Black Belt and move to cities in Alabama, most especially Mobile.  And I cite to the imminent historians in Alabama including Wayne Flynt who have described

09:53:41    the process whereby black people have left in large numbers in a couple of different waves the Black Belt for the city of Mobile, and they share then the current residents of the urban core of Mobile that history with black people in the Black Belt.  And it's not just the migration.  It's not just ancestry

09:54:03    and heritage.  It's cultural, and it's multifaceted when it comes to the history.

For example, you look at the mid-20th Century and the Civil Rights movement.  Where were black people first active, in terms of organizing to bring down Jim Crow and to have

09:54:23    access to the franchise?  You would look at something like John

Hewlett in the Lowndes County Freedom Association.  That is in

the heart of the Black Belt.  You would look at John Cashin who

is from Huntsville, but when he forms his National Democratic

Party of Alabama, where do they first run candidates?  They run

them in the Black Belt.  Where do they first win races?  They

win them in the Black Belt.

Literally at the same time, you have John LeFlore in

Mobile organizing black stevedores and then organizing a local

chapter of the Non-Partisan Voters League.  And all of these

individuals and anyone associated with this organizational

activity is facing the sort of brunt or butt end of withe

backlash.  So all that to see there are these important

connections I feel like when it comes to the Black Belt and

Mobile, and that is what I am reporting in this supplemental

report.

Q    Let's move now, Dr. Bagley, to page 21 of your report,

where you describe the living conditions in the Black Belt.

Can you take us through those?

A    Sure.  And I'm trying to find that page.  And it is --

here it is.

Q    Page --

A    Thank you.  I cite to a report that the United Nations

published in 2019.  The UN sent a special representative to the

United States that year to examine conditions of extreme

poverty.  And one of the places they looked was the Alabama

```
 1   Black Belt.  The UN's special representative reported that
 2   there were indeed conditions of extreme poverty, especially
 3   when it came to, for example, drinking water and waste water
 4   systems.  He reported widespread findings of, you know, folks
 5   having to try to fashion their own water systems with PVC pipe,
 6   drinking water systems at the same time that their septic tanks
 7   are backing up in their yard and you have got drinking water
 8   that's exposed to raw sewage, and you have got people getting
 9   sick, sometimes entire households at a time with E. Coli and
10   hookworm and so on.
11       And I also talk briefly about the effects of the
12   environmental pollution in the Black Belt.  I talk about how
13   the Court in *People First* found that black people are more
14   likely to live in areas that suffer from the effects of
15   environmental pollution.  And I talk briefly on page 21 about
16   the case of Uniontown in the south central Black Belt where 4
17   million tons of potentially toxic coal ash was dumped sometime
18   ago with -- over the protestation of then Congressman Artur
19   Davis.  And that has been fairly recently found to continue to
20   have an adverse impact on people in that area.
21   Q   Dr. Bagley, let's talk more then about the environmental
22   deprivation, particularly in large areas with high black
23   populations in the state:  Can you describe your other
24   findings?
25   A   Yeah.  I look at -- the Environmental Protection Agency
```

1    will designate certain areas that are in need of more or less

2    immediate clean up due to the effects of pollution, especially

3    industrial pollution.

4         The north Birmingham neighborhood in the city of

09:58:10  5    Birmingham was designated as one such site.  They call them

6    super fund sites.  That neighborhood historically became all

7    black through white flight.  It was a relatively poorer

8    neighborhood.  And it sits in the immediate vicinity of heavy

9    industrial factories, especially coke producing factories, that

09:58:33 10    is not Coca-Cola, but heavy industrial fuel from coal.

11         The EPA found that the soil in that neighborhood was

12    highly toxic.  And as I described in my report, it actually

13    attempted to fast track the clean up at that site, and that was

14    opposed by the state's Department of Environmental Management

09:59:01 15    and by the office of the Attorney General, though it was

16    supported by the mayor of Birmingham at the time and the then

17    representative of the Seventh Congressional District, Terri

18    Sewell.

19    Q    Let's move, then, to living conditions of those

09:59:22 20    incarcerated, which you discussed in your report, as well.  Can

21    you take us through the discrimination in the Alabama penal

22    system?

23    A    Yes.  And this is on pages 19 and 20, I believe.  First of

24    all, black people in Alabama are grocery disproportionately

09:59:43 25    represented in terms of the numbers of the incarcerated.  As I

am sure has been said in this area many times, black people
constitute around 27 percent of the state's population, and
they constitute around 50 percent of those incarcerated in the
state's prisons.

     I think you have to consider that along side repeated
findings of violent and unsafe conditions in the state's
prisons.

          The state's Department of Corrections has long been
subjected to litigation, including back to the 1970s, when
there was a *Lee v. Macon* style issued against the state.  A
more recent case is ongoing in the Middle District where Judge
Thompson just issued an order just several days ago or a couple
of weeks ago holding the state accountable for hiring more
personnel.  The Court in that case found that mental health
care in the state's prison system was, quote, horrendously
inadequate.  As part of that case, the state also faces a
lawsuit initiated some years ago by the Department of Justice
alleging unsafe, unsanitary conditions.  That side of the
reporter issued -- or published by the New York Times paints a
picture of the state's prison system whereby violence is
endemic, rape is not uncommon, corruption not uncommon, and so
on.

          And, again, I just say you have to consider along with
these allegations and findings that black people are
disproportionately represented in terms of being incarcerated

1  in the state.

2       Finally, on page 20, I also look at a report issued by a

3  juvenile justice task force that was convened the state in I

4  think 2017 or at least issued this report in 2017.  That task

10:01:53  5  force found there were racial disparities at more or less every

6  level of the juvenile justice system.  And as far as I know,

7  very little has been done to act upon those findings as of

8  right now.

9  Q    Can you tell us a little bit more about that enactment or

10:02:11 10  the empanelment of the task force you just mentioned with

11  respect to the juvenile penal system?

12  A    Yeah.  So that again was issued I think in 2017.  I

13  believe it was Governor Ivey who convened that task force.  I

14  think it was bipartisan, maybe included both elected officials

10:02:31 15  and private sector individuals.

16       The findings were that a larger share of black youth were

17  placed in detention and out of home diversion.  Black people

18  were represented disproportionately in terms of dispositions to

19  the youth -- Department of Youth Services custody and so on.

10:02:51 20       And, again, as far as I am aware, I don't know that much

21  has been done to act upon or to remedy those racial

22  disparities.

23  Q    Thank you.  Let's turn now to Senate Factor 6, which is

24  the extent to which political campaigns in Alabama have been

10:03:07 25  characterized by overt or subtle racial appeals.

```
 1        Just to start, Dr. Bagley, how do you define racial
 2   appeals in your report?
 3   A    So a racial appeal simply means that a candidate is making
 4   an appeal that would seem to be intended to encourage a racial
 5   group to vote block.  You know, it wouldn't be exclusively too
 6   white or black or Latinx candidates.  If you are issuing an
 7   appeal that would seem to only appeal to one racial group to
 8   vote collectively or as they used to say in this kind of
 9   litigation to vote block, that to me is a racial appeal.  And I
10   cite to several of those from the last few years in this
11   report.  Former Chief Justice of the Supreme Court Roy Moore
12   has suggested that we would be better off without the 13, 14th
13   and 15th Amendments.  Of course, eliminating slavery,
14   guaranteeing rights for former slaves and so on.  The 19th
15   Amendment, of course, expanding that to black women.
16        He also had suggested that we were better off during
17   slavery times even though we had slavery he says, and we were
18   strong in our families and cared for one another.  Chief
19   Justice Tom Parker also ran an ad in 2018 that was actually
20   found by a federal court to be a racial appeal.  Justice Parker
21   talked about the leftist mob trying to destroy our society
22   while an image of black congresswoman Maxine Waters from
23   California appears.  The Court found that there was, quote, no
24   other reason for that, other than for it -- to be to draw
25   attention to race.
```

1    Representative Mo Brooks had repeatedly talked about,
2  quote, war on whites, and claiming that there are people out
3  there saying that, quote, whites hate everyone else.
4    Republican Moore, Republican Barry Moore has talked about
10:05:24  5  what happened on January 6th of last year, where a black police
6  officer shot a white female veteran by saying, I understand
7  that this was a case in, quote, you know that doesn't fit the
8  narrative.  And then finally Republican Pringle has run an ad
9  in which he says if you look like me, they say you're -- they
10:05:47 10  call you a racist and blame you for everyone else's problems.
11  And that is in a campaign ad that Representative Pringle ran
12  quite recently.
13    Those are the -- those are a number of examples that I
14  cite in the report on 27 and 28.
10:06:03 15  Q   Thank you, Dr. Bagley.  And just to go back for a second,
16  with respect to the insurrection that you mentioned on January
17  the 6th, would you mind just providing a little more clarity
18  about what that statement was about?
19  A    Yes.  This was in regards to the shooting of one of the
10:06:27 20  infiltrators of the capital, Ashli Babbitt by the U.S. Capitol
21  police.  He said, I understand it was a black police officer
22  that shot a white female veteran.  You know that doesn't fit
23  the narrative.
24    I think when someone says, you know that doesn't fit the
10:06:44 25  narrative, this is sort of a flippant way of saying, yeah,

```
 1  people indicate or people always claim that it's white police
 2  who shoot black people, and this, you know, this quote unquote
 3  doesn't fit the narrative, meaning this is not what those other
 4  people like to say.  In other words, I mean, it's drawing
 5  attention to race quite clearly.
 6  Q    And that's how you characterize racial appeals in Senate
 7  Factor 6 in your report was drawing attention to race?
 8  A    Correct.
 9  Q    Motivating block voting?
10  A    That's right.
11  Q    So let's turn to Senate Factor 7, the extent to which
12  black Alabamians have been elected to public office, which
13  begins on page 28 of your report.  What were your conclusions
14  with respect to Senate Factor 7, Dr. Bagley?
15  A    So first, if you look at the congressional districts,
16  which are obviously at issue here, until the 1990s, black
17  citizens in Alabama didn't have the opportunity to elect a
18  black representative.  Since 1990, they have only had a
19  majority in that one district.  And as 27 percent of the
20  population, you have to compare that to one district out of
21  seven being around, you know, 14 percent, in terms of potential
22  for representation.
23       Secondly, black citizens currently hold no statewide
24  office in the state.  They have not held statewide office in
25  the last 20 years, despite having run over the years for
```

1  Governor, for Lieutenant Governor, for Senate, for Secretary of
2  State, and a number of different statewide offices.

3      In fact, only three individuals, three black individuals
4  had ever held state office in Alabama.  Only two of those
10:08:35 5  individuals was actually elected to that position.  And both of
6  those individuals were eventually appointed to that position
7  and, therefore, had the benefit of being incumbents when they
8  were elected.

9      Finally, I discussed black representation in the state
10:08:56 10  Legislature.  Representation there is roughly proportionate to
11  the black population.  But I think you have to recognize that
12  that is only because of repeated sustained litigation in these
13  federal courts through protest action on the streets, through a
14  really a Herculean effort on the part of black citizens of this
10:09:22 15  state to gain access to the franchise, to overturn diluted
16  schemes like you saw in *Dillard* and continue to do that even
17  very recently.  So, yes, there is something very closely
18  resembling proportional representation in the state
19  Legislature, but it is taking great, great effort to get there.
10:09:46 20  Q    Thank you, Dr. Bagley.

21      And move now to Senate Factor 8, which is the lack of
22  responsiveness on the part of elected officials to
23  particularize needs of the minority community in Alabama, which
24  begins on page 29 of your report on to 30 and 31.  What were
10:10:03 25  your findings with respect to Senate Factor 8, Dr. Bagley?

A    Well, first, I think it's important to recognize that
since the '90s, black leaders in the state have called for the
creation of the second majority-minority congressional
district.

10:10:21   Repeatedly that has been, you know, sort of summarily
brushed aside.  And so that to me is the most important example
of a lack of responsiveness with respect to this case.  But I
think you could also look at the -- all the things that I talk
about in Factor 5.

10:10:44   So what I mean by that is if you have black citizens who
live in impoverished areas with the lack of basic services, who
suffer the attendant health issues we talked about.  If their
children are attending failing schools, if they lack
transportation, if they needed a DOT ruling to get the local
10:11:08   DMV reinstated, if their school systems are crippled by
underfunding, if they suffer discrimination in the workplace,
if they attempted to, as the city of Birmingham did, raise the
minimum wage and were overridden by the state Legislature, and
so on.

10:11:26   All of these are examples of things that would tend to
need an adequate response that black citizens in the state are
not getting.  And if you look at where they do have
representation, that is, you look at Representative Sewell, and
her record has been one of attempting to address those things.
10:11:45   For example, supporting a bill that would improve the water

1    systems in her district.

2         For example, she's the only representative to have voted

3    for the infrastructure bill that just passed the United States

4    Congress.  The other representatives in the state in Congress

10:12:04  5    voted against and then even touted as being beneficial to their

6    district after the fact.  So these are all examples.

7         I think the other relevant one to mention would be the

8    state's repeated failure to expand Medicaid, to close the

9    coverage gap between Medicaid parameters and ACA or Obamacare

10:12:31 10   parameters wherein black people would stand to benefit greatly

11   as black leaders in the state have argued, and the state has

12   repeatedly rejected those efforts, despite Representative

13   Sewell and some others attempting to compel the state to do

14   that.

10:12:49 15   Q    And with respect to the infrastructure bill you just

16   listed, Dr. Bagley, that is a bipartisan bill, right?

17   A    Yes.  Yes, it was.  I believe the majority leader voted

18   for that bill.

19   Q    Thank you.  Sorry for cutting you off.

10:13:02 20   A    No problem.

21   Q    Having analyzed the Senate Factors in this case, did you

22   reach any ultimate conclusions?

23   A    Yes.  Only that -- I mean, these Senate Factors are

24   present.  It would seem to me that given the socio-historical

10:13:17 25   factors I have examined here and the affirmative findings with

1  respect to these Senate Factors that HB-1 may well result

2  ultimately in the impairment of black voters' ability to fully

3  and equitably participate in the political process.

4  Q    Thank you, Dr. Bagley.

10:13:39 5        MS. SADASIVAN:  Your Honors, I don't have any further

6  questions at this time.

7            JUDGE MARCUS:  All right.  Mr. Harris?

8                     CROSS-EXAMINATION

9  BY MR. HARRIS:

10:13:47 10 Q    All right, Dr. Bagley, can you hear me okay?

11 A    Yes, sir, Mr. Harris.

12 Q    Thank you very much.  This is my first time in this

13 proceeding.  I wanted to make sure you could hear me.

14 A    Okay.

10:13:55 15 Q    Let's see.  Are you an attorney?

16 A    No.

17 Q    Are you a political scientist?

18 A    I am a historian and a historian solely.

19 Q    Okay.  And so it's safe to say you are not a sociologist

10:14:09 20 either; is that right?

21 A    That's right.  Some consider history to be a social

22 science.  We kind of straddle the boundaries between social

23 science and humanities.

24 Q    Okay.  And I believe when you were introduced earlier, you

10:14:23 25 said your expertise focused on 20th Century issues; is that

1  right?

2  A    19th and 20th Century.  My Ph.D. examinations were in

3  both.

4  Q    I see.  And it's right that the title of your

10:14:36 5  dissertation, School Desegregation, Law and Order, and

6  Litigating Social Injustice in Alabama 1954 to 1974; is that

7  right?

8  A    That's correct, although there is an epilogue in there

9  that brings those issues up to the present day.

10:14:50 10  Q    I see.  So epilogue, you kind of try to put a bow on it;

11  is that fair to say?

12  A    Maybe.

13  Q    Not trying to characterize it.

14  A    Fair enough.

10:15:06 15        JUDGE MARCUS:  Can you answer the question,

16  Mr. Bagley.

17        THE WITNESS:  Yes, Your Honor.  I traced developments

18  from 1974 up to the present to the extent that they're relevant

19  to my thesis.

10:15:21 20  BY MR. HARRIS:

21  Q    Okay.  Let me see.  All right.  I'm looking at your

22  report.  Do you have a copy of your report there with you?

23  A    Yes, sir.

24  Q    Okay.  So when I reference it, you will able to look at it

10:15:34 25  without me having to put it on my screen; is that right?

```
         1  A     That is correct.
         2  Q     If at any point you would like me to show it, I will be
         3  more than happy do that.
         4        You say -- let me see here.  It is your opinion, is it
10:15:49 5  not, that HB-1 will deny black Alabamians an equitable right to
         6  elect candidates of their choices; is that right?
         7  A     I am saying given my findings, that's possible.
         8  Q     Okay.  Are you saying it's possible, or you say that it
         9  will result?
10:16:02 10 A     I am saying that it is possible.  I believe -- where are
        11  we in the report?
        12  Q     Sure.  It is the last paragraph on page 1.
        13  A     The last full paragraph, or.
        14  Q     Yes.  No.  I'm sorry.  I have been asked is how it starts.
10:16:20 15 A     Right.  Yes.  So yes.  It will result in impairment of
        16  black voters' ability to participate fully and equitably in the
        17  political process in electing candidates of their choice given
        18  the findings here.
        19  Q     Okay.  So I guess my very basic question, Dr. Bagley, is
10:16:40 20 are you here to provide history for someone to make that
        21  conclusion, or are you here to make a conclusion about whether
        22  HB-1 will affect black voters' ability to elect the candidate
        23  of their choice?
        24  A     I am not here to draw legal conclusions.  I want to be
10:16:54 25 clear about that.  What I have been asked to do is provide a
```

1  Senate Factors analysis to lay out what I feel like are the

2  relevant factors, and to say here are my findings as a

3  historian.

4  Q    Okay.  And as a historian, in other contexts, do you give

10:17:12  5  state legislatures your opinion on their laws?

6  A    Could you ask that again?

7  Q    Sure.  Let's say the Georgia Legislature is wanting to

8  create a bill, and they're curious about its effect.  Would

9  they call you up and say, you know, do you think this bill

10:17:26 10  would negatively affect Georgians or anything like that?

11  A    I have not done that.  I guess it's not inconceivable if

12  they wanted to avoid a Section 2 claim or violation.

13  Q    Okay.  But that's not something you have ever done?

14  A    No.

10:17:39 15  Q    Okay.  Is any part of your testimony meant to show the

16  intent of Alabama's 2021 Legislature?

17  A    This is not an intent report, no.

18  Q    Okay.  And still kind of on background here.  Can you walk

19  me through how your process of historiography how you went

10:18:03 20  about finding the sources on which you relied in your report?

21  A    Sure.  I mean, it's multifaceted.  It's sort of dove tails

22  with a sort of totality of the circumstances analysis.

23       I read case law.  That can lead to obviously other case

24  law.  I have read the relevant secondary sources.  I've very

10:18:27 25  recently and over the years done research in the papers of

1  Judge Frank Johnson, the library of Congress.  I have done

2  archival research.  Obviously, I follow any and all press

3  coverage that I can, including very recently and over the years

4  relevant to the state Legislature to politics in Alabama to

10:18:48 5  society in Alabama, and so on.

6  Q    And I hope I'm making sense here, Dr. Bagley.  I guess I

7  am asking a more basic question.  On not exactly what you

8  looked at, but how you got it.  For example, when you are look

9  at case law, how, you know, how do you search for it, or what

10:19:07 10  do you do there, and looking at primary sources, how do you

11  determine which individual sources, you know, you will analyze?

12  A    Well, as a historian of Alabama, I am sort of generally

13  aware of the basic parameters of its history of discrimination,

14  right?  So if I am aware of the Sayre Law, the Boswell

10:19:25 15  Amendment, the *Davis vs. Schnell* decision, Alabama's voter

16  questionnaire that was at issue in Justice Department of

17  litigation.  You read those decisions.  Those decisions cite

18  other decisions.  I am aware of the work of, you know,

19  Dr. Flynt, Dr. Feldman, other historians who have written about

10:19:48 20  those things.  So there is no one singular path to analysis.

21  It's a very broad and wide ranging search.

22  Q    And this is, again, more of a general process question.

23      So let's say in conducting your research and you come

24  across a piece of evidence that you think might weigh against

10:20:13 25  your ultimate conclusion, you mentioned earlier that you have

1    to weigh the evidence against itself kind of --

2    A    Right.

3    Q    -- and when you described your process.

4    A    Yes.

10:20:21  5    Q    So can you explain to me when you go through that process

6    of weighing evidence against itself and against the other

7    evidence you are looking at, how did you determine what to

8    include or not to include in your analysis?

9    A    I see.  Okay.  So when I look at the Senate Factors, you

10:20:40 10    know, and I list them on page 2, what they've asked us to

11    identify is the extent, for example, with Factor 1 of a history

12    of the official discrimination.  To me, that means where has

13    the state discriminated, and in particular in this case, with

14    respect to redistricting?

10:20:59 15        It doesn't ask us to, you know, proactively seek out those

16    instances in ways in which the state has not discriminated or

17    has repudiated its discrimination or has done the right thing

18    by the law.

19        That being said, I don't feel like I'm hiding instances

10:21:20 20    where that is the case, especially with respect to

21    redistricting.  For example, the state has occasionally had its

22    plans for congressional redistricting or House and Senate

23    redistricting precleared by the Justice Department.  And that

24    is in the report.

10:21:35 25        So I think what you may be trying to say is that I am out

1181

```
      1   there simply gathering all of the negative that I can in

      2   regards to the state and dumping that in a report and not --

      3   you know, these instances where the state may have made

      4   progress.  And that's not what I am trying to do.

10:21:54  5   Q    Dr. Bagley, I am not trying to trip you up on your own

      6   words.  I am truly trying to understand.  You say you followed

      7   the Senate Factors; is that right?

      8   A    Yes.

      9   Q    And in doing so, you looked for the history of official

10:22:13 10   discrimination; is that right?

     11   A    Sure.

     12   Q    So you're looking for instances of discrimination and not

     13   the opposite, right?

     14   A    To an extent, because that's what the Senate Factors asked

10:22:25 15   us to do.  But, again, I'm not hiding the fact that, you know,

     16   there may be instances where the state, you know, had a plan

     17   that would pass muster in court or got a plan precleared in

     18   this sort of thing.

     19        I talked about earlier how there was a semblance of

10:22:41 20   proportional representation in the state Legislature, thanks to

     21   the efforts of black litigants over the years and so on.

     22   Q    Right.  Okay.  So it's your opinion that you did include

     23   such positive evidence in the redistricting context, for

     24   example, when it came up?

10:22:56 25   A    Yeah.
```

```
 1   Q    Okay.  And one -- I think last question on this topic.  So
 2   it's right then that you structured your analysis around the
 3   Senate Factors.  Would you say that's typical for a historian
 4   in your field when conducting a historiography?
 5   A    No, we wouldn't, you know, for example, actually use the
 6   Senate Factors framework in say a published essay or historical
 7   monograph.  But, you know, historians in this type of
 8   litigation, including Dr. Flynt, who I mentioned earlier, and
 9   others that I happen to I know have conducted these type of
10   analyses and these cases in the litigation.  Now, that being
11   said, I think alluded to how our mode of inquiry is quite
12   similar to a total -- a totality of the circumstances inquiry
13   in general.
14   Q    So I'm trying to figure out the distinction between what
15   you would do in your academic work and following the Senate
16   Factors here.
17        So if the Senate Factors look, say, for the history of
18   official discrimination and define those sorts of instances, is
19   that the same sort of work you would do just a historiography
20   essay or published work, or is it -- I'm trying to see if
21   there's any sort of substantive difference in what the work you
22   might perform as a historian and the work that you are
23   performing in this case?
24   A    Substantively, I don't think so.  I mean, structurally,
25   sure.  Again, I wouldn't publish an essay for a history journal
```

```
 1    where I lay out the Senate Factors and then structure an essay.
 2    Those would be obviously uncommon.  But in terms of looking at
 3    the history of discrimination, patterns of discrimination on
 4    the part of the state, the effects of discrimination, the fact
10:24:41  5    that, you know, black people aren't being able to elect
 6    candidates of their choice in statewide office, all of those
 7    would be things that would not be uncommon at all for us to
 8    consider, nor are the sources that I used here uncommon for
 9    historians to consider or to use.
10:24:56 10    Q    Okay.  I am going to try and go through your report kind
11    of chronologically -- not chronologically, but from front to
12    back and starting with Senate Factor 1 here on page 3.
13          So is it right that Senate Factor 1 is the extent of any
14    history of official discrimination in the state or political
10:25:26 15    subdivision that touched on the right of the members of the
16    minority group to register, to vote, or otherwise to
17    participate in the democratic process; is that right?
18    A    That is correct.
19    Q    And I believe earlier today you testified that you tried
10:25:41 20    to focus this section on the redistricting process; is that
21    right?
22    A    Yes.  I kind of run through Reconstruction up to the
23    mid-20th Century relatively quickly because it's more or less
24    accepted in litigation in my experience that the state engaged
10:26:02 25    in a variety of discriminatory practices up to that time.
```

1  Q    Okay.  You mentioned two specific cases earlier -- *Jones*

2  *vs. The Jefferson County Board of Education* and also the

3  *Pleasant Grove* case.  Do you recall that testimony?

4  A    Yes.

10:26:22 5  Q    And I bring it up here because you mentioned it briefly in

6  the introduction.  I am not trying to get too out of order.

7  Did you review the filings in those cases?

8  A    I am generally aware of the disposition.

9  Q    Did you review any of the filings?

10:26:41 10  A    Some in one of the cases.  But I am aware of, again, how

11  those played out.

12  Q    Okay.  And would a historian in your field typically

13  review those sorts of publicly available primary sources in

14  writing about them?

10:27:00 15  A    If, you know, they're like me and they school

16  desegregation in Alabama, racial politics, voting rights in

17  Alabama, if you are writing a book as I am about voting rights

18  litigation in Alabama, then, yes.

19  Q    Okay.  And I believe about these suits you mentioned that

10:27:22 20  these jurisdictions were compelled to discard election systems;

21  is that right?

22  A    Yes.  I use that word compelled carefully.  I think -- and

23  you can correct me if I am wrong -- I believe there were

24  consent decrees or settlements in both of those cases.  I use

10:27:40 25  the word compelled not to say compelled by court order, but to

1  acknowledge the fact that the board of education or the city

2  council didn't just voluntarily decide to discard these

3  at-large systems.  They were sued and presumably entered into

4  these settlements or consent decrees because they thought there

10:27:58 5  was a reasonable chance they might lose.

6  Q    So it is your understanding as a historian that they did

7  not agree to the consent decree or settle until after the

8  complaint started?

9  A    It's my understanding that they agreed to discard those

10:28:15 10  systems as part of the litigation.

11  Q    Okay.  And I have been thinking about *Jones* so far.  And

12  thinking about *Pleasant Grove*, too, that was -- can you -- what

13  was that case about?

14  A    *Pleasant Grove* involved an at-large election members of

10:28:34 15  the city council, and once that was disposed of and the counsel

16  did away with its at-large election system, I believe that two

17  black individuals were elected to the city council, if I am not

18  mistaken.

19  Q    And is it right that you did not review any of the filings

10:28:51 20  in that case?

21  A    Not specifically, not although, again, I followed press

22  coverage of the case and am generally aware of how it unfolded.

23  Q    Okay.  I am going to show you what's been marked as

24  Defendants' Exhibit 99.  I hope I am, anyway.

10:29:16 25      Can you see that, Dr. Bagley?

```
         1  A    Yes.
         2  Q    Can you read the caption of the case, the title of it up
         3  here?
         4  A    Yeah.  Alabama State Conference of NAACP Eric Calhoun and
10:29:26 5  Jennifer Ford vs. City of Pleasant Grove.
         6  Q    And is this the case that you are finding in your opinion?
         7  A    Yes, sir.
         8  Q    Okay.  I am going to scroll down to page 6.  And I have
         9  highlighted something here on this document.  Do you see that?
10:29:45 10 A    I do.
        11  Q    Can you read that for me, please?
        12  A    This settlement is the result of a compromise between the
        13  parties, and nothing in this agreement constitutes an admission
        14  of liability on the part of the city or any city official.
10:29:57 15 Nothing set forth in this settlement, the fact of settlement,
        16  or any act performed or document executed pursuant to or in
        17  furtherance of the settlement may be construed -- I apologize
        18  to the court reporter for blasting through that -- may be
        19  construed or be used as an admission of evidence of the
10:30:17 20 validity of any claim or allegation, or of any act, omission,
        21  liability, or wrongdoing on the part of the city or as
        22  supporting certification in any action or proceeding of any
        23  kind whatsoever.
        24  Q    And it's right that you did not read this document in
10:30:34 25 conducting your analysis?
```

 1          MS. SADASIVAN:  Object, Your Honors.  This is a

 2   confidential settlement agreement.  And I don't see its

 3   relevance to Dr. Bagley.

 4          JUDGE MARCUS:  Is it in evidence?

10:30:48  5          MR. HARRIS:  Yes, Your Honor.  I mean, it's publicly

 6   filed up here on the top as you can see.

 7          JUDGE MARCUS:  I will allow the question.  Overruled.

 8          THE WITNESS:  So I have read probably this in general.

 9   You know, I am aware that there was a settlement.  I think -- I

10:31:04 10   will emphasize my point that whereas the city here is saying we

11   admit to nothing here, nonetheless, as a historian and not a

12   lawyer, I look at this and see the city had an at-large system,

13   a sort of textbook dilutive system that would and should have

14   failed under *Dillard*, and they were sued, and they entered into

10:31:29 15   a settlement to do away with that.

16       So the lawyers and the Court can, of course, reckon with

17   the particulars here, but that is the way that I view it as a

18   historian.  The city had a dilutive structure, was sued, and

19   then by part of that litigation agreed to do away with that

10:31:51 20   diluted structure.

21   BY MR. HARRIS:

22   Q    Okay.

23          JUDGE MARCUS:  Mr. Harris, we generally take a break

24   to give our reporter a break about an hour and a half into it.

10:32:11 25   I do not mean to break your thread.

 1        Just find a convenient point as you proceed if you would.

 2              MR. HARRIS:  Your Honor, I think this is --

 3              JUDGE MARCUS:  You don't have to at this moment, but

 4  just at a convenient point.

10:32:27  5              MR. HARRIS:  Understood, Your Honor.  I think now is

 6  as good a time as any to take a break on my end.

 7              JUDGE MARCUS:  Thank you.  We will take a 15-minute

 8  break, and then come back and finish up the cross.

 9        Your timing on cross, the balance of the cross?

10:32:41 10              MR. HARRIS:  I would expect between 30 and 45 minutes.

11              JUDGE MARCUS:  Thanks very much.  Thank you all.  We

12  will see you back here in 15 minutes.

13              (Recess.)

14              JUDGE MARCUS:  Do we have all of the parties ready to

10:47:04 15  proceed?  Counsel for the Secretary of State and for Milligan?

16              MR. HARRIS:  I'm ready, Your Honor.

17              MS. SADASIVAN:  Yes, Your Honor.

18              JUDGE MARCUS:  All right.  You may proceed with your

19  cross-examination, Mr. Harris.

10:47:18 20              MR. HARRIS:  Thank you.

21  BY MR. HARRIS:

22  Q    At the bottom of page 4, you reference the Sayre Law.  I

23  think you mentioned it in passing maybe in your

24  cross-examination just a few moments ago or if not in your

10:47:34 25  direct.  And that they replaced the party ballot with the

1  secret ballot.  When you say the secret ballot, what do you

2  mean?

