FILED
2022 Jan-18 PM 03:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ALABAMA
 2                         SOUTHERN DIVISION

 3

 4      BOBBY SINGLETON, et al.,        *
                 Plaintiffs,            *   2:21-cv-1291-AMM
 5                                       *   January 12, 2022
        vs.                              *   Birmingham, Alabama
 6                                       *   8:30 a.m.
        JOHN MERRILL, in his official *
 7      capacity as Alabama Secretary *
        of State, et al.,                *
 8               Defendants.            *
        *******************************
 9                                       *
        EVAN MILLIGAN, et al.,           *
10               Plaintiffs,            *   2:21-cv-1530-AMM
                                         *
11      vs.                              *
                                         *
12      JOHN MERRILL, in his official *
        capacity as Alabama Secretary *
13      of State, et al.,                *
                 Defendants.            *
14      *******************************
                                         *
15      MARCUS CASTER, et al.,           *
                 Plaintiffs,            *   2:21-cv-1536-AMM
16                                       *
        vs.                              *
17                                       *
        JOHN MERRILL, in his official *
18      capacity as Alabama Secretary *
        of State, et al.,                *
19               Defendants.            *
        *******************************
20

21

             TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
22                      VIA ZOOM CONFERENCE
                            VOLUME VII
23            BEFORE THE HONORABLE ANNA M. MANASCO,
                 THE HONORABLE TERRY F. MOORER,
24               THE HONORABLE STANLEY MARCUS

25
```

CHRISTINA K. DECKER, RMR, CRR
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1

2      Proceedings recorded by OFFICIAL COURT REPORTER, Qualified

3   pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
     and Procedures Vol. VI, Chapter III, D.2.  Transcript

4           produced by computerized stenotype.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                          APPEARANCES

 2

        FOR THE SINGLETON PLAINTIFFS:
 3
        James Uriah Blacksher
 4      JAMES U. BLACKSHER, ATTORNEY
        825 Linwood Road
 5      Birmingham, AL 35222
        205-612-3752
 6      Fax: 866-845-4395
        Email: Jublacksher@gmail.com
 7
        Myron C Penn
 8      PENN & SEABORN LLC
        53 Highway 110
 9      PO Box 5335
        Union Springs, AL 36089
10      334-738-4486
        Fax: 334-738-4432
11      Email: Myronpenn28@hotmail.com

12      Joe R Whatley, Jr
        WHATLEY KALLAS LLP
13      2001 Park Place North Suite 1000
        Birmingham, AL 35203
14      205-488-1200
        Fax: 800-922-4851
15      Email: Jwhatley@whatleykallas.com

16      Henry C Quillen
        WHATLEY KALLAS LLP
17      159 Middle Street Suite 2D
        Portsmouth, NH 03801
18      603-294-1591
        Fax: 800-922-4851
19      Email: Hquillen@whatleykallas.com

20      W Tucker Brown
        WHATLEY KALLAS LLC
21      P.O. Box 10968
        Birmingham, AL 35202-0968
22      205-488-1200
        Fax: 800-922-4851
23      Email: Tbrown@whatleykallas.com

24

25
</pre>

1    Diandra "Fu" Debrosse Zimmermann
     DICELLO LEVITT GUTZLER
2    420 20th Street North
     Suite 2525
3    Birmingham, AL 35203
     205-855-5700
4    Fax: 205-855-5784
     Email: Fu@dicellolevitt.com
5
     Eli Joseph Hare
6    DICELLO LEVITT GUTZLER LLC
     420 20th Street North, Suite 2525
7    Birmingham, AL 35203
     205-855-5700
8    Fax: 205-855-5784
     Email: Ehare@dicellolevitt.com
9

10   FOR THE MILLIGAN PLAINTIFFS:

11
     Deuel Ross
12   NAACP LEGAL DEFENSE &
     EDUCATIONAL FUND, INC.
13   700 14th Street N.W. Ste. 600
     Washington, DC 20005
14   (202) 682-1300
     Dross@naacpldf.org
15
     Leah Aden
16   Stuart Naifeh
     Kathryn Sadasivan
17   Brittany Carter
     NAACP LEGAL DEFENSE &
18   EDUCATIONAL FUND, INC.
     40 Rector Street, 5th Floor
19   New York, NY 10006
     (212) 965-2200
20   Laden@naacpldf.org
     Snaifeh@naacpldf.org
21
     Davin M. Rosborough
22   Julie Ebenstein
     AMERICAN CIVIL LIBERTIES
23   UNION FOUNDATION
     125 Broad St.
24   New York, NY 10004
     (212) 549-2500
25   Drosborough@aclu.org
     Jebenstein@aclu.org

1    Kaitlin Welborn
     LaTisha Gotell Faulks
2    AMERICAN CIVIL LIBERTIES UNION
     OF ALABAMA
3    P.O. Box 6179
     Montgomery, AL 36106-0179
4    (334) 265-2754
     Kwelborn@aclualabama.org
5    Tgfaulks@aclualabama.org

6    David Dunn
     HOGAN LOVELLS US LLP
7    390 Madison Avenue
     New York, NY 10017
8    (212) 918-3000
     David.dunn@hoganlovells.com
9
     Michael Turrill
10   Harmony A. Gbe
     HOGAN LOVELLS US LLP
11   1999 Avenue of the Stars
     Suite 1400
12   Los Angeles, CA 90067
     (310) 785-4600
13   Michael.turrill@hoganlovells.com
     Harmony.gbe@hoganlovells.com
14
     Shelita M. Stewart
15   Jessica L. Ellsworth
     HOGAN LOVELLS US LLP
16   555 Thirteenth Street, NW
     Washington, D.C. 20004
17   (202) 637-5600
     Shelita.stewart@hoganlovells.com
18
     Blayne R. Thompson
19   HOGAN LOVELLS US LLP
     609 Main St., Suite 4200
20   Houston, TX 77002
     (713) 632-1400
21   Blayne.thompson@hoganlovells.com

22

23

24

25

1       Sidney M. Jackson
        Nicki Lawsen
2       WIGGINS CHILDS PANTAZIS
        FISHER & GOLDFARB, LLC
3       301 19th Street North
        Birmingham, AL 35203
4       Phone: (205) 341-0498
        Sjackson@wigginschilds.com
5       Nlawsen@wigginschilds.com

6

7       FOR THE CASTER PLAINTIFFS:

8       Abha Khanna
        ELIAS LAW GROUP LLP
9       1700 Seventh Avenue, Suite 2100
        Seattle, WA 98101
10      206-656-0177
        Email: AKhanna@elias.law

11

12      Aria C Branch
        ELIAS LAW GROUP LLP
        10 G St NE, Suite 600
13      Washington, DC 20002
        202-968-4490
14      Fax: 202-968-4498
        Email: ABranch@elias.law

15

16      Daniel C Osher
        ELIAS LAW GROUP
        10 G Street NE
17      Suite 600
        Washington, DC 20002
18      202-968-4490
        Email: DOsher@elias.law

19

20      Joseph N. Posimato
        Elias Law Group LLP
        10 G Street, NE; Suite 600
21      Washington, DC 20002
        202-968-4518
22      Email: Jposimato@elias.law

23      Lalitha D Madduri
        ELIAS LAW GROUP LLP
24      10 G Street NE, Suite 600
        Washington, DC 20002
25      202-968-4490
        Email: Lmadduri@elias.law

```
1        Olivia N. Sedwick
         Elias Law Group LLP
2        10 G Street, NE; Suite 600
         Washington, DC 20002
3        202-968-4518
         Email: Osedwick@elias.law
4

5        Richard P Rouco
         QUINN CONNOR WEAVER DAVIES & ROUCO LLP
6        Two North Twentieth Street
         2 20th Street North
7        Suite 930
         Birmingham, AL 35203
8        205-870-9989
         Fax: 205-803-4143
9        Email: Rrouco@qcwdr.com

10

11

12       FOR THE DEFENDANT:

13       Andrew Reid Harris
         OFFICE OF THE ATTORNEY GENERAL
14       CONSTITUTIONAL DEFENSE DIVISION
         501 Washington Avenue
15       Montgomery, AL 36130
         334-353-8891
16       Email: Reid.Harris@AlabamaAG.gov

17       Benjamin Matthew Seiss
         ALABAMA OFFICE OF THE ATTORNEY GENERAL
18       P.O. Box 300152
         501 Washington Ave (36104)
19       Montgomery, AL 36130
         334-353-8917
20       Fax: 334-353-8400
         Email: Ben.seiss@alabamaag.gov
21
         Brenton Merrill Smith
22       OFFICE OF THE ATTORNEY GENERAL OF ALABAMA
         P.O. Box 300152
23       501 Washington Avenue
         Montgomery, AL 36130
24       334-353-4336
         Fax: 334-353-8400
25       Email: Brenton.Smith@AlabamaAG.gov
```

```
 1       Edmund Gerard LaCour, Jr.
         OFFICE OF THE ATTORNEY GENERAL
 2       501 Washington Avenue
         P.O. Box 300152
 3       Montgomery, AL 36104
         334-242-7300
 4       Fax: 334-242-4891
         Email: Edmund.Lacour@AlabamaAG.gov
 5
         James W Davis
 6       OFFICE OF THE ATTORNEY GENERAL
         501 Washington Avenue
 7       P O Box 300152
         Montgomery, AL 36130-0152
 8       334-242-7300
         Fax: 334-353-8400
 9       Email: Jim.davis@alabamaag.gov

10       Misty Shawn Fairbanks Messick
         OFFICE OF THE ATTORNEY GENERAL
11       FOR THE STATE OF ALABAMA
         501 Washington Avenue
12       P O Box 300152
         Montgomery, AL 36130-0152
13       334-242-7300
         Fax: 334-353-8440
14       Email: Misty.Messick@AlabamaAG.gov

15       Alexander Barrett Bowdre
         OFFICE OF THE ALABAMA ATTORNEY GENERAL
16       P.O. Box 300152
         Montgomery, AL 36130
17       334-242-7300
         Fax: 334-353-8400
18       Email: Barrett.Bowdre@alabamaAG.gov

19       Thomas Alexander Wilson
         STATE OF ALABAMA
20       OFFICE OF THE ATTORNEY GENERAL
         501 Washington Street
21       Montgomery, AL 36103
         334-242-7300
22       Fax: 334-353-8400
         Email: Thomas.wilson@alabamaAG.gov
23

24

25
```

```
 1        J Dorman Walker
          BALCH & BINGHAM LLP
 2        P O Box 78
          Montgomery, AL 36101
 3        334-834-6500
          Fax: 334-269-3115
 4        Email: Dwalker@balch.com

 5

 6

 7

 8

 9        COURTROOM DEPUTY:  Frankie N. Sherbert

10

11        COURT REPORTER:  Christina K. Decker, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          <u>**I N D E X**</u>

2

3    BRADLEY BYRNE                                        1655
     DIRECT EXAMINATION                                  1656
4    BY MR. DAVIS
     CROSS-EXAMINATION                                   1696
5    BY MS. WELBORN
     CROSS-EXAMINATION                                   1711
6    BY MR. OSHER
     CROSS-EXAMINATION                                   1733
7    BY MR. WHATLEY
     REDIRECT EXAMINATION                                1747
8    BY MR. DAVIS

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        P R O C E E D I N G S

 2                   (In open court.)

 3             JUDGE MARCUS:  Are the parties ready to proceed?

 4             MR. DAVIS:  Defense is ready, and Mr. Byrne the next

 5   witness is here and ready, Judge.

 6             JUDGE MARCUS:  Okay.  Caster plaintiffs are ready?

 7             MS. KHANNA:  Yes, Your Honor.

 8             JUDGE MARCUS:  And the Milligan and Singleton

 9   plaintiffs?

10             MR. BLACKSHER:  Singleton are.

11             MS. WELBORN:  Milligan are, as well, thank you.

12             JUDGE MARCUS:  We are going to turn now to your next

13   witness, Mr. Davis.

14             MR. DAVIS:  Thank you, Judge.  The defense calls

15   Mr. Bradley Byrne.

16                        BRADLEY BYRNE,

17   having been first duly sworn, was examined and testified as

18   follows:

19             JUDGE MARCUS:  Thanks very much.  And if you would be

20   kind enough to state your name for the record.

21             THE WITNESS:  My name is Bradley Byrne, B-R-A-D-L-E-Y,

22   B-Y-R-N-E.

23             JUDGE MARCUS:  Thank you very much.  And with that,

24   Mr. Davis, you may proceed.

25             MR. DAVIS:  Thank you, Judge.
```

|    |    |
|----|----|
| 1  | DIRECT EXAMINATION |
| 2  | BY MR. DAVIS: |
| 3  | Q    Good morning, Mr. Byrne. |
| 4  | A    Good morning. |
| 08:30:45 5 | Q    Where do you live, Mr. Byrne? |
| 6  | A    I live in Fair Hope, Alabama. |
| 7  | Q    How long have you lived in the Gulf Coast region? |
| 8  | A    My entire life. |
| 9  | Q    And what do you do for a living? |
| 08:30:57 10 | A    I am a lawyer. |
| 11 | Q    Have you ever served in public office? |
| 12 | A    I have. |
| 13 | Q    Would you please tell the Court about your experience in |
| 14 | public service beginning with your earliest appointed or |
| 08:31:10 15 | elected position? |
| 16 | A    Yes.  I was elected to the Alabama State School Board in |
| 17 | 1994 and took office in December of that year because my |
| 18 | predecessor left to go take another position, so I started that |
| 19 | a little bit earlier. |
| 08:31:25 20 | I served the Alabama State School Board eight years.  I |
| 21 | was elected to the Alabama State Senate in 2002, and under |
| 22 | Alabama law, you take office immediately after general |
| 23 | election.  So I became the state senator in November of 2002. |
| 24 | I served there until May of 2007, when I became the chancellor |
| 08:31:43 25 | post-secondary education for the state of Alabama. |

1       In December of 2013, I was elected in a special election

2   to the United States House of Representatives representing the

3   First District, which is the southwestern part of Alabama.  I

4   served there until January 3rd of last year, when I left

08:32:01  5   office, and my term expired.

6   Q    Thank you, Mr. Byrne.

7       I want to share my screen now and show you a map that has

8   been marked as Defendants' Exhibit 55.  Can you see this map,

9   Mr. Byrne?

08:32:14 10   A    I can.

11   Q    I will represent to you that these are the congressional

12   districts that the Alabama Legislature passed November the last

13   districting cycle.

14       Does the First Congressional District look similar to the

08:32:33 15   district as it existed when you represented the First District?

16   A    It is similar.  It does not include the lower half of

17   Clarke County that I had in my district.  And there's a small

18   sliver of the eastern part of Escambia County that is now part

19   of the Second District, but other than that, it's the same

08:32:51 20   district that I had.

21   Q    To your recollection, does the Second District look

22   similar in structure to the way it was when you were serving in

23   Congress?

24   A    It does.

08:32:58 25   Q    Thank you.  How would you describe Gulf Coast region,

1  Mr. Byrne?  And by that, I mean what is it, if anything, that

2  binds that region together to make it a community of interest?

3  A    Well, we are on the water.  We are on the Gulf of Mexico.

4  We have lots of bodies of water in the district.  Mobile Bay is

08:33:22 5  very prominent, and Perdido Bay is pretty prominent.  A number

6  of rivers, sounds, et cetera.  So water defines the district

7  very much.  It's not just any kind of water.  It's salt water,

8  brackish water, et cetera.

9       What that means is we have a major deep water port.  We

08:33:40 10  have a major ship building industry.  We have major tourism

11  industry that's related to the beaches and the water.  And also

12  a major seafood industry.  And all of those are unique in terms

13  of Alabama unique to this part of the state.

14       And so when you deal with the things that happen in this

08:33:58 15  part of the state, you are dealing with something that's unique

16  in the state of Alabama.

17  Q    Do people throughout the region through the other counties

18  in the First District commute in to Mobile for employment?

19  A    Yeah.  There are major highways that come from the

08:34:16 20  northern part of the district into both Mobile and Baldwin

21  counties.  So people in what I call the collar counties, which

22  are Washington County, Escambia County, Monroe County, and

23  presently that lower part of Clarke County, they'll use those

24  highways to go back and forth.

08:34:29 25       It's not just their jobs.  It may be going to the doctor,

1   the hospital, their shopping, et cetera.  So there's this sort

2   of larger community involving these four, five counties that

3   flow into and out of Mobile and Baldwin counties.  It used to

4   be just Mobile County.  Baldwin County has grown so much.

08:34:49  5   Baldwin County is now a very big part of that, as well.

6   Q    What role does the Port of Mobile play, if anything, in

7   binding that region together?

8   A    Well, it's huge.  Mobile started out in the 18th Century

9   as a port.  It was a port for French traders, but it was still

08:35:07  10   a port, and it's been a port for 300-plus years, and the port

11   continues to grow.  In fact, it had amazing growth last year.

12   It's not just the port itself.  The port is at the very center

13   of what is a major logistics hub.  For example, we have one of

14   Walmart's four mega distribution centers here in Mobile County.

08:35:25  15   That's all related to the port.

16      The fact that we have Airbus in Mobile, we have it in part

17   because they can ship directly via the ship channels directly

18   from a port in Europe to a port right outside of their assembly

19   facility here in Mobile.  So that port is the anchor for the

08:35:46  20   economy around here.  And it literally directly and indirectly

21   creates tens of thousands of jobs.  So it's extremely important

22   to this area.

23   Q    Are there industries in the area along the rivers that

24   flow into the port?

08:36:01  25   A    Oh, yeah.  We have major industries, chemical industry

1 players, steel industry players up and down the Mobile river

2 and as you get further north of that into the Tombigbee River.

3 So the river, the Tombigbee River, then on the eastern side,

4 the Alabama River, those are very important to the economy and

08:36:25 5 the culture of this area.

6 Q    And do any of those industries rely on the port for

7 distribution of the products?

8 A    Well, for the distribution of their products, but also for

9 stuff that comes in that they have to use to create their

08:36:41 10 product.  Maybe different types of elements that go into the

11 chemical process.  In the case of steel, we actually have steel

12 slabs that come up from Brazil that are then offloaded off the

13 ships and put on barges that come up to a company called AM/NS

14 Calvert.  It's a multinational company that employs well over

08:37:01 15 2,000 people in the production of coal and steel.

16 Q    Is there anything unique about the history of this region,

17 in terms of international influence?

18 A    Yeah.  We were founded by the French in 1702.  We had

19 20 years in there where we were a British colony and then 30 or

08:37:21 20 40 years where we were a Spanish colony.

21      So unlike the rest of the state of Alabama, we have this

22 extensive Colonial history, and it continues to form our

23 culture today.  We're far more likely to have Catholic

24 residents here than in any other part of the state.  We have

08:37:42 25 Mardi Gras, which may sound like just sort of a frivolous fun

thing, but Mardi Gras is big business here.  There are a lot of
businesses that that is what they do.  So it's not unusual to
find Mardi Gras parades not just here in Mobile, but you go
north of here into Washington County, you go over into Baldwin
08:37:55 County, several of the cities in Baldwin County, and even up
into Monroe County, they have Mardi Gras because there is that
cultural connection between the two.

          I was reading an interesting article the other day about
Truman Capote.  He used to have relatives in Monroe County that
08:38:20 he would visit.  Mr. Capote wrote that he actually entered into
contests as a child to write stories, and those stories were
part of a contest in the *Mobile Press Register*.  He was in
Monroe County.  This is 100 years ago.

          So you can see that there's this long-term connection
08:38:34 between what I call the collar counties in the First
Congressional District and Mobile itself.

Q    Are Baldwin County in Mobile County closely connected?
A    Oh, yeah.  If you look at a map of Mobile and Baldwin
counties, it looks like an inverted U.  And what's in the
08:38:53 interior of that U is Mobile Bay.  And so if you go back
literally centuries, you will see a connection between the two
counties.

          So my family is originally from Baldwin County.  The
Byrnes were from Baldwin County.  But if you go back to the
08:39:08 late 18th Century, you will see one of my ancestors was

```
 1  actually baptized in the Roman Catholic Church here in Mobile.
 2  So there's this intersection between those two counties that's
 3  been going on for a very long time.
 4  Q    Would you say those counties are more closely connected
 5  today than they were, say, in the '60s and 70s?
 6  A    Oh, yeah.  For example, when -- I live in Baldwin County,
 7  and I work in Mobile County.
 8       If you were in my car with me today, you would have seen
 9  thousands of cars crossing from Baldwin County into Mobile
10  County.  So you have lots of people who live in Baldwin County,
11  but work in Mobile County.
12       Not as many people, but there are people who live in
13  Mobile County and work in Baldwin County.
14       So there's really strong interconnection between the two
15  counties.
16  Q    What are -- you mentioned a few of these.  Let's get on
17  the record and say what are some of the major industries and
18  employers in the Mobile region?
19  A    For instance, the Port of Mobile.  That's a big one.  You
20  have AM/NS Calvert, which is the steel company.  There's
21  Outokumpu, which is a stainless steel company; there's SSAB,
22  another coal and steel company; and Earth Pipe, which is a
23  steel pipe company, so those are steel companies.
24       Numerous chemical companies.  I think about it.  Huntsman,
25  there's -- oh, shoot.  There's Shell.  I can't remember all the
```

08:39:24 (line 5)
08:39:42 (line 10)
08:39:56 (line 15)
08:40:17 (line 20)
08:40:42 (line 25)

1  chemical companies.  It must be 20.

2  Q    Of course.

3  A    We have the University of south Alabama, which is a major

4  employer in this area.  We have Austal USA, which is a

08:41:01  5  ship-building company.  We have Airbus USA, which is major

6  airplane assembly facility here.  We have the Mitchell Cancer

7  Research Center.  We have -- I mentioned the Walmart mega

8  distribution center.  We have a number of other logistic

9  distribution centers because of the port.

08:41:21  10  And then if you go into the southern part of Baldwin

11  County, you have major businesses are there to provide

12  condominium access to tourists that come down here, hotels,

13  restaurants, et cetera.  In Bon Secour, Alabama and Bayou La

14  Batre, Alabama, these are two of the largest seafood

08:41:43  15  distribution places literally in the United States of America.

16  So Nelson Bon Secour Fishery in Bon Secour, huge

17  distributor for seafood.  I can remember eating crab meat in

18  Washington D.C. and finding out during the meal that that crab

19  meat came from Bon Secour, Alabama.

08:42:01  20  So you know, no other part of Alabama has industries like

21  this.  I am not saying it's better or worse than the other

22  parts of the state.  It's just unique.

23  Q    Would you describe the First District as racially diverse?

24  A    Oh, yes.  Very much so.  We have obviously long-time white

08:42:21  25  and black communities, but we have Hispanic communities.  Down

1664

in Bayou La Batre, we have a number of southeast Asian

communities, people that left those areas in the aftermath of

the Vietnam War and settled Bayou La Batre, Alabama and formed

these huge fishing communities.  We have other Asian

08:42:40  communities here.  This is always been because of the port I

guess a very diverse area, going back to the earliest times

here.

So it's not unusual to find somebody like me who has

French ancestors, you know, Scottish ancestors, Irish

08:42:58  ancestors, German ancestors.  It's not unusual to find people

here that can draw their lines back to various parts of Africa.

There are people here that can draw their lines back to the

various nations in southeast Asia.  This is a very diverse area

and always has been.

08:43:15  Q    Are there military interests in the First District?

A    Yes, sir.

Q    What do you have?

A    We have a shipyard here called Austal USA that makes two

different ships presently for the United States Navy, combat

08:43:33  ship and the expeditionary fast transport vessel.  Those are

the only vessels that that shipyard makes.  It employs

presently about 3,500 people.  At one point, it had as many as

4,500 people.  Ship building has been a major part of Mobile

going back to Colonial times.

08:43:50  We have all -- you have people here who are like fifth,

1  sixth generation ship builders.  Making ships is not like any

2  other manufacturing process because they're so darn big.  It's

3  just a lot more to it than making a car, or even making the

4  airplanes that Airbus makes here.

08:44:09  5      So we -- that ship building for the Navy here is a big

6  deal.

7  Q    In the years when you were representing this area in

8  Congress, Mr. Byrne, were there any particular issues that you

9  would focus on?

08:44:23 10 A    Sure.  When you are a Congressman, you're the primary

11 representative for the people in your district in Washington,

12 D.C.

13     So there were a myriad of things that were particular to

14 this district that I had to focus on.  The shipyard, for

08:44:43 15 example, very critical that we make sure those ships are

16 authorized and appropriated year after year after year.

17 There's nothing automatic about that.  There's a fight over

18 that every year.

19     But it may sound mundane.  We had a huge issue here in

08:44:56 20 involving the Gulf Red Snapper, which is the number one fish

21 people like to catch out in the Gulf of Mexico.  We have a huge

22 industry in Orange Beach built up around charter boats, people

23 that own their own boats.  Think about it.  It is not just the

24 fact of the boat, it's you have to buy fuel for the boat, you

08:45:14 25 have to buy ice for the boat, you have to buy bait for the

1  boat, you have to buy beer to go out and have fun in the summer
2  time.  It's a huge industry.  And we have a real problem with
3  those seasons being artificially shortened, and we had to go
4  work on trying to get those seasons back to a reasonable level.
08:45:32  5  For friends of mine that wanted to go fishing on Saturday, it
6  was for that industry.  It was important.
7       We have a program in the federal government called GOMESA.
8  It is an acronym.  But basically, it provides a certain
9  percentage of what the federal government gets in off shore gas
08:45:47  10  leases and oil leases that go to the states that border the
11  Gulf of Mexico.  That's to help them deal with what could be
12  the very negative effect from that like with the BP oil spill
13  that we had back in 2010.  So I was constantly working on that
14  and similar programs.
08:46:03  15       So I actually formed a caucus in Congress called the I-10
16  Caucus because those of us that represented districts in the
17  Gulf Coast had sort of unique problems that we would actually
18  work on together because those same interests weren't shared
19  with our colleagues and our state delegations up in the upper
08:46:21  20  parts of our states.  So we would work together on things like
21  that.
22       And then there would be just the stuff that, you know,
23  every industry faces when you deal with federal government
24  regulations.  Ship building has all sorts of interesting issues
08:46:36  25  with the Coast Guard, et cetera.  So, yeah, I mean, I had to

1  work on those.  And really had to become an expert on those

2  issues along with my staff.

3  Q    Obviously, a longer snapper season would benefit the

4  people who enjoy going out in the Gulf and fishing.  Does it

08:46:54 5  have any benefit to other residents of the First District

6  having a healthy fishing industry?

7  A    Okay.  That's an industry around it.  There are charter

8  boat fleets, people that work on charter boats.  There are

9  people that run marinas.  There are people that sell fuel.

08:47:10 10  There are people that sell ice.  There are people that sell

11  bait.  There are people that, you know, provide condos and

12  hotel rooms that people stay in when they go fishing.

13      I mean, I remember when I was first elected and I had a

14  meeting with the people in Orange Beach that were in that

08:47:24 15  industry, and the room was just crammed full of people.  I

16  never really thought of it that clearly before just how many

17  people were touched by the fact that we do or do not have a

18  good snapper season.  And it was a major motivation to make

19  sure that we got that problem solved because it touched so many

08:47:41 20  different lives and touched so many different jobs.

21  Q    Would issues that you worked on such as is the snapper

22  season or a healthy port or a healthy ship building industry,

23  would they help both the black and the white residents of the

24  First District?

08:47:55 25  A    Oh, yeah.  I mean, people down here, we have people of all

races that are working in all of these industries.  And it's a

major source to get good high paying jobs.  So it's a benefit

to everybody that we do that.

Q    Uh-huh.  Are you familiar with the Wiregrass region in the

08:48:15 Second District?

A    I am.  I told you earlier that I was a chancellor of

post-secondary education for the state of Alabama.  And we had

three or four colleges in the Wiregrass region.  We had a

number of vacancies in those colleges, so I had to go through

08:48:37 presidential searches.  When you do a presidential search for a

community college, you have to involve the community.  You have

to get involved with the community.  You have to understand

that community.

     So, for example, Lurleen B. Wallace Community College in

08:48:55 Andalusia, Alabama, that's Covington County, I spent a lot of

time in Andalusia because we had to build a vacancy there.  So,

yes, I have spent a lot of time in the Wiregrass of Alabama

because of that position.

Q    Tell me how the interest of the Wiregrass would compare to

08:49:13 the interest of the counties that are in the First

Congressional District.

A    Well, what I described to you before is in the First

Congressional District southwest Alabama, something's built

around the water, okay?  The Wiregrass is built around a couple

08:49:29 of things.  Fort Rucker, which an Army helicopter training base

there in Ozark is a big part of the Wiregrass.  Troy State

University is a huge part of the Wiregrass.

People in the Wiregrass sort of revolve around Dothan down

at the southern end and Montgomery at the northern end.  And

they have agricultural interests that are different from the

agricultural interests that will be out here in southwest

Alabama.  They don't have a nursery industry like we have here.

We have major wholesale nursery businesses here.  They don't

have major watermelon crops.  They don't have major pecan

crops.  They're more built in to peanuts and cotton and cattle.

So they face, for example, during -- during in Andalusia,

Alabama, you face more towards Troy or Ozark or Dothan.  You

don't face down here in southwest Alabama.  In addition, it's

kind of hard to get from Mobile to the Wiregrass.  We don't

have really good highway connections over there.  So it's not

easy for people from there to come here or for people from here

to go there.

So they sort of face to the southeastern part of the

state.  We face to the southwestern part of the state.

Q    If you were representing the Second District, would you

focus on the same issues that you are focused on when

representing the First?

A    No, sir.  For example, I was on the Armed Services

Committee, and with the Navy shipyard, I am going to be focused

on Navy stuff.

1       If I represented the Second Congressional District, I

2   would be focused on the Army and particularly Army helicopters.

3   That's what they do at Fort Rucker.

4       In this district, I was focused for higher education

08:51:21 5   reasons on the University of South Alabama.  If I represented

6   the Second District, I would be focused on Troy.  Now, Troy has

7   a different mission from the University of South Alabama.  They

8   have an international presence.  So working with Troy would be

9   very different from working for the University of South

08:51:36 10  Alabama.  Troy doesn't have a medical school, but it has a

11  whole lot of other stuff that's pretty darn important.  So

12  there would -- and the agricultural interests I just described

13  are very different.

14      So I would think being the congressman from the Second

08:51:51 15  District requires a different level of expertise and level of

16  expertise that I feel like I had to have to represent this

17  district.

18  Q   I want to share another screen now, Mr. Byrne.  And this

19  is Milligan Exhibit 3, page 7 of that exhibit.

08:52:11 20      These are some proposed congressional maps that one of the

21  plaintiffs' experts presented, I will represent to you,

22  Mr. Byrne.

23      Review just say these -- here's Plan A and B, and then I

24  will scroll down to Plan C and Plan D, as well.

08:52:29 25      Focus on any of those, and tell us what's your reaction

1    is.  Do you see any issues with representing these districts?

2    A    Yes.  If you look at Plan A and Plan B, you see it takes

3    in part of Mobile County, all of Baldwin County, and then goes

4    east into the Wiregrass legion.  So you would essential have to

08:52:56  5    become an expert on two different regions altogether, two

6    different communities of interest.  I know that's important for

7    those proceedings.

8         Then if you look at that district just above it, that

9    district is essentially part of the Black Belt and part of

08:53:14  10    southwest Alabama.  So the person representing that district

11    would essentially have to have two very dramatically different

12    sets of expertise.  I think it would be very difficult to be

13    the congressman for either of those districts not just the fact

14    you would have this vast geographic area you would have to

08:53:33  15    cover, but you would be covering two very different communities

16    of interest.

17    Q    Uh-huh.  Why would it make it more difficult to represent

18    a district if it encompassed different communities of interest?

19    A    Well, for example, if you represented that blue district

08:53:50  20    at the very bottom, you would have to be an expert on things

21    involving Navy shipyards and Army helicopter bases.  You would

22    have to be an expert when it comes to agricultural issues like

23    everything from wholesale nurseries, watermelons, pecans, to

24    peanuts, cattle production, and cotton production.  You would

08:54:13  25    have to be focused on two major universities that have very

1  different missions.  You would have to be focused on Dothan.

2  You would have to be focused on Andalusia.  You would have to

3  be focused on Brewton, Mobile, and then all of Baldwin County,

4  which is the fastest growing county in the state.

08:54:30 5      So I am not saying you couldn't do it.  It would be

6  extremely difficult to do it, and you would find yourself

7  somewhat diffused in your ability to be an effective advocate

8  for that region.

9  Q    What do you mean by diffused?

08:54:44 10 A    Well, there's only so many hours in the day for a

11  congressman and the staff that that congressman has.  And there

12  are hundreds if not thousands of issues in Washington.  And you

13  have got to figure out what your focus is going to be on.  And

14  focus is very important for a member of Congress because

08:55:02 15 there's just not enough bandwidth, and there's only 435

16  congressmen, and you are one of them.

17      So you really have to figure out where am I going to put

18  my time?  Where am I going to put the resources of my staff?

19  What fights am I going to fight.  If you are fighting a whole

08:55:21 20 bunch of different fights because you have to, because you have

21  got that many interests in your district, you are not going to

22  be effective on each one of those.  The more you can sort of

23  focus your energies, the more effective you will be.

24      I will give you an example.  Everybody in the House of

08:55:32 25 Representatives and the staff and the leadership, et cetera

 1    knew that I was interested in a bridge across Mobile Bay,

 2    fixing the snapper problem, and gaining the ships authorizing

 3    and appropriated for the shipyard here.  Literally, I had the

 4    Speaker come up to me on the floor and say, we get it.  It's

08:55:50  5    that bridge, it's those ships, and it's those fish.  Now, when

 6    they know that, they know they have got to make me happy on

 7    that to get my votes.  If they don't make me happy on that,

 8    they are not going to get my votes.

 9          Now, if I say I have 20 different things I want you to

08:56:03 10    make me happy on, they will say, look, I am not going to make

11    you happy on 20 things.  You tell me what your priorities are.

12    We will help you get those things done, and then you will be a

13    part of the team.  That's how it works.  Anybody that tries to

14    be like out there fighting on every fight tends not to win any

08:56:22 15    fight.

16    Q    Let's say you represented -- I guess I should show you the

17    maps again.  If you represented a blue district, do you see any

18    difficulty in just getting around and visiting your

19    constituents?

08:56:35 20    A    Yeah.  It's a long way from Mobile to Dothan.  Actually,

21    the way you get from Mobile to Dothan is that you get on

22    Interstate 10, you drive east through the Florida panhandle,

23    and then you get just north of Panama City you turn north.  So

24    it's about a three to three-and-a-half hour drive from Mobile

08:56:58 25    to Dothan.

1    And north of there to Henry County, that's a county just

2  north of Houston County, it's even further than that.  And so

3  in order to represent the people in Abbeville who deserve good

4  representation, even if you just visited there for an hour, you

08:57:13 5  would spend three-and-a-half, maybe four hours just to get

6  there and that much going back, so it's a long haul.

7    And the interests as I said of that southeastern part of

8  the state are very different than the interests in the

9  southwestern part of the state.

08:57:27 10    So when you finish with having your meetings in an area

11  like that, go back to Washington, you have to decide, all

12  right, what I am going to focus on?  What are the priorities

13  for this sort of sprawling district with all these different

14  interests?

08:57:39 15    And somebody is going to lose out.  That's just the way it

16  is.  There's only so much bandwidth for a congressman, and that

17  person has to decide what am I going to focus on?  Am I going

18  to help the shipyard in Mobile, or am I going to help Fort

19  Rucker?

08:57:54 20  Q    Where do you think a congressman or congresswoman who

21  represented the blue district would want to have local offices?

22  A    Well, you clearly want to have your main office Mobile,

23  but you want to have as pretty significant office as you can

24  afford in Dothan.  You are only allotted so much money as a

08:58:13 25  congressman for your office, staff, and your office rent.  So

1   you have got to spread that over Mobile and Dothan.  And

2   Baldwin County is the fastest growing county in the state.  You

3   have to have a presence in Baldwin County for a lot of

4   different reasons.

08:58:31 5       Then I guess you try to find some way to put something in

6   Andalusia.  That's kind of more centrally located

7   geographically.  But as I said, and I can say it's really hard

8   to get from here to Andalusia.  Andalusia is a pretty hefty

9   drive from here.  Not as far as Dothan, but it's still a hefty

08:58:51 10  drive because there's no good highway to get there.

11  Q    Look at this yellow district or tan, the one above the

12  blue district.

13       Let's say there was a primary election in that district,

14  and someone was running to be the Democratic candidate, and

08:59:09 15  that someone was from Mobile.  There was another person running

16  in the primary from Montgomery.  Do you have any thoughts on

17  who might have a stronger base of support geographically?

18  A    I would think that if you were from Montgomery, you would

19  have a stronger chance than if you're representing that part

08:59:29 20  that's in Mobile.

21       The Black Belt -- what those counties primarily look like

22  to me, the Black Belt is kind of its own thing.  It's got very

23  rural, very agricultural.  And they look more to Montgomery

24  than they look to Mobile for sure.  So I would think somebody

08:59:50 25  from Montgomery would have a better shot at that district than

1    somebody from Mobile.

2    Q     Do you think it possible, Mr. Byrne, if you had a map in

3    Plan A or Plan B that you could have, say, a congressman for

4    the blue district from Dothan or Andalusia and a congressman

09:00:10  5    for the yellow district from Montgomery so that you had no one

6    in Congress from the Mobile region?

7    A     That could happen, yeah.  It's kind of hard to know

8    exactly what parts of Mobile County are being taken with those

9    two plans.  But if you dilute the vote in Mobile County, that

09:00:29 10    obviously is going to make the vote of the rest of that

11    district -- those two districts more important.  So, yeah, you

12    could have a congressman from Dothan under both of those plans

13    and a congressman from Montgomery and not a congressman from

14    Mobile, which would be a tragedy for the people down here.

09:00:45 15    Q     Why would it be a tragedy for the people down there?

16    A     I'm not saying somebody from Dothan or Montgomery wouldn't

17    care about this area.  But as I said before, you wouldn't have

18    somebody that's focused, focused on the port, focused on the

19    shipyard, focused on our fishery in the Gulf of Mexico, focused

09:01:01 20    on the nursery issues we have here.  They just -- they're just

21    not enough bandwidth to be as focused as I was able to be

22    focused.  I could walk in a room and talk about any of those

23    issues and master it.  If I had to represent those other areas,

24    as well, or somebody from the other areas had to represent

09:01:22 25    Mobile, I just don't think that you could master it.

```
 1   Q    Do Mobile and Montgomery ever compete each other, in terms
 2   of trying to recruit businesses, for example?
 3   A    Not that I know of.  Their economic development plan,
 4   their industrial plan is very different from ours.  Montgomery,
 5   for all the right reasons, has really focused on two things --
 6   automotive, obviously with the Hyundai plant there and all the
 7   suppliers of the Hyundai plant, but also because of their Air
 8   Force presence, they really focus on how they can magnify
 9   Maxwell Air Force Base and things that are a part of that.
10        I think they have made a very smart decision to do that,
11   by the way, but that's a different economic plan than what we
12   have done here.  So we're as much trying to help them because
13   of the port.  So as anything else, I don't really think we
14   believe ourselves that we're competing with them.
15   Q    Would you have any concerns with the congressional map
16   that divided the Mobile region along racial lines?
17   A    Yes.
18   Q    What would those be?
19   A    Well, when you are a Congressman, you should be
20   representing everybody and thinking about how I do X is that
21   going to affect everybody in my district?  You shouldn't be
22   thinking about, I am going to do this because it helps black
23   people, or I'm going to do this because it helps white people.
24   I am going to do this because it helps everybody.  And if you
25   help everybody, everybody rises.  That's what you want.
```

1    Mobile is a little bit different from the rest of the
2  state.  We do not have the same history during the Civil Rights
3  movement that Selma, Montgomery, Birmingham did.  We had a
4  mayor here named Joe Lang who worked with a Civil Rights leader
09:03:14  5  down here named John LeFlore.  And so we didn't have some of
6  the violence, the extent of the violence that you saw in the
7  other parts of the state.  We tried to work through our issues
8  because we thought it was more important for us to work through
9  those issues and work together to try to figure out a way to
09:03:31  10  live together harmoniously.  Were we perfect about it?  No, we
11  did not.  But we didn't have the problems you saw in the rest
12  of the state because we at least made the effort to work
13  together.
14  Q    When you said that you worked -- that you served on the
09:03:47  15  state school board, correct?
16  A    Yeah.
17  Q    I want to share a map now which is Defendants' Exhibit 26.
18       This is the 2001 map, Mr. Byrne.  I know -- I think you
19  were in the State Senate then, weren't you?
09:04:08  20  A    In 2001, I was still on the state school board.
21  Q    Okay.  So which district did you represent in the state
22  school board?
23  A    District number 1.
24  Q    Thank you.  Did you ever get calls from people in, say
09:04:25  25  District 5 when you were on the school board?

1    A    I did.  There was some people in Monroe County, I

2    remember, and maybe Clarke County who thought I was their state

3    school board member, and they would call me, and I would always

4    call the member for that district when they did and ask him or

09:04:42  5    her because it changed if they wanted me to help those people,

6    and they would say, please.  And I would go up there and talk

7    with them and explain to them I was not their school board.

8    Q    Now, I want to share a newer map.  This is from Caster

9    Exhibit 1, which for the record, was Mr. Cooper's report.  This

09:05:12  10   is page 19 of that report.  And I will represent to you,

11   Mr. Byrne, this is the new state school board map that was

12   passed by the Legislature this cycle just a couple of months

13   ago.

14       What thoughts if any do you have about this map, in

09:05:26  15   particular, the way the blue district includes part of Mobile

16   and Baldwin County is constructed?

17   A    Well, I testified before the Legislature Redistricting

18   Committee that I felt like Mobile and Baldwin County should be

19   kept whole and contiguous.  So to the extent that this map

09:05:47  20   includes a district that comes from Montgomery all the way into

21   Mobile County, I didn't much like it.

22   Q    Why did you not like it?

23   A    Because Mobile County school system is the largest school

24   system in the state.  And it has unique issues because it's the

09:06:06  25   largest in the state.  And I felt like we needed a school board

member who was focused on Mobile County as well as the other
counties.  I had Baldwin and Escambia as well.  But there were
so many issues with the Mobile County school system, a lot of
my time was spent focused on that.  And if you break it up into
two different people, you don't really have that level of
focus.

       I'm not saying that the people that represent those two
districts aren't working as hard as they can.  I'm sure they
are.  But it's very difficult to be focused on the Mobile
County school system if you have got almost all the Black Belt,
which that district up in the northern part is and a big chunk
of the Wiregrass, which the lower part of the -- the lower
district is.

Q     Someone who has served both in Congress and on the state
school board, how do the roles of those two offices compare to
each other, Mr. Byrne?

A     They're very different.  You're on the state school board,
you are focused on educational issues.  That's it.

       Now, there are some work force development issues that go
with that, et cetera.  But that's pretty much it.  You are just
focused on educational issues.  When you are in the United
States Congress, you are focused on a large number of issues.
I mean, it's almost everything comes within the purview of the
United States Congress from foreign policy, defense policy,
health care, to internal security, and education, as well.  I

1   was on the Education and Labor Committee in the House of

2   Representatives.  And one of the problems I had as a

3   congressman is that people expected you to be knowledgeable on

4   so many different things.

09:07:48  5       Now, at least you have got a staff in Congress.  When I

6   was on the state school board, I had no staff.  I had to rely

7   upon the staff of the State Department of Education, and they

8   had other things to do.

9       So it was difficult to me to be on the state school board.

09:08:03 10  But at least I could just focus on one set of issues and try to

11  master them.

12      And so it was very different being in both of those roles.

13  But I enjoyed both of those roles.

14  Q   Considering the different roles between the school board

09:08:17 15  and the congressman, even if you assumed it made sense to split

16  Mobile County in a school board map, does that mean it would

17  make sense to do so in a congressional map?

18  A   No.  It would not make sense.  At least on the school

19  board, you are focused on one set of issues.  So if I'm from

09:08:38 20  Montgomery and I have got half of Mobile County from Mobile and

21  I have part of the Wiregrass, at least, I have got a

22  geographically diverse area.  At least, I'm really only focused

23  on a very set, defined set of issues.

24      Now, they are very important issues.  Don't get me wrong.

09:08:56 25  But at least I could focus on those issues and try to make sure

1    as I go from county to county that I am applying what I know on

2    these issues to each one of those counties as they are very

3    different.

4    Q    When you campaigned for Congress in the different

09:09:11   5    elections, Mr. Byrne, what parts of your district would you

6    campaign in?

7    A    All of them.  I had a -- go ahead.

8    Q    Would you campaign in areas that were both more -- would

9    you campaign in neighborhoods or areas that had a large

09:09:30  10    African-American community?

11    A    Oh, yeah.  You can't run for Congress in this district --

12    I will just make sure -- to be clear -- in this district

13    without touching every part of it.  And I made a concerted

14    effort to go everywhere.  In fact, if you look at my schedule,

09:09:49  15    I spent a disproportionate amount of my time in the more rural

16    areas than I did in more populated areas, because if you want

17    to go up to Monroeville, you might as well spend some time in

18    Monroe County.

19         There are parts of Monroe County that are almost

09:10:07  20    completely African-American.  There's a little town in north

21    Monroe county called Beatrice that's 50/50.  I had a town ball

22    in Beatrice.  Someone said, why in the world would you bother

23    spending time in Beatrice because it's so small?  I said they

24    deserve to be represented, too.  So I went to all parts of my

09:10:25  25    district.

```
 1          Prichard probably didn't give me 5 percent of the vote in
 2     my elections.  I probably lost there by a huge margin.  But I
 3     would go and have town hall meetings and campaign in Prichard
 4     because I believed the people in Prichard deserve to have a
 5     good congressman.
 6     Q    When you ran for Congress, Mr. Byrne, did you run as a
 7     candidate of any political party?
 8     A    Yes.  I was a Republican.
 9     Q    Why are you a Republican, Mr. Byrne?
10     A    Because the Republican Party is closer to the conservative
11     principles that I believe in than the Democratic Party is.  I
12     started out as a Democrat, but I felt like by 1997 I guess is
13     when I switched parties, the Democratic Party had migrated away
14     from what were my principles.  Not putting down the Democratic
15     Party if people are Democrats.  I have friends who are
16     Democrats and work with a lot of Democrats, but I just felt
17     like the Republican Party is more closely aligned with where I
18     stood on issues and principles.
19     Q    Did you work with Democrats when you were in Congress?
20     A    Oh, yes.  All the time.  I will give you two examples.  I
21     served on the Armed Services Committee.  Every year, the only
22     bill the Armed Services Committee works on is the National
23     Defense Authorization, which we have passed out of the Congress
24     every year since John Kennedy was president.  Those bills are
25     always bipartisan 100 years ago percent of the time.  We work
```

09:10:42  (line 5)
09:10:54  (line 10)
09:11:15  (line 15)
09:11:31  (line 20)
09:11:53  (line 25)

1  -- from the very beginning of the years, we work on that bill.

2  We consciously work together to make sure that bill, the bill

3  that authorizes the defense of this country is something that

4  we can all vote for.

09:12:08  5       So we work at being bipartisan, very much so.

6       The other example I give you is this:  Shortly after

7  President Trump was elected, this "Me-Too" movement came out.

8  And we discovered that we have "Me-Too" problems in United

9  States Congress.  But we also discovered that members of the

09:12:28  10  United States Congress weren't subject to the same processes

11  that the private sector was subject to under Title VII of the

12  1964 Civil Rights Act.

13       Now, I spent a career as a labor employment attorney

14  telling small, medium-sized businesses in Alabama what they had

09:12:44  15  to do to comply with that law.  And here in Congress, the body

16  that passed that law was not holding itself under the same set

17  of accountability processes.

18       So I worked with a very liberal Democrat congresswoman

19  from California, Jackie Speier, and we put together a bill that

09:13:04  20  made Congress be as accountable, even more accountable than we

21  hold people in the private sector, and that bill that Jackie

22  and I put together passed the United States House unanimously,

23  passed the United States Senate unanimously, and is a law of

24  the United States now.  And those are just two examples.

09:13:20  25       I worked all the time in a bipartisan manner, because I

```
 1   firmly believe that the best legislation in Washington is
 2   bipartisan legislation.  The hardest legislation to pass in
 3   Washington is partisan legislation.  And it's always a problem,
 4   always.
```
09:13:36
```
 5        So I enjoyed working the bipartisan fashion.  I know you
 6   look up there now and think, they're completely divided.  They
 7   can't get along.  And there are problems.  Don't get me wrong.
 8   But there are still people up there, former colleagues of mine
 9   on both sides of the aisle that understand what I say is true,
```
09:13:53
```
10   and they're still trying to work together to make things happen
11   and happen in the right way.
12   Q    When you served on the delegation with Congresswoman
13   Sewell for the Seventh District, did you have the opportunity
14   to work with her on any issues?
```
09:14:09
```
15   A    Oh, all the time.  All the time.  We shared Clarke County.
16   We actually had joint town halls together.
17        If she had an issue that affected her district, you know
18   uniquely, she would call on the other members of the delegation
19   to help her, and we always did, 100 years ago percent of the
```
09:14:26
```
20   time.  And she always helped us.  We all worked together.  It
21   wasn't like it was unique to her.
22        So Terry was a part of a group called Faith and Politics.
23   I assume she is still a part of it.  That's the group that
24   brings the pilgrimage to Alabama every year around the
```
09:14:47
```
25   anniversary of the Edmund Pettus Bridge March from 1965.  She
```

1   wanted to make sure that when that group came here to Alabama,

2   which would bring couple hundred people, people from Congress,

3   people from business and industry, people from foundations, she

4   wanted to make sure that we were all working together, that

09:15:08 5   they saw Alabama, the Alabama delegation working together.

6        So I always participated in that pilgrimage with her.

7   Usually on Saturday mornings when she did her program either at

8   Brown Chapel in Selma or the Dexter Avenue Baptist Church in

9   Montgomery, she would ask me to be sort of her sidekick for it,

09:15:27 10  so that we could get up and tell the people from all the other

11  parties of America here's a Democrat and Republican, black

12  woman and white man working together on issues that matter to

13  the people of Alabama, in particular, matters that revolve

14  around Civil Rights.

09:15:40 15       And I was always honored that she felt comfortable enough

16  to ask me to do that.  And I can tell you, you can sit in that

17  room with some of the people in that room like John Lewis who

18  we lost last year, and you realize what people in this state

19  went through to get us the quality of life we have got today --

09:15:58 20  to get to today.  I feel like a little bitty nothing compared

21  to people like that.  But it was an honor always to be with

22  Terry and to work with her on -- whether it's the pilgrimage or

23  other things that were important to our district.

24  Q    When you were in Congress, Mr. Byrne, were there any

09:16:17 25  issues you worked on to devote your time and your political

```
 1   capital towards that you thought and expected to have a
 2   particular benefit to your African-American constituents?
 3   A    Just about everything.  If I am doing something that's
 4   going to benefit the economy in southwest Alabama, it's going
09:16:36  5   to benefit African-Americans in my district, of course, it is.
 6   If you go to the various businesses in this area, and I
 7   traveled and met with workers in every one of these industries.
 8   It was always black and white.  That's the nature of our work
 9   force down here.  I mean, whether you are at a chemical plant,
09:16:56 10   steel plant, ship building plant, airplane, you are going to
11   have a mixed group of people.
12       So every time I was doing something for the economy.  But
13   I particularly felt like I was helping them every time we
14   worked on education issues.  And this goes back to my state
09:17:13 15   school board days.  I think the number one Civil Rights issue
16   in Alabama today is the fact that we don't give a quality
17   education to black people like we do the white people.  And I
18   really feel strongly about that.  We are not going to have the
19   sort of gains and advances and progress we need in this state
09:17:30 20   until we make more improvements to our education system.
21   That's true across the country, but I am more focused on
22   Alabama.
23   Q    Have you spent any time working with HBCUs, Mr. Byrne?
24   A    Yes, sir.  HBCUs are historically black colleges and
09:17:48 25   universities.  We had several of them in the two-year college
```

1  system in Alabama include Bishop State here in Mobile.  So when

2  I was on the state school board, I worked with them.  When I

3  was chancellor of post-secondary education I worked with them.

4  And by the way, including Tuskegee, and then when I got to

09:18:06  5  Congress, a congresswoman from North Carolina named Alma Adams

6  asked me to be a co-chair with her of the HBCU Congressional

7  Causas.  So for five years I guess it was, I was the co-chair

8  of the HBCU Congressional Caucus.

9  Q    Did you spend time working on community health centers?

09:18:33  10  A    Oh, yes.  We have several community health centers here in

11  the district.  I've gotten to know them pretty well.  I am very

12  impressed with the quality of health care that they provide to

13  their patients.  And I was a strong advocate for them and

14  continue to be a strong advocate for them because I think that

09:18:56  15  they provide quality health care close near where people live,

16  so it's community plan, and it's the best way I think to get

17  primary health care to people in those communities.  So I am a

18  strong supporter of community health center.

19  Q    Back to your co-chairmanship on the HBCU caucus, I am not

09:19:21  20  suggesting this was the reason you did it, but did you receive

21  any recognition for your service in that area?

22  A    I did.  The Thurgood Marshall Fund gave me an award

23  three years.  Probably one of the awards that I am the most

24  proud of.  Thurgood Marshall Fund works to provide funding,

09:19:40  25  private funding to HBCUs across America.  And I had no idea

```
 1    they were going to give me an award, and it just knocked me out
 2    when they did.  I remain in contact with them.  I still
 3    continue to work with them even though I am not in Congress
 4    because I am a huge believer in HBCUs, and I think what the
```
09:19:59
```
 5    Thurgood Marshall Fund is doing and the United Negro College
 6    Fund, both of them together are doing great work for those
 7    colleges, and I think they are important to America.
 8    Q    Just a few more questions, Mr. Byrne.  And I will remind
 9    you.  We want to make sure the Court understands your testimony
```
09:20:15
```
10    that Ms. Decker can take it down.  We will try to slow down
11    just a little.  I want to -- when you were in Congress, did you
12    consider yourself to be the representative of both Republicans
13    and Democrats in your district?
14    A    Yes.
```
09:20:30
```
15    Q    Did you consider yourself to be the representative of both
16    the white and African-American constituents in your district?
17    A    Absolutely, yes.
18    Q    I want to share a screen now, Mr. Byrne.  This is Milligan
19    Exhibit 5.  It is the report of one of their experts, Dr. King,
```
09:20:57
```
20    and she is offering opinions on certain issues.  I want to read
21    this introduction section into the record so you can get some
22    context.  Dr. King writes, White law makers in Alabama learned
23    long ago to color mask their public statements, just as they
24    have learned to color mask the legislation intended to protect
```
09:21:22
```
25    their racial prerogatives.
```

1    Not since the high tide of brazen white supremacy when

2  George Wallace proclaimed, segregation forever, have public

3  figures been so bold.

4           MS. WELBORN:  Mr. Davis, this is Dr. Bagley's report,

09:21:43 5  not Dr. King's report.

6           MR. DAVIS:  I apologize for that confusion.  Yes.

7  Thank you for the correction.

8  BY MR. DAVIS:

9  Q    Then Mr. Bagley after giving some examples says this.

09:22:03 10           JUDGE MARCUS:  I think you have to just -- as we

11  proceed, Mr. Davis, just take your time and speak right into

12  the speaker.

13           MR. DAVIS:  Thank you, Judge.

14  BY MR. DAVIS:

09:22:16 15  Q    I will read now an excerpt into the record from Milligan

16  Exhibit 5, the Bagley report.

17    Dr. Bagley writes, Representative Bradley Byrne of the

18  State's First Congressional District when he was vying for a

19  Senate seat aired a campaign ad in which he condemned black

09:22:36 20  people by placing their images in a fire.

21    The television spot begins with Byrne staring into a wood

22  fire in a backyard and lamenting the loss of his brother in the

23  armed services.  He shifts to lamenting the course the country

24  is taking as the faces of black and brown people appear in the

09:22:56 25  fire.  Former national football league quarterback Colin

1    Kaepernick appears in the fire as Byrne calls him an entitled

2    athlete dishonoring the American flag.  Members of the

3    congressional caucus known as the Squad, Ilhan Omar and

4    Alexandria Ocasio Cortez appear in the fire and are accused of

09:23:17 5    attacking America and cheapening 9/11.  No white people appear

6    in the fire.

7         My question to you, Mr. Byrne, is:  Is there anything you

8    care to say in response?

9    A    Yes, sir.  That ad was about my brother.  And the fire was

09:23:38 10   a fire in the fire pit at our hunting camp that he and I used

11   to sit around all the time.  So that ad was about my brother.

12        Now, the fact that I'm contrasting a rich, NFL quarterback

13   named Colin Kaepernick who won't stand up during the national

14   anthem with my brother's service who made far less than Colin

09:24:01 15   Kaepernick makes and literally contracted a disease during one

16   of his deployments with the 20th Special Forces group that

17   killed him, I think that's a legitimate thing for me to raise.

18   I have grave disagreements with Representative Alexandria

19   Ocasio Cortez and Representative Omar.  But I can tell you I

09:24:18 20   never had any negative interaction with either one of them.

21        Representative Alexandria Ocasio Cortez, actually, her

22   office was in my office building.  And when she was relatively

23   new, she couldn't find her way to her office and literally

24   stopped me in the hallway and asked me, can you tell me where

09:24:36 25   my office is?  I said, yes, ma'am, and I told her where it was.

And we sort of developed a personal rapport just because she
got to the moment of weakness, which we all have in Congress by
the way.  It's easy to get lost in those buildings.

09:24:50
    So we never really had a political conversation, but we
would have these personal sort of, you know, informal social
interactions.  I disagree with her on the issues, but I don't
have any problems with her as a person.

    The same is true for Ms. Omar.  Now, Ms. Omar served on
the Education and Labor Committee with me.  So we would have
09:25:07 interactions about education issues, and we had some
disagreements about -- but there was no -- that was really
about my brother.  It was not about those other people.  And
the fact that we used them was to simply contrast them and
their positions with the service that my brother had rendered
09:25:29 to our country.

Q   Was it your intention to single out anyone because of
their race?

A   No.  I singled out Mr. Kaepernick because he won't stand
up during the national anthem, and there are plenty of black
09:25:43 athletes that stand up during the national anthem by the way.
I have noticed that's not as what a lot of people try to
portray it to be.

    And I am singling out Ms. Alexandria Ocasio Cortez and
Ms. Omar because of their attacks against America.  They attack
09:25:56 American values.  And I think it's perfectly within the realm

of what's appropriate dialogue to say, I expect somebody that's

making this money as Colin Kaepernick to stand up during the

national anthem, and I don't think members of Congress should

be attacking the country.

09:26:12   Q    Mr. Byrne, I want you to think of the people who are

involved in congressional campaigns, whether it's a candidate

or someone considering a run, that person's staff, volunteers,

and then I want you to assume that a couple of weeks before the

January 28th deadline, the congressional map changes from the

09:26:40  way it's usually been and what the Legislature passed to all of

a sudden it changes to something like what the plaintiffs are

representing excuse me -- what the plaintiffs are proposing.

        Do you see any issues that would cause with congressional

campaigns?

09:26:57  A    Yes, sir.  First of all, we have primaries in four months,

general election in ten months.  Once you turn the calendar to

the beginning of the year, you have that primary staring you in

the face, you have already set your campaign in place.  You

already have your plan in place.  You have already got

09:27:17  volunteers set up ready to go.  You have got, you know, the

campaign ad messaging already worked out.  And you are hitting

the ground running.

        So if you change my district on me with that little time,

it's going to put a substantial burden on my ability to refocus

09:27:33  my campaign, conduct my campaign, get volunteers, et cetera.

1    And particularly if you give me a new geographic area that I

2    haven't represented before, where I don't have, you know, the

3    natural contacts, et cetera, that's a huge problem for any

4    community.  And I don't -- and that's true for any candidate,

09:27:52  5    Democrat, Republican, people that are long-time public office

6    holders, people that are brand new.  It could be a tremendous

7    difficulty.

8    Q    Mr. Byrne, you said you went to a public hearing where

9    some of these districts were at issue.  Why did you go to the

09:28:13 10    public hearing?  Why are you here today to talk to the Court

11    about districts?

12    A    Number one, I am a citizen, so I have -- so I am not just

13    any citizen.  I mean, I served on the state school board, held

14    a district for eight years.  I served in the United States

09:28:33 15    House of Representatives representing one of the districts for

16    seven years.  I have, you know, a unique set of understandings

17    about what it's like to represent these areas.  And I felt like

18    I owed it to the system.  I owed it to the public to stand up

19    and say -- as somebody that's actually done this work, these

09:28:51 20    districts the way I'm proposing them makes sense this way.

21        And the most important thing I was trying to say is keep

22    this particular community together.  Keep these communities

23    together.  Don't pull southwest Alabama apart because we work

24    together down here.  Mobile area Chamber of Commerce doesn't

09:29:13 25    just do economic development for Mobile County.  They also do

1695

1    it for Washington County.

2          JUDGE MARCUS:  Let me stop you for a second,

3    Mr. Byrne.  You cut out.  The sound cut out for a minute.  So

4    take your time and just repeat what you just said if you would,

09:29:29  5    please.

6          THE WITNESS:  Yes, sir.  What I have been the most

7    concerned about is that people that pull apart southwest

8    Alabama and have different parts being represented -- we work

9    together down here in southwest Alabama.  The example I used

09:29:48 10    was the Mobile area Chamber of Commerce, the economic

11    development for both Mobile County and Washington County,

12    because we're so closely connected.

13       We need to stay together down here.  We have a group

14    called CAP, Cultural Alabama partnership, that pulls together

09:30:05 15    these counties so that we have common representation, common

16    advocacy efforts with the Alabama Legislature and the members

17    of Congress.  So keep us together.  Don't pull us apart.  Let

18    us be one group of people that work together for our region of

19    the state and maximize the benefits that we want to get for our

09:30:27 20    people down here.

21          MR. DAVIS:  Thank you, Mr. Byrne.  I have no further

22    questions and pass the witness at this time.

23          JUDGE MARCUS:  Thank you, counsel.  Cross-examination

24    in what order did you propose to proceed on behalf of Milligan

09:30:40 25    and Caster and the Singleton?  And we leave that up to you.

```
 1              MS. WELBORN:  I will be going first for the Milligan
 2    plaintiffs, Your Honor.
 3              JUDGE MARCUS:  All right.  And, Mr. Whatley, would you
 4    be going second or the Caster folks going second?
09:30:57  5       MR. WHATLEY:  Doesn't matter to me, Your Honor.
 6              JUDGE MARCUS:  I leave that up to you.  So let's
 7    begin --
 8              MR. WHATLEY:  I am happy for the Caster plaintiffs to
 9    go second.
09:31:03 10      JUDGE MARCUS:  All right.  Thanks very much.
10    Ms. Welborn, you may proceed with your cross-examination.
12              MS. WELBORN:  Thank you.
13                        CROSS-EXAMINATION
14    BY MS. WELBORN:
09:31:10 15 Q    Representative Byrne, my name is Kaitlin Welborn, and I
16    represent the Milligan plaintiffs.  Good morning.
17    A    Good morning.
18    Q    So I'd like to talk about the current redistricting plan
19    first.  You had no direct role in drawing the current
09:31:25 20  congressional map in Alabama, right?
21    A    I didn't have any direct role, but I did testify before
22    the committee.
23    Q    But other than that, you did not do anything to --
24    A    That's correct.
09:31:37 25 Q    -- help draw the congressional map?
```

```
        1  A     That's correct.
        2  Q     And you did not provide any input to Mr. Hinaman, the map
        3  drawer?
        4  A     I did not know Mr. Hinaman.
09:31:49 5  Q     I'm sorry?
        6  A     I don't think I know him.
        7  Q     Okay.  And you did not speak with Representative Pringle
        8  about the 2021 map?
        9  A     I did.
09:31:59 10 Q     You did?
       11  A     Yes.
       12  Q     I'm sorry?
       13  A     He is the chair of the committee, and I testified before
       14  the committee.
09:32:08 15 Q     Okay.  But did you speak to Representative Pringle outside
       16  of the public hearing?
       17  A     I don't believe I did, no.
       18  Q     Okay.  And did you not speak with Senator McClendon
       19  outside of the public hearing?
09:32:22 20 A     I don't believe I did, no.
       21  Q     And you did not speak with Secretary Merrill's expert
       22  Thomas Bryan?
       23  A     No, ma'am.
       24  Q     Okay.  You first ran for Congress in a special election in
09:32:34 25 2013, right?
```

1698

1    A     That's correct.

2    Q     And at that time, you had already held state office in

3    Alabama for some time as you had mentioned, right?

4    A     That's correct.

09:32:44  5    Q     So you were something of a known quantity to the voters in

6    your district?

7    A     Well, I thought I was better known than I found out that I

8    was, but, yes, to some people, I was a known quantity.

9    Q     And in the 2013 special election, your opponent,

09:33:05 10    Mr. LeFlore was black, right?

11    A     That's correct.

12    Q     And he lost to you by over 30 percent?

13    A     I don't remember the percent.

14    Q     And then you faced Mr. LeFlore again in the 2014 general

09:33:20 15    election?

16    A     That's right.

17    Q     And at that time, he lost to you by over 35 percent?

18    A     Once again, I don't remember the percent.

19    Q     Okay.  As a congressional representative, don't you have

09:33:35 20    to focus on multiple issues all at once?

21    A     You do.

22    Q     And you have to learn about all of the issues that matter

23    to your constituents?

24    A     You do, but there's some issue you know more about than

09:33:49 25    others to be honest with you.  You can't be an expert on

1    everything.

2    Q    And some Representatives in Congress represent entire

3    states, right?

4    A    That's true.

09:33:57  5    Q    Is it impossible to be knowledgeable about, for example,

6    both the University of South Alabama and Troy University at the

7    same time?

8    A    Well, you can be knowledgeable about them, but you can be

9    more knowledgeable about one than two.

09:34:15 10    Q    Okay.  Wouldn't having two congressional representatives

11    representing Mobile and Baldwin give the region even greater

12    influence in Congress?

13    A    Well, the truth of the matter is if you have two different

14    ones, you don't have one that's just entirely focused on a

09:34:33 15    particular interest.  So --

16    Q    No.  You have two that are focused on that area?

17    A    Unfortunately, when you have two, you don't have the same

18    amount of focus.  That's just the honest truth about it.  So if

19    I am only concerned about the University of South Alabama, I

09:34:47 20    know I am the congressman for the University of South Alabama,

21    and they don't have anybody but me to go up there and do what

22    needs to be done for them.  And so it really is better to have

23    just one than to have two that are sort of split and paying

24    attention to other things.

09:35:02 25    Q    Representative Sewell and Palmer both live in Birmingham,

1700

```
 1  right?
 2  A    I don't think -- I know Representative Sewell lives in
 3  Birmingham.  I think Representative Palmer lives outside of
 4  Birmingham, but in the metro area.
09:35:24  5  Q    In Jefferson County?
 6  A    Yeah.
 7  Q    Okay.  Are you aware of any criticisms of either of those
 8  representatives failing to adequately represent the rest of
 9  their districts?
09:35:35 10  A    I've never heard anybody criticize either one of them for
11  what they do for their district.  Each one of them in their own
12  way do an excellent job for their district.
13  Q    Okay.  Are you aware that District 4 stretches across the
14  northern part of the state from Lamar and Tuscaloosa counties
09:35:53 15  all the way east to Etowah and Dekalb counties?
16  A    I am.  I believe that's Congressman Aderholt's district.
17  Q    That's right.  It's Congressman Aderholt.
18       And presumably, Representative Aderholt campaigns
19  everywhere in his district, right?
09:36:10 20  A    I don't know where he campaigns, but Congressman Aderholt
21  like Congresswoman Sewell and Congressman Palmer, does an
22  excellent job in his district.
23  Q    I would like to talk about the economics of the Mobile
24  area.
09:36:22 25       You spoke quite a bit about the port in Mobile.  Does
```

```
 1  Republican Carl your successor also work to protect ship
 2  building in Congress?
 3  A    Yes, ma'am.  He is doing a good job.
 4  Q    Wouldn't you expect anyone who represented Mobile to work
 5  to protect the ship building industry in Congress?
 6  A    Oh, I think that's true.  The question is, once again,
 7  it's bandwidth.  How much time can you devote to that issue if
 8  you have got other competing issues?  So I can't say this about
 9  Congressman Carl because I am not there with him all the time.
10  But for me, every day that I woke up in Congress, I was
11  concerned about that shipyard.  And that's what it took because
12  there were all sorts of people trying to take the money away
13  from those programs that they were building ships for, for
14  other programs.  And it was a fight every day just like the red
15  snapper fight was a fight every day.
16        Now, if I have got to worry about several other issues in
17  addition to those, I am not going to be as effective in that
18  fight as I would be if I'm focused on those.
19  Q    Okay.  But if the port in Mobile were in a different
20  district than CD 1, it would still be true that someone would
21  work to represent, you know, the ship -- protect the ship
22  building industry in Congress?
23  A    I would think so, but I would think it would be a question
24  of how much time, how much effort, and how much priority they
25  put on it.  And if they have got other things they are
```

1  competing with, it wouldn't be as much.  That's just the nature

2  of things.

3  Q    Okay.  And other than the port, you mentioned a few other

4  industries such as Airbus and fishing, and said that those are

09:38:05 5  some of the largest industries in the Mobile area, right?

6  A    Yeah.  I also mentioned tourism and seafood, et cetera.

7  Q    Okay.  The largest industry in Mobile County is health

8  care; is that right?

9  A    I guess if you put all the hospitals together, it might --

09:38:26 10  that might be true, yeah.

11  Q    And the second largest industry is retail sales; is that

12  right?

13  A    In terms of numbers of employees, that may be true.  I

14  don't know about payrolls.

09:38:36 15  Q    Okay.  And the recent economic growth in Mobile County has

16  attracted more people to move to the Mobile area; is that

17  right?

18  A    That's correct.

19  Q    And people go to Mobile County from other counties to

09:38:50 20  work?

21  A    Oh, yes.  A lot of people do.

22  Q    And to live?

23  A    Yes.

24  Q    And to shop?

09:38:57 25  A    Oh, yes.

```
 1   Q     And those people may come from Clarke County?
 2   A     Yes.
 3   Q     Conecuh County?
 4   A     Not too many people from Conecuh County.
 5   Q     Okay.  What about Wilcox County?
 6   A     Not very many people from Wilcox County.
 7   Q     And migration from other areas would include people moving
 8   from the area commonly known as the Black Belt, right?
 9   A     There are people that move here from the Black Belt, yes.
10   Q     Okay.  You don't know the level of migration into the
11   Mobile area in the past decade, do you?
12   A     You mean where they came from?
13   Q     The level of migration.
14   A     The level.  Oh, I couldn't quantify it for you, but we
15   have had migration.
16   Q     Or the past 50 years?
17   A     We have had migration the last 50 of years, yes.
18   Q     But you don't know the level?
19   A     No, I can't quantify for you.
20   Q     And you don't have a breakdown of where those migrants
21   have come from?
22   A     No, ma'am.
23   Q     Are you aware of the racial disparities in the poverty
24   level in Mobile?
25   A     You mean the percentage of people who are in poverty who
```

Timestamps in left margin: 09:39:10 (line 5), 09:39:28 (line 10), 09:39:45 (line 15), 09:39:56 (line 20), 09:40:08 (line 25)

1    are black versus white?

2    Q    Yes.

3    A    I know that it's a higher percentage poverty among black

4    people than white people in Mobile County.

09:40:26 5    Q    Are you aware that over 51 percent of people living below

6    the poverty line in Mobile County are black, even though only

7    36 percent of Mobile County is black?

8    A    I don't know the figure precisely, but I wouldn't be

9    surprised if that was the case.

09:40:43 10    Q    Okay.  Are you aware that the Mobile City Council had to

11    be sued in the 1970s and 1980s to ensure black representation?

12    A    I am well aware of that, yes, ma'am.

13    Q    And are you aware that the Mobile County School Board had

14    to be sued in the 1970s and 1980s to ensure black

09:41:01 15    representation?

16    A    I am well aware that, yes, ma'am.

17    Q    You mentioned representative John Lewis and the

18    commemoration of the Selma to Montgomery March?

19    A    Correct.

09:41:13 20    Q    But you did not support the John Lewis Voting Rights

21    Advancement Act while you were in Congress, did you?

22    A    I did not.

23    Q    You are familiar with the area referred to as the Black

24    Belt, right?

09:41:29 25    A    Oh, yes, ma'am.

1  Q    And the Black Belt is generally an area whose counties are

2  generally majority black, right?

3  A    It's actually called the Black Belt because of the soil.

4  The soil is dark and rich there, so it's not called the Black

09:41:44 5  Belt of race or ethnicity.

6  Q    That's not what I asked.  Is it an area whose counties are

7  generally majority black?

8  A    Yes.  There are some exceptions to that, but yes, as a

9  region, it's majority black.

09:42:00 10 Q    Okay.  And in general, the Black Belt has lower income

11 levels than other areas of the state, right?

12 A    Yes, ma'am, that's correct.

13 Q    And it has lower education levels than other areas?

14 A    There are exceptions to that, but that's true.

09:42:17 15 Q    And it has worse health care and facilities than other

16 areas?

17 A    I don't know that.  I have toured hospitals in the Black

18 Belt, and there the number of good hospitals in Black Belt, so

19 I can't verify what you just said.

09:42:28 20 Q    Okay.  That's perfect, because I would like to talk about

21 health care now.

22      In December 2020, you were interviewed by al.com about

23 your time after Congress.  Do you recall this interview?

24 A    Well, yeah, I did a lot of interviews when I was a member

09:42:45 25 of Congress, but I do recall generally that interview.

```
            1              MS. WELBORN:  Mr. Ang, could you bring up that
            2   article?
            3   BY MS. WELBORN:
            4   Q    Mr. Byrne, do you recognize this article?
09:42:55    5   A    It's been a while since I've read it, but, yes, John
            6   Sharp.  I remember the article he wrote, yeah.
            7              MS. WELBORN:  Your Honor, we would like to mark this
            8   document as Milligan Plaintiffs' Exhibit 55 for identification.
            9              JUDGE MARCUS:  Okay.
09:43:12   10              MS. WELBORN:  Mr. Ang, could you flip to page 2,
           11   please?
           12   BY MS. WELBORN:
           13   Q    And, Republican Byrne, could you please read the paragraph
           14   starting with, the daily data?
09:43:24   15   A    The daily data that I've got in this -- which really
           16   forced me to focus on the fact that there is a problem with the
           17   ability of black people to be able to get good, primary health
           18   care.  One thing I have worked on in Congress and will continue
           19   to be interested in, is how do we get primary health care to
09:43:43   20   black people?  It's clear with the data we have is that black
           21   people with underlying health conditions are disproportionately
           22   affected by the novel Coronavirus virus.  We should want
           23   everyone in our communities to have real access to quality
           24   primary health care.
09:44:01   25   Q    Thank you.
```

1    MS. WELBORN:  And, Mr. Ang, could you flip to the last

2    page, please?

3    BY MS. WELBORN:

4    Q    And, Representative Byrne, could you read the paragraph

09:44:11 5    starting with, many of us have access?

6    A    Many of us have access to primary health care, and we take

7    that for granted, but for a disproportionate number of people

8    in the state, and a disproportionate number of black people,

9    that's not true.  It's not good for our communities, for our

09:44:27 10    state, or our nation.

11    Q    Thank you.

12    MS. WELBORN:  And, Mr. Ang, you can take that down.

13    BY MS. WELBORN:

14    Q    Representative Byrne, do you agree that it is difficult

09:44:37 15    for black people in Mobile County to get primary health care?

16    A    Yes, ma'am.

17    Q    And would you agree that it is difficult for black people

18    in the Black Belt to get primary health care?

19    A    I don't know as much as the Black Belt as I do about

09:44:51 20    Mobile County, but I wouldn't be surprised if that was true.

21    Q    Okay.  Thank you.  You are aware that the Affordable Care

22    Act allows states to opt in to Medicaid expansion, right?

23    A    I am.

24    Q    And you are aware that Governor Bentley convened a task

09:45:07 25    force that recommended that Alabama opt into Medicaid

1  expansion, right?

2  A    I don't know about that.

3  Q    Okay.  But Alabama has not opted into Medicaid expansion?

4  A    That's correct.

09:45:20  5  Q    And if Medicaid were expanded in Alabama about, 220,000

6  more Alabamians would receive health care coverage; is that

7  right?

8  A    No.

9  Q    I'm sorry?

09:45:35  10  A    I said no.

11  Q    Okay.  Do you have a different figure?

12  A    No.  I think what you are saying is they would be covered

13  by Medicaid, but it doesn't mean they would have access to

14  health care because there are not enough health care providers

09:45:51  15  to provide health care to.

16  Q    I'm sorry.  I'm talking about health care coverage, so

17  insurance?

18  A    It's a difference between coverage and gaining health

19  care.

09:45:59  20  Q    Okay.  220,000 more Alabamians would be covered by

21  Medicaid and have Medicaid insurance?

22  A    Yes.  But they wouldn't necessarily be able to get health

23  care because we don't have doctors that will take care of them.

24  We have --

09:46:14  25  Q    Thank you.

1  A    We have one pediatrician in Escambia County, Alabama that

2  will take Medicaid patients because the level of pay is so low

3  for Medicaid.  So you can have Medicaid and not be able to get

4  health care because there's no doctor to give it to you.

09:46:29 5  That's --

6  Q    Okay.  Thank you.

7  A    -- why I support community health centers.

8  Q    But of those 220,000 Alabamians who would be covered under

9  Medicaid in that they have Medicaid insurance, black people

09:46:44 10  would disproportionately be among those at those people, right?

11  A    I don't know that figure.  I couldn't -- I couldn't

12  quantify that.

13  Q    And while you were in office, you opposed Medicaid

14  expansion, right?

09:46:55 15  A    I did because I thought we should have community health

16  centers instead.

17  Q    Okay.  And Representative Sewell supports Medicaid

18  expansion?

19  A    She does.

09:47:04 20  Q    And that Alabama Black Legislative Caucus supports

21  Medicaid expansion?

22  A    I don't know.

23  Q    Okay.  In Congress, you made opposition to the Affordable

24  Care Act a major priority; is that fair?

09:47:19 25  A    I did.

1    Q    And you sponsored a 2015 bill to repeal the Affordable

2    Care Act?

3    A    Repeal and replace.

4    Q    And in 2017, you supported a budget revolution to appeal

09:47:32 5    the Affordable Care Act?

6    A    That's correct.

7    Q    Do you recall the American Health Care Act of 2017?

8    A    I do.

9    Q    And it sought to repeal the Affordable Care Act, as well,

09:47:44 10   right?

11   A    Repeal and replace.

12   Q    And you supported the American Health Care Act, right?

13   A    Yes, because I thought it was going to give a better

14   health care system than the one that the Affordable Care Act

09:47:57 15   provided.

16   Q    Okay.  Thank you.

17        Do you know what percentage of black voters voted for you

18   in the 2014 and 2018 general elections?

19   A    I don't.

09:48:07 20   Q    Would it surprise you that in your 2014 election only

21   15 percent of black voters in District 1 voted for you?

22   A    No.

23   Q    And would it surprise you to know that in 2018 only

24   5.4 percent of black voters in District 1 voted for you?

09:48:29 25   A    That would surprise me, yeah.

```
 1  Q    Okay.
 2           MS. WELBORN:  I believe I have no further questions,
 3  but if I could please confer with my colleagues for a few
 4  minutes.
 5           JUDGE MARCUS:  You may.
 6           MS. WELBORN:  Thank you.
 7      We have no further questions.  Thank you.
 8           JUDGE MARCUS:  All right.  Thank you.  And you may
 9  proceed, Mr. Osher.
10           MR. OSHER:  Thank you, Your Honor.
11                         CROSS-EXAMINATION
12  BY MR. OSHER:
13  Q    Good morning, Representative.  How are you?
14  A    Good morning.  I'm well, thank you.
15  Q    Can you hear me okay?
16  A    I can.
17  Q    Great.  My name is Dan Osher.  I represent the Caster
18  plaintiffs in this lawsuit.  I think we met a few years ago
19  during the *Chestnut* litigation where you testified.  Do you
20  remember that?
21  A    I do.
22  Q    Great.
23      Representative, how long did you serve in Congress?
24  A    Seven years.
25  Q    And during that time and when you were campaigning, did
```

09:48:40   (line 5)
09:49:09   (line 10)
09:49:17   (line 15)
09:49:29   (line 20)
09:49:38   (line 25)

```
 1    you reach out to your constituents to try to learn what their
 2    interests and needs were?
 3    A    Constantly.
 4    Q    I'm sorry.  I didn't catch that answer.
 5    A    Constantly.
 6    Q    What about organizations that served your constituents,
 7    did you reach out to meet with any such organizations?
 8    A    Typically, they would reach out to me.  So somebody
 9    reached out to me and said, will you come speak to our group,
10    or can we come meet with you?  I would say, yes.
11    Q    Okay.  You mentioned Airbus during your testimony.  That
12    is a pretty big presence in Mobile; isn't that right?
13    A    Yes, sir.
14    Q    Did you ever seek out a meeting to meet with
15    Representatives from Airbus?
16    A    No.  They sought out meetings with me.
17    Q    So you never reached out to them during your candidacy or
18    serving Congress?
19    A    I didn't have to.  They reached out to me.
20    Q    Fair enough.
21         What about Austal, did you ever reach out to them?
22    A    Yes, sir, but that was part of the back and forth in
23    trying to get ships authorized and appropriated.  So I would
24    initiate conversations with them and tell them this is what
25    just happened or what's about to happen.
```

09:49:52  (line 5)
09:50:05  (line 10)
09:50:21  (line 15)
09:50:34  (line 20)
09:50:50  (line 25)

```
 1   Q    Sure.  And that was a huge project in your district,
 2   right?  I believe you spent a lot of time on that?
 3   A    Yes, sir.  A lot of time.
 4   Q    Any other of the companies that you identified in your
 5   direct examination, did you reach out to any of those while you
 6   were serving or campaigning?
 7   A    I would probably each reach out to the University of South
 8   Alabama because I was on the education committee, and I was
 9   trying to -- but in general, if I spoke with companies, that
10   would have been because they or somebody representing their
11   industry reached out to me.
12   Q    Sure.  Busy guy.  I wouldn't dispute that.  So you
13   testified in the Chestnut trial while you were in office you
14   never had a formal reading with the Alabama State Conference of
15   the NAACP; isn't that right?
16   A    That's correct.  They never reached out to me.
17   Q    And you never reached out to them?
18   A    No.
19   Q    And you didn't know who the president of that organization
20   was when you testified in Chestnut; is that right?
21   A    Yes, sir.
22        JUDGE MARCUS:  Give him a chance to complete his
23   answer.  You may proceed, Mr. Byrne.
24        THE WITNESS:  I still don't know.
25   BY MR. OSHER:
```

1  Q     And you testified in *Chestnut* that you never held a

2  meeting with anyone from the Urban League while you were in

3  office, right?

4  A     That's correct.  They never reached out to me.

09:52:21  5  Q     And you never reached out to them?

6  A     That's right.

7  Q     And you testified in *Chestnut* you never met with anyone

8  from the Southern Christian Leadership Conference; isn't that

9  right?

09:52:31  10  A     Not that I am aware of.

11  Q     And you testified in *Chestnut* that you never had a meeting

12  with anyone from the National Coalition of Black Civic

13  Participation; isn't that right?

14  A     That's correct.  Now, I think what I said in that trial

09:52:43  15  and I will say again today is I may have met with those people

16  when I was somewhere else.  Like I may have met with them in

17  Selma during the pilgrimage, but I didn't meet with them as

18  members of organizations.  It was part of a bigger meeting.

19  Q     Of course.  Understood.  And you testified in *Chestnut*

09:53:03  20  that you never met with anyone from LULAC, the League of United

21  Latin American Citizens; isn't that right?

22  A     That's correct.

23  Q     And you testified in *Chestnut* that you didn't even know

24  what that organization was?

09:53:15  25  A     That's correct.

1  Q    And you further testified that you never paid attention to

2  what extent your black constituents supported or opposed you in

3  your congressional races; isn't that right?

4  A    That's right.  It didn't matter.  I still had to represent

09:53:33 5  them, whether they voted for me or not.

6  Q    Sure.  But you didn't pay attention to whether they

7  actually supported or opposed you?

8  A    No.  Wouldn't matter.

9  Q    So during your seven years in Congress, and I think you

09:53:47 10  already talked about this, you got to know the other members of

11  the Alabama delegation; isn't that right?

12  A    Our delegation worked together very well, very closely.

13  Q    And I -- in Ms. Welborn's cross-examination, you talked

14  about this a little bit, but I'd like to dig down a little

09:54:08 15  more.

16        MR. OSHER:  Jeff, can I have you pull up Caster

17  Plaintiffs' Exhibit 12?  Thanks.

18  BY MR. OSHER:

19  Q    And, Representative, I will represent to you that this is

09:54:26 20  a map of the congressional plan that was in place I believe the

21  whole time that you were in office?

22  A    That's correct.

23  Q    Over a decade between 2012 and this year, or I should say

24  last year.

09:54:41 25        So Robert Aderholt represented District 4, right?

```
 1  A    That's correct.

 2  Q    So looking at his district -- and let's see.

 3           MR. OSHER:  Jeff, could you focus in on the purple

 4  district there?  Yeah.  Perfect.

 5  BY MR. OSHER:

 6  Q    So looking at that district, it spans the width of the

 7  state.  It has corners in Colbert County in northwest down to

 8  Lamar and Tuscaloosa counties, then over east to Etowah,

 9  Marshall, and Dekalb County; isn't that right?

10  A    Yes, sir.

11  Q    Would you say that's an accurate description of that

12  description?

13  A    Yes, sir.

14  Q    Did Representative Aderholt ever express to you that it

15  was too difficult for him to travel to the different parts of

16  his district?

17  A    No.  I actually know that area fairly well because I have

18  campaigned in there twice running for statewide office, and

19  that area, it has an awful lot in common with one another.

20  Q    Sure.  That --

21           JUDGE MARCUS:  Just let him finish his answer.

22           THE WITNESS:  I said they're very similar.

23  BY MR. OSHER:

24  Q    My apologies for -- I didn't mean to talk over you,

25  Representative.
```

09:54:59  (line 5)
09:55:22  (line 10)
09:55:32  (line 15)
09:55:49  (line 20)
09:56:02  (line 25)

1717

```
 1          That wasn't my question.  My question was:  Did
 2   Representative Aderholt ever express to you that it was too
 3   difficult for him to travel to the different parts of his
 4   district when he represented them?
09:56:13 5   A    No.  When you are in Congress and you are delegated to a
 6   district like that, you do what you have to do, and I am sure
 7   he does an excellent job of it.
 8   Q    And he is an effective representative of his district?
 9   A    Yes.  Very much so.
09:56:28 10  Q    And you testified that you got to know Representative
11   Sewell pretty well during your time in Congress?
12   A    Actually, I knew her before I got to Congress.  But she
13   and I worked very closely together when I was in Congress.
14   Q    She is also a very effective Representative of her
09:56:42 15  district?
16   A    Very effective.
17          MR. OSHER:  Jeff, can we focus on District 7 in the
18   map?
19   BY MR. OSHER:
09:56:53 20  Q    So, again, looking at this district, her district started
21   out in -- well, it goes down to the south in Clarke County,
22   then to Montgomery in the east, up to Birmingham in the
23   northeast in Jefferson County, and then over to Pickens County
24   in the west.  Do you see that?  Did I describe her district
09:57:13 25  accurately?
```

1    A    Yes.

2    Q    In your time in Congress, did Representative Sewell ever

3    express to that you it was too difficult for her to travel to

4    the different parts of her district?

09:57:26  5    A    She never said it was too difficult, but she said it was

6    pretty difficult.

7    Q    When did she say that?

8    A    On several different occasions.  She would talk about what

9    her schedule was and how difficult it was for her to be able to

09:57:39 10    go from Birmingham to Clarke County to Lowndes County to

11    Choctaw County, just the difficulty in travel, and the fact

12    that, you know, she's got parts of Jefferson County an urban

13    county, parts of Montgomery County another urban county

14    together with the rural Black Belt counties.  It's tough, it's

09:58:01 15    real tough on her, but she is very smart and very capable, and

16    she does -- she works hard.

17    Q    And you said she's a very effective representative?

18    A    Oh, yes very effective.

19    Q    And let's look at District 3.

09:58:17 20        As you spoke a bit about earlier, looking at that district

21    -- and I'm sorry.  Who represents District 3?

22    A    It's Mike Rogers.

23    Q    And he did the whole time you were in office; is that

24    right?

09:58:29 25    A    Oh, yes.  Yeah.

1    Q    So looking at his district, it has at least half of the

2    eastern border of the state running all the way up from

3    Cherokee County and all the way down to Russell County; isn't

4    that right?

09:58:41 5    A    That's right.

6    Q    Okay.  Did Representative Rogers ever say to you that it

7    was too difficult for him to travel to the different parts of

8    his district?

9    A    No.  I think he felt like his district had a lot of

09:58:52 10    commonality -- not necessarily easy to get from Cherokee County

11    to Russell County, but the commonality of interests they had

12    made it a little bit easier on him.

13        He does have the Anniston Army Depot, so he is going to be

14    focused on that.  But in Russell County, he has got people that

09:59:11 15    are across the river from a major Army base, so he's got that

16    to contend with, too.  But he's a ranking member of the House

17    Armed Services Committee now, soon to be the chairman, and so

18    he will be in a unique position to help both of those.

19    Q    Sure.  That wasn't my question.  My question was about the

09:59:29 20    difficulty of travel to the different parts of the district.

21    And --

22    A    Yeah.  He would say, I have had a long day or a long

23    couple of three days because I have to go from Cherokee County

24    all the way down to Pike Road in Montgomery.  That's a long

09:59:44 25    way.

```
 1   Q    But he's -- you think he's a very effective representative

 2   in his district?

 3   A    Oh, yeah, yeah.

 4   Q    Okay.

 5            MR. OSHER:  You can take that down, Jeff, thank you.

 6   BY MR. OSHER:

 7   Q    In your direct examination, do you recall talking to

 8   Mr. Davis about how the illustrative plans that the plaintiffs

 9   have offered in this case may result in no congressional

10   representative living in Mobile?  Do you remember that?

11   A    Yes.

12   Q    And I think -- I can't remember.  It might have been

13   Mr. Davis or you said that that would be a tragedy?

14   A    It would be a tragedy if we didn't have somebody from

15   Mobile representing the Mobile area, yeah.

16   Q    Okay.

17            MR. OSHER:  Jeff, could I have you pull up Defendants'

18   Exhibit 2, which I believe is Mr. Bryan's report that was

19   offered by the state in this case?

20        Can you go to page 27?  Next page, please.  And can you

21   zoom in on the Figure 5.6, Alabama enacted plan.  Any way to

22   zoom in further.

23   BY MR. OSHER:

24   Q    Representative, can you see that map?

25   A    I can.
```

1   Q    Okay.  I will represent to you that this is the current

2   enacted map, and it has dots as to where each of the current

3   Representatives live.  Do you see that?

4   A    I do.

10:01:19 5   Q    Can you tell me which congressional representative

6   currently lives in Montgomery?

7   A    I don't think anybody currently lives in Montgomery.

8   Q    And you would agree that Montgomery is the third biggest

9   city in Alabama?

10:01:38 10   A    Actually, now, I think it's the fourth.

11   Q    Fair enough.  You would say that Montgomery is a very

12   important city in the state of Alabama?

13   A    Oh, yes, very important city.

14   Q    Okay.

10:01:50 15        MR. OSHER:  You can take that down, Jeff.  Thank you.

16   BY MR. OSHER:

17   Q    You spoke a bit about District 5 in the State Board of

18   Education plan.  Do you remember that?

19   A    I can't remember which district it was.

10:02:03 20   Q    District 5 is the one that connects Montgomery to Mobile

21   with the Black Belt?

22   A    Okay.  I remember that one.

23   Q    And up until a few years ago, Ella Bell represented that

24   district for a long time; is that right?

10:02:17 25   A    She did, yes.

```
 1    Q    Did she ever express to you that it was too difficult for
 2    her to represent a district that had both Montgomery and Mobile
 3    in it?
 4    A    Yes.
10:02:27  5    Q    When did she say that?
 6    A    I think I mentioned earlier that I would get phone calls
 7    from people in her district at -- thinking I was their state
 8    school board member.  And asking me to come to meetings.  And I
 9    would call her and I would say, it's your district, not my
10:02:46 10    district.  I don't want to do anything in your district you
11    don't know about.  I said, do you want me to do something?  She
12    said, would you please, because I cannot get down there.  It's
13    too far me to get from Montgomery to there.  I have other
14    things going on.  And so I said, sure, I will be happy to do
10:02:59 15    it.  So I would do that for her from time to time and for her
16    predecessor.
17    Q    And if she was a member of Congress and you were also a
18    member of Congress and that sort of confusion arose, that would
19    -- the same thing would happen, right, you would talk to the
10:03:17 20    other member of the Congress and try to figure it out?
21    A    Yes.  But I got to be honest with you, that never happened
22    when I was in Congress.  I guess people know who their
23    Congressman is.  So I never got any calls from Terri Sewell's
24    district, for example, saying would you come meet with us
10:03:32 25    except for Clarke County because she and I shared Clarke
```

1  County.

2  Q    And Clarke County is the only district -- I'm sorry -- the

3  only county that your district split last redistricting cycle,

4  right?

10:03:43  5  A    That's right.  And we had an understanding we would work

6  together in Clarke County, and there was never any issue.

7  Q    Sure.  Ella Bell extremely effectively represented that

8  district, right?

9  A    I don't think I would agree with that.

10:04:01 10  Q    Dr. Tommy Stewart succeeded Ella Bell to represent that

11  district?

12  A    I -- yeah.  I don't know him, but I -- I know the name.

13  Q    Did you ever speak to Dr. Stewart?

14  A    Not that I can recall.

10:04:19 15  Q    What about Dr. Chestnut, who currently represents that

16  district?

17  A    I don't recall having any interaction with Dr. Chestnut

18  either.  I've been away from the state school board for a

19  while.

10:04:30 20  Q    You voted to -- in Ms. Welborn's cross-examination, you

21  spoke about your efforts to repeal the Affordable Care Act;

22  isn't that right?

23  A    That's right.

24  Q    You testified in *Chestnut* that you never tried to

10:04:48 25  determine whether your black constituents wanted the Affordable

1  Care Act to be stay in place, right?

2  A    I didn't try to determine anybody's particular views on

3  that.  I just listened to what people were telling me.  And I

4  had a lot of people telling me they wanted to change it.

10:05:02  5  Q    You never sought out the advice from the state conference

6  of the NAACP on that issue?

7  A    I think I testified earlier I never had any interaction

8  with them consciously.  I may have been in a room with some of

9  them and didn't know they were members of that organization.

10:05:16  10  Q    And you never even tried to figure out what their position

11  was on the issue?

12  A    No.  I -- when it came to that issue, I had plenty of

13  people tell me what their positions was.  I didn't have to

14  reach out to people.

10:05:30  15  Q    In *Chestnut*, you testified that while you were in office

16  you never even tried to determine how many black constituents

17  you actually had; isn't that right?

18  A    Well, I knew them in general, but I didn't know precisely.

19  I knew it was about 25 percent.

10:05:44  20  Q    In fact, when you were asked about a percentage of your

21  district that was black during *Chestnut*, you said, it didn't

22  matter to me.  Isn't that right?

23  A    It didn't matter to me.

24  Q    You voted against the First Step Act?

10:05:59  25  A    You have to refresh me.  I don't know what the First Step

1725

1    Act was.

2    Q    The First Step Act was the criminal justice reform?

3    A    Oh, yeah, yeah, yeah.  I'm sorry.  Yes, I did.

4    Q    But you testified in *Chestnut* that you never tried to

10:06:15  5    determine whether your black constituents felt that that bill

6    would improve their lives, right?

7    A    I never heard from anybody about that bill.

8    Q    You didn't attempt to discern the Alabama NAACP's view on

9    the bill?

10:06:30  10    A    I never had any interaction with them.  Consciously

11    knowingly.

12    Q    You spoke a bit about the various factories and plants

13    that are located in Mobile?

14    A    (Nodded head.)

10:06:44  15    Q    Do you recall that?

16    A    That's right.

17    Q    Are you aware that there are higher rates of cancer and

18    asthma among the black community in Mobile due to their

19    proximity to those factories and plants?

10:06:55  20    A    I'm not, but I wouldn't argue with it.  In general, I know

21    that we have an issue with regard to the quality of health care

22    that's been available to black people in Alabama in my

23    district.

24    Q    Do you know who Alabama commemorates in Congress' Statuary

10:07:19  25    Hall?

```
 1   A    Yes.  It's Helen Keller, and it's -- I forgot his name --
 2   a former Civil War general.
 3   Q    Joseph Wheeler?
 4   A    Yeah.
 5   Q    And Joseph Wheeler was a calvary general for the
 6   Confederate Army; isn't that right?
 7   A    I know he was a general.  I don't know if it was calvary
 8   or not.
 9   Q    But he was on the Confederate side of the Civil War?
10   A    Right.  I know a lot more about Helen Keller than I know
11   about him.
12   Q    Did you ever try to determine how your black constituents
13   felt about Alabama celebrating a Confederate general in the
14   halls of Congress?
15   A    I never asked them, but I think I can guess.
16   Q    You never reached out to?
17   A    No.
18   Q    And what is your guess as to how they would feel about it?
19   A    I don't think they would like it.  That's a decision by
20   the state, not a decision by Congress.
21   Q    You would agree with me that members of Congress can use
22   their influence to try to change state policy?
23   A    Some do.  I didn't.  I didn't think it was appropriate.
24   Now, when I was in the Legislature, I supported putting Helen
25   Keller's statute in there.  I actually served on the committee
```

10:07:31 (line 5)
10:07:43 (line 10)
10:07:53 (line 15)
10:08:08 (line 20)
10:08:29 (line 25)

1727

```
 1    that raised the money to put the statue there because I think

 2    Helen Keller was a better representative of the state than the

 3    person we had there before.

 4    Q    Oh, you're referring to the Joseph Wheeler statue, or the

10:08:44  5    one that was replaced by Helen Keller?

 6    A    The one replaced by Helen Keller.

 7    Q    You didn't take any action in the Legislature to remove

 8    the Joseph Wheeler statue or replace it with something else?

 9    A    No.  We were kind of focused on Helen Keller when I was in

10:08:57 10    the Legislature.

11    Q    Speaking of your time in the Legislature, when did you

12    serve in the Senate?

13    A    From November of 2002 to May of 2007.

14    Q    During that time, I imagine you went to the Alabama

10:09:15 15    Capitol pretty often?

16    A    Yes, sir.

17    Q    Did you often walk by the monument to Confederate soldiers

18    and sailors that sits in front of the Capitol?

19    A    If I did, I didn't pay any attention to it.  I didn't know

10:09:30 20    that we had one.

21    Q    So you sort of turned a blind eye to it?

22    A    I was busy doing other things.  I wasn't paying attention

23    to stuff like that.

24    Q    Were you aware that while you were there, the memorial was

10:09:40 25    surrounded by flags of the Confederate states?
```

```
 1  A     I don't remember that, either.
 2  Q     Is it your contention that that shrine to the Confederacy
 3  does not exist in front of the Capitol?
 4  A     Oh, no. I'm not saying they don't.  I just never paid any
 5  attention to them.
 6  Q     So you never tried to determine whether your black
 7  constituents had a problem with that sitting at the foot of the
 8  Capitol?
 9  A     I never had a discussion with any constituent about that.
10  Q     And is your assumption that you described earlier the same
11  here that you would think that your black constituents probably
12  did not appreciate that?
13  A     If they even knew about it.
14  Q     Representative, you would agree that the poverty rate
15  among black Alabamians is significantly higher than it is among
16  white Alabamians?
17  A     I know it's higher.  I don't know I can say it's
18  significantly higher.
19  Q     Am I right that when you testified in Chestnut, you
20  actually said you didn't know if that was the case, right?
21  A     No.  But I wouldn't be surprised if it was higher.
22  Q     Understood.  I will represent to you that the poverty rate
23  is more than double among black Alabamians than it is white
24  Alabamians.
25         What about child poverty rates?  Do you know if there's a
```

Timestamps: 10:09:58 (line 5), 10:10:08 (line 10), 10:10:32 (line 15), 10:10:44 (line 20), 10:11:06 (line 25)

```
  1   disparity there?
  2   A    I don't.  I don't know what the child poverty rate is.
  3   Q    Would it surprise you if it was nearly triple among black
  4   Alabamians than it is white Alabamians?
10:11:19  5   A    It would not.
  6   Q    Household average income, do you know if that's lower
  7   among black Alabamians than white Alabamians?
  8   A    I don't know, but I would not be surprised if it were.
  9   Q    Same with unemployment rate, do you know if it's -- if
10:11:35 10   it's higher than among black Alabamians than white Alabamians?
 11   A    I don't know, but I wouldn't be surprised if it were.
 12   Q    I will represent to you that it's more than double among
 13   black Alabamians than white Alabamians.  Does that surprise
 14   you?
10:11:48 15   A    Yeah, that kind of does surprise me.
 16   Q    Okay.  Do you have any reason to dispute that?
 17   A    No.  I am just saying -- I don't have the data in front of
 18   me, so I am not going to try to guess at the data, but as I
 19   come around and looked at this as an industry down in this part
10:12:08 20   of the state, there are plenty of black people that work in
 21   every industry that we have got down here.  And that doesn't
 22   surprise me because 25 percent of the people that live down
 23   here are black and expected to be in the work force, and they
 24   are.
10:12:21 25   Q    Representative you are a little quiet now, if you wouldn't
```

```
  1  mind speaking up.

  2  A    Okay.

  3  Q    Thank you.

  4  A    I will move a little closer.

  5  Q    I will represent to you that one of the Caster plaintiffs'

  6  experts in this case reported that the black unemployment rate

  7  among -- the black Alabamian unemployment rate is 7.8 percent,

  8  and that for white Alabamians, it's 3.8 percent.  So the -- so

  9  he reports that it's more than double among black Alabamians?

 10  A    I don't know.

 11  Q    So assuming the figures that I discussed there are true,

 12  you would agree that those disparities stem from Alabama's

 13  centuries' long discrimination against black people in the

 14  state?

 15  A    I think the problems that are facing the black community

 16  with regard to all these issues is a function of the failure of

 17  the state of Alabama to provide a quality education to them.

 18  Q    Does that have -- is that rooted in the discrimination

 19  that Alabama had against black individuals?

 20  A    No.  It's rooted in the overall failure to the Alabama

 21  public education system, which -- white people just not as much

 22  as it affects black people.  It's the reason I got in public to

 23  begin with is because I thought the biggest problem facing

 24  Alabama was our inability to provide quality education to all

 25  of our citizens, and we're still not doing enough.  And it's
```

1  having these effects that I think hurt everybody in Alabama,

2  but particularly the people who are not getting that quality

3  education.

4  Q    So is it your testimony that the disparities that I have

10:13:56 5  described have no roots in the centuries' long discrimination

6  that Alabama, the entrenched discrimination in Alabama against

7  black individuals?

8  A    I don't know that I can say that there's no effect.  But

9  what I'm saying is, is that the single biggest problem, the

10:14:15 10  thing that's the biggest cause for them is our failure to

11  provide quality education to everybody in the state.  We live

12  in a time when you're going to be valued by what you know and

13  what you do with what you know.  And if we don't provide

14  quality education to all of our people, they won't get the

10:14:32 15  economic value in their lives that they need.  If they don't

16  have the economic value in their lives, they can't afford

17  quality health care and all these other stuff.  So I continue

18  to believe today as I did when I ran for state school board in

19  1994, if you want to address all the other issues, fix the

10:14:48 20  education system in the state.

21  Q    You agree with me that Alabama had for a very long time a

22  strictly segregated education system?

23  A    Oh, yes, sir, absolutely.  To our great shame, we did

24  that.

10:15:03 25  Q    Just a few more questions, Representative.

```
  1        You testified on direct about the -- the campaign ad.  Do

  2   you recall that?

  3   A    Yes.

  4   Q    Your campaign ad.

10:15:17  5        I understand your testimony that that ad was intended to

  6   be primarily about your brother; is that right?

  7   A    That's correct.

  8   Q    So regardless of your intent, do you know how that ad was

  9   perceived among your black constituents?

10:15:29 10   A    I don't know that I ever had a discussion with a black

 11   person about that ad.

 12   Q    You didn't hear any feedback from the black community or

 13   the press on this?

 14   A    Not that I can recall.

10:15:44 15   Q    You understand, don't you, that images of black people in

 16   a fire could trigger a connection in the minds of some to the

 17   more horrific eras of racial discrimination in Alabama?

 18   A    No.

 19   Q    You would agree that in Alabama, there is a horrific

10:16:03 20   history of lynching black Americans?

 21   A    Yes, sir.

 22   Q    And that history included burning black individuals alive?

 23   A    Never heard of that.

 24   Q    You would also agree, wouldn't you, that Alabama has had a

10:16:17 25   history of bombing and burning down houses occupied by black
```

1  Alabamians?

2  A    Yes, sir.  To our great shame.

3  Q    You would also agree that the KKK used burning crosses to

4  terrorize black individuals in Alabama?

10:16:31  5  A    Yes, sir.  To our great shame, they did that.

6           MR. OSHER:  Your Honor, if I can just have a minute.

7           JUDGE MARCUS:  You may.

8  BY MR. OSHER:

9  Q    Just one more question, Representative.  Sitting here

10:17:11 10  today, do you understand how the images included in that ad

11  might be viewed negatively by the black community?

12  A    No.

13           MR. OSHER:  That's all I have.  Thank you.

14           JUDGE MARCUS:  All right.  Thank you.  And who will be

10:17:25 15  conducting cross-examination for the Singleton plaintiffs?

16           MR. WHATLEY:  Your Honor, I am Joe Whatley.  I will.

17           JUDGE MARCUS:  All right.  Thank you, Mr. Whatley, and

18  you may proceed.

19           MR. WHATLEY:   Thank you.

10:17:35 20                      CROSS-EXAMINATION

21  BY MR. WHATLEY:

22  Q    Mr. Byrne, it's good to see you again.  I have a few

23  questions.

24       First of all, I, along with other counsel, I represent the

10:17:47 25  Singleton plaintiffs.  Are you familiar with the whole county

1 plan that the Singleton plaintiffs have proposed, Singleton

2 plan number one?

3 A    I don't know if it's the Singleton plan, but I have seen a

4 map that shows whole counties.

10:18:03 5 Q    Okay.  And are you aware that that plan keeps Mobile

6 County whole?

7 A    The map that I saw kept Mobile County whole.

8 Q    And you would agree that's a good thing?

9 A    That's a good thing.  What I was concerned about was that

10:18:23 10 it added Andalusia and the county that Andalusia is in and took

11 away Washington County and Monroe County.  I don't think that's

12 a community of interest between Covington County which is where

13 Andalusia is and Mobile.

14 Q    Okay.  We will talk about that in a second.

10:18:35 15 A    Okay.

16 Q    But it also kept Mobile and Baldwin counties together, the

17 two Gulf counties?

18 A    It did.

19 Q    And that was something you viewed to be crucial, correct?

10:18:43 20 A    Yes.

21 Q    Okay.  And you know when you are drawing districts you

22 have to keep the population -- you have to have an eye on the

23 population.  What you have -- how equal it has to be is a

24 question the judges will decide.  But you know that you have to

10:18:58 25 look to population of counties when you are drawing districts,

```
 1  correct?
 2  A    That's correct.
 3  Q    And by putting Covington in instead of Washington and
 4  Monroe, they came -- the Singleton plaintiffs came to districts
 5  that had relatively equal population, correct?
 6  A    That's correct.  It has some flaws other than that, but,
 7  yes, it does do that.
 8  Q    And you would also agree that Covington and Escambia
 9  counties have some commonalities, correct?
10  A    Yes.  But Escambia County is not the core of the district.
11  Q    I'm sorry.  I couldn't hear you?
12  A    I'm sorry.  Escambia County is not the core of the
13  district.  And the part of Escambia County that is closest to
14  Covington County, which is Brewton and east Brewton, not really
15  Atmore, which on the other end of Escambia County, clearly much
16  more to Mobile.
17  Q    And the county seat in Escambia County?
18  A    Brewton.
19  Q    Remind me where that is?
20  A    It's Brewton.
21  Q    Okay.  In that eastern end of the county that's closer to
22  Covington?
23  A    That's right.
24  Q    And not far from Andalusia?
25  A    That's right.
```

1736

Q    Okay.

         MR. WHATLEY:  Let's pull up Caster Exhibit 12.  And go
down so we can see the southern part of that, Suzanne.

BY MR. WHATLEY:

Q    This is the current district -- I think you just testified
the district that -- District 1 is the one you served in this
configuration?

A    That's correct.

Q    Okay.  Now, I will tell you as a preliminary matter both,
Mr. Hare and I grew up in Monroeville.  And my mother and his
parents still live in Monroeville.  So let's spend a little bit
of time talking about your testimony about Monroe County.

         Now, Monroe County -- in Monroe County, the economy is
largely or in many respects built around the tree; isn't that
right?  You have paper mills, you have the timber business
especially in the northern part of the county.  It's -- that's
a huge part of the county -- economy; isn't that right?

A    It's a significant part of it, yes.

Q    Okay.  And they don't have ship building in Monroe County,
for example?

A    No.  But you have people from Monroe County that work in
the shipyards.

Q    True.  People commute.  But they don't do it in Monroe
County?

A    They don't do it in Monroe County, no.

1737

```
 1  Q     And, in fact, between 2010 and 2020, between the two
 2  censuses, Monroe County lost a significant part of its
 3  population, didn't it, what, around 15 percent?
 4  A     I don't know the exact percent, but they did lose a
 5  significant amount of population.
 6  Q     Okay.  And in Monroe County or at least Monroeville also
 7  has a tourist element to its economy, doesn't it?
 8  A     It does.  They try to attract people there because it's
 9  the home of Harper Lee, who you probably knew.
10  Q     Right.  And you brought up Truman Capote in your direct
11  testimony.  Were you aware that Truman was the other boy, To
12  Kill a Mockingbird?
13  A     Yes.
14  Q     Not Harper Lee's brother obviously, but the other boy in
15  To Kill a Mockingbird?
16  A     Yes.
17  Q     And what you're saying -- in Monroeville, especially
18  pre-COVID and we hope post-COVID, a lot of the economy is built
19  around the Mockingbird, it's built around Harper Lee and Truman
20  Capote and attracting tourists to Monroeville based on that?
21  A     They're trying to develop more tourism off of that, yes.
22  I don't know to what extent they have been successful.
23  Q     Well, you know at least pre-COVID and even last year to
24  some extent they have a -- the To Kill a Mockingbird play and
25  attract hundreds -- attract thousands of people into
```

10:21:52 (line 5)
10:22:10 (line 10)
10:22:30 (line 15)
10:22:48 (line 20)
10:23:05 (line 25)

```
 1  Monroeville to see the Mockingbird play?

 2  A    Yes, they do.  In fact, I've seen it three or four times

 3  and got to be on the jury one time.

 4  Q    Okay.  And that -- especially in the spring is a big part

 5  of the economy?

 6  A    In the spring, I would think it would be, yeah.

 7  Q    Okay.  And you mentioned that you attended a town hall

 8  meeting in Beatrice, right?

 9  A    Yeah.  Yeah.

10        MR. WHATLEY:  And, Suzanne, can you make the District

11  1 larger?

12  BY MR. WHATLEY:

13  Q    Is kind of in the northeastern corner of Monroe County?

14  A    I don't know -- yeah, I guess that's northeastern.

15  Q    And one of the things that's important in Beatrice's

16  economy is hunting camps.  You mentioned you were at you a

17  hunting camp, at your hunting camp, but hunting camps are big

18  up there, right?

19  A    Yes.

20  Q    Okay.  And I think you said the northern part of Monroe

21  County is a predominately black area, right?

22  A    Yes.

23  Q    And, in fact, especially the northern half of Monroe

24  County is considered to be part of the Black Belt, right?

25  A    I don't know that.
```

```
 1  Q    You don't know that.

 2       Do you know that both its population and its economy have

 3  a lot of similarities to the rest of the Black Belt, correct?

 4  A    I don't think I would agree with that.  It has some

 5  interesting unique industries there.  You mentioned tourism, in

 6  terms of the Mockingbird, but also there's a plant there that

 7  does pre-manufactured concrete walls.  It's another plant there

 8  that makes the cardboard containers that are used to package

 9  various goods including some of the craft beer that are made in

10  Mobile.  So I don't know other counties in the Black Belt that

11  have those sort of more advanced industries.

12  Q    Yes, sir.  I'm sorry.  Did I cut you off?

13  A    No.  I finished.

14  Q    Okay.  You were talking about the precast concrete.  You

15  were talking about Gate or Gate-Lazenby?

16  A    Yes.

17  Q    Okay.  What I was really focused on is more the part of

18  the county north of Monroeville?

19  A    Okay.

20  Q    And Gate-Lazenby -- I don't mean to make this personal,

21  but I worked my way through college working there.  But north

22  of Gate-Lazenby is also south of Monroeville, right?

23  A    Yes.

24  Q    Okay.  And north of --

25  A    But in Monroe County.
```

10:24:52 (line 5)
10:25:21 (line 10)
10:25:40 (line 15)
10:25:49 (line 20)
10:26:06 (line 25)

```
 1  Q    North of Monrovia, in the northern part of the county,
 2  that is the area where wouldn't you agree with me at least the
 3  population is very similar to what you found in the Black Belt?
 4  A    I would think in very north Monroe County, it would be
 5  very similar to say Wilcox County.
 6  Q    Right.  And you talked about the education.  The high
 7  school in Beatrice is J. F. Shields, right?
 8  A    I don't know the name of it.
 9  Q    But you know there is a high school in --
10  A    That's right.  I think I have been there.
11  Q    Yes, sir.  And it is an all-black school?
12  A    I know it's predominantly black.  I don't know if it's all
13  black.
14  Q    And the white children around Beatrice go to the all-white
15  private school, Monroe Academy down in Monroeville, don't they?
16  A    I don't know that.
17  Q    You don't know that?
18  A    No.
19  Q    Well, you mentioned that there were some white folks at
20  your town hall meeting in Beatrice.  Do you know where their
21  children go to school?
22  A    I didn't ask where they children went to school.  People
23  in the town hall meeting were mainly older.
24  Q    Okay.  You do know that there is an all-white private
25  academy in Monroe County where many of the white students go to
```

Timestamps:
10:26:21 (line 5)
10:26:44 (line 10)
10:27:03 (line 15)
10:27:13 (line 20)
10:27:29 (line 25)

```
 1  school?
 2  A    I know that there's a private academy.  I don't know the
 3  racial mix of it.  I don't think I have ever been to that
 4  school.
```
10:27:41 `5  Q    Okay.  Now, let's go over to Clarke County, if we could.`
```
 6        You represented -- and, again, I have relatives there, so
 7  I am going to focus on some issues.  You are represented the
 8  part of Clarke County that includes Grove Hill?
 9  A    Part of Grove Little, not all of Grove Hill.
```
10:28:06 `10  Q    And you represented the part that goes out on Highway 84,`
```
11  the road that goes sort of east and west to there, that's
12  Highway 84, right?
13  A    Yeah.
14  Q    And are you aware that there's a town of Whatley about
```
10:28:23 `15  six miles east of Grove Hill?`
```
16  A    I am aware of it.
17  Q    On Highway 84?
18  A    Yes.
19  Q    Okay.  And so as an example, my cousins in Grove Hill or
```
10:28:42 `20  north of Highway 84 in Grove Hill would have been represented`
```
21  by you, right?
22  A    Depending upon exactly where they live, probably so.  But
23  if they were northeast, they wouldn't be represented by me.
24  Q    And if they were northwest, they would be?
```
10:28:57 `25  A    They would be.`

1742

```
         1  Q    Okay.  And my cousins in Whatley, Alabama, six miles to
         2  the east in the same county, would have been represented by
         3  Congresswoman Sewell?
         4  A    I think that's right, yes.
10:29:09 5  Q    Okay.  And I want to be clear.  This question is not meant
         6  to disparage either you or Congresswoman Sewell.  You would
         7  agree, I think you already have, that she is an outstanding
         8  congresswoman?
         9  A    She is an outstanding congresswoman.
10:29:26 10 Q    But wouldn't you agree, sir, and I think this has been
        11  your testimony, that if you had combined Clarke County, that my
        12  cousins in Whatley and my cousins in Grove Hill would have been
        13  better represented regardless of whether it was you or her?
        14  A    By having just one congressman?
10:29:52 15 Q    Yes?
        16  A    Yeah.  I think that's what I have been saying in previous
        17  testimony.  I think it's better for a county to have one
        18  congressman and not to be split up.  But what Congresswoman
        19  Sewell and I did was from the very beginning we said we will
10:30:05 20 work together, and we did.  We worked together very well.  We
        21  used to do joint town halls together for example.  Thomasville
        22  was not in my district, but the mayor of Thomasville would come
        23  and see me every time he was in Washington.  He is a personal
        24  friend, and if Congresswoman Sewell needed help from
10:30:22 25 Thomasville, she got it from me 100 years ago percent of the
```

1    time.  That's just the way we worked things out.

2    Q    But despite that fact, your testimony is that it would be

3    better off to keep counties together?

4    A    Yes.  That's my position.

10:30:34  5    Q    And you believe that it would be better to keep Tuscaloosa

6    so it's not split, for example?

7    A    Yes.

8    Q    And the same for other counties in Alabama that are split,

9    such as Montgomery?

10:30:46 10    A    Yes.  Now, I understand that when you're trying to balance

11    out population, sometimes you can't make that happen.  But to

12    the maximum extent possible, counties should be kept whole and

13    contiguous in congressional districts.

14    Q    And you were asked specifically about the -- about

10:31:09 15    Montgomery not having a Congress person.  Do you recall that?

16    A    I don't remember the question just put that way, no.

17    Q    In any event, Montgomery currently does not have a member

18    of Congress living there, correct?

19    A    No one that lives there, yes, that's correct.

10:31:26 20    Q    Yes.  I'm sorry.  I wasn't clear with my question.

21    A    They had Martha Roby previously, and now their present

22    member is from Coffee County.

23    Q    And was it your testimony that by splitting or splitting

24    any county you might make it less likely that a congressperson

10:31:44 25    reside there?

```
 1    A     Yeah.

 2    Q     Okay.

 3    A     You start splitting counties like that, and that county

 4    loses its influence.  That's why I don't want Mobile County to

10:31:55  5    be split.

 6    Q     And --

 7              MR. DAVIS:  Give me one second.  Sorry to interrupt,

 8    Mr. Whatley.  Judge, I just want to check on Mr. Byrne.  We

 9    have been going about two hours.

10:32:05 10              JUDGE MARCUS:  We have been going a long time.

11         Let me ask you, Mr. Whatley:  How much longer you have

12    with Mr. Byrne.  Perhaps this would be a convenient time for a

13    short break.

14              MR. WHATLEY:  It's fine for me to take a short break,

10:32:20 15    Your Honor.

16              JUDGE MARCUS:  All right.  We will take a break for

17    15 minutes, and then we will pick up the balance of your

18    examination.

19         Question, though, Mr. Whatley:  How much longer do you

10:32:32 20    think you have with Mr. Byrne?

21              MR. WHATLEY:  I would guess about 10 or 15 minutes.

22    Perhaps the break will make it shorter.

23              JUDGE MARCUS:  I'm sorry.  I didn't mean to cut you

24    off.

10:32:41 25              MR. WHATLEY:  I said perhaps the break will make it
```

| | |
|---|---|
| 1 | shorter and more organized. |
| 2 | JUDGE MARCUS:  All right.  We will break for |
| 3 | 15 minutes and then pick up the thread of the cross by |
| 4 | Mr. Whatley and any redirect by Mr. Davis. |
| 10:32:53 5 | Thank you.  We will in a 15-minute recess. |
| 6 | (Recess.) |
| 7 | JUDGE MARCUS:  Mr. Whatley, are you ready to proceed |
| 8 | at this point? |
| 9 | MR. WHATLEY:  Yes, sir. |
| 10:48:40 10 | JUDGE MARCUS:  Mr. Byrne, you all set to go forward? |
| 11 | THE WITNESS:  Yes, sir, I am. |
| 12 | JUDGE MARCUS:  Thank you very much.  Mr. Whatley, you |
| 13 | may complete your cross. |
| 14 | MR. WHATLEY:  Thank you, Your Honor. |
| 10:48:51 15 | Suzanne, will you put back up for just a minute the 2011 |
| 16 | plan?  I think it's Caster Exhibit 12, Your Honor. |
| 17 | JUDGE MARCUS:  Just so I'm clear, Mr. Whatley, this is |
| 18 | the plan that actually was enacted by the state Legislature in |
| 19 | 2011, correct? |
| 10:49:23 20 | MR. WHATLEY:  Yes, sir.  Yes, sir, Your Honor.  And |
| 21 | just to put it in context, Mr. Byrne, it's the plan that |
| 22 | existed when you served in Congress, correct? |
| 23 | THE WITNESS:  Yes, sir. |
| 24 | BY MR. WHATLEY: |
| 10:49:34 25 | Q    Okay.  I want to focus back on Clarke County for just one |

1746

1        second.

2            And I don't think I asked you about the economy of Clarke

3        County.  In Clarke County, a big part of the county also

4        focuses on the tree, correct?

10:49:52  5    A    Yes.

6        Q    And so a paper mill and lumber mill in Jackson?

7        A    Yes.

8        Q    In the southern part of the county, correct?

9        A    That's correct.

10:50:05 10    Q    And there is a paper mill -- I don't know if you can see

11       it -- it's in the edge of Wilcox County and Pine Hill, not far

12       from Thomasville that you mentioned, correct?

13       A    Yes.  Yes.

14       Q    And so they make paper, and they produce lumber in Clarke

10:50:28 15    County, and they don't make ships, correct?

16       A    They don't make ships in Clarke County.

17       Q    But they do make paper, and they do produce timber?

18       A    That's correct.

19       Q    Okay.  We can take that down.

10:50:39 20           Mr. Byrne, I think in your -- you have clearly said before

21       -- I don't remember if it was in your testimony in the previous

22       case, or in your deposition, that you think it's important that

23       each of the urban or Metropolitan -- or each of the cities in

24       Alabama have its own congressional district or be in a separate

10:51:12 25    congressional district?

A    Yes.  I think that the four metro areas in the state, plus

Dothan, Tuscaloosa, Auburn, all those areas need to have sort

of at the center of their community adequately represented in

the United States Congress.

10:51:26  Q    So there ought to be in separate -- and to be clear, there

ought to be separate congressional districts or Huntsville,

Mobile, Montgomery, and Birmingham should each be located in a

separate congressional district from each other?

A    Yes.

10:51:45  Q    Okay.  And going to Congressman Palmer, I think there was

some questioning about Congressman Palmer earlier maybe by both

counsel.  Isn't it correct that Congressman Palmer currently

lives in Shelby County?

A    To be honest with you, I don't know exactly where he

10:52:06  lives.  He either lives in the southern part of Jefferson

County or in Shelby County.  I don't know.

Q    Were you aware that at one point he did live in Jefferson

County and he moved to Shelby County?

A    I am not aware of that.

10:52:18  Q    You are not aware of that.  Okay.

         MR. WHATLEY:  Your Honors, I think that's all I have.

         JUDGE MARCUS:  Thank you.  Redirect, Mr. Davis?

         MR. DAVIS:  Yes, Your Honor, briefly.

                    REDIRECT EXAMINATION

10:52:30  BY MR. DAVIS:

1  Q    Mr. Byrne, did you turn down any meeting requests from the

2  Alabama NAACP?

3  A    No.

4  Q    Would you have been happy to meet with them had they asked

10:52:38 5  for a meeting?

6  A    Absolutely.  I meet with just about everybody.

7  Q    We talked about the third districts -- and the Third

8  District and the Fourth Congressional District when you were

9  speaking with Mr. Osher.  Do you consider the areas encompassed

10:52:54 10  in Alabama's Third Congressional District to be part of a

11  community of interest?

12  A    I do.  That's east Alabama, and it got a common set of

13  industries and things that they're interested in, and they

14  largely look to Auburn as their university.

10:53:09 15  Q    What about the Fourth Congressional District, do you

16  consider those areas to be part of a community of interest?

17  A    They are.  We have similar industry in all those areas all

18  tied to the automobile industry, for example.  And they have

19  very similar -- when you go from one of those towns to the

10:53:27 20  next, walking from the east side of the state to the west, the

21  towns are very similar to one another.

22  Q    Do you consider the more urban parts of Mobile County to

23  be part of the same community of interest with Montgomery,

24  Macon, and Barbour counties?

10:53:47 25  A    I have been up and down those other places.  They just

1  don't have a connection to Mobile or so.

2  Q    And what about the more rural parts of Mobile County?  Are

3  they part of a community of interest with the Wiregrass in

4  Dothan?

10:54:02 5  A    No, they are not.

6  Q    When you are considering --

7  A    Let me give an example there.  One of the maps I saw of

8  Covington County in the First Congressional District, there's

9  really no connection between Covington County and the main

10:54:20 10  interest that you can see in the First Congressional District.

11  So I don't see that it makes any sense to put a Wiregrass

12  county like Covington in with a district that's primarily

13  centered with Mobile and Baldwin County.  It's hard to get to

14  Andalusia from Mobile, very hard.  And so as the result, very

10:54:38 15  few people go back and forth between Andalusia and Mobile.

16  Q    Which districts would allow a Congressman or congresswoman

17  to more effectively represent the constituents of District 1,

18  whether they're black, whether they're white, Republican,

19  Democrat, rich or poor?  Would that be the districts as passed

10:54:59 20  in Alabama's plan, or the districts that plaintiffs are

21  proposing that we viewed a little while ago?

22  A    The Legislature plan by far.  And as I said before, I

23  testified before that committee, and I listened to other people

24  talk while I was there.  And the Legislature effectively did

10:55:17 25  what we were asked to do, which was to keep our part of the

```
 1   state together.
 2   Q    Uh-huh.  And would your ability as a Congressman to
 3   represent your constituents, would it be negatively impacted if
 4   your district changed at the last minute to a vastly different
 5   structure, including different areas of the state?
 6   A    Very definitely so, yes.
 7   Q    We talked about a lot issues, Mr. Byrne.  Is there
 8   anything else you would like to bring to the Court's attention
 9   as they consider these various plans?
10   A    Yes, sir.  I would want to say this.  I have great respect
11   for the Court and this proceeding, and I know the Court's got
12   some difficult decisions to make.  But we're pretty far along
13   into this campaign cycle.  And I have seen what it does to
14   congressmen in other states when at the last minute, courts
15   start moving things around.  And I think it hurts the
16   effectiveness of congressmen when that happens.  I am not
17   saying the Court may not have a good reason to do it.
18        But as I said earlier, we are just a few months away from
19   primaries.  And it would be very difficult to start shifting
20   this thing around.  It was hard enough as it was when the
21   Legislature pass these districts.  People held back and held
22   back and held back.  And now, they're right in the meat of
23   these campaigns.  And I just think it would be terrible if we
24   change course on all these candidates running for these various
25   offices, Democrat, Republican, doesn't matter.  It's going to
```

1  have the very same detrimental effect on those candidates and
2  on those congressmen, sitting congressmen if all of a sudden
3  these things are moved around some more.

4      And the second thing I would say is, I've tried to say a
10:56:55 5  little bit earlier, Covington County doesn't fit with the First
6  Congressional District.  They're wonderful people over there.
7  I have good friends.  I worked with a lot of them when we were
8  replacing the president of the community college.  But I don't
9  think they would want to be in a district with Mobile because
10:57:09 10  they look to Dothan.  They look to the Wiregrass.

11      So that map that has Covington County with Mobile, that
12  just doesn't fit.  And I think the way the Legislature has
13  drawn the First Congressional District makes all the sense in
14  the world, given the needs that they have to try to take a few
10:57:26 15  areas away from that district presently because of the growth
16  in Baldwin County.  I think they did the best they could
17  possibly do.

18          MR. DAVIS:  Thank you, Your Honor.

19          MS. WELBORN:  I'm sorry.  We just objected to that
10:57:38 20  last line of questioning and move to strike it as beyond the
21  scope of Mr. Byrne's direct.  Asking, you know, anything else
22  he wanted to add was not in Mr. Byrne's direct examination.

23          JUDGE MARCUS:  It would have been wiser to object
24  before the question was asked, but while the question I think
10:57:58 25  did go beyond, the answer, I think bore upon the stuff that

 1   came up in cross.  So the objection is overruled, and we will

 2   not strike that portion of the testimony.  But thank you.

 3        Any other questions, Mr. Davis, that you have for

 4   Mr. Byrne?

10:58:13  5             MR. DAVIS:  No, Your Honor.  That completes redirect.

 6             JUDGE MARCUS:  Any other questions any of the lawyers

 7   have for Mr. Byrne?

 8        All right.  Judge Moorer, Judge Manasco, did either of you

 9   have a question for Mr. Byrne?

10:58:30 10            JUDGE MANASCO:  None from me.

11            JUDGE MOORER:  No, sir.

12            JUDGE MARCUS:  Mr. Byrne, I have got a question for

13   you.  Perhaps you can help me with this.

14        On your direct examination by Mr. Davis, you were asked

10:58:47 15   about the 2021 map that the Legislature adopted for the State

16   Board of Education.

17            THE WITNESS:  Right.

18            JUDGE MARCUS:  And it was observed that -- you

19   observed that you testified, if I heard you right, with regard

10:59:06 20   to that and urged the Legislature not to split Mobile County.

21   Did I have that right?

22            THE WITNESS:  Yes, sir, that's what I said.

23            JUDGE MARCUS:  And then the testimony came out that,

24   in fact, the Legislature in 2021 split Mobile County in the

10:59:29 25   maps that it drew for the board of education, and it

specifically split Mobile County between Districts 1 and 5.
This is the board of ed map I am talking about.  Do you recall
all of that discussion?

          THE WITNESS:  Yes, sir, I do.

10:59:47          JUDGE MARCUS:  I just have one question, if you know
the answer.  I was curious, do you know why the Legislature
actually split Mobile County between Districts 1 and 5 when
they drew the board of education maps?

          THE WITNESS:  Yes, sir.  They actually did this in
11:00:09 2011.  The other district -- District 1 is the one down here.
District 5 I guess is the other one.  That district lost a lot
of population, and they had to pick it up somewhere.  And they
believed that the best way to pick it up was to go south into
Mobile County.

11:00:25     So while I was sympathetic to the fact the Legislature had
to make some significant changes to that district, I didn't
like the fact that they were splitting Mobile County because of
the fact the Mobile County school system is so big and has so
many issues as any big school systems does.

11:00:41     I would like to see a school board member that's focused
on that primarily as their job.

          JUDGE MARCUS:  Thank you much.

     Any follow-up questions from any of the lawyers based on
the question that I had asked Mr. Byrne?  Mr. Davis?

11:00:55          MR. DAVIS:  No, Your Honor.

```
 1              JUDGE MARCUS:  Mr. Whatley?

 2              MR. WHATLEY:  No, Your Honor.

 3              JUDGE MARCUS:  Mr. Osher?  Counsel for --

 4              MS. WELBORN:  No, Your Honor.

11:01:03 5      JUDGE MARCUS:  -- for Milligan?

 6         All right.  We thank you very much for your time and

 7    efforts this morning, Mr. Byrne, and you are excused.

 8              THE WITNESS:  Thank you, Your Honor.

 9              JUDGE MARCUS:  Does that close the presentation of

11:01:20 10   evidence for the state?

11              MR. DAVIS:  It does, Your Honor.

12              JUDGE MARCUS:  And that would be for both the

13    Secretary of State as the party defendant and for the

14    intervening defendants McClendon and Pringle, correct?

11:01:38 15     MR. DAVIS:  That's right, Judge.

16              JUDGE MARCUS:  Okay.  Did -- before we get to

17    exhibits, which I wanted to talk about before we went on to

18    closing arguments, was there anything by way of rebuttal either

19    from the Milligan plaintiffs, the Caster plaintiffs, or the

11:01:55 20   Singleton plaintiffs?

21              MR. BLACKSHER:  Singleton plaintiffs, no, Your Honor.

22              JUDGE MARCUS:  Thank you.  Milligan?

23              MR. ROSS:  No, Your Honor.

24              JUDGE MARCUS:  And for Caster, Ms. Khanna?

11:02:09 25     MS. KHANNA:  No, Your Honor.
```

|          |    |                                                                        |
|----------|----|------------------------------------------------------------------------|
|          | 1  | JUDGE MARCUS:  Okay.  So, then, we can turn to the                     |
|          | 2  | question of the objections on some of the exhibits.  I think           |
|          | 3  | that was one open piece of business that you flagged late              |
|          | 4  | yesterday for us, Mr. Davis, and I think it is -- there are            |
| 11:02:29 | 5  | some open questions.  I wanted to give you all a chance to             |
|          | 6  | address the exhibits to which you are objecting.  We will              |
|          | 7  | generally take it under advisement, and the three judges will          |
|          | 8  | have a chance to discuss it, and we will give you our answer or        |
|          | 9  | answers in any written opinion or opinions that we may present.        |
| 11:02:53 | 10 | But let's talk first about the -- I guess the exhibits                  |
|          | 11 | with regard to Milligan.  There was an objection to -- we              |
|          | 12 | received M-1 to 46, 48, 49, 50.  There was an objection to 47,         |
|          | 13 | if I recall that right.  Mr. Ross, that was a transcript of the        |
|          | 14 | Alabama Senate floor debate on November the 3rd, 2021.  And I          |
| 11:03:35 | 15 | think the objection was simply based on authenticity.  Do I            |
|          | 16 | have that right, Mr. Ross?                                             |
|          | 17 | MR. ROSS:  Yes, Your Honor.  We were waiting to hear               |
|          | 18 | back from Mr. Davis.  He was supposed to, I guess, listen to           |
|          | 19 | the recording and review the transcript.                               |
| 11:03:52 | 20 | JUDGE MARCUS:  Gotcha.  Mr. Davis, where are we on                 |
|          | 21 | M-47?                                                                   |
|          | 22 | MR. DAVIS:  Judge, I haven't had a chance to listen to            |
|          | 23 | the recordings, but I think the cat's out of the bag on this           |
|          | 24 | one, anyway.  I think this same transcript is in the record            |
| 11:04:06 | 25 | elsewhere as an exhibit to a deposition.  So for purposes of           |

1756

1    the preliminary injunction, we will withdraw the objection.

2            JUDGE MARCUS:  Okay.  So we -- so the record is clear,

3    Mr. Ross, we will receive M-47, that transcript.

4        I think that was the only objection there were to your

11:04:25 5    exhibits.  Have I got that right, or did I miss something?

6            MR. ROSS:  That's right, Your Honor.

7            JUDGE MARCUS:  Okay.  Let's turn to the Singleton

8    exhibits, if we could.

9        Mr. Quillen, I take it you will be commenting on those as

11:04:41 10   we go along.

11           MR. QUILLEN:  Yes.

12           JUDGE MARCUS:  Okay.  Help me with this.  As I recall

13   this, and I reviewed our original discussion at the beginning

14   of the trial, Singleton 1 to 31 was received.  35 to 41 was

11:04:57 15   received.  44 and 45 were received.  There was no objection to

16   46 to 50 and 53 to 59.  Although some of those overlapped with

17   exhibits that the defendants had already put in.  Do I have

18   that right?

19           MR. QUILLEN:  That's right.

11:05:15 20           JUDGE MARCUS:  Okay.  So the first objection or

21   objections that I saw that were interposed were the Singleton's

22   32, 33, and 34.  And that concerned some mapping software that

23   was used that was the DRA acronym if my recollection has that

24   correct.  And that was data drawn from the DRA created to use

11:05:47 25   the maps and the software.  There were objections to relevance

```
         1   and authenticity.  I think they really -- the arguments were

         2   the same on 32, 33, and 34.

         3       Did you want to address those three exhibits, Mr. Quillen?

         4   And then we will give Mr. Davis a chance to interpose his

11:06:13 5   objections.

         6           MR. QUILLEN:  Yes.  And I think I can probably

         7   accelerate the discussion.  There were nine exhibits that were

         8   objected to, and that was 32, 33, and 34, 42 and 43, 51 and 52,

         9   60 and 61.  We don't intend to rely on those in our proposed

11:06:3810   findings of fact and conclusions of law.  And we did not refer

        11   to them in this hearing.  So we are fine with just withdrawing

        12   them for purposes of this preliminary injunction hearing.

        13           JUDGE MARCUS:  Okay.  So 42, 43, 51, 52, 60, 61, and

        14   32 to 34 are not offered and not received.  Do I have that

11:06:5815   right?

        16           MR. QUILLEN:  That's right.  There is one other issue

        17   that we wanted to cover, though.

        18           JUDGE MARCUS:  Sure.

        19           MR. QUILLEN:  On ECF number 70, on the Singleton

11:07:1020   docket, is a set of stipulations of fact between the Singleton

        21   plaintiffs and the state that was not on the exhibit list, but

        22   it's been agreed to by the Singleton plaintiffs and the state.

        23   So just to make sure that it is, you know, reflected in the

        24   record here, we would like to introduce that as Exhibit -- I

11:07:3425   guess we will call it S-70.
```

1758

```
 1              JUDGE MARCUS:  That would be Singleton 70, right?
 2              MR. QUILLEN:  Yes.  We will call it Singleton 70.  And
 3    I think our understanding would be consistent with the other
 4    exhibits that have come in, that the other plaintiffs wouldn't
11:07:49 5    be bound by it, but could use it if they saw fit.
 6              JUDGE MARCUS:  But it would be coming in to the record
 7    in these proceedings?
 8              MR. QUILLEN:  Yes, it would.
 9              JUDGE MARCUS:  Any objection, Mr. Davis?
11:08:00 10             MR. DAVIS:  Mr. Quillen, is this the second set of
11    stipulations that we entered into?
12              MR. QUILLEN:  That's correct.
13              MR. DAVIS:  No objection from the defendants, Your
14    Honor.
11:08:07 15             JUDGE MARCUS:  Does anyone else have any objection to
16    the receipt of Singleton 70?
17              MR. ROSS:  Your Honor.
18              JUDGE MARCUS:  Yes.
19              MR. ROSS:  The Milligan -- I wanted to be clear that
11:08:18 20    this is -- that those stipulations will not be used in the
21    Milligan case at all.  We just -- we didn't have any part of
22    drawing up those stipulations.
23              JUDGE MARCUS:  I understand.  So you are not relying
24    on them and you are not using them.  I understand the point.
11:08:33 25             MR. ROSS:  Yes.
```

```
 1          JUDGE MARCUS:  This is just a piece of evidence that
 2   the Singleton plaintiffs have offered, and the state has no
 3   objection to it.
 4         Anything else on that, Ms. Khanna, for the Caster
 5   plaintiffs?
 6          MS. KHANNA:  Only to echo what Mr. Ross said.  This
 7   has no part of the Caster case, and we certainly have not
 8   agreed or stipulated to any of those.
 9          JUDGE MARCUS:  Okay.  With that, let's turn,
10   Mr. Davis, to your exhibits.  Most of them were received, but
11   there were some objections, and I wanted to go briefly to those
12   to see where we were.
13         My record shows we have received following:  Defendants' 1
14   to 14, 19 to 26, 31 to 48, 50 to 67, 69 to 71, Defendants'
15   Exhibits 72 and 73 inclusive to 91, Defendant's Exhibits 98 and
16   99, Defendants' Exhibits 107 to 137 inclusive, Defendant 138,
17   Defendant 142, Defendant 144, Defendant 145, Defendant 147 to
18   149, Defendant 155, Defendants' 159 to Defendants' 161,
19   Defendant 164, 165 inclusive to 71.  There had been an
20   objection to Defendants' 72, but that objection was dropped, if
21   I recall that and have that properly listed.  And so Defendant
22   172 will come in.
23         Do I have all of these of these correct, Mr. Davis?  I'm
24   sorry, Mr. Davis.  You are muted.
25          MR. DAVIS:  Apologies.  Yes, Your Honor.  That's
```

```
 1   consistent with my notes.
 2          JUDGE MARCUS:  Okay.  So let's go to the couple that
 3   are -- or appear to still be in dispute.
 4       The first one I have was Defendant Exhibit 15.  That was a
11:11:00  5   public hearing transcript of the joint legislative committee on
 6   reapportionment going back to the '92 drawings.  This was a
 7   hearing that occurred on June the 14th, '91, if I have that
 8   right.  Do I have that right, Mr. Davis?
 9          MR. DAVIS:  Yes, Judge.
11:11:20 10          JUDGE MARCUS:  And the objection I think the Milligan
11   folks raised was A, it wasn't relevant, at least as far as they
12   could see; and, B, that it was hearsay to the extent you were
13   offering it for the truth of its contents.
14       Do you want to tell me your response to the relevance and
11:11:43 15   hearsay objection, assuming Defendant 15 is still objected to
16   by the Milligan folks.  Mr. Ross?
17          MR. ROSS:  Yes, Your Honor.  We also have foundation
18   objection, as well.
19          JUDGE MARCUS:  Okay.  Mr. Davis?
11:11:59 20          MR. DAVIS:  Well, the foundation objection is new.  It
21   wasn't raised until yesterday.  On the joint status report,
22   it's only relevant hearsay that were addressed.
23          JUDGE MARCUS:  Correct.
24          MR. DAVIS:  I would say this:  All of these historical
11:12:14 25   documents about the congressional records were 15 plus many
```

others.  We think, of course, their relevant when talking about

the districts.  We have said many times that Alabama is

preserving the core of districts.  Knowing how they got the way

they got we think is directly relevant to the considerations

11:12:34 5  before the Court.  And if the Court chooses to put less weight

on some of it than others, it certainly can do so.  But, of

course, of these records of how the '92 plan got developed, how

the 2001 plan got developed and the 2011 and the 2021 are

relevant.

11:12:55 10      As far as hearsay, these are official transcripts -- 15,

16, and 17 were the public hearings.  And the Court has a great

deal of leeway to consider hearsay evidence and preliminary

injunction hearing.

14      I would add, too, in terms of foundation, authenticity,

11:13:19 15  pardon me, these are 30-year old documents.  We can give you a

declaration that says when we got the request for production

from the Milligan plaintiffs, we went as they requested us to

do and looked for records related to preclearance of these old

congressional plans and any other documents that we had about

11:13:37 20  congressional districting.  We found these in our filing

cabinets and our storage records in the office.  We think

that's sufficient for -- to consider these 30-year old

documents authentic.

24      But also, believe it or not, for 15, 16, and 17, yesterday

11:13:56 25  afternoon, we found the reporter who took down these

```
 1  transcripts and we can give you a declaration from him, as
 2  well.  So I don't know why we need to fight over these.  That's
 3  --
 4          JUDGE MARCUS:  In connection with what Mr. Davis said,
11:14:11 5  does that satisfy you on authenticity, Mr. Ross?
 6          MR. ROSS:  I believe so, Your Honor.  We --
 7          JUDGE MARCUS:  You still have your objections.  That's
 8  not -- your objection still should be addressed regarding
 9  relevancy and hearsay, but let me ask you a couple of questions
11:14:29 10  about that.
11      Why wouldn't it be relevant insofar as it bears on the
12  issue of intent for the drawing of the '92 maps since the claim
13  has been made that essentially the successive iterations or
14  maps built on the foundation of the '92 map, and doesn't this
11:14:54 15  bear on the intent of the Legislature back then, the
16  transcript?  And on the equal protection claim you've raised?
17          MR. ROSS:  The racial predominance claim?  Your Honor,
18  my concern is that it appears that Mr. Davis is intending to
19  use this not with respect to the racial gerrymandering claim,
11:15:12 20  but with respect to the Section 2 claim.  We don't think that
21  it has a bearing on our current Section 2 claim, which is
22  solely about discriminatory effects.
23      I understand your point, Your Honor, that it could have
24  some bearing on why they drew the majority-black district that
11:15:32 25  they drew, and that they have -- from our perspective carried
```

1    forward to today.

2         But as I said, we don't think it has any bearing on our

3    Section 2 claim at all.

4         JUDGE MARCUS:  Are you offering it on both or just on

11:15:45  5    the equal protection claims that have been made?

6         MR. DAVIS:  I do not know, Your Honor, for sure if we

7    will cite to these documents addressing the Section 2 claim.  I

8    think we could.  There could be history of the districts could

9    relate to communities of interest which we think would be very

11:16:08 10    relevant to the Section 2 claim.  But the Court will be able to

11    discern whether it's due any weight for one claim or another.

12         JUDGE MARCUS:  I understand.  I will say in a

13    preliminary injunction hearing, the law is pretty clear that

14    hearsay may be considered and received insofar as the materials

11:16:32 15    are sufficiently relevant and insofar as there is a sufficient

16    indicia of reliability and trustworthiness.

17         We will -- I take it the argument on 15 is the same as the

18    argument on Defendant Exhibit 16, which is the public hearing

19    from the same joint legislative committee, August 21, '91, and

11:17:01 20    the same argument for the public hearing transcript of the

21    joint legislative committee on October 2nd, '91, the same

22    objections -- relevancy, hearsay -- pertain to all three, so

23    there will be nothing more we have to say about those.

24         Do I have that right, or is there something you wanted to

11:17:22 25    add, Mr. Ross?

```
 1              MR. ROSS:  That's right, Your Honor, 15, 16, and 17.
 2              JUDGE MARCUS:  All right.  We will reserve, give the
 3      judges the opportunity to address it, and decide.
 4          I should say parenthetically that you can make use of
11:17:36  5   whatever exhibits we've reserved on if you deem it appropriate
 6      in the course of your closing argument.  This is a three-judge
 7      panel.  We are the triers of the fact and the law, and we do
 8      not have a jury here.
 9          The next one was Defendants' Exhibit 18.  That was --
11:18:03 10   Mr. Davis, but my question is, wasn't that already received in
11      evidence?  Wasn't this a duplicate of what came in, in one of
12      your other exhibits?
13              MR. DAVIS:  I don't know if that's the case or not.  I
14      have no interest in a duplicate exhibit.  If someone can assure
11:18:21 15   me...
16              JUDGE MARCUS:  I just -- what's the objection to that,
17      Mr. Ross, the DOJ objection letter?
18              MR. ROSS:  That was the only objection, Your Honor.  I
19      believe it already came in through one of the Milligan
11:18:31 20   exhibits.  But if not, our only objection was to flag for them
21      that it was a duplicate of something we thought had already
22      been admitted into evidence.
23              JUDGE MARCUS:  Thanks very much.  So the record is
24      clear, Mr. Davis, Defendant 18 is received.
11:18:44 25              MR. DAVIS:  Thank you.
```

1       JUDGE MARCUS:  Whether it's a duplicate or not.  This
2   way we will make sure we haven't made a mistake in that.
3       MR. DAVIS:  I appreciate that.
4       JUDGE MARCUS:  Defendant 27, there was an objection
11:18:54 5   to.  That was the 2011 plan cited in *Alabama v. Holder*.
6       What were you seeking to put in there, Mr. Davis, and why?
7   There was an objection on the grounds of relevance, and the
8   question was what relevance this has to the 2021 map and the
9   Section 2 claim.
11:19:25 10      MR. DAVIS:  And, Judge, in 2011, Alabama sought
11  preclearance, both through the administrative process and
12  through the judicial process.  To our way of thinking, this was
13  just part of the story of how the maps came to be what they
14  are.
11:19:38 15      JUDGE MARCUS:  And your objection, Mr. Ross?
16      MR. ROSS:  Your Honor, we stipulated that the maps
17  were precleared, and as the Court well knows, Section 5
18  preclearance doesn't mean anything.  It has no bearing
19  whatsoever on the current process at all.
11:19:53 20      So we don't think that these -- the fact that the state
21  filed this lawsuit is relevant at all, particularly because we
22  have already stipulated that it gained preclearance in 2011.
23      JUDGE MARCUS:  Help me with this what happened here.
24      Did the Department of Justice basically give its blessing
11:20:09 25  to the 2011 plan?  And if the answer to the question is yes,

1  wouldn't that bear on the 2021 plan insofar as it basically
2  copied in the main -- the plan from '11?  Just help me
3  understand this.

4       MR. ROSS:  Two points, Your Honor.  One, as I said,
11:20:31 5  and as you know, Section 5 of the Voting Rights Act expressly
6  says that preclearance does not mean that the Justice
7  Department is giving its blessings.  The Section 2 standard is
8  separate from the Section 5 standard, so the Section 5 standard
9  was only essentially retrogression, did you decline to draw a
11:20:49 10  majority-black district.  It doesn't consider whether or not
11  you failed to draw a second majority-black district.  And so
12  that -- that is our the basis of our -- I mean, it's not the
13  basis for our relevance objection, but is why I said we didn't
14  think the prior clearance is relevant at all.

11:21:08 15       JUDGE MARCUS:  I understand.  Mr. Davis, anything
16  further on that?

17       MR. DAVIS:  Judge, whether preclearance or not has any
18  legal significance, the Court can sort out.  These documents
19  related to the preclearance effort contain a lot of helpful
11:21:19 20  information.  Because we told the Department of Justice, here
21  are the districts, here are the demographics of the districts.
22  We think it provides a lot of helpful information within those
23  documents about the plan that was being submitted.

24       MR. ROSS:  Your Honor, if I may.

11:21:34 25       JUDGE MARCUS:  Sure.

1    MR. ROSS:  We -- we can't -- the fact that they filed

2  a complaint doesn't establish any facts whatsoever.  We filed a

3  complaint.  That doesn't mean that in ten years someone could

4  we rely on it and say all the things in our complaint are true,

11:21:49 5  so we don't think it has any bearing except perhaps to show

6  they filed a complaint.

7    JUDGE MARCUS:  I understand.  We will reserve on that.

8  I take it the same issues obtained for Defendant 28 and 29,

9  same objection, right?  Mr. Ross?

11:22:13 10    MR. ROSS:  Yes, Your Honor.

11    JUDGE MARCUS:  Okay.  We will reserve on 28 and 29.

12    And I guess 30 falls into the same thing.  That was simply

13  an errata sheet correcting Defendant 27, if I have that right.

14  Do I have that right, Mr. Davis?  You're muted, Mr. Davis.

11:22:34 15    MR. DAVIS:  Yes, Your Honor, that's correct.

16    JUDGE MARCUS:  Okay.  So we will reserve on 27 to 30

17  inclusive.

18    The next one was Defendant 49.  That was the annual report

19  -- 2020 annual report of the state personnel board issued by

11:22:54 20  the Alabama State Personnel Department.

21    If I understood the objection, it was a relevancy object,

22  right?

23    MR. ROSS:  Yes, Your Honor.  And there was a

24  foundation issue.  We don't know where the document came from

11:23:13 25  or who created it.

1           JUDGE MARCUS:  Mr. Davis?

2           MR. DAVIS:  Well, as for relevance, Your Honor, the

3     plaintiffs' experts have made various contentions, including

4     whether there's discrimination in state government in the

11:23:25 5    employment of state government.  And this report provides

6     statistics for how many people who work in state government are

7     African-American.  And African-Americans are disproportionately

8     represented in government.

9         As far as foundation, that's not raised until today.  And

11:23:40 10   so we think it's too late to add that objection.  If it had

11    been raised earlier, I might have been able to address it

12    between now and the date that our objections were due.

13          MR. ROSS:  The only additional point on that is that

14    our experts testified about federal court cases finding that

11:24:02 15   Alabama engaged in racial discrimination.  And so this has no

16    bearing whatsoever about how many black people may work for the

17    state if they're being discriminated against as federal courts

18    have found repeatedly.

19          JUDGE MARCUS:  I think we have our objection.  We will

11:24:16 20   reserve on it.

21        The next one is Defendants' 68.  That was the application

22    of a former Secretary of State back in 1992 who was an

23    appellant in the Supreme Court in the *Wesch* litigation.

24        And there was an objection there.

11:24:41 25       Your objection there, Mr. Ross, was?

```
 1              MR. ROSS:  Your Honor --
 2              JUDGE MARCUS:  One was --
 3              MR. ROSS:  Your Honor, I -- the basis for the hearsay
 4    objection was the same concern that I just raised with the
11:24:54 5    complaint.  The fact that you filed a complaint or filed a
 6    brief in court doesn't mean that the Court can take anything
 7    from the allegations or facts in that brief for complaint.  And
 8    so we just have a concern that the state as Mr. Davis said is
 9    trying to rely on this for facts and anything else.
11:25:13 10             JUDGE MARCUS:  Mr. Davis?
11             MR. DAVIS:  Judge, we think this is part of the
12    history of the Wesch litigation.  It's not just relying on what
13    Secretary Kemp said or what he alleged in his pleadings, but
14    the fact of who was doing what -- who was for the plan, who was
11:25:30 15   opposed to the plan, who was appealing, who was seeking a stay.
16    We think that's part of the story of the '92 plans and ought to
17    be considered for making the record complete.
18             JUDGE MARCUS:  I take it the same issues obtained with
19    regard to Defendants' 92 and Defendants' 93 to 97.  That
11:25:52 20   appears to be an appendix to a brief submitted in the Wesch
21    litigation from the appellees in the case.  92 was a letter as
22    best I can tell from the Department of Justice to the Alabama
23    Attorney General regarding the '92 map.  It was a single
24    document.  There the question was really what relevance this
11:26:22 25   has.
```

|     |     |
| --- | --- |
|          | 1 |
|          | 2 |
|          | 3 |
|          | 4 |
| 11:26:37 | 5 |

```
         1    I know as a general matter it tells a story about what

         2  happened in '92.  But this -- does this letter from the

         3  Department of Justice have any bearing on any issue in this

         4  case?

11:26:37 5          MR. DAVIS:  I'm sorry, Your Honor.

         6          JUDGE MARCUS:  It may, but it just didn't jump off the

         7  page at me when I looked at it.

         8          MR. DAVIS:  Which exhibit are you referring to at the

         9  moment?

11:26:46 10          JUDGE MARCUS:  92.  Defendant 92.

        11    I moved on from 68 to the Defendant 92, which, as I

        12  understood it, was an appendix to the brief of one of the

        13  parties in the Wesch litigation.  And the only thing in that

        14  exhibit was a single letter from the Department of Justice to

11:27:15 15  the Alabama Attorney General regarding the '92 map, and in it,

        16  there was apparently no objection interposed by the Department

        17  of Justice.  It bore on a deadline, the qualifying deadline,

        18  and that struck me as having nothing to do with even the story

        19  in the broadest sense.

11:27:40 20          MR. DAVIS:  Oh.  I -- 92, I am looking at, Judge,

        21  seems to have more to it than that.

        22          JUDGE MARCUS:  That was the only thing.  I may have

        23  missed it.

        24    Now, with regard to 93 to 97, there are other pieces of

11:27:56 25  the appendix to the jurisdictional statement filed by Alabama.
```

1      And I was just talking about 92 appeared to be only a

2  single letter from the Department of Justice regarding a

3  qualifying deadline that didn't seem to me to have any bearing

4  on this case taking the broadest view of relevance that I could

11:28:22  5  think of.  I mean --

6           MR. DAVIS:  I will share if I can, Judge.  I show a

7  motion to dismiss or affirm and who was asking to do so or not.

8           JUDGE MARCUS:  Is this part of 92?

9           MR. DAVIS:  Yes, Judge.  It's part of 92 on the pdf I

11:28:38 10  have.

11           JUDGE MARCUS:  Okay.  So I may have not properly

12  characterized it.

13      What's in Defendant 92?  Why don't you lay that out for

14  me?

11:28:46 15           MR. DAVIS:  It is -- I'm struggling to keep all these

16  separate.

17           JUDGE MARCUS:  Sure.  Take your time.

18           MR. DAVIS:  It's part of -- it is appellee Wesch's

19  motion to dismiss or affirm.  I show it as a 15-page pdf.  The

11:29:06 20  letter you are referring to -- the letter is part of it.

21           JUDGE MARCUS:  Okay.  So it includes the letter, but

22  it was the brief, the whole brief?

23           MR. DAVIS:  Correct, Judge.

24           JUDGE MARCUS:  Is there an objection to that,

11:29:20 25  Mr. Ross?  You can take that down.  Thanks.

1772

1    MR. ROSS:  Your Honor, again, our concern is obviously
2  the Court can take judicial notice of someone having filed a
3  brief.  Our concern is that the state is trying to use it for
4  more than that.  It's trying to say that the things that are in
11:29:35 5  the brief are true or not true, and we don't think that's
6  appropriate at all.
7    JUDGE MARCUS:  Anything further on that?  If not, we
8  will reserve.
9    Okay.  The next grouping was Defendants' 93 to Defendant
11:29:50 10  97 inclusive.  And I saw that as a series of attachments in an
11  appendix to the jurisdictional statement filed in the Supreme
12  Court.  Again, it related to 1992.  Do I at least have an
13  accurate description of what's in 93 to 97?
14    MR. DAVIS:  Yes, Judge.  We think it has helpful
11:30:21 15  information about the procedural history of the *Wesch*
16  litigation.
17    JUDGE MARCUS:  Anything further on the point,
18  Mr. Ross, beyond what's already been said?
19    MR. ROSS:  No, Your Honor.  The same relevancy and
11:30:35 20  hearsay arguments.
21    JUDGE MARCUS:  We will reserve on 93 to 97.
22    The next grouping were Defendants' exhibits 100 to 106
23  inclusive.  Those were the preclearance submissions made by
24  Alabama to the Department of Justice, regarding the 2011 maps.
11:30:57 25    Have I described it accurately?

```
 1          MR. DAVIS:  Judge, these were exhibits to a
 2  preclearance submission.
 3          JUDGE MARCUS:  Right.
 4          MR. DAVIS:  Each is a different map that was proposed.
 5          JUDGE MARCUS:  Right.  Right.  Now, as I understood
 6  the objection, it was a singular objection by Mr. Ross, maybe
 7  fell into the category of the doctrine of completeness.  He
 8  didn't object to what you offered.  He objected because you
 9  only chose a small piece of it, and you wanted it all in.  Do I
10  have that right, Mr. Ross, or have I mischaracterized that?
11          MR. ROSS:  I think that's generally true, Your Honor.
12  I think it also was that we frankly may not have had the
13  opportunity to confirm or whether or not this was everything
14  that was submitted with the map, and, you know, again these are
15  things that are older.  And so that was the basis of our
16  concern, yes.
17          JUDGE MARCUS:  So if he puts everything in and shows
18  it to you, you will have no objection, if I hear you right?
19          MR. ROSS:  That's right, Your Honor.  We can withdraw
20  the objection, just to make things easier for the Court.
21          JUDGE MARCUS:  Okay.  So let's make sure, Mr. Davis,
22  that you include the whole kit and caboodle, not just picking
23  your way through the preclearance submission.  Does that work
24  for you?
25          MR. DAVIS:  Of course.  I don't know of anything this
```

11:31:08 (line 5)
11:31:30 (line 10)
11:31:45 (line 15)
11:32:02 (line 20)
11:32:17 (line 25)

```
 1   is missing.  I don't think anything is.  If there is, Mr. Ross
 2   has it, and he's welcome to put it in.  Produced.
 3           JUDGE MARCUS:  Mr. Ross, is there something missing
 4   that you cannot isolate and point out?
11:32:32  5      MR. ROSS:  At this moment -- I'm sorry.  At this
 6   moment, Your Honor, I guess I would -- this is more of a -- we
 7   were working on this quickly over the holiday, so that may have
 8   been the issue.  I'm sorry.
 9           JUDGE MARCUS:  All right.  We will receive Defendants'
11:32:45 10  100 to 106.  We will give you the opportunity to speak with
11   Mr. Davis and come back with something else if it has been
12   excluded.  And we will give you until the end of business
13   tomorrow just to let us know if you would be kind enough on
14   that.
11:33:00 15      With that caveat, Mr. Davis, we receive Defendant 100 to
16   106 inclusive.
17       The next item was Defendant 138.  That was the
18   reapportionment committee guidelines from 2011.
19       I think the objection there was relevancy, Mr. Ross?
11:33:22 20      MR. ROSS:  Yes, Your Honor.  Yes.  That was our
21   concern was that if it were relevant or not.
22           JUDGE MARCUS:  I think it came up in the course of an
23   examination of one of the witnesses.
24       Mr. Davis, comment about 138.
11:33:44 25      MR. DAVIS:  Yes.  Trey Hood was -- Dr. Trey Hood was
```

asked yesterday about the 2011 guidelines and whether it did or

it did not include observing the core of districts as a

guideline.  Right.

          MR. ROSS:  Your Honor -- sorry.  Just to save time, we

will drop the objection.

          JUDGE MARCUS:  All right.  We will receive Defendant

138.

     139 from the defendant related to the *Thompson v. Merrill*

litigation, if I have that right.  And what it was, was an

interrogatory to the Alabama board of pardons.  And I wasn't

sure that I understood what the relevance was in that regard.

And I think the same issue came up with regard to Defendant

140.  Do I have that right, Mr. Ross, the basis of your

objection?

          MR. ROSS:  Yes, Your Honor.

          JUDGE MARCUS:  Mr. Davis?

          MR. DAVIS:  We agree those two should be considered

together.

     The relevance is responding to plaintiffs' experts.  Their

Senate Factor experts talk about the proportionality of people

who have been disenfranchised because of felony convictions.

This is sworn testimony.  I do not know as I'm sitting here if,

in fact, we will cite to it.  But we do think that because this

sworn testimony addresses the felon disenfranchisement and --

that it does relate to what plaintiffs' experts have alleged

1    concerning felon disenfranchisement in Alabama.

2         JUDGE MARCUS:  The heart of the objection was

3    relevancy and hearsay or just relevancy?

4         MR. ROSS:  Relevance and hearsay, Your Honor, but, you

11:35:43  5    know, I think the primary concern was that the state should

6    have someone come and testify about what this is and where it's

7    coming from and shouldn't just be allowed to drop in all these

8    documents which we have never seen before and have not heard

9    anyone testify about today.  And I think, again, there's a

11:36:00 10    relevance concern, because this is from, again, from some other

11    litigation -- actually, this Court -- that the state is trying

12    to bring in.

13         JUDGE MARCUS:  Mr. Davis, how do we know that it is

14    what it purports to be from the Alabama Board of Pardons and

11:36:16 15    Parole?  That is one of the points that he's at least raising.

16         MR. DAVIS:  It's sworn testimony, Judge.  And these

17    are documents from this litigation.  It's --

18         JUDGE MARCUS:  I'm sorry.  Could you help me?  Whose

19    sworn testimony does it embody?

11:36:33 20         MR. DAVIS:  Lee Gwaltney a member of the Alabama Board

21    of Pardons and Paroles.

22         JUDGE MARCUS:  Okay.  We will reserve on 139 and 140.

23         The next one was Defendant 141, which was an article from

24    the BBC News purporting to address or explain why President

11:37:04 25    Trump got support from minorities in 2020.

```
 1          Were you offering that for the truth of its contents,
 2     Mr. Davis?
 3               MR. DAVIS:  Yes.  And I don't think that's -- I don't
 4     think this came up in any exam.  I'm told maybe it did.
 5               JUDGE MARCUS:  It did, but only -- if my recollection
 6     is right, only very, very briefly.
 7          Is there any objection to this, Mr. Ross?
 8               MR. ROSS:  Yes, Your Honor.  They said they're trying
 9     to use it for anything that's -- we don't think it's relevant.
10     We think it has multiple layers of hearsay.
11               JUDGE MARCUS:  Mr. Davis?  Why should we take the BBC
12     report, news report as telling any -- us anything about why
13     President Trump got support from minorities in 2020?  It all
14     may be absolutely true and easily provable.  His objection is
15     this isn't the way to prove it.
16               MR. DAVIS:  I have nothing to add to what Mr. Barrett
17     may have added yesterday.
18               JUDGE MARCUS:  We will reserve on 141.
19          The next one was Defendant 143, if I have it right.
20     Supplemental stipulation in the *Wesch* litigation in '92.  There
21     was a statement that according to the 1990 data, the district
22     was large enough to create -- or the population was large
23     enough to create a single majority-minority district.  I think
24     the objection there was relevancy.  Do I have that right,
25     Mr. Ross?
```

1778

```
 1          MR. ROSS:  Your Honor, we could drop the objection to
 2   -- I think this is -- the same information is already in the
 3   opinion in the case, so we will drop the objection.
 4          JUDGE MARCUS:  Without objection, Mr. Davis, 143 is
 5   received.
 6      144 and 145, those concern the deposition of Mr. Hinaman,
 7   which we have.  Is there some reason we shouldn't consider
 8   this, Mr. Ross?
 9          MR. ROSS:  Your Honor, I believe we included a copy of
10   that yesterday.
11          JUDGE MARCUS:  Okay.  So 144 and 145 are received.
12   Those were the -- Mr. Davis, can you hear me okay?
13          MR. DAVIS:  I can now, Your Honor.  You faded out on
14   my screen.
15          JUDGE MARCUS:  I'm sorry.  144 and 145 are received.
16   Those are the two parts of Mr. Hinaman's deposition.
17      The next item I have to which there was an objection was
18   Defendant 146.  That was the 2000 map of the population
19   regarding the State Board of Education and the state of
20   Alabama, and it was broken down by counties, and there were
21   various statistics that were being offered.  If I understand
22   the objection, that was relevancy, Mr. Ross?
23          MR. ROSS:  Yes, Your Honor.  And it's also -- frankly,
24   looking at the exhibit, it's difficult to even tell what one
25   can take from it since the lines -- it's not -- you can't
```

11:39:05   (line 5)
11:39:26   (line 10)
11:39:54   (line 15)
11:40:23   (line 20)
11:40:44   (line 25)

```
 1  really tell what the State Board of Education lines were.
 2              JUDGE MARCUS:  We're having trouble -- Mr. Ross, we
 3  are having trouble hearing you.
 4              MR. ROSS:  I'm sorry.  Give me one moment, Your Honor.
11:40:59  5      JUDGE MARCUS:  Sure.  Take your time.
 6              MR. ROSS:  Sorry, Your Honor.  Can you hear me now?
 7              JUDGE MARCUS:  Hear you perfectly.  Mr. Davis, are you
 8  able to hear Mr. Ross?
 9              MR. DAVIS:  Yes, Judge.  I can hear.
11:41:29 10     JUDGE MARCUS:  Thank you.
11              MR. ROSS:  Thank you.  So I think our primary concern
12  just looking at the document is that it's difficult to tell
13  what it even purports to represent since there's -- it's not
14  clear what the district lines are that they're showing.  And so
11:41:47 15  the rest of the information also doesn't appear to be
16  particularly helpful or relevant.
17              JUDGE MARCUS:  Mr. Davis?
18              MR. DAVIS:  The maps appear elsewhere in the record,
19  Judge, and just the statistics of the plan.  The plaintiffs are
11:42:03 20  arguing that because Alabama made certain decisions in its
21  board of education map that it would be okay to make those same
22  decisions in the congressional map, and we strenuously disagree
23  with that.  But we want to tell the story of how these board of
24  education maps got to be the way they are.  And Your Honor
11:42:21 25  asked Mr. Byrne about that briefly just today.  And we think we
```

1 can tell the story that how it didn't split Mobile County in

2 the '90s, it didn't in the 2000, it did for the first time in

3 the 2010s because they needed to add population and because

4 Alabama was subject to Section 5.  This is part of that story.

11:42:41 5      JUDGE MARCUS:  Let me ask one question:  If I heard

6 Mr. Ross right, one of the concerns he had was just it wasn't

7 clear, legibility, the lines weren't clear.  Are they clear in

8 this report?  146?

9      MR. DAVIS:  I would say that the map itself is not

11:42:58 10 very clear.  It's hard to tell the difference between a county

11 line and a district line.  These districts statistics are quite

12 clear, and we believe that the historical map's presented

13 elsewhere in the case, including in Mr. Cooper's report.

14      JUDGE MARCUS:  Thank you.  We will reserve.

11:43:14 15      Defendant 150.  This purported to be a study showing

16 morbidity rates.  This came from the CDC.  I think it was March

17 of '21 that it came from.  I take it you are offering it as a

18 public record.

19      MR. DAVIS:  Yes, Judge.  It was referenced in

11:43:40 20 Dr. McIntosh's declaration that we submitted and that is in

21 evidence.

22      MR. ROSS:  We will drop our objection.

23      JUDGE MARCUS:  No objection?  Without objection,

24 Defendant 150 is received.

11:43:50 25      152, it had been marked for identification.  We have

1  already sustained that objection.  That was the Wall Street

2  Journal article being offered for its truth, if I have that

3  right.

4       Did you want to say anything more about that?

11:44:07  5       MR. DAVIS:  No, Your Honor.  We consider that issue

6  resolved.

7       JUDGE MARCUS:  Okay.  Defendant 153, that was an

8  article that came from a sentencing project think tank, if I

9  have that right.

11:44:24 10       Anything further on that one?  Mr. Ross or Mr. Davis?

11       MR. ROSS:  No, Your Honor, just reminding the Court

12  that we don't think anything about other states is relevant.

13       JUDGE MARCUS:  Mr. Davis, any comment you had wanted

14  to make, to make this record complete?

11:44:41 15       MR. DAVIS:  No, nothing to add, Judge.

16       JUDGE MARCUS:  All right.  The next one was 154.  That

17  was another newspaper article.

18       Any comment about that?

19       MR. ROSS:  Just the layers of hearsay, Your Honor.

11:44:59 20       MR. DAVIS:  Judge, I do not think this came up in any

21  -- in any witness examination.  We thought it of import that a

22  congress -- a state representative from Mobile, an

23  African-American Democrat woman was talking about keeping

24  Baldwin and Mobile County together, but we didn't have the

11:45:21 25  opportunity to question any witness about that.

```
 1              JUDGE MARCUS:  Are you still offering it?
 2              MR. DAVIS:  Sure.  I will offer it for the record.
 3              JUDGE MARCUS:  All right.  We will reserve on it.
 4     Just so the record is clear, this was a newspaper article about
11:45:38  5    what a congressman may have said.
 6          Defendant 155, voter determination letter from the
 7     Department of Justice.  I think the date was May 18, 2020.
 8              MR. ROSS:  I believe we dropped that objection if it's
 9     -- I think it's just the list of Section 5 objections in
11:45:59 10    Alabama.  And if so, we dropped that objection.
11              JUDGE MARCUS:  He has got that description right, does
12     he not, Mr. Davis?
13              MR. DAVIS:  Yes, that is correct.
14              JUDGE MARCUS:  We will receive Defendant 155.
11:46:11 15        Defendant 156, that was the felony voting rights statement
16     prepared by the Alabama Secretary of State apparently.  Do we
17     have an objection to that at this point, Mr. Ross?
18              MR. ROSS:  Your Honor, it was the same relevance
19     concern.  I don't think any of our -- anyone on our side
11:46:31 20    testified about that or anyone else from the Secretary of
21     State.
22              JUDGE MARCUS:  Is it a public record under 803(8) of
23     the Federal Rules of Evidence, Mr. Ross?
24              MR. ROSS:  Yes, Your Honor.  We will drop the
11:46:45 25    objection.
```

1            JUDGE MARCUS:  All right.  156 is received.

2        157 was an article, Mr. Davis, you had offered from the

3   Montgomery Adviser.  It was an Alabama Senate profile, and

4   there was a comment by Robert Kennedy, Jr.  That was in 157.

11:47:08  5   The objection was, I take it, hearsay, Mr. Ross?

6            MR. ROSS:  Hearsay and relevance, Your Honor.

7            JUDGE MARCUS:  Mr. Davis?

8            MR. DAVIS:  Your Honor, this -- Mr. Kennedy was a

9   candidate who -- or the voting rights expert, Dr. Palmer, and

11:47:33 10   Dr. Liu looked at the election, so we wanted the profile in to

11   confirm his race and the opponent in the election and that he

12   also ran in 2017 in an election that I don't think was

13   considered by one or both of plaintiffs' experts.

14            JUDGE MARCUS:  So you're offering it for the truth of

11:47:52 15   its contents as to each of those points?

16            MR. DAVIS:  For the characteristics of Mr. Kennedy and

17   for which elections he was a candidate in, yes.

18            JUDGE MARCUS:  Mr. Ross, objection?  Is that your

19   objection is hearsay?

11:48:04 20            MR. ROSS:  Yes, Your Honor.  And just to be clear that

21   plaintiffs obviously -- not obviously, but we understand that

22   Mr. Kennedy is African-American, and I believe that the

23   Secretary may have already put in evidence of who ran in the

24   2017 primary election.  So we also, again, renew our relevance

11:48:21 25   and hearsay objections for those reasons.

```
 1              JUDGE MARCUS:  Just one question, Mr. Davis:  Does

 2    this duplicate what's already in the record?

 3              MR. DAVIS:  I'm not sure that the 2017 information is

 4    there, but it very well could be, Judge.  There's a lot to keep

 5    up.

 6              JUDGE MARCUS:  We will reserve on Defendant 157.

 7         Defendant 158, that was the article from the economic

 8    policy institute.  As I understand it, that's a D.C. think

 9    tank, not a public record.  We've reserved on that.

10         Any further comment about that, Mr. Ross, Mr. Davis?

11              MR. ROSS:  No, Your Honor.

12              MR. DAVIS:  Nothing further, Judge.

13              JUDGE MARCUS:  All right.  We will reserve on 158.

14         162, that Mr. Davis offered was a report from the U.S.

15    commission on Civil Rights dated September 2007, if I have that

16    right.  And there was a completeness objection, I believe the

17    defendant put in the front page and only six pages, but

18    apparently the claim is that there was more.  And if you put

19    that in, he suggested you wanted to put the balance of it in,

20    as well, Mr. Davis.  Do I have that accurate?

21              MR. ROSS:  Yes, Your Honor.  Although I am having some

22    computer issues, I can't see -- we'll just drop the objection,

23    Your Honor.  If it's a government document, it's fine.

24              JUDGE MARCUS:  All right.  Without objection,

25    Mr. Davis, Defendant 162 is received.
```

The timestamps in the left margin: 11:48:36 (line 5), 11:48:54 (line 10), 11:49:10 (line 15), 11:49:37 (line 20), 11:49:57 (line 25).

```
            1        The next one was Defendant 163.  Isn't that already in the
            2  docket sheet, which the Court obviously can take notice of,
            3  Mr. Ross?
            4            MR. ROSS:  Yes --
11:50:17    5            MR. DAVIS:  163 is not needed.  We can withdraw
            6  offering 163.
            7            JUDGE MARCUS:  All right.  163 has been withdrawn.
            8        Same question I have on Defendant 164.  All it is, is the
            9  notice of the Hinaman deposition.  It's noted on the docket.
11:50:32   10  I'm hard pressed to see an objection to that.
           11            MR. ROSS:  We had dropped that objection, I believe,
           12  Your Honor.
           13            JUDGE MARCUS:  164, Mr. Davis, is received.
           14        I think that covered your -- your exhibits.  Do I have
11:50:51   15  that right?
           16            MR. DAVIS:  I think that's right, Judge.
           17            JUDGE MARCUS:  The only thing that was left out from
           18  our discussion -- so we have covered Singleton, Milligan.  The
           19  defendants' exhibits were the Caster exhibits, Ms. Khanna, and
11:51:10   20  we discussed them at the beginning.  Just so the record is
           21  clear, and you tell me if I have misapprehended any of this.
           22        Caster Exhibits 1 to 93 have been received, and 95 to 104
           23  have been received.  The only objection was to plaintiff Caster
           24  Exhibit 94, which was a COVID-tracking project from the
11:51:40   25  Atlantic, if I have that right.
```

1    MS. KHANNA:  Yes, Your Honor.  And we will withdraw

2  Exhibit 94.

3    JUDGE MARCUS:  Okay.  So 94 is not being offered?

4    MS. KHANNA:  That's correct.  Then I think the only

11:51:51  5  other outstanding issues for Caster plaintiffs' exhibits are --

6  Caster Exhibit 105, I believe, was also admitted into the

7  record during the course of testimony.  I believe those were

8  the DOJ guidelines that Mr. Bryan referred to.

9    JUDGE MARCUS:  Yes, I believe that is correct.  Do I

11:52:12 10  have that right, Mr. Davis?

11    MR. DAVIS:  That is my recollection, as well, yes.

12    JUDGE MARCUS:  It's in.

13    MS. KHANNA:  And then Caster 106 is the amicus brief

14  that Mr. Bryan co-authored in the *Evenwel* Supreme Court case,

11:52:25 15  and I believe that Mr. Davis and I were supposed to confer on

16  what redactions would be appropriate.  We sent him a copy just

17  this morning.  I know he was in with Representative Byrne, so

18  happy to work that out over the course --

19    JUDGE MARCUS:  What's your sense of this one,

11:52:41 20  Mr. Davis?

21    MR. DAVIS:  I am confident we will work it out.  I

22  have not had a chance to look at the document yet.

23    JUDGE MARCUS:  If you would let us know in the next

24  day or two, we would be much appreciative.

11:52:51 25    MR. DAVIS:  Gladly.

```
 1              JUDGE MARCUS:  Ms. Khanna, was there another one, 107?
 2              MS. KHANNA:  I believe that's it.  I think we have
 3    everything resolved for Caster plaintiffs.
 4              JUDGE MARCUS:  Okay.  We have covered the exhibits.
 5    The ones we have reserved on, as I said, the judges will confer
 6    and give you a ruling when we give you written opinion in the
 7    -- in the case.
 8          Which brings us then I take it we're at the point where
 9    we're ready for closing argument.  It may be appropriate to
10    break.  It's just a little bit before 12:00.  I have 11:53
11    Central Standard Time.
12          So perhaps we should take our lunch break now, and then
13    come back in one hour and proceed with closing.  That works for
14    everyone?
15              MR. BLACKSHER:  Yes, Judge.
16              MR. DAVIS:  Yes, Judge.
17              JUDGE MARCUS:  Okay.  Have you for the plaintiffs
18    decided how you're going to break up your argument or
19    arguments?
20              MR. BLACKSHER:  Yes, Your Honor.  The Caster and
21    Milligan plaintiffs have graciously allowed me to proceed
22    first, followed I think by the Caster plaintiffs, and then the
23    Milligan plaintiffs in our closing arguments.
24              JUDGE MARCUS:  And as I said, we gave you a total of
25    an hour and a half to be divided up any way you want.  Have you
```

1788

1    reached any determination about that?

2           MR. BLACKSHER:  I guess we were thinking it was just

3    30 minutes apiece, and, you know, I'm not sure that I will take

4    30 minutes, but I commit not to do more than that.

11:54:33  5           JUDGE MARCUS:  All right.  We will leave that to you.

6    And who will be making the argument for Caster, and who will be

7    making the closing argument for Milligan?

8           MS. KHANNA:  Your Honor, I will be making the argument

9    for Caster.

11:54:48 10           MR. ROSS:  And, Your Honor, it will be myself and my

11   colleague who will be doing the closing for Milligan.

12           JUDGE MARCUS:  And you are free to split up your

13   arguments between your lawyers any way you see fit.  That's not

14   an issue.

11:54:59 15       One final question before we break for lunch that I have:

16   Did you intend to reserve any of your time for rebuttal?  We

17   have given the hour and a half, Mr. Davis, Mr. LaCour, you have

18   that full 90 minutes to respond to the three closing arguments

19   by each of the three sets of plaintiffs.

11:55:21 20       I just wanted to know whether they intended to reserve any

21   time for rebuttal.

22           MR. BLACKSHER:  Singleton would like to reserve a

23   little time, maybe five minutes or ten minutes at most.

24           JUDGE MARCUS:  Okay.

11:55:34 25           MS. KHANNA:  Same with Caster, Your Honor, about

```
 1   five minutes, maybe 15 to 20 between all three of us, I would
 2   imagine.
 3              MR. ROSS:  Same, Your Honor.
 4              JUDGE MARCUS:  All right.  We will leave that to you
 5   folks.
 6       And with that, it is 11:55, if I have it right.  We will
 7   bring you back in one hour and proceed.  Does that give you
 8   enough time to prepare and proceed with your closings for each
 9   of the plaintiffs and the defendant?
10              MR. BLACKSHER:  Yes, Your Honor.
11              MS. KHANNA:  Yes, Your Honor.
12              MR. DAVIS:  Yes, Your Honor.
13              MR. ROSS:  Yes, Your Honor.
14              JUDGE MARCUS:  I should say Mr. LaCour.  That works
15   for you?
16              MR. LACOUR:  Yes, Your Honor.
17              JUDGE MARCUS:  We will see you folks back here in
18   one hour, and we will take up closing argument at that point.
19   Thank you all much.
20              (Recess.)
21              JUDGE MARCUS:  I take it the parties are ready to
22   proceed with their closing statements?
23              MR. BLACKSHER:  Yes.
24              JUDGE MARCUS:  Mr. LaCour, you are ready, as well, and
25   counsel for Caster and Milligan, as well?
```

```
 1              MR. LACOUR:  Yes, Your Honor.
 2              MS. KHANNA:  Yes, Your Honor.  Although I can't -- for
 3   some reason, I can't see the Court, any of the judges on the
 4   Court.
 5              JUDGE MARCUS:  Can you see me?  Mr. Blacksher?
 6              MR. BLACKSHER:  I see you, Your Honor, and I see Judge
 7   Moorer, and I see Judge Manasco.
 8              JUDGE MARCUS:  All right.  Mr. Ross, are you also
 9   ready to proceed?
10              MR. ROSS:  Yes, Your Honor.
11              JUDGE MARCUS:  All right.  We asked Judge Manasco's
12   deputy clerk to give you a five-minute warning when you run up
13   against your 30 minutes.
14         Having said that, Mr. Blacksher, we would be delighted to
15   hear from you.  You may proceed.
16              MR. BLACKSHER:  Thank you, Your Honor.  And first of
17   all, I want to thank the Court, Judge Marcus, Judge Manasco,
18   Judge Moorer, for, first of all, giving us this hearing so
19   promptly.  And secondly, for your patience as we spent, what, a
20   week almost in trial.
21         There is a problem here.  I am getting Joe Bagley on the
22   screen and not Judge Marcus.
23         But can you see me, Judge Marcus?
24              JUDGE MARCUS:  I see you and hear you just fine.  Just
25   tell me whenever you are ready to proceed.
```

```
 1              MR. BLACKSHER:  I am ready to proceed now.
 2              JUDGE MARCUS:  Thanks so very much.
 3              MR. BLACKSHER:  So it is important for the Court to
 4    keep in mind that the Singleton plaintiffs have sought a
13:02:09 5    preliminary injunction based solely on Count One of their
 6    amended complaint, which alleges a racial gerrymander, not
 7    Count Two of the complaint, which alleges intentional
 8    discrimination.
 9         And the difference is important for the purposes of
13:02:29 10   understanding the racial gerrymander claim because unlike
11    intentional discrimination, the injuries suffered or found to
12    be unconstitutional in a racial gerrymander claim is the mere
13    segregation of individual voters based on their race separating
14    one from the other based on their race.
13:03:00 15        It is not an injury of vote dilution or any other
16    practical injury to the voter herself.  Whereas in our second
17    count, we are alleging that the state purposefully
18    intentionally continued to adopted the 2021 plan for the
19    purpose of discriminating against black voters by denying them
13:03:31 20   an opportunity to elect members of Congress in at least two
21    districts.
22         So the issue in the racial gerrymander case resolves
23    around the 1992 decision.  And think Your Honors sort of put it
24    correctly and when we were just before lunch.
13:03:56 25        There's no dispute that the 1992 gerrymander was enacted
```

```
 1  not for the purpose of discriminating against blacks, but
 2  allegedly for the purpose of providing them an opportunity to
 3  elect at least one candidate of their choice.  And it did so by
 4  splitting four counties -- Clarke, Jefferson, Tuscaloosa, and
 5  Montgomery -- for the express purpose of creating a
 6  majority-black district.
 7      And the issue in this case is whether that district drawn
 8  and authorized by the Voting Rights Act allegedly in 1992 can
 9  still be justified by the Voting Rights Act in 2021.  Because
10  there's no dispute -- there's no dispute that the 2021 plan
11  carries forward the 1992 racial gerrymander.
12      In their opposition to our motion for preliminary
13  injunction, the defendant said, quote, both the 2001 and 2011
14  maps maintain the cores of districts, changing them only to
15  equalize population.  The 2011 map largely built off the 2001
16  map, which itself, built off the 1992 map.
17          JUDGE MARCUS:  Mr. Blacksher, can I ask you a question
18  about what you are raising?
19          MR. BLACKSHER:  Certainly.
20          JUDGE MARCUS:  If I hear the argument clearly, you
21  seem to be saying that we have to go back to 1992 for the heart
22  of your argument, because that plan was infirm, and it
23  essentially was carried forward in each successive iteration --
24  in 2000, 2011, and 2021.  That much I have right, correct?
25          MR. BLACKSHER:  Not exactly, Your Honor.
```

13:04:29  5
13:04:58 10
13:05:26 15
13:05:45 20
13:06:14 25

1          JUDGE MARCUS:  Okay.  Put it to me exactly.

2          MR. BLACKSHER:  Well, you used the word infirm.  We

3     don't allege that the 1992 *Wesch* plan was constitutionally

4     infirm at that time.  At that time, the parties stipulated and

13:06:33 5    the Court agreed that the gerrymander could be justified by

6     complying with Section 2 of the Voting Rights Act.

7          The three-judge district court in *Wesch* specifically said

8     they were not addressing the merits of that question, but it

9     was going to accept the stipulation of the parties that the

13:06:58 10   Voting Rights Act justified it.

11         But the next year, 1993, the Supreme Court in *Shaw v. Reno*

12    announced the racial gerrymandering cause of action, the racial

13    gerrymandering equal protection violation.  That the state

14    continued to use the Voting Rights Act to justify perpetuating

13:07:30 15   the 1992 intentional gerrymander based on Section 5 of the

16    Voting Rights Act as counsel has said numerous times, the state

17    felt like it could not reduce the size -- could not reduce that

18    black-majority district District 7 because it would cause

19    retrogression in the ability of blacks to elect candidates of

13:08:00 20   their choice, and, therefore, it was -- it was in compliance

21    with Section 5, and the Justice Department signed off on their

22    submissions under Section 5.

23         But the question of whether Section 5 actually required

24    perpetuating their racial gerrymander was never litigated in a

13:08:24 25   court.  It is now before the Court that precise question

1  whether the intentional separation of voters based on their
2  race in District 7 today in 2021 still can be justified by the
3  Voting Rights Act.

4      Now, to be clear, the state's position in their response
13:08:51 5  to our complaint is not that the -- not that the Voting Rights
6  Act can justify gerrymander, but that the 2021 plan now is no
7  longer a gerrymander because the division -- the creation of a
8  majority black CD 7 in 1992 has over the years developed into
9  basically a new set of traditional redistricting principles.
13:09:30 10  It is now the core of what are traditional in the congressional
11  redistricting of Alabama districts.  And that -- that is simply
12  wrong as a matter of law.  And if I could -- if the Court would
13  allow me to share my screen for a second.

14      JUDGE MARCUS:  Sure.

13:10:07 15      MR. BLACKSHER:  Share -- I don't want to do that.
16  Sorry.  Okay.  Now I'm ready.  I'm sorry, Judge.

17      JUDGE MARCUS:  You take your time.

18      MR. BLACKSHER:  So this is *Bartlett vs. Strickland*,
19  2009.  And it says, Our holding also should not be interpreted
13:10:42 20  to entrench majority-minority districts by statutory command,
21  for that, too, could pose a constitutional concern.  That is
22  essentially what the state is arguing in this case.  That over
23  the years, that gerrymander, which was carried out under
24  authorization allegedly of the Voting Rights Act in 1992 is now
13:11:09 25  so entrenched that it is -- that it -- that the Voting Rights

1    Act still justifies it.

2        As you can see, the majority-minority districts are only

3    required at all if all three *Gingles* factors are met.

4        In fact, the law now is that before -- well, let me just

13:11:50  5    back up here.  Before we get to strict scrutiny, we want to

6    establish first of all that what we have with the 2021 plan is,

7    in fact, a racial gerrymander.

8        So there's no dispute among the parties that the 2021 plan

9    perpetuates the 1992 majority-black district in CD 7.

13:12:19 10        And the fact that it was drawn color blind allegedly by

11    Mr. Hinaman by not looking at racial figures does not undermine

12    the fact that it's carrying forward the intentional separation

13    of voters based on their race that was started in 1992.  That's

14    *North Carolina vs. Covington* at page 2553.

13:12:48 15        So it is a gerrymander, and the question is based on race,

16    and the question is whether the 2021 plan can survive strict

17    scrutiny.

18        JUDGE MARCUS:  Can I stop you at this point,

19    Mr. Blacksher?

13:13:05 20        MR. BLACKSHER:  Yes, sir.

21        JUDGE MARCUS:  If I heard you right in response to my

22    question, when the plan was adopted in '92, drawing District 7

23    the way it does, adopted by a three-judge district court, and

24    summarily affirmed by the Supreme Court of the United States

13:13:27 25    thereafter, that plan was not unconstitutional, it did not

```
 1   constitute a racial gerrymander.  Do I have that right?
 2             MR. BLACKSHER:  Not at that time.  That's correct.
 3             JUDGE MARCUS:  So there came a point in time when it
 4   became unconstitutional, violated equal protection of laws
13:13:52 5   because it was a racial gerrymander.  My question to you is:
 6   When did it come to be unconstitutional -- when the Supreme
 7   Court decided Shaw, or when they decided Barlett v. Strickland,
 8   or when the plan was redrawn in 2000, or when the plan was
 9   redrawn in 2010, or when the plan was redrawn in 2020?  I'm
13:14:20 10   just trying to get my arms around how what started out
11   constitutional morphed into an unconstitutional racial
12   gerrymander.  Was it the Supreme Court opinion in Shaw that did
13   it, or were there additional changes in circumstances on the
14   ground?  When did it become unconstitutional to carry that
13:14:46 15   forward?
16             MR. BLACKSHER:  It should have been or could have been
17   challenged as constitutional after 1993 Shaw v. Reno, and
18   Miller vs. Johnson.  But it was never examined.  That is, the
19   question of whether the Shaw jurisprudence had rendered the
13:15:08 20   racial gerrymander approved in 1992 was still in compliance
21   with the Equal Protection Clause.  That question was not
22   examined in the Section 5 process.
23        The Justice Department preclearances simply looked at the
24   question of retrogression.
13:15:28 25        No one raised the issue of whether the Shaw jurisprudence
```

now placed that plan in constitutional question.

JUDGE MARCUS:  So if I have the answer, your answer to my question correct, once *Shaw* was decided, and thereafter each of the iterations in 2000, 2010, and '21 were unconstitutional racial gerrymandering, they just didn't get challenged until you challenged it in this suit.  Do I have that right?

MR. BLACKSHER:  Almost.  I can't say that they were unconstitutional without having examined whether they could have been justified by a narrowly-tailored compelling objective.  That's another -- that's the next step.

JUDGE MARCUS:  Okay.  So at least by this point, by the time they drew HB-1 in '21, it was a racially gerrymandered map in violation of equal protection.  That's your position, correct?

MR. BLACKSHER:  Yes, Your Honor.

JUDGE MARCUS:  Okay.  Thank you.

MR. BLACKSHER:  In which event, it should be subjected to strict scrutiny.  And as the Court knows, in *Cooper vs. Harris*, and *Abbot vs. Perez*, the Supreme Court held that for compliance with Section 2 to be a compelling state interest, there must be a, quote, meaningful legislative inquiry into whether a district drawn without regard to race would run afoul of Section 2, and that just assuming that Section 2 requires a minority majority district isn't enough.

But that is, in fact, what happened.  The state never did

a meaningful inquiry into whether Section 2 of the Voting
Rights Act still justifies perpetuating the 1992 gerrymander.

In fact, counsel for the reapportionment committee advised
the leadership that merely because it still contained a
54 percent black majority, the Voting Rights Act was complied
with.  But as we know under *Cooper v. Harris*, *Abbott vs. Perez*,
and earlier cases for that matter in the *Shaw* jurisprudence, it
is not enough simply to look at whether or not there's a
majority like district.  The question is whether it was
necessary, because all three of the *Gingles* conditions were
present, not just the ability of a compact majority-black
district to be drawn, but whether or not there was
racially-polarized voting sufficient so that the white majority
usually could be counted on to defeat the choice of black
voters.

That question was never examined in this case.  Even
though even that on September 27th, the Singleton plaintiffs
filed their complaint and spelled out this line of cases under
the *Shaw* jurisprudence demonstrated that by eliminating the
gerrymander, namely, making whole those counties that were
split, there appear two districts in which blacks can elect
candidates of their choice even though neither of those
districts has a black-voter majority.

Nevertheless, the leadership under the advice of counsel,
I think, simply refused to consider that argument, and that's

```
 1  why we are here.

 2       So no one disputes in this case -- we have no evidence

 3  that -- and I don't think any of the parties have disputed that

 4  District 6 and 7 in the whole county plan that was contained

13:19:58  5  and is still contained in the Singleton complaint performed as

 6  opportunity districts for black voters, namely, all you have to

 7  do -- this is not a case where you have to examine

 8  racially-polarized voting.  You don't have to identify what

 9  constituted black person or not a black person.  You don't have

13:20:22 10  to do algorithms.  All you have to do is look at the election

11  returns, which is what Professor Davis did.  And they show

12  clearly 55, 56 percent majorities for the Democratic candidates

13  in those two districts based on the election returns, and

14  there's no dispute in this case that black voters in Alabama,

13:20:55 15  over 90 percent, support the candidates who are Democratic.

16       So it is the Singleton plaintiffs' contention that because

17  there are without -- without having to persist and perpetuate

18  that 1992 racial gerrymander, by going back to whole counties,

19  which is what the state had been using before the 1992

13:21:31 20  gerrymander, it becomes apparent that Section 2 of the Voting

21  Rights Act can be complied with, and, therefore, any effort to

22  violate traditional districting principles by splitting county

23  boundaries in order to reach a black majority is an unjustified

24  and unconstitutional racial gerrymander.

13:22:01 25       For us, the question for this Court is what is the remedy,
```

1   what should have the Legislature have done, what should this

2   Court do?  And we think that *Abrams vs. Johnson* the 1997

3   decision, provides the best guidance.  It says, of course, that

4   the remedy should use traditional districting principles.  That

13:22:26 5   was the case you recall where a three-judge district court in

6   Georgia had to draw a congressional plan because a Legislature

7   had failed to do so.

8        *Abrams* says that the Court should give no deference to the

9   gerrymandered plan.  And *Abrams* says whole counties should be

13:22:46 10   used as building blocks.

11        In fact, in *Wesch v. Hunt* in 1992, the opinion quoted the

12   guidelines that were in place that were put in place by the

13   1991 reapportionment committee that said that counties -- and I

14   am quoting now -- counties should be used as district building

13:23:08 15   blocks where possible.

16        So the state's expert demographer, Tom Bryan, demonstrated

17   by his examples, first of all, that you can't draw a

18   majority-black district simply using whole counties to -- I

19   think what Mr. Bryan demonstrates is that the Singleton plan

13:23:53 20   comes closest to achieving the smallest practicable equal

21   population among districts using whole counties.  And,

22   therefore, it should be the plan that any remedy should start

23   with.  And I will stop there.

24        JUDGE MARCUS:  Thank you.  And so we're clear, you

13:24:13 25   have reserved five minutes for rebuttal, Mr. Blacksher.

1         All right.  We will proceed with -- are we going next with

2    Caster?

3              MS. KHANNA:  Yes, Your Honor.  Thank you.

4              JUDGE MARCUS:  All right.  Thank you.  And you may

13:24:26  5    proceed.

6              MS. KHANNA:  Thank you, Your Honor, and I would also

7    like to reserve five minutes for rebuttal.

8         I wanted to -- the Court has heard a lot of testimony and

9    received a lot of evidence in three different cases on a very

13:24:40 10    condensed time frame.  And I understand that sifting through

11    the record probably feels like a Herculean task at this point.

12    So I want to use my time today to simplify the issues and cut

13    right to the heart of the matter, because at the end of the

14    day, plaintiffs' claim under Section 2 of the Voting Rights Act

13:24:59 15    is straightforward, largely undisputed, and compels just one

16    outcome.

17         Section 2 prohibits congressional maps that dilute

18    minority votes.  It doesn't matter why that dilution occurs,

19    whether it was intentional or inadvertent, only that it does

13:25:18 20    occur.

21         Dilution of black-voting strength might result from

22    limiting black voters opportunity to elect to a single

23    district, or from dispersing black voters across districts,

24    where their voices are drowned out.

13:25:33 25         The question before this Court is whether as a result of

```
 1   the 2021 congressional plan, black-voting strength in Alabama
 2   is unlawfully confined to a single district, 14 percent of the
 3   state's congressional delegation, in a state where black
 4   residents comprise over a quarter of the population.
13:25:53 5       Here, Your Honor, both the law and the evidence make clear
 6   that the answer to that question is a resounding yes.
 7       In Thornburg vs. Gingles, the Supreme Court set out three
 8   evidentiary preconditions for claims brought under Section 2.
 9   This Court would be hard pressed to find another case that so
13:26:14 10  readily illustrates each one.
11       First, plaintiffs must establish that black voters in
12   Alabama are sufficiently numerous and geographically compact to
13   form a majority of the Voting Age Population in a second
14   congressional district.
13:26:29 15      Here, plaintiffs' expert demographer, William Cooper, has
16   produced not one, but seven such plans.  Defendants suggest
17   that Mr. Cooper's illustrative districts count individuals who
18   did not fit their preferred definition of black.  But that
19   argument is both incorrect and ultimately irrelevant.
13:26:51 20      As a legal matter, the Supreme Court instructed in Georgia
21   v. Ashcroft that when examining vote dilution of a single
22   racial group as we are here, courts should look at all
23   individuals who identify themselves as black.
24       The principled matter, when Alabama citizens self identify
13:27:09 25  as black on the census, the state should not be in the business
```

```
        1   of telling them that they're wrong, or deciding that who is
        2   sufficiently black to warrant the protection of federal law.
        3       But as a practical matter, this debate is immaterial to
        4   plaintiffs' claim.  Whether you count the any-part black
13:27:27 5   population, the black registered voter population, or even just
        6   the single-race non-Hispanic black citizens of voting age, all
        7   of Mr. Cooper's illustrative plans contain two majority-black
        8   districts.
        9       In short, plaintiffs satisfaction of the numerosity
13:27:46 10  requirement of Gingles I is beyond dispute.
       11       The compactness element of Gingles I meanwhile is
       12   satisfied when plaintiffs' proposed majority-minority districts
       13   are consistent with traditional districting principles.  As
       14   Mr. Cooper has testified, each of the Caster plaintiffs'
13:28:06 15  illustrative plans maintains population equality, includes
       16   contiguous districts, have compactness scores comparable to the
       17   enacted congressional plan and other Alabama statewide plans,
       18   splits the same number or fewer political subdivision
       19   boundaries as the enacted plan, minimizes pairing of
13:28:29 20  incumbents, and complies with the principles of non-dilution of
       21   minority voting strength.
       22       Defendants offer very little to dispute these facts.  In
       23   fact, Mr. Bryan did not even evaluate Mr. Cooper's plans on the
       24   vast majority of these principles because he recognized that
13:28:48 25  they had all been satisfied.
```

```
         1     So instead, he and the state emphasized a handful of them.
         2  Core retention.  Mr. -- defendants and Mr. Bryan fault
         3  plaintiffs for failing to maintain the status quo in their
         4  illustrative plans.  But, of course, that is precisely what
13:29:07 5  this case challenges, the status quo for Alabama's
         6  congressional plan that dilutes the voting strength of black
         7  voters.
         8     Defendants next turn to incumbency protection suggesting
         9  that Section 2 cannot interfere with the chosen residences of
13:29:23 10 existing members of Congress, but Mr. Cooper's Illustrative
         11 Plan 5 pairs no incumbents at all.  And all of his remaining
         12 plans pair only two incumbents, both of whom have served in
         13 office for one year, undermining Mr. Bryan's apparent personal
         14 preference for continuity of representation above all else.
13:29:47 15    Defendants' last resort in attempting to upend plaintiffs
         16 showing under Gingles I is to focus on communities of interest.
         17 And, in fact, just one community of interest on which the bulk
         18 of their case appears to rest, that's between Mobile and
         19 Baldwin counties.
13:30:04 20    But as the evidence demonstrates, defendants' argument on
         21 this point fails at every level.
         22    First, under the reapportionment committee's own
         23 guidelines, communities of interest like the other principles
         24 the defendants highlight comes toward the end of a long list of
13:30:21 25 factors to be considered in drawing a redistricting plan.
```

1      And it certainly comes well after compliance with the

2  Voting Rights Act.

3           JUDGE MARCUS:  Wouldn't it be true to say more

4  accurately, Ms. Khanna, that communities of interest are often

13:30:42  5  discussed, conceptualized, and considered along with

6  compactness, geographic compactness?

7           MS. KHANNA:  I do believe --

8           JUDGE MARCUS:  If one's heads on the coin, and the

9  other tails on the same coin?

13:30:59 10           MS. KHANNA:  I'm not sure if I would quite

11  characterize that way, but I completely agree, Your Honor, when

12  discussing the compactness under *Gingles I*, the Court doesn't

13  look at the number, the Reock score.  It looks at whether these

14  districts makes sense, and whether they make sense is a

13:31:15 15  question that involves, well, what are the boundaries of it?

16  Are they generally keeping together political subdivision

17  boundaries?  Do they encompass a community of interest, or are

18  they kind of randomly picking and choosing from disparate

19  portions of the state.

13:31:28 20      I agree it's part of the inquiry.  But it certainly is on

21  the Alabama redistricting criteria not something that on its

22  own can subordinate the very important criteria of complying

23  with the Voting Rights Act.  So it's a little bit of -- it

24  certainly is something to be considered, but it is not

13:31:49 25  something that can outweigh the question and --

1       JUDGE MARCUS:  I wasn't so much asking you to put a

2  weight on each -- as I was suggesting that when you ask about

3  the question of reasonable compactness, it's often considered

4  in tandem with communities of interest.  You would agree with

13:32:11 5  that, would you not?

6       MS. KHANNA:  Yes, Your Honor.  Under *Davis v. Chiles*

7  in the Eleventh Circuit, the question of reasonable compactness

8  is whether or not the maps are drawn consistent with

9  traditional districting principles.  And communities of

13:32:23 10 interest is one of those traditional districting principles.

11      JUDGE MARCUS:  I reference it because if you look at

12 Justice Kennedy's opinion, in LULAC, it's clear that when he's

13 talking about reasonable compactness, in the very same

14 discussion, he reviews the problem of community of interest and

13:32:46 15 suggests that part of the problem with how one of those

16 districts was drawn was that not only were they disparate in

17 terms of geography, but communities of interest were equally

18 separated.  I am suggesting the two frequently come together in

19 the analysis.  Is that a fair way to look at this?

13:33:11 20      MS. KHANNA:  Yes, Your Honor.  I think communities of

21 interest like many of the other factors we have discussed are

22 one of the traditional districting criteria that courts look at

23 when evaluating compactness under *Gingles I*, and my

24 understanding of the *LULAC* opinion is it was informative, that

13:33:27 25 there wasn't really any evidence.  That there was a community

1  of interest if this district was trying to encompass other than

2  just sheer -- merely trying to get wrangle up a bunch of

3  minorities in different pockets of the state.  That's certainly

4  not what we have here.

13:33:40  5      And, indeed, the Alabama criteria make clear that -- or

6  rather the guidelines made clear that if there's ever a

7  conflict between complying with the Voting Rights Act and

8  communities of interest, core preservation, incumbency

9  protection, those principles should gave way to the broader

13:33:57 10  principle of complying with minority voter rights.

11      JUDGE MARCUS:  I have it.  You were talking about when

12  I interrupted you the community of interest proffer combining

13  Mobile County and Baldwin County in the same district.

14      MS. KHANNA:  Yes, Your Honor.  And I would also -- in

13:34:17 15  addition to the guidelines on this point, the Caster plaintiffs

16  have offered reams of evidence and testimony about the shared

17  communities of interest between Mobile and Montgomery,

18  particularly for black residents who face many of the same

19  challenges in education, employment, criminal justice reform in

13:34:34 20  both areas.

21      Plaintiffs have offered the *Chestnut* trial testimony of

22  witnesses like former State Senator Hank Sanders and former

23  State Representative John Knight who explain that the urban

24  center of Mobile shares more in common with the urban center of

13:34:50 25  Montgomery with economically and culturally than suburban

1808

```
 1    Baldwin County.  Community organizer Karen Jones, precisely the
 2    sort of person that Mr. Bryan testified is best situated to
 3    provide testimony on communities of interest further confirm
 4    this fact.
 5        But plaintiffs do not need to disprove that a community of
 6    interest exists in the areas that defendants emphasize.  At the
 7    very least, the evidence indicate that there are divergent
 8    views in Alabama -- how voters in Alabama view their
 9    communities, which only exemplify the fact that communities of
10    interest across the state can overlap and sometimes conflict
11    with one another.
12        There's nothing sacred about the one community of interest
13    that defendants choose to focus on.  Indeed, defendants'
14    suggestion that the Gulf Coast counties comprise an invaluable
15    community of interest is directly undermined by the State's
16    Board of Education plan which splits Mobile County the same way
17    plaintiffs propose here and yet was governed by the very same
18    criteria as the congressional plan.
19        Defendants may not like plaintiffs' illustrative plans as
20    a policy matter.  But Legislature may choose to prioritize
21    different communities in the map drawing process and will
22    likely have an opportunity to do so if this Court enjoins the
23    current map.
24        But the state's policy preference as to which communities
25    merit representation and which do not has no bearing on
```

13:35:05 (line 5)
13:35:25 (line 10)
13:35:45 (line 15)
13:36:02 (line 20)
13:36:18 (line 25)

1    plaintiffs' showing under *Gingles I*.  Plaintiffs illustrative

2    maps are just that, illustrative.  We are not asking the Court

3    to order that one of them be selected or adopted.  The only

4    question is whether a second majority-black district is

13:36:35 5    feasible, consistent with traditional districting principles,

6    and plainly it is.

7         Plaintiffs have proved there are many ways to draw such a

8    district in Alabama while balancing a variety of all the

9    different redistricting principles, including but not limited

13:36:49 10    to avoiding minority vote dilution.

11         The second and third *Gingles* preconditions are simply

12    beyond dispute.  Defendants have presented no evidence

13    contradicting plaintiffs' racially-polarized voting experts,

14    both Dr. Palmer and Dr. Liu.  Between those two experts, they

13:37:07 15    examined 30 elections between 2008 and 2020.  And they found

16    racially-polarized voting in every single one.

17         That result held whether examining the single-race black

18    population, or the any-part black population.

19         In fact, the state's own expert, Dr. Hood, conducted a

13:37:24 20    racially-polarized voting analysis for some of the same

21    geographical areas and elections as plaintiffs' experts, and

22    found the same extremely high levels of racially-polarized

23    voting.

24         On *Gingles III,* Dr. Palmer and Dr. Liu provided unrefuted

13:37:39 25    testimony that not only does the white majority usually defeat

1    black-preferred candidates in both congressional and statewide
2    elections, it always defeats those candidates in every district
3    except for Congressional District 7, the state's one
4    majority-black district.

13:37:54 5          The evidence thus establishes that each of the three
6    *Gingles* preconditions is easily satisfied.  The Eleventh
7    Circuit has said in Fayette County that it will be only the
8    very unusual case in which the plaintiffs had kind of
9    established the existence of the three *Gingles* preconditions,
13:38:12 10   but still had failed to establish a violation of Section 2
11   under the totality of circumstances.

12          We submit, Your Honor, that this is not an unusual case.
13   To the contrary, it is a textbook case.  All of the relevant
14   Senate Factors weigh in favor of a finding of vote dilution, in
13:38:31 15   many cases, based on undisputed and objective facts.

16          Let's begin with the sheer numbers.  While the state is
17   correct that the Voting Rights Act does not mandate
18   proportionality, the Supreme Court has held this factor is
19   relevant in the totality of circumstances analysis.  And here
13:38:47 20   the disparities between the black and white populations and
21   their share of congressional districts are glaring.

22          Black residents make up over 27 percent of Alabama's
23   population.  But they are a majority of voters in just
24   14 percent of its congressional districts.

13:39:03 25          White residents make up 63 percent of the population.  But

1  they are a majority of voters in over 85 percent of the

2  congressional districts.

3      Just 30 percent of the black population lives in a strict

4  where they have an opportunity to elect their preferred

13:39:20 5  candidates.  By contrast, 92 percent of white residents reside

6  in a district where they can elect their preferred candidates.

7      And if Alabama were to draw an additional black-majority

8  district, black representation would be approximately

9  proportional to the black share of the population.  While

13:39:38 10  whites would still have a greater share of congressional

11  districts than their share of the population by nearly 10

12  percentage points.

13      The Senate Factors tell the compelling story behind these

14  numbers.  Senate Factor 1 examines Alabama's history of

13:39:53 15  official discrimination.  Any student of American history knows

16  that state-sponsored discrimination as denied the franchise to

17  black citizens since the early 20th Century and before.

18      Dr. King surveyed Alabama's history of poll taxes,

19  literacy tests, white primaries, and the brutal violence that

13:40:12 20  confronted black residents who were brave enough to attempt to

21  cast a ballot.

22      And while those specific tools are no longer in place for

23  sure, racial discrimination in voting is unfortunately not just

24  a thing of the past.  Only a few years ago, the U.S. Department

13:40:28 25  of Transportation had to intervene after the Governor made it

1    harder for black voters to comply with the state's voter ID law

2    by closing motor vehicle locations in disproportionately black

3    areas.

4        And just this decade, a federal judge lamented that

13:40:43 5  Alabama remains vulnerable to politicians setting an agenda

6    that exploits racial differences and that political exclusion

7    through racism remains a real and enduring problem in the

8    state.  That was in *U.S. vs. McGregor*.

9        Senate Factor 2 examines the extent to which voting is

13:41:03 10 racially polarized in the region.  Dr. Palmer demonstrated that

11   voting in the region is not only racially polarized, it's

12   significantly so with over 92 percent of blacks voting for

13   their preferred candidates while nearly 85 percent of white

14   voters voting for the opposing candidates.

13:41:19 15      Now, the state contends that this undisputed evidence of

16   racially-polarized voting is merely reflective of partisan

17   interests that just so happened to fall on racial lines.  But

18   both the Supreme Court and the Eleventh Circuit have held that

19   Section 2 plaintiffs do not have to prove that racial

13:41:36 20 polarization is driven by biracial animus.

21       Even if the reasons why black and white voters are

22   polarized were relevant under Section 2, the burden would be on

23   defendants to affirmatively prove under the totality of the

24   circumstances that race is not one of those reasons.

13:41:56 25      The record here cannot support such a conclusion.  The

1    state's own expert, Dr. Hood, has expressly agreed both in his

2    published work and on the witness stand that race remains very

3    much a part of the calculus for voters today, even if it is not

4    the sole factor in voter traces.

13:42:12  5         Senate Factor 3 asks whether Alabama has used voting

6    practices that enhance the opportunity for discrimination such

7    as at-large elections, majority vote requirements, anti-single

8    shot provisions, and Alabama has checked all of those boxes.

9         Senate Factor 5 examines the extent to which

13:42:30 10   African-Americans in Alabama bear the effects of discrimination

11   in areas such as education, employment, and health, which

12   hinder their ability to participate effectively in the

13   political process.

14        It should come as no surprise that the vestiges of

13:42:45 15   discrimination continue to plague blacks in Alabama on

16   virtually every dimension as shown by Mr. Cooper, Mr. Jones,

17   Dr. King, and Dr. Caster, and is echoed in the testimony in

18   *Chestnut* by Dr. McCrary, Senator Sanders, Representative

19   Knight, Commissioner Tyson, Karen Jones, and Lakeisha Chestnut

13:43:04 20   herself.

21        This evidence confirms what we all know:  Because black

22   Alabamians have less flexible work schedules, less access to

23   affordable type child care, fewer educational opportunities,

24   and unstable housing arrangements, it is harder for them to

13:43:19 25   access and navigate the voting process.

1    Senate Factor 6 asks whether Alabama's elections have been
2    characterized by overt or subtle racial appeals, and they have
3    been.  Dr. Bagley noted several examples such as politicians
4    running ads saying that white men are blamed for everyone
13:43:38  5    else's problems.  Dr. King's report similarly surveys the
6    various ways that Alabama politicians have recently used race
7    to negatively stereotype minorities and prey upon the fears of
8    white voters.
9    Senate Factor 7, the extent to which the minority group
13:43:53 10    members have been elected to public office weighs decidedly in
11    favor of plaintiffs' claim.
12    Alabama's congressional delegation has never included more
13    than a single black representative, and then too from the
14    state's one majority-black district.
13:44:09 15    And the absence of a single black statewide elected
16    official in the last quarter of a century is glaring in a state
17    with such a large black population.
18    Senate Factor 8, Alabama's nonresponsiveness to the needs
19    of black voters is readily proved by the number of issues that
13:44:29 20    the state has not addressed.  Refusing to expand Medicaid under
21    the Affordable Care Act, which would disproportionately help
22    uninsured black Alabamians of all ages, ignoring environmental
23    pollution that black Alabamians in Lowndes County and the Gulf
24    Coast experience.  These realities demonstrate the state's
13:44:50 25    disinterest in solving the problems that have a

1    disproportionate and grave effect on black Alabamians.

2        As for Senate Factor 9, the tenuousness of the state's

3    justifications for the enacted map, it is telling that all of

4    the justifications provided by defendants and the witnesses in

13:45:09 5    this case flatly ignore the prioritization of criteria in the

6    state's very own guidelines.

7        Ultimately, in evaluating the totality of the

8    circumstances under the Senate Factors, this Court need not

9    equate racial differences and disparities with racism.

13:45:29 10       Rather, this Court can review the -- former Senator

11   Sanders' testimony in *Chestnut* side by side with former

12   Congressman Byrne's testimony.  And it will see are two very

13   different political realities.  From Senator Sanders'

14   perspective, race has defined not only his childhood growing up

13:45:51 15   in Alabama, but also his present reality, his right to vote,

16   his personal experiences in education, criminal justice, and

17   the sting that he feels from Confederate monuments, and his

18   continued fight for equality in all aspects of his

19   professional, political, and civic life.

13:46:10 20       From Congressman Byrne's perspective, race has not been a

21   salient issue.  He didn't know the black composition of his

22   district when he was in office.  He doesn't notice Confederate

23   flags and monuments in the halls of Alabama's government.  He

24   does not -- he's not confronted on a daily basis with the stark

13:46:28 25   socioeconomic disparities between black and white communities

1    in Alabama.

2              THE COURTROOM DEPUTY CLERK:  Ms. Khanna, you have

3    5 minutes of your 25.

4              MS. KHANNA:  Thank you.

13:46:38 5        Your Honor, this Court does not have to disbelieve either

6    of these two gentlemen.  Both of them, long-time, hard-working

7    representatives of Alabama's residents to see that the reality

8    in life of life in Alabama for blacks is just different than

9    the reality of life in Alabama for whites.

13:46:55 10       It should come as no surprise that many well-intentioned

11   white representatives believe that the Voting Rights Act has

12   done its job and solved the problem of racial inequity to

13   access to the franchise, while many black representatives

14   believe that the struggle for racial equality in voting and so

13:47:12 15  many other areas is an ongoing battle they continue to fight

16   every day.

17       Your Honor, I reserve the balance of my time for rebuttal.

18             JUDGE MARCUS:  Let me ask you a question, Ms. Khanna.

19   And you are on our time, not yours.

13:47:26 20            MS. KHANNA:  Okay.

21             JUDGE MARCUS:  One of the arguments the state has

22   made, and it has been explained by some witnesses, including

23   Mr. Byrne, former Congressman Byrne this morning, is that even

24   assuming arguendo you were right about Section 2 and that you

13:47:53 25  could draw two majority-minority districts that were reasonably

1    compact and otherwise complied with *Gingles II* and *III* and that

2    the Senate Factors in the aggregate tilted in your favor, even

3    if assuming all of that is true, that it is late in the day and

4    the Court sitting in equity as this Court is doing would have

13:48:18  5    to and must take into account the timing, the closeness of the

6    primary, which is scheduled for late May, I think it was the

7    24th, and the election, which is about ten months off, and the

8    argument they make, simply put, is it's too late in the day to

9    be fussing with new maps.  Even if everything you say is true,

13:48:48 10    they dispute that, but they say even assuming it were so, it's

11    too late in the day.

12        What's your answer?

13        MS. KHANNA:  Your Honor, I think that's just wrong.

14    The fact is this is not the -- we are not in a last minute

13:49:04 15    before the election moment right now.  We are a full four --

16    more than four months away from the primary election.  There's

17    a congressional filing deadline coming up.

18        JUDGE MARCUS:  Let me stop you.  The primary election

19    is 24 May.  Do I have that right?

13:49:19 20        MS. KHANNA:  I believe that's right.

21        JUDGE MARCUS:  So we are about four-and-a-half months

22    from then.

23        MS. KHANNA:  Exactly.  And while Alabama has imposed a

24    congressional filing deadline for the end of January, that is

13:49:31 25    perhaps one of the longest spans between a congressional filing

1    deadline and the congressional primary that I am aware of in

2    the country and is certainly not at all necessary.

3        If this Court were to find that plaintiffs have

4    established a sufficient likelihood of success on the merits

13:49:48 5    and that the plan should be enjoined, it would have maximum

6    flexibility to postpone that filing deadline, give the

7    Legislature an opportunity to adopt a remedy, have a

8    court-imposed remedy, whatever the remedial process will be,

9    there will be ample time for candidates to file and to not have

13:50:06 10   to touch the election deadlines at all.  The primary would stay

11   in place.

12       You know, there are a lot of redistricting and voting

13   rights cases litigated across the country in election years.

14   And when people talk about the eve of an election or what's

13:50:21 15   coming at the last minute, they do not mean four months before

16   a relevant election.  They're talking weeks at that point.  And

17   here, the Court has just ample discretion and ample amount of

18   time to not disrupt anything in the election calendar, but

19   still achieve or recognize the Voting Rights Act violation

13:50:42 20   that's in the enacted plan and alleviate plaintiffs of the

21   injury that they're bound to suffer from any election that's

22   going to be held under that map.

23           JUDGE MARCUS:  Let me ask a final question.  It's

24   something you touched on already, and all of the parties have,

13:50:59 25   and that is weighing the various and sometimes competing

1   communities of interest.

2       In this case, we have heard substantial evidence of -- at

3   least two communities of interest, one shaped by the Black Belt

4   and environs, the second shaped by the Gulf Coast -- Baldwin

13:51:21 5   and Mobile counties.  And it's been pointed out to us that

6   those communities of interest in some ways are overlapping, and

7   in some ways are competing with each other.

8       How does a court in your view go about weighing, if we

9   have to weigh at all, the relevant strengths of these competing

13:51:48 10   communities of interest?

11       MS. KHANNA:  I don't think that the Court has to

12   decide that one community of interest trumps another.

13       Communities of interest, the definition provided by

14   Alabama and hosts of other states, is purposefully vague and

13:52:05 15   can mean a lot of different things to a lot of different

16   people.  And I don't think there's any objective standard by

17   which to say this community of interest is more important than

18   this community of interest.  We all belong to different

19   communities, all of which have different importance to

13:52:21 20   different people.

21       I think that the question for the Court is whether or not

22   -- the only question for the Court is whether or not plaintiffs

23   have satisfied their burden to show that a second

24   majority-black district can be drawn consistent with

13:52:34 25   traditional districting principles, including communities of

1    interest.

2         And where plaintiffs have established sensible districts

3    that meet a host of traditional districting criteria and

4    supported those with the testimony from community members

13:52:49 5   explaining how they view their communities to comport with

6    those districts, I believe that's all that is required to

7    satisfy *Gingles I.*

8         If there are policy preferences about, well, I think we

9    want to prioritize community over that community for this

13:53:05 10  reason or that reason, I believe those policy preferences are

11   not for this Court to make and not -- and certainly are up to

12   the Legislature to make in adopting a remedy plan.  But they

13   have to do so consistent with the Voting Rights Act.

14        It cannot be the case that because the people in power

13:53:22 15  have a preference for some communities of interest that they

16   claim is most important and inviable contrary to their own

17   guidelines, contrary to their board of election plan, that

18   everything else falls away.  We cannot have a second

19   majority-black district because these two areas really, really

13:53:41 20  want to stay together.  I think is important to stay together.

21        There are a lot of competing factors here.  But minority

22   voting rights cannot be relegated to the bottom of that

23   consideration, and if anything, need to be weighted at the very

24   top, and as long as we have shown which I believe we have that

13:53:57 25  communities of interest can -- are consistent in -- with those

         1    districts, I believe we satisfied *Gingles I*.

         2            JUDGE MARCUS:  All right.  Thank you.  And you have

         3    reserved your five minutes for rebuttal.  We will turn to

         4    Mr. Ross.

13:54:12 5            JUDGE MANASCO:  Judge Marcus, I have a question for

         6    Ms. Khanna.  Ms. Khanna, I want to make sure that there's one

         7    precise detail that I understand about the Caster plaintiffs'

         8    request for relief.  To the Caster plaintiffs, is there a

         9    difference, and if there is, please comment on it for me,

13:54:31 10   between an injunction that expresses a ruling that there have

        11    to be two districts in which black Alabamians have an

        12    opportunity to elect a representative of their choice, and an

        13    injunction that expresses ruling that there have to be two

        14    majority-black districts?

13:54:51 15           MS. KHANNA:  I --

        16            JUDGE MANASCO:  Feel free to postpone the answer to

        17    the question until the post hearing submissions.  I'm genuinely

        18    not trying to put anybody on the spot.  I just need to fully

        19    understand the difference, if there is one.

13:55:06 20           MS. KHANNA:  No.  I think it's a very important

        21    question, Your Honor, and it really does pinpoint kind of the

        22    nub of the issue of the difference between plaintiffs' standard

        23    to liability and what exactly is the proper remedy, right?  So

        24    there's no question that in order to show liability under

13:55:22 25   Section 2, we need to establish that it's possible to create a

1    majority-minority district over 50 percent, which I believe we
2    have done in states.
3         On the question of remedy, I actually it's believe as a
4    matter of law that there are multiple ways to remedy a Section
13:55:37   5    2 violation, and that they do not have to be hinged to that
6    *Bartlett* standard for proving liability.  I think we have seen
7    it in other states like Texas, which in areas where the courts
8    has fully agreed that there's no question of the Voting Rights
9    Act applies, no question Section 2 applies where you can draw
13:55:54  10    50-plus districts either for black residents or Latino
11    residents.  But where the ultimate remedy has been a 49 percent
12    district or a 48 percent district, that the Court feels is --
13    has sufficiently provided black voters an opportunity to elect
14    their preferred candidates.  I believe there is a little bit
13:56:11  15    more flexibility on the remedy than there is on the liability.
16         But I do believe that making sure -- making clear that the
17    Voting Rights Act requires two districts in which black voters
18    have an opportunity to elect their preferred candidates is
19    really important to guide whatever remedy that is.  I would
13:56:28  20    also say the evidence here -- I don't have -- I don't have an
21    answer off the cuff about what exactly is the best percentage
22    for such a second district or the right percentage, but I will
23    say that the racially-polarized voting evidence here does
24    indicate that it's very hard for black voters in Alabama to get
13:56:46  25    an opportunity to elect unless and until they are a majority of

```
 1   the eligible voters.

 2              JUDGE MANASCO:  Thank you.

 3              JUDGE MARCUS:  I am still not sure, Ms. Khanna, that I

 4   understand the answer to that question.  So let me come at it

 5   one more time.

 6       You say, and I think it's clear that for purposes of

 7   Section 2 under the Voting Rights Act, you have to establish

 8   first as an evidential matter the circumstances surrounding

 9   Gingles I.  That requires you to prove that you can establish

10   on the record two majority-minority districts.  It's not enough

11   simply to say you can create two opportunity districts.  That

12   wouldn't get you to home plate with regard to establishing a

13   Gingles Section 2 analysis.  I have that correct.

14              MS. KHANNA:  Absolutely.  Under Bartlett v.

15   Strickland, we have to pass 50 percent.

16              JUDGE MARCUS:  If I understand what you are asking

17   this Court to do, assuming you otherwise can circumnavigate all

18   of the circumstances in Gingles, not just I but II and III, and

19   the Senate Factors, as well, you are asking us one, to say

20   preliminarily that HB-1 violates the Voting Rights Act.  That's

21   the first thing you are asking, correct?

22              MS. KHANNA:  Yes.

23              JUDGE MARCUS:  And then the second -- and this is

24   where I want to be sure I understand you with clarity -- what

25   would you have us say to the Legislature, if we were to
```

13:57:02 (line 5)
13:57:28 (line 10)
13:57:52 (line 15)
13:58:14 (line 20)
13:58:35 (line 25)

otherwise agree?  What is it that they have to do?

Do they have to draw two majority-minority districts in order to comply with the Voting Rights Act?  Is that what you would have us tell them?  Or would you have us simply say it's enough for them to draw two opportunity districts?

MS. KHANNA:  I will certainly try.  You're right, Your Honor, that the first thing we are requesting is the declaratory relief that says there is a violation of Section 2.

The next thing we would request is an injunction that says there cannot -- you cannot use this map in the upcoming election, the enacted map.

The next thing after that, frankly, does not require the Legislature to do anything.  It would not be an injunction against the Legislature to then go and come up with a different map.  It would be a chance -- the Court would need a remedy for the violation.  We believe there's ample time to impose a remedy, and the Court could and likely should give the Legislature an opportunity to develop that remedy, to develop a remedy that is consistent with Section 2.

JUDGE MARCUS:  All of that is clear.  The question, though, remains open:  If you are otherwise right, and I underscore if, what is it you would have us say to the Legislature?  This map is no good, we'd ask you to go back and draw another map, and what, if anything, would you have us say beyond the fact that this map violates Section 2 because two

1  majority-minority districts could be drawn?  Would we say

2  anything further?  Ought we to in your view?

3        MS. KHANNA:  Yes.  I believe that the instruction

4  should be that the -- that Alabama must adopt a map, that any

14:00:34 5  map that Alabama adopts must comply with Section 2 by

6  containing two congressional districts that provide black

7  voters an opportunity to elect the preferred candidates.

8        I don't -- as a legal matter, I believe that is the --

9  that's the remedy for a Section 2 violation.

14:00:57 10       As an evidentiary matter, and as a localized matter in

11  Alabama, I believe that the evidence shows that in order to

12  have an opportunity to elect the preferred candidate, black

13  voters need to be a majority of the Voting Age Population or

14  somewhere very, very close to that, given the sheer levels of

14:01:19 15  racially-polarized voting.  It would not be sufficient to call

16  a 42 percent or 38 percent district necessarily an opportunity

17  to elect district, given the evidence here.

18       So I think that while there -- while legally I think the

19  answer is Section 2 requires the creation of an additional

14:01:40 20  opportunity to elect district, practically, I think that might

21  -- that that will likely be an additional district in addition

22  to the one that currently exists that is over 50 percent Black

23  Voting Age Population or very close to that.

24       JUDGE MARCUS:  Thank you very much.  We will proceed

14:02:02 25  now with the argument from the Milligan plaintiffs.

1826

1          MR. ROSS:  Thank you, Your Honors.  I will provide the

2    closing for the Milligan plaintiffs on our Section 2 claim.  My

3    colleague Davin Rosborough will address our racial

4    gerrymandering claim.  We reserve five minutes for rebuttal.

14:02:18 5          Your Honors, this lawsuit concerns two of our most

6    fundamental constitutional rights; the right to vote, and the

7    right to be free from racial discrimination.

8          This is not a new fight in Alabama.  The state has an

9    undeniable history of discrimination against black voters,

14:02:30 10   including a decades' long pattern of passing discriminatory

11   redistricting plans.

12         Yet despite black voters' calls for a second

13   majority-black district, last year the Legislature ignored

14   those requests and enacted HB-1 which continues the long

14:02:46 15   pattern of discrimination.  Indeed, no one disputes that black

16   people are about 27 percent of Alabama's population, but

17   because of racially-polarized voting, they can elect their

18   candidates of choice in only one of the state's seven

19   congressional districts.

14:03:02 20        And no one disputes that about one-third of black voters

21   are packed into District 7 which has an unnecessarily high

22   59 percent black registered voter population, and that HB-1

23   cracks the rest of the Black Belt across for another three

24   congressional districts preventing the creation of a second

14:03:19 25   majority-black district.

<pre>
 1            As Ms. Khanna aptly explained, these facts and others
 2       plainly show a violation of the Voting Rights Act.
 3            Although rights involved are important, the claim is quite
 4       simple.  In 1982, a bipartisan Congress passed the amended
14:03:37 5   Voting Rights Act.  And the Supreme Court in *Thornburg vs.*
 6       *Gingles* laid out the straightforward framework for proving
 7       these claims.
 8            As Ms. Khanna already explained, first, black voters must
 9       show that they are numerous, sufficient numerous and
14:03:53 10  geographically compact enough to constitute a majority and an
11       additional district.  Second and third, they must show that
12       voting is racially polarized.  Once these preconditions are
13       established, the Court must examine the totality of the
14       circumstances.
14:04:08 15       Majority of the factors do not need to point one way or
16       the other.
17            Your Honors, the overwhelming and undisputed evidence
18       shows that plaintiffs have satisfied both the *Gingles*
19       preconditions, and that under the totality of the
14:04:23 20  circumstances, HB-1 impermissibly dilutes black-voting
21       strength.  With respect to the *Gingles* preconditions, the
22       Milligan plaintiffs' expert Dr. Moon Duchin and the Caster
23       plaintiffs' expert Mr. Bill Cooper offered ten illustrative
24       plans containing two majority-black districts with black
14:04:40 25  registered voter, black single-race voter, black any-part voter
</pre>

1828

1    populations over 50 percent.

2        All of the plans are geographically compact, and the plans

3    attempt, unlike HB-1 to keep the Black Belt whole.  The plans

4    also were drawn consistent with the state's own traditional

14:05:01  5    redistricting principles.  This alone is sufficient to satisfy

6    *Gingles I* requirements.

7        With respect to *Gingles II* and *III*, the plaintiffs' expert

8    Dr. Baodong Liu showed that across seven congressional primary

9    and general elections from 2008 to today, black people gave an

14:05:17 10   average of 88 percent of their votes to black-preferred

11    candidates.  In contrast in the same seven elections, white

12    people gave an average of 13.5 percent of their votes to the

13    black-preferred candidates.

14        Outside of the majority-black District 7, black-preferred

14:05:33 15   candidates enjoyed no electoral success at all.

16        These same pattern held in ten statewide elections.  Stark

17    racially-polarized voting was apparent in both statewide

18    general and primary elections for President, U.S. Senate,

19    Lieutenant Governor, Secretary of State, and other offices.

14:05:51 20       Dr. Palmer, the Caster expert, found the same pattern of

21    RPV so too did the defendant's expert Dr. Trey Hood.  Indeed,

22    Dr. Hood agreed with Dr. Liu and Dr. Palmer that voting is

23    racially polarized and that black voters cannot consistently

24    elect their candidates of choice in districts below a majority.

14:06:10 25       Your Honors, these statistics are at the heart of the

1    Voting Rights Act case.  And these statistics are unrefuted by

2    the defendants.  No black person, regardless of their party or

3    qualifications, has ever won a majority white congressional

4    district in Alabama.  As the Eleventh Circuit has repeatedly

14:06:30 5    stated, The surest indication of race conscious politics is a

6    pattern of racially-polarized voting.

7          Your Honor, with respect to Senate Factors, plaintiffs'

8    Mr. Evan Milligan and Captain Shalela Dowdy testified Alabama's

9    Legislature has ignored the advocacy of black community calling

14:06:50 10   for two majority-black districts, that the current plan leaves

11   black voters without responsive representation in Congress,

12   that HB-1 ignores the shared history, the shared familial and

13   cultural bonds, the shared experiences, and the shared concerns

14   about racial inequities in education, health, employment, and

14:07:11 15   other areas that establish a shared interest of communities

16   amongst black people in Montgomery County, Mobile County, and

17   across the Black Belt.

18         In addition, Dr. Bagley plaintiffs' historian confirmed

19   that the shared history of the Black Belt exists between Mobile

14:07:28 20   County.

21         He also testified that at least seven of the Senate

22   Factors support a finding of vote dilution, including Senate

23   Factor 1, the state's long and intense history of de jure and

24   de facto racial discrimination, including a 2017 opinion by

14:07:43 25   three-judge court that Alabama state legislative maps were

enacted with racially predominant motive, including racial
discrimination and redistricting in five of the six
redistricting cycles from 1960 to 2010, and several recent
court decisions finding that the state or its local
jurisdictions violated the Voting Rights Act or the
Constitution.

Your Honors, with respect to Senate Factor 5, no one can
dispute there's a history of discrimination in voting -- or
excuse me -- in education and employment, health, and every
other area of Alabama, and that stark socioeconomic disparities
between black and white people continue to exist.

Indeed, Your Honors, in the 2020 elections, black voter
registration and turnout rates were about 10 points below those
of white voters.  That even ignoring this lower level of black
participation in the state, socioeconomic disparities have made
it much more difficult for black voters to financially
contribute to political campaigns or otherwise engage in
politics.

As Ms. Khanna already explained, there's been some
startling examples of racial appeals in just last ten years.
White congressional candidates have accused the political
opponents of conducting a war on whites.  They have called for
the repeal of the Reconstruction amendments, which gave black
people their freedom after the Civil War.  They ran campaigns
with burning images of out-of-state black Congress people, and

```
        1   other minority members of Congress, and accused them of trying
        2   to tear this country up.  They used other overt and subtle
        3   appealed to call for block voting.  Because of block voting, no
        4   black candidate has ever won an election for Congress outside
14:09:27 5  of District 7.
        6       As of Senate Factor 8, the congressman who were elected
        7   from the majority white districts have been unresponsive to the
        8   specific needs of black voters.  As we heard, these
        9   congressmen, including Congressman Byrne opposed bipartisan
14:09:44 10 infrastructure laws that provided important resources to the
        11  Black Belt.  They have opposed the bipartisan effort to restore
        12  the Voting Rights Act.  And they have opposed the Medicaid
        13  expansion that would allow 220,000 disproportionately black
        14  voters to receive health insurance despite the fact that 39
14:10:05 15 other states have agreed to this expansion.
        16      Your Honor, despite this overwhelming and largely
        17  undisputed evidence, the defendants tried to make a number of
        18  arguments which are irrelevant or distractions.  Defendants
        19  will claim that the plaintiffs' illustrative plans do not
14:10:26 20 contain true majority-black districts, but, again, under any
        21  measure plaintiffs' plans have two compact majority districts
        22  even using the most restrictive definition of black.
        23      Defendants will claim that plaintiffs' plans do not
        24  respect traditional redistricting principles, but this is
14:10:45 25 merely an attempt to graft the standards from the Shaw claims
```

1    on to Section 2.

2          The Eleventh Circuit has specifically rejected this

3    approach in *Davis vs. Chiles*.

4          Even so, Dr. Duchin and Mr. Cooper testified that

14:10:59  5    plaintiffs' plans respect the black community -- Black Belt

6    community of interest unlike HB-4.  The plaintiffs' plans are

7    as compact or more compact than HB-1.  The plaintiffs' plans

8    split the same or fewer counties than the six county split in

9    HB-1, that plaintiffs' plans keep the Black Belt's core in two

14:11:18 10    districts rather than four, that Dr. Duchin's plans split the

11    same or fewer majority black cities in HB-1, and that the plans

12    either do not pair incumbents or can be easily adjusted to not

13    do so.

14          Indeed, as been said many times, plaintiffs' plan looks

14:11:35 15    very similar to the Alabama State Board of Education plan.  And

16    the State Board of Education plan and the congressional plan

17    were both drawn by the same Legislature pursuant to the same

18    traditional redistricting criteria.

19          Your Honors, with respect to *Gingles II* and *III*, Dr. Liu's

14:11:54 20    methodology has been questioned.  Dr. Hood testified on

21    cross-examination that he used the exact same method as Dr. Liu

22    in conducting his racially-polarized voting analysis.  Dr. Liu

23    also found that whether you use any-part black or single-race

24    black, voting is racially polarized, and black people prefer

14:12:15 25    the same candidates.

1    Dr. Liu also testified that the fact that he found that

2  black people, whether he used any-part black or single-race

3  black, voted for the same candidates was consistent with his

4  own research finding that black people, whether you look at

14:12:29  5  black Latinos or other people with varied racial or ethnic

6  identities tend to vote the same.

7    Defendants also allege that partisanship not racism

8  explains white block voting in Alabama.  But no precedent

9  supports the state's theory the plaintiffs are required to

14:12:47 10  prove or disprove why voting is racially polarized.

11    As the Supreme Court said in *Gingles*, the difference

12  between the choices made by black and white voters is not the

13  reason -- it's the difference between the choices made by black

14  and white voters, not the reason for that difference, that

14:13:03 15  results in black voters having less opportunity and violations

16  of the Voting Rights Act.

17    Your Honors, even if this were relevant, Dr. Liu's

18  analysis showed that there was racially-polarized voting in

19  both Democratic and Republican primaries, and that strikingly

14:13:20 20  even in some general elections, majorities of white Democrats

21  voted against black Democratic candidates to support white

22  candidates.

23    Defendants will also knit pick at the totality of the

24  circumstances analysis.  They have asserted that court orders

14:13:37 25  -- certain court orders do not count, but declaratory judgments

1  and consent orders, particularly those containing liability

2  findings are binding court orders like any other.

3      The state has also attempted to argue that Alabama's

4  racial disparities in employment and education are similar to

14:13:55 5  other states.  But Section 2 requires an intensely local

6  analysis of the relevant facts and not a comparison among

7  states.

8      This is because as Dr. King testified, each of the states

9  Alabama references have their own terrible histories of racial

14:14:10 10  discrimination.  And these states past or ongoing instances of

11  discrimination or racial disparities does not absolve Alabama

12  of its own history.

13      Defendants do not come close to over-rebutting any of

14  plaintiffs' evidence going to the totality of the

14:14:28 15  circumstances.

16      Finally, the defendants may argue that it's simply too

17  late for relief to the plaintiffs.  The evidence shows that

18  this is incorrect.  The Court heard how quickly HB-1 was drawn

19  and enacted.  However, no one has ever voted under the maps at

14:14:47 20  issue here.  There is no risk of voter confusion.  As, Your

21  Honor, already said, the primary election is nearly five months

22  away.  The general election is over nearly 11 months away.

23      Your Honor, the plaintiffs have met their four

24  requirements of the preliminary injunction standard.  As our

14:15:09 25  proposed findings of fact and conclusions of law will show, the

1  plaintiffs have shown a substantial likelihood of success on

2  the merits.  They have shown irreparable injury in the form of

3  vote dilution as described by the Supreme Court, the Eleventh

4  Circuit, and district courts across Alabama, the equity

14:15:27 5  strongly favor plaintiffs' interest in exercising their right

6  to vote free from racially discriminatory redistricting, and

7  there is no countervailing weighty concerns the defendants have

8  identified.

9       At this stage, what we are asking the Court to do is

14:15:42 10  extend any upcoming election deadlines and give the state an

11  opportunity to devise new maps that completely cure the

12  constitutional and statutory violations.

13       In sum, this case presents the precise evil the Voting

14  Rights Act was designed to remedy, the dilution of black

14:16:00 15  voters' voting strength.

16       Federal courts, as you know, play a vital role in ensuring

17  that every citizen can participate equally in the political

18  process.  And this Court has the power to order Alabama to

19  remedy the Section 2 violations here by requiring it to draw

14:16:17 20  two black districts.

21       As the Supreme Court has explained, district courts have a

22  duty to cure illegal districts -- excuse me -- districts even

23  through an orderly process in advance of elections.  We simply

24  ask this Court to take up that duty.

14:16:35 25       Thank you, Your Honors.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1    JUDGE MARCUS:  Thank you very much.  Any questions,

2  Judge Manasco or Judge Moorer for Mr. Ross?

3    JUDGE MANASCO:  I have got one.  It's the same one

4  that I asked counsel for the Caster plaintiffs.

14:16:48 5    Mr. Ross, do you see a difference, and if you do, please

6  comment on it for me, between an injunction that directs the

7  use of a map that contains two districts in which black voters

8  would have an opportunity to elect a representative of their

9  choice on the one hand, and, on the other hand, an injunction

14:17:07 10  which requires the use of a map that includes two

11  majority-black districts?

12    MR. ROSS:  Your Honor, we're happy to brief this in

13  our proposed findings of fact and conclusions of law, but I

14  will say that I think the answer, as Ms. Khanna said, is

14:17:23 15  complex.  I think that this Court can and should issue a

16  declaratory judgment saying that the current maps violates

17  Section 2, and then give the Legislature an opportunity to draw

18  districts that cure the violation, obviously working from the

19  illustrative plans.

14:17:39 20    If the Legislature were to draw one district that looked a

21  lot like District 7 and another district that was 45 percent

22  black, or something else, then this Court would need to decide

23  with evidence or argument from the parties whether or not that

24  completely cured the violation.

14:17:57 25    And so I think my answer is simply that the Court has to

1837

1    give -- find the Section 2 violation, give the Legislature the

2    opportunity to cure it, and whatever the Legislature comes up

3    with, whether it's a 45 percent black district and a 50 percent

4    black district, the parties will need to decide then whether or

14:18:19 5    not that cures the violation that the Court finds.

6              JUDGE MANASCO:  Thank you.

7              JUDGE MARCUS:  Anything further, Judge Moorer?

8              JUDGE MOORER:  No, sir.

9              JUDGE MARCUS:  All right.  You broke up your argument

14:18:31 10   in half, Mr. Ross, and only devoted your time to Section 2.  I

11   take it your colleague Mr. Rosborough is going to address the

12   constitutional claim?

13             MR. ROSS:  Yes, Your Honor.

14             JUDGE MARCUS:  Thank you.  Mr. Rosborough.

14:18:48 15            THE CLERK:  You have 10 minutes total of the 30 that

16   was given the 25 that was given.

17             MR. ROSBOROUGH:  Thank you.  Understood.  Thank you.

18             THE COURTROOM DEPUTY CLERK:  Thank you.

19             MR. ROSBOROUGH:  Good afternoon, Your Honors.  Davin

14:19:01 20   Rosborough for the Milligan plaintiffs.

21        My colleague, Mr. Ross, has discussed the compelling

22   evidence that HB-1 violates Section 2 of the VRA by failing to

23   create a second congressional district that will allow black

24   voters to elect candidates of their choosing.

14:19:15 25        The same packing of black voters in District 7 in

1  unjustified numbers and simultaneously cracking of many of the

2  state's black voters among Districts 1, 2, and 3, violate the

3  Fourteenth Amendment to the Constitution as a racial

4  gerrymander.

14:19:30 5      Under HB-1, District 7's registered voter population is

6  just under 60 percent black, and the district contains about a

7  third of Alabama's black voters.  In contrast, Districts 1, 2,

8  and 3 systematically fracture much of the remaining black

9  population into separate districts such that the Black Voting

14:19:52 10 Age Population in each is below 30 percent.

11      This irreparably harms voters in those districts like our

12  clients by subjecting them to unfair racial divisions.

13      Of course, we agree with the Supreme Court in *Bush v. Vera*

14  that district scrutiny does not apply merely because

14:20:07 15 redistricting is performed perform with consciousness of race.

16  States can and should draw black-majority districts when doing

17  so serves the state's compelling interest in complying with the

18  VRA, so long as the districts are narrowly tailored to that

19  end.

14:20:22 20     But here the Alabama Legislature took no action whatsoever

21  to narrowly tailor that use of race in District 7 to comply

22  with the VRA or any other compelling governmental interest.

23  The cracking of black voters across Districts 1, 2, and 3 shows

24  the opposite of VRA compliance.  These establish a violation of

14:20:41 25 the Fourteenth Amendment.

1          There's no dispute that the current districts originate

2    from the maps drawn in 1992 arriving out of the *Wesch*

3    litigation.

4          The parties there agreed that, quote, a single member

14:20:53  5    significant majority 65 percent or more African-American

6    congressional district should be created.  That district was

7    District 7.

8          Mr. Randy Hinaman was the individual who drew the

9    challenged map here, and he also drew that map adopted in '92.

14:21:08 10    He worked on the 2000-cycle maps, and he drew the 2011 maps.

11          Mr. Hinaman admitted that race played a major role in the

12    design of District 7 in 1992.  Other than complying with

13    population requirements, race was his top consideration.

14          He drew District 7 in 1992 with the intent to make a

14:21:28 15    majority-black district, which he accomplished by assigning

16    counties in precincts with high concentrations of

17    African-American voters.

18          Mr. Hinaman also admits that the 2021 districts can be

19    traced back to these '92 districts with each successive map

14:21:43 20    preserving most and as much as possible those districts.

21          Representative Pringle agrees concerning District 7.

22          Even as to the 2011 plans, Secretary Merrill has stated

23    that Congressional District 7 appeared to be racially

24    gerrymandered.  Mr. Hinaman agreed with his assessment.

14:22:02 25          But the plaintiffs have also presented extensive expert

1840

```
      1    testimony of racial predominance.  Dr. Imai's one
      2    majority-minority district simulation showed that the state's
      3    decision to pack a number of black voters from Montgomery
      4    County into District 7 made it a racial outline.
14:22:19 5         Now, the state was considered -- entitled to consider race
      6    for VRA compliance.  But Dr. Imai's race blind maps rebut the
      7    state's argument that race didn't play a role at all and
      8    instead shows the predominant role did it play.
      9         Dr. Williamson also found compelling evidence of racial
14:22:35 10   predominance with the three counties split in District 7
     11    Jefferson, Montgomery, and Tuscaloosa and particularly the
     12    manner of those splits.
     13         Areas of those counties with higher BVAP were drawn into
     14    Congressional District 7 with disproportionately white census
14:22:52 15   blocks within those counties drawn into other districts
     16    creating a range of 25 to 45 disparities in those counties.
     17         The racial predominance evidence in CD 7 is overwhelming
     18    and unrebutted.
     19         As to Districts 1, 2, and 3, the defendants correctly
14:23:07 20   contend that they've maintained the cores of these districts
     21    since the '92 maps.
     22         Yet in '92, the U.S. Attorney General objected to the
     23    Alabama Legislature's plan, which they admit was quite similar
     24    to the *Wesch* plan because it fragmented the rest of the black
14:23:24 25   population outside of District 7.  The AG noted a
```

1  predisposition on the part of state political leadership to

2  limit black voting potential to a single district.

3      Since then, despite black voters in these districts making

4  up around 90 percent of the Voting Age Population necessary to

14:23:42 5  form an entire congressional district, have consistently been

6  held at or below 30 percent BVAP since the '92 maps.

7      The racial heat map from defendants' own expert Mr. Bryan

8  demonstrates the way that the district boundaries slice through

9  the middle of black communities at every turn.  As you can see

14:24:02 10  from the added red lines, Districts 1, 2, 3, and 7, cut

11  directly down the middle of black communities in the Black Belt

12  that are excluded from District 7.

13      Dr. Williamson's analysis confirms this racial cracking

14  isn't due to geography or other factors.  He exposed that black

14:24:19 15  Alabamians are more likely to be diffused across districts in

16  the Black Belt than other regions using multiple measures of

17  analysis, and he showed that for Districts 2 and 3, counties

18  with higher black populations were more likely to border

19  another district, a hallmark of cracking.

14:24:35 20      Dr. Imai also showed likely racial predominance in

21  Districts 1, 2, and 3.  Even when drawn a majority-minority

22  district and considering Mobile and Baldwin and the Black Belt

23  as communities of interest, the second highest BVAP district

24  would tend to have a BVAP in the high 30s and up to 40 percent

14:24:55 25  as opposed to the state's cracking of black voters and

1    preventing any district above 30 percent.

2        Now, Dr. Imai's report shows nothing about the validity of

3    any illustrative plans, of course, because he did not take race

4    into account at all except for one-MMD.

14:25:12  5        Even though this is perfectly admissible under the

6    Fourteenth Amendment and necessary for VRA compliance.  What it

7    does show is isolating the extent of the state's use of race in

8    its maps and how it cracked the black community.

9        In response, the defendants rely on a few primary

14:25:30 10   arguments to try to avoid what the evidence shows.

11       First, they conflate the plaintiffs' racial gerrymandering

12   claim under *Shaw* with an intentional vote dilution claim to try

13   to impose a different standard of proof.  But *Shaw* recognized

14   this is an analytically distinct form of claim from a vote

14:25:46 15  dilution claim.  A racial gerrymandering claim doesn't require

16   an intent to disadvantage black voters, but only that the state

17   that has used race as a basis for separating voters into

18   districts as it said in *Miller*.

19       Second, defendants argued that their maps cannot be racial

14:25:57 20  gerrymanders where they prioritize preserving existing district

21   cores and ignored race while drawing the maps.  But in *North*

22   *Carolina vs. Covington*, the Supreme Court explicitly rejected

23   the argument that one can avoid racial predominance by

24   readopting cores of previous districts and not looking at race

14:26:19 25  when doing so.  And it explained that it didn't matter that the

1  claim arose in a challenge to remedial rather than original

2  districts.

3       The Supreme Court rejected the argument that preserving

4  cores prevented their challenge because the plaintiffs remained

14:26:34 5  segregated on the basis of race because of those lines the

6  state readopted.

7       It explained that it is the segregation of the plaintiffs,

8  not the Legislature's line drawing as such that gives rise to

9  the claims.  Just because a Legislature chooses to readopt

14:26:48 10 those lines does not mean those readopted portions are not

11 relevant.  The Courts in Alabama Legislative Black Caucus and

12 *Clark vs. Putnam County* found racially gerrymander districts as

13 well despite those districts preserving the cores of existing

14 districts.

14:27:03 15      Defendants were well aware of this racial history, and the

16 state even admitted that District 7 under the 2011 plan was a

17 racial gerrymander, yet they chose to di largely readopt these

18 lines in HB-1.

19      Third, defendants argue that Mr. Hinaman didn't look at

14:27:17 20 race while drawing the 2021 maps.  The Supreme Court in

21 *Covington* rejected the same defense.  As is true here, it did

22 little to undermine the evidence concerning the shape and the

23 demographics of those districts that the districts

24 unconstitutionally sort voters on the basis of race.

14:27:34 25      Even looking only at the new district lines shows racial

```
 1   disparities.  The only analysis of those changes in the record
 2   comes from Dr. Williamson.  And he showed that for Districts 2
 3   and 3 black voters were moved out of those districts in much
 4   higher percentages than they were moved in.
 5   	    Finally, defendants cannot rebut plaintiffs' evidence of
 6   racial predominance with any other factor.  Given that they
 7   only changed the lines a little bit, minor changes to make a
 8   district more compact or respond to incumbents would not
 9   predominate.  Mr. Hinaman even testified in his deposition at
10   page 73 that requests for congressional representatives were
11   not major.
12   	    Finally, a state's predominant use of race does not mean
13   the map is unconstitutional.  Instead, the state now carries
14   the burden to show that its separation of voters based on race
15   was narrowly tailored to serve the VRA, and it has not met its
16   burden here.
17   	    In cases where the Court has found the state met this
18   test, the state made a strong showing of pre-enactment analysis
19   would justifiable conclusions.  A majority-black district is
20   constitutional even where race predominates so long as the
21   state had a good reason to draw it.  But narrow tailoring
22   District 7 required the state to assess performance in each
23   redistricting cycle.
24   	    It's undisputed that the state never bothered to ask that
25   question or conduct any form of tailoring for District 7 here.
```

14:27:50
14:28:07
14:28:22
14:28:38
14:28:53

1    The parties agree that no racial-polarization analysis was

2 conducted for any congressional districts.  And Senator

3 McClendon testified that the state did nothing to ensure that

4 the BVAPs of such districts were not too high.

14:29:11 5    If defendants had performed a racially-polarized voting

6 analysis, it would have revealed a lack of narrow tailor.

7 Dr. Liu showed the districts just above 50 percent BVAP or

8 around 53 percent of black registered voters, as proposed in

9 Plaintiffs' Exhibit 1 maps, can perform for black voters, and

14:29:30 10 the VRA offers no safe harbor for cracking black voters among

11 Congressional Districts 1, 2, and 3.  Nothing in the VRA

12 requires or could require the state to keep the black

13 populations in those districts below 30 percent.

14    All of the evidence points to district lines in the

14:29:46 15 challenged districts that separate voters based on race and do

16 not do so in a narrowly tailored manner to comply with the

17 Voting Rights Act.

18    Because HB-1 violates Section 2 of the VRA and the

19 Constitution, the Court should order defendants to redraw the

14:30:02 20 congressional map to create two districts that allow black

21 voters to elect candidates of choice in a manner narrowly

22 tailored to comply with the VRA, such this map will satisfy

23 both the VRA and the Constitution.

24    Thank you, Your Honors.

14:30:18 25    JUDGE MARCUS:  Mr. Rosborough, I have two questions

1  for you.

2     You first, the same question I put earlier to

3  Mr. Blacksher.  The plan as adopted in '92 by the district

4  court in *Wesch* and approved by the Supreme Court on a summary

14:30:41 5  calendar, did that plan violate the Equal Protection Clause in

6  your view?

7     MR. ROSBOROUGH:  Your Honor, I don't necessarily -- I

8  don't think that that plan at that time it was enacted in 1992

9  violated the Equal Protection Clause.  I think the plan became

14:30:58 10  problematic because the state was required to assess the

11  districts with each districting cycle.  And over time, over the

12  last few decades, Alabama has changed.  And yet the state has

13  not performed that analysis.  It certainly hasn't done so in

14  this cycle or the last cycle.

14:31:17 15     And so that district very well may have been and likely

16  was narrowly tailored when it was put into place in 1992, but

17  it no longer is.  And that's an obligation the state has in

18  every cycle, and it ceased to do that here.

19     JUDGE MARCUS:  Second question, a different one.

14:31:36 20     You have presented two different theories traveling on two

21  different causes of action; Section 2 claim, which your

22  colleague has argued, and a constitutional claim.  For the

23  purposes of this preliminary injunction hearing, if you are

24  correct on the Section 2 claim, and I underscore if, would

14:32:05 25  there be any reason for this Court by your lights to address

1  the constitutional question during this preliminary injunction
2  proceeding?

3       MR. ROSBOROUGH:  Your Honor, I think the answer is no.
4  Any remedy for a Section 2 violation would have to be
14:32:27 5  constitutionally compliant.  And, you know, we think our two
6  theories are consistent with each other.

7       So to the extent the state -- to the extent the Court
8  finds the Section 2 violation, no, I don't think it needs to
9  address our constitutional theory.

14:32:40 10       JUDGE MARCUS:  The reason I raise the question, again,
11  assuming you are otherwise correct, which remains to be seen,
12  the reason I raise the question is because there is a long
13  standing doctrine in our court's history and the Eleventh
14  Circuit's history, the old Fifth Circuit history, and in the
14:33:02 15  Supreme Court to avoid constitutional questions, when you don't
16  have to answer them, and they might otherwise be resolved
17  through a statutory construction.  Is that the correct
18  application of that principle of constitutional avoidance in
19  this case?

14:33:21 20       MR. ROSBOROUGH:  I think it is, Your Honor.  If the
21  Court rules that the plaintiffs have likely established -- have
22  met their burden and the Court wants to issue a preliminary
23  injunction on the Section 2 claim, I think it would be
24  appropriate and permissible for the Court to avoid a ruling at
14:33:41 25  this time on the constitutional claim under the canon of

1    constitutional avoidance.

2            JUDGE MARCUS:  Conversely, if you were to lose on this

3    preliminary injunction on Section 2, then this Court would be

4    obligated to address the constitutional claim, correct?

14:33:59  5            MR. ROSBOROUGH:  I think that's exactly right, Judge

6    Marcus.

7            JUDGE MARCUS:  All right.  Thank you.  Judge Manasco,

8    any questions?

9            JUDGE MANASCO:  (Shook head.)

14:34:07 10            JUDGE MARCUS:  Judge Moorer?

11            JUDGE MOORER:  No questions.

12            JUDGE MARCUS:  All right.  We thank you.  The Milligan

13    plaintiffs have reserved five minutes for rebuttal, as well.

14        Mr. LaCour, I thought we would take a 15-minute break, and

14:34:21 15    then when we come back, we would be happy to hear your

16    argument.  You have a full 90 minutes toward that purpose.  You

17    can use as much or all of it as you see fit.

18        With that, we will be in recess for 15 minutes.

19            (Recess.)

14:48:43 20            JUDGE MARCUS:  I see Mr. LaCour.  Are counsel for the

21    plaintiffs present?

22            MR. BLACKSHER:  Singleton is here.

23            JUDGE MARCUS:  Thank you, Mr. Blacksher.  I see

24    Mr. Ross and Ms. Khanna, as well.  We are ready to proceed,

14:50:36 25    Mr. LaCour.  Thank you.

1          MR. LACOUR:  Thank you, Your Honors.

2          This case represents an extraordinary attack on an

3     ordinary map.

4          We have here an equal protection claim that lacks any

14:50:52  5     mention of the current Legislature's intent, and we have a

6     Section 2 claim in which the plaintiffs themselves have proven

7     through two of their experts that you could not draw two

8     majority-minority districts if you drew based only on

9     traditional race-neutral districting principles.

14:51:09 10          So plaintiffs' equal protection claim fails because

11     traditional race -- redistricting principles were not

12     subordinated to race in the 2021 Legislature's map.  And

13     plaintiffs' Section 2 claims fail at *Gingles I* because in each

14     of their 11 illustrative plans, traditional redistricting

14:51:28 15     principles are subordinated to race.

16          But before I get into the merits any further, I did want

17     to touch on the fact that the burden is incredibly high here.

18     Not only are they seeking an injunction, which is an

19     extraordinary and drastic remedy in and of itself, they're

14:51:46 20     asking for what essentially would be a mandatory injunction

21     where the burden would need to be even higher on them.

22          Let me move to the other laptop closer.  Is this a little

23     bit clearer?

24          JUDGE MARCUS:  It is.  Thank you.

14:52:10 25          MR. LACOUR:  Thank you.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1    So we are talking a preliminary injunction which in and of

2  itself is an extraordinary and drastic remedy, what would

3  essentially be a mandatory injunction because the Legislature

4  would need to act to put in place new maps on a very expedited

14:52:31  5  time frame.  And then we're adjudicating a redistricting, which

6  the Supreme Court has repeatedly said is a serious intrusion

7  into the most vital of local functions.  There are complex

8  interplays here.  And in addition, you must presume the good

9  faith of the Legislature and exercise extraordinary caution

14:52:48  10  particularly when you are adjudicating racial gerrymandering

11  claims like those brought by the Singleton and by the Milligan

12  plaintiffs.

13    So I will turn first to the equal protection claim because

14  I do think some of the evidence you heard from the Milligan

14:53:04  15  plaintiffs actually benefits us tremendously when it comes to

16  the Section 2 claim.  So I will start with equal protection and

17  move to Section 2 after that.

18    But if the Court has any questions, I am not here to give

19  a monologue.  I would love to hear what is on each of your

14:53:21  20  minds and try to answer any questions you right have.

21    But again, evidentiary burden is particularly heavy for

22  the plaintiffs for a racial gerrymandering claim.  It is not

23  enough to merely prove that the Legislature was aware of race.

24  After all, the Legislature was, of course, aware that District

14:53:37  25  7 was going to contain at least one black woman, Terri Sewell.

1    They knew that District 6 was going to contain at least one
2    white man, Gary Palmer.  You have to show that race
3    predominated, and that means that it subordinated traditional
4    districting principles.
14:53:52 5         And in addition, keep in mind we are looking at the -- we
6    are looking at intent of the Legislature, which any time you
7    are dealing with any law, it's going to be a particularly
8    difficult inquiry.  We are talking 35 Senators, 105 members of
9    the House, the Governor, who signed this into being, and the
14:54:15 10   best intent -- the best evidence of intent of any law is to
11   look at the text.
12        Now, of course, the text here is a lot of coordinates.  So
13   I think looking at the map is particularly good evidence.  And
14   I will briefly share I think a map that everyone is well
14:54:32 15   acquainted with at this point.
16        If I can find it.  There we go.
17        So, again, this is the map that Tom Bryan prepared that
18   was part of Defendant's Exhibit 2, and this is page 52.  And as
19   we talked about a lot with a lot of witnesses this past week
14:54:55 20   and a half, this demonstrates some of the changes from the 2011
21   lines to the 2021 lines.
22        As we also establish through many witnesses and is evident
23   in a lot of the case law that we have cited in our PI response
24   that you will see in our findings of fact and conclusions of
14:55:13 25   law we submit Friday, it is a quite common thing for a

1852

14:55:33

14:55:50

14:56:08

14:56:26

14:56:47

```
 1   Legislature when it sits down to draw lines every ten years to
 2   start with the previous map.  That's what we have here.  Again,
 3   these light blue lines show where the changes were made from
 4   the 2011 map to the 2021 map.
 5       Now, the unrebutted testimony in this case from the map
 6   drawer is that his goal was to start with the guidelines.  He
 7   was handed the guidelines by the legislative redistricting
 8   committee, which I will note, those were voted on by the
 9   Legislature.
10       So it is a brief aside, but you heard some evidence or
11   testimony suggesting that the Legislature didn't have input and
12   that its process of drawing the map was outsourced to the
13   congressional district.  That's -- that's not true.  What
14   happened was you had a redistricting committee that came
15   together, that voted on and approved guidelines by an
16   overwhelming margin.  One of the Democrats who voted in favor
17   of these guidelines was none other than plaintiff Senator Bobby
18   Singleton.
19       So for him to come to this Court and express surprise that
20   we ended up with a map that retained the course of districts
21   that minimized population deviation down to one person one vote
22   and that it tried to minimize county splits and protect
23   incumbents while trying to be compact is -- it's not quite
24   unclean hands, but it's a little bit disingenuous.
25       In any event, turning back, it's clear how we got to where
```

we got in 2021 in district -- between Districts 2 and 3 here on

the eastern border of District 2.  You have a line where

Montgomery County -- split Montgomery County was taken away.

That's consistent with the guidelines to minimize splits of

14:57:09  5    counties.

You have -- if you are looking down between Districts 1

and District 7, you had the split of Clarke County closed off

to return all of Clarke County to District 7 and consistent

with that traditional race-neutral districting principle.

14:57:27 10    Then if you look up to District 7 on the north side, as

Mr. Hinaman explained is undisputed here, District 7 was lower

on population when compared with the other districts by about

53,000 people.  We needed to find 50,000 -- 53,000 new people

to add to District 7, and he did consistent with the guidelines

14:57:54 15    that says how to draw compact districts was to make this a far

more regular district.  By this line here that you are looking

at, the former line of District 7 going into Jefferson County

was far more narrow, for less regular and instead he broadened

that out.

14:58:15 20    Now, that required taking away some of the northern tip of

that line, and as a result, there was some population from the

Homewood area was moved from District 7 -- District 6, rather,

into District 7.  And then finally, to equalize population and

to get more population, they had to go to another

14:58:37 25    population-dense county that had already been split.  That was

1    Tuscaloosa County, around here.

2         I will return to this in a moment when we talk about

3    Dr. Williamson, why his analysis really is -- easily has no

4    bearing on the ultimate issue of whether race predominated in

14:58:57 5    this map.

6         But --

7              JUDGE MARCUS:  Can I ask you a question about that

8    map?

9              MR. LACOUR:  Yes, Your Honor.

14:59:05 10              JUDGE MARCUS:  When the map was drawn in '92, it's

11    clear that that thumb sticks all the way into Jefferson County

12    and places it in District 7, and pretty much everybody

13    including the cartographer, Mr. Hinaman, has said that that was

14    done for a predominantly race-based reason, that is to say, to

14:59:31 15    create one majority-minority district.

16         I think I have those facts right on that, right?

17              MR. LACOUR:  Yes, Your Honor.

18              JUDGE MARCUS:  Did race predominate when they drew the

19    map in '92?

14:59:46 20              MR. LACOUR:  Yes, it did.  But that only gets you to

21    the second step of scrutiny.

22              JUDGE MARCUS:  Correct.  So get me to the second step,

23    if you would.

24              MR. LACOUR:  Yes.  And so I do want to be clear.  Our

15:00:00 25    argument here is not that the VRA justifies the drawing of this

1855

1    map in -- drawing of CD 7 currently.  At least, that's not an

2    argument we have developed at this point.  Our argument is that

3    this is not a map in which race predominates, because a law

4    that happens to look a lot like another law from the past could

15:00:22  5    be passed for entirely different reasons.

6        What's relevant is not the intent of the 1992 Legislature,

7    or to be more accurate, the 1992 three-judge court that

8    ultimately ordered this map into effect.  What's relevant is

9    the 2021 Legislature.

15:00:40 10        That's what the Court said -- the Supreme Court said in

11    *Abbott vs. Perez*.  There you have a 2011 map of the Texas

12    Legislature that was deemed unlawful, a new map was put in

13    place by a court, by the three-judge court at issue there for

14    the 2012 elections, and then in 2013, you had the Legislature

15:01:02 15    enact a new map that looked a lot like the court-ordered map.

16    And then when the district court later reconsidered, said,

17    well, you didn't sufficiently purge the discriminatory intent

18    from the map that we had ordered you to conduct your election

19    on, on an interim basis, the Supreme Court said, well, no, the

15:01:22 20    2011 Legislature's intent is not the relevant inquiry here.  It

21    is the 2013 Legislature's intent.

22        And I take the point from the Milligan plaintiffs that --

23    I believe the Singleton plaintiffs, too, that was an

24    intentional vote dilution claim and not a racial gerrymandering

15:01:36 25    claim.  But both of those are products of the Equal Protection

1  Clause.  And to state a claim under the Equal Protection Clause
2  you have to show intent.  Whose intent?  The intent of the
3  actor whose law you are challenging.

4      If I took one of my son's puzzles that had -- alphabet
15:01:54 5  puzzles, and I threw it up in the air, and at random, a couple
6  of words were spelled, I didn't intend to spell the words.
7  That was done at random.

8      Similarly, there could be very different -- but if I
9  purposefully arrange the letters to spell a word, there is
15:02:10 10  intent behind that.

11      And so then we have to ask, well, what was the intent that
12  led to this act, Act 2021-555?  And we have excellent evidence
13  to show the race-neutral reasons that produced this map.  It's
14  there in the guidelines that plaintiff Singleton voted for.
15:02:31 15  It's there.  It just jumps off the face of the map if you look
16  at it.

17      And we are not really getting any sort of -- I mean, there
18  wasn't really any sustained argument against that, other than
19  the statistical analyses that you heard about from Drs.  Imai
15:02:48 20  and Dr. Williamson.  And I am happy and eager to address those
21  in a minute.

22      And then this idea that there is some affirmative
23  obligation for the state to purge a gerrymander.  But that's
24  directly contrary to *Abbott*.  It's also directly contrary to
15:03:05 25  *Cromartie*, which a case we cited right there, page 1 of our PI

1    response.  And I will find the exact quote, if you have just a

2    moment.  But it's *Easley v. Cromartie*, 532 U.S. at 249.  And

3    what the Supreme Court said was, the Constitution does place an

4    affirmative obligation upon the Legislature to avoid creating

15:03:28  5    districts that turn out to be heavily even majority-minority.

6        So if you follow traditional districting principles, you

7    are fine.  And that's exactly what we have here.  That's black

8    letter law.  And I have not seen an answer to it from any of

9    the plaintiffs in the three reply briefs that we got.

15:03:47 10        Similarly, like *Miller vs. Johnson* said that adhering to

11   traditional districting principles instead of creating as many

12   majority-minority districts as possible does not support an

13   inference that the plan discriminates on race.

14        So it's not enough for them to come here and say that

15:04:04 15   there's more we could have done equal to lower the Black Voting

16   Age Population, because the Equal Protection Clause does not

17   put some sort of racial ceiling on a district.

18        I think *Cromartie* says quite to the contrary.  And if we

19   were to go about unpacking, I think that would be a much more

15:04:24 20   race-conscious action.  I think what they are -- what the

21   Singleton and Milligan plaintiffs are demanding of us raises

22   far more Equal Protection Clause issues than what the

23   Legislature did here, which was draw lines race neutrally, come

24   up with race-neutral districting guidelines, hand them over to

15:04:45 25   the map drawer, and expressly tell them, draw maps on a

race-neutral basis, and all of the testimony is that that is exactly what he did.  That is how the map appears, as well.

They have not pointed to changes in the map that would suggest that they were done for some racial purpose.  And if you look at the White Voting Age Population, the trends there, 1992, I believe it was around 63 percent of Black Voting Age Population.  Then you move to 2011, we were sitting around 60 percent.  If you move to 2021, we're down to 54 percent.  If we're trying to pack, we are doing a pretty bad job of it.  But the answer is, is like there was this intervention in Alabama political history in 1992 that produced this map.

But there's no equal protection obligation to keep an eye on racial demographics and make sure that we undo it at just the right moment.  And that's for the import of the position that's being pushed by Singleton plaintiffs and by the Milligan plaintiffs.  But it's, again, directly contradicted by cases like *Easley vs. Cromartie* and *Abbott vs. Perez.*

JUDGE MARCUS:  I think you have answered my question.  Thank you.

MR. LACOUR:  Excellent.

Then I will turn briefly to Dr. Williamson's analysis and why it proves nothing in this case.  Really, for a similar reason to Dr. Imai's, neither of them started with the prior map.  Their analysis was based on a fanciful premise that there was a blank slate and said if Alabama were to draw a map

1    starting at year 0, Alabama has a completely blank map other

2    than some county lines, I suppose, and they were to draw a

3    line, and they were to draw lines for the first time ever, you

4    wouldn't expect to see splits in CD 7 and in CD 2 and in CD 3.

15:06:51  5        Well, while professors might draw maps on blank slates,

6    that's not what legislatures do, and that's not what the

7    Legislature did here either.  So that the obvious alternative

8    explanation to borrow language from *Iqbal* for why there are

9    splits in Tuscaloosa County and in Jefferson County and in

15:07:11 10   Montgomery County, is because they were already there.

11        And so unless there is some sort of new affirmative

12   obligation to every ten years try to unpack minority voters

13   through some race focused process, under the Equal Protection

14   Clause, which would be, again, very bizarre, his analysis

15:07:34 15   really shows nothing.

16        And then he talks about the fact that some of the voters

17   who were being added to District 7 were more likely to be black

18   voters than those who are being taken out, and I will pull up

19   the map one more time we were just looking at just to sort of

15:07:53 20   underscore why that is through a flawed way to look at things

21   or give to give the obvious alternative explanation.

22        So you have got some voters here between Districts 7 and

23   4.  This is Tuscaloosa County.  And you see that blue line.

24   Well, the reality is, I mean, District 7 has a population of --

15:08:15 25   a black population percentage of about 54 percent.

1      So most places you go in District 7 are going to have the

2   substantial black population, and most places just across the

3   line into District 4 are going to have a somewhat similar black

4   population percentage.  So we couldn't -- because of

15:08:35  5   contiguity, we couldn't just jump over south Tuscaloosa County

6   and go pick up voters from the more predominantly white part of

7   Tuscaloosa.  And so that's again another obvious alternative

8   explanation there.

9      Similar issue if you look down to Districts 2 and 3, we

15:08:52 10   were closing off Montgomery, and when you do that, like you're

11   going to pick up people based on whoever happens to be in that

12   part of Montgomery.  Going back down to closing the county

13   split at Clarke County between 7 -- District 7 and District 1,

14   and Clarke County is a Black Belt county.  And when they close

15:09:14 15   that split you get down to the minimal number split of six, you

16   heard about when Dr. Duchin was testifying that was an easy and

17   obviously to do that.

18      So, again, I don't think his analysis sheds any light on

19   the real world reasons why the scores of legislators who voted

15:09:36 20   for Act 2021-555 decided to vote for this particular piece of

21   legislation.

22      Now, turning to Dr. Imai, this is where it really gets

23   fun.  Dr. Imai ran 10,000 -- Dr. Imai was the expert if you

24   recall who had his algorithm that could produce thousands and

15:10:07 25   thousands of maps.  And what he testified to was that he

1    programmed in to his algorithm -- and I will try not to read,

2    but I think I want to make sure I really get this -- really get

3    this right.

4         So here's how the Milligan plaintiffs describe what

15:10:29  5    Dr. Imai did.  This is coming from Milligan docket entry 69,

6    page 26, if you look at the ECF pagination.  They said, quote,

7    he created an algorithm that produced 10,000 simulated plans.

8    His race-neutral simulation drew maps that followed the stated

9    guidelines of creating seven contiguous districts keeping

15:10:50 10    population deviations to a minimum and never above .5 percent

11    developing districts that are reasonably compact, respecting

12    county boundaries where possible, and avoiding incumbent

13    pairings.

14         Then what the Milligan plaintiffs describe as their

15:11:05 15    striking finding is that of the 10,000 generated districts, not

16    a single simulated plan had a BVAP as high as District 7.  BVAP

17    being Black Voting Age Population.

18         What I would note for this Court is that it appears that

19    none of the 10,000 maps included even one district of

15:11:24 20    50 percent Black Voting Age Population, and in the Milligan

21    plaintiffs' view, they said, quote, this alone shows that HB-1

22    used race as a predominant factor.

23         Now, I will return to that in just a moment.  Let me first

24    explain why that's wrong as to HB-1.  It's wrong to HB-1 for

15:11:44 25    the reasons Dr. William's analysis is completely flawed, too.

Dr. Imai said he could have factored in core retention to his

algorithm.  He could have included an additional traditional

districting principle.  He decided not to.  Maybe if he had

included it, his analysis might have shed a little bit of

15:12:05  light.  But I think he said he wouldn't have really been able

to tell if race was doing anything if you had included the

cores of the previous districts.

So, again, if you start with a fanciful premise of the

blank slate map draw, you are going to get irrelevant results.

15:12:22  But interestingly, even when he's not constrained by core

retention, which means he has more discretion, he has more

ability to go out and find majority-minority districts,

consistent with traditional districting principles except for

one that he sort of arbitrarily decided to scrap, he still

15:12:41  couldn't find even one 50 percent BVAP district much less two.

And that is critical when we move to the *Gingles I*

analysis because what plaintiffs have essentially done -- if I

was the Caster plaintiffs, I might be a little upset with

Milligan plaintiffs at this moment, but what they have done is

15:13:01  they have shown to almost a mathematical certainty that if the

Alabama Legislature had sat down with Dr. Imai's algorithm and

said, let's figure out if it's possible to find a second

majority-minority district in Alabama, let's draw 10,000 maps

that all comply with our traditional nonracial districting

15:13:22  criteria, not one of them would have even one majority-minority

1    district much less two majority-minority districts.

2         It follows -- and then Dr. Duchin does one better.  She

3    said when she ran her algorithms, the algorithms she ran to get

4    her maps here, she made it a non-negotiable factor that there

15:13:46 5    be two minority-majority districts.  So wherever any

6    traditional districting criteria came into conflict with race,

7    race was going to have to predominate.

8         And we heard individual testimony -- testimony from her

9    and Dr. Cooper saying -- not from Dr. Cooper -- from Mr. Cooper

15:14:00 10   rather that there were times when they were looking to split

11   precincts and decided to do it on a racial grounds to make sure

12   that they kept hitting the racial targets to make sure they

13   keep sorting voters based on race.

14        But Dr. Duchin said she ran 2 million maps in Alabama with

15:14:20 15   traditional districting criteria, albeit not core retention,

16   and so, again, she was freer than our Legislature would have

17   been to see what was out there in the world of race neutral but

18   otherwise traditionally drawn maps.  2 million maps, and not

19   one of them had two majority-black districts.

15:14:40 20        What that means is race necessarily has to predominate if

21   you are going to get a second majority-black district in

22   Alabama.  And if that's the case, I ask you to put yourself in

23   the shoes of the Legislature.  They run their 2 million maps.

24   They're trying do their best to comply with Equal Protection

15:15:02 25   Clause and comply with Section 2 of the VRA.  They see that it

1  is -- you can't even get a one in a million map, not even a one

2  in two million map, that has a second majority-black district

3  consistent with the guidelines.

4      So then it would fall to them to decide, okay, which

15:15:21  5  guidelines should we toss in favor of race?  Core retention,

6  out the door.  Incumbency protection, out the door.  Which

7  should we compromise in favor of race?

8      Well, compactness.  We know compactness was compromised

9  because if you look at our District 2 in the 2021 map, and you

15:15:36 10  look at their District 2, their Districts 2 do bizarre things

11  and stretch -- they split Mobile and stretch from Mobile all

12  the way to Russell County on the Georgia border.

13      Compromise at least in three of Dr. Duchin's maps on

14  county splits where she had seven, eight or nine splits instead

15:15:54 15  of six.  And I think you can look at her maps and the racial

16  heat maps and see exactly why she was doing that.

17      So then the question is, like, what is the Legislature

18  supposed to do?  And then second, I mean, how is the

19  Legislature supposed to know which traditional race neutral

15:16:13 20  districting criteria they are supposed to scrap in favor of

21  race, how many of them they are supposed to scrap, and how much

22  should race predominate in the districting process such that

23  they can comply with Section 2, but they're not violating the

24  Equal Protection Clause?

15:16:31 25      And then, I mean it's an unhappy task for you all because

```
 1  how are you all supposed to decide when the Legislature has
 2  struck that racial balance correctly?  And I don't think -- I
 3  don't think there is a judicially manageable principle that
 4  would allow you to do that.  I mean, look back at Rucho vs.
15:16:49  5  Common Cause just from 2019.  That was the end of the long
 6  journey to try to find a judicially manageable principle to
 7  determine how much partisanship was too much in a redistricting
 8  process.
 9      And the Court finally said like, look, we just cannot
15:17:05 10  figure this out, there is not a good way to do it.  How much
11  more so when you have got equal protection overlays factored in
12  here, how much -- how much should race predominate over
13  traditional districting principles?  And we would contend that
14  the Court has already answered that and said none.
15:17:24 15      What Section 2 demands of a plaintiff trying to establish
16  that there is a reasonably compact district out there is that
17  they need to show consistent with traditional race-neutral
18  districting principles, you could draw that additional
19  majority-minority district.
15:17:43 20      And I think that's pretty clearly established from the
21  extensive litigation in the 1990 s over Georgia's maps.  And
22  excuse me for just a second.
23      So if you will recall, there was a sort of a trilogy of
24  cases and I think if you are looking for some of our like --
15:18:10 25  cases that are really resolve this -- one of the cases that
```

really resolves this would be that *Miller*, which is the '95

U.S. Supreme Court case, then *Johnson*, which is the remand to

the Southern District of Georgia, followed by *Abrams* which

affirmed -- which affirmed in *Johnson*, which affirmed the

*Johnson* decision.

        And -- and it was interesting a moment ago counsel for

Milligan was referencing the 1992 DOJ objection to Alabama's

plan and was saying, like -- I guess it is evidence that

Alabama could have drawn a second majority-black district and

then really should have, and there was something sort of

suspicious that Alabama didn't do that in 1992.

        Well, look at the *Miller vs. Johnson* case because what

happened to Alabama there is exactly what happened to Georgia,

where Georgia had just gone from 10 districts to 11 districts

after the 1990 census.  And Georgia, just like Alabama today

had 27 percent black population.  And the Georgia Legislature

looked everywhere to try to find a second majority-black

district.

        They had one that was sort of centered around Atlanta.

They were looking around to try to draw a second that was

consistent with their traditional race-neutral principles.

They came up with a map, sent to it DOJ, and DOJ said, no.  We

have a max-black policy.  You need to draw three districts, not

just two, because three will get you to proportional

representation, 27 percent, which if that sounds familiar,

that's essentially what the plaintiffs are asking for here is
proportional representation despite the fact that Section 2
expressly says, nothing herein shall guarantee a right to
proportional representation.

15:19:52    But, anyway, returning back to Miller, Georgia finally got
the message.  They drew their three majority-minority
districts, hit that proportional representation target, but
they had subjugate traditional race-neutral districting
principles to do that.  And then they got sued under Equal
15:20:12 Protection Clause claim, and the Supreme Court in *Miller* said
that they did violate the Equal Protection Clause, and the case
got remanded back to *Johnson* -- or back to the district court,
which then produced the Johnson opinion.

         And the three-judge court there ultimately had to draw
15:20:29 maps itself because the Georgia Legislature dead locked and
couldn't pass a map.  And I think what the Court did there
should be very instructive for this Court, too.  They looked at
traditional districting principles of Georgia.  One of them was
that was Georgia had a long tradition of having a district in
15:20:48 each of the four corners of the state.

         Of course, here in Alabama, we have a long tradition
dating back to at least the '70s of having a southwestern
district anchored by the Gulf, a southeastern district anchored
by the Wiregrass, and a northern District 5 that runs through
15:21:05 Tennessee Valley.

1        They also looked at the tradition of having a

2   majority-black district -- or anchored by Atlanta -- looked at

3   some of the other traditional districting principles, I believe

4   core retention was mentioned, and then ultimately said as part

15:21:22 5   of its Section 2 compactness analysis, we can not even draw a

6   second compact majority-minority district.

7        Again, despite the fact they had 27 percent just like

8   Alabama today, and they have 11 districts to work with, not

9   just 7, they said, we cannot consistent with Section 2 draw a

15:21:42 10   second majority-minority district.  If you look at -- and this

11   is what they said.  If you look at nonracial factors, it is

12   just not going to be doable.  And that was a ruling.  They

13   approved new map that had only one majority-black district, and

14   that got taken up, and the Supreme Court cited -- had to

15:22:01 15   consider whether the Section 2 analysis was correct, and the

16   Supreme Court affirmed, and that's when the Supreme Court said

17   Section 2 does not required a state to draw a predominantly

18   nonracial lines a map that is not reasonably compact.

19        What that means is you start with traditional race-neutral

15:22:18 20   districting principles.  And race cannot predominate.  That

21   does not mean Section 2 is not going to do anything.  I'm sure

22   you will hear that from Caster plaintiffs and the Milligan

23   plaintiffs when they beam back in, in just a little bit.

24        But I think, Judge Marcus, you referenced *LULAC* a moment

15:22:38 25   ago.  I think *LULAC* is a great example of where Section 2 can

1   really do some work in a vote dilution case without requiring a

2   state to subordinate traditional race-neutral districting

3   principles to race in its redistricting process.  There you had

4   District 23 and District 25 at issue.

15:23:05 5       District 23 is interesting in that it had a -- it had

6   52 percent Latino CVAP there.  They had a sufficiently compact

7   majority-minority population that came up just shy of Alstein

8   (phonetic), an incumbent.

9       When the Texas Republican party took back the House and

15:23:29 10  the Senate, they did a they redrew the lines, and they pulled

11  100,000 Latinos out of District 23, and they plugged 100,000

12  Anglo-Texans into District 23 to try to protect the incumbent.

13  And what the Supreme Court said there was, well, clearly

14  there's a compact district.  And we know it is a compact

15:23:53 15  distract -- that you could draw a compact District 23 that had

16  a majority-minority population because it was already there.

17  It had been there before.

18      And so Section 2 did some work in that instance and -- and

19  what Texas did there was deemed to be violative of -- violative

15:24:12 20  of Section 2.

21      Now, in that same case, you had District 25 at issue.  And

22  the reason District 25 got drawn was because Section 5 was

23  still in effect at the time in Texas.  And Texas sort of undid

24  this Latino opportunity district in 23, in order to satisfy

15:24:31 25  preclearance, they drew a new Latino opportunity District 25.

1          Now, the problem was kind of like plaintiffs' District 2

2    in this case, they were combining disparate minority

3    populations.  They started around the Rio Grande.  They

4    stretched north and kept whole counties.  It's not that

15:24:51  5    terrible of a looking district, but stretched all the way up to

6    Austin to pull in Latino voters from Austin.  And the fact that

7    these voters in Austin and these voters on the Rio Grande both

8    wanted to elect Democrats wasn't enough to make them part of

9    one big community of interest.

15:25:07  10         The -- Justice Kennedy's opinion is clear.  You can't just

11    assume from a group of voters' races they think alike and share

12    the same political interests and prefer the same candidates.

13              JUDGE MARCUS:  Let me ask you about that case, if I

14    can for a moment.

15:25:24  15              MR. LACOUR:  Absolutely.

16              JUDGE MARCUS:  The problem there as you have pointed

17    it out, and the Supreme Court highlighted it in Justice

18    Kennedy's opinion was that the Legislature took a certain

19    portion of the Hispanic population found in Austin, Texas, and

15:25:42  20    combined it with a certain portion of the Hispanic population

21    300 miles away on the Texas/Mexican border.  And there was

22    nothing apparently that tied the interests of the folks they

23    took from Austin to the population they combined it with on the

24    Mexican/Texas border.  That was the problem.  It was a big

15:26:13  25    elongated district, covered a whole lot of geography, and like

a bar bell on each end, you had disparate Hispanic communities.

That would be a fair description of what was going on and what

troubled the Court there.  Do I have that right?

             MR. LACOUR:  Yes, Your Honor.

15:26:31      JUDGE MARCUS:  I want you to help me with the

comparison to this case.

       The plaintiffs say the difference here is, one, the

district isn't as big elongated.  It's nothing like 300 miles;

and, two, that the African-American population is equally

15:26:57 distributed throughout that entire rectangular shape; and,

three, that there is a recognized community of interests in

that district.

       Are those observations accurate, and do they fairly

distinguish *LULAC* from this case in your view?

15:27:22      MR. LACOUR:  I don't think their observations are

accurate.  First of all, note, everything is bigger in Texas.

It makes sense they will be able to stretch their districts a

little bit bigger than we might be here.

       I think the districts they have draw here are still like

15:27:34 incredibly unusual in how they stretch from Mobile all the way

to the Georgia border.

       In fact, if you look back at the *Wesch* decision from 1992,

the Court ultimately was trying to decide between two different

plans -- the Reed Plan and the Pierce Plan.  Ultimately,

15:27:51 decided against the Reed Plan, in part, because it was going to

1    split Mobile and stretch all the bay to Georgia, and the Court

2    said that's not compact.  The Court also said it's going to

3    scuttle the core retention of existing Districts 1 and 2, and

4    that's as a result, it's going to do a poor job at preserving

15:28:12  5    communities of interest.

6        So we don't just make this up yesterday.  This is

7    something a court in Alabama recognized 30 years ago.  But to

8    return more to your question, one, I don't think their plan is

9    really all that focused on that community of interest of the

15:28:31  10    Black Belt.  And this is something I really want to make sure

11    is abundantly clear for the record.  There are just fundamental

12    misstatements about what their plans and our plans do with the

13    Black Belt.  Both Caster and Milligan state that we split the

14    Black Belt counties among four districts.  That's not true.  We

15:28:51  15    split among it three.

16        In the Caster reply, they state they put all the Black

17    Belt counties into one district.  That's flatly false.  They

18    split into three districts just like we did.

19        Similar, the Milligan plaintiffs assert that one of their

15:29:04  20    plans puts all 18 of their Black Belt counties into just two

21    districts.  That's not true either.  That's Plan D.  If you

22    look, part of Pickens County is in a third district.  So I

23    think all the plans in terms of keeping Black Belt counties

24    together do about the same.

15:29:21  25        Most counties of the Black Belt are in just two districts

1    in our plan and in the illustrative plans, but each of the

2    illustrative plans and our plan has at least one if not two

3    that stretch into a third district.

4         So -- and I don't think that was necessarily a conscious

15:29:40  5    misrepresentation by the plaintiffs, but I do think it

6    underscores the risks of trying to adjudicate such complicated

7    factual and legal issues on such a short basis that things like

8    that can be missed.  But I will return to the equities later.

9         Getting back to communities of interest.  I think the way

15:30:00 10    they have tried to define communities of interest is to

11   basically make it synonymous with race.  And I think LULAC

12   talks about the fact that there are nonracial communities of

13   interest.  And if you are allowed to just paper over that and

14   make communities -- define community of interest so broadly as

15:30:20 15   to really be tantamount to race, then you have -- like I think

16   you start to create equal protection violation -- equal

17   protection questions within Section 2.

18        And I mean, think about it this way, as well:  I mean, it

19   would invite legislatures to engage in packing and to bless

15:30:37 20   that packing.  This isn't racial gerrymandering.  We are just

21   putting all the black people who are all part of one big

22   community of interest into one big district.  I mean, that's

23   not racial.  That's just communities of interest, you guys.  I

24   mean, that clearly cannot fly.  The Court should be very

15:30:56 25   cautious before embracing a theory like that.

1    Moreover, Dr. Duchin said her goal wasn't just to pair

2    communities of interest or pair Black Belt counties together

3    within districts.  It was expressly to put them into

4    majority-black districts, and I'm not aware of any traditional

15:31:15 5    districting principle that would say it's vital not only to

6    keep communities of interest together, but to make sure they go

7    into certain racially composed districts.

8        I mean, Mountain Brook is a like famous community in

9    Alabama.  It's predominantly white.  It has its own school

15:31:34 10    system and shops and other things that I am sure people find

11    sort of unique and special about it who live there.  If the

12    Legislature said it's really important that we put Mountain

13    Brook a majority-white district and pair them with suburbs of

14    Huntsville, I mean, that would be an obvious equal protection

15:31:51 15    violation right there.

16        And I don't think there's any -- anything really that's

17    better about the particular proposal being pitched by the

18    plaintiffs in this case.  I mean, certainly I don't think they

19    have done must have have much to establish some connection between

15:32:08 20    the Black Belt and Mobile.  And you heard from plaintiff Dowdy,

21    she said, my great, great, grandparents migrated to Mobile from

22    the Black Belt.  But she also has family in Huntsville and

23    family in Birmingham.  And I am sure she has cousins elsewhere

24    in the state and possibly elsewhere.

15:32:22 25        There are plenty of African-Americans who left the Black

1  Belt at some point for Chicago and for Detroit through part of

2  the great migration.

3      I don't think they're part of a community of interest with

4  anybody in Lowndes County or in Barbour County.

15:32:38  5      So and finally, and we have communities of interest that

6  we have proposed that really can be kept --

7          JUDGE MARCUS:  Can I ask you -- before you go on to

8  those communities of interest, I take it you agree that there

9  is fairly defined a community of interest that comprehends the

15:33:05 10  Black Belt, however you define that geographic mass, right?

11  You agree with that?

12          MR. LACOUR:  I think there's certainly evidence that

13  the Black Belt has unique aspects that could constitute a

14  community of interest.

15:33:20 15          JUDGE MARCUS:  The reason I asked is we have said it

16  in opinions that the Black Belt constitutes a community of

17  interest, not the only community, but a community of interest.

18  And I just want to ask you whether you agree with that or you

19  think that's not so?

15:33:39 20          MR. LACOUR:  I would not dispute what this Court has

21  said.

22          JUDGE MARCUS:  And it would be marked by rural

23  agrarian rooted in the soil -- richness of the soil, et cetera,

24  that would constitute a community of interest, right?

15:33:59 25          MR. LACOUR:  Yes.

| | |
|---|---|
| 1 | JUDGE MARCUS:  How far would that community of |
| 2 | interest extend as you see it?  What would be bounded within |
| 3 | that community?  18 counties or something less? |
| 4 | MR. LACOUR:  I think we have... |
| 15:34:16 5 | JUDGE MARCUS:  Or something more. |
| 6 | MR. LACOUR:  Stipulated to 18 counties that go from |
| 7 | Pickens over to Barbour and some of those counties in between. |
| 8 | JUDGE MARCUS:  Thanks very much.  I didn't mean to cut |
| 9 | you off.  And you were about to turn to the Gulf Coast |
| 15:34:34 10 | community of interest, I think. |
| 11 | MR. LACOUR:  Yes.  I will note that these communities |
| 12 | of interest are not new inventions of the state.  I mean, they |
| 13 | are -- you can see them if you look back at the maps from the |
| 14 | 1970s.  You can see them referenced expressly in the |
| 15:34:57 15 | three-judge court's decision in *Wesch* in 1992.  And you heard |
| 16 | from former Representative Byrne today, and it was also his |
| 17 | testimony in the record from *Chestnut* litigation, former |
| 18 | Representative Joe Bonner's testimony, as well, about the |
| 19 | unique interests there. |
| 15:35:14 20 | We have heard as well from plaintiffs, like plaintiff |
| 21 | Shalela Dowdy who said, yeah, there are a lot of people from |
| 22 | Washington and Monroe County that go down to the port for work |
| 23 | and to shop.  And that's not true of people who live almost in |
| 24 | Georgia.  And counties themselves -- I mean, Dr. Davis talked |
| 15:35:34 25 | about the importance of counties in and of themselves as sort |

of an organizing principle for people.  All those get blown up
by any of the illustrative plans.  There's no plan that's been
produced that could keep Mobile County whole, that could avoid
dividing it up from Baldwin County, and through combining it
nearly all the way across the state.

        And I mean, when Representative Byrne was talking about
the difficulties of presenting a place like -- I mean, really
has echoes in the LULAC decision.  I will quote it for you.
This is 548 U.S. at 434.  And the practical consequence of
drawing a district to cover two different communities is that
one or both groups will be unable to achieve their political
goals.  Compactness is, therefore, about more than, quote,
style points, closed quote.

        And I think that's exactly what you were hearing about
today from the Representative, that -- and he's explained why
it's important to have a district sort of anchored by the Gulf
and anchored by the port both for everyone who lives within
that district, and those now five counties, also for the entire
state.  If the port is strong, it is our avenue -- it's
Alabama's avenue to the world.  If the port is strong, then
that is going to be -- that's going to go down to the benefit
of every Alabamian.  I think that's the testimony of
defendants' witnesses and many of plaintiffs' witnesses alike.

        I note -- I know plaintiff Dowdy said multiple times,
what's good for the port is good for all of Alabama.  And we

1    would not contest that in any way.

2        I mean, if you look at some of the other problems with

3    their -- with their maps -- and we can -- I am happy to talk

4    more about with the mathematical impossibility of their map.  I

15:37:36 5    think it was briefly referenced by Milligan's counsel after

6    talking about Imai and saying Imai's evidence is somehow

7    striking and proves racial predominance in our maps, but has

8    nothing to say about the illustrative plans.

9        I don't really understand that.  Unless, again, their

15:37:56 10   theory is there is a traditional redistricting principle that

11   basically -- I mean, I think the approach is one that like is

12   fundamentally circular.  They would allow a Section 2 plaintiff

13   to prove that it is possible to compose a district in

14   accordance with traditional districting principles by relaxing

15:38:22 15   or ignoring them, which is what their plaintiffs did to form

16   the maps that they formed in this case.

17       I mean, they, again, they scrapped core retention.  They

18   said, that's too hard.  It's impossible is what Dr. Duchin

19   said.  I think Caster counsel said something to that effect a

15:38:41 20   moment ago.  They -- no mind to incumbency protection except in

21   one of the 11 maps.  Their District 2 is far less compact than

22   our District 2.  And as a result, the District 1 is far less

23   compact.

24       We talked brief about communities of interest and how they

15:38:57 25   dread many long established and many judicially recognized

communities of interest.  And I mean, Dr. Duchin testified about the extra county splits and how she had a nonnegotiable principle of making sure she hit her racial targets.

15:39:20   I mean, if a state came and said we had a nonnegotiable principle of hitting nonnegotiable targets, we know what would happen.  It would lose equal protection claim.  That's what happened in the *Cooper* litigation.

So I did want to touch on something.  There was a suggestion that the *Davis vs. Chiles* case somehow undercuts our

15:39:42 argument.  I think quite the contrary.  *Davis vs. Chiles* -- Chiles is C-H-I-L-E-S, and I apologize for quoting.  139 F.3d at 425 and then at 426.

What the Eleventh Circuit said was, Our precedents require plaintiffs to show that it would be possible to design an

15:40:09 electoral district consistent with traditional districting principles in which minority voters could successfully elect a minority candidate.

Now, the problem there was that the district court said, oh, well, the map drawer knew that race was -- he knew what the

15:40:26 race was of these two districts that he drew.  And if a Legislature did that and picked those maps because of their racial breakdown, that would be an equal protection problem, and, therefore, this fails.  But that was not -- what the Court explained was that's not the way to look at this.

15:40:44 They did explain like, and I will quote this, Certainly

```
 1  race was a factor in various process -- he was a map drawer --
 2  of designing the proposed subdistricts.  But he testified that
 3  it would have been difficult for him to have drawn some
 4  districts for the Second Circuit and the Leon County courts
 5  without creating at least two new majority-minority districts.
 6       And the Court said, absent some evidence belying Terry's
 7  characterization of his design process, Chiles cannot rely
 8  solely on criticism of Terry's motivations, blocked Davis'
 9  proposed remedies.
10       So I think what this drawing suggests is Mr. Terry here
11  had to compromise traditional nonracial districting principles
12  and subordinate them to race, then plaintiffs' claims would
13  have failed at Gingles 1 in Davis vs. Chiles, too.
14       And so I think an interesting way to think about it --
15  let's imagine Dr. Imai had done his analysis the right way,
16  which meant including also including core retention in the
17  algorithm, and he produced this 10,000 maps.  5,000 of them had
18  one majority-minority district, 5,000 of them had two
19  majority-minority districts -- well, all consistent with
20  traditional redistricting principles.
21       I am not sure if absent the VRA, the Legislature could
22  say, well, we want the one with two majority-black districts
23  just because of equal protection issues, although perhaps
24  because race might not predominate there.
25       Certainly, a VRA plaintiff could say, we are going to pick
```

1    from one of these good maps, instead of from one of those good

2    maps.  But that's not what we are dealing with here.  We are

3    dealing only with bad maps.  They didn't produce a single good

4    map.  And that's the critical difference.

15:42:29  5    So I mean, to go back to *Chiles*, I mean, again, Terry map

6    drawer said it would have been difficult for him to draw based

7    on race-neutral principles without getting at least two

8    majority-minority districts.

9    Dr. Duchin's testimony was exactly the opposite.  She said

15:42:49 10    -- and this is at transcript page 685, quote, it is hard to

11    draw two majority-black districts by accident, which in her

12    view meant it showed the importance of doing so on purpose.

13    Like were not criticizing their motivations.  I understand

14    that he have to keep race in mind when they're putting their

15:43:11 15    map together, but that doesn't mean race can predominate, and

16    that's obviously what we have here to a mathematical certainty.

17    And again, they -- it means what they had to do was they

18    have to bend and they had break numerous criteria to produce 11

19    racial gerrymanders.

15:43:31 20    And I don't think the Legislature would be able to draw a

21    map like that consistent with the Equal Protection Clause or

22    Section 2.

23    JUDGE MANASCO:  Let me ask you a question about that.

24    So I understand the general contours of the argument.  But

15:43:44 25    I took at a more granular level what Dr. Duchin to be saying is

```
 1  that because of what she was asked to do as a Gingles I expert,
 2  she took the 50 percent as a nonnegotiable threshold.  And then
 3  she only bent and broke insofar as was necessary not to come
 4  under 50 percent.  So, for example, I think -- and I don't have
 5  the cite handy, but my memory is that she testified that after
 6  50 percent, for example, she took not splitting counties to be
 7  of greater priority.
 8       Why is that inconsistent with the Section 2 mission?  I
 9  completely understand your argument as to why it's inconsistent
10  with the idea that we ought not be separating voters based on
11  race for constitutional purposes.
12       But in the limited universe of a Section 2 claim, why is
13  that hierarchy so long as it respects other traditional
14  districting principles insofar as it can along side the
15  50 percent threshold, why is it inconsistent with Section 2?
16            MR. LACOUR:  Because I don't think that's what the
17  Court was referring to when it said reasonably compact.  Again,
18  reasonable compactness analysis takes into account traditional
19  districting principles.  And drawing a non-compact district to
20  benefit a racial group is not a traditional districting
21  principle.  If it is, it makes their whole two Section 2
22  compactness argument self-referencing and really
23  indecipherable.
24       They're saying, we could draw a reasonably compact map
25  consistent with traditional districting principles if we ignore
```

some of them in favor of race.  But that means it's not

reasonably compact.  That's why the Supreme Court has said

Section 2 does not require a state to draw based on

predominantly on racial lines a district that's not reasonably

15:45:48 compact.  What that necessarily means is that reasonable

compactness has to be without reference to race.

Now, like I said, if she drew two maps consistent with

racial -- consistent perfectly with traditional districting

principles, and one had two majority-minority districts and one

15:46:09 didn't, it would be perfectly fine for her to pick the one that

had the two majority-minority districts.

But what she testified to was that she drew 2,000 such

maps, 2000.  Not 2000.  2 million.  I am sorry.  I was off by

the three zeros.  2 million maps where she didn't even plug in

15:46:28 all of our traditional districting principles into the

algorithm constraints.  She had even more discretion than the

Legislature would have had to go out looking for majority

population to put within a district.  And not one of them came

back above 50 percent.  I mean, not one of them came back with

15:46:47 two districts above 50 percent.

And I -- so I don't know how it could be even -- how it

could be any clearer that race predominated.

I mean, it's not even a one in a million map we have in

front of us.  These are maps you would never expect to see.

15:47:03 And I don't see how it could be that -- to return to the text

of Section 2, we are talking about equal opportunity and
whether anyone has had equal access so political process denied
them based on account of race.  I mean, is the Legislature's
failure to completely scrap several race-neutral traditional
districting principles and bend others in favor of race, like
isn't a refusal to do that somehow denying someone equal
opportunity?  I think the answer is obviously no.

      And you look at *Abrams*, again, keep in mind, I think they
hone in a lot on proportional representation.  And you see it
throughout.  But, of course, throughout the briefing -- but, of
course, Section 2 expressly says proportional representation is
not the benchmark.  And we know it can't be the benchmark
because Georgia in the '90s had 27 percent black population
just like Alabama today.  They have 11 districts they can work
with.  We only have seven.

      And even then the district court said, Section 2 only
gives me free reign to draw one majority-minority district,
9 percent of the state's black population -- or 9 percent of
the state's congressional districts were majority black, even
though 27 percent of the state's black population -- or blacks
made up 27 percent of the black's population, and the Supreme
Court affirmed that.

      I think then in vote dilution itself, you heard about vote
dilution from plaintiffs.  I mean, it diluted against what?
Against what standard?  And proportional representation is not

1   the standard.  It was an interesting discussion with Dr. Duchin

2   talking about Massachusetts and the Republicans there.  And

3   because the Republican population in Massachusetts is so evenly

4   dispersed across the state, I mean, what she testified to was

15:49:02 5   that it is literally impossible to draw even one majority

6   Republican congressional district in Massachusetts, despite the

7   fact that there are nine congressional districts from the state

8   and despite the fact that Republicans regularly register about

9   a third, 35 percent in statewide elections.

15:49:22 10       So proportion representation is not the right baseline.

11  The right baseline is what would you expect from a race-neutral

12  draw of the districts?  And we didn't have time to go out and

13  get an expert with an algorithm to produce 10,000 maps.  But

14  the plaintiffs did.  And we know what came back.  30,000 maps

15:49:44 15  from Dr. Imai, none of which have two majority-black districts,

16  and 2 million maps from Dr. Duchin, none of which have two

17  majority-black districts.

18       So, again, unless you are going to impute race as a

19  traditional districting principle in the Section 2 compactness

15:49:59 20  analysis, which I think the Court pretty expressly rejected in

21  *Abrams* when they found the three-judge court's decision in that

22  case, there is no way they can satisfy *Gingles I*.  It's a

23  mathematical impossibility.

24            JUDGE MANASCO:  Thank you.  I think you answered my

15:50:16 25  question.

```
 1              JUDGE MARCUS:  Let me ask a follow up if I could,
 2     Mr. LaCour, on Judge Manasco's question.
 3        Does this issue, then, all boil down to whether some or
 4     all of the illustrative plans were drawn in a reasonably
15:50:36  5     compact way?  Is that the essential question you're
 6     highlighting here?
 7              MR. LACOUR:  Yes.
 8              JUDGE MARCUS:  Reasonably compact.
 9              MR. LACOUR:  Yes.
15:50:46 10              JUDGE MARCUS:  Okay.
11              MR. LACOUR:  That reasonable compactness analysis
12     takes into account traditional districting principles like
13     maintenance of communities of interest and traditional
14     subdivisions and the other guidelines that we have been
15:51:02 15     discussing today.
16              JUDGE MARCUS:  Thank you.
17              MR. LACOUR:  Great.  Let me see if there's anything
18     else I want to say on that point before moving on to another --
19     I think in Miller vs. Johnson similarly supports the notion
15:51:31 20     that the traditional districting principles you are looking at
21     in a Section 2 compactness inquiry are not race-focused
22     traditional districting principles.  In Miller, the Court was
23     look at a racial gerrymandering claim -- the Court said -- this
24     is 515 U.S. 900 at 916.  So in looking at a racial
15:52:08 25     gerrymandering claim, quote, a plaintiff must prove that the
```

1    legislature subordinated traditional race-neutral districting

2    principles, including but not limited to compactness,

3    continuity, and respect for political subdivisions or

4    communities defined by actual shared interests to racial

15:52:21  5    considerations.  Where these or other race-neutral

6    considerations are the basis for redistricting legislation and

7    are not subordinated to race, state can defeat a claim.  The

8    district has been gerrymandered on racial lines, close quote.

9         Now, the Court here nowhere suggests that there are

15:52:37 10    legitimate race-focused principles that states could point to

11    as a defense race predominated in their maps.  It would make no

12    sense to allow a state to rebut a charge of racial

13    gerrymandering by showing the state was promoting race-focused

14    districting principles.

15:52:55 15         Now, of course, compliance with the VRA can justify a

16    racial gerrymander, but the need to employ race to comply with

17    the Voting Rights Act does not mean that there was never a

18    racial gerrymander in the first place.  So I think it's similar

19    analysis when we're looking at the compactness inquiry.  Are

15:53:13 20    race-neutral principles been subordinated to race or not?  And

21    here obviously were.

22         Return for a moment on communities of interest.  I did

23    find that I think -- it was not -- it's clearly not something

24    that Mr. Cooper had given a lot of thought to when we asked him

15:53:57 25    about communities of interest between the Gulf and the

1    Wiregrass.  He suggested, well, it's from transcript 498:  Do
2    you have an opinion about whether there's a community of
3    interest that includes both voters in Houston County and voters
4    in this wider portion of Mobile County that you include in
15:54:17 5    District 1?  His response:  There very well should be.  They
6    live in south Alabama.  I suspect maybe there's more University
7    of Alabama fans down in Mobile than the eastern part of the
8    state, Auburnland.

9          And, again, I think we have got communities of interest
15:54:32 10   here that have been recognized by courts for a long time, ample
11   testimony from plaintiffs and defendants that our maps preserve
12   them, and to the extent the Court is being asked to adjudicate
13   which one should get preference over the other, I think that,
14   too, potentially raises some justiciability questions.

15:54:53 15         I'm not sure how the Court is going to sort of decide this
16   one is more important than the other if there isn't a healthy
17   dose of deference to the Legislature.  Again, we are not
18   inventing any nuance in the 2021 map.  Again, it's a map that
19   looks a lot like the map is looked for 50 years now.  And I
15:55:14 20   think that is some very strong evidence of what the Legislature
21   considers to be particularly important.

22         I will address for a moment the arguments about the State
23   Board of Education plan, which has gotten some play in the last
24   couple of days.

15:55:41 25         If you will recall, I believe this is Defendants'

1    Exhibit 26.  The 2001 version of the State Board of Education

2    plan, which has eight districts just like -- eight districts

3    just like the current plan has eight districts did not split

4    Mobile.  Mobile and Baldwin County and I believe one other

15:56:02  5    county were kept together in that sort of southwestern

6    district.  Then you fast forward to 2011.  And I think the

7    record shows that split came about in 2011.  And the reason for

8    that was Section 5.

9        We had -- need to show that there was not retrogression.

15:56:24 10   But that particular district, there had been a majority-black

11   district north of Mobile or -- not majority black, it was at

12   least heavy percentage black north of Mobile that had lost a

13   substantial percentage of its population.  And so at that --

14   its black population at that.  Its numbers had gone down, and I

15:56:48 15   believe what the preclearance submissions will show is that the

16   state had a felt need to ensure that that number stayed about

17   the same for Section 5 purposes.  The only way that could

18   possibly be done was to break into Mobile and split that county

19   and the State Board of Education plan as far as I am aware for

15:57:08 20   the first time ever.

21       So if anything, that just shows that the -- actually race

22   predominated over traditional districting principles there,

23   because we couldn't consistent with them maintain or really

24   surpass the Section 5 preclearance standard.  And once you sort

15:57:28 25   of understand that, I think the -- whatever you can glean from

```
        1  the 2021 map is really quite minimal other than the fact that
        2  state followed its guidelines, both for its State Board of
        3  Education map and for its congressional map, because we
        4  retained the cores of that district just like we retained the
15:57:47 5  cores of our congressional districts.  We did not try to sort
        6  of undo that or affirmatively unpack or satisfy whatever novel
        7  theory of Equal Protection Clause you've been hearing about
        8  from the plaintiffs today.
        9      So turning briefly to Gingles II and III, just to clear up
15:58:15 10 something that I think was said somewhat dismissively from the
       11  Caster plaintiffs, we don't have a preferred definition of
       12  black.  That is not our argument that there's one proper
       13  definition and another that's not.
       14      Our only point is that if you are trying to satisfy
15:58:32 15 Gingles I, II, and III, you are not supposed to mix and match.
       16  So and if they are going to mix and match single-race black
       17  versus any-part black, it's incumbent on them to establish that
       18  there's some strong basis for thinking that those people who
       19  identify as any-part black are going to have -- really going to
15:58:57 20 be part of that same community or have the same interests as
       21  those who identify as single-race black.
       22      So that's the only point we have there.
       23      I would note that, I mean, this need for them to trod out
       24  for you all multiple different definitions and metrics by which
15:59:13 25 to measure black population in their illustrative plans just
```

1    suggests how incredibly thin they are slicing things here and

2    how hard it is for them to find a majority-minority population

3    within the state, which again ties back into what I think are

4    fatal *Gingles I* problems with their case.

15:59:34    5        Now, touching on the totality of the circumstances.  As

6    the Supreme Court has recognized, things have changed in the

7    South.  And as the Alabama and the NAACP court, Judge Watkins'

8    lengthy and well-reasoned opinion from 2020 recognized things

9    have changed in Alabama, as well.  We think that politics and

15:59:58   10   not race is relevant to whether anyone has been denied equal

11   opportunity on account of race, which is the test in Section 2.

12       The Alabama NAACP decision had after a lengthy trial and

13   multiple years of litigation far more time than we had to build

14   a record in this case came away with the conclusion that the

16:00:19   15   reason why black-preferred candidates were not winning in

16   judicial elections in Alabama was not because they were the

17   candidates preferred by blacks, but because blacks preferred

18   Democrats.

19       If you look at the *Clements* decision from the Fifth

16:00:36   20   Circuit -- this is 999 F.2d 831 at 879 -- en banc court there

21   said, To extent the candidates preferred by black voters are

22   consistently defeated because of their substantive political

23   positions, per the casualties of interest group politics, not

24   racial considerations, this is not the harm against which

16:00:56   25   Section 2 protects.  Section 2 protects black voters against

defeat on account of race or color, not on account of political

platform.  And I submit that we have come forth with evidence

to show that to the extent the black-preferred candidates are

not prevailing in congressional elections in Alabama is on

account of political party platform, not on account of race.

We do have evidence that white Republicans support black

Republicans.  We have Kenneth Paschal's recent election to the

State House.  He's a black Republican from the famous Shelby

County.  We have also established that in any state where there

is a substantial black population, black voters are going to

vote overwhelmingly Democratic, which means that the VRA is

only going to kick in if there are white voters who tend to

support the Republican Party.  And I don't think the VRA was

passed to give Democratic Party interests a second bite at the

apple every single redistricting cycle.

Touching briefly on some of the other totality of the

circumstances evidence, which we will address much more fully

to the extent we can in our findings of fact and conclusions of

law.  I think we have shown that many of the gaps between white

the black Alabamians of our similar or even less severe than

what you would see between black and white Americans

nationwide.  I know the Milligan plaintiffs think that is

totally irrelevant.  But I have a hard time seeing how it could

be irrelevant if there was a gap of 1 percent of voter

registration in Alabama and 20 percent nationwide, I think that

```
        1   would obviously be relevant on whether Alabama's history was
        2   influencing a sort of disparity there.
        3       So if you look at what Dr. King said, she -- and I believe
        4   it was the -- I believe she was with Caster plaintiffs.  I'm
16:03:00  5   sorry.  I am getting a little mixed up this late in the day.
        6   They referred to what they call widely disparate incarceration
        7   rates in Alabama.  But when you look at the source she actually
        8   cited, it showed Alabama's black/white disparities in
        9   incarceration rates were the second lowest in the country out
16:03:19 10   of all 50 states.
       11       If you look at voter registration, voter turnout rates
       12   from the Census Bureau over the last several years, Alabama is
       13   doing far better than many other states that don't have
       14   Alabama's regrettable history of racial discrimination.
16:03:37 15       And while the Milligan plaintiffs have said that
       16   comparisons are irrelevant, both Drs. Bagley and King have
       17   comparisons in their reports and said in their testimony that
       18   such comparison could be helpful.
       19       So I would leave you with that.
16:03:57 20       Now, one other potential way to look at Section 2 issue
       21   would be to look at Brnovich.  There was something from the
       22   Supreme Court's most recent Section 2 case that I found
       23   interesting.  It's actually from Justice Kagan's dissent where
       24   she was putting forward a more plaintiff-friendly reading of
16:04:19 25   Section 2, and in her -- and I will stipulate, of course, it
```

1    was not a vote dilution case, but it does still involve the

2    exact same statute and the exact same claim.

3        She said Section 2 demands of plaintiffs proof of a

4    statistically racial disparity in electoral opportunities, not

16:04:41 5  outcomes, resulted from a law not needed to achieve a

6    government's legitimate goals.

7        If we were to apply Justice Kagan's view of what Section 2

8    demands here, I think we would easily surpass that.  We have

9    legitimate reasons for core retention.  We have legitimate

16:04:59 10 reasons for incumbency protection.  We legitimate reasons for

11   keeping the counties that have been CD 1 for 50 years in CD 1

12   and for not stretching CD 2 from one border of the state to the

13   other border of the state.

14       And we know that we can't pursue those legitimate goals in

16:05:21 15 compliance with the demands of the Section 2 plaintiffs in this

16   case.

17       So I think even under Justice Kagan's reading of Section

18   2, their claims would necessarily fail.

19       And I don't say that that's a controlling opinion, but I

16:05:36 20 do think it sheds some light on how the Court should be

21   thinking about Section 2 and what it is that it's really

22   supposed to be doing.  And I don't think it is a black

23   maximization statute, rather DOJ thought that was the case in

24   the early '90s, and the Supreme Court disabused them of that

16:05:57 25 motion in *Miller v. Johnson* and the *Abrams* case.

            1    So here again, based on maps drawn based solely on
            2    race-neutral traditional principles, the most you could hope
            3    for would be one majority-black district, and that's what we
            4    have.
16:06:16    5        I would like to turn to the equities now unless the Court
            6    has further questions about the merits.
            7        So first, I think there was some suggestion that the
            8    process was -- the redistricting process was rushed, that we
            9    had delayed in some way.  I will just simply remind the Court
16:06:43   10    that the state of Alabama did not cause COVID.  The state of
           11    Alabama did not cause the Census Bureau's delays in turning
           12    over critical data that we needed to redistrict.  We were
           13    supposed to know by March 31st, I believe.  We were supposed to
           14    get our data by March 31st and as of -- by March 31st.  But mid
16:07:11   15    to late March, the bureau announced they weren't going to give
           16    us the data until September 30th.  We didn't sit on our hands
           17    and wait.  We actually sued the Census Bureau in part based on
           18    that delay and said you have a statutory obligation to give us
           19    that data far sooner than September 30th.  And just several
16:07:29   20    days after we brought that lawsuit, the bureau announced
           21    actually they could give us to about six weeks earlier than
           22    they had initially anticipated.  That's how we ended up getting
           23    that data in the middle of August.
           24        And we immediately got to work finalizing or -- drawing
16:07:45   25    and finalizing maps.  The Legislature had been told by the

1    Secretary of State the maps were going to be needed by early
2    November in order to do all the different administrative steps
3    needed to get ready for an election.  I will talk about a few
4    of those in a moment.  And so that was for the window the
16:08:04  5    Legislature was working in, and despite it being very tight,
6    they were numerous public hearings held.

7         Also, just keep in mind, while this litigation has really
8    centered on the congressional districts, there were three other
9    sets of maps we have to draw this particular time around.

16:08:21 10        The State House, State Senate, and the State Board of
11   Education maps, that's another 148 districts that needed to be
12   drawn, needed to be debated, needed to be voted on eventually.

13            THE COURTROOM DEPUTY CLERK:  Mr. LaCour, you have
14   ten minutes.

16:08:44 15        MR. LACOUR:  Thank you, Frankie.

16        With all this mind, we have been at this about two months.
17   And the election machinery is well -- is already humming along.
18   As you know, the qualifying deadline is January 28th, we're
19   talking two weeks from when our findings of fact and
16:09:06 20   conclusions of law are due.

21        Now, there was a lot of discussion about May 24th as the
22   primary election date and sort of a suggestion that we have a
23   leisurely four months by which the Legislature could come back
24   together and draw a new map that complies with either like
16:09:26 25   these violations of Section 2 alleged by the plaintiffs or by

 1   an equal protection demands that the plaintiffs have we think

 2   invented, but May 24th is not the critical deadline.  The

 3   critical deadline is Marsh 30th.  And I will tell why it's

 4   because that's when you absentee ballots need to be printed and

16:09:45  5   ready to go.  So we're talking seven weeks away from the

 6   election beginning, not four months.

 7        And April 9th, we have the federal law deadline to send

 8   out our UOCAVA ballots.  Those are to servicemen and women

 9   overseas and other federal employees overseas.  We have to get

16:10:04 10   those ballots out the door to them.

11        If you are looking for some other dates and deadlines,

12   Defendants' Exhibit 7 is the administrative calendar, the

13   Secretary of State's administrative calendar.  It's included

14   with the declaration of the Director of Elections Clay Helms.

16:10:24 15        And I think his declaration is also incredibly important

16   evidence on this.  And I have not heard anything from the

17   plaintiffs to really rebut it.  He's explained that in -- I

18   believe it's about 40 to 45 of Alabama's 67 counties, the

19   process of assigning voters to the appropriate voting districts

16:10:46 20   is manual.  It's a very time-consuming process.

21        They literally take out maps.  They have their voter

22   registration information, and they say, well, you live at 123

23   Main Street.  Let's look at the map.  123 Main Street is in

24   District 2.  We will assign you to District 2.  You will make

16:11:05 25   sure when you show up to vote you go to the right precinct and

1    you get the right ballot.  So you are voting for the candidates

2    of District 2, not the ones for District 1.

3        That's the process that takes -- in the past, it took I

4    believe three to four months is what he has averred in his

16:11:23  5    declaration.  And I have not heard any to the contrary deadline

6    proposed by the plaintiffs to suggest that he is pulling the

7    wool over on plaintiffs in this case.  And that's consistent

8    with similar testimony he gave by declaration in our litigation

9    against the Census Bureau in the spring of 2021.

16:11:46 10       I think also this Court should take into account what

11    Bradley Byrne and what other people have testified to, which is

12    if you dramatically shift the lines and you move hundreds of

13    thousands of voters out of one district and hundreds of

14    thousands of new ones into the district, that's going to create

16:12:07 15    confusion for those voters.  It will create serious problems

16    for candidates, and you will potentially have several districts

17    with no incumbent and maybe no candidate running in it, which I

18    think is not good for the Democratic process.  It is severe

19    public harm.

16:12:24 20       I mean, if you look at the *Favors v. Cuomo* decision, the

21    Eastern District of New York, that's 881 F. Supp. 2d, 356,

22    there's a really key quote they have from Nate Persily, who is

23    one of the leading experts on election law issues.  They said,

24    quote, A court should have as its goal the imposition of a plan

16:12:48 25    no later than one month before candidates may begin qualifying

1    for the primary ballot, which means that the court should begin

2    drawing its plan about three months before the beginning of

3    ballot -- before the beginning of ballot qualification in order

4    to build in time for possible hearings and adjustments to

16:13:04  5    plans.

6        I think that's wise, and I think we are well past that.  I

7    mean, you have already heard some of the difficulties and

8    potential complications of if this Court were to enter a

9    preliminary injunction, it's not even clear if the Legislature

16:13:17 10    at this moment would need to draw two majority-black districts

11    or just two districts that would perform for -- for black

12    voters even if they weren't at 50 percent.

13        And, of course drawing map isn't the end of the story.  We

14    would have to come back, and it would have to be analyzed by

16:13:35 15    this Court.  We would have more experts coming in to say this

16    does perform or this doesn't perform.  And keep in mind too, we

17    have three sets of plaintiffs here with some competing theories

18    of what the federal law demands.

19        So I don't expect if Singleton wins that the Caster and

16:13:51 20    Milligan plaintiffs will be really thrilled with the product

21    from the Legislature and vice versa.  So we may have more

22    litigation over the remedial map.  So this would not be our

23    last hearing by any means.

24        The complaints about the need for urgent action are

16:14:10 25    tempered a little by the longevity of the alleged harms.  I

think by their theories, there have been some sort of packing

issue for at least a decade.  There's been underrepresentation

or vote dilution claim for at least a decade.  Lakeisha

Chestnut, one of the Caster plaintiffs did sue us, but it

16:14:33  wasn't until 2018.  The Singleton plaintiffs sued over the 2011

map.  They waited ten years to do that.

        So I just think that, in particular, when you are looking

at maps and political geography that has been so settled in the

state for so long, equities would suggest that like courts

16:14:51  should do who courts have done in numerous cases when you have

requests for preliminary injunctive relief this late in the

day, and that would be to say, like if the Court were to make

some new law and deem this map to be unconstitutional, to allow

it to be used one more time, because I don't think if you adopt

16:15:09  the plaintiffs' approach to Section 2 *Gingles I* or if you adopt

this new theory of equal protection by which we have an

affirmative obligation to sort of undo a VRA district years

later, I don't think this Court will be the last word on that.

        So and that's -- I mean something else that was noted as

16:15:31  well as well by the *Favors* court, that these complicated

record-intensive cases, complicated legal issues, and the Court

said, like, we have only will a few weeks to even dig into

this.  I mean, we put together -- we were able to get two

experts together.  We were able to get some good testimony in

16:15:50  front of you all.  I know there's more we could say.  You heard

1  from all the historians.  We haven't had time to get around.

2  We haven't had time to get our own algorithmic math whiz to

3  redo or duplicate some of the stuff the Drs. Imai and Duchin

4  have done.

16:16:05 5      But I do think this claim -- before this Court goes and

6  alters the state's political geography and political destiny,

7  it needs to be very, very sure that we have done something

8  wrong here.

9      And, honestly, I think these are incredibly ordinary maps.

16:16:23 10 It's clear why they were drawn like they were drawn.  It's

11  right there in the guidelines.  These were race-neutral reasons

12  for doing it.  And at the same time, as well, like Section 2

13  does not require anything different from what the Legislature

14  did.

16:16:39 15      As the Court in LULAC said, the purpose of the VRA was to

16  prevent discrimination and the exercise of the electoral

17  franchise and to foster our transformation to a society that's

18  no longer fixated on race.

19      Here, we know thanks to plaintiffs' own experts that if

16:16:55 20 race were not considered, it is virtually impossible to draw a

21  map with two majority-minority districts.  Section 2 does not

22  require separate but equal congressional districts for

23  Alabamians; thus, because Section 2 does not require Alabama to

24  subordinate its traditional race districting principles to

16:17:09 25 race, those Section 2 claims necessarily fail.

```
 1              JUDGE MARCUS:  Thank you very much, Mr. LaCour.  We
 2   will take our usual break of 15-minute break and then come back
 3   with the rebuttals, and we will finish up this afternoon.
 4   Thank you all.  We will be back in 15 minutes.
16:17:48 5              MR. LACOUR:  Favors was the longer quote.
 6              JUDGE MARCUS:  Why don't you give us the full title of
 7   that case that came under the Eastern District of New York.
 8              MR. LACOUR:  Favors v. Cuomo, 881 F. Supp. 2d 356, 362
 9   -- or at 362.  That's Eastern District of New York 2012.
16:18:20 10             JUDGE MARCUS:  Thank you much.  We will take a
11   15-minute break at this point.
12        (Recess.)
13              JUDGE MARCUS:  The parties are ready to begin the
14   reply at this point?  Do I have that right, Mr. Blacksher,
16:29:24 15   Ms. Khanna, and Mr. Ross?
16              MR. BLACKSHER:  Yes.
17              MR. ROSS:  Yes, Your Honor.
18              MS. KHANNA:  Yes, Your Honor.
19              JUDGE MARCUS:  All right.  Thank you.
16:29:34 20      Mr. Blacksher?  We will take it in the same order that the
21   arguments were made by the plaintiffs.
22              MR. ROSS:  Your Honor, if I may, the Caster plaintiffs
23   have allowed the Milligan plaintiffs to go next.
24              JUDGE MARCUS:  I'm sorry.  You mean the Singleton
16:29:55 25   plaintiffs.
```

1        MR. ROSS:  Oh I'm sorry.  I believe it will go

2   Singleton, Milligan, and then Caster.  I'm sorry, Your Honor.

3        JUDGE MARCUS:  Thank much.  Mr. Blacksher, you may

4   proceed.

16:30:04  5        MR. BLACKSHER:  Judge, you made -- Judge Marcus, you

6   made a -- asked an important question.

7      If the Court rules for the plaintiffs, what should it tell

8   the Legislature to do?  Because whatever this Court tells the

9   Legislature -- what it tells the Legislature it did wrong, and

16:30:39 10   what it tells the Legislature it must do right in the future is

11   going to be the benchmark for redrawing congressional districts

12   probably for several more decades.

13      So it seems to us that the choice is between telling the

14   Legislature that it must draw districts by beginning with a

16:31:05 15   racial target, or whether it should draw districts by beginning

16   with traditional districting criteria, we believe that if this

17   Court were to rule for the plaintiffs -- the Milligan and

18   Caster plaintiffs on their Section 2 claims without addressing

19   their Fourteenth Amendment claims, that necessarily says to the

16:31:35 20   Legislature the 2021 enacted plan violated the Voting Rights

21   Act because it did not contain two majority-black districts,

22   per *Bartlett vs. Strickland*.  Now, that's going to say to the

23   Legislature that they should begin any remedial plan with a

24   racial target.

16:32:01 25      What the Singleton plaintiffs have proposed is that the

16:32:29

16:33:01

Court say to the Legislature the problem with your 2021 plan is
that it perpetuated a gerrymander that violated traditional
districting principles by splitting Jefferson, Tuscaloosa, and
Montgomery counties for the purpose of reaching a racial
target, namely a black-majority district.  And, therefore, you
should begin again solely with race-neutral principles which
are historically in Alabama, whole counties, and see what kind
of plan you can draw, and then to achieve the lowest
practicable population deviation, and then look to see whether
or not it complies with Section 2 of the Voting Rights Act.

      If it does not comply Section 2 of the Voting Rights Act
by providing blacks the opportunity to elect candidates of
their choice that Section 2 guarantees, then your plan must be
modified however is necessary to accomplish that statutory

16:33:24

objective.

      So that's critical to us.  We have been interested from
the beginning in the Singleton case, our clients are interested
in trying not only to win a lawsuit for 2022, but to try to get
our redistricting process back on track.  That's something that

16:33:54

legislators and ordinary citizens and incumbent members of
Congress can understand and apply without having to have a
statistician with algorithms next to their elbow.

      Let me respond to something that Mr. LaCour said.  He's
characterized the Singleton plaintiffs' claims as a novel

16:34:31

Fourteenth Amendment claim.  It is nothing but novel.  And let

me, if the Court would permit, let me share the screen with
you.

So, Your Honor, what I have on the screen is Section 2G of
the redistricting guidelines.  And let me read what it says.

No district will be drawn in a manner that subordinates
race-neutral districting criteria to considerations of race,
color, or membership in a language-minority group, except that
race, color, or membership in a language-minority group may
predominate over race-neutral districting criteria to comply
with Section 2 of the Voting Rights Act, provided there is a
strong basis in evidence in support of such a race-based
choice.  A strong basis in evidence exists when there is good
reason to believe that race must be used in order to satisfy
the Voting Rights Act.

Now, what the state is saying, that is essentially the
statement of law that the Singleton plaintiffs in this action
are attempting to enforce.  What the state is saying is that
the 1992 racial gerrymander done for good reasons, thinking it
was required by Section 2 of the Voting Rights Act, is now a
race-neutral districting criteria.

And as I pointed out, the Supreme Court has said you
cannot entrench -- that is entrenching a racial gerrymander,
precisely what the Supreme Court has said the state may not do.

But that is the state's defense here.  They are not
claiming, as Mr. LaCour emphasized, that perpetuating the 1992

1   racial gerrymander is justified by the Voting Rights Act.  They

2   are saying there was no gerrymander at all because that 1992

3   plan has become race-neutral criteria.

4       Finally, let me just respond to Mr. LaCour's concern about

16:37:19 5   the problems of election officials assigning voters to the

6   correct precincts if the Court orders a remedy in time for use

7   in the May 24th primary.

8       In the case of the congressional districts, if the

9   Legislature adopts, either by enacting a new plan or by a court

16:37:47 10   order, the whole county's plan that the Singleton plaintiffs

11   have provided or one like it, there's very little problem

12   assigning voters to their precincts in each county because they

13   all have the same congressional representative to vote for.

14   There's no precinct split.

16:38:12 15       So what the plaintiffs in the Singleton case have asked

16   this Court to do at the end of their motion for preliminary

17   injunction and amended motion, is if it finds for us that --

18   the plaintiffs, that the 2021 plan perpetuates a racial

19   gerrymander without justification, that it should tell the

16:38:42 20   Legislature that the plan proposed by the plaintiffs -- the

21   whole county plan -- is constitutional, or in that if they

22   thought that the whole county plan has too large a population

23   deviation, then they can lower the population deviation in the

24   way Singleton 2 and 3 plans do, or in some other way that

16:39:10 25   splits just a few thousand people out of a couple of

```
 1   counties -- something that I don't like at all, Your Honor.  I
 2   call them deviation orphans.
 3        But that is unquestionably what this Court must do,
 4   because the Supreme Court time and time again has heard from
 5   dissenting members of the Court that we are just encouraging
 6   gerrymandering for the sake of mathematical equality.  And so I
 7   don't think this Court has any choice but to consider lowering
 8   the deviation to a level below -- probably below the 2.46 or
 9   2.47 that the Singleton plan itself has unless *Tennant vs.*
10   *Jefferson County* suggests that the Supreme Court is finally
11   backing down enough to provide some fairness and common sense
12   for ordinary citizens.
13        But, in any event, that's not an issue that we can give
14   you any policy guidance on, because you have to look at the
15   cases and decide that that's a decision for the Court, it's a
16   question of law.
17        I think that's the end of my --
18             JUDGE MARCUS:  Thank you, Mr. Blacksher.
19        We will hear now from counsel for Milligan.
20             MR. ROSS:  Yes, Your Honor.  There's a lot to respond
21   to, so --
22             JUDGE MARCUS:  Will you take down from the screen
23   that -- thanks very much.
24             MR. BLACKSHER:  Sorry.
25             JUDGE MARCUS:  Quite all right.
```

16:39:31 (line 5)
16:39:56 (line 10)
16:40:13 (line 15)
16:40:25 (line 20)
16:40:37 (line 25)

1    Mr. Ross, you may proceed.

2         MR. ROSS:  Thank you, Your Honor.

3    Your Honor, it is the state that presents circular

4    arguments.  First, it's the defense that says that for Section

16:40:47 5    2 -- a Section 2 claim to be viable, plaintiffs must satisfy

6    *Gingles I* without considering race.

7    And then, secondarily, they say that on the racial

8    gerrymandering claim, that race can predominate, even when it's

9    necessary to comply with the Voting Rights Act.

16:41:05 10   But Mr. LaCour's only right as to the second point.  The

11   Supreme Court has repeatedly said that compliance with the

12   Voting Rights Act means that a state can consider, it's not,

13   per se, unconditional to purposefully draw majority-black

14   districts.

16:41:22 15   This is because even if race does predominate, a state

16   will still -- a map can still be constitutional if it's

17   narrowly tailored to comply with the Voting Rights Act.

18   Indeed, the state's own redistricting guidelines and the

19   state's own expert, Mr. Hinaman, considered race, required the

16:41:41 20   consideration of race, and Mr. Hinaman drew the majority-black

21   District 7 intentionally to create a majority-black district.

22   He plainly said so in his testimony.  He also plainly said that

23   even if that district had not turned out majority black, he

24   himself would have adjusted it so that it would still be a

16:42:01 25   majority-black district.

1909

1    So that is very similar to what Dr. Duchin did here.  Like

2    the state, she considered race only to the extent necessary to

3    draw the two majority-black districts and to satisfy *Gingles* 1.

4    Dr. Duchin didn't consider other redistricting principles.  She

16:42:19  5    said that her non-negotiables were compactness, maintaining

6    communities of interest, particularly the Black Belt, and that

7    the reason her maps are cut across the state is because the

8    Black Belt, a community of interest that has existed in Alabama

9    for 200 years, itself cuts across the state.

16:42:35 10    Dr. Duchin also prioritized not cutting -- splitting

11    counties and she did so in one map, and split fewer counties

12    than the state's map.

13    Only after considering all of these other factors did she

14    look at race to satisfy *Gingles I*.  And even if Dr. Duchin

16:42:53 15    didn't draft -- even so, she drafted two majority-black

16    districts with bare majority black populations, even though she

17    testified that it would be possible for her to draw two

18    majority-black districts with higher black populations.  She

19    drew them with lower populations because she was trying to

16:43:09 20    narrowly tailor them, as is required by the Constitution.

21    Moreover, again, nothing is per se constitutional about

22    even setting racial targets.  The Supreme Court said in *Bethune*

23    *Hill* and the *Alabama Legislative Black Caucus* case that the use

24    of racial targets are valid means of complying with the Voting

16:43:31 25    Rights Act.

1        Indeed, in *Bethune Hill* the Supreme Court upheld the

2   state's use of a 55 percent BVAP racial target, where the state

3   had good reason to set that target to comply with the Voting

4   Rights Act.

16:43:44  5        Here, again, Alabama's own redistricting principles,

6   consistent with its recent Supreme Court precedent, require the

7   state to take into consideration Section 2.  And the state's

8   own guidelines when talking about communities of interest

9   discuss that race is one thing that can be considered.

16:44:04 10        Second, there's been a lot of talk about communities of

11   interest, but as the state and other -- as many witnesses who

12   testified today have said over the last few weeks, not every

13   district has to contain a single community of interest.  Many

14   of the districts that currently exist have multiple communities

16:44:24 15   of interest in them.

16        Huntsville may have different interests than Franklin

17   County.  Birmingham may have different interests an Selma.  And

18   so there's no requirement, either under the state's

19   redistricting guidelines, or under the considerations that

16:44:38 20   Mr. Hinaman or the Legislature took into consideration that

21   every congressional district must contain a single community of

22   interest.

23        Here, however, the Black Belt, as I said, is a community,

24   a black community that has existed in Alabama for 200 years.

16:44:56 25   Nearly every witness, including Representative Byrne, testified

that the Black Belt is a community of interest.  Every witness,
including Representative Byrne, testified that there is a clear
community of interest that exists between black people and the
community in Mobile and the Black Belt in the northwest of the
state.

But the state split Mobile County to comply with the
Voting Rights Act to draw the two majority black board of
education districts is compelling evidence that, consistent
again with the state's own redistricting criteria, that the
state could and should draw split Mobile County in order to
draw two majority black congressional districts.

Third, I want to talk a little bit about Dr. Imai.  As
Dr. Imai himself testified repeatedly, his analysis tells us
nothing about whether or not drawing two majority-black
districts complies with the traditional redistricting
principles.

Dr. Imai said that he did not consider race in drawing his
district -- even though as again the Supreme Court has said
that you can do so, even though the state itself has said that
you should consider race when doing so to comply with the
Voting Rights Act, when considering communities of interest,
and indeed Dr. Imai said that even he took into consideration
as many redistricting principles as he could, but he didn't
take into consideration all of them.

One important consideration is communities of interest.

1 | And Dr. Imai did not -- wasn't able to identify every community
2 | of interest in Alabama, because the state does not provide a
3 | list of those things.  And those communities may include large
4 | places with large black or other racial group populations like
16:46:44 5 | the Black Belt.

6 | Your Honor, Mr. LaCour also talked about the *Miller* case,
7 | which is a Supreme Court case, a series of Supreme Court cases
8 | from the 1990s.  First of all, *Miller* involved a Section 5
9 | objection for the Supreme Court, where the Department of
16:46:59 10 | Justice had repeatedly rejected maps drawn by Georgia because
11 | they had failed to draw three majority-black districts.  The
12 | Supreme Court said that that was unnecessary.

13 | The reason why the Supreme Court said it was unnecessary
14 | to comply with the Voting Rights Act to draw three
16:47:16 15 | majority-black districts is because in Georgia, unlike in
16 | Alabama, black Congressmen had repeatedly won from majority
17 | white congressional districts.  In fact, today black
18 | Congressmen are elected in Georgia from a majority white
19 | congressional districts.

16:47:29 20 | That is not and has never been the case in Alabama.
21 | Again, no black person in Alabama has ever won a majority white
22 | congressional district.  That was not the case in the *Miller*.
23 | It is not the case today in Georgia.  And Alabama has a very
24 | different history than Georgia.

16:47:45 25 | Finally, on the racial gerrymandering claim, Mr. LaCour

1  ignores the fact that in *Alabama Legislative Black Caucus*, the

2  Supreme Court made very clear and said that states, when

3  they're drawing a district to comply with the Voting Rights

4  Act, must ask to what extent must we preserve existing

16:48:08  5  minorities percentages in order to maintain the minority's

6  present ability to elect the candidate of choice.

7       The Supreme Court has required Alabama and other states,

8  when they're drawing majority-black districts, to consider at

9  what percentage they need to draw those districts.  The problem

16:48:21 10  in ALBC was that Alabama chose to draw 60 percent black

11  districts, and didn't consider whether or not a black district

12  would comply with the Voting Rights Act and perform at a level

13  of 50 percent or something else.

14       That's the same issue here.  Alabama has drawn a

16:48:37 15  majority-black district that's 60 percent black registered

16  voter population.  Plaintiffs shown that districts with as low

17  as 51 or 52 percent black registered voter populations could

18  perform in the same way as District 7 today.

19       Alabama, though, never bothered to consider that question.

16:48:57 20  We have testimony from the Legislature, we have stipulations

21  that Alabama didn't conduct any sort of racial polarization

22  analysis or any other analysis to determine whether or not

23  continuing to pack District 7 was necessary to comply with

24  Voting Rights Act.

16:49:10 25       Your Honor, unless you have any other questions, I

```
 1  appreciate your time.
 2            JUDGE MARCUS:  Thank you, Mr. Ross.
 3       Finally, Ms. Khanna.
 4            MS. KHANNA:  Thank you, Your Honor.
 5       As I mentioned in my previous argument, Caster plaintiffs
 6  have established each of the Section 2 elements step by step,
 7  methodically proving a Section 2 violation.
 8       To say that there's a strong basis in evidence to believe
 9  Section 2 requires a second majority-black district would be a
10  glaring understatement in light of the overwhelming evidence in
11  this case.
12       So instead of addressing the Section 2 standard,
13  defendants pivot straight to a hypothetical claim under the
14  Equal Protection Clause, arguing that plaintiffs' illustrative
15  plans are racial gerrymanders.
16       But the Eleventh Circuit has made clear in Davis that the
17  question posed under Gingles I in a Section 2 case, whether an
18  illustrative plan was created consistent with traditional
19  districting principles is wholly distinct from the question
20  posed in racial gerrymandering cases of whether or not race
21  predominated in drawing district lines.  You simply cannot
22  conflate the two.  A court adjudicating a state Section 2
23  liability considers only the first question, not the second.
24       Mr. LaCour talked a lot about Miller v. Johnson.  Miller
25  was a racial gerrymandering case, which is very telling.  Since
```

the Eleventh Circuit in *Davis* made clear -- and I will direct

quote -- The District Court's attempt to apply authorities such

as *Miller* to this Section 2 case is unpersuasive because the

*Miller* and *Gingles* lines address very different context, end

16:50:58 quote.

Defendants' decision to lean into *Miller* only underscores

their attempt to turn away from the actual Section 2 legal

standard, which we have readily satisfied.

But even if defendants could ignore this find binding

16:51:14 precedent, they point to no evidence that race predominated in

Mr. Cooper's illustrative plans, all of which balance a host of

traditional redistricting criteria in myriad ways in accordance

with the law and Alabama's own redistricting guidelines.

Mr. Cooper testified during the hearing and in his reports

16:51:32 that he drew districts to follow county boundaries.  And where

he had to divide counties to achieve population equality, he

followed municipal boundaries.  That's with the city of Mobile.

Or VTD boundaries, or other objective geographic borders.

Mr. Bryan could not point to a single line in Mr. Cooper's

16:51:53 illustrative maps that was explainable based on race alone.  He

conducted no analysis of the extent to which traditional

boundaries -- counties, municipalities, VTDs, highways,

rivers -- informed those district lines.

Mr. LaCour stated several times that plaintiffs' plans

16:52:12 scrapped traditional districting principles.  But there is zero

basis in evidence for that claim.  Mr. Cooper considered and
balanced every single principle, and certainly the defendants
have not established otherwise.

It is true that core retention had to compromise to give
way to plaintiffs' obligation to create a new district that
didn't exist before.  But even there Mr. Cooper kept Districts
4 and 5 as untouched as possible.

He didn't cast aside incumbent consideration.  He avoided
pairing them in one of his plans, and he paired only two in his
other plans.

Defendants' complaint is not any of the traditional
districting principles were broken or scrapped.  Instead, it is
that not every traditional principle was maximized.  And that
is just not the standard.

Under defendants' theory, the fact that Mr. Cooper was
able to draw a plan with fewer political subdivision splits
than the enacted plan will be proof enough that the enacted
plan is an unconstitutional racial gerrymander.

But clearly, they have taken the opposite position.  That
is not the law.

All defendants have for their claim that racial
gerrymandering is what -- is what the plaintiffs' maps provide
is that plaintiffs charged with the task of drawing an
additional majority-black district in order to advance their
claim and be in this court knowingly drew an additional

```
 1   majority-black district.

 2        If that not only sounds backwards as an intuitive matter,

 3   it is backwards as a legal matter.  The Eleventh Circuit has

 4   held in Davis to penalize plaintiffs for attempting to make the

 5   vert showing that Gingles demands would make it impossible as a

 6   matter of law for any plaintiffs to bring a successful Section

 7   2 claim.

 8        Contrary to defendants' suggestion, the consideration of

 9   race does not equate to the predominance of race.  And even if

10   the Eleventh Circuit hadn't made this clear, hadn't already

11   addressed this issue, the fact is that race may predominate in

12   redistricting consistent with the Constitution in order to

13   comply the compelling state interests, which is Section 2 of

14   the Voting Rights Act.

15        The state of Alabama is well aware of this fact.  Indeed

16   the Legislature incorporated it verbatim in their redistricting

17   guidelines.  To hold otherwise would mean that states could

18   point to the fact that any one principle could have been

19   better, could have been more compact, could have been more

20   maximized to escape liability under Section 2 of the Voting

21   Rights Act, but that is clearly not the law.

22        Mr. LaCour also brought up the Alabama NAACP judicial

23   redistricting case.  And I think it's important to call out

24   some very important distinctions between that case and this

25   one.
```

1       Again, back to *Davis*, that was a redistricting case for
2   judges who tried to move from an at-large judicial system to
3   entirely new restructured election system, not move district
4   lines this way or that, but to totally revamp the way that
16:55:22 5   judges are elected.  And with what the Eleventh Circuit said in
6   *Davis*, and I quote, thus, in this circuit, Section 2 of the
7   Voting Rights Act frankly cannot be said to apply in any
8   meaningful way to at-large judicial elections.

9       So right from the outset, we're just dealing with a
16:55:41 10   different, substantively different kind of issue under Section
11   2 as recognized by the Eleventh Circuit.

12      In that case, in the Alabama NAACP case, there was a
13   dramatically different evidence.  The Court criticized the
14   plaintiffs for emphasizing population equality in judicial
16:56:01 15   districts.  But that's required in congressional districts.
16   The Court criticized the plaintiffs' racially-polarized voting
17   expert for only looking at races with black candidates.  But of
18   course, Dr. Palmer looked at all races.

19      In concluding that partisanship -- that partisanship drew
16:56:18 20   or drove some of the voter choices, the Court there relied
21   heavily on evidence that has not been offered in this case.  It
22   pointed to defendants' evidence involving multi-varied analysis
23   controlling for partisan variables, data regarding
24   straight-ticket voting and the impact on judicial elections,
16:56:35 25   and specifically the successes of black-preferred candidates in

1  judicial races.

2       Here, defendant offered no such evidence.  And defendants'

3  own expert agrees that race and party are inextricably

4  intertwined.

16:56:51  5       And finally, Your Honor, for that case, it's important to

6  know that case committed a significant legal error in its

7  totality of the circumstances analysis.  Even if we put aside

8  all the way that it's factually distinguishable, although it

9  begins with the correct statement that it is not the law that

16:57:07 10  Section 2 plaintiffs must prove racial bias is driving election

11  results, in evaluating the case, it doesn't completely misapply

12  that legal standard, suggesting that plaintiffs need to present

13  evidence of individual voters, quote, subjective voting

14  motivations.  The Section 2 effects test was meant to rely on

16:57:27 15  objective evidence and results and ultimate results without

16  creating the evidentiary burden, and, frankly, the divisive

17  atmosphere of having to prove discriminatory intent.

18       This Court is well aware, that district court opinion is

19  not binding here, but the Eleventh Circuit legal standard is.

16:57:48 20  And we would invite the Court not to make the same errors that

21  that Court made.

22       The last point, Your Honor, on timing.  Mr. LaCour talked

23  a lot about how a lot of people -- a lot of things might need

24  to get done to allow for a change in the electoral process --

16:58:04 25  in the redistricting maps at this point.  But the fact remains

there is absolutely nothing unusual about this redistricting

case.  These cases almost always proceed on expedited schedules

once plans are passed and before elections are held.

And, yes, the state might have to veer from its planned

administrative calendar.  But that is not enough to outweigh

the fundamental and irreparable harm to plaintiffs' voting

rights.  When the Legislature -- from when the Legislature took

up redistricting last fall to when it passed the enacted maps,

it took nine days.  Nine days to pass the map that we have been

litigating.

The Legislature now has some 11 examples of how to draw a

map that complies with Section 2.  How to draw a map that

provides black voters an opportunity to elect in two

congressional districts.  It can choose any, it can choose

none.  It can base some portions of its remedy on any one of

those.

But at the end of the day, even if it were too late, even

if January before a May primary, two-and-a-half months before a

single ballot needs to be printed were too late, defendants

cannot deny that if we have established liability, plaintiffs

are entitled to relief at some point.  It can't always be too

late or too soon.  The Court cannot just shrug at the legal

violation sit on its hands so as not to inconvenience election

officials people or candidates' campaigns.

When will it ultimately be the right time to vindicate

1  this Voting Rights Act violation?  It wasn't before the last

2  election.  That's what they it told us then.  It's not before

3  the next election.  That's what they're telling us now.  But

4  eventually, Your Honor, relief must be granted, and we would

16:59:52  5  submit that it must be granted as soon as possible to avoid the

6  vote dilution that is certain to result from the use of the

7  enacted map in any future elections.

8        Thank you, Your Honors.

9        JUDGE MARCUS:  Thank you very much.  A couple of

17:00:09  10  observations from me, and then I will turn to my colleagues to

11  see if they have anything to add or address.

12        First, I wanted to take a moment to commend all of the

13  lawyers in this case for having done a really outstanding job

14  in preparing and marshalling an enormous body of evidence for

17:00:36  15  this Court to consider in this preliminary injunction hearing.

16  You have presented a very thorough and detailed set of facts,

17  broad and deep that will allow this Court hopefully to reach an

18  appropriate answer.  The record is lengthy and detailed.

19        The second, I hope and expect that we will give you an

17:01:09  20  opinion in this case within two weeks of the date when we get

21  the proposed findings of fact and conclusions of law from the

22  parties, which have been set for the end of the day on January

23  the 14th.  But I did really want to take a moment to commend

24  all of the lawyers for having done a really outstanding job in

17:01:42  25  this case.

```
 1           With that, Judge Manasco, any questions or comments?

 2           JUDGE MANASCO:  Thank you.  First, I will echo what

 3      you said about the commendation of the lawyers.  I think, you

 4      know, what all of you were able to accomplish would have been

17:01:57  5  remarkable under any circumstance in this amount of time.  But

 6      I am mindful that there were holidays, and there was pandemic

 7      duress, and so I think it was all the more remarkable under the

 8      circumstances.

 9           The other thing is I still do have one question.  And I

17:02:13 10  will direct it to Mr. Davis, if he's still with us.

11           But, Mr. Davis, you are free to punt it to any other

12      person on your team, if you think appropriate.  And it's really

13      just sort of an evidentiary question about the logistics.  We

14      have heard a lot today about timing.  And I recall you saying

17:02:35 15  at one of our earlier proceedings early on in the life of the

16      case that if any relief were ordered, the Legislature would

17      want the opportunity to take the first cut at another map.  And

18      so my question is:  Is there anything in the record or any

19      argument you want to make about how long that might take if --

17:02:59 20  and I underscore the if -- any relief were ordered?

21           MR. DAVIS:  Your Honor, there is nothing in the record

22      to my knowledge that would address that question.  I can share

23      that you would -- we got the census data -- the day we got the

24      census data is in the record, and the draft congressional plan

17:03:18 25  was completed soon before the reapportionment committee met.
```

1    That's not quite apples to apples because the map drawer was

2    also working on other maps.

3        All I can tell you -- I think it would take at least a

4    couple of weeks to confer to meet with legislators.  The

17:03:36  5  Legislature will be in session, so we won't have to go through

6    the Governor to call.  But you have to draft the plan, then it

7    will take several days to get to the Legislature.

8        Mr. Walker, do you have more information that you can

9    share?  I will give you this seat.

17:03:49 10         MR. WALKER:  No.  Just saying there will be -- it will

11   be more difficult because --

12              MR. DAVIS:  Oh.  I think -- it may -- I take it

13   Mr. Walker's point is however long it took last time had he

14   been doing just the congressional plan, might take longer since

17:04:07 15  inevitably an order would require drastic changes.  It would

16   not be a least change.  So there would be more the Legislature

17   has to weigh because it would blow up the map.  It would be

18   completely different from the way things were before.

19       So I couldn't give you anything more than a guess.  I

17:04:26 20  don't see how it could possibly be done within less than a

21   couple of weeks.  But it could be much longer.  It could be a

22   little quicker.  That's the best I could do, Judge.

23              JUDGE MANASCO:  Understood.  Thank you.

24              JUDGE MARCUS:  Any other comments or questions about

17:04:45 25  that from anyone, or, Judge Moorer, any questions?

1    MR. LACOUR:  I am I guess depending on the ruling the

2 legislative redistricting committee could even potentially pass

3 new guidelines and do new things.  One of the guidelines in

4 North Carolina at issue in the *Rucho* case was partisan

17:05:06  5 advantage, for example.  And they used that to draw the present

6 gerrymander.  That's not what we did in this case despite

7 having a supermajority of Republicans in both houses.

8    But in any event, there are multiple considerations that

9 through no fault of the Legislature at that point if we are

17:05:27 10 enjoined from using our current map.

11    JUDGE MANASCO:  Understood.

12    MS. KHANNA:  Your Honor, if I may.

13    JUDGE MARCUS:  Ms. Khanna?

14    MS. KHANNA:  If I may just touch briefly on this.  At

17:05:40 15 the time of the Legislature drew the enacted plan, it also drew

16 a State House plan, a State Senate plan, a State Board of

17 Education plan.  It was drawing a lot of plans at the same

18 time.  I can imagine it would take less time to focus just on

19 the one plan and the violation that this Court would specify if

17:05:56 20 it were to find in favor of plaintiffs.

21    Mr. LaCour also brought up North Carolina.  North Carolina

22 I believe has a statute that says if the Court -- when and if a

23 Court strikes down an enacted redistricting map, the

24 Legislature gets two weeks to provide a remedy.  North Carolina

17:06:12 25 legislatures have done this multiple times and I think well

```
 1    under two weeks several times.  So this is -- like I said, the
 2    expedited process here not new.  The need to redraw maps is not
 3    new.  The need to make clear that any new map regardless of
 4    what the state's preferred guidelines are needs to comply with
17:06:29  5    Section 2 of the Voting Rights Act is certainly not new and is
 6    required by law.
 7              JUDGE MANASCO:  Thank you.
 8              JUDGE MARCUS:  Any other questions or comments?  Judge
 9    Moorer?
17:06:42 10              JUDGE MOORER:  No.  I just want to echo the comments
11    of my colleagues about the lawyers' performance in this case.
12    Your help has been very, very good and very helpful to the
13    Court.
14              JUDGE MARCUS:  Anything further from any of the
17:06:57 15    parties?  If not, we will be adjourned.  Mr. Blacksher for the
16    Singleton plaintiffs?
17              MR. BLACKSHER:  No, Your Honor.  Thank you very much.
18              JUDGE MARCUS:  Mr. Ross for Milligan?
19              MR. ROSS:  No, Your Honor.  Just thanking the panel
17:07:13 20    for their time and attention to these issues.
21              JUDGE MARCUS:  Ms. Khanna?
22              MS. KHANNA:  No, Your Honor.  Same thing.  I just want
23    to thank the Court for its flexibility, time, and patience.
24              JUDGE MARCUS:  Mr. Davis, anything further or
17:07:24 25    Mr. LaCour?
```

1    MR. DAVIS:  Nothing else from the defendants, Judge.

2    JUDGE MARCUS:  Thank you all much.  I am sorry.

3  Mr. LaCour, was there anything further?

4    MR. LACOUR:  Just thanking you all as well.

17:07:35  5    JUDGE MARCUS:  Thank you all again for your

6  considerable efforts.  This Court is adjourned.

7    (Whereupon, the above proceedings were concluded at

8    5:07 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
1                          CERTIFICATE

2

3

4        I certify that the foregoing is a correct

5   transcript from the record of proceedings in the

6   above-entitled matter.

7

8

9

10

11                                          01-12-2022

12   Christina K. Decker, RMR, CRR              Date

13   Federal Official Court Reporter

14   ACCR#:  255

15

16

17

18

19

20

21

22

23

24

25
```