# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| BOBBY SINGLETON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.: |
| v. | ) | 2:21-cv-1291-AMM |
| | ) | |
| JOHN H. MERRILL, *in his* | ) | THREE-JUDGE COURT |
| *official capacity as Alabama* | ) | |
| *Secretary of State, et al.* | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| EVAN MILLIGAN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.: |
| v. | ) | 2:21-cv-1530-AMM |
| | ) | |
| JOHN H. MERRILL, *in his* | ) | THREE-JUDGE COURT |
| *official capacity as Alabama* | ) | |
| *Secretary of State, et al.* | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| MARCUS CASTER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.: |
| v. | ) | 2:21-cv-1536-AMM |
| | ) | |
| JOHN H. MERRILL, *in his* | ) | |
| *official capacity as Alabama* | ) | |
| *Secretary of State*, | ) | |
| | ) | |
| Defendant. | ) | |

# DEFENDANTS' EMERGENCY
# MOTION FOR STAY PENDING APPEAL[1]

---

[1] Because the Court granted the same relief to the Caster and Milligan Plaintiffs and entered the same preliminary injunction order in their cases, Defendants will file an identical copy of this document in both *Caster* and *Milligan*.

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... i

**INTRODUCTION** ........................................................................4

**STANDARD OF REVIEW** ...........................................................7

**ARGUMENT** ...............................................................................8

    I.    **The Milligan and Caster Plaintiffs Have Not Shown That Their Section 2 Claims Are Likely to Succeed on the Merits.** ......................8

        A.    **Plaintiffs Cannot Satisfy *Gingles*'s First Precondition.** ...............8

        B.    **Even If *Gingles*'s First Precondition Permitted Plaintiffs to Subordinate Traditional Districting Criteria to Race, *Gingles*'s "Totality of Circumstances" Inquiry Would Prohibit Relief Under Section 2.** ....................................................14

        C.    **If Section 2 Requires States to Subordinate Traditional Redistricting Criteria to Race, Then Section 2 Is Unconstitutional.** ...................................................................16

    II.   **The Balance of Equities Weighs Heavily In Favor Of A Stay.** ..........18

**CONCLUSION** ...........................................................................23

**CERTIFICATE OF SERVICE** ...................................................25

On January 24, 2022, this Court issued an order granting a preliminary injunction based on the Voting Rights Act Section 2 claims of the Caster and Milligan Plaintiffs. *See Milligan* DE107, *see also Caster* DE101. As counsel for the Singleton Plaintiffs explained in closing, the Court's decision is likely not only to affect one upcoming election, but could become "the benchmark for redrawing congressional districts probably for several more decades." Tr. 1903:5-12.[2] That should have been reason enough to decline granting extraordinary relief at the preliminary-injunction stage following just two months of litigation at a breakneck pace and with limited factfinding.

But more significantly, the Order has taken Section 2 to a new (and likely unconstitutional) place, by blessing illustrative plans and demanding a remedy that concededly sacrifices traditional race-neutral redistricting principles to racial considerations. The Order will require race to be used at all times, in all places, and for all districts. The Order never grappled with the stunning concession by Plaintiffs that when their expert, Dr. Duchin, did not include race as a consideration in her map-making algorithms, not a single map of *two million* race-neutral maps came back with two majority-black districts. Tr. 682:3-14. In other words, only if Alabama had

---

[2] "Tr." cites refer to the transcript of the preliminary injunction hearing.

1

permitted race to predominate (to the exclusion of other redistricting criteria), could Alabama have drawn two majority-black districts.

But more significantly, the Order has taken Section 2 to a new (and likely unconstitutional) place, by blessing illustrative plans and demanding a remedy that concededly sacrifices traditional non-racial redistricting principles to racial considerations. While the Court recounted how Dr. Moon Duchin's "algorithms 'found plans with two majority-[B]lack districts in literally thousands of ways'" when the algorithm was programmed to prioritize those racial targets, Op. 56, the Court never grappled with the stunning concession that when Dr. Duchin removed her racial preference from the equation and programmed the algorithm to draw **two million** versions of Alabama's congressional maps in accordance with only a few traditional non-racial districting criteria, **not one map** came back with two majority-black districts. Tr. 682:3-14. Dr. Kosuke Imai reached the same conclusion: based on the political geography of Alabama and the broad dispersion of black Alabamians, it is essentially impossible to draw a map like those presented by Plaintiffs unless traditional districting principles give way to race. MX1:7-9 ¶¶ 18-19, 26; Tr. 235:12-236:18 ("conclud[ing] that race predominate[s]" where Districts 2 and 7 exceed 50% BVAP).

