FILED

2022 Jan-26  AM 07:49
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| MARCUS CASTER, LAKEISHA CHESTNUT, BOBBY LEE DUBOSE, BENJAMIN JONES, RODNEY ALLEN LOVE, MANASSEH POWELL, RONALD SMITH, and WENDELL THOMAS, | |
| Plaintiffs, | Case No. 2:21-CV-1536-AMM |
| v. | |
| JOHN H. MERRILL, in his official capacity as Alabama Secretary of State, | |
| Defendant, | |
| and | |
| CHRIS PRINGLE and JIM McCLENDON, | |
| Intervenor-Defendants. | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL

# TABLE OF CONTENTS

I.  Introduction ........................................................................................1

II.  Argument............................................................................................2

    A.  Defendants fail to show they are likely to succeed in their appeal. ..........3

        i.  The applicable appellate standards of review require significant deference to this Court's conclusions. .................................................3

        ii.  This Court's finding that Plaintiffs satisfied the *Gingles* preconditions was not clearly erroneous. ...........................................5

        iii.  The Court did not clearly err in concluding that the totality of circumstances indicate HB 1 will result in vote dilution..................11

    B.  Defendants fail to satisfy any of the remaining stay factors. ..................12

III. Conclusion.........................................................................................15

## I.    Introduction

After "a seven-day preliminary injunction hearing"; "live testimony from seventeen witnesses (eleven experts and six other fact witnesses); more than 400 pages of prehearing briefing and 600 pages of post-hearing briefing; reports and rebuttal reports from every expert witness; more than 350 hearing exhibits; [and] joint stipulations of fact that span seventy-five pages," this Court issued an extensively reasoned, 225-page opinion enjoining HB 1 and finding that the question of Plaintiffs' success on the merits of their Section 2 claim is not even "a close one." Order, ECF No. 101, at 3, 195. Defendants now ask this Court to stay its decision.

Issuing a stay is extraordinary relief, and litigants who request it must overcome a significant burden. Defendants' motion to stay comes nowhere close to meeting, much less carrying, that burden. On the merits, Defendants offer nothing but the same basic argument they have offered throughout these entire proceedings: that faithful application of decades-settled Supreme Court and Eleventh Circuit Section 2 case law somehow violates the Equal Protection Clause. But this Court has already considered and rejected that argument. On the equities, Defendants' hyperbole about this Court's injunction sowing "chaos" is not supported by the record. Each of the arguments Defendants' motion presents on the issue of equities and timing was considered and rejected by the Court in its fulsome order.

Defendants offer no reason for this Court to question the propriety of its

preliminary injunction. Their motion to stay should be denied.

## II.    Argument

"[A] stay of a preliminary injunction is 'extraordinary relief' for which the moving party bears a 'heavy burden.'" *Schultz v. Alabama*, No. 5:17-cv-270-MHH, 2018 WL 9786086, *3 (N.D. Ala. Nov. 8, 2018) (quoting *Winston-Salem/Forsyth Cnty. Bd. of Educ. v. Scott*, 404 U.S. 1221, 1231 (1971)). While Defendants articulate the proper legal standard, Defs.' Emergency Mot. for Stay Pending Appeal ("Mot."), ECF No. 103, at 7, they make no effort to grapple with any of this Court's extensive findings to satisfy that standard. As a result, Defendants fail to show that any of the four relevant factors favors a stay: (1) they do not make a "strong showing that [they are] likely to succeed on the merits" of their appeal; (2) they do not demonstrate they "will be irreparably injured absent a stay"; (3) they do not show that a stay will not "substantially injure the other parties interested in the proceeding"; and (4) "the public interest lies" firmly against issuing a stay. *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019).

"A stay is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Id.* at 1327 (quoting *Va. R. Co. v. United States*, 272 U.S. 658, 672 (1926)). And, like "a motion for reconsideration, a motion to stay should not be used to relitigate matters" already decided by the Court. *ODonnell v. Harris Cnty.*, 260 F. Supp. 3d 810, 815 (S.D. Tex. 2017).

**A.      Defendants fail to show they are likely to succeed in their appeal.**

Defendants have not made any showing—let alone a strong showing—that their appeal is likely to succeed. "To satisfy [their] burden" on this element, Defendants "must show more than the mere possibility of success on the merits." *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1317. Here, that burden is particularly difficult for Defendants to satisfy, given the significant deference the Eleventh Circuit must give this Court's conclusion that Plaintiffs were likely to succeed on the merits of their claim. Unsurprisingly, Defendants fall far short.

