**U.S. Department of Justice**

FILED
2022 Feb-01  PM 02:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Guidance under Section 2 of the Voting Rights Act, 52 U.S.C. 10301, for redistricting and methods of electing government bodies

## Published September 1, 2021

The Voting Rights Act of 1965 is a landmark civil rights law that protects our democratic process against racial discrimination.  One of the key protections of the Voting Rights Act is Section 2, 52 U.S.C. § 10301, which is a permanent nationwide prohibition on voting practices that discriminate on the basis of race, color, or membership in a language minority group (as defined in Sections 4(f)(2) and 14(c)(3) of the Act, 52 U.S.C. §§ 10303(f)(2), 10310(c)(3)).  Section 2 prohibits both voting practices that result in citizens being denied equal access to the political process on account of race, color, or membership in a language minority group, and voting practices adopted or maintained for the purpose of discriminating on those bases.

Section 2 covers any voting qualification or prerequisite to voting or standard, practice, or procedure related to voting.  As relevant for purposes of this guidance, Section 2 covers methods of electing public officials.  This coverage includes a variety of electoral practices, such as: 1) districting plans used in single-member district election systems or multi-member district election systems; 2) mixed election systems, e.g., any combination of single-member, multi-member and at-large seats, and any associated districting plans; and 3) at-large election systems.

Caster Plaintiffs' Exhibit 105, Page 1

# U.S. Department of Justice

Following the release of 2020 Census redistricting data, all fifty States and thousands of counties, parishes, municipalities, school districts, and special purpose districts will craft new districting plans. The Department of Justice will undertake its usual nationwide reviews of districting plans and methods of electing governmental bodies to evaluate compliance with Section 2.  It is the Department's view that guidance identifying its general approach to Section 2 in this context would be useful.  This guidance is not legally binding, nor is it intended to be comprehensive; rather, it is intended only to aid jurisdictions as they comply with Section 2.[1]

The discussion provides guidance concerning the following topics:

- Enforcement of Section 2 by the Department of Justice
- Section 2 Analysis: Discriminatory Result
- Section 2 Analysis: Discriminatory Intent
- Other Federal Laws Governing Redistricting
- Use of 2020 Census Data
- Complaints and Comments

---

[1]  In connection with the 2000 and 2010 Census redistricting cycles, the Department of Justice issued guidance concerning redistricting under Section 5 of the Voting Rights Act, 52 U.S.C. § 10304, which establishes preclearance requirements for voting changes in certain covered jurisdictions.  76 Fed. Reg. 7470 (February 9, 2011); 67 Fed. Reg. 5411 (January 18, 2001).  In 1973, the Supreme Court held that redistricting is a "standard, practice, or procedure with respect to voting" within the meaning of Section 5.  *Georgia v. United States*, 411 U.S. 526, 531-35 (1973). The Department's guidance focused on Section 5 because it was the provision under which the Department initially reviewed redistricting plans for covered jurisdictions.  However, in 2013, the Supreme Court held that the coverage formula in Section 4(b) of the Act, 52 U.S.C. § 10303(b), which determines which jurisdictions are required to comply with Section 5, is now unconstitutional.  *Shelby County v. Holder*, 570 U.S. 529, 557 (2013).  Hence, as the Department has described previously, there are no jurisdictions currently covered by Section 5, and jurisdictions previously covered by the Section 4(b) formula do not need to seek preclearance for new voting changes, such as redistricting plans, absent enactment of a new coverage provision.  At present, the only jurisdictions that need to seek preclearance for redistricting plans (or other changes in methods of election) are those covered for such changes by a current federal court order entered under Section 3(c) of the Act, 52 U.S.C. § 10302(c).  The Department's prior guidance concerning redistricting under Section 5 is no longer operative.  It may still be of assistance to jurisdictions in complying with Section 3.

Caster Plaintiffs' Exhibit 105, Page 2

**U.S. Department of Justice**

## Enforcement of Section 2 by the Department of Justice

Congress has charged the Attorney General with responsibility for enforcement of the Voting Rights Act on behalf of the United States.  52 U.S.C. § 10308(d).  The Department of Justice has delegated that enforcement to the Assistant Attorney General for the Civil Rights Division.  28 C.F.R. § 0.50.  The Division has in turn vested enforcement responsibility for the civil provisions of the Voting Rights Act and other federal voting rights laws in the Voting Section.  Justice Manual § 8-2.271.  The Division's decisions regarding initiation or settlement of litigation are committed to the Assistant Attorney General.  28 C.F.R. §§ 0.50, 0.160; Justice Manual § 8-2.270.  The Division can also consider participating as amicus curiae in cases in any federal or state court that raise issues under Section 2 of the Voting Rights Act.  *See, e.g.*, 28 U.S.C. § 517.

Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, prohibits discrimination in voting on the basis of race, color, or membership in a language minority group.  This permanent, nationwide prohibition applies to any voting qualification or prerequisite to voting or standard, practice, or procedure, including districting plans and methods of election for governmental bodies.  *Growe v. Emison*, 507 U.S. 25, 39-40 (1993).

As amended in 1982, Section 2 prohibits voting practices that result in citizens being denied equal access to the political process on account of race, color, or membership in a language minority group.  It also continues to prohibit adopting or maintaining voting practices for the purpose of disadvantaging citizens on account of race, color, or membership in a language minority group.  *Chisom v. Roemer*, 501 U.S. 380, 394 n.21 (1991).  The essence of a discriminatory results claim alleging vote dilution is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by minority voters to elect their preferred representatives.  *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).  Regardless of whether an electoral law or practice violates Section 2's results test, Section 2 also prohibits any electoral law, practice, or procedure enacted or maintained with the intent to disadvantage voters because of their race, color, or membership in a

U.S. Department of Justice

# U.S. Department of Justice

language minority group.  States and political subdivisions should take the Voting Rights Act's requirements into account when redrawing electoral maps, altering a method of election, or maintaining a method of election that could have the potential to discriminate.

The Department of Justice enforces Section 2 of the Voting Rights Act across the country.  The Department's efforts to evaluate compliance with Section 2 and identify potential violations have a very broad scope.  This work encompasses jurisdictions of all types that conduct elections for their governmental bodies.  Thus, the Department reviews methods of election for U.S. House of Representatives seats, state legislatures, county commissions, city councils, school boards, judicial bodies, special governmental units with elected boards, and more.  Likewise, the Department evaluates all kinds of methods of election, including at-large election systems, districting plans involving multi-member districts, districting plans using single-member districts, and mixed methods of election.  The Department evaluates districting plans and methods of election for compliance with Section 2 regardless of whether those plans or methods were adopted by legislative bodies, local boards, redistricting commissions, state courts, or other governmental bodies.  The Department's analysis of compliance with Section 2 is intensely localized insofar as it looks to the particular facts in each jurisdiction and that jurisdiction's method of election.  Historically, the great majority of Section 2 cases brought by the Department have addressed concerns about racial discrimination in voting at the local level.  The Department will monitor for compliance with Section 2 around the country in this decade, as it has in prior decades. [2]

When the Assistant Attorney General for the Civil Rights Division authorizes a Section 2 enforcement action, the Division seeks to resolve matters amicably and avoid protracted litigation where it is feasible to do so. [3]

---

[2] Following release of the decennial census data, this work extends throughout each decade.  The fact that the Department has not challenged a particular jurisdiction's method of election over any given time period does not constitute agreement that it complies with Section 2.

[3] Some examples of recent Section 2 enforcement matters involving methods of election for governmental bodies that were settled by consent decree include *United States v. City of West Monroe,* No. 3:21-cv-00988 (W.D. La. Apr. 14, 2021), ECF No. 4 (board of aldermen); *United States v. Chamberlain School District,* No. 4:20-cv-04084 (D.S.D. June 18, 2020), ECF No. 4 (school board); and *United States v. City of Eastpointe,* No. 2:17-cv-10079 (E.D. Mich. June 25, 2019), ECF No. 64 (city council).

# U.S. Department of Justice

The Department's Section 2 cases challenging methods of election for governmental bodies include actions against a variety of jurisdictions, including states, counties, municipalities, school districts, and special districts. [4]

The Department's cases under Section 2 have also challenged a variety of different methods of election, including at-large election systems, as well as district-based election systems and mixed election systems involving a combination of at-large elections and district elections. [5]

In the course of investigating and bringing enforcement actions under Section 2 of the Voting Rights Act, the Department applies well-established case law, which is briefly described below.

---

[4]  *See, e.g., United States v. Texas*, No. 5:11-cv-00360 (W.D. Tex.), ECF No. 907 (state legislative and congressional districts); *United States v. Charleston County*, No. 2:01-cv-00155 (D.S.C.) (county commission); *United States v. Marion County*, No. 4:99-cv-00151 (M.D. Ga.) (county commission); *United States v. Morgan City*, No. 6:00-cv-01541 (W.D. La.) (city council); *United States v. City of Lawrence*, No. 1:98-cv-12256 (D. Mass.) (city council and school board); *United States v. Village of Port Chester*, No. 1:06-cv-15173 (S.D.N.Y.) (board of trustees); *United States v. Georgetown County School District*, No. 2:08-cv-00889 (D.S.C.) (school board); and *United States v. Upper San Gabriel Valley Municipal Water District*, No. 2:00-cv-07903 (C.D. Cal.) (board of directors for special purpose district).

