FILED
2022 Feb-01 PM 02:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

No. 14-940

In The
# Supreme Court of the United States

SUE EVENWEL, ET AL.,
*Appellants,*

v.

GREG ABBOTT, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS, ET AL.,
*Appellees.*

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS*

## BRIEF OF DEMOGRAPHERS PETER A. MORRISON, THOMAS M. BRYAN, WILLIAM A. V. CLARK, JACOB S. SIEGEL, DAVID A. SWANSON, AND THE PACIFIC RESEARCH INSTITUTE AS *AMICI CURIAE* IN SUPPORT OF APPELLANTS

C. DEAN MCGRATH, JR.
McGrath & Associates
1025 Thomas Jefferson St., NW
Ste. 110G
Washington, D.C. 20007
(202) 295-2304

BRADLEY A. BENBROOK
*Counsel of Record*
STEPHEN M. DUVERNAY
Benbrook Law Group, PC
400 Capitol Mall, Ste. 1610
Sacramento, CA 95814
(916) 447-4900
brad@benbrooklawgroup.com

August 2015

*Counsel for Amici Curiae*

## QUESTION PRESENTED

In *Reynolds v. Sims*, 377 U.S. 533 (1964), this Court held that the Equal Protection Clause of the Fourteenth Amendment includes a "one-person, one-vote" principle. This principle requires that, "when members of an elected body are chosen from separate districts, each district must be established on a basis that will insure, as far as is practicable, that equal numbers of voters can vote for proportionally equal numbers of officials." *Hadley v. Junior Coll. Dist. of Metro. Kansas City, Mo.*, 397 U.S. 50, 56 (1970). In 2013, the Texas Legislature enacted a State Senate map creating districts that, while roughly equal in terms of total population, grossly malapportioned voters. Appellants, who live in Senate districts significantly overpopulated with voters, brought a one-person, one-vote challenge, which the three-judge district court below dismissed for failure to state a claim. The district court held that Appellants' constitutional challenge is a judicially unreviewable political question.

The question presented is whether the "one-person, one-vote" principle of the Fourteenth Amendment creates a judicially enforceable right ensuring that the districting process does not deny voters an equal vote.

## TABLE OF CONTENTS

Page

QUESTION PRESENTED ............................... i

TABLE OF AUTHORITIES ............................. iv

INTEREST OF *AMICUS CURIAE* .................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................ 3

ARGUMENT ................................................ 5

I. The Census Bureau Designed And Implemented The American Community Survey To Furnish Detailed Demographic Data On An Ongoing Basis For Places of All Sizes ................................................ 5

A. The ACS Has Modernized The Census Bureau's Collection Of Demographic Data .................................................... 5

B. The Federal Government Relies On ACS Data To Administer Federal Programs ............................................ 10

II. The Bureau Calculates CVAP From ACS Data And Publishes Annual Updates In A Readily Accessible Format ........... 12

III. CVAP Data Are Routinely Used To Prove And Remediate Inequalities In Voting .................................................... 15

A. The Judiciary Has Determined That CVAP Data Are Necessary In Section 2 Claims, And State And Local Governments Rely On Them When Redistricting ....................................... 15

B. CVAP Was A Key In Measuring Compliance With Section 5 Of The Voting Rights Act ............................... 20

C. Congress Relied On CVAP Data To Protect Minority Voting Rights In Section 203 Of The VRA ..................... 22

IV. Demographers Can Use Straightforward Techniques To Construct State And Local Voting Districts Of Substantially Equal CVAP ........................................... 23

V. Redistricting Based On Survey Data Fits Comfortably Within The Court's Decisions Recognizing That Redistricting Is Not A Precise Mathematical Exercise .............. 27

CONCLUSION ..................................................... 31

## TABLE OF AUTHORITIES

Cases Page

*Barnett v. City of Chicago*,
141 F.3d 699 (7th Cir. 1998) .................................. 18

*Bartlett v. Strickland*,
556 U.S. 1 (2009) .................................................... 17

*Brown v. Thompson*,
462 U.S. 835 (1983) ................................................ 30

*Campos v. City of Houston*,
113 F.3d 544 (5th Cir. 1997) ............................ 17, 18

*Connor v. Finch*,
431 U.S. 407 (1977) ................................................ 29

*Gaffney v. Cummings*,
412 U.S. 735 (1973). ................................... 28, 29, 30

*Georgia v. Ashcroft*,
539 U.S. 461 (2003) ................................................ 29

*Hadley v. Junior Coll. Dist. of Metro. Kansas City, Mo.*, 397 U.S. 50 (1970). ........................................... i

*League of United Latin Am. Citizens v. Perry*,
548 U.S. 399 (2006) ........................................... 16, 29

*Mahan v. Howell*,
410 U.S. 315 (1973) ................................................ 29

*Negron v. City of Miami Beach*,
113 F.3d 1563 (11th Cir. 1997) .............................. 17

*Pender Cnty. v. Bartlett*,
649 S.E.2d 364 (N.C. 2007) ................................... 17

*Reynolds v. Sims*,
377 U.S. 533 (1964) ....................................... passim

*Romero v. City of Pomona*,
883 F.2d 1418 (9th Cir. 1989) ............................... 17

*Shelby County v. Holder*,
570 U.S. ——, 133 S. Ct. 2612 (2013) ................... 20

