FILED
2022 Jun−23 AM 09:51
U.S. DISTRICT COURT
N.D. OF ALABAMA



APPEAL,PROTECTIVE ORDER

# U.S. District Court
## Northern District of Alabama (Southern)
## CIVIL DOCKET FOR CASE #: <u>2:21−cv−01536−AMM</u>
### *Internal Use Only*

| | |
|---|---|
| Caster et al v. Merrill | Date Filed: 11/16/2021 |
| Assigned to: Judge Anna M Manasco | Jury Demand: None |
| Case in other court:  Alabama Middle, 2:21−cv−00751 | Nature of Suit: 441 Civil Rights: Voting |
| Cause: 42:1973 Voting Rights Act | Jurisdiction: Federal Question |

**<u>Plaintiff</u>**

**Marcus Caster**                    represented by   **Abha Khanna**
ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
206−656−0177
Email: <u>AKhanna@elias.law</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aria C Branch**
ELIAS LAW GROUP LLP
10 G St NE, Suite 600
Washington, DC 20002
202−968−4490
Fax: 202−968−4498
Email: <u>ABranch@elias.law</u>
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel C Osher**
ELIAS LAW GROUP
10 G Street NE
Suite 600
Washington, DC 20002
202−968−4490
Email: <u>DOsher@elias.law</u>
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph N. Posimato**
Elias Law Group LLP
10 G Street, NE; Suite 600
Washington, DC 20002
202−968−4518
Email: <u>jposimato@elias.law</u>
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Lalitha D Madduri**
ELIAS LAW GROUP LLP
10 G Street NE, Suite 600
Washington, DC 20002
202–968–4490
Email: lmadduri@elias.law
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Olivia N. Sedwick**
Elias Law Group LLP
10 G Street, NE; Suite 600
Washington, DC 20002
202–968–4518
Email: osedwick@elias.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard P Rouco**
QUINN CONNOR WEAVER DAVIES &
ROUCO LLP
Two North Twentieth Street
2 20th Street North
Suite 930
Birmingham, AL 35203
205–870–9989
Fax: 205–803–4143
Email: rrouco@qcwdr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lakeisha Chestnut**                    represented by  **Abha Khanna**
                                          (See above for address)
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

                                          **Aria C Branch**
                                          (See above for address)
                                          *LEAD ATTORNEY*
                                          *PRO HAC VICE*
                                          *ATTORNEY TO BE NOTICED*

                                          **Daniel C Osher**
                                          (See above for address)
                                          *LEAD ATTORNEY*
                                          *PRO HAC VICE*
                                          *ATTORNEY TO BE NOTICED*

**Joseph N. Posimato**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lalitha D Madduri**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Olivia N. Sedwick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard P Rouco**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bobby Lee DeBouse**                    represented by   **Abha Khanna**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aria C Branch**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel C Osher**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph N. Posimato**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lalitha D Madduri**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Olivia N. Sedwick**
(See above for address)

3

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard P Rouco**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**Benjamin Jones**                    represented by    **Abha Khanna**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aria C Branch**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel C Osher**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph N. Posimato**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lalitha D Madduri**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Olivia N. Sedwick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard P Rouco**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**Rodney Allen Love**                    represented by    **Abha Khanna**
(See above for address)
*LEAD ATTORNEY*

4

*ATTORNEY TO BE NOTICED*

**Aria C Branch**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel C Osher**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph N. Posimato**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lalitha D Madduri**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Olivia N. Sedwick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard P Rouco**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Manasseh Powell**                    represented by  **Abha Khanna**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aria C Branch**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel C Osher**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph N. Posimato**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lalitha D Madduri**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Olivia N. Sedwick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard P Rouco**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Ronald Smith**                    represented by   **Abha Khanna**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aria C Branch**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel C Osher**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph N. Posimato**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lalitha D Madduri**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Olivia N. Sedwick**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard P Rouco**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Wendell Thomas**                    represented by   **Abha Khanna**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aria C Branch**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel C Osher**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph N. Posimato**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lalitha D Madduri**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Olivia N. Sedwick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard P Rouco**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

7

**John H Merrill**
*in his offical offical capacity as Alabama*
*Secretary of State*

represented by   **Andrew Reid Harris**
OFFICE OF THE ATTORNEY
GENERAL
CONSTITUTIONAL DEFENSE
DIVISION
501 Washington Avenue
Montgomery, AL 36130
334–353–8891
Email: Reid.Harris@AlabamaAG.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin Matthew Seiss**
ALABAMA OFFICE OF THE
ATTORNEY GENERAL
P.O. Box 300152
501 Washington Ave (36104)
Montgomery, AL 36130
334–353–8917
Fax: 334–353–8400
Email: ben.seiss@alabamaag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brenton Merrill Smith**
OFFICE OF THE ATTORNEY
GENERAL OF ALABAMA
P.O. Box 300152
501 Washington Avenue
Montgomery, AL 36130
334–353–4336
Fax: 334–353–8400
Email: Brenton.Smith@AlabamaAG.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Edmund Gerard LaCour , Jr.**
OFFICE OF THE ATTORNEY
GENERAL
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36104
334–242–7300
Fax: 334–242–4891
Email: Edmund.Lacour@AlabamaAG.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James W Davis**
OFFICE OF THE ATTORNEY
GENERAL
501 Washington Avenue

P O Box 300152
Montgomery, AL 36130–0152
334–242–7300
Fax: 334–353–8400
Email: jim.davis@alabamaag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Misty Shawn Fairbanks Messick**
OFFICE OF THE ATTORNEY
GENERAL
FOR THE STATE OF ALABAMA
501 Washington Avenue
P O Box 300152
Montgomery, AL 36130–0152
334–242–7300
Fax: 334–353–8440
Email: Misty.Messick@AlabamaAG.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Barrett Bowdre**
OFFICE OF THE ALABAMA
ATTORNEY GENERAL
P.O. Box 300152
Montgomery, AL 36130
334–242–7300
Fax: 334–353–8400
Email: Barrett.Bowdre@alabamaAG.gov
*ATTORNEY TO BE NOTICED*

**Thomas Alexander Wilson**
STATE OF ALABAMA
OFFICE OF THE ATTORNEY
GENERAL
501 Washington Street
Montgomery, AL 36103
334–242–7300
Fax: 334–353–8400
Email: thomas.wilson@alabamaAG.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jim McClendon**                    represented by   **Christina Rossi Pantazis**
*dwalker@balch.com*                                   BALCH AND BINGHAM
                                                      Labor & Employment
                                                      1901 Sixth Avenue North, Ste. 1500
                                                      Birmingham, AL 35203
                                                      205–226–3473
                                                      Fax: 205–488–5631
                                                      Email: crossi@balch.com
                                                      *ATTORNEY TO BE NOTICED*

9

**J Dorman Walker**
BALCH & BINGHAM LLP
P O Box 78
Montgomery, AL 36101
334–834–6500
Fax: 334–269–3115
Email: dwalker@balch.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Chris Pringle**                     represented by   **Christina Rossi Pantazis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**J Dorman Walker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Jeff Coleman**                      represented by   **Algert Swanson Agricola , Jr**
Coleman for Congress                                  AGRICOLA LAW, LLC
P.O. Box 8722                                         127 South 8th Street
Dothan, AL 36304                                      Opelika, AL 36801
334–759–7557
Fax: 334–759–7558
Email: al@agricolalaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Barbara H. Agricola**
AGRICOLA LAW
127 South 8th Street
Opelika, AL 36801
334–759–7557
Fax: 334–759–7558
Email: barbara@agricolalaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin J Espy**
MELTON ESPY & WILLIAMS PC
P O Box 5130
Montgomery, AL 36103
334–263–6621
Fax: 334–263–7252
Email: bespy@mewlegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph C Espy , III**

MELTON ESPY & WILLIAMS PC
301 Adams Avenue
P O Drawer 5130
Montgomery, AL 36103−5130
334−263−6621
Fax: 334−263−7252
Email: jespy@mewlegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William M Espy**
MELTON ESPY & WILLIAMS PC
P O Drawer 5130
Montgomery, AL 36103
334−263−6621
Fax: 334−263−7252
Email: wespy@mewlegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 11/04/2021 | 3 | | COMPLAINT for Declaratory and Injunctive Relief against John H. Merrill (Filing fee $402.00 receipt number 4602065148.), filed by Manasseh Powell, Bobby Lee DeBouse, Ronald Smith, LaKeisha Chestnut, Wendell Thomas, Marcus Caster, Benjamin Jones, Rodney Allen Love. (Attachments: # 1 Civil Cover Sheet, # 2 fee receipt)(djy, ) Modified on 11/8/2021 to clarify text as reflected in pleading (am, ). [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/06/2021) |
| 11/05/2021 | 1 | | NOTICE of Appearance by Edmund Gerard LaCour, Jr on behalf of John H. Merrill (LaCour, Edmund) [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/05/2021) |
| 11/05/2021 | 2 | | NOTICE of Appearance by James William Davis on behalf of John H. Merrill (Davis, James) [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/05/2021) |
| 11/08/2021 | 4 | | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Marcus Caster, LaKeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, & Wendell Thomas; Corporate Disclosures due by 11/18/2021. (Attachments: # 1 Standing Order & Sample)(am, ) [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/08/2021) |
| 11/08/2021 | 5 | | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to John H. Merrill; Corporate Disclosures due by 11/18/2021. (Attachments: # 1 Standing Order & Sample)(am, ) [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/08/2021) |
| 11/08/2021 | 6 | | Summons Issued as to John H. Merrill and mailed CMRRR w/ 1 Complaint. (am, ) [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/08/2021) |

| 11/08/2021 | 7 | **ORDER: it is ORDERED that the parties shall SHOW CAUSE, if any there be, on or before 11/15/2021, why this action should not be transferred to the Northern District of Alabama, as further set out in Order. Signed by Honorable Judge William Keith Watkins on 11/8/2021. (am, )** [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/08/2021) |
|---|---|---|
| 11/08/2021 | 8 | Corporate/Conflict Disclosure Statement by John H. Merrill re 5 Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement. (Davis, James) [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/08/2021) |
| 11/08/2021 | 9 | NOTICE of Appearance by Benjamin Matthew Seiss on behalf of John H. Merrill (Seiss, Benjamin) [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/08/2021) |
| 11/08/2021 | 10 | NOTICE of Appearance by Brenton Merrill Smith on behalf of John H. Merrill (Smith, Brenton) [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/08/2021) |
| 11/09/2021 | 11 | NOTICE of Appearance by Andrew Reid Harris on behalf of John H. Merrill (Harris, Andrew) [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/09/2021) |
| 11/09/2021 | 12 | (STRICKEN AS AN ERRONEOUS DOCKET ENTRY – FILED IN WRONG CASE) NOTICE of Appearance by Andrew Reid Harris on behalf of John H. Merrill (Harris, Andrew) Modified on 11/10/2021 (am, ). (Main Document 12 replaced on 11/10/2021) (am, ). [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/09/2021) |
| 11/10/2021 | 13 | NOTICE of Error: re: 12 Notice of Appearance which is hereby STRICKEN as an Erroneous docket entry; Counsel filed in the wrong case) (am, ) [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/10/2021) |
| 11/10/2021 | 14 | Corporate/Conflict Disclosure Statement by Marcus Caster. (Rouco, Richard) [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/10/2021) |
| 11/10/2021 | 15 | Corporate/Conflict Disclosure Statement by LaKeisha Chestnut. (Rouco, Richard) [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/10/2021) |
| 11/10/2021 | 16 | Corporate/Conflict Disclosure Statement by Bobby Lee DeBouse. (Rouco, Richard) [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/10/2021) |
| 11/10/2021 | 17 | Corporate/Conflict Disclosure Statement by Benjamin Jones. (Rouco, Richard) [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/10/2021) |
| 11/10/2021 | 18 | Corporate/Conflict Disclosure Statement by Rodney Allen Love. (Rouco, Richard) [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/10/2021) |
| 11/10/2021 | 19 | Corporate/Conflict Disclosure Statement by Manasseh Powell. (Rouco, Richard) [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/10/2021) |

| 11/10/2021 | 20 | | Corporate/Conflict Disclosure Statement by Ronald Smith. (Rouco, Richard) [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/10/2021) |
|---|---|---|---|
| 11/10/2021 | 21 | | Corporate/Conflict Disclosure Statement by Wendell Thomas. (Rouco, Richard) [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/10/2021) |
| 11/12/2021 | 22 | | Return Receipt Card showing service of Summons & Complaint signed by B. McCaster for John H. Merrill served on 11/9/2021, answer due 11/30/2021. (am, ) [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/12/2021) |
| 11/12/2021 | 23 | | Motion for Admission of Aria C. Branch Pro Hac Vice (Filing fee $75.00 receipt number BALMDC–3122462.) by Marcus Caster, LaKeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Exhibit Declaration of Aria C. Branch)(Rouco, Richard) Modified on 11/15/2021 to add PHV attorney's name (am, ). [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/12/2021) |
| 11/12/2021 | 24 | | Motion for Admission Abha Khanna Pro Hac Vice (Filing fee $75.00 receipt number AALMDC–3122483.) by Marcus Caster, LaKeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Exhibit Declaration of Abha Khanna)(Rouco, Richard) Modified on 11/15/2021 to add PHV attorney's name (am, ). [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/12/2021) |
| 11/12/2021 | 25 | | Motion for Admission Joseph N. Posimato Pro Hac Vice (Filing fee $75.00 receipt number AALMDC–3122489.) by Marcus Caster, LaKeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Exhibit Declaration of Joseph N. Posimato)(Rouco, Richard) Modified on 11/15/2021 to add PHV attorney's name (am, ). [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/12/2021) |
| 11/12/2021 | 26 | | Motion for Admission of Lalitha D. Madduri Appear Pro Hac Vice (Filing fee $75.00 receipt number AALMDC–3122494.) by Marcus Caster, LaKeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Exhibit Declaration of Lalitha D. Madduri)(Rouco, Richard) Modified on 11/15/2021 to add PHV attorney's name (am, ). [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/12/2021) |
| 11/15/2021 | 27 | | **TEXT ORDER: GRANTING the 23 Motion for Admission of Aria C. Branch Pro Hac Vice; the 24 Motion for Admission of Abha Khanna Pro Hac Vice; the 25 Motion for Admission of Joseph N. Posimato Pro Hac Vice; and the 26 Motion for Admission of Lalitha D. Madduri Pro Hac Vice. Signed by Honorable Judge William Keith Watkins on 11/15/2021. (NO PDF attached to this entry) (am, )** [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/15/2021) |
| 11/15/2021 | 28 | | RESPONSE TO 7 ORDER TO SHOW CAUSE by Marcus Caster, Wendell Thomas, Ronald Smith, Manasseh Powell, Rodney Allen Love, Benjamin |

| | | | |
|---|---|---|---|
| | | | Jones, Bobby Lee DeBouse, LaKeisha Chestnut. (Rouco, Richard) Modified on 11/16/2021 to add linkage & and add additional plaintiff filer names (am, ). [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/15/2021) |
| 11/15/2021 | 29 | | RESPONSE TO ORDER TO SHOW CAUSE by John H. Merrill re 7 Order to Show Cause,. (Harris, Andrew) [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/15/2021) |
| 11/16/2021 | 30 | | **ORDER: it is ORDERED that this action be transferred immediately to the United States District Court for the Northern District of Alabama, as further set out in Order. Signed by Honorable Judge William Keith Watkins on 11/16/2021. (am, )** [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/16/2021) |
| 11/16/2021 | | | Case transferred to Northern District of Alabama; Electronically transferred via CM/ECF transfer to Clerk. (NO PDF attached to this entry) (am, ) [Transferred from Alabama Middle on 11/16/2021.] (Entered: 11/16/2021) |
| 11/16/2021 | 31 | | Case transferred in from District of Alabama Middle; Case Number 2:21–cv–00751. Original file certified copy of transfer order and docket sheet received. (Entered: 11/16/2021) |
| 11/17/2021 | 32 | | NOTICE of Appearance by Misty Shawn Fairbanks Messick on behalf of John H Merrill (Messick, Misty) (Entered: 11/17/2021) |
| 11/17/2021 | 33 | | NOTICE of Appearance by Alexander Barrett Bowdre on behalf of John H Merrill (Bowdre, Alexander) (Entered: 11/17/2021) |
| 11/18/2021 | 34 | | NOTICE of Appearance by Thomas Alexander Wilson on behalf of John H Merrill (Wilson, Thomas) (Entered: 11/18/2021) |
| 11/18/2021 | 35 | | NOTICE by John H Merrill *Notice of Filing* (Attachments: # 1 Exhibit Motion for Status Conference)(Davis, James) (Entered: 11/18/2021) |
| 11/18/2021 | 36 | | ORDER setting deadline on response to motions in Singleton and Milligan. Signed by Judge Anna M Manasco on 11–18–2021. (TGC) (Entered: 11/18/2021) |
| 11/18/2021 | 37 | | ORDER Rule 16 Conference set for 11/23/2021 10:00 AM CST. Signed by Judge Anna M Manasco on 11–18–2021. (TGC) (Entered: 11/18/2021) |
| 11/22/2021 | 38 | | RESPONSE to *Defendant's Motion to Consolidate* filed by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas. (Rouco, Richard) (Entered: 11/22/2021) |
| 11/22/2021 | 39 | | STATUS REPORT *Joint* by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas. filed by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas (Rouco, Richard) (Entered: 11/22/2021) |
| 11/23/2021 | | | Minute Entry for proceedings held before Circuit Judge Marcus and Judges Manasco and Moorer: Scheduling Conference held on 11/23/2021. (Court Reporter Teresa Roberson.) (FNC) (Entered: 11/23/2021) |
| 11/23/2021 | 40 | | |

| | | | |
|---|---|---|---|
| | | | **SCHEDULING ORDER FOR PRELIMINARY INJUNCTION PROCEEDINGS** – the following schedule is ORDERED in connection with the Plaintiffs anticipated motion for preliminary injunction: On or before **DECEMBER 7, 2021**, the parties shall file a joint statement of facts that are stipulated for purposes of preliminary injunction proceedings. The Plaintiffs shall file their motion for preliminary injunctive relief on or before **DECEMBER 15, 2021**. The Secretary shall file any objections to the Plaintiffs motion on or before **DECEMBER 22, 2021**. The Plaintiffs shall file any reply in support of their motions for preliminaryinjunctive relief within five days of the filing of any objection. On or before **DECEMBER 10, 2021**, the parties shall exchange any expertreports related to the motion for preliminary injunction.On or before **DECEMBER 20, 2021**, the parties shall exchange any expertrebuttal reports related to the motion for preliminary injunction. On or before **DECEMBER 17, 2021**, the parties shall complete all discoveryrelated to the motion for preliminary injunction, other than the filing of the expert rebuttal reports. Any other motions related to the application for preliminary injunctive relief or hearing thereof shall be filed on or before close of business on **DECEMBER 17,2021**. **At or before 4:00 pm Central Standard Time on DECEMBER 23, 2021**,the parties shall file a joint pretrial report as directed. The court **SETS** a hearing on the Plaintiffs motion for preliminary injunctiverelief on **JANUARY 4, 2022, at 9:00 a.m. Central Standard Time** in Courtroom 8 in the Hugo L. Black United States Courthouse. Within five days of the completion of the preliminary injunction hearing, theparties shall file proposed findings of fact and conclusions of law for the courtsconsideration. Signed by Judge Anna M Manasco on 11/23/2021. (KAM) (Entered: 11/23/2021) |
| 11/30/2021 | 41 | | MOTION for Leave to Appear Pro Hac Vice *Olivia N. Sedwick* by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas. (Attachments: # 1 Exhibit Certificate of Good Standing)(Rouco, Richard) (Entered: 11/30/2021) |
| 11/30/2021 | | | PHV Fee paid: $ 75, receipt number 1126–3970045 (B4601117162). (Rouco, Richard) Modified on 11/30/2021 (DNW, ). (Entered: 11/30/2021) |
| 11/30/2021 | 42 | | *Defendant's* ANSWER to 3 Complaint, by John H Merrill.(Davis, James) (Entered: 11/30/2021) |
| 12/01/2021 | 43 | | TEXT ORDER. Plaintiffs' Motion for Leave for Olivia N. Sedwick to Appear Pro Hac Vice, Doc. 41 , is GRANTED. Counsel are reminded that at least one attorney for each party may be required to be physically present at every hearing and status conference. Signed by Judge Anna M Manasco on 12/1/2021. (FNC) (Entered: 12/01/2021) |
| 12/07/2021 | 44 | | STIPULATION *Joint Stipulation of Facts* by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas. filed by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas (Rouco, Richard) (Entered: 12/07/2021) |
| 12/13/2021 | 45 | | **TEXT ORDER**: The parties were ordered to exchange any expert reports related to the motion for preliminary injunction on or before December 10, |

| | | |
|---|---|---|
| | | 2021, and to exchange any rebuttal reports related to that motion on or before December 20, 2021, Doc. 40 . In light of the preliminary injunction hearing set on January 4, 2022, the parties are **ORDERED** to file on or before **DECEMBER 14, 2021**, any expert reports exchanged, and to file on or before **DECEMBER 21, 2021**, any rebuttal reports exchanged. Signed by Judge Anna M Manasco on 12/13/2021. (DNW) (Entered: 12/13/2021) |
| 12/14/2021 | 46 | Unopposed MOTION for Protective Order by John H Merrill. (Attachments: # 1 Exhibit A – Proposed Protective Order)(Davis, James) (Entered: 12/14/2021) |
| 12/14/2021 | 47 | Unopposed MOTION for Protective Order *(AMENDED)* by John H Merrill. (Attachments: # 1 Exhibit A – Proposed Protective Order)(Davis, James) (Entered: 12/14/2021) |
| 12/14/2021 | 48 | NOTICE by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas *of Filing Expert Report: William S. Cooper* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D–1, # 5 Exhibit D–2, # 6 Exhibit D–3 District 1, # 7 Exhibit D–3 District 2, # 8 Exhibit D–3 District 7, # 9 Exhibit D–4, # 10 Exhibit E–1, # 11 Exhibit E–2, # 12 Exhibit E–3, # 13 Exhibit E–4, # 14 Exhibit F–1, # 15 Exhibit F–2, # 16 Exhibit G–1, # 17 Exhibit G–2, # 18 Exhibit G–3 District 2, # 19 Exhibit G–3 District 7, # 20 Exhibit G–4, # 21 Exhibit H–1, # 22 Exhibit H–2, # 23 Exhibit H–3 District 2, # 24 Exhibit H–3 District 7, # 25 Exhibit H–4, # 26 Exhibit I–1, # 27 Exhibit I–2, # 28 Exhibit I–3 District 2, # 29 Exhibit I–3 District 7, # 30 Exhibit I–4, # 31 Exhibit J–1, # 32 Exhibit J–2, # 33 Exhibit J–3 District 2, # 34 Exhibit J–3 District 7, # 35 Exhibit J–4, # 36 Exhibit K–1, # 37 Exhibit K–2, # 38 Exhibit K–3 District 2, # 39 Exhibit K–3 District 7, # 40 Exhibit K–4, # 41 Exhibit L–1, # 42 Exhibit L–2, # 43 Exhibit L–3 District 2, # 44 Exhibit L–3 District 7, # 45 Exhibit L–4, # 46 Exhibit M–1, # 47 Exhibit M–2, # 48 Exhibit N–1, # 49 Exhibit N–2, # 50 Exhibit O–1, # 51 Exhibit O–2, # 52 Exhibit P–1, # 53 Exhibit P–2, # 54 Exhibit Q–1, # 55 Exhibit Q–2, # 56 Exhibit R–1, # 57 Exhibit R–2)(Rouco, Richard) (Entered: 12/14/2021) |
| 12/14/2021 | 49 | NOTICE by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas *of Filing Expert Report: Max Palmer* (Rouco, Richard) (Entered: 12/14/2021) |
| 12/14/2021 | 50 | NOTICE by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas *of Filing Expert Report: Bridgett King* (Rouco, Richard) (Entered: 12/14/2021) |
| 12/14/2021 | 51 | NOTICE by John H Merrill re 45 Order,, (Attachments: # 1 Exhibit 1 Bryan report – Singleton, # 2 Exhibit 2 Bryan report – Milligan & Caster, # 3 Exhibit 3 Bryan cv, # 4 Exhibit 4 Hood report)(Davis, James) (Entered: 12/14/2021) |
| 12/14/2021 | 52 | MOTION for Leave to Appear Pro Hac Vice *Daniel C. Osher* by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas. (Attachments: # 1 Exhibit Declaration of Daniel C. Osher, # 2 Exhibit Certificate of Good Standing)(Rouco, Richard) (Entered: 12/14/2021) |

| 12/14/2021 | 53 | | PROTECTIVE ORDER. Signed by Judge Anna M Manasco on 12/14/2021. (FNC) (Entered: 12/14/2021) |
| 12/14/2021 | 54 | | TEXT ORDER DENYING AS MOOT 46 , Motion for Protective Order. Signed by Judge Anna M Manasco on 12/14/2021. (FNC) (Entered: 12/14/2021) |
| 12/14/2021 | | | PHV Fee paid: $75, receipt number B4601117473 for Richard R. Rouco. (DNW, ) (Entered: 12/14/2021) |
| 12/14/2021 | 55 | | TEXT ORDER. Plaintiffs' Motion for Leave for Daniel C. Osher to Appear Pro Hac Vice, Doc. 52 , is GRANTED. Counsel are reminded that at least one attorney for each party may be required to be physically present at every hearing and status conference. Signed by Judge Anna M Manasco on 12/14/2021. (FNC) (Entered: 12/14/2021) |
| 12/15/2021 | 56 | | MOTION for Preliminary Injunction by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Affidavit Declaration of Lalitha D. Maddduri)(Madduri, Lalitha) (Entered: 12/15/2021) |
| 12/16/2021 | 57 | | **ORDER**: The parties are **ORDERED** to do the following: Send two hard copies of all exhibits and demonstratives that the parties intend to use during the preliminary injunction hearing to the court at the address listed below as soon as practicable after the exhibits are filed as part of the parties joint pretrial report due on or before December 23, 2021, but in any event for a confirmed delivery on or before **DECEMBER 28, 2021**. File with the court not later than **DECEMBER 27, 2021** a list of all counsel who will attend and participate in the preliminary injunction hearing so that the court may arrange appropriate seating in the courtroom. Alert the court not later than **DECEMBER 27, 2021**, by an e–mail to Judge Manasco's chambers (Manasco_Chambers@alnd.uscourts.gov), with a copy to all counsel, if counsel intends to use any audio–visual equipment during the preliminary injunction hearing other than the courtroom document camera. Signed by Judge Anna M Manasco on 12/16/2021. (DNW, ) (Entered: 12/16/2021) |
| 12/17/2021 | 58 | | Joint MOTION for Hearing *Request for Pre–Hearing Conference* by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas. (Rouco, Richard) (Entered: 12/17/2021) |
| 12/17/2021 | 59 | | TEXT ORDER granting 58 . The parties' joint motion for a pre–hearing conference is GRANTED. A conference is SET for Monday, December 20, 2021, at 4:00 p.m. CST. The conference will be held by Zoom. The court will email the parties a link to participate. Signed by Judge Anna M Manasco on 12–17–2021. (TGC) (Entered: 12/17/2021) |
| 12/20/2021 | 60 | | MOTION to Intervene by Jim McClendon, Chris Pringle. (Attachments: # 1 Exhibit A)(Walker, J) (Entered: 12/20/2021) |
| 12/20/2021 | 61 | | |

| | | |
|---|---|---|
| | | **VACATED** TEXT ORDER. The court has received the MOTION to Intervene filed by Chris Pringle, Jim McClendon 60 . Movant is ORDERED to advise the court whether this motion is opposed or unopposed by NOON on December 20, 2021. Signed by Judge Anna M Manasco on 12/20/2021. (FNC) Modified on 12/20/2021 (FNC). (Entered: 12/20/2021) |
| 12/20/2021 | 62 | TEXT ORDER. Text Order 61 is VACATED. Signed by Judge Anna M Manasco on 12/20/2021. (FNC) (Entered: 12/20/2021) |
| 12/20/2021 | 63 | TEXT ORDER: Any response to the motion to intervene, Doc. 60 , must be filed on or before DECEMBER 23, 2021, at 9:00 a.m. CST. Signed by Judge Anna M Manasco on 12/20/2021. (KEK) (Entered: 12/20/2021) |
| 12/20/2021 | | Minute Entry for proceedings held before Judge Anna M Manasco: Status Conference held on 12/20/2021. (Court Reporter Teresa Roberson.) (FNC) (Entered: 12/20/2021) |
| 12/21/2021 | 64 | NOTICE by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas *of Filing Rebuttal Expert Report of Dr. Bridgett King* (Rouco, Richard) (Entered: 12/21/2021) |
| 12/21/2021 | 65 | NOTICE by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas *of Filing Rebuttal Expert Report of William S. Cooper* (Attachments: # 1 Exhibit A–1, # 2 Exhibit A–2, # 3 Exhibit A–3 District 2, # 4 Exhibit A–3 District 7, # 5 Exhibit B–1, # 6 Exhibit B–2, # 7 Exhibit B–3, # 8 Exhibit B–4, # 9 Exhibit B–5, # 10 Exhibit B–6, # 11 Exhibit B–7, # 12 Exhibit C–1, # 13 Exhibit C–2, # 14 Exhibit C–3, # 15 Exhibit C–4, # 16 Exhibit D–1, # 17 Exhibit D–2, # 18 Exhibit D–3)(Rouco, Richard) (Entered: 12/21/2021) |
| 12/21/2021 | 66 | NOTICE by John H Merrill *(Secretary of State's Notice of Filing Supplemental Expert Reports)* (Attachments: # 1 Exhibit A – Thomas Bryan – Supplemental Report Final, # 2 Exhibit B – MV Hood III – AL Supplemental Expert Report)(Davis, James) (Entered: 12/21/2021) |
| 12/21/2021 | 67 | **TEXT ORDER**: During the conference held on December 20, 2021, the parties in Caster, Case No. 2:21–cv–1536–AMM, Singleton, Case No. 2:21–cv–1291–AMM, and Milligan, Case No. 2:21–cv–1530–AMM, agreed to coordinate in drafting a joint proposed order of proceedings for the preliminary injunction hearing set for January 4, 2021. Accordingly, the parties are **ORDERED** to file in each case on or before **5:00 PM CENTRAL STANDARD TIME ON DECEMBER 23, 2021**, such joint proposed order of proceedings.Signed by Judge Anna M Manasco on 12/21/2021. (DNW) (Entered: 12/21/2021) |
| 12/21/2021 | 68 | RESPONSE to Motion re 60 MOTION to Intervene filed by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas. (Rouco, Richard) (Entered: 12/21/2021) |
| 12/21/2021 | 69 | **TEXT ORDER**: This case is before the court on a motion to intervene by Alabama Senator Jim McClendon and Alabama Representative Chris Pringle. Doc. 60 . Senator McClendon and Representative Pringle move to intervene as |

| | | | |
|---|---|---|---|
| | | | defendants in their official capacities. Id. at 1. For many of the reasons offered in the motion, which, notably, is unopposed by all of the parties to this action, the motion is **GRANTED**. Signed by Judge Anna M Manasco on 12/21/2021. (DNW, ) (Entered: 12/21/2021) |
| 12/22/2021 | 70 | | **ORDER**: The court has decided to conduct the preliminary injunction hearing that will begin on January 4, 2022, remotely via Zoom. The Zoom information will be provided to all parties at a later date. Signed by Judge Anna M Manasco on 12/22/2021. (DNW) (Entered: 12/22/2021) |
| 12/22/2021 | 71 | | RESPONSE in Opposition re 56 MOTION for Preliminary Injunction filed by John H Merrill. (LaCour, Edmund) (Entered: 12/22/2021) |
| 12/22/2021 | 72 | | AFFIDAVIT re 71 Response in Opposition to Motion *Declaration in Support of Defendants' Response* by John H Merrill. filed by John H Merrill (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15)(LaCour, Edmund) (Entered: 12/23/2021) |
| 12/23/2021 | 73 | | JOINT PRETRIAL REPORT filed by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas. (Attachments: # 1 Exhibit 1–10, # 2 Exhibit 11–20, # 3 Exhibit 21–30, # 4 Exhibit 31–40, # 5 Exhibit 41–50, # 6 Exhibit 51–60, # 7 Exhibit 61–70, # 8 Exhibit 71–80, # 9 Exhibit 81–90, # 10 Exhibit 91–103)(Khanna, Abha) Modified on 12/27/2021 (FNC). (Entered: 12/23/2021) |
| 12/23/2021 | 74 | | STIPULATION *Regarding Coordinated Preliminary Injunction Hearing and Discovery* by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas. filed by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas (Rouco, Richard) (Entered: 12/23/2021) |
| 12/23/2021 | 75 | | PLAINTIFFS' EXHIBITS TO PRETRIAL REPORT 73 filed by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas. (Attachments: # 1 Exhibit 11–20, # 2 Exhibit 21–30, # 3 Exhibit 31–40, # 4 Exhibit 41–50, # 5 Exhibit 51–60, # 6 Exhibit 61–70, # 7 Exhibit 71–80, # 8 Exhibit 81–90, # 9 Exhibit 91–103)(Khanna, Abha) Modified on 12/27/2021 (FNC). (Entered: 12/23/2021) |
| 12/23/2021 | 76 | | STIPULATION *Secretary of State's Notice of Filing Defendant and Defendant–Intervenor's Stipulated Exhibits* by John H Merrill. filed by John H Merrill (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40)(Davis, James) |

| | | | |
|---|---|---|---|
| | | | (Entered: 12/23/2021) |
| 12/23/2021 | 77 | | STIPULATION *Secretary of State's Notice of Filing Defendant and Defendant−Intervenor's Stipulated Exhibits* by John H Merrill. filed by John H Merrill (Attachments: # 1 Exhibit 41, # 2 Exhibit 42, # 3 Exhibit 43, # 4 Exhibit 44, # 5 Exhibit 45, # 6 Exhibit 46, # 7 Exhibit 47, # 8 Exhibit 48, # 9 Exhibit 49, # 10 Exhibit 50, # 11 Exhibit 51, # 12 Exhibit 52, # 13 Exhibit 53, # 14 Exhibit 54, # 15 Exhibit 55, # 16 Exhibit 56, # 17 Exhibit 57, # 18 Exhibit 58, # 19 Exhibit 59, # 20 Exhibit 60, # 21 Exhibit 61, # 22 Exhibit 62, # 23 Exhibit 63, # 24 Exhibit 64, # 25 Exhibit 65, # 26 Exhibit 66, # 27 Exhibit 67, # 28 Exhibit 68, # 29 Exhibit 69, # 30 Exhibit 70, # 31 Exhibit 71, # 32 Exhibit 72, # 33 Exhibit 73, # 34 Exhibit 74, # 35 Exhibit 75, # 36 Exhibit 76, # 37 Exhibit 77, # 38 Exhibit 78, # 39 Exhibit 79, # 40 Exhibit 80)(Davis, James) (Entered: 12/23/2021) |
| 12/23/2021 | 78 | | STIPULATION *Secretary of State's Notice of Filing Defendant and Defendant−Intervenor's Stipulated Exhibits* by John H Merrill. filed by John H Merrill (Attachments: # 1 Exhibit 81, # 2 Exhibit 82, # 3 Exhibit 83, # 4 Exhibit 84, # 5 Exhibit 85, # 6 Exhibit 86, # 7 Exhibit 87, # 8 Exhibit 88, # 9 Exhibit 88, # 10 Exhibit 88, # 11 Exhibit 88, # 12 Exhibit 88, # 13 Exhibit 89, # 14 Exhibit 90, # 15 Exhibit 91, # 16 Exhibit 92, # 17 Exhibit 93, # 18 Exhibit 94, # 19 Exhibit 95, # 20 Exhibit 96, # 21 Exhibit 97, # 22 Exhibit 98, # 23 Exhibit 99, # 24 Exhibit 100)(Davis, James) (Entered: 12/23/2021) |
| 12/23/2021 | 79 | | STIPULATION *Secretary of State's Notice of Filing Defendant and Defendant−Intervenor's Stipulated Exhibits* by John H Merrill. filed by John H Merrill (Attachments: # 1 Exhibit 101, # 2 Exhibit 102, # 3 Exhibit 103, # 4 Exhibit 104, # 5 Exhibit 105, # 6 Exhibit 106, # 7 Exhibit 107, # 8 Exhibit 108, # 9 Exhibit 109, # 10 Exhibit 110, # 11 Exhibit 111, # 12 Exhibit 112, # 13 Exhibit 113, # 14 Exhibit 114, # 15 Exhibit 115, # 16 Exhibit 116, # 17 Exhibit 117, # 18 Exhibit 118, # 19 Exhibit 119, # 20 Exhibit 120, # 21 Exhibit 121, # 22 Exhibit 122, # 23 Exhibit 123, # 24 Exhibit 124, # 25 Exhibit 125)(Davis, James) (Entered: 12/23/2021) |
| 12/23/2021 | 80 | | STIPULATION *Secretary of State's Notice of Filing Defendant and Defendant−Intervenor's Stipulated Exhibits* by John H Merrill. filed by John H Merrill (Attachments: # 1 Exhibit 126, # 2 Exhibit 127, # 3 Exhibit 128, # 4 Exhibit 129, # 5 Exhibit 130, # 6 Exhibit 131, # 7 Exhibit 132, # 8 Exhibit 133, # 9 Exhibit 134, # 10 Exhibit 135, # 11 Exhibit 136, # 12 Exhibit 137, # 13 Exhibit 138, # 14 Exhibit 139, # 15 Exhibit 140, # 16 Exhibit 141, # 17 Exhibit 142, # 18 Exhibit 143, # 19 Exhibit 144, # 20 Exhibit 145, # 21 Exhibit 146, # 22 Exhibit 147, # 23 Exhibit 148, # 24 Exhibit 149, # 25 Exhibit 150)(Davis, James) (Entered: 12/23/2021) |
| 12/23/2021 | 81 | | STIPULATION *Secretary of State's Notice of Filing Defendant and Defendant−Intervenor's Stipulated Exhibits* by John H Merrill. filed by John H Merrill (Attachments: # 1 Exhibit 151, # 2 Exhibit 152, # 3 Exhibit 153, # 4 Exhibit 154, # 5 Exhibit 155, # 6 Exhibit 156, # 7 Exhibit 157, # 8 Exhibit 158, # 9 Exhibit 159, # 10 Exhibit 160, # 11 Exhibit 161, # 12 Exhibit 162, # 13 Exhibit 163, # 14 Exhibit 164, # 15 Exhibit 165, # 16 Exhibit 166, # 17 Exhibit 167, # 18 Exhibit 168, # 19 Exhibit 169, # 20 Exhibit 170)(Davis, James) (Entered: 12/23/2021) |
| 12/27/2021 | 82 | | |

| | | | |
|---|---|---|---|
| | | | NOTICE by John H Merrill re <u>57</u> Order,,,, *of Persons Participating in Hearing* (Davis, James) (Entered: 12/27/2021) |
| 12/27/2021 | <u>83</u> | | NOTICE by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas *of Persons Participating in Hearing* (Khanna, Abha) (Entered: 12/27/2021) |
| 12/27/2021 | <u>84</u> | | RESPONSE in Support re <u>56</u> MOTION for Preliminary Injunction filed by Marcus Caster, Lakeisha Chestnut, Benjamin Jones, Bobby Lee DeBouse, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4, # <u>5</u> Exhibit 5)(Khanna, Abha) (Entered: 12/27/2021) |
| 12/28/2021 | <u>85</u> | | ORDER Regarding Screen–Sharing. All counsel and their staff will have the ability to share their screens during the preliminary injunction hearing. However, the court urges the parties to be mindful as they prepare for the hearing that (1) each member of the court will have ready access during the hearing to hard copies of all demonstratives and exhibits submitted by the parties, and (2) it is the court's preference to be able to see both the examining lawyer and the testifying witness while the witness is testifying about documents that are screen–shared. Signed by Judge Anna M Manasco on 12/28/2021.(FNC) (Entered: 12/28/2021) |
| 12/30/2021 | <u>86</u> | | Unopposed MOTION to Amend/Correct *Witness List* by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas. (Khanna, Abha) (Entered: 12/30/2021) |
| 12/30/2021 | 87 | | TEXT ORDER: Plaintiffs' Unopposed Motion to Amend Witness List, Doc. <u>86</u> , is GRANTED. Signed by Judge Anna M Manasco on 12/30/2021. (KMB) (Entered: 12/30/2021) |
| 01/02/2022 | <u>88</u> | | Unopposed MOTION to Amend/Correct *Exhibit List* by John H Merrill. (Attachments: # <u>1</u> Exhibit D171)(Davis, James) (Entered: 01/02/2022) |
| 01/02/2022 | 89 | | Defendants unopposed motion to amend exhibit list, Doc. <u>88</u> , is GRANTED. Signed by Judge Anna M Manasco on 01/02/2022. (TGC) (Entered: 01/02/2022) |
| 01/03/2022 | <u>90</u> | | MOTION to Amend/Correct <u>73</u> Notice (Other), *Preliminary Injunction Exhibit List* by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas. (Attachments: # <u>1</u> Exhibit Voter Registration Form)(Rouco, Richard) (Entered: 01/03/2022) |
| 01/03/2022 | <u>91</u> | | ORDER: Due to the current pandemic circumstances, the court has decided to make available to the public a livestream of the consolidated preliminary injunction hearing in this case. Any member of the press or interested citizen may obtain the information necessary to access the livestream by following the instructions that appear on the website for the Northern District of Alabama (https://www.alnd.uscourts.gov/instructions–view–public–hearing). The livestream also will be broadcast in the Jury Assembly Room of the Hugo Black Courthouse in Birmingham, Alabama, until further notice, per the courts prior orders. Signed by Judge Anna M Manasco on 1/3/2022. (DNW) |

| | | | |
|---|---|---|---|
| | | | (Entered: 01/03/2022) |
| 01/03/2022 | 92 | | **TEXT ORDER**: Plaintiffs' unopposed motion to amend exhibit list, Doc. 90 , is **GRANTED**. Signed by Judge Anna M Manasco on 1/3/2022. (DNW) (Entered: 01/03/2022) |
| 01/04/2022 | | | Minute Entry for proceedings held before Judge Anna M Manasco: Motion Hearing held on 1/4/2022 re 56 MOTION for Preliminary Injunction. Hearing begins; verbal notice of presence; exhibits discussed and noted which were admitted and objected to; objected exhibits to be addressed at later time during the hearing; no opening statements; testimony taken of plff Singleton with direct and cross, witness excused; testimony of N. Davis, witness qualified as an expert as noted on the record; direct and cross; lunch break; resume; cont. examination of N. Davis; witness excused; testimony of plff Milligan, direct and cross, witness excused; testimony of Kosuke Imai, witness qualified as an expert as noted on the record; break; resume; break; resume; court adj to 1/5/2022 at 9:00 AM central time. (Court Reporter Christina Decker.) (FNC) (Entered: 01/04/2022) |
| 01/05/2022 | | | Minute Entry for proceedings held before Judge Anna M Manasco: Motion Hearing– DAY 2 – held on 1/5/2022 re 56 MOTION for Preliminary Injunction. Hearing begins; testimony of Kosuke Imai continued/redirect; witness excused; Ryan Williamson called; qualified as an expert as to this hearing, as stated on the record; direct, cross and redirect; witness excused; Witness S. Dowdy called; direct and cross; lunch break; resume; cont. cross; redirect; witness excused; Section 2 claims begin; Caster Plff calls Expert William Cooper, court qualifies witness as expert, as stated on the record; cross; redirect; court questions for witness; witness excused as to Section 2 claims; Def direct of Cooper as to Singleton claims; no cross; discussions of agenda for 1/6; court adj to 1/6/2022 at 9:00 AM central time. (Court Reporter Christina Decker.) (FNC) (Entered: 01/05/2022) |
| 01/06/2022 | | | Minute Entry for proceedings held before Judge Anna M Manasco: Motion Hearing– DAY 3 – held on 1/6/2022 re 56 MOTION for Preliminary Injunction. Hearing begins; discussions regarding schedule for today; Milligan plffs call Moon Duchin, witness qualified as an expert, as stated on the record; argument re: Exh M–48, taken under advisement; break; resume; objections addressed and o/r Exh M–48 received, as stated on the record; cross; break for lunch; resume; cross continues; redirect and recross, witness excused; Caster Plffs call Dr. Maxwell Palmer; court discusses scheduling issues; testimony of Dr. Palmer begins; witness qualified witness as expert, as stated on the record; direct begins; cross; witness excused; discussions re: starting new witness and start time for 1/7/22; Def Merrill calls Tom Bryan – court qualifies witness as an expert, as stated on the record; direct begins; court adj until 1/7/2022 at 8:30 AM central time. (Court Reporter Christina Decker.) (FNC) (Entered: 01/06/2022) |
| 01/07/2022 | | | Minute Entry for proceedings held before Judge Anna M Manasco: Motion Hearing– DAY 4 – held on 1/7/2022 re 56 MOTION for Preliminary Injunction. Hearing begins; pre hearing discussions regarding due date of Findings of Facts and Conclusions of Law which is now due by Friday, Jan 14; direct of Tom Bryan cont; break; direct cont; cross by Caster; lunch break, cont cross by Caster; cross by Milligan; cross by Singleton; redirect by def |

| | | | |
|---|---|---|---|
| | | | Merrill; questions by the court; court adj until 1/10/2022 at 9:00 AM central time. (Court Reporter Christina Decker.) (FNC) (Entered: 01/07/2022) |
| 01/08/2022 | 93 | | ORDER regarding public access to consolidated preliminary injunction hearing. Signed by Judge Anna M Manasco on 1/8/22. (KMB) (Entered: 01/08/2022) |
| 01/10/2022 | 94 | | TEXT ORDER: The requirement that, [w]ithin five days of the completion of the preliminary injunction hearing, the parties shall file proposed findings of fact and conclusions of law for the courts consideration in the courts Scheduling Order for Preliminary Injunction Proceedings, Doc. 40 , is VACATED. That order remains in effect as to all other provisions contained therein. The parties are ORDERED to file proposed findings of fact and conclusions of law for the courts consideration by midnight Central Standard Time on Friday, January 14, 2022. Signed by Judge Anna M Manasco on 1/10/2022. (FNC) (Entered: 01/10/2022) |
| 01/10/2022 | 95 | | NOTICE of Appearance by Christina M Rossi on behalf of Jim McClendon, Chris Pringle (Rossi, Christina) (Entered: 01/10/2022) |
| 01/10/2022 | | | Minute Entry for proceedings held before District Judge Anna M Manasco: Motion Hearing– DAY 5 – held on 1/10/2022 re 56 MOTION for Preliminary Injunction. Hearing begins; pre hearing discussions regarding Caster Exh 106 – parties to discuss what part of the exhibit to be admitted – court w/h ruling on admission of exhibit; time and need for closing arguments discussed; Milligan calls Dr. Joseph Bagley; witness qualified as an expert, as stated on the record; direct; cross; redirect; lunch break; resume; court notifies parties plffs will have 90 mins total for closing – plffs can reserve some time for rebuttal and defs will have 90 mins total for closing; further discussions re: admission of def X17, arguments, court o/r objections as stated on the record; Milligan plffs call B. Liu; witness qualified as an expert, as stated on the record; direct begins; cross; redirect; court questions; witness excused; Caster Plff calls Benjamin Jones and direct begins; cross; witness excused; court adj until 1/11/2022 at 9:00 AM central time. (Court Reporter Christina Decker.) (FNC) (Entered: 01/10/2022) |
| 01/11/2022 | | | Minute Entry for proceedings held before District Judge Anna M Manasco: Motion Hearing– DAY 6 – held on 1/11/2022 re 56 MOTION for Preliminary Injunction. Hearing begins; discussions regarding order of witnesses; Def calls Dr. Trey Hood; court certifies witness as an expert, as stated on the record; direct by State; cross by Milligan; cross by Caster; cross by Singleton; redirect; witness excused; lunch break; resume; Caster calls Dr. Bridgett King; court qualifies witness as an expert, as stated on the record; direct begins; cross by state; state moves to admit DX 158; argument; court reserves ruling; state moves to admit DX 153; argument; court reserves ruling; redirect; witness excused; Caster calls Dr. Marcus Caster; direct; cross by state; witness excused; court adj until 1/12/2022 at 8:30 AM central time. (Court Reporter Christina Decker.) (FNC) (Entered: 01/11/2022) |
| 01/12/2022 | | | Minute Entry for proceedings held before District Judge Anna M Manasco : Motion Hearing– DAY 7 – held on 1/12/2022 re 56 MOTION for Preliminary Injunction. Hearing begins; State calls Bradley Byrne; direct; cross by Milligan; cross by Caster; cross by Singleton; redirect; court questions; witness excused; presentation of evidence is closed; no rebuttal; objected |

| | | |
|---|---|---|
| | | exhibits addressed as stated on the record; lunch; Singleton close, court questions; Caster close, court questions; Milligan close, court questions; Merrill close, court questions; rebuttal by Singleton, Milligan and Caster; court addresses the parties; questions by the court; hearing adj. (Court Reporter Christina Decker.) (FNC) (Entered: 01/12/2022) |
| 01/14/2022 | 96 | Statement of Facts *Proposed Findings of Fact and Conclusions of Law* by John H Merrill. filed by John H Merrill (LaCour, Edmund) (Entered: 01/14/2022) |
| 01/14/2022 | 97 | Statement of Facts *Proposed Findings of Fact and Conclusions of Law* by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas. filed by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas (Khanna, Abha) (Entered: 01/14/2022) |
| 01/16/2022 | 98 | NOTICE by John H Merrill re 96 Statement of Facts *Tables of Authorities for Defs' Proposed Findings of Fact and Conclusions of Law* (LaCour, Edmund) (Entered: 01/16/2022) |
| 01/18/2022 | 99 | Transcript of Proceedings NOTICE: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. (A copy can be obtained at http://www.alnd.uscourts.gov/local/court%20forms/transcripts/Transcript%20Redaction%20Policy.pdf) See Transcript Redaction Policy (Attachments: # 1 2, # 2 3, # 3 4, # 4 5, # 5 6, # 6 7) (DNW, ) (Entered: 01/18/2022) |
| 01/24/2022 | 100 | **ORDER**: A status conference is set for **1:00 PM CENTRAL STANDARD TIME on WEDNESDAY, JANUARY 26, 2022**, by Zoom. The Zoom information will be provided to all parties at a later date. Signed by Judge Anna M Manasco on 1/24/2022. (DNW) (Entered: 01/24/2022) |
| 01/24/2022 | 101 | PRELIMINARY INJUNCTION, MEMORANDUM OPINION, AND ORDER. Signed by Judge Anna M Manasco on 1/24/2022. (KMB) (Entered: 01/24/2022) |
| 01/25/2022 | 102 | NOTICE OF APPEAL by John H Merrill. Filing fee $ 505, receipt number 1126–4000310 (B4601118126). (LaCour, Edmund) Modified on 1/25/2022 (DNW, ). (Entered: 01/25/2022) |
| 01/25/2022 | 103 | MOTION to Stay re 101 Order on Motion for Preliminary Injunction, 102 Notice of Appeal *Emergency Motion for Stay Pending Appeal* by John H Merrill. (LaCour, Edmund) (Entered: 01/25/2022) |
| 01/25/2022 | 104 | TEXT ORDER. Plaintiffs are DIRECTED to file their response to the Defendants' Emergency Motion for Stay Pending Appeal at or before 8:00 am Central Standard Time on January 26, 2022. Signed by Judge Anna M Manasco on 1/25/2022. (KMB) (Entered: 01/25/2022) |
| 01/25/2022 | 105 | NOTICE of Transmittal to the 11th Circuit. (DNW) (Entered: 01/25/2022) |
| 01/25/2022 | 106 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 102 Notice of Appeal (DNW) (Entered: 01/25/2022) |

| 01/26/2022 | 107 | | Opposition to *Motion to Stay* filed by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas. (Rouco, Richard) (Entered: 01/26/2022) |
|---|---|---|---|
| 01/26/2022 | | | Minute Entry for proceedings held before Judge Anna M Manasco: Status Conference held on 1/26/2022. (Court Reporter Christina Decker.) (FNC) (Entered: 01/26/2022) |
| 01/26/2022 | 108 | | TEXT ORDER. A Status Conference set for Friday, January 28, 2022 at 03:00 PM by Zoom before Circuit Judge Stan Marcus and District Judges Anna M Manasco and Terry Moorer. The court will provide the zoom information to the parties by separate email. Signed by Judge Anna M Manasco on 1/26/2022. (FNC) (Entered: 01/26/2022) |
| 01/26/2022 | 109 | | ORDER ON MOTION TO CLARIFY. Signed by Judge Anna M Manasco on 1/26/2022. (KMB) (Entered: 01/26/2022) |
| 01/27/2022 | 110 | | ORDER DENYING DEFENDANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL. Signed by Judge Anna M Manasco on 1/27/2022. (KMB) (Entered: 01/27/2022) |
| 01/28/2022 | 111 | | NOTICE by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas *Proposed Remedial Process* (Rouco, Richard) (Entered: 01/28/2022) |
| 01/28/2022 | 112 | | NOTICE by Jim McClendon, John H Merrill, Chris Pringle *(Notice Regarding Defendants' Position on Issues Raised By the Court)* (Davis, James) (Entered: 01/28/2022) |
| 01/28/2022 | | | Minute Entry for proceedings held before Judge Anna M Manasco: Status Conference held on 1/28/2022. (Court Reporter Christina Decker.) (FNC) (Entered: 01/28/2022) |
| 01/28/2022 | 113 | | TEXT ORDER. Status Conference set for Wednesday, February 2, 2022 at 02:00 PM by Zoom before Circuit Judge Stan Marcus and District Judges Anna M Manasco and Terry Moorer. The court will provide the zoom information to the parties by email. Signed by Judge Anna M Manasco on 1/28/2022. (FNC) (Entered: 01/28/2022) |
| 02/01/2022 | 114 | | Exhibit List of Plaintiff Caster from PI Hearing, held January 4, 2022 through January 12, 2022. Exhibits 1 through 103 efiled prior to the PI Hearing and can be found in Doc. 75 . Docs 104, 105 and 106 admitted during the PI hearing, are attached. (Attachments: # 1 Plff Exh 104, # 2 Plff Exh 105, # 3 Plff Exh 106)(FNC) (Entered: 02/01/2022) |
| 02/01/2022 | 115 | | Exhibit List for def Merrill from PI Hearing, held January 4, 2022 through January 12, 2022. Exhibits e–filed prior to the PI Hearing and can be found at Docs. 76 (Exhibits 1–40); 77 (Exhibits 41–80); 78 Exhibits 81–100; 79 Exhibits 101–125; 80 (Exhibits 126–150) and 81 (Exhibits 151–170). Exhibit 171 admitted during the PI hearing is attached. (Attachments: # 1 Def Exh 171)(FNC) (Entered: 02/01/2022) |
| 02/01/2022 | 116 | | RESPONSE to *Court Inquiry for Remedial Proceedings* filed by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas. (Rouco, |

| | | | |
|---|---|---|---|
| | | | Richard) (Entered: 02/01/2022) |
| 02/01/2022 | 117 | | NOTICE by John H Merrill *(Notice Regarding Defendants' Position on Issues Raised by the Court)* (Davis, James) (Entered: 02/01/2022) |
| 02/02/2022 | 118 | | TEXT ORDER. The Status Conference set for 2:00 PM, this date, is CANCELLED. Signed by Judge Anna M Manasco on 2/2/2022. (FNC) (Entered: 02/02/2022) |
| 02/03/2022 | 119 | | **ORDER**:The parties are **ADVISED** that if the Legislature is unable to enact a new map as of February 7, 2022, the court intends to draw on its inherent authority and, pursuant to Federal Rule of Civil Procedure 53, to issue a detailed order appointing Mr. Allen as Special Master and retaining Dr. Persily as an expert cartographer, with instructions (1) not to incur costs until February 8, 2022 and, thereafter (2) to consult all parties about the parties proposals for drawing a remedial map and to obtain the supporting data at the earliest opportunity after that date. Signed by Judge Anna M Manasco on 2/3/2022. (DNW, ) (Entered: 02/03/2022) |
| 02/07/2022 | 120 | | Order of the court appointing Special Master and expert cartographer, and providing instructions to parties. Signed by Judge Anna M Manasco on 2/7/2022. (KMB) (Entered: 02/07/2022) |
| 02/07/2022 | 121 | | TRANSCRIPT REQUEST by John H Merrill (LaCour, Edmund) (Entered: 02/07/2022) |
| 02/07/2022 | 122 | | RESPONSE to filed by Jim McClendon, Chris Pringle. (Attachments: # 1 Exhibit A)(Walker, J) (Entered: 02/07/2022) |
| 02/08/2022 | 123 | | All parties are DIRECTED to respond to the Singleton Plaintiffs Emergency Motion (Singleton Doc. 104) not later than Monday, February 14, 2022. Signed by Judge Anna M Manasco on 2/8/2022. (KMB) (Entered: 02/08/2022) |
| 02/12/2022 | 124 | | MOTION to Intervene by Jeff Coleman. (Agricola, Algert) (Entered: 02/12/2022) |
| 02/12/2022 | 125 | | Corporate Disclosure Statement by Jeff Coleman. filed by Jeff Coleman (Agricola, Algert) (Entered: 02/12/2022) |
| 02/14/2022 | 126 | | All parties are DIRECTED to file responses to the emergency motion to intervene on or before 12:00pm Central Standard Time on Thursday, February 17, 2022. Signed by Judge Anna M Manasco on 02/14/2022. (TGC) (Entered: 02/14/2022) |
| 02/14/2022 | 127 | | RESPONSE to *Singleton Plaintiffs' Emergency Motion for a Ruling on Their Renewed Motion for a Preliminary Injunction* filed by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas. (Khanna, Abha) (Entered: 02/14/2022) |
| 02/14/2022 | 128 | | RESPONSE to re 123 *Singleton Plaintiffs' Emergency Motion* filed by John H Merrill. (LaCour, Edmund) (Entered: 02/14/2022) |
| 02/15/2022 | 129 | | The Singleton plaintiffs are DIRECTED to file a reply in support of their emergency motion for a ruling by 5:00pm Central Standard Time on Thursday, February 17, 2022. Signed by Judge Anna M Manasco on 2/15/2022. (KMB) |

| | | | |
|---|---|---|---|
| | | | (Entered: 02/15/2022) |
| 02/16/2022 | 130 | | RESPONSE to Motion re 124 MOTION to Intervene filed by Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, Wendell Thomas. (Khanna, Abha) (Entered: 02/16/2022) |
| 02/17/2022 | 131 | | RESPONSE to Motion re 124 MOTION to Intervene filed by John H Merrill. (Bowdre, Alexander) (Entered: 02/17/2022) |
| 02/25/2022 | 132 | | ORDER denying 124 Motion to Intervene. Signed by Judge Anna M Manasco on 2–25–2022. (TGC) (Entered: 02/25/2022) |
| 04/07/2022 | 133 | | ORDER. Signed by Judge Anna M Manasco on 04/07/2022. (TGC) (Entered: 04/07/2022) |
| 04/12/2022 | 134 | | RESPONSE to re 133 *Court's April 7, 2022 Order* filed by John H Merrill. (LaCour, Edmund) (Entered: 04/12/2022) |
| 04/14/2022 | | | Minute Entry for proceedings held before Judge Anna M Manasco: Status Conference held on 4/14/2022. (Court Reporter Christina Decker.) (FNC) (Entered: 04/14/2022) |
| 04/15/2022 | 135 | | ORDER. Signed by Judge Anna M Manasco on 04/15/2022. (TGC) (Entered: 04/15/2022) |
| 04/19/2022 | 136 | | Transcript of Proceedings held on 4/14/2022, before Judge Manasco. Court Reporter/Transcriber Christina M. Decker, Telephone number 256–506–0085. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. NOTICE: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. (A copy can be obtained at http://www.alnd.uscourts.gov/local/court%20forms/transcripts/Transcript%20Redaction%20Policy.pdf) See Transcript Redaction Policy Redaction Request due 5/10/2022. Redacted Transcript Deadline set for 5/20/2022. Release of Transcript Restriction set for 7/18/2022. (DNW) (Entered: 04/19/2022) |
| 04/20/2022 | 137 | | RESPONSE to re 135 *Court's Order of April 15, 2022 Regarding Dates Related to the 2024 Congressional Election* filed by John H Merrill. (LaCour, Edmund) (Entered: 04/20/2022) |
| 05/02/2022 | 138 | | ORDER. Signed by Judge Anna M Manasco on 05/02/2022. (TGC) (Entered: 05/02/2022) |
| 05/03/2022 | | | Set/Reset Hearings: Status Conference set for 11/16/2022 at 10:00 AM central time by Zoom, before Judge Anna M Manasco. The court will provide the zoom information to the parties by separate email. (FNC) (Entered: 05/03/2022) |
| 06/23/2022 | 139 | | NOTICE of Transmittal to the U.S. Supreme Court. (DNW) (Entered: 06/23/2022) |

FILED

2022 Jun-23 AM 09:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**Northern District of Alabama**
**Office of the Clerk**
**Hugo L. Black United States Courthouse**
**Room 140, 1729 5th Avenue North**
**Birmingham, Alabama 35203**
**(205) 278-1700**

June 23, 2022

Scott S. Harris                         U.S.D.C. No. 2:21-cv-01536-AMM
Clerk of Court                          U.S. Supreme Court   No.  21-1087
U.S. Supreme Court                      IN RE: John Merrill et al. v. Marcus Caste,   et al.

Enclosed are documents regarding an appeal in this matter.   Please acknowledge receipt on the enclosed copy of this transmittal.

X          Certified copy of Notice of Appeal, Docket Entries and Judgment/Order and Opinion appealed from enclosed.   Please check
           if judgment was oral:

           Certified record supplemental record on appeal consisting of:   volume(s) of pleadings, etc.;   volume(s) of transcripts;

X          First Notice of Appeal? YES          Dates of other Notices:

           The following materials **SEALED** in this court (order enclosed) consisting of:

           Original papers (court file) and certified copy of docket entries per USCA request.

X          There was a hearing from which a transcript could be made.

           Copy of CJA Form 20 or District Court order appointing counsel.

X          The appellant docket fee has been paid. No          Date Paid:

           The appellant has been leave to appeal in forma pauperis and   a request for certificate of appealability (order enclosed).

X          The Judge/Magistrate Judge appealed from is: Judge Manasco

           The Court Reporter is:

           This is a **BANKRUPTCY APPEAL**.   Please send notice of final order and/or opinion to: Scott W. Ford, Acting Clerk, U.S.
           Bankruptcy Court, 1800 5th Avenue North, Birmingham, Alabama 35203.

           This is a **DEATH PENALTY** appeal.

           Appellant having failed to cure procedural defects re: appeal fee, the appeal is due to be DISMISSED.

           Other:

xc:  Counsel                           Sharon Harris, Clerk

                                       By:___D. Wiggins_____
                                              Deputy Clerk

FILED

2022 Jan-25 AM 10:01
U.S. DISTRICT COURT
N.D. OF ALABAMA


# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| MARCUS CASTER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 2:21-cv-1536-AMM |
| JOHN H. MERRILL, in his official | ) | |
| capacity as Alabama Secretary of | ) | NOTICE OF APPEAL |
| State, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF APPEAL OF ORDER
## GRANTING PRELIMINARY INJUNCTION

Notice is hereby given that all Defendants in the above-captioned case hereby

appeal to the United States Court of Appeals for the Eleventh Circuit from this

Court's January 24, 2022 Preliminary Injunction Memorandum and Order granting

the Plaintiffs' motion for preliminary injunction. *See Caster* DE101.

Respectfully submitted,

Steve Marshall
*Attorney General*

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr. (ASB-9182-U81L)
*Solicitor General*

A. Barrett Bowdre (ASB-2087-K29V)
Thomas A. Wilson (ASB-1494-D25C)
*Deputy Solicitors General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

Misty S. Fairbanks Messick (ASB-1813-T71F)
A. Reid Harris (ASB-1624-D29X)
Brenton M. Smith (ASB-1656-X27Q)
Benjamin M. Seiss (ASB-2110-O00W)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Thomas.Wilson@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Reid.Harris@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov

**Counsel for Secretary of State Merrill**

Dorman Walker (ASB-9154-R81J)
BALCH & BINGHAM LLP
Post Office Box 78 (36101)
105 Tallapoosa Street, Suite 200
Montgomery, AL 36104
Telephone: (334) 269-3138
Email: dwalker@balch.com

**Counsel for Sen. McClendon and Rep. Pringle**

## CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to the following counsel:

> Abha Khanna
> ELIAS LAW GROUP LLP
> 1700 Seventh Avenue, Suite 2100
> Seattle, WA 98101
> 206-656-0177
> Email: AKhanna@elias.law

> Aria C Branch
> ELIAS LAW GROUP LLP
> 10 G St NE, Suite 600
> Washington, DC 20002
> 202-968-4490
> Fax: 202-968-4498
> Email: ABranch@elias.law

> Daniel C Osher
> ELIAS LAW GROUP
> 10 G Street NE
> Suite 600
> Washington, DC 20002
> 202-968-4490
> Email: DOsher@elias.law

> Joseph N. Posimato
> Elias Law Group LLP
> 10 G Street, NE; Suite 600
> Washington, DC 20002
> 202-968-4518
> Email: jposimato@elias.law

> Lalitha D Madduri
> ELIAS LAW GROUP LLP

10 G Street NE, Suite 600
Washington, DC 20002
202-968-4490
Email: lmadduri@elias.law

Olivia N. Sedwick
Elias Law Group LLP
10 G Street, NE; Suite 600
Washington, DC 20002
202-968-4518
Email: osedwick@elias.law

Richard P Rouco
QUINN CONNOR WEAVER DAVIES & ROUCO LLP
Two North Twentieth Street
2 20th Street North
Suite 930
Birmingham, AL 35203
205-870-9989
Fax: 205-803-4143
Email: rrouco@qcwdr.com

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Solicitor General*
***Counsel for Secretary of State
Merrill***

4

FILED

2022 Jan-24  PM 06:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **MARCUS CASTER**, *et al.*,      ) | |
| ) | |
|     **Plaintiffs,**      ) | |
| ) | |
| **v.**      ) | **Case No.: 2:21-cv-1536-AMM** |
| ) | |
| **JOHN H. MERRILL**, *in his*      ) | |
| *official capacity as Alabama*      ) | |
| *Secretary of State*, *et al.*,      ) | |
| ) | |
|     **Defendants.**      ) | |

## <u>ORDER</u>

This redistricting case is one of four cases currently pending in the Northern District of Alabama that allege that Alabama's electoral maps are racially gerrymandered in violation of the United States Constitution and/or dilute the votes of Black Alabamians in violation of the Voting Rights Act of 1965, 52 U.S.C. § 10301: *Singleton v. Merrill*, Case No. 2:21-cv-1291-AMM (challenges the congressional map on constitutional grounds only), *Milligan v. Merrill*, Case No. 2:21-cv-1530-AMM (challenges the congressional map on constitutional and statutory grounds), *Thomas v. Merrill*, Case No. 2:21-cv-1531-AMM (challenges the state legislative map on constitutional grounds only), and this case, which challenges the congressional map on statutory grounds only.

*Singleton* and *Milligan* are before a three-judge court that includes the

undersigned judge, and *Caster* is before the undersigned sitting alone, on separate motions for preliminary injunctive relief. Although each set of plaintiffs asserts a different theory of liability and requests a different remedy, all plaintiffs request a preliminary injunction barring one of the Defendants, Alabama Secretary of State John H. Merrill, from conducting congressional elections according to Alabama's 2021 redistricting plan for its seven seats in the United States House of Representatives ("the Plan," or "HB1").

The Plan includes one majority-Black congressional district, District 7, which has been represented by a Black Democrat since its inception as a majority-Black district in 1992: first Congressman Earl Hilliard, then Congressman Artur Davis, and now Congresswoman Terri Sewell. District 7 became a majority-Black district when a three-judge federal court drew it that way in a ruling that was summarily affirmed by the Supreme Court of the United States. *Wesch v. Hunt*, 785 F. Supp. 1491, 1497–1500 (S.D. Ala. 1992), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992), and *aff'd sub nom. Figures v. Hunt*, 507 U.S. 901 (1993). The *Milligan* and *Caster* plaintiffs now request a declaration that the Plan violates federal law; a preliminary injunction barring Secretary Merrill from conducting any elections pursuant to the Plan; and a preliminary injunction under the Voting Rights Act ordering Secretary Merrill to conduct Alabama's congressional elections according to a map that includes either two majority-Black districts, or two districts in which Black voters

2

otherwise have an opportunity to elect a representative of their choice, or a combination of two such districts. *Milligan* Doc. 1 ¶ 211; *Milligan* Doc. 69 at 36; *Milligan* Doc. 103 ¶¶ 576–84; *Caster* Doc. 3 at 30–31; *Caster* Doc. 56 at 8, 40; *Caster* Doc. 97 ¶¶ 493–97.

The preliminary injunction proceedings are highly time-sensitive because of state-law deadlines applicable to Alabama's next congressional election. The Plan became law on November 4, 2021, and Alabama Code Section 17-13-5(a) effectively establishes a deadline of January 28, 2022 for candidates to qualify with major political parties to participate in the 2022 primary election for the United States House of Representatives and Senate. Alabama Code Section 17-13-3(a) establishes the date of that election as May 24, 2022. The general election will occur on November 8, 2022, approximately one year after these lawsuits were commenced.

The parties and their counsel have developed an extremely extensive record on an extremely expedited basis. The court has had the benefit of a seven-day preliminary injunction hearing that covered *Singleton*, *Milligan*, and *Caster* and included live testimony from seventeen witnesses (eleven experts and six other fact witnesses); more than 400 pages of prehearing briefing and 600 pages of post-hearing briefing; reports and rebuttal reports from every expert witness; more than 350 hearing exhibits; joint stipulations of fact that span seventy-five pages; and able

argument by the forty-three lawyers who have appeared in the litigation. The transcript of the preliminary injunction hearing spans nearly 2,000 pages.

On December 20, 2021, the three-judge court in *Singleton* and *Milligan* and this court held a Rule 16 conference in all three cases to discuss the logistics for the preliminary injunction proceedings. At that hearing, the *Caster* and *Milligan* plaintiffs alerted both the three-judge court and this court of their intention to coordinate their presentations of their statutory claims at the preliminary injunction hearing, and all counsel in both of those cases agreed that all evidence admitted in either case was admitted in both cases unless counsel raised a specific objection. *See Singleton* Doc. 72-1; *Caster* Doc. 74; Tr. Dec. 20, 2021 Hrg. at 14–17. At the preliminary injunction hearing, counsel for the State repeated his understanding that any evidence admitted in one case could be used in any other case. Tr. 29. Accordingly, the court has considered all evidence adduced in *Singleton*, *Milligan* and *Caster*.

The court adopts the recitation of the evidence, legal analysis, findings of fact and conclusions of law explained in the preliminary injunction, memorandum opinion and order entered contemporaneously in *Singleton* and *Milligan* (attached in full to this Order as Exhibit A), including that court's assessments of the credibility of expert witnesses, as though they were set forth in full herein. Accordingly, the court concludes that the *Caster* plaintiffs are substantially likely to establish that the

4

Plan violates Section Two of the Voting Rights Act. More particularly, the court concludes that the *Caster* plaintiffs are substantially likely to establish each part of the controlling Supreme Court test, including: (1) that Black Alabamians are sufficiently numerous to constitute a voting-age majority in a second congressional district (Black Alabamians comprise approximately 27% of the State's population, and Alabama has seven congressional seats); (2) that Alabama's Black population in the challenged districts is sufficiently geographically compact to constitute a voting-age majority in a second reasonably configured district (the *Milligan* plaintiffs and the *Caster* plaintiffs submitted many illustrative plans that include a second majority-Black district and respect Alabama's traditional redistricting principles); (3) that voting in the challenged districts is intensely racially polarized (this is not genuinely in dispute); and (4) that under the totality of the circumstances, including the factors that the Supreme Court has instructed the court to consider, Black voters have less opportunity than other Alabamians to elect candidates of their choice to Congress.

Because the court also concludes that the *Caster* plaintiffs have established the other requirements for preliminary injunctive relief, the court **GRANTS IN PART** the *Caster* plaintiffs' motion for a preliminary injunction, and under Federal Rule of Civil Procedure 65(d) the court **PRELIMINARILY ENJOINS** Secretary Merrill from conducting any congressional elections according to the Plan.

Because the *Caster* plaintiffs are substantially likely to prevail on their claim under the Voting Rights Act, under the statutory framework, Supreme Court precedent, and Eleventh Circuit precedent, the appropriate remedy is a congressional redistricting plan that includes either an additional majority-Black congressional district, or an additional district in which Black voters otherwise have an opportunity to elect a representative of their choice. *See, e.g.*, *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009); *Cooper v. Harris*, 137 S. Ct. 1455, 1470, 1472 (2017). Supreme Court precedent also dictates that the Alabama Legislature ("the Legislature") should have the first opportunity to draw that plan. *See, e.g.*, *North Carolina v. Covington*, 138 S. Ct. 2548, 2554 (2018); *White v. Weiser*, 412 U.S. 783, 794–95 (1973).

The Legislature enjoys broad discretion and may consider a wide range of remedial plans. As the Legislature considers such plans, it should be mindful of the practical reality, based on the ample evidence of intensely racially polarized voting adduced during the preliminary injunction proceedings, that any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it.

The court **STAYS** the January 28, 2022 qualification deadline for 14 days, through February 11, 2022, to allow the Legislature the opportunity to enact a remedial plan. Based on the evidentiary record before the court, the court is confident that the Legislature can accomplish its task: the Legislature enacted the Plan in a

6

matter of days last fall; the Legislature has been on notice since at least the time that this litigation was commenced months ago (and arguably earlier) that a new map might be required; the Legislature already has access to an experienced cartographer; and the Legislature has not just one or two, but at least eleven illustrative remedial plans to consult, one of which pairs no incumbents. Nevertheless, if the Legislature is unable to pass a remedial plan in 14 days, the court **ORDERS** two other Defendants, Senator Jim McClendon and Representative Chris Pringle, who co-chair Alabama's Permanent Legislative Committee on Reapportionment ("the Legislators") to advise the court so that the court may retain (at the expense of the Defendants) an eminently qualified expert to draw on an expedited basis a map that complies with federal law for use in Alabama's 2022 congressional elections.

The court **ORDERS** Secretary Merrill to advise the political parties participating in the 2022 congressional elections of this order.

During the preliminary injunction hearing, the court accepted into evidence the overwhelming majority of the exhibits that the parties offered; most were stipulated, and the court ruled on some evidentiary objections and reserved ruling on others. All pending objections are **SUSTAINED**.

Compliance with the preliminary injunction in *Singleton* and *Milligan* constitutes compliance with this preliminary injunction.

**DONE** and **ORDERED** this 24th day of January, 2022.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE

EXHIBIT A

FILED

2022 Jan-24 PM 06:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **BOBBY SINGLETON**, *et al.*, | ) |
| | ) |
|     **Plaintiffs**, | ) |
| | ) |
| **v.** | )   **Case No.: 2:21-cv-1291-AMM** |
| | ) |
| **JOHN H. MERRILL**, *in his* | )   **THREE-JUDGE COURT** |
| *official capacity as Alabama* | ) |
| *Secretary of State*, *et al.*, | ) |
| | ) |
|     **Defendants**. | ) |

---

| | |
|---|---|
| **EVAN MILLIGAN**, *et al.*, | ) |
| | ) |
|     **Plaintiffs**, | ) |
| | ) |
| **v.** | )   **Case No.: 2:21-cv-1530-AMM** |
| | ) |
| **JOHN H. MERRILL**, *in his* | )   **THREE-JUDGE COURT** |
| *official capacity as Secretary of* | ) |
| *State of Alabama*, *et al.*, | ) |
| | ) |
|     **Defendants**. | ) |

Before MARCUS, Circuit Judge, MANASCO and MOORER, District Judges.

PER CURIAM:

## PRELIMINARY INJUNCTION
## MEMORANDUM OPINION AND ORDER

These redistricting cases, which have been consolidated for the limited

purpose of expedited preliminary injunction proceedings, are two of four cases currently pending in the Northern District of Alabama that allege that Alabama's electoral maps are racially gerrymandered in violation of the United States Constitution and/or dilute the votes of Black Alabamians in violation of the Voting Rights Act of 1965, 52 U.S.C. § 10301: *Singleton v. Merrill*, Case No. 2:21-cv-1291-AMM (challenges the congressional map on constitutional grounds only), *Milligan v. Merrill*, Case No. 2:21-cv-1530-AMM (challenges the congressional map on constitutional and statutory grounds), *Thomas v. Merrill*, Case No. 2:21-cv-1531-AMM (challenges the state legislative map on constitutional grounds only), and *Caster v. Merrill*, Case No. 2:21-cv-1536-AMM (challenges the congressional map on statutory grounds only).

*Singleton* and *Milligan* are before this three-judge court, and *Caster* is before Judge Manasco sitting alone, on separate motions for preliminary injunctive relief. Although each set of plaintiffs asserts a different theory of liability and requests a different remedy, all plaintiffs request a preliminary injunction barring one of the Defendants, Alabama Secretary of State John H. Merrill, from conducting congressional elections according to Alabama's 2021 redistricting plan for its seven seats in the United States House of Representatives ("the Plan," or "HB1").

The Plan includes one majority-Black congressional district, District 7, which has been represented by a Black Democrat since its inception as a majority-Black

district in 1992: first Congressman Earl Hilliard, then Congressman Artur Davis, and now Congresswoman Terri Sewell. District 7 became a majority-Black district when a three-judge federal court drew it that way in a ruling that was summarily affirmed by the Supreme Court of the United States. *Wesch v. Hunt*, 785 F. Supp. 1491, 1497–1500 (S.D. Ala. 1992), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992), and *aff'd sub nom. Figures v. Hunt*, 507 U.S. 901 (1993).

The *Milligan* and *Caster* plaintiffs now request a declaration that the Plan violates federal law; a preliminary injunction barring Secretary Merrill from conducting any elections pursuant to the Plan; and a preliminary injunction under the Voting Rights Act ordering Secretary Merrill to conduct Alabama's congressional elections according to a map that includes either two majority-Black districts, or two districts in which Black voters otherwise have an opportunity to elect a representative of their choice, or a combination of two such districts. *Milligan* Doc. 1 ¶ 211; *Milligan* Doc. 69 at 36; *Milligan* Doc. 103 ¶¶ 576–84; *Caster* Doc. 3 at 30–31; *Caster* Doc. 56 at 8, 40; *Caster* Doc. 97 ¶¶ 493–97.

The preliminary injunction proceedings are highly time-sensitive because of state-law deadlines applicable to Alabama's next congressional election. The Plan became law on November 4, 2021, and Alabama Code Section 17-13-5(a) effectively establishes a deadline of January 28, 2022 for candidates to qualify with major political parties to participate in the 2022 primary election for the United

States House of Representatives and Senate. Alabama Code Section 17-13-3(a) establishes the date of that election as May 24, 2022. The general election will occur on November 8, 2022, approximately one year after these lawsuits were commenced.

The parties and their counsel have developed an extremely extensive record on an extremely expedited basis. The court has had the benefit of a seven-day preliminary injunction hearing that covered *Singleton*, *Milligan*, and *Caster* and included live testimony from seventeen witnesses (eleven experts and six other fact witnesses); more than 400 pages of prehearing briefing and 600 pages of post-hearing briefing; reports and rebuttal reports from every expert witness; more than 350 hearing exhibits; joint stipulations of fact that span seventy-five pages; and able argument by the forty-three lawyers who have appeared in the litigation. The transcript of the preliminary injunction hearing spans nearly 2,000 pages.

Based on the findings of fact and conclusions of law explained below, including our assessments of the credibility of expert witnesses, we conclude that the *Milligan* plaintiffs are substantially likely to establish that the Plan violates Section Two of the Voting Rights Act. More particularly, we conclude that the *Milligan* plaintiffs are substantially likely to establish each part of the controlling Supreme Court test, including: (1) that Black Alabamians are sufficiently numerous to constitute a voting-age majority in a second congressional district (Black Alabamians comprise approximately 27% of the State's population, and Alabama

has seven congressional seats); (2) that Alabama's Black population in the challenged districts is sufficiently geographically compact to constitute a voting-age majority in a second reasonably configured district (the *Milligan* plaintiffs and the *Caster* plaintiffs submitted many illustrative plans that include a second majority-Black district and respect Alabama's traditional redistricting principles); (3) that voting in the challenged districts is intensely racially polarized (this is not genuinely in dispute); and (4) that under the totality of the circumstances, including the factors that the Supreme Court has instructed us to consider, Black voters have less opportunity than other Alabamians to elect candidates of their choice to Congress.

Because we also conclude that the *Milligan* plaintiffs have established the other requirements for preliminary injunctive relief, we **GRANT IN PART** the *Milligan* plaintiffs' motion for a preliminary injunction, and under Federal Rule of Civil Procedure 65(d) we **PRELIMINARILY ENJOIN** Secretary Merrill from conducting any congressional elections according to the Plan.

Because the *Milligan* plaintiffs are substantially likely to prevail on their claim under the Voting Rights Act, under the statutory framework, Supreme Court precedent, and Eleventh Circuit precedent, the appropriate remedy is a congressional redistricting plan that includes either an additional majority-Black congressional district, or an additional district in which Black voters otherwise have an opportunity to elect a representative of their choice. *See, e.g.*, *Bartlett v. Strickland*, 556 U.S. 1,

Page **5** of **225**

24 (2009); *Cooper v. Harris*, 137 S. Ct. 1455, 1470, 1472 (2017). Supreme Court precedent also dictates that the Alabama Legislature ("the Legislature") should have the first opportunity to draw that plan. *See, e.g.*, *North Carolina v. Covington*, 138 S. Ct. 2548, 2554 (2018); *White v. Weiser*, 412 U.S. 783, 794–95 (1973).

The Legislature enjoys broad discretion and may consider a wide range of remedial plans. As the Legislature considers such plans, it should be mindful of the practical reality, based on the ample evidence of intensely racially polarized voting adduced during the preliminary injunction proceedings, that any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it.

We **STAY** the January 28, 2022 qualification deadline for 14 days, through February 11, 2022, to allow the Legislature the opportunity to enact a remedial plan. Based on the evidentiary record before us, we are confident that the Legislature can accomplish its task: the Legislature enacted the Plan in a matter of days last fall; the Legislature has been on notice since at least the time that this litigation was commenced months ago (and arguably earlier) that a new map might be required; the Legislature already has access to an experienced cartographer; and the Legislature has not just one or two, but at least eleven illustrative remedial plans to consult, one of which pairs no incumbents. Nevertheless, if the Legislature is unable to pass a remedial plan in 14 days, we **ORDER** two other Defendants, Senator Jim

McClendon and Representative Chris Pringle, who co-chair Alabama's Permanent Legislative Committee on Reapportionment ("the Legislators") to advise the court so that the court may retain (at the expense of the Defendants) an eminently qualified expert to draw on an expedited basis a map that complies with federal law for use in Alabama's 2022 congressional elections.

We further **ORDER** Secretary Merrill to advise the political parties participating in the 2022 congressional elections of this order.

Because we grant partial relief on statutory grounds, and "[a] fundamental and longstanding principle of judicial restraint requires that [we] avoid reaching constitutional questions in advance of the necessity of deciding them," *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988); *see also League of United Latin Am. Citizens v. Perry* ("*LULAC*"), 548 U.S. 399, 442 (2006), *Thornburg v. Gingles*, 478 U.S. 30, 38 (1986), we **RESERVE RULING** on the constitutional issues raised in the *Singleton* and *Milligan* plaintiffs' motions for preliminary injunctive relief.

\*\*\*

## TABLE OF CONTENTS

I.    BACKGROUND ........................................................................10

   A.   Procedural Posture ..............................................................10

   B.   Factual and Legal Background ............................................21

   C.   Claims and Defenses ..........................................................34

      1.   *Singleton* ....................................................................34

2.   *Milligan* ...................................................................................35

3.   *Caster* .....................................................................................39

4.   Secretary Merrill and the Legislators ....................................41

II.   STANDARD OF REVIEW ...................................................................42

III.   APPLICABLE LAW ............................................................................43

IV.   ANALYSIS – VOTING RIGHTS ACT ................................................52

  A.   The Milligan Plaintiffs' Arguments ...................................................52

    1.   *Gingles* I – Numerosity and Reasonable Compactness .........................52

    2.   *Gingles* II and III – Racially Polarized Voting .....................................65

    3.   The Senate Factors and Proportionality ...............................................71

    4.   Remaining Elements of Request for Preliminary Injunctive Relief ........82

  B.   The *Caster* Plaintiffs' Arguments ...................................................83

    1.   *Gingles* I – Numerosity and Reasonable Compactness .........................84

    2.   *Gingles* II and III – Racially Polarized Voting .....................................92

    3.   The Senate Factors and Proportionality ...............................................96

    4.   Remaining Elements of Request for Preliminary Injunctive Relief ......102

  C.   Defendants' Arguments - *Milligan* ...........................................102

    1.   *Gingles* I – Numerosity and Reasonable Compactness .......................102

    2.   *Gingles* II and III – Racially Polarized Voting ...................................116

    3.   The Senate Factors and Proportionality .............................................118

  D.   Defendants' Arguments - *Caster* ...............................................122

    1.   *Gingles* I – Numerosity and Reasonable Compactness .......................122

    2.   *Gingles* II and III – Racially Polarized Voting ...................................129

    3.   The Senate Factors and Proportionality .............................................130

  E.   Defendants' Further Attacks on Relief Sought in *Milligan* and *Caster* ....131

    1.   Remaining Elements of Request for Preliminary Injunctive Relief ......131

    2.   Constitutionality of Plaintiffs' Proposed Maps ...................................136

    3.   Constitutionality of Plaintiffs' Interpretation of Section Two .............138

    4.   Whether Section Two Affords Plaintiffs a Private Right of Action ......138

V.   FINDINGS OF FACT AND CONCLUSIONS OF LAW – VOTING RIGHTS
ACT ....................................................................................................139

A. How to measure the Black voting-age population ....................................139

B. The Milligan plaintiffs are substantially likely to establish a Section Two violation. ..................................................................................................146

    1. *Gingles* I – Numerosity.....................................................................146

    2. *Gingles* I – Compactness ................................................................147

        a. Credibility Determinations ............................................148

        b. Geographic Compactness Scores ....................................157

        c. Reasonable Compactness and Traditional Districting Principles.......159

    3. *Gingles* II and III – Racially Polarized Voting....................................174

    4. The Senate Factors and Proportionality ..............................................178

        a. Senate Factor 2 ..............................................................178

        b. Senate Factor 7 ..............................................................180

        c. Senate Factors 1, 3, and 5 ..............................................182

        d. Senate Factor 6 ..............................................................188

        e. Senate Factor 8 ..............................................................192

        f. Senate Factor 9 ..............................................................193

        g. Proportionality...............................................................193

C. The *Milligan* plaintiffs have established the remaining elements of their request for preliminary injunctive relief. .......................................................197

    1. Irreparable Harm ...............................................................................197

    2. Equities and Timing...........................................................................199

D. We reject Defendants' argument that plaintiffs' remedial plans are unconstitutional..........................................................................................204

E. We reject Defendants' argument that plaintiffs' interpretation of Section Two is unconstitutional. ..................................................................................207

F. We reject Defendants' argument that the Voting Rights Act does not provide a private right of action. ....................................................................207

VI. REMEDY ...........................................................................................210

VII. ANALYSIS – CONSTITUTIONAL CLAIMS ......................................214

VIII. EVIDENTIARY RULINGS ................................................................217

APPENDIX A..........................................................................................218

# I.    BACKGROUND

## A.    Procedural Posture

On September 27, 2021, after the results of the 2020 census were released, the *Singleton* plaintiffs filed a complaint against Secretary Merrill. *Singleton* Doc. 1. The *Singleton* plaintiffs are registered voters in Alabama's Second, Sixth, and Seventh Congressional Districts under the Plan; the lead plaintiff, Bobby Singleton, is a Black Senator in the Legislature. *Id.* at 3–4; *Singleton* Doc. 47 ¶ 26; Tr. 36.[1] The *Singleton* plaintiffs asserted that holding the 2022 election under Alabama's old congressional map ("the 2011 congressional map") would violate the Equal Protection Clause of the Fourteenth Amendment because the districts were malapportioned and racially gerrymandered. *Singleton* Doc. 1 at 30–36. On October 29, 2021, the Chief Judge of the Eleventh Circuit convened a three-judge court to adjudicate *Singleton*. *Singleton* Doc. 13.

The Secretary moved to dismiss on the ground that the case was moot and unripe because Alabama would not use the 2011 congressional map for the 2022 congressional election. *Singleton* Doc. 11. Before the motion to dismiss was fully

---

[1] Page number pincites in this order are to the CM/ECF page number that appears in the top right-hand corner of each page, if such a page number is available. Citations to the transcript from the preliminary injunction hearing are identified by page number. Any other transcripts referenced are identified by the date of the hearing that they recorded. The transcript for the preliminary injunction hearing may be found at *Singleton* Doc. 86, *Milligan* Doc. 105, and *Caster* Doc. 99.

briefed, Alabama enacted the Plan. On the day that Alabama Governor Kay Ivey signed the Plan into law (November 4, 2021), the *Singleton* plaintiffs amended their complaint to stake their claims on the Plan and assert a claim of racial gerrymandering under the Equal Protection Clause of the Fourteenth Amendment and a claim of intentional discrimination under the Fourteenth and Fifteenth Amendments. *Singleton* Doc. 15 at 38–48. The *Singleton* plaintiffs requested, among other things, a declaratory judgment, permanent injunction, and trial on the merits in December 2021. *Id.* at 46–47. The *Singleton* plaintiffs did not then request preliminary injunctive relief. The court denied as moot Secretary Merrill's motion to dismiss. *Singleton* Doc. 21.

On the same day that the *Singleton* plaintiffs filed their amended complaint, the *Caster* plaintiffs filed a lawsuit against Secretary Merrill in the Middle District of Alabama. *Caster* Doc. 3. The *Caster* plaintiffs are citizens of Alabama's First, Second, and Seventh Congressional Districts under the Plan. *Id.* at 4–6. The *Caster* plaintiffs challenge the Plan only under Section Two of the Voting Rights Act of 1965, 52 U.S.C. § 10301 ("Section Two"). *Id.* at 29–31. The *Caster* action was transferred to the Northern District of Alabama, *Caster* Doc. 30, and is pending before Judge Manasco sitting alone.

On November 8, 2021, the Legislators filed an unopposed motion to intervene as defendants in *Singleton*. *Singleton* Doc. 25. The Legislators asserted that they

must be allowed to intervene as of right because "[t]he relief sought by [Plaintiffs] . . . would necessarily impair and impede the [Legislators'] ability to protect the Reapportionment Committee's interest in conducting Congressional redistricting," Secretary Merrill "has no authority to conduct redistricting," and "[t]he Reapportionment Committee . . . [is] the real party in interest" in the case. *Id.* ¶¶ 8–9. In the alternative, the Legislators asserted that they should be permitted to intervene "to assert both factual and legal defenses in support of the constitutionality and lawfulness" of the Plan and that they are "uniquely positioned to present such . . . defenses because of their leadership of the Reapportionment Committee." *Id.* ¶¶ 12–13. "Without intervention," the Legislators argued, "Sen. McClendon and Rep. Pringle will not be able to protect their interests as Chairs of the Committee and state legislators." *Id.* ¶ 18.

On November 9, 2021, the court held a Rule 16 conference in *Singleton.* Counsel appeared for the plaintiffs, Secretary Merrill, and the Legislators as putative intervenor-defendants. At that hearing, counsel for the *Singleton* plaintiffs advised the court that they would move for a preliminary injunction. Later that day, the court set a preliminary injunction hearing for January 4, 2022 and set prehearing deadlines, including a discovery cutoff. *Singleton* Doc. 29.

On November 16, 2021, the *Milligan* plaintiffs filed their lawsuit against Secretary Merrill and the Legislators. *Milligan* Doc. 1. The *Milligan* plaintiffs are

Black registered voters in Alabama's First, Second, and Seventh Congressional Districts and two organizational plaintiffs — Greater Birmingham Ministries and the Alabama State Conference of the National Association for the Advancement of Colored People, Inc. ("NAACP") — with members who are registered voters in those Congressional districts and the Third Congressional District. *Id.* at 6–9. The *Milligan* plaintiffs assert a claim of vote dilution under Section Two, a claim of racial gerrymandering under the Fourteenth Amendment, and a claim of intentional discrimination under the Fourteenth Amendment. *Id.* at 48–52. The *Milligan* plaintiffs request, among other things, a declaratory judgment and preliminary and permanent injunctive relief. *Id.* at 52–53.

On the day *Milligan* was filed, the district judge to whom the case was assigned ordered the parties to simultaneously file briefs that explained and supported their positions on the questions whether (1) a three-judge panel appointed under 28 U.S.C. § 2284 has jurisdiction to hear both the Voting Rights Act claims and the constitutional claims asserted in *Milligan*, and (2) *Milligan* should be consolidated with *Singleton*, in whole or in part. *Milligan* Doc. 2.

On November 17, 2021, this court granted the Legislators' unopposed motion to intervene in *Singleton*. *Singleton* Doc. 32.

On November 18, 2021, the *Milligan* plaintiffs advised the district judge of their position that (1) a three-judge court had jurisdiction to hear statutory claims

asserted in a case that also asserted constitutional claims, and (2) *Singleton* and *Milligan* should be consolidated only for the limited purpose of some aspects of preliminary injunction proceedings. *Milligan* Docs. 16, 18.

That same day, Secretary Merrill moved (in *Singleton* and *Milligan*) to dismiss or join in the *Singleton* action both the *Milligan* plaintiffs and the *Caster* plaintiffs under Federal Rule of Civil Procedure 19. *Singleton* Doc. 33; *Milligan* Docs. 17, 21. Secretary Merrill also moved (in *Singleton* only) to consolidate all three actions under Rule 42. *Singleton* Doc. 36.

Later that day, the district judge to whom *Milligan* was assigned entered an order finding that *Milligan* was required to be heard by a district court of three judges, *Milligan* Doc. 22, and a three-judge court was convened by the Chief Judge of the Eleventh Circuit that was composed of the same three judges that comprised the *Singleton* court. *Milligan* Doc. 23.

That evening, each three-judge court ordered the parties in all three cases to meet and confer immediately; set a Rule 16 conference to include all parties in all three cases for November 23, 2021; ordered the parties to file ahead of that conference a joint status report explaining their positions on (1) the question whether *Milligan* and/or *Caster* should be consolidated with *Singleton* for the limited purpose of preliminary injunction proceedings, and (2) whether the expedited schedule previously entered in *Singleton* would be suitable for consolidated preliminary

injunction proceedings; and set a deadline for responses to the Secretary's motions to dismiss or join, and to consolidate. *Singleton* Docs. 40, 41; *Milligan* Doc. 31.

Also on that evening, the *Caster* court set a deadline for the *Caster* plaintiffs to file objections to the Secretary's motions to dismiss or join, and to consolidate, *Caster* Doc. 36, and entered an order directing the same meet-and-confer and joint status report, and setting the same Rule 16 conference, that the three-judge courts directed and set in *Singleton* and *Milligan*. *Caster* Doc. 37.

On November 19, 2021, the *Singleton* plaintiffs filed a motion for preliminary injunction requesting, *inter alia*, that the court enjoin the state from using the Plan for the 2022 election and adopt one of their plans "on January 28, 2022 if the State does not adopt its own constitutional plan by that date." *Singleton* Doc. 42 at 31–32.

In advance of the Rule 16 conference on November 23, 2021, the *Singleton* plaintiffs and *Caster* plaintiffs filed documents expressing their concern that neither the *Singleton* three-judge court nor the *Milligan* three-judge court had jurisdiction to consolidate all three cases. *Singleton* Docs. 43, 44; *Caster* Docs. 28, 38, 39.

Before and at the November 23, 2021 conference, the *Singleton* plaintiffs and *Milligan* plaintiffs indicated that they had no objection to consolidating *Singleton* and *Milligan* only for the limited purposes of preliminary injunction discovery and a preliminary injunction hearing, *Singleton* Doc. 43 ¶ 1; *Milligan* Doc. 39 ¶ 1, and the *Caster* plaintiffs indicated that they had no objection to participating in the

preliminary injunction hearing(s) that would occur in *Singleton* and *Milligan* and coordinating discovery with the parties in those cases, *Caster* Doc. 38 at 14 n.4; *Caster* Doc. 39 ¶ 1.

Accordingly, the *Singleton* court consolidated *Singleton* and *Milligan* "for the limited purposes of preliminary injunction discovery and a preliminary injunction hearing"; set a consolidated preliminary injunction hearing for January 4, 2022; and set prehearing deadlines for discovery, motions, and briefs. *Singleton* Doc. 45; *Milligan* Doc. 40. That court reserved ruling on the motion for further consolidation of *Singleton* and *Milligan*, denied the motion to consolidate *Caster*, and denied the motion for joinder. *Singleton* Doc. 45 at 3–9; *Milligan* Doc. 40 at 3–9. The *Caster* court then set a preliminary injunction hearing for January 4, 2022 and set the same prehearing deadlines that were set in *Singleton* and *Milligan*. *Caster* Doc. 40.

The *Milligan* plaintiffs noticed the depositions of the Legislators and served them with requests for production. *Milligan* Doc. 48-1 at 1–18. On December 6, 2021, the Legislators filed in *Milligan* only a motion for a protective order "forbidding their depositions and production of documents in violation of their legislative immunity and privilege." *Milligan* Doc. 55 at 2.[2] The Legislators requested an "order that Sen. McClendon and Rep. Pringle not be deposed and that

---

[2] The Legislators later amended their motion for a protective order, so citations are to their Second Amended Motion.

written discovery not be had." *Id.* at 10.

The next day, the Legislators filed answers in both *Singleton* and *Milligan*. *Singleton* Doc. 48; *Milligan* Doc. 51. (Secretary Merrill also answered in all three cases. *Singleton* Doc. 49; *Milligan* Doc. 52; *Caster* Doc. 42.) The Legislators asserted in those answers numerous factual and legal defenses involving their work on the Plan and the Committee's intent when drawing the electoral map that the plaintiffs challenge. *See, e.g.*, *Singleton* Doc. 48 ¶¶ 3, 65, 8 (p.10); *Milligan* Doc. 51 ¶¶ 3, 5, 56–57, 60, 62–66, 176, 182, 184, 187, 208, 9 (p.33), 24 (p.35). The Legislators asserted legislative immunity and privilege in a single sentence at the end of each answer. *Singleton* Doc. 48 ¶ 13 (p.11); *Milligan* Doc. 51 ¶ 25 (p.35).

On December 7, 2021, the parties in all three cases filed joint stipulations of fact applicable to the preliminary injunction proceedings. *Singleton* Doc. 47; *Milligan* Doc. 53; *Caster* Doc. 44.

On December 13, 2021, after the *Milligan* plaintiffs filed an opposition to the Legislators' motion for a protective order, *Milligan* Doc. 56, the court issued a short order denying the Legislators' motion on the ground that the Legislators waived their legislative immunity and privilege when they put in issue their work as legislators by taking various steps in the litigation, including but not limited to failing to move to dismiss *Singleton* or *Milligan* on the basis of legislative immunity; intervening in *Singleton* "to assert both factual and legal defenses in support of the constitutionality

and lawfulness" of the electoral map that is the subject of this action, which intervention was sought before *Milligan* was filed naming them as defendants and was not for the limited purpose of asserting their legislative immunity or privilege, *Singleton* Doc. 25 ¶ 12; and filing answers in both *Singleton* and *Milligan* that assert numerous factual and legal defenses, many of which concern their "intent," "motive[s,]" and "motivations behind" their work as legislators on the electoral map, *see, e.g., Singleton* Doc. 48 ¶¶ 3, 65, 8 (p.10); *Milligan* Doc. 51 ¶¶ 56, 182, 208. *Milligan* Doc. 59.

In that order, the court also set a deadline for the Legislators to file any other discovery objections. *Id.* at 3. The next day, the Legislators filed additional discovery objections. *Milligan* Doc. 63. That same day, the court issued a work-it-out order finding that the additional objections were boilerplate and directing counsel to meet and confer forthwith and make every attempt to resolve the Legislators' additional discovery objections. *Milligan* Doc. 64. The Legislators did not renew any objections after the meet-and-confer.

On December 15, 2021, the plaintiffs in *Milligan* and *Caster* timely filed their respective motions for preliminary injunctive relief, *Milligan* Doc. 69; *Caster* Doc. 56, and the *Singleton* plaintiffs renewed their earlier motion, *Singleton* Doc. 57. The defendants later timely filed responses. *Singleton* Doc. 67; *Milligan* Doc. 78; *Caster* Doc. 71.

Page **18** of **225**

All parties timely filed their initial expert reports (which were simultaneously exchanged) and expert rebuttal reports.[3] *Singleton* Docs. 54, 56, 60–62; *Milligan* Docs. 66, 68, 74, 76; *Caster* Docs. 48–51, 64–66. The expert witnesses were not deposed before the preliminary injunction hearing, so the first time they were cross-examined about their opinions in this case was during their live testimony before the court. *See* Tr. of Nov. 23, 2021 Hrg. at 31–34.

On December 16, 2021, the court issued a longer order explaining why it concluded that the Legislators' litigation conduct waived their legislative immunity and privilege. *Milligan* Doc. 71.

On December 20, 2021, at the request of the parties, the court held a Rule 16 conference in all three cases to discuss the logistics for the hearing. At that hearing, the *Caster* and *Milligan* parties alerted the court of their intention to coordinate their presentations of their statutory claims at the preliminary injunction hearing, and all counsel in both of those cases agreed that all evidence admitted in either case was admitted in both cases unless counsel raised a specific objection. *See Singleton* Doc. 72-1; *Caster* Doc. 74; Tr. Dec. 20, 2021 Hrg. at 14–17.[4]

---

[3] For good cause, the court allowed Dr. Duchin to submit a short supplemental report on December 27, 2021. *Milligan* Doc. 92-1; Tr. 604–08.

[4] At the preliminary injunction hearing, counsel for the State repeated his understanding that any evidence admitted for purposes of one case could be used in any other case. Tr. 29.

Page **19** of **225**

Also on December 20, 2021, the Legislators filed an unopposed motion to intervene in *Caster* that made no mention of legislative immunity or privilege. *Caster* Doc. 60. The *Caster* court later granted that motion. *Caster* Doc. 69.

On December 22, 2021, the three-judge court and the *Caster* court issued an order that the January 4 preliminary injunction hearings would occur by Zoom on account of the rising level of COVID-19 infections throughout the country. *Singleton* Doc. 66; *Milligan* Doc. 77; *Caster* Doc. 70. At that time, approximately forty-one lawyers had appeared in the three cases, and if consolidated hearings were to occur in person in Birmingham, Alabama, those attorneys, along with lay and expert witnesses, would have traveled from various locations nationwide, including New Hampshire, Maryland, Texas, New York, the District of Columbia, California, and Washington, as well as from various locations in Alabama. The court provided public access to the Zoom proceedings by livestream. *Singleton* Doc. 78; *Milligan* Doc. 98; *Caster* Doc. 91. No party objected to the virtual nature of the hearing.

On December 23, 2021, after the close of preliminary injunction discovery, the parties in *Singleton* filed a second joint stipulation of fact for the purposes of the preliminary injunction proceedings. *Singleton* Doc. 70. Also on that date, the parties in all three cases filed joint pretrial reports that included a witness list, exhibit list, and extensive exhibits, *Singleton* Doc. 71; *Milligan* Doc. 80; *Caster* Doc. 73, and a joint submission explaining their preferred order of proceedings during the

Page **20** of **225**

coordinated preliminary injunction hearing, *Singleton* Doc. 72; *Caster* Doc. 74. We accepted without modification the order of proceedings that the parties proposed for the preliminary injunction hearing.

A hearing on all three motions for preliminary injunctive relief commenced on January 4, 2022 and concluded on January 12, 2022. The relevant testimony is described in the appropriate section below.

### B.     Factual and Legal Background

Article I, § 2, of the United States Constitution requires that Members of the House of Representatives "be apportioned among the several States . . . according to their respective Numbers" and "chosen every second Year by the People of the several States." U.S. CONST. art. I, § 2. Each state's population is counted every ten years in a national census, and state legislatures rely on census data to apportion each state's congressional seats into districts.

"Redistricting is never easy," *Abbott v. Perez*, 138 S. Ct. 2305, 2314 (2018), and is "primarily and foremost a state legislative responsibility." *Wesch*, 785 F. Supp. at 1497. "[F]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions," and when "assessing the sufficiency of a challenge to a districting plan, a court must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus." *Abbott*, 138 S. Ct. at 2324 (quoting *Miller v. Johnson,* 515 U.S. 900, 915–16 (1995)) (internal quotation marks

omitted). In this instance, an already difficult task became even more difficult due to the delayed release of the census data as a result of pandemic-related challenges for the Census Bureau.

Redistricting must comply with federal constitutional and statutory requirements. *Bartlett*, 556 U.S. at 7; *Reynolds v. Sims,* 377 U.S. 533, 554–60 (1964); *Wesberry v. Sanders*, 376 U.S. 1, 6 (1964). Two such requirements are relevant here.

*First,* the "one person, one vote" rule requires a state to make one person's "vote in a congressional election" as "nearly as is practicable . . . worth as much as another's." *Wesberry*, 376 U.S. at 7–8, 18 (internal quotation marks omitted). This standard "does not require that congressional districts be drawn with precise mathematical equality," but states must "justify population differences between districts that could have been avoided by a good-faith effort to achieve absolute equality." *Tennant v. Jefferson Cnty. Comm'n*, 567 U.S. 758, 759 (2012) (internal quotation marks omitted).

*Second*, "federal law impose[s] complex and delicately balanced requirements regarding the consideration of race" in congressional redistricting. *Abbott*, 138 S. Ct. at 2314. On the one hand, the Equal Protection Clause "restrict[s] the use of race in making districting decisions." *Id*. More particularly, "[t]he Equal Protection Clause forbids 'racial gerrymandering,' that is, intentionally assigning citizens to a district

on the basis of race without sufficient justification." *Id.* (quoting *Shaw v. Reno,* 509 U.S. 630, 641 (1993)). The Equal Protection Clause "also prohibits intentional 'vote dilution,'" which is "invidiously . . . minimiz[ing] or cancel[ing] out the voting potential of racial or ethnic minorities." *Abbott*, 138 S. Ct. at 2314 (quoting *Mobile v. Bolden,* 446 U.S. 55, 66–67 (1980) (plurality opinion)).

"When a voter sues state officials for drawing . . . race-based lines, [Supreme Court precedents] call for a two-step analysis. *First*, the plaintiff must prove that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Cooper*, 137 S. Ct. at 1463 (emphasis added) (internal quotation marks omitted). "The racial predominance inquiry concerns the actual considerations that provided the essential basis for the lines drawn, not *post hoc* justifications the legislature in theory could have used but in reality did not." *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 799 (2017). Although "a conflict or inconsistency between the enacted plan and traditional redistricting criteria is not a threshold requirement or a mandatory precondition" to establish racial predominance, such "conflict or inconsistency may be persuasive circumstantial evidence" of it. *Id.* Traditional redistricting principles "includ[e] compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, incumbency protection, and political

affiliation." *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015) (citation and internal quotation marks omitted).

"[U]ntil a claimant makes a showing sufficient to support th[e] allegation" of "race-based decisionmaking," "the good faith of a state legislature must be presumed." *Miller*, 515 U.S. at 915. "[T]he burden of proof lies with the challenger, not the State." *Abbott*, 138 S. Ct. at 2324.

"*Second*, if racial considerations predominated over others, the design of the district must withstand strict scrutiny. The burden thus shifts to the State to prove that its race-based sorting of voters serves a compelling interest and is narrowly tailored to that end." *Cooper*, 137 S. Ct. at 1464 (emphasis added) (citation and internal quotation marks omitted).

Application of the restrictions imposed by the Equal Protection Clause is "complicated." *Abbott*, 138 S. Ct. at 2314. For example, "because a voter's race sometimes correlates closely with political party preference, it may be very difficult for a court to determine whether a districting decision was based on race or party preference." *Id.* (citations omitted).

On the other hand, while "the Equal Protection Clause restricts the consideration of race in the districting process, compliance with the Voting Rights Act of 1965 . . . pulls in the opposite direction: It often insists that districts be created precisely because of race." *Id*. Section Two provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301.

As relevant here, a state violates Section Two "if its districting plan provides 'less opportunity' for racial minorities [than for other members of the electorate] 'to elect representatives of their choice.'" *Abbott*, 138 S. Ct. at 2315 (quoting *LULAC*, 548 U.S. at 425). "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47.

"[A] plaintiff may allege a § 2 violation in a single-member district if the manipulation of districting lines fragments [cracks] politically cohesive minority

voters among several districts or packs them into one district or a small number of districts, and thereby dilutes the voting strength of members of the minority population." *Shaw v. Hunt*, 517 U.S. 899, 914 (1996) ("*Shaw II*").

Under *Gingles*, a plaintiff asserting a claim of vote dilution under Section Two "must prove three threshold conditions": "first, that the minority group is sufficiently large and geographically compact to constitute a majority in a . . . district; second, that [the minority group] is politically cohesive; and third, that the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate [("the *Gingles* requirements")]." *Growe v. Emison*, 507 U.S. 25, 40 (1993) (internal quotation marks omitted) (alterations accepted).

"In a § 2 case, only when a party has established the *Gingles* requirements does a court proceed to analyze whether a violation has occurred based on the totality of the circumstances." *Bartlett*, 556 U.S. at 11–12. "Courts use factors drawn from a report of the Senate Judiciary Committee accompanying the 1982 amendments to the [Voting Rights Act] (the Senate [F]actors) to make the totality-of-the-circumstances determination." *Georgia State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015); *accord Johnson v. De Grandy*, 512 U.S. 997, 1010 n.9 (1994) (quoting *Gingles*, 478 U.S. at 44–45); *see also infra* at Part III (enumerating and analyzing Senate Factors). "Another relevant consideration is whether the number of districts in which the minority group forms

an effective majority is roughly proportional to its share of the population in the relevant area." *LULAC*, 548 U.S. at 426; *accord De Grandy*, 512 U.S. at 1000. When a plaintiff alleges vote dilution "based on a statewide plan," the proportionality analysis ordinarily is statewide. *LULAC*, 548 U.S. at 437–38.

Intent is not an element of a Section Two violation, and "proof that a contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against minority voters, is not required under Section 2 of the Voting Rights Act." *City of Carrollton Branch of NAACP v. Stallings*, 829 F.2d 1547, 1553 (11th Cir. 1987).

Because "the Equal Protection Clause restricts consideration of race and the [Voting Rights Act] demands consideration of race, a legislature attempting to produce a lawful districting plan is vulnerable to competing hazards of liability." *Abbott*, 138 S. Ct. at 2315 (internal quotation marks omitted). "In an effort to harmonize these conflicting demands, [the Supreme Court has] assumed that compliance with the [Voting Rights Act] may justify the consideration of race in a way that would not otherwise be allowed." *Id.*; *accord Cooper*, 137 S. Ct. at 1464.

More specifically, the Court has "assumed that complying with the [Voting Rights Act] is a compelling state interest, and that a State's consideration of race in making a districting decision is narrowly tailored and thus satisfies strict scrutiny if the State has good reasons for believing that its decision is necessary in order to

comply with the [Voting Rights Act]." *Abbott*, 138 S. Ct. at 2315 (internal quotation marks and citations omitted).

A basic history of redistricting in Alabama is crucial to a complete understanding of the claims raised in *Singleton, Milligan*, and *Caster*. Since 1973, Alabama has been apportioned seven seats in the United States House of Representatives. *See Milligan* Doc. 53 (joint stipulations of fact) ¶ 28. In all the congressional elections held under the maps drawn after the 1970 census and the 1980 census, Alabama elected all-white delegations to the House. *See id.* ¶ 44.

After the 1990 census, the Legislature initially failed to enact a new congressional redistricting plan. *See Wesch*, 785 F. Supp. at 1494–95. A voter in Alabama's First Congressional District sued the state and asserted that holding the 1992 election under the old map would violate the one person, one vote rule. *Id.* at 1492–93. Several Black voters intervened in the action as plaintiffs to assert a Section Two claim. *Id.* at 1493. The parties submitted various redistricting plans for the court's consideration, and the court retained its own expert. *Id.* at 1493, 1495.

The district court ultimately ordered that congressional elections be held according to a plan that closely tracked the original plaintiff's proposed plan. *See Wesch v. Folsom*, 6 F.3d 1465, 1467–68 (11th Cir. 1993). That plan created one "significant majority African–American district with an African–American population of 67.53%." *Id.* at 1468; *Wesch*, 785 F. Supp. at 1498, 1581 app. A. That

district, the Seventh Congressional District ("District 7"), included Black communities in Jefferson, Tuscaloosa, and Montgomery counties. *Wesch*, 785 F. Supp. at 1509, 1569 app. A (Jefferson County); *id*. at 1510, 1581 app. A (Tuscaloosa County); *id*. at 1510, 1575 app. A (Montgomery County).

The *Wesch* court did not decide whether Section Two "require[d] the creation of such a district under the circumstances" because the parties stipulated that according to the 1990 census data, "the African American population in the State of Alabama is sufficiently compact and contiguous to comprise a single member significant majority (65% or more) African American Congressional district," and that "a significant majority African American Congressional district should be created." *Id.* at 1498–99. The court found that the new plan "create[d] a majority African–American district that provide[d] African–Americans a reasonable opportunity to elect a candidate of their choice, and d[id] so without the need for extensive gerrymandering." *Id.* at 1499.  The map for the new plan was drawn in large part by cartographer Randy Hinaman. *Milligan* Doc. 70-2 at 35–36.

In the 1992 election held using the court-ordered map, voters in District 7 elected Alabama's first Black Congressman (Earl Hilliard) in over 90 years. *See Milligan* Doc. 53 ¶ 44. District 7 remains a majority-Black district to this day and in every election since 1992 has elected a Black Democrat. *See id.* ¶¶ 44, 47, 49, 58.

After the 2000 census, Alabama enacted a congressional districting plan that took Montgomery County out of District 7 and divided that county between Districts 2 and 3. *Id.* ¶ 65. After the 2010 census, Alabama enacted a congressional districting plan that added parts of Montgomery County back to District 7 and divided the rest of Montgomery County between Districts 2 and 3. *Id.* That map was drawn by Mr. Hinaman as well. *See Milligan* Doc. 70-2 at 23. According to the 2010 census data, in District 7 the Black voting-age population ("BVAP") comprised 60.91% of the total voting-age population.[5] *Milligan* Doc. 53 ¶ 52.

The Legislators and Committee began the congressional redistricting process in May 2021 using population estimates from the Census Bureau. *Id.* ¶ 80. As part of that work, the Committee enacted guidelines for the 2021 redistricting cycle ("the Legislature's redistricting guidelines"). *Milligan* Doc. 88-23 (Ex. M28).[6] For the convenience of the reader, because the parties have relied extensively on the

---

[5] As explained *infra* at Part V.A, unless we state otherwise, when we recite statistics about Black Alabamians from census data collected in or after the 2000 census, we are referring to any census respondent who identified themselves as Black, regardless whether that respondent also identified as a member of another race or other races. To use the labels that the parties and their experts have supplied, we employ the "any-part Black" metric rather than the "single-race Black" metric, unless we state otherwise.

[6] Exhibits that are identified by a combination of a letter and a number in this manner are preliminary injunction hearing exhibits.

Legislature's redistricting guidelines, they are reproduced in relevant part below and

attached in full to this Order as Appendix A.

10    **II. CRITERIA FOR REDISTRICTING**

11    a.    Districts shall comply with the United States Constitution, including the
12    requirement that they equalize total population.

13    b.    Congressional districts shall have minimal population deviation.

14    c.    Legislative and state board of education districts shall be drawn to achieve
15    substantial equality of population among the districts and shall not exceed an
16    overall population deviation range of ±5%.

17    d.    A redistricting plan considered by the Reapportionment Committee shall
18    comply with the one person, one vote principle of the Equal Protection Clause of
19    the 14th Amendment of the United States Constitution.

20    e.    The Reapportionment Committee shall not approve a redistricting plan that
21    does not comply with these population requirements.

22    f.    Districts shall be drawn in compliance with the Voting Rights Act of 1965, as
23    amended. A redistricting plan shall have neither the purpose nor the effect of
24    diluting minority voting strength, and shall comply with Section 2 of the Voting
25    Rights Act and the United States Constitution.

26    g.    No district will be drawn in a manner that subordinates race-neutral
27    districting criteria to considerations of race, color, or membership in a language-
28    minority group, except that race, color, or membership in a language-minority
29    group may predominate over race-neutral districting criteria to comply with
30    Section 2 of the Voting Rights Act, provided there is a strong basis in evidence in
31    support of such a race-based choice. A strong basis in evidence exists when there
32    is good reason to believe that race must be used in order to satisfy the Voting
33    Rights Act.

1    h.    Districts will be composed of contiguous and reasonably compact
2    geography.

21    j.    The following redistricting policies are embedded in the political values,
22    traditions, customs, and usages of the State of Alabama and shall be observed to
23    the extent that they do not violate or subordinate the foregoing policies prescribed
24    by the Constitution and laws of the United States and of the State of Alabama:

25    (i)    Contests between incumbents will be avoided whenever possible.

26    (ii)    Contiguity by water is allowed, but point-to-point contiguity and long-lasso
27    contiguity is not.

28    (iii)    Districts shall respect communities of interest, neighborhoods, and political
29    subdivisions to the extent practicable and in compliance with paragraphs a
30    through i. A community of interest is defined as an area with recognized
31    similarities of interests, including but not limited to ethnic, racial, economic, tribal,
32    social, geographic, or historical identities. The term communities of interest may,
33    in certain circumstances, include political subdivisions such as counties, voting

Page **31** of **225**

precincts, municipalities, tribal lands and reservations, or school districts. The
discernment, weighing, and balancing of the varied factors that contribute to
communities of interest is an intensely political process best carried out by elected
representatives of the people.

(iv)   The Legislature shall try to minimize the number of counties in each district.

(v)   The Legislature shall try to preserve the cores of existing districts.

(vi)   In establishing legislative districts, the Reapportionment Committee shall
give due consideration to all the criteria herein. However, priority is to be given to
the compelling State interests requiring equality of population among districts and
compliance with the Voting Rights Act of 1965, as amended, should the
requirements of those criteria conflict with any other criteria.

g.   The criteria identified in paragraphs j(i)-(vi) are not listed in order of
precedence, and in each instance where they conflict, the Legislature shall at its
discretion determine which takes priority.

*Milligan* Doc. 88-23 at 1-3.

The 2020 census data was released in August 2021, and the Committee continued its redistricting work. *Milligan* Doc. 53 ¶ 80. Mr. Hinaman (who drew the 1992 map and the 2011 map) prepared the map that ultimately became the Plan, and he testified that it "can be traced back to the 2011 map, the 2001 map, and the 1992 map in that order." *Milligan* Doc. 70-2 at 37, 39. Mr. Hinaman testified that when he prepared the Plan he was focused on the preservation of the cores of previous districts, and he "turned race on" only at the end of the process to facilitate an evaluation whether the Plan complies with Section Two. *Id.* at 39–40, 142–44, 222–23. He also testified, however, that when he initially crafted the plan in 1992 race was "a major factor." *Id.* at 35–36

Governor Ivey called a Special Legislative Session on redistricting to begin on October 28, 2021, *Milligan* Doc. 53 ¶ 88, the Legislature passed the Plan in both houses on November 3, 2021, and the Plan became law with Governor Ivey's

signature on November 4, 2021, *id.* ¶ 182. The Plan map appears below.



RC 000553

*Milligan* Doc. 88-19.

### C.    Claims and Defenses

#### 1.    *Singleton*

The *Singleton* plaintiffs allege that the Plan "intentionally perpetuated the unconstitutional racial gerrymandering" that occurred when the *Wesch* court created District 7 and again after the 2000 and 2010 censuses when the racial composition of that district was materially unchanged. *Singleton* Doc. 15 ¶¶ 1–2. The *Singleton* plaintiffs allege that Section Two "no longer requires maintenance of a majority-[B]lack Congressional District in Alabama," and that "the State cannot rely on [Section Two] to justify splitting county boundaries when Districts drawn without racial gerrymandering provide [B]lack voters constituting less than a majority, combined with reliably supportive white voters, an opportunity to elect candidates of their choice." *Id.* ¶ 3.

The *Singleton* plaintiffs assert that new congressional districts must be drawn without splitting counties, which was the "race-neutral" way that Alabama drew Congressional maps from 1822 until 1964. *Id.* ¶¶ 6, 20, 35. The *Singleton* plaintiffs propose a congressional districting plan for the 2022 election that they allege "eliminates these racial gerrymanders" by drawing district lines solely on county lines without diminishing Black voters' "opportunity to elect the candidates of their choice." *Id.* ¶¶ 42–43, 53. The *Singleton* plaintiffs call their proposed map the

"Whole County Plan." *Id.* at 31. Senator Singleton sponsored the Whole County Plan in the Legislature, which rejected it. *Id.* ¶¶ 47–48.

The *Singleton* plaintiffs assert claims in two counts. In Count I, they allege that the Plan "is racially gerrymandered, in violation of the Equal Protection Clause of the Fourteenth Amendment and Article I, § 2 of the Constitution of the United States." *Id.* ¶ 56. In Count II, they assert that the state violated the Fourteenth and Fifteenth Amendments because the districts in the Plan were drawn (and the Whole County Plan was rejected) to intentionally discriminate against Black voters. *Id.* ¶¶ 75–79. The *Singleton* plaintiffs' motion for preliminary injunctive relief pertains only to Count I. *Singleton* Doc. 57 at 8. We were not asked to address the claim Singleton asserted in Count II at this stage of these proceedings.

The *Singleton* plaintiffs assert that their Whole County Plan "end[s] the 1992 racial gerrymander . . . without splitting a single county and with only slight population deviations." *Singleton* Doc. 15 ¶ 41. In the Whole County Plan, the Seventh Congressional District would contain 49.9% Black registered voters, and the Sixth Congressional District would contain 42.3% registered Black voters. *Id.* ¶ 42. The *Singleton* plaintiffs say that Black voters would "have an opportunity to elect the candidate of their choice in both districts" because recent election returns reflect "dependable biracial coalition voting" in both proposed districts. *Id.*

### 2.    *Milligan*

The *Milligan* plaintiffs allege that the Voting Rights Act now requires two majority-Black or Black-opportunity congressional districts in Alabama.[7] The *Milligan* plaintiffs assert that Alabama's consideration of race in the Plan "was not narrowly tailored to comply with" the Voting Rights Act, and that the Plan reflects the Legislature's "desire to use . . . race to maintain power by packing one-third of Black Alabamians into [District 7] and cracking the remaining Black community." *Milligan* Doc. 1 ¶ 4.

The *Milligan* plaintiffs rely on several statistics to support these allegations: The 2020 census data establish that 26.9% of Alabamians identify as any-part Black and 63.1% identify as non-Hispanic white. *Id.* ¶ 42. A significant number of Black Alabamians live in an area that begins in Jefferson County and extends south- and west-ward to Mobile County and then east- and north-ward to Montgomery and Macon counties. *Id.* ¶¶ 87–89, 165–68.

Much of that area is known as the Black Belt. *Id.* ¶ 8 & n.1. The *Milligan* parties stipulated that the Black Belt "is named for the region's fertile black soil. The region has a substantial Black population because of the many enslaved people

---

[7] When we use the phrase "Black-opportunity," we mean a district in which a "meaningful number" of non-Black voters often "join[] a politically cohesive black community to elect" the Black-preferred candidate, *Cooper*, 137 S. Ct. at 1470. We distinguish a Black-opportunity district from a majority-Black district, in which Black people comprise "50 percent or more of the voting population and . . . constitute a compact voting majority" in the district, *Bartlett*, 556 U.S. at 19.

brought there to work in the antebellum period. All the counties in the Black Belt are majority- or near majority-BVAP." *Milligan* Doc. 53 ¶ 60. They further stipulated that the Black Belt includes eighteen "core counties" (Barbour, Bullock, Butler, Choctaw, Crenshaw, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Montgomery, Perry, Pickens, Pike, Russell, Sumter, and Wilcox), and that an additional five counties (Clarke, Conecuh, Escambia, Monroe, and Washington) are "sometimes included within the definition of the Black Belt." *Id.* ¶ 61.

According to the *Milligan* plaintiffs, Black voters in the Black Belt tend to share common "political beliefs, cultural values, and economic interests." *Milligan* Doc. 1 ¶ 89. Under the Plan, those Black voters are placed into four Congressional districts: Districts 1, 2, and 3, where the *Milligan* plaintiffs assert that their votes are diluted, and District 7, which the *Milligan* plaintiffs assert is packed. *Id.* ¶¶ 165–69.

The *Milligan* plaintiffs contend that the Legislature could have "more naturally drawn a second majority-Black Congressional District that complies with traditional redistricting principles, like maintaining whole counties, and respects the contiguity and communities of actual interest in the Black Belt counties." *Id.* ¶ 8. The *Milligan* plaintiffs allege that "(1) voting-age Black Alabamians are sufficiently numerous and geographically compact to be a majority of the voting-age population in two single member U.S. Congressional districts in Alabama; (2) the voting patterns of Black voters are politically cohesive; and (3) white voters in Alabama

vote sufficiently as a bloc to typically defeat the candidates preferred by Black voters." *Id.* ¶ 9 (footnote omitted). The *Milligan* plaintiffs assert that "[v]oting in Alabama has historically been and remains extremely racially polarized across the state" and that one indicator of the Legislature's improper consideration of race in enacting the Plan was its failure to conduct a racial-polarization analysis. *Id.* ¶¶ 5, 9.

The *Milligan* plaintiffs assert claims in three counts. In Count One, which asserts a claim of vote dilution, the *Milligan* plaintiffs say that the Plan violates Section Two because voting in Alabama is racially polarized, "Black voters in Alabama are sufficiently numerous and geographically compact enough" to draw two majority-Black congressional districts, and under "the totality of the circumstances," Black voters "have less opportunity" than other Alabamians "to elect representatives of their choice to Congress." *Id.* ¶¶ 191–95.

In Count Two, the *Milligan* plaintiffs assert a claim of racial gerrymandering under the Fourteenth Amendment and 42 U.S.C § 1983. *Id.* at 49–50. In Count Three, they assert that the Plan was enacted to intentionally discriminate against Black people in violation of the Fourteenth Amendment, 42 U.S.C. § 1983, and Section Two. *Id.* at 50–52. To support Counts Two and Three, the *Milligan* plaintiffs use building blocks similar to the ones the *Singleton* plaintiffs use to support their constitutional challenge, including: (1) the court-ordered plan in *Wesch*; (2) the *Wesch* court's decision not to conduct its own Section Two analysis; (3) the

Legislature's subsequent maintenance of that court-ordered plan; and (4) the Seventh Congressional District's Black voting age population of 55.3%, which is allegedly greater than is necessary to comply with Section 2. *Id.* at 40–48.

The *Milligan* plaintiffs claim that the only proper remedy is a plan that contains two majority-Black congressional districts. *Milligan* Doc. 69 at 36. The *Milligan* plaintiffs offered as a remedy in their complaint a congressional districting plan with the Second and Seventh Congressional Districts as majority-Black districts, but asserted that alternative plans could address their claims, *Milligan* Doc. 1 ¶¶ 89–90. The remedial map offered in the *Milligan* plaintiffs' complaint was introduced in the Alabama Senate by Senator Kirk Hatcher, a Black legislator, and is sometimes referred to in the pleadings as "the Hatcher plan." *See Milligan* Doc. 1 ¶¶ 82, 185; *Milligan* Doc. 53 ¶ 113. In their motion for a preliminary injunction, the *Milligan* plaintiffs offered four additional illustrative remedial maps prepared by Dr. Moon Duchin, one of their expert witnesses. *See Milligan* Doc. 68-5 at 7, 11 ("the Duchin plans").

### 3.   *Caster*

The *Caster* plaintiffs, in turn, argue that the Plan violates Section Two because it "strategically cracks and packs Alabama's Black communities," which the *Caster* plaintiffs say are "sufficiently numerous and geographically compact to support two majority-Black congressional districts." *Caster* Doc. 3 ¶¶ 1, 2. The *Caster* plaintiffs

assert that the Plan cracks Black voters between the First, Second, and Third Congressional Districts and packs Black voters into the Seventh Congressional District. *Id.* ¶ 4. The *Caster* plaintiffs argue that each of the congressional districts "among which the Black population is significantly cracked . . . includes at least one significant Black population center in an otherwise overwhelmingly white district" *id.* ¶ 39, and that cracking is "exemplified by the splitting of the state's historical Black Belt," *id.* ¶ 40. (The parties in *Caster* stipulated to the same facts about the Black Belt to which the parties in *Milligan* stipulated. *See Caster* Doc. 44 ¶¶ 33, 34.)

The *Caster* plaintiffs assert that "there is widespread racially polarized voting in Alabama, and when considered against the totality of the circumstances," including Alabama's long history of discrimination, unlawful redistricting, and racial appeals in political campaigns, the Plan's "failure to create two majority-Black districts dilutes the Black vote in violation of Section 2." *Caster* Doc. 3 ¶ 4; *id.* ¶¶ 39–40, 52–82. The *Caster* plaintiffs assert their claims in a single count, which is a claim of vote dilution under Section Two. *Id.* ¶¶ 90–95.

The *Caster* plaintiffs urge the court to adopt any remedy that includes two majority-Black or Black-opportunity congressional districts. *Id.* at 31; *Caster* Doc. 97 ¶¶ 494-505. In connection with their motion for a preliminary injunction, the *Caster* plaintiffs offer seven illustrative remedial maps prepared by their expert

witness, Mr. Bill Cooper. *See Caster* Doc. 48 at 23–37; Tr. 437, 450–52 ("the Cooper plans").

### 4.      Secretary Merrill and the Legislators

Secretary Merrill and the Legislators (collectively, "the Defendants") argue that all the plaintiffs' claims fail because the Committee followed the common and acceptable practice of starting with the prior map and adjusting the district boundaries only as necessary to comply with the one-person, one-vote rule and serve traditional redistricting criteria such as preserving the cores of existing districts and drawing compact districts. *See Milligan* Doc. 78 at 16. As for the prior map, the Defendants argue that "[f]or nearly 50 years, Alabama's congressional districts have remained remarkably similar," that "[n]either the 2001 Map nor the 2011 Map were ever declared unlawful by a court and both were precleared by the Department of Justice[]" under Section 5 of the Voting Rights Act, which applied to all congressional districting plans in Alabama from 1965 to 2013. *Id.* at 20, 58.

The Defendants argue that the Plan is race-neutral because the State cartographer "adjusted the districts' population without examining racial demography" when he drew the Plan and that there is no evidence that the Legislature adopted the Plan for racially discriminatory reasons. *Id.* at 16.

The Defendants say that "[n]othing" in the Voting Rights Act "entitles Plaintiffs to court-ordered districts of their preferred racial composition—especially

not at the preliminary injunction stage with election deadlines just weeks away." *Id.* More particularly, the Defendants argue that "nothing" in the Voting Rights Act "requires Alabama to draw two majority-[B]lack districts with slim [B]lack majorities as opposed to one majority-[B]lack district with a slightly larger majority." *Id.* at 17.

The Defendants contend that every remedial map proposed by the *Milligan* and *Caster* plaintiffs "fail[s] the Supreme Court's test for vote dilution" because the plaintiffs "are unable to produce maps with a second majority-black district unless they completely ignore traditional districting criteria such as compactness and maintaining communities of interest," "eviscerate the State's political geography," and "subjugat[e] traditional districting criteria to race." *Id.* at 17–18. The Defendants assert that the plaintiffs' remedial maps "carv[e] up Alabama's longstanding existing districts," include an "unprecedented" split of Mobile County, "splic[e] together areas with no common interests (such as the shipyards of Mobile and the peanut farms of Dothan)," and "pit[] incumbents against each other." *Id.* at 18.

## II.   STANDARD OF REVIEW

"[A] preliminary injunction is an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (internal quotation marks omitted). "A party seeking a preliminary injunction must establish that (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered

unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Vital Pharms., Inc. v. Alfieri*, No. 20-14217, 2022 WL 179337, at *5 (11th Cir. Jan. 20, 2022) (published citation forthcoming) (internal quotation marks and citation omitted). "[T]he burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).

## III.   APPLICABLE LAW

Because we do not now decide the constitutional claims before us, we discuss in this section only the law applicable to the *Milligan* plaintiffs' claims under the Voting Rights Act. Our analysis proceeds in the two steps that Supreme Court precedent requires. We first consider whether the *Milligan* plaintiffs have established the three *Gingles* requirements: (1) that as a group, Black voters in Alabama are "sufficiently large and geographically compact to constitute a majority in some reasonably configured legislative district"; (2) that Black voters are "politically cohesive"; and (3) that each challenged district's white majority votes "sufficiently as a bloc to usually defeat [Black voters'] preferred candidate." *Cooper*, 137 S. Ct. at 1470 (internal quotation marks omitted).

"The 'geographically compact majority' and 'minority political cohesion' showings are needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district. And the 'minority political cohesion' and 'majority bloc voting' showings are needed to establish that the challenged districting thwarts a distinctive minority vote by submerging it in a larger white voting population." *Growe*, 507 U.S. at 40 (citations omitted).

"Unless these points are established, there neither has been a wrong nor can be a remedy." *Id.* at 40–41. Accordingly, if the *Milligan* plaintiffs fail to establish any one of these three conditions, we need not consider the other two. *See Voinovich v. Quilter*, 507 U.S. 146, 158 (1993).

As to the first *Gingles* requirement, "a party asserting § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent." *Bartlett*, 556 U.S. at 19–20. As the Supreme Court has explained, "it is a special wrong when a minority group has 50 percent or more of the voting population and could constitute a compact voting majority but, despite racially polarized bloc voting, that group is not put into a district." *Id.* at 19. The unit of analysis is the Black voting-age population (again, "BVAP"): "[O]nly eligible voters affect a group's opportunity to elect candidates." *LULAC*, 548 U.S. at 429; *see also Bartlett*, 556 U.S. at 19 (referring to 50% or more of the "voting population").

Even if a group is sufficiently large, "there is no § 2 right to a district that is not reasonably compact." *LULAC*, 548 U.S. at 430 (citing *Abrams v. Johnson*, 521 U.S. 74, 91–92 (1997)). Because the injury in a Section Two claim is vote dilution, the compactness analysis "refers to the compactness of the minority population, not to the compactness of the contested district." *Id.* at 433 (quoting *Bush v. Vera*, 517 U.S. 952, 997 (1996) (Kennedy, J., concurring)) (internal quotation marks omitted). "If, because of the dispersion of the minority population, a reasonably compact majority-minority district cannot be created, § 2 does not require a majority-minority district . . . ." *Vera*, 517 U.S. at 979.

Compactness analysis is concerned less with aesthetics and more with functionality: compactness "is critical to advancing the ultimate purposes of § 2, ensuring minority groups equal 'opportunity . . . to participate in the political process and to elect representatives of their choice.'" *LULAC*, 548 U.S. at 434 (alteration in original) (quoting 42 U.S.C. § 1973(b)). A "minority group [that] is spread evenly throughout" the relevant geographic area (*i.e.*, "substantially integrated throughout" that area), is not compact enough to "maintain that they would have been able to elect representatives of their choice" in a single district. *Gingles*, 478 U.S. at 51 n.17.

"While no precise rule has emerged governing § 2 compactness, the inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries." *LULAC*, 548 U.S. at 433

(internal quotation marks omitted). "A district that reaches out to grab small and apparently isolated minority communities is not reasonably compact." *Id.* (quoting *Vera*, 517 U.S. at 979) (internal quotation marks omitted). "[B]izarre shaping of" a district that, for example, "cut[s] across pre-existing precinct lines and other natural or traditional divisions," suggests "a level of racial manipulation that exceeds what § 2 could justify." *Vera*, 517 U.S. at 980–81.

The term "community of interest" is a term of art. Under the Legislature's redistricting guidelines, a "community of interest" is "defined as an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities." *Milligan* Doc. 88-23 (Ex. M28) at 2. The term "may, in certain circumstances, include political subdivisions such as counties, voting precincts, municipalities, tribal lands and reservations, or school districts." *Id.* at 2–3. The Legislature's redistricting guidelines provide that the "discernment" of a "communit[y] of interest" is "best carried out by elected representatives of the people." *Id.* at 3.

Controlling precedents offer relatively little guidance about the meaning of "community of interest" in the redistricting context. The Supreme Court has held that residents of a Hasidic Jewish community may have a community of interest. *See United Jewish Orgs. of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 153–54 (1977). In *LULAC*, the Supreme Court held that a district court erred when it "did not make

any finding about compactness," and despite finding that "[t]he Latinos in the Rio Grande Valley and those in Central Texas" 300 miles away were "'disparate communities of interest,' with 'differences in socio-economic status, education, employment, health, and other characteristics,'" "ruled . . . that . . . [the district combining the two communities] would be an effective Latino opportunity district." *LULAC*, 548 U.S. at 432 (quoting the district court's decision). The Court reasoned that the bare "mathematical possibility of a racial bloc does not make a district compact." *Id.* at 435. And another three-judge court has held that residents of a district combining people with disparate "economic conditions, educational backgrounds, media concentrations, commuting habits, and other aspects of life" do not share a "tangible communit[y] of interest," *Johnson v. Miller*, 864 F. Supp. 1354, 1389–90 (S.D. Ga. 1994), *aff'd and remanded,* 515 U.S. 900 (1995).

"[T]he first *Gingles* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *De Grandy*, 512 U.S. at 1008. Accordingly, to establish the first *Gingles* condition, the *Milligan* plaintiffs must establish that Black voters are sufficiently numerous and geographically compact to support at least two reasonably configured majority-Black districts. *See id.*; *accord Voinovich*, 507 U.S. at 153.   This requirement "relates to the availability of a remedy," *Nipper v. Smith*, 39 F.3d 1494, 1526 (11th Cir. 1994), so the *Milligan*

plaintiffs must "demonstrate the existence of a proper remedy," *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999) (collecting cases).

To determine whether the *Milligan* plaintiffs satisfy this requirement, we compare the Plan with each of the four Duchin plans and each of the seven Cooper plans. *See LULAC,* 548 U.S. at 430 (quoting *De Grandy*, 512 U.S. at 1008) (stating requirement of "a comparison between a challenger's proposal and the 'existing number of reasonably compact districts'").

Critically, our comparison is for the limited purpose of evaluating whether the plaintiffs have satisfied the first *Gingles* requirement: "[a] § 2 district that is **reasonably** compact and regular, taking into account traditional districting principles," need not also "defeat [a] rival compact district[]" in a "beauty contest[]." *Vera*, 517 U.S. at 977 (emphasis in original) (internal quotation marks omitted).

The second and third *Gingles* requirements rise and fall on whether the *Milligan* plaintiffs establish that voting in the challenged districts is racially polarized. *See, e.g.*, *LULAC*, 548 U.S. at 427. As the Supreme Court has explained, "in the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters." *Voinovich*, 507 U.S. at 158 (quoting *Gingles*, 478 U.S. at 49 n.15).

If the *Milligan* plaintiffs establish all three *Gingles* requirements, we must then analyze whether a Section Two violation has occurred based on "the totality of

the circumstances." *Bartlett*, 556 U.S. at 11–12. In this step, we consider the Senate

Factors, which include:

> the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction.

*De Grandy*, 512 U.S. at 1010 n.9 (quoting *Gingles*, 478 U.S. at 44–45). "[E]vidence

demonstrating that elected officials are unresponsive to the particularized needs of

the members of the minority group and that the policy underlying the State's or the

political subdivision's use of the contested practice or structure is tenuous may have

probative value." *Id.* (quoting *Gingles*, 478 U.S. at 45).

The Senate Factors are not exhaustive. Under controlling Supreme Court

precedent, we must also consider whether the number of Black-majority districts in

the Plan is roughly proportional to the Black share of the population in Alabama.

*See LULAC*, 548 U.S. at 426; *accord De Grandy*, 512 U.S. at 1000. Although Section

Two expressly provides that "nothing in this section establishes a right to have

members of a protected class elected in numbers equal to their proportion in the

population," 52 U.S.C. § 10301(b), the Supreme Court has held that "whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area" is a "relevant consideration" in the totality-of-the-circumstances analysis. *LULAC*, 548 U.S. at 426; *accord De Grandy*, 512 U.S. at 1000. "[P]roportionality . . . is obviously an indication that minority voters have an equal opportunity, in spite of racial polarization to participate in the political process and to elect representatives of their choice . . . ." *De Grandy,* 512 U.S. at 1020 (internal quotation marks omitted); *accord Alabama Legislative Black Caucus v. Alabama*, 989 F. Supp. 2d 1227, 1286–87 (2013) (concluding that the totality of the circumstances weighed against a finding that the state legislative map violated Section Two in part because the number of majority-Black districts in the Legislature is "roughly proportional to the [B]lack voting-age population"), *vacated on other grounds*, 575 U.S. 254 (2015).

We may also consider "any circumstance that has a logical bearing on whether" the challenged structure and its interaction with local social and historical conditions "affords equal 'opportunity.'" *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2338 (2021); *see also District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018) (observing that a "totality of the circumstances" test "requires courts to consider the whole picture" and "recognize[s] that the whole is often greater than the sum of its parts" and "precludes [a] sort of divide-and-conquer analysis" in which

each factor is "viewed in isolation") (internal quotation marks omitted).

Our Section Two analysis "assess[es] the impact of the contested structure or practice on minority electoral opportunities on the basis of objective factors." *Gingles*, 478 U.S. at 44 (internal quotation marks omitted). Whether the legislature intended that impact is "the wrong question." *Id.* (internal quotation marks omitted). This means that "proof that a contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against minority voters, is not required under Section 2 of the Voting Rights Act." *City of Carrollton Branch of NAACP*, 829 F.2d at 1553. Accordingly, we neither consider nor decide whether the Legislature intended to dilute the votes of Black Alabamians.

If we determine that the Plan violates Section Two, controlling precedent makes clear both that the Legislature should get the first cut at drawing a new map, and that we must not restrict that work any more than is necessary to ensure compliance with Section Two. *See, e.g.*, *North Carolina*, 138 S. Ct. at 2554. Further, if we determine that the Plan violates Section Two, that would not be a determination that the *Milligan* plaintiffs are entitled to a map of their choice, or to one of the remedial maps submitted to establish the first *Gingles* requirement: those maps are illustrative maps submitted for the purposes of establishing liability under Section Two. The Legislature retains "flexibility" in their work, subject to the rule that a "district drawn in order to satisfy § 2 must not subordinate traditional districting

principles to race substantially more than is reasonably necessary to avoid § 2 liability." *Vera*, 517 U.S. at 978–79 (internal quotation marks omitted).

Only if the Legislature fails promptly to draw a new map that complies with Section Two would it "become[] the unwelcome obligation of the federal court to devise and impose a reapportionment plan pending later legislative action." *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) (internal citation and quotation marks omitted).

## IV.   ANALYSIS – VOTING RIGHTS ACT

### A.   The Milligan Plaintiffs' Arguments

The *Milligan* plaintiffs first argue that they are substantially likely to succeed on their Section Two claim because they satisfy each of the *Gingles* requirements and prevail on an analysis of the totality of the circumstances.

#### 1.   *Gingles* I – Numerosity and Reasonable Compactness

To satisfy the first *Gingles* requirement, the *Milligan* plaintiffs must establish that Black voters as a group are "sufficiently large and geographically compact to constitute a majority in some reasonably configured legislative district." *Cooper*, 137 S. Ct. at 1470 (internal quotation marks omitted); *accord Growe*, 507 U.S. at 40. To establish that, the *Milligan* plaintiffs rely on the testimony of expert witness Dr. Moon Duchin.

Dr. Duchin's credentials include an undergraduate mathematics degree from Harvard University and two graduate mathematics degrees from the University of Chicago. *Milligan* Doc. 68-5 at 1. Dr. Duchin is a Professor of Mathematics at Tufts

University, where she runs a redistricting research lab known as the Metric Geometry and Gerrymandering Group; there she uses her mathematical specialty, metric geometry, to understand redistricting. *Id.* at 1, 18; Tr. 550–51. She has published more than a dozen peer-reviewed papers focused on redistricting issues in various journals that include the Election Law Journal, Political Analysis, Foundations of Data Science, the Notices of the American Mathematical Society, Statistics and Public Policy, the Virginia Policy Review, the Harvard Data Science Review, Foundations of Responsible Computing, and the Yale Law Journal Forum. *Milligan* Doc. 68-5 at 4; Tr. 552. She has researched and taught courses about the history of the census and focused on the United States Census Bureau, and her redistricting research is supported by the National Science Foundation. Tr. 552–53. She was elected as a Fellow of the American Mathematical Society four years ago and has been both a Radcliffe Fellow and a Guggenheim Fellow. *Milligan* Doc. 68-5 at 4. At the preliminary injunction hearing, Dr. Duchin was qualified as an expert in redistricting, applied mathematics, quantitative redistricting analysis, and demography and use of census data, with no objection from any party. Tr. 554–55. For the reasons explained in our findings of fact and conclusions of law (*see infra* Part V.B.2.a), we find Dr. Duchin's testimony highly credible.

Dr. Duchin opined in her report that because 27.16% of Alabama residents identified as any-part Black on the 2020 Decennial Census (1,364,736 residents out

of 5,024,279 total residents), Black Alabamians are sufficiently numerous to constitute majorities of three out of seven congressional districts. *Milligan* Doc. 68-5 at 5. Dr. Duchin reasoned that because each congressional district will contain approximately one-seventh, or 14.3% of Alabama's population, 7.2% of the population is sufficient to constitute a majority in a district. *Id.* at n.2.

At the preliminary injunction hearing, Dr. Duchin testified that her opinion about numerosity also is based on her illustrative plans (discussed in detail below), each of which includes two congressional districts with a BVAP over 50% using the any-part Black metric to measure BVAP. Tr. 585; *see also Milligan* Doc. 68-5 at 10–12 & n.4. Dr. Duchin also testified that her opinion about numerosity is based on the analysis she performed using the mathematical algorithms that she developed, which demonstrated that there are "literally thousands of different ways" to create plans with two majority-Black districts. Tr. 565.

Dr. Duchin's testimony on compactness is that although the "constraints of geography," meaning the location of Black voters throughout the state, "make it impossible to create three" majority-Black congressional districts, "it is readily possible to create two" such districts "without sacrificing traditional districting principles like population balance, contiguity, respect for political subdivisions like counties, cities, and towns, or the compactness of the districts, and with heightened respect for communities of interest." *Milligan* Doc. 68-5 at 5 (internal citations

Page **54** of **225**

omitted); *see also id.* at 5–10; Tr. 556.

Dr. Duchin opined that the Plan "packs Black population into District 7 at an elevated level of over 55% BVAP, then cracks Black population in Mobile, Montgomery, and the rural Black Belt across Districts 1, 2, and 3, so that none of them has more than about 30% BVAP." *Milligan* Doc. 68-5 at 6 fig.1; Tr. 564. She illustrated this point with a side-by-side comparison of the Plan and a demographic map in which "[d]arker shading indicates precincts with a higher share of BVAP":



*Milligan* Doc. 68-5 at 6 fig.1.

Dr. Duchin testified at the preliminary injunction hearing that her "main

question was whether [she] could make plans that had two majority-[B]lack districts while showing great respect for the other additional districting principles." Tr. 570–71.  She testified that she began to consider whether it was possible to draw a second majority-Black congressional district in Alabama by using computer algorithms to generate large numbers of drawings, and those algorithms "found plans with two majority-[B]lack districts in literally thousands of ways." Tr. 565. Using some of those plans as inspiration, she then began to draw by hand using other computer programs associated with her lab that are publicly available. Tr. 565–66. As she drew by hand, she relied on census data (both voting precinct-level data and more granular census block-level data) and she considered the Plan, previous Alabama plans, the plan that Alabama uses to elect its eight-member State Board of Education (which includes two majority-Black districts),[8] and the Legislature's redistricting guidelines. Tr. 566–70, 622, 657–60, 673–74, 690.

Dr. Duchin explained her understanding of traditional redistricting principles

---

[8] The *Milligan* parties stipulated that "[t]he Alabama [State Board of Education] is a nine-member body that sets education policy for Alabama's K-12 schools. The Governor serves as the president of the SBOE, and the remaining eight members are elected to the Board from single-member districts. In 2021, Alabama adopted an eight-district SBOE Plan (the "2021 SBOE Plan") with two majority-Black districts, Districts 4 and 5. According to 2020 Census data, District 4 is 51% BVAP, and District 5 is 51% BVAP. In each election since 2011, a Black Democrat won a majority of Black voters and the election in Districts 4 and 5 of the SBOE. District 5 of the SBOE Plan connects the City of Mobile to the Black Belt Counties." *Milligan* Doc. 53 ¶¶ 66–69.

and the Legislature's redistricting guidelines, testified about the priority she assigned to various such principles in her work on this case, and explained how she resolved conflicts among such principles when they arose. Tr. 573–76, 621–30, 635, 657–60. In Dr. Duchin's view, it is "common" for traditional redistricting principles to conflict during the map-drawing process, and "redistricting is all about th[e] tradeoffs" that must occur when conflicts arise. Tr. 576.

More particularly, Dr. Duchin testified that she relied heavily on the Legislature's redistricting guidelines, and she took the creation of two majority-Black districts, which she was asked to try to draw, as a "nonnegotiable principle" sought in her illustrative plan, along with equal population among districts. Tr. 622, 647, 657–60, 690. Dr. Duchin labeled this principle "minority opportunity to elect," based on the provision in the Legislature's redistricting guidelines that "Districts shall be drawn in compliance with the Voting Rights Act of 1965, as amended. A redistricting plan shall have neither the purpose nor the effect of diluting minority voting strength, and shall comply with Section 2 of the Voting Rights Act and the Constitution." Tr. 574, 682-83; *see also* Ex. M28 (available at *Milligan* Doc. 88-23). She further testified that "after" population balance and minority opportunity to elect, she "took contiguity and compactness to be highest ranked following the Alabama guidelines" based on the way that those principles are expressed in those guidelines. Tr. 577, 622.

Dr. Duchin repeatedly testified that she focused on race **only** to the extent that was necessary to be sure that she maintained two districts with BVAPs of greater than 50% to satisfy *Gingles* I. She "describe[d] the priority order this way: When you have to split a [voting tabulation district] looking to balance population, as I just said, by far, the first thing that I look at is the total population of the [census] blocks. After that, the next consideration I had was compactness, trying to make kind of less eccentric and more regular boundaries between districts. I -- over the course of the many draft maps made, I did sometimes look at race of those blocks, but really, only to make sure that I was creating two districts over 50 percent. Beyond ensuring crossing that 50 percent line, there was no further consideration of race in choosing blocks within the split [voting tabulation districts]." Tr. 572–73.

Relatedly, Dr. Duchin emphasized that it was "simply not [her] goal" to "maximize" the BVAP in the two majority-Black districts in her plans. Tr. 578. She testified that "[w]e've seen from the state that it's possible to have a substantially higher BVAP in a district, and I can tell you that it's possible, while having two districts to still have a substantially higher BVAP in a district." Tr. 578. She further testified that when she prepared her illustrative plans, there were times when she made decisions "that had the effect of reducing the Black Voting Age Population in one of the minority-majority [B]lack districts in order to satisfy other redistricting principles." Tr. 578. She gave as an example that she "took . . . county integrity to

take precedence over the level of BVAP once that level was past 50 percent." Tr. 578.

Dr. Duchin offered four plans to illustrate her point that it is possible to draw two contiguous and reasonably compact majority-Black congressional districts, and she testified at the preliminary injunction hearing that her four illustrative plans are "far from the only plans" that could be drawn with two such districts. Tr. 577. She supplied the following maps in her report:



*Milligan* Doc. 68-5 at 7 fig.2.

Dr. Duchin testified that like the Plan, each of her plans nearly perfectly

distributes Alabama's population into contiguous districts: each district in each plan

is within a one-person deviation of the baseline of 717,754 people per district, and

each district in each plan is contiguous. *Id.* at 8; Tr. 586–90; *see also Milligan* Doc. 92-1 (Ex. M48) (supplemental report correcting previous mistake in contiguity analysis without consequence to mathematical analysis or substantive conclusions).

Dr. Duchin also testified that like the Plan, each of her plans respects existing political subdivisions in the state. Tr. 599. Her opinion is that "to make seven finely population-tuned districts, it is necessary to split at least six of Alabama's 67 counties into two pieces, or to split some counties into more than two pieces." *Milligan* Doc. 68-5 at 8; Tr. 626. She opined that both the Plan and all four of her plans "split nine counties or fewer, giving them high marks for respecting these major political subdivisions," and one of her plans has the same number of county splits (the Plan splits six counties once, and Duchin Plan D splits four counties once and Jefferson County twice). *Milligan* Doc. 68-5 at 8. She also opined that all of her plans "are comparable to the State's plan on locality splits, with [Duchin] Plan B splitting fewer localities" than the Plan. *Id.*

Dr. Duchin testified that she considered compactness when she drew each of her plans by computing compactness scores for those plans using three metrics that are commonly cited in professional redistricting analyses: the Polsby-Popper score, the Reock score, and the cut-edges score. *Id.* at 9; Tr. 590–94.[9] Dr. Duchin provided

---

[9] Dr. Duchin explained the Polsby-Popper and Reock metrics as follows: "Polsby-Popper is the name given in this setting to a metric from ancient mathematics: the isoperimetric ratio comparing a region's area to its perimeter via the formula $4\pi A/P^2$.

average compactness scores for each of her plans on each of these metrics, *Milligan*

Doc. 68-5 at 9, and testified that all four of her plans "are superior to" and

"significantly more compact than" the Plan using an average Polsby-Popper metric.

*Id.*; Tr. 593. More particularly, she testified that the least compact districts in her

plans – Districts 1 and 2 – were "comparable to or better than the least compact

districts" in both the Plan and the 2011 Congressional map. Tr. 594; *accord* Tr. 655–

56. Dr. Duchin testified that in her opinion, she was able to "maintain reasonable

compactness by Alabama standards in [her] entire plan" because "[a]ll of [her]

---

Higher scores are considered more compact, with circles uniquely achieving the optimum score of 1. Political scientist Ernest Reock created a different score based on the premise that circles were ideal: it is computed as the ratio of a region's area to that of its circumcircle, where the circumcircle is defined as the smallest circle in which the region can be circumscribed. Polsby-Popper is thought to be relevant as a measure of how erratically the geographical boundaries divide the districts, but this sometimes penalizes districts for natural features like coastlines of bays and rivers. Reock has a much weaker justification, since the primacy of circles is the goal rather than the consequence of the definition." *Milligan* Doc. 68-5 at 9. Dr. Duchin further explained that, as with the Polsby-Popper metric, a higher Reock score is better than a lower Reock score. *Id.* Dr. Duchin also explained the cut-edges score as follows: "Recently, some mathematicians have argued for using discrete compactness scores, taking into account the units of Census geography from which the district is built. The most commonly cited discrete score for districts is the *cut edges* score, which counts how many adjacent pairs of geographical units receive different district assignments. In other words, cut edges measures the 'scissors complexity' of the districting plan: how much work would have to be done to separate the districts from each other? Plans with a very intricate boundary would require many separations. Relative to the contour-based scores, this better controls for factors like coastline and other natural boundaries, and focuses on the units actually available to redistricters rather than treating districts like free-form Rorschach blots." *Id.*

districts are more compact" on a Polsby-Popper metric than "the least compact district from 10 years ago" in Alabama. Tr. 665.

Dr. Duchin testified that her plans also respect the Black Belt as a community of interest as that term is defined by the Legislature's redistricting guidelines. *See Milligan* Doc. 68-5 at 13; *Milligan* Doc. 88-23 (Ex. M28) at 2–3 ("A community of interest is defined as an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities."). Dr. Duchin observed that in the Plan, eight of the eighteen core Black Belt counties are "partially or fully excluded from majority-Black districts," while "[e]ach of the 18 Black Belt counties is contained in majority-Black districts in at least some" of her alternative plans. *Milligan* Doc. 68-5 at 13; *see also* Tr. 666–68.

Dr. Duchin opined in her report that because her plans were designed to include two majority-Black districts, "it should be expected" that they "would disrupt the structure of the prior plans" and would not retain the cores of prior districts to the same extent that the Plan does. *Milligan* Doc. 68-5. at 10. At the preliminary injunction hearing, she testified that she "judge[s] it to be impossible to have as high of a core preservation as, for instance, you see in the newly enacted plans, while also having two majority-[B]lack districts." Tr. 600.

Dr. Duchin testified at the preliminary injunction hearing that although her plans pair incumbents, that circumstance is the result of her focus on principles that

are assigned greater priority in the Legislature's redistricting guidelines. Tr. 669–70. She explained that fewer pairings were possible, but would come at the expense of compactness and keeping counties whole. Tr. 669–70. She observed that because two paired incumbents live in the same county just miles apart, a plan would have to split that county to avoid pairing those incumbents. Tr. 671.

The *Milligan* plaintiffs argue that each of Dr. Duchin's plans "retain most of Birmingham in District 7," "keep the Black Belt and Montgomery county together," do not split Montgomery County, and "are more compact than HB1." *Milligan* Doc. 69 at 12–13.

At the preliminary injunction hearing, the *Milligan* plaintiffs also offered testimony from two of the individual plaintiffs. Plaintiff Evan Milligan is Black and lives in Montgomery in District 7. Mr. Milligan works as the Executive Director of Alabama Forward, a coalition of non-profit groups that works on voting issues in Alabama. Tr. 127. Mr. Milligan testified about the Black community in Montgomery County as well as what he believes the Black community in Montgomery has in common with the Black Belt. Tr. 137–44. Plaintiff Shalela Dowdy is Black and currently lives in Mobile in District 1. Captain Dowdy is an Army Veteran and currently works as a community organizer. Tr. 365–66. Captain Dowdy testified about the Black community in Mobile County as well as what she believes the Black community in Mobile has in common with the Black Belt. Tr. 370–76.

## 2. *Gingles* II and III – Racially Polarized Voting

To satisfy the second and third *Gingles* requirements, that Black voters are "politically cohesive," and that each challenged district's white majority votes "sufficiently as a bloc to usually defeat [Black voters'] preferred candidate," *Cooper*, 137 S. Ct. at 1470 (internal quotation marks omitted), the *Milligan* plaintiffs first rely on a racial polarization analysis conducted by expert witness Dr. Baodong Liu.

Dr. Liu is a tenured professor of political science at the University of Utah, where he focuses on the "relationship between election systems and the ability of minority voters to participate fully in the political process and to elect representatives of their choice." *Milligan* Doc. 68-1 at 2. Dr. Liu has written or edited eight books and published more than thirty articles in peer-reviewed journals such as Social Science Quarterly, American Politics Research, Sociological Methods and Research, Political Behavior, and the American Review of Politics. *Id.*; Tr. 1255. He has served as an expert witness in vote dilution cases in six states and has advised the United States Department of Justice on methodological issues concerning racially polarized voting. *Milligan* Doc. 68-1 at 2. At the preliminary injunction hearing, he was qualified as an expert in racial-polarization analysis and American political behavior without objection from any party. Tr. 1255. For the reasons explained in our findings of fact and conclusions of law (*see infra* Part V.B.3), we find that Dr. Liu is a credible expert witness.

Page **65** of **225**

The *Milligan* plaintiffs first asked Dr. Liu to opine (1) whether racially polarized voting occurs in Alabama, and (2) whether such voting has resulted in the defeat of Black-preferred candidates in Alabama congressional elections. *Milligan* Doc. 68-1 at 1. Dr. Liu first examined seven biracial endogenous elections – congressional elections in the districts at issue in this litigation that provided a choice between a Black candidate and a white candidate – based on case law indicating that evidence about biracial elections and endogenous elections is more probative of racially polarized voting than is evidence about other kinds of elections. *See Milligan* Doc. 68-1 at 3–4 & n.1; *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1301 (11th Cir. 2020); *Davis v. Chiles*, 139 F.3d 1414, 1417–18 & n.3 (11th Cir. 1998); *Clark v. Calhoun Cnty.*, 88 F.3d 1393, 1397 (5th Cir. 1996). Dr. Liu also considered six biracial exogenous elections – in this case, elections for statewide offices that provided a choice between a Black candidate and a white candidate. *See Milligan* Doc. 68-1 at 4.

Dr. Liu studied racially polarized voting in these thirteen elections by using a statistical procedure known as ecological inference, which he opines "has been widely used as the most-advanced and reliable statistical procedure for [racially polarized voting] estimates in not only academic research but also voting rights cases in the last two decades." *Id.* at 5. Dr. Liu used both the any-part Black metric and the single-race Black metric to study the endogenous elections, and the single-race

Black metric to study the exogenous elections. Tr. 1338–39. Dr. Liu's order of analysis was first to "evaluate whether or not the preferred candidate of [B]lack voters received majority support from the [B]lack group. And then . . . to look at whether the majority voters do not share that preference, that is to say, only a minority of the white majority group voted for the same candidate, and if so, then [to] look at whether the [B]lack-preferred candidate is defeated." Tr. 1257.

In his report, Dr. Liu opined that "in 13 out of the 13 elections (100%) in which Black voters expressed a preference for Black candidates, that preference was not shared by white majority voters," and "the white majority voted sufficiently as a bloc to typically defeat all the Black candidates in those elections." *Milligan* Doc. 68-1 at 18. In the general elections in the challenged districts Dr. Liu studied (excepting District 7), Black support for the Black-preferred candidate always exceeded 90% and white support for the Black-preferred candidate never exceeded 12.6%. *Id.* at 9. Dr. Liu observed that the "only Black success in winning a biracial endogenous election since the 2008 elections was Terri Sewell[,] who ran in a Black-majority congressional district," District 7. *Id.* at 18. Dr. Liu provided a table of his results to demonstrate both the existence and the extent of the racially polarized voting that he observed:

**Table 1: Estimated Racial Support for Black Candidate in Endogenous Elections**

| Election | Black Candidate(s) | White Candidate(s) | % vote cast for Black Cand | Black Support for Black Cand (95% CI)[19] | White Support for Black Cand (95% CI) | Black-Cand Won? | RPV? |
|---|---|---|---|---|---|---|---|
| 2020 CD1, primary | James Averhart | Kiani Gardner and Frederick Collins | 40.2% | 53.8% (.52-.56) | 16.7% (.13-.20) | Into Runoff | Yes |
| 2020 CD1, general | James Averhart | Jerry Carl | 35.6% | 93.3% (.88-.96) | 12.6% (.09, .17) | No | Yes |
| 2020 CD2, general | Phyllis Harvey-Hall | Barry Moore | 34.5% | 93.4% (.88-.96) | 5.2% (.04-.1) | No | Yes |
| 2020 CD3, general | Adia Winfrey | Mike Rogers | 32.4% | 92.6% (.88-.95) | 6.6% (.03-.12) | No | Yes |
| 2018 CD1, general | Robert Kennedy, Jr. | Bradley Byrne | 36.8% | 94.6% (.92-.96) | 8.1% (.08-.13) | No | Yes |
| 2012 CD7, general | Terri Sewell | Don Chamberlain | 75.8% | 96.3% (.94-.98) | 26.1% (.20-36) | Yes | Yes |
| 2010 CD7, general | Terri Sewell | Don Chamberlain | 72.5% | 95.5% (.93-.97) | 19.3% (.16-23) | Yes | Yes |

*Milligan* Doc. 68-1 at 9.

In his rebuttal report, Dr. Liu responded to the report of one of the Defendants' experts, Dr. M.V. Hood. *See infra* Part IV.C.2 & Part IV.D.2. Dr. Liu opined that the recent election of a Black Republican, Kenneth Paschal, to represent Alabama House District 73, is "an unreliable election to estimate white support for a Black Republican candidate" because the turnout for that election (a special election) was so low that it suggests that "white voters were not highly interested in this election

Page **68** of **225**

featuring a Black Republican candidate." *Milligan* Doc. 76-1 at 3 (discussing "low overall" turnout of 5.3% of the voting age population, and only 1.7% of the white voting age population). Dr. Liu further opined that the 2016 Republican presidential primary in Alabama offers a better election to estimate white support for a Black Republican candidate, and it indicates low support because the Black Republican candidate, Ben Carson, received far less support than the white Republican candidate, Donald Trump. *Id.* at 3–4. Based on Dr. Liu's expertise and our observation of this testimony, we credit the testimony and find it particularly helpful.

At the preliminary injunction hearing, Dr. Liu's testimony emphasized the clarity and starkness of the pattern of racially polarized voting that he observed, particularly in the highest-value data set – the biracial endogenous elections. *See* Tr. 1271–75 (Liu testimony about Table 1 in his report, which reflects evidence of racially polarized voting in biracial endogenous elections). Dr. Liu explained that in those elections, "Black support for [B]lack candidates was almost universal" and "overwhelmingly in the 90[%] range," Tr. 1271, that Black voters were "super cohesive in choosing the same candidate from their own racial group," Tr. 1274, and that the Black-preferred candidate was defeated in every election except the one in District 7, which is majority-Black, Tr. 1275. Dr. Liu testified that he observed a similar pattern in the exogenous elections he studied, Tr. 1275–76, which provides a "supplemental piece of evidence" of racially polarized voting, Tr. 1276, and

ultimately that racially polarized voting in Alabama is "very clear," Tr. 1293.

At the preliminary injunction hearing, Dr. Liu testified that after he submitted his report, he was made aware of an eighth biracial endogenous election since 2008. Tr. 1268–69. Dr. Liu further testified that he analyzed that election after he submitted his report, and "[t]he result turned out to be racially polarized just as [he] found in [his] report for other elections." *Id.* at 1269.

The *Milligan* plaintiffs also asked Dr. Liu to perform an effectiveness analysis, in which he evaluated "the levels of opportunities for minority voters to elect candidate[s] of their choice" in four plans – the Plan, Duchin Plan A, Duchin Plan B, and Duchin Plan D. *See Milligan* Doc. 68-1 at 14–18; Tr. 1259, 1312–13. Dr. Liu first concluded that Duchin Plans B and D "clearly offer Black voters in Alabama more opportunities to elect candidates of their choice than does" the Plan, and when he later analyzed Duchin Plan A, he reached the same conclusion as to that plan, Tr. 1312–13.

The *Milligan* plaintiffs also rely on several federal court decisions to establish that voting is racially polarized in Alabama. More particularly, the *Milligan* parties stipulated that "[n]umerous federal courts in Alabama have found that the state's elections were racially polarized at the time and locations at issue in their respective cases. *See, e.g., Ala. State Conf. of NAACP v. Alabama*, No. 2:16-CV-731-WKW, 2020 WL 583803, at *17 (M.D. Ala. Feb. 5, 2020) (accepting the undisputed

statistical evidence proving the existence of racially polarized voting statewide); *Jones v. Jefferson Cnty. Bd. of Educ.*, No. 2:19-cv-01821-MHH, 2019 WL 7500528, at *2 (N.D. Ala. Dec. 16, 2019) (finding that voting is racially polarized in Jefferson County elections); *United States v. McGregor*, 824 F. Supp. 2d 1339, 1345–46 & n.3 (M.D. Ala. 2011) (finding that voting is racially polarized across Alabama)." *Milligan* Doc. 53 at ¶ 118.

### 3.     The Senate Factors and Proportionality

Next, the *Milligan* plaintiffs turn to an analysis of the totality of the circumstances. They begin with the nine Senate Factors, which they number as follows:

1.    "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process";

2.    "the extent to which voting in the elections of the state or political subdivision is racially polarized";

3.    "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group";

4.    "if there is a candidate slating process, whether the members of the minority group have been denied access to that process";

5.    "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process";

Page **71** of **225**

6. "whether political campaigns have been characterized by overt or subtle racial appeals";

7. "the extent to which members of the minority group have been elected to public office in the jurisdiction";

8. "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group"; and

9. "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."

*Gingles*, 478 U.S. at 36–37 (quoting S. Rep. No. 97-417 at 28–29).

The *Milligan* plaintiffs observe that "[i]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances," *Georgia State Conf. of NAACP*, 775 F.3d at 1342, and they argue that in this case the Senate Factors "confirm" the Section Two violation. *Milligan* Doc. 69 at 16.

The *Milligan* plaintiffs emphasize Senate Factors Two and Seven – racially polarized voting and a lack of Black electoral success – because in *Gingles* the Supreme Court flagged them as the "most important" factors. *Id.* The *Milligan* plaintiffs assert that it is "essentially undisputed that voting is racially polarized." *Id.*; *Milligan* Doc. 94 at 19 (citing *Milligan* Doc. 66-4 at 13); *see also infra* at Part IV.C.2 (explaining that Defendants' expert agreed that voting in Alabama is racially polarized). The *Milligan* parties jointly stipulated as fact that (1) "no Black candidate has ever won in a majority-white congressional district" in Alabama, *Milligan* Doc.

53 ¶¶ 44, 121, (2) "no Black person has won a statewide race in a generation," *id.* ¶¶ 167–68, and (3) "nearly all other Black legislators in Alabama are elected from majority-Black districts created to comply" with the Voting Rights Act or the Constitution, *Milligan* Doc. 69 at 16 (citing *Milligan* Doc. 53 ¶ 169).

The *Milligan* plaintiffs assert that Factors 1, 3, and 5 also are present because "Alabama has an undisputed and ongoing history of discrimination against Black people in voting, education, employment, health, and other areas." *Milligan* Doc. 69 at 17–18. The *Milligan* plaintiffs rely on the following facts jointly stipulated by the Defendants, *see id.*:

- Prior to 1960, the Legislature failed to reapportion for 50 years. As a result, Alabama's entire legislative apportionment scheme was struck down for violating the principle of one person, one vote. *Reynolds v. Sims*, 377 U.S. 533, 568 (1964). On remand, a three-judge court found that, in devising remedial maps to correct the malapportionment, the "Legislature intentionally aggregated predominantly Negro counties with predominantly white counties for the sole purpose of preventing the election of Negroes to [State] House membership." *Sims v. Baggett*, 247 F. Supp. 96, 108-109 (M.D. Ala. 1965).

- Following *Reynolds* and the 1970 Census, the Legislature again failed to redistrict and a three-judge federal court was forced to draw new district lines. *Sims v. Amos*, 336 F. Supp. 924, 940 (M.D. Ala. 1972). The court rejected the Alabama Secretary of State's proposed map because of its racially "discriminatory effect" on Black voters. *Id*. at 936.

- In the 1980s, the United States Attorney General denied preclearance under the Voting Rights Act to maps drawn by the Legislature to redistrict State House and Senate maps because of their discriminatory effect on Black voters in Jefferson County and the Black Belt. U.S. Dep't of Justice Ltr. to Ala. Attorney General Graddick, May 6, 1982, https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1520.pdf. Shortly thereafter, a three-judge court rejected Alabama's proposed

interim remedial state maps in part because Alabama's maps "had the effect of reducing the number of 'safe' black districts" in and near Jefferson County. *Burton v. Hobbie*, 543 F. Supp. 235, 238 (M.D. Ala. 1982).

- After the 1990 census, the State entered a consent decree to resolve a Voting Rights Act lawsuit filed on behalf of Black voters. *See Brooks v. Hobbie*, 631 So. 2d 883, 884 (Ala. 1993).

- Most recently, after the 2010 census, Black voters and legislators successfully challenged 12 state legislative districts as unconstitutional racial gerrymanders. *See Alabama Legislative Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1348-49 (M.D. Ala. 2017).

- Today, Alabama has a majority-vote requirement in all primary elections.

- Before the Civil War, Black people were barred from voting in the state. After the passage of the Reconstruction Acts and Amendments, Alabama was forced to allow Black men access to the franchise, and the 1867 Alabama Constitution granted every male person over the age of 21—who satisfied the citizenship and residency requirements—the right to vote. This meant that for the first time in Alabama's history, Black people voted and held public office. In response, white leaders reformed the Democratic party with the intent of "redeeming" the State and re-establishing white supremacy. This was accomplished by using violence to deter Black people from political participation and, once the Redeemers returned to political office, to pass racially discriminatory laws to cement their control.

- In 1874, Democratic candidates were elected to public office in large numbers. On election day, in Eufaula, Alabama, members of a white paramilitary group known as the White League, killed several unarmed Black Republican voters and turned away thousands of voters from the polls.

- The following year, in 1875, the Alabama legislature adopted a new state constitution and passed a series of local laws and ordinances designed to strip Black Americans of the civil rights they enjoyed briefly during Reconstruction.

- At the 1901 Constitutional Convention, 155 white male delegates gathered in Montgomery with the express intention "to establish white supremacy in the State." The Convention ratified changes to the constitution that required literacy tests as a prerequisite to register to vote and mandated payment of an

Page 74 of 225

annual $1.50 poll tax, which was intended to and had the effect of disenfranchising Black voters. *United States v. Alabama*, 252 F. Supp. 95, 99 (M.D. Ala. 1966).

- After the United States Supreme Court invalidated white-only primaries in 1944, Alabama passed the "Boswell Amendment" to its Constitution in 1946, adding an "understanding requirement" meant to give registrars broad discretion to deny African Americans the ability to register to vote.

- After a federal court invalidated the Boswell Amendment in 1949, Alabama replaced its understanding requirement with a literacy test, again with the purpose of preventing African Americans from registering to vote.

- After the Supreme Court outlawed the white primary in 1944, many Alabama counties shifted to at-large elections, the intent of which was to prevent African Americans from electing their candidates of choice.

- In 1951, Alabama enacted a law prohibiting single-shot voting in municipal elections, the intent of which was to prevent African Americans from electing their candidates of choice.

- In 1957, Alabama transformed the boundaries of the city of Tuskegee into a twenty-eight-sided figure designed to fence out African Americans from the city limits and ensure that only white residents could elect city officials. *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

- In 1964 and 1965, Dallas County Sheriff Jim Clark, Alabama state troopers, and vigilantes violently assaulted peaceful Black protesters attempting to gain access to the franchise.

- On March 7, 1965, in what became known as Bloody Sunday, state troopers viciously attacked and brutally beat unarmed peaceful civil rights activists crossing the Edmund Pettus Bridge in Selma, where less than 5 percent of Black voters were registered to vote. Bloody Sunday helped pave the way for the passage of the Voting Rights Act in 1965 and Alabama was declared a "covered" state under Section 4(b) of the Act.

- Between 1965 and 2013, at least 100 voting changes proposed by Alabama state, county or city officials were either blocked or altered pursuant to Section 5 of the Voting Rights Act. No objection was raised after 2008. The objections include at least 16 objections between 1969 and 2008 in cases where a

proposed state or local redistricting plan had the purpose or would have the effect of diminishing the ability of Black voters to elect their candidates of choice. The last sustained objection to an Alabama state law occurred in 1994.

- In 1986, a court found that the state laws requiring numbered posts for nearly every at-large voting system in Alabama had been intentionally enacted to dilute Black voting strength, and that numbered posts had the effect of diluting Black voting strength in at-large elections. *Dillard v. Crenshaw Cty.*, 640 F. Supp. 1347, 1357 (1986). The court also found that from the late 1800s to the 1980s, Alabama had purposefully manipulated the method of electing local governments as needed to prevent Black citizens from electing their preferred candidates. *Id.*

- Ultimately, a defendant class of 17 county commissions, 28 county school boards, and 144 municipalities were found to be employing at-large election systems designed and motivated by racial discrimination. These cases resulted in settlement agreements with about 180 Alabama jurisdictions that were required to adopt new election systems including single-member districts, limited voting, and cumulative voting systems, in an attempt to purge the state's election systems of intentional discrimination.

- Between 1965 and 2021, subdivisions in Alabama continued to use at-large elections with numbered posts.

- Federal courts recently ruled against or altered local at-large voting systems with numbered post created by the State Legislature to address their alleged racially discriminatory purpose or effect. *See, e.g.*, *Jones*, 2019 WL 7500528, at *4; *Ala. State Conf. of the NAACP v. City of Pleasant Grove*, No. 2:18-cv-02056, 2019 WL 5172371, at *1 (N.D. Ala. Oct. 11, 2019).

- Black voters have challenged other Alabama voting laws under the Voting Rights Act and the Constitution in federal court. *See, e.g.*, *People First of Alabama v. Merrill*, 491 F. Supp. 3d 1076, 1106-1107 (N.D. Ala. 2020); *Harris v. Siegelman*, 695 F. Supp. 517, 530 (M.D. Ala. 1988). For example, the Supreme Court struck down Alabama's discriminatory misdemeanant disfranchisement law, *Hunter v. Underwood*, 471 U.S. 222 (1985), and a state law permitting certain discriminatory annexations, *Pleasant Grove v. United States*, 479 U.S. 462, 466-67 (1987).

- Since the *Shelby County v. Holder* decision in 2013, federal courts have ordered more than one political subdivision in Alabama to be re-subjected to

preclearance review under Section 3(c) of the Voting Rights Act. *See Jones*, 2019 WL 7500528, at *4-5; *Allen v. City of Evergreen*, No. 13-0107, 2014 WL 12607819, at *2 (S.D. Ala. Jan. 13, 2014).

- Individuals with lower household incomes are less likely to vote.

- Alabama's policy of denying Black people equal access to education persisted after the Supreme Court's decision in *Brown v. Board of Education*. In 1956, after a federal court ordered the segregated University of Alabama to admit a Black woman named Autherine Lucy, white people gathered on campus, burned a cross, and marched through town chanting, "Hey, hey, ho, ho, Autherine has got to go!"

- In 2018, in a case challenging the attempt by the City of Gardendale, which is 85% white, to form a school district separate from Jefferson County's more racially diverse district, the Eleventh Circuit affirmed a finding that "race was a motivating factor" in the city's effort. *Stout v. Jefferson Cnty. Bd. of Ed.*, 882 F.3d 988, 1007-1009 (11th Cir. 2018).

- Alabama's constitution still contains language that mandates separate schools for Black and white students after a majority of voters rejected repeal attempts in 2004 and 2012, although the provision has not been enforceable for decades.

- Alabama was the first state ever to be subjected to a statewide injunction prohibiting the state from failing to disestablish its racially dual school system. *Lee v. Macon Cty. Bd. of Ed.*, 267 F. Supp. 458 (M.D. Ala.), *aff'd* 389 U.S. 215 (1967). The order resulted from the court's finding that the State Board of Education, through Governor George Wallace, had previously wielded its powers to maintain segregation across the state. *Id.*

- A trial court found that for decades, state officials ignored their duties under the statewide desegregation order. *See Lee v. Lee Cnty. Bd. of Educ.*, 963 F. Supp. 1122, 1128-30 (M.D. Ala. 1997). A court also found that the state did not satisfy its obligations to remedy the vestiges of segregation under this order until as late as 2007. *Lee v. Lee County Bd. of Educ.*, 476 F. Supp. 2d 1356 (M.D. Ala. 2007).

- In 1991, a trial court in *Knight v. Alabama*, 787 F. Supp. 1030 (N.D. Ala. 1991), found that Alabama had failed to eliminate the lingering and continued effects of segregation and discrimination in the University of Alabama and

Auburn University, and at the state's public Historically Black Colleges and Universities (HBCUs).

- In 1995, the trial court issued a remedial decree analogous to the statewide injunction issued in *Lee v. Macon*, and the court oversaw implementation of that order for over a decade. *Knight v. State of Ala.*, 900 F. Supp. 272 (N.D. Ala. 1995). Alabama did not satisfy its obligations under that order until 2006. *Knight v. Alabama*, 469 F. Supp. 2d 1016 (N.D. Ala. 2006).

*Milligan* Doc. 53 ¶¶ 130–54, 157–65.

In addition to the stipulated facts, the *Milligan* plaintiffs rely on the expert testimony of Dr. Joseph Bagley. *See Milligan* Doc. 69 at 17–18. Dr. Bagley is an Assistant Professor of History at Georgia State University, where he focuses on "United States constitutional and legal history, politics, and race relations, with a focus on Alabama and Georgia." *Milligan* Doc. 68-2 at 1. He has published one book and been accepted as an expert in another voting rights case. *Id.* At the preliminary injunction hearing, he was qualified as an expert in Alabama political history and historical methodology without objection from any party. Tr. 1142. The *Milligan* plaintiffs asked Dr. Bagley to perform a Senate Factors analysis, which he did according to "common standards of historiography." *Milligan* Doc. 68-2 at 1; Tr. 1143. For the reasons explained in our findings of fact and conclusions of law (*see infra* Part V.B.4.c), we find that Dr. Bagley is a credible expert witness.

At the preliminary injunction hearing, Dr. Bagley explained his understanding of the Senate Factors and the methods and sources he used to perform his analysis. Tr. 1143–46. Dr. Bagley opined about Senate Factors 1, 5, 6, 7, and 8, and he

considered Senate Factor 3 in connection with his discussion of Senate Factor 1. *Milligan* Doc. 68-2 at 3–31. His ultimate opinion is that each of those Senate Factors is present, and that together they mean that the Plan "will deny [B]lack Alabamians an equitable right to elect candidates of their choices." Tr. 1177.

When Dr. Bagley explained his opinions at the preliminary injunction hearing, he began by testifying that the Alabama Constitution of 1901 remains in force today, explaining that the enactment of that constitution was explicitly for the purpose of "establish[ing] white supremacy" and "disenfranchis[ing] entirely [B]lack voters," Tr. 1146, and explaining that although many provisions of that constitution have been invalidated, blocked, or nullified, "racist" and "discriminatory" language remains in force in that constitution to this day, Tr. 1146–47.

As to Senate Factor 1, Dr. Bagley testified that he focused his analysis on the redistricting context beginning in the 1960s and continuing to the present. Tr. 1148–55. He tracked the extensive history of federal judicial involvement in and supervision of Alabama redistricting efforts during that sixty-year period, *Milligan* Doc. 68-2 at 8–16; Tr. 1148–55, and he concluded that "Alabama has an undisputed history of discrimination against Black citizens, especially when it comes to registering to vote, voting, and enjoying an equitable chance to participate in the political process, and this has been recognized by numerous courts." *Milligan* Doc. 68-2 at 3. "In particular," he continued, "white legislators of both major political

parties have, in the last 50 years, manipulated the redistricting process to prevent Black citizens from electing members of Congress or, in the last 30 years, to limit Black voters' ability to elect members of Congress from more than one district." *Id.*

As to Senate Factor 5, Dr. Bagley opined in his report that "Black citizens in Alabama lag behind their white counterparts in nearly every statistical socioeconomic category, due largely to a history of discrimination," and that these disparities adversely affect Black voters' "ability to engage politically." *Milligan* Doc. 68-2 at 17–26. At the preliminary injunction hearing, Dr. Bagley explained at a high level the bases for the detailed opinions on these issues that appear in his report, Tr. 1155–58, which include federal court findings of workplace, educational, and other forms of discrimination against Black people by local governments and state entities, Tr. 1158–61, and active litigation in federal court concerning such matters. Dr. Bagley also testified about the historical and cultural significance of the Black Belt and the "extreme poverty" and environmental pollution there. Tr. 1161-65.

As to Senate Factor 6, Dr. Bagley testified that he considers a racial appeal in a political campaign to occur when "a candidate is making an appeal that would seem to be intended to encourage a racial group to vote bloc." Tr. 1169. Dr. Bagley opined in his report that white officials in Alabama "learned long ago to colormask their public statements," that his analysis of campaign ads, public speech, and

campaign appeals on social media "reveal that direct invocations of race still appeal to white voters," and that "campaigns and politicians' public statements have recently trended back towards more overt racial appeals," *Milligan* Doc. 68-2 at 3, 26–27. Dr. Bagley gave in his report examples of racial appeals from former elected officials in Alabama (*e.g.,* former Alabama Supreme Court Chief Justice Roy Moore and former Congressman Bradley Byrne) as well as current officeholders (Alabama Supreme Court Chief Justice Tom Parker, Congressman Mo Brooks, Congressman Barry Moore, and Representative Chris Pringle), *id.* at 26–28, and he described some of these examples at the preliminary injunction hearing, Tr. 1169–71.

As to Senate Factor 7, Dr. Bagley opined in his report that "the ability of Black Alabamians to elect candidates from among their own to statewide offices has been almost nonexistent, while Black candidates have had some success at the local level, thanks to litigation and federal government intervention." *Milligan* Doc. 68-2 at 3. Dr. Bagley pointed out that only three Black people have ever held any statewide office, and that none hold statewide office presently or have held such office in the last twenty years. *Id.* at 29; Tr. 1171–72.

As to Senate Factor 8, Dr. Bagley opined that Alabama's lack of responsiveness to the needs of Black people is "exemplified" by the Legislature's failure to draw a second majority-Black congressional district. *Milligan* Doc. 68-2 at 29; Tr. 1173. He also opined that the state's response to the COVID-19 pandemic

reflected a lack of response to the particular needs of the Black community, and he referenced inequitable distribution of vaccines. *Milligan* Doc. 68-2 at 29. He argued that many of the discriminatory experiences that he identified as part of his analysis of Senate Factor 5 also evince Alabama's lack of responsiveness to the needs of Black Alabamians. *Id.* at 30–31; Tr. 1173–74.

Finally, the *Milligan* plaintiffs make a proportionality argument: that "[d]espite Black Alabamians constituting nearly 27% of the population, they only have meaningful influence in" 14% of congressional seats. *Milligan* Doc. 69 at 17; *see also* Tr. 609 (Dr. Duchin testimony that "majority-white districts are present in the enacted plan super proportionally with respect to population"); Tr. 1171 (Dr. Bagley testimony that "as 27 percent of the population, you have to compare that to one district out of seven being around, you know, 14 percent in terms of potential for representation").

For all of these reasons, the *Milligan* plaintiffs assert that they will prevail on their claim of vote dilution under the totality of the circumstances.

### 4. Remaining Elements of Request for Preliminary Injunctive Relief

As to the remaining elements of their request for a preliminary injunction, the *Milligan* plaintiffs assert that they will suffer an irreparable harm absent a preliminary injunction because "[a]ny loss of constitutional rights is presumed to be an irreparable injury." *Milligan* Doc. 69 at 37 (citing *Elrod v. Burns*, 427 U.S. 347,

373 (1976)). The *Milligan* plaintiffs argue that the equities favor them because they have a "particularly strong interest in exercising their right to vote free from a racially discriminatory districting scheme that dilutes their vote"; there is "no harm [to the Defendants] from the state's nonenforcement of invalid legislation"; and in any event, because Alabama enacted the Plan in a five-day special session last year, Alabama could quickly enact a remedial map in January 2022 so that the 2022 congressional elections could go forward with a valid map, or the court could draw an interim map in that timeframe. *Id.* at 38–39 (quoting *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012)). The *Milligan* plaintiffs point out that the primary election is months away and contend that the injury they allege to their voting rights outweighs whatever administrative inconvenience might be caused by an injunction. *Id.* at 39–40. Finally, the *Milligan* plaintiffs argue that a preliminary injunction is in the public interest because protection of the franchise is in the public interest. *Id.* at 40.

### B. The *Caster* Plaintiffs' Arguments

In the light of the parties' agreement that argument and evidence developed in *Caster* is admissible in *Milligan* absent a specific objection, *see Singleton* Doc. 72-1; *Caster* Doc. 74; Tr. of Dec. 20, 2021 Hrg. at 14–17, we next discuss the arguments and evidence developed by the *Caster* plaintiffs in support of their Section Two claim. The *Caster* plaintiffs first argue that they are substantially likely

to succeed on their Section Two claim because they satisfy each of the *Gingles* requirements and prevail on an analysis of the totality of the circumstances.

### 1.  *Gingles* I – Numerosity and Reasonable Compactness

To establish the first *Gingles* requirement, the *Caster* plaintiffs rely on the expert testimony of Mr. Bill Cooper. *See Caster* Doc. 56 at 12; *Caster* Doc. 48 (original report); *Caster* Doc. 65 (rebuttal report). Mr. Cooper earned a bachelor's degree in economics from Davidson College and has earned his living for the last thirty years by drawing maps, both for electoral purposes and for demographic analysis. *Caster* Doc. 48 at 1; Tr. 418–19. He has extensive experience testifying in federal courts about redistricting issues and has been qualified in forty-five voting rights cases in nineteen states, including two recent cases in Alabama (*Alabama Legislative Black Caucus*, 231 F. Supp. 3d 1026 (M.D. Ala. 2017), and *Chestnut v. Merrill*, No. 2:18-CV-00907-KOB). *Caster* Doc. 48 at 1–2; Tr. 421. He reported that five of those lawsuits "resulted in changes to statewide legislative boundaries," and "[a]pproximately 25 of the cases led to changes in local election district plans." *Caster* Doc. 48 at 2. He has worked both on behalf of plaintiffs and on behalf of defendants in redistricting cases. Tr. 421–22. At the preliminary injunction hearing, he was qualified as an expert in redistricting, demographics, and census data without objection from any party. Tr. 422–23. For the reasons explained in our findings of

fact and conclusions of law (*see infra* Part V.B.2.a), we find Mr. Cooper's testimony highly credible.

In Mr. Cooper's initial report, he provided demographic statistics about Alabama and demographic changes that occurred in Alabama between the 2010 census and the 2020 census. *See Caster* Doc. 48 at 5–10. Mr. Cooper reported that according to 2020 census data, Alabama's any-part Black population increased by 83,618 residents, which constitutes a 6.53% increase in Alabama's Black population since 2010, which is 34% of the state's entire population increase since then. *Id.* at 6–7. In the same period, Alabama's white population shrunk from 67.04% of the state's total population to 63.12% of its total population. *Id.* at 6 (And in the 1990 census data, which were used in *Wesch*, Alabama's white population was 73.65% of its total population. *See Wesch*, 785 F. Supp. at 1503 app. B.)

Mr. Cooper also offered six illustrative plans in his initial report, each of which includes two congressional districts (Districts 2 and 7, located in southern and central Alabama) with a BVAP over 50% using the any-part Black metric. *Caster* Doc. 48 at 20–36 (initial report about Cooper plans 1–6). Mr. Cooper offered a seventh illustrative plan in his rebuttal report, which also includes two congressional districts with a BVAP over 50% using the any-part Black metric. *Caster* Doc. 65 at 2–6 (rebuttal report about Cooper plan 7). In all the majority-Black districts in all the Cooper plans, the BVAP is between 50% and 52%, except that in two plans, the

District 7 BVAP is between 53% and 54%. *See Caster* Doc. 48 at 23–35; *Caster* Doc. 65 at 2–5.

At the preliminary injunction hearing, Mr. Cooper testified that his opinions are based on these seven illustrative plans, Tr. 424, 426–28, and that even if the more restrictive single-race Black metric were used to measure BVAP, one of his plans (Cooper Plan 6) demonstrates that Black Alabamians are sufficiently numerous to comprise two majority-Black congressional districts in Alabama. Tr. 452–56, 475; *Caster* Doc. 65 at 5 n.2 (Cooper Rebuttal Report: "Under Illustrative Plan 6, District 2 and District 7 are also majority [single-race] BVAP – 50.19% and 50.05%, respectively.").

Mr. Cooper testified that he expected to be able to draw illustrative plans with two reasonably compact majority-Black congressional districts because, at the same time the Legislature enacted the Plan, the Legislature also enacted a redistricting plan for the State Board of Education, which plan included two majority-Black districts. *Caster* Doc. 48 at 15–20; Tr. 433–37. Mr. Cooper testified that the Board of Education plan has included two Black-opportunity districts since 1996, and that continuously for those twenty-five years, more than half of Black voters in Alabama have lived in one of those two districts. *Caster* Doc. 48 at 16; Tr. 435. Mr. Cooper explained that the Board of Education plan splits Mobile County into two districts (with one district connecting Mobile County to Montgomery County, and another

connecting Mobile County to Baldwin County). Tr. 435–36; *Caster* Doc. 48 at 17 fig.8.

Mr. Cooper also testified about his understanding of traditional districting criteria, how he considered them in his work, and the role that he assigned to race. Tr. 437–41. He explained:

> Q.  So what specific traditional districting principles did you consider in drawing the illustrative plans in this case?
>
> A.  Well, I took all of them into consideration. I examined the document produced back in May by the Alabama Legislature outlining the guidelines for redistricting. But a lot of that just incorporates the general concept of traditional redistricting principles. So I didn't prioritize any of them. I tried to balance them.
>
> …
>
> Q.  So was any one factor of the ones we just mentioned predominant, the predominant factor when you were preparing your illustrative plans in this case?
>
> A.  Not really. I feel like I gave them equal weighting. It would be possible to prioritize others and come up with different configurations, but perhaps at the expense of one of the key redistricting principles. So you could draw very compact districts, but they might split numerous counties because they're perfect squares. Or you draw a district that is -- two districts that are maybe 60 percent [B]lack, but they wouldn't be contiguous. That, you know, so you have to balance it.
>
> Q.  And did race predominate in your development of any of the illustrative plans?
>
> A.  No. It was a consideration. This is a Section 2 lawsuit, after all. But it did not predominate or dominate.

Tr. 439–41.

Mr. Cooper testified that it was "necessary" for him to consider race to opine whether "the [B]lack population is sufficiently large and geographically compact to allow for the creation of an additional majority-[B]lack district," and that "[o]ne of the traditional redistricting principles is to be aware" that "you are not diluting minority voting strengths when you are developing a voting plan and the underlying districts." Tr. 437; *accord* Tr. 478–49 (cross).

Mr. Cooper further testified that if he had wanted to assign race a greater role, he could have:

> But I did not try to maximize Black Voting Age Population. You know, my plans were intended to balance those. If I had just wanted to go in there willy-nilly and create two majority-[B]lack districts without paying attention to county lines, without paying attention to precinct lines, without paying attention to municipal lines, I could have drawn a fairly compact looking district that would have been higher in Black VAP for both District 7[] and District 2. I'm balancing things, and I'm not trying to take things to extreme, so I can't give you a really good -- I can't give you a really good example of what extreme I might have been able to hit. But these plans in no way maximize Black Voting [A]ge Population in District 2 and 7.

Tr. 503.

Mr. Cooper testified that all his plans reflect population equality across districts, within a one-person margin of deviation for all districts except two districts, which deviate by two people. Tr. 441, 443.

When Mr. Cooper was asked how his illustrative plans show "respect for political subdivision boundaries," he replied that he "felt like it was important to

Page **88** of **225**

either meet or beat the county split achievement of [the Plan]," which splits six counties, and that each of his illustrative plans splits between five and seven counties. Tr. 441–42; *Caster* Doc. 48 at 22; *Caster* Doc. 65 at 5. Mr. Cooper further testified that if he had to split a county, he then tried to minimize precinct splits, and if he had to split a precinct to get to zero population deviation, he then tried to rely on "municipal lines, primary roads, [and] waterways." Tr. 443–44.

Mr. Cooper testified that he considered geographic compactness by "eyeballing" as he drew his plans, obtaining readouts of the Reock and Polsby-Popper compactness scores from the software program he was using as he drew, and trying to "make sure that [his] score was sort of in the ballpark of" the score for the Plan, which he used as a "possible yardstick." Tr. 444–46. He explained the meaning of both scores and that it was possible to be "really obsessive about [them]." Tr. 444. Both in his expert report and at the preliminary injunction hearing, he testified that all of his plans either are at least as compact as the Plan (Cooper Plan 7 has a slightly higher Reock score, Tr. 460), or they scored "slightly lower" than the Plan; he opined that all of his plans are "certainly within the normal range if you look at districts around the country." Tr. 446, 458; *accord Caster* Doc. 48 at 35–37. Mr. Cooper's rebuttal report offered Cooper plan 7 specifically in response to criticism from the Defendants' expert, Thomas Bryan, that the first six Cooper plans were insufficiently compact. *See Caster* Doc. 65 at 2 (Cooper rebuttal report).

Page **89** of **225**

Mr. Cooper testified that his software allowed him to have an "instant readout as to whether the district" he was drawing was contiguous, and he "took that into account." Tr. 446. In his report, he testified that all of his illustrative plans comply with the requirement of contiguity. *Caster* Doc. 48 at 21.

Mr. Cooper further testified that he considered communities of interest in two ways: first, he considered "political subdivisions like counties and towns and cities," and second, that he has "some knowledge of historical boundaries" and the Black Belt, and he considered the Black Belt. Tr. 447.

At the preliminary injunction hearing, Mr. Cooper testified in detail about how each of his illustrative plans configures Districts 2 and 7 as majority-Black districts, as well about other key features of his plans – namely, that Cooper Plan 5 includes two majority-Black districts and protects all incumbents, Tr. 468, and that Cooper Plan 7 includes two majority-Black districts and is at least as compact, if not more compact, than the Plan, Tr. 472. Ultimately, Mr. Cooper opined that each of his illustrative plans "achieves the goals of population equality, contiguity, compactness, respect for political subdivision boundaries, communities of interest, and non[-]dilution of minority voting strength." Tr. 474.

At the conclusion of his testimony about the *Caster* plaintiffs' claims, Mr. Cooper was called by the State to testify about matters relevant to the *Singleton* action. Tr. 525–26. During that examination, Mr. Cooper testified that before he was

engaged by the *Caster* plaintiffs, counsel for the *Singleton* plaintiffs asked him to draw a draft plan that ultimately became the Whole County Plan. Tr. 527–28. Mr. Cooper further testified that he drew that draft plan and that he did so in "half of an afternoon," and "[n]ot for pay." Tr. 527–28.

At the preliminary injunction hearing, the *Caster* plaintiffs also relied on the testimony of two of the named plaintiffs. Plaintiff Benjamin Jones is Black and lives in Montgomery in District 2. Mr. Jones works as the CEO of a community action agency in Montgomery and pastors a church in nearby Pike Road, Alabama. Tr. 1343–44. Mr. Jones testified about the unique needs of the Black community in Montgomery and what he believes the Black community in Montgomery has in common with the Black Belt. Tr. 1348–56, 1359. Plaintiff Marcus Caster is Black and lives in McIntosh, Alabama, which is in Washington County in District 1. Dr. Caster works as a teacher in the Clarke County school system and as an adjunct professor of business. Tr. 1620–21. In 2018, Dr. Caster was a candidate for a state legislative seat. Tr. 1622–23. Dr. Caster testified about the needs of the Black community in his area and what he believes the Black community in his area shares in common with the Black Belt. Tr. 1636–38. Dr. Caster specifically testified that "[B]lack residents of [his] area [and] the city of Mobile have more in common with the Black Belt region . . . than they do with Baldwin County," and that "[B]lack

residents of Washington and Mobile County would be better served if they were a part of the congressional district that covered the Black Belt." Tr. 1636–38.

### 2. *Gingles* II and III – Racially Polarized Voting

To satisfy the second and third *Gingles* requirements, that Black voters are "politically cohesive," and that each challenged district's white majority votes "sufficiently as a bloc to usually defeat [Black voters'] preferred candidate." *Cooper*, 137 S. Ct. at 1470 (internal quotation marks omitted), the *Caster* plaintiffs rely on a racial polarization analysis conducted by Dr. Maxwell Palmer as well as numerous federal court decisions.

Dr. Palmer is a tenured Associate Professor of Political Science at Boston University, where he has been on the faculty since he earned his doctorate in political science at Harvard University in 2014. *Caster* Doc. 49 at 1. His work focuses on American politics and political methodology. *Id.* He has published one book and numerous articles in peer-reviewed journals, including the American Political Science Review, Journal of Politics, British Journal of Political Science, Journal of Empirical Legal Studies, and Political Science Research and Methods. *Id.* He has extensive experience as an expert witness and litigation consultant in redistricting cases, and he served as an independent racially polarized voting analyst for the Virginia Redistricting Commission in 2021. *Id.* At the preliminary injunction hearing, Dr. Palmer was qualified as an expert in redistricting and data analysis with

no objection from any party. Tr. 700–01. For the reasons explained in our findings of fact and conclusions of law (*see infra* Part V.B.3), we find that Dr. Palmer is a credible expert witness.

Dr. Palmer analyzed the extent to which voting is racially polarized in Congressional Districts 1, 2, 3, 6, and 7 because he was told that the proposed Black-opportunity districts would include voters from those districts. *Caster* Doc. 49 ¶ 9; Tr. 704. He examined how voters in those districts voted in the 2012, 2014, 2016, 2018, and 2020 general elections, as well as the 2017 special election for the United States Senate, and statewide elections for President, the United States Senate, Governor, Lieutenant Governor, Secretary of State, Attorney General, and several other offices. *Id.* ¶¶ 6–7, 10; *see also* Tr. 707–13 (explaining how he used precinct-level data and analyzed the results on a district-by-district basis).

He used publicly available data, including census data, that he ordinarily uses in research of this nature, and he relied on the ecological inference statistical procedure that "estimates group-level preferences based on aggregate data." *Id.* ¶¶ 11–13.

Dr. Palmer opined in his report that "Black voters are extremely cohesive," *id.* ¶ 16, "[w]hite voters are highly cohesive," *id.* ¶ 17, and "[i]n every election, Black voters have a clear candidate of choice, and [w]hite voters are strongly opposed to this candidate," *id.* ¶ 18. Dr. Palmer concluded that "[o]n average, Black voters

supported their candidates of choice with 92.3% of the vote[,]" and "[o]n average, [w]hite voters supported Black-preferred candidates with 15.4% of the vote, and in no election did this estimate exceed 26%." *Id.* ¶¶ 16–17. He further opined that there is "strong evidence of racially polarized voting in each of the five congressional districts." *Id.* ¶ 21. He found "strong evidence of racially polarized voting across [his] focus area," as well as "strong evidence of racially polarized voting in each of the five individual congressional districts." *Id.* ¶ 6.

At the preliminary injunction hearing, Dr. Palmer testified about the ecological inference method that he used, Tr. 703–05, and explained that he selected that methodology because in his opinion it is "the best available method for assessing racially polarized voting" and his "understanding is that ecological inference is the [method] currently preferred by courts," Tr. 705–06. He described his analysis step-by-step, Tr. 706–716, and characterized the evidence of racially polarized voting across the five districts he studied as "very strong," Tr. 701.

He testified that he next examined whether the Black-preferred candidates were able to win elections in the districts that he studied. Tr. 716. Dr. Palmer testified that in his examination of statewide elections, he considered the share of the vote that the Black-preferred candidate was able to win in the districts that he was focused on, Tr. 717, and that the Black-preferred candidate was able to win only one out of twelve elections that he studied (when Doug Jones, a white Democrat, beat Roy

Moore, a controversial Republican accused of sexual misconduct, in the special election for the United States Senate in 2017). Tr. 717–18. Dr. Palmer testified that in his examination of elections in congressional districts, the Black-preferred candidate won only those elections that occurred in District 7, the majority-Black congressional district. Tr. 718. Accordingly, Dr. Palmer testified that his conclusion was that "Black-preferred candidates are largely unable to win elections in the focus area with the exception of" District 7. Tr. 719.

In addition to his analysis of racially polarized voting, Dr. Palmer also performed a functionality analysis to analyze the performance of the majority-Black districts in the Cooper plans. *See Caster* Doc. 49 at 9–11, figs.6–7, tabs.10–15; Tr. 720–22. At the preliminary injunction hearing, Dr. Palmer explained his analysis and the results that appear in his report, Tr. 720–22, and he concluded that across the six Cooper Plans, "[B]lack-preferred candidates are able to win every election in both the Second and Seventh Congressional District," Tr. 721.

The *Caster* plaintiffs argue that Dr. Palmer's conclusions fit with a "long line of federal courts that have concluded that Black voters in various parts of Alabama vote cohesively," and that because of the confluence of Dr. Palmer's analysis and these authorities, "cohesion among Black voters in Alabama remains beyond dispute." *Caster* Doc. 56 at 14–15 (citing *Ala. State Conf. of NAACP*, 2020 WL 583803, at *35; *Ala. State Conf. of NAACP v. City of Pleasant Grove*, 372 F. Supp.

Page **95** of **225**

136

3d 1333, 1340 (N.D. Ala. 2019); *Jones v. Jefferson Cnty. Bd. of Educ.*, No. 2:19-cv-1821-MHH, 2019 WL 7500528, at *2 (N.D. Ala. Dec. 16, 2019); *Dillard v. City of Greensboro*, 946 F. Supp. 946, 952–53 (M.D. Ala. 1996); *Dillard v. Baldwin Cnty. Bd. Of Educ.*, 686 F. Supp. 1459, 1465 (M.D. Ala. 1988)). The *Caster* plaintiffs also argue that several of these authorities conclude that Black-preferred candidates are consistently defeated by white bloc voting, except when Black voters make up a majority of eligible voters. *See Caster* Doc. 56 at 16.

### 3.    The Senate Factors and Proportionality

Next, the *Caster* plaintiffs turn to the totality of the circumstances. They begin with several proportionality arguments. *See id.* at 19–20. *First,* they argue that Black Alabamians are disproportionately under-represented in the Plan, because they comprise 27% of the population of the state but have an opportunity to elect a representative of their choice in only 14% of the congressional districts. *See id.* at 19; Tr. 432. *Second*, they argue that white Alabamians are over-represented because 86% of congressional districts are majority-white, but white Alabamians comprise only 63% of the population; they also argue that even if Alabama were to draw a second majority-Black congressional district, this circumstance would persist, because 71.5% of congressional districts would be majority-white. *See Caster* Doc. 56 at 19–20; Tr. 432–33. And *third*, they argue that under the Plan, less than one-third of Alabama's Black population resides in a majority-Black district, while 92%

of Alabama's non-Hispanic white population resides in a majority-white district. *See Caster* Doc. 48 ¶ 28; Tr. 431.

The *Caster* plaintiffs then analyze the Senate Factors, and they rely on three sources of support: judicial authorities, facts stipulated by the parties, and the testimony of political scientist Dr. Bridgett King. Dr. King is a tenured Associate Professor of Political Science at Auburn University in Auburn, Alabama, where she joined the faculty in 2014 and her research focuses on election administration, public policy, citizen voting experiences, and race/ethnicity. *Caster* Doc. 50 at 1–3. Her research on election administration is supported by the National Science Foundation. *Id.* at 3. She has edited four books, authored eight book chapters, and published ten articles in peer-reviewed journals that include the Election Law Journal, Journal of Black Studies, and Social Science Quarterly. *Id.* at 4. At the hearing, Dr. King was qualified as an expert in political science, research methodology, history of voting, and elections in the United States and Alabama, voting behavior, and the matters discussed in her reports without objection from any party. Tr. 1506–07. For the reasons explained in our findings of fact and conclusions of law (*see infra* Part V.B.4.c), we find that Dr. King is a credible expert witness.

Dr. King submitted a fifty-six-page report setting forth her opinion as to each Senate Factor. *Caster* Doc. 50. She "reviewed Alabama's well-documented, pervasive, and sordid history of racial discrimination in the context of voting and

political participation" and opined that "the continuing effects of this discrimination . . . , the persistence of severe and ongoing racially polarized voting, and the state's racialized politics significantly and adversely impact the ability of Black Alabamians to participate equally in the state's political process." *Caster* Doc. 50 at 4.

As to Senate Factor 1, the *Caster* plaintiffs observe that numerous federal courts have recognized Alabama's history of official discrimination and that multiple federal courts have recognized Alabama's history of official discrimination in voting. *See Caster* Doc. 56 at 20–22 (collecting cases between 1963 and *Alabama Legislative Black Caucus* in 2017, in which the court invalidated twelve state legislative districts as racial gerrymanders).

The *Caster* plaintiffs assert that the passage of the Voting Rights Act "did not, and has not, stopped Alabama from continuing to try to reduce and dilute the Black vote." *Id.* at 21. As support, the *Caster* plaintiff rely on the facts, jointly stipulated by the parties, that (1) since the passage of the Voting Rights Act, the Justice Department has sent election observers to Alabama nearly 200 different times, and (2) that between 1965 and 2013, more than 100 voting changes proposed by the State or its local jurisdictions were blocked or altered under Section 5 of the Voting Rights Act. *Id.* at 21–22 (citing *Caster* Doc. 44 ¶¶ 117–18).

As to Senate Factor 2, the *Caster* plaintiffs rely on the evidence of racially polarized voting and lack of success for Black-preferred candidates that they

submitted to establish the second and third *Gingles* requirements. *See Caster* Doc. 56 at 26. As to Senate Factor 3, the *Caster* plaintiffs argue that Alabama "has employed a variety of voting practices designed to discriminate against Black voters." *Id.* at 26. They rely on testimony from Dr. King about Alabama's reliance on at-large elections, anti-single shot voting laws, majority-vote requirements, and numbered-place requirements. *See id.* The *Caster* plaintiffs do not analyze Senate Factor 4 because Alabama's congressional elections do not use a slating process. *Id.* at 27.

As to Senate Factor 5, the *Caster* plaintiffs argue that "[t]here can be no question that the wellbeing of Alabama's Black community continues to suffer as a result of the State's history of discrimination" because "Black Alabamians lag behind their white counterparts on nearly every socioeconomic indicator." *Id.* Here they rely on demographic statistics supplied by Mr. Cooper, who opined about substantial lags on several socioeconomic indicators: rates of poverty and child poverty, reliance on food stamps, levels of educational attainment, rates of unemployment, participation in professional occupations, homeownership, home value, and access to transportation. *See Caster* Doc. 48 at 37–39. At the preliminary injunction hearing, Mr. Cooper testified that these disparities are "just clearly apparent . . . to most anyone, and data really brings it out." Tr. 424.

The *Caster* plaintiffs further argue that although they are not required to establish that these disparities depress Black political participation, Dr. King's opinion is that they do. *Caster* Doc. 56 at 18, 27–31. The *Caster* plaintiffs offered as additional evidence testimony in another redistricting case (*Chestnut*) from a county commissioner, state representative, and one of the named plaintiffs in *Caster* to the effect that these socioeconomic disparities compromise Black Alabamians' "faith in the system." *Id.* at 27–28 (internal quotation marks omitted).

As to Senate Factor 6, the *Caster* plaintiffs argue that "Alabama politicians have consistently utilized racial appeals to influence voter behavior." *Id.* at 31. The *Caster* plaintiffs' examples of recent racial appeals include (1) Representative Mo Brooks' 2014 assertion that Democrats are "waging a war on whites," (2) former Supreme Court Chief Justice Roy Moore's 2017 assertion that the federal government "started [to] create new rights in 1965, and today we've got a problem," (3) State Representative Will Dismukes' 2020 speech in front of a Confederate flag in Selma honoring Confederate General Nathan Bedford Forrest, who became the first Grand Wizard of the Ku Klux Klan, and (4) Congressman Bradley Byrne's ad "showing Congresswomen Ilhan Omar, Alexandria Ocasio-Cortez, Ayanna Pressley, and Rashida Talib, and former NFL quarterback Colin Kaepernick—all people of color—burning in a fire juxtaposed against references to the 9/11 terrorist attacks." *Id.* at 32–33 (internal quotation marks omitted).

As to Senate Factor 7, the *Caster* plaintiffs argue that there can be no question that Black Alabamians are underrepresented in public office. The *Caster* plaintiffs point out that the parties have stipulated that Earl Hilliard, who was elected to Congress in 1992, was the first Black person to represent Alabama there since the 19th century; that only two Black candidates have been elected to statewide office in Alabama, both of whom ran as incumbents after being first appointed; that no Black person has won statewide office in twenty-five years; and that only one Black member of the Legislature is not elected from a majority-Black district. *Id.* at 34.

As to Senate Factor 8, the *Caster* plaintiffs argue that the clearest indicator that Alabama is not responsive to its Black voters is its failure to remedy the socioeconomic disparities that established Senate Factor 5. *Id.* at 35. And like the *Milligan* plaintiffs, the *Caster* plaintiffs argue that the state's response to the COVID-19 pandemic "has exemplified and exacerbated its historic neglect of Black residents," and the *Caster* plaintiffs describe race-based disparities in access to testing and vaccines. *Id.* at 36–37.

Finally, as to Senate Factor 9, the *Caster* plaintiffs argue that the justification for the Plan is tenuous at best, and that the Legislators' failure to conduct a racial-polarization analysis before refusing to draw a second majority-Black congressional district undermines whatever justification may exist. *Id.* at 38.

### 4.      Remaining Elements of Request for Preliminary Injunctive Relief

The *Caster* plaintiffs argue that Black voters in Alabama will suffer irreparable harm incapable of redress if the election occurs and we later determine that the Plan diluted their votes. *Id.* at 38–39.  And the *Caster* plaintiffs urge that a preliminary injunction is in the public interest and the equities favor an injunction because protection of the franchise is in the public interest. *Id.* at 39–40.

### C.     Defendants' Arguments - *Milligan*

Defendants' position is that "[n]othing in Section 2 supports Plaintiffs' extraordinary request that this Court impose districts with Plaintiffs' surgically targeted racial compositions while jettisoning numerous traditional districting criteria." *Milligan* Doc. 78 at 18. More particularly, Defendants assert that the *Milligan* plaintiffs are unlikely to prevail on their Section Two claim for four reasons. Defendants first argue that the *Milligan* plaintiffs cannot establish any of the *Gingles* requirements and that even if they could, they are unlikely to prevail in an analysis of the totality of the circumstances. *Id.* at 63–124. We consider that argument in this part, and Defendants' other three arguments in Part IV.E.

### 1.      *Gingles* I – Numerosity and Reasonable Compactness

Defendants assert that the *Milligan* plaintiffs are unlikely to succeed on their Section Two claim because the Duchin plans do not satisfy the first *Gingles* requirement. Defendants assert that using the single-race Black metric, only Duchin

plan A includes a second majority-Black congressional district, and that the majority-Black congressional districts in all the Duchin plans are not reasonably compact because those plans "completely ignore traditional districting criteria," "eviscerate the State's political geography by carving up Alabama's longstanding existing districts . . . splicing together areas with no common interests . . . and consequently pitting incumbents against each other," and "subjugat[e] traditional districting criteria to race." *Milligan* Doc. 78 at 18, 41. Defendants rely on the testimony of their *Gingles* I expert, Mr. Thomas M. Bryan.

Mr. Bryan's credentials include an undergraduate degree in history and a graduate degree in urban studies from Portland State University, and a graduate degree in management and information systems from George Washington University. *Milligan* Doc. 66-2 at 2. Mr. Bryan formerly worked as an analyst for the Oregon State Data Center and as a statistician for the U.S. Census Bureau. *Id.* For the past twenty years, Mr. Bryan has owned a demographic consultancy and has "been involved with over 40 significant redistricting projects, serving roles of increasing responsibility." *Id.* at 2–3. At the preliminary injunction hearing, Mr. Bryan was qualified as an expert in redistricting, demography, statistical transformation, and predicting population shifts, without objection from any party. Tr. 772–74. For the reasons explained in our findings of fact and conclusions of law (*see infra* Part V.B.2.a), we assign very little weight to Mr. Bryan's testimony.

In their opposition to the *Milligan* plaintiffs' motion for a preliminary injunction, Defendants speculate that the *Milligan* plaintiffs may have cherry-picked different definitions for their arguments about numerosity and racially polarized voting: Defendants suggests that the *Milligan* plaintiffs' *Gingles* II and III experts may have relied on the single-race Black metric to assess racially polarized voting, while the *Gingles* I expert relied on the any-part Black metric to assess numerosity. *Milligan* Doc. 78 at 67–69. Defendants further argue that Dr. Duchin "did not try to preserve the cores of prior districts," *id.* at 40, and did not "even consider the State's traditional interests in avoiding contests between incumbents," *id.* at 71. Defendants emphasize that incumbents may achieve seniority in Congress and develop longstanding relationships with constituents, and that the cores of Alabama's congressional districts have been stable for approximately fifty years (with the exception of the 1992 map, which was "a substantial change"). *See id.* at 76–78.

Defendants also argue that the *Milligan* plaintiffs cannot establish reasonable compactness because their remedial maps do not respect communities of interest—namely, Alabama's Gulf Coast region, including Mobile and Baldwin Counties, which the Plan includes in District 1, and Alabama's Wiregrass region, which the Plan includes with the Montgomery metropolitan area in District 2. *Id.* at 82–83. Defendants contend that the Gulf Coast region is a "discrete community of interest with unique cultural, economic, and historical traits not shared by the rest of the

State. The communities in District 1 share a highway and river system; Mobile Bay and the Gulf of Mexico; and employers whose work centers around the Port of Mobile. The people of District 1 also share a unique history, including heavy Spanish and French influence, the origination of Mardi Gras in the New World, and all the attributes that come from being Alabama's only coastal region." *Id.* at 82 (internal citations omitted). Defendants further contend that District 2 "respects" a different "communit[y] of interest" that "revolves around agricultural and military concerns." *Id.* at 83. Defendants object to the Duchin plans on the ground that they "break up the Gulf Coast and scramble it with the Wiregrass," "separate Mobile and Baldwin Counties for the first time in half a century," and "split Mobile County for the first time in the State's history." *Id.* at 85. Defendants further assert that the Duchin plans do not respect the Black Belt as a community of interest because they split it between two districts. *Id.* at 85–86 n.15.

In his initial report, Mr. Bryan (1) opined that the single-race Black metric "has been most defensible from a political science/*Gingles* 2 voting behavior perspective," (2) explained his understanding of traditional redistricting principles, and (3) compared the performance of the Plan with the remedial plan offered in the *Milligan* plaintiffs' complaint (sometimes called the "Hatcher plan") on the basis of four traditional redistricting principles: communities of interest, core retention,

incumbency, and compactness. *See Milligan* Doc. 66-2 at 5, 9–32.[10]

Mr. Bryan did not cite any sources to support his opinion that the single-race Black metric was "most defensible." *See id.* at 11. In the section of his opinion addressing the metrics, Mr. Bryan cited (1) a set of redistricting guidelines recently published by the United States Department of Justice ("the Justice Department Guidelines") that the Justice Department will use to evaluate whether plans enacted after the 2020 census violate Section Two, *see id.* at 11 & n.12, and (2) a Supreme Court case, *Georgia v. Ashcroft*, 539 U.S. 461, 473 n.1 (2003), *see id.* at 11 & n.13. Because the Justice Department Guidelines indicate that the Justice Department will rely on the any-part Black metric, Mr. Bryan included statistics computed on both metrics in his report. *Milligan* Doc. 66-2 at 11.

To support his understanding of traditional redistricting principles, Mr. Bryan cited a report prepared by the Congressional Research Service. *Id.* at 9. Earlier in his report, Mr. Bryan described some of the Legislature's redistricting guidelines and opined without citation that "[p]lans were drawn in compliance with the published criteria for redistricting." *Id.* at 6, 9 & n.7.

---

[10] The *Milligan* plaintiffs offered the Hatcher plan in their complaint and the Duchin plans in their expert reports. *See Milligan* Doc. 1, *Milligan* Doc. 68-5. And the Duchin plans (and Cooper plans) are significantly different from the Hatcher plan. *Compare Milligan* Doc. 1 ¶ 89, *with Milligan* Doc. 68-5 at 7, *Caster* Doc. 48 at 23–33, *and Caster* Doc. 65 at 2–3.

Next Mr. Bryan compared the Plan to the Hatcher plan. *See id.* at 15–32. When Mr. Bryan considered communities of interest, he cited a definition from the University of Michigan and did not cite the one in the Legislature's redistricting guidelines. *Id.* at 15. Mr. Bryan focused on the split of Mobile and Baldwin counties in the Hatcher plan, and he reviewed testimony on this issue from two former Congressmen from that area (former Congressman Jo Bonner and former Congressman Bradley Byrne) in *Chestnut. See Milligan* Doc. 66-2 at 17. Based on this testimony, he opined that "[a]side from racial differences, the entire southwest corner of Alabama represents a significant Alabamian community of interest." *Id.*; *accord* Tr. 1008. He further opined that "Mobile and Baldwin counties are an inseparable [community of interest]." *Milligan* Doc. 66-2 at 18.

Mr. Bryan opined that the Plan "registers consistently and significantly higher levels of core retention for both total and Black population than the Hatcher plan." *Id.* at 25. Mr. Bryan then concluded that the Plan "respects incumbents," but the Hatcher plan does not because it pairs them in two districts.  *Id.* at 28. Mr. Bryan also opined that the Hatcher plan "scores worse" than the Plan on four "of the most common statistical measures" of compactness. *Id.* at 29, 32. Mr. Bryan ended that report with the opinion that the Hatcher plan "performs more poorly than the 2021 enacted plan with respect to all traditional districting criteria." *Id.*

In Mr. Bryan's rebuttal report, he provided opinions about the Duchin plans

on the basis of three traditional redistricting principles: core retention, protection of incumbents, and compactness. *See Milligan* Doc. 74-1 at 11. Mr. Bryan first opined that the Duchin plans "break up a strong community of interest in Mobile, Baldwin, and surrounding counties." *Id.* at 3. Mr. Bryan identified in his rebuttal report a mistake in Dr. Duchin's analysis that resulted in "islands" from one district appearing in another (a circumstance also described as a "stray census block[]"). *See id.* at 7; Tr. 587. Dr. Duchin submitted corrected plans, and Mr. Bryan's analyses reflect the corrected plans. *See Milligan* Doc. 74-1 at 7.

Mr. Bryan confirmed in his rebuttal report that Duchin Plan C contains two majority-Black districts regardless whether they are measured using the single-race Black or any-part Black metric. *Id.* at 8. He opined that the Plan "performs substantially better" than any Duchin plan in terms of core retention, and that the Duchin plans "pack incumbents," while the Plan "respects" them. *Id.* at 12, 15, 16.

Mr. Bryan offered two opinions about compactness. He first opined that in each Duchin plan "compactness is sacrificed." *Id.* at 3. He later opined that "Dr. Duchin's plans perform generally better *on average* than the enacted State of Alabama plans, although some districts are significantly less compact than Alabama's." *Id.* at 19 (emphasis in original).  He offered an ultimate opinion that "[i]n the hierarchy of redistricting criteria priorities, [he] assess[ed] the benefit of this accomplishment as being more than offset by the significant detrimental impact

to the continuity of representation." *Id.*

At the preliminary injunction hearing, Mr. Bryan identified the source for his opinion about the single-race Black metric – he testified that the "political scientists that [he] ha[s] worked with have told [him] that it is easier to defend the political performance, the political voting behavior of the more homogenous, smallest, most cohesive [B]lack population." Tr. 841–42. Mr. Bryan testified that he is not a political scientist, that he cited no political science literature or particular political scientist for this opinion, and that this opinion was based on information that he did not cite in his report. Tr. 896–98. He further described the opinion as "a secondary passing comment" and testified that he is "definitely not making a judgment that one [metric] is right or wrong or better or worse." Tr. 898–99; *see also* Tr. 1038–39. He further testified that he had not read during the preparation of his report the Supreme Court case that he cited in this portion of his report (*Georgia*, 539 U.S. at 473 & n.1). Tr. 903–06. Mr. Bryan read into the record the passage from *Georgia* that he cited, Tr. 907, and he conceded that *Georgia* indicates that "it is proper to look at all individuals who identify themselves as [B]lack." Tr. 909.

During Mr. Bryan's direct examination, he testified that it was "[his] understanding that race . . . wasn't even looked at as part of the process" of drawing the Plan. Tr. 783. On cross examination, he clarified that he did not know who drew the Plan, had not communicated with that person, and had been told by Defendants'

counsel that "race was not looked at in drawing the legislature's plan." Tr. 1027.

Mr. Bryan testified extensively about his understanding of traditional redistricting principles. During his direct examination, Mr. Bryan testified that he had "not ever heard" that "minority opportunity to elect" was a "traditional or contemporary redistricting principle," and "would not agree with that." Tr. 868. On cross-examination, he conceded that the Congressional Research Service report that he cited "specifically includes as the second criterion protecting . . . minorities from vote dilution." Tr. 926–28 (testimony about *Milligan* Doc. 74-1 at 4).

Mr. Bryan testified that he was familiar with the Legislature's redistricting guidelines. Tr. 935. He testified during his first cross examination (by counsel for Caster) that he could not agree that those guidelines expressed a "hierarchy" for redistricting principles, except that the top priority is to "equalize population." Tr. 942–43; *see also* Tr. 939. When that counsel asked him whether the Legislature's redistricting guidelines indicated that compliance with the Voting Rights Act was more important than retaining the cores of previous districts, he testified that he did not understand the guidelines to say that. Tr. 941. During his second cross-examination (by counsel for Milligan), he explained that he understood the Legislature's redistricting guidelines to prioritize contiguity and compactness above communities of interest and protection of incumbents. Tr. 1043–44.

Mr. Bryan also testified that he personally could not assign an order of

importance to redistricting criteria because he is "not an authority to prioritize or offer an opinion on which traditional redistricting criteria are more important than the other." Tr. 940. After cross examination, the court asked him whether he adhered to the opinion in his rebuttal report about the "hierarchy of redistricting criteria priorities," *Milligan* Doc. 74-1 at 19, and if so, what his hierarchy was and where he got it. Tr. 1110–11. Mr. Bryan testified that "there's no fixed hierarchy" but that his "professional assessment" is that improved compactness "is not worth the tradeoff [to] the significant damage to continuity of representation." Tr. 1111–13.

Mr. Bryan further testified that he was not asked to assess and did not assess whether the Plan or the Duchin plans comply with Section Two, and that it was his "understanding" that "any regard for the Voting Rights Act compliance was accommodated and taken care of and considered in the drawing of the [P]lan." Tr. 939; *see also* Tr. 1026.

Mr. Bryan conceded that "if a plan adds a majority-minority district that wasn't there before, the core retention of that plan will be less than a plan that retains the same number of majority-minority districts as the previous plan." Tr. 946–47; *see also* Tr. 1066–67 (similar).

During his direct examination, Mr. Bryan testified that he regards the communities of interest principle as a "leading criteria," Tr. 842, and that the former Congressmen's testimony that he reviewed "was as good of information as you could

possibly get," and that he was "hard pressed to think of another document or testimony that [he] could refer to that would be any more enlightening than what the Byrne and Bonner testimony provided," Tr. 844. On cross-examination, Mr. Bryan testified that there "certainly would be" demographic statistics that "one looks at to determine communities of interest," Tr. 1058–59; that such statistics could include "age groups, income groups, employment groups, different types of family structure," and "[r]acial composition," Tr. 1059–60; and that there is nothing "in any of [his] reports that talks at all about [his] use of any statistical analysis in connection with communities of interest," Tr. 1061.

Further, when Mr. Bryan initially was asked about his opinion that Mobile and Baldwin counties comprise an "inseparable" community of interest, Tr. 1006, he confirmed that he had not reviewed any other testimony from the *Chestnut* litigation. Tr. 1008–11. Mr. Bryan asserted that his failure to review the other *Chestnut* testimony was due to time constraints, but conceded that he "had plenty of time to read Bonner and Byrne, but [he] didn't have any time to read" testimony from other witnesses to the opposite effect. Tr. 1061–62. Mr. Bryan acknowledged that his opinion about Mobile and Baldwin counties was based largely on their "coastal nature" and the port, but indicated that he was aware that healthcare is the largest industry employer in Mobile, followed by retail. Tr. 1070–71.

On cross examination, Mr. Bryan conceded that the Black Belt is a community

of interest, but would not opine whether the Plan or any Duchin plan is "better" for the Black Belt as a community of interest. Tr. 1063–65, 1109.

Also at the preliminary injunction hearing, when Mr. Bryan testified about whether the Duchin plans protect incumbents, he testified that he did not investigate or know when he prepared his report that the incumbents in Districts 1 and 2 have each served less than one year in office. Tr. 965–67.

When Mr. Bryan testified about the aggregate measures of compactness in Dr. Duchin's report, he testified that he understood that Dr. Duchin may have presented compactness scores disaggregated to the district level in a subsequent report, but he "did not see that report or those findings." Tr. 869. Mr. Bryan further testified that when he assessed the compactness of a proposed district, he relied exclusively on the statistical scores. Tr. 971–72. He further testified that he has "no opinion on what is reasonable and what is not reasonable" compactness. Tr. 979.

Mr. Bryan explained his overall opinion that Dr. Duchin was able to "achieve a [B]lack majority population in two districts" and "a balanced population" only by "sacrific[ing]" traditional districting criteria. Tr. 874. He explained further:

> And by that, I mean there were cases where there is less compactness, the core retention is sacrificed significantly. So, therefore, the continuity of representation because of the cracking and packing of the incumbents and then the -- mostly based on the -- mostly based on the incumbents, but also based on the core retention analysis, there is a significant impact to the continuity of representation in these plans.

Tr. 874.

Page **113** of **225**

Also at the preliminary injunction hearing, Defendants offered testimony from former Congressman Bradley Byrne.  Tr. 1656. Mr. Byrne has served on the State Board of Education and in the State Senate, and he represented District 1 in the United States House of Representatives from December 2013 to January 2021. Tr. 1656–57. He testified about the community of interest in the Gulf Coast and some Senate Factors. *See infra* Part IV.C.3. Mr. Byrne has extensive experience in and knowledge of Alabama's Gulf Coast region, and his testimony was helpful to the court.

Mr. Byrne testified that water "defines" District 1 "very much." Tr. 1658. He described Mobile Bay, Perdido Bay, and "[a] number of rivers [and] sounds," and explained that District 1 has a "major deep water port" and a "major ship building industry," "major tourism industry," and "major seafood industry," and that those things are "unique to this part of the state." Tr. 1658. Mr. Byrne described the industries and jobs that are related to these attributes of District 1, as well as the racial diversity of the district. Tr. 1658–65. Mr. Byrne also described the French and Spanish colonial history of the area and how that impacts the culture of the area; he offered the example of Mardi Gras. Tr. 1660–61. Mr. Byrne testified about how these attributes of District 1 shaped his work in Congress, Tr. 1665–68, and how difficult it would be, in his estimation, for one member of Congress to represent portions of both the Gulf Coast and the Wiregrass, Tr. 1669–75. Mr. Byrne also

testified about the possibility, if the City of Mobile and/or Mobile County are split between two congressional districts, that "you [could] ha[ve] no one in Congress from the Mobile region" because "you dilute the vote in Mobile County." Tr. 1676. Mr. Byrne discussed the electoral map for the State Board of Education and explained reasons why he thought "even if you assumed it made sense to split Mobile County in a school board map," "[i]t would not make sense" to split Mobile County in a congressional map. Tr. 1681. Mr. Byrne described his experiences working with Congresswoman Sewell, testified that they worked together "all the time," and gave examples of that effort; he also described his time as co-chair of the HBCU Congressional Caucus and his work with community health centers. Tr. 1685–89.

On cross-examination, Mr. Byrne was asked about other representatives who represent districts that span multiple counties and include both rural and urban areas – Congresswoman Sewell and Congressman Palmer – and he replied that he has "never heard anybody criticize either one of them for what they do for their district." Tr. 1700; *see also* Tr. 1717 (describing Congresswoman Sewell as "[v]ery effective"). Mr. Byrne was asked about his testimony that it would be "a tragedy if we didn't have somebody from Mobile representing the Mobile area" in Congress, and he conceded that currently, none of Alabama's congressional delegation lives in Montgomery, which he described as a "very important city." Tr. 1720–21. Later, Mr. Byrne explained: "You start splitting counties like that, and that county loses its

Page **115** of **225**

influence. That's why I don't want Mobile County to be split." Tr. 1744.

### 2. *Gingles* II and III – Racially Polarized Voting

Defendants first contend that the *Milligan* plaintiffs cannot establish that voting in Alabama is racially polarized because their racial-polarization analysis "selectively highlights Alabama's recent electoral history, leaving out necessary context and election results that do not fit their narrative." *Milligan* Doc. 78 at 97. Defendants offer as examples (1) that Dr. Liu failed to consider the 2020 Democratic primary in District 2, in which a Black woman defeated a white man, (2) that the *Milligan* plaintiffs do not mention that the Alabama Democratic Conference (the Black caucus of the Alabama Democratic Party) supported a non-Black woman in the 2020 Democratic primary in District 1, and (3) that the Alabama Democratic Conference endorsed Doug Jones, a non-Black man, over a Black man in the 2017 Democratic primary for election to the United States Senate. *Id.* at 97–98. Defendants next contend that the *Milligan* plaintiffs cannot establish racially polarized voting if they "mix and match their preferred minority groups" by using any-part Black statistics to satisfy *Gingles* I and single-race Black statistics to satisfy *Gingles* II and III. *Id.* at 96–97.

At the preliminary injunction hearing, Defendants offered the testimony of Dr. M.V. Hood on this and other issues. Dr. Hood is a tenured professor in the Department of Political Science at the University of Georgia, where he has served

on the faculty for more than twenty years. *Milligan* Doc. 66-4 at 4. Dr. Hood's work focuses on electoral politics, racial politics, election administration, and Southern politics, and his research is supported by the National Science Foundation. *Id.* He has published numerous articles in peer-reviewed journals, currently serves on the editorial board for two such journals, and has extensive experience testifying as an expert witness in redistricting cases. *See id.* Dr. Hood was qualified at the hearing as an expert in political science, empirical social science research, and the matters discussed in his reports, without objection from any party. Tr. 1382–83. For the reasons explained in our findings of fact and conclusions of law (*see infra* Part V.B.3), we find that Dr. Hood is a credible expert witness.

Dr. Hood offered two relevant opinions in his initial report. *First*, he was asked to prepare a functionality analysis of Districts 6 and 7 (the minority-influence districts) in the *Singleton* plaintiffs' Whole County Plan, and as part of that analysis he opined that voting is racially polarized in those districts and in District 7 in the Plan. *Milligan* Doc. 66-4 at 14. And *second*, he was asked by Defendants to consider whether white voters vote for minority Republican candidates, and he opined that "ideology trumps race in the case of white Republicans and their support for GOP minority nominees." *Id.* at 16. He described a recent special primary election for a vacancy in the Legislature in which a Black Republican, Kenneth Paschal, won in a district with an 84.1% white voting-age population. *Id.*

At the preliminary injunction hearing, Dr. Hood acknowledged that he did not perform a functionality analysis for the maps proposed by the *Milligan* plaintiffs. Tr. 1417. He testified about his finding that voting is racially polarized in District 7 in the Plan and would be polarized in the Districts 6 and 7 proposed in the Whole County Plan. Tr. 1420–21. He explained that he used the ecological inference method and agreed with Dr. Liu that it is an appropriate way to analyze racially polarized voting. Tr. 1422. He further testified that he and Dr. Liu "both found evidence of" racially polarized voting in Alabama. Tr. 1421. He also testified, as he did in *Chestnut*, that "an interest in core preservation as a redistricting consideration does not trump compliance with Section 2 of the Voting Rights Act." Tr. 1436.

### 3.    The Senate Factors and Proportionality

Defendants assert that the "balance" of the Senate Factors favors the State because things in Alabama have "changed dramatically." *Milligan* Doc. 78 at 101–02 (quoting *Shelby Cnty. v. Holder*, 570 U.S. 529, 547 (2013)) (internal quotation marks omitted). As to Senate Factor 1, Defendants acknowledge Alabama's "sordid history" and assert that it "should never be forgotten," but that Alabama has "[o]vercome [i]ts [h]istory." *Milligan* Doc. 78 at 102. Defendants also argue that the *Milligan* plaintiffs fail to tie many of their assertions about discrimination in Alabama to Black Alabamians' ability to vote. *Id.* at 103. Defendants assert that several of the *Milligan* plaintiffs' assertions about discrimination in Alabama are

misleading – namely, the assertions that Alabama employers account for a disproportionate number of racial discrimination claims, "that Alabama has a recent history of discrimination in state public employment," and that a number of Alabama school districts are resistant to desegregation. *See id.* at 103–05 (internal quotation marks omitted).

As to Senate Factor 2, Defendants argue that what the *Milligan* plaintiffs "characterize as racial bloc voting is more readily explained as the result of politics, not race." *Id.* at 106. Defendants assert that Black-preferred candidates lose statewide elections in Alabama not because they are Black or Black-preferred, but because they are Democrats and Alabama is a "ruby red" state. *Id.* (quoting *Ala. State Conf. of NAACP*, 2020 WL 583803, at *42) (internal quotation marks omitted). Defendants point to the recent election of a Black Republican, Kenneth Paschal, in a state legislative district. *Id.* at 107–08.

As to Senate Factor 3, Defendants assert that the *Milligan* plaintiffs erroneously focus on the majority-vote requirements in Alabama primary elections, without arguing that Alabama adopted or maintains that requirement for a nefarious reason. *Id.* at 109. Defendants do not analyze Senate Factor 4 because it is not relevant. *Id.* at 110.

As to Senate Factor 5, Defendants do not contest that past discrimination existed, but dispute that Black Alabamians still "bear the effects of discrimination,"

and that those effects "hinder their ability to participate effectively in the political process." *Id.* at 112 (quoting *Gingles*, 478 U.S. at 37) (internal quotation marks omitted). Defendants assert that the *Milligan* plaintiffs have failed to "connect the dots" from historical discrimination to current outcomes, and Defendants challenge the *Milligan* plaintiffs' assertions about current outcomes. *See id.* (asserting that racial disparities in poverty rates are lower in Alabama than in Connecticut).

As to Senate Factor 6, Defendants argue that another federal court in Alabama has recently held that "there is no evidence that Alabama political campaigns generally . . . are characterized by racial appeals." *Id.* at 113 (quoting *Ala. State Conf. of NAACP*, 2020 WL 583803, at *58) (internal quotation marks omitted). Defendants also argue that historical evidence of racial appeals in campaigns is not probative of current conditions, and that the recent evidence the *Milligan* plaintiffs offer "reach[es] too far." *Id.* at 113–14.

As to Senate Factor 7, Defendants argue that minorities "have achieved a great deal of electoral success in Alabama's districted races for State offices." *Id.* at 116. Defendants point out that 27 of the 105 (25.7%) members of the Alabama House of Representatives are Black, 7 of the 35 (20%) Alabama State Senators are Black, and 25% of the members of the State Board of Education are Black. *Id.*

As to Senate Factor 8, Defendants vehemently contest the *Milligan* plaintiffs' argument that elected officials in Alabama are not responsive to the needs of the

Black community. *Id.* at 117. Defendants submit testimony from the Chief Medical Officer of the Alabama Department of Public Health about the State's outreach to the Black community in response to the COVID-19 pandemic, *id.* & *Milligan* Doc. 79-15, and argue that the other instances of an alleged lack of responsiveness (such as the failure to expand Medicaid) reflect political decisions by state leadership, not racial ones, *Milligan* Doc. 78 at 119.

As to Senate Factor 9, Defendants urge that a procedure is tenuous only if it "markedly departs from past practices or from practices elsewhere in the jurisdiction," so the Plan cannot be tenuous, because it does not meaningfully depart from the 2011 congressional map. *Id.* at 119–20 (quoting S. Rep. 97-417, 29 n.117).

Finally, Defendants argue that when we consider the totality of the circumstances, we should consider that compared to national rates, Alabama's rates of Black voter registration and Black voter turnout are high, and that as a result, both major political parties "actively court [B]lack support." *Id.* at 121–22.

At the preliminary injunction hearing, Defendants did not offer any expert testimony about the Senate Factors. Former Congressman Bradley Byrne testified about the campaign ad that both the *Milligan* plaintiffs and the *Caster* plaintiffs assert was an overt racial appeal. Mr. Byrne testified that the ad was about his brother, not about race; more particularly, Mr. Byrne testified that he was trying to contrast his brother's sacrifice for his country (his brother died as a result of a disease

he contracted while deployed with the Special Forces) with Mr. Kaepernick's refusal to stand during the national anthem. Tr. 1690–92. On cross examination, Mr. Byrne testified that he did not recall ever having a discussion with a Black person about the campaign ad and that, although he was aware of the "history of bombing and burning down houses occupied by [B]lack Alabamians," and of the use of "burning crosses to terrorize Black individuals," he did not understand that "images of [B]lack people in a fire could trigger a connection in the minds of some to the more horrific eras of racial discrimination in Alabama." Tr. 1732–33.

Mr. Byrne also was asked about socioeconomic disparities between Black Alabamians and white Alabamians, and he testified that he "think[s] the problems that are facing the [B]lack community with regard to all these issues is a function of the failure of the state of Alabama to provide a quality education to them." Tr. 1730. He further testified that he does not think that failure is "rooted in . . . discrimination," but it is an "overall failure" in the Alabama public education system which affects Black people more than white people. Tr. 1730.

### D.   Defendants' Arguments - *Caster*

Defendants take the same basic position in *Caster* that they took in *Milligan*.

### 1.   *Gingles* I – Numerosity and Reasonable Compactness

Defendants first assert that the *Caster* plaintiffs are unlikely to succeed on their Section Two claim because the Cooper plans do not satisfy the first *Gingles*

requirement, and Defendants rely on the expert testimony of Mr. Bryan.

In their opposition to the *Caster* plaintiffs' motion for preliminary injunctive relief, Defendants assert that using the single-race Black metric, no Cooper plan includes a second majority-Black congressional district. *Caster* Doc. 71 at 67. Defendants also assert that the Cooper plans "conflat[e] *Gingles*'s compactness inquiry with mere geographic compactness," *id.* at 72, and prioritize race above traditional redistricting principles, *id.* at 73–94. Defendants contend that the Cooper plans "do strange things in their search for" a second majority-Black district, *id.* at 75, and they argue that the Cooper plans (like the Duchin plans) do not respect the communities of interest that are protected by the Plan in Districts 1 (the Gulf Coast) and 2 (Montgomery and the Wiregrass), "dividing some of the State's most historic and economically important regions," *id.* at 82–85. Defendants object to what they call the "laser precision with which [the *Caster* plaintiffs] attempt to comply with *Gingles*'s 50-percent-plus-one requirement" as evidence that the Cooper plans subordinate traditional redistricting principles to considerations of race. *Id.* at 89.

In their opposition to the *Caster* plaintiffs' motion for a preliminary injunction, Defendants acknowledged that the Cooper plans "match" the Plan in terms of the number of county splits – the Plan splits six counties, and the Cooper plans split six counties. *Id.* at 92. Defendants also acknowledged that one of the Cooper plans pairs no incumbents. *Id.* at 93.

In his rebuttal report, Mr. Bryan provided his opinions about the then-six Cooper plans, this time on the basis of three traditional redistricting principles that he selected: core retention, protection of incumbents, and compactness. *See Caster* Doc. 66-1 at 1. Mr. Bryan opined that the Cooper plans "run[] afoul of traditional redistricting principles" and "break up a strong community of interest in Mobile, Baldwin, and surrounding counties." *Id.* at 3. Mr. Bryan also opined that the Plan "registers consistently and significantly higher levels of core retention for both total and Black population than" the Cooper plans, and that this "superior record" shows "the significant incremental loss of the continuity of representation borne disproportionally by Alabama's Black population" in the Cooper plans. *Id.* at 15. Mr. Bryan also opined in his rebuttal report that the Cooper plans "pack incumbents," while the Plan "respects" them. *Id.* at 16.

Mr. Bryan offered two opinions about compactness in his rebuttal report. He first opined that in each Cooper plan "compactness is sacrificed." *Id.* at 3. He later opined that with the exception of Cooper plan 4, which "has comparable scores" to the Duchin plans and the Plan, "the remaining Cooper Plans all have inferior compactness scores to the Duchin Plans" and the Plan. *Id.* at 18.

At the preliminary injunction hearing, Mr. Bryan testified that none of the Cooper Plans contains two majority-Black districts using the single-race Black metric. Tr. 864–66. Mr. Bryan further testified that he did not review any of the

exhibits to Mr. Cooper's report, which included charts, tables, census data, and maps with information to support the opinions in the report, and he did not review Mr. Cooper's supplemental report offering Cooper plan 7 and "ha[s] not analyzed" that report. Tr. 871, 885–86. Mr. Bryan conceded that using the any-part Black metric, all Cooper plans 1-6 include two majority-Black congressional districts. Tr. 914–15.

During his direct examination, Mr. Bryan testified that he did not "see anything that would lead a map drawer to draw" any of the Cooper plans 1-6 "other than a desire to divide voters by race in order to draw two majority-[B]lack districts." Tr. 875–76. Mr. Bryan also acknowledged that the low core retention scores for Cooper plans 1-6 "just reflect . . . rearranging of the [B]lack population for the effort to create two [B]lack majority districts." Tr. 866.

On cross examination, Mr. Bryan conceded that "it is evident" that Cooper 1-6 plans equalize population across districts, Tr. 930, and that he did not evaluate and offered no opinion about whether Cooper plans 1-6 "failed to abide by the principle of non-dilution of minority voting strength," Tr. 931, contiguity, Tr. 931, or "the extent to which Mr. Cooper's plan[s] split political subdivisions," Tr. 931–32.

Mr. Bryan further testified on cross examination that his opinion that Cooper plans 1-6 "pack incumbents" did not rely on the word "pack" "as a precise scientific term," but rather as "convenient language" referring to "pairing incumbents." Tr. 955. He conceded that it "may not have been appropriate to use that [in the]

redistricting context." Tr. 955.

When Mr. Bryan was asked about his opinion with respect to each Cooper plan and incumbents, he could not recall why he did not offer an opinion about Cooper plan 5 on that issue. Tr. 960–62. He testified that it might have been because Mr. Cooper did not provide a shapefile for Plan 5, but then testified that he never asked Mr. Cooper to provide the shapefile because "[t]here was no time for that[,]" and instead that his team built it from other data that Mr. Cooper supplied. Tr. 960–61. When asked whether he "had an opportunity to evaluate" Cooper plan 5 in preparing his rebuttal report, Mr. Bryan replied that he did. Tr. 961. In response to the question, "Isn't it true . . . that Mr. Cooper's Illustrative Plan 5 does not pair any incumbents?," Mr. Bryan testified that he did not know. Tr. 962.

Mr. Bryan further testified that all other Cooper plans 1-6 "pair just one set of incumbents," the incumbents in Districts 1 and 2, and that he did not know who those incumbents were. Tr. 962–66. When he was told that both of those incumbents had been in office for less than a year, he testified that "any amount of experience is valuable and important." Tr. 967.

When Mr. Bryan testified about compactness, he explained that he relied on compactness scores alone and did not "analyze any of the specific contours of the districts." Tr. 971. He further explained that he "provide[d] no analysis to the extent to which county or city or [voting tabulation district] boundaries informs the

compactness of a given district" in the Cooper plans. Tr. 971–72.

After Mr. Bryan offered that testimony, counsel for the *Caster* plaintiffs recalled his earlier testimony about how the Cooper plans "draw lines that appear to [him] to be based on race" and asked him where in his rebuttal report he offered any analysis "of the way in which specific districts in Mr. Cooper's illustrative plans are configured outside of their objective compactness scores." Tr. 972–73. Mr. Bryan testified that it "appears [he] may not have written text about that," "that part of the report and the analysis was pretty light," and he "refer[red] to the map of . . . Cooper's plans to support [his] observation." Tr. 973–75. Later during the same examination, he returned to the point and testified that "the Cooper plans in my analysis do not make [—] appear to make [—] any effort to conform to any other administrative geography, rather only to try and capture the most densely [B]lack population of Mobile." Tr. 988. A few minutes later, when shown a map of Cooper plan 6 and asked whether he understood that the city of Mobile had been kept whole in that map, he was "not able to say with certainty whether" the district lines of District 2 conform with the boundaries of the city of Mobile. Tr. 989–92. He later opined that the district lines "appear[ed]" to have been drawn on the basis of race – to "grab this [B]lack population" – and acknowledged both that he was "drawing inferences of an effort based on the appearance of the district," Tr. 995–96, and that he was offering an opinion that he had not expressed in his report, Tr. 996–97.

As for the compactness scores, Mr. Bryan testified that the compactness scores for Cooper plan 4 are comparable to the compactness scores for the Plan, Tr. 976–77, and that he offered "no opinion on what is reasonable and what is not reasonable" in terms of compactness, Tr. 979.

When Mr. Bryan was asked about his opinions about communities of interest, he acknowledged that his rebuttal report did not analyze the Cooper plans based on communities of interest. Tr. 979–80.

When Mr. Bryan was asked whether he had any opinions about Cooper plan 7, he testified that he did not review Cooper plan 7, that it was "in [his] e-mail somewhere," but that if "there is significant evidence of a revelatory or new different plan that is a breakthrough in this case, then [he] probably would have been alerted to that and [he] was not." Tr. 976.

At the conclusion of the examinations of Mr. Bryan, the court asked him about his testimony concerning the protection of incumbents. *See* Tr. 1114–16. In response, Mr. Bryan testified that "when two incumbents are pitted in the same district because of redistricting," that is "something that incumbents can solve themselves if they want to," and "there's no rule that other people who are not incumbents cannot run and win against incumbents." Tr. 1114–15.

Also at the hearing, Defendants offered testimony from former Congressman Bradley Byrne, which we already have described. *See supra* Part IV.C.1.

## 2.    *Gingles* II and III – Racially Polarized Voting

As with *Gingles* I, Defendants take the same basic position on *Gingles* II and III in *Caster* that they took in *Milligan*. At the preliminary injunction hearing, Defendants offered the testimony of Dr. Hood on this and other issues. *See supra* at Part IV.C.2 (discussing Dr. Hood's testimony with respect to *Milligan*). In Dr. Hood's rebuttal report, he considered the testimony of Dr. Palmer, the *Caster* plaintiffs' *Gingles* II and III expert. *See Caster* Doc. 66-2. As Dr. Hood explained at the hearing, his rebuttal report raised three questions about the data on which Dr. Palmer relied, but he did not identify any errors that would affect Dr. Palmer's analyses or conclusions. *See id.* at 2–4; Tr. 1407–11, 1449–50, 1456, 1459–61.

On cross-examination, Dr. Hood testified that he does not dispute Dr. Palmer's conclusions that (1) "[B]lack voters in the areas he examined [Districts 1, 2, 3, 6, and 7] vote for the same candidates cohesively," (2) "[B]lack Alabamians and white Alabamians in the areas he examined consistently preferred different candidates," and (3) "that the candidates preferred by white voters in the areas that he looked at regularly defeat the candidates preferred by [B]lack voters." Tr. 1445. Dr. Hood also testified that he does not "offer anything to dispute Dr. Palmer's conclusions on the functionality of plaintiffs' illustrative [B]lack majority districts," Tr. 1446, and that he and Dr. Palmer both found evidence of a "substantive pattern" of racially polarized voting in District 7, Tr. 1448.

### 3.     The Senate Factors and Proportionality

Defendants' arguments about the Senate Factors in *Caster* are mostly identical to their arguments about the Senate Factors in *Milligan*, so we here describe only their arguments that are unique to *Caster*. As to Senate Factor 1, Defendants argue that one of the *Caster* plaintiffs' assertions about discrimination in Alabama is misleading (the assertion about two municipalities that were "bailed-in" under the preclearance provisions of the Voting Rights Act). *Caster* Doc. 71 at 105–06.

As to Senate Factor 3, Defendants assert that Alabama "does not use practices or procedures that enhance the potential for discrimination." *Id.* at 109. Defendants argue that we should reject the *Caster* plaintiffs' assertions about numbered-place requirements and at-large judicial elections because the *Alabama State Conference of the NAACP* court considered those issues and found insufficient evidence that "any current procedures were adopted or maintained for discriminatory reasons." *Id.* at 109–10 (citing *Ala. State Conf. of NAACP*, 2020 WL 583803, at *55). As to Senate Factor 5, Defendants challenge Mr. Cooper's assertions about current outcomes. *See id.* at 112 (asserting that racial disparities in poverty rates are relatively lower in Alabama than in Connecticut).

As to Senate Factor 6, Defendants assert that the *Caster* plaintiffs overreach when they describe a campaign ad for former Congressman Bradley Byrne that involved a campfire; Defendants assert that the images of minority congresswomen

and Colin Kaepernick were not "burning" in the fire, but "appear[ed] in overlays," "just as an image of 9/11 does." *Id.* at 114 (internal quotation marks omitted).

At the preliminary injunction hearing, Defendants did not offer expert testimony about the Senate Factors. Mr. Bryan was asked whether he disputed Mr. Cooper's statistics about socioeconomic disparities, and he testified that he does not. Tr. 879. Mr. Bryan also was asked whether he addressed any of the conclusions in Dr. King's report relating to the history of discrimination in Alabama, and he replied that he did not. Tr. 879. Defendants offered testimony from former Congressman Bradley Byrne, which we already have described. *See supra* at Part IV.C.3.

## E.    Defendants' Further Attacks on Relief Sought in *Milligan* and *Caster*

### 1.    Remaining Elements of Request for Preliminary Injunctive Relief

In their opposition to the motions for preliminary injunctive relief, Defendants assert that even if a set of plaintiffs is substantially likely to prevail on its Section Two claim, we should deny preliminary injunctive relief because "it is far too late in the day to grant the preliminary relief that Plaintiffs seek" and a preliminary injunction would "inflict[] grave harm on the public interest." *Milligan* Doc. 78 at 135–45.

Defendants first argue that a preliminary injunction would "throw the current election into chaos and leave insufficient time for maps to be redrawn, hundreds of

thousands of voters to be reassigned to new districts, and thousands of new signatures to be obtained by candidates and political parties seeking ballot access." *Id.* Defendants next argue that under these circumstances, courts "often" reject requests for preliminary injunctive relief, and they cite one decision by a three-judge court, which in turn cites another such decision and statements by the Supreme Court in the 1960s that injunctive relief may be inappropriate when there is "great difficulty" of "reworking a state's entire electoral process." *Id.* at 136 (citing *Favors v. Cuomo*, 881 F. Supp. 2d 356, 371 (E.D.N.Y. 2012), which in turn cites *Diaz v. Silver*, 932 F. Supp. 462, 466-68 (E.D.N.Y. 1996); *Reynolds*, 377 U.S. at 585; and *Roman v. Sincock*, 377 U.S. 695, 709–10 (1964)) (internal quotation marks omitted).

Defendants then argue that we should follow the path charted by several federal courts that have "withheld the granting of relief, and even dismissed actions, where an election was imminent and the election process had already begun." *Id.* at 137–38 (quoting *Pileggi v. Aichele*, 843 F. Supp. 2d 584, 593 (E.D. Pa. 2012) (collecting cases)) (internal quotation marks omitted). To support this argument, Defendants offer a declaration prepared by Clay Helms, the Alabama Director of Elections. *Milligan* Doc. 79-7.

Mr. Helms attested that "[t]here are substantial obstacles to changing the Congressional districts at this late date," that "local election officials are already under time pressures created by the fact that the maps were adopted in November,

2021," and that "[c]andidates and their supporters would also be impacted by changing the lines." *Id.* ¶ 2.

Mr. Helms explained how each county's Board of Registrars reassigns registered voters to the correct precincts and districts, *id.* ¶¶ 6-9, that in forty-five of Alabama's sixty-seven counties, this is a manual process, *id.* ¶¶ 7–10, and that "[c]ompleting the reassignment process before the next election," not the upcoming one, "provides time for notifying voters of any changes, which both reduces voter confusion and improves turnout." *Id.* ¶ 11. Mr. Helms also attested that under Alabama law, absentee voting for the May 24, 2022 primary will begin on March 30, 2022. *Id.* ¶ 12; *see also* Ala. Code §§ 17-11-5(b), 17-11-12. Mr. Helms also attested that federal law requires Alabama to send "'a validly requested absentee ballot to an absent uniformed services voter or overseas voter . . . [if] the request is received at least 45 days before an election for Federal office, not later than 45 days before the election,' unless an exemption is obtained." *Id.* ¶ 13 (quoting 52 U.S.C. § 20302(a)(8)(A)). This federal deadline for the 2022 congressional primary election is Saturday, April 9, 2022. *Id.*

Mr. Helms further attested that "[i]f the Boards of Registrars and county commissions have to redo the reassignment process on an abbreviated schedule the likely result is one or more of the following: (1) thousands of dollars in unexpected costs incurred by the Boards of Registrars to contract with an entity to assist them in

the process; (2) a rushed reassignment process, potentially increasing the likelihood of mistaken reassignments; and (3) less time to notify voters about changes, potentially increasing the likelihood of voter, political party, and candidate confusion." *Id.* ¶ 18. Finally, Mr. Helms described potential impacts of a preliminary injunction on candidates, political parties, and independent candidates, and about the potential costs of a special election, if one were ordered. *Id.* ¶¶ 20–25.

Defendants next argue that the candidates seeking to run in the party primaries already "have expended significant time and money," and they need to know "significantly in advance" of the qualifying deadline "who may run where." *Milligan* Doc. 78 at 138–39 (quoting *Favors*, 881 F. Supp. 2d at 371) (internal quotation marks omitted). Defendants also argue that redrawing congressional district lines at this time may hamper the ability of candidates seeking to appear on the ballot as independent candidates to garner the required number of signatures on the petition that they must file under Alabama law. *See id.* at 140. Defendants further argue that based on how long it historically has taken to complete the district-assignment process following remedial redistricting, "there is no reason to believe that potentially hundreds of thousands of voters could be swapped among districts" after entry of a preliminary injunction and in time for the state to comply with the April 9, 2022 deadline for mailing some absentee ballots overseas. *Id.* 142–43.

Defendants next argue that based on *Favors*, if the court were to draw a

remedial map, it should have done so "no later than one month before" the qualification deadline. *Id.* at 143 (quoting *Favors*, 881 F. Supp. 2d at 364) (internal quotation marks omitted).

At the preliminary injunction hearing, Mr. Byrne testified about the potential impacts of a preliminary injunction on congressional campaigns. Mr. Byrne testified that changing the congressional map "a couple of weeks before the January 28th deadline" would cause issues with congressional campaigns, Tr. 1693; that at the beginning of an election year, "you have already set your campaign in place[,] . . . already have your plan in place[,] . . . already got volunteers set up ready to go[,] . . . got . . . the campaign ad messaging already worked out[, a]nd you are hitting the ground running," Tr. 1693; and that "if you change [the] district on [a candidate] with that little time, it's going to put a substantial burden on [their] ability to refocus [their] campaign, conduct [their] campaign, get volunteers, et cetera." Tr. 1693.

Mr. Byrne further testified that, "if you give [a candidate] a new geographic area that [they] haven't represented before, where [they] don't have . . . the natural contacts, et cetera, that's a huge problem for any community." Tr. 1694. Mr. Byrne also testified that "[i]t could be a tremendous difficulty[]" for "any candidate, Democrat, Republican, people that are long-time public office holders, people that are brand new." Tr. 1694. Mr. Byrne further testified that "we are just a few months away from primaries[, a]nd it would be very difficult to start shifting this thing

around[]" when candidates are "right in the meat of these campaigns." Tr. 1750. Mr. Byrne testified that it would have a "detrimental effect" on candidates "if all of a sudden these things are moved around some more." Tr. 1750–51. Further, Mr. Byrne testified that he has "seen what it does to congressmen in other states when at the last minute, courts start moving things around," and that he "think[s] it hurts the effectiveness of congressmen when that happens." Tr. 1750. Mr. Byrne testified that he was "not saying [that] the Court may not have a good reason to do it." Tr. 1750.

## 2.    Constitutionality of Plaintiffs' Proposed Maps

Defendants argue that the remedial maps offered by the *Milligan* plaintiffs and the *Caster* plaintiffs are unconstitutional because they discriminate on account of race and cannot satisfy strict scrutiny. *Milligan* Doc. 78 at 124–30. Defendants argue that the remedial maps prioritize race above all race-neutral traditional redistricting principles except for population balance. *Id.* at 126–27. Defendants accuse the plaintiffs of "subvert[ing] every race-neutral, traditional redistricting factor to 'racial tinkering.'" *Id.* (quoting *Miller*, 515 U.S. at 919).

Defendants rest this argument on two grounds. *First,* they contend that "[a]ll traditional criteria would lead a map-drawer to keep Mobile whole and to keep it with the other Gulf Coast counties that share common interests, and Plaintiffs muster no race-neutral explanation for" "their universal decision to split Mobile County." *Id.* at 127. *Second*, they argue that the statistical analysis prepared by Dr. Imai (which

they contend is "fundamentally flawed," *id.* at 53) indicates that the Duchin plans and Cooper plans are extreme outliers because they did not appear in Dr. Imai's 10,000 race-neutral simulated maps. *Id.* at 127–28.

Defendants further assert that plaintiffs' remedial maps cannot satisfy strict scrutiny because they are not narrowly tailored to protect a compelling state interest. *Id.* at 128–32. Defendants argue that "'[a] State's interest in remedying the effects of past or present racial discrimination' will only 'rise to the level of a compelling state interest' if the State 'satisf[ies] two conditions,'" *id.* at 125 (quoting *Shaw II*, 517 U.S. at 909). First, "the discrimination must be identified discrimination." *Id.* (quoting *Shaw II*, 517 U.S. at 909) (internal quotation marks omitted). Defendants say that "[t]his means that '[a] generalized assertion of past discrimination in a particular industry or region is not adequate,' and, as a corollary, that 'an effort to alleviate the effects of societal discrimination is not a compelling interest.'" *Id.* at 125–26 (quoting *Shaw II*, 517 U.S. at 909–10). The second condition is that a legislature "'must have had a strong basis in evidence to conclude that remedial action was necessary, before it' acts based on race." *Id.* at 126 (quoting *Shaw II*, 517 U.S. at 910) (emphasis omitted).

Defendants urge us to find that, based on the plaintiffs' analysis of the Senate Factors, their contention is that their remedial plans are necessary because of generalized assertions about past discrimination. *Id.* Defendants suggest that the

plaintiffs' remedies are "naked attempts to extract from Section 2 a non-existent right to proportional (indeed, maximal) racial representation in Congress." *Id.* at 129.

### 3.   Constitutionality of Plaintiffs' Interpretation of Section Two

Separately, Defendants argue that the *Milligan* plaintiffs and the *Caster* plaintiffs rely on an interpretation of Section Two that "disproportionately construes the statute in relation to vote dilution, dragging it into unconstitutional waters." *Id.* at 130. Defendants argue that Section Two is constitutional only if it is construed and applied with geographic and temporal limitations to ensure that it is a "proportionate" remedy, and that this requires us to focus exclusively on "circumstances relevant to Alabama *today*." *Id.* at 130–31 (emphasis in original) (internal quotation marks omitted). Defendants then assert that both the plaintiffs do just the opposite: they "seek to mire the State – and the statute – in historical conditions that no longer pertain to [B]lack Alabamians' ability to participate in the political process." *Id.* at 131 (internal quotation marks omitted).

### 4.   Whether Section Two Affords Plaintiffs a Private Right of Action

Finally, Defendants argue that Section Two does not establish a private right of action. *Milligan* Doc. 78 at 132–35. Defendants cite a concurring opinion in *Brnovich* for the proposition that this is an "open question," *id.* at 133; argue that Section Two does not provide a "clear expression of Congress's intent to provide a private right of action," *id.* at 133–34; and contend that other sections of the Voting

Rights Act indicate that if Congress had intended Section Two to provide a private right of action in Section Two, Congress knew how to do that, *id.* at 134–35.

## V. FINDINGS OF FACT AND CONCLUSIONS OF LAW – VOTING RIGHTS ACT

We first consider whether the *Milligan* plaintiffs have established that they are substantially likely to succeed on their Section Two claim. In this analysis we rely on evidence adduced by both the *Milligan* plaintiffs and the *Caster* plaintiffs because all parties in both of those cases twice agreed that any evidence admitted in either case was admitted in both cases unless counsel raised a specific objection. *See Singleton* Doc. 72-1; *Caster* Doc. 74; Tr. of Dec. 20, 2021 Hrg. at 14–17.

We next discuss whether the *Milligan* plaintiffs have established the remaining elements of their request for preliminary injunctive relief. Finally, we address Defendants' other arguments against preliminary injunctive relief.

### A. How to measure the Black voting-age population

At the threshold, we decide which measure of the Black voting age population to employ in our *Gingles* analysis. Since 2000, the United States Census Bureau has allowed census respondents to identify themselves as members of a racial group by checking one or more boxes, so a Black Alabamian may identify as Black alone (which the parties and their witnesses sometimes refer to as "single-race Black"), or as both Black and another race or other races (which the parties and their witnesses sometimes refer to as "any-part Black.") *See Milligan* Doc. 78 at 96; *Milligan* Doc.

94 at 12–13; *Milligan* Doc. 68-1 at 15; *Milligan* Doc. 68-5 at 10; *Milligan* Doc. 66-2 at 10–11; Tr. 558–60, 1262, 1312–15.

Defendants make three arguments about the single-race Black metric. *First,* Defendants argue that if we rely on the single-race Black metric, only one of the four Duchin plans offered by the *Milligan* plaintiffs "clears the numerosity threshold," and the *Caster* plaintiffs have "failed to demonstrate that Alabama could create a second majority-minority district." *Milligan* Doc. 78 at 67.

*Second,* Defendants argue that the *Milligan* and *Caster* plaintiffs "appear" to rely on the any-part Black metric for their numerosity analyses under *Gingles* I, but the Black-alone metric for their racial polarization analyses under *Gingles* II and III, and we should not allow metric cherry-picking. *Id.* at 67–69; Tr. 1890 (closing argument).

*Third,* Defendants argue that the single-race Black metric "has been most defensible from a political science / *Gingles* 2 voting behavior perspective." *Milligan* Doc. 78 at 69 (citing supplemental expert report of Thomas M. Bryan, whose opinion includes that exact language). At the preliminary injunction hearing, Defendants adduced testimony from Mr. Bryan about that opinion, Tr. 841–42 (direct); Tr. 1039–40 (cross); 1101–02 (redirect); *see also supra* at Part IV.D.1 (describing Bryan testimony), as well as testimony from other witnesses about the single-race Black metric, Tr. 1412–14 (direct examination of Dr. Hood). In closing argument, counsel

for Defendants clarified that Defendants are not suggesting that "there's one proper definition and another that's not," and that Defendants "don't have a preferred definition of [B]lack." Tr. 1890.

We reject all three arguments by Defendants. We reject the first argument because the *Milligan* plaintiffs and the *Caster* plaintiffs each have submitted one remedial map that includes two congressional districts with a BVAP of greater than 50% using the single-race Black metric: Duchin Plan A and Cooper Plan 6. *See Milligan* Doc. 76-4 at 3, Tab. 1 (Duchin Rebuttal Report, describing Duchin Plan A); Tr. 581–82 (Duchin testimony); *Caster* Doc. 65 at 5 n.2 (Cooper Rebuttal Report: "Under Illustrative Plan 6, District 2 and District 7 are also majority [single-race] BVAP – 50.19% and 50.05%, respectively."); *Caster* Doc. 48-41 (Ex. L-1) (Cooper Report, providing additional statistics relating to Cooper Plan 6); Tr. 471–72, 475 (Cooper testimony). Mr. Bryan did not rebut this testimony by Dr. Duchin and Mr. Cooper. Accordingly, even if we agreed with the Defendants' definitional choice (and we do not), the decision about which metric to use is not dispositive of the question whether the *Milligan* plaintiffs and/or *Caster* plaintiffs have satisfied their burden to establish numerosity.

We reject the second argument because the evidence adduced at the preliminary injunction hearing conclusively disproves Defendants' suggestion that the *Milligan* plaintiffs' experts may have cherry-picked different metrics for their

*Gingles* I analysis and their *Gingles* II and III analysis. *See Milligan* Doc. 94 at 21 (reply brief); *Milligan* Doc. 68-1 at 15 n.20 (Liu report, explaining metric underlying *Gingles* II and III opinion); Tr. 1338–39 (Liu testimony, explaining same); *Caster* Doc. 84 at 26–27 (reply brief); Tr. 744 (Palmer testimony, explaining same).

We reject the third argument, that the single-race Black metric is "more defensible" than the any-part Black metric, for five separate and independent reasons. *First,* the obvious one: the single-race Black metric cannot be the correct metric because it excludes some persons who identify as Black, and Defendants have not identified any legal basis for us to decide a case about Black Alabamians' access to the franchise using a measure that excludes some Alabamians who identify as Black.

*Second,* Supreme Court precedent directs us to use the any-part Black metric. Although the Supreme Court has not directly decided this question in a case asserting the same claims we must decide, the Supreme Court has decided to rely on the any-part Black metric in a case about the Voting Rights Act. *See Georgia*, 539 U.S. at 473 n.1. In *Georgia*, the Supreme Court concluded that "it is proper to look at *all* individuals who identify themselves as [B]lack" in their census responses, even if they "self-identify as both [B]lack and a member of another minority group," because the case involved "an examination of only one minority group's effective exercise of the electoral franchise." *Id.* at n.1 (emphasis in original). Because we also

Page **142** of **225**

must decide a case that involves claims about one minority group's effective exercise of the electoral franchise, we likewise rely on the any-part Black metric.

Our decision in this regard is consistent with the decisions of other district courts considering voting rights claims post-*Georgia. See, e.g.*, *Covington v. North Carolina*, 316 F.R.D. 117, 125 n.2 (M.D.N.C. 2016), *aff'd* 137 S. Ct. 2211 (2017) (Mem.); *Mo. State Conf. of NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1020 n.4 (E.D. Mo. 2016); *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1343 n.8 (N.D. Ga. 2015).

*Third,* during the preliminary injunction hearing, Mr. Bryan largely abandoned his opinion that the single-race Black metric was the "most defensible" metric. *See* Tr. 841–42 (direct); Tr. 1039–40 (cross); 1101–02 (redirect). He adhered to his original statement to the limited extent that "the [unnamed] political scientists that [he has] worked with have told [him] that it is easier to defend the political performance, the political voting behavior of the more homogenous, smallest, most cohesive black population," *see* Tr. 841–42, but was adamant that he has "no opinion whether one is right or wrong or better or worse," Tr. 842, 912–13, 1039, 1101–02. Under these circumstances, we cannot assign any weight to Mr. Bryan's original opinion that the single-race Black metric is the "most defensible" metric for us to use.

Further, Mr. Bryan's testimony on this issue causes us to question his credibility as an expert witness. Although Mr. Bryan testified that his original opinion was based on what political scientists told him, Tr. 841–42, when Defendants' political science expert, Dr. M.V. Hood, was asked whether Mr. Bryan had consulted him about Mr. Bryan's opinion in this case, Dr. Hood testified that Mr. Bryan had not, Tr. 1424. Further, although Mr. Bryan cited *Georgia* in his expert report in connection with his opinion that the single-race Black metric was the "most defensible" metric for us to use, *see Milligan* Doc. 66-2 at 11 n.13, he testified that he did not read it in connection with his preparation of that report, Tr. 906. We explain below our full credibility determination with respect to Mr. Bryan. *See infra* at Part V.B.2.a.

*Fourth*, as Mr. Bryan expressly acknowledged – and included in his report – the Justice Department Guidelines indicate that based on *Georgia*, when the Justice Department reviews redistricting plans to ensure compliance with Section Two, the Justice Department will rely on the any-part Black metric rather than the single-race Black metric. *See* Ex. C105 (full text of Justice Department Guidelines); *Milligan* Doc. 66-2 at 11 (Bryan report quoting Justice Department Guidelines); Tr. 899–903 (Bryan testimony on cross examination admitting that Justice Department Guidelines indicate that Justice Department will rely on any-part Black metric). The passage of those guidelines that Mr. Bryan included in his report states:

The Department of Justice will follow both aggregation methods defined in Part II of the Bulletin. The Department's initial review will be based upon allocating any response that includes white and one of the five other race categories identified in the response. Thus, the total numbers for "Black/African American," "Asian," "American Indian/Alaska Native," "Native Hawaiian or Other Pacific Islander," and "Some other race" reflect the total of the single-race responses and the multiple responses in which an individual selected a minority race and white race.

The Department will then move to the second step in its application of the census data by reviewing the other multiple-race category, which is comprised of all multiple-race responses consisting of more than one minority race. Where there are significant numbers of such responses, the Department will, as

required by both the OMB guidance and judicial opinions, allocate these responses on an iterative basis to each of the component single-race categories for analysis. *Georgia v. Ashcroft,* 539 U.S. 461, 473, n.1 (2003).

Ex. C105 at 12–13.

And *fifth,* historical evidence about this issue that was not disputed (either in the expert rebuttal reports or at the preliminary injunction hearing) defeats Defendants' assertion that it would be "most defensible" for us to rely on the single-race Black metric. *Milligan* Doc. 78 at 69. Two expert witnesses described the "one drop rule," which asserted for centuries and for discriminatory purposes that "a single drop of Black blood makes a person Black." *Caster* Doc. 64 at 3 (King Rebuttal Report); *see also id.* at 2–5; *Milligan* Doc. 68-2 at 5 (Bagley Report). No defense expert, including Mr. Bryan, refuted (or even engaged) this point. Accordingly, we credit Dr. King's expert testimony that the any-part Black metric is the more "accurate" metric because it includes anyone who now identifies as Black

and historically would have been identified as Black, *see* Tr. 1529–31, and her testimony that the single-race Black metric is not the prevailing metric in political science, *see Caster* Doc. 64 at 5.

For each and all of these reasons, we decline to take the step — which we regard as odious — of deciding whether Alabama's congressional redistricting plan dilutes the votes of Black Alabamians by marginalizing some of those persons based on their decision to identify both as Black and as part of another race or other races. The irony would be great if being considered only "part Black" subjected a person to an extensive pattern of historical discrimination but now prevented one from stating a claim under a statute designed in substantial part to remedy that discrimination. Unless we state otherwise, when we recite statistics about Black Alabamians from census data collected in or after the 2000 census, we are referring to any census respondent who identified themselves as Black, regardless whether that respondent also identified as a member of another race or other races.

### B.   The Milligan plaintiffs are substantially likely to establish a Section Two violation.

#### 1.   *Gingles* I – Numerosity

We first find that the *Milligan* plaintiffs have established that Black voters as a group are "sufficiently large . . . to constitute a majority" in a second majority-minority legislative district. *Cooper*, 137 S. Ct. at 1470 (internal quotation marks omitted). This issue is not disputed. Defendants do not make any arguments about

**Page 146 of 225**

numerosity in their opposition to a preliminary injunction other than the argument about metric cherry picking that we have rejected. *Compare Milligan* Doc. 78 at 67– 69, *with* Part V.A, *supra*. Further, Defendants do not dispute that using the any-part Black metric, the *Milligan* plaintiffs and the *Caster* plaintiffs have submitted a total of eleven remedial plans in which two congressional districts would have a BVAP of greater than 50%. *See Milligan* Doc. 78 at 67–69; *Milligan* Doc. 74-1 at 2, 8–10; Tr. 854, 862–66, 914–15. And Defendants acknowledge that even using their preferred single-race Black metric, the plaintiffs have submitted a remedial plan in which two congressional districts would have a BVAP of greater than 50%. *See Milligan* Doc. 78 at 67; *Milligan* Doc. 74-1 at 2, 8; Tr. 1040.

### 2.   *Gingles* I – Compactness

We next find that the *Milligan* plaintiffs have established that Black voters as a group are sufficiently large "and geographically compact" to constitute a majority in a second congressional district. *Cooper*, 137 S. Ct. at 1470 (internal quotation marks omitted). We proceed in two steps: *first*, we repeat and explain our credibility determinations about the testimony of the parties' three *Gingles* I expert witnesses: Dr. Duchin, Mr. Cooper, and Mr. Bryan; and *second*, we consider the parties' arguments about geographic compactness. In the next section, we will consider the State's argument that even if the Duchin plans or the Cooper plans perform reasonably well or as well as the Plan on measures of geographic compactness, the

Duchin plans and Cooper plans do not establish reasonable compactness for *Gingles* purposes because they do not otherwise adhere to traditional districting criteria, particularly with respect to communities of interest.

### a.   Credibility Determinations

*First*, we find Dr. Duchin's testimony highly credible. There can be no question that Dr. Duchin is an eminently qualified expert – she has earned relevant degrees from some of the world's finest educational institutions, her academic research focused on redistricting is regularly reviewed by her peers and selected for publication in leading journals, and her work on redistricting issues includes both academic and litigation work. *See supra* at Part IV.A.1.

Throughout Dr. Duchin's reports and her live testimony, her opinions were clear and consistent, and she was able to explain the basis for each step of her analysis and every conclusion she drew. *See Milligan* Doc. 68-5; *Milligan* Doc. 76-4; Tr. 549–695. Indeed, she was able to explain a complex analytic process in a manner that was sufficiently clear for non-mathematicians to understand it, evaluate it, and ask her questions about it. *See Milligan* Doc. 68-5; *Milligan* Doc. 76-4; Tr. 549–695.

In our observation, Dr. Duchin subjected her work to very high standards and rigorous quality control. Every time she was asked whether she had reviewed relevant materials, she had. *See, e.g.*, Tr. 636, 655, 661–62. She was careful not to

overstate her opinions and commonly refused to testify about matters outside the scope of her expertise or opinions. *See, e.g.*, Tr. 609, 614–15, 620, 637, 643–44, 660, 668, 674. The only mistake identified in her work, either in the filings or during the hearing, was a discrete mistake in her analysis of contiguity that Mr. Bryan identified after her initial report was filed; she immediately corrected the mistake so that Mr. Bryan's rebuttal analysis could proceed on the basis of corrected information, and the correction had no impact on her substantive conclusions. *See Milligan* Doc. 74-1 at 7; *Milligan* Doc. 92-1 (Ex. M48); Tr. 587–90.

More particularly, we credit Dr. Duchin's testimony that she carefully considered traditional redistricting criteria when she drew her illustrative plans. She was candid that she prioritized race only to the extent necessary to answer the essential question asked of her as a *Gingles* I expert ("Is it possible to draw a second, reasonably compact majority-Black district?"), and clearly explained, with concrete examples, that she did not prioritize it to any greater extent. *See supra* at Part IV.A.1. She acknowledged that tradeoffs between traditional districting criteria are necessary, and she did not ignore any criteria. Further, she articulated a reasonable explanation based on the Legislature's redistricting guidelines why, when she was forced to choose between competing redistricting principles, she prioritized some principles over others. *See supra* at Part IV.A.1.

During Dr. Duchin's live testimony, we carefully observed her demeanor, particularly as she was cross-examined for the first time about her work on this case. She consistently defended her work with careful and deliberate explanations of the bases for her opinions. Her testimony was internally consistent and thorough and we observed no reason to question the veracity of her testimony. We find that her methods and conclusions are highly reliable, and ultimately that her work is helpful to the court.

*Second,* we find Mr. Cooper's testimony highly credible. Mr. Cooper has spent the majority of his professional life drawing maps for redistricting and demographic purposes, and he has accumulated extensive expertise (more so than any other *Gingles* I expert in the case) in redistricting cases, particularly in Alabama. *See supra* at Part IV.B.1. Indeed, his command of districting issues in Alabama is sufficiently strong that he was able to draw a draft remedial plan for Singleton's counsel in "half of an afternoon." Tr. 527–28 (testimony discussing that as a courtesy to counsel in *Singleton*, Mr. Cooper drew a draft Whole County Plan).

Throughout Mr. Cooper's reports and his live testimony, his opinions were clear and consistent, and he had no difficulty articulating his basis for them. *See Caster* Doc. 48; *Caster* Doc. 65; Tr. 417–531. But he was not dogmatic: he took seriously Mr. Bryan's criticism of the compactness of his first six plans and prepared

a seventh remedial plan that was responsive to that concern. *See Caster* Doc. 65 at 2 (Cooper rebuttal report).

As we did with Dr. Duchin, we particularly credit Mr. Cooper's testimony that he worked hard to give "equal weighting" to all traditional redistricting criteria. Tr. 439–41. He was candid that he prioritized race only to the extent necessary to answer the essential question asked of him as a *Gingles* I expert ("Is it possible to draw a second, reasonably compact majority-Black district?"), and clearly explained that he did not prioritize it to any greater extent. *See supra* at Part IV.B.1. Indeed, he explained what his plans and opinions might have looked like if he had assigned it greater weight. Tr. 503. Like Dr. Duchin, Mr. Cooper acknowledged that tradeoffs between traditional districting criteria are necessary, and he did not ignore any criteria. He articulated a reasonable basis for the choices he made when he was forced to choose between competing redistricting principles – namely, the choices that the Plan made. *See supra* at Part IV.B.1 (testimony that he felt it was important to "meet or beat" the Plan's performance with respect to some race-neutral redistricting criteria).

During Mr. Cooper's live testimony, we carefully observed his demeanor, particularly as he was cross-examined for the first time about his work on this case. He consistently defended his work with careful and deliberate explanations of the bases for his opinions. We observed no internal inconsistencies in his testimony, no

Page **151** of **225**

appropriate question that he could not or would not answer, and no reason to question the veracity of his testimony. We find that his methods and conclusions are highly reliable, and ultimately that his work as a *Gingles* I expert is helpful to the court.

*Third*, we assign very little weight to Mr. Bryan's testimony — the only *Gingles* I expert testimony offered by Defendants. We divide our credibility determination in two parts – one that is relative to Dr. Duchin and Mr. Cooper, and another that is not relative. Compared to Dr. Duchin and Mr. Cooper, Mr. Bryan's work was considerably less thorough: Dr. Duchin and Mr. Cooper based their opinions on a wide-ranging consideration of the requirements of federal law and all or nearly all traditional redistricting criteria, but Mr. Bryan considered only three or four traditional redistricting criteria (depending on the report). *See Milligan* Doc. 74-1 at 11; *Caster* Doc. 66-1 at 1; Tr. 929–30. Further, Mr. Bryan volunteered on cross-examination that he did not review an authority cited in his report (which authority contravened the opinion he offered in the report), Tr. 903–07, 909; testified that he never reviewed the exhibits to Mr. Cooper's report, Tr. 884–86, 976; testified that he never reviewed Cooper plan 7, which was prepared directly in response to a criticism that he had offered, but simply left it "in [his] e-mail somewhere" before he testified, Tr. 884–86, 976; and testified that he understood that Dr. Duchin may have presented compactness scores disaggregated to the district level in a subsequent

report (following his criticism of her aggregated scores), but he "did not see that report or those findings," Tr. 869.

Additionally, Mr. Bryan's credentials are considerably weaker than Dr. Duchin's or Mr. Cooper's: he does not have the academic record or the record of peer-reviewed publications that Dr. Duchin has, and he does not have the experience testifying as an expert witness in redistricting litigation (and particularly in such litigation in Alabama) that Mr. Cooper has.

Separate and apart from our relative evaluation, we question the basis for Mr. Bryan's opinions. In addition to the concern that we already have articulated about the appropriate metric to use to measure the Black voting age population, *see supra* at Part V.A, we are concerned about numerous other instances in which Mr. Bryan offered an opinion without a sufficient basis (or in some instances any basis). For example:

- Mr. Bryan opined in his report that "[p]lans were drawn in compliance with the published criteria for redistricting," *Milligan* Doc. 66-2 at 6 & n.7, but evaluated in that report only four of those criteria. *See id.* at 15–32.

- Although Mr. Bryan selected only four traditional redistricting principles to consider and evaluate in his initial report, he expressly opined in that report that the Hatcher plan "performs more poorly than the 2021 enacted plan with respect to **all** traditional districting criteria." *Id.* at 32 (emphasis added).

- Mr. Bryan testified that he did not "see anything that would lead a map drawer" to split Mobile and Baldwin counties "other than a desire to divide voters by race in order to draw two majority-[B]lack districts,"

Tr. 875–76, but did not examine all of the traditional redistricting principles set forth in the Legislature's guidelines. *See supra* at Part IV.C.1.

- Further on the above issue, Mr. Bryan conceded that the Black Belt is a community of interest, but would not opine whether the Plan or any Duchin plan is "better" for the Black Belt as a community of interest, Tr. 1063–65, 1109, meaning that he did not consider whether a possible explanation for splitting Mobile and Baldwin counties could be to keep together, as much as possible, a different community of interest.

- When Mr. Bryan testified about communities of interest during his cross examination, he testified that there "certainly would be" demographic statistics that "one looks at to determine communities of interest," Tr. 1058–59; that such statistics could include "age groups, income groups, employment groups, different types of family structure," and "[r]acial composition," Tr. 1059–60; and that there is nothing "at all in any of [his] reports that talks at all about [his] use of any statistical analysis in connection with communities of interest," Tr. 1061.

- When Mr. Bryan was asked about his opinion that Mobile and Baldwin counties comprise an "inseparable" community of interest, Tr. 1006, he confirmed that the testimony of former Congressmen Bonner and Byrne was the only basis for that opinion, and that he had not reviewed any other testimony from the *Chestnut* litigation. Tr. 1008–11.

- Relatedly, after Mr. Bryan testified on cross that his opinions about compactness relied on compactness scores alone and did not "analyze any of the specific contours of the districts" in the Cooper plans, Tr. 971, counsel for the *Caster* plaintiffs recalled his earlier testimony about how the Cooper plans "draw lines that appear to [him] to be based on race" and asked him where in his rebuttal report he offered any analysis "of the way in which specific districts in Mr. Cooper's illustrative plans are configured outside of their objective compactness scores." Tr. 972–73. Mr. Bryan testified that it "appears [he] may not have written text about that finding," "that part of the report and the analysis was pretty light," and he "refer[red] to the map of . . . Cooper's plans to support [his] observation." Tr. 973–75.

We are mindful of the serious time exigencies of this litigation and the

compressed schedule applied to Mr. Bryan's work as a result. Although the schedule might have limited Mr. Bryan's ability to perform some work that he otherwise might have performed, it did not cause him to overstate his opinions, offer testimony without a sufficient basis, cite material that he had not reviewed, or offer opinions at the preliminary injunction hearing that he had not offered in his reports.

Additionally, internal inconsistencies and vacillations in Mr. Bryan's testimony undermine Mr. Bryan's credibility as an expert witness. We describe one example here. One of the critical issues with respect to communities of interest is whether keeping the Black Belt together (*i.e.*, split between as few congressional districts as possible) is important and, if it is, whether that requires splitting Mobile County. When Mr. Bryan was asked whether he investigated any communities of interest besides the Gulf Coast, he indicated that he did not find any evidence that other communities of interest were split in the proposed plans:

> Yes. I particularly [sic] in places where districts crossed administrative pieces of geography such as counties. I explored and investigated places where that happened to see if there were any significant communities of interest there. Cities, for example, that were going to get split by the boundaries. I didn't find any else where that seemed to be relevant.

Tr. 1062. He was then asked whether he gave any consideration to the Black Belt as a community of interest, and he testified that he did, but that the Duchin and Cooper plans do not protect it because they split it:

> I did. I looked at that carefully. And it was notable and interesting to me that in those 18 -- I think there's different definitions, 18 or 19

counties that within the Black Belt many of the plaintiff plans seemed to cut the Black Belt into different pieces. Two pieces. I think there were some cases I saw it was cut into three pieces in different plaintiff plans, as well. So I acknowledged it as a community of interest, but it does not seem to be one that prevailed in the development of these plans.

Tr. 1063. Minutes later, Mr. Bryan was asked, "[O]ne of the things that Dr. Duchin's models perform is to aggregate the Black Belt more than the existing plan or the 2011 plan, isn't that correct?" Tr. 1064. And in direct contravention of his previous testimony, he replied: "It appears so." *Id.*; *see also* Tr. 1065 (acknowledging that Duchin plans had "fewer splits" of the Black Belt than any other plan, and that "[f]ewer splits are generally better").

During Mr. Bryan's live testimony, we carefully observed his demeanor, particularly as he was cross-examined for the first time about his work on this case. On more than one occasion when a questioner asked a reasonable question about the basis for his opinions, he offered dogmatic and defensive answers that merely incanted his professional opinion and reflected a lack of concern for whether that opinion was well-founded. *See, e.g.*, Tr. 1111–13. Because Mr. Bryan consistently had difficulty defending both his methods and his conclusions, and repeatedly offered opinions without a sufficient basis, and because we observed internal inconsistencies in his testimony on important issues, we find that his testimony is unreliable.

### b.    Geographic Compactness Scores

We next consider the question whether the compactness scores for the Duchin plans and Cooper plans indicate that the majority-Black congressional districts in those plans are reasonably compact. The record supplies two metrics for us to use to assess what these scores say about reasonableness: the testimony of eminently qualified experts in redistricting, and the relative compactness of the districts in the remedial plans compared to that of the districts in the Plan.

We first consider the expert testimony. On the one hand, both Dr. Duchin and Mr. Cooper testified that the compactness scores for their remedial plans were reasonable. Dr. Duchin testified that measuring compactness "is one of the areas of [her] specialization," Tr. 590, and that the majority-Black districts in her plans were reasonably compact, Tr. 594. And Mr. Cooper testified about this multiple times: he first said that all of his plans are "certainly within the normal range if you look at districts around the country," Tr. 446; then that the compactness scores "match[] up fine if you look at districts around the country or even if you look at some of the legislative districts in Alabama," Tr. 471; then that "if you look at congressional plans around the country, those scores are just fine," Tr. 492; and then that "[the compactness scores] are absolutely within a normal range for congressional districts nationwide," Tr. 493. On the other hand, Mr. Bryan testified that he offered "no opinion on what is reasonable and what is not reasonable" in terms of compactness,

Tr. 979. Accordingly, the corollary of our decision to credit Dr. Duchin and Mr. Cooper is a finding that the Black population in the majority-Black districts in the Duchin plans and the Cooper plans is reasonably compact.

We next consider the geographic compactness scores for the districts in the remedial plans as compared to scores for the districts in the Plan. Dr. Duchin testified that all four of her plans "are superior to" and "significantly more compact than" the Plan using an average Polsby-Popper metric, *Milligan* Doc. 68-5 at 9; Tr. 593, to which even Mr. Bryan largely agreed, *see Milligan* Doc. 741-1 at 19 ("My analysis of compactness shows that Dr. Duchin's plans perform generally better on average than the enacted State of Alabama plans, although some districts are significantly less compact than Alabama's, and significantly better than Bill Cooper's plans.") (emphasis omitted).

If we look at compactness scores disaggregated to the district level, we find that Dr. Duchin testified that the least compact districts in her plans – Districts 1 and 2 – were "comparable to or better than the least compact districts" in both the Plan and the 2011 Congressional map, Tr. 594; *accord* Tr. 655–56, and Mr. Bryan did not dispute this testimony. Further, Dr. Duchin testified that in her opinion, she was able to "maintain reasonable compactness by Alabama standards in [her] entire plan" because "[a]ll of [her] districts are more compact" on a Polsby-Popper metric than "the least compact district from 10 years ago" in Alabama, Tr. 665, and Mr. Bryan

Page **158** of **225**

again did not dispute this testimony.

As for the compactness scores of the Cooper plans, Mr. Bryan testified at the preliminary injunction hearing that the compactness scores for Cooper plan 4 are comparable to the compactness scores for the Plan, Tr. 976–77, and that he did not assess Cooper plan 7, which Mr. Cooper drew in response to Mr. Bryan's criticism about the compactness scores of Cooper plans 1-6.

Ultimately, as far as compactness scores go, all the indicators point in the same direction. Regardless how we study this question, the answer is the same each time. We find that based on statistical scores of geographic compactness, each set of Section Two plaintiffs has submitted remedial plans that strongly suggest that Black voters in Alabama are sufficiently numerous and reasonably compact to comprise a second majority-Black congressional district.

### c.   Reasonable Compactness and Traditional Districting Principles

Compactness is about more than geography. It ultimately "refers to the compactness of the minority population, not to the compactness of the contested district." *LULAC*, 548 U.S. at 430 at 433 (quoting *Vera*, 517 U.S. at 997 (Kennedy, J., concurring)) (internal quotation marks omitted). If the minority population is too dispersed to create a reasonably configured majority-minority district, Section Two does not require such a district. As Mr. Cooper explained:

Q.     And, Mr. Cooper, in your experience, is there a bright line standard for when a district is considered compact?

A.     No. No. And you really have to go beyond compactness scores and take into account other factors, like odd-shaped counties, odd-shaped cities, odd-shaped precincts. There just really is not a bright line rule, nor should there be.

Tr. 458.

Because Mr. Cooper testified that the "most common" compactness metric is "just eyeballing it as you draw the plan," Tr. 444, we begin this analysis of reasonable compactness with two visual assessments. *First*, a visual assessment of the geographic concentration of the Black population in Alabama. Dr. Duchin included in her report a map that reflects the geographic dispersion of Black residents across Alabama:



Figure 3:  Black voting-age population share is shown by shading at the precinct level.  The major cities have visible concentrations of Black population, and the Black Belt rural counties are clearly visible running East-West across the state.

**Page 160 of 225**

*Milligan* Doc. 68-5 at 12 fig.3. Dr. Duchin described the centers of Black population in Alabama that are apparent on this map – both urban population centers and the Black Belt. *See id.* at 12–13. She reported that the Black population in the four largest cities (Birmingham, Huntsville, Montgomery, and Mobile) includes approximately 400,000 people and comprises approximately one-third of the Black population in Alabama. *Id.* at 12. And she reported that the Black population in the Black Belt, which stretches east to west across the state, includes approximately 300,000 people. *Id.* at 12–13. Dr. Duchin explained in her report that the Plan either partially or fully excludes eight of the eighteen Black Belt counties from majority-Black congressional districts, and that "[e]ach of the 18 Black Belt counties is contained in majority-Black districts in at least some of the alternative plans" that she presents. *Id.* at 13. These aspects of Dr. Duchin's report are not in dispute.

Our visual assessment of the geographic dispersion of Black population in Alabama, together with statistics about Black population centers in the state, suggest to us that Black voters in Alabama are relatively geographically compact. The map reflects that there are areas of the state where much of Alabama's Black population is concentrated, and that many of these areas are in close proximity to each other. Just by looking at the population map, we can see why Dr. Duchin and Mr. Cooper expected that they could easily draw two reasonably configured majority-Black districts.

*Second*, we consider our visual assessment of the majority-Black districts in the Duchin and Cooper plans. *See Milligan* Doc. 68-5 at 7 (Duchin plan maps) and *Caster* Doc. 48 at 23–33 and *Caster* Doc. 65 at 3 (Cooper plan maps). We do not see tentacles, appendages, bizarre shapes, or any other obvious irregularities that would make it difficult to find that any District 2 could be considered reasonably compact. We do see that District 7 in all the illustrative plans has what has been referred to as a "finger" that reaches into Jefferson County for the apparent purpose of capturing Black population from the Birmingham area. *Milligan* Doc. 70-2 at 170. But that finger has been there (in some form, and basically the same form) in every congressional map since *Wesch*, *see Singleton* Doc. 73-22 at 40–43, and it is still present, so it cannot mean that the illustrative plans are any less compact than the Plan.

We next turn to the question whether the Duchin plans and the Cooper plans reflect reasonable compactness when our inquiry takes into account, as it must, "traditional districting principles such as maintaining communities of interest and traditional boundaries." *LULAC*, 548 U.S. at 433 (internal quotation marks omitted). We consider each traditional redistricting criterion in turn. We do not discuss the question whether the Duchin plans and the Cooper plans equalize population across districts because the parties agree and the evidence makes clear that they do, *see Milligan* Doc. 68-5 at 8, 13; *Caster* Doc. 48 at 21–34; *Caster* Doc. 65 at 2–6; Tr.

930, and we do not discuss the question whether the Duchin plans and the Cooper plans include contiguous districts because the parties agree and the evidence makes clear that they do that as well, *see Milligan* Doc. 68-5 at 8, 13; *Caster* Doc. 48 at 21–34; *Caster* Doc. 65 at 2–6; Tr. 931.

We first consider whether the Duchin plans and the Cooper plans respect existing political subdivisions, such as counties, cities, and towns. The Duchin plans perform at least as well as the Plan on this score, and some Duchin plans outperform the Plan. Both the Plan and all four Duchin plans "split nine counties or fewer, giving them high marks for respecting these major political subdivisions," and one of her plans has the same number of county splits (the Plan splits six counties once, and Duchin Plan D splits four counties once and Jefferson County twice). *Milligan* Doc. 68-5 at 8. Further, all the Duchin plans "are comparable to the State's plan on locality splits, with [Duchin] Plan B splitting fewer localities" than the Plan. *Id.*

Likewise, the Cooper plans perform at least as well as the Plan, and in some instances they perform better than the Plan. Mr. Cooper "felt like it was important to either meet or beat the county split achievement of [the Plan]," which splits six counties, and each of his illustrative plans splits between five and seven counties. Tr. 441–42; *Caster* Doc. 48 at 22; *Caster* Doc. 65 at 5. Mr. Cooper further testified that if he had to split a county, he then tried to minimize precinct splits, and if he had to split a precinct to get to zero population deviation, he then tried to rely on

"municipal lines, primary roads, [and] waterways." Tr. 443–44. Mr. Bryan testified that he did not evaluate and offered no opinion on "the extent to which Mr. Cooper's plan[s] split political subdivisions," Tr. 931–32.

We next consider whether the Duchin plans and the Cooper plans respect communities of interest. Communities of interest are defined under the Legislature's guidelines as areas "area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities." *Milligan* Doc. 88-23 (Ex. M28) at 2. The term "may, in certain circumstances, include political subdivisions such as counties, voting precincts, municipalities, tribal lands and reservations, or school districts." *Id.* at 2–3. The Legislature has said that the "discernment" of a "communit[y] of interest" is "best carried out by elected representatives of the people." *Id.* at 3.

Before we explain our findings and conclusions on this issue, we observe that this was fervently disputed during the preliminary injunction hearing, and all parties devoted significant time and argument to it. Defendants strongly object to Dr. Duchin and Mr. Cooper's decisions to split Mobile County in every illustrative plan, and they insist that there is no legitimate reason to separate Mobile County and Baldwin County. The *Milligan* plaintiffs and the *Caster* plaintiffs urge us that the Black Belt better fits the Legislature's definition of "community of interest," so splitting it into as few districts as possible should be the priority over keeping the

Gulf Coast counties together, and one way to split the Black Belt less is to split the Gulf Coast counties and include some of the population of Mobile County with a district that also includes part of the Black Belt.

Critically, our task is not to decide whether the majority-Black districts in the Duchin plans and Cooper plans are "better than" or "preferable" to a majority-Black district drawn a different way. Rather, the rule is that "[a] § 2 district that is **reasonably** compact and regular, taking into account traditional districting principles," need not also "defeat [a] rival compact district[]" in a "beauty contest[]." *Vera*, 517 U.S. at 977–78 (emphasis in original) (internal quotation marks omitted). In analyzing this issue, we are careful to avoid the beauty contest that a great deal of testimony and argument seemed designed to try to win.

The Black Belt stands out to us as quite clearly a community of interest of substantial significance. "The Black Belt is a collection of majority-Black counties that runs through the middle of Alabama. The Black voters in the Black Belt share a rural geography, concentrated poverty, unequal access to government services, and lack of adequate healthcare." *Milligan* Doc. 70-4 ¶ 11. Mr. Cooper prepared a map that reflects the geographic dispersion of Alabama's Black population and clearly demarcates the Black Belt:

**Page 165 of 225**



**Figure 2**
**2020 Census – Black Belt Region and Black Population by County**

*Caster* Doc. 48 at 8 fig.2.

That the Black Belt is an important community of interest is common knowledge in Alabama; has been acknowledged in other redistricting cases, *see Alabama Legislative Black Caucus*, 231 F. Supp. 3d at 1222 (Pryor, J.: "all parties have recognized [the Black Belt] as a community of interest"); and is clear from the record before us. The parties were able to stipulate what counties it includes, where it is located, and why it is described as the Black Belt. *See Milligan* Doc. 53 ¶¶ 60, 61. They further stipulated that the Black Belt "has a substantial Black population because of the many enslaved people brought there to work in the antebellum

**Page 166 of 225**

period." *Id.* ¶ 60. Dr. Bagley provided a fuller explanation of the sad role that slavery played in the demographic heritage of the Black Belt:

> White settlers began to flood into the state of Alabama when most of the remaining Creek Indians were forced out via the Indian Removal Act of 1830. By then, the United States government had banned the importation of slaves from abroad, so many settlers brought enslaved Black people with them from the older plantation areas of the Upper South. Others purchased them from slave markets in Montgomery, Mobile, Jackson, and other cities. American chattel slavery expanded dramatically between that time and the Civil War, giving rise to the "Cotton Kingdom" of the antebellum era when cotton was America's most valuable export and enslaved Black people were its most valuable commodity. The Black Belt of Alabama became home to not only the wealthiest white plantation owners in the state, but to some of the wealthiest individuals in the young nation, some of whom held hundreds of people in bondage.

*Milligan* Doc. 76-2 at 1. Most Section Two experts testified about the Black Belt, and their opinions addressed a range of demographic, cultural, historical, and political issues about how the Black Belt became the Black Belt, how it has changed over time, and what shared experiences and concerns there make it unique today. Every lay witness testified about their understanding of the Black Belt, their connections to it, and its significance to them and to Alabama politics.

Under the Plan, the Black Belt is split into four Congressional districts: Districts 1, 2, and 3, where the *Milligan* plaintiffs assert that their votes are diluted, and District 7, which the *Milligan* plaintiffs assert is packed. And eight of the eighteen core Black Belt counties are "partially or fully excluded from majority-Black districts." *Milligan* Doc. 68-5 at 13; *see also* Tr. 666–68.

In contrast, the Duchin plans contain the overwhelming majority of the Black Belt in just two districts, and "[e]ach of the 18 Black Belt counties is contained in majority-Black districts in at least some" of her alternative plans. *Milligan* Doc. 68-5 at 13; *see also* Tr. 598–99. Likewise, the Cooper plans clearly assign substantial weight to the Black Belt: in all Cooper plans, the overwhelming majority of the Black Belt is in just two districts. *Caster* Doc. 48 at 22–35; *Caster* Doc. 65 at 3–4; Tr. 447, 450–51.

Accordingly, it is apparent that the remedial maps submitted by the *Milligan* plaintiffs and the *Caster* plaintiffs respect this important community of interest. Defendants do not dispute this obvious fact (and Mr. Bryan conceded it, Tr. 1063); instead, they say that the plaintiffs' attempt to unite much of the Black Belt as a community of interest in a remedial District 2 is "merely a blunt proxy for skin color." *Milligan* Doc. 78 at 86. To that end, at the preliminary injunction hearing, Defendants tried to adduce testimony that apart from race, a Black resident of Mobile County has more in common with her white neighbor than with a Black resident from the Black Belt. Tr. 156.

Defendants are swinging at a straw man. Each set of plaintiffs developed substantial argument and evidence, including expert evidence, about the shared history and common economy (or lack thereof) in the Black Belt; the overwhelmingly rural, agrarian experience; the unusual and extreme poverty there;

**Page 168 of 225**

and major migrations and demographic shifts that impacted many Black Belt residents, just to name a few examples. *See, e.g.*, Tr. 138–44 (Mr. Milligan), 1064 (Mr. Bryan), 1161–65, 1239 (Dr. Bagley), 1358–59 (Mr. Jones), 1875 (counsel for the Secretary); *Milligan* Doc. 68-2 at 21. The Black Belt is overwhelmingly Black, but it blinks reality to say that it is a "blunt proxy" for race – on the record before us, the reasons why it is a community of interest have many, many more dimensions than skin color.

Because we find that the Black Belt is a community of interest, and because we find that the Duchin plans and the Cooper plans respect it at least as much as the Plan does, and likely more, we need not consider how the Districts 2 and 7 might perform in a beauty contest against other plans that also respect communities of interest. Together with our finding that the Duchin plans and the Cooper plans respect existing political subdivisions, our finding that the Duchin plans and the Cooper plans respect the Black Belt supports a conclusion that the Duchin plans and the Cooper plans establish reasonable compactness for purposes of the first *Gingles* requirement.

Nevertheless, we consider Defendants' argument that Alabama's Gulf Coast counties also comprise a community of interest, which the Duchin plans and the Cooper plans "completely ignore." *Milligan* Doc. 78 at 18. As an initial matter, Defendants overstate the point. When Mr. Cooper was asked to explain the

configuration of Mobile County in his illustrative plans, his response reflected that

he considered communities of interest there:

> Well, in the illustrative plans, all of the illustrative plans include a significant portion of the city of Mobile, or in the case of District 6 and 7, all of Mobile. In illustrative plan 1, the only -- the primary area of Mobile that I excluded from District 2 is the waterfront area of Mobile, which is actually a grouping of precincts that are predominantly African-American and I put into District 1 so that there was a transportation route between District 1 and Mobile County and District 1 in Baldwin County. So you don't need to drive outside of District 1 to get from one part of District 1 to the other. You have a straight route going across U.S. 98 and Mobile Bay. And there are a few precincts that are split along that route I-10 area coming in to downtown Mobile. And that actually is a feature of most of my plans, except for illustrative Districts 6 and 7 -- illustrative plans 6 and 7, which keep all of Mobile whole, extending it right up to the waterfront.

Tr. 451–52.

Further, compared to the record about the Black Belt, the record about the

Gulf Coast community of interest is less compelling. Only two witnesses testified

about it: Mr. Bryan, who was forced to concede that his analysis was partial,

selectively informed, and poorly supported, and Mr. Byrne, who was substantially

more effective at describing what the areas have in common, but who also

acknowledged the importance of the Black Belt, Tr. 1675, 1705. And ultimately, we

do not find that Mr. Byrne's testimony supported Defendants' overdrawn argument

that there can be no legitimate reason to split Mobile and Baldwin Counties

consistent with traditional redistricting criteria. Rather, his testimony simply

explained the political advantages that likely would accrue for those areas if they are

able to be kept together. And if those advantages really are as compelling as Defendants suggest, we expect that the Legislature will assign them great weight when it draws a replacement map. We also note in passing that the Legislature has repeatedly split Mobile and Baldwin Counties in creating maps for the State Board of Education districts in Alabama, and the Legislature did so at the very same time it drew the Plan. *See Caster* Doc. 48 ¶¶ 32–41.

Finally, we turn to the last two traditional redistricting criteria in play: incumbency protection and core retention. Dr. Duchin testified that she did not address incumbents anywhere in her report or her illustrative maps. Tr. 668. Mr. Cooper testified that he tried to protect incumbents where possible, paired as few incumbents as possible, paired only the most junior incumbents when pairings were necessary, and in Cooper plan 5 paired no incumbents. Tr. 468, 471, 483, 505; *see also* Tr. 964–67. Mr. Cooper also testified that it would be easy to protect more incumbents more often if an additional county split (or two) were tolerable. Tr. 483–84. This is enough. To demand more would be to require that every remedial plan invariably protect every incumbent, and that is too much. There is no legal basis for that rule, and we decline to adopt it. When the Legislature prepares a replacement map, it is well within its discretion to adopt a map that protects every incumbent; Cooper plan 5 is just such a map.

In any event, we note that under the Legislature's redistricting guidelines, the protection of incumbents is a decidedly lower-level criterion, *see Milligan* Doc. 88-23 (Ex. M28), and that this is consistent with the lower-level importance that criterion has been afforded in other redistricting cases. *See, e.g.*, *Larios v. Cox*, 300 F. Supp. 2d 1320, 1348 (N.D. Ga. 2004), *aff'd*, 542 U.S. 947 (2004).

As for core retention, there is no question that the Plan retains more of the cores of the 2011 congressional map than do the Duchin plans or the Cooper plans. But this is not the fatal flaw that Defendants suggest. The Legislature's redistricting guidelines do not establish that core retention must be the (or even a) priority among competing traditional redistricting principles, and expressly leave room for other principles to be assigned greater weight. *See Milligan* Doc. 88-23 (Ex. M28). Further, as Dr. Duchin explained, some core disruption – indeed, a significant level of core disruption – is to be expected when the entire reason for the remedial map is to draw a second majority-minority district that was not there before. Tr. 599–600. And finally, Defendants do not identify (and we have been unable to find) a single case in which core retention was assigned the great weight that they urge, and a proposed majority-Black district was rejected under *Gingles* I for inadequate core retention. This dearth makes sense: that finding would turn the law upside-down, immunizing states from liability under Section Two so long as they have a

longstanding, well-established map, even in the face of a significant demographic shift.

Ultimately, we find that Defendants do not give either the *Milligan* plaintiffs or the *Caster* plaintiffs enough credit for the attention Dr. Duchin and Mr. Cooper paid to traditional redistricting criteria. Defendants set a high bar for themselves when they asserted that the plaintiffs' remedial plans are not reasonably compact because they "completely ignore," "subjugat[e]," "jettison[]," *Milligan* Doc. 78 at 18, and "sacrifice[]" traditional districting criteria, Tr. 874, and they did not meet it. The evidence clearly establishes that Dr. Duchin and Mr. Cooper carefully studied the Legislature's redistricting guidelines, considered many traditional redistricting principles, made careful decisions about how to prioritize particular principles when circumstances forced tradeoffs, and illustrated what different remedial plans might look like if the principles were prioritized in a different order. As a result, they developed plans that have nearly zero population deviation, include only contiguous districts, include districts that are at least as geographically compact as those in the Plan, respect traditional boundaries and subdivisions at least as much as the Plan, protect important communities of interest, protect incumbents where possible, and provide a number of majority-Black districts that is roughly proportional to the Black percentage of the population. Accordingly, we find that the remedial plans

developed by those experts satisfy the reasonable compactness requirement of *Gingles* I.

### 3.    *Gingles* II and III – Racially Polarized Voting

We discuss our *Gingles* II and III findings together. As explained below, following the preliminary injunction hearing, there is no serious dispute that Black voters are "politically cohesive," nor that the challenged districts' white majority votes "sufficiently as a bloc to usually defeat [Black voters'] preferred candidate." *Cooper*, 137 S. Ct. at 1470 (internal quotation marks omitted).

As an initial matter, we credit the testimony of both the *Milligan* plaintiffs' *Gingles* II and III expert, Dr. Liu, and the *Caster* plaintiffs' *Gingles* II and III expert, Dr. Palmer. Both experts have credentials that include substantial academic work in electoral politics and significant experience testifying in redistricting cases in federal courts. *See supra* at Parts IV.A.2, IV.B.2. In our observation, both witnesses consistently and thoroughly explained the work they performed for this case and the bases for the conclusions they reached, and we discern no reason to question the reliability of their testimony.

Dr. Liu's testimony emphasized the clarity and starkness of the pattern of racially polarized voting that he observed, particularly in the biracial endogenous elections that he considered. *See* Tr. 1271–76. Dr. Liu's testimony about those elections indicates that voting in Alabama is clearly and intensely racially polarized:

he testified that "Black support for [B]lack candidates was almost universal" and "overwhelmingly in the 90[%] range," Tr. 1271, that Black voters were "super cohesive," Tr. 1274, and that the Black-preferred candidate was defeated in every election except the one in the majority-Black district he considered, Tr. 1275. This testimony leaves no doubt in our minds that voting in Alabama is racially polarized, but if it did, Dr. Liu's confirmatory findings in the exogenous elections would resolve it. Tr. 1275–76. Put simply, the numbers do not lie: they tell us that racially polarized voting in Alabama, and particularly in the districts challenged here, is "very clear." Tr. 1293.

Dr. Palmer reached the same conclusion that Dr. Liu reached, although he took a different analytic route to get there. *See Caster* Doc. 49. Like Dr. Liu, Dr. Palmer repeatedly invoked adjectives and adverbs that indicate to us that voting in Alabama is clearly and intensely racially polarized: he opined that "Black voters are extremely cohesive," *id.* ¶ 16, "[w]hite voters are highly cohesive," *id.* ¶ 17, and "[i]n every election, Black voters have a clear candidate of choice, and [w]hite voters are strongly opposed to this candidate," *id.* ¶ 18. Here again, the numbers do not lie, and in Dr. Palmer's analysis even the averages tell the story: Dr. Palmer concluded that "[o]n average, Black voters supported their candidates of choice with 92.3% of the vote," and "[o]n average, [w]hite voters supported Black-preferred candidates with 15.4% of the vote, and in no election did this estimate exceed 26%." *Id.* ¶¶ 16–

17. Dr. Palmer described the evidence of racially polarized voting across the five districts he studied as "very strong," Tr. 701, and we agree.

Although Defendants made several arguments in their opposition to the motions for a preliminary injunction about why the *Milligan* plaintiffs and the *Caster* plaintiffs could not establish racially polarized voting, *see Milligan* Doc. 78 at 97–98, those arguments ignored that – and in our view were substantially undercut because – Defendants' expert, Dr. Hood, opined in his report that he found evidence of racially polarized voting in Districts 6 and 7 in the Whole County Plan and District 7 in the Plan. *See Milligan* Doc. 66-4 at 14 ("For all of the functional analyses performed, racially polarized voting is present with black voters overwhelmingly supporting the Democratic candidate and more than a majority of white voters casting a ballot for the Republican candidate."). Notably, Dr. Hood employed the same kinds of methods in his analysis that Drs. Liu and Palmer employed – namely, ecological inference methods. Tr. 1422; *Milligan* Doc. 68-1 at 5; *Caster* Doc. 49 ¶¶ 11–13.

As an initial matter, we credit Dr. Hood's testimony. His credentials include substantial academic work in electoral politics and significant experience testifying in redistricting cases in federal courts. As his report and rebuttal report explained, his scope of work was quite limited, *see Milligan* Doc. 66-4 at 3 (explaining that he was asked to opine about only two issues); *Milligan* Doc. 74-2 at 3–4 (rebuttal report,

raising limited questions about work performed by plaintiffs' experts), and at the preliminary injunction hearing we observed that he was careful not to overstate his opinions based on his limited analysis, and he thoroughly explained the work that he performed and limited conclusions he reached.

At the preliminary injunction hearing, Dr. Hood repeatedly acknowledged that he either agrees with or does not dispute the critical findings of Drs. Liu and Palmer on the question whether voting in Alabama, and specifically in the districts at issue in this litigation, is racially polarized. More particularly, he testified that he and Dr. Liu "both found evidence of" racially polarized voting in Alabama, Tr. 1421; that he does not dispute "Dr. Palmer's conclusions that [B]lack voters in the areas he examined [Districts 1, 2, 3, 6, and 7] vote for the same candidates cohesively," Tr. 1445; that he does not dispute "Dr. Palmer's conclusion that [B]lack Alabamians and white Alabamians in the areas he examined consistently preferred different candidates," Tr. 1445; and that he does not dispute "Dr. Palmer's conclusion that the candidates preferred by white voters in the areas that he looked at regularly defeat the candidates preferred by [B]lack voters," Tr. 1445. Dr. Hood also testified that he and Dr. Palmer both found evidence of a "substantive pattern" of racially polarized voting in District 7. Tr. 1448.

This record supports only one finding: that voting in Alabama, and in the districts at issue in this litigation, is racially polarized for purposes of the second and

third *Gingles* requirements.

### 4. The Senate Factors and Proportionality

We begin our analysis of the totality of the circumstances aware that "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances," *Ga. State*, 775 F.3d at 1342 (internal quotation marks omitted). Consistent with this reality, we find that both the *Milligan* plaintiffs and the *Caster* plaintiffs have established that they are substantially likely to prevail on their argument that on balance, the totality of the circumstances weighs in favor of their request for relief. We first analyze the Senate Factors and we then consider the proportionality arguments that the plaintiffs have raised. We begin with Factors 2 and 7, which *Gingles* suggests are the "most important." 478 U.S. at 48 n.15.

### a. Senate Factor 2

**"[T]he extent to which voting in the elections of the state or political subdivision is racially polarized." Gingles, 478 U.S. at 36-37.**

We have little difficulty finding that this factor weighs heavily in favor of the *Milligan* plaintiffs and *Caster* plaintiffs. We already have found that voting in the challenged districts is racially polarized, *see supra* at Part V.B.3, and that finding is based both on substantial evidence adduced by both the *Milligan* plaintiffs and the *Caster* plaintiffs, and the agreement of the Defendants' expert witness. Further, that

**Page 178 of 225**

evidence establishes a pattern of racially polarized voting that is clear, stark, and intense.

Defendants urge us to look deeper to determine whether that pattern is attributable to politics rather than race because "what appears to be bloc voting on account of race may, instead, be the result of political or personal affiliation of different racial groups with different candidates." *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000). But if we look deeper, we are looking at very little evidence. The only evidence Defendants offer to support their assertion that party, not race, may be the real issue is the recent election of a Black Republican, Kenneth Paschal, to the Alabama House from a majority-white district. *See Milligan* Doc. 78 at 107–09. One election of one Black Republican is hardly a sufficient basis for us to ignore (1) the veritable mountain of undisputed evidence that in all the districts at issue in this case, and in all statewide elections, voting in Alabama is polarized along racial lines, (2) the testimony of Dr. Liu that the election of Representative Paschal is "an unreliable election to estimate white support for a Black Republican candidate" because the turnout for that election (a special election) was so low that it suggests that "white voters were not highly interested in this election featuring a Black Republican candidate," *Milligan* Doc. 76-1 at 3, and (3) the testimony of Dr. Liu, unrebutted by Dr. Hood, that the 2016 Republican presidential primary in Alabama offers a better election to estimate white support

for a Black Republican candidate, and it indicates low such support because the Black Republican candidate, Ben Carson, received far less support than the white Republican candidate, Donald Trump, *Milligan* Doc. 76-1 at 3–4. On cross examination, Dr. Hood indicated that he had not "looked at turnout specifically" with respect to the special election of Mr. Paschal. Tr. 1432–33.

Defendants also point us to the decision of the court in the *Alabama State Conference of the NAACP* case, which involved a Section Two challenge to Alabama's at-large process for electing appellate judges. *Ala. State Conf. of NAACP v. Alabama*, 2020 WL 583803 (M.D. Ala. Feb. 5, 2020). That court found that Alabama is a "ruby red" state, which has made it "virtually impossible for Democrats – of any race – to win statewide in Alabama in the past two decades." *Id.* at *42. But that finding was based on an evidentiary record – trial testimony from two expert witnesses, one of whom conducted a multivariate regression statistical analysis – that is absent here. And read in context, that finding does not stand for the broad proposition that racially polarized voting in Alabama is simply party politics. *See id.* Accordingly, we cannot independently reach the same conclusion that the *Alabama State Conference of the NAACP* court reached, and we cannot assign the weight to its conclusion that Defendants urge us to assign.

### b.   Senate Factor 7

**"The extent to which members of the minority group have been elected to public office in the jurisdiction."** *Gingles*, 478 U.S. at 37.

Page **180** of **225**

Likewise, we have little difficulty finding that Senate Factor 7 weighs heavily in favor of the *Milligan* plaintiffs and *Caster* plaintiffs. Three jointly stipulated facts do most of the heavy lifting here: (1) "[i]n congressional races in the . . . majority-white CDs 1, 2, and 3, Black candidates have never won election to Congress," *Milligan* Doc. 53 ¶ 126; (2) "[n]o Black person has won statewide office in Alabama since 1996" and "[t]here are currently no African-American statewide officials in Alabama," *id.* ¶¶ 167–68, and (3) "[t]he overwhelming majority of African-American representatives in the Alabama Legislature come from majority-minority districts," *id.* ¶ 169, which districts were created to comply with the Voting Rights Act or the Constitution, *Milligan* Doc. 69 at 16.

Defendants do not dispute that Black Alabamians enjoy virtually zero success in statewide elections, but they urge us that Black candidates have enjoyed "a great deal of electoral success" in "elections statewide," by which they mean "Alabama's districted races for State offices," including the Legislature and the State Board of Education. *See Milligan* Doc. 78 at 116. But Defendants do not engage the *Milligan* plaintiffs' point that nearly all of that success is attributable to the creation of majority-Black districts to comply with federal law. This silence makes sense: Defendants stipulated that "[t]he overwhelming majority of African-American representatives in the Alabama Legislature come from majority-minority districts." *Milligan* Doc. 53 ¶ 169.

### c.   Senate Factors 1, 3, and 5

**Senate Factor 1: "The extent of any history of official discrimination in the state … that touched the right of the members of minority group to register, to vote, or otherwise to participate in the democratic process."** *Gingles*, 478 U.S. at 36-37.

**Senate Factor 3: "The extent to which the state … has used … voting practices or procedures that may enhance the opportunity for discrimination against the minority group."** *Id.* at 37.

**Senate Factor 5: "The extent to which members of the minority group in the state … bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process."** *Id.*

We analyze these three Senate Factors together because much of the evidence that is probative of one of them is probative of more than one of them. Alabama's extensive history of repugnant racial and voting-related discrimination is undeniable and well documented. Defendants argue that Alabama has come a long way, but the question for us is more pointed: has it come far enough for these factors to be neutral or to weigh in favor of Defendants?

Defendants urge us to focus our analysis exclusively on the recent evidence on these factors submitted by the *Milligan* plaintiffs and the *Caster* plaintiffs. We are aware of the instruction that "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott*, 138 S. Ct. at 2324 (internal quotation marks omitted). But that instruction was issued in a different context (that did not involve the Senate Factors, which expressly include an historical focus), so we do not conclude that it requires us to fully discount

Alabama's shameful history. And testimony from one of the *Caster* plaintiffs at the preliminary injunction hearing provided a powerful reminder of the palpable recency of discrimination that is a generation distant: Benjamin Jones testified that his parents were active in civil rights marches in the 1960s, that "they went to jail on a number of occasions for voting," and that he can recall his parents' strategy that they did not go to marches together because one of them had to be reliably out of jail to parent him and his fifteen siblings. Tr. 1345. If Alabama's history of jailing Black persons for voting and marching in support of their voting rights is sufficiently recent for a plaintiff to recall firsthand how that history impacted his childhood, then it seems insufficiently distant for us to completely disregard it in a step of our analysis that commands us to consider history.

Nevertheless, even if we focus primarily on the more recent evidence, we find that these Senate Factors still weigh against Defendants. The *Milligan* parties stipulated to at least two recent instances of official discrimination that bear on Senate Factors 1 and 3: (1) "[A]fter the 2010 census, Black voters and legislators successfully challenged 12 state legislative districts as unconstitutional racial gerrymanders. *See Alabama Legislative Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1348-49 (M.D. Ala. 2017)." *Milligan* Doc. 53 ¶ 134; and (2) "Federal courts recently ruled against or altered local at-large voting systems with numbered post created by the State Legislature to address their alleged racially discriminatory

purpose or effect. *See, e.g.*, *Jones*, 2019 WL 7500528, at *4; *Ala. State Conf. of the NAACP v. City of Pleasant Grove*, No. 2:18-cv-02056, 2019 WL 5172371, at *1 (N.D. Ala. Oct. 11, 2019)." *Milligan* Doc. 53 ¶ 153.

 Further, the *Caster* parties stipulated to two probative facts that post-date the passage of the Voting Rights Act that also bear on Senate Factors 1 and 3 – namely, that "(1) since the passage of the Voting Rights Act, the Justice Department has sent election observers to Alabama nearly 200 different times, and (2) that between 1965 and 2013, more than 100 voting changes proposed by the State or its local jurisdictions were blocked or altered under Section 5 of the Voting Rights Act. *Caster* Doc. 44 ¶¶ 117–18.

 Additionally, we are mindful of the many federal judicial rulings involving official voting-related discrimination to which the *Caster* plaintiffs direct our attention. *Caster* Doc. 56 at 22–23. Two of those cases are relatively recent: *Alabama Legislative Black Caucus*, 231 F. Supp. 3d 1026 (M.D. Ala. 2017), in which the court invalidated twelve state legislative districts as racial gerrymanders; and *United States v. McGregor*, 824 F. Supp. 2d 1339, 1345-47 (M.D. Ala. 2011), in which the court found that Alabama State Senators conspired to depress Black voter turnout by keeping a referendum issue popular among Black voters (whom the Senators called "Aborigines") off the ballot.

In addition to stipulated facts and judicial precedents, we have the benefit of testimony from two expert witnesses for the plaintiffs – Dr. Bagley and Dr. King – about these Senate Factors. As an initial matter, we repeat our findings that both Dr. Bagley and Dr. King are credible expert witnesses. Both of them prepared lengthy, detailed reports that set forth substantial evidentiary bases for their opinions in a manner that is consistent with their expertise and applicable professional methods and standards. *Milligan* Doc. 68-2; *Caster* Doc. 50. During their cross examinations, both of them offered careful explanations for their opinions, and we observed no internal inconsistencies, overstatements, or other reasons to question the reliability of their testimony.

Although Dr. Bagley and Dr. King were cross-examined at the preliminary injunction hearing, *see* Tr. 1175, 1533, and Defendants challenged some of their assertions in opposition to the plaintiffs' motions for preliminary injunctive relief, Doc. 78 at 103–05, 112–13, Defendants did not offer any expert testimony to rebut their opinions. Accordingly, only lawyer argument sits on the opposite side of the scale from the evidentiary showing by these expert witnesses.

Both Dr. Bagley and Dr. King opined at some length about current socioeconomic disparities between Black Alabamians and white Alabamians on several dimensions: education, economics, housing, and health. *See Milligan* Doc. 68-2 at 17–26; *Caster* Doc. 50 at 30–45. They are substantial and undeniable. As

one example, Dr. Bagley opined that "Black communities in the Black Belt continue to struggle in primitive conditions and suffer unusual health difficulties and lack of even the most basic services." *Milligan* Doc. 68-2 at 21. More particularly, Dr. Bagley described a 2019 United Nations report that found that extreme poverty conditions in the Black Belt were "very uncommon in the First World," reported that Black residents "lacked proper sewage and drinking water systems and had unreliable electricity," and described instances in which households fell ill due to E.coli and hookworm infections as a result of drinking water contaminated with raw sewage. *See Milligan* Doc. 68-2 at 21.

As another example, Dr. Bagley reported that Black Alabamians are less likely to have access to a vehicle than are white Alabamians, *id.* at 17, and Mr. Cooper reported that the proportion of Black Alabamians who lack access to a vehicle (11.7%) is more than triple the proportion of white Alabamians who lack such access (3.8%), *Caster* Doc. 73-1 at 39; *accord* Tr. 1629–30 (testimony of Dr. Caster about lack of access to personal transportation in the Black Belt).

Dr. King's report identified many similarly substantial disparities. As she explained, the unemployment rate for Black workers in Alabama (4.6%) is nearly twice that of white workers (2.5%); the child poverty rate for Black Alabamians is 34.1%, while the same rate for while children is 13.2%; the median household income of Black Alabamians is $35,900, nearly half the white median household

income of $59,966; 19% of Black Alabamians have no health insurance, compared to 12.9% of white Alabamians; the infant mortality rate is more than two times higher among Black infants in Alabama than white infants; and a quarter of Black households in Alabama rely on food stamps, compared to 8.2% of white households. *See Caster* Doc. 50 at 30–45.

Both Dr. Bagley and Dr. King also opined that these disparities are inseparable from and (at least in part) the result of, the state's history of official discrimination. *See, e.g.*, *Milligan* Doc. 68-2 at 17; *Caster* Doc. 50 at 30. Both experts also opine that these disparities hinder Black Alabamians' opportunity to participate in the political process today. *See, e.g.*, *Milligan* Doc. 68-2 at 17; *Caster* Doc. 50 at 30. Dr. Bagley explained two ways how: (1) that because white Alabamians tend to have "more education and therefore higher income" than Black Alabamians, they tend to be better able than Black Alabamians to "afford a car, internet service, a personal computer, or a smart phone; . . . take time off from work; . . . afford to contribute to political campaigns; . . . afford to run for office; . . . [and to] have access to better healthcare," and (2) that "[e]ducation has repeatedly been found to correlate with income [and] independently affects citizens' ability to engage politically." *Milligan* Doc. 68-2 at 17. We credit this testimony.

In the light of this testimony, we reject Defendants' arguments that the *Milligan* plaintiffs and the *Caster* plaintiffs cannot demonstrate a causal connection

between the disparate socio-economic status and depressed political participation of Black Alabamians, and that racial parity in rates of voter registration and turnout means that those plaintiffs cannot demonstrate depressed political participation. *Milligan* Doc. 78 at 110–12. We regard those arguments as too formulaic – the point of Factor 5 is for us to consider whether the lasting effects of official discrimination "hinder" the ability of Black Alabamians to participate in the political process, *Gingles*, 478 U.S. at 37, and a laser focus on parity in registration and turnout rates would overlook (1) other aspects of political participation, and (2) the question whether the lasting effects of discrimination make it harder for Black Alabamians to participate at the levels that they do, even if those levels are nearly on par or on par with the levels of white participation.

### d.    Senate Factor 6

**Senate Factor 6: "Whether political campaigns have been characterized by overt or subtle racial appeals." *Gingles*, 478 U.S. at 37.**[11]

We find that Senate Factor 6 weighs in favor of the *Milligan* plaintiffs and the *Caster* plaintiffs, but to a lesser degree than do Senate Factors 2, 7, 1, 3, and 5. Dr. Bagley and Dr. King offered several examples of racial campaign appeals in their expert reports, *see Milligan* Doc. 68-2 at 26–28; *Caster* Doc. 50 at 45–49, some of

---

[11] We agree with the parties that because there is not a slating process for Alabama's congressional elections, Senate Factor 4 is not relevant. *Caster* Doc. 44 ¶ 120; *Milligan* Doc. 78 at 110.

which they testified about at the preliminary injunction hearing. We do not need to decide whether every example reflected a racial appeal, but at least three of them did, and all three were in recent congressional elections.

First, when a former Chief Justice of the Alabama Supreme Court, Roy Moore, ran for Senate in 2017, he won the Republican Party nomination. In 2011, the year before he was elected to the Alabama Supreme Court, he said during a radio interview that the amendments to the Constitution that follow the Tenth Amendment (including the Thirteenth Amendment, which abolished slavery, the Fourteenth Amendment, which requires States to provide equal protection under the law to all persons, and the Fifteenth Amendment, which provides that the right to vote shall not be denied or abridged on the basis of color or previous enslavement) have "completely tried to wreck the form of government that our forefathers intended." *See Milligan* Doc. 68-2 at 27. During his 2017 Senate campaign, Mr. Moore acclaimed the antebellum period in the South: "I think it was great at the time when families were united – even though we had slavery. They cared for one another. People were strong in the families. Our families were strong. Our country had a direction." *See id.*

Second, Congressman Mo Brooks, who currently represents District 5 and is now running for the open Senate seat, has repeatedly claimed that Democrats are waging a "war on whites." *See id.* at 27–28 & n.94. Although Defendants suggest

that the plaintiffs have misunderstood other campaign ads that they claim are racial appeals, Defendants do not contest these two examples, which we find are obvious and overt appeals to race.

Third, even if Mr. Byrne did not intend his campfire commercial to be a racial appeal (a question that we need not and do not decide), a reasonable viewer might have perceived it as one. We have reviewed the ad.[12] It opens with two images superimposed onto one another: one of then-Congressman Byrne seated in darkness at a campfire, and another of a plane crashing into the World Trade Center and exploding. Mr. Byrne says: "When the towers fell, I knew my brother would be going to war. Dale was a true patriot. I can't bring him back. I miss him every day." The next image is of Mr. Byrne's face, the one after that is of him holding a snapshot of a decorated military serviceman photographed in front of an American flag, and the one after that is of him sitting by the campfire and speaking. He next says: "It hurts me to hear Ilhan Omar cheapening 9/11, entitled athletes dishonoring our flag, the Squad attacking America." While he speaks that sentence, the shot transitions several times: it first shows a close-up of glowing embers with the face of Congresswoman Omar, who is a person of color and is wearing a hijab,

---

[12] Defendants supplied a link to the ad in their opposition to the motions for preliminary injunctive relief. *See Milligan* Doc. 78 at 114 (providing this link: https://www.youtube.com/watch?v=31HHFy8JkoU).

superimposed onto the embers; it then transitions to an image of professional football player Colin Kaepernick, who is a person of color and is wearing his hair in an Afro, superimposed onto darkness with a billow of smoke; and it finally transitions to an image of four women of color, including Congresswoman Omar, Congresswoman Alexandria Ocasio-Cortez and two other congresswomen superimposed onto the darkness just above the campfire. Next, Mr. Byrne appears in front of the campfire and states: "Dale fought for that right, but I will not let them tear our country apart. That's why I'm running for Senate." We do not disagree with the *Milligan* plaintiffs and the *Caster* plaintiffs that the video of a white man narrating as images of prominent persons of color (and only persons of color) are juxtaposed with images of the 9/11 terrorist attacks, in or on or hovering above a crackling fire, could be understood as a racial appeal.

Accordingly, we cannot accept Defendants' argument that we should find, as the *Alabama State Conference of the NAACP* court found, that "[t]here is no evidence that Alabama political campaigns generally … are characterized by racial appeals." *Milligan* Doc. 78 at 113 (quoting *Ala. State Conf. of NAACP*, 2020 WL 583803, at *58). That was a statement about a different record – one that did not include testimony from Dr. Bagley or Dr. King, one that made no mention of Roy Moore's affection for slavery or a "war on whites," and one that primarily was focused on Alabama judicial elections – more particularly, 128 statewide judicial

Page **191** of **225**

races over a period of thirty-eight years. *See Ala. State Conf. of NAACP*, 2020 WL 583803, at *58.

But at the same time, we cannot find that this factor weighs as heavily in favor of the *Milligan* plaintiffs as do the other factors that we already have discussed. Although the three examples we just described are prominent and recent, the record does not contain any systematic or statistical evaluation of the extent to which political campaigns are characterized by racial appeals, so we cannot determine whether these examples indicate that racial appeals occur frequently, regularly, occasionally, or rarely. Accordingly, we find that there is some evidence that political campaigns (more particularly, congressional campaigns) in Alabama are characterized by overt or subtle racial appeals.

### e.     Senate Factor 8

**Senate Factor 8: "Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." *Gingles*, 478 U.S. at 37.**

We make no finding about Senate Factor 8. The parties vehemently dispute whether the decisions that form the basis for the arguments of the *Milligan* plaintiffs and the *Caster* plaintiffs about this factor are political or race-based. And Defendants have submitted testimony on at least one of these issues (the state's response to the COVID-19 pandemic) that the *Milligan* plaintiffs and the *Caster* plaintiffs have not directly engaged. On this record, we cannot make a well-reasoned finding whether

there is a lack of responsiveness on the part of elected officials in Alabama to the needs of the Black community, nor whether such lack of responsiveness (if it exists) is significant.

### f.       Senate Factor 9

**Senate Factor 9: Whether the policy underlying the Plan is "tenuous."**

Likewise, we make no finding about Senate Factor 9.

### g.       Proportionality

Finally, we turn to the proportionality arguments made by the *Milligan* plaintiffs and the *Caster* plaintiffs. Although Section Two expressly provides that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population," 52 U.S.C. § 10301(b), the Supreme Court has held that "whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area" is a "relevant consideration" in the totality-of-the-circumstances analysis. *LULAC*, 548 U.S. at 426; *accord De Grandy*, 512 U.S. at 1000.

More particularly, "proportionality . . . is obviously an indication that minority voters have an equal opportunity, in spite of racial polarization, to participate in the political process and to elect representatives of their choice." *De Grandy,* 512 U.S. at 1020 (internal quotation marks omitted); *accord Alabama Legislative Black Caucus*, 989 F. Supp. 2d at 1286–87 (concluding that the totality of the

Page **193** of **225**

circumstances weighed against a finding that the state legislative map violated Section Two in part because the number of majority-Black districts in the Legislature is "roughly proportional to the [B]lack voting-age population"), *vacated on other grounds*, 575 U.S. 254 (2015).

We have no such indication here. As the *Milligan* plaintiffs correctly observe, "[d]espite Black Alabamians constituting nearly 27% of the population, they only have meaningful influence in" 14% of congressional seats. *Milligan* Doc. 69 at 17. And as the *Caster* plaintiffs correctly add, white Alabamians are over-represented because 86% of congressional districts are majority-white, but white Alabamians comprise only 63% of the population; they also point out that even if Alabama were to draw a second majority-Black congressional district, this circumstance would persist, because 71.5% of congressional districts would be majority-white. *See Caster* Doc. 56 at 19–20; Tr. 432–33. Further, the share of Alabama's population that is white according to the 2020 census data (63.12%) has decreased substantially in the nearly thirty years since *Wesch* ordered one majority-Black district (according to the 1990 census data, Alabama's white population was 73.65% of its total population. *See Wesch*, 785 F. Supp. at 1503 app. B.)

Further, the *Caster* plaintiffs offer a view from a different angle: they observe that under the Plan, less than one-third of Alabama's Black population resides in a majority-Black district, while 92% of Alabama's non-Hispanic white population

resides in a majority-white district. *See Caster* Doc. 48 ¶ 28; Tr. 431.

These statistics are not in dispute, and Defendants' only answer is to remind us that the text of Section Two "expressly repudiates any claim for proportional representation." *Milligan* Doc. 78 at 65 (emphasis omitted); *id.* at 129 (asserting that plaintiffs' remedial plans are "naked attempts to extract from Section 2 a non-existent right to proportional (indeed, maximal) racial representation in Congress"). In the light of *LULAC* and *De Grandy*, this is a non-answer. We do not resolve the *Milligan* plaintiffs' motion for a preliminary injunction solely (or even in the main) by conducting a proportionality analysis; rather, consistent with *LULAC* and *De Grandy*, we consider the proportionality arguments of the plaintiffs as part and parcel of the totality of the circumstances, and we draw the limited and obvious conclusion that this consideration weighs decidedly in favor of the plaintiffs.

Ultimately, we find that every Senate Factor we were able to make a finding about, along with proportionality, weighs in favor of the *Milligan* plaintiffs and the *Caster* plaintiffs, and that no Senate Factors or other circumstances we consider at this stage weigh in favor of Defendants.

\*\*\*

As the foregoing analysis makes clear, we do not regard the question whether the *Milligan* plaintiffs are substantially likely to prevail on the merits of their Section Two claim as a close one. This is for several reasons: (1) We have considered a

Page **195** of **225**

record that is extensive by any measure, and particularly extensive for a preliminary injunction proceeding, and the *Milligan* plaintiffs have adduced substantial evidence in support of their claim. (2) There is no serious dispute that the plaintiffs have established numerosity for purposes of *Gingles* I, nor that they have established sharply racially polarized voting for purposes of *Gingles* II and III, leaving only conclusions about reasonable compactness and the totality of the circumstances dependent upon our findings. (3) In our analysis of compactness, we have credited the *Milligan* plaintiffs' principal expert witness, Dr. Duchin, after a careful review of her reports and observation of her live testimony (which included the first cross-examination of her that occurred in this case). (4) Separately, we have discounted the testimony of Defendants' principal expert witness, Mr. Bryan, after a careful review of his reports and observation of his live testimony (which included the first cross-examination of him that occurred in this case). (5) If the *Milligan* record were insufficient on any issue (and it is not), the *Caster* record, which is equally fulsome, would fill in the gaps: the *Caster* record (which by the parties' agreement also is admitted in *Milligan*), compels the same conclusion that we have reached in *Milligan*, both to this three-judge court and to Judge Manasco sitting alone. Put differently, because of the posture of these consolidated cases, the record before us has not only once, but twice, established that the Plan substantially likely violates Section Two.

### C.   The *Milligan* plaintiffs have established the remaining elements of their request for preliminary injunctive relief.

We find that the *Milligan* plaintiffs have established the remaining elements of their request for preliminary injunctive relief. Our finding proceeds in two parts: we first discuss whether the *Milligan* and the *Caster* plaintiffs have established that they will suffer an irreparable harm absent preliminary injunctive relief, and we then discuss Defendants' assertion that a preliminary injunction will harm the public interest because the timing of such an injunction will precipitate political and administrative chaos.

### 1.  Irreparable Harm

We find that the plaintiffs will suffer an irreparable harm if they must vote in the 2022 congressional elections based on a redistricting plan that violates federal law. "Courts routinely deem restrictions on fundamental voting rights irreparable injury. And discriminatory voting procedures in particular are the kind of serious violation of the Constitution and the Voting Rights Act for which courts have granted immediate relief." *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (citing *Obama for Am. v. Husted,* 697 F.3d 423, 436 (6th Cir. 2012); *Alternative Political Parties v. Hooks,* 121 F.3d 876 (3d Cir. 1997); *United States v. City of Cambridge,* 799 F.2d 137, 140 (4th Cir. 1986); *Williams v. Salerno,* 792 F.2d 323, 326 (2d Cir. 1986)).

This rule makes sense. "Voting is the beating heart of democracy," and a "fundamental political right, because it is preservative of all rights." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1315 (11th Cir. 2019) (internal quotation marks omitted) (alterations accepted). And "once the election occurs, there can be no do-over and no redress" for voters whose rights were violated and votes were diluted. *League of Women Voters of N.C.*, 769 F.3d at 247.

Defendants minimize but do not dispute plaintiffs' arguments about irreparable injury. *See Milligan* Doc. 78 at 144 ("Plaintiffs assert irreparable harm from purportedly having to vote in a district that they feel should have a different racial makeup."). At the preliminary injunction hearing, Defendants adduced no testimony and made no argument that the plaintiffs' injuries would not be irreparable.

Accordingly, we find that the plaintiffs will suffer an irreparable harm absent a preliminary injunction. Further, we observe that absent preliminary relief, the *Milligan* plaintiffs will suffer this irreparable injury until 2024, which is nearly halfway through this census cycle. Weighed against the harm that Defendants assert they will suffer — the administrative burden of drawing and implementing a new map, and upsetting candidates' campaigns, discussed fully below — the irreparable harm to the *Milligan* plaintiffs' voting rights is greater.

## 2.      Equities and Timing

We next find that a preliminary injunction is in the public interest, and we reject Defendants' argument that such relief will harm the public interest because the timing of an injunction will precipitate political and administrative chaos.

The principal Supreme Court precedent that addresses the timing issue is older than the Voting Rights Act. In *Reynolds*, which involved a constitutional challenge, the Court explained "once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." 377 U.S. at 585. "However," the Court acknowledged, "under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid." *Id.* The Court explained that "[i]n awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles." *Id.*

More recently, the Supreme Court has held that district courts should apply a necessity standard when deciding whether to award or withhold immediate relief. In

*Upham v. Seamon*, the Court explained: "[W]e have authorized District Courts to order or to permit elections to be held pursuant to apportionment plans that do not in all respects measure up to the legal requirements, even constitutional requirements. Necessity has been the motivating factor in these situations." 456 U.S. 37, 44 (1982) (citations omitted).

We conclude that under these precedents, we should not withhold immediate relief for two reasons: *first*, Alabama's congressional elections are not imminent, and *second,* even if those elections were nearly imminent, it is not necessary that we allow those elections to proceed on the basis of an unlawful plan.

As our discussion of the various deadlines makes clear, *see supra* Part IV.E.1, Alabama's 2022 congressional elections are not imminent. We are not on the eve of the general election (it is some ten months away), nor on the eve of the primary election (it is some two and a half months away), nor on the eve of a deadline to mail some absentee ballots for the primary election. We are on the eve of the qualifying deadline, which is set by state law as 116 days before the date of the primary election. Ala. Code § 17-13-5(a). Even if we consider the start date of the primary election as April 9, 2022, when some absentee ballots must be mailed, we are still months, not weeks or days, away from the beginning of that election.

We discern no legal basis to conclude that "imminent" means "months away." Defendants urge us to consider *Favors*, 881 F. Supp. 2d 356, *see supra* at Part

IV.E.1, but that case was fundamentally unlike this one. In *Favors*, the plaintiffs' claims were based on "novel, contested" legal grounds, and the plaintiffs had adduced "virtually no" evidence to support them. 881 F. Supp. 2d at 370–71. Here, the primary election is not set to begin for more than two months, the plaintiffs' claims are based on a statute enacted decades ago and a substantial body of case law that has developed as a result, and both the *Milligan* plaintiffs and the *Caster* plaintiffs have developed an extremely robust evidentiary record to afford us the opportunity confidently to decide their motion for preliminary injunctive relief.

Further, both the *Milligan* plaintiffs and the *Caster* plaintiffs argue that if we hold that the primary elections are "imminent" and withhold preliminary relief on that ground, we would essentially be ruling that "the redistricting process is above the law." *Milligan* Doc. 94 at 46; Tr. 1920 (*Caster* closing argument: "It can't always be too late or too soon."). We agree, and absent controlling case law directing us to do so, we are not inclined to take that step.

Even if we were worried that the elections are coming too soon (which we are not), we have no evidence from which we could find (or even infer) that it is necessary that we allow those elections to proceed on the basis of an unlawful plan. Mr. Helms has identified several administrative challenges of complying with a preliminary injunction, but he has not testified that it is undoable. *See Milligan* Doc. 79-7. And much of the remainder of his testimony (and Mr. Byrne's testimony) on

this issue indicates that compliance could be expensive for candidates and result in confusion for some voters, *see id.* & Tr. 1693–94, 1750–51, but campaign expense and potential confusion are not the standard we are bound to apply. Necessity is.

Further, Mr. Helms's declaration is only part of the story. The rest of it already has unfolded and suggests that it is not necessary for us to allow the congressional elections to proceed on the basis of an unlawful plan. Defendants have known since at least 2018 that persons and organizations such as the *Milligan* plaintiffs and *Caster* plaintiffs would likely assert a Section Two challenge to any 2021 congressional redistricting plan that did not include two majority-Black districts or districts in which Black voters otherwise have an opportunity to elect a representative of their choice. Indeed, *Chestnut* raised many of the same issues that these cases raise, and the plaintiffs' *Gingles* I expert there opined that two reasonably compact majority-Black districts could be drawn in Alabama based on the 2010 census data. *Caster* Doc. 48 at 20. The 2020 census data then reflected an increase in the any-part Black population in Alabama, potentially making a Section Two claim even stronger. *Id*. at 6. Later, but before the Plan was enacted, Senator Hatcher presented in the Legislature a plan that contained two majority-Black districts. *Milligan* Doc. 53 ¶ 113. The Legislature then passed the Plan, taking a mere five days in legislative session to do so. The *Caster* and *Milligan* plaintiffs then

commenced their lawsuits within hours or days of the enactment of the Plan,[13] and

the court held a Rule 16 conference involving all parties in *Singleton*, *Milligan*, and

*Caster* on November 23, 2021. One of the things that the parties and court discussed

at that conference was that if a preliminary injunction were ordered, the Legislature

wanted the first cut at drawing a new map. The court immediately expedited the

preliminary injunction proceedings, although the proceedings were held in January

2022 instead of December 2021 at the request of the Defendants to allow the parties

to develop the record. *See* Tr. of Nov. 9, 2021 Hrg. at 3; Tr. of Nov. 23, 2021 Hrg.

at 25–26.

Put simply, Defendants have been on notice for a long while that, depending

on how any given Section Two challenge played out, they could be required to

conduct the 2022 congressional elections on the basis of a map that includes two

majority-Black districts or districts in which Black voters otherwise have an

opportunity to elect a representative of their choice. And the Legislature already has

demonstrated just how quickly it can prepare a map.

Both the law and the facts are clear. If a plaintiff asserts a meritorious claim

of vote dilution under Section Two, the plaintiff should be forced to cast a vote based

---

[13] The *Singleton* plaintiffs already had filed their lawsuit, but within hours of the
Plan being signed by the Governor filed the amended complaint to address the
enacted 2021 Plan. *Singleton* Doc. 15.

on the unlawful plan only if absolutely necessary. We have no convincing evidence that it is necessary for us to withhold relief and a substantial basis to conclude that it is not. We have proceeded with all deliberate speed so as not to deprive plaintiffs of an opportunity for a timely remedy, and now the state must do the same.

### D.    We reject Defendants' argument that plaintiffs' remedial plans are unconstitutional.

We next consider Defendants' argument that the Duchin plans and Cooper plans are unconstitutional because they discriminate on account of race and cannot satisfy strict scrutiny. *Milligan* Doc. 78 at 124–30. Based on the testimony at the preliminary injunction hearing, we reject this argument because it is based on the flawed factual premise that the Duchin plans and Cooper plans prioritize race above all race-neutral traditional redistricting principles except for population balance, and the flawed legal premise that the role Dr. Duchin and Mr. Cooper assigned to race is unconstitutional. *Id.* at 126–27.

*First*, the flawed factual premise. Both Dr. Duchin and Mr. Cooper consistently and repeatedly refuted the accusation that when they prepared their illustrative plans, they prioritized race above everything else. They explained that they prioritized race only as necessary to answer the essential question asked of them as *Gingles* I experts: Is it possible to draw two reasonably compact majority-Black congressional districts? *See supra* at Part V.B.2. More particularly, Dr. Duchin and Mr. Cooper testified that they prioritized race only for the purpose of determining

and to the extent necessary to determine whether it was possible for the *Milligan* plaintiffs and the *Caster* plaintiffs to state a Section Two claim. As soon as they determined the answer to that question, they assigned greater weight to other traditional redistricting criteria. Indeed, Dr. Duchin and Mr. Cooper testified about how the maps might have looked if they had prioritized race above everything else.

Dr. Duchin's testimony that she considered two majority-Black districts as "non-negotiable" does not change this analysis. All that means is that Dr. Duchin did not allow a minimum level of compliance with that criterion to yield to other considerations. It does not mean that she tried to maximize the number of majority-Black districts, or the BVAP in any particular majority-Black district, which she would have done if race were her predominant consideration.

*Second*, the flawed legal premise. This strikes us as obvious: a rule that rejects as unconstitutional a remedial plan for attempting to satisfy *Gingles* I would preclude any plaintiff from ever stating a Section Two claim. *See Davis*, 139 F.3d at 1424–25 ("To penalize Davis, as the district court has done, for attempting to make the very showing that *Gingles* [and other precedents] demand would be to make it impossible, as a matter of law, for any plaintiff to bring a successful Section Two action."); *see also Clark v. Calhoun Cnty.*, 88 F.3d 1393, 1406–07 (5th Cir. 1996) ("[T]he first *Gingles* factor is an inquiry into causation that necessarily classifies voters by their race.").

Indeed, a rule that strikes down a remedial plan the moment the plan proposes two districts with a BVAP that exceeds 50% would render superfluous all *Gingles* analysis past numerosity: if satisfying numerosity is an immediate constitutional dead end, there would be no need to consider compactness, racially polarized voting, or the totality of the circumstances. If Section Two is to have any meaning, it cannot require a showing that is necessarily unconstitutional. Defendants have identified no precedent that ever has taken such a senseless step, and we will not be the first.

Even if we were to subject the Duchin maps and Cooper maps to strict scrutiny, we would need to determine whether they are narrowly tailored to protect a compelling state interest. *See, e.g.*, *Alabama Legislative Black Caucus*, 231 F. Supp. 3d at 1061–64. In this context, narrow tailoring does not "require an exact connection between the means and ends of redistricting" but rather just "good reasons to draft a district in which race predominated over traditional districting criteria." *Id.* at 1064 (internal quotation marks and emphasis omitted). Based on the case law assuming that compliance with the Voting Rights Act is a sufficient reason, the "laser precision" BVAPs that Defendants deride, *see Milligan* Doc. 102 ¶ 475, the testimony of Dr. Duchin and Mr. Cooper about when and how and how much they considered race, and our finding that the Duchin plans and Cooper plans respect traditional redistricting principles, we do not see "a level of racial manipulation that exceeds what § 2 could justify," *Vera*, 517 U.S. at 980–81.

### E.   We reject Defendants' argument that plaintiffs' interpretation of Section Two is unconstitutional.

We next consider the Defendants' argument that the plaintiffs' interpretation of Section Two is unconstitutional because it focuses too much on history, which severs the statute from the geographic and temporal limitations that make it a proportional remedy. *Milligan* Doc. 78 at 130–31. We have little difficulty rejecting this argument. We cannot agree with the overly simplistic accusation that the *Milligan* plaintiffs and the *Caster* plaintiffs "seek to mire the State – and the statute – in historical conditions that no longer pertain to [B]lack Alabamians' ability to participate in the political process." *Id.* at 131 (internal quotation marks omitted). Both sets of plaintiffs have followed a well settled series of steps to establish a Section Two violation, *see supra* Part III, and Supreme Court precedents dictate that some of those steps are focused on history, and others are focused on the present day. If we focus exclusively on the present day, we surely will run afoul of the instructions about history. And in any event, as we already have explained, we disagree with Defendants that the history has been fully overcome and is so distant that it may be ignored, discounted, or set aside to the extent that they suggest.

### F.   We reject Defendants' argument that the Voting Rights Act does not provide a private right of action.

Since the passage of the Voting Rights Act, federal courts across the country, including both the Supreme Court and the Eleventh Circuit, have considered

numerous Section Two cases brought by private plaintiffs. *See, e.g.*, *Brnovich*, 141 S. Ct. 2321; *Bartlett*, 556 U.S. 1; *LULAC*, 548 U.S. 399; *Voinovich*, 507 U.S. 146; *Chisom v. Roemer*, 501 U.S. 380 (1991); *Hous. Lawyers' Ass'n v. Att'y Gen.*, 501 U.S. 419 (1991); *Gingles*, 478 U.S. 30; *Wright*, 979 F.3d 1282. And on the other side of the scale, no federal court anywhere ever has held that Section Two does not provide a private right of action.

Moreover, although the Supreme Court has not directly decided this question, it has decided a close cousin of a question, and that precedent strongly suggests that Section Two provides a private right of action. In *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996), the Supreme Court held that Section Ten of the Voting Rights Act authorizes private actions. After comparing the text of Sections Two, Five, and Ten of the Voting Rights Act, the Court reasoned:

> Although § 2, like § 5, provides no right to sue on its face, "the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965." S. Rep. No. 97–417, at 30. We, in turn, have entertained cases brought by private litigants to enforce § 2. It would be anomalous, to say the least, to hold that both § 2 and § 5 are enforceable by private action but § 10 is not, when all lack the same express authorizing language.

*Id.* at 232 (opinion of Stevens, J., with one justice joining) (some internal citations omitted); *accord id.* at 240 (opinion of Breyer, J., with two justices joining). On this reasoning, the understanding that Section Two provides a private right of action was necessary to reach the judgment that Section Ten provides a private right of action.

Five justices concurred in that reasoning and judgment. A ruling that Section Two does not provide a private right of action would badly undermine the rationale offered by the Court in *Morse*.

When Defendants first explained in their opposition to the motions for preliminary injunctive relief this argument about Section Two, they did not mention or discuss *Morse*. *See Milligan* Doc. 78. After the *Milligan* plaintiffs relied on *Morse* in their reply brief, *Milligan* Doc. 94 at 28, Defendants addressed it in their post-hearing brief — in one paragraph out of 231 pages — by implying that *Morse* was "fractured" on the relevant issue and dismissing the passage about that issue as dicta. *Milligan* Doc. 102 ¶ 686. As the Eleventh Circuit has explained, "there is dicta and then there is dicta, and then there is Supreme Court dicta. This is not subordinate clause, negative pregnant, devoid-of-analysis, throw-away kind of dicta. It is well thought out, thoroughly reasoned, and carefully articulated analysis by the Supreme Court describing the scope of one of its own decisions." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006); *see also Henderson v. McMurray*, 987 F.3d 997, 1006 (11th Cir. 2021) (Pryor, J.). Even if the Supreme Court's statements in *Morse* about Section Two are technically dicta, they deserve greater respect than Defendants would have us give.

Holding that Section Two does not provide a private right of action would work a major upheaval in the law, and we are not prepared to step down that road

today.

## VI.   REMEDY

"Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions. It is well settled that 'reapportionment is primarily the duty and responsibility of the State.'" *Miller*, 515 U.S. at 915 (quoting *Chapman v. Meier,* 420 U.S. 1, 27 (1975)). Indeed, "[f]ederal courts are barred from intervening in state apportionment in the absence of a violation of federal law precisely because it is the domain of the States, and not the federal courts, to conduct apportionment in the first place." *Voinovich*, 507 U.S. at 156. Put differently, each State has a "sovereign interest in implementing its redistricting plan." *Vera*, 517 U.S. at 978.

Even when a federal court finds that a redistricting plan violates federal law, the Supreme Court "has repeatedly held that redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt." *Wise*, 437 U.S. at 539–40 (opinion of White, J.) (collecting cases). Upon such a finding, "it is therefore, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet [applicable federal legal] requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan. The new legislative plan, if forthcoming,

will then be the governing law unless it, too, is challenged and found to violate" federal law. *Id.* at 540.

Just as a state's "freedom of choice to devise substitutes for an apportionment plan found unconstitutional, either as a whole or in part, should not be restricted beyond the clear commands of the Equal Protection Clause," *id.* (internal quotation marks omitted), a state's freedom of choice to devise substitutes for a plan found to violate Section Two should not be restricted beyond the clear commands of the Constitution and the Voting Rights Act.

Accordingly, following a determination that a redistricting plan violates Section Two, "[s]tates retain broad discretion in drawing districts to comply with the mandate of § 2." *Shaw II*, 517 U.S. at 917 n.9. A state may rely on a Section 2 plaintiff's remedial plan, but is not required to do so, nor to "draw the precise compact district that a court would impose in a successful § 2 challenge," *Vera*, 517 U.S. at 978 (internal quotation marks omitted). Instead, "the States retain a flexibility that federal courts enforcing § 2 lack, both insofar as they may avoid strict scrutiny altogether by respecting their own traditional districting principles, and insofar as deference is due to their reasonable fears of, and to their reasonable efforts to avoid, § 2 liability." *Id.*

If — and only if — the state legislature cannot or will not adopt a remedial map that complies with federal law in time for use in an upcoming election does the

job of drawing an interim map fall to the courts. "Legislative bodies should not leave their reapportionment tasks to the federal courts; but when those with legislative responsibilities do not respond, or the imminence of a state election makes it impractical for them to do so, it becomes the unwelcome obligation of the federal court to devise and impose a reapportionment plan pending later legislative action." *Wise*, 437 U.S. at 540 (opinion of White, J.) (internal quotation marks and citation omitted); *accord Growe*, 507 U.S. at 36-37.

"Quite apart from the risk of acting without a legislature's expertise, and quite apart from the difficulties a court faces in drawing a map that is fair and rational, the obligation placed upon the Federal Judiciary is unwelcome because drawing lines for congressional districts is one of the most significant acts a State can perform to ensure citizen participation in republican self-governance." *LULAC*, 548 U.S. at 415–16 (citation omitted). "That Congress is the federal body explicitly given constitutional power over elections is also a noteworthy statement of preference for the democratic process. As the Constitution vests redistricting responsibilities foremost in the legislatures of the States and in Congress, a lawful, legislatively enacted plan should be preferable to one drawn by the courts." *Id.* at 416.

The *Milligan* plaintiffs and *Caster* plaintiffs agree on the legal requirements applicable to the appropriate remedy for the Section Two violation they have established. Both sets of plaintiffs appreciate that "the Court must give the

Legislature the first opportunity to suggest a legally acceptable plan to remedy the Section 2 violation." *Milligan* Doc. 103 ¶ 574; *Caster* Doc. 97 ¶ 501. And both sets of plaintiffs concede that the Legislature has discretion to decide whether to enact a remedial plan that contains two majority-Black districts, or two districts in which Black voters otherwise have an opportunity to elect a representative of their choice, or a combination of such districts. *Milligan* Doc. 103 ¶¶ 577, 582; *Caster* Doc. 97 ¶¶ 494–96, 505.

Both sets of plaintiffs also suggest, and we agree, that as a practical reality, the evidence of racially polarized voting adduced during the preliminary injunction proceedings suggests that any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it. *Milligan* Doc. 103 ¶ 583; *Caster* Doc. 97 ¶ 497.

Defendants express some doubt as to whether the state will be able to "draw a map that can garner sufficient support in two legislative chambers and secure the governor's signature" given the time exigencies, but they assert that "the court should not deprive Alabama's Legislature of that prerogative." *Milligan* Doc. 102 ¶¶ 709, 711.

Accordingly, the preliminary injunction that we issue affords the State a limited opportunity to enact a new map. We already have concluded that under applicable precedent, the timing of the election does not foreclose preliminary

injunctive relief, *see supra* Part V.C.2, but there can be no doubt that there is a limited window in which the Legislature may adopt a new map. To facilitate the timely development of a remedial map, we have stayed the qualification deadline for a brief period that we believe is sufficient but not longer than necessary.

We are confident that the Legislature can accomplish its task: the Legislature enacted the Plan in a matter of days last fall; the Legislature has been on notice since at least the time that this litigation was commenced months ago (and arguably earlier) that a new map might be necessary; the Legislature already has access to an experienced cartographer; the Legislature has not just one or two, but at least eleven illustrative remedial plans to consult, one of which pairs no incumbents; and Mr. Cooper demonstrated that he can draw a draft plan in part of an afternoon. Indeed, there is a plethora of experts in these very cases whom the Legislature could consult. Further, there is precedent for such a schedule. *See Larios*, 300 F. Supp. 2d at 1356–57.

## VII.   ANALYSIS – CONSTITUTIONAL CLAIMS

The *Singleton* plaintiffs' motion for a preliminary injunction asserts that those plaintiffs are substantially likely to succeed on their claims because recent Supreme Court precedents, including *Cooper*, *Covington*, and *Abbott*, "hold that Section 2 of the Voting Rights Act cannot justify the perpetuation of a racially gerrymandered, majority-Black Congressional district when a legislature had no reason to believe

that such a district was necessary to give Black voters the opportunity to elect the candidate of their choice." *Singleton* Doc. 57 at 9.

The *Singleton* plaintiffs assert that because District 7 was and is a racial gerrymander, it is subject to strict scrutiny and is not narrowly tailored to further a compelling government interest because the Legislature "not only failed to perform any analysis that would have indicated that a single majority-Black district was necessary, but also absolved itself of any substantial involvement in the drawing of the plan, which it left to Mr. Hinaman [the state cartographer] and Alabama's Congressional delegation." *Id.* at 9, 25–29.

The *Singleton* plaintiffs assert that Secretary Merrill has stipulated that race was the predominant factor when District 7 was drawn in 1992 and has conceded in an earlier lawsuit that because District 7 is racially gerrymandered, it would not be constitutional if drawn for the first time today. *Id.* at 13, 22.

The *Milligan* plaintiffs' motion for a preliminary injunction makes some arguments in support of their constitutional claims that are similar to the *Singleton* plaintiffs' arguments about the origins of District 7, *see Milligan* Doc. 69 at 20–26, and other arguments in support of their constitutional claims that are unique to the *Milligan* action and depend on the testimony of two expert witnesses: Dr. Kosuke Imai and Dr. Ryan Williamson, *see id.* at 26–31. Dr. Imai used simulation algorithms to generate 10,000 congressional maps and argued that District 7 is an "extreme

outlier in terms of its consideration of race" because not a single District 7 out of the 10,000 had a BVAP as high as the actual District 7. *Id.* at 26–27. Dr. Williamson used different methods of statistical analysis to argue that race played a predominant role in the Legislature's decision to split each of the three counties that the Plan splits between District 7 and other districts. *Id.* at 27–28. The *Milligan* plaintiffs also rely on work performed by Drs. Imai and Williamson to support their arguments that race predominated in the Legislature's decisions about Districts 1, 2, and 3. *See id.* at 28–31.

Although the parties in *Singleton* and *Milligan* filed extensive stipulations of fact for purposes of the preliminary injunction proceedings, *Singleton* Docs. 47, 70, *Milligan* Doc. 53, numerous facts remain in dispute, Defendants vehemently contest the opinions of Drs. Imai and Williamson, *see, e.g.*, Tr. 206–70, 301–04, 337–61, and the constitutional issues are "complicated," *Abbott*, 138 S. Ct. at 2314.

For these reasons, in the light of our decision to issue a preliminary injunction on statutory grounds, and because Alabama's upcoming congressional elections will not occur on the basis of the map that is allegedly unconstitutional, we decline to decide the constitutional claims asserted by the *Singleton* and *Milligan* plaintiffs at this time. This restraint is consistent with the longstanding canon of constitutional avoidance, *see Lyng*, 485 U.S. at 445 (collecting cases dating back to *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 341 (1936) (Brandeis, J., concurring)), which

has particular salience when a court considers (as we do here) a request for equitable relief, *see id.*, and which is commonly applied by three-judge courts in redistricting cases that involve both constitutional and statutory claims, *see, e.g.*, *LULAC*, 548 U.S. at 442; *Gingles*, 478 U.S. at 38.

## VIII. EVIDENTIARY RULINGS

During the preliminary injunction hearing, the court accepted into evidence the overwhelming majority of the exhibits that the parties offered; most were stipulated, and the court ruled on some evidentiary objections and reserved ruling on others. All pending objections are **SUSTAINED**.

**DONE** and **ORDERED** this 24th day of January, 2022.

**STANLEY MARCUS**
UNITED STATES CIRCUIT JUDGE

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE

**TERRY F. MOORER**
UNITED STATES DISTRICT JUDGE

Page **217** of **225**

**APPENDIX A**

Page **218** of **225**

FILED
2021 Dec-27  PM 01:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

1  **REAPPORTIONMENT COMMITTEE REDISTRICTING GUIDELINES**

2  May 5, 2021

3  **I. POPULATION**

4  The total Alabama state population, and the population of defined subunits
5  thereof, as reported by the 2020 Census, shall be the permissible data base used
6  for the development, evaluation, and analysis of proposed redistricting plans. It is
7  the intention of this provision to exclude from use any census data, for the purpose
8  of determining compliance with the one person, one vote requirement, other than
9  that provided by the United States Census Bureau.

10  **II. CRITERIA FOR REDISTRICTING**

11  a.    Districts shall comply with the United States Constitution, including the
12  requirement that they equalize total population.

13  b.    Congressional districts shall have minimal population deviation.

14  c.    Legislative and state board of education districts shall be drawn to achieve
15  substantial equality of population among the districts and shall not exceed an
16  overall population deviation range of ±5%.

17  d.    A redistricting plan considered by the Reapportionment Committee shall
18  comply with the one person, one vote principle of the Equal Protection Clause of
19  the 14th Amendment of the United States Constitution.

20  e.    The Reapportionment Committee shall not approve a redistricting plan that
21  does not comply with these population requirements.

22  f.    Districts shall be drawn in compliance with the Voting Rights Act of 1965, as
23  amended. A redistricting plan shall have neither the purpose nor the effect of
24  diluting minority voting strength, and shall comply with Section 2 of the Voting
25  Rights Act and the United States Constitution.

26  g.    No district will be drawn in a manner that subordinates race-neutral
27  districting criteria to considerations of race, color, or membership in a language-
28  minority group, except that race, color, or membership in a language-minority
29  group may predominate over race-neutral districting criteria to comply with
30  Section 2 of the Voting Rights Act, provided there is a strong basis in evidence in
31  support of such a race-based choice. A strong basis in evidence exists when there
32  is good reason to believe that race must be used in order to satisfy the Voting Rights
33  Act.

10213405.2

RC 044593

Page **219** of **225**

h.     Districts will be composed of contiguous and reasonably compact geography.

i.     The following requirements of the Alabama Constitution shall be complied with:

(i)     Sovereignty resides in the people of Alabama, and all districts should be drawn to reflect the democratic will of all the people concerning how their governments should be restructured.

(ii)    Districts shall be drawn on the basis of total population, except that voting age population may be considered, as necessary to comply with Section 2 of the Voting Rights Act or other federal or state law.

(iii)   The number of Alabama Senate districts is set by statute at 35 and, under the Alabama Constitution, may not exceed 35.

(iv)    The number of Alabama Senate districts shall be not less than one-fourth or more than one-third of the number of House districts.

(v)     The number of Alabama House districts is set by statute at 105 and, under the Alabama Constitution, may not exceed 106.

(vi)    The number of Alabama House districts shall not be less than 67.

(vii)   All districts will be single-member districts.

(viii)  Every part of every district shall be contiguous with every other part of the district.

j.     The following redistricting policies are embedded in the political values, traditions, customs, and usages of the State of Alabama and shall be observed to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States and of the State of Alabama:

(i)     Contests between incumbents will be avoided whenever possible.

(ii)    Contiguity by water is allowed, but point-to-point contiguity and long-lasso contiguity is not.

(iii)   Districts shall respect communities of interest, neighborhoods, and political subdivisions to the extent practicable and in compliance with paragraphs a through i. A community of interest is defined as an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities. The term communities of interest may, in certain circumstances, include political subdivisions such as counties, voting

2

10213405.2

RC 044594

1  precincts, municipalities, tribal lands and reservations, or school districts. The
2  discernment, weighing, and balancing of the varied factors that contribute to
3  communities of interest is an intensely political process best carried out by elected
4  representatives of the people.

5  (iv)   The Legislature shall try to minimize the number of counties in each district.

6  (v)    The Legislature shall try to preserve the cores of existing districts.

7  (vi)  In establishing legislative districts, the Reapportionment Committee shall
8  give due consideration to all the criteria herein. However, priority is to be given to
9  the compelling State interests requiring equality of population among districts and
10 compliance with the Voting Rights Act of 1965, as amended, should the
11 requirements of those criteria conflict with any other criteria.

12 g.    The criteria identified in paragraphs j(i)-(vi) are not listed in order of
13 precedence, and in each instance where they conflict, the Legislature shall at its
14 discretion determine which takes priority.

15 **III. PLANS PRODUCED BY LEGISLATORS**

16 1.    The confidentiality of any Legislator developing plans or portions thereof
17 will be respected. The Reapportionment Office staff will not release any
18 information on any Legislator's work without written permission of the Legislator
19 developing the plan, subject to paragraph two below.

20 2.    A proposed redistricting plan will become public information upon its
21 introduction as a bill in the legislative process, or upon presentation for
22 consideration by the Reapportionment Committee.

23 3.    Access to the Legislative Reapportionment Office Computer System, census
24 population data, and redistricting work maps will be available to all members of
25 the Legislature upon request. Reapportionment Office staff will provide technical
26 assistance to all Legislators who wish to develop proposals.

27 4.    In accordance with Rule 23 of the Joint Rules of the Alabama Legislature
28 "[a]ll amendments or revisions to redistricting plans, following introduction as a
29 bill, shall be drafted by the Reapportionment Office." Amendments or revisions
30 must be part of a whole plan. Partial plans are not allowed.

31 5.    In accordance with Rule 24 of the Joint Rules of the Alabama Legislature,
32 "[d]rafts of all redistricting plans which are for introduction at any session of the
33 Legislature, and which are not prepared by the Reapportionment Office, shall be
34 presented to the Reapportionment Office for review of proper form and for entry
35 into the Legislative Data System at least ten (10) days prior to introduction."

3

10213405.2

RC 044595

## IV. REAPPORTIONMENT COMMITTEE MEETINGS AND PUBLIC HEARINGS

1.   All meetings of the Reapportionment Committee and its sub-committees will be open to the public and all plans presented at committee meetings will be made available to the public.

2.   Minutes of all Reapportionment Committee meetings shall be taken and maintained as part of the public record. Copies of all minutes shall be made available to the public.

3.   Transcripts of any public hearings shall be made and maintained as part of the public record, and shall be available to the public.

4.   All interested persons are encouraged to appear before the Reapportionment Committee and to give their comments and input regarding legislative redistricting. Reasonable opportunity will be given to such persons, consistent with the criteria herein established, to present plans or amendments redistricting plans to the Reapportionment Committee, if desired, unless such plans or amendments fail to meet the minimal criteria herein established.

5.   Notice of all Reapportionment Committee meetings will be posted on monitors throughout the Alabama State House, the Reapportionment Committee's website, and on the Secretary of State's website. Individual notice of Reapportionment Committee meetings will be sent by email to any citizen or organization who requests individual notice and provides the necessary information to the Reapportionment Committee staff. Persons or organizations who want to receive this information should contact the Reapportionment Office.

## V. PUBLIC ACCESS

1.   The Reapportionment Committee seeks active and informed public participation in all activities of the Committee and the widest range of public information and citizen input into its deliberations. Public access to the Reapportionment Office computer system is available every Friday from 8:30 a.m. to 4:30 p.m. Please contact the Reapportionment Office to schedule an appointment.

2.   A redistricting plan may be presented to the Reapportionment Committee by any individual citizen or organization by written presentation at a public meeting or by submission in writing to the Committee. All plans submitted to the Reapportionment Committee will be made part of the public record and made available in the same manner as other public records of the Committee.

10213405.2

4

RC 044596

Page **222** of **225**

1  3.    Any proposed redistricting plan drafted into legislation must be offered by a
2  member of the Legislature for introduction into the legislative process.

3  4.    A redistricting plan developed outside the Legislature or a redistricting plan
4  developed without Reapportionment Office assistance which is to be presented for
5  consideration by the Reapportionment Committee must:

6  a.    Be clearly depicted on maps which follow 2020 Census geographic
7  boundaries;

8  b.    Be accompanied by a statistical sheet listing total population for each district
9  and listing the census geography making up each proposed district;

10  c.    Stand as a complete statewide plan for redistricting.

11  d.    Comply with the guidelines adopted by the Reapportionment Committee.

12  5.    Electronic Submissions

13  a.    Electronic submissions of redistricting plans will be accepted by the
14  Reapportionment Committee.

15  b.    Plans submitted electronically must also be accompanied by the paper
16  materials referenced in this section.

17  c.    See the Appendix for the technical documentation for the electronic
18  submission of redistricting plans.

19  6.    Census Data and Redistricting Materials

20  a.    Census population data and census maps will be made available through the
21  Reapportionment Office at a cost determined by the Permanent Legislative
22  Committee on Reapportionment.

23  b.    Summary population data at the precinct level and a statewide work maps
24  will be made available to the public through the Reapportionment Office at a cost
25  determined by the Permanent Legislative Committee on Reapportionment.

26  c.    All such fees shall be deposited in the state treasury to the credit of the
27  general fund and shall be used to cover the expenses of the Legislature.

28                             **Appendix.**

29        **ELECTRONIC SUBMISSION OF REDISTRICTING PLANS**

30      **REAPPORTIONMENT COMMITTEE - STATE OF ALABAMA**

5

10213405.2

RC 044597

Page **223** of **225**

1

2      The Legislative Reapportionment Computer System supports the electronic
3   submission of redistricting plans. The electronic submission of these plans must
4   be via email or a flash drive. The software used by the Reapportionment Office is
5   Maptitude.

6      The electronic file should be in DOJ format (Block, district # or district #,
7   Block). This should be a two column, comma delimited file containing the FIPS
8   code for each block, and the district number. Maptitude has an automated plan
9   import that creates a new plan from the block/district assignment list.

10      Web services that can be accessed directly with a URL and ArcView
11   Shapefiles can be viewed as overlays. A new plan would have to be built using this
12   overlay as a guide to assign units into a blank Maptitude plan. In order to analyze
13   the plans with our attribute data, edit, and report on, a new plan will have to be
14   built in Maptitude.

15      In order for plans to be analyzed with our attribute data, to be able to edit,
16   report on, and produce maps in the most efficient, accurate and time saving
17   procedure, electronic submissions are REQUIRED to be in DOJ format.

18   Example: (DOJ FORMAT BLOCK, DISTRICT #)

19   SSCCCTTTTTTBBBBDDDD

20   SS         is the 2 digit state FIPS code

21   CCC        is the 3 digit county FIPS code

22   TTTTTT     is the 6 digit census tract code

23   BBBB       is the 4 digit census block code

24   DDDD           is the district number, right adjusted

25   **Contact Information:**

26   Legislative Reapportionment Office

27   Room 317, State House

28   11 South Union Street

29   Montgomery, Alabama 36130

30   (334) 261-0706

6

10213405.2

RC 044598

Page **224** of **225**

1   For questions relating to reapportionment and redistricting, please contact:

2   Donna Overton Loftin, Supervisor

3   Legislative Reapportionment Office

4   donna.overton@alsenate.gov

5   Please Note: The above e-mail address is to be used only for the purposes of
6   obtaining information regarding redistricting. Political messages, including those
7   relative to specific legislation or other political matters, cannot be answered or
8   disseminated via this email to members of the Legislature. Members of the
9   Permanent Legislative Committee on Reapportionment may be contacted through
10  information contained on their Member pages of the Official Website of the
11  Alabama Legislature, legislature.state.al.us/aliswww/default.aspx.

7

10213405.2

RC 044599

Page **225** of **225**