

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| BOBBY SINGLETON, *et al.*, | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 2:21-cv-1291-AMM |
| | ) | |
| WES ALLEN, *in his official capacity as Secretary of State of Alabama*, *et al.*, | ) ) ) | THREE-JUDGE COURT |
|     Defendants. | ) | |

---

| | | |
|---|---|---|
| EVAN MILLIGAN, *et al.*, | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 2:21-cv-1530-AMM |
| | ) | |
| WES ALLEN, *in his official capacity as Secretary of State of Alabama*, *et al.*, | ) ) ) | THREE-JUDGE COURT |
|     Defendants. | ) | |

---

| | | |
|---|---|---|
| MARCUS CASTER, *et al.*, | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.: 2:21-cv-1536-AMM |
| WES ALLEN, *in his official capacity as Secretary of State of Alabama*, *et al.*, | ) ) ) | |
|     Defendants. | ) | |

## **STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**

## TABLE OF CONTENTS

INTEREST OF THE UNITED STATES ...................................................................1

INTRODUCTION ................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ............................................3

LEGAL STANDARD...........................................................................................5

ARGUMENT ......................................................................................................8

    I.    The Court Should Assess Whether the 2023 Plan Provides Two
           Districts in Which Black Voters Have the Opportunity to Elect
           Candidates of Their Choice. .......................................................................9

    II.   If the 2023 Plan Does Not Pass Muster, the Court Should Impose
           Its Own Remedial Plan. ............................................................................15

CONCLUSION ..................................................................................................16

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) ................................................................13

*Allen v. Milligan*, 143 S. Ct. 1487 (2023) ........................................................ *passim*

*Alpha Phi Alpha Fraternity Inc. v. Raffensperger*,
   587 F. Supp. 3d 1222 (N.D. Ga. 2022) ................................................................13

*Chapman v. Meier*, 420 U.S. 1 (1975) ..................................................................5

*Clark v. Putnam Cnty.*, 293 F.3d 1261 (11th Cir. 2002) ........................................7

*Dillard v. City of Greensboro*, 74 F.3d 230 (11th Cir. 1996) .................................6

*Dillard v. Crenshaw County*, 831 F.2d 246 (11th Cir. 1987) ............................5, 6

*Evenwel v. Abbott*, 578 U.S. 54 (2016) ................................................................7

*Georgia State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*,
   996 F. Supp. 2d 1353 (N.D. Ga. 2014) ................................................................16

*Hall v. Virginia,* 385 F.3d 421 (4th Cir. 2004) ......................................................9

*Johnson v. DeGrandy,* 512 U.S. 997 (1994) ..........................................................9

*Large v. Fremont Cnty.*,
   No. 05-cv-270, 2010 WL 11508507 (D. Wyo. Aug. 10, 2010) ..........................11

*Larios v. Cox*, 314 F. Supp. 2d 1357 (N.D. Ga. 2004) ..........................................7

*League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) .....................15

*Miller v. Johnson*, 515 U.S. 900 (1995) ...............................................................15

*Perez v. Abbott*, 253 F. Supp. 3d 864 (W.D. Tex. 2017) .......................................12

*Reynolds v. Sims*, 377 U.S. 533 (1964) ............................................................ 5, 15

*Rodriguez v. Bexar Cnty.*, 385 F.3d 853 (5th Cir. 2004) ................................. 12, 13

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ..................................... 6, 7, 9, 13

*United States v. Dallas County Commission*,
   850 F.2d 1433 (11th Cir. 1988) ...........................................................................6

*United States v. Osceola Cnty.*,
   474 F. Supp. 2d 1254 (M.D. Fla. 2006) ..............................................................11

*United States v. Village of Port Chester*,
   704 F. Supp. 2d 411 (S.D.N.Y. 2010) ................................................................11

*Upham v. Seamon*, 456 U.S. 37 (1982) ................................................................7

*Wesch v. Hunt*, 785 F. Supp. 1491 (S.D. Ala. 1992) .............................................1

