FILED
2023 Jul-28  PM 08:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| MARCUS CASTER, LAKEISHA CHESTNUT, BOBBY LEE DUBOSE, BENJAMIN JONES, RODNEY ALLEN LOVE, MANASSEH POWELL, RONALD SMITH, and WENDELL THOMAS,<br><br>　　　　　　Plaintiffs,<br><br>　v.<br><br>WES ALLEN, in his official capacity as Alabama Secretary of State,<br><br>　　　　　　Defendant,<br><br>　and<br><br>CHRIS PRINGLE and JIM McCLENDON,<br><br>　　　　　　Intervenor-Defendants. | Case No. 2:21-CV-1536-AMM |

### PLAINTIFFS' OBJECTIONS TO ALABAMA LEGISLATURE'S REMEDIAL CONGRESSIONAL PLAN

I.  **Introduction**

Alabama is in open defiance of the federal courts. More than 18 months ago, this Court enjoined Alabama's 2021 congressional plan as a violation of Section 2 of the Voting Rights Act ("VRA") and ordered the State to provide Plaintiffs relief in the form of a new congressional plan that allows Black Alabamians the opportunity to elect a candidate of their choice in two districts. Alabama resisted—seeking a stay and ultimately review of the Court's injunctive order from the U.S. Supreme Court. But the Supreme Court affirmed this Court's ruling, finding as this Court did that Alabama's 2021 congressional plan violated the VRA.

Alabama, however, remains undeterred. In the wake of the Supreme Court's order, the State passed Senate Bill 5 ("SB5"), a "remedial plan" in name only. Rather than include two districts in which Black voters have an opportunity to elect a candidate of their choice, as this Court ordered, Alabama's new plan contains only one, the same number as the 2021 plan rejected by this Court and the Supreme Court. The plan does not even come close to giving Black voters an additional opportunity to elect a candidate of their choice: Black voters in the purported remedial district comprise less than 40% of the voting age population, and Black-preferred candidates would have lost over 94% of statewide elections since 2016.

Plaintiffs have waited the better part of two years for relief. They now respectfully request that the Court enjoin Alabama's proposed plan as a plainly insufficient remedy and proceed to a Court-driven remedial process to ensure Plaintiffs obtain relief in time for the 2024 election.

## II. Factual Background

### A. The Court struck down Alabama's congressional plan and provided the State with clear guidance on a proper remedy.

On January 24, 2022, after a seven-day hearing involving extensive fact and expert witness testimony, the Court found that Alabama's 2021 congressional plan ("HB1") likely violated Section 2 of the VRA. *Caster v. Merrill*, No. 2:21-cv-1536-AMM, 2022 WL 264819 (N.D. Ala. Jan. 24, 2022). Critical to the Court's holding was *Caster* and *Milligan* Plaintiffs' extensive evidence of racially polarized voting in Alabama. The Court determined that there was "no serious dispute that Black voters are 'politically cohesive,'" and "that the challenged districts' white majority votes 'sufficiently as a block to usually defeat [Black voters'] preferred candidate.'" *Id.* at 68. There was no doubt, the Court concluded, that "voting in Alabama is clearly and intensely racially polarized." *Id.* at 69.

The Court came to this conclusion after considering, and finding reliable, extensive expert evidence. This included the testimony of *Caster* Plaintiffs' expert Dr. Maxwell Palmer, who the Court credited as an expert in redistricting and data analysis. *Id.* at 38. Dr. Palmer testified that "the evidence of racially polarized voting

across the five districts he studied [was] very strong." *Id.* And, across the congressional districts he analyzed, "the Black-preferred candidate won only those elections that occurred in District 7, the majority-Black congressional district." *Id.* at 39. Accordingly, Dr. Palmer concluded that "Black-preferred candidates are largely unable to win elections" outside of District 7, the one majority-Black district in HB1. *Id.* The Court also credited the testimony of *Milligan* Plaintiffs' expert Dr. Baodong Liu, whose analysis echoed Dr. Palmer's and exposed "the clarity and starkness of the pattern of racially polarized voting" in Alabama. *Id.* at 28.

The Court also found important the testimony of Alabama's own expert Dr. M.V. Hood, whose expert report "found evidence of racially polarized voting in Districts 6 and 7 in the Whole County Plan and District 7 in the [Challenged] Plan." *Id.* at 69. Dr. Hood testified during the hearing on the motion for a preliminary injunction "that he either agrees with or does not dispute the critical findings of Drs. Liu and Palmer on the question whether voting in Alabama, and specifically in the districts at issue in this litigation, is racially polarized." *Id.* at 70. In sum, the Court explained, the evidence adduced during the preliminary injunction hearing "support[ed] only one finding: that voting in Alabama, and in the districts at issue in this litigation, is racially polarized for purposes of the second and third *Gingles* requirements." *Id.*

As a result of this finding, the Court was exceedingly clear that any remedy for Alabama's Section 2 violation must account for Alabama's "clear[] and intense[] racially polarized" voting. *Id.* at 69. While the Court acknowledged that "the appropriate remedy" for Alabama's Section 2 violation did not necessarily require a second majority-Black district, "as a practical reality, the evidence of racially polarized voting adduced during the preliminary injunction proceedings suggests that any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it." *Id.* at 83.

