FILED

2023 Aug-19  AM 07:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| EVAN MILLIGAN, et al., <br> *Plaintiffs*, <br><br> v. <br><br> WES ALLEN, et al., <br> *Defendants*. | No. 2:21-cv-01530-AMM |
| MARCUS CASTER, et al., <br> *Plaintiffs*, <br><br> v. <br><br> WES ALLEN, et al., <br> *Defendants*. | No. 2:21-cv-01536-AMM |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................... ii

TABLE OF AUTHORITIES ............................................................ iv

I.      PROPOSED FINDINGS OF FACT ....................................... 2

    A.   Passage of 2023 Plan ............................................................. 2

       i. Co-Chairs Livingston and Pringle fully understood what was required by Section 2 and the Court's preliminary injunction. .................................. 2

       ii.  The Co-Chairs' instructions to Randy Hinaman ...................... 3

       iii.  Hinaman drafted several possible plans for consideration. ..................... 5

       iv.  The Committee hosted public hearings and readopted the 2021 Guidelines. ......................................................... 6

       v.  The Committee considered and passed Representative Pringle's Community of Interest plan over Black legislators' objections. ............... 7

       vi.  Senators turned against the COI Plan to pursue a more aggressive plan for preserving power at Black voters' expense. ........................................ 8

       vii.  Senators and Mr. LaCour drafted the "Compromise" SB5 bill. ............. 10

       viii.   The Legislature knew, based on the analysis of Defendants' expert, that the 2023 Plan lacked a second opportunity district. ......................... 12

       ix.  Mr. LaCour drafted and inserted unprecedented legislative "findings" that were not requested by the Committee's Chairs. ............................... 12

       x.  The Legislature passed SB5 over opposition of Black legislators. .......... 15

    B.   Performance of the 2023 Plan ................................................ 15

    C.   2021 Liability Findings ......................................................... 18

II.    PROPOSED CONCLUSIONS OF LAW ........................................... 24

    A.   Legal Standard at Remedial Stage .......................................... 24

    B.   Alabama's 2023 Plan fails to provide Black voters with an additional district in which they have an opportunity to elect their preferred candidates. ........................................................ 27

    C.   The passage of a remedial plan does not reset the State's Section 2 liability. ...................................................................... 30

    D.     Even if Plaintiffs were required to re-prove Alabama's Section 2 liability, they have done so here. ...............................................36

      i.Plaintiffs have satisfied their burden in establishing the Gingles preconditions regarding the 2023 Plan....................................................37

      ii.  Plaintiffs have satisfied their burden under the totality-of-circumstances to prove that the 2023 Plan violates Section 2. ........................................45

**III.     ALTERNATIVE FINDINGS OF FACT AND CONCLUSIONS OF LAW: ALABAMA'S "COMMUNITIES OF INTEREST" EVIDENCE IS INADMISSIBLE, BUT IF THE COURT CONSIDERS IT, IT SHOULD ALSO CONSIDER THE STRONG EVIDENCE OF A COMMUNITY OF INTEREST BETWEEN THE BLACK BELT AND MOBILE COUNTY AND THE SIGNIFICANT DISSIMILARITIES BETWEEN MOBILE AND BALDWIN COUNTIES.**.......................................................51

**IV.     PROPOSED ORDER**..........................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott v. Perez*,
 138 S. Ct. 2305 (2018)...................................................................22, 26, 28

*Abrams v. Johnson*,
 521 U.S. 74 (1997)...........................................................................34

*Allen v. Milligan*,
 143 S. Ct. 1487 (2023)................................................................*passim*

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of
 Albany*,
 281 F. Supp. 2d 436 (N.D.N.Y. 2003)................................................49

*Askew v. City of Rome*,
 127 F.3d 1355 (11th Cir. 1997)...........................................................34

*Baldus v. Members of Wis. Gov't Accountability Bd.*,
 862 F. Supp. 2d 860 (E.D. Wis. 2012)................................................34

*Bartlett v. Strickland*,
 556 U.S. 1 (2009).............................................................................35

*Bethune-Hill v. Va. State Bd. of Elections*,
 580 U.S. 178 (2017).........................................................................42

*Brown v. Bd. of Sch. Comm'rs of Mobile Cnty.*,
 542 F. Supp. 1078 (S.D. Ala. 1982)...................................................21

*Bush v. Vera*,
 517 U.S. 952 (1996).........................................................................20

*Clerveaux v. E. Ramapo Cent. Sch. Dist.*,
 984 F.3d 213 (2d Cir. 2021)..............................................................49

*Dillard v. Crenshaw Cnty*,
 831 F. 2d 246 (11th Cir. 1987).........................................31, 32, 33, 46

*Ga. State Conf. of NAACP v. Fayette Cnty. Bd. Of Comm'rs*,
  775 F.3d 1336 (11th Cir. 2015) .......................................................... 46

*Harris v. Ariz. Indep. Redistricting Comm'n*,
  578 U.S. 253 (2016) ........................................................................ 35

*Jeffers v. Clinton*,
  756 F. Supp. 1195 (E.D. Ark. 1990) ................................................. 33

*Ketchum v. Byrne*,
  740 F.2d 1398 (7th Cir. 1984) .................................................... 25, 49

*League of United Latin Am. Citizens v. Perry*,
  457 F. Supp. 2d 716 (E.D. Tex. 2006) .............................................. 26

*League of United Latin Am. Citizens v. Perry*,
  548 U.S. 399 (2006) ................................................................. *passim*

*McGhee v. Granville Cnty.*,
  860 F.2d 110 (4th Cir. 1988) ...................................................... 32, 33

*Meek v. Metro. Dade Cnty.*,
  985 F.2d 1471 (11th Cir. 1993) ........................................................ 47

*Milligan v. Allen*,
  582 F. Supp. 3d 924 (N.D. Ala. 2022) ....................................... *passim*

*North Carolina v. Covington*,
  138 S. Ct. 2548 (2018) ....................................................... 30, 31, 33

*Perez v. Texas*,
  No. 11-CA-360, 2012 WL 13124275 (W.D. Tex. Mar. 19, 2012) .................... 26

*Perry v. Perez*,
  565 U.S. 388 (2012) ................................................................. 34, 43

*Pope v. Cnty. of Albany*,
  94 F. Supp. 3d 302 (N.D.N.Y. 2015) ................................................ 48

*Shaw v. Reno*,
  509 U.S. 630 (1993) ........................................................................ 41

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) ..........................................................................*passim*

*United States v. Dallas Cnty. Comm'n*,
    850 F.2d 1433 (11th Cir. 1988) ......................................................*passim*

*United States v. Euclid City Sch. Bd.*,
    632 F. Supp. 2d 740 (N.D. Ohio 2009) .......................................25, 28

*United States v. Marengo Cnty.*,
    731 F. 2d 1546 (11th Cir. 1984) ........................................................48

*United States v. Osceola Cnty.*,
    474 F. Supp. 2d 1254 (M.D. Fla. 2006)............................................34

*Upham v. Seamon*,
    456 U.S. 37 (1982)........................................................................34, 43

*Voinovich v. Quilter*,
    507 U.S. 146 (1993)............................................................................35

*Wright v. Sumter Cnty. Bd. of Elections & Registration*,
    979 F.3d 1282 (11th Cir. 2020) .........................................................29

**Statutes**

52 U.S.C. § 10301(b) ................................................................................37

The *Caster* and *Milligan* Plaintiffs respectfully submit the following proposed findings of fact and conclusions of law, and proposed order granting injunctive relief against Alabama's 2023 remedial plan (the "2023 Plan").

The question presented during these remedial proceedings is straightforward: Does the 2023 Plan remedy Alabama's likely Section 2 violation by providing Black voters the opportunity to elect a candidate of their choice in a second congressional district? It is beyond dispute that the 2023 Plan fails to do so. The white-preferred candidate in Congressional District 2, Alabama's proposed remedial district, would defeat the Black-preferred candidate in virtually every election contest analyzed. Under any measure of an opportunity district, CD 2 fails to perform.

Rather than participate in the remedial process, Alabama seeks to upend it. Alabama argues that its proposed remedy obviates the very liability finding that required it. Instead, it seeks to reopen and relitigate this Court's findings and conclusions on liability, which were affirmed by the U.S. Supreme Court. By muddying and confusing the Court's remedial process, Alabama refuses to afford its Black citizens equal access to the State's political process. If there were any doubt that Section 2 remains essential to the protection of voting rights in America, Alabama's behavior in this case—six decades after the passage of the Voting Rights Act—silences it, resoundingly.

- 1 -

Plaintiffs have waited 18 months for relief. Because Alabama's plan fails to provide a complete remedy, the Court must enjoin the 2023 Plan and proceed to a court-driven remedial process to ensure Plaintiffs may vote under a lawful congressional plan in the 2024 elections.

## I.    PROPOSED FINDINGS OF FACT

### A.    Passage of 2023 Plan

i.    *Co-Chairs Livingston and Pringle fully understood what was required by Section 2 and the Court's preliminary injunction.*

1.    Representative Chris Pringle and Senator Steve Livingston served as Co-Chairs of the Permanent Legislative Committee on Reapportionment ("the Committee") during the special session. Joint Stipulations, *Milligan*, ECF No. 251 ¶ 11.

2.    Both Representative Pringle and Senator Livingston were aware of the Court's remedial order in this case. Exs. M46 (Livingston Dep., ECF No. 261-4) at 51:1–52:1, 55:11–22; M47 (Pringle Dep, ECF No. 261-5) at 17:11–20:12.

3.    When shown this Court's instruction that the "legislature . . . should be mindful . . . that any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it," *Milligan v. Allen*, 582 F. Supp. 3d 924, 936 (N.D. Ala. 2022) (three-judge court), Senator Livingston testified that his deposition on August 9, 2023, was "actually the first time that's been pointed out to me in a paragraph," Ex. M46 at 51:21–22.

- 2 -

4.      Nonetheless, when asked about the significance of the Court's order in this case, Senator Livingston testified that "[a]s I understand it, the Courts have ordered us to provide two opportunity districts, minority — majority minority opportunity districts." *Id.* at 24:17–20.

5.      Senator Livingston testified that, while some members of the Committee "were very vague at the definition" of an opportunity district, the Committee's "minority members were pretty specific about [sic] they thought it meant that we had to draw two majority minority districts, not opportunity districts." *Id.* at 25:14–20.

6.      Representative Pringle testified that he was familiar with the guidance in the Court's preliminary injunction order, which required "either two majority minority districts or something close to it," such that "a protected class of citizens [can] elect a candidate of their choosing." Ex. M47 at 17:21–25. He testified that the Legislature was "charged with drawing a map that would provide an opportunity for the black voters to elect a candidate of their choosing." *Id.* at 19:11–14.

