FILED
2024 Feb-14 PM 04:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| MARCUS CASTER, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 2:21-cv-1536-AMM |
| | ) | |
| Hon. WES ALLEN, in his official capacity as Secretary of State, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

**DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

BACKGROUND ........ 3

LEGAL STANDARD ........ 5

ARGUMENT ........ 6

I. Section 2 Does Not Unambiguously Confer New Individual Rights. ........ 6

A. Section 2, as Remedial Legislation to Enforce the Fifteenth Amendment, Does Not Confer Substantive Rights. ........ 7

B. Section 2 Does Not Unambiguously Confer *New* Rights. ........ 12

C. Section 2 Does Not Unambiguously Confer *Individual* Rights. ........ 14

D. The VRA's Express Method of Enforcement Shows Further that Section 2 Confers No New Individual Rights. ........ 17

II. The VRA Contains No Clear Evidence That Congress Intended To Authorize Private Suits Under Section 2. ........ 19

III. Plaintiffs Fail To Plead Facts Showing An Unequal Opportunity "To Participate In The Political Process." ........ 25

CONCLUSION ........ 34

CERTIFICATE OF SERVICE ........ 36

# TABLE OF AUTHORITIES

**Cases**

*31 Foster Child. v. Bush*,
329 F.3d 1255 (11th Cir. 2003) .......................................................... 1, 2, 7, 19

*Abbott v. Perez*,
138 S. Ct. 2305 (2018)..........................................................................16

*Alexander v. Sandoval*,
532 U.S. 275 (2001)......................................................... 6, 7, 14, 19, 20, 22, 25

*Allen v. Milligan*,
599 U.S. 1 (2023)............................................................................ 19, 31

*Allen v. Milligan*,
143 S. Ct. 1487 (2023)............................................................................3

*Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*,
86 F.4th 1204 (8th Cir. 2023) ............................................ 15, 16, 18, 19, 21-25

*Armstrong v. Exceptional Child Ctr.*,
575 U.S. 320 (2015)...............................................................................6

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...............................................................................5

*Baird v. Consol. City of Indianapolis*,
No. IP87-111C, 1991 WL 557613 (S.D. Ind. Apr. 25, 1991)............................33

*Bd. of Trs. of Univ. of Ala. v. Garrett*,
531 U.S. 356 (2001)..............................................................................10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...............................................................................6

*Bellitto v. Snipes*,
935 F.3d 1192 (11th Cir. 2019) ...........................................................22

*Brnovich v. Democratic National Committee*,
141 S. Ct. 2321 (2021)....................................................................................22

*Bourdon v. U.S. Dep't of Homeland Sec.*,
940 F.3d 537 (11th Cir. 2019) ........................................................................12

*California v. Sierra Club*,
451 U.S. 287 (1981)..................................................................................7, 16

*Cannon v. Univ. of Chicago*,
441 U.S. 691 (1979).........................................................................................16

*Carey v. Throwe*,
957 F.3d 468, 481, 483 (4th Cir. 2020) ..........................................................13

*Chapman v. Houston Welfare Rights Org.*,
441 U.S. 600 (1979)........................................................................................17

*Chavis v. Whitcomb*,
305 F. Supp. 1364 (S.D. Ind. 1969)........................................................ 27, 32

*Chelentis v. Luckenbach S.S. Co.*,
247 U.S. 372 (1918)........................................................................................10

*Chisom v. Roemer*,
501 U.S. 380 (1991)........................................................... 2, 10, 25, 26

*City of Boerne v. Flores*,
521 U.S. 507 (1997)................................................................... 7, 8, 10-12

*City of Mobile v. Bolden*,
446 U.S. 55 (1980).................................................................................. 10, 23

*Civil Rights Cases*,
109 U.S. 3 (1883)...........................................................................................8, 9

*Cort v. Ash*,
422 U.S. 66 (1975)...........................................................................................20

*Davis v. Monroe County Board of Education*,
526 U.S. 629 (1999)....................13

*Egbert v. Boule*,
596 U.S. 482 (2022)....................19

*Gebser v. Lago Vista Independent School District*,
524 U.S. 274 (1998)....................13

*Georgia State Conf. of NAACP v. Georgia*,
2022 WL 18780945 (N.D. Ga. Sept. 26, 2022).................... 15, 22, 24

*Golden State Transit Corp. v. Los Angeles*,
493 U.S. 103 (1989)....................7

*Gonzaga Univ. v. Doe*,
536 U.S. 273 (2002)....................1, 2, 6, 7, 12-18, 20, 21

*Gregory v. Ashcroft*,
501 U.S. 452 (1991)....................17

*Gumber v. Fagundes*,
2021 WL 4311904 (N.D. Cal. July 3, 2021) ....................14

*Health and Hosp. Corp. of Marion Cnty. v. Talevski*,
599 U.S. 166 (2023)....................6

*In re Wild*,
994 F.3d 1244 (11th Cir. 2021) .................... 20, 21

*Jefferson Cnty. v. Acker*,
210 F.3d 1317 (11th Cir. 2000) .................... 12, 24

*Johnson v. DeSoto Cnty. Bd. of Com'rs*,
204 F.3d 1335 (11th Cir. 2000) ....................26

*Johnson v. Hous. Auth. of Jefferson Par.*,
442 F.3d 356 (5th Cir. 2006) ....................7

*Jones v. City of Lubbock*,
727 F.2d 364 (5th Cir. 1984) ....................................................................11

*Kimble v. Marvel Ent., LLC*,
576 U.S. 446 (2015)..................................................................................25

*Kimel v. Fla. Bd. of Regents*,
528 U.S. 62 (2000)....................................................................................11

*Lane v. Wilson*,
307 U.S. 268 (1939)....................................................................................9

*Love v. Delta Air Lines*,
310 F.3d 1347 (11th Cir. 2002) ................................................................22

*LULAC v. Clements*,
999 F.2d 831 (5th Cir. 1993) ........................................................... 26, 34

*LULAC v. Perry*,
548 U.S. 399 (2006)..................................................................................15

*Maine v. Thiboutot*,
448 U.S. 1 (1980)........................................................................................9

*Malecki v. Christopher*,
2008 WL 11497819 (M.D. Pa. May 27, 2008)..........................................14

*McDonald v. S. Farm Bureau Life Ins. Co.*,
291 F.3d 718 (11th Cir. 2002) ..................................................................20

*Milligan v. Allen*,
Case No. 2:21-cv-1530 ...............................................................................5

*Morse v. Republican Party of Virginia*,
517 U.S. 186 (1996).............................................................................. 22-25

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
458 U.S. 50 (1982)......................................................................................8

*Nev. Dep't of Hum. Res. v. Hibbs*,
538 U.S. 721 (2003)....................11

*Nipper v. Smith*,
39 F.3d 1494 (11th Cir. 1994)....................26

*Pennhurst State Sch. and Hosp. v. Halderman*,
451 U.S. 1 (1981)....................14

*Permian Basin Area Rate Cases*,
390 U.S. 747 (1968)....................23

*Reno v. Bossier Par. Sch. Bd.*,
520 U.S. 471 (1997)....................11

*Resnick v. AvMed, Inc.*,
693 F.3d 1317 (11th Cir. 2012)....................6

*Schwab v. Crosby*,
451 F.3d 1308 (11th Cir. 2006)....................24

*Schwier v. Cox*,
340 F.3d 1284 (11th Cir. 2003)....................12

*Shaw v. Hunt*,
517 U.S. 899 (1996)....................15

*Singleton v. Allen*,
2023 WL 6567895 (N.D. Ala. Oct. 5, 2023)....................5

