# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| MARCUS CASTER, *et al.*,            ) | |
| )  | |
| *Plaintiffs*,              ) | |
| ) | |
| v.              ) | Case No. 2:21-cv-1536-AMM |
| ) | |
| Hon. WES ALLEN, in his official           ) | |
| capacity as Secretary of State, *et al.*,  ) | |
| ) | |
| *Defendants*.           ) | |

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

The Voting Rights Act is considered by many to be "the most successful civil rights statute" in this nation's history. *Allen v. Milligan*, 599 U.S. 1, 10 (2023). Still, the VRA is a statute subject to the same interpretative principles as any other law, including when determining who can enforce it and what it means to violate it. When moving to dismiss, Defendants discussed at length a handful of Supreme Court decisions that shed light on these questions—namely, *City of Boerne v. Flores*, *South Carolina v. Katzenbach*, *Chisom v. Roemer*, *Whitcomb v. Chavis*, and *White v. Regester*. Plaintiffs largely ignore these cases. Their Section 2 claim should be dismissed.

## ARGUMENT

I.     **Section 2 Is Not Privately Enforceable.**[1]

   A.     *Morse* **Is Inapposite.**

The "search for Congress's intent" "to create a private right of action" to enforce Section 2 begins and ends with the "text and structure" of the Voting Rights Act. *Alexander v. Sandoval*, 532 U.S. 275, 288, 289 (2001). Plaintiffs turn first to a fractured Supreme Court decision employing an "abandoned" method of interpretation to find a different statute privately enforceable. *Id.* at 287.

Five Supreme Court Justices have agreed that Section 10 of the VRA contains a private cause of action. *Morse v. Republican Party of Va.*, 517 U.S. 186, 234-35 (1996) (plurality opinion); *id.* at 240 (Breyer, J., concurring in the judgment). When it comes to private plaintiffs suing under Section 10, *Morse* "directly controls," *Rodriguez de Quijas v. Shearson/Am. Express Inc.*, 490 U.S. 477, 484 (1989), and Defendants do not suggest that "more recent cases have, by implication, overruled" it, *Agostini v. Felton*, 521 U.S. 203, 237 (1997). *Contra* Doc. 227 ("Response") at 11

---

[1] Plaintiffs suggest in passing that Defendants have waived this argument. Response at 13. They are mistaken. Defendants pleaded this defense when answering Plaintiffs' original complaint, *see* doc. 42 at 14, and argued it consistently during the preliminary injunction phase, *see* doc. 71, 132-35; doc. 96 at 217-20. There is no "sandbagging." Further, Plaintiffs' offer no authority to support the idea that *every* appealable issue not presented to the Supreme Court in a cert petition arising from a preliminary injunction of a different law is waived in the district court following the Supreme Court's disposition.

2

n.1. Instead, Defendants argue merely that legal or factual assumptions that "go beyond the case … may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision." *Cohens v. State of Virginia*, 19 U.S. 264, 399 (1821) (declining to recognize dicta in *Marbury v. Madison* as binding).

The question whether Section 2 contains a private right of action has never been presented to the Supreme Court. *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) (Gorsuch, J., concurring). "Lower courts have treated this as an open question." *Id.* And Defendants respectfully submit that Justices Stevens's and Breyer's assumptions about Section 2 in *Morse* went "beyond the case" and have not settled the question here. *Cohens*, 19 U.S. at 399. Given both opinions' reliance upon "congressional purposes" and "contemporary legal context," *Sandoval*, 532 U.S. at 287, *Morse* is appropriately understood as a "moribund," "discredited," and "gravely wounded" decision outside the context of its Section 10 holding,

*Jefferson County v. Acker*, 210 F.3d 1317, 1320 (11th Cir. 2000).[2] It should not be extended. *Id.*[3]

Plaintiffs' reliance on *Morse* echoes many of the unavailing arguments made by the plaintiffs in *Sandoval*. *Cf.* Brief for Appellees at 14, 23, *Sandoval v. Hagan*, 197 F.3d 484 (11th Cir. 1999), 1999 WL 33619019 ("The Supreme Court has consistently indicated that a private right of action is available to enforce regulations issued pursuant to Title VI" and "Congress … ratified private enforcement of disparate impact regulations."). There, the plaintiffs relied on *Guardians Association v. Civil Service Commission*, 463 U.S. 582 (1983)—a "fragmented" decision—and several others building upon it for the proposition that "a private right of action was available to enforce" Title VI's disparate impact regulations. *See id.* at 15-16. They also argued that the "regulations were uniformly viewed as privately enforceable," and Congress could have changed that view when amending Title VI, but it did not.

