FILED
2024 Aug-07  PM 06:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

# REPLY REPORT OF MAXWELL PALMER, PH.D.

1. My name is Maxwell Palmer. I am currently an Associate Professor of Political Science at Boston University. I previously submitted a report in this matter on May 17, 2024. In that report I found strong evidence of racially polarized voting across the state of Alabama. Black and White voters consistently support different candidates. I also found strong evidence of racially polarized voting in each of the seven individual congressional districts under SB 5, the plan passed by the state legislature in 2023. I found that Black-preferred candidates are largely unable to win elections in Alabama, and are only regularly successful in majority-minority districts. Finally, I analyzed eight illustrative maps and found that Black-preferred candidates are consistently able to win elections in both majority-minority congressional districts in each of those maps.

2. I have been asked to respond to the reports of Dr. Hood and Dr. Bonneau in this matter. Neither Dr. Hood nor Dr. Bonneau dispute:

   - My racially polarized voting analysis, including the data used, methodology, interpretation of the results, and my conclusion that there is a strong and consistent pattern of racially polarized voting across Alabama and in each congressional district.

   - My analysis of the performance of Black-preferred candidates, and my conclusion that Black-preferred candidates are rarely able to win elections outside of majority-minority districts.

   - My analysis of eight illustrative maps, and my conclusion that Black-preferred candidates would be able to win elections in the two majority-minority districts in each map.

3. Indeed, Dr. Hood offers no opinions at all on my report. Dr. Bonneau offers no criticisms of my methodology or conclusions.

4. I was also asked to evaluate the performance of the majority-minority districts in Plaintiffs' Illustrative Map 9. I find that Black-preferred candidates are consistently able to win elections in both majority-minority congressional districts under this map.

# Comments on Dr. Hood's Report

5. In Section V, Dr. Hood presents data on the performance of Dr. Ben Carson in the 2016 Republican Primary for President. Dr. Hood notes that Carson received 10.2% of the vote in Alabama. Carson ranked fourth in the primary, behind Donald Trump, Ted Cruz, and Marco Rubio; 90% of the voters in Alabama's Republican primary preferred a different candidate. Dr. Hood does not conduct any further analysis of Carson's

performance in Alabama, such as if he performed especially well in certain parts of the state or if he was the preferred candidate of any group of voters.

6. In Section VI, Dr. Hood asks "Are white voters willing to vote for minority Republican candidates?" It is not clear why this question is relevant to the voting rights of Black voters. However, the evidence presented by Dr. Hood does not show that White voters are equally willing to support Black candidates as they are White candidates in Republican primaries. Rather, Dr. Hood shows only that in a few select cases, Black candidates won a Republican primary against a White candidate.

7. A more complete look at the evidence shows that Black candidates are rarely successful in Republican primaries. Dr. Hood provides the example of Senator Tim Scott, who won the Republican primary for Senate in South Carolina in 2014.[1] Senator Scott is the exception, not the rule. For the 2022 redistricting cycle, the South Carolina Senate Judiciary Committee produced a data set of all candidates for state and county office in South Carolina from 2012 to 2020. Over this time period, 664 candidates ran in a contested Republican primary for 266 offices. Fifteen of these primaries included at least one White candidate and at least one Black candidate. In only two of these primaries, the 2014 primary for U.S. Senate (where Tim Scott won) and the 2016 primary for State House District 31, a Black candidate defeated a White candidate. In the other 13 cases, a White candidate was victorious.[2]

8. Dr. Hood also provides the example of Alabama State Representative Kenneth Paschal, a Black Republican who came in second to a White Republican in a 2021 special Republican primary election, defeated a White Republican in the special runoff election, and then defeated a White Democrat in the following special election in House District 73. As a special election, turnout was extremely low. In the Republican primary, 3,004 votes were cast across five candidates; Paschal received 27% of the vote to 31% of the vote for the leading White candidate.[3] Turnout in the runoff election was even lower (2,891 votes); Paschal won by 63 votes.[4] The fact that one Black candidate was successful in one special Republican primary runoff is not evidence that White voters consistently support minority candidates in Republican primaries in Alabama.

