IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| BOBBY SINGLETON, et al.,   )<br>)<br>   *Plaintiffs*,           )<br>)<br>v.                                   )<br>)<br>WES ALLEN, in his official )<br>capacity as Alabama Secretary of )<br>State, et al.,             )<br>)<br>   *Defendants*.          ) | Case No.: 2:21-cv-1291-AMM<br><br>**THREE-JUDGE COURT** |

| | |
|---|---|
| EVAN MILLIGAN, et al.,    )<br>)<br>   *Plaintiffs*,           )<br>)<br>v.                                   )<br>)<br>WES ALLEN, in his official )<br>capacity as Secretary of State of )<br>Alabama, et al.,          )<br>)<br>   *Defendants*.          ) | Case No.: 2:21-cv-01530-AMM<br><br>**THREE-JUDGE COURT** |

| | |
|---|---|
| MARCUS CASTER, et al.,  )<br>)<br>   Plaintiffs,           )<br>)<br>v.                                   )<br>)<br>WES ALLEN, in his official )<br>Capacity as Alabama Secretary of )<br>State, et al.,             )<br>)<br>   Defendants.          ) | Case No.: 2:21-cv-01536-AMM |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE**
(*MILLIGAN* DOC. 416, *CASTER* DOC. 323)

The *Milligan* and *Caster* Plaintiffs move to exclude portions of the testimony of Defense expert Dr. Wilfred Reilly, a political scientist.[1] Specifically, they seek to exclude opinions comparing socioeconomic statistics for regions at issue in this case and examining census data related to the "Great Migration." They claim that Dr. Reilly is not qualified to express opinions on what is and is not a community of interest.

But Defendants are not offering Dr. Reilly as an expert on redistricting. He is instead, in the challenged portion of his testimony, using his expertise in political science and statistics to examine census and other data related to Mobile County, Mobile City, Baldwin County, and Black Belt Counties. Specifically, he examined Alabama Department of Labor data to explore who is commuting into Mobile County and from which counties, and to which other counties Mobile County residents are commuting. He then examines population density, per capita income, and crime rates to explore similarities and dissimilarities of counties in the region. Finally, Dr. Reilly examines census data with respect to the Great Migration to see if that data supports a view that Black Alabamians were relocating from rural areas

---

[1] The *Singleton* plaintiffs later joined in the motion. *See Singleton* doc. 272; *Milligan* doc. 421; *Caster* doc. 325.

2

to Mobile. Dr. Reilly's experience and expertise in data analysis, statistics, and political science qualify him to express opinions on this data.

### A.  Standard for Expert Testimony

To admit expert testimony, a court must find that (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). An expert may be qualified in a variety of ways, including scientific training, education, or experience in the field. *See Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 851 (11th Cir. 2021).

### B.  As an expert in political science and statistics, Dr. Reilly is qualified to compare socioeconomic metrics among counties and regions.

Dr. Reilly has a Ph.D. in political science and teaches at Kentucky State University, including courses on statistics. He describes his core expertise as "statistics, international relations, race and ethnic group relations, public law, and

theory." Reilly depo. at 20.[2] A focus of his research (and his report in this case) has been a study of socioeconomic gaps among racial groups and their causes. Reilly Report at 1. Such work naturally involves evaluating data, which is what Dr. Reilly does here. And, in another Alabama redistricting case, he was very recently admitted without objection as an expert "in political science, statistics, race relations, and a study of the impact of racial discrimination on socioeconomic gaps." *Ala. State Conf. of the NAACP, et al., v. Allen*, Case No. 2:21-cv-1531 (N.D. Ala.), Trial Tr. 779:20-780:1.[3]

The first question Dr. Reilly addresses is: "Are there many 'shared commonalities' between the City of Mobile (AL) and the Black Belt counties of Alabama, and are these characteristics that Mobile does not share with Mobile

---

[2] Dr. Reilly's expert report, his deposition in this case, and his deposition in *Stone v. Allen* were filed in *Caster* as docs. 323-1, 323-2, and 323-3, respectively. The same exhibits were filed in *Milligan* as docs. 416-1, 416-2, and 416-3, respectively.

[3] Plaintiffs seem to argue that experts must have experience in the venue state to be credible. *Caster* doc. 416 at 5 (citing cases where courts credited experts and noted their previous redistricting work in the venue states of Georgia and Alabama); *Milligan* Doc. 323 at 5 (same). But these cases do not support that argument. In the first, *Alpha Phi Alpha Fraternity Inc. v. Raffensberger,* 700 F. Supp. 3d. 1136, (N.D. Ga. 2023), immediately after crediting the testimony of an expert witness who had experience "particularly in Georgia," the court found credible an expert with no apparent Georgia experience, *id*. at 1209 (finding the testimony of Dr. Lisa Hadley "truthful and reliable"); *see also Singleton v. Merrill*, 582 F. Supp 3d 924, 1005 (N.D Ala. 2022) (crediting Bill Cooper, who had redistricting experience "particularly in Alabama," and Dr. Moon Duchin, who did not at that time). Likewise, Plaintiffs draw a false parallel between *Ala. State Conf. of NAACP v. Alabama*, 612 F. Supp 3d 1232 (M.D. Ala. 2020), in which the court held the NAACP's expert was not qualified to testify about "the subjective voting motivations of Alabamians" where among other flaws he did not "know[] any Alabama voter outside those he worked with professionally on this case," 612 F. Supp. 3d232, and this case. Dr. Reilley's proper analysis of census data—and Plaintiffs never challenge the accuracy of the data he presents—does not depend on his knowing Alabamians.

