FILED

2025 Jan-31  PM 05:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| BOBBY SINGLETON, et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No.: 2:21-cv-1291-AMM |
| | ) | |
| WES ALLEN, in his official capacity as Alabama Secretary of State, et al., | ) ) ) | **THREE-JUDGE COURT** |
| | ) | |
| *Defendants*. | ) | |

_____

| | | |
|---|---|---|
| EVAN MILLIGAN, et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No.: 2:21-cv-01530-AMM |
| | ) | |
| WES ALLEN, in his official capacity as Secretary of State of Alabama, et al., | ) ) ) | **THREE-JUDGE COURT** |
| | ) | |
| *Defendants*. | ) | |

_____

| | | |
|---|---|---|
| MARCUS CASTER, et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No.: 2:21-cv-01536-AMM |
| | ) | |
| WES ALLEN, in his official Capacity as Alabama Secretary of State, et al., | ) ) ) | |
| | ) | |
| *Defendants*. | ) | |

## PRETRIAL ORDER

A pretrial conference was held in the above cases on January 28, 2025, wherein, or as a result of which, the following proceedings were held and actions were taken:

1.  Appearances. Appearing at the conference were:

    *For Plaintiffs Evan Milligan, Khadidah Stone, Shalela Dowdy, Letetia Jackson, Alabama State Conference of the NAACP, and Greater Birmingham Ministries* ("Milligan Plaintiffs"): Deuel Ross, Davin Rosborough, Kathryn Sadasivan, Brittany Carter, Colin Burke, Theresa Lee, Dayton Campbell-Harris, Laurel Hattix, Sidney Jackson, Nicki Lawsen, David Dunn, Michael Turrill, Shelita Stewart, Harmony Gbe, Amanda Allen, and Jay Ettinger.

    *For Plaintiffs Marcus Caster, Lakeisha Chestnut, Bobby Lee Dubose, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, and Wendell Thomas* ("Caster Plaintiffs"): Abha Khanna, Lali Madduri, Richard Medina, and Alison Ge.

    *For Plaintiffs Bobby Singleton, Rodger Smitherman, Leonette W. Slay, Darryl Andrews, and Andrew Walker* ("Singleton Plaintiffs"): James Uriah Blacksher, U.W. Clemon, Edward Still, Myron Penn, and J.S. "Chris" Christie.

    *For Defendant Wes Allen, in his official capacity as Alabama Secretary of State*: Jim Davis, Soren Geiger, Charles McKay, Misty S. Fairbanks Messick, Richard Mink, Ben Seiss, and Brenton Smith.

    *For Defendants Steve Livingston and Chris Pringle, in their official capacities as Co-Chairs of the Alabama Permanent Legislative Committee on Reapportionment*: Dorman Walker, Michael Taunton, and Riley Kate Lancaster.

2.  Nature of the Action, Jurisdiction and Venue.

    (a)  The nature of this action is as follows: racial vote dilution under Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301

(all Plaintiffs); intentional racial discrimination under the Fourteenth Amendment to the U.S. Constitution (only Milligan and Singleton Plaintiffs); racial gerrymandering under the Fourteenth Amendment to the U.S. Constitution (only Singleton Plaintiffs).

(b)     The court has subject matter jurisdiction of this action under the following statutes, rules, or cases:

<u>Plaintiffs' statement</u>: 28 U.S.C. §§ 1331, 1343, and 1357; 52 U.S.C. §§ 10301, 10302 and 42 U.S.C. § 1983; 28 U.S.C. §§2201 and 2202.

<u>Defendants' statement</u>: 28 U.S.C. §§ 1331, 1343, 2201, 2202; ; 42 U.S.C. §1983; and, 52 U.S.C. §§ 10301, 10302.

(c)     Plaintiffs maintain that all jurisdictional and procedural requirements prerequisite to maintaining this action ***have*** been met.

Defendants agree that all jurisdictional and procedural prerequisites to maintaining this action have been met, except that there is no private right of action to enforce Section 2 of the Voting Rights Act.

(d)     Personal jurisdiction and venue ***are not*** contested.

