FILED
2025 Feb-24  PM 05:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA**

MARCUS CASTER, LAKEISHA
CHESTNUT, BOBBY LEE DUBOSE,
BENJAMIN JONES, RODNEY ALLEN
LOVE, MANASSEH POWELL,
RONALD SMITH, and, WENDELL
THOMAS,

              Plaintiffs,

    v.

WES ALLEN, in his official capacity
as Alabama Secretary of State,

              Defendant,

CHRIS PRINGLE and JIM McCLENDON,

              Intervenor-Defendants.

Case No. 2:21-CV-1536-AMM

**~~FIRST~~[PROPOSED] SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF**

    Plaintiffs Marcus Caster, LaKeisha Chestnut, Bobby Lee DuBose, Benjamin
Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, and Wendell Thomas
file this Complaint for Declaratory and Injunctive Relief against Defendant Wes
Allen in his official capacity as the Alabama Secretary of State, and allege as
follows:

    1.        Plaintiffs bring this voting rights action to challenge SB 5 (the
"2023 Plan"), passed on July 21, 2023, which establishes new congressional districts

for Alabama based on the 2020 Census~~, on the grounds that it violates~~. Plaintiffs challenge the 2023 Plan under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, because it dilutes Black voting strength and confines Black voting power to one majority-Black district~~.~~ and was enacted with the intent to dilute the votes of Black Alabamians in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

2.      Between 2010 and 2020, Alabama's population grew by 244,543 people. More than a third of that growth came from Alabama's Black population. In other words, Black Alabamians were the primary driver of Alabama's population growth over the last decade. During the same period, the state's white population fell by 33,051 people. And yet the state's 2023 Plan further entrenches the state's white majority by creating only a single majority-Black district in the state, despite Alabama's Black population being sufficiently numerous and geographically compact to support two majority-Black congressional districts. Indeed, while Black Alabamians now comprise more than 27 percent of the state's population and nearly 26 percent of the state's voting age population, they have the opportunity to elect a candidate of their choice in just one out of seven districts in the 2023 Plan.

3.      ~~SB 5 (the~~ "~~The~~ 2023 Plan~~")~~ was passed as a purported remedial plan after Alabama's 2021 Plan was enjoined by this Court under Section 2 of the Voting Rights Act. But rather than remedy the Section 2 violation, Alabama willfully

doubled down on it. This is consistent with Alabama's long history of discriminatory voting laws. Black Alabamians have long suffered from voting discrimination and vote dilution and as a result have endured systemic neglect of the issues and needs that deeply affect their community.

4.    The ~~state's newly enacted congressional redistricting plan~~2023 Plan deepens these issues by creating only a single majority-Black district. ~~SB 5~~The Plan "cracks" Black voters between the First and Second Congressional Districts despite—or ~~perhaps~~ because of—the fact that the Black population in these districts is sufficiently numerous and geographically compact to form a majority of the voting age population in a second district. Additionally, there is widespread racially polarized voting in Alabama, and when considered against the totality of the circumstances, the enacted plan's failure to create two majority-Black districts dilutes the Black vote in violation of Section 2 of the Voting Rights Act.

5.    Alabama's brazen defiance of this Court's instruction to draw an additional majority-Black or Black opportunity district to remedy its likely violation of Section 2 continues a long and well-documented history of intentional discrimination and vote dilution in Alabama. The state's knowing failure to comply is yet another instance of such intentional vote dilution in violation of Section 2.

~~5.~~6.    Accordingly, Plaintiffs seek an order (1) declaring that ~~SB 5~~the 2023 Plan violates Section 2 of the Voting Rights Act; (2) enjoining Defendant from

conducting future elections under ~~SB 5~~the 2023 Plan; (3) ordering that the state retain the current court-ordered congressional redistricting plan (the "Remedial Plan") that includes two districts in which Black voters have an opportunity to elect a candidate of their choice; and (4) providing any such additional relief as is appropriate.

## JURISDICTION AND VENUE

~~6.~~7.     This Court has original jurisdiction over the subject matter of this action pursuant to 42 U.S.C. §§ 1983 and 1988 and under 28 U.S.C.§§ 1331, 1343(a)(3) and (4), and 1357 because the matter in controversy arises under the laws of the United States and involves the assertion of deprivation, under color of state law, of rights under federal law.

~~7.~~8.     This Court has personal jurisdiction over Defendant, who is sued in his official capacity and resides within this state, pursuant to Fed. R. Civ. P. 4(k)(1)(A).

~~8.~~9.     Venue is proper because a substantial part of the events that give rise to Plaintiffs' claims have occurred, and will occur, in this District. 28 U.S.C. § 1391(b).

~~9.~~10.     This Court has authority to grant declaratory and injunctive relief under Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

10.11.    Plaintiffs are citizens of the United States and are registered to vote in Alabama.

11.12.    Plaintiff Marcus Caster is a Black citizen of the United States and of the state of Alabama, a registered voter, and a resident of Washington County who, under the 2023 Plan, resides in the Seventh Congressional District ("CD 7"). CD 7 is a majority-Black district which is drawn in a manner that prevents the creation of an additional district in which Black voters have an opportunity to elect their candidates of choice, as required by the Voting Rights Act.

12.13.    Plaintiff LaKeisha Chestnut is a Black citizen of the United States and of the state of Alabama, a registered voter, and a resident of Mobile County who, under the 2023 Plan, resides in the First Congressional District ("CD 1"). CD 1 is a majority-white district in which Black voters like Ms. Chestnut do not have an opportunity to elect their preferred candidates. An additional majority-Black district could be drawn incorporating all or some of Mobile County, including Ms. Chestnut's residence.

13.14.    Plaintiff Bobby DuBose is a Black citizen of the United States and of the state of Alabama, a registered voter, and a resident of Jefferson County who, under the 2023 Plan, resides in CD 7. CD 7 is a majority-Black district which is drawn in a manner that prevents the creation of an additional district in which Black

voters have an opportunity to elect their candidates of choice, as required by the Voting Rights Act.

14.15.    Plaintiff Benjamin Jones is a Black citizen of the United States and of the state of Alabama, a registered voter, and a resident of Montgomery County who, under the 2023 Plan, resides in the Second Congressional District ("CD 2"). CD 2 is a majority-white district in which Black voters like Mr. Jones do not have an opportunity to elect their preferred candidates. An additional majority-Black district could be drawn incorporating all or some of Montgomery County, including Mr. Jones's residence.

15.16.    Plaintiff Rodney Love is a Black citizen of the United States and of the state of Alabama, a registered voter, and a resident of Jefferson County who, under the 2023 Plan, resides in CD 7. CD 7 is a majority-Black district which is drawn in a manner that prevents the creation of an additional district in which Black voters have an opportunity to elect their candidates of choice, as required by the Voting Rights Act.

16.17.    Plaintiff Manasseh Powell is a Black citizen of the United States and of the state of Alabama, a registered voter, and a resident of Montgomery County who, under the 2023 Plan, resides in CD 2. CD 2 is a majority-white district in which Black voters like Mr. Powell do not have an opportunity to elect their preferred candidates. An additional majority-Black district could be drawn incorporating all

or some of Montgomery County, including Mr. Powell's residence.

