FILED

2026 May-07  PM 04:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

EVAN MILLIGAN, *et al.*,

    Plaintiffs,

    v.

WES ALLEN, *et al.*,

    Defendants.

Case No.: 2:21-cv-01530-AMM

MARCUS CASTER, *et al.*,

    Plaintiffs,

    v.

WES ALLEN, in his official capacity as Alabama Secretary of State,

    Defendant.

Case No.: 2:21-cv-1536-AMM

## *CASTER* PLAINTIFFS' RESPONSE TO DEFENDANTS' EMERGENCY MOTION TO STAY (ECF NO. 427)

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

LEGAL STANDARD...........................................................................................4

ARGUMENT ......................................................................................................4

I.    Defendants have knowingly waived the right to seek a stay and, in
      any event, are estopped from seeking such relief.............................................4

II.   Defendants fail to show irreparable harm. .....................................................10

III.  The mere prospect of remand in view of *Callais* does not alter
      Defendants' likelihood of success on the merits, particularly based
      on the record in this case. ...........................................................................13

IV.   The equities weigh staunchly against facilitating Defendants' effort
      to undermine this Court's injunction.............................................................18

CONCLUSION...................................................................................................22

**INTRODUCTION**

Almost exactly a year ago, the Chairs of Alabama's legislative committees tasked with redistricting told this Court that they agreed to "voluntarily forgo *any rights* that they may have to attempt to draw an additional congressional district map" before the release of the 2030 Census. ECF No. 404 ¶ 3 (emphasis added). They further stated they would *not* challenge "the duration of an injunction that requires the Secretary of State to use the [Special Master] Plan for the 2026, 2028, and 2030 congressional elections." ECF No. 411 ¶ 2. Thus, Defendants represented to this Court that—in order to "maintain[] the status quo pending any appeal"— they would not seek to replace Alabama's current congressional map "so long as the Special Master's Remedial Plan 3 . . . remains in place," as it has since October 2023. ECF No. 404 ¶ 4.

To be sure, Defendants made clear that their commitments were "subject to [their] rights to appeal," *id.* ¶ 6, but they consistently maintained that unless and until "the defendants prevail on appeal" the Special Master Plan will remain in place. ECF No. 416 at 38:3–6; *see also id.* at 66:2-3 ("In other words, the *appeal in this case* will determine what map is used for the rest of the decade.") (emphasis added). And because that appeal remains pending, Defendants' "agreement to continue to enforce this Court's remedial plan through the 2030 congressional elections" remains in place as well. ECF No. 416 at 26:20–25; *see also* ECF No. 411 ¶ 1 ("Defendants

1

represented to the Court and continue to represent to the Court that the Special Master Plan 3 . . . will remain in place for the 2026, 2028 and 2030 congressional elections, subject to Defendants' rights on appeal."). As Defendants acknowledge, *that* plan—which was drawn blind to race—reflects the "status quo," ECF No. 404 ¶ 4, rather than the 2023 map enacted by the Legislature, which has never even been used.

Defendants now seek to disrupt the status quo by asking for the very relief they previously elected to "voluntarily forgo." That extraordinary demand should be rejected for several reasons. To start, Defendants have knowingly waived the opportunity to seek to stay or truncate this Court's mandatory injunction and, in any event, are judicially estopped from the backflip they now attempt. To permit such bad faith legal maneuvering would "mak[e] a mockery of justice." *Am. Nat'l Bank v. Fed. Dep. Ins. Corp.*, 710 F.2d 1528, 1536 (11th Cir. 1983) (explaining that "[j]udicial estoppel is applied to the calculated assertion of divergent sworn positions"). Further still, Defendants make only a fleeting assertion of irreparable harm, with nary an explanation for how that harm apparently first arose nearly a year after this Court's merits determination and nine months after entry of its permanent injunction. Indeed, the equities weigh staunchly against Defendants' effort to circumvent this Court's longstanding injunction—and to alter Alabama's existing congressional maps—in order to facilitate the Legislature's parallel efforts to void

an ongoing primary election. Defendants themselves previously cried foul over such alterations months *ahead* of these deadlines, yet now seek similar revisions less than *two weeks* before Alabama's primary election.

