FILED

2026 May-12  AM 09:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| MARCUS CASTER, *et al.*,<br><br>      Plaintiffs,<br><br>  v.<br><br>WES ALLEN, in his official capacity as Alabama Secretary of State,<br><br>      Defendant. | Case No. 2:21-CV-1536-AMM |

## *CASTER* PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................4

LEGAL STANDARD............................................................................................5

ARGUMENT .........................................................................................................5

I.      A TRO is necessary to maintain the status quo. .............................................5

II.     The 2023 Plan is still unlawful after *Callais*........................................................7

        A.      *Callais* does not upset this Court's Section 2 finding..........................7

        B.      The Court's finding of discriminatory intent is unaffected by
                *Callais* and supports Section 2 liability. ...........................................17

III.    Black Alabamians, including Plaintiffs, will suffer irreparable harm
        absent an injunction. ...............................................................................20

IV.     The balance of equities and the public interest favor relief. .........................24

CONCLUSION ...................................................................................................28

**INTRODUCTION**

This Court should preserve the status quo and enter a Temporary Restraining Order enjoining Alabama from canceling its ongoing primary elections. The Supreme Court vacated this Court's injunction and remanded "for further consideration in light of" its recent decision in *Louisiana v. Callais*, Nos. 24-109 & 24-110, 2026 WL 1153054 (U.S. Apr. 29, 2026). *Allen v. Caster*, No. 25-243, 2026 WL 1282800, at *1 (U.S. May 11, 2026). Nothing about that routine grant, vacate, and remand (GVR) order expresses any judgment on the merits of Plaintiffs' claims. *See Wellons v. Hall*, 558 U.S. 220, 225–26 (2010) (per curiam) (explaining granting, vacating, and remanding "assists this Court by procuring the benefit of the lower court's insight before we rule on the merits" (quoting *Lawrence v. Chater*, 516 U.S. 163, 167 (1996) (per curiam)). Meanwhile, Alabama's May 19 primary election is ongoing. Candidates have qualified, ballots have been printed and distributed, and votes have been cast. Amidst all this, Alabama has enacted legislation requiring election officials to throw out any votes that have already been cast in the congressional primary—or that will be cast—so that they can conduct a do-over election under a plan that this Court has already twice found to be unlawful.

The Court should immediately enter an *ex parte* Temporary Restraining Order (TRO) to maintain the status quo while it takes up the Supreme Court's instruction to "further consider" the issues in this case in light of *Callais*. Failing to do so would

1

have irreversible consequences. If the May 19 primary does not go forward as planned, an untold number of votes will be irretrievably lost, and this Court's ability to order effective relief will be hamstrung. Defendants, by canceling the primary election before the Court could grant any relief, would avoid the very review that the Supreme Court explicitly directed the Court to undertake. The Court should not allow such gamesmanship.

On the merits, *Callais* does nothing to disturb this Court's thorough findings of fact and conclusions of law concerning Alabama's 2023 Plan. *Callais* held that a congressional map enacted by the Louisiana legislature to remedy a Section 2 violation was an impermissible racial gerrymander in violation of the Fourteenth Amendment. It expressly did "not overrule[]" overrule the Supreme Court's earlier decision affirming this Court's preliminary injunction. 2026 WL 1153054, at *18. Those same factual findings support liability under Section 2 under the standard applied in *Callais*. And several significant features sharply distinguish this case from *Callais*. The remedial plan at issue here was drawn race-blind by a court-appointed special master, so there can be no contention, unlike in *Callais*, that it is an unconstitutional racial gerrymander. Alabama, unlike Louisiana, has not defended the 2023 Plan as a partisan gerrymander. And, importantly, this Court made an independent finding of intentional racial discrimination that *Callais* did not address.

2

Plaintiffs will undoubtedly suffer irreparable harm in the absence of a TRO. Absentee voting and voting pursuant to the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) has already begun. The cancelation of the May 19 primary would invalidate these lawfully cast votes in violation of voters' fundamental rights and sow "chaos" in the ranks of all voters—including those who have yet to cast their ballots. And allowing the state to reimpose the 2023 map, which this Court found violated Section 2 by "intentional[ly] . . . dilut[ing] Black Alabamians' voting strength," ECF No. 401 at 23, would also constitute irreparable harm by requiring voters to vote in an election based on a map that violates federal law.

The equities and public interest point in the same direction. Alabama's primary election is not merely approaching—it is well underway. Upending the status quo would not only harm the candidates and voters who have organized their participation around the current map; it would deal a serious blow to public confidence in the integrity of the electoral process itself. Indeed, when this Court granted a preliminary injunction against Alabama's 2021 map with the 2022 primary day more than 15 weeks away, Alabama adamantly argued that changing the map was "a prescription for chaos for candidates, campaign organizations, independent groups, political parties, and voters, among others." *Merrill v. Milligan*, 142 S. Ct. 879, 879–80 (2022) (Kavanaugh, J., concurring). The Supreme Court agreed and

3

issued a stay to maintain the status quo. *Id.* And Alabama would suffer no harm here. The May 19 primary will proceed anyway because there are other offices on the ballot.

