FILED

2026 May-15  AM 11:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |
|---|---|
| MARCUS CASTER, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WES ALLEN, in his official capacity<br>as Alabama Secretary of State,<br><br>Defendant. | Case No. 2:21-CV-1536-AMM |

## *CASTER* PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

# TABLE OF CONTENTS

Introduction...................................................................................................................1

Background ..................................................................................................................2

Legal Standard ............................................................................................................4

Argument......................................................................................................................5

I.    The 2023 Plan is still unlawful after *Callais*....................................................5

    A.    Plaintiffs' illustrative maps and the special master's proposed remedial maps satisfy *Gingles* 1 as articulated in *Callais*. ...................6

        1.    The illustrative maps did not use race as a districting criterion...........6

        2.    The illustrative maps meet all the state's legitimate districting objectives...................................................................................................9

        3.    Alabama legislators disclaimed any partisan intent...........................16

    B.    The Court's findings establish racially polarized voting under *Callais*.........................................................................................................17

    C.    The totality of the circumstances demonstrates that Black Alabamians suffer present-day intentional racial discrimination regarding voting. ..........................................................................................23

    D.    The Court's finding of discriminatory intent is unaffected by *Callais* and supports Section 2 liability. ...........................................25

II.    Black Alabamians, including Plaintiffs, will suffer irreparable harm absent an injunction. ...................................................................................28

III.    The balance of equities and the public interest favor relief. .........................32

Conclusion ...............................................................................................................38

Certificate of Service ................................................................................................39

**INTRODUCTION**

Pundits and politicians have been quick to pen obituaries for Section 2 after the Supreme Court's decision in *Louisiana v. Callais*, No. 24-109, 2026 WL 1153054 (U.S. Apr. 29, 2026). Cancel the burial. The heart of that statute still beats with full force, the Court confirmed, where "circumstances give rise to a strong inference that intentional discrimination occurred." *Id.* at *12. Here, Plaintiffs have much more than an inference; they have an overwhelming evidentiary record and official findings of this Court *proving* that the congressional map legislators enacted in 2023—the same map they now seek to reimpose by canceling ongoing elections— intentionally discriminates against Black voters. Thus, if any case satisfies *Callais*'s revised Section 2 standard, it is this one. If any voters remain entitled to Section 2's protections, they are Black Alabamians like Plaintiffs.

Start with what Alabama actually did. After this Court found—and the Supreme Court affirmed—that Alabama's 2021 congressional map violated Section 2, legislators did not attempt to restore the rights they had withheld from their Black constituents. Instead, they purposefully jerry-rigged redistricting criteria to guarantee Black voters could *never* elect a second congressional candidate under the new map. This Court found as much, and that finding remains unimpeachable.

Then consider what *Callais* actually requires. For Section 2 liability to attach, the Court said, illustrative maps must be drawn without race as a districting criterion

1

(check, *see* ECF No. 401 at 339); illustrative maps must meet the state's legitimate districting objectives (check, *see id.* at 345); plaintiffs must disentangle racialized voting from partisan politics (check, *see id.* at 403, 409); and the totality of circumstances must demonstrate relevant present-day discrimination (check, *see id.* at 416–17). Every Section 2 element identified in *Callais* has already been proven by Plaintiffs and found by this Court, building on findings affirmed in full by the Supreme Court in *Allen v. Milligan*, 599 U.S. 1 (2023). And as the *Callais* majority went out of its way to confirm, they "have not overruled *Allen*." *Callais*, 2026 WL 1153054, at *18.

Finally, heed the extraordinary and grossly inequitable disruption that Defendants are seeking to impose in service of a last-minute restoration of their unlawful map. Even with primary elections already underway—candidates have been certified, UOCAVA ballots have been mailed, absentee ballots have been cast—Alabama cynically seeks to manipulate districts and deadlines to dilute the votes of its Black citizens. Section 2 endures to prevent exactly that. This Court should preliminarily enjoin the 2023 Plan while this case is pending final resolution on remand.

## BACKGROUND

The Court is, of course, well familiar with the factual and procedural history of this case. *See generally* ECF No. 401 (Findings of Fact and Conclusions of Law).

2

As particularly relevant here, on May 8, the Governor of Alabama signed House Bill 1, which authorizes a "special primary election" in the event "[(i)] a federal court, by issuing a judgment or by vacating an injunction, permits the reinstatement of the last legislatively enacted [c]ongressional districts . . . to be used in the 2026 General Election, and (ii) the court ruling is made at a time too late to be accommodated during the normal 2026 primary election schedule."[1] Crucially, HB 1 requires a special primary "regardless of whether a regular primary election was held for the affected [c]ongressional districts using the previous boundary lines."[2] Alabama's 2026 primary is scheduled for May 19; absentee voting is already underway.

The same day HB 1 was signed, Defendants filed an Emergency Application in the Supreme Court requesting a stay pending appeal of the injunctions barring the State from using the 2023 Plan. *See* Emergency Appl. for Stay at 25, *Allen v. Caster*, No. 25A1229 (U.S. May 8, 2026).[3] On May 11, the Supreme Court vacated this Court's injunction, remanded to the United States Court of Appeals for the Eleventh Circuit "with instructions to remand to the District Court for further consideration in light of *Louisiana v. Callais*," and dismissed Defendants' stay application as moot. *Allen v. Caster*, No. 25-243, 2026 WL 1282800, at *1 (U.S. May 11, 2026) (citation

---

[1]    H.B. 1, 2026 Gen. Assemb., Spec. Sess. 1 (Ala. 2026), https://arc-sos.state.al.us/cgi/actdetail.mbr/detail?page=act&year=2026&act=612.
[2] *Id.*
[3] Defendants filed a similar request in this Court on May 5, 2026. ECF No. 427. Although this Court ordered expedited briefing on that motion, Defendants proceeded to the Supreme Court without awaiting resolution from this Court.

omitted). One day later, and with voting in the 2026 primary well underway, the Governor of Alabama issued a proclamation pursuant to HB 1 directing a special primary election to be held on August 11, 2026 using "the last legislatively enacted congressional maps,"[4] *i.e.*, the 2023 Map this Court invalidated under the Fourteenth Amendment and Section 2 of the Voting Rights Act.

The case has now returned to this Court from the Eleventh Circuit. ECF No. 435.

## LEGAL STANDARD

"A preliminary injunction may be entered when a plaintiff establishes four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest." *Friedenberg v. Sch. Bd. of Palm Beach Cnty.*, 911 F.3d 1085, 1090 (11th Cir. 2018) (quoting *Palmer v. Braun,* 287 F.3d 1325, 1329 (11th Cir. 2002)) (internal quotation marks omitted).

---

[4] Proclamation by Governor Kay Ivey (May 12, 2026), available at https://perma.cc/9TMH-93QA.

