FILED

2026 May-18  AM 11:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| BOBBY SINGLETON, *et al.*,<br>Plaintiffs,<br><br>v.<br><br>HON. WES ALLEN, in his official capacity as Alabama Secretary of State, *et al.*,<br>Defendants. | Case No. 2:21-cv-1291-AMM<br><br>THREE-JUDGE COURT |
| EVAN MILLIGAN, *et al.*,<br>Plaintiffs,<br><br>v.<br><br>HON. WES ALLEN, in his official capacity as Alabama Secretary of State, *et al.*,<br>Defendants. | Case No. 2:21-cv-1530-AMM<br><br>THREE-JUDGE COURT |
| MARCUS CASTER, *et al.*,<br>Plaintiffs,<br><br>v.<br><br>HON. WES ALLEN, in his official capacity as Alabama Secretary of State, *et al.*,<br>Defendants. | Case No. 2:21-cv-1536-AMM |

### STATE DEFENDANTS' JOINT OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF CONTENTS........................................................................... i

INTRODUCTION ................................................................................. 1

BACKGROUND ................................................................................. 6

      A.      The 2021 Plan and *Allen v. Milligan*.............................................. 6

      B.      The 2023 Plan and This Court's Injunctions ................................. 9

      C.      *Callais* and the 2026 Special Legislative Session......................... 12

LEGAL STANDARD.......................................................................... 18

ARGUMENT ..................................................................................... 20

      I.      Plaintiffs' §2 Claims Are Unlikely To Survive *Callais*. ..................................................................................... 23

      A.      Plaintiffs' §2 claims fail under the updated *Gingles* framework. ........................................................................ 23

      B.      *Gingles* I: Plaintiffs' expert map-drawers considered race in their map-drawing process and failed to meet all of the State's districting objectives.................................................................... 27

           1.   Plaintiffs impermissibly used race to draw illustrative maps. .....28

           2.   Plaintiffs failed to meet all of the State's legitimate districting objectives...................................................................29

      C.      *Gingles* II and III: Plaintiffs' racially polarized voting analysis did not control for party affiliation. .................... 33

           1.   Race and politics must be disentangled as part of *Gingles* II and III, not as one factor among many............................................34

           2.   Plaintiffs must "disentangl[e] race and politics."........................35

3.  It is Plaintiffs' burden to "disentangl[e] race and politics," not the State Defendants'. ...............................................36

4.  Plaintiffs did not "disentangl[e] race and politics"— and this Court's finding that the two are intertwined is dispositive....................................................................................36

D.  Totality of the Circumstances ..................................................... 40

II.  Plaintiffs' Equal Protection Claims Are Unlikely To Survive *Callais* And Cannot Justify The Remedy Plaintiffs Seek..................................................................................... 43

A.  Because Plaintiffs are unlikely to prove vote dilution under §2, they are unlikely to prove unconstitutional vote dilution....................................................... 43

B.  Plaintiffs cannot show discriminatory intent. .............................. 48

1.  Plaintiffs cannot overcome the presumption of good faith. .........49

2.  Plaintiffs fail to present an alternative map that could rule out the inference that non-racial factors motivated the 2023 Plan. ................................................................................................59

3.  The 2023 Plan is better explained by partisan motives than by racial animus, especially in light of the 2026 Special Session.....62

4. Plaintiffs cannot rely on *Allen v. Milligan* to show intentional discrimination................................................................................67

C.  Even if Plaintiffs' Equal Protection claims could succeed, the Special Master Plan is not a proper remedy. ......................................................................................... 71

III.  The Equities And *Purcell* Strongly Counsel Against Entering Any Injunction Now........................................................... 75

A.  The Supreme Court sided with State Defendants on the equities when it expedited consideration,

vacated the judgments, and immediately issued its judgment. ................................................................ 75

B.    *Purcell* cuts against injunctive relief, not in its favor. ........................................................................ 76

C.    Plaintiffs' concerns about Alabama's Special Primary Election are not properly before this Court and do not warrant this Court's intervention. ............................. 83

IV.    Defendants Request A Stay Of Any Injunction That Issues. .......................................................................... 88

CONCLUSION ............................................................................... 88

CERTIFICATE OF SERVICE .......................................................... 91

iii

**INTRODUCTION**

The Court should deny Plaintiffs' requests for emergency relief and reconsider these cases under the proper legal standard in the normal course. "The coordinated trial of these cases consumed eleven trial days," "the transcript spans more than 2,600 pages," the Court "heard live testimony from twenty-three witnesses (including thirteen experts)" and "received testimony by designation for twenty-eight additional witnesses," "considered stipulated facts spanning thirty-nine pages," "processed more than 790 putative exhibits," and "received more than 840 pages of proposed findings and conclusions after trial." Doc. 490 at 10[1] (hereafter "*Milligan* Op."). Then the Court issued a 571-page opinion replete with factual findings and legal conclusions. *See id*.

*All of it* must be reconsidered through the prism of *Callais*. The Court's previous factual findings do not just port over, and the parties will necessarily have a lot to say about how the *Callais* standard applies to this record. There is no reason to litigate this case at breakneck speed (where the State Defendants are given just 72 hours over a weekend to respond to three preliminary injunction motions) when the hill is so steep for Plaintiffs and the relief they seek—the reimposition of the

---

[1] Unless otherwise noted, citations are to the *Milligan* docket, with pincites to the pagination in the ECF header.

1

injunctions the Supreme Court just lifted—cannot be granted without risking election chaos.[2]

Indeed, while Plaintiffs profess concern over voter "uncertainty" and "confusion" (Doc. 531 at 4), ping-ponging back and forth between maps and courts will only make matters worse. The *Purcell* principle makes that obvious, and Plaintiffs cannot make it their case because (1) the status quo shifted immediately when the Supreme Court vacated the injunctions, the 2023 Plan became operative law, and, in response, the Governor promptly called a Special Primary Election, and (2) *Purcell* is rooted in federalism principles and the recognition that States can alter *their* election rules at the last minute, but courts should not. As Justice Kavanaugh put it: "It is one thing for state legislatures to alter their own election rules in the late innings and to bear the responsibility for any unintended consequences. It is quite another thing for a federal district court to swoop in and alter carefully considered and democratically enacted state election rules when an election is imminent." *Democratic*

---

[2] Nor does the Supreme Court's expedited order vacating, remanding, and issuing its judgment "forthwith" indicate otherwise. *See* Order, *Allen v. Milligan*, No. 25-274 (U.S. May 11, 2026). The State Defendants moved the Supreme Court to expedite consideration of their cases, "vacate the injunctions and judgments" in light of *Callais*, "remand the cases to the district court, and immediately issue its judgments" "to afford Alabama the same opportunity as other States to use a lawfully enacted congressional map free of an injunction that cannot be reconciled with Section 2 of the Voting Rights Act 'as properly construed'" in *Callais*. *See* Mot. to Expedite Consideration of Jurisdictional Statement, *Allen v. Milligan*, No. 25-274 (U.S. Apr. 30, 2026). Issuing the judgments "forthwith pursuant to Rule 45.3," Order, *supra*, ensured that the injunctions would be lifted immediately.

*Nat'l Comm. v. Wis. State Leg.*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring); *see also id.* at 28 (Roberts, C.J., concurring), 28-30 (Gorsuch, J., concurring).

Plaintiffs cannot meet their burden on the merits, either. Despite the length and complexity of the record, some things are clear. To take just one example, *Callais* requires plaintiffs to offer illustrative maps that "meet *all* the State's legitimate districting objectives, including traditional districting criteria and the State's specific political goals." *Louisiana v. Callais*, No. 24-109 (U.S. Apr. 29, 2026), Slip Op. 29 (emphasis added) ("*Callais* Op."). Yet it is undisputed that Plaintiffs' illustrative maps and the Court's remedial map "do[] not achieve all the political goals of the Legislature, particularly the goal of keeping Mobile and Baldwin Counties whole and together in one congressional district." *Milligan* Op. 525. That should be the end of it under *Callais*, and Plaintiffs cannot escape that result by wishing away any districting objective they cannot meet as not "legitimate" (*contra Caster* Doc. 437 at 13-14), particularly when this Court agreed "that the Gulf Coast is a community of interest," *Milligan* Op. 351. Though Plaintiffs and this Court disagreed that the State could prioritize keeping the Gulf Coast community intact, *Callais* held that "it is up to each State to decide what weight, if any," to give its districting factors. *Callais* Op. 24. Plaintiffs cannot succeed with their old illustrative maps.

Nor are Plaintiffs correct that the Court's finding of intentional vote dilution can stand unaffected by *Callais*. For one, *Callais* makes clear that there was no vote

3

dilution in the State's map, so there certainly can't be intentional vote dilution. For another, the context of *Callais* validates what the State Defendants have been saying for three years: Alabama did not act in defiance of this Court's preliminary injunction order but instead acted in good faith to try to avoid the competing liabilities of §2 and the Equal Protection Clause.

While this Court rejected that argument, *Callais* vindicates it. This Court found intentional discrimination because it was "not aware of any other case in which a state legislature—faced with a federal court order declaring that its electoral plan unlawfully dilutes minority votes and requiring a plan that provides an additional opportunity district—responded with a plan that state officials conceded does not provide that district." *Milligan* Op. 63. But *Callais* shows that Louisiana faced that exact same preliminary finding (also confirmed on appeal), responded by drawing a second opportunity district, and then was told by the Supreme Court that it was *wrong to do that* because the §2 plaintiffs had "failed to prove their § 2 case" under the *Gingles* framework as updated in *Callais*, *see Callais* Op. 15-17, 33, 36. That is the outcome Alabama feared, and *Callais* confirms that fear was reasonable. As the Supreme Court held, "interpreting §2 of the Voting Rights Act to outlaw a map solely because it fails to provide a sufficient number of majority-minority districts would create a right that the" Constitution "does not protect." *Callais* Op. 24. And, while the Plaintiffs insist the State was wrong since *Callais* was not yet on the books,

the State Defendants well knew that §2 "was designed to enforce the Constitution—not collide with it." *Id.* at 1.

Last, even if this Court's finding of intentional discrimination could stand alone absent a finding of vote dilution under *Callais*, its remedy could not. The Special Master Plan was drawn as a "complete remedy to the Section Two violation," Doc. 509 at 11, and the Court determined that the Plan also redressed the constitutional violation it had found because it "restore[d] the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct,'" *id.* at 14 (relying on *Milliken v. Bradley*, 433 U.S. 267, 280 (1977)). But without an underlying finding of vote dilution as governed by *Callais*, the Special Master Plan would in fact do much more than restore Plaintiffs to where they "would have occupied in the absence of such conduct." If intent was the problem, the remedy would be a map not tainted by the Legislature's intent. There is no reason that map would need to split the Gulf Coast counties or look anything like the Special Master's Plan.

In sum, Plaintiffs cannot meet the preliminary injunction factors, and even if they could, *Purcell* would counsel against court-imposed changes to Alabama's election at this late stage. The Court should therefore deny Plaintiffs' motions and consider its ruling in light of *Callais* in the normal course.

5

## BACKGROUND

This Court is of course familiar with the extensive history of this case before the Supreme Court vacated the Court's injunctions in light of *Callais* and Plaintiffs moved for preliminary injunctions. But as with most everything in this case, this history takes on a new light when viewed through the lens of *Callais*.

### A.    The 2021 Plan and *Allen v. Milligan*

In 2021, Alabama enacted a congressional map that largely retained existing district lines. Because the 2021 Plan prioritized core retention, the eighteen core Black Belt counties that had been split among three districts in the 2011 Plan remained split among those three districts. Montgomery County was also split between Districts 2 and 7. Plaintiffs sued and this Court preliminarily enjoined the Plan.

"At the heart of" the Plaintiffs' case were allegations that the 2021 Plan "crack[ed]" "two of the State's principal majority-Black communities of interest—the Black Belt and the City of Montgomery." *Milligan* Appellees' Br. 1, 5, *Allen v. Milligan* No. 21-1086 (U.S. filed July 11, 2022). In challenging the 2021 Plan, the *Milligan* and *Caster* Plaintiffs introduced 11 illustrative plans purporting to show that a "reasonably configured" majority-minority district could be drawn to better unify the Black Belt. *See Singleton v. Merrill*, 582 F. Supp. 3d. 924, 1012-15 (N.D. Ala. 2022). The Court concluded that those illustrative plans, along with evidence

6

on the other *Gingles* factors, likely established a §2 violation and preliminarily enjoined the Secretary of State from using the 2021 Plan in the then-upcoming 2022 elections. *Id.* at 936.

The Supreme Court stayed the preliminary injunction, *Milligan*, 142 S. Ct. at 879, and then affirmed this Court's decision preliminarily enjoining use of the 2021 Plan, *Allen v. Milligan*, 599 U.S. 1, 42 (2023). In its decision, the Supreme Court emphasized that it was applying §2 caselaw as it existed at the time, *id.*, and agreed that Plaintiffs' illustrative maps were "reasonably configured because," while they split the Gulf Coast, "they joined together a different community of interest" in the Black Belt, which the 2021 Plan had split. *Id.* at 21. Crucially, there would "be a split community of interest in both" the State's 2021 Plan and Plaintiffs' alternatives. *Id.*

There are six significant limitations to the Supreme Court's decision in *Allen*. First, "[t]he decision in that case was based on the State of Alabama's specific argument that its 'race-neutral benchmark' was 'necessary in any redistricting case,'" and that the benchmark must be derived from "the 'median or average number of majority-minority districts' in a race-blind 'multimillion-map set.'" *Callais* Op. 31 (citations omitted). The *Allen* Court "rejected that 'single-minded view.'" *Id.* (quoting *Allen*, 599 U.S. at 26). "*Allen*, in short, was about whether

7

Alabama's novel evidentiary standard required a change to [the Supreme Court's] existing §2 precedent. It did not." *Id.* (citation omitted).

Second, the Supreme Court "had no occasion in *Allen* to confront the presumption that compliance with §2 may serve as a compelling interest for a State to satisfy strict scrutiny." *Id.* at 32.

Third, the *Allen* Court "left open whether 'race-based redistricting' under §2, even if permissible when the Voting Rights Act was enacted in 1982, could 'extend indefinitely into the future' despite significant changes in relevant conditions." *Id.* (quoting *Allen*, 599 U.S. at 45 (Kavanaugh, J., concurring in part)).

Fourth, "because the State in *Allen* did not cite partisan goals in defending its map," the Supreme Court "did not address whether §2 plaintiffs must disentangle race from politics in proving their case." *Id.*

Fifth, the Court did not reach a majority as to whether Plaintiffs' use of race in drawing their maps was permissible—only four Justices joined that portion of Chief Justice Roberts's opinion. 599 U.S. at 30-33 (§III.B.1). On the other hand, four Justices warned Alabama against passing the Plaintiffs' remedial plans: "If the State did this, we would call it a racial gerrymander, and rightly so." *Id.* at 59 (Thomas, J., dissenting).

And sixth, the *Allen* Court applied §2 caselaw as it existed at the time to affirm this Court's preliminary injunction of Alabama's 2021 map based on a hastily

8

assembled record. The Court found that the preliminary record contained "insufficient" and "poorly supported" testimony about the Gulf Coast region, so the Court doubted whether keeping it together achieved a legislative goal. 599 U.S. at 21; see *id.* at 23 (noting that the district court's findings had "gone unchallenged").

## B.    The 2023 Plan and This Court's Injunctions

After the Supreme Court ruled in *Allen*, rather than proceeding to a full trial on the 2021 map, Alabama enacted a new map that corrected the deficiencies the Supreme Court and this Court had pointed out and kept *both* the Black Belt and the Gulf Coast communities of interest in as few districts as possible.

In setting redistricting priorities for the new plan, the Legislature declared that "[t]he congressional districting plan shall keep together communities of interest," *Milligan* Op. 555, and that the Black Belt in particular would "be kept together to the fullest extent possible," *id.* at 51. The 2023 Plan thus placed the Black Belt's 18 core counties into two districts (the fewest possible) and unified Montgomery County, the most populous area of the Black Belt. *See id.* at 556. The Legislature also prioritized keeping the Gulf Coast's two counties together given the region's "long history and unique interests" as well as the Wiregrass region, considering its "rural geography, agriculture, and major military base." *Id.* at 557, 560.[3] The 2023

---

[3] Notably, Alabama has united the Gulf Coast in its Congressional map for five decades and the 2021 Plan continued to protect that community of interest. Respect for the Gulf Coast was not invented in 2023 to avoid drawing a district joining black voters who were hundreds of miles apart.

Plan also accomplished these goals. *Id.* at 565. There was no longer an unnecessary "split community of interest." *Allen*, 599 U.S. at 21.

