FILED
2026 May-19 AM 11:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| MARCUS CASTER, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WES ALLEN, in his official capacity as Alabama Secretary of State,<br><br>Defendant. | Case No. 2:21-CV-1536-AMM |

# ***CASTER* PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS


INTRODUCTION ....................................................................................1

ARGUMENT ........................................................................................2

I. The 2023 Plan is still unlawful after *Callais*.................................................2

A. Plaintiffs' illustrative maps and the special master's proposed remedial maps satisfy *Gingles* 1 as articulated in *Callais*. ..................3

1. The illustrative maps did not use race as a districting criterion. ....................................................................................3

2. The illustrative maps meet all the state's legitimate districting objectives. ......................................................................5

3. Defendants still fail to identify any partisan goals. ....................6

B. The Court's findings establish racially polarized voting under *Callais*.........................................................................................8

C. The totality of the circumstances demonstrates that Black Alabamians suffer present-day intentional racial discrimination regarding voting. .......................................................................9

D. The Court's finding of discriminatory intent is unaffected by *Callais* and supports Section 2 liability. .............................................9

II. Equitable factors uniformly weigh in favor of an injunction.........................13

CONCLUSION ......................................................................................19

CERTIFICATE OF SERVICE ..................................................................21

## INTRODUCTION

The Supreme Court's decision in *Callais* did nothing to change the facts in Alabama. It did not retroactively alter the illustrative map-drawers' non-racial criteria. It did not magically emulsify racial voting patterns with partisan politics. It did not erase the multiple recent examples of intentional election-related discrimination from the lives of affected Black voters. And it certainly did not cleanse the Alabama Legislature's illegitimate purpose in enacting the 2023 Plan. This Court made findings on a full record that remains the definitive account of Alabama's racial geography, racialized politics, and racially discriminatory policymaking process.

Unable to revise that record, Defendants spend nearly 90 pages seeking to revise the law. But *Callais*'s "update" to the Section 2 inquiry did not render that test incoherent or impossible. It did not invite legislatures to immunize discriminatory maps by concocting pretextual and inviolable criteria that lock in an illegitimate scheme. It did not defeat liability in every instance where racial attitudes are sufficiently antagonistic that members of different racial groups vote for different parties. And it did not require legislators to inscribe racial slurs in official legislative findings before an inference of malintent can attach. Because the Section 2 facts (as found by this Court) continue to establish liability under the Section 2 test (as clarified by *Callais*), Plaintiffs are likely to succeed on the merits once again.

The equities are similarly clear-cut. In 2022, Defendants decried the prospect of map changes "mere days before the first in a series of forthcoming election deadlines." Emergency Appl. for Admin. Stay & Stay at 37, *Merrill v. Milligan*, No. 21-1086 (U.S. Jan. 28, 2022). Then, the haste reflected candidate-qualifying deadlines in February. Now, voting in the May 19 primary election will have *concluded* by the time Plaintiffs' motion is resolved. Defendants' only response is that it is now the Alabama Legislature, rather than a court, holding the match near the powder keg. But harm is harm. Disruption is disruption. The source of the wound does not determine its depth. The Court should preserve the status quo—the map that has been in force for three years and administered in elections just this week—and preliminarily enjoin the 2023 Plan.

**ARGUMENT**

**I. The 2023 Plan is still unlawful after *Callais*.**

Alabama offers almost no substantive defense on the merits of Plaintiffs' Section 2 claim. The *Caster* Plaintiffs have explained in detail why the record that has already been developed in this case, and the facts the Court has already found, more than suffice to satisfy Section 2 as interpreted in *Callais*. Instead of refuting Plaintiffs' arguments, Defendants take one of two unsuccessful tacks, at times attempting to raise Plaintiffs' burden beyond *Callais*'s clarified Section 2 standard, and elsewhere unsuccessfully attempting to relitigate fact questions unaltered by

*Callais* that this Court has already decided. Neither strategy overcomes Plaintiffs' clear showing that Alabama's 2023 Plan continues to violate Section 2 of the Voting Rights Act.[1]

### A. Plaintiffs' illustrative maps and the special master's proposed remedial maps satisfy *Gingles* 1 as articulated in *Callais*.