3  A    So what they attempted to do there -- you had a situation

4  before where you could simply look at the top of a ballot and

10:47:53 5  see the emblem.  The emblem for the Democratic Party at the

6  time said white supremacy for the right.  It had the roaster on

7  there.  You could simply identify the emblem and vote a

8  straight party ticket.  What the Sayre Law did is allow for

9  people to go in and only get help from a state-appointed

10:48:17 10  official and have to read a card with instructions and so on.

11  So it's called the secret ballot, but what it was intended do

12  is make it more difficult for people who are illiterate to be

13  able to just simply come in and see that logo and vote under a

14  straight party ticket.

10:48:35 15  Q    I see.  And so the secret ballot is what we still have

16  today; is that right?

17  A    More or less, yes.

18  Q    Okay.  And just to clarify your opinion, so it's not your

19  opinion that when we go to the polls in 2022 and use a secret

10:48:55 20  ballot, is that the sort of -- the fact of racial

21  discrimination that you are opining on in your report, is that

22  part of racial discrimination?

23  A    No.  And the Sayre Law is only relevant to this history of

24  discrimination insofar it was plainly an attempt to

10:49:12 25  simultaneously disenfranchise illiterate black people and poor

```
 1    white folks who were voting for populace candidates at that
 2    time.  And of course, it's no longer on the book.  So, you
 3    know, the Sayre Law is an example of something I mentioned
 4    earlier that was enacted.  There was obviously pushback against
 5    it, and it's no longer in place as such.
 6    Q    But the secret ballot is in place, right?
 7    A    The basic parameters of the way we vote, yes.
 8    Q    Okay.  At page 5 -- and you mentioned this in your
 9    testimony, as well.  Discussing Alabama's anti-miscegenation
10    law.  Do you recall that testimony?
11    A    I do.
12    Q    And in your report -- so why did you include that in your
13    report?
14    A    Well, I wanted to talk about the 1901 constitution.  And I
15    wanted to mention that -- obviously, as we've said with things
16    that were a part of that constitution, like the poll tax, and
17    literacy tests, some of that, not the language about the poll
18    tax, but some of that has been invalidated over the years
19    through litigation, and it is no longer active.  But there have
20    been at times these referenda to attempt to remove some of that
21    language and it -- some of it hasn't been removed, and some of
22    it has.  And so I know the miscegenation language was removed I
23    think by referendum in 2000, but like the segregated schools
24    language is still in there.
25    Q    Okay.  So this one-drop rule, the one drop of black blood
```

10:49:30  (line 5)
10:49:49  (line 10)
10:50:05  (line 15)
10:50:26  (line 20)
10:50:48  (line 25)

```
 1  you used that as an example of invidious racial discrimination;
 2  is that right?
 3  A    Yeah.  I mean, it's relevant obviously to the
 4  miscegenation statute.  Yeah.  And that's been the way that
 5  typically the law characterized black people throughout the
 6  years.
 7  Q    And, Dr. Bagley, I am not trying to put words in your
 8  mouth, but I believe in your testimony you used the phrase
 9  any-part black.  Do you recall that?
10  A    I may well -- if you say I did, then I did.
11  Q    And I just want to know what did you mean by that?
12  A    I just mean that the one-drop rule meant that if you -- I
13  mean, when they say one drop, that's what they mean, any-part
14  black.  If you were, you know, one-fourth African-American, if
15  you were what they would have called mulatto, anything like
16  that, even back of course to codification of racial law and
17  slavery times, that meant you were a black person.
18  Q    Okay.  Let me see here.  Okay.  I am going to jump on to
19  page 8, and you're summarizing redistricting in Alabama between
20  1960s and the 1980s; is that right?
21  A    Yes, sir.
22  Q    And I believe you testified that this was the focus of
23  your report was the history related to redistricting; is that
24  right?
25  A    I tried to focus my Factor 1 findings on that, yeah.
```

 1   Q     Okay.  So in particular, did you have a focus on

 2   congressional redistricting or just redistricting at large

 3   would you say?

 4   A     Well, congressional redistricting has been more at issue

10:52:40   5   since the '90s, so in terms of the last 30 years, the focus of

 6   the balance may tend to be there, but I've looked at the state

 7   Legislature, as well.

 8   Q     Okay.  Let me see here.  At the top of page 10, I believe

 9   this is right -- and this is the paragraph that is cut off.  So

10:53:02  10   this is I think straddling 9 and 10.  Let me see here.  I want

11   to make sure that -- it -- I guess my question is:  Is it right

12   that the 1960 congressional redistricting map, was that passed

13   by the Legislature without court intervention?

14   A     I believe so.  I think the situation there they ran at

10:53:31  15   large, yeah.  That was -- yes.  They ended up, I think, in that

16   decade running all the seats for Congress at large rather than

17   actually redistricting.

18   Q     Okay.  Can you read starting with, some had pushed, there

19   at the top of page 10, that first full sentence?

10:53:50  20   A     Some had pushed for maintaining the at-large election of

21   the delegation, but with numbered posts.  This is the impetus

22   of the *Mizell* and the executive committee meeting warning that

23   voters would put a scalawag Republican or Negro in there that

24   became central to the *Dillard* litigation years later.

10:54:11  25   Q     And as I understand it, that was -- that was rejected; is

1   that right?

2   A     That's correct.

3   Q     Okay.  So it's right, then, that that quote was not --

4   that was rejected by the Alabama Legislature in the '60s?  I

10:54:25  5   just want to make sure I understand.

6   A     Yes, sir.  No.  They did not follow through with that in

7   respect to the congressional delegation.  It just became the

8   sort of smoking gun in *Dillard* because it showed that this was

9   the reason why a number of places were used in general, but,

10:54:40 10   yes, you are correct with respect to congressional.

11   Q     So did you review any other information about Alabama's

12   congressional redistricting between 1960 and 1990?

13   A     Whatever I reviewed is reflected in the footnotes.

14   Q     Okay.  So my question for you is:  Why did you not

10:55:07 15   include, or maybe did not review if you didn't review it, any

16   information related to congressional redistricting in the '70s

17   and '80s?

18   A     Let's see.  This would be reflected on page 11?  Do I have

19   that right?

10:55:24 20   Q     That is 10 and 11 is this era, and I sure enough may have

21   missed it.  I found state Legislature information.

22   A     Uh-huh.

23   Q     And I could not find congressional.  And that is what I'm

24   asking.

10:55:37 25   A     So if Factor 1 is asking us to identify the history of

1    discrimination, and that's what I found in the '70s and '80s,

2    it was with respect to the state House.  As you can see, when I

3    talk about, you know, the 2000-cycle, for example, if the plan

4    was precleared or passed or was enacted by the Court, I'm not

10:56:01  5    trying to hide that fact.

6        So if I've not discussed congressional reapportionment

7    plans with respect to the '70s and '80s, that means that it was

8    not contentious.

9    Q    And what does that mean?

10:56:15 10   A    Well, I simply mean that, you know, in the case of the

11   '70s and '80s, it was probably inconceivable black people were

12   focusing their attention at that time on gaining access to

13   simply being able to elect members to the state Legislature.

14   And so it's not until the '90s that they actually -- it becomes

10:56:39 15   feasible to actually attempt to given the makeup of the -- even

16   the federal government at the time, to challenge the state's

17   congressional plan to actually get a majority-minority

18   district.  I think if you would have ask black leaders in the

19   '60s and '70s, and evening at the beginning of the '80s if that

10:56:59 20   were possible, they would have said no.  So this just means

21   this is the source of black activists' efforts up to that

22   point.

23   Q    And when you say black activists, who do you mean?

24   A    I mean those who are advocating for up to that point state

10:57:19 25   legislative redistricting plans that would include districts

```
 1  that would allow black voters to elect candidates of their

 2  choice.

 3  Q    Okay.  And is your -- and the reason it's not in the

 4  report -- and correct me if I am misstating your statement,

 5  please.  The reason you haven't included it is because you

 6  think that black leaders just weren't -- just weren't focused

 7  on the issue; is that right?

 8  A    I think the -- I think up -- I'm sorry if I cut you off.

 9             MS. SADASIVAN:  I was going to object, Your Honors,

10  because that mischaracterizes earlier testimony.  I think

11  Dr. Bagley answered the question.

12             JUDGE MARCUS:  Why don't you put the question again,

13  Mr. Harris.

14             MR. HARRIS:  Sure.  I apologize, Your Honor.  I am

15  looking at my last question to see how I can look at it.

16  BY MR. HARRIS:

17  Q    Is it right that you did not include information about

18  congressional redistricting in the '70s and '80s because in

19  your opinion as a historian, black activists did -- were not

20  pursuing that; is that right?

21  A    I think the focus at that time was on the initial

22  break-throughs that occur in the 1970s.  I mean, if you think

23  about what is it, Fred Gray and Thomas Reed are the very first

24  black citizens elected to the state Legislature.  That had just

25  happened.  So the focus was on expanding access to state level
```

10:57:41
10:57:56
10:58:14
10:58:32
10:58:54

1196

1    positions or rather district level positions.

2        And I'm not saying it wasn't on anyone's radar until the

3    1990s, but the focus was different.  And so the focus of my

4    report is different is all I'm saying.

10:59:17 5    Q    Okay.  So what information did you review about that as

6    part of your historiography?

7    A    Again, any information I reviewed is reflected in the

8    footnotes.  So you can see there there's a number of press

9    coverage, there's case law cited there, Civil Rights Division

10:59:35 10   objection letters I'm looking at, and so on.

11   Q    Okay.

12   A    Mr. Blacksher wrote an article that's referenced there.

13   Q    Okay.  Earlier we were talking about -- down on to page

14   12.  We talked briefly about the litigation from *Pleasant Grove*

10:59:58 15   in Jefferson County.  And I believe you kind of mentioned that

16   -- I think you related those to *Dillard* somehow; is that right?

17   A    The focus in both the *Dillard* litigation and those cases

18   were at-large voting schemes.

19   Q    Okay.  And you mentioned in your report and I believe in

11:00:26 20   your direct testimony that *Dillard* would compel in the 180s

21   some 183, I believe?

22   A    Yes, sir.

23   Q    Local governments to change their election system.  And

24   you talked a little bit about when you use the word compel, you

11:00:42 25   use that very carefully; is that right?

```
 1   A     Yes.
 2   Q     And I believe you said that you were aware that some of
 3   those were, for example, settlement agreements; is that right?
 4   A     That's right.
 5   Q     Do you know how many of those 183 were settlement
 6   agreements?
 7   A     Not off the top of my head, no.
 8   Q     Would you have reviewed information in the past about how
 9   many of them were?
10   A     No doubt, yes.
11   Q     Okay.  And so then can you give me a ballpark?  Is it
12   maybe a dozen or a 100 or some -- can you kind of give me what
13   your understanding is?
14   A     I mean --
15         MS. SADASIVAN:  I am going to object.  I am sorry, I
16   am going to object because Dr. Bagley did already answer that,
17   but.
18         JUDGE MARCUS:  You may ask the answer, and you may
19   answer it if you can.  If you can't answer it, just tell us,
20   Mr. Bagley.
21         THE WITNESS:  Yes, Your Honor.  I do not know that
22   figure.  It could be several dozen, in fact.  But, again, I as
23   a historian, it's clear to me that those systems were not going
24   to be voluntarily discarded.  I mean, *Dillard* was the impetus
25   for those changes in the 1980s, whether local governments were
```

Timestamps: 11:00:52 (line 5), 11:01:05 (line 10), 11:01:16 (line 15), 11:01:27 (line 20), 11:01:46 (line 25)

 1  compelled by a court order to discard those systems or not.

 2  And, two, of course, if it was a consent decree or settlement,

 3  I mean, that has the weight of the Court behind it, as well.

 4        But, no, sir, I do not know that number.

11:02:06  5        MR. HARRIS:  I am going to try to share my screen

 6  again.  And I'm not trying to pull a fast one on counsel.  This

 7  has not been marked as an exhibit.  It is a court opinion.  And

 8  if -- I would like to show Dr. Bagley.  I don't know if I need

 9  to preclear these exhibits or not.

11:02:27 10        JUDGE MARCUS:  Just mark it for identification so we

11  have a number to it.

12        MR. HARRIS:  Certainly.

13  BY MR. HARRIS:

14  Q    Let me see here.

11:02:35 15        All right.  Where are we at this point?

16        MR. DAVIS:  I don't recall.  It's probably around 5 or

17  6.

18        MR. HARRIS:  If anyone has a hand on where we are, we

19  might be Exhibit 6 at this point.

11:02:54 20        JUDGE MARCUS:  That's fine.  You mark it for

21  identification.

22        MR. HARRIS:  Certainly.

23        JUDGE MARCUS:  As Defendant Exhibit 6.

24        MR. HARRIS:  Certainly.

11:03:01 25  BY MR. HARRIS:

1  Q     And can you read the caption again for me, please,

2  Dr. Bagley?

3  A     Yes.  This is in the Northern District Court for Alabama,

4  *Dillard vs. Baldwin County.*

11:03:11  5  Q     And just for identification purposes, I am not sure this

6  is relevant, but Middle District of Alabama, correct?

7  A     Yes, sir.

8  Q     And I'm -- and are you -- does this look to you like the

9  *Dillard* litigation you have been talking about?

11:03:25 10  A     Yes, sir.

11  Q     Okay.  And I am going to scroll down here a little bit.

12        I have highlighted here that 176 of these jurisdictions

13  entered into an interim consent decree.  Do you see that?

14  A     I do.

11:03:41 15  Q     So that's 176 of the 183.  Were you aware that the number

16  was that high?

17  A     I figured it was relatively high, yes.

18  Q     Does that have any effect on your opinion?

19  A     No.  Again, I mean, it's not that these 176 all of a

11:03:57 20  sudden decided that they needed to discard these dilutive

21  systems out of magnanimity.  They did it because this lawsuit

22  was filed you know.  And whether they were directly subjected

23  to a court order ordering directly to do so doesn't change my

24  general understanding of how that unfolded.

11:04:20 25  Q     Okay.  And along these lines, is it your understanding as

1 a historian when you're examining these documents that numbered

2 post-voting systems are discriminatory per se or that they're

3 always found to be discriminatory?

4 A    If they're used in conjunction with at-large voting with

11:04:42 5 majority vote requirements and so on, they have traditionally

6 been found, I believe, to be so.

7 Q    Okay.  So are you aware of any court decisions about

8 numbered post-voting laws that have come to the opposite

9 conclusion?

11:04:59 10 A    Not off the top of my head, no.

11 Q    Okay.  So you haven't read an opinion from a couple of

12 years ago about judicial elections in Alabama?  Does that ring

13 any bells?

14 A    All right.  Yes.  So there -- the -- do you refer to the

11:05:19 15 *NAACP vs. State of Alabama* case.

16 Q    That's the one?

17 A    Yes, sir.  I am aware of that.

18 Q    And that was the case with numbered post-voting and

19 majority vote requirements, right?

11:05:31 20 A    For judges, I believe so, yes, sir.

21 Q    For judges, that's right.  And do you know how judges are

22 elected in Alabama?

23 A    Yeah.  I think I actually cite to this case at some

24 point --

11:05:39 25 Q    Oh, good.

```
 1  A      -- in my report.

 2  Q      Okay.  So you read it, then; is that right?

 3  A      I am aware of it, yes.

 4  Q      I'm sorry.  Did you read it?

 5  A      Yes.

 6  Q      Okay.  And do you recall the Court considering historical

 7  evidence?

 8  A      Yes.

 9  Q      Okay.  And did you give any weight to the Court's holding

10  in that case as you were preparing your opinion in this case?

11  A      Yes.  I said I've mentioned it in the report.  I can't

12  tell you where exactly.  I think in a couple of different

13  places, but I don't remember who the historian that testified

14  in that case was.  But my report is my report.  So if, you

15  know, the Court can consider my report in this case, you know,

16  whatever the Court found in that case is -- is what it is.

17  Q      Okay.  So you don't think that your opinion is -- well,

18  withdrawn.

19         Let me see.  So you did cite it in your report that I see

20  on page -- let me see -- at 17.  You say that -- and you quote

21  it as saying, Though things you have changed, the effects of

22  discrimination persist to some degree.  I am not sure if you

23  are reading it, but does that sound right?

24  A      Yes, sir.

25  Q      Okay.  And you did read other parts of that opinion, too?
```

Times in left margin:
11:05:48 (line 5)
11:06:01 (line 10)
11:06:22 (line 15)
11:06:45 (line 20)
11:07:05 (line 25)

1   A    Yeah, at some point, yes.

2   Q    Okay.  But you decided not to include any other sort of

3   analysis or historical information from that opinion; is that

4   right?

11:07:16 5   A    That's right.

6   Q    And you -- and why is that?

7   A    I cite to what I felt like was most relevant for my

8   report.  I included that case, that finding, I considered

9   things on balance, and I considered the totality of the

11:07:34 10   circumstances, so I am not trying to act like that decision was

11   not rendered.  But I considered it as part of my analysis.

12   Q    Okay.  And I believe when we started this line of

13   questioning, you said it was your opinion -- and please again

14   correct me -- that if -- that numbered post-voting requirements

11:07:55 15   combined with majority requirements in a statewide election or

16   in a general election -- I don't recall exactly; is that right

17   -- were generally found to be discriminatory; is that right?

18   A    Yes.  I don't know that we said in which kind of election

19   or another, but generally speaking, yes.  Although very clearly

11:08:12 20   not universally.

21   Q    Sure.  So did you disagree with the Court's opinion that

22   you read?

23   A    Well, I am not a lawyer, and I am not going to say I

24   disagree with any court finding.

11:08:23 25   Q    Okay.  And you said you didn't -- were unaware of who the

1  expert was in that case; is that right?

2  A    Correct.

3  Q    Okay.  All right.  We can move on to 1990s redistricting

4  cycle, which you have starting on page 12.

11:08:51 5       Let me see.  You mentioned that the Legislature submitted

6  a congressional plan to the Department of Justice and that the

7  Department of Justice objected; is that right?

8  A    Yes, sir.

9  Q    And you cite that objection letter in your report, right?

11:09:08 10  A    I do.

11  Q    So did you read the state of Alabama's submission that

12  prompted that objection?

13  A    Not in its entirety, no.

14  Q    But --

11:09:20 15  A    I am aware of it.  I mean, obviously, I cite to the

16  objection letter.  I am aware that there was litigation ongoing

17  at that time or had recently concluded one or the other and

18  that the Court ultimately adopted a different plan.

19  Q    Okay.  What sorts of documents or what specific documents,

11:09:45 20  if you know, did you review related to the redistricting plan

21  from the -- after the 1990s census cycle?  So related, for

22  example, to that objection letter or the *Wesch* case or -- what

23  sorts of documents did you consider?

24  A    Obviously, the opinion of the Court in *Wesch*, press

11:10:06 25  coverage of that process, looking at the footnotes here, again,

```
       1  Mr. Blacksher's article, more press coverage, and so on.
       2  Q    Okay.  So did you consider any documents that you do not
       3  cite in your report, so things that you thought didn't make the
       4  cut on importance or relevance?
11:10:32 5  A    Anything I considered should be in the footnotes.
       6  Q    Okay.  Earlier today, I believe in the context of another
       7  Senate Factor in responsiveness to the needs of black
       8  Alabamians --
       9  A    Uh-huh.
11:10:47 10  Q    -- you mentioned that black leaders from Alabama have been
      11  trying to advocate for a two-majority-minority congressional
      12  districts since the '90s; is that right?
      13  A    I did say that, yes.
      14  Q    And what black leaders are you referring to?
11:11:02 15  A    I know that some in the 1990s did not, which may be your
      16  point.  Not every black leader in the state in 1990s was
      17  pushing for two majority-minority districts.  You know, I don't
      18  want to misstate, but among the black leaders at the time, some
      19  of them were supportive of the one majority-minority plan,
11:11:25 20  others were supportive of two.  That's not in this portion of
      21  the report.  I am not, you know -- I am not going to speak to
      22  anything that's not in there, but, yes, I am aware that some
      23  black leaders were supportive of two at that time, and some
      24  were not.  Some were -- I hesitate to use the word content
11:11:45 25  here, but some leaders were supportive enough of having the one
```

1    majority-minority district that they were -- that they at that

2    time supported that idea.

3    Q    So is it your opinion that such leaders were not

4    responsive to the needs of black Alabamians?

11:12:02 5    A    No.  I think they weighed what was possible at the time.

6    This goes back to what I was saying earlier about focusing in

7    the '70s and the '80s on, you know, election to the state

8    House, the state Senate versus Congress.

9    Q    Okay.  Let me see.  So you said, I believe, that you were

11:12:26 10   aware of or that you may have seen the state's submission to

11   the Department of Justice that prompted the letter; is that

12   right?

13   A    Uh-huh.  Yes, sir.

14   Q    Okay.  Those have been introduced into evidence as

11:12:40 15   exhibits 22 and 23.  Let me see here.  I am going to show you.

16          There are two -- I guess they are 22 and 23.  There was a

17   formatting problem with the first one.

18          JUDGE MARCUS:  Back up for a second, Mr. Harris.  Can

19   you give me the numbers again?  I want to make sure I have that

11:13:21 20   right.

21          MR. HARRIS:  Yes, Your Honor.  Defendants' Exhibit 22

22   and 23.  It's the second half of the same document.

23          JUDGE MARCUS:  Thank you.

24   BY MR. HARRIS:

11:13:35 25   Q    There.  I found it.  You see my screen, Dr. Bagley?

1   A     Yes, sir.

2   Q     Does this look familiar to you?

3   A     Yes.  That appears to be the state's submission to the DOJ

4   from March of '92.

11:13:49 5   Q     Okay.  And do you know if you have reviewed this

6   information?

7   A     Sometime ago, but yes.

8   Q     Okay.  And you say sometime ago.  Like in what context

9   would you -- as part of this case or?

11:14:00 10   A     As part of my work trying to write this manuscript, voting

11   rights litigation in the state.

12   Q     I see.

13   A     I have more recently read the *Wesch* decision, and

14   obviously, I cite to the preclearance objection letter in the

11:14:15 15   report.  I do not cite to this document in the report.

16   Q     All right.  And we have here in this full paragraph, and

17   this is on page 9 of the Defendants' Exhibit 22.  You know,

18   it's talking about black political leaders in Alabama.  Do you

19   see that?

11:14:35 20   A     Yes.  And I was aware that Mr. Reed and Mr. Gray had at

21   that time gotten behind the one majority-minority district

22   plan.

23   Q     Okay.  And you said -- you named those two people by name.

24   Who is Joe Reed?

11:14:53 25   A     Joe Reed is a long influential black educator and leader

1207

```
       1  in the state.
       2  Q    Okay.  And this identifies him as the chair of the ADC.
       3  Do you know what that is?
       4  A    The Alabama Democratic Conference.
11:15:08  5  Q    And what is that?
       6  A    The black political organization.
       7  Q    Okay.  And you also mentioned Mr. Gray by name.  Who is
       8  that?
       9  A    He was also a part of ADC.
11:15:18 10  Q    Okay.
      11         MR. HARRIS:  And, Your Honor, also there's been an
      12  objected to exhibit is what I had planned to reference next.
      13  That's Defendants' Exhibit 17.
      14         JUDGE MARCUS:  I'm with you.
11:15:37 15         MR. HARRIS:  Let me see who is objecting to it.  I
      16  have it.  It is -- yeah, the Milligan defendants.  So I am
      17  happy to discuss it, or I am not sure how you want to approach
      18  it.
      19         JUDGE MARCUS:  Let me pull it up.  That was the public
11:15:52 20  hearing transcript?
      21         MR. HARRIS:  Yes, sir.  And it's cited in that --
      22         JUDGE MARCUS:  The committee on reapportionment,
      23  right?
      24         MR. HARRIS:  Yes, Your Honor.
11:16:00 25         JUDGE MARCUS:  All right.  Do you want to question him
```

```
  1   about it, or you want to offer it first?  What is it you want
  2   to do?
  3              MR. HARRIS:  So, Your Honor, this is the hearing
  4   transcript that was cited in that DOJ submission that contains
11:16:12 5   testimony from these black leaders.  I'm trying to see how this
  6   would affect his opinion that Alabama is nonresponsive to the
  7   needs of black Alabamians.
  8              JUDGE MARCUS:  All right.  You may use it for the
  9   purposes of impeaching him.
11:16:24 10              MR. HARRIS:  Okay.
 11              JUDGE MARCUS:  That's what you want to do now is use
 12   it to impeach, I take it.
 13              MR. HARRIS:  Yes, Your Honor, that's right.
 14   Separately, we would also like to have it in evidence.
11:16:35 15              JUDGE MARCUS:  I understand that.  There's a dispute
 16   about the admission of 17, counsel?
 17              MS. SADASIVAN:  Yes, Your Honor.  We've objected to
 18   the exhibit.  I should also add that Dr. Bagley hasn't seen the
 19   transcript -- although he cited to in his report the DOJ's
11:16:51 20   objection, he has not seen any of the transcripts of the public
 21   hearing, so I am not sure what evidence Mr. Reed is trying to
 22   offer for -- Mr. Harris is trying to offer for impeachment.
 23              JUDGE MARCUS:  He is trying to do two things, counsel.
 24   He is trying to impeach with the document, which he may do, and
11:17:06 25   he is trying to substantively offer it, as well.  We will take
```

```
 1  the substantive offer when we get to his case.
 2       In the meantime, you may -- particularly with an
 3  objection, but you may use the document for purposes of
 4  impeachment.  You may proceed, Mr. Harris.
 5             MR. HARRIS:  Thank you, Your Honor.
 6  BY MR. HARRIS:
 7  Q    And, Dr. Bagley, is it right that you have never seen this
 8  document?
 9  A    I am --
10  Q    I am going back to the beginning so you could see.  I
11  wasn't trying to pull a fast one.  Is it right you don't recall
12  ever seeing this document?
13  A    Are we still looking at the state submission?
14  Q    I'm sorry.  Can you see --
15  A    Yes.
16             JUDGE MARCUS:  Let's cut to the chase.
17       You have shown him page 9.  This is a public hearing
18  transcript from the joint legislative committee on
19  reapportionment.  Have you seen it before or haven't you,
20  Mr. Bagley?
21             THE WITNESS:  I -- I'm sorry.  I've --
22  BY MR. HARRIS:
23  Q    I've made a mistake I am afraid with what you can see and
24  what you cannot.  And I am very, very sorry.
25       This is what -- Defendants' Exhibit -- can you see this?
```

Timestamps in left margin:
11:17:20 (line 5)
11:17:31 (line 10)
11:17:47 (line 15)
11:18:01 (line 20)
11:18:12 (line 25)

```
 1  A    Yes.  And, no, I have not reviewed that.
 2            JUDGE MARCUS:  What you put up -- just so the record
 3  is crystal clear, Mr. Harris, on the screen is the legislative
 4  committee hearings on reapportionment, October 2nd, 1991.
11:18:35  5  That's what you are asking Dr. Bagley whether he has seen
 6  before or not.
 7            MR. HARRIS:  That's right.
 8            JUDGE MARCUS:  Have you seen it, Dr. Bagley?
 9            THE WITNESS:  No, Your Honor, I have not reviewed this
11:18:46 10  particular document.
11            JUDGE MARCUS:  All right.
12            MR. HARRIS:  Thank you for that.  I apologize for the
13  confusion.
14  BY MR. HARRIS:
11:18:53 15  Q    Why not?
16  A    I'm not sure how to answer that.  It's not come across,
17  you know, my desk.  It's -- I have not -- I am not even sure
18  how exactly I would have accessed that, to be honest with you.
19  It is case -- published case law is much easier for me to
11:19:15 20  review, particularly during, you know, a pandemic when we are
21  not doing archival research.
22  Q    And in terms of how you would see it -- and I want to be
23  clear where this came from -- in that last exhibit we looked at
24  was the DOJ submission letter.  Do you recall that?
11:19:30 25  A    Yes.
```

```
 1   Q      Okay.  And this is cited in that letter, so --
 2   A      Okay.
 3   Q      -- that's where it's coming from.
 4          Is this the type of information, the testimony about
 5   redistricting that an historian in your field would likely
 6   consider when writing or developing sort of historiography
 7   about redistricting in Alabama?
 8   A      It right be considered, sure.
 9   Q      Okay.  And why is that?
10   A      Because it's a part of the public record.
11   Q      Okay.  And you think it's relevant how the Legislature
12   acted at that point?
13   A      Sure.  You know, I would just say if I'm examining, you
14   know, three-quarters of a century of history, I am not going to
15   be able to access every single relevant source.
16   Q      Sure.
17          You know what?  I -- I had hoped to read a portion of this
18   document.  And, you know what?  I will stop here.  I won't do
19   that.  I have gotten confused with my document.
20          I do want to talk about Wesch, though.  And you mentioned
21   that specifically.  You say you have read Wesch opinion; is
22   that right?
23   A      Yes, sir.
24   Q      And what is that?
25   A      That is -- the Wesch case was the case whereby the Court
```

 1  took under consideration a number of plans that had been

 2  submitted to the state Legislature for congressional

 3  redistricting in the '90s.  And the Court ultimately, I

 4  believe, ordered the enactment of one of such plan with some

11:21:12  5  slight modifications put in place by the Court.

 6  Q    Okay.  Let me see here.  And you mentioned that black

 7  voters joined the suit citing specifically the lack of a second

 8  majority black congressional district; is that right?

 9  A    Where is that if you don't mind?

11:21:30 10  Q    Let me see.  In the first sentence of the first full

11  paragraph on page 13.  And starting with black voters, so that

12  second clause is what I was citing.

13  A    Yes, I see that.

14  Q    And why did you include that fact in the report?

11:21:47 15  A    I felt it was relevant that you had people challenging at

16  every step of the way the state's plans.

17        JUDGE MARCUS:  I'm sorry.  I -- do you understand the

18  question, Dr. Bagley?

19        THE WITNESS:  Yes.  Yes, Your Honor.  I think so.

11:22:08 20        JUDGE MARCUS:  Could you answer it?

21        THE WITNESS:  Would you restate it please, Mr. Harris.

22  BY MR. HARRIS:

23  Q    Sure.  I think you -- I think you answered what I meant to

24  ask, anyway, and is why you didn't it include it.  So you

11:22:22 25  testified I believe that you said black voters were challenging

1    the state's action at every step of the way; is that right?

2    A    Yes.

3    Q    Okay.  Now --

4    A    I mean, not uniformly of course as you have just pointed

11:22:35  5    out.  I mean, there have been some black leaders in the state

6    who have been supportive of initially one majority-minority

7    district.

8    Q    Okay.  I'm going to show -- again, this has not previously

9    been marked as an exhibit, but it is the *Wesch* opinion that you

11:22:52 10    cite in your report that is a *Wesch* document.

11         Is it right that you have read that case?

12    A    Yes.

13    Q    Okay.  Great.  Sorry.  I know I already asked that.  We

14    will mark this for identification as Exhibit 7.  And it's as

11:23:08 15    published in the federal supplement 785 F. Supp. 1491.  This is

16    just the Westlaw version of it.

17         I'm going to scroll down to paragraph 26 of the opinion

18    where it is on the fourth page of this case file I printed.

19    Can you read that?  Do you see that on your screen, Dr. Bagley?

11:23:30 20    A    I do.

21    Q    Okay.  And I pulled this up.  You say black voters join

22    the suit citing specifically the lack of a second majority

23    black congressional district.  Is this what you are referring

24    to?

11:23:43 25    A    Where specifically?

1   Q    I'm sorry.

2        Paragraph 26.  So the Hilliard Plan that we're advocating

3   two African-American majority districts?

4   A    Yes.  Earl Hilliard was among those who dating back to the

5   '90s was supportive of two majority-black districts.