The Court's Order concludes that such predominance is permissible under the Voting Rights Act. That conclusion is an erroneous interpretation of the Voting

2

Rights Act (at best) and an unconstitutional application of the Voting Rights Act (at worst). Under the Court's order, even if the Legislature had generated two million maps with race-neutral criteria to assess whether it could find a second majority-Black district and found not one, it still should have "infuse[d] race into" this redistricting and must forever "infuse race into virtually every redistricting" to come, "raising serious constitutional questions." *LULAC v. Perry*, 548 U.S. 399, 446 (2006) (opinion of Kennedy, J.). That is not the law, and at a minimum, Defendants should be able to confirm on appeal whether it is before the State's political destiny is forever reshaped by federal court order.

Defendants therefore file this Emergency Motion for Stay Pending Appeal. To enable Defendants to expeditiously seek a stay on appeal (if necessary) by January 26, 2022, Defendants respectfully requests that the Court issue a ruling on this Motion by the **end of the day today, January 25, 2022**.

**INTRODUCTION**

This is the rare Section 2 case in which Plaintiffs have admitted that they cannot possibly draw a map with an additional majority-minority district unless traditional redistricting principles are subordinated to race. Indeed, testimony from Plaintiffs' experts demonstrates the impossibility of such a map: one expert generated thirty-thousand congressional maps for Alabama based on several traditional race-neutral districting principles and another expert—Dr. Duchin—generated *two million*. But *not one* of these two-million-plus race-neutral maps contained two majority-minority districts. As Plaintiffs themselves concede, to produce maps with two majority-minority districts, Plaintiffs necessarily must prioritize race at the expense of traditional race-neutral districting principles. Plaintiffs' map drawers testified that they bent or ignored traditional criteria to hit their racial targets. Because "§ 2 does not require a State to create, on predominantly racial lines, a district that is not 'reasonably compact,'" *Abrams v. Johnson*, 521 U.S. 74, 91-92 (1997), the Legislature was not required to draw a map that—to a mathematical certainty—could not have been drawn without compromising traditional districting principles to race.

This emphatically does not mean, as the Court misconceived, that "a remedial plan" would be rendered "unconstitutional … for attempting to satisfy *Gingles I*." Op. 205. Plaintiffs' problem is not their *subjective* intent to draw majority-minority

4

districts, but the *objective* fact that they could not do so without subordinating traditional districting principles to race. Thus, for example, if the first million of Plaintiffs' two million race-neutral maps included two majority-minority districts and the second million included only one such district, Section 2 might permit Plaintiffs to pick from the first group even "if race for its own sake is the overriding reason for choosing one map over others." *Bethune-Hill v. Va. St. Bd. of Elections*, 137 S. Ct. 788, 799 (2017). But that did not occur here. What Plaintiffs did, but cannot permissibly do, is rely on a plan that "conflicts with traditional redistricting criteria." *Id.* And the problem for Plaintiffs is that they could not draw *any* map with two majority-minority districts "consistent with traditional districting principles." *Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998).

The race-neutral baseline approach follows from the fact that any "assignment of voters on the basis of race" is subject to constitutional law's "strictest scrutiny." *Miller*, 515 U.S. at 915. Section 2 permits race-conscious districting only in a limited context. Specifically, Section 2 *does* permit limited racial preference among maps that honor a State's "traditional districting principles," *LULAC*, 548 U.S. at 433; that is, a legislature generally may choose a plan with more majority-minority districts rather than fewer so long as (1) the map honors traditional districting principles, and (2) to do otherwise would dilute minority voting power. But Section 2 does *not* permit a legislature (or Plaintiffs) to inject "non-negotiable" (in Dr. Duchin's words)

racial preferences into the map-drawing stage and then choose a plan from the suite of race-based maps subordinating traditional redistricting principles. Plaintiffs' contrary view would take Section 2 beyond its promise of "equal[] … opportunity," 52 U.S.C. § 10301(b), and "would unnecessarily infuse race into virtually every redistricting, raising serious constitutional questions." *Bartlett v. Strickland*, 556 U.S. 1, 20 (2009) (plurality op.). Because "Section 2 does not guarantee minority voters an electoral advantage," *id.*, and because Plaintiffs' maps sacrifice traditional districting criteria to race, their claims fail.