> **i.      The applicable appellate standards of review require significant deference to this Court's conclusions.**

Defendants' appeal of this Court's preliminary injunction will involve a significant amount of deference to the Court's findings and conclusions. *First*, an appellate court's "review of a district court's finding of vote dilution under section 2 is only for clear error." *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1301 (11th Cir. 2020). This is because "the section 2 inquiry is particularly dependent upon the facts of each case and requires an intensely local appraisal of the design and impact of the contested electoral mechanisms." *Id.* (quoting *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1226 (11th Cir. 2000) (en banc)). The "application of the clearly-erroneous standard to ultimate findings of vote dilution preserves the benefit of the trial court's particular familiarity with the indigenous political reality without endangering the rule of law." *Id.* (quoting

- 3 -

*Thornburg v. Gingles*, 478 U.S. 30, 79 (1986)).

Thus, this Court's vote-dilution finding can be reversed only if the appellate court is "left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *Silva v. Pro Transp., Inc.*, 898 F.3d 1335, 1339 (11th Cir. 2018)). "This standard does not allow [the appellate court] to reverse" simply because it is convinced it would "have decided the case differently"; unless it is "compelled to conclude that [this Court's] findings are not supported by substantial evidence, [it] must affirm." *Id.* (internal quotation marks omitted).

The appellate court's clear-error review "extends not only to [this Court's] ultimate conclusion of vote dilution, but also to [any] 'finding that different pieces of evidence carry different probative values in the overall section 2 investigation.'" *Id.* (quoting *Solomon*, 221 F.3d at 1227). This is because the various factors considered in that analysis "will be more or less probative depending upon the facts of the case." *Id.* As a result, an appellate court "review[s] *all* of the district court's findings regarding the probative value assigned to each piece of evidence for clear error." *Id.* (internal quotation marks omitted).

*Second*, this Court's decision to issue a preliminary injunction and its determinations underlying that decision—such as Plaintiffs' likelihood of success on the merits—independently receive deference on appeal. *See Jones v. Gov. of Fla.*, 950 F.3d 795, 806 (11th Cir. 2020). "This deferential standard follows from [t]he

expedited nature of preliminary injunction proceedings, in which *judgments . . . about the viability of plaintiff's claims* and the balancing of equities and the public interest . . . are the district court's to make." *Id.* (emphasis added) (internal quotation marks omitted).

Considering the multiple layers of deference this Court's findings will receive on appeal, Defendants have an extraordinarily high burden to show that their appeal is likely to succeed. Their motion falls woefully short of that burden.

> **ii.    This Court's finding that Plaintiffs satisfied the *Gingles* preconditions was not clearly erroneous.**

In finding Plaintiffs satisfied the first *Gingles* precondition, the Court engaged in an in-depth analysis, determining whether Plaintiffs' illustrative plans comported with each of the traditional redistricting principles. Order 157-74. Defendants' motion largely ignores the Court's analysis. Instead, it presents incorrect legal assertions and irrelevant factual contentions that do not alter the Court's ultimate conclusion.[1]

Defendants' argument that Mr. Cooper and Dr. Duchin "decided to work backwards" in a way that Section 2 does not allow finds no basis in the factual record and contradicts the applicable legal standard. Mot. 8. As the Court explained, they

---

[1] Defendants' motion does not challenge the Court's findings as to the second or third *Gingles* preconditions. As such, Defendants have waived any argument as to those preconditions. *See Toffel v. Jefferson Cnty. Barber Comm'n*, No. 2:16-cv-1340-CLM, 2020 WL 6870449, at *7 (N.D. Ala. 2020) (finding a failure to raise argument in motion "waive[s] the right to assert" it).

did the exact opposite. Order 204–05. Indeed, Mr. Cooper and Dr. Duchin both explained how their districts would have looked quite different if they followed the approach Defendants accuse them of taking. *Id.* at 205. To support their argument, Defendants rely exclusively on Dr. Duchin's statement that she considered two majority-Black districts as a "non-negotiable" when drawing her districts. Mot. 8. But that statement does not suggest Dr. Duchin (or, of course, Mr. Cooper) "first drew two majority-minority districts . . . and then determined *ex post* which districting principles they would (or could) attempt to respect." *Id.* Dr. Duchin's statement simply indicates that she was trying to answer the single question the first *Gingles* precondition poses: is it possible to draw a second majority-Black district in a manner that complies with traditional redistricting principles? *See* Order 205. It would have made no sense, in answering that question, for Dr. Duchin to consider plans that did not contain two majority-minority districts.