[5]  *See, e.g., United States v. Blaine County*, No. 4:99-cv-00122 (D. Mont.) (at-large elections for county commission); *United States v. School Board of Osceola County*, No. 6:08-cv-00582 (M.D. Fla.) (single-member district plan for school board); *United States v. Crockett County*, No. 1:01-01129 (W.D. Tenn.) (multi-member district system for county commission); *United States v. South Dakota*, No. 3:00-cv-03015 (D.S.D.) (multi-member district in state legislative districting plan); *United States v. City of Euclid*, No. 1:06-cv-01652 (N.D. Ohio) (mixed at-large and ward method of election for city council).

U.S. Department of Justice

## Section 2 Analysis: Discriminatory Result

Section 2 of the Voting Rights Act prohibits, among other things, any electoral practice or procedure that minimizes or cancels out the voting strength of members of racial or language minority groups in the voting population.  This phenomenon is known as vote dilution.

In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the Supreme Court set out the framework for challenges to such practices or procedures.  In *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321, 2337 (2021), the Supreme Court described *Gingles* as "our seminal § 2 vote-dilution case" and recognized that "[o]ur many subsequent vote-dilution cases have largely followed the path that *Gingles* charted."

Analysis begins by considering whether three *Gingles* preconditions exist.  First, the minority group must be sufficiently large and geographically compact to constitute a majority of the voting-age population in a single-member district.  Second, the minority group must be politically cohesive.  And third, the majority must vote sufficiently as a bloc to enable it — in the absence of special circumstances, such as the minority candidate running unopposed — usually to defeat the minority group's preferred candidate.

If all three *Gingles* preconditions are present, consideration proceeds to an analysis of the totality of the circumstances in a jurisdiction.  This analysis incorporates factors enumerated in the Senate Report that accompanied the 1982 Voting Rights Act Amendments, S. Rep. No. 97-417, at 28-29 (1982), which are generally known as the "Senate Factors."  These factors are themselves drawn from earlier case law.  *Id.* at 28 nn. 112-113.  The factors include:

# U.S. Department of Justice

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals; and

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

The Senate Report also identified two additional factors that have probative value in some cases:

- whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

- whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

The Senate Factors are neither comprehensive nor exclusive, and other factors may also be relevant and may be considered. For example, the Supreme Court held in *Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994), that proportionality of minority voters' representation in a single-member district plan is also a relevant fact in the totality of circumstances. A finding of vote dilution in violation of Section 2 does not require that a particular number or a majority of these factors is present in a jurisdiction.

# U.S. Department of Justice

*Gingles* describes a review of the totality of the circumstances that requires a "searching practical evaluation of the past and present reality" of a jurisdiction's electoral system that is "intensely local," "fact-intensive," and "functional" in nature. 478 U.S. at 45-46, 62-63, 79.  Liability depends on the unique factual circumstances of each case and the totality of the circumstances in the particular jurisdiction in question.   Thus, for example, the Supreme Court found that Texas's use of multimember state legislative districts impermissibly diluted minority voting strength, see *White v. Regester*, 412 U.S. 755, 765-70 (1973), while concluding that Indiana's use of multimember state legislative districts did not, *Whitcomb v. Chavis*, 403 U.S. 124, 148-55 (1971).

As the cases recognize, Section 2 vote-dilution violations can take several different forms.  At-large election systems or multimember districts can submerge minority voters within a larger majority electorate that can effectively control all available positions.  *Gingles*, 478 U.S. at 48-49.  Districting plans may dilute minority voting strength by cracking or "fragmenting the minority voters among several districts where a bloc-voting majority can routinely outvote them" or by "packing them into one or a small number of districts to minimize their influence."  *De Grandy*, 512 U.S. at 1007; *see also Gingles*, 478 U.S. at 46 n.11.  Some plans may do both.

# U.S. Department of Justice

## Section 2 Analysis: Discriminatory Intent

Section 2 of the Voting Rights Act also prohibits use of a redistricting plan or method of election adopted or maintained for a discriminatory purpose, which is the same prohibition imposed by the Fourteenth and Fifteenth Amendments.