*Swan v. Adams*,
385 U.S. 440 (1967) ............................................... 29

*Texas v. United States*,
133 S. Ct. 2885 (2013) ........................................... 21

*Texas v. United States*,
887 F.Supp.2d 133 (D. D.C. 2012) ......................... 21

*Thornburg v. Gingles*,
478 U.S. 30 (1986) ..................................... 15, 16, 17

*Townsend v. Holman Consulting Corp.*,
914 F.2d 1136 (9th Cir. 1990) ............................... 17

*United States v. Sch. Bd. of Osceola Cnty.*,
No. 6:08-cv-00582-GKS-DAB (M.D. Fla. Apr. 16, 2008) ..................................................................... 19

*United States v. Town of Lake Park, Fla.*,
No. 09-cv-80507-KAM (S.D. Fla. Mar. 31, 2009) .. 19

*United States v. Village of Port Chester*,
No. 06-civ-15173 (S.D.N.Y. Dec. 15, 2006) ........... 19

*Voinovich v. Quilter*,
507 U.S. 146 (1993) ................................................ 30

Statutes

20 U.S.C. § 6821 ........................................................ 10

42 U.S.C. § 1395w-4(e)(1)(H)(v)(II) .......................... 10

52 U.S.C. § 10301(a) ................................................ 15

52 U.S.C. § 10503 ...................................................... 22

Other Authorities

Arizona Independent Redistricting Commission, *United States Dep't of Justice Submission Under Section 5 of Voting Rights Act, State of Arizona Legislative Redistricting Plan* (Feb. 28, 2012) ...... 21

Br. for the United States as *Amicus Curiae* Supporting Appellees, *League of United Latin Am. Citizens v. Perry* (2006) (Nos. 05–204, 05–254, 05–276, 05–439). ......................................................... 16

Bruce E. Cain & Karin Mac Donald,
*Voting Rights Act Enforcement: Navigating Between High and Low Expectations*, in *The Future of the Voting Rights Act* (David L. Epstein et al., eds., 2006) .......... 20

Congressional Research Service,
*The 2010 Decennial Census: Background and Issues* (Feb. 3, 2011) .......... 5

Congressional Research Service,
*The American Community Survey: Development, Implementation, and Issues for Congress* (June 17, 2013) .......... 6, 7, 10, 12

Mark Doms,
*The American Community Survey: Best Quality Data with the Least Public Burden* (June 30, 2014) .......... 11

Lapkoff & Gobalet Demographic Research, Inc.,
*Redistricting Report to the Board of Trustees Hartnell Community College District* (Oct. 13, 2011) .......... 18

Michael Li,
*Updated demographic data for Texas legislative & congressional maps*, Texas Redistricting & Election Law, http://txredistricting.org/post/78929777903/updated-demographic-data-for-texas-legislative (Mar. 8, 2014) .......... 20

March 18, 2015 Memorandum of Peter A. Morrison to Waterbury, Connecticut, Board of Alderman regarding the City of Waterbury 2015 Aldermanic Districting Plan ....................................................18

Catherine McCully, *Designing P.L. 94-171 Redistricting Data for the Year 2020 Census* (U.S. Census Bureau Dec. 2014) ..........................................................................14

State Appellees' Br., *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) (Nos. 05–204, 05–254, 05–276, 05–439) ......................................16

State of California Citizens Redistricting Commission, *Final Report On 2011 Redistricting* (Aug. 15, 2011).......................................................19

Nicholas Stephanopoulos & Eric McGhee, *Partisan Gerrymandering & the Efficiency Gap*, 82 U. Chi. L. Rev. 831 (2015).....................................30

Texas Legis. Council, *Estimating Citizenship Voting Age Population Data (CVAP), Addendum to Data for 2011 Redistricting in Texas* (March 2013) .....................20

U.S. Census Bureau, *A Compass for Understanding and Using American Community Service Data: What Congress Needs to Know* (2008)..................................9, 10, 11

U.S. Census Bureau,
*A Compass for Understanding and Using American Community Service Data: What General Data Users Need to Know* (2008) ........................... 14

U.S. Census Bureau,
*American Community Survey Design and Methodology* (Jan. 2014) ......................................... 6

U.S. Census Bureau,
*American Community Survey Information Guide* (April 2013) ............................................... 7, 8, 9, 10

U.S. Census Bureau,
*American Community Survey, Questions on the Form and Why We Ask* .......................................... 11

U.S. Census Bureau,
*Frequently Asked Questions, Can you tell me more about group quarters (GQ) or group housing facilities in the American Community Survey (ACS)?* .................................................................. 7, 8

U.S. Census Bureau,
*Methodology for the United States Population Estimates: Vintage 2014* (2014) ............................ 27

U.S. Census Bureau,
*Subjects Planned for the 2010 Census and American Community Survey: Federal Legislative and Program Uses* (2008)...................................... 11

U.S. Comm'n on Civil Rights,
*Redistricting and the 2010 Census: Enforcing Section 5 of the Voting Rights Act* (Sept. 2012) ............................................... 20, 21

x

U.S. Dep't of Commerce Economics & Statistics Admin., *The Value of the American Community Survey: Smart Government, Competitive Businesses, and Informed Citizens* (April 2015) .................................................... passim