*Wise v. Lipscomb*, 437 U.S. 535 (1978)............................................................ 5, 15

*Wright v. Sumter Cnty. Bd. of Elections & Registration*,
  979 F.3d 1282 (11th Cir. 2020) .................................................. 7, 9, 14, 16

*Wright v. Sumter Cnty. Bd. of Elections and Registration*,
  657 Fed. Appx. 871 (11th Cir. 2016) ..................................................14

*Wright v. Sumter County Bd. of Elections & Registration*,
  No. 14-cv-42, 2020 WL 499615 (M.D. Ga. Jan. 29, 2020) ................................11

## Statutes

28 U.S.C. § 517 ....................................................................................1

52 U.S.C. § 10301 .............................................................................1, 9

52 U.S.C. § 10304 ..............................................................................10

52 U.S.C. § 10308 ................................................................................1

## Other Authorities

@GovernorKayIvey, Twitter (July 21, 2023, 5:44 PM CT),
  https://perma.cc/5FDK-HVXG ........................................................5

United States Department of Justice, Guidance Concerning
  Redistricting Under Section 5 of the Voting Rights Act,
  76 Fed. Reg. 7470 (Feb. 9, 2011) ....................................................10

United States Department of Justice, Guidance Under Section 2
  of the Voting Rights Act for Redistricting and Methods of Electing
  Government Bodies (Sept. 1, 2021), https://perma.cc/82BD-KGXB ............. 6, 10

## INTEREST OF THE UNITED STATES

The United States respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United States in a suit pending in a court of the United States."  This case presents important questions regarding the application of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.  Congress has explicitly vested the Attorney General with authority to enforce Section 2 on behalf of the United States.  *See id.* § 10308(d).  Accordingly, the United States has a substantial interest in ensuring the proper application of Section 2.  The United States expresses no view on any factual disputes before the Court, nor on any legal questions other than those related to applying Section 2 to the proposed remedy in this case.

## INTRODUCTION

For over a century after Reconstruction, Alabama elected no Black Representatives to Congress.  *See* Prelim. Inj. Op. 28-29, Doc. No. 88.[1]  That changed only after a group of plaintiffs sued, alleging that the State's Congressional redistricting plan diluted the votes of Black Alabamians in violation of Section 2 and the Constitution.  *See id.*; *see also Wesch v. Hunt*, 785 F. Supp. 1491, 1492-93 (S.D. Ala. 1992), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902

---

[1] Unless otherwise noted, all citations to the record refer to documents in *Singleton v. Allen*, No. 23-cv-1291 (N.D. Ala.).

(1992), *aff'd sub nom. Figures v. Hunt*, 507 U.S. 901 (1993). To remedy the violation, a three-judge federal court drew the first majority-Black district in Alabama in 1992. *See* Prelim. Inj. Op. 28-29 (noting the creation of District 7 with a Black population of 67.53%). That district has elected a Black Representative in every election since then. *See id.*

The State enacted a new Congressional plan in late 2021 (the "2021 Plan") and litigation commenced soon after. *See id.* at 10-13. In early 2022, this Court, in a detailed preliminary injunction ruling, determined that the plan, which contained only one district in which Black voters formed a majority, likely diluted the voting strength of Black Alabamians in violation of Section 2. *See id.* at 4-5. So this Court ordered that a remedial plan would need to include "two districts in which Black voters either comprise a voting-age majority or something quite close to it." *Id.* at 213 (citations omitted). The Supreme Court subsequently affirmed this Court's preliminary injunction opinion, declining to "disturb the District Court's careful factual findings" or "upset [its] legal conclusions." *Allen v. Milligan*, 143 S. Ct. 1487, 1506 (2023).

Alabama enacted a remedial Congressional plan last Friday (the "2023 Plan"). This Court must now decide whether that plan remedies the likely Section 2 violation in the 2021 Plan. Whether Districts 2 and 7, the two districts with the highest concentrations of Black voters in the 2023 Plan, provide an equal

2

opportunity for Black voters to elect candidates of their choice hinges on how the districts perform for Black-preferred candidates in a functional analysis. Should the 2023 Plan fail to cure the likely Section 2 violation, the Court must design and effectuate its own remedial plan.