During the preliminary injunction hearing, Plaintiffs offered no fewer than eleven illustrative plans, each of which, this Court found, illustrated different configurations Alabama could use to draw a congressional plan that not only remedied the Section 2 violation by providing Black voters with the opportunity to elect a candidate of their choice in two districts, but also complied with the State's traditional redistricting criteria, including the communities of interest criterion. *Id.* at 68 ("Accordingly, we find that the remedial plans developed by [Plaintiffs'] experts satisfy the reasonable compactness requirement of *Gingles I*.").

**B. The U.S. Supreme Court affirmed.**

Last month, the Supreme Court affirmed the Court's preliminary injunction order. In doing so, the Supreme Court emphasized that it found "no reason to disturb the District Court's careful factual findings" which had "gone unchallenged by

Alabama in any event." *Allen v. Milligan*, 143 S. Ct. 1487, 1506 (2023). The Supreme Court reiterated this Court's finding that there was "no serious dispute" that voting in Alabama is racially polarized and specifically underscored Dr. Hood's testimony "that the candidates preferred by white voters in the areas that he looked at regularly defeat the candidates preferred by Black voters." *Id.* at 1505. The Supreme Court also agreed with the Court's finding that Plaintiffs' eleven illustrative plans "'strongly suggest[ed] that Black voters in Alabama' could constitute a majority in a second, reasonably configured, district," *id.* at 1504, and expressly rejected Alabama's argument that Plaintiffs' failure to keep together the Gulf Coast region in the southwest of the state was fatal, describing the "State's argument [as] unpersuasive," *id.* at 1504-05.

### C. Following remand, Alabama adopted a remedial plan that defies the rulings of this Court and the Supreme Court.

On July 21, 2023, Alabama enacted proposed remedial plan SB5. Alabama's proposal directly defies the prior rulings of this Court and the Supreme Court. According to the Legislature's own analysis copied below (attached as Exhibit 1), SB5 contains just one district, CD 7, with an AP BVAP above 50%; the district with the next highest AP BVAP is CD 2, with an AP BVAP of just 39.93%, which, as discussed further below, will almost never enable Black voters to elect the candidates of their choice; *see also* Expert Report of Dr. Maxwell Palmer ("Palmer

Rep."), Exhibit 2, at 1 ¶¶ 6-7 (confirming AP BVAPs for CD 2 and CD 7); *infra* Part III.B.

**Alabama's Population Summary of SB5**

**Population Summary**
Thursday, July 20, 2023                                                                                                    7:14 PM

| District | Population | Deviation | % Devn. | [% White] | [% Black] | [% AP_Wht] | [% AP_Blk] | [% 18+_Blk] | [% 18+_AP_Blk] |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 717,754 | 0 | 0.00% | 65.36% | 25.07% | 70.31% | 26.46% | 23.8% | 24.63% |
| 2 | 717,755 | 1 | 0.00% | 50.86% | 39.93% | 54.97% | 41.63% | 38.83% | 39.93% |
| 3 | 717,754 | 0 | 0.00% | 70.79% | 20.39% | 75.16% | 21.76% | 19.93% | 20.7% |
| 4 | 717,754 | 0 | 0.00% | 81.53% | 6.93% | 86.55% | 7.9% | 6.74% | 7.22% |
| 5 | 717,754 | 0 | 0.00% | 69.02% | 17.59% | 75.72% | 19.29% | 17.33% | 18.33% |
| 6 | 717,754 | 0 | 0.00% | 70.23% | 19.36% | 75.03% | 20.51% | 18.58% | 19.26% |
| 7 | 717,754 | 0 | 0.00% | 40.89% | 51.32% | 44.15% | 52.59% | 49.68% | 50.65% |

Pursuant to the Court's June 20 Scheduling Order, Plaintiffs now object to SB5 as an insufficient remedy for Alabama's Section 2 violation.

### III. Argument

#### A. Legal Standard

To remedy a Section 2 violation, a state must fashion a remedial district that "*completely* remedies the prior dilution of minority voting strength and *fully* provides equal opportunity for minority citizens to participate and to elect candidates of their choice." *United States v. Dallas Cnty. Com'n, Dallas Cnty., Ala.*, 850 F.2d 1433, 1442 (11th Cir. 1988) (citing S. Rep. No. 417, 97th Cong. 2d Sess. 26, *reprinted in* 1982 U.S. Code Cong. & Adm. News 177, 208); *White v. Alabama*, 74 F.3d 1058, 1069 n.36 (11th Cir. 1996) (same); *see also Wright v. Sumter Cnty. Bd. of Elections & Reg.*, 979 F.3d 1282, 1309 (11th Cir. 2020) (finding Section 2 remedy available where special master showed the ability to draw additional minority

opportunity districts); *Caster*, 2022 WL 264819, at *3 ("[T]he appropriate remedy is a congressional redistricting plan that includes either an additional majority-Black congressional district, or an additional district in which Black voters otherwise have an opportunity to elect a representative of their choice.").