7.      Representative Pringle also confirmed his understanding that whether a district is an "opportunity" district "turns on the ability to elect."  *Id.* at 20:2–12.

                    ii.    *The Co-Chairs' instructions to Randy Hinaman*

8.      After the Supreme Court's decision affirming the Court's preliminary injunction, the Co-Chairs turned to Randy Hinaman, the Legislature's longtime map

drawer (and drawer of the enjoined 2021 Plan) and instructed him to develop new potential congressional plans. Ex. M43 (Hinaman Dep, ECF No. 261-1) at 19:22–20:12.

9.      Representative Pringle instructed Mr. Hinaman "to follow the [Committee's 2021 Redistricting] Guidelines and the ruling in *Milligan v.* [*Allen*]. He was given instruction to consider the Black Belt, Gulf, and Wire Grass communities of interest and to minimize county splits." Ex. M20 (Pringle Resp. to Pls.' Third Set of Interrogs., ECF No. 238-3) at 4.

10.     Senator Livingston does not remember providing any individual guidance to Mr. Hinaman but recalls that the Committee told Mr. Hinaman to abide by the 2021 Redistricting Guidelines and "expressed to him that the Court's ordered us to look at an opportunity district – districts." Ex. M46 at 22:19–23:23.

11.     Mr. Hinaman testified that he was asked to draw a map that added a second opportunity district. Ex. M43 at 67:7–19. Specifically, he was instructed by the Chairs to "draw a district that provides the opportunity for African American voters to [ ] elect a candidate of their choice." *Id.* at 68:22–69:16.

12.     No one instructed Hinaman to try to add a second majority Black district and he did not attempt to do so, *id.* at 67:22–68:15, but the Chairs did instruct him to keep Mobile and Baldwin counties together, *id.* at 80:2–12.

    iii. *Hinaman drafted several possible plans for consideration.*

13. Mr. Hinaman drew three maps on his own for the Committee to consider: the "Community of Interest" Plan, the "Russell Split" plan, and the "Expanded Black Belt" plan. Ex. M43 at 23:11–16, 84:4–87:9.

14. All three of these plans kept Mobile and Baldwin counties together, kept the counties defined by Defendants as the Wiregrass together except for Covington County, kept the Black Belt in two districts except for the split of Russell County in the "Russell Split" plan, and did not pair incumbents. *See* Exs. M21 (ECF No. 238-4), M26 (ECF No. 238-9), M27 (ECF No. 238-10).

15. All three of the plans maintained CD 7 as a majority-BVAP district, and CD 2 had BVAPs of 42.5% for the Community of Interest plan (Ex. M24, *Milligan*, ECF No. 238-7), 43.38% in the Russell Split plan (Ex. M26, *Milligan*, ECF 238-9), and 44.01% in the Expanded Black Belt plan (Ex. M27, *Milligan*, ECF No. 238-10).

16. While Hinaman drew the Russell Split and Expanded Black Belt plans just as options for the Committee to consider, Hinaman Dep. at 84:15–23, 86:13–87:9, he understood that his Community of Interest plan was the preferred plan of the Chairs and that each would sponsor it in their respective legislative bodies, *id.* at 30:20–31:14.

iv. *The Committee hosted public hearings and readopted the 2021 Guidelines.*

17. On June 27, 2023, Governor Kay Ivey called a special legislative session to begin on July 17, 2023, for the purpose of enacting a remedial districting plan. *Milligan*, ECF No. 251 ¶ 10.

18. The Committee held two pre-special session hearings on June 27 and July 13 to receive input from the public on redistricting plans. *Id.* ¶ 12.

19. For the June 29 meeting, Representative Pringle asked a historian to come and testify at that hearing regarding the historical connection between Mobile and Baldwin that allegedly makes them a community of interest. Ex. M47 at 45:23–46:15. He did not ask anyone to speak on behalf of the need for two districts in which Black voters could elect candidates of their choice. *Id.* at 46:16–20.

20. At the July 13 hearing, Representative England (who is Black) proposed an amendment to the Committee's guidelines that offered specific instructions on remedying the likely VRA violation found by the Court. Ex. M35.

21. At the hearing on July 13, the Committee voted (along racial lines) to reject the amendment and re-adopt the State's 2021 Legislative Redistricting Guidelines ("the 2023 Guidelines"). *Milligan*, ECF No. 251 ¶ 13; *see also* Ex. M47 at 49:8–14.

- 6 -

22.    Representative Pringle testified that "the public hearings made perfectly clear that people wanted a district they thought that Blacks could elect a candidate of their choosing." Ex. M47 at 64:19–22.

23.    The Committee Co-Chairs failed to present any of their plans for input at the public hearings, as Representative Pringle said the Community of Interest plan was not yet done. *Id.* at 60:6–11.

24.    The only plans proposed and available for public comment during the pre-session hearings were the "VRA Plaintiffs' Remedial Plan" submitted by the *Milligan* and *Caster* Plaintiffs and two different plans put forward by Senator Singleton and Senator Hatcher. *Milligan*, ECF No. 251 ¶ 15.

  v.    *The Committee considered and passed Representative Pringle's Community of Interest plan over Black legislators' objections.*

25.    On July 17, the first day of the Special Session, Representative Pringle introduced the "Community of Interest" plan (the "COI plan"). *Id.* ¶ 16. The COI Plan had a Black voting age population ("BVAP") of 42.45% in Congressional District 2 ("CD 2"). *Id.* ¶ 17.

26.    The COI Plan passed out of Committee on July 17 along racial lines, with all Black members of the Committee voting against it. *Id.* ¶ 18. Under the COI Plan, the Committee's performance analysis showed that Black-preferred candidates would have won two of the four statewide races in 2020 and 2022 that were analyzed by the Legislature. *Id.*

27.    Senator Livingston agreed that the COI Plan kept Mobile and Baldwin together, the Black Belt in two districts, and all of the Wiregrass in one district except part of Covington County, which satisfied SB5's legislative findings. Ex. M46 at 62:1–13.

28.    The COI Plan passed the full House on July 19 along racial lines (except for one Black member of the House). *Milligan*, ECF No. 251 ¶ 22.

>  vi.    *Senators turned against the COI Plan to pursue a more aggressive plan for preserving power at Black voters' expense.*

29.    Senator Livingston also introduced a plan on July 17, named the "Opportunity" or "Livingston 1" Plan. The Opportunity Plan had a BVAP of 38.31% in CD 2. *Milligan*, ECF No. 251 ¶¶ 19-20.

30.    At some point soon after the Committee passed Representative Pringle's COI Plan, the Senate Republican contingent of the Committee moved from supporting that plan to looking at other plans, and Senator Livingston testified he had to move with them or he would "be left behind." Ex. M46 at 65:20–66:18.

31.    Senator Livingston understood that other Committee members moved on because they had "received some additional information they thought they should go in the direction of compactness, communities of interest, and making sure that congressmen are not paired against each other," but he did not know where or who this information came from or who received it other than "other committee members." *Id.* at 67:6–68:21; Ex. M38 (ECF No. 238-19).

32.    The Senate majority began working on a plan introduced in Committee on July 17 as the Opportunity Plan, which turned out to have been drafted by outside political consultant and head of Red State Strategies, Chris Brown, and dropped off on a thumb drive to the Reapportionment Office by Senator Dan Roberts. Ex. M17, Livingston Responses to Pls.' Third Set of Interrogs. at 4-5 (ECF No. 238-2); Ex. M46 at 70:5–71:3; Ex. M47 at 72:1–15, 75:21–23.

33.    The Opportunity Plan (or "Livingston 1") had a BVAP of 52.59% in CD 7, and 38.31% in CD 2. Ex. M39 (ECF No. 238-20).

34.    Senator Livingston "had no view one way or the other" about whether the Opportunity Plan provided a fair opportunity to Black voters to elect a Black-preferred candidate in the second district, *see* Livingston Dep. 71, nor did Representative Pringle, *see* Pringle Dep. 79-80.

35.    From this plan, Senator Livingston and a number of other Republican Senators made minor changes and introduced a revised version as Livingston Plan 2, which passed the Senate on July 19. Ex. M38.

36.    Senator Livingston admitted that the Livingston 2 plan appeared to include a version of CD 2 identical to the one in the Livingston 1 Plan, Livingston Dep. 75-76, and that the main differences between the two plans were tweaks to improve compactness, *id.* at 80-81. Despite having an identical configuration of CD

2, he believed Livingston 2 provided a better opportunity than the Livingston 1 Plan through the tweaks they made, but could not say why. *Id.* at 78.

37.     Representative Pringle testified that Livingston 2 and the 2023 plan ultimately enacted in SB5 advanced through the Senate because he rejected Senator Livingston's request to substitute the COI Plan for Livingston 2 in the House. Pringle Dep. 101. Representative Pringle insisted that if Livingston wants to "pass a senate plan, you're going to pass the senate on the senate bill number, and you're not going to put my name on it." *Id.* at 101-02. Pringle testified he didn't want his name on the Senate because he thought his COI Plan "was a better plan" in terms of VRA compliance. *Id.* at 102.

38.     On July 20, the House passed the COI Plan and the Senate passed the Opportunity Plan along racial lines (with the exception of one Black member of the House). Joint Stips., *Milligan*, ECF No. 251 ¶ 22.

       vii.     *Senators and Mr. LaCour drafted the "Compromise" SB5 bill.*

39.     After the differing bills passed the House and Senate, Senator Livingston testified they "started making sausage"—"we had two different bills, and we had to come to some compromise in between them to pass one" and that resulted in Livingston 3, which was passed out of Conference Committee and ultimately enacted. Livingston Dep. 83.

40.    Representative Pringle was largely unaware of how SB5 came together or the prior Senate plans, noting that the map appears to have been drawn by Alabama's Solicitor General Edmund LaCour and several senators: Mr. LaCour "was upstairs meeting with the senators in a different room working with them to draw what ultimately became the Livingston plans." Pringle Dep. 28.

41.    The major changes from Livingston 2 to the final 2023 Plan were adding Lowndes and Butler to CD 2, making Etowah County whole and putting it in CD 3, putting the remainder of Blount into CD 4, and adding Lawrence to CD 5. Livingston Dep. 84. Senator Livingston testified the conference committee "focused on communities of interest, compactness, and not putting incumbents against each other," *id.* at 87, and claimed not to have considered race in drawing it, *id.* at 48.

42.    Senator Livingston testified that even though CD 2 in the Plan had only about 40% BVAP, it was the committee's decision that this constituted "something quite close to a majority of black voting age population," and when asked how the committee made that decision, he said: "this is the plan that was brought forward in the end and was compromised upon." *Id.* at 52.