*Singleton v. Allen*,
Case No. 2:21-cv-1291....................5

*Singleton v. Merrill*,
582 F. Supp. 3d 924 (N.D. Ala. 2022)....................24

*Smith v. Brunswick Cnty. Va. Bd. of Sup'rs*,
984 F.2d 1393 (4th Cir. 1993)....................26

*South Carolina v. Katzenbach*,
383 U.S. 301 (1966)........................................................................ 8-11

*Stone v. Allen*,
No. 2:21-cv-1531 (N.D. Ala. Feb. 13, 2024)................................. 24, 25, 32, 33

*Suter v. Artist M.*,
503 U.S. 347 (1992)........................................................................6, 15

*Taggart v. Lorenzen*,
139 S. Ct. 1795 (2019)........................................................................26

*Thornburg v. Gingles*,
478 U.S. 30 (1986)............................................................... 26, 31, 33

*United States v. Cruikshank*,
92 U.S. 542 (1875)..............................................................................9

*United States v. Mississippi*,
380 U.S. 128 (1965)............................................................................12

*United States v. Reese*,
92 U.S. 214 (1875)........................................................................9, 12

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981)............................................................................19

*Uno v. City of Holyoke*,
72 F.3d 973 (1st Cir. 1995)..................................................................26

*Vital Pharms., Inc. v. Alfieri*,
23 F.4th 1282 (11th Cir. 2022) ...........................................................19

*Webster v. Fall*,
266 U.S. 507 (1925)............................................................................23

*Whitcomb v. Chavis*,
403 U.S. 124 (1971)..................................................2, 26-30, 31-34

*White v. Regester*,
412 U.S. 755 (1973) .......... 26, 29-31

*Wilder v. Virginia Hospital Association*,
496 U.S. 498 (1990) .......... 18

*Wright v. Roanoke Redevelopment and Housing Authority*,
479 U.S. 418 (1987) .......... 17

**Statutes**

18 U.S.C. §241 .......... 10

34 U.S.C. §12601 .......... 13

42 U.S.C. §1983 .......... 1, 2, 6, 7, 10-12, 14, 15, 17, 18, 21

42 U.S.C. §2000a-3(a) .......... 20

42 U.S.C. §2000d .......... 15

52 U.S.C. §10101(a)(2)(B) .......... 12

52 U.S.C. §10301(a) .......... 14, 16

52 U.S.C. §10301(b) .......... 25

52 U.S.C. §10302(c) .......... 21

52 U.S.C. §10308 .......... 18

79 Stat. 437 .......... 1

Ala. Code §17-14-70.1(3)(a)-(f) .......... 3

Ala. Code §17-14-70.1(3)(g) .......... 3

**Acts**

Ala. Act No. 2023-563....................3

Civil Rights Acts of 1957....................10

Civil Rights Acts of 1960....................10

Civil Rights Act of 1964....................10, 12, 20

Developmentally Disabled Assistance and Bill of Rights Act....................14

Violent Crime Control and Law Enforcement Act of 1994....................13

Voting Rights Act of 1965....................1-3, 6-14, 17-19, 21-23, 32

**Other Authorities**

Erwin Chemerisnky, *The Assumptions of Federalism*, 58 STAN. L. REV. 1763 (2006)....................8

Michael W. McConnell, *Institutions and Interpretation: A Critique of City of Boerne v. Flores*, 111 HARV. L. REV. 153 (1997)....................8

Tracy A. Thomas, *Congress' Section 5 Power and Remedial Rights*, 34 U.C. DAVIS L. REV. 673 (2001)....................8

Voting Section Litigation, *Cases Raising Claims Under Section 2 of the Voting Rights Act*, https://www.justice.gov/crt/voting-section-litigation #sec2cases (last visited Feb. 5, 2024)....................18

## INTRODUCTION

The *Caster* Plaintiffs challenge the congressional map enacted by the Alabama Legislature in 2023, alleging it dilutes the voting strength of black Alabamians in violation of Section 2 of the Voting Rights Act. Plaintiffs' claim should be dismissed.

First, §2 is not privately enforceable. That's so for the fundamental reason that §2 does not create "new individual rights" "in clear and unambiguous terms." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 286, 290 (2002). Thus, "there is no basis for a private suit" under §2 directly or under §1983. *Id.* at 286. With any question of statutory interpretation, the inquiry requires careful analysis of "the text and structure." *31 Foster Child. v. Bush*, 329 F.3d 1255, 1270 (11th Cir. 2003). "If they provide some indication that Congress may have intended to create individual rights, and some indication it may not have, that means Congress has not spoken with the requisite 'clear voice.'" *Id.*

Here, the text and structure of the VRA provide more than "some indication" that §2 created no new federal rights. The VRA was not enacted to create new rights but rather, in the words of the Act's preamble, "to enforce" the preexisting rights guaranteed by "the fifteenth amendment to the Constitution." 79 Stat. 437. And the text places enforcement solely in the hands of the U.S. Attorney General, further "evidenc[ing] a congressional intent to avoid the multiple interpretations of [the

VRA] that might arise if the act created enforceable individual rights." *31 Foster Child.*, 329 F.3d at 1270. The answer to this question is at least ambiguous, and "[a]mbiguity precludes enforceable rights." *Id.*

It follows, then, that §2 itself contains no implied right of action, for if there is no unambiguously conferred right, "there is no basis for a private suit, whether under §1983 *or* under an implied right of action." *Gonzaga*, 536 U.S. at 286 (emphasis added).

Finally, assuming that private persons may bring §2 claims, Plaintiffs have not plausibly alleged that black voters in the challenged areas have less opportunity than others to (1) participate in the political process, and (2) elect the candidates of their choice. Both showings are required, *see Chisom v. Roemer*, 501 U.S. 380 (1991), and the Supreme Court's decision in *Whitcomb v. Chavis*, 403 U.S. 124 (1971), sets forth what the first entails. The *Whitcomb* plaintiffs' vote dilution claims failed because they did not show that black voters in the 1960s in Marion County, Indiana, were not "allowed to register [and] vote, to choose the political party they desired to support, to participate in its affairs [and] to be equally represented on those occasions when legislative candidates were chosen." 403 U.S. at 149. Plaintiffs here have similarly failed to allege such barriers to political participation in Alabama today.

## BACKGROUND

In 2021, Alabama enacted a congressional plan that largely retained existing district lines. *See Allen v. Milligan*, 143 S. Ct. 1487, 1501 (2023). This Court determined that the plan likely violated §2, and the Supreme Court affirmed. *Id.* at 1498.

On July 21, 2023, the Legislature passed, and the Governor signed into law, new redistricting legislation. *See* Ala. Act No. 2023-563; *Caster* doc. 165-1.[1] The 2023 Act repeals the 2021 Plan and replaces it with the 2023 Plan. The Act's legislative findings outline the traditional principles given effect in the 2023 Plan, which prioritizes equal population, contiguity, reasonably compact geography, minimizing splits of county lines, maintaining communities of interest, and avoiding the pairing of incumbents. Ala. Code §17-14-70.1(3)(a)-(f). The redistricting statute then states that the following secondary principles shall be given effect to the extent it can be done consistent with the primary principles above: "1. Preserve the cores of existing districts. 2. Minimize the number of counties in each district. 3. Minimize splits of neighborhoods and other political subdivisions in addition to minimizing the splits of counties and communities of interest." *Id.* §17-14-70.1(3)(g).