---

[2] Plaintiffs praise *Morse* as a "model opinion," whose "reasoning spans dozens of pages" of "careful consideration." Response at 11. But *Morse* offers only a few sentences of assumptions about Section 2. Second, the two-Justice plurality acknowledged up front that the question "might have been" decided differently "if the Voting Rights Act had been enacted recently" before proceeding to look past the text in favor of "contemporary legal context." *Id.* at 230-31. *But see Sandoval*, 532 U.S. at 288 ("legal context matters only to the extent it clarifies text").

[3] There is currently no directly controlling circuit precedent. Plaintiffs cite one vacated opinion and dictum from one unpublished opinion. They state the vacated one is "binding on this Court." Response at 11. To the contrary, that case no longer has any "precedential effect." *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 634 n.6 (1979).

4

*Id.* at 26; *see also* Brief for Respondents at 32-37, *Sandoval*, 532 U.S. 275, 2000 WL 1846068.

The Supreme Court in *Sandoval* rejected these arguments. Noting that it is "bound by holdings, not language," the Court refused to give precedential weight to dicta from earlier Title VI cases. *Sandoval*, 532 U.S. at 282. The Court also rejected the "congressional ratification" argument by noting first that none of its decisions had actually decided the issue before Congress amended Title VI. *Id.* at 291. And even if Congress was on notice of the prevailing view, it would be "impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of the Court's statutory interpretation." *Id.* at 292.

Like the *Sandoval* plaintiffs, the *Caster* Plaintiffs argue that: (1) dicta from a fragmented decision controls; (2) private plaintiffs have been bringing these suits for decades; (3) and the "ball is in Congress's court." These arguments fell short in *Sandoval*; they should here as well.

### B.   Plaintiffs' Textual Arguments Fail.

Plaintiffs' approach to the VRA's text likewise fails. *See Ark. State Conf. NAACP v. Ark. Bd. of Apportionment ("Arkansas NAACP")*, 86 F.4th 1204 (8th Cir. 2023). Their textual argument hinges on select phrases found in Sections 3, 12, and 14. Response at 17-19. Section 3 recognizes certain remedies in proceedings instituted by "the Attorney General or an aggrieved person" in actions brought "under

5

any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10302. Plaintiffs declare that "there is no doubt that by 'Attorney General or an Aggrieved person' Congress intended 'to provide the same remedies to private parties as had formerly been available to the Attorney General alone.'" Response at 17 (quoting portion of *Morse* plurality opinion not reflected in Justice Breyer's opinion). To the contrary, that premise is very much in doubt. *See Morse*, 517 U.S. at 286-89 (Thomas, J., dissenting, joined by the Chief Justice and two other Justices). Because Section 2 enforces the Fifteenth Amendment, Plaintiffs jump to the conclusion that a private right of action for that provision must exist. They give dispositive weight to the two words "any statute," as if their meaning were not modified and limited by the phrase "a proceeding under." Response at 17 n.2. That interpretive mistake begs the question by assuming that actions may be instituted under Section 2 in the first instance. Instead, the phrase "a proceeding under any statute" "most reasonably refers to statutes that already allow for private suits," like Section 5 and 42 U.S.C. § 1983, because "instituting a proceeding requires the underlying cause of action to exist first." *Arkansas NAACP*, 86 F.4th at 1211; *see also Morse*, 517 U.S. at 289 (Thomas, J., dissenting).

Even more troubling, Plaintiffs would read Section 3 as creating "new private rights of action for every voting-rights statute that did not have one, including § 2." *Arkansas NAACP*, 86 F.4th at 1212; Response at 18 n.2. In other words, Plaintiffs

6

posit that Congress, by adding the phrase "or an aggrieved person" when amending Section 3 in 1975, intended to "transform the enforcement of 'one of the most substantial' statues in history by the subtlest of implications." *Arkansas NAACP*, 86 F.4th at 1213. "Congress typically does not 'hide elephants in mouseholes,'" *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 274 (2023), or stealthily "alter sensitive federal-state relationships" in "areas of traditional state responsibility," *Bond v. United States*, 572 U.S. 844, 858 (2014). Plaintiffs' interpretation is implausible.