9. Furthermore, Rep. Paschal's success is the exception for Black candidates in Republican primaries in Alabama. A more complete look at primary candidates shows that Black Republicans are rarely successful. There were ten Black candidates in the 2022 and 2024 Republican primaries in Alabama.[5] Two ran for statewide office in 2022, two ran

---

[1]Scott was the incumbent at the time, having been appointed to the seat in 2013 by Governor Nikki Haley.

[2]In the 2016 primary for State House District 31, the Black candidate, Michael A. Fowler, won with 282 of only 479 votes cast; Fowler lost the general election with 23% of the vote. There were also two Republican primaries, for State House District 15 in 2016 and 2018, where both candidates were Black.

[3]https://www.sos.alabama.gov/sites/default/files/election-2021/Certification%20of%20Primary%20Results.pdf

[4]https://www.sos.alabama.gov/sites/default/files/election-2021/HD73_Republican_Party-Certification_of_Results-Special_Primary_Runoff_Election.pdf

[5]I analyzed candidates in the regular primary and runoff elections and did not examine special elections. However, there was at least one state legislative special election in 2024 where a Black candidate ran and lost

for state representative in 2022, and six ran for U.S. Congress in 2024. Nine of the ten Black Republican candidates lost to a White candidate in their primary elections. One Black candidate, Christian Horn, won the primary election for the majority-Black 7th Congressional District in 2024 against a White opponent with 58% of the vote.[6]

# Comments on Dr. Bonneau's Report

10. Dr. Bonneau finds that "African American candidates either perform as well as or outperform White candidates of the same political party in judicial, state legislative, and congressional elections in Alabama" (Bonneau at 45). This conclusion is based on incorrect data and misinterpretation of statistical results. After correcting Dr. Bonneau's data and reanalyzing his results, I find no evidence that Black candidates outperform White candidates of the same party in Alabama. Indeed, I find strong evidence that Black candidates receive fewer votes than White candidates of the same party.

11. Dr. Bonneau begins his analysis with elections for the Alabama Supreme Court since 2000. He conducts two regression analyses.[7] First, he examines the relationship between the vote share of the Democratic candidate in each contest and the percentage of the registered voters in each county who are Black (Bonneau at 11–12). While his empirical estimates are incorrect due to flaws in his data (described below), his results are otherwise unremarkable; Dr. Bonneau simply finds evidence that Black and White voters prefer different candidates in these elections.

12. Dr. Bonneau's second statistical analysis of Supreme Court candidates uses a multivariate regression model to compare the performance of Black and White Democratic candidates from 2010 to 2020, conditional on the percentage of the registered voters in each county who are Black (Bonneau at 13). Dr. Bonneau estimates that "African American candidates perform 4.3 percentage points better than White candidates." There are two critical errors in this analysis. First, the 4.3 percentage point difference that Dr. Bonneau estimates is not statistically significant. In other words, this difference, as estimated by Dr. Bonneau, may be due to randomness, and he cannot conclude that Black candidates perform meaningfully better than White candidates in these elections.

13. Second, there is a major error in Dr. Bonneau's data. Dr. Bonneau incorrectly includes three uncontested elections where there is no Democratic candidate, and in all three elections the nonexistent losing Democratic candidate is coded as White. These three elections are the reason why Dr. Bonneau's estimate for the difference in vote shares

---

in a Republican primary.