County and with neighboring Baldwin County?" Reilly Report at 5. He reviews commuting patterns to see that 12.8% of people who work in Mobile County commute in from Baldwin County, the largest source of workers outside Mobile County itself, while no other county supplies more than 1.5% of the Mobile County workforce. Reilly Report at 6. In fact, 24.8% of Baldwin County workers commute to Mobile County. *Id.* at 6 n.14. Similarly, more Mobile County residents who commute to other counties work in Baldwin County (8%) than any other, with no more than 1.5% of Mobile residents commuting to any other single county. *Id.* at 8.

Dr. Reilly then looks at population density using census data. He finds that the City of Mobile has a population density of 1,341 persons per square mile and compares that to the population density of Mobile County as a whole (337), Baldwin County (145.8) and the average Black Belt county (40.98 with Montgomery County, 26.25 without). *Id.* at 9-10. He compares per-capita income of Mobile City ($31,328), Mobile County ($30,482), Baldwin County ($38,907) and the average Black Belt County ($24,433). Then, using 2022 murder rates as an indicator of violent crimes,[4] Dr. Reilly notes that Mobile and Baldwin County, with double-digit murders that year, look little like Black Belt counties (except perhaps Montgomery County) when it comes to crime rates. *Id.* at 9-11. As Dr. Reilly notes, these metrics

---

[4] Plaintiffs argue that Dr. Reilly did not explain why he used murder rates, ignoring his citation to an academic article in support of using murder rates as an indicator of violent crime rates. Reilly Report at 11 n.23.

5

(population density, per capita income, and crime rates) are frequently used in the social sciences to compare similarities and dissimilarities among geographical regions. Reilly Report at 7 n.15. And finally, using unemployment and "Help Wanted" data from the Alabama Department of Labor, Dr. Reilly noted that there was little overlap in professions when comparing workers in Mobile and Baldwin County to those in Barbour County.[5]

None of this analysis requires extensive prior knowledge of the State. Dr. Reilly's expertise in using socioeconomic data qualifies him to examine it here and express opinions on whether (based on the criteria examined) Mobile city has more in common with Mobile and Baldwin Counties or the Black Belt.

### C. As an expert in political science and statistics, Dr. Reilly is qualified to opine on whether census data provides evidence of migration into Mobile.

Another question Dr. Reilly explored is: "How strong are historical ties between Mobile and the Black Belt – i.e., are many or most Mobile city residents former residents of the Black Belt?" Reilly Report at 5. For this, Dr. Reilly reviewed census reports on the "Great Migration" and its effect on the Black populations of various cities. Between 1910 and 1940, the Black population of Mobile dropped 7.3%, and it dropped another 1.5% between 1940 and 1970. *Id.* at 14. Montgomery

---

[5] Plaintiffs criticize Dr. Reilly for not reviewing unemployment and "Help Wanted" data for additional Black Belt Counties, but they will have the opportunity during cross to explore whether other Black Belt counties have more overlap with Mobile.

6

lost 6.4% of its Black population between 1910 and 1940, and another 10.8% between 1940 and 1970. *Id.* This analysis only goes so far, of course. The census data include figures for only larger U.S. cities, not smaller towns such as those in the Black Belt. These data, however, do not provide evidence of a large influx of Black citizens into Mobile or Montgomery from the Black Belt. If one looks at northern cities, however, the Black population rapidly increased during the same period. Between 1940 and 1970, Chicago's Black population grew by 24.6%, Detroit's by 34.5%, Newark's by 43.6%, and Washington, D.C.'s by 42.8%.

While Dr. Reilly described the question as exploring "historical ties," he did so by examining census data, which does not require the expertise of a historian. Once again, this analysis is squarely within Dr. Reilly's wheelhouse.

### D. Plaintiffs' remaining criticisms of Dr. Reilly's report are without merit.

In addition to challenging Dr. Reilly's qualifications to discuss census and similar data, Plaintiffs take a handful of additional shots at his report, but each lacks merit. Plaintiffs contend that Dr. Reilly said he need not provide citations for his opinions, but that is incorrect. The specific opinion in question—that a city can be known for certain industries—was something that Dr. Reilly called a "truism" for which he would not require a citation in a student's paper. Reilly depo. at 138-139. He did not say that citations in general are not required.