3.     <u>Parties and Trial Counsel</u>. There are no fictitious parties**.**

The parties and designated trial counsel are correctly named as set out below:

|  | Parties: | Trial Counsel: |
| --- | --- | --- |
| Plaintiffs: | Evan Milligan | Deuel Ross, Davin Rosborough, Kathryn Sadasivan, Brittany Carter, Colin Burke, Theresa Lee, Dayton Campbell-Harris, Laurel Hattix, Sidney Jackson, Nicki Lawsen, David Dunn, Michael Turrill, Shelita Stewart, Harmony Gbe, Amanda Allen, and Jay Ettinger. |
|  | Khadidah Stone | Same Counsel as Mr. Milligan |
|  | Shalela Dowdy | Same Counsel as Mr. Milligan |
|  | Letetia Jackson | Same Counsel as Mr. Milligan |
|  | Alabama State Conference of the NAACP | Same Counsel as Mr. Milligan |
|  | Greater Birmingham Ministries | Same Counsel as Mr. Milligan |
|  | Marcus Caster | Abha Khanna, Lali Madduri, Richard Medina, and Alison Ge. |
|  | Lakeisha Chestnut | Same Counsel as Dr. Caster |
|  | Bobby Lee Dubose | Same Counsel as Dr. Caster |
|  | Benjamin Jones | Same Counsel as Dr. Caster |
|  | Rodney Allen Love | Same Counsel as Dr. Caster |
|  | Manasseh Powell | Same Counsel as Dr. Caster |
|  | Ronald Smith | Same Counsel as Dr. Caster |
|  | Wendell Thomas | Same Counsel as Dr. Caster |
|  | Bobby Singleton | James Uriah Blacksher, U.W. Clemon, Edward Still, Myron Penn, and J.S. "Chris" Christie. |
|  | Rodger Smitherman | Same Counsel as Sen. Singleton |
|  | Leonette W. Slay | Same Counsel as Sen. Singleton |
|  | Darryl Andrews | Same Counsel as Sen. Singleton |
|  | Andrew Walker | Same Counsel as Sen. Singleton |
| Defendants: | Wes Allen, in his official capacity as Alabama Secretary of State | Jim Davis, Soren Geiger, Charles McKay, Misty S. Fairbanks Messick, Richard Mink, Ben Seiss, Brenton Smith, Scott Woodard, Matt Duggan, Dylan Mauldin. |

| Parties: | Trial Counsel: |
|---|---|
| Sen. Steve Livingston and Rep. Chris Pringle, in their official capacities as Chairs of the Alabama Permanent Legislative Committee on Reapportionment | Dorman Walker, Michael Taunton, and Riley Kate Lancaster. |

4. <u>Pleadings</u>. The following pleadings have been allowed:

    i. *Milligan v. Allen*

      a. Complaint, Doc. 1 (Nov. 16, 2021)

      b. Rep. Pringle and Sec. McClendon's Answer to Plaintiffs' Complaint, Doc. 51 (Dec. 7, 2021)

      c. Secretary of State's Answer to Plaintiffs' Complaint, Doc. 52 (Dec. 7, 2021)

      d. First Amended Complaint, Doc. 329 (Jan. 31, 2024)

      e. Secretary Allen's Answer to Plaintiffs' Amended Complaint, Doc. 374 (July 25, 2024)

      f. Rep. Pringle and Sen. Livingston's Answer to Plaintiffs' First Amended Complaint, Doc. 375 (July 25, 2024)

      g. Secretary Allen's Amended Answer to Plaintiffs' Amended Complaint, Doc. 380 (Aug. 1, 2024)

      h. Rep. Pringle and Sen. Livingston's Amended Answer to Plaintiffs' First Amended Complaint, Doc. 381 (Aug. 2, 2024)

    ii. *Caster v. Allen*

      a. Complaint, Doc. 3 (Nov. 4, 2021)

      b. Defendant's Answer to Plaintiffs' Complaint, Doc. 42 (November 30, 2021)

      c. First Amended Complaint, Doc. 271 (Jan. 31, 2024)

      d. Secretary Allen's Answer to Plaintiffs' First Amended Complaint, Doc. 293 (July 25, 2024) (filed in error)

e.  Secretary Allen's  Answer to Plaintiffs'  Amended Complaint, Doc. 294 (July 26, 2024)

f.  Secretary Allen's Amended Answer to Plaintiffs'  Amended Complaint, Doc. 298 (August 1, 2024)

g.  Rep. Pringle and Sen. Livingston's Answer to Plaintiffs' First Amended Complaint, Doc. 301 (August 2, 2024)

*iii. Singleton v. Allen*

a.  Complaint, Doc. 1 (September 27, 2021)

b.  Amended Complaint, Doc. 15 (November 4, 2021)

c.  Sec. McClendon, Rep. Pringle Answer to Amended Complaint, Doc. 48 (December 7, 2021)

d.  Defendant Merrill's Answer to Amended Complaint, Doc. 49 (December 7, 2021)

e.  Amended Complaint (Second), Doc. 229 (January 31, 2024)

f.  Secretary Allen's Answer to Plaintiffs' Second Amended Complaint, Doc. 248 (July 25, 2024)

g.  Rep. Pringle and Sen. Livingston's Answer to Second Amended Complaint, Doc. 249 (July 25, 2024)

5.   Statement of the Case.

(a)   Narrative Statement of the Case.