~~17.~~18.   Plaintiff Ronald Smith is a Black citizen of the United States and of the state of Alabama, a registered voter, and a resident of Bullock County who, under the 2023 Plan, resides in CD 2. CD 2 is a majority-white district in which Black voters like Mr. Smith do not have an opportunity to elect their preferred candidates. An additional majority-Black district could be drawn incorporating all or some of Bullock County, including Mr. Smith's residence.

~~18.~~19.   Plaintiff Wendell Thomas is a Black citizen of the United States and of the state of Alabama, a registered voter, and a resident of Montgomery County who, under the 2023 Plan, resides in CD 2. CD 2 is a majority-white district in which Black voters like Mr. Thomas do not have an opportunity to elect their preferred candidates. An additional majority-Black district could be drawn incorporating all or some of Montgomery County, including Mr. Thomas's residence.

~~19.~~20.   Defendant Wes Allen is sued in his official capacity as the Secretary of State of Alabama. The Secretary of State is Alabama's chief election officer. Ala. Code § 17-1-3(a). In that capacity, he is responsible for providing uniform guidance for election activities and implementing the state's election laws and regulations, including SB 5. *Id.*

## LEGAL BACKGROUND

~~20.~~21.   Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits

any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" Thus, in addition to prohibiting practices that deny outright the exercise of the right to vote, Section 2 prohibits vote dilution. A violation of Section 2 is established if it is shown that "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by [majority-Black voters] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

21.22.    The dilution of voting strength "may be caused by the dispersal of [members of a racial or ethnic group] into districts in which they constitute an ineffective minority of voters or from the concentration of [members of that group] into districts where they constitute an excessive majority." *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986).

22.23.    In *Thornburg v. Gingles*, the United States Supreme Court identified three necessary preconditions (the "*Gingles* preconditions") for a claim of vote dilution under Section 2 of the Voting Rights Act: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50-51; *see also Allen v. Milligan*, 599

U.S. 1, 17-18 (2023).

23.24.    Once all three preconditions are established, the statute directs courts to consider whether, under the totality of the circumstances, members of a racial group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b); *see Allen*, 599 U.S. at 18-19. The Senate Report on the 1982 amendments to the Voting Rights Act identifies several non-exclusive factors that courts should consider when determining if, under the totality of the circumstances in a jurisdiction, the operation of the electoral device being challenged results in a violation of Section 2.

24.25.    These Senate factors include: (1) the history of official voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority-vote requirements, and prohibitions against bullet-voting; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate

effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; (7) the extent to which members of the minority group have been elected to public office in the jurisdiction; (8) whether elected officials are unresponsive to the particularized needs of the members of the minority group; and (9) whether the policy underlying the state's or the political subdivision's use of the contested practice or structure is tenuous.

25.26.    The Senate Report itself and the cases interpreting it have made clear that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. No. 97-417, at 29 (1982)); *see also id.* at 1566 ("The statute explicitly calls for a 'totality-of-the circumstances' approach and the Senate Report indicates that no particular factor is an indispensable element of a dilution claim.").

27.    Section 2 of the Voting Rights Act also prohibits the enforcement of any voting standard, practice, or procedure that has the purpose of denying or abridging the right to vote on account of race, color, or membership in a large minority group. 52 U.S.C. § 10301(a); *see also Chisom v. Roemer*, 501 U.S. 380, 394 n.21 (1991). Under current Eleventh Circuit law, intent alone does not establish a Section 2 violation without a corresponding discriminatory effect. *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 942 (11th Cir. 2023)

("A finding of discriminatory impact is necessary and sufficient to establish a section 2 violation."). The Legislature's discriminatory intent in enacting the 2023 Plan also bears on the totality of the circumstances under Section 2.

28.    Thus, in addition to the Senate Factors listed above, the non-exhaustive *Arlington Heights* factors guide courts in determining whether a particular decision was made with a discriminatory intent: (1) the discriminatory impact of the official action; (2) the historical background of the decision; (3) the specific sequence of events leading up to the challenged action; (4) substantive and procedural departures from the normal-decision making process; and (5) contemporaneous viewpoints expressed by the decisionmakers. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977); *see also United States v. Georgia*, 574 F. Supp. 3d 1245, 1250-51 & n.3 (N.D. Ga. 2021) (applying *Arlington Heights* to a Section 2 intentional discrimination claim).

## FACTUAL ALLEGATIONS

### A. Alabama's 2021 Redistricting Process

26.29.    Alabama's 2021 Plan was the product of a muddled and harried process, which left legislators little time to meaningfully consider alternative proposals and necessary redistricting criteria.

27.30.    On October 26, 2021, two days before the Legislature took up redistricting in a special session, the Alabama Legislative Committee on

Reapportionment held a hearing to approve plan proposals to be presented to the full Legislature. Committee members, however, were not sent the proposed plans until the night before the hearing, forcing them to vote and debate maps they had almost no time to consider.

28.31.    It quickly became apparent that no committee member understood why the maps were drawn the way they were. The chair of the committee explained that the proposed maps were drawn not by, or in coordination with, committee members but rather were the product of committee staff and the committee's attorney. It was also revealed that the proposed maps were not subjected to functional or racial polarization analyses, tests critical to determining whether a plan complies with Section 2 of the Voting Rights Act.

29.32.    Many committee members found these substantive and procedural flaws fatal to the committee's work and implored the chair to postpone approval of the maps until members could meaningfully consider the proposals and to allow time to determine whether the maps complied with the Constitution and the Voting Rights Act. Members were emphatic that to do otherwise would make a mockery of the committee's work and leave them unable to intelligently explain the advantages or disadvantages of the ultimately approved proposals to the full legislature.

30.33.    These objections were overruled or voted down along party lines by the Republican-led committee. In the end, each proposal, including the

congressional plan that formed the basis of the enacted map, ~~were~~was approved only by Republican committee members who had fewer than 24 hours to consider the proposals for which they voted.

~~31.~~34.    The Legislature's special session was no less perfunctory. The Legislature began formally considering map proposals on October 28, 2021. By November 1, 2021, the congressional map had passed the House. And by, November 3, 2021, it was approved by the ~~senate~~Senate. Throughout the session, Democratic legislators criticized the law's passage as irreparably flawed, leaving legislators little time to consider the map and in the dark as to the data and process that led to the map's drawing. Moreover, many legislators lamented the 2021 Plan's failure to create a second majority-Black district and emphasized the state's continued practice of stymying Black representation within the state.

~~32.~~35.    Governor Kay Ivey signed the 2021 Plan into law on November 3, 2021.

## B. Challenge to the 2021 Plan

~~33.~~36.    Just hours after the 2021 Plan was signed into law, Plaintiffs filed suit against it under Section 2 of the Voting Rights Act. Plaintiffs argued that the 2021 Plan unlawfully diluted the voting strength of Black voters in Alabama. To ensure they could obtain relief in time for the 2022 elections and in light of the

irreparable harm the 2021 Plan imposed, Plaintiffs moved to preliminary enjoin the state from holding any elections under the plan.