On the merits, Defendants do not even claim they are likely to prevail on Plaintiffs' claims—merely that the Supreme Court may "vacate and remand for further proceedings" in light of the *Callais* decision. ECF No. 427 ("Mot.") at 1. But as the Supreme Court itself has explained, remanding based on intervening precedent merely invites "further consideration" by lower courts and is not otherwise a "final determination on the merits." *Tyler v. Cain*, 533 U.S. 656, 666 n.6 (2001) (citation omitted). So the mere prospect of remand says nothing about Defendants' likelihood of success on the merits, as nearly every circuit has explained. In any event, even if Defendants bothered to claim a probability of success on the merits, such an effort would fail in view of the many differences between this case and *Callais*— differences that the *Caster*, *Singleton*, and *Milligan* Plaintiffs have already identified to the Supreme Court in response to Defendants' motion to expedite their still-pending appeal.

Defendants' emergency motion reflects a cynical about-face from numerous statements previously made in open court and filings before this tribunal, both with respect to their election administration plans *and* the feasibility of late-in-time

changes to Alabama's maps. The Court should emphatically reject such gamesmanship and deny the motion.

## LEGAL STANDARD

"[F]our factors are relevant to granting a stay: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Hand v. Scott*, 888 F.3d 1206, 1207 (11th Cir. 2018) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)). "The first two factors are the 'most critical.'" *Id.* (quoting *Nken*, 556 U.S. at 426).

## ARGUMENT

**I.  Defendants have knowingly waived the right to seek a stay and, in any event, are estopped from seeking such relief.**

Defendants have, by word and deed, purposefully waived any conceivable right to a stay through "the intentional relinquishment or abandonment of a known right." *Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004) (internal quotation marks and citation omitted). In contrast to mere forfeiture, "[w]aiver directly implicates the power of the parties to control the course of the litigation; if a party affirmatively and intentionally relinquishes an issue, then courts must respect that decision." *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) (en banc). Indeed, "federal courts do not have 'carte blanche to depart from the principle of party

4

presentation basic to our adversary system,' [and] it is an 'abuse of discretion' for a court 'to override a deliberate waiver.'" *Id.* (alteration omitted) (quoting *Wood v. Milyard*, 566 U.S. 463, 472–73 (2012)). These principles inform the very scope of the Court's equity jurisdiction: while federal courts "enjoy broad jurisdiction and equitable power, a party can waive rights that the court could otherwise protect." *FTC v. Elite IT Partners, Inc.*, 91 F.4th 1042, 1047 (10th Cir.) (further observing that "a party can freely waive the right to invoke the court's jurisdiction or equitable authority"), *cert. denied*, 145 S. Ct. 150 (2024).

Defendants' waiver of any right to a stay of the injunction could hardly have been more explicit. They told the Court they would "voluntarily forgo any rights" to replace the Special Master Plan *specifically* to "maintain[] the status quo pending appeal." ECF No. 404 ¶¶ 3–4. Defendants also affirmatively represented that "they will not challenge on appeal the duration of an injunction that requires the Secretary of State to use . . . Special Master [Plan 3] for the 2026, 2028, and 2030 congressional elections." ECF No. 411 ¶ 2. When Judge Marcus asked what the consequence of that concession was, defense counsel responded: "I think it is effectively a waiver of our right to contest a mandatory injunction as being entered that extends too long." ECF No. 416 at 39:22–24. When pressed what would occur if a future Legislature purported to adopt new maps—precisely what Defendants now contemplate— defense counsel again conceded the Secretary "has to comply" with this Court's

5

injunction and it "doesn't matter what maps they pass." *Id.* at 42:6–11. In other words, Defendants *repeatedly* agreed to abide by the current map—and waived any right to redraw it, upend it, or truncate its duration—subject only "to the Defendants' rights to appeal." ECF No. 404 ¶ 6. Defendants have exercised those appellate rights, but are not entitled to unwind the clock on their waiver of any right to undo this Court's injunction while that appeal is pending.