The Court should immediately issue an *ex parte* temporary restraining order prohibiting Defendants or those acting in concert with them from taking any action to cancel, postpone, or otherwise undermine the ongoing May 19, 2026 primary election, and maintaining the status quo of this Court's remedial map.

## BACKGROUND

On May 8, the Governor of Alabama signed House Bill 1, which authorizes a "special primary election" "in the event a federal court issues or vacates an order affecting the boundaries of Congressional districts in a time frame that allows for a supplemental special primary election during the 2026 General Election cycle."[1] That same day, shortly before this Court denied a similar request, Defendants filed an Emergency Application in the Supreme Court requesting a stay pending appeal of the injunctions barring the State from using the 2023 Plan. *See* Emergency Appl. for Stay at 25, *Allen v. Caster*, No. 25A1229 (U.S. May 8, 2026). On May 11, the Supreme Court vacated this Court's injunction and remanded to the United States

---

[1]   H.B.   1,   2026   Gen.   Assemb.,   Spec.   Sess.   (Ala.   2026),   https://arc-sos.state.al.us/cgi/actdetail.mbr/detail?page=act&year=2026&act=612.

Court of Appeals for the Eleventh Circuit "with instructions to remand to the District Court for further consideration in light of *Callais*." *Allen* 2026 WL 1282800, at *1.

## LEGAL STANDARD

"The standard of review for a temporary restraining order is the same as that for a preliminary injunction." *Pareto Health (AL), LLC v. WeCare TLC, LLC*, No. 2:21-CV-00530-AMM, 2021 WL 4860760, at *2 (N.D. Ala. Apr. 23, 2021) (citing *Roche Diagnostics Corp. v. Priority Healthcare Corp.*, No. 2:18-CV-01479-KOB-HNJ, 2019 WL 5810312, at *2 (N.D. Ala. Nov. 7, 2019)). A movant must establish "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Id.* (quoting *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005) (per curiam)).

## ARGUMENT

I.    **A TRO is necessary to maintain the status quo.**

An immediate *ex parte* TRO is necessary to "preserv[e] the status quo and prevent[] irreparable harm" until the Court can more fully address the application of *Callais* to Plaintiffs' claims. *Granny Goose Foods, Inc. v. Bhd. of Teamsters Loc. No. 70*, 415 U.S. 423, 439 (1974). As this Court has already recognized, the Special Master Plan "is the status quo in Alabama." *Milligan* ECF No. 525 at 5; *see Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733–734 (D.C. Cir. 2022) ("[T]he status quo [i]s

5

'the last peaceable uncontested status' existing between the parties before the dispute developed." (quoting 11A *Wright & Miller's Federal Practice and Procedure* § 2948 (3d ed. 1998))). It was used "for Alabama's 2024 congressional elections and . . . for the 2026 congressional elections that are occurring now." *Milligan* ECF No. 525 at 5. To throw out ballots already cast in the ongoing primary in service of holding a "do-over" primary election under the 2023 Plan would "upend Alabama's status quo . . . in the middle of an election." *Id.* at 6.

In the absence of a status-quo-protective TRO, the May 19 congressional primary election will not go forward as planned, causing the irreversible loss of time and votes. The Supreme Court specifically instructed this Court to "further consider[]" the case "in light of" *Callais*. *Allen*, 2026 WL 1282800, at \*1. As explained below, when the Court does so, it will find that *Callais* does not in any way undermine the Court's liability findings or its remedial order. But allowing Defendants to stop the ongoing election mid-stream could hamper the Court's ability to meaningfully address these issues and order effective relief. For this reason alone, the Court should grant the TRO.

## II.    The 2023 Plan is still unlawful after *Callais*.

Plaintiffs are likely to show that the 2023 Plan is still unlawful under the test articulated in *Callais*.[2] The Supreme Court decided in *Callais* that a congressional map enacted by the Louisiana legislature to remedy a Section 2 violation was an impermissible racial gerrymander in violation of the Fourteenth Amendment. Among much else, unlike in *Callais*, the remedial districts at issue here were drawn *race-blind* by the special master "without any particular difficulty." ECF No. 401 at 535. And they were adopted to remedy a Section 2 violation nearly identical to the one that the Supreme Court affirmed on the merits in *Allen v. Milligan*, 599 U.S. 1 (2023). Indeed, *Callais* expressly did "not overrule[] *Allen*," *Callais*, 2026 WL 1153054, at *18, the reasoning of which continues to govern this case, *see Allen*, 599 U.S. at 21.