## ARGUMENT

### I.   The 2023 Plan is still unlawful after *Callais*.

The 2023 Plan is still unlawful under the test articulated in *Callais*.[5] Here, unlike in *Callais*, the record shows that Plaintiffs' experts did not inappropriately use race in drawing their illustrative maps, and it is *undisputed* that the remedial districts were drawn *race-blind* by the special master "without any particular difficulty." ECF No. 401 at 535. Here, unlike in *Callais*, the record shows that the Alabama legislature intentionally adopted novel and unprecedented redistricting criteria to make it mathematically impossible to draw a second majority-Black district *after* this Court and the Supreme Court ruled that was what Section 2 required. Here, unlike in *Callais*, Defendants have not defended the 2023 Plan as a partisan gerrymander—indeed, they disclaimed any partisan motivation. Here, unlike in *Callais*, there is an extensive record of intra-party racial polarization and recent discrimination in voting. Here, unlike in *Callais*, the Supreme Court *already affirmed* a finding of Section 2 liability, *Allen v. Milligan*, 599 U.S. 1 (2023), which *Callais* expressly did "not overrule[]," *Callais*, 2026 WL 1153054, at *18. And here,

---

[5] The Supreme Court's decision to vacate and remand for further consideration in light of *Callais* in no way expresses a view on the merits of Plaintiffs' claims. The Supreme Court's issuance of a "GVR [order] makes no decision as to the merits of a case." *Diaz v. Stephens*, 731 F.3d 370, 378 (5th Cir. 2013) (first citing *Kenemore v. Roy*, 690 F.3d 639, 642 (5th Cir. 2012); and then citing *Tyler v. Cain*, 533 U.S. 656, 666 n.6 (2001)); *see also United States v. M.C.C. of Fla., Inc.*, 967 F.2d 1559, 1562 (11th Cir. 1992) (explaining a GVR "merely requires further consideration in light of a new Supreme Court decision"); *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 845 (6th Cir. 2013) ("The GVR order is not equivalent to reversal on the merits, nor is it an invitation to reverse." (citation modified) (citing *Tyler*, 533 U.S. at 666 n.6)).

unlike in *Callais*, the Court found through an extensive analysis of the *Arlington Heights* factors that the 2023 Plan was enacted with racially discriminatory intent.

**A.** **Plaintiffs' illustrative maps and the special master's proposed remedial maps satisfy *Gingles* 1 as articulated in *Callais*.**

*Callais* reaffirmed that "[t]he first *Gingles* precondition is that a community of minority voters must be sufficiently numerous and compact to constitute a majority in a reasonably configured district." *Callais*, 2026 WL 1153054, at *15. Under *Callais*, to make this showing, "plaintiffs' illustrative maps must satisfy two conditions." *Id.* "First, in drawing illustrative maps, plaintiffs cannot use race as a districting criterion." *Id.* That is, plaintiffs cannot use "a process that would be unconstitutional if a State engaged in such mapmaking." *Id.* "Second, illustrative maps must meet all the State's legitimate districting objectives, including traditional districting criteria and the State's specified political goals." *Id.* This Court's careful and extensive findings of fact more than satisfy this standard.

**1. The illustrative maps did not use race as a districting criterion.**

Plaintiffs "submitted more than a dozen" maps showing "that it is *possible* to draw a reasonably configured remedial district." ECF No. 401 at 379. The evidence and this Court's careful factual findings make clear that "race did not predominate in [Plaintiffs' experts'] mapdrawing processes." *Id.* at 375. In other words, the evidence showed that race was not "use[d] . . . as a districting criterion" in a way "that would be unconstitutional if a State engaged in such mapmaking." *Callais*,

2026 WL 1153054, at *15 (citing *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 6 (2024)). *Callais* provides no reason to revisit that finding of fact.

Start with Mr. Cooper. This Court has already credited Mr. Cooper for "the care he took not to alert himself to information about race that might allow it to become predominant." ECF No. 401 at 338. The "only information about race that he was aware of as he placed lines" was his general awareness of where predominantly Black municipalities and precincts were, *id.* at 338–39, the same as Alabama's own long-time mapdrawer, *see id.* at 96, 202–04. Mere awareness of general demographic information cannot render a districting map unconstitutionally race-based "because we expect that redistricting legislatures will almost always be aware of racial demographics." *Alexander*, 602 U.S. at 22 (citation modified).

This Court has already rejected Defendants' argument that Mr. Cooper must have inappropriately used race based on "his belief that 'the non-dilution of minority voting strength is a traditional redistricting principle.'" ECF No. 401 at 375–76 (citation modified). There is nothing unconstitutional about avoiding the dilution of minority voting strength, particularly where the guidelines that governed the legislature's redistricting process in 2023 *also* identified "the non-dilution of minority voting strength" as a "traditional redistricting principle." *Id.* at 62, 375–376. Defendants cannot argue that it "would be unconstitutional if a State engaged

7

in" the same process Mr. Cooper did, because that would mean the 2023 Plan is also unconstitutional. *Callais*, 2026 WL 1153054, at *15.

As to Dr. Duchin, this Court has already credited her testimony that she "just did not look at race as she placed district lines." ECF No. 401 at 335. Moreover, as the Supreme Court recognized, Dr. Duchin testified that "the randomized algorithms she employed found plans with two majority-black districts in literally thousands of different ways," demonstrating that "it is certainly possible to draw the illustrative maps she produced in a race-blind manner." *Allen*, 599 U.S. at 34 n.7 (citation modified). And the Court has already rejected Defendants' attempt to "splice[] together" Dr. Duchin's testimony to suggest that she "placed district lines in her plans based on racial targets." ECF No. 401 at 375. As the Court explained,

> [W]hen she testified that she would 'need to cross [the majority-Black] threshold in order to submit the map to the Court,' she was not admitting that she set a racial target as she drew maps; she was explaining that of the many maps she drew, she screened out of her expert report the maps that did not contain two Black-majority districts.

*Id.* (alteration in original) (quoting Tr. 288).

That is what *Gingles* 1 requires—even after *Callais*. The "entire point" of *Gingles* 1 is to show "that an additional majority-minority district could be drawn." *Allen*, 599 U.S. at 33. There is no probative value in presenting to the Court illustrative maps that do not satisfy that threshold. *Callais* does not instruct otherwise: it merely holds that "an illustrative map in which race was used has no

8

value in proving a § 2 plaintiff's case." 2026 WL 1153054, at *15. And there is no constitutional impropriety in a mapmaker "consider[ing] the relevant racial data only *after*" drawing a proposed map, "to check that the maps [s]he produced complied with [the Supreme Court's] Voting Rights Act precedent." *Alexander*, 602 U.S. at 22; *see also Allen*, 599 U.S. at 102 (Alito, J., dissenting) ("A plaintiff's expert can first create maps using only criteria that do not give race a predominant role and then determine how many contain the desired number of majority-minority districts.").