Plaintiffs moved to preliminarily enjoin the 2023 Plan. This time, the heart of their case was whether Alabama could keep the Gulf Coast together. Plaintiffs argued that §2 *requires* splitting the Gulf Coast by segregating Mobile County so that Mobile's black voters could be combined with black voters in the Black Belt to form a second majority-black district. *See id.* at 345 ("The record contains no map that includes two majority-Black districts without splitting Mobile County, and all agree that it is not possible to draw such a map without splitting Mobile County.").

The Legislature had good reasons to avoid segregating Mobile's white and black voters. The Alabama Attorney General warned the Legislature that placing the race of voters ahead of traditional districting principles "would likely open the State up to claims that it has violated the Constitution's Equal Protection Clause," invoking the Supreme Court's weeks-old decision in *SFFA v. Harvard*, 600 U.S. 181 (2023). *See Caster* Doc. 319-25 at 152. And the *Singleton* Plaintiffs reminded legislators during the 2023 Special Session that a "trial on the merits is still pending," *id.* at 144-45; *Milligan* Doc. 404-32:71-73, on the racial gerrymandering claims they had brought based on county splits. Facing those competing hazards, Alabama passed what it believed were §2-compliant districts while prioritizing nonracial traditional districting principles such as respecting communities of interest, *Milligan*

10

Op. 554-61, and protecting incumbents by "not pair[ing] [them] within the same district," *id.* at 51.

By close of trial on Plaintiffs' challenge to the 2023 Plan, the following was undisputed: (1) both the Black Belt and the Gulf Coast are communities of interest to be respected in any reasonably configured map, *see Milligan* Op. 346, 351; (2) one could create equally populated districts by "keep[ing] the Gulf Coast together and split[ting] the Black Belt into only two districts" as the State did, *id.* at 360; (3) every alternative map that adds a majority-minority district splits the Gulf Coast, *see id.* at 345-46; and (4) the only way to form a second majority-minority district is by "splitting Mobile County" and combining it with rural Black Belt counties hundreds of miles away, *id.* at 345; *see also id.* at 120-21, 206-210. As the Court recognized, no alternative plan "achieve[d] all the political goals of the Legislature, particularly the goal of keeping Mobile and Baldwin Counties whole and together in one congressional district." *Milligan* Op. 525.

Following trial, this Court permanently enjoined use of the 2023 Plan, finding that it violated both §2 of the VRA and the Equal Protection Clause of the Fourteenth Amendment. *See Milligan* Op. As to the former holding, the Court reasoned that Plaintiffs' alternatives respected the Black Belt "much better" by placing more Black Belt counties in majority-black districts. *Milligan* Op. 350. As to the latter holding, as the Court saw it, the 2023 Legislature made a "deliberate decision not to satisfy"

11

the Court's statements in its preliminary injunction order enjoining use of the 2021 Plan that "any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it." *Milligan* Op. 517.

The State Defendants appealed the final injunctions to the Supreme Court and filed jurisdictional statements in August 2025 asking the Court to resolve whether §2 can require States "to intentionally create a second majority-minority district without violating the Fourteenth or Fifteenth Amendments to the U.S. Constitution." *See* Jurisdictional Statement i, *Allen v. Milligan*, No. 25-274 (filed U.S. Aug. 6, 2025). The Supreme Court did not take action until May 11, 2026—shortly after it decided *Louisiana v. Callais*.

### C.    *Callais* and the 2026 Special Legislative Session

On April 29, 2026, the Supreme Court issued its decision in *Callais*, in which the Court significantly "update[d] the *Gingles* framework" to "realign it with the text of §2 and constitutional principles." *Callais* Op. 29. It expressly answered the question Alabama had posed: "[I]nterpreting §2 of the Voting Rights Act to outlaw a map solely because it fails to provide a sufficient number of majority-minority districts would create a right that the [Fifteenth] Amendment does not protect." *Callais* Op. 24.

The next day, the State Defendants moved the Supreme Court "to expedite consideration of their pending jurisdictional statements in *Singleton* and *Milligan* and their petition for a writ of certiorari before judgment in *Caster*, vacate the injunctions and judgments below in light of th[e] Court's decision in *Callais*, remand the cases to the district court, and immediately issue its judgment." *See* Mot. to Expedite at 3, *Milligan*, *supra* n.2. As the State Defendants told the Supreme Court, they requested expedited consideration "to afford Alabama the same opportunity as other States to use a lawfully enacted congressional map free of an injunction that cannot be reconciled with Section 2 of the Voting Rights Act 'as properly construed.'" *Id.* at 1 (quoting *Callais* Op. 3).

Plaintiffs opposed the motion on many of the same grounds on which they now seek relief here.

They argued that the Court should not vacate this Court's equal protection holding because it could stand independently of its §2 findings. *E.g.*, *Milligan* Opp. to Mot. to Expedite at 1-2, No. 25-274 (U.S. filed May 1, 2026) (arguing that, "unlike in *Louisiana v. Callais*, the District Court below found that the Alabama Legislature enacted a new 2023 congressional map in violation of the Fourteenth Amendment's ban on intention racial discrimination.");[4] *Singleton* Opp. to Mot. to Expedite at 2,

---

[4] In fact, in *Callais*, "[t]he plaintiffs claimed, and the court below held, that the map enacted by the state legislature in SB8 impermissibly discriminated on the basis of race and thus violated the

No. 25-273 (U.S. filed May 4, 2026) (asserting that the Court's equal protection ruling was not dependent on its §2 ruling).

They argued that *Allen* still governed this case, even if *Callais* governed everywhere else. *E.g.*, *Milligan* Opp., *supra*, at 3 (arguing that "the reasoning underlying *Allen* still governs this case"); *Caster* Opp. to Mot. to Expedite at 2, No. 25-243 (U.S. filed Apr. 30, 2026) ("Indeed, *Callais* expressly did not overrule *Allen*.").

And they raised practical concerns, invoked the *Purcell* principle, and argued that granting Defendants' motion would be inconsistent with the Secretary's previous representations about the hardships of late-breaking court-imposed changes to elections. *E.g.*, *Milligan* Opp., *supra*, at 4-5 (arguing that "[n]o changes to the state's congressional plan can be effectuated so close to Alabama's May 19, 2026 primary Election Day" because "*voters are already voting*" and, "[a]s Alabama once represented in this case, it would have taken 'heroic efforts' to respond to an injunction issued 'just seven weeks' before the *first* day of absentee voting"); *Caster* Opp. to Mot. to Expedite at 1-3, No. 25-243 (U.S. filed Apr. 30, 2026) ("The decision in *Callais* does nothing to justify Petitioners' demand that this Court adopt extraordinary procedures to expedite consideration and thereby enable a mid-election change of districts here, months closer to election day than the one the Court blocked in

---

plaintiffs' rights under the Fourteenth Amendment's Equal Protection Clause." *Callais* Op. 32 n.2. The Court emphasized this: "*the decision before us is based on the Fourteenth Amendment.*" *Id.* (emphasis in original).

2022" and does "nothing to abate the 'chaos and confusion' of a mid-election change").

The Supreme Court rejected these arguments and on May 11 granted the State Defendants' motion, vacated and remanded the cases in light of *Callais*, and ordered the Clerk to issue the judgments "forthwith" under Rule 45.3, causing the injunctions to be immediately lifted. Order, *Milligan*, *supra*. While Justice Sotomayor in dissent echoed Plaintiffs' concerns that "vacating the District Court's injunction will immediately replace the current map with Alabama's 2023 Redistricting Plan," which she thought was not "appropriate" "because Alabama's congressional primary election is next week," *id.* at 4 (Sotomayor, J., dissenting), the Court decided otherwise and ordered that its ruling vacating the injunctions take effect immediately.

Parallel with these Supreme Court proceedings, Alabama's elected officials went to work to determine a plan for the 2026 primary election cycle in the event this Court's injunctions were lifted. On May 1, Governor Kay Ivey directed the Legislature to convene in Special Session beginning May 4 to "consider legislation to provide for a special primary election for electing members of the United States House of Representatives … in districts whose boundary lines are altered by a court issuing a judgment, vacating an injunction, or otherwise ordering or permitting an alteration in the boundaries of such districts." Doc. 530-1 at 21.

15

On May 4, the Legislature began its Special Session.[5] The session came in the midst of a national race to "reshape Congress for the midterms," with States both blue and red engaging in last-minute redistricting efforts to send more representatives of the political majority's party to Congress.[6] And the White House publicly pressured States with Republican majorities in the statehouse to take action to shore up more Republican seats.[7] These partisan realities were reflected in the Alabama statehouse as well; as Sen. Greg Albritton (R-Atmore) put it: "This has nothing to do with personalities. It has nothing to do with race. It has something to do with our partisanship and our [ ] Republicans and Ds and how we're separating."[8]

On May 8, the Legislature passed and the Governor signed into law Act 2026-612, which provides:

> Section 1. (a) It is the intent of the Legislature that a special primary election, as contemplated in this section, be held only in the event a federal court issues or vacates an order affecting the boundaries of Congressional districts in a time frame that allows for a supplemental special primary election during the 2026 General Election cycle.
>
> (b) In the event: (i) a federal court, by issuing a judgment or by vacating an injunction, permits the reinstatement of the last legislatively

---

[5] *See Alabama Legislature Begins Special Session to Redraw Congressional District Lines*, WAKA 8 NEWS (May 4, 2026), https://perma.cc/4CVD-E2W9.

[6] *See* David W. Chen and Ashley Cai, *Tracking the Battle to Reshape Congress for the Midterms*, N.Y. TIMES (updated May 15, 2026), https://perma.cc/B3A2-ZMDN.

[7] *E.g.*, Paul Steinhauser, *Trump Urges Republicans to 'BE BOLD' As Red States Push to Rewrite Congressional Maps*, FOX NEWS (May 12, 2026), https://perma.cc/49CT-XBDG.

[8] Videorecording of Senate Floor Debate, https://www.youtube.com/watch?v=2ecxRAvdl1U (May 8, 2026), at 0:26:22; *see also id.* at 0:36:30 ("[I]t has to deal with partisan ideals of where we are."); 1;14-19: ("[T]hese were drawn in a partisan way. We did draw them in a way that would benefit Republicans. That, that's kind of what we're supposed to do…").

16

enacted Congressional districts, as enacted by Act 2023-563 of the 2023 Second Special Session, to be used in the 2026 General Election, and (ii) the court ruling is made at a time too late to be accommodated during the normal 2026 primary election schedule held or to be held in accordance with Chapter 13 of Title 17, Code of Alabama 1975, the state shall hold a new special primary election for the affected Congressional Districts in accordance with this section, so long as certification of the special primary election can be completed by August 26, 2026.

(c)(1) Upon a federal court making a ruling described in subsection (b), the Governor shall issue a proclamation calling for a special primary election to be held as soon as possible for the affected Congressional districts, consistent with subsection (b). Notwithstanding any state law to the contrary, the Governor shall set a calendar for the election as required to effectuate the purposes of this section, provided the dates specified in the election calendar do not violate federal law. A special primary election held pursuant to this section shall be required for the affected Congressional districts regardless of whether a regular primary election was held for the affected Congressional districts using the previous boundary lines.

(2) Notwithstanding any state law to the contrary, the candidate who receives the greatest number of votes at the special primary election shall be deemed the winner and party nominee of that primary election, and no primary runoff election shall be held.

(d) No candidate shall be deemed the party nominee of a political party for an affected Congressional office based solely on the results of the regular primary election if a new special primary election is held pursuant to this section. Any official certification of results of the regular primary election for an affected Congressional office is void for purposes of determining the party nominee once a new special primary election is required under this section. However, a candidate who was eligible and qualified for the regular primary election for an affected Congressional district office shall remain eligible to appear on the ballot for the new special primary election, subject to laws and party rules not inconsistent with Chapter 13 of Title 17, Code of Alabama 1975. The certification of a nominee for an affected office shall be based solely on the results of the new special primary election conducted under this section.

(e)(1) Nothing in this section prohibits a party from choosing its candidates by any means allowed by law other than by primary election.

(2) Nothing in this section shall alter the timing of regular primary elections when no change in district boundaries has occurred as described in subsection (b).

(3) Nothing in this section shall be construed to alter the date scheduled for the 2026 General Election.

Section 2. This act shall become effective immediately.

Doc. 530-1 at 22-27 (Ala. Act 2026-612).

On May 12, following the Supreme Court's decision vacating the injunctions in these cases, Governor Ivey called for a special primary election to be held in the affected congressional districts on August 11, 2026. Doc. 530-1 at 28-30. Candidate qualifying closes on May 22, and the two major political parties must certify their candidates no later than May 26. *Id.* at 28, 31-32.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). "[W]here the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest." *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Its "chief function … is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990). Here, the status quo is that the State is moving forward with the implementation of the 2023 Plan. That status quo took hold on May 11 when the Supreme Court vacated the injunctions in these cases.

Where, as here, a preliminary injunction is sought to *change* the status quo and force another party to act, it becomes a "mandatory or affirmative injunction" and the burden on the moving party increases. *Exhibitors Poster Exch. v. Nat'l Screen Serv. Corp.,* 441 F.2d 560, 561 (5th Cir. 1971) (*per curiam*). Thus, a mandatory injunction "'should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party.'" *Id.* (quoting *Miami Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1978)); *see also Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party."); *Ne. Fla. Chapter*, 896 F.2d at 1285 (recognizing, in an appeal concerning an injunction issued at the beginning of the case, that "overrul[ing] the

19

decision of the elected representatives of the people" "in a sense interferes with the processes of democratic government").

Moreover, the Supreme Court has repeatedly recognized that "[r]edistricting is primarily the duty and responsibility of the State, and federal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Abbott v. Perez*, 585 U.S. 579, 603 (2018) (cleaned up). Thus, when "assessing the sufficiency of a challenge to a districting plan, a court must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus. And the good faith of the state legislature must be presumed." *Id.* (cleaned up). As particularly relevant here, courts must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Miller v. Johnson*, 515 U.S. 900, 916 (1995). And if the Court does issue an injunction, it must give the Legislature an opportunity to draw a new map. *Growe v. Emison*, 507 U.S. 25, 36-37 (1993) (error to draw map unless defendants proved "unwilling or unable" to do so).

## ARGUMENT

Plaintiffs are unlikely to succeed under *Callais*, and the equities weigh heavily against them. To start, Plaintiffs undersell the scope of the task they ask this Court to perform on the eve of Alabama's elections. While the *Milligan* Plaintiffs try to emphasize that a vacatur in light of an intervening precedent is typically "limited in nature" and "its effect is 'not to nullify all prior proceedings," Doc. 531 at 3 (quoting

20

*United States v. Tamayo*, 80 F.3d 1514, 1520 (11th Cir. 1996)), the rule is that the Court must reconsider every aspect of its opinion that could be affected by the new decision, *see Tamayo*, 80 F.3d at 1520; *United States v. M.C.C. of Fla., Inc.*, 967 F.2d 1559, 1561-63 (11th Cir. 1992). Here, that is *everything*—the resolution of Plaintiffs' §2 claims most obviously, but also the Court's equal protection holdings, which were intertwined with and depended on its §2 findings. *Callais* affects it all— which is likely why the Supreme Court vacated the entirety of the Court's order and injunction over claims of the dissenters that the equal protection ruling could stand alone. *See* Order, *Milligan*, *supra* n.2.

Likewise, while Plaintiffs act as though the Court's factual findings under the prior regime can simply be dusted off and applied anew, that is not true, either: factual findings made using an incorrect legal standard—even if that standard was correct at the time but no longer is—"cannot stand." *Abbott v. Perez*, 585 U.S. 579, 607 (2018); *cf. e.g.*, *United States v. Brown*, 934 F.3d 1278, 1307 (11th Cir. 2019) ("If a district court applies an incorrect legal standard in reaching a factual conclusion, the resulting finding is not insulated by the clear-error standard."). The Court must reconsider the evidence and view it all through the lens of *Callais*.

Plaintiffs' claims cannot survive such reconsideration. *Callais* made clear that "interpreting §2 of the Voting Rights Act to outlaw a map solely because it fails to provide a sufficient number of majority-minority districts would create a right that

21

the Amendment does not protect." *Callais* Op. 24. It makes clear that the "opportunity" that §2 protects "is whatever opportunity results from the application of the State's combination of permissible criteria." *Id.* at 22. That illustrative maps under *Gingles* I "cannot use race" at all and "must meet all the State's legitimate districting objectives, including traditional districting criteria and the State's specified political goals." *Id.* at 29. That Plaintiffs must "disentangle race from politics" at *Gingles* II and III, *id.* at 30, and that the totality-of-the-circumstances test "must focus on evidence that has more than a remote bearing on … present-day intentional racial discrimination regarding voting," *id.* at 30. In other words, *Callais* demonstrates that many of the things Defendants had argued must be true about §2 if it is to be interpreted consistently with the Constitution are, in fact, true. *See generally* Doc. 481. That should change the outcome not only on Plaintiffs' §2 claims but also on the *Milligan* and *Singleton* Plaintiffs' claims under the Equal Protection Clause.