#### 1. The illustrative maps did not use race as a districting criterion.

Defendants do not dispute this Court's earlier finding that "race did not predominate in [Plaintiffs' experts'] mapdrawing processes." ECF No. 401 at 375.[2] Instead, Defendants attempt to raise the bar even further, arguing that "*Callais* does not leave room for the use of race, even if it did not predominate." Opp. 32. Not so. *Callais* holds that illustrative maps may not be "produce[d] . . . by using race—a process that would be unconstitutional if a State engaged in such mapmaking." *Louisiana v. Callais*, 146 S. Ct. 1131, 1159 (2026) (citing *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 6 (2024)). That means that race may not be given "a predominant role in redistricting decisions." *Alexander*, 602 U.S. at 6. *Callais*

---

[1] Although Alabama asks the Court to "reconsider the evidence and view it all through the lens of *Callais*," Opp. 25, Alabama does not argue that additional evidence is necessary or identify any specific findings that it believes to be superseded by *Callais*. For example, even while the Court may "reconsider" whether Plaintiffs satisfy *Callais*'s reformulation of *Gingles* 1, there is no basis to revisit the subsidiary findings that Plaintiffs identified a Black community that is sufficiently numerous to constitute a majority in a reasonably compact district, and that illustrative maps identified this community without using race as a criterion. *See* ECF No. 401 at 339. Plaintiffs' satisfaction of *Callais*'s other "updates" to the Section 2 test can similarly be confirmed on the existing record.

[2] Page number pincites are to the CM/ECF page number that appears in the top right-hand corner of each page, if available.

does not hold Section 2 plaintiffs to a higher standard than it does the state's own mapmakers. At most, Defendants suggest that Plaintiffs' mapmakers had some general awareness of the state's racial demographics, the same as Alabama's own mapmaker. *See Miller v. Johnson*, 515 U.S. 900, 916 (1995) ("Redistricting legislatures will, for example, almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process); *see, e.g.*, ECF No. 401 at 96 (Alabama's longtime mapmaker, Randy Hinaman, testifying to his awareness that District 2 in the Community of Interest Plan "was an area of geography that had a compact enough African American population in the relevant counties to draw a district that could perform as an opportunity district.").

In any event, Plaintiffs' illustrative maps satisfy even Defendants' proposed heightened standard. The record here is clear that neither Mr. Cooper nor Dr. Duchin used racial data in determining where to draw district lines. ECF No. 401 at 338–39; *id.* at 335. When these experts testified that race was a "consideration," Opp. 32, they meant only that they "considered the relevant racial data only *after*" drawing a proposed map, "to check that the maps [they] produced complied with [the Supreme Court's] Voting Rights Act precedent," *Alexander*, 602 U.S. at 22; *see also* ECF No. 401 at 375, which *requires* Plaintiffs to adduce an illustrative district where minorities make up more than 50 percent of the voting-age population, *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009). That, of course, is a necessary step in any Section

2 case even after *Callais*. And it is exactly what Alabama's own mapmaker did. *See* ECF No. 401 at 204 ("Mr. Hinaman testified that he did not look at racial data in 2021 *until* the week before the Committee co-chairs, their counsel Mr. Walker, and Mr. Hinaman submitted plans to the Legislature, at which point those persons did turn on race and look at the racial breakdowns in the various maps." (citation modified) (emphasis added)).

**2. The illustrative maps meet all the state's legitimate districting objectives.**

Defendants identify just three supposedly "neutral" criteria on which Plaintiffs' illustrative maps fare worse than the 2023 Plan: (1) keeping the Gulf Coast together, (2) splitting the Black Belt into only two districts, and (3) avoiding incumbent pairings. Opp. 33–34. But, as explained in the Motion, *Callais* requires that illustrative maps meet "all the state's *legitimate* districting objectives." 146 S. Ct. at 1159 (emphasis added). Defendants utterly fail to engage with Plaintiffs' argument that these criteria, enshrined for the first time in a set of unprecedented legislative "findings," are not *legitimate* redistricting objectives because, as this Court found, they were *specifically designed* to make it impossible to draw a Black opportunity district. Mot. 13–17.