6   Q    Okay.  Can you read that paragraph 26 for me, please?

7   A    The Hilliard Plan includes two majority African-American

8   districts, with an African-American population of 59.33 percent

9   and 61.98 percent respectively.  Although this plan was

10  submitted by the intervenors, they took the position that the

11  Hilliard Plan probably provided obstacles of sufficient nature

12  to cast doubt on their opportunity to elect candidates of their

13  choice in these districts.

14  Q    Okay.  And do you think this is the plan that you're

15  referencing in your report or -- excuse me -- the claim you are

16  referencing in your report?

17  A    Yes.

18  Q    Okay.

19  A    Well, yes.  That -- yes.

20  Q    Okay.  And is it your opinion that this is part of the

21  state's history of discrimination in redistricting?

22  A    Well, it's my opinion that, you know, that where you're

23  having to litigate this to even get the one majority-minority

24  district, again, we're looking at the totality of the

25  circumstances.

```
 1  Q    Okay.  And I want to talk a little bit more about that.
 2  You say litigating one majority-minority district.  What do you
 3  mean by that?
 4  A    I mean, the plan that was adopted was adopted by a court
 5  with modifications by the Court at that time.
 6  Q    Do you -- and there was a DOJ objection letter as you have
 7  already said and I believe you testified.  Did the state also
 8  pass a different map that year, do you know?
 9  A    There was a separate map, yeah.  While the Wesch
10  litigation was ongoing, the state passed a map.  That was the
11  one the DOJ objected to.  And then the Court adopted the map in
12  Wesch, one of the maps that had been submitted as part of the
13  process with modifications by the Court, yeah.
14  Q    Okay.  And have you seen the state's plan that was -- like
15  the one that -- not the Court's plan, but the state's plan?
16  A    I believe you showed me the submission to the Department
17  of Justice just a minute ago.
18  Q    Right.  That's right.
19  A    Uh-huh.
20  Q    Do you know how it compared to the Court ordered plan that
21  was ultimately entered?
22  A    It was fairly similar, I believe.
23  Q    Okay.  So the state's plan that it passed also contained
24  majority-minority district; is that right?
25  A    Yes.
```

11:25:25 (line 5)
11:25:42 (line 10)
11:26:02 (line 15)
11:26:11 (line 20)
11:26:28 (line 25)

```
 1   Q    Okay.  Okay.  You say in your report that what you just
 2   said just now that the Pierce Plan was ultimately adopted or a
 3   modify version of the Pierce Plan; is that right?
 4   A    Yes.
 5   Q    Okay.  Then at 13, you say, the Pierce Plan was originally
 6   the Larry Dixon Plan.  And I believe that's the last full
 7   paragraph on 13.  Why do you include that information here?
 8   A    It was just known in the litigation as the Dixon-Pierce
 9   Plan.
10   Q    It was known as the Dixon-Pierce Plan?
11   A    It was referred to as such at some point, yeah.
12   Q    Okay.  So the Pierce Plan was referred to the Larry Dixon
13   Plan is your testimony?
14   A    No. I'm saying that I have seen it referenced as the
15   Dixon-Pierce Plan somewhere before.  I include Mr. Dixon there
16   because he is among the individuals I discussed or referred to
17   at least in a footnote later that was part of the McGregor
18   investigation.
19   Q    I see.  So -- okay.
20        Now, do you note -- did the state adopt the Larry Dixon
21   Plan, or did the Court adopt the Larry Dixon Plan?
22   A    The Dixon Plan, I believe, became the Pierce Plan, which
23   the Court then made some changes to, and that was ultimately
24   adopted is my understanding.
25   Q    So the Dixon Plan became a different plan, which became a
```

1    different plan, right?

2    A    There was some -- there were minor changes made is my

3    understanding.

4    Q    Okay.  All right.  And moving on to 2000, which I believe

11:28:25  5    we have starting on 14 -- bottom of 13 and on to 14.  Is it

6    right that the state -- that the Legislature passed and the

7    Department of Justice precleared the state's congressional plan

8    after 2000?

9    A    Yes, sir.

11:28:43 10   Q    Okay.  And do you know whether anyone ever declared those

11   plans unlawful in 2000 either the Department of Justice or a

12   federal court?

13   A    No, sir.  There was not objection or adverse ruling.

14   Q    Okay.  And do you know what Alabama legislator sponsored

11:29:17 15   that plan that was ultimately passed in 2000?

16   A    Not off the top of my head, no.

17   Q    Okay, Dr. Bagley, I will represent to you that earlier in

18   this case, there's been testimony that that was Hank Sanders.

19   Does that name ring a bell to you?

11:29:31 20   A    Yes.  Mr. Sanders a black legislator from Selma.

21   Q    Okay.  And is it your opinion that Mr. Sanders was not

22   responsive to the needs of black Alabamians in 2000 when he

23   sponsored that map?

24   A    That would not be my opinion, no.

11:29:46 25   Q    Okay.  And did you look at that bill?  And, again, I am

1218

```
 1  coming back to your historiography here.  Did you consider the
 2  2000 bill in the map that was passed?
 3  A    I do refer to it.  I do discuss it on 13 and 14.  I state
 4  plainly that the plan was passed and enacted and, you know, was
11:30:11  5  precleared.
 6  Q    Okay.  And, you know, in the first full paragraph on page
 7  14, you reference the redistricting battles of the early 2000s.
 8  And this is three lines up, where it starts with between the
 9  redistricting.  Do you see that in the first full paragraph on
11:30:30 10  page 14?
11  A    Yes.
12  Q    Okay.  When you say the redistricting battles of the early
13  2000s, what are you referring to?
14  A    This is at 14, first full paragraph?  I am just trying to
11:30:49 15  find where you are reading from.
16  Q    I'm happy to show it on the screen.
17  A    No, no, no.  You don't have to do that.  It's the
18  paragraph that begins, The Republican party?
19  Q    That's the one.
11:30:59 20  A    Yeah.  I mean, I talk about in the previous paragraph if
21  you will allow me to go back.
22  Q    Certainly.
23  A    Three separate actions challenging the state's failure
24  were filed and consolidated.  The state was forced to
11:31:13 25  acknowledge portion -- three-judge court invited the submission
```

1  of plans, heard testimony, appointed its own experts.  I'm

2  paraphrasing at this point.

3  Q    Uh-huh.

4  A    You know, these consolidated cases.  I referred to that

11:31:28 5  litigation.

6  Q    Okay.  So you're referring to the plans that were

7  precleared when there was no adverse rulings, and that's the

8  redistricting battles of the early 2000s?

9  A    Correct.

11:31:38 10  Q    Okay.  And so is it your opinion that it was the

11  redistricting battles of the early 2000s that led to the

12  Republican takeover of the Alabama Legislature in 2010?

13  A    I'm not trying to draw a direct causal connection there,

14  not necessarily, no.

11:31:56 15  Q    Okay.  So it's not your opinion, then, that redistricting

16  caused the Republican takeover in 2010?

17  A    No.

18  Q    Okay.  On the 2010 plan, and let me see here.  On looking

19  at page 16 of your report?

11:32:19 20  A    Uh-huh.

21  Q    Actually -- so it straddles 15 and 16.  And what I want to

22  ask about is the absolute first words on page 16.  But it might

23  help to start at the bottom of 15.

24       You cite Senator Bobby Singleton as saying, I think it's

11:32:35 25  political packing, in terms of the 2010 plan.

```
      1          Do you remember that part of your report?
      2    A    Yes.
      3    Q    And what does that mean?
      4    A    What did Senator Singleton mean?
11:32:49 5  Q    Sure.  Or what did you think it meant when you put it in
      6    your report?
      7    A    That he was arguing that the map was packing black voters
      8    into the Senate district, I believe.
      9    Q    So to you, political packing is the same as packing black
11:33:04 10  voters?
     11    A    I think that's probably what Senator Singleton meant, but
     12    this cuts to the issue of is it party or race, which is a
     13    thorny issue.
     14    Q    Can you say more about that?  What do you mean?  How do
11:33:23 15  you consider that a historian?
     16    A    I think I deal with that in the report by simply showing
     17    the shifts in the park fees -- I mean, what's at issue here is
     18    discrimination against the state's black citizens, though.  So
     19    I don't know that Senator Singleton meant to refer simply to
11:33:44 20  political parties.  I think he meant to refer to the black
     21    citizens.  I think that was the point, and I think that has
     22    been the point.
     23    Q    Okay.  Let me see here.  So as part of that discussion,
     24    you reference the Alabama Legislative -- the ALBC, the Alabama
11:34:11 25  Legislative Black Caucus case.  Do you recall that?
```

```
 1    A     Yes.

 2    Q     And speaking again about the congressional plan

 3    specifically, you say that after preclearance occurred on that

 4    2010 plan, this severed that issue from the Alabama Legislative

11:34:29 5  Black Caucus case.  And now I'm starting here at the bottom of

 6    page 16 and four lines up on the far right side is where it

 7    says this --

 8    A     Uh-huh.

 9    Q     Do you see that?

11:34:39 10 A     Yes.

11    Q     What does that mean?  That sentence?  What does that mean?

12    It's severed.  You can take a minute to read it.

13    A     I see it.  I just mean that was, you know, wouldn't have

14    been a consideration anymore by that point.

11:34:51 15 Q     Is it your understanding if something is precleared that

16    it can't be challenged in courts?

17    A     It can, yeah.  But I mean, if it received preclearance, it

18    may be the case that, you know, one might reconsider

19    challenging it or what have you.

11:35:09 20 Q     Okay.  So is it your opinion that Alabama's 2010

21    congressional map was part of the state's lack of

22    responsiveness to the needs of black Alabamians?

23    A     If I don't state that my explicitly in the report, then

24    that's not the case.

11:35:25 25 Q     Okay.  So that is not your opinion?
```

```
 1  A    Would you say it again, please?
 2  Q    Certainly.  Is it your opinion that the 2010 congressional
 3  map from Alabama was part of the state's lack of responsiveness
 4  to the needs of black Alabamians, or part of the history of
11:35:41 5  discrimination against black Alabamians, either way?
 6  A    No.  I mean, I just -- the plan is an outgrowth of what
 7  had been in place, you know, since the '90s.  Obviously, there
 8  were those who took issue with that.  There were some who did
 9  not, and I think that's accurately detailed in my report.
11:36:02 10  Q    Okay.  And then lastly, as a point of clarification --
11  well, the last redistricting point I believe comes at page 29,
12  and you mentioned Chestnut litigation unless I have got my
13  pages wrong.  Here we go.  Yeah.  And under, lack of
14  responsiveness on -- you have Roman Numeral VI Section 2 of
11:36:38 15  your report, you mention that State Representative Prince
16  Chestnut, a named plaintiff in a lawsuit that was pending when
17  the 2020 census was published.  Is that what you have written
18  here?
19  A    Yes, sir.
11:36:51 20  Q    And are you referring to Chestnut v. Merrill, the
21  redistricting lawsuit that ended in 2019?
22  A    Yes, sir.
23  Q    Okay.  And so that was not pending when the census was
24  issued; is that right?
11:37:05 25  A    I'm not sure precisely when that litigation ceased.
```

```
 1   Q     Okay.  And you mentioned --
 2   A     I think -- I'm sorry.  I don't mean to speak over you.
 3   Q     I take it back.  I apologize.  Please continue,
 4   Dr. Bagley.
11:37:21 5   A     I think, if I'm remembering correctly, the imminent
 6   publication of this census data would have rendered that
 7   litigation moot.  Maybe I am wrong on the precise procedural
 8   details there, but that's my recollection.
 9   Q     Okay.  And is it possible that you meant Lakeisha Chestnut
11:37:40 10  who is also a plaintiff in this case and not Representative
11   Prince Chestnut?
12   A     Yes.
13   Q     Okay.  All right.
14         Factor 5 is the effects of past discrimination.
11:37:53 15        You mentioned and you testified earlier today about
16   employment discrimination claims.  Do you recall that
17   testimony?
18   A     Yes, sir.
19   Q     And it was your testimony that Alabama had the
11:38:07 20  disproportionate share of racial discrimination claims; is that
21   right?
22   A     Based on the EEOC data, yes, sir -- well, yes.
23   Q     And based on what about the EEOC data?
24   A     I cited to the fact that 45 percent of the claims in
11:38:26 25  Alabama were racially based claims.  Then the very next line I
```

```
 1   cite to the fact that racially based claims accounted for
 2   3.1 percent of national racial plans -- excuse me -- Alabama's
 3   racially based claims accounted for 3.1 percent of national
 4   racial claims, although Alabama's population as of the last
 5   census accounted for only 1.5 percent of the national
 6   population.
 7   Q    Okay.
 8             MS. SADASIVAN:  Your Honor, would it be possible to
 9   take a break now?
10             JUDGE MARCUS:  Do you have an objection to doing that,
11   Mr. Harris?
12             MR. HARRIS:  I have no specific objection, Your Honor.
13   I'm at the Court's pleasure.
14             JUDGE MARCUS:  How long a break did you need, counsel,
15   at this point?
16             MS. SADASIVAN:  Just a five or ten-minute break.
17             JUDGE MARCUS:  All right.  We will take a ten-minute
18   break at this point.
19             MS. SADASIVAN:  Thank you, Your Honors.
20             (Recess.)
21             JUDGE MARCUS:  Are you ready to proceed now, counsel?
22             MS. SADASIVAN:  Yes, Your Honor.  Thank you.
23             JUDGE MARCUS:  All right.  Mr. Harris, are you ready
24   to proceed?
25             MR. HARRIS:  I sure am.
```

11:38:52 (line 5)
11:39:03 (line 10)
11:39:14 (line 15)
11:46:25 (line 20)
11:46:35 (line 25)

BY MR. HARRIS:

Q    Dr. Bagley, are you ready to go?

A    Yes, sir.

Q    Great.  So I had just asked about your statistic about 3.1 percent of national racial discrimination claims accounting even though Alabama was just 1.5 percent of the population; is that right?

A    Yes.

Q    Okay.  So in your analysis, do you find it helpful to compare Alabama to other states and see how Alabama stacks up?

A    I have done that here, but it's not necessary to do that everywhere because we're dealing with Alabama and Alabama exclusively.

Q    So I'm sorry.  So why do you do it here?  You say it's usually not helpful?

A    Well, I mean, it's -- you can compare Alabama to other states.  Sometimes that might be helpful, sometimes it might not be.  The Court can take it for what it is.

Q    Okay.  But how about you, as a historian, and as you're conducting this historiography, how do you decide that this is helpful to you in this context?

A    I think it's part and parcel of the totality of the circumstances.

Q    Okay.  Do you know what percent of the nation's black population resides in Alabama?

```
 1   A      I think it's about 3 percent.
 2   Q      Okay.  And does that affect your analysis?
 3   A      Well, no, I mean, if you go back to the number I cited
 4   here, all that means is that Alabama's number of discriminatory
11:48:20  5   claims is -- lines up with its black population.  I don't
 6   understand how that's helpful or not.
 7   Q      Okay.  So that's -- you don't -- not helpful.  Thank you.
 8          You also testified some earlier today about the Alabama's
 9   Department of Corrections of having -- being disproportionately
11:48:41 10   having problems with black Alabamians; is that right?
11   A      I believe I testified that the number of incarcerated
12   black citizens in Alabama is substantially higher than the
13   black population of the state.
14   Q      I see.  Thank you.
11:48:57 15          Did you compare Alabama to other states in that metric the
16   same way you did with employment discrimination claims?
17   A      No.
18   Q      I'm sorry.  Did you say no?
19   A      Yes.
11:49:11 20   Q      And why not?
21   A      I was simply running through the findings of the DOJ
22   report.  What page is this, by the way?
23   Q      Let me see.  I do not recall.  I was just remembering your
24   testimony from earlier today.  I can tell you the EEOC
11:49:28 25   information is between 18 and 19.  I'm not sure.
```

1   A    Yeah.  This is 19 and 20.

2   Q    Okay.

3   A    Yeah.  So I am looking at the litigation, and I talked

4   about the litigation in the '70s, the *Braggs v. Dunn* case which

11:49:42  5   is ongoing, the New York Times report, the federal Justice

6   Department investigation, these are the sources I cite to

7   there.

8   Q    And I'm trying to understand why it's helpful for you as a

9   historian to compare Alabama to other states in the context of

11:49:58  10   employment discrimination, but not in the context of prisons

11   and the Department of Corrections.  Could you -- can you help

12   me understand that?

13   A    I think if you look at the report generally, comparing

14   Alabama to other states is not something that I have done.  We

11:50:11  15   can drill down on literally one line in that paragraph and say

16   that I have done that there with discrimination.  It's not even

17   -- it's only 50 percent even of what I was looking at in

18   regards to the EEOC data, so I don't think that I am

19   necessarily selectively comparing Alabama to other states.  I

11:50:31  20   mean, it's just one line in a 33-page report.

21   Q    Okay.  And you also mentioned in your report about the

22   Department of Corrections that the state plans to use funds --

23   federal funds, Rescue Plan Act funds for prison construction;

24   is that right?

11:50:58  25   A    Yes.

```
  1   Q    And how does that affect your opinion in this case?

  2   A    Could you show me where that is?

  3   Q    Yes.  It is in the middle of the first full paragraph of

  4   page 20.

11:51:17 5  A    Well, I'm talking about the justice system in general in

  6   Alabama.

  7   Q    Uh-huh.

  8   A    And we're talking about something that has garnered

  9   criticism from black leaders in the state using these COVID

11:51:30 10 funds to just simply build more prisons.

 11   Q    Okay.  So it's your opinion that using these funds on

 12   prisons is part of the state's history of discrimination; is

 13   that right?  Excuse me -- effective past discrimination?

 14   A    I think it's part of the state's systemic problem with its

11:51:49 15 prison systems broadly speaking or its criminal justice system.

 16   Q    So, okay.  So you think the state's use of funds is part

 17   -- evidences the problem of the problems with the Department of

 18   Corrections?

 19   A    What I state in the report is that the state was recently

11:52:10 20 criticized for trying to address overcrowding by pledging funds

 21   intended for COVID relief to the building of new prisons,

 22   thereby taking funds away from one crisis that

 23   disproportionately affects black people to address another one.

 24   Q    Okay.  I will move on.  You mentioned the lack of

11:52:36 25 broadband I think as a big problem on page 18.  Were you still
```

1229

```
 1  in the context of the COVID 19 pandemic?
 2  A    Yes.
 3  Q    And do you know whether the state also plans to use Rescue
 4  Plan Act funds for broadband expansion?
 5  A    They do.
 6  Q    Does that affect your opinion at all?
 7  A    No, not overall, no.  I mean, that's great that they have
 8  done that.
 9  Q    Okay.  So do you think that sheds any light about the
10  responsiveness from the state of Alabama to the needs of the
11  black community?
12  A    I don't think the fact that the state has very, very
13  reasonably decided to use these funds for that overturns the
14  weight of evidence for the rest of the report, no.
15  Q    Okay.  All right.  Moving right along.  I believe I'm
16  getting closer.  And I thank you for your patience, Dr. Bagley.
17        Looking at Senate Factor 6, political campaigns
18  characterized by racial appeals.  I think you testified earlier
19  today when someone draws attention to race is kind of what you
20  consider as part of this factor; is that right?
21  A    Draws attention to race would be an intention of getting
22  people to block vote.
23  Q    Okay.  When you were preparing your report or conducting
24  your analysis for this case, how many campaign advertisements
25  did you view?
```

11:52:48 (line 5)
11:53:01 (line 10)
11:53:17 (line 15)
11:53:45 (line 20)
11:54:04 (line 25)

```
 1   A     I'm not sure honestly.

 2   Q     Can you give me an estimate, a ballpark?

 3   A     Dozens, maybe.

 4   Q     Dozens.  Okay.  And do you have a sense of how many

 5   political advertisements might be prepared or published in a

 6   given electoral cycle?

 7   A     No.  I mean, I'm sure it's quite a few.  I'm sure it's a

 8   great many.

 9   Q     And, you know, the gist of my question is:  What does it

10   mean for you for a campaign to be characterized by racial

11   appeals to use the terminology of the Senate Factor?

12   A     I think it's asking us whether racial appeals are present.

13   I don't think -- I don't take that language to mean like

14   someone's entire campaign has to be predicated upon, you know,

15   a racial appeal.  I mean, are racial appeals present is what

16   that means to me.  I suppose you could read it that way, but

17   that is not the way I read it.

18   Q     So I would like to -- I am looking just in your summary at

19   the beginning on page 2, just how you bullet pointed the list.

20         The question, according to -- what we have here is whether

21   political campaigns have been characterized by overt or subtle

22   racial appeals.

23         So I am asking what, to you, as you conduct your analysis,

24   what does it mean that the campaign be characterized by these

25   appeals?
```

11:54:22 (line 5)
11:54:37 (line 10)
11:54:56 (line 15)
11:55:16 (line 20)
11:55:34 (line 25)

1  A    That means if there are present in those campaigns public

2  statements or advertisements where candidates are appealing to

3  race.

4  Q    Okay.  So is one enough?

11:55:45  5  A    Well, it's not just one ad that airs one time.  It is an

6  ad that airs repeatedly and is viewed presumably by hundreds

7  and thousands of people.  So, yes, I mean, we are not talking

8  about a one-off statement if we are talking about campaign ads

9  in the modern day and age.

11:56:03  10  Q    Okay.  And you mentioned the extent to which minorities

11  have been elected to office in Alabama.  You mentioned earlier

12  today that not in the last 20 years has a minority been elected

13  to statewide office; is that right?

14  A    Yes.

11:56:30  15  Q    And do you know how many Governors that are black are

16  currently serving nationwide?

17  A    Not off the top of my head.

18  Q    Can you provide an estimate?

19  A    To what end?  That's not really something I discuss in my

11:56:49  20  report or that I find relevant.  They asked us to what extent

21  they have been elected in Alabama.  I don't have to speak to, I

22  don't feel like, you know, to what extent they have been

23  elected elsewhere.

24  Q    So this is not a situation where you find it helpful to

11:57:04  25  consider Alabama in the context of other states?

```
          1  A     No.  I mean, again, this goes back around to -- we're
          2  talking about one line earlier that we're trying to, you know,
          3  characterize the entire report.  Again, furthermore, if we're
          4  talking about black people being elected to statewide office,
11:57:26  5  if that's true in other states, that just means other states
          6  are probably dealing with the effects of past discrimination,
          7  too.  I don't know how that absolves the state of Alabama.
          8  Q     So I will represent to you, Dr. Bagley, it's my
          9  understanding that there zero black Governors nationwide.  So
11:57:44 10  do you think this factor would be satisfied for every state in
         11  the United States?  You said it doesn't --
         12  A     Not based on that law in fact.  Given the totality of
         13  circumstances, I'm sure it would apply to a great many states,
         14  but if you are doing a totality of the circumstances analysis,
11:57:59 15  you can't cherry-pick one single thing, and say, well, it's not
         16  true just of Alabama, it's true of everyone, and say that is,
         17  you know, the end all be all.
         18  Q     Okay.  In the context of the lack of responsiveness to the
         19  needs of Alabamians, and, again, to quote your report, I
11:58:21 20  believe you describe this as the particularized -- excuse me --
         21  particularized needs of the black community; is that right?
         22  A     Yes.
         23  Q     And what does that mean to say the particularized needs of
         24  the black community?
11:58:34 25  A     Just means things that will be of great concern to black
```

1 Alabamians.

2 Q Okay.  So is it still a particularized need in your

3 understanding if it affects black and white people similarly or

4 alike or how --

11:58:49  5 A Yeah.

6 Q -- does that weigh into your analysis?

7 A Yes.  I don't mean exclusively.

8 Q Okay.

9 A But there may be things that carry more weight with black

11:58:57 10 citizens.

11 Q Okay.  And I want to think specifically about the state's

12 response to the COVID-19 pandemic, which you cite as evidence

13 of lack of responsiveness.

14 And I want to make sure I understand the context of the

11:59:13 15 Senate Factor, as well.  Is it your opinion that this is modern

16 day discrimination, or is this an effect of past

17 discrimination?

18 A Both.

19 Q Okay.  So it is your opinion that the state of Alabama

11:59:24 20 discriminates against its citizens based on their response to

21 COVID-19?

22 A I think the decorative *People First* found disparities in

23 terms of COVID's effects were traceable to systemic factors.

24 Q Traceable to systemic factors.  And I am sorry.  What does

11:59:45 25 that mean?

```
 1  A     I can find it in the report if it's useful.
 2  Q     Yeah.
 3  A     This is not in the section, which was referenced earlier.
 4  Q     Okay.
12:00:10  5  A     Bottom of page 17, the Court and People First acknowledge
 6  that, quote, due to patterns resulting from -- sorry.  Back
 7  that up.
 8        But also bottom of 17 the -- that the Court found
 9  discrimination and systemic racism contributed to elevated
12:00:32 10  COVID-19 risks for black people and other minorities.
11  Q     Okay.  All right.  So did you speak to anyone about, for
12  example, at the Alabama Department of Public Health about their
13  response to COVID-19?
14  A     No.
12:00:51 15  Q     No?  Okay.
16        Are you familiar with any efforts undertaken by the
17  Department of Public Health to reach out to the black
18  community?
19  A     I'm aware that they have done a good job of getting people
12:01:13 20  vaccinated.
21  Q     Okay.  Does that factor into your analysis?
22  A     I'm not sure if I cite specifically to that or not.
23  Q     Okay.  And when you say they have done a good job of
24  getting people vaccinated, what is your basis for that
12:01:28 25  statement?
```

```
 1  A     Black people are vaccinated in Alabama at a high rate.
 2  Q     Relative to what?  I'm sorry.
 3  A     Just in general.
 4  Q     Do you mean compared to?
12:01:40 5  A     Compared with the population of black people in Alabama,
 6  the rate is high.
 7  Q     Okay.  Okay.  In terms of responsiveness, also you
 8  mentioned a recently enacted photo ID law in this section, as
 9  well.  Are you referring -- what are you talking about there,
12:02:16 10  and this is the -- I'm sorry.  Do I need to cite it for you?
11  A     No.  Not at all.  Photo ID law, yes.
12  Q     Are you referring to the law passed in 2011?
13  A     Yes, I think so.
14  Q     Okay.  And you state that that law was challenged in
12:02:38 15  courts as being discriminatory; is that right?
16  A     Yes.
17  Q     Do you know the outcome of that lawsuit?
18  A     Yeah.  The law was upheld.
19  Q     Okay.  But is there a reason you chose not to include that
12:02:53 20  in your report?
21  A     No.  I don't -- in fact, I didn't realize that I didn't to
22  be perfectly honestly.  I think everybody knows the law was
23  upheld.
24  Q     Okay.  And you also reference the Alabama's minimum wage
12:03:08 25  law that was challenged in courts; is that right?
```

```
        1  A     Yes.

        2  Q     Do you know whether that was challenged -- or excuse me --

        3  what the result of that litigation?

        4  A     Yeah.  That the state won that, as well.

12:03:17 5  Q     When you say the state won that it was -- well, withdrawn.

        6  Excuse me.  I will take it back.

        7        Is there a particular reason you chose not to include that

        8  in your report, either?

        9  A     No.  Again, I think if I cite to the case, then, you know,

12:03:38 10 the citation is there, so it's not like I'm hiding the fact

       11  that that's -- that was the ultimate disposition of that.

       12  Q     Okay.  I am going to move to your rebuttal report I think

       13  briefly.

       14        And so do you have experience in your field as a historian

12:03:59 15 defining or analyzing communities of interest?  Are you

       16  familiar with that term?

       17  A     I am familiar with that term.  I understand it to be

       18  nebulous.  I understand the state has guidelines laying out

       19  what for the state would be a community of interest.  I don't

12:04:16 20 purport to define that myself.

       21  Q     Okay.  So just to clarify, that's not within the scope of

       22  your expertise in this case; is that right?

       23  A     Correct.

       24  Q     Okay.  And you state in your report that -- on page 3 in

12:04:31 25 the last paragraph on page 3, do you have it in front of you?
```

```
 1   A     Yes.
 2   Q     Okay.  You're talking about Mobile and Baldwin counties,
 3   and then you say, the population of Mobile County east of
 4   Interstate 65 is overwhelmingly black and shares little today
 5   with the rest of the Metropolitan area, which is predominantly
 6   white.
 7        What is the basis of that conclusion?
 8   A     So if you look at Mobile east of 65, there is this sliver
 9   between I think Spring Hill and Government, where the
10   population is a little bit more diverse.  But studying school
11   desegregation, I know that the rest of the state north and
12   south of that, from Prichard to Mayesville, is overwhelmingly
13   black.  There are pockets of black population outside of 65,
14   for example, just northwest of Prichard in the Baldwin County
15   area, but that is traditionally speaking where as --
16   substantially as a result of the integration of the schools,
17   white people fled west of 65 to other parts of the county or
18   across the bay to Baldwin.
19   Q     Okay.  So is it right that your statement that they share
20   little today is that one area is predominantly black and the
21   other is predominantly white?
22   A     No.  The area of urban core, other than, again, portions
23   of that midtown sliver are -- also suffer from poverty.  They
24   go to failing schools, and so on.  They -- if you look at
25   socioeconomic indicators, for example, these are all things
```

1238

|     |     |
|-----|-----|
| | 1 | that I am tying those people living in the urban core to people |
| | 2 | in the Black Belt.  Those are all commonalities.  If you look |
| | 3 | at people from Russell County to Lowndes County, they also go |
| | 4 | to failing schools.  They have higher infant mortality rates, |
| 12:06:34 | 5 | and so on.  So historically speaking, there are these ties that |
| | 6 | those people inside the 65 and the rest of the county don't |
| | 7 | have. |
| | 8 | Q    Is it right, though, that this is outside your field of |
| | 9 | expertise?  I believe you testified that you apparently |
| 12:06:47 | 10 | consider is coming up to communities of interest? |
| | 11 | A    Specifically defining what is a community of interest is |
| | 12 | not something I would purport to do.  I am aware that this |
| | 13 | state has guidelines based on that, and that ethnicity, |
| | 14 | history, these are all things that one would consider, just |
| 12:07:06 | 15 | based on the state's own guidelines.  But I am not drawing -- |
| | 16 | in the report, I am not saying this is or is not a community of |
| | 17 | is.  I am simply pointing out things that people have in common |
| | 18 | that the state might well consider on something like a |
| | 19 | community of interest. |
| 12:07:24 | 20 | Q    Okay.  In the context of your rebuttal report, you talk |
| | 21 | about migration of black Alabamians historically; is that |
| | 22 | right? |
| | 23 | A    Yes. |
| | 24 | Q    Is that called the great migration?  Is that a historical |
| 12:07:40 | 25 | term? |

1  A    Typically, when people refer to the great migration, they

2  mean the historical migration of black people out of the South

3  to cities in other parts of the country.  What I am pointing

4  you to in the report is that historians specifically of Alabama

12:07:53  5  have found that in addition to that, lesser known is the

6  migration of black people internally from rural areas like the

7  Black Belt to cities like Mobile.

8  Q    And I'm trying to understand the entirety of your

9  historical analysis on this point, Dr. Bagley.  Is it right

12:08:16  10  that millions of people from the South went to the north to

11  places like Chicago and Detroit; is that right?

12  A    Millions of people from throughout the South migrated to

13  cities in the Northeast, the Midwest and the West.  What I am

14  pointing out is there was also a -- I believe Dr. Flint calls

12:08:34  15  it hemorrhaging of people to -- from the Black Belt to urban

16  areas including Mobile.

17  Q    Okay.  But some number less than millions, I imagine; is

18  that right?

19  A    Of course.

12:08:48  20  Q    Okay.