Plaintiffs' Section 2 claims fail for additional reasons that will be fleshed out on appeal, but even if the merits of their claims presented a close call, the equities would be dispositive. There has been but "a few weeks of discovery and an abbreviated trial" over "legally and factually complicated" claims. *Favors v. Cuomo*, 881 F. Supp. 2d 356, 371 (E.D.N.Y. 2012). And were the Court's order to go into effect, requiring the State to redraw its maps with the 2022 campaign cycle in full swing, chaos would ensue. The State would have insufficient time to reassign voters to new districts; independent candidates would suddenly learn they had been collecting signatures from the wrong people; and districts would likely be left unrepresented with no assurance that qualified candidates would decide—within days—to launch a campaign. Prudence and equity alone therefore require that Plaintiffs' motions be denied.

## **STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 62(d), "[w]hile an appeal is pending

from an interlocutory order … that grants … an injunction, the court may suspend"

the injunction. In considering whether to stay an injunction pending appeal, courts

weigh the following four factors:

> (1) whether the stay applicant has made a strong showing that he is
>     likely to succeed on the merits;
> (2) whether the applicant will be irreparably injured absent a stay;
>
> (3) whether issuance of the stay will substantially injure the other
>     parties interested in the proceeding; and
>
> (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 426 (2009); *Swain v. Junior*, 958 F.3d 1081, 1088

(11th Cir. 2020) (staying preliminary injunction pending appeal). "The first two

factors are 'the most critical.'" *Swain*, 958 F.3d at 1088 (quoting *Nken*, 556 U.S. at

434). "[W]here the government is the party opposing the … injunction, its interest

and harm merge with the public interest." *Id.* at 1091 (citing *Nken*, 556 U.S. at 435).

Here, all of these factors weigh in favor of granting a stay.

Moreover, when evaluating challenges to electoral processes "just weeks

before an election," federal courts must "weigh, in addition to the harms attendant

upon issuance or nonissuance of an injunction, considerations specific to election

cases and its own institutional procedures." *Purcell v. Gonzalez*, 549 U.S. 1, 4

(2006).

## ARGUMENT

**I.   The Milligan and Caster Plaintiffs Have Not Shown That Their Section 2 Claims Are Likely to Succeed on the Merits.**

### A. Plaintiffs Cannot Satisfy *Gingles*'s First Precondition.

The Milligan and Caster Plaintiffs assert that Section 2 of the Voting Rights Act requires two majority-minority districts where there is currently one. However, these Plaintiffs' experts made clear that drawing a two-majority-minority-district map using traditional, race-neutral districting principles was virtually impossible— out of *two-million* race-neutral attempts, *not one* contained two majority-minority districts. That should have ended their endeavor.

Instead, Plaintiffs decided to work backwards. Rather than following traditional, race-neutral districting criteria and determining whether any such maps could contain two majority-minority districts, Plaintiffs first drew two majority-minority districts—that is, they began by granting themselves the relief they seek under Section 2—and then determined *ex post* which districting principles they would (or could) attempt to respect. By looking first to racial quotas and second to the State's redistricting guidelines, there is no question that "[r]ace was the criterion that … could not be compromised." *Shaw II*, 517 U.S. at 907; *see also* Op. 205 (noting Dr. Duchin's testimony that she considered two majority-Black districts as 'non-negotiable'"). The crux of Plaintiffs' argument is that because Section 2 contemplates limited, race-conscious relief, the statute necessarily requires States to

8

subordinate non-racial, traditional redistricting criteria to race, and even to inject racial preferences into each non-racial criterion. This argument, now endorsed by this Court, is limitless. It permits race to predominate in redistricting at all times, in all places, and in all districts.