Even if, contrary to the evidentiary record and this Court's findings, Mr. Cooper and Dr. Duchin had taken the approach Defendants imagine, that would not mean Plaintiffs cannot satisfy the first *Gingles* precondition. That standard requires only that Plaintiffs show they can draw a second majority-minority district that is "consistent with traditional redistricting principles." *Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998). The question of a plan's consistency with traditional redistricting principles is focused only on reasonableness; there are no bright line

rules. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006). As this Court extensively explained—through an analysis of each and every traditional redistricting principle—Mr. Cooper's and Dr. Duchin's plans meet that consistency requirement. Order 159-74. That Defendants prefer the enacted plan— or even think it better comports with certain traditional redistricting principles—is not a basis to call Plaintiffs' illustrative plans racial gerrymanders. *Id.* at 165 ("[O]ur task is not to decide whether the majority-Black districts in the Duchin plans and Cooper plans are 'better than' or 'preferable' to a majority-Black district drawn a different way.").

Because Defendants fail to offer any persuasive challenge to the Court's extensively reasoned conclusion that Mr. Cooper's and Dr. Duchin's plans are consistent with each of the relevant traditional redistricting principles, their empty rhetoric about the supposed unconstitutionality of Plaintiffs' plans quickly crumbles. As they did before, Defendants point to *Miller v. Johnson*, 515 U.S. 900 (1995), claiming that intentionally drawing a second majority-minority district constitutes unconstitutional racial gerrymandering. Mot. 9-10. The Court has addressed that argument. Order 205-06 (explaining that just because satisfying the first *Gingles* precondition requires consideration of race does not render Plaintiffs' illustrative plans racial gerrymanders). As they did before, Defendants claim that Plaintiffs are seeking "electoral advantage" for Black voters and "maximiz[ation of] black voting

power." Mot. 10, 12 (quoting *Bartlett v. Strickland*, 556 U.S. 1, 20 (2009)). The Court has addressed that argument. Order 205 (explaining how, if Mr. Cooper and Dr. Duchin wanted to maximize Black voting power, their illustrative plans would have looked much different). And as they did before, Defendants assert Plaintiffs' illustrative plans somehow "abandon[] all redistricting principles." Mot. 11. The Court has addressed that argument. Order 173-74 ("Defendants set a high bar for themselves when they asserted that the plaintiffs' remedial plans are not reasonably compact because they 'completely ignore,' 'subjegat[e],' jettison[],' and 'sacrifice[]' traditional districting criteria, and they did not meet it." (citations omitted)).

The separate (but entirely repetitive) section in Defendants' motion arguing that Section 2 would be unconstitutional if it "requires states to subordinate traditional redistricting criteria to race" is, for the same reasons, a blatant red herring. Mot. 16-17. No one in this case, including the Court, has suggested that Section 2 requires subordination of traditional redistricting principles. Indeed, the Court said the exact opposite, explaining that Plaintiffs satisfied the first *Gingles* precondition precisely because their illustrative plans were drawn *consistent* with traditional redistricting principles. Order 48, 159-74.

Finally, Defendants claim that computer simulated plans generated according to selective redistricting criteria prove that race predominated in the drawing of Mr. Cooper's and Dr. Duchin's illustrative plans. Not so.

- 8 -

Defendants oversell what these simulations show. No expert suggested that the computer simulation analyses discussed in this case showed that two majority-Black districts could be drawn only by elevating race above all other criteria. The only conclusion one can draw from the simulation results is that the creation of two majority-minority districts requires *some consideration* of race. But as the Court explained, the first *Gingles* precondition *requires* consideration of race. Order 205-06. The simulations themselves tell us nothing about whether Plaintiffs' illustrative plans satisfy that precondition; instead, one must consider whether Plaintiffs' *illustrative plans* (and not the simulations) contain two majority-Black districts *and* respect traditional redistricting principles. The Court concluded that they do, and Defendants offer no explanation for why that analysis was flawed.

Defendants' reliance on the simulated plans is also misplaced for another reason: as Defendants themselves readily admit, the computer simulations did not take into account all of the Legislature's redistricting guidelines or the traditional redistricting principles that Mr. Cooper and Dr. Duchin balanced in drawing their plans. Thus, in arguing that the simulations prove race predominated in *Mr. Cooper's* and *Dr. Duchin's* illustrative plans, Defendants compare apples to oranges. There is no dispute that Dr. Duchin's simulation set complied "with only a few traditional non-racial districting criteria." Mot. 2. Likewise, Dr. Imai's simulation set did not consider many of the State's enumerated criteria—all of which Mr.