The Department will examine the circumstances surrounding adoption or continued use of a redistricting plan or method of election to determine whether there is direct or circumstantial evidence of any discriminatory purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  *See, e.g., White*, 412 U.S. at 765-70; *Rogers v. Lodge*, 458 U.S. 613, 623-27 (1982).

Direct evidence detailing a discriminatory purpose may be gleaned from the public statements of members of the adopting body or others who may have played a significant role in the process.  *See, e.g., Busbee v. Smith*, 549 F. Supp. 494, 508 (D.D.C. 1982) (three-judge court), *aff'd*, 459 U.S. 1166 (1983).  However, "smoking gun" or other stark evidence of intent is rare and is not required to establish a discriminatory purpose.  The Department will also evaluate whether circumstantial evidence establishes a discriminatory intent.  For example, in *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 440 (2006), the Supreme Court suggested that reducing Hispanic/Latino voting strength in a district because a growing Hispanic/Latino community appeared poised to vote out an incumbent "bears the mark of intentional discrimination."

When assessing evidence of a possible discriminatory purpose, the Department of Justice is guided by the Supreme Court's decision in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977); *see also Brnovich*, 141 S. Ct. at 2349 (citing the "familiar approach outlined in *Arlington Heights*").

*Arlington Heights* outlines a non-exhaustive list of factors relevant to this "sensitive inquiry":  (1) The impact of the decision; (2) the historical background of the decision, particularly if it reveals a series of

decisions undertaken with discriminatory intent; (3) the sequence of events leading up to the decision; (4) whether the challenged decision departs, either procedurally or substantively, from the normal practice; and (5) contemporaneous statements and viewpoints held by the decisionmakers.  429 U.S. at 266-68.  The Senate Factors (described above) may also provide evidence of discriminatory intent. *Rogers*, 458 U.S. at 620-21.

Discriminatory intent implies that the decisionmaker selected or reaffirmed a particular course of action at least in part because of, and not merely in spite of, its adverse effects upon an identifiable minority group.  The Department of Justice will draw the normal inferences from the foreseeability of a discriminatory impact, and Section 2 does not require proof that one or more government actors are "racist" or bear racial animus.  A concurring opinion in *Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990), provides a useful example of intentional discrimination without racial animus.

> Assume you are an anglo homeowner who lives in an all-white neighborhood.  Suppose, also, that you harbor no ill feelings toward minorities.  Suppose further, however, that some of your neighbors persuade you that having an integrated neighborhood would lower property values and that you stand to lose a lot of money on your home.  On the basis of that belief, you join a pact not to sell your house to minorities.  Have you engaged in intentional racial and ethnic discrimination?  Of course you have.  Your personal feelings toward minorities don't matter; what matters is that you intentionally took actions calculated to keep them out of your neighborhood.

*Id*. at 778 n.1 (Kozinski, J., concurring in part and dissenting in part); *see also N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 222 (4th Cir. 2016).  Discriminatory intent need only be one motivating factor behind the enactment or enforcement to violate Section 2.  It need not be the only motivating factor.  So, for example, if a jurisdiction purposefully reduces minority voting strength in order to protect an incumbent elected official, the fact that incumbent protection was a motivating factor — or even the primary motivating factor — does not mean a plan is lawful.  *See, e.g., LULAC*, 548 U.S. at 440; *Garza*, 918 F.2d at 771.

**U.S. Department of Justice**

## Other Federal Law Governing Redistricting

Section 2 of the Voting Rights Act is the Department of Justice's principal tool to protect voters from racial discrimination regarding redistricting and methods of election for governmental bodies.  The U.S. Constitution imposes additional requirements on redistricting plans beyond those in Section 2 of the Act.  The Fourteenth Amendment prohibits substantial disparities or malapportionment in total population between electoral districts in the same districting plan (colloquially known as the "one-person, one-vote" principle).  *Baker v. Carr*, 369 U.S. 186 (1962). The Fourteenth Amendment also prohibits certain forms of racial gerrymandering in drawing electoral districts.  *Shaw v. Reno*, 509 U.S. 630 (1993).