U.S. Dep't of Commerce, *The American Community Survey* (2015 Informational Copy) ............................................. 12

Caster Plaintiffs' Exhibit 106, Page 11

## INTEREST OF *AMICI CURIAE*[1]

Peter A. Morrison, Ph.D., is an applied demographer and the founding director of RAND Corporation's Population Research Center. Now retired from RAND, he consults as a demographer with expertise in measuring the racial, ethnic, and citizenship composition of local populations. He has decades of experience constructing and evaluating local districting plans that comply with Voting Rights Act requirements. He has been appointed to committees of the National Academy of Sciences, chaired the U.S. Census Bureau's Advisory Committee on Population Statistics, and served as an invited participant on the Bureau's Working Group on Race and Ethnicity, 2010 Decennial Census. He has been elected President of the Southern Demographic Association and as a Director of the Population Association of America. Dr. Morrison served as a paid consultant for Appellants in the underlying litigation.

Thomas M. Bryan, M.I.S, M.U.S., is Principal, Bryan GeoDemographics, and a specialist in geographic information systems ("GIS") and geospatial analysis. A former Census Bureau analyst, he has extensive technical experience accessing, evaluating, and applying American Community Survey data for local redistricting. He served as a

---

[1] All parties have consented to the filing of this brief. In accordance with Rule 37.6, no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amici* curiae, their members, or their counsel made a monetary contribution to its preparation or submission.

paid consultant for Appellants in the underlying litigation.

William A. V. Clark, Ph.D., is Distinguished Professor Emeritus of Geography and Statistics at UCLA. Professor Clark has extensive experience evaluating redistricting plans using census data, is an elected Member of the National Academy of Sciences, and a Fellow of the American Academy of Arts and Sciences.

Jacob S, Siegel, M.A., is a private consultant at J. Stuart Siegel Demographic Services. Previously he was a Senior Demographic Statistician at the U.S. Census Bureau and a Professorial Lecturer in Demography at Georgetown University. He is the primary author of the *Methods and Materials of Demography*, which demographers regard as the authoritative source of technical demographic methods, and the author of *Applied Demography*. He is a former President of the Population Association of America.

David A. Swanson, Ph.D., is a Professor of Sociology at the University of California, Riverside. Professor Swanson has chaired the U.S. Census Bureau's Scientific Advisory Committee and the Population Association of America's Applied Demography Committee and served as editor of *Population Research and Policy Review*. With Mr. Siegel, he co-edited the second edition of *The Methods and Materials of Demography*.

The Pacific Research Institute ("PRI") is a nonprofit non-partisan 501(c)(3) organization that champions freedom, opportunity, and personal responsibility by advancing free-market policy solutions to the issues that impact the daily lives of

Americans. Founded in 1979 and based in San Francisco, PRI is supported by private contributions. Its activities include compilation, assessment, evaluation and analysis of complex statistical data, and the publication of studies based on such data.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Appellants contend that it violates the one-person, one-vote principle when States, such as Texas, dilute the power of citizens' votes by as much as 50% compared to other voters in nearby districts. Here, Texas refused to reduce these imbalances despite having the data—citizen voting age population (CVAP) statistics compiled by the United States Census Bureau—and the means available to do so.

*Amici* demographers will demonstrate that States and political subdivisions can—and, in many cases, already do—take CVAP into account when developing redistricting plans. Using official Census Bureau data, professional demographers, such as *amici*, can readily establish district boundaries that divide citizen voting-age population on a "substantially equal" basis. *Reynolds v. Sims*, 377 U.S. 533, 578-79 (1964).

The foundation for this demographic work is the citizenship data collected through the Census Bureau's American Community Survey ("ACS"). The Bureau designed and implemented the ACS to collect detailed demographic information on an ongoing basis. The ACS, which replaced the "long form" questionnaire beginning with the 2010 Decennial Census, collects a broad range of demo-

graphic data covering citizenship and other economic, social, housing, and financial characteristics. The survey is administered on a rolling basis and reaches approximately 3.5 million households each year. The federal government relies on ACS data to, among other things, serve as the basis for distributing more than $450 billion in federal programs.

The Census Bureau compiles running 1-, 3-, and 5-year summaries of ACS data and publishes them on its website. The Bureau's data tables include CVAP at every level of geography for which ACS data are collected throughout the Nation. These tables, in turn, allow demographers, legislators, and the general public to calculate a jurisdiction's CVAP with relative ease.

The reliability of the Census Bureau's CVAP data is demonstrated by its widespread use and acceptance. The Justice Department, States and local governments use CVAP data to ensure compliance with the Voting Rights Act ("VRA"). This Court, U.S. Courts of Appeals, and district courts have also relied on CVAP data. For example, CVAP is a necessary consideration when evaluating minority voting-strength under Section 2 of the VRA. CVAP was likewise a key metric when assessing retrogression under Section 5 of the VRA. And CVAP data govern whether States and localities must provide non-English language ballot materials under Section 203 of the VRA.

In short, the Bureau's CVAP data is reliable enough to allow states, like Texas, to draw, analyze, and adjust voting district boundary lines of substantially equal numbers of eligible voters.

## ARGUMENT

### I. The Census Bureau Designed And Implemented The American Community Survey To Furnish Detailed Demographic Data On An Ongoing Basis For Places Of All Sizes.