## FACTUAL AND PROCEDURAL BACKGROUND

Black Alabamians comprise around 27% of the State's voters. *See* Prelim. Inj. Op. 82. After the 2020 Census revealed that Alabama's population grew by 5.1% in the prior decade, the State redrew its Congressional districts. *See Allen*, 143 S. Ct. at 1501; *see also* Prelim. Inj. Op. 85 (noting that Alabama's Black population grew by 6.53% and white population shrunk by 3.92% from 2010 to 2020). In late 2021, Alabama enacted the 2021 Plan. *See* Prelim. Inj. Op. 32-33. That plan included only one majority-Black district out of seven. *See id.*; *see also* 2021 Plan Pop. Summ. Rep. 1, *Caster* Doc. No. 48-4 (reflecting District 7 with a Black voting-age population of 55.26%[2] and District 2, the district with the second largest Black population, with a Black voting-age population of 30.12%).

Soon, three groups of plaintiffs challenged the 2021 Plan. *See Allen*, 143 S. Ct. at 1502. After a weeklong hearing that included over a dozen witnesses, a few

---

[2] All percentages for Black voting-age population in this Statement of Interest include "any [C]ensus respondent who identified themselves as Black, regardless [of] whether that respondent also identified as a member of another race or other races." Prelim. Inj. Op. 146; *see also id.* at 139-46 (referring to this metric as "any-part Black").

hundred exhibits, and a thousand pages of briefing, this Court concluded in early 2022 that the 2021 Plan likely violated Section 2 and issued a preliminary injunction prohibiting Alabama from using the plan in upcoming elections. *See id.* The State appealed, and the Supreme Court affirmed last month, finding "no reason to disturb the District Court's careful factual findings" nor "a basis to upset the District Court's legal conclusions." *Id.*

To remedy the likely Section 2 violation, this Court afforded Alabama an opportunity to enact a remedial plan. *See* Prelim. Inj. Op. 213. "[A]s a practical reality," the Court stressed, that plan would "need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it." *Id.* (citations omitted); *see also* Scheduling Order 2, Doc. No. 135 ("[The] appropriate remedy is a [C]ongressional redistricting plan that includes either an additional majority-Black [C]ongressional district[] or an additional district in which Black voters otherwise have an opportunity to elect a representative of their choice." (citations omitted)).  Following the Supreme Court's ruling, this Court gave the State until July 21, 2023 to enact a remedial plan. *See* Scheduling Order ¶ 3.  If no new plan was enacted by that date, the Court suggested that it would instruct its appointed special master and cartographer to start work on a remedial plan. *See id.* ¶¶ 4, 9.

On July 21, the Legislature passed, and the Governor signed, the 2023 Plan.

*See* Defs.' Status Report 2, Doc. No. 139; @GovernorKayIvey, Twitter (July 21, 2023, 5:44 PM CT), https://perma.cc/5FDK-HVXG.  This plan purports to redraw District 2 into a new district where Black voters can elect candidates of their choice and retain District 7 as a district where Black voters can do the same.  To do so, the 2023 Plan increases the Black voting-age population in District 2 from 30.12% in the prior plan to just 39.93% and decreases the Black voting-age population of District 7 from 55.26% in the prior plan to 50.65%.  *See* 2021 Plan. Pop. Summ. Rep. 1; 2023 Plan Pop. Summ. Rep. 2, Doc. No. 139-1.  The United States now files this Statement of Interest to assist the Court in evaluating whether the 2023 Plan remedies the likely Section 2 violation in the 2021 Plan.