Whether a remedial district performs for a minority group is a fact-based analysis turning on the likelihood that the injured minority group will be able to elect their candidate of choice. *See, e.g.*, *Martinez v. Bush*, 234 F. Supp. 2d 1275, 1302-10 (S.D. Fla. 2002) (evaluating whether a district is an opportunity district by considering past election performance and minority voting age population). While there is no universal numerical threshold that separates a performing district from a non-performing district, Plaintiffs are not aware of any case in which a court has approved a Section 2 remedial district with less than a majority-minority voting-age population. In this case, however, the Legislature's proposed remedial district fails under any conceivable measure.

### B. SB5 does not remedy Alabama's Section 2 violation.

SB5 does not remedy Alabama's Section 2 violation for a very simple reason: it fails to create a remedial district in which Black voters have an opportunity to elect a candidate of their choice. The demographic statistics of SB5 speak for themselves. Like its predecessor, SB5 contains just *one* majority-Black district: CD 7, which has an AP BVAP of 50.65%. The next highest AP BVAP is 39.93% in CD 2—in blatant

disregard for this Court's guidance that "any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it." *Caster*, 2022 WL 264819, at *3.

Expert analysis of SB5 confirms what the numbers suggest—SB5 fails to provide an opportunity for Black voters to elect their preferred candidates in a second congressional district. Dr. Maxwell Palmer, the same expert whose analysis this Court credited and relied on in entering its preliminary injunction order, analyzed 17 statewide elections between 2016 and 2022 to determine how Black-preferred candidates would perform in SB5's CD 2. *See* Palmer Rep. at 5 ¶¶ 15-17. The average vote share for Black-preferred candidates in CD 2 across all 17 elections is 44.5%, well below what would be needed to win a two-party election. *Id.* at 5 ¶ 18. In fact, under SB5, Black voters in CD 2 would have elected their candidate of choice in *just one* out of 17 races. *Id.* at 5 ¶ 18 & Figure 3 (copied below). Put another way, Black-preferred candidates in CD 2 would have been defeated by white-preferred candidates 94% of the time. *Id.* at 5 ¶ 20. As such, the State's proposed remedial district indisputably fails to give Black voters an opportunity "to elect representatives of their choice." 52 U.S.C. § 10301(a)-(b).



Figure 3: Vote Shares of Black-Preferred Candidates Under the SB 5 Plan

The Legislature's justifications for SB5 do nothing to blunt the unavoidable conclusion that SB5 is an insufficient remedy. SB5 was accompanied by a statement of legislative intent in which the Legislature enumerated several redistricting criteria that allegedly guided their map drawing process, emphasizing the same two communities of interest—one in the Gulf Coast region and another in the Wiregrass region—that both this Court and the Supreme Court found "insufficient to sustain" Alabama's failure to provide an additional minority opportunity district. *Milligan*, 143 S. Ct. at 1504-05; *see also Caster*, 2022 WL 264819, at *67. Those criteria and communities of interest have no bearing on the only relevant question regarding the plan: whether it remedies Alabama's Section 2 violation by creating two districts in

which the state's Black voters have an opportunity to elect a candidate of their choice.

Indeed, glaringly absent from the Legislature's statement is *any* discussion of the extent to which SB5 provides Black voters an opportunity to elect in a second congressional district. While the Legislature states its general intent "to comply with federal law, including the U.S. Constitution and the Voting Rights Act of 1965, as amended," S.B. 5, 2023 Leg., 2d Spec. Sess. (Ala. 2023), at no point does it explain how SB5 *actually complies* with Section 2, let alone with the specific instructions and guidance provided by this Court. This is not surprising: Plaintiffs' expert analysis shows that it decidedly does not.

## IV. Conclusion

The Legislature's task was clear: it must provide Black voters in Alabama the opportunity to elect their preferred candidates in two congressional districts. It has failed. Plaintiffs respectfully ask the Court to enjoin SB5 for failing to remedy the Section 2 violation and proceed to a judicial remedial process to ensure Plaintiffs obtain relief in time for the 2024 election.

Dated: July 28, 2023

Richard P. Rouco
(AL Bar. No. 6182-R76R)
**Quinn, Connor, Weaver, Davies & Rouco LLP**
Two North Twentieth
2-20th Street North, Suite 930
Birmingham, AL 35203
Phone: (205) 870-9989
Fax: (205) 803-4143
Email: rrouco@qcwdr.com

Respectfully submitted,

By */s/ Abha Khanna*
Abha Khanna*
**Elias Law Group LLP**
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
Phone: (206) 656-0177
Email: AKhanna@elias.law

Lalitha D. Madduri*
Joseph N. Posimato*
Jyoti Jasrasaria*
**Elias Law Group LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, D.C. 20001
Phone: (202) 968-4518
Email: LMadduri@elias.law
Email: JPosimato@elias.law
Email: JJasrasaria@elias.law

*Attorneys for Plaintiffs*
**Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2023, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

<u>/s/ Richard P. Rouco</u><br>
Richard P. Rouco<br>
Counsel for Plaintiffs