43.    Representative Pringle testified that the BVAP of just under 40% in the 2023 Plan enacted in SB5 was basically splitting the difference of the BVAPs between the Livingston 2 and COI plans. Pringle Dep. 100. Regarding any significance of that BVAP number, Representative Pringle testified that "[y]ou're

going to have to talk to Senator Livingston and Eddie LaCour"—"[t]hat's what the senate came up with, and they were not going to allow us to pass the house plan." *Id*. at 101.

44. On July 21, a bicameral Conference Committee adopted the 2023 Plan as Senate Bill 5 ("SB5"). The 2023 Plan is a modified version of the Opportunity Plan. Joint Stips., *Milligan*, ECF No. 251 ¶ 23.

> viii. *The Legislature knew, based on the analysis of Defendants' expert, that the 2023 Plan lacked a second opportunity district.*

45. Dr. Hood analyzed how the 2023 Plan would perform for Black-preferred candidates in seven statewide contests in 2018 and 2020. Ex. M3 (ECF No. 200-3). Black-preferred candidates lost in the new CD 2 in all seven elections, representing no change from the 2021 Plan. *Id*.; Pringle Dep. 96-97; Livingston Dep. 90.

46. Representative Pringle saw this analysis on the Friday morning before the final vote on SB5 and this analysis was available to all members of the Conference Committee as well. Pringle Dep. 95, 97.

> ix. *Mr. LaCour drafted and inserted unprecedented legislative "findings" that were not requested by the Committee's Chairs.*

47. SB5 also included approximately six pages of legislative "findings." Ex. M4 at 2-8 (ECF No. 200-4). These findings mention the VRA only to say that it is the "intent" of the Legislature to comply with it, and that the VRA never requires

districts that violate traditional districting principles. *Id.* at 2. This contrasts with the Committee's own 2023 Guidelines, which it readopted the previous week. The 2023 Guidelines stated that "Districts shall be drawn in compliance with the Voting Rights Act of 1965, as amended" and a "redistricting plan shall have neither the purpose nor the effect of diluting minority voting strength," Ex. M25 at 1 (ECF No. 238-8).

48.     SB5's "findings" declare several principles that are "non-negotiable for the Legislature," which do not include VRA compliance: minimal population deviation, contiguity, reasonable compactness, no more than six county splits, keeping together communities of interest as specifically described in the findings, and not pairing incumbents. Ex. M4 at 3. This contrasts from the Guidelines, which state that "priority is to be given to the compelling State interests requiring equality of population among districts and compliance with the Voting Rights Act of 1965, as amended, should the requirements of those criteria conflict with any other criteria." Ex. M25 at 3.

49.     In terms of communities of interest, SB5's findings recognized only three: "the Black Belt, the Gulf Coast, and the Wiregrass," and altered the Guidelines' definition of "community of interest" to remove from the definition shared "ethnic, racial, tribal, social . . . identities," and add similarity of "transportation infrastructure, broadcast and print media, educational institutions." *Compare* Ex. M4 at 4, *with* Ex. M25 at 2. The findings also define the county

parameters of each region (with some counties identified as being in both the Black Belt and Wiregrass). While several pages of findings are devoted to linking Mobile and Baldwin, including reference to its shared "French and Spanish colonial heritage," only five lines are provided to the Black Belt. Ex. M4 at 4-8.

50.     Representative Pringle testified he "does not know" why these "findings" were included in the bill, Pringle Dep. 91, and that the "first time I saw that was Friday morning on the floor of the House when the Senate bill was brought up," *id.* at 92. Representative Pringle agreed that "some of them look like they are" in conflict with the redistricting Guidelines adopted the week before. *Id.* at 93.

51.     Senator Livingston likewise does not know why the findings were included in the bill, and testified that the findings were drafted by Mr. LaCour. Livingston Dep. 101-02; *see also* Ex. M17 at 6.

52.     Representative Pringle testified that the findings attached to the bill that became the 2023 Plan were not debated by the Legislature and were not revealed until the members were asked to vote on the bill. Pringle Dep. 90-92.

53.     Mr. LaCour described these findings as "essentially . . . describing the map" enacted in SB5. Aug. 14 H'rg Tr. 162 (*Milligan*, ECF No. 265).

54.     Representative Pringle testified that he has never seen another redistricting bill with similar types of legislative findings concerning communities of interest. Pringle Dep. 91.

x.     *The Legislature passed SB5 over opposition of Black legislators.*

55.     On July 21, the final day of the Special Session, SB5 was passed by both houses of the Legislature, along racial lines (with the exception of one Black member of the house). Joint Stip., *Milligan*, ECF No. 251 ¶ 29. Governor Ivey signed the bill that same day on July 21. *Id.* ¶ 26. SB5 contains the State's 2023 Plan. *Id.* ¶ 27.

56.     Representative Pringle testified that "[w]hat I could get passed at the house, I could not get passed at the Senate. The Senate made it perfectly clear they were not going to pass my plan, they were going to pass their plan. And we made the decision that it was more important – we had to pass something and not just go to Montgomery and completely fail and not pass a plan." Pringle Dep. 100-101.

**B.     Performance of the 2023 Plan**

57.     The 2023 Plan contains seven districts, only one of which is majority-Black. CD 7 has an any-part Black voting age population ("AP BVAP") of 50.65%. Joint Stip. *Milligan*, ECF No. 251 ¶ 2. The next highest AP BVAP in the 2023 Plan is found in CD 2, which has a 39.93% AP BVAP. *Id.* ¶ 4.

58.     Plaintiffs' experts Drs. Maxwell Palmer and Baodong Liu analyzed the electoral performance of the 2023 Plan. *Id.* ¶¶ 6-7. Defendants do not dispute the findings of Drs. Palmer and Liu. *Id.* ¶¶ 6-8.

59.     The Court has previously accepted Drs. Palmer and Liu as qualified to testify as experts regarding redistricting and data analysis. *Milligan*, 582 F. Supp. 3d at 967, 980-81. The Court again finds Drs. Palmer and Liu credible, their analysis methodologically sound, and their conclusions reliable. The Court credits Dr. Palmer's and Dr. Liu's expert reports and conclusions.

60.     Dr. Palmer analyzed 17 statewide elections between 2016 and 2022 to determine how the Black-preferred candidates in CD 2, the proposed remedial district in the 2023 Plan, would perform in election contests. Caster Ex. 1 at 5 ¶¶ 15-17.

61.     Dr. Palmer concluded that the average vote share for Black-preferred candidates in CD 2 across all 17 elections is 44.5%, sharply below the threshold necessary to win in a two-party election. *Id.* at 5 ¶ 18.

62.     His analysis further demonstrated that the Black-preferred candidates in CD 2 would have been defeated by the white-preferred candidate 94% of the time (in 16 out of 17 contests). *Id.* at 5 ¶¶ 18, 20.

63.     In the single election in which the Black-preferred candidate prevailed in Dr. Palmer's analysis, the Black-preferred candidate was Doug Jones, and the white-preferred candidate was Roy Moore, a controversial figure in Alabama politics for various reasons, including accusations that he sexually abused or

harassed several teenage women. Jan. 6, 2023 Prelim. Inj. Hr'g. Tr. Vol. 3 at 718:1-9.

64. Like Dr. Palmer, Dr. Liu analyzed the electoral performance of proposed remedial district CD 2. Ex. M2, Liu Report at 1.

65. Dr. Liu analyzed 11 statewide biracial elections between 2014 and 2022 and found that in CD 2 the average two-party vote-share for Black-preferred candidates is 42.2%. Joint Stip., *Milligan*, ECF No. 251 ¶ 7; see *also* Ex. M2, Liu Report at 1.

66. In terms of election outcomes, Dr. Liu concluded that the Black-preferred candidate in CD 2 would have lost all 11 election contests. Joint Stip., *Milligan*, ECF No. 251. ¶ 7, Tbl. 1.

67. Dr. Liu also analyzed the 2020 presidential election between Biden-Harris and Trump-Pence. *Id.* ¶ 8. His analysis of both the 2020 presential election and the 11 biracial elections he previously considered showed that the average two-party vote-share for Black-preferred candidates in CD 2 is 42.3%, *id.* ¶ 8(a), and that, once again, the Black-preferred candidate in CD 2 would have lost all 12 election contests analyzed, *id.* ¶ 8(b).

68. The Alabama Legislature also analyzed the performance of the 2023 Plan in seven election contests. *Id.* ¶ 9; see *also* Ex. M3. That analysis showed that under the 2023 Plan, the average two-party vote-share for Black-preferred

candidates in CD 2 is 46.6% and that the Black-preferred candidate in CD 2 would have lost all seven election contests analyzed. Joint Stip., *Milligan*, ECF No. 251 ¶ 9.

69.     Defendants stipulated to the analyses completed by Drs. Palmer and Liu and have not submitted any performance evidence of their own. *Id*. ¶¶ 6-8. The 2023 Plan's electoral performance as a factual matter is therefore undisputed.

70.     Based on the forgoing, the Court finds that voting is racially polarized in CD 2 and that the white-preferred candidate in CD 2 in the 2023 Plan will virtually always defeat the Black-preferred candidate in biracial and other elections.

### C.     2021 Liability Findings

71.     On January 24, 2022, the Court found that Alabama's 2021 congressional plan likely violated Section 2 of the Voting Rights Act. *Milligan v. Merrill*, 582 F. Supp. 3d 924 (N.D. Ala. 2022), *aff'd sub nom. Allen v. Milligan*, 143 S. Ct. 1487 (2023). The Court's ruling rested on a robust factual record, developed over a seven-day hearing, involving dozens of exhibits and extensive fact and expert witness testimony.

72.     The Parties all agree that the Court's January 24, 2022, factual findings and the record on which they were based continue to be part of the record during this remedial proceeding. *See* Aug. 14 H'rg Tr. at 61:8-12.

73.     Accordingly, the Court incorporates its preliminary injunction record for the purposes of this remedial proceeding.

74.     During the liability phase of these proceedings the Court found that Plaintiffs had established the factual basis to satisfy the three *Gingles* preconditions and the totality of the circumstances analysis. *Milligan*, 582 F. Supp. 3d at 1004-26.

75.     Defendants do not contest the factual (or legal, for that matter) basis necessary to establish the numerosity prong of the first *Gingles* precondition, the second and third *Gingles* preconditions, and the totality of the circumstances analysis with respect to the state's 2023 Plan. Aug. 14 H'rg Tr. at 63:22–65:18.

76.     Accordingly, the Court concludes as a factual matter that the numerosity prong of the first *Gingles* precondition, the second and third *Gingles* preconditions, and the totality of the circumstances analysis have been proven with respect to the 2023 plan.