The 2023 Plan flows from these traditional principles of compactness, county lines, and communities of interest. Because uniting the Black Belt took precedence over core retention, Districts 1, 2, and 7 saw substantial changes. The Legislature,

[1] All citations to the record are to the *Caster* record unless otherwise stated.

however, did not completely reshuffle the deck, so the cores of each district were not entirely abandoned, and incumbents were not paired against each other. The changes from 2021 to 2023 are shown below. The map shows the 2021 districts with the 2023 lines in red.



The *Caster* Plaintiffs objected on §2 grounds and sought a new preliminary injunction, "barring Alabama … from conducting congressional elections according to Alabama's 2023 redistricting plan." Doc. 223 at 3. Meanwhile, plaintiffs in *Milligan v. Allen*, Case No. 2:21-cv-1530, objected to the 2023 Plan on §2 and Equal Protection grounds, and plaintiffs in *Singleton v. Allen*, Case No. 2:21-cv-1291, objected solely on Equal Protection grounds. Doc. 223 at 1. The Court granted the *Caster* and *Milligan* Plaintiffs relief "on statutory grounds" and reserved ruling on the *Singleton* Plaintiffs' constitutional issues. *Id.* at 7-8. Remedial proceedings before a special master ensued, a remedial plan was chosen, and the Secretary of State was ordered to administer the State's upcoming congressional election according to that plan. *See Singleton v. Allen*, 2023 WL 6567895, at *19 (N.D. Ala. Oct. 5, 2023).

The *Caster* Plaintiffs amended their complaint to challenge the 2023 Plan. Doc. 271.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Plaintiffs must plead all facts establishing an entitlement to relief with more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Resnick v. AvMed, Inc.*,

693 F.3d 1317, 1324 (11th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

If a plaintiff has no statutory authority to seek judicial relief in federal court, his suit must be dismissed. *See Suter v. Artist M.*, 503 U.S. 347, 363-64 (1992) (reversing denial of motion to dismiss on ground that Adoption Act neither confers an enforceable right under §1983 nor contains an implied right of action).

## ARGUMENT

### I. Section 2 Does Not Unambiguously Confer New Individual Rights.

If a federal statute does not create "new individual rights" "in clear and unambiguous terms," then "there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Gonzaga*, 536 U.S. at 286, 290; *accord Alexander v. Sandoval*, 532 U.S. 275, 289 (2001).

The "*Gonzaga* test" is the "established method for ascertaining unambiguous conferral" of "individual rights." *Health and Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023) (internal quotation marks omitted). With this test, the Supreme Court "plainly repudiate[d] the ready implication of a § 1983 action" that earlier cases "exemplified." *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 330 n.* (2015). No longer do federal "courts apply a multifactor balancing test to pick and choose which federal requirements may be enforced by § 1983 and which may not." *Gonzaga*, 536 U.S. at 286. Ultimately, "very few statutes are held to confer

rights enforceable under § 1983." *Johnson v. Hous. Auth. of Jefferson Par.*, 442 F.3d 356, 360 (5th Cir. 2006).

Here, the text and structure of the VRA reveal that §2 created no new individual rights. First, the VRA created only new remedies enforceable by the Attorney General, not new rights enforceable by millions of private plaintiffs. Second, the right to vote free from discrimination recognized and protected by §2 is not a *new* right; in other words, it was not created or conferred by the VRA. Third, §2 does not have "an *unmistakable* focus on the benefited class," *Gonzaga*, 536 U.S. at 284, but rather a "general proscription" of "discriminatory conduct." *California v. Sierra Club*, 451 U.S. 287, 294 (1981). Finally, §2 contains a robust "federal review mechanism," *Gonzaga*, 536 U.S. at 289, which suggests further that Congress intended "to avoid the multiple interpretations of [the VRA] that might arise if the act created enforceable individual rights." *31 Foster Child.*, 329 F.3d at 1270.

### A. Section 2, as Remedial Legislation to Enforce the Fifteenth Amendment, Does Not Confer Substantive Rights.

Unless a federal statute creates "substantive private rights," *Sandoval*, 532 U.S. at 290, it does not secure privately enforceable rights. *Gonzaga*, 536 U.S. at 285 (quoting *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107-08 n.4 (1989)). Unlike with some Commerce or Spending Clause legislation, Congress does not confer substantive rights when enforcing the provisions of the Fourteenth and Fifteenth Amendments. *City of Boerne v. Flores*, 521 U.S. 507, 527 (1997) ("Any

suggestion that Congress has a substantive, non-remedial power under the Fourteenth Amendment is not supported by our case law.").[2] The VRA is an exercise of Congress's power to enforce the "constitutional prohibition against racial discrimination in voting" guaranteed by the Fifteenth Amendment. *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966). As such, it created only "new remedies," not new rights. *Id.* at 308, 315, 329-31.[3] Therefore, §2—one of its "remedial portions"—is not privately enforceable. *Id.* at 316.

Congress's "parallel" enforcement powers under §5 of the Fourteenth Amendment and §2 of the Fifteenth Amendment are "corrective or preventive, not definitional." *City of Boerne*, 521 U.S. at 518, 525. As the Supreme Court explained long ago, the Fourteenth Amendment invests Congress with the power only "to provide modes of relief against State legislation[] or State action" "when these are subversive of the fundamental rights specified in the amendment." *Civil Rights Cases*, 109 U.S. 3, 11 (1883); *see also City of Boerne*, 521 U.S. at 524-25 (discussing *Civil Rights*

[2] *See also* Erwin Chemerisnky, *The Assumptions of Federalism*, 58 STAN. L. REV. 1763, 1770 (2006) (recognizing that "Congress may not use its Section 5 powers to expand the scope of rights or to create new rights"); Michael W. McConnell, *Institutions and Interpretation: A Critique of City of Boerne v. Flores*, 111 HARV. L. REV. 153, 189 (1997) (Congress "cannot create new rights" when enforcing the Fourteenth Amendment.).

[3] "Constitutional remedies, unlike statutory remedies, cannot be authorized as a derivative power based on the legislature's power over the substantive law because Congress has no power over the substance of constitutional rights." Tracy A. Thomas, *Congress' Section 5 Power and Remedial Rights*, 34 U.C. DAVIS L. REV. 673, 701 (2001); *see also N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 83-84 (1982) (plurality opinion) (contrasting Congress's broad power to define and prescribe remedies for statutory rights with Congress's limited power to enforce constitutional rights, *i.e.*, rights "not of congressional creation").

*Cases*). "Positive rights and privileges are undoubtedly secured by the Fourteenth Amendment; but they are secured by way of prohibition against State laws and State proceedings affecting those rights and privileges." *Civil Rights Cases*, 109 U.S. at 11.