And by Plaintiffs' own logic, if "an aggrieved person" can sue under every voting-rights statute, then so can the Attorney General, who is named first in Section 3. But that's not right. Private parties may vindicate their constitutional voting rights under statutes like § 1983, but the Attorney General cannot do so on their behalf. *Cf. Inyo County v. Paiute-Shoshone Indians*, 538 U.S. 701, 711-12 (2003). Section 3 should not be read in a way that would create such inconsistencies. The better interpretation is that "Private plaintiffs can sue under statutes like 42 U.S.C. § 1983, where appropriate, and the Attorney General can do the same under statutes like § 12. And then § 3 sets the ground rules in the types of lawsuits each can bring." *Arkansas NAACP*, 86 F.4th at 1213.[4]

---

[4] Plaintiffs' reliance on Section 14(e) is misplaced for essentially the same reasons as their reliance on Section 3. *See* Response at 18; *see also Arkansas NAACP*,

7

## C. The Voting Rights Act Only Enforces Preexisting Rights.

The critical question for private enforcement under § 1983 is "whether Congress *intended to create a federal right.*" *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002). Nowhere do Plaintiffs identify "with particularity" the new right Congress supposedly created. *Blessing v. Freestone*, 520 U.S. 329, 342 (1997). They argue that Section 2 protects the "right of any citizen … to vote free from discrimination" by creating "a right to an undiluted vote." Response at 15-16 (quoting *LULAC v. Perry*, 548 U.S. 399, 437 (2006), *Shaw v. Hunt*, 517 U.S. 899, 917 (1996)). This "paints with too broad a brush," *Blessing*, 520 U.S. at 342, because protecting an existing right is not creating a new one, and the right to be free from racial vote dilution is a constitutional right recognized by the Supreme Court before the VRA's enactment. *See Reynolds v. Sims*, 377 U.S. 533, 558 (1964).[5] Because Plaintiffs have

---

86 F.4th at 1213 n.4. Further, Section 12(f), *see* Response at 19, most logically refers to the "fast-tracked lawsuits" the Attorney General may bring in federal court when notified by a federal observer of "'well-founded' allegations from people who allege that 'they have not been permitted to vote.'" *Arkansas NAACP*, 86 F.4th at 1210 (quoting 52 U.S.C. § 10308(f)). In such proceedings, the Attorney General may bypass procedural encumbrances like exhaustion of remedies by the "person asserting rights." 52 U.S.C. § 10308(f).

[5] Plaintiffs repeat Section 2's reference to "the right of any citizen." Response at 15, 16, 19. But there is no presumption of § 1983 enforceability just because a statute "speaks in terms of 'rights.'" *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 18-20 (1981). To enjoy the presumption, the statute must unambiguously *create* rights.

not shown that Section 2 confers "new individual rights" "in clear and unambiguous terms," the basis for their private suit evaporates. *Gonzaga*, 536 U.S. at 286, 290.

Instead, Plaintiffs' confuse the "fundamental" "distinction between rights and remedies," *Chelentis v. Luckenbach S.S. Co.*, 247 U.S. 372, 384 (1918), by asserting that Congress created rights when it passed this "remedial, preventative legislation" to enforce the Reconstruction Amendments, *City of Boerne v. Flores*, 521 U.S. 507, 532 (1997); Response at 20-21. But the Court in *South Carolina v. Katzenbach* described over and over the "new *remedies*" Congress created in the VRA to protect the constitutional right to vote free from discrimination. 383 U.S. 301, 308 (1966) (emphasis added). Nowhere did the Court hint at new rights.[6] And even after "Congress amended the Act in 1982 in order to relieve plaintiffs of the burden of proving discriminatory intent," *Chisom v. Roemer*, 501 U.S. 380, 403 (1991), the Voting Rights Act remains a statute to enforce the rights guaranteed by the Constitution, not new rights guaranteed by the Voting Rights Act.

---

[6] The federal government states that Section 2, by virtue of its placement in the United States Code, "created a new individual *statutory* right." Statement of Interest at 13. But the United States never explains why Congress would bother to merely "codify the Fifteenth Amendment"—already enforceable under § 1983—in Section 2. *Id.* Commonsense and the VRA's structure suggest that it would be only to do something new, namely, allow the Attorney General to enforce the Fifteenth Amendment. *See Arkansas NAACP*, 86 F.4th at 1211. The United States' other arguments largely repeat those made by Plaintiffs.