[6]Horn unofficially withdrew from the contest before the primary, and was replaced on the ballot by his opponent for the general election. https://1819news.com/news/item/cd-7-gop-primary-candidate-who-won-after-dropping-out-of-race-says-system-is-rigged-and-racist

[7]Dr. Bonneau also presents partial data on campaign expenditures in Supreme Court elections (Bonneau at 9 and Table 2). It is not clear how this analysis relates to the preferences of voters for candidates of different races. Furthermore, Dr. Bonneau's data is missing three contested elections (the three contests in 2010 listed in Dr. Bonneau's Appendix A), and he incorrectly records Donna Wesson Smalley, the Democratic candidate in 2018, as Black.

between Black and White Democratic candidates is positive. By including three non-existent White candidates who received 0% of the vote, the average vote for White Democrats is substantially reduced. Fixing this error dramatically changes the results: the estimated difference between Black and White candidates is -10.1 percentage points, and is highly statistically significant.[8] In other words, fixing the error in Dr. Bonneau's data demonstrates the exact opposite of Dr. Bonneau's initial conclusion: Black Democratic candidates for the Supreme Court receive significantly lower vote shares, on average, than White Democratic candidates.

14. Moreover, a more careful analysis may help us better understand why this relationship emerges. I conducted a racially polarized voting analysis, as described in my prior report, using ecological inference models and Dr. Bonneau's county-level election data for six contested Supreme Court elections since 2010.[9] I find that Black and White voters in all six elections are sharply polarized. Black voters have a clear preferred candidate in each election, and White voters strongly oppose this candidate. Most notably, for the five elections where the Black-preferred candidate is a White Democrat, on average 21.6% of White voters supported this candidate, while in the one election where the Black-preferred candidate was Black, only 9.5% did so.[10] White voters supported White Democratic candidates at twice the rate that they supported the one Black Democratic candidate. Table 1 presents the full results of the ecological inference analysis.

15. Dr. Bonneau then turns to state legislative elections. He compares vote shares for Democrats who lost contested seats for the legislature in 2022 by the race of the candidate, and finds that Black Democrats received higher vote shares than White Democrats for both State House and State Senate elections (Bonneau at 14–15). While there are several issues with this analysis, the simplest is that the differences in vote shares that Dr. Bonneau reports are not statistically significant.[11] Using Dr. Bonneau's data and a simple t-test for a difference in means, neither the difference in vote shares for Black and White Democrats running for House nor Senate are statistically significant. In other words, we cannot reject the hypothesis that there is no differences in vote shares at all, and Dr. Bonneau cannot conclude that Black candidates perform meaningfully

---

[8]While I simply replicate Dr. Bonneau's analysis here, with corrections to his data, I do not endorse his methodology as the best way to assess differences in the performance of Black and White candidates. As discussed below, differences across candidates and elections make such comparisons difficult. Furthermore, this analysis simply compares the vote shares of candidates conditional on the percentage of the registered voters in each county who are Black; this analysis does not allow us to identify if support for Black and White candidates varies by racial group.

[9]I analyze six of the seven contested elections. I exclude the 2012 contest for Chief Justice, as Dr. Bonneau's data is missing data for 33 of the 67 counties.

[10]Across the Black-preferred candidates, the estimated difference between the support for the Black candidate and each of the five White candidates is statistically significant.

[11]Additionally, as discussed below, Black and White Democrats may be running in very different districts with very different characteristics, making such comparisons invalid. Furthermore, Dr. Bonneau uses county-level data, rather than district-level data. This means that a candidate running in a district contained within one county will appear in the data once, while another candidate running in a district spanning multiple counties will have several observations (up to 8) in the data. This artificially inflates the sample size (from 25 to 48 in the House, and from 8 to 23 in the Senate), and gives some candidates greater weight than others.

better than White candidates in these elections.

16. Dr. Bonneau mentions one important constraint on this analysis: "It is important to remember that in state legislative races, unlike statewide races, the electorate and candidates for each seat are unique" (Bonneau at 16). Candidates running in very different districts will be different from each other, face different kinds of opponents, compete for voters from different electorates, and run different campaigns. Comparisons across these differences are challenging, and Dr. Bonneau does not show that such comparisons have any validity.