Plaintiffs also imply that Dr. Reilly relied exclusively on a Wikipedia page for a definition of the Black Belt. But that isn't all he cited. He cited as well to the Alabama Black Belt Heritage Project. Reilly Report at 12. Plaintiffs seem to disagree with Dr. Reilly's statement that Clarke, Conecuh, Escambia, Monroe, and Washington Counties are not typically considered to be part of the Black Belt, but for purposes of the preliminary injunction hearing in 2022, the Milligan and Caster plaintiffs stipulated that the Black Belt contains "18 core counties" and that "Clarke, Conecuh, Escambia, Monroe, and Washington Counties are *sometimes* included within the definition of the Black Belt." *Caster* doc. 44 ¶34; *Milligan* doc. 53 ¶61 (emphasis added).

Plaintiffs take issue with Dr. Reilly's statement in his deposition, describing his analysis of crime rates, that the "expectation was that although the Black Belt counties [are] heavily minority, poor, might have a higher crime rate than most tiny agrarian counties, that would be nowhere on par with Mobile, for example." Reilly depo. at 145. Plaintiffs argue that Dr. Reilly is relying on a "'powerful racial stereotype' that Black people are 'violence prone.'" *Milligan* doc. 416 at 11. But as Plaintiffs know, Dr. Reilly, who is Black, has made plain that he does not believe any racial group is inferior or more inclined to criminality than any other.

As Dr. Reilly explains, when looking at any gap, whether it is income or education attainment or criminal convictions, there are three schools of thought.

8

Some believe that the only possible explanation is historic or racism. Others–who Dr. Reilly refers to as geneticists and who he describes as "bizarre"—assume the gap is the result of genetics or racial inferiority. Reilly Report at 1. Dr. Reilly does not hold this view, nor do Defendants. A third group, the culturalists, which includes Dr. Reilly, find that "gaps are reduced quite significantly, or even are eliminated entirely, when other relevant variables are (1) actually taken into account and (2) properly adjusted for." *Id.*

Take, for example, gaps among racial groups in SAT scores. White students tend to score higher than Black students, and Asian students tend to out-perform them all. Reilly Report at 19. To say that white students tend not to test as well as Asian students on average is not to say that any racial group is superior to another, and it makes little sense to assume that racism is the cause of a white-Asian test score gap. Dr. Reilly believes that much of the score gap between whites and Asians, and the gap between whites and Blacks, can be explained by study time: "Almost literally every scholar to analyze this question empirically from the political center-on-right (e.g. Fordham and Ogbu 1986; McWhorter 2000; Ogbu 2003; Thernstrom and Thernstrom 2003; Sowell 2005; Chua 2011; Reilly 2020; Sowell 2020) has pointed out that American white students tend to study and prep for school more than American Black students." Reilly Report at 27.

9

Likewise with crime rates. Different racial groups have different rates of "criminality." Whites tend to commit more crimes than Asians, and the Black crime rate is typically 2.4 to 2.5 times the white rate. Reilly depo. at 210; Reilly Report at 27.[6] Plaintiffs' expert Traci Burch acknowledges that racial groups tend to have different rates of criminality and points out that those differences do not perfectly translate to gaps in incarceration rates. Burch Rebuttal Report at 5; Reilly depo. at 211.

That is not at all to say that any person is more likely to commit a crime because of his or race, and Plaintiffs know that Dr. Reilly does not believe it to be so. Reilly depo. at 197 ("I certainly don't think it's genetics or anything like that."); Reily depo. at 210 ("I mean, it's worth noting, by the way, that I'm not a geneticist here."). Dr. Reilly is not relying on racial stereotypes.

### E. Conclusion

Dr. Reilly is amply qualified to discuss the data he examined, and Plaintiffs' other criticisms of his report do not withstand scrutiny. Plaintiffs' motion in limine should be denied.

Respectfully submitted,

Steve Marshall
*Attorney General*

---

[6] The Department of Justice reports violent crime rates among various racial groups, using victim reporting. *See* Thompson, Alexandra and Tapp, Susannah N., "Criminal Victimization, 2022," p. 12, Table 11, available at https://bjs.ojp.gov/document/cv22.pdf (last visited January 8, 2025).

        <u>s/ James W. Davis</u>
Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

Soren Geiger (ASB-0336-T31L)
  *Assistant Solicitor General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*
Richard D. Mink (ASB-4802-M76R)
Misty S. Fairbanks Messick (ASB-1813-T71F)
Brenton M. Smith (ASB-1656-X27Q)
Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Soren.Geiger@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Richard.Mink@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov

***Counsel for Secretary of State Allen***

<u>s/Michael P. Taunton</u>
J. Dorman Walker (ASB-9154-R81J)
BALCH & BINGHAM LLP
Post Office Box 78 (36101)

445 Dexter Avenue, Suite 8000
Montgomery, Alabama 36104
Telephone: (334) 269-3138
DWalker@Balch.com

Michael P. Taunton (ASB-6833-H00S)
Riley Kate Lancaster (ASB-1002-X86W)
BALCH & BINGHAM LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, Alabama 35203
Telephone: (205) 251-8100
MTaunton@Balch.com
RLancaster@Balch.com

***Counsel for Sen. Livington & Rep. Pringle***

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing was filed using the Court's CM/ECF system on January 8, 2025, which will serve all counsel of record.

                                                s/James W. Davis_____
  &nbsn;                                     *Counsel for Secretary of State Allen*