In 2021, the Alabama Legislature enacted the 2021 congressional redistricting plan, which provided for the electoral districts of the Alabama congressional delegation. The *Milligan* and *Caster* Plaintiffs successfully obtained a preliminary injunction against the 2021 plan. *Allen v. Milligan*, 599 U.S. 1 (2023). On remand, the Alabama Legislature enacted another congressional redistricting plan (the "2023 plan").  The *Milligan* and *Caster* Plaintiffs successfully obtained a preliminary injunction against the 2023 plan. The *Singleton*, *Milligan*, and *Caster* Plaintiffs allege that the 2023 plan denies Black Alabamians an equal opportunity to participate in the political process and elect candidates of their choice in violation of Section 2 of the Voting Rights Act. The *Singleton* and *Milligan* Plaintiffs allege that the 2023 plan was enacted or maintained for a racially discriminatory purpose in violation of the U.S. Constitution and the Voting Rights Act. The *Singleton* Plaintiffs

allege that the 2023 plan is an unconstitutional racial gerrymander. All Defendants dispute all claims.

(b)    Undisputed Facts.

The *Milligan* Plaintiffs, *Caster* Plaintiffs, and Defendants have jointly stipulated to certain facts, which were filed separately as *Milligan* Doc. 436 and *Caster* Doc. 342. The *Singleton* Plaintiffs and Defendants stipulated to certain facts "for purposes of preliminary injunction proceedings" filed as *Singleton* Doc. 47. The *Singleton* Plaintiffs and Defendants agree that all such stipulations except for paragraph 14 may be considered at trial.

(c)    Plaintiffs' Claims.

1.    Section 2 of the Voting Rights Act (All Plaintiffs): Plaintiffs claim that Defendants violated Section 2 of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10301, by enacting and carrying out a legislative plan for Alabama's congressional districts that inhibits Black voters from participating in the political process and having the opportunity to elect candidates of choice on equal terms with white voters.

Section 2 of the VRA protects minority voters against districting schemes that "'operate[ ] to minimize or cancel out' minority voters' 'ability to elect their preferred candidates,"—a risk that is at its "greatest 'where minority and majority voters consistently prefer different candidates' and where minority voters are submerged in a majority voting population that 'regularly defeat[s]' their choices." *Allen v. Milligan*, 599 U.S. 1, 17–18 (2023) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 47, 48 (1986)). "A district is not equally open . . . when minority voters face— unlike their majority peers—bloc voting along racial lines, arising against the backdrop of substantial racial discrimination within the State, that renders a minority vote unequal to a vote by a nonminority voter." *Id.* at 25.

"To succeed in proving a Section 2 violation, "plaintiffs must satisfy three preconditions. First, the minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district. A district will be reasonably configured, our cases explain, if it comports with traditional districting criteria, such as being contiguous and reasonably compact. Second, the minority group must be able to show that it is politically cohesive. And third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it to defeat the minority's preferred candidate. Finally,

a plaintiff who demonstrates the three preconditions must also show, under the totality of circumstances, that the political process is not equally open to minority voters." *Id.* at 18 (cleaned up). This inquiry requires that the Court "conduct an intensely local appraisal of the electoral mechanism at issue, as well as a searching practical evaluation of the past and present reality." *Id.* at 19 (cleaned up).

Plaintiffs intend to prove that racially polarized voting in the relevant parts of Alabama is consistent and extreme and that white bloc voting regularly prevents Black voters from electing preferred candidates outside of congressional districts that are majority-Black or quite close to it. Racially polarized voting carries strong enough force and consistency in Alabama that it stifles the opportunities of Black voters despite their being sufficiently numerous and geographically compact enough to form a second reasonably configured congressional district where they make up a majority of the voting-eligible population.