34.37.    In January 2022, this Court held a seven-day hearing on Plaintiffs' motion for preliminary relief, which involved extensive fact and expert witness testimony and hundreds of pages of briefing. On January 24, 2022, the Court granted Plaintiffs' motion, finding that Plaintiffs' evidence of racially polarized voting in Alabama, the state's Black population's ability to form a voting-age majority of an additional reasonably compact district, and the state's sordid history of racial discrimination demonstrated that Plaintiffs were likely to succeed on their claim that the 2021 Plan violated Section 2 of the Voting Rights Act.

35.38.    Based on its finding that Alabama likely violated Section 2 of the Voting Rights Act, the Court ordered Alabama to adopt a new congressional districting plan that remedied the likely vote dilution Plaintiffs had demonstrated during the hearing. While the Court acknowledged that "the appropriate remedy" for Alabama's Section 2 violation did not necessarily require a second majority-Black district, "as a practical reality, the evidence of racially polarized voting adduced during the preliminary injunction proceedings suggests that any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it." PI Order, ECF No. 101 at 6.

36.39.    Alabama immediately sought to stay this Court's order, first before this Court and, when its efforts were denied, before the U.S. Supreme Court. The Supreme Court stayed this Court's decision pending its resolution of the case on the merits.

37.40.    In June 2023, the Supreme Court affirmed this Court's preliminary injunction ruling, finding "no reason to disturb the District Court's careful factual findings," which had "gone unchallenged by Alabama in any event," and no "basis to upset the District Court's legal conclusions." The Supreme Court reiterated this Court's conclusions that there is "no serious dispute" that voting in Alabama is racially polarized" and that Plaintiffs illustrative plans "strongly suggest[ed] that Black voters in Alabama could constitute a majority in a second, reasonably configured, district." The Court also rejected Alabama's challenges to Plaintiffs' illustrative plans, which focused mainly on communities of interest, as an attempt by the state to engage in a "beauty contest" disavowed by the Supreme Court's precedent.

## C. Passage of the 2023 Remedial Redistricting Plan

38.41.    After the Supreme Court affirmed the Court's preliminary injunction order, Alabama represented to Plaintiffs and this Court that its Legislature intended to pass a remedial plan to resolve the likely Section 2 violation in the 2021 Plan.

39.42.    To that end, Governor Ivey called a special session on June 27, 2023 to begin on July 17, 2023 for the purpose of passing a new congressional plan.

40.43.    Ahead of the special session, Representative Chris Pringle and Senator Steve Livingston were selected to serve as Co-Chairs of the Legislature's Permanent Legislative Committee on Reapportionment ("the Committee").

41.44.    Both Representative Pringle and Senator Livingston were aware of the rulings from this Court and the Supreme Court and testified that they understood this Court's order required the passage of a remedial plan with an additional district in which Black voters had an opportunity to elect a candidate of their choice.

42.45.    To assist with their drawing of a new plan, the Co-Chairs engaged Randy Hinaman to draw new plans for the Legislature. He was instructed "to follow the [Committee's 2021 Redistricting] Guidelines and the ruling in *Milligan v. Allen*." He also was instructed "to consider the Black Belt, Gulf, and Wire Grass communities of interest and to minimize county splits." The Committee expressed to Mr. Hinaman that this Court had "ordered the [Legislature] to look at an opportunity district." Mr. Hinaman gave testimony confirming these instructions.

43.46.    Mr. Hinaman drafted three proposals for the Committee to consider: the "Community of Interest" ("COI") Plan, the "Russell Split" Plan, and the "Expanded Black Belt" Plan. None of these plans created two districts in which Black Alabamians had an opportunity to elect a candidate of their choice, as the Co-

Chairs and Mr. Hinaman knew was required by the Court's order. Rather, they intentionally carried forward the same cracking and packing of the state's Black population that led this Court to find that the 2021 Plan unlawfully diluted the voting power of Black Alabamians under Section 2. Of these three Plans, the Co-Chairs settled on the COI Plan, and both intended to sponsor that Plan in their respective legislative chambers.

44.47.    Ahead of the special session, the Committee held two hearings to receive public input on the state's adoption of a remedial plan. At neither hearing did the Co-Chairs offer any testimony or evidence that Mr. Hinaman's plans remedied the state's likely Section 2 violation. To the contrary, during the second hearing the Committee voted down (along racial lines) Representative England's proposed amendments to the Committee's redistricting guidelines that provided specific instructions to remedy the likely Section 2 violation found by the Court. They did so despite Representative Pringle's testimony that "the public hearings made perfectly clear that people wanted a district they thought that Blacks could elect a candidate of their choosing." The Committee instead voted to re-adopt the state's 2021 Redistricting Guidelines (again along racial lines).

45.48.    The Co-Chairs did not present any plan drawn by Mr. Hinaman for public comment during the pre-session hearings. The only plan available for public comment during that period was the VRA Plaintiffs' Remedial Plan submitted by

the *Caster* and *Milligan* Plaintiffs, and two other plans submitted separately by Senators Singleton and Hatcher.

46.49.    On July 17, the first day of the Special Session, Representative Pringle introduced the COI Plan in the House. The Committee's own analysis showed that under the COI Plan, Black voters would not have a reasonable opportunity to elect a candidate of their choice in two districts, as this Court ordered. The COI Plan, nevertheless, passed the House two days later on July 19.

47.50.    The COI Plan had less success in the Senate. Although Senator Livingston introduced the COI Plan in the Senate, his caucus quickly moved away from the plan because they had "received some additional information they thought they should go in the direction of compactness, communities of interest, and making sure that congressmen are not paired against each other." He did not know where the information came from.

48.51.    The Senate then began work on what became known as the Opportunity Plan, which was drafted by an outside consultant named Chris Brown, head of Red State Strategies, and was dropped off on a thumb drive to the Reapportionment Office by Senator Dan Roberts.

49.52.    The Opportunity Plan had a lower BVAP in CD 2 than even the COI Plan. Indeed, Senator Livingston testified that he "had no view one way or the other" about whether the Opportunity Plan provided Black voters an opportunity to

elect a candidate of their choice in a second district. After a few changes to the Opportunity Plan, none of which changed the Plan's original configuration of CD 2, the Senate settled on a plan called Livingston 2, which was then passed out of the Senate.

50.53.    Since the House and Senate passed two different plans, the two chambers were forced to reconcile their differences. The result was a plan called Livingston 3. Livingston 3 was drawn by Alabama Solicitor General Edmund LaCour and several senators. It contained only one majority-Black district, CD 7—the only district in the plan in which Black voters would have an opportunity to elect their candidates of choice. The district with the next highest Black population, CD 2, had a BVAP of 39.93 percent.

51.54.    Dr. Hood, the same expert on which Defendants relied during the preliminary injunction stage of this action, analyzed how the 2023 Plan's version of CD 2 performs for Black-preferred candidates in seven statewide contests between 2018 and 2020. His analysis showed that the Black-preferred candidate lost in the new CD 2 in every election he analyzed, reflecting no improvement in Black voting strength from the 2021 Plan this Court determined unlawfully diluted the voting power of Black Alabamians.