*Callais* offers them no basis for a do-over. That case was first argued *prior* to Defendants' representations, and the Secretary's own counsel here submitted two amicus briefs in support of Louisiana in January 2025 and September 2024, respectively. *See* Brief of Alabama and 13 Other States, *Louisiana v. Callais*, Nos. 24-109, 24-110 (U.S. Jan. 28, 2025); Brief of Alabama and 12 Other States, *Louisiana v. Callais*, Nos. 24-109, 24-110 (U.S. Sept. 3, 2024). Defendants staked their position fully knowing that *Callais* was pending.

Even if Defendants' past statements somehow do not rise to the level of waiver, Defendants are nonetheless estopped from backtracking on their prior commitments. The "doctrine of judicial estoppel is applied to the calculated assertion of sworn divergent positions, and is designed to prevent parties from making a mockery of justice by inconsistent pleadings." *Allapattah Servs., Inc. v. Exxon Corp.*, 372 F. Supp. 2d 1344, 1367 (S.D. Fla. 2005) (collecting authority); *accord New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (explaining that "[w]here a

6

party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position"). In *New Hampshire*, the Supreme Court identified three factors that "typically inform the decision whether to apply" judicial estoppel. 532 U.S. at 750. First, the party's two positions must be clearly inconsistent. *Id.* Second, the party must have succeeded in persuading a court to accept its earlier position. *Id.* And third, the party must "derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 751.

Each factor weighs in favor of estoppel here. *First*, Defendants previously, and repeatedly, took the position that the Special Master's map would remain in place for the 2026, 2028, and 2030 congressional elections subject only to a ruling on the merits of their appeal, "thus maintaining the status quo pending any appeal." ECF No. 404 ¶ 4; *see also* ECF No. 417, Ex. A at 8 (noting Legislators' representation "'that the Legislature is out of the map-drawing business outside of the context of this litigation' and that 'the [pending] *appeal in this case* will determine what map is used for the rest of the decade'" (emphasis added) (quoting ECF No. 416 at 65–66)). But now they seek a stay in order to facilitate Alabama conducting the "fast approaching" congressional elections "under the 2023 Plan," ECF No. 427 at 7, a map that has never been used in any congressional election, even though the merits of Defendants' appeal remain unresolved. Defendants'

previous representation that they would forego any change to the status quo through 2030 unless they "prevail on appeal," ECF No. 416 at 38:3–6, is flatly inconsistent with their current attempt to upend the status quo based on the prospect that this case may require "reconsider[ation] in light of *Callais*," ECF No. 427 at 3.

That is not the only inconsistency. Defendants previously took the view that "chaos" would ensue if this Court effectuated new districts "days before the candidate qualifying deadline and less than *two months* before absentee voting is to begin," Emergency Application for Administrative Stay and Stay at 38–39, *Merrill v. Milligan*, No. 21-1087 (U.S. Jan. 28, 2022) (emphasis added)—a view they apparently now abandon in their rush to set up new maps less than *two weeks* before Alabama's currently scheduled primary, *see also* ECF No. 71 at 28, 120–23 (making similar arguments); *accord Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring) (explaining it would have taken "heroic efforts" to respond to an injunction issued "just seven weeks" before the first day of absentee voting). Those positions are "clearly inconsistent." *New Hampshire*, 532 U.S. at 750.

*Second*, Defendants persuaded the Court to accept their representations at the remedial phase, as evinced by the Court's serial reference to these concessions in its permanent injunction order. *See* ECF No. 417, Ex. A at 8–9, 11, 13. That is particularly reflected in the Court's decision to decline relief under Section 3(c) of the Voting Rights Act. As the Court explained then, "So long as the Legislature does

not pass any legislation that would violate the injunctive relief we have entered, and the Secretary abides by our injunctions, we can discern no compelling reason to tread into such intrusive waters." ECF No. 417, Ex. A at 13. In other words, Defendants obtained a beneficial ruling from this Court made in reliance on a position Defendants now seek to abandon.[1]