### A.    *Callais* does not upset this Court's Section 2 finding.

*Callais* revised the first *Gingles* precondition, which requires plaintiffs to submit illustrative maps with an additional opportunity district. *Callais*, 2026 WL 1153054, at *15. Under the revised standard, (1) "plaintiffs cannot use race as a

---

[2] The Supreme Court's decision to vacate and remand for further consideration in light of *Callais* in no way expresses a view on the merits of Plaintiffs' claims. The Supreme Court's issuance of a "GVR [order] makes no decision as to the merits of a case." *Diaz v. Stephens*, 731 F.3d 370, 378 (5th Cir. 2013) (citing *Tyler v. Cain*, 533 U.S. 656, 666 n.6 (2001)); *see also United States v. M.C.C. of Fla., Inc.*, 967 F.2d 1559, 1562 (11th Cir. 1992) (explaining a GVR "merely requires further consideration in light of a new Supreme Court decision"); *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 845 (6th Cir. 2013) ("The GVR order is not equivalent to reversal on the merits, nor is it an invitation to reverse." (citation modified) (citing *Tyler*, 533 U.S. at 666 n.6)).

7

districting criterion"; and (2) the "illustrative maps must meet all the State's legitimate districting objectives, including traditional districting criteria and the State's specified political goals." *Id.* This Court's careful findings of fact more than suffice to satisfy even this revised standard.

First, Plaintiffs "submitted more than a dozen" maps showing "that it is *possible* to draw a reasonably configured remedial district." ECF No. 401 at 379. Indeed, the Supreme Court already determined that Plaintiffs satisfied the first *Gingles* precondition at the preliminary injunction phase by presenting 11 illustrative maps "contain[ing] two majority-black districts that comported with traditional districting criteria." *Allen*, 599 U.S. at 20; *see Callais*, 2026 WL 1153054, at *18 ("[W]e have not overruled *Allen*."). Contrary to Defendants' repeated arguments, there is no impropriety in "screen[ing] out . . . the maps that did not contain two Black-majority districts." ECF No. 401 at 375. The "entire point" of *Gingles* 1, even after *Callais*, is to show "that an additional majority-minority district *could* be drawn." *Allen*, 599 U.S. at 33 (emphasis added). And the Alabama Legislature *itself* identified "the non-dilution of minority voting strength" as a "traditional redistricting principle." ECF No. 401 at 375–376; *id.* at 62.

But even if the proposed districts submitted by the Plaintiffs were not enough, the remedial districts proposed by the Special Master more than satisfy the first *Gingles* precondition as revised by *Callais*. Those were undisputedly drawn *race-*

*blind* by the court-appointed special master "without any particular difficulty." ECF No. 401 at 535. The parties stipulated that the Special Master's cartographer "drafted the Special Master Plan without reference to any illustrative or proposed plan," "did not display racial demographic data within the mapping software, Maptitude, while drawing his remedial proposals," and "drew his proposals based on other nonracial characteristics and criteria." *Id.* at 555 (citation modified). That should be the end of the matter.

Second, this Court found that "Plaintiffs' illustrative plans often do meet or beat the 2023 Plan" on Alabama's own stated criteria. ECF No. 401 at 345. The same is true of the Special Master's plans. ECF No. 401 at 79–82.

Defendants in this case have consistently argued that the illustrative maps do not pass muster because none keep the two Gulf Coast counties whole. But *Callais* requires that illustrative maps meet "all the state's *legitimate* districting objectives." 2026 WL 1153054, at *15 (emphasis added). This Court made a factual finding that Alabama's so-called "non-negotiable" criteria, including maintaining the Gulf Coast in one district, were specifically designed to make it impossible to draw an additional majority-Black district. *See* ECF No. 401 at 524–25. This Court found that, "[f]or the first time that anyone involved in these cases can remember or find, the Legislature included in the state law with the map extensive legislative findings," including several "non-negotiable" criteria that made it "mathematically

9

impossible" to draw an additional Black opportunity district. *Id.* at 435–36. In fact, "counsel for the State conceded in closing argument that he is 'not aware of a way to draw two majority-Black districts without going against the Legislature's priority of keeping Mobile and Baldwin County whole.'" *Id.* at 362. A purportedly neutral redistricting criterion that is intentionally designed to make the drawing of an additional Black opportunity district impossible is not a "legitimate" criterion by any definition.

This is not the first time Defendants have asked for prioritization of their preferred Gulf Coast community of interest over Section 2 of the Voting Rights Act. *See Allen*, 599 U.S. at 20–21. The Supreme Court already rejected Applicants' argument "that plaintiffs' maps erred by separating [the Gulf Coast region] into two different districts," as "not . . . persuasive." *Id.* at 20. That Court further held that "[e]ven if the Gulf Coast did constitute a community of interest, . . . [t]he District Court concluded—correctly, under our precedent—that it did not have to conduct a 'beauty contest[]' between plaintiffs' maps and the State's." *Id.* at 21 (citation omitted); *see also id.* ("The District Court understandably found [the PI record] insufficient to sustain Alabama's overdrawn argument that there can be no legitimate reason to split the Gulf Coast region." (citation modified)). And Defendants' previous contention that the Gulf Coast is now somehow inviolable is further belied by its State Board of Education Plan, which splits the Gulf Coast in the very same

way that Defendants now say is "non-negotiable." ECF 401 at 373. In fact, Alabama placed Mobile and Baldwin Counties in different congressional districts for nearly 100 years and only placed them together in the 1970s to prevent the reelection of a Black incumbent. *Id.* at 364–65.