Even if the proposed districts submitted by the Plaintiffs were not enough, the Court also has the benefit of the remedial districts proposed by the Special Master, which were *undisputedly* drawn "race-blind without any particular difficulty." ECF No. 401 at 535. The parties stipulated that the Special Master's cartographer "drafted the Special Master Plan without reference to any illustrative or proposed plan," "did not display racial demographic data within the mapping software, Maptitude, while drawing his remedial proposals," and "drew his proposals based on other nonracial characteristics and criteria." *Id.* at 555 (citation modified). That is more than enough to satisfy the requirements of *Gingles* and *Callais*.

### 2. The illustrative maps meet all the state's legitimate districting objectives.

*Callais* requires that illustrative maps meet "all the state's legitimate districting objectives." 2026 WL 1153054, at *15. Here, the Court has already found that "Plaintiffs' illustrative plans often do meet or beat the 2023 Plan" on Alabama's

9

own stated criteria. ECF No. 401 at 345. The same is true of the Special Master's plans. *Id.* at 79–82. Those criteria were outlined in the Alabama House redistricting committee's 2021 redistricting guidelines and re-adopted in the 2023 redistricting guidelines. The guidelines give highest priority to population equality, compliance with state and federal law, contiguity, and compactness. *Id.* at 557–58. The guidelines also provided that the following policies shall be observed "to the extent that they do not violate or subordinate" any of the foregoing criteria: avoiding incumbent pairings whenever possible, respecting communities of interest, minimizing the number of counties in each district, and preserving the cores of existing districts. *Id.* at 558–59. Representative Pringle, the committee co-chair, testified that these guidelines—which have been largely unchanged since the 1990s—"cover all the bases." *Id.* at 103.

There is no dispute that Plaintiffs' illustrative plans satisfy these criteria. Each of the illustrative plans equalizes population and is contiguous. *Id.* at 351–52. Multiple plans "fall within the cap on county splits set in the 2023 legislative findings." *Id.* at 352. Multiple plans "perform[] at least as well as" or "outperform" the 2023 Plan on municipality and county splits. *Id.* On compactness, as Defendants' expert conceded, "the Cooper Plans and Duchin Plans outperform not only the 2023 Plan, but also plans and districts that Alabama has enacted for the past thirty years." *Id.* at 342. In short, as this Court found:

> Regardless whether we credit expert testimony, make our own visual assessment, review statistical scores of geographic compactness, consider the extent to which those Plans and districts respect traditional districting principles, or do all these things, the result is the same: the Plaintiffs have offered at least one illustrative plan that contains only equipopulous and contiguous districts that are reasonably geographically compact; respects existing political subdivisions; protects important and overlapping communities of interest; protects all incumbents except one; and provides two majority-Black districts without allowing race to predominate in the drawing process.

*Id.* at 379.

Defendants have never disputed any of this. Instead, they rely on a set of unprecedented "legislative findings" that were inserted into the bill enacting the 2023 Plan just hours before its passage, specifically in service of this litigation. "For the first time that anyone involved in these cases can remember or find, the Legislature included in the state law with the map extensive legislative findings," including several "non-negotiable" criteria that made it "mathematically impossible" to draw an additional Black opportunity district. *Id.* at 435–36. These findings, the Court found, "are replete with sharp departures from (and some outright conflicts with) Alabama's traditional districting guidelines," *id.* at 521, and were specifically designed to "checkmate" any attempt to create an additional Black opportunity district in "an intentional official effort to entrench the likely vote dilution [the Court] previously found." *Id.* at 524–25. Accordingly, as this Court has already concluded, *id.*, there is nothing "legitimate" about the redistricting objectives

11

presented in the legislative findings. *See Callais*, 2026 WL 1153054, at *15 (holding that illustrative maps meet "all the state's *legitimate* districting objectives" (emphasis added)).

Primary among these newly adopted "non-negotiable" criteria was that "the Black Belt, the Gulf Coast, and the Wiregrass" "shall be kept together to the fullest extent possible." ECF No. 401 at 61. As this Court found, however, the "cumulative effect" of Defendants' "non-negotiable" focus on the Gulf Coast "was to prescribe a majority-White district in an unsplittable community of interest, such that an additional opportunity district would be mathematically impossible." *Id.* at 435. Indeed, "counsel for the State conceded in closing argument that he is 'not aware of a way to draw two majority-Black districts without going against the Legislature's priority of keeping Mobile and Baldwin County whole.'" *Id.* at 362 (quoting Tr. 2648).

The Supreme Court already rejected Defendants' argument "that plaintiffs' maps erred by separating [the Gulf Coast region] into two different districts," as "not . . . persuasive." *Id.* at 20 (quoting *Allen*, 599 U.S. at 20–21). This Court, the Supreme Court held, "understandably found [the PI record] insufficient to sustain Alabama's overdrawn argument that there can be no legitimate reason to split the Gulf Coast region." *Allen*, 599 U.S. at 21 (citation modified). Defendants were unable to legitimize their purported state interest in Gulf Coast unity on the trial

12

record. As this Court found, Defendants' contention that the Gulf Coast is now somehow inviolable is belied by its State Board of Education Plan, which splits the Gulf Coast in the very same way that Defendants now say is "non-negotiable." ECF 401 at 373. In fact, Alabama placed Mobile and Baldwin Counties in different congressional districts for nearly 100 years and only placed them together in the 1970s to prevent the reelection of a Black incumbent. *Id.* at 364–65.

Moreover, the legislative findings' discussion of "communities of interest" is hardly race-neutral. The findings "describe the 'French and Spanish colonial heritage' of one community of interest (the Gulf Coast) while remaining silent on the heritage of all other communities of interest in Alabama (including the Black Belt)." *Id.* at 522 (quoting App. A at 6). And the findings "exalt and extol" the Gulf Coast "for pages," while devoting only "a couple of short paragraphs" to the Black Belt. *Id.* The Court rightly found this disparate treatment to be "especially pointed in a voting rights case where one of the allegations is that the majority-White community of interest in the Gulf Coast is being used to entrench race-based discrimination against the majority-Black community of interest in the Black Belt, which shares a heritage of enslavement." *Id.* at 522–23.

The legislative findings also elevated to "non-negotiable" status a requirement that "[t]he congressional districting plan shall not pair incumbent members of Congress within the same district." *Id.* at 371 (alteration in original). As an initial

13

matter, at least one plan, Cooper Plan 5, "pairs no incumbents." ECF No. 101 at 15, 132, 223.[6] But even setting that aside, this new "non-negotiable" criterion contradicts the 2023 guidelines that governed the 2023 redistricting process, which provided only that incumbent pairings should be "avoided whenever possible." ECF No. 401 at 558–59. Like the exaltation of the Gulf Coast, the elevation of avoiding incumbent pairings to non-negotiable status was plainly a pretext to make the drawing of a majority-Black remedial district mathematically impossible. *Id.* at 525.