The equities also weigh against Plaintiffs. The Supreme Court just considered the same arguments from Plaintiffs and *still* granted Defendants' motion to expedite to ensure the injunctions would be lifted in time "to afford Alabama the same opportunity as other States to use a lawfully enacted congressional map free of an injunction that cannot be reconciled with Section 2 of the Voting Rights Act 'as properly construed'" in *Callais*. *See* Mot. to Expedite, *Milligan*, *supra* n.2. Entering

22

a new injunction would only cause additional chaos and confusion. The Court should deny Plaintiffs' motions.

## I.    Plaintiffs' §2 Claims Are Unlikely To Survive *Callais*.

Plaintiffs have not proven their §2 case under *Callais* and are very unlikely to succeed on the merits. Plaintiffs "used" race in their map-drawing process, failed to meet all of the State's legitimate districting objectives, did not control for party affiliation in their racially-polarized-voting analysis (and this Court affirmatively found race and politics *were* intertwined), and put great weight on the history of racial disparities in a broad range of fields rather than present-day discrimination related to voting. No rushed injunction should be issued under those circumstances.

### A.    Plaintiffs' §2 claims fail under the updated *Gingles* framework.

In *Callais*, the Supreme Court "update[d]" the *Gingles* framework to align it "with the statutory text and reflect[] important developments since [it] decided *Gingles* 40 years ago." *Callais* Op. 26. Every single factor considered by this Court in its order enjoining use of the 2023 Congressional Map was altered by *Callais*:

| *Milligan* Opinion | *Callais* Opinion |
|:---:|:---:|
| *Gingles* I: Numerosity and Compactness | |
| ***"MEET OR BEAT IS NOT THE CONTROLLING TEST"*** | ***ALL LEGITIMATE DISTRICTING OBJECTIVES MUST BE MET*** |
| "Nevertheless, the State urges us to reject the Plaintiffs' maps in part because they 'fail to respect' the 2023 Plan. And the State attacks | "[I]llustrative maps **must meet all the State's legitimate districting objectives**, including traditional districting criteria and |

| | |
|---|---|
| the Duchin Plans and Cooper Plans on the ground that they underperform against the 2023 Plan on various metrics. **But 'meet-or-beat' is not the controlling test**…. An illustrative plan may be reasonably configured even if it does not outperform the 2023 Plan on every (or any particular) metric. The standard does not require the Plaintiffs to offer the best map; they must offer a reasonable one." *Milligan* Op. 333-34 (cleaned up) (emphasis added).<br><br>The Court allowed Plaintiffs to satisfy *Gingles* with illustrative plans that made "tradeoffs" and that merely "tried to balance" districting criteria. *Milligan* Op. 328. *See also Milligan* Op. 345. (acknowledging that "it is not possible to draw [a map with two majority-Black districts] without splitting Mobile County" from its community of interest)' *id.* at 341 (finding "tradeoffs" to be "always involve[d]"). | the State's specified political goals. If the State's aims in drawing a map include a target partisan distribution of voters, a specific margin of victory for certain incumbents, … the plaintiffs' illustrative maps must achieve these goals just as well. If not, the plaintiffs would fail to demonstrate that the State's chosen map was driven by racial considerations rather than permissible aims. Only by meeting all the State's legitimate objectives can the illustrative maps help to 'disentangle race' from politics and other constitutionally permissible considerations." *Callais* Op. 29-30 (emphasis added). |
| ***RACE MAY NOT PREDOMINATE***<br><br>"Because the Voting Rights Act demands consideration of race, Section Two plaintiffs and their map drawers will be aware of racial demographics[.] … That said, **race may not be the predominant factor** in drawing district lines unless there is a compelling reason." *Milligan* Op. 107-08 (citations and quotation marks omitted) (cleaned up) (emphases added). | ***RACE CANNOT BE CONSIDERED***<br><br>"First, in drawing illustrative maps, **plaintiffs cannot use race as a criterion**. If a plaintiff can produce an additional majority-minority district only by using race—a process that would be unconstitutional if a State engaged in such mapmaking—that illustrative map sheds no light on whether the State acted unconstitutionally by *not* adopting such a map. Thus, **an illustrative map in which race was used has no value in proving a §2 plaintiff's case**." *Callais* Op. 29 (citation omitted) (emphases added). |
| **Gingles II & III – Racially Polarized Voting** ||
| ***RACE AND POLITICS DO NOT NEED TO BE DISENTANGLED***<br><br>"Under controlling precedent, [the second and third *Gingles*] preconditions **do not** | ***RACE AND POLITICS MUST BE DISENTANGLED***<br><br>"To satisfy the second and third preconditions—politically cohesive voting by the minority and racial-bloc voting by the |

24

| | |
|---|---|
| **require that we fully disentangle party and race**." *Milligan* Op. 379 (emphasis added).<br><br>"We acknowledge the well-known reality that party affiliations drive voting patterns, but we understand this evidentiary record as telling us that **we cannot separate voters' racial considerations from their party affiliations**, and that we must not ignore the powerful role that voters' race plays in their partisan attachments." *Milligan* Op. 400-01. | majority—the plaintiffs must provide an analysis that **controls for party affiliation**. In other words, they must show that voters engage in racial bloc voting that cannot be explained by partisan affiliation. This is, once again, **critical for disentangling race and politics**." *Callais* Op. 30 (quotation marks and citation omitted) (cleaned up) (emphases added). |
| **Totality of the Circumstances** | |
| *PAST DISCRIMINATION AND SOCIO-ECONOMIC DISPARITIES ARE GIVEN SUBSTANTIAL WEIGHT*<br><br>The Court assigned substantial weight to testimony concerning "stark racial disparities, particularly in the rural Black Belt, that (1) are clearly traceable to Alabama's lengthy and terrible history of official discrimination, and (2) unsurprisingly hinder Black Alabamians' political participation." *Milligan* Op. 416. *See also id.* at 409-19. | *PAST DISCRIMINATION AND SOCIO-ECONOMIC DISPARITIES ARE GIVEN "MUCH LESS WEIGHT"*<br><br>"[T]he 'totality of circumstances' inquiry must focus on evidence that has more than a remote bearing on what the Fifteenth Amendment prohibits: present-day intentional racial discrimination regarding voting. **Discrimination that occurred some time ago, as well as present-day disparities that are characterized as the ongoing effects of societal discrimination, are entitled to much less weight**. Far more germane are current data and current political conditions that shed light on current intentional discrimination. In large part *because of* the Voting Rights Act, our Nation has made great strides in eliminating racial discrimination in voting. And if, as a result of this progress, it is hard to find pertinent evidence relating to intentional present-day voting discrimination, that is cause for celebration." *Callais* Op. 30-31 (cleaned up and emphasis added). |

In *Callais*, the Supreme Court found that §2, "properly construed," begins with its text and the text of the Fifteenth Amendment. The Court held that, today, "the focus of §2 must be enforcement of the Fifteenth Amendment's prohibition on

25

*intentional* racial discrimination." *Callais* Op. 23. And it made clear that §2 "imposes liability only when the circumstances give rise to a strong inference that intentional discrimination occurred." *Id.* Such an inference would be proper, for instance, when "application of a State's districting algorithm yields numerous maps with districts in which the members of a minority group constitute a majority" and the "State cannot provide a legitimate reason for rejecting all those maps and eliminating all majority-minority districts." *Id.*

Under *Callais*, §2 plaintiffs thus have the burden of "disentangl[ing] race from politics"—a burden this Court explicitly relieved Plaintiffs from, *e.g.*, *Milligan* Op. 379. This showing can only be made "by offering an alternative map that achieves all the State's objectives—including partisan advantage and any of the State's other political goals—at least as well as the State's map," *and* by "provid[ing] a racially polarized voting analysis that controls for party affiliation." *Callais* Op. 25, 29-30 (quotation omitted). "Properly understood," the *Callais* Court concluded, "§2 thus does not intrude on States' prerogative to draw districts based on nonracial factors." *Id.* at 24.

Without the benefit of the *Callais* opinion, and therefore relying on an obsolete §2 standard, this Court's prior analysis—and Plaintiffs' evidence—cannot survive the Supreme Court's holding that §2 simply guarantees minority voters "whatever opportunity results from the application of the State's combination of

permissible criteria," "nothing less and nothing more." *Id.* at 22. Simply stated, even if this Court had correctly applied §2 precedent as interpreted before *Callais*, that precedent can no longer support this Court's injunction. Moreover, the record evidence reveals that (using this updated standard) Plaintiffs cannot establish even a prima facie §2 claim, let alone a violation.

**B.    *Gingles* I: Plaintiffs' expert map-drawers considered race in their map-drawing process and failed to meet all of the State's districting objectives.**

"The first *Gingles* precondition is that a community of minority voters must be sufficiently numerous and compact to constitute a majority in a reasonably configured district." *Callais* Op. 29. Before *Callais*, §2 plaintiffs were able to satisfy this requirement simply by offering "illustrative maps with their desired number of majority-minority districts." *Id. Callais*, however, held that such maps, "are not alone sufficient" and "prove only that the State *could* create an additional majority-minority district, not that the State's failure to do so violated §2." *Id.*

Thus, the Supreme Court updated *Gingles* I to add the following to prerequisites: (1) "in drawing illustrative maps, plaintiffs cannot use race" and (2) "illustrative maps must *meet all the State's legitimate districting objectives*, including traditional districting criteria and the State's specific political goals." *Id.* (emphasis added). "[A]n illustrative map in which race was used has no value in proving a §2 plaintiff's case." *Id.* Likewise, a map that fails to achieve the State's legitimate

27

districting objectives "fail[s] to demonstrate that the State's chosen map was driven by racial considerations rather than permissible aims" and thus cannot prove a §2 claim. *Id.*

### 1. Plaintiffs impermissibly used race to draw illustrative maps.

By contrast, this Court understood the use of race to be a permissible districting criterion when drawing an illustrative map, so long as race did not "predominate" in the districting process. *Milligan* Op. 107. In fact, this Court considered "the Voting Rights Act [to] 'demand[] consideration of race[.]'" *Id.* (quoting *Abbott v. Perez*, 585 U.S. 579, 587 (2018)). Accordingly, the Court was not concerned when Plaintiffs' experts acknowledged that race was considered in their map-drawing process. *See, e.g.*, *id.* at 325 (crediting *Milligan* expert, Dr. Duchin, even though she testified that "[a]s a matter of process, race is a consideration that doesn't dominate others"); *id.* at 326-27 (crediting *Caster* expert, Mr. Cooper, even though he testified, "[Race] was a consideration. This is a Section 2 lawsuit, after all.").

But *Callais* does not leave room for the use of race, even if it did not predominate. *See Callais* Op. 29. "If a plaintiff can produce an additional majority-minority district only by using race—a process that would be unconstitutional if a State

28

engaged in such mapmaking—that illustrative map … has no value in proving a §2 plaintiff's case." *Id.* (citation omitted).[9]

### 2. Plaintiffs failed to meet all of the State's legitimate districting objectives.

*Second*, this Court did not have the benefit of *Callais* and applied a different standard when analyzing whether Plaintiffs' experts considered the State's legitimate districting objectives. While the *Callais* Court emphasized that an illustrative map "must meet *all* the State's legitimate districting objectives"—that it "must achieve these goals *just as well*" as the State, *Callais* Op. 29 (emphases added)—this Court repeatedly noted that a "meet or beat" standard is "not the controlling test," *Milligan* Op. 332-34 (noting that *Gingles* I "does not require Plaintiffs to offer the best map" but simply "a reasonable one").

By contrast, Alabama argued that Plaintiffs had not offered proper comparator maps because they fared poorly on neutral districting criteria as compared to the 2023 Plan. *See, e.g.*, Doc. 481 at 64-76. No alternative map preserved the two Gulf

---

[9] The State Defendants *never* conceded or stipulated that the Special Master Plan—a map that does not satisfy *Gingles* I—was drawn race blind. *Contra, e.g.*, Doc. 531 at 5. They stipulated: "*According to the Special Master's report*, Mr. Ely did not display racial demographic data within, … Maptitude, while drawing … the Remedial Plan[.]" Doc. 436 ¶143 (emphasis added). At the remedial phase, the Court recognized that the State Defendants "objected to the Special Master's Remedial Plans as 'unconstitutional racial gerrymanders that harm Alabama voters by subjecting them to racial classifications'" and "asserted that even if Mr. Ely performed his work 'race blind,' his 'starting point was a plan where race predominates over traditional criteria, and the changes were too modest to undo the race-based decisions.'" Doc. 311 at 25-26. The State Defendants maintain that objection today.

Coast counties, comprising the Gulf Coast community of interest, in a single district. Many of the alternatives split the Black Belt counties among three, four, and even five districts. And they all fared worse at protecting incumbents (and ultimately, then-incumbent Representative Jerry Carl lost his seat). But the State explicitly provided in its traditional redistricting guidelines that it desired to keep together and respect communities of interest, including the Gulf Coast, and avoid pairing incumbents. Indeed, this Court agreed with the State that no alternative to the 2023 Plan "achieve[s] all the political goals of the Legislature," *Milligan* Op. 525, observing that it was "impossible" to draw another race-based district in Alabama while achieving the State's valid legislative goals. *E.g.*, *Milligan* Op. 504, 514, 345; *see also id.* at 129 ("All of Dr. Duchin's plans split Mobile and Baldwin counties.").

Nonetheless, this Court held that the illustrative plans could satisfy *Gingles* 1 even if "they underperform against the 2023 Plan on various metrics." *Milligan* Op. 333. Indeed, the Court said that illustrative plans need not "outperform" on "any particular[ ] metric," even the "traditional districting principle[s] the Legislature deems most pertinent." *Milligan* Op. 333-34 (emphasis added). This Court reasoned, "neither the evidence nor the law supports a mandate that we or Dr. Duchin or Mr. Cooper must prioritize the Gulf Coast above all other communities of interest." *Id.* at 354.

*Callais* firmly rebuffed that reasoning. "If the State's aims in drawing a map include … any …. goal not prohibited by the Constitution, the plaintiffs' illustrative maps must achieve these goals just as well." *Callais* Op. 29. An illustrative plan that does not achieve the State's legitimate districting criteria cannot "demonstrate that the State's chosen map was driven by racial considerations rather than permissible aims. *Only* by meeting *all* the State's legitimate objectives can the illustrative maps help to 'disentangle race' from politics and other constitutionally permissible considerations." *Id.* at 29-30 (emphasis added). In contrast, this Court held that "requiring a plaintiff to meet or beat an enacted plan" or "satisf[y] a particular [redistricting] principle" would "immunize" racial discrimination. *Milligan* Op. 334. But as *Callais* clarified, Plaintiffs must do more than "show that it is *possible* to draw" a map that achieves *some* of the Legislature's goals. *Milligan* Op. 369. It is not enough to show that a plaintiff can, by establishing their own set of priorities, draw one in an infinite number of available maps that is loosely adjacent to the State's chosen criteria; Plaintiffs must produce maps that "meet all … the State's specified political goals," *Callais* Op. 29.

Because this Court applied a different standard, however, the State was enjoined and a variety of its valid goals were sacrificed—such as maintaining the Gulf Coast community of interest in one district, maintaining the Black Belt in two districts, and protecting incumbents. *Milligan* Op. 345, 349-53, 355-56, 359-60; *see*

31

*Milligan* Op. 120-121 (Duchin Maps); 206-210 (Cooper Maps); Doc. 107 (PI Op.) at 155. For example, in contrast to the preliminary litigation over the 2021 Plan, the State defended the 2023 Plan by building a robust trial record about the Gulf Coast, such that this Court ultimately accepted "that the Gulf Coast is a community of interest." *Milligan* Op. 353. Yet, despite the State insisting that this was an important legislative goal, Plaintiffs failed to draw a single map that satisfied this criterion: "every Duchin Plan, every Cooper Plan, and the Special Master Plan" carved up the Gulf, and "[t]he record contains no map that includes two majority-Black districts without splitting Mobile County." *Id.* at 345-46. This failure on Plaintiffs' part is now dispositive at *Gingles* I, because illustrative maps "must meet all the State's legitimate districting objectives … just as well." *Callais* Op. 29.