Defendants instead argue, in attacking the Court's finding of intentional discrimination, that under *Callais* the Court had *no choice* but to "accept the Legislature's effective designation of the Gulf Coast as unsplittable and its

designation of it as superlative to other factors." Opp. 56; *id.* at 57 (defending maintaining a "unified Gulf Coast" because it "preserv[es] the core of a district in use for half a century"). But the Supreme Court itself has emphasized that it "has never held that a State's adherence to a previously used districting plan can defeat a § 2 claim," because "if that were the rule, a State could immunize from challenge a new racially discriminatory redistricting plan simply by claiming that it resembled an old racially discriminatory plan." *Allen v. Milligan*, 599 U.S. 1, 22 (2023). Simply put, "[t]hat is not the law: § 2 does not permit a State to provide some voters 'less opportunity . . . to participate in the political process' just because the State has done it before." *Id.* (quoting 52 U.S.C. § 10301(b)).

This Court already carefully weighed the evidence and determined that this treatment of the Gulf Coast was devised specifically as part of "an intentional official effort to entrench the likely vote dilution [the Court] previously found." ECF No. 401 at 524–25. That is not an "end-run" around *Callais*. *Contra* Opp. 56. It is consistent with *Callais*'s holding that Section 2 imposes liability where the evidence "supports a strong inference that the State intentionally drew its districts to afford minority voters less opportunity because of their race." 146 S. Ct. 1131 at 1157.

**3. Defendants still fail to identify any partisan goals.**

Defendants conspicuously do *not* argue that Plaintiffs' illustrative plans failed to achieve any specified partisan goals, such as a particular allocation of Republican

seats.[3] That is unsurprising—as Plaintiffs explained, Alabama legislators actively *disclaimed* any partisan intent when enacting the 2023 Plan. Mot. 18. Instead, Defendants rely on the same generalized statements of partisan intent that this Court previously rejected as insufficient. *See* Mot. 18; ECF No. 401 at 546. While "legislatures can prioritize legitimate partisan and political reasons as they see fit," Opp. 75, the record here simply does not support Defendants' contention that politics was all that was at play here.

*Callais* did not change the facts *or* the law on this point. It merely reiterated the Supreme Court's holdings in *Alexander* regarding the importance of disentangling race and politics. 146 S. Ct. at 1156–57 (citing *Alexander*, 602 U.S. at 9–10). *Alexander*, of course, was decided a year before this Court issued its permanent injunction and is fully accounted for in this Court's decision. *E.g.*, ECF No. 401 at 507 (discussing presumption of good faith under *Alexander*). There is no need to revisit these conclusions in light of *Callais*.

Defendants' attempt to rehabilitate the record on this score by pointing to scattered partisan statements made during the *2026* special session, Opp. 67–70, is a nonstarter. Alabama cannot retroactively establish partisan intent behind the *2023*

---

[3] Defendants make a brief reference to a statement about "seven Republican congressmen." Opp. 74. But, of course, neither the 2023 Plan nor any other proposal produced seven Republican seats. And, in any event, that statement is already baked into this Court's finding that partisanship was not meaningfully at play, and nothing in *Callais* changes that. ECF No. 401 at 503.

Plan by pointing to statements made by a handful of legislators *three years* after the fact. Statements that are "remote in time and made in unrelated contexts" are not "'contemporary statements' probative of the decision at issue" under *Arlington Heights*. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 35 (2020) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977)) (plurality op. of Roberts, J.).

### B. The Court's findings establish racially polarized voting under *Callais*.

Defendants simply ignore the extensive evidence of *intra*-party racial polarization discussed in Plaintiffs' Motion, including the testimony of Defendants' *own experts*. *See* Mot. 19–24. Instead, they stretch *Callais* well beyond its limits by arguing that "a tight correlation between political partisanship and race" is now "*dispositive* of Plaintiffs' claims under Section 2." Opp. 40 (emphasis added). *Callais* says no such thing: it held that "simply pointing to *inter*-party racial polarization proves nothing" on its own because legislators may engage in political gerrymandering that has a disparate racial impact. 146 S. Ct. at 1159 (citation modified). "[D]isentang[ling] race and politics," does not require affirmatively *dis*proving any relationship between race and party. *Id.* (citation modified). It only requires an analysis that "controls for party affiliation." *Id.* There is more than enough in the record and in this Court's findings on that score, and Defendants address none of that evidence in their Opposition. *See* Mot. 19–24.