21         MR. HARRIS:  Your Honor, I believe I am very nearly

22  done.  If I can have just a moment to confer.

23         JUDGE MARCUS:  You sure can.

24  BY MR. HARRIS:

12:09:27  25  Q    Let me see.  Very quickly, Dr. Bagley.  I do have one

1        thing to follow up on.

2             This is -- as part of your direct testimony, you mentioned

3        that blacks are proportionately represented in the Alabama

4        state Legislature; is that right?

12:09:43  5    A    I believe that's roughly the case.

6        Q    And you said that that was at least in part due to

7        litigation; is that right?

8        A    Yes.

9        Q    Okay.  And what litigation would that be, do you know?

12:09:56 10    A    Yeah.  I talk in my report about the various challenges to

11       the state's state redistricting plans, for example.  I talk

12       about earlier in the report challenges to the state's voter

13       questionnaire.  I talk about challenges to the devices in the

14       1901 constitution.  I mean, all manner of legal challenges

12:10:18 15    throughout the 20th Century paved the way for black people to

16       be able to vote period, to be able to register to vote, to be

17       able to even conceive of getting elected to the State

18       Legislature in the 1960s and into the 1970s.  To be able to,

19       you know, go from there.  I mean, it takes, what is it, decades

12:10:39 20    from there to achieve that semblance of proportional

21       representation.  So it's a very long litigative history.

22       Q    So just to be clear, you are not referring to a specific

23       example of litigation that by which black Alabamians won that

24       proportional representation?

12:10:55 25    A    No.

```
 1   Q    Okay.
 2            MR. HARRIS:  Thank you.  That's all I have.
 3            JUDGE MARCUS:  Counsel, redirect?  How much do you
 4   have?  Can we do this before lunch?
 5            MS. SADASIVAN:  Would you mind if I confer with my
 6   co-counsel quickly?
 7            JUDGE MARCUS:  Of course.  Take your time.
 8            MS. SADASIVAN:  Thank you, Your Honor.  Okay.  We are
 9   ready, Your Honor, to proceed with redirect.
10            JUDGE MARCUS:  How much do you have for Dr. Bagley?
11            MS. SADASIVAN:  Not much.  I think it should be done
12   in 15 minutes maximum.
13            JUDGE MARCUS:  All right.  Let's go forward.  Thank
14   you.
15                    REDIRECT EXAMINATION
16   BY MS. SADASIVAN:
17   Q    Dr. Bagley, your analysis did not express -- your report
18   in this case did not discuss discriminatory intent; is that
19   right?
20   A    That's correct.
21   Q    So your analysis in Senate Factor 1 discussing the
22   redistricting process was not an attempt to demonstrate
23   discriminatory intent as the Supreme Court explained the
24   analysis in Arlington Heights, or to chronicle the
25   discriminatory intent of a particular Legislature moving
```

The timestamps in the left margin are: 12:11:03 (line 5), 12:11:42 (line 10), 12:11:51 (line 15), 12:12:00 (line 20), 12:12:16 (line 25).

forward; is that correct?

A    Yeah, it's not an Arlington Heights analysis, correct?
Not an intent analysis.

Q    And your Senate Factor 1 analysis was intended to
chronicle indicia of official discrimination in the state of
Alabama that touched on the right of black people to
participate in the political process, correct?

A    That's correct.

Q    And in making a discriminatory intent analysis, which you
didn't do in this case, you might have considered other factors
relevant to assessing discrimination in its past and present
form, correct?

A    Of course.  Yes.

Q    You testified earlier about the Sayre Law.  The Sayre Law
prohibited certain assistance for illiterate voters; is that
right?

A    Correct.

Q    And that was intended to target generally black people,
correct?

A    It was.  And it, in fact, had that effect.

Q    Now, are you aware of whether there was litigation ending
in around 1988 under the Voting Rights Act changed the Sayre
Law's prohibition on assistance?

A    Yes.

Q    And you are aware that the Voting Rights Act was amended

1  to include Section 2 a way to ensure the provision of

2  insistence?

3  A    Yes, yes, absolutely.  That is all correct.

4          MR. HARRIS:  Your Honor, can I object on leading on

12:13:34 5  some of these questions?  I'm not -- I know this is --

6          JUDGE MARCUS:  I think the problem, Mr. Harris, is

7  that leading has been the order of the day since we got started

8  on direct.  I'm not going to prohibit it at a point unless it

9  goes too far.

12:13:51 10         Ask your next question, counsel.

11         MS. SADASIVAN:  Thank you, Your Honor, and

12  respectfully, I will not object to compound questions and those

13  kinds of things going forward.

14         JUDGE MARCUS:  Just put your question, please.

12:14:02 15        MS. SADASIVAN:  Thank you.

16  BY MS. SADASIVAN:

17  Q    Dr. Bagley, in your discussion of the one-drop rule, you

18  are not taking a position on who should be considered black,

19  correct?

12:14:09 20 A    No.  I am simply saying that -- and with respect to the

21  miscegenation clause and other elements of Alabama in terms of

22  its constitutional laws historically speaking, that has been

23  the definition that is used.

24  Q    And do you consider a Court's assessment of historical

12:14:26 25 facts to be definitive or binding on you as a historian?

```
 1   A    No, not necessarily.  Again, I am approaching this from a
 2   totality of the circumstances lens.
 3   Q    And in the '90s, it was generally thought that an
 4   effective majority black district required 65 percent BVAP
 5   right?
 6   A    That was the Department of Justice policy at that time as
 7   I understand it.
 8   Q    And your report discusses that, regardless of some black
 9   political leaders believed in the 1990s that the DOJ objected
10   to the 1991's congressional plan?
11   A    I do discuss that in the report, yes.
12   Q    With respect to Senate Factor 7, Dr. Bagley, you assessed
13   all statewide offices in your analysis of Senate Factor 7;
14   isn't that right?
15   A    Correct.  Not just governor.  I mean, I note that black
16   candidates have run for a number of statewide offices, and the
17   facts of how many have been elected are the same.
18   Q    So your analysis that there have been no black statewide
19   elected initials Alabama is not limited to the Governor of the
20   state?  You considered a number of positions?
21   A    No, correct.  Yes, and I point out that black candidates
22   have run for a number of those different offices.
23   Q    So you are aware that Alabama is one of only ten states
24   since Reconstruction where only white candidates have won
25   election for President, Senate, Governor, and nonjudicial
```

```
 1   statewide offices?
 2   A    Yes, of course.  And that, again, that's indicated in the
 3   report.
 4            MS. SADASIVAN:  Thank you, Your Honors and Dr. Bagley.
12:15:54 5   No further questions.
 6            JUDGE MARCUS:  All right.  Judge Manasco, Judge
 7   Moorer, any questions for Dr. Bagley?
 8            JUDGE MANASCO:  None from me.
 9            JUDGE MOORER:  No.  Thank you.
12:16:06 10            JUDGE MARCUS:  If there's nothing further, Dr. Bagley,
11   we thank you for your time.  And you are excused.
12            THE WITNESS:  Thank you, Your Honors.
13            JUDGE MARCUS:  Before we break for lunch, I just
14   wanted to ask one question.  The next witness coming on would
12:16:21 15   be Dr. Liu; is that right?
16            MR. ROSS:  Yes, Judge Marcus.
17            JUDGE MARCUS:  All right.  And then after Liu, did you
18   have another one, or was that it?
19            MR. ROSS:  That's it for the Milligan plaintiffs.  I
12:16:37 20   believe Caster has several witnesses after that.
21            JUDGE MARCUS:  Okay.  I have 1:16 -- 12:16.  We will
22   see you folks back here at 1:30, and we will get started at
23   1:30 Central Standard Time.
24        Thank you.  We will be in recess.
12:16:59 25            (Recess.)
```

1    JUDGE MARCUS:  One preliminary matter before you put
2  on your next witness, which I take it from Milligan would be
3  Dr. Liu, right?

4    MR. ROSS:  Yes, Your Honor.

13:31:14  5    JUDGE MARCUS:  We, the judges, talked a little bit
6  about the request for closing argument.  And we wanted to give
7  you our sense of it so you could make your plans appropriately.

8    We will give each side the opportunity to make closing
9  argument.  We will give the plaintiffs of which there are three
13:31:34 10  sets -- they are the Singleton plaintiffs, the Milligan
11  plaintiffs, the Caster plaintiffs, and, of course, there are
12  the two sets of defendants.  We will give the plaintiffs a
13  total of 90 minutes for closing argument, and we leave it to
14  the plaintiffs to decide how to break up or order that time.

13:31:57 15    You're free to use it any way you deem appropriate.  If
16  you cannot agree, then each of the three sets of plaintiffs
17  would get 30 minutes.  You are free to reserve some of that if
18  it's your pleasure for rebuttal.  We leave that up to you.  But
19  the plaintiffs have a total of an hour and a half.

13:32:20 20    The defendants likewise are given an hour and a half for
21  their case.  So we have allocated a total of three hours for
22  closing argument, which is not to say you have to take all of
23  it, but that's what we have given you.  And so we will leave it
24  up to you for the plaintiffs how to order and break it up.

13:32:44 25    The defendants have already indicated, if I heard

1  Mr. LaCour right, that Mr. LaCour will be making the argument

2  for both sets of defendants.  Do I have that right, Mr. LaCour?

3        MR. LACOUR:  That's correct, Your Honor.

4        JUDGE MARCUS:  All right.  You need not give us an

13:33:02 5  answer today.  We leave that up to you to address and tell us

6  when we get to closing argument.

7        Final matter that I want to preliminarily to take up is

8  there was a motion, an offer, really, to receive Defendants'

9  Exhibit 17.  Mr. Harris, you were offering that.  That was the

13:33:33 10  public hearing transcript of the joint legislative committee,

11  if I have that right.

12        Anything further anyone wants to say on that before we

13  rule?

14        MR. ROSS:  Your Honor, Deuel Ross for the Milligan

13:33:53 15  plaintiffs.  This is a document that was some 30-years old that

16  we were not aware of and have no way to verify where it came

17  from or what exactly it is, and so that was our concern with

18  respect to the objection, that it, you know, we don't know how

19  the transcript was created.  All this is essentially hearsay

13:34:09 20  evidence.

21        JUDGE MARCUS:  Well, if I hear your objection, it

22  really is an authentication objection.  Although initially I

23  heard it to sound in relevance.  It seemed to us that it was

24  relevant insofar as it bore on the question of intent in

13:34:33 25  drawing the '92 map, which I take it is part of the

constitutional claim that you have made, Milligan has made, and
there's, of course, constitutional claim that the Singleton
plaintiffs have made.  So it struck us that it was relevant, it
bore directly on the question of intent, at least way back
13:35:00   when.  How much of the antecedent history you can bring
forward, and in what manner if at all remains to be seen, but
it certainly struck me as being relevant to these proceedings.

        I think, if I hear Mr. Ross right, Mr. Harris, the heart
of the objection is foundational.  Can you establish that it is
13:35:28   what it purports to be?  That's really the objection if I hear
Mr. Ross right is being raised.  Do I have that right,
Mr. Ross?

            MR. ROSS:  Your Honor, I would just add that at this
time, we are not bringing our intentional discrimination case
13:35:43   as to the failure to draw two majority-black districts.  And so
I would just say that it is from our perspective not
necessarily relevant to our Section 2 and racial gerrymandering
claims.

            JUDGE MARCUS:  It may not be relevant to Section 2,
13:35:58   but the fact is that there are two racial gerrymandering equal
protection claims before the panel; one that has been raised by
Mr. Blacksher on behalf of Singleton and one that you and your
colleagues have raised on behalf of the Milligan plaintiffs.
So insofar as the constitutional claim is before this panel on
13:36:24   a preliminary injunction hearing, beyond the Section 2 claim,

1   it seems to me it is, certainly is for Mr. Blacksher's clients,

2   and I thought it was for your clients, as well, it seems

3   relevant to me.  Am I missing something here?

4          MR. ROSS:  I think, Your Honor, from our perspective,

13:36:46  5   it may be relevant to our racial gerrymandering claim.  I think

6   it is probably more relevant to our intentional discrimination

7   claim.  So separate, you know, as you know, we have two equal

8   protection claims.

9          JUDGE MARCUS:  I understand that.

13:37:01 10     Mr. Blacksher, this is all relevant to gerrymandering and

11   equal protection, isn't it, from your claim?

12          MR. BLACKSHER:  I think I join the concern voiced by

13   Mr. Ross.  I don't -- we don't object to the document coming

14   in.  This is a bench trial.  The Court knows very well how to

13:37:21 15  handle that.

16     I just want to emphasize that the gerrymandering claim

17   that we are seeking relief for on preliminary injunction does

18   not involve intentional discrimination and doesn't involve

19   discrimination at all.  It involves placing individual voters

13:37:37 20  on -- based on their race on opposite sides of a line.  And

21   that is not -- the Court has emphasized -- the same as

22   discrimination.

23     Discrimination produces a practical concrete harm by

24   diluting someone's vote, whereas the racial gerrymandering

13:37:56 25  claim is based simply, totally on the separation based -- or

 1    classifying an individual based on his or her race.  And that

 2    is what -- what the Courts have called an expressive harm, not

 3    discrimination.  And I know that's confusing, because it's

 4    confusing to all of us.  But it's important to understand that

13:38:16  5    in this context, even though it has nothing to do with -- even

 6    though we don't object to the exhibit.

 7              JUDGE MARCUS:  Mr. Harris?

 8              MR. HARRIS:  Your Honor, I don't think at this point I

 9    will make an argument related to what Mr. Blacksher just said.

13:38:32 10    I will point out related to discovery there was truncated

 11    discovery in case.  These documents were responsive to the

 12    discovery request as far as the preclearance files that they

 13    had, and that's where this came from.  It resulted from that

 14    discovery request.  And it was produced a while back by

13:38:52 15    bringing it to trial.

 16              JUDGE MARCUS:  I think the only real objection from

 17    our perspective is can you lay the foundation that this is what

 18    it purports to be.

 19         I don't ask you to do that now, but whenever we finally

13:39:05 20    address the problem, we will leave it to you to lay the

 21    foundation, if you can.

 22              MR. HARRIS:  Thank you, Your Honor.  Will do.

 23              JUDGE MARCUS:  Subject to that, the objection is

 24    overruled.

13:39:16 25         We do think it is germane and relevant to the equal

```
 1   protection claim or claims in some measure, which are before us
 2   in some measure at this point.
 3       But the ultimate determination will be made when and if
 4   Mr. Harris can produce the appropriate foundation that it is
 5   what it purports to be.
 6       With that, let's proceed with -- are we all clear sort of
 7   on where the Court's coming from on this defense exhibit -- if
 8   I have the number right, Mr. Harris, it was Defense 17.
 9           MR. HARRIS:  Right, Your Honor.  And very briefly, I
10   will add that we -- the state's position is that it also is
11   relevant in the context of the Section 2 cases, and I'm not
12   trying to argue about that now, but I just wanted to make sure
13   that was clear.
14           JUDGE MARCUS:  I understand.  We will leave it to you
15   to set the foundation, if you can.
16       With that, Mr. Ross you may proceed with your next
17   witness.
18           MR. ROSS:  Thank you, Your Honor.  Our next is
19   Dr. Baodong Liu.
20           JUDGE MARCUS:  Thank you.
21           MR. ROSS:  I believe he's here.
22           JUDGE MARCUS:  Thank you.
23                   BAODONG LIU,
24   having been first duly sworn, was examined and testified as
25   follows:
```

|  |  |
|---|---|
| 1 | JUDGE MARCUS:  Would you be kind enough to state your |
| 2 | name for the record, please. |
| 3 | THE WITNESS:  Baodong Liu. |
| 4 | JUDGE MARCUS:  Could you spell that just for our court |
| 13:40:50 5 | reporter. |
| 6 | THE WITNESS:  My first name is B-A-O-D-O-N-G.  Last |
| 7 | name, L-I-U. |
| 8 | JUDGE MARCUS:  Thank you much, Dr. Liu.  And counsel |
| 9 | you may proceed. |
| 13:41:13 10 | MR. ROSS:  Thank you, Your Honor. |
| 11 | DIRECT EXAMINATION |
| 12 | BY MR. ROSS: |
| 13 | Q    Dr. Liu, did you prepare any expert reports for this case? |
| 14 | A    Yes. |
| 13:41:19 15 | Q    Do you have copies of those reports with you? |
| 16 | A    Yes, I do. |
| 17 | Q    Okay.  How many reports did you prepare? |
| 18 | A    I submitted my initial preliminary report on |
| 19 | December 10th, and then I also submitted a rebuttal report on |
| 13:41:39 20 | December 20th. |
| 21 | Q    All right.  So let's begin with your first report, which |
| 22 | was previously marked as Plaintiffs' Exhibit M-4.  Let's turn |
| 23 | to page 21.  Dr. Liu, what is your highest level of education? |
| 24 | A    I received a Ph.D. in political science from University of |
| 13:42:02 25 | New Orleans in 1999. |

```
 1   Q      What's your current occupation?
 2   A      I am a professor of political science and ethnic studies
 3   at University of Utah.
 4   Q      And how long have you taught there?
13:42:15  5   A      Ever since 2008.
 6   Q      And what other administrative roles have you had at the
 7   University of Utah?
 8   A      I have served as both the interim director for ethnic
 9   studies program for which I established the first bachelor's
13:42:35 10   degree in ethnic studies here at University of Utah, as well as
11   serving as the associate chair for the whole department of
12   political science.
13   Q      Okay.  And where else have you taught?
14   A      I have taught in other universities.  Prior to University
13:42:56 15   of Utah, I taught at branch for the UW -- UW meaning University
16   Wisconsin system, the branch is Oshkosh, and before that, I
17   also taught at small liberal college in Missouri called
18   Stephens College.
19   Q      Okay.  And turning back to your position now at University
13:43:18 20   of Utah, what graduate level courses do you teach?
21   A      I have taught many graduate level courses, especially
22   concerning American political system.  My expertise is American
23   electoral system and political behaviors.  I have taught what
24   we call 6,000 level.  That's both master and Ph.D. in political
13:43:47 25   behavior in America, as well as the advanced quantitative
```

```
 1  method for all graduate students.
 2  Q    Okay.  And what do you consider your areas of
 3  specialization?
 4  A    I am primarily concentrated on the American electoral
 5  system and also how American voters voted and the consequence
 6  of especially voting along racial lines in America.
 7       And moreover, I am also an expert of the advanced
 8  quantitative method.  So I do research about how to use
 9  technology, especially, software to seek for answers related to
10  political issues.  So I teach things like R coding for graduate
11  students.
12  Q    Have you won any awards?
13  A    I won quite a few awards from the premier American
14  Political Science Association called American Political Science
15  Association, and also regional associations such as
16  Southwestern Political Association, Southern Political
17  Association, and I also served as a fellow at National Humanity
18  Center.
19  Q    And have you ever published books?
20  A    Yes.  I have published a total of eight books.
21  Q    And what issues do your books generally cover?
22  A    My books vary from local level politics, such as southern
23  cities as New Orleans, Memphis, and so on.  Mayor elections,
24  city council elections, school board elections, all the way to
25  state level elections, such as Governor, Lieutenant Governor,
```

and so on.  But also the national elections, such as

Presidential elections.  I have had at least one book on Obama

and also my forthcoming book is about the election of President

Trump.

13:45:58 5  Q    And have you written any peer-reviewed articles?

6  A    I have published more than 30 peer-reviewed articles.

7  Q    And do they generally cover the same topics as your books?

8  A    Yes.  Generally, it's about American political behavior,

9  elections, and also city politics, so issues such as urban

13:46:22 10  economics, urban voters, political behavior, opinions, and

11  such.

12  Q    Okay.  And have you ever testified as an expert in court?

13  A    Yes, I have.

14  Q    About how many cases have you testified in?

13:46:38 15  A    About a half a dozen.

16  Q    Okay.  And in what areas did you testify?

17  A    I have been asked to serve as expert witness, especially

18  for racially-polarized voting or RPV.

19       MR. ROSS:  Your Honors, I would like to tender Dr. Liu

13:47:01 20  as an expert in racial-polarization analysis and American

21  political behavior.

22       JUDGE MARCUS:  Any objection, Mr. Harris?

23       MR. HARRIS:  No objection.

24       JUDGE MARCUS:  Seeing none, we will qualify Dr. Liu in

13:47:12 25  those fields, and you may proceed to present his opinions to

1    us.

2            MR. ROSS:  Thank you, Your Honor.

3    BY MR. ROSS:

4    Q    Dr. Liu, if during your testimony you wish to have any

13:47:23 5   pages from your reports displayed, please let me know, and I

6    will have Mr. Ang do it.

7            I'd like to turn to your role in this case.

8            When were you first contacted about this case?

9    A    It was about the second week of November.

13:47:37 10  Q    Okay.  And when did you submit your initial report?

11   A    I submitted on the 10th of December.

12   Q    Okay.  And looking at page 1 of your initial report, what

13   were you asked to determine?

14   A    I have been asked specifically to analyze elections in

13:48:01 15  Alabama to provide opinion to the Court whether or not there

16   has been a pattern of racially-polarized voting in especially

17   congressional elections in Alabama.

18   Q    Okay.  And how does your report define racially-polarized

19   voting?

13:48:19 20  A    Racially-polarized voting is very important topic not only

21   for academic research but also for all litigations concerning

22   Section 2 of Voting Rights Act.

23           The Supreme Court of United States has used the *Gingles*

24   decision to lay out a clear legal definition of RPV, and

13:48:41 25  especially the second condition and third condition of *Gingles*.

1  The second one being that the minority voters, in this case in

2  Alabama, it's African-American voters have shown cohesiveness

3  in political -- in elections.  And that is to say that they

4  vote for the same candidate.

13:49:04  5        And the third condition made it clear that the majority

6  voters have to show that they voted as a voting block, which

7  enable a typical defeat for the black-preferred candidate.

8  Q     Okay.  And, Dr. Liu, just so maybe to speed things up a

9  little bit, if I refer to racially-polarized voting as RPV, you

13:49:29 10  will understand what I mean; is that right?

11  A     Yes.  It's a very common way to address it.

12  Q     Okay.  And when you're making your determination about RPV

13  -- when you are making your determination about RPV, is it

14  based on whether or not a candidate receives a majority of

13:49:48 15  support from a particular racial group?

16  A     As I stated in my initial report, my operational

17  definition of RPV following the *Gingles II* and *III* conditions

18  is that I first of all evaluate whether or not the preferred

19  candidate of black voters received majority support from the

13:50:13 20  black group.  And then I started to look at whether the

21  majority voters do not share that preference, that is to say,

22  only a minority of the white majority group voted for the same

23  candidate, and if so, then I look at whether the

24  black-preferred candidate is defeated.

13:50:36 25  Q     Okay.  And to find RPV, do you require that

1  black-preferred candidates receive supermajority or some other

2  threshold of the black vote?

3  A    It is important to see beyond racially-polarized voting,

4  whether there is a huge racial gap or somewhat gap or just a

13:51:00  5  small gap.  But one has to establish whether there is

6  racially-polarized voting in the first place.  And then we can

7  talk about the gap.

8  Q    All right.  So is it right, then, that you don't use any

9  sort of threshold of 60 percent or something else to determine

13:51:18  10  whether or not there's racially-polarized voting?

11  A    I strongly disagree to use a ridged, like threshold to say

12  beyond this point then it's racially-polarized voting.  Below

13  this, it's not because obviously, elections have their own

14  context.

13:51:40  15  Q    Okay.  Okay.  So looking at page 3 of your report, what

16  did you find with respect to RPV in Alabama?

17  A    It is my opinion that based on all the elections I have

18  analyzed, the total of 13 elections, there has been a

19  racially-polarized voting pattern, in that blacks preferred the

13:52:04  20  same candidate who is from their own racial group, and that

21  black preference is not shared by the white majority voters.

22  And -- and those results typically enable the defeat of

23  black-preferred candidates.

24  Q    Did you also conduct an effectiveness analysis in this

13:52:28  25  case?

```
 1   A     Yes, I did.

 2   Q     And what is an effectiveness analysis?

 3   A     Effectiveness analysis is a research project that allows

 4   experts like me to analyze different redistricting plans

13:52:43 5   concerning certain jurisdiction.  And using comparative study,

 6   we can evaluate given different racial configurations what are

 7   the levels of opportunities for minority voters to elect

 8   candidate of their choice.

 9   Q     Okay.  Thank you, Dr. Liu.  Let's turn to your methodology

13:53:04 10   which I believe is discussed on page 6 of your report.

11         What is ecological inference?

12   A     Ecological inference is a method or a tool for scholars to

13   study to the extent to which racial groups may differ or

14   exhibit sameness in their choice of voting.  And by using the

13:53:30 15   ecological data usually, in election studies, we use political

16   precincts.  That's the place where voters cast their votes.  So

17   we use the precinct election returns for candidates, and then

18   associated with it, we attach the demographics.  In this case,

19   racial demographics.

13:53:56 20         In Alabama, we would look at black racial density in these

21   precincts.  And then we look at whether or not the demographic

22   features, such as black density, has a relationship with the

23   election returns for candidates that we see, say, for very

24   homogenous black precincts, their support for black candidates

13:54:24 25   is very high as opposed to very white homogenous precincts, the
```

```
        1   support is very low.  And then we use ecological inference
        2   technology to get the specific racial estimates for that we
        3   have both point estimates, that is the best estimation of the
        4   vote.  Say, the percentage of votes from the black groups is
13:54:50 5   at, say, 92 percent.  That's what we call point estimate.  And
        6   we also have the uncertainty estimate along the point estimate.
        7   That's ecological inference.
        8   Q    Thank you, Dr. Liu.
        9        So here in this case, what data did you use to identify
13:55:1010   the race of voters in the precincts?
       11   A    For race of voters, I used the census data.
       12   Q    Okay.  Is that the 2010 and 2020 census data?
       13   A    Yes.  For elections that took place around the year of
       14   2020, say, the 2020 election, or 2018 election, I used 2020
13:55:3715   census data.  But for the elections I also analyzed, there was
       16   a little way back, I used the 2010, say, 2012 elections, and so
       17   on.
       18   Q    What is the American Community Survey?
       19   A    American Community Survey is survey that interviewed a
13:56:0020   sample of American population.  And they raised questions about
       21   their racial identity, social economic indicators, and such.
       22   Q    Okay.  And did you use American Community Survey data, as
       23   well?
       24   A    Yes.  I -- I have primarily relied on the census data,
13:56:2125   especially the racial demographics, such as Black Voting Age
```

```
 1   Population to do my RPV analysis.  But then after I have
 2   finished my RPV analysis, I also use American Community Survey
 3   data to double check what I have found.
 4   Q    Okay.  And where did you obtain the election and precinct
 5   data for your report?
 6   A    The election returns are easily accessible from the
 7   Secretary of State of Alabama website.
 8   Q    Okay.  And are there other sources listed in your report?
 9   A    Yes.  In my report, I have a particular documentation,
10   which I used as Appendix 3 that shows how the demographer in
11   this case that has provided me the matched data set between
12   election returns and the census.
13        So that documentation provides details about the sources.
14   Q    And did you verify those sources?
15   A    Yes.  I asked the counsel for the plaintiff to clarify
16   what are the sources for the data provided to me, and they did.
17   And then I went ahead and look at the website.  And those are
18   very commonly used public source data.  And, therefore, I
19   verified them, and I used them, and run my RPV, which provide
20   in my view the most precise outcome for the RPV analysis.
21   Q    Okay.  And you said that you looked at websites to verify
22   the data.  What were those -- do you recall what it was?
23   A    Yes.  One source is hosted in the Harvard database where
24   political scientists deposit their data, and it has been used
25   by scholars across America.  So that's a very reliable source
```

```
 1    of data.  And I also look at open-election data source.  That's
 2    a GitHub of public source -- venue for not only scientists, but
 3    also programmers from computer science and other areas to
 4    deposit their data and double check the accuracy, as well as
 5    software development.  So it's a very, very highly reputable
 6    data source.
 7    Q    Okay.  And turning back to your use of census data, is it
 8    common to use that for ecological inference?
 9    A    Yes, it is actually very common.  The only -- I have done
10    that for my own books and articles.  I have used it in
11    litigations related to expert witness works, and so many of my
12    colleagues have used it census, as well.
13    Q    Okay.  And for the census data, what category did you use
14    for -- to identify black people?
15    A    I used the particular one called non-Hispanic Black Voting
16    Age Population to do my first analysis of RPV.
17    Q    Okay.  And did you use any-part black for your RPV
18    analysis?
19    A    Yes, I did.  Especially for the endogenous elections, that
20    is congressional elections, I have used the non-Hispanic,
21    single-race VAP data from census, as well as any-part black in
22    the census data to do my RPV analysis.
23    Q    Did your results change depending on which category of
24    black you used?
25    A    It's the same.  It's Alabama.  So it doesn't surprise me
```

the -- when I use both, it gives me the same results.

Q    Okay.  Would it be possible for you to analyze how
multi-racial black people vote separate from how single-race
black people vote?

14:00:58 5   A    Could you explain your question?

Q    Sure.  So you said that you use both single-race black to
do your RPV analysis, and then separately, you also analyze for
people who identified as single race as well as people who may
have identified as any-part black; is that right?

14:01:18 10  A    Oh, yes.  Yes.  If your question is about whether I do
both, the single race and any-part black, as is absolutely, but
if your question is, did I do only the multi-racial black --

Q    I'm sorry.

A    Okay.

14:01:41 15  Q    I'm sorry, Dr. Liu.  My question was:  Would it be even
possible to separate out how single-race black people vote
versus how black people who may identify with a different
racial group may vote in Alabama?

A    That's a great question.  Alabama population structure is

14:02:00 20  very clear.  There are very few blacks who identify themselves
as multi-racial or they check multiple boxes in the census,
unlike Florida or New York, where there are there are
concentration of black, communities who are, say, Latino
blacks, and so on.  So in Alabama, you have very few blacks

14:02:32 25  that identify that way.  And maybe you have, you know, one or

```
 1  two from a whole precinct.  It's just impossible to use the --
 2  that one or two from a whole neighborhood, of whole precinct
 3  that have heavily population from the black community
 4  identifying as only single-race black.  So there's no way for
 5  us to analyze that so-called multi-racial black.
 6       By the way, I also address that in my own academic
 7  research.  It's been a -- a very important topic for us as
 8  scholars to study, say Presidential election of 2008, Obama is
 9  obviously multi-racial.  His mother is white.  But he's
10  representing all blacks.  And that's been proved by own data
11  analysis, also my colleagues in the country.
12  Q    You mean that black people voted for him; is that right?
13  A    Yes.
14  Q    Voted for President Obama?
15  A    Yes.  My research is that it is the shared black
16  experience, whether being those who identified them as
17  single-race black or multi-racial black, their political
18  behavior showed this extraordinary cohesiveness, and that's
19  proved by President Obama's electoral success all over the
20  country from the black community.
21  Q    Thank you.  If I will call ecological inference EI for
22  short, you will understand what I mean, correct?
23  A    Yes.
24  Q    Okay.  Did your EI analysis calculate turnout?
25  A    Yes.
```

14:03:02 — line 5
14:03:34 — line 10
14:03:53 — line 15
14:04:18 — line 20
14:04:34 — line 25

```
 1   Q     Okay.  And those are estimates; is that right?
 2   A     Yes.
 3   Q     Okay.  And how does EI generally estimate turnout?
 4   A     There is a particular tool within EI.  It's called EI pack
14:04:51 5   in the -- our software tools.  We can use that one to estimate
 6   racial turnout because it's a tool also called as R by C -- R
 7   meaning rows, C meaning columns, that intuitively, it's about
 8   multiple groups.  So if we have multiple groups, we can
 9   estimate all groups' racial turnout and their breakdown of vote
14:05:27 10  choice.  So in the EI pack tool, we can use particularly for
11   this no-vote group, meaning the people among the voting age of
12   population that didn't cast their vote.  And then we will do
13   the estimation along racial lines.  And we will get the
14   breakdown of racial groups turnout in that way.
14:05:45 15  Q     And did that turnout estimate, does that impact your
16   analysis of racially-polarized voting?
17   A     No.  The racially-polarized voting is the racial breakdown
18   of how they vote in their choice for candidate, right?  So the
19   racial turnout is simply about the group who cast their vote
14:06:09 20  versus the group that didn't cast.
21         So the EI pack give us both outcomes.
22   Q     Thank you, Dr. Liu.  So it's -- the racial turnout
23   estimate is simply additional information that the ecological
24   inference estimates; is that right?
14:06:27 25  A     Yes.  Scholars can choose to calculate turnout.  A lot of
```

1  scholars don't calculate turnout.  It just depends on the

2  context in which we are asked to do our research.