"The preamble to the Voting Rights Act of 1965 establishes that the central purpose of the Act is '[t]o enforce the fifteenth amendment to the Constitution of the United States.'" *Chisom v. Roemer*, 501 U.S. 380, 383 (1991). In accordance with its constitutional authority under the Fifteenth Amendment, Section 2 of the VRA is thus a non-discrimination provision; racial equality is the target. *Georgia v. Ashcroft*, 539 U.S. at 490 ("The purpose of the Voting Rights Act is to prevent discrimination in the exercise of the electoral franchise and to foster our transformation to a society that is no longer fixated on race.").

To be sure, the statute permits limited race-conscious relief where traditional, race-neutral districting criteria are already met. It is not, however, the categorical and limitless exception to the Fourteenth Amendment. It does not provide a map-drawer *carte blanche* to prioritize race above traditional criteria and taint the entire districting process with racial preferences—just what the Court has sanctioned here. Indeed, this latter interpretation not only runs afoul of Section 2's non-discrimination mandate, but also drags the statute headlong into conflict with the Fourteenth Amendment's Equal Protection guarantee. *See Miller*, 515 U.S. at 927 (interpreting

9

Section 2 to "command that States engage in presumptively unconstitutional race-based districting" brings the statute "into tension with the Fourteenth Amendment"). "Section 2 does not guarantee minority voters an electoral advantage," *Bartlett v. Strickland*, 556 U.S. 1, 20 (2009); where, as here, "minority voters have the same opportunity to elect their candidate as any other political group with the same relative voting strength," the VRA cannot place a race-based thumb on the scale for Plaintiffs, *id.* To do so would distort the statute's plain language, "emphasi[zing] the word 'opportunity' at the expense of the word 'equally.'" *Id.*

In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the Supreme Court attempted to chart a constitutional course for Section 2's provision of limited, race-conscious relief. To show Section 2 claims are viable, *Gingles* requires that Plaintiffs first satisfy three threshold preconditions: "namely (1) that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district, (2) that the minority group is politically cohesive, and (3) that the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." *Bartlett*, 556 U.S. at 8-9 (internal quotation marks omitted).[3]

This Court concluded that Plaintiffs may subordinate a State's traditional districting principles to race in order to satisfy *Gingles*'s first precondition, so long

---

[3] Moreover, the Eleventh Circuit requires that plaintiffs in Section 2 litigation "demonstrate the existence of a proper remedy." *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999).

as they do it only "to the extent necessary to determine whether it was possible for the Milligan plaintiffs and the Caster plaintiffs to state a Section Two claim." Op. 204. Of course, a Plaintiff must identify as part of *Gingles*'s first precondition that a majority-minority district can be drawn. But *Gingles* does not permit a Plaintiff to satisfy *Gingles 1* by abandoning all redistricting principles. But that is precisely what occurred here. The uncontested evidence here is that it is *impossible* to draw two majority-minority districts in Alabama if one were to consider only race-neutral redistricting principles. That is dispositive—there can be no clearer indication that *Gingles 1* cannot be satisfied than Plaintiffs' experts own algorithms. But by importing into the redistricting process this new "creation of two majority-Black districts" principle, Op. 57, the Court allowed Plaintiffs to start at the end (*i.e.*, "two districts must be drawn") and then work backwards to explain why traditional districting principles were only somewhat compromised. Only "'after' … minority opportunity to elect" was satisfied did the maps then try to satisfy "'compactness.'" Op. 57. The Court thus accepted Plaintiffs' position that, because Section 2 contemplates *some* racial considerations in its relief, the statute duly permits nearly *any* racial considerations Plaintiffs (or a court) might propose—and requires legislatures to "infuse race into virtually every redistricting." *Bartlett*, 556 U.S. at 21.