- 9 -

Cooper and Dr. Duchin considered and balanced in their illustrative plans—including near-zero population deviation, respect for communities of interest, and non-dilution of minority voting rights. MPX1 at 7 ¶ 18.

Indeed, the simulations at issue did not take into account the most contested redistricting criterion in this case: respect for communities of interest. As the Court observed, that criterion "was fervently disputed during the preliminary injunction hearing, and all parties devoted significant time and argument to it." Order 164. But the simulations on which Defendants so heavily rely did not account for this criterion at all. Whether simulated maps that do not adhere to the Legislature's redistricting guidelines, federal law, or traditional redistricting criteria indicate that race was considered in the drawing of a hypothetical plan is irrelevant to whether race predominated in the drawing of Mr. Cooper's and Dr. Duchin's plans.

Ultimately, race was not the predominant factor in either Mr. Cooper's or Dr. Duchin's analyses. Order 204. As the Court found, both Mr. Cooper and Dr. Duchin balanced a range of traditional criteria, considering them each equally, and no one consideration predominated over any other consideration. *See id*. Had they instead allowed race to predominate in the drawing of their districts, they would have drawn districts that looked very different. *Id.* at 205. Devoid of any supporting record evidence or factual findings from this Court, Defendants are left only with their own repeated insistence of "subordination" of traditional districting principles as the basis

- 10 -

for their stay application. Far from demonstrating a likelihood of success on the merits of their appeal, this approach demonstrates just the opposite.

> ### iii. The Court did not clearly err in concluding that the totality of circumstances indicate HB 1 will result in vote dilution.

Defendants offer no reason to question—let alone to find clearly erroneous—this Court's conclusion that the totality-of-circumstances analysis confirms what the *Gingles* preconditions indicate: HB 1 would dilute the voting strength of Black voters in Alabama. Defendants assert that the Legislature did not have race in mind when it "decline[d] to pass congressional plans resembling Plaintiffs' illustrative maps" and instead was thinking about "traditional redistricting principles and basic political geography and demographics." Mot. 15. But that fact, even if true, makes no difference. "A discriminatory *result* is all that is required" to establish a Section 2 claim; "discriminatory intent is not necessary." *Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015). To the extent Defendants are asserting that HB 1 cannot violate Section 2 because it complies with traditional redistricting principles, that is obviously wrong. The Section 2 inquiry looks to HB 1's effect on Black voters, not its compliance with other redistricting principles.

Defendants do not otherwise challenge the Court's analyses relating to the totality of the circumstances. They do not challenge the Court's conclusion that Senate Factors 1, 2, 3, 5, 6, and 7 weigh in favor of a vote-dilution finding, or that

the proportionality consideration does as well. *See* Mot. 14-15. As a result, Defendants offer no reason to expect that an appellate court would find the Court's ultimate vote-dilution finding clearly erroneous.

**B.   Defendants fail to satisfy any of the remaining stay factors.**

In addition to their failure to show they are likely to succeed in their appeal, Defendants do not demonstrate that they will suffer irreparable harm absent a stay, that such harm outweighs the irreparable harm that HB 1 will cause to Plaintiffs and other Black Alabamians whose voting strength HB 1 dilutes, or that the public interest favors a stay. *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1317.

The Court has considered and rejected Defendants' overblown warnings of "chaos" resulting from an order requiring the alteration of Alabama's congressional plan. Order 131-36, 199-204. Defendants' motion rehashes those arguments without so much as addressing—let alone refuting—the Court's conclusions otherwise, and thus provides no basis to stay the Court's reasoned decision. Most notably, Defendants do not challenge the Court's conclusions that, if HB 1 violates Section 2, its use during the 2022 elections would irreparably harm Plaintiffs and other Black voters, and for that reason would disserve the public interest. Order 197-98.