The Department does not enforce these particular constitutional requirements directly through Section 2.  However, the Department will consider these background constitutional requirements when enforcing Section 2.  For example, malapportioned districts may facilitate vote dilution, and district boundaries drawn predominantly on the basis of race may provide evidence of discriminatory intent.  In addition, the Department will consider whether any efforts to change the apportionment base for a districting plan to a measure other than total population (*e.g.*, to equalize eligible voter population between districts) may violate Section 2 if the resulting districting plan, "designedly or otherwise," will "operate to minimize or cancel out" the voting strength of racial minority groups.  *Burns v. Richardson*, 384 U.S. 73, 88 (1966) (*quoting Fortson v. Dorsey*, 379 U.S. 433, 439 (1965)).  *See* U.S. Amicus Brief at 32-35, filed in *Evenwel v. Abbott*, No. 14-940 (U.S. Sept. 25, 2015).

Finally, in any lawsuit in which the Department participates, it will propose remedies that are consistent with the requirements of the U.S. Constitution. [6]

---

[6]  Beyond the requirements of Section 2 of the VRA, and the U.S. Constitution, districting plans and methods of election may be subject to other federal or state requirements as well.  *See, e.g.*, 2 U.S.C. § 2c (requiring the use of single-member districts to elect members of the U.S. House of Representatives).

Caster Plaintiffs' Exhibit 105, Page 11

# U.S. Department of Justice

## Use of 2020 Census Data

Consistent with past practice, the Department of Justice will evaluate districting plans and methods of election using the 2020 Census redistricting data set issued by the Census Bureau pursuant to Public Law 94-171, 13 U.S.C. § 141(c).  The Census Bureau released the 2020 Census redistricting data to the States and the public on August 12, 2021. [7]

As in 2010 and 2000, the 2020 Census Public Law 94-171 data will include counts of persons who have identified themselves as members of more than one racial category.  This reflects the October 30, 1997, decision by the Office of Management and Budget (OMB) to incorporate multiple-race reporting into the Federal statistical system.  62 Fed. Reg. 58,782.  Likewise, on March 9, 2000, OMB issued Bulletin No. 00–02 addressing "Guidance on Aggregation and Allocation of Data on Race for Use in Civil Rights Enforcement."  Part II of that Bulletin describes how such census responses will be allocated by Federal executive agencies for use in civil rights monitoring and enforcement.

The Department of Justice will follow both aggregation methods defined in Part II of the Bulletin.  The Department's initial review will be based upon allocating any response that includes white and one of the five other race categories identified in the response.  Thus, the total numbers for "Black/African American," "Asian," "American Indian/Alaska Native," "Native Hawaiian or Other Pacific Islander," and "Some other race" reflect the total of the single-race responses and the multiple responses in which an individual selected a minority race and white race.

The Department will then move to the second step in its application of the census data by reviewing the other multiple-race category, which is comprised of all multiple-race responses consisting of more than one minority race.  Where there are significant numbers of such responses, the Department will, as

---

[7] In circumstances where states aim, pursuant to state law, to reallocate certain group quarters populations (such as individuals confined in correctional facilities), the Department will review these data as well.

U.S. Department of Justice

# U.S. Department of Justice

required by both the OMB guidance and judicial opinions, allocate these responses on an iterative basis to each of the component single-race categories for analysis.  *Georgia v. Ashcroft,* 539 U.S. 461, 473, n.1 (2003).

As in the past, the Department will analyze Hispanic/Latino persons as a separate minority group for purposes of enforcement of the Voting Rights Act, pursuant to Sections 2, 4(f)(2), and 14(c)(3) of the Act.  52 U.S.C. §§ 10301, 10303(f)(2), 10310(c)(3).  The Census asks respondents to answer both the Hispanic origin question and the race question.  A Hispanic/Latino tabulation of Census data includes those who respond affirmatively to the Hispanic origin question, irrespective of their response to the race question, e.g., white, a minority race, "some other race" or multiple races.  If there are significant numbers of responses in a jurisdiction that self-identify as Hispanic/Latino and one or more minority races (for example, Hispanics/Latinos who list their race as Black/African American), the Department will conduct its initial analysis by allocating those responses to the Hispanic/Latino category and then repeat its analysis by allocating those responses to the relevant minority race category.

**U.S. Department of Justice**

## Complaints and Comments

Members of the public are encouraged to send any complaints or comments regarding possible violations of the federal voting rights laws to the Voting Section.  This can include complaints or comments about methods of election or districting plans that may violate Section 2 of the Voting Rights Act.  This can also include requests for the Department to consider participation in cases as amicus curiae on issues under the federal voting rights laws.  Finally, this can include comments regarding this guidance document.  Complaints and comments can be submitted online through the Civil Rights Division's website portal – civilrights.justice.gov.  The Voting Section can also be reached through its toll-free number: (800) 253-3931.

Caster Plaintiffs' Exhibit 105, Page 14