The Census Bureau conducts a decennial enumeration of persons in the United States pursuant to Article 1, section 2 of the Constitution. The Bureau's mandate, however, is not limited to the enumeration. The Bureau collects detailed information from residents on an ongoing basis through the ACS.[2]

#### A. The ACS Has Modernized The Census Bureau's Collection Of Demographic Data.

For nearly 60 years, the Census Bureau supplemented its decennial census with a "long form" questionnaire that elicited detailed socioeconomic and housing information from a sample of the population. Congressional Research Service, *The 2010 Decennial Census: Background and Issues* 3 (Feb. 3, 2011).[3] Prompted by declining response rates, increasing costs, and expanding needs for

---

[2] This is one of numerous Bureau surveys that supplement the decennial census. 13 U.S.C. § 193. In addition to the ACS, among the most widely relied on national sample surveys are the Current Population Survey (CPS), http://www.census.gov/cps/, and the Survey of Income and Program Participation (SIPP), http://www.census.gov/sipp/.

[3] Online at https://www.census.gov/history/pdf/2010-background-crs.pdf (all internet materials as visited Aug. 4, 2015).

timely demographic data following the 1990 Census, the Census Bureau "began developing and testing a new means of data collection called a 'rolling sample' or 'continuous measurement' survey that became the American Community Survey." Congressional Research Service, *The American Community Survey: Development, Implementation, and Issues for Congress* 1 (June 17, 2013) (*ACS Development and Implementation*).[4]

After extensive testing and analysis, the Bureau implemented the ACS nationwide in 2005 and 2006, and it stopped using the "long form" with the 2010 Census. U.S. Census Bureau, *American Community Survey Design and Methodology* 5-9 (Jan. 2014) (*ACS Design and Methodology*).[5] The Bureau assigns thousands of field representatives across the Nation to administer the ACS. *Id.* at 2. They are supported by Bureau field partners in six regional offices, survey managers at a Bureau processing center in Indiana, and call centers in Arizona, Maryland, and Indiana. *Id.* Recipients of the survey must provide answers—participation is not voluntary—and many of these resources are used for following up with non-responders.[6]

---

[4] Online at https://www.fas.org/sgp/crs/misc/R41532.pdf.

[5] Online at http://www2.census.gov/programs-surveys/acs/methodology/design_and_methodology/acs_design_methodology_report_2014.pdf.

[6] *See* U.S. Dep't of Commerce Economics & Statistics Admin., *The Value of the American Community Survey: Smart Government, Competitive Businesses, and Informed Citizens* 9 (April 2015) (*Value of the ACS*), online at http://www.esa.gov/sites/default/files/the-value-of-the-

"Since its start," the Bureau notes, "the ACS has been providing a continuous stream of updated information for states and local areas, and will revolutionize the way we use statistics to understand our communities." U.S. Census Bureau, *American Community Survey Information Guide* 2 (April 2013) (*ACS Information Guide*).[7] The survey is currently sent to approximately 295,000 addresses each month—nearly 3.54 million addresses annually—in all 3,141 counties in the 50 states, the District of Columbia, and Puerto Rico. *ACS Development and Implementation* at 11; *ACS Design and Methodology* at 10. "The large sample size affords comprehensive coverage of the Nation and permits statistically reliable estimation for small and large geographic areas." *Value of the ACS, supra* note 6, at 5.

The Bureau obtains its survey address data from its Master Address File (MAF)—the Bureau's "official inventory of known housing units (HUs), group quarters (GQs),[8] and selected non-

---

acs.pdf ("The mandatory nature of the survey ensures that the sample sizes for all areas are sufficient for reliable statistics.").

7 Online at http://www.census.gov/programs-surveys/acs/about/information-guide.html.

8 "Group quarters include such places as college residence halls, residential treatment centers, skilled nursing facilities, group homes, military barracks, correctional facilities, and workers' dormitories. Group quarters are categorized into two groups, institutional and non-institutional, in the ACS estimates. Institutional group quarters: Includes facilities for people under formally authorized, supervised care or custody at the time of interview, such as correctional facilities, nursing facilities/skilled nursing facilities, in-patient hospice facilities, mental (psychiatric) hospitals, group

residential units (public, private, and commercial)." *ACS Design and Methodology* at 18. Since 2000, the Bureau has also developed and updated in the MAF an inventory of "special places (SPs)," which are "places such as prisons, hotels, migrant farm camps, and universities." *Id*. at 26.

The ACS collects data in five general categories:

1. Demographic characteristics—such as age, sex, Hispanic origin, race;

2. Economic characteristics—such as income, work status, occupation;

3. Social characteristics—such as citizenship, ancestry, place of birth, education, and disability;

4. Housing characteristics—such as age of structure and number of rooms; and

5. Financial characteristics—such as housing value and rent.

U.S. Census Bureau, *A Compass for Understanding and Using American Community Service Da-*

---

homes for juveniles, and residential treatment centers for juveniles. Non-institutional group quarters: Includes facilities that are not classified as institutional group quarters, such as college/university housing, group homes intended for adult, residential treatment facilities for adults, workers' group living quarters and Job Corps centers, and religious group quarters." Census Bureau, *Frequently Asked Questions, Can you tell me more about group quarters (GQ) or group housing facilities in the American Community Survey (ACS)?*, online at https://ask.census.gov/faq.php?id=5000&faqId=1681.