## LEGAL STANDARD

After finding a violation of Section 2, a district court should give the relevant jurisdiction an opportunity to propose a legally acceptable remedy.  *See Reynolds v. Sims*, 377 U.S. 533, 586 (1964).  If the jurisdiction fails to respond or responds with a legally unacceptable remedy, the responsibility falls on the district court to fashion an appropriate remedial plan.  *See Wise v. Lipscomb*, 437 U.S. 535, 539-40 (1978); *Chapman v. Meier*, 420 U.S. 1, 27 (1975).

First and foremost, the remedial plan must cure the proven vote dilution. *See Dillard v. Crenshaw County*, 831 F.2d 246, 252 (11th Cir. 1987) ("This Court cannot authorize an element of an election proposal that will not with certitude

*completely* remedy the Section 2 violation.").  Accordingly, the district court must "exercise [its] traditional equitable powers to fashion . . . relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and . . . elect candidates of their choice."  *United States v. Dallas County Commission*, 850 F.2d 1433, 1438 (11th Cir. 1988) (citation omitted), *vacated on other grounds*, 220 F.3d 1297 (11th Cir. 2000).

Second and relatedly, any proposed plan to remedy a Section 2 violation must not itself violate Section 2.  *See Dillard v. City of Greensboro*, 74 F.3d 230, 233 (11th Cir. 1996); *Crenshaw County*, 831 F.2d at 249-50, 252.  In late 2021, the Department of Justice provided guidance on what Section 2 requires in redistricting.  *See* United States Department of Justice, Guidance Under Section 2 of the Voting Rights Act for Redistricting and Methods of Electing Government Bodies (Sept. 1, 2021), https://perma.cc/82BD-KGXB [hereinafter Section 2 Guidance].  That guidance explained that redistricting plans must pass scrutiny under the framework outlined in *Thornburg v. Gingles*, 478 U.S. 30 (1986).[3]

---

[3] Under *Gingles*, as reaffirmed by *Allen*, a plaintiff must satisfy three preconditions to establish a Section 2 violation: the minority group must (1) "be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district," (2) "show that it is politically cohesive," and (3) "demonstrate that the white majority votes sufficiently as a bloc to enable it . . . [usually] to defeat the minority's preferred candidate."  *Allen*, 143 S. Ct. at 1503 (first alteration in

Third, the remedial plan must achieve population equality in accordance with the Constitution's one-person, one-vote requirement.  *See Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1299, 1311 (11th Cir. 2020) (affirming a remedial plan that the district court ensured complied with the Equal Protection Clause); *see also Clark v. Putnam Cnty.*, 293 F.3d 1261, 1276 (11th Cir. 2002).  For Congressional plans, the population of each district must be "as close to perfect equality as possible."  *Evenwel v. Abbott*, 578 U.S. 54, 59 (2016) (citation omitted).

Fourth and finally, the remedial plan should avoid "intrud[ing] on state policy any more than is necessary" to cure any legal defect.  *Upham v. Seamon*, 456 U.S. 37, 41-42 (1982) (citation omitted).  This means that the plan should follow traditional redistricting principles to the extent possible given the need to ensure compliance with Section 2 and the Constitution.  *See Larios v. Cox*, 314 F. Supp. 2d 1357, 1360 (N.D. Ga. 2004) (three-judge court).  During the recent redistricting cycle in Alabama, the Legislature's articulated principles included ensuring the contiguity and compactness of districts, avoiding pairing incumbents,

---

original and citations omitted).  Upon demonstrating those preconditions, the plaintiff must also show that the political process is not "equally open" to minority voters under the "totality of [the] circumstances."  *Id.* (citations omitted); *see also Gingles*, 478 U.S. at 36-38 (identifying nine factors relevant to the totality of the circumstances, including the extent to which voting is racially polarized and members of the minority group have been elected to office).

respecting communities of interest, minimizing the number of counties in each district, and preserving the core of existing districts. *See* Prelim. Inj. Op. 31-32. The remedial plan should afford appropriate weight to these principles.