77.     Alabama does, however, contest whether the Court's *Gingles* compactness finding applies to the 2023 Plan.

78.      During the liability phase, the Court concluded that Plaintiffs' 11 illustrative plans followed traditional redistricting criteria and demonstrated that the Black population in Alabama is sufficiently geographically compact to constitute a voting-age majority in two congressional districts. *See Milligan*, 582 F. Supp. 3d at 1016. We find once again that Plaintiffs' illustrative plans are reasonably configured

for purposes of the first *Gingles* precondition.

79.    Alabama insists that the 2023 Plan's balance of districting criteria diverges from the criteria balanced by the 2021 Plan and therefore the Court cannot rely on its prior *Gingles* 1 finding during this remedial phase. Aug. 14 H'rg Tr. at 37:9-38:6. But to establish the first *Gingles* precondition, this Court does "not have to conduct a 'beauty contest[]' between plaintiffs' maps and the State's." *See Allen v. Milligan*, 143 S. Ct. 1487, 1505 (2023); *Bush v. Vera*, 517 U.S. 952, 977-78 (1996) (plurality). As we found in the liability phase, "our task is not to decide whether the majority-Black districts in the [illustrative] plans are 'better than' or 'preferable' to a majority-Black district drawn a different way. Rather, the rule is that '[a] § 2 district that is reasonably compact and regular, taking into account traditional districting principles,' need not also 'defeat [a] rival compact district[]' in a 'beauty contest[].'" *Milligan*, 582 F. Supp. 3d at 1012 (quoting *Vera*, 517 U.S. at 977–78). "Compactness is . . . about more than 'style points.'" *League of United Latin Am. Citizens v. Perry* ("*LULAC*"), 548 U.S. 399, 434 (2006).

80.    Alabama's emphasis on new communities of interest in the 2023 Plan therefore does not change our findings. First, Alabama agrees with the Plaintiffs that the Black Belt is an established and significant community of interest. *Milligan*, ECF No. 220 at 23. Alabama, therefore, does not claim that Plaintiffs were required to connect far-flung communities to create illustrative plans with an additional compact

majority-Black opportunity district.

81.     Second, communities of interest are overlapping and fluid, so Alabama is wrong to suggest that there is only one way to respect communities of interest in a state. No single district is required to contain (or even could contain) a single, unified community of interest. For example, SB5's legislative findings acknowledge that the Black Belt and Wiregrass communities both share several counties, and that even SB5's prioritized communities can be split into two districts. Ex. M4 at 4-5, 8.

82.     In addition, Plaintiffs presented undisputed evidence that the Black Belt and the City of Mobile share economic, transportation, social, and cultural commonalities and therefore comprise their own shared and overlapping community of interest.[1] *See, e.g.*, Pls.' Proposed Findings of Fact & Conclusions of Law, *Milligan*, ECF No. 103 ¶¶ 39-49 (summarizing lay and expert witness testimony on the overlapping and shared Black Belt and Mobile community of interest).

83.     For example, Plaintiff Evan Milligan testified that the cities of Mobile and Prichard are "anchor cities" for the western Black Belt. PI Hr'g. Tr. Vol. 1 at 144; *see also Brown v. Bd. of Sch. Comm'rs of Mobile Cnty.*, 542 F. Supp. 1078, 1087 (S.D. Ala. 1982) (quoting a 19th-century politician who identified Mobile as a "town[] in the 'black belt'"). Plaintiff Shalela Dowdy testified that people in the

---

[1] Subject to the motion in limine, Plaintiffs also presented evidence in the declarations of Representative Jones, Ex. M9 ¶¶ 5–13, and their expert Dr. Joseph Bagley, Ex. M15 at 1–4.

Black Belt and Mobile work at the port, PI Hr'g. Tr. Vol. 3 at 379, celebrate Mardi Gras together, and share common concerns about the region's poor internet access and lack of quality education and healthcare services, *id*. at 372-75, 414-15. Plaintiff Marcus Caster also spoke about the City of Mobile and Black Belt's socioeconomic relationship, and their communities' shared familial, communal, cultural, and historical ties. PI Hr'g. Tr. Vol. 6 at 1619-38.

84.     This Court already credited much of this testimony. The Court again finds that Plaintiffs' expert William Cooper "considered communities of interest" in connecting the Black Belt and Mobile via a highway. *Milligan*, 582 F. Supp. 3d at 1015; *accord Abbott v. Perez*, 138 S. Ct. 2305, 2332 (2018) (upholding an opportunity district drawn along a highway corridor). The Court also notes that Alabama apparently recognized this community in connecting parts of Mobile County and the Black Belt in its 2021 Board of Education plan. *Milligan*, 582 F. Supp. 3d at 1015; *see also id*. at 966, 980 (summarizing Plaintiff Dowdy and Plaintiff Caster's testimonies on the sociohistorical connections between the Black Belt and Mobile). And the Court again finds that there have been "major migrations and demographic shifts" between the Black Belt and City of Mobile that affected this area's residents. *Id*. at 1014 (citing PI Hr'g. Tr. Vol. 5 at 1161-65, 1239 (Dr. Bagley on Black Belt residents' migration primarily to nearby Mobile and Montgomery)).

85.     The Court finds that the Black Belt and Mobile County, including the

City of Mobile, are an overlapping historical-socioeconomic community of interest.

86.     Third, Plaintiffs have shown that their illustrative plans respect communities of interest even if the Court were to assume that the Wiregrass and Gulf Coast are communities of interest. As already explained, the question posed by the first *Gingles* precondition is whether the minority community is geographically compact enough to be placed in a reasonably configured majority-minority district. *Milligan*, 143 S. Ct. at 1503. Rather than connecting unrelated, disparate communities, Plaintiffs' illustrative plans reunite the Black Belt with the shared and overlapping City of Mobile community of interest.

87.     Finally, the Court also incorporates its finding that race did not predominate in the drawing of Plaintiffs' illustrative plans. *Milligan*, 582 F. Supp. 3d at 1029-30. The passage of the 2023 Plan does nothing to alter the manner in which Plaintiffs' illustrative plans were drawn 18 months ago and Alabama has provided no other reliable evidence to contest our prior finding.

88.     Alabama, for example, submits a report by Mr. Thomas Bryan purporting to show that Plaintiffs' illustrative plans split counties along racial lines, an indication, in his view, that race predominated "in the drawing of both the 2nd and 7th districts in Plaintiffs' VRA Remedial Plan and Cooper Plans 1 – 7." Defs.' Ex. J, Bryan Report, *Milligan*, No. 220-10 at 8. During the preliminary injunction phase of this proceeding, "we assign[ed] very little weight to Mr. Bryan's testimony"

and do so again here.[2] *Milligan*, 582 F. Supp. 3d at 985.

89.     Putting aside for the moment Plaintiffs' arguments that Mr. Bryan's expert report should be excluded, *see Milligan*, ECF No. 233 at 3-7, nothing in his report alters this Court's conclusion that Mr. Cooper's and Dr. Duchin's testimony was highly credible or that they made considerable efforts to give equal weight to all traditional redistricting criteria in drawing their illustrative plans. *Milligan*, 582 F. Supp. 3d at 1029-30.

90.     The Court thus incorporates and re-adopts the preliminary injunction record and order issued on January 24, 2022, as if fully set forth herein.

## II.     PROPOSED CONCLUSIONS OF LAW

91.     Alabama's 2023 Plan fails to remedy the state's Section 2 liability and therefore must be enjoined.

### A.     Legal Standard at Remedial Stage

92.     On January 24, 2022, the Court determined that Alabama's 2021 congressional plan, which provided the State's Black citizens just a single opportunity district, likely violated Section 2 of the Voting Rights Act. The Supreme Court of the United States affirmed that order on June 8, 2023. What remains in this case is to decide whether Alabama's 2023 Plan properly remedies that likely

---

[2]     Plaintiffs filed a motion in limine to exclude this evidence from the record. *Milligan*, ECF No. 233. However, in the event the Court denies Plaintiffs' motion and wishes to consider the expert reports of Mr. Bryan and Mr. Trende, Plaintiffs respectfully request that the Court incorporate the findings of fact in paragraphs 88 and 89 above.

violation by providing Black Alabamians a second district in which they have an opportunity to elect their candidate of choice.

93.   "The essence of a" Section 2 vote dilution claim "is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

94.   To remedy a Section 2 violation, a state must fashion a remedial plan that "*completely* remedies the prior dilution of minority voting strength and *fully* provides equal opportunity for minority citizens to participate and to elect candidates of their choice." *United States v. Dallas Cnty. Comm'n* ("*Dallas*"), 850 F.2d 1433, 1442 (11th Cir. 1988) (citing S. Rep. No. 417, 97th Cong. 2d Sess. 26, *reprinted in* 1982 U.S. Code Cong. & Adm. News 177, 208).

95.   Whether a state's proposed plan is a Section 2 remedy therefore depends on whether it addresses a state's Section 2 liability. *Id.*; *see also Ketchum v. Byrne*, 740 F.2d 1398, 1412 (7th Cir. 1984) (concluding that a remedial proposal did not cure VRA violation because it did not "grant to minority citizens a reasonable and fair opportunity to elect candidates of their choice as that concept has been understood in redistricting jurisprudence"); *United States v. Euclid City Sch. Bd.*, 632 F. Supp. 2d 740, 752 (N.D. Ohio 2009) ("[A] legally acceptable plan is one that corrects the existing Section 2 violation without creating one anew.").

96.     Because the "essence" of Section 2 liability is unequal electoral opportunity, the remedy for such liability is a new plan that cures that inequality through the creation of additional districts in which the injured minority group has an opportunity to elect their preferred candidates. *See League of United Latin Am. Citizens v. Perry*, 457 F. Supp. 2d 716, 719 (E.D. Tex. 2006) (three-judge court) (ordering a remedial plan with an "effective Latino opportunity district"); *Perez v. Texas*, No. 11-CA-360, 2012 WL 13124275, at *5 (W.D. Tex. Mar. 19, 2012) (three-judge court) (holding that Section 2 required the "creation of a new Latino district").

97.     Whether a remedial district provides a minority group an opportunity to elect is a fact-based analysis that evaluates the likelihood that the injured minority group's candidate of choice will be elected based on factors such as the district's demographics, the degree of racially polarized voting in the state, and historical election performance. *See, e.g.*, *LULAC*, 548 U.S. at 428-29 (considering past election performance and the minority citizen voting-age population in a district to determine whether it offered an "effective opportunity" under the VRA); *cf. also Abbott*, 138 S. Ct. at 2332-33 (evaluating whether illustrative plans included "opportunity districts" by reviewing their past election performance).