One such right is the right to vote free from discrimination. "The right to vote in the States comes from the States; but the right of exemption from the prohibited discrimination comes from the United States. The first has not been granted or secured by the Constitution of the United States; but the last has been." *United States v. Cruikshank*, 92 U.S. 542, 556 (1875); *see also United States v. Reese*, 92 U.S. 214, 217-18 (1875) (describing Fifteenth Amendment as securing a "new constitutional right"). From the ratification of the Fifteenth Amendment up until the passage of the VRA, Congress attempted to secure the right to vote free from discrimination in myriad ways—all largely ineffective. *See Katzenbach*, 383 U.S. at 310-14 (chronicling Congress's "unsuccessful remedies" prescribed "to cure the problem of voting discrimination"). One remedy was §1983 and its statutory predecessor, which have allowed private parties to seek redress for violations of their Fifteenth Amendment rights. *See, e.g.*, *Lane v. Wilson*, 307 U.S. 268, 269 (1939); *cf. Maine v. Thiboutot*, 448 U.S. 1, 26-29 (1980) (Powell, J., dissenting) (relaying history of §1983 and noting that "cases dealing with purely statutory civil rights claims remain nearly as rare

as in the early years”). Criminal prohibitions were another enforcement mechanism. *See, e.g.*, 18 U.S.C. §241.

Despite these measures, many States persisted in their “unremitting and ingenious defiance of the Constitution.” *Katzenbach*, 383 U.S. at 309. Something more was needed—more than the Enforcement Act of 1870, more than the Civil Rights Acts of 1957, 1960, and 1964, and more than §1983. Congress passed in 1965 a “complex scheme” of “stringent new remedies” necessary to “banish the blight of racial discrimination in voting.” *Katzenbach*, 383 U.S. at 308, 315; *see also Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 373 (2001) (Congress promulgated “in the Voting Rights Act a detailed but limited remedial scheme.”). With these “new, unprecedented remedies,” Congress enforced the provisions of the Fifteenth Amendment without making “a *substantive* change in the governing law.” *City of Boerne*, 521 U.S. at 519, 526.

This “fundamental” “distinction between rights and remedies” is on full display in §2. *Chelentis v. Luckenbach S.S. Co.*, 247 U.S. 372, 384 (1918). As originally enacted, “the coverage provided by § 2 was unquestionably coextensive with the coverage provided by the Fifteenth Amendment.” *Chisom v. Roemer*, 501 U.S. 380, 392 (1991); *see also City of Mobile v. Bolden*, 446 U.S. 55, 61 (1980). Section 2 obviously made no “substantive change in the governing law” because the remedy corresponded directly to the underlying constitutional right. *City of Boerne*, 521 U.S.

at 519. As such, §2's inclusion in the VRA, by itself, would have done nothing to redress violations of the underlying right to vote free from discrimination that wasn't already being done through §1983 actions to enforce the Fifteenth Amendment. But §2 paired with §12 did a new thing: grant the federal government the power to bring civil and criminal actions to secure Fifteenth Amendment rights. *Katzenbach*, 383 U.S. at 316.

In 1982, Congress amended §2 by replacing the language "to deny or abridge" with the language "in a manner which results in a denial or abridgement" to reflect its determination "that a 'results' test was necessary to enforce the fourteenth and fifteenth amendments." *Jones v. City of Lubbock*, 727 F.2d 364, 375 (5th Cir. 1984). Consequently, "a violation of § 2 is no longer *a fortiori* a violation of the Constitution." *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 482 (1997). As such, §2's prophylactic remedy changed the evidentiary bar for proving a §2 claim. *See City of Boerne*, 521 U.S. at 518 (collecting examples of similar remedies promulgated to protect voting rights). But it did not and could not create new substantive rights, because even prophylactic remedies cannot "substantively redefine the States' legal obligations." *Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 728 (2003) (quoting *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 88 (2000)). If the legal duty remains unaltered, so does the corresponding legal right. This must be so, because the corresponding right here is a constitutional right, which Congress has no power to change.

*See City of Boerne*, 521 U.S. at 519. The only conclusion is that Congress created no new rights in §2, and §2 thus cannot give rise to private enforcement under §1983 or an implied right of action.[4]

### B. Section 2 Does Not Unambiguously Confer *New* Rights.

Even if Congress, when exercising its remedial powers, could confer substantive rights, only "*new* rights" are enforceable under §1983. *Gonzaga*, 536 U.S. at 287 (emphasis added). Section 2 protects the right of any citizen to vote free from discrimination. Protecting an existing right is not creating a new one, and the right to vote free from discrimination was enshrined more than 150 years ago in the Fifteenth Amendment. *See Reese*, 92 U.S. at 217-18. Section 2 protects that preexisting right by delineating how States might violate it and by giving the Attorney General the tools and authority he needed to enforce more effectively the guarantees of the Fifteenth Amendment. Thus, because §2 conferred no "new rights," it cannot be privately enforceable absent an express cause of action, which is lacking.

[4] In *Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003), the Eleventh Circuit read a different statute, 52 U.S.C. §10101(a)(2)(B), as creating rights enforceable under §1983. Known as the "Materiality Provision," this statute is found in Title I of the Civil Rights Act of 1964, which Congress passed pursuant to its Fifteenth Amendment enforcement power. *See United States v. Mississippi*, 380 U.S. 128, 138 (1965). The *Schwier* court neither heard nor considered the argument that Congress creates new remedies, not new rights, when enforcing the Reconstruction Amendments. This case concerned a different statute, different text, and different arguments. Because it does not "directly control," this Court is "not obligated to extend" its reach "by even a micron." *Jefferson Cnty. v. Acker*, 210 F.3d 1317, 1320 (11th Cir. 2000); *Bourdon v. U.S. Dep't of Homeland Sec.*, 940 F.3d 537, 548 (11th Cir. 2019) ("[S]tare decisis doesn't apply to statutory interpretation unless the statute being interpreted is the same one that was being interpreted in the earlier case.").

Compare §2 with provisions of Titles VI and IX, which the Supreme Court has cited as statutes containing "explicit rights-creating terms" and which conferred *new* rights never before articulated in federal law. *Gonzaga*, 536 U.S. at 284. Both statutes are Spending Clause legislation, not legislation enforcing the Reconstruction Amendments, *see Davis v. Monroe County Board of Education*, 526 U.S. 629, 640 (1999); *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 287 (1998), so they are not purely "remedial."

Section 2, however, is like other statutes enacted to enforce preexisting rights. The Violent Crime Control and Law Enforcement Act of 1994, for example, declared it "unlawful for any governmental authority" or agent "to engage in a pattern or practice of conduct by law enforcement officers … that deprives persons of rights, privileges, or immunities secured or protected by the Constitution" or federal law. 34 U.S.C. §12601(a). That provision references "rights," but makes clear that no new right is created. And structure confirms it too; the following subsection empowers the Attorney General to bring civil actions when he has "has reasonable cause to believe that a violation of" §12601(a) has occurred. §12601(b). Courts interpreting this statute have concluded that it "confers no such express right upon a benefitted class. Instead, the statute only prohibits certain governmental conduct without conferring an unambiguous private right of action." *Malecki v. Christopher*, 2008 WL

11497819, at *3 n.6 (M.D. Pa. May 27, 2008); *see also Gumber v. Fagundes*, 2021 WL 4311904, at *5 (N.D. Cal. July 3, 2021). The same is true of §2.

**C. Section 2 Does Not Unambiguously Confer *Individual* Rights.**

Unless a federal statute confers "individual rights," *Gonzaga*, 536 U.S. at 285-86, it does not secure "rights enforceable under § 1983." *Id.* at 285. Statutes that "have an aggregate focus," in that "they are not concerned with whether the needs of any particular person have been satisfied … cannot give rise to individual rights." *Id.* at 288 (internal quotation marks omitted). Similarly, "[s]tatutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Sandoval*, 532 U.S. at 289 (internal quotation marks omitted); *accord Gonzaga*, 536 U.S. at 273 (The text must be "phrased in terms of the persons benefited.").