This is not just semantics; the "distinction between rights and remedies is fundamental." *Chelentis*, 247 U.S. at 384.[7] Only federal *rights* are enforceable under § 1983. *Gonzaga*, 536 U.S. at 282. Because the VRA creates new remedies, not new rights, it should be no surprise that the VRA "lists only one plaintiff who can enforce § 2: the Attorney General." *Arkansas NAACP*, 86 F.4th at 1208. As the Court concluded in *Katzenbach*, "After enduring nearly a century of widespread resistance to the Fifteenth Amendment, Congress has marshalled an array of potent weapons against the evil, with authority in the Attorney General to employ them effectively." *Katzenbach*, 383 U.S. at 337. Consistent with Congress's remedial power, the VRA's text does not display a congressional intent to create privately enforceable rights. Plaintiffs' Section 2 claim should be dismissed.

## II. Plaintiffs Fail To State A Claim Under The Text Of Section 2.

Plaintiffs accuse Defendants of attempting to "remake the Section 2 standard" into one that has "no quarter in either precedent or the statutory text." Response at 8, 29. To the contrary, Defendants appropriately focus on the text of the statute they have allegedly violated and the two Supreme Court cases from which that text was

---

[7] Plaintiffs' only retort is that principles of "rights and remedies" grounded in the Supreme Court's "enforcement clause" jurisprudence are "foreign to Section 2 jurisprudence." Response at 20. The former must apply to the latter, given that the VRA is enforcement legislation. Defendants submit the two can be reconciled by interpreting Section 2 in light of the remedial power Congressed wielded to enact it.

pulled to elucidate its meaning. These arguments do not challenge *Gingles* or *Milligan*, and the Senate Factors still apply. *Contra* Response at 26, 28.

Defendants' point is that the Senate Factors, by themselves, neither define the phrase "less opportunity … to *participate* in the political process," nor state how much evidence is required to make such a showing. 52 U.S.C. 10301(b) (emphasis added). Where the challenged electoral system is not "equally open," the Senate Factors, though "neither comprehensive nor exclusive," *Thornburg v. Gingles*, 478 U.S. 30, 45 (1986), should "confirm liability," *Veasey v. Abbott*, 830 F.3d 216, 306 (5th Cir. 2016) (en banc) (Jones, J., concurring in part and dissenting in part).

Plaintiffs refuse to engage with *Whitcomb* and *White* or even acknowledge that Section 2's text finds its source in those two decisions. Because the phrase "participate in the political process" "is obviously transplanted from another legal source," standard rules of statutory interpretation mandate that "it brings the old soil with it." *Taggart v. Lorenzen,* 139 S. Ct. 1795, 1801 (2019). Thus, *Whitcomb* and *White* inform what the text means. Courts have recognized this for decades. In *Chisom v. Romer*, the Supreme Court observed that Section 2's results test "is meant to restore the pre-*Mobile* standard … employed in *Whitcomb* … and *White*." 501 U.S. at 394 n.21 (quoting S. Rep. No. 97-417, at 27 (1982), and *Thornburg v. Gingles*, 478 U.S. 30, 83-94 (1986) (O'Connor, J., concurring in judgement)); *see also id.* at 397-98. The Court emphasized that Section 2 plaintiffs must show not only "the

11

inability to elect representatives of their choice" but *also* that "the members of the protected class have less opportunity to participate in the political process." *Id.* at 397. Plaintiffs do not address this conclusion from *Chisom*.[8]

*Whitcomb* and *White* speak with a unified voice: "less opportunity … to participate in the political process" means "being denied access to the political system," *Whitcomb*, 403 U.S. 124, 155 (1971), in other words, being excluded "from effective participation in political life," *White*, 412 U.S. 755, 769 (1973).

In *White*, black voters of Dallas County, Texas, voted Democrat, but a combination of at-large elections and a "white-dominated organization … in effective control of Democratic Party candidate slating" shut them out. 412 U.S. at 766-67. Likewise, the Mexican-American residents of Bexar County were excluded from "effective participation" due to "cultural incompatibility … conjoined with the poll tax and the most restrictive voter registration procedures in the nation." *Id.* at 768-69. This explained why their "voting registration remained very poor in the county" and why the county's "delegation in the House was insufficiently responsive to Mexican-American interest." *Id.* at 768.