17. While Dr. Bonneau acknowledges the value of statewide elections, he does not evaluate any non-judicial statewide elections. However, Black and White Democratic candidates running for statewide office at the same time offer a much better comparison than legislative elections in different parts of the state. In 2018, seven statewide offices were contested (Governor, Lieutenant Governor, Attorney General, Secretary of State, State Auditor, Chief Justice of the Supreme Court, and Associate Justice of the Supreme Court). The Democratic candidates for Lieutenant Governor and State Auditor were Black, and the other five Democratic candidates were White. While comparisons across candidates are imperfect (as each candidate is different and faces a different opponent), the performance of these candidates and differences in their support from Black and White voters are revealing.[12]

18. At the top of the ballot, the White Democratic candidate for Governor, Walt Maddox, received 40.4% of the vote, 1.7 percentage points more than Will Boyd, the Black Democratic candidate for Lieutenant Governor. Furthermore, the ecological inference estimates for these elections in my prior report show that the difference is due to lower support for Boyd from White voters. I estimated that 23.9% of White voters supported Maddox and 18.6% of White voters supported Boyd, a difference of 5.3 percentage points. This difference is statistically significant. In contrast, I estimated that 91.5% of Black voters supported Maddox and 93.1% supported Boyd, a difference of 1.6 percentage points which is not statistically significant.

19. While there is variation across the other candidates, on average Black voters supported the Black and White Democratic candidates with the same percentages of the vote, while White voters averaged 2.2 percentage points higher for White Democrats than for Black Democrats.[13]

20. Dr. Bonneau presents a few anecdotes from state legislative elections as supposed evidence of the importance of party or the lack of importance of race in election

---

[12]I examined elections from 2018 because that is the only year from 2016 to 2022, the years analyzed in my prior report, where some of the statewide Democratic candidates were Black and some were White. In 2016, 2017, and 2020, all of the statewide Democratic candidates were White, and in 2022 all of the statewide Democratic candidates were Black.

[13]The differences in vote shares for Black and White candidates for Black voters were not statistically significant. For White voters, the differences in their support for the candidates for Governor, Attorney General, and Chief Justice of the Supreme Court were statistically significant, and in no case was the estimated vote share of a Black Democratic candidate statistically significantly higher than the estimated vote share of a White Democratic candidate.

outcomes. He highlights a case where a White Democrat defeated a Black Democrat in a primary election in a district that was 55% Black (Bonneau at 17). Dr. Bonneau argues that "while the data cannot tell us the reasons why voters in House District 74 selected the candidate they did the data do indicate that the race of the candidate was not a factor in an African American candidate losing either the Democratic primary." This statement is incorrect. First, the only data Dr. Bonneau presents are the percent of the district population that was Black, the vote share of the winning candidate, and the race of the candidates. He conducts no analysis of voting patterns, turnout, or vote choice in the primary, and presents no other information about the dynamics of this election. Similarly, Dr. Bonneau mentions Rep. Paschal's victory in HD 73 (discussed above). Without presenting any evidence about the election other than Paschal's vote share in the general election, Dr. Bonneau claims that "this illustrates that voters do make selections based on the candidate's positions as well as their political party affiliation" (Bonneau at 18). Dr. Bonneau has no evidence to support this claim, and there is no evidence or discussion in his report about the role of a candidate's positions on vote choice.

21. The above analyses demonstrate that Dr. Bonneau does not have any empirical evidence that Black candidates perform as well as or better than White candidates of the same party. Dr. Bonneau also argues that the use of straight ticket voting in Alabama "indicates that the race of the candidates for either party did not matter" because "voters were not voting for individual candidates." (Bonneau at 4) However, this assertion is unsupported, and contradicted by the above analyses. One possibility is that the voters who do not utilize straight ticket voting make significantly different choices based on the race of the candidates, such that on average we observe the substantial differences discussed above. Alternatively, straight ticket voting allows voters to override their initial partisan choice for individual ballot items, such that the use of straight ticket voting does not ensure that the voter did not still select specific candidates of another party. Without seeing the actual ballot images, the simple use of straight ticket voting is not enough to tell us that voters are not voting for individual candidates, let alone their reasons for doing so.