Plaintiffs will also demonstrate that the Enacted Plan denies Black Alabamians an equal opportunity to participate in the political process and elect candidates of choice due to the combination of the district boundaries in the relevant area, race dominating the political system, past and present racial discrimination, and other factors that inhibit equal electoral opportunities as reflected in consistently depressed turnout numbers for Black voters. These factors that harm Black political participation include a long history and ongoing pattern of discrimination in voting, including multiple times in the current districting cycle; educational discrimination, including the vestiges of *de jure* segregated school systems, funding disparities, and poor educational outcomes; significant racial disparities in employment opportunities, transportation, and infrastructure barriers including computer and internet access; racial disparities in access to healthcare, incidences of serious health conditions, and health outcomes; and the consequences of past systematic discrimination in jury selection, and significant overrepresentation of Black people in the criminal legal system.

These consequences are evident in, among other things, the inability of Black candidates to win election to statewide office—no Black candidate, regardless of party, has won a statewide election in nearly thirty years, and the only Black candidate to ever win a contested election was a State Supreme Court justice who was first appointed and thus ran for reelection as an incumbent—and Black candidates' inability to win election to congressional outside of majority or near-majority-Black districts. Plaintiffs will also show how race and racial issues affect party and candidate choice, how Black candidates face greater limitations and difficulties in non-majority Black districts regardless of political party, how recent

political campaigns have been characterized by overt and subtle racial appeals, and how the Legislature has been unresponsive to the particular concerns of Black voters, particularly as it concerns congressional districting as found by this Court in 2023.

2.    Intentional Racial Discrimination under the Fourteenth Amendment to the U.S. Constitution (*Milligan* and *Singleton* Plaintiffs): The *Milligan* and *Singleton* Plaintiffs claim that Defendants violated the Fourteenth Amendment by enacting and carrying out a legislative plan for Alabama's congressional districts that intentionally discriminates against Black Alabamians.

The factors identified by the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corporation* provide guidance in identifying Alabama's discriminatory intent. 429 U.S. 252, 266–68 (1977). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* Relevant factors include "the racial 'impact of the official action,' the 'historical background of the decision,' the 'specific sequence of events leading up to the challenged decision,' procedural or substantive 'departures from the normal' sequence, and 'legislative or administrative history.'" *Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F. 3d 988, 1006 (11th Cir. 2018) (quoting *Arlington Heights*, 429 U.S. at 266-68). Additional factors are also relevant, including the foreseeability of the disparate impact; the legislature's knowledge of that impact; and the availability of less discriminatory alternatives. *Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983).

The *Milligan* Plaintiffs claim that the 2023 Plan represents Alabama's latest discriminatory scheme, designed with the intent to crack Black voters into congressional districts in a manner that prevents the creation of two congressional districts in which Black voters have an equal opportunity to elect candidates of their choice. The *Milligan* Plaintiffs contend that the direct and circumstantial evidence of the Legislature's intent will show that the 2023 Plan intentionally perpetuated the discriminatory effects of the 2021 Plan.

As this Court previously explained, the "State delayed remedial proceedings but ultimately did not even nurture the ambition to provide the required remedy," and this blatant defiance of the law constitutes an "extraordinary circumstance" in which Alabama "concedes [that the 2023 plan] does not provide [an additional opportunity] district." *Singleton v. Allen*, 690 F. Supp. 3d 1226, 1239 (N.D. Ala. 2023) (three-judge court).

The *Singleton* Plaintiffs further claim that the drafter of the 2023 Plan acted with discriminatory purpose "by intentionally drawing Congressional District lines in order to destroy otherwise effective crossover districts." *Singleton* Doc. 229 ¶ 75. The *Singleton* Plaintiffs claim that "[t]he drafter of [the 2023 Plan] did not include Jefferson County among the communities of interest the 2023 enacted plan is intended to protect." *Id.* ¶ 64. And the drafter excluded Jefferson County because it "is the one county in the state with a proven record of effective and persistent biracial politics." *Id.* The complaint claims that "[t]he drafter of the 2023 . . . plan knew that White voters in Jefferson County are more likely to share the equal rights and progressive political agenda of Black voters than do White voters in the Wiregrass." *Id.* ¶ 65. The *Singleton* Plaintiffs say that is why "[t]he 2023 plan . . . places Black voters in the eastern Black Belt in the same district with the Wiregrass counties, ensuring they would have no opportunity to elect a candidate of their choice." *Id.* And the *Singleton* Plaintiffs allege that "[b]y splitting Jefferson County and the Black Belt the 2023 . . . plan perpetuates Alabama's policy since Reconstruction of creating and maintaining election systems that are designed to encourage White electoral solidarity." *Id.* ¶ 66.