52.55.    Dr. Hood's analysis was available to all members of the legislative conference committee prior to their decision to vote to pass the 2023 Plan.

53.56.    In addition to new legislative districts, SB 5 also appended several pages of "legislative findings" to the new Plan. In contrast to the Committee's 2023 Guidelines, these findings make only passing reference to the Voting Rights Act. The lion's share of their substance is instead focused on several "non-negotiable" principles: minimal population deviation, contiguity, reasonable compactness, no more than six county splits, keeping together communities of interest as specifically described in the findings, and not pairing incumbents. Neither compliance with this Court's prior orders nor compliance with the Voting Rights Act was included as a "non-negotiable" principle.

54.57.    The "legislative findings" also identify three communities of interest: the Black Belt, the Gulf Coast, and the Wiregrass, and amend the 2023 Guidelines' definition of "community of interest" to delete reference to shared "ethnic, racial, tribal, social . . . identities" and to add reference to similar "transportation infrastructure, broadcast and print media, educational institutions." The "legislative findings" delineate the county boundaries of each community of interest and devote several pages to supporting a purported connection between Mobile and Baldwin Counties, while allotting only five lines to the Black Belt.

55.58.    These so-called "legislative findings" were not the product of careful legislative deliberation. They were instead drafted by Mr. LaCour, who, as Alabama's Solicitor General, was at the time one of Defendant's lead counsel in

this case. Mr. LaCour drafted these findings without legislative input. Indeed, Representative Pringle testified that he "does not know" why the findings were included in the bill and that the "first time [he] saw [them] was Friday morning on the floor of the House when the Senate Bill was brought up." Representative Pringle further confirmed that the findings were not considered by the Legislature and members were only made aware of them just before they were asked to vote on the bill. Senator Livingston similarly testified that he did not know why the findings were included in the bill.

56.59.    The Livingston 3 Plan—including the "legislative findings" in support of the plan—was adopted by both houses as Senate Bill 5 (the "2023 Plan") and signed into law on July 21, 2023.

### D. The 2023 Plan

57.60.    Of the 2023 Plan's seven congressional districts, only CD 7 is majority-Black, with an any-part Black voting age population ("AP BVAP") of 50.65 percent. The next highest AP BVAP in the Plan is found in CD 2, which has an AP BVAP of 39.9 percent.

58.61.    Like the 2021 Plan, the 2023 Plan "cracks" Black voters in CDs 1 and 2, preventing the emergence of a second congressional district in which Black voters would have an opportunity to elect their candidate of choice.

59.62.    Plaintiffs' expert Dr. Maxwell Palmer analyzed the electoral performance of the 2023 Plan and concluded that it does not contain a second district in which Black voters have the opportunity to elect a candidate of their choice. Defendants did not dispute this analysis when it was presented.

60.63.    Dr. Palmer analyzed 17 statewide elections between 2016 and 2020 to determine whether Black voters in the proposed remedial district in the 2023 Plan, CD 2, had the opportunity to elect a candidate of their choice. He found that the average vote share for Black-preferred candidates in CD 2 across all 17 elections was merely 44.5 percent, decidedly short of the 50 percent threshold necessary to win in a two-party election. In terms of election contests, that average vote share translated into the Black-preferred candidate losing to the white-preferred candidate in 94 percent of elections (16 out of 17).

61.64.    Even then, the only election contest Black-preferred candidates would have won was the contest between Doug Jones and Roy Moore, a controversial Alabama politician who, among other things, was accused of sexually abusing or harassing several teenage women.

62.65.    The 2023 Plan could have been drawn to include two majority-Black districts. Indeed, Plaintiffs had offered seven illustrative plans during the preliminary injunction stage of this litigation, each of which included two reasonably configured majority-Black districts.

63.66.    But rather than embrace the creation of a second congressional district in which Black voters would have an opportunity to elect their candidates of choice, the Legislature worked to avoid one.

**E. Challenge to 2023 Plan**

64.67.    Within days of the state's passage of the 2023 Plan, Plaintiffs objected to the Plan on the basis that it failed to remedy this Court's finding that the state had likely violated Section 2 of the Voting Rights Act because it did not provide Black voters with an additional district in which they had an opportunity to elect a candidate of their choice.

65.68.    Defendants did not defend the 2023 Plan on the basis that it remedied this Court's finding that the 2021 Plan likely violated Section 2. Defendants argued instead that they were under no obligation to remedy the state's Section 2 violation because the state's passage of the new Plan effectively reset Defendants' liability, requiring Plaintiffs to prove once again that a congressional plan with a single Black-opportunity district results in unlawful vote dilution under the Voting Rights Act.

66.69.    This Court held a remedial hearing on Plaintiffs' objections to the 2023 Plan on August 14, 2023. The record before the Court comprised the entire January 2022 preliminary injunction record along with new expert reports, deposition transcripts, and other evidence submitted during the remedial phase.

67.70.    During the hearing, Alabama conceded that the 2023 Plan does not include two districts that provide Black voters the opportunity to elect candidates of their choice. Defendants also conceded that, to the extent Plaintiffs were required to re-meet the *Gingles* liability standard as to the new plan, Plaintiffs had already met their burden as to the second and third *Gingles* preconditions and the totality of the circumstances.

68.71.    On September 5, 2023, this Court issued a thorough and carefully reasoned order preliminarily enjoining Alabama from conducting any elections under the 2023 Plan and directing a Special Master and cartographer to begin work on a court-drawn remedial plan.

69.72.    The Court held that the 2023 Plan, as Defendants conceded, did not remedy the likely Section 2 violation that it had previously found and the Supreme Court affirmed because the Plan failed to provide an additional district in which Black voters had an opportunity to elect a candidate of their choice. The Court was "deeply troubled that the State enacted a map that the State readily admits does not provide the remedy [it] said federal law requires" and was "disturbed by the evidence that the State delayed remedial proceedings" without "even nurtur[ing] the ambition to provide the required remedy." Remedial Order, ECF No. 223, at 8.

70.73.    The Court also found that, in the alternative, even if Plaintiffs were required to show that the 2023 Plan likely violates Section 2 anew, they had carried

their burden. The Court found that Plaintiffs had demonstrated through 11 illustrative plans that it was possible for Black Alabamians to form a voting-age majority in an additional reasonably compact district. In so doing, the Court expressly rejected Alabama's argument, as both it and the Supreme Court had done in the past, that Section 2 requires Plaintiffs to proffer an illustrative plan that "meets or beats" the 2023 Plan on every traditional redistricting principle to establish liability. Accepting Alabama's premise, the Court explained, "would allow the State to immunize from challenge a racially discriminatory redistricting plan simply by claiming that it best satisfied a particular principle the State defined as non-negotiable."

71.74.    Based on the extensive remedial record, and Defendants' concessions, the Court also found that Plaintiffs had satisfied the remaining *Gingles* factors to establish Section 2 liability.

72.75.    Despite this Court's *second* determination that the state had violated the Voting Rights Act, Alabama continued to resist. After this Court issued its remedial order, the Secretary of State—this time alone—once again immediately sought a stay from this Court and, when that motion was denied, sought an emergency stay from the Supreme Court. This time, however, the Supreme Court denied the Secretary's request.