*Third*, Defendants would plainly derive unfair advantage from being permitted to backtrack on their prior representations that the Special Master's Map would govern pending resolution of their merits appeal. Those representations informed how the parties approached the remedial phase of this litigation and, in turn, the parties and numerous third parties across Alabama have acted in reliance on those representations for purposes of the 2026 congressional elections. Indeed, Alabamians are participating in elections that Defendants promised to hold under the Special Master's map *as this motion is being briefed.* Candidates have already qualified, accepted contributions, and have been certified for the May 19 primary, and absentee ballots were distributed nearly five weeks ago to overseas voters, while

---

[1] The fact that Defendants more generally lost on the merits before this Court is of no consequence. Judicial estoppel applies where "a court accepted the party's position, even though the party lost the judgment." 18B *Wright & Miller's Federal Practice & Procedure Juris.* § 4477.2 & n.6 (3d ed. updated Apr. 2026).

all other absentee voters have been eligible to request and receive ballots since late March.[2]

Fundamentally, judicial estoppel serves "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. at 749 (internal quotation marks and citation omitted). That principle applies with full force here. The present posture of the case was entirely foreseeable when Defendants committed to using the Special Master's map for the duration of their merits appeal. The Court should hold them to that commitment.

## II.    Defendants fail to show irreparable harm.

"The authority to grant stays has historically been justified by the perceived need 'to prevent irreparable injury to the parties or to the public' pending review." *Nken*, 556 U.S. at 432 (quoting *Scripps-Howard Radio v. FCC*, 316 U.S. 4, 9 (1942)). Thus, an "applicant for stay first must show irreparable harm if a stay is denied." *Rubin v. United States*, 524 U.S. 1301 (1998) (Rehnquist, J., in chambers), and "the absence of a substantial likelihood of irreparable injury" precludes equitable relief, *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam).

---

[2] *See* Ala. Sec'y of State, *Administrative Calendar: 2026 Statewide Election*, https://www.sos.alabama.gov/sites/default/files/election-2026/AdminCalendar%20-2026.pdf; 52 U.S.C. § 20302(a)(8).

Defendants make only a fleeting effort to show irreparable harm through the bare invocation of "the State's sovereign interests," including use of "its lawfully enacted map." Mot. at 6. But those purported interests should have been no less apparent to Defendants a year ago when this Court issued its liability determination, *see* ECF No. 401, or nine months ago when this Court entered a permanent injunction, *see* ECF No. 417. A delay of "even only a few months . . . militates against a finding of irreparable harm," *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (concluding "five-month delay" contradicted claim of irreparable harm), and courts routinely find that claims of irreparable harm are undermined by delays similar to those here.[3] Indeed, such delay is particularly confounding in the stay context, where the supposed harm of an injunction should be apparent to the affected party from the get-go. *See Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977) (explaining that party's request for a stay "20 days after filing their certiorari petition" reflected "delay in . . . seeking a stay [that] vitiates much of the force of their allegations of irreparable harm").

---

[3] *See also Badillo v. Playboy Ent. Grp., Inc.*, No. 8:04-CV-591-T-30TBM, 2004 WL 1013372, at \*2 (M.D. Fla. Apr. 16, 2004) (denying preliminary injunction where movant failed to "explain the over nine month delay" in seeking relief); *Hernandez v. Stingray Grp. Inc.*, No. 24-CV-21226, 2025 WL 2263629, at \*9 (S.D. Fla. Mar. 10, 2025) (ten-month delay is "reason enough to undermine the showing of irreparable harm"); *Zea v. Nat'l Ass'n of Realtors®*, No. 25-CV-81016, 2026 WL 236311, at \*3 (S.D. Fla. Jan. 14, 2026) (similar for one year delay).