Defendants' insistence on the inviolability of the Gulf Coast continues to fail for the same reason the Supreme Court rejected their "related argument based on 'core retention.'" *Allen*, 599 U.S. at 21; *see* Br. for Appellants at 60 ("*Merrill* Appellants' Br."), *Merrill v. Milligan*, Nos. 21-1086, 21-1087 (U.S. Apr. 25, 2022) (defending Alabama's "longstanding interests in maintaining the Gulf Coast and respecting the existing district"). Like core retention, Alabama's Gulf Coast criterion has the practical effect of entrenching CD-2 as a majority-White district, precluding the creation of a second majority-Black district. ECF No. 401 at 362. "No document, testimony, or lawyer disputes . . . this point." *Id.* And as with core retention, the Supreme Court "has never held that a State's adherence to a previously used" majority-White district "can defeat a § 2 claim. If that were the rule, a State could immunize from challenge a new racially discriminatory redistricting plan simply by" mandating the preservation of a predominantly White community that was prioritized in "an old racially discriminatory plan." *Allen*, 599 U.S. at 22. "That is not the law: § 2 does not permit a State to provide some voters 'less opportunity . . . to participate in the political process'" simply by proclaiming one community of

11

interest paramount to all others. *Id.* (alteration in original) (quoting 52 U.S.C. § 10301(b)).

The same is true of Alabama's pretextual insistence on splitting the Black Belt into two districts instead of three. The problem of cracking is not the *number* of districts into which a community is split, but the *effect* of that dispersal—that it leaves the community in "districts in which they constitute an ineffective minority of voters." *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986); *cf. Gill v. Whitford*, 585 U.S. 48, 67 (2018) (noting that vote dilution harm "arises from the particular composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district").

Alabama does not dispute that, under the 2023 Plan, Black voters in southern Alabama are dispersed into two districts—CDs 1 and 2—in which they constitute an *ineffective* minority of voters, or that CD-7 remains the sole district in which Black voters have the opportunity to elect their preferred candidates. ECF No. 401 at 60; *see also id.* at 434 (explaining that the State "sent a lawyer into court to concede that the 2023 Plan has only one Black-opportunity district"). "This evidence—and concession—undermine the State's assertion that the 2023 [P]lan remedies the cracking of Black voting strength in the Black Belt simply by splitting the Black Belt into fewer districts." *Id.* at 370–71. Whether Black Belt voters are fragmented

to form a minority of two or three districts makes no difference; it is the denial of an additional opportunity district that matters.

Defendants' elevation of incumbent protection to non-negotiable similarly cannot immunize them from Section 2 liability. The *entire point* of a Section 2 claim is to provide minority voters a district in which they have an opportunity to elect their candidate of choice. It *requires* a showing that minority voters prefer different candidates than their White counterparts. If such a claim requires illustrative districts in which *the same representatives will win re-election*, then Section 2 is well and truly meaningless. It would make the mere invocation of "incumbent protection" a kill switch. And it has nothing to do with disentangling race and politics because it would immunize both racial and partisan gerrymanders. Even a hypothetical illustrative district composed of a majority of Black Republicans who prefer different candidates from their White Republican counterparts for purely racial reasons would not satisfy Defendants' incumbency-protection criteria.[3]

Ultimately, a "reasonably configured" *Gingles* 1 illustrative district cannot be rendered "unreasonable" just because the legislature chooses to elevate a particular community of interest—or any other criterion—as especially important. To rule

---

[3] To the extent Defendants may argue that all the illustrative plans paired incumbents in the same district, that is false. At least one plan, Cooper Plan 5, "pairs no incumbents." ECF No. 101 at 15, 132, 223. Moreover, "because two paired incumbents live[d] in the same county just miles apart, a plan would have to split that county to avoid pairing those incumbents." *Id.* at 73.

otherwise would let states evade Section 2 by gerrymandering their redistricting criteria to match their preferred districts. *See Allen*, 599 U.S. at 21.

Finally, this Court has already done the work of "disentang[ling]" race and politics, as *Callais* requires. 2026 WL 1153054, at *15. Defendants argued extensively to this Court that Alabama's admittedly "stark[] and intense[]" racial polarization—and resulting "nearly invariant" electoral losses for Black-preferred candidates—is merely the consequence of partisan differences. ECF No. 401 at 283, 402. But despite Defendants' best efforts, this Court found "no evidence that only party politics are at work." *Id.* at 403. To the contrary, this Court found there was an "overwhelming evidentiary record about the importance of race in Alabama politics." *Id.* at 409. The result of such stark racial polarization is that "Black Alabamians enjoy virtually zero success in statewide elections," *Allen*, 599 U.S. at 22 (citation omitted), or at the state or federal level outside of majority-Black districts prescribed by § 2, *regardless of their partisan affiliation*. ECF No. 401 at 411–13.