Ultimately, the legislative findings' "non-negotiable" criteria fail for the same reason the Supreme Court rejected Defendants' "related argument based on 'core retention.'" *Allen*, 599 U.S. at 21. Like core retention, Alabama's so-called "non-negotiable" legislative findings have "the practical effect" of entrenching CD-2 as a majority-White district, precluding the creation of a second majority-Black district. ECF No. 401 at 362. "No document, testimony, or lawyer disputes . . . this point." *Id.* And as with core retention, the Supreme Court "has never held that a State's adherence to a previously used" majority-White district "can defeat a § 2 claim. If that were the rule, a State could immunize from challenge a new racially discriminatory redistricting plan simply by" mandating the preservation of a predominantly White community that was prioritized in "an old racially

---

[6] Moreover, "because two paired incumbents live[d] in the same county just miles apart, a plan would have to split that county to avoid pairing those incumbents," ECF No. 101 at 73, thus placing multiple redistricting criteria at odds.

discriminatory plan." *Allen*, 599 U.S. at 22. "That is not the law: § 2 does not permit a State to provide some voters 'less opportunity . . . to participate in the political process'" simply by proclaiming one community of interest paramount to all others. *Id.* (alteration in original) (quoting 52 U.S.C. § 10301(b)). Importantly, nothing in *Callais* alters this holding. As the *Callais* Court stated many times over: "we have not overruled *Allen*." *Callais*, 2026 WL 1153054, at *18.

*Callais* requires that illustrative maps meet "all the state's *legitimate* districting objectives." *Id.* at *15 (emphasis added). A set of racially charged "legislative findings" that are intentionally designed to make the drawing of majority-minority districts impossible is not a "legitimate" criterion by any definition. As this Court recognized, "requiring a plaintiff to meet or beat an enacted plan on *every* redistricting principle a State selects would allow the State to immunize from challenge a racially discriminatory redistricting plan simply by claiming that it best satisfied a particular principle the State defined as non-negotiable." ECF No. 401 at 344. Alabama's so-called "non-negotiable" criteria were specifically designed to make it impossible to draw an additional majority-Black district. *See id.* at 524–25. Nothing in *Callais* disturbs that finding of fact, and that finding precludes Defendants' reliance on those criteria to argue that Plaintiffs' illustrative maps do not satisfy *Gingles* 1 under *Callais*.

15

### 3.  Alabama legislators disclaimed any partisan intent.

Notably absent from either Alabama's 2023 guidelines *or* its "legislative findings" is any reference to "the State's specified political goals," *Callais*, 2026 WL 1153054, at *15; *see id.* at *18 (acknowledging that, like with the 2023 map, Alabama "did not defend its [2021] map on the ground that it was drawn to achieve a political objective"). And though Defendants—years after the 2023 Plan was enacted—suggested in post-trial briefing that partisan motivations might be at play, this Court found "precious little evidence to support the State's claim." ECF No. 401 at 546. Certainly, the record reveals no identifiable partisan "target[s]," *Callais*, 2026 WL 1153054, at *15. "The only evidence in the record that any legislator considered partisan advantage in 2023 is the testimony from the Legislators about the calls they received from former Speaker McCarthy about the slim Republican majority in the United States House, and the testimony from Representative Pringle and Senator Livingston that they spoke with various congressional and political party staff." ECF No. 401 at 546. "[N]either Legislator testified that they acted on those conversations, or even that they seriously considered acting on them." *Id.* Senator Livingston, in fact, testified that his conversation with Speaker McCarthy "really didn't play into [his] efforts." *Id.* at 100 (alteration in original) (citation omitted).

16

In short, Defendants not only failed to establish a partisanship defense for the 2023 Plan—they explicitly disclaimed it. Instead, Defendants adamantly insisted—in detailed legislative findings and legal arguments—that the 2023 Plan was grounded in its desire to preserve the predominantly White Gulf Coast community, rooted in White colonial heritage. *Id.* at 522. That choice forecloses Defendants from claiming a partisan justification that now, under *Callais*, might be more legally defensible. Defendants cannot retroactively manufacture an intent that they failed to assert or establish three years ago.

Because Defendants did not put forth partisan advantage as a criterion, there was no need for Plaintiffs to present an alternative map that achieves the state's "partisan advantage" goals, *Callais*, 2026 WL 1153054, at *13. *Callais* requires only that illustrative maps satisfy "the State's *specified* political goals." *Id.* at *15 (emphasis added). Where, as here, no such goals are specified, that requirement is met.

> **B.    The Court's findings establish racially polarized voting under *Callais*.**

Under *Callais*, "[t]o satisfy the second and third [*Gingles*] preconditions—politically cohesive voting by the minority and racial-bloc voting by the majority—the plaintiffs must provide an analysis that controls for party affiliation." *Id.* This Court has already done the work of "disentangling race from politics." *Id.* (quoting

17

*Alexander*, 602 U.S. at 6).[7] Defendants argued extensively to this Court that Alabama's admittedly "stark[] and intense[]" racial polarization—and resulting "nearly invariant" electoral losses for Black-preferred candidates—is merely the consequence of partisan differences. ECF No. 401 at 283, 402. But despite Defendants' best efforts, this Court found "no evidence that only party politics are at work." *Id.* at 403. To the contrary, this Court found there was an "overwhelming evidentiary record about the importance of race in Alabama politics." *Id.* at 409. The result of such stark racial polarization is that "Black Alabamians enjoy virtually zero success in statewide elections," *Allen*, 599 U.S. at 22 (citation omitted), or at the state or federal level outside of majority-Black districts prescribed by § 2, *regardless of their partisan affiliation*. ECF No. 401 at 411–13.

Plaintiffs established through extensive fact and expert testimony that Black Alabamians "have 'less opportunity' than their majority counterparts because of race, not just because of partisan affiliation." *Callais*, 2026 WL 1153054, at *15. Start with the experts. Dr. Baodong Liu "testified at length that 'race is more important than party' in Alabama elections." ECF No. 401 at 153 (citing Tr. 584–87). His analysis showed that, in 2008, White Democrats in Alabama supported Senator John McCain over then-Senator Barack Obama. *Id.* at 407. He "drew a

---

[7] Although "[u]nder controlling precedent" at the time, *Gingles* 2 and 3 "d[id] not require that [the Court] fully disentangle party and race," the Court nonetheless "consider[ed] causation in [its] analysis of the totality of the circumstances (particularly Senate Factor 2)." ECF No. 401 at 389.

similar conclusion from his analysis of the 2008 Alabama Democratic primary for president." *Id.* at 153. Dr. Liu also showed that, in 2024, the four Black candidates in the CD-2 Republican primary together amassed only 6 percent of the primary vote, all of them finishing behind the four White candidates. *Id.* at 408. This data, the Court found, "suggests that White Republicans are not willing to support minority candidates" even within their own party. *Id.* at 407. Dr. Liu also "analyzed two nonpartisan Montgomery mayoral runoff elections . . . to control for party, and found that "when the party 'cue' [was] taken away and only the racial cue remaine[d], it [was] race, rather than party, that drove the election outcomes." *Id.* at 152 (alterations in original) (quotation omitted). Finally, Dr. Liu testified about the 2021 District 1 Democratic primary, in which over 50 percent of Black voters supported the Black candidate, compared to only 16.7 percent of White voters. *Id.* at 153. All of this shows "intra-party racial-bloc voting." *Callais*, 2026 WL 1153054, at *15.