Additionally, the 2023 Plan also prioritized unification of the Black Belt to fix the problem with the 2021 Plan, which had split the Black Belt among three districts. By placing the Black Belt counties into just two districts, the Legislature achieved its "non-negotiable" goal of keeping the Black Belt "together to the fullest extent possible." *Milligan* Op. 555-56 (SB5). That was an additional non-racial objective that Plaintiffs' illustrative maps did not "meet … just as well." *Callais* Op. 29.[10] Plaintiffs' maps also failed by failing to protect incumbent representatives

---

[10] The Court excused Plaintiffs' failure here by defining "respect" for the Black Belt in racial rather than geographic terms, faulting the 2023 Plan for placing "only half [ ] of the … Black Belt

whom "the legislature sought to protect." *Callais* Op. 33; *see Milligan* Op. 555 (SB5) ("The congressional districting plan shall not pair incumbent members of Congress within the same district."); *Milligan* Op. 86 (State's mapmaker: "I was looking at … not pairing incumbents, which, obviously we had incumbents that could have been paired there in terms of Barry Moore in Coffee County and Jerry Carl in Mobile[.]"). This Court did not give "weight" to incumbency because it thought doing so would "defeat the Voting Rights Act." *Milligan* Op. 361. But *Callais* embraced a different view. *Callais* Op. 33. As in Louisiana's case, "because the plaintiffs' illustrative maps failed to protect all the incumbents that the State sought to shield, the plaintiffs did not meet their burden on [the first *Gingles*] precondition." *Callais* Op. 34.

### C.     *Gingles* II and III: Plaintiffs' racially polarized voting analysis did not control for party affiliation.

This Court said that the *Gingles* II and III preconditions do not require the Court to "fully disentangle party and race." *Milligan* Op. 379. It continued:

> They direct us to assess only whether Black voters in Alabama are "politically cohesive," and whether each challenged district's "white majority votes sufficiently as a bloc to enable it … to defeat the [Black-]preferred candidate." *Allen*, 599 U.S. at 18 (quoting *Gingles*, 478 U.S. at 51). We see those patterns clearly from the evidence, a consensus of experts agrees, and that concludes our *Gingles* analysis.

---

counties [ ] in a majority-Black district." *Milligan* Op. 350. But it was legitimate for the Legislature to make unifying the Black Belt (a geographic feature) a legislative priority independent of race, *see, e.g., Callais* Op. 24, and Plaintiffs are required to meet that criterion "just as well" in their illustrative maps, *id.* at 29.

*Id.*

*Callais* has now concluded otherwise. *See, e.g.*, *Callais* Op. 25. As the Court explained, disentangling race from politics is necessary because, otherwise, §2 could be used toward partisan ends. "When the vast majority of voters, regardless of race, favors the same political party," the Court said, "a map that is disadvantageous for members of one racial group cannot be explained on the ground that it was drawn to favor a particular political party." *Id.* at 27. "But in a State"—like Alabama—"where both parties have substantial support and where race is often correlated with party preference, a litigant can easily exploit §2 for partisan purposes by 'repackag[ing] a partisan-gerrymandering claim as a racial-gerrymandering claim.'" *Id.* (quoting *Alexander*, 602 U.S. at 21). Thus, "simply pointing to *inter*-party racial polarization proves nothing, because 'a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact.'" *Id.* at 30 (quoting *Alexander*, 526 U.S. at 9).

## 1. Race and politics must be disentangled as part of *Gingles* II and III, not as one factor among many.

Under *Callais*, then, the Court cannot side-step this analysis or allow Plaintiffs to side-step it when examining *Gingles* II and III. According to *Callais*, "[t]o satisfy the second and third preconditions—politically cohesive voting by the minority and racial-bloc voting by the majority—the plaintiffs must provide an analysis that

34

controls for party affiliation." *Callais* Op. 30. This is not simply one of many "factors" to be analyzed as part of the "totality of the circumstances," but is now "critical" to analyzing the preconditions themselves. *Id.* A §2 plaintiff's inability to "disentangle race and politics" is now *dispositive* to a §2 claim. This Court plainly applied a contrary standard when it declined to look at partisan affiliation as part of its *Gingles* II and III analysis. *Milligan* Op. 379.

### 2. Plaintiffs must "disentangl[e] race and politics."

This Court's analysis of party affiliation as part of the Senate Factors is also at odds with *Callais*. This Court held, for instance, that the idea "that race and party" can be viewed as "separate and independent factors" was "fictional." *Milligan* Op. 398. But that is now *precisely* the finding and analysis *Callais* requires. Indeed, *Callais* held that a §2 plaintiff "must show that voters engage in racial bloc voting that cannot be explained by partisan affiliation"—in other words, that a §2 plaintiff is required to "disentangl[e] race and politics," *Callais* Op. 30. "[S]imply pointing to *inter*-party racial polarization," *Callais* added, "proves nothing, because 'a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact." *Id.* (quotation omitted) (emphasis added).

35

### 3. It is Plaintiffs' burden to "disentangl[e] race and politics," not the State Defendants'.

In its analysis of partisan affiliation as part of the "totality of the circumstances," however, this Court did not hold Plaintiffs to their burden. First, the Court analyzed partisanship in terms of whether the State Defendants had "presented substantial evidence" that partisanship drove electoral outcomes *over* race. *See, e.g.*, *Milligan* Op. 392 ("the State urges us …"); *id.* at 395 ("the State's assertion …"). *Callais* makes clear, however, that this burden falls on "the plaintiffs [to] provide an analysis that controls for party affiliation. In other words, they must show that voters engage in racial bloc voting that cannot be explained by partisan affiliation." *Callais* Op. 30. The Court's analysis flipped this burden.

### 4. Plaintiffs did not "disentangl[e] race and politics"—and this Court's finding that the two are intertwined is dispositive.

Plaintiffs did not carry their burden. During trial, Plaintiffs' two racially-polarized-voting (RPV) experts, Dr. Baodong Liu (*Milligan* Plaintiffs) and Dr. Maxwell Palmer (*Caster* Plaintiffs), showed only that black voters and white voters typically preferred different political candidates at the polls. As the State Defendants' expert, Dr. Christopher Bonneau, noted "[the] analysis must end there; [they] cannot provide an explanation for why BPCs [black-preferred candidates] lose. This is, even if we were to grant that EI [ecological inference] is 100% accurate in recovering

36

individual-level behavior from aggregate data, that data would still not tell us *why* we observe what we observe." Doc. 409-1 ¶25.

Drs. Liu and Palmer agreed that their RPV analyses did not reach the question of "why" voters voted the way they did. Dr. Palmer acknowledged that his RPV analysis did not say anything about the motivations of voters. Doc. 464 at 526:25-527:4.[11] He agreed that, because his RPV analysis was limited simply to detecting whether RPV existed, he did not analyze or control for any variables other than the race of voters that might affect the outcome of election results. *Id.* at 530:11-532:4. And Dr. Liu also agreed that his analysis did not reach the question of voter motivation. Doc. 465 at 567:24-568:7; 619:2-17.

Dr. Bonneau then noted, "in Table 1 of Dr. Liu's report, in all 9 elections he analyzes, the Black candidate represented the Democratic Party, and the white candidate represented the Republican Party," Doc 409-1 ¶32. For his part, Dr. Liu agreed that the black-preferred candidate in every election he analyzed was a Democrat; that this was generally true in Alabama; and that it comported with black voter preferences nationally. Doc. 465 at 626:1-12. And Dr. Liu further admitted that the white-preferred candidate in every general election he analyzed and in which he found RPV was very likely a Republican, *id.* at 627:20-629:14. At a minimum, he

---

[11] Pincites to trial transcripts align with the page and line numbers within the transcript itself, not the ECF pagination.

stated that the white-preferred candidates in the elections that he analyzed were not candidates of the Democratic Party and that he was not aware of a third-party with a major presence in Alabama. *Id.* at 629:15-630:11.[12] Dr. Liu also ultimately agreed that if white voters preferred Democratic candidates, he would not expect to find RPV in a general election. *Id.* at 630:21-635:6. Dr. Palmer, meanwhile, openly agreed that the black-preferred candidate in all 17 statewide elections that he analyzed—regardless of the candidate's race—was a Democrat and that black voters in Alabama tended to support Democrats "very strongly." Doc. 464 at 528:23-529:11. As such, Drs. Liu's and Palmer's *racial* polarization analysis could just as easily be labeled a *political* polarization analysis.

That does not satisfy Plaintiffs' burden to "disentangle race from politics" under *Callais* (at 34)—as the *Callais* Court itself recognized when it rejected Dr. Palmer's similar analysis in *Robinson*. *Compare Callais* Op. 34 ("Nor did the plaintiffs meet their burden on the second and third *Gingles* preconditions. To show racially polarized voting, the *Robinson* plaintiffs offered evidence that black and white voters consistently supported different candidates, but their analysis did not control

---

[12] In Dr. Liu's effort to disclaim the obvious fact that his RPV analyses also showed *political* polarization, he went so far as to testify that he *did not know* whether his report relied on official election results, despite agreeing that the official results would include the party affiliation of each candidate for office. Doc. 465 at 637:24-639:9. He could not, for instance, identify Rep. Barry Moore's party affiliation. *Id.* at 639:10-640:14. He could not even identify the election results for the 2022 General Elections, *id.* at 640:22-647:14, or confirm whether his analysis had relied on them, *id.* at 637:24-639:6, despite including data for those election results in his report and having claimed to rely on the election results. *id.* at 566:4-17; Doc. 403-16 at 6, 9.

for partisan preferences."), *with Robinson v. Ardoin*, 605 F. Supp. 3d 759, 798-806 (M.D. La. 2022) (relying on Dr. Palmer's testimony to find racially polarized voting), *vacated and remanded on other grounds*, 86 F.4th 574 (5th Cir. 2023).

Moreover, again relying on Dr. Palmer's opinion, this Court explicitly found that race and politics *were* intertwined, dismissed the notion that "race and party are separate and independent factors" as "fictional," and wrote extensively on how "race is a critical factor in how and why voters form partisan attachments." *Milligan* Op. 398; *see id.* at 399 (crediting Dr. Palmer's opinion). This Court's position was that it was "obvious" that "race plays a central role in party attachments" and that "partisanship [was] based on race." *Milligan* Op. 400. Indeed, this Court held:

> We acknowledge the well-known reality that party affiliations drive voting patterns, but we understand this evidentiary record as telling us that *we cannot separate voters' racial considerations from their party affiliations,* and that we must not ignore the powerful role that voters' race plays in their partisan attachments.

*Id.* at 400-01 (emphasis added).

Assuming *arguendo* the factual validity of this Court's analysis, however, this finding is fatal to Plaintiffs' claims under *Callais*. Plaintiffs bear the burden to "disentangl[e] race and politics" and "show that voters engage in racial bloc voting that cannot be explained by partisan affiliation," *Callais* Op. 30—and that remains true "even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact." *Id.* (cleaned up). As such, showing

39

a tight correlation between political partisanship and race—which is what this Court found and is contrary to what Plaintiffs are required to show—is now dispositive of Plaintiffs' claims under Section 2.

### D.    Totality of the Circumstances

*Callais* also updated the "totality of the circumstances" inquiry. This inquiry must now give greater weight to, and focus more on, "present-day intentional racial discrimination regarding voting." *Callais* Op. 30. "Discrimination that occurred some time ago, as well as present-day disparities that are characterized as the ongoing 'effects of societal discrimination,' are entitled to much less weight." *Id.* at 30-31.

At the totality-of-the-circumstances stage, this Court concluded that Alabama has not "yet outrun the effects of its past," *Milligan* Op. 465, drawing on decades-old history and socioeconomic data with little-to-no "bearing on what the Fifteenth Amendment prohibits: present-day intentional racial discrimination regarding voting," *Callais* Op. 30. The Court assigned, for instance, substantial weight to testimony asserting that "stark racial disparities, particularly in the rural Black Belt, … (1) are clearly traceable to Alabama's lengthy and terrible history of official discrimination, and (2) unsurprisingly hinder Black Alabamians' political participation." *Milligan* Op. 416; *see also id.* at 409-19. Even now, the *Singleton* Plaintiffs encourage this Court to rely on Dr. Riser, who focused on the 19th century, and Dr.

40

Frederickson, who focused on the 20th century, *Singleton* Doc. 357 at 10-12, while the *Caster* Plaintiffs invoke, *inter alia*, school desegregation cases, *Caster* Doc. 437 at 26. None of this aligns with *Callais*'s charge.

Further, this Court's (and others') opinion that it would be "very unusual" for a defendant to lose on the *Gingles* preconditions but win on the totality of the circumstances, *Milligan* Op. 109 (quoting *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015)), is contrary to *Callais*'s suggestion that in fact it might be "hard to find pertinent evidence" at the final stage, *Callais* Op. 31. Indeed, the Supreme Court implied that it would not be "unusual" at all for a plaintiff to lose totality-of-the-circumstances, finding that "[e]ven if the *Robinson* [§2] plaintiffs had met their burden on the *Gingles* preconditions, they still would have failed to show an objective likelihood of intentional discrimination based on the totality of the circumstances." *Callais* Op. 34.

The Court continued: "Much of the cited evidence—such as the low number of black Louisianans who have been elected to Congress in recent decades—failed to disentangle race from politics. Indeed, the [district] court observed that black voters have been aligned with the Democratic party for decades and that issues discussed by that party appealed to black voters. Those observations should have undercut, not strengthened, any showing of intentional racial discrimination because race and politics are so intertwined." *Id.* (citation omitted). The Court concluded by

41

finding that "none of the historical evidence presented by plaintiffs came close to showing an objective likelihood that the State's challenged map was the result of intentional racial discrimination." *Id.* at 35. Yet this was the same kind of evidence that Plaintiffs presented here, even using testimony from several overlapping experts. *Compare Milligan* Op. 380-433, *with Robinson*, 605 F. Supp. 3d at 806-15.

The "totality of the circumstances" inquiry under *Callais* does not turn on generalized racial and socioeconomic disparities, nor should the Court have discounted the State's arguments about the present "parity in rates of voter registration and turnout," *e.g.*, *Milligan* Op. 417, which go to the heart of "equal opportunity to vote," *Brnovich v. DNC*, 594 U.S. 647, 671 (2021); *see Callais* Op. 34-35.

*    *    *

In sum, Plaintiffs' claims cannot survive *Callais*, and "[n]othing in *Allen* dictates a result that differs." *Callais* Op. 31. "*Allen* did not address the central issue" that the Court resolved in *Callais*; "[i]ndeed, *Allen* did not discuss the Fourteenth Amendment at all." *Id.* at 32. Nor did the Court's decision in *Allen* "reach two pivotal issues that" the Court "squarely address[ed]" in *Callais*: "whether 'race-based redistricting' under §2, even if permissible when the Voting Rights Act was enacted in 1982, could 'extend indefinitely into the future,'" and "whether §2 plaintiffs must disentangle race from politics in proving their case." *Id.*

42

Those answers are now clear—and now clearly doom Plaintiffs' claims. And while Plaintiffs argue that *Allen* somehow controls resolution of Alabama's 2023 Plan even in the face of *Callais*, if that were true, the Supreme Court would not have vacated and remanded these cases for the Court *to apply Callais*. Under *Callais*'s revised standard, Plaintiffs are unlikely to succeed on the merits of their §2 claims.

**II.      Plaintiffs' Equal Protection Claims Are Unlikely To Survive *Callais* And Cannot Justify The Remedy Plaintiffs Seek.**

**A.      Because Plaintiffs are unlikely to prove vote dilution under §2, they are unlikely to prove unconstitutional vote dilution.**

*Callais* undercuts this Court's prior constitutional holding in every respect. *Contra, e.g.*, Doc. 531 at 4 (asserting that it was "untouched"). First, the constitutional violation this Court found was intentional vote dilution, and *Callais* defined vote dilution—for the first time in light of recent developments in election law and constitutional law. *Callais* Op. 20-22. The Supreme Court also significantly updated the standard for proving it. *Callais* Op. 29-31. If Plaintiffs are not likely to prove a §2 violation, they are even less likely to prove *intentional* vote dilution. Indeed, it is "doubt[ful] that *any* plaintiff … can establish a constitutional vote dilution claim where his section 2 claim has failed." *Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1344 (11th Cir. 2000). And the notion that *Callais* sheds no light on the requirements of the Constitution is expressly rejected by the opinion itself. *Id.* at 32 n.2 ("[*T*]*he decision before us is based on the Fourteenth Amendment*.").

43

Second, because *Callais* concerns situations in which "the circumstances give rise to a strong inference that intentional discrimination occurred," a plaintiff bringing a constitutional intentional vote dilution claim must *at least* surpass the showing required of §2 plaintiffs. *Callais* Op. 23; *see also id.* at 36 (holding that plaintiffs must disentangle politics and race "regardless whether the case is brought pursuant to the Fourteenth Amendment or the VRA"). In other words, there could be a question whether a defendant who violated §2 did so unconstitutionally as well, but it would be very rare for a constitutional violation to exist without a §2 violation. On top of that heavy burden, Plaintiffs must overcome the even heavier presumption of legislative good faith, which requires drawing inferences in the State's favor whenever plausible. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 10 (2024); *Abbott v. LULAC*, 146 S. Ct. 418, 419 (2025). Given *Callais*'s reaffirmance that States are free to weigh partisan and political goals as they see fit, Plaintiffs here can neither overcome the presumption of legislative good faith nor demonstrate intentional vote dilution.