### C. The totality of the circumstances demonstrates that Black Alabamians suffer present-day intentional racial discrimination regarding voting.

The *Caster* Plaintiffs' Motion identified *multiple recent* examples of judicial findings of "present-day intentional racial discrimination regarding voting," *Callais*, 146 S. Ct. at 1160, that are discussed in this Court's earlier findings. Mot. 25–26; *see also* ECF No. 401 at 416–17 (citing cases). Defendants simply ignore all these examples specifically related to voting, and instead complain that the *Caster* Plaintiffs *also* cited two examples involving school desegregation. Opp. 45. Even accepting the dubious proposition that school desegregation cases *as recent as 2018*, *see Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988 (11th Cir. 2018), are irrelevant, that is no response to the several specific examples of recent voting-related discrimination that Plaintiffs identified. *See* Mot. 25–26. And, of course, the most salient example of recent intentional discrimination in voting remains the Court's finding that the 2023 Plan itself was motivated by intentional discrimination. That finding, which certainly satisfies the "totality of the circumstances" under *Callais*, remains unaffected by the Supreme Court's decision.

### D. The Court's finding of discriminatory intent is unaffected by *Callais* and supports Section 2 liability.

Nothing in *Callais* requires this Court to revisit its careful finding of discriminatory intent under the *Arlington Heights* factors. As the *Caster* Plaintiffs have explained, the Court's finding of discriminatory intent is relevant to their

Section 2 claim. Mot. 27; *contra* Opp. 52 n.13. Section 2, though it does not *require* a finding of intentional discrimination, imposes liability "when the circumstances give rise to a strong inference that intentional discrimination occurred." *Callais*, 146 S. Ct. at 1156. This Court's findings under *Arlington Heights* give rise to much more than a "strong inference"—they conclusively establish that intentional discrimination *did* in fact occur. *See* Opp. 49 (arguing that Section 2 "was intended to be *more* permissive than the constitutional standard" (citation omitted)).

The factual record on this point is unchanged, as is the law governing it.[4] The bulk of Defendants' attacks on the Court's previous finding of discriminatory intent merely rehash arguments that the Court has already rejected and claim error in findings of fact the Court has already made. And Defendants' few attempts to argue that the analysis has changed in the intervening year fail to move the needle.

*First*, this Court has already concluded, after reviewing an "extensive record," ECF No. 401 at 20, and making careful findings of fact, that "the Plaintiffs have rebutted the presumption of legislative good faith, and that the Legislature acted with discriminatory intent when it passed the 2023 Plan," *id.* at 536. Defendants' suggestion that Plaintiffs must overcome the presumption anew, Opp. 53–54,

[4] Defendants' suggestion that *Callais* altered the constitutional standard for finding intentional discrimination because it was "based on the Fourteenth Amendment," Opp. 47 (quoting *Callais*, 146 S. Ct. at 1141 n.2), is specious. *Callais* involved a racial gerrymandering claim, which is "analytically distinct" from intentional vote dilution. *Alexander*, 602 U.S. at 38 (quotation omitted).

ignores that Plaintiffs here are challenging the *very same enactment*, the 2023 Plan, that the Court already found was enacted with discriminatory intent. This case is accordingly nothing like *Abbott v. Perez*, 585 U.S. 579 (2018), where a *new* legislature enacted a *new* districting plan based on a plan already blessed by a federal court after that court enjoined an earlier, intentionally discriminatory plan. *See id.* at 604 ("The 2013 Texas Legislature did not reenact the plan previously passed by its 2011 predecessor. Nor did it use criteria that arguably carried forward the effects of any discriminatory intent on the part of the 2011 Legislature."). The *only* intent that is relevant to the 2023 Plan that Plaintiffs seek—once again—to enjoin, is—once again—the intent of the legislature that enacted it. There is *no basis* to "consider the 2026 legislation as a ratification or reenactment of the 2023 Plan by a new Legislature." Opp. 70–71. The 2026 legislation does not enact a redistricting plan at all—it merely provides for a "special primary" to be held using the Legislature's old, racially discriminatory 2023 Plan.