3  Q    Okay.  And can ecological inference be used to identify a

4  voter's intent, why they're voting a particular way?

14:06:50  5  A    That is -- I wouldn't frame the question that way because

6  EI is simply a tool.  So using this tool, we can study first of

7  all, the voting patterns, the racial groups' choice for

8  candidates.  And then with the facts produced by EI tool, we

9  can then study whether it's racial intent or there are other

14:07:23 10  factors, the agenda, social class, neighbors, economics.  So EI

11  is a tool that allows, you know, scholars to study all kinds of

12  questions.  That's what EI is.

13  Q    And does your report attempt to identify the reason why

14  people voted for or against the politician?

14:07:44 15  A    In my full report, there is no single word about intent

16  because I was simply asked to do RPV analysis.  And intent was

17  not my task.

18  Q    Thank you, Dr. Liu.  Other than your EI analysis, did you

19  rely on any other data or polls in your report?

14:08:08 20  A    After I completed my RPV analysis by using EI, and then I

21  double checked, I already said I used American Community Survey

22  data to double check.  I also used exit polls to double check

23  for some elections I analyzed.

24  Q    Thank you, Dr. Liu.  Do you remember how many exit polls

14:08:36 25  you looked at?

```
 1  A    Yes.  I looked at -- can you -- how many elections I have

 2  completed my -- for the exit polls.

 3  Q    I will move on to a different question.

 4       Dr. Liu.  So what elections did you analyze for your

 5  report using EI?

 6  A    I analyzed primarily the congressional elections.  Those

 7  are what we call endogenous elections because they are the

 8  election relevant to the litigation or issue.  Then I also look

 9  at statewide biracial elections that obviously took place in

10  Alabama recently.

11  Q    Are those statewide elections called exogenous elections?

12  A    Yes.

13  Q    And you mentioned you looked at biracial elections.  Why

14  did you look at biracial elections?

15  A    Biracial elections are vital for scholars, like Dr. Hood's

16  stated in he has SSQ piece meaning Social Science Quarterly

17  publication.  It is vital for us in the voting rights or

18  dilution cases to analyze elections which involve minority

19  candidates, especially for litigations which involve the

20  particular minority group, in this case black.  So biracial

21  elections that involve a black candidate is super important for

22  us to see how black voters vote when there is presence of black

23  candidacy in the candidate pool, whereas in uni-racial

24  elections being uni-racial back or uni-racial white, we don't

25  have the opportunity to evaluate realistically how different
```

14:08:54 (line 5)
14:09:21 (line 10)
14:09:36 (line 15)
14:10:12 (line 20)
14:10:38 (line 25)

```
 1    racial groups would vote given a choice of different racial
 2    candidates.  So that is why it is very important to use
 3    biracial election to establish whether the two preferred
 4    candidate of choice of minority voters have realistic chance of
14:11:06  5    being elected.
 6    Q    Okay, Dr. Liu.  How did you identify the elections that
 7    you analyze in your report?
 8    A    I have done very extensive research in the southern study,
 9    including Alabama.  I have also served as expert witness for
14:11:22 10    Alabama case before this one.  So I knew some elections.  I
11    certainly knew President Obama's elections.  I wrote a book
12    about him in 2008.  So I knew Alabama data and also knew some
13    statewide elections in Alabama such as Lieutenant Governor race
14    in 2018, and so I asked the counsel to give me those data, some
14:11:48 15    of those data directly from the Secretary of State website as I
16    said.  I also asked the counsel to help me identify especially
17    all the endogenous elections as many as we can.  So I went
18    ahead and made my own effort to try to analyze as many as
19    possible.
14:12:13 20    Q    Did you identify every endogenous election?
21    A    I made to best of my effort to analyze all of them.  I
22    believe I did all the congressional election analysis before
23    the deadline, which is December 10th, but after I submitted my
24    initial report, there was one general election.  I believe that
14:12:44 25    was CD 1 in 2014 that I didn't have data about.  And so I went
```

```
 1  ahead after I submitted my report, analyzed the 2014 CD 1
 2  election involving a black candidate named LeFlore, and white
 3  candidate named Byron.  The result turned out to be racially
 4  polarized just as I found in my report for other elections.  So
14:13:19  5  that just reconfirmed my opinion of the Obama -- I mean, under
 6  Alabama's congressional elections.  I also know there was
 7  special election in the CD 1 2013, which I still haven't had
 8  data.  So that's the only one I knew of at this point I haven't
 9  analyzed, but I don't have data at this point.
14:13:53 10  Q    When you said CD 1, do you mean Congressional District 1?
11  A    Oh, sorry, yes, yes.  Yes.  Congressional District Number
12  1.
13  Q    Thank you, Dr. Liu.
14       And is it right that you went back for your analysis to
14:14:06 15  about 2008?
16  A    Yes, I did.
17  Q    Why did you go back to 2008?
18  A    For us, the task is to provide our opinion to the Court
19  about whether there has been a racially-polarized voting
14:14:24 20  pattern in Alabama and the consequence on redistricting
21  process.
22       So one should use all the elections that would allow us to
23  analyze the voters at issue, in this case, Alabama.  And
24  obviously, more recent elections represent the same voters that
14:14:48 25  will vote in near future, who may be affected by this decision
```

1  process.  But I also went back to 2008 because longitudinal

2  data set can allow us to see how over time voters voted so that

3  we avoid making mistakes by using just single -- well, couple

4  of elections to generalize all voters in Alabama.  So I went

14:15:18  5  back, but I didn't go back too far.  I went back 2008.  That

6  would allow me to use the 2010 census data and then see whether

7  I can see coherence in vote choice.  That's why I went back to

8  2008.

9  Q    Thank you, Dr. Liu.  And how many endogenous elections did

14:15:40  10  you look at using ecological inference?

11  A    I analyzed seven endogenous elections for my initial

12  report.  As I said, I did one more after I submitted.

13  Q    Okay.  And how many exogenous elections did you analyze

14  using EI?

14:16:00  15  A    I analyzed six exogenous elections before I submitted my

16  report.

17  Q    Your initial report; is that right?

18  A    Yes, yes, that's what I mean.  Initial report.

19  Q    And did you analyze additional exogenous elections for

14:16:17  20  your rebuttal report?

21  A    Yes, I did.

22  Q    All right.  Thank you, Dr. Liu.  So let's talk about the

23  seven endogenous elections.  Can you please turn to page 9 and

24  look at Table 1 of your report?  And I will also ask Mr. Ang to

14:16:31  25  please pull up Table 1, if possible.

```
        1  A      Yes, I am here.

        2  Q      Thank you.

        3         Dr. Liu, what does Table 1 show?

        4  A      Table 1 is a table for me to report to the Court what's

14:16:48 5  the RPV analysis show for the endogenous elections.

        6  Q      Okay.  So, Dr. Liu, let's begin with the general elections

        7  here on this table.  What was the highest level of white voter

        8  support for the black candidates in these general elections?

        9  A      In these general elections, it is pretty consistent.  The

14:17:13 10 white support for black candidate usually had been in the teens

       11  range, just barely over, you know, 10, 15, or so.  But the

       12  highest is about a quarter all of white electorate that

       13  supported a black candidate, in this case, the CD 7, the black

       14  incumbent in CD 7.

14:17:43 15 Q      Is it right that the lowest level of white voter support

       16  for a black candidate is 5 percent?

       17  A      Yes.  It was as low as 5.2 percent in CD 2 election in

       18  2020.

       19  Q      And in a general election, what was the highest level of

14:18:02 20 black voter support for a black candidate?

       21  A      Black support for black candidates was almost universal,

       22  as shown in Table 1.  It's overwhelmingly in the 90s range

       23  between 90 and 95, sometimes even surpass 95 percent.

       24  Q      Okay.  And now, let's talk about the primary election that

14:18:24 25 you looked at for CD 1.
```

1        What did you -- did you find RPV in the Congressional

2   District 1 primary election from 2020?

3   A    Yes, I did.

4   Q    Okay.  And is it right that the RPV was -- the black

14:18:44  5   support for the black candidate was lower in that election?

6   A    Yes.  Primary elections usually feature candidates from

7   same race -- sorry -- same party.  And so voters vote for the

8   same Democratic candidates in this particular election that I

9   analyzed.  And the RPV was not as high as other general

14:19:15 10   elections, which is pretty typical.

11   Q    Okay.  And this election went into a runoff; is that

12   right?

13   A    Yes, it did.

14   Q    And do you know the results of that runoff?

14:19:26 15   A    Yes.  I believe the black candidate James Averhart won the

16   runoff, but in the general election, as I recall it here, he

17   was defeated in the biracial election.

18   Q    Okay.  And I believe you say in your report your

19   understanding was that black voters were the majority in the

14:19:47 20   primary electorate; is that right?

21   A    Could you -- could you --

22   Q    Sorry.  I was saying I believe you say in your report that

23   black voters were the majority of the primary electorate in

24   that election; is that right?

14:20:01 25   A    I do not recall.  Could you point --

```
 1              MR. ROSS:  Mr. Ang, if you can just take that down and
 2    -- I believe it's there in the middle there where it says.
 3              THE WITNESS:  You mean the -- for this specific
 4    primary election?
14:20:25  5    BY MR. ROSS:
 6    Q    Yes.  I believe it's -- I will find it, and we can come
 7    back to it.
 8              MR. ROSS:  But maybe on the next page, Mr. Ang.
 9         So I think there you say that the -- we will come back to
14:20:51 10    it.
11    BY MR. ROSS:
12    Q    So, Dr. Liu, your RPV analysis, you talk a little bit
13    about -- what's the difference between general and primary
14    elections?
14:21:03 15    A    The general elections usually feature candidates from two
16    major parties.  And the candidate pool is much smaller.  And
17    the profiles for the candidates are more visible.  And they're
18    highly competitive.  Usually they result in a very large racial
19    gap, whereas in primary --- like I said, especially for
14:21:34 20    Democratic primary, the candidates are from the same party.
21         And if we have both white and black candidates in a
22    primary in southern state such as Alabama, we may still see
23    racially-polarized voting, but that is at a lower level
24    compared to a general election.
14:21:59 25    Q    So Dr. Liu?
```

```
 1  A    Sorry.  I need to add one more point.
 2       That is, in primary, usually voter turnout is lower than
 3  general election, especially because it's only a subset of
 4  population that participated.  And even the subset may shrink
 5  if a primary does not feature major candidates.
 6  Q    Okay.
 7       MR. ROSS:  And, Mr. Ang, if you can just pull up the
 8  paragraph after Table 1, the full paragraph, that begins to be
 9  more specific.
10  BY MR. ROSS:
11  Q    And do you see, Dr. Liu, in the middle of that paragraph
12  where you say, black voters were the majority of the electorate
13  in the 2020 primary?
14  A    Yes.
15  Q    The fourth line?
16  A    Yes.  Now I know what you refer to.
17  Q    Okay.  Thank you, Dr. Liu.
18       MR. ROSS:  You can take it down, Mr. Ang.
19  BY MR. ROSS:
20  Q    So in sum, Dr. Liu, what can we take from Table 1?
21  A    Table 1 gives us a very good look into how biracial
22  elections show the racially-polarized voting pattern that is in
23  all seven congressional elections but having super cohesive in
24  choosing the same candidate from their own racial group.  And
25  that preference was not shared by the white majority voters.
```

```
          1  Like I said, overwhelming support from the black groups at the
          2  90s range, but only in the teens range, sometimes just a little
          3  bit over teen for the white group for the black-preferred
          4  candidate.  And more importantly, the black-preferred candidate
14:24:05  5  was typically defeated in these endogenous elections with the
          6  only exception of CD 7, which has a different racial
          7  configuration in the district.  CD 7 is a black majority
          8  district.  The racially-polarized voting did not lead to the
          9  black defeat.  Instead, we saw the black success in those CD 2
14:24:34 10  elections.
         11  Q    Thank you, Dr. Liu.
         12        MR. ROSS:  I am going to move on to Table 2, which is
         13  on page 11.  Mr. Ang, if you can pull that up, please.
         14  BY MR. ROSS:
14:24:47 15  Q    Dr. Liu, what does Table 2 show?
         16  A    Table 2 is table for me to report to the Court what
         17  happened in the exogenous elections that are biracial.  Do we
         18  see again racially-polarized voting or lack of?
         19  Q    And here looking at Table 2, what was the highest level of
14:25:13 20  white support for a black candidate?
         21  A    Again, it's consistent finding.  The white support for
         22  black candidates in these biracial exogenous elections were
         23  very low.  Usually it's in the teens.
         24  Q    Okay.  And what was the highest level of black voter
14:25:33 25  support for a black candidate?
```

| | |
|---|---|
| 1 | A     Once again, we see the consistent finding, just like we |
| 2 | saw in the endogenous elections.  In these exogenous elections, |
| 3 | black support for black candidates were overwhelming in the 90s |
| 4 | range, sometimes surpass 95 percent. |
| 14:25:55 5 | Q     Thank you, Dr. Liu.  In sum, what does Table 2 show? |
| 6 | A     So Table 2 give us a very clear message that is in the |
| 7 | exogenous election, we receive supplemental piece of evidence |
| 8 | empirically that racially-polarized voting is not only enduring |
| 9 | not only in endogenous but in exogenous elections.  And these |
| 14:26:19 10 | exogenous elections are super important for us because they |
| 11 | involve the voters that voted in those congressional elections. |
| 12 | And most likely, they will vote in the near future in the |
| 13 | redistrict areas based on whatever final plan adopted by the |
| 14 | Court. |
| 14:26:39 15 | Q     Thank you, Dr. Liu.  So let's move on to Table 3, which is |
| 16 | on page 13. |
| 17 |       Dr. Liu, what is Table 3 showing us? |
| 18 | A     In order to use the data from exogenous elections, again, |
| 19 | these are the biracial statewide elections. |
| 14:27:10 20 |       I also look at -- I also looked at the congressional |
| 21 | districts.  By that, I mean, I use the same EI methodology and |
| 22 | the same data set from exogenous elections.  In this table, I |
| 23 | reported 2008 presidential election, and then I look at what |
| 24 | happened in the congressional districts.  And as seven of them, |
| 14:27:43 25 | I reported the RPV pattern in the seven congressional districts |

1  related to the 2008 presidential election.

2  Q    And what did you find in those seven congressional

3  districts for the 2008 election?

4  A    I found in all seven congressional districts there was a

14:28:04 5  racially-polarized voting pattern, that is, Obama was an

6  overwhelming choice for the black voters, and white voters with

7  majority overwhelmingly voted against him.

8  Q    And did the black candidate win in any district?

9  A    Yes.  In CD 7.

14:28:28 10  Q    Okay.  And did you conduct a similar analysis for the 2012

11  presidential election?

12  A    Yes, I did.  The results are very similar to this one.

13  Q    Okay.  Thank you, Dr. Liu.

14       Let's move on to page 13 where you discuss exit polls.

14:28:49 15       MR. ROSS:  And you can take it down, Mr. Ang.

16  BY MR. ROSS:

17  Q    Dr. Liu, what exit polls do you recall reviewing?

18  A    I reviewed the presidential exit polls for both 2008 and

19  2012.  And I also reviewed the exit poll for statewide U.S.

14:29:12 20  Senate election that took place in Alabama in 2008.

21  Q    Okay.  Did you also look at the 2008 Democratic primary?

22  A    Yes, I did.

23  Q    Okay.  And let's start with the Presidential elections.

24  What did you find with respect to the 2012 and 2008

14:29:33 25  Presidential elections looking at those exit polls?

1   A    The exit polls give us additional empirical evidence that

2   racially-polarized voting did take place in 2008 and 2012

3   presidential elections, which reconfirm what we found by using

4   EI technology.

14:29:59 5   Q    Okay.  In looking at the 2008 election in particular, did

6   you see anything with respect to how white Democrats voted?

7   A    Yes.  In 2008, like I said, I not only looked at the

8   general election between Obama and McCain, but also the

9   Democratic primary in 2008 between Hillary Clinton and Barack

14:30:34 10   Obama.  Both of them are high profile national figures.  It's

11   very enlightening to see how voters voted, especially in the

12   Democratic primary in 2008, because both candidates -- Clinton

13   and Obama -- are Democrats.  So I was able to see whether race

14   played a role.  Indeed I saw that Hillary Clinton received

14:31:02 15   72 percent of white vote.

16   Q    And how much support did then Senator Obama receive in the

17   primary?  Sorry, Dr. Liu.

18        How much support did the -- how much support did President

19   Barack Obama receive in the 2008 Democratic primary from black

14:31:33 20   voters?

21   A    That was 84 percent.

22   Q    Okay.  And then in the 2008 general election, how much

23   support did President -- sorry -- Senator McCain receive from

24   white Democrats specifically?

14:31:48 25   A    Yes.  He received the majority white support -- I believe

1  it was 50, 51 or -- or 52 percent.  Yeah.  I can --

2  Q    And that's -- that's white Democratic support; is that

3  right?

4  A    Yes.  Yes.

14:32:04  5  Q    Okay.  And how much black support did President Obama

6  receive in the 2008 election?

7  A    It's almost universal.  More than 95 percent.

8  Q    Okay.  In looking at page 13 of your report, Dr. Liu, did

9  you also analyze -- I think you already mentioned this -- the

14:32:26 10  election between Senator Sessions and State Senator Figures?

11  A    Yes.  I did.  I also look at the exit poll for that

12  particular U.S. Senate election.  And it showed that Senator

13  Sessions received overwhelming white support.  But more

14  importantly, even 58 percent white Democratic supported Senator

14:32:56 15  Sessions.  So that shows that race obviously outweighed party

16  for these white Democrats.

17  Q    Thank you, Dr. Liu.  And what are your sources for these

18  exit polls?

19  A    I am a scholar of presidential elections.  As I said, I

14:33:17 20  have published a book on Obama.  My forthcoming book is about

21  President Trump.  So I have accumulated very large database

22  myself.  My students use my own database.  And for exit polls,

23  every time national medias that publish their exit poll

24  results, especially CNN, I recorded them in my database.

14:33:44 25        But for this particular report, I also used a double

1280

```
 1  reference check.  And I went to Google and searched for
 2  confirmation of these numbers.  So I saw some websites after I
 3  googled, and these are the numbers I reported.
 4  Q    So just to be clear, you relied on your own data source,
 5  which was essentially collected from CNN; is that right?
 6  A    Yes.  Every time when CNN or NBC and other major media
 7  networks published their numbers on exit polls, I recorded them
 8  in my own database.  So my students can use them.  But for this
 9  report, I went back to CNN, the CNN website doesn't have that
10  -- those numbers anymore.  So then I googled, and I found
11  second source for my confirmation of the numbers.
12  Q    Okay.  Thank you, Dr. Liu.
13       So let's move on to the page 15 of your report, Table 4.
14       MR. ROSS:  Thank you, Mr. Ang.
15  BY MR. ROSS:
16  Q    Dr. Liu, what does Table 4 show?
17  A    Table 4 is a table for me to show to the Court what's the
18  result of my first effectiveness analysis.
19  Q    Okay.  And can we just walk through -- so your first
20  effectiveness analysis, you -- is it right that you were
21  comparing the plan that's at issue here, the adopted plan, to
22  several of Dr. Duchin's plans; is that right?
23  A    Yes.  This is a table that shows the results in
24  comparison.  There are three plans.  The first is the adopted
25  congressional redistricting plan.  And the second and the
```

14:34:14 (line 5)
14:34:43 (line 10)
14:35:02 (line 15)
14:35:27 (line 20)
14:35:51 (line 25)

```
           1  third, those proposed by the plaintiffs in this -- they are
           2  named as Plan B and Plan D.
           3  Q    Okay.  Thank you, Dr. Liu.  Is it right for the Table 4,
           4  you are looking at the 2018 Lieutenant Governor race in
14:36:15   5  Alabama?
           6  A    Yes, it is.
           7  Q    And is it right that later you look at the State Auditor
           8  elections?
           9  A    Yes.
14:36:21  10  Q    2018, as well?
          11  A    Yes.
          12  Q    Why did you choose the 2018 Lieutenant Governor and State
          13  Auditor elections?
          14  A    The 2018 statewide elections allow me to evaluate how
14:36:35  15  voters voted in those recent biracial elections.
          16       And more importantly, for effectiveness analysis, they
          17  allow me -- these two elections allow me to have reasonable
          18  projection about what will happen in near future given
          19  different racial configurations according to these plans.
14:37:00  20  Q    Thank you, Dr. Lieu.
          21       And which of plaintiffs' plans did you analyze for your
          22  effectiveness analysis?
          23  A    I analyzed Plan B and Plan D.  And before I submitted my
          24  preliminary report, I had time to analyze these two, but after
14:37:28  25  I submitted, I also analyzed Plan A.
```

1   Q    Okay.  And what type of -- again, going back to the sort

2   of the racial group that you used to identify black people, did

3   you again use both any-part black and single-race black?

4   A    For the Plan A, I did analyze after I submitted.  I used

14:37:51 5   both single race or non-Hispanic Black VAP, as well as any-part

6   Black VAP.  However, I want to emphasize they do not matter at

7   all.  Because here, I reported the final row here, total, in my

8   table.  That's the same.  Regardless whether I use single-race

9   black or any-part black, they are the same.

14:38:25 10  Q    Thank you, Dr. Liu.  And for your effectiveness analysis,

11  how did you determine who actually would win in your -- in the

12  various plans?

13  A    My final row in these sub tables in Table 4, it's called

14  total.  It's very clear that the black candidate would receive

14:38:53 15  35 percent -- 35.5 percent in the 2018 Lieutenant Governor CD 2

16  race, and the white candidate would receive 64.5 percent.

17  Therefore, the black candidate will be defeated according to

18  the adopted plan.

19  Q    Thank you, Dr. Liu.  And is it right for Plan B and D,

14:39:22 20  looking at plaintiffs' plan that the black candidate would have

21  won; is that right?

22  A    Yes.  The Plan B it shows the black candidate would

23  receive 56.8 percent, which is certainly more than majority.

24  And Plan D also give us the majority.

14:39:42 25       And by the way, these are simply the tally of votes given

1   the racial configuration of these plans.

2   Q    So thank you, Dr. Liu.  And I want just to clarify.  So

3   when you were tallying up who would win or lose under each

4   plan, you are relying on the actual election results; is that

14:40:03 5   right?

6   A    Yes.  This is what effectiveness analysis is all about

7   because different plans give us different racial

8   configurations.

9        We use -- I mean, I use in this case the 2018 the real

14:40:20 10  election that happened recently and simply tally the votes,

11  given different plans.

12  Q    When you show the turnout data here, that didn't play any

13  role in determining who would win or lose under each plan; is

14  that right?

14:40:35 15  A    Right.  The turnout is simply an estimate based on the EI

16  pack, software program, which has nothing to do with the vote

17  tally.

18  Q    Okay.  And then you have here estimates of what

19  racially-polarized voting would be; is that right?

14:40:54 20  A    Right.  Those are based on the EI technology.

21  Q    Okay.  And, again, those are -- that's simply information

22  about racially-polarized voting.  It didn't play a role in your

23  determining who would win or lose under each of the plans; is

24  that right?

14:41:10 25  A    Right.  The final outcome, again, is based on simply the

```
 1   -- the total votes for political candidate.  And then compare
 2   candidates, see who is the winner.  But the RPV,
 3   racially-polarized picture in all these different plans, given
 4   racial configurations, are done by the EI technology.
```
14:41:37  5   Q    Okay.  Thank you, Dr. Liu.  And sorry.  Just one final
```
 6   question.  So is it right that under any of the plans you found
 7   that voting would have been racially polarized in 2018; is that
 8   right?
 9   A    Yes.  For CD 2, these three plans are uniform, in terms of
```
14:41:58 10   racially-polarized voting, but the outcome is different.  The
```
11   black candidate would be elected in the Plan B and Plan D.  And
12   black candidate would be defeated in the adopted plan.
13   Q    Okay.  All right.  Thank you, Dr. Liu.
14        And sorry.  Just to be clear on how you're getting this
```
14:42:20 15   total.  Is it right that you're simply adding up who won in
```
16   each of the precincts that would be in CD 2 under any of the
17   adopted plans; is that right?
18   A    Yes.
19   Q    Okay.  Thank you, Dr. Liu.
```
14:42:32 20        MR. ROSS:  You can take it down.  Mr. Ang.
```
21        Let's go to Table 5, please.
22   BY MR. ROSS:
23   Q    And, Dr. Liu, is it right that Table 5 is a similar
24   effectiveness analysis except using -- looking again at
```
14:42:52 25   Congressional District 2 under each of the plans, but using the

```
         1  2018 State Auditors' race?

         2  A     Yes.

         3  Q     Okay.  Thank you.  And is it right that, again, under the

         4  adopted plan, the black candidate would lose, but under Plans B

14:43:07 5  and D, the black candidate would receive over 56 percent of the

         6  vote?

         7  A     Yes.

         8  Q     Thank you.

         9        And is it right that voting was racially polarized in

14:43:15 10 these elections?

        11  A     Yes.

        12  Q     Thank you.

        13        MR. ROSS:  You can take this down, Mr. Ang.

        14  BY MR. ROSS:

14:43:29 15 Q     Dr. Liu, let's go to Table 6.  I'm sorry.  Just to be

        16  clear, and, again, Dr. Liu, for all these tables, the turnout

        17  estimate is part of the racial-polarization analysis.  It

        18  didn't determine who would win or lose under the plan; is that

        19  right?

14:43:45 20 A     Correct.

        21  Q     Thank you.

        22        All right.  So here, again, this is -- is this right that

        23  -- well, can you tell me what Table 6 shows?

        24  A     Table 6 is once again an effectiveness analysis for

14:44:00 25 different congressional district, in this case, CD 7.  I once
```

1  again used the Lieutenant Governor for race in 2018.  And I

2  used the EI technology for the RPV and simply used the vote

3  tally given the different racial configurations or plans and

4  reported to the Court the outcomes.

14:44:20 5  Q    Thank you.

6       And is it right that the black candidate wins in all three

7  of these plans?

8  A    Yes.  The black candidate in this case, the name is Will

9  Boyd win all CD 7, regardless whether we are talking about

14:44:41 10  adopted plan, or Plan B and Plan D, but there is nuance about

11  this.

12  Q    And what is that nuance?

13  A    Well, CD 7 is, as I said earlier, is a majority-black

14  district.  However, if we adopted the Plan B and Plan D, the

14:45:00 15  same result.  It's black majority.  But no packing of black

16  voters as what the adopted plan showed.

17       So adopted plan would elect the black voter.  However,

18  adopted plan would pack many, many voters in that district.

19  And the consequence of that is to dilute the black strengths in

14:45:29 20  other districts.

21  Q    So is it right, Dr. Liu, just to summarize, that under the

22  adopted plan, the black candidate received about 66 percent of

23  the vote, but under plaintiffs' plans, the black candidate

24  would receive a little more than 60 percent of the vote?

14:45:45 25  A    Yes.  They are pretty similar.

```
 1   Q     Thank you, Dr. Liu.
 2            MR. ROSS:  You can take that down, Eric.
 3         Can we look at tables 6 and 7, as well.  Sorry.  Table 7.
 4   BY MR. ROSS:
14:46:13  5   Q     And is it right, Dr. Liu, that Table 7 is similar analysis
 6   as Table 6, except this time looking at the State Auditor race?
 7   A     Yes.
 8   Q     And do we see essentially the same results that the black
 9   candidate would win in CD 7 under any of the plans?
14:46:31 10   A     Yes.
11   Q     Okay.  And sorry.  Can you say again what the difference
12   is between how much the black candidate would win under the
13   adopted plan versus under plaintiffs' proposed plans?
14   A     Yeah.  The adopted plan would elect black candidate in CD
14:46:51 15   7 for the State Auditor race by 66.1 percent whereas the Plan B
16   61.9 percent, and Plan D, 62.9 percent.
17   Q     Thank you, Dr. Liu.
18         And in any case, the black candidate would win with over
19   20 -- by over 20 points; is that right?
14:47:15 20   A     Yes.
21   Q     Thank you.
22         So let's turn to the end -- well, Dr. Liu, you mentioned
23   that you had looked at Plan A.  Are the results roughly the
24   same for Plan A, as well?
14:47:32 25   A     Yeah.  Plan A, like I said, I not only use any-part black,
```

```
 1  but also single-race black for Plan A verification.  I found
 2  the same result.  Obviously, the exact statistic varied a
 3  little bit.
 4  Q    Okay.  Thank you, Dr. Liu.
 5       Let's just to wrap up your final -- your initial report,
 6  can you tell us what -- in sum, what did you find in your
 7  initial report with respect to RPV?
 8  A    In sum, the elections that took place in Alabama revealed
 9  the same message that is if given the choice between black
10  candidate and white candidate, black voters vote cohesively in
11  choosing the candidate from their same race.  And that
12  preference for black candidates is not shared by white voters
13  who voted as a block.
14       And the black -- the white block voting enabled typically
15  the defeat of black candidates with only exception of the black
16  candidate from CD 7, which is black majority district.
17            MR. ROSS:  Mr. Ang, you can take at that down.  Thank
18  you.
19  BY MR. ROSS:
20  Q    So Dr. Liu, I want to turn to your rebuttal report, which
21  is Plaintiffs' Exhibit M-8.  If you need any pages from that
22  report displayed, please let me know.
23       Just beginning on page 1 of your rebuttal report, I
24  believe there is a section entitled, Areas of Agreement With
25  Dr. Hood.  Did you review Dr. Hood's initial report in this
```

14:47:53
14:48:18
14:48:42
14:49:01
14:49:25

 1  case?

 2  A    Yes, I did.

 3  Q    All right.  And so how many areas of agreement were there

 4  between you and Dr. Hood?

14:49:36 5  A    There are a total of four areas of agreement between me

 6  and Dr. Hood.  And the first one is that we both found there

 7  has been a racially-polarized pattern between black voters and

 8  white voters.

 9       Secondly, the negative effect of RPV is clear, that is,

14:50:01 10  the black candidates are typically defeated in white majority

11  context.

12       And thirdly, we agree that the methodology that we can use

13  to estimate racial voting is EI technology.  And finally, we

14  also agree that in the Democratic primary, white voters and

14:50:24 15  black voters may choose different candidates if given the

16  choice between two racial groups' candidates, and that

17  differences may lead to the defeat of black candidates if that

18  district is configured in a way that dilute black votes.

19  Q    Thank you.

14:50:51 20       So is it your understanding that Dr. Hood also used EI?