11

This position contravenes Supreme Court precedent and collapses the distinction between permissible race-conscious remedies under Section 2 and unconstitutional racial gerrymanders. The former permits race-conscious relief only where plaintiffs demonstrate that redistricting has "result[ed] in a denial or abridgement of the right … to vote on account of race or color," 52 U.S.C. §10301(a), and requires a remedy which honors "traditional districting principles." *LULAC*, 548 U.S. at 433. The latter, however, occurs where these traditional principles are "subordinated to racial objectives." *Miller*, 515 U.S. at 919. The district court's interpretation of Section 2 contorts the statute into a permanent exemption to the Fourteenth Amendment's Equal Protection guarantees. The VRA is not an unwritten constitutional amendment. If, as the Court has interpreted here, the VRA means race-based redistricting is *always* permissible, then the VRA is unconstitutional as applied to single-member districts.

Plaintiffs undertook "serious gerrymandering" by subordinating traditional redistricting principles to their goal of maximizing black voting power, which is precisely what "[t]he Voting Rights Act does not require." *Gonzalez v. City of Aurora*, 535 F.3d 594, 600 (7th Cir. 2008) (Easterbrook, J.). And more fundamentally, Plaintiffs' position puts the cart before the horse; their task in this litigation is to show that Alabama has violated Section 2, and only then may this

Court sanction a race-conscious remedy. Plaintiffs may not presume the truth of what they are required to prove.

Plaintiffs' approach goes well beyond the cynical picture of gerrymandering "run amok" Justice Kagan painted in her *Rucho* dissent. 139 S. Ct. at 2520 (Kagan, J., dissenting). There, Justice Kagan lamented the possibility that "today's mapmakers can generate thousands of possibilities at the touch of a key—and then choose the one giving their party maximum advantage (usually while still meeting traditional districting requirements)." *Rucho,* 139 S. Ct. at 2513. Here, Dr. Duchin's actions would make Justice Kagan's nefarious mapmaker blush; Dr. Duchin generated *millions* of random race-neutral maps, but *none* provided her preferred result. Only when she imposed algorithmic requirements to maximize black Alabamians' electoral advantage—necessarily reshaping maps at the expense of race-neutral criteria—did she find maps that hit her racial targets. In *Rucho*, Justice Kagan deemed North Carolina's congressional map an extreme political gerrymander after an "expert produced 3,000 maps, adhering … to the districting criteria that the North Carolina redistricting committee had used, other than partisan advantage," and every "one of the 3,000 maps would have produced at least one more Democratic House Member than the State's actual map." *Rucho,* 139 S. Ct. at 2518. Those 3,000 maps were enough, in Justice Kagan's view, to declare the North Carolina map "an out-out-outlier." *Id.* Here, several more "out's" are warranted,

given that generating *two million* maps on grounds other than race failed to generate even one map with two majority-black district.

By accepting maps that disregard the State's traditional redistricting principles to the extent they conflict with Plaintiffs' preferred racial quotas, the district court misconstrued Section 2. The Order endorses maps in which race predominates over traditional districting principles—that is, maps embodying racial gerrymanders which the Legislature never could have passed in the first instance—and orders the Legislature to adopt such a map. *See, e.g.*, *Shaw II*, 517 U.S. at 907 (racial gerrymander where "[r]ace was the criterion that … could not be compromised"); *Miller*, 515 U.S. at 916 (racial gerrymander where map "subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations"). Because "[Section] 2 does not require a State to create, on predominantly racial lines, a district that is not 'reasonably compact,'" *Bush v. Vera*, 517 U.S. 952, 979 (1996), the Court should stay its Order.

   **B. Even If *Gingles*'s First Precondition Permitted Plaintiffs to Subordinate Traditional Districting Criteria to Race, *Gingles*'s "Totality of Circumstances" Inquiry Would Prohibit Relief Under Section 2.**

Only if Plaintiffs can clear *Gingles*'s threshold hurdles do they then proceed to Section 2's "totality of circumstances" inquiry, which demands a holistic investigation aimed at whether "the political processes … in the State … are not

equally open to participation by [black Alabamians] in that [they] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. §10301(b). Under the statute, this inquiry establishes whether black Alabamians suffer "denial or abridgement of the right … to vote on account of race or color." *Id.* at §10301(a).

The Legislature did not decline to pass congressional plans resembling Plaintiffs' illustrative maps "on account of race or color," but rather because of traditional districting principles and basic political geography and demographics. Indeed, Plaintiffs proved as much; neither Dr. Imai's tens of thousands of maps nor Dr. Duchin's millions of race-neutral maps produced a *single* two-majority-minority-district map.