Defendants are also wrong in asserting that Alabama does not have enough time "to exercise its sovereign prerogative and craft an appropriate remedy." Mot. 19-20. Their citation to a law review article claiming that, in an ideal world,

- 12 -

mapdrawers should have a month to draw a new plan, provides no insight into whether two weeks is not enough time. *Id.* What *does* offer insight into that question is the amount of time it took Alabama to enact HB 1: nine days. So too does the fact that several courts have provided similar amounts of time for state legislatures to enact lawful remedial plans. *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, Nos. 2021-1193, 2021-1198, 2021-1210, 2022 WL 110261, at *28 (Ohio Jan. 12, 2022) (10 days); *Harris v. McCrory*, 159 F. Supp. 3d 600, 627 (M.D.N.C. 2016) (14 days); *Larios v. Cox*, 300 F. Supp. 2d 1320, 1357 (N.D. Ga. 2004) (per curiam) (three-judge court) (19 days). As the Court emphasized in its decision, we are "months, not weeks or days, away from the beginning of" the 2022 elections. Order 200. And Alabama has long been on notice that it might be forced to draw a second district in which Black voters have the opportunity to elect a candidate of their choice, as far back as 2018. *Id.* at 202-03. To the extent Alabama is now caught off guard, that is its own fault.

Defendants also repeat their previously raised concerns about the costs that implementing a new congressional plan will have on Alabama's election administration, Mot. 20-21, which this Court has already concluded are unavailing, Order 201. Defendants again point to Mr. Helm's affidavit, the contents of which this Court extensively considered yet found insufficient to justify allowing HB 1 to be used in 2022. Order 132-34, 201-02. And their identification of deadlines

occurring in March and April 2022, Mot. 20-21, underscores the Court's point that we are still "months" away from the beginning of the election cycle, not "weeks or days," Order 200.

Defendants' attempt, for a third time, to invoke *Favors* again fails. Mot. 19. That case involved a preliminary injunction sought in April of an election year, leading to a decision in May. *See Favors v. Cuomo*, 881 F. Supp. 2d 356, 362 (E.D.N.Y. 2012). Needless to say, this is a much different proceeding. For the same reason, Defendants' citations to *Mac Govern v. Connolly*, 637 F. Supp. 111 (D. Mass 1986), decided in June of an election year, and *Pileggi v. Aichele*, 843 F. Supp. 2d 584 (E.D. Pa. 2012), decided just over two months prior to a primary election, do not help them in this case. Finally, *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), is even less applicable. There, the Supreme Court worried that a *last-minute* injunction against a voter-identification law would "result in voter confusion and consequent incentive to remain away from the polls." *Id.* at 4-5. But this litigation does not impact whether a given voter can *cast* a ballot; it impacts only the candidates listed on their ballot. Defendants provide no argument or authority for prioritizing the preferences of a handful of *candidates* seeking to run for election over the undisputed irreparable harm to millions of *voters* casting ballots in those

- 14 -

elections.[2]

Defendants' arguments about the propriety of an injunction against HB 1 under the circumstances of this case were unconvincing when they were offered in opposition to Plaintiffs' requested preliminary injunction. They have not improved in the less than two weeks since the Court's hearing ended. As a result, Defendants have not shown that any of the factors relevant to their motion supports a stay.

## III.   Conclusion

Defendants offer no reason to believe they are likely to succeed on the merits, and they have failed to show that the equities support staying this Court's injunction. As a result, their motion to stay should be denied.

---

[2] While Defendants now rely heavily on the potential harms to potential candidates who may have spent "significant time and money ahead of the January 28 qualifying deadline," Mot. 21, they failed to offer *any* evidence or testimony from or about a single candidate to substantiate this assertion.

Dated: January 26, 2022

Respectfully submitted,

By /s/ *Richard P. Rouco*

Abha Khanna*
**Elias Law Group LLP**
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
Phone: (206) 656-0177
Email: AKhanna@elias.law

Lalitha D. Madduri*
Daniel C. Osher*
Joseph N. Posimato*
Olivia N. Sedwick*
**Elias Law Group LLP**
10 G St. NE, Suite 600
Washington, D.C. 20002
Phone: (202) 968-4518
Email: LMadduri@elias.law
Email: DOsher@elias.law
Email: JPosimato@elias.law
Email: OSedwick@elias.law

*Attorneys for Plaintiffs*
*Admitted Pro Hac Vice*

Richard P. Rouco
(AL Bar. No. 6182-R76R)
**Quinn, Connor, Weaver, Davies & Rouco LLP**
Two North Twentieth
2-20th Street North, Suite 930
Birmingham, AL 35203
Phone: (205) 870-9989
Fax: (205) 803-4143
Email: rrouco@qcwdr.com

- 16 -

## CERTIFICATE OF SERVICE

I hereby certify that on January 26, 2022, a copy of the foregoing was filed with the Clerk of Court using the CM/ECF system, which will provide electronic notice of filing to all counsel of record.


*/s/ Richard P. Rouco*
Richard P. Rouco
Counsel for Plaintiffs