*ta: What Congress Needs to Know* 2 (2008) (*Bureau Compass for Congress*).[9]

The Bureau compiles running 1-, 3-, and 5-year summaries of data collected by the ACS and publishes them on its American FactFinder website.[10] *ACS Design and Methodology* at 182-97 (detailing preparation and dissemination of data). Its sampling methods capture representative and statistically valid data:

> The ACS is . . . representative geographically, providing statistically valid information for states, counties, and other large and small areas, such as cities, townships, and villages, congressional and state legislative districts, American Indian and Alaska Native areas and Hawaiian home lands, zip code tabulation areas, and school districts. The ACS is also representative of many small distinct populations, for example, reporting 2009–2013 estimates of per capita income by race and Hispanic origin for Crenshaw County, Alabama (2014 estimated population: 13,977).

*Value of the ACS* at 7 (emphasis omitted).

The Bureau refers to the ACS as a "revolution in data collection" that is now "the cornerstone of [its] effort to keep pace with the nation's ever-increasing demands for timely and relevant data

---

[9] Online at https://www.census.gov/content/dam/Census/library/publications/2008/acs/ACSCongressHandbook.pdf.

[10] The Census Bureau's American FactFinder is online, accessible at http://factfinder.census.gov/faces/nav/jsf/pages/index.xhtml.

about population and housing characteristics." *ACS Design and Methodology* at 1.

**B. The Federal Government Relies On ACS Data To Administer Federal Programs.**

Congress now allocates federal funding among beneficiaries in a wide variety of programs based on ACS data. The Congressional Research Service recently estimated that

> ACS data . . . are used to distribute more than $450 billion a year in funding. Thus, the timeliness and quality of ACS data are important for many reasons, but especially to promote the equitable allocation of scarce public resources.

*ACS Development and Implementation* at 1. *See*, *e.g.*, 42 U.S.C. § 1395w-4(e)(1)(H)(v)(II) (relying on ACS for rate-setting adjustments for physician reimbursement under Medicare); 20 U.S.C. § 6821 (funding allocation for education of immigrant children and children with limited English proficiency).

The federal government uses ACS data in the course of implementing multiple programs and policies:

> The questions on the ACS supply the raw data needed for a range of programs affecting education, veterans, employment, housing and community development, public health care, commuting, services for the elderly and disabled, and assistance programs for low-income families and children.

*Census Bureau Compass for Congress* at 4; *see also Value of the ACS* at 14-25 (elaborating on federal uses of ACS data).[11] The Commerce Department reports that 13 different cabinet-level agencies use ACS data, as do the Board of Governors of the Federal Reserve, the Social Security Administration, the Federal Communications Commission, and the National Science Foundation. *Value of the ACS* at 19.

Given these wide-ranging uses of ACS data, the Commerce Department's Under Secretary for Economic Affairs recently observed that "[t]he ACS is truly a unique, national treasure, producing a wealth of data on which our country relies to make important decisions." Mark Doms, *The American Community Survey: Best Quality Data with the Least Public Burden* (June 30, 2014) (noting also that the "value of ACS is immense" owing to the "fact that the ACS captures so much information so comprehensively").[12]

---

[11]   The Bureau submitted a report to Congress before the 2010 Census detailing federal legislative and program use for each subject and question included in the census and ACS, and it maintains an online compilation detailing how the federal government uses the ACS data, sorted by each question from the survey. U.S. Census Bureau, *Subjects Planned for the 2010 Census and American Community Survey: Federal Legislative and Program Uses* (2008); U.S. Census Bureau, *American Community Survey, Questions on the Form and Why We Ask*, http://www.census.gov/acs/www/about/why-we-ask-each-question/.

[12]   Online at http://www.commerce.gov/news/blog/2014/06/american-community-survey-best-quality-data-least-public-burden.

The conclusion that States and local governments can reliably use ACS data to distribute voting power equitably among their citizens is bolstered by the fact that the federal government *already* uses ACS data to distribute equitably a wide array of benefits and to manage federal programs.

## II. The Bureau Calculates CVAP From ACS Data And Publishes Annual Updates In A Readily Accessible Format.

The ACS data most relevant to this case are the Bureau's published data tables that furnish compilations of citizen voting-age population (CVAP) data.[13] The Bureau publishes this data for all States, counties, cities and other Census "places," and, at the smallest level, Census block groups.[14] A block group is a cluster of census blocks that contains between 600 and 3,000 people. *Value of the ACS* at 25.[15]

---

[13] The citizenship data is specifically requested by the ACS, which asks: "Is this person a citizen of the United States?" U.S. Dep't of Commerce, *The American Community Survey* 8 (2015 Informational Copy), online at http://www2.census.gov/programs-surveys/acs/methodology/questionnaires/2015/quest15.pdf.

[14] Online at http://www.census.gov/programs-surveys/acs/geography-acs/concepts-definitions.html.

[15] A block "is the smallest geographic entity for which the Census Bureau tabulates decennial census data. Many blocks correspond to individual city blocks bounded by streets, but blocks— especially in rural areas—may include many square miles and may have some boundaries that are not streets." *ACS Development and Implementation* at 10 n.63.