## ARGUMENT

This Court already ruled that the 2021 Plan likely diluted the voting strength of Black Alabamians in violation of Section 2. *See id.* at 4-5. At this remedy stage, the fundamental question before the Court is whether the 2023 Plan fully cures that likely dilution. Under this Court's prior decision, a remedial plan is nondilutive only if Black voters have a realistic opportunity to elect their candidates of choice in two districts—in the 2023 Plan, Districts 2 and 7. *See id.* at 213. To determine that, this Court should assess the districts functionally, discerning how voting-age population, voter registration, political cohesion, bloc voting, historical election patterns, and other factors interact and impact whether and how often Black-preferred candidates prevail in the relevant districts in reconstituted exogenous elections. Based on its earlier review, this Court expressed the expectation that a remedial district would likely need a majority or near-majority Black voting-age population to provide Black voters with an opportunity to elect candidates of their choice. *See id.* If Districts 2 and 7—which have a Black voting-age population of 39.93% and 50.65%, respectively—both provide such an opportunity, then the 2023 Plan should pass muster under Section

2.  If those districts do not provide that opportunity, this Court should develop its own remedial plan.

### I.     The Court Should Assess Whether the 2023 Plan Provides Two Districts in Which Black Voters Have the Opportunity to Elect Candidates of Their Choice.

For the 2023 Plan to remedy the likely Section 2 violation in the 2021 Plan, the plan must afford Black voters in Alabama an "equal opportunity to participate in the political processes and . . . elect candidates of their choice." *Gingles,* 478 U.S. at 44; *see also Hall v. Virginia,* 385 F.3d 421, 429-30 (4th Cir. 2004); 52 U.S.C. § 10301(b).

While a remedial plan is not a "guarantee of electoral success" for the minority community, *Johnson v. DeGrandy,* 512 U.S. 997, 1014 n.11 (1994) (noting that "the ultimate right of [Section] 2 is equality of opportunity"), the plan must provide a genuine opportunity to "exercise an electoral power that is commensurate with its population," *Hall*, 385 F.3d at 429 (citation omitted). When assessing potential remedies, district courts often assess whether a given plan provides minority voters with an opportunity to elect candidates of their choice based on analyses of the relevant districts' performance—a determination afforded deference by appellate courts. *See Wright*, 979 F.3d at 1309 (finding "no clear error" where the district court selected a plan "on the ground that it was the

only option that gave [B]lack voters in [the jurisdiction] an opportunity to elect four candidates of their choice to the school board").

As the ability to analyze districts' electoral performance has become more sophisticated, the Department of Justice has relied on functional analyses to determine whether a remedy will provide minority voters with the opportunity to elect candidates of their choice. For example, the Department made clear in redistricting guidance pertaining to Section 5 of the Voting Rights Act, 52 U.S.C. § 10304, that jurisdictions needed to conduct a "functional analysis of the electoral behavior within the particular jurisdiction or election district." United States Department of Justice, Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act, 76 Fed. Reg. 7470, 7471 (Feb. 9, 2011). The same principle applies to assessing the opportunity to elect under Section 2. *See* Section 2 Guidance 8 ("*Gingles* describes a review of the totality of the circumstances that requires a 'searching practical evaluation of the past and present reality' of a jurisdiction's electoral system that is 'intensely local,' 'fact-intensive,' and 'functional' in nature." (citation omitted)). A functional analysis can include a variety of factors, including registration and turnout rates, polarized and crossover voting, growing and shrinking populations, and various kinds of election analyses.

Because a functional analysis is jurisdiction specific, courts have discretion to consider any and all relevant factors. *See, e.g.*, *Wright v. Sumter County Bd. of*