98.     This precedent is consistent with the Court's prior orders. During the liability phase, the Court concluded that "[b]ecause the [] plaintiffs are substantially likely to prevail on their claim under the Voting Rights Act, under the statutory

framework, Supreme Court precedent, and Eleventh Circuit precedent, the appropriate remedy is a congressional redistricting plan that includes either an additional majority-Black congressional district, or an additional district in which Black voters otherwise have an opportunity to elect a representative of their choice." *Milligan*, 582 F. Supp. 3d at 936. The Supreme Court affirmed this ruling in full. *See Milligan*, 143 S. Ct. at 1517.

99.    We, therefore, reaffirm our prior holding that the appropriate remedy to Alabama's likely Section 2 liability is a plan that provides Black voters an additional opportunity district. *See LULAC*, 548 U.S. at 428-29; *see also Dallas*, 850 F.2d at 1442.

**B.    Alabama's 2023 Plan fails to provide Black voters with an additional district in which they have an opportunity to elect their preferred candidates.**

100.   Based on the preponderance of the evidence, much of which Alabama does not contest, Plaintiffs have met their burden of establishing that the 2023 Plan fails to remedy the Court's prior finding of vote dilution because it does not create an additional Black opportunity district.

101.   Like its predecessor, the 2023 Plan contains just one majority-Black district: CD 7, which has an AP BVAP of 50.65%. Joint Stip. *Milligan*, ECF No. 251 ¶ 2. The district with the next highest AP BVAP is CD 2, with 39.93%. *Id.* ¶ 3.

102.   CD 2 in the 2023 Plan does not provide Black voters an opportunity to elect candidates of their choice. Dr. Palmer, whose analysis the Court credited and relied on during the liability phase of this proceeding, analyzed 17 statewide elections between 2016 and 2022 to determine how Black-preferred candidates would perform in CD 2. Dr. Palmer found that the average vote share for Black-preferred candidates in CD 2 across all 17 elections is just 44.5% of the two-party vote. *Supra*, PFOF ¶ 61 & Caster Ex. 1 at 6, fig.3. He explained that as a result, the Black-preferred candidate would have lost 16 out of the 17 elections Dr. Palmer analyzed. Put another way, Black-preferred candidates in CD 2 would have been defeated by white-preferred candidates 94% of the time. PFOF ¶ 62; *cf. Abbott*, 138 S. Ct. at 2332 (holding that an illustrative plan did not create "performing districts" where minority candidates lost 80% to 100% of races).

103.   "Special circumstances" explain the Black-preferred candidate's single win in 2017 in the new CD 2. *See Gingles*, 478 U.S. at 57 ("[S]pecial circumstances . . . may explain minority electoral success in a polarized contest"). It was a single-race election. *See Euclid*, 632 F. Supp. 2d at 752 ("[E]qual opportunity is not met when candidates favored by blacks can win, but only if the candidates are white.") (citation omitted). And the white-preferred candidate was a "controversial Republican accused of sexual misconduct." *Milligan*, 582 F. Supp. 3d at 982.

104. Dr. Baodong Liu, whose analysis the Court credited and relied on during the liability phase of this proceeding, similarly evaluated the 2023 Plan and found that CD 2 fails to create an additional opportunity district. *See id.* at 1016-17. In the 11 statewide biracial elections between 2014 and 2022 he analyzed, Dr. Liu determined that the average two-party vote-share for Black-preferred candidates is 42.2%, again a figure significantly below what would be needed to win a two-party election. Ex. M2 at 3-4. As a result, the Black candidate in CD 2, who was the Black-preferred candidate in all 11 elections, would have lost all 11 biracial contests analyzed by Dr. Liu. *Id.* at 2; *see Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1301 (11th Cir. 2020) (noting that biracial elections are more probative of racially polarized voting than single-race elections).

105. Alabama does not dispute the conclusions reached by Drs. Palmer and Liu regarding the performance of CD 2. To the contrary, Alabama stipulated to them. Joint Stip., *Milligan*, ECF No. 251 ¶¶ 6-8.

106. Indeed, Alabama's own analysis of the performance of the 2023 Plan corroborates the findings of Plaintiffs' experts. Across seven statewide election contests the Legislature analyzed, the average two-party vote-share for the Black-preferred candidates in CD 2 is 46.6%, and the Black-preferred candidate would have lost election in all seven contests. Ex. M3.

107.   On this evidence, undisputed and overwhelming, the Court must conclude that the 2023 Plan indisputably fails to give Black voters an additional opportunity to elect representatives of their choice. *See LULAC*, 548 U.S. at 428-29 (finding that district was not an opportunity district where Anglo bloc voting "often, if not always, prevent[ed] Latinos from electing the candidate of their choice").

### C.   The passage of a remedial plan does not reset the State's Section 2 liability.

108.   Although Alabama does not contest that the 2023 Plan fails to provide Black voters an additional opportunity district, the State argues that its passage of the 2023 Plan means it didn't have to. *See, e.g.*, Aug. 14 H'rg Tr. at 75:5-9 (Judge Manasco: "So does our statement that the appropriate remedy for the . . . likely violation that we found would be an additional opportunity district have any relevance to what we're doing now?;" Mr. LaCour: "I don't think so, your honor.").

109.   Alabama contends that its passage of the 2023 Plan resets the Court's liability finding and therefore Plaintiffs must prove their Section 2 case anew to be afforded a remedy. Alabama's argument, however, is foreclosed by the Supreme Court's decision in *North Carolina v. Covington*, 138 S. Ct. 2548, 2552 (2018). Like Alabama here, the state defendants in *Covington* argued that "[w]here . . . a lawsuit challenges the validity of a statute," a state's passage of "remedial plans" moots the case and "the plaintiffs' . . . claims cease[] to exist." *Id*. at 2552. The Supreme Court flatly rejected that argument, explaining that because the plaintiffs argued that the

legislature's proposed remedy failed to cure the violation, their "claims remained the subject of a live dispute, and the District Court properly retained jurisdiction." *Id.* at 2553.

110.   Plaintiffs' claim here is of a piece. Plaintiffs' Section 2 claim turns not just on the particular lines in a particular map but on a finding of vote dilution. *Id.* at 2552-53 ("[I]n the remedial posture in which this case is presented, the plaintiffs' claims . . . d[o] not become moot simply because the General Assembly drew new district lines around them."). The passage of a remedial plan does nothing to moot that claim, and Plaintiffs' challenge to the sufficiency of that remedy means the matter remains live. *Id.*

111.   The cases on which Alabama relies do not say otherwise. Alabama places much weight on *Dillard v. Crenshaw County*, 831 F. 2d 246 (11th Cir. 1987), a case it misreads for the proposition that Plaintiffs must reprise their Section 2 challenge upon the passage of a proposed remedy. Defs.' Resp. at 24, 27-29. But *Dillard* stands for no such thing.

112. *Dillard* involved a successful Section 2 challenge to an at-large electoral scheme, which the defendant county proposed to remedy with a single-member scheme that would include a chairperson elected at-large. *Id.* at 248. The plaintiffs argued that because the remedy maintained some portion of the at-large scheme that was present in the state's original violation, the remedy was

automatically unlawful. *Id.* The *Dillard* court explained, however, that "evidence showing a violation in an *existing* election scheme may not be completely coextensive with a *proposed* alternative" where the very method of electing representatives has changed, as was the case in *Dillard*. *Id.* at 250. Accordingly, every case citing *Dillard* for its remedial guidance has done so within the context of remedying an at-large election system with a new election system altogether. *See, e.g.*, *McGhee v. Granville Cnty.*, 860 F.2d 110, 114 (4th Cir. 1988).

113.    *Dillard* did not hold, as Alabama argues, that the passage of a proposed remedy resets liability or that a previous liability finding is irrelevant for the purposes of evaluating a remedy. To the contrary, the *Dillard* court expressly stated that the question before it was whether the proposed remedy "*fails to correct the original violation* of amended Section 2 of the Voting Rights Act of 1965." 831 F.2d at 248 (emphasis added). Indeed, *Dillard* ultimately readopted the earlier liability findings, *id.* at 250, and relied on them to reject the defendant county's remedial proposal, *id.* at 252. The Court also held that courts "cannot authorize an element of an election proposal that will not with certitude *completely* remedy the Section 2 violation." *Id*.

114.    The lesson of *Dillard*, therefore, is directly contrary to the interpretation pressed by Alabama. And unlike in *Dillard*, at issue here is an apples-to-apples comparison. Alabama seeks to replace its dilutive single-member congressional

districting scheme with another single-member districting scheme that dilutes Black voting power in precisely the same way. *See Milligan*, 582 F. Supp. 3d at 1016-17. Alabama's purported remedy is insufficient on its face.

115.   Other cases on which Alabama relies stand for the same proposition. *See, e.g.*, *McGhee*, 860 F.2d at 112, 118 ("If a vote dilution violation is established, the appropriate remedy is to restructure the districting system to eradicate, to the maximum extent possible by that means, the dilution proximately caused by that system."); *Jeffers v. Clinton*, 756 F. Supp. 1195, 1199 (E.D. Ark. 1990), *aff'd*, 498 U.S. 1019 (1991) (rejecting a proposed remedy as insufficient based on the prior liability findings and concluding that the defendants' remedial districts "would have been held unlawful at the liability stage" because their BVAPs fell below the BVAPs required to afford Black voters a real opportunity to elect their candidates of choice).

116.   The holdings in *Covington*, *Dillard*, *McGhee*, and *Jeffers* speak as one: The passage of a remedy does not erase the very liability that triggered it, and the sufficiency of a proposed remedy is measured by the degree to which it resolves the court's liability finding. This precedent makes good sense, for otherwise a state could avoid complying with the VRA indefinitely by repeatedly passing purported "remedial" plans that perpetuate the very dilution that made the state liable in the first place.

117.   Alabama's remaining arguments are similarly flawed.

118.   Alabama argues that the state policies reflected in the 2023 Plan, rather than the Court's liability determination, should govern the remedial process. Defs.' Resp. at 25-26. Courts, however, cannot adhere to a state's policies where, as here, doing so would perpetuate a violation of the VRA.[3] *See Perry v. Perez*, 565 U.S. 388, 941 (2012); *Upham v. Seamon*, 456 U.S. 37, 43 (1982); *see also Baldus v. Members of Wis. Gov't Accountability Bd.*, 862 F. Supp. 2d 860, 863 (E.D. Wis. 2012) (three-judge court) (rejecting a state agency's remedy and increasing a remedial district's minority voting-age population to create an "effective majority-minority" district); *United States v. Osceola Cnty.*, 474 F. Supp. 2d 1254, 1258 (M.D. Fla. 2006) (rejecting a government's remedial proposal that, "given the high degree of historically polarized voting," perpetuated a VRA violation).[4] And

---

[3] The record creates considerable doubt as to the weight the Legislature's "findings" accompanying the 2023 Plan deserve in any event. The Legislature failed to debate or meaningfully consider those "findings," and not even Representative Pringle, Chair of the House Reapportionment committee, or Minority Leader Singleton saw those "findings" before they were voted on. Ex. M46 at 101:2-102:13; Ex. M47 at 90:18-92:23.