Section 2(a) references "a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. §10301(a). But there is no presumption of §1983 enforceability just because a statute "speaks in terms of 'rights.'" *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 18-20 (1981) (holding that the "bill of rights" provision of the Developmentally Disabled Assistance and Bill of Rights Act was not enforceable under §1983). Rather, courts must take "pains to analyze the statutory provisions in detail, in light of the entire

legislative enactment, to determine whether the language in question created enforceable rights, privileges, or immunities within the meaning of § 1983." *Suter v. Artist M.*, 503 U.S. 347, 357 (1992) (internal quotation marks omitted).

As explained above, the "right" referenced in the text of §2(a) is the preexisting right to vote free from discrimination conferred by the Fifteenth Amendment.[5] If §2 created an individual right, it must be something different. And if this different right exists, it must be "unambiguously conferred." *Gonzaga*, 536 U.S. at 282. Disagreement among courts over this question at least suggests ambiguity.

In *Georgia State Conf. of NAACP v. Georgia*, the court compared §2's text to that of §601 of Title VI and concluded that "both provisions clearly confer private rights." 2022 WL 18780945, at *4 (N.D. Ga. Sept. 26, 2022) (three-judge court). The court identified §2's new right as "a right not to have one's vote denied or abridged on account of race or color." *Id.*

In contrast, the majority in *Arkansas NAACP* also compared §2 to Title VI, but it noticed some important dissimilarities. *Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1209-10 (8th Cir. 2023) ("*Arkansas NAACP*"). Section 601 of Title VI begins, "[n]o person … shall … be subjected to discrimination." 42 U.S.C. §2000d. The "unmistakable focus" is "on the benefited class," not the

[5] There is no disputing that the underlying constitutional right to vote free from discrimination, which includes the right to an undiluted vote, is an individual right. *See Shaw v. Hunt*, 517 U.S. 899, 917 (1996); *LULAC v. Perry*, 548 U.S. 399, 437 (2006).

regulated party. *Gonzaga*, 536 U.S. 286 (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 691 (1979)). But §2 begins, "No voting qualification … shall be imposed … by any State." 52 U.S.C. §10301. The focus here is on the conduct prohibited and the party regulated. "It is a 'general proscription' of 'discriminatory conduct, not a grant of a right 'to any identifiable class.'" *Arkansas NAACP*, 86 F.4th at 1209 (quoting *Sierra Club*, 451 U.S. at 294, *Gonzaga*, 536 U.S. at 284). A phrase or two later, however, §2 adjusts its focus to the person benefited—"any citizen." 52 U.S.C. §10301(a). The majority decided that it "is unclear what to do when a statute focuses on both" the person regulated *and* the individual protected. *Arkansas NAACP*, 86 F.4th at 1210.

If unmistakable clarity is the standard for conferring privately enforceable individual rights, §2 does not meet it. "Basic federalism principles confirm" this. *Carey v. Throwe*, 957 F.3d 468, 481, 483 (4th Cir. 2020) ("To the extent [the *Gonzaga*] standard permits a gradation, we think it sound to apply its most exacting lens when inferring a private remedy [that] would upset the usual balance of state and federal power."). "Redistricting is primarily the duty and responsibility of the State, and federal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) (cleaned up). To scrutinize §2 with anything less than the "most exacting lens," *Carey*, 957 F.3d at 483, for the presence of a privately enforceable federal right

would potentially "subject to judicial oversight" every state redistricting map "at the behest of a single citizen," *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 645 (1979) (Powell, J., concurring). Section 2's text does not make unmistakably clear Congress's intent to "upset the usual constitutional balance of federal and state powers" in that way. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

### D. The VRA's Express Method of Enforcement Shows Further that Section 2 Confers No New Individual Rights.

Finally, where a statute provides a "federal review mechanism," the Supreme Court has been less willing to identify "individually enforceable private rights." *Gonzaga*, 536 U.S. at 289-90.[6] For example, the *Gonzaga* Court held that the Family Educational Rights and Privacy Act's nondisclosure provisions created no rights enforceable under §1983. *Id.* at 290-91. The Court's conclusion was "buttressed by the mechanism that Congress chose to provide for enforcing those provisions. Congress expressly authorized the Secretary of Education to '*deal with violations*' of the Act …." *Id.* at 289.

The Court contrasted FERPA's authorization of federal enforcement with provisions in the Public Housing Act and the Medicaid Act that lacked a "federal review mechanism." *Id.* at 280, 290. In *Wright v. Roanoke Redevelopment and Housing*

[6] This argument is distinct from the second prong of the §1983 enforceability inquiry, which asks whether Congress, *after* conferring new individual rights, "specifically foreclosed a remedy under §1983." *Gonzaga*, 536 U.S. at 284 n.4.

*Authority*, 479 U.S. 418 (1987), the Court held that the rent-ceiling provision of the Public Housing Act was enforceable under §1983 in "significant" part because "the federal agency charged with administering the Public Housing Act had never provided a procedure by which tenants could complain to it about the alleged failures of state welfare agencies to abide by the Act's rent-ceiling provision." *Gonzaga*, 536 U.S. at 280 (internal quotation marks omitted and alterations adopted). And in *Wilder v. Virginia Hospital Association*, 496 U.S. 498 (1990), the Court also held that a reimbursement provision of the Medicaid Act was privately enforceable in part because there was "no sufficient administrative means of enforcing the requirement against States that failed to comply." *Gonzaga*, 536 U.S. at 280-81.

In the VRA, like in FERPA, Congress expressly provided for federal enforcement of the VRA's provisions. Pursuant to his powers under §12 of the VRA, the Attorney General can and does enforce §2. *See* 52 U.S.C. §10308; *see also* Voting Section Litigation, *Cases Raising Claims Under Section 2 of the Voting Rights Act*, https://www.justice.gov/crt/voting-section-litigation #sec2cases (last visited Feb. 5, 2024). As the Eighth Circuit recently summarized, "If the text and structure of § 2 and § 12 show anything, it is that Congress intended to place enforcement in the hands of the Attorney General, rather than private parties." *Arkansas NAACP*, 86 F.4th at 1211. This inclusion of a robust and express "federal review mechanism" suggests further that Congress did not confer privately enforceable rights.

In sum, the text and structure provide at least "some indication" that Congress did not intend to "create individual rights" through §2. *31 Foster Child.*, 329 F.3d at 1270. For Congress to create a new private right, total clarity is required. Because it is lacking here, the necessary conclusion is that §2 is not privately enforceable until Congress says otherwise.

## II. The VRA Contains No Clear Evidence That Congress Intended To Authorize Private Suits Under Section 2.[7]

"[C]reating a cause of action is a legislative endeavor," *Egbert v. Boule*, 596 U.S. 482, 491 (2022), because to do so "is to assign new private rights and liabilities—a power that is in every meaningful sense an act of legislation," *id.* at 503 (Gorsuch, J., concurring). Put simply, "private rights of action to enforce federal law must be created by Congress." *Sandoval*, 532 U.S. at 286. The sole role played by a federal court is to look to the "text and structure" of the statute for "clear evidence

[7] The Secretary is mindful that this Court adopted the findings of fact and conclusions of law in the *Milligan* order enjoining the State's use of the 2021 plan. Doc. 101 at 4. In that order, this Court rejected Defendants' truncated argument that §2 contains no implied right of action. That "conclusion of law made" at the "preliminary injunction" stage is "not binding at" later stages. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *accord Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1289 (11th Cir. 2022). The Supreme Court in *Allen v. Milligan* did "not address whether §2 contains a private right of action." 599 U.S. 1, 90 (2023) (Thomas, J., dissenting). And this motion presents new and expanded arguments not presented before. Also, this Court emphasized the fact that "no federal court anywhere has held that Section Two does not provide a private right of action." Doc. 101 at 208. Since then, the Eastern District of Arkansas and the Eighth Circuit have held that §2 does not provide a private right of action. *Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1207 (8th Cir. 2023), *reh'g en banc denied*, 2024 WL 340686 (8th Cir. Jan. 30, 2024).

that Congress intended to authorize" private suits. *In re Wild*, 994 F.3d 1244, 1255-56 (11th Cir. 2021) (en banc).