---

[8] Also, the lower courts have widely acknowledged that Congress, when amending section 2, "scrap[ped] the 'intent' test imposed by *City of Mobile v. Bolden*" and "insert[ed] in its place the 'results' test earlier adumbrated in *White v. Regester* and *Whitcomb v. Chavis*." *Uno v. City of Holyoke*, 72 F.3d 973, 982 (1st Cir. 1995); *see also Johnson v. DeSoto Cnty. Bd. of Com'rs*, 204 F.3d 1335, 1346 n.23 (11th Cir. 2000); *Nipper v. Smith,* 39 F.3d 1494, 1517 (11th Cir. 1994) (en banc) (plurality opinion); *Chapman v. Nicholson*, 579 F. Supp. 1504, 1506-07 (N.D. Ala. 1984).

In *Whitcomb*, black voters in Marion County, Indiana, faced electoral defeat year after year, but there was no evidence that they suffered an unequal "opportunity to participate and influence the selection of candidates and legislators." 403 U.S. at 149, 153. That's because nothing in the record suggested they were not "allowed" to register and vote, choose the party they desired to support, participate in its affairs, and have an equal vote when the party's candidates were chosen. *Id.* at 149-50.

All three minority groups—black voters in Dallas County, Mexican-Americans in Bexar County, and black residents in Marion County—experienced socioeconomic disparities and persistent political defeat. But the political process was closed to two and open to one. The difference was that the black residents in Marion County had access to those traditional means of political participation like registering, voting, and engaging in the activities of their preferred political party, while their Texas counterparts did not. Thus, plaintiffs alleging that an electoral system is not equally open must establish the bare minimum—that they face *more inequality* in terms of those traditional methods of participation than did black Indianians in 1960s Marion County. If they cannot, then they necessarily fail to state a claim.

Plaintiffs have not alleged that the political system is more closed to black voters of 2020s Alabama than it was for black residents of 1960s Marion County. Thus, their Section 2 claim should be dismissed.

## CONCLUSION

The Amended Complaint should be dismissed.

        Steve Marshall
          *Attorney General*

        *s/ Edmund G. LaCour Jr.*
        Edmund G. LaCour Jr. (ASB-9182-U81L)
          *Solicitor General*

        James W. Davis (ASB-4063-I58J)
          *Deputy Attorney General*

        Soren Geiger (ASB-0336-T31L)
          *Assistant Solicitor General*

        Misty S. Fairbanks Messick (ASB-1813-T71F)
        Brenton M. Smith (ASB-1656-X27Q)
        Benjamin M. Seiss (ASB-2110-O00W)
        Charles A. McKay (ASB-7256-K18K)
          *Assistant Attorneys General*

        OFFICE OF THE ATTORNEY GENERAL
        STATE OF ALABAMA
        501 Washington Avenue
        P.O. Box 300152
        Montgomery, Alabama  36130-0152
        Telephone: (334) 242-7300
        Fax: (334) 353-8400
        Edmund.LaCour@AlabamaAG.gov

        Soren.Geiger@AlabamaAG.gov
        Jim.Davis@AlabamaAG.gov
        Misty.Messick@AlabamaAG.gov
        Brenton.Smith@AlabamaAG.gov
        Ben.Seiss@AlabamaAG.gov
        Charles.McKay@AlabamaAG.gov

        ***Counsel for Secretary of State Allen***

        *s/ Dorman Walker*
        Dorman Walker (ASB-9154-R81J)

BALCH & BINGHAM LLP  
Post Office Box 78 (36101)  
105 Tallapoosa Street, Suite 200  
Montgomery, AL 36104  
Telephone: (334) 269-3138  
Email: dwalker@balch.com  

Michael P. Taunton (ASB-6853-H00S)  
BALCH & BINGHAM LLP  
1901 Sixth Avenue North, Suite 1500  
Birmingham, AL 35203  
Telephone: (205) 226-3451  
Email: mtaunton@balch.com  

***Counsel for Sen. Livingston and Rep. Pringle***

## CERTIFICATE OF SERVICE

I certify that on March 21, 2024, I electronically filed the foregoing notice with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

s/    Edmund G. LaCour Jr.
Counsel for Secretary Allen