22. Dr. Bonneau provides a minimal analysis of congressional elections in Alabama by analyzing the correlation between the Democratic vote share and the percentage of the population that was Black in each congressional district. Dr. Bonneau uses this correlation alone to conclude that "political party is driving these election results, not race" (Bonneau at 23). This conclusion is unfounded. It simply shows that Black voters supported Democratic candidates in these elections, not what factors cause Black voters to choose which candidates to support. Furthermore, using a single correlation (with six observations) to tell a "story" is not the standard for reaching conclusions in empirical research in political science, nor for ruling out other explanations.

23. Implicit in Dr. Bonneau's incorrect conclusion about the role of party is his assumption that the effects of race and party are separable. In other words, Dr. Bonneau assumes (without any evidence) that an individual's race and an individual's political party are two separate and independent factors that influence vote choice. A long literature in

political science about how voters develop partisan attachments and make decisions about voting shows the opposite: an individual's background, including their race, is a key factor in their politics and party preferences.[14] This means that even if members of a racial group strongly support candidates of a single party, race, as a key factor in driving their support for that party, is an inseparable part of their support for those candidates. If race causes party, then we can't find that party alone, without race, can cause vote choice. Due to the fundamental linkage of race and party, the effects of the two cannot be separated. In other words, the strong support of Democratic candidates by Black voters cannot be attributed to partisan preferences alone, but to a mix of personal and political factors and experiences of which race is an essential part.

24. Finally, Dr. Bonneau offers no substantive criticism of my racially polarized voting analysis. He raises one specific criticism of ecological inference, writing "there is a significant inferential limitation: EI cannot tell us about the reasons behind the observed (inferred) data. . . even if we were to grant that EI is 100% accurate in recovering individual-level behavior from aggregate data, that data would still not tell us why we observe what we observe" (Bonneau at 25). Dr. Bonneau is correct in this observation, but it is a broad criticism of most observational research, not of ecological inference in particular. Indeed, this criticism applies equally to Dr. Bonneau's regression analyses and other results. Furthermore, answering the question of "why we observe what we observe" is not the purpose of ecological inference, nor is it part of a racially polarized voting analysis. The purpose of a racially polarized voting analysis is to determine *if voters of a minority group are politically cohesive* and *if the white majority votes as a bloc to defeat the minority-preferred candidate.* Such determinations do not require understanding why racial bloc voting occurs, only if such voting occurs.

# Performance of the Majority-Minority Congressional Districts in Plaintiffs' Illustrative Map 9

25. I also analyzed the performance of Black-preferred candidates for the versions of CD 2 and CD 7 in Plaintiffs' Illustrative Map 9 by calculating the percentage of the vote won by the Black-preferred candidates across the 17 statewide races from 2016 through 2022. I find that both districts perform for Black-preferred candidates. In both districts the Black-preferred candidate won all 17 elections, with an average of 57% of the vote in CD 2 and 64% of the vote in CD 7. Table 2 provides the full results of this analysis.

---

[14]See, for example, Dawson, Michael C. *Behind the mule: Race and class in African-American politics.* Princeton University Press, 1995; Dawson, Michael C. *Black visions: The roots of contemporary African-American political ideologies.* University of Chicago Press, 2001; Jardina, Ashley. *White identity politics.* Cambridge University Press, 2019; White, Ismail K., and Chryl N. Laird. *Steadfast democrats: How social forces shape Black political behavior.* Princeton University Press, 2020; Hood III, Morris V., Quentin Kidd, and Irwin L. Morris. *The rational southerner: Black mobilization, republican growth, and the partisan transformation of the American south.* Oxford University Press, 2014.

8

I reserve the right to supplement my report in this case in light of additional facts, testimony, and/or materials that may come to light.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*Maxwell Pal*

Maxwell Palmer

Executed this 31st day of July, 2024, at Wellfleet, Massachusetts.