3.      Racial Gerrymandering under the Fourteenth Amendment to the U.S. Constitution (*Singleton* Plaintiffs):

The *Singleton* Plaintiffs claim that the 1992 map that resulted from the *Wesch* consent judgment was a racial gerrymander because it split seven counties expressly "for the purpose of drawing one majority-Black district," and Alabama simply "continued the 1992 racial gerrymander in the Congressional redistricting plans enacted after the 2000 and 2010 censuses." *See Singleton* Doc. 229 ¶¶ 22, 27. According to the *Singleton* Plaintiffs, the State conceded in 2019 that the 1992 map was a racial gerrymander. *Id.* ¶¶ 15 & n.1, 26. And the *Singleton* Plaintiffs assert that, as their proposed plan demonstrates, it is now "practicable to end the 1992 racial gerrymander and draw a seven-district Congressional plan without splitting a single county and with only slight population deviations." *Id.* ¶ 39.

The *Singleton* Plaintiffs claim that "the Legislature preserved the racial gerrymander of Congressional District 7" when it enacted the 2021 Plan, *id.* ¶ 46, and again when it enacted the 2023 Plan, *id.* ¶ 55. "District 7 contains about 54% of Jefferson County's population, but more than 71% of its Black population, resulting in a thirty-point gap between the proportion of the population that is Black inside and outside the district (57% inside, compared to 27% outside)." *Id.* The *Singleton* Plaintiffs specifically claim that "District 7 sharply separates majority-Black

Birmingham from the relatively White 'Over the Mountain' suburbs like Mountain Brook and Vestavia Hills." *Id.* The *Singleton* Plaintiffs also specifically claim that the Legislature acted with discriminatory purpose when it enacted the 2023 Plan that "intentionally perpetuates the unconstitutional racial gerrymandering of Jefferson County." *Id.* ¶ 2.

(d) <u>Defendant's Defenses</u>.

1.      *Section 2: Gingles Preconditions*. Plaintiffs allege that the 2023 Plan violates § 2 because an additional majority-black congressional district could be drawn. Plaintiffs have failed to produce an illustrative plan that is "reasonably configured,"—i.e., one that "comports with traditional districting criteria." *Allen v. Milligan*, 599 U.S. 1, 18 (2023). Moreover, their illustrative plans also fail because they subordinate "traditional race-neutral districting principles … to racial considerations." *Miller v. Johnson*, 515 U.S. 900, 916 (1995); *accord Allen*, 599 U.S. at 29 n.4, 30-33. Their § 2 claim would require something that "§ 2 never requires," the "adoption of districts that violate traditional redistricting principles." *Allen*, 599 at 30 (cleaned up). Further, Plaintiffs' evidence does not show that "racial bloc voting is operating at such a level" that a § 2 remedy is "necessary for black-preferred candidates to win." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 212 (4th Cir. 2024).

*Section 2: Totality of Circumstances*. Plaintiffs' evidence does not show that "based on the totality of circumstances, … the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by" black Alabamians "in that [they] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b); *accord Ala. NAACP v. State of Alabama*, 612 F. Supp. 3d 1232, 1290 (M.D. Ala. 2020). Specifically, Plaintiffs will not prove that black Alabamians have been "excluded … from effective participation in political life." *White v. Regester*, 412 U.S. 755, 769 (1973). Defendants will demonstrate with expert and lay testimony that the political processes in Alabama are open to all, and that "what appears to be bloc voting on account of race is instead the result of political or personal affiliation of different racial groups with different candidates." *Ala. NAACP*, 612 F. Supp. at 1316 (quoting *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000)).

2.      *Section 2: Privately Enforceable*. Section 2 does not unambiguously confer new rights. Thus, "there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 286

(2002); *see also Ark. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023).

3.      *Section 2: Section 2 can no longer constitutionally authorize race-based districting*. Applying § 2 to redistricting plans is no longer constitutional under the Fourteenth Amendment, Fifteenth Amendment, or both. "[E]ven if Congress in 1982 could constitutionally authorize race-based redistricting under § 2 for some period of time, the authority to conduct race-based redistricting cannot extend indefinitely into the future." *Allen v. Milligan*, 599 U.S. 1, 45 (2023) (Kavanaugh, J., concurring). More than forty years after the 1982 amendments to § 2, "no end is in sight" to § 2's requirements for race-based redistricting. *SFFA v. Harvard*, 600 U.S. 181, 213 (2023). Section 2, thus, can no longer justify a State or court "pick[ing] winners and losers based on the color of their skin." *Id.* at 229.[1]

4.      *Fourteenth Amendment: Racial Gerrymandering*. Singleton Plaintiffs will not prove that race predominated over traditional, non-racial objectives in the 2023 Plan's design. They offer no direct evidence "that race played a role in the drawing of district lines," *Alexander v. S.C. NAACP*, 602 U.S. 1, 8 (2024), and their circumstantial evidence "could plausibly support multiple conclusions" besides racial discrimination, *id.* at 10, such as "compactness," *id.* at 7, "core preservation," *id.*, "political goals," *id.* at 37, and protecting incumbents.