73.76.    After the Supreme Court denied Defendant's application for a stay, this Court held a hearing on three remedial proposals drafted by the court-appointed Special Master. The Court ultimately ordered the adoption of Remedial Plan 3, which was drawn without reference to Plaintiffs' illustrative plans or any other plan proposed in the course of this litigation.

74.77.    In addition to creating two districts in which Black voters have an opportunity to elect a candidate of their choice, as this Court ordered, Remedial Plan 3 maintains 86.9 percent of Alabamians in the same district in which they resided under the 2023 Plan, while also preserving all 18 Black Belt counties in Districts 2 and 7 and splitting just six counties. In other words, Remedial Plan 3 completely remedies the vote dilution that this Court had found while hewing closely to the state's own redistricting preferences to extent permissible under law.

75.78.    Alabama has since adopted Remedial Plan 3 and, as it stands, Remedial Plan 3 has established the state's congressional districts for the 2024 election cycle.

## F.  Racial Polarization in Alabama

76.79.    Voting in Alabama is racially polarized. Black voters in Alabama are politically cohesive and overwhelmingly support Democratic candidates. The white majority in Alabama is also politically cohesive, overwhelmingly supports Republican candidates, and historically votes as a bloc to defeat Black voters'

candidates of choice.

77.80.    The last time voters in CD 1 elected a Black candidate to represent them in Congress, for example, was during Reconstruction. Indeed, while about a quarter of the voting age population in CD 1 is Black, white Republicans have been continuously elected to represent CD 1 since 1965.

78.81.    Analysis from Dr. Maxwell Palmer, Plaintiffs' expert in this case and whose testimony the Court has credited time and again, shows voting in Alabama is extremely racially polarized. For example, in the 2023 Plan's CD 2, on average 90.3 percent of white voters voted against the Black-preferred candidate across twelve election contests.

79.82.    Federal courts also have consistently found that voting in Alabama is and remains severely racially polarized. In *Buskey v. Oliver*, for example, the U.S. District Court for the Middle District of Alabama concluded that the City of Montgomery, which is the county seat of Montgomery County in the Black Belt, is "a city still polarized by race, with only white council members being elected from predominantly white council districts and with only black council members being elected from predominantly black council districts." 565 F. Supp. 1473, 1482 (M.D. Ala. 1983).

80.83.    In *United States v. Dallas County Commission*, 739 F.2d 1529, 1536 (11th Cir. 1984), the Eleventh Circuit found that racially polarized voting

existed in Dallas County elections for the period from 1966 through 1978. On remand, the U.S. District Court for the Southern District of Alabama determined that voting patterns in Dallas County remained polarized along racial lines between 1978 and 1986. *United States v. Dallas Cty. Comm'n*, 636 F. Supp. 704, 710 (S.D. Ala. 1986).

81.84.   In 2011, the Middle District of Alabama recognized "[i]n an era when the degree of racially polarized voting in the South is increasing, not decreasing, Alabama remains vulnerable to politicians setting an agenda that exploits racial differences." *United States v. McGregor*, 824 F. Supp. 2d 1339, 1347 (M.D. Ala. 2011) (internal quotation marks omitted); *see also Dillard v. Baldwin Cnty. Comm'n*, 222 F. Supp. 2d 1283, 1290 (M.D. Ala. 2002) ("[B]lack citizens of Baldwin County still suffer from . . . racially polarized voting and from historically depressed conditions, economically and socially.") *aff'd*, 376 F.3d 1260 (11th Cir. 2004).

82.85.   And most recently this Court and the Supreme Court found that Plaintiffs had demonstrated overwhelming evidence of the state's racial polarization sufficient to sustain a preliminary injunction under Section 2 of the Voting Rights Act. *See Allen v. Milligan*, 599 U.S. 1, 20-23 (2023); *Caster v. Merrill*, 2022 WL 264819, at *68-*70* (N.D. Ala. Jan. 24, 2022) ("This record supports only one finding: that voting in Alabama, and in the districts at issue in this litigation, is

racially polarized for purposes of the second and third *Gingles* requirements.”).

83.86.     The cause of the state’s racial polarization can be found in its long history of racial discrimination: “Racial bloc voting by whites is attributable in part to past discrimination, and the past history of segregation and discrimination affects the choices of voters at the polls.” *Brown v. Bd. of Sch. Comm’rs of Mobile Cnty.*, 542 F. Supp. 1078, 1094 (S.D. Ala. 1982), *aff’d*, 706 F.2d 1103 (11th Cir. 1983), *aff’d* 464 U.S. 1005 (1983).

**G. Alabama’s History of Racial Discrimination**

84.87.     In a region infamous for its racial discrimination, Alabama stands out. After nearly a century of formal disenfranchisement, Reconstruction granted Black Alabamians the right to vote. Almost immediately afterward, however, Alabama embarked on what would become a centuries-long program to ensure Black citizens could never exercise that right. At first manifesting in literacy tests and poll taxes, Alabama’s effort to discriminate against Black voters morphed over time into white primaries, and eventually into the vote dilution reflected in the map at issue in this litigation.

85.88.     Consider first Alabama’s 1901 constitutional convention. The state ratified voter restrictions such as literacy tests, employment and property requirements, and a cumulative poll tax, which formed a legal blockade against the Black vote.

86.89.    The state's intentions were obvious. The President of the constitutional convention, John B. Knox, explained that the purpose of the convention was "to establish white supremacy in this State," asserting that within

> the white man [is] an inherited capacity for government, which is wholly wanting in the Negro. Before the art of reading and writing was known, the ancestors of the Anglo-Saxon had established an orderly system of government . . . the Negro on the other hand, is descended from a race lowest in intelligence and moral perceptions of the races of men.

87.90.    Delegates to the convention both understood and desired that these laws would restrict the Black vote. It was the judgment of one delegate that "th[e] poll tax qualification is the most important provision" in the proposed constitution because "in the Black Belt and . . . in many counties in the state, there is a large percentage of those young Negroes who are coming of age that will be able to read and write, [and] therefore will be qualified under the provisions of this article" to vote. "The only safety valve," he continued, "that is contained in this article, after 1903 for a large proportion of the Negroes in this State is this Poll tax of $1.50." *United States v. Alabama*, 252 F. Supp. 95, 99 (M.D. Ala. 1966). Alabama "want[ed] that poll tax to pile up so high that [Black voters] will never be able to vote again." *Id.* The state's poll tax would exist until 1966, when a federal court finally struck it down. *Id.*

88.91.    At the same time that Alabama actively worked to disenfranchise Black voters, it strove to protect the enfranchisement of white voters. For example,

to avoid unintentionally suppressing white voters, the 1901 constitution provided "grandfather clauses" that exempted voters from the constitution's voter suppression provisions if they could show, for example, a vague level of "understanding" of the U.S. Constitution or that they were veterans or descendants of veterans, requirements very few Black Alabamians at the time could meet.

89.92.    The effect of the 1901 constitution on the Black vote was staggering. In 1900 there were approximately 181,000 registered Black male voters in Alabama. By 1903, there were 3,000.