11

Defendants' delay is particularly inexcusable because nothing has changed about the nature of their alleged irreparable harm since the Court issued its merits ruling and permanent injunction. "When determining if the movant delayed in seeking [equitable relief], courts look to when the movant first learned" of the alleged irreparable harm. *Tallahassee Bail Fund v. Marshall*, No. 4:22CV297-MW/MAF, 2022 WL 22804776, at *3 (N.D. Fla. Oct. 11, 2022) (collecting authority). After all, for harm to be irreparable, it must also be "actual and imminent." *Siegel*, 234 F.3d at 1176–77 (citation omitted). Here, Defendants' perfunctory claim of irreparable harm "relie[s] exclusively on evidence that was available" when the alleged harm first arose, undercutting any notion of imminence. *Wreal*, 840 F.3d at 1248. Equitable relief "will generally not be granted in favor of one who, with full knowledge of what is being done or with the means of acquiring such knowledge, acquiesces or delays in asserting rights until" the point at which the status quo can be "alter[ed] only with great damage." 42 *Am. Jur. 2d Injunctions* § 44 (2025) (footnote omitted); *cf. Tread Athletics LLC v. Germanowski*, No. 25-14295-CV, 2025 WL 3554217, at *2 (S.D. Fla. 2025) ("Inexcusable delay, or laches, can defeat a claim for injunctive relief.").

Finally, Defendants' effort to establish irreparable harm by pointing to an intervening *merits* decision in another case goes nowhere. Notwithstanding Defendants' mistaken belief that their fortunes on the *merits* have improved, *but see*

12

*infra* § III, they cite no authority for the notion that improved odds on the merits can obviate the requirement to prove irreparable harm. The opposite is true: "When considering success on the merits and irreparable harm, courts cannot dispense with the required showing of one simply because there is a strong likelihood of the other." *Nken*, 556 U.S. at 438 (Kennedy, J., concurring). Accordingly, regardless of whether Defendants are right or wrong about the impacts of *Callais* on the merits, they "cannot rely solely on [their perceived] likelihood of success on the merits . . . to establish a likelihood of irreparable harm." *Hoop Culture, Inc. v. GAP Inc.*, 648 F. App'x 981, 985 (11th Cir. 2016) (collecting authority); *see also United States v. Lambert*, 695 F.2d 536, 540 (11th Cir. 1983) (explaining that "success in establishing a likelihood it will prevail on the merits does not obviate the necessity to show irreparable harm"). Defendants' bare reliance on *Callais* as a source of irreparable harm simply confirms the rank opportunism of their stay motion, rather than bona fide harm.

**III.  The mere prospect of remand in view of *Callais* does not alter Defendants' likelihood of success on the merits, particularly based on the record in this case.**

On the merits, Defendants contend that the Supreme Court's recent decision in *Callais* will require vacatur and reconsideration of this Court's injunction. *See* Mot. at 3. But, tellingly, they never actually assert that they are likely to *prevail* on the merits of Plaintiffs' claims—only that they "are likely to succeed in showing that

vacatur in light of *Callais* is necessary." *Id.* at 6; *see also id.* at 1 (arguing the injunction "will need to be vacated and reconsidered"). That distinction is important because merely obtaining reconsideration of this Court's injunction is *not* the same as achieving success *on the merits*: "The decision to remand is not a resolution of the controversy on its merits." *Loffland Bros. Co. v. Rougeau*, 655 F.2d 1031, 1032 (10th Cir. 1981); *see also Fleming v. FCC*, 225 F.2d 523, 526 (D.C. Cir. 1955) (explaining "it is not unusual for an appellate body to 'remand causes for further proceedings without deciding the merits'" (quoting *Ford Motor Co. v. NLRB*, 305 U.S. 364, 373 (1939)); *Menders v. Loudoun Cnty. Sch. Bd.*, 65 F.4th 157, 166 (4th Cir. 2023) ("Without expressing a view on the merits, we remand for the consideration of these claims on the merits and for further action consistent with this opinion."); *Aguilar-Quintanilla v. McHenry*, 126 F.4th 1065, 1071 (5th Cir. 2025) ("As we have cautioned before, remand is no indicator of success on the merits."). The same is true for vacatur, which merely removes a lower court's judgment or order, but does not itself dispose of a case on the merits. *See, e.g.*, *SDVF, LLC v. Cozzia USA LLC*, 132 F.4th 1114, 1118 (9th Cir. 2025) (explaining that an "order vacating a judgment is not" itself "a judgment" under Rule 60); *accord Miners' Bank of Dubuque v. United States ex rel. Grant*, 46 U.S. 213, 215 (1847) ("Reversing the judgment, and awarding a new trial, is not a final judgment."). That is particularly so when a higher court grants "an appellate vacation of judgment for consideration