Defendants' *own experts* dispel their claim. Defendants offered Dr. Trey Hood to testify to Alabama's purportedly race-blind politics, but his testimony was "widely inconsistent" with his own scholarly work, including several articles that "directly refute his litigation opinions." *Id.* at 392–93. Contrary to Defendants' position, Dr. Hood's published scholarship "spanning nearly a decade"

14

"repeat[edly]" concludes that "race remains the dominant political influence in Southern politics today." *Id.* at 403. Where the very scholarship that *qualifies* Dr. Hood as an expert explicates "[t]oday's racialized partisan cleavage," *id.* at 302 (quotation omitted), Defendants can hardly contend otherwise. *See id.* at 403 ("Ultimately, Dr. Hood's opinions support the Plaintiffs more than the State on the issue of racially polarized voting.").

Defendants' other expert on this issue, Dr. Christopher Bonneau, conceded that the data on racial voting patterns "established 'that White voters in Alabama support White Democrats more than they support Black Democrats.'" *Id.* at 308 (quoting Trial Tr. 1789). This is consistent with the undisputed data demonstrating that White Alabamians of *both* major parties are less willing to support minority candidates. For instance, in 2008, White Democrats in Alabama supported Senator John McCain over then-Senator Barack Obama. *Id.* at 407. And in 2024, the four Black candidates in the CD-2 Republican primary finished behind the four White candidates, together amassing only 6% of the primary vote. *Id.* at 408.

Moreover, while Black and White Alabamians both consider themselves to be ideologically conservative and hold similar views on important social issues, their voting patterns do not reflect those shared values. This Court heard and credited extensive testimony on this issue from both fact and expert witnesses. *See, e.g., id.* at 177 (expert testimony of Dr. Joseph Bagley); *id.* at 256–57 (lay testimony of Dr.

15

Valtoria Jackson). Indeed, "no one dispute[d]" Dr. Maxwell Palmer's testimony that "race drives party attachments" in Alabama. *Id.* at 409. And that testimony "fits with the lay testimony [the District Court] heard from multiple Black voters" who explained that "racial concerns drive" their party affiliation. *Id.* at 409. "[A]s other witnesses explained, the position of the Democratic Party on both racial issues and other issues that are important to Black Alabamians overrides the obvious alignment between these voters' conservative Christian beliefs and the Republican Party." *Id.* at 409–10.

Ultimately, Alabama's asserted partisan explanation for racial polarization is directly at odds with the "political reality" borne out in the evidentiary record. *Id.* at 408. As this Court found based on its "intensely local appraisal," *Allen*, 599 U.S. at 19 (citation omitted), "it denies reality for us to say that at the end of the day, all of that is just party politics." ECF No. 401 at 409.

Finally, in considering the totality of the circumstances, this Court "focus[ed] on evidence . . . [of] present-day intentional racial discrimination." *Callais*, 2026 WL 1153054, at *16. The Court declined to "assign Alabama's shameful history dispositive weight," ECF No. 401 at 414, and did not "grant Section Two relief simply because [it] condemn[s] past discrimination." *Id.* Instead, this Court "carefully considered an extensive record about both past and present discrimination"—including documented incidents of official discrimination found

16

"in the last ten years by federal judges who remain in service today," the bail-in of three Alabama jurisdictions in the last decade, and ongoing school desegregation litigation in three major school districts, *id.* at 414–17—to conclude that "under all the circumstances in Alabama *today*, Black Alabamians have less opportunity than other Alabamians to elect representatives of their choice," *id.* at 7 (emphasis added). This record does not want for "pertinent evidence relating to intentional present-day voting discrimination." *Callais*, 2026 WL 1153054, at *16.

**B.    The Court's finding of discriminatory intent is unaffected by *Callais* and supports Section 2 liability.**

This Court has already found that "the evidence supports a strong inference that the State intentionally drew its districts to afford minority voters less opportunity because of their race." *Id.* at *13. That finding alone—though made in the context of a claim under the Fourteenth and Fifteenth Amendments, suffices to demonstrate Plaintiffs' likelihood of success. *Callais* does nothing to undermine the Court's factual findings in that regard.

First, *Callais* did not and could not change the law in this regard because it did not address a claim of intentional vote dilution under the Fourteenth or Fifteenth Amendment—it considered whether a redistricting plan enacted to comply with Section 2 was a racial gerrymander. *See Alexander v. S.C. State Conf. of NAACP*, 602 U.S. 1, 38 (2024) ("A vote-dilution claim is analytically distinct from a racial-gerrymandering claim and follows a different analysis." (citation modified)); *Allen*,

17

2026 WL 1282800 (Sotomayor, J., dissenting) ("[T]he District Court remains free on remand to decide for itself whether *Callais* has any bearing on its Fourteenth Amendment analysis or if its prior reasoning is unaffected by that decision.").