Even Defendants' *own experts* support these conclusions. Defendants offered Dr. Trey Hood to testify to Alabama's purportedly race-blind politics, but his testimony was "widely inconsistent" with his own scholarly work, including several articles that "directly refute his litigation opinions." ECF No. 401 at 392–93. Dr. Hood's published scholarship "spanning nearly a decade" "repeat[edly]" concludes that "race remains the dominant political influence in Southern politics today." *Id.*

19

at 403. Where the very scholarship that *qualifies* Dr. Hood as an expert explicates "[t]oday's racialized partisan cleavage," *id.* at 302 (quotation omitted), Defendants can hardly contend otherwise. *See id.* at 403 ("Ultimately, Dr. Hood's opinions support the Plaintiffs more than the State on the issue of racially polarized voting.").

Defendants' other expert on this issue, Dr. Christopher Bonneau, conceded that the data on racial voting patterns "established 'that White voters in Alabama support White Democrats more than they support Black Democrats.'" *Id.* at 384 (quoting Trial Tr. 1789). This is consistent with Dr. Liu's undisputed data demonstrating that White Alabamians of *both* major parties are less willing to support minority candidates. And, while Defendants have made much hay of the election of "one Black Republican from one majority-White district in 150 years," *id.* at 406–07, even Dr. Bonneau agreed that "Representative Paschal's election is a 'unicorn.'" *Id.* at 407 (quoting Tr. at 1688). That admission "tells [the Court] that the State may be substantially overstating White voters' willingness to support minority candidates." *Id.*

Moreover, the Court heard and credited extensive fact and expert testimony that, while Black and White Alabamians both consider themselves to be ideologically conservative and hold similar views on important social issues, their voting patterns do not reflect those shared values. Dr. Joseph Bagley testified that "many Black Alabamians identify as conservative Christians." *Id.* at 177. "They

20

consider themselves, perhaps, even fundamentalist conservatives or, more importantly, evangelical conservatives, and yet, they do not vote for Republican candidates." *Id.* (quoting Tr. 1360). The "numbers don't bear . . . out" that Black Alabamians vote based on liberal or conservative policy positions, rather than race. *Id.* (quoting Tr. 1361–62). Fact witnesses back up Dr. Bagley's account. Pastor Valtoria Jackson explained, "that on abortion as well as LGBTQ rights, the Republican Party aligns closely with the Black church." *Id.* at 257 (quoting Tr. at 1106–07). Plaintiff Evan Milligan testified that many in the Black community "are conservative on issues about sexuality, abortion, gender, and sometimes even in terms of government services." *Id.* at 188 (quoting Tr. at 1174). The State's witness, Dr. Carrington, agreed that "Black and White Christians in Alabama hold similar views on abortion." *Id.* at 318 (quoting Tr. at 1621). Nevertheless, "most Black people do not support Republican candidates because Republicans do not campaign in Black communities." *Id.* at 257. "[B]oth racial issues and other issues that are important to Black Alabamians override[] the obvious alignment between these voters' conservative Christian beliefs and the Republican Party." *Id.* at 409–10.

Because White politicians across parties do not support issues important to Black voters, polarized voting in Alabama cannot be explained by the parties' appeals to policy. Unlike Black Democrats, the White Democrats elected to Congress from Alabama failed to support civil rights bills as recently as 2009. Trial

21

Tr. 716:23–720:8 (L. Jackson). White Republicans from the Alabama congressional delegation voted against the First Step Act—a 2018 law passed by a Republican-controlled congress and signed by President Trump—intended to reduce racial disparities in sentencing. Trial Tr. 715:13–716:16 (L. Jackson). And Black Republicans have also been disappointed by Republicans' lack of support for criminal legal reform and increased transit funding. Stone Tr. 864:4–865:12 (Branyon); 1338:9–1339:4 (Coley).

The evidence also showed that White Democrats are less responsive to the needs of Black voters than are Black Democrats. The president of the Alabama State Conference of the NAACP testified that Black members have regularly met with his organization to discuss issues of importance to Black voters, but "he has not seen any White legislators at those events"—regardless of party. ECF No. 401 at 211–12. And "the only elected officials who have met with the NAACP about civil rights issues are Black." *Id.* at 212.

Ultimately, Alabama's asserted partisan explanation for racial polarization is directly at odds with the "political reality" borne out in the evidentiary record. *Id.* at 408. As this Court found based on its "intensely local appraisal," *Allen*, 599 U.S. at 19 (citation omitted), "it denies reality for us to say that at the end of the day, all of that is just party politics." ECF No. 401 at 409.

22

C.    **The totality of the circumstances demonstrates that Black Alabamians suffer present-day intentional racial discrimination regarding voting.**

*Callais* held that "the 'totality of the circumstances' inquiry must focus on evidence that has more than a remote bearing on what the Fifteenth Amendment prohibits: present-day intentional racial discrimination regarding voting." *Callais*, 2026 WL 1153054, at \*16. "Discrimination that occurred some time ago," or "present-day disparities that are characterized as the ongoing effects of societal discrimination," while relevant, are "entitled to much less weight" than "current data and current political conditions that shed light on current intentional discrimination." *Id.* (quotations omitted). This record, and this Court's findings, more than satisfy that standard.