Because the State did not violate §2 under *Callais*, this Court's previous conclusion that the State violated the Equal Protection Clause likewise wilts away. The Court's constitutional holding assumed that the State had "refused to provide" "the remedy that federal law requires." *E.g.*, *Milligan* Op. 499, 538. But what "federal law requires" depends on the meaning of §2. And because "[a] plaintiff pressing a

44

vote-dilution claim cannot prevail simply by showing that race played a predominant role in the districting process" but must instead "show that the State's districting plan 'has the purpose *and* effect' of diluting the minority vote," *Alexander*, 602 U.S. at 38 (quoting *Shaw v. Reno*, 509 U.S. 630, 645 (1993)), Plaintiffs must at least first show vote dilution under the *Callais* standard. Indeed, "even if the standards are not completely identical in application, we know that section 2 was intended to be *more* permissive than the constitutional standard," *Johnson*, 204 F.3d at 1344, so it may well be that the constitutional standard is *Callais*-plus. *See also Thompson v. Kemp*, 309 F. Supp. 3d 1360, 1366 (N.D. Ga. 2018) (three-judge court) (noting that plaintiff bringing claims of intentional vote dilution must "sufficiently alleg[e] the *Gingles* preconditions"); *Ga. State Conf. of NAACP v. State*, 269 F. Supp. 3d 1266, 1279 (N.D. Ga. 2017) (three-judge court) (intentional vote-dilution requires "establish[ing] a discriminatory effect under the totality of the circumstances"). As explained above, though, *Callais* shows that this Court applied the wrong standard when it concluded that §2 obligated the State to draw a new majority-black district (or "something quite close to it"). *Milligan* Op. 517. The constitutional holding built upon that premise cannot stand on its own.

Plaintiffs' motions bring claims of intentional vote dilution, *see* Doc. 531 at 17-22; *Singleton* Doc. 357 at 3, 6; they have no alternative constitutional theory. And any "successful equal protection claim under the Fourteenth Amendment requires

45

proof of *both* an intent to discriminate and actual discriminatory effect." *Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021). Thus, under circuit precedent, Plaintiffs must establish the *Gingles* preconditions and that the totality of the circumstances support vote dilution to maintain a constitutional intentional vote dilution claim. In other words, there can be no "intentional" vote dilution without vote dilution, and the latter is governed by *Callais*.

In *Johnson v. DeSoto County Board of Commissioners*, the Eleventh Circuit explained that "the Supreme Court, historically, has articulated the same general standard, governing the proof of injury, in both section 2 and constitutional vote dilution cases; plaintiffs, in both cases, must show that there is evidence that excluded groups have less opportunity to participate in the political process and to elect candidates of their choice." 204 F.3d at 1344 (quotations omitted). Assuming discriminatory intent was present, that Court rejected an intentional vote dilution claim for failing to "establish that an alternative system of districting could exist whereby the black-minority vote could elect its preferred candidates"; the plaintiffs couldn't satisfy the *Gingles* preconditions. *Id.* at 1346; *see also Ga. State Conf. of NAACP*, 269 F. Supp. 3d at 1280-81 (rejecting intentional vote dilution claims where the allegations failed to meet the *Gingles* preconditions); *Lowery v. Deal*, 850 F. Supp. 2d 1326, 1336 (N.D. Ga. 2012) (same); *Broward Citizens for Fair Dists. v. Broward Cnty.*, 2012 WL 1110053, at *9 (S.D. Fla. April 3, 2012) (same); *Tyson v. Town of*

46

*Homer*, 2021 WL 8893039, at *9 (N.D. Ga. July 2, 2021) (same); *Martinez v. Bush*, 234 F. Supp. 2d 1275, 1340-48 (S.D. Fla. 2002) (three-judge court) (same in pre-*Rucho* political gerrymandering case).

Yet this Court's finding of a constitutional violation was entirely intertwined with the now-vacated §2 violation. Most significantly, it was the primary basis used to overcome the heavy presumption of good faith owed to the Legislature. *See* Doc. *Milligan* Op. 538-42. In the absence of a §2 violation, this Court must reapply the presumption of legislative good faith from scratch. *See infra* § II.B.1. In addition, the Court's *Arlington Heights* analysis relied on the Legislature *knowing* there would be vote dilution, *Milligan* Op. 517-19, but if there is no §2 liability under the proper standard, then the Legislature did not know or foresee a disparate impact.

But as discussed *supra* §I, Plaintiffs cannot meet either the *Gingles* preconditions or the totality of the circumstances, as "updated" by *Callais*. The 2023 Plan does not (and never did) have the effect of diluting black voting strength, as *Callais* now demonstrates. Thus, the *Milligan* and *Singleton* Plaintiffs' motions premised on intentional vote dilution claims necessarily fail because they have not proven vote dilution. In short, the failure of the §2 claims in this case likewise sinks the constitutional claims.

47

### B.     Plaintiffs cannot show discriminatory intent.

Even if Plaintiffs could show discriminatory effects by meeting the test for §2 established by *Callais*, they would still fail to establish a prima facie case of discriminatory intent. As an initial matter, Plaintiffs' preliminary injunction motions do not discuss each *Arlington Heights* factor and do not defend every ground relied upon in the Court's prior opinion, instead relying on a few discrete points. But it is not the State Defendants' burden to *dis*prove Plaintiffs' case for preliminary injunctive relief, let alone the merits of the underlying intentional dilution claims. The Court should not award relief on grounds not raised by Plaintiffs.

Plaintiffs' burden is a heavy one. To succeed on their Fourteenth Amendment intentional vote dilution claims, *Milligan* and *Singleton* Plaintiffs must overcome the presumption of legislative good faith and prove that the Alabama Legislature enacted the 2023 Plan "as a purposeful device to minimize or cancel out the voting potential" of black Alabamians. *Miller*, 515 U.S. at 911 (quotation marks omitted).[13] In other words, Plaintiffs must "show that the legislature relied on race for an *invidious* reason: to harm a racial group's ability to elect the group's preferred

---

[13] *Caster* Plaintiffs have not pleaded any constitutional claims and cannot, of course, receive preliminary injunctive relief premised on the underlying merits of claims they have not included in their operative complaint. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("[T]he [only] proper procedure for plaintiffs to assert a new claim is to amend the complaint."); *cf. Kaimowitz v. Orlando*, 122 F.3d 41, 43 (11th Cir. 1997), *opinion amended on reh'g*, 131 F.3d 950 (11th Cir. 1997) ("A district court should not issue an injunction when the injunction in question is not of the same character, and deals with a matter lying wholly outside the issues in the suit.").

48

candidates." *Tenn. NAACP v. Lee*, 746 F. Supp. 3d 473, 502 (M.D. Tenn. 2024) (three-judge court) (per curiam). Plaintiffs "cannot prove this invidious reason merely by showing that the legislature knew that the revised map would have such harmful effects on the racial group. Rather, the legislature must have drawn the map 'because of, not merely in spite of, those adverse effects.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676-77 (2009)) (citation modified). If Plaintiffs make this showing, they are still not entitled to relief; then, "the burden [would] shift[ ]" to the State Defendants "to demonstrate that the [2023 Plan] would have been enacted" regardless of the alleged racial motivation. *GBM*, 992 F.3d at 1321 (quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)).

### 1. Plaintiffs cannot overcome the presumption of good faith.

"[W]hen a court assesses whether a duly enacted statute is tainted by discriminatory intent, 'the good faith of the state legislature must be presumed.'" *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022) (per curiam) (quoting *Abbott*, 585 U.S. at 603). This presumption applies through *each* stage of litigation, *see Miller*, 515 U.S. at 916-17, including after a predecessor redistricting plan has been subject to "findings of discriminatory intent by" a district court, *Perez v. Abbott*, 274 F. Supp. 3d 624, 648-49 & n.37 (W.D. Tex. 2017); *see Abbott*, 585 U.S. at 603-05; *contra Milligan* Op. 538.

49

The presumption that a Legislature acts for legitimate, rather than discriminatory, reasons serves important ends. It encourages caution before federal courts intrude "on the most vital of local functions"; it recognizes that redistricting is a "complex" and "difficult subject for legislatures"; it is sensitive to the fact that legislators are "almost always … aware of racial demographics"; and it keeps the burden of proof on the Plaintiffs. *Miller*, 515 U.S. at 915-16. Moreover, "this presumption reflects the Federal Judiciary's due respect for the judgment of state legislators, who are similarly bound by an oath to follow the Constitution," and it seeks to avoid "declaring that the legislature engaged in 'offensive and demeaning' conduct." *Alexander*, 602 U.S. at 11. Without this safeguard, federal courts would be more easily "transformed into weapons of political warfare" by "the losers in the redistricting process"—an "often-unstated danger" that invites "illegitimate invasions" into "a traditional domain of state authority." *Cooper*, 581 U.S. at 291 (Alito, J., concurring in part); *accord Alexander*, 602 U.S. at 11.

In *Abbott v. Perez*, the Supreme Court reversed a finding of intentional discrimination made in a challenge to Texas's districting plan because the district court failed to give proper effect to the presumption at trial. The district court instead found that the legislature, when enacting a 2013 remedial plan, had not sufficiently addressed problems contained in the originally enjoined 2011 plan, *Abbott*, 585 U.S. at 610-12, and faulted the legislature for what the district court saw as legal

50

gamesmanship, *Perez v. Abbott*, 274 F. Supp. 3d 624, 650 (W.D. Tex. 2017), *rev'd and remanded*, 585 U.S. 579 (2018). Following "the guidance in *Arlington Heights* virtually to a tee," *id.* at 642 (Sotomayor, J., dissenting), the district court had devoted pages of analysis to evidence of racial discrimination, *see generally Perez*, 274 F. Supp. 3d at 645-52, including evidence that the predecessor plan bore "the taint of discriminatory intent," *id.* at 648, that discriminatory "effects continu[ed]," *id.* at 649, and that "the Legislature pushed the redistricting bills through quickly in a special session" without "consider[ing]" certain alternatives, *id.* Even so, the Supreme Court held that this evidence was not "strong enough to overcome the presumption of legislative good faith." *Abbott*, 585 U.S. at 610.

A similar analysis applies here. At the outset, Plaintiffs lack direct evidence of racial discrimination. That is likely dispositive, as the Supreme Court "ha[s] never invalidated an electoral map in a case in which the plaintiff failed to adduce any direct evidence." *Alexander*, 602 U.S. at 8. Direct evidence would be an "express acknowledgement," "confession," *Alexander*, 602 U.S. at 8, or statement proving that the Legislature adopted the 2023 Plan "for a racist reason," *Tenn. NAACP*, 746 F. Supp. 3d at 503.

**a. The Legislature's Goal of Keeping Gulf Coast in One District.** Treating the Legislature's emphasis on the Gulf Coast as "direct" evidence of discrimination (*e.g.*, Doc. 531 at 27) cannot be squared with *Callais* or *Alexander*. "[I]t is up to each

51

State to decide what weight, if any," a traditional districting factor or political goal is to be given. *Callais* Op. 24-25. And contrary to Plaintiffs' assertions, partisan politics are not the only kind of political goal the State may have. *Id.* at 25 ("A plaintiff may carry its disentanglement burden by offering an alternative map that achieves all the State's objectives—including partisan advantage *and any of the State's other political goals*—at least as well as the State's map." (emphasis added)).

The Legislature's desire to keep the Gulf Coast community of interest together in a single district in the same way it has done for the past 50 years is a quintessential political goal. The Supreme Court acknowledged as much in *Allen v. Milligan* when it recounted testimony that the State sought to keep the community together "to preserve [its] political advantage" and to prevent it from "los[ing] its influence." 599 U.S. at 21. After trial, this Court too recognized that "the Gulf Coast is a community of interest." *Milligan* Op. 353. *Callais* makes clear that this Court must "accept the Legislature's effective designation of [the Gulf Coast] as unsplittable" and "its designation of it as superlative" to other factors. *Contra id.* at 353. Neither this Court nor Plaintiffs may redefine this longstanding goal or reweigh its importance to the State. To do so would work an end-run around *Callais* and force the Court to answer a political question—what is the Gulf's "fair share of political power"—in violation of *Rucho v. Common Cause*, 588 U.S. 684, 709 (2019).; *accord Banerian v. Benson*, 589 F.Supp.3d 735, 738 (W.D. Mich. 2022).

52

The prioritization of the Gulf Coast provides neither direct nor circumstantial evidence of intentional racial discrimination. In addition to the political goal identified above, maintaining a unified Gulf Coast in 2023 would have served multiple *other* traditional districting principles such as (1) preserving the core of a district in use for half a century, (2) protecting incumbents, and (3) maintaining the integrity of political subdivisions like the City of Mobile and Mobile County. Implementation of the Special Master's Plan trampled each of these and other political goals. Nor does the State Board of Education plan shed any light on the intent behind the congressional plan—the Board has 8 members, its map preserves different district cores, and it performs a very different function compared to that of Congress—and its map received correspondingly light attention. And while Plaintiffs renew their contention that the legislative reference to "French and Spanish colonial heritage" is "explicitly racial," *see, e.g.*, Doc. 531 at 18, this Court has already rejected that this phrase "is a colormasked reference to White people," *Milligan* Op.at 513. The regional culture of the Gulf Coast region is shared by residents of all races. *See* Ala. Code §§17-14-70.1(3)(f), 17-14-70.1(4)(f); *Barnhart v. Ingalls*, 275 So.3d 1112, 1117 n.1 (Ala. 2018) (citing Ala. Code §1-3-8(c)) ("Mardi Gras is observed as a State holiday only

in Mobile and Baldwin Counties, and State offices in those locales are accordingly closed on that holiday.").[14]

Neither is it direct evidence of intentional racial discrimination that the Legislature made detailed findings about the importance of the Gulf Coast—or made more findings about the Gulf Coast as to compared to other communities of interest. *Contra id.*; Doc. 531 at 18-19. Because all parties agreed that the Black Belt was a community of interest, there was little need for the Legislature to elaborate on it. By contrast, the Legislature focused on the Gulf Coast given the short shrift that it had just been given as a community of interest from the federal courts: The Supreme Court described the Gulf Coast community as "poorly supported" at the preliminary-injunction stage and the testimony in its defense as "insufficient." 599 U.S. at 21. It

---

[14] Nor is the Legislature's reference out of the ordinary. Courts routinely note the influence of colonial-era traditions—including French, Spanish, and English—upon parts, or even all of, present-day America. *See, e.g.*, *United States v. Vereen*, 920 F.3d 1300, 1310 (11th Cir. 2019) (Marcus, J.) (Congress "legislates against the background of Anglo-Saxon common law." (quoting *United States v. Bailey*, 444 U.S. 394, 414 (1980))); *Roper v. Simmons*, 543 U.S. 551, 561 (2005) (appealing to "civilized standards of decency" expressed "by other nations that share our Anglo-American heritage"); *In re Morgan*, 286 B.R. 678, 681 (Bankr. E.D. Wis. 2002) (recounting that community property "was adopted by eight of the United States before statehood, principally from their Spanish and French heritage"); *Ellison v. Conoco*, 950 F.2d 1196, 1208 (5th Cir. 1992) (acknowledging "Louisiana's French civil law heritage" and "the French understanding"); *Opdyke Inv. Co. v. Norris Grain Co.*, 413 Mich. 354, 364-65 (1982) (referencing Louisiana's "French civil-law heritage"); *Wyly's Est. v. Comm'r*, 610 F.2d 1282, 1287 (5th Cir. 1980) (noting that "the Texas community system of marital property is derived from the Spanish Civil Law, a heritage of Spanish-Mexican sovereignty"); *United States v. Candalaria-Gonzalez*, 547 F.2d 291, 294 (5th Cir. 1977) (recalling that "the presumption of innocence … is fundamental to Anglo-Saxon concepts of fair trial"); *Melancon v. McKeithen*, 345 F. Supp. 1025, 1029 (E.D. La.) (Wisdom, J.) (three-judge court) (narrating that "Louisiana jurists, influenced by their French and Spanish legal heritage, never accepted the civil jury's findings as sacrosanct").

is neither odd nor evidence of racial motivation that the Legislature focused more attention to confirm the existence and importance of a disputed community of interest compared to those left undisputed (or not even implicated, like those in North Alabama) in active litigation. And the Legislature prioritized keeping the Gulf Coast *and* the Black Belt communities intact to the extent possible. To conclude that the Legislature's lesser discussion of the Black Belt compared to the Gulf Coast is direct (or even circumstantial) evidence of intentional racial discrimination would be to treat the Black Belt as a "proxy for race," which would "blink[] reality." *Milligan* Op. 348.