*Second*, Defendants are wrong that "Plaintiffs lack direct evidence of racial discrimination." Opp. 55. This Court found: "We regard both the 2023 legislative findings and the contemporaneous public comments by legislators as including direct evidence." ECF No. 401 at 530. Defendants, short of relitigating arguments already rejected, offer no reason why *Callais* should change that finding.

*Third*, *Callais* in no way "vindicates" Defendants' supposed fear of racial gerrymandering liability. Opp. 60. As an initial matter, this Court "ha[s] no evidence that the Legislature was specifically concerned about potential gerrymandering liability when it enacted the 2023 Plan." ECF No. 401 at 544. That is merely Defendants' post hoc litigation position. But in any event, *Callais* does not "demonstrate[] that had Alabama adopted one of the Plaintiffs' maps in 2023, it likely would have adopted an unconstitutional racial gerrymander." Opp. 60. As explained, neither Plaintiffs' proposed maps nor the Special Master's proposals were racial gerrymanders. "[T]hey were created to show, as our cases require, that an additional majority-minority district could be drawn. That is the whole point of the enterprise." *Allen,* 599 U.S. at 33. Finding otherwise would require accepting the circular proposition that *any* illustrative or remedial map drawn to comply with Section 2, even as interpreted in *Callais*, is necessarily a racial gerrymander.

*Finally*, that *Callais* altered the standard for vote dilution cannot retroactively validate Defendants' "deliberate decision to ignore, evade, and strategically frustrate requirements spelled out in a court order" affirmed by the Supreme Court. ECF No. 401 at 28. Defendants implausibly ask the Court to infer that the Alabama Legislature "did not know or foresee a disparate impact" because "there is no § 2 liability under the [*Callais*] standard." Opp. 51. In other words, Defendants ask the Court to assume that the legislators who enacted the 2023 Plan were prescient—they

accurately predicted that three years down the line, the Supreme Court would update the test for vote dilution under Section 2, and they were thus justified in ignoring this Court and the Supreme Court, because they knew better. Setting aside that Defendants are wrong that there is no Section 2 liability here under *Callais*, Defendants cannot ignore federal injunctions grounded in settled law simply because they anticipate that the law might change. *See Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls."); *Agostini v. Felton*, 521 U.S. 203, 207 (1997) ("[L]ower courts should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

## II. Equitable factors uniformly weigh in favor of an injunction.

The irreparable harm Plaintiffs will face from being forced to vote in a second primary election under an unlawful map, the electoral chaos that proceeding under the 2023 Plan is bound to engender, and the lack of prejudice to Defendants and the public from proceeding under a map that has been in place for over three years all weigh heavily in favor of an injunction.

Irreparable harm is undeniable here: Plaintiffs and the public will be irreparably harmed by being forced to vote under the 2023 Plan—whether in the

May 19 primary or the August 11 Special Election—which this Court has already found "amount[s] to intentional racial discrimination" by virtue of its "dilut[ion] [of] Black Alabamians' voting strength." ECF No. 401 at 23; *see Singleton v. Merrill*, 582 F. Supp. 3d 924, 1026 (N.D. Ala. 2022). Absent preliminary relief, the imposition of the 2023 Plan will require voters to vote in "elections based on a redistricting plan that violates federal law," ensuring that they "suffer[] irreparable injury." *Singleton*, 582 F. Supp. 3d at 1026 (quotation omitted). Defendants do not meaningfully dispute this—they simply restate their argument that the 2023 Plan is lawful.