21  A    Yes, he did.

22  Q    Can you use voter registration data for an EI analysis?

23  A    Yes.

24  Q    And what data is your understanding that Dr. Hood used for

14:51:09 25  his analysis?

 1  A    He's RPV analysis is based on -- as I can see from his own

 2  R code, he provided it to the Court and the counsel for

 3  plaintiffs.  He used the EI pack, which is the same software

 4  program that I used.  And he engaged in analysis of turnout.

14:51:36  5  But somehow he used registration data to talk about turnout.

 6  Q    All right.  Thank you, Dr. Liu.  Let's -- did you -- is it

 7  right that Dr. Hood ran some elections that you did not in your

 8  initial report?

 9  A    Yes.  As I said, I had four areas of agreement with

14:52:06 10  Dr. Hood, but I also have very strong disagreement with him

11  regarding some of his assertion, especially in terms of the

12  selection of elections.

13       He chose to use the 2020 Presidential election, which is

14  not a biracial election, even though in his own publication

14:52:36 15  Social Science Quarterly, he and his coauthor indicated that

16  it's necessary to use elections which include minority

17  candidates so that we can test whether RPV matters.  He didn't

18  do that.  He used the 2020 Presidential election, which

19  featured white men for both major political parties, even

14:53:04 20  though for the Vice-President candidate from the Democratic

21  side, we had a black Asian woman on the ticket, but she is not

22  on the top of the ticket.  So that's contrary to what he

23  suggested in his own publication.  But in order to test his

24  idea about racially-polarized voting in 2020 Presidential

14:53:37 25  election, I went ahead and did verification study by using data

1    from this election.  And this election, which is not biracial,

2    revealed the same thing -- racially polarized pattern as he

3    reported in his original report.

4        But my disagreement with Dr. Hood is more than that.  It

14:53:56 5    is where he turned to the assertion that the black conservative

6    candidate success in Alabama he choose the House District 73 to

7    make that claim.  But he didn't provide any RPV analysis on his

8    own.  So I went ahead and I did my own RPV analysis.  In that,

9    RPV analysis indeed show that's not an effective election to

14:54:29 10    show the true preference of either white or black voters.  And

11    moreover, it's only a very narrow election involving very few

12    voters.

13        I chose the 2016 Republican primary, which is statewide.

14    And very competitive election featuring future President Donald

14:54:56 15    Trump and other ten black Republican prominent figures,

16    including a black conservative, so I analyzed that as well.

17    Q    So you conducted EI analysis of that election?

18    A    Yes, I did.

19    Q    Did you find that white Republicans supported Dr. Carson

14:55:16 20    in that election?

21    A    The support for Dr. Carson, who once upon a time was even

22    the leading figure among all the black -- I mean, all

23    Republican nominees for president.

24        The white support for him in Alabama was at a single-digit

14:55:39 25    level, unlike what Dr. Hood claimed.  There has been average --

1  an average equal or even more support for black conservative in

2  -- in America, especially Alabama he said.  There's no

3  empirical evidence whatsoever for that.

4  Q    Thank you, Dr. Liu.

14:56:00 5       And what was the black turnout in that election, according

6  to your estimates?

7  A    The black turnout for the Republican primary is very low.

8  And it's just over 1 percent, about 1.7 percent.

9       And the -- for the same reason, we look at the whites

14:56:28 10  turnout, especially for the House District 73 that Dr. Hood

11  claimed as the evidence for black conservative success in white

12  community, the white turnout in that HD 73 was low as

13  1.3 percent.

14       So white voters didn't vote much in that election.

14:56:57 15      So both HD 73 and Presidential nominee contest for

16  Republican Party in 2016 revealed the extent to which how

17  voters are involved.  And that's why there's no empirical

18  evidence for Dr. Hood's claim on the black conservative success

19  among white voters empirically.

14:57:25 20 Q    Thank you, Dr. Liu.

21       So in sum, can you tell me what did you find with respect

22  to, again, taking into consideration your rebuttal report, what

23  did you find with racially-polarized voting in Alabama?

24 A    The original report I give to the Court and also my

14:57:46 25  rebuttal report, as well as Dr. Hood's own findings, the only

14:58:19

14:58:50

14:59:12

14:59:20

14:59:40

```
 1    congressional elections, but exogenous elections, as well as
 2    one non-biracial election that Dr. Hood himself included, it's
 3    very clear that in Alabama there has been a pattern of
 4    racially-polarized voting in that black voters choose the
 5    candidate from their own racial group, and that preference was
 6    not shared by the majority white voters who voted as a block
 7    that enables the typical defeat of black candidates.  With the
 8    exception of the majority-black districts, the RPV failed to
 9    prevent the election of black candidates.
10            MR. ROSS:  Sorry.  Judges, if you will just give me
11    one moment.
12            JUDGE MARCUS:  Take your time.
13            MR. ROSS:  I believe we are set.  We will pass the
14    witness for now.
15            JUDGE MARCUS:  You will be doing the cross I take it,
16    Mr. Harris?
17            MR. HARRIS:  Yes, I will.
18            JUDGE MARCUS:  Would this be a convenient time for a
19    break for you?
20            MR. HARRIS:  That would be great.
21            JUDGE MARCUS:  Okay.  It's almost 3:00 o'clock your
22    time Central Standard, 4:00 o'clock Eastern Standard Time.  We
23    will take a 15-minute break, and then we will come back to your
24    cross-examination, Mr. Harris, of Dr. Liu.  Thank you.
25            (Recess.)
```

1    JUDGE MARCUS:  Good afternoon, folks.  Is everybody
2 ready to proceed with the cross-examination of Dr. Liu by
3 Mr. Harris?  Mr. Harris, you ready?
4    MR. HARRIS:  Yes.
15:17:24 5    JUDGE MARCUS:  Mr. Ross, all set?
6    MR. ROSS:  Yes, Your Honor.
7    JUDGE MARCUS:  Dr. Liu, are you ready to proceed?
8    THE WITNESS:  Yes, I am ready, Your Honor.
9    JUDGE MARCUS:  All right.  Thank you.  You may
15:17:34 10 proceed, Mr. Harris.
11    MR. HARRIS:  Thank you.
12                    CROSS-EXAMINATION
13 BY MR. HARRIS:
14 Q    Dr. Liu, I am looking at your expert report, and do you
15:17:46 15 have it in front of you; is that right?
16 A    Yes, I do.
17 Q    Okay.  Great.  You say that you are asked to express
18 opinions on whether RPV exists in Alabama and whether or not
19 RPV has resulted in the defeats of black-preferred candidates
15:18:02 20 in Alabama congressional elections; is that right?
21 A    Yes.
22 Q    Okay.  And looking at your conclusion or opinion in page 3
23 in the opinion section, you say in -- the final sentence there
24 is, As a result, the black-preferred candidates were typically
15:18:20 25 defeated in biracial elections in Alabama?

A      Yes.

Q      So why did you focus exclusively on biracial elections in Alabama?

A      As I stated in my report, RPV analysis would give us the realistic result to see the real opportunity to elect candidate of choice if the election involves a candidate from a minority group and a candidate from the majority group.  So, therefore, the true preference will be revealed by the empirical data instead of any theorization.

Q      Is that your understanding of the law, or is that your professional judgment that you exercise in your academic research?

A      It is, of course, included in my academic research.  The U.S. political science literature has documented it all the way back from the 1960s in terms of how, say, average Americans embrace candidates who are Irish in very, very early on U.S. history about urban elections.

So, indeed, literature revealed the importance of presence of minority voter -- minority candidates immobilizing minority voters to participate, but it is also based on -- the question in front of me as expert witness, that is, what is the RPV and the result of it?  That task that I have as expert witness make me believe that only by using biracial elections can we know the answer.

Q      Just to clarify, and I believe you said this already.

```
 1  It's your opinion that the only way to empirically determine
 2  RPV between two racial groups is to analyze biracial elections?
 3  A    The only way to tell whether or not different racial
 4  groups preferred different candidates is to analyze elections
```
15:20:50 ```
 5  that gives us a choice between different candidates.  Then we
 6  can know.  That is, yes.  But I am not making overarching
 7  argument to say uni-racial elections have no implications, no
 8  use whatsoever.  That's not what I wanted to claim.
 9  Q    Dr. Liu, I am trying to understand the difference between
```
15:21:16 ```
10  those two statements.
11        So you don't think that biracial elections are the only
12  way to empirically determine whether RPV exists?
13  A    RPV itself, as empirical measure, of course, can have
14  elections, which have uni-racial candidates because different
```
15:21:46 ```
15  racial groups may choose different candidates even if the
16  candidates share the racial identity.  It's just empirical
17  fact.
18        However, the RPV to evaluate the opportunity to elect
19  candidate of choice, that has to be based on the evaluation of
```
15:22:11 ```
20  elections which allow scholars to measure the choice in the
21  first place.
22  Q    And by the choice, what are you referring to exactly?
23  A    By choice, I mean, whether a racial group prefer a
24  candidate from whatever particular kind of racial group, one
```
15:22:35 ```
25  has to have a choice between that group and alternative.
```

```
 1  Q    Okay.  So I think I understand your testimony to be that

 2  uni-racial elections can sometimes be probative, and correct me

 3  if I am wrong; is that right?

 4  A    Uni-racial elections may give us results that racial

 5  groups choose candidates differently that is racially

 6  polarized.  That's empirical possibility, yes.

 7  Q    Okay.  And it's your opinion, then, that biracial

 8  elections are simply more helpful to you than uni-racial

 9  elections?

10  A    As I stated, the biracial elections will or would allow us

11  to evaluate, given the choice between racial groups, the

12  preference of racial groups.  That is the reason why biracial

13  elections allow us to fully evaluate the candidate of choice,

14  especially for different racial groups.

15  Q    Okay.  So if you will try to answer a hypothetical

16  question for me, is it your opinion that all else equal, that a

17  2008 biracial elections is more probative than a 2020

18  uni-racial election?

19  A    If your question is about to evaluate candidate of choice

20  of racial groups, the answer is yes.

21       The 2008 Presidential election featured a black candidate

22  and a white candidate from the two major parties, whereas the

23  2020 Presidential elections featured both party candidates as

24  whites.

25       So, therefore, yes.
```

1   Q    And so the 2020 Presidential election, do you -- that is

2   -- that is not probative to you at all?  It's not relevant to

3   your RPV analysis, or just much less so even than an older

4   election?

15:25:32 5              MR. ROSS:  Objection.  Asked and answered.

6              JUDGE MARCUS:  I will take it one more time.

7   Overruled.

8              THE WITNESS:  The 2020 Presidential election may

9   reveal racially polarized pattern or not.

15:25:46 10       However, to answer the question such as the one in front

11  of me as expert witness, the 2008 Presidential election is the

12  one that allowed me to evaluate two candidate of choice for

13  racial group, whereas, 2020 does not have that level of

14  empirical data for me to form opinion on.

15:26:19 15 BY MR. HARRIS:

16  Q    Okay.  So do your conclusions in this case, do they apply

17  to all Alabama elections or all endogenous elections or only to

18  biracial elections?

19  A    My opinion, as I stated in the report -- initial report,

15:26:44 20 is about the choice given to the voters.  When choice is given,

21  they choose their own racial group.  That is applied to

22  endogenous elections, as well as exogenous elections in

23  Alabama.

24  Q    Okay.  It's even more helpful for me to use an example.  I

15:27:13 25 am looking at page 15 of your report, and this is part of your

```
 1  effectiveness analysis of the plaintiffs' plans.  Are you
 2  looking at your report?
 3  A    Yes.  I am here.
 4  Q    Okay.  Great.  And in the columns, you list black
 5  candidate and white candidate; is that right?
 6  A    Yes.
 7  Q    So what does that mean?
 8  A    It means black candidate and white candidate.
 9  Q    Okay.  So if, for example, in 2022 or in the next
10  congressional election, if that were two white candidates, if
11  both the Democrat and the Republican were white?
12  A    Uh-huh.
13  Q    Is your analysis relevant at all to considering that?
14  A    No.  I mean, if I understand your question clearly, if
15  your question is about can I use the same Table 4 to apply for
16  -- apply to a hypothetical election where there is only
17  uni-racial candidacy, then the answer is no.
18  Q    Okay.  Switching gears a little bit, Dr. Liu.  Is it right
19  that your analysis does not consider the reasons why voters
20  vote the way they do?
21  A    My task for this case is to provide empirical facts to the
22  Court, whether there has been racially-polarized voting and
23  whether that pattern has result as the black defeat typically
24  in those elections.
25       So in no place of my whole report did I report to the
```

```
        1  Court about intent.
        2  Q    Okay.  So, for example, did you consider characteristics
        3  about individual candidates other than race, such as their
        4  financial support, or campaign tactics, or anything like that?
15:29:28 5  A    If the question is in general whether I am a scholar to
        6  consider those factors in my scholarly work, the answer is yes.
        7  But for this particular task in front of me, it's not about
        8  intent.  It's about whether empirically there is evidence of
        9  racially-polarized voting and what's the result of it.
15:29:57 10  Q    Okay.  Thank you.
       11       I would like to look at which elections you included in
       12  your analysis.  And you have this elections analyzed section at
       13  pages 3 and 4 of your report.
       14       So and I know you testified some about this already.  I
15:30:29 15  believe -- let's see.  On page 4, you say there were only seven
       16  such endogenous biracial elections during the period under
       17  study; is that right?
       18  A    As I already said, it is a report that is submitted on
       19  December 10th.
15:30:56 20  Q    Uh-huh.
       21  A    I sought as many as I could.  And these were the elections
       22  I was aware of and had data about.
       23       After I submitted, I became aware of the fact that there
       24  was a CD 1 biracial elections in 2014 that I was not even aware
15:31:29 25  of.  So when I put that statement there, that is when I
```

1   submitted my report.  I did as much as I could.

2   Q    Okay.  And I believe you testified today that you made

3   your own efforts, right?  Isn't what you just said to identify

4   those elections; is that right?

15:31:47 5   A    I, indeed, have said that as a scholar of southern

6   politics, I have studied many states including Alabama, and I

7   have served as expert witness for cases related to Alabama.

8        So I knew some elections, but obviously, I didn't know all

9   of the congressional and, you know, all the elections that may

15:32:15 10  be relevant for me.  So I asked the counsel to help me.  If I

11  missed, just charge a fine, and did as much as I could.

12  Q    Okay.  I will look at some of these specifically.  In

13  2019, so besides the 2014 election you just mentioned, is that

14  the only election you are aware of that was not included in

15:32:45 15  your report that was, in fact, the endogenous biracial election

16  in Alabama?

17  A    As I said, I tried my best.  At this point, these general

18  elections, at least, that are congressional elections.  The

19  only one I missed was that 2014 election, which reconfirmed my

15:33:11 20  findings.

21       If I have anything missing, I would absolutely be more

22  than glad to go ahead and analyze it.  But I believe I have

23  found very, very strong consistent pattern.

24  Q    Okay.  I'm looking at page 9 of your report, which has

15:33:33 25  this chart of -- it's Table 1, titled, Estimated Racial Support

1302

1   For Black Candidate in Endogenous Elections.

2   A    Okay.  --

3   Q    In this --

4   A    Yes, I did.

15:33:47 5   Q    And in this chart, you list these endogenous elections; is

6   that right?

7   A    Yes.

8   Q    And you include the 2021 primary -- the very first one,

9   2021 CD primary, and you note it went into a runoff; is that

15:34:05 10   right?

11   A    Yes.  Yeah.  It -- the black candidate James Averhart

12   indeed got into the runoff, and I was aware of the fact that he

13   won the run off.  But then he lost in the general.  And that's

14   why, like I said, I try my best to include the general

15:34:25 15   elections before I can finish my RPV analysis.  And this is

16   what I did.

17   Q    Okay.  So did you consider the runoff election -- do you

18   know whether the runoff election was a biracial election?

19   A    I believe it was.  But I had time at that point.  And like

15:34:46 20   I said, I did my best to do the general elections.

21       And I also did the primary.  So the runoff I believe he

22   won.  That's why he got into the general election.  But I

23   didn't have the time.  I thought it's a lesser election in

24   terms of importance for me to draw conclusion because I analyze

15:35:14 25   his own primary.  And then his general.

```
 1        So maybe there's this runoff.  I will be happy to follow
 2   up with that one, too.
 3   Q    So to make sure I understand you, if you had had more
 4   time, you would have preferred to include more biracial
 5   elections; is that right?
 6   A    I believe that endogenous elections are more probative for
 7   me to draw conclusion, and that's supported by the courts in
 8   this country.  And I also believe that's indeed should be my
 9   responsibility to do.  So I try my best.
10   Q    Oh, I understand, Dr. Liu.  And I'm trying to just make
11   sure I understand where you are.
12        If there were more endogenous biracial elections in
13   Alabama, would you like to consider those in forming your
14   opinion?
15   A    Yes.
16   Q    So you didn't just come to a point and say, I have all the
17   data I need, this is it?  If there were more, you would be
18   interested to see more?
19   A    Well, if you raise question that way, I think it may lead
20   to different kind of feeling about my statement.  My statement
21   is, I have tried my best, and I would include as many elections
22   I could.  That doesn't I don't have an opinion.  As I form
23   these opinions, these facts, accumulating in front of me, I
24   form opinions, and obviously, there is plausibility that I
25   could include more elections.  But if the facts are
```

```
 1  overwhelming, then I stand by my opinion.  Because one or two

 2  elections just wouldn't change my overall opinion about RPV in

 3  this case.

 4  Q    Okay.  I won't stay here too long, but I am going to go to

 5  Defendants' Exhibit 91.  I believe it has been admitted without

 6  objection.

 7       All right.  Can you see my screen, Dr. Liu?

 8  A    Yes.

 9  Q    This is -- what does this appear to be to you?  Have you

10  ever seen a document like this?

11  A    No, I have never seen this particular document.

12  Q    Right.  So I will represent to you that this is a

13  certification of candidates from Alabama, and it's dated

14  December 20, 2019.  Do you see that?

15  A    Yes.

16  Q    Let me see here.  Do you see this is from the Alabama

17  Democratic Party?

18  A    Yes.  I saw that.

19  Q    So I am looking at Congressional District 2 primary.  We

20  see here Phyllis Harvey-Hall and Nathan Mathis in the election.

21  Do you see that?

22  A    Yes, I saw that.

23  Q    But you did not analyze the election between Phyllis

24  Harvey-Hall and Nathan Mathis, did you?

25  A    I don't believe so.
```

```
 1  Q     Do you know why that is?
 2  A     As I said, I -- with the time I had, I did my best to
 3  analyze endogenous in general elections first.
 4  Q     Okay.  So if you had been aware -- so, excuse me.  I take
 5  that back.  So were you aware of this election and decided not
 6  to include it, or were you unaware of this election?
 7  A     I certainly was not aware of this election.
 8  Q     Okay.
 9  A     That's not even in my report.  I had no idea.  But like I
10  said, I tried to do my best first for the general election.  So
11  I didn't have the time to dive into all the primary elections.
12  Q     Okay.  You chose to just choose one primary election; is
13  that right?
14  A     I didn't choose simply because, you know, this election CD
15  1 had multiple candidates, as you can see, from 2000 I believe
16  18.  And I even missed another one of the CD 1.  So CD 1 to me
17  with the time I had obviously involved black candidates.  So I
18  tried my best to see whether I could get data, and I did.
19  Q     Okay.  And along these same lines, you referenced Will
20  Boyd earlier in your testimony earlier, I believe.  And you
21  mentioned Robert Kennedy, Jr., here, on page 9; is that right?
22  A     Yes.
23  Q     And do you know whether those candidates were involved in
24  another biracial statewide election that you did not include in
25  this report?
```

15:39:05 (line 5)
15:39:23 (line 10)
15:39:49 (line 15)
15:40:34 (line 20)
15:40:52 (line 25)

1  A      I -- to this point, I still don't know what you are

2  saying, so I obviously have no idea.

3  Q      Okay.  Okay.  And looking still at page 9 in this table

4  you include here, you look at, the very last column, says RPV

15:41:19  5  question mark.  And it has yes.  So did I understand your

6  testimony today earlier that if it's higher than -- if it's a

7  majority, if it's 50 percent or more, then for black support of

8  the black candidate, and then the less than a majority or a

9  minority of white support for a white candidate, that makes the

15:41:41 10  yes box an RPV?

11  A      Yeah.  Operationally, obviously we have had had -- we have

12  to have some kind of framework to form opinion on RPV, yes.

13  Q      Uh-huh.

14  A      That's the framework.  The majority black support this

15:41:59 15  particular candidate, and yet the majority white oppose this

16  candidate, yes, that's the framework.

17  Q      Okay.  And so, for example, in that 2020 CD 1 primary?

18  A      Yes.

19  Q      The black support says 53.8 percent; is that right?

15:42:17 20  A      Yes.

21  Q      So if that had been 51 percent, would your conclusion have

22  been the same?  Does it only matter that it's above 50; is that

23  right?

24  A      Yes.

15:42:27 25  Q      Okay.  So if, say, black support for a candidate is

```
 1  51 percent and white support for the white candidate is
 2  49 percent, would RPV be established?
 3  A    I have studied this issue in all my professional career.
 4  Up to now, I haven't found that election that took place in
 5  America.  But indeed, I will say categorically speaking,
 6  obviously, the majority from a group voted for a candidate, and
 7  the majority from another group opposed that candidate, even
 8  though the gap between the two racial groups as you put it is
 9  so small, but majority of one group voted this way and a
10  majority of the other group voted different way, that would
11  satisfy conceptually racially-polarized voting.
12  Q    Okay.  And is that your understanding of the law as it
13  exists, or is that a professional judgment that you use as an
14  RPV expert in your academic work?
15  A    Thank you, Mr. Harris.  It's a great question.
16        I am an expert on racial politics.  And I have served as
17  expert witness for racially-polarized voting.  So obviously, I
18  have built my own reputation on research of my own.
19        However, I'm not a lawyer.  So I cannot give you opinion
20  about, you know, what the case law eventually evolve and
21  define.  My position on this is that reading the *Gingles* Number
22  *II* and Number *III* condition, that is relevant to me for my role
23  to play indeed.  I stand by the opinion that we should use this
24  majority black support for a candidate of their own, and then
25  the majority white disagree.  I think that's the baseline for
```

15:42:50 (line 5)
15:43:22 (line 10)
15:43:46 (line 15)
15:44:12 (line 20)
15:44:48 (line 25)

1  all of us as expert witness that should report to the Court for

2  RPV.  But beyond that, as scholars and expert witness, we look

3  at racial gap, how large is racially-polarized voting reveal,

4  and so on.  These are all important questions.

15:45:11  5  Q    Great.  And I have I guess some general questions about

6  the underlying data you use in your report.

7       In Appendix 3, like I believe you mentioned on your

8  direct, you have -- this is described as your description of

9  the data acquisition processing and aggregations process; is

15:45:40 10  that right?

11  A    Yes, correct.

12  Q    So I -- on your direct, I believe you said that this came

13  from the demographer, or can you explain to me the appendix,

14  and did you write the appendix, or just explain to me the

15:45:55 15  nature of this document?

16  A    Sure.  The Appendix 3 is a documentation I demanded, and

17  the reason is this, I have served as expert witness for

18  two decades.  Every time in a given case, I work with a

19  demographer.  And a demographer that is expert, say, Black VAP

15:46:25 20  in political areas in that nature.  I am not demographer.  So

21  since I have worked with the lawyers for this case in the past,

22  they will -- very familiar with what I wanted in my data set

23  for the demographer to do.  And I asked the demographer -- the

24  lawyer to help me understand what is the source of the data,

15:46:57 25  how they match it.

```
     1        And since this is the first time I worked on this case,
     2   which has this demographer, who I never had a direct contact
     3   during my research, so I asked the counsel to help me out
     4   understand what the data processing acquisition was, and that
15:47:18 5   was the documentation from the demographer.  And I read it, and
     6   it appeared to be the most comprehensive and objective
     7   description of the detail data processing that I have ever seen
     8   in my role as expert witness, but it is not my document.  It is
     9   demographer's.
15:47:41 10  Q    Okay.  So just for example, looking at number one, under
    11   Data Acquisition, it says, Acquired 2016, 2018, and 2020
    12   precinct level shapefiles.  So you did not acquire those,
    13   right?  This just describes what either plaintiffs' counsel or
    14   what someone else did, right?
15:48:04 15  A    Again, I am not demographer.  So it's not my job to find
    16   whatever shapefiles and put in my computer to run these.  So
    17   always in my voting rights case expert witness experience, I
    18   have had a demographer who does shapefiles and try to join in
    19   that way.  So yes, indeed this is what they described in
15:48:37 20  detail.
    21   Q    Just to be clear, when you say what they described in
    22   detail, who are you referring to?
    23   A    I mean the demographer working on this case.  So I never
    24   worked directly with this particular demographer during my
15:48:58 25  research on RPV.
```

1  Q    So what did you do to verify that the information was

2  reliable or accurate?

3  A    Yeah.  After I received this description, I went to the

4  website, and I asked the lawyer to clarify what is the voting

15:49:20  5  election science team, and I was able to get the website, and

6  then I went to the website.  I realize it's the Harvard data

7  first, which actually I was very familiar with in the past

8  because in my other voting rights cases, I knew demographer

9  when he -- they get data from there.  So I understood, okay,

15:49:46  10  they went there to collect the shapefile, which to me is very

11  standard.

12       And then I also had questions about open elections in the

13  description.  And I asked the counsel to help me to get the

14  detail about what is the open elections.  And I was told that

15:50:08  15  it's on GitHub.  I went to GitHub.  I wrote recent peer-review

16  article which I presented in my international conference about

17  GitHub.  So I know GitHub very well.  That's a place where

18  scholars, data scientists deposit their data, and I went to

19  especially Alabama data set on open elections.  I realized

15:50:34  20  indeed it's on GitHub.  So that means all users, all over the

21  world can check on the data, accuracy, and everything.  So it

22  must be one of the most vigorous source of data.  That's why I

23  believe my RPV is grounded on these sources that are in the

24  public domain and very reliable.

15:51:01  25  Q    Okay.

1    Did I understand you right that as you reviewed this data
2 process, you asked counsel what the voting and election science
3 team was?
4 A    Yes.  I asked in particular after they told me about the,
15:51:21 5 you know, the Harvard base where they hosted the data, and I
6 got to know more detail about the data concerning this
7 particular description right here, it is data originally
8 compiled by scholars, political scientists, professional
9 political scientists from University of Florida that deposited
15:51:53 10 the data in this public domain on Harvard database, on the
11 website.  So I gain more confidence.  You know, University
12 Florida has had some very prominent professors such as Michael
13 McDonald, and so on, who have been the leading experts on
14 turnout and voter participation and so on.  So I trust the
15:52:21 15 source because of that verification I did with the counsel.
16 Q    Okay.  Is it within your expertise to be able to clean and
17 match this sort of data?  So had you wanted to, could you have,
18 you know, acquired the shapefiles or other election data to be
19 able to get them in a workable format for you?
15:52:51 20 A    Thank you, Mr. Harris.  That's a very good question,
21 because I want to clarify what I do.  I'm an expert on RPV.  So
22 my job is to provide empirical data and evidence for the Court
23 to understand RPV related.  I am not demographer.  So it's not
24 my job to do anything related to shapefiles.  I always had a
15:53:19 25 demographer working on the case.  Very often there are

```
     1  different demographer, depending on whatever case we are
     2  talking.  But in this case, I never had -- it's not even
     3  necessary for me to -- to use shapefiles because it has nothing
     4  do with my job.  I don't do those things.
15:53:45 5  Q    Thank you.
     6       I might have used a bad example.  So are you -- so census,
     7  for example, census data I believe you referred to several
     8  times in your direct examination, and you are aware of the
     9  difference between single-race black and any-part black; is
15:54:06 10  that right?
    11  A    Yes.  I am aware of.
    12  Q    Uh-huh.  And so I know that you talked about this some
    13  before, and I want to make sure I can understand.
    14       So at what point in your analysis, did you use single-race
15:54:25 15  black data?
    16  A    Yes.  As I said in my report, the effectiveness analysis
    17  that I reported to the Court in my preliminary report, that was
    18  based on any-part black.  But I did have time after I submitted
    19  my report to analyze yet another plan called Plan A in which I
15:54:54 20  did use any-part black, as well as single-race black.  So
    21  that's the first important point for me to tell you what I did.
    22  And the second is that for my report on RPV, all the tables you
    23  saw on RPV analysis, not effectiveness analysis, I did both
    24  single-race black, as well as any-part black for endogenous
15:55:36 25  elections I reported there.
```

1    So when I had time, I always try to double check by using
2    both.  And like I said, already in the direct, it doesn't
3    matter.  It doesn't surprise me, though.  I mean, it's Alabama.
4    We don't have too many African-Americans who identify
15:56:03 5    themselves as multi-racial black by checking multiple boxes.
6    It's not Florida or New York.  And there's no concentration of
7    anywhere in Alabama I am aware of that is, you know, a
8    community of multi-racial black, so to speak.
9    So the results that I have reached in all my analysis,
15:56:28 10   including RPV, effectiveness analysis, they're all the same, no
11   matter what I use.
12   Q    So, for example, looking at page 9, this is the same Table
13   1 that we looked at a few moments ago.
14   The statistics -- so earlier you said you used both in
15:56:48 15   your RPV analysis.  And I'm trying to understand, for example,
16   in this chart, when you say black support for black candidate,
17   and you have a percent, what does black mean in that chart?
18   A    Yeah.  In the charts about RPV, including Table 1, that's
19   the exact statistic based on my operation of EI using
15:57:14 20   single-race black, or more fully or academically, it's
21   non-Hispanic Voting Age Population, that is black.  That's how
22   one should understand this, yeah, that's based on that
23   particular non-Hispanic Voting Age Population that is black.
24   Q    Non-Hispanic voting?
15:57:44 25   A    Yeah.  Some use single race to say the same thing.