This Court's conclusion that the 2021 Map "results in a denial or abridgement of" Plaintiffs' rights "on account of race or color" is thus legally erroneous. 52 U.S.C. § 10301(a). Where *no* iteration of race-neutral districting principles can produce a map with two majority-minority districts, Plaintiffs cannot show that the State's "political processes" for Congressional districting are not "equally open" to them. In other words, failure to give Plaintiffs' a race-based preference that no other similarly sized and dispersed group could expect to receive from a neutral redistricting process is not failure to treat Plaintiffs equally.

## C. If Section 2 Requires States to Subordinate Traditional Redistricting Criteria to Race, Then Section 2 Is Unconstitutional.

Congress derived its authority to enact the VRA pursuant to the Fifteenth Amendment, *Chisom*, 501 U.S. at 383, which guarantees that "[t]he right of citizens of the United States to vote shall not be denied or abridged by … any State on account of race, color, or previous condition of servitude," and permits Congress to "enforce" its substantive provisions "by appropriate legislation." U.S. CONST. amend. XV, §§1-2. Congress may enforce the substantive provisions of the Fourteenth and Fifteenth Amendments "by creating private remedies against the States for *actual violations* of those provisions." *United States v. Georgia*, 546 U.S. 151, 158 (2006) (emphasis added). This Court's interpretation of Section 2 would not only unmoor the statute from its constitutional authority under the Fifteenth Amendment but also turn the VRA into a tool for race-based "electoral advantage," creating "serious constitutional concerns under the Equal Protection Clause." *Bartlett*, 556 U.S. at 20-21.

The Court misinterprets Section 2 as a nearly all-purpose exemption to the Fourteenth Amendment's prohibition against race-based sorting. Where, as here, the Court-ordered remedy is "obviously … created solely to effectuate the perceived common interests of one racial group," the court is ordering a racial gerrymander "altogether antithetical to our system of representative democracy." *Shaw I*, 509 U.S. at 648.

16

The Court did not offer any answer to the critical question of whether daylight exists between (1) racial gerrymandering repugnant to the Constitution (maps that conflict with traditional principles because of racial considerations) and (2) the race-conscious relief (maps that do not conflict with traditional principles but are selected with an eye toward race) that can be required under Section 2. If Section 2 is constitutional, then necessarily the answer is "Yes." To hold otherwise would convert Section 2 into a thoroughgoing exemption to the Fourteenth Amendment; while an amendment may permanently modify the Constitution, a statute cannot. Yet the Court collapsed these discrete concepts, holding that Section 2's limited, highly contextual, race-conscious relief permits plaintiffs to subordinate all aspects of redistricting to race.

By failing to distinguish race-conscious relief from racial gerrymandering, the Court interprets Section 2 to "command that States engage in presumptively unconstitutional race-based districting," which in turn brings the statute "into tension with the Fourteenth Amendment." *Miller*, 515 U.S. at 927. The Court's interpretation ignores that any "exercise of [Congress's] Fifteenth Amendment authority even when otherwise proper still must 'consist with the letter and spirit of the Constitution.'" *Id.* (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819)). Requiring States' redistricting processes to bear an "uncomfortable resemblance to political apartheid," *Shaw I*, 509 U.S. at 647, consists with neither.

17

## II.   The Balance of Equities Weighs Heavily In Favor Of A Stay.

A stay is also warranted because this Court's order at this late hour is inflicting grave harm on the public interest. "When the massive disruption to the political process of the [State] is weighed against the harm to plaintiffs of suffering through one more election based on an allegedly invalid districting scheme, equity requires that [this Court] deny relief." *Mac Govern v. Connolly*, 637 F. Supp. 111, 116 (D. Mass. 1986) (three-judge court).

Enjoining the State from using the 2021 Map throws the current election into chaos and leaves almost no time for maps to be redrawn, hundreds of thousands of voters to be reassigned to new districts, and thousands of new signatures to be obtained by candidates and political organizations seeking ballot access. And those harms will be vastly magnified here given that the State's 2021 Map largely preserves preexisting, decades-old districts while making minimal changes to equalize population, whereas Plaintiffs seek to redraw much of the map.