The Bureau publishes this data online through its American FactFinder website. These data enable demographers, legislators, or any interested person to calculate a jurisdiction's CVAP with relative ease by selecting the relevant geography and data from Table B05003.[16]

Consider the following example for Denton County, Texas. The calculated CVAP for the county is 447,100, computed as follows from Table B05003:

1. Add the numbers for "Male: 18 years and over" and "Female: 18 years and over," to get the total voting-age population:

$$243{,}096 + 258{,}357 = 501{,}453$$

2. Subtract from the total voting-age population the numbers for non-citizens ("Male: 18 years and over: Not a U.S. citizen" and "Female: 18 years and over: Not a U.S. citizen"):

$$501{,}453 - 27{,}358 - 26{,}995 = 447{,}100$$

This calculation can be performed using Table B05003 for any particular state, county, city, census tract, census block group, or other ACS level of geography. Using the margin of error shown for each row of data, one can calculate the corre-

[16] Table B05003, from which the tables for all ACS geographies can be accessed, is online at http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_13_5YR_B05003&prodType=table ("Sex By Age By Nativity And Citizenship Status").

sponding margin of error for the calculated CVAP of 447,100.[17]

The Bureau also furnishes the "Citizen Voting Age Population (CVAP) Special Tabulation" of ACS data prepared for the U.S. Department of Justice for the purpose of redistricting. The Special Tabulation provides CVAP data from the ACS's 5-year estimates, updated annually (most recently for 2009-2013).[18] The Bureau explains: "States continue to use the ACS to analyze characteristics of the districts established in the redistricting process. The citizenship by voting age and race and ethnicity custom tabulation (CVAP) is now released on an annual basis every February per the request of several states and the Department of Justice." Catherine McCully, *Designing P.L. 94-171 Redistricting Data for the Year 2020 Census* 22 (U.S. Census Bureau Dec. 2014).[19]

In short, CVAP data are readily accessible to State and local governments, as well as their demographers and their citizens.

---

17 The methodology for calculating the margin of error for an ACS estimate is explained in U.S. Census Bureau, *A Compass for Understanding and Using American Community Service Data: What General Data Users Need to Know* 10-11 & A-11-A-17 (2008).

18 Published online at https://www.census.gov/rdo/data/voting_age_population_by_citizenship_and_race_cvap.html.

19 Online at http://www.census.gov/content/dam/Census/library/publications/2014/rdo/pl94-171.pdf.

### III. CVAP Data Are Routinely Used To Prove And Remediate Inequalities In Voting.

Assertions that ACS CVAP data are not sufficiently reliable to use in connection with redistricting are without merit and contrary to decisions of this Court and the courts of appeal, as well as the practices of States, local jurisdictions, and the Justice Department.

#### A. The Judiciary Has Determined That CVAP Data Are Necessary In Section 2 Claims, And State And Local Governments Rely On Them When Redistricting.

Section 2 of the Voting Rights Act prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). The Court has established three "necessary preconditions" for an actionable vote-dilution claim under Section 2 of the Voting Rights Act: (1) a minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district," (2) the minority group must be "politically cohesive," and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986).

This Court's recent Section 2 cases have accepted CVAP as the yardstick when assessing minority voting-strength. Most notably, CVAP was at the heart of a critical dispute over Texas's redistricting plans during the last apportionment

cycle. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 423-25, 427-29, 436-42 (2006) (opinion of Kennedy, J.) (*LULAC*);[20] *id.* at 493-94, 502-10 (Roberts, C.J., concurring in part, concurring in the judgment in part, and dissenting in part) (relying on CVAP as relevant statistic in compactness inquiry). The Court approved of the litigants' reliance on CVAP as a necessary consideration under *Gingles*: "Latinos, to be sure, are a bare majority of the voting-age population in new District 23, but only in a hollow sense, for the parties agree that the relevant numbers must include citizenship. This approach fits the language of § 2 because only eligible voters affect a group's opportunity to elect candidates." *LULAC*, 548 U.S. at 429 (opinion of Kennedy, J.).[21] The Court also used CVAP to determine proportionality when evaluating a minority group's opportunity to elect their candidate of choice. *Id.* at 436 ("We proceed now to the totality of the circumstances, and first to the proportionality inquiry, comparing the percentage of total districts that are Latino opportunity districts with the Latino share of the citizen voting-age population.").

---

[20]   In fact, Justice Kennedy's opinion references the ACS when referring to Latino CVAP in Texas. *LULAC*, 548 U.S. at 438.

[21]   When seeking affirmance, Texas and the United States (as *amici*) each relied on CVAP to argue that the challengers failed to meet their burden under Section 2. State Appellees' Br. at 93-95, *LULAC v. Perry*, 548 U.S. 399 (2006) (Nos. 05–204, 05–254, 05–276, 05–439) (discussing CVAP and Section 2 compliance); Br. for the United States as *Amicus Curiae* Supporting Appellees at 24-30, *LULAC v. Perry*.