10

*Elections & Registration*, No. 14-cv-42, 2020 WL 499615, at *6 (M.D. Ga. Jan. 29, 2020) (crediting a special master's conclusion that a district "slightly below" the population threshold he had set for opportunity districts would be an opportunity district if the election were moved to November and no white incumbent was running), *aff'd*, 979 F.3d 1282 (11th Cir. 2020); *United States v. Village of Port Chester*, 704 F. Supp. 2d 411, 450-51 (S.D.N.Y. 2010) (determining that the jurisdiction's remedial plan afforded Hispanic voters an opportunity to elect their preferred candidates where the Hispanic citizen voting-age population was high enough to be "well above" the threshold of exclusion in a cumulative voting system, provided that the jurisdiction implemented an education program and election day support for Spanish speakers); *Large v. Fremont Cnty.*, No. 05-cv-270, 2010 WL 11508507, at *13 (D. Wyo. Aug. 10, 2010) (rejecting the jurisdiction's remedial plans because they "suffer[ed] from the same deficiencies [previously] discussed . . . and tend[ed] to perpetuate the isolation and polarization that . . . existed in the past" in the jurisdiction); *United States v. Osceola Cnty.*, 474 F. Supp. 2d 1254, 1256 (M.D. Fla. 2006) (finding that the jurisdiction's remedial plan resulted in an unequal opportunity for Hispanic voters because it included two at-large seats that would be "completely out of the reach of the Hispanic community," as the court had already found that Hispanic voters had no reasonable opportunity to elect candidates of their choice in at-large elections).

Courts have considered "reconstituted" or "recompiled" exogenous[4] election analyses as part of their functional assessment of proposed districts' future performance. *Rodriguez v. Bexar Cnty.*, 385 F.3d 853, 860 n.5 (5th Cir. 2004) ("This court has repeatedly endorsed the analysis of exogenous elections in Section 2 vote dilution cases."); *see also Perez v. Abbott*, 253 F. Supp. 3d 864, 883 (W.D. Tex. 2017) (recognizing the value of exogenous election indices where a proposed district has not had endogenous elections). These analyses aggregate votes from past elections to predict how proposed districts will perform in future elections.

Reconstituted election analyses make use of exogenous elections (*e.g.*, statewide contests), rather than endogenous elections (*e.g.*, district-specific contests), because they require every voter in the analyzed district to have had the same ballot contests in the analyzed elections. Proposed districts often include precincts that were not previously part of the district, meaning that the voters in those precincts have not voted in the same endogenous elections as the rest of the precincts in the district. Thus, to determine how voters now living in a proposed district would vote if they all had the same candidates before them, reconstituted analyses measure how each precinct in the proposed district voted in exogenous

---

[4] Exogenous elections are those for positions other than the ones at issue, as compared to endogenous elections, which are those for the positions at issue. In this case, exogenous elections are those for positions other than United States Representative.

elections and then recompile the vote count to determine whether minority-preferred candidates would prevail if the district were drawn as proposed.  *See Rodriguez*, 385 F.3d at 861 ("Reconstituted election analysis is a relatively simple method that extracts actual election results from a variety of statewide and local races that subsume the area being analyzed and determines, precinct-by-precinct within the new district, the racial composition of the vote and the 'winner' within the new district.").

Data on how often minority-preferred candidates would be expected to win inform courts' determinations regarding whether minority voters have an "equal opportunity to participate in the political processes and . . . elect candidates of their choice," as required by *Gingles*.  *Gingles*, 478 U.S. at 44 (citations omitted); *see also, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2332 (2018) (noting that expert testimony, based on seven years of county election returns for statewide elections, established that two districts would not be "performing" districts where, if drawn to both be majority-Latino, "one performed for Latinos in only 7 out of 35 relevant elections, and the other did so in *none* of the 35 elections").

Recompiled election analyses are also used by courts at the liability stage to determine whether a plaintiff's illustrative plan would provide minority voters with an opportunity to elect candidates of their choice.  *See, e.g.*, *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 587 F. Supp. 3d 1222, 1314 (N.D. Ga. 2022)

(crediting an expert's recompiled election results and conclusion that the plaintiff's illustrative maps provided "at least one additional [B]lack opportunity district compared to the enacted plan"); *cf. Wright v. Sumter Cnty. Bd. of Elections and Registration*, 657 Fed. Appx. 871, 873-74 (11th Cir. 2016) (Tjoflat, J., concurring) (noting the importance of recompiled election results in evaluating a proposed seven-district plan).  Though the context is slightly different between the liability and remedial stages, the principle remains the same: a recompiled election analysis can help determine whether a district creates an opportunity for minority voters to elect candidates of their choice.