[4] Alabama also cites *Askew v. City of Rome*, 127 F.3d 1355 (11th Cir. 1997), to support the supremacy of legislative redistricting principles. However, the *Askew* court merely observed that court-ordered remedies to Section 2 violations generally seek "to eliminate vote dilution in the manner that least disrupt[s]" the jurisdiction's "chosen electoral system and its districting principles." 127 F.3d at 1376 (emphasis added); *see also Abrams v. Johnson*, 521 U.S. 74, 101 (1997) (affirming district court's remedy in racial gerrymandering challenge, which "t[ook] into account traditional state districting factors"); *id.* at 79 ("When faced with the necessity of drawing district lines by judicial order, a court, as a general rule, should be guided by the legislative policies underlying the existing plan, *to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act*.") (emphasis added). Alabama has not cited a single case that authorizes jurisdictions to allow their purported policy preferences to *override* compliance with the VRA, either in the first instance or on remedy.

- 34 -

compliance with the VRA itself can, and often does, constitute a traditional districting criterion. *See Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253, 258, 263-64 (2016). Courts are particularly skeptical of state districting policies like core retention, *Milligan*, 143 S. Ct. at 1505, and incumbency protection, *LULAC*, 548 U.S. at 440-41, which tend to perpetuate existing unlawful districting schemes.

119.    Alabama also argues that "the 2023 Plan has remedied the 'cracking' that Plaintiffs said was 'the heart of' their challenge to the 2021 Plan." Defs.' Resp. at 4-5; *see also* Tr. of July 31, 2023 Status Conference at 32:8-9, *Caster*, ECF No. 188 (Mr. LaCour: "That cracking has been remediated. There is no more cracking of the black belt in [Alabama's] plan."). Defendants apparently believe the term "cracking" to be synonymous with "dividing." *See id.* at 32:17-18 (Mr. LaCour: "Well, now there are three communities of interest that are at issue. We cracked none of them. They cracked two of them."). But in the VRA context, "cracking" is a term of art, defined as "the dispersal of [Black voters] into districts in which they constitute an ineffective minority of voters." *Gingles*, 478 U.S. at 46 n.11; *see also Voinovich v. Quilter*, 507 U.S. 146, 153-54 (1993). "[I]t is a special wrong when a minority group has 50 percent or more of the voting population and could constitute a compact voting majority but, despite racially polarized bloc voting, that group is not put into a district." *Bartlett v. Strickland*, 556 U.S. 1, 19 (2009) (plurality).

- 35 -

120.   Contrary to Defendants' suggestion, the "cracking" of Black voters in the Black Belt is not resolved by uniting them in a district where they remain an "ineffective minority of voters." And as explained above, CD 2 under the 2023 Plan does not afford Black voters in the Black Belt an effective opportunity to elect their preferred candidates. *Caster*, ECF No. 179 at 6; *Caster*, ECF No. 186 at 6 ("Defendants do not intend to put on evidence challenging the demographic or election numbers in the 'performance' reports offered by the *Caster* Plaintiffs[.]").

### D.   Even if Plaintiffs were required to re-prove Alabama's Section 2 liability, they have done so here.

121.   Even if Plaintiffs were required to re-prove Section 2 liability during the remedial stage of the proceedings, they have done so.

122.   To prevail on a Section 2 claim, plaintiffs must show that (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group "is politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50–51; *see also Milligan*, 143 S. Ct. at 1503 (describing the purpose of these preconditions).

123.   Once a plaintiff has made this threshold showing, the Court must then examine "the totality of circumstances"—including the Senate Factors, which are the nine factors identified in the U.S. Senate report that accompanied the 1982

amendments to the Voting Rights Act—to determine whether "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of the minority group. 52 U.S.C. § 10301(b); *see also Gingles*, 478 U.S. at 43–44 (describing the Senate Factors).

      i.   *Plaintiffs have satisfied their burden in establishing the* Gingles *preconditions regarding the 2023 Plan.*

124.   Here, Defendants concede that Plaintiffs have met their burden on the numerosity prong of the first *Gingles* precondition, the second and third *Gingles* preconditions, and the totality of the circumstances analysis with respect to the 2023 Plan, as determined in this Court's preliminary injunction order. Aug. 14 H'rg Tr. at 63:22–65:18. The Court agrees.

125.   First, Plaintiffs have shown, and Defendants do not dispute, that Alabama's Black population is sufficiently numerous to constitute a majority in a second congressional district. *See Milligan*, 582 F. Supp. 3d at 1004 ("[P]laintiffs have submitted a total of eleven remedial plans in which two congressional districts would have a BVAP of greater than 50%"); *see also Milligan*, ECF No. 78 at 67–69; *Milligan*, ECF No. 74-1 at 2, 8–10; Tr. 854, 862–66, 914–15.").

126.   Second, "there is no serious dispute" that voting in Alabama is extraordinarily racially polarized, which has resulted in the overwhelming defeat of Black-preferred candidates in Alabama congressional elections outside of the State's single majority-minority district. *Milligan*, 582 F. Supp. 3d at 1016-18 (concluding

Plaintiffs have satisfied the first and second *Gingles* preconditions, finding Plaintiffs' experts credible and outlining their analyses, and noting that Defendants' own expert, Dr. Hood, found evidence of racially polarized voting in the districts at issue).

127.   And third, there is no dispute that for purposes of these proceedings Plaintiffs have established their burden to prove that under the totality of circumstances, Black Alabamians are denied an equal opportunity to elect their preferred congressional representatives. *See Milligan*, 582 F. Supp. 3d at 1018-26 (finding (1) elections in Alabama were racially polarized; (2) Black voters enjoy little success in statewide elections; (3) Black voters face substantial socioeconomic disparities that lead to depressed political participation; (4) Alabama has employed voting mechanisms that tend to increase opportunity for discrimination; (5) political campaigns have been characterized by overt or subtle racial appeals; (6) Alabama has an "extensive history of repugnant racial and voting-related discrimination"; and (7) proportionality considerations weigh in Plaintiffs' favor).

128.   The only element in dispute is the compactness prong of the first *Gingles* precondition: Alabama's entire Section 2 defense of the 2023 Plan depends on their contention that Plaintiffs have not shown that the Black population is sufficiently compact to create two reasonably configured majority-Black congressional districts. But that too has been firmly established by the record.

129.   The Supreme Court explained that to satisfy the first *Gingles* precondition, Plaintiffs must show that the minority group is "sufficiently . . . [geographically] compact to constitute a majority in a reasonably configured district." *Milligan*, 143 S. Ct. at 1503. "A district will be reasonably configured," the Court found, "if it comports with traditional districting criteria, such as being contiguous and reasonably compact." *Id.*

130.   Plaintiffs satisfied this precondition 18 months ago. During the preliminary injunction phase, Plaintiffs submitted 11 illustrative plans that demonstrated the possibility of drawing congressional plans with two majority-minority districts that comported with objective traditional redistricting principles. As a result, this Court found, and the Supreme Court affirmed, "that plaintiffs' illustrative maps 'strongly suggest[ed] that Black voters in Alabama' could constitute a majority in a second, reasonably configured, district." *Milligan*, 143 S. Ct. at 1504 (quoting *Milligan*, 582 F. Supp. 3d at 1010).

131.   To reach that conclusion, this Court and the Supreme Court rejected Alabama's argument that Plaintiffs' maps were not reasonably configured because of their treatment of certain communities of interest, *id.* (citing *Milligan*, 582 F. Supp. 3d at 1012-15), and emphasized that *Gingles* 1 did not require either the Court or Plaintiffs "to conduct a 'beauty contest[]' between plaintiffs' maps and the State's." *Id.* (quoting *Milligan*, 582 F. Supp. 3d at 1012).

132.   Accordingly, Plaintiffs have already established the factual and legal predicates to satisfy the first *Gingles* precondition.

133.   Nevertheless, Alabama argues that because the 2023 Plan purportedly reflects a different balance of the State's newly-identified redistricting principles, Aug. 14 Hr'g Tr. at 37:9-38:6, Plaintiffs' 11 illustrative plans cannot be used to satisfy the first *Gingles* precondition.[5] Alabama is wrong for several reasons.

134.   First, the Section 2 results claims at issue here are not about the intent of the legislature. *Milligan*, 143 S. Ct. at 1514. Indeed, both this Court and the Supreme Court have already rejected Alabama's attempt to "require[] plaintiffs to demonstrate that any deviations between the State's enacted plan and race-neutral alternatives 'can be explained *only* by racial discrimination.'" *Id*. The metric for identifying dilution and satisfying *Gingles* 1 cannot turn on how Plaintiffs' plans compare to a state's plan and its purportedly race-blind application of redistricting criteria. *Cf. id*. at 1512-13 (rejecting Alabama's similar simulations argument).

135.   Second, the question posed by the first *Gingles* precondition is whether a "reasonably compact" district can be drawn around a geographically compact minority group. *LULAC*, 548 U.S. at 435; *see also id.* at 433 ("[T]he first *Gingles* condition refers to the compactness of the minority population, not to the

---

[5] Alabama concedes that no other fact or circumstance relevant to *Gingles* 1 has changed since the preliminary injunction hearing. Remedial Hr'g Tr. at 37:9-38:6.

compactness of the contested district." (quoting *Vera,* 517 U.S. at 997)). And to weigh that question, courts consider "objective factors," *Shaw v. Reno*, 509 U.S. 630, 647 (1993), like contiguity, respect for "existing political subdivisions, such as counties, cities, and towns," and compactness (meaning no "tentacles, appendages, bizarre shapes, or any other obvious irregularities that would make it difficult to find [the minority group] sufficiently compact"). *Milligan*, 143 S. Ct. at 1503 (citations omitted). Applying these factors, the Supreme Court affirmed "that plaintiffs' illustrative maps 'strongly suggest[ed] that Black voters in Alabama' could constitute a majority in a second, reasonably configured, district." *Id*. at 1504 (citation omitted). Absent a new census showing a dramatic shift in the geographic compactness of Black Alabamians, nothing can change this conclusion, including Alabama's passage of the 2023 Plan.

136.    Third, the focus of the *Gingles* 1 compactness inquiry is on whether the plan is "reasonably configured," as measured by whether the plan comports with objective traditional criteria such as compactness and contiguity. *See id*. at 1503. There is no accompanying requirement that illustrative plans satisfy a specific criterion at a specific threshold. *Id*. at 1505; *see also LULAC*, 548 U.S. at 433 ("[N]o precise rule has emerged governing § 2 compactness.").