"The bar for showing legislative intent is high," and intent "will not be presumed." *McDonald v. S. Farm Bureau Life Ins. Co.*, 291 F.3d 718, 723 (11th Cir. 2002). Congress can make the court's job easy by communicating its intent expressly, as it did in Title II of the Civil Rights Act of 1964. *See* 42 U.S.C. §2000a-3(a) ("Whenever any person has engaged … in any act or practice prohibited by … this title, a civil action for preventive relief … may be instituted by the person aggrieved."). Or Congress can do so by (1) unambiguously conferring a new individual right on a particular class of persons, *Gonzaga*, 536 U.S. at 283, 285, and then (2) "clearly and affirmatively manifest[ing] its intent" "to authorize a would-be plaintiff to sue," *In re Wild*, 994 F.3d at 1256. Either way, a federal court will not read into a statute that which does not exist clearly and unambiguously on its face. Gone are the days when federal courts "'provide such remedies as are necessary to make effective the congressional purpose' expressed by a statute." *Sandoval*, 532 U.S. at 287 (quoting *Cort v. Ash*, 422 U.S. 66, 78 (1975)).

No one disputes that Congress has not *expressly* authorized private persons to sue under §2, as it did in the Civil Rights Act of 1964. And "a careful examination of the statute's language" reveals no unambiguous conferral of new individual rights

nor a clear authorization for plaintiffs to seek judicial enforcement of §2. *In re Wild*, 994 F.3d at 1255.

As explained above, §2 does not confer "new individual rights" "in clear and unambiguous terms." *Gonzaga*, 536 U.S. at 286, 290. A court's "role in discerning whether personal rights exist in the implied right of action context" does "not differ from its role" "in discerning whether personal rights exist in the § 1983 context." *Id.* at 285. Where Congress confers only new remedies and not new rights, such as with §2, there can be no implied right of action.

Section 3 of the VRA does not change the analysis. That section confers certain powers on a court if, for example, it finds a constitutional violation in a "proceeding instituted by the Attorney General or an aggrieved person" in "a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. §10302(c). Section 3's "aggrieved person" language at most recognizes the existence of statutes by which private parties could enforce the Fourteenth and Fifteenth Amendments, like §1983, which predated the VRA. That's because "instituting a proceeding requires the underlying cause of action to exist first." *Arkansas NAACP*, 86 F.4th at 1211. To the extent §3 refers to VRA actions, "[t]he most logical deduction … is that Congress meant to address those cases brought pursuant to the private right of action that this Court had recognized as of 1975, *i.e.*, suits under § 5, as well as any rights of action that [the Court] might recognize in the

future." *Morse v. Republican Party of Virginia*, 517 U.S. 186, 289 (1996) (Thomas, J., dissenting). Thus, while §3 recognizes that other private rights of action exist, the provision does not create a new one or show that §2 creates one.

Further, the VRA is not silent about who can enforce its provisions. Section 12 provides the remedial framework—enforcement by the Attorney General—but any "mention of private plaintiffs or private remedies … is missing." *Arkansas NAACP*, 86 F.4th at 1210. If the "statutory structure provides a discernible enforcement mechanism, *Sandoval* teaches that [the court] ought not to imply a private right of action because the express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Love v. Delta Air Lines*, 310 F.3d 1347, 1353 (11th Cir. 2002). Section 12's express framework for enforcement is, at the very least, "a thumb on [the] scale against finding an implied private cause of action." *Ga. State Conf. of NAACP*, 2022 WL 18780945, at *7; *see also Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019) (holding that the Help America Vote Act "creates no private cause of action" because "Congress established only two HAVA enforcement mechanisms," and private suits were not one).

Finally, this question remains an open one in this Circuit. The Supreme Court has only ever assumed, without deciding, that §2 is privately enforceable. *See Brnovich v. Democratic National Committee*, 141 S. Ct. 2321, 2350 (2021) (Gorsuch, J., concurring, joined by Thomas, J.) ("Our cases have assumed—without deciding—

that the Voting Rights Act of 1965 furnishes an implied cause of action under § 2. Lower courts have treated this as an open question."); *see also City of Mobile v. Bolden*, 446 U.S. 55, 60 (1980) (plurality opinion) (Stewart, J., joined by two other Justices and the Chief Justice) ("Assuming, for present purposes, that there exists a private right of action to enforce [Section 2]."). The Supreme Court did not answer this question in *Morse v. Republican Party of Virginia*, 517 U.S. 186, 232-33 (1996), or anywhere else.

In *Morse*, Justice Stevens (announcing the judgment of the Court and joined by Justice Ginsburg) and Justice Breyer (concurring and joined by Justices O'Connor and Souter) mentioned §2 on the way to finding §10 privately enforceable. *See* 517 U.S. at 232, 240. Both opinions *assumed* "the existence of a private right of action under Section 2," and sought to avoid the "anomalous" result of permitting private suits under §2 and §5 but not §10. *Id.* at 232; *id.* at 240. These "background assumptions" are not binding holdings, and for three reasons are not controlling. *Arkansas NAACP*, 86 F.4th at 1215.

First, questions "neither brought to the attention of the court nor ruled upon[] are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925); *see also Permian Basin Area Rate Cases*, 390 U.S. 747, 775 (1968). The "Supreme Court's holding in *Morse* concerned only Section 10 of the VRA and did not concern Section 2." *Georgia State Conf. of*

*NAACP v. Georgia*, 2022 WL 18780945, at *7 n.6 (N.D. Ga. Sept. 26, 2022) (three-judge court). No binding precedent from the Supreme Court or elsewhere requires this Court to do anything other than to "start with the text, apply first principles, and use the interpretive tools the Supreme Court has provided." *Arkansas NAACP*, 86 F.4th at 1216 n.7.

Second, the statements in *Morse* about §2 were "devoid-of-analysis," *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006), making them "the least valuable kind" of dicta. *Arkansas NAACP*, 86 F.4th at 1216. While this Court has stated that "[e]ven if the Supreme Court's statements in *Morse* about Section Two are technically dicta, they deserve greater respect than Defendants would have us give," *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1032 (N.D. Ala. 2022); *see also Stone v. Allen*, No. 2:21-cv-1531 (N.D. Ala. Feb. 13, 2024), ECF 143 at 20, Defendants submit that these statements are not the kind of dicta the *Schwab* court touted as particularly persuasive. 451 F.3d at 1325 ("well thought out, thoroughly reasoned, and carefully articulated analysis by the Supreme Court describing the scope of one of its own decisions" that comprised "more than five hundred words"). The statements in *Morse* about §2 remain unreasoned assumptions.