8

**Table 1:** Ecological Inference Results — Supreme Court Elections — County Data

| Year | Winner | Loser | Black | White | Other |
|------|--------|-------|-------|-------|-------|
| 2010 | Parker | Parsons | 89.6% (84.5, 94.9) | 23.4% (21.3, 25.3) | 52.6% (19.8, 84.9) |
|      | Bolin | Edwards | 81.5% (67.9, 94.7) | 20.9% (15.7, 26.5) | 53.1% (15.9, 92.1) |
|      | Wise | Chambers | 84.5% (74.3, 92.0) | 19.6% (16.5, 23.3) | 54.6% (23.0, 90.0) |
| 2018 | Parker | Vance | 93.7% (85.8, 98.3) | 22.2% (19.9, 25.5) | 64.1% (32.8, 89.2) |
|      | Mitchell | Smalley | 83.3% (72.8, 89.4) | 22.0% (18.9, 26.1) | 59.9% (20.7, 90.8) |
| 2022 | Cook | Kelly* | 90.2% (86.9, 93.1) | 9.5% (8.4, 10.6) | 69.0% (46.7, 88.6) |

* Indicates that the candidate was Black.

**Table 2:** Vote Share of Black-Preferred Candidates — Illustrative Map 9

|      |                       | CD 1  | CD 2  | CD 3  | CD 4  | CD 5  | CD 6  | CD 7  |
|------|-----------------------|-------|-------|-------|-------|-------|-------|-------|
| 2016 | U.S. President        | 23.4% | 56.8% | 31.7% | 20.1% | 31.0% | 23.5% | 61.4% |
|      | U.S. Senator          | 24.1% | 55.3% | 32.3% | 23.1% | 31.6% | 24.0% | 60.1% |
| 2017 | U.S. Senator          | 36.4% | 67.3% | 45.8% | 33.5% | 48.7% | 42.2% | 74.1% |
| 2018 | Attorney General      | 29.1% | 60.3% | 36.3% | 28.0% | 36.7% | 30.4% | 65.8% |
|      | State Auditor         | 27.1% | 58.8% | 34.8% | 25.1% | 36.1% | 28.5% | 64.4% |
|      | Governor              | 27.4% | 57.9% | 34.6% | 26.9% | 36.8% | 31.6% | 66.1% |
|      | Lt. Governor          | 26.2% | 58.0% | 34.0% | 24.1% | 34.8% | 27.8% | 64.3% |
|      | Supreme Ct., Place 4  | 26.6% | 58.4% | 34.5% | 25.5% | 36.1% | 28.3% | 64.8% |
|      | Supreme Ct., Chief    | 29.3% | 61.3% | 37.2% | 27.8% | 38.6% | 34.5% | 67.2% |
|      | Sec. of State         | 26.5% | 58.0% | 34.3% | 24.4% | 35.5% | 28.2% | 64.0% |
| 2020 | U.S. President        | 25.1% | 57.2% | 33.0% | 21.1% | 34.1% | 27.5% | 63.6% |
|      | U.S. Senator          | 28.6% | 59.4% | 35.4% | 24.5% | 37.2% | 30.2% | 65.3% |
| 2022 | Attorney General      | 19.9% | 52.2% | 26.7% | 16.7% | 29.2% | 23.5% | 60.2% |
|      | Governor              | 18.3% | 50.8% | 25.1% | 14.9% | 26.6% | 21.3% | 59.5% |
|      | Supreme Ct., Place 5  | 20.4% | 52.9% | 27.3% | 17.2% | 30.0% | 23.5% | 60.5% |
|      | Sec. of State         | 19.6% | 53.0% | 26.5% | 16.4% | 29.1% | 23.1% | 60.6% |
|      | U.S. Senator          | 19.1% | 51.7% | 26.3% | 16.5% | 28.6% | 23.1% | 60.2% |