5.      *Fourteenth Amendment: Intentional Vote Dilution*. Singleton and Milligan Plaintiffs cannot establish that the 2023 Plan had "the purpose *and* effect of diluting the minority vote." *Id.* at 39. They muster insufficient evidence to overcome the "presumption that the" Alabama Legislature "acted in good faith" by failing to "rule out the possibility" that the 2023 Plan was enacted to advance traditional districting principles or partisan goals, which is "dispositive." *id.* at 20, 24; *see also Abbott v. Perez*, 585 U.S. 579, 610-12 (2018).

---

[1] Plaintiffs contend that this argument is new and does not appear to be reflected in Defendants' answers. Defendants contend that they adequately preserved the defense and that the way these cases have been litigated and the evidence disclosed show that there is no prejudicial surprise. See *Milligan* doc. 380, defenses 2, 7, 9-11, 17; *Singleton* doc. 248, defenses 2, 9, 14-16, 18, 22; *Caster* doc. 298, defenses 2, 6, 9, 11-13, 15, and 19.

6.    Discovery and Other Pretrial Procedures.

    (a)    Pretrial Discovery.

        i.    Pursuant to previously entered orders of the court, discovery is closed.

    (b)    Pending Motions.

        i.    Plaintiffs' Motion in Limine to Exclude in Part the Testimony of Defendants' Experts Dr. Wilfred Reilly Preclude Irrelevant Evidence and Testimony, *Milligan* Doc. 416; *Caster* Doc. 323; *Singleton* Doc. 272.

7.    Stipulation as to Evidence

        i.    The parties stipulate that "[e]vidence introduced in any case may be considered in every case subject to the objection of either a party to the case from which the evidence originates or the case in which the evidence is being introduced." *Singleton* Doc. 287 at 2 (quoting *Singleton* Doc. 231 at 7; *Milligan* Doc. 330 at 7; *Caster* Doc. 272 at 7); *Milligan* Doc. 444 at 2 (quoting the same); *Caster* Doc. 356 at 2 (quoting the same).

8.    Trial Date.

    (a)    These cases are set for Non-Jury trial on February 10, 2025.

    (b)    Plaintiffs believe the trial will likely take 9-10 days. Defendants believe, based on information now available, that the trial may take as long as 15 days.

9.    The parties are to read and comply fully with each provision contained in Exhibits A and B to this order, which are incorporated into this order by reference as if fully set forth herein.

The Court **ORDERS** that the above provisions be binding on all parties unless modified for good cause shown.

**DONE** and **ORDERED** this 31st day of January, 2025.

**STANLEY MARCUS**
UNITED STATES CIRCUIT JUDGE

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE

**TERRY F. MOORER**
UNITED STATES DISTRICT JUDGE

## EXHIBIT A – STANDARD PRETRIAL PROCEDURES

1. **<u>Witnesses</u>**.

The parties shall file witness lists on or before the date specified in the pretrial order. If a witness shown on the list will be presented by deposition, the party designating that witness must specify the pages of the deposition to be used. Objections to witness lists must be filed on or before the date specified in the pretrial order.

Unless specifically agreed by the parties in writing or allowed by the court for good cause shown, the parties shall be precluded from offering substantive evidence through any witness not included on the party's witness list. The listing of a witness does not commit the party to have that witness available at trial or to call that witness to testify, but it does preclude the party from objecting to the presentation of that witness's testimony by another party.

As to any witnesses shown on the list to be presented by deposition, an opposing party may serve a list of additional pages of the deposition to be used, and may serve and file a list disclosing any objections to the use of the deposition testimony under Federal Rules of Civil Procedure 32 or 26(a)(3)(B). Any objections to deposition testimony should be accompanied by excerpts from the depositions including the testimony to which the objection relates and must be filed with objections to the witness list.