90.93.    For Alabama, even 3,000 Black voters were still too many. The state's voter suppression laws brought about one-party rule in Alabama, shifting the importance of the general election to the primary. Realizing that excluding Black voters from primary contests would effectively eliminate the chance for Black voters to influence the outcome of any election, Alabama legislators seized the opportunity by inventing the all-white primary system. Alabama expressly excluded Black voters from participating in primary elections, cutting off Black Alabamians from any hope of political power.

91.94.    Alabama fiercely defended its right to disenfranchise its Black citizens in the face of federal interference. Fearing that the United States Senate would pass a law eliminating the state's poll tax, the Alabama Legislature in 1942 congratulated its U.S. Senators on "their magnificent fight against the measure now

pending in Congress which is calculated to destroy our Poll Tax Law." *Id.* at 102.

92.95.    Legal upsets, however, only emboldened Alabama. After the Supreme Court found the use of white-only primaries unconstitutional in *Smith v. Allwright*, 321 U.S. 649 (1944), Alabama ratified a new constitutional amendment that would require new voting registrants to "understand and explain," and read and write, an article of the U.S. Constitution. Like its predecessors, this voting measure was motivated by racial discrimination. One drafter of the amendment explained that the "understanding" clause would give "discretion to the Board of Registrars and enable them to prevent from registering those elements in our community which have not yet fitted themselves for self-government."

93.96.    A court ultimately concluded that the "understanding" clause was unlawful, but Alabama quickly replaced it with a questionnaire that took advantage of the state's racial disparity in education to bar Black voters from the polls. One academic explained that even an "honestly designed educational test" would "bar the ballot to the great mass of uneducated Negroes."

94.97.    The state's effort to disenfranchise Black voters extended to its electoral devices. For example, Alabama embraced at-large elections to dilute the Black vote whenever it perceived a threat of meaningful Black voter participation. Alabama also passed a bill eliminating "single-shot" voting, which had previously enabled "a minority group to win some at-large seats if it concentrates its vote behind

a limited number of candidates and if the vote of the majority is divided among a number of candidates." *City of Rome v. United States*, 446 U.S. 156, 184 n.19 (1980), *abrogated by Shelby Cnty. v. Holder*, 570 U.S. 529 (2013).

95.98.    Further, in a primitive form of gerrymandering that would portend the more sophisticated line drawing to come, the city of Tuskegee redrew its city limits in 1957 to oust Black residents and eliminate their ability to influence city council elections. This flagrantly discriminatory gerrymander would be declared unconstitutional by the Supreme Court three years later in *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

96.99.    This period in the state's centuries-long effort to disenfranchise Black voters culminated in 1965 on "Bloody Sunday." On March 7, 1965, non-violent activists began a march from Selma to Montgomery to protest Alabama's voter suppression laws and practices. As the marchers crossed the Edmund Pettus Bridge, Dallas County Sheriff Jim Clark directed state troopers to attack the unarmed activists with billy clubs and tear gas. The country and world watched in horror.

97.100.    Bloody Sunday and the public outcry it produced motivated Congress to pass the landmark Voting Rights Act in August 1965. Because of the state's history of adopting and enforcing unconstitutional devices designed to disenfranchise Black voters, Alabama was deemed a "covered" state under the Voting Rights Act, requiring Alabama to submit changes to its electoral practices or

procedures to the U.S. Department of Justice or to a Federal District Court for approval.

98.101.    The Voting Rights Act was not the cure-all the country had hoped for: Alabama has remained incorrigibly committed to voter suppression.

99.102.    From the Act's passage in 1965 to 1982, when the Voting Rights Act was reauthorized, the Department of Justice was forced to send election observers to Alabama a staggering 107 times to prevent Alabama from restricting Black voters from accessing the polls. Between 1982 and 2006, the Department sent observers to the state another 91 times. In 1992, for example, the Department sent officials to Greensboro, Alabama after white election officials—incensed by the election of the first Black officials to local office—sought to prevent Black voters from entering polling places. All told, between 1965 and 2013 the Department blocked at least 100 of Alabama's proposed voting changes under the Voting Rights Act's preclearance process. *See* U.S. Dep't of Justice, Civil Rights Division, Voting Section, Voting Determination Letters for Alabama, http://www.justice.gov/crt/records/vot/obj_letters/state_letters.php?state=al    (last updated May 18, 2020) (listing all objections imposed against Alabama under Section 5 of the Voting Rights Act).

100.103.  Over the nearly six decades since the Voting Rights Act was passed, Alabama has been sued dozens of times over its racially discriminatory

voting practices. *See, e.g.*, *People First of Ala. v. Merrill*, 467 F. Supp. 3d 1179 (N.D. Ala. 2020) (witness requirement for absentee ballots); *Greater Birmingham Ministries v. Alabama*, 161 F. Supp. 3d 1104 (N.D. Ala. 2016) (photo identification law); *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254 (2015) (racial gerrymandering); *S. Christian Leadership Conf. of Ala. v. Sessions*, 56 F.3d 1281 (11th Cir. 1995) (at-large system for electing trial judges); *City of Pleasant Grove v. United States*, 479 U.S. 462 (1987) (selective annexations); *Hunter v. Underwood*, 471 U.S. 222 (1985) (felon disenfranchisement); *Harris v. Graddick* (*Harris I*), 593 F. Supp. 128 (M.D. Ala. 1984) (appointment of disproportionately few Black poll officials); *United States v. Alabama*, 252 F. Supp. 95 (M.D. Ala. 1966) (discriminatory administration of the poll tax); *United States v. Logue*, 344 F.2d 290 (5th Cir. 1965) (racial discrimination in voter registration); *Sims v. Baggett*, 247 F. Supp. 96 (M.D. Ala. 1965) (racial gerrymandering); *United States v. Atkins*, 323 F.2d 733 (5th Cir. 1963) (racial discrimination in voter registration).

101.104.   The Supreme Court's invalidation of Section 4 of the Voting Rights Act in *Shelby County v. Holder*, 570 U.S. 529 (2013), left the state unchecked to continue its legacy of racially discriminatory practices. The day after *Shelby County* was decided, Alabama announced that it would pursue a strict voter ID law. Alabama then proceeded to close 31 offices providing driver's license services to make it more difficult for voters to obtain the necessary photo ID to satisfy the state's new law.

An investigation by the Federal Department of Transportation concluded that "African Americans residing in the Black Belt region of Alabama were disproportionately underserved by [the state's] driver licensing services, causing a disparate and adverse impact on the basis of race."

102.    The state's conduct in this very matter makes clear that Alabama's pattern of discriminatory voting laws is hardly a thing of the past. After both this Court and the Supreme Court concluded that the 2021 Plan likely violated Section 2, Alabama willfully refused to comply with this Court's instruction that any remedial plan must provide Black Alabamians with a second district in which they had an opportunity to elect a candidate of their choice. In so doing, Alabama sought to perpetuate the racially discriminatory effects of its congressional districting scheme by contriving tenuous and facially implausible explanations for its blatant non-compliance with judicial orders.