14

in light of a particular decision" which is "'much more limited in nature' than a general vacation by an appellate court, and its effect is 'not to nullify all prior proceedings.'" *United States v. Tamayo*, 80 F.3d 1514, 1520 (11th Cir. 1996) (quoting *United States v. M.C.C. of Fla., Inc.*, 967 F.2d 1559, 1562 (11th Cir. 1992)).

Indeed, the Supreme Court routinely remands matters without opining on the ultimate merits. *E.g.*, *Tyler*, 533 U.S. at 666 n.6 (explaining that "remand[] for further consideration" in light of intervening authority is "not a 'final determination on the merits'" (quoting *Henry v. Rock Hill*, 376 U.S. 776, 777 (1964) (per curiam)); *Rock Hill*, 376 U.S. at 777 (explaining an "earlier remand did not amount to a final determination on the merits"); *Villa v. Van Schaick*, 299 U.S. 152, 155 (1936) (per curiam) (remanding while "express[ing] no opinion as to the merits").

This is also true when the Supreme Court employs its GVR procedure to vacate and remand a case. *See Wellons v. Hall*, 558 U.S. 220, 225–26 (2010) (per curiam) (explaining GVR "assists this Court by procuring the benefit of the lower court's insight *before we rule on the merits*" (emphasis added) (quoting *Lawrence ex rel. Lawrence v. Chater*, 516 U.S. 163, 167 (1996) (per curiam)). As numerous circuit courts, including the Eleventh Circuit, have recognized, the Supreme Court's use of a "GVR [order] makes no decision as to the merits of a case." *Diaz v. Stephens*, 731 F.3d 370, 378 (5th Cir. 2013) (citing *Tyler*, 533 U.S. at 666 n.6); *see also M.C.C. of Fla.*, 967 F.2d at 1562 (explaining a GVR "merely requires further consideration

15

in light of a new Supreme Court decision"); *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 845 (6th Cir. 2013) ("The GVR order is not equivalent to reversal on the merits, nor is it an invitation to reverse" (citation modified) (citing *Tyler*, 533 U.S. at 666 n.6)); *Texas v. United States*, 798 F.3d 1108, 1116 (D.C. Cir. 2015) ("[I]t is well-settled that a GVR has no precedential weight and does not dictate how the lower court should rule on remand."); *United States v. Norman*, 427 F.3d 537, 538 n.1 (8th Cir. 2005) ("The GVR is not the equivalent of a reversal on the merits, however. Rather, the Court remands for the sake of judicial economy-so that the lower court can more fully consider the issue with the wisdom of the intervening development."); *Hughes Aircraft Co. v. United States*, 140 F.3d 1470, 1473 (Fed. Cir. 1998) ("Vacatur and remand by the Supreme Court, however, does not create an implication that the lower court should change its prior determination."); *Gonzalez v. Justs. of Mun. Ct. of Bos.*, 420 F.3d 5, 7 (1st Cir. 2005) ("The GVR order itself does not constitute a final determination on the merits; it does not even carry precedential weight.").

Vacatur and remand in such cases "is neither an outright reversal nor an invitation to reverse; it is merely a device that allows a lower court that had rendered its decision without the benefit of an intervening clarification to have an opportunity to reconsider that decision and, if warranted, to revise or correct it." *Gonzalez*, 420

16

F.3d at 7. That Defendants here merely raise the prospect of remand—but stop short of even asserting a probability of success on the merits—dooms their stay request.