Second, unlike here, there was no showing in *Callais* of a "deliberate decision to ignore, evade, and strategically frustrate requirements spelled out in a court order" affirmed by the Supreme Court. ECF No. 401 at 28. It does not matter, as Defendants recently argued to the Supreme Court, that this Court's 2021 injunction applied a pre-*Callais* test. This Court faithfully applied binding precedent, as the Supreme Court affirmed. *See Allen*, 599 U.S. at 23 ("The Court faithfully applied our precedents and correctly determined that, under existing law, HB1 violated § 2."). Defendants cannot ignore federal injunctions grounded in settled law simply because they anticipate that the law might change. And in any event, the Supreme Court was explicit that it "ha[s] not overruled *Allen*." *Callais*, 2026 WL 1153054, at *18.

Third, *Callais* lends no credence to Defendants' argument that they feared Applicants' argument that they ignored the Court's order because they feared a racial gerrymandering claim. ECF No. 401 at 543. This Court "ha[s] no evidence that the Legislature was specifically concerned about potential gerrymandering liability when it enacted the 2023 Plan." *Id.* at 544. Moreover, the Legislature had assurance from both this Court and the Supreme Court that it was possible to draw a remedial district that did not give undue consideration to race. *Allen*, 599 U.S. at 33. Indeed,

18

the special master "prepared three proposed remedial plans race-blind without any particular difficulty." ECF No. 401 at 535. The fact remains that this Court found "the purpose of the design of the 2023 Plan was to crack Black voters across congressional districts in a manner that makes it impossible to create two districts in which they have an opportunity to elect candidates of their choice." *Id.* at 25. In other words, Alabama went out of its way to *avoid* creating a second Black-opportunity district. *Callais* does nothing to change that evidentiary record.

Finally, unlike in the *Robinson* case underlying *Callais*, there Court found "precious little evidence to support the State's claim" that the 2023 Plan was motivated by partisanship. ECF No. 401 at 546. To the contrary, Alabama adamantly insisted—in detailed legislative findings and legal arguments—that the 2023 Plan was grounded in its desire to preserve the predominantly White Gulf Coast community, rooted in White colonial heritage. *Id.* at 522. There was no need to present an alternative map that achieves the state's "partisan advantage" goals, *Callais*, 2026 WL 1153054, at *13, because Defendants did not put forth partisan advantage as a defense. *See id.* at *18 (acknowledging that, like with the 2023 map, Alabama "did not defend its [2021] map on the ground that it was drawn to achieve a political objective").

19

III.    **Black Alabamians, including Plaintiffs, will suffer irreparable harm absent an injunction.**

Plaintiffs will suffer "irreparable injury . . . unless the injunction issues."[4] *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003). Absent preliminary relief, Plaintiffs and other Alabamians will be irreparably harmed in at least three ways: (i) through the cancelation of their already cast votes; (ii) by being forced to vote under a district map that this Court concluded was motivated by "intentional racial discrimination," ECF No. 401 at 23; and (iii) through the confusion and chaos that this last-minute change to the district map would bring.

Irreparable injury is a harm that "cannot be undone through monetary remedies." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010). It is well established that the deprivation of constitutional rights "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The right to "vot[e] is a fundamental right guaranteed by the Due Process Clause of the Fourteenth Amendment." *Hoblock v. Albany Cnty. Bd. of Elections*, 341 F. Supp. 2d 169, 176 (N.D.N.Y. 2004), *aff'd*, 422 F.3d 77 (2005). Accordingly, courts "routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *see also, e.g.,*

---

[4] "[T]he four criteria for obtaining a preliminary injunction are identical to those for issuance of a temporary restraining order." *Windsor v. United States*, 379 F. App'x 912, 916–17 (11th Cir. 2010).

20

*Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (similar); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) ("The registration applicants in this case would certainly suffer irreparable harm if their right to vote were impinged upon.").

Alabamians who have already cast their ballots have a long-settled constitutional right to have their votes counted, which would be denied by the eleventh-hour cancelation of the May 19 primary. The "Fourteenth Amendment guarantees" a voter's "ability to cast a meaningful ballot." *Polelle v. Fla. Sec'y of State*, 131 F.4th 1201, 1213 (11th Cir.), *cert. denied sub nom. Polelle v. Byrd*, 146 S. Ct. 298 (2025). "[R]etroactive changes to election procedures raise serious due process concerns, particularly where those changes result in invalidating the votes of individuals who cast ballots in reliance on previously established rules." *Griffin v. N.C. State Bd. of Elections*, 781 F. Supp. 3d 411, 435 (E.D.N.C. 2025). Indeed, a state violates voters' substantive due process rights when it tells voters "one thing before the election and change[s] its policy thereafter." *Scheer v. City of Miami*, 15 F. Supp. 2d 1338, 1344 (S.D. Fla. 1998).