As *Callais* requires, this Court declined to "assign Alabama's shameful history dispositive weight," ECF No. 401 at 413, and did not "grant Section Two relief simply because [it] condemn[s] past discrimination." *Id.* Instead, the Court "carefully considered an extensive record about both past and present discrimination," *id.* at 414, to conclude that "under all the circumstances in Alabama *today*, Black Alabamians have less opportunity than other Alabamians to elect representatives of their choice." *Id.* at 7 (emphasis added). For example:

- Federal courts recently ruled against or altered local at-large voting systems with numbered posts created by the Legislature to address their alleged racially discriminatory purpose or effect. *See* ECF No. 401 at 416–17 (collecting cases);

23

- Since the decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), federal courts have ordered multiple political subdivisions in Alabama to be bailed back into preclearance review. *See* ECF No. 401 at 416 (collecting cases);

- In 2018, the Eleventh Circuit affirmed a finding that "race was a motivating factor" in an effort by a city that is 85% White to form a school district separate from Jefferson County's more racially diverse district. ECF No. 401 at 416 (quoting *Stout ex rel. Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1000, 1009 (11th Cir. 2018));

- A court determined that Alabama did not satisfy its obligations to remedy the vestiges of segregation under a 1967 injunction until as late as 2007. ECF No. 401 at 416 (citing *Lee v. Lee Cnty. Bd. of Educ.*, 476 F. Supp. 2d 1356, 1367–68 (M.D. Ala. 2007));

- After the 2010 census, Black voters and legislators successfully challenged 12 state legislative districts as unconstitutional racial gerrymanders. *See* ECF No. 401 at 417 (citing *Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1348–49 (M.D. Ala. 2017); and

- In *United States v. McGregor*, 824 F. Supp. 2d 1339, 1345–47 (M.D. Ala. 2011), a federal court found that Alabama State Senators conspired to depress Black voter turnout by keeping a referendum issue popular among Black voters (whom the Senators called "Aborigines") off the ballot. ECF No. 401 at 417.

In short, this record does not want for "pertinent evidence relating to intentional present-day voting discrimination." *Callais*, 2026 WL 1153054, at *16.

Ultimately, however, the most damning evidence on the totality of the circumstances is the Court's finding *in this very case* that Alabama intentionally discriminated against Black voters when it enacted the 2023 Plan. That finding does not merely "shed light on current intentional discrimination," *id.*; it conclusively establishes that racial discrimination is presently infecting the Legislature's

24

redistricting efforts. And for the reasons explained below, nothing in *Callais* requires the Court to revisit that finding of fact.

> **D.** **The Court's finding of discriminatory intent is unaffected by *Callais* and supports Section 2 liability.**

Although Section 2 "does not demand a finding of intentional discrimination, it imposes liability only when the circumstances give rise to a strong inference that intentional discrimination occurred." *Id.* at *12. In adjudicating a constitutional claim under *Arlington Heights*, this Court has already found not just that "the evidence supports a *strong inference* that the State intentionally drew its districts to afford minority voters less opportunity because of their race," *id.* at *13 (emphasis added)—it found there is "*no doubt*" that is what happened. ECF No. 401 at 25 (emphasis added). That finding suffices to demonstrate Plaintiffs' likelihood of success and remains undisturbed by *Callais*.

First, *Callais* did not and could not change the applicable law on intentional vote dilution under the Fourteenth or Fifteenth Amendments because it had no such claim before it—instead, it considered whether a redistricting plan enacted to comply with Section 2 was a racial gerrymander. *See Alexander*, 602 U.S. at 38 (2024) ("A vote-dilution claim is analytically distinct from a racial-gerrymandering claim and follows a different analysis." (citation modified)). As Justice Sotomayor correctly noted, this Court "remains free on remand to decide for itself whether *Callais* has any bearing on its Fourteenth Amendment analysis or if its prior reasoning is

25

unaffected by that decision." *Allen*, 2026 WL 1282800, at \*3 (Sotomayor, J., dissenting). Nothing in the Court's remand order took issue with Justice Sotomayor's characterization, and nothing in *Callais* casts doubt upon the well-worn *Arlington Heights* standard or how this Court applied it. This Court's conclusion that "every one" of the applicable *Arlington Heights* and Circuit factors showed that "the Legislature acted with discriminatory intent when it passed the 2023 Plan," with "no factor, or even material part of a factor" tilting in the State's favor, survives untouched. ECF No. 401 at 536.

Second, the fact that this Court's 2021 injunction applied a pre-*Callais* test does not exonerate Alabama from the Court's finding of intentional discrimination. This Court faithfully applied binding precedent, as the Supreme Court affirmed. *See Allen*, 599 U.S. at 23 ("The Court faithfully applied our precedents and correctly determined that, under existing law, HB1 violated § 2."). There was no excuse for Alabama's "deliberate decision to ignore, evade, and strategically frustrate requirements spelled out in a court order" affirmed by the Supreme Court. ECF No. 401 at 28. Defendants cannot ignore federal injunctions grounded in settled law simply because they anticipate that the law might change. And in any event, nothing in *Callais* excuses Defendants' insistence on diluting the Black vote over complying with a federal court order: the Supreme Court was explicit that it "ha[s] not overruled *Allen*." *Callais*, 2026 WL 1153054, at \*18.

26

Third, contrary to Defendants' recent submission to the Supreme Court, *Callais* lends no credence to their argument that they ignored this Court's injunction because they feared a racial gerrymandering claim. ECF No. 401 at 543. This Court "ha[s] no evidence that the Legislature was specifically concerned about potential gerrymandering liability when it enacted the 2023 Plan." *Id.* at 544. Moreover, the Legislature had assurances from both this Court and the Supreme Court that it was possible to draw a remedial district that did not give undue consideration to race. *Allen*, 599 U.S. at 33. Indeed, the special master "prepared three proposed remedial plans race-blind without any particular difficulty." ECF No. 401 at 535. This Court already found that Alabama went out of its way to *avoid* creating a second Black-opportunity district, *see id.* at 25, and *Callais* does nothing to change that evidentiary record.

Finally, as described above, there is no evidence in this record to suggest that the Alabama Legislature was motivated by pure partisanship rather than race. In fact, the record refutes that contention. There can be no "adverse inference" against Plaintiffs from failing to produce an alternative map "that met the State's avowedly partisan goals," *Abbott v. League of United Latin Am. Citizens*, 146 S. Ct. 418, 419 (2025), because Alabama had not avowed any such goals in its lead-up to or defense of the 2023 Plan. The only remaining explanation, as this Court found, is race.

27

## II.    Black Alabamians, including Plaintiffs, will suffer irreparable harm absent an injunction.

Plaintiffs will suffer "irreparable injury . . . unless the injunction issues." *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003). Absent preliminary relief, Plaintiffs and other Alabamians will be irreparably harmed in at least three ways: (i) by being forced to vote under a district map that violates the Voting Rights Act and was motivated by "intentional racial discrimination," ECF No. 401 at 23; (ii) through the cancelation of their already cast votes, including an absentee ballot already cast by Plaintiff Smith; and (iii) through the confusion and chaos that this last-minute change to the district map would bring.

Irreparable injury is a harm that "cannot be undone through monetary remedies." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (quotation omitted). The deprivation of constitutional rights "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The right to "vot[e] is a fundamental right guaranteed by the Due Process Clause of the Fourteenth Amendment." *Hoblock v. Albany Cnty. Bd. of Elections*, 341 F. Supp. 2d 169, 176 (N.D.N.Y. 2004), *aff'd*, 422 F.3d 77 (2005). Accordingly, courts "routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *see also, e.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (similar); *Williams v.*

28

*Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) ("The registration applicants in this case would certainly suffer irreparable harm if their right to vote were impinged upon.").