But Plaintiffs' motions do just that, complaining that differences in legislative findings and prioritization of the Gulf Coast and Black Belt is "'inconsistent treatment' of these *Black* and *White* Communities" that provides "'significant evidence' of a §2 violation." Doc. 531 at 18-19 (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1015 (1994)). Having reduced these non-racial communities of interest to no more than demeaning racial labels exposes Plaintiffs' request for what it is: a demand for intentional race-based redistricting based on something other than a §2 violation, the narrow circumstance that *could* justify using race Plaintiffs thus seek to turn §2 on its head—not just using but *elevating* race and subordinating all traditional districting principles or political goals. Their claim does not entitle them to that and the Constitution forbids it. *Callais* Op. 33.

55

**b. The Legislature's Concerns About Racial Gerrymandering.** *Callais* also vindicates the State's concern that it would have risked constitutional liability by subordinating its interests to connect black voters in Mobile with rural black voters on the other side of the State—some "250 miles" away. *Callais* Op. 16. Constitutional claims were pending *in these cases* when Alabama drew its new map, including one brought by the *Singleton* Plaintiffs on the theory that District 7—the core of which was drawn in §2 litigation over 30 years ago—was an unconstitutional racial gerrymander then and so continued to be an unconstitutional gerrymander today. *Milligan* Op. 466-67; *cf. McClure v. Jefferson Cnty. Comm'n*, 800 F. Supp. 3d 1209, 1267 (N.D. Ala. 2025) ("The history of the Commission's consistent … effort to create and maintain two majority Black voting districts in Jefferson County permits the inference that the Commission continued its decades-long practice in 2021.").

*Callais* demonstrates that had Alabama adopted one of the Plaintiffs' maps in 2023, it likely would have adopted an unconstitutional racial gerrymander. Indeed, because *Callais* was an "eas[y]" case, *Callais* Op. 33, it is more than "plausible" that Alabama feared the same outcome had it—like Louisiana—drawn lines using race to create a second race-based district, *see Alexander v. S.C. Conf. NAACP*, 602 U.S. 1, 10 (2024). Indeed, four Justices warned Alabama of just that in *Allen*: "If the State did this, we would call it a racial gerrymander, and rightly so." 599 U.S. at 59

(Thomas, J., dissenting). And the dissent also pointed out that only four Justices disagreed with that conclusion because Justice Kavanaugh had not joined the corresponding portion of Chief Justice Roberts's opinion. *Id.* The State Defendants have thus rightfully and consistently feared facing a racial gerrymandering claim by enacting one of Plaintiffs' maps or some other remedial plan throughout this litigation. *See, e.g.*, Doc. 267 at 12, 89 (2023); Doc. 78 at 64 (2021). *Callais* now shows that the warning of four Justices was not to have been lightly disregarded.

Just look at what happened in Louisiana: The fact that it had adopted a remedial plan pursuant to a district court's order that it remedy a §2 violation did not insulate it from liability for unconstitutional racial sorting in *Callais*. Just the opposite: "The State's intentional compliance with the court's demands constituted an 'express acknowledgment that race played a role in the drawing of district lines.'" *Callais* Op. 33 (quoting *Alexander*, 602 U.S. at 8). Even if *Callais* had not so clearly proven the litigation risk of using race (even at the behest of a court), this Court erred in finding "racial animus" (*Milligan* Op. 536) behind the State's effort to *avoid* the noxious practice of racial sorting.

Consider how this logic would have applied in Louisiana. Before *Callais*, this Court concluded that when a State does not "create an additional Black-opportunity district" after a preliminary finding of likely vote dilution, the State has "the purpose of entrenching what it knew from federal court orders was very likely

57

discriminatory" and therefore "purposefully deprive[s] Black [voters] of the same opportunity to elect a candidate." *Milligan* Op. 539. On this view, Louisiana—also faced with a preliminary §2 finding and instructions telling it to draw a second majority-minority district—was therefore constitutionally *required* to draw such a district. But *Callais* held the opposite: Louisiana was constitutionally *prohibited* from doing that.

*Callais* shows that Louisiana should have instead "double[d] down" on its traditional districting criteria and constitutional defenses. *Contra Milligan* Op. 541. But when Alabama did just that, the Court deemed the State's effort unconstitutional—not for violating the preliminary order (which it did not), *Milligan* Op. 527, but for attempting to enact a better map, present a better record at trial, and ultimately try "to 'find another argument' to persuade" both this Court and the Supreme Court that *there was no §2 violation* (i.e., no vote dilution) in the first place. *Milligan* Op. 55. Trying, inside the rules of procedure, to *persuade* the federal judiciary of the ultimately validity of the State Defendants' legal positions is not "open disregard" or "defiance" of court orders, no matter how many times Plaintiffs say it. *Contra* Doc. 531 at 21-22. And it is not intentional discrimination either.

Plaintiffs' intentional-discrimination arguments present a heads-they-win, tails-Alabama-loses game. Had Alabama enacted one of Plaintiffs' proffered maps in 2023 (even at this Court's behest) it would have violated the Constitution just as

Louisiana did in *Callais*. But having declined to voluntarily violate the Constitution in that way, this Court held that Alabama violated the Constitution for so declining. The only way *not* to lose is apparently not to play—to let the Court draw the map instead. But acquiescing to such a "serious intrusion on the most vital of local functions" is itself a loss. *Abbott*, 585 U.S. at 603 (quoting *Miller*, 515 U.S. at 915). It cannot be that States faced with a preliminary §2 finding must either cede their primary "duty and responsibility" of redistricting to federal courts, *id.*, or be found to have engaged in intentional racial discrimination before a trial has even occurred. In any event, *Callais* shows that States face litigation hazards no matter which map they choose and no matter which inning of the ballgame that they choose it.

### 2. Plaintiffs fail to present an alternative map that could rule out the inference that non-racial factors motivated the 2023 Plan.

Relatedly, the rejection of nonviable alternative maps that do not meet the Legislature's neutral priorities does not show intentional racial discrimination. This requirement flows from both the Supreme Court's redistricting precedents and the requirement that plaintiffs alleging intentional discrimination prove "the availability of less discriminatory alternatives." *GBM*, 992 F.3d at 1321-22; *cf. Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 287 (1977). Here, Plaintiffs have "failed to identify viable alternatives to the [2023 Plan] that would have achieved the *same* objectives." *League of Women Voters of Fla. v. Fla. Sec'y of State*, 66 F.4th 905, 941 (11th Cir. 2023) (emphasis added); *accord Callais* Op. 25 ("A plaintiff may

carry its disentanglement burden by offering an alternative map that achieves *all* the State's objectives—including partisan advantage and any of the State's other political goals—at least as well as the State's map." (emphasis added)). "Without an alternative map, it is difficult for plaintiffs to defeat [the] starting presumption that the legislature acted in good faith. This presumption of legislative good faith directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, 602 U.S. at 10.

Plaintiffs have not identified a *viable* alternative map presented to the Legislature—one that would have accomplished all (or even most of) the Legislature's non-racial goals, which include: (1) population equality; (2) keeping the Black Belt, Wiregrass, and Gulf Coast each within the minimal number of districts possible; (3) avoiding incumbency contests; (4) minimizing county splits; (5) prioritizing compactness; (6) preserving the cores of existing districts; and (7) avoiding a meritorious gerrymandering suit. *Cf. id.* at 9-10. And that's without mentioning a Republican Alabama Legislature's assumed partisan goal of maintaining six Republicans in the congressional delegation. *Cf. id.*; *see also Baird*, 976 F.2d at 361 ("It cannot be surprising that the party with political control opposes a plan that would ensure the loss of at least one of [its] seats.").

60

As just one (of many) examples, the "Singleton Plan" does not achieve minimum population deviation, does not protect incumbents, and departs widely from the 2023 Plan's lines, retaining only 51% of CD2's core, 49% of CD3's core, 49% of CD6's core, and 44% of CD7's core.[15] *See Singleton* Doc. 357 at 13; Doc 409-91 at 2. Or, as to the "'Community of Interest' Plan," even Plaintiffs concede that it made the election of a Democrat significantly more likely. Doc. 531 at 6.[16] It would not have met the partisan goals of the Legislature as a whole—notwithstanding that one or more Republican legislators may have tolerated it in spite of that partisan impact because they believed it to be a better §2 remedy (and thereby risking a gerrymandering suit as explained above). The "obvious alternative explanations" better explain the Legislature's decision not to enact the alternative plans Plaintiffs cite rather than an invidious racial motive. *Iqbal*, 556 U.S. at 682.

In any event, because "awareness is not enough," the Legislature's "rejection" of Plaintiffs' preferred maps does not show "a discriminatory purpose." *Simpson v.*

---

[15] The *Singleton* Plaintiffs' assertion that the Singleton Plan's failure to "preserve the cores of districts or protect all incumbents" are not determinative because these "cannot be non-negotiable principles," *Singleton* Doc. 357 at 13, fails to grapple with the *Callais*' requirement that alternative maps meet all of the State's constitutional goals, *Callais* Op. 25.

[16] The Court also recognized that at least some Republican legislators had actual knowledge of a performance analysis framed in purely partisan terms (i.e., "Republican" v. "Democrat" vote share) showing that Republican candidates would win every election under the 2023 Plan, *see Milligan* Op. 477-78. By contrast, the "'Community of Interest' Plan" would have resulted in Republican losses in two of the four modeled races in its District 2. *Id* at 475-75. Republican legislators thus had actual knowledge that the 2023 Plan would meet their partisan goals, whereas the other plans Plaintiffs now point to would not.

*Hutchinson*, 636 F. Supp. 3d 951, 956 (E.D. Ark. 2022) (citing *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)); *see also GBM*, 992 F.3d at 1327 ("[A]lthough the Alabama legislature did not [implement] the alternative option[s] that Plaintiffs would have preferred, we cannot say that the legislature failed to consider" them); *League*, 66 F.4th at 940 (noting that the "legislative branch is not hamstrung by judicial review to adopt any amendment that a bill's opponents claim would improve it"). The unalarming fact that Democratic legislators were not brought into the map-drawing room, so to speak, *Milligan* Op. at 507, suggests only that party politics were at play. Senator Singleton, a Plaintiff and the black Democratic Senate Minority Leader, confirmed as much when answering whether it is common for the Democratic and Republican caucuses to discuss legislation without members of the other party present: "We do it all the time." Doc. 472 at 2373. Indeed, "a party in power typically develops its plan by itself and that process is not, standing alone, evidence of an intent to discriminate on the basis of race." *ALBC*, 989 F. Supp. 2d at 1273. In sum, the refusal to include *nonviable* "alternative options that Plaintiffs would have preferred is not evidence of discriminatory intent." *League*, 66 F.4th at 940.

### 3. The 2023 Plan is better explained by partisan motives than by racial animus, especially in light of the 2026 Special Session.

The Court also previously assigned improper weight to a few statements of a few legislators. Its opinion appears not to have given any weight to other statements

of Republican legislators speaking in terms of a "Republican opportunity plan" and having "seven Republican congressm[e]n," which clearly show partisan (rather than racial) goals. *Compare Milligan* Op. 493, with *id.* at 521-22. On the other hand, it gave at least *some* weight to the statements of Democratic legislators who opined that their political opponents intended to flaunt the VRA or were engaged in racial discrimination. *Id.* at 521-22. But the statements of "legislators whose preferences did not prevail," *id.*—including one who is a plaintiff in this very litigation—shed no light on the intent of the legislators whose preferences did. Those statements are inherently unreliable given the political incentives at play (for instance, that they may be used as evidence to vindicate those legislators' political preferences through litigation instead of legislation) and for too many other reasons to list here.[17]

The statements of Republican legislators during the 2026 Special Session re-affirm these political motivations and must be considered as part of any *Arlington Heights* analysis. *See* Videorecording of Senate Floor Debate, https://www.youtube.com/watch?v=2ecxRAvdl1U (May 8, 2026), at 26:26-26:33 (Senator Albritton, presenting HB1 on Senate Floor: "It has nothing to do with race. It has something to do with our partisanship and our [] Republican[s] and

---

[17] In any event, a handful of legislators—particularly those who voted *against* the measure at issue—can't make the entire Legislature their "cat's paw." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689 (2021). To the contrary, the Supreme Court has instructed lower courts to infer a lawful motive when "plausibl[e]," *Alexander*, 602 U.S. at 10, even when a few legislators downplay their partisan aims, *id.* at 79-80 (Kagan, J., dissenting).

D[emocrat]s."); *id.* at 35:44-36:36 (Senator Albritton: "It has to deal with the partisanship aspects of where we were [and] of where we are. It has to deal with where we are ideology when it comes to politics and those type matters. It deals with who's in power back…. it has to deal with the partisan ideas of where we are. Not the individuals, not the race.") (cleaned up); *id.* at 1:14:26-37 (Senator Albritton: "[T]hese were drawn in a partisan way. We did draw them in a way that would benefit Republicans. That's kind of what we're supposed to do …. to be able to draw things based on how the partisanship and the voters elect.") (cleaned up); *id.* at 2:33:03-34:00; *see also* Videorecording of House Floor Debate, https://www.youtube.com/watch?v=tptIfi94AWk (May 6, 2026), at 3:21:44-54 (Representative Pringle, presenting HB1 on the House Floor : "I said I believe if the Republicans run quality candidates turnout that it's the opportunity for the Republicans to win all seven districts if they run good candidates."); *id.* at 3:23:01.

And in that same session Senator Singleton—a Plaintiff and the black Democratic Senate Minority Leader—admitted that the 2023 Plan was drawn to be "partisan." *See, e.g.,* Videorecording of Senate Floor Debate, https://www.youtube.com/watch?v=2ecxRAvdl1U (May 8, 2026), at 1:15:28-33 (Senator Singleton: "We did draw maps that was partisan and that's why the court felt that they were unconstitutional."); *id.* at 17:00-17:06 (Senator Singleton: "And for some, it may be just politics and we're trying to help Washington get a little

power for the midterm."); *id.* at 34:27-32 (Senator Singleton: "You don't want to be here, but you did it because you want to satisfy some folks in Washington."); *id.* at 50:38-50:42 (Senator Singleton: "This is all playing to Trump. This is all playing to Washington."); *cf. id.* at 1:17:02-07 (Senator Singleton: "That map, [the 2022 State Senate Plan], what we're doing here is just to try to help one of our members.").

Other black Democratic senators made similar statements or otherwise contended that politics and race could not be disentangled. *Id.* at 2:30:30 (Senator Figures: "But what you want to do now with redoing these districts is have a guaranteed outcome that only Republicans would have representation in Congress."); *id.* at 2:25:02 (Senator Figures: "You Republicans seek congressional control approaching 100% of Alabama's seven congressional seats while Democrats hold only two."); *id.* at 2:31:17-37 (Senator Figures: "You want to guarantee that you have drawn the lines that would guarantee Republicans six seats and your preference is seven seats in Congress to represent Alabama…."); *id.* at 2:32:03-12 (Senator Figures: "And, you know what, it's not even just about people of color, there are so many white people who are against you."); *Id.* at 3:00:41-19 (Senator Stewart: "What you're asking for when you have a bill or a map with all seven Republican seats you're asking when 30%, actually 40% of Alabamians vote Democrat, what you're asking for is overrepresentation. …. And that, my friends, is Republican DEI.") *Id.* at

65

3:02:28-33 (Senator Stewart: "So don't tell me that race and politics can simply be separated in America.").

Taken together, these statements confirm what the State Defendants have argued all along. The 2023 Plan was adopted not for "reasons unknown," *Milligan* Op. at 506, but to achieve ordinary partisan and political goals. And, while opposing those goals, Democratic legislators (perhaps inadvertently) confirmed that those were the true motivators or that party and race cannot otherwise be disentangled as Plaintiffs must to prevail.

The Court's analysis a year ago emphasized what it called "departures from the norm" in the wake of the preliminary injunction, *Milligan* Op. at 514-15, but those alleged departures are equally explained by the Legislature's race-neutral goals. If the Legislature wanted to keep the Gulf Coast together, for example, after this Court deemed the State's evidence insufficient at the preliminary-injunction stage, it would not be surprising that it called that goal "non-negotiable" or chose to focus on the Gulf Coast rather than other communities that were not disputed. *Id.* Likewise, the fact that the Court found it "impossible" to accommodate the Legislature's political goal while creating another Democratic leaning district does not transform that goal into a racially discriminatory one.