That irreparable harm is amplified by the fact that Defendants plan to invalidate thousands of Alabamians' lawfully cast votes in the May 19 primary. As Plaintiffs have explained, discarding votes that were already cast in reliance on established voting procedures raises serious due process concerns. *See* Mot. 30–31. Those injuries persist regardless of whether Plaintiffs have separately pleaded a due process claim. *Contra* Opp. 87–88. Whether cast in terms of due process or fundamental fairness, the fact remains that the public interest and public confidence in elections will be gravely disserved by "void[ing]," thousands of votes. Ex. F at 34, ECF 436-1. And an August Special Election held under the intentionally

discriminatory and unlawful 2023 Plan is hardly an adequate substitute.[5] Once votes cast under a non-discriminatory map are voided, there can "be no do-over and no redress." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).

Next, allowing the 2023 Plan to take effect at this late juncture is a recipe for electoral chaos. Absent an injunction, Alabama voters will be required to vote in a second primary, under a different map, very likely with different sets of candidates. But votes cast in the congressional races on May 19 "will be tabulated and made public," and then subsequently "void[ed]." Ex. F at 34, ECF 436-1. This is a recipe for confusion and distrust. "[D]iscarding [] lawful votes [] erodes public confidence that the election results reflect the people's will. And when public confidence in the election results falters, public confidence in the elected representative follows." *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 78 (2026). And after the public release and voiding of these results, candidates will have to qualify again, voters and candidates will be moved into new districts, and they will be required to cast new ballots for the same office for which they previously voted. Defendants simply respond that the

[5] Similarly, Defendants fail to distinguish *Griffin v. Burns*—in which the court concluded that a state "could not, constitutionally, invalidate the absentee . . . ballots that state officials had offered to the voters in th[e] primary," 570 F.2d 1065, 1074 (1st Cir. 1978)—by observing that the remedy in *Griffin* was to initiate a special election. *See* Opp. 89. Here, a new election is not necessary to remedy the constitutional injury—all that is required is to proceed with Alabama's elections as planned. That does not change the nature of the constitutional harm.

2023 Plan is "well known." Opp. 87. Well known to whom? Perhaps to Defendants, who have spent years litigating it. But most Alabama voters are complete strangers to the 2023 Plan, which was quickly enjoined by this Court three years ago and has never been used in any election.

Defendants facetiously deride this argument as a "reverse-*Purcell*" theory. Opp. 82. But, while *Purcell* as a doctrine is often applied to avoid federal judicial interference in ongoing elections, the practical considerations that undergird *Purcell*'s rationale include preventing voter confusion and disenfranchisement. *See Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam) (discussing prevention of "voter confusion and consequent incentive to remain away from the polls"); *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (adopting new map within seven weeks of primary "is a prescription for chaos for candidates, campaign organizations, independent groups, political parties, and voters, among others") (Kavanaugh, J., concurring). This is the rare case where judicial *inaction* is more likely than not to cause widespread voter confusion and distrust. Those harms are no less real when they are inflicted by a state legislature—especially when used to invalidate an already-conducted election.

Indeed, as Plaintiffs have pointed out, Defendants themselves have repeatedly argued that any change in Alabama's electoral map at a point even further from the congressional primary would cause chaos for candidates, voters, and election

officials. *See* Mot. 36–37. Defendants freely admit that "[i]t will no doubt be a challenge for elections officials to prepare to use the 2023 Plan." Opp. 87. Even so, Defendants now weakly assert that "[t]oday's circumstances are different" because the "2023 Plan will be easier to implement than a new map" would have been in 2022. Opp. 85–87. That might have been convincing three or four months ago. But with votes currently being cast in an ongoing election, Defendants' recently discovered flexibility in discarding votes and calling for a new election under a different map is "clearly inconsistent with [their] earlier position," *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (quotation omitted), where they were adamant that changes even earlier in the electoral process would "throw the [] election into chaos." ECF No. 71 at 135. Defendants' newfound position creates a clear perception that this Court—and the Supreme Court—was misled, and that Defendants "would derive an unfair advantage . . . if not estopped." *New Hampshire*, 532 U.S. at 750–51.