```
 1  Because it's non-Hispanic Voting Age Population that is black
 2  in the census.  There are people who just refer that as, okay,
 3  single-race black.  But I don't -- I don't -- I never use that
 4  term in my report.  I use the term non-Hispanic Voting Age
 5  Population that is black.
 6  Q    And it could be that we just are using -- I am sure I'm
 7  using the wrong terms, Dr. Liu.  And I am trying to understand
 8  you say you -- what is your -- what is single-race black?  When
 9  I say that, do you know understand what I mean?
10  A    Yeah.  In my report, at least, my -- again, I never use
11  the single-race black, so I cannot speak for everyone.  But in
12  my report, the black measurements have two ways -- one is the
13  non-Hispanic Voting Age Population that is black.  Some people
14  refer that as single-race black, but I never did that.  But
15  there is also any-part black term.  The any-part black term at
16  least in my report is the black persons who identify them not
17  only as what I just said non-Hispanic Black VAP, that part, but
18  also, like they check on other boxes, so therefore they have
19  other racial identify being Latino or white or other.
20       In Dr. Hood's report, he called that multi-racial black.
21  Again, I never use that word.  Yes, I understand your confusion
22  about that.  But, again, I am not demographer.  I'm just trying
23  to clarify what I have done in my own RPV analysis.
24  Q    So you say as you use it, I believe you define single-race
25  black as non-Hispanic Voting Age Population that is black?
```

```
 1   A    Yes.
 2   Q    Is that right?  So you mean they only check black when
 3   identifying their race on the census, is that what you mean?
 4   A    Again, I don't want to speak for the -- any demographers
 5   that have worked -- in particular this one.  In the data set I
 6   have received from the state demographer person, in particular,
 7   there is a column called non-Hispanic Black VAP.  That's what I
 8   use.  And that's my understanding of the so-called single-race
 9   black.  I cannot speak for any demographer or any other
10   scholars that used a similar term.
11   Q    So the data you use that you are referring to with a
12   column that has non-Hispanic BVAP, you are referring to data
13   you received from the demographer in this case?
14   A    Yes.  Yes.
15   Q    Okay.  So you didn't go back to verify what sort of racial
16   data that was, you just knew it was from the census; is that
17   right?
18        MR. ROSS:  Objection.  Asked and answered.  He's asked
19   this multiple times.
20        JUDGE MARCUS:  Overruled.
21        THE WITNESS:  The answer is yes.  I am not a
22   demographer.  I have always worked in voting rights cases where
23   there is a given demographer, whatever that case, the counsel
24   has provided.
25   BY MR. HARRIS:
```

16:00:23 (line 5)
16:00:50 (line 10)
16:01:05 (line 15)
16:01:24 (line 20)
16:01:40 (line 25)

1    Q    Okay.  You talked a little bit about multi-racial voters

2    on your direct examination.  And I believe you said that there

3    were very few in Alabama; is that right?

4    A    In comparison.  I used the word, like unlike Florida or

16:02:05  5    New York where we know for sure there are concentrations of

6    multi-racial, but even some people call biracial say Latino

7    blacks, right?  In Florida, we know of -- I am again not a

8    demographer.  I know in Alabama, it is usually we are talking

9    about the black community who identify as black only.  So

16:02:33 10    that's what I mean.

11    Q    So did you examine any data in Alabama about either

12    multi-racial black or any other statistic that could have shed

13    light on that?

14    A    I'm not a demographer, so I -- it's not my job to -- to

16:02:58 15    analyze populations.  But my -- my belief that in southern

16    states other than Florida and Texas, traditionally we are

17    talking about the black people who identify them as black.  I

18    just want to reiterate that the fact that I did both any black

19    and so-called single-race black in my term is non-Hispanic VAP

16:03:39 20    black, I did both, and they show the same results that just

21    reinform my understanding of Alabama, that is, there are not

22    too many the black people that only identify them as

23    multi-racial black, because if that's the case, then, my RPV

24    will give me very different results.  Every time I run both,

16:04:06 25    they give me almost identical results.  So that's essentially

```
 1  suggests there are not too many multi-racial black.  But I am
 2  not demographer, so I never did any shapefile analysis or
 3  distribution or population in that nature.
 4  Q    Is this along the same lines of what you said earlier on
 5  your direct that it would be impossible for to analyze
 6  multi-racial blacks?
 7  A    It is not my job.  In the first place, I am not a
 8  demographer.  I don't to shapefiles or other ways of geocoding.
 9  But I form my opinion based on my RPV analysis and
10  understanding of southern politics and U.S. history.  But I am
11  not demographer.
12  Q    Okay.  I appreciate you stopping me, Dr. Liu, if I am
13  trying to veer out something you didn't mean to testify about.
14  And please keep doing that.  I am not trying to lead you
15  astray.
16       But in your direct, you mentioned the shared black
17  experience, I think you said?
18  A    Yes.
19  Q    In talking about the political cohesiveness.  And I --
20  A    Yes.
21  Q    I think you were referring to multi-racial voters, and I
22  could be mistaken.  When you were talking about that shared
23  black experience of racial groups, can you explain more what
24  you were talking about?
25  A    Certainly.  I will be glad to.
```

16:06:09

16:06:37

16:07:07

16:07:39

16:08:15

          The literature increasingly is paying attention to the
     fact America is becoming more multi-racial.  So scholars such
     as me need to understand how the multi-racial overall picture
     of USA has impacted how voters voted.  And in particular, my
     research has brought me to the study of the black people in
     USA, in obviously, there are some states as like I said,
     Florida, Texas, you know, there are immigrants and multi-racial
     communities.
          But the question about whether different kinds of blacks
     may lead to the voting decisions of these so-called different
     blacks differently, that's what I am interested as a scholar.
     I have done research especially related to Obama's Presidential
     election, because there was a national dialogue about whether
     Obama represents all black, whether his mom is white.  That
     represents the blackness, a sense in that nature, I have
     studied extensively, extensively about that.  All my studies in
     empirical research have lead me to believe that though there
     are increasingly multi-racial fact in the black community
     itself, the shared blackness has made the Obama Presidential
     election a very clear piece of empirical evidence to say that
     they voted for Obama.  Regardless whether we are talking about
     blacks and, say, Florida, or New York, or in Alabama, or even
     here in Utah, that shared blackness to me has to be reported to
     the Court when we talk about, you know, issues concerning
     racially-polarized voting especially in the context of Alabama,

1    which doesn't have multi -- too many multi-racial blacks in my

2    research.

3    Q    Okay, Dr. Liu, is it correct that you did not conduct an

4    analysis in this case about the cohesiveness of multi-racial

16:08:39 5    black Alabamians and single-race black Alabamians?

6            MR. ROSS:  Objection.  Misstates his testimony.

7            MR. HARRIS:  Please correct me.  I'm --

8            JUDGE MARCUS:  Do you understand the question,

9    Dr. Liu?

16:08:53 10            THE WITNESS:  I'm trying --

11            JUDGE MARCUS:  Either you do or you don't.  If you

12    don't, we will have him rephrase it.

13            THE WITNESS:  Okay.  I -- please do clarify your

14    questions.

16:09:03 15            JUDGE MARCUS:  Would you rephrase it, because I am not

16    sure regardless of anyone else sitting in this virtual

17    courtroom that I understand the question.

18    BY MR. HARRIS:

19    Q    Dr. Liu, I am curious about the cohesiveness of

16:09:23 20    multi-racial black voters as I think you've described them and

21    non-multi-racial black voters.  That's the premise I am getting

22    at here.  My question is whether you conducted an analysis

23    about the cohesiveness of those two groups of voters, of

24    multi-racial voters and non-multi-racial black voters.

16:09:40 25    A    If I understand your question clearly, if you insist in

1   analyzing multi-racial blacks only, there's no way to do it.

2   There are just few of them in Alabama.  But I object to the

3   assertion that I have never done anything about cohesiveness

4   analysis for multi-racial because I did.  The any-part black

16:10:08  5   include the multi-racial black community obviously.  So I did

6   both.  The non-Hispanic Black VAP and any-part Black VAP that

7   includes these multi-racial blacks.  So the assertion that I

8   have never done any cohesive analysis for them, I disagree with

9   that general statement.

16:10:34  10  Q    Okay.  I think this will be my last question on this

11  point.  And looking again at Table 9, can you tell me just very

12  simply, you said you use both types of any-part black and

13  single-race black.  In the numbers that appear on this chart,

14  are these numbers single race or any-part black?

16:10:59  15  A    Are you talking about Table 1?

16  Q    Yes.

17  A    Yes.  Table 1.

18          JUDGE MARCUS:  Just stop for a moment.  Which table

19  are we referring to, Mr. Harris?

16:11:11  20          MR. HARRIS:  I apologize.  Table 1 on page 9 titled

21  Estimated Racial Support For Black Candidates in Endogenous

22  Elections.

23          THE WITNESS:  Yes.  As I noted in my report, my RPV

24  analysis including this one for endogenous elections is the

16:11:31  25  report of the statistical findings by using non-Hispanic VAP

```
     1  that is black.
     2  BY MR. HARRIS:
     3  Q    And that is the number you received from the demographer
     4  labeled as such, right?
16:11:54  5  A    Yes.
     6  Q    Okay.  Thank you.  I would like to ask you a few questions
     7  about your effectiveness analysis starting at -- I'm looking at
     8  page 15 at this chart.
     9       And I know you spoke about this some on direct, but I am
16:12:26 10  still not sure I understand.
    11       Can you describe to me what the turnout column on these
    12  tables is?  And this is Table 4 labeled CD 2, plans compared
    13  based on the RPV analysis of the 2018 Lieutenant Governor
    14  election.
16:12:44 15  A    Yes.  The turnout column is the column for the estimation
    16  of racial groups turnout.  So, for example, the first row is
    17  the estimation for the black voters in the 2018 Lieutenant
    18  Governor election in the areas based on the adopted plan for CD
    19  2.
16:13:21 20  Q    Okay.  And why -- so do I -- am I reading it correctly
    21  that in that first table, for example, turnout is higher for
    22  black voters than it is for white voters?
    23  A    That's a very good question.  The black turnout is a
    24  variable.  It varies in different elections just like white
16:13:50 25  turnout.  But black turnout can be different, especially when
```

1  black candidates aren't involved in certain elections, such as

2  Presidential election in 2008.  President Obama as back then

3  the black candidate enhanced the black interest in

4  participating in that unprecedented election.

16:14:24  5      So elections all have their own contextual backgrounds.

6  For this particular election, actually, Table 1 -- I mean,

7  sorry.  Table 4 shows CD 2, the black turnout at 43 percent and

8  the white turnout is 42.5, it's basically neck and neck.

9  Q    Okay.  But that -- okay.  Thank you for clarifying that.

16:14:54  10  So that is what this says, though.  And you referred to that as

11  an estimate, I believe.  Is that an estimate of turnout?

12  A    Yes.  It's an estimate based on the EI method.

13  Q    The estimate you said is based on the EI method.  What

14  does -- what do you mean by that?

16:15:20  15  A    Yeah.  As I explained to the Court earlier, the ecological

16  inference method which Dr. Hood also used is a method to use

17  ecological data from geographic areas, in this case, political

18  precincts, as well as the demographic racial data from Geo

19  units, and see the relationship between the two, the EI

16:15:48  20  technology allow us to estimate not only the breakdown of

21  racial vote for candidates, in this case, Will Boyd, but also

22  the turnout of racial groups.

23      So that's why I used.  The census data and the election

24  return matched for the particular election.  And this is the

16:16:18  25  racial estimation of turnout that I reported based on EI.

1           MR. HARRIS:  Your Honor, if I can have just a moment
2    to confer with a colleague.
3           JUDGE MARCUS:  Yes, you may.
4           MR. HARRIS:  I apologize for that.
16:17:06  5    BY MR. HARRIS:
6    Q    I'll -- so this is an estimate of turnout.  Are you aware
7    that you can get actual turnout information from the Alabama
8    Secretary of State to not have to use estimated turnout data?
9    Is that something you considered?
16:17:16 10   A    I read Dr. Hood's report.  I certainly am aware now that
11   he claimed he used the racial registration data from the
12   Secretary of State, which number one, I was not aware of when I
13   did my RPV analysis.  Number two, his report give us the same
14   picture.  We both agreed by using whatever his data or my
16:17:53 15   census data, same result, RPV, racially polarized, whether, in
16   his case, he wants to use the 2020, I duplicated his research
17   from the same thing.
18         So I will be happy to see how he did it.  He didn't
19   explain what he mean biracial registration data, he one time
16:18:22 20   mentioned historical data, and then he also label as 2020
21   general turnout.  I asked the counsel for plaintiff to get
22   detailed explanation of how he got it, what he mean by the
23   racial turnout, how he got the number.  To my best of my
24   knowledge, he has not provided, and since I don't know how he
16:18:54 25   did it.

1  Q     Okay.  I'd like to ask you a couple of questions about

2  your rebuttal report.  Do you also have that in front of you?

3  A     Yes.  Let me -- yes, I am here.

4  Q     Okay.  And I am looking at page 3 specifically where you

16:19:20  5  are referring to Dr. Hood's, quote, misleading assertion about

6  black Republican candidate success.  Do you see that on page 3?

7  A     Yes, I am here.

8  Q     And I am looking at paragraph 2 where you say, A super

9  white majority district unfortunately does not allow any

16:19:39  10  realistic opportunity to estimate the extent to which RPV or

11  lack thereof may have any influence on the election outcome in

12  a typical racially contested election in Alabama.  Did I read

13  that about right?

14  A     Yes.

16:19:59  15  Q     Okay.  So I guess, can you explain to me what this

16  sentence means -- do you just mean, it doesn't show us that it

17  could affect the outcome, or doesn't tell us anything about RPV

18  at all?

19  A     No.  I didn't say anything at all.  I say what I mean,

16:20:20  20  that is, like you already re-read my statement.

21        So this is the super white majority district.  And

22  Dr. Hood used that to try to make assertion about the black

23  conservative success in Alabama.  First of all, that is not

24  correct, because this is only one small narrow House district

16:20:52  25  with 84 percent, according to his statement, white.  So how can

```
 1  you use this single area with so many whites talking about
 2  whole RPV?  That's my point, number one.
 3       Number two, as I followed the statement by presenting more
 4  facts about that race itself, to see how indeed it took -- the
 5  election took place and how groups participated and voted,
 6  indeed, as I said, it's not representative of Alabama, which is
 7  all this litigation is about.  It's about congressional
 8  districting -- redistricting.
 9       So just granted, even if we use 73 House State District to
10  talk about all Alabama congressional districts, what can we
11  learn?  Well, my paragraph stated clearly if we indeed engage
12  in RPV analysis by using the real election data from that
13  particular race that he talked about, here is the finding.
14  Very few white voters even from that very homogeneous white
15  community participated.  It's single digit, certainly less than
16  2 percent.  How do you use that election to have this
17  overarching argument for the black conservative candidates'
18  success in Alabama?  So I think my statement is very clear, and
19  my facts are here.  I didn't see any empirical data from Dr.
20  Hood about this particular election.  That's why I used that
21  sentence.
22  Q    Okay.  So do you dispute that a black Republican defeated
23  a white Republican in the primary in that election?
24  A    I didn't have that in my whole paragraph.  I don't think I
25  said anything about --
```

The timestamps in the left margin: 16:21:21 (line 5), 16:21:46 (line 10), 16:22:16 (line 15), 16:22:44 (line 20), 16:23:07 (line 25).

1    Q    Okay.  I'm not saying you did.  I'm trying to make sure.

2    Are you aware that a primary election occurred before this

3    general election?

4    A    I think I -- I referred in my report -- in my rebuttal

16:23:26 5    report how he won.  He won with just a small number -- small

6    margin.  I think I quoted here -- let me double check.

7         He defeated his white opponent in the primary was I

8    believe 50 -- 52 percent or something.  So let me double check.

9         51.1 percent vote.  So I had that.  So, of course, I was

16:24:03 10    aware of that primary.

11    Q    Okay.  And just to clarify, your opinion in general on

12    this point is that white Republicans do not support black

13    nominees or candidates; is that right?

14              MR. ROSS:  Objection.  It misstates his testimony.

16:24:35 15              JUDGE MARCUS:  Why don't you reframe your question?  I

16    am not sure that's exactly what he said.

17              MR. HARRIS:  I apologize, Your Honor.  Let me see.

18    BY MR. HARRIS:

19    Q    In your rebuttal and near the close, this is the last

16:24:52 20    paragraph you have on page 4, before your attestation there,

21    it's -- in that last sentence, you said that Dr. Hood's

22    assertion about white conservative support for black

23    Republicans has little, if any, empirical support; is that

24    right?

16:25:09 25    A    Yes, I say that.  Yeah.

1327

```
 1   Q    Okay.  So is it -- is it your opinion, then, that white
 2   Republicans do not support black candidates?
 3   A    It's -- it's stated in my rebuttal.  Dr. Hood and I both
 4   agree that there's racially-polarized voting.  In Alabama in
 5   particular, black voters show preference for black candidates
 6   who in my -- to the best of my knowledge, are all Democratic
 7   candidate at least in my RPV analysis.  In his analysis, he
 8   used -- even though the -- it's 73, he didn't use any RPV
 9   analysis whatsoever.  But he agreed with me.  At least I quoted
10   him in my rebuttal that the racially-polarized voting hadn't
11   existed in Alabama.
12   Q    Okay.  Thank you, Dr. Liu.  This will be my last little
13   section here.
14        Is it right that in Appendix 2 of your report you included
15   the cases in which you have testified previously?
16   A    Yes, correct.
17   Q    Okay.  I would like to ask you about a few of those.
18        One of them, League of Women Voters of Florida, et al.,
19   vs. Detzner, et al.  Do you recall that case?
20   A    Yes.
21   Q    What was it about?
22   A    The case was about the redistricting in Florida, yes.
23   Q    And do you recall if the Court -- do you know what the
24   Court thought of your opinion in that case?
25   A    It's been a while.  Vaguely.
```

```
 1  Q     What's your recollection?
 2  A     When I say vaguely, I remember some.  Obviously not all of
 3  them.
 4  Q     Sure.  And what was your -- you said generally or vaguely.
16:27:17  5  What's your general recollection if you had one?
 6  A     Yeah.  My recollection was that the League of Women Voters
 7  sued the government, and the state Legislature asked me to
 8  conduct racially-polarized voting, which I did.  And -- and so
 9  both sides got some support from the courts and lose some
16:27:46 10  points of their arguments, and, yeah, so I did my work about
11  RPV.  I vaguely remember some of those elections, but --
12  Q     And I am sorry.
13  A     Right.
14  Q     I'm sorry, Dr. Liu.  I may not have asked a good question.
16:28:04 15  Do you remember whether the trial court discussed your
16  testimony or referred to it in its opinion?
17  A     I don't remember anything in detail.
18  Q     Okay.  I would like to show you the opinion in that case,
19  which has not been marked as an exhibit.  This is another
16:28:28 20  published opinion from the Florida Supreme Court.
21        Okay.  Can you see my screen here?
22        JUDGE MARCUS:  Do you want to put a number on it for
23  identification, Mr. Harris?
24        MR. HARRIS:  Certainly.  Are we at 7?
16:28:44 25        JUDGE MARCUS:  I think you used 7.  I think your next
```

1    one will be 8.

2           MR. HARRIS:   Okay.   We will refer to this as the

3    Defendants' PI Hearing Exhibit 8.

4    BY MR. HARRIS:

16:28:53  5    Q    Can you read the caption of this case, the title of it up

6    here?

7           MR. ROSS:   Your Honor, I am going to object.   He said

8    he doesn't remember anything about this case, so I am not sure

9    why Mr. Harris is showing to it him.

16:29:04  10          JUDGE MARCUS:   To impeach him.   We will allow it.

11   Overruled.   Let's see if we can move this along, Mr. Harris.

12   Let's get right to the impeachment, please.

13          MR. HARRIS:   Absolutely.

14   BY MR. HARRIS:

16:29:15  15   Q    Do you recall whether the trial court opined and the

16   Supreme Court affirmed that the data you relied on was suspect?

17   A    I don't recall that at all.

18   Q    Okay.

19   A    I have no recollection of -- what -- what's stated here.

16:29:28  20   Q    Okay.

21   A    I cannot read.

22   Q    I'm sorry.   Can you read this highlighted section here?

23   And I mean, literally, can you.   I am not asking you to read

24   it.

16:29:41  25   A    Yeah, it's much clearer now.

```
 1   Q    Okay.  And it says, The trial court did not find professor
 2   Liu's testimony to be particularly helpful because the data he
 3   used to draw his conclusions from was suspect.
 4        Do you know what that order might have been referring to?
 5   A    I don't recall this at all.  The Court can certainly
 6   decide to either accept or not accept my testimony.  But in my
 7   20 years of serving as expert witness, I have many courts,
 8   quite a few courts that accepted my testimonies.  But I don't
 9   remember this exact quote at all.
10   Q    Do you know whether other courts have disregarded your
11   opinion like the one we just saw?
12   A    Could you repeat that question, please?
13   Q    Yes.  Do you know of any other instance in which a court
14   has treated your opinion that way, either disregarded it or
15   accorded it less weight because of the data you relied on?
16   A    No, I don't -- if I understand your question, you are
17   asking me whether I remember any of the courts that did not
18   accept my opinion or like this Court.  I don't.  In fact, I
19   remember quite a few courts that accepted my opinions.
20   Q    Okay.
21        MR. HARRIS:  And I'm not trying to belabor this point,
22   Your Honor.  This will be my last exhibit.
23   BY MR. HARRIS:
24   Q    I am going to show you another court opinion from Second
25   Circuit Court of Appeals in New York.  Do you recall giving
```

```
         1   testimony in this case?

         2   A    Yes, I remember this case.

         3   Q    And do you recall giving testimony specifically at the

         4   preliminary injunction hearing in this case?

16:31:30 5   A    That's a decade ago.  If you want to -- I mean, obviously,

         6   what details?

         7   Q    It's true -- do you recall giving different sets of

         8   testimony?  I'm just trying to make sure it's not confused,

         9   because there's two different sets of opinions, and I am not

16:31:48 10  trying to -- I am trying to make sure it's not -- I am not

        11   confusing the issue.

        12   A    (Nodded head.)

        13   Q    What I will represent to you what I am showing you here is

        14   an opinion based on the preliminary injunction proceedings in

16:31:59 15  that case, which is the same level of the proceedings we are at

        16   here.

        17        And do you recall the Court's treatment of your opinion in

        18   this case?

        19   A    I remember vividly the Court eventually reversed its

16:32:14 20  original decision and fully embraced my opinion, if I recall

        21   clearly.  Is this the first one -- decision?  I don't know what

        22   you are talking about here.  I have not seen this.

        23   Q    That's all right.  I apologize.  I know that all of these

        24   -- courts love to find a way to make things confusing it seems.

16:32:37 25        JUDGE MARCUS:  Mr. Harris, would you get right to the
```

```
 1  question, please.
 2          MR. HARRIS:  Yes, Your Honor.
 3  BY MR. HARRIS:
 4  Q    Do you recall that the Court found that you omitted data
 5  and that the record provided no insight as to why the data
 6  wasn't analyzed and that from when similar elections were?
 7  A    Again, I mean, there are so many details that I cannot
 8  recall everything.
 9  Q    Okay.
10  A    But this Court, this particular Court eventually decided
11  to use my opinion to find -- to have their final verdict.  So I
12  stand by my original report in the Albany case.
13  Q    Okay.
14          MR. HARRIS:  Thank you.  That is -- those are all the
15  questions I have.
16          JUDGE MARCUS:  All right.  Thank you.  Mr. Ross, are
17  you ready to go forward, or do you need a short break?  What's
18  your pleasure?
19          MR. ROSS:  If we could have just five minutes, Your
20  Honor.
21          JUDGE MARCUS:  You sure can.
22          (Recess.)
23          JUDGE MARCUS:  Mr. Ross, are you ready to proceed?
24          MR. ROSS:  Yes, Your Honor.
25          JUDGE MARCUS:  Thank you much.  You may go forward.
```

```
 1                        REDIRECT EXAMINATION

 2  BY MR. ROSS:

 3  Q     Dr. Liu, I just have a few additional questions for you.

 4        In looking at the 2020 Presidential election, you were

 5  able to identify black voters preferred candidate, right?

 6  A     Could you repeat that question, please?

 7  Q     Yeah, sure.  In looking at the election for the 2020

 8  President -- sorry.  Strike that.

 9        In looking at the 2020 Presidential election, you were

10  able to identify black voters' preferred candidate, correct?

11  A     Yes.

12  Q     And it's possible to conduct RPV analysis for uni-racial

13  elections, right?

14  A     Yes.  I stated the EI technology allow us to analyze any

15  elections as long as we have the data from the geographic

16  areas.  And then there may be the clear statistical result that

17  groups don't vote the same way.  So you have racially polarized

18  that's factually possible, of course.

19  Q     Right.  But it's your position as a scholar, though, that

20  biracial elections are more important than uni-racial

21  elections; is that right?

22  A     Yeah.  I also reemphasize, not also in my report but here

23  during in both direct and cross, biracial elections are the

24  only elections that allow us to evaluate how different voter

25  groups would make their decisions given a choice between
```

```
 1    candidates from their own racial group and alternatives.
 2         So only biracial elections allow us to do that.  That's
 3    why it's so important for us to report to the Court for these
 4    biracial elections when given the choice how voters decide.
```
16:41:20  5    Q    But, again, you're not saying that you can't conduct an
```
 6    RPV or effectiveness analysis for elections involving only
 7    white candidates, right?
 8    A    Right.  Correct.
 9    Q    Okay.  Thank you.
```
16:41:34 10         And just you had talked about -- you went over some of the
```
11    Democratic primaries that you analyzed.  Is it right that the
12    in some instances there was sort of smaller majority of black
13    voters or white voters were voting for different candidates; is
14    that right?
```
16:41:55 15    A    Yes.
```
16         MR. ROSS:  Why don't we if, Mr. Ang, if you can pull
17    up Table 1 again.
18         And just that first row there.
19    BY MR. ROSS:
```
16:42:16 20    Q    Is it right that the black support for the black candidate
```
21    was about 54 percent?
22    A    Yes.
23    Q    And white support for the white -- for the black candidate
24    was only about 17 percent?
```
16:42:29 25    A    Yes.

Q     And so Mr. Harris was positing a scenario in which, you
know, there was 49 percent white support for black candidate
and 51 percent for a black candidate.  That's not the scenario
here in your report, right?

16:42:47  A     Again, like I already said, when I answered his question
that the hypothetical 51 versus 49, in my 20-plus years of
academic research, I haven't found exact that kind.  But one
would be curious if that happens, why that happens.  But this
one certainly is not.

16:43:11  Q     There's a large difference between the black and the white
voter support, right?

A     There are 53.16, that is more than 35 percent.

Q     Thank you, Dr. Liu.

        MR. ROSS:  You can take that down, Mr. Ang.

16:43:27  BY MR. ROSS:

Q     For the endogenous elections, I believe that you said this
on the direct, but just to clarify.  For the endogenous
elections, you looked at both any-part black and single-race
black, correct?

16:43:44  A     Could you repeat that question, please?

Q     Sorry.  For your RPV analysis of endogenous elections, you
used both any-part black and single-race black, correct?

A     Correct.

Q     And whether you used any-part black or single-race black,
16:44:01  the RPV analysis essentially came out the same; is that right?

A     Yeah.   Like I repeatedly reported to the Court, including

today, the results are the same, no matter whether you are

doing endogenous particular elections by using single race or

any part to do RPV or effectiveness analysis that I conducted

16:44:27 for Plan A, they are the same.   And that just support my belief

that in Alabama they're just too few multi-racial blacks that

would make any difference whatsoever.

Q     Okay.   And just to be clear, what you were doing in your

effectiveness analysis, you were applying the results of the

16:44:48 2018 election to the plan adopted in 2021, correct?

A     Yes.

Q     And so what voter turnout might have been in a 2018

election, you were sort of -- whatever that turnout was, you

were making an estimate, right, because --

16:45:06 A     Yes, yes.

Q     -- you were applying 2018 results to 2021 -- a 2021 plan,

correct?

A     Yes.   Those are, again, by EI technology, we estimate in

the particular election given a plan if the district is drawn

16:45:24 that way, that district has that turnout.

Q     And, again, for your effectiveness analysis to determine

whether or not a black or a white candidate won, you were

looking at ultimately what the actual results of the election

were so the turnout didn't -- the turnout aspect of your RPV

16:45:44 analysis didn't matter, right?

```
 1  A    Yes.  That's a very important fact for the effectiveness
 2  analysis.  I understand that my result is simply based on total
 3  votes if the district is joined in that way for that particular
 4  election, so there's no EI or statistical inference whatsoever
 5  when I reported that.  But Dr. Hood's report used his ways of
 6  analyzing RPV, and then turnout, and then create a hypothetical
 7  election that he called his functionality analysis to get some
 8  kind of result.  But those are not actual results.  Mine, in my
 9  report, those are the vote tally if the district is drawn that
10  way.
11  Q    Thank you, Dr. Liu.
12       And Mr. Harris asked you about the *Pope vs. Albany County*
13  case.  I believe you already said this.  Just to confirm, the
14  district court ultimately agreed with you there was
15  racially-polarized voting, correct?
16  A    Yes.
17  Q    The district court found that there was a Section 2
18  violation?
19  A    Yes.
20  Q    Okay.  Thank you.
21            MR. ROSS:  No more questions, Your Honor.
22            JUDGE MARCUS:  Judge Manasco, any questions?
23            JUDGE MANASCO:  None from me.
24            JUDGE MARCUS:  Judge Moorer?
25            JUDGE MOORER:  No, sir.
```

1          JUDGE MARCUS:  I have one for you, if I might,
2   Dr. Liu.  I want to be sure that I understand this correctly.
3          THE WITNESS:  Yes, Your Honor.
4          JUDGE MARCUS:  You did an RPV analysis using 13
16:47:31 5   elections, correct.
6          THE WITNESS:  Correct.  For my initial report.
7          JUDGE MARCUS:  Yes.  I am talking about in report 1,
8   and seven of those initially were endogenous elections.
9          THE WITNESS:  Yes.
16:47:47 10          JUDGE MARCUS:  And six were exogenous elections,
11   correct?
12          THE WITNESS:  Correct.
13          JUDGE MARCUS:  When you did your analysis of all 13
14   endogenous and exogenous, did you do that analysis both based
16:48:05 15   on single-race black and any-part black?
16          THE WITNESS:  For the endogenous elections.
17          JUDGE MARCUS:  Yes, sir.
18          THE WITNESS:  Yes, I did.  But for exogenous
19   elections, which are supplemental evidence for me to report to
16:48:25 20   the Court, I didn't have time to do both any part and single
21   race.
22      So only for the endogenous elections I did both.
23          JUDGE MARCUS:  So what did you do for the exogenous
24   elections?
16:48:43 25          THE WITNESS:  For the exogenous elections, I did the

1   non-Hispanic VAP that is black.  Some people call that single
2   race.  But that's the term I use.
3                  JUDGE MARCUS:  That was in your first report or in
4   your second report?
16:49:01 5                THE WITNESS:  In my first report.
6                  JUDGE MARCUS:  And what about in your second report?
7   Did you address this question -- just bear with me for a
8   moment.
9                  THE WITNESS:  Sure.
16:49:10 10               JUDGE MARCUS:  Did you address this definitional
11  question in your second report?
12                 THE WITNESS:  In my second report, I believe I did
13  also the -- the non-Hispanic VAP that is black, because those
14  are exogenous elections.
16:49:41 15               JUDGE MARCUS:  Final question from me:  In your
16  analysis, did you find any difference as to racial-polarization
17  voting, whether you used one metric of black or a different
18  metric?
19                 THE WITNESS:  They are very close.  They're not in
16:49:56 20  front of me.  But the results of using non-Hispanic Black VAP
21  versus any-part Black VAP are very close.
22      I will be glad to report to the Court the details.  But
23  they do vary statistically, but none of them come to the point
24  where I need to change anything at all, even the level of -- or
16:50:31 25  the gap of RPV is pretty close.

1340

```
          1         JUDGE MARCUS:  All right.  Thank you.  Any follow up
          2  from counsel based on anything that I asked?  Let me start with
          3  Mr. Ross, and then Mr. Harris.
          4         MR. ROSS:  No, Your Honor.  Thank you.
16:50:48  5         JUDGE MARCUS:  Mr. Harris?
          6         MR. HARRIS:  No, Your Honor.
          7         JUDGE MARCUS:  All right.  Anyone have any questions?
          8  Any further questions for Dr. Liu?
          9      All right.  Seeing none, Dr. Liu, we thank you, and you
16:51:00 10  are excused.
         11         THE WITNESS:  Thank you, Your Honor.
         12         JUDGE MARCUS:  We will take a short break, but before
         13  we do, just tell me where we are with regard to your next
         14  witness.
16:51:13 15         MS. KHANNA:  Your Honor, our next witness will be
         16  Mr. Jones for the Caster plaintiffs.
         17         JUDGE MARCUS:  Okay.  And what's your timing on that?
         18  Do you think we can get Jones in before we break?
         19         MS. KHANNA:  I do.
16:51:26 20         JUDGE MARCUS:  That is through for the day.
         21  Mr. LaCour, are you going to be conducting the examination of
         22  Mr. Jones?
         23         MR. HARRIS:  I believe Mr. Bryant Smith will be on
         24  behalf of the state.
16:51:40 25         JUDGE MARCUS:  Do you think we have enough time to get
```