Former Representative Byrne testified about the problems with drastically changing the congressional lines this late in the day. Tr. 1693:16-1694:7. And Plaintiff Dowdy too recognized the obvious fact that candidates often spend significant time and money to campaign and meet prospective voters. Tr. 399:16-21. Add to that now the reality that candidates will have mere days to even consider whether to run in brand new districts.

18

To pull the rug out from these candidates and their voters in the run-up to an election requires extraordinary justification. Courts often reject requests to preliminarily enjoin the use of redistricting plans in impending elections, and this Court should have followed suit here. As those courts have recognized, "elections are complex to administer, and the public interest [is] not … served by a chaotic, last-minute reordering of ... districts. It is best for candidates and voters to know significantly in advance of the petition period who may run where." *Favors v. Cuomo*, 881 F. Supp. 2d 356, 371 (E.D.N.Y. 2012) (three-judge court) (citing *Diaz v. Silver,* 932 F. Supp. 462, 466-68 (E.D.N.Y. 1996) (three-judge court)). Thus, "[t]he Supreme Court has held that an injunction may be inappropriate even when a redistricting plan has actually been found unconstitutional because of the great difficulty of unwinding and reworking a state's entire electoral process." *Id.* (citing *Reynolds v. Sims,* 377 U.S. 533, 585 (1964); *Roman v. Sincock,* 377 U.S. 695, 709-10 (1964)).

Relatedly, the Court leaves precious little time for the State to exercise its sovereign prerogative and craft an appropriate remedy. Drawing new maps takes time. One expert advises courts that are considering map-drawing themselves to budget "one month for the drawing of a plan and an additional month for hearings and potential modifications to it … so that all concerned can proceed in a nonfrenzied fashion." Nathaniel Persily, *When Judges Carve Democracies: A Primer on*

*Court-Drawn Redistricting Plans*, 73 Geo. Wash. L. Rev. 1131, 1147-48 (2005). But a frenzied process is guaranteed by the Court's order.

Accordingly, "[s]ince the *Reynolds* decision, a number of federal courts have withheld the granting of relief, and even dismissed actions, where an election was imminent and the election process had already begun." *Pileggi v. Aichele*, 843 F. Supp. 2d 584, 593 (E.D. Pa. 2012) (three-judge court) (collecting cases). Those serious concerns about timing and administrability apply with full force here. As Alabama's Director of Elections Clay Helms has attested, "[t]here are substantial obstacles to changing the Congressional districts at this late date." DX7:2. Indeed, pandemic-related delays to census numbers stalled the redistricting process, in turn creating a situation in which "local election officials are already under time pressures created by the fact that the maps were adopted in November, 2021." *Id.*

It is important to recognize that, while the primary election will be held on May 24, 2022, absentee voting starts on March 30, 2022, which is only weeks away. And there are all sorts of activities that must be accomplished in advance of that March 30 deadline, including candidate qualification. Similarly, under Alabama law political parties must certify their candidates to probate judges and the Secretary of State by March 9, *see* Ala. Code §17-13-22, and the Secretary must certify the names of opposed candidates for state and federal offices by March 11, *see id.* at §17-13-5(b).

20

The harms that would flow from enjoining the 2021 Map are varied and certain. Candidates seeking to run in major party primaries have expended significant time and money ahead of the January 28 qualifying deadline. A primary will be required for voters to choose among them. *See* Ala. Code § 17-13-1. Much of the time and money spent to engage with potential voters would prove wasted if those voters are later moved to a different district. One of many reasons "[i]t is best for candidates and voters to know significantly in advance of the petition period who may run where." *Favors*, 881 F. Supp. 2d at 371.

For absentee voting to begin on March 30, 2022, DX7:4, ballots must be finalized and printed in advance. Federal law requires that the ballots of voters protected by the Uniformed and Overseas Citizens Absentee Voting Act be transmitted no later than April 9, 2022, if they have been requested by that time. DX7:4-5; 52 U.S.C. § 20302(a)(8). Where recent experience shows that election officials struggled to complete the district-assignment process within four months following remedial redistricting, DX7:4, Plaintiffs have failed to provide any reason to believe that potentially hundreds of thousands of voters could be swapped among districts in the three months between this opinion's issuance and the April 9, 2022 deadline to have absentee ballots for UOCAVA voters out the door for congressional primary elections.