Likewise, in *Bartlett v. Strickland*, 556 U.S. 1 (2009), the Court and litigants relied on CVAP to evaluate the first *Gingles* requirement.[22]

Every Circuit Court to consider the issue has concluded that CVAP is a necessary consideration when evaluating the first *Gingles* requirement. *Romero v. City of Pomona*, 883 F.2d 1418, 1426 (9th Cir. 1989) ("[E]ligible minority voter population, rather than total minority population, is the appropriate measure of geographical compactness."), *overruled in part on other grounds by Townsend v. Holman Consulting Corp.*, 914 F.2d 1136, 1141 (9th Cir. 1990); *Negron v. City of Miami Beach*, 113 F.3d 1563, 1569 (11th Cir. 1997) ("[T]he proper statistic for deciding whether a minority group is sufficiently large and geographically compact is voting age population as refined by citizenship."); *Campos v. City of Houston*, 113 F.3d 544, 548 (5th Cir. 1997) ("[C]ourts evaluat-

---

[22]   556 U.S. at 12-15 (opinion of Kennedy, J.); *see also id.* at 26-28, 36-40 (Souter, J., dissenting). Although Justice Kennedy's opinion refers simply to "African-American voting-age population," rather than citizen voting-age population, the lower court's decision and Justice Souter's dissent make clear that the relevant metric in the case was CVAP. *Pender Cnty. v. Bartlett*, 649 S.E.2d 364, 371-76 (N.C. 2007) (describing "the critical question on appeal" as "whether the 'sufficiently large and geographically compact' minority population must constitute a numerical majority of citizens of voting age in order to satisfy the first *Gingles* precondition."); *Bartlett*, 556 U.S. at 27 (Souter, J., dissenting) ("In the plurality's view, only a district with a minority population making up 50% or more of the citizen voting age population (CVAP) can provide a remedy to minority voters lacking an opportunity 'to elect representatives of their choice.'").

ing vote dilution claims under section 2 of the Voting Rights Act must consider the citizen voting-age population of the group challenging the electoral practice when determining whether the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district."); *accord Barnett v. City of Chicago*, 141 F.3d 699, 704 (7th Cir. 1998) ("We think that citizen voting-age population is the basis for determining equality of voting power that best comports with the policy of the statute.").

In order to meet these Section 2 requirements, States and local jurisdictions throughout the Nation retain professionals like *amici* demographers to draw, analyze, and adjust voting district boundary lines to comply with Section 2—and they universally rely on CVAP data to accomplish this.[23] After *Bartlett*, moreover, demographers use CVAP to adjust boundary lines to ensure that districts retain majority-minority status. Every fraction of a percentage point is of intense interest to the political players in this process; they trust

---

23 *Amicus* Dr. Morrison routinely relies upon CVAP to assess Section 2 compliance when consulting for several jurisdictions. For an example of a city that established new voting district boundary lines to comply with Section 2, see https://www.scribd.com/doc/273405839/Morrison-Memo-Waterbury-Aldermanic-2015-03-18 (March 18, 2015 Memorandum of Peter A. Morrison to Waterbury, Connecticut, Board of Alderman regarding the City of Waterbury 2015 Aldermanic Districting Plan). For an example of demographers using CVAP to analyze and adjust small-jurisdiction district lines in an effort to comply with Section 2, see Lapkoff & Gobalet Demographic Research, Inc., *Redistricting Report to the Board of Trustees Hartnell Community College District* (Oct. 13, 2011), online at http://bit.ly/1IluwrD.

that CVAP is a reliable data source for this sensitive work.

The Department of Justice likewise has relied on CVAP when bringing Section 2 enforcement actions. *E.g.*, Complaint ¶ 12, *United States v. Sch. Bd. of Osceola Cnty.*, No. 6:08-cv-00582-GKS-DAB (M.D. Fla. Apr. 16, 2008) ("The Hispanic population of the county is sufficiently numerous and geographically compact that a properly apportioned single-member district plan for electing the School Board can be drawn in which Hispanic persons would constitute a majority of the citizen voting-age population in one out of five districts."); Complaint ¶ 8, *United States v. Town of Lake Park, Fla.*, No. 09-cv-80507-KAM (S.D. Fla. Mar. 31, 2009); Complaint ¶ 8, *United States v. Village of Port Chester*, No. 06-civ-15173 (S.D.N.Y. Dec. 15, 2006).

Further examples abound. California's independent redistricting commission relied on ACS's CVAP data to assure that its final maps met the requirements of Section 2 of the Voting Rights Act. State of California Citizens Redistricting Commission, *Final Report On 2011 Redistricting* 15 & n.3 (Aug. 15, 2011) (explaining reliance on ACS and CVAP data); *see also id.* at 17-19 (discussing Section 2 compliance). Texas did so in constructing and defending its state legislative boundaries during this redistricting cycle.[24]

---

[24] The Texas Legislative Council published a research guide for using CVAP in connection with redistricting, along with CVAP data for each district in each set of maps. Texas Legis. Council, *Estimating Citizenship Voting Age Population Data (CVAP), Addendum to Data for 2011 Redistricting*

In short, CVAP is now an indispensable feature in voting rights litigation under Section 2.