At the liability stage of this case, the parties' experts conducted election analyses of the illustrative plans offered by Plaintiffs, which analyses this Court referenced in support of its conclusion that "the evidence of racially polarized voting . . . suggests that any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it."  Prelim. Inj. Op. 213 (citations omitted); *see also* Pls.' Proposed Findings of Fact and Conclusions of Law ¶¶ 353-58, *Milligan* Doc. 103.  Now at the remedy stage, these analyses can be conducted by the parties' experts or the Court-appointed special master.  *See Wright*, 979 F.3d at 1309 (relying on the conclusions of a special master).  Either way, these analyses can be helpful in determining whether Districts 2 and 7 in the 2023 Plan—which have Black voting-

age populations of 39.93% and 50.65%, respectively—afford minority voters an equal opportunity to elect candidates of their choice or whether, as the Court previously suggested, each district's Black voting-age population must be "something quite close to" a majority to provide that opportunity.  Prelim. Inj. Op. 213 (citations omitted).

## II.    If the 2023 Plan Does Not Pass Muster, the Court Should Impose Its Own Remedial Plan.

"It is well settled that reapportionment is primarily the duty and responsibility of the State."  *Miller v. Johnson*, 515 U.S. 900, 915 (1995) (citations omitted).  So when a court determines that a redistricting plan violates federal law, it must first afford the jurisdiction a "reasonable opportunity" to adopt a remedial plan.  *Wise*, 437 U.S. at 540.  This Court has done that: it gave Alabama over a month to enact a remedial plan.  *See* Scheduling Order ¶ 3.  And the State has now enacted one: the 2023 Plan.  *See* Defs.' Status Report 2.  So should the Court now conclude that the 2023 Plan fails to completely remedy the likely Section 2 violation in the 2021 Plan, it must assume the responsibility of devising and implementing a legally acceptable plan.  *See Sims*, 377 U.S. at 585-87; *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 415-16 (2006); *Wise*, 437 U.S. at 539-40.  As with any jurisdiction's remedial plan, any remedial plan this Court itself devises and orders must cure the likely vote dilution, not itself create a new Section 2 violation, ensure the population of each district is as equal as possible,

and afford appropriate weight to traditional redistricting principles. *See Wright*, 979 F.3d at 1308-11; *Georgia State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 996 F. Supp. 2d 1353, 1358-59 (N.D. Ga. 2014).

## CONCLUSION

The United States respectfully submits this Statement of Interest to assist the Court in evaluating whether the 2023 Plan fully cures the likely Section 2 violation in the 2021 Plan.

Dated: July 28, 2023

PRIM F. ESCALONA
United States Attorney

/s/ Jason R. Cheek
JASON R. CHEEK
Assistant United States Attorney
Northern District of Alabama
United States Department of Justice
1801 Fourth Avenue North
Birmingham, AL 35203
(205) 244-2104
jason.cheek@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

/s/ Michelle Rupp
T. CHRISTIAN HERREN, JR.
TIMOTHY F. MELLETT
MICHELLE RUPP
JAYWIN SINGH MALHI
Attorneys, Voting Section
Civil Rights Division
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(800) 253-3931
chris.herren@usdoj.gov
timothy.f.mellett@usdoj.gov
michelle.rupp@usdoj.gov
jaywin.malhi@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that, on July 28, 2023, I electronically filed the foregoing under seal with the Clerk of the Court using the CM/ECF system and caused to be served by email a copy of this filing to counsel of record.

*/s/ Jason R. Cheek*
JASON R. CHEEK
Assistant United States Attorney
Northern District of Alabama
United States Department of Justice
1801 Fourth Avenue North
Birmingham, AL 35203
(205) 244-2104
jason.cheek@usdoj.gov