137.    This makes good sense. As the Supreme Court has observed, those "redistricting factors a legislature could consider" are "numerous and malleable" and

"surprisingly ethereal." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 190 (2017). Requiring Section 2 plaintiffs to justify their illustrative plans against just those districting criteria identified by the state in just the way the state desires would permit states to contrive self-serving criteria designed to ensure no plaintiff, no matter the vote dilution at stake, could satisfy the *Gingles* test.

138.   Alabama's approach in this case only illustrates the point. Alabama appended "findings," drafted by counsel for Defendants Mr. LaCour, to the 2023 Plan as a means of reinventing the State's districting criteria, and then faulted Plaintiffs' illustrative plans for not abiding by them.  Aug. 14 Hr'g Tr. at 156:21-25 (Alabama's counsel explaining its strategy that altering the balance of districting criteria in the 2023 Plan allegedly permits the State to ignore the Court's order requiring the creation of a second opportunity district).

139.   Fortunately, precedent forecloses that outcome. As the Supreme Court explained, district courts do "not have to conduct a beauty contest[] between plaintiffs' maps and the State's." *Id*. at 1505.

140.   Moreover, Alabama admits that the findings and redistricting criteria contained in SB5 are "essentially . . . describing the map." Aug. 14 Hr'g. Tr. 162. Thus, taken to its logical conclusion, SB5's legislative findings could purport to require Plaintiffs' illustrative plans to retain the core of the existing map to satisfy *Gingles* 1. But the Supreme Court has already rejected the notion that "a State could

immunize from challenge a new racially discriminatory redistricting plan simply by claiming that it resembled an old racially discriminatory plan." *Milligan*, 143 S. Ct. at 1505.

141.   For this reason, Alabama's hand-waving regarding the Supreme Court's statement that "§ 2 never require[s] adoption of districts that violate traditional redistricting principles" is of no moment. *Id.* at 1510. The Supreme Court did not mean that a Section 2 claim can be defeated whenever a state identifies a criterion on which a plaintiff's illustrative plans fails to beat the state's plan. Otherwise, the Court could not have flatly rejected Alabama's argument that Plaintiffs' Section 2 claim failed because their illustrative plans did not perform well on Alabama's much touted "core retention" criterion. *Id.* at 1505; *see also id.* (rejecting Alabama's arguments on the same score with respect to communities of interest). Courts cannot adhere to state policy preferences when those preferences perpetuate violations of the Constitution or the VRA. *See Perry*, 565 U.S. at 393; *Upham*, 456 U.S. at 43; *see also LULAC*, 548 U.S. at 441 (rejecting a state policy of incumbency protection because it could "[]not justify the [plan's] effect on Latino voters").

142.   Rather, the Court was describing the simple proposition that a Section 2 illustrative plan must be "reasonably configured" in that it generally comports with objective traditional criteria such as compactness, contiguity, political subdivision

splits, and equal population. *See Milligan*, 143 S. Ct. at 1504. After all, "[d]istricting involves myriad considerations" and "[q]uantifying, measuring, prioritizing, and reconciling these criteria requires map drawers to make difficult, contestable choices." *Id.* at 1513. For example, "the scientific literature contains dozens of competing metrics on the issue of compactness" alone. *Id.* (internal quotations omitted). There is, therefore, no clear threshold that separates a compliant plan from a non-compliant plan when it comes to districting criteria. *See LULAC*, 548 U.S. at 433 (noting that "no precise rule has emerged governing § 2 compactness").

143.   Thus, the fact that Alabama has drawn a new plan that it asserts improves on one or more metrics does nothing to undermine the fact that Plaintiffs' 11 illustrative plans show that the minority group is geographically compact and numerous enough to be a majority in a reasonably configured district.  We are once again "careful to avoid the beauty contest that a great deal of [Alabama's] testimony and argument seemed designed to try to win." *Milligan*, 582 F. Supp. 3d at 1012.

144.   Finally, Alabama's argument that the passage of the 2023 Plan means race predominated in the drawing of Plaintiffs' illustrative plans is deeply confused. This Court already rejected that argument. *See id*. at 1029 ("reject[ing]" Defendants' argument that Plaintiffs' illustrative plans "prioritize race above all race-neutral traditional redistricting principles"). And the Supreme Court affirmed. *See Milligan*, 143 S. Ct. at 1510-12. The Court explained that the "very reason a plaintiff adduces

- 44 -

a map at the first step of Gingles is precisely *because of* its racial composition—that is, because it creates an additional majority-minority district that does not then exist." *Id*. at 1512 n.7. And the Court held that, "under certain circumstances," the Constitution *does* "authorize[] race-based redistricting as a remedy" for VRA violations. *Id*. at 1516-17. Alabama fails to explain how the 2023 Plan's passage could inform whether race predominated in the drawing of Plaintiffs' illustrative plans 18 months ago or why the 2023 Plan prevents a complete remedy in this case.

145.   The Supreme Court, and this Court, have already found that Plaintiffs' illustrative plans demonstrate that Black Alabamians are sufficiently geographically compact to draw reasonably configured congressional plans with two majority-Black districts. *Id.* at 1504. The Supreme Court has also affirmed that "the effects test of § 2 as interpreted in *Gingles*" can "authorize[] race-based redistricting as a remedy for state districting maps that violate § 2." *Id.* at 1516-17. Because the passage of the 2023 Plan does nothing to upset that conclusion, the Court finds that even if Plaintiffs were required to prove that the 2023 Plan violates Section 2, they have fully carried their burden.

> ii.   *Plaintiffs have satisfied their burden under the totality-of-circumstances to prove that the 2023 Plan violates Section 2.*

146.   At the remedial stage, the Senate Factors that weighed in favor of an initial violation should also favor finding a continuing violation. *See Dallas*, 850 F. 2d at 1438-40 (readopting prior findings related to factors 2, 3, 5, and 7 to hold that

a remedial plan "perpetuates rather than ameliorates the inequities" in the prior plan); *Dillard*, 831 F. 2d at 250 (finding no error in applying earlier findings on the Senate Factor to show that a remedial plan failed to address the initial Section 2 violation).

147.   The "most important" factors are racial polarization and a lack of Black electoral success. *Gingles*, 478 U.S. at 48 n.15. The presence of these factors alone will often "point[] commandingly" in favor of the plaintiffs. *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. Of Comm'rs*, 775 F.3d 1336, 1347 n.9 (11th Cir. 2015).

148.   Defendants do not dispute that Plaintiffs have met their burden as to the nine Senate Factors. Aug. 14 Hr'g Tr. 63-65. Thus, the Court readopts its earlier finding that Factors 1, 2, 3, 5, 6, and 7 separately, and together, all favor Plaintiffs. *See Milligan*, 582 F. Supp. 3d at 1018-26.

149.   The undisputed presence of these Factors also weighs in favor of finding that the 2023 Plan perpetuates the likely Section 2 violation. For example, in both the old and new plans, voting is highly racially polarized in CD 2, PFOF ¶¶ 69-70, 72, 75, and Black candidates never win elections, PFOF ¶¶ 69-70; *see Dallas*, 850 F.2d at 1439 (rejecting a remedial plan with a majority-white "swing" district in which racial polarization "effectively foreclosed" Black voters from "having an equal opportunity to elect candidates of their choice"); *Dillard*, 831 F. 2d at 253 (similar). The Court also again credits Dr. Bagley's expert testimony that white people tend to have more education and higher incomes, which means that they are

better able than Black Alabamians to "take time off from work; afford to contribute to political campaigns; [and] afford to run for office." *Id*. at 1022 (internal alterations and citations omitted).

150.   Based on this evidence, the Court rejects any notion that the new CD 2 is an opportunity district merely because Black-preferred candidates lose by smaller margins than under the 2021 Plan, but still over 10%-points. PFOF ¶¶ 62-63, 66-69. Rather, Black citizens have a "more difficult time garnering political strength than whites because of the insurmountable social and economic barriers," *Dallas*, 850 F. 2d at 1439, which means Black-preferred candidates are unlikely to overcome a ten-point deficit. *See, e.g.*, Ex. M46 at 99 (Senator Livingston testifying that U.S. Senator Doug Jones was a well-funded, well-known white incumbent who was preferred by Black voters, but who would have still lost in the new CD 2 by 4%-points in the high turnout 2020 elections). And, as in the past, *Milligan*, 582 F. Supp. 3d at 1023-24, racial appeals can have a "substantial influence" in elections in the new CD 2 by encouraging racial polarization. *Meek v. Metro. Dade Cnty.*, 985 F.2d 1471, 1487 (11th Cir. 1993). As readopted, our prior findings on Senate Factors 1, 2, 3, 5, 6, and 7 all support our findings that the 2023 Plan likely violates Section 2.

151.   In 2022, this Court declined to make findings on Senate Factors 8 (unresponsiveness) and 9 (tenuousness). *See Milligan*, 582 F. Supp. 3d at 1024. But Plaintiffs have now offered new and undisputed evidence during the remedial phase

that the Legislature was unresponsive to Black voters' calls for a second opportunity district and that its reasons for refusing to draw a new opportunity district were tenuous. *See supra* Section I.A.

152.   "[E]vidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous may have probative value." *Gingles*, 478 U.S. at 45. This is particularly true in two specific contexts.[6]

153.   *First*, a districting plan may be tenuous where the policies it is based on, even if legitimate in the abstract, serve to entrench racial vote dilution or evince a lack of responsiveness to members of the minority community. *See LULAC*, 548 U.S. at 441 (citing the tenuousness factor in explaining that using incumbency protection to exclude "voters from the district simply because they are likely to vote against the officeholder . . . cannot justify the effect on Latino voters"); *Pope v. Cnty. of Albany*, 94 F. Supp. 3d 302, 348 (N.D.N.Y. 2015) (finding fault where the drawers weighed factors like incumbency protection while ignoring the "possible dilution of

---

[6] Notably, while unresponsiveness and tenuousness are "important" circumstantial evidence of intentional discrimination, their presence is "less important under the results test" because "even a consistently applied practice premised on a racially neutral policy would not negate a plaintiff's showing through other factors that the challenged practice denies minorities fair access to the process." *United States v. Marengo Cnty.*, 731 F. 2d 1546, 1571-72 (11th Cir. 1984) (citation omitted).

minority voting strength, especially when members of the minority community vocally raised the issue"); *see also Ketchum*, 740 F.2d at 1408 ("[M]any devices employed to preserve incumbencies are necessarily racially discriminatory."); *cf. also Milligan*, 143 S. Ct. at 1505 (explaining Alabama's reliance on "core retention" could not justify a racially dilutive plan).