Third, *Morse* is a "gravely wounded" decision. *Jefferson Cnty. v. Acker*, 210 F.3d 1317, 1320 (11th Cir. 2000). Just "five years after *Morse*, the Supreme Court made clear that 'text and structure' are the guideposts, not 'contemporary legal

context.'" *Ark. NAACP*, 86 F.4th at 1216 (quoting *Sandoval*, 532 U.S. at 287-88 and noting that *Morse* relied upon the latter). *Morse* has not answered the question.

And while this Court in *Stone* held that statutory stare decisis would need to be overcome to conclude that §2 does not create privately enforceable rights, *Stone*, No. 2:21-cv-1531, ECF 143 at 20, Defendants submit that the doctrine is not applicable here because the question has not been decided by binding precedent. While "stare decisis carries enhanced force when a decision … interprets a statute," *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 456 (2015), courts adjudicating §2 claims without passing on whether there is a private right of action have not yet interpreted that aspect of the statute. The issue must be decided before getting stare decisis treatment.

## III. Plaintiffs Fail To Plead Facts Showing An Unequal Opportunity "To Participate In The Political Process."

Assuming that private plaintiffs have statutory authority to bring a §2 claim, Plaintiffs here failed to allege sufficiently that Alabama's electoral systems are not "equally open" to minority voters. Returning to the text, Plaintiffs must allege that members of a minority group "have less opportunity than other members of the electorate [1] to participate in the political process *and* [2] to elect representatives of their choice." 52 U.S.C. §10301(b) (emphasis added). In *Chisom v. Roemer*, the Court clarified that §2 did "not create two separate and distinct rights." 501 U.S. 380, 397 (1991). Rather, "the opportunity to participate and the opportunity to elect" form a "unitary claim." *Id.* at 397-98. Thus, proving only the second prong—less

opportunity to elect—"is not sufficient to establish a violation unless, under the totality of the circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process." *Id.* at 397.

To determine if Plaintiffs have sufficiently alleged that black voters in Alabama currently have "less opportunity than other members of the electorate to participate in the political process," it is of first importance to determine what that phrase means. *Chisom* points to the answer. The 1982 amendments to "§ 2 [were] intended to 'codify' the results test employed in *Whitcomb v. Chavis*, 403 U.S. 124 (1971), and *White v. Regester*, 412 U.S. 755 (1973)." *Chisom*, 501 U.S. at 394 n.21 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 83 (1986) (O'Connor, J., concurring in the judgment)). Those two decisions supplied §2's key language. And because the phrase "is obviously transplanted from another legal source, it brings the old soil with it." *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019). Thus, "it is to *Whitcomb* and *White* that [courts] should look in the first instance in determining how great an impairment of minority voting strength is required to establish vote dilution in violation of § 2." *Gingles*, 478 U.S. at 97 (O'Connor, J., concurring in the judgment).[8]

[8] *See also Johnson v. DeSoto Cnty. Bd. of Com'rs*, 204 F.3d 1335, 1346 n.23 (11th Cir. 2000); *Nipper v. Smith*, 39 F.3d 1494, 1517 (11th Cir. 1994) (en banc) (plurality opinion); *Uno v. City of Holyoke*, 72 F.3d 973, 982 (1st Cir. 1995); *LULAC v. Clements*, 999 F.2d 831, 851 (5th Cir. 1993) (en banc); *Smith v. Brunswick Cnty. Va. Bd. of Sup'rs*, 984 F.2d 1393, 1399 (4th Cir. 1993).

**A.** *Whitcomb* makes clear what is *not* enough to establish a "vote dilution" claim. The plaintiffs in *Whitcomb* challenged the use of a multimember districting scheme in Marion County, Indiana, to elect the county's "eight senators and 15 members of the house," alleging the system illegally "diluted the force and effect of" a heavily black and poor part of Marion County "termed 'the ghetto area.'" 403 U.S. at 128-29. In identifying the "racial element" of plaintiffs' claim, the district court determined the area was "inhabited predominantly by members of a racial, ethnic, or other minority group, most of whom are of lower socioeconomic status than the prevailing status in the metropolitan area and whose residence in the section is often the result of social, legal, or economic restrictions or custom." *Chavis v. Whitcomb*, 305 F. Supp. 1364, 1373 (S.D. Ind. 1969). The court found further that voters in that area had "almost no political force or control over legislators under the present districting scheme because the effect of their vote is cancelled out by other contrary interest groups in Marion County." *Id.* at 1368. The court concluded that the plaintiff group's "voting strength … is severely minimized … by virtue of": (1) the control exerted by "party organizations" over nominations in the primary election; (2) the inability of black voters "to be assured of the opportunity of voting for prospective legislators of their choice"; and (3) "the absence of any particular legislator accountable" to black voters residing in the area. *Id.* at 1386; *see also Whitcomb*, 403 U.S. at 135-36 (summarizing district court's conclusions).

Then, there was the lack of proportionality. For "the period 1960 through 1968," plaintiffs' relevant area made up "17.8% of the population" of Marion County, but was home to only "4.75% of the senators and 5.97% of the representatives." *Whitcomb*, 403 U.S. at 133. Part of the disproportionality arose because the voters there "voted heavily Democratic," while "the Republican Party won four of the five elections from 1960 to 1968" and did not slate anyone from the area in several of those elections. *Id.* at 150-52. The district court found vote dilution and ordered single-member districting, under which voters from plaintiffs' area "would elect three members of the house and one senator." *Id.* at 129.

The Supreme Court reversed the finding of vote dilution. Critical to the Court's holding was the lack of "evidence and findings that ghetto residents had less" "opportunity to participate in and influence the selection of candidates and legislators." *Id.* at 149, 153. The Court made clear what these words meant by describing what plaintiffs failed to prove:

> We have discovered nothing in the record or in the court's findings indicating that poor [blacks] were not allowed [1] to register or vote, [2] to choose the political party they desired to support, [3] to participate in its affairs or [4] to be equally represented on those occasions when legislative candidates were chosen. Nor did the evidence purport to show or the court find that inhabitants of the ghetto were [5] regularly excluded from the slates of both major parties, thus denying them the chance of occupying legislative seats.

*Id.* at 149-50.

This is what "equal opportunity to participate in the political process" means—be "allowed" to register and vote, choose the party one desires to support, participate in its affairs, and have an equal vote when the party's candidates are chosen. The political party the plaintiffs in *Whitcomb* favored in 1960s Marion County was the Democratic Party, and it was "reasonably clear" that their "votes were critical to Democratic Party success." *Id.* at 150. Thus, the Supreme Court explained, "it seem[ed] unlikely that the Democratic Party could afford to overlook the ghetto in slating its candidates." *Id.*

It made *no* difference to the Court that the Democratic Party had lost all 23 legislative seats in "four of the five elections from 1960 to 1968." *Id.* The record suggested that "had the Democrats won all of the elections or even most of them, the ghetto would have had no justifiable complaints about representation." *Id.* at 152. That the area did not "have legislative seats in proportion to its populations emerge[d] more as a function of losing elections," not built-in racial bias. *Id.* at 153. The plaintiffs' alleged denial of equal opportunity was "a mere euphemism for political defeat at the polls." *Id.* That was not enough to establish vote dilution.