Objections to the witness list not made within the time specified in the pretrial order, other than objections under Federal Rules of Evidence 402 and 403, shall be deemed waived, unless such failure to timely object is excused by the court for good cause shown.

2. **<u>Exhibits</u>**.

The parties shall file exhibit lists on or before the date specified in the pretrial order. Objections to exhibit lists must be filed on or before the date specified in the pretrial order.

(a)  **Marking**. Each party that anticipates offering more than five (5) exhibits as substantive evidence shall premark the exhibits in advance of trial, using exhibit labels and lists available from the Clerk of Court. The court will provide up to 100 labels; if any party needs more labels, that party must use labels of the same type as those supplied by the court. Counsel <u>must</u> contact the courtroom deputy for the appropriate exhibit list form for use at trial. The Court urges counsel to be judicious in determining which documents are actually relevant to necessary elements of the case.

(b)  **Examination by Opposing Party**. Except where beyond the party's control or otherwise impractical (*e.g.*, records from an independent third-party being obtained by subpoena), each party shall make exhibits available for inspection and copying. The presentation of evidence at trial ordinarily will not be interrupted for opposing counsel to examine a document that has been identified and was made available for inspection.

(c)  **Limiting Personal Information in Transcripts and Exhibits**. The judiciary's privacy policy restricts the publication of certain personal data in documents filed with the court. The policy requires limiting Social Security and financial account numbers to the last four digits, using only initials for the names of minor children, and limiting dates of birth to the year. However, if such information is elicited during testimony or other court proceedings, it may become available to the public. The better practice is for you to avoid introducing this information into the record in the first place. Please take this into account when questioning witnesses, presenting documents, or making other statements in court. If a restricted item is mentioned in court, you may ask to have it stricken from the record or partially redacted to conform to the privacy policy, or the court may do so on its own motion.

(d)  **Objections**. Objections to the exhibit list not made within the time specified in the pretrial order, other than objections under Federal Rules of Evidence 402 and 403, shall be deemed waived, unless such failure to timely object is excused by the court for good cause shown.

3.      <u>**Failure to Disclose**</u>.

**THE PARTIES ARE REMINDED THAT THEY WILL NOT BE ALLOWED TO USE AT TRIAL ANY WITNESS OR EXHIBIT NOT DISCLOSED IN ACCORDANCE WITH FEDERAL RULES OF CIVIL PROCEDURE 26(a) OR 26(e), UNLESS THE FAILURE WAS SUBSTANTIALLY JUSTIFIED OR THE OFFERING PARTY CAN SHOW THAT ITS FAILURE TO DISCLOSE WAS HARMLESS.** *See* **Fed. R. Civ. P. 37(c)(1).**

4.      <u>**Use of Depositions at Trial**</u>.

(a)     The Court will accept the parties' written agreement to use a deposition at trial even though the witness is available. In the absence of such an agreement, parties must comply with Federal Rule of Civil Procedure 32.

(b)     Before trial, counsel must provide the courtroom deputy with a copy of all depositions to be used as exhibits at trial.

(c)     Counsel will designate the portion of any deposition that counsel anticipates reading by citing pages and lines in the final witness list. Objections, if any, to those portions (citing pages and lines) with supporting authority must be filed with objections to the witness list.

(d)     Use of videotape depositions is permitted and the parties must make good faith efforts to agree on admissibility or edit the videotape to resolve objections.

(e)     In a non-jury trial, for any deposition offered as a trial exhibit, counsel shall attach to the front of the exhibit a summary of what each party intends to prove by the deposition testimony, with line and page citations, and include an appropriate concordance of the deposition pages offered.

## EXHIBIT B – GUIDELINES FOR CONDUCT OF TRIALS

*These guidelines reflect the standard practices of this Court in the trial of cases. They do not alter the rules of civil or criminal procedure, the rules of evidence, or local rules.*

1.      **Hours**. This trial will ordinarily commence at 8:30 a.m. and continue until approximately 5:00-5:30 p.m., Mondays through Thursdays, and on Fridays will run from 8:30 a.m. until 2:45 p.m. On the first day of trial, Monday, February 10, 2025, proceedings will commence at 9:00 a.m. There is no trial scheduled for Monday, February 17, 2025 or Monday, February 24, 2025.

  (a)    **Punctuality**. You, your client, and your witnesses should be present and ready to proceed promptly at the appointed time, both at the beginning of the day and after recesses. Counsel should be present at the courthouse at least 30 minutes before the beginning of each trial day to avoid delays and to be available to discuss unanticipated problems.