103.105. What is briefly described here as Alabama's history of voter discrimination cannot possibly capture the state's centuries-long efforts to maintain white supremacy within its borders. Nevertheless, several federal courts, including the U.S. Supreme Court, have acknowledged the state's history in official opinions which provide additional context. *See, e.g.*, *McGregor*, 824 F. Supp. 2d at 1346 ("The intersection of political strategy and purposeful racial prejudice is nothing new. Alabama has a lengthy and infamous history of racial discrimination in

voting."); *Hunter*, 471 U.S. at 229 ("[T]he Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks . . . . The delegates to the all-white convention were not secretive about their purpose."); *Dillard v. Crenshaw Cnty.*, 640 F. Supp. 1347, 1360 (M.D. Ala. 1986) ("As the late Judge Richard T. Rives stated, 'from the Constitutional Convention of 1901 to the present, the State of Alabama has consistently devoted its official resources to maintaining white supremacy and a segregated society.'") (quoting *United States v. Alabama*, 252 F. Supp. at 101).

### H. Alabama's History of Unlawful Redistricting

104.106.   Alabama's practice of voter suppression has extended to its modern redistricting efforts. During the 1980 redistricting cycle, the Department of Justice rejected Alabama's proposed legislative redistricting plan because it reduced the number of majority-Black districts within the state. And it objected again to Alabama's revised map because it intentionally "cracked" Black voters in Black Belt counties.

105.107.   The Department also intervened in Alabama's 1992 redistricting plan for appearing once again to "crack" majority-Black voting populations to dilute Black voting power.

106.108.   During the 2010 redistricting cycle, Alabama packed the state's existing majority-Black legislative districts with many more Black voters, with the

result of limiting the number of districts in which Black voters would have an opportunity to elect their preferred candidates. Of the 15,785 individuals added to Senate District 26, for example, only 36 were white. *Ala. Legis. Black Caucus*, 575 U.S. at 260.

107.109.   The state's "packing" of Black Alabamians in House and Senate districts drew a lawsuit from the Alabama Legislative Black Caucus and the Alabama Democratic Conference, who argued that Alabama's state legislative redistricting plans were racial gerrymanders that diluted the Black vote. After being reversed by the U.S. Supreme Court, the United States District Court for the Middle District of Alabama agreed with the plaintiffs, concluding that several state House and Senate districts were unconstitutionally drawn on the basis of race. *Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026 (M.D. Ala. 2017).

110.        During the 2020 redistricting cycle, Alabama continued its practice of diluting Black voting strength by *twice* adopting a congressional plan that prevented Black voters from having the ability to elect a candidate of their choice in more than one district. This Court and the Supreme Court found that Alabama's 2021 plan likely diluted the voting power of Black voters in violation of Section of the Voting Rights Act. Undeterred, in open defiance of this Court's order, and notwithstanding the extensive evidence in the record of a Section 2 violation, Alabama enacted the 2023 Plan to achieve the same dilutive effect as the 2021 Plan.

This litigation

108.111.   The state's conduct in this very matter makes clear that Alabama's pattern of discriminatory voting laws is hardly a thing of the past and has made plain that without judicial intervention Alabama would remain committed to diluting the voting power of its Black citizens. After both this Court and the Supreme Court concluded that the 2021 Plan likely violated Section 2, Alabama willfully refused to comply with this Court's instruction that any remedial plan must provide Black Alabamians with a second district in which they had an opportunity to elect a candidate of their choice. In so doing, Alabama sought to perpetuate the racially discriminatory effects of its congressional districting scheme by contriving tenuous and facially implausible explanations for its blatant non-compliance with judicial orders.

## I. Ongoing Effects of Alabama's History of Discrimination

109.112.   Black Alabamians lag behind their white counterparts on nearly every measure, including in areas such as education, employment, income, and access to health care. For example, according to the five-year American Community Survey between 2015 and 2019, 27 percent of Black Alabamians were living below the poverty line, more than twice the number of impoverished white Alabamians during the same period. And according to one report, white Alabamians lead their Black counterparts in bachelor's degrees by double-digits. Indeed, education

outcomes for Black Alabamians are particularly dire. As of 2014, 43 school districts in Alabama were under some form of federal oversight as a result of continued segregation, despite the Supreme Court's *Brown v. Board of Education* decision 60 years ago.

110.113.  Black Alabamians also lag behind economically. Black incomes are substantially lower than those paid to their white counterparts, and Black Alabamians are unemployed within the state at much higher rates, too. Similar disparities exist in the areas of housing, home ownership, and access to a vehicle.

111.114.   Low-income voters face a number of hurdles to voter participation including working multiple jobs, working during polling place hours, lack of access to childcare, lack of access to transportation, and higher rates of illness and disability. All of these hurdles make it more difficult for poor and low-income voters to participate effectively in the political process.

## J.  History of Racial Appeals in Political Campaigns

112.115.   Political campaigns in Alabama have long relied on explicit and implicit racial appeals to stir voters.

113.116.   At the height of Jim Crow, Governor George Wallace famously ran on a platform of "segregation now, segregation tomorrow, segregation forever." Sadly, such sentiments were not confined to that era.

114.117.   In 2010, some Alabama state senators were recorded strategizing

about suppressing Black voter turnout by keeping an issue important to Black Alabamians—whether to legalize electronic bingo—off the ballot. In these conversations, then-state Senator Scott Beason, then-state Representative Benjamin Lewis (now an appointed county judge), and other influential members of the Alabama legislature are heard targeting Black voters for "mockery and racist abuse." *McGregor*, 824 F. Supp. 2d at 1346. They referred to Blacks as "Aborigines" and "Indians" and predicted that if the ballot measure appeared on the ballot "every black in this state will be bused to the polls . . . [e]very black, every illiterate would be bused on HUD financed buses." *Id.* at 1345 (citation and internal quotation marks omitted). A federal district court found that the state senators' efforts to depress Black voter turnout constituted an intentionally discriminatory "scheme" to "maintain and strengthen white control of the political system," and that "political exclusion through racism remains a real and enduring problem in this State." *Id.* at 1347.

115.118.  Still more, at a November 2015 rally for then-candidate Donald Trump in Birmingham, a peaceful Black Lives Matter protester was punched and kicked by a group of men yelling, "Go home nigger," after the protester interrupted Trump's speech by shouting "Black Lives Matter!" The next day, referring to the beaten Black Lives Matter protester, then-candidate Trump stated, "Maybe he should have been roughed up, because it was absolutely disgusting what he was

doing."

116.119.  More recently, Roy Moore, who ran for U.S. Senate in 2017, stated at a revival in Jackson, Alabama, "They started [to] create new rights in 1965, and today we've got a problem," an apparent reference to the Voting Rights Act. When asked to speak about the last time America was great, Moore stated, "I think it was great at the time when families were united—even though we had slavery—they cared for one another . . . . Our families were strong, our country had a direction."

**K. Extent to Which Black Alabamians Have Been Elected to Public Office**

117.120.  As a consequence of Alabama's past history of voter suppression and racial discrimination, Black Alabamians have struggled to be elected to public office in the state.

118.121.  From Reconstruction until 1992, Alabama failed to elect a single Black representative to Congress. Although today 27.2 percent of Alabama's population is Black, not one statewide elected office is currently held by a Black Alabamian. And Alabama has never had a Black governor or U.S. senator.