Such an assertion would fail in any event. *Callais* expressly did "not overrule[] *Allen*," *Louisiana v. Callais*, Nos. 24-109 & 24-110, 2026 WL 1153054, at *18 (U.S. Apr. 29, 2026), the reasoning of which continues to govern this case, *see Allen v. Milligan*, 599 U.S. 1, 21 (2023). For good reason. The remedial districts at issue here were drawn race-blind by a court-appointed special master "without any particular difficulty." *Caster v. Allen*, No. 2:21-CV-1536-AMM, 2025 WL 1643532, at *210 (N.D. Ala. May 8, 2025). And they were adopted to remedy a Section 2 violation nearly identical to the one affirmed on the merits in *Allen*. Further still, the Supreme Court has already spotted a critical difference between how Louisiana and Alabama have defended their congressional maps—whereas Louisiana had "been forthright from the beginning that its aim was to protect the State's most prominent Republican House members," Alabama "did not defend its [2021] map on the ground that it was drawn to achieve a political objective." *Callais*, 2026 WL 1153054, at *18. The same is true of the 2023 map, which this Court determined to be predominantly motivated by "racial animus," rather than "partisan goals." *Caster*, 2026 WL 1643532, at *214.

Defendants also fail to grapple with the fact that this Court's injunction rests upon the independently sufficient determination that the 2023 plan amounted to

17

intentional race discrimination in violation of the Fourteenth Amendment—a claim not at issue in *Callais*. *See Caster*, 2025 WL 1643532, at *8 (concluding "the 2023 Plan" cannot be understood "as anything other than an intentional effort to dilute Black Alabamians' voting strength"). Thus, unlike the litigants in *Callais*, Defendants' liability turns on their "deliberate decision to ignore, evade, and strategically frustrate requirements spelled out in a court order" affirmed by the Supreme Court in *Allen*. *Id.* at *10. Defendants fail to address, let alone explain away, these material differences between this case and *Callais*—never mind the "overwhelming evidentiary record" of racial discrimination. *Id.* at *158. Accordingly, they do not show a probability of success on the merits.

## IV. The equities weigh staunchly against facilitating Defendants' effort to undermine this Court's injunction.

The remaining equities likewise cut against a stay. For one, Defendants have done little to show they are likely to prevail on the merits, meaning there is little reason to doubt this Court's conclusion that Alabama's 2023 map reflects "an intentional effort to dilute Black Alabamians' voting strength and evade the unambiguous requirements of court orders standing in the way." *Caster*, 2025 WL 1643532. It is beyond cavil that the public interest is best served by holding elections free from such discrimination, particularly given that the currently extant Special Master map was drawn blind to race. *E.g.*, *United States v. Berks County*, 277 F. Supp. 2d 570, 582 (E.D. Pa. 2003); *cf. Rice v. Cayetano*, 528 U.S. 495, 512 (2000).

18

Relatedly, Alabama's regularly scheduled primary election is already underway.[4] Candidates and voters alike are already actively participating in that election, where candidates have been certified, ballots printed, campaign funds collected, and votes cast. These individuals all have an important stake in avoiding Defendants' effort to void an ongoing election. *See, e.g.*, *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (explaining the "public interest" favors avoiding "substantial risk that citizens will be disenfranchised"); *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012) (explaining "[t]he public interest therefore favors permitting as many qualified voters to vote as possible"); *cf. Duke v. Massey*, 87 F.3d 1226, 1233 (11th Cir. 1996) (observing that "burdens on candidate access to the ballot directly burden the voters' ability to voice preferences"). Indeed, permitting Defendants to carry out their cynical ploy to nix elections under a congressional map they previously swore to use—based only on contrived arguments that ignore the stark differences between this case and *Callais*—would do grievous harm to the public's confidence in the electoral system. *See First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 788–89 (1978) (recognizing importance of "[p]reservation of the individual citizen's confidence in government," in addition to maintaining the "integrity of the electoral process").

---

[4] *See* Ala. Sec'y of State, *supra* note 2.