Many Alabama voters have already cast lawful, timely ballots for the May 19 primary elections, which would be invalidated if the injunction is not issued. The Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) requires states to send absentee ballots to overseas citizens at least 45 days before federal elections. 52 U.S.C. § 20302(a)(8). Consistent with this requirement, Alabama was required to

21

submit absentee ballots to citizens covered by UOCAVA more than a month ago, by April 4, 2026. *See Griffin*, 781 F. Supp. 3d at 444 (The "retroactive invalidation of overseas military and civilian voters' ballots violates their substantive due process rights.").

Additionally, absentee voting is also already well underway. State law authorizes several categories of Alabamians to vote absentee under various circumstances, including, among other things, where the person expects to be out of the state, is ill, or expects to work a 10 hour or longer shift on election day. Ala. Code § 17-11-3. These voters' rights would be violated, too, were the Court to allow Alabama to cancel the primary elections. *See, e.g.*, *Griffin v. Burns*, 570 F.2d 1065, 1074 (1st Cir. 1978) (determining a state "could not, constitutionally, invalidate the absentee . . . ballots that state officials had offered to the voters in this primary, where the effect of the state's action had been to induce the voters to vote by this means"); *Hoblock*, 341 F. Supp. 2d at 176 ("[B]y providing absentee ballots that voters rely upon in good faith to cast their vote, and then invalidating them, the Board has effectively taken away their guaranteed right to vote in the election.").

Second, any attempt by the state to implement the 2023 congressional map for special primary elections would further irreparably harm Plaintiffs and other Black Alabamians. Voters "suffer an irreparable harm if they must vote in . . . congressional elections based on a redistricting plan that violates federal law."

22

*Singleton v. Merrill*, 582 F. Supp. 3d 924, 1026 (N.D. Ala. 2022). This Court already concluded that, based on a "corpus of undisputed evidence," the 2023 Plan "amounted to intentional racial discrimination in violation of the Fourteenth Amendment's Equal Protection guarantee" by "intentional[ly] . . . dilut[ing] Black Alabamians' voting strength." ECF No. 401 at 23.

Finally, Plaintiffs and all Alabama voters will be irreparably harmed by the "chaos" and confusion that a change to the district maps at this time would bring. *Merrill*, 142 S. Ct. at 879–80 (Kavanaugh, J., concurring). Even where a party demonstrates its entitlement to a new congressional map—something Alabama has decidedly not shown here—the Supreme Court has precluded the imposition of such a map in Alabama at the State's insistence when the primary was more than 15 weeks away. *Id.* at 879–80 (noting Alabama's argument that changing the map when "the primary elections begin (via absentee voting) just seven weeks from" the District Court's order was "a prescription for chaos for candidates, campaign organizations, independent groups, political parties, and voters, among others"). Other federal courts have found that the equities of delaying the election or introducing a new map so close to an election have counseled in favor of using the old map, despite its infirmities. *See, e.g.*, *Covington v. North Carolina*, 316 F.R.D. 117, 177 (M.D.N.C. 2016) (finding that postponing elections would "cause significant and undue disruption to North Carolina's election process and create considerable confusion,

23

inconvenience, and uncertainty among voters, candidates, and election officials," and allowing election to proceed under maps "despite their unconstitutionality"), *aff'd*, 581 U.S. 1015 (2017).

## IV.     The balance of equities and the public interest favor relief.

The balance of the equities and the public interest strongly favor a temporary restraining order.[5] Absent injunctive relief, the 2023 Map will become just the latest avoidable example of dilution of the Black vote in Alabama. Even in light of *Callais*, there is little reason to doubt this Court's conclusion that Alabama's 2023 map violates Section 2, to say nothing of its conclusion (unaddressed by *Callais*) that it constitutes "an intentional effort to dilute Black Alabamians' voting strength and evade the unambiguous requirements of court orders standing in the way." ECF No. 401 at 23. It is beyond cavil that the public interest is best served by holding elections free from such discrimination and legal infirmities, particularly given that the current map was drawn blind to race. *Id.* at 77–78; *cf. Rice v. Cayetano*, 528 U.S. 495, 512 (2000); *see also Kennedy v. Riley*, No. 2:05-cv-1100-MHT, 2007 WL 1461746, at *2 (M.D. Ala. May 17, 2007) (concluding that vindicating rights protected under the VRA is in the public service because the Act "is intended to protect the right to vote and because that right is a fundamental political right in that it is preservative of all

---

[5] These two "factors merge when the Government is the opposing party," as it is here. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

rights") (citation modified); *Campbell v. Bennett*, 212 F. Supp. 2d 1339, 1348 (M.D. Ala. 2002) (explaining claims at issue "touch upon the public's . . . right to vote, and the preservation of such rights through injunctive relief is not contrary to the public interest").