First, any attempt by the State to implement the 2023 Plan in the upcoming 2026 elections would irreparably harm Plaintiffs and other Black Alabamians because, as set forth above, the 2023 Plan violates both statutory and constitutional voting rights. *Supra* § I. This Court's conclusion that the 2023 Plan violates Section 2 of the Voting Rights Act not only survives *Callais*, it *exemplifies Callais*'s emphasis on intentional discrimination and the distinction between race and party in the Section 2 analysis. Additionally, this Court already concluded based on a "corpus of undisputed evidence" the 2023 Plan "amounted to intentional racial discrimination in violation of the Fourteenth Amendment's Equal Protection guarantee" by "intentional[ly] . . . dilut[ing] Black Alabamians' voting strength." ECF No. 401 at 23. Voters "suffer an irreparable harm if they must vote in . . . congressional elections based on a redistricting plan that violates federal law." *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1026 (N.D. Ala. 2022).

Second, Plaintiffs and Black Alabamians will be irreparably harmed not only by the 2023 Plan itself but also by the last-minute attempt to swap in that long-enjoined map in the middle of an ongoing election. Many Alabama voters have already cast lawful, timely ballots for the May 19 primary elections under the district lines that have been in place for nearly three years. Pursuant to the Uniformed and

29

Overseas Citizens Absentee Voting Act (UOCAVA), 52 U.S.C. § 20302(a)(8), Alabama sent absentee ballots to overseas citizens more than a month ago, by April 4, 2026. Absentee voting is also already well underway. *See* Ala. Code §§ 17-11-3, 17-11-5. Plaintiff Ronald Smith, for instance, already cast an absentee ballot in the primary election in District 2 under the Special Master Plan. His vote—and those of other Alabamians—would be wholly invalidated if the 2023 Plan is not enjoined, and his rights—and those of other Alabamians—would be violated were the Court to allow Alabama to throw out those votes. *See, e.g.*, *Griffin v. Burns*, 570 F.2d 1065, 1074 (1st Cir. 1978) (determining a state "could not, constitutionally, invalidate the absentee . . . ballots that state officials had offered to the voters in this primary, where the effect of the state's action had been to induce the voters to vote by this means"); *Hoblock*, 341 F. Supp. 2d at 176 ("[B]y providing absentee ballots that voters rely upon in good faith to cast their vote, and then invalidating them, the Board has effectively taken away their guaranteed right to vote in the election."). *Griffin v. N.C. State Bd. of Elections*, 781 F. Supp. 3d 411, 444 (E.D.N.C. 2025) (concluding the "retroactive invalidation of overseas military and civilian voters' ballots violates their substantive due process rights."). The "Fourteenth Amendment guarantees" a voter's "ability to cast a meaningful ballot." *Polelle v. Fla. Sec'y of State*, 131 F.4th 1201, 1213 (11th Cir.), *cert. denied sub nom. Polelle v. Byrd*, 146 S. Ct. 298 (2025). "[R]etroactive changes to election procedures raise serious due process

30

concerns, particularly where those changes result in invalidating the votes of individuals who cast ballots in reliance on previously established rules." *Griffin*, 781 F. Supp. 3d at 435. Indeed, a state violates voters' substantive due process rights when it tells voters "one thing before the election and change[s] its policy thereafter." *Scheer v. City of Miami*, 15 F. Supp. 2d 1338, 1344 (S.D. Fla. 1998).

Finally, Plaintiffs and all Alabama voters will be irreparably harmed by the "chaos" and confusion that a change to the district maps at this time would bring. *Merrill v. Milligan*, 142 S. Ct. 879, 879–80 (2022) (Kavanaugh, J., concurring). Even where a party demonstrates its entitlement to a new congressional map— something Alabama has decidedly not shown here—the Supreme Court has precluded the imposition of such a map in Alabama at the state's insistence when the primary was more than 15 weeks away. *Id.* at 879–80 (noting Alabama's argument that changing the map when "the primary elections begin (via absentee voting) just seven weeks from" the District Court's order was "a prescription for chaos for candidates, campaign organizations, independent groups, political parties, and voters, among others"). Other federal courts have found that the equities of delaying the election or introducing a new map so close to an election have counseled in favor of using the old map, despite its infirmities. *See, e.g.*, *Covington v. North Carolina*, 316 F.R.D. 117, 177 (M.D.N.C. 2016) (finding that postponing elections would "cause significant and undue disruption to North Carolina's election

31

process and create considerable confusion, inconvenience, and uncertainty among voters, candidates, and election officials," and allowing election to proceed under maps "despite their unconstitutionality"), *aff'd*, 581 U.S. 1015 (2017).

### III.   The balance of equities and the public interest favor relief.

The balance of the equities and the public interest strongly favor a preliminary injunction.[8] Absent injunctive relief, the 2023 Plan will become just the latest avoidable example of dilution of the Black vote in Alabama. Even in light of *Callais*, there is little reason to doubt this Court's conclusion that Alabama's 2023 map violates Section 2, to say nothing of its conclusion (unaddressed by *Callais*) that it constitutes "an intentional effort to dilute Black Alabamians' voting strength and evade the unambiguous requirements of court orders standing in the way." ECF No. 401 at 23. It is beyond cavil that the public interest is best served by holding elections free from such discrimination and legal infirmities, particularly given that the current map was drawn blind to race. *Id.* at 77–78; *cf. Rice v. Cayetano*, 528 U.S. 495, 512 (2000); *see also Kennedy v. Riley*, No. 2:05-cv-1100-MHT, 2007 WL 1461746, at *2 (M.D. Ala. May 17, 2007) (concluding that vindicating rights protected under the VRA is in the public service because the Act "is intended to protect the right to vote and because that right is a fundamental political right in that it is preservative of all

---

[8] These two "factors merge when the Government is the opposing party," as it is here. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

rights") (citation modified); *Campbell v. Bennett*, 212 F. Supp. 2d 1339, 1348 (M.D. Ala. 2002) (explaining claims at issue "touch upon the public's . . . right to vote, and the preservation of such rights through injunctive relief is not contrary to the public interest").