Finally, even if the Court adheres to its view of the 2023 Plan, it should consider the 2026 legislation as a ratification or reenactment of the 2023 Plan by a new

66

Legislature under new circumstances after a new deliberative process that clearly involved partisan and political motives. *Cf. Thompson v. Sec'y of State for the State of Ala.*, 65 F.4th 1288, 1298 (11th Cir. 2023). The analysis should focus on current conditions because it is axiomatic that Plaintiffs cannot obtain a federal-court injunction of *the 2023 Plan* but only *its enforcement*; in turn, its enforcement in the 2026 special primaries can be explained and understood only with the 2026 statute and its enactment context in view. Just as a felon disenfranchisement law passed for allegedly racial reasons a century ago can nonetheless be reenacted or extended for perfectly lawful reasons today—because its present enforcement would *not* be discriminatory—the Court should train its focus on the 2026 Legislature and *its* lawful motives, which supersede those of the 2023 Legislature—whatever the Court thought of them at the time. As in *Abbott v. Perez*, the later Legislature cannot be stained by the "taint[ ] [of allegedly] discriminatory intent" from a prior legislative session. 585 U.S. 579, 584 (2018).

### 4. Plaintiffs cannot rely on *Allen v. Milligan* to show intentional discrimination.

Last, the Supreme Court's decision in *Allen v. Milligan*, 599 U.S. 1 (2023), cannot show intentional discrimination by the Alabama Legislature. *Allen* was about the since-repealed 2021 Plan in a preliminary-injunction posture. At the time, the Supreme Court had not yet clarified that plaintiffs could not use race to draw their illustrative maps. *Callais* Op. 29. At the time, Alabama had hoped for a new

"evidentiary standard" (*id.* at 31) to reconcile Plaintiffs' burden of proof in §2 litigation with the State's constitutional requirements in redistricting. Those arguments did not succeed and others were not yet explored, given the case's preliminary-injunction posture. *See Allen*, 599 U.S. at 26; *see also id.* at 45 (Kavanaugh, J., concurring).

But *Allen* "did not address the central issue" of *Callais* ("the presumption that compliance with §2 may serve as a compelling interest for a State to satisfy strict scrutiny,") nor "whether 'race-based redistricting under §2' … could 'extend indefinitely into the future despite significant changes in relevant conditions," nor "whether §2 plaintiffs must disentangle race from politics in proving their case," nor "the Fourteenth Amendment at all." *Callais* Op. 32. Indeed, *Callais* explains that the holding in *Allen* "was about whether Alabama's novel evidentiary standard required a change to our existing § 2 precedent" and the decision was based on only that "specific argument." *Callais* Op. 31. To the extent Plaintiffs cite *Allen* for more, they rest their claims on either dicta or abrogated reasoning.

After *Allen*, rather than continue to litigate the 2021 Plan on the merits, the State replaced it with the 2023 Plan. A full trial regarding the lawfulness of the 2023 Plan followed, and all agreed it was "impossible" to draw another majority-minority district without sacrificing the State's lawful policy goal of keeping the Gulf Coast together, among others. Throughout the course of those proceedings on the merits

68

of the 2023 Plan, Alabama raised the exact issues decided in *Callais*. There is no reason they should now be decided or applied differently from *Callais*.

*    *    *

At bottom, Plaintiffs fail to disentangle race from politics. But they must do so "regardless whether the case is brought pursuant to the Fourteenth Amendment or the VRA." *Callais* Op. 36. The way for a plaintiff to "carry its disentanglement burden" is "an alternative map that achieves all the State's objectives—including partisan advantage and any of the State's other political goals—at least as well as the State's map." *Callais* Op. 25.

This Court conceded that neither the illustrative map nor the court-drawn map achieved "all the political goals of the legislature." *Milligan* Op. 525. That should end the inquiry. As *Callais* now makes crystal clear, Plaintiffs indeed are "required to meet or beat the 2023 Plan" on the Legislature's stated criteria. *Contra Milligan* Op. 369. Because no alternative plan does so, Plaintiffs cannot show "circumstances [that] give rise to a strong inference of discrimination" under §2, *Callais* Op. 35, let alone evidence proving actual intentional discrimination under the Equal Protection Clause. At the end of the day, Plaintiffs' arguments collapse into complaints that the Legislature acted "in spite of" rather than "*because of*" race. *Contra Miller*, 515 U.S. at 916 (emphasis added) (quoting *Feeney*, 442 U.S. at 279). That does not carry their heavy burden to prove intentional racial discrimination.

69

And for all the foregoing reasons, Plaintiffs cannot overcome the presumption of good faith, which requires drawing inferences in the State's favor whenever plausible. *Alexander*, 602 U.S. at 10; *Abbott v. LULAC*, 146 S. Ct. 418, 419 (2025) ("[T]he District Court failed to honor the presumption of legislative good faith by construing ambiguous direct and circumstantial evidence against the legislature."); *Abbott v. LULAC*, No. 25-845, 2026 WL 1127246 (2026) (adopting reasoning of stay opinion, 146 S. Ct. 418, and summarily reversing).

As discussed above, the State prioritized both partisan and non-partisan goals, but they were legitimate political goals all the same. State officials had contact with the Republican Speaker of the United States House, *Milligan* Op. 536; they spoke in terms of a "Republican opportunity plan" and having "seven Republican congressm[e]n," *id.* at 493; they enacted incumbency protection as a "non-negotiable" redistricting principle, *id.* at 432; and they passed the 2023 Plan along party lines, *id.* at 83. That's more than enough to suggest that partisan politics were at work. The State Defendants strongly disagreed with attempts to distinguish *Alexander* as a "round-one case" even before *Callais*, *see Abbott v. Perez*, 585 U.S. 579, 584 (2018)), but the round-one distinction has no force after *Callais*, which relied heavily on *Alexander* for the need to disentangle race and politics in "a round-two case." *Contra Milligan* Op. 538.

70

As *Callais* makes clear, legislatures can prioritize legitimate partisan and political reasons as they see fit; there is no violation of the Constitution or §2 when a State adopts a redistricting plan for political reasons, so there is no violation to "evade" or "excuse" in the first place. *Contra Milligan* Op. 537. After *Callais*, "courts must treat partisan advantage like any other race-neutral aim … that States may rely on as desired." *Callais* Op. 25. So too with any "other political goals." *Id.* "[B]ecause they are not forbidden by the Constitution, it is up to each State"—not litigants or federal courts—"to decide what weight, if any, they warrant." *Id.* at 24. Because Plaintiffs' constitutional claims instead require the Court to reweigh those political goals for itself and find that the Legislature mis-weighed them, their claims must fail.

## C.    Even if Plaintiffs' Equal Protection claims could succeed, the Special Master Plan is not a proper remedy.

This Court ordered the Special Master Plan as a §2 remedy. Everyone agreed that the Special Master Plan was a "complete remedy to the Section Two violation." *See* Doc. 509 at 11. The Court later held that the Special Master Plan also "fully redress[es] the constitutional … violation[]" it had found. *Id.* at 14. And the Court concluded it was "do[ing] no more than enter[ing] a remedy designed to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Id.* (relying on *Milliken v. Bradley*, 433 U.S. 267, 280 (1977)). Even assuming that conclusion was correct as to the §2 violation, it is no

71

longer correct in light of *Callais*. And without the underlying §2 finding, the Special

Master Plan would do in fact do a great deal more than restore Plaintiffs to where

they would have been absent the *constitutional* violation.

The constitutional violation this Court found did not then, and does not now,

demand the Special Master Plan or a remedial map with two opportunity districts.

That the Special Master Plan was, at that time, sufficient to remedy the constitutional

violation says nothing about whether it was necessary to do so. And necessity is the

standard—as the Court has recognized throughout the litigation. "The Court acts

within the bounds of its authority only if our modifications of a state plan are limited

to those necessary to cure any constitutional … defect." Doc. 311 at 33 (quoting

*Upham v. Seamon*, 456 U.S. 37, 43 (1982) (per curiam) (citation modified)); *cf.*

*North Carolina v. Covington*, 585 U.S. 969, 978 (2018) (holding that the district

court's remedial authority on a racial gerrymandering claim was "limited to ensuring

that the plaintiffs were relieved of the burden of voting in racially gerrymandered

legislative districts").

The Court has never considered whether the Special Master Plan is necessary

to remedy the constitutional violation standing alone. *See Milligan* Op. 496 (declin-

ing to decide the *Singleton* Plaintiffs' constitutional claims because those claims do

not "involve relief beyond that to which they are entitled on their Section Two

claims"). And the *Milligan* Plaintiffs don't argue that it is necessary. *See* Doc. 527.

But the Special Master Plan is *not* necessary to remedy any violation based on intent, nor is any plan with two black opportunity districts. This Court has not held otherwise. *See Milligan* Op. 540-42. And it couldn't under *Callais*: a court cannot "outlaw a map solely because it fails to provide a sufficient number of majority-minority districts" because the Constitution "does not protect" such a right. *Callais* Op. 24.

The constitutional violation this Court identified was one of process:

> We hold that when (1) a Legislature redistricts a State's congressional electoral map; (2) a federal court enters a preliminary injunction ruling that the State's map likely dilutes minority votes and unambiguously requiring an additional opportunity district as a remedy; (3) the State exhausts its appellate rights as to that ruling; (4) the ruling is affirmed by the Supreme Court; (5) on remand, the Legislature enacts a new map that it admits does not include an additional opportunity district; (6) the Legislature enacts (as part of that map) legislative findings that all agree make an additional opportunity district mathematically impossible to draw; and (7) key legislators admit their understanding of the remedy that was required and refused, then the Legislature may subject itself to a finding that it has enacted a map for the purpose of discriminating against minority voters by diluting their voting strength.

*Milligan* Op. 541-42. The only tether to the substance or features of the map was through the underlying §2 finding, which is now unwarranted under *Callais*. The Court "d[id] not hold" that the 2023 Plan would have been intentional discrimination on its own. *Id.* at 540. It "ha[s] not considered that question." *Id.*

A process violation warrants no more than a process fix: process without the unconstitutional taint. *Cf. United States v. Ferretiz-Hernandez*, 139 F.4th 1286, 1293 (11th Cir. 2025) ("Laws do not carry forward 'taint' through reenactment unless the

later legislature acted with the same constitutionally impermissible purpose."). So long as a law is re-enacted through a deliberative process and results in substantive changes, discriminatory intent vanishes. *Thompson v. Sec'y of State for the State of Ala.*, 65 F.4th 1288, 1298 (11th Cir. 2023). That test is not tied to one particular remedy (the Special Master Plan) or any one remedy type (a map with two black opportunity districts). So no particular remedy or remedy type is necessary to remedy the constitutional violation that the Court found.[18]

A remedy is proper only when it "most closely approximate[s] the state-proposed plan." Doc. 311 at 32 (quoting *Upham*, 456 U.S. at 42). The Court recognized that it would exceed its "authority" to consider "any plans that redrew Districts 3, 4, and 5 because … changes to them [we]re 'not necessary … to remedy the vote dilution.'" *Milligan* Op. 70. That applies to Districts 1, 2, 6, and 7 just the same. The Special Master Plan goes well beyond what is necessary to remedy the process violation the Court found. It is thus an inappropriate remedy that the Court is without authority to impose to remedy the constitutional violation standing alone. If the Court identifies a likely constitutional violation in the 2026 enforcement of the 2023 Plan, it should enter no more than a prohibitory or negative injunction against that enforcement.

---

[18] Myriad maps could be that remedy, like the 2021 Plan. *See Milligan* Op. 537 ("The Legislature may well have drawn the 2021 Plan the way it did for partisan reasons – we did not decide that then, do not decide it now, and do not know.").

74

**III.    The Equities And *Purcell* Strongly Counsel Against Entering Any Injunction Now.**

**A.    The Supreme Court sided with State Defendants on the equities when it expedited consideration, vacated the judgments, and immediately issued its judgment.**

This Court should take seriously that the Supreme Court already passed upon the same equitable arguments Plaintiffs lodge here. They complain, for example, that voters are currently voting under the court-drawn plan, *see, e.g.*, Doc. 531 at 2, but they made that objection in the Supreme Court, *see, e.g.*, *Milligan* Opp., *supra*, at 5 ("[V]oters are already voting." (emphasis omitted)). Plaintiffs try to recast *Purcell* as a rule that could *favor* judicial intervention, *see, e.g.*, Doc. 531 at 11, but the Supreme Court heard variants of that argument too, *see, e.g.*, *Caster* Opp., *supra*, at 1-3 ("The decision in *Callais* does nothing to justify Petitioners' demand that this Court adopt extraordinary procedures to expedite consideration and thereby enable a mid-election change of districts here, months closer to election day than the one the Court blocked in 2022" and does "nothing to abate the 'chaos and confusion' of a mid-election change").

Nonetheless, the Supreme Court decided (1) to grant the State Defendants' motion for expedited consideration, (2) to vacate the injunctions, and (3) issue its judgments "forthwith" under Rule 45.3 so that its decision would have the immediate effect of lifting the injunctions—just as the State Defendants asked and Plaintiffs opposed. True, as Plaintiffs point out, the Court did not issue a reasoned opinion

75

accompanying its orders. But it had to consider the equities to issue equitable relief to the State. The Court removed the impediment to the 2023 Plan from this Court's injunctions, and it did so quickly—knowing full well that early voting had begun in Alabama, that the State planned to hold elections under the 2023 Plan, and that Plaintiffs would try to invert *Purcell*.

As far as the equities are concerned, the key difference between last Monday and today is that now *Plaintiffs* have the burden to prove their right to extraordinary equitable relief. They must prove a substantial likelihood of success in light of *Callais*, which altered every single element of the *Gingles* analysis in the State's favor. They must do so with an evidentiary record produced without the benefit of *Callais*. And they must overcome *Purcell*. If the Supreme Court thought that Plaintiffs should surpass each of these hurdles, it could have just summarily affirmed (relief the *Milligan* and *Singleton* Plaintiffs specifically moved for and that *Caster* Plaintiffs requested in opposing the State's petition); it could have held the case until the end of the Term in the normal course; or, it could have let the mandate issue in 32 days as provided by that Court's rules. It did none of those things.

### B.    *Purcell* cuts against injunctive relief, not in its favor.

The Supreme Court rejected Plaintiffs' *Purcell* arguments, and this Court should too.

Plaintiffs suggest that *Purcell* means that it is too late for Alabama to change its own election laws. But *Purcell* stands for the proposition that "lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020); *Purcell v. Gonzalez*, 549 U.S. 1 (2006). It is a principle based on federalism and the recognition that state legislatures, not courts, have the expertise to set election rules. *See Abbott v. LULAC*, 146 S. Ct. 418, 419 (2025) ("The District Court improperly inserted itself into an active primary campaign, causing much confusion and upsetting the delicate federal-state balance in elections."); *Gardner v. Henderson*, No. 2:26-CV-00084-RJS-JCB, 2026 WL 496448, at *16 (D. Utah Feb. 23, 2026) (3-judge court) (Tymkovich, J., concurring) (explaining that "*Purcell*, while commonly justified by anti-disruption principles, is also grounded in a federalism principle—protecting states' constitutional interest under the Elections Clause in governing their own elections").

The *Purcell* doctrine thus limits courts, not legislatures. As Justice Kavanaugh wrote, "It is one thing for state legislatures to alter their own election rules in the late innings and to bear the responsibility for any unintended consequences. It is quite another thing for a federal district court to swoop in and alter carefully considered and democratically enacted state election rules when an election is imminent." *Democratic Nat'l Comm. v. Wisconsin State Legislature*, 141 S. Ct. 28, 31 (2020)

(Kavanaugh, J., concurring). Thus, because *Purcell* applies to counter "federal intrusion on state lawmaking processes," *id.* at 28 (Roberts, C.J., concurring), Plaintiffs cannot use the case to *impose* such intrusions.

Eleventh Circuit precedent forecloses Plaintiffs' reverse-*Purcell* arguments as well. *See League of Women Voters of Fla. v. Fla. Sec'y of State*, 32 F.4th 1363 (11th Cir. 2022) (per curiam). While *Purcell* imposes a "'heightened' burden" on a party seeking injunctive relief affecting elections, it also "serves to *lower* the state's bar" when seeking to stay (or otherwise opposing) such an injunction. *Id.* at 1372. So, a State "need not show, for instance—as a plaintiff would to obtain a 'late-breaking injunction' in the first place—that its position is 'entirely clearcut'" but instead "need only show that plaintiffs' position is *not*." *Id. Purcell* applies no litigation burden at any time on the State seeking to vindicate State law. Applying that logic here, Plaintiffs cannot carry their heightened burden by attempting to saddle the State with it instead.