On the other side of the scale, Defendants can identify no significant harm that is likely to befall the public if an injunction is granted. Defendants' claim that the Court would "caus[e] much confusion," Opp. 91, by enjoining a map that has never been used in favor of a map that has been in place for the last three years gets things exactly backwards. Keeping the Special Master's Plan in place would ensure continuity and stability and cannot conceivably cause any voter confusion. The

Special Master's Plan has been in place for the past three years, candidates have qualified and campaigned based on these congressional districts, and voters who have voted in these districts before will go to the polls as normal *today*, May 19th. An injunction precluding the use of the 2023 Plan and keeping the Special Master's Plan in place would do much more to diminish confusion and preserve the status quo than allowing Defendants to impose the 2023 Plan at the eleventh hour and redo an already-completed election. And it will not require Alabama election officials to do anything other than continue to administer Alabama's elections as planned.

Defendants respond that the State will face harm from "the inability to enforce its . . . plans," Opp. 91 (quoting *Abbott*, 585 U.S. at 602 n.17), but in weighing such harm against the harm suffered by voters required to vote under a racially discriminatory plan, courts have consistently found that the harm to "plaintiffs' voting rights is greater." *Singleton*, 582 F. Supp. 3d at 1026; *see also Singleton v. Allen*, 690 F. Supp. 3d 1226, 1319 (N.D. Ala. 2023) ("Weighed against the harm that the State will suffer—having to conduct elections according to a court-ordered districting plan—the irreparable harm to the Plaintiffs' voting rights unquestionably is greater."); *Self Advoc. Sols. N.D. v. Jaeger*, 464 F. Supp. 3d 1039, 1054 (D.N.D. 2020) (finding "harm to the state is outweighed by the harm inherent in the deprivation of the Plaintiffs' fundamental right to vote").

Finally, Defendants' suggestion that the Supreme Court "already passed upon the same equitable arguments" raised in Plaintiffs' preliminary injunction motions, Opp. 75, is equal parts factually and legally incorrect. The Supreme Court did not "pass" on any issue it did not discuss and was not required to decide in a motion to expedite. A GVR, which is not a decision on the merits, cannot conceivably pre-answer any of the determinative factors used in deciding whether to grant injunctive relief on remand. When the Supreme Court utilizes its GVR procedure, "it is not making a decision that has *any determinative impact* on future lower-court proceedings." *Kenemore v. Roy*, 690 F.3d 639, 641 (5th Cir. 2012) (emphasis added); *see* Mot. 5 n.5 (discussing impact of GVRs). The Supreme Court's GVR order did not address either the equities or *Purcell*. Far from precluding an injunction, the Supreme Court's order specifically directed this Court to "further consider[]" the case "in light of *Louisiana v. Callais*." *Allen v. Caster*, Nos. 25-243, 25-273, & 25-274, 2026 WL 1282800, at *1 (U.S. May 11, 2026). For the reasons discussed, that analysis requires enjoining the 2023 Plan and ordering Alabama to continue to use the Special Master Plan in the 2026 elections.

## CONCLUSION

The Court should once again preliminarily enjoin the 2023 Plan and any steps to implement it and order Alabama to leave in place the Special Master Plan previously ordered until final resolution of the case on remand.

Dated: May 19, 2026

Respectfully submitted,

By /s/ *Abha Khanna*

Abha Khanna*
**Elias Law Group LLP**
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
Phone: (206) 656-0177
Email: AKhanna@elias.law

Lalitha D. Madduri*
Richard A. Medina*
**Elias Law Group LLP**
250 Massachusetts Ave. NW,
Suite 400
Washington, D.C. 20001
Phone: (202) 968-4490
Email: LMadduri@elias.law
Email: RMedina@elias.law

*Attorneys for Caster Plaintiffs*
**Admitted Pro Hac Vice*

Richard P. Rouco
(AL Bar. No. 6182-R76R)
**Quinn, Connor, Weaver, Davies & Rouco LLP**
Two North Twentieth
2-20th Street North, Suite 930
Birmingham, AL 35203
Phone: (205) 870-9989
Fax: (205) 803-4143
Email: rrouco@qcwdr.com

**CERTIFICATE OF SERVICE**

I hereby certify that on May 19, 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I certify that a copy of the foregoing has been served by ordinary U.S. Mail upon all parties for whom counsel has not yet entered an appearance electronically: None.

/s/ *Abha Khanna*
Abha Khanna
Counsel for *Caster* Plaintiffs