```
 1  it in?  We will go as far we can go.
 2          MR. HARRIS:  I got a thumbs up from Mr. Smith.  He
 3  thinks so.
 4          JUDGE MARCUS:  Okay.  Many, many thanks.  We will take
 5  a ten-minute break at this point.
 6          (Recess.)
 7          JUDGE MARCUS:  Are the parties ready to proceed?
 8          MS. KHANNA:  Yes, Your Honor.  For the Caster
 9  plaintiffs, my colleague Dan Osher will be taking Mr. Jones'
10  testimony.
11          JUDGE MARCUS:  And, Mr. Smith, you are ready, as well?
12          MR. SMITH:  Yes, Your Honor.
13          JUDGE MARCUS:  And, Mr. Osher, you will be doing the
14  questioning of Benjamin Jones, correct?
15          MR. OSHER:  That's correct, Your Honor.
16          JUDGE MARCUS:  All right.  Thank you very much.
17  Mr. Jones, if you would be kind enough to raise your right hand
18  and repeat after me.
19                      BENJAMIN JONES,
20  having been first duly sworn, was examined and testified as
21  follows:
22          JUDGE MARCUS:  If you would be kind enough to give us
23  your full name for the record.
24          THE WITNESS:  Benjamin Jones.
25          JUDGE MARCUS:  Thank you, sir.  And you may proceed,
```

Timestamps (left margin): 16:51:50 (line 5), 16:59:51 (line 10), 17:00:03 (line 15), 17:00:06 (line 20), 17:00:24 (line 25)

```
 1  counsel, with your direct.
 2          MR. OSHER:  Thank you, Your Honor.
 3                    DIRECT EXAMINATION
 4  BY MR. OSHER:
 5  Q    Good afternoon, Mr. Jones.
 6  A    Good afternoon.
 7  Q    Thanks for offering your time to appear today.  Can you
 8  hear me okay?
 9  A    I can, yes.
10  Q    Great.  Are you a plaintiff in this lawsuit?
11          JUDGE MARCUS:  Let me just stop you for a moment,
12  Mr. Osher.  Maybe if you can lean in and just keep your voice
13  up so that our court reporter can hear you, as well as all of
14  us in this virtual courtroom.  Thanks very much.
15          MR. OSHER:  No problem.
16  BY MR. OSHER:
17  Q    Mr. Jones, are you a plaintiff in this lawsuit?
18  A    I am.
19  Q    Where do you live?
20  A    I live in Montgomery, Alabama.
21  Q    Do you know what congressional district you live in?
22  A    I live in Congressional District Number 2.
23  Q    Where did you grow up?
24  A    I grew up in Barbour County, Alabama, Eufaula, which is
25  where I was born and raised.
```

Timestamps in left margin: 17:00:30 (line 5), 17:00:38 (line 10), 17:00:56 (line 15), 17:01:03 (line 20), 17:01:21 (line 25)

```
 1   Q     And do you have family in Alabama today?
 2   A     I do have family in Alabama.  I have sister-in-law and
 3   niece and nephew here in the Montgomery area, and I grew up, of
 4   course, in Eufaula, so I have cousins and other relatives here
 5   in Alabama.
 6   Q     And is that in Barbour County; is that right?
 7   A     That is in Barbour County.
 8   Q     Mr. Jones, how do you identify in terms of your race?
 9   A     Black.
10   Q     Could you tell me a bit about your educational background?
11   A     I graduated high school Barbour County in the school
12   system, public school system.  Studied chemical engineering at
13   Tuskegee University, Tuskegee, Alabama.  Studied -- well,
14   jurisprudence at Jones School of law Faulkner University in
15   Montgomery.  Studied theology at Birmingham Theological
16   Seminary in Birmingham, Alabama, and studied public policy and
17   administration at Virginia Commonwealth University in Richmond,
18   Virginia.
19   Q     And what do you currently do for a living?
20   A     Currently, I'm the CEO of Montgomery Community Action
21   Agency working with the Community Action Committee Agency,
22   Inc., and I pastor a church in the Pike Road area outside of
23   Montgomery County.
24   Q     Can you tell us a little bit about Montgomery Community
25   Action, what does that organization do?
```

A      Montgomery Community Action Agency is a non-profit agency.
We have the Head Start program where we served 1,299 children
and families with Early Head Start and Head Start program.  We
have senior program.  We administer the CSBG -- Community
17:03:23  Services Block Grant programs.  We administer LIHEAP -- Low
Income Heat and Energy Assistance Program.  We have senior
programs.  We have youth programs.  And housing programs.  We
also have a self-sufficiency program where we help individuals
with training and getting jobs.
17:03:41 Q    Can you tell us what the general demographic of the
community that Montgomery Community Action services?
A      Montgomery Community Action generally serves a population
with demographics of about 80-plus percent black, and the other
would be about I guess 10 percent, 15 percent white.  And then
17:04:08 the others would just be that few numbers of Hispanics and
Latinos.
Q    And can you tell us a little bit about your church?  Where
is it located?
A    My church is located in the outskirts of Montgomery
17:04:22 County, Pike Road area.  And the demographics of my church is
about 90 percent black and about 10 percent white.
Q    So through this work at Montgomery Community Action and
pastoring your church, would you say that you have had the
opportunity to become familiar with the interests and needs of
17:04:40 the black community in your area?

```
 1   A      I would say so, yes.
 2   Q      Okay.  Mr. Jones, are you registered to vote in Alabama?
 3   A      I am.
 4   Q      Do you vote regularly?
 5   A      Never missed an election since I was voting age.
 6   Q      Would you say it's important to you?
 7   A      It's extremely important to me.  Voting is extremely
 8   important.  I am 1 of 16 children raised by my parents, and
 9   voting was extremely important to them, and my parents
10   participated in the voting right marches of the 1960s.
11   Q      Can you tell us a little bit more about your father's
12   activism?
13   A      My father was extremely active in marching and
14   participating in the Civil Rights marches of 1960s along with
15   some of my older sisters and brothers.  And they went to jail
16   on a number of occasions for voting, and my mother -- I think
17   they just had a strategy that they put together, and my mother
18   had to stay out, so she wasn't allowed to go to the marches,
19   but someone had to be out to get them out of jail, and so my
20   understanding was they went on several occasions.
21   Q      Being able to vote, what does that mean to you?
22   A      Well, for me, voting is extremely critical.  It is the
23   opportunity to be a part of the operation of local, state, and
24   national government.  Partly because we are governed by the
25   voting of individuals.  We are supposed to be led by ourselves
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1   in terms of voting and selecting a representative to represent
 2   our interests.  So it's extremely important to have my
 3   interests represented.
 4   Q    Do you know who currently represents the Second
 5   Congressional District?
 6   A    Yes.  Barry Moore.
 7   Q    And prior to last year, do you know who represented the
 8   Second Congressional District?
 9   A    Martha Roby.
10   Q    Did you vote for Barry Moore in 2020?
11   A    I did not.
12   Q    But he won nonetheless?
13   A    He did.
14   Q    And did you vote for Martha Roby the election cycle before
15   then?
16   A    I did not.
17   Q    And she won nonetheless?
18   A    She did.
19   Q    Do you know whether since 2012 the congressional elections
20   in your district have been competitive?
21   A    Well, I wouldn't say they've been competitive.  Since I
22   recall, Martha Roby I think ran in 2014 was Eric Wright, and I
23   think that was about a 30-something percent swing.  She had
24   about 60-plus percent, and the same happened with Barry Moore
25   with Phyllis Harvey-Hall.  He had about 60 something, and she
```

17:06:33  5
17:06:43 10
17:06:55 15
17:07:05 20
17:07:35 25

```
 1  had about 30 percent.  So I wouldn't say that was very
 2  competitive.
 3  Q    So those are 30-point margins?
 4  A    Correct.
```
17:07:45
```
 5  Q    And both of those races that you identified, Mr. Wright
 6  and Ms. Harvey-Hall, those were both black candidates?
 7  A    They were, yes.
 8  Q    In light of these results, do you feel like you have a say
 9  in Alabama's congressional elections?
```
17:08:02
```
10  A    Well, for my congressional district, I think that is
11  almost a foregone conclusion that the conservative candidate is
12  going to win in the general election, yes.
13  Q    And you said that you did not support Mr. Moore last
14  election, and you did not support Ms. Roby before then.  Can
```
17:08:28
```
15  you tell us why you voted for the candidate that opposed those
16  representatives?
17  A    Well, certainly because the -- because of my work with
18  Community Action and my pastoring and just knowing the black
19  community that I serve here in Montgomery County, I haven't
```
17:08:53
```
20  felt that Martha Roby have represented the interests of the
21  blacks in this -- in this Montgomery area.  And just judging
22  from the campaign for Barry Moore, I did not see where he would
23  represent the interest of the blacks, as well.
24  Q    Mr. Jones, what result are you trying to achieve in this
```
17:09:20
```
25  lawsuit?
```

1348

```
 1  A    Well, I would like to just see for the blacks in
 2  Montgomery in this area a candidate who at least have an
 3  opportunity to represent the interests of the black community.
 4  Q    And is it your understanding that to bring about that
 5  result, the plaintiffs in this case are seeking to create a
 6  second majority-black district?  Is that your understanding?
 7  A    That is correct, yes.
 8  Q    If that were to happen, do you think it's likely that
 9  someone else who has not served your congressional district
10  would then be elected?
11  A    I believe so, yes.
12  Q    Uh-huh.  And would that change in representation -- do you
13  think that would benefit or harm the black community in your
14  area?
15  A    Well, I think it can only benefit the black community,
16  certainly the more representation that we have, the better the
17  opportunity of our interests to be served.
18  Q    Mr. Jones, based on your experience working in Montgomery,
19  does the black community there have unique needs relating to
20  education?
21  A    I would say that the black community has unique needs,
22  because in Montgomery public school system in Montgomery
23  County, population of blacks in the school system is probably
24  about 85 to 90 percent, and certainly Montgomery County has for
25  a long time had a very low tax base for millage for the school
```

Timestamps (left margin): 17:09:44 (line 5), 17:10:00 (line 10), 17:10:10 (line 15), 17:10:34 (line 20), 17:10:55 (line 25)

1      system, and the majority of the whites in Montgomery County are

2      in the public schools.  And I mean -- in the private schools --

3      blacks in the public schools.  And so with the low tax base,

4      the school system is substandard.  So the education is

17:11:18  5      substandard.  And so then that causes issues for blacks, in

6      terms of getting a good quality education and going from that

7      to getting a good quality job to serve their families.

8      Q      What about affordable child care for kids who aren't yet

9      of school age?  Is that a problem for a unique problem -- I

17:11:40  10      should say -- sorry.  Does the black community have a unique

11      need in that area, as well?

12      A      Oh, absolutely.  Child care is expensive for everybody.

13      But when you're struggling to hold more than one job or so to

14      support your family, then it becomes extremely critical, and so

17:12:03  15      with the cost of child care, it is extremely difficult on

16      blacks who are perhaps working low -- low-income jobs in the

17      beginning.  So that just makes it all the more difficult.

18      Q      Are you aware that a recent federal legislation that would

19      have addressed this unique -- this particular need that the

17:12:26  20      black community has?

21      A      Well, I think that the bipartisan infrastructure bill had

22      some funds in it for creating jobs and perhaps addressing some

23      needs that could have been helpful or would be helpful or will

24      be helpful to blacks in Montgomery County because that bill did

17:12:51  25      pass.

```
 1   Q    Do you know if Representative Moore voted for that
 2   infrastructure bill?
 3   A    No.  He voted against it.  As a matter of fact, the entire
 4   delegation did, except for Terri Sewell.
 5   Q    Uh-huh.  And Terri Sewell represents -- am I correct, she
 6   represents a majority-black district?
 7   A    She does, yes.
 8   Q    What about the Build Back Better Act?  Are you familiar
 9   with that?
10   A    I am.
11   Q    Yes.  Do you know whether that legislation addresses the
12   need of affordable child care?
13   A    It does, yeah.  There is affordable child care in that I
14   think the -- a few hundred billion in there, couple of hundred
15   billion for --
16   Q    And?
17   A    Child tax credit and some -- some that are in there for
18   our pre-K, which is a part of what we work with, as well, so
19   all of that would be beneficial to blacks in the low-income
20   bracket.
21   Q    Do you know how Representative Moore voted on the Build
22   Back Better Act?
23   A    He voted against it.
24   Q    And the Build Back Better Act and the infracture act, did
25   you want Representative Moore to support them?
```

17:13:02  5
17:13:13 10
17:13:31 15
17:13:49 20
17:13:58 25

```
 1  A     Absolutely.
 2  Q     And do you think that his opposition to these pieces of
 3  legislation did it serve or disserve the black community in
 4  your area?
17:14:09  5  A     Definitely disserved the community.
 6  Q     You talked about this a bit.  Does the black community in
 7  your area have unique needs related to employment?
 8  A     Yes absolutely.
 9        I mean, clearly, employment for everyone was important.
17:14:30 10  But if you start out with an education system that is poor,
11  then it makes it all the more difficult to get good quality
12  jobs, a good high-paying job, and so for the black community,
13  for a large portion of the black community in Montgomery
14  County, if they're seeking a job, they're seeking jobs in those
17:14:56 15  areas that are going to be low wages.  And so that makes it all
16  the more difficult for them to get good quality employment.
17  And then that also bleeds then into affordable housing, because
18  if you don't have a good quality job, it's difficult to get
19  good quality housing and all the other issues that comes along
17:15:20 20  with it like black health care and things of that nature.
21  Q     Based on your experience, has the COVID-19 pandemic
22  exacerbated the black community's needs related to employment?
23  A     Most definitely.  In our -- in this agency, we've seen a
24  tremendous increase over the last couple of years in those
17:15:42 25  persons who have come to seek assistance from the program.
```

```
 1  That's true across all of racial groups in -- for us, but
 2  blacks were already the higher number, and that just compounded
 3  it to be even greater.  So we have seen a tremendous amount of
 4  blacks seeking assistance.
```
17:16:03  5  Q    Are you familiar with the American Rescue Plan?

      6  A    I am.  Yes.

      7  Q    Is that otherwise known as the 2021 COVID Relief Bill?

      8  A    It is, yes.

      9  Q    Did that legislation -- do you know whether that

17:16:19  10  legislation had provisions providing assistance to people who

    11  lost their job during the pandemic?

    12  A    It did.  And had provisions for funding for our agency, as

    13  well, to assist people, so it was a bill that provided

    14  assistance for a number of families on that level, yes.

17:16:38  15  Q    And how did Representative Moore vote on that piece of

    16  legislation?

    17  A    He voted against that also.

    18  Q    And did you want him to support it?

    19  A    Absolutely.

17:16:47  20  Q    Did his vote against that bill serve or disserve the black

    21  community in your area?

    22  A    Definitely disserved the black community.

    23  Q    You talked a bit about health care.  Is that a unique need

    24  among the black community in your area?

17:17:03  25  A    Health care is a tremendous need.  We have in the black

1353

|   | |
|---|---|
| 1 | community, Montgomery County, there's a lot of diabetes, a lot |
| 2 | of preexisting conditions that was aggravated by COVID-19 or |
| 3 | brought out or highlighted by COVID-19.  And so there's a |
| 4 | tremendous need for health care. |

17:17:21  5   Q    When she was in office, did Martha Roby take any actions

6   relating to legislation dealing with health care?

7   A    The only thing that I could think of is that she voted to

8   repeal the Affordable Care Act.

9   Q    Did you want her to support the repeal of the Affordable

17:17:41 10  Care Act?

11  A    Not at all.

12  Q    Why not?

13  A    I mean, of course, the Affordable Care Act if it was

14  repealed would have certainly hurt a tremendous number of black

17:17:53 15  families in Montgomery County.  As a matter of fact, we were

16  hoping that there would be more support for expanding it and

17  for Alabama accepting the expansion of Medicaid.

18  Q    And has, to your knowledge, has Alabama expanded Medicaid

19  under the Affordable Care Act?

17:18:12 20  A    Not -- not to date, no.

21  Q    And what effect has that had on the black community?

22  A    It's certainly has been a negative for the black community

23  for the entire state for those who are poor and impoverished

24  and in need of health care.

17:18:29 25  Q    We spoke about the Build Back Better Act a bit ago.  Do

|   | |
|---|---|
| 1 | you know whether that contained provisions helping those who |
| 2 | don't have access because of the failure to expand Medicaid |
| 3 | under the Affordable Care Act? |
| 4 | A    It does have provisions for health care. |
| 17:18:46  5 | Q    And Representative Moore voted against that legislation? |
| 6 | A    Absolutely. |
| 7 | Q    What about access to utilities, quality and affordable |
| 8 | utilities, is that an issue for the black community in your |
| 9 | area? |
| 17:19:05 10 | A    It is.  As I stated earlier, the agency here at Community |
| 11 | Action, we assist families with energy assistance, and we have |
| 12 | a tremendous number of blacks who have -- COVID has increased |
| 13 | that number, but we have a tremendous number of blacks that |
| 14 | come to our agency for assistance with energy because of the |
| 17:19:32 15 | need for it and the difficulty of maintaining it. |
| 16 | Q    Any of the legislation we have talked about, did that |
| 17 | address that need? |
| 18 | A    Well, I think -- yeah, the American Rescue Plan assisted |
| 19 | in that area.  Build Back Better will provide funding to help |
| 17:19:55 20 | that, as well.  And some of the climate change items that are |
| 21 | there, as well. |
| 22 | Q    Any other pieces of federal legislation that you believe |
| 23 | Representative Moore's positions have been adverse to the black |
| 24 | community in your area? |
| 17:20:10 25 | A    I would say that -- well, the Voting Rights Act have been |

1  something that would have been -- will be beneficial to the

2  black community if it's passed.  And Representative Moore has

3  not voted in favor of that.

4  Q    Can you tell us a bit more about why you think those

17:20:36  5  voting-related pieces of legislation would benefit the black

6  community?

7  A    Well, because clearly as I stated earlier, voting is one

8  of those things that is important because it gives us an

9  opportunity to select those representatives who would represent

17:20:54 10  our interest.  And if we are not clearly -- if we don't have

11  that clear right to have better access to voting, better access

12  to voter registration, and all of those things, then it's

13  adverse to the black community.

14  Q    The things that we have talked about -- education, health

17:21:15 15  care, employment, those -- you are not asserting that white

16  residents of Alabama don't have needs related to those areas,

17  right?

18  A    Oh, absolutely not.  Those are things that every race will

19  need, and every person in Alabama would really need to have

17:21:36 20  access to all of those things.  I guess my assertion is that

21  blacks are behind in all of those things already.  We have a

22  higher rate of uneducated individuals.  We have a higher rate

23  of persons in need of health care, a higher rate of persons in

24  need of affordable housing, and certainly a higher rate of

17:21:59 25  blacks in prison.  So criminal justice is important to us, as

1356

1   well, than it is whites in jail.

2        So we are -- our representation is out of sort for a

3   number of things.  And our population in the state of Alabama

4   is about 20-plus percent, 25, 27 percent.  And our

17:22:23  5   representation in the prison is about 50-plus percent.

6   Q    We have been talking a lot about federal legislation,

7   which I guess that is not surprising because this case is about

8   congressional districts.

9        Aside from federal legislation, do you think a

17:22:39 10   congressional representative can also impact state policy?

11   A    Well, I certainly think so.  I certainly think that

12   because of the way state legislators approach congressional

13   delegation for support on things that they want, I think that

14   gives the opportunity for collaboration and that collaboration

17:23:05 15   could be helpful to local policies, as well as federal policy.

16   Q    And you spoke earlier about Representative Sewell who

17   represents District 7, which is a majority-black district.  Do

18   you think she has used her political capital as a federal

19   legislator to impact state policy that's been beneficial to the

17:23:25 20   black community?

21   A    Oh, absolutely.  I think that she has taken every

22   opportunity to collaborate with state officials and state

23   government and do what she could from her position to assist in

24   those things that are of interest to blacks in her district and

17:23:44 25   throughout the state.

```
 1  Q     Mr. Jones, are you a member of a political party?
 2  A     I am.  I am a registered Democrat.
 3  Q     Do you have a sense of whether in Alabama black voters
 4  tend to support either of the major political parties?
 5  A     Of course, black voters in Alabama tend to vote
 6  Democratic.  And I think, of course, that's based on looking
 7  for who would best represent the black interest.
 8  Q     Can you tell us a little bit more -- well, why don't you
 9  tell us why you are a member of the Democratic Party.
10  A     Well, again, I will stress that I -- I am a part of the
11  Democratic Party only because it represents more of those
12  interests that I have in terms of things I would like to see
13  like the Build Back Better Act or the infrastructure bill that
14  would help the American Rescue Plan and anything that could
15  help the population that I serve, which is not necessarily
16  having to be black, just those persons who are low income and
17  in need, and those things are better represented by the
18  Democrats at this time.
19  Q     Do you have a sense of whether white voters in Alabama
20  tend to support one of the two major parties?
21  A     Well, certainly in Alabama, the majority of white voters
22  support the Republican Party.
23  Q     Do you think -- to what extent, if any, do you think this
24  division is influenced by race in issues explicitly tied to
25  race?
```

```
 1  A    Well, I mean, from all of my voting career and all of my
 2  time voting in Alabama, I would say that I am -- I have always
 3  had a sense that race was playing a part in every election.
 4  When I think about the southern strategy and how race always
17:25:49  5  seems to come up in how it's always somehow even if it's
 6  indirect or direct, it somehow plays a part in our voting in
 7  Alabama.
 8  Q    Do you think that division has gotten better or worse in
 9  the last few years?
17:26:04 10  A    I'd say it's gotten much worse.
11  Q    Can you tell us why you say that?
12  A    Well, it appears that there is no compromise or
13  collaboration as it relates to the things that would represent
14  the interest of all people, including those who are low income
17:26:27 15  and impoverished and in need of health care, things of those
16  nature.  It seems that those things are not even considered.
17  It's just it seems that everything goes along partisan lines.
18  Q    And --
19  A    And race becomes a big part of that since blacks tend to
17:26:48 20  be the ones who have the higher numbers in the negative
21  categories.
22  Q    Mr. Jones, are you familiar with the region called the
23  Black Belt?
24  A    I am, yes.
17:27:01 25  Q    Does the black community have an important history in the
```

```
 1  Black Belt?
 2  A    Oh, no doubt.  Absolute.
 3  Q    To what extent, if any do you think there are connections
 4  between the black communities in your area and those who live
 5  in the Black Belt?
 6  A    Well, those items that we talked about earlier, education,
 7  is an issue in the Black Belt because of the poverty, the level
 8  of poverty, the low tax base in the Black Belt, along with that
 9  would be health care issues because it's very rural in the
10  Black Belt.  And there's not a lot of quality health care
11  available to people in the Black Belt.  Affordable housing
12  would be the same issue in the Black Belt, as well as criminal
13  justice is an issue in the Black Belt.
14       So Montgomery is tied to the Black Belt.  It's almost one
15  and the same for the black population.
16  Q    And joining those two areas together to enable black
17  voters in the area to elect their candidate of choice, would
18  that allow those communities to receive better representation?
19  A    I think it would, yes.
20       MR. OSHER:  Mr. Jones, I have no more questions for
21  you.  Thank you.
22       JUDGE MARCUS:  All right.  Thank you.
23  Cross-examination, Mr. Smith?
24       MR. SMITH:  Thank you, Your Honor.
25                        CROSS-EXAMINATION
```

```
 1   BY MR. SMITH:
 2   Q     Good evening, Mr. Jones.  Can you hear me okay?
 3   A     Yes, sir.  Good evening, Mr. Smith.
 4   Q     All right.  Mr. Jones, you spoke about the organization
 5   you lead, the Montgomery Community Action, right?
 6   A     That's correct.
 7   Q     And that organization, you all have programs that provide
 8   financial assistance to Montgomery residents.  Did I understand
 9   that right?
10   A     That is correct.  Montgomery County we serve.
11   Q     And do you receive grants from the state that fund any of
12   those programs?
13   A     We receive grants from the federal government that do come
14   through the state, LIHEAP and CSBG.
15   Q     You do receive some grants that are administered by ADECCO
16   for example?
17   A     That is correct.  Absolutely.
18   Q     And, Mr. Jones, I think you testified that you pastor a
19   church in Pike Road; is that right?
20   A     That is correct.
21   Q     And that's in the eastern part of Montgomery County, east
22   of the city, right?
23   A     That's correct.
24   Q     And, Mr. Jones, would you support a congressional plan
25   that put your church in a district that would be represented by
```

1  a Republican representative?

2  A     It is now, yes.

3  Q     What I'm asking, I think, Mr. Jones, is whether you would

4  support a new congressional plan that had the result of putting

17:29:47 5  your church in a district that would be represented by a

6  Republican representative?

7  A     I am not -- well, I guess I am not really clear.  Since

8  it's already there, I am not clear that I understand the

9  question.

17:30:06 10  Q     Well, let me share my screen with you, Mr. Jones.

11        Mr. Jones, this is Caster Plaintiffs' Exhibit 19, I

12  believe.  And this is a proposed congressional map.

13        Mr. Jones, based on your familiarity with your church and

14  with Montgomery County, would it look to you like your church

17:30:44 15  would probably be in the green portion of this map?

16  A     231?  Yes.  Some portion of it.

17  Q     And, Mr. Jones, if that green district was represented by

18  a Republican representative, would you support that plan?

19  A     I mean, I guess I'm not really sure that it would make a

17:31:11 20  difference on that end of it, so.

21  Q     Mr. Jones, would you prefer if your church were in a

22  district that was represented by a Democratic representative?

23  A     Well, I guess my main interest would be a person who would

24  serve the interests of the black community.  So if that would

17:31:32 25  be a Democratic representative, yes.

```
 1  Q     So, Mr. Jones, to that point, what kind of representative
 2  would, in your view, represent the interests of the black
 3  community?
 4  A     Well, clearly, one that would vote for the Build Back
 5  Better plan, one that would vote for a bipartisan
 6  infrastructure plan, one that would support the expansion of
 7  Medicaid in the state of Alabama, one that just would take into
 8  consideration the needs of the black community.
 9  Q     Could that person be either black or white?
10  A     Could be, yes.
11  Q     Could that person be either a Republican or a Democrat?
12  A     Very much could be, yes.
13  Q     And, Mr. Jones, I heard you testify you gave some
14  testimony about race being part of the reason that people vote
15  the way they do.  Is that based on any research you have done,
16  or is that just your opinion?
17  A     Actually, just based on my experience and the people that
18  I know and talk to, not necessarily research or opinion, just
19  people that I have had conversation with.
20  Q     Thank you, Mr. Jones.
21        Mr. Jones, do you know state Senator Kirk Hatcher?
22  A     I do.
23  Q     And how do you know him?
24  A     I know him as a representative for the state Senate here
25  in Montgomery.  And I know him as an employee of Montgomery
```

```
         1  Community Action.
         2  Q    So he is one of your employees?
         3  A    He is, yes.
         4  Q    And, Mr. Jones, you testified that you grew up in Barbour
17:33:24 5  County, right?
         6  A    I did.
         7  Q    And specifically, in Eufaula?
         8  A    That's correct.
         9  Q    And Eufaula, it hugs the Georgia line, right?
17:33:33 10 A    That's correct, yes.
        11  Q    So, Mr. Jones, based on your familiarity with Eufaula, do
        12  folks in Eufaula drive to Mobile for work?
        13  A    Folks in Eufaula?  To Mobile?  No.
        14  Q    Do they get their news from Mobile?
17:33:52 15 A    They don't.
        16  Q    Do they go hopping in Mobile?
        17  A    Perhaps from time to time, they might.
        18  Q    But not as a regular matter?
        19  A    No.
17:34:03 20      MR. SMITH:  Your Honor, if I could have just a moment.
        21       JUDGE MARCUS:  You sure can.
        22       MR. SMITH:  No further questions, Your Honor.  We pass
        23  the witness.  Thank you, Mr. Jones.
        24       JUDGE MARCUS:  All right.  Thank you.  Mr. Osher, any
17:34:20 25 redirect?
```

```
 1              MR. OSHER:  No, Your Honor.  Mr. Jones, thank you for
 2   your time.
 3              THE WITNESS:  Thank you.
 4              JUDGE MARCUS:  Any questions, Judge Manasco, Judge
 5   Moorer, for Mr. Jones?
 6              JUDGE MANASCO:  None from me.
 7              JUDGE MOORER:  No.  Thank you.
 8              JUDGE MARCUS:  Thank you, Mr. Jones.  You are excused.
 9              THE WITNESS:  Thank you.
10              JUDGE MARCUS:  We will break for the day until 9:00
11   a.m. Central Standard Time tomorrow.
12         Just a quick question.  Ms. Khanna, are you -- you have
13   another witness you are putting on tomorrow morning?
14              MS. KHANNA:  Tomorrow, we have two witnesses.  Our
15   expert Dr. King, and our final fact witness, Mr. Caster.
16         We have spoken with Mr. Davis for the state who noted that
17   Dr. Hood, his schedule requires that he goes tomorrow morning,
18   so we would allow him to come in out of order tomorrow morning.
19              JUDGE MARCUS:  Okay.  That's your pleasure, counsel,
20   for the counsel for the state?  You are going to start with
21   Dr. Hood in the morning, right?
22              MR. DAVIS:  Yes, Your Honor.  Because of scheduling
23   issues, plaintiffs' counsel have graciously agreed.
24              JUDGE MARCUS:  Length of time with Dr. Hood, your
25   sense, direct, cross?
```

1        MR. DAVIS:  Mr. Smith will be leading that direct.
2  And he believes it will take less than an hour, correct, Mr.
3  Smith?  Yes.
4        JUDGE MARCUS:  And on cross, your sense, Ms. Khanna,
17:35:41 5  Mr. Ross, Mr. Blacksher?
6        MS. KHANNA:  The various groups, I think, have
7  discussed on timing.  Ms. Madduri will be crossing for our
8  team, the Caster team, and we believe it will be about
9  45 minutes or less.
17:35:56 10        JUDGE MARCUS:  Mr. Ross, any sense?
11        MR. ROSS:  The same, Your Honor.  45 minutes or so.
12        JUDGE MARCUS:  Okay.  And, Mr. Blacksher, if you have
13  any questions?  Of course, that's your choice.
14        MR. BLACKSHER:  Yes.  I think Mr. Quillen will
17:36:11 15  cross-examine, and it should not take any longer than the
16  45 minutes the others are talking about.
17        JUDGE MARCUS:  Okay.  I only go through this so you
18  can have lined up, Ms. Khanna, your next witness after that, I
19  guess that whether it's the fact witness or your expert.  You
17:36:29 20  will get to them maybe late in the morning, perhaps not until
21  after lunch.
22      Any other issues that anyone wanted to raise before we
23  break for the evening?
24      All right.  Seeing none, thank you all.  And we will see
17:36:45 25  you back here at 9:00 a.m. Central Standard Time.

1    (Whereupon, the above proceedings were concluded at

2    5:36 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1       <u>CERTIFICATE</u>

2

3

4       I certify that the foregoing is a correct

5   transcript from the record of proceedings in the

6   above-entitled matter.

7

8

9

10

11                                          <u>01-10-2022</u>

12   Christina K. Decker, RMR, CRR          Date

13   Federal Official Court Reporter

14   ACCR#:  255

15

16

17

18

19

20

21

22

23

24

25