21

In short, "the election machinery wheels [are] in full rotation," *Graves v. City of Montgomery,* 807 F.Supp.2d 1096, 1112 (M.D. Ala. 2011), and can't be stopped without grave damage to the public. That is why courts and redistricting experts have recognized that a court that must draw a map, "should have as its goal the imposition of a plan no later than one month before candidates may begin qualifying for the primary ballot,' which 'means that the court should begin drawing its plan about three months before the beginning of ballot qualification in order to build in time for possible hearings and adjustments to the plan.'" *Favors*, 881 F. Supp. 2d at 364 (quoting Persily, *When Judges Carve Democracies: A Primer on Court-Drawn Redistricting Plans*, 73 Geo. Wash. L. Rev. at 1147). We are already well past such timeframes.

Finally, "[c]ases in which the Supreme Court has found a problem under § 2 all involve transparent gerrymandering that boosts one group's chances at the expense of another's." *Gonzalez*, 535 F.3d at 598. But the Guidelines the Alabama Legislature implemented and the map it enacted are entirely ordinary. The Legislature did not break sharply from the past to enact a brazen partisan gerrymander. *See Rucho*, 139 S. Ct. at 2491 (Republican redistricting committee chair "explain[ing] that the map was drawn with the aim of electing ten Republicans and three Democrats because he did 'not believe it [would be] possible to draw a map with 11 Republicans and 2 Democrats'"). Nor did the Legislature break up an

22

established community of minority voters to take "away [their] opportunity because [they] were about to exercise it." *LULAC*, 548 U.S. at 440.

All Alabama seeks to do is implement a map that largely carries forward districts that have existed for half a century and that, since 1992, have been approved by federal courts and Legislatures controlled first by Democrats and more recently by Republicans. It may be that at the close of full discovery and a full trial, that this Court determines that the 2021 Plan nevertheless contains some legal flaw. But just two months into this litigation, it is not clear that Plaintiffs will prevail. And roughly two months before absentee voting begins, it is clear that the Court's order will cause irreparable harm to Alabama, its aspiring congressional representatives, and the voters they seek to represent. The Court should stay its preliminary injunction order pending appeal.

## CONCLUSION

The Court should grant stays pending appeal of its orders granting the *Caster* and *Milligan* Plaintiffs' motions for preliminary injunction. As noted above, due to the exigencies imposed by these cases and these orders, and Defendants' potential need to seek appellate review on an expedited basis, Defendants respectfully request that the Court issue a ruling on this stay motion by the end of the day today, January 25.

Respectfully submitted,

Steve Marshall
 *Attorney General*

Dorman Walker (ASB-9154-R81J)
BALCH & BINGHAM LLP
Post Office Box 78 (36101)
105 Tallapoosa Street, Suite 200
Montgomery, AL 36104
Telephone: (334) 269-3138
Email: dwalker@balch.com

**Counsel for Sen. McClendon and Rep. Pringle**

*/s/ Edmund G. LaCour Jr.*
Edmund G. LaCour Jr. (ASB-9182-U81L)
 *Solicitor General*

A. Barrett Bowdre (ASB-2087-K29V)
Thomas A. Wilson (ASB-1494-D25C)
 *Deputy Solicitors General*

James W. Davis (ASB-4063-I58J)
 *Deputy Attorney General*

Misty S. Fairbanks Messick (ASB-1813-T71F)
A. Reid Harris (ASB-1624-D29X)
Brenton M. Smith (ASB-1656-X27Q)
Benjamin M. Seiss (ASB-2110-O00W)
 *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Reid.Harris@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov

**Counsel for Secretary Merrill**

24

## CERTIFICATE OF SERVICE

I certify that I electronically filed this document using the Court's CM/ECF system on January 25, 2022, which will serve all counsel of record.

/s/Edmund G. LaCour Jr.

Edmund G. LaCour

*Counsel for Secretary Merrill*