### B. CVAP Was A Key In Measuring Compliance With Section 5 Of The Voting Rights Act.

Until this Court struck down Section 4(b) of the Voting Rights Act in *Shelby County v. Holder*, 570 U.S. ——, 133 S. Ct. 2612 (2013), a staple of Section 5 preclearance work involved analyzing retrogression by referencing CVAP data. Indeed, the Justice Department itself routinely consulted CVAP data in conducting preclearance reviews and in pursuing Section 5 enforcement.[25] *See* U.S. Comm'n on Civil Rights, *Redistricting and the 2010 Census: Enforcing Section 5 of the Voting Rights Act* 54-55 (Sept. 2012) (describing the DOJ's "proportional retrogression" enforcement standard, which "assess[es] the gap between the actual number of minority ability districts and

---

*in Texas* (March 2013); Michael Li, *Updated demographic data for Texas legislative & congressional maps*, Texas Redistricting & Election Law, http://txredistricting.org/post/78929777903/updated-demographic-data-for-texas-legislative (Mar. 8, 2014).

[25] Consideration of CVAP is necessary to gauge the true effect of a proposed redistricting plan. "[T]o measure the 'real' electoral prospects of affected minority groups [in Section 5 retrogression analysis], as opposed to apparent ones, the Justice Department, and the jurisdictions themselves, often needed to look at Citizen Voting Age Population (CVAP), voter registration or Statement of Vote data." Bruce E. Cain & Karin Mac Donald, *Voting Rights Act Enforcement: Navigating Between High and Low Expectations*, in *The Future of the Voting Rights Act* 133 (David L. Epstein et al., eds., 2006).

the number of districts that would be roughly proportional to the minority share of the citizen voting age population").

For example, the Arizona Independent Redistricting Commission relied on CVAP to assess Hispanic voting strength when seeking Section 5 preclearance from the Department of Justice for its proposed legislative redistricting plan. Arizona Independent Redistricting Commission, *United States Dep't of Justice Submission Under Section 5 of Voting Rights Act, State of Arizona Legislative Redistricting Plan* 37 & n.3 (Feb. 28, 2012) (detailing commission's reliance on ACS's CVAP data to draw proposed districts); *see generally id.* at 84-133 (relying on CVAP when evaluating the proposed plan's effect on minority voters' ability to elect candidates of their choice).

In a similar vein, CVAP was widely used in earlier voting-rights litigation related to the same plans that are at issue in this case. *See Texas v. United States*, 887 F.Supp.2d 133 (D. D.C. 2012), vacated and remanded, *Texas v. United States*, 133 S. Ct. 2885 (2013). The District Court analyzed each challenged district by comparing Hispanic CVAP in the existing (or "benchmark") plan against Texas's proposed plan to determine whether the new plan ran afoul of Section 5's prohibition on retrogression. 887 F.Supp.2d at 153-56 (Congressional plan); 162-63 (State Senate plan); 167-177 (State House plan).

### C. Congress Relied On CVAP Data To Protect Minority Voting Rights In Section 203 Of The VRA.

Demographers, the courts, State and local governments, and the Justice Department are not alone in their reliance on CVAP. Congress explicitly relied on CVAP data to protect minority voting rights. Section 203 of the Voting Rights Act, 52 U.S.C. § 10503, prohibits states and political subdivisions from providing English-only voting materials if a threshold percentage of citizens have limited proficiency in English. To determine whether a State or political subdivision is subject to Section 203's requirements, the statute defines a "covered State or political subdivision" "based on the 2010 American Community Survey census data and subsequent American Community Survey data in 5-year increments, or comparable census data." *Id.*, subd. (b)(2)(A). Two of these calculations must expressly consider "the citizens of voting age" as calculated by the ACS. *Id.*, subds. (b)(2)(A)(i)(I) and (II).

This mandate, Congress declared, is an issue of constitutional magnitude:

> The Congress declares that, in order to enforce the guarantees of the fourteenth and fifteenth amendments to the United States Constitution, it is necessary to eliminate such discrimination by prohibiting these practices [that exclude citizens of language minorities from participation in the electoral process], and by prescribing other remedial devices.

*Id.*, subd. (a).

All of this begs the question: If everyone agrees that CVAP is valid and sufficiently reliable for the various purposes outlined above, how could it be insufficiently valid and reliable for one-person, one-vote claims, especially since the Court has already instructed that exact precision is not required to satisfy the Fourteenth Amendment? *See Reynolds*, 377 U.S. at 578-79; *see also* Section V, *infra*. The answer: CVAP data are valid and reliable. Where necessary, they can be used to subdivide, with a known degree of reliability, almost any populated territory into districts populated by substantially equal numbers of voting-age citizens.



The content is redacted.

Page body is fully redacted.

24









[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

27

Plaintiffs' Exhibit 106, Page 38







30

Caster Plaintiffs' Exhibit 106, Page 41

## CONCLUSION

*Amici* support appellants and agree it is unjust for state and local governments to construct districts of grossly disproportionate voting strength, particularly when they have reliable data at their fingertips to reduce those imbalances. State and local jurisdictions throughout the Nation already hire demographers to analyze their districts' compliance with the Voting Rights Act based on CVAP data. These jurisdictions can use that same data to comply with the one-person, one-vote principle.

Respectfully submitted,

C. DEAN MCGRATH, JR.
McGrath & Associates
1025 Thomas Jefferson St., NW
Ste. 110G
Washington, D.C. 20007
(202) 295-2304

BRADLEY A. BENBROOK
*Counsel of Record*
STEPHEN M. DUVERNAY
Benbrook Law Group, PC
400 Capitol Mall, Ste. 1610
Sacramento, CA 95814
(916) 447-4900
brad@benbrooklawgroup.com

August 2015

*Counsel for Amici Curiae*