154.   That aspect of tenuousness presents itself strongly here, where Defendants have elevated incumbency protection to a "non-negotiable" factor in its findings, Ex. M4 at 3, and where Sen. Livingston testified that this was one of the three primary factors considered in drawing the new map, Ex. M46 at 47-48. Protection of incumbents thus functions in the same manner as core retention did in the 2021 Plan, in that adhering to it could "immunize from challenge a new racially discriminatory redistricting plan simply" because it refused to substantially change key boundaries to benefit an incumbent representative. *Milligan*, 143 S. Ct. at 1505.

155.   *Second*, aspects of the process leading to the enactment may highlight inconsistent treatment that make the asserted policies seem themselves tenuous or pretextual for other unstated goals like preserving political power in spite of continued racial vote dilution. *See Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213 (2d Cir. 2021) (finding that decisionmakers went to "extraordinary lengths to preserve th[e] [challenged] system to maintain political power" despite its discriminatory effect); *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty.*

*of Albany*, 281 F. Supp. 2d 436, 455 (N.D.N.Y. 2003) (finding tenuousness where a county's "assorted goals" in redistricting failed to create new opportunity districts).

156.   Here, Defendants were aware that the Black community and Black legislators wanted them to draw a second majority-minority district or something close to it, PFOF ¶ 22, Defendants knew that Black legislators disagreed that Mobile and Baldwin could never be split, Ex. M9 ¶¶ 5–13, and Defendants knew well that the Court's finding of intense racial polarization required such a district to provide Black voters with an opportunity to elect. PFOF ¶¶ 1-7. Alabama's circular and contorted justifications to avoid doing so demonstrates both lack of responsiveness and tenuousness.

157.   Indeed, before voting on SB5, legislators were aware that Black-prefferred candidates would never win elections in CD 2 under the 2023 Plan. PFOF ¶¶ 45-46. And that the Legislature had other plans that met the findings and guidelines in SB5 and (while wholly inadequate to satisfy Section 2) would at least rarely perform for Black voters in CD 2, unlike the 2023 Plan. PFOF ¶¶ 25-28.

158.   Defendants' attempt to use legislative "findings" as the basis for defining communities of interest when they admit these findings were "essentially . . . describing the map" enacted in SB5, are circular and pretextual. Aug. 14 Hr'g Tr. 162; *see supra* ¶ 140. And Defendants' assertion of avoiding racial gerrymandering also lacks any substantive basis, where the Supreme Court held that Plaintiffs'

illustrative maps were reasonably configured. *Milligan*, 143 S. Ct. 1504. Thus, the Legislature could have drawn any number of opportunity districts that avoid racial gerrymandering concerns simply by referencing any of the Plaintiffs' eleven illustrative plans. *Cf. Milligan*, 582 F. Supp. 3d at 1034 (noting that "the Legislature has not just one or two, but at least eleven illustrative remedial plans to consult" to devise a proper remedy to the likely violation); *cf. also Milligan*, 143 S. Ct. at 1504 (affirming that "plaintiffs adduced eleven illustrative maps—that is, example districting maps that *Alabama could enact*—each of which contained two majority-black districts that comported with traditional districting criteria") (emphasis added).

III.  **ALTERNATIVE FINDINGS OF FACT AND CONCLUSIONS OF LAW: ALABAMA'S "COMMUNITIES OF INTEREST" EVIDENCE IS INADMISSIBLE, BUT IF THE COURT CONSIDERS IT, IT SHOULD ALSO CONSIDER THE STRONG EVIDENCE OF A COMMUNITY OF INTEREST BETWEEN THE BLACK BELT AND MOBILE COUNTY AND THE SIGNIFICANT DISSIMILARITIES BETWEEN MOBILE AND BALDWIN COUNTIES.[7]**

159.  In addition to the evidence in this regard cited *supra* from the 2022 hearing, Representative Sam Jones (and the former Mobile Mayor) provided written

---

[7] As explained in Plaintiffs' motion in limine (ECF No. 233), this Court should exclude under Rules 401 and 702 Alabama's "community of interest evidence" concerning Mobile and Baldwin and the Wiregrass, including the expert reports of Thomas Bryan and Sean Trende. In the event the Court does consider Defendants' evidence, however, Plaintiffs provide these Alternative Proposed Findings of Fact and Conclusions of Law regarding Plaintiffs' uncontested evidence about the strong connections between parts of Mobile County and the Black Belt, and factors that weaken any purported community of interest between Mobile and Baldwin Counties.

testimony showing that "the City of Mobile and other nearby communities in Northern Mobile County such as Prichard, Chickasaw, and Mount Vernon, have more similarities and closer ties to much of Alabama's Black Belt than these communities do with Baldwin County." Ex. M9 ¶ 5 (ECF No. 200-9).

160.   Economically, Mobile has "attracted job seekers from Alabama's Black Belt for decades," which has "created a regular migration from the Black Belt to Mobile," and has led companies to "actively recruit talent from the Black Belt." *Id.* ¶¶ 7-8. Black Belt residents also depend on Mobile for "specialized healthcare or high-level treatment." *Id.* ¶ 9.

161.   Mobile and the Black Belt also share significant cultural ties, some of which result from substantial migration from the Black Belt to Mobile, pastors in both areas serving the other as well, *id.* ¶¶ 7, 10-11, a shared Mardi Gras tradition which "has the feel of a family reunion" unlike Baldwin's separate celebration, *id.* ¶ 12.

162.   By contrast, "Baldwin County shares little of these cultural or community ties that the City of Mobile and Northern Mobile County share with the Black Belt," *id.* ¶ 15, with the City of Mobile serving as "Southern Alabama's industrial center, [and] Baldwin County's economy is driven by tourism, *id.* ¶ 16, and the counties having separate community college systems, *id.*

163.   Additionally, Plaintiffs' expert Dr. Bagley explained the shared and

interconnected history between Mobile and the Black Belt supported not only through intermigration but also similar histories through civil rights battles and segregated schools. Ex. M15 (ECF No. 200-15) at 2-3.

164.   Mobile's Black representatives also shared commonalities between the regions through continuing family, cultural, and economic ties. *Id.* at 3-5.

165.   In contrast, Dr. Bagley and the representatives note the massive economic and income disparities between Mobile and Baldwin, differing educational systems, demographics, and outcomes, and how racial discrimination paired the two counties together in a district after the passage of the VRA. *See id.* at 4-7.

*     *     *

Alabama is correct about one thing: The relevant question during these remedial proceedings is whether the 2023 Plan complies with Section 2 of the Voting Rights Act. The answer is it does not. After a seven-day hearing, careful consideration of the extensive preliminary injunction record, and a judgment from the Supreme Court, what Section 2 requires in this case has been well-established: a seven single-member districting scheme that provides Black voters a single opportunity district dilutes the votes of Black people in likely violation of Section 2. To remedy this likely violation, therefore, Alabama must adopt a remedial plan that includes an additional minority opportunity district. Because Plaintiffs have shown

- 53 -

the 2023 Plan fails to provide that district, the Court must enjoin the 2023 Plan as an insufficient remedy and as a likely violation of Section 2 of the Voting Rights Act.

## IV.   PROPOSED ORDER

1.      The 2023 Plan fails to remedy the Court's prior finding of likely vote dilution and, based on the foregoing findings and conclusions, likely violates Section 2 anew.

2.      The Court, therefore, **ENJOINS** Defendants, as well as their agents and successors in office, from using the 2023 Plan in any election, including the 2024 primary and general elections.

3.      The Court further orders that:

    a.  Mr. Allen, Mr. Scodro, and Mr. Ely are **DIRECTED** to immediately begin their work assisting the Court in developing a remedial districting plan. Mr. Allen, Mr. Scodro, and Mr. Ely shall submit proposed plans and supporting arguments (including mapmaking criteria), data, and reports on the docket within 7 days following entry of this Order.

    b.  *Milligan* and *Caster* Plaintiffs shall submit proposed plans and supporting arguments (including mapmaking criteria), data, and reports within 7 days following entry of this Order.

    c.  The Parties' objections to any proposed plans are due within 3 days of the submission of proposed plans by the Plaintiffs.

     d. Mr. Allen, Mr. Scodro, and Mr. Ely are **DIRECTED** to submit their recommendation on a remedial plan 14 days following entry of this order.

     e. The Parties' responses to the Special Master's recommendation are due 3 days after its submission.

**DONE** and **ORDERED** this _____ day of August, 2023.

_____
STANLEY MARCUS
UNITED STATES CIRCUIT JUDGE


_____
ANNA A. MANASCO
UNITED STATES DISTRICT JUDGE


_____
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE

Dated: August 19, 2023

Richard P. Rouco
(AL Bar. No. 6182-R76R)
**Quinn, Connor, Weaver, Davies & Rouco LLP**
Two North Twentieth
2-20th Street North, Suite 930
Birmingham, AL 35203
Phone: (205) 870-9989
Fax: (205) 803-4143
Email: rrouco@qcwdr.com

Respectfully submitted,

By */s/ Abha Khanna*
Abha Khanna*
Makeba Rutahindurwa*
**Elias Law Group LLP**
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
Phone: (206) 656-0177
Email: AKhanna@elias.law
Email: MRutahindurwa@elias.law

Lalitha D. Madduri*
Joseph N. Posimato*
Jyoti Jasrasaria*
**Elias Law Group LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, D.C. 20001
Phone: (202) 968-4518
Email: LMadduri@elias.law
Email: JPosimato@elias.law
Email: JJasrasaria@elias.law

*Attorneys for Caster Plaintiffs*
*\*Admitted Pro Hac Vice*

/s/ Deuel Ross
Deuel Ross*
NAACP LEGAL DEFENSE &
   EDUCATIONAL FUND, INC.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Leah Aden*
Stuart Naifeh*
Brittany Carter*
NAACP LEGAL DEFENSE &
   EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200

Shelita M. Stewart*
Jessica L. Ellsworth*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
shelita.stewart@hoganlovells.com

David Dunn*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

Michael Turrill*
Harmony A. Gbe*
HOGAN LOVELLS US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com

/s/ Sidney M. Jackson
Sidney M. Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
WIGGINS CHILDS PANTAZIS
   FISHER & GOLDFARB, LLC
301 19th Street North
Birmingham, AL 35203
Phone: (205) 341-0498
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

Davin M. Rosborough*
Julie Ebenstein*
Dayton Campbell-Harris*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
jebenstein@aclu.org
dcampbell-harris@aclu.org

Blayne R. Thompson*
HOGAN LOVELLS US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

*Counsel for Milligan Plaintiffs*

Janette Louard*
Anthony Ashton*
Anna Kathryn Barnes*
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE (NAACP)
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-5777
jlouard@naacpnet.org
aashton@naacpnet.org
abarnes@naacpnet.org

***Counsel for Plaintiff Alabama State Conference of the NAACP***