**B.** *White v. Regester* provides a helpful contrast. There, black voters of Dallas County, Texas, favored the Democratic Party, but at-large elections and "a white-dominated organization that [was] in effective control of Democratic Party candidate

slating in Dallas County" combined to deny black voters equal opportunity to participate in the political process. 412 U.S. at 766-67. The district court had found that "the Texas rule requiring a majority vote as a prerequisite to nomination in a primary election" and "the so-called 'place' rule limiting candidacy for legislative office from a multimember district to a specified 'place' on the ticket" "enhanced the opportunity for racial discrimination." *Id.* at 766. But "[m]ore fundamentally," the Democratic Party "did not need the support of the [black] community to win elections in the county, and it did not therefore exhibit good-faith concern for the political and other needs and aspirations of the [black] community." *Id.* at 767. Because "the black community" was "effectively excluded from participation in the Democratic primary selection process," it "was therefore generally not permitted to enter into the political process in a reliable and meaningful manner." *Id.* Similarly, Mexican-American residents of Bexar County, Texas, were "excluded … from effective participation in political life" by virtue of "cultural incompatibility … conjoined with the poll tax and the most restrictive voter registration procedures in the nation." *Id.* at 768-69. The Supreme Court found "no reason to disturb" the district court's "findings and conclusions." *Id.* at 767.

**C.** The point of this historical study is straightforward: "unequal opportunity to participate in the political process," as it appears in §2, carries a particular meaning; *Whitcomb* and *White* supply that meaning. *See Allen v. Milligan*, 599 U.S. 1, 13

(2023) (discussing *White*). These two decisions speak with a unified voice: a plaintiff must show that members of the minority group are excluded "from effective participation in political life," *White*, 412 U.S. at 769; *i.e.*, they are "denied access to the political system," *Whitcomb*, 403 U.S. at 155. Access to the "political system" means access to those tangible and traditional methods of participation like registering to vote, voting, and participating in the political party of one's choosing. *Id.* at 149-50. Thus, Plaintiffs need to allege that, based on the totality of the circumstances, black Alabamians today face *more inequality* in terms of those traditional methods of participation than did black Indianians in 1960s Marion County.[9] Here, the allegations comes nowhere close.

To be sure, Plaintiffs generally allege that "Black Alabamians lag behind their white counterparts on nearly every measure, including in areas such as education, employment, income, and access to health care." Doc. 271 ¶109. They allege that "Black incomes are substantially lower than those paid to their white counterparts, and Black Alabamians are unemployed within the state at much higher rates, too. Similar disparities exist in the areas of housing, home ownership, and access to a

[9] The Secretary recognizes that Senate Factor 5 calls for an examination into "the extent to which members of the minority group … bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to *participate effectively in the political process*." *Gingles*, 478 U.S. at 37 (emphasis added). And the Secretary is mindful that this Court found Defendants' Senate 5 arguments for the 2021 Map "too formulaic." *Caster* doc. 101 at 188. This brief does not make a Senate Factor 5 argument, but rather an argument of statutory interpretation of §2 aided by the Supreme Court's decisions supplying the statute's operative text.

vehicle." *Id.* ¶110. Plus, they allege, "[l]ow-income voters face a number of hurdles to voter participation including working multiple jobs, working during polling place hours, lack of access to childcare, lack of access to transportation, and higher rates of illness and disability." *Id.* ¶111.

But that does not prove §2 vote dilution because the same or worse could undoubtedly be said for poor black residents of Marion County in the 1960s compared to residents of the "upper middle-class and wealthy suburban area" one township over. *Chavis*, 305 F. Supp. at 1385. After all, the *Whitcomb* Court heard similar evidence, such as "[s]trong differences … in terms of housing conditions, income and education levels, rates of unemployment, juvenile crime, and welfare assistance," along with historical data showing "gross inequity of representation" in the general assembly. 403 U.S. at 132-33. *Whitcomb* shows that access to "the political process" means access to voter registration, voting, and participating in the political party of one's choosing. *Id.* at 149. Like the *Whitcomb* plaintiffs, Plaintiffs here plead facts about socioeconomic disparities, but not about disparities when it comes to voting rights. Their Voting Rights Act claim should fail.

Defendants again recognize this Court's order yesterday in *Stone*, which ruled that plaintiffs in that case stated a plausible §2 claim because they "plead[ed] factual allegations about the Senate Factors to assert that the political process in Alabama is

not equally open to Black voters." *Stone*, No. 2:21-cv-1531, ECF 143 at 23. Defendants respectfully submit that while the types of evidence discussed in the Senate Factors are likely to be present where there is sufficiently "great an impairment of minority voting strength … to establish vote dilution in violation of § 2," *Gingles*, 478 U.S. at 97 (O'Connor, J., concurring in the judgment), presence of such evidence is not sufficient where unequal opportunity to participate in the political process is not shown.

Based solely on the Amended Complaint, there is every reason to believe that, "had the Democrats won all of the elections or even most of them" in Alabama, black voters "would have had no justifiable complaints about representation." *Whitcomb*, 403 U.S. at 152. Thus, "the failure of [black voters] to have legislative seats in proportion to [their] populations emerge more as a function of losing elections," not built-in racial bias. *Id.* at 153. And losing in the political process is not the same as being excluded from it. Plaintiffs' contrary approach of alleging a history of discrimination (which surely existed in 1960s Indiana too[10]), socioeconomic disparities (which *defined* the plaintiff group in *Whitcomb*), and elections that didn't go the

[10] *See, e.g.*, *Baird v. Consol. City of Indianapolis*, No. IP87-111C, 1991 WL 557613, at *6 (S.D. Ind. Apr. 25, 1991) ("Dr. Moore testified about the history of race discrimination in Indiana generally and in Marion County in particular. Dr. Moore described patterns of discrimination that began before 1787, when blacks were being brought into the state as slaves.").

"right" way alleges nothing about whether black Alabamians have an equal opportunity to "participate in the political process." The bottom line is that Plaintiffs' allegations might plausibly show an unequal opportunity to participate "only if *Whitcomb* is purged from … voting rights jurisprudence." *LULAC v. Clements*, 999 F.2d 831, 862 (5th Cir. 1993) (en banc) (discussing *Whitcomb* at length).

## CONCLUSION

The First Amended Complaint should be dismissed.


Steve Marshall
*Attorney General*

*s/ Edmund G. LaCour Jr.*
Edmund G. LaCour Jr. (ASB-9182-U81L)
*Solicitor General*

James W. Davis (ASB-4063-I58J)
*Deputy Attorney General*

Soren Geiger (ASB-0336-T31L)
*Assistant Solicitor General*

Misty S. Fairbanks Messick (ASB-1813-T71F)
Brenton M. Smith (ASB-1656-X27Q)
Benjamin M. Seiss (ASB-2110-O00W)
*Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Soren.Geiger@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov

Misty.Messick@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov

***Counsel for Secretary of State Allen***

*s/ Dorman Walker*_______
Dorman Walker (ASB-9154-R81J)
BALCH & BINGHAM LLP
Post Office Box 78 (36101)
105 Tallapoosa Street, Suite 200
Montgomery, AL 36104
Telephone: (334) 269-3138
Email: dwalker@balch.com

Michael P. Taunton (ASB-6853-H00S)
BALCH & BINGHAM LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, AL 35203
Telephone: (205) 226-3451
Email: mtaunton@balch.com

***Counsel for Sen. Livingston and Rep. Pringle***

## CERTIFICATE OF SERVICE

I certify that on February 14, 2024, I electronically filed the foregoing notice with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

*s/ Edmund G. LaCour Jr.*
Counsel for Secretary Allen