  (b)    **Recesses**. A witness whose examination has not been completed at the time of a recess or adjournment should be back in the witness box at the time trial is scheduled to resume.

  (c)    **Requests for changes**. Make known to the Court as soon as can be anticipated any requests for changes in the trial schedule, including those relating to religious holidays or arising because of unavailability of witnesses.

2.      **Witnesses**. Cooperative witnesses not immediately needed should, to the extent practical, be placed "on call." However, you remain responsible for having sufficient witnesses available in court so that, absent developments that could not have been reasonably anticipated, the trial may proceed during the normal trial hours without the need for adjournments or lengthy recesses to obtain further witnesses. Since defendants should be ready to proceed with their evidence promptly at the conclusion of the plaintiff's presentation, plaintiff's counsel should keep defendant's counsel advised as to when they expect to complete their presentation of evidence.

  (a)    **Order**. Counsel are expected to cooperate in resolving scheduling problems, including agreement in most circumstances for a witness to be called out of the normal order, even if the testimony of another witness is interrupted. Such accommodations are the norm for physicians and other similar professionals called as witnesses and may be appropriate for other witnesses with personal, family, or occupational conflicts. Counsel are also expected to cooperate in placing "on call" those employees of another party whose absence

would disrupt such party's normal business activities.

(b) **Production**. Do not ask opposing counsel to produce a witness or a document in a way that might suggest to the jury that such counsel would be concealing evidence if the witness or document is not produced. Address such requests to opposing counsel (or, if necessary, to the court) in a manner that will not be heard by the jury.

(c) **Oaths**. The courtroom deputy ordinarily administers an oath/affirmation to the witnesses and immediately asks their name and place of residence. If you know that the standard questions might be inappropriate (for example, the witness is in prison), so advise the deputy before the witness is called to the stand.

(d) **Release**. Witnesses should be released from further attendance or subpoena as soon as they are no longer needed. After testifying, a witness shall be deemed as released by consent unless counsel or the court indicates that the witness should not be so excused. You should not consent to release of a witness if you will later offer in evidence a prior inconsistent statement about which the witness was not examined or if you wish to make a proffer of testimony of that witness to which an objection was sustained.

(e) **Exclusion**. Requests under Federal Rule of Evidence 615 for exclusion of witnesses from the courtroom should be made before examination of the first witness begins, preferably before opening statements. Be alert for witnesses arriving during trial and inadvertently coming into the courtroom. Although the Rule does not prevent talking with excluded witnesses during recesses about their expected testimony, do not in such discussions disclose the courtroom testimony given by other witnesses. After testifying and provided they will not be recalled, witnesses are no longer subject to the Rule and may remain in the courtroom.

**3.** **Examination of witnesses**. Absent physical disabilities, examination of a witness should ordinarily be conducted while the witness is seated in the witness box and counsel is standing at the lectern.

(a) **Approaching clerk's desk or witness box**. Permission of the Court to approach the clerk's desk or the witness box is not necessary if for the purposes of submitting or obtaining an exhibit, handing an exhibit to the witness, or conducting examination about an exhibit when counsel needs to be next to the witness during the examination. Return to the lectern after such examination is finished.

(b) **Other locations**. Request permission of the Court if you wish the witness to step from the witness box (for example, to display an injury,

to prepare a sketch, or to identify objects in a photograph). Assist the court in assuring that your voice and that of the witness are sufficiently loud to be heard and that opposing counsel's view is not obstructed.

(c) **Depositions**. As you use or read from a deposition, indicate the page and line number of the starting and stopping points. Colloquies and objections of counsel should ordinarily be omitted, as should questions that are rephrased or changed prior to the answer being given. When the deposition refers to an exhibit, counsel may, in addition to the identification used in the deposition, indicate the exhibit number used during the trial. Persons asked to read the deponent's testimony should do so fairly and impartially. Depositions are not ordinarily read aloud in non-jury cases; you should submit to the court well before the trial is completed a list of the portions you want the Court to read.

(d) **Harassment**. Treat witnesses with courtesy, even when conducting vigorous impeachment. Do not shout at, ridicule, harass, or unfairly embarrass a witness. Use temperate language when requesting the Court's assistance to control or direct a witness who is giving unresponsive or argumentative answers.

**4.    Special equipment**. Audio-visual equipment should be brought into the courtroom and tested before or after trial hours or during a recess. You are responsible for seeing that the trial is not substantially delayed while such equipment is being set up. Make arrangements with the courtroom deputy if you need special access to the courtroom.