119.122.  It took the creation of the state's first majority-Black district through litigation—CD 7—before a Black Alabamian could win election to federal office. The citizens of CD 7 have elected a Black representative in every election since 1992, and today CD 7 is represented by Congresswoman Terri Sewell, who first won the seat in 2010.

120.123.  But Black voters in Alabama have been limited to a single Black member of Congress for thirty years. And because of the state's racially polarized voting, it is unlikely to elect another Black candidate to Congress absent the creation of a second congressional district "in which Black voters either comprise a voting-age majority or something quite close to it." PI Order, ECF No. 101, at 6.

121.124.  Black Alabamians have fared no better in statewide elections. Not a single statewide office in the state is held by a Black official—indeed, a Black official has not held a statewide office in the past 23 years. And no Black Alabamian has ever held a non-judicial statewide office. Even the only two Black candidates ever to have won a statewide judicial election have done so only after first being appointed by the Governor.

122.125.  Finally, although the state's Legislature has several Black members, the lion's share of these legislators won their seats only after court-ordered redistricting plans created new majority-Black districts.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of Section 2 of the Voting Rights Act
### 52 U.S.C. §§§ 10301; 42 U.S.C. § 1983
### Vote Dilution

123.126.  Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the count below as though fully set forth

herein.

124.127.   Section 2 of the Voting Rights Act prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that results in the denial or abridgement of the right of any U.S. citizen to vote on account of race, color, or membership in a language ~~majority-Black~~minority group. 52 U.S.C. § 10301(a).

125.128.   The district boundaries created by ~~SB 5~~the 2023 Plan combine to "crack" and "pack" Black Alabamians, resulting in the dilution of their electoral strength in violation of Section 2 of the Voting Rights Act.

126.129.   Black Alabamians are sufficiently numerous and geographically compact to constitute a majority of eligible voters in two congressional districts.

127.130.   Black voters in CDs 1, 2, 6, and 7 are politically cohesive, and elections in the state reveal a clear pattern of racially polarized voting that allows blocs of white voters usually to defeat Black-preferred candidates.

128.131.   The totality of the circumstances establishes that the enacted congressional plan has the effect of denying Black voters an equal opportunity to participate in the political process and to elect candidates of their choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

132.        ~~In enforcing the district boundaries in SB 5~~In enforcing the district boundaries in the 2023 Plan, Defendant has acted and, absent relief from this Court,

will act to deny Plaintiffs' rights guaranteed to them by Section 2 of the Voting Rights Act. Plaintiffs seek relief and all available remedies under 42 U.S.C. § 1983 and Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

## COUNT II

### Violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301; 42 U.S.C. § 1983
### Intentional Racial Discrimination

133.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the count below as though fully set forth herein.

134.     Section 2 of the Voting Rights Act prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that has the purpose and effect of denying or abridging the right of any U.S. citizen to vote on account of race, color, or membership in a language minority group. 52 U.S.C. § 10301(a).

135.     One of the motivating factors in the drawing and passage of the 2023 Plan was a racially discriminatory purpose. Specifically, the 2023 Plan was drafted and passed at least in part to minimize the political power of Black Alabamians by limiting their ability to influence congressional elections to a single district out of seven.

136.     The district boundaries created by the 2023 Plan combine to

"crack" and "pack" Black Alabamians, resulting in the intentional dilution of their electoral strength in violation of Section 2 of the Voting Rights Act.

137.    Black Alabamians are sufficiently numerous and geographically compact to constitute a majority of eligible voters in two congressional districts.

138.    Black voters in CDs 1, 2, 6, and 7 are politically cohesive, and elections in the state reveal a clear pattern of racially polarized voting that allows blocs of white voters usually to defeat Black-preferred candidates.

139.    The totality of the circumstances establishes that the enacted congressional plan has the effect of denying Black voters an equal opportunity to participate in the political process and to elect candidates of their choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

140.    Moreover, other circumstantial evidence, including the Senate Factors and the *Arlington Heights* factors, supports a finding that the Legislature had a discriminatory purpose in enacting the 2023 Plan. For instance, Alabama has a well-documented and recent history of discriminating against Black Alabamians in districting, especially in congressional and state-legislative redistricting.

141.    Most recently, in this very case, Alabama went so far as to defy this Court's clear order—affirmed by the Supreme Court—rather than provide Black voters in Alabama with the fair electoral opportunities that the Voting Rights Act requires. It did so knowing that its actions would have the effect of diluting Black

voting strength in Alabama.

142.    The 2023 Plan was thus enacted with both the intent and the effect of diluting Black Alabamians' electoral strength in violation of Section 2 of the Voting Rights Act.

~~129.~~143.   In enforcing the district boundaries in the 2023 Plan, Defendant has acted and, absent relief from this Court, will act to deny Plaintiffs' rights guaranteed to them by Section 2 of the Voting Rights Act. Plaintiffs seek relief and all available remedies under 42 U.S.C. § 1983 and Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.  Declare that ~~SB 5~~the 2023 Plan violates Section 2 of the Voting Rights Act because it has the effect of denying Black voters an equal opportunity to participate in the political process and to elect candidates of their choice;

~~A.~~B.   Declare the 2023 Plan violates Section 2 of the Voting Rights Act because it was passed with discriminatory intent as a motivating factor and has a discriminatory effect;

~~B.~~C.   Enjoin Defendant, as well as his agents and successors in office, from enforcing or giving any effect to the boundaries of the congressional districts as drawn in ~~SB 5~~the 2023 Plan, including an injunction barring

Defendant from conducting any further congressional elections under ~~SB 5~~the 2023 Plan;

~~C.~~D.  Hold hearings, consider briefing and evidence, and otherwise take actions necessary to order the adoption of a valid congressional plan that includes two congressional districts in Alabama in which Black voters have an opportunity to elect their candidates of choice;

~~D.~~E.  Grant such other or further relief the Court deems appropriate, including but not limited to an award of Plaintiffs' attorneys' fees and reasonable costs.

Respectfully submitted,

By /s/ *Abha Khanna*

Abha Khanna*
~~Makeba Rutahindurwa~~*
**Elias Law Group LLP**
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
Phone: (206) 656-0177
AKhanna@elias.law
~~MRutahindurwa@elias.law~~

Dated: ~~January 31, 2024~~February 24, 2025

Richard P. Rouco
(AL Bar. No. 6182-R76R)
**Quinn, Connor, Weaver, Davies & Rouco LLP**
Two North Twentieth
2-20th Street North, Suite 930
Birmingham, AL 35203
Phone: (205) 870-9989
Fax: (205) 803-4143
Email: rrouco@qcwdr.com

Lalitha D. Madduri*
~~Joseph N. Posimato~~Richard A. Medina*
~~Jyoti Jasrasaria~~Qizhou Ge*
**Elias Law Group LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, D.C. 20001
Phone: (202) 968-4490
LMadduri@elias.law
~~JPosimato~~RMedina@elias.law
~~JJasrasaria~~AGe@elias.law

*Attorneys for Plaintiffs*
*\*Admitted Pro Hac Vice*