Finally, it bears emphasis that Defendants' current motion is directly at odds with their past arguments *against* preliminary relief. When Plaintiffs sought such relief in *December* 2021, Defendants fretted that amending Alabama's congressional map at that time would "almost certainly obstruct the State's upcoming elections," ECF No. 71 at 28, which were then proceeding on the same election calendar as the 2026 elections. They insisted such a course would "throw the current election into chaos and leave insufficient time for maps to be redrawn, hundreds of thousands of voters to be reassigned to new districts, and thousands of new signatures to be obtained by candidates and political parties seeking ballot access." *Id.* at 120. Defendants admonished the Court that "the critical date for having maps in place is not May 24, 2022, when the primary election will be held, nor even March 30 when absentee voting will begin, but months earlier still." *Id.* at 123. Defendants then raced to the Supreme Court to block this Court's preliminary injunction—which issued *four months* before the May primary—based on concerns about implementing "new districts days before the candidate qualifying deadline and less than two months before absentee voting is to begin." Emergency Application for Administrative Stay and Stay at 39, *Merrill v. Milligan*, No. 21-1086 (U.S. Jan. 28, 2022).

Defendants once more offer no explanation for their past representations, even though they now ask for similar relief they sought to block then—a last minute change to Alabama's congressional map—months *after* when they previously

20

claimed such relief was unworkable under Alabama's election calendar. Alabama's primary elections are now *less than two weeks away*, with candidates certified, ballots printed, and citizens already voting. *Supra* note 2. Contrary to Defendants' offhand concession that these elections are "fast approaching," Mot. at 7, such elections are in fact *occurring and ongoing*. If the *Purcell* principle means anything, it surely prohibits a lower court from swapping a State's congressional maps *in the midst* of an actual election. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (explaining the Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules *on the eve of an election*" (emphasis added)); *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1284 (11th Cir. 2020) ("The Supreme Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." (internal quotation marks and citation omitted)).

On the other side of the ledger, Defendants do not even try to explain how the public interest or equities favor a stay, relying solely upon the State's supposed sovereign interest. *See* Mot. at 7. But as explained, the State has sat upon its right to vindicate that supposed interest over the past year. *See supra* § II. Nor do they grapple with *Purcell* and the timing of their request, noting only that the Alabama Legislature is looking into whether certain "election deadlines could be shifted." Mot. at 7. Indeed, taking Defendants at their word, changing the map now would

"throw the current election into chaos," ECF No. 71 at 120, which is decidedly not in the public interest. Finally, to the extent Defendants argue that "unifying the Gulf Coast in one district" serves the public's interest, *id.* at 6, that theory runs headlong into this Court's finding that such a goal served largely as pretext for "prescribing a majority-White district there." *Caster*, 2025 WL 1643532, at *140. None of Defendants' limited theories on the equities dislodge the commonsense conclusion that the public's interest is best preserved by holding Alabama's congressional elections under the very maps that Defendants promised to use.

## CONCLUSION

The emergency motion to stay should be denied.

Respectfully submitted this 7th day of May 2026.

By: /s/ *Abha Khanna*

Richard P. Rouco

Abha Khanna*

(AL Bar. No. 6182-R76R)

ELIAS LAW GROUP LLP

**Quinn, Connor, Weaver, Davies & Rouco LLP**

1700 Seventh Ave., Suite 2100

Two North Twentieth

Seattle, WA 98101

2-20th Street North, Suite 930

(206) 656-0177

Birmingham, AL 35203

AKhanna@elias.law

Phone: (205) 870-9989

Fax: (205) 803-4143

Lalitha D. Madduri*

Email: rrouco@qcwdr.com

Richard A. Medina*

ELIAS LAW GROUP LLP

250 Massachusetts Ave, NW Suite 400

Washington, DC 20001

(202) 968-4490

LMadduri@elias.law

RMedina@elias.law

*Admitted Pro Hac Vice*

**Counsel for Caster Plaintiffs**

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 7, 2026, a copy of the foregoing has been served

on all counsel of record through the Court's CM/ECF system.


<u>/s/ Abha Khanna</u>
Abha Khanna
Counsel for Caster Plaintiffs