Even worse, Alabama voters are voting in an election that is *currently taking place*. Candidates have been certified, ballots printed and mailed, campaign funds spent, and votes cast. *See* Ala. Code §§ 17-11-12, 17-11-5; 52 U.S.C. § 20310 (requiring mailing of absentee ballots to voters abroad by April 4); *see also Absentee Voting Information*, Ala. Sec'y of State, https://www.sos.alabama.gov/alabama-votes/voter/absentee-voting [https://perma.cc/C34R-QAL6] (last visited May 12, 2026) (setting forth eight expansive categories for absentee voting, including working during polling hours). These individuals all have an important stake in avoiding Defendants' effort to void their votes in an ongoing election—to say nothing of implementing an unlawful map along the way. *See, e.g.*, *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (explaining the "public interest" favors avoiding "substantial risk that citizens will be disenfranchised"); *Obama for Am.*, 697 F.3d at 437 (explaining "[t]he public interest therefore favors permitting as many qualified voters to vote as possible"); *cf. Duke v. Massey*, 87 F.3d 1226, 1233 (11th Cir. 1996) (observing that "burdens on candidate access to the ballot directly burden the voters' ability to voice

25

preferences"). With "election machinery . . . already in motion, the public interest weighs strongly in favor" of preserving the status quo. *Veasey v. Perry*, 769 F.3d 890, 896 (5th Cir. 2014). Indeed, permitting Applicants to carry out their ploy to nix elections under a congressional map that has been in place for nearly three years would do severe harm to the public's confidence in the electoral system. *See First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 788–89 (1978) (recognizing importance of "[p]reservation of the individual citizen's confidence in government," in addition to maintaining the "integrity of the electoral process").

Defendants' gambit to sneak in an unlawful map right at the buzzer is directly at odds with their past arguments regarding the feasibility of upsetting its congressional map so late in the game. When Plaintiffs sought to replace the 2021 Plan with a lawful map in January 2022, Defendants adamantly argued that amending Alabama's congressional map at that time would "almost certainly obstruct the State's upcoming elections," ECF No. 71 at 28, which were then proceeding on the same election calendar as the 2026 elections. They insisted such a course would "throw the current election into chaos and leave insufficient time for maps to be redrawn, hundreds of thousands of voters to be reassigned to new districts, and thousands of new signatures to be obtained by candidates and political parties seeking ballot access." *Id*. at 120. Defendants admonished this Court that "the critical date for having maps in place is not May 24, 2022, when the primary election

will be held, nor even March 30 when absentee voting will begin, but months earlier still." *Id*. at 123. Defendants then raced to the Supreme Court to block this Court's preliminary injunction—which issued *four months before* the May primary—based on concerns about implementing "new districts days before the candidate qualifying deadline and less than two months before absentee voting is to begin." Emergency Appl. for Admin. Stay & Stay at 39, *Milligan*, No. 21-1086 (U.S. Jan. 28, 2022). The Court should take Defendants at their own word that changing the map now would "throw the current election into chaos," ECF No. 71 at 120, a result that is decidedly not in the public interest even independent of the obvious fact that the 2023 Map is just as unlawful and unconstitutional as it was the day it was signed into law. The public's interest is best preserved by holding Alabama's congressional elections under the very maps that they used in 2024 and are currently using under the ongoing election.

On the other side of the ledger, Defendants can face no conceivable harm by allowing the May 19 primary to proceed under the Special Master's plan, as they have long planned. Indeed, the May 19 primary will need to go forward as scheduled anyway because there are other offices on the ballot. A temporary restraining order would simply maintain the status quo and ensure that the May 19 primary proceeds as planned while this Court considers the merits in light of *Callais*. *See supra* § I. And Defendants' unexcused delay in seeking any interim appellate relief from this

Court's injunction only underscores that Defendants face no real harm by continuing on with business as usual while this Court has an opportunity to further consider Plaintiffs' challenges in light of *Callais*. *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (explaining that a delay of "even only a few months . . . militates against a finding of irreparable harm").

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court immediately issue an *ex parte* temporary restraining order (1) prohibiting Defendants or those acting in concert with them from taking any action to cancel, postpone, or otherwise undermine the ongoing May 19, 2026 primary election, and (2) maintaining the status quo of this Court's remedial map until the Court can fully consider the merits.

Dated: May 12, 2026

Respectfully submitted,

By /s/ *Abha Khanna*

Richard P. Rouco
(AL Bar. No. 6182-R76R)
**Quinn, Connor, Weaver, Davies
& Rouco LLP**
Two North Twentieth
2-20th Street North, Suite 930
Birmingham, AL 35203
Phone: (205) 870-9989
Fax: (205) 803-4143
Email: rrouco@qcwdr.com

Abha Khanna*
**Elias Law Group LLP**
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
Phone: (206) 656-0177
Email: AKhanna@elias.law

Lalitha D. Madduri*
Richard A. Medina*
**Elias Law Group LLP**
250 Massachusetts Ave. NW,
Suite 400
Washington, D.C. 20001
Phone: (202) 968-4490
Email: LMadduri@elias.law
Email: RMedina@elias.law

*Attorneys for Caster Plaintiffs*
*\*Admitted Pro Hac Vice*

29

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I certify that a copy of the foregoing has been served by ordinary U.S. Mail upon all parties for whom counsel has not yet entered an appearance electronically: None.

/s/ *Abha Khanna*
Abha Khanna
Counsel for *Caster*
Plaintiffs

30