Even worse, Alabama voters are voting in an election that is *currently taking place*. Candidates have been certified, ballots printed and mailed, campaign funds spent, and votes cast. *See* Ala. Code §§ 17-11-12, 17-11-5; 52 U.S.C. § 20310 (requiring mailing of absentee ballots to voters abroad by April 4). All voters have an important stake in avoiding Defendants' effort to void their ballots in an ongoing election, particularly where that effort is driven by a state's desire to impose an unlawful map. *See, e.g.*, *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (explaining the "public interest" favors avoiding "substantial risk that citizens will be disenfranchised"); *cf. Duke v. Massey*, 87 F.3d 1226, 1233 (11th Cir. 1996) (observing that "burdens on candidate access to the ballot directly burden the voters' ability to voice preferences"). With "election machinery . . . already in motion, the public interest weighs strongly in favor" of preserving the status quo, *Veasey v. Perry*, 769 F.3d 890, 896 (5th Cir. 2014), while this Court effectuates the Supreme Court's instruction to "further consider[]" the case "in light of *Callais*," *Allen*, 2026 WL 1282800, at *1. Indeed, permitting Applicants to carry out their ploy to nix elections under a congressional map that has been in place for nearly three

33

years would do severe harm to the public's confidence in the electoral system. *See First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 788–89 (1978) (recognizing importance of "[p]reservation of the individual citizen's confidence in government," in addition to maintaining the "integrity of the electoral process").

Defendants' gambit to sneak in an unlawful map right at the buzzer is directly at odds with their past arguments regarding the feasibility of upsetting its congressional elections so late in the game. When Plaintiffs sought to replace the 2021 Plan with a lawful map in January 2022, Defendants adamantly argued that amending Alabama's congressional map at that time would "almost certainly obstruct the State's upcoming elections," ECF No. 71 at 43, which were then proceeding on the same election calendar as the 2026 elections. They insisted such a course would "throw the current election into chaos and leave insufficient time for maps to be redrawn, hundreds of thousands of voters to be reassigned to new districts, and thousands of new signatures to be obtained by candidates and political parties seeking ballot access." *Id*. at 135. Defendants admonished this Court that "the critical date for having maps in place is not May 24, 2022, when the primary election will be held, nor even March 30 when absentee voting will begin, but months earlier still." *Id*. at 138. Defendants then raced to the Supreme Court to block this Court's preliminary injunction—which issued *four months before* the May primary—based on concerns about implementing "new districts days before the candidate qualifying

34

deadline and less than two months before absentee voting is to begin." Emergency Appl. for Admin. Stay & Stay at 39, *Milligan*, No. 21-1086 (U.S. Jan. 28, 2022). The Court should take Defendants at their own word that changing the map now would "throw the current election into chaos," ECF No. 71 at 135, a result that is decidedly not in the public interest even independent of the obvious fact that the 2023 Plan is just as unlawful and unconstitutional as it was the day it was signed into law. The public's interest is best preserved by holding Alabama's congressional elections under the very maps that they used in 2024 and are currently using in the ongoing election.

On the other side of the ledger, Defendants face no conceivable harm by allowing the 2026 congressional elections to proceed under the Special Master Plan, as they have long planned. Just four years ago, Defendants successfully argued that the State itself would be irreparably harmed by an eleventh-hour change in congressional district lines, regardless of the plan's lawfulness. *Milligan*, 142 S. Ct. at 880 (Kavanaugh, J., concurring).[9] But judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory

---

[9] That view is in line with now-existing Article IV, Section 111.08 of the Alabama Constitution, which prohibits new legislation "relating to the conduct of [a] general election" from being implemented earlier than six months before election day—a prohibition inconsistent with Defendants' last-minute election changes here.

35

argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted).

Nor can Defendants point to their recent legislation purporting to cancel the May 19 primary in a handful of districts to claim irreparable harm now. As an initial matter, any harm the State faces from that legislation is entirely of its own making. No litigant may "satisfy the irreparable harm requirement if the harm complained of is self-inflicted." 11A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 2948.1 (3d ed. 2013). In any event, the May 19 primary will need to go forward as scheduled anyway because there are other offices on the ballot. A preliminary injunction would simply maintain the status quo and ensure that the May 19 primary proceeds as planned across the state.

The "*Purcell* principle," which is meant to avoid "voter confusion and consequent incentive to remain away from the polls" resulting from changes immediately before an election, does not preclude relief. *Purcell v. Gonzales*, 549 U.S. 1, 4–5 (2006) (per curiam). *Purcell* is all about maintaining the status quo "[w]hen an election is close at hand" so that "the rules of the road [are] clear and settled." *Milligan*, 142 S. Ct. at 880–81 (Kavanaugh, J., joined by Alito, J., concurring). Under the status quo, votes are currently being cast in an election administered using the Special Master Plan, which is the only map Alabama has known since this Court's preliminary injunction in 2023. None of the principles

36

animating *Purcell* stand in the way of reinstating an injunction that Alabama has already been complying with for years. "Unlike in *Purcell*, here the 'status quo is one in which the challenged [map] has not been in effect.'" *OPAWL v. Yost*, 748 F. Supp. 3d 554, 567 (S.D. Ohio 2024) (quoting *Republican Nat'l Comm. v. Common Cause R.I.*, 141 S. Ct. 206, 206 (2020) (denying motion for stay)).

To the extent *Purcell* has any bearing on this situation at all, it can be "overcome" when "(i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., joined by Alito, J., concurring). Each prong is indisputably met here. *Callais* did not upset this Court's careful Section 2 or constitutional analysis; it is still "not a close call." ECF No. 401 at 7; *supra* § I. Plaintiffs will suffer irreparable harm absent preliminary relief. *Supra* § II. Plaintiffs moved as swiftly as possible by applying for a temporary restraining order just hours after the Supreme Court's GVR. ECF No. 432. And to the extent simply reinstating this Court's long-running injunction can be thought to involve any "changes" at all, it would *mitigate*, not create, "significant cost, confusion, or hardship" that would naturally result from running a second primary

37

election under an unlawful map, well after voters have already voted. *Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., joined by Alito, J., concurring).

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court once again preliminarily enjoin the 2023 Plan and any steps to implement it and order Alabama to leave in place the Special Master Plan previously ordered until final resolution of the case on remand.

Dated: May 15, 2026

Respectfully submitted,

By /s/ *Abha Khanna*

Richard P. Rouco
(AL Bar. No. 6182-R76R)
**Quinn, Connor, Weaver, Davies & Rouco LLP**
Two North Twentieth
2-20th Street North, Suite 930
Birmingham, AL 35203
Phone: (205) 870-9989
Fax: (205) 803-4143
Email: rrouco@qcwdr.com

Abha Khanna*
**Elias Law Group LLP**
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
Phone: (206) 656-0177
Email: AKhanna@elias.law

Lalitha D. Madduri*
Richard A. Medina*
**Elias Law Group LLP**
250 Massachusetts Ave. NW,
Suite 400
Washington, D.C. 20001
Phone: (202) 968-4490
Email: LMadduri@elias.law
Email: RMedina@elias.law

*Attorneys for Caster Plaintiffs*
**Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I certify that a copy of the foregoing has been served by ordinary U.S. Mail upon all parties for whom counsel has not yet entered an appearance electronically: None.

/s/ *Abha Khanna*
Abha Khanna
Counsel for *Caster*
Plaintiffs

39