Again, to be clear, it is Plaintiffs—not the State Defendants—who now ask this Court for late-breaking relief. *Contra, e.g.*, Doc. 531 at 12 (describing the Secretary as asking for "a late order … reinstating" the 2023 Plan). Neither an injunction nor a declaratory judgment "erase[s] a duly enacted law from the statute books." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1255 (11th Cir. 2020) (quotation omitted); *see also Steffel v. Thompson*, 415 U.S. 452, 469 (1974) ("Of course, a

favorable declaratory judgment … cannot make even an unconstitutional statute disappear." (internal quotation marks omitted)). And the 2023 Plan is a duly enacted Alabama statute. Ala. Code § 17-14-70. So, when the Supreme Court vacated this Court's order enjoining use of the 2023 Plan, the Plan sprang back into full legal force. The State Defendants do not ask this Court to "reinstat[e]" the 2023 Plan, *contra* Doc. 531 at 12; it's already in effect.[19] Instead, *Plaintiffs* ask this Court to enjoin the 2023 Plan's enforcement and so must bear the heavy burdens attendant with such an extraordinary request.[20] *Purcell* therefore does not require this Court to enter an injunction but instead leads to the opposite conclusion.

---

[19] By the same token, without an active court order enjoining use of the statutory 2023 Plan, no legal authority permitted election officials to continue voluntarily using the Special Master's Map in Alabama's 2026 Elections. The State was thus between a rock and a hard place: continuing to hold congressional elections under the Special Master Plan with no legal basis to support the results (and likely violating the Constitution as *Callais* makes clear) *or* moving quickly to provide for a Special Primary Election under the State's lawful and readily available 2023 Plan. Had the Supreme Court waited until the end of the term to vacate this Court's injunction and the State had *not* put in place a contingency for holding special primary elections, it would have been stuck with invalid results from a primary election held under the Special Master's Map and staring down a General Election that it would be statutorily required to hold under the 2023 Plan.

[20] Neither *Frank v. Walker* nor *Moore v. Harper* involve the Supreme Court applying *Purcell* the way Plaintiffs need this Court to do so. In *Frank*, the Supreme Court vacated the Seventh Circuit's stay of a district court's injunction of a state voter ID law, when the effect of the stay meant that voters would be subject to the law even though "absentee ballots have been sent out without any notation that proof of photo identification must be submitted." 574 U.S. 929 (2014) (Alito, J., dissenting). Even Justice Alito in dissent found that this was "particularly troubling" and provided "a colorable basis for the Court's decision," *id.*—he just thought it did not meet the higher standard requiring a showing that the appellate court had "clearly and demonstrably erred," *id.* (quotations omitted). As for *Moore*, that case involved a dispute about whether a state supreme court or the state legislature alone had the constitutional authority to set the manner of elections; by denying a stay of the *state supreme court*, the U.S. Supreme Court declined to interfere with a late change made pursuant to *state* law. *See* 142 S. Ct. 1089 (2022).

Plaintiffs are also mistaken in thinking that the Special Master Plan still represents the "status quo." This Court acknowledged in its May 8 order that its injunction *established* a new status quo. *See* Doc. 525 at 6. But in vacating that injunction, the Supreme Court altered the status quo once more, shifting the expectations of voters and candidates in the process.

"Status quo" is defined simply as "[t]he situation that currently exists." *Status Quo*, BLACK'S LAW DICTIONARY (12th ed. 2024). The situation that currently exists is that the injunction prohibiting use of the 2023 Plan and requiring use of the Special Master Plan has been vacated, certain votes that will be cast in the May 19 primary election are void, and a Special Primary Election has been called for the affected congressional districts using the Legislature's statutory 2023 Plan. Doc. 530-1 at 5-11, 28-30; Ala. Act No. 2026-612 §§(c)-(d). The 2023 Plan is in full legal force.

When the Supreme Court issued its *Callais* decision, Governor Ivey and the Alabama Legislature moved diligently. Doc. 530-1 at 21-30. Recognizing the injunction in place at the time, the Legislature passed a law that said *if* the injunction is lifted and Alabama's 2023 Plan is again enforceable, and *if* the Governor determines there is time for a special primary election using the 2023 Plan, the Governor shall call such an election. Ala. Act No. 2026-612. The Supreme Court vacated this Court's injunction, and Governor Ivey—necessarily determining that there was sufficient time to call a special election—issued a proclamation and a writ of election

calling for a Special Primary Election on August 11, 2026, using the 2023 Plan. Doc. 530-1 at 28-30. All these moves were lawful without any injunction prohibiting the use of the 2023 Plan, and all were extensively covered in the media. These events have led to a new status quo that Plaintiffs now seek to upend.

Changing that status quo now would create immense difficulties. To the extent it will already be a challenge for election officials to hold the Special Primary Election, that was the Alabama Legislature's choice. If the Court were to step in now and change the map to be used, the challenge would multiply. *See generally* Doc. 530-1. *Purcell*, far from requiring court intervention, warrants against it.[21]

Plaintiffs argue that the State Defendants' position here is inconsistent with what they've said before concerning *Purcell* and that the State Defendants are judicially estopped from suggesting that Alabama can proceed with the August 11

---

[21] Plaintiffs appear to request only that this Court order that the results of the May 19, 2026 Primary Election be canvassed and certified rather than asking to commandeer the now-scheduled August 11, 2026 Special Primary Election and hold it under some map other than the statutory 2023 Plan. To the extent they had requested such relief, however, that would go far beyond maintaining the status quo and would require a much higher showing. The State has made a one-time policy choice to (1) hold a special primary and (2) forgo the ordinarily required and politically desirous runoff for that primary given the exigencies involved. And the State did so because it considered it of overriding importance to be able to use its own statutory 2023 Plan to elect congressional representatives. Those political tradeoffs were within the State's sovereign prerogative. An order requiring the State to instead use a different map in the Special Primary Election would undermine the premise of the State in setting that very election and would thus need to find separately (1) that a court-ordered special primary election is warranted; and (2) that the State's ordinary requirement that a runoff be required for all elections can be disregarded. That is a much heavier burden than that Plaintiffs engage with here.

Special Primary Election or that *Purcell* counsels against replacing the 2023 Plan. But the present situation is different from what the parties faced in 2022 or in 2023.

In 2022, when this Court required a new map on the eve of qualifying, registrars throughout the State were busy reassigning voters to a multitude of districts—state Senate, state House, school board, county commission, you name it—because it was the first election to be held with new maps following the 2020 census. *See* Doc. 79-7 at 2-3. And no one knew what a remedial map would resemble or what counties would be involved. The State Defendants thus argued that it was too late for a federal court to impose a new map, and the Supreme Court agreed.

In 2023, the State Defendants were asked their best judgment of the last date that a new map could be imposed to use in the 2024 elections. Again, neither the State Defendants nor anyone else could predict what a remedial map would look like,[22] so they did not know how drastic the changes would be or what parts of the State would be affected. They responded that it was not possible to give a single date with certainty and know that so long as a plan was in place by that date, it could be imposed without causing disruption for election officials, candidates and voters. Doc. 162. Secretary Allen nonetheless noted that he considered it "likely that a new

---

[22] Doc. 162 at 3 ("Predicting that date now is as difficult a task as a contractor trying to estimate how long it will take to construct a home when he does not know if it will be two bedrooms or ten, nor whether there will be unforeseen weather or supply-chain issues.").

plan [entered] by around October 1, 2023, would provide enough time" to perform the work needed to hold the 2024 primary elections under a new map. *Id.*

Today's circumstances are different. It will no doubt be a challenge for elections officials to prepare to use the 2023 Plan that the Supreme Court reinstated by vacating this Court's injunction, *see* Doc. 530-1, but that Plan is well known, and its use is required under state law. The "shape files" are available to use with GIS systems to identify which voters will need to be reassigned. *Cf.* Doc. 530-1 at 17-18. The fact that the State will be using a map that has existed for nearly three years does not eliminate all difficulty, but the 2023 Plan will be easier to implement than a new map. *Id.* at 19. The State Defendants have not been inconsistent and estoppel does not apply. *Contra, e.g.*, Doc. 531 at 11.

> **C.    Plaintiffs' concerns about Alabama's Special Primary Election are not properly before this Court and do not warrant this Court's intervention.**

Plaintiffs also throw out theoretical due process and state-law concerns about Alabama's Special Primary and Act 2026-612. *E.g.*, *Caster* Doc. 437 at 31-33 (due process), *Milligan* Doc. 531 at 15-17, *Singleton* Doc. 357 at 17-19, and *Caster* Doc. 437 at 37 n.9 (state constitutional claims). *None* of these claims appear anywhere in Plaintiffs' operative complaints, they are not before the Court, and thus they offer no reason for the Court to grant Plaintiffs' request. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (The only "proper procedure for

plaintiffs to assert a new claim is to amend the complaint."); *cf. Kaimowitz v. Orlando*, 122 F.3d 41, 43 (11th Cir. 1997), *opinion amended on reh'g*, 131 F.3d 950 (11th Cir. 1997) ("A district court should not issue an injunction when the injunction in question is not of the same character, and deals with a matter lying wholly outside the issues in the suit.").

The concerns are meritless in any event. To the extent Plaintiffs argue that the Court should intervene because of fears of some type of due-process injury, selecting nominees in the Special Primary Election does not interfere with any Plaintiff's vote. As an initial matter, the regularly scheduled Primary Election is going forward on May 19, and there are a number of important races on the ballot as well as constitutional amendments; the election is not cancelled. Doc. 530-1 at 9-12. Secondly, while Plaintiffs claim (without evidence) that their members have already voted (*see Caster* Doc. 437 at 32), it is certain that they have not voted in a Democratic primary for Congress in the districts that will be part of the August 11 Special Primary Election.[23] All candidates for the Democratic nomination in Districts 1, 2, 6, and 7 are

---

[23] *Caster* Plaintiffs claim, for instance, that "Plaintiff Ronald Smith … has already cast an absentee ballot in the primary election in District 2 under the Special Master Plan," and assert that "[h]is vote—and those of other Alabamians—would be wholly invalidated if the 2023 Plan is not enjoined." *Caster* Doc. 437 at 32. Smith resides in Bullock County, *Milligan* Op. 238, and neither the Republican nor the Democratic primary race there involves a candidate for Congress. Thus, voters there will not vote in a congressional primary. *See* Secretary of State's Office, Sample Ballot, Republican Primary for May 19, 2026, Bullock County, https://www.sos.alabama.gov/sites/default/files/sample-ballots/2026/pri/Bullock%20-%20Rep.pdf.; *id.*, Sample Ballot, Democratic Primary for May 19, 2026, Bullock County, https://www.sos.alabama.gov/sites/default/files/sample-ballots/2026/pri/Bullock%20-%20Dem.pdf.

currently unopposed—no candidate qualified to run against them—and, thus, they will not be on the ballot on May 19. *See* Doc. 530-1 at 9-10.

And in any event, it is not disenfranchisement when voters in affected districts would have the opportunity to vote in an alternate special election, and none of Plaintiffs' cases say otherwise. For instance, in *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978), on which the *Caster* Plaintiffs rely, Rhode Island had issued "absentee and shut-in ballots" during a primary election and the State Supreme Court had subsequently determined that those ballots were invalid because State law did not authorize their use in primary—as opposed to general—elections. *Id.* at 1066-68. Plaintiffs' claim was "simply that Rhode Island could not, constitutionally, invalidate the absentee and shut-in ballots that state officials had offered to the voters in this primary, where the effect of the state's action had been to induce the voters to vote by this means rather than in person" "effectively stripping them of their vote in the primary." *Id.* at 1074. That situation is very different from the one here. As just noted, the Plaintiffs have not voted in any Democratic Primary in Congressional Districts 1, 2, 6 or 7, because those races are uncontested. But, what if they had, and if this Court were to conclude that their rights were thereby violated? In *Griffin*, the remedy was *a special election*. *Id.* at 1079-80 (affirming remedy).

Notably, a special election "had the virtue of giving the voters a further chance, in a fair election, to express their views." *Id.* at 1079. So, too, here. Pursuant

85

to *Callais*, the 2023 Plan is lawful and, accordingly, should be in place for the General Election in November. Holding a Special Primary Election in August allows the voters to pick the candidates for that election, and it avoids a situation where the party nominees are picked under one map, while the eventual winners are selected using a different map.

As for Plaintiffs' purported concern that Act 2026-612 violates the Alabama Constitution, *see* Doc. 531 at 15-17, that cannot be a ground for relief in this forum because the Eleventh Amendment precludes federal courts from "instruct[ing] state officials on how to conform their conduct to state law," *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984). Plaintiffs cannot get around *Pennhurst* simply by dressing the state-law issue in equity's clothing.

There is no state constitutional problem anyway. Plaintiffs argue that Act 2026-612 violates Alabama's constitutional provision requiring that "[t]he implementation date for any bill enacted by the Legislature in a calendar year in which a general election is to be held and relating to the conduct of the general election shall be at least six months before the general election," Ala. Const. art. IV, § 111.08. *See* Doc. 531 at 15-16, *Singleton* Doc. 357 at 17-19; *Caster* Doc. 437 at 37 n.9. But among other reasons, to the extent (if at all) that Act No. 2026-612 relates to "the conduct" of an election, it relates only to the conduct of the *Primary* Election, not the General. In no way does the Act change the Congressional District lines to be

86

used for the General Election. The Supreme Court did that when it vacated this Court's injunctions prohibiting enforcement of the 2023 Plan. Section 111.08 does not apply to the Supreme Court; by its very terms, it is a limit on the Legislature and no one else. Ala. Const. art. IV, § 111.08 ("The implementation date for any bill enacted by the Legislature …."). And besides, the implementation date of the 2023 Plan was July 21, 2023, Ala. Act 2023-563, which is more than 6 months before the 2026 General Election.

*    *    *

The State and the public will face irreparable harm if a preliminary injunction issues, and the equities weigh against granting injunctive relief. A State (and therefore the public, whose interests merge with the State's, *Swain*, 958 F.3d at 1091) always faces irreparable harm from "the inability to enforce its duly enacted plans," *Abbott v. Perez*, 585 U.S. at 602 n.17.[24] And an injunction now would "improperly insert[]" this Court "into an active primary campaign, causing much confusion and upsetting the delicate federal-state balance in elections." *LULAC*, 146 S. Ct. at 419. Whatever the difficulties may be in implementing the 2023 Plan now, the public would only be harmed further if this Court imposes a new injunction *after* the regularly scheduled 2023 Primary Election has already occurred.

---

[24] *Contra, e.g.*, Doc. 531 at 17 ("Alabama, in contrast suffers 'no harm from the state's nonenforcement' of an intentionally discriminatory map." (quoting *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012)).

87

Every argument Plaintiffs raise here concerning the election calendar and any chaos they think will result was made before the Supreme Court when opposing the State's motion to expedite consideration. The Supreme Court vacated anyway, rejecting those arguments. This Court should reject them as well.

## IV.    Defendants Request A Stay Of Any Injunction That Issues.

Though the Court should not grant any injunction, if it does, given the extreme time exigencies involved and the overlapping considerations for entering an injunction and staying it, the State Defendants request that the Court stay implementation of such relief pending appeal, or at least rule on the stay issue at the same time it enters its other orders. *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (acknowledging "substantial overlap" between elements required to grant stay and those for preliminary injunction). Appellate courts typically will not consider stay requests unless the district court rules upon them first, and the process of seeking, responding, and ruling upon stay motions often reduces the time available for appellate relief by (at least) several days. Given the election, that is time State Defendants do not have. Thus, to facilitate the potential for meaningful appellate review, the State Defendants respectfully ask the Court to stay any injunction it enters.

## CONCLUSION

The Court should deny Plaintiffs' motions for extraordinary relief and should instead reconsider these cases under the proper legal standard in the normal course.

Dated: May 18, 2026

Respectfully submitted,

Steve Marshall
  *Attorney General*

s/ A. Barrett Bowdre
A. Barrett Bowdre (ASB-2087-K29V)
  *Solicitor General*

Robert M. Overing (ASB-1813-T71F)
 *Principal Deputy Solicitor General*

James W. Davis (ASB-4063-I58J)
Brenton M. Smith (ASB-1656-X27Q)
  *Deputy Attorneys General*

Richard D. Mink (ASB-4802-M76R)
Misty S. Fairbanks Messick (ASB-1813-T71F)
Benjamin M. Seiss (ASB-2110-O00W)
Matthew R. Duggan (ASB-1512-D00L)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Barrett.Bowdre@AlabamaAG.gov
Robert.Overing@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov
Richard.Mink@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Matt.Duggan@AlabamaAG.gov

*Counsel for Secretary Allen*

Michael P. Taunton (ASB-6833-H00S)
Riley Kate Lancaster (ASB-1002-X86W)
BALCH & BINGHAM LLP

89

1901 Sixth Avenue North, Suite 1500
Birmingham, Alabama 35203
Telephone (205) 251-8100
MTaunton@Balch.com
RLancaster@Balch.com

*Counsel for Senator Livingston and Representative Pringle*

90

**CERTIFICATE OF SERVICE**

I certify that on May 18, 2026, I electronically filed this document using the

Court's CM/ECF system, which will serve counsel of record.

s/ A. Barrett Bowdre
A. Barrett Bowdre
*